Philip M. Guffy
**HUNTON ANDREWS KURTH LLP**
600 Travis Street, Suite 4200
Houston, Texas  77002
Tel:	713-220-4200
Fax:	713-220-4285
Email: pguffy@huntonak.com

 -and-

Paul N. Silverstein
Brian Clarke
**HUNTON ANDREWS KURTH LLP**
200 Park Avenue
New York, NY 10166
Tel:	(212) 309-1000
Email: psilverstein@huntonak.com
	brianclarke@huntonak.com

*Counsel for the Petitioning Creditors*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § § | Chapter 7 |
| GOODMAN NETWORKS, INC., | § § | Case No. 21-31641 (MVL) |
| Debtor. | § § § | |

**STATEMENT OF PETITIONING CREDITORS
IN SUPPORT OF INVOLUNTARY CHAPTER 7 PETITION**

Pursuant to section 303 of title 11 of the United States Code (the "**Bankruptcy Code**"), JLP Credit Opportunity Master Fund Ltd., JLP Credit Opportunity IDF Series Interests of the SALI Multi-Series Fund, L.P., JLP Institutional Credit Master Fund LP, and Alimco Re Ltd (collectively, the "**Petitioning Creditors**") have filed involuntary petitions under chapter 7 of the Bankruptcy Code against Goodman Networks, Inc. d/b/a Goodman Solutions ("**Goodman Networks**" or the "**Debtor**") because the Debtor failed to pay approximately $18 million in principal, plus

interest, to holders of its 8% Senior Secured Notes due 2022 (the "**Notes**") when the notes matured on May 31, 2022 (the "**Maturity Date**"). The Debtor is generally not paying its debts as they become due. The Petitioning Creditors therefore respectfully request that this Court enter an order for relief against the Debtor under Section 303(h)(1) of the Bankruptcy Code and Rule 1013 of the Federal Rules of Bankruptcy Procedure. Copies of the documents referenced in this statement are attached to the Declaration of Paul N. Silverstein (the "**Silverstein Declaration**") attached here as **Exhibit 1**.

PRELIMINARY STATEMENT

1. The Debtor is part of a defunct group of businesses that historically provided field services to the satellite television industry, professional services and network infrastructure to the telecommunications industry, and installation and maintenance services for satellite communications.[1] The other entities that make up the group are GNET ATC, LLC ("**GNET**"); Multiband Field Services, Inc. ("**MFS**"); and Goodman Network Services, LLC ("**GNS**" and together with Goodman Networks, GNET, and MFS, the "**Obligors**"). As part of its prior bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of Texas under Case No. 17-31575 (the "**Prior Proceedings**"), Goodman Networks issued the Notes to provide financing to the reorganized business and the other Obligors unconditionally guaranteed the Notes.

2. In the five months prior to the Maturity Date, the Obligors engineered several transactions that, on their face, appear to be fraudulent under applicable state law and also give

---

[1] On March 13, 2017, the Goodman Networks, MFS, and GNS filed petitions for voluntary relief in the United States Bankruptcy Court for the Southern District of Texas under Case No. 17-31575 with a "prepackaged" plan of reorganization. The plan was confirmed on May 4, 2017 and went effective on May 31, 2017. *See* Case No. 17-31575, Docket Nos. 236 and 259.

EMF_US 91160062

rise to claims against the Obligors' officers and controlling shareholders. These transactions include: a $44 million loan to a company owned and controlled by the Obligors' then-CEO; a highly suspect "settlement" with a preferred shareholder that resulted in a $13.5 million cash payment and the transfer of other assets to such shareholder; the repurchase of approximately $17 million of Notes held by insiders or for the benefit of insiders of the Debtor, and an attempt to use and divert Goodman Network's remaining cash to satisfy obligations of a related third party.

3. In light of what appears to be serious and brazen misconduct on the part of the Obligors and the individuals controlling the Obligors, and the inability of the Obligors to pay their debts as they come due, the Petitioning Creditors respectfully request entry of an order for relief against the Debtor under section 303(h) of the Bankruptcy Code.

## FACTUAL BACKGROUND

### I. The Obligors

4. The Obligors presently have no business operations and they appear to have no employees. Goodman Networks was founded and controlled by John Goodman and his brothers Jason, Jonathan, Joseph, and James Goodman. On information and belief, the remaining Obligors are subsidiaries or affiliates of Goodman Networks.

### II. The Notes

5. In connection with the Prior Proceedings, the Notes were issued by Goodman Networks pursuant to that certain indenture (as amended, restated or otherwise modified from time to time, the "**Indenture**") dated as of May 31, 2017 by and among Goodman Networks as Issuer, UMB Bank, National Association as Trustee (the "**Trustee**"), and U.S. Bank National Association, as Collateral Agent (the "**Collateral Agent**") in the original principal amount of $112,500,000.[2]

---

[2] A copy of the Indenture is attached to the Silverstein Declaration as **Exhibit A**.

GNET, MFS, and GNS each, jointly and severally, unconditionally guaranteed all obligations under the Indenture.[3]

6. In addition to the Indenture, the Obligors, the Trustee, and the Collateral Agent also executed that certain Pledge and Security Agreement (the "**Pledge and Security Agreement**") dated as of May 31, 2017 by and among Goodman Networks, each of the Grantors from time to time party thereto, and the Collateral Agent.[4] Under the Pledge and Security Agreement, the Obligors granted a lien on all or substantially all their assets to the Collateral Agent to secure repayment of the Notes.[5]

7. Under the terms of the Indenture, the Notes matured on the Maturity Date, and all amounts, including principal and interest, became due and payable. On the Maturity Date, the Petitioning Creditors understand that the outstanding principal amount of the Notes was $18,018,544, plus interest, fees, expenses, and other amounts due under the Indenture.

8. Prior to the Maturity Date, on or about February 18, 2022, the Trustee sent a letter to the Debtor noting that the Debtor and the Obligors had engaged in certain transactions that may have violated the terms of the Indenture, inquiring whether the Debtor intended to make the upcoming interest payment due on the Notes, and noting the upcoming Maturity Date.[6] On February 21, 2022, the Debtor's then-CEO, James Frinzi, sent an email to the Trustee assuring that the upcoming interest payment would be made and that the Debtor would pay the full outstanding

---

[3] MFS and GNS executed guarantees contemporaneously with the execution of the Indenture. GNET executed its guarantee on September 19, 2019. A copy of the Third Supplemental Indenture providing for GNET's guarantee obligations is attached here as **Exhibit B**.

[4] A copy of the Pledge and Security Agreement is attached to the Silverstein Declaration as **Exhibit C**.

[5] When the Pledge and Security Agreement was initially executed, the Grantors included MFS and GNS. On information and belief, on or about September 19, 2019, GNET executed a Pledge Supplement and became an Additional Grantor under the terms of the Pledge and Security Agreement.

[6] A copy of the Trustee's February 18, 2022 letter is attached to the Silverstein Declaration as **Exhibit D**.

4

principal on the Maturity Date.[7]  The Maturity Date came and went, but the Debtor made no payments on the Notes.

9. After the Maturity Date, representatives of the Debtor and the Obligors, including then-CEO James Frinzi and John Goodman, reached out to the Petitioning Creditors and their counsel to discuss payment of the Notes. These discussions included promises of payment as well as an offer to enter into a forbearance agreement. After 2 months of negotiations on a forbearance agreement, the Obligors admitted that they had not sold any assets or raised any funds to pay the Notes. The Obligors have failed to make any payments on the Notes since the Maturity Date despite requests by the Trustee and the Petitioning Creditors for payment.

### III.  The Obligors' Transfers and Inability to Pay Their Debts

10. The Obligors publicly stated that they had sufficient funds to pay the Notes in full as of January 1, 2022. Between the first of the year and the Maturity Date, however, the Obligors engaged in a series of transactions that depleted their estates of valuable assets that could have been used to pay the Petitioning Creditors and others.

11. First, on or about January 21, 2022, the Obligors loaned $44 million to American Metals Recovery and Recycling, Inc. ("**AMRR**"). According to publicly available information, AMRR is majority-owned and controlled by James Frinzi (or companies owned and controlled by him). At the time the loan was made, James Frinzi was *also* the CEO of the Obligors. According to SEC disclosures filed by AMRR, those funds were used primarily to fund the acquisition of AMR Resources, LLC. In exchange, AMRR executed a note (the "**AMRR Note**") and security agreement in favor of the Obligors.

---

[7] A copy of the Debtor's February 21, 2022 email is attached to the Silverstein Declaration as **Exhibit E**.

12. Second, in March 2022, the Obligors entered into a "settlement" with an unidentified preferred stockholder. Under the terms of this alleged settlement (the documentation of which has not been provided to the Petitioning Creditors), the Obligors repurchased the preferred stock for over $13 million in cash plus the conveyance of $22 million of the AMRR Note and other assets.

13. Third, prior to the Maturity Date, the Obligors spent approximately $17 million to repurchase certain of the Notes. On information and belief, these Notes were purchased at a discount from other holders by insiders of the Obligors who then had them purchased by the Obligors (either directly or through a straw purchaser) at an increased price.

14. Fourth, on or about August 15, 2022, after the Trustee and Collateral Agent began to pursue remedies against the Obligors for non-payment, approximately $4.4 million was transferred out of a bank account owned by the Debtor that had been pledged as collateral for the Notes. On information and belief, this transfer was directed by James Goodman, a shareholder of the Debtor, for the purpose of paying down obligations owed by another one of his companies, Goodman Networks Telecom Services LLC, and not owed by the Debtor. The Petitioning Creditors understand that the transfer has since been reversed at the direction of the Petitioning Creditors, the Trustee, and the Collateral Agent.

## BASIS FOR RELIEF

15. Entry of an order of relief against the Debtor is appropriate under section 303(h) of the Bankruptcy Code because the Petitioning Creditors are qualified to commence this case, the Debtor is generally not paying its debts as they become due, and there is no bona fide dispute as to the liability or amount of its debts.

EMF_US 91160062

**I. The Petitioning Creditors are Qualified to Commence this Case**

16. Under section 303(b) of the Bankruptcy Code, an involuntary case may be commenced by three or more creditors who hold unsecured claims that are not contingent and are not subject to bona fide dispute if such claims aggregate at least $18,600.[8] Here, all four Petitioning Creditors hold claims against the Debtor on account of the Notes. The Notes matured and became due and payable on the Maturity Date. There is no bona fide dispute that the Debtor owes the full balance on the Notes.

17. The Petition Creditors hold unsecured claims totaling at least $18,600 in the aggregate because, while Notes are secured by the assets of the Debtor, those assets appear insufficient to pay the full balance of the Notes. The Petitioning Creditors understand that the outstanding principal owed on the Notes is $18,018,544, plus interest, fees, expenses, and other amounts due under the Indenture.

18. On August 26, 2022, the Debtors sent a letter offering to purchase all the notes at 42 cents on the dollar. To the extent there is any question that the Petitioning Creditors hold unsecured claims totaling at least $18,600 in the aggregate, each of the Petitioning Creditors has executed a waiver of its right to its security interests in any assets of the Debtor up to $4,650.[9] Such waivers have been filed contemporaneously with this statement.

19. The Petitioning Creditors possess the right to commence this involuntary case under the terms of the Indenture. Section 6.07 of the Indenture provides that:

---

[8] 11 U.S.C. § 303(b)(1).

[9] *See, e.g.*, *In re Green*, Case No. 06-11761-FM, 2007 WL 1093791, at *5 (Bankr. W.D. Tex. Apr. 9, 2007) ("A secured creditor may waive security for all or a portion of its claim, to meet the aggregate unsecured debt requirement of § 303(b)."); *CC Britain Equities, L.L.C. v. Allen-Main Assocs. Ltd. P'ship. (In re Allen-Main Assocs. Ltd. P'ship.)*, 223 B.R. 59, 61 (2d Cir. B.A.P. 1998) ("Under the appropriate circumstances, it is also possible for a fully secured creditor to waive all or part of its claim to become an eligible unsecured creditor.").

EMF_US 91160062

> Notwithstanding any other provision of this Indenture, the right of any Holder of a Note to receive payment of principal of, premium on, if any, or interest on the Note, on or after the respective due dates expressed in the Note (including in connection with an offer to purchase), or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder; *provided* that a Holder shall not have the right to institute any such suit for the enforcement of payment if and to the extent that the institution or prosecution thereof or the entry of judgment therein would, under applicable law, result in the surrender, impairment, waiver or loss of the Lien of this Indenture upon any property subject to such Lien.[10]

Thus, notwithstanding any limitations in the Indenture on actions by individual holders, there is no bar to a holder individually seeking to enforce its right to payment when payment is due. This provision is consistent with section 316(b) of the Trust Indenture Act which prohibits any modification of a bondholders rights to receive payment and interest without that bondholder's consent.[11] This general exemption from "no action clauses" applies to the filing of involuntary bankruptcy petitions.[12] As set forth above, the Notes became due and payable on the Maturity Date and, as of this date, have not been paid.

20. Further, the Petitioning Creditors have the right to commence this case as beneficial holders. Section 316(b) does not distinguish between "record holders" and "beneficial holders," and courts have held that beneficial holders are permitted to bring actions to enforce their right to payment.[13] This is consistent with the Bankruptcy Code, which treats beneficial holders as holding

---

[10] Indenture § 6.07.

[11] 15 U.S.C. § 77ppp(b).

[12] *See, e.g.*, *In re FMB Bancshares, Inc.*, 517 B.R. 361, 369 (Bankr. M.D. Ga. 2014) (holding that involuntary bankruptcy proceeding could be construed as suit to enforce payment that was no barred by no action clause); *In re Envirodyne Indus., Inc.*, 174 B.R. 986, 997 (Bankr. N.D. Ill. 1994) (holding that involuntary bankruptcy filing was collective action to enforce payment that was not subject to no action clause in indenture).

[13] *See, e.g.*, *In re Bd. of Dirs. of Multicanal S.A.*, 307 B.R. 384, 387 n.2 (Bankr. S.D.N.Y. 2004) (noting that Section 316(b) refers to "'holders' without qualification," and that "the Federal courts have permitted beneficial holders to sue to vindicate [Trust Indenture Act] rights").

claims under section 101(5) as the beneficial holder is the party with the ultimate right to payment.[14]

## II. The Debtor Is Not Generally Paying Its Debts as they Come Due

21. Section 303(h) of the Bankruptcy Code provides that "[i]f the petition is not timely controverted, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed."[15] If, however, a party challenges the petition, the court shall order relief against the debtor if the petitioning creditors can show that "the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount."[16] As set forth above, there is no dispute as to the Debtor's liability on the Notes nor the amount that is due and payable.

22. "In determining whether an alleged debtor is generally paying its debts as they come due, courts typically look to four factors: (i) the number of unpaid claims; (ii) the amount of such claims; (iii) the materiality of the non-payments; and (iv) the nature of the debtor's overall conduct in its financial affairs."[17] No one factor is dispositive, and courts consider these factors in the context of the facts of the case.[18] Additionally, courts "may also look at whether the debtor has terminated its business operations entirely, and whether the past debts that are due are extremely large in comparison to the debtor's assets."[19]

---

[14] *See, e.g.*, *In re Pioneer Fin. Corp.*, 246 B.R. 626, 633 (Bankr. D. Nev. 2000) (noting that "it is the beneficial holder, not a holder of record, who has the 'claim' and the 'right to payment.'"); *In re Southland Corp.*, 124 B.R. 211, 227 (Bankr. N.D. Tex. 1991) (holding that beneficial holder of security was proper party to vote on a plan of reorganization).

[15] 11 U.S.C. § 303(h).

[16] *Id.* § 303(h)(1).

[17] *In re Acis Cap. Mgmt., L.P.*, 584 B.R. 115, 143 (Bankr. N.D. Tex. 2018)

[18] *Id.*

[19] *In re Paper I Partners, L.P.*, 283 B.R. 661, 677 (Bankr. S.D.N.Y. 2002)

EMF_US 91160062

23. Here, the Debtor has ceased its business operations, and the liability on the Notes appears to exceed the Debtor's assets. Further, as set forth above, the Debtor in connection with the other Obligors has engaged in a series of fraudulent transactions that have depleted their estates of assets and have attempted to put what few assets remain beyond the reach of creditors. On information and belief, the amounts owed by the Debtor to its creditors significantly exceed its assets. As a result, these non-payments are material.

## CONCLUSION

24. Based on the facts set forth above and any additional facts that may be adduced, entry of and order for relief against the Debtor is appropriate under section 303(f) of the Bankruptcy Code.

Dated: September 6, 2022
       Houston, Texas

Respectfully Submitted,

/s/ Philip M. Guffy
Philip M. Guffy
**HUNTON ANDREWS KURTH LLP**
600 Travis Street, Suite 4200
Houston, Texas 77002
Tel: 713-220-4200
Fax: 713-220-4285
Email: pguffy@huntonak.com

-and-

Paul N. Silverstein
Brian Clarke
**HUNTON ANDREWS KURTH LLP**
200 Park Avenue
New York, NY 10166
Tel: (212) 309-1000
Email: psilverstein@huntonak.com
       brianclarke@huntonak.com

*Counsel for the Petitioning Creditors*

EMF_US 91160062

# Exhibit 1

## Silverstein Declaration

EMF_US 91160062