# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |  |
|---|---|---|
| In re: | § | Case No. 22-31641-mvl7 |
|  | § |  |
| GOODMAN NETWORKS, INC., | § | Involuntary Chapter 7 |
|  | § |  |
| *Alleged Debtor.* | § |  |

**DECLARATION OF HOWARD KONICOV
IN SUPPORT OF JOINDER OBJECTION**

I, Howard Konicov, declare as follows:

1.　　I am over 18 years of age, of sound mind, and am competent to testify about the matters set forth below.  The facts stated herein are within my personal knowledge and are true and correct.

2.　　I am the Managing Director in the Restructuring Group at CFGI.  During my career, I have served as financial advisor to businesses, secured creditors, unsecured creditors and trustees in connection with insolvencies,  viability challenges, and workout situations including liquidations.

3.　　I earned a Bachelor of Science in Accounting from the  University of Rhode Island. I am a Certified Public Accountant, admitted to practice in the State of New York. I am also a Certified Insolvency and Restructuring Advisor (CIRA).

4.　　I submit this Declaration in Support of Goodman's Objection to Joinder to the Involuntary Petition against Goodman Networks, Inc. ("Goodman") [Docket No. 29] (the "Joinder").

5.　　On December 20, 2021, GNET ATC LLC ("GNET ATC") retained our firm to provide financial advisory services to GNET and Goodman.

6.　　 As such, I have knowledge of Goodman's financial management, books and records,  and historical financial activity.

7.　　Particularly, CFGI has supported Goodman by communicating with creditors and responding to creditor inquiries, assisting in and provided guidance over the preparation of interim financial statements, and investigated historical financial transactions.

8.　　As such, I have personal knowledge of the matters set forth.

**Organization and Business**

9.      Goodman Networks Incorporated, a Texas corporation, and its subsidiaries are in the satellite communications and e-commerce industries.

10.      Goodman served the satellite television industry by providing onsite installation, upgrade and maintenance of satellite television systems to both the residential and commercial market customers. Goodman was an original equipment manufacturer-to-consumer links providing critical forward logistics, post-manufacturing support, reverse logistics, field installation and engineering services and equipment sales.

### Goodman Notes

11.      JLP Credit Opportunity IDF Series Interests of the SALI Multi-Series Fund, L.P., JLP Institutional Credit Master Fund LP, and Alimco Re Ltd. (collectively, the "Petitioning Creditors") are bondholder creditors pursuant to that certain indenture dated May 31, 2017 ("the Indenture"), by and among Goodman Networks as Issuer, UMB Bank, National Association as Trustee (the "Trustee"), and U.S. Bank National Association, as Collateral Agent (the "Collateral Agent") in the original principal amount of $112,500,000, (collectively, "the Parties"). In connection with the Indenture, the Parties executed that certain Pledge and Security Agreement dated May 31, 2017 (the "Pledge and Security").

12.      Subsequently, the Parties supplemented the Indenture four times ("the Indenture Supplements").

13.      On or about May 13, 2022, Goodman engaged Globic Advisors ("Globic") to identify the maximum number of holders with positions in the Bonds, including holders who hold their Bonds in "Street Name" with the ultimate goal of restructuring the notes.

14.      Through the process, I worked closely with the Globic representative in providing requested information and responding to inquiries.

15.      Per Globic, there are 301 bondholder creditors who have consensually disclosed their identity, and approximately 60 financial institutions serving as custodians all of the notes.

### Master Service Agreement

16.      From my review of Goodman's records, it's my understanding that on September 14, 2019, Goodman, as buyer, and Genesis-ATC, as seller, entered into an Asset Purchase Agreement (the "APA"). Attached hereto as **Exhibit 1** is a copy of the APA.

17.      In relevant part, the APA states that:

> "Acquired Assets" means all right, title and interest in and to all of Company's assets, other than the Excluded Assets, including its (a) Owned Real Property and Leased Real Property, (b) tangible personal property, (c) Intellectual Property, goodwill associated therewith, licenses, sublicenses, agreements, covenants not to sue, permissions granted and obtained with respect thereto,

and rights thereunder, remedies against any infringements thereof, and rights to protection all interests therein under the laws of all jurisdictions, (d) leases, subleases and rights thereunder, (e) agreements, contracts, indentures, mortgages, instruments, Liens, guaranties, other similar arrangements, and rights thereunder, (f) accounts, notes and other receivables, (g) securities (excluding the capital stock in its Subsidiaries), (h) claims, deposits, prepayments, refunds, causes of action, choses in action, rights of recovery, rights of set-off and rights of recoupment (including any such item relating to the payment of Taxes), (i) franchises, approvals, permits, licenses, orders, registrations, certificates, variances and similar rights obtained from governments and governmental agencies, (j) books, records, ledgers, files, documents, correspondence, lists, plats, architectural plans, drawings, and specifications, creative materials, advertising and promotional materials, studies, reports, and other printed or written materials, and (k) all rights to insurance policies and any proceeds thereof.

APA para. 5.

18.    Thereafter, on the same day, Goodman, as assignor, and GNET ATC , as assignee, entered into certain Assignment and Assumption Agreement (the "Assumption"). Attached hereto as **Exhibit 2** is copy of the Assumption.

19.    In relevant part, the Assumption states that:

Assignor hereby assigns, transfers and conveys to Assignee, and Assignee hereby accepts all of Assignor's right, title and interest in and under the Purchase Agreement, and Assignee hereby assumes all of Assignor's liabilities, duties and obligations with respect to the Purchase Agreement (the "Assignment").

Assignment para. 1.

20.    It is my understanding that at issue here are services in relation to that certain Master Service Agreement between FSCLE, as customer, and Genesis-ATC, as service provider, dated January 20, 2014 (the "Service Agreement"). Service Agreement attached hereto as **Exhibit 3**.

21.    The APA and the Assumption encompassed the Service Agreement.

22.    Consistent with the Assignment, the financial operating results emanating from the Service Agreement were recorded on GNET ATC's books and records. Accordingly, the accounts receivable (revenues) and accounts payable (expenses) associated with the Service Agreement have been recorded on GNET's books.

23.    For administrative ease, and as an accommodation, the cash deposits were received by a Goodman Network bank account and the remittances to FSCLE were transferred out of the same account. The revenue and expenses from such transactions were never recorded in Goodman's books and records.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 31th day of October, 2022.

Howard Konicov

67038817;2
67115621;1

# EXHIBIT 1

ASSET PURCHASE AGREEMENT

by and among

GENESIS NETWORKS TELECOM SERVICES, LLC D.B.A. GENESIS-ATC,

and

GOODMAN NETWORKS, INC.

_____

Dated as of September 14, 2019

## TABLE OF CONTENTS

ARTICLE I Definitions ................................................................................................ 1

ARTICLE II Basic Transaction ................................................................................ 7
Section 2.1   Purchase and Sale of Assets and Assumption of Liabilities ..................... 7
Section 2.2   Purchase Price ................................................................................... 8
Section 2.3   Use of Cash and Closing Proceeds ..................................................... 8
Section 2.4   Post-Closing Earnout Payments ......................................................... 8
Section 2.5   Closing ............................................................................................. 8
Section 2.6   Deliveries at Closing ......................................................................... 9
Section 2.7   Purchase Price Adjustment ................................................................ 9
Section 2.8   Allocation ......................................................................................... 9

ARTICLE III Buyer's Representations and Warranties ........................................ 9
Section 3.1   Organization of Buyer ....................................................................... 10
Section 3.2   Authorization of Transaction ............................................................. 10
Section 3.3   Non-contravention ............................................................................ 10
Section 3.4   Brokers' Fees ................................................................................... 10
Section 3.5   Disclaimer of Other Representations and Warranties ............................ 10

ARTICLE IV Company's Representations and Warranties .................................. 10
Section 4.1   Organization, Qualification and Corporate Power ................................. 10
Section 4.2   Authorization of Transaction ............................................................. 11
Section 4.3   Non-contravention ............................................................................ 11
Section 4.4   Brokers' Fees ................................................................................... 11
Section 4.5   Title to Assets .................................................................................. 11
Section 4.6   Sufficiency of Acquired Assets .......................................................... 11
Section 4.7   Not Used. ........................................................................................ 11
Section 4.8   Financial Statements ........................................................................ 11
Section 4.9   Events Subsequent to Most Recent Fiscal Year End .............................. 12
Section 4.10  Undisclosed Liabilities ...................................................................... 12
Section 4.11  Compliance with Laws ...................................................................... 12
Section 4.12  Tax Matters ..................................................................................... 12
Section 4.13  Real Property ................................................................................... 14
Section 4.14  Intellectual Property ......................................................................... 15
Section 4.15  Tangible Assets ................................................................................ 15
Section 4.16  Contracts ........................................................................................ 15
Section 4.17  Litigation ......................................................................................... 17
Section 4.18  Employees ....................................................................................... 17
Section 4.19  Employee Benefits ............................................................................ 17
Section 4.20  Environmental, Health and Safety Matters .......................................... 19
Section 4.21  IT Assets ......................................................................................... 19
Section 4.22  Affiliate Transactions ....................................................................... 20
Section 4.23  Disclaimer of Other Representations and Warranties ........................... 20

i

ARTICLE V Pre-Closing Covenants ......................................................................... 20
    Section 5.1    General ........................................................................ 20
    Section 5.2    Notices and Consents ................................................ 20
    Section 5.3    Operation of Business ............................................... 20
    Section 5.4    Preservation of Business ........................................... 21
    Section 5.5    Full Access ................................................................ 21
    Section 5.6    Notice of Developments ............................................ 21
    Section 5.7    Exclusivity ................................................................. 21

ARTICLE VI Post-Closing Covenants ...................................................................... 21
    Section 6.1    General ........................................................................ 21
    Section 6.2    Transition .................................................................. 22
    Section 6.3    Confidentiality .......................................................... 22

ARTICLE VII Conditions to Obligation to Close ...................................................... 22
    Section 7.1    Conditions to Buyer's Obligation ............................. 22
    Section 7.2    Conditions to Company's Obligation ....................... 23

ARTICLE VIII Remedies for Breaches of This Agreement ...................................... 24
    Section 8.1    Survival of Representations and Warranties ............. 24
    Section 8.2    Indemnification Provisions for Buyer's Benefit ....... 24
    Section 8.3    Indemnification Provisions for Company's Benefit .. 26
    Section 8.4    Matters Involving Third Parties ................................ 26
    Section 8.5    Not Used .................................................................... 26
    Section 8.6    Recoupment Against Post-Closing Payments ........... 26
    Section 8.7    Intentionally Omitted ................................................ 27
    Section 8.8    Purchase Price Adjustment ....................................... 27

ARTICLE IX Termination .......................................................................................... 27
    Section 9.1    Termination of Agreement ........................................ 27
    Section 9.2    Effect of Termination ................................................ 27

ARTICLE X Miscellaneous ........................................................................................ 27
    Section 10.1    Press Releases and Public Announcements ............. 27
    Section 10.2    No Third-Party Beneficiaries .................................. 27
    Section 10.3    Entire Agreement .................................................... 27
    Section 10.4    Succession and Assignment ..................................... 28
    Section 10.5    Counterparts ............................................................ 28
    Section 10.6    Notices .................................................................... 28
    Section 10.7    Governing Law; Jurisdiction; Waiver of Jury Trial.. 28
    Section 10.8    Amendments and Waivers ....................................... 29
    Section 10.9    Severability ............................................................. 29
    Section 10.10        Expenses ...................................................... 29
    Section 10.11        Construction ................................................ 29
    Section 10.12        Tax Matters .................................................. 29
    Section 10.13        Employee Benefits Matters .......................... 30
    Section 10.14        Specific Performance ................................... 31

**Exhibit A**—   Specified Net Assets
**Exhibit B**—   Financial Statements
**Disclosure Schedule**—      Exceptions to Representations and Warranties Concerning
Company and Its Subsidiaries

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "*Agreement*"), is entered into as of September 14, 2019, by and among Goodman Networks Incorporated, a Texas corporation ("*Buyer*"), and Genesis Networks Telecom Services, LLC d.b.a. Genesis-ATC (the "*Company*"). Each of the Parties are referred to herein as a "*Party*" and collectively as the "*Parties*".

## RECITALS

WHEREAS, at the Closing, Company, upon the terms and subject to the conditions set forth in this Agreement, desires to sell and transfer to Buyer, and Buyer desires to purchase and accept from Company, substantially all of the assets (and assume certain of the Liabilities) of Company in return for the Purchase Price;

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I
### Definitions

"*Accounting Principles*" means GAAP applied in a manner consistent with the Audited Financial Statements.

"*Acquired Assets*" means all right, title and interest in and to all of Company's assets, other than the Excluded Assets, including its (a) Owned Real Property and Leased Real Property, (b) tangible personal property, (c) Intellectual Property, goodwill associated therewith, licenses, sublicenses, agreements, covenants not to sue, permissions granted and obtained with respect thereto, and rights thereunder, remedies against any infringements thereof, and rights to protection all interests therein under the laws of all jurisdictions, (d) leases, subleases and rights thereunder, (e) agreements, contracts, indentures, mortgages, instruments, Liens, guaranties, other similar arrangements, and rights thereunder, (f) accounts, notes and other receivables, (g) securities (excluding the capital stock in its Subsidiaries), (h) claims, deposits, prepayments, refunds, causes of action, choses in action, rights of recovery, rights of set-off and rights of recoupment (including any such item relating to the payment of Taxes), (i) franchises, approvals, permits, licenses, orders, registrations, certificates, variances and similar rights obtained from governments and governmental agencies, (j) books, records, ledgers, files, documents, correspondence, lists, plats, architectural plans, drawings, and specifications, creative materials, advertising and promotional materials, studies, reports, and other printed or written materials, and (k) all rights to insurance policies and any proceeds thereof.

"*Adverse Consequences*" means all actions, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments or orders, decrees, rulings, damages, dues, penalties, fines, costs, amounts paid in settlement, Liabilities, obligations, Taxes, liens, losses, expenses and fees, including court costs and attorneys' fees and expenses.

"*Affiliate*" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act.

"*Affiliated Group*" means any affiliated group within the meaning of Code §1504(a) or any similar group defined under a similar provision of state, local or non-U.S. law.

"*Agreement*" has the meaning set forth in the preface above.

"*Assumed Indebtedness*" means Indebtedness of Company as of the Closing Date expressly assumed by Buyer on and subject to the terms and conditions of this Agreement, but not to exceed $13,000,000 (and any amount in excess of $13,000,000 shall be an Excluded Liability).

"*Assumed Liabilities*" means (a) all Liabilities of Company solely to the extent such Liability was first incurred, arose or related to events first occurring after the Closing (other than any liability resulting from, arising out of, relating to, in the nature of, or caused by any breach of contract, breach of warranty, tort, infringement or misappropriation, violation of law, or environmental matter, including without limitation those arising under Environmental, Health, and Safety Requirements), (b) all obligations of Company under the agreements, contracts, leases, licenses, and other arrangements referred to in the definition of Acquired Assets and reflected in the calculation of Net Working Capital either (i) to furnish goods, services, and other non-Cash benefits to another party after the Closing or (ii) to pay for goods, services, and other non-Cash benefits that another party will furnish to it after the Closing, excluding any liabilities of the nature described in the definition of Excluded Liabilities Clauses (a) through (k), and (c) the Assumed PTO; *provided*, *however*, that, notwithstanding anything provided in causes (a) through (c) above, the Assumed Liabilities shall not include any Excluded Liabilities.

"*Assumed PTO*" means the amount of the accrued but unused paid time off of the Transferred Employees as of the Closing Date.

"*Audited Financial Statements*" means the Financial Statements described in clause (i) of Section 4.8 below.

"*Buyer*" has the meaning set forth in the preface above.

"*Cash*" means cash and cash equivalents (including marketable securities and short-term investments) calculated in accordance with GAAP applied on a basis consistent with the preparation of the Financial Statements.

"*Closing*" has the meaning set forth in Section 2.5 below.

"*Closing Date*" has the meaning set forth in Section 2.5 below.

"*Closing Date Cash Payment*" has the meaning set forth in Section 2.2.

"*Closing Statement*" has the meaning set forth in Section 2.7(a) below.

"*COBRA*" means the requirements of Part 6 of Subtitle B of Title I of ERISA and Code §4980B and of any similar state law.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Company*" has the meaning set forth in the preface above.

"*Company Expenses*" means (without duplication), (i) the aggregate amount Company's Liabilities to outside legal counsel, advisors and other Persons in connection with the transactions contemplated hereby (or the consummation of transactions contemplated hereby) and (ii) all Company Liabilities under or in connection with any severance arrangements, stay bonuses, incentive bonuses, transaction bonuses, termination and change of control arrangements, and similar obligations that are owed to any Person or that will be triggered, either automatically or with the passage of time, in whole or in part by the consummation of the transactions contemplated hereby.

"*Company Stockholder*" means any person who or that holds any common stock of the Company.

"*Confidential Information*" means any information concerning the businesses and affairs of Company that is not already generally available to the public.

"*Disclosure Schedule*" has the meaning set forth in <u>Article IV</u> below.

"*Employee*" means each employee who is employed by the Company as of the Closing Date.

"*Employee Benefit Plan*" means any "employee benefit plan" (as such term is defined in ERISA §3(3)) and any other employee benefit plan, program or arrangement of any kind.

"*Encumbrance Documents*" has the meaning set forth in <u>Section 4.12</u> below.

"*Environmental, Health and Safety Requirements*" means, whenever in effect, all federal, state, local, and non-U.S. statutes, regulations ordinances, and other provisions having the force or effect of law, all judicial and administrative orders and determinations, all contractual obligations and all common law concerning public health and safety, worker health and safety, pollution or protection of the environment.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*ERISA Affiliate*" means each Person that is treated as a single employer with Company for purposes of Code §414.

"*Estimated Net Working Capital*" means an amount equal to the Net Working Capital as estimated in good faith by Company.

"*Excluded Assets*" means (i) Company's intercompany accounts receivable, and (ii) Cash.

"*Excluded Liabilities*" means all Liabilities, other than the Assumed Liabilities, including without limitation:  (a) all Liabilities of Company arising out of, relating to or otherwise in respect of the Acquired Assets or the business of the Company first incurred, occurring or arising out of or relating to events that occurred on or before Closing (including any related continuing Liabilities), (b) any Liability of Company for income taxes, (c) except as provided in <u>Section 10.10</u> below, any Liability of Company for Taxes arising in connection with the consummation of the transactions contemplated hereby or arising with respect to periods through the date of the Closing Date, except to the extent such Taxes are included in the calculation of Indebtedness, (d) any Liability of Company for the unpaid Taxes of any Person under Reg. §1.1502-6 (or any similar

provision of state, local, or non-U.S. law), as a transferee or successor, by contract, or otherwise, (e) any Liability relating to or in connection with the employment or termination of employment of any Employee by the Company, or for compensation of any kind due and payable to any officer, director, employee or consultant of Company first due and owing prior to Closing, (f) all Liabilities relating to any Employee Benefit Plan and any other compensation or benefit plan, program, policy, agreement or arrangement of any kind, (g) any obligation of Company to indemnify any Person by reason of the fact that such Person was a director, officer, employee, or agent of Company or was serving at the request of any such person or entity, (h) any Liability of the Company for costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby including any Company Expenses, (i) any Indebtedness of the Company other than the Assumed Indebtedness and any liability relating to any intercompany liability, including, without limitation, any intercompany accounts payable, (j) any Liability relating to environmental matters (other than those shown on the face of the Most Recent Balance Sheet) and existing or pending litigation, or (k) any Liability or obligation of Company under this Agreement.

"*Financial Statements*" has the meaning set forth in <u>Section 4.8</u> below.

"*Fundamental Representations*" has the meaning set forth in <u>Section 8.1</u> below.

"*GAAP*" means United States generally accepted accounting principles as in effect from time to time, consistently applied.

"*Indebtedness*" means, as of any applicable time of determination, without duplication, the following: (i) all indebtedness for borrowed money, (ii) all Liabilities for debt securities of any kind, (iii) all Liabilities in connection with letters of credit or similar items, (iv) all Liabilities for deferred purchase price of property or services (other than trade payables incurred in the Ordinary Course of Business) and all deferred purchase price Liabilities related to past acquisitions, contingent or otherwise, (v) all Liabilities arising from cash/book overdrafts, (vi) all deferred rent obligations, (vii) all Liabilities under capitalized leases, (viii) all Liabilities under any title retention agreements, (ix) all Liabilities arising out of interest rate, currency or other hedge agreements or other hedging arrangements, (x) all Company Expenses, (xi) all indebtedness of others guaranteed by Company or secured by any Lien on the assets of Company, (xii) any customer pre-payments or deposits, (xiii) all accrued and unpaid Taxes of Company as of the Closing Date, (xiv) all accrued and unpaid obligations of Company for compensation related expenses not otherwise included in Company Expenses, and (xv) all non-current Liabilities (determined in accordance with GAAP), including for each of the foregoing clauses (i) through (xv), any principal, premium, accrued and unpaid interest and all other amounts payable in connection therewith.

"*Indemnified Party*" has the meaning set forth in <u>Section 8.4</u> below.

"*Indemnifying Party*" has the meaning set forth in <u>Section 8.4</u> below.

"*Intellectual Property*" means all of the following in any jurisdiction throughout the world: (a) all inventions, all improvements thereto and all patents, patent applications and patent disclosures, together with all reissuances, continuations, divisions, continuations-in-part, revisions, extensions and reexaminations thereof, (b) all trademarks, service marks, trade dress, logos, slogans, trade names, corporate names, Internet domain names, other source identifiers and rights in telephone numbers and social media assets, together with all translations, adaptations, derivations and combinations thereof and including all goodwill associated

therewith and all applications, registrations and renewals in connection therewith, (c) all rights of publicity, privacy and endorsement, (d) rights in databases and collections of data and all copyrightable works, all copyrights and all applications, registrations and renewals in connection therewith, (e) all mask works and all applications, registrations and renewals in connection therewith, (f) all trade secrets and Confidential Information, (g) all computer software, (h) all advertising and promotional materials, (i) all other proprietary rights and (j) all copies and tangible embodiments thereof (in whatever form or medium).

"*IT Systems*" has the meaning set forth in <u>Section 4.20</u> below.

"*Knowledge*" or "*Company's Knowledge*" means actual knowledge of James Goodman, Cathy Kincy, Sean Nelson or Steve Seago after reasonable investigation.

"*Lease Consents*" has the meaning set forth in <u>Section 7.1</u> below.

"*Leased Real Property*" means all leasehold or subleasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property held by Company.

"*Leases*" means all leases, subleases, licenses, concessions and other agreements (written or oral), including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, pursuant to which Company holds any Leased Real Property, including the right to all security deposits and other amounts and instruments deposited by or on behalf of Company thereunder.

"*Liability*" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

"*Lien*" means any mortgage, pledge, lien, encumbrance, charge or other security interest, other than (a) liens for Taxes not yet due and payable or for Taxes that the taxpayer is contesting in good faith through appropriate proceedings, (b) purchase money liens and liens securing rental payments under capital lease arrangements and (c) mechanics', materialman's, and similar liens.

"*LOI*" means that certain Letter of Intent by and among the Buyer and the Company dated as of July 24, 2019.

"*Material Adverse Effect*" or "*Material Adverse Change*" means any effect or change that would or could reasonably be expected to be materially adverse to the business, assets, condition (financial or otherwise), operating results, operations or business prospects of Company, taken as a whole, or to the ability of Company to consummate timely the transactions contemplated hereby, including any adverse change, event, development or effect arising from or relating to (a) general business or economic conditions, including such conditions related to the business of Company, (b) political or social conditions, including the engagement by the United States in hostilities, or the occurrence of any military or terrorist attack upon any military or governmental installation, equipment or personnel of the United States, (c) changes in United States GAAP, (d) changes in laws, rules, regulations or orders, or other binding directives issued by any governmental entity and (e) the taking of any action contemplated by this Agreement and the other agreements contemplated hereby.

"*Most Recent Balance Sheet*" means the balance sheet contained within the Most Recent Financial Statements.

"*Most Recent Financial Statements*" has the meaning set forth in Section 4.8 below.

"*Most Recent Fiscal Month End*" has the meaning set forth in Section 4.8 below.

"*Most Recent Fiscal Year End*" has the meaning set forth in Section 4.8 below.

"*Multiemployer Plan*" has the meaning set forth in ERISA §3(37).

"*Negative Quarter Carry Forward*" has the meaning set forth in Section 2.4.

"*Net Working Capital*" means the amount by which (a) the sum of Acquired Assets listed on Exhibit A exceeds (b) the sum of the Assumed Liabilities listed on Exhibit A determined in accordance with the Accounting Principles and calculated as 11:59 p.m. (Central time) on the day immediately prior to the Closing Date.

"*Ordinary Course of Business*" means the ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency).

"*Owned Real Property*" means all land, together with all buildings, structures, improvements and fixtures located thereon, including all electrical, mechanical, plumbing and other building systems, fire protection, security and surveillance systems, telecommunications, computer, wiring and cable installations, utility installations, water distribution systems and landscaping, together with all easements and other rights and interests appurtenant thereto (including air, oil, gas, mineral and water rights), owned by Company.

"*Party*" has the meaning set forth in the preface above.

"*Permitted Encumbrances*" means with respect to each parcel of Real Property encumbrances that arise in the Ordinary Course of Business, are not due and payable (if at all) as of the Closing Date, and do not otherwise hinder or threaten to hinder the Company's ability to conduct its business as presently conducted, or as presently proposed to be conducted.

"*Person*" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, any other business entity or a governmental entity (or any department, agency or political subdivision thereof).

"*Post-Closing Earnout Payment Amount*" means an aggregate amount up to $6,000,000, calculated in accordance with Section 2.4, as adjusted pursuant to Section 2.7 and Article VIII.

"*Post-Closing Earnout Payments*" has the meaning set forth in Section 2.4 below.

"*Pre-Closing Tax Period*" has the meaning set forth in Section 8.2(d)(i).

"*Prohibited Transaction*" has the meaning set forth in ERISA §406 and Code §4975.

"*Purchase Price*" has the meaning set forth in Section 2.2.

6

"*Real Property*" has the meaning set forth in <u>Section 4.13</u> below.

"*Restrictive Covenant Agreements*" means agreements, in form and substance reasonably acceptable to Buyer, pursuant to which the signatory to such agreement covenants not to compete with the Buyer and not to solicit the customers or employees of the Buyer or the Company.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Securities Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Tax*" or "*Taxes*" means any federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not and including any obligations to indemnify or otherwise assume or succeed to the Tax Liability of any other Person.

"*Tax Return*" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto and including any amendment thereof.

"*Third-Party Claim*" has the meaning set forth in <u>Section 8.4</u> below.

"*Transaction Documents*" means this Agreement, the Restrictive Covenant Agreements, TSA, assumption or assignment agreement, bill of sale and such other ancillary documents contemplated by the parties in connection with the transactions contemplated hereby.

"*Transferred Employee*" has the meaning set forth in <u>Section 10.13</u>.

"*TSA*" means a Transaction Services Agreement by and among the Buyer and the Company pursuant to which the Company, at cost (if any): (i) provides certain services to Buyer related to facilitating payments from Company's customers to Buyer under the assigned customer agreements, (ii) takes all actions necessary to effectuate any assignment of Company's customer agreements to Buyer, (iii) grants Buyer access to all Company Bank accounts into which any monies paid to Company on account of Company's or Buyer's ownership or operation of the Acquired Assets have been or may be deposited into and (iv) provides such other services as are necessary to carry out the terms of this Agreement or the transactions contemplated hereby.

**ARTICLE II**
**Basic Transaction**

**Section 2.1    <u>Purchase and Sale of Assets and Assumption of Liabilities</u>**. On and subject to the terms and conditions of this Agreement, Buyer agrees to (i) purchase from Company, and Company agrees to sell, transfer, convey and deliver to Buyer, all of the Acquired Assets free and clear of any Liens at the Closing for the consideration specified below in this <u>Article II</u> and (ii) assume and become responsible for all of the Assumed Liabilities at the

7

Closing; *provided*, *however*, Buyer will not assume or have any responsibility with respect to the Excluded Liabilities.

      **Section 2.2**    **Purchase Price**.

        (a)      the aggregate consideration for the Acquired Assets and covenants by Company under the Transaction Documents is equal to the aggregate sum of (i) the Assumed Indebtedness, *plus* (ii) $7,000,000 (the "*Closing Date Cash Payment*") (as adjusted pursuant to this Section 2.2 and Section 2.7), *plus* (iii) Post-Closing Earnout Payments in accordance with Section 2.4 hereof (such aggregate amount is the "*Purchase Price*"). Company will notify Buyer of the amount of Estimated Net Working Capital at least 3 business days prior to Closing.

        (b)      On the Closing Date, subject to its rights under Section 9.1, Buyer will pay to Company, by wire transfer or delivery of other immediately available funds, an amount equal to (A) the Closing Date Cash Payment, either (B) plus the amount by which the Estimated Net Working Capital exceeds $0 or (C) minus the absolute value by which the Estimated Net Working Capital is less than $0.

      **Section 2.3**    **Use of Cash and Closing Proceeds**. Company covenants to use such amounts of Cash (i) retained by Company and (ii) received from Buyer at Closing as is necessary to (A) extinguish any remaining Indebtedness of Company (other than Assumed Indebtedness) and (B) eliminate any remaining security interests encumbering any Acquired Assets.

      **Section 2.4**    **Post-Closing Earnout Payments**. Subject in all respects to Section 2.7 and Article VIII of this Agreement, Buyer shall pay to the Company the Post-Closing Earnout Payment Amount as follows: Starting with the first full fiscal quarter following the Closing, and ending on the eighth full fiscal quarter following the Closing (the "*Earnout Period*"), Buyer will calculate the quarterly EBITDA for such fiscal quarter and (i) if the EBITDA for such fiscal quarter minus any prior Negative Quarter Carry Forward is positive, Buyer will pay Company 90% of such positive quarterly EBITDA towards the Post-Closing Earnout Payment Amount ("*Post-Closing Earnout Payments*"); or (ii) if the EBITDA for such fiscal quarter is negative, carry forward such negative amount (the "*Negative Quarter Carry Forward*") for purposes of calculating future fiscal quarters in the Earnout Period  Each such Post-Closing Earnout Payment due and payable no later than forty-five (45) days following the closing of each applicable fiscal quarter.  In no event will payments pursuant to this Section 2.4 exceed the Post-Closing Earnout Payment Amount in the aggregate or continue following the close of the Earnout Period if the full Post-Closing Earnout Payment Amount is not earned within the Earnout Period. For clarification, the EBITDA for the Post-Closing Earnout shall be adjusted to treat and include the interest expense for any factoring arrangement in the "cost of goods sold" expense.

      **Section 2.5**    **Closing**. The closing of the transactions contemplated by this Agreement (the "*Closing*") shall take place by the exchange of electronic documents at 10:00 a.m. Central Time on (a) the second (2) business day after (but not including) the date that all of the conditions to the Closing set forth in Article VII (other than those conditions that, by their terms, are to be satisfied or waived at the Closing, but subject to the satisfaction or waiver of those conditions on the Closing Date) shall have been satisfied or waived by the Party or Parties entitled to waive the same or (b) as otherwise agreed between the Parties.  The date on which the Closing occurs is referred to in this Agreement as the "*Closing Date*".

**Section 2.6**     **Deliveries at Closing**. At the Closing: (i) Company will deliver to Buyer the various certificates, instruments and documents referred to in <u>Section 7.1</u> below, (ii) Buyer will deliver to Company the various certificates, instruments and documents referred to in <u>Section 7.2</u> below, (iii) Company will use its best efforts to execute, acknowledge and deliver to Buyer (A) assignments (including transfer documents) in a form and substance reasonably acceptable to Buyer and (B) such other instruments of sale, transfer, conveyance and assignment as Buyer and its counsel reasonably may request; (iv) Buyer will execute, acknowledge and deliver to Company (A) an assumption in the form and substance reasonably acceptable to Company and (B) such other instruments of assumption as Company and its counsel may reasonably request; and (v) Buyer will deliver to Company the consideration specified to be delivered at Closing in <u>Section 2.2</u> above.

**Section 2.7**     **Purchase Price Adjustment**

(a)     Company will notify Buyer of the amount of Estimated Net Working Capital at least 3 days prior to Closing (with reasonable evidence supporting its calculation).

(b)     Within 90 days after the Closing Date, Buyer will prepare and deliver to Company a closing statement (the "*Closing Statement*") setting forth its calculation of the Net Working Capital (with reasonable evidence supporting its calculation).

(c)     If the Company disputes Buyer's calculation of Closing Net Working Capital the Parties will work in good faith to resolve such dispute.  If the Parties are unable to resolve such dispute, the Parties will submit to customary dispute resolutions procedures.

(d)     If the Net Working Capital (as finally determined pursuant to this Section 2.7) is greater than the Estimated Net Working Capital, such excess shall be added to the Post-Closing Earnout Payment Amount.  If the Estimated Net Working Capital is greater than the Net Working Capital, then (i) the remaining Post-Closing Earnout Payment Amount will be reduced by an amount equal to such difference (up to the full amount of the Post-Closing Earnout Payment Amount) and (ii) if such difference exceeds the remaining Post-Closing Earnout Payment Amount, then the Company will pay to Buyer, within 5 business days, the amount of such excess by wire transfer of immediately available funds.

**Section 2.8**     **Allocation**. Within 30 days after delivery of the Closing Statement, Buyer shall prepare and deliver to Company an allocation of the Purchase Price (and all other capital costs) among the Acquired Assets, and each Party will file all Tax Returns consistent with such allocation schedule.

### ARTICLE III
### Buyer's Representations and Warranties.

Buyer represents and warrants to Company that the statements contained in this <u>Article III</u> are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this <u>Article III</u>).

Section 3.1 **Organization of Buyer**. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Texas.

Section 3.2 **Authorization of Transaction**. Subject to Section 7.1(a), Buyer has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder. Without limiting the generality of the forgoing, the Buyer's board of directors has duly authorized the execution, delivery and performance of this Agreement by Buyer.  This Agreement constitutes the valid and legally binding obligation of Buyer, enforceable in accordance with its terms and conditions.

Section 3.3 **Non-contravention**. Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (A) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency or court to which Buyer is subject or any provision of its charter, bylaws or other governing documents or (B) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, cancel or require any notice under any agreement, contract, lease, license, instrument or other arrangement to which Buyer is a party or by which it is bound or to which any of its assets are subject.

Section 3.4 **Brokers' Fees**. Buyer has no Liability to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement.

Section 3.5 **Disclaimer of Other Representations and Warranties**. Company, on its own behalf and on behalf of its Affiliates, acknowledges, represents, warrants and agrees that (i) Buyer makes no representation or warranty, express or implied and (ii) Company has not relied upon the accuracy or completeness of any express or implied representation, warranty, statement, or information of any nature made or provided by any Person, in each case other than the representations and warranties expressly set forth in this Article III; *provided*, *however*, that nothing contained herein or elsewhere in this Agreement will limit any remedy Company may have for any fraud by Buyer, or any of its respective officers, directors, employees, agents, or representatives, whether or not relating to a representation made in a written agreement among the Parties.

**ARTICLE IV**
**Company's Representations and Warranties**

Company represents and warrants to Buyer that the statements contained in this Article IV are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Article IV), except as set forth in the disclosure schedule delivered by Company to Buyer on the date hereof (the "*Disclosure Schedule*"). The Disclosure Schedule will be arranged in paragraphs corresponding to the lettered and numbered paragraphs contained in this Article IV.

Section 4.1 **Organization, Qualification and Corporate Power**. Company is a limited Liability company duly organized, validly existing and in good standing under the laws of the state of Texas. Company is duly authorized to conduct business and are in good standing under the laws of each jurisdiction where such qualification is required. Company has full corporate power and authority and all licenses, permits and authorizations necessary to carry on

the businesses in which it is engaged and in which it presently propose to engage and to own and use the properties owned and used by it. Company is not in default under or in violation of any provision of its company agreement.

**Section 4.2**   **Authorization of Transaction**. Company has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder.  Without limiting the generality of the forgoing, the [members//board of managers] of Company have duly authorized the execution, delivery and performance of this Agreement by Company.  This Agreement constitutes the valid and legally binding obligation of Company, enforceable in accordance with its terms and conditions.

**Section 4.3**   **Non-contravention**. Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency or court to which Company is subject or any provision of the company agreement of Company or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any agreement, contract, lease, license, instrument or other arrangement to which any of Company is a party or by which it is bound or to which any of its assets is subject (or result in the imposition of any Lien upon any of its assets). To its Knowledge, Company does not need to give any notice to, make any filing with or obtain any authorization, consent or approval of any government or governmental agency in order for the Parties to consummate the transactions contemplated by this Agreement.

**Section 4.4**   **Brokers' Fees**. Company has no Liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement.

**Section 4.5**   **Title to Assets**. Company has good and marketable title to, or a valid leasehold interest in the Acquired Assets, free and clear of all Liens (other than Liens that secure the Assumed Indebtedness and are agreed to in writing by Buyer).  Without limiting the generality of the foregoing, Company has good and marketable title, and insurable (at ordinary rates) fee simple absolute title of record to all of the Acquired Assets (other than leased assets subject to a valid and unexpired lease), and shall convey such Acquired Assets to Buyer at Closing free and clear of any Liens or restriction on transfer.  At Closing, none of the Acquired Assets are owned by any Person other than Company, except for property subject to a valid, unexpired lease.

**Section 4.6**   **Sufficiency of Acquired Assets**. To the Company's Knowledge, the Acquired Assets constitute all of the assets, rights and properties, tangible or intangible, real or personal, that are used or necessary for use in connection with the operation of Company's business as currently conducted. Upon the consummation of the transactions contemplated by this Agreement (and subject to the provisions hereof), when conveyed, Buyer will acquire good and valid title to all of the Acquired Assets, free and clear of any Liens (other than Permitted Encumbrances).

**Section 4.7**   **Not Used.**

**Section 4.8**   **Financial Statements**. Attached hereto as <u>Exhibit B</u> are the following financial statements (collectively the "*Financial Statements*"): (i) audited consolidated and

11

unaudited consolidating balance sheets and statements of income, changes in stockholders' equity and cash flow as of and for the fiscal year ended December 31, 2018 (the "*Most Recent Fiscal Year End*") for Company; and (ii) unaudited consolidated and consolidating year-to-date balance sheets and statements of income, changes in stockholders' equity and cash flow (the "*Most Recent Financial Statements*") as of and for the months ended June 30, 2019 (the "*Most Recent Fiscal Month End*") for Company. The Financial Statements (including the notes thereto) have been prepared in accordance with GAAP throughout the periods covered thereby, present fairly the financial condition of Company as of such dates and the results of operations of Company for such periods, are correct and complete and are consistent with the books and records of Company; *provided*, *however*, that the Most Recent Financial Statements are subject to normal year-end adjustments and lack footnotes and other presentation items.

   **Section 4.9**   **Events Subsequent to Most Recent Fiscal Year End**. Since the Most Recent Fiscal Year End, there has not been any Material Adverse Change.

   **Section 4.10**   **Undisclosed Liabilities**. Company does not have any material Liability (and there is no basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim or demand against any of them giving rise to any Liability), except for (i) Liabilities set forth on the face of the Most Recent Balance Sheet and (ii) Liabilities that have arisen after the Most Recent Fiscal Month End in the Ordinary Course of Business (none of which results from, arises out of, relates to, is in the nature of, or was caused by any breach of contract, breach of warranty, tort, infringement or misappropriation, or violation of law).

   **Section 4.11**   **Compliance with Laws**. Company has complied, and to its knowledge its predecessors and Affiliates have complied, with all applicable laws (including rules, regulations, codes, plans, injunctions, judgments or orders, decrees, rulings and charges thereunder and including the Foreign Corrupt Practices Act, 15 U.S.C. 78dd-1 *et seq.*) of federal, state, local and non-U.S. governments (and all agencies thereof), and no action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand or notice has been filed or commenced against any of them alleging any failure so to comply.

   **Section 4.12**   **Tax Matters**.

    (a)   Company has filed all Tax Returns it was required to file under applicable laws and regulations. All such Tax Returns were correct and complete in all material respects and were prepared in substantial compliance with all applicable laws and regulations. All Taxes due and owing by Company (whether or not shown on any Tax Return) have been paid. Company is not currently the beneficiary of any extension of time within which to file any Tax Return. No claim has ever been made by an authority in a jurisdiction where Company does not file Tax Returns that Company is or may be subject to taxation by that jurisdiction. There are no Liens for Taxes (other than Taxes not yet due and payable) upon any of Company assets.

    (b)   Company has withheld and paid all Taxes required to be withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party.

    (c)   Neither Company or any director or officer (or employee responsible for Tax matters) of Company expects any authority to assess any additional Taxes for any period for which Tax Returns have been filed. No federal, state, local or non-U.S. tax

audits or administrative or judicial Tax proceedings are pending or being conducted with respect to Company. Company has not received from any federal, state, local or non-U.S. taxing authority (including jurisdictions where Company has not filed Tax Returns) any (i) notice indicating an intent to open an audit or other review, (ii) request for information related to Tax matters or (iii) notice of deficiency or proposed adjustment for any amount of Tax proposed, asserted or assessed by any taxing authority against Company. Section 4.12(c) of the Disclosure Schedule lists all federal, state, local and non-U.S. income Tax Returns filed with respect to Company for taxable periods ended on or after December 31, 2015, and indicates those Tax Returns that have been audited and indicates those Tax Returns that currently are the subject of audit. Company has made available to Buyer correct and complete copies of all federal income Tax Returns, examination reports and statements of deficiencies assessed against or agreed to by Company filed or received since December 31, 2015.

(d)     Company has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(e)     Company is not Party to, nor bound by, any Tax allocation or sharing agreement. Company (i) has not been a member of an Affiliated Group filing a consolidated federal income Tax Return (other than a group the common parent of which was Company) and (ii) has no Liability for the Taxes of any Person (other than Company) under Reg. §1.1502-6 (or any similar provision of state, local or non-U.S. law), as a transferee or successor, by contract or otherwise.

(f)     The unpaid Taxes of Company (i) did not, as of the Most Recent Fiscal Month End, exceed the reserve for Tax Liability (rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the Most Recent Balance Sheet (rather than in any notes thereto) and (ii) do not exceed that reserve as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of Company in filing its Tax Returns. Since the date of the Most Recent Balance Sheet, Company has not incurred any Liability for Taxes arising from extraordinary gains or losses, as that term is used in GAAP, outside the Ordinary Course of Business consistent with past custom and practice.

(g)     Company will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting for a taxable period ending on or prior to the Closing Date; (ii) use of an improper method of accounting for a taxable period ending on or prior to the Closing Date; (iii) "closing agreement" as described in Code §7121 (or any corresponding or similar provision of state, local or non-U.S. income Tax law) executed on or prior to the Closing Date; (iv) installment sale or open transaction disposition made on or prior to the Closing Date; (v) prepaid amount received on or prior to the Closing Date; or election under Code §108(i).

(h)     Company has not distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Code §355 or Code §361.

(i)     Company has not been a party to any "reportable transaction," as defined in Code §6707A(c)(1) and Reg. §1.6011-4(b).

(j)     Company (i) is not a "controlled foreign corporation" as defined in Code §957, (ii) is not a "passive foreign investment company" within the meaning of Code §1297 and (iii) does not have a permanent establishment (within the meaning of an applicable Tax treaty) or otherwise has an office or fixed place of business in a country other than the country in which it is organized.

(k)     Company has not received any letter ruling from the Internal Revenue Service (or any comparable ruling from any other taxing authority).

**Section 4.13    <u>Real Property</u>**.

(a)     <u>Section 4.13(a)</u> of the Disclosure Schedule sets forth the address and description of each parcel of Owned Real Property. With respect to each parcel of Owned Real Property:(i) Company has good and marketable indefeasible fee simple title, free and clear of all Liens, except Permitted Encumbrances; (ii)except as set forth in Section 4.13(a) of the Disclosure Schedule, Company has not leased or otherwise granted to any Person the right to use or occupy such Owned Real Property or any portion thereof; and (iii)other than the right of Buyer pursuant to this Agreement, there are no outstanding options, rights of first offer or rights of first refusal to purchase such Owned Real Property or any portion thereof or interest therein.

<u>Section 4.13(a)</u> of the Disclosure Schedule sets forth the address of each parcel of Leased Real Property and a true and complete list of all Leases for each such Leased Real Property (including the date and name of the parties to such Lease document). Company has made available to Buyer a true and complete copy of each such Lease document and in the case of any oral Lease, a written summary of the material terms of such Lease. Except as set forth in Section 4.13(a) of the Disclosure Schedule, with respect to each of the Leases: (i) such Lease is legal, valid, binding, enforceable and in full force and effect; (ii) the transactions contemplated by this Agreement do not require the consent of any other party to such Lease (except for those Leases for which Lease Consents are obtained), will not result in a breach of or default under such Lease and will not otherwise cause such Lease to cease to be legal, valid, binding, enforceable and in full force and effect on identical terms following the Closing; (iii)neither Company nor any other party to the Lease, is in breach of or default under such Lease and no event has occurred or circumstance exists that, with the delivery of notice, the passage of time or both, would constitute such a breach or default or permit the termination, modification or acceleration of rent under such Lease; (iv)Company has not collaterally assigned or granted any other Lien in such Lease or any interest therein; and

(i)     there are no Liens on the estate or interest created by such Lease.

(b)     The Owned Real Property identified in <u>Section 4.13(a)</u> of the Disclosure Schedule and the Leased Real Property identified in Section 4.13(a) of the Disclosure Schedule (collectively, the "*Real Property*"), comprise all of the real property used or

intended to be used in, or otherwise related to, Company's business; and Company is not a party to any agreement or option to purchase any real property or interest therein.

(c)    There is no condemnation, expropriation or other proceeding in eminent domain, pending or threatened, affecting any parcel of Real Property or any portion thereof or interest therein.

(d)    The current use and occupancy of the Real Property and the operation of Company's business as currently conducted thereon do not violate any easement, covenant, condition, restriction or similar provision in any instrument of record or other unrecorded agreement affecting such Real Property (the "*Encumbrance Documents*").

**Section 4.14    Intellectual Property**. Company owns or has the right to access and use (pursuant to a valid and enforceable written license, sublicense, agreement, covenant not to sue or permission set forth on Section 4.13(b) of the Disclosure Schedule) all Intellectual Property necessary or desirable for the operation of Company's business as presently conducted and as presently proposed to be conducted. Each item of Intellectual Property owned, accessed or used by Company immediately prior to the Closing will be owned or available for access and use by Company on identical terms and conditions immediately subsequent to the Closing. Company has taken all necessary and desirable action to maintain and protect each item of Intellectual Property that it owns or uses. To Company's Knowledge, neither Company or any of its businesses as presently conducted, and as presently proposed to be conducted, has or will interfere with, has or will infringe upon, has or will dilute, has or will misappropriate, or otherwise has or will come into conflict with, any Intellectual Property rights of third parties. To Company's Knowledge no third party has interfered with, infringed upon, diluted, misappropriated or otherwise come into conflict with, any of Company's Intellectual Property rights.

**Section 4.15    Tangible Assets**. Company owns or leases all buildings, machinery, equipment and other tangible assets necessary for the conduct of their business as presently conducted and as presently proposed to be conducted. To Company's Knowledge, each such tangible asset is free from defects (patent and latent), has been maintained in accordance with normal industry practice, is in good operating condition and repair (subject to normal wear and tear) and is suitable for the purposes for which it presently is used.

**Section 4.16    Contracts**. Section 4.16 of the Disclosure Schedule lists the following contracts and other agreements to which Company is a party:

(a)    any agreement (or group of related agreements) for the lease of personal property to or from any Person providing for lease payments in excess of $250,000 per annum;

(b)    any agreement (or group of related agreements) for the purchase or sale of raw materials, commodities, supplies, products or other personal property, or for the furnishing or receipt of services, the performance of which will extend over a period of more than 1 year, result in a material loss to Company, or involve consideration in excess of $250,000;

(c)    any agreement concerning a partnership or joint venture;

(d)     any agreement (or group of related agreements) under which it has created, incurred, assumed any Indebtedness for borrowed money, or any capitalized lease obligation, in excess of $250,000 or under which it has imposed a Lien on any of its assets, tangible or intangible;

(e)     any agreement concerning the Company's confidentiality or non-competition obligations;

(f)     any agreement with any of Company Stockholders and their Affiliates (other than Company);

(g)     any profit sharing, stock option, stock purchase, stock appreciation, deferred compensation, severance or other material plan or arrangement for the benefit of its current or former directors, officers and employees;

(h)     any agreement for the employment of any individual on a full-time, part-time, consulting or other basis providing annual compensation in excess of $100,000 or providing material severance benefits;

(i)     any agreement under which it has advanced or loaned any amount to any of its directors, officers and employees outside the Ordinary Course of Business;

(j)     any agreement under which the consequences of a default or termination could have a Material Adverse Effect;

(k)     any settlement, conciliation or similar agreement with any governmental entity or which will require satisfaction of any obligations after the execution date of this Agreement;

(l)     any guarantee for any Liability (including Indebtedness) of any other Person;

(m)     any agreement granting a power of attorney executed on behalf of the Company;

(n)     any Company insurance policy that has coverage in excess of $1,000,000; or

(o)     any other agreement (or group of related agreements) the performance of which involves consideration in excess of $300,000.

Company has made available to Buyer a correct and complete copy of each written agreement (as amended to date) listed in Section 4.16 of the Disclosure Schedule. With respect to each such agreement: (A) the agreement is legal, valid, binding, enforceable and in full force and effect; (B) the agreement will continue to be legal, valid, binding, enforceable and in full force and effect on identical terms following the consummation of the transactions contemplated hereby; (C) to Company's Knowledge, no party is in material breach or default, and no event has occurred that with notice or lapse of time would constitute a material breach or default, or permit termination, modification or acceleration, under the agreement; and (D) to Company's Knowledge, no party has repudiated any material provision of the agreement.

16

Section 4.17    **Litigation**. Section 4.17 of the Disclosure Schedule sets forth each instance in which Company or its officers or directors (in their capacity as such), is or, at any time during the 2 years prior to the date of this Agreement, was (i) subject to any outstanding injunction, judgment, order, decree, ruling or charge or (ii) a party or, to the Company's Knowledge, threatened to be made a party to any action, suit, proceeding, hearing or investigation of, in or before any court or quasi-judicial or administrative agency or before any arbitrator. None of the actions, suits, proceedings, hearings and investigations set forth in Section 4.17 of the Disclosure Schedule could result in any Material Adverse Change. Neither Company nor its directors and officers has any reason to believe that any such action, suit, proceeding, hearing or investigation may be brought or threatened against Company or that there is any basis for the foregoing.

Section 4.18    **Employees**.

(a)    To the Company's Knowledge, no executive, key employee or significant group of employees plans to terminate employment with Company during the next 12 months.  Company is not a party to or bound by any collective bargaining agreement, nor has it experienced any strike or material grievance, claim of unfair labor practices or other collective bargaining dispute within the past 2 years. To the Company's Knowledge there is no organizational effort presently being made or threatened by or on behalf of any labor union with respect to employees of Company and no such effort has occurred within the past 3 years.

(b)    Company has paid all wages, salary, commissions, bonuses, wage supplements, reimbursements, severance and other payments that have come due and payable by it pursuant to applicable law, contract or Company policy. Each individual who is providing or within the past 2 years has provided services to Company and is or was classified as an independent contractor is or was properly classified as such.

Section 4.19    **Employee Benefits**.

(a)    Section 4.19 of the Disclosure Schedule lists each Employee Benefit Plan that Company maintains, to which Company contributes or has any obligation to contribute, or with respect to which Company has any Liability.

(i)    Each such Employee Benefit Plan (and each related trust, insurance contract or fund) has been maintained, funded and administered in accordance with the terms of such Employee Benefit Plan.

(ii)    All contributions (including all employer contributions and employee salary reduction contributions) that are due have been made within the time periods prescribed by ERISA and the Code to each such Employee Benefit Plan that is an Employee Pension Benefit Plan and all contributions for any period ending on or before the Closing Date that are not yet due have been made to each such Employee Pension Benefit Plan or accrued in accordance with Company's past custom and practice. All premiums or other payments for all periods ending on or before the Closing Date have been paid with respect to each such Employee Benefit Plan that is an Employee Welfare Benefit Plan.

(iii)     Each such Employee Benefit Plan that is intended to meet the requirements of a "qualified plan" under Code §401(a) has received a determination or opinion letter from the Internal Revenue Service that such Employee Benefit Plan is so qualified, and nothing has occurred since the date of such determination that could reasonably be expected to adversely affect the qualified status of any such Employee Benefit Plan.

(iv)     There have been no Prohibited Transactions with respect to any such Employee Benefit Plan or any Employee Benefit Plan maintained by an ERISA Affiliate. No Fiduciary has any Liability for material breach of fiduciary duty or any other material failure to act or comply in connection with the administration or investment of the assets of any such Employee Benefit Plan. No action, suit, proceeding, hearing or investigation with respect to the administration or the investment of the assets of any such Employee Benefit Plan (other than routine claims for benefits) is pending or, to the Company's Knowledge, threatened. To the Company's Knowledge, there is no basis for any such action, suit, proceeding, hearing or investigation.

(v)     Company has made available to Buyer correct and complete copies of the plan documents and summary plan descriptions, the most recent determination letter received from the Internal Revenue Service, the most recent annual report (Form 5500, with all applicable attachments), and all related trust agreements, insurance contracts and other funding arrangements that implement each such Employee Benefit Plan.

(b)     Neither Company nor any ERISA Affiliate contributes to, has any obligation to contribute to, or has any Liability under or with respect to any Employee Pension Benefit Plan that is a "defined benefit plan" (as defined in ERISA §3(35)). No Company asset is subject to any Lien under ERISA or the Code.

(c)     Neither Company nor any ERISA Affiliate contributes to, has any obligation to contribute to, or has any Liability (including withdrawal Liability as defined in ERISA §4201) under or with respect to any Multiemployer Plan.

(d)     Company does not maintain, contribute to or have an obligation to contribute to, or have any Liability with respect to, any Employee Welfare Benefit Plan or other arrangement providing health or life insurance or other welfare-type benefits for current or future retired or terminated directors, officers or employees (or any spouse or other dependent thereof) of Company or of any other Person other than in accordance with COBRA.

(e)     The consummation of the transactions contemplated by this Agreement will not accelerate the time of the payment or vesting of, or increase the amount of, or result in the forfeiture of compensation or benefits under, any Employee Benefit Plan.

(f)     Section 4.19(e) of the Disclosure Schedule lists each agreement, contract, plan or other arrangement—whether or not written and whether or not an Employee Benefit Plan (collectively a "*Plan*")—to which Company is a party that is a "nonqualified deferred compensation plan" subject to Code §409A.  No amounts under any such Plan is or has been subject to the interest and additional tax set forth under Code

18

§409A(a)(1)(B). Company does not have any actual or potential obligation to reimburse or otherwise "gross-up" any Person for the interest or additional tax set forth under Code §409A(a)(1)(B).

**Section 4.20    Environmental, Health and Safety Matters**.

(a)    Neither Company nor its predecessors or Affiliates has received any notice, report order, directive, or other information regarding any actual or alleged material violation of Environmental, Health and Safety Requirements, or any Liabilities, including any material investigatory, remedial or corrective obligations, relating to any of them, their business or their past or current facilities arising under Environmental, Health and Safety Requirements.

(b)    Neither Company, nor its predecessors or Affiliates has treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled, manufactured, distributed, exposed any person to, or released any substance, including without limitation any hazardous substance, or owned or operated any property or facility which is or has been contaminated by any such substance so as to give rise to any current or future material Liabilities, including any material Liability for fines, penalties, response costs, corrective action costs, personal injury, property damage, natural resources damages or attorneys' fees, pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, the Solid Waste Disposal Act, as amended, or any other Environmental, Health and Safety Requirements.

**Section 4.21    IT Assets**.

(a)    Without limiting the generality of any representation or warranty herein, the Company has used its best efforts to ensure that (A) none of the computer software, computer hardware (whether general or special purpose), telecommunications capabilities (including all voice, data and video networks) and other similar or related items of automated, computerized and/or software systems and any other networks or systems and related services that are used by or relied on by Company in the conduct of its business (collectively, the "*IT Systems*") have experienced bugs, failures, breakdowns or continued substandard performance and is not aware of any such bugs, failures, break downs or continued substandard performance that have occurred in the past 12 months that has caused any substantial disruption or interruption in or to the use of any IT Systems or data by Company; and (B) the IT Systems are sufficient for the needs of Company's businesses of Company, including as to capacity, scalability and ability to process current and anticipated peak volumes in a timely manner.

(b)    Company has taken reasonable steps to safeguard the IT Systems, including the implementation of procedures to ensure that the IT Systems are free from any malicious or disabling codes or instructions, timer, copy protection device, clock, counter or other limiting design or routing and any "back door," "time bomb," "Trojan horse," "worm," "drop dead device," "virus," documentation error or corrupt code, malware, "spyware," or other software routines or hardware components that in each case could permit unauthorized access to, or the unauthorized disablement or unauthorized erasure of, any of the IT Systems, data or other software by a third party, and to date there have been no successful unauthorized intrusions or breaches of the IT Systems.

**Section 4.22** **Affiliate Transactions**. To the extent any of Company's Affiliates, directors, officers, employees, shareholders or Company's subsidiaries' directors, officers, employees and shareholders (a) has been involved in any business arrangement or relationship with Company or any of its subsidiaries within the past 12 months or (b) owns any asset, tangible or intangible, that is used in the business of Company, (i) details regarding such involvement or ownership is provided on Section 4.22 of the disclosure schedule and (ii) such Affiliate transaction (if any) has been approved by Company.

**Section 4.23** **Disclaimer of Other Representations and Warranties**. Buyer, on its own behalf and on behalf of its Affiliates, acknowledges, represents, warrants, and agrees that (i) Company makes no representation or warranty, express or implied and (ii) Buyer has not relied upon the accuracy or completeness of any express or implied representation, warranty, statement, or information of any nature made or provided by any Person, in each case other than the representations and warranties expressly set forth in this Article IV; *provided*, *however*, that nothing contained herein or elsewhere in this Agreement will limit any remedy *Buyer* may have for fraud by Company, or any of its respective officers, directors, employees, agents, or representatives, whether or not relating to a representation made in a written agreement among the Parties.

## ARTICLE V
## Pre-Closing Covenants

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing:

**Section 5.1** **General**. Each of the Parties will use its best efforts to take all actions and to do all things necessary, proper or advisable in order to consummate and make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the Closing conditions set forth in Article VII below).

**Section 5.2** **Notices and Consents**. Company will use its best efforts to obtain any third-party consents referred to in Section 4.3 above, the Lease Consents and the items set forth on Section 5.2 of the Disclosure Schedule. Each of the Parties will give any notices to, make any filings with and use its best efforts to obtain any authorizations, consents and approvals of governments and governmental agencies in connection with the matters referred to in Section 3.2 and Section 4.3 above.

**Section 5.3** **Operation of Business**. Prior to the Closing, the Company's member shall conduct their business and operations only in the ordinary course and consistent with historical practice. Without limiting the generality of the foregoing, the business shall not, without Buyer's prior written consent, (a) incur any material liability or obligation, other than those in the Ordinary Course of Business; (b) incur any indebtedness for borrowed money (except for capital expenditures in the normal course of business); (c) make any loans or advances other than in the ordinary and usual course of business; (d) materially increase the annual level of compensation with any senior executive, manager, shareholder, employee or contractor, or grant any unusual or extraordinary bonuses, benefits or other forms of compensation to any such persons, except in amounts keeping with past practices; (e) transfer any of its assets or properties, except in the ordinary and usual course of business; and (f) make any investment of a capital nature, other than capital expenditures relating to operations that are made in the ordinary and usual course of business; acquire or commit to

20

acquire any material assets; or enter into any contract, agreement or commitment that is material to the business, its assets, properties or financial position. Furthermore, the Company shall cause the business to stay in good standing with its customers, vendors, trade creditors and lenders and to maintain its productive assets in good working order.

Section 5.4    **Preservation of Business**. Company will keep its business and properties substantially intact, including its present operations, physical facilities, working conditions, insurance policies and relationships with lessors, licensors, suppliers, customers and employees.

Section 5.5    **Full Access**.  From the date of this Agreement through the earlier of the Closing or the termination of this Agreement in accordance with its terms, Company shall during ordinary business hours, upon reasonable notice, as deemed necessary by Buyer in its sole discretion: (a) give Buyer and its representatives reasonable access to the books, records, offices for the purposes of conducting due diligence with respect to the transactions contemplated hereby, (b) permit Buyer to make reasonable inspections thereof as it may reasonably request and provide Buyer with access to billing, vendor purchase, employee and other information reasonably necessary to evaluate the business and operations of the business, and (c) furnish Buyer with such other financial and operating data and other information with respect to the business as it may from time to time reasonably request; *provided*, *however*, that any such access shall be conducted in such a manner so as not to interfere unreasonably with the operation of the business and shall be at the expense of Buyer.

Section 5.6    **Notice of Developments**. Each Party will give prompt written notice to the others of any Material Adverse Effect or a breach of any of its own representations and warranties in Article III or Article IV above, as applicable. No disclosure by any Party pursuant to this Section 5.6, however, shall be deemed to amend or supplement Annex I or the Disclosure Schedule or to prevent or cure any misrepresentation, breach of warranty or breach of covenant.

Section 5.7    **Exclusivity**. Through and until August 24, 2019 (30 days from the execution of the LOI), Company will not (i) solicit, initiate or encourage the submission of any proposal or offer from any Person relating to the acquisition of any debt or equity securities or other voting securities, or any substantial portion of Company's assets (including any acquisition structured as a merger, consolidation or share exchange) or (ii) participate in any discussions or negotiations regarding, furnish any information with respect to, assist or participate in or facilitate in any other manner any effort or attempt by any Person to do or seek any of the foregoing. Company will notify Buyer immediately if any Person other than Buyer makes any proposal, offer, inquiry or contact with respect to any of the foregoing.

**ARTICLE VI**
**Post-Closing Covenants**

The Parties agree as follows with respect to the period following the Closing:

Section 6.1    **General**. In case at any time after the Closing any further actions are necessary or desirable to carry out the purposes of this Agreement, each of the Parties will take such further actions (including the execution and delivery of such further instruments and documents) as any other Party may reasonably request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefor under Article VIII below). Company acknowledges and agrees that, from and after the Closing, Buyer will be

entitled to possession of all documents, books, records (including Tax records), agreements and financial data of any sort relating to the Acquired Assets.

**Section 6.2     Transition**. Company will not take any action that is designed or intended to have the effect of discouraging any lessor, licensor, customer, supplier or other business associate of Company from maintaining the same business relationships with Company after the Closing as it maintained with Company prior to the Closing. Company will refer all customer inquiries relating to the Acquired Assets or any business of Company related thereto to Buyer from and after the Closing. The Parties acknowledge that Buyer intends to retain certain non-SG&A employees as well as selected SG&A employees and integrate the Company's operations into Buyer's existing operational, finance, HR, IT and marketing leadership. In the event that following the Closing Date, Company or any of its Affiliates receives any monies constituting Acquired Assets, Company shall promptly endorse or pay such amounts over to Buyer in accordance with the terms of the TSA, unless otherwise agreed to in writing by the Buyer. In the event that, following the Closing, Buyer or Company discovers that a contract (or applicable contractual rights) that would have been deemed an Acquired Asset pursuant to the terms of this Agreement, then, subject to any required consents or notice periods, Company and Buyer shall cooperate in good faith to assign, transfer and convey such contract (or applicable contractual rights) to Buyer.

**Section 6.3     Confidentiality**. Each Party will, using the same degree of care with which they treats their own Confidential Information (but not less than a reasonable standard of care), treat and hold as such all of the Confidential Information of the other Party, refrain from using any of the Confidential Information of the other Party except in connection with this Agreement and deliver promptly to such other Party or destroy all tangible embodiments (and all copies) of the Confidential Information that are in its possession; *provided*, that Buyer may use any Confidential Information pertaining to the Acquired Assets or the Assumed Liabilities as is commercially expedient following the Closing. If Company is, on the advice of counsel, compelled to disclose any Confidential Information to any tribunal or else stand liable for contempt, such Confidential Information may be disclosed to the tribunal; *provided*, *however*, that the disclosing entity shall use its best efforts to obtain, at the request of Buyer, an order or other assurance that confidential treatment will be accorded to such portion of the Confidential Information required to be disclosed as Buyer shall designate.

**ARTICLE VII**
**Conditions to Obligation to Close**

**Section 7.1     Conditions to Buyer's Obligation**. Buyer's obligation to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction (or waiver by the Buyer) of the following conditions:

(a)     final approval by Buyer's board of directors;

(b)     the contemporaneous execution of the Transaction Documents, in a form acceptable to Buyer and its legal counsel, and the consummation of the transactions contemplated thereby;

(c)     Buyer's satisfaction with the results of its continuing business, legal, environmental and accounting due diligence regarding Company and the Acquired Assets, determined in Buyer's sole discretion;

(d)      delivery by Company of the Most Recent Financial Statements for the Company through the Most Recent Fiscal Months End, as well as an unaudited consolidated and consolidating year-to-date balance sheet as of the Closing Date;

(e)      Company's last twelve (12) months pro forma adjusted EBIDTA for the quarter ending June 30, 2019 shall equal at least $4,800,000 and Company shall have delivered satisfactory evidence of such to Buyers;

(f)      all Acquired Assets shall be free and clear of any Liens;

(g)      the representations and warranties set forth in Article IV above shall be true and correct in all material respects at and as of the Closing Date, except to the extent that such representations and warranties are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case such representations and warranties (as so written, including the term "material" or "Material") shall be true and correct in all respects at and as of the Closing Date;

(h)      Company and Company Stockholders shall have performed and complied with all of their covenants hereunder in all material respects through the Closing, except to the extent that such covenants are qualified by the term "material," in which case Company shall have performed and complied with all of such covenants (as so written, including the term "material" or "Material") in all respects through the Closing;

(i)      no Material Adverse Effect shall have occurred and there shall not have been any event, occurrence, fact, circumstance condition or change that would have or be reasonably likely to have a Material Adverse Effect;

(j)      Company shall have delivered to Buyer a certificate to the effect that each of the conditions specified above in Section 7.1(d)-(i) is satisfied in all respects;

(k)      Company will procure all of the third-party consents specified in Section 5.2 above or evidence reasonably satisfactory to Buyer that such assignments are in process;

(l)      the Parties will use best efforts to receive all authorizations, consents and approvals of governments and governmental agencies referred to in Section 3.2 and Section 4.3 above;

(m)      Company shall have delivered Restrictive Covenant Agreements in a form and substance reasonably acceptable to Buyer executed by the Company Stockholders and Company managers identified in Section 7.1(m) of the Disclosure Schedule.

Buyer may waive any condition specified in this Section 7.1 if it executes a writing so stating at or prior to the Closing.

**Section 7.2      Conditions to Company's Obligation**. The obligation of Company to consummate the transactions to be performed by them in connection with the Closing is subject to satisfaction (or waiver by Company) of the following conditions:

(a)      contemporaneous execution of the Transaction Documents in a form acceptable to Company and its legal counsel;

(b)      the representations and warranties set forth in Article IV above shall be true and correct in all material respects at and as of the Closing Date, the except to the extent that such representations and warranties are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case such representations and warranties (as so written, including the term "material" or "Material") shall be true and correct in all respects at and as of the Closing Date;

(c)      Buyer shall have performed and complied with all of its covenants hereunder in all material respects through the Closing, except to the extent that such covenants are qualified by the term "material," in which case Buyer shall have performed and complied with all of such covenants (as so written, including the term "material" or "Material") in all respects through the Closing;

(d)      Buyer shall have delivered to Company a certificate to the effect that it has used its best efforts to satisfy each of the conditions specified above in Section 7.2(b)-Section 7.1(c) in all respects; and

(e)      the Parties will use best efforts to receive all authorizations, consents and approvals of governments and governmental agencies referred to in Section 3.2 and Section 4.2 above.

Company may waive any condition specified in this Section 7.2  if it executes a writing so stating at or prior to the Closing.

## ARTICLE VIII
## Remedies for Breaches of This Agreement

**Section 8.1      Survival of Representations and Warranties**. The Parties agree that, except as provided in the following sentence, all of the representations and warranties of the Company contained in Article IV above shall survive the Closing hereunder (even if Buyer knew or had reason to know of any misrepresentation or breach of warranty at the time of Closing) and shall expire on the date that is the 18-month anniversary of the Closing Date, subject to Section 8.2. The representations and warranties of the Parties contained in Section 4.1 (*Organization, Qualification* and *Corporate Power*), Section 4.2 (*Authorization of Transaction*), Section 4.3 (*Non-Contravention*), Section 4.4 (*Brokers' Fees*), Section 4.5 (*Title to Assets*), Section 4.12 (*Tax Matters*), Section 4.13 (*Real Property*), Section 4.17 (*Employees*), Section 4.20 (*Environmental Health and Safety*) and Section 4.22 (*Affiliate Transactions*) above (collectively, the "*Fundamental Representations*") shall survive the Closing (even if the damaged Party knew or had reason to know of any misrepresentation or breach of warranty at the time of Closing) and continue in full force and effect for the maximum period for bringing a breach of contract claim permitted under the statute of limitations of the jurisdiction specified in Section 10.7.

**Section 8.2      Indemnification Provisions for Buyer's Benefit**.

(a)      In the event the Company breaches (or in the event any third party alleges facts that, if true, would mean the Company breached) any of its representations, warranties contained in Article IV (other than Fundamental Representations) and,

provided that Buyer makes a written claim for indemnification against the Company before expiration of the applicable survival period set forth in Section 8.1 above, then such survival period shall not expire with respect to such claim and the Company shall be obligated to indemnify Buyer from and against any Adverse Consequences that Buyer may suffer (including any Adverse Consequences Buyer may suffer after the end of any applicable survival period) resulting from, arising out of, relating to, in the nature of or caused by the breach (or the alleged breach) up to a maximum amount of $5,000,000, and any applicable statute of limitations period on filing a lawsuit with respect to such claim shall be tolled such that the applicable statute of limitations period shall not expire until 1 year after the later of (i) the date of Buyer's written claim for indemnification and (ii) the expiration of the applicable survival period set forth in Section 8.1 above; *provided*, *however*, that the Company shall not have any obligation to indemnify Buyer from and against any Adverse Consequences resulting from, arising out of, relating to, in the nature of or caused by the breach (or alleged breach) of any representation or warranty of the Company pursuant to this Section 8.2(a) until Buyer has suffered Adverse Consequences by reason of all such breaches (or alleged breaches) in excess of a $100,000 aggregate threshold (at which point the Company will be obligated to indemnify Buyer from and against all such Adverse Consequences relating back to the first dollar).

(b)     In the event the Company breaches (or in the event any third party alleges facts that, if true, would mean the Company breached) any of its covenants or any Fundamental Representations, and provided that Buyer makes a written claim for indemnification against the Company before expiration of the applicable survival period set forth in Section 8.1 above, then such survival period shall not expire with respect to such claim and the Company shall indemnify Buyer from and against any Adverse Consequences Buyer may suffer (including any Adverse Consequences Buyer may suffer after the end of any applicable survival period) resulting from arising out of, relating to, in the nature of or caused by the breach (or the alleged breach), from the first dollar of such Adverse Consequences suffered, up to a maximum amount of one hundred percent (100%) of the Purchase Price, and any applicable statute of limitations period on filing a lawsuit with respect to such claim shall be tolled such that the applicable statute of limitations period shall not expire until 1 year after the later of (i) the date of Buyer's written claim for indemnification and (ii) the expiration of the applicable survival period set forth in Section 8.1 above.

(c)     Notwithstanding anything to the contrary contained in this Agreement, in the event the Company breaches any of its representations, warranties or covenants contained herein and such breach arises out of or is caused by the Company's fraudulent, intentional or willful act, then (i) such breach shall survive the Closing for the applicable statute of limitations period and (ii) the Company's obligation to indemnify Buyer from and against any Adverse Consequences resulting from, arising out of, relating to, in the nature of, or caused by such breach shall (A) be limited to 100% of the Purchase Price and (B) shall not be subject to any deductible or tipping basket.

(d)     *Tax Indemnification.* The following provisions shall govern the allocation of responsibility as between the Parties for certain tax matters following the Closing Date:

(i)      Company shall jointly and severally indemnify each of its subsidiaries, Buyer and each of Buyer's Affiliates and hold them harmless from and against without duplication, any loss, claim, Liability, expense or other damage attributable to (i) all Taxes (or the non-payment thereof) of Company and its Subsidiaries for all taxable periods ending on or before the Closing Date and the portion through the end of the Closing Date for any taxable period that includes (but does not end on) the Closing Date *("Pre-Closing Tax Period"*), (ii) all Taxes of any member of an affiliated, consolidated, combined or unitary group of which Company or any of its subsidiaries (or any predecessor of any of the foregoing) is or was a member on or prior to the Closing Date, including pursuant to Treasury Regulation §1.1502-6 or any analogous or similar state, local or non-U.S. law or regulation and (iii) any and all Taxes of any person (other than Company and its subsidiaries) imposed on Company or any of its subsidiaries as a transferee or successor, by contract or pursuant to any law, rule or regulation, which Taxes relate to an event or transaction occurring before the Closing.

(ii)      All transfer, documentary, sales, use, stamp, registration and other such Taxes and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with consummation of the transactions contemplated by this Agreement shall be paid by Company when due and Company will, at its own expense, file all necessary Tax Returns and other documentation with respect to all such Taxes, fees and charges and, if required by applicable law, as necessary, Buyer will and will cause its Affiliates to, join in the execution of any such Tax Returns and other documentation.

**Section 8.3**    **Indemnification Provisions for Company's Benefit**. In the event Buyer breaches (or in the event any third party alleges facts that, if true, would mean Buyer has breached) any of its representations, warranties, and covenants contained herein and, provided that Company makes a written claim for indemnification against Buyer within such survival period (if there is an applicable survival period pursuant to Section 8.1 above), then Buyer shall indemnify Company from and against the entirety of any Adverse Consequences suffered (including any Adverse Consequences suffered after the end of any applicable survival period) resulting from, arising out of, relating to, in the nature of or caused by the breach (or the alleged breach).

**Section 8.4**    **Matters Involving Third Parties**.  If any third party notifies any Party (the "*Indemnified Party*") with respect to any matter (a "*Third-Party Claim*") that may give rise to a claim for indemnification against any other Party (the "*Indemnifying Party*") under this Article VIII, then the Indemnified Party shall promptly notify each Indemnifying Party thereof in writing; *provided*, *however*, that no delay on the part of the Indemnified Party in notifying any Indemnifying Party shall relieve the Indemnifying Party from any obligation hereunder unless (and then solely to the extent) the Indemnifying Party is thereby prejudiced.

**Section 8.5**    **Not Used** .

**Section 8.6**    **Recoupment Against Post-Closing Payments**. Any indemnification to which Buyer is entitled under this Agreement as a result of any Adverse Consequences it may suffer shall first be made as a reduction of the Post-Closing Earnout Payment Amount payable by Buyer in accordance with Section 2.4 hereof until the Post-Closing Earnout Payment Amount

is reduced to zero ($0), and thereafter payable by wire transfer of immediately available funds by Company to Buyer.

**Section 8.7**    **Intentionally Omitted**.

**Section 8.8**    **Purchase Price Adjustment**. Notwithstanding anything to the contrary herein, Company shall not be obligated to indemnify Buyer against any Adverse Consequences as a result of or based upon or arising from, any claim or Liability to the extent such claim or Liability is taken into account in determining the Purchase Price pursuant to Section 2.7 above.

## ARTICLE IX
### Termination

**Section 9.1**    **Termination of Agreement**. The Parties may terminate this Agreement as provided below:

(a)    the Parties may terminate this Agreement by mutual written consent at any time prior to the Closing;

(b)    Either Party may terminate this Agreement by giving written notice to the other Party at any time prior to the Closing in the event such other Party has breached any material representation, warranty or covenant contained in this Agreement in any material respect, such breaching Party received notice of the breach, and the breach continued without cure for a period of 15 days after the notice of breach, by reason of the failure of any condition precedent under Section 7.1 hereof (unless the failure results primarily from the terminating party itself breaching any representation, warranty or covenant contained in this Agreement).

**Section 9.2**    **Effect of Termination**. If any Party terminates this Agreement pursuant to Section 9.1 above, all rights and obligations of the Parties hereunder shall terminate without any Liability of any Party to any other Party (except for any Liability of any Party then in breach).

## ARTICLE X
### Miscellaneous

**Section 10.1**    **Press Releases and Public Announcements**. No Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement without the prior written approval of Buyer; *provided*, *however*, that any Party may make any public disclosure it believes in good faith is required by applicable law (in which case the disclosing Party will use its reasonable best efforts to advise the other Parties prior to making the disclosure).

**Section 10.2**    **No Third-Party Beneficiaries**. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

**Section 10.3**    **Entire Agreement**. This Agreement (including the documents referred to herein) constitutes the entire agreement among the Parties and supersedes any prior

understandings, agreements or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

**Section 10.4    Succession and Assignment**. This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the Parties; *provided*, *however*, that Buyer may (i) assign any or all of its rights and interests hereunder to one or more of its Affiliates and (ii) designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases under (i) or (ii) Buyer nonetheless shall remain responsible for the performance of all of its obligations hereunder).

**Section 10.5    Counterparts**. This Agreement may be executed in one or more counterparts (including by means of facsimile), each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

**Section 10.6    Notices**. All notices, requests, demands, claims and other communications hereunder shall be in writing. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) one (1) business day after being sent to the recipient by reputable overnight courier service (charges prepaid), (iii) one (1) business day after being sent to the recipient by facsimile transmission or electronic mail or (iv) 4 business days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid and addressed to the intended recipient as set forth below:

    (a)    To Company prior to the Closing:

        Genesis Networks Telecom Services, LLC
        1354 N Loop 1604 E, Suite 103
        San Antonio, Texas 78232
        Attention: Anthony Fetter
        Email: anthony.fetter@genesisnet.com

    (b)    To Buyer or Company after the Closing:

        Goodman Networks
        2801 Network Blvd, suite 300
        Frisco, TX  75235
        Attention: Anthony Rao
        Email: arao@goodmannetworks.com

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

**Section 10.7    Governing Law; Jurisdiction; Waiver of Jury Trial**.

    (a)    This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Texas without giving effect to any choice or conflict of

28

law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Texas.

(b)     Each of the Parties submits to the jurisdiction of any state or federal court sitting in Texas, in any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of the action or proceeding may be heard and determined in any such court. Each of the Parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto. Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in <u>Section 10.6</u> above.

(c)     **EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).**

**Section 10.8    <u>Amendments and Waivers</u>**. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the Parties.  No waiver by any Party of any provision of this Agreement or any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such default, misrepresentation or breach of warranty or covenant.

**Section 10.9    <u>Severability</u>**. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

**Section 10.10 <u>Expenses</u>**. Each of Buyer and Company shall bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

**Section 10.11 <u>Construction</u>**. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local or non-U.S. statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation.

**Section 10.12 <u>Tax Matters</u>**.

(a)     *Cooperation on Tax Matters.*

(i)    Company shall cooperate fully, as and to the extent reasonably requested by the Buyer, in connection with any audit, litigation or other proceeding with respect to Taxes to the extent related to the transactions contemplated hereby. Such cooperation shall include the retention and (upon the Buyer's request) the provision of records and information that are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  Company agrees (A) to retain all books and records with respect to Tax matters pertinent to the Acquired Assets relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by Buyer, any extensions thereof) of the respective taxable periods and to abide by all record retention agreements entered into with any taxing authority and (B) to give the Buyer reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the Buyer so requests, Company shall allow the Buyer to take possession of such books and records.

(ii)    Buyer and the Company further agree, upon request, to use their best efforts to obtain any certificate or other document from any governmental authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including, but not limited to, with respect to the transactions contemplated hereby).

**Section 10.13  Employee Benefits Matters**.    Buyer shall make an offer of employment to each Employee as it determines in its sole discretion and any such offer of employment shall be made on terms and conditions determined in the sole discretion of Buyer.  Each such Employee who accepts such offer of employment and commences such employment is referred to herein as a "Transferred Employee".  Effective as of the Closing Date, the Transferred Employees shall cease active participation in and accrual of benefits under the Employee Benefit Plans.  Each Transferred Employee shall receive credit for service with Company and its predecessors under such employee benefit plans and arrangements (other than equity or equity-based plans or arrangements) of Buyer and its Affiliates in which the Transferred Employees may participate during the calendar year in which the Closing Date occurs (each, a "Buyer Plan") for purposes of eligibility and vesting to the same extent and for the same purpose for which such Transferred Employee was credited service under the Employee Benefit Plans; provided, however, that in no event shall such credit result in the duplication of benefits or compensation or the funding thereof.  Buyer shall assume all Assumed PTO, except to the extent such amount is required to be paid to employees by the Company in accordance with law, and Company shall assume, retain, and shall be solely responsible for, and shall indemnify and hold harmless Buyer and its Affiliates against, any and all Liabilities relating to or at any time arising under or in connection with any Employee Benefit Plan and any other compensation or benefit plan, program, agreement, policy or arrangement of any kind at any time maintained, sponsored or contributed to or required to be contributed to by Company or any of its Affiliates or under or with respect to which Company or any of its Affiliates has any Liability.  Nothing contained in this Section 10.13 (whether express or implied) shall (i) create or confer any rights, remedies or claims upon any employee of Company or any right of employment or engagement or continued employment or engagement or any particular term or condition of employment or engagement for any Transferred Employee or any other Person, (ii) be considered or deemed to establish, amend, or modify any Employee Benefit Plan, Buyer Plan, or any other benefit or compensation

plan, program, policy, agreement, arrangement, or contract, (iii) prohibit or limit the ability of Buyer or any of its Affiliates to amend, modify or terminate any benefit or compensation plan, program, policy, agreement, arrangement, or contract at any time assumed, established, sponsored or maintained by any of them or (iv) confer any rights or benefits (including any third-party beneficiary rights) on any Person other than the parties to this Agreement.

**Section 10.14  <u>Specific Performance</u>**. Each Party acknowledges and agrees that the other Parties would be damaged irreparably in the event any provision of this Agreement is not performed in accordance with its specific terms or otherwise is breached, so that a Party shall be entitled to injunctive relief to prevent breaches of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in addition to any other remedy to which such Party may be entitled, at law or in equity. In particular, the Parties acknowledge that the business of Company is unique and recognize and affirm that in the event Company breaches this Agreement, money damages would be inadequate and Buyer would have no adequate remedy at law, so that Buyer shall have the right, in addition to any other rights and remedies existing in its favor, to enforce its rights and the other Parties' obligations hereunder not only by action for damages but also by action for specific performance, injunctive and/or other equitable relief.

* * * * *

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**BUYER**:

GOODMAN NETWORKS, INC.

By: _____
Name: John Goodman
Title: Chief Executive Officer

**THE COMPANY**:

GENESIS NETWORKS TELECOM SERVICES,
LLC D.B.A. GENESIS-ATC

By: _____
Name: James Goodman
Title: Chief Executive Officer

# EXHIBIT A

## Net Working Capital Accounts

The Acquired Assets and Assumed Liabilities listed in the balance sheet accounts below will be utilized to determine the Net Working Capital calculation.

Current Assets
  Accounts Receivable
    300-1100-000 Genesis Telecom-Accounts Receivable-
    300-1100-999 Genesis Telecom-Accounts Receivable-Allocation Acc
    300-1102-000 Genesis Telecom-AR Contra Account-
    100-1110-520 Genesis Telecom-Due from-ATCLE
    326-1110-520 Genesis Telecom Accessory Pkg-Intercompany Receiva
    300-1100-710 Genesis Telecom-Accounts Receivable-Cisco
    300-1100-720 Genesis Telecom-Accounts Receivable-STB
    325-1100-000 Genesis Telecom RLS-Accounts Receivable-
    300-1100-730 Genesis Telecom-Accounts Receivable-Ciena
    300-1105-000 Genesis Telecom-Allowance for Uncollectibles-
    300-1110-516 Genesis Telecom-Intercompany Receivable-GNGS Goo
    100-1111-520 Genesis Telecom-Intercompany Receivable-ATCLE
    100-1666-000 Genesis Telecom-Balance Sheet Clean-Up-
    *Total Accounts Receivable*

  Other Current Assets
    Inventories:
    300-1300-000 Genesis Telecom-Inventories-
    300-1300-713 Genesis Telecom-Inventories-Technicolor
    300-1300-714 Genesis Telecom-Inventories-WNC
    300-1300-720 Genesis Telecom-Inventories-Arris STB
    300-1300-725 Genesis Telecom-Inventories-Arris STB/DTV
    300-1300-746 Genesis Telecom-Inventories-Fiber Raceway
    300-1300-712 Genesis Telecom-Inventories-Humax
    399-1300-720 Genesis Telecom VAR Consign-Inventories-Arris STB
    300-1300-710 Genesis Telecom-Inventories-Cisco
    300-1300-724 Genesis Telecom-Inventories-Google
    *Total Inventories*

    Unbilled Receivables    :
    300-1115-000 Genesis Telecom-Unbilled Receivables-
    320-1115-737 Genesis Telecom Field-Unbilled Receivables-Pilot P
    300-1116-000 Genesis Telecom-Accounts Receivable - Other
    310-1115-000 Genesis Telecom VAR Sales-Unbilled Receivables-
    320-1115-000 Genesis Telecom Field-Unbilled Receivables-
    *Total Unbilled Receivables*

    Other Current Assets
    100-1570-000 Genesis Telecom-Prepaid Expenses-
    325-1350-000 Genesis Telecom RLS-Project WIP/Billing-
    300-1350-000 Genesis Telecom-Project WIP/Billing-
    *Total Other Current Assets*

*Total Current Assets*

Current Liabilities
  Accounts Payable:
    100-2000-000 Genesis Telecom-Accounts Payable-
    300-2000-000 Genesis Telecom-Accounts Payable-
    326-2000-520 Genesis Telecom Accessory Pkg-Accounts Payable-AT(
    326-2010-520 Genesis Telecom Accessory Pkg- Payable
    Total Accounts Payable

  Accrued Purchases:
    300-2020-000 Genesis Telecom-Received Not Invoiced-
    300-2020-712 Genesis Telecom-Received Not Invoiced-Humax
    300-2020-713 Genesis Telecom-Received Not Invoiced-Technicolor
    300-2020-714 Genesis Telecom-Received Not Invoiced-WNC
    300-2020-725 Genesis Telecom-Received Not Invoiced-Arris STB/DT
    300-2020-730 Genesis Telecom-Received Not Invoiced-Ciena
    399-2020-743 Genesis Telecom VAR Consign-Received Not Invoi-Net
    399-2020-720 Telecom VAR Consig-Received Not Inv-Arris STB
    300-2020-744 Genesis Telecom-Received Not Invoiced-Pace DSL
    *Total Accrued Purchases*

  Other Accrued Expenses:
    100-2025-000 Genesis Telecom-Other Accrued Expense-
    100-2025-713 Genesis Telecom-Other Accrued Expe-Technicolor
    Total Other Accrued Expenses

  Accrued Insurance:
    300-2025-720 Genesis Telecom-Other Accrued Expense-Arris STB
    300-1305-000 Genesis Telecom-Inventory Reserve-
    *Total Telecom-Other Accrued Expense-Motorola*

  Other Current Liabilities
    100-2253-000 Genesis Telecom-CA PTO Accrual-
    300-2410-000 Genesis Telecom-Sub Contractor Accrued Expense-
    *Total Other Current Liabilities*

*Total Current Liabilities*

**EXHIBIT B**

**Financial Statements**

Previously provided in Data room.

# EXHIBIT 2

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "Agreement") is made and entered into as of September 14, 2019, by and between Goodman Networks Incorporated, a Texas corporation ("Assignor"), and GNET ATC, LLC, a Texas limited liability company and a wholly-owned subsidiary of Assignor ("Assignee"). Each of Assignor and Assignee are referred to herein individually as a "Party" and collectively as the "Parties." Any capitalized terms used but not otherwise defined in this Agreement shall have the respective meanings ascribed to such terms in the Purchase Agreement (defined below).

## W I T N E S S E T H :

**WHEREAS**, Assignor is a party to the Asset Purchase Agreement, by and between the Assignor and Genesis Networks Telecom Services, LLC D.B.A. Genesis-ATC, a Texas limited liability company ("Genesis"), dated as of September 14, 2019 (the "Purchase Agreement");

**WHEREAS**, Assignor may assign the Purchase Agreement to Assignee, as an Affiliate of Assignor, pursuant to Section 10.04 of the Purchase Agreement; and

**WHEREAS**, Assignor desires to assign to Assignee, and Assignee desires to assume, all right, title, interest and obligations under the Purchase Agreement on the terms and conditions provided herein.

**NOW, THEREFORE**, the Parties hereby agree as follows:

1.    <u>Assignment of the Purchase Agreement</u>.  Assignor hereby assigns, transfers and conveys to Assignee, and Assignee hereby accepts all of Assignor's right, title and interest in and under the Purchase Agreement, and Assignee hereby assumes all of Assignor's liabilities, duties and obligations with respect to the Purchase Agreement (the "Assignment").

2.    <u>References</u>.  Any reference in the Purchase Agreement to "the Buyer" shall hereafter be deemed to refer to Assignee.

3.    <u>Successors</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

4.    <u>Counterparts</u>.  This Agreement may be (a) executed in counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument, and (b) by telecopy or other electronic signature (which shall be deemed an original for all purposes).

5.    <u>Entire Agreement</u>.  This Agreement and the agreements contemplated hereby constitute the full and entire understanding and agreement between the Parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the Parties is expressly canceled.

6.    <u>GOVERNING LAW</u>.  This Agreement shall be interpreted and construed in accordance with the laws of the State of Texas and any and all claims, controversies and causes of action arising out of or relating to this Agreement, whether sounding in contract, tort or statute, shall be governed by the laws of the State of Texas, including its statutes of limitations, without giving effect to any conflict of law or other rule that would result in the application of the laws of a different jurisdiction.

*[Remainder of page intentionally left blank.  Signature page follows.]*

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first written above.

**GOODMAN NETWORKS INCORPORATED**

By: _____

Name:

Title:

**GNET ATC, LLC**

By: _____

Name:

Title:

# EXHIBIT 3

# EXHIBIT A

## Master Services Agreement

# MASTER SERVICES AGREEMENT

THIS MASTER SERVICES AGREEMENT (this "Agreement"), dated as of January 20, 2014 (the "Effective Date"), is entered into by and between ATC Logistics & Electronics, Inc., a Delaware corporation, with its principal place of business at 13500 Independence Parkway Fort Worth, Texas 76177 ("Customer"), and Genesis Networks Telecom Services, LLC, a Texas limited liability company, with its principal place of business in the United States at 600 N Loop 1604, E, San Antonio, TX 78232 ("GENESIS") collectively referred to herein as the "Parties" or individually as a "Party".

**1.     Services; Appendices.**  GENESIS agrees to provide such logistics and logistics-related services ("Services") as may be agreed to by Customer and GENESIS from time to time and which are set forth in one or more Statements of Work ("SOWs") a form of which is attached hereto as Exhibit 2.  Upon its execution by both the Parties, an SOW will be incorporated herein for all purposes.  If Customer also issues purchase orders for the Services, all purchase orders will be subject to the terms and conditions of this Agreement and applicable SOWs and none of the terms of such purchase orders will apply except to the extent agreed to by the Parties in writing.  In all cases where the terms of this Agreement and any SOW are in disagreement, the terms in the SOW shall control.

**2.     Commencement of Services.**  No commitment to obtain Services from GENESIS is made by Customer except by the execution of SOWs by Customer.  This Agreement and those Exhibits executed and attached hereto at the time this Agreement is executed will become effective as of the Effective Date.  Any SOWs added after the Effective Date will become effective as indicated in those SOWs.

**3.     Term.**  Unless earlier terminated by either Party pursuant to Section 27, this Agreement shall be in effect for a period of (5) five years, at the end of which period this Agreement will automatically renew for successive (1) one-year periods unless either Party gives the other Party notice of its intent not to renew at least ninety (90) days prior to the end of the then-current term; provided that this Agreement shall remain in effect at all times that any SOW is in effect.

**4.     Safe and Legal Services.**  Customer will not request, and GENESIS will not be expected to perform, Services requiring GENESIS or any of its representatives, agents, or employees to exceed or violate any applicable federal, state, provincial or local laws, statutes, rules, regulations, ordinances or orders.

**5.     Operational Control.**  As between the Parties, GENESIS will have sole and exclusive control over: (i) the manner GENESIS and its subcontractors perform Services and (ii) the personnel and assets used to perform Services. GENESIS will engage, employ, or subcontract with such individuals or other entities as it may deem necessary in connection therewith, provided the majority of the Services will be provided by GENESIS' employees (whether permanent employees or contract employees).  Such individuals will not be considered employees or subcontractors of Customer and will be subject to employment or engagement, and discharge, discipline and control solely and exclusively by GENESIS.

**6.     Taxes.**  GENESIS assumes full responsibility for the payment of wages and fringe benefits, local, state, and federal payroll taxes or contribution of taxes for unemployment insurance, pensions, worker's compensation, Social Security and related protection with respect to the persons engaged by GENESIS in the performance of the Services, on and after the date those persons become engaged by GENESIS.

**7.     Cooperation in Operations.**  Both Parties will cooperate in all matters relating to the Services.

**Proprietary and Confidential**
This Agreement and information contained herein is not for use or disclosure outside of ATC Logistics & Electronics, Inc., its Affiliates, and third party representatives, and Genesis Networks Telecom Services, LLC except under written agreement by the contracting Parties.

1

**8.**   **Warranties; Performance Metrics.**   GENESIS warrants for a period of ninety (90) days from the day a Service is provided that such Services will be free from defect in workmanship and performed in a good and workmanlike manner consistent with industry practices and the specifications set forth herein and subject to the performance metrics, if any, set forth in the applicable SOWs.  THE FOREGOING WARRANTY IS THE SOLE WARRANTY WITH RESPECT TO THE SERVICES AND SUPERSEDES ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

**9.**   **Rates and Charges.**   The initial rates, fees and charges to be charged to and paid by Customer for the Services are set forth in the applicable SOWs.  GENESIS agrees there are no other applicable rates or charges for the Services except those established in the applicable SOWs.  Any change in rates, fees or charges agreed to by GENESIS and Customer will be set forth in a Change Order to the applicable SOW and signed by both Parties (a "Change Order").  A form of Change Order is attached hereto as Exhibit 1.  Upon its execution by both the Parties, a Change Order will be incorporated herein for all purposes.  GENESIS and Customer agree to perform an annual review of the prices for the Services.  The basis for the review will be set forth in the applicable SOWs.  Start-up expenses and fees, if any, will be paid in accordance with the applicable SOWs.

**10.**   **Payment.**

A.   *Terms*.   GENESIS will invoice Customer directly on a monthly basis for the Services and Customer will pay each invoice as set forth in the applicable SOW.  All amounts not paid by Customer when due will be charged interest at the rate of one percent (1.0%) (or the highest rate permitted by law if less) for each month they are past due.

B.   *Electronic Transfers*.   The Parties will endeavor to exchange any and all necessary data electronically.  When invoices are submitted electronically, all Parties involved must have capabilities to receive and verify acknowledgments of such invoices.  Customer may pay its invoices by electronic transfer of funds to a bank designated by GENESIS.  GENESIS agrees to hold Customer harmless for uncollected funds not properly or timely transferred from the bank or deposited in accordance with the applicable electronic funds transfer.  If the Parties deem it appropriate, a third party agreement regarding electronic data interchange ("EDI") will be entered into; otherwise, all EDI will be conducted in accordance with standard commercial practices.  GENESIS and Customer each agree to utilize commercially reasonable efforts to complete compatible electronic interchange systems as soon as possible; however, reasonable delays in such development will not be considered a breach of this Agreement.

**11.**   **Hazardous Substances.**   If, in providing the Services, Customer will require GENESIS to handle, warehouse or broker transportation of hazardous substances, those hazardous substances must be listed by Customer in the applicable SOWs and Customer must provide GENESIS with copies of all relevant Material Safety Data Sheets with respect to such hazardous substances, if any ("MSDS").  Customer shall, promptly after execution of this Agreement and each SOW, provide GENESIS with all necessary and legally prescribed handling and disposal instructions for any hazardous substances that Customer is required to provide under federal, state, and local law, if any.  Customer agrees to update the information required by this Section 11 from time to time as necessary.  Unless otherwise agreed in an SOW, Customer will not require GENESIS to dispose of Customer's hazardous substances.

**12.**   **Customer Inventory.**   GENESIS will be liable for any physical damage to, or theft, or loss of, Customer's inventory and other property ("Customer's Property") while in GENESIS' care, custody and control, subject to any allowances provided in the SOWs.  In the event GENESIS is liable for any damage to, or theft or loss of, Customer's Property, GENESIS shall pay to Customer an amount equal to the depreciated cost of Customer's Property or the replacement cost of Customer's Property, whichever is less.  For the purposes of this Section 12, Customer's Property will no longer be considered to be in GENESIS' care, custody and control once GENESIS has tendered Customer's

**Proprietary and Confidential**
This Agreement and information contained herein is not for use or disclosure outside of ATC Logistics & Electronics, Inc., its Affiliates, and third party representatives, and Genesis Networks Telecom Services, LLC except under written agreement by the contracting Parties.

Property to a third party common carrier notwithstanding that GENESIS may have arranged for such carrier's services. All taxes payable with respect to Customer's Property shall be the responsibility of Customer.

**13.**   **No Solicitation of Employees.**  Except with the other Party's written consent, during the term of this Agreement and for a period of twelve (12) months after its termination, neither Party will solicit, hire, or employ, or cause any other person to solicit, hire or employ, any employees of the other Party; provided, however, the foregoing shall not apply with respect to any person: (A) once such person ceases to be an employee of such other Party for a period of at least six (6) months; or (B) who responds to a general solicitation for employment from the other Party.

**14.**   **Confidentiality.**

    A.   *Obligation.*  The nature and details of the business relationship covered by this Agreement, and the business information regarding one Party (the "Disclosing Party") to which the other Party (the "Receiving Party") may become privy during the term of this Agreement (collectively the "Information") constitute confidential and proprietary information, the disclosure, misuse, copying or distribution of which could result in competitive harm to the Disclosing Party.  The Receiving Party agrees to maintain the Disclosing Party's Information in the strictest confidence and agrees not to: (i) disclose, copy, or distribute the Disclosing Party's Information, whether orally or in writing, directly or indirectly, in whole or in part, except to those of the Receiving Party's employees, agents, and subcontractors on a need to know basis with regard to the Information, or (ii) use the Disclosing Party's Information other than in connection with the Services.  The foregoing shall not limit the Receiving Party, solely for purposes of marketing, from informing actual or potential customers or suppliers of the existence of this Agreement between the Parties.  GENESIS and Customer further agree they will: (i) require all of their employees, agents and subcontractors to abide by the terms of the confidentiality obligations set forth under this Section 14 and (ii) be liable for any breach hereof by any such employee, agent or subcontractor.  The confidentiality obligations set forth in this Section 14 will remain in effect for five (5) years from the date of the last disclosure made hereunder.

    B.   *Exceptions.*  Nothing herein will apply to any Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Party or its representatives, (ii) was available to the Receiving Party on a non-confidential basis prior to its disclosure by the Disclosing Party, (iii) becomes available to the Receiving Party on a non-confidential basis from a source other than the Disclosing Party, provided such source is not known to be subject to any prohibition against transmitting the Information, (iv) is independently developed by the Receiving Party without use of the Information, or (v) is disclosed pursuant to an order of court; provided that in the event that Information is to be disclosed pursuant to this clause (v), the Receiving Party will give the Disclosing Party prompt written notice of such disclosure and the right to defend against such disclosure, at the Disclosing Party's expense, and provided further the Receiving Party will cooperate reasonably in such defense at the Disclosing Party's expense.

**15.**   **Independent Contractor.**  In the performance of the Services, GENESIS will be an independent contractor and will not be or act as, or be deemed to be, an agent of Customer, and GENESIS will not have the right to bind Customer in any manner.  GENESIS' employees shall not be deemed to be Customer's employees.  Nothing contained in any SOW or this Agreement may be construed to be inconsistent with the relationships or statuses described herein.  Customer has no direct control or supervision over the employees of GENESIS and, in fact, disavows any right to do so, and Customer in no way directs or controls the operations of GENESIS or the manner of its performance.  No joint venture or other relationship between GENESIS and Customer is created hereby.

**16.**   **Customer Equipment.**  From time to time Customer may provide to GENESIS equipment that Customer owns (or has the right to use as lessee or licensee) and which will be listed in an SOW (the "Customer Equipment") for GENESIS to use exclusively in providing the Services and not for providing services to any third party.  GENESIS shall exercise reasonable care in the use and custody of all Customer Equipment and shall not encumber, transfer, deliver or sublet any of the Customer Equipment to any third party.  The Customer Equipment may include

**Proprietary and Confidential**
This Agreement and information contained herein is not for use or disclosure outside of ATC Logistics & Electronics, Inc., its Affiliates, and third party representatives, and Genesis Networks Telecom Services, LLC except under written agreement by the contracting Parties.

software, which GENESIS shall not make available to any third party and has no right to copy or retain a copy of in any form.  Upon the termination of this Agreement, the Customer Equipment (including all copies of software included therein) must be promptly returned to Customer.  Until the Customer Equipment is returned to Customer, the risk of damage, theft, loss or destruction of the Customer Equipment shall be with GENESIS.  If any of the Customer Equipment is destroyed or damaged in any manner whatsoever before the Customer Equipment is returned to Customer, GENESIS shall replace such destroyed Customer Equipment and repair such damaged Customer Equipment at its own expense.  Customer Equipment will remain the property of Customer (or its lessor or licensor) throughout and after the term of this Agreement.

**17.**   **Computer Systems Support Agreements.**  If hardware or software or any other equipment that is owned or controlled by Customer, an affiliate of Customer, or a designated third party is used to communicate, process data, or otherwise provide the Services to Customer, or if Customer, an affiliate of Customer, or a designated third party supplies the services to obtain, repair, or maintain such equipment, then GENESIS and Customer agrees to enter into a computer systems support agreement regarding such equipment and services that sets forth their respective obligations with respect to support of such systems.

**18.**   **Modifications to GENESIS' Systems.**  Customer acknowledges that GENESIS' systems, including information retrieval and processing systems and their hardware and software (collectively the "GENESIS Systems"), are the property of GENESIS.  In order to provide the Services to Customer, GENESIS may agree to modify GENESIS Systems to meet special Customer needs.  However, such modifications are to be made at the sole discretion of GENESIS, and will be prepared and released only as formal releases or updates of the GENESIS Systems and will remain the property of GENESIS unless otherwise provided in an SOW.

**19.**   **Intellectual Property.**

A.   *GENESIS' Technology.*  Customer will have no right to the technology of GENESIS except as provided in the SOWs.  Upon termination of this Agreement or expiration or termination of an SOW, all technical systems, including but not limited to telecommunications and computer hardware and software, used to provide the Services to Customer that GENESIS owns ("GENESIS Technology") will revert to GENESIS' possession and control and Customer warrants that it will make no copies of any GENESIS Technology.  The use of any such GENESIS Technology during the term of this Agreement shall not be deemed to give Customer a license to use such GENESIS Technology or have any ownership rights in any such GENESIS Technology.  If at the termination of this Agreement, excepting Customer's termination without cause, Customer requests continued use of GENESIS Technology, GENESIS will license Customer to use that GENESIS Technology for a mutually agreeable transition period, provided that GENESIS will not have to grant such license if either: (i) it does not then have the right to grant such license or (ii) the Parties cannot reach agreement on a licensing fee for such license.

B.   *Customer's Technology.*  Customer from time to time purchases or develops systems to operate its businesses it considers proprietary including but not limited to telecommunications and computer hardware and software, owned by Customer and used to provide the Services to Customer ("Customer Technology").  Customer may give GENESIS the right to use Customer Technology solely for the providing of Services.  Upon termination of this Agreement, GENESIS shall cause all Customer Technology in its possession to revert to Customer's possession and control and GENESIS warrants that it will make no unauthorized copies of any Customer Technology.  The use of any Customer Technology during the term of this Agreement shall not be deemed to have given GENESIS a license to use or ownership rights in any such Customer Technology.

C.   *Shared Technology.*  The Parties may during the term of this Agreement jointly develop systems or information.  In that event, the Parties will use commercially reasonable efforts to enter into an agreement apportioning their interests in such systems or information.

**Proprietary and Confidential**
This Agreement and information contained herein is not for use or disclosure outside of ATC Logistics & Electronics, Inc., its Affiliates, and third party representatives, and Genesis Networks Telecom Services, LLC except under written agreement by the contracting Parties.

**20.  Indemnification.**  Except as otherwise provided herein, and subject to the provisions of Section 21, each Party (the "Indemnifying Party") will indemnify, defend, and hold harmless the other Party and its affiliates and their respective officers, directors, employees, subcontractors, and agents (collectively, the "Indemnified Party") from and against any and all liabilities, damages, fines, penalties, costs, claims, interest, and expenses (including costs of defense, settlement, and reasonable attorney's fees) ("Losses") to the extent they are caused by: (i) the acts or omissions of the Indemnifying Party or its agents, employees or subcontractors including, without limitation, the breach of this Agreement (including the warranties contained herein), or (ii) the violation by an Indemnifying Party of any applicable federal, provincial, state, or local law, statute, regulation, rule, ordinance, order or government directive governing or applicable to the Indemnifying Party's performance under this Agreement.  Notwithstanding the foregoing, neither Party will have any obligation to indemnify, defend, or hold harmless the other Party for acts or failures to act of any common carrier.

**21.  Notice and Opportunity to Defend; Limitations and Threshold Amounts.**

A.  *Notice; Opportunity.*  If any Losses covered by the indemnities set forth in this Agreement are asserted against an Indemnified Party, such Party shall notify the Indemnifying Party as promptly as practicable and give the Indemnifying Party an opportunity to defend the same.  The Indemnified Party shall extend reasonable cooperation to the Indemnifying Party in connection with such defense.  If the Indemnifying Party fails to defend against the claim within a reasonable time, the Indemnified Party shall be entitled to assume the defense thereof, and the Indemnifying Party shall be liable to repay the Indemnified Party all its expenses reasonably incurred in connection with said defense (including reasonable attorneys' fees and settlement payments) until the Indemnifying Party assumes such defense, provided that the Indemnified Party may not settle any matter without the Indemnifying Party's consent, which may not be unreasonably withheld.

B.  *Liability.*  Notwithstanding any other provision of this Agreement, indemnity obligations entered into hereunder shall be due only to the extent of the Losses actually suffered (i.e., Losses reduced by any Offset).  For the purposes of this Section 21 (B) only, the definition of "Offset" includes but is not limited to, any offsetting or related asset or service received by the Indemnified Party and any recovery by the Indemnified Party from any third party, including an insurer, and any tax benefit realized by the Indemnified Party relating to the Losses.  The Indemnifying Party will be subrogated to all rights of the Indemnified Party against any third party with respect to any claim for which indemnity was paid.

**22.  Limitations on Damages.**  Notwithstanding any other provision of this Agreement neither Party shall be liable to the other Party for any special, indirect, consequential or punitive damages, including, but not limited to, loss of production, loss of income, or loss of profits, even if the breaching Party was given prior notice of the possibility of such damages.  Customer shall not have the right of set-off.  In no event shall Customer's damages for any failure of GENESIS to perform hereunder be in excess of GENESIS' fees for the six months directly prior to the date that Customer claims GENESIS so failed to perform; provided, however, such fees shall not include the value of transportation services purchased in the event GENESIS' Services include transportation brokerage.

**23.  GENESIS' Insurance.**  During the term of this Agreement, GENESIS will maintain and will require that its agents and subcontractors also maintain policies of insurance in the following types and amounts, unless different types and amounts are required in specific SOWs:

A.  *Worker's Compensation.*  Worker's compensation insurance in accordance with statutory requirements for the states or provinces in which Services are to be performed, including employer's liability insurance in an amount not less than $1,000,000;

B.  *Liability.*  Commercial General Liability Insurance (including Broad Form Contractual Liability Insurance) protecting GENESIS from any and all claims for damages due to bodily injury (including death), personal

**Proprietary and Confidential**
This Agreement and information contained herein is not for use or disclosure outside of ATC Logistics & Electronics, Inc., its Affiliates, and third party representatives, and Genesis Networks Telecom Services, LLC except under written agreement by the contracting Parties.

injury, or property damage alleged to have been caused by the negligent acts or omissions of GENESIS or any employee, contractor or agent of GENESIS, excepting common carriers, which insurance will: (i) be occurrence-based, (ii) provide coverage in an amount equal to at least $1,000,000, combined single limit, per occurrence, and (iii) list Customer as an additional insured, provided that such coverage will not include losses to the extent due to negligence or willful misconduct of Customer or any agents, employees, servants or invitees of Customer;

C.   *Automobile*.   Automobile liability insurance (including owned, non-owned, and hired vehicles) with minimum limits of not less than $1,000,000 per occurrence combined single limit for personal injury and property damage; and

D.   *Legally Required*.   Any insurance coverage required by any government body for the types of Services provided to Customer.

GENESIS will also require common carriers to provide customary insurance if GENESIS provides transportation management services hereunder.  All such insurance will be primary and any insurance carried by Customer will be excess.

**24.   Insurance Companies.**   All insurance policies required herein will be issued by reputable insurance companies having an A.M. Best rating of "A-" or better and that are authorized to do business under the laws of the states and provinces where the Services will be performed.  GENESIS will maintain all such required insurance in force unless otherwise agreed to in writing.

**25.   Insurance Certificates.**   Within thirty (30) days of the Effective Date, GENESIS will furnish to Customer certificates evidencing the insurance required herein.  Each certificate will set forth the amount of coverage, policy number, and date of expiration.  Such certificates: (i) will be provided at each renewal of the insurance provided for above (unless they are without termination) and for so long as this Agreement remains in effect, and (ii) will provide that the policy will not be terminated or cancelled without written notice to Customer at least thirty (30) days prior to such termination or cancellation.  The Parties agree that the failure of Customer to demand such certificate of insurance or failure of Customer to identify a deficiency will not be construed as a waiver of GENESIS's obligation to maintain the insurance required under this Agreement.

**26.   Reserved.**

**27.   Termination Rights.**   The Parties will have the termination rights set forth below.

A.   *Insolvency*.   If a petition in bankruptcy is filed by either Party, or if either Party is adjudicated as bankrupt, or if either Party makes a general assignment for the benefit of creditors, or if a receiver is appointed on account of the insolvency of either Party, then the other Party, without prejudice to any other right or remedy it may have under any applicable law or statute, may terminate this Agreement upon giving at least five (5) days, prior written notice of such termination.

B.   *Mutual Consent*.   This Agreement, or any SOW, may be terminated at any time by the mutual written consent of Customer and GENESIS.

C.   *Unilateral*.   This Agreement, or any SOW, may be terminated by either Party by providing ninety (90) days' prior written notice to the other Party.  Either Party may terminate this Agreement upon written notice to the other Party if there have been no SOWs in effect for at least sixty (60) days.

**Proprietary and Confidential**
This Agreement and information contained herein is not for use or disclosure outside of ATC Logistics & Electronics, Inc., its Affiliates, and third party representatives, and Genesis Networks Telecom Services, LLC except under written agreement by the contracting Parties.

D. _Breach_.

(i)      If either Party commits a material breach of its obligations under this Agreement, other than a payment obligation, the non-breaching Party will provide written notice describing the material breach to the breaching Party.  The breaching Party will have thirty (30) days to cure such breach (or, if the Parties agree a cure is not feasible within thirty (30) days, such longer period of time for cure as the Parties may agree in writing).  If the breach is not cured within such period, then the non-breaching Party may terminate this Agreement immediately upon written notice to the breaching Party.

(ii)      If Customer fails to pay any amounts due GENESIS under Section 10, above and such failure continues for fifteen (15) days after written notice, GENESIS may terminate this Agreement immediately upon written notice to Customer.

**28.    Effect of Termination or Expiration.**  Termination or expiration of this Agreement or any SOW will not relieve any Party of liability for any breach thereof nor relieve any Party of its obligation to pay any amount accruing prior to such termination.  The provisions of Sections 8, 10, 12-14, 16, 19-22, 28, 31, 34-36 and 38-40 specifically shall survive termination or expiration of this Agreement.

**29.    Audits.**  Customer shall have the right from time to time to physically inspect the Services being performed by GENESIS and the facilities in which Services are provided, and to perform audits on GENESIS, including inspection of GENESIS' books, records and computer data relevant to provision of the Services, to ensure inventory, quality, process and business controls are maintained; provided, however, such inspections and audits shall be conducted upon reasonable notice to GENESIS and so as not to interfere with GENESIS' day to day business operations.

**30.    Force Majeure.**  This Agreement will be temporarily suspended during any period to the extent that Customer or GENESIS during that period is unable to carry out its obligations under this Agreement or the SOWs by reason of an Act of God or the public enemy, fire, flood, labor disorder, strike, sick-out, civil commotion, closing of the public highways, government interference, government regulations, or any similar event or occurrence beyond the reasonable control of the affected Party ("Force Majeure"), and neither Party will have any liability to the other Party for any delay in performance or failure to perform to the extent this Agreement or any SOW is so temporarily suspended. due to such Force Majeure.  Once such Force Majeure ceases, GENESIS shall promptly send written notice to Customer that GENESIS can resume fulfilling its obligations under this Agreement ("Resumption Notice").  Where GENESIS cannot fulfill its obligations under this Agreement due to a Force Majeure, Customer will have the right to use other means to fulfill its requirements.  Any Service provided for Customer by such other means during such Force Majeure, and until ten (10) days following Customer's receipt of GENESIS' Resumption Notice, will be credited against any minimum volume commitments, if any, made by Customer in any SOW.

**31.    Compliance with Laws.**  Each Party will, and will require all of its subcontractors and agents to, comply with the provisions of any international, federal, provincial, state, or local statute, regulation, rule, ordinance or order that is applicable to the provision of the Services.  The Parties agree to abide by all import, export, and related laws and regulations and to share such information (proprietary or otherwise) as may be necessary to comply with such laws and regulations.

**32.    Modification and Waiver.**  No release, discharge, abandonment, waiver, alteration, or modification of any of the provisions of this Agreement, any SOWs or any Exhibits or attachments hereto, will be binding upon either Party unless set forth in a writing signed by both Parties.  No waiver by a Party of any default or breach of warranty or covenant will be deemed to extend to any prior or subsequent default or breach or affect in any way any rights arising by virtue of any prior or subsequent occurrence.  No failure or delay by a Party in exercising any right,

**Proprietary and Confidential**
This Agreement and information contained herein is not for use or disclosure outside of ATC Logistics & Electronics, Inc., its Affiliates, and third party representatives, and Genesis Networks Telecom Services, LLC except under written agreement by the contracting Parties.

power or privilege hereunder will operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

**33.** **Notices.** All notices and other communications hereunder shall be in writing, sent to the addresses or fax numbers set forth below and shall be deemed duly given (i) when delivered by personal delivery, (ii) five business days after having been sent by registered or certified mail, return receipt requested, postage prepaid, (iii) on the business day that it is transmitted by fax and the fax confirmation is received, *provided* that such notice or other communication is promptly thereafter mailed in accordance with the provisions of clause (ii) above, or (iv) the business day following being sent through an overnight delivery service in circumstances in which such service guarantees next day delivery. Any Party may give any notice or other communication using any other means but it will not be deemed to have been duly given unless and until it is actually received by the person for whom it is intended.

If to GENESIS, then to:
Todd Richard
Genesis Networks Telecom Services, LLC
600 N Loop 1604 E
San Antonio, TX 78232
Facsimile: (210) 489-6612

If to Customer, then to:          with copy to:
Joe Young              General Counsel
ATC Logistics & Electronics, Inc.     GENCO
13500 Independence Parkway     100 Papercraft Park
Fort Worth, TX 76177        Pittsburgh, PA 15238
Facsimile: (817) 490-4320      Facsimile: (412) 820-3762

Any Party may change the address to which notices and other communications are to be delivered by giving the other Parties notice in the manner provided above.

**34.** **Governing Law.** This Agreement will be construed and enforced in accordance with, and governed by, the laws of the state Texas without regard to rules of conflict of laws.

**35.** **Entire Agreement.** This Agreement, together with all SOWs and attachments and Exhibits hereto, constitutes the entire agreement between Customer and ATCLE with respect to the subject matter hereof and supersedes all prior oral or written and all contemporaneous oral representations and agreements with regard to the same subject matter.

**36.** **Assignment.** Neither Party may assign its rights or delegate its obligations under this Agreement without the written consent of the other Party, which consent shall not be unreasonably withheld. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their successors and permitted assigns.

**37.** **Execution in Counterparts.** This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement, and shall become a binding agreement when counterparts have been signed by each Party and delivered to the other Parties.

**38.** **Titles and Headings; Interpretation.** Titles and headings to sections herein are inserted for the convenience of reference only and shall not be deemed to be a part of or to affect the meaning or interpretation of this Agreement. No Party hereto, nor its respective counsel, shall be deemed the drafter of this Agreement or any SOW, and all

**Proprietary and Confidential**
This Agreement and information contained herein is not for use or disclosure outside of ATC Logistics & Electronics, Inc., its Affiliates, and third party representatives, and Genesis Networks Telecom Services, LLC except under written agreement by the contracting Parties.

provisions hereof or thereof shall be construed in accordance with their fair meaning, and not strictly for or against either Party hereto.

**39.   Severability.**  If any provision of this Agreement or any SOW is ruled by a court or arbitrator of competent jurisdiction to be illegal or unenforceable, that will not affect the other parts of this Agreement and the SOWs, then: (i) all remaining provisions shall be enforceable in accordance with their terms, and (ii) the illegal or unenforceable provision will be construed so as to be legal and enforceable to the greatest extent possible.

**40.   Mediation; Arbitration.**

A.   _Mediation._  All disputes arising under this Agreement shall be submitted for settlement by mediation prior to any other action being taken.  To commence settlement mediation, if a dispute arises, the aggrieved Party will give notice to the other Party that the aggrieved Party has a claim against the other Party (the date that notice is delivered will be called the "Notice Date").  Any demand for settlement mediation will identify the provision or provisions of this Agreement alleged to have been breached and will state the issue proposed to be resolved in mediation and the remedy sought.  If after two (2) days of mediation the dispute is not settled, or if the mediator declares an impasse prior to the end of the two-day period, mediation will terminate unless the Parties mutually agree to continue mediation.

B.   _Unsuccessful Mediation._  If mediation pursuant to Subsection A is unsuccessful or is declared an impasse, the Parties may submit the dispute to binding arbitration by mutual agreement to do so, or the aggrieved Party may seek any other remedy in law or equity.  If arbitration is elected, the demand for arbitration will identify the provision or provisions of this Agreement alleged to have been breached and will state the issue proposed to be submitted to arbitration and the remedy sought.  Arbitration hearings will commence no later than sixty (60) days after the Notice Date and will last no longer than five (5) days.

C.   _Rules._  The Parties will use the then current applicable commercial mediation and arbitration rules of the CPR Institute for Dispute Resolution, Inc. (the "Provider") to choose the mediator or arbitrator.  Mediation and arbitration effected pursuant to this Agreement will be governed by, and the terms of this Section 40 will be construed in accordance with, 9 U.S.C. §§1-16.  In the event arbitration is used, the arbitral award will be in writing.  Judgment upon the award rendered may be entered in any court of competent jurisdiction.

D.   _Privileged._  The settlement, mediation and any arbitration will be compromise negotiations and all offers, promises, conduct and statements, whether oral or written, made in the course of the mediation or arbitration by any of the Parties, their agents, employees, experts and attorneys or by the mediator or arbitrator, will be confidential, privileged, and inadmissible for any purpose, including impeachment under Rule 408 of the Federal Rules of Evidence and any applicable federal or state statute, rule or common law provisions, and in any judicial or arbitration proceeding.

E.   _Other Suits._  As to any dispute or controversy that under the terms of this Agreement is made subject to mediation and then binding arbitration, no suit at law or in equity based on such dispute or controversy will be instituted by either Party other than a suit to confirm, enforce, vacate, modify or correct the award of the arbitrator or arbitrators as provided by law; provided, however, that this clause will not limit the right to obtain any provisional remedy including, without limitation, injunctive relief, writ for recovery of possession or similar relief, from any court of competent jurisdiction, as may be necessary to protect a Party's property rights.

**41. Original Signatures.** Original signatures transmitted and received via facsimile or other electronic transmission of a scanned document, (e.g., pdf or similar format) are true and valid signatures for all purposes hereunder and shall bind the Parties to the same extent as that of an original signature.

**Proprietary and Confidential**
This Agreement and information contained herein is not for use or disclosure outside of ATC Logistics & Electronics, Inc., its Affiliates, and third party representatives, and Genesis Networks Telecom Services, LLC except under written agreement by the contracting Parties.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the day and year first above written.

**ATC LOGISTICS & ELECTRONICS, INC.**

**GENESIS NETWORKS TELECOM SERVICES, LLC**

By: _____ CFO

By: _____

Todd Richard
Chief Executive Officer

**Proprietary and Confidential**

This Agreement and information contained herein is not for use or disclosure outside of ATC Logistics & Electronics, Inc., its Affiliates, and third party representatives, and Genesis Networks Telecom Services, LLC except under written agreement by the contracting Parties.

# EXHIBIT 1

## Form of Change Order

This Change Order No. <INSERT NUMBER>, effective as of <MM/DD/YYYY>, amends the <INSERT NAME OF SOW> ("SOW"), by and between Genesis Networks Telecom Services, LLC ("GENESIS") and <INSERT CUSTOMER'S NAME> ("Customer") dated as of <MM/DD/YYYY> as follows:

    A.  Changes to the Service Description.
        [DESCRIBE IN DETAIL THE CHANGES TO THE SOW]

    B.  Changes to the Pricing Schedule.
        [DESCRIBE IN DETAIL THE CHANGES TO THE PRICING SCHEDULE]

    C.  Other Changes.
        [DESCRIBE OTHER CHANGES RESULTING FROM THE CHANGE ORDER]

Except as otherwise specifically provided herein, all other sections of the SOW remain unchanged.

**IN WITNESS WHEREOF**, each of the Parties has caused this Change Order No. <INSERT NUMBER> to be executed by its duly authorized representative.

ATC LOGISTICS & ELECTRONICS, INC.    <INSERT CUSTOMER NAME>

By: _____    By: _____

Name: _____    Name: _____

Title: _____    Title: _____

**Proprietary and Confidential**
This Agreement and information contained herein is not for use or disclosure outside of ATC Logistics & Electronics, Inc., its Affiliates, and third party representatives, and Genesis Networks Telecom Services, LLC except under written agreement by the contracting Parties.

## Exhibit 2

## STATEMENT OF WORK FOR
## [TYPE OF SERVICE]

This Statement of Work (this "SOW") is attached to and made a part of that certain Master Services Agreement between the Parties to this SOW, which agreement was effective as of _____, 20_____ (the "Agreement"). All initial capitalized terms found in this SOW have the same meaning as set forth in the Agreement, unless indicated otherwise in this SOW.

[INSERT SPECIFIC TERMS OF SOW FOR SERVICES TO BE PROVIDED—USE ADDITIONAL SOWS FOR ADDITIONAL SERVICES—EACH SOW SHOULD HAVE A SPECIFIC TERM]

**GENESIS NETWORKS TELECOM**

**SERVICES, LLC**

**[CUSTOMER'S NAME]**

By: _____

Name: _____

Title: _____

Date: _____

By: _____

Name: _____

Title: _____

Date: _____

**Proprietary and Confidential**

This Agreement and information contained herein is not for use or disclosure outside of ATC Logistics & Electronics, Inc., its Affiliates, and third party representatives, and Genesis Networks Telecom Services, LLC except under written agreement by the contracting Parties.