**<u>Exhibit A</u>**

**AMRR 8-K dated September 6, 2022**

DMS 300049874

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 8-K

### CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): **September 6, 2022 (August 31, 2022)**

# American Metals Recovery and Recycling Inc.

(Exact name of registrant as specified in its charter)

| Nevada | 000-56318 | 27-2262066 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**American Metals Recovery and Recycling Inc.**
**4301 West Bank Dr. Suite 110B**
**Austin, Texas 78746**
(Address of principal executive offices) (Zip Code)

Registrant's telephone number, including area code: **(866) 365-0620**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.001 per share | AMRR | OTC Markets |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

## Item 1.01    Entry into a Material Definitive Agreement

The information set forth in Item 1.01 of this Current Report on Form 8-K (this "Form 8-K") is incorporated herein by reference.

## Item 2.01    Completion of Acquisition or Disposition of Assets

Effective August 31, 2022, American Metals Recovery and Recycling Inc. (the "Company") entered into and closed an Asset Purchase Agreement (the "Agreement") with Multiband Global Resources, LLC, a Delaware limited liability company, pursuant to which the Company acquired substantially all of the Multiband Global Resources LLC assets in exchange for one million (1,000,000) shares of Series A Convertible Preferred Stock of the Company, par value $0.001 per share (the "Series A Preferred Stock") issued to the Frinzi Family Trust as the recipient designated by Multiband Global Resources, LLC. The acquired assets included one million dollars ($1,000,000) cash, certain Frontier E-Waste Recycling Contact, office lease and office equipment. One of the closing conditions was the execution of a certain trademark acquisition agreement by and between the Company and Goodman Networks Inc., a Texas corporation (the "Trademark Agreement"), assigning tradenames of "Multiband" and "Multiband Global" to the Company. The Trademark Agreement was executed on August 16, 2022.

The foregoing description of the Agreement does not purport to be complete and is qualified in its entirety by reference to the complete text of the Agreement, which is filed as Exhibit 1.01 to this Form 8-K and is incorporated by reference herein.

*Information Regarding Certain Relationships and Related Person Transactions*

James Frinzi, the CEO and the majority shareholder of the Company, is the sole member of Multiband Global Resources LLC. Mr. Frinzi is also a beneficiary and co-trustee of the Frinzi Family Trust.

## Item 3.02    Unregistered Sales of Equity Securities.

The applicable information set forth in Item 2.01 and Item 3.03 of this Form 8-K are incorporated by reference in this Item 3.02. The Series A Preferred Stock was issued without registration under the Securities Act of 1933, as amended (the "Securities Act"), based on the exemption from registration afforded by Section 4(a)(2) of the Securities Act.

## Item 3.03    Material Modification to Rights of Security Holders.

On August 31, 2022, the Company filed with the Secretary of State of the State of Nevada (the "Secretary of State") a Certificate of Withdrawal (the "Certificate of Withdrawal") of Certificate for the Certificate of Designation of Preferences, Rights and Limitations of Series A Preferred Stock, par value $0.001 per share (the "Old Series A Preferred Stock"). The Certificate of Withdrawal became effective with the Secretary of State upon filing.

At the time of the filing of the Certificate of Withdrawal, the Company had total of six hundred thousand issued and outstanding shares of Old Series A Preferred Stock all of which were held by Multiband Global Resources LLC. Upon issuance of the Series A Preferred Stock (as defined in Item 5.03 below) six hundred thousand (600,000) shares of Series A Preferred Stock are being issued to the Frinzi Family Trust as the person designated by Multiband Global Resources, LLC.

The foregoing description of the Certificate of Withdrawal does not purport to be complete and is qualified in its entirety by reference to the Certificate of Withdrawal, a copy of which is filed as Exhibit 3.1 to this Form 8-K and is incorporated herein by reference.

## Item 5.01    Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year.

On August 31, 2022, the Company filed with the Secretary of State a Certificate of Designation of Series A Preferred Stock (the "Series A Certificate of Designation") and a Certificate of Designation of Series B Convertible Preferred Stock, with a par value of $0.001 per share (the "Series B Preferred Stock")( such Certificate of Designation the "Series B Certificate of Designation, and together with Series A Certificate of Designation, the "Certificates of Designation") designating the preferences, limitations, powers, conversion features and relative rights of the Series A Preferred and Series B Preferred, respectively. The Company designated one million six hundred thousand (1,600,000) shares of its authorized and unissued preferred stock as Series A Preferred Stock and fifty-four thousand (54,000) shares of its authorized and unissued preferred stock as Series B Preferred Stock. The Certificates of Designation became effective with the Secretary of State upon filing.

Series A Preferred Stock shall convert into such number of fully paid and non-assessable shares of Common Stock that represent twenty percentage (20%) of the Company's issued and outstanding Common Stock as computed one day prior the Company is listed

on Nasdaq for trading Common Stock. The time of the conversion shall be the date on which the Company's securities are listed on a national exchange, after giving effect to any securities issued in connection with such uplisting to a national exchange. Upon the conversion and the issuance of the conversion shares further thereto, the shares of Series A Preferred Stock shall be deemed cancelled and of no further force or effect. Series B Preferred Stock shall have the right to convert all or any portion of such holder's Series B Preferred Stock into fully paid and non-assessable shares of Common Stock at any time or from time to time at such holder's sole discretion (the "Conversion Right"). Each share of Series B Preferred Stock as to which the Conversion Right is exercised shall be converted into shares of the Company's issued and outstanding Common Stock at an exercise price of $3.13 per share.

The foregoing description of the Certificates of Designation is not complete and is subject to and qualified in its entirety by reference to the Series A Certificate of Designation and the Series B Certificate of Designation, copies of the which are filed as Exhibits 5.01 and 5.02, respectively, to this Form 8-K, and are incorporated herein by reference.

**Item 9.01**    **Financial Statements and Exhibits**

(d) Exhibits

The following documents are filed as exhibits to this report:

| Exhibit No. | Description |
| --- | --- |
| 2.01 | Asset Purchase Agreement, effective August 31, 2022, by and between the Company and Multiband Global Resources, LLC |
| 3.03 | Certificate of Withdrawal of Certificate for the Certificate of Designation of Preferences, Rights and Limitations of Series A Preferred Stock |
| 5.01 | Certificate of Designation of Series A Convertible Preferred Stock |
| 5.02 | Certificate of Designation of Series B Convertible Preferred Stock |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: September 6, 2022                                              **American Metals Recovery and Recycling Inc.**

                                                                     By:      /s/ James Frinzi
                                                                     Name:   James Frinzi
                                                                     Title:    Chief Executive Officer

EX-99.201 2 ex2_01.htm EXHIBIT 2.01

**Exhibit 2.01**

DocuSign Envelope ID: 72D05ED4-5A9D-4E9B-ABFE-0606BD18FF67

# ASSET PURCHASE AGREEMENT

## August  31 , 2022

This ASSET PURCHASE AGREEMENT (this "**Agreement**") by and between American Metals Recovery & Recycling Inc., a Nevada corporation (the "**Buyer**"), and Multiband Global Resources, LLC, a Delaware limited liability company (the "**Seller**"). The Buyer and the Seller are referred to individually as a "**Party**" and collectively as the "**Parties**."

## RECITALS

A.  The Seller is an affiliate of the Buyer, in the business of providing professional services related to digital assets and infrastructure lifecycle (the "**Business**").

B.  The Seller desires to sell, transfer and otherwise convey, and the Buyer desires to purchase and acquire, certain of the Seller's assets related to the Business, on the terms and subject to the conditions of this Agreement.

## AGREEMENT

In consideration of the above recitals and the promises set forth in this Agreement, the Parties agree as follows.

1.  **Basic Transaction**.

    1.1    **Purchase and Sale of Assets**.  On the terms and subject to the conditions of this Agreement, the Buyer agrees to purchase from the Seller, and the Seller agrees to sell, transfer, convey and deliver to the Buyer at the Closing, all right, title and interest in, to and under all assets of the Seller related to the Business (collectively, the "**Acquired Assets**"), free and clear of all security interests, liens, claims, charges, restrictions and encumbrances of any nature, in exchange for the Purchase Price (as defined in Section 1.3 below), including, without limitation:

        (a)    all of the inventory, supplies, computers, computer components, software, printers, telephones and other items and materials related to the Business, including, without limitation, those assets identified on **Schedule 1** to this Agreement, together with all related warranties, tools, accessories and spare parts;

        (b)    all accounts receivable, notes or other security, claim, remedy or other right related to any of the foregoing of the Seller;

        (c)    all intellectual property assets owned by, licensed to or otherwise controlled by the Seller or used in, developed for use in or necessary to the conduct of the Business as previously, now or planned to be conducted,

1

4863-6475-9071, v.7

9/8/22, 8:53 AM    https://www.sec.gov/Archives/edgar/data/1488638/000121465922010948/ex2_01.htm

DocuSign Envelope ID: 72D05ED4-5A9D-4E9B-ABFE-0606BD18FF67

including, without limitation, internet domain names, all associated web addresses, URLs, websites and web pages and all content and data thereon or relating thereto related to the Business including, without limitation, those intellectual property assets identified on **Schedule 1** to this Agreement;

(d) The trade names "Multiband" and "Multiband Global" the marks and logos for "Multiband Global", as intended by the parties to be acquired by that certain Trademark Acquisition Agreement made by and between Goodman Networks Inc., a Texas corporation, or its assignees and the Buyer, essentially in the form attached hereto as Exhibit C, once the attached form and related items are finalized and properly addressed.

(e) all of the Seller's books, records and other documents and information, including, without limitation, all vendor and distributor lists, customer lists and other customer information, marketing and advertising materials, inventory records, purchase orders and invoices, sales orders, product data, price lists, and product advertising and brochures related to the Business;

(f) the current telephone and fax numbers, e-mail addresses, mailing lists, including, without limitation, those identified on **Schedule 1** to this Agreement;

(g) the contracts and agreements of the Seller identified on **Schedule 1** to this Agreement (the "**Acquired Contracts**");

(h) to the extent assignable, all permits, licenses and other governmental approvals held by the Seller in connection with its Business or for the ownership and use of the Acquired Assets;

(i) all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums, and fees;

(j) cash and cash equivalents of the Seller;

(k) all goodwill and general intangibles associated with the Acquired Assets and the Business; and

(l) all of Seller's rights under warranties, indemnities, and all similar rights against third parties to the extent related to any Acquired Assets.

1.2 **Liabilities**.  On the terms and subject to the conditions of this Agreement, the Buyer will assume only those liabilities of the Sellers which are set forth on **Schedule 1**, after the close of business on the Closing Date (collectively, the "**Assumed Liabilities**").  The Seller is solely responsible and liable for making all payments due under, and curing all defaults arising under or relating to, the

4863-6475-9071, v.7

2

DocuSign Envelope ID: 72D05ED4-5A9D-4E9B-ABFE-0606BD18FF67

Assumed Liabilities prior to the Closing Date.  With the exception of the Assumed Liabilities, the Buyer will not assume any other claims, indebtedness, liabilities or warranty work of any kind, whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether secured or not secured and whether due or to become due, including any liability for any taxes, fees, assessments or charges of any kind whatsoever, or any interest, additions or penalties with respect thereto.

1.3     **Purchase Price**.  In consideration for the Acquired Assets, the Buyer shall issue to the Seller, or to the person assigned by the Seller, one million (1,000,000) shares of Series A Preferred Stock of the Buyer and assume the Assumed Liabilities (the "**Purchase Price**").

1.4     **The Closing**.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place at the offices of the Seller located at 4301 Westbank Drive, B-110, Austin, TX 78746 at 9:00 a.m. on the third business day after the respective Parties have satisfied or waived all conditions to the obligations of the Parties to consummate the transactions contemplated by this Agreement (other than actions the Parties will take at the Closing itself) as of the date first above written (the "**Closing Date**").

1.5     **Buyer's Deliveries at the Closing**.  Subject to the terms and conditions set forth in this Agreement, the Buyer will make the following deliveries at the Closing:

(a)     executed and acknowledged (if appropriate) certificates, instruments and documents that the Seller and its counsel have reasonably requested;

(b)     the Purchase Price;

(c)     an Assignment and Assumption Agreement, in the form attached to this Agreement as **Exhibit A**, assigning to the Buyer the Acquired Contracts and all licenses or permits held by the Seller which the Buyer desires to have assigned to it (the "**Assignment and Assumption Agreement**"); and

1.6     **Seller's Deliveries at the Closing**.  Subject to the terms and conditions set forth in this Agreement, the Seller will make the following deliveries at the Closing:

(a)     executed and acknowledged (if appropriate) certificates, instruments and documents that the Buyer and its counsel have reasonably requested;

(c)     executed Bill of Sale for the Acquired Assets, in the form attached as **Exhibit B** to this Agreement; and

(d)      the Assignment and Assumption Agreement;

2.     **Representations and Warranties of the Seller**.  The Seller represent and warrant to the Buyer that the statements contained in this Section 2 are correct and complete as of the

4863-6475-9071, v.7

DocuSign Envelope ID: 72D05ED4-5A9D-4E9B-ABFE-0606BD18FF67

date of this Agreement and will be correct and complete as of the Closing Date, except as set forth in the attached disclosure schedule accompanying this Agreement (the "**Seller's Disclosure Schedule**").  The Seller's Disclosure Schedule will be arranged in paragraphs corresponding to the sections contained in this Section 2.

2.1    **Organization, Qualification and Power**.  The Seller is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware.  The Seller is duly authorized to conduct business and is in good standing under the laws of each jurisdiction where qualification is required. The Seller has full organizational power and authority and all permits and licenses necessary to carry on the businesses in which it is engaged and in which it presently proposes to engage, and to own and use the properties owned and used by it.

2.2    **Authorization of Transaction**.  The Seller has full power and authority, organizational or otherwise, to enter into and perform its obligations under this Agreement.  In addition, the Seller's members have duly authorized the execution and performance of this Agreement and the ancillary documents to which the Seller is a party.  This Agreement and the ancillary documents to which any of the Seller is a party constitute valid and legally binding obligations of the Seller, as applicable, enforceable in accordance with their respective terms and conditions.

2.3    **Noncontravention; Consents**.  Except as disclosed on **Schedule 2.3**, neither the execution, delivery and performance of this Agreement and the ancillary documents to which any of the Seller is a party, nor the consummation of the contemplated transactions will not (a) conflict with, result in a violation or breach of, constitute a default under any law, regulation, or governmental order applicable to the Seller, the Business or Acquired Assets; (b) conflict with, result in a violation or breach of, constitute a default under any provision of the articles of organization, operating agreement or other organizational documents of the Seller; or (c) conflict with, result in a violation or breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any agreement, contract, lease, license, instrument or other arrangement to which any of the Seller is a party or is bound or to which any of the Seller's assets are subject.  No consent, approval, authorization or order of any court, governmental agency or body, or third party is required for the Seller to consummate the transactions contemplated by this Agreement.

2.4    **Title to Assets; Sufficiency of Assets**.  Except as disclosed in **Schedule 2.4**, the Acquired Assets are free and clear of all security interests, liens, encumbrances of any nature, infringements, licenses, liens or claims of third parties.  The Seller has good and marketable title to, a valid license to or a valid leasehold interest in the Acquired Assets.  The Acquired Assets are in good operating condition and constitute all of the assets used or necessary for the operation of the Business as presently conducted.

4863-6475-9071, v.7

DocuSign Envelope ID: 72D05ED4-5A9D-4E9B-ABFE-0606BD18FF67

2.5 **Disclosure.** No representation or warranty made by the Seller herein or in any agreements, certificates or documents delivered in connection with this Agreement contains any untrue statement of a material fact or omits to state a material fact necessary to make such representation or warranty not misleading.

3. **Representations and Warranties of the Buyer**. The Buyer represents and warrants to the Seller that the statements contained in this Section 3 are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date.

3.1 **Organization, Qualification and Power**. The Buyer is a corporation, duly organized, validly existing and in good standing under the laws of the State of Nevada. The Buyer is duly authorized to conduct business and is in good standing under the laws of each jurisdiction where qualification is required. The Buyer has full corporate power and authority and all permits and licenses necessary to carry on the businesses in which it is engaged and in which it presently proposes to engage, and to own and use the properties owned and used by it.

3.2 **Authorization of Transaction**. The Buyer has full power and authority, corporate or otherwise, to enter into and perform its obligations under this Agreement and the ancillary documents to which the Buyer is a party. The execution and delivery by the Buyer of this Agreement and any ancillary documents to which the Buyer is a party, the performance by the Buyer of its obligations hereunder and the consummation by the Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of the Buyer. This Agreement and the ancillary documents to which the Buyer is a party constitute the valid and legally binding obligations of the Buyer, enforceable in accordance with their respective terms and conditions.

3.3 **Noncontravention**. Neither the execution, delivery and performance of this Agreement or the ancillary documents to which the Buyer is a party, nor the consummation of the contemplated transactions will not (a) conflict with or result in a violation or breach of, or default under, any law, order or regulation to which the Buyer is subject; (b) conflict with or result in a violation or breach of any provision of the articles of incorporation, bylaws or other organizational documents of the Buyer; or (c) conflict with, result in a violation or breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any agreement, contract, lease, license, instrument or other arrangement to which the Buyer is a party or is bound or to which any of the Buyer's assets are subject.

3.4 **Broker Fees**. The Buyer does not have any liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which the Seller could become liable or obligated.

5

DocuSign Envelope ID: 72D05ED4-5A9D-4E9B-ABFE-0606BD18FF67

4.    **Closing Conditions**.

4.1    **Conditions to Obligation of the Buyer**.  The obligation of the Buyer to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

(a)    The representations and warranties set forth in Section 2 of this Agreement, the ancillary documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all material respects at and as of the Closing Date;

(b)    The Seller will have performed and complied with all of its, his or her covenants in all material respects through the Closing;

(c)    The Seller will have procured all required governmental and third party consents, authorizations and approvals;

(d)    No action, suit or proceeding will be pending or threatened before any court or quasi-judicial or administrative agency of any federal, state, local or foreign jurisdiction or before any arbitrator wherein an unfavorable injunction, judgment, order, decree, ruling or charge would adversely affect any of the transactions contemplated by this Agreement, the right of the Buyer to own the Acquired Assets, or the right of the Buyer to acquire and operate the Business;

(e)    The documents required under Section 1.6 hereof shall be tendered by the Seller for delivery to the Buyer at the Closing;

(f)    There will not have occurred a material adverse change in the Seller's business, operations, properties, financial condition, assets (including the Acquired Assets), liabilities or prospects, individually or collectively; and

(g)    The Seller will have delivered such other documents and instruments as are reasonably necessary or appropriate to effect the consummation of the contemplated transactions or that may be required under any laws or any agreements to which the Seller is a party.

4.2    **Conditions to Obligation of the Seller**.  The obligation of the Seller to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

(a)    The representations and warranties set forth in Section 3 of this Agreement, the ancillary documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all material respects at and as of the Closing Date;

(b)    The Buyer will have performed and complied with all of its covenants in all material respects through the Closing;

4863-6475-9071, v.7

DocuSign Envelope ID: 72D05ED4-5A9D-4E9B-ABFE-0606BD18FF67

(c)    No action, suit or proceeding will be pending or threatened before any court or quasi-judicial or administrative agency of any federal, state, local or foreign jurisdiction or before any arbitrator wherein an unfavorable injunction, judgment, order, decree, ruling or charge would adversely affect any of the transactions contemplated by this Agreement, the right of the Buyer to own the Acquired Assets, or the right of the Buyer to acquire and operate the Business;

(d)    The Buyer will have entered into the ancillary documents identified in Section 1.5 of this Agreement, and all such agreements must be in full force and effect; and

(e)    The Buyer will have delivered other documents and instruments as are reasonably necessary or appropriate to effect the consummation of the contemplated transactions or that may be required under any laws or any agreements to which the Buyer is a party.

4.3    **Waiver**.  A Party may waive an obligation owed to it by another Party under this Section 6 by executing a written statement of such waiver prior to or at the Closing.

5.    **Remedies for Breaches of this Agreement**.

5.1    **Survival of Representations, Warranties and Covenants**.  The representations, warranties and covenants contained in this Agreement will survive the Closing and continue in full force and effect until the expiration of the applicable statute of limitations.

5.2    **Indemnification by the Seller**.  Subject to the limitations and qualifications set forth in this Agreement:

(a)    The Seller agrees to indemnify the Buyer and its officers, directors, employees, agents and affiliates (the "**Buyer Parties**") from and against the entirety of any actions, suits, proceedings, investigations, audits, charges, complaints, claims, losses, demands or damages, including reasonable attorney fees and costs (collectively, "**Adverse Consequences**") the Buyer Parties may suffer through and after the date of the claim for indemnification resulting from, arising out of, relating to, in the nature of, or caused by:

(i)    a breach or non-fulfillment by the Seller of any representations or warranties or covenants contained in this Agreement, the ancillary documents or any certificate or instrument delivered by or on behalf of the Seller pursuant to this Agreement, provided that the Buyer makes a written claim for indemnification;

(ii)    any liability other than Assumed Liability, of the Seller that becomes a liability of the Buyer by operation of law under any

7

4863-6475-9071, v.7

DocuSign Envelope ID: 72D05ED4-5A9D-4E9B-ABFE-0606BD18FF67

common law doctrine of de facto merger or successor liability, under environmental, health and safety requirements, employment laws, employee benefit laws or otherwise; and

(iii)    any liability of the Seller for unpaid taxes, fees, assessments or charges of any kind whatsoever, or any interest, additions or penalties with respect thereto. with respect to any tax year or portion thereof ending on or before the Closing Date (or for any tax year beginning before and ending after the Closing Date to the extent allocable to the portion of such period beginning before and ending on the Closing Date).

(b)    The Seller's indemnification obligations for breach of the representations, warranties and covenants contained in this Agreement shall be limited to the amount of the Purchase Price.

5.3    **Indemnification by the Buyer**.  The Buyer agrees to indemnify each of the Seller and its officers, governors, employees, agents and affiliates (collectively, the "**Seller Parties**") from and against the entirety of any Adverse Consequences the Seller Parties may suffer through and after the date of the claim for indemnification resulting from, arising out of, relating to, in the nature of or caused by a breach by the Buyer of any representations or warranties or non-fulfillment of any covenants contained in this Agreement, the ancillary documents or any certificate or instrument delivered by or on behalf the Buyer pursuant to this Agreement, provided that any of the Seller makes a written claim for indemnification against the Buyer.  The Buyer's indemnification obligations shall be limited to the amount of the Purchase Price.

5.4    **Matters Involving Third Parties**.

(a)    If any third party shall notify either Party (the "**Indemnified Party**") with respect to any matter (a "**Third Party Claim**") that may give rise to a claim for indemnification against any other Party (the "**Indemnifying Party**") under this Section 5, then the Indemnified Party shall promptly notify each Indemnifying Party in writing and shall provide information regarding the nature of the Third Party Claim to the extent known by the Indemnified Party.  Delay on the part of the Indemnified Party in notifying any Indemnifying Party shall not relieve the Indemnifying Party from his, her or its obligation unless (and then solely to the extent) the Indemnifying Party is prejudiced.

(b)    The Indemnifying Party will have the right to defend the Indemnified Party against the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party so long as (i) the Indemnifying Party notifies the Indemnified Party in writing within 15 days after the Indemnified Party has given notice of the Third Party Claim that the Indemnifying Party will indemnify the Indemnified Party from and against

4863-6475-9071, v.7

DocuSign Envelope ID: 72D05ED4-5A9D-4E9B-ABFE-0606BD18FF67

the entirety of any Adverse Consequences the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of or caused by the Third Party Claim, (ii) the Indemnifying Party provides the Indemnified Party with evidence reasonably acceptable to the Indemnified Party that the Indemnifying Party will have the financial resources to defend against the Third Party Claim and fulfill its indemnification obligations, (iii) the Third Party Claim involves only money damages and does not seek an injunction or other equitable relief against the Indemnified Party, (iv) settlement of, or an adverse judgment with respect to, the Third Party Claim is not, in the good faith judgment of the Indemnified Party, likely to establish a precedential custom or practice materially adverse to the continuing business interests of the Indemnified Party, and (v) the Indemnifying Party conducts the defense of the Third Party Claim actively and diligently.

(c) So long as the Indemnifying Party is conducting the defense of the Third Party Claim in accordance with Section 5.4(b), (i) the Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim, (ii) the Indemnified Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party (not to be withheld unreasonably), and (iii) the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party (not to be withheld unreasonably).

(d) If any of the conditions in Section 5.4(b) is not or is no longer satisfied, (i) the Indemnified Party may defend against, and consent to the entry of any judgment or enter into any settlement with respect to, the Third Party Claim in any manner it reasonably may deem appropriate (and the Indemnified Party need not consult with, or obtain any consent from, any Indemnifying Party), (ii) the Indemnifying Party will reimburse the Indemnified Party promptly and periodically for the costs of defending against the Third Party Claim (including reasonable attorney fees and expenses), and (iii) the Indemnifying Parties will remain responsible for any Adverse Consequences the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim to the fullest extent provided in this Section 5.

5.5 **Other Indemnification Provisions**. The above indemnification provisions are in addition to, and not in derogation of, any statutory, equitable or common law remedy any Party may have with respect to the transactions contemplated by this Agreement.

9

4863-6475-9071, v.7

DocuSign Envelope ID: 72D05ED4-5A9D-4E9B-ABFE-0606BD18FF67

6.    **Termination**.

    6.1    **Termination of Agreement**.  The Parties may terminate this Agreement as provided below:

        (a)    the Buyer and the Seller may terminate this Agreement by mutual written consent at any time prior to the Closing;

        (b)    the Buyer may terminate this Agreement by giving written notice to the Seller at any time prior to the Closing if Buyer is not reasonably satisfied with the results of its continuing business, legal and accounting due diligence regarding the Seller;

        (c)    the Buyer may terminate this Agreement by giving written notice to the Seller at any time prior to the Closing in the event the Seller has breached any representation, warranty or covenant contained in this Agreement in any material respect, the Buyer has notified the Seller of such breach and the breach has continued without cure or written waiver of such breach by the Buyer for a period of 30 days after the notice of such breach; and

        (d)    the Seller may terminate this Agreement by giving written notice to the Buyer at any time prior to the Closing in the event the Buyer has breached any material representation, warranty or covenant contained in this Agreement in any material respect, the Seller has notified the Buyer of such breach and the breach has continued without cure or written waiver of such breach by the Seller for a period of 30 days after the notice of such breach.

    6.2    **Effect of Termination**.  If any Party terminates this Agreement pursuant to Section 6.1, all rights and obligations of the Parties under this Agreement will terminate except the obligations under Section 5.1 will survive.

7.    **Miscellaneous**.

    7.1    **No Third-Party Beneficiaries**. Except for the indemnifications provisions set forth above, this Agreement will not confer any rights or remedies upon any person other than the Parties and their respective successors and permitted assigns.

    7.2    **Entire Agreement**.  This Agreement, the Exhibits and the Schedules and any documents, certificates or other instruments delivered pursuant to this Agreement constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations by or between the Parties, written or oral, to the extent they related in any way to the subject matter of this Agreement.

    7.3    **Succession and Assignment**.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

4863-6475-9071, v.7

DocuSign Envelope ID: 72D05ED4-5A9D-4E9B-ABFE-0606BD18FF67

The Buyer may assign this Agreement and any of its rights, interests or obligations under this Agreement to any of its subsidiary or affiliate without the prior written approval of the Seller.  The Seller may not assign either this Agreement or any of its rights, interests or obligations under this Agreement.

7.4     **Counterparts and Facsimile Signatures**.  This Agreement may be executed in two or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument, and by facsimile.

7.5     **Notices**.  Any notice, offer, request, demand, claim or other communication provided for by this Agreement must be in writing and will be deemed given or delivered when delivered by hand, transmitted by facsimile or email or three days after the day when deposited in the United States mail, certified or registered, return receipt requested, postage prepaid and properly addressed to the intended recipient. Any Party may send any notice, request, demand, claim or other communication to the intended recipient at the address set forth above using any other means, but no such notice, request, demand, claim or other communication will be deemed to have been duly given unless and until it actually is received by the intended recipient.

7.6     **Governing Law; Consent to Jurisdiction**.  This Agreement will be governed by and construed in accordance with the domestic laws of the State of Texas without giving effect to any choice or conflict of law provision or rule.  Each of the Parties submits to the jurisdiction of any state or federal court sitting in the City of Austin, County of Travis, Texas, in any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect to the action or proceeding may be heard and determined there.

7.7     **Amendments and Waivers**.  No amendment of any provision of this Agreement will be valid unless the same is in writing and signed by the Parties.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant under this Agreement, whether intentional or not, will be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant under this Agreement.

7.8     **Severability**.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability of the remaining terms and provisions of this Agreement or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

7.9     **Expenses**.  Whether or not the transactions under this Agreement are consummated, each of the Buyer, the Seller will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and these transactions.

11

DocuSign Envelope ID: 72D05ED4-5A9D-4E9B-ABFE-0606BD18FF67

7.10 **Specific Performance**. Each of the Parties acknowledges and agrees that the other Party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached. Accordingly, each of the Parties agrees that the other Party is entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement in any action instituted, in addition to any other remedy to which it may be entitled, at law or in equity.

**THE REMAINDER OF THIS PAGE IS BLANK.  SIGNATURE PAGE FOLLOWS.**

12

4863-6475-9071, v.7

DocuSign Envelope ID: 72D05ED4-5A9D-4E9B-ABFE-0606BD18FF67

The Parties have executed this Agreement as of the date first above written.

**BUYER:**

American Metals Recovery and Recycling
Inc.

By _Joseph O'Bell_
Its _Secretary_

**SELLER:**

Multiband Global Resources, LLC

By _James Frinzi_
Its _CEO_

13

4863-6475-9071, v.7

DocuSign Envelope ID: 72D05ED4-5A9D-4E9B-ABFE-0606BD18FF67

## SCHEDULE 1
### Acquired Assets

1. One Million dollars ($1M USD) in cash.

2. Acquired Contracts:

   Frontier E-Waste Recycling Contract.

3. Office lease with Escalade Westbank, LLC.

4. Office equipment and furniture up to $3,000.

5. The trade names "Multiband" and "Multiband Global" the marks and logos for "Multiband Global as intended by the parties to be acquired by that certain Trademark Acquisition Agreement made by and between Goodman Networks Inc., a Texas corporation, or its assignees, and the Buyer.

14

4863-6475-9071, v.7

DocuSign Envelope ID: 72D05ED4-5A9D-4E9B-ABFE-0606BD18FF67

**SCHEDULE 2.3**
**Consents**

None.

4863-6475-9071, v.7

DocuSign Envelope ID: 72D05ED4-5A9D-4E9B-ABFE-0606BD18FF67

**SCHEDULE 2.4**
**Title to Assets**

None.

16

DocuSign Envelope ID: 72D05ED4-5A9D-4E9B-ABFE-0606BD18FF67

# EXHIBIT A

## Assignment and Assumption Agreement

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Agreement**") between American Metals Recovery & Recycling Inc. (the "**Buyer**"), and Multiband Global Resources, LLC, a Delaware limited liability company (the "**Seller**"), takes effect on August 31  2022.

## RECITALS

A.  Pursuant to that certain Asset Purchase Agreement dated August 31, 2022 among the Buyer and the Seller (the "**Purchase Agreement**"), the Seller has agreed, among other things, to assign, transfer and convey to the Buyer all of the Seller's right, title and interest in, to and under the Acquired Contracts.

B.  The Seller desires to assign such right, title and interest in, to and under the Acquired Contracts.

C.  All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Purchase Agreement.

## AGREEMENT

In consideration of the above recitals and the promises set forth in this Agreement, the Parties agree as follows:

1.  **Assignment**.  Subject to the terms and conditions of the Purchase Agreement, effective as of the Closing Date, the Seller does hereby assigns, transfers and delivers to the Buyer, its successors and permitted assigns, all of the Seller's right, title and interest in, to and under the Acquired Contracts.

2.  **Acceptance and Assumption**.  Subject to the terms and conditions of the Purchase Agreement, effective as of the Closing Date, the Buyer does hereby accept the assignment by the Seller of the Acquired Contracts.

3.  **Limitation of Assumption**.  Notwithstanding any provisions of this Agreement to the contrary, nothing contained in this Agreement shall in any way supersede, modify, replace, amend, change, rescind, waive, exceed, expand, enlarge or in any way affect the provisions, including warranties, covenants, agreements, conditions, representations or, in general any of rights and remedies, and any of the obligations and indemnifications of the Seller or Buyer set forth in the Purchase Agreement nor shall this Agreement expand or enlarge any remedies under the Purchase Agreement including without limitation any limits on indemnification specified therein.  This Agreement is intended only to effect the transfer of certain property transferred pursuant to the Purchase Agreement and shall be governed entirely in accordance with the terms and conditions of the Purchase Agreement.

17

4863-6475-9071, v.7

DocuSign Envelope ID: 72D05ED4-5A9D-4E9B-ABFE-0606BD18FF67

4. **Limitation on Assignment**. Nothing in this Agreement will be deemed to constitute an assignment or an attempt to assign an Acquired Contract if the attempted assignment of any such document without the consent of the other Party to such document would constitute a breach of such document or affect in any way the rights of the Seller under such document. If the consent of any such other Party has not been obtained or the assignment under this Agreement would be ineffective or otherwise would affect the rights of the Seller or the Buyer under such document, the Seller will cooperate with the Buyer in any reasonable arrangement designed to provide for the Buyer the benefits under such document, including the enforcement, at the cost of the Seller and for the benefit of the Buyer, of any and all rights of the Seller against such other Party to such document arising out of the breach or cancellation of such document by such other Party or otherwise.

5. **Governing Law**. This Agreement shall be governed by the laws of the State of Texas without regard to its conflicts of law principles.

6. **Counterparts**. This Agreement may be executed in counterparts and when taken together shall constitute one and the same agreement.

7. **Further Assurances**. Each Party will from the date of this Agreement, upon the reasonable request of the other Party, execute such other documents as the other Party may reasonably request to obtain the full benefit of this Agreement.

The Parties have executed this Agreement as of the date first above written.

**BUYER**:

American Metals Recovery & Recycling Inc.

By _____Joseph O Bell_____

Its _____Secretary_____

**SELLER**:

Multiband Global Resources, LLC

By _____James Frinzi_____

Its _____CEO_____

18

4863-6475-9071, v.7

DocuSign Envelope ID: 72D05ED4-5A9D-4E9B-ABFE-0606BD18FF67

**EXHIBIT B**
Bill of Sale

**BILL OF SALE**

This BILL OF SALE, dated as of August 31, 2022, is being executed and delivered by Multiband Global Resources LLC, a Delaware limited liability company (the "**Seller**"), pursuant to that certain Asset Purchase Agreement, dated as of August 31 , 2022 (the "**Purchase Agreement**"), by and among the among American Metals Recovery & Recycling Inc. (the "**Buyer**"), and the Seller shall be effective upon the Closing, as such term is defined in the Purchase Agreement. The execution and delivery of this Bill of Sale is a condition to Buyer's obligations under the Purchase Agreement.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Seller hereby agrees as follows:

1. Capitalized terms used herein but not defined herein shall have the meanings assigned such terms in the Purchase Agreement.

2. Subject to the terms and conditions of the Purchase Agreement, effective as of the Closing Date, the Seller hereby sells, conveys, assigns, transfers and delivers to Buyer, and Buyer hereby agrees to take title of, free and clear of all security interests, liens, claims, charges, restrictions and encumbrances of any nature, all of the Seller's right, title, and interest in and to the Acquired Assets.

3. Specifically excluded from the sale, conveyance, transfer, assignment and delivery hereunder are the Excluded Assets.

4. From time to time after the date hereof, the Seller shall execute and deliver, or cause its affiliates to execute and deliver, to the Buyer such instruments of sale, transfer, conveyance, assignment and delivery, and such consents, assurances, powers of attorney and other instruments as may be reasonably requested by the Buyer or its counsel in order to vest in the Buyer all right, title and interest of the Seller in and to the Acquired Assets and otherwise in order to carry out the purpose and intent of this Bill of Sale.

5. Notwithstanding any provisions of this Bill of Sale to the contrary, nothing contained in this Bill of Sale shall in any way supersede, modify, replace, amend, change, rescind, waive, exceed, expand, enlarge or in any way affect the provisions, including warranties, covenants, agreements, conditions, representations or, in general any of rights and remedies, and any of the obligations and indemnifications of the Seller or the Buyer set forth in the Purchase Agreement nor shall this Bill of Sale expand or enlarge any remedies under the Purchase Agreement including without limitation any limits on indemnification specified therein. This Bill of Sale is intended only to effect the transfer of certain property transferred pursuant to the Purchase Agreement and shall be governed entirely in accordance with the terms and conditions of the Purchase Agreement.

6. This Bill of Sale shall be governed by and construed in accordance with the laws of the State of Texas applicable to contracts executed and performed in such State, without giving effect to its conflicts of laws principles.

19

4863-6475-9071, v.7

DocuSign Envelope ID: 72D05ED4-5A9D-4E9B-ABFE-0606BD18FF67

IN WITNESS WHEREOF, the Seller has caused this Bill of Sale to be executed and delivered on the date and year first written above.

**MULTIBAND GLOBAL RESOURCES, LLC.**

By: _____

Name: _James Frinzi_____

Title: _CEO_____

1

4863-6475-9071, v.7

DocuSign Envelope ID: 72D05ED4-5A9D-4E9B-ABFE-0606BD18FF67

**EXHIBIT C**
**Form of Trademark Acquisition Agreement**

4863-6475-9071, v.7

9/8/22, 8:53 AM

EX-3.03 3 ex3_03.htm EXHIBIT 3.03

**Exhibit 3.03**



**BARBARA K. CEGAVSKE**
Secretary of State
202 North Carson Street
Carson City, Nevada 89701-4201
(775) 684-5708
Website: www.nvsos.gov

## Certificate, Amendment or Withdrawal of Designation

### NRS 78.1955, 78.1955(6)

☐ Certificate of Designation
☐ Certificate of Amendment to Designation - Before Issuance of Class or Series
☐ Certificate of Amendment to Designation - After Issuance of Class or Series
☒ Certificate of Withdrawal of Certificate of Designation

**TYPE OR PRINT - USE DARK INK ONLY - DO NOT HIGHLIGHT**

| | |
|---|---|
| **1. Entity information:** | Name of entity:<br>American Metals Recovery and Recycling Inc.<br><br>Entity or Nevada Business Identification Number (NVID):  NV20091055301 |
| **2. Effective date and time:** | For Certificate of Designation or Amendment to Designation Only (Optional):  Date:       Time:<br>(must not be later than 90 days after the certificate is filed) |
| **3. Class or series of stock:** (Certificate of Designation only) | The class or series of stock being designated within this filing: |
| **4. Information for amendment of class or series of stock:** | The original class or series of stock being amended within this filing: |
| **5. Amendment of class or series of stock:** | ☐ Certificate of Amendment to Designation- Before Issuance of Class or Series<br>As of the date of this certificate no shares of the class or series of stock have been issued.<br><br>☐ Certificate of Amendment to Designation- After Issuance of Class or Series<br>The amendment has been approved by the vote of stockholders holding shares in the corporation entitling them to exercise a majority of the voting power, or such greater proportion of the voting power as may be required by the articles of incorporation or the certificate of designation. |
| **6. Resolution:** Certificate of Designation and Amendment to Designation only) | By resolution of the board of directors pursuant to a provision in the articles of incorporation this certificate establishes OR amends the following regarding the voting powers, designations, preferences, limitations, restrictions and relative rights of the following class or series of stock.* |
| **7. Withdrawal:** | Designation being Withdrawn: Series A Preferred Stock   Date of Designation: 08/22/2014<br><br>No shares of the class or series of stock being withdrawn are outstanding.<br><br>The resolution of the board of directors authorizing the withdrawal of the certificate of designation establishing the class or series of stock: *<br><br>Please see the resolution of the board of directors authorizing the withdrawal attached. |
| **8. Signature:** (Required) | X _____  Joseph O'Bell, Secretary Date:  8/31/2022<br>Signature of Officer |

* Attach additional page(s) if necessary
This form must be accompanied by appropriate fees.

Page 1 of 1
Revised: 1/1/2019

EX-5.01 4 ex5_01.htm EXHIBIT 5.01

**Exhibit 5.01**

9/8/22, 8:53 AM Case 22-31641-mvl7 Doc 45-1 sec.gov Filed 11/01/22 /Archives/edgar/1488638/... Entered 11/01/22 12:31:30 Desc

Exhibit A    Page 54 of 78

## CERTIFICATE OF DESIGNATIONS,
## PREFERENCES AND RIGHTS OF
## SERIES A CONVERTIBLE PREFERRED STOCK
## OF
## AMERICAN METALS RECOVERY AND
## RECYCLING INC.

American Metals Recovery and Recycling Inc., a corporation organized and existing under the laws of the State of Nevada (the "Company"), hereby certifies that the following resolution was adopted by the Board of Directors of the Company (the "Board") on August 31, 2022, in accordance with the provisions of its Articles of Incorporation (as amended, the "Articles of Incorporation") and bylaws. The authorized series of the Company's preferred stock shall have the following preferences, privileges, powers and restrictions thereof, as follows:

**RESOLVED**, that pursuant to the authority granted to and vested in the Board in accordance with the provisions of the Articles of Incorporation and bylaws of the Company, the Board hereby authorizes a series of the Company's preferred stock (the "Preferred Stock"), and hereby states the designation and number of shares, and fixes the relative rights, preferences, privileges, powers and restrictions thereof as follows:

### I.    NAME OF THE COMPANY

American Metals Recovery and Recycling Inc.

### II.    DESIGNATION AND AMOUNT; DIVIDENDS

A.    Designation.  The designation of said series of Preferred Stock shall be Series A Convertible Preferred Stock, $0.001 par value per share (the "Series A Preferred Stock").

B.    Number of Shares. The number of shares of Series A Preferred Stock authorized shall be one million and six hundred thousand (1,600,000) shares. Each share of Series A Preferred Stock shall have a stated value equal to $100 (the "Stated Value").

C.    Dividends.  Dividends shall not be payable on the Series A Preferred.

### III.    LIQUIDATION PREFERENCE

In the event of any liquidation, dissolution or winding up of the Company, either voluntary or involuntary, the holders of record of shares of Series A Preferred Stock shall be entitled to receive, at their option, immediately prior and in preference to any distribution to the holders of the Company's common stock, $0.001 par value per share (the "Common Stock"), and other junior securities, a liquidation preference equal to the Stated Value per share. If upon the occurrence of such event the assets and funds thus distributable among the holders of the Series A Preferred Stock shall be insufficient to permit the payment to such holders of the full preferential amounts due to the holders of the Series A Preferred Stock, then the entire assets and funds of the Company legally available for distribution to holders of Series A Preferred Stock shall be distributed among the holders of the Series A Preferred, pro rata, based on the liquidation amounts to which such holders are entitled.

4855-2602-9343, v.6

Series A Preferred Stock shall rank (i) senior to Common Stock and any other class or series of capital stock of the Corporation created specifically ranking by its terms junior to the Series A Preferred Stock; and (ii) junior to any class or series of capital stock of the Corporation hereafter created specifically ranking by its terms senior to any Series A Preferred Stock, in each case, as to distributions of assets upon liquidation, dissolution or winding up of the Corporation, whether voluntarily or involuntarily.

A consolidation or merger of the Company with or into any other corporation or corporations, or a sale, conveyance or distribution of all or substantially all of the assets of the Company shall be deemed to be a liquidation, dissolution or winding up within the meaning of this section if the shares of stock of the Company outstanding immediately prior to such transaction represent immediately after such transaction less than a majority of the voting power of the surviving corporation (or the acquirer of the Company's assets in the case of a sale of assets).

IV. **CONVERSION**

(a)  Conversion

(i)  Subject to the terms and conditions herein, all shares of Series A Preferred Stock shall convert Stock into such number of fully paid and non-assessable shares of Common Stock that represent twenty percentage (20%) of the Company's issued and outstanding Common Stock (the "Conversion Shares") as computed at the Conversion Time (defined below) of such conversion (the "Conversion"). The time of the Conversion shall be the date on which the Company's securities are listed on a national exchange, after giving effect to any securities issued in connection with such uplisting to a national exchange. Upon the Conversion and the issuance of the Conversion Shares further thereto, the shares of Series A Preferred Stock shall be deemed cancelled and of no further force or effect. The holder of Series A Preferred Stock shall deliver a written notice to the Company that the holder elects to convert all of the shares of Series A Preferred Stock held by such holder (a "Conversion Notice"), which notice shall specify the name or names (with address or addresses) in which shares of the Conversion Shares are to be issued.

(ii)  The Conversion of Series A Preferred Stock shall be deemed to have been made one day prior the Company is listed on Nasdaq for trading Common Stock (the "Conversion Date"). Until the Conversion Date with respect to any share of Series A Preferred Stock has occurred, such share of Series A Preferred Stock will remain outstanding and will be entitled to all of the powers, designations, preferences and other rights provided herein, including entitle the holder thereof to the voting rights provided in Section V herein. Effective as of the Conversion Date, the rights of the holder of such shares of Series A Preferred Stock as a holder thereof will cease and from and after such time the holder entitled to receive Common Stock issuable upon such conversion will be treated for all purposes as the record holder of such Common Stock.

(iii)  As promptly as practicable on or after the Conversion Date, the Company will update or cause to be updated the Company's stock register to reflect the shares of Common Stock held by such holder as a result of the Conversion and issue and deliver, or cause to be issued and delivered evidence of such issuance reasonably satisfactory to such holder. Each holder agrees to surrender at the office of the Company the certificate(s) in respect of the Series A Preferred Stock so converted, duly endorsed or assigned to the Company or in blank, as applicable.

(b)  Conversion Adjustments

(i) Adjustments for Reclassification, Exchange and Substitution. Subject to Section III

4855-2602-9343, v.6

above, if Common Stock issuable upon conversion of Series A Preferred Stock shall be changed into the same or a different number of shares of any other class or classes of stock, whether by capital reorganization, reclassification or otherwise (other than a subdivision or combination of shares provided for above), then, in any such event, in lieu of the number of shares of Common Stock which the holders would otherwise have been entitled to receive, each holder of Series A Preferred Stock shall have the right thereafter to convert such shares of Series A Preferred Stock into a number of shares of such other class or classes of stock which a holder of the number of shares of Common Stock deliverable upon conversion of the Series A Preferred Stock immediately before that change would have been entitled to receive in such reorganization or reclassification, all subject to further adjustment as provided herein with respect to such other shares.

(ii) Other Distributions. In the event the Company shall declare a distribution payable in securities of other persons, evidences of indebtedness issued by this Company or other persons, assets (excluding cash dividends) or options or rights as applicable, then, in each such case for the purpose of this Section IV, the holders of the Series A Preferred Stock shall be entitled to a proportionate share of any such distribution as though they were the holders of the number of shares of Common Stock into which their shares of Series A Preferred Stock are convertible as of the record date fixed for the determination of the holders of Common Stock entitled to receive such distribution.

(iii) Adjustment upon issuance of shares of Common Stock. If and whenever on or after the date on which the holder received shares of Series A Preferred Stock ("Issuance Date") through the Conversion Date (the "Anti-Dilution Termination Date"), the Company issues or sells, or in accordance with the terms herein is deemed to have issued or sold, any shares of Common Stock or Common Stock Equivalents (a "Dilutive Issuance"), the number of Conversion Shares issuable upon conversion will be adjusted to entitle the holder to acquire such number of shares of Common Stock (the "Adjustment Shares") necessary to maintain the holders Fully-Diluted Ownership Percentage at the time of the Issuance Date. "Fully-Diluted Ownership Percentage" shall mean the percentage ownership calculated by dividing (i) the aggregate number of Conversion Shares as of the Issuance Date by (ii) the aggregate number of all issued and outstanding shares of Common Stock or Common Stock Equivalents of the Company (including any shares of Common Stock or Common Stock Equivalents which are issuable upon exercise or conversion of options, warrants or other securities or rights within 60 days of the date on which such calculation is being made). If the Series A Preferred Stock has not been converted prior to or on the Anti-Dilution Termination Date, the holder of such Series A Preferred Stock will, upon conversion, be entitled to the Conversion Shares and any Adjustment Shares as of the Anti-Dilution Termination Date and will not be subject to any further adjustment. "Common Stock Equivalents" shall mean any securities of the Company or a Company subsidiary which would entitle the holder thereof to acquire at any time Common Stock, including, without limitation, any debt, preferred stock, right, option, warrant or other instrument that is at any time convertible into or exercisable or exchangeable for, or otherwise entitles the holder thereof to receive, Common Stock.

(c)    Notice of Adjustment.  Upon any adjustment provided for under this section IV(b), the Company shall give written notice thereof, which notice shall state the Conversion Shares resulting from such adjustment, setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based.

(d)    Reservation of Shares.  The Company shall at all times reserve and keep available, out of its authorized but unissued shares of Common Stock or out of shares of Common Stock held in its treasury, solely for the purpose of effecting the conversion of the shares of the Series A Preferred, the full number of shares of Common Stock deliverable upon the conversion of all shares of the Series A Preferred Stock from time to time outstanding. The Company shall from time to time in accordance with Nevada law take all steps necessary to increase the authorized amount of its Common Stock if at any time the authorized number of shares of Common Stock remaining unissued shall not be sufficient to permit the conversion of

4855-2602-9343, v.6

all of the shares of the Series A Preferred. Notwithstanding the foregoing, in the event there are insufficient number of shares of Common Stock to effect a conversion under the terms hereunder, the holder shall not be permitted to convert into shares of Common Stock of the Company that have not yet been authorized.

(e)    Fractional Shares.  No fractional shares or scrip representing fractional shares of Common Stock shall be issued upon the conversion of the Series A Preferred Stock.  Fractional shares will be rounded to the next highest whole number.

## V.    VOTING RIGHTS

The holders of our Series A Preferred Stock will vote together with the holders of the Company's Common Stock on an as converted basis on each matter submitted to a vote of holders of Common Stock and shall represent 73.31% of the voting outstanding shares of Common Stock.

In addition, the affirmative vote of the holders of a majority of the Company's outstanding Series A Preferred Stock is required to (i) amend the Company's Articles of Incorporation or bylaws in a way that would be adverse to the holders of the Company's Series A Preferred, (ii) redeem or repurchase any capital stock of the Company, (iii) declare or pay dividends on any class of capital stock of the Company, or (iv) issue any securities in parity with or senior to the rights of the Series A Preferred Stock with respect to distributions of assets  upon liquidation, dissolution or winding up of the Company.

## VI.    REDEMPTION

The Series A Preferred Stock is not redeemable without the express written approval of at least 66.67% of all Series A holders.

## VII.    REISSUANCE

No shares of Series A Preferred Stock which have been converted to Common Stock shall be reissued by the Company; provided, however, that any such share, upon being converted and canceled, shall be restored to the status of an authorized but unissued share of Preferred Stock without designation as to series, rights or preferences and may thereafter be issued as a share of Preferred Stock not designated as Series A Preferred Stock.

## VIII.    NO IMPAIRMENT

The Company will not, by amendment of its Certificate of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Certificate of Designation and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the holders of the Series A Preferred Stock against impairment.

## IX.    MISCELLANEOUS

(a)    Lost or Stolen Certificates. Upon receipt by the Company of (i) evidence of the loss, theft, destruction or mutilation of any certificates for any Series A Preferred Stock  and (ii) in the case of loss, theft or destruction, indemnity (with a bond or other security) reasonably satisfactory to the Company, or in the case of mutilation, the certificate for Series A Preferred Stock  (surrendered for cancellation), the Company shall execute and deliver new certificates for Series A Preferred.

4855-2602-9343, v.6

(b)      Waiver. Notwithstanding any provision in this Certificate of Designation to the contrary, any provision contained herein and any right of the holders of Series A Preferred Stock granted hereunder may be waived as to all shares of Series A Preferred Stock (and the holders thereof) upon the unanimous written consent of the holders of the Series A Preferred Stock.

(c)      Notices. Any notices required or permitted to be given under the terms hereof shall be sent by certified or registered mail (return receipt requested) or delivered personally, by nationally recognized overnight carrier or by confirmed facsimile or email transmission, and shall be effective five (5) days after being placed in the mail, if mailed, or upon receipt or refusal of receipt, if delivered personally or by nationally recognized overnight carrier or confirmed facsimile transmission, in each case addressed to a party as set forth below, or such other address and telephone and fax number as may be designated in writing hereafter in the same manner as set forth in this Section.

If to the Company:
        American Metals Recovery and Recycling Inc..


        Attn: Joseph O'Bell, General Counsel


If to the holders of Series A Preferred Stock, to the address listed in the Company's books and records.

4855-2602-9343, v.6

IN WITNESS WHEREOF, the undersigned has signed this certificate as of the 31st day of August, 2022.

**AMERICAN METALS RECOVERY AND RECYCLING INC.**

By: _____

Name: Joseph O'Bell

Title: Secretary

4855-2602-9343, v.6

**Exhibit 5.02**

## CERTIFICATE OF DESIGNATIONS, PREFERENCES AND RIGHTS OF SERIES B CONVERTIBLE PREFERRED STOCK OF AMERICAN METALS RECOVERY AND RECYCLING INC.

American Metals Recovery and Recycling Inc., a corporation organized and existing under the laws of the State of Nevada (the "Company"), hereby certifies that the following resolution was adopted by the Board of Directors of the Company (the "Board") on August 31, 2022 in accordance with the provisions of its Articles of Incorporation (as amended, the "Articles of Incorporation") and bylaws. The authorized series of the Company's preferred stock shall have the following preferences, privileges, powers and restrictions thereof, as follows:

**RESOLVED**, that pursuant to the authority granted to and vested in the Board in accordance with the provisions of the Articles of Incorporation and bylaws of the Company, the Board hereby authorizes a series of the Company's preferred stock (the "Preferred Stock"), and hereby states the designation and number of shares, and fixes the relative rights, preferences, privileges, powers and restrictions thereof as follows:

### I.    NAME OF THE COMPANY

American Metals Recovery and Recycling Inc.

### II.    DESIGNATION AND AMOUNT; DIVIDENDS

A.    _Designation_. The designation of said series of Preferred Stock shall be Series B Convertible Preferred Stock, $0.001 par value per share (the "Series B Preferred Stock").

B.    _Number of Shares_. The number of shares of Series B Preferred Stock authorized shall be 54,000 shares. Each share of Series B Preferred Stock shall have a stated value equal to $100 (the "Stated Value").

C.    _Dividends_. Dividends shall not be payable on the Series B Preferred Stock.

### III.    LIQUIDATION PREFERENCE

Series B Preferred Stock shall rank (i) junior to the Series A Convertible Preferred Stock, which series is being authorized and established concurrently herewith, $0.001 par value per share (the "Series A Preferred Stock"); (ii) rank senior to all classes or series of shares of common stock of the Company, $0.001 par value per share (the "Common Stock"),; (iii) senior to any class or series of capital stock of the Company created specifically ranking by its terms junior to the Series B Preferred Stock; (iv) junior to any class or series of capital stock of the Company hereafter created specifically ranking by its terms senior to any Series B Preferred Stock; and (v) on a parity with any other class or series of capital stock of the Company created specifically ranking by its terms on parity with the Series B Preferred Stock, in each case, as to distributions of assets upon liquidation, dissolution or winding up of the Company, whether voluntarily or involuntarily.

Subject to the rights of holders of shares of the Series B Preferred Stock, in the event of any liquidation, dissolution or winding up of the Company, either voluntary or involuntary, the holders of record

4858-4473-0911, v.4

of shares of Series B Preferred shall be entitled to receive, at their option, immediately prior and in preference to any distribution to the holders of Common Stock and other junior securities, a liquidation preference equal to the Stated Value per share. If upon the occurrence of such event the assets and funds thus distributable among the holders of the Series B Preferred Stock shall be insufficient to permit the payment to such holders of the full preferential amounts due to the holders of the Series B Preferred Stock, then the entire assets and funds of the Company legally available for distribution to holders of Series B Preferred Stock shall be distributed among the holders of the Series B Preferred Stock, pro rata, based on the liquidation amounts to which such holders are entitled.

A consolidation or merger of the Company with or into any other corporation or corporations, or a sale, conveyance or distribution of all or substantially all of the assets of the Company shall be deemed to be a liquidation, dissolution or winding up within the meaning of this section if the shares of stock of the Company outstanding immediately prior to such transaction represent immediately after such transaction less than a majority of the voting power of the surviving corporation (or the acquirer of the Company's assets in the case of a sale of assets).

## IV.    <u>CONVERSION</u>

(a)    <u>Optional Conversion.</u>

(i)    Subject to the terms and conditions herein, each holder of shares of Series B Preferred Stock shall have the right to convert all or any portion of such holder's Series B Preferred Stock into fully paid and non-assessable shares of Common Stock at any time or from time to time at such holder's sole discretion (the "<u>Conversion Right</u>"). Each share of Series B Preferred Stock as to which the Conversion Right is exercised shall be converted into shares of the Company's issued and outstanding Common Stock at an exercise price of $3.13 per share, the ("<u>Conversion Shares</u>"). Upon any such optional conversion and the issuance of Conversion Shares further thereto, the shares of Series B Preferred Stock shall be deemed cancelled and of no further force or effect. The Conversion Right of a holder of Series B Preferred Stock shall be exercised by the holder by delivering written notice to the Company that the holder elects to convert all or a portion of the shares of Series B Preferred Stock held by such holder (a "<u>Conversion Notice</u>"), which notice shall state (i) the number of shares of Series B Preferred Stock that are being redeemed by such holder and (ii) specify the name or names (with address or addresses) in which shares of Common Stock are to be issued.

(i)    The conversion of any share of Series B Preferred Stock shall be deemed to have been made in connection with any exercise of the Conversion Right at the close of business on the date the Conversion Notice is deemed given (the "<u>Conversion Date</u>"). Until the Conversion Date with respect to any share of Series B Preferred Stock has occurred, such share of Series B Preferred Stock will remain outstanding and will be entitled to all of the powers, designations, preferences and other rights provided herein, including entitle the holder thereof to the voting rights provided in <u>Section V herein</u>. Effective as of the Conversion Date, the rights of the holder of such shares of Series B Preferred Stock as a holder thereof will cease and from and after such time the holder entitled to receive Common Stock issuable upon such conversion will be treated for all purposes as the record holder of such Common Stock.

(ii)    As promptly as practicable on or after the Conversion Date, the Company will update or cause to be updated the Company's stock register to reflect the shares of Common Stock held by such holder as a result of the Conversion and issue and deliver, or cause to be issued and delivered evidence of such issuance reasonably satisfactory to such holder. Each holder agrees to surrender at the office of the Company the certificate(s) in respect of the Series B Preferred Stock so converted, duly endorsed or assigned to the Company or in blank, as applicable.

4858-4473-0911, v.4

(b)    Conversion Adjustments

(i) Adjustments for Reclassification, Exchange and Substitution. Subject to Section III above, if Common Stock issuable upon conversion of Series B Preferred Stock shall be changed into the same or a different number of shares of any other class or classes of stock, whether by capital reorganization, reclassification or otherwise (other than a subdivision or combination of shares provided for above), then, in any such event, in lieu of the number of shares of Common Stock which the holders would otherwise have been entitled to receive, each holder of Series B Preferred Stock shall have the right thereafter to convert such shares of Series B Preferred Stock into a number of shares of such other class or classes of stock which a holder of the number of shares of Common Stock deliverable upon conversion of the Series B Preferred Stock immediately before that change would have been entitled to receive in such reorganization or reclassification, all subject to further adjustment as provided herein with respect to such other shares.

(ii)    Other Distributions. In the event the Company shall declare a distribution payable in securities of other persons, evidences of indebtedness issued by this Company or other persons, assets (excluding cash dividends) or options or rights as applicable, then, in each such case for the purpose of this Section IV, the holders of the Series B Preferred Stock shall be entitled to a proportionate share of any such distribution as though they were the holders of the number of shares of Common Stock into which their shares of Series B Preferred Stock are convertible as of the record date fixed for the determination of the holders of Common Stock entitled to receive such distribution.

(c)    Notice of Adjustment. Upon any adjustment provided for under this section IV(b), the Company shall give written notice thereof, which notice shall state the Conversion Shares resulting from such adjustment, setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based.

(d)    Reservation of Shares. The Company shall at all times reserve and keep available, out of its authorized but unissued shares of Common Stock or out of shares of Common Stock held in its treasury, solely for the purpose of effecting the conversion of the shares of the Series B Preferred Stock, the full number of shares of Common Stock deliverable upon the conversion of all shares of the Series B Preferred Stock from time to time outstanding. The Company shall from time to time in accordance with Nevada law take all steps necessary to increase the authorized amount of its Common Stock if at any time the authorized number of shares of Common Stock remaining unissued shall not be sufficient to permit the conversion of all of the shares of the Series B Preferred Stock. Notwithstanding the foregoing, in the event there are insufficient number of shares of Common Stock to effect a conversion under the terms hereunder, the holder shall not be permitted to convert into shares of Common Stock of the Company that have not yet been authorized.

(e)    Fractional Shares. No fractional shares or scrip representing fractional shares of Common Stock shall be issued upon the conversion of the Series B Preferred Stock. Fractional shares will be rounded to the next highest whole number.

V.    VOTING RIGHTS

The holders of our Series B Preferred Stock will vote together with the holders of the Company's Common Stock on an as converted basis on each matter submitted to a vote of holders of Common Stock.

In addition, the affirmative vote of the holders of a majority of the Company's outstanding Series

4858-4473-0911, v.4

B Preferred Stock is required to (i) amend the Company's Articles of Incorporation or bylaws in a way that would be adverse to the holders of the Company's Series B Preferred Stock, (ii) redeem or repurchase any capital stock of the Company, (iii) declare or pay dividends on any class of capital stock of the Company, or (iv) issue any securities in parity with (other than shares of Series A Preferred Stock) or senior to the rights of the Series B Preferred Stock with respect to distributions of assets upon liquidation, dissolution or winding up of the Company.

## VI. LIMITATIONS ON CONVERSION

The Company shall not effect the conversion of shares of Series B Preferred Stock, and a holder of Series B Preferred Stock shall not have the right to convert any such shares, to the extent that after giving effect to such conversion, such an individual, a corporation, a limited liability company, a partnership, an association, a trust or any other entity ("Person" together with such Person's affiliates) would beneficially own in excess of 4.99% (or, upon election by a Holder prior to the issuance of any shares of Preferred Stock, 9.99%) (the "Beneficial Ownership Limitation") of the shares of Common Stock outstanding immediately after giving effect to such conversion. For purposes of the foregoing sentence, the aggregate number of shares of Common Stock beneficially owned by such Person and its affiliates shall include the number of shares of Common Stock issuable upon conversion of shares of Series B Preferred Stock held by such Person and its affiliates with respect to which the determination of such sentence is being made, but shall exclude shares of Common Stock which would be issuable upon (i) conversion of the remaining, unexercised shares of Series B Preferred Stock beneficially owned by such Person and its affiliates and (ii) exercise or conversion of the unexercised or unconverted portion of any other securities of the Company beneficially owned by such Person and its affiliates (including, without limitation, any convertible notes or convertible preferred stock or warrants) subject to a limitation on conversion or exercise analogous to the limitation contained herein. Except as set forth in the preceding sentence, for purposes of this paragraph, beneficial ownership shall be calculated in accordance with Section 13(d) of the Exchange Act. The number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of securities of the Company, including shares of Series B Preferred Stock, by a holder thereof and its affiliates since the date as of which such number of outstanding shares of Common Stock was reported. By written notice to the Company, a holder of Series B Preferred Stock may from time to time increase or decrease the Beneficial Ownership Limitation to any other percentage specified in such notice; provided that (i) any such increase will not be effective until the sixty-first (61st) day after such notice is delivered to the Company, and (ii) any such increase or decrease will apply only to such holder. The provisions of this paragraph shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this Section IV to correct this paragraph (or any portion hereof) which may be defective or inconsistent with the intended Beneficial Ownership Limitation herein contained or to make changes or supplements necessary or desirable to properly give effect to such limitation.

## VII.    REDEMPTION

The Series B Preferred Stock is not redeemable without the express written approval of at least 66.67% of all Series B Preferred holders.

## VIII.   REISSUANCE

No shares of Series B Preferred Stock which have been converted to Common Stock shall be reissued by the Company; provided, however, that any such share, upon being converted and canceled, shall be restored to the status of an authorized but unissued share of Preferred Stock without designation as to series, rights or preferences and may thereafter be issued as a share of Preferred Stock not designated as Series B Preferred Stock.

## IX.  NO IMPAIRMENT

The Company will not, by amendment of its Certificate of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Certificate of Designation and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the holders of the Series B Preferred Stock against impairment.

## X.  MISCELLANEOUS

(a)    Lost or Stolen Certificates. Upon receipt by the Company of (i) evidence of the loss, theft, destruction or mutilation of any certificates for any Series B Preferred Stock  and (ii) in the case of loss, theft or destruction, indemnity (with a bond or other security) reasonably satisfactory to the Company, or in the case of mutilation, the certificate for Series B Preferred Stock  (surrendered for cancellation), the Company shall execute and deliver new certificates for Series B Preferred Stock.

(b)    Waiver. Notwithstanding any provision in this Certificate of Designation to the contrary, any provision contained herein and any right of the holders of Series B Preferred Stock  granted hereunder may be waived as to all shares of Series B Preferred Stock  (and the holders  thereof) upon the unanimous written consent of the holders of the Series B Preferred Stock.

(c)    Notices. Any notices required or permitted to be given under the terms hereof shall be sent by certified or registered mail (return receipt requested) or  delivered personally, by nationally recognized overnight carrier or by confirmed facsimile or email transmission, and shall be effective five (5) days after being placed in the mail, if mailed, or upon receipt or refusal of receipt, if delivered personally or by nationally recognized overnight carrier or confirmed facsimile transmission, in each case addressed to a party as set forth below, or such other  address and telephone and fax number as may be designated in writing hereafter in the same manner as set forth in this Section.

If to the Company:

American Metals Recovery and
Recycling Inc.

Attn: Joseph O'Bell, General Counsel

If to the holders of Series B Preferred Stock, to the address listed in the Company's books  and records.

4858-4473-0911, v.4

IN WITNESS WHEREOF, the undersigned has signed this certificate as of the 31st day of August, 2022.

**AMERICAN METALS RECOVERY AND RECYCLING INC.**

By: _____

Name:  Joseph O'Bell

Title:  Secretary

4858-4473-0911, v.4