# EXHIBIT A

66441683;1

FILED
11/19/2021 2:21 PM
Mary Angie Garcia
Bexar County District Clerk
Accepted By: Laura Castillo
Bexar County - 166th District Court

Case 22-31641-mvl7   Doc 77-2   Filed 11/22/22   Entered 11/22/22 09:32:05   Desc
Exhibit A   Page 2 of 24      6 CITS PPS   WJD

CAUSE NO. _____2021CI24147_____

| | | |
|---|---|---|
| **ARRIS SOLUTIONS, INC.,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **BEXAR COUNTY, TEXAS** |
| | § | |
| **GOODMAN NETWORKS INC. d/b/a** | § | |
| **GOODMAN SOLUTIONS;** | § | |
| **GNET ATC, LLC f/k/a GENESIS** | § | |
| **NETWORKS TELECOM SERVICES, LLC;** | § | |
| **JAMES FRINZI; JAMES GOODMAN;** | § | |
| **JASON GOODMAN; and BRAD KOZMA** | § | |
| | § | |
| *Defendants.* | § | **___ JUDICIAL DISTRICT** |

## ORIGINAL PETITION AND JURY DEMAND

Plaintiff ARRIS Solutions, Inc. ("**ARRIS**") files this Original Petition and Jury Demand (the "**Petition**") against Defendants Goodman Networks Inc. d/b/a Goodman Solutions ("**Goodman Solutions**"), GNET ATC, LLC f/k/a Genesis Telecom Services, LLC ("**GNET**"), James Frinzi, James Goodman, Jason Goodman, and Brad Kozma, and requests that the Court enter judgment in its favor on all causes of action.

### I.   INTRODUCTION

1.      ARRIS brings this lawsuit to recover more than $30 million stolen by Defendants pursuant to a fraudulent scheme.  Goodman Solutions and GNET are part of a web of companies owned and controlled by the Goodman family, including James Goodman and Jason Goodman.

2.      Beginning in 2008, ARRIS (through its predecessor, Motorola) began doing business with GNET (through its predecessor Genesis Telecom Services, LLC), pursuant to a Distributor Agreement.  Under that Agreement, ARRIS sold products on consignment to GNET for the benefit of AT&T Inc. ("**AT&T**").  GNET promised that it would require AT&T to make payments for those products directly into an escrow account managed by an independent, third-

party escrow agent. On a periodic basis, the escrow agent would pay a fractional percentage of the AT&T payment to GNET for its role as consignee, and the balance would be paid to ARRIS. Although this payment relationship continued as intended for many years, beginning in approximately 2019, unbeknownst to ARRIS, GNET stopped requiring AT&T to make its payments directly into escrow. Instead, GNET began factoring the AT&T receivables through Citibank and then self-funding the escrow account to make it appear as though the escrow arrangement with AT&T remained intact.

3.     Because GNET hid the change in its financial relationship with AT&T from ARRIS, ARRIS continued building and selling products to GNET on consignment. On information and belief, GNET and its management took money received from AT&T that should have been earmarked for paying ARRIS and used it for other purposes. Beginning in July 2021, GNET's deception caught up with it. It began missing payments to ARRIS that never should have been missed if the escrow arrangement between the parties had continued as promised.

4.     Finally, in October 2021, GNET's newly-appointed Chief Executive Officer, James Frinzi, admitted to ARRIS that GNET could not pay ARRIS's outstanding invoices— amounting to more than $30 million. James Frinzi stated that neither he nor anyone else at the company had any explanation as to where ARRIS's money had gone.

## II.     DISCOVERY CONTROL PLAN

5.     ARRIS intends to conduct discovery pursuant to a Level 3 discovery control plan under Tex. R. Civ. P. 190.4.

6.     The relief sought in this Petition is within the jurisdictional limits of the Court. ARRIS seeks monetary relief in excess of $30,000,000, injunctive relief, and an award of its attorneys' fees and costs incurred.

**ORIGINAL PETITION AND JURY DEMAND – Page 2**

## II.   PARTIES

7.      At all relevant times, plaintiff ARRIS was a Delaware corporation.  Before April 4,

2019, ARRIS maintained its principal place of business in Suwanee, Georgia.  On or about April

4, 2019, CommScope (NASDAQ: COMM) acquired ARRIS International plc (NASDAQ:

ARRS), including its interest in ARRIS, and ARRIS moved its principal place of business to

Hickory, North Carolina.

8.      Defendant Goodman Solutions is a Texas corporation.  On information and belief,

its principal place of business is located at 2801 Network Blvd., Suite 300, Frisco, TX 75034.

9.      Defendant GNET is a Texas limited liability company.  On information and belief,

its principal place of business is located at 1354 N. Loop 1604 E., Suite 103, San Antonio TX

78232.

10.     Defendant James Frinzi ("Frinzi") is a natural person who, on information and

belief, resides in Austin, Texas.  He can be served with process at 10300 Lisa Cove, Austin, Texas

78733, or wherever he may be found.

11.     Defendant James Goodman is a natural person who, on information and belief,

resides in San Antonio, Texas. He can be served with process at 103 Tomahawk Trail, San

Antonio, Texas 78232, or wherever he may be found.

12.     Defendant Jason Goodman is a natural person who, on information and belief,

resides in San Antonio, Texas.  He can be served with process at 234 W. Woodlawn Ave., San

Antonio, TX 78212, or wherever he may be found.

13.     Defendant Brad Kozma ("Kozma") is a natural person who, on information and

belief, resides in Frisco, Texas. He can be served with process at 5897 Willoughby, Frisco, Texas

75033, or wherever he may be found.

**ORIGINAL PETITION AND JURY DEMAND – Page 3**

## III.    JURISDICTION AND VENUE

14.    The Court has subject matter jurisdiction over this lawsuit pursuant to TEX. GOVT. CODE § 24.007(b) because the amount in controversy is more than $500, exclusive of interest.

15.    The Court has personal jurisdiction over Goodman because it is organized under the laws of the state of Texas and conducts its business from its principal office in Frisco, Texas. Goodman Solutions is therefore subject to the general jurisdiction of the Texas courts.

16.    The Court has personal jurisdiction over GNET because it is organized under the laws of the state of Texas and conducts its business from its principal office in San Antonio, Texas. GNET is therefore subject to the general jurisdiction of the Texas courts.

17.    The Court has personal jurisdiction over Frinzi because he is a citizen of and resides in the state of Texas, and he is therefore subject to the general jurisdiction of the Texas courts.

18.    The Court has personal jurisdiction over James Goodman because he is a citizen of and resides in the state of Texas, and he is therefore subject to the general jurisdiction of the Texas courts.

19.    The Court has personal jurisdiction over Jason Goodman because he is a citizen of and resides in the state of Texas, and he is therefore subject to the general jurisdiction of the Texas courts.

20.    The Court has personal jurisdiction over Kozma because he is a citizen of and resides in the state of Texas, and he is therefore subject to the general jurisdiction of the Texas courts.

21.    Venue is appropriate in this Court under TEX. CIV. PRAC. & REM. CODE § 15.002(a) because Defendants GNET, James Goodman, and Jason Goodman reside in Bexar County, and because all or a substantial part of the events giving rise to this lawsuit occurred in Bexar County.

**ORIGINAL PETITION AND JURY DEMAND – Page 4**

## IV.   FACTUAL ALLEGATIONS

### A.   The Parties

22.   ARRIS is a global innovator in IP, video, and broadband technology. In particular, ARRIS develops equipment for video delivery and devices for displaying video. ARRIS's innovations combine hardware, software, and services across the cloud, network, and home to power TV and Internet.   Specifically, ARRIS develops, manufactures, and sells end-to-end equipment solutions for video delivery and display (e.g., content delivery and acquisition, video infrastructure, delivery networks, and end user devices) that are purchased by various enterprises, which in turn offer television, video, broadband, and/or wireless Internet service, to their customers or use it internally in their businesses.

23.   Defendant Goodman Solutions describes itself as a "leading field services company with 2,000 network and electronics technicians, serving customers across the nation."   The company was formed in February 2000 and initially was managed almost exclusively by members of the Goodman family, including James Goodman, John Goodman, Joseph Goodman, Jonathan Goodman, and Jason Goodman.   On information and belief, James Goodman remains at the helm of Goodman Solutions today.   Goodman Solutions is the sole member of Defendant GNET.

24.   Defendant GNET is a value-added reseller ("**VAR**") of technology products and services.   At all relevant times, GNET acted as a VAR purchasing product on consignment from ARRIS and reselling that product to AT&T Inc.

25.   Defendant James Frinzi is GNET's current Chief Executive Officer.   Previously, he served as Vice President of Government Relations at Goodman Networks.

26.   Defendant James Goodman is the founder of Goodman Solutions and a bevy of other family-owned and managed businesses, including GNET's predecessor Genesis Networks

Telecom Services, LLC.  Goodman Solutions' website describes James Goodman as "the driving force behind [the company's] direction and growth."

27.    Defendant Jason Goodman is a co-founder of Goodman Solutions who has served as the company's Vice President of Government Solutions and Construction.  On information and belief, he also served as GNET's CEO prior to the appointment of James Frinzi to that role on or about October 1, 2021.

28.    Defendant Brad Kozma serves as Chief Financial Officer for Goodman Solutions and, on information and belief, is acting CFO for GNET.

**B.        The Parties' Enter into a Binding Distributor Agreement**

29.    The relationship between ARRIS and GNET began with a Non-Exclusive Distributor Agreement executed by their predecessors-in-interest, General Instrument Corporation d/b/a Home & Networks Mobility Business of Motorola Inc. (**"Motorola"**) and Genesis Networks, Inc. (**"Genesis"**), with an effective date of December 12, 2008 (**"Distributor Agreement"**). Under the Distributor Agreement, Motorola appointed Genesis as a non-exclusive distributor of certain Motorola products (namely, set-top boxes for use with home television systems), solely for the purpose of buying and reselling Motorola's products to AT&T and its affiliates.

30.    AT&T required Motorola and Genesis to enter into the Distributor Agreement because AT&T wanted to purchase products through minority-owned businesses like Genesis. AT&T was not a party to the Distributor Agreement.

31.    Under the Distributor Agreement, Genesis purchased products on consignment from Motorola at established prices and shipped those products directly to AT&T.  Further, the Distributor Agreement obligated Genesis to "require all payments from its customers for Motorola

Products to be made payable to an escrow account," subject to an escrow agreement substantially

in the form attached to the Distributor Agreement:

### 4.6    Payments in Escrow

Notwithstanding any provision in this agreement to the contrary, Distributor agrees that it shall require all payments from its customers for Motorola Products to be made payable to an escrow account. The terms governing release of monies from such escrow account shall be substantially similar to those attached in Exhibit N, and in any event must require written instructions signed by both Motorola and Distributor prior to any payment of monies from such escrow account to Distributor, and shall grant Motorola a priority secured creditor security interest in both the Motorola Products and any proceeds from the sale of such Products. For the avoidance of doubt, Distributor hereby grants Motorola a Purchase Money Security Interest in all Products provided by Motorola pursuant to this Agreement and the proceeds from the sale of such Products, and Distributor agrees to execute such UCC financing statements, security agreements and other documents as may be reasonably required to perfect such security interest. **Failure of Distributor to require payment from any customer as set forth in this section, or failure to otherwise abide by the requirements of this section, will constitute a material breach of this Agreement that will allow Motorola to immediately terminate this agreement and recover all unpaid-for Products from Distributor without legal process, in addition to any other remedies that may be available to Motorola in this Agreement, at law or in equity.**

32.    Genesis also granted Motorola a "Purchase Money Security Interest" in all products and proceeds from the sales of all products provided to Genesis pursuant to the Distribution Agreement.

33.    On July 6, 2010, Motorola consented to the assignment of the Distributor Agreement from Genesis to Genesis Networks Telecom Services, LLC (**"GNET Telecom"**). Thereafter, pursuant to an undated Assignment, Assumption and Consent, Motorola consented to the further assignment of the Distributor Agreement from GNET Telecom to Defendant GNET ATC, LLC.

34.    On April 3, 2013, Motorola notified various business partners, including Genesis Networks, of the acquisition by ARRIS Group Inc. of Motorola's home business.

35.    Following the closing of that acquisition, on February 6, 2015, Motorola assigned the Distributor Agreement to Plaintiff ARRIS Solutions, Inc.

**ORIGINAL PETITION AND JURY DEMAND – Page 7**

36.    Motorola and Genesis amended the Distributor Agreement numerous times over the years, to extend the agreement's term and to modify various other provisions.  However, GNET's obligation to require all payments from its customers for Motorola (later ARRIS) products to be made payable directly to an escrow account remained intact and unchanged.

37.    Pursuant to a Letter of Terms effective as of June 21, 2018, ARRIS and GNET Telecom reaffirmed the Distributor Agreement and agreed that the pricing for a particular ARRIS product being sold pursuant to that agreement would be increased.  Under the heading "Miscellaneous," the Letter of Terms made clear that "all other terms and conditions of the [Distributor] Agreement . . . would remain the same and in full force and effect."

**C.    The Parties Enter into a Binding Escrow Arrangement**

38.    Simultaneously with the execution of the Distributor Agreement in 2008, the parties executed an Escrow Agreement.  The Escrow Agreement expressly contemplated that AT&T would pay for goods and services sold by Motorola to Genesis by depositing payment directly into an escrow account managed by a third-party escrow agent, who alone would have the power of withdrawal.

39.    The parties further agreed that the escrow agent would release funds due to Motorola and Genesis on the first business day of each week during the term of the Distributor Agreement.

40.    Simultaneously with the assignment of the Distributor Agreement by Genesis to GNET Telecom, on July 6, 2010, Motorola and GNET Telecom entered into a new Escrow Agreement in substantially the same form as the original agreement and appointed Western National Bank in Odessa, Texas as Escrow Agent.  Thereafter, on February 9, 2011, Motorola and GNET Telecom entered into a new Escrow Agreement (**"2011 Escrow Agreement"**).  As before,

that agreement contemplated that AT&T would pay for Motorola's products by making payment directly into an escrow account managed by a third-party escrow agent, who alone would have the power of withdrawal.  The parties agreed that the escrow agent would not make any payments to GNET Telecom without written instruction signed by both Motorola and GNET Telecom.

41.     The 2011 Escrow Agreement appointed the Bank of San Antonio as Escrow Agent. The agreement further recited that it would remain in effect "until all invoices submitted by Motorola to Distributor for payment of goods or services delivered in connection with the Contract have been paid in full, unless Distributor and Motorola agree otherwise in a written agreement."

**D.     GNET Surreptitiously Ceases to Require that AT&T Pay for Goods by Depositing Payment Directly into Escrow**

42.     On information and belief, sometime in 2019, GNET ceased requiring AT&T to pay for goods sold by ARRIS by making payment directly into the Bank of San Antonio escrow account.

43.     Instead, on information and belief, GNET began factoring its AT&T receivables using an AT&T-sponsored program through Citibank and funding the Bank of San Antonio escrow account itself.

44.     GNET did not disclose to ARRIS that AT&T no longer was making payments for goods sold by ARRIS directly into escrow.

**E.     ARRIS Fails to Receive Timely Payment for Goods Sold to GNET**

45.     On or about June 30, 2021, ARRIS became aware that it had not received distributions from escrow due and owing on account of sales of its products to GNET.  As of that date, GNET's account was past due in the amount of $9,062,377.05.

46.     CommScope's Vice President of Sales, Mark Smith, immediately convened a meeting between CommScope (which by then had acquired ARRIS's parent ARRIS International

plc) and those individuals charged with management of GNET's relationship with CommScope, including Jody Goodman, Jason Goodman, Brad Kozma (GNET's CFO), and Steve Seago (Vice President of Business & Corporate Development for Goodman Solutions).

47.     During that meeting, which took place by telephone conference on July 1, 2021, Mr. Smith and CommScope's Senior Manager of Credit & Collections (US and CANADA), Nancy Lewallen, asked GNET's management to explain the reason for the missed payment. Mr. Kozma stated that the payment was missed because AT&T had significantly reduced consumption during the global pandemic. When Mr. Smith expressed confusion with this explanation in light of the escrow arrangement requiring AT&T to make payments directly into escrow, Mr. Kozma did not reveal that AT&T no longer made payments into escrow. Instead, he cryptically stated that all bank sweeps occurred in compliance with company financial policy.

48.     Mr. Smith also asked GNET management whether AT&T was making timely payments into the designated escrow account. Again, nobody on the telephone conference representing GNET told Mr. Smith and Ms. Lewallen that AT&T no longer made payments directly into escrow. Instead, they stated that AT&T's payments were "mostly" on time, falsely implying that AT&T was continuing to make direct payments into escrow as required by the parties' Distributor Agreement.

49.     On the same call, Mr. Smith and Ms. Lewallen sought GNET's assurance that there would be no future missed payments. Mr. Kozma, as GNET's CFO, in an effort to give the false impression that GNET was continuing to abide by its escrow obligations pursuant to the parties' Distributor Agreement, stated that he understood the process better and would be taking internal action to ensure timely future payment. Again, however, he did not reveal that GNET was

accepting payments directly from AT&T or self-funding the Bank of San Antonio escrow account, in direct violation of the Distributor and Escrow Agreements between the parties.

50.    Based on this conversation with GNET's management and, in particular, the assurances given by GNET's CFO, Brad Kozma, ARRIS continued to sell products to GNET for the benefit of AT&T.

51.    Thereafter, on or about October 1, 2021, ARRIS learned through communications with AT&T that AT&T was moving its business away from GNET. Although AT&T representatives told ARRIS that senior management at Goodman Solutions was aware of the decision, nobody at Goodman Solutions or GNET informed ARRIS.

52.    Around the same time, ARRIS became aware that GNET's account was past due in the amount of approximately $2,300,000. At the time, ARRIS already had more than 400,000 additional units of product in transit to AT&T or being built pursuant to GNET purchase orders.

53.    On October 11, 2021, Ms. Lewallen's team reached out to Goodman Solutions' AR Manager, Stephanie Elmore, to seek assurance that GNET would make the past-due payment. Ms. Elmore never responded.

54.    On the same date, Mr. Smith brought the missed payment to the attention of Steve Seago. In response, Mr. Seago stated that GNET had experienced recent personnel changes in the accounting group, implying that those changes were the reason for the missed payment. On information and belief, Mr. Seago knew that this statement was false when made. Mr. Seago also made a hollow promise to "escalate" the issue and to get back to Mr. Smith as soon as possible.

55.    On October 13, 2021, having heard nothing further from Mr. Seago, Mr. Smith reached out again. This time, Mr. Seago directed Mr. Smith to correspondence from GNET's new

Chief Executive Officer, James Frinzi.  In that e-mail dated October 12, 2021, addressed to Mr.

Smith and copying Mr. Seago, Mr. Frinzi stated:

> I regret to inform you that GNET ATC is presently not in a cash position to make payments in full.  We arrived at this situation as a result of forward funding purchase orders.  With the decrease in volume, and losing the DirecTV business, GNET ATC has a complex situation to resolve.  Furthermore, it is our understanding that AT&T is terminating GNET ATC as a supplier.  Consequently GNET will not be in a position to pay invoices.

56.    Incredibly, Mr. Frinzi made no mention of GNET's decision—nearly two years

prior—to begin self-funding the Bank of San Antonio escrow account or its failure to abide by its

contractual obligation to require AT&T and its affiliates to make payments directly into that

account.  Instead, on information and belief, Mr. Frinzi falsely blamed various other circumstances

for GNET's payment problems.

57.    As a result, on October 18, 2021, counsel for ARRIS wrote to Mr. Frinzi and

demanded immediate assurance of future performance by GNET.  No response from Mr. Frinzi or

GNET was forthcoming.

58.    On the same date, counsel for ARRIS wrote to Mr. Frinzi and demanded immediate

payment of GNET's past due balance of $2,337,477.12.  Again, no response from Mr. Frinzi or

GNET was forthcoming.

59.    By October 24, 2021, GNET's outstanding payable to ARRIS grew to at least $30.3

million.

## V.    CAUSES OF ACTION

### A.    Count I—Breach of Distributor Agreement (Against Defendant GNET)

60.    ARRIS hereby incorporates the allegations contained in paragraph 1 through 59 as

if fully set forth herein.

61.     ARRIS and GNET are parties to the Distributor Agreement, as amended from time to time including by the Letter of Terms dated June 21, 2018.  The Distributor Agreement, as amended, is a valid, enforceable contract that contains express provisions requiring GNET to require all payments from its customers (including AT&T and its affiliates) for Motorola (later ARRIS) products to be made payable directly to an escrow account.

62.     ARRIS has performed and satisfied its contractual obligations under the Distributor Agreement, as amended.

63.     GNET has breached the Distributor Agreement by ceasing to require that AT&T and its affiliates make payments for goods sold by ARRIS (formerly Motorola) directly into an escrow account designated by the parties.

64.     GNET further breached the Distributor Agreement by failing to make payments to ARRIS under that Agreement as they became due.

65.     As a direct and proximate result of GNET's breaches of the Distributor Agreement, ARRIS has suffered and will continue to suffer actual damages of at least $30.3 million. ARRIS also has been forced to incur attorneys' fees and costs in seeking to enforce the Distributor Agreement, and ARRIS requests an award of the same.

66.     In this action, ARRIS also seeks an order of injunctive relief to enjoin GNET from transferring any portion of the amounts owed by GNET to ARRIS to any third party.

**B.     Count II—Breach of Escrow Agreement (Against Defendant GNET)**

67.     ARRIS hereby incorporates the allegations contained in paragraph 1 through 66 as if fully set forth herein.

68.     ARRIS and GNET are parties to an Escrow Agreement dated February 9, 2011. The Escrow Agreement is a valid, enforceable contract that contains express provisions requiring

AT&T (the "Customer") to submit payment for any goods or services sold to GNET under the Distributor Agreement directly to The Bank of San Antonio, as Escrow Agent. The Escrow Agreement further provides that it "shall remain in effect until all invoices submitted by [ARRIS] to Distributor for payment of goods or services delivered in connection with the Contract have been paid in full."

69.     ARRIS has performed and satisfied its contractual obligations under the Escrow Agreement.

70.     GNET has breached the Escrow Agreement by ceasing to require that AT&T submit payment for any goods or services sold to GNET under the Distributor Agreement directly to The Bank of San Antonio, as Escrow Agent.

71.     As a direct and proximate result of GNET's breach of the Escrow Agreement, ARRIS has suffered and will continue to suffer actual damages of at least $30.3 million. ARRIS also has been forced to incur attorneys' fees and costs in seeking to enforce the Escrow Agreement, and ARRIS requests an award of the same.

72.     In this action, ARRIS also seeks an order of injunctive relief to enjoin GNET from transferring any portion of the amounts owed by GNET to ARRIS to any third party.

**C.     Count III—Actual Fraud (Against Defendants Goodman Solutions, GNET, Frinzi, and Kozma)**

73.     ARRIS hereby incorporates the allegations contained in paragraph 1 through 72 as if fully set forth herein.

74.     GNET, by and through its Chief Executive Officer James Frinzi, Chief Financial Officer Brad Kozma, and employee Steve Seago, made representations to ARRIS regarding the reasons for missed payments on GNET's accounts with ARRIS. Goodman Solutions, as GNET's sole member, exercised authority and control of the actions undertaken by GNET. Accordingly,

Goodman Solutions knew or should have known of the representations made to ARRIS and also knew or should have known the true reasons for GNET's missed payments to ARRIS.

75.    The representations made to ARRIS were made by senior executives of GNET, at least one of whom—Brad Kozma—had overlapping duties and served in the same executive role at Goodman Solutions.  In particular, during a telephone conference that took place on July 1, 2021, Goodman/GNET CFO Brad Kozma stated that GNET's account with ARRIS was past due because AT&T had significantly reduced consumption during the global pandemic.  Mr. Kozma further stated that he understood the payment process better and would be taking internal action to ensure timely future payment.

76.    On October 11, 2021, when CommScope VP Mark Smith brought another missed payment to the attention of GNET employee Steve Seago, Mr. Seago stated that GNET had experienced recent personnel changes in the accounting group, implying that those changes were the reason for the missed payment.

77.    In an e-mail on October 12, 2021, GNET CEO James Frinzi stated that GNET's missed payments due and owing to CommScope not because of an altered escrow arrangement but "as a result of forward funding purchase orders."

78.    On information and belief, these representations were false when made.  Based on the facts now known to ARRIS, the reason that GNET missed payments is because it began self-funding the Bank of San Antonio escrow account.  Further, on information and belief, GNET failed to earmark funds received from AT&T for payment to ARRIS and instead withdrew and used those funds for other purposes.

79.    Defendants Goodman Solutions, GNET, Frinzi, and Kozma knew these representations were false when made or made those representations recklessly, as positive assertions, without regard for their truth or falsity.

80.    ARRIS justifiably relied upon Defendants' representations in continuing to build and sell product to GNET pursuant to invoices from GNET to ARRIS.

81.    As a result of Defendants' misrepresentations, ARRIS has suffered actual and proximate injury.

82.    Defendants Goodman Solutions, GNET, Frinzi, and Kozma made a conscious decision to permit ARRIS to rely on their false representations. They took affirmative steps to camouflage GNET's actions, including intentionally omitting facts regarding funding of the escrow account.  Goodman Solutions and GNET, in particular, continued this pattern of willful behavior for nearly two years, having ceased to require direct payments by AT&T into escrow for goods.  Taken together, Defendants' actions were fraudulent and/or malicious or, at the very least, were grossly negligent with respect to their duty to disclose the true facts to ARRIS.  As a result, ARRIS is entitled to an award of exemplary damages pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code.

**D.    Count IV—Fraud by Nondisclosure (Against All Defendants)**

83.    ARRIS hereby incorporates the allegations contained in paragraph 1 through 82 as if fully set forth herein.

84.    At all relevant times, Goodman Solutions, as sole member GNET, exercised authority and control of the actions undertaken by GNET.  Goodman Solutions acted through its founder, James Goodman, who has stood at the helm of that company since its inception and, on

information and belief, has an intimate understanding of the financial health of Goodman Solutions and its owned and managed companies, including GNET.

85.     At all relevant times, GNET was controlled by its sole member, Goodman Solutions and its founder, James Goodman, and acted through designated officers, CEO Jason Goodman (later James Frinzi) and CFO Brad Kozma.

86.     Goodman Solutions and GNET, by and through their executive leadership, including James Goodman, Jason Goodman, and Brad Kozma, represented to ARRIS that they would cause AT&T to make payments for goods sold by ARRIS to GNET directly into an escrow account, to be managed solely by a third-party escrow agent.  After taking over as GNET's CEO, James Frinzi continued this artifice.

87.     Defendants instead decided to permit GNET to self-fund the escrow account and thereafter concealed from ARRIS that AT&T was no longer making payments directly into that account.  Defendants were aware that ARRIS had no visibility into which company was making payments into escrow and that ARRIS would assume the payments were coming into the account directly from AT&T.  Defendants' concealment induced ARRIS to continue building and selling products to GNET.

88.     By repeatedly making representations to ARRIS stating that AT&T would make payments for ARRIS goods directly into escrow, by repeatedly indicating to ARRIS that AT&T was continuing to fund the escrow account, and by acting as if nothing in the payment relationship with AT&T had changed, Defendants assumed a duty to later disclose if the facts and circumstances surrounding the funding of the escrow account were no longer true and accurate.

89.     Defendants' statements regarding the escrow account and the financial arrangement between the parties were material to the relationship between the ARRIS and GNET.  If GNET,

its owners, and its executives had told ARRIS that they had ceased to require AT&T to make payments directly into escrow, ARRIS would not have continued building and selling products to GNET pursuant to purchase orders sent by GNET to ARRIS.

90.     As a result of Defendants' fraudulent concealment, ARRIS has suffered actual and proximate injury.

91.     Defendants took affirmative steps to camouflage GNET's actions, including intentionally omitting facts regarding funding of the escrow account.  Goodman Solutions and GNET, in particular, continued this pattern of willful behavior for nearly two years, having ceased to require direct payments by AT&T into escrow for goods.  Taken together, Defendants' actions were fraudulent and/or malicious or, at the very least, were grossly negligent with respect to their duty to disclose the true facts to ARRIS.  As a result, ARRIS is entitled to an award of exemplary damages pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code.

**E.     Count V—Negligent Misrepresentation (Against Defendants Goodman Solutions, GNET, Frinzi, and Kozma)**

92.     ARRIS hereby incorporates the allegations contained in paragraph 1 through 91 as if fully set forth herein.

93.     GNET, by and through its CEO James Frinzi, CFO Brad Kozma, and employee Steve Seago, made representations to ARRIS regarding the reasons for missed payments on GNET's accounts with ARRIS.  Goodman Solutions, as GNET's sole member, exercised authority and control of the actions undertaken by GNET.  Accordingly, Goodman Solutions knew or should have known of the representations made to ARRIS and also knew or should have known the true reasons for GNET's missed payments to ARRIS.

94.     In particular, during a telephone conference that took place on July 1, 2021, Mr. Kozma stated that GNET's account with ARRIS was past due because AT&T had significantly

reduced consumption during the global pandemic.  Mr. Kozma further stated that he understood the payment process better and would be taking internal action to ensure timely future payment.

95.     On October 11, 2021, when CommScope VP Mark Smith brought another missed payment to the attention of GNET employee Steve Seago, Mr. Seago stated that GNET had experienced recent personnel changes in the accounting group, implying that those changes were the reason for the missed payment.

96.     On information and belief, these representations were false when made.  Based on the facts now known to ARRIS, the reason that GNET missed payments is because it began self-funding the Bank of San Antonio escrow account.  Further, on information and belief, GNET failed to earmark funds received from AT&T for payment to ARRIS and instead used those funds for other purposes.

97.     Defendants Goodman Solutions, GNET, Frinzi, and Kozma did not exercise reasonable care or competence in providing information to ARRIS regarding the reasons for GNET's missed payments.

98.     ARRIS justifiably relied upon Defendants' representations in continuing to build and sell product to GNET pursuant to invoices from GNET to ARRIS.

99.     As a result of Defendants' misrepresentations, ARRIS has suffered actual and proximate injury.

### F.  Count VI—Conspiracy (Against All Defendants)

100.     ARRIS hereby incorporates the allegations contained in paragraph 1 through 99 as if fully set forth herein.

101.     Defendants combined to defraud and deceive ARRIS.

**ORIGINAL PETITION AND JURY DEMAND – Page 19**

102.    Defendants' objective in combining together was to unlawfully defraud ARRIS of millions of dollars to which ARRIS was owed.

103.    Defendants had a meeting of the minds on their objective to defraud ARRIS and did, in fact, work together to deceive and defraud ARRIS.

104.    Defendants committed an unlawful, overt act to defraud ARRIS when they concealed and actively hid that they were accepting payments directly from AT&T and circumventing the escrow account.

105.    Defendants further committed an unlawful, overt act to defraud ARRIS when they absconded with millions of dollars owed to ARRIS and misrepresented that GNET was unable to pay ARRIS for reasons other than Defendants' own fraud.  On information and belief, Defendants agreed and conspired to conceal from ARRIS the truth about their financial fraud for nearly two years.

106.    As a proximate result of Defendants' wrongful acts, ARRIS suffered injury, including but not limited to millions of dollars in lost revenue.

## VI.    APPLICATION FOR PERMANENT INJUNCTION

107.    ARRIS hereby incorporates the allegations contained in paragraph 1 through 106 as if fully set forth herein.

108.    ARRIS seeks, at the conclusion of trial, the entry of a permanent injunction against Defendants prohibiting them from transferring any of the money received from AT&T and which should have been earmarked for payment to ARRIS to any third party.  *See* TEX. CIV. PRAC. & REM. CODE § 65.011. As described more fully above, Defendant GNET has violated, and is continuing to violate, its contractual obligations to require AT&T to pay money owed directly into an escrow account and to ensure that such money, once received, is earmarked for distribution and

thereafter distributed to ARRIS.   On information and belief, Defendants Goodman Solutions, James Goodman, Jason Goodman, James Frinzi, and Brad Kozma, have either controlled GNET's actions vis-à-vis the Distributor and Escrow Agreements and/or have permitted money that should have been earmarked for and distributed to ARRIS to instead be directed to other parties, entities, and/or accounts.

109.    In light of the substantial outstanding accounts receivable owed by GNET and in view of Mr. Frinzi's October correspondence indicating that GNET could not pay invoices as they become due, there is a substantial likelihood that GNET is insolvent or in the zone of insolvency, such that damages may not be collectible from Defendants and would not be sufficient to compensate ARRIS for its losses.

110.    Should Defendants' conduct continue, ARRIS will suffer imminent and irreparable harm.

111.    Based on the foregoing information as well as any additional information or evidence as may be learned in discovery and properly submitted to the Court for consideration at trial, ARRIS requests that the Court set its application for a permanent injunction for a full trial, and after the trial, issue a permanent injunction against Defendants prohibiting them from transferring any money received from AT&T for goods sold by ARRIS to GNET to any third party.

## VII.    CONDITIONS PRECEDENT

C.    Pursuant to TEX. R. CIV. P. 54, ARRIS alleges that all conditions precedent necessary to the bringing of this suit have been performed or have occurred.

## VIII.    REQUEST FOR DISCLOSURE

D.    Pursuant to Tex. R. Civ. P. 194, ARRIS requests that Defendants disclose, within 50 days of service of this request, the information or material described in Rule 194.2.

## IX.    JURY DEMAND

E.    ARRIS hereby demands trial by jury on all claims and issues so triable and tenders with this Petition the applicable jury fee.

## X.    PRAYER FOR RELIEF

ARRIS prays that, after trial of this matter, the Court enter judgment in his favor against Defendants granting the following relief:

1.    Actual damages;

2.    Exemplary damages;

3.    Attorneys' fees and legal expenses for instant case and for any appeal to the Court of Appeals and/or the Texas Supreme Court;

4.    Court costs;

5.    Pre-judgment and post-judgment interest; and

6.    Permanent injunctive relief restraining Defendants from further dissipating any money received from AT&T on account of goods sold by ARRIS to GNET.

ARRIS specifically reserves the right to pursue additional causes of action other than those specifically outlined above that are supported by the facts pleaded herein or that may be supported by other facts that emerge during discovery.

Respectfully submitted,

By:  _/s/ Amy L. Ruhland_
Amy L. Ruhland (Rudd)
State Bar No. 24043561
Amy.Ruhland@us. dlapiper.com
Ryan Sullivan
State Bar No. 24102548
Ryan.Sullivan@us.dlapiper.com
**DLA Piper LLP (US)**
303 Colorado Street, Suite 3000
Austin, TX  78701
Telephone: (512) 457-7000
Facsimile:  (512) 457-7001

**COUNSEL FOR PLAINTIFF
ARRIS SOLUTIONS, INC.**