**BUTLER SNOW LLP**
Adam M. Langley (admitted *pro hac vice*)
R. Campbell Hillyer (admitted *pro hac vice*)
6075 Poplar Avenue, Suite 500
Memphis, TN 38119
Telephone: (901) 680-7316
adam.langley@butlersnow.com

and

Candice Carson (TX Bar No. 24074006)
2911 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219
Telephone: (469) 680-5502
candice.carson@butlersnow.com

*Counsel for FedEx Supply Chain Logistics & Electronics, Inc.*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| GOODMAN NETWORKS, INC. | § | Case No. 22-31641 (MVL) |
| | § | |
| Debtor. | § | |
| | § | |

**FEDEX SUPPLY CHAIN LOGISTICS & ELECTRONICS, INC'S**
**OBJECTION TO THE MOTION TO CONVERT CHAPTER 7 CASE TO CHAPTER 11**

FedEx Supply Chain Logistics & Electronics, Inc. ("FSCLE") files this objection to the

*Motion to Convert Chapter 7 Case to Chapter 11* (the "Motion to Convert"), which Akerman

LLP filed as "Proposed Attorneys for the Debtor" purportedly on behalf of Goodman Networks,

Inc's (the "Debtor") former management. [Docket No. 133]. FSCLE would show as follows:

### PRELIMINARY STATEMENT

1.      The Motion to Convert should be denied for cause. The Debtor does not have an

absolute right to convert under *Marrama*, *Jacobsen*, and the practice in the Northern District of

1

Texas. *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365 (2007); *In re Jacobsen*, 609 F.3d 647, 660 (5th Cir. 2010); *In re Foster*, 530 B.R. 650, 654 (N.D. Tex. 2015), aff'd (Dec. 1, 2015); *Dan Thomason & Assocs., LLC v, Breakwell* (*In Re Dan Thomason & Assocs.*), LLC, No. 3–10–CV–379–K, 2010 WL 3385025, at *2 (N.D. Tex. Aug. 25, 2010). The Debtor cannot reorganize under chapter 11, and the Debtor and those that controlled it have acted in bad faith, committed fraud, caused substantial and continuing losses of the Debtor's assets, grossly and fraudulently mismanaged the Debtor's assets, and mismanaged cash and cash collateral. The Motion to Convert is a bad faith and futile attempt to prevent a chapter 7 trustee from pursuing avoidance and other actions against insiders and affiliates of the Debtor. The Court should deny the Motion to Convert.

2.     Moreover, the Debtor's former management and Akerman have no authority to act on behalf of the Debtor after the entry of the Order for Relief because only a chapter 7 trustee may represent the bankruptcy estate and prosecute proceedings of the Debtor. 11 U.S.C. §§ 323 ("The trustee in a case under this title is the representative of the estate."); 363(a) and (b); 704(a); FED. R. BANKR. P. 6009 ("With or without court approval, the trustee . . . may prosecute or may enter an appearance and defend any pending action or proceeding by or against the debtor, or commence and prosecute any action or proceeding in behalf of the estate . . ."); *C.W. Mining Co. v Aquila, Inc.*, (*In re C.W. Mining Co.*), 636 F.3d 1257, 1260 (10th Cir. 2011); *In re Bear Creek Trail, LLC*, 35 F.4th 1277, 1282 (10th Cir. 2022). The Debtor's former management and Akerman have no authority and, therefore, no standing to prosecute the Motion to Covert under Section 706(a) of Title 11 of the United States Code (the "Bankruptcy Code") because Section 706(a) is only the Debtor's right and that right is controlled by the chapter 7 trustee now. The Debtor's former management may seek a motion to convert under Section 706(b) if it has good cause and can reorganize, but the Motion to Convert does not seek Section 706(b) relief and could not because

2

the Debtor already admitted its sole business purpose is to liquidate. The Court should deny the

Motion to Convert on authority and standing grounds alone.

### BACKGROUND FACTS

3.      On September 6, 2022, an involuntary petition was filed by four creditors

(the "Original Petitioning Creditors"). [Docket No. 1]. The alleged Debtor filed an answer and

motion to dismiss the involuntary petition. [Docket Nos. 18 and 19].

4.      FSCLE then joined the involuntary petition and moved to compel the alleged

Debtor to file a Bankruptcy Rule 1003(b) list of creditors. [Docket Nos. 29 and 32]. The Court

granted FSCLE's motion to compel [Docket No. 53], and the alleged Debtor filed its Bankruptcy

Rule 1003(b) list. [Docket No. 58]. The Court set December 12, 2022, as a deadline for additional

joinders. [Docket No. 53].

5.      Prior to the entry of the Order for Relief, counsel for the then alleged Debtor,

unequivocally represented that, if three uncontested creditors from the Bankruptcy Rule 1003(b)

list joined, the involuntary petition should be granted as the contests would become moot.

November 28, 2022, Hearing Transcript, attached hereto as Exhibit 1, at 70:24-71:8 ("But I will

tell you what could impact this case, and that is you recall you made us send out a list of . . . notices

to creditors. Frankly, if three of them show up on the 12th, and their claims are of a sufficient

amount and they're not disputed, then that would . . . render it all moot. I mean it would.").

6.      After the Bankruptcy Rule 1003(b) list was filed, ARRIS Solutions, Inc., Frase

Protection, Inc. ("Frase"), FedEx Freight, Inc. ("FedEx Freight"), Call Center Systems, LLC ("Call

Center Systems"), Joseph Rexing, Jr., and Leo Rexing (the "Rexings"), HCL America, Inc. and

HCL Technologies Corporate Service Limited ("HCL"), and Glympse, Inc. ("Glympse"), joined

the involuntary petition. [Docket Nos. 77, 100, 105, 108, 110, 123, and 125].

7.      Frase, FedEx Freight, HCL, and Glympse are shown as undisputed on the
Bankruptcy Rule 1003(b) list. [Docket No. 58]. These creditors alone had a sufficient amount of
debt under Section 303(b) for immediate entry of an order for relief.

8.      The alleged Debtor objected to the joinders of FSCLE and ARRIS. [Docket Nos. 43
and 77] but did not object to any additional joinders. The alleged Debtor did not dispute the amount
of debt owed to FSCLE and ARRIS but asserted that FSCLE and ARRIS were creditors of the
alleged Debtor's wholly owned subsidiary, GNET ATC, LLC. The objections made to FSCLE
were made in bad faith, as evidence was obtained through discovery that plainly shows that all
transactions pursuant to the Master Services Agreement at issue were conducted between FSCLE
and the Debtor and that the objection to the joinder was based on the Debtor's unilateral attempt
to "isolate liability" at GNET ATC as late as November 2021 (over two years after the purported
assignment). [FedEx_075677, attached hereto as Exhibit 2]. Evidence obtained from limited
discovery would have shown that all relevant invoicing and purchase orders were made between
FSCLE and the Debtor. All transactions with FSCLE were conducted through the Debtor's bank
accounts, and all documentation and Tax IDs given to FSCLE related to the Master Services
Agreement were for the Debtor. Additionally, the purported assignment from the Debtor to GNET
ATC that was the basis of the alleged Debtor's objection was never consented to by FSCLE, which
consent was required in writing by the Master Services Agreement, or even known by FSCLE.

9.      The Debtor and its related parties James Goodman, John Goodman, James Frinzi,
Genesis Networks Telecom Services, LLC d/b/a Genesis-ATC, and GNET ATC engaged in
discovery abuses during the gap period. They filed numerous motions to quash discovery, failed
to attend depositions, produced tens of thousands of pages of documents of irrelevant information
in an effort to frustrate FSCLE's discovery of relevant information, failed to timely designate

designees for 30(b)(6) topics, failed to properly answer requests for admission, and otherwise abused the discovery process. FSCLE has spent considerable expense addressing the Debtor's bad faith objection to its joinder.

10.     On December 9, 2022, the alleged Debtor was required pursuant to the Court's scheduling order to file briefing related to any objections to the claims of the petitioning and joining creditors. It failed to file any briefs/objections and instead represented to the Court by email that it would not be contesting the joinders.

11.     On December 12, 2022, the Court entered the Order for Relief. [Docket No. 132].

12.     Based on the entry of the Order for Relief, the petitioning and joining creditors cancelled eight depositions and withdrew their motions to compel discovery and for sanctions. FSCLE has not sought additional discovery motions in reliance upon the Order for Relief.

13.     After entry of the order for relief, Akerman, purportedly acting as proposed attorneys for the Debtor, filed the Motion to Convert seeking to covert the involuntary chapter 7 case to a case under chapter 11 so that the Goodman brothers could remain in possession of the Debtor's estate. Akerman has not been employed in the involuntary chapter 7 case and does not represent the chapter 7 trustee.

14.     On December 13, 2022, the Court held a status conference and set December 19, 2022, as the hearing date on the Motion to Convert. It also heard for the first time that the Honorable Russell Nelms ("Judge Nelms") was appearing as a purported "independent director" on behalf of the Debtor's former management under a last-minute arrangement that was not disclosed to any of the creditors.

15.     On December 14, 2022, Scott Seidel of the Seidel Law Firm was appointed as the interim chapter 7 trustee. There is no dispute that Mr. Seidel is the Debtor's sole authorized agent.

16.     Now, FSCLE files this objection to the Motion to Convert and briefs the legal issues that were initially presented at the December 13 status conference, being (A) whether there is an absolute right to convert under Section 706(a) and (B) whether the Debtor's former management, through Akerman, can act on behalf of the Debtor after the Order for Relief to the detriment of Mr. Seidel and the bankruptcy estate. And, FSCLE will now show that the Debtor is not qualified to be a debtor in possession under chapter 11 because of its bad faith conduct, gross mismanagement, improper use of cash collateral, and inability to reorganize.

## ARGUMENT

**A.     The Order for Relief was appropriately entered.**

17.     The Order for Relief was appropriately entered in accordance with Section 303 and Bankruptcy Rule 1013. Twelve creditors holdings over $130 million in claims against the Debtor have filed or joined the involuntary petition. The Debtor's own Bankruptcy Rule 1003(b) list evidences that four of those creditors are uncontested: Frase, FedEx Freight, HCL, and Glympse. The Debtor listed Call Center Systems and the Rexings as debts being owed by Multiband, but the documentation verified in those entities' joinders shows that the Debtor – not Multiband – entered into those transactions. The Debtor did not object to the joinders of Call Center Systems and Rexings; therefore, they are also uncontested. Thus, there are six uncontested creditors holding the requisite aggregate amount of debt under Section 303(b). Therefore, the Court was required to enter an order for relief as soon as was practicable pursuant to Bankruptcy Rule 1013. Indeed, Debtor admitted this: "Frankly, if three of them show up on the 12th, and their claims are of a sufficient amount and they're not disputed, then that would . . . render it all moot." November 28, 2022 Hearing Tr. 70:24-71:8.

18.     On December 9, 2022, the Debtor notified the Court that it would not contest the six additional joinders and also did not file any further briefing/objections as was required to

contest the Original Petitioning Creditors, FSCLE, and ARRIS under the current scheduling order. [Docket No. 109].

19.    Furthermore, FSCLE, and likely ARRIS too, would have been successful at showing that there was not a bona fide dispute as to their claims against the Debtor. *See* Paragraph 8, *supra*.

20.    On December 12, 2022, the Court entered the Order for Relief. This was done properly even though the Debtor's former management, through the alleged Debtor's counsel, protested by email that its admission that it was not contesting the joinders was not consent to entry for an order for relief. But former management's protests aside, the Court was required to look at the joinders and independently determine whether an Order for Relief should be entered because the other contests were mooted, as counsel on behalf of the alleged Debtor conceded at the November 28, 2022 hearing. The Court correctly determined the ongoing contests were mooted by the joinders and that an Order for Relief should be entered immediately. The Debtor's admission that it would not contest the joinders was *de facto* consent to an order for relief. Where there is not a bona fide contest, the Debtor does not get to voluntarily obstruct the entry of an order for relief in an <u>*involuntary*</u> case without good cause and properly asserted objections.

**B.    The Debtor does not have an absolute right to convert, especially, where there is an abuse of process and bad faith actions taken by the Debtor's management.**

21.    The Motion to Convert cites *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365 (2007)[1] but does not convey its import. The central holding in *Marrama* is that Section 706(a)

---

[1] "[*Marrama*'s] holding is not limited to a request to convert to Chapter 13, but its principles apply equally to Chapter 11 conversions." *Breakwell*, at *1 (N.D. Tex. Aug. 25, 2010) (citing *In re FMO Assocs. II, LLC*, 402 B.R. 546, 550 (Bankr. E.D.N.Y. 2009); *In re George Love Farming, LC*, 366 B.R. 170, 177–78 (Bankr. D. Utah 2007); *In re Broad Creek Edgewater, LP*, 371 B.R. 752, 758 (Bankr. D.S.C. 2007); *In re Irmen*, No. 07 B 03103, 2008 WL 320484, at *3 (Bankr. N.D. Ill. Feb. 1, 2008; *In re 10 Bears at Chiloquin, Inc.*, No. 06–62079–FRA7, 2007 WL 1673538, at *2 (Bankr.

does not provide an absolute right to convert. *Id*. "[T]he broad authority granted to bankruptcy judges to take any action that is necessary or appropriate 'to prevent an abuse of process' described in §105(a) of the Code, is surely adequate to authorize an immediate denial of a motion to convert filed under § 706 in lieu of a conversion order that merely postpones the allowance of equivalent relief and may provide a debtor with an opportunity to take action prejudicial to creditors." *Id*. at 375. The Motion to Convert's absolute right argument arising from *Marrama* is unfounded.

22.    Post-*Marrama*, courts apply a burden shifting analysis that utilizes Section 1112(b) and asks whether conversion would be an act of futility because cause exists to convert it back to a case under chapter 7. This standard is well-summarized by a Tennessee bankruptcy court:

> The debtor has the initial burden to show: (1) there has been no prior conversion in the case, (2) the debtor is eligible for relief under 11 U.S.C. § 109, and (3) conversion is to achieve a purpose permitted under the proposed chapter. The burden then shifts to the objecting party to establish "cause" by a preponderance of the evidence. The burden then shifts back to the debtor to prove either the existence of 'unusual circumstances' or that there is a reasonable likelihood a plan will be confirmed and that any deficiencies in the case are reasonably justified and will be cured within a reasonable period of time. . . . When determining whether a debtor should be allowed to convert a case from Chapter 7 to Chapter 11, courts consider the "for cause" factors set forth in 11 U.S.C. § 1112(b) or whether the debtor has acted in bad faith. In addition, courts analyze whether the debtor has a business to reorganize as well as the debtor's assets, business operations, and whether a separate business infrastructure exists. Other courts consider the purpose of a conversion and if the purpose is only to liquidate, which is more compatible with a Chapter 7 than a Chapter 11 case, conversion may not be appropriate. In each instance, though, the goal is to determine the benefits to all the parties.

*In re Gordon*, No. 312-09605, 2015 WL 5553506, at *2 (Bankr. M.D. Tenn. Sept. 18, 2015) (citations and marks omitted); *see also In re Zamora-Quezada*, 622 B.R. 865, 881 (Bankr. S.D. Tex. 2017) ("In order to resolve the pending Motion to Convert, the Court ***must determine*** whether Debtor is eligible to be a debtor in chapter 11 or whether Debtor is not eligible to become a debtor

---

D. Or. June 6, 2007); *In re Euro–American Lodging Corp.*, 365 B.R. 421, 425 (Bankr. S.D.N.Y. 2007).

due to bad-faith conduct amounting to cause under § 1112.") (citing 11 U.S.C. §706; emphasis added).

23.    The Fifth Circuit affords the bankruptcy court "discretion" to act upon a motion to convert "where the debtor has acted in bad faith or abused the bankruptcy process." *In re Jacobsen*, 609 F.3d 647, 660 (5th Cir. 2010).[2] The Bankruptcy Code's conversion statutes are to be construed to "reject a construction of the statute that would afford an abusive debtor an escape hatch."  *Id*. The Fifth Circuit has acknowledged that *Marrama* "identified a bad-faith exception in a provision that seemingly created an unqualified right to convert a case from Chapter 7." *In re Elliott*, 506 F. App'x 291, 293 (5th Cir. 2013). "*Marrama* and *Jacobsen* suggested that bankruptcy courts may invoke the bad-faith exceptions to § 706 and § 1307(b), respectively, only if the debtor's bad faith is somehow 'atypical' or 'extraordinary.'" *Id*. at 294. In other words, the Debtor having lost a bitterly contested involuntary chapter 7 petition and having acted in bad faith to frustrate creditors by transferring assets to insiders should not be afforded an escape hatch to stay in control as a debtor in possession in a chapter 11 case.

24.    The Motion to Convert also relies on *In re Premier Gen. Holdings, Ltd.*, 427 B.R. 592, 601 (Bankr. W.D. Tex. 2010), but this case's holding was informed by a pre-*Marrama* case out of a Nebraska bankruptcy court, *Matter of Omaha Midwest Wholesale Distributors, Inc.*, 94 B.R. 160, 162 (Bankr. D. Neb. 1988), and does not adequately assess *Marrama's* impact, which

---

[2] Courts have consistently found that the chapter 13 analysis performed in *Jacobsen* also applies to Section 1112(b). *In re Foster*, 530 B.R. at 654 (N.D. Tex. 2015); *Breakwell*, at *2 (N.D. Tex. Aug. 25, 2010); *In re Daughtrey*, 896 F.3d 1255 (11th Cir. 2018); *In re Miller*, 496 B.R. 469 (Bankr. E.D. Tenn. 2013); *In re Woodruff*, 580 B.R. 291, 296 (Bankr. M.D. Ga. 2018); *In re FMO Assoc. II, LLC*, 402 B.R. 546, 551 (Bankr. E.D.N.Y. 2009); *In re Broad Creek Edgewater*, LP, 371 B.R. 752, 758 (Bankr. D.S.C. 2007); *Mercury Data Systems, Inc*., 586 B.R. 260, 270 (Bankr. E.D. Ky. 2018); *In re Goines*, 397 B.R. 26, 33 (Bankr. M.D.N.C. 2007); *In Re Mitrano*, 472 B.R. 706, 710 (E.D. Va. 2012); *In Re George Love Farming, LC*, 366 B.R. 170, 177–78 (Bankr. D. Utah 2007).

was addressed in *Jacobsen*. In *Omaha Midwest Wholesale Distributors*, the bankruptcy court plainly found an absolute right to convert. *Id*. at 162. Thus, *Omaha Midwest Wholes Distributors* was overruled by *Marrama*, and *Premier Gen. Holdings* was, therefore, wrongly decided after *Marrama*. Neither *Omaha Midwest Wholes Distributors* nor *Premier Gen. Holdings* have been cited authoritatively for the legal position that the Debtor's former management urges here. The Court should disregard the Motion to Convert's case law and instead interpret Section 706(a) under equitable principles articulated by *Marrama* and *Jacobsen* so to avoid the Debtor being afforded an escape hatch.

25.     Indeed, post-*Marrama*, local practice in the Northern District of Texas follows this Supreme Court precedent and finds that there is not an absolute right to convert. Judge Ed Kinkeade stated: "Courts readily apply [*Marrama*] to deny Chapter 7 to Chapter 11 conversions if facts establish that one of the 'causes' to dismiss or convert a Chapter 11 case are present. In short, a debtor does not have an unqualified right to convert a Chapter 7 proceeding into a Chapter 11 reorganization." *Breakwell* at *2 (affirming Chief Judge Stacey G. Jernigan's oral ruling, attached hereto as <u>Exhibit 3</u> ("This Court does believe that *Marrama* supersedes *Martin* and does give this Court equitable discretion to decline to allow conversion by a Chapter 7 debtor to Chapter 11").[3] Similarly Judge John H. McBryde, applying *Marrama* and *Jacobsen*, affirmed Judge Nelm's denial of a motion to convert from chapter 7 to chapter 11 by stating:

> Here, the bankruptcy court denied a conversion that would have been futile under the circumstances. This essentially is the meaning the Fifth Circuit gave to *Marrama* in *In Re Jacobsen* . . . By denying the conversion sought by Debtor, the bankruptcy court dispensed with futile procedural niceties in order to reach more expeditiously an end result required by the Code. Therefore, the bankruptcy court had the power to deny Debtor's motion for conversion.

---

[3] *Marrama* expressly abrogated prior Fifth Circuit practice as articulated in *Matter of Martin*, 880 F.2d 857, 859 (5th Cir. 1989). *Marrama*, 549 U.S. at 368 fn 2.

*In re Foster*, 530 B.R. 650, 654 (N.D. Tex. 2015), aff'd (Dec. 1, 2015) (citations and marks omitted).

26.    The practice in the Northern District of Texas follows the practice across the Fifth Circuit and across the United States. *See*, *e.g.*, *In re Zamora-Quezada*, 622 B.R. 865 (Bankr. S.D. Tex. 2017); *In re Jenkins*, No. 19-13234-JDW, 2021 WL 1845572, at *3 (Bankr. N.D. Miss. May 7, 2021). There is not an absolute right to convert a chapter 7 case to chapter 11.

**C.    The December 19, 2022, hearing conducted on six days' notice and without a reasonable opportunity for discovery does not establish due process and allow this Court to properly weigh evidence.**

27.    FSCLE advances this argument so that it does not waive its due process rights to present evidence of bad faith, mismanagement, and the lack of an ability to reorganize after properly conducting discovery in this chapter 7 case. FSCLE will not belabor the point. The Court set a hearing on six days' notice and without the reasonable opportunity for any discovery on the basis that the Debtor, purportedly acting through its former management and counsel, had an absolute right to convert an involuntary chapter 7 case to a chapter 11 case. FSCLE trusts that upon an examination of the case law cited herein, the Court will (A) deny the Motion to Covert at the December 19 hearing based upon (i) legal grounds presented herein or (ii) the limited evidence presented below and by other objecting creditors or (B) provide FSCLE and other parties in interest, including the chapter 7 trustee and the United States Trustee, a reasonable opportunity to conduct discovery in this chapter 7 case and present evidence of bad faith conduct, mismanagement, and the lack of an ability to reorganize at a later scheduled evidentiary hearing in this chapter 7 case.

**D.     The limited evidence in FSCLE's possession establishes that the Debtor acted with extraordinary bad faith and completely depleted the estate for the benefit of insiders and to the detriment of creditors. There is no hope of reorganization.**

28.     The Debtor's former management argues the "Debtor has not engaged in bad faith conduct that is [] 'atypical' or 'extraordinary.'" Motion to Convert, ¶ 25. First, the Motion to Convert admits the Debtor engaged in bad faith conduct but only argues such bad faith is not "atypical or extraordinary." *Id*. Indeed, counsel admitted at the December 13 status conference that $44 million was fraudulently conveyed by the Debtor to its former CEO. He indicated that signed documents may have been forged by management. Whether signatures were forged or not, the Debtor's former management has not pursued any causes of action against the Debtor's former CEO. Such fraudulent conduct and its lack of oversight is not typical and ordinary. Indeed, the Debtor has engaged in extraordinary bad faith conduct and other actions that give cause to deny the Motion to Convert beyond a $44 million insider transaction, as outlined below.[4]

**(1)     The timing and manner of the Motion to Convert negates good faith intentions.**

29.     The Debtor's former management does not have good faith intentions and any effort to assert that it can act in good faith for the benefit of creditors as a debtor in possession should be deemed waived and estopped.

---

[4] It should be noted that FSCLE has not conducted any discovery into the Debtor's bad faith actions. The discovery to date was limited to whether FSCLE was a qualified petitioning creditor. FSCLE received documents from the Debtor and observed one partial deposition of Howard Konicov, who was the 30(b)(6) designee for CFGI, LLC, Goodman Networks, and GNET ATC. Mr. Konicov's deposition was ongoing when the order for relief was entered. The parties agreed to end his deposition and cancel other depositions based on the order for relief mooting the need for discovery. Despite the limitations on discovery, there is more than sufficient evidence in the record to find the Debtor acted in bad faith, grossly mismanaged its assets, caused substantial and continuing losses and diminution of the estate's assets, lacks a reasonable likelihood of rehabilitation, and used its cash collateral without authorization. FSCLE reserves the right to conduct additional discovery related to the Debtor's bad faith actions and conduct.

30.     The involuntary petition was filed on September 6, 2022. The Motion to Convert was filed on December 12, 2022. The Debtor's former management only filed the Motion to Convert after twelve creditors holdings claims in excess of $130 million joined as petitioning creditors and the contest against the involuntary order for relief became hopelessly lost by the Debtor. Indeed, the Motion to Convert was filed after the Court correctly entered the Order for Relief. The Debtor did not want a bankruptcy case, bitterly contested it, and raised a bad faith objection as to FSCLE in order to frustrate a bankruptcy case. Having taken the affirmative position to contest a bankruptcy case and transfer assets to insiders and affiliates, the Debtor's former management cannot in good faith say that it now wants a bankruptcy case but only if it remains in control of the causes of actions against themselves.

31.     Former management of the Debtor could have caused the Debtor to file a voluntary chapter 11 case prior to the commencement of the involuntary chapter 7 case. It did not do so. Former management could have put its wholly owned subsidiaries into voluntary chapter 11 cases prior to the entry of the Order for Relief. It did not do so. Former management could have pursued causes of actions against insiders, affiliates, and other beneficiaries of fraudulent transfers. It did not do so. Instead, former management contested everything that the petitioning and joining creditors could do to subject this Debtor to bankruptcy protections while transferring additional money to insiders. Remarkably, former management has determined that moneyed owed for the transfer of business assets to the Goodmans affiliates, insider transactions outside the ordinary course of business, are uncollectible and, therefore, provided no real consideration to the Debtor. *See* Assets Spreadsheet, attached hereto as Exhibit 4.

32.     The Court should estop the Debtor's former management from asserting that it wants to properly manage the Debtor in bankruptcy for the benefit of creditors when it

affirmatively contested bankruptcy protections and acted against the interest of creditors prior to the entry of the Order for Relief by making transfers to insiders and prepetition creditors during the gap period. FSCLE and other creditors have been prejudiced because it could have immediately sought conversion or the appointment of a trustee three months ago and avoided the Debtor's bad faith actions during the gap period.

33.    Put simply, the Debtor's former management had every opportunity to put the Debtor and its subsidiaries in a voluntary bankruptcy case before it chose to fight creditors and transfer assets to insiders. Having failed to timely seek bankruptcy relief and having now depleted the estate, the Debtor's former management should be barred from being a debtor in possession. The Debtor's former management is not acting in good faith as evidenced by their pre-Order-for-Relief conduct discussed below.

**(2)    The Debtor's prepetition actions evidence bad faith conduct, gross mismanagement, and improper use of cash collateral.**

34.    The Debtor's former management has presided over an extraordinary pre-petition fraud. As of June 30, 2019, the Debtor and its affiliates had $394 million in assets at or about the time of the acquisition of Genesis-ATC. [Goodman Networks Board Meeting Presentation, September 6, 2019, FEDEX_009449, attached hereto as Exhibit 5, at pp. 4]. On December 31, 2020, the Debtor and its subsidiaries had $190 million in assets. [Docket 80-1 at pp. 7]. On December 31, 2021, the Debtor and its subsidiaries had $109 million in assets. *Id*. On July 31, 2022, the Debtor and its subsidiaries had $13 million in assets. *Id*. at 4. Thus, from June 30, 2019, until July 31, 2022 (a month before the involuntary petition date), the Debtor depleted $381 million in assets. Indeed, the Debtor went from having operating assets in 2019 to no operating assets as of the petition date. *Id*. (showing in 2019 $275 million in current assets (e.g., cash, trade receivables, and inventories) and $19 million in property and equipment, as compared to zero

14

today). [FEDEX_009449, <u>Ex. 5</u>, at pp. 4]. These assets did not disappear. They were transferred to insiders to "isolate liability" and protect the Goodmans and their assets. [FedEx_075677, <u>Ex. 2</u>].

35.     On November 22, 2022, the Original Petitioners filed a motion for summary judgment [Docket No. 80] and attached consolidated financial statements for the Debtor, GNET ATC, and Multiband Field Services. [Docket No. 80-1, attached hereto as <u>Exhibit 16</u>]. The Debtor had not produced these consolidated financial statements to FSCLE prior to them being filed with the Court. The consolidated financial statement show the Debtor made cash disbursements of at least $83,861,334 to insiders in 2022, including AMRR, Multiband Global Resources, senior noteholders, and preferred stockholders. *Id*. at pp. 10. AMRR and Multiband Global Resources are controlled by James Frinzi, the Debtor's former CEO. [Docket 80-1 at pp. 5, Note A; Howard Konicov Deposition Transcript dated December 12, 2022, attached hereto as <u>Exhibit 7</u> ("<u>Konicov Tr.</u>") at 55:24-56:4]. The Debtor's own 30(b)(6) designee, Howard Konicov, who acted as the Debtor's financial advisor, referred to some of these transfers as "this nonsense with the AMRR assignment." [Konicov Tr. 143:14-15].[5] There is nothing in the books and records of the company supporting the validity of these transactions. [Konicov Tr. 101:12-102:25]. Based on former management's counsel's representations at the December 13 status conference, these transactions purportedly involve fraudulent signatures.

36.     In addition, the Debtor caused material businesses of the Debtor to be transferred to insiders prior to 2022. Substantial business assets were transferred to entities controlled by John Goodman, namely, Goodman Telecom Holdings, LLC and Goodman Telecom Services LLC. The

---

[5] Immediately upon Mr. Konicov testifying about the "nonsense" regarding AMRR, counsel for the alleged Debtor immediately interrupted and ended the deposition based on the entry of the Order for Relief. [Konicov Tr. 143:13 – 144:22].

consolidated financial statements show that Goodman Telecom Holdings owes the Debtor over $8 million related to this transfer. [Docket No. 80-1 at pp. 6, Note D]. It is unclear if any cash consideration was paid by John Goodman's entities for the acquisition of these assets. Remarkably, the Debtor has determined that this $8 million owed by Goodman Telecom Holdings is not fully collectible. [Assets Spreadsheet, Ex. 4]. John Goodman, therefore, is materially conflicted from adequately representing the interests of the estate because he would have to pursue collection actions against his own other entities and seek the avoidance of fraudulent transfers. Indeed, John Goodman was paid $450,000 during the gap period to prosecute the contest of the involuntary petition. Consulting Agreement (the "Consulting Agreement") with Goodman MBE Group LP ("MBE Group") executed by the Debtor on October 4, 2022, attached hereto as Exhibit 8.

37.    Similarly, the Debtor caused substantial business assets to be transferred to entities controlled by James Goodman, namely Unified Field Services, Inc. and Genesis Networks Enterprises, LLC. [Docket No. 80-1 at pp. 5, Note B; Konicov Tr. 56:10-13 (identifying the sale in "mid '21")]. It is unclear if any cash consideration was paid by James Goodman's entities for the acquisition of these assets. What is clear is that Unified Field Services owes the Debtor $6.6 million related to the transfers. [Assets Spreadsheet, Ex. 4]. Again, remarkably, the Debtor has fully reserved against this receivable for uncollectability. *Id*. In addition, $4.7 million of cash is identified as "restricted" because it is encumbered by a "related party" lien for the benefit of Genesis Networks Enterprises. *Id*. The Debtor's own financial advisor and 30(b)(6) designee, Mr. Konicov, admitted there is no documentation for this related party encumbrance. [Konicov Tr. 113:23–115:6]. John Goodman, therefore, is materially conflicted from adequately representing the interests of the estate because he would have to pursue collection actions against his own brother's entities and seek the avoidance of fraudulent transfers. And, James Goodman, who is

purportedly still a controlling shareholder of the Debtor, is also materially conflicted. *See* Goodman Networks Inc. Written Consent of Voting Shareholders (the "Debtor Written Consent") dated December 12, 2022, attached hereto as Exhibit 10 (showing James Goodman as signatory for the Debtor).[6]

38.     Also, the Debtor caused at least $13.5 million in cash to be transferred to another related entity 18920 NW 11th LLC, although it appears other assets including intellectual property were also transferred without return consideration and documentation. [Konicov Tr. 76:4-89:6]. Mr. Konicov represented that the only reason for the transfers was to "deplete" cash at the Debtor and GNET ATC entities. [Konicov Tr. 137:9-138:17]. And, the Debtor has now identified these cash transfers as potential avoidable fraudulent transfers but admits it has never made a demand related thereto. [Assets Spreadsheet, Ex. 4; Konicov Tr. 92:5-22].

39.     The extraordinary mismanagement and bad faith do not stop there because the Debtor's 30(b)(6) designee testified to unauthorized use of cash and cash collateral. Mr. Konicov admitted: "Payments and receipts at least during my involvement with Goodman were not - - were not always made respecting the - - - the legality of the transaction, you know, as to who held the note. There was - - there were inconsistencies. There were inconsistences. And since I had - - I didn't have a role in managing cash or initiating cash transactions or - - or recording cash transactions, they happened, you know, - - they happened in the way that you are seeing." [Konicov Tr. 138:25-139:10].

40.     Furthermore, the Debtor and its wholly owned subsidiaries did not maintain functioning boards, have board meetings, or keep minutes and records of board actions. [Konicov Tr. 51:2-52:13; 53:25-54:22]. In a response to interrogatories sworn to by John Goodman, the

---

[6] Exhibit 9 was intentionally omitted.

alleged Debtor could not identify any "officers, directors, executives, and board members of Goodman Networks" since September 2022, and did not identify any of the Goodmans as having a role in the company since December 2021. *See* alleged Debtor's sworn Response to FSCLE's Interrogatories, attached hereto as Exhibit 15 (stating "We do not have visibility to these records that were managed by our legal counsel."). The failure to have any functioning governance should preclude this purported management group from acting on behalf of a debtor in possession.

41.     In November 2021, the Debtor and its subsidiaries embarked on intentional efforts to "isolate liability" to frustrate creditors. The express purpose was "[f]irst and foremost" to "maintain a plan that protects people with the last name Goodman" and Frinzi "from personal liability." [FedEx_075677, Ex. 2]. Second, the plan is to "protect each respective asset." *Id*. Only after protecting the Goodmans, Frinzi, and assets, would any efforts be made to deal with bond holders and trade creditors. *Id*. From November 2021 until the entry of the Order for Relief, the Debtor executed this plan by first causing the Goodmans to purportedly leave the business at the end of 2021 [Ex. 15], which then allowed the fraudulent transfers and bad faith conduct outlined above. Mr. Frinzi even acknowledged to James and Jason Goodman that "my name is going to be on all of the lawsuits." *Id*.

42.     And, even after the filing of the involuntary petition, the Debtor caused or attempted to cause unauthorized post-petition transfers of cash to creditors in order to dissuade them from joining the involuntary petition. For example, Samantha Sondrup, a non-attorney acting for Goodman Networks, filed the attached paper in a civil court proceeding offering to pay $7,500 in satisfaction of Insurance Company of the West's $42,579.00 claim. [Sondrup Letter, attached hereto as Exhibit 11]. Similar efforts were made to creditors that joined the involuntary petition, including creditors represented by counsel. John Goodman authorized himself a $450,000

payment. [John Goodman Email, dated November 4, 2022, attached hereto as <u>Exhibit 6</u>; *see also* <u>Exhibit 8</u>]. Section 549 prohibits these types of unauthorized transfers, especially where the Debtor is utilizing limited available cash to prefer certain creditors and insiders over other creditors.

43.    Based on these facts, the Motion to Convert should be denied for cause under Sections 706 and 105(a) consistent with the basis for cause set out in Section 1112(b)(4)(A), (B), and (D). Similarly, a trustee would have to be appointed upon conversion due to the Debtor's fraud, dishonesty, incompetence, and gross mismanagement of the affairs of the Debtor by its former management. 11 U.S.C. § 1104(a)(1). The Debtor has acted in bad faith and grossly and fraudulently mismanaged its assets. The Debtor has intentionally caused the diminution of the its assets in order to "isolate liability" at a company with no assets in order to frustrate creditors for the benefit of insiders of the Debtor. The Debtor is hopelessly insolvent and has suffered substantial and continuing losses. It has no business assets. Its primary assets are avoidance and other actions against insiders and affiliates. Debtor has shown an inability to pursue causes of actions against related parties. The Debtor has caused unauthorized use and commingling of cash collateral that has substantially harmed FSCLE and other creditors. The Debtor's former management is hopelessly compromised and incapable of operating as a debtor in possession in a chapter 11 case.

**(3)    The post-petition management of the Debtor raises red flags about good faith and fair dealing.**

44.    After the status conference held by the Court on December 13, 2022, FSCLE received four documents produced by the Debtor. The documents are as follows:

- The Consulting Agreement, <u>Ex. 8</u>;
- Consent of Managers of MBE Group (the "<u>MBE Group Consent</u>") dated September 21, 2022, attached hereto as <u>Exhibit 12</u>;
- The Debtor Written Consent, <u>Ex. 10</u>; and

- Engagement Letter with Russell F. Nelms dated December 11, 2022 (the "Nelms Engagement"), attached hereto as Exhibit 13.

45.    These documents unequivocally show that the Debtor executed the Consulting Agreement post-petition while in contested litigation with the petitioning creditors and therein agreed to pay John Goodman "a non-refundable fee of $450,000 in lump sum prior to commencement of the Services, as compensation for all Services for the entirety of the Term." [Consulting Agreement, Ex. 8, at pp. 1]. The Consulting Agreement provides "John Goodman will serve as the representative for the MBE Group and will be the sole recipient of the consulting fee and will be responsible for all taxes associated with the consulting fee." *Id*. The Consulting Agreement is executed by Samantha Sondrup as Chief of Staff of the Debtor.[7] Remarkably, John Goodman authorized his own payment, demonstrating the lack of controls in place for management. [John Goodman Email, Ex. 6]. The Consulting Agreement was countersigned by Joseph Goodman on behalf of MBE Group. [Consulting Agreement, Ex. 8]. MBE Group is purportedly a voting shareholder of the Debtor along with James Goodman, Joseph Goodman, Jonathan Goodman and Jason Goodman. [Debtor Written Consent, Ex. 10].

46.    This is a prime example of the true nature of the Debtor's control and operations being nothing more than a closely held family web of "Goodmans" all involved in transactions which benefit each other with no regard for corporate formalities or to the fiduciary obligations that the Debtor owes its creditors.

47.    The MBE Group Consent states that John Goodman is the manager of the general partner of MBE Group and that MBE Group authorizes John Goodman to be the primary provider of services pursuant to the Consulting Agreement and to be paid accordingly. The MBE Group

---

[7] Ms. Sondrup was not identified as an officer or director of the Debtor. *See* alleged Debtor's sworn Response to FSCLE's Interrogatories, attached hereto as Exhibit 15.

Consent is executed by James Goodman, Jason Goodman, John Goodman, Jonathan Goodman and Joseph Goodman as managers of MBE Group. [MBE Group Consent, Ex. 12]. Not surprisingly this is the same group of "Goodmans" that executed the Debtor Written Consent. [Debtor Written Consent, Ex. 10]. This is an insider transaction authorized on both sides by the same parties which resulted in John Goodman obtaining a nonrefundable $450,000 fee from the Debtor while insolvent and during an involuntary bankruptcy proceeding.

48.     The Debtor Written Consent purports to be done on December 12, 2022, the day this Court entered the order for relief for the involuntary chapter 7. [Debtor Written Consent, Ex. 10]. However, the signature pages attached to the Debtor Written Consent contain a signature footer dated February 24, 2022, so it is unknown if the voting shareholders executed the Debtor Written Consent on December 12, 2022 before the Order for Relief was entered at 1:30 p.m. *Id*. The Debtor Written Consent is not signed by John Goodman, who has been held out by the Debtor as the only remaining individual at the Debtor and its director and CEO. *Id*. The Debtor Written Consent authorizes the filing of a voluntary chapter 11 bankruptcy for the Debtor and retains Judge Nelms as an "Independent Director." *Id*. It does not state if Judge Nelms is the only director or one of several on a board of directors. It does state that Judge Nelms "or his designee to include John Goodman" is authorized to take actions on behalf of and in the name of the Debtor and that "the authority of John Goodman granted pursuant to the terms of that certain consulting agreement shall continue in full force and effect." *Id*. The Debtor Written Consent is window dressing by the Goodmans. It tries to create an appearance of a "new and reformed Debtor" that is above reproach and reformed from the Debtor's prior actions and financial transactions that resulted in this involuntary bankruptcy case. [David Parham and John Goodman Email dated December 7, 2020, attached hereto as Exhibit 14 ("he would bring a lot of credibility to our side which could be helpful

in fighting the trustee motion")]. Further, Judge Nelms serves as a purported "independent director," but he serves at the pleasure of and answers to the shareholders all of which are Goodmans or Goodman controlled entities. [Debtor Written Consent, Ex. 10]. Judge Nelms's engagement is not irrevocable and he is not irremovable, and he does not have any more power and authority than John Goodman. *Id.* The employment of Judge Nelms is unfortunately nothing more than attempt to mask or distract from the core issue that the Goodmans cannot be allowed to control the Debtor any longer and that the only true "independent" party capable of taking the necessary actions for the Debtor's estate and its creditors is the chapter 7 trustee.

49.    The Nelms' Engagement at the last minute appears to be a legal engagement of counsel despite defining Judge Nelms as the "sole independent director" of the Debtor. [Nelms Engagement, Ex. 13]. The Nelms Engagement is countersigned not by the Debtor but by John Goodman in capacity "Goodman MBE Group Representative." *Id.* For clarity, the Debtor purports to hire its own Executive Chairman as a consultant for a non-refundable fee of $450,000 and that consultant (not the Debtor) hires Judge Nelms for a separate $150,000 retainer to cover a $900/hr rate. In sum, the Debtor has now spent $600,000 post-petition to assemble an insider consultant and independent director all to liquidate a company that has no operations and no business assets. And, the John Goodman/Judge Nelms agreements and expenses do not even include all the fees and expenses incurred by the Akerman firm as "proposed counsel for the Debtor," who has been utilizing at least four attorneys to fight the involuntary petition. The Nelms Engagement states that Judge Nelms shall have all the powers and duties of a trustee set forth in Title 11 and contains a blanket indemnification for any actions taken by him as the "independent director."  [Nelms Engagement, Ex. 13]. This is all but an admission that the Debtor needs a bankruptcy trustee appointed, rather than an insider consultant hired at a shocking nonrefundable fee and an

"independent director" which the Debtor has granted the quasi powers of a trustee coupled with an indemnification from the Debtor's bankruptcy estate. The estate principally consists of insider avoidance actions against the very Goodmans that are seeking to remain in control of those causes of actions as debtors in possession albeit with them hiring Judge Nelms to work alongside the Goodmans in pursuing the actions against themselves. This arrangement raises concerns of disinterestedness and has the appearance of actual conflicts, given that ultimate authority still rests with the Goodmans.

50.    All the foregoing agreements and transfers are unwarranted and come at a tremendous cost to the Debtor's estate. Indeed, these agreements will need to be investigated by a chapter 7 trustee and potentially unwound.

51.    The simplest and most rational solution is a chapter 7 trustee for the Debtor who can and will accomplish everything and more that all the foregoing insider consultant, independent director, and proposed Debtor's counsel would suggest they will do for the Debtor. The Debtor already has a chapter 7 trustee appointed.

**E.    The Debtor's former management, acting through Akerman and Judge Nelms, lacks authority to act on behalf of the Debtor after the Order for Relief.**

52.    Only a chapter 7 trustee is authorized to act as representative of the Debtor after entry of the entry of the Order for Relief in this chapter 7 case. 11 U.S.C. §§ 323 ("The trustee in a case under this title is the representative of the estate."); 363(a) and (b); 704(a); FED. R. BANKR. P. 6009 ("With or without court approval, the trustee … may prosecute or may enter an appearance and defend any proceeding by or against the debtor, or commence or prosecute any action or proceeding in behalf of the estate before any tribunal."); *see also*, *e.g.*, *C.W. Mining Co. v Aquila, Inc.*, (*In re C.W. Mining Co.*), 636 F.3d 1257, 1260 (10th Cir. 2011) ("Authority to make legal decisions, like all other business decisions, passed to the Trustee alone."); *In re Bear Creek Trail,*

*LLC*, 35 F.4th 1277, 1282 (10th Cir. 2022) ("Permitting someone other than the trustee to litigate or appeal on behalf of the debtor would threaten the 'orderly manner' of bankruptcy proceedings.") (citing *C.W. Mining*).

53.    The United States Supreme Court authoritatively held that, "[u]pon <u>the commencement of a case</u> in bankruptcy, all corporate property passes to an estate represented by the trustee." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1985) (emphasis added). It is the commencement of the case (i.e., the order for relief) that is the trigger for the ouster of a management's control of the debtor – not the appointment of a trustee, which, nonetheless, is imminent and immediate in a chapter 7 case. *See* 11 U.S.C. § 701(a)(1) ("Promptly after the order for relief under this chapter, the United States trustee shall appoint one disinterested person . . . to serve as interim trustee in the case."). "Congress contemplated that when a trustee is appointed, he assumes control of the business, and the debtor's directors are 'completely ousted.'" *Weintraub* at 352-53 (citing H.R. Rep. No. 95–595, pp. 220–221 (1977)). "[T]he debtor's directors retain virtually no management powers" and "should not exercise the traditional management function of controlling the corporation's attorney-client privilege . . ." *Id. Weintraub* plainly establishes that any rights to litigate or move on behalf of the debtor are the estate's rights and only the trustee is representative of those rights.

54.    The Fifth Circuit in *United States v. Campbell*, 73 F.3d 44, 47 (5th Cir. 1996), adopted the *Weintraub* holding and made it clear that individual debtors in a chapter 7 case retain personal rights that are distinct from an inanimate entity like a corporation or partnership "that can act only through its agents." *United States v. Campbell*, 73 F.3d 44, 47 (5th Cir. 1996) (citing *Weintraub* at 356). In an individual chapter 7 case, the individual debtor retains certain rights like

24

the ability to seek conversion under Section 706(a), but in a corporate chapter 7, the debtor may only act through its agent, the trustee.

55.     The court in *C.W. Mining Co.* clearly articulated this distinction when it held, following appointment of a chapter 7 trustee in a corporate debtor's bankruptcy case, former management is forbidden to appeal on the debtor's behalf. *C.W. Mining Co.* 636 F.3d at 1260. The facts in *C.W. Mining* are substantially similar to those presented here. In *C.W. Mining*, an involuntary bankruptcy petition was filed against C.W. Mining Company ("CWMC"). An order for relief under chapter 7 of the Bankruptcy Code was entered against CWMC. Following the order for relief, CWMC's former management filed papers purportedly on behalf of CWMC seeking an appeal of the entry of the order for relief. The chapter 7 trustee filed a motion to dismiss the appeal for lack of standing and the Tenth Circuit Bankruptcy Appellate Panel denied the motion to dismiss but affirmed the bankruptcy court on the merits of the entry of the order for relief in the involuntary case. CWMC's management appealed to the Tenth Circuit and the trustee cross-appealed on the standing issue. The Tenth Circuit phrased the issue before it as follows: "This case turns on a simple question – following appointment of a Chapter 7 trustee in a corporate debtor's bankruptcy, may former management appeal an adverse bankruptcy court ruling on the debtor's behalf?" *Id.* The Tenth Circuit's answer to this question was equally simple: "Supreme Court precedent and bankruptcy law compel us to conclude that such an appeal is forbidden." *Id.*

56.     The Tenth Circuit's holding was "premised on the fact that: (1) a corporation can only act through its agents; and (2) after a Chapter 7 trustee is appointed, the trustee is the only agent authorized to act for the corporation. C.W. still may have an appeal right, but the only natural person who can control the right is the trustee." *Id*. at 1266. The court was clear that "[t]his rule does not follow for natural persons in Chapter 7 bankruptcy." *Id*. The court did not dispute that the

debtor has a right to appeal, but it correctly held that right is vested in the estate – not in former management.

57.    The debtor, whether individual or corporate, has a right to seek conversion under Section 706(a). However, only a trustee has authority to move under Section 706(a) on behalf of a corporate debtor. Former management does not have authority and standing to act under Section 706(a) and, instead, is restricted to acting as a party in interest under Section 706(b). The Debtor has standing to move under Section 706(a), but Akerman and its client do not have authority to direct the Debtor to so move. Like the *C. W. Mining* case, "this case is about the [m]anagers' authority, not about [the Debtor's] standing." *C.W. Mining Co.*, 636 F.3d at 1259.

58.    *C. W. Mining* has been cited authoritatively in the Northern District of Texas. *In re Acis Cap. Mgmt., L.P.*, 604 B.R. 484, 511 (N.D. Tex. 2019), *aff'd sub nom. Matter of Acis Cap. Mgmt., L.P.*, 850 F. App'x 302 (5th Cir. 2021). The *Acis Cap. Mgmt.* case was also an involuntary chapter 7 case that was converted to chapter 11. However, the *Acis Cap. Mgmt.* case is distinguishable because it was converted on the motion of the <u>chapter 7 trustee</u> – not the debtor's former management. [Case No. 18-30265, Docket No. 166]. The Chapter 7 trustee in *Acis Cap. Mgmt.* plainly had authority under Section 706(a) that the Debtor's former management lacks here.

59.    The decision to seek conversion under Section 706(a) is the Debtor's decision, and the Debtor may only act through the trustee. All of John Goodman, Judge Nelms, and the Akerman law firm lack authority and standing to bring a Section 706(a) motion. Instead, only Section 706(b) is available to parties in interest other than the Debtor. And, the present motion does not seek relief under Section 706(b). The distinction between subparts (a) and (b) is meaningful because the burden for "cause" under subpart (a) is upon the objecting parties applying the *Marrama* standard; whereas, under subpart (b) the burden is on the moving party to show "cause" for conversion.

60.    The Motion to Convert must be denied on the grounds that the movant lacks authority to bring the action on behalf of the Debtor under Section 706(a).

**F.    Alternatively, the Court should immediately appoint a chapter 11 trustee if the Court is still inclined to convert the chapter 7 case to a case under chapter 11.**

61.    As evidenced by the status conference on December 13, 2022, and the briefing and evidence above, FSCLE strongly objects to the conversion of this chapter 7 case to a case under chapter 11, especially before a chapter 7 trustee and the United States Trustee have had ample time to participate in this chapter 7 case. Alternatively, FSLCE asserts the "cause" for denying the Motion to Convert is also cause for the appointment of a trustee under Section 1104(a)(1). *See In re Basil Street Partners, LLC*, 477 B.R. 856 (Bankr. M.D. Fla. 2012) (allowing for conversion but immediately appointing a chapter 11 trustee). Therefore, even if this case is converted to a case under chapter 11, the Court should immediately appoint a chapter 11 trustee. But, again a chapter 11 trustee is unnecessary where the Court already has a chapter 7 trustee getting up to speed and beginning his investigation into the Debtor's affairs and dealings.

**WHEREFORE**, FSCLE objects to the Motion to Convert and respectfully requests the Court deny the Motion to Convert and enter such other relief as is just and reasonable under the circumstances of this case.

Dated: December 16, 2022

Respectfully submitted,

**BUTLER SNOW LLP**

*/s/ Adam M. Langley*
Adam M. Langley (admitted *pro hac vice*)
R. Campbell Hillyer (admitted *pro hac vice*)
Gadson William Perry (admitted *pro hac vice*)
6075 Poplar Avenue, Suite 500
Memphis, TN  38119
Telephone: (901) 680-7316
adam.langley@butlersnow.com
cam.hillyer@butlersnow.com
will.perry@butlersnow.com

Candice Carson (TX Bar No. 24074006)
2911 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219
Telephone: (469) 680-5502
candice.carson@butlersnow.com

*Counsel for FedEx Supply Chain Logistics*
*& Electronics, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Candice M. Carson, certify that the foregoing pleading was filed electronically through the Court's ECF system and served electronically on all parties enlisted to receive service electronically in this case.

Dated: December 16, 2022

*/s/ Candice M. Carson*
CANDICE M. CARSON
