# EXHIBIT 7

## TO

## FSCLE OBJECTION TO THE MOTION TO CONVERT
## CHAPTER 7 CASE TO CHAPTER 11

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

_____

In re:                          Case No.:
                                22-31641(MVL)

GOODMAN NETWORKS, INC.

        Debtor.
_____

DEPOSITION

OF

HOWARD KONICOV

December 12, 2022

ALPHA REPORTING CORPORATION
a Veritext Corporation
236 Adams Avenue
Memphis, TN 38103
901-523-8974
www.veritext.com

Page 1

```
 1                 The deposition of HOWARD KONICOV is
 2     taken on this, the 12th day of December 2022, on
 3     behalf of the Creditors, pursuant to notice and
 4     consent of counsel, beginning at approximately
 5     11:00 a.m. EST via Zoom.
 6                 This deposition is taken pursuant to the
 7     terms and provisions of the Federal Rules of
 8     Civil Procedure.
 9                 All forms and formalities are waived.
10     Objections are reserved, except as to form of the
11     question, to be disposed of at or before the
12     hearing.
13                 The signature of the witness is waived.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page  2

```
 1                    A P P E A R A N C E S
 2      FOR THE PETITIONING CREDITORS:
 3                        RYAN P. PHAIR, ESQ.
                          rphair@huntonak.com
 4                        Hunton Andrews Kurth
                          2200 Pennsylvania Avenue, NW
 5                        Washington, DC 20037
                          202-955-1921
 6
                          BRIAN M. CLARKE, ESQ.
 7                        brianclarke@huntonak.com
                          Hunton Andrews Kurth
 8                        200 Park Avenue
                          New York, New York 10166
 9                        212-850-2825
10                        PHILLIP MICHAEL GUFFY, ESQ.
                          pguffy@huntonak.com
11                        Hunton Andrew Kurth
                          600 Travis Street, Suite 4200
12                        Houston, Texas 77002
                          713-220-4200
13
        FOR ARRIS SOLUTIONS, INC.:
14
                          RYAN J. SULLIVAN, ESQ.
15                        ryan.sullivan@us.dlapiper.com
                          DLA Piper
16                        303 Colorado Street, Suite 3000
                          Austin, Texas 78701
17                        512-457-7000
18                        LAURA ELIZABETH SIXKILLER, ESQ.
                          laura.sixkiller@us.dlapiper.com
19                        DLA Piper
                          2525 East Camelback Road,
20                        Suite 1000
                          Phoenix, Arizona 85016
21                        480-606-5100
22
23
24
25
```

Alpha Reporting                    800-556-8974
A Veritext Company                 www.veritext.com

```
 1                    APPEARANCES CONTINUED
 2    FOR FEDEX SUPPLY CHAIN LOGISTICS AND ELECTRONICS:
 3                    ROBERT CAMPBELL HILLYER, ESQ.
                      cam.hillyer@butlersnow.com
 4                    ADAM LANGLEY, ESQ.
                      adam.langley@butlersnow.com
 5                    Butler Snow
                      6075 Poplar Avenue, Suite 500
 6                    Memphis, Tennessee 38119
                      901-680-7322
 7
 8    FOR JOHN GOODMAN, GNET ATC, LLC
 9                    ANDREA HARTLEY, ESQ.
                      andrea.hartley@akerman.com
10                    Akerman LLP
                      2001 Ross Avenue, Suite 3600
11                    Dallas, Texas 75201
                      214-720-4300
12
13
14
15    ALSO APPEARING:
16                    JENNIFER LEE, ESQ.
                      MATTHIAS KLEINSASSER, ESQ.
17                    JASON RUDD, ESQ.
18
19
20    REPORTED BY:
                    Valerie Hall Gilliam, CRR, RPR, LCR
21
22
23
24
25
                                             Page 4
```

```
 1                  I N D E X
 2               EXAMINATION INDEX
 3  HOWARD KONICOV
        BY MR. PHAIR . . . . . . . . . . . . . . .  18
 4
 5                  EXHIBIT INDEX
 6  EXHIBIT NO.           DESCRIPTION              PAGE
 7   EXHIBIT NO. 1 Notice                           73
 8   EXHIBIT NO. 2 Goodman Networks, Inc.           74
                   Assets as of 10/31/22
 9
     EXHIBIT NO. 3 Goodman_001933 through 1935  124
10
     EXHIBIT NO. 4 Goodman_006995 through 996   129
11
     EXHIBIT NO. 5 Goodman_007522 through 523   132
12
     EXHIBIT NO. 6 Goodman Networks et al.       139
13                 Financial Presentation to
                   Bondholders, June 8, 2022
14
                   OBJECTION INDEX
15
        BY MS. HARTLEY   . . . . . . . . . . . .  50
16      BY MS. HARTLEY   . . . . . . . . . . . .  53
        BY MS. HARTLEY   . . . . . . . . . . . .  59
17      BY MS. HARTLEY   . . . . . . . . . . . .  93
        BY MS. HARTLEY   . . . . . . . . . . . . 119
18      BY MS. HARTLEY   . . . . . . . . . . . . 119
        BY MS. HARTLEY   . . . . . . . . . . . . 123
19      BY MS. HARTLEY   . . . . . . . . . . . . 138
20
21
22
23
24
25
```

Alpha Reporting                    800-556-8974
A Veritext Company                 www.veritext.com

```
1                    (11:07 a.m. EST)

2              MR. PHAIR:  So Matthias, I'm sorry.  I

3    didn't hear you in your discussion earlier.  I

4    think our position is third parties, your

5    witnesses that you represent are nonparties,

6    they're testifying later this week.  We don't

7    think it's appropriate that you participate in

8    this deposition.

9              And I don't even know actually how you

10   got the link, but I don't think you can sort of

11   show up at a deposition uninvited.  So I think

12   for you and Jason, I think we respectfully ask

13   for you to leave the Zoom at this point.

14             MR. KLEINSASSER:  Okay.  Can you hear

15   me?

16             MR. PHAIR:  Yes.

17             MR. KLEINSASSER:  Okay.  So I guess my

18   first question is, we all signed a protective

19   order governing, you know, confidential

20   information and testimony in this proceeding.  So

21   if I cannot listen to the deposition, how am I

22   supposed to fulfill my obligations to my client

23   under the protective order that everyone here

24   signed?

25             MR. PHAIR:  Look, man, you're a nonparty
```

Page 6

1    to the deposition.  Like, you weren't even sent a

2    link.  I don't even know how you got a link, but

3    you don't get to Zoom bomb depositions that you

4    didn't notice.

5              MR. KLEINSASSER:  That's not what I

6    asked you.

7              MR. PHAIR:  Look, I'm not being deposed

8    today.  I've made a request of you.  This is not

9    your deposition.  You were not invited to this

10   deposition, nor was Jason.  Respectfully, you

11   cannot Zoom bomb a deposition that you were not

12   invited to and that you are not a party to.

13             So we respectfully ask for you to leave

14   the Zoom at this point.

15             MR. KLEINSASSER:  Yeah.  Well, that's a

16   cute term, Zoom bomb.  I want you to respond to

17   my question as to how I'm supposed to fulfill my

18   obligation to my client with a protective order

19   that you signed, your client signed.

20             MR. PHAIR:  You're a nonparty to this

21   proceeding.

22             MR. KLEINSASSER:  Okay.  And I'm sorry,

23   what rule are you citing for this?

24             MR. PHAIR:  Look, Matthias, I'm not

25   going to argue with you.  You weren't invited to

Page 7

1  this deposition.  You're not supposed to be here.

2  We're respectfully asking you to leave.

3           MR. KLEINSASSER:  Okay.  Well, I tell

4  you what, I'm not going to hold this up, but I

5  will tell you if this is going to be your

6  position, that just justifies why your deposition

7  of my client as a nonparty, this just underscores

8  how completely unreasonable this is.

9           So at any rate, I'm not going to hold

10  this up if that's your position, and I'll sign

11  off, but I'm just voicing my objections to you on

12  the record.  I think you're being completely

13  unreasonable.  And I'll also just point out, you

14  won't even answer my question about a protective

15  order.

16           It is not a question of you being

17  deposed.  I'm not being deposed either.  I just

18  want you to answer the question.  You signed the

19  protective order.  What's your response to that?

20           MR. PHAIR:  I'm not going to be deposed

21  sitting here today.  You weren't invited.

22           MR. KLEINSASSER:  You're not under oath.

23  I'm just asking --

24           (SPEAKING OVER ONE ANOTHER.)

25           THE COURT REPORTER:  One at a time,

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1  please.  One at a time.

2          MR. PHAIR:  I'm not debating with you,

3  Matthias.

4          MR. KLEINSASSER:  Okay.

5          MR. PHAIR:  I've asked you to leave.

6          MR. KLEINSASSER:  Can you at least state

7  for the record you're not going to answer the

8  question?

9          MR. LANGLEY:  This is Adam Langley for

10  FedEx.  I'm going to pose the same objection over

11  third parties appearing in these depositions.

12          MR. KLEINSASSER:  Well, and I have the

13  same question for you, Adam.  You signed a

14  protective order as well, so what's your response

15  to that?

16          MR. LANGLEY:  Your client was not

17  invited to this deposition.  He's a nonparty.  I

18  don't understand what you're even arguing.  So I

19  think at this point, we've made it very clear.

20  This is our deposition.  We should not go forward

21  with nonparties that weren't invited by any party

22  to this litigation.

23          MR. KLEINSASSER:  Okay.  Well, I tell

24  you what.  It is clear y'all are not going to

25  answer the question, so I'll sign off, but I'm

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1   just doing this under objection that this is

2   completely unreasonable, particularly given the

3   fact that you guys signed a protective order.

4   You could have raised it at the time if you had a

5   concern with it.  So at any rate, I'll sign off.

6        MS. HARTLEY:  Matthias, before you sign

7   off, just on record, Andrea Hartley on behalf of

8   Goodman Networks, Inc.  We don't object to any

9   nonparties attending as long as they're not

10  asking questions, just for the record.

11       MR. RUDD:  And this is Jason Rudd for

12  James Frinzi.  We do not intend to ask any

13  questions.  Frankly, I thought we were invited

14  because all the parties to the schedule signed

15  off on the protective order.  We all signed off

16  on the schedule of the deposition.  And my

17  understanding is the invitations went to all of

18  the parties to the protective order and to that

19  schedule.  So I think it's appropriate for us to

20  listen in.  I will not answer -- I will not ask

21  any questions, but I do plan to listen in.

22       MR. PHAIR:  So I'm sorry, so the

23  position here is that Matthias is willing to

24  accede to our request to leave, but Jason, you

25  will not?

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1              MR. RUDD:  I don't think there's a basis

2     to ask me to leave.  I did receive an invitation

3     to listen in on this deposition, and that's what

4     I intend to do.  We all agreed to the schedule.

5     We all agreed to the protective order to permit

6     the schedule to go forward.  I don't see a basis

7     for me not to be able to listen in.

8              Plus, this isn't typical litigation

9     where you're in a two-party dispute.  This is in

10    the context of a bankruptcy filing where there

11    are multiple parties in interest.  You have a

12    much broader concept of who is allowed to

13    participate in these proceedings than you would

14    have in a typical two-party litigation dispute.

15    So I think it's a different situation, and I

16    don't think there's a basis to kick people out,

17    especially if the debtors or the deponent do not

18    have an objection to us appearing and listening

19    in.

20              MR. PHAIR:  Well, the people who noticed

21    the deposition have an objection.  It's our

22    deposition.  We control the deposition.  We do

23    not invite you to that deposition.  You are a

24    nonparty to this deposition, and we're asking you

25    to leave, politely and respectfully on the

Alpha Reporting                           800-556-8974
A Veritext Company                        www.veritext.com

1    record.

2            MR. RUDD:  So for purposes of the other

3    depositions that are scheduled to go forward this

4    week, is that the position as to all the

5    depositions?

6            MR. PHAIR:  If they are party

7    depositions, then anyone who's a party is more

8    than happy to participate.  But if you are a

9    nonparty, then you are not allowed to participate

10   in a deposition.  That is just common practice.

11   I mean, this shouldn't be controversial.

12           MR. RUDD:  We are a party to discovery,

13   though, and we are a party to the protective

14   order that governs the bankruptcy case that has a

15   broad definition of parties and interests.

16   Again, this is not typical litigation where there

17   are just a plaintiff and defendant.  There are

18   multiple parties in interest to this matter,

19   including potential creditors.

20           MR. PHAIR:  Of which you are not, right?

21   I mean, you're a nonparty.  Your witness is

22   testifying, I believe, later this week.  We do

23   not consent to having you on this call.  We do

24   not invite you.  We do not want you.  This is our

25   deposition.  We control it.  We noticed it.  We

Alpha Reporting                 800-556-8974
A Veritext Company              www.veritext.com

1   do not want you here.  We're asking you politely

2   to leave.

3           MR. RUDD:  But my client does have

4   potential interest in the bankruptcy estate.  He

5   could be a creditor.  We may have to file proof

6   of claim if there is a bankruptcy claim.  So I

7   think from that perspective, we are entitled to

8   listen in and monitor the case as it goes forward

9   to determine whether or not we have a claim that

10  needs to be asserted against the bankruptcy

11  estate.

12          MR. PHAIR:  Is your client in the room

13  with you, Jason?

14          MR. RUDD:  No.  I'm only here as

15  counsel.  My client is not in the room.

16          MR. PHAIR:  What is your authority for

17  showing up at a deposition that you were not

18  invited to and where the noticing party has asked

19  you to leave?  Like, I've never heard anyone try

20  and do that before, so I'm curious as to what --

21  why you think you can show up at a deposition

22  that you aren't invited to.

23          MR. RUDD:  I guess I'm surprised we

24  weren't invited.

25          MR. KLEINSASSER:  Yeah.  I'll just jump

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1   in.  This happens all the time in bankruptcy.  I

2   mean, I don't know how much bankruptcy litigation

3   you do, but in my experience, you know, generally

4   in bankruptcy, it is an open book, whoever wants

5   to attend, attends.  And I would love for you to

6   cite the rule that you're citing that requires us

7   to be excluded if you're going to ask him for

8   authority.  As of right now, you won't answer any

9   question.

10          So you know, you keep saying you're not

11   being deposed.  He's not being deposed either.

12   So why don't we just have an open conversation

13   about this and say, if you think you've got a

14   rule to exclude him, let us know what it is.

15          MR. PHAIR:  The rule is simple.  You're

16   not a party to the -- like, you're not a party to

17   this, right?  You're not.  And Matthias, you --

18          MR. KLEINSASSER:  So what --

19          (SPEAKING OVER ONE ANOTHER.)

20          THE COURT REPORTER:  One at a time,

21   please.

22          MR. KLEINSASSER:  -- the Rule of Civil

23   Procedure is.  Ryan, what Federal Rule of Civil

24   Procedure are you citing?

25          MR. PHAIR:  We are not sitting here

Alpha Reporting                          800-556-8974
A Veritext Company                    www.veritext.com

1    debating this.  This is our deposition.  You were
2    not invited to it.  You don't just get to Zoom
3    bomb depositions that you were not invited to.
4    That is not how this works.  I mean, this is
5    common, standard practice.  Not to mention that
6    your witnesses are testifying later this week.
7            MR. KLEINSASSER:  So you don't have any
8    rules?  That's what you're saying --
9            MR. PHAIR:  My goodness.  The rule is
10   this is our deposition.  If we want to, I believe
11   we can instruct the court reporter or whoever's
12   controlling the deposition to forcibly remove
13   you.  That's what you want us to do?
14           MR. KLEINSASSER:  Jason, I interrupted
15   you.  I'm sorry.  What else are you saying?
16           MR. RUDD:  I just don't understand this
17   concept of not being a party and not being able
18   to participate in the deposition in the context
19   of a bankruptcy.  You guys have filed an
20   involuntary petition that invokes the possibility
21   that any potential creditor could be a party of
22   interest in this matter.
23           And normally, in a bankruptcy process
24   when the debtor is being deposed, even in the
25   context of involuntary petition, anyone who is a

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    potential creditor would be able to listen in and

2    understand what the debtor's testimony is going

3    to be in support of whether or not this case

4    should go forward.

5              So the bankruptcy code provides a very

6    broad definition of who a party of interest is.

7    And I think that it's appropriate for us as a

8    potential party in interest to be able to listen

9    in.

10             That being said, I also received an

11   invite to this in the context of the overall

12   negotiations for this discovery schedule, and we

13   were a party to that and a party to the

14   protective order.  So I don't see any basis for

15   us to be excluded from that.

16             MR. PHAIR:  All right.  I'm sort of done

17   wasting time on this.  Like we've aired it out.

18   It's fine.  Can we -- can we remove Matthias

19   and --

20             MR. KLEINSASSER:  Hold on.  I'm not

21   done.  So I'm going to read you -- I'm going to

22   read you an article.  This is actual legal

23   authority, not just Ryan's authority because he

24   doesn't like us being here.

25             Federal Rules of Civil Procedure were

Page 16

1    amended 1993.  Federal Rule of Evidence 615 no
2    longer applies.  There's no automatic witness
3    sequestration from depositions at the request of
4    a party under the federal rule.
5              So there is no rule that prohibits us
6    from being here, okay?  And if you have any
7    authority to the contrary to that, that's fine.
8    But generally, the rule is that people, you know,
9    with relevant information can attend a
10   deposition.
11             MR. PHAIR:  Okay.  Can we please remove
12   Matthias and Jason from the deposition that they
13   were not invited to?
14             THE COURT REPORTER:  Okay.  Let me --
15             MR. KLEINSASSER:  Ma'am, I will remove
16   myself voluntarily just to save you the time, but
17   I just want to be clear, I'm doing this, you
18   know, with an objection.  And to be clear, to the
19   extent that this is improper under the Rules,
20   Ryan, y'all filed a motion for sanctions against
21   my client.  Obviously, we reserve the right to do
22   that against y'all.  So with that, I'm going to
23   be signing off.
24             MR. PHAIR:  Sure.  And Matthias, I mean,
25   we welcome -- well, okay.

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1            And Jason is the other one.

2            (WHEREUPON, MATTHIAS KLEINSASSER

3    VOLUNTARILY EXITED AND JASON RUDD WAS REMOVED

4    FROM THE ZOOM DEPOSITION.)

5            MS. MILLS:  This is Doni.  Real quick.

6    I need to remove Exhibit Share access, is that

7    correct, for both Jason and Matthias?

8            MR. PHAIR:  Yes, ma'am.

9            MS. MILLS:  Okay.

10           MR. PHAIR:  We're ready to begin

11    whenever Mr. Konicov is.

12           THE COURT REPORTER:  Will the attorneys

13    stipulate that I may swear in the witness

14    remotely?

15           MR. PHAIR:  Yes, ma'am.

16           MS. HARTLEY:  Yes.

17              HOWARD KONICOV,

18    having been called as a witness, was duly sworn

19    and testified as follows:

20                  EXAMINATION

21    BY MR. PHAIR:

22       Q.   Good morning, Mr. Konicov.  My name is

23    Ryan Phair.  I'm a partner at Hunton Andrews

24    Kurth in Washington DC, and I'm here today

25    representing the petitioning creditors.

1               Before we get started, can you please
2      state your full name for the record?
3           A.    Howard Konicov, K-O-N-I-C-O-V.
4           Q.    And where do you currently reside?
5           A.    New Jersey.
6           Q.    Any other location?
7           A.    No.
8           Q.    And what is your occupation?
9           A.    I'm a CPA and a financial consultant.
10          Q.    Who do you work for?
11          A.    A firm by the name of CFGI.
12          Q.    Okay.  And what does CFGI stand for?
13          A.    It's not -- it's Corporate Finance
14     Group, but we -- we label ourselves and we brand
15     ourselves as CFGI.
16          Q.    Okay.  And my understanding is that you
17     were engaged in this matter; is that correct?
18          A.    Correct.
19          Q.    Who were you engaged by?
20          A.    I believe -- I believe the engagement
21     letter was for GNET.
22          Q.    And just so I'm clear, there's a lot of
23     different corporate entities, is GNET -- which
24     one?
25          A.    GNET ATC, LLC is the one that I'm aware

                                         Page 19

```
 1    of.

 2         Q.   So there's a written engagement letter

 3    between you and GNET ATC.

 4         A.   Yes, sir.

 5         Q.   Okay.  And Mr. Konicov, I noticed you

 6    were straining a little bit.

 7              Are you having a hard time hearing me?

 8         A.   No.

 9         Q.   Okay.  Just wanted to make sure.

10              And when were you engaged by GNET ATC?

11         A.   I think the -- I recall a late December

12    2021 date.

13         Q.   Okay.  And is -- go back to that.

14              Have you ever been deposed before?

15         A.   Yes.

16         Q.   How many times?

17         A.   I believe once.

18         Q.   And what was that matter?

19         A.   It was Steve and Barry's, which was

20    pending -- I don't recall where it was pending.

21         Q.   A bankruptcy proceeding of some kind?

22         A.   It was.

23         Q.   Okay.  And how many years ago was that?

24         A.   Twelve years, thirteen years ago.

25         Q.   Okay.  I just wasn't sure if it was
```

Page 20

1    recent or current.  But I'm sure your counsel has

2    gone over this with you, but just to sort of set

3    some of the basic ground rules for the deposition

4    today, just sort of briefly walk through it.

5            I'll obviously be asking questions

6    today; you'll be giving us answers.  Ms. Gilliam,

7    the court reporter, she'll be trying to take it

8    down as best she can.  It's helpful to her if you

9    and I are able to sort of separate our answers,

10   meaning like that we're not talking over each

11   other.  I'm sure she'll scold us if we start

12   doing that, but to the best of our ability, we

13   should try and do that.

14           If you need to take a break at any point

15   today, just let me know.  The only stipulation

16   that we have is that if there's a question

17   pending, we answer that -- we request that you

18   answer the question and then we're happy to take

19   a break.

20           Generally speaking, we'll probably break

21   on the hour, or every other hour or so, but if

22   you need to do so more or less often or if you

23   just kind of want to be done with this and just

24   sort of -- you know, we can accommodate that

25   accordingly.

Page 21

1                Does that make sense?

2        A.    Yes, it does.

3        Q.    Is there any reason why you can't

4    testify truthfully and competently today?

5        A.    No reason.

6        Q.    Okay.  When did you first become aware

7    that you might be deposed in this case?

8        A.    I don't -- I don't recall.

9        Q.    What did you do to prepare for your

10   deposition today?

11       A.    I spent time producing information.

12   I've been following the various pleadings that

13   have been set forth identifying topics for

14   deposition.  I've been reviewing them with

15   counsel.  I've been involved in the case for

16   almost 12 months now.

17       Q.    And when you say "involved in the case,"

18   what do you mean?

19       A.    Serving as a financial advisor.

20       Q.    And as a financial advisor to GNET ATC;

21   is that correct?

22       A.    GNET ATC and its related affiliates.

23       Q.    So does the engagement letter between

24   CFGI and GNET ATC cover Genesis as well, or does

25   it cover just GNET ATC?

Page 22

1        A.    It says GNET.  However, during the

2    course of the engagement, we -- I wasn't --

3    became involved in other very -- you know,

4    close -- closely-related affiliates.

5        Q.    And do you have separate engagement

6    letters for those other closely-related

7    affiliates?

8        A.    I do not.

9        Q.    Did you amend the engagement letter to

10   include these other closely-related affiliates?

11       A.    I did not.

12       Q.    But you're currently serving as a

13   financial advisor to the other closely-related

14   affiliates?

15       A.    I would say that, yes.

16       Q.    Which other closely-related affiliates

17   are you serving as a financial advisor to?

18       A.    Goodman Networks, Inc.

19       Q.    Any others?

20       A.    Multiband Field Services, Inc.

21       Q.    Any others?

22       A.    No.

23       Q.    So the three entities that you're

24   serving as financial advisor to are GNET ATC,

25   Goodman Networks, Inc. and Multiband Field

Alpha Reporting                    800-556-8974
A Veritext Company            www.veritext.com

1    Services, Inc.; is that correct?

2         A.   Yes.

3         Q.   Are you serving to any -- are you

4    serving as a financial advisor to any individuals

5    in an individual capacity?

6         A.   No.

7         Q.   Getting back to your preparation for

8    your deposition today, did you review any

9    documents in preparation for your deposition here

10   today?

11        A.   Not specifically, no.

12        Q.   Did you talk to anyone at the company in

13   preparation for your deposition here today?

14        A.   No.

15        Q.   So did you do any specific work to

16   prepare for your deposition here today?

17        A.   Aside from having conversations with

18   Ms. Hartley and --

19        Q.   Let me just pause there.  So I don't

20   want you to reveal your communications with

21   Ms. Hartley.  I'm sure she's about to tell you

22   the exact same thing.  But the -- just -- well,

23   let me break it down and ask crisper questions so

24   we don't go there.

25             Have you met with Ms. Hartley in advance

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    of your deposition here today?

2         A.   Yes.

3         Q.   How many times?

4         A.   Twice by telephone.

5         Q.   And when were -- when were those

6    telephone calls?

7         A.   Yesterday evening was one of them.

8         Q.   What about the other?

9         A.   And I would probably say Wednesday or

10   Thursday of last week.

11        Q.   And on those calls, was it just you and

12   Ms. Hartley or was there anyone else on those

13   calls?

14        A.   Last evening was just Ms. Hartley and

15   myself.

16        Q.   And what about the call on Wednesday or

17   Thursday of last week?

18        A.   Ms. Hartley's co-counsel was on the

19   phone.

20        Q.   Which co-counsel?

21        A.   Ms. Hartley's co-counsel -- partner.

22        Q.   Oh, someone from the Akerman firm?

23        A.   Yes.

24        Q.   Got it.

25        A.   But let me -- let me -- that -- that was

Page 25

```
 1    not for the preparation of deposition.  That was

 2    just my other --

 3              THE COURT REPORTER:  I'm sorry.  He

 4    froze.

 5              MR. PHAIR:  Yeah.

 6              THE WITNESS:  -- at that point, the only

 7    thing we were to topic on --

 8    BY MR. PHAIR:

 9        Q.   Mr. Konicov, I apologize.  I don't mean

10    to interrupt you, but you cut out for a minute.

11        A.   Oh.

12        Q.   So if you can go back to the beginning

13    of what you were saying and let me just -- maybe

14    the court reporter can read the question back.

15              (WHEREUPON, THE REQUESTED PORTION WAS

16    READ BY THE COURT REPORTER.)

17        A.   Yes.  The -- the Wednesday and Thursday

18    conversation dealt with the scheduling of the

19    deposition and whether the deposition was

20    confirmed or not.

21        Q.   Got it.

22        A.   Last night -- last evening, conversation

23    with Ms. Hartley was more substantive on the

24    preparation for the deposition.

25        Q.   Okay.  How long did you talk to
```

Alpha Reporting                        800-556-8974

A Veritext Company              www.veritext.com

```
 1   Ms. Hartley last night?
 2        A.    It was late.  Probably 20 minutes or so.
 3        Q.    Okay.  And were any documents shown to
 4   you in the course of that conversation?
 5        A.    No.
 6        Q.    And you said that you haven't reviewed
 7   any documents in preparation for your deposition.
 8        A.    I -- no, I have not.
 9        Q.    Okay.  Okay.  Getting back to your
10   retention on behalf of GNET ATC, Goodman
11   Networks, Inc. and Multiband Field Services.  Who
12   is your current primary point of contact at the
13   companies for your engagement?
14        A.    Well, I report to -- I do have a
15   colleague at CFGI that I'm working with, and our
16   current contact is John Goodman.
17        Q.    And has Mr. Goodman been your primary
18   point of contact throughout your engagement since
19   December of 2021?
20        A.    He has not.
21        Q.    How has that changed over time?
22        A.    Mr. Frinzi, James Frinzi was the
23   debtor -- the company's principal -- was my
24   principal contact from the beginning of our
25   engagement, probably up until 60 to 90 days ago.
```

Alpha Reporting                          800-556-8974
A Veritext Company                    www.veritext.com

1    And I believe that's when I started -- that's

2    when John Goodman stepped in as the -- as the

3    point -- as the contact point.

4         Q.   Did you receive a formal communication

5    that said that Mr. Goodman would be your point of

6    contact going forward?

7         A.   I don't recall formal.

8         Q.   Okay.  How did you become aware that

9    Mr. Goodman would be your point of contact going

10   forward?

11        A.   Probably through e-mail notification of

12   some sort.

13        Q.   Going back to your original retention in

14   December of 2021, you mentioned, was it

15   Mr. Frinzi who retained you initially?

16        A.   Yes.

17        Q.   Did you know Mr. Frinzi prior to your

18   engagement?

19        A.   No.

20        Q.   How did it come to be that you were

21   engaged by Mr. Frinzi?

22        A.   My -- my partner had been in

23   communication with Mr. Frinzi around the time

24   that the engagement letter was signed, and he

25   had -- my -- the partner from CFGI asked me to --

1    asked me to assist in representing the company.

2         Q.   What is your partner's name?

3         A.   Joseph Baum.

4         Q.   And do you understand how Mr. Baum knew

5    Mr. Frinzi?

6         A.   I do not.

7         Q.   Okay.  And had you had any contact or

8    awareness of the companies before your retention

9    by the three companies that we referenced

10   earlier?

11        A.   No.

12        Q.   So you had no prior affiliation with

13   Goodman Networks?

14        A.   That's right.

15        Q.   Okay.

16        A.   No prior.

17        Q.   And did Mr. Baum do work for any of the

18   Goodman companies prior?

19        A.   I don't believe so.

20        Q.   Did you ever come to understand how it

21   was that your firm was engaged by the three

22   companies?

23        A.   I believe that a former client of

24   Joseph's.

25        Q.   Would you explain that a little more?

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1       A.    A former client of Joseph Baum.

2       Q.    Oh, Goodman Networks was a former

3   client?

4       A.    No.  No.  A former client of Joseph Baum

5   may have introduced Joseph to this opportunity.

6       Q.    Do you know what that client was?

7       A.    I don't know the name of the client.

8       Q.    Was it a client that was in some way

9   affiliated with any of the companies?

10      A.    No.

11      Q.    Completely unrelated?

12      A.    At the time -- well, -- at the time when

13  we were engaged, my understanding -- I don't know

14  if there's an affiliation.  I don't believe there

15  is.

16      Q.    Did -- did -- is there -- is it -- is

17  the former client somehow affiliated now with

18  Goodman Networks or any of the companies that you

19  are representing?

20      A.    Not that I'm aware of.

21      Q.    And who was Mr. Baum's client

22  contact?  Was that Mr. Frinzi?

23      A.    Yes.

24      Q.    And do you know if Mr. Baum knew

25  Mr. Frinzi before being introduced to him by this

Page 30

1    former client?

2         A.    I do not know that.  I do not know.

3         Q.    Do you know if Mr. Baum knew any of the

4    principals at the companies before this

5    engagement?

6         A.    I do not know; however, based on my

7    understanding, he did not have a -- a

8    relationship with them.

9         Q.    Was this a RFP process to get this work?

10        A.    I don't recall whether there was an RFP.

11        Q.    Do you know whether it was a competitive

12   engagement?

13        A.    I don't believe so.

14        Q.    Who negotiated the retention between

15   CFGI and GNET ATC?

16        A.    It would have been my colleague, Joseph

17   Baum.

18        Q.    Do you know who he negotiated with at

19   the company?

20        A.    It would have been James Frinzi.

21        Q.    Okay.  And what are the terms of CFGI's

22   engagement by GNET ATC?

23        A.    When you ask for the term -- when you

24   suggest terms, can you -- can you narrow it down?

25        Q.    Sure.  Let's start with the scope of

1    engagement.  What is the scope of your engagement

2    with GNET ATC?

3         A.   Well, when we were hired, we were hired

4    to present, I'll call it -- there were a few

5    different elements to our involvement or the

6    need.

7              One is to provide support to the finance

8    and accounting function of GNET and its

9    affiliates.  When we -- it was clear that certain

10   creditors hadn't been paid at the time, and we

11   were -- we were asked to make contact with

12   certain creditors, explain the situation.  We

13   ascertained the financial condition of the

14   companies and we supervised the existing finance

15   and administrative resources that the company

16   had.

17        Q.   Anything else?

18        A.   I don't recall.  I don't -- there may

19   have been other things that were specified on the

20   engagement letter; however, my -- that list is

21   substantively what we -- what we did.  We

22   ultimately also assisted litigation counsel in

23   defending certain actions that were -- that were

24   pending against the company.

25        Q.   Which actions were those?

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1          A.    ARRIS is one of them.  Call Center was

2     another.  When I say "actions," I'm not -- it's

3     not necessarily asserted litigation.  It was

4     communication -- communication that was made by

5     creditors, making demands.  It hadn't always got

6     to the litigation stage.  Various other creditors

7     also stayed in ready touch with the -- the bond

8     trustee and their counsel.  I did that at various

9     points of our representation.

10         Q.    Okay.  Anything else that was within the

11    scope of the engagement?

12         A.    I don't recall.

13         Q.    Did the scope of the engagement change

14    over time?

15         A.    You know, it was -- it was a company

16    that Goodman -- GNET and its affiliates were

17    companies that had ceased doing business, that

18    did not have sufficient resources.  We were

19    financial advisors to that business, and

20    essentially our -- the services that we provided

21    and the scope that we provided was consistent

22    with us representing that.

23              There were things that came up from time

24    to time that may have been different.  However, I

25    summarized for you what the nuts and bolts of our

Alpha Reporting                      800-556-8974
A Veritext Company              www.veritext.com

1   representation was and how we helped.  We also

2   provided financial information from time to time,

3   and we worked closely with the Akerman firm.

4        Q.   Okay.  Anything else that you provided?

5        A.   I don't believe so.

6        Q.   Okay.  Did you or your firm provide

7   legal advice to the companies?

8        A.   Not -- no.  No.  We -- I have a long

9   history in solvency and bankruptcy matters, and I

10  know a thing or two about these situations, but

11  I'm not a lawyer.

12       Q.   Okay.  Are you responsible for auditing

13  the financial statements of GNET ATC or any of

14  the other companies?

15       A.   No.

16       Q.   And, like sitting here today, are you

17  making any representations as to the accuracy of

18  the financial statements of GNET ATC?

19       A.   No.

20       Q.   And I just want to be clear.  I think

21  you answered this, but I just want to be clear.

22            What you're doing now for the company is

23  the same thing that you were planning to do when

24  you were engaged in December of 2021; is that

25  correct?

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1      A.   No.  Right now -- right now, we're --
2  you know, engagements go in phases.  Certain
3  things become priorities and certain things
4  change as far as the needs of what a company
5  needs from their financial advisor.  What -- what
6  I've been doing over the last 30, 60, 90 days is
7  different than what I had been doing early in the
8  engagement.
9      Q.   How so?
10      A.   I would -- my involvement really -- my
11  involvement has been focused on supporting the
12  company's process and progress in this
13  litigation -- in certain litigation with the
14  petitioning creditors and other litigation that
15  has been asserted in that context.
16      Q.   Okay.  Are you providing -- I think we
17  went over this earlier.  Are you providing
18  business advice or legal advice to the company?
19      A.   Well, I'm not providing legal advice.
20  Right -- I -- previously, I was more involved
21  in -- in staying in touch with the finance
22  function and understanding the cash position
23  that -- I'm not doing that now.
24      Q.   Okay.  Were you involved in the prior
25  bankruptcy involving Goodman Networks?

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

```
 1          A.    No.

 2          Q.    Do you know who was?

 3          A.    From a financial perspective or from a

 4    legal perspective?  I don't recall.  Big firms.

 5    Big firms.

 6          Q.    Okay.  Do you know why the company

 7    didn't use whoever their financial advisor was in

 8    the prior bankruptcy and why they were looking

 9    for new advisors?

10          A.    I don't know.

11          Q.    How are you being compensated for this

12    engagement?

13          A.    We have hourly rates.  And we -- we bill

14    based on -- on time incurred.

15          Q.    Is there any contingent interest in this

16    engagement?

17          A.    No.

18          Q.    Who -- who pays you?

19          A.    I -- unclear whether it had been GNET

20    and/or Goodman.  I can't tell you who.  It's one

21    of the entities that I mentioned earlier as to

22    the entities that are in this corporate group.

23          Q.    Has Multiband ever paid you directly?

24          A.    I -- I seriously doubt it.

25          Q.    So it would have been one of -- either
```

Page 36

1    GNET ATC or Goodman Networks, Inc.?

2         A.   Yes.  And it may have just been GNET,

3    but I can't give you a factual answer.

4         Q.   Have you received any compensation in

5    connection with this engagement outside of the

6    corporation paying you?

7         A.   No.

8         Q.   Okay.  Let me take a step back.  If you

9    could, could you just kind of walk me through

10   your background and your history leading up to

11   this engagement?  Like start with your education,

12   maybe.

13        A.   Okay.  I was educated as a -- at -- in

14   business school, University of Rhode Island

15   business school.  I quickly joined a -- I quickly

16   joined a middle market CPA firm in New York City.

17   After graduation, I stayed in traditional public

18   accounting for about 10 years.

19           After joining the public accounting firm

20   and then I pursued a specialty within -- within

21   the accounting firm, a specialty that focused on

22   representing various constituents in different

23   levels of -- of insolvencies, of bankruptcies, of

24   workouts, restructurings, liquidations.  I've

25   done that for most of my career.  Most -- most of

Page 37

1    it was done in the context of a consulting

2    wing -- consulting segment within the CPA firm.

3            I retired from the CPA firm by the name

4    of CohnReznick, by the way, in 2017.  I initiated

5    my own consulting platform and I served as the

6    interim CFO, served in interim CFO roles, mostly

7    dealing with some level of distress or challenged

8    companies.

9            In December of 2000, I joined CFGI.

10       Q.   And what were you working on at CFGI

11   before the Goodman engagement?

12       A.   I'm not quite sure how busy I was, but

13   we had represented a -- a company that was in

14   Chapter 11 in -- I'm trying to remember where.  I

15   think the Southern District of New York.  I might

16   be wrong about that.  But it was a -- it was a --

17   it was a Chapter 11 company in a retail

18   environment, and it ultimately reorganized,

19   traditional CFO -- traditional financial advisor

20   roles.

21       Q.   And have you ever been engaged

22   previously in the same industry as GNET ATC,

23   Goodman Networks or Multiband?

24       A.   Have I been -- I'm sorry.  Would you

25   repeat that?

1       Q.    Yeah.  You know, it might be easier, for

2    terminology sake, rather than having me repeat

3    all three companies.

4       A.    Yes.

5       Q.    So I think I'll refer to those as the

6    Goodman companies.  And when I refer to the

7    Goodman companies, what I'm referring to is the

8    three entities that you mentioned being engaged

9    by; that's Goodman ATC, Goodman Networks, Inc.

10   and Multiband.

11          Is that fair?

12      A.    Fair.

13      Q.    And if I -- if I want to refer to one of

14   the other entities, I'll specifically --

15      A.    Sure.

16      Q.    -- mention that.  But just for ease of

17   communication, when I refer to the Goodman

18   companies, those three companies are what I'm

19   referring to.

20          Is that fair?

21      A.    Fair.

22      Q.    Okay.  Have you ever been engaged in --

23   for a project in the same or similar industry as

24   the industry that the Goodman companies operated?

25      A.    I'm sure I have.  I -- by -- at the time

Page 39

1    that I became involved in -- in the Goodman

2    companies, you know, the companies had stopped

3    operations, so there was no backdrop of an

4    operating company, so to speak.

5         Q.   Okay.  But within say, the past 10

6    years, have you ever been engaged by a company in

7    the same industry as the Goodman companies?

8         A.   I can't think of one, sitting here right

9    now.

10         Q.   Okay.  Have you ever been retained as an

11    expert in connection with a bankruptcy

12    proceeding?

13         A.   I've been retained as a financial

14    advisor in connection with a bankruptcy

15    proceeding.  And in that role, I provided

16    testimony in certain bankruptcy litigation from

17    time to time.

18         Q.   And again, take the past 10 years.

19         In the past 10 years, have you provided

20    testimony in any other bankruptcy proceeding?

21         A.   Yes, I have.

22         Q.   And what -- what proceedings were those?

23         A.   There was a case pending in Iowa.  It

24    was -- it was -- it was pending in Iowa, in

25    whatever district Des Moines is.  And the name of

1    the company was -- it had two names.  I'm not
2    sure what the official name was on the docket.
3    It was either Fan Steel or Welpman.
4         Q.   Okay.  And what -- I don't need the
5    specific opinion, but what type of testimony did
6    you provide?
7         A.   It was -- it was contested.  It was --
8    it was fairly early on in the case.  I believe it
9    was -- it was in connection with a contested
10   cash -- cash collateral.
11        Q.   Other than the Iowa matter, have you
12   submitted any other testimony in a bankruptcy
13   proceeding over the past 10 years?
14        A.   I can't recall one.
15        Q.   And does it change the answer if I go
16   outside of the bankruptcy proceeding and say any
17   civil, criminal litigation?
18        A.   No.  It does not change the answer.
19        Q.   Have you ever been retained as an expert
20   to perform a valuation analysis?
21        A.   I recall something many, many -- I
22   recall something many years ago, being retained
23   by a judge in Chancery Court in Elizabeth, New
24   Jersey on a shareholder dispute.
25        Q.   And when you say "many years ago"?

                                        Page 41

1        A.    Too long ago.  It just comes -- other
2   than that, probably 25 years ago.
3        Q.    Okay.  And do you consider yourself a
4   valuation expert?
5        A.    No.  No.  No.
6        Q.    The CFGI team that was working with the
7   Goodman companies, who were the people that you
8   were working with on your own team?
9        A.    Well, Joseph.  And we have -- there was
10   another individual, his name is Steve Norowitz.
11        Q.    Anyone else?
12        A.    Oh, I don't recall anybody else.  There
13   may have been, but it would be very limited.
14        Q.    And what were the roles of the three of
15   you in the Goodman companies' engagement?
16        A.    Well, Joseph was the partner, and I
17   supported the client and I supported him as we
18   progressed through the assignment, engagement.
19   Steve provided more nuts and bolts, financial
20   analysis worked closely with the finance team to
21   examine the books and records, be in a position
22   to come up with financial -- have a better
23   understanding of the details of the financial
24   records.  And I served as kind of in between, if
25   that makes sense.

Alpha Reporting                     800-556-8974
A Veritext Company              www.veritext.com

1        Q.    Okay.   So was this more of a

2    hierarchical structure or did you sort of

3    separate out what each of you were responsible

4    for?

5        A.    No.   We stayed in ready touch.   We all

6    had something -- we all kind of knew what each

7    one of us was doing.   We weren't in silos.   We do

8    have different levels and we are at different

9    levels, however, so in that regard, it's

10   hierarchical, but not substantively.

11       Q.    And do you have a sense of what

12   Mr. Baum's experience and expertise was?

13       A.    I do.   His background is similar to

14   mine, although he's got probably 10 or 15 years

15   less experience.   He's -- he -- that

16   notwithstanding, has probably more testimony

17   experience.   We actually worked together at

18   CohnReznick at certain parts of our career.

19   There, we shared -- we shared some assignments,

20   and on the other hand, we worked separately on

21   different assignments, but we -- but we knew each

22   other and we worked in the same office.

23       Q.    And what about Mr. Norowitz?

24       A.    He had some experience at CohnReznick as

25   well.   When I was there, not quite sure if Joseph

Page 43

1    was there at the same time.  Mr. Norowitz

2    resigned from CohnReznick and at some point

3    became a part of financial management in New York

4    City, some kind of New York City commercial

5    business.  I believe it was real estate, and

6    he -- that was his background.

7         Q.   Okay.  And then on the client side, let

8    me step back.

9              So who was managing the Goodman -- well,

10   I guess, at the time you said it was Goodman ATC

11   is the way it started, is that right, when you

12   were first retained?

13        A.   GNET ATC.

14        Q.   Who was managing GNET ATC when you were

15   first retained?

16        A.   That would have been James Frinzi.

17        Q.   Okay.  And what was his title and role?

18        A.   I believe he was CEO, although I never

19   saw it formally documented.

20        Q.   Is he still a CEO?

21        A.   I don't believe so.

22        Q.   When did he stop being the CEO?

23        A.   I don't recall when he noticed the

24   fact -- he noticed his resignation; however,

25   probably 90 days ago, plus or minus 30 days.

Alpha Reporting                          800-556-8974
A Veritext Company                    www.veritext.com

1        Q.   Were there any other officers of GNET
2   ATC that you interacted with?
3        A.   None.
4        Q.   So all of your interactions were with
5   Mr. Frinzi?
6        A.   Yes.  Until which time John Goodman came
7   on.
8        Q.   And Mr. Goodman came on, you said 60, 90
9   days ago?
10       A.   Yeah.  Yeah.  Probably closer to 60 days
11   for him -- Mr. Goodman.
12       Q.   How did you find out that Mr. Frinzi had
13   left as CEO?
14       A.   I recall -- I recall an e-mail with --
15   with a letter attached to it.  I recall seeing
16   that.
17       Q.   And was Mr. Goodman announced as the new
18   CEO or your principal contact at the same time as
19   you received that e-mail?
20       A.   I don't -- I don't believe so.
21       Q.   How long was the lag between when
22   Mr. Frinzi stepped down as CEO and when
23   Mr. Goodman took over?
24       A.   You know, it could have been 30 days,
25   plus or minus 30 days.

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1        Q.    So in the 30 days where there was this

2    lag period, who were you reporting to at the

3    company?

4        A.    There was -- I was reporting to Joseph.

5    Joseph was -- there was -- I don't -- I wasn't

6    reporting to anybody.  There was nobody to report

7    to.  I was in touch with some of the finance --

8    one of the finance manager and -- and another

9    administrative individual.

10       Q.    So let me just -- so -- so you're

11   engaged by the -- how are you working for the

12   company if you're not reporting to anyone?

13       A.    Well, I'm an experienced financial

14   advisor.  I -- I progressed.  I used my skill and

15   my judgment to hold things together, stay in

16   communication with constituents, got support from

17   Joseph Baum, I supported him and we got through

18   it.

19       Q.    But there was no one at the time that

20   was giving you direction and control from the

21   company?

22       A.    No.  It was a very short period of time.

23       Q.    Did Mr. Baum ever take a position at the

24   company?

25       A.    No.

1      Q.    Who was the finance manager that you

2  referred to earlier?

3      A.    Her name is Stephanie Elmore.

4      Q.    And how did you work with Ms. Elmore?

5      A.    She was -- she was helping the company

6  when we were retained, and I believe she's still

7  helping the company today.  She was previously --

8  she had the responsibility of -- of paying the

9  bills and managing cash.  And she had the

10 responsibility of maintaining the books and

11 records and providing -- she was our liaison as

12 we gathered information related to the company's

13 financial situation, relating to the company's

14 books and records.

15     Q.    Who's the admin individual you referred

16 to?

17     A.    Her name was Samantha Sondrup.  S- --

18 I'll give it a shot.

19     Q.    Sure.  Close counts.

20     A.    S-O-N-D-R-U-P.

21     Q.    Okay.  Other than Sandra (sic) and

22 Stephanie, were there any other people that you

23 reported to or interacted with at the company?

24     A.    Other than James Frinzi, no, nobody.

25     Q.    Who are the company's auditors?

Alpha Reporting                    800-556-8974
A Veritext Company            www.veritext.com

1          A.    Well, they don't have auditors right
2     now.
3          Q.    Did they have auditors at the time you
4     were engaged?
5          A.    They were standing by, but they never --
6     the situation did not call for a financial
7     statement auditor, so they never got started with
8     it.
9          Q.    And who was the auditor standing by?
10          A.    I'm drawing a blank.
11          Q.    Did you work with the auditors at all?
12          A.    No.
13          Q.    So am I correct then that if they
14     haven't been involved, that the company's
15     financial statements haven't been audited since
16     January 1, 2021?
17          A.    That's correct.
18          Q.    Did you ever have any interactions with
19     James Goodman?
20          A.    I did not.  I've seen -- I've been on
21     some e-mails, but very few and very limited.
22          Q.    Do you know who he is?
23          A.    I do.
24          Q.    Who is he?
25          A.    He's John Goodman's brother.

Page 48

1      Q.    Does he have any role or title in the

2    company?

3      A.    Right now, I don't believe so.

4      Q.    At any point during your engagement, did

5    James Goodman have any role or title in the

6    Goodman companies?

7      A.    I believe he was a board member at some

8    point in one of the companies; however, I recall

9    that he resigned that board position.

10     Q.    So let's talk a little bit about the

11   board.

12           GNET ATC, who was on the board of GNET

13   ATC at the time you were retained?

14     A.    I know -- I don't -- if there was a

15   board member of GNET, it would have been James

16   Frinzi; however, that's unvalidated by me at this

17   point, factually.  That was my understanding.

18     Q.    Are you aware of any other board members

19   of GNET ATC other than James Frinzi?

20     A.    I'm not; however, there may be paperwork

21   in there that supports other Goodman individuals

22   or other third parties that may have sat on the

23   board, but I'm not aware of them.

24     Q.    But functionally for your purposes, it

25   was Mr. Frinzi?

Page 49

1         A.    Yes.

2         Q.    Did you ever present to the GNET ATC

3    board?

4         A.    Mr. Frinzi, yes.

5         Q.    In his capacity as a -- as a board

6    member?

7         A.    I -- you know, I -- that's up to him as

8    to what his capacity was.  He was -- he was CEO,

9    plus he was a board member, so we presented to

10   him in both capacities.

11        Q.    Did you ever present to the full GNET

12   ATC board?

13        A.    My understanding was that Frinzi was the

14   only board member.  If my understanding is

15   correct, then, yes.

16        Q.    Okay.  But you've never met with anyone

17   besides Mr. Frinzi who has identified themselves

18   as a GNET ATC board member; is that correct?

19            MS. HARTLEY:  Objection.  I believe it's

20   been asked and answered.

21            But go ahead, Howard.

22            THE WITNESS:  If John Goodman is a board

23   member of GNET, then I would have met with him;

24   not physically, but various phone calls, e-mail

25   communication.

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

```
 1   BY MR. PHAIR:

 2        Q.   But you never walked into a board

 3   meeting?

 4        A.   No.  No.  No.  No.

 5        Q.   Are you aware of any board meetings ever

 6   taking place?

 7        A.   During my retention?

 8        Q.   Yes.

 9        A.   During my involvement?  I'm not aware of

10   any.

11        Q.   Have you ever seen any minutes of a

12   board meeting of GNET ATC?

13        A.   None.

14        Q.   Switching gears to Goodman Networks,

15   Inc.

16             Who were the board members of Goodman

17   Networks, Inc. when you were first retained?

18        A.   My understanding was that James Goodman

19   was a board member of Goodman Networks, Inc.  My

20   understanding is that he resigned from that board

21   at some point in time during my involvement.

22        Q.   At the time you were engaged, was there

23   anyone besides James Goodman who was a board

24   member of Goodman Networks, Inc.?

25        A.   Not that I know of; however, I know
```

Page 51

1   there's a chart that's been provided with -- that

2   might be useful to you.  Not that I -- not that

3   I -- not that I'm aware of.

4        Q.   Did you ever attend a board meeting of

5   Goodman Networks, Inc.?

6        A.   No.  No.

7        Q.   Did you ever present any financial

8   analysis to the board of Goodman Networks, Inc.

9   formally?

10       A.   No.

11       Q.   Are you aware of any minutes of any

12   board meetings of Goodman Networks, Inc.?

13       A.   No.

14       Q.   When do you believe James Goodman

15   resigned from the board of Goodman Networks,

16   Inc.?

17       A.   I don't know.  Andrea would know, but I

18   would say probably in the first four months of

19   the year of 2022, sometime in there.

20       Q.   So when you were first --

21       A.   That's my understanding, yeah.

22       Q.   When you were first retained in December

23   of 2021, was James Goodman a member of the board

24   of any of the Goodman companies?

25       A.   My understanding he was a member of

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    Goodman Networks, Inc. board.  That's my

2    understanding.

3        Q.    Okay.  But he was not a member of the

4    board of GNET ATC at the time you were first

5    retained in December of 2021, correct?

6        A.    That's my understanding.

7        Q.    Okay.  Why did Mr. Goodman resign from

8    the board of Goodman Networks, Inc.?

9            MS. HARTLEY:  Objection.  Calls for

10   speculation.

11           But go ahead, Howard, if you know.

12   BY MR. PHAIR:

13       Q.    Let me rephrase.

14           Do you know why Mr. Goodman resigned

15   from the board of Goodman Networks, Inc.?

16       A.    I do not know.

17       Q.    Did Mr. Goodman ever tell you why he

18   resigned from the board of Goodman Networks,

19   Inc.?

20       A.    No.

21       Q.    Have you and Mr. Baum ever discussed why

22   James Goodman resigned from the board of Goodman

23   Networks, Inc.?

24       A.    We have not.

25       Q.    When you were first retained in December

Alpha Reporting                          800-556-8974
A Veritext Company              www.veritext.com

1    of 2021, who was the members of the board of

2    Multiband Global?

3         A.   I do not know.

4         Q.   Have you ever --

5         A.   There may not be a board, but I do not

6    know.

7         Q.   Have you ever presented to the board of

8    Multiband Global?

9         A.   No.

10        Q.   Have you ever seen minutes of the

11   meetings of the board of Multiband Global?

12        A.   No.

13        Q.   Do you know whether the board of

14   Multiband Global even exists?

15        A.   Hold on.  You're getting a couple of the

16   entities crossed, meaning that is the within the

17   Goodman umbrella is Multiband Field Services.

18        Q.   Okay.

19        A.   Nothing to do with Multiband Global.  I

20   think your line of questioning relates to

21   Multiband Field Services.  It was a subsidiary of

22   Goodman Networks, Inc.

23        Q.   Got it.  So when you were referring

24   earlier, just so we can clarify because I think

25   that's an important point.

Alpha Reporting                    800-556-8974
A Veritext Company            www.veritext.com

1        A.    Yeah.

2        Q.    The Multiband Field Services, that is a

3   subsidiary of Goodman Networks, Inc.; is that

4   correct?

5        A.    Correct.

6        Q.    And at some point, you became engaged by

7   Multiband Field Services; is that correct?

8        A.    It was a -- it was a wholly owned

9   subsidiary of Goodman Networks, so it was -- it

10  was integrated.  It was part of this -- this

11  company, and we were dealing with business issues

12  related to Multiband Field Services either --

13  Multiband Field Services, Inc.  We didn't get

14  formally retained by that entity, but

15  substantively, we were -- we were helping out

16  whenever necessary, wherever necessary.

17       Q.    Were you retained by Multiband Global at

18  any point in time?

19       A.    No.  No.

20       Q.    So you believe you were only retained by

21  Multiband Field Services, not Multiband Global;

22  is that correct?

23       A.    Yes, correct.

24       Q.    And is Multiband Global, what is their

25  relationship to the Goodman companies?

Alpha Reporting                        800-556-8974
A Veritext Company                 www.veritext.com

1        A.    My understanding is that it's -- at the

2    time, Frinzi was in place.  He had

3    management/ownership interest in Multiband

4    Global.

5        Q.    And how does Multiband Global relate to

6    Multiband Field Services?

7        A.    There's -- I don't believe there's any

8    relationship of multi -- maybe in their business

9    purpose; however, some -- however, it just by way

10   of background.  Multiband Field Services sold its

11   assets at some point, I'm thinking in mid of '21

12   to a third party, so as a result, it ceased

13   operations.

14       Q.    Okay.  I want to go back to quickly

15   the -- you said earlier, there was a time where

16   James Goodman was either a board member -- well,

17   let me start -- I'll ask it again just because

18   I'm not clear on it.

19            So when you were retained in December of

20   '21, did Mr. Goodman, James Goodman, have any

21   board or officer role for any of the companies

22   that you were engaged by?

23       A.    My understanding is that James Goodman

24   was a board member of Goodman Networks, Inc., the

25   parent company.

Alpha Reporting                    800-556-8974
A Veritext Company          www.veritext.com

1      Q.  And that was at the time of your

2  retention in December 2020?

3      A.  Correct.

4      Q.  And when did that change?

5      A.  As I said, and I don't mind saying it

6  again, it's my understanding that he resigned

7  within the first 120 days of -- of 2022.

8      Q.  And did you have -- so between January

9  and April of 2022, did you have any interactions

10  with James Goodman?

11      A.  None.

12      Q.  And have you had any interactions with

13  James Goodman since April of 2022?

14      A.  None.

15      Q.  Were you aware of Mr. Goodman at any

16  point providing any officer functions to the

17  company as opposed to just the board?

18      A.  I'm not aware of any.

19      Q.  Okay.

20      MR. PHAIR:  This might be a good time

21  for us to take a quick break, so maybe take five

22  minutes and circle back, if that's okay with you,

23  Mr. Konicov.

24      THE WITNESS:  Well, I don't eat that

25  fast.

Alpha Reporting                   800-556-8974
A Veritext Company              www.veritext.com

1              MR. PHAIR:  Do you want a break for

2    lunch?  We can do that, too, if you want to.  I

3    know we're on the East Coast, so it's lunch here.

4    Our friends in Texas, it might be a little early,

5    but I'm fine doing whatever you want.

6              THE WITNESS:  Let's keep it moving.

7    I'll defer to Andrea as to how she wants to

8    proceed.  We're both on the same coast.

9              MS. HARTLEY:  Maybe another hour and

10   then we'll break, if that works for everybody.

11             THE WITNESS:  Perfect.  Let's do that.

12             MR. PHAIR:  Yes.  But I need two minutes

13   for a bathroom break.  Is that all right?

14             THE WITNESS:  It's good to be young.

15             MR. PHAIR:  So let's go off the record.

16   I promise I'll be back in two minutes, and we can

17   go for another hour and break for lunch.

18             (WHEREUPON, A RECESS WAS TAKEN FROM

19   12:18 P.M. UNTIL 12:26 P.M., AT WHICH TIME THE

20   DEPOSITION CONTINUED AS FOLLOWS:)

21   BY MR. PHAIR:

22       Q.   Mr. Konicov, before the break, we were

23   talking a little bit about the board composition

24   of some of the Goodman companies.

25             Do you recall that?

1          A.    I do.

2          Q.    And do you understand that you were

3     designated to testify as to the composition of

4     some of those boards?

5                MS. HARTLEY:  I'm going to object.  This

6     deposition is first of CFGI.  We did designate

7     Mr. Konicov as a representative of the companies,

8     but -- and I apologize if that wasn't made clear,

9     but he is not familiar with all of the subjects

10    in all of the different subpoenas, and that there

11    are other people that may be testifying or

12    actually being examined on another day that would

13    have more information on certain topics.

14                MR. GUFFY:   Andrea, this is Phillip

15    Guffy, Hunton Andrews Kurth.  I spoke with your

16    partner, David Parham, regarding this.  What he

17    told me was that Mr. Konicov would be testifying

18    with respect to all of the topics in our notice

19    with the exception of Number 4 and Number 9.

20                And Topic Number 3 was with respect to

21    the current and past officers and directors of

22    all of the Goodman companies.  So that was

23    something that we were told that Mr. Konicov

24    would be testifying to.

25                MS. HARTLEY:  Okay.  We'll go forward

1    then, to the extent he can answer.

2              THE WITNESS:  I'll do the best I can.

3              MR. PHAIR:  But just to be clear,

4    Ms. Hartley, is Mr. Konicov being put forward as

5    a corporate rep to testify on those topics, or

6    are you saying he can testify to it in his

7    individual capacity?

8              MS. HARTLEY:  No.  If we had agreed that

9    he would be testifying as a corporate rep, we

10   will.  I'm just saying there could be other

11   corporate representatives that have also been

12   noticed that may be able to respond better,

13   but --

14             MR. PHAIR:  Okay.  Well, let's do this.

15   Let's get his knowledge, and we can take it from

16   there.

17             MS. HARTLEY:  Okay.

18             MR. PHAIR:  So Valerie, just to make

19   sure I'm doing this correct, so I'm in the

20   Exhibit Share.  I click the checkmark and then I

21   upload it?  Is that how I do it?

22             MS. MILLS:  I'll jump in on this one.

23   So you're in Exhibit Share, you're wanting to

24   share a document; is that correct?

25             MR. PHAIR:  Yes, ma'am.

Alpha Reporting                  800-556-8974
A Veritext Company          www.veritext.com

```
 1              MS. MILLS:  So if you've got the
 2    document, if you right click it, you'll see a
 3    dropdown where it says you've got some options
 4    toward the bottom, you'll see --
 5              MR. PHAIR:  Introduce exhibit?
 6              MS. MILLS:  Yes.  Yes.
 7              MR. PHAIR:  Okay.  And then will you
 8    identify the exhibit or do I do that?
 9              MS. MILLS:  So you'll do that.  If
10    you'll go ahead and do the first one, if you'll
11    put whatever information you want on there,
12    whether it's the witness name, and then you can
13    hit "mark exhibit."  You can move that sticker
14    around if it's covering something up.  If you
15    would, just kind of keep it in the right side of
16    the page, if possible.  And once you fill out the
17    first one, it will carry over to the next one as
18    well, so you only have to do that one time.
19              MR. PHAIR:  Got it.  Okay.
20              So then I am going to introduce what we
21    have marked as Konicov Exhibit 1, and let's see
22    if this works.
23              That's not good.  I got a note that
24    says:  This file cannot be uploaded.  Our file
25    storage service vendor is experiencing an outage.
```

Page 61

1          MS. MILLS:  Hold on.  I've never had

2     that before.  Hang on one second.

3          So Ryan, what does that error say?

4          MR. PHAIR:  It says:  Our file storage

5     service vendor is experiencing an outage.  Please

6     try again later.

7          Why don't we go off the record, Valerie,

8     for a minute, just so we can get this resolved.

9          (WHEREUPON, A RECESS WAS TAKEN FROM

10    12:36 P.M. UNTIL 12:36 P.M., AT WHICH TIME THE

11    DEPOSITION CONTINUED AS FOLLOWS:)

12    BY MR. PHAIR:

13        Q.   Mr. Konicov, are you aware of a secured

14    note that Goodman Networks issued in May 2017?

15        A.   Yes.

16        Q.   What is your understanding of those

17    notes?

18        A.   They originated in connection with the

19    companies coming out of Chapter 11 back then.

20    They -- there was a principal amount that I was

21    aware of when we -- when I first became involved

22    with Goodman.  I -- I -- I have had

23    communications with the collateral -- with the

24    bond trustee from time to time during my

25    involvement and their counsel, you know.

Alpha Reporting                 800-556-8974
A Veritext Company          www.veritext.com

1            I haven't read the indenture from page

2    to page, but I'm familiar with the -- the status

3    of them.  I do know that they were in default.

4    If you have any specific questions --

5        Q.   Sure.  No, I wasn't trying to give you a

6    memory contest here.

7        A.   Okay.

8        Q.   Just trying to get a base level.

9            Is it your understanding that the notes

10   are secured?

11       A.   Yes.

12       Q.   And do you know what collateral secures

13   the notes?

14       A.   My understanding was everything.  I

15   never became aware that there were certain

16   collateral -- I don't know if there's -- if

17   there's any collateral that is not part of their

18   security package, for example.

19       Q.   Okay.  And you're aware that the

20   maturity date of the notes was May 31st, 2022,

21   correct?

22       A.   Yes.

23       Q.   And when you say they're in default,

24   what do you mean?

25       A.   Payment default.

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1      Q.    And does that mean that Goodman

2  Networks, Inc. did not pay the outstanding

3  amounts due on the notes when they matured?

4      A.    Yes.

5      Q.    Are the notes still outstanding?

6      A.    I believe so.

7      Q.    Do you know what the approximate amounts

8  are that are currently due on the notes?

9      A.    I'll answer as best I can.  At or around

10  the time of the default -- the default or May 31,

11  there was approximately 15 to 20 million

12  outstanding, somewhere in there.

13      Q.    And was that principal or was that

14  principal and everything?

15      A.    Principal.

16      Q.    And do you know how much interest and

17  fees had accrued on that?

18      A.    I don't know.

19      Q.    Okay.  You mentioned that you had

20  communications with the bond trustee.

21            Who was that?

22      A.    UNB.

23      Q.    And the collateral agent?

24      A.    I never had communications with the

25  collateral agent, not that I know of.  I may have

Page 64

1    been on some e-mails with them, but the bond
2    trustee, I did have communications with.
3         Q.   When did you first become aware that
4    Goodman Networks was likely to default on the
5    notes?
6         A.   I don't -- I don't recall.
7         Q.   How many communications have you had
8    with the bond trustee?
9         A.   Lately, none.  During the period -- I
10   mean, during the six-month period from March to
11   September, we were in frequent contact.  As far
12   as how many, I would say once every two to three
13   weeks I would check in with them.
14        Q.   And why were you checking in with them?
15        A.   It's my role as a financial advisor
16   to -- to a company, giving them updates and
17   status, status reports.
18        Q.   Status reports on what?
19        A.   On the company's financial condition, on
20   the company's management structure, on requests
21   that were made on delivering certain requests for
22   information, certain technical things.  We --
23   bond trustee, we worked with the bond trustee and
24   their counsel in getting interest paid in April.
25   There was a technical, complex process I recall,

Alpha Reporting                          800-556-8974
A Veritext Company                      www.veritext.com

1    so there was some constant touch around that

2    time.  Yeah.  So I -- all of the above.

3         Q.   Other than the bond trustee and the

4    company, have you had discussions with anyone

5    else about the notes?

6         A.   Any -- any -- aside from the bond

7    trustee and the company?

8         Q.   Yes, sir.

9         A.   Counsel.

10        Q.   You mean your counsel?

11        A.   Yes.

12        Q.   Okay.  Good.  Don't want to know about

13   that.

14        A.   Okay.

15        Q.   Other than your counsel, the debtor and

16   the bond trustee, have you had communications

17   with anyone else about the notes?

18        A.   Just my colleagues at CFGI.

19        Q.   No one besides those four entities you

20   just listed?

21        A.   No one besides those -- what I said was

22   other than -- other than my colleagues at CFGI, I

23   had no contact about the bonds with anybody else.

24        Q.   Who is your contact at the bond trustee?

25        A.   Gavin Wilkinson.

Alpha Reporting                    800-556-8974
A Veritext Company            www.veritext.com

1      Q.    Anyone else?

2      A.    No.

3      Q.    When you spoke with the bond trustee,

4   did you have any in-person meetings?

5      A.    No.

6      Q.    Did you have any Zoom meetings?

7      A.    I set up Zoom meetings.  I don't recall

8   whether -- I don't believe they -- they went on

9   video.

10      Q.    Did you ever make a presentation to the

11   bond trustee?

12      A.    Yes.

13      Q.    When?

14      A.    A formal presentation -- I mean, every

15   time I spoke to them, I made presentations, but

16   we made -- my firm made a formal presentation on,

17   I believe it was August 3rd, '22.

18      Q.    Any other time?

19      A.    I don't believe so, no.

20      Q.    When you spoke to the bond trustee, did

21   you ever have representatives of the company on

22   the line with you?

23      A.    No.

24      Q.    So Mr. Frinzi or Mr. Goodman would never

25   be on the line with you when you spoke with a

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1   bond trustee?

2        A.   Correct.

3        Q.   You were serving as their agent for

4   purposes of discussions with the bond trustee?

5        A.   I was -- I was serving -- yes.  Yes.

6        Q.   Did CFGI perform any assessment of the

7   value of Goodman Networks' assets and

8   liabilities?

9        A.   To the extent we had information, yes.

10  To the extent we had information to -- to

11  determine value, we did.  Otherwise, we presented

12  what was reflected on the books and records.

13       Q.   Can you explain that a little bit more?

14       A.   Well, if there's a asset -- if there's

15  an asset of some amount, hypothetically, let's

16  say there's Asset A for five million dollars

17  that's recorded on the books and records, if it's

18  due from a third party, we -- we either --

19  hypothetically, we would talk to the counterparty

20  of that asset, right, to determine its

21  collectability, its realizable value.  To the

22  extent that we never had that opportunity or

23  never were provided information, we couldn't do

24  that, and we presented the information as

25  reflected on the books and records.

Page 68

1        Q.    What were the instances in which you

2    were not provided information?

3        A.    I can't name them all, but for example,

4    as I understood it, it was collateral sitting at

5    an insurer that was encumbered by the insurer to

6    pay insurance claims.  One of the things that we

7    typically -- we typically do is get a third party

8    bank statement and evidence that collateral.  To

9    the extent that we couldn't find it or it didn't

10   exist, then that's an example.

11       Q.    Any other instances in which you were

12   not able to get enough information to do a proper

13   valuation of Goodman's assets and liabilities?

14       A.    I don't -- well, you know, just because

15   we don't have all the information doesn't mean

16   that the -- the -- the balance, that the recorded

17   values are incorrect.

18            To the extent assets are created based

19   on cash going out, for example, if a loan -- if

20   the companies are making cash advances and those

21   cash advances are pursuant to a loan -- loan

22   arrangement, then we would have information.

23   The -- the note receivable would be indicative of

24   that information, would represent the

25   information.

Alpha Reporting                     800-556-8974
A Veritext Company              www.veritext.com

1        Q.   Were you involved in preparing the list

2   of assets that was filed with the bankruptcy

3   court in November?

4        A.   Yes, I was.

5        Q.   And what was your involvement with that?

6        A.   I did it.  I put the -- I put the

7   schedule together.

8        Q.   Who else worked with you on that?

9        A.   I conferred with my colleague, Joseph.

10  I may have had a conversation with Stephanie at

11  that point.  The information was pretty much --

12  we knew what we had.  We knew what we didn't

13  have.  So the information was there.  It was full

14  information, so...

15       Q.   Did you have any conversation with

16  Mr. Frinzi about the November asset list?

17       A.   None.

18       Q.   Do you have any conversation with any

19  member of the Goodman family about the November

20  asset list?

21       A.   Yes.

22       Q.   Which one?

23       A.   John Goodman.

24       Q.   And what conversations did you have with

25  Mr. Goodman?

1        A.   He had -- I submitted the schedule.   He

2    was copied on it, and he raised some questions.

3    He raised some questions on the presentation

4    that -- that was -- that was included.

5        Q.   What questions did Mr. Goodman have?

6        A.    I don't recall all of them, but I do

7    recall one of them, and that was related to the

8    present -- related to the particular asset that

9    was due from a related party.   The related

10   party's called United Field Services.

11       Q.   Okay.   Did he have any other concerns

12   besides the valuation of the UFS-related asset?

13       A.   I don't recall.   I don't believe -- I

14   don't believe he did.

15       Q.   How many times did you talk to

16   Mr. Goodman about the November asset list?

17       A.   Once.

18       Q.   And was that a telephone call?   Zoom

19   call?

20       A.   That was a telephone call, I believe.

21       Q.   How long did that telephone call last,

22   roughly?

23       A.   Fifteen minutes.

24       Q.   Okay.   So other than a 15-minute call

25   with John Goodman, did you have any other

1    discussions with the Goodman family, any of their

2    members, about the November asset list?

3        A.    I did not.

4        Q.    Where did you get the information in the

5    November asset list?

6        A.    The books and records of the company.

7        Q.    Anything else?

8        A.    No.

9        Q.    And who did you get that information

10   from, the books and records?

11       A.    We worked with Stephanie Elmore.  She

12   was the custodian of the books and records, and

13   we -- we shared information -- she shared

14   information with us.

15       Q.    How did you determine the value of the

16   assets of Goodman Networks?

17       A.    The value as reflected on the books and

18   records were appropriate.  Reserves were included

19   for work applied to various assets on an

20   as-appropriate basis where we knew there was

21   significant realization issues.  Where we didn't

22   have a reason, have a factual reason to -- to

23   impair a value of an asset, we didn't.  The

24   liabilities -- were there -- I don't recall if

25   that -- that's the asset side.  I'm not clear

Page 72

 1   whether -- I don't recall whether the schedules

 2   that you're discussing includes liabilities or

 3   not.  And if it does, I'm not clear whether your

 4   question is about the liabilities.  Maybe it was

 5   just assets.

 6        Q.   All right.  Let me see if I can

 7   introduce the exhibit, see if this works.  I'm

 8   going to mark as Konicov Exhibit 2 -- I didn't

 9   introduce Konicov Exhibit 1, but I'm going to go

10   back and do that.  I just wanted to be clear on

11   the record as to what I was doing.

12             (WHEREUPON, documents were marked as

13   Exhibit Nos. 1 and 2.)

14   BY MR. PHAIR:

15        Q.   I tell you what, let's do that.  It will

16   be easier than getting it confused, let me go

17   back.  Hold on a second.

18             MR. PHAIR:  Yeah, it is still telling me

19   that the file storage vendor is experiencing an

20   outage.

21             MS. MILLS:  Ryan, I did speak to tech

22   services.  They said if you'll just log out real

23   quick and log back in, it should correct the

24   problem.

25             MR. GUFFY:  Ryan, I can try.  If you'll

Page 73

1    shoot me a message as to which exhibit you want.

2            MR. PHAIR:  Yeah, I was just going back

3    to the deposition notice.

4            MR. GUFFY:  Okay.  Let me see if I can

5    get that published.  Okay.  It should be up.

6            MR. PHAIR:  I think you need to put the

7    stamp on it, Phil.

8            MR. GUFFY:  I did.  I did put the stamp

9    on it.  It is at the bottom right.

10           MR. PHAIR:  That's weird, I'm not seeing

11   it.

12           MS. MILLS:  So, Ryan, that stamp will be

13   in the marked folder.  I'm not sure if you're in

14   the marked folder or the private folder.  But

15   once it's stamped, it will be in the marked

16   folder as stamped.

17           MR. PHAIR:  Got it.  Okay.  All right.

18   So everyone can see this?

19           THE WITNESS:  I cannot.  It's in the

20   deposition of corporate rep 12-12.  In that

21   subfolder, there's a folder called Marked

22   Exhibits with two exclamation parts.

23           MS. MILLS:  Yeah.  Howard, are you in

24   the marked folder from 12-12?

25           THE WITNESS:  Yeah.  The folder that

 1   says Marked Exhibits, I'm trying to go in.

 2             MS. MILLS:  If you would just refresh

 3   your screen at the top.

 4             THE WITNESS:  Exhibit Share.

 5             MR. PHAIR:  Doni, can I just share on my

 6   screen like what I have?

 7             MS. MILLS:  Yeah.  Absolutely.

 8             MR. PHAIR:  Why don't we do that?  Let

 9   me share --

10             MS. MILLS:  So Valerie, you need to give

11   access to share the screen.

12             THE COURT REPORTER:  Okay.

13             MR. PHAIR:  All right.  Let's come back

14   because we will have plenty of time over the

15   break to do it.

16   BY MR. PHAIR:

17        Q.   Getting back to the November asset list,

18   we were talking about how you determine the value

19   of the assets of Goodman Networks.

20             Do you recall that?

21        A.   I do.

22        Q.   What valuation methodology did you use?

23   Did you use book value or something else?

24        A.   It depends which asset you're referring

25   to.  I mean, there was a small handful of assets,

Alpha Reporting                    800-556-8974
A Veritext Company          www.veritext.com

1    you know, I can't give you a -- a blanket answer.

2    And I don't recall what all the assets were.  I

3    could name most of them, but, you know.

4         Q.   Are you familiar with an entity called

5    18920 Northwest 11th?

6         A.   Yes.

7         Q.   What is that entity?

8         A.   I -- what specifically would you like to

9    know about the entity?

10        Q.   What does it do?

11        A.   As I understand it, that entity -- the

12   business side of that entity was they acquired

13   certain rights that either Goodman or GNET had in

14   connection with a stream of business that they

15   had specifically, a particular contract with

16   providing wifi services or telecom services in

17   connection with a -- a college venue.  I don't

18   know what else they do besides that.  That's my

19   understanding of what they do, a component of

20   what they do.

21        Q.   Who are the principals of 18920

22   Northwest 11th?

23        A.   The only principal that I knew of was

24   the individual that countersigned the agreement.

25   I forget what her name was, or is.

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1      Q.   Do you know who manages 18920 Northwest
2  11th?
3      A.   I do not.
4      Q.   What else do you know about 18920
5  Northwest 11th besides this rights arrangement
6  that you just discussed?
7      A.   I know that there were some assets
8  transferred over to that entity pursuant to a
9  settlement agreement or some form of legal
10 agreement.
11     Q.   Settlement of what claim?
12     A.   I'm unclear.  Well, from my
13 understanding, it was a settlement of certain --
14 certain claims that this entity had in connection
15 with a preferred stock position.
16     Q.   All right.  Well, let's jump back.  So
17 is 18920 Northwest 11th a shareholder of Goodman
18 Networks, Inc.?
19     A.   I do not know.
20     Q.   Is 18920 Northwest 11th a shareholder of
21 any Goodman entity?
22     A.   I do not know.
23     Q.   Have you seen any evidence that 18920 --
24 that 18920 Northwest 11th is a shareholder of any
25 Goodman Networks entity?

Alpha Reporting                    800-556-8974
A Veritext Company            www.veritext.com

1          A.    I have not.

2          Q.    Have you ever discussed 18920

3    Northwest -- that's a really hard thing to say.

4    It's a little tongue twister.  Strike that.

5                Have you ever discussed 18920 Northwest

6    11th with Mr. Frinzi?

7          A.    Yes.

8          Q.    When did you discuss the 18920 Northwest

9    11th with Mr. Frinzi?

10         A.    I recall on one of my periodic calls

11   with -- with him and perhaps specifically on --

12   in connection with preparing the presentation for

13   the bondholders.  I would have discussed that

14   agreement with him then.

15         Q.    Any other discussions with Mr. Frinzi

16   about 18920 Northwest 11th?

17         A.    None.

18         Q.    So this call that you had with

19   Mr. Frinzi about 18920 Northwest 11th would have

20   happened before August 2022 when you made the

21   presentation to the bondholders?

22         A.    Yes.

23         Q.    And what did Mr. Frinzi tell you about

24   18920 Northwest 11th at this telephone call?

25         A.    He described the agreement, to the best

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    of his ability, he described the business terms

2    of the agreement.

3         Q.    Anything else that he said about 18920

4    Northwest 11th on this telephone call?

5         A.    No.

6         Q.    What were the business terms of the

7    agreement that he shared with you?

8         A.    Well, it's on the agreement.  There

9    was -- there were -- there were various

10   components of the agreement that the agreement

11   specified.  I suppose my conversation with Frinzi

12   would have been just to confirm them, confirm

13   those -- confirm my understanding.  The

14   business -- the -- the terms of the agreement

15   included a number of financial and, I guess,

16   business legal conveyances from the -- from the

17   Goodman entities over to this entity, 18920.

18        Q.    Did Mr. Frinzi share with you any

19   documentation about these agreements?

20        A.    Yes.  There's -- the settlement

21   agreement or the notice -- the settlement

22   agreement, I recall seeing.  I don't know whether

23   I got them from Frinzi or I got them from some of

24   the -- you know, one of the staff members of

25   Goodman.

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1        Q.    Did you make any independent effort to

2    verify what Mr. Frinzi was telling you?

3        A.    As to the -- as to the certain parts of

4    it, yes.  Certain components of it, yes.

5        Q.    Which components were you able to verify

6    independently?

7        A.    The cash consideration.

8        Q.    Anything else?

9        A.    None, no.

10       Q.    What were you not able to confirm?

11       A.    There was -- I wasn't clear -- I mean,

12   because I wasn't clear on the legality or whether

13   there was sufficient documentation to evidence

14   that Goodman had conveyed its -- some of its

15   rights under a note receivable.  That's one of

16   them.

17       Q.    What else?

18       A.    There was a conveyance of Goodman

19   Networks or GNET that had a conveyance of its

20   rights under a loan agreement with Multiband

21   Global resources.  I don't believe -- I don't

22   recall whether or not I was able to examine that

23   loan agreement, whether that was forthcoming,

24   included in the books and records.

25             I know that I made several requests to

Page 80

1  the company's -- to Frinzi himself and to

2  certain, you know, staff people, seeking to get

3  the information.  Only some of it I was able to

4  ultimately get.  But I'm going through the list,

5  so AMRR was a component of that, the conveyance

6  of approximately 50 percent of the company's

7  rights.

8            There was a conveyance of Global.  There

9  was a conveyance of the company's contract

10  rights, I believe, in that line of business that

11  I previously discussed with you.  And there was a

12  conveyance of certain intellectual property as

13  well.  I'm probably missing a thing or two.  I'm

14  sure I am.  I don't have it handy.

15       Q.   So you mentioned that Mr. Frinzi wasn't

16  able to give you certain information.  What was

17  he not able to give you?

18       A.   I guess legitimate documentation that

19  would show the conveyance of the AM -- AMRR note

20  receivable or a portion of that note receivable,

21  plus the Multiband Global --

22       Q.   What is --

23       A.   -- note receivable.

24       Q.   Was Mr. Frinzi's failure to produce

25  legitimate documentation, was that a concern for

Alpha Reporting                    800-556-8974
A Veritext Company            www.veritext.com

1  you?

2     A.   Yes.

3     Q.   How so?

4     A.   Well -- well, in the context of 18920,

5  or are you asking the -- are you asking the

6  question just generally?

7     Q.   Both.

8     A.   Well, I can't answer it for 18920;

9  however, you know, when a company conducts

10  transactions with related parties, it -- it

11  heightens the need to document it properly.

12     Q.   Did you express your concern to

13  Mr. Frinzi?

14     A.   Personally?

15     Q.   Yes.

16     A.   I probably did.  Whether I did it in

17  writing or not, I probably didn't do it in

18  writing.

19     Q.   What was Mr. Frinzi's response when you

20  expressed your concern about the lack of

21  legitimate documentation?

22     A.   That the information exists and he will

23  get it to us.  Ultimately, we were able to get a

24  lot of the information.

25     Q.   Were you able to get the information

Alpha Reporting                        800-556-8974
A Veritext Company              www.veritext.com

1    that you believed you were lacking from

2    Mr. Frinzi?

3         A.   No, not all of it.  Some of it, but not

4    all of it.

5         Q.   Were you ever able to get legitimate

6    documentation from Mr. Frinzi?

7         A.   Some.  Other information we obtained

8    other ways.

9         Q.   What information did you -- what

10   legitimate documentation did you not get from

11   Mr. Frinzi?

12        A.   I can give you an example.

13        Q.   Sure.

14        A.   One of our inquiries had to do with this

15   note receivable, all right, that was -- that was

16   in support of the company's advance over to AMRR.

17   We -- I had asked him to produce the information

18   several times to support that, any information to

19   support that.  I don't recall getting it from

20   him.

21        Q.   Okay.  Did you have access to the full

22   books and records of Goodman Networks, Inc.?

23        A.   From -- from a financial reporting view,

24   yes.

25        Q.   Were you ever able to determine from the

Alpha Reporting                           800-556-8974
A Veritext Company                     www.veritext.com

1    books and records of Goodman Networks, Inc.

2    whether 18920 Northwest 11th was a shareholder of

3    the company?

4         A.   I was not able to determine that.  I

5    didn't -- in any list that I had, I did not see

6    them among the list of preferred stockholders;

7    however, the list that I may have examined may

8    have been outdated.  I don't know.

9         Q.   Did you ever ask for updated lists?

10        A.   Yes.

11        Q.   Did you receive them?

12        A.   I don't know how old the list was, but

13   no, I didn't receive them.  I only had that one

14   list.

15        Q.   So while having access to the books and

16   records of Goodman Networks, Inc., are you aware

17   of 18920 Northwest 11th ever being a shareholder

18   of Goodman Networks, Inc.?

19        A.   I'm not aware of them ever being a

20   shareholder.

21        Q.   Do you know who Evelina Pinkhasova is?

22        A.   I do now.  She's the principal of 18920.

23   She's the individual that countersigned that --

24   that agreement that we just talked about.

25        Q.   Did you ever have any discussion with

Alpha Reporting                    800-556-8974
A Veritext Company            www.veritext.com

1    Mr. Frinzi about Evelina Pinkhasova?

2        A.   I did not.

3        Q.   Have you ever had any direct

4    communications with Evelina Pinkhasova?

5        A.   No.

6        Q.   Do you know, is she a lender of some

7    type?  Do you have any idea of what her status

8    is?

9        A.   I don't know.  I don't know.

10       Q.   I'm sorry.  Go ahead.  I didn't mean to

11   interrupt you.

12       A.   I'm done.  I don't know.  I don't know

13   what her role is or her skill set are, yeah.

14       Q.   Is there any documentation within

15   Goodman Networks Inc's books and records about

16   who Evelina Pinkhasova is?

17       A.   I don't believe so.  You know, in the

18   accounting records, no.  To the extent something

19   exists that wasn't -- wasn't made available, it's

20   possible.

21       Q.   But have you as an advisor to a company

22   with access to the books and records, have you

23   ever seen anything within the company's books and

24   records that indicates who Ms. Pinkhasova is?

25       A.   I have not.

Alpha Reporting                          800-556-8974
A Veritext Company              www.veritext.com

1          Q.   We talked about your conversations with

2     Mr. Frinzi regarding 18920 Northwest 11th.

3               Have you had similar conversations with

4     Mr. Goodman?

5          A.   No.

6          Q.   Have you had any conversations with any

7     of the Goodmans regarding 18920 Northwest 11th?

8          A.   Let me clarify that.  I don't believe I

9     answered that correctly.

10              I did participate in certain

11    conversations with John Goodman where he was

12    researching or he was interested to know -- know

13    about these transactions, specifically the cash

14    transfers associated with the counterparties.

15    And it was kind of a factual download for me to

16    explain to him what I knew, what we saw -- what I

17    knew and how we've -- how we've summarized it and

18    communicated it in our presentations and our

19    various communications with the bond trustee and

20    other -- and other relevant parties.

21         Q.   Did Mr. Goodman ever express to you why

22    he was interested in learning more about these

23    transactions?

24         A.   No.

25         Q.   How many times have you discussed 18920

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    Northwest 11th with Mr. Goodman?

2         A.   No more than two or three.

3         Q.   When were those conversations?

4         A.   I don't -- I don't recall.

5         Q.   Past month, 90 days or a year ago?

6         A.   Probably early on in his involvement.  I

7    think he started to -- I think he became directly

8    involved as a responsible through his -- through,

9    you know, as a responsible executive, 90 days

10   ago, so it would have been early on in that

11   process.

12        Q.   Okay.  So sometime in the past 90 days,

13   you've had two or three conversations with

14   Mr. Goodman where he's inquired about 18920

15   Northwest 11th?

16        A.   Yes.

17        Q.   And has Mr. Goodman ever expressed to

18   you any concern with the lack of undocumentation?

19        A.   I know he was bewildered by it.  He

20   was -- he was more -- it was more a situation of

21   that he was trying to get his hands around it.

22   He never made any judgment or never drew -- at

23   least in front of me, never drew any conclusions

24   about how he -- he really felt about it.  So I

25   don't know the level of concern that he really

Page 87

1    had.  It doesn't mean he didn't have a level of

2    concern.  He just chose not to share that with

3    me.

4          Q.   Did Mr. Goodman ever tell you that he

5    was aware of this transaction when it happened?

6          A.   Mr. Goodman being John Goodman?

7          Q.   That's the Goodman that you referred to.

8          A.   Yes.  Yes.  Yes.  Yes.  Yeah.  And

9    that's the only.  I just wanted to freshen.

10         Q.   Yeah.  No.  I appreciate that.

11         A.   Yeah.  Would you repeat the question?

12         Q.   Has Mr. Goodman ever indicated to you

13   whether he was aware or unaware of the 1819 --

14   18920 Northwest 11th transaction at the time that

15   it was made?

16         A.   No.

17         Q.   No, he hasn't or no, he was not aware?

18         A.   No, he hasn't indicated to me that he

19   wasn't aware.  I don't know if he was aware or

20   not.

21         Q.   Has Mr. Goodman ever expressed to you --

22   I'm sorry.  Go ahead.

23         A.   I can tell you, he was not in a

24   corporate role at that point.  So I'd be -- you

25   know, he was not involved in the company at all

Alpha Reporting                           800-556-8974
A Veritext Company                      www.veritext.com

1    at or around the time those transactions were

2    made, then he had been separated from the company

3    for a long time, that's my understanding.

4             And based on my observation, that was --

5    that was everything -- I mean, that was -- that

6    was the way it was.  In other words, I would be

7    surprised if he -- if he knew about it.  The

8    platform of who was in charge and who was making

9    the decisions and who was executing transaction

10   did not include John Goodman.

11       Q.   Has Mr. Goodman ever expressed any

12   concern to you regarding Mr. Frinzi?

13       A.   I never had a conversation with John

14   Goodman while Frinzi was in there.

15       Q.   So it sounds like --

16       A.   A concern?  What kind of concern?

17       Q.   Any kind of concern.

18       A.   The only conversation that I had with

19   John Goodman had to do with getting a -- a --

20   getting some kind of waiver or forbearance

21   agreement in place, in connection with the AMRR

22   note.  So, you know, Frinzi is a principal there.

23   So that was the only time the conversation would

24   come up about Frinzi with him, at least as it

25   relates to conversations that I had.

Alpha Reporting
A Veritext Company

800-556-8974
www.veritext.com

1      Q.   Did you have any conversations with any

2    other Goodman about 18920 Northwest 11th?

3      A.   None.   None.

4      Q.   Okay.   Any conversations with anyone

5    else about 18920 Northwest 11th?

6      A.   No.   Just my colleagues at CFGI.

7      Q.   Okay.   A few questions ago you had --

8    you had mentioned something about a waiver

9    forbearance.

10         Can you explain that a little bit more?

11     A.   I believe that certain payments had

12   become due in connection with the -- AMMR (sic)

13   loan that's due Goodman.   I believe those

14   payments hadn't been made timely.   I was told

15   they hadn't been made timely.   And there was a

16   discussion early on of -- of protecting or

17   enforcing our rights -- when I say "our rights,"

18   I mean Goodman's rights, in connection with that

19   default.   I don't know if it amounted to a

20   default, but there was discussion there.   I don't

21   know if that agreement was ever consummated.   I

22   haven't been involved.

23     Q.   Trying to understand.

24         Why would a waiver forbearance -- who

25   was seeking the waiver forbearance?

1        A.    AMRR would be seeking the forbearance.

2   In other words, they borrowed money, they owe the

3   money back to Goodman, right, according to a

4   schedule.  They were unable to accommodate that

5   schedule.  And presumably, we have rights under

6   that -- "we" being Goodman, have rights to -- to

7   collect, so that would be the context of the

8   forbearance agreement.

9        Q.    Did AMRR ever ask for a waiver of

10  forbearance?

11       A.    I don't know.

12       Q.    But to your knowledge, you're not aware

13  of them?

14       A.    They may have.  I don't know.

15       Q.    So what was the context of you

16  discussing a waiver of forbearance with

17  Mr. Goodman?

18       A.    Just on a -- from a business

19  perspective, you know, it was -- he raised -- he

20  raised a number of points that were sound

21  business points to keep -- to maximize the value

22  or to preserve the value and to -- and to create,

23  you know, a platform where Goodman can monitor,

24  can assess, Goodman can assess the AMRR's ability

25  to repay the note and also monitor the -- the

Page 91

1    AMRR's financial condition and financial

2    performance, just like any lender would.

3         Q.   Okay.  I want to come back to that after

4    the break.

5              On the 18920 Northwest 11th, does

6    Goodman Networks have a claim against them?

7              Let me rephrase that.

8         A.   It would be a litigation claim.  It

9    would have to be brought in litigation,

10   presumably.

11        Q.   Right.  So let me -- are you aware of

12   any claim that Goodman Networks has ever asserted

13   against 18920 Northwest 11th?

14        A.   I am not.

15        Q.   Are you aware of Goodman Networks ever

16   notifying 18920 Northwest 11th that it had a

17   claim against them?

18        A.   I am not aware of that.

19        Q.   Has Goodman Networks ever demanded

20   payment from 18920 Northwest 11th based on its

21   claim?

22        A.   Not that I know of.

23        Q.   What is the nature of the claim that

24   18 -- that Goodman Networks has against 18920

25   Northwest 11th?

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

```
 1              MS. HARTLEY:  Objection, just to the
 2      extent it calls for a legal conclusion.
 3              But Howard, you can answer.
 4      BY MR. PHAIR:
 5         Q.   Sure.  Let me rephrase.
 6              Are you aware of any legal claim that
 7      Goodman Networks has against 18920 Northwest
 8      11th?
 9         A.   I -- I -- I don't -- yeah.  Yes, I am.
10         Q.   Okay.  What is the nature of that claim?
11         A.   I believe it would be some kind of
12      fraudulent conveyance claim, clawback claim,
13      perhaps.  You know, unless there's -- unless
14      there's information out there to validate and
15      support the -- the -- you know, the equitableness
16      of the transaction, I believe there's a potential
17      fraudulent conveyance claim.  I can't -- I can't
18      say anything more than potential.
19         Q.   So can you describe to me the nature of
20      the fraudulent conveyance claim?  Like what do
21      you believe was fraudulently conveyed?
22         A.   Cash.  The -- you know, Goodman's
23      interest in AMRR's -- Goodman's rights, 50
24      percent of Goodman's rights and entitlement
25      under -- under the AMRR loan agreement, Goodman's
```

Alpha Reporting                    800-556-8974
A Veritext Company            www.veritext.com

1   rights under amounts due, pursuant to Multiband

2   -- to advances made to Multiband Global

3   Resources.  Perhaps even Goodman's rights under

4   the transfer of certain intellectual property.

5   I'm going through an accounting of what was

6   conveyed, right?  I'm going through an accounting

7   of what was conveyed.

8          One of the things that the agreement --

9   one -- why don't you ask your next question?  Or

10   we can stay on that question, if you want.

11       Q.   I just want to make sure I get

12   everything --

13       A.   Yeah.  The agreement will set forth in

14   bullet format all the conveyances, all the

15   consideration.

16       Q.   What agreement?

17       A.   There's a settlement agreement.

18       Q.   A settlement agreement between who?

19       A.   Between Goodman/GNET and I may as well

20   say Multiband Field Services because I saw their

21   name in there somehow.  It's between the Goodman

22   companies and 18920 entity.

23       Q.   So because there's a settlement

24   agreement, is there any live claim by Goodman

25   Networks against 18920 Northwest 11th?

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1          A.   What do you mean by "live"?

2          Q.   Well, like you said, there's a

3    settlement agreement.

4               So has that been resolved or is there

5    still an outstanding claim?

6          A.   As I understand it, the -- the

7    settlement agreement discussed or presented --

8    and I know your firm was presented -- I don't

9    mind you asking questions, but I know your firm

10   was given that settlement agreement, but the

11   settlement agreement introduces the facts, right,

12   the fact that Goodman owes 18920 a material

13   amount.  Why am I thinking 15 million dollars?

14   It would be whatever amount is specified on that

15   agreement under some kind of promissory note,

16   under some kind of promissory note.  And that was

17   the -- that was the justification in the

18   agreement, of the agreement's reasonableness.

19              So for example, Goodman was relieved of

20   its obligation under a 15-million dollar -- I

21   could be wrong on the amount.  Goodman was

22   relieved under its obligation of the

23   15-million-dollar loan -- a promissory note that

24   was due to 18920, in exchange for the conveyance

25   of these assets.

Alpha Reporting                    800-556-8974
A Veritext Company            www.veritext.com

1      Q.   So I want to make sure that we're being

2   accurate and that I'm understanding it correctly.

3           So my understanding is there's a

4   settlement agreement regarding -- like with the

5   shareholder of 18920 Northwest 11th, correct?

6      A.   Yes.

7      Q.   And that was based on a claim that 18920

8   Northwest 11th allegedly had against Goodman

9   Networks, correct?

10     A.   That's what the settlement agreement

11  refers to, correct.

12     Q.   Okay.  So putting that aside, 18920

13  Northwest 11th claims against Goodman Networks,

14  putting that aside, I understand that's by the

15  settlement agreement.

16          Are there claims that Goodman Networks

17  has against 18920 Northwest 11 currently?

18     A.   We talked about that, and that the claim

19  is the potential fraudulent conveyance act -- the

20  fraudulent conveyance that may -- that

21  potentially exists to clawback any of those

22  conveyances.

23     Q.   Which --

24     A.   And I believe it was scheduled -- I

25  think it may have been disclosed in the asset

Page 96

1  list that your -- that you previously referred

2  to.

3       Q.   So that's what I'm asking about,

4  obviously.

5       A.   Yeah.

6       Q.   So the claim that's listed in the asset

7  list that Goodman believes it has against 18920

8  Northwest 11th is a fraudulent conveyance

9  clawback claim?

10      A.   Potential.  Clawback is not -- you know,

11  fraudulent conveyance is a better terminology.

12  Clawback, I don't -- so I don't know what a

13  clawback claim is, other than the ability to

14  avoid it and bring the money back in.

15      Q.   Sure.  So the way you're asserting is

16  that Goodman Networks has some kind of fraud

17  claim against 18920 Northwest?

18      A.   Potentially.  Potentially.  We're

19  being -- we're being assertive about it to

20  preserve any value that may exist.  There would

21  have to be a process to -- of interaction with

22  this counterparty to really make a factual

23  determination and then to determine whether

24  there's -- there's sufficient -- there's

25  sufficient facts that have taken place so that

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

```
 1    Goodman can bring a claim.
 2         Q.   What was it that Goodman believes it was
 3    defrauded out of?  That's what I'm trying to
 4    drill down on.
 5         A.   Is that me?  We went through a list of
 6    the -- of the conveyances, right.  So to the
 7    extent that those -- those items/assets were
 8    conveyed to 18920, to the extent that that --
 9    Goodman did not receive equivalent value in
10    return for the conveyance of those assets, that
11    would give rise to the potential claim.
12         Q.   So, but you mentioned like AMRR.
13              What is the relationship between 18920
14    Northwest 11th and AMRR?
15         A.   I suppose if that transfer -- if the
16    transfer of 50 percent of Goodman's interest in
17    the AMRR loan was legal or authorized or proper,
18    which I'm not -- I'm not clear that it was.  But
19    assuming that it was, just hypothetically, then
20    18920 would have an amount due from AMRR for that
21    portion of the note assigned.
22         Q.   Okay.  And has Goodman Networks made any
23    attempt to determine its likelihood of success in
24    pressing such a claim?
25         A.   I don't know.  I don't know.  I don't
```

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

believe so because I don't believe we -- I don't believe Goodman Networks -- I'm not sure -- I'm not aware of whether Goodman Networks has initiated conversations with 18920. I certainly haven't been involved in that.

Q. Do you know if 18920 Northwest 11th has sufficient funds to pay back the funds that were transferred to it, pursuant to this fraudulent conveyance?

A. I do not know.

Q. Has any attempt been made, to your awareness, of determining whether pressing this fraudulent conveyance claim against 18920 Northwest 11th would be something that the company could actually collect on?

A. I do not know.

Q. Has any attempt been made to investigate potential defenses that 18920 Northwest 11th could raise if Goodman Networks brought a claim against it?

A. Specifically, the only defense that I believe may exist or does exist is the existence of this 15-million-dollar obligation that Goodman owes to 18920 or did owe to 18920, and you'll have to forgive me if I'm getting the dollar

1    amount wrong.

2              To the extent that's a valid obligation,

3    that would be a defense.  I have not seen or I

4    have not received any -- any in -- any -- any

5    answers to my inquiries to -- on the Goodman side

6    as to whether that note -- that obligation

7    exists.

8         Q.   It sounds like you have some concerns

9    about whether the 15-million-dollar AMRR note is

10   a valid obligation.

11             Is that fair?

12        A.   Well, we're getting crushed up, and I

13   know it's complicated.  So the AMRR note, there's

14   the -- let's stay with the -- let's stay with

15   18920.

16             The agreement stipulates that -- or

17   delineates that Goodman owes to 18920, 15 million

18   dollars, okay?  So in exchange for that

19   obligation -- in exchange for the forgiveness of

20   that obligation, Goodman conveyed a bunch of

21   assets to 18920 in exchange for that -- in

22   exchange for that obligation.

23             Assuming that the obligation exists,

24   then it would be -- presumably, it would be a

25   reasonable transaction.  I mean, if you -- I'm

                                        Page 100

1    not going to say prudent.  I'm not going to say

2    that it complies with insolvency priority, but

3    it -- on its face, it's a quid pro quo.  You

4    follow?

5           We -- Goodman doesn't have to pay the 15

6    million dollars back.  Goodman is conveying these

7    assets in payment of the 15-million-dollar

8    obligation.  Goodman owes 18920, 15 million

9    dollars, and Goodman is satisfying that

10   obligation through the conveyance of these

11   assets.

12       Q.   So you mentioned in that answer that

13   you're assuming that the obligation is valid.  Do

14   you have any concern whether the obligation is

15   valid?

16       A.   I can't find it on the books and

17   records.  Doesn't mean that it doesn't exist,

18   because books and records don't always reflect

19   all transactions, but I -- it wasn't on the books

20   and records, and I don't have a copy of -- I

21   don't have any information on the background of

22   that note obligation.

23       Q.   So there's no documentation of that

24   obligation, correct?

25       A.   I don't have that.  Not that I have.

                                        Page 101

1        Q.   And you have asked Mr. Frinzi and

2    Mr. Goodman for documentation --

3        A.   I wouldn't have asked Mr. Goodman

4    because he -- you know, that was -- it was an

5    old -- it was an old transaction by that point.

6    I would have asked -- I would have asked

7    Mr. Frinzi.  I would have asked -- and I don't

8    recall his answer.  I know you're going to ask

9    that next.  I don't recall his answer.  I would

10   have asked the accounting.  I would have asked

11   Stephanie, I would have asked Samantha to see if

12   they had any record.  I would have researched it

13   on the books and records myself, and that's

14   where -- and that's where it is.

15       Q.   So there was nothing in the books and

16   records, correct?

17       A.   Correct.  Nothing recorded, right.

18       Q.   And Ms. Elmore wasn't able to produce

19   any documentation to establish that it was a

20   valid obligation, correct?

21       A.   Correct.

22       Q.   And you asked Mr. Frinzi, and he wasn't

23   able to come forward with any documentation

24   either, correct?

25       A.   Correct.

Page 102

1          Q.   Okay.

2               MR. PHAIR:  Why don't we break here for

3    lunch.  We're at 1:40, and then we can get the

4    exhibits.  I'm running out of questions to ask

5    you without exhibits because it makes it a lot

6    easier.

7               So why don't we break here for lunch?

8    Andrea -- Ms. Hartley, I'm sorry, how much time

9    do y'all need?

10              MS. HARTLEY:  However long Howard --

11   want 30 minutes?

12              THE WITNESS:  That's fine.  20 minutes

13   is fine for me.

14              MR. PHAIR:  Probably going to need at

15   least 30 minutes.

16              MS. HARTLEY:  Yeah.  Ryan, if you need

17   more, that's okay.

18              MR. PHAIR:  Give me like 30, 40 minutes

19   something like that just so I can -- I'm more

20   worried about the exhibits because I want to make

21   sure when we restart, we can get that all sorted

22   out.  I think it will help.  So it's 1:40 now, so

23   let's see about circling back at 2:15.

24              (WHEREUPON, A RECESS WAS TAKEN FROM 1:40

25   P.M. UNTIL 2:16 P.M., AT WHICH TIME THE

                                        Page 103

1    DEPOSITION CONTINUED AS FOLLOWS:)

2    BY MR. KLEINSASSER:

3         Q.   Mr. Konicov, before the break, we talked

4    a little bit about some of the corporate

5    entities, and I want to talk -- I want to go back

6    to that for a second.

7              First of all, are you aware of a company

8    called GNET ATC, Inc.?

9         A.   I am not aware of that company.

10        Q.   Is there any reference in the books and

11   records of the company to a company known as GNET

12   ATC, Inc.?

13        A.   No, no.  We only have one GNET, and as

14   far as I could tell, it was always GNET -- GNET

15   ATC, LLC.  I don't know the history there.

16        Q.   Sorry.  Go ahead.

17        A.   I don't know if that's an entity or just

18   some confusion or maybe the predecessor entity,

19   or I'm not aware.  I'm not aware.

20        Q.   Have you ever had any discussion about

21   GNET ATC, Inc. with either Mr. Frinzi or any of

22   the Goodman entities?

23        A.   None.

24        Q.   Right now, is there a board of Goodman

25   Networks, Inc.?

Page 104

1      A.   There may be.  Andrea would know.  I'm

2    sorry, Andrea.  You know, I know that when

3    Mr. Goodman got involved, there was some

4    resolutions, you know, maybe -- I don't know if

5    there's a board member.  I don't know if there's

6    any board members, to tell you the truth.

7      Q.   But apart -- putting aside the question

8    of whether who's on the board, are you aware of

9    there being a functioning board for Goodman

10   Networks, Inc.?

11     A.   I'm not aware.  It doesn't mean that

12   there's not, but I'm not aware.

13     Q.   Are you aware of any other current

14   officer of Goodman Networks, Inc. other than

15   Mr. Goodman?

16     A.   No.  I'm not aware of anybody other than

17   Mr. Goodman.

18     Q.   Let's -- let's go to the marked

19   exhibits.  I'm going to introduce what's been

20   marked as Exhibit 1.  That should be in your

21   folder.  It looks like it wants me to redo it.

22   So stamp --

23     A.   How do you make it bigger?

24        MR. GUFFY:  It's already in the folder,

25   Ryan.  Valerie, can I get screen share access,

Page 105

1    just so I can make it bigger for everyone?

2              THE COURT REPORTER:  Yes.

3              MR. PHAIR:  No.  I got it.  My bad.  I

4    got it.

5    BY MR. PHAIR:

6         Q.   So it's Exhibit 1.  It was asking me to

7    stamp it, so I wasn't sure if they wanted me to

8    stamp it.

9              So Exhibit 1, Mr. Konicov, do you have

10   that in your folder now?

11        A.   I do.

12        Q.   Have you seen this document before?

13        A.   I think so, yes, I have.

14        Q.   What is it?

15        A.   Notice of Deposition.

16        Q.   Okay.  And if you scroll down in the

17   topics of inquiry, to Page 2.

18        A.   Yeah.

19        Q.   Number 3, topics of inquiry says:

20   Current and past officers and directors of the

21   debtor, GNET Goodman Services and MFS, from

22   January 2021 to the present.

23             Do you see that?

24        A.   Yes.

25        Q.   And is it your understanding that you

Page 106

1   are testifying as a corporate representative as

2   to that topic today?

3        A.   Yes.

4        Q.   Okay.  Can you tell me who are the

5   current officers and directors of the debtor?

6        A.   Who are the current?

7        Q.   Yes, sir.

8        A.   The only officer I -- you know, the only

9   one that would be an officer and/or a director

10  would be John Goodman or -- or perhaps an

11  affiliate of John Goodman.  I recall seeing some

12  documentation where it was -- yeah.  So that's --

13  that's my understanding.

14       Q.   But, I mean, I just want to make sure --

15  I'm not asking for your understanding.  I'm

16  asking for the facts.

17            Like can you sit here today and tell me

18  who are the current officers and directors of the

19  debtor?

20       A.   No.

21       Q.   Can you tell me who the past officers

22  and directors of the debtor were?

23       A.   No.  No.  But I can tell you that there

24  was a chart that was prepared, and it indicated

25  every -- all of the officers.  It predated my --

Page 107

1    my involvement.  And when I look at this, I mean,

2    the most efficient way to do it is to look at

3    that chart.

4         Q.   Did you prepare that chart, sir?

5         A.   I didn't.  I did not, no.

6         Q.   Maybe just to cut to the point, for

7    Topic 3, are you able to, as a factual matter,

8    represent to me who the current and past officers

9    and directors of the debtor GNET, Goodman

10   Services and MFS were from January 1, 2020 to the

11   present?

12        A.   No.

13        Q.   Are there any other of these topics of

14   inquiry that you've been prepared to testify to

15   today?

16        A.   One, two, I'm familiar with.  Four, I'm

17   familiar with.  Five, six, I'm familiar with.

18   Seven, I don't believe I am, but I could tell you

19   what I know.  Eight, I know -- I know some stuff

20   about that.  The indentured, Number 9, I know.  I

21   know about that.  The no payment AMRR note, I

22   know.  I know about 11, although I probably don't

23   have all the answers that you're looking for.

24   12, again -- well, 12 was -- was produced.

25   There's documentation that produces that

                                      Page 108

1   schedule.  I mean, there was -- there was

2   disclosure of the transfers, so we could talk

3   about that.  What's Number 13?  I'm familiar with

4   that.

5        Q.   Just so we're clear, maybe this is a

6   question more for Ms. Hartley.

7             MR. PHAIR:  Ms. Hartley, is he prepared

8   to testify as a corporate representative on any

9   these topics today or just give us his

10  understanding as an individual witness?

11            MS. HARTLEY:  We were producing him both

12  for his understanding as a corporate

13  representative, but I think going forward -- I

14  guess my answer is if we only go forward with his

15  understanding, I don't know who else with the

16  company right now may be able to answer those.

17  Right now, Mr. Konicov was the best person to put

18  forward.

19            MR. PHAIR:  Okay.  All right.  Let's

20  circle back to that.

21  BY MR. PHAIR:

22       Q.   With regard to the -- the current board

23  of directors, are you aware of any controls that

24  exist for the current board?

25       A.   I don't know what you mean by

                                    Page 109

1    "controls."  Can you help me there?

2         Q.   Are there any decisions that the company

3    makes that is required to be reviewed and

4    approved by the board?

5         A.   Well, to the extent John Goodman is the

6    board member, he's making decisions, so he's

7    going to make all the decisions.  I mean, he's --

8    so the board will be making the decisions, so

9    there's your control.

10         Q.   So the sole officer and the sole board

11    member are the same person is what you're saying.

12         A.   I'm not sure if John Goodman's an

13    officer.

14         Q.   So I guess the question is:  Who has

15    oversight over Mr. Goodman as the officer?

16         A.   I don't know.

17         Q.   Who has authority to write checks on

18    behalf of the company?

19         A.   I believe that's Mr. Goodman, John

20    Goodman.  In fact -- yes.  That is Mr. Goodman.

21         Q.   When did Mr. Goodman gain this

22    authority?

23         A.   Not until 90 days or so, plus or minus a

24    few weeks.  I don't --

25         Q.   Sorry.  Go ahead.

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

```
 1          A.    Yep.  No.  Go ahead.

 2          Q.    Is there any board resolution appointing

 3    Mr. Goodman to this role 90 days ago?

 4          A.    I believe there is, yes.

 5          Q.    Does Mr. Goodman have a -- like a

 6    retention agreement or, you know, employment

 7    agreement, sorry?

 8          A.    I'm not aware.

 9          Q.    Okay.  All right.

10          MR. PHAIR:  I want to -- I'm still

11    getting the service vendor is experiencing an

12    outage.

13          MR. GUFFY:  Ryan, my understanding is

14    that there may be a firewall issue with your

15    connection to the office.  If you tell me which

16    one you want, I'll get it published.

17          MR. PHAIR:  Okay.  Let's bring up the

18    November asset list.

19          MR. GUFFY:  All right.  If you refresh

20    your marked exhibits folder, it will be there.

21    Exhibit 2.

22          THE WITNESS:  I got it.

23    BY MR. PHAIR:

24          Q.    There we go.  All right.  Mr. Konicov,

25    we have uploaded what we marked as Konicov
```

Alpha Reporting                 800-556-8974
A Veritext Company          www.veritext.com

1    Exhibit 2.

2            Do you recognize this document?

3        A.   I do.

4        Q.   What is it?

5        A.   It's a list of assets for the Goodman

6    Networks parent company.

7        Q.   And what was this list of assets

8    prepared?

9        A.   Format request pursuant to the

10   litigation that's going on.

11       Q.   Who prepared this list of assets?

12       A.   I did.

13       Q.   Okay.  At the top, it says that this

14   list of assets is current as of 10-31-22.

15           Do you see that?

16       A.   Uh-huh.

17       Q.   Were there any -- I'm sorry.  Go ahead.

18       A.   Yes, I do.

19       Q.   Were there any material changes to

20   Goodman Networks' assets between the petition

21   date and October 31st, 2022?

22       A.   There may have been.  I'm not aware of

23   any.  And when I say that is I don't -- I

24   don't -- I've not as -- the cash position of the

25   company, I'm not as -- I'm not involved in -- in

1   monitoring that anymore since John Goodman has

2   come in.  So it's potentially -- I see that cash

3   is listed as TBD.  I can't -- I can't give you an

4   answer about the cash position.

5        Q.   Okay.  And it uses the term "restricted

6   cash."

7             What is restricted cash?

8        A.   You know, cash that's encumbered by --

9   for some reason.  This is encumbered because --

10  oh, actually, let me -- yeah -- yeah.  This cash

11  as I understood it, this restricted cash, it

12  had -- it had been situated at a particular bank,

13  and it was collateral for a -- another entity

14  that's outside of the Goodman companies that we

15  see here.

16       Q.   What other entity?

17       A.   I believe it's Genesis.  I don't know

18  the full name, but Genesis is -- Genesis-Telecom,

19  something close to that.

20       Q.   And is Genesis the company that is

21  affiliated with James Goodman?

22       A.   Yes, it is.

23       Q.   And why is the restricted cash for

24  Genesis showing up on the Goodman Networks, Inc.

25  as its assets?

Page 113

```
 1        A.   Because it's cash of Goodman; however,
 2   there's been a -- the cash presumably through
 3   some transaction or some agreement is pledged as
 4   security or collateral for a Genesis -- an
 5   obligation that Genesis owes.
 6        Q.   When you prepared this statement, did
 7   you review documentation of that transaction?
 8        A.   No.  The documentation, as I understand
 9   it, didn't exist.  I -- I investigated -- I
10   investigated the circumstances at some point upon
11   which this -- this cash became restricted several
12   months ago, but -- and I do understand that the
13   bank may have -- may have asserted an offset of
14   this amount at some point, but I also understand
15   that that issue hasn't been resolved.  So for
16   completeness and for presentation, I've listed
17   the 4.7 million as restricted cash.
18        Q.   Okay.  But you've investigated that and
19   you have not been able to find any documentation
20   about -- no?
21        A.   Yeah.  Uh-huh.  Uh-huh.  Yeah.  I
22   asked -- it was several months ago.  I can't
23   remember when.  Probably earlier in 2022, where I
24   followed up with the -- the folks at Goodman and,
25   in fact, I inquired of -- I followed up with the
```

Page 114

1    bank that relates to this particular asset and

2    I've never received any documentation, only that

3    I received that there was a consensual agreement,

4    and I don't know when, between the parties that

5    this cash would be pledged as security in support

6    of a Genesis obligation.

7         Q.   What is the source of that obligation,

8    if there's no documentation?  Like where is it

9    coming from?

10        A.   Well, the bank -- the bank.  I'm sorry.

11   I got crushed up.

12        Q.   No problem.

13        A.   Oh, I see.  It's me.

14        Q.   Yeah.  You froze out for about 30

15   seconds, but I'll just re-ask the question.

16             What is the source of the information

17   that this restricted cash should be appearing on

18   the asset statement of Goodman Networks, Inc.?

19   Like if there's no documentation --

20        A.   We have a bank account.  We have a bank

21   account, right?

22        Q.   Okay.

23        A.   There's cash in the bank account.

24   There's cash in the bank account.  The cash is

25   unavailable, cannot be accessed, and the

Page 115

1    conversation with some executive over at the bank

2    confirmed to me that that cash is restricted and

3    it's pledged to support an obligation of Genesis.

4    That's -- that's the fact pattern.

5         Q.   Okay.  But you -- sitting here today,

6    you're not saying that there are -- that you have

7    evidence that that transaction --

8         A.   I don't.  I don't.  I don't.  You

9    know -- you know, it -- I asked for the

10   information; I never got it.  So the point is, is

11   I've never seen the documentation.

12        Q.   Is the 4.7 listed for restricted cash,

13   is that the amount that is currently in the bank

14   account?

15        A.   I don't know.  I do recall the bank had

16   swept that out, and the -- your client made

17   some -- I believe it's your client -- maybe it's

18   not your client.  The bond trustee had made

19   some -- made a demand, put it back in, and I

20   don't know what the outcome was.

21        Q.   Okay.  The next asset listed is the 1.5

22   million Class E preferred units of Goodman

23   Telecom Holdings, LLC.

24             Do you see that?

25        A.   I do.

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1        Q.    What does that refer to?

2        A.    In connection with some transaction,

3   some asset purchase or asset sale, Goodman

4   received consideration.  As part of its

5   consideration that Goodman received were these

6   shares of Class E preferred units in Goodman

7   Telecom Holdings.

8        Q.    Okay.  And how did you value those

9   shares?

10       A.    It's an estimate based -- it's an

11  estimate, without taking into account any kind of

12  formal valuation.

13       Q.    When you say it's an estimate, what

14  methodology did you use to estimate it?

15       A.    It had a -- a book value of eight

16  million dollars.  In other words, the investment

17  has a book value of eight million dollars.  But

18  without understanding Goodman's -- Goodman

19  Telecom's financial position, I used my judgment

20  and reduced the value from eight million to three

21  million.

22       Q.    What is your understanding of Goodman

23  Telecom Holding's current financial position?

24       A.    I have no understanding.

25       Q.    So do you have any reason to believe

                                        Page 117

1    that three million is still accurate today?

2         A.   Do I have any reason to believe that

3    it's accurate?  It's a conservative value, so

4    it's prudent.

5         Q.   Where -- like where did the three

6    million come from?  Is there any math behind it?

7         A.   No.  No.  I think I -- I recall a

8    discussion that I had with counsel.

9         Q.   Don't tell me --

10        A.   I'm not.

11        Q.   I just want to be careful.

12        A.   I'm not -- who, perhaps John -- I don't

13   recall having a conversation with John Goodman on

14   this.  But, you know, John Goodman is the

15   Goodman -- I believe he's Goodman Telecom

16   Holdings, so he would know, right?  He would

17   know.  But has the company validated it?  Have I

18   validated the reasonableness of that valuation,

19   no.

20        Q.   So Mr. Goodman is, is he -- what is his

21   position at Goodman Telecom Holdings, LLC?

22        A.   I think if you go on -- based on -- I

23   think he's the CEO or president or something like

24   that.

25        Q.   So the book value of the 1.5 million

1    Class E preferred units was eight million; is

2    that correct?

3         A.   Yes.  Yes.

4         Q.   And based on conversation with John

5    Goodman, you reduced that to three million?

6         A.   No.  Based on the conversation with

7    counsel.

8         Q.   You reduced it to three million?

9         A.   Yeah.  Yeah.

10            MS. HARTLEY:  Objection.

11   BY MR. PHAIR:

12        Q.   How did you choose three million versus

13   four million or two million or one million?

14            MS. HARTLEY:  Objection to the extent it

15   calls for attorney/client privilege.

16            THE WITNESS:  I was just being prudent,

17   conservative, that's all.  I could have used two

18   million.  I could have used four million.

19   BY MR. PHAIR:

20        Q.   Did the number come from you, or did it

21   come from counsel?  And that's just a yes-or-no

22   question.

23        A.   Yes.

24        Q.   So the three million came from you?

25        A.   The three million came from me.  I put

Page 119

1    it on -- I -- it was -- it was deliberation that

2    I wasn't a part of, to come up with this number.

3    I think it was probably a discussion that I had

4    with counsel, not Andrea, about what to value.

5         We had carried that number in our

6    presentations at eight million dollars, the same

7    presentation that you might be familiar with.

8    And the value is what the value is.  Three

9    million may be overstated or understated, but I

10   didn't have access to the information, and it

11   would require a valuation to come up with a

12   precise number.

13        Q.   Okay.  The next asset is listed as a

14   13.5 million dollar claim against 18920 Northwest

15   11th.

16        Do you see that?

17        A.   Yes.

18        Q.   And that's the 18920 Northwest 11th

19   claim that we were talking about earlier?

20        A.   Yes.

21        Q.   How did you come up with the 13.5

22   million dollar valuation for that claim?

23        A.   That was the cash receipts that -- that

24   was transferred to that entity.

25        Q.   So --

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1         A.    Sometime in March.

2         Q.    So that claim is valued based on the

3    total amount that could be potentially asserted

4    against 18920 Northwest 11th, correct?

5         A.    The total tangible cash that went out of

6    the company to 18920.  As far as the other assets

7    transferred, I'm not sure whether they were

8    legitimately transferred or not.  And when I say

9    "other assets," I'm talking about the things that

10   we talked about, the loan, receivable, you know,

11   the AMRR, the Multiband Global.  That's the cash

12   piece.

13        Q.    Okay.  But so, I'm trying to get at is

14   how did you arrive at the 13.5 million?  It

15   sounds like you were just --

16        A.    Cash proceeds.

17        Q.    -- the full value of the claim.

18        A.    No.  It was the cash proceeds transfer

19   as -- gross cash transfer.  That's how much --

20   yeah.  That's what was paid to them.  That was

21   the value -- this is the amount of cash that was

22   transferred out of the Goodman entities into

23   18920.

24        Q.    Okay.  But this claim has never been

25   asserted against 18920 Northwest 11th, correct?

                                         Page 121

```
 1          A.    Not that -- not that I know of.

 2          Q.    And --

 3          A.    I don't believe so, no.

 4          Q.    Have you made any attempt to discount

 5    the claim value here by the probability of

 6    success on that claim?

 7          A.    I have not.

 8          Q.    Have you made any attempt to assess the

 9    collectability on that claim against 18920

10    Northwest 11th?

11          A.    I have not.

12          Q.    Do you know whether 18920 Northwest 11th

13    even has 13.5 million to provide?

14          A.    I do not know the cash position.

15          Q.    Have you ever valued a litigation claim

16    before?

17          A.    I'm sure I have.

18          Q.    In what context?

19          A.    Fraudulent conveyance litigation,

20    preference litigation.

21          Q.    And do you typically value claims

22    without regard to their likelihood of success,

23    collectability, whether they've ever been

24    asserted?

25          A.    It's -- do you typically?  Well, you do
```

Page 122

1    it -- you put -- you provide the information

2    based on the information that exists.  If there's

3    limitations to the information that exists, you

4    put it on, you make a footnote as the footnote

5    indicates here in Footnote D.

6        Q.    So Goodman Networks, Inc. has counsel,

7    correct?

8        A.    Yes.

9        Q.    Are you aware of Goodman Networks,

10   Inc.'s counsel ever evaluating the likelihood of

11   success of a claim by Goodman against 18920

12   Northwest 11th, LLC?

13           MS. HARTLEY:  Object to the extent it

14   calls for attorney/client privilege.

15           But Howard, you can answer.

16           THE WITNESS:  They wouldn't have the --

17   first, it's a -- it's a -- I mean, it's

18   financial -- it's a financial -- you know,

19   there's a financial investigation and there's a

20   legal investigation.

21           So whether counsel has looked into the

22   legal, I think they have the same questions that

23   I have, which we discussed earlier.

24   BY MR. PHAIR:

25       Q.    But my question was:  Are you aware --

Page 123

1    and it is just yes or no -- of counsel for

2    Goodman Networks, Inc. ever providing an opinion

3    as to the likelihood of success of a claim

4    against 18920 Northwest 11th?

5         A.   I'm not aware.

6         Q.   And has Goodman Networks, Inc. ever

7    demanded payment from 18920 Northwest 11th of

8    this 13.5 million dollar claim?

9         A.   I'm not aware.

10        Q.   Is it your understanding that Goodman

11   Networks transferred 13.5 million to 18920

12   Northwest 11th?

13        A.   Yes.  That's a fact.

14        Q.   Wasn't one of the other subsidiaries?

15        A.   Oh, oh.  Where the money came from?

16        Q.   Yes.

17        A.   I don't recall if it was -- if it came

18   from GNET or if it came from Goodman Networks.

19   If it's on the Goodman Networks schedule, then

20   based on the information available, it was a

21   Goodman transfer -- Networks, Inc. transfer.

22             MR. PHAIR:  Phillip, can you bring up

23   the 18920 payments?  That's Goodman 1933.

24             (WHEREUPON, a document was marked as

25   Exhibit No. 3.)

                                    Page 124

1              MR. GUFFY:  Yes.  One sec, please.  All

2    right.  It's been published.  You should see it

3    in your folder after you refresh.

4              THE WITNESS:  Got it.

5    BY MR. PHAIR:

6         Q.   Mr. Konicov, we've uploaded what we've

7    marked as Konicov Exhibit 3.

8              Do you see that?

9         A.   Yes.

10        Q.   And I'll represent to you that this was

11   an e-mail chain that was produced by Goodman

12   Networks in discovery.

13             You see your name at the top of this

14   e-mail chain, correct?

15        A.   Uh-huh.  Yes.

16        Q.   And if we look at the next e-mail down,

17   we see it's from Stephanie Elmore and was sent on

18   May 23rd, 2022, at 11:47 a.m., correct?

19        A.   Yes.

20        Q.   And you receive this e-mail, correct,

21   sir?

22        A.   Yes.

23        Q.   And she sent this e-mail to you in

24   response to your e-mail dated May 20th, 2022,

25   asking, "where are the payments associated with

                                  Page 125

1    the March redemption of preferred stock?"

2         Do you see that?

3         A.   I do.

4         Q.   And by the "March redemption of

5    preferred stock," were you referring to the

6    transaction that is the basis of 18920 claim?

7         A.   Yeah.  It was -- at that time, it was,

8    maybe still today, my understanding was is that

9    there was preferred stock that was being

10   redeemed.

11        Q.   Okay.

12        A.   That's how it was described to me, so I

13   was referencing the preferred stock because

14   that's how we would discuss it internally.  We

15   knew -- we knew that 18920 when we talked about

16   redemption preferred stock, we were talking about

17   18920.

18        Q.   Okay.  And if we look at Ms. Elmore's

19   e-mail, we see a list of payments.

20        Do you see that?

21        A.   I do.

22        Q.   And it shows two payments to 18920

23   Northwest 11th, correct?

24        A.   Correct.

25        Q.   And those two payments total roughly

Page 126

1    about 11.5 million, correct?

2         A.   Correct.

3         Q.   And that's not 13.5 million as listed in

4    the asset sheet, correct?

5         A.   Correct.

6         Q.   Where did the other two million come

7    from?

8         A.   There was a payment that went out to RBC

9    Capital Markets for two million dollars.  And

10   ultimately, I researched this payment, had some

11   conversations, collected some more information,

12   and I determined that RBC was collecting it on

13   behalf -- or subsequently remitted it to 18920.

14         So when you take those two payments up

15   above and you add the two million, that's the

16   13.5 million.

17        Q.   Did you ever have any conversation with

18   Mr. Frinzi about this?

19        A.   Yeah.  I think I communicated to him

20   that I wanted to know the deal, the background of

21   the two million dollars and ultimately what --

22   where it went and how it was used and why it was

23   used.  And he had put me in touch with, I

24   believe, some representative, perhaps RBC -- or

25   RBC and I learned then that these monies were

                                        Page 127

1    ultimately transmitted from this third party RBC

2    over to 18920.

3         Q.   Did Mr. Frinzi ever tell you that the

4    two million was going to purchase bonds?

5         A.   Did he every tell me that this two

6    million?  He may have.  He may have at some

7    point.  I don't recall.

8              THE WITNESS:  Could I ask you to pause

9    for two minutes?

10             MR. PHAIR:  Sure.

11             THE WITNESS:  Okay.  Thank you.

12             (WHEREUPON, A RECESS WAS TAKEN FROM 2:52

13   P.M. UNTIL 2:55 P.M., AT WHICH TIME THE

14   DEPOSITION CONTINUED AS FOLLOWS:)

15   BY MR. PHAIR:

16        Q.   Mr. Konicov, before the break, we were

17   talking about a 13.5 million that was paid to

18   18920 Northwest 11th.

19             Do you recall that?

20        A.   I do.

21        Q.   Do you know who paid the 13.5 million to

22   18920 Northwest 11th?

23        A.   Who executed the transfer?

24        Q.   Which -- which entity?

25        A.   I -- you know -- I don't recall.  It's

                                        Page 128

 1    factual.  I don't recall.

 2        Q.   All right.  Let's take a look at the

 3    bank statements.

 4             MR. PHAIR:  Phillip, if you can bring up

 5    the 1838 statement, please.

 6             THE WITNESS:  Yeah, the bank statement

 7    would indicate that.

 8             MR. GUFFY:  Just a moment.

 9             (WHEREUPON, a document was marked as

10    Exhibit No. 4.)

11             MR. GUFFY:  All right.  That has been

12    published.  You should see it in your folder

13    after you refresh.

14    BY MR. PHAIR:

15        Q.   Do you have that, Mr. Konicov?

16        A.   I do.

17        Q.   Okay.  We've uploaded what we've marked

18    as Konicov Exhibit 4.

19             Do you recognize this document?

20        A.   I do.

21        Q.   What is it?

22        A.   It's a bank statement.

23        Q.   And it's a bank statement for Prosperity

24    Bank.

25             Do you see that?

Page 129

1          A.   I do.

2          Q.   Who is Prosperity Bank?

3          A.   It's a commercial bank that -- that

4     Goodman had a relationship with, a commercial

5     bank, yeah.

6          Q.   And this bank statement is for account

7     1838 in the name of Goodman Networks, Inc.,

8     correct?

9          A.   Correct.

10         Q.   Are you familiar with this bank account?

11         A.   I'm familiar with all the bank accounts

12    to some extent, yes.

13         Q.   And is this a Goodman Networks' bank

14    account?

15         A.   Uh-huh.  Yes, it is.

16         Q.   And what is the 1838 account used for?

17         A.   I don't know the specific purpose of

18    this account.

19         Q.   Okay.  If you look at the various debits

20    from the account, if you scroll to the second

21    page, on March 11th, 2022, you see a domestic

22    wire to 18920 Northwest 11th in the approximate

23    amount of 7.5 million.

24              Do you see that?

25         A.   I do.

1          Q.    And does this show a transfer of
2    proximately 7.5 million to 18920 Northwest 11th
3    on March 11th?
4          A.    It does.
5          Q.    And would this be in connection with the
6    payments that are the subject of the claim?
7          A.    Yes.
8          Q.    Okay.  Where is the remaining six
9    million of the 13.5 million that was transferred
10   to 18920 Northwest 11th from Goodman Networks
11   Inc.?
12         A.    It's not on here.  Is your question --
13   it's not on here.  It wasn't paid from this
14   account.
15         Q.    So which Goodman Networks, Inc. account
16   was it transferred from?
17         A.    I don't know.
18         Q.    Would it surprise you --
19         A.    Actually -- actually, if you go back to
20   that other chart that -- that was up there -- I'm
21   just drawing a blank.  Bear with me.  Yeah.  So
22   it -- you know, it's referring to what is it,
23   Exhibit 3, there's a reference there, says ATC.
24   So perhaps that's a GNET ATC account, I don't
25   know, it has like four digits, 0690.

                                          Page 131

1           MR. PHAIR:  Yeah.  Let's take a look at

2      that account.

3           Phillip, if you could bring up the East

4      West 0690 account.

5           MR. GUFFY:  One moment, please.

6           (WHEREUPON, a document was marked as

7      Exhibit No. 5.)

8           MR. GUFFY:  That's been published.

9      Please refresh your folders.

10          THE WITNESS:  There we are.

11     BY MR. PHAIR:

12      Q.   Mr. Konicov, do you have it in front of

13     you?

14      A.   I do.

15      Q.   We've marked what's been marked as

16     Konicov Exhibit 5.

17          Do you recognize this document?

18      A.   I don't recognize it, but it's a bank

19     statement.

20      Q.   Okay.  Bank statement for who?

21      A.   It's a GNET ATC, LLC bank statement,

22     East West Bank.

23      Q.   And have you reviewed any GNET ATC bank

24     statements as part of your work for the

25     companies?

Alpha Reporting                    800-556-8974
A Veritext Company                 www.veritext.com

```
 1        A.    When -- on occasion.

 2        Q.    Are you familiar -- well, let me start

 3   here.

 4              So I'm showing you a bank statement for

 5   an account at East West Bank in the name of GNET

 6   ATC, LLC.

 7              Do you see that?

 8        A.    Yeah.  That's -- that's the name of the

 9   account or the owner of the account.

10        Q.    And the account number for the GNET ATC,

11   LLC account at East West is 0690, correct?

12        A.    Correct.

13        Q.    Are you familiar with this bank account?

14        A.    I assume -- yes.

15        Q.    Is this a Goodman Networks, Inc.

16   account?

17        A.    Doesn't appear to be so.  It appears to

18   be a GNET ATC, LLC account.

19        Q.    If you go down once again to March 11th,

20   there is an outgoing wire from GNET ATC, LLC to

21   18920 Northwest 11th of approximately four

22   million, correct?

23        A.    Uh-huh.  Correct.

24        Q.    And so that would have also been in

25   connection with the claim that we were
```

Page 133

1    referencing earlier regarding 18920 Northwest

2    11th, correct?

3         A.    Correct.

4         Q.    So the claim of the 13.5 million, 7.5

5    million of that was coming from Goodman Networks,

6    Inc., correct?

7         A.    Correct.

8         Q.    And four million was coming from GNET

9    ATC, LLC, correct?

10        A.    Correct.

11        Q.    So why are the claims of GNET ATC, LLC

12   being presented as assets of Goodman Networks,

13   Inc.?

14        A.    Well, it was an accommodation.  You

15   know, what dictates is really who the

16   counterparty is, right?  So who the counterparty

17   to the 18920 transaction was, right?  This

18   account happened to have 3.8 million dollars in

19   it at the beginning of the month, and you could

20   see it was depleted down to $264 by the end of

21   the month.  So absolutely, it's coming from a

22   GNET account, and why it came out of GNET instead

23   of Goodman, I can't answer you that.

24             However, given the condition -- given

25   the cash management system and the protocols that

Page 134

1    were being used, one company would often make

2    cash payments or collect cash on behalf of

3    another.

4         Q.   So, but the claim -- at least for the

5    four million would be a claim that was owned by

6    GNET ATC, LLC who actually made the payment to

7    18920.

8         A.   Not necessarily, no.  No.  No.  I think

9    the claim would be -- the claim would be dictated

10   by who was the Goodman entity that entered into

11   the settlement agreement with 18920.  The fact

12   that GNET paid part of it was just a function of

13   the fact that the GNET had cash wherewithal.

14        If it was done cleanly, the cash from

15   GNET would have been transferred over to Goodman,

16   and Goodman would have released this -- this

17   other payment of 3.9, but for whatever reason, it

18   wasn't done like that.  So the entity -- what

19   I'm -- what I'm suggesting is the entity that

20   makes the payment isn't always the entity that

21   has the claim.

22        Q.   Are you offering a legal opinion on

23   that?

24        A.   Absolutely not.

25        Q.   So what's the basis of your statement

Alpha Reporting                        800-556-8974
A Veritext Company              www.veritext.com

1    then as to who owns the claim?

2         A.   I don't -- whoever -- in my -- in my

3    world, it's not about -- I mean, one entity can

4    make payments.  These -- this cash management

5    system was commingled, right?  So the

6    determination of Goodman Networks -- of cash

7    coming out of GNET ATC as opposed to Goodman was

8    made only because the cash at GNET ATC account

9    existed.  That was why it was made.  It doesn't

10   necessarily follow that GNET ATC -- GNET ATC is a

11   related party of Goodman.

12              So, but the question is:  Who entered

13   into the agreement with 18920 for the settlement?

14        Q.   So when you prepared the statement of

15   assets, the November statement of assets, were

16   you preparing a statement of assets of Goodman

17   Networks, Inc. or of Goodman Networks, Inc. and

18   GNET together?

19        A.   Goodman Networks, Inc. separate, and

20   then the subsidiaries were on a separate page.

21        Q.   So for purposes of the 13.5 million --

22   strike that.  I'll come back to it.

23              Do you believe GNET ATC, LLC has a claim

24   against 18920 Northwest 11th?

25        A.   You want to know if GNET ATC has a claim

Alpha Reporting                          800-556-8974
A Veritext Company                      www.veritext.com

1    against --

2         Q.    18920 Northwest 11th.

3         A.    Well, only one of them has a claim

4    against -- it's either Goodman or it's GNET, it's

5    not both.  And the analysis was prepared with the

6    assumption and the knowledge that the 18920

7    agreement was between 18920 and Goodman Networks,

8    Inc. -- yeah.

9         Q.    So if it was between them, why was GNET

10   ATC making the payments?

11        A.    I told you why.

12        Q.    Because?

13        A.    Because GNET had the money.  Because

14   GNET had the money in the account.  Because at

15   the time that the payments needed to get made or

16   were made on March 11th, that GNET had 3.8

17   million dollars in the account and that -- those

18   funds were depleted with these two transfers --

19   well, predominantly with this transfer of 3.9.

20        Q.    So but I'm not understanding.

21             Why would GNET ATC make a payment if it

22   wasn't a party to the --

23        A.    Because it's a related party, and the

24   cash management was commingled, so it was all one

25   and the same.  That's why.

1        Q.   So for purposes of the assets, are we

2    assuming that they're all commingled as well?

3        A.     Purposes of the assets, I can't tell you

4    that.  I can't tell you that.  I mean, I think

5    the agreement between -- the agreement with

6    18920, if I recall correctly, maybe you'll put

7    the exhibit up -- if I recall correctly, was an

8    agreement between 18920 and Goodman Networks.

9            The fact that GNET released some of its

10   cash doesn't make it a GNET claim, you know.

11   That doesn't make -- it is a GNET payment, but it

12   doesn't -- but what it is, it's a GNET payment on

13   behalf of Goodman.  That's how related parties do

14   business.  They do -- they do -- they do

15   business, and given the condition of the books

16   and records and what, you know, it was -- this is

17   how it was done.

18       Q.   So your position is that Goodman

19   Networks, Inc. and GNET ATC, their cash situation

20   was all commingled together?

21            MS. HARTLEY:  Objection.  It's been

22   asked and answered.  I don't know if that's

23   exactly correct.

24            But go ahead, Howard, you can answer.

25            THE WITNESS:  Payments and receipts, at

                                        Page 138

```
 1   least during my involvement with Goodman, were
 2   not -- were not always made respecting the -- the
 3   legality of the transaction, you know, as to who
 4   held the note.  There was -- there were
 5   inconsistencies.  There were inconsistencies.
 6   And since I had -- I didn't have a role in
 7   managing cash or initiating cash transactions
 8   or -- or recording cash transactions, they
 9   happened, you know -- they happened in the way
10   that you're seeing.
11   BY MR. PHAIR:
12        Q.   Did Goodman Networks, Inc. pay GNET back
13   for advancing the four million?
14        A.   Not that I know of, no.
15        Q.   Okay.  Let's move on.
16        A.   Okay.
17        Q.   I would like to talk a little bit about
18   the presentation that you made to the bondholders
19   on June 8th of 2022.
20             MR. PHAIR:  Phillip, if you can bring
21   that up.
22             MR. GUFFY:  Yep.  One second, please.
23             (WHEREUPON, a document was marked as
24   Exhibit No. 6.)
25             MR. GUFFY:  That has been published.
```

Page 139

1    Please refresh your folders.

2              THE WITNESS:  June 8th.  Okay.

3    June 8th.

4    BY MR. PHAIR:

5         Q.   Do you have that, Mr. Konicov?

6         A.   I do.

7         Q.   We've marked what has been introduced as

8    Konicov Exhibit 6.

9              Do you recognize this document,

10   Mr. Konicov?

11        A.   I do.

12        Q.   What is it?

13        A.   It's a financial presentation made to

14   the bondholders.

15        Q.   Okay.  And who are the bondholders in

16   this instance?

17        A.   You know, I -- I'm drawing a blank as to

18   this report.  I -- I'm not familiar with -- I

19   mean, I know that it was prepared.  I just don't

20   know the circumstances.  I'm not quite sure if

21   your firm was representing the -- yeah.  Yeah,

22   Yeah.  Okay.

23              So I believe soon after the default took

24   place, I believe there was -- there was a

25   formation of an informal committee.  And I

                                    Page 140

1    believe this was prepared in connection with --

2    to present to that informal committee.  As long

3    as -- as well as the -- as well as to the bond

4    trustee and their counsel as well.

5          Q.    Were you involved in preparing this

6    presentation?

7          A.    Yes, I was.

8          Q.    And was this presentation, was this

9    in-person meeting, Zoom meeting or telephone

10   conference?

11         A.    To tell you the truth, I don't recall

12   whether we had any meeting associated with this

13   presentation.  I believe it maybe was just

14   delivered via e-mail, and it began the -- the

15   conversation of a potential forbearance agreement

16   with the bondholders.

17         Q.    What was the purpose of preparing this

18   presentation?

19         A.    I think to just explain the financial

20   condition of the company and explain the

21   company's sources and uses of cash since the

22   beginning of the year and to document the

23   company's assets and liabilities.

24         Q.    Okay.  Do you believe that the

25   information contained in this presentation is

Page 141

1    accurate?

2         A.    I believe it's reasonable.

3         Q.    Wasn't my question.

4         A.    Do I believe it's accurate?  What do you

5    mean by "accurate"?  Accurate is a -- is a very

6    precise term.

7         Q.    So the financial -- the financial

8    figures that are presented in this presentation,

9    do you believe these numbers to be accurate?

10        A.    I believe -- yes.  I believe they

11   were -- they were at the time this report was

12   prepared, that it was based on the information

13   that was currently available.

14        Q.    And do you have any reason to doubt the

15   information that was prepared and sent to the

16   bondholders in this presentation?

17        A.    I have no reason to doubt.

18        Q.    Sitting here today, would you change any

19   of the information or representations in this

20   presentation that was sent to the bondholders?

21        A.    I could see the -- the -- at the time

22   this was prepared, I could see the valuation of

23   the preferred units is eight million dollars,

24   which was book value.  That was -- that was

25   further refined based on the disclosures that we

1   had gone over earlier.  I could see that the --

2   while the monies went -- are disclosed, and they

3   went out to the preferred stock requirement as

4   disclosed on Page 10, I can see that there was no

5   assets set up for as a potential claim.  It was

6   just a different presentation.

7          MS. HARTLEY:  Ryan -- sorry, Howard,

8   finish.

9          THE WITNESS:  Yeah.  I'm just running

10  through here to, maybe we can cut to -- you know

11  what I mean?  So I would say those are -- those

12  are two differences.

13         The other differences, I'm not sure what

14  we showed in, you know, this nonsense with the

15  AMRR assignment.  I believe that the number that

16  shows here on Page 7, you could see it's a

17  22-million-dollar amount.  If I went back to the

18  statement of assets, I'm not sure if -- it was

19  probably -- it may have been 44 million, and I

20  think we got some additional information that

21  demonstrated that that assignment was not

22  legitimate or valid, you know, subsequent to June

23  8th.  Those are my comments.  Yeah.  Go ahead.

24         MS. HARTLEY:  Ryan, interrupting the

25  depo because your firm may know as well, the

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    Court has entered an order for relief under

2    Chapter 7, so I would ask that this deposition be

3    terminated at this time.

4             MR. GUFFY:  Andrea, this is Phillip

5    Guffy.  Can you give us a few moments to talk

6    before we respond to that?

7             MS. HARTLEY:  Sure.

8             MR. GUFFY:  Can we go off the record,

9    please, Valerie?

10            (WHEREUPON, A RECESS WAS TAKEN FROM 3:18

11   P.M. UNTIL 3:19 P.M., AT WHICH TIME THE

12   DEPOSITION CONTINUED AS FOLLOWS:)

13            MR. GUFFY:  In light of the order for

14   relief being entered, the petitioning creditors

15   do consent to ending the deposition.

16            THE COURT REPORTER:  So off record?

17            MR. GUFFY:  We can go off record.

18            MR. LANGLEY:  This is Adam with FedEx.

19   I'll make the same representation for FedEx as

20   well.

21            THE COURT REPORTER:  Okay.

22            MR. SULLIVAN:  ARRIS joins that.

23            THE COURT REPORTER:  Okay.  Now off

24   record?

25            MR. GUFFY:  I think so.

                                      Page 144

1                    (WHEREUPON, THE DEPOSITION TERMINATED AT

2    2:20 P.M.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Alpha Reporting                                800-556-8974
A Veritext Company                             www.veritext.com

```
 1                C E R T I F I C A T E
 2    STATE OF TENNESSEE        )
                                )
 3    COUNTY OF SHELBY          )
 4
              I, Valerie Hall Gilliam, CRR, RPR, LCR
 5    #456, Licensed Court Reporter, in and for the
      State of Tennessee, do hereby certify that the
 6    above deposition was reported by me, and the
      transcript is a true and accurate record to the
 7    best of my knowledge, skills, and ability to
      discern testimony and comments via
 8    videoconference transmission.
 9            I further certify that I am not related
      to nor an employee of counsel or any of the
10    parties to the action, nor am I in any way
      financially interested in the outcome of this
11    case.
12            I further certify that I am duly licensed
      by the Tennessee Board of Court Reporting as a
13    Licensed Court Reporter as evidenced by the LCR
      number and expiration date following my name
14    below.
15            I further certify that this transcript is
      the work product of this court reporting agency
16    and any unauthorized reproduction and/or transfer
      of it will be in violation of Tennessee Code
17    Annotated 39-14-104, Theft of Services.
18    Dated: I
19
20            Valerie Hall Gilliam
              Valerie Hall Gilliam, CRR, RPR, LCR 456
21            Expiration Date June 30, 2024
22
23
24
25
```

Page 146

```
 1    In Re Goodman Networks, Inc., D/B/A Goodman Solutions v.

 2    Howard Konicov Job No. 5605136

 3                    E R R A T A   S H E E T

 4    PAGE_____ LINE_____ CHANGE_____

 5    _____

 6    REASON_____

 7    PAGE_____ LINE_____ CHANGE_____

 8    _____

 9    REASON_____

10    PAGE_____ LINE_____ CHANGE_____

11    _____

12    REASON_____

13    PAGE_____ LINE_____ CHANGE_____

14    _____

15    REASON_____

16    PAGE_____ LINE_____ CHANGE_____

17    _____

18    REASON_____

19    PAGE_____ LINE_____ CHANGE_____

20    _____

21    REASON_____

22

23    _____   _____

24    Howard Konicov                          Date

25
```

Page 147

1  In Re Goodman Networks, Inc., D/B/A Goodman Solutions v.

2  Howard Konicov 5605136

3                    ACKNOWLEDGEMENT OF DEPONENT

4     I, Howard Konicov, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____     _____

12  Howard Konicov                           Date

13  *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    _____ DAY OF _____, 20___.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25

                                        Page 148

**[001933 - 2525]**

**0**

**001933**   5:9
**006995**   5:10
**007522**   5:11
**0690**   131:25
132:4 133:11

**1**

**1**   5:7 48:16
61:21 73:9,13
105:20 106:6,9
108:10
**1.5**   116:21
118:25
**10**   37:18 40:5,18
40:19 41:13
43:14 143:4
**10-31-22**   112:14
**10/31/22**   5:8
**1000**   3:20
**10166**   3:8
**11**   38:14,17
62:19 96:17
108:22
**11.5**   127:1
**119**   5:17,18
**11:00**   2:5
**11:07**   6:1
**11:47**   125:18
**11th**   76:5,22
77:2,5,17,20,24
78:6,9,16,19,24
79:4 84:2,17
86:2,7 87:1,15
88:14 90:2,5
92:5,13,16,20,25
93:8 94:25 96:5
96:8,13 97:8

98:14 99:6,14,18
120:15,18 121:4
121:25 122:10
122:12 123:12
124:4,7,12
126:23 128:18
128:22 130:21
130:22 131:2,3
131:10 133:19
133:21 134:2
136:24 137:2,16
**12**   1:11 22:16
108:24,24
**12-12**   74:20,24
**120**   57:7
**123**   5:18
**124**   5:9
**129**   5:10
**12:18**   58:19
**12:26**   58:19
**12:36**   62:10,10
**12th**   2:2
**13**   109:3
**13.5**   120:14,21
121:14 122:13
124:8,11 127:3
127:16 128:17
128:21 131:9
134:4 136:21
**132**   5:11
**138**   5:19
**139**   5:12
**15**   43:14 64:11
71:24 95:13,20
95:23 99:23
100:9,17 101:5,7
101:8 146:18

**18**   5:3 92:24
**1819**   88:13
**1838**   129:5 130:7
130:16
**18920**   76:5,21
77:1,4,17,20,23
77:24 78:2,5,8
78:16,19,24 79:3
79:17 82:4,8
84:2,17,22 86:2
86:7,25 87:14
88:14 90:2,5
92:5,13,16,20,24
93:7 94:22,25
95:12,24 96:5,7
96:12,17 97:7,17
98:8,13,20 99:4
99:6,13,18,24,24
100:15,17,21
101:8 120:14,18
121:4,6,23,25
122:9,12 123:11
124:4,7,11,23
126:6,15,17,22
127:13 128:2,18
128:22 130:22
131:2,10 133:21
134:1,17 135:7
135:11 136:13
136:24 137:2,6,7
138:6,8
**1933**   124:23
**1935**   5:9
**1993**   17:1

**2**

**2**   5:8 73:8,13
106:17 111:21

**112**:1
**20**   27:2 64:11
103:12 148:15
**200**   3:8
**2000**   38:9
**2001**   4:10
**20037**   3:5
**2017**   38:4 62:14
**202-955-1921**
3:5
**2020**   57:2 108:10
**2021**   20:12 27:19
28:14 34:24
48:16 52:23
53:5 54:1
106:22
**2022**   1:11 2:2
5:13 52:19 57:7
57:9,13 63:20
78:20 112:21
114:23 125:18
125:24 130:21
139:19 146:18
**2024**   146:21
**20th**   125:24
**21**   56:11,20
**212-850-2825**
3:9
**214-720-4300**
4:11
**22**   67:17 143:17
**22-31641**   1:4
**2200**   3:4
**236**   1:23
**23rd**   125:18
**25**   42:2
**2525**   3:19

**[264 - actions]**

**264**   134:20
**26624**   146:20
**2:15**   103:23
**2:16**   103:25
**2:20**   145:2
**2:55**   128:13

**3**

**3**   5:9 59:20
106:19 108:7
124:25 125:7
131:23
**3.8**   134:18
137:16
**3.9**   135:17
**3.9.**   137:19
**30**   35:6 44:25
45:24,25 46:1
103:11,15,18
115:14 146:21
**3000**   3:16
**303**   3:16
**31**   64:10
**31st**   63:20
112:21
**3600**   4:10
**38103**   1:23
**38119**   4:6
**39-14-104**
146:17
**3:19**   144:11
**3rd**   67:17

**4**

**4**   5:10 59:19
129:10,18
**4.7**   114:17
116:12

**40**   103:18
**4200**   3:11
**44**   143:19
**456**   146:5,20
**480-606-5100**
3:21

**5**

**5**   5:11 132:7,16
**50**   5:15 81:6
93:23 98:16
**500**   4:5
**512-457-7000**
3:17
**523**   5:11
**53**   5:16
**5605136**   147:2
148:2
**59**   5:16

**6**

**6**   5:12 139:24
140:8
**60**   27:25 35:6
45:8,10
**600**   3:11
**6075**   4:5
**615**   17:1

**7**

**7**   143:16 144:2
**7.5**   130:23 131:2
134:4
**713-220-4200**
3:12
**73**   5:7
**74**   5:8
**75201**   4:11
**77002**   3:12

**78701**   3:16

**8**

**8**   5:13
**85016**   3:20
**8th**   139:19 140:2
140:3 143:23

**9**

**9**   59:19 108:20
**90**   27:25 35:6
44:25 45:8 87:5
87:9,12 110:23
111:3
**901-523-8974**
1:24
**901-680-7322**
4:6
**93**   5:17
**996**   5:10

**a**

**a.m.**   2:5 6:1
125:18
**ability**   21:12
79:1 91:24
97:13 146:7
**able**   11:7 15:17
16:1,8 21:9
60:12 69:12
80:5,10,22 81:3
81:16,17 82:23
82:25 83:5,25
84:4 102:18,23
108:7 109:16
114:19
**absolutely**   75:7
134:21 135:24
**accede**   10:24

**access**   18:6
75:11 83:21
84:15 85:22
105:25 120:10
**accessed**   115:25
**accommodate**
21:24 91:4
**accommodation**
134:14
**account**   115:20
115:21,23,24
116:14 117:11
130:6,10,14,16
130:18,20
131:14,15,24
132:2,4 133:5,9
133:9,10,11,13
133:16,18
134:18,22 136:8
137:14,17
**accounting**   32:8
37:18,19,21
85:18 94:5,6
102:10
**accounts**   130:11
**accrued**   64:17
**accuracy**   34:17
**accurate**   96:2
118:1,3 142:1,4
142:5,5,9 146:6
**acknowledge...**
148:3
**acquired**   76:12
**act**   96:19
**action**   146:10
**actions**   32:23,25
33:2

[actual - applied]

actual 16:22
adam 4:4 9:9,13
 144:18
adam.langley
 4:4
adams 1:23
add 127:15
additional
 143:20
additions 148:6
admin 47:15
administrative
 32:15 46:9
advance 24:25
 83:16
advances 69:20
 69:21 94:2
advancing
 139:13
advice 34:7
 35:18,18,19
advisor 22:19,20
 23:13,17,24 24:4
 35:5 36:7 38:19
 40:14 46:14
 65:15 85:21
advisors 33:19
 36:9
affiliate 107:11
affiliated 30:9
 30:17 113:21
affiliates 22:22
 23:4,7,10,14,16
 32:9 33:16
affiliation 29:12
 30:14
agency 146:15

agent 64:23,25
 68:3
ago 20:23,24
 27:25 41:22,25
 42:1,2 44:25
 45:9 87:5,10
 90:7 111:3
 114:12,22
agreed 11:4,5
 60:8
agreement 76:24
 77:9,10 78:14,25
 79:2,7,8,10,10
 79:14,21,22
 80:20,23 84:24
 89:21 90:21
 91:8 93:25 94:8
 94:13,16,17,18
 94:24 95:3,7,10
 95:11,15,18 96:4
 96:10,15 100:16
 111:6,7 114:3
 115:3 135:11
 136:13 137:7
 138:5,5,8 141:15
agreement's
 95:18
agreements
 79:19
ahead 50:21
 53:11 61:10
 85:10 88:22
 104:16 110:25
 111:1 112:17
 138:24 143:23
aired 16:17
akerman 4:10
 25:22 34:3

akerman.com
 4:9
al 5:12
allegedly 96:8
allowed 11:12
 12:9
alpha 1:22
amend 23:9
amended 17:1
ammr 90:12
amount 62:20
 68:15 95:13,14
 95:21 98:20
 100:1 114:14
 116:13 121:3,21
 130:23 143:17
amounted 90:19
amounts 64:3,7
 94:1
amrr 81:5,19
 83:16 89:21
 91:1,9 93:25
 98:12,14,17,20
 100:9,13 108:21
 121:11 143:15
amrr's 91:24
 92:1 93:23
analysis 41:20
 42:20 52:8
 137:5
andrea 4:9 10:7
 52:17 58:7
 59:14 103:8
 105:1,2 120:4
 144:4
andrea.hartley
 4:9

andrew 3:11
andrews 3:4,7
 18:23 59:15
annotated
 146:17
announced
 45:17
answer 8:14,18
 9:7,25 10:20
 14:8 21:17,18
 37:3 41:15,18
 60:1 64:9 76:1
 82:8 93:3
 101:12 102:8,9
 109:14,16 113:4
 123:15 134:23
 138:24
answered 34:21
 50:20 86:9
 138:22
answers 21:6,9
 100:5 108:23
anybody 42:12
 46:6 66:23
 105:16
anymore 113:1
apart 105:7
apologize 26:9
 59:8
appear 133:17
appearances 4:1
appearing 4:15
 9:11 11:18
 115:17
appears 133:17
appended 148:7
applied 72:19

[applies - aware]

applies   17:2
appointing
   111:2
appreciate   88:10
appropriate   6:7
   10:19 16:7
   72:18,20
approved   110:4
approximate
   64:7 130:22
approximately
   2:4 64:11 81:6
   133:21
april   57:9,13
   65:24
argue   7:25
arguing   9:18
arizona   3:20
arrangement
   69:22 77:5
arris   3:13 33:1
   144:22
arrive   121:14
article   16:22
ascertained
   32:13
aside   24:17 66:6
   96:12,14 105:7
asked   7:6 9:5
   13:18 28:25
   29:1 32:11
   50:20 83:17
   102:1,3,6,6,7,10
   102:10,11,22
   114:22 116:9
   138:22
asking   8:2,23
   10:10 11:24

13:1 21:5 82:5,5
95:9 97:3 106:6
107:15,16
125:25
asserted   13:10
33:3 35:15
92:12 114:13
121:3,25 122:24
asserting   97:15
assertive   97:19
assess   91:24,24
122:8
assessment   68:6
asset   68:14,15
68:16,20 70:16
70:20 71:8,12,16
72:2,5,23,25
75:17,24 96:25
97:6 111:18
115:1,18 116:21
117:3,3 120:13
127:4
assets   5:8 56:11
68:7 69:13,18
70:2 72:16,19
73:5 75:19,25
76:2 77:7 95:25
98:7,10 100:21
101:7,11 112:5,7
112:11,14,20
113:25 121:6,9
134:12 136:15
136:15,16 138:1
138:3 141:23
143:5,18
assigned   98:21
assignment
42:18 143:15,21

assignments
43:19,21
assist   29:1
assisted   32:22
associated   86:14
125:25 141:12
assume   133:14
assuming   98:19
100:23 101:13
138:2
assumption
137:6
atc   4:8 19:25
20:3,10 22:20,22
22:24,25 23:24
27:10 31:15,22
32:2 34:13,18
37:1 38:22 39:9
44:10,13,14 45:2
49:12,13,19 50:2
50:12,18 51:12
53:4 104:8,12,15
104:21 131:23
131:24 132:21
132:23 133:6,10
133:18,20 134:9
134:11 135:6
136:7,8,10,10,23
136:25 137:10
137:21 138:19
attached   45:15
attempt   98:23
99:11,17 122:4,8
attend   14:5 17:9
52:4
attending   10:9
attends   14:5

attorney   119:15
123:14
attorneys   18:12
audited   48:15
auditing   34:12
auditor   48:7,9
auditors   47:25
48:1,3,11
august   67:17
78:20
austin   3:16
authority   13:16
14:8 16:23,23
17:7 110:17,22
authorized
98:17
automatic   17:2
available   85:19
124:20 142:13
avenue   1:23 3:4
3:8 4:5,10
avoid   97:14
aware   19:25
22:6 28:8 30:20
49:18,23 51:5,9
52:3,11 57:15,18
62:13,21 63:15
63:19 65:3
84:16,19 88:5,13
88:17,19,19
91:12 92:11,15
92:18 93:6 99:3
104:7,9,19,19
105:8,11,12,13
105:16 109:23
111:8 112:22
123:9,25 124:5,9

[awareness - bondholders]

**awareness** 29:8
99:12

**b**

**b** 147:1 148:1
**back** 20:13 24:7
26:12,14 27:9
28:13 37:8 44:8
56:14 57:22
58:16 62:19
73:10,17,23 74:2
75:13,17 77:16
91:3 92:3 97:14
99:7 101:6
103:23 104:5
109:20 116:19
131:19 136:22
139:12 143:17
**backdrop** 40:3
**background**
37:10 43:13
44:6 56:10
101:21 127:20
**bad** 106:3
**balance** 69:16
**bank** 69:8
113:12 114:13
115:1,10,10,20
115:20,23,24
116:1,13,15
129:3,6,22,23,24
130:2,3,5,6,10
130:11,13
132:18,20,21,22
132:23 133:4,5
133:13
**bankruptcies**
37:23

**bankruptcy** 1:1
11:10 12:14
13:4,6,10 14:1,2
14:4 15:19,23
16:5 20:21 34:9
35:25 36:8
40:11,14,16,20
41:12,16 70:2
**barry's** 20:19
**base** 63:8
**based** 31:6 36:14
69:18 89:4
92:20 96:7
117:10 118:22
119:4,6 121:2
123:2 124:20
142:12,25
**basic** 21:3
**basis** 11:1,6,16
16:14 72:20
126:6 135:25
**bathroom** 58:13
**baum** 29:3,4,17
30:1,4,24 31:3
31:17 46:17,23
53:21
**baum's** 30:21
43:12
**bear** 131:21
**began** 141:14
**beginning** 2:4
26:12 27:24
134:19 141:22
**behalf** 2:3 10:7
27:10 110:18
127:13 135:2
138:13

**believe** 12:22
15:10 19:20,20
20:17 28:1
29:19,23 30:14
31:13 34:5 41:8
44:5,18,21 45:20
47:6 49:3,7
50:19 52:14
55:20 56:7 64:6
67:8,17,19 71:13
71:14,20 80:21
81:10 85:17
86:8 90:11,13
93:11,16,21
96:24 99:1,1,2
99:22 108:18
110:19 111:4
113:17 116:17
117:25 118:2,15
122:3 127:24
136:23 140:23
140:24 141:1,13
141:24 142:2,4,9
142:10,10
143:15
**believed** 83:1
**believes** 97:7
98:2
**best** 21:8,12 60:2
64:9 78:25
109:17 146:7
**better** 42:22
60:12 97:11
**bewildered**
87:19
**big** 36:4,5
**bigger** 105:23
106:1

**bill** 36:13
**bills** 47:9
**bit** 20:6 49:10
58:23 68:13
90:10 104:4
139:17
**blank** 48:10
131:21 140:17
**blanket** 76:1
**board** 49:7,9,11
49:12,15,18,23
50:3,5,9,12,14
50:18,22 51:2,5
51:12,16,19,20
51:23 52:4,8,12
52:15,23 53:1,4
53:8,15,18,22
54:1,5,7,11,13
56:16,21,24
57:17 58:23
104:24 105:5,6,8
105:9 109:22,24
110:4,6,8,10
111:2 146:12
**boards** 59:4
**bolts** 33:25
42:19
**bomb** 7:3,11,16
15:3
**bond** 33:7 62:24
64:20 65:1,8,23
65:23 66:3,6,16
66:24 67:3,11,20
68:1,4 86:19
116:18 141:3
**bondholders**
5:13 78:13,21
139:18 140:14

[bondholders - choose]

140:15 141:16
142:16,20
**bonds** 66:23
128:4
**book** 14:4 75:23
117:15,17
118:25 142:24
**books** 42:21
47:10,14 68:12
68:17,25 72:6,10
72:12,17 80:24
83:22 84:1,15
85:15,22,23
101:16,18,19
102:13,15
104:10 138:15
**borrowed** 91:2
**bottom** 61:4
74:9
**brand** 19:14
**break** 21:14,19
21:20 24:23
57:21 58:1,10,13
58:17,22 75:15
92:4 103:2,7
104:3 128:16
**brian** 3:6
**brianclarke** 3:7
**briefly** 21:4
**bring** 97:14 98:1
111:17 124:22
129:4 132:3
139:20
**broad** 12:15
16:6
**broader** 11:12
**brother** 48:25

**brought** 92:9
99:19
**bullet** 94:14
**bunch** 100:20
**business** 33:17
33:19 35:18
37:14,15 44:5
55:11 56:8
76:12,14 79:1,6
79:14,16 81:10
91:18,21 138:14
138:15
**busy** 38:12
**butler** 4:5
**butlersnow.com**
4:3,4

**c**

**c** 3:1 19:3 146:1
146:1
**call** 12:23 25:16
32:4 33:1 48:6
71:18,19,20,21
71:24 78:18,24
79:4
**called** 18:18
71:10 74:21
76:4 104:8
**calls** 25:6,11,13
50:24 53:9
78:10 93:2
119:15 123:14
**cam.hillyer** 4:3
**camelback** 3:19
**campbell** 4:3
**capacities** 50:10
**capacity** 24:5
50:5,8 60:7

**capital** 127:9
**career** 37:25
43:18
**careful** 118:11
**carried** 120:5
**carry** 61:17
**case** 1:4 12:14
13:8 16:3 22:7
22:15,17 40:23
41:8 146:11
**cash** 35:22 41:10
41:10 47:9
69:19,20,21 80:7
86:13 93:22
112:24 113:2,4,6
113:7,8,10,11,23
114:1,2,11,17
115:5,17,23,24
115:24 116:2,12
120:23 121:5,11
121:16,18,19,21
122:14 134:25
135:2,2,13,14
136:4,6,8 137:24
138:10,19 139:7
139:7,8 141:21
**ceased** 33:17
56:12
**center** 33:1
**ceo** 44:18,20,22
45:13,18,22 50:8
118:23
**certain** 32:9,12
32:23 35:2,3,13
40:16 43:18
59:13 63:15
65:21,22 76:13
77:13,14 80:3,4

81:2,12,16 86:10
90:11 94:4
**certainly** 99:4
**certify** 146:5,9
146:12,15
**cfgi** 19:11,12,15
22:24 27:15
28:25 31:15
38:9,10 42:6
59:6 66:18,22
68:6 90:6
**cfgi's** 31:21
**cfo** 38:6,6,19
**chain** 4:2 125:11
125:14
**challenged** 38:7
**chancery** 41:23
**change** 33:13
35:4 41:15,18
57:4 142:18
147:4,7,10,13,16
147:19
**changed** 27:21
**changes** 112:19
148:6
**chapter** 38:14,17
62:19 144:2
**charge** 89:8
**chart** 52:1
107:24 108:3,4
131:20
**check** 65:13
**checking** 65:14
**checkmark**
60:20
**checks** 110:17
**choose** 119:12

[chose - company]

chose 88:2
circle 57:22
  109:20
circling 103:23
circumstances
  114:10 140:20
cite 14:6
citing 7:23 14:6
  14:24
city 37:16 44:4,4
civil 2:8 14:22
  14:23 16:25
  41:17
claim 13:6,6,9
  77:11 92:6,8,12
  92:17,21,23 93:6
  93:10,12,12,17
  93:20 94:24
  95:5 96:7,18
  97:6,9,13,17
  98:1,11,24 99:13
  99:19 120:14,19
  120:22 121:2,17
  121:24 122:5,6,9
  122:15 123:11
  124:3,8 126:6
  131:6 133:25
  134:4 135:4,5,9
  135:9,21 136:1
  136:23,25 137:3
  138:10 143:5
claims 69:6
  77:14 96:13,16
  122:21 134:11
clarify 54:24
  86:8
clarke 3:6

class 116:22
  117:6 119:1
clawback 93:12
  96:21 97:9,10,12
  97:13
cleanly 135:14
clear 9:19,24
  17:17,18 19:22
  32:9 34:20,21
  56:18 59:8 60:3
  72:25 73:3,10
  80:11,12 98:18
  109:5
click 60:20 61:2
client 6:22 7:18
  7:19 8:7 9:16
  13:3,12,15 17:21
  29:23 30:1,3,4,6
  30:7,8,17,21
  31:1 42:17 44:7
  116:16,17,18
  119:15 123:14
close 23:4 47:19
  113:19
closely 23:4,6,10
  23:13,16 34:3
  42:20
closer 45:10
coast 58:3,8
code 16:5 146:16
cohnreznick
  38:4 43:18,24
  44:2
collateral 41:10
  62:23 63:12,16
  63:17 64:23,25
  69:4,8 113:13
  114:4

colleague 27:15
  31:16 70:9
colleagues 66:18
  66:22 90:6
collect 91:7
  99:15 135:2
collectability
  68:21 122:9,23
collected 127:11
collecting
  127:12
college 76:17
colorado 3:16
come 28:20
  29:20 42:22
  75:13 89:24
  92:3 102:23
  113:2 118:6
  119:20,21 120:2
  120:11,21 127:6
  136:22
comes 42:1
coming 62:19
  115:9 134:5,8,21
  136:7
comments
  143:23 146:7
commercial 44:4
  130:3,4
commingled
  136:5 137:24
  138:2,20
committee
  140:25 141:2
common 12:10
  15:5
communicated
  86:18 127:19

communication
  28:4,23 33:4,4
  39:17 46:16
  50:25
communications
  24:20 62:23
  64:20,24 65:2,7
  66:16 85:4
  86:19
companies 27:13
  29:8,9,18,22
  30:9,18 31:4
  32:14 33:17
  34:7,14 38:8
  39:3,6,7,18,18
  39:24 40:2,2,7
  42:7,15 49:6,8
  52:24 55:25
  56:21 58:24
  59:7,22 62:19
  69:20 94:22
  113:14 132:25
company 24:12
  29:1 31:19
  32:15,24 33:15
  34:22 35:4,18
  36:6 38:13,17
  40:4,6 41:1 46:3
  46:12,21,24 47:5
  47:7,23 49:2
  55:11 56:25
  57:17 65:16
  66:4,7 67:21
  72:6 82:9 84:3
  85:21 88:25
  89:2 99:15
  104:7,9,11,11
  109:16 110:2,18

[company - corporate]

112:6,25 113:20
118:17 121:6
135:1 141:20
**company's** 27:23
35:12 47:12,13
47:25 48:14
65:19,20 81:1,6
81:9 83:16
85:23 141:21,23
**compensated**
36:11
**compensation**
37:4
**competently**
22:4
**competitive**
31:11
**complete** 148:8
**completely** 8:8
8:12 10:2 30:11
**completeness**
114:16
**complex** 65:25
**complicated**
100:13
**complies** 101:2
**component**
76:19 81:5
**components**
79:10 80:4,5
**composition**
58:23 59:3
**concept** 11:12
15:17
**concern** 10:5
81:25 82:12,20
87:18,25 88:2
89:12,16,16,17

101:14
**concerns** 71:11
100:8
**conclusion** 93:2
**conclusions**
87:23
**condition** 32:13
65:19 92:1
134:24 138:15
141:20
**conducts** 82:9
**conference**
141:10
**conferred** 70:9
**confidential** 6:19
**confirm** 79:12
79:12,13 80:10
**confirmed** 26:20
116:2
**confused** 73:16
**confusion**
104:18
**connection** 37:5
40:11,14 41:9
62:18 76:14,17
77:14 78:12
89:21 90:12,18
111:15 117:2
131:5 133:25
141:1
**consensual**
115:3
**consent** 2:4
12:23 144:15
**conservative**
118:3 119:17
**consider** 42:3

**consideration**
80:7 94:15
117:4,5
**consistent** 33:21
**constant** 66:1
**constituents**
37:22 46:16
**consultant** 19:9
**consulting** 38:1
38:2,5
**consummated**
90:21
**contact** 27:12,16
27:18,24 28:3,6
28:9 29:7 30:22
32:11 45:18
65:11 66:23,24
**contained**
141:25
**contest** 63:6
**contested** 41:7,9
**context** 11:10
15:18,25 16:11
35:15 38:1 82:4
91:7,15 122:18
**contingent** 36:15
**continued** 4:1
58:20 62:11
104:1 128:14
144:12
**contract** 76:15
81:9
**contrary** 17:7
**control** 11:22
12:25 46:20
110:9
**controlling**
15:12

**controls** 109:23
110:1
**controversial**
12:11
**conversation**
14:12 26:18,22
27:4 70:10,15,18
79:11 89:13,18
89:23 116:1
118:13 119:4,6
127:17 141:15
**conversations**
24:17 70:24
86:1,3,6,11 87:3
87:13 89:25
90:1,4 99:4
127:11
**conveyance**
80:18,19 81:5,8
81:9,12,19 93:12
93:17,20 95:24
96:19,20 97:8,11
98:10 99:9,13
101:10 122:19
**conveyances**
79:16 94:14
96:22 98:6
**conveyed** 80:14
93:21 94:6,7
98:8 100:20
**conveying** 101:6
**copied** 71:2
**copy** 101:20
**corporate** 19:13
19:23 36:22
60:5,9,11 74:20
88:24 104:4
107:1 109:8,12

[corporation - delineates]

corporation 1:22
1:22 37:6
correct 18:7
19:17,18 22:21
24:1 34:25
48:13,17 50:15
50:18 53:5 55:4
55:5,7,22,23
57:3 60:19,24
63:21 68:2
73:23 96:5,9,11
101:24 102:16
102:17,20,21,24
102:25 119:2
121:4,25 123:7
125:14,18,20
126:23,24 127:1
127:2,4,5 130:8
130:9 133:11,12
133:22,23 134:2
134:3,6,7,9,10
138:23 148:8
corrections
148:6
correctly 86:9
96:2 138:6,7
counsel 2:4
13:15 21:1
22:15 25:18,20
25:21 32:22
33:8 62:25
65:24 66:9,10,15
118:8 119:7,21
120:4 123:6,10
123:21 124:1
141:4 146:9
counterparties
86:14

counterparty
68:19 97:22
134:16,16
countersigned
76:24 84:23
counts 47:19
county 146:3
couple 54:15
course 23:2 27:4
court 1:1 8:25
14:20 15:11
17:14 18:12
21:7 26:3,14,16
41:23 70:3
75:12 106:2
144:1,16,21,23
146:5,12,13,15
cover 22:24,25
covering 61:14
cpa 19:9 37:16
38:2,3
create 91:22
created 69:18
creditor 13:5
15:21 16:1
creditors 2:3 3:2
12:19 18:25
32:10,12 33:5,6
35:14 144:14
criminal 41:17
crisper 24:23
crossed 54:16
crr 4:20 146:4
146:20
crushed 100:12
115:11
curious 13:20

current 21:1
27:12,16 59:21
105:13 106:20
107:5,6,18 108:8
109:22,24
112:14 117:23
currently 19:4
23:12 64:8
96:17 116:13
142:13
custodian 72:12
cut 26:10 108:6
143:10
cute 7:16

**d**

d 5:1 47:20
123:5 147:1
148:1
dallas 1:2 4:11
date 20:12 63:20
112:21 146:13
146:21 147:24
148:12
dated 125:24
146:18
david 59:16
day 2:2 59:12
148:15
days 27:25 35:6
44:25,25 45:9,10
45:24,25 46:1
57:7 87:5,9,12
110:23 111:3
dc 3:5 18:24
deal 127:20
dealing 38:7
55:11

dealt 26:18
debating 9:2
15:1
debits 130:19
debtor 1:6 15:24
27:23 66:15
106:21 107:5,19
107:22 108:9
debtor's 16:2
debtors 11:17
december 1:11
2:2 20:11 27:19
28:14 34:24
38:9 52:22 53:5
53:25 56:19
57:2 146:18
decisions 89:9
110:2,6,7,8
declare 148:4
deemed 148:6
default 63:3,23
63:25 64:10,10
65:4 90:19,20
140:23
defendant 12:17
defending 32:23
defense 99:21
100:3
defenses 99:18
defer 58:7
definition 12:15
16:6
defrauded 98:3
deliberation
120:1
delineates
100:17

[delivered - drew]

delivered 141:14
delivering 65:21
demand 116:19
demanded 92:19
124:7
demands 33:5
demonstrated
143:21
depends 75:24
depleted 134:20
137:18
depo 143:25
deponent 11:17
148:3
deposed 7:7 8:17
8:17,20 14:11,11
15:24 20:14
22:7
deposition 1:8
2:1,6 6:8,11,21
7:1,9,10,11 8:1,6
9:17,20 10:16
11:3,21,22,22,23
11:24 12:10,25
13:17,21 15:1,10
15:12,18 17:10
17:12 18:4 21:3
22:10,14 24:8,9
24:13,16 25:1
26:1,19,19,24
27:7 58:20 59:6
62:11 74:3,20
104:1 106:15
128:14 144:2,12
144:15 145:1
146:6
depositions 7:3
9:11 12:3,5,7

15:3 17:3
des 40:25
describe 93:19
described 78:25
79:1 126:12
description 5:6
designate 59:6
designated 59:3
details 42:23
determination
97:23 136:6
determine 13:9
68:11,20 72:15
75:18 83:25
84:4 97:23
98:23
determined
127:12
determining
99:12
dictated 135:9
dictates 134:15
differences
143:12,13
different 11:15
19:23 32:5
33:24 35:7
37:22 43:8,8,21
59:10 143:6
digits 131:25
direct 85:3
direction 46:20
directly 36:23
87:7
director 107:9
directors 59:21
106:20 107:5,18
107:22 108:9

109:23
discern 146:7
disclosed 96:25
143:2,4
disclosure 109:2
disclosures
142:25
discount 122:4
discovery 12:12
16:12 125:12
discuss 78:8
126:14
discussed 53:21
77:6 78:2,5,13
81:11 86:25
95:7 123:23
discussing 73:2
91:16
discussion 6:3
84:25 90:16,20
104:20 118:8
120:3
discussions 66:4
68:4 72:1 78:15
disposed 2:11
dispute 11:9,14
41:24
distress 38:7
district 1:1
38:15 40:25
division 1:2
dla 3:15,19
docket 41:2
document 60:24
61:2 82:11
106:12 112:2
124:24 129:9,19
132:6,17 139:23

140:9 141:22
documentation
79:19 80:13
81:18,25 82:21
83:6,10 85:14
101:23 102:2,19
102:23 107:12
108:25 114:7,8
114:19 115:2,8
115:19 116:11
documented
44:19
documents 24:9
27:3,7 73:12
doing 10:1 17:17
21:12 33:17
34:22 35:6,7,23
43:7 58:5 60:19
73:11
dollar 95:20,23
99:23,25 100:9
101:7 120:14,22
124:8 143:17
dollars 68:16
95:13 100:18
101:6,9 117:16
117:17 120:6
127:9,21 134:18
137:17 142:23
domestic 130:21
doni 18:5 75:5
doubt 36:24
142:14,17
download 86:15
drawing 48:10
131:21 140:17
drew 87:22,23

[drill - exclude]

drill 98:4
dropdown 61:3
due 64:3,8 68:18
71:9 90:12,13
94:1 95:24
98:20
duly 18:18
146:12

**e**

e 3:1,1 5:1 28:11
45:14,19 48:21
50:24 65:1
116:22 117:6
119:1 125:11,14
125:16,20,23,24
126:19 141:14
146:1,1 147:3,3
147:3
earlier 6:3 29:10
35:17 36:21
47:2 54:24
56:15 114:23
120:19 123:23
134:1 143:1
early 35:7 41:8
58:4 87:6,10
90:16
ease 39:16
easier 39:1 73:16
103:6
east 3:19 58:3
132:3,22 133:5
133:11
eat 57:24
educated 37:13
education 37:11

efficient 108:2
effort 80:1
eight 108:19
117:15,17,20
119:1 120:6
142:23
either 8:17 14:11
36:25 41:3
55:12 56:16
68:18 76:13
102:24 104:21
137:4
electronics 4:2
elements 32:5
elizabeth 3:18
41:23
elmore 47:3,4
72:11 102:18
125:17
elmore's 126:18
employee 146:9
employment
111:6
encumbered
69:5 113:8,9
enforcing 90:17
engaged 19:17
19:19 20:10
28:21 29:21
30:13 34:24
38:21 39:8,22
40:6 46:11 48:4
51:22 55:6
56:22
engagement
19:20 20:2
22:23 23:2,5,9
27:13,18,25

28:18,24 31:5,12
31:22 32:1,1,20
33:11,13 35:8
36:12,16 37:5,11
38:11 42:15,18
49:4
engagements
35:2
entered 135:10
136:12 144:1,14
entities 19:23
23:23 36:21,22
39:8,14 54:16
66:19 79:17
104:5,22 121:22
entitled 13:7
entitlement
93:24
entity 55:14 76:4
76:7,9,11,12
77:8,14,21,25
79:17 94:22
104:17,18
113:13,16
120:24 128:24
135:10,18,19,20
136:3
environment
38:18
equitableness
93:15
equivalent 98:9
error 62:3
especially 11:17
esq 3:3,6,10,14
3:18 4:3,4,9,16
4:16,17

essentially 33:20
est 2:5 6:1
establish 102:19
estate 13:4,11
44:5
estimate 117:10
117:11,13,14
et 5:12
evaluating
123:10
evelina 84:21
85:1,4,16
evening 25:7,14
26:22
everybody 58:10
evidence 17:1
69:8 77:23
80:13 116:7
evidenced
146:13
exact 24:22
exactly 138:23
examination 5:2
18:20
examine 42:21
80:22
examined 59:12
84:7
example 63:18
69:3,10,19 83:12
95:19
exception 59:19
exchange 95:24
100:18,19,21,22
exclamation
74:22
exclude 14:14

Alpha Reporting                    800-556-8974
A Veritext Company                 www.veritext.com

[excluded - first]

excluded   14:7
16:15
executed   128:23
executing   89:9
executive   87:9
116:1
exhibit   5:5,6,7,8
5:9,10,11,12
18:6 60:20,23
61:5,8,13,21
73:7,8,9,13 74:1
75:4 105:20
106:6,9 111:21
112:1 124:25
125:7 129:10,18
131:23 132:7,16
138:7 139:24
140:8
exhibits   74:22
75:1 103:4,5,20
105:19 111:20
exist   69:10 97:20
99:22,22 101:17
109:24 114:9
existed   136:9
existence   99:22
existing   32:14
exists   54:14
82:22 85:19
96:21 100:7,23
123:2,3
exited   18:3
experience   14:3
43:12,15,17,24
experienced
46:13
experiencing
61:25 62:5

73:19 111:11
expert   40:11
41:19 42:4
expertise   43:12
expiration
146:13,21
explain   29:25
32:12 68:13
86:16 90:10
141:19,20
express   82:12
86:21
expressed   82:20
87:17 88:21
89:11
extent   17:19
60:1 68:9,10,22
69:9,18 85:18
93:2 98:7,8
100:2 110:5
119:14 123:13
130:12

### f

f   146:1
face   101:3
fact   10:3 44:24
95:12 110:20
114:25 116:4
124:13 135:11
135:13 138:9
facts   95:11 97:25
107:16
factual   37:3
72:22 86:15
97:22 108:7
129:1

factually   49:17
failure   81:24
fair   39:11,12,20
39:21 100:11
fairly   41:8
familiar   59:9
63:2 76:4
108:16,17,17
109:3 120:7
130:10,11 133:2
133:13 140:18
family   70:19
72:1
fan   41:3
far   35:4 65:11
104:14 121:6
fast   57:25
federal   2:7 14:23
16:25 17:1,4
fedex   4:2 9:10
144:18,19
fees   64:17
felt   87:24
field   23:20,25
27:11 54:17,21
55:2,7,12,13,21
56:6,10 71:10
94:20
fifteen   71:23
figures   142:8
file   13:5 61:24
61:24 62:4
73:19
filed   15:19 17:20
70:2
filing   11:10
fill   61:16

finance   19:13
32:7,14 35:21
42:20 46:7,8
47:1
financial   5:13
19:9 22:19,20
23:13,17,24 24:4
32:13 33:19
34:2,13,18 35:5
36:3,7 38:19
40:13 42:19,22
42:23 44:3
46:13 47:13
48:6,15 52:7
65:15,19 79:15
83:23 92:1,1
117:19,23
123:18,18,19
140:13 141:19
142:7,7
financially
146:10
find   45:12 69:9
101:16 114:19
fine   16:18 17:7
58:5 103:12,13
finish   143:8
firewall   111:14
firm   19:11 25:22
29:21 34:3,6
37:16,19,21 38:2
38:3 67:16 95:8
95:9 140:21
143:25
firms   36:4,5
first   6:18 22:6
44:12,15 51:17
52:18,20,22 53:4

[first - global]

53:25 57:7 59:6
61:10,17 62:21
65:3 104:7
123:17
**five** 57:21 68:16
108:17
**focused** 35:11
37:21
**folder** 74:13,14
74:14,16,21,24
74:25 105:21,24
106:10 111:20
125:3 129:12
**folders** 132:9
140:1
**folks** 114:24
**follow** 101:4
136:10
**followed** 114:24
114:25
**following** 22:12
146:13
**follows** 18:19
58:20 62:11
104:1 128:14
144:12
**footnote** 123:4,4
123:5
**forbearance**
89:20 90:9,24,25
91:1,8,10,16
141:15
**forcibly** 15:12
**foregoing** 148:5
**forget** 76:25
**forgive** 99:25
**forgiveness**
100:19

**form** 2:10 77:9
**formal** 28:4,7
67:14,16 117:12
**formalities** 2:9
**formally** 44:19
52:9 55:14
**format** 94:14
112:9
**formation**
140:25
**former** 29:23
30:1,2,4,17 31:1
**forms** 2:9
**forth** 22:13
94:13
**forthcoming**
80:23
**forward** 9:20
11:6 12:3 13:8
16:4 28:6,10
59:25 60:4
102:23 109:13
109:14,18
**four** 52:18 66:19
108:16 119:13
119:18 131:25
133:21 134:8
135:5 139:13
**frankly** 10:13
**fraud** 97:16
**fraudulent** 93:12
93:17,20 96:19
96:20 97:8,11
99:8,13 122:19
**fraudulently**
93:21
**frequent** 65:11

**freshen** 88:9
**friends** 58:4
**frinzi** 10:12
27:22,22 28:15
28:17,21,23 29:5
30:22,25 31:20
44:16 45:5,12,22
47:24 49:16,19
49:25 50:4,13,17
56:2 67:24
70:16 78:6,9,15
78:19,23 79:11
79:18,23 80:2
81:1,15 82:13
83:2,6,11 85:1
86:2 89:12,14,22
89:24 102:1,7,22
104:21 127:18
128:3
**frinzi's** 81:24
82:19
**front** 87:23
132:12
**froze** 26:4
115:14
**fulfill** 6:22 7:17
**full** 19:2 50:11
70:13 83:21
113:18 121:17
**function** 32:8
35:22 135:12
**functionally**
49:24
**functioning**
105:9
**functions** 57:16
**funds** 99:7,7
137:18

**further** 142:25
146:9,12,15

**g**

**gain** 110:21
**gathered** 47:12
**gavin** 66:25
**gears** 51:14
**generally** 14:3
17:8 21:20 82:6
**genesis** 22:24
113:17,18,18,20
113:24 114:4,5
115:6 116:3
**getting** 24:7 27:9
54:15 65:24
73:16 75:17
83:19 89:19,20
99:25 100:12
111:11
**gilliam** 4:20 21:6
146:4,20
**give** 37:3 47:18
63:5 75:10 76:1
81:16,17 83:12
98:11 103:18
109:9 113:3
144:5
**given** 10:2 95:10
134:24,24
138:15 148:9
**giving** 21:6
46:20 65:16
**global** 54:2,8,11
54:14,19 55:17
55:21,24 56:4,5
80:21 81:8,21
94:2 121:11

[gnet - guess]

**gnet** 4:8 19:21
19:23,25 20:3,10
22:20,22,24,25
23:1,24 27:10
31:15,22 32:2,8
33:16 34:13,18
36:19 37:1,2
38:22 44:13,14
45:1 49:12,12,15
49:19 50:2,11,18
50:23 51:12
53:4 76:13
80:19 94:19
104:8,11,13,14
104:14,21
106:21 108:9
124:18 131:24
132:21,23 133:5
133:10,18,20
134:8,11,22,22
135:6,12,13,15
136:7,8,10,10,18
136:23,25 137:4
137:9,13,14,16
137:21 138:9,10
138:11,12,19
139:12
**go** 9:20 11:6
12:3 16:4 20:13
24:24 26:12
35:2 41:15
50:21 53:11
56:14 58:15,17
59:25 61:10
62:7 73:9,16
75:1 85:10
88:22 104:5,16
105:18 109:14

110:25 111:1,24
112:17 118:22
131:19 133:19
138:24 143:23
144:8,17
**goes** 13:8
**going** 7:25 8:4,5
8:9,20 9:7,10,24
14:7 16:2,21,21
17:22 28:6,9,13
59:5 61:20
69:19 73:8,9
74:2 81:4 94:5,6
101:1,1 102:8
103:14 105:19
109:13 110:7
112:10 128:4
**good** 18:22
57:20 58:14
61:23 66:12
**goodman** 1:5 4:8
5:8,9,10,11,12
10:8 23:18,25
27:10,16,17 28:2
28:5,9 29:13,18
30:2,18 33:16
35:25 36:20
37:1 38:11,23
39:6,7,9,9,17,24
40:1,7 42:7,15
44:9,10 45:6,8
45:11,17,23
48:19 49:5,6,21
50:22 51:14,16
51:18,19,23,24
52:5,8,12,14,15
52:23,24 53:1,7
53:8,14,15,17,18

53:22,22 54:17
54:22 55:3,9,25
56:16,20,20,23
56:24 57:10,13
57:15 58:24
59:22 62:14,22
64:1 65:4 67:24
68:7 70:19,23,25
71:5,16,25 72:1
72:16 75:19
76:13 77:17,21
77:25 79:17,25
80:14,18 83:22
84:1,16,18 85:15
86:4,11,21 87:1
87:14,17 88:4,6
88:6,7,12,21
89:10,11,14,19
90:2,13 91:3,6
91:17,23,24 92:6
92:12,15,19,24
93:7 94:19,21,24
95:12,19,21 96:8
96:13,16 97:7,16
98:1,2,9,22 99:2
99:3,19,23 100:5
100:17,20 101:5
101:6,8,9 102:2
102:3 104:22,24
105:3,9,14,15,17
106:21 107:10
107:11 108:9
110:5,15,19,20
110:20,21 111:3
111:5 112:5,20
113:1,14,21,24
114:1,24 115:18
116:22 117:3,5,6

117:18,22
118:13,14,15,15
118:20,21 119:5
121:22 123:6,9
123:11 124:2,6
124:10,18,19,21
124:23 125:11
130:4,7,13
131:10,15
133:15 134:5,12
134:23 135:10
135:15,16 136:6
136:7,11,16,17
136:19 137:4,7
138:8,13,18
139:1,12 147:1,1
148:1,1
**goodman's**
48:25 69:13
90:18 93:22,23
93:24,25 94:3
98:16 110:12
117:18
**goodmans** 86:7
**goodness** 15:9
**governing** 6:19
**governs** 12:14
**graduation**
37:17
**gross** 121:19
**ground** 21:3
**group** 19:14
36:22
**guess** 6:17 13:23
44:10 79:15
81:18 109:14
110:14

Alpha Reporting    800-556-8974
A Veritext Company    www.veritext.com

[guffy - information]

**guffy** 3:10 59:14
59:15 73:25
74:4,8 105:24
111:13,19 125:1
129:8,11 132:5,8
139:22,25 144:4
144:5,8,13,17,25
**guys** 10:3 15:19

**h**

**h** 147:3
**hall** 4:20 146:4
146:20
**hand** 43:20
**handful** 75:25
**hands** 87:21
**handy** 81:14
**hang** 62:2
**happened** 78:20
88:5 134:18
139:9,9
**happens** 14:1
**happy** 12:8
21:18
**hard** 20:7 78:3
**hartley** 4:9 5:15
5:16,16,17,17,18
5:18,19 10:6,7
18:16 24:18,21
24:25 25:12,14
26:23 27:1
50:19 53:9 58:9
59:5,25 60:4,8
60:17 93:1
103:8,10,16
109:6,7,11
119:10,14
123:13 138:21

143:7,24 144:7
**hartley's** 25:18
25:21
**hear** 6:3,14
**heard** 13:19
**hearing** 2:12
20:7
**heightens** 82:11
**held** 139:4
**help** 103:22
110:1
**helped** 34:1
**helpful** 21:8
**helping** 47:5,7
55:15
**hereto** 148:7
**hierarchical**
43:2,10
**hillyer** 4:3
**hired** 32:3,3
**history** 34:9
37:10 104:15
**hit** 61:13
**hold** 8:4,9 16:20
46:15 54:15
62:1 73:17
**holding's** 117:23
**holdings** 116:23
117:7 118:16,21
**hour** 21:21,21
58:9,17
**hourly** 36:13
**houston** 3:12
**howard** 1:10 2:1
5:3 18:17 19:3
50:21 53:11
74:23 93:3
103:10 123:15

138:24 143:7
147:2,24 148:2,4
148:12
**huh** 112:16
114:21,21
125:15 130:15
133:23
**hunton** 3:4,7,11
18:23 59:15
**huntonak.com**
3:3,7,10
**hypothetically**
68:15,19 98:19

**i**

**idea** 85:7
**identified** 50:17
**identify** 61:8
**identifying**
22:13
**impair** 72:23
**important** 54:25
**improper** 17:19
**inc's** 85:15
**inc.'s** 123:10
**include** 23:10
89:10
**included** 71:4
72:18 79:15
80:24
**includes** 73:2
**including** 12:19
**inconsistencies**
139:5,5
**incorrect** 69:17
**incurred** 36:14
**indenture** 63:1

**indentured**
108:20
**independent**
80:1
**independently**
80:6
**index** 5:2,5,14
**indicate** 129:7
**indicated** 88:12
88:18 107:24
**indicates** 85:24
123:5
**indicative** 69:23
**individual** 24:5
42:10 46:9
47:15 60:7
76:24 84:23
109:10
**individuals** 24:4
49:21
**industry** 38:22
39:23,24 40:7
**informal** 140:25
141:2
**information**
6:20 17:9 22:11
34:2 47:12
59:13 61:11
65:22 68:9,10,23
68:24 69:2,12,15
69:22,24,25
70:11,13,14 72:4
72:9,13,14 81:3
81:16 82:22,24
82:25 83:7,9,17
83:18 93:14
101:21 115:16
116:10 120:10

Alpha Reporting                    800-556-8974
A Veritext Company                 www.veritext.com

[information - june]

123:1,2,3 124:20
127:11 141:25
142:12,15,19
143:20
**initially**  28:15
**initiated**  38:4
99:4
**initiating**  139:7
**inquired**  87:14
114:25
**inquiries**  83:14
100:5
**inquiry**  106:17
106:19 108:14
**insolvencies**
37:23
**insolvency**  101:2
**instance**  140:16
**instances**  69:1
69:11
**instruct**  15:11
**insurance**  69:6
**insurer**  69:5,5
**integrated**  55:10
**intellectual**
81:12 94:4
**intend**  10:12
11:4
**interacted**  45:2
47:23
**interaction**
97:21
**interactions**  45:4
48:18 57:9,12
**interest**  11:11
12:18 13:4
15:22 16:6,8
36:15 56:3

64:16 65:24
93:23 98:16
**interested**  86:12
86:22 146:10
**interests**  12:15
**interim**  38:6,6
**internally**
126:14
**interrupt**  26:10
85:11
**interrupted**
15:14
**interrupting**
143:24
**introduce**  61:5
61:20 73:7,9
105:19
**introduced**  30:5
30:25 140:7
**introduces**  95:11
**investigate**
99:17
**investigated**
114:9,10,18
**investigation**
123:19,20
**investment**
117:16
**invitation**  11:2
**invitations**  10:17
**invite**  11:23
12:24 16:11
**invited**  7:9,12,25
8:21 9:17,21
10:13 13:18,22
13:24 15:2,3
17:13

**invokes**  15:20
**involuntary**
15:20,25
**involved**  22:15
22:17 23:3
35:20,24 40:1
48:14 62:21
70:1 87:8 88:25
90:22 99:5
105:3 112:25
141:5
**involvement**
32:5 35:10,11
51:9,21 62:25
70:5 87:6 108:1
139:1
**involving**  35:25
**iowa**  40:23,24
41:11
**island**  37:14
**issue**  111:14
114:15
**issued**  62:14
**issues**  55:11
72:21
**items**  98:7

## j

**j**  3:14
**james**  10:12
27:22 31:20
44:16 47:24
48:19 49:5,15,19
51:18,23 52:14
52:23 53:22
56:16,20,23
57:10,13 113:21

**january**  48:16
57:8 106:22
108:10
**jason**  4:17 6:12
7:10 10:11,24
13:13 15:14
17:12 18:1,3,7
**jennifer**  4:16
**jersey**  19:5
41:24
**job**  147:2
**john**  4:8 27:16
28:2 45:6 48:25
50:22 70:23
71:25 86:11
88:6 89:10,13,19
107:10,11 110:5
110:12,19 113:1
118:12,13,14
119:4
**joined**  37:15,16
38:9
**joining**  37:19
**joins**  144:22
**joseph**  29:3 30:1
30:4,5 31:16
42:9,16 43:25
46:4,5,17 70:9
**joseph's**  29:24
**judge**  41:23
**judgment**  46:15
87:22 117:19
**jump**  13:25
60:22 77:16
**june**  5:13 139:19
140:2,3 143:22
146:21

Alpha Reporting          800-556-8974
A Veritext Company          www.veritext.com

[justification - liabilities]

**justification**
95:17
**justifies**   8:6

**k**

**k**   19:3
**keep**   14:10 58:6
61:15 91:21
**kick**   11:16
**kind**   20:21 21:23
37:9 42:24 43:6
44:4 61:15
86:15 89:16,17
89:20 93:11
95:15,16 97:16
117:11
**kleinsasser**   4:16
6:14,17 7:5,15
7:22 8:3,22 9:4
9:6,12,23 13:25
14:18,22 15:7,14
16:20 17:15
18:2 104:2
**knew**   29:4 30:24
31:3 43:6,21
70:12,12 72:20
76:23 86:16,17
89:7 126:15,15
**know**   6:9,19 7:2
14:2,3,10,14
17:8,18 21:15,24
23:3 28:17 30:6
30:7,13,24 31:2
31:2,3,6,11,18
33:15 34:10
35:2 36:2,6,10
39:1 40:2 45:24
48:22 49:14

50:7 51:25,25
52:17,17 53:11
53:14,16 54:3,6
54:13 58:3
62:25 63:3,12,16
64:7,16,18,25
66:12 69:14
76:1,3,9,18 77:1
77:4,7,19,22
79:22,24 80:25
81:2 82:9 84:8
84:12,21 85:6,9
85:9,12,12,17
86:12,12 87:9,19
87:25 88:19,25
89:22 90:19,21
91:11,14,19,23
92:22 93:13,15
93:22 95:8,9
97:10,12 98:25
98:25 99:6,10,16
100:13 102:4,8
104:15,17 105:1
105:2,2,4,4,5
107:8 108:19,19
108:19,20,21,22
108:22 109:15
109:25 110:16
111:6 113:8,17
115:4 116:9,9,15
116:20 118:14
118:16,17
121:10 122:1,12
122:14 123:18
127:20 128:21
128:25 130:17
131:17,22,25
134:15 136:25

138:10,16,22
139:3,9,14
140:17,19,20
143:10,14,22,25
**knowledge**   60:15
91:12 137:6
146:7
**known**   104:11
**konicov**   1:10 2:1
5:3 18:11,17,22
19:3 20:5 26:9
57:23 58:22
59:7,17,23 60:4
61:21 62:13
73:8,9 104:3
106:9 109:17
111:24,25 125:6
125:7 128:16
129:15,18
132:12,16 140:5
140:8,10 147:2
147:24 148:2,4
148:12
**kurth**   3:4,7,11
18:24 59:15

**l**

**label**   19:14
**lack**   82:20 87:18
**lacking**   83:1
**lag**   45:21 46:2
**langley**   4:4 9:9,9
9:16 144:18
**late**   20:11 27:2
**lately**   65:9
**laura**   3:18
**laura.sixkiller**
3:18

**lawyer**   34:11
**lcr**   4:20 146:4,13
146:20
**leading**   37:10
**learned**   127:25
**learning**   86:22
**leave**   6:13 7:13
8:2 9:5 10:24
11:2,25 13:2,19
**lee**   4:16
**left**   45:13
**legal**   16:22 34:7
35:18,19 36:4
77:9 79:16 93:2
93:6 98:17
123:20,22
135:22
**legality**   80:12
139:3
**legitimate**   81:18
81:25 82:21
83:5,10 143:22
**legitimately**
121:8
**lender**   85:6 92:2
**letter**   19:21 20:2
22:23 23:9
28:24 32:20
45:15
**letters**   23:6
**level**   38:7 63:8
87:25 88:1
**levels**   37:23 43:8
43:9
**liabilities**   68:8
69:13 72:24
73:2,4 141:23

[liaison - mean]

liaison  47:11
licensed  146:5
  146:12,13
light  144:13
likelihood  98:23
  122:22 123:10
  124:3
limitations  123:3
limited  42:13
  48:21
line  54:20 67:22
  67:25 81:10
  147:4,7,10,13,16
  147:19
link  6:10 7:2,2
liquidations
  37:24
list  32:20 70:1
  70:16,20 71:16
  72:2,5 75:17
  81:4 84:5,6,7,12
  84:14 97:1,7
  98:5 111:18
  112:5,7,11,14
  126:19
listed  66:20 97:6
  113:3 114:16
  116:12,21
  120:13 127:3
listen  6:21 10:20
  10:21 11:3,7
  13:8 16:1,8
listening  11:18
lists  84:9
litigation  9:22
  11:8,14 12:16
  14:2 32:22 33:3
  33:6 35:13,13,14

40:16 41:17
  92:8,9 112:10
  122:15,19,20
little  20:6 29:25
  49:10 58:4,23
  68:13 78:4
  90:10 104:4
  139:17
live  94:24 95:1
llc  4:8 19:25
  104:15 116:23
  118:21 123:12
  132:21 133:6,11
  133:18,20 134:9
  134:11 135:6
  136:23
llp  4:10
loan  69:19,21,21
  80:20,23 90:13
  93:25 95:23
  98:17 121:10
location  19:6
log  73:22,23
logistics  4:2
long  10:9 26:25
  34:8 42:1 45:21
  71:21 89:3
  103:10 141:2
longer  17:2
look  6:25 7:7,24
  108:1,2 125:16
  126:18 129:2
  130:19 132:1
looked  123:21
looking  36:8
  108:23
looks  105:21

lot  19:22 82:24
  103:5
love  14:5
lunch  58:2,3,17
  103:3,7

m

m  3:6
ma'am  17:15
  18:8,15 60:25
mail  28:11 45:14
  45:19 50:24
  125:11,14,16,20
  125:23,24
  126:19 141:14
mails  48:21 65:1
maintaining
  47:10
making  33:5
  34:17 69:20
  89:8 110:6,8
  137:10
man  6:25
management
  44:3 56:3 65:20
  134:25 136:4
  137:24
manager  46:8
  47:1
manages  77:1
managing  44:9
  44:14 47:9
  139:7
march  65:10
  121:1 126:1,4
  130:21 131:3
  133:19 137:16

mark  61:13 73:8
marked  61:21
  73:12 74:13,14
  74:15,21,24 75:1
  105:18,20
  111:20,25
  124:24 125:7
  129:9,17 132:6
  132:15,15
  139:23 140:7
market  37:16
markets  127:9
material  95:12
  112:19
math  118:6
matter  12:18
  15:22 19:17
  20:18 41:11
  108:7
matters  34:9
matthias  4:16
  6:2 7:24 9:3
  10:6,23 14:17
  16:18 17:12,24
  18:2,7
matured  64:3
maturity  63:20
maximize  91:21
mean  12:11,21
  14:2 15:4 17:24
  22:18 26:9
  63:24 64:1
  65:10 66:10
  67:14 69:15
  75:25 80:11
  85:10 88:1 89:5
  90:18 95:1
  100:25 101:17

Alpha Reporting          800-556-8974
A Veritext Company          www.veritext.com

**[mean - negotiations]**

105:11 107:14
108:1 109:1,25
110:7 123:17
136:3 138:4
140:19 142:5
143:11
**meaning** 21:10
54:16
**meeting** 51:3,12
52:4 141:9,9,12
**meetings** 51:5
52:12 54:11
67:4,6,7
**member** 49:7,15
50:6,9,14,18,23
51:19,24 52:23
52:25 53:3
56:16,24 70:19
105:5 110:6,11
**members** 49:18
51:16 54:1 72:2
79:24 105:6
**memory** 63:6
**memphis** 1:23
4:6
**mention** 15:5
39:16
**mentioned** 28:14
36:21 39:8
64:19 81:15
90:8 98:12
101:12
**message** 74:1
**met** 24:25 50:16
50:23
**methodology**
75:22 117:14

**mfs** 106:21
108:10
**michael** 3:10
**mid** 56:11
**middle** 37:16
**million** 64:11
68:16 95:13,20
95:23 99:23
100:9,17 101:6,7
101:8 114:17
116:22 117:16
117:17,20,21
118:1,6,25 119:1
119:5,8,12,13,13
119:13,18,18,24
119:25 120:6,9
120:14,22
121:14 122:13
124:8,11 127:1,3
127:6,9,15,16,21
128:4,6,17,21
130:23 131:2,9,9
133:22 134:4,5,8
134:18 135:5
136:21 137:17
139:13 142:23
143:17,19
**mills** 18:5,9
60:22 61:1,6,9
62:1 73:21
74:12,23 75:2,7
75:10
**mind** 57:5 95:9
**mine** 43:14
**minus** 44:25
45:25 110:23
**minute** 26:10
62:8 71:24

**minutes** 27:2
51:11 52:11
54:10 57:22
58:12,16 71:23
103:11,12,15,18
128:9
**missing** 81:13
**moines** 40:25
**moment** 129:8
132:5
**moments** 144:5
**money** 91:2,3
97:14 124:15
137:13,14
**monies** 127:25
143:2
**monitor** 13:8
91:23,25
**monitoring**
113:1
**month** 65:10
87:5 134:19,21
**months** 22:16
52:18 114:12,22
**morning** 18:22
**motion** 17:20
**move** 61:13
139:15
**moving** 58:6
**multi** 56:8
**multiband** 23:20
23:25 27:11
36:23 38:23
39:10 54:2,8,11
54:14,17,19,21
55:2,7,12,13,17
55:21,21,24 56:3
56:5,6,10 80:20

81:21 94:1,2,20
121:11
**multiple** 11:11
12:18
**mvl** 1:4

**n**

**n** 3:1 5:1 19:3
47:20
**name** 18:22 19:2
19:11 29:2 30:7
38:3 40:25 41:2
42:10 47:3,17
61:12 69:3 76:3
76:25 94:21
113:18 125:13
130:7 133:5,8
146:13
**names** 41:1
**narrow** 31:24
**nature** 92:23
93:10,19
**necessarily** 33:3
135:8 136:10
**necessary** 55:16
55:16 148:6
**need** 18:6 21:14
21:22 32:6 41:4
58:12 74:6
75:10 82:11
103:9,14,16
**needed** 137:15
**needs** 13:10 35:4
35:5
**negotiated** 31:14
31:18
**negotiations**
16:12

[networks - offering]

**networks** 1:5 5:8
5:12 10:8 23:18
23:25 27:11
29:13 30:2,18
35:25 37:1
38:23 39:9
51:14,17,19,24
52:5,8,12,15
53:1,8,15,18,23
54:22 55:3,9
56:24 62:14
64:2 65:4 68:7
72:16 75:19
77:18,25 80:19
83:22 84:1,16,18
85:15 92:6,12,15
92:19,24 93:7
94:25 96:9,13,16
97:16 98:22
99:2,3,19 104:25
105:10,14 112:6
112:20 113:24
115:18 123:6,9
124:2,6,11,18,19
124:21 125:12
130:7,13 131:10
131:15 133:15
134:5,12 136:6
136:17,17,19
137:7 138:8,19
139:12 147:1
148:1
**never** 13:19
44:18 48:5,7
50:16 51:2 62:1
63:15 64:24
67:24 68:22,23
87:22,22,23

89:13 115:2
116:10,11
121:24
**new** 3:8,8 19:5
36:9 37:16
38:15 41:23
44:3,4 45:17
**night** 26:22 27:1
**nonparties** 6:5
9:21 10:9
**nonparty** 6:25
7:20 8:7 9:17
11:24 12:9,21
**nonsense** 143:14
**normally** 15:23
**norowitz** 42:10
43:23 44:1
**northern** 1:1
**northwest** 76:5
76:22 77:1,5,17
77:20,24 78:3,5
78:8,16,19,24
79:4 84:2,17
86:2,7 87:1,15
88:14 90:2,5
92:5,13,16,20,25
93:7 94:25 96:5
96:8,13,17 97:8
97:17 98:14
99:6,14,18
120:14,18 121:4
121:25 122:10
122:12 123:12
124:4,7,12
126:23 128:18
128:22 130:22
131:2,10 133:21
134:1 136:24

137:2
**nos** 73:13
**notary** 148:13
148:19
**note** 61:23 62:14
69:23 80:15
81:19,20,23
83:15 89:22
91:25 95:15,16
95:23 98:21
100:6,9,13
101:22 108:21
139:4
**noted** 148:7
**notes** 62:17 63:9
63:13,20 64:3,5
64:8 65:5 66:5
66:17
**notice** 2:3 5:7
7:4 59:18 74:3
79:21 106:15
**noticed** 11:20
12:25 20:5
44:23,24 60:12
**noticing** 13:18
**notification**
28:11
**notifying** 92:16
**notwithstanding**
43:16
**november** 70:3
70:16,19 71:16
72:2,5 75:17
111:18 136:15
**number** 59:19
59:19,20 79:15
91:20 106:19
108:20 109:3

119:20 120:2,5
120:12 133:10
143:15 146:13
**numbers** 142:9
**nuts** 33:25 42:19
**nw** 3:4

**o**

**o** 19:3,3 47:20
**oath** 8:22
**object** 10:8 59:5
123:13
**objection** 5:14
9:10 10:1 11:18
11:21 17:18
50:19 53:9 93:1
119:10,14
138:21
**objections** 2:10
8:11
**obligation** 7:18
95:20,22 99:23
100:2,6,10,19,20
100:22,23 101:8
101:10,13,14,22
101:24 102:20
114:5 115:6,7
116:3
**obligations** 6:22
**observation** 89:4
**obtained** 83:7
**obviously** 17:21
21:5 97:4
**occasion** 133:1
**occupation** 19:8
**october** 112:21
**offering** 135:22

[office - parts]

**office** 43:22
111:15
**officer** 56:21
57:16 105:14
107:8,9 110:10
110:13,15
**officers** 45:1
59:21 106:20
107:5,18,21,25
108:8
**official** 41:2
**offset** 114:13
**oh** 25:22 26:11
30:2 42:12
113:10 115:13
124:15,15
**okay** 6:14,17
7:22 8:3 9:4,23
17:6,11,14,25
18:9 19:12,16
20:5,9,13,23,25
22:6 26:25 27:3
27:9,9 28:8 29:7
29:15 31:21
33:10 34:4,6,12
35:16,24 36:6
37:8,13 39:22
40:5,10 41:4
42:3 43:1 44:7
44:17 47:21
50:16 53:3,7
54:18 56:14
57:19,22 59:25
60:14,17 61:7,19
63:7,19 64:19
66:12,14 71:11
71:24 74:4,5,17
75:12 83:21

87:12 90:4,7
92:3 93:10
96:12 98:22
100:18 103:1,17
106:16 107:4
109:19 111:9,17
112:13 113:5
114:18 115:22
116:5,21 117:8
120:13 121:13
121:24 126:11
126:18 128:11
129:17 130:19
131:8 132:20
139:15,16 140:2
140:15,22
141:24 144:21
144:23
**old** 84:12 102:5
102:5
**once** 20:17 61:16
65:12 71:17
74:15 133:19
**open** 14:4,12
**operated** 39:24
**operating** 40:4
**operations** 40:3
56:13
**opinion** 41:5
124:2 135:22
**opportunity**
30:5 68:22
**opposed** 57:17
136:7
**options** 61:3
**order** 6:19,23
7:18 8:15,19
9:14 10:3,15,18

11:5 12:14
16:14 144:1,13
**original** 28:13
**originated** 62:18
**outage** 61:25
62:5 73:20
111:12
**outcome** 116:20
146:10
**outdated** 84:8
**outgoing** 133:20
**outside** 37:5
41:16 113:14
**outstanding** 64:2
64:5,12 95:5
**overall** 16:11
**oversight** 110:15
**overstated** 120:9
**owe** 91:2 99:24
**owes** 95:12
99:24 100:17
101:8 114:5
**owned** 55:8
135:5
**owner** 133:9
**ownership** 56:3
**owns** 136:1

| **p** |
|---|

**p** 3:1,1,3 47:20
**p.m.** 58:19,19
62:10,10 103:25
103:25 128:13
128:13 144:11
144:11 145:2
**package** 63:18
**page** 5:6 61:16
63:1,2 106:17

130:21 136:20
143:4,16 147:4,7
147:10,13,16,19
**paid** 32:10 36:23
65:24 121:20
128:17,21
131:13 135:12
**paperwork**
49:20
**parent** 56:25
112:6
**parham** 59:16
**park** 3:8
**part** 44:3 55:10
63:17 117:4
120:2 132:24
135:12
**participate** 6:7
11:13 12:8,9
15:18 86:10
**particular** 71:8
76:15 113:12
115:1
**particularly**
10:2
**parties** 6:4 9:11
10:14,18 11:11
12:15,18 49:22
82:10 86:20
115:4 138:13
146:10
**partner** 18:23
25:21 28:22,25
42:16 59:16
**partner's** 29:2
**parts** 43:18
74:22 80:3

Alpha Reporting 800-556-8974
A Veritext Company www.veritext.com

[party - position]

**party** 7:12 9:21
11:9,14 12:6,7
12:12,13 13:18
14:16,16 15:17
15:21 16:6,8,13
16:13 17:4
56:12 68:18
69:7 71:9 128:1
136:11 137:22
137:23
**party's** 71:10
**pattern** 116:4
**pause** 24:19
128:8
**pay** 64:2 69:6
99:7 101:5
139:12
**paying** 37:6 47:8
**payment** 63:25
92:20 101:7
108:21 124:7
127:8,10 135:6
135:17,20
137:21 138:11
138:12
**payments** 90:11
90:14 124:23
125:25 126:19
126:22,25
127:14 131:6
135:2 136:4
137:10,15
138:25
**pays** 36:18
**pending** 20:20
20:20 21:17
32:24 40:23,24

**pennsylvania**
3:4
**people** 11:16,20
17:8 42:7 47:22
59:11 81:2
**percent** 81:6
93:24 98:16
**perfect** 58:11
**perform** 41:20
68:6
**performance**
92:2
**period** 46:2,22
65:9,10
**periodic** 78:10
**permit** 11:5
**person** 67:4
109:17 110:11
141:9
**personally** 82:14
**perspective** 13:7
36:3,4 91:19
**petition** 15:20,25
112:20
**petitioning** 3:2
18:25 35:14
144:14
**pguffy** 3:10
**phair** 3:3 5:3 6:2
6:16,25 7:7,20
7:24 8:20 9:2,5
10:22 11:20
12:6,20 13:12,16
14:15,25 15:9
16:16 17:11,24
18:8,10,15,21,23
26:5,8 51:1
53:12 57:20

58:1,12,15,21
60:3,14,18,25
61:5,7,19 62:4
62:12 73:14,18
74:2,6,10,17
75:5,8,13,16
93:4 103:2,14,18
106:3,5 109:7,19
109:21 111:10
111:17,23
119:11,19
123:24 124:22
125:5 128:10,15
129:4,14 132:1
132:11 139:11
139:20 140:4
**phases** 35:2
**phil** 74:7
**phillip** 3:10
59:14 124:22
129:4 132:3
139:20 144:4
**phoenix** 3:20
**phone** 25:19
50:24
**physically** 50:24
**piece** 121:12
**pinkhasova**
84:21 85:1,4,16
85:24
**piper** 3:15,19
**place** 51:6 56:2
89:21 97:25
140:24
**plaintiff** 12:17
**plan** 10:21
**planning** 34:23

**platform** 38:5
89:8 91:23
**pleadings** 22:12
**please** 9:1 14:21
17:11 19:1 62:5
125:1 129:5
132:5,9 139:22
140:1 144:9
**pledged** 114:3
115:5 116:3
**plenty** 75:14
**plus** 11:8 44:25
45:25 50:9
81:21 110:23
**point** 6:13 7:14
8:13 9:19 21:14
26:6 27:12,18
28:3,3,5,9 44:2
49:4,8,17 51:21
54:25 55:6,18
56:11 57:16
70:11 88:24
102:5 108:6
114:10,14
116:10 128:7
**points** 33:9
91:20,21
**politely** 11:25
13:1
**poplar** 4:5
**portion** 26:15
81:20 98:21
**pose** 9:10
**position** 6:4 8:6
8:10 10:23 12:4
35:22 42:21
46:23 49:9
77:15 112:24

Alpha Reporting                    800-556-8974
A Veritext Company                www.veritext.com

[position - protective]

113:4 117:19,23
118:21 122:14
138:18
**possibility** 15:20
**possible** 61:16
85:20
**potential** 12:19
13:4 15:21 16:1
16:8 93:16,18
96:19 97:10
98:11 99:18
141:15 143:5
**potentially**
96:21 97:18,18
113:2 121:3
**practice** 12:10
15:5
**precise** 120:12
142:6
**predated** 107:25
**predecessor**
104:18
**predominantly**
137:19
**preference**
122:20
**preferred** 77:15
84:6 116:22
117:6 119:1
126:1,5,9,13,16
142:23 143:3
**preparation**
24:7,9,13 26:1
26:24 27:7
**prepare** 22:9
24:16 108:4
**prepared** 107:24
108:14 109:7

112:8,11 114:6
136:14 137:5
140:19 141:1
142:12,15,22
**preparing** 70:1
78:12 136:16
141:5,17
**present** 32:4
50:2,11 52:7
71:8 106:22
108:11 141:2
**presentation**
5:13 67:10,14,16
71:3 78:12,21
114:16 120:7
139:18 140:13
141:6,8,13,18,25
142:8,16,20
143:6
**presentations**
67:15 86:18
120:6
**presented** 50:9
54:7 68:11,24
95:7,8 134:12
142:8
**preserve** 91:22
97:20
**president** 118:23
**pressing** 98:24
99:12
**presumably** 91:5
92:10 100:24
114:2
**pretty** 70:11
**previously** 35:20
38:22 47:7
81:11 97:1

**primary** 27:12
27:17
**principal** 27:23
27:24 45:18
62:20 64:13,14
64:15 76:23
84:22 89:22
**principals** 31:4
76:21
**prior** 28:17
29:12,16,18
35:24 36:8
**priorities** 35:3
**priority** 101:2
**private** 74:14
**privilege** 119:15
123:14
**pro** 101:3
**probability**
122:5
**probably** 21:20
25:9 27:2,25
28:11 42:2
43:14,16 44:25
45:10 52:18
81:13 82:16,17
87:6 103:14
108:22 114:23
120:3 143:19
**problem** 73:24
115:12
**procedure** 2:8
14:23,24 16:25
**proceed** 58:8
**proceeding** 6:20
7:21 20:21
40:12,15,20
41:13,16

**proceedings**
11:13 40:22
**proceeds** 121:16
121:18
**process** 15:23
31:9 35:12
65:25 87:11
97:21
**produce** 81:24
83:17 102:18
**produced** 108:24
125:11
**produces** 108:25
**producing** 22:11
109:11
**product** 146:15
**progress** 35:12
**progressed**
42:18 46:14
**prohibits** 17:5
**project** 39:23
**promise** 58:16
**promissory**
95:15,16,23
**proof** 13:5
**proper** 69:12
98:17
**properly** 82:11
**property** 81:12
94:4
**prosperity**
129:23 130:2
**protecting** 90:16
**protective** 6:18
6:23 7:18 8:14
8:19 9:14 10:3
10:15,18 11:5
12:13 16:14

[protocols - records]

protocols 134:25
provide 32:7
34:6 41:6
122:13 123:1
provided 33:20
33:21 34:2,4
40:15,19 42:19
52:1 68:23 69:2
provides 16:5
providing 35:16
35:17,19 47:11
57:16 76:16
124:2
provisions 2:7
proximately
131:2
prudent 101:1
118:4 119:16
public 37:17,19
148:19
published 74:5
111:16 125:2
129:12 132:8
139:25
purchase 117:3
128:4
purpose 56:9
130:17 141:17
purposes 12:2
49:24 68:4
136:21 138:1,3
pursuant 2:3,6
69:21 77:8 94:1
99:8 112:9
pursued 37:20
put 60:4 61:11
70:6,6 74:6,8
109:17 116:19

119:25 123:1,4
127:23 138:6
putting 96:12,14
105:7

**q**

question 2:11
6:18 7:17 8:14
8:16,18 9:8,13
9:25 14:9 21:16
21:18 26:14
73:4 82:6 88:11
94:9,10 105:7
109:6 110:14
115:15 119:22
123:25 131:12
136:12 142:3
questioning
54:20
questions 10:10
10:13,21 21:5
24:23 63:4 71:2
71:3,5 90:7 95:9
103:4 123:22
quick 18:5 57:21
73:23
quickly 37:15,15
56:14
quid 101:3
quite 38:12
43:25 140:20
quo 101:3

**r**

r 3:1 47:20 146:1
147:3,3
raise 99:19
raised 10:4 71:2
71:3 91:19,20

rate 8:9 10:5
rates 36:13
rbc 127:8,12,24
127:25 128:1
read 16:21,22
26:14,16 63:1
148:5
ready 18:10 33:7
43:5
real 18:5 44:5
73:22
realizable 68:21
realization
72:21
really 35:10 78:3
87:24,25 97:22
134:15
reason 22:3,5
72:22,22 113:9
117:25 118:2
135:17 142:14
142:17 147:6,9
147:12,15,18,21
reasonable
100:25 142:2
reasonableness
95:18 118:18
recall 20:11,20
22:8 28:7 31:10
32:18 33:12
36:4 41:14,21,22
42:12 44:23
45:14,14,15 49:8
58:25 65:6,25
67:7 71:6,7,13
72:24 73:1
75:20 76:2
78:10 79:22

80:22 83:19
87:4 102:8,9
107:11 116:15
118:7,13 124:17
128:7,19,25
129:1 138:6,7
141:11
receipts 120:23
138:25
receivable 69:23
80:15 81:20,20
81:23 83:15
121:10
receive 11:2 28:4
84:11,13 98:9
125:20
received 16:10
37:4 45:19
100:4 115:2,3
117:4,5
recess 58:18
62:9 103:24
128:12 144:10
recognize 112:2
129:19 132:17
132:18 140:9
record 8:12 9:7
10:7,10 12:1
19:2 58:15 62:7
73:11 102:12
144:8,16,17,24
146:6
recorded 68:17
69:16 102:17
recording 139:8
records 42:21,24
47:11,14 68:12
68:17,25 72:6,10

Alpha Reporting 800-556-8974
A Veritext Company www.veritext.com

[records - resources]

72:12,18 80:24
83:22 84:1,16
85:15,18,22,24
101:17,18,20
102:13,16
104:11 138:16
**redeemed**
126:10
**redemption**
126:1,4,16
**redo** 105:21
**reduced** 117:20
119:5,8
**refer** 39:5,6,13
39:17 117:1
**reference** 104:10
131:23
**referenced** 29:9
**referencing**
126:13 134:1
**referred** 47:2,15
88:7 97:1
**referring** 39:7
39:19 54:23
75:24 126:5
131:22
**refers** 96:11
**refined** 142:25
**reflect** 101:18
**reflected** 68:12
68:25 72:17
**refresh** 75:2
111:19 125:3
129:13 132:9
140:1
**regard** 43:9
109:22 122:22

**regarding** 59:16
86:2,7 89:12
96:4 134:1
**relate** 56:5
**related** 22:22
23:4,6,10,13,16
47:12 55:12
71:7,8,9,9,12
82:10 136:11
137:23 138:13
146:9
**relates** 54:20
89:25 115:1
**relating** 47:13
**relationship**
31:8 55:25 56:8
98:13 130:4
**released** 135:16
138:9
**relevant** 17:9
86:20
**relief** 144:1,14
**relieved** 95:19
95:22
**remaining** 131:8
**remember** 38:14
114:23
**remitted** 127:13
**remotely** 18:14
**remove** 15:12
16:18 17:11,15
18:6
**removed** 18:3
**reorganized**
38:18
**rep** 60:5,9 74:20
**repay** 91:25

**repeat** 38:25
39:2 88:11
**rephrase** 53:13
92:7 93:5
**report** 27:14
46:6 140:18
142:11
**reported** 4:20
47:23 146:6
**reporter** 8:25
14:20 15:11
17:14 18:12
21:7 26:3,14,16
75:12 106:2
144:16,21,23
146:5,13
**reporting** 1:22
46:2,4,6,12
83:23 146:12,15
**reports** 65:17,18
**represent** 6:5
69:24 108:8
125:10
**representation**
33:9 34:1
144:19
**representations**
34:17 142:19
**representative**
59:7 107:1
109:8,13 127:24
**representatives**
60:11 67:21
**represented**
38:13
**representing**
18:25 29:1
30:19 33:22

37:22 140:21
**reproduction**
146:16
**request** 7:8
10:24 17:3
21:17 112:9
**requested** 26:15
**requests** 65:20
65:21 80:25
**require** 120:11
**required** 110:3
148:13
**requirement**
143:3
**requires** 14:6
**researched**
102:12 127:10
**researching**
86:12
**reserve** 17:21
**reserved** 2:10
**reserves** 72:18
**reside** 19:4
**resign** 53:7
**resignation**
44:24
**resigned** 44:2
49:9 51:20
52:15 53:14,18
53:22 57:6
**resolution** 111:2
**resolutions**
105:4
**resolved** 62:8
95:4 114:15
**resources** 32:15
33:18 80:21
94:3

Alpha Reporting
A Veritext Company

[respect - seconds]

respect  59:18,20
respectfully  6:12
  7:10,13 8:2
  11:25
respecting  139:2
respond  7:16
  60:12 144:6
response  8:19
  9:14 82:19
  125:24
responsibility
  47:8,10
responsible
  34:12 43:3 87:8
  87:9
restart  103:21
restricted  113:5
  113:7,11,23
  114:11,17
  115:17 116:2,12
restructurings
  37:24
result  56:12
retail  38:17
retained  28:15
  40:10,13 41:19
  41:22 44:12,15
  47:6 49:13
  51:17 52:22
  53:5,25 55:14,17
  55:20 56:19
retention  27:10
  28:13 29:8
  31:14 51:7 57:2
  111:6
retired  38:3
return  98:10

reveal  24:20
review  24:8
  114:7
reviewed  27:6
  110:3 132:23
reviewing  22:14
rfp  31:9,10
rhode  37:14
right  12:20 14:8
  14:17 16:16
  17:21 29:14
  35:1,1,20 40:8
  44:11 48:1 49:3
  58:13 61:2,15
  68:20 73:6 74:9
  74:17 75:13
  77:16 83:15
  91:3 92:11 94:6
  95:11 98:6
  102:17 104:24
  109:16,17,19
  111:9,19,24
  115:21 118:16
  125:2 129:2,11
  134:16,17 136:5
rights  76:13 77:5
  80:15,20 81:7,10
  90:17,17,18 91:5
  91:6 93:23,24
  94:1,3
rise  98:11
road  3:19
robert  4:3
role  40:15 44:17
  49:1,5 56:21
  65:15 85:13
  88:24 111:3
  139:6

roles  38:6,20
  42:14
room  13:12,15
ross  4:10
roughly  71:22
  126:25
rphair  3:3
rpr  4:20 146:4
  146:20
rudd  4:17 10:11
  10:11 11:1 12:2
  12:12 13:3,14,23
  15:16 18:3
rule  7:23 14:6,14
  14:15,22,23 15:9
  17:1,4,5,8
rules  2:7 15:8
  16:25 17:19
  21:3
running  103:4
  143:9
ryan  3:3,14
  14:23 17:20
  18:23 62:3
  73:21,25 74:12
  103:16 105:25
  111:13 143:7,24
ryan's  16:23
ryan.sullivan
  3:15

s

s  3:1 47:17,20
  147:3
sake  39:2
sale  117:3
samantha  47:17
  102:11

sanctions  17:20
sandra  47:21
sat  49:22
satisfying  101:9
save  17:16
saw  44:19 86:16
  94:20
saying  14:10
  15:8,15 26:13
  57:5 60:6,10
  110:11 116:6
says  23:1 61:3
  61:24 62:4 75:1
  106:19 112:13
  131:23
schedule  10:14
  10:16,19 11:4,6
  16:12 70:7 71:1
  91:4,5 109:1
  124:19
scheduled  12:3
  96:24
schedules  73:1
scheduling  26:18
school  37:14,15
scold  21:11
scope  31:25 32:1
  33:11,13,21
screen  75:3,6,11
  105:25
scroll  106:16
  130:20
sec  125:1
second  62:2
  73:17 104:6
  130:20 139:22
seconds  115:15

[secured - sort]

secured 62:13
63:10
secures 63:12
security 63:18
114:4 115:5
see 11:6 16:14
61:2,4,21 73:6,7
74:4,18 84:5
102:11 103:23
106:23 112:15
113:2,15 115:13
116:24 120:16
125:2,8,13,17
126:2,19,20
129:12,25
130:21,24 133:7
134:20 142:21
142:22 143:1,4
143:16
seeing 45:15
74:10 79:22
107:11 139:10
seeking 81:2
90:25 91:1
seen 48:20 51:11
54:10 77:23
85:23 100:3
106:12 116:11
segment 38:2
sense 22:1 42:25
43:11
sent 7:1 125:17
125:23 142:15
142:20
separate 21:9
23:5 43:3
136:19,20

separated 89:2
separately 43:20
september 65:11
sequestration
17:3
seriously 36:24
served 38:5,6
42:24
service 61:25
62:5 111:11
services 23:20
24:1 27:11
33:20 54:17,21
55:2,7,12,13,21
56:6,10 71:10
73:22 76:16,16
94:20 106:21
108:10 146:17
serving 22:19
23:12,17,24 24:3
24:4 68:3,5
set 21:2 22:13
67:7 85:13
94:13 143:5
settlement 77:9
77:11,13 79:20
79:21 94:17,18
94:23 95:3,7,10
95:11 96:4,10,15
135:11 136:13
seven 108:18
share 18:6 60:20
60:23,24 75:4,5
75:9,11 79:18
88:2 105:25
shared 43:19,19
72:13,13 79:7

shareholder
41:24 77:17,20
77:24 84:2,17,20
96:5
shares 117:6,9
she'll 21:7,11
sheet 127:4
shelby 146:3
shoot 74:1
short 46:22
shot 47:18
show 6:11 13:21
81:19 131:1
showed 143:14
showing 13:17
113:24 133:4
shown 27:3
shows 126:22
143:16
sic 47:21 90:12
side 44:7 61:15
72:25 76:12
100:5
sign 8:10 9:25
10:5,6
signature 2:13
146:20
signed 6:18,24
7:19,19 8:18
9:13 10:3,14,15
28:24
significant 72:21
signing 17:23
silos 43:7
similar 39:23
43:13 86:3
simple 14:15

sir 20:4 66:8
107:7 108:4
125:21
sit 107:17
sitting 8:21
14:25 34:16
40:8 69:4 116:5
142:18
situated 113:12
situation 11:15
32:12 47:13
48:6 87:20
138:19
situations 34:10
six 65:10 108:17
131:8
sixkiller 3:18
skill 46:14 85:13
skills 146:7
small 75:25
snow 4:5
sold 56:10
sole 110:10,10
solutions 3:13
147:1 148:1
solvency 34:9
sondrup 47:17
soon 140:23
sorry 6:2 7:22
10:22 15:15
26:3 38:24
85:10 88:22
103:8 104:16
105:2 110:25
111:7 112:17
115:10 143:7
sort 6:10 16:16
21:2,4,9,24

[sort - sure]

28:12 43:2
**sorted** 103:21
**sound** 91:20
**sounds** 89:15
100:8 121:15
**source** 115:7,16
**sources** 141:21
**southern** 38:15
**speak** 40:4 73:21
**speaking** 8:24
14:19 21:20
**specialty** 37:20
37:21
**specific** 24:15
41:5 63:4
130:17
**specifically**
24:11 39:14
76:8,15 78:11
86:13 99:21
**specified** 32:19
79:11 95:14
**speculation**
53:10
**spent** 22:11
**spoke** 59:15 67:3
67:15,20,25
**staff** 79:24 81:2
**stage** 33:6
**stamp** 74:7,8,12
105:22 106:7,8
**stamped** 74:15
74:16
**stand** 19:12
**standard** 15:5
**standing** 48:5,9
**start** 21:11 31:25
37:11 56:17

133:2
**started** 19:1 28:1
44:11 48:7 87:7
**state** 9:6 19:2
146:2,5
**statement** 48:7
69:8 114:6
115:18 129:5,6
129:22,23 130:6
132:19,20,21
133:4 135:25
136:14,15,16
143:18
**statements** 34:13
34:18 48:15
129:3 132:24
**states** 1:1
**status** 63:2 65:17
65:17,18 85:7
**stay** 46:15 94:10
100:14,14
**stayed** 33:7
37:17 43:5
**staying** 35:21
**steel** 41:3
**step** 37:8 44:8
**stephanie** 47:3
47:22 70:10
72:11 102:11
125:17
**stepped** 28:2
45:22
**steve** 20:19
42:10,19
**sticker** 61:13
**stipulate** 18:13
**stipulates**
100:16

**stipulation**
21:15
**stock** 77:15
126:1,5,9,13,16
143:3
**stockholders**
84:6
**stop** 44:22
**stopped** 40:2
**storage** 61:25
62:4 73:19
**straining** 20:6
**stream** 76:14
**street** 3:11,16
**strike** 78:4
136:22
**structure** 43:2
65:20
**stuff** 108:19
**subfolder** 74:21
**subject** 131:6
**subjects** 59:9
**submitted** 41:12
71:1
**subpoenas** 59:10
**subscribed**
148:14
**subsequent**
143:22
**subsequently**
127:13
**subsidiaries**
124:14 136:20
**subsidiary** 54:21
55:3,9
**substantive**
26:23

**substantively**
32:21 43:10
55:15
**success** 98:23
122:6,22 123:11
124:3
**sufficient** 33:18
80:13 97:24,25
99:7
**suggest** 31:24
**suggesting**
135:19
**suite** 3:11,16,20
4:5,10
**sullivan** 3:14
144:22
**summarized**
33:25 86:17
**supervised** 32:14
**supply** 4:2
**support** 16:3
32:7 46:16
83:16,18,19
93:15 115:5
116:3
**supported** 42:17
42:17 46:17
**supporting**
35:11
**supports** 49:21
**suppose** 79:11
98:15
**supposed** 6:22
7:17 8:1
**sure** 17:24 20:9
20:25 21:1,11
24:21 31:25
38:12 39:15,25

Alpha Reporting
A Veritext Company

800-556-8974
www.veritext.com

[sure - time]

41:2 43:25
47:19 60:19
63:5 74:13
81:14 83:13
93:5 94:11 96:1
97:15 99:2
103:21 106:7
107:14 110:12
121:7 122:17
128:10 140:20
143:13,18 144:7
**surprise** 131:18
**surprised** 13:23
89:7
**swear** 18:13
**swept** 116:16
**switching** 51:14
**sworn** 18:18
148:14
**system** 134:25
136:5

**t**

**t** 146:1,1 147:3,3
**take** 21:7,14,18
37:8 40:18
46:23 57:21,21
60:15 127:14
129:2 132:1
**taken** 2:2,6
58:18 62:9
97:25 103:24
128:12 144:10
**talk** 24:12 26:25
49:10 68:19
71:15 104:5
109:2 139:17
144:5

**talked** 84:24
86:1 96:18
104:3 121:10
126:15
**talking** 21:10
58:23 75:18
120:19 121:9
126:16 128:17
**tangible** 121:5
**tbd** 113:3
**team** 42:6,8,20
**tech** 73:21
**technical** 65:22
65:25
**telecom** 76:16
113:18 116:23
117:7,23 118:15
118:21
**telecom's** 117:19
**telephone** 25:4,6
71:18,20,21
78:24 79:4
141:9
**tell** 8:3,5 9:23
24:21 36:20
53:17 73:15
78:23 88:4,23
104:14 105:6
107:4,17,21,23
108:18 111:15
118:9 128:3,5
138:3,4 141:11
**telling** 73:18
80:2
**tennessee** 4:6
146:2,5,12,16
**term** 7:16 31:23
113:5 142:6

**terminated**
144:3 145:1
**terminology**
39:2 97:11
**terms** 2:7 31:21
31:24 79:1,6,14
**testified** 18:19
**testify** 22:4 59:3
60:5,6 108:14
109:8
**testifying** 6:6
12:22 15:6
59:11,17,24 60:9
107:1
**testimony** 6:20
16:2 40:16,20
41:5,12 43:16
146:7 148:8
**texas** 1:1 3:12,16
4:11 58:4
**thank** 128:11
**theft** 146:17
**thing** 24:22 26:7
34:10,23 78:3
81:13
**things** 32:19
33:23 35:3,3
46:15 65:22
69:6 94:8 121:9
**think** 6:4,7,10,11
6:12 8:12 9:19
10:19 11:1,15,16
13:7,21 14:13
16:7 20:11
34:20 35:16
38:15 39:5 40:8
54:20,24 74:6
87:7,7 96:25

103:22 106:13
109:13 118:7,22
118:23 120:3
123:22 127:19
135:8 138:4
141:19 143:20
144:25
**thinking** 56:11
95:13
**third** 6:4 9:11
49:22 56:12
68:18 69:7
128:1
**thirteen** 20:24
**thought** 10:13
**three** 23:23 29:9
29:21 39:3,8,18
42:14 65:12
87:2,13 117:20
118:1,5 119:5,8
119:12,24,25
120:8
**thursday** 25:10
25:17 26:17
**time** 8:25 9:1
10:4 14:1,20
16:17 17:16
20:7 22:11
27:21 28:23
30:12,12 32:10
33:14,23,24 34:2
34:2 36:14
39:25 40:17,17
44:1,10 45:6,18
46:19,22 48:3
49:13 51:21,22
53:4 55:18 56:2
56:15 57:1,20

**[time - understanding]**

58:19 61:18
62:10,24,24
64:10 66:2
67:15,18 75:14
88:14 89:1,3,23
103:8,25 126:7
128:13 137:15
142:11,21 144:3
144:11
**timely** 90:14,15
**times** 20:16 25:3
71:15 83:18
86:25
**title** 44:17 49:1,5
**tn** 1:23
**today** 7:8 8:21
18:24 21:4,6,15
22:4,10 24:8,10
24:13,16 25:1
34:16 47:7
107:2,17 108:15
109:9 116:5
118:1 126:8
142:18
**told** 59:17,23
90:14 137:11
**tongue** 78:4
**top** 75:3 112:13
125:13
**topic** 26:7 59:20
107:2 108:7
**topics** 22:13
59:13,18 60:5
106:17,19
108:13 109:9
**total** 121:3,5
126:25

**touch** 33:7 35:21
43:5 46:7 66:1
127:23
**traditional**
37:17 38:19,19
**transaction** 88:5
88:14 89:9
93:16 100:25
102:5 114:3,7
116:7 117:2
126:6 134:17
139:3
**transactions**
82:10 86:13,23
89:1 101:19
139:7,8
**transcript** 146:6
146:15 148:5,8
**transfer** 94:4
98:15,16 121:18
121:19 124:21
124:21 128:23
131:1 137:19
146:16
**transferred** 77:8
99:8 120:24
121:7,8,22
124:11 131:9,16
135:15
**transfers** 86:14
109:2 137:18
**transmission**
146:8
**transmitted**
128:1
**travis** 3:11
**true** 146:6 148:8

**trustee** 33:8
62:24 64:20
65:2,8,23,23
66:3,7,16,24
67:3,11,20 68:1
68:4 86:19
116:18 141:4
**truth** 105:6
141:11
**truthfully** 22:4
**try** 13:19 21:13
62:6 73:25
**trying** 21:7
38:14 63:5,8
75:1 87:21
90:23 98:3
121:13
**twelve** 20:24
**twice** 25:4
**twister** 78:4
**two** 11:9,14
34:10 41:1
58:12,16 65:12
74:22 81:13
87:2,13 108:16
119:13,17
126:22,25 127:6
127:9,14,15,21
128:4,5,9 137:18
143:12
**type** 41:5 85:7
**typical** 11:8,14
12:16
**typically** 69:7,7
122:21,25

**u**

**u** 47:20
**ufs** 71:12
**uh** 112:16
114:21,21
125:15 130:15
133:23
**ultimately** 32:22
38:18 81:4
82:23 127:10,21
128:1
**umbrella** 54:17
**unable** 91:4
**unauthorized**
146:16
**unavailable**
115:25
**unaware** 88:13
**unb** 64:22
**unclear** 36:19
77:12
**underscores** 8:7
**understand** 9:18
15:16 16:2 29:4
29:20 59:2
76:11 90:23
95:6 96:14
114:8,12,14
**understanding**
10:17 19:16
30:13 31:7
35:22 42:23
49:17 50:13,14
51:18,20 52:21
52:25 53:2,6
56:1,23 57:6
62:16 63:9,14
76:19 77:13

Alpha Reporting
A Veritext Company

## [understanding - willing]

79:13 89:3 96:2
96:3 106:25
107:13,15
109:10,12,15
111:13 117:18
117:22,24
124:10 126:8
137:20
**understated**
120:9
**understood**  69:4
113:11
**undocumentati...**
87:18
**uninvited**  6:11
**united**  1:1 71:10
**units**  116:22
117:6 119:1
142:23
**university**  37:14
**unreasonable**
8:8,13 10:2
**unrelated**  30:11
**unvalidated**
49:16
**updated**  84:9
**updates**  65:16
**upload**  60:21
**uploaded**  61:24
111:25 125:6
129:17
**us.dlapiper.com**
3:15,18
**use**  36:7 75:22
75:23 117:14
**useful**  52:2
**uses**  113:5
141:21

**v**

**v**  19:3 147:1
148:1
**valerie**  4:20
60:18 62:7
75:10 105:25
144:9 146:4,20
**valid**  100:2,10
101:13,15
102:20 143:22
**validate**  93:14
**validated**  118:17
118:18
**valuation**  41:20
42:4 69:13
71:12 75:22
117:12 118:18
120:11,22
142:22
**value**  68:7,11,21
72:15,17,23
75:18,23 91:21
91:22 97:20
98:9 117:8,15,17
117:20 118:3,25
120:4,8,8 121:17
121:21 122:5,21
142:24
**valued**  121:2
122:15
**values**  69:17
**various**  22:12
33:6,8 37:22
50:24 72:19
79:9 86:19
130:19
**vendor**  61:25
62:5 73:19

111:11
**venue**  76:17
**verify**  80:2,5
**veritext**  1:22
**versus**  119:12
**video**  67:9
**videoconference**
146:8
**view**  83:23
**violation**  146:16
**voicing**  8:11
**voluntarily**
17:16 18:3

**w**

**waived**  2:9,13
**waiver**  89:20
90:8,24,25 91:9
91:16
**walk**  21:4 37:9
**walked**  51:2
**want**  7:16 8:18
12:24 13:1
15:10,13 17:17
21:23 24:20
34:20,21 39:13
56:14 58:1,2,5
61:11 66:12
74:1 92:3 94:10
94:11 96:1
103:11,20 104:5
104:5 107:14
111:10,16
118:11 136:25
**wanted**  20:9
73:10 88:9
106:7 127:20

**wanting**  60:23
**wants**  14:4 58:7
105:21
**washington**  3:5
18:24
**wasting**  16:17
**way**  30:8 38:4
44:11 56:9 89:6
97:15 108:2
139:9 146:10
**ways**  83:8
**we've**  9:19 16:17
86:17,17 125:6,6
129:17,17
132:15 140:7
**wednesday**  25:9
25:16 26:17
**week**  6:6 12:4,22
15:6 25:10,17
**weeks**  65:13
110:24
**weird**  74:10
**welcome**  17:25
**welpman**  41:3
**went**  10:17
35:17 67:8 98:5
121:5 127:8,22
143:2,3,17
**west**  132:4,22
133:5,11
**wherewithal**
135:13
**whoever's**  15:11
**wholly**  55:8
**wifi**  76:16
**wilkinson**  66:25
**willing**  10:23

Alpha Reporting
A Veritext Company

[wing - zoom]

**wing**   38:2
**wire**   130:22
   133:20
**witness**   2:13
   12:21 17:2
   18:13,18 26:6
   50:22 57:24
   58:6,11,14 60:2
   61:12 74:19,25
   75:4 103:12
   109:10 111:22
   119:16 123:16
   125:4 128:8,11
   129:6 132:10
   138:25 140:2
   143:9
**witnesses**   6:5
   15:6
**words**   89:6 91:2
   117:16
**work**   19:10
   24:15 29:17
   31:9 47:4 48:11
   72:19 132:24
   146:15
**worked**   34:3
   42:20 43:17,20
   43:22 65:23
   70:8 72:11
**working**   27:15
   38:10 42:6,8
   46:11
**workouts**   37:24
**works**   15:4
   58:10 61:22
   73:7
**world**   136:3

**worried**   103:20
**write**   110:17
**writing**   82:17,18
**written**   20:2
**wrong**   38:16
   95:21 100:1
**www.veritext....**
   1:24

**x**

**x**   5:1

**y**

**y'all**   9:24 17:20
   17:22 103:9
**yeah**   7:15 13:25
   26:5 39:1 45:10
   45:10 52:21
   55:1 66:2 73:18
   74:2,23,25 75:7
   85:13 88:8,10,11
   93:9 94:13 97:5
   103:16 106:18
   107:12 113:10
   113:10 114:21
   114:21 115:14
   119:9,9 121:20
   126:7 127:19
   129:6 130:5
   131:21 132:1
   133:8 137:8
   140:21,21,22
   143:9,23
**year**   52:19 87:5
   141:22
**years**   20:23,24
   20:24 37:18
   40:6,18,19 41:13
   41:22,25 42:2

   43:14
**yep**   111:1 139:22
**yesterday**   25:7
**york**   3:8,8 37:16
   38:15 44:3,4
**young**   58:14

**z**

**zoom**   2:5 6:13
   7:3,11,14,16
   15:2 18:4 67:6,7
   71:18 141:9

Alpha Reporting
A Veritext Company

800-556-8974
www.veritext.com

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.