Philip M. Guffy
**HUNTON ANDREWS KURTH LLP**
600 Travis Street, Suite 4200
Houston, Texas  77002
Tel:     713-220-4200
Fax:     713-220-4285
Email:  pguffy@huntonak.com

 -and-

Paul N. Silverstein
Brian Clarke
**HUNTON ANDREWS KURTH LLP**
200 Park Avenue
New York, NY  10166
Tel:     (212) 309-1000
Email:  psilverstein@huntonak.com
        brianclarke@huntonak.com

*Counsel for the Original Petitioners*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 7 |
| | § | |
| GOODMAN NETWORKS, INC., | § | Case No. 22-31641 (MVL) |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |

## ORIGINAL PETITIONERS' OBJECTION TO DEBTOR'S
## MOTION TO CONVERT CHAPTER 7 CASE TO CHAPTER 11
### [Related to Docket No. 133]

JLP Credit Opportunity Master Fund Ltd., JLP Credit Opportunity IDF Series Interests of

the SALI Multi-Series Fund, L.P., JLP Institutional Credit Master Fund LP, and Alimco Re Ltd

(collectively, the "**Original Petitioners**")[1] for their objection (this "**Objection**") to the *Motion to*

---

[1]    The undersigned represent unaffiliated investment managers and investment advisers to funds that are the collective beneficial holders of approximately two-thirds of the outstanding Notes (defined below) (such holders, which include the Original Petitioners, the "**Majority Noteholders**").

*Convert Chapter 7 Case to Chapter 11* (the "**Motion to Convert**") [Docket No. 133] filed by the above-captioned debtor (the "**Debtor**"), respectfully represent:

**PRELIMINARY STATEMENT**

1.      As demonstrated herein, it is well-established, including by bankruptcy courts and district courts in this District, that a debtor does not have an absolute right to convert a chapter 7 case to a chapter 11 case.  In *Marrama v. Citizens Bank of Mass.*, the Supreme Court held that a court may deny a motion to convert under section 706(a) of the Bankruptcy Code if cause would exist to convert the case back to chapter 7.[2]  Later, in *Law v. Seigel*, the Supreme Court clarified this holding stating that a court is not required to engage in "futile procedural niceties in order to reach more expeditiously an end result required by the Code."[3]  Following *Marrama*, bankruptcy courts in this District (and district courts on appeal) have denied motions under section 706(a) to convert a chapter 7 case to chapter 11 where cause would exist to convert the case back.  .  In *Dan Thomason & Assocs., LLC v, Breakwell*, the district court confirmed Judge Jernigan's ruling denying a debtor's motion to convert a chapter 7 case to chapter 11 where there was no hope of a reorganization and the debtor's management was not suited to run a chapter 11 case.[4]  Similarly, in *In re Foster*, then-Judge Nelms denied a motion to convert a chapter 7 case to chapter 11 citing *Marrama*, and the District Court affirmed that decision as well.[5]

2.      Like those cases, this case does not belong in chapter 11.  There is no business to reorganize.  The Debtor has stated clearly that it's goal in chapter 11 would be to file a plan of

---

[2]      549 U.S. 365, 375 (2007).

[3]      571 U.S. 415, 426 (2014).

[4]      No. 3:10-CV-00379-K, 2010 WL 3385025, at *2 (N.D. Tex. Aug. 25, 2010)

[5]      530 B.R. 650, 651 (N.D. Tex. 2015), *aff'd* (Dec. 1, 2015).

2

liquidation.[6]  The Debtor concedes that the purpose of bringing in former bankruptcy judge Russell

Nelms as an "independent director" was that he would "be helpful in fighting a trustee motion."[7]

Instead, the majority stockholders of the Debtor (John Goodman, James Goodman, and their

family members (the "**Goodman Family**")) want to use the control granted by a chapter 11 case,

and Mr. Nelms' credibility, to ensure that they are not the targets of the investigation into, and

eventual litigation to undo, the wholesale looting of the Debtor and its subsidiaries that occurred

prepetition.

3.      The Motion to Convert is the Debtor's latest gambit to delay this proceeding and

avoid any accountability for the Goodman Family.  Over the last two years, the Goodman Family

and other insiders of the Debtor have stripped the Debtor and its subsidiaries of valuable assets

and transferred the proceeds to themselves and entities under their control.  The first time the

Original Petitioners heard anything about a potential motion to convert was from James

Goodman's counsel on December 7, 2022, the night before his deposition was scheduled to take

place.  Mr. Goodman's counsel then used the suggestion of a future motion to convert as grounds

to refuse to produce his client for his scheduled deposition.  The Goodman Family has been

desperately trying to avoid appearing for depositions since this case began.  That is because the

documents produced so far show millions of dollars in transfers by the Debtor and its subsidiaries

to various Goodman Family members and companies they or other insiders control.

4.      Now, the Debtor claims it wants to proceed with this case in a chapter 11.  Knowing

that the Majority Noteholders, the other creditors, and, most likely, the Court would not allow the

Goodman Family to run a chapter 11 case that will necessarily involve investigating claims against

---

[6]      Motion to Convert ¶ 15.

[7]      Email from David Parham to John Goodman dated December 7, 2022, attached here as **Exhibit A**.

DMS 300575656

those same family members, the Debtor retained Mr. Nelms as a so-called independent director. The Debtor has thus admitted the need for an independent fiduciary in this case, and while the Majority Noteholders have confidence in Mr. Nelms (and would be happy to have him serve as the Debtor's permanent chapter 7 trustee), the proposed arrangement here still leaves the Goodman Family in ultimate control. Because the Goodman Family controls substantially all of the Debtors' outstanding shares, the Goodman Family can just as easily remove Mr. Nelms from the board as they appointed him. Further, pursuant to the written resolution appointing Mr. Nelms as director, John Goodman specifically retains all the management powers he had prior to Mr. Nelms' appointment. The Debtor is also retaining its prepetition counsel, who took direction from John Goodman throughout this case and prior thereto. While it appears that Mr. Nelms would nominally be in charge of the Debtor (until the Goodman Family decides otherwise), the day-to-day operations will still be handled by the same people (Goodman family members) that were handling them prepetition.

5.    This is important because it is apparent that the Debtor plans to point the finger at its former CEO, James Frinzi, as the bad actor here. While there is no doubt that James Frinzi is a bad actor and that the Debtor will have multiple causes of action against him and his affiliates, the discovery produced to the Original Petitioners shows that the Debtor may also have millions of dollars' worth of claims against the Goodman Family. Over the last two years, the Debtor and its subsidiaries have transferred close to $4 million dollars to the Goodman Family and affiliates under highly questionable circumstances. In particular, since January 2021, the Debtor has paid close to $1 million to, or for benefit of, John Goodman as well as over $1.1 million to James Goodman or companies he controls. John Goodman is also obligated under a put-right to purchase approximately $8 million worth of preferred equity interests currently held by the Debtor in

4

another one of John Goodman's companies.  This put right is exercisable by the Debtor now, yet the Debtor has refused to require John Goodman to honor this obligation.  This is on top of numerous other payments to Goodman Family members discussed below, and this may just be the tip of the iceberg as discovery in this case just began and is still not complete.  The Debtor may well have myriad claims against John Goodman, James Goodman, and other Goodman Family members, the very people who own and a control a majority of the stock of the Debtor and appointed Mr. Nelms as a director (and whom they can remove if they choose).

6.      There is a very real conflict of interest between the Goodman Family's pecuniary interests and the interests of the Debtor's estate and its creditors.  A proper fiduciary of this estate would conduct a thorough investigation of the facts and circumstances around the millions of dollars transferred to the Goodman Family and their affiliates, both prepetition and postpetition, and, if warranted, would prosecute any claims against the Goodman Family and their affiliates.  However, so long as any Goodman Family members retain any control over the Debtor or have any role here, the Court and the creditors cannot trust that those fiduciary duties will be fulfilled.

7.      Nor is appointing a chapter 11 trustee (whether it is Mr. Nelms or someone else) the appropriate solution in this case under the circumstances.  The Debtor has already expressly stated that it would be liquidating rather than reorganizing.  There are no business operations.  The Debtor has further admitted that its primary assets are litigation claims against, among others, James Frinzi and his companies and an entity called 18290 NW 11th, LLC.  Liquidating these causes of action, along with causes of action against members of the Goodman Family and their affiliates, is something that can just as easily be done (if not done better) in a chapter 7 case by an experienced chapter 7 trustee with lower administrative costs.  There is no need for this estate to incur the added expense of a chapter 11 case, including the costs of preparing a disclosure

5

statement and plan, soliciting votes, and moving forward with what in all likelihood would be a contested confirmation hearing. The Debtor also lacks the funds necessary to prosecute a chapter 11 case, and the Majority Noteholders, Trustee, and Collateral Agent will oppose any attempt by the Debtor to use the Debtor's remaining cash to fund such a proceeding, particularly if the Goodman Family has any involvement with the case. As a result, cause would exist for converting this case back to chapter 7 because the estate would be incurring substantial expenses with no likelihood of rehabilitation.

8.      Alternatively, if the Court finds that the record is not sufficiently developed to determine whether cause exists to convert this case from chapter 11 to chapter 7, the Court should defer ruling on the Motion to Convert to allow the Original Petitioners time to conduct appropriate discovery to supplement the record. This Motion to Convert has been set for hearing on just 4 business days' notice.[8] Obviously, the Original Petitioners have not had any opportunity to conduct discovery specifically on the issues they believe are presented in the Motion to Convert. The Original Petitioners request, at a minimum, that the Court allow sufficient time to for such discovery before ruling on the Motion to Convert.[9]

## BACKGROUND

I.      **The Notes and the Debtor's Default**

9.      The Debtor is part of a defunct group of businesses with no employees and no business operations. It appears that the Debtor does not even have a board of directors. As part of its prior bankruptcy proceedings in the United States Bankruptcy Court for the Southern District

---

[8]    It appears that the Court viewed this matter as raising purely legal issues -- whether the Debtor had an absolute right to convert the case -- and did not set this matter as evidentiary hearing.

[9]    As the undersigned indicated at the recent status conference before this Court, the Original Petitioners do not contest the Debtor's standing to bring the Motion to Convert.

of Texas under Case No. 17-31575, Goodman Networks issued 8% Senior Secured Notes due 2022 (the "**Notes**") to provide financing to the reorganized business. The other entities that guaranteed the Notes are GNET ATC, LLC ("**GNET**"); Multiband Field Services, Inc. ("**MFS**"); and Goodman Network Services, LLC ("**GNS**" and together with Goodman Networks, GNET, and MFS, the "**Obligors**").

10.   The Notes were issued by Goodman Networks pursuant to that certain indenture (as amended, restated or otherwise modified from time to time, the "**Indenture**") dated as of May 31, 2017 by and among Goodman Networks as Issuer, UMB Bank, National Association as Trustee (the "**Trustee**"), and U.S. Bank National Association, as Collateral Agent (the "**Collateral Agent**") in the original principal amount of $112,500,000. The other Obligors each, jointly and severally, unconditionally guaranteed all obligations under the Indenture.

11.   In addition to the Indenture, the Obligors, the Trustee, and the Collateral Agent also executed that certain Pledge and Security Agreement (the "**Pledge and Security Agreement**") dated as of May 31, 2017 by and among Goodman Networks, each of the Grantors from time to time party thereto, and the Collateral Agent. Under the Pledge and Security Agreement, the Obligors granted a lien on all or substantially all their assets to the Collateral Agent to secure repayment of the Notes.

12.   Under the terms of the Indenture, the Notes matured on May 31, 2022 (the "**Maturity Date**"), and all amounts, including principal and interest, then became due and payable. The Obligors failed to make any payments on the Notes on the Maturity Date.

13.   After the Maturity Date, the Majority Noteholders demanded payment on the Notes from the Obligors. Representatives of the Debtor, including then-CEO James Frinzi and John Goodman, responded and the parties engaged in discussions. These discussions included

7

purported promises of payment as well as an offer to enter into a forbearance agreement for a delayed payment. The Debtor ultimately stopped responding to inquiries from the Majority Noteholders and no forbearance agreement was executed nor were any payments made on the Notes.

14.     When it became clear that the Debtor had no intention of entering into a forbearance agreement or otherwise addressing its default on the Notes, the Original Petitioners filed an involuntary petition against the Debtor. After initially contesting the petition, the Debtor withdrew its opposition in an email to the Court on December 9, 2022. The Court entered the order for relief under chapter 7 on December 12, 2022 [Docket No. 132]. On December 14, 2022, the U.S. Trustee appoint Scott M. Seidel as interim chapter 7 trustee for the Debtor [Docket No. 141].

## II.    The Debtor's Transfers and Assets

15.     In connection with the discussions noted above, the Debtor provided the Majority Noteholders with a financial presentation dated June 8, 2022 (the "**June Presentation**"). A copy of the June Presentation is attached here as **Exhibit B**. The June Presentation contained financial information for the Debtor and the other Obligors, including current assets and liabilities as well a cash flow statement for January 1, 2022 through the Maturity Date.

16.     This cash flow statement reflected that the Obligors had over $66 million in "unrestricted cash" at the beginning of 2022.[10] By the Maturity Date, however, they had less than $500,000 in "unrestricted cash." Over the 5 months prior to the Maturity Date, the Debtor and the other Obligors transferred away over $65 million in cash leaving themselves unable to pay the Notes. The vast majority of this money was transferred to insiders of the Debtor, including then-CEO James Frinzi and his companies, the Goodman Family and their affiliates, and other related

---

[10]    *See* Exhibit B, slide 10.

8

parties.  James Goodman was the chairman of the board of directors of the Debtor during this time period and other Goodman Family members, including Jason Goodman and Joseph Goodman may have been on the board during this period.[11]

A.    Transfers to James Frinzi's Companies

17.    Between January 11, 2022 and January 28, 2022, the Obligors loaned $44 million to American Metals Recovery and Recycling, Inc. ("**AMRR**").  AMRR, a public company, is majority-owned and controlled by James Frinzi (or companies owned and controlled by him).  At the time the loan was made, James Frinzi was ***also*** the CEO of the Obligors and James Goodman was the chairman of the board of directors of the Debtor.  This loan is evidenced by a note (the "**AMRR Note**") that was executed on behalf of GNET by James Goodman and on behalf of AMRR by James Frinzi.  A copy of the AMRR Note is attached here as **Exhibit C**.  The Debtor has recently alleged that James Frinzi forged James Goodman's signature on the AMRR Note but has presented no evidence for this, nor, to the Original Petitioners' knowledge, has the Debtor made any attempt to recover those funds.  It strains credulity that $44 million could be paid out without anyone raising the issue with the board of directors.  AMRR has since defaulted on the AMRR Note having failed to make any payments that have come due.  In its SEC filings, AMRR has disclosed that it is "in negotiation with [GNET] to modify the loan and its terms."  The Majority Noteholders will not consent to any amendment of the terms of the AMRR Note (which is Collateral under the Security Agreement) and further submit that the Debtor should have no control over any such negotiations with AMRR.

---

[11]   It remains unclear who was (or is) on the board of directors of the Debtor at any given time.  Despite repeated requests by the Original Petitioners, the Debtor has not provided this very basic information claiming, incredibly, that "it does not have visibility to these records."  During the partial deposition of the Debtor's corporate representative, Howard Konicov, on Monday, December 12, he testified that he did not know for sure who was on the Debtor's board of directors at any point.

DMS 300575656

18.     In addition to the AMRR Note, the June Presentation states that $4.4 million was transferred to Multiband Global Resources, LLC as "loans issued" (the "**Multiband Transfer**"). Multiband Global Resources, LLC is owned and managed by James Frinzi and is the parent company of AMRR.  The Debtor, however, has not provided any notes or other documents supporting the existing of any loan obligation in connection with the Multiband Transfer.

B.     Transfers to the Goodman Family and Affiliates

19.     In addition to the transfers disclosed in the June Presentation, the Debtor also disclosed millions of dollars worth of transfers to the Goodman Family and their affiliates that occurred in 2021 and early 2022.  Attached here as **Exhibit D** is a list of those transfers provided by the Debtor.  This included:

- $513,742.92 on behalf of John Goodman

- $1,152,466.01 to James Goodman and companies under his ownership and/or control.

- $723,850.79 to Jason Goodman

- $22,955.87 to Jonathan Goodman

- $483,519.54 to Joseph Goodman

- $129,803.82 to Madison Goodman

- $250,000 to Jake Goodman

In addition to these amounts, the Debtor transferred $450,000 to John Goodman pursuant to a postpetition consulting agreement (the "**Goodman Consulting Agreement**") (a copy of which is attached here as **Exhibit E**).  It is not clear what, if any, services John Goodman provided to the Debtor, which has no business operations, in exchange for such payment.  Altogether, the Debtor and the other Obligors have transferred over $3.7 million to Goodman Family and affiliates since January 2021.

10

20.    While many of these transfers are listed as "payroll," many stand out, such as a $491,725 transfer to Jason Goodman on September 13, 2021 and a $377,967.39 transfer to Joseph Goodman on the same day.  The Debtor also transferred close to $700,000 to People NQ, Inc. (a company owned and controlled by James Goodman) and $250,000 to Jake Goodman, both for "Consulting."  The Original Petitioners also learned that the $513,742.92 transferred to Prosperity Bank and labeled "Genesis loan" was actually paid on account of a personal obligation of John Goodman to Prosperity Bank.  This was done on account of an alleged severance agreement of which there is no documentation or other evidence.[12]

21.    In addition, after negotiations with the Debtor failed to produce any progress on payment of the Notes, the Majority Noteholders directed the Trustee and the Collateral Agent to begin exercising remedies against the collateral securing the Notes, including by exercising rights under deposit account control agreements.  Upon seizing one of the Debtor's bank accounts at Prosperity Bank that was pledged as security for the Notes, it was revealed that the day prior to the Collateral Agent's exercise of remedies, over $4.4 million had been transferred from that account to pay off an obligation owed by Genesis Networks, one of James Goodman's companies.[13]  Discovery produced by the Debtor revealed that James Goodman had attempted to pledge these funds, belonging to the Debtor and subject to a valid and enforceable deposit account control agreement in favor of the Collateral Agent, as collateral for loan to Genesis Networks.  The discovery also indicates that it was James Goodman who worked with Prosperity Bank to transfer

---

[12]    A copy of email correspondence produced by the Debtor between Howard Konicov of GFCI, the Debtor's financial advisor, and John Goodman regarding this alleged obligation is attached here as **Exhibit F**.

[13]    Upon demand from the Collateral Agent and the Trustee, Prosperity Bank reversed the transfers and is holding the funds in a segregated account.

11

the funds out of the account before the Trustee and Collateral Agent could enforce the terms of the Indenture and the Pledge and Security Agreement.

22.    The foregoing likely only scratches the surface of what needs to be investigated in this case, as the discovery being conducted by the Original Petitioners was cut off by the Debtor's latest delaying tactic in filing the Motion to Convert in the middle of the first deposition to actually go forward.    At a minimum, the evidence uncovered to date shows that this case requires a thorough investigation into the timing and circumstances of the transfers to the Goodman Family and their affiliates by disinterested professionals who have no connection with the Goodman Family.    This would include the transfers that have already been identified, but further investigation is warranted into any additional claims that may exist.    Such an impartial investigation cannot happen when the parties undertaking such investigation have any connections at all to the Goodman Family.

C.    Other Transfers

23.    The June Presentation and discovery have also revealed other transfers that warrant a thorough investigation.    In February 2022, the Obligors spent approximately $17 million to repurchase certain of the Notes.    These Notes were purchased from an entity related to a then-board member of AMRR.

24.    In March 2022, the Obligors entered into a "settlement" with 18920 NW 11th LLC, an entity that was allegedly a preferred shareholder of the Debtor and is controlled by the former AMRR board member mentioned above.    A copy of that settlement agreement is attached here as **Exhibit G**.    Under the terms of this alleged settlement, the Obligors paid over $14 million in cash and allegedly conveyed $22 million of the AMRR Note, the receivable for the Multiband Transfer, and other assets to 18920 NW 11th LLC.    However, the Debtor has produced no evidence of any

12

obligations owed to 18920 NW 11th LLC that would need to be settled.  As noted above, James

Goodman was the chairman of the Debtor's board of directors at the time these transfers occurred.

    D.    <u>Class E Preferred Units in Goodman Telecom Holdings, LLC</u>

    25.    Included in the Debtor's assets in the June Presentation are "Class E Preferred

Units, Goodman Telecom Holdings, LLC" with a value of $8 million.[14]  These units were

transferred to the Debtor as part of the purchase price under an asset purchase agreement by and

among Goodman Telecom Services, LLC ("**GTS**") (a subsidiary of Goodman Telecom Holdings,

LLC ("**GTS Holdings**")), the Debtor, and GTS Holdings dated June 30, 2020 (the "**GTS APA**").

A copy of the GTS APA is attached here as **<u>Exhibit H</u>**.  Under the terms of the GTS APA, GTS

purchased 2 business lines from the Debtor for an aggregate purchase price of $41 million.

    26.    Of that amount, $8 million was in the form of 1,516,519 Class E Units in GTS

Holdings with a per unit purchase price of $5.275.[15]  Section 6.7(e) of GTS Holdings' company

agreement provides that, after the first anniversary of the effective date of the company agreement,

a holder of Class E Units (i.e., the Debtor) can demand that John Goodman purchase all of that

holder's Class E Units at the Original Per Unit Purchase Price plus the value of any accrued but

unissued PIK Units.[16]  In other words, under the terms of these documents, the Debtor currently

has the right to demand that John Goodman purchase the Class E Units for their full face value of

approximately $8 million plus the value of any accrued PIK Units.  So far, the Debtor has not

exercised this right.

---

[14]    Exhibit B, slide 7.

[15]    The Class E Units are collateral under the Pledge and Security Agreement.

[16]    The GTS Holdings Company Agreement provides that the Class E Units accrue the right to distributions at an annual rate of 10% of the Original Per Unit Purchase Price multiplied by the total number of units.  Such distributions are supposed to paid in additional Class E Units (PIK Units) on December 31st of each year.

13

27.     On November 23, 2022, the Debtor provided the Original Petitioners with a revised asset list (the "**November Asset List**") (attached here as <u>**Exhibit I**</u>) that listed the Class E Units with a value of $3 million.  No explanation for this reduction in value was given.  In his partial deposition, Howard Konicov, the Debtor's corporate representative designated under Federal Rule of Civil Procedure 30(b)(6) and financial advisor, testified that he prepared the November Asset List.  When asked why he was now valuing the Class E Units at $3 million instead of $8 million, as he had previously valued it, he testified that this was an estimate he had come up with based on a discussion with either his counsel or with John Goodman, and that the value could be understated or overstated.  Counsel for the Debtor has told the Original Petitioners that this put right "went away," but did not explain how, when, or indicate what value the Debtor received in exchange for a presently exercisable put right being terminated.

28.     At a minimum, the Debtor must be required to produce all documents and communications related to John Goodman's obligation to purchase the Class E Units immediately and not permit Mr. Nelms (who was appointed by the Goodman Family) to exercise control over any investigation into the facts surrounding John's Goodman's obligation to purchase the Class E Units.

### III.    The Retention of Mr. Nelms

29.     At the Court status conference on December 13, 2022 (the "**Status Conference**"), the Original Petitioners learned for the first time that the Debtor had retained Mr. Nelms as an independent director of the Debtor.  As indicated above, according to the Debtor's counsel, having him on board "could be helpful in fighting a trustee motion."[17]  The Debtor subsequently provided the Original Petitioners with a copy of Mr. Nelms' engagement letter dated December 9, 2022 and

---

[17]   *See* Exhibit A.

DMS 300575656

executed by John Goodman on December 11, 2022 (the "**Engagement Letter**") (attached here as **Exhibit J**) and the written consent of the Debtor's shareholders appointing Mr. Nelms as a director dated December 12, 2022 (the "**Written Consent**") (attached here as **Exhibit K**).[18]

30.     At the Status Conference, counsel for the Debtor represented that Mr. Nelms would be in charge of the Debtor's chapter 11 proceeding and indicated that the creditors should be satisfied with Mr. Nelms.  As has been stated, the undersigned has high regard for, and takes no issue with, Mr. Nelms or his qualifications.  The Majority Noteholders are not satisfied, however, with the arrangement created by the Goodman Family because it still leaves the Goodman Family involved with the management of the Debtor and with ultimate control over who the directors of the Debtor are.[19]  As has been set forth extensively above, there are many potential causes of action that may be brought against the Goodman Family and others.  While it may be in the Goodman Family's interest to have a hand in the investigation and disposition of claims against them, it is not in the best interests of the Debtor's estate or its creditors.  What is in the best interests of the Debtor's estate and its creditors is to have the Goodman Family fully divested of any control over, or involvement with, the Debtor in any capacity.

31.     Under the terms of the Engagement Letter, Mr. Nelms is described as "the sole independent director" of the Debtor.  The Engagement Letter further states that Mr. Nelms "shall have the powers and duties of a trustee set forth in Title 11 of the United States Code."[20]  The Written Consent, however, states that Mr. Nelms is appointed as "**an** independent director."  In

---

[18]   Though the engagement letter was signed by John Goodman on December 11, 2022, Howard Konicov was apparently unaware of this development on December 12, 2022 despite testifying at his depositions that he had conferred with counsel for the Debtor on the evening of December 11, 2022.

[19]   *See* Written Consent.

[20]   The Debtor and Mr. Nelms are free to describe the engagement however they like, but the "the powers and duties of a trustee set forth in" the Bankruptcy Code may only be conferred on an individual upon a court order directing the appointment of a trustee and the U.S. Trustee appointing such individual as trustee.

15

discussions with Mr. Nelms, as suggested by the Court, Mr. Nelms candidly conceded that he did

not view himself as having the powers and duties of a chapter 11 trustee under section 1104 of the

Bankruptcy Code.  As a result, he is not specifically tasked with investigating the Debtor and its

operations nor is he obligated to report on the findings of any such investigation.[21]

32.     As noted above, the Debtor has not been forthcoming regarding the composition of

its board, and it is unclear if there are any other board members at present.  Further, if the

shareholders can appoint Mr. Nelms by written consent, they can remove him by written consent,

too.  Nothing in the Engagement Letter or the Written Consent limits the power of the Goodman

Family to remove Mr. Nelms from his position for any reason or no reason at all, to change the

scope of his duties and authority, or to appoint additional directors.

33.     The Written Consent also specifically provides "that the authority of John

Goodman granted pursuant to the terms of that certain consulting agreement, shall continue in full

force and effect in accordance with the terms thereof."  This would appear to be the Goodman

Consulting Agreement, discussed above.  Under the Goodman Consulting Agreement, John

Goodman acted as a manager for the Debtor in exchange for a $450,000 non-refundable fee,

though it is not clear what services he has performed for a non-operating debtor in exchange for

such payment.  Under the terms of the Written Consent, John Goodman retains all his management

rights under the Goodman Consulting Agreement notwithstanding Mr. Nelms' appointment.

<u>**ARGUMENT**</u>

I.     <u>**The Bankruptcy Code Does Not Give the Debtor an Absolute Right to Convert**</u>

34.     Section 706(a) of the Bankruptcy Code provides that "The debtor may convert a

case under this chapter to a case under chapter 11, 12, or 13 of this title at any time, if the case has

---

[21]   *See* ¶¶ 43 and 44, below.

DMS 300575656

not been converted under section 1112, 1208, or 1307 of this title."[22]  This ability to convert a

chapter 7 case, however, is not an absolute right.  As the Supreme Court held in *Marrama v.*

*Citizens Bank of Massachusetts*, a bankruptcy court has discretion to deny a motion to convert

filed under section 706 if the court finds that conversion "merely postpones the allowance of

equivalent relief and may provide a debtor with an opportunity to take action prejudicial to

creditors."[23]  The Supreme Court noted that if "cause" existed to convert the case back to chapter

7, it was "tantamount to a ruling that the individual does not qualify as a debtor" under the other

chapter.[24]  And under section 706(d), "a case may not be converted to a case under another chapter

of this title unless the debtor may be a debtor under such chapter."[25]

35.      Thus, in the Supreme Court's view, if cause exists to convert a case from chapter 11

to chapter 7, the debtor is essentially ineligible to be a debtor under chapter 11, and the court may

deny the motion to convert.  The Supreme Court clarified its holding in *Marrama* in *Law v. Siegel*,

a case concerning the proper scope of section 105(a).[26]  In that case, the parties arguing for an

expanded view of the scope of section 105(a) argued that *Marrama*, stood for the proposition that

a court could use section 105(a) to go beyond the Bankruptcy Code, by, for example, denying a

motion to convert under section 706(a) because cause existed to convert it back.[27]  The Supreme

Court disagreed, noting that even absent the justification under section 706(d), the ruling in

*Marrama* "suggests that in some circumstances a bankruptcy court may be authorized to dispense

---

[22]   11 U.S.C. § 706(a).

[23]   549 U.S. 365, 375 (2007).

[24]   *Id.* at 373-74.

[25]   11 U.S.C. § 706(d).

[26]   571 U.S. 415 (2014).

[27]   *Id.* at 425-26.

17

with futile procedural niceties in order to reach more expeditiously an end result required by the Code."[28]  In other words, if the ultimate result mandated by the Bankruptcy Code is that the case should be one under chapter 7, the court is under no obligation to first convert the case to chapter 11 only to then turn right around and convert it back to chapter 7.

36.      While the debtor in *Marrama* was attempting to convert his chapter 7 case to chapter 13, *Marrama's* holding is not limited to such cases.[29]  As courts have applied *Marrama* to cases where a debtor in a chapter 7 case seeks to convert the case to chapter 11, they have held that denial of a motion to convert is appropriate where cause would exist to convert the chapter 11 case back to chapter 7.[30]  Even prior to *Marrama*, courts would deny a motion to convert a chapter 7 case to chapter 11 where cause existed to immediately convert the case back to chapter 11.[31] This is because "[t]o permit conversion to Chapter 11 in those circumstances would be futile and a wasted act."[32]  As the Eleventh Circuit stated, requiring the bankruptcy court to "go through the formality of granting conversion and then, in the next breath, dismiss the case or convert it to a Chapter 7 . . . would place form over substance and defy common sense."[33]

---

[28]   *Id.* at 426.

[29]   *See, e.g.*, *Dan Thomason & Assocs., LLC v, Breakwell*, No. 3:10-CV-00379-K, 2010 WL 3385025, at *1 (N.D. Tex. Aug. 25, 2010) ("[*Marrama's*] holding is not limited to a request to convert to Chapter 13, but its principles apply equally to Chapter 11 conversions.").

[30]   *Id.* ("Courts readily apply [*Marrama*] to deny Chapter 7 to Chapter 11 conversions if facts establish that one of the 'causes' to dismiss or convert a Chapter 11 case are present."); *In re Euro-Am. Lodging Corp.*, 365 B.R. 421, 425 (Bankr. S.D.N.Y. 2007) ("*Marrama* suggests that if 'cause' exists to convert or dismiss a hypothetical chapter 11 case, the chapter 7 debtor seeking to convert to chapter 11 is ineligible for relief under that chapter within the meaning of § 706(d)"); *In re Broad Creek Edgewater, LP*, 371 B.R. 752, 758 (Bankr. D.S.C. 2007) ("Thus, if 'cause' . . . exists to convert or dismiss the Chapter 13 or 11 case then it would be procedurally and practically inefficient to grant a motion to convert a Chapter 7 case to a case under Chapter 13 or 11 only to immediately dismiss the case or reconvert it to a Chapter 7, and therefore, the motion to convert should be denied.").

[31]   *See, e.g., In re Eugene Alexander, Inc.*, 191 B.R. 920, 924 (Bankr. M.D. Fla. 1994)   ("The court should nevertheless not permit conversion if 'cause' exists to convert a Chapter 11 case to a case under Chapter 7 or to dismiss a Chapter 11 case pursuant to the provisions of Section 1112(b) of the Bankruptcy Code.")

[32]   *Id.*

[33]   *In re Daughtrey*, 896 F.3d 1255, 1276 (11th Cir. 2018).

DMS 300575656

37.     Bankruptcy courts, and district courts (on appeal), in this District agree.  In *Dan Thomason & Associates*, Judge Jernigan denied a motion to convert a chapter 7 case to chapter 11 brought by the debtor.[34]  In ruling on the motion, Judge Jernigan found that *Marrama* applied and that it gave the court "equitable discretion to decline to allow conversion by a Chapter 7 debtor to Chapter 11."[35]  In denying the motion, Judge Jernigan stated that allowing conversion "would be an exercise in futility."[36]  This was because the case would be a liquidation regardless if it were in chapter 7 or chapter 11, but that the debtor had "no cash to fund a Chapter 11 case."[37]  Further, the court noted that "[t]he Chapter 7 trustee is uniquely qualified to handle the business of liquidating assets in a bankruptcy case."[38]  Ultimately, Judge Jernigan found that if the case were converted to chapter 11, "there would be an immediate need to appoint a chapter 11 trustee."[39]  Thus, conversion would be an "exercise in futility" just as in *Marrama*.[40]  Judge Kinkeade affirmed Judge Jernigan's ruling on appeal, holding that "a debtor does not have an unqualified right to convert a Chapter 7 proceeding into a Chapter 11 reorganization" and that the bankruptcy court's determination to deny the motion was correct.[41]

38.     Similarly, in *In re Foster*, then-Judge Nelms denied a motion filed by the debtor to convert a chapter 7 case to chapter 11.[42]  In making his decision, Judge Nelms acknowledged that

---

[34]  *In re Dan Thomason & Assocs., LLC*, Case No. 07-33871-SGJ.

[35]  Hr'g Tr., Oct. 13, 2009, 66:22-24, Case No. 07-33871-SGJ, Docket No. 128.  A copy of the relevant portions of this transcript are attached here as **Exhibit L**.

[36]  *Id.* at 67:3-7.

[37]  *Id.* at 67:16-19.

[38]  *Id.* at 68:2-5.

[39]  *Id.* at 69:1-5.

[40]  *Id.* at 69:6-10.

[41]  *Dan Thomason & Assocs.*, 2010 WL 3385025 at *2.

[42]  *In re Foster*, Case No. 12-43804-RFN.  (The case was reassigned to Judge Morris on July 29, 2019, when the debtor filed a motion to reopen the case.)

DMS 300575656

*Marrama* was the controlling authority.[43]  Judge McBryde affirmed Judge Nelms' decision on

appeal.[44]  On appeal, the debtor attempted to argue that Judge Nelms had erred in denying the

motion because *Law v. Siegel* had circumscribed a bankruptcy court's ability to deny a motion to

convert under section 105(a).[45]  Judge McBryde disagreed noting that in *Law v. Siegel* itself, the

Supreme Court had referenced *Marrama* and found that *Marrama* did not endorse using section

105(a) to "contravene express provisions of the Code."[46]  Rather, what *Marrama* endorsed was

"that in some circumstances a bankruptcy court may be authorized to dispense with futile

procedural niceties in order to reach more expeditiously an end result required by the Code."[47]

Judge McBryde went on to hold that the bankruptcy court had the power to deny the debtor's

motion to convert based on *Marrama* and consistent with *Law v. Siegel*.[48]

  39. Accordingly, this Court has the power to dispense with futile procedural niceties

and deny the Motion to Convert if cause would exist to convert the case back to chapter 7.

**II. <u>Cause Would Exist to Convert this Case to Chapter 7</u>**

  40. Section 1112 of the Bankruptcy Code provides that the court may convert a

chapter 11 case to chapter 7 "for cause."[49]  Cause is not defined, but "[s]ection 1112 sets forth a

nonexhaustive list of factors to assist the bankruptcy court in determining when cause exists.

---

43 Hr'g Tr., Dec. 15, 2014, 3:3-7, Case No. 12-43804-RFN, Docket No. 303.  A copy of this transcript is attached
  here as **<u>Exhibit M</u>**.

44 *In re Foster*, 530 B.R. 650, 651 (N.D. Tex. 2015), *aff'd* (Dec. 1, 2015).

45 *Id.* at 653.

46 *Id.* at 653-654 (quoting *Law v. Siegel*, 571 U.S. 415, 426 (2014)).

47 *Id.* at 653.

48 *Id.* at 654.

49 11 U.S.C. § 1112(b)(1).

Those factors include the 'diminution of the estate and absence of a reasonable likelihood of rehabilitation' and an inability to effectuate a reorganization plan."[50]

41.      As the Debtor has stated, it has no business of any kind to rehabilitate here.  The Debtor claims that it intends to file a plan of liquidation if it's allowed to remain in chapter 11.[51] Thus, just like the debtor in *Dan Thomason & Assocs.*, this case will be a liquidation regardless of whether it is in chapter 11 or chapter 7.  Also like the debtor in *Dan Thomason & Assocs.*, the Debtor here lacks the cash to fund a chapter 11 case.  What little cash is left at the Debtor, and all other assets that can be converted into cash, are fully encumbered by the Collateral Agent's valid, perfected, and enforceable liens under the Pledge and Security Agreement.  The Collateral Agent, the Trustee, and the Majority Noteholders will not consent to the use of their cash collateral to fund a chapter 11 case.  The Debtor will also not be able to provide adequate protection to the Collateral Agent and the Trustee because the Debtor has no unencumbered assets and its primary non-cash assets are litigation claims with no assured or certain outcomes.  As a result, the very first step in this chapter 11 case would be a contested cash collateral hearing.  In sum, allowing the Debtor to be in chapter 11 would result in a constant and material diminution of the estate with no hope of rehabilitating the Debtor.

42.      Cause also exists to convert a chapter 11 case where the Debtor's prepetition management engaged in fraudulent transfers and otherwise cannot be trusted to properly discharge their duties.[52]  Such conduct can also be grounds for the appointment of a chapter 11 trustee.[53]

---

[50]   *Tuli v. U.S. Trustee*, 124 F. App'x 830, 831 (5th Cir. 2005) (citing 11 U.S.C. § 1112(b)).

[51]   Motion to convert ¶ 15.

[52]   *See, e.g.*, *Eugene Alexander, Inc.*, 191 B.R. at 924.

[53]   11 U.S.C. § 1104(a)(1) (trustee may be appointed "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the debtor").

DMS 300575656

Here, the Debtor has clearly recognized that its prepetition management leaves much to be desired -- hence the attempt to avoid the appointment of a trustee by engaging Mr. Nelms. John Goodman and James Goodman are potential litigation targets, and several of the other Goodman Family members were board members at the time of the most egregious transfers revealed so far.

43. In an attempt to stave off conversion or the appointment of a chapter 11 trustee, however, the Debtor has brought in Mr. Nelms as an "independent director." But this does not solve the Debtor's problems. First, as set forth above, the Goodman Family retains ultimate control over the selection (and removal) of directors, and John Goodman remains in his managing consultant role.

44. Second, and significantly, an independent director is not a substitute for a true independent, disinterested fiduciary like a trustee. The concept of an "independent director" has no meaning under the Bankruptcy Code. The Bankruptcy Code requires a trustee to be "disinterested," a different concept entirely. A trustee has a formal duty under section 1106 to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business" and to file a statement regarding such investigation."[54] An independent director exercising the powers of a debtor in possession, like Mr. Nelms, has no such duty.[55] A trustee also has a legal duty under 18 U.S.C. § 3057 to report actual or suspected bankruptcy crimes to the U.S. Attorney, which may well be the case here given the transaction history. Again, an independent director like Mr. Nelms has no such responsibility.

---

[54] 11 U.S.C. § 1106(a)(3) and (4).

[55] *Id.* § 1107(a).

22

45.     The independent director concept has been employed here to maintain the Goodman Family's (and their preferred counsel's) control over the Debtor and to deflect investigations of, and potential litigation against, the Goodman Family and on to other targets (i.e., James Frinzi).  At a minimum, the continued presence of John Goodman in management and the Goodman Family as the power behind the Debtor threatens the legitimacy of any investigation conducted by Mr. Nelms.  For the Majority Noteholders to truly have any confidence that the Debtor's estate will be administered fairly and expediently, free from any involvement by John Goodman and the Goodman Family, the Goodman Family must be fully divested from any position of authority, control, or influence at the Debtor.

46.     And while Mr. Nelms is certainly qualified to be a true chapter 11 trustee if directed by the court and appointed by the U.S. Trustee, it is much more in the interests of creditors for this case to remain in chapter 7.  There is no business here that can be reorganized under chapter 11.  Further, since the current management must be ousted for a proper administration of the Debtor's estate anyway, there is no benefit that will be gained by having a continuity of management for the liquidation process.  Given the lack of any business to reorganize, the Court should be guided by what is in the best interests of creditors.  Regardless of which chapter this case proceeds under, it will be a liquidation.  Proceeding under chapter 7 will result in lower administrative costs relative to a chapter 11 case, which will increase the ultimate recoveries to creditors.  As a result, a chapter 7 case is in the best interests of the creditors.

## III.   If the Court Does Not Deny the Motion to Convert, it Should Allow Time for Discovery

47.     The Original Petitioners' efforts at discovery have been repeatedly hampered by delaying tactics from the Debtor.  While the Debtor has produced some documents, no depositions have been completed.  At this point, the Majority Noteholders have only an incomplete picture of

23

the circumstances that led to the Debtor and the other Obligors burning through $65 million of their collateral in 5 short months.  As this Motion to Convert is being heard on only 4 business days notice, there certainly has not been time to develop the picture further.  Before the Court displaces the duly appointed interim chapter 7 trustee and hands control of the Debtor back to John Goodman and the Goodman Family, the Original Petitioners should be given an opportunity to conduct appropriate discovery and show that cause exists to keep this case in chapter 7.

**WHEREFORE**, the Original Petitioners respectfully request that the Court deny the Motion to Convert, or, in the alternative, defer any ruling on the Motion to Convert until after the Original Petitioners have had an opportunity to conduct appropriate discovery, and grant such other and further relief as may be just and proper.

Dated:  December 17, 2022  
      Houston, Texas

Respectfully Submitted,

*/s/  Philip M. Guffy*  
Philip M. Guffy (TX Bar No. 24113705)  
**HUNTON ANDREWS KURTH LLP**  
600 Travis Street, Suite 4200  
Houston, Texas  77002  
Tel:     713-220-4200  
Fax:     713-220-4285  
Email:  pguffy@huntonak.com

 -and-

Paul N. Silverstein  
Brian Clarke  
**HUNTON ANDREWS KURTH LLP**  
200 Park Avenue  
New York, NY 10166  
Tel:     (212) 309-1000  
Email: psilverstein@huntonak.com  
       brianclarke@huntonak.com

*Counsel for the Original Petitioners*

24

## CERTIFICATE OF SERVICE

I certify that on December 17, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

*/s/ Philip M. Guffy*
Philip M. Guffy

DMS 300575656