IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS (DALLAS)

| | |
|---|---|
| In Re: | ) Case No. 22-31641-mvl7 |
| | ) Dallas, Texas |
| GOODMAN NETWORKS, INC., GOODMAN | ) |
| NETWORKS INC. D/B/A GOODMAN | ) |
| SOLUTIONS, | ) December 19, 2022 |
| | ) 9:33 a.m. |
| Debtor. | ) |
| | ) |
| ------------------------------ | ) |

TRANSCRIPT OF HEARING ON

MOTION TO CONVERT CASE FROM CHAPTER 7 TO 11. FEE AMOUNT $922
FILED BY DEBTOR GOODMAN NETWORKS INC D/B/A GOODMAN SOLUTIONS
(133)

BEFORE THE HONORABLE MICHELLE V. LARSON

UNITED STATES BANKRUPTCY COURT

Transcription Services:          eScribers, LLC
                                 7227 North 16th Street
                                 Suite #207
                                 Phoenix, AZ 85020
                                 (973) 406-2250

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE

```
1    APPEARANCES:

2    For the Debtor:            MATTHIAS KLEINSASSER, ESQ.
                                WINSTEAD PC
3                              300 Throckmorton Street
                                Suite 1700
4                              Fort Worth, TX 76102

5    For the Debtor:            DAVID W. PARHAM, ESQ.
                                LAURA TAVERAS, ESQ.
6                              AKERMAN LLP
                                2001 Ross Avenue, Suite 3600
7                              Dallas, TX 75201

8    For the Chapter 7 Trustee: DAVOR RUKAVINA, ESQ.
                                THOMAS D. BERGHMAN, ESQ.
9                              MUNSCH, HARDT, KOPF & HARR
                                500 N. Akard Street
10                             Suite 3800
                                Dallas, TX 75201
11
     For UMB Bank, National     ERIC A. SCHAFFER, ESQ.
12   Association, as indenture  STONECIPHER LAW FIRM
     trustee:                   125 First Avenue
13                             Pittsburg, PA 15222

14   For FedEx Supply Chain     CANDICE M. CARSON, ESQ.
     Logistics & Electronics,   BUTLER SNOW LLP
15   Inc., creditor:            2911 Turtle Creek
                                Suite 1400
16                             Dallas, TX 75219

17                             ROBERT C. HILLYER, ESQ.
                                ADAM LANGLEY, ESQ.
18                             GADSON W. PERRY, ESQ.
                                BUTLER SNOW LLP
19                             6075 Poplar Avenue
                                Suite 500
20                             Memphis, TN 38119

21   For Frase Protection, Inc., CANDICE M. CARSON, ESQ.
     creditor:                 BUTLER SNOW LLP
22                             2911 Turtle Creek
                                Suite 1400
23                             Dallas, TX 75219

24

25
```



```
 1                              ROBERT C. HILLYER, ESQ.
                                ADAM LANGLEY, ESQ.
 2                              BUTLER SNOW LLP
                                6075 Poplar Avenue
 3                              Suite 500
                                Memphis, TN 38119
 4
     For Alimco Re Ltd.,        PHILIP M. GUFFY, ESQ.
 5   Creditor:                  PAUL SILVERSTEIN, ESQ.
                                HUNTON ANDREWS KURTH, LLP
 6                              600 Travis Street
                                Suite 4200
 7                              Houston, TX 77002

 8   For ARRIS Solutions, Inc., LAURA E. SIXKILLER, ESQ.
     Creditor:                  DLA PIPER LLP(US)
 9                              2525 E. Camelback Road
                                Suite 1000
10                              Phoenix, AZ 85016

11                              RYAN J. SULLIVAN, ESQ.
                                DLA PIPER LLP(US)
12                              303 Colorado Street
                                Suite 3000
13                              Austin, TX 78701

14   For U.S. Bank National     KATHLEEN M. LAMANNA, ESQ.
     Association, as Collateral SHIPMAN & GOODWIN LLP
15   Agent:                     One Constitution Plaza
                                Hartford, CT 06103
16
     For HCL America, Inc.,     ADAM M. LANGLEY, ESQ.
17   Creditor:                  BUTLER SNOW LLP
                                6075 Poplar Ave., Suite 500
18                              Memphis, TN 38119

19   For Glympse, Inc.,         ADAM M. LANGLEY, ESQ.
     Creditor:                  BUTLER SNOW LLP
20                              6075 Poplar Ave., Suite 500
                                Memphis, TN 38119
21

22

23

24

25
```



Colloquy

1          THE CLERK:  Be seated.

2          THE COURT:  Good morning, everyone.  All righty.  We

3    have one matter on the docket today, which is case number 22-

4    31641, Goodman Networks, Inc. and Goodman Networks.  I'll take

5    appearances on the record and I'll start with those in the

6    courtroom.

7          MR. PARHAM:  Good morning, Your Honor.  David Parham

8    from Akerman on behalf of the debtor, Goodman Networks.  And

9    also with me is Laura Taveras and Russ Nelms is in the

10   courtroom and John Goodman is on WebEx.

11         THE COURT:  Okay.  Good morning.

12         MR. RUKAVINA:  Your Honor, good morning.  Davor

13   Rukavina and Thomas Berghman, proposed general counsel to

14   Scott Seidel, the Chapter 7 trustee.  Mr. Seidel is also

15   present in the courtroom.

16         THE COURT:  Good morning.

17         MS. CARSON:  Good morning, Your Honor.  Candice

18   Carson with Butler Snow LLP.  My partners Adam Langley and Cam

19   Hillyer are on the WebEx.  Adam will be presenting the motion.

20         THE COURT:  Thank you so much.

21         All right --

22         MS. CARSON:  Apologies, Your Honor.  Butler Snow

23   represents FedEx Supply Chain Electronics -- Logistics and

24   Electronics, Inc.

25         THE COURT:  Okay.  Thank you.  Among others as I

Colloquy

1    recall.

2            MS. CARSON:  Yes.

3            THE COURT:  All righty.  I'll now take appearances on

4    WebEx.

5            MR. SILVERSTEIN:  Good morning, Your Honor.  Paul

6    Silverstein and Philip Guffy from Hunton Andrews Kurth on

7    behalf of the original petitioner creditors.

8            THE COURT:  Good morning, Mr. Silverstein.

9            MS. SIXKILLER:  Laura -- I'm sorry, Your Honor.

10   Laura Sixkiller and Ryan Sullivan on behalf of ARRIS

11   Solutions.

12           THE COURT:  Good morning to you both.

13           MR. KLEINSASSER:  Your Honor, Matthias Kleinsasser

14   with Winstead PC on behalf of James Goodman individually.

15           THE COURT:  Good morning, Mr. Kleinsasser.

16           MR. LANGLEY:  Your Honor, Adam Langley with Butler

17   Snow on behalf of FedEx Supply Chain Logistics & Electronics.

18   And I'm just supplementing because Mr. Will Perry is also in

19   here on behalf of FedEx as well.

20           THE COURT:  All righty.

21           MR. SCHAFFER:  Your Honor, Eric Schaffer for UMB

22   Bank, the indenture trustee.

23           THE COURT:  Good morning, Mr. Schaffer, and welcome

24   to our court.

25           MR. SCHAFFER:  Thank you.



Colloquy

1          THE COURT:  I think I've already signed your pro hac.

2          MR. SCHAFFER:  Yes, Your Honor.

3          THE COURT:  Okay.  Thank you.

4          Is there anyone else --

5          MS. LAMANNA:  Good morning, Your Honor.

6          THE COURT:  -- oh, I'm sorry.  I'm sorry for

7    interrupting.  Please proceed.

8          MS. LAMANNA:  Oh, that's all right.  (Audio

9    interference).

10         THE COURT:  Okay.  I've got a really bad connection.

11   I can see it's Kathleen LaManna. Good morning.  But I've got

12   a -- I've had some problem with your audio.  Could you try

13   again?

14         MS. LAMANNA:  (Audio interference).

15         THE COURT:  We don't --

16         MS. LAMANNA:  Your Honor, I represent -- I represent

17   U.S. Bank as collateral agent.

18         THE COURT:  Okay.  Thank you.  If you intend to

19   participate substantively today, Ms. LaManna, we may have to

20   address your audio.  But for now, I was able to get your

21   appearance and I thank you for that.

22         All righty.  Is there anyone else who wishes to make

23   an appearance this morning?  All right.  Hearing no further

24   appearances, we are here today on the debtor's motion to

25   convert from Chapter 7 to Chapter 11.  I was able to review

Colloquy

1    the filings that were received over the weekend.  Thank you

2    very much for meeting that filing deadline.  I am sure it was

3    not easy to meet it on short notice.  So I appreciate you

4    doing so.

5          We were able to review your pleadings, at least --

6    least three times.  So I think we are ready to go today.  Is

7    there anyone -- is there anyone that has any concerns about

8    proceeding today?

9          MR. PARHAM:  No, Your Honor.

10         THE COURT:  Okay.  Thank you, Mr. --

11         MR. SILVERSTEIN:  Your Honor, it's Paul Silverstein.

12   May I?

13         THE COURT:  Of course.

14         MR. SILVERSTEIN:  Thank you.  We received, I think,

15   either this morning or last night -- Mr. Guffy can correct

16   me -- a witness and exhibit list from the debtor.  Is that --

17   was it last night?

18         THE COURT:  There was one filed, yes.  It was --

19         MR. GUFFY:  Yes, it was last night.

20         THE COURT:  Yeah.

21         MR. SILVERSTEIN:  It was filed last night, several

22   days late in accordance with the Court's rules.  We were

23   not -- we were not expecting this to be an evidentiary

24   hearing, given the three business days notice so I just say

25   that for the record.  Had I known that Mr. Parham -- had Mr.

Colloquy

1    Parham filed his witness and exhibit list timely, I would have

2    been there in person.

3            THE COURT:  Okay.  Well, I --

4            MR. SILVERSTEIN:  So I don't know -- I don't know how

5    to --

6            THE COURT:  Well, okay, let's see.  All right.  Well,

7    I --

8            MR. SILVERSTEIN:  I'm not sure --

9            THE COURT:  From a timing standpoint, obviously, when

10   a hearing is expedited in the fashion that it was, I don't

11   typically require the witness and exhibit list three days

12   prior to the hearing.  I do recognize that it was -- that it

13   was filed last night.  Of course, obviously, I gave responses

14   until Saturday, which is certainly irregular.

15           MR. SILVERSTEIN:  Your Honor, I thought we were

16   dealing with two legal issues.  One, whether a debtor's -- the

17   former management of the debtor had standing once an order

18   approving was entered and a trustee was appointed, number one.

19   And number two, whether 706(a) of the Code is unconditional or

20   absolute.  I thought that there were two legal issues to be

21   addressed, which is what we addressed in our briefs.

22           THE COURT:  And I appreciate that.  Again, from a

23   witness and exhibit list standpoint, I'm now looking at the

24   exhibit list that was filed by the debtor.  5 through 9 are

25   pleadings.  4 is the docket.  Number 3 is the engagement

Colloquy

1   letter, which I know that you guys have reviewed because

2   you've referenced it in your papers.

3          MR. SILVERSTEIN:  Yes.

4          THE COURT:  Number 2 is a resume` of Mr. Nelms -- of

5   Mr. Nelms', which I am sure that you're familiar with.  And

6   then, I think that number 1 is the shareholder agreement,

7   which I believe was a question that was raised in the

8   pleadings.  So I don't think they've sandbagged you in any

9   way.  So -- but I --

10         MR. SILVERSTEIN:  (Indiscernible).

11         THE COURT:  -- I understand the issue on the legal

12   issue versus the evidentiary hearing.

13         MR. SILVERSTEIN:  Yeah.  And again, I'm not

14   suggesting at all that we were sandbagged with respect to

15   exhibits.  We know those exhibits.  It's with respect to the

16   witnesses is what I'm referring to.

17         THE COURT:  Oh, okay.  Mr. Goodman and Mr. Nelms?

18         MR. SILVERSTEIN:  Yes.

19         THE COURT:  Okay.  Thank you, Mr. Silverstein.

20         MR. RUKAVINA:  Your Honor, briefly --

21         MR. SILVERSTEIN:  Thank you, Your Honor.

22         MR. RUKAVINA:  I heard Your Honor now mention twice

23   that there was a filing deadline.  I think Your Honor

24   mentioned Saturday.  The trustee filed his objections Sunday

25   around noon.  I assure you Mr. Berghman and I scoured the

Colloquy

1    docket.  We did not find any objection deadline.  So if I need

2    to orally move for leave, I do.  I was away with my family for

3    Christmas.  Mr. Berghman was busy.  But when we got this case

4    from Mr. Seidel Friday, we did everything we can.  So if there

5    is leave needed, I would request leave.

6         THE COURT:  No.  No leave needed, Mr. Rukavina.  I'm

7    not sure if the deadline was in my minutes but if it wasn't,

8    it was at a time when Mr. Seidel was -- had not been

9    appointed.

10        MR. RUKAVINA:  Thank you, Your Honor.

11        THE COURT:  So again, we had an opportunity to review

12   your pleading as well.  So no need to apologize or for leave.

13   Again, this was -- this was primarily set on today's notice

14   because the creditors and the debtor had been leading up to

15   this day for quite some time, albeit I'm sure the creditors

16   will tell you on a different issue.  It was primarily on the

17   motion to dismiss.  So at the prior hearing, after the debtor

18   filed -- the order for relief was granted.  The debtor filed

19   its motion to convert.  There was a great deal of issues with

20   respect to whether or not A, the debtor had standing.  B, the

21   debtor had an absolute right.  And I guess C, whether facts

22   existed such that the debtor should not allow to be -- to

23   convert, what I'll paraphrase as a futility argument.

24        MR. RUKAVINA:  Then Your Honor, it does sound like

25   our pleading is hopefully helpful, at least on A and B.  And

Colloquy

1   then, as far as C, we'll have to defer to the creditors since

2   we've just come in.

3          THE COURT:  Fair enough.  Thank you, Mr. Rukavina.

4          Ms. Carson?

5          MS. CARSON:  Oh, one -- one housekeeping matter, Your

6   Honor.

7          THE COURT:  Um-hum.

8          MS. CARSON:  We received a communication from the

9   court clerk that you would request hard copies at the

10  beginning of the hearing.

11         THE COURT:  Okay.  Thank you.

12         MS. CARSON:  May I approach?

13         THE COURT:  Please.  Thank you very much.  Is this

14  two sets?

15         MS. CARSON:  Yes.

16         THE COURT:  Okay.  Thank you.

17         All righty.  Here's my intention.  My intention is to

18  let the debtor make it's case today.  As I've already said at

19  the prior hearing, this is without prejudice to the creditors.

20  If the Court were to convert at the close of the hearing, then

21  it's without prejudice to allow the creditors to either move

22  to reconvert or, again, after we see the debtor's case and the

23  debtor's evidence, it may -- it may have bearing on how we

24  proceed at the end of the day.

25         I appreciate and it was certainly laid out in each of

12

Colloquy

1     the creditor's objections that they would have liked more

2     discovery.  So I appreciate that and I hear -- and I hear the

3     creditors in that regard.  So with that, I'll allow for

4     openings and then we'll proceed with the debtor's evidence.

5              Mr. Parham?

6              MR. PARHAM:  Your Honor, we have --

7              THE COURT:  Please.

8              MR. PARHAM:  -- a file with two binders with evidence

9     in them.

10             THE COURT:  Thank you, Mr. Parham.

11             That pile's getting too big for you to reach over.

12             MR. PARHAM:  Okay.  Good morning, Your Honor, and

13    under those ground rules, what I would like to do is I'll give

14    a brief opening statement and also address the standing issue

15    because I think that's germane at the beginning.  And then,

16    what I would like to do is reserve the bulk of our argument,

17    with respect to cause depending on what the various

18    petitioning creditors have to say.  Because I'm not sure yet

19    at this point exactly what allegations I'll need to rebut.

20             THE COURT:  Okay.

21             MR. PARHAM:  And certainly, I think that's a better

22    way to proceed.  Your Honor, pursuant to 706(a), either the

23    debtor has a right to seek conversion -- the statute says the

24    debtor may convert.  And courts often in fact enter conversion

25    orders even without hearings.  And that's pretty standard

13

Colloquy

1    frankly in this district and I think probably across the

2    country.

3            There is a court-created exception as the Court's

4    aware for either cause or bad faith.  And cause is defined as

5    the factors in -- listed in 1112(b).  And bad faith is defined

6    in the Supreme Court case as conduct that is, for a typical

7    debtor, extraordinary or extreme.  So it's rare, frankly, that

8    a motion to convert is denied.  And importantly, in those

9    cases where it is denied, there is always an element of post-

10   order for relief conduct.

11           And in fact, in the cases you see in this district --

12   I think in Judge Jernigan's case, the debtor had been in

13   bankruptcy for two years in Chapter 7.  And the debtor itself

14   was incapacitated and there was question as to whether the

15   spouse was capable of actually conducting the estate.

16           So there is this post-petition.  And in this case,

17   we've had a week since the order for relief was entered.  And

18   there are no allegations -- we haven't done anything.  We

19   haven't had -- so we think that on that basis alone, and as

20   the Court looks at what I suspect is going to be the argument

21   that comes behind, is going to all involve pre-petition

22   activities.  Activities that frankly will attribute to a prior

23   CEO.

24           But there is no post-petition hook.  And for that

25   reason, and that reason alone, we don't think that the



Colloquy

1    exceptions for either cause or bad faith are applicable here.

2    With respect to the standing issue -- and I'll address that

3    briefly.

4           706(a) says the debtor may convert.  It says the

5    debtor.  It doesn't say -- it doesn't make a distinction for

6    an individual debtor.  Debtor is defined in the Code as the

7    person or municipality -- that's Section 101(13).  A person --

8    definition of person doesn't include the trustee.

9           By contrast, Section 323(a) does talk about the

10   trustee being the person in charge of the estate.  So that

11   would include, for example, a debtor-in-possession.  So I

12   think the Code is clear that basically it is a right of the

13   debtor to seek -- to seek to convert.

14          And even in the Tenth Circuit case cited by FedEx,

15   the court there found the debtor had a right to seek to

16   convert.  They just found, and I'll address it in a second,

17   that they lost that when a trustee was appointed subsequent in

18   the case.

19          So there's, I don't think, any question but that the

20   debtor had the right to seek to convert.  And it makes no

21   sense that that right, frankly, would be taken away by the

22   appointment of a trustee.  The notion -- and that's not been

23   the practice in this district.  I don't think it's been the

24   practice in courts across the country.

25          In fact, in the Monarch case, the Supreme Court case



Colloquy

1    that's cited, you'll note that the trustee was an objective

2    party.  And obviously, courts have the obligation to consider

3    standing and I think this Court certainly would have been

4    aware of recent Supreme Court cases where the Supreme Court

5    typically looks at standing.  In that case, standing wasn't an

6    issue -- wasn't -- in fact, in the Supreme Court, it was fine

7    for the debtor to go forward on it's conversion issues and

8    issues and the trustee to object.

9         The fact is -- I think where the distinction is, or

10   may be, is that under 706(a), the debtor gets the right to

11   convert.  And it can't be that it's a race to a hearing.  And

12   that you only get that right if you can get to a hearing

13   before the U.S. Trustee appoints an interim trustee and then

14   you lose it.  That literally makes no sense and that's the

15   result that I think the creditors here are arguing for.

16        And I think it misses the point because in the Code,

17   if you go to -- I believe it's Rule 6009 --

18        THE COURT:  Um-hum.

19        MR. PARHAM:  -- it talks about how a trustee or the

20   debtor-in-possession has the ability to -- or is the

21   authorized representative for actions for or against the

22   estate.  And this is not an action for or against the estate.

23   This is -- it's not like this is a claim objection or it's a

24   litigation or a state court litigation and that sort of thing.

25   It's a question over what chapter.  It's an administrative

Colloquy

1    issue.  It's not an action against the estate.

2         And I think that's the distinction really that the

3    court in the Tenth Circuit missed.  And again, it's set up,

4    frankly, an incredible -- an incredible scenario where

5    literally it's a race.  And if we would have had our

6    hearing -- I forget if Mr. Seidel was appointed on Wednesday

7    or Thursday.

8         THE COURT:  Um-hum.

9         MR. PARHAM:  If we had a hearing on Wednesday, I

10   guess, or the day before he was appointed, there's no issue.

11   It just can't be that you lose a right that the Code gives you

12   because the U.S. Trustee acts and -- as it should -- and

13   appoints a trustee.

14        So we think it's clear.  We think the practice is

15   clear.  Even the cases that are cited to in the cause section

16   by the -- by the objecting creditors here, the debtor's always

17   involved as a party.  And I don't think there's any qu3estion

18   but that the practice in this district is not to relieve the

19   debtor of it's ability to move to convert and to prosecute a

20   conversion motion where -- in the case of the district court

21   case, an appeal of an order -- because there's been a trustee

22   appointed.  It's just not the law and that's not the way that

23   these things are handled.

24        So again, I guess to back -- just to kind of to

25   recap.  Our position is the debtor may convert.  It is the

Colloquy

1    debtor.  That right doesn't go away when there's an interim

2    appointment of a trustee or interim trustee is appointed.

3    There's no cause here.  There's no post-order of relief

4    conduct that can be pointed to that would give rise to taking

5    that right away.  Certainly, this is not a case where there's

6    been a prolonged chapter proceeding where there've been

7    misrepresentations to the Court, which you see in a lot of the

8    cases where there's a denial.  You know, there are issues with

9    misrepresentations to the court or some other kind of post --

10   post-conduct -- bad conduct by a debtor post -- post order for

11   relief.

12          So you just don't see that here.  It's just not

13   existent.  And to the extent that there are other -- there are

14   pre-petition issues certainly in this case.  I think in most

15   cases, there are pre-petition issues that should not prohibit

16   us from exercising the right to convert.  And certainly to the

17   extent that they're raised by the creditors, we would like the

18   opportunity at the end of the day to -- or after their

19   presentation, to address those.

20          And again, I would just point out as we go through,

21   some of the allegations in the briefs in fact involve non-

22   debtor entities, like the AMRR transaction, which was with

23   GNET ATC, which is not a debtor here.  So I question, even if

24   you were going to look at pre-petition actions, which I don't

25   think you can -- should -- without post-petition actions, it's

Colloquy

1    really kind of hard for me to see how an action with respect

2    to -- that some subsidiary took, managed by people who are not

3    managing the debtor today, would have any relevance towards

4    the issue that we're talking about today.

5         So with that, I will sit down and then we'll call Mr.

6    Nelms after the other parties --

7         THE COURT:  Okay.

8         MR. PARHAM:  -- have their say.

9         THE COURT:  Thank you.  All righty.

10        Mr. Rukavina?

11        MR. RUKAVINA:  Your Honor, thank you and good

12   morning.  And I apologize if I don't know as much about this

13   case my esteemed colleagues.  But I think we'll make our

14   arguments the same.

15        First Your Honor, this is not a motion to convert to

16   Chapter 11.

17        THE COURT:  Um-hum.

18        MR. RUKAVINA:  This is a motion to convert to Chapter

19   22.  Let's be clear about that.  They've had their chance.

20   They've messed it up.  All that remains is a liquidation.  The

21   question is, will insiders paying 900 dollars per hour to an

22   independent director manage the liquidation?  Or will an

23   independent fiduciary, whom the creditors prefer and whom the

24   Congress prefers, manage this liquidation?  So let's not have

25   a Chapter 22 here.  Let's have a Chapter 7, as is appropriate.

Colloquy

1          Your Honor, we focus primarily on several legal

2    issues that may be quasi-factual but are predominantly legal.

3    First, this is a debtor out of the money by its own admission.

4    It does not have standing.  It has no standing to object to

5    claims.  It has no standing in the bankruptcy case.  Now there

6    is a caveat which is that Section 706(a) does talk about a

7    debtor.  So it may that Congress created an exception to

8    standing where it gave a debtor, an insolvent debtor, standing

9    to seek a conversion.

10         Of course, I think that 99.9 percent of cases that

11   address this, address the case with an individual or consumer

12   Chapter 7 debtor because that's really -- that's really the

13   person that decides.  Here we have a corporate debtor.  We

14   have a corporation that's governed by articles of

15   incorporation and bylaws.  Most importantly, if the debtor has

16   standing under 706(a), then the question is who decides for

17   the debtor whether to file a motion to convert?

18         As we've argued in our papers, and as I'll argue at

19   closing, that person's the trustee.  As the Supreme Court has

20   made clear -- as the Supreme Court of Texas has made clear, a

21   trustee displaces management.  The trustee decides what the

22   corporation does.  For the same reason, Your Honor, under

23   706(d), it is the debtor's burden to demonstrate that is

24   eligible for relief under 109.

25         We argue that the debtor is not because Mr. Seidel

Colloquy

 1    has not authorized it to file a Chapter 11 petition.  We also

 2    argue that if the Court disagrees with us and Mr. Seidel

 3    doesn't make the decision, that the pre-petition management

 4    documents that would authorize a filing under Texas law have

 5    not been complied with.  So the debtor does today have to make

 6    a prima facie case that it is eligible under Section 109,

 7    pursuant to Section 706(d), it will not be able to do so.

 8         I think that's part of the conceptual problem that

 9    we're dealing with here from the debtor's perspective.  The

10    debtor would have this Court act as though we were still

11    before the order for relief.  We are not.  This is now a

12    Chapter 7 case, like any other Chapter 7 case, with an all-

13    powerful trustee and with the Court having the final word on

14    anything and everything that may happen.

15         As we briefed, the debtor had it's chance before the

16    order for relief.  It did not take it.  So whether it's res

17    judicata, whether it's just too late, or whether it's the

18    trustee controls the decision for conversion, this is a

19    Chapter 7 and it needs to stay a Chapter 7.

20         I'm sure that my colleagues will present the Court

21    with all kinds of evidence as to why cause to immediately

22    reconvert would be appropriate.  I'll do my best by helping.

23    I do believe that there has been a violation of the automatic

24    stay, post-petition.  We'll talk about that a little bit but I

25    want to focus again on those corporate governance issues

Colloquy

 1   because let's not forget this is a corporate Chapter 11

 2   debtor.

 3           Your Honor, I'll point out as well, that my read --

 4   and this is not in my -- in my objection.  Again, we didn't

 5   have a lot of time to prepare.  My read of Rule 2002, in

 6   particular (a)(4), is the twenty-one days notice of this

 7   motion -- and the Court can modify the twenty-one days, but

 8   notice is required on all creditors and all equity holders.

 9   The certificate of service here references service by ECF

10   only.  I don't know if the debtor's going to supplement that

11   today but there is no evidence -- no evidence that all

12   creditors and all equity holders have been served with this

13   motion or this notice of hearing.

14           That's a fatal defect.  I don't know if that means a

15   denial or if that means a continuance.  Mr. Seidel will defer

16   to the Court on that.  But I want to say something else that I

17   think might be of interest to everyone in this room, that

18   might tie into the notice issue and a potential continuance.

19   Mr. Seidel waived the debtor's privilege on anything and

20   everything having to do with the involuntary filing, the

21   motion, the retention of Mr. Nelms.

22           So it's all fair game.  Let's see what happens.

23   Let's see what the agreements are, what the representations

24   are, what the intentions by the Goodman family are.  Mr.

25   Seidel, who unquestionably controls the debtor's privilege, at

Colloquy

1   least as of the end of December 12th, 2022, waived that

2   privilege for those purposes.

3         Your Honor, that's all I have by way of opening.  And

4   whether now or at the end of opening, I'll also invoke the

5   rule.

6         THE COURT:  Okay.  Thank you.  In terms of invocation

7   of the rule, we'll wait until the conclusion of oral argument.

8         Mr. Silverstein?  You're on mute.

9         MR. SILVERSTEIN:  I am now unmuted.  Thank you for

10   that.

11         THE COURT:  You were on a roll there, though, I could

12   tell.

13         MR. SILVERSTEIN:  Yeah, I know.  I clearly was on a

14   roll.  Your Honor, when we had the last status conference, I

15   actually was not prepared to argue or deal with Section 706.

16   And I made a -- I actually made a statement when I said I

17   disagreed with FedEx's position on standing.

18         Having read the pleadings at least three times and

19   having done the research over the weekend and in the days

20   before the weekend, I think it's pretty clear that under

21   706(a), once an order for relief is entered and a trustee is

22   appointed, which was done properly by this Court and by the

23   U.S. Trustee, the debtor does not have the authority to do

24   anything under 706(a) because that former management -- or the

25   former consultant, or the former shareholder, or the former --

Colloquy

1    or the shareholders who allegedly purportedly owned the

2    debtor, are no longer in control of the debtor and they no

3    longer have corporate authority under 706(a).  They have

4    standing under 706(b) but this is not a motion under 706(b).

5    This is a motion under 706(a).

6         I think the trustees -- the interim trustee's

7    counsel's comments were right on target, as were the comments

8    that FedEx made in its brief.  I think -- I think the debtor

9    has no ability to do this once the order for relief is entered

10   and once a trustee has been appointed.  I think what's the so-

11   called confusion here is that the practice in this court and

12   many other courts is that when an involuntary position is

13   filed, they're typically filed under Chapter 7 -- generally.

14   I mean, I file them voluntary 11s but typically they're filed

15   under 7s.

16        The debtor basically, very often, will immediately

17   file a Chapter 11 petition or convert the case.  And it's not

18   often -- there's often not even a hearing on it.  It's often

19   automatic.  This is not that situation.  This was an

20   involuntary position that was filed in September, three, four

21   months ago.  And the debtor has basically, for lack of a

22   better word, rope-a-doped this for the last three or four

23   months, and basically, raised nonsensical and dilatory

24   objections to the petitioner creditor standing.

25        Your Honor will recall that we filed a motion for

                                      24

                            Colloquy

1    partial summary judgment on one of the debtor's arguments as

2    to why the petitioner creditors did not have -- were not --

3    were over secured.  The debtor then realizing that that was a

4    loser argument, changed their story and they came up with

5    a -- they concocted an argument that basically alleged that a

6    litigation claim against an entity by the name of 18920, was

7    worth par and there was no risk whatsoever in ever

8    recovering -- I think, the what, fourteen million dollars or

9    fourteen million dollars of that was conveyed to that entity.

10   And that's a transfer that the debtor's done nothing

11   whatsoever to try to reclaim, even though they say it's worth

12   par.

13           So there's a lot of gamesmanship going on here that's

14   basically geared by the Goodman family to retain control, even

15   to the extent of post-petition, John Goodman paid himself

16   450,000 dollars to be the consultant.  My understanding -- and

17   I don't -- we didn't get to fully develop the facts here

18   because discovery was stopped by this suggestion by the debtor

19   that they were going to convert the case, which they never

20   did, for quite some time.

21           But he paid himself -- there was a probably new board

22   of directors.  It's not clear who the stockholders are.  John

23   Goodman puts 450,000 dollars in his pocket to be consultant,

24   doing who knows what.  I have no idea what -- we have no idea

25   what he did and why he took that money but it's -- this whole

25

Colloquy

1    case from the pre-petition and post-petition is replete with

2    insider transactions.

3         So it's -- you know, this is not a race as Mr. Parham

4    suggested it was.  I mean, the trustee displaces management

5    and, frankly, the debtor's stockholders no longer have

6    standing to make a motion under 706(a).  But getting to 706(a)

7    generally, even that standing issue aside, I think the case

8    law is pretty clear, both from the U.S. Supreme Court in two

9    decisions, from the Judge Jernigan decision that was affirmed

10   on appeal, from the Judge Nelms' decision that was affirmed on

11   appeal by Judge McBride, and I think Judge McBride is not a

12   judge who is too easy on bankruptcy lawyers -- bankruptcy

13   judges as I think everyone in this courtroom knows.

14        It's absolutely not an absolute right, number one.

15   Number two, when there are grounds to convert the case to

16   Chapter 7, which there are here, and which we have outlined,

17   Federal Express has outlined, and ARRIS has outlined quite

18   well in those pleadings, I believe.  It's just an absurdity to

19   suggest that the debtor, controlled by the Goodman family,

20   somehow has a right to run this proceeding under the guise of

21   having an independent director, namely former Judge Nelms, who

22   by the terms of the documents themselves, is not in control.

23        And at Your Honor's suggestion, we had a conversation

24   with Judge Nelms.  It was a very good and candid conversation,

25   try to understand where he was coming from and where things

Colloquy

1    stood.  And one of the things we asked Judge Nelms, and I

2    think we discussed this in our pleading was well, your

3    engagement letter, Judge Nelms, says that you have the powers

4    of a trustee.  And we asked whether that meant he had -- did

5    that mean that he had the powers of a trustee under Section

6    1104 to which his response was no.  It means obviously the

7    debtor-in-possession.  And he also looked at the corporate

8    resolution, I think it's called a resolution, that was signed

9    by various shareholders who may or may not be a majority of

10   shareholders, we don't know that.  It's been represented, I

11   guess, that they do.  It says, in no uncertain terms, that

12   John Goodman shall retain his role as CEO/consultant, and

13   that's not to be disturbed at all.

14          But back on the legal issue, I think the Supreme

15   Court made the point best when -- and I think that was in Law

16   v. Siegel -- when it said that the court is not required to

17   engage in "futile procedural niceties in order to reach more

18   expeditiously an end result required by the Code" namely that

19   if we're going to end up back in Chapter 7 anyway, the notion

20   of converting a case to Chapter 11 and then converting back

21   makes absolutely no sense whatsoever.  This is a liquidation.

22   The debtor has no business.  It does not operate.  And what

23   the debtor has is causes of action against the Goodmans,

24   causes of action against others.

25          I think one of the things we pointed out in our



Colloquy

1    papers is that the debtors are -- seem to be -- the debtor

2    seems to be taking the position now that Mr. Frinzi is really

3    the bad guy and the Goodmans are really the good guys, which,

4    you know, we've tried to develop as best we could based on the

5    several -- we've had to take that that's really nonsense.

6    Clearly, Mr. Frinzi is a bad guy and a bad actor, there's no

7    question about that.  But the Goodmans are way up there on the

8    list.  I think four million dollars was transferred to the

9    Goodmans in various consulting fees and other things since, I

10   think, during the last year if my memory serves me.

11          So our point is that the notion of this absolute

12   right is just not true.  It's not the law.  I mentioned

13   standing is not the law.  But I think this case absolutely

14   belongs in a Chapter 7, and the Goodman family simply cannot

15   be allowed to have any control or influence over the debtor,

16   which it does under the resolution that -- under which it put

17   Mr. Nelms in.  And frankly, one of the emails we received from

18   the debtor -- I'm not sure when we received it, but we're --

19   context basically is an email I believe from Mr. Parham to

20   John Goodman, saying, got to get Nelms in there because it'll

21   help defeat a trustee motion.

22          I mean, seriously, Your Honor, I mean, it's a bit of

23   a game because to put in the respectable guy who's going to

24   somehow recover for the bad guys -- and again, Mr. Nelms does

25   not intend to recover for the bad guys, but Mr. Nelms is not

Colloquy

1   in control.  He's not in control as an independent director.

2   And frankly, we -- in the conversation with Mr. Nelms that we

3   had last week, we were talking a little bit about the Highland

4   Capital case.  And in the Highland Capital case, three

5   independent directors were appointed.  It was Mr. Nelms, Mr.

6   Dubell (ph.), and Jim Seary (ph.) were appointed independent

7   directors.  But they were not appointed independent directors

8   by the debtor.  They were appointed independent directors

9   through negotiations with the committee, because otherwise a

10  Chapter 11 trustee would have been appointed in that case, and

11  thereafter, Mr. Seary, I think Your Honor remembers he was a

12  Lehman Brothers fellow years and years ago before they went

13  bankrupt.  Mr. Seary ended up becoming CEO and that case has

14  proceeded.

15          So the gamesmanship is just -- it's pretty

16  extraordinary in this case, particularly in the context of a

17  liquidation of a non-operating entity.  There are no

18  operations.  There's no rehabilitation here.  The secured

19  creditors, my clients and the trustee and the collateral agent

20  are likewise here.  We obviously -- we have to marshal some

21  of -- we have to marshal our collateral.  And then there are

22  obviously causes of action against various people that we're

23  going to have to deal with, and among those people are the

24  Goodmans and their cohorts, as well as Mr. Frinzi and others.

25  So it just sort of defies logic to suggest that the Goodmans

29

Colloquy

1    somehow can continue in at least -- in any sort of control

2    over this proceeding.

3           As we said the other day, we'd be very happy -- all

4    the respect to Mr. Seidel who we don't know, but we hear good

5    things about -- we'd be happy to have Mr. Nelms as the

6    permanent Chapter 7 trustee.  But the arrangement set up by

7    the Goodman family does not give him the independence and the

8    duties and the obligations that a Chapter 7 trustee would

9    have.

10           In fact, one of the issues here, like in other cases,

11   is that there's an obligation for a trustee to make criminal

12   referrals to the U.S. Attorney.  That may be important in this

13   case, okay?  And that's well -- that is definitely, definitely

14   not within Mr. Nelms' authority here.  The engagement allows

15   John Goodman, in no uncertain terms, to remain in a management

16   role; it's unacceptable.  As I said, there's four million

17   dollars in transfers to the Goodman family, including the

18   450,000 dollars paid to John Goodman so he can provide

19   management services to a company with no business operations?

20           I'm not going to go over everything we've listed in

21   our objection; Your Honor can see it.  Your Honor can see the

22   ARRIS objection, Your Honor can see the FedEx objection.

23   There's a lot of meat in there.  As far as the evidentiary

24   issues, the information that we have that we put in there as

25   exhibits, we got all that information from the debtor.  So I

Colloquy

1    think that certainly goes a long way in terms of the

2    credibility of the information generally.

3           And as I said before, we've heard a lot about James

4    Frinzi, about the debtor's claims against him, and the

5    debtor's plans to go after him, and that's great.  We agree

6    he's a bad actor, but he wasn't the lone gunman here, to use a

7    bad expression, particularly in a Dallas -- in a Dallas

8    setting, so I apologize for that.

9           I think that the Goodmans or the debtor or the

10   debtor's stockholders, whoever they are, are saying, well,

11   everything is fine because everything bad happened

12   pre-petition.  And again, we submit that not -- that

13   everything bad happened post-petition also because of the

14   debtor's dilatory tactics, the debtor's payment to Mr.

15   Goodman, and the debtor's actions.  And a trustee is here

16   already, an order for relief has been entered.

17          The stockholders, as I said -- and I'm being

18   repetitive and I apologize for that -- don't control the

19   debtor.  The debtor can't -- the debtor's stockholders can't

20   go out now and sign a contract that would bind the debtor.

21   The debtors can't go out now and take a loan.  The debtors

22   can't take corporate action now because the stockholders

23   don't -- I'm sorry -- the stockholders can't do that now, or

24   Mr. John Goodman, as a consultant/CEO, can't do that now

25   because he's no longer in control of the debtor.  Which goes

Colloquy

1    back to the 706(a) standing issue that I mentioned earlier,

2    that I was mistaken about at the status conference, but I've

3    now really read and understood, and absolutely agree with

4    FedEx and others.

5            And I think that -- I think -- well, let me just also

6    add that, again, if Mr. Nelms was a Chapter 11 trustee, that

7    wouldn't be the worst outcome here.  But here, in a Chapter 7

8    case, I mean, there's no need for a committee here.  There's

9    no business to reorganize here; the debtor has no business.

10   We're liquidating, and there are liquidation -- there are

11   litigation claims against many individuals, including the

12   Goodmans.  You don't need a Chapter 11 case for that.

13           And so I think our papers are pretty fulsome papers

14   which had a lot of information in them, and I don't really

15   think I have anything more to add unless Mr. Guffy or Mr.

16   Clark, who I think is on, tells me that I'm missing something.

17   They're probably telling me that I should've stopped five

18   minutes ago.

19           THE COURT:  Mr. Guffy, Mr. Clark, anything to add

20   other than to tell your partner to zip it?

21           MR. GUFFY:  I think Mr. Silverstein said it well,

22   Your Honor.

23           THE COURT:  Thank you, Mr. Guffy.  All right.

24           And thank you very much, Mr. Silverstein.

25           Mr. Langley?



32

Colloquy

1          MR. SILVERSTEIN:  Thank you for (audio interference).

2          THE COURT:  You're welcome.

3          MR. SILVERSTEIN:  (Audio interference).

4          MR. LANGLEY:  Good morning, Your Honor.

5          THE COURT:  Good morning.

6          MR. LANGLEY:  Adam Langley, Butler Snow, on behalf of

7     FedEx Supply Chain Logistics & Electronics, Inc.  And I'm just

8     going to say FedEx like everybody else because I think that's

9     easier.

10          Your Honor, there are two issues here that we have

11     briefed.  The first is the standing issue, and I'd like to

12     take that up first because I think it makes sense to address

13     that jurisdictional issue first.

14          The C.W. Mining case was brought up pretty

15     significantly in our last hearing.  We've done additional

16     research.  The Eleventh Circuit has just recently reaffirmed

17     that, as of June 2022 in In re Bear Creek Trail, LLC, 35 F.

18     449 -- excuse me, F.4th 1277, that's in our brief as well.

19     And then we've also learned, as of this morning actually, that

20     the Fourth Circuit has essentially adopted the same rule in

21     the In re Public-Sector Solutions, Inc. case, which was 602 F.

22     App'x 929.  And that does reference to an affirmance of the

23     district court opinion that also relied on C.W. Mining.  So

24     from a standpoint of case law, we have the C.W. Mining, which

25     is a Tenth Circuit decision; the Bear Creek Trail, which is a

Colloquy

1    Tenth Circuit decision; the Public-Sector Solutions was a

2    Fourth Circuit decision.

3            And quite frankly, I didn't hear any citation from

4    Mr. Parham as to his position of any authority, other than

5    local practice, is what he is relying on.  Again, nothing in

6    the record from a case law or from any, just procedural

7    actions in the Northern District of Texas to support his

8    position.  And we would suggest that this position from C.W.

9    Mining, Bear Creek, and this Fourth Circuit case are well-

10   reasoned.  And they're well-reasoned because they're

11   substantially based on the Weintraub case out of the Supreme

12   Court, which dealt with the attorney/client privilege after a

13   Chapter 7 case was commenced and an appointment of trustee was

14   had.

15           And very clearly, Weintraub, which has been affirmed

16   by the Fifth Circuit as applying not only to corporations, but

17   to partnerships, in Campbell 73 F.3rd 44 -- that that case

18   holds that after a Chapter 7 order for relief and an

19   appointment of trustee -- which both elements now have been

20   met in this case -- former management is completely ousted

21   from managing the debtor, and that makes sense in a Chapter 7

22   case.

23           And I know Mr. Parham and the debtor's former manager

24   are unhappy about that, but they had every opportunity to get

25   in here and file a Chapter 7 petition -- or excuse me -- file

Colloquy

1    a Chapter 11 petition voluntarily for months -- quite frankly,

2    for years, as they have been dissipating assets during that

3    time period.  And I would suggest that the Tenth Circuit, the

4    Fourth Circuit, and the United States Supreme Court, and the

5    logic that's been applied throughout the Fifth Circuit, is

6    based on Section 323 which does refer to the estate, so the

7    trustee is representing the estate; we don't dispute that.

8           But Rule 6009, actually, is broader than Mr. Parham

9    indicated.  And if you look at Rule 6009 it says, "With or

10   without court approval, the trustee or debtor-in-

11   possession" -- here we have a trustee -- "may prosecute or may

12   enter an appearance and defend any pending action or

13   proceeding by or against the debtor".  It goes on, "or

14   commence and prosecute any action or proceeding in behalf of

15   the estate before any tribunal."

16          So Rule 6009's very plain that it is the trustee that

17   is acting in any proceeding by the debtor after the order for

18   relief.  And so it's not just 323 of the Code that says the

19   trustee is acting for the estate, but Rule 6009 actually

20   builds upon that, and says the trustee is acting for the

21   debtor after the order for relief and the appointment of the

22   trustee.  So we think there's both co-basis; we think there's

23   a Rule basis; we think that the Supreme Court case in

24   Weintraub is analogous.  We think that's consistent with how

25   C.W. Mining, Bear Creek, and the Fourth Circuit, and the

Colloquy

1   Public-Sector, all decided the issue.  And so we think there

2   is not only just a little case law, we think there is

3   overwhelming case law, statutory support, and Rule support for

4   this.  And we heard nothing from the other side to suggest

5   that there's any basis in the law, fact, or any otherwise to

6   substantiate what he's done.

7           Now, I understand that the Fifth Circuit in In re

8   Martin, prior to the Marrama decision, had different practices

9   that were done and were handled.  And that officially changed

10  after Marrama specifically overruled the Fifth Circuit's

11  Martin decision and changed practice in the Fifth Circuit,

12  including the Northern District of Texas.

13          And that gets into the second issue, but before we

14  get to the second issue, I think it would be helpful to talk

15  about what authority we're talking about.  So the C.W. Mining

16  case, I think, it does it really clearly.  It says the debtor

17  clearly has standing to move under 706(a).  There's no doubt

18  that the debtor has standing to move under 706(a).  The

19  question is, who is the debtor?  With an individual, that's

20  very plain.  The individual debtor has personal rights that

21  are guaranteed under the United States Constitution, and those

22  rights can't be divested from that debtor.

23          But with a inanimate entity, like a corporation in

24  Weintraub or a partnership in Campbell -- the Fifth Circuit

25  case -- those inanimate entities only can act through agents.

Colloquy

1    That's fundamental state law.  I saw on the trustee's brief,

2    it cited the FISMA case.  That's a Fifth Circuit case where it

3    says you have to go through the correct procedural niceties to

4    have authority to file a Chapter 11 bankruptcy petition in

5    that case.  And if you don't meet the state law requirements,

6    you don't have the authority to file, therefore, you don't

7    have the ability to prosecute a Chapter 11 case.

8         And here, I would suggest there's two authority

9    issues that defeat this motion to convert.  The first is the

10   one that's been very plainly put before you.  Mr. Seidel is a

11   Chapter 7 trustee, he controls the debtor under Rule 6009 and

12   Bankruptcy Code 323.  We think only his authority is what can

13   cause the conversion, and that's -- should end it.  And we

14   think that's actually been done.

15        We cited a case in this district, I think it was the

16   ARRIS case.  It's a long opinion, but essentially, there, it

17   was the Chapter 7 trustee that moved to convert a Chapter 7

18   case to Chapter 11, where there was very good cause to convert

19   it because there was an operating business.  There were assets

20   that needed to be managed under a Chapter 11 scheme which is

21   beneficial in serving context, but not every context.  Here,

22   we would suggest that's not what's happening.  The Chapter 7

23   trustee, who has the authority to convert, is opposing the

24   conversion.  So we would say that's the first basis for

25   authority.  The trustee is opposing it.  The trustee is the

Colloquy

1  only one that controls the 706(a) right.

2           The second issue, we would say, is does the debtor,

3  acting through Mr. Parham or Mr. Nelms or Mr. Goodman, even

4  have authority?  And that's a question we simply can't answer

5  based on what we got in the pre-order for relief discovery.

6           I would suggest, Your Honor, if you'd turn to Exhibit

7  15 that we submitted.  That is the sworn interrogatory

8  response, where we asked them to identify all the officers,

9  directors, and board members, and I believe, maybe even

10  managing agents of the debtor.  And they did not identify a

11  single person as having authority to act after September 4th,

12  2022.  The idea that the Goodmans were controlling this --

13  they all are indicated, except for John Goodman, who is blank

14  on the date he started and the day he was terminated.  The

15  remainder of the Goodmans were all, purportedly, out of this

16  by December 31st, 2021.  Yet, as you saw by the papers that

17  were submitted by all the parties including the debtor, I

18  believe, intends to set -- or the debtor, through Akerman,

19  intends to provide -- Mr. Nelms' employment today was,

20  purportedly, on the signature of all the Goodmans and this new

21  entity that we -- was not even disclosed here, this MBE Group

22  entity that we didn't have any awareness of until all Mr.

23  Nelms' papers started being produced after the status

24  conference last week.

25           So we have a question -- the authority of the debtor

Colloquy

1    to act apart from the trustee, we don't think that can happen.

2    But we think there are extremely complicated issues of

3    corporate law that haven't been followed here, such that Mr.

4    Parham's client can act for the debtor, even if you could find

5    that they could act for the debtor.  So we think there's a

6    duplicitous issue here of -- they don't act because they're

7    not the trustee.

8            And B, they don't act because they don't have clear

9    authority under state law to act for the debtor in that

10   context.  This may be why they didn't file a Chapter 11

11   voluntary petition for the all the months that they had the

12   opportunity of (sic), because they couldn't figure out who had

13   corporate governance right.

14           And indeed, in the 30(b)(6) testimony of Mr. Konicov,

15   who was a 30(b)(6) designee for both CFGI, for Goodman

16   Networks, and GNET -- and that was all represented by Akerman

17   in those three depositions where he used 30(b)(6).  He

18   couldn't identify any board meetings, any minutes, any types

19   of actions, other than at one point, John Goodman became in

20   control; he didn't have a basis for that.  Before that, it was

21   James Frinzi, the CEO, that order (indiscernible) now --

22           MR. KLEINSASSER:  I'm going to object to this, Your

23   Honor.

24           MR. LANGLEY:  -- and again (indiscernible) --

25           MR. KLEINSASSER:  Excuse me.  I'm going to object to

Colloquy

1    this because this deposition testimony is not admissible in

2    evidence.  It violates Rule 32.  It's also hearsay, Your

3    Honor.  There's no exception that applies.  I understand that

4    Mr. Langley is probably going to say he's just making

5    argument.  When it's testimony repackaged as argument, it's

6    not admissible.

7            So I'm going to respectfully ask that the Court

8    either rule as to whether is this admissible or not or ask him

9    to confine his statements to pure argument and not former

10   testimony, Your Honor.  And I'm happy to explain the basis, if

11   you'd like, for why this is inadmissible hearsay and why it

12   also violates Rule 32, Your Honor.

13           MR. SILVERSTEIN:  And I would join in that objection,

14   Your Honor.

15           THE COURT:  Okay.  So Mr. Kleinsasser, please explain

16   to the Court the basis for your objection of why it can't be

17   used in argument, given, again, this is not an evidentiary

18   portion of the hearing.

19           MR. KLEINSASSER:  Yeah.  So I -- just to clarify,

20   Your Honor, I'm not saying that the mere fact that someone

21   raises a contested fact is necessarily violating the rule

22   against using evidence that's inadmissible.  I mean, the Mr.

23   Silverstein argued his portion of this, I thought was totally

24   appropriate, for example, right?  But when you're literally

25   sitting here saying this guy testified this, this guy

Colloquy

1       testified that, and it's a deposition that's not admissible, I

2       think that's plainly backdooring in evidence that shouldn't be

3       before the Court.  The reason that it's not admissible is that

4       the deposition was terminated; there was no cross-examination.

5               In order to use a deposition in a court proceeding,

6       you have to comply with Rule 32, Your Honor.  Rule 32

7       requires, among other things, that the deposition may be used

8       to the extent it would be admissible under the Federal Rules

9       of Evidence if the deponent were present and testifying.

10      Well, under 611 there's a rule -- there's a right to cross-

11      examination, number one.  Cross-examination never happened in

12      the deposition.  So if that witness were here today, there'd

13      be an opportunity to cross-examine him.  That wasn't case.

14              Second, Your Honor, it's hearsay.  The exception for

15      former testimony in a deposition proceeding under the hearsay

16      rule -- under Rule 804, requires the declarant, among other

17      things, be unavailable.  There's been no showing that the

18      declarant is not available here, so the bottom line is it's

19      inadmissible hearsay.  It also violates Rule 32, and I don't

20      think it's appropriate for it to be -- for the purported

21      evidence of that deposition to be specifically referenced in

22      argument.

23              THE COURT:  Okay.  Thank you, Mr. Kleinsasser.  And

24      before I turn to Mr. --

25              MR. KLEINSASSER:  Thank you.



Colloquy

```
 1          THE COURT:  -- Mr. Langley for a response, who

 2   terminated the deposition?

 3          MR. PARHAM:  Your Honor, the deposition was

 4   terminated, I believe, by everybody because the order for

 5   relief was entered.  And so the whole purpose of the discovery

 6   was to determine the qualifications of petitioning creditors.

 7   And once the order for relief was entered by the Court, which

 8   happened in the course of the -- early on, frankly, in the

 9   course of the deposition, there was no reason to go forward

10   with it.

11          THE COURT:  So it's an agreed termination?

12          MR. GUFFY:  Your Honor, may I?  This is Philip

13   Guffy --

14          THE COURT:  Well, let Mr. Parham --

15          MR. GUFFY:  -- from the original petitioning

16   creditors.  We --

17          THE COURT:  -- answer my question, and then I'll turn

18   to you, Mr. Guffy.

19          MR. PARHAM:  I believe it was terminated by the

20   agreement of all parties, is my understanding.

21          THE COURT:  Okay.  Thank you, Mr. Parham.

22          Mr. Guffy?

23          MR. GUFFY:  Yes, Your Honor.  We were conducting the

24   deposition at the time.  The counsel for the debtor who was

25   appearing was Andrea Hartley, and Ms. Hartley requested that
```

Colloquy

1   the deposition be terminated in light of the order for relief.

2   And we did not oppose that, we consented to the termination.

3          THE COURT:  Thank you very much, Mr. Guffy.

4   Appreciate that.  All right.

5          MR. RUKOVINA:  Your Honor --

6          MR. SILVERSTEIN:  And Your Honor, if I may?  When Mr.

7   Guffy says we "consented to the termination", I think the

8   better word is that we acceded to counsel's request.  Given

9   the circumstances, it -- I don't want you to read too much

10  into the fact that we consented to -- we didn't, at that

11  point, argue over terminating it, but the debtor requested

12  that it be terminated.  That's what happened.

13         THE COURT:  Thank you, Mr. Silverstein.

14         Mr. Rukovina?

15         MR. RUKOVINA:  Briefly, Your Honor, to the extent

16  that the trustee has any say in this matter, his say is as

17  follows.  This is a corporate rep deposition of the debtor.

18  The trustee now owns that.  The trustee waives any rights

19  under Rule 32.  It is now the debtor that is trying to prevent

20  its own deposition from being used again.  That's a right that

21  Mr. Seidel controls, and he waives it.

22         I'll also add that my friend and colleague, Mr.

23  Kleinsasser, I don't believe has filed any papers.  Maybe he

24  has, in which case, I apologize.  But if he hasn't, then I

25  don't think his objection on hearsay or otherwise is

Colloquy

1    meritorious.

2          MR. KLEINSASSER:  Yeah.  And that -- I have to

3    disagree with that, Your Honor.  My client is a creditor for a

4    number of reasons with the debtor.  At this point, of course,

5    it's considered a no-asset case, nobody's filed a claim in

6    this case.  So during the prior contested matter which really

7    just went to the -- whether an order for relief was

8    appropriate.  Of course, my client was a non-party to that

9    particular contested matter, but as of this time, he's a

10   creditor just as much as any creditor that would have a claim

11   disputed or not in this proceeding, whether we're talking

12   about ARRIS or FedEx or whatever.  So I do have a right to be

13   heard.  I am making an objection.

14         And again, even if Rule 32 could be waived, it's

15   still inadmissible hearsay.  The declarant is not on --

16   there's no showing he's unavailable, which is the requirement

17   for a former testimony.  It was actually not a corporate rep

18   of the debtor, it was a corporate rep of an entity called

19   CFGI.  And the debtor certainly did not authorize the

20   witness -- I don't -- to my knowledge, at least, to testify on

21   that subject -- or that particular question.

22         So again, there's no cross-examination, the

23   deposition has never even been signed.  I was actually

24   excluded from the deposition.  So I just think is

25   inappropriate way to backdoor in evidence that should not be

Colloquy

1    before the Court at this time.

2          MR. SILVERSTEIN:  Your Honor, it's Paul Silverstein.

3    Not to belabor the point, but CFGI was a 30(b)(6) witness

4    designated by the debtor.

5          MR. GUFFY:  That's what I was going to say, Your

6    Honor, this was a deposition that we noticed and that we were

7    taking at the time that it was terminated.  We noticed this as

8    a deposition -- a 30(b)(6) deposition of the debtor, Goodman

9    Networks, Inc.  Mr. Konicov, who works for CFGI, the debtor's

10   financial advisor, was put up as the corporate rep for Goodman

11   Networks on most of the topics that were on our notice of

12   deposition.  Included in that list of topics was the

13   management, the officers, and directors of the debtor.  So

14   that was a topic that was specifically noticed under 30(b)(6),

15   and Mr. Konicov was put up by the debtor as the 30(b)(6)

16   witness for that topic.

17         THE COURT:  Thank you, Mr. Guffy.

18         Mr. Langley?

19         MR. LANGLEY:  Yes, Your Honor.  Sorry, I didn't

20   intend to have an administrative dispute in opening

21   statements, but we'll take it as we may.  The Konicov

22   deposition was a 30(b)(6) deposition of the debtor, of GNET,

23   and of CFGI.  We don't know why the debtor and counsel

24   designated him for three different entities when they're all

25   separate entities and there's potentially competing claims and

Colloquy

1    conflicts of interest that have been asserted by the debtor,

2    but they did that.

3            And that's what they did, and Mr. Kleinsetter (sic)

4    was not a party to that.  His client, James Goodman, who has

5    got his hands all over these different businesses is not a

6    party to this.  I'm not sure -- they haven't filed papers, so

7    I'm not sure how they have the right to even object to the

8    entry of evidence where it's the debtor's right, here -- where

9    the trustee controls that.  If you want to -- for argument's

10   sake, if Mr. Parham had chose that, he's not the one so moving

11   here, maybe he's going to now, but Mr. --

12           THE COURT:  He did, he joined.  And you may have not

13   have heard it --

14           MR. LANGLEY:  He joined?  Okay.

15           THE COURT:  -- but he joined in Mr. Kleinsasser's

16   objection.

17           MR. LANGLEY:  Okay.  We would argue, though, that

18   this was a deposition under 30(b)(6).  It was a debt properly

19   designated for three different entities.  Under Rule 32(a)(3)

20   we can use that for any purposes.  It was concluded at the

21   request of the debtor's counsel, Akerman, acting for, again,

22   all three of those entities.  And so we did consent after the

23   order for relief because we thought all these were mooted --

24   all these questions were mooted.

25           Could they have cross-examined us or allowed the

Colloquy

1    deposition to continue?  Absolutely, but they requested it be

2    terminated, it was terminated.  We have a signed, certified --

3    excuse me -- it's certified, and the signature on that was

4    waived, so it is a full deposition transcript that is -- can

5    be admitted for any purpose under Rule 32(a)(3).

6    Alternatively, we would argue under (a)(4)(d) of Rule 32 that

7    the witness is not unavailable.  This was scheduled on four

8    business days, we got our brief filed late on Friday, others

9    got it on Saturday.  We did not have opportunity to subpoena

10   Mr. Konicov or anything other party in advance of this

11   hearing, so I would say that it is unavailable.  And for

12   purposes of this ex parte hearing, we should at least be

13   allowed to use a deposition that was done under Rule 30(b)(6)

14   for three different entities that the debtor put forth.  It's

15   our only opportunity because everything else was cut off.

16          THE COURT:  Okay.  Thank you, Mr. Langley.  Not

17   exactly sure how it's an ex parte hearing, but we'll move past

18   that.

19          Again, as this -- as it concerns whether or not to be

20   able to use allusions to a deposition transcript in an opening

21   for purposes of the standing argument -- the 706 argument that

22   the parties have been arguing this morning, the Court is going

23   to overrule Mr. Kleinsasser's objection, in part due to

24   32(a)(3) which does allow a 30(b)(6) transcript to be used for

25   any purposes.  I can only assume that those purposes would

Colloquy

1    include argument.  Again, if we were taking evidence at this

2    juncture, I'll allow the parties to reserve their objections.

3    But again, for argument purposes, I think that Mr. Langley is

4    well within his rights to quote from the transcript.

5           Mr. Langley, please proceed.

6           MR. LANGLEY:  Yes, Your Honor.  Before we got

7    interrupted, we were talking about the second idea of

8    authority.  Not that the trustee controls authority, but

9    that -- did the debtor, presumably acting through the former

10   management, even have authority at this point in time -- and

11   to employ Mr. Nelms and Mr. Goodman.

12          And from the transcript, it was very clear that James

13   Frinzi was employed at the time that Mr. Konicov and CFGI got

14   involved, which I believe was sometime around November or

15   December 2021.  At that point, they represented -- he

16   represented only James Frinzi, who controlled these entities.

17   And then sometime around September, that ended and John

18   Goodman somehow became in control.  There was no disclosure of

19   James Goodman, there was no disclosure of Joseph Goodman,

20   there was no disclosure of Jason Goodman, there was no

21   disclosure of Jonathan Goodman.  None of those were disclosed

22   as acting and having authority.  There was no disclosure of

23   MBE Group which is in the -- again, in the papers that were

24   presented on Judge Nelms.

25          So we have real questions whether any of those



Colloquy

1   persons had authority to even hire John Goodman, pursuant to

2   the consulting agreement or Judge Nelms, pursuant to his

3   engagement.  And so we think there's a double basis that they

4   lacked authority and that they didn't follow the corporate

5   formalities under state law to get Judge Nelms or John Goodman

6   employed.  And we think that the trustee also is now the

7   acting agent after the order for relief and its appointment.

8   So that's a dual basis that we assert, that there's a lack of

9   authority and therefore a lack of standing under 706(a).

10        I want to be clear, when we're saying 706(a), we are

11   not asserting they couldn't move under 706(b).  They most

12   certainly have authority to do that, and we just think that

13   that is a hopeless cause.  And the reason they're fighting so

14   hard to be under (a) is because -- it is correct, the burden

15   is on the objecting parties to show cause under the Marrama

16   standard.  Whereas under 706(b) the burden is on the movant to

17   demonstrate that there is a cause to convert to Chapter 11.

18        So we would have a complete evidentiary burden shift

19   if we moved to Section 706(b).  And given the fact that

20   they've admitted there is no ability to reorganize, it pretty

21   much defeats their ability to show cause under 706(b).  So

22   that's why they were proceeding so aggressively under 706(a)

23   is there is no ability to move under 706(b) given the fact

24   that they've already admitted there is no ability to

25   reorganize.  And so what we're left with, is there an absolute

Colloquy

1    right to convert under 706(a) if Mr. Parham's client does have

2    the authority to so move under 706(a)?

3         And that has been a rule, conclusively, under

4    Marrama, that 706(a) which was an issue in a Chapter 13 case

5    with this exact same provision, whether it's Chapter 12,

6    Chapter 13, or Chapter 11.  That was conclusive that there is

7    a bad-faith exception to 706(a) and the courts have all looked

8    at it since and said yes, we could read this as having an

9    absolute right.  And I think the Marrama court even

10   acknowledged that there is, upon a surface reading, an

11   absolute right to convert.  But each of the courts that have

12   held since Marrama have said that absolute right, while it

13   does appear from the language, is not what the Marrama court

14   held.

15        And Jacobson follows that and says yes, there is

16   perceivably an absolute right here, but it's equivocal.  There

17   could be -- given 105(a), given 706(d), given the Court's

18   inherent rights to police conduct in this Court, there is an

19   equivocal situation where this could be read -- though it's

20   absolute, the Court has inherent equitable powers under

21   105(a), its own rights, and in 706(d) to determine whether

22   this is something that should be in Chapter 11 and whether it

23   otherwise is an abuse of process or whether it's just a futile

24   exercise with procedural niceties that we convert and have to

25   immediately convert back and we spend a lot of money, a lot of

Colloquy

1    time, a lot of effort.

2          We would suggest, given the Marrama case and the

3    Jacobson case, that this should stay here.  And we had some

4    discussion at the status conference over local practice, and

5    we have gone to some good length to at least try to identify

6    everything locally that has occurred.  We identified the

7    Foster case which was the Judge McBride case that affirmed

8    Judge Nelms.  So we don't think there's a good faith basis

9    now, with Judge Nelms involved with the debtor's counsel to

10   assert that there's an absolute right.  They have essentially

11   conceded that this morning when they acknowledged that there's

12   a cause element that has to be proven.

13         We also cited, too, the -- I apologize -- the

14   Breakwell case, which was a Judge Kinkeade decision affirming,

15   I believe it's -- is it Judge Jacobson?  We've attached the

16   transcript there in our evidence.  Both of those cases looked

17   at it and said hey, these are hopelessly insolvent companies.

18   They have no business assets.  They have no ability to do

19   anything except pursue causes of action.  And here, we're

20   talking about causes of action against the very people that

21   would be put in control if this was converted to Chapter 11.

22         And I would turn you to Exhibit 4 that we are going

23   to submit later.  But for just purposes of argument, they

24   listed, as of October 31st, 2022, the assets that remain in

25   this company and it's a pretty remarkable list.  For cash, it

51

Colloquy

1   was to be determined.  They couldn't even figure out what the

2   cash balance was that existed post-petition.  They then

3   identified -- there is a restricted cash of 4.7 million, but

4   that restricted cash is limited by a -- the bank that's

5   holding it as collateral for another related party obligation,

6   which, pursuant to the Konicov deposition, was a Genesis

7   entity that is owned by James Goodman.  So perceivably, this

8   four-seven million is subject to actions between the Goodmans

9   already.  So there's going to be an issue for the trustee to

10  look at as to what to do with that 4.7 million, and that

11  asserted restrictions that have been placed on it by James

12  Goodman.

13         Next, there is a Goodman Telecom Holding preferred

14  unit that's listed as three million, but the book value,

15  through testimony, was eight million.  That is a transfer of

16  significant assets of the debtor to a John Goodman owned

17  entity, Goodman Telecom Holdings.  Remarkably, there's an

18  eight-million-dollar callable note that they have identified

19  here as preferred units, and we haven't seen the details on

20  that.  But presumably, that note could be called immediately,

21  and immediately due; it has not been done so.  Instead, John

22  Goodman, when he's in control here in October 31st, 2022, has

23  decided that it's not fully collectible.  So how do we re-

24  insert John Goodman with any type of control in a Chapter 11

25  case when he's asserting he can't even collect against his own

Colloquy

1    entities?  That's a real issue.  That's something the Chapter

2    7 trustee doesn't have that same conflict of interest.

3         Next, we move down to a three-million-dollar

4    receivable that has written down from the 6.6 million that's

5    apparently due.  The United Field Services -- I've heard it

6    said Unified Services Field Services, Inc.  I'm not sure how

7    to say it given the testimony we've had, but we do know that

8    that entity is owned by entities that are related to James

9    Goodman.  And so again, that's -- that was significant assets

10   that were transferred from the debtor to Unified Field

11   Services, that now are being -- purportedly, the full

12   consideration cannot be paid.  And then James Goodman is not

13   going to track down and chase his own assets in a Chapter 11

14   case.  So we have real concerns with, again, the Goodmans

15   facing the Goodmans.  That same concern -- that same conflict

16   of interest does not exist with a Chapter 7 trustee.

17        The next one is a 13.5-million-dollar claim to 18920

18   11th, LLC.  This only became an asset after this involuntary

19   case was filed when they admitted, essentially, that there was

20   13.5 million in cash and other assets that had been

21   transferred at some point in time, just shortly before the

22   petition was filed in 2022.  So those, they are now admitting

23   was a fraudulent transfer.  They're putting the blame on James

24   Frinzi.  I think the evidence that we'll put forward later

25   will very clearly indicate the Goodmans had control over James

Colloquy

1    Frinzi, they had knowledge of what he was doing, and that any

2    effort to make him the scapegoat is, frankly, done as a

3    litigation strategy, and not due to facts.

4         We could turn to the next page.  They've got two

5    entities that they represent don't have boards -- that haven't

6    had boards.  That the evidence we'll put forward later --

7    evidence is that they -- the CEO of these entities didn't have

8    independent spending power.  And they are trying to create and

9    isolate liability at these entities because they're

10   essentially defunct.  And what they're saying is that there

11   was forty-four million dollars transferred to AMRR.  That's a

12   loan receivable; it's never been paid.  There's a collection

13   concern on that.  That's again James Frinzi.  There's other

14   issues regarding intercompany and inability to describe cash

15   balances that are at issue here.

16        I'm an accountant.  And I won't pretend to be an

17   expert accountant, here, but at least, looking through my

18   glass accounting eyes, this is alarming.  This is

19   extraordinarily alarming.  It's the type of issue that I want

20   investigated as the attorney for FedEx with an eighty-

21   something million dollar claim.  We need these detailed

22   investigations to occur.  If the Goodmans are involved in the

23   investigation, there will be obfuscation here.  And we're

24   concerned that they will not adequately represent the estate

25   and the creditors.

Colloquy

1            And we believe that Mr. Seidel and the attorneys he's

2    employed are fully capable of administering what is a Chapter

3    7 liquidation.  And they will investigate this under 704.

4    They will go through all the motions to make sure that the

5    Goodmans do not run away with assets or have not run away with

6    assets without it being properly adjudicated before Your

7    Honor.

8            And I think that's what FedEx and the other creditors

9    are really interested in here.  Not whether this is a Chapter

10   7 or 11 case, but that the merits on these avoidable transfers

11   or fraudulent transfers or whatever they end up being, be

12   administered and pursued by an independent fiduciary, like a

13   Chapter 7 trustee.

14           And that's what we're essentially asking for here is

15   that a Chapter 7 trustee, not a dishonest but maybe

16   unfortunate, debtor be able to do that in a Chapter 11 case.

17   And we respect Judge Nelms, I have nothing to suggest that he

18   would be acting in bad faith in a Chapter 11 case.  I'm not

19   going to even pretend to make that argument.

20           THE COURT:  Appreciate that.

21           MR. LANGLEY:  But we do have concern that he wasn't

22   granted authority to act as a Chapter 11 trustee.  And that

23   the Goodmans still play a role in this and they haven't

24   relinquished the reins.  And a independent director is only

25   good as the independence he's given, and here it wasn't given.

Colloquy

1    So we don't have any concerns with Judge Nelms.  We just have

2    concerns with the Goodmans continuing to play games, the

3    Goodmans continuing to have their hands in this, and the

4    Goodmans continuing to take advantage of the laxity regarding

5    corporate formalities that existed pre-petition, post-

6    petition, pre-order for relief, and post-order for relief.

7        And the evidence that we'll put forward will indicate

8    that persons on behalf of the debtor, after the petition was

9    filed, were filing pleadings in courts, were sending payments

10   to creditors, trying to prevent them from joining in this

11   case.  So there were post-petition transfers that were

12   involved here, that weren't authorized.  They were attempting

13   to settle with those creditors.

14       So there will be significant evidence we can put

15   forward to demonstrate that there have been post-petition

16   transfers that are preferential to certain creditors and not

17   other who were fighting them, like FedEx, like ARRIS, like the

18   original petitioning creditors, and those.  And that's

19   antithetical to bankruptcy.  This is a estate that needs to be

20   administered for the right of all creditors.

21       And Mr. Silverstein and Mr. Guffy and my client may

22   end up having intercreditor disputes later on.  We can deal

23   with that in a Chapter 11 -- Chapter 7 context.  And we can

24   deal with that if that comes up, we may not.  I don't know

25   what this case is going to hold, but what I think we do need

Colloquy

1    is somebody with an independent mind, like a Chapter 7

2    trustee, to be able to marshal evidence, to be able to marshal

3    claims, to be able to examine those claims, to bring those

4    claims.  And absent that, we have real disputes that are going

5    to be fought with the debtor in a Chapter 11 case.

6         If the Court has any inclination to make this under

7    Rule 1001, speedy, just, and inexpensive, Chapter 7 is where

8    this needs to be.  If we're put in Chapter 11, the disputes

9    that you've seen pre-petition pre-order for relief will

10   continue in a Chapter 11 case because we have to defend our

11   rights, we have to have organize committees, we have to do all

12   the things that Chapter 11 creditors have to do that they

13   don't have to do in a Chapter 7 case because a trustee is

14   doing it on their behalf.

15        And so that's a huge issue that we would like to do,

16   is we would like to relinquish the reins.  We'll continue to

17   monitor the Chapter 7 trustee to the extent we need to.  But

18   we don't want to have to push all these claims and advance

19   them on our own and incur significant costs in a Chapter 11

20   fighting a plan, fighting whatever actions are taken that we

21   aren't going to pretend to hypothetically know.  But we do

22   know that this is more properly situated in a Chapter 7 case.

23   We assert again, Marrama, Jacobson, the Foster case, and the

24   Breakwell case, all suggest that this Court should not go

25   through an exercise of futility of procedural nicety.  This

Colloquy

1    Court should keep it where it belongs, in a Chapter 7 case,

2    and we would ask you to do that.

3            THE COURT:  Thank you very much, Mr. Guffy.

4            Ms. Sixkiller?

5            MS. SIXKILLER:  Yes, Your Honor.  ARRIS joins the

6    opening statements of original petitioning creditors, and

7    FSCLE, as well as the opening comments and statement of the

8    interim trustee presented through his proposed counsel.

9    Because we've had such extensive opening statements so far, we

10   don't intend to add anything else at this time.

11           THE COURT:  Thank you very much, Ms. Sixkiller.

12           MS. SIXKILLER:  You're welcome.

13           THE COURT:  I appreciate the brevity.  Although, I --

14           MS. SIXKILLER:  We figured you might.

15           THE COURT:  -- I certainly enjoy the back and forth,

16   but I appreciate the brevity when it's called for.  Thank you

17   so much.

18           Mr. Schaffer, anything to add to what I'll loosely

19   call the standing argument by way of opening this morning?

20           MR. SCHAFFER:  No, Your Honor, nothing to add.  Thank

21   you.

22           THE COURT:  Okay.  Thank you, Mr. Schaffer.  In Price

23   is Right parlance, I think Mr. Schaffer just said, one dollar.

24   I'm old.  I'm sorry.

25           All righty.  Is there anyone that I'm missing?



Colloquy

1          Ms. LaManna, would you like to make any opening

2     statements this morning?  I will take that as a no.  All

3     righty.

4          All righty.  If there's anyone on the phone that

5     wishes to make any comments by way of opening statement,

6     please press star six to unmute.

7          Okay.  Well, it is 10:53.  I think that we're going

8     to take a ten minute convenience break.  And when we come

9     back, I will hear from the debtor in rebuttal with respect to

10    the legal argument on standing.  And I'll also hear from the

11    debtor with respect to the service issues, and then we'll

12    proceed thereafter.  All right?

13         So again, 10- -- about 10:54, we'll return -- my math

14    is horrible.  Let's say, we'll return at 11:10.

15              THE CLERK:  All rise.

16         (Recess from 10:54 a.m. until 11:10 a.m.)

17              THE CLERK:  All rise.

18              THE COURT:  Please be seated.  Thank you very much

19    for your patience.  We will go back on the record in case

20    number 22-31641, Goodman Networks, Inc.

21         All righty.  I think that when we left everyone had

22    made, essentially, an opening argument with respect to

23    standing.  I'll now turn back to the debtors for rebuttal.

24         I won't bury the lead.  Given the lack of service of

25    the motion to convert, I'm not sure that it would be

Colloquy

1    appropriate for the Court to do an evidentiary hearing today.

2    I'll hear from the debtor in that regard, but that's where I'm

3    leaning at this juncture.  But I don't believe that that means

4    that I couldn't -- I couldn't rule upon the -- again, what

5    we've loosely called the standing argument.

6          So again, I'm going to go to the debtor first with

7    respect to rebuttal.  Ms. Taveras.

8          MS. TAVERAS:  Good morning, Your Honor.

9          THE COURT:  Good morning.

10         MS. TAVERAS:  I'll first address the legal arguments

11   and then turn to notice issues, if that's okay with the Court.

12         THE COURT:  Please.

13         MS. TAVERAS:  Section 706(a) is clear; the debtor may

14   convert.  It does not say the trustee.  It does not say

15   individuals only.  It does say debtors.  Section 303(23)(b)

16   defines the roles on responsibilities of a trustee.  Trustee

17   is not given the title of debtor.  If we turn -- here it is

18   Goodman Networks that is the debtor.  It is Goodman Network

19   that continues to be the debtor, throughout the entire case

20   Goodman Networks will be the debtor.

21         If we look at the Supreme Court case cited, we really

22   have to look at the issue that it deals with, and it's a --

23   it's a privilege issue, and it directly relates to a trustee's

24   capacity to manage the estate.  And the Code specifically

25   notes that its decision aligns with the careful design of the

Colloquy

1    Bankruptcy Code.  The Bankruptcy Code states it is the debtor

2    that has the right to move for conversion.

3            If we look at the cited cases, the Tenth Circuit case

4    particularly, the court explicitly holds that before a trustee

5    is appointed control of the corporation remains vested in its

6    managers.  That court cites to another Tenth Circuit Court

7    case, Bartman (ph.), and in that case the court distinguishes

8    that a trustee had not been appointed, and that is why the

9    court heard that appeal.  That is also the case here, a

10   trustee had not been appointed by the time that the motion to

11   convert was filed.

12           Ultimately, the creditors are arguing that it was

13   this Court's intention to deny debtor's rights to seek

14   conversion when it entered the order for relief.  Debtor would

15   posit that that is not the case, nor was that the Court's

16   intention.

17           I think we also should look at 341(d) because it

18   makes that distinction of trustee and debtor.  341(d) says,

19   the trustee will examine the debtor.  If we follow the

20   trustee's reasoning, and the creditors' reasoning through

21   341(d) it leaves no room for the debtor.

22           I think the Code, throughout, also makes various

23   distinctions between the rights that it reserves for

24   individuals versus the rights that it reserves for

25   corporations.  And in Section 706(a), that distinction is not



Colloquy

1      made about creating a difference between an individual debtor

2      and a corporate debtor.

3             And unless Mr. Parham has additional information I

4      will turn the floor to him.

5             THE COURT:  Thank you, Ms. Taveras.

6             MS. TAVERAS:  Thank you.

7             MR. PARHAM:  No, Your Honor, Ms. Taveras, I think,

8      summarized our position on a standing fine.  There's no --

9      there's just no distinction in 706.  And this whole notion

10     that somehow you have a right -- that if a trustee gets

11     appointed somewhere along the way you lose that right, it

12     stands all these cases on their head.  The Breakwell case, I

13     think, had been, what, two years in Chapter 7 before there was

14     a motion to convert, and still the debtor was able to pursue

15     it.  And the same thing for -- in Foster you have a trustee.

16     So it's established practice in this district, and I think

17     across the country.  And this notion that somehow you're

18     divested of that right just isn't the case.

19            With respect to notice, I mean we noticed everyone

20     that we could, I mean given how fast things were moving.  And

21     I would argue that certainly the opposition view that this

22     should not be a Chapter 11, is more than adequately

23     represented among the parties in this court.  I mean they

24     have -- I don't know what anyone else, if they didn't get

25     notice, would add to it but certainly we're here for a robust

Colloquy

1    hearing on the issue.  Like again, at that point in time in

2    the case there was no matrix, and it was -- I think we filed

3    our motion like an hour after the order for relief was

4    entered.

5           THE COURT:  Okay.  Thank you very much, Mr. Parham.

6           MR. RUKAVINA:  May I briefly reply, Your Honor?

7           THE COURT:  Yes, you may, Mr. Rukavina.

8           MS. TAVERAS:  I'm sorry, Your Honor.

9           THE COURT:  Ms. Taveras, uh-hum.

10          MS. TAVERAS:  They had a full hour to put on their

11   opening statement, we had five minutes.  To the extent that

12   there is anything else to address, I think we've sufficiently

13   covered the grounds of the nature of this hearing.

14          MR. RUKAVINA:  I was going to point out, Your Honor,

15   that they filed the creditors list at docket 58 on November

16   9th, they didn't serve it, so they know who their creditors

17   are.  And I was going to point out that they need to present

18   evidence of corporate authority.

19          THE COURT:  Thank you very much, Mr. Rukavina.

20          Is there anyone else who wishes to be heard again

21   solely with respect to the argument issue on standing?

22          MR. SILVERSTEIN:  Your Honor, very, very briefly if I

23   might.  We're not arguing that the debtor doesn't have

24   standing.  What we're arguing is who controls the debtor,

25   that's the argument.



Colloquy

1          So obviously when you read the statute it says

2    debtor, but the question is who controls the debtor.  Is the

3    debtor controlled by its former management, or by its

4    stockholders who purport to have authority, or not.  That's

5    really the principle question.  Thank you.

6          MR. PARHAM:  And, Your Honor, we were going to

7    address that in the evidentiary section.

8          THE COURT:  Um-hum.

9          MR. PARHAM:  Because with the consent and with Mr.

10   Nelms' testimony.

11         To answer Mr. Silverstein's question, the person in

12   control of the debtor right now is Mr. Nelms who has been

13   appointed in that capacity by the -- by the shareholders of

14   the corporation.  The exhibit that was introduced dealt with

15   officers and directors.  The consent was a shareholder

16   consent, not an officer and director consent.  And so that is

17   an issue that certainly we can clear up -- we're going to

18   clear it up in evidence.  But if we're going to have an

19   argument I can clear it up as argument.

20         There's no question here about the consent of the --

21   of the shareholders to appoint Mr. Nelms, and Mr. Nelms to

22   decide to file the motion to convert.  We've covered the

23   corporate side of it.  It just -- we were going to present

24   that as part of the evidence on the issue, so I'll make it as

25   part of the argument if that's where we are here.

Colloquy

1        MR. RUKAVINA:  Well, Your Honor, I think that --

2        THE COURT:  Thank you, Mr. Parham.

3        MR. RUKAVINA:  -- that's my argument, Your Honor,

4   that Mr. Parham should put on his evidence as to corporate

5   authority.

6        THE COURT:  I understand.  Okay.

7        All righty.  Here's what we're going to do, I will

8   allow the -- I will allow the debtor to move forward on the

9   issue of, let's just say, who controls the debtor.  We've

10  called it standing, we've called it who controls.  I mean

11  we've argued about -- I mean we've -- I've heard argument on

12  this in a number of different ways.

13       As I said, to the extent that we get to that portion

14  of the argument on what I'll loosely call a futility argument,

15  or a cause for conversion argument, then I'm going to continue

16  that portion of the evidentiary hearing.  There's been no

17  service of any parties that I can see on the docket.  I think

18  that, notwithstanding the Court's expedition, there is no

19  reason not to have served any creditors at all in -- excuse

20  me, in accordance with 2002(a)(4).  So the Court will not

21  proceed on the -- on the evidentiary portion as it revolves

22  around the creditors' arguments of no rehabilitative purpose,

23  the issues of the pre- or post-petition transactions that the

24  creditors allege lack merit, or require investigation in some

25  way, and things of that nature.  Again, given the lack of

Colloquy

1   service, the Court is going to continue those particular

2   issues in any event -- and which will also serve to remedy the

3   creditors' due process concerns, and the concerns over a lack

4   of discovery.

5          I think at the last status conference Mr. Langley

6   asked for sixty to ninety days.  I'm not willing to go out

7   that far, but I am willing to give the parties a few more

8   weeks, again, as it relates to those types of arguments.

9   Because I'm not sure that this case, and these parties would

10  benefit from doing this twofold.

11         So with that the Court will give the debtor

12  opportunity to put on its evidence today with respect to the

13  control of the debtor -- who controls this debtor day to day.

14  And then at the conclusion of evidence, if the Court is

15  prepared, I'll address standing.  And if not, the Court will

16  probably be in a position to give bench ruling this week no

17  matter what, again, on that narrow legal argument.

18         Okay.  With that, Mr. Parham.

19         MR. PARHAM:  Yeah, Your Honor, we call Mr. Nelms.

20         THE COURT:  All righty.

21         MR. RUKAVINA:  Your Honor, will recall I've invoked

22  the rule, please.

23         THE COURT:  Okay.  All right.  Are there any other

24  witnesses?

25         MR. RUKAVINA:  Mr. Goodman, I believe.



Colloquy

1              THE COURT:  Okay.  Mr. Goodman, if you could just --

2              You won't need to be sworn in, sir.

3              Mr. Goodman, if you'll disconnect for me.  And then

4         when and if you're called, sir, we'll take a break to

5         allow Counsel to contact you.

6              MR. GOODMAN:  Okay.  I will disconnect.  Thank you.

7              THE COURT:  Okay.  Thank you, Mr. Goodman.

8              Any other concerns, Mr. Rukavina?

9              MR. RUKAVINA:  Your Honor, no.  I'm sure that Mr.

10   Kleinsasser will not be discussing evidence to his client.

11             THE COURT:  I'm sure of it.

12             All righty, please be seated.

13             Again, it's very awkward, former Judge Nelms is an

14   officer of the court, and so there's -- I'll dispense with the

15   swearing in.

16   DIRECT EXAMINATION

17   BY MR. PARHAM:

18   Q.   Mr. Nelms, could you state your name for the record?

19   A.   Russell Nelms.

20   Q.   Okay.  And if you could, Mr. Nelms, could you give us

21   some of your background, please?

22   A.   Yes, I graduated from law school in 1978.  I had been --

23   I had gone to undergrad on an Army program, and law school as

24   well on a different Army program, and I had a commitment to

25   the United States Army after I got out of law school.  So from



Russell Nelms - Direct

1    1978 to 1982 I was a prosecutor, and a defense counsel, and

2    chief of military justice in the Army.

3        From there I went to Carrington Coleman, 1984.  I went

4    immediately into their bankruptcy section, and worked with

5    Carrington Coleman for the next twenty years, for the last

6    sixteen of those years, I think, as a partner.

7        I was called to the bench in 2004, I was a United States

8    Bankruptcy Judge for Fort Worth.  And I served in that

9    capacity from 2004 to the end of my tenure in November 2018.

10        After 2018 -- I retired in 2018, and at that time I have

11    worked, I guess, on the fringes of the legal practice, the

12    bankruptcy world.  I haven't really practiced law.  But I have

13    served in the capacity as an independent director in cases, a

14    liquidating trustee, an independent manager, a plan

15    administrator, and I have conducted mediations.

16   Q.   Okay.  And, Mr. Nelms, when were you contacted about this

17    particular engagement?

18   A.   Get the date straight here.  It wasn't -- well, let's

19    see.  It was, I guess, about ten days ago.  It was on a -- I

20    believe it was on a Thursday when I was contacted you -- by

21    you, Mr. Parham.  And you encouraged me to get in touch with

22    John Goodman.  No, I think you called me on a Wednesday.  You

23    called me on a Wednesday.  I spoke with Mr. Goodman on a

24    Friday, two days later.  And we spoke, we had some

25    communications over the weekend, I sent them an engagement

Russell Nelms - Direct

1   letter.

2        And on Monday -- it was the same day that the Court

3   entered its order for relief.  I -- my engagement letter was

4   signed that day, and my -- and a retainer was placed with me

5   on that day.

6   Q.   Okay.  And let me ask you, Exhibit -- ask you to turn to

7   Exhibit -- let me see here.  Exhibit 3, I believe.  Our

8   Exhibit 3.

9   A.   Yes.

10  Q.   And that is your engagement letter?

11  A.   Yes, it is.

12  Q.   Okay.  And pursuant to that engagement letter, paragraph

13  3, can you review it, please?

14  A.   See -- ask that question again, please?  Okay.  Paragraph

15  3?

16  Q.   Um-hum.

17  A.   Okay.  Yeah, typically speaking, in an engagement letter

18  I set forth my responsibilities that I have --

19  Q.   Um-hum.

20  A.    -- to, kind of, define the scope of my engagement.

21       I went back to Title 11, and looked at specifically

22  Chapter 11.  And ultimately I just decided that, in essence,

23  what this paragraph does, it takes the Bankruptcy Code and

24  attaches to my engagement letter.  Just intended that -- that

25  my responsibilities would be those of a debtor-in-



Russell Nelms - Direct

1  possession --

2  Q.   Uh-hum.

3  A.   -- pursuant to Title 11.

4  Q.   Okay.

5  A.   That was my thinking.

6  Q.   Okay.  And so you would, I guess, have very broad

7  authority under your engagement letter, correct?

8  A.   I would have the -- all of the powers, and duties, and

9  responsibilities of a debtor-in-possession; that's correct.

10  Q.   Okay.  And those would include, I assume, authorizing

11  filing the motion to convert.

12  A.   It would, yes.

13  Q.   Okay.  And did you authorize the filing of the motion to

14  convert?

15  A.   I did.

16  Q.   Okay.  Exhibit 1 is -- can you identify -- well, let

17  me -- first of all, let me offer Exhibit 3.

18        THE COURT:  Is there any objection to the admission

19  of Exhibit 3?  Hearing no objection, Exhibit 3 is hereby

20  admitted.

21     (Russell Nelms Engagement Letter was hereby received into

22  evidence as Debtor's Exhibit 3, as of this date.)

23  Q.   Okay.  And, Mr. Nelms, could you identify Exhibit 1?

24  A.   Yes, Exhibit 1 is the written consent of the voting

25  shareholders in lieu of a meeting which was executed by the

Russell Nelms - Direct

1    shareholders whose names appear on this document.  It was

2    executed on December the 12th.

3    Q.   Okay.  And are you familiar with this document?

4    A.   I'm sorry, say again?

5    Q.   Are you familiar with this document?

6    A.   I am familiar with the document, yes.

7    Q.   Okay.  And, in fact, were you given an opportunity to

8    review it prior to its execution?

9    A.   I did.  I -- I did review this prior to its execution.

10   Q.   Okay.  Now this document is the consent of shareholders,

11   correct?

12   A.   That's correct.

13   Q.   Okay.  And so earlier on there was a comment from FedEx's

14   counsel about Exhibit 15.

15         THE COURT:  Mr. Parham, make sure that it's being

16   picked up by the mic.

17         MR. PARHAM:  I'm sorry.  Oh, be close to the mic?

18         THE COURT:  Yes.

19         MR. PARHAM:  I'm sorry.

20         THE COURT:  Make sure that your comments are close to

21   the microphone.  Thank you.

22         MR. PARHAM:  Okay.

23   Q.   Now, let me show you the Exhibit 15 (indiscernible) FedEx

24   (indiscernible) --

25   A.   Okay.



Russell Nelms - Direct

1   Q.   And let me ask you, does that exhibit speak to

2   shareholders at all?

3   A.   This particular exhibit, as I'm reviewing it, reflects --

4   it appears to reflect board positions -- not board positions

5   but -- well, CFO positions, executive chairman -- it tends to

6   indicate officers, it appears to me.  It doesn't appear to

7   address share ownership.

8   Q.   Okay.  Thank you.  And there is a difference between a

9   director, is there not, and a shareholder?

10  A.   Yes, that's correct.

11  Q.   Okay.  So in the instant case, let me -- let me ask you,

12  your -- under your authorities that you were given pursuant to

13  the consent which authorize you to be a -- retained you as a

14  director, correct?

15  A.   Yes.

16  Q.   Okay.  And you've talked a little bit about your powers

17  in that capacity.  Would you view that as also the ability to

18  investigate -- to conduct investigations into these various

19  pre-petition transactions referred about?

20  A.   Well, not just the ability, but the duty and

21  responsibility to do so.

22  Q.   Okay.  And is that something you're prepared to do?

23  A.   Yes.

24  Q.   Okay.  And in taking this -- taking on this role, you

25  understood that there were going to be issues such as that,

Russell Nelms - Direct

1   and might, in fact, even be issues -- well, let me just ask

2   you, are you prepared, if necessary, to investigate the

3   Goodmans?

4   A.   Yes.

5   Q.   Okay.  And have you had the opportunity to investigate

6   any of these pre-petition transactions, or even the

7   post-petition transactions we've heard about?

8   A.   Not really, no.

9   Q.   And why is that?

10  A.   Well, as I say the first substantive contact I had with

11  the case was on a Friday, my retention was on a Monday.  And I

12  think I -- I think that the Court entered its order for relief

13  about twenty minutes after my engagement letter was signed.

14  So at that point I just went into, kind of, maintain status

15  quo mode.

16  Q.   Okay.  Now, you did participate in a conference with Mr.

17  Silverstein, and the other counsel for the petitioning

18  creditors?

19  A.   I did.

20  Q.   Okay.  And one of the questions that came up was, well,

21  can the shareholders just fire you if they don't like what

22  you're doing.

23  A.   Correct.

24  Q.   Okay.  And is your view -- what is your view on that?

25  A.   Well, the engagement letter itself is silent with respect

Russell Nelms - Direct

1   to that.  My position would be that I don't think that just --

2   I can be served with a notice of termination, and that the

3   shareholders have the right to terminate me.  And that absent

4   my agreement with them that if I wanted to just leave, that's

5   one thing, but if I oppose it, I -- I think I'd have the right

6   to come to this Court, and take and -- and contest my alleged

7   termination.

8   Q.   Okay.  And if the -- if an order of relief was entered

9   and the case was converted to Chapter 11, would you be

10  applying for Court approval of your retention?

11  A.   Yes, certainly given the contentiousness of things,

12  already up to this point I think that's the -- I think that's

13  the best thing to do for everyone concerned.

14  Q.   Okay.  And any issue regarding whether you could be

15  dismissed by the shareholders without Court approval could be

16  handled in the retention order; could it not?

17  A.   Yeah, it could be, yes.

18  Q.   Okay.  Let me ask you, you've had an opportunity to visit

19  with Mr. Goodman since your retention, correct?

20  A.   I have, yes.

21  Q.   Okay.  And what is your views in terms of whether or not

22  he should be involved in the management of this company going

23  forward?

24  A.   Well, at this point I -- I've had just a few

25  conversations with Mr. Goodman.  Number one, I happen to like

Russell Nelms - Direct

1   Mr. Goodman.  Number two, I think he's been forthright in --

2   in his discussions with me.  I wouldn't have an interest in

3   taking on the case at all if I didn't have some high degree of

4   comfort with Mr. Goodman.  And based upon our discussions, at

5   least at this point, I believe that Mr. Goodman needs to have

6   some involvement with this company because I think he

7   represents the fastest, and the most economical, and certainly

8   the most knowledgeable solution to an early resolution of this

9   case.

10      So I -- I've already told Mr. Goodman that if the time

11  comes where we need to part ways, and -- and that we have a

12  conflict in working together that that'll have to happen.  But

13  for the time being, I -- I think Mr. Goodman represents a very

14  necessary and critical part of the -- of the Chapter 11.

15  Q.   Okay.  And notwithstanding that, though, you do view it

16  as a (indiscernible) under powers and duties here, as I think

17  you've put it, to investigate all of the --

18  A.   I -- I mean I've got those duties, and responsibilities.

19  One of the first things that I did do -- and this was -- this

20  happened even before the order for relief was entered, but

21  I -- I contacted Dennis Faulkner at LainFaulkner.  I told him

22  that -- that there was -- I was kind of looking for a turn key

23  operation in terms of financial advisor, that is, people who

24  could help us with schedules, statement of financial affairs.

25  But I also thought that there may be some forensic accounting

Russell Nelms - Direct

1    services needed here, and he assured me that he could provide

2    all of those -- those services.

3    Q.   Okay.  Give me just one second, let me see if there's

4    anything else I wanted to ask you on this.

5         So in your engagement letter your hourly rate is 900

6    dollars per hour?

7    A.   Yes.  That's my rate, yes.

8    Q.   Okay.  And do you know what a Chapter 3 -- or Chapter 7

9    trustee commission would be?

10   A.   It varies upon the rate of recoveries.  It just --

11        MR. GUFFY:  Your Honor, I want to object to this line

12   of questioning here.  This is supposed to be whether the

13   debtor -- who controls the debtor, who has authority to act

14   for the debtor.  I think we're now getting into issues that

15   are more properly reserved for what do you call the futility

16   and the cause arguments that you've already decided are going

17   to be continued.

18        THE COURT:  Mr. Parham.

19        MR. PARHAM:  Your Honor, I'll withdraw the question.

20        THE COURT:  Okay.

21        MR. PARHAM:  He may have a point.

22        THE COURT:  Fair enough.

23   BY MR. PARHAM:

24   Q.   Let me ask you this, just to finish up here, the consent

25   talks about Mr. Goodman's -- John Goodman's continuing role.

Russell Nelms - Direct

1    How do you view Mr. Goodman's continuing role with the respect

2    to management of the debtor and the right for new authorities?

3    A.    Mr. Goodman would report to me.  I think for the benefit

4    of the creditors of this estate, even those who have said some

5    fairly unkind things about -- or suggested some unkind things

6    about Mr. Goodman today, is that I think he's uniquely

7    qualified to help implement a successful reorganization here

8    which would be much -- much quicker, and -- and handled much

9    more efficiently than if we pursued in his absence.

10        And as I say I -- I'm -- I'm open to having my mind

11   changed.  I'm not always right in my evaluation of people.

12   But my conversations with Mr. Goodman, at this point in time,

13   suggest to me that -- that he's somewhat integral to the

14   reorganization.  And so -- but he would, in all instances,

15   report to me.

16   Q.    Okay.  So he'd be assisting you --

17   A.    He would be.

18   Q.    -- in providing --

19   A.    Yes.

20   Q.    -- in providing --

21   A.    Um-hum.

22   Q.    -- information for you.

23   A.    Right.

24   Q.    And you're the one calling the shots though.

25   A.    I'll be calling the shots, yes.



Russell Nelms - Direct

1    Q.    And that's pursuant to the engagement letter and the

2    consent.  And, in fact, as we go forward -- as we -- as we

3    file the motion the convert, which is the first thing we did,

4    that was your call?

5    A.    It's my call.

6    Q.    Okay.

7              THE COURT:  Anything further?

8              MR. PARHAM:  Concludes our --

9              THE COURT:  Direct?  Okay.

10             MR. PARHAM:  Yes.

11             THE COURT:  Thank you very much.

12             Mr. Rukavina.

13             MR. RUKAVINA:  Your Honor, I'm not sure if Mr. Parham

14   moved to admit Exhibit 1.  If he did --

15             THE COURT:  He --

16             MR. PARHAM:  If I didn't, I would like to do that.

17             THE COURT:  Is there any objection to the admission

18   of Exhibit 1?

19             MR. RUKAVINA:  Not by me, Your Honor.

20             THE COURT:  Okay.  Hearing no objection.  The Court

21   will admit Exhibit 1.

22        (Written Consent of Voting Shareholders was hereby

23   received into evidence as Debtor's Exhibit 1, as of this

24   date.)

25             THE COURT:  And the Court will also note for the

Russell Nelms - Cross

1    record that the debtor's exhibit list was filed -- let's see

2    if it was filed with the exhibits.

3         MR. RUKAVINA:  They were not, Your Honor, filed with

4    the exhibit list.

5         THE COURT:  Okay.  It was not, so one thing that I'm

6    going ask, Mr. Parham, is that after the hearing if you could

7    upload any exhibits that were admitted.  I appreciate that.

8    It makes it so much easier for the clerk's office.

9         All right.  So Exhibit 1 and Exhibit 3 have hereby

10   been admitted.

11        MR. RUKAVINA:  May I proceed, Your Honor?

12        THE COURT:  Please.

13   CROSS-EXAMINATION

14   BY MR. RUKAVINA:

15   Q.   Mr. Nelms, it's very strange to call you Mr. Nelms

16   instead of Judge Nelms.  Even socially I still call you Judge,

17   but I think here decorum requires that I call you Mr. Nelms.

18   A.   I agree.

19   Q.   Exhibit 1, Mr. Nelms, you said that you saw that before

20   it was executed.  Do you know when this document was executed?

21   A.   Yes, it was -- this was executed -- I think Monday was

22   the 12th.

23   Q.   Correct.

24   A.   So it was executed on the 12th.

25   Q.   Okay.  How do you know that?  How do you know that that's

Russell Nelms - Cross

1    when everyone signed it?

2    A.   I know that because I -- because I was receiving emails

3    from John Goodman as the signatures were coming in --

4    Q.   Okay.

5    A.   -- I was actually getting copied on that correspondence.

6    Q.   So you think that we can go to your emails for exact

7    dates and times that all the signatures came in?

8    A.   Yes.

9    Q.   Okay.  Why were the signatures coming to as opposed to

10   someone else?  Do you know?

11   A.   Oh, they weren't just coming to me, they were also going

12   to Mr. Parham as well.

13   Q.   Is it fair to say that you and Mr. Parham were just

14   waiting on these signatures to file the motion to convert?

15   A.   No, that's really -- that's not really the case.

16   Q.   Well, why wasn't the motion to convert filed earlier on

17   the 12th as opposed to after the order for relief?

18   A.   Well, let me just put this in its right context.

19   Q.   Okay.

20   A.   We weren't scrambling around to try to -- to -- we

21   weren't scrambling around in an effort to try to beat the

22   entry of the order for relief.  We -- we -- to be quite frank

23   with you, at the time, in light of the fact that there was

24   going to be a hearing, which I guess was scheduled for today,

25   we actually thought we had a full week to file the motion --

Russell Nelms - Cross

1    to file the motion to convert.

2    Q.   Okay.

3    A.   And so it wasn't like there was this real urgency on our

4    part to do this.  We were -- we were just doing all of this

5    stuff anyway.  And then I think it was, kind of, in the middle

6    of when these signatures were coming in that we received the

7    copy of the order for relief.

8    Q.   Okay.  So at least one of the signatures was signed after

9    the order for relief.

10   A.   Yeah.  The -- the --

11   Q.   Okay.

12   A.   -- one or more signatures were signed after the order for

13   relief.  I think that's what the -- what the email trail will

14   show.

15   Q.   Okay.  Well, I have a few question for you, Mr. Nelms,

16   about Exhibit 1, so you might want to pull it out and read it

17   as I'm asking you questions.

18   A.   Now, which -- which exhibit?

19   Q.   Exhibit 1, sir.

20   A.   Okay.

21   Q.   That's the shareholder consent.

22   A.   Yeah.

23   Q.   Okay.  Now the very first sentence says, the undersigned

24   shareholders holding a majority of the issued and outstanding

25   shares.  You see that, sir?

escribers

Russell Nelms - Cross

1   A.   I do.

2   Q.   And to your understanding, do those shareholders hold the

3   majority?

4   A.   That's my understanding.

5   Q.   Okay.  You don't have any independent knowledge?

6   A.   I don't.

7   Q.   Do you know whether there's other shareholders that have

8   not signed this document?

9   A.   I don't.

10  Q.   Okay.  The second whereas -- please take time to read it

11  if you need to, but it lists and identifies several

12  subsidiaries.  Do you see that, Mr. Nelms?

13  A.   In the third -- in the third whereas?

14  Q.   No, in the second whereas.  In the judgment of the voting

15  shareholders of the corporation it is desirable.  Do you see

16  that, sir.

17  A.   Oh, yes.  Yes --

18  Q.   Okay.

19  A.   -- I see.  Yes, um-hum.

20  Q.   It references as wholly-owned subsidiaries Goodman

21  Network Services, LLC; GNET ATC, LLC; and Multiband Field

22  Services, Inc.  Do you see that, sir?

23  A.   I do.

24  Q.   Okay.  And they're defined as subsidiaries.  Do you see

25  that?



Russell Nelms - Cross

1    A.   I do, yes.

2    Q.   And I know you've only been in this case for, I guess, a

3    week or so, but do you agree, or do you have any reason to

4    disagree that those subsidiaries are wholly owned by the

5    debtor?

6    A.   It's my understanding that they are.

7    Q.   Okay.  And would you also, then, understand that the

8    debtor's ownership of those subsidiaries would be property of

9    the estate?

10   A.   The ownership interests --

11   Q.   Yes.

12   A.   -- whether they're represented by shares, or

13   membership --

14   Q.   Yes.  Yeah.

15   A.   -- interest would be property of this estate; that's

16   correct.

17   Q.   And did anyone ask you whether signing this document,

18   Exhibit 1, might be a stay violation?

19   A.   No, I was -- I was not asked that question.

20   Q.   Do you recall discussing with Mr. Parham, or any other

21   lawyer for the debtor whether there was -- the automatic stay

22   being implemented?  I'm sorry, implicated.

23   A.   Well, you're asking whether -- I mean you have to keep in

24   mind that at this point -- I guess if we're having this

25   discussion here -- well, hang on just a second, I'm trying

Russell Nelms - Cross

1    to -- okay.  I'm sorry, say -- ask your question again,

2    please.

3    Q.   Yes.  Yes, Mr. Nelms.  Prior to this document being

4    executed, so I'm talking about prior to last -- this last

5    Monday.

6    A.   Right.

7    Q.   And you've heard me say that the trustee is waiving the

8    debtor's privilege.  So my question to you is, do you know

9    whether you and Mr. Parham, or any other debtors' attorney

10   discussed whether the automatic stay applied to the execution

11   of Exhibit 1?

12   A.   Okay.  Well, let me be clear about one thing.

13   Q.   Yeah.

14   A.   Number one, I'm not answering because I think the

15   privilege has been waived because I think that's an area of

16   dispute.  But I'm going to answer your question because of

17   this reason, because what it -- that -- that discussion, had

18   it occurred, would have been before I became an independent

19   director --

20   Q.   Okay.

21   A.   -- therefore not privileged.

22   Q.   Okay.

23   A.   But the answer to your question is no.

24   Q.   Okay, fair enough.

25   A.   But I just -- I wanted to make that clear because I

Russell Nelms - Cross

1   didn't want to purport to waive the privilege by answering it.

2   Q.   I respect that.  My questions now are about the rest of

3   this document beginning with the paragraph that says, now

4   wherefore be it resolved.  You see, Mr. Nelms, this is the

5   third highlighted or bolded --

6   A.   I do see it.

7   Q.   Okay.  And it talks about authorizing the filing of a

8   voluntary Chapter 11 petition for the subsidiaries.  Do you

9   see that, sir?

10  A.   Yes, I do.

11  Q.   Okay.  And then the last -- there on page 1, further

12  resolved, the last paragraph.  It appoints you, you being the

13  independent director, to take any and all necessary steps, et

14  cetera, on behalf of the subsidiaries.  Do you see that, sir?

15  A.   Tell me which resolve paragraph you're looking at,

16  please.

17  Q.   The last on page 1, Mr. Nelms, further resolved, the

18  independent director shall, acting alone in each case, et

19  cetera, et cetera.

20  A.   I see what you're saying, yes.

21  Q.   Okay.  And then we can talk about the next page, but do

22  you agree with me that this document authorizes the retention

23  of Akerman as bankruptcy counsel for the subsidiaries?

24  Further resolved that the --

25  A.   Yes.  Yes --



Russell Nelms - Cross

1   Q.   Yeah.

2   A.   -- I see that one.

3   Q.   Okay.

4   A.   I see that provision, yes.

5   Q.   Okay.  And that this document also authorizes the

6   retention of LainFaulkner as financial advisors to the

7   subsidiaries.  Do you see that, sir?

8   A.   That's correct.

9   Q.   Okay.  And that you as the independent director are

10  authorized on behalf of, and in the name of the subsidiaries

11  to retain such other professional, et cetera, as you deem

12  appropriate.  Do you see that, sir?

13  A.   I do.

14  Q.   I'm paraphrasing, obviously.

15  A.   Yes.

16  Q.   Yeah.

17  A.   I understand.

18  Q.   Okay.

19  A.   But I agree with you.

20  Q.   Okay.  So this document, in addition to other things,

21  basically gives you managerial rights over the subsidiaries,

22  correct?

23  A.   It does.

24  Q.   Okay.  The subsidiaries have not filed Chapter 11

25  petitions yet, have they?



Russell Nelms - Cross

1  A.   No, that I would consider to be a violation of the

2  automatic stay.

3  Q.   Okay.  And perhaps it's legal argument where Mr. Parham

4  can discuss it, but I will suggest to you, sir, as a

5  bankruptcy expert, and as a renowned, and beloved bankruptcy

6  judge that the whole of Exhibit 1 is a stay violation.

7       I'd like to now move, Mr. Nelms, to a document that's an

8  email which I've marked as Exhibit TA.

9       MR. RUKAVINA:  Your Honor, T for trustee, and A for

10  TA.  May I approach?

11       THE COURT:  Yes, you may.  Thank you very much.

12  Q.   Mr. Nelms, do you recognize --

13       MR. RUKAVINA:  And I don't know how to do it for our

14  colleagues on the -- on the internet, but it's an email from

15  Russell Nelms to John Goodman, David Parham, Shanna Dinkins on

16  December the 15th.  No, I'm sorry that's when it's archived.

17  It's sent on December the 10th.

18       I don't know how to show it to them, Your Honor,

19  maybe Mr. Berghman does.

20       THE COURT:  Mr. Berghman, if you can put it on the

21  screen, please do so.  If not, perhaps you can email it to the

22  other counsel if --

23       THE CLERK:  (Indiscernible).

24       THE COURT:  Pardon?

25       MR. BERGHMAN:  I got you.



Russell Nelms - Cross

1              THE CLERK:  He can (indiscernible).

2              THE COURT:  Okay.

3              MR. RUKAVINA:  I don't even know where the camera on

4       me is, I could show it to the --

5              THE COURT:  You give us just a moment, I think Mr.

6       Berghman can join and share it, just one moment.

7              MR. RUKAVINA:  Didn't we used to have an ELMO, or

8       whatever they called it?

9              THE COURT:  We did have an ELMO.  I think it's right

10      there under the --

11             THE CLERK:  We still (indiscernible).

12             MR. RUKAVINA:  It belongs in the Museum of Science

13      and Industry from the '80s.

14             THE COURT:  Oh, they won't be able to see from the

15      ELMO either.

16             MR. RUKAVINA:  Oh.  Well, Your Honor, I'll see if Mr.

17      Berghman can't email this.  In the meantime, shall we proceed?

18             THE COURT:  Yeah, exactly.

19      BY MR. RUKAVINA:

20      Q.   Mr. Nelms, do you recognize Exhibit TA?

21      A.   I do.

22      Q.   Does this appear to be a true and correct copy of the

23      email that you sent?

24      A.   It is.

25             MR. RUKAVINA:  I move to admit TA, Your Honor.



(973) 406-2250 | operations@escribers.net | www.escribers.net

Russell Nelms - Cross

1          THE COURT:  Any objection to the --

2          MR. PARHAM:  Your Honor, I'm going to object on the

3     basis of --

4          THE COURT:  -- admission of TA?

5          MR. PARHAM:  Yeah, I'm going to object on the basis

6     of relevancy.  I just don't see that this has anything at all

7     to do with the standing issue.

8          MR. RUKAVINA:  It does, Your Honor, because Mr.

9     Parham asked Mr. Nelms multiple questions about the enrollment

10    of Mister -- the role of Mr. Goodman.  Mr. Nelms testified

11    that his role is instrumental -- I forget the exact words, but

12    Mr. Nelms testified that he's also in charge, so this is

13    rebuttal to those purposes.

14         THE COURT:  All righty, I'm going to overrule the

15    objection to relevancy, and that the Court will weigh it

16    properly in connection with the decision.  So the objection is

17    overruled.  Exhibit TA is hereby admitted.

18         (December 10 Email Sent by Russell Nelms was hereby

19    received into evidence as Trustee's Exhibit TA, as of this

20    date.)

21    Q.   So Mr. Nelms, this is an email that you sent to Mr.

22    Goodman, and Mr. Parham, copying Miss -- I think -- I guess

23    it's a Ms. Dinkins.

24    A.   Yes.

25    Q.   Just for my -- is she your assistant?



Russell Nelms - Cross

1    A.    Ms. Dinkins is my paralegal --

2    Q.    I apologize.

3    A.    -- and my assistant.

4    Q.    I apologize, I just didn't remember her name.  Okay.

5          Would you agree with me -- or, I'm sorry.  Would you

6    please read into the record the paragraph that begins with, as

7    I am sure that Dave would agree.  It's about four or five

8    paragraphs in.

9    A.    Yes.

10   Q.    Please read that.

11   A.    As I'm sure that Dave would agree, in the early stages of

12   the bankruptcy the emphasis is on collecting cash, protecting

13   assets, and reducing expenses, not necessarily settling

14   claims.  Also avoidance actions are down the road items.

15   Q.    Thank you, sir.  Thank you, sir.  Two paragraphs down you

16   write, we will need an accounting firm that does specialized

17   bankruptcy accounting.  Do you see that, sir?

18   A.    I do.

19   Q.    Why did you say that?  Why did you say that you need that

20   accounting firm?

21   A.    At this point I had seen some consolidated financial

22   statements which -- well, let me -- let me back up.  I think

23   in any bankruptcy case you're always going to need a financial

24   consultant who can do specialized insolvency accounting that

25   can perform those services.  And some of those are fairly

Russell Nelms - Cross

1   routine.  But when I looked at the consolidated financials

2   that were sent to me -- and these were prepared by CGFI, is

3   that the company?  There was some -- there were some monies

4   that had gone out the door that -- that I -- that I didn't get

5   an explanation for, the money coming back for -- well, I'll

6   make -- I'll refer to the AMRR transaction.  It looks at the

7   level of one of the subsidiaries, and I guess it was GNET,

8   forty-four million dollars went out the door, a forty -- a

9   forty-four-million-dollar note came back, then after that

10  twenty-two million dollars of that note was signed to -- I

11  believe to a preferred shareholder.

12  Q.   Do you know which preferred shareholder?

13  A.   Somebody's told me that it -- is it Tin (ph.) -- I don't

14  know.  I don't -- I don't know who it is.

15       But just looking at that entry, itself alerted me to the

16  fact that -- that this was -- this was the type of transaction

17  that needed some -- that needed to be investigated.

18  Q.   Next you write, John, your current firm may do that type

19  of work.  Who's John?

20  A.   John Goodman.

21  Q.   Were you suggesting that you might consider John

22  Goodman's firm to look at the specialized bankruptcy

23  accounting that you might need?

24  A.   Yeah, I did suggest that.

25  Q.   Okay.



Russell Nelms - Cross

1          THE COURT:  Where do you see that, Mr. Rukavina?

2          MR. RUKAVINA:  Your Honor, it's the paragraph

3     beginning, we will need an accounting firm.  Do you see that,

4     Your Honor?

5          THE COURT:  Okay, thank you.

6          MR. RUKAVINA:  The sentence after that.

7          THE COURT:  Um-hum.

8          MR. RUKAVINA:  Has, Your Honor, found it?

9          THE COURT:  Um-hum.

10         MR. RUKAVINA:  Okay.

11         THE COURT:  Thank you.  And it's also up on the

12    screen now, Mr. Rukavina.

13         MR. RUKAVINA:  Oh.  Thank you, Mr. Berghman.

14    Q.   I'll read the next paragraph, Mr. Nelms.  "John, you

15    mentioned a willingness to purchase some or all of the bonds.

16    I would hold off on that.  It is possible that any investment

17    would be structured differently in the bankruptcy case and

18    that you could be afforded additional protections not

19    available outside bankruptcy.  That is something you would

20    want to talk with your own lawyers about."

21         Did I read that correctly, Mr. Nelms?

22    A.   You did.

23    Q.   What are you referring to?  What willingness had John

24    manifested to purchase some or all of the bonds?  Do you

25    remember?



Russell Nelms - Cross

1  A.   Yes, I do believe that -- that Mr. Goodman has been in

2  negotiations for some time with bondholders to purchase the

3  bonds from them.

4  Q.   Did he tell you why he wanted to purchase them?

5  A.   I think he did tell me why.  I don't remember why.

6  Q.   Okay.  Now, you -- obviously you never represented or

7  purported to represent Mr. Goodman as an attorney, right?

8  A.   That's correct.

9  Q.   Okay.  Why are you giving him, whatever this is, advice,

10  or a suggestion?  Or I'm not trying to put words in your

11  mouth, why are you telling him anything about his willingness

12  to purchase bonds?

13       MR. PARHAM:  I'm going to object again.  I'm not

14  seeing where this goes anywhere towards the standing of the

15  debtor to pursue a chapter motion to confer.

16       MR. RUKAVINA:  It doesn't, Your Honor.  But again,

17  Mr. Parham elicited evidence and testimony from Mr. Nelms that

18  I am now impeaching.  He opened the door to this by talking

19  about how Mr. Nelms will be independent, Mr. Goodman will not

20  have management.  Mr. Goodman, however, is instrumental.  I'm

21  using this to -- I don't want to impeach Mr. Nelms, I think

22  the world of him, but I don't think that this email suggests

23  the kind of strong man that is now being suggested.

24       THE COURT:  Objection overruled.

25  Q.   Do you remember my question, Mr. Nelms?



Russell Nelms - Cross

1    A.    Yes, I do.

2    Q.    Okay.  Why were you -- again, whatever this is, a

3    suggestion, why were you telling Mr. Goodman what you thought

4    he might ought to do or not to do?

5    A.    Well, at that point in the case it appeared to me that

6    one of the -- that one of the, perhaps, sources of cash that

7    could be used by the debtor is that Mr. Goodman, himself,

8    might be that sort of -- that he might be that repository of

9    cash, that he would be willing to come forward, and help us

10   fund the debtor-in-possession.  And given the choice of those

11   two things, and if -- if Mr. Goodman's going to sit there, and

12   he has a choice of going out and buying some -- using that

13   cash to buy bonds, or using that cash to help me fund a

14   bankruptcy case, I want that cash.  I don't -- you know, so

15   I'd rather have it, and then we could put in the -- we can put

16   that in the pot, and the bondholders can get their pro rata

17   shares.  So that's what I was thinking.

18   Q.    And that's also why you're telling him that if --

19   basically, if you're going to use some money you get more

20   protections inside of bankruptcy than out.

21   A.    Sure.  That's right.  Um-hum.

22   Q.    So far in this email we basically seen that you're

23   suggesting that avoidance actions might come later on down the

24   road.  You're suggesting that you might hire Mr. Goodman's

25   firm.  And you're suggesting that if he's going to put in

Russell Nelms - Cross

1    money, then he might do it when there's more protection for

2    him.  Is that, generally, correct?

3    A.   I'm sorry, did -- did you say that I suggested that we

4    would hire his firm?

5    Q.   Well, no I didn't say that.  You inquired as to whether

6    his firm would do that work.  Here's what I'm trying to say,

7    Mr. Nelms, this is -- this is a couple days before you were

8    retained.  I understand that, right.  And doing debtor work, I

9    understand sometimes you need to look at sources of recovery

10   that might be your own client, and that's sometimes very

11   uncomfortable, correct?

12   A.   Correct.

13   Q.   Okay.  You're not suggesting anywhere in here something

14   like, we got to start suing people right away, are you?

15   A.   No, I'm not suggesting that here.  I have to tell you, I

16   wouldn't suggest it in any Chapter 11 case.

17   Q.   You're not --

18   A.   That's not the first thing you do; that's right.

19   Q.   That's right.  And you're not suggesting here, let's get

20   in a third-party forensic accountant right away to find out

21   what happened, are you?  An independent --

22   A.   No, I think I did suggest that.

23   Q.   But then you suggested that -- well, I'm sorry, then you

24   asked John whether he might be able to do that, correct?

25   A.   Did I -- I asked John whether his firm might be able do

Russell Nelms - Cross

1   it?

2   Q.   Yeah.

3   A.   I did ask that question.

4   Q.   By the way, did he ever respond to that question?

5   A.   No, here's what happened in response to that.

6   Q.   Let me stop you.

7   A.   Okay.

8   Q.   Was there ever -- do you remember an email response to

9   this?

10   A.   This is because he didn't -- if he responded by -- no, he

11   didn't respond by email.

12   Q.   Okay.  Did you recall whether anyone responded to your

13   email TA?

14   A.   No, there --

15   Q.   Okay.

16   A.   -- wasn't a response to that.

17   Q.   So what happened with respect to the possibility that you

18   might retain Mr. Goodman's firm to be this accountant that

19   you're talking about?

20   A.   Well, we had a discussion on Sunday night.  This is --

21   this letter was on a Sunday -- or this was on a Saturday, we

22   spoke on a Sunday night.  And we started going through some of

23   these transactions, and I think one of the things I learned in

24   that -- in that discussion was that CGFI had basically done

25   the accounting work for this forty-four-million-dollar note.

Russell Nelms - Cross

1    They had --

2    Q.    And pardon me --

3    A.    -- been involved in that transaction.

4    Q.    -- and pardon me, CGFI, unknown name to me.

5    A.    That -- that's the accounting that -- when I say Mr.

6    Goodman's accounting firm, that's CGFI.

7    Q.    Okay.

8    A.    I believe.

9    Q.    Those are also the ones that did the balance sheet that

10   you saw that --

11   A.    Yes.

12   Q.    Okay.

13   A.    That's right.

14   Q.    And I apologize.

15   A.    Yeah.

16   Q.    I thought it meant ground fault interruption circuit

17   which is I use when I build bathrooms, but go ahead --

18   A.    Oh, yeah.

19   Q.    -- please continue.

20   A.    Well, they had been involved in that transaction which

21   was, I thought, a transaction that would have to be

22   investigated.  And because they were involved in that

23   transaction, and maybe other transactions, I knew at that

24   point we couldn't use them.

25   Q.    Understand.



(973) 406-2250 | operations@escribers.net | www.escribers.net

Russell Nelms - Cross

1    A.   So at that point that's when I knew we had to go a

2    different direction.

3    Q.   Did you make that decision after you were retained or

4    before?

5    A.   No, I had already -- I had already -- I think I was on

6    the phone with Dennis Faulkner first thing on Monday morning.

7    Q.   Oh, I got it.

8         Let's focus on the last paragraph of that page, Mr.

9    Nelms.  "Based upon my review of the financials, it appears

10   that we should file voluntary petitions on behalf of Multiband

11   Field Services, and GNET ATC."  Do you see that, sir?

12   A.   Yes.

13   Q.   Did I read that correctly?

14   A.   Yes, you did.

15   Q.   So, let me -- let me ask you something, so here you are

16   on Saturday, December the 10th.  We've seen earlier that

17   you've recommended that the debtor agree to the entry of an

18   order for relief under Chapter 11, stating that you think that

19   Judge Larson would grant that relief.  And then you've also

20   stated at the bottom that you think -- or it appears that we

21   should file voluntary petitions.  Your recommendations on

22   those weren't taken, were they?

23   A.   When you say they weren't taken, we --

24   Q.   Let's read.  Let's read.  You start by saying, "it

25   appears that the next steps are the following, agree to the

Russell Nelms - Cross

1   entry of an order for relief under Chapter 11".  The debtor

2   never agreed to the entry of an order for relief under Chapter

3   11, did it?  Yes, or no, Mr. Nelms.

4   A.   Well --

5   Q.   Mr. Nelms, did the debtor ever agree to the entry of an

6   order for relief under Chapter 11?

7   A.   I'm going to answer your question here.

8   Q.   Okay.

9   A.   It depends.

10   Q.   Okay.  The debtor never --

11   A.   The answer -- because the answer is that I believe that

12   in an email that Mr. Parham had with the -- the Court's clerk,

13   he indicated that -- that the debtor would.

14        MR. RUKAVINA:  We'll just move --

15   A.   And he also indicated that they intended to confer.

16        MR. RUKAVINA:  -- move to strike, Your Honor.

17   Hearsay, best evidence.

18        THE COURT:  Objection overruled.  I mean excuse me,

19   motion to strike denied.

20        MR. RUKAVINA:  Okay.

21   Q.   Did the debtor ever file a voluntary Chapter 11 petition?

22   A.   It did not.

23   Q.   Okay.  Did the debtor ever consent to the entry for an

24   order for relief?

25   A.   Not by virtue of filing, no.



Russell Nelms - Cross

1   Q.    Okay.  And in the last paragraph, did a voluntary

2   petition ever get filed on behalf of Multiband Field Services,

3   and/or GNET ATC?

4   A.    Yeah, we did not do that between --

5   Q.    Okay.

6   A.    -- Saturday and Monday.

7   Q.    And you still haven't done it through to today, correct?

8   A.    I would think -- if you're taking the position that

9   Exhibit 1 is a violation of the automatic stay, I think you'd

10  definitely take the position that that would be.

11  Q.    I would, but just, again, we've clarified that Multiband

12  Field Services and GNET, no petitions have been filed on or --

13  A.    That's correct --

14  Q.    Correct.

15  A.    -- they haven't been filed; that's right.

16  Q.    Okay.  You continue to write, "we should then move to

17  have them administratively consolidated with the case of GNI".

18  GNI meaning this case, right?

19  A.    That's correct.

20  Q.    Okay.  "This consolidation would immediately reduce the

21  amount of attorney's fees going out the door."  Did I read

22  that correctly?

23  A.    That's correct.

24  Q.    Okay.  Your recommendations on those things weren't

25  followed either, were they?  As of today, they weren't

Russell Nelms - Cross

1    followed.

2    A.    No.

3    Q.    Okay.  You continue writing, "also efficiencies would be

4    achieved because we could put an end to discovery for the time

5    being".  Okay.  What did you mean, sir, about putting an end

6    to discovery for the time being?

7    A.    Well, my understanding is there's been a lot of discovery

8    in this case, it's been very contentious.  I think everybody

9    has spent a lot of money in discovery.  And so, it means that,

10   number one, there is going to be an automatic stay in effect

11   which puts it into discovery.  And so -- and then that's

12   coupled with another thing.  And this is something that I

13   mention in my interview on Thursday.

14        In my capacity I'm going to do a lot of stuff without

15   discovery.  You need something, you call me or my lawyer up,

16   and if it's not a problem, we're going to be sending that to

17   you.  You don't need to notice me for a deposition.  You don't

18   need to -- you don't need to prepare a notice for production

19   of documents, all that other stuff.  I'm here to cooperate

20   here, I'm not here to create obstacles.

21   Q.    And I respect that, because you're a professional.  So

22   you've already established that you, certainly as of this

23   date, had some questions about some pre-petition transactions,

24   correct?

25   A.    I had seen that consolidated financial statement; that's

Russell Nelms - Cross

1    true.

2    Q.   And did I understand your answer to mean that you

3    wouldn't need discovery to get to the bottom of that.  You'd

4    use your powers as a director to get to the bottom of what

5    happened, find out the information relevant to that?

6    A.   Well, I think that the first person I would go to would

7    be John Goodman, himself.

8    Q.   Okay.  So you would get the answers to your satisfaction

9    you'd think, right?  You'd think that you'd get -- you know

10   you'd hope that as the independent director you'd get answers

11   satisfactory to you, whatever those answers might be,

12   regarding any transactions that you might have questions

13   about, correct?

14   A.   Well, I'm not suggesting that Mr. Goodman, alone, is

15   going to satisfy all -- is going to satisfy me with respect to

16   all of my questions.  But I have confidence that -- that due

17   to my contacts with Mr. Goodman, as well as the use of Mr.

18   Faulkner that I would be -- and let's face it, creditors also

19   have a lot of information that they can provide me.  So I

20   didn't intend this to be a single source of information.

21   Q.   But once you would receive all this information you would

22   control whether, when, and how you would give it to creditors,

23   right?

24   A.   Would I control it?

25   Q.   Um-hum.



Russell Nelms - Cross

1    A.   Yes, I would have control over that information; that's

2    correct.

3    Q.   Okay.  One moment, Mr. Nelms.

4         THE COURT:  Um-hum.

5    Q.   I doubt that you know anything about this document as it

6    pre-dates you.  So I'm just going to ask a couple questions,

7    generally.  Have you heard of any shareholders by the name of

8    Ron Hill?

9    A.   No.

10   Q.   William (ph.) Dirkwah?

11   A.   No.

12   Q.   That sounds Klingon.  D-I-R-K-W-A-H.  Skip Hullett (ph.)?

13   A.   No.

14   Q.   Scott Pickett (ph.)?

15   A.   No.

16   Q.   Alarshia M. Pickett (ph.)?

17   A.   No.

18   Q.   Have you heard of other shareholders other -- whose last

19   name is not Goodman?

20   A.   I -- I have not.

21   Q.   Okay.  Have you seen a listing of shareholders of the

22   debtor?

23   A.   I have not.

24   Q.   Have you requested one?

25   A.   I have -- when the order for relief was entered I



Russell Nelms - Cross

1    moderated my activities.

2            MR. RUKAVINA:  Pass the witness, Your Honor.  Thank

3    you.

4            THE COURT:  Thank you, Mr. Rukavina.

5            All righty.  Mr. Guffy, Mr. Silverstein,

6    cross-examination for Mr. Nelms?

7            MR. SILVERSTEIN:  Yes (audio interference) thank you,

8    Your Honor.  Can you hear me okay?

9            THE COURT:  I can.

10           MR. SILVERSTEIN:  Good.  Thank you.

11   CROSS-EXAMINATION

12   BY MR. SILVERSTEIN:

13   Q.   Good afternoon, Mr. Nelms.  We were discussing Exhibit 1,

14   which is the written consent.  Do you have that document

15   nearby?

16   A.   Yes, I do.

17   Q.   Thank you.  You see these signatures on page 4, I

18   believe?  I don't think it's a numbered page, but it's after

19   page 3.  There's James Goodman, see that?  There's Joseph

20   Goodman.

21   A.   I do, yes.

22   Q.   There's Jonathan (audio interference) Jason (audio

23   interference) and then --

24   A.   Yes.

25   Q.   -- Goodman MBE.  How many shares do you understand that



Russell Nelms - Cross

1    James Goodman owns?

2    A.   I don't know.

3         MR. RUKAVINA:  You Honor, I'll object that as

4    speculation.

5         Sorry, Mr. Silverstein, for objecting to my own

6    ally's objection, but I'm going to rest on that objection.

7    Lack of foundation.

8    Q.   Mr. Nelms, do you know how many shares Joseph --

9         THE WITNESS:  Did you withdraw that?  I don't know.

10   Were you waiting for a ruling Mister --

11        MR. RUKAVINA:  I objected, yes.

12        THE COURT:  I was waiting for Mr. Silverstein to

13   respond to your objection.

14        MR. SILVERSTEIN:  I'm asking Mr. Nelms if he knows

15   how many shares each of these people own.

16        THE WITNESS:  I don't, no.

17        MR. SILVERSTEIN:  I don't know what the objection

18   (audio interference) --

19        THE COURT:  Now I'm going to rule.

20        MR. SILVERSTEIN:  -- I don't know what the basis for

21   objection (indiscernible).

22        MR. RUKAVINA:  Yeah, I do not have an objection to

23   that question.  That's a different question than how much does

24   Joe own.

25        THE COURT:  I think his original question was how --

Russell Nelms - Cross

1   does he understand how much he owns.  I'm going to overrule

2   the objection.  I'm going to allow the witness to testify as

3   to his understanding, if he has any, of what the -- of Mr.

4   James E. Goodman (ph.) owns.

5           MR. SILVERSTEIN:  Thank you, Your Honor.  Excuse me.

6           THE COURT:  I'm going --

7           MR. SILVERSTEIN:  So it's --

8           THE COURT:  -- I'm going to take control of this

9   pretty soon.

10  BY MR. SILVERSTEIN:

11  Q.   It is your testimony, Mr. Nelms, that you have no idea

12  how many shares the -- one, two, three, four, five entities

13  who signed this resolution own in the aggregate?

14  A.   That's my testimony, yes.

15          MR. PARHAM:  Your Honor --

16  Q.   So you have no idea if the (indiscernible) majority of

17  the --

18          THE COURT:  Just one moment, Mr. Silverstein, Mr.

19  Parham has stood for an objection.

20          MR. PARHAM:  Yeah.  No.  Well, actually --

21          THE COURT:  Please speak to the mic.

22          MR. PARHAM:  -- I apologize for interrupting Mr.

23  Silverstein.

24          I was going to ask if we could just take a short two

25  or three-minute break for the witness to get a drink in.

Russell Nelms - Cross

1          THE COURT:  Oh, of course.

2          THE WITNESS:  Oh.  You know, Your Honor, I don't

3    really need a drink.  I just -- I don't need to take a break.

4    I just needed a cup of water if anybody has one.

5          THE COURT:  Okay.

6          MR. RUKAVINA:  I've already drank mine, I apologize.

7          THE WITNESS:  No.

8          THE COURT:  We'll bring one.

9          THE WITNESS:  Oh, okay.  Thank you.

10          THE COURT:  We'll bring one.

11          Mr. Burns (ph.), if you could bring a water in.

12          THE WITNESS:  Sorry to ask.

13          THE COURT:  We're fine.

14          MR. SILVERSTEIN:  Tell me when I can proceed.

15          THE WITNESS:  Oh.

16          THE COURT:  You can proceed, Mr. Silverstein.

17          MR. SILVERSTEIN:  Okay.  I don't want anyone to be

18    parched when I'm questioning, but --

19    BY MR. SILVERSTEIN:

20    Q.   Mr. Nelms, you have no idea if the folks who signed

21    Exhibit 1, in fact, own a majority of the shares in Goodman

22    Networks?

23    A.   That's correct.

24    Q.   So you have no idea if this is a valid resolution?

25    A.   I relied on it, but I'm relying on the representation

Russell Nelms - Cross

1   from these people that it was valid.

2   Q.   Where do they make -- where do they each give you that

3   representation?

4   A.   By virtue of their signatures.

5   Q.   Okay.  Thank you.  Now you mentioned Mr. Goodman as being

6   somehow knowledgeable about this business; is that correct?

7   A.   Yes.

8   Q.   Has John Goodman told you that he is knowledgeable about

9   this business?

10  A.   He has.

11  Q.   Do you know when John Goodman was last involved in the

12  operation of this business when it was an operating business?

13  A.   Well, I think the best way to put this is, is that if we

14  take this debtor and the two subsidiaries, I think that

15  Mister -- that Mr. Goodman has been working to resolve various

16  issues with respect to this enterprise that consist of these

17  three entities for some time now.  But I can't -- I can't tell

18  you --

19  Q.   (Indiscernible) --

20  A.   -- I can't tell you the beginning date of that.

21  Q.   And when you say -- what kind of involvement do you think

22  he's had?  What's your understanding as to that?

23  A.   Well, he does have a consulting agreement.

24       THE WITNESS:  Thank you.  Thank you.

25  A.   He has a consulting agreement.  I'm not -- the -- I've



Russell Nelms - Cross

1   seen the consulting agreement, but as I recall on my copy, I

2   don't think it was dated so I'm not sure exactly when it

3   started.  But I think that he has -- for example, and this is

4   my understanding, he has been attempting to work with Mr.

5   Frinzi with respect to understanding this forty-four-million-

6   dollar transaction, why it was done, where the money went.  He

7   has been trying to -- to work with him on some type of

8   resolution of that particular issue.

9       Also I understand he's been behind the scenes negotiating

10  with bondholders with respect to the purchase of their bonds.

11  So you know there's several moving parts to these three

12  different entities, and I think that -- my understanding is

13  that Mister -- Mr. Goodman has been attempting to work with --

14  with -- with creditors of each of those entities in order to,

15  kind of, solve these problems.

16  Q.   Would it surprise you if I told you that Mr. John Goodman

17  told me that prior to the involuntary petition being filed he

18  had no involvement with this company for years and knows

19  nothing about this company?

20  A.   Are you saying --

21  Q.   Would that surprise you?

22  A.    -- are you saying prior to the filing of the involuntary

23  petition?

24  Q.   Yes.

25  A.   I wouldn't necessarily be surprised if he said that he



Russell Nelms - Cross

1    didn't have -- that he hadn't been having an involvement prior

2    to the involuntary petition, yes.  I -- would -- would I be

3    surprised --

4    Q.   (Indiscernible) the September -- September of this

5    year --

6    A.   I'm sorry, the question is would I be surprised.  I guess

7    my answer is no, would not be surprised.

8    Q.   Do you believe that Mr. John (audio interference) has any

9    knowledge of the transaction with the entity called 18920

10   where, I think, fourteen million dollars was paid to that

11   entity?

12   A.   I do believe that Mr. Goodman would have knowledge about

13   that.  I -- I -- I think the answer to your question is yes, I

14   think he has knowledge.

15   Q.   And do you know what -- how he would have obtained that

16   knowledge?  When the transaction occurred --

17   A.   I don't.

18   Q.   -- or after the fact?  And what about the AMRR forty-two-

19   million-dollar transaction which happened, I believe, in early

20   '22, unless I'm wrong on that?

21        I'm right on that.  Okay, '22.  I see Mr. Guffy, he's

22   nodding his head, so it's the right date.

23        You think he had knowledge of that transaction?

24        MR. PARHAM:  Your Honor, again, I'm not sure what

25   this has to do with corporate authority, but -- so I would

Russell Nelms - Cross

1    object on --

2            MR. SILVERSTEIN:  I didn't hear.

3            MR. PARHAM:  -- relevance.  I would object on

4    relevance.

5            THE COURT:  If you would give your objection at the

6    mic, please.

7            MR. PARHAM:  Yeah, Your Honor, I would object on the

8    basis of relevance.  I'm not sure what any of this has to do

9    with --

10           THE COURT:  He's objecting on the basis of relevance,

11   Mr. Silverstein.

12           MR. SILVERSTEIN:  Well, Mr. Parham opened the door

13   when he asked questions about John Goodman, and when Mr. Nelms

14   testified about how John Goodman is an important and

15   significant factor here.  So I think it's fair game.

16           THE COURT:  I'm going to overrule the objection, and

17   give you a little bit of rope here, Mr. Silverstein, but --

18           MR. SILVERSTEIN:  (Audio interference) I'll try not

19   to hang myself.  Thank you.

20   Q.   Mr. Nelms, can you turn to page 2 of Exhibit 1, and read

21   the second further resolved paragraph, please?  Remind me --

22           THE COURT:  And before you -- before we turn to that,

23   Mr. Nelms, I missed your response to whether or not Mr.

24   Goodman would have any knowledge of the AMRR transaction.

25           THE WITNESS:  Well, my understanding --



Russell Nelms - Cross

1          MR. SILVERSTEIN:  According to my --

2          THE WITNESS:  -- Mr. Goodman was not involved in that

3    transaction.  I think that was a Mr. Frinzi transaction.  But

4    I know that's he's been -- my understanding is he's been

5    involved in trying to pursue its collectability.

6    Q.   Thank you, Mr. Nelms.  Page 2 of Exhibit 1, can you look

7    at the second further resolved paragraph, and please read that

8    to us.  It's very short.

9    A.   I see that, yes.  Oh, did you want --

10   Q.   You mind reading it out loud?

11   A.   -- I'm sorry, did you want me to read that?

12   Q.   If you don't mind.

13   A.   Okay.  "Further resolved that the authority of John

14   Goodman granted pursuant to the terms of that certain

15   consulting agreement shall continue in full force and effect

16   in accordance with the terms thereof."

17   Q.   And you said you haven't read the consulting agreement;

18   is that correct?

19   A.   Say again, please.

20   Q.   You said, I believe, that you have not read the

21   consulting agreement; is that true?

22   A.   No, I have read the consulting agreement.

23   Q.   You have read, okay I misunderstood.  And is it -- is

24   your understanding that under the consulting agreement Mr.

25   Goodman effectively acts as the CEO of the company -- of

Russell Nelms - Cross

1   Goodman Networks, Inc.?

2   A.   My recollection of it is, is that it grants him fairly

3   broad powers as a consultant.  So whether you -- whether it's

4   those of a CEO or not I don't know.

5   Q.   Okay.  He's referred to as a consultant, does the company

6   have any other officers?  And by company (audio

7   interference) --

8   A.   I don't know.

9   Q.   -- use the word company I mean Goodman (audio

10  interference) --

11  A.   Are we talking about Goodman --

12  Q.   -- (audio interference)?

13  A.   -- Networks, Inc.?

14  Q.   Yeah, I'm only talking about Goodman Networks, Inc.  If I

15  was unclear, I apologize.

16  A.   I don't know.

17  Q.   You don't know.

18  A.   Huh-uh.

19  Q.   You testified that you don't think that the folks who

20  signed this written consent can terminate you.  Tell me the

21  basis for that belief because I don't see it in any document

22  anywhere, and the documents suggest that they can terminate

23  you the same way they hired you.

24  A.   Well, the basis of that belief, I guess, is formed by

25  virtue of my own experience.  I, in various capacities, have

Russell Nelms - Cross

1    dealt with shareholders, in the context of bankruptcy cases,

2    trying to remove officers, directors, or management when some

3    of their activities begin to focus on the shareholders,

4    themselves.  And the recourse that the person who's in charge

5    has to the bankruptcy court to challenge the legitimacy of

6    that, the correctness of it, and if necessary, to move to

7    convert the case to a different chapter, or to appoint a

8    trustee based upon the efforts to remove.  So, yes, I -- I --

9    that's the basis of my belief.

10   Q.   Is it your understanding that prior to your being

11   appointed as the director, Goodman Networks, Inc. had no board

12   of directors?

13   A.   No, I don't have that belief.

14   Q.   You think there was a board of (audio interference) with

15   members?

16   A.   I just -- the answer is, I just don't know one way or the

17   other.

18   Q.   Do you believe that you're the sole director at the

19   moment?

20   A.   I do believe that, yes.

21   Q.   So before you were appointed director there -- director

22   there was no -- there were no -- there's no board of

23   directors; doesn't that follow?

24   A.   Probably at -- yeah, at the -- at the moment of my

25   appointment, my understanding is that there weren't other

Russell Nelms - Cross

1    directors.  Now in some time earlier in relation to that had

2    there been, I don't know.  But at the time of my appointment,

3    yes, I -- I wasn't being appointed as one among other

4    directors.

5    Q.   And if I were to tell you that the folks at the debtor

6    have no idea who was on that board of directors when we've

7    asked them those questions, would that surprise you?

8    A.   I guess it would not surprise me.

9    Q.   Yeah, you said earlier, and you said the same thing to us

10   when we spoke by phone last week, that you want to be informal

11   about this, and you don't need to send notices of deposition,

12   you would just give the information to anybody when they

13   requested it.  Did you say something like that a little while

14   ago?

15   A.   I did.

16   Q.   And isn't the fundamental issue there what information

17   you actually have?  Because I don't think you have any

18   information, or am I wrong?

19   A.   Well, as I sit here right now, I don't have a lot of

20   information.

21   Q.   Okay.  And you said also, I think, in your testimony that

22   in response to the (audio interference) the interim trustee's

23   counsel that discovery is distracting.  I believe there was

24   some discussion about a email, and you said discovery is

25   distract -- distracting, is that correct?



Russell Nelms - Cross

1    A.   Yeah, I don't think that's a very controversial

2    statement.

3    Q.   Okay.  But how do you -- how do you figure out the facts

4    in this case without discovery?

5    A.   Well, I guess one way to figure out the facts is to call

6    you, Mr. Silverstein and see what you know, call Mr. Langley,

7    see what he knows, call Mr. Goodman and see what he knows,

8    check with my accountants to see what the records show.  You

9    know, I mean this goes back to my --

10   Q.   There are no records.

11   A.   -- this goes back to my days in the Army.  In the Army we

12   didn't have discovery.  When I was a prosecutor and defense

13   counsel, we didn't have any discovery.  We called up people.

14   We talked to people.  That's really a pretty easy and

15   effective way to do it.  It's faster and it's cheaper.

16   Q.   If people know anything, you're right.  But all -- we've

17   got no information.  So when you say you'd talk to me, I don't

18   know anything yet because basically it's been a total

19   obfuscation of the facts, but -- so I don't know how you

20   conclude that.  It doesn't make sense.

21   A.   Well, but you -- well, I do -- not to argue with you

22   about this, Mr. Silverstein, but your --

23   Q.   No, please do.

24   A.   -- your claim is based upon some documents.  How about if

25   I give you a call, and ask if you can send those documents to

116

Russell Nelms - Cross

1   me?  And how about if I have questions about that, you want to

2   have a discussion about those documents?  Can we do that?

3   Q.   Yeah, that's not a controversy, and Mr. Schaffer could

4   probably send you those documents as we're -- as we're

5   cross-examining you right now; you'd have them in about five

6   minutes.

7   A.   I know but you were saying --

8   Q.   But that's (indiscernible) --

9   A.   -- how do I find things out, and that's -- that's how you

10  find things out.

11  Q.   But what our -- isn't it true that they're -- that the

12  debtor had roughly sixty-odd million dollars in January of

13  2022, and as of the -- according to the CFGI (sic) initial

14  report, which I think you've seen, they had something like

15  several hundred thousand dollars by the date the involuntary

16  petition was filed.

17          MR. PARHAM:  Once again  --

18  Q.   You're aware of that, aren't you?

19          MR. PARHAM:  -- Your Honor, again (indiscernible) --

20          THE COURT:  You're not being picked up.

21          MR. PARHAM:  I'm sorry, I'm going to object on the

22  basis of relevancy given the way we've limited this --

23          MR. SILVERSTEIN:  Again, it's the same opening of the

24  door that I (audio interference) before.  I know you gave me

25  some rope, Judge, I won't use that much more.  But if I can

Russell Nelms - Cross

1    use a little bit -- my point -- the point I'm trying to make

2    is that when sixty, seventy million dollars goes south, one

3    has to figure out what happened.  And when one figures out

4    what happened, one has to dig, and one has to investigate.

5    That's what we've been trying to do for the last four months,

6    frankly, in connection with the discovery that's been

7    occurring in this case, in addition to whether the petitioning

8    creditors were eligible.  So I'm just trying to make the point

9    that Mister -- I'm just trying to get from Mr. Nelms the

10   response to -- response to how do you figure out what happened

11   in this train wreck here.

12           THE COURT:  Okay.  I'm going to sustain the

13   objection, because I do believe that we're getting -- we're

14   getting a little bit into what I would consider the futility

15   arguments, the arguments about the pre- and post-petition

16   activities.  We're getting -- we're getting perilously close

17   to that.  I will allow you to ask the witness about what he

18   would do.  Although I believe we -- believe we may have -- if

19   we haven't beat the horse, we have certainly been--

20           MR. SILVERSTEIN:  Yeah.

21           THE COURT:  -- angry with it.  So let's --

22           MR. SILVERSTEIN:  (Audio interference).

23           THE COURT:  -- stay on task.

24           MR. SILVERSTEIN:  Understood, Your Honor. (Audio

25   interference) my rope on that.  I get it.



Russell Nelms - Cross

1          THE COURT:  All righty.

2          MR. SILVERSTEIN:  I will not beat the horse -- I will

3    not beat the horse anymore, and I apologize if I -- if I did.

4    BY MR. SILVERSTEIN:

5    Q.   Mr. Nelms, do you think the debtor right now, between you

6    as the independent director, or John Goodman right now could

7    go out and borrow money on behalf of the debtor?

8    A.   Can the debtor -- can I borrow money on behalf of the

9    debtor; is that your question?

10   Q.   Yeah, with an interim trustee in place -- with an interim

11   trustee in place.

12   A.   Well, not with a Chapter 7 trustee in place, no.

13   Q.   Okay.

14

15          MR. SILVERSTEIN:  I think I have a few more questions

16   and I actually may ask Mr. Guffy if he has any follow up that

17   I've missed.

18          MR. GUFFY:  Just a couple.

19   BY MR. GUFFY:

20   Q.   Mr. Nelms, as a director, who do you report to?

21   A.   Well, as a director, you report to the board but I think

22   the key word there is report.

23          MR. PARHAM:  Your Honor, again, I think it's one

24   lawyer per witness.  It's your discretion but I think one

25   lawyer per witness and handing it off to another --



119

Russell Nelms - Cross

1          MR. SILVERSTEIN:  I'll ask the question, okay?

2          THE COURT:  Okay.

3    BY MR. SILVERSTEIN:

4    Q.   Mr. Nelms, to whom do you report?

5    A.   The independent director reports to the board.

6    Q.   But the board is just you.  So you report to yourself?

7    A.   I do.

8    Q.   Who else is on the board?

9    A.   Well, I guess let's ask the question this way.

10   Q.   Why don't you answer the question?

11   A.   Because your question is this, in a board -- if you're a

12   board, who reports to the board?  I guess I'm chasing my tail

13   a little bit on that question.

14   Q.   Yeah, I'm not understanding the answer.

15   A.   Again, I --

16   Q.   To whom do you report?

17   A.   I'm the board.

18   Q.   Do you report to John Goodman since he is --

19   A.   The board --

20   Q.   -- the consultant slash --

21   A.   -- the board --

22   Q.   -- CEO?  Do you?

23   A.   I guess -- you know, I'm sorry.  I guess I misunderstood

24   Mr. Guffy's question.  I apologize for that.  I -- I'm -- I

25   thought he was asking as a board member, who do I report to.



Russell Nelms - Cross

1    And the -- and -- and the independent director, the board,

2    reports to the shareholders.  So I report to the shareholders.

3    Q.   Who have a right to fire you because they appointed

4    you --

5    A.   I'd say that's --

6    Q.   -- and that's to whom you (audio interference)?

7    A.   I'd say that because this debtor is in -- is in

8    bankruptcy, that right is qualified.

9    Q.   And where is that written?

10   A.   It's written in my mind.  It's a good mind.

11          MR. SILVERSTEIN:  Again, Your Honor, if I could have

12   a little more rope and just let Mr. Guffy finalize any

13   questions he had, notwithstanding Mr. Parham's objection, I

14   would appreciate that.  I would have been there in person had

15   I seen this witness and exhibit list.  I'm a little

16   handicapped here because I was not expecting testimony.  So if

17   you could indulge me, have Mr. Guffy finish up, that would be

18   great.  If not, I understand.

19          THE COURT:  All right.  But let's make sure we're not

20   repetitive.

21          Anything further, Mr. Guffy?

22          MR. GUFFY:  Just one additional question, Your Honor.

23   BY MR. GUFFY:

24   Q.   Mr. Nelms, under your understanding, who did John Goodman

25   report to as a consultant before you were appointed?

Russell Nelms - Cross

1    A.   Well, Mr. Goodman's -- as I understand it, his services

2    were spread across the debtor and its two subsidiaries.  But

3    the subsidiaries as I understand it are wholly-owned

4    subsidiaries of GNI.  So he reported to the shareholders of

5    GNI.

6           MR. GUFFY:  Thank you.  Nothing further from me.

7           THE COURT:  Thank you very much.

8           MR. SILVERSTEIN:  Thank you, Your Honor, for the

9    indulgence.

10          THE COURT:  You're welcome.

11          All righty.  I'll go now to Mr. Langley.

12          Mr. Langley, cross-examination for the witness?

13          MR. LANGLEY:  Yes.  Thank you, Your Honor.

14   CROSS-EXAMINATION

15   BY MR. LANGLEY:

16   Q.   Mr. Nelms, good afternoon and thank you for being here.

17   Can you go back to your engagement letter and tell me who

18   signed that engagement letter?

19   A.   The engagement letter was signed by John Goodman.

20   Q.   And in what capacity was he signing?

21   A.   This is Exhibit 3, correct?

22   Q.   It is, yes.  And you can, by all means, refer to it.

23   A.   He signed in the capacity of Goodman MBE -- MBE Group

24   representative.

25   Q.   And what is your knowledge regarding that entity?



Russell Nelms - Cross

1   A.   I have no knowledge about that entity.

2   Q.   And what made you assume that you had authority based on

3   this signature then?

4   A.   Well, because I had -- I had specifically broached the

5   question of authority with Mr. Goodman.  Originally, when I

6   drafted this, he had indicated that he would sign in the

7   capacity, I believe, as consultant.  I told him that I -- I

8   mean, that didn't sound right to me.  And so that -- that they

9   needed to basically review their own authority and to let me

10  know exactly what that authority was.  So that's -- this is --

11  this comes from Mr. Goodman.

12  Q.   And I'll ask Ms. Carson to assist me here.  I don't

13  believe the consulting agreement for Mr. Goodman's been

14  entered into the record.

15       MR. LANGLEY:  Ms. Carson, do you have a copy of that

16  we can present to Mr. Nelms?

17       And I'll refer to everyone else it is document 8 in

18  the exhibits that we submitted.

19       THE COURT:  All righty.

20       Ms. Carson, do you have an exhibit binder for the

21  witness?

22       MS. CARSON:  Um-hum.  He has it.

23       THE WITNESS:  Oh, I'm sorry.  Thank you.

24       THE COURT:  Thank you very much, Ms. Carson.

25  Q.   Mr. Nelms, I believe you testified you had seen the

123

Russell Nelms - Cross

1   consulting agreement with Mr. John Goodman.  Is that correct?

2   A.   Yes.

3   Q.   And as Exhibit 8 here, that we've just identified, is

4   that the consulting agreement you were referencing?

5   A.   It is.  This differs from the one that I saw.  The ones

6   that I saw did not have signatures on it.

7   Q.   So to follow up then, you understood that Mr. Goodman was

8   acting for the debtor pursuant to a consulting agreement that

9   you never saw the signatures?

10   A.   No, as a matter of fact --

11   Q.   Is that correct?

12   A.   -- I think I testified to the opposite.  What I said was,

13   his capacity when he originally mentioned it to me was

14   consultant.  And I said that I didn't think that consultant

15   was sufficient.  That's when they changed it to, what Goodman

16   MBE or whatever.  So no.  The answer's no.

17   Q.   Okay.  And Mr. John Goodman -- let me go and back up.

18   You indicated that you had seen the consulting agreement but

19   it was not signed, correct?

20   A.   Correct.

21   Q.   Okay.  And if we turn to the back of this document, are

22   there signatures?

23   A.   Yes, this document has signatures.

24   Q.   Do you have reason to believe those signatures aren't

25   authentic?

124

Russell Nelms - Cross

1   A.   I have no reason to believe that these are not authentic.

2   Q.   Okay.  Do you have any reason to believe they are

3   authentic?

4   A.   No.

5   Q.   Do you know signed on behalf of Goodman Networks?

6   A.   This is -- according to this, it's a person named

7   Samantha Sondrup.

8   Q.   Okay.  And what is her position?

9   A.   This document says chief of staff.

10  Q.   What is your understanding of that role at the debtor?

11  A.   I have no understanding of that.

12  Q.   Do you know if Ms. Sondrup was an officer of the debtor?

13  A.   I do not know.

14  Q.   Do you know if Ms. Sondrup was a director of the debtor?

15  A.   At the time of this -- that this was executed?  Or at any

16  time?  I guess the answer -- the answer to the question is --

17  Q.   At the time this was executed.

18  A.   -- it kind of doesn't make any difference.  I just don't

19  know.

20  Q.   And do you know if Ms. Sondrup was a shareholder of the

21  debtor at this time?

22  A.   Please ask again.  I'm sorry.

23  Q.   Do you know if Ms. Sondrup was a shareholder of the

24  debtor at the time she signed this consulting agreement?

25  A.   I don't know.

Russell Nelms - Cross

1   Q.   Do you have any reason to dispute the testimony of Mr.

2   Konicov, who was the debtor's 30(b)(6) witness when he said

3   that Ms. Sondrup was an administrative person at the debtor?

4   A.   Well, first of all, I don't know what Mr. Konicov

5   testified to but I don't have any reason to dispute anything

6   that he said because I don't know what he said.

7   Q.   But specifically, you wouldn't have any information that

8   would dispute that Ms. Sondrup was an administrative person at

9   the debtor?

10  A.   I have no knowledge about that topic at all.

11  Q.   Let's turn back to the first page of this consulting

12  agreement and there's a section 1A that talks about services.

13  I believe Mr. John Goodman is employed, pursuant to this

14  consulting agreement.   What services does it identify -- and

15  I'd ask you to read section 1A.

16  A.   1A?   Did you want me to read this into the record?

17  Q.   Yes, please.

18  A.   Okay.   "In exchange for the consultant fee, consultant

19  agrees to use its commercially reasonable efforts to perform

20  advisory and consulting services from time to time that are

21  customarily associated with executive management, financial

22  counsel and review, capital structure, and potential capital

23  raises, and overall business strategy, and shall include but

24  not necessarily be limited to the following defined as the

25  services.

Russell Nelms - Cross

1          "One, consultant shall provide advisory services related

2     to all legal, financial, personnel, and operational decisions

3     for company and its affiliates and subsidiaries.  Two,

4     consultant shall provide other services as may be reasonably

5     requested by the company during the term of this agreement."

6     Q.   Okay.  And is this services what you believe authorized

7     Mr. John Goodman to sign your engagement letter?

8     A.   I haven't been -- I'll tell you -- I didn't rely on the

9     consulting agreement for this reason -- for that purpose.

10    Q.   Let's look at --

11    A.   I mean, so if you want to cut the --

12    Q.   -- section 1B.  Can you read --

13    A.   I'll -- let me, you know, I'll help you here.  And maybe

14    I shouldn't help you here, but if you're -- if all -- this

15    question goes to what investigation of authority did I do with

16    respect to the execution -- execution of my retention

17    agreement, I did not do anything.

18    Q.   Okay.  And in section 1B, can you read that section?

19    A.   "The company will not control, direct, or otherwise

20    supervise consultant's performance of the services, and there

21    are no requirements that consult provide a reasonable number

22    of hours or days per week, provided however that consultant

23    shall use its commercially reasonable efforts to perform the

24    services."

25    Q.   Okay.  And based on this section 1B, do you think John

Russell Nelms - Cross

1    Goodman had any oversight from the company?

2    A.   Okay.  When I -- did John Goodman have any oversight of

3    the company?  And here, the company's defined as Goodman

4    Networks, Incorporated.  I assume he did but again, I haven't

5    investigated that topic.

6         MR. LANGLEY:  Your Honor, I would move to have this

7    consulting agreement entered into the record as -- I don't

8    know what exhibit we're on but whatever exhibit is next.

9         THE COURT:  All right.  Thank you very much, Mr.

10   Langley.

11        Is there any objection to the admission of FedEx's

12   Exhibit 8, which can be found at docket 147-8?  Hearing no

13   objection, FedEx Exhibit 8 -- again, at docket 147-8 -- is

14   hereby admitted.

15        (Consulting Agreement was hereby received into evidence as

16   Creditor's Exhibit 8, as of this date.)

17   Q.   Judge Nelms, there's a 450,000-dollar nonrefundable fee

18   in this consulting agreement.  Do you have any knowledge about

19   whether that was paid or not?

20   A.   I do not have any knowledge about that.

21   Q.   Okay have you investigated with Mr. Goodman that fee?

22   A.   I've not investigated that fee with Mr. Goodman.

23   Q.   Have you investigated any fees received by Mr. Goodman

24   related to his operations related to this company?

25   A.   I have not.

Russell Nelms - Cross

1    Q.   Have you investigated any transfers to Mr. Goodman or any

2    related or affiliated entities of Mr. Goodman received --

3              MR. PARHAM:  Your Honor, again --

4              MR. LANGLEY:  -- from the company?

5              MR. PARHAM:  -- I think I would object.

6              THE COURT:  (Indiscernible).

7              MR. PARHAM:  I think in his direct -- I'm sorry, I'll

8    move (indiscernible) -- in his direct, he indicated that

9    because the order for relief was entered, literally within an

10   hour or so after he was assigned, he hasn't done any

11   investigations into any of these transfers.  So I don't know

12   what -- I think this is just -- I would object that it's

13   duplicative.

14             THE COURT:  Okay.  Thank you very much, Mr. Parham.

15             Mr. Langley, were you able to hear the objection?

16             MR. LANGLEY:  Yes, Your -- yes, Your Honor, he has

17   testified over and over that he's relying on John Goodman,

18   almost providing character testimony to him.  And I want to

19   understand the basis that he has to think that Mr. Goodman has

20   any role in capacity of this and that it can be done in good

21   faith for the benefit of creditors.  I mean, we're talking

22   about authority to file and I want to understand that

23   authority.

24             THE COURT:  Okay.  I think the goal and the line of

25   questioning you just stated is a little bit different than the

Russell Nelms - Cross

1    question that you asked.  So I'm going to --

2              MR. LANGLEY:  Well, let me strike that.  I'll try

3    to --

4              THE COURT:  Okay.  And look, I think that the

5    objection to the line of questioning on what have you done to

6    investigate Mr. Goodman or alleged transfers, has been asked

7    and answered.  Given the timing of the engagement agreement to

8    the order for relief, I think that the witness has credibly

9    testified, very little if anything, if not just because of the

10   timing.  So I'm going to ask that you -- that we not kind

11   of --

12             MR. LANGLEY:  I'll move on --

13             THE COURT:  -- hit that again.

14             MR. LANGLEY:  -- I'll move on.  Yep.

15             THE COURT:  But I do understand the line of

16   questioning that you articulated in your response to the

17   evidentiary objection and I'll let you pursue that.

18   Q.   Your Honor -- or excuse me, Your Honor -- Judge -- Mr.

19   Nelms, have you done anything to confirm that Mr. Goodman had

20   authority to transfer cash or other assets to himself, or

21   related entities and affiliates?

22   A.   I haven't done that.  Just -- I just want to make sure

23   everybody understands this because I checked this.  My

24   engagement letter was signed -- I received it at 1:26 on that

25   Monday.  I think it was December the 12th, a week ago today.

Russell Nelms - Cross

 1    The order for conversion was entered at 1:46.  So anything

 2    that happened in between those twenty minutes, I can pretty

 3    much tell you, I didn't do it.

 4    Q.   Mr. Nelms, I'm going to refer you back to the written

 5    consent that I believe was Debtor's Exhibit 1 and ask you to

 6    turn to the signature page.  Let me know when you're there.

 7    A.   I'm sorry.  Tell me again what I'm looking at, please.

 8         THE COURT:  He said Debtor's 1.

 9    A.   Debtor's 1.

10         THE COURT:  The written consent.

11    Q.   I believe it's the written consent of the voting

12    shareholders in lieu of a meeting.

13    A.   Okay, I'm looking at --

14    Q.   Were you able to find it?

15    A.   I'm looking at Exhibit 1.

16    Q.   Okay.  Would you turn to the signature page?

17    A.   Yes.

18    Q.   Okay.  At the bottom of the signature page, there's a

19    italicized statement.  Would you please read that?

20    A.   The footer?

21    Q.   Yes.

22    A.   "Signature page to Goodman Networks voting shareholders

23    written consent, dated 2/24/22."

24    Q.   Do have any knowledge of whether that date is accurate or

25    not?



Russell Nelms - Cross

1   A.   Well, yeah, I think I do have knowledge about that.

2   Q.   And what is that knowledge?

3   A.   That -- my knowledge is that that date's not accurate.

4   Q.   And what do you base that on?

5   A.   I base it on the fact, and I mentioned this in response

6   to questions by Mr. Rukavina earlier.  On this Monday, as the

7   signature pages were being -- Mr. John Goodman was trying to

8   procure the signatures of other parties during the course of

9   the day to this agreement.  And so there was correspondence

10  between him and the other Goodmans.  We were receiving -- Mr.

11  Parham and I were receiving copies of this.  So I could

12  actually see these being exchanged coming back and forth on

13  December the 12th.

14  Q.   Did you see any of the parties to this agreement, or to

15  this written consent, sign it?

16  A.   No, I didn't.

17  Q.   Okay.  Do you have any knowledge that these weren't

18  signed back in February of -- 24 of 2022?

19  A.   Well, my experience in this case would suggest to me that

20  they weren't but if you're saying can I swear on a stack of

21  Bibles, the answer is no.

22  Q.   And did -- on this first one, did James Goodman provide

23  this copy to you?

24  A.   No.

25  Q.   This first signature page?



Russell Nelms - Cross

1    A.    I think I received -- I think I've received copies

2    from -- all the copies from John.

3    Q.    So other than John Goodman, you did not receive a

4    signature page from any of the other signatories.  Is that

5    correct?

6    A.    I don't think that I did but then again, I wasn't

7    checking that carefully to see who the sender was.

8    Q.    And to confirm, though, you did indicate that at least

9    one of the signatures you believe was sent after the order for

10   relief was entered, correct?

11   A.    Yes, I think that's correct.

12   Q.    Mr. Nelms, can you fire John Goodman as consultant?

13   A.    Yes.

14   Q.    And on what basis do you say that?

15   A.    Because John Goodman and I have agreed to that.

16   Q.    And is that agreement in writing?

17   A.    No, it's oral.

18   Q.    Can the Goodman shareholders that are identified on this

19   written consent, fire you?

20   A.    They can try.

21   Q.    Your engagement letter calls for a 150,000-dollar

22   retainer.  You indicated that one of the written consents was

23   not provided until after the order for relief.  Were you paid

24   your retainer?

25   A.    Yes.  I think I received my retainer at 1:26 on Monday,

Russell Nelms - Cross

1  which was twenty minutes before the order for relief.

2  Q.   Do you know who paid your retainer?

3  A.   I know that John Goodman was responsible for its payment.

4  I don't know the source of the funds.

5  Q.   When you say responsible, was he responsible as a

6  capacity for the debtor, or was he responsible in some other

7  capacity?

8  A.   I don't know.

9  Q.   And you did not see -- just to confirm, you did not see

10  the source of funds?  Is that correct?

11  A.   I did not see the source of funds, no.

12  Q.   Have you seen any operating agreement for GNET ATC LLC?

13  A.   Operating statements?

14  Q.   I'll repeat it.  Have you seen an operating agreement for

15  GNET ATC LLC?

16  A.   No, I have not.

17  Q.   Have you seen an operating agreement for Multiband Field

18  Services LLC?

19  A.   No.

20  Q.   Have you seen any governance documents related to the two

21  subsidiaries of the debtor?

22  A.   I have not.

23  Q.   Have you seen any governance documents other than the

24  written consent that authorizes you to file this Chapter 11

25  petition -- have you seen any governance documents to --

Russell Nelms - Cross

1    related to the debtor?

2    A.    I have not.

3          MR. LANGLEY:  Your Honor, I pass the witness.

4          THE COURT:  Thank you very much, Mr. Langley.

5          Ms. Sixkiller, any cross examination for the witness?

6          MS. SIXKILLER:  Yes, Your Honor, briefly.  I hope I

7    remember some of the exhibit numbers so I apologize if I get

8    that wrong but --

9    CROSS-EXAMINATION

10   BY MS. SIXKILLER:

11   Q.    Mr. Nelms, pleasure to meet you.  Sorry I'm not in the

12   court today.  Can you hear me clearly?

13   A.    I can.  I can hear you well.

14   Q.    Section 1B of the consulting agreement was reaffirmed in

15   Exhibit 1, the shareholder consent.  Is that correct?

16   A.    That's correct.

17   Q.    And it was reaffirmed without modification, is that

18   right?

19   A.    Yes, it was.

20   Q.    Okay.  Exhibit 1, the shareholder consent.  It also

21   grants authority to others to act besides reaffirming that

22   consulting agreement, right?

23   A.    My recollection is that it does.

24   Q.    Okay.  So Akerman, for example, in the third resolution

25   on page 2 of Exhibit 1, that is one of the, I guess, entities

Russell Nelms - Cross

1    that is given some authority by the shareholders, correct?

2    A.    That's correct.

3    Q.    They were retained as attorneys for the corporation and

4    subsidiaries in the, I guess, yet to be filed voluntary

5    bankruptcy case, is that right?

6    A.    Yes, that's correct.

7    Q.    They're also though retained, not just as bankruptcy

8    counsel, but also "as general corporate counsel and for all

9    other relevant purposes."  Did I read that correctly?

10   A.    That's correct.

11   Q.    Okay.  So their authority wasn't limited to the

12   bankruptcy proceeding?

13   A.    No, that's correct.  By the virtue of that document, I

14   think that's right.

15   Q.    Okay.  Then, LainFaulkner company in the fourth

16   resolution.  That entity was also given some authority over

17   the debtor and subsidiaries by the shareholders in Exhibit 1,

18   correct?

19   A.    Yes.

20   Q.    And that authority, though also was not limited to the

21   bankruptcy proceeding, is that right?

22   A.    That's correct.

23   Q.    Yeah, it was also retained for "for all relevant

24   purposes".  Is that right?

25   A.    That's my recollection, yes.



Russell Nelms - Cross

1    Q.    And for you, Mr. Nelms, we can see the authority you were

2    granted by the shareholders discussed in three resolution

3    clauses, I believe, starting with the first one on the -- it's

4    the last resolution on page 1 of Exhibit 1.  Is that right?

5    A.    Hang on just a second, please.

6    Q.    It's okay.  I know it's hard to describe them so it's the

7    first -- it's the last resolution on page 1.  That is one of

8    the resolutions discussing your --

9    A.    Yes, that's --

10   Q.    authority.  Is that correct?

11   A.    Yes, that's correct.

12   Q.    Okay.  And that one is limited to in connection with or

13   related to the voluntary bankruptcy case, is that right?

14   A.    Correct.

15   Q.    Okay.  And the second clause giving you authority is the

16   fifth resolution clause on page 2 of Exhibit 1.  Is that

17   right?  We jumped down to there to see your next resolution

18   giving you authority.

19   A.    Would you ask that question again, please?

20   Q.    Sure.  The next resolution in the shareholder consent,

21   Exhibit 1, that gives you, Mr. Nelms, authority with regard to

22   the debtor or subsidiaries is the fifth resolution clause on

23   page 2.  Is that right?

24            THE COURT:  Page 2, right under the LainFaulkner.

25            THE WITNESS:  Right under LainFaulkner, excuse me.

Russell Nelms - Cross

1   Okay.

2          THE COURT:  It's easier to eyeball.  Right under that

3   one is the --

4          THE WITNESS:  I see what you're saying.

5          THE COURT:  There you go.

6   A.   Yes.  You know, obviously, the -- the document speaks for

7   itself.

8   Q.   Yes.  There's a saying in Arizona, though, not to

9   disagree too much but we actually modified one of our rules.

10  That's where I normally practice.  It says the documents don't

11  speak.  It's in Rule 8 so sorry if I'm going over things a

12  little too much.  But in that fifth resolution clause, it

13  limits your authority -- the one right under the one for the

14  Faulkner -- it limits your authority to "in connection with

15  the voluntary bankruptcy case and the subsidiaries bankruptcy

16  cases on such terms as are deemed necessary, proper, or

17  desirable".  Is that right?

18  A.   That is my recollection, yes.

19  Q.   Okay.  And then, the last resolution giving you, Mr.

20  Nelms, authority is the one right below that.  Is that right?

21  A.   Is the -- is this the next to the last further resolved

22  on page 2?

23  Q.   Yeah.  It's the one that says -- let me see if I can find

24  my exact number.  It's right below the one we just read so you

25  have the LainFaulkner one and then the clause two for your

escribers

Russell Nelms - Cross

1   authority is below that, independent director, we just went

2   over.  And it is the third one with your authority is right

3   below that.  It's the second -- it's the third from the last

4   on page --

5   A.   I see it.

6   Q.   -- 2.

7   A.   Okay.  And --

8   Q.   Okay.

9   A.   -- your question about this one was?

10  Q.   This one is limited -- limits your powers to prosecute --

11  "to prosecute the involuntary bankruptcy case and to carry out

12  and put into effect the purposes of the foregoing resolutions

13  and the transactions contemplated by these resolutions".  Is

14  that right?

15  A.   Yes.

16  Q.   Okay.  And the transactions contemplated in the

17  shareholder consent is the filing of bankruptcy or the

18  converting of the involuntary bankruptcy, right?

19  A.   Yes.

20  Q.   Okay.  So the day-to-day decisions of the company, like

21  hiring and firing, that is not vested in you by the

22  shareholders, correct?

23  A.   Well, no, I guess I disagree with that.

24  Q.   It's a yes or no, sir.

25  A.   I would disagree but --



Russell Nelms - Cross

1   Q.   Where in here does it vest you as not -- authority to

2   take the actions outside of the prosecution of the bankruptcy

3   in connection with the yet to be filed voluntary bankruptcy

4   and -- yeah, that's the other two clauses.  So in connection

5   with the voluntary bankruptcy, or the involuntary bankruptcy,

6   where does it give you other authority?

7   A.   Well, if you look at my engagement agreement, and again,

8   I drafted the agreement, the engagement letter to basically

9   give me all of the powers of a debtor-in-possession under

10  Title XI of the United States Code.  And so --

11  Q.   But that language -- oh, sorry, sir.  Didn't mean to cut

12  you off.

13  A.   No, but it's -- I'm acting pursuant to that -- I'm --

14  debtors-in-possession hire professionals.  They fire

15  professionals.  They operate the business in its ordinary

16  course of business.  They ask courts for permission to do

17  things that are not in the ordinary course of business.  I

18  mean, I'm having a hard time thinking of something that would

19  not be embraced within the context of that engagement letter.

20  Q.   But sir, you would agree that it was possible for the

21  shareholders to put that language in the shareholder consent

22  and yet they did not.  Correct?

23  A.   They could have put that in there.

24  Q.   Okay.  And they did not put that in the shareholder

25  consent, did they?

Russell Nelms - Cross

1   A.   They didn't.

2   Q.   Okay.  They also, in there again, as we've gone -- I

3   guess, a couple folks have gone over, but they reaffirmed the

4   consulting agreement, which I think is Exhibit 8, with John

5   Goodman.  Correct?

6   A.   Yes, I believe that's in here.  Yes.

7   Q.   Okay.  And that is the second resolution clause on page

8   2.  And in that clause, the shareholders did not modify or

9   change that consulting agreement at all, did they?

10  A.   There was no change.

11  Q.   Okay.  So they reaffirmed it as it was written.  And so

12  it -- to the extent it conflicts with the shareholder consent,

13  you would agree that it has -- it overrides your authority,

14  right?

15  A.   No.  I would not agree with that.

16  Q.   Okay.  So --

17  A.   I mean, let's put this --

18  Q.   -- as for the --

19  A.   -- and I'll tell you the reason why.  It's an executory

20  contract.  Right?  I can either assume or reject that

21  executory contract anytime -- anytime I want to.  So I

22  wouldn't say that it overrides my powers.  No.

23  Q.   In that third clause, outlining your authority, it said

24  that one of your roles was to put into effect the purpose of

25  the foregoing resolutions.  Correct?

Russell Nelms - Cross

1    A.   Yeah, I'm going to take your word for it, yes.

2    Q.   Okay.  And one of those resolutions is that the authority

3    of John Goodman granted pursuant to the terms of the certain

4    consulting agreement shall continue in full force and effect

5    in accordance with the terms thereof.  Correct?  That's one of

6    the resolutions?

7    A.   I'm sure that it says that, yes.

8    Q.   Okay.  So as far as terminating the consulting agreement,

9    you're contending you have an oral agreement with John Goodman

10   but you don't have the agreement of the shareholders.

11   Correct?

12   A.   About -- with respect to my firing John?

13   Q.   Well, to terminate the consulting agreement.

14   A.   Yeah, that's found -- that's found squarely within the

15   concept of an executory contract in Title XI.  It's

16   rejectable.

17   Q.   Okay, in Title XI but what I'm saying is on this

18   shareholder consent, the shareholders did not give you

19   authority to terminate the consulting agreement, correct?

20   A.   They gave me the authority to do everything I need to do

21   in Title XI and that includes rejecting that contract.

22   Q.   And what you're pointing to for that is the engagement

23   letter, correct?

24   A.   I'm sorry, say again.

25   Q.   When you're saying they gave you all the authority under

Russell Nelms - Cross

1    Chapter 11, or Title XI, you're saying -- you're referring to

2    the engagement letter, correct?

3    A.    I'm sorry.  There's got two things going on here.  Number

4    one, I'm sorry.  I'm just hearing you electronically.  And

5    number two, I'm sorry, I did not wear my hearing aids today so

6    I don't hear any -- very well anyway but -- I hate to keep

7    asking you to repeat yourself but would you do that please?

8    Q.    Certainly.  The authority that you're saying that they

9    gave you under Title XI, that comes from the engagement

10    letter, correct?

11    A.    It does come from the engagement letter, yes.

12    Q.    Okay.  They did not lay out that authority in the

13    shareholder consent, correct?

14    A.    You know, I have to tell you.  I have not sat down and

15    parsed the language of this -- of this written consent here

16    and overlayed it with the engagement letter.  So if there are

17    inconsistencies there, then -- then they are there.  I can

18    tell you what I understand my authority --

19    Q.    You can't --

20    A.    -- to be but if you want me to say how well is this

21    consistent with that -- they may not be fully consistent.

22    Q.    Okay.  Thank you.

23         MS. SIXKILLER:  No further questions at this time.

24         THE COURT:  Thank you very much, Ms. Sixkiller.

25         Is there anyone else who wishes to cross-examine the

Russell Nelms - Cross

1    witness?

2              MR. SCHAFFER:  Yes, Your Honor.

3              THE COURT:  Mr. Schaffer?

4              MR. SCHAFFER:  Your Honor, Eric Schaffer for UMB Bank

5    as indenture trustee.  Thank you, Your Honor.

6    CROSS-EXAMINATION

7    BY MR. SCHAFFER:

8    Q.   Mr. Goodman (sic), you testified about the debtor's need

9    for cash to fund the case, I believe.  Do you understand that

10   UMB Bank has not consented to the use of cash collateral?

11   A.   Yes, I understand that.

12             MR. SCHAFFER:  No further questions.  Thank you.

13             THE COURT:  Thank you, Mr. Schaffer.

14             Anyone else wish to cross-examine the witness?  All

15   righty.

16             Redirect, Mr. Parham?

17             MR. PARHAM:  Just with respect to the last -- just

18   one question with respect to the last question that Ms.

19   Sixkiller asked.

20   REDIRECT EXAMINATION

21   BY MR. PARHAM:

22   Q.   Mr. Nelms, if you go to, again, Exhibit 1 and the last

23   paragraph -- the last further resolved.

24   A.   I'm sorry --

25             THE COURT:  The shareholder consent.



Russell Nelms - Redirect

1  A.    Could you -- could you get a little bit closer to that

2  microphone of yours?

3  Q.    I'm sorry.

4  A.    Because I can't hear.

5  Q.    Okay.  The first -- Exhibit 1 --

6  A.    Yes.

7  Q.    The shareholder consent.

8  A.    Okay.  I'm looking at Exhibit 1.

9  Q.    Okay.  And so if you go down to the last paragraph on the

10  first page, the last further resolved.

11  A.    Yep.

12  Q.    Okay.  And you look at the powers granted by the

13  shareholders to the independent director.  And if you just

14  read that.  Yes, do you think that gives you the powers

15  consistent with what is in your engagement letter?

16  A.    My reading of this document, when I received it and when

17  I reviewed it, was that it was consistent with my engagement

18  letter.

19        MR. PARHAM:  Okay.  No further questions, Your Honor.

20        THE COURT:  Thank you very much, Mr. Parham.

21        Does this conclude all the questions for the witness?

22  All righty.  It is 1:08 and I'm about to start chewing on my

23  legal pad if I don't get some food pretty soon.  And so how

24  long would the parties like to -- I mean, Mr. Parham, do you

25  have any other witnesses or evidence to put on today?

Colloquy

1              MR. PARHAM:  No, Your Honor.

2              THE COURT:  No?  Okay.

3              MR. RUKAVINA:  Your Honor, I'm going to have just a

4       few questions for Mr. Goodman.

5              THE COURT:  Okay.  All righty.  So what we're going

6       to do is, we are going to take a break and obviously, we've

7       gone well into the -- that a normal lunch hour -- so we're

8       going to return at 2:15.  All righty?

9              THE CLERK:  All rise.

10         (Recess from 1:09 p.m. until 2:22 p.m.)

11             THE CLERK:  All rise.

12             THE COURT:  Please be seated.  All right, ladies and

13      gentlemen.  We're going to go back on the record in case

14      number 22-31641, Goodman Networks.

15             As I recall, when we broke for the lunch hour, we had

16      just concluded the debtor's presentation of evidence; is that

17      my understanding?

18             MR. PARHAM:  Your Honor, we --

19             THE COURT:  Mr. Parham?

20             MR. PARHAM:  -- we concluded Mr. Nelms and I was not

21      going to ask Mr. Goodman questions, but I think I would like

22      to ask Mr. Goodman just a very short set of questions if it's

23      all right?

24             THE COURT:  Okay.  Fair enough.  All righty.

25             Mr. Goodman, I'll ask that you raise your right hand



John Goodman - Direct

1    for me.

2         (Witness sworn)

3              THE COURT:  I need you to unmute your audio.

4              MR. GOODMAN:  Oh.  I'll do it again, sorry.

5              THE COURT:  Ah, that's okay.  Were you able to hear

6    the oath?

7              MR. GOODMAN:  I was.  I do.

8              THE COURT:  Okay.  Thank you very much.

9              MR. PARHAM:  Okay.

10             THE COURT:  Mr. Parham?

11   DIRECT EXAMINATION

12   BY MR. PARHAM:

13   Q.   Yeah.  Mr. Goodman, I just have a very few questions I

14   want to ask you.  First of all, are you familiar with the

15   shareholders of Goodman Networks, Inc.?

16   A.   Yes, I am.

17   Q.   Okay.  And would that be James Goodman, Joseph Goodman,

18   Jonathan Goodman, Jason Goodman, and the Goodman MBE Group,

19   LLC?

20   A.   Yes, it would be.

21   Q.   Okay.  And does that constitute all of the shareholders

22   of Goodman Networks?

23   A.   It does.

24   Q.   Okay.  And with --

25   A.   The -- I'm sorry, the -- I'm sorry, the majority



John Goodman - Direct

1   shareholders, not all of the shareholders.

2   Q.   Okay, so there are other shareholders, but this would

3   constitute a majority?

4   A.   It would constitute a majority, yes.

5   Q.   Okay.

6   A.   Are you asking of the entire company or just the MBE

7   Group?  I just want to be clear.  And let me turn up my volume

8   because I can't hear you very well.

9   Q.   Okay.

10  A.   I'm sorry.  Let me turn it up.  Can you -- can you ask

11  the question again, please?

12  Q.   Okay.  I'm asking for the entire company.  For the

13  entire -- as opposed to the Goodman MBE Group.  For the entire

14  company, do the directors, James Goodman, Joseph -- not

15  directors, shareholders -- James Goodman, Joseph Goodman,

16  Jonathan Goodman, Jason Goodman, and the MBE Group, do they

17  constitute a majority of the outstanding shares of Goodman

18  Networks, Inc.?

19  A.   They would, yes.

20  Q.   Okay.  And Goodman MBE GP, LLC, are you familiar with

21  that entity?

22  A.   I am.

23  Q.   Okay.  And what percentage of the shares of Goodman

24  Networks, Inc. does Goodman MBE Group, LP hold?

25  A.   A majority.

John Goodman - Direct

1   Q.   Okay.

2   A.   It would be roughly -- I don't know the exact number, but

3   it's going to be greater than fifty percent.  So there is the

4   Goodman MBE Group, LLC and then there is the Goodman MBE

5   Group, LP.  The majority voting stock of Goodman Networks is

6   held in the LP.  The LLC is the general partner from my --

7   from my understanding.

8        That was put together in 2017 in agreement with the

9   bondholders and the restructure in 2017.  It was required by

10  the bondholders in order to preserve the MBE component of

11  Goodman Networks at the time.  So this should be common

12  knowledge to the bondholders' counsel and all of the

13  bondholders.

14  Q.   Okay.

15  A.   It's in all the restructure documents -- the pre-packaged

16  restructure documents in 2017.

17  Q.   Okay.  And when you say the MBE, you're talking about the

18  minority business enterprise?

19  A.   It's a minority business enterprise.  The Goodman

20  Networks was founded in 2000.  We were founded on the basis of

21  being a minority business entity -- a Hispanic business

22  entity -- and a lot of our contracts depended on our minority

23  business designation.  So we have been a minority business

24  entity since inception.

25  Q.   Okay.  Are you familiar with Jody Goodman?



John Goodman - Direct

1    A.    I am.

2    Q.    Okay.  And is he an authorized signer for the Goodman MBE

3    Group GP, LLC?

4    A.    He is.

5    Q.    Okay.  And he actually signed the consent agreement for

6    Goodman MBE GP, LP, right, LLC -- excuse me, and LP, correct?

7    A.    In reference to my -- in reference to the consent and the

8    consulting agreement, if that's what you're referring to, yes,

9    he did.

10   Q.    Yes, that's exactly what I was referring to.  And you're

11   familiar with the written consent that was executed on

12   December 12th?

13   A.    I am.

14   Q.    Okay.  And you actually went and got signatures from the

15   various voting shareholders, correct?

16   A.    I did so via email.  I called each of them, explained to

17   them the situation, they requested that I step in and help the

18   company.  So I spoke with them on the phone and sent them the

19   request via email after speaking with them and received their

20   signatures via email.

21   Q.    Okay.  And with respect to Mr. Nelms' engagement letter,

22   you also signed that -- you signed that as Goodman MBE Group

23   representative, correct?

24   A.    I did.

25   Q.    Okay.



John Goodman - Direct

1    A.    Yes.

2    Q.    And is the group representative, is that -- can you

3    explain that designation?

4    A.    Yes.   That was authorized by the Goodman MBE Group.   It

5    gave me the authority to hire consultants or other people into

6    the company to help represent the company.

7    Q.    Okay.   Okay.

8              MR. PARHAM:   No further questions, Your Honor.

9              Thank you, Mr. Goodman.

10             THE COURT:   Thank you, Mr. Parham.

11             THE WITNESS:   Thank you.

12             THE COURT:   Mr. Rukavina?

13             MR. RUKAVINA:   Your Honor, I was going to have

14   questions of Mr. Goodman probably on direct, but if I can do

15   it now, if the Court will give me some latitude, or I can

16   reserve questions for direct?

17             THE COURT:   All right.   Any objection to Mr.

18   Rukavina, basically, crossing the witness beyond the scope of

19   direct?

20             MR. PARHAM:   Well, given the nature of this hearing,

21   I would not want to say beyond the scope of direct without

22   hearing what the questions are.   As long as it's within the

23   scope of this hearing, which goes to shareholder authorities,

24   I don't care.   But I want to reserve the right if we start

25   going afield and talking into other subjects.



John Goodman - Direct

1          THE COURT:  All right.  Well, what I'll have Mr.

2    Rukavina do then is to cross-examine him at this time and he,

3    as he said, has reserved the right to recall him.

4          MR. RUKAVINA:  Okay.

5          THE COURT:  Okay?

6          THE WITNESS:  Your Honor, since I can hardly hear

7    David -- David, if there is anything that I cannot answer,

8    please let me know.  But I can't hear David very well wherever

9    he's sitting, I'm sorry.

10          THE COURT:  Okay.  So this was a --

11          MR. PARHAM:  Yeah, we've had that problem, I'm --

12          THE COURT:  -- point of questioning between the Court

13    and Mr. Parham as to the nature of the cross-examination.  For

14    now, Mr. Rukavina, counsel to the Chapter 7 trustee, Mr. Scott

15    Seidel, is going to seek cross-examination, and various of the

16    other counsel may seek to cross-examine you as well.

17          MR. RUKAVINA:  I'm usually told, Mr. Goodman, to

18    quiet myself because I'm usually loud and obnoxious, so if you

19    can't hear me, I'll be surprised.  With that said --

20          THE WITNESS:  I heard you really -- I heard you

21    really loud and clear earlier this morning so --

22          MR. RUKAVINA:  Good, I will try.

23          THE WITNESS:  -- you sound clear to me right now.

24          MR. RUKAVINA:  My only problem is --

25          THE WITNESS:  Okay.



John Goodman - Cross

1          MR. RUKAVINA:  -- I have an accent and I speak fast,

2    so please, I hate this electronic stuff, please tell me to

3    slow down if you don't understand me, sir.

4          THE WITNESS:  I will, thank you.

5    CROSS-EXAMINATION

6    BY MR. RUKAVINA:

7    Q.   Do you have a copy of the Debtor's Exhibit 1, which is

8    the shareholder consent?

9    A.   I think I do.  Let me find it.  Are you referencing the

10   document that says, "consent of a majority of the managers of

11   the general partner of the Goodman MBE Group", dated September

12   21st, 2022?

13   Q.   I have dated December 12th, 2022.

14         THE COURT:  I think you're talking about two

15   different documents, Mr. Rukavina.

16         MR. RUKAVINA:  I'm talking about --

17         THE COURT:  Based on what he just said --

18         MR. RUKAVINA:  Yes.

19         THE COURT:  -- the title is.

20   Q.   Okay, so Mr. Goodman, I'm talking about --

21   A.   Um, I don't think I do.

22   Q.   Okay.  It's your Exhibit 1 --

23   A.   Not in my possession.

24   Q.   My partner, Thomas, will try to put it up.  What document

25   are you talking about, September 12th?

John Goodman - Cross

1    A.   No, I'm not -- I'm not talking about a December 12th

2    document.

3    Q.   Okay.

4    A.   I was talking about the majority of the managers of the

5    general partnership.  It was a consent.

6    Q.   Okay.  Mr. Goodman, what date is the document that you're

7    talking about that you have in front of you?

8    A.   September 21st, 2022.

9    Q.   Okay.  I'm going to ask my partner, Thomas Berghman, to

10   pull up Debtor's Exhibit 1, which is the written consent of

11   the voting shareholders, in lieu of a meeting, it's dated

12   December 12th, 2022, and this is the document that Mr. Parham

13   was asking you about, okay?

14        MR. RUKAVINA:  So Mr. Berghman, can you control that

15   screen?

16        MR. BERGHMAN:  It's up.

17        MR. RUKAVINA:  It's up?  I don't see it.  Oh, here it

18   is.

19   Q.   Do you see that, Mr. Goodman?

20   A.   I do.  I do.  Could you make it a little bit larger,

21   please?

22   Q.   Yeah.  I'm going to ask you, only right now, about the

23   opening paragraph.  You see it references the terms of that

24   seventh amended and restated shareholders' agreement of the

25   corporation dated as of June 1, 2020.  Do you see that, sir?

John Goodman - Cross

1   A.   Just one second.  I'm trying to read this.  "In the terms

2   of the seventh and amended restated shareholders' agreement of

3   the corporation, dated as June 1st, 2020."

4   Q.   Yes, sir.  Do you see that reference?

5   A.   I do see that.

6   Q.   Are you familiar, to some degree, with that seventh

7   amended and restated agreement?

8   A.   I'm sure I've seen it.  I can't recall it by memory, but

9   I'm sure I've seen it before.

10   Q.   Do you know whether the seventh amended is the last

11   amendment or do you know if there's a subsequent amendment

12   after?

13   A.   I do --

14   Q.   Go ahead sir.

15   A.   I do not.  I do not because as I was not an officer of

16   the company and I had left the company before then.  I haven't

17   been involved with the company for roughly two and a half

18   years.

19   Q.   Okay.

20   A.   So I do not know if there was another seventh and amended

21   restated shareholders' agreement or another amended and

22   restated shareholders' agreement.

23   Q.   Okay.  You personally signed this document -- the

24   Debtor's Exhibit 1 --

25           UNIDENTIFIED SPEAKER:  No.



John Goodman - Cross

1  Q.   -- that's in front of you, right?

2       UNIDENTIFIED SPEAKER:  No.

3  A.   Can you scroll down so I --

4  Q.   Yes.

5  A.   -- can see the signature.

6  Q.   Maybe you didn't, maybe you didn't.  I had thought that

7  there was a Jonathan Goodman that signed this.

8  A.   I'm not Jonathan.  Jonathan is my brother.  I am John

9  Goodman.

10  Q.   Oh, then I apologize to you, sir.  So you did not

11  necessarily sign this document.  We'll go to signature pages,

12  and you tell me.

13  A.   I do not see my signature on there, so no, sir, I did

14  not.

15  Q.   Okay.  I understand.

16  A.   My name's -- my name is not on there.

17  Q.   Okay.  And that just -- and I have to apologize to you --

18  that's again proof that then Mr. Seidel and I have been

19  involved in this case since Friday, so we did not know that

20  there was a Jonathan Goodman and a John Goodman.

21  A.   Yeah.  I know it's odd, but --

22  Q.   Okay.

23  A.   -- my parents chose to use both those names.

24  Q.   Well, I'm going to now ask Mr. Berghman to pull up

25  another document that's going to be marked TB, as in Toy

John Goodman - Cross

1    Bermuda -- I'm trying to think of something that doesn't have

2    to do with tuberculosis or Thomas Berghman.

3            MR. RUKAVINA:  May I approach, Your Honor?

4            THE COURT:  I think Tango Bravo is what you're --

5            MR. RUKAVINA:  Tango Bravo, there you go.  Tom, Tango

6    Bravo.  May I approach?

7            THE COURT:  Yes, you may.

8            THE WITNESS:  Is it possible to make this larger as

9    well, so I can read it?  Perfect, thank you very much.

10           THE COURT:  You're welcome, sir.

11   Q.   So what I'm asking -- and you're certainly welcome to

12   read this, it's a lengthy document -- I don't have any

13   questions about the document other than do you believe that

14   this is a copy -- a true and correct copy of that seventh

15   amended and restated shareholders' agreement?

16   A.   I don't know.

17   Q.   Okay.

18   A.   I'm -- if you're telling me it is, I'm assuming it is.

19   I -- can you scroll down, please?  Can you continue to scroll

20   down?

21           MR. BERGHMAN:  This is unsigned.  Is this the signed

22   agreement?

23           MR. RUKAVINA:  That's all I have.  I don't have a

24   signed agreement.  If he can't authenticate it, then --

25   A.   I'm sorry, can you scroll back up?  Or I'm sorry, I want

John Goodman - Cross

1     to see the signature pages.  It got smaller, by the way.

2          MR. RUKAVINA:  Yeah, zoom in if you can Thomas.

3     A.   Thank you very much.  If that's the first one, could you

4     continue to go down?

5          Okay, now I would like the opportunity to read it.  So

6     you can go back to the top, please, I wanted to look at the

7     signature pages.  Give me one second to read it.

8          Okay, you can go down, please.

9          Okay, can you hold right there?

10         Can you go up just a little bit?  I apologize.

11         MR. RUKAVINA:  Is there a way we can let him control

12    it, Thomas?

13         MR. BERGHMAN:  I don't think so.

14    A.   Can you go up again?

15         Can you go up past the drag notice?

16         Okay.  I'm all the way down to fair market value.  Can

17    you go below that?

18         Okay, can you hold right here?

19         Okay, continue to go down to the next page, please.

20         Okay, you can go down past involuntary transfer, please.

21         Can you go to the -- take the MBE Group to the top of the

22    page?

23         Okay.  Can you hold right there for a second?  I'm sorry,

24    I'm looking at two screens so -- you'll have to forgive me,

25    I'm not looking into the camera right now.



John Goodman - Cross

1       Okay.  Go ahead and scroll down.

2       Okay.  Hold it right there.

3  Q.  Mr. Goodman, let me pause you.  This is an eighteen-page

4  single spaced document.  I'm just going to move on.  If you

5  need to read the whole document -- I was going to ask whether

6  you remember having signed this document, but if you need to

7  read all eighteen pages, I don't --

8  A.  I don't -- I'm sorry, I'm just trying to make sure I

9  understand what I'm reading.  I don't remember --

10  Q.  Okay.

11  A.  -- quite honestly.

12  Q.  Then there's no point in you reading it if you don't

13  remember.

14       MR. RUKAVINA:  Let's go -- you can pull that away,

15  Mr. Berghman.

16  Q.  Going back to the Debtor's Exhibit 1 which was the

17  December 12th unanimous consent that we just discussed, do you

18  know who drafted that document?

19       MR. RUKAVINA:  Pull it up, Mr. Berghman.

20  A.  Can you pull it up, please?

21  Q.  Yep, he's going to do it.  And I apologize, Mr. Goodman,

22  you don't have a copy of the debtor's own exhibits in front of

23  you?

24  A.  I don't think I do -- I don't --

25  Q.  Okay.  Very well.  Do you know who drafted this document?



(973) 406-2250 | operations@escribers.net | www.escribers.net

159

John Goodman - Cross

 1    This is the document that you said you coordinated with other

 2    Goodmans getting them to sign.

 3    A.   Haynes and Boone is my personal counsel, so Haynes and

 4    Boone should have drafted anything that I had -- that I had

 5    signed.

 6    Q.   Okay.  You don't know whether Mr. Parham or Akerman, or

 7    the Akerman law firm drafted this?

 8    A.   I don't remember.  I know that Haynes and Boone drafted

 9    my final documents.

10    Q.   Okay.

11    A.   Can you scroll down?

12         MR. RUKAVINA:  Scroll down, Thomas, I think he asked.

13    A.   Can you scroll down, please?

14         Can you scroll up so I can see the title, please?  I'm

15    not trying to be difficult.  I'm just trying to make sure I've

16    got the right document here.

17    Q.   All right, we'll take all the time that we need.  I'm

18    just surprised that you don't have a copy of your own

19    exhibits, but it's okay.

20    A.   Well, I could have a copy.  They could be in my email

21    somewhere.  I just wasn't aware that I needed to have all

22    these copies of these documents in front of me, so I

23    apologize.

24         THE COURT:  This is the document that your counsel

25    was questioning you about earlier, Mr. Goodman, if that helps.

160

John Goodman - Cross

1    A.    Can you scroll down a little bit?  Okay, if this was the

2    document that -- this would have been -- yeah, if this is the

3    document that -- that was retaining Mr. Nelms, then yes, it

4    would have been drafted by, I believe, by Akerman.

5    Q.    Do you know that, or do you say you believe that -- who

6    drafted it?

7    A.    I -- as far as my memory -- as far as I recall, I believe

8    so.

9    Q.    Okay.  How come you're not a signatory to this document;

10   do you know?

11   A.    Because as -- as the creditors would know on the

12   bondholders' side, I had been in negotiation with them for

13   quite some time in order to buy the bonds and we had an issue

14   around the Trust Indenture Act.  And we were in negotiations

15   to remove me as an affiliate and the bondholders had agreed at

16   that point to change the indenture to remove -- to allow me as

17   an affiliate to vote.  And Haynes and Boone has -- had advised

18   me that the Trust Indenture Act may not allow me even though

19   the bondholders were willing to edit the existing indenture to

20   exclude me as an affiliate so that I could vote a majority of

21   the bonds.

22        I had my brother purchase my common ownership with --

23   which is basically worthless so that I would no longer be a --

24   an affiliate or a member of the MBE Group.  Therefore, I was

25   no longer part of the MBE Group so that I could separate

John Goodman - Cross

1    myself in order to try to purchase the bonds and not have an

2    issue with the Trust Indenture Act.

3    Q.   And which brother was it that purchased your stock?

4    A.   Jonathan Goodman.

5    Q.   Okay.  Going back to this exhibit, sir, Debtor's Exhibit

6    1, you mentioned that you coordinated getting the other

7    Goodmans' signatures, correct?

8    A.   Yes, sir.

9    Q.   Did you also have any role with Mr. Parham or Akerman in

10   drafting this document or deciding what terms would be placed

11   into this document?

12   A.   I had spoken with -- with Russ, I'm sure prior to this

13   document -- or, from what I recall, prior to this document.  I

14   wasn't involved in drafting this document, no.

15   Q.   Okay.  Did anyone seek your approval for the terms of

16   this document before it went out for execution?

17   A.   I don't recall, but I'm sure that I saw it prior to

18   sending it out to each of my brothers.

19   Q.   Okay.  Who decided to hire Russ -- by Russ, you mean

20   former Judge Russell F. Nelms, correct?

21   A.   Yes.

22   Q.   Who decided to hire him?

23   A.   I decided to hire him.  I got a recommendation --

24   Q.   Why did you --

25   A.   -- that he would be --



John Goodman - Cross

1    Q.    -- decide to hire him?

2    A.    Based on his bio, and based on the information that I

3    learned about him.

4    Q.    Okay.  Let me ask the question a different way.  At the

5    time that you decided to hire Mr. Nelms, had you decided that

6    the company should file a Chapter 11 and that's why you needed

7    someone like Mr. Nelms?

8    A.    I think we had lots of discussion and we were still

9    trying to decide if we -- when and if we were going to file a

10   Chapter 11.

11          THE COURT:  Could you take that --

12   A.    I think the -- I'm sorry?

13          THE COURT:  I was asking Mr. Berghman to stop sharing

14   the document.  Please go ahead.

15   A.    Oh, okay.  I think we -- there were a lot of

16   conversations between myself and Akerman in reference to the

17   upcoming hearing, I think which was supposed to happen today

18   on the Chapter 7, and we had conversations in reference to

19   would it -- does it make sense to file a Chapter 11?  And if

20   we were going to file a Chapter 11 that we would need a

21   director or we would need an officer of the company because I

22   wasn't currently serving as the CEO as was stated in some of

23   the creditors' petitions.  I've never been serving as the CEO.

24   But that we would need someone that was independent as a

25   director and as a representative of the company.

John Goodman - Cross

1   Q.   Okay.  So you reference that you had discussions with

2   Akerman.  Did you ever decide that the company should file a

3   Chapter 11 or convert to Chapter 11?

4   A.   I did.  We had a conversation and we decided that that

5   was probably the best course of action.

6   Q.   Okay.  Who's we?

7   A.   Myself and Akerman.

8   Q.   Okay.  And when was this conversation?

9   A.   I do not recall but based on looking at the petition by

10  the creditors, I think it would have been before one of the

11  exhibits that introduced me to Russ or before I got his bio.

12  Q.   Okay.  Well, if I would tell you --

13  A.   I don't remember the exact date.  I apologize.

14  Q.   No, I understand.  But let me try to -- let me try to

15  narrow it in.  So this Court, early afternoon of December

16  12th, entered the order for relief.  Do you know what the

17  order for relief is?

18  A.   It would have been to put us into a involuntary Chapter

19  7.

20  Q.   Correct.  It would grant the Chapter 7.  So if I tell

21  you --

22  A.   Right.

23  Q.   Yeah.  If I tell you that the Court did so on December

24  12th, is it your testimony that you and Akerman decided to

25  file an 11 or convert to 11 before December 12th?

1    A.    That is correct; it was before December 12th.

2    Q.    And before you even interviewed Mr. Nelms?

3    A.    Yes.  From my recollection, it would have been before I

4    interviewed Mr. Nelms.

5    Q.    Okay.  And if Mr. Nelms, right now in open court, said

6    judge, I'm withdrawing the motion to convert, do you believe

7    that he would have the ability to do so?

8    A.    Based on us hiring him, I believe he would.

9    Q.    Okay.  And do you believe that the other shareholders

10   would have the ability to contest him doing so?

11   A.    Not the way that -- not the way that -- from the way that

12   I read the consent.  I believe that the other shareholders

13   gave him full authority to manage and to run the -- to run the

14   process as he saw fit.

15   Q.    Okay.  Let's briefly touch on that.

16         MR. RUKAVINA:  So if we can go to, now, the

17   consulting agreement?

18   Q.    Mr. Goodman, my partner is putting up what has been

19   marked as Exhibit 8 which is a consulting agreement between

20   Goodman Networks Incorporated and Goodman MBE Group L -- Are

21   you familiar with this document?

22   A.    On 12/16 -- is this the agreement between myself and the

23   MBE Group or the consent approving it?

24   Q.    I don't know, sir.

25   A.    Let me look --



John Goodman - Cross

1    Q.    Yeah, let my -- my part --

2    A.    Let me --

3    Q.    Take a look.

4    A.    Can you -- let me take a look at it real quick.

5    Q.    Sure.

6    A.    Can you scroll down a little bit, please?  Okay.  I

7    recognize this, yes.

8    Q.    So this is a consulting agreement between the debtor and

9    Goodman MBE Group, LP, which is an entity affiliated with you,

10   correct?

11   A.    It was at the time, yes.

12   Q.    Okay.  Is it fair to say that you would be the primary

13   consultant providing services pursuant to this agreement?

14   A.    Yes, per the MBE's request.

15   Q.    Understood.  One moment, please.  So we'll put the

16   consulting agreement to the side.  Oh, before we do that, stay

17   on the consulting agreement.

18        MR. RUKAVINA:  And Mr. Berghman, please scroll down

19   to the signature page.

20   Q.    Do you see that signature page, Mr. Goodman?

21   A.    I do, yes.

22   Q.    Who is Samantha Sondrup?

23   A.    She would have been the chief of staff to Jim Frinzi, who

24   was the CEO.

25   Q.    The CEO on October 4th, 2022?



John Goodman - Cross

1   A.   I'd have to look at his resignation date.  I believe it

2   was before then.  But she remained the chief of staff at the

3   company.

4   Q.   Well, Ms. Sondrup, on October 4th, 2022, was not an

5   officer or a director of the company, was she?

6   A.   Not to my knowledge, no.

7   Q.   So to your knowledge, who, on behalf of the company, the

8   corporation itself, authorized the corporation to enter into

9   this consulting agreement with Goodman MBE Group, LP?

10  A.   The voting shareholders of the company.

11  Q.   By ratifying it later on; is that correct?

12  A.   I'm not sure what you mean by "ratifying it later on".

13  They actually signed it and approved it prior to her signing

14  it.

15  Q.   Okay.  So you're telling me that there's a consent of

16  shareholders before this consulting agreement that approved

17  this consulting agreement?

18  A.   I'm just looking at the dates that they signed it.  Jimmy

19  signed it on 9/23; she signed it on 10/4.  I'm talking about

20  this agreement.

21  Q.   Yep.  So I asked you who, on behalf of the company, the

22  corporation, had the authority to approve this.  And I thought

23  you said that the shareholders did by a shareholder agreement.

24  Is that correct not correct?

25  A.   Yeah, I'm not -- I -- I'm getting confused at what you're



John Goodman - Cross

1    asking me.  What I'm saying is that Samantha Sondrup signed it

2    on 10/4.  If you're asking me if she was an officer of the

3    company or a director, she was not.  She was the chief of

4    staff to Jim Frenzi who was the CEO.  And to my knowledge, he

5    resigned and Samantha -- he left.  He had given instruction,

6    from what I was told, by Samantha Sondrup, and by Stephanie

7    Elmore, who was another consultant there, that Jim Frenzi gave

8    her the power to negotiate with -- to work with attorneys, to

9    work with AIG, to work with the banks.  And when I got

10   involved, she was the person that was directly responsible for

11   working with attorneys, the insurance companies, and with the

12   consultants of the business.  So she was the individual that

13   was signing legally for the company, as there was no one else

14   in the company, that I was aware of, that was -- that was --

15   that was doing anything on the company's behalf outside of

16   Samantha Sondrup.

17   Q.   Is that why the company needed your consulting services?

18   A.   I -- I was requested by the family to provide my

19   consulting services because Jim Frinzi has resign -- had

20   resigned.  I -- I can't speak for Samantha or what -- what

21   anyone else thought.  What they shared with me was that Jim

22   Frinzi had resigned, and they asked me, based on my long-term

23   historical experience with the company, and taking the company

24   through the -- the prepack Chapter 11 in 2017, they asked me

25   to come back because they felt like that I had the most

John Goodman - Cross

1  experience and was the most knowledgeable person in a process

2  like this before.

3  Q.   And we're going to refer, perhaps, to this consulting

4  agreement again.

5        MR. RUKAVINA:  But because we only have one screen,

6  I'm going to ask Mr. Berghman to pull that down and pull up

7  that email, please, Thomas.

8  Q.   So are you familiar with this email between John Goodman,

9  whom I'm assuming is you, and a Stephanie Elmore?

10  A.   That is -- yeah, that is me.

11  Q.   Okay.  Are you familiar with this email dated November

12  4th, 2022?

13  A.   Yes, I am.

14        MR. RUKAVINA:  Your Honor, I'd move to admit this as

15  Tango Charlie.  I do not have a copy.  We'll have to file it

16  with the Court.

17        THE COURT:  Yes.  All your admitted exhibits, at the

18  end of the day, Mr. Rukavina, we'll ask you to file those with

19  the Court.  It makes it a lot easier on the clerk's office.

20        Is there any objection to the admission of this

21  email, Exhibit TC?

22        Okay.  Hearing no objection, Exhibit TC is admitted.

23   (11/4/22 email between John Goodman and Stephanie Elmore

24  was hereby received into evidence as Trustee's Exhibit TC, as

25  of this date.)

John Goodman - Cross

1   Q.   Who's Stephanie Elmore?

2   A.   She was the chief of staff at Goodman Networks.

3   Q.   I'm sorry; I thought we established that --

4   A.   Oh, I'm sorry.  Stephanie Elmore -- Stephanie Elmore --

5   Stephanie was a former long-term employee of Goodman Networks.

6   And I guess, somewhere over the last two-and-a-half years, she

7   left and became a consultant.  I don't know what transpired in

8   the two-and-a-half years when I wasn't there, but she handled

9   a lot of the accounting, the AR, the AP within the company.

10  Q.   Okay.  So you're basically telling her, pay me X dollars

11  pursuant to the attached.  Were you paid those dollars?

12  A.   Yes, I was.

13  Q.   Now, I guess here's my question.  Who, on behalf of the

14  corporation, the company, authorized that payment to you?  Or

15  did you authorize it to yourself?

16  A.   Stephanie Elmore -- or not Stephanie Elmore -- Samantha

17  Sondrup executed the agreement on behalf of the company, and

18  then I sent it to Stephanie to make a payment to me.

19  Q.   And you were -- when you sent this email, neither you nor

20  Stephanie were an officer of the corporation, correct?

21  A.   That is correct.

22  Q.   And what is --

23  A.   I was not an officer in the company.

24  Q.   And when you sent this email, neither you nor Stephanie

25  Elmore were a director of the corporation, correct?

John Goodman - Cross

1    A.   That is correct.

2    Q.   Okay.  Now we're going to pull up the Russell Nelms

3    engagement letter, which is the Debtor's Exhibit 3.  I'm sure

4    you've seen this before.  Maybe you have a paper copy.  If

5    not, then you'll negotiate with my partner.

6         MR. RUKAVINA:  But what I want you to look at first,

7    Thomas, is the very last page.  Go back a little -- go down a

8    little lower, Thomas.  I want to see the very bottom of it.

9    Okay.

10   Q.   It says, "agreed to an acknowledged, this 11th day of

11   December, 2022, John Goodman, capacity, Goodman MBE Group

12   representative."  Do you see that, sir?

13   A.   I do.

14   Q.   Okay.  This document's already been admitted into

15   evidence.  Do you remember signing this document?

16   A.   I do.

17   Q.   On December 11th, 2022?

18   A.   I believe so.  That's the date that's on there.

19   Q.   And this is the document by which you, on behalf of the

20   debtor, retained Mr. Nelms as independent director, correct?

21   A.   I believe so.

22        MR. RUKAVINA:  Okay.  Now, go back, Thomas, to the

23   shareholder agreement, Exhibit 1.  I'm sorry, the

24   ratification, whatever we want to call it, the unanimous

25   consent.



John Goodman - Cross

1    Q.   Now, we're going to look at this document in some detail.

2    This is the document that your counsel was asking you about,

3    that's signed by the other Goodmans but not by you.

4         MR. RUKAVINA:  You need to go to the signature page,

5    Thomas, so he can refresh his memory.

6    Q.   So all of these Goodmans have signed at different times.

7         MR. RUKAVINA:  Let's go to page 2, Thomas.

8    Q.   This is the document you testified before you think

9    Akerman prepared, you did not approve ahead of time, and you

10   did not participate in its drafting.  Do you remember giving

11   me those answers?

12   A.   I believe so.

13        MR. RUKAVINA:  Okay.  Near the bottom of the second

14   page, Thomas, the second to last "further resolved".

15   Q.   Okay.  I'm going to stop it right there, and I'm going to

16   read to you, sir, the second to last "further resolved".

17   "Further resolved" --

18   A.   Can you make that just a little -- can you make that just

19   a little bigger for me, please?

20   Q.   Of course.  Okay.  "Further resolved that any and all

21   actions heretofore taken by the officers, directors, or

22   representatives of the corporation, and/or the subsidiaries,

23   in the name of and on behalf of the corporation or the

24   subsidiaries, in furtherance of the involuntary Chapter 7 case

25   and/or the voluntary Chapter 11 petition, or the subsidiaries'

John Goodman - Cross

1    voluntary bankruptcy cases be, and the same hereby are

2    ratified, approved, and adopted."  Do you see that, sir?

3    A.   I do see that.

4    Q.   Okay.  And --

5    A.   Last paragraph, yeah.

6         MR. RUKAVINA:  And scroll to the top, Thomas, the

7    second "further resolved" paragraph.  Actually, it's right

8    there, Thomas.

9    Q.   If you read near the top, Mr. Goodman, "Further resolved

10   that the authority of John Goodman, granted pursuant to the

11   terms of that certain consulting agreement, shall continue in

12   full force and effect in accordance with the terms thereof."

13   Do you see that, sir?

14   A.   I do see that.

15   Q.   Okay.  So is this what you meant earlier that the

16   shareholders approved your consulting agreement?

17   A.   I believe what I'm saying -- the way I read that is that

18   my consulting agreement allowed me to hire and gave me the

19   power to be able to hire Mr. Nelms or any other people that we

20   needed to assist us at the company.

21   Q.   So here's what I'm trying to do here with the time line,

22   and I'm going to try to walk you through it step by step.  The

23   first thing I see here is that the company retains you as a

24   consultant and a chief of staff, who is neither on officer nor

25   a director, signs that for the company.

John Goodman - Cross

1          Then on December the 11th, you sign a contract with Mr.

2     Nelms, on behalf of the company, making Mr. Nelms the

3     independent director.

4          And then on December 12th, the majority shareholders

5     authorize, approve, and ratify all of those things that were

6     done that I mentioned beforehand.  Do you agree with that?

7     A.   I agree with the way you're laying it out, yes.  But I

8     would tell you that I believe that the MBE consulting

9     agreement that had -- gave me the power and ability to be --

10    to be able to hire Mr. Nelms, based on the shareholders

11    approving my consulting agreement.

12    Q.   And --

13    A.   And what I shared with them was, after I had interviewed

14    Mr. Nelms, and talked to him, and decided to hire him, then I

15    went out and also got their approval.  But I don't think I

16    needed their approval, initially, to be able to enter into an

17    engagement with Mr. Nelms.

18    Q.   Okay.  So it's your understanding that before you got

19    their approval you had the authority to retain the sole

20    director for a corporation that you were not a shareholder of.

21    Is that your understanding, Mr. Goodman?

22    A.   Yes, it is.  That's -- that's -- I believe, if I go

23    through the consulting agreement or the consent, it allowed me

24    to do so.

25    Q.   The consulting agreement --



John Goodman - Cross

1  A.   At least that's my understanding.

2  Q.   Go ahead.  Is that a copy of the consulting agreement you

3  have in front of you?

4  A.   Yeah, it is.

5  Q.   Okay.

6  A.   I'm trying to look at it here.

7  Q.   Sir, take your time.

8  A.   On the first page, 1(a)(i) says, "A consultant shall

9  provide advisory services related to all legal, financial,

10  personal, and operational decisions for the company and its

11  affiliates and subsidiaries."

12  Q.   Okay.  Well, sir, are you a licensed attorney?

13  A.   No.

14  Q.   Certainly you weren't --

15  A.   I'm not.

16  Q.   Certainly you weren't suggesting you were going to be

17  practicing law there without a license, correct?

18  A.   No, I'm not practicing law.

19  Q.   That's what I mean.  So it says, "consultant shall

20  provide advisory services related to all legal" -- obviously

21  you weren't trying to suggest that you were going to be a

22  lawyer for the company, right?

23  A.   No, I was not.

24  Q.   Okay.  But the paragraph that you just read for the

25  judge, you read that to authorize you to select for the

John Goodman - Cross

1    corporation the sole director of the corporation, correct?

2    A.   I believe I had the authority to be able to -- to engage

3    and to bring someone in and negotiation the contract.  And at

4    the end of the day, the shareholders had to ratify it and

5    approve it.

6    Q.   That's what I mean.  So if it turns out that the

7    shareholders ratified and approved it --

8         MR. RUKAVINA:  Strike that.

9    Q.   If it turns out that the shareholders signed debtor's

10   document 1 after the Court entered her order for relief, then

11   that would mean that it would be after the order for relief

12   that the shareholders approved both the consulting agreement

13   and ratified Mr. Nelms' selection as the sole director,

14   correct?

15   A.   I don't know the answer to that.  I'm not an attorney, so

16   I can't answer that legally.

17   Q.   Did you -- and I'm not going to talk about talks that you

18   had to your lawyer.  Do you not answer me with respect to your

19   own lawyer.  But did you ever discuss with Akerman whether the

20   so-called automatic stay of the bankruptcy case applied to

21   this written consent of the voting shareholders or to the

22   retention of Mr. Nelms?

23   A.   Can you -- can you say that again, please?

24   Q.   Yes.  Did you ever discuss with Akerman -- not your own

25   lawyer, but with Akerman -- anything having to do with the

John Goodman - Cross

1    automatic stay?

2    A.    Not that I recall.

3    Q.    Did anyone at Akerman give you any advice with respect to

4    whether bankruptcy court approval was needed to enter into any

5    of these transactions, the consulting agreement, the Nelms

6    agreement, and the shareholder consent?

7    A.    Can you ask me that again just so I make sure -- I want

8    to be really clear that I understand what you're asking me.

9    Q.    Yeah.  So I'm talking about communications solely between

10   you and any attorney at Akerman, okay?  Are you with me so

11   far?

12   A.    I am.

13   Q.    And my sole question is did you discuss with Akerman

14   whether approval from the bankruptcy court was needed in order

15   for the debtor to enter into the consulting agreement that

16   we've looked at?

17   A.    No, I do -- I do not recall having a conversation with

18   Akerman that said that I needed to enter into an agreement

19   with Mr. Nelms in order to -- to get a stay --

20   Q.    Okay.

21   A.    -- if that's what you're asking me.

22   Q.    No.  No, sir.

23   A.    I -- I don't --

24   Q.    That was not my question.  Let me try to dumb --

25   A.    Okay.

John Goodman - Cross

1   Q.   Let me try to simplify my question.  Did you ever discuss

2   with Akerman whether the bankruptcy judge had to approve the

3   consulting agreement that we've looked at?

4   A.   No, not that I recall.

5   Q.   Okay.  Did you ever discuss with Akerman whether the

6   bankruptcy judge had to approve the Nelms engagement letter

7   we've looked at?

8   A.   Not that I recall, no.

9   Q.   Did you ever discuss with Akerman whether the bankruptcy

10   judge had to approve the written consent of the shareholders,

11   dated December 12th, 2022, that we looked at?

12   A.   Not that I recall.

13   Q.   Okay.  Did you ever discuss with Akerman whether any

14   approval from the bankruptcy court was necessary for the

15   debtor to undertake any actions?

16   A.   Did I -- can you say that one more time, please, so that

17   I understand it --

18   Q.   Did you ever --

19   A.   -- clearly.

20   Q.   Did you ever discuss with Akerman that the bankruptcy

21   judge had to approve or didn't have to approve any potential

22   cause or action that the debtor wanted to do?

23   A.   In reference to the Chapter -- in reference to the

24   Chapter 11, yes, that the judge -- or the bankruptcy judge

25   would have to approve us in our filing our motion to -- to



John Goodman - Cross

1    move to a Chapter 11.

2    Q.    Okay.  And you told me already that you decided that

3    moving to Chapter 11 was better, right?

4    A.    I don't know when we had the conversation, but we did

5    have a conversation, at some point, that we would be better

6    off moving to a Chapter 11.  And I -- I just don't remember

7    when we -- exactly when we had that conversation.  I'm sorry.

8    Q.    Okay.  But it was, in any event, before December 12th,

9    2022, right, the date that the judge entered your order for

10    relief?

11    A.    Yes, I believe it was.  We had lots of conversations

12    about Chapter 11 and Chapter 7 and what would -- you know,

13    what was the best process and what would happen.  And they

14    explained to me what would happen in a Chapter 11 and a

15    Chapter 7.

16    Q.    And then you decided that the Chapter 11 would be better,

17    right?

18    A.    Yes.

19    Q.    For whom?  Better for whom?

20    A.    For everyone involved.

21    Q.    Including creditors?

22    A.    Yes, of course creditors.  One of the things you have to

23    understand is that I'm -- that I came into this only a month

24    ago, or a month-and-a-half ago, and I'm still trying to figure

25    everything out.  And absolutely I know the fiduciary duty of

John Goodman - Cross

1   an officer or anyone else involved in a business; when you

2   become insolvent, your fiduciary duty is the creditors.  And

3   the creditors always have to be first.

4   Q.   And you're a creditor yourself, right?

5   A.   I am not a creditor.

6   Q.   Okay.  I had thought I heard your counsel, in opening

7   arguments, state that you're a creditor.

8   A.   No, I think you're -- I think you're misunderstanding

9   that my brother James is a creditor.  He still owns bonds.

10  Q.   Oh.

11  A.   He still owns bonds.  But I'm not a creditor, no.

12  Q.   Okay.  So James owns bonds.  Did you not tell me, half an

13  hour ago, that you no longer own stock in the corporation

14  because you were trying to negotiate with bondholders to

15  acquire some of their position?

16  A.   That is correct.

17  Q.   So does that mean that you never did in fact acquire any

18  of the bondholders' position?

19  A.   I have not.

20  Q.   Other than James -- and let's -- again, I'm not trying to

21  be smart about this; I don't know this case.  Are the other

22  Goodmans that signed that document all your siblings?

23  A.   They are, yes.

24  Q.   Other than James, do any of the other siblings own debt

25  against the company, hold claims?



John Goodman - Cross

1   A.   I'm not -- not that I'm aware of.

2   Q.   And did you discuss with the siblings, before they signed

3   that document, that a Chapter 11 would be more in the interest

4   of creditors as opposed to a Chapter 7?

5   A.   I -- I definitely had a conversation with the creditors

6   that Chapter 11 would give us more time to understand what has

7   occurred over the last -- at least for me, the last two-and-a-

8   half years, the last twelve months, the last six months, the

9   last three months, and that we have a fiduciary duty, when a

10   company becomes insolvent, to the creditors, first and

11   foremost, before we have it with anyone else.

12   Q.   Did you discuss whether a Chapter 7 versus a Chapter 11

13   would be better for creditors with your siblings?

14   A.   I do not recall having a distinguishing conversation with

15   my siblings that a 7 or 11 would be better for the creditors

16   because, in my opinion, whether it's a 7 or an 11, your

17   fiduciary duty is always to the creditors.

18   Q.   I guess I'm still trying to understand when this document

19   ratifying the Nelms retention was signed, and you saying that

20   you decided that the conversion was appropriate, why you

21   and/or the signatories decided that the conversion was

22   appropriate.

23   A.   I believe that the conversion to 11 was appropriate

24   because there were a lot of unknowns.  I do not understand

25   everything that happened out there.  I also believe that going

John Goodman - Cross

1    into a Chapter 11 would allow the company to preserve the

2    value for AMRR versus a Chapter 7.  It would give us time to

3    be able to be able to preserve that value for the creditors'

4    benefit.  And I still believe that today.  I believe that

5    there are certain actions that can be taken with AMRR that

6    will preserve that value for all of the creditors involved.

7    Q.    So do you agree --

8    A.    I would -- I personally would never recommend --

9    recommend a Chapter 7 because I believe that you need someone

10   with significant experience in this space, that understands

11   that business.  And I've always believed that based -- when

12   the brothers asked me go back, that I could help preserve that

13   value for the creditors.  And it's always been for the

14   creditors.

15   Q.    So one way to preserve that value is the added control

16   that you would have in a Chapter 11 versus a Chapter 7,

17   correct?

18   A.    I don't know -- I'm not smart enough, nor am I bankruptcy

19   attorney that I understand all of the control between the 7

20   and the 11, but the little knowledge that I do have, I believe

21   that, through negotiating, which we -- which we tried to put

22   in place a forbearance with AMRR, a forbearance agreement that

23   would give control and oversight in a Chapter 11 of that

24   business, with someone that was experienced in the space,

25   would -- would help preserve the value for the creditors.

John Goodman - Cross

1    Q.   You're obviously very sophisticated, having spearheaded

2    the 2017 prepack.  Are you a CPA?

3    A.   I am not a CPA.

4    Q.   Do you have any --

5    A.   And I'm --

6    Q.   Do you have any professional license -- and again, I

7    don't know you, so I'm not trying to be smart about it.  I --

8    A.   No, I understand.  No, I do not have any professional

9    license.

10             MR. PARHAM:  This seems be going --

11             THE COURT:  Just one moment --

12             MR. PARHAM:  -- going --

13             THE COURT:  -- Mr. Parham.

14   A.   I was advised by counsel -- through the entire process, I

15   was advised by counsel --

16             THE COURT:  Please, Mr. Parham, approach the podium.

17             MR. PARHAM:  I'm sorry.  Your Honor, this seems to be

18   going way beyond corporate authority and really almost to the

19   point of a deposition.  I do object to the scope of the --

20             MR. RUKAVINA:  It doesn't, Your Honor.  I'm almost

21   done, and I can either tell Your Honor in a sidebar what the

22   relevance is, or you can trust me and make your relevance

23   ruling later.

24             THE COURT:  Okay.  I'm going to give you a little bit

25   of latitude, Mr. Rukavina.

John Goodman - Cross

1    Q.    Here's the point, Mr. Goodman.  You know what the

2    bankruptcy estate is, right?

3    A.    To my own knowledge --

4    Q.    Okay.

5    A.    -- yes.

6    Q.    Do you agree that controlling the bankruptcy estate in

7    this process is important to the creditors?

8         MR. RUKAVINA:  Strike that.

9    Q.    Do you agree that who --

10   A.    I don't really -- I'm not sure I understand your question

11   completely.

12   Q.    Do you understand that, in a Chapter 11 case, unless the

13   judge does something else, the debtor will manage the

14   bankruptcy estate?

15   A.    I believe the debtor's representative will -- in this

16   case will manage the bankruptcy estate in a Chapter 11 --

17   Q.    And --

18   A.    -- which is Mr. Nelms who I've engaged.

19   Q.    So do I understand that, because you want what's best for

20   the creditors, you believe that Mr. Nelms controlling the

21   process is best for the creditors?

22   A.    I believe that Mr. Nelms controlling the process will be

23   very beneficial to the creditors.  I believe it'll be just as

24   beneficial as anyone else.

25   Q.    Just as beneficial as anyone else?



John Goodman - Cross

1   A.    Anyone else that -- with his -- anyone else with the

2   experience of -- of Mr. Nelms.

3   Q.    So does it not matter that it be in Chapter 11 as opposed

4   to Chapter 7?

5   A.    No, I believe it needs to be in Chapter 11 because I

6   believe Chapter 11 will preserve the value for the creditors

7   greater than it will be in Chapter 7.

8   Q.    Because the debtor --

9   A.    I would just --

10  Q.    Because the debtor has control --

11  A.    I --

12  Q.    Because the debtor controls the process.

13  A.    No.  No, it has nothing -- it has nothing to do with the

14  creditor having -- I mean, the debtor having control.  I

15  believe that the debtor retains significant knowledge that can

16  help through the process of Chapter 11.

17       And I'd like to give you just a -- just a few moments of

18  what the actual debtors have accomplished, and what they've

19  done since 2017, that has significantly reduced debt and has

20  always looked out for the debtholders and the -- I mean, for

21  the creditors.  And I'd love that opportunity.

22       In 2017, when we -- when we went through the prepack, we

23  significantly paid down the bonds.  When I came into the

24  company, when the family asked me to come back -- the family

25  asked me to leave in '14; they asked me to come back in '17 to

John Goodman - Cross

1    help the company as -- just like they did in the last three

2    months.  When I did come back, I helped take the company

3    through a prepack Chapter 11.

4         Upon that, I found the company in disarray with a

5    negative six million of EBITDA.  Within twelve months, we

6    turned that to a positive of twenty million of EBITDA.  Since

7    that time, the company -- I mean, the bondholders had 112

8    million dollars of bondholder debt.  The family, including

9    James, put in twenty-five million dollars of equity in early

10   2020 to help the company continue to grow and to expand.

11        And during that time, the family and the company bought

12   down over -- roughly about ninety-some-odd million dollars of

13   the -- of the bondholders' debt.  And we have continuously

14   worked with the bondholders and offered, through the

15   Pressprich (ph.) agency.

16        I've had multiple conversations with bondholders,

17   continue to buy them down, but we have not only worked with

18   the bondholders, we have paid down roughly ninety -- over

19   ninety million dollars of the bondholder debt through company

20   means and personal means.  We have acquired over eighty

21   percent of the bondholders' preferred Series A1 stock and

22   their common stock.

23        So we -- we have -- we have done a yeoman's job, in my

24   mind, and I'm just speaking personally and passionately, that

25   we've reduced almost a hundred million dollars of leftover

John Goodman - Cross

1   bondholder debt.  And I've been in negotiations with the

2   bondholders -- and Mr. Silverstein would know this, because

3   I've spoken to him directly about this -- trying to buy the

4   remaining bonds in order to continue to reduce debt.

5        And the entire plan was we get the bondholders paid down,

6   then we use the assets that AMRR -- I don't know how AMRR got

7   that money, and I'm not going to tell anybody here that I

8   understand.  But then how do we ensure that the unsecured

9   creditors also get a position so that they can either recover

10  all of or some of what they -- what's been taken from them.

11       And the knowledge that I have, the experience that I had,

12  and the process that I've been through working with the

13  bondholders, I believe that by me being involved, having

14  someone independent like Mr. Nelms will help this company

15  through a Chapter 11.  And I believe this company will become

16  an operating company again very shortly once we get ahold of

17  AMRR.  And I don't want that to be lost.

18       You put it in a Chapter 7, you're going to end up

19  liquidating or -- or forcing that company into bankruptcy, if

20  you're not careful what you're doing, because they have

21  operating bonds, they -- they are working under a top secret

22  security clearance.  And if you're not careful, you're going

23  to destroy the entire value and there's going to be nothing

24  left.  There's going to be a little bit of cash with

25  Prosperity, a little bit of cash with AIG, and there's going

John Goodman - Cross

1   to be nothing left except for the bondholders.

2        And forgive me for my passion, but when I'm talking I'm

3   thinking about the bondholders, I'm thinking about the

4   unsecured creditors, I'm thinking about everyone involved.

5   Everyone recognizes the shareholders have no value.

6   Q.   So let me --

7   A.   But we do have --

8   Q.   Let me stop you.

9   A.   -- a fiduciary duty --

10  Q.   Let me stop you now.  Let me stop you now, Mr. Goodman.

11  A.   I'm not finished, please.  We do have a fiduciary duty

12  and a responsibility to act on behalf of the creditors, and

13  that's exactly what I've been trying to do.

14  Q.   Let me stop you, Mr. Goodman.

15  A.   That's exactly what I've been speaking to the MBE Group

16  about.

17  Q.   Mr. Goodman, it's clear that you're passionate.  It's

18  clear that you have a goal and a vision for how to get the

19  company through this.  And you disagree with those that

20  suggest a Chapter 7 liquidation is the better route.  Isn't

21  that just another way to say control -- that who controls this

22  case matters?

23  A.   No, I do not.  I believe that -- I believe that, through

24  a Chapter 11, that this company and the creditors, in

25  particular the creditors, will be better off than going

John Goodman - Cross

1   through a Chapter 7.

2   Q.   But that only happens if you and Mr. Nelms have control

3   to keep it out of Chapter 7.

4   A.   It's got --

5   Q.   You're not going to --

6   A.   It's got nothing to do with control with me.  What it's

7   got to do with is the -- the most knowledge --

8   Q.   Okay.

9   A.   -- and the experience in a partnership to know where to

10  go, what to do, and how to preserve value.

11  Q.   Now, you mentioned, Mr. Goodman --

12  A.   I have not had --

13  Q.   Hold on, sir.

14  A.   Sir, I have not had --

15  Q.   Hold on, sir.

16  A.   -- a chance to --

17  Q.   Mr. Goodman --

18       THE COURT:  All right.  You guys are talking over one

19  another.  You guys are talking over one another.  I'm going to

20  stop you right there.  I'm going to let Mr. Rukavina get a

21  question on the table, and then I'll allow Mr. Goodman to

22  answer it.

23       Mr. Rukavina?

24  Q.   Mr. Goodman, you mentioned that the company or your

25  siblings -- I don't remember who, but you used the word

John Goodman - Cross

1   "bought down" more than ninety million dollar of bond debt.

2   What did you mean by "bought down"?

3   A.   Reduced the amount of bondholder debt.  It was 112 --

4   112,500,000, I believe, at the prepacked restructure, and

5   today the face value of that is 18 million, which a majority

6   of that was purchased -- the net of that -- take 18 million

7   from the 112, the net of that was personally bought by my

8   brother James, which I think was 35 million dollars, and the

9   company, I believe, purchased 54 million of that.  So I could

10  be off four or five million dollars, but the company and the

11  family has continued to reduce that debt.

12  Q.   And did the company and your brother James buy those

13  bonds for any kind of discount?

14  A.   We -- we purchased the bonds at negotiated prices.  I

15  can't tell you today.  We'd have to look back and see what the

16  bonds were trading at that point in time.  But it's just a

17  matter of fact.  And you can track anything.  You can see that

18  the bondholders were consistently buying debt at below-par

19  value and selling it across to each other.  That's easily

20  trackable.

21  Q.   Sir --

22  A.   And I can't tell you if -- I know when the company bought

23  it, it was not below what it was trading.  And I can't tell

24  you what it -- what the price was when my brother bought it.

25  Q.   But it was trading for below face, correct?

John Goodman - Cross

1   A.   Not -- no, I can't -- I can't answer that.  I can't -- I

2   can only answer on behalf of the company.  I can't answer on

3   behalf of my brother.

4   Q.   I'm asking on behalf of --

5   A.   We -- we --

6   Q.   -- the company.  When the company purchased fifty-four-

7   something million, or whatever number you said, you mentioned

8   that the company didn't necessarily purchase it for less than

9   it was trading out.  My question is the bonds that the company

10  purchased, when it purchased them, it was less than the face

11  amount or face value of the bonds; isn't that true?

12  A.   No.  No, that's not accurate.

13  Q.   You --

14  A.   When we purchased the fifty-some-odd million dollars of

15  bonds, it was above what the bond price was at that point.

16  Q.   Okay.  Maybe I'm using words that I have no --

17  A.   Oh, I'm sorry.  If you're asking did we buy it below the

18  dollar par value --

19  Q.   Yes.

20  A.   -- we bought it -- we bought it -- and I can't remember,

21  I think it was around seventy-five cents, but at the time it

22  was trading down around forty-eight cents on the public

23  market, somewhere around there.

24  Q.   And do you believe that if this case goes into a Chapter

25  11, it will give you and Mr. Nelms a better ability to

John Goodman - Cross

1   continue negotiating out or purchasing the remaining bonds?

2   A.   No.   Mr. Nelms' role here has nothing to do with the

3   bonds, in my opinion.   His role is very clearly to ensure that

4   he is looking out for the best interests of the creditors.   He

5   has nothing to do with the bonds.   He's not advising me on the

6   bonds.   Akerman's not advising me on the bonds.   I don't

7   have -- other than my personal attorneys, no one is advising

8   me on the bonds.

9   Q.   Forget about --

10  A.   Mr. Nelms' role here --

11  Q.   I asked -- I asked --

12  A.   I'm sorry?

13  Q.   -- an inartful question.   Forget about Mr. Nelms.   Do you

14  believe that, if this case goes to a Chapter 11, it'll make

15  your job easier to negotiate purchases or retiring the

16  remaining bonds?

17  A.   I do not believe that.   And I will tell you that my

18  negotiation with the bondholders, and what we have negotiated,

19  the price was far above what the bonds were trading for at the

20  time we negotiated, significantly above.

21  Q.   And how much debt that he purchased does your brother

22  James hold, approximately?

23  A.   I can't answer that specifically.   I believe he purchased

24  somewhere around thirty to forty million of bonds, and I think

25  today he's holding -- I -- I don't know exactly what he's

John Goodman - Cross

 1   holding today.  You'd have to ask him that.

 2          MR. RUKAVINA:  Thank you.  Your Honor, I'll pass the

 3   witness.

 4          THE COURT:  Thank you very much, Rukavina.

 5          THE WITNESS:  Was I going to have an opportunity to

 6   speak?

 7          THE COURT:  I'll allow counsel to redirect you --

 8          MR. PARHAM:  Your Honor --

 9          THE COURT:  -- at the end of cross-examination.  But

10   we've got a few lawyers to get through cross-examination.  So

11   I'll start with Mr. Silverstein.

12          MR. SILVERSTEIN:  Thank you, Your Honor.  I'll be

13   very brief.

14   CROSS-EXAMINATION

15   BY MR. SILVERSTEIN:

16   Q.   Good afternoon, Mr. Goodman.  How are you.

17   A.   Good, Paul.  How are you?

18   Q.   Fine.  Thank you.  You mentioned a couple of times that

19   when you got involved, at one point you said you got involved

20   one to one-and-a-half months ago.  Then you said you got

21   involved three months ago.  Can you pinpoint that for me?

22   When did you get involved?

23   A.   I -- I cannot pinpoint the exact dates, but I think that

24   you would know that I had multiple conversations with the

25   primary representatives at Phoenix, that I've had over the



John Goodman - Cross

1   past two or three years.  I've spoken to them, I think, in

2   July and -- and sometime in, maybe, June or July, and then

3   August.  And then --

4   Q.   But --

5   A.   I --

6   Q.   Yeah, I'm sorry.  I don't mean to interrupt.  I'm trying

7   to go back to when you said I got involved.  And my question

8   related to when you got involved with the company recently in

9   connection with the bankruptcy.  You said one to one-and-a-

10   half months, and then you said three months.  Can you give me

11   generally -- is three months accurate?

12   A.   I'd have -- I'm sorry, Paul; I'd have to go back and look

13   because, originally, my family asked my brother Jonathan to go

14   in and help.  He declined, because he hadn't been involved

15   with the company for four or five years, and he didn't feel

16   like he had the experience.  I've been busy running my own

17   company and -- and handling a bunch of my own business.  The

18   family came back to me, asked me to get involved.  And I'd

19   have to go back and look at my email.  I don't know exactly

20   when that date was.  I apologize.

21   Q.   That's okay.  Is it somewhere between one-and-a-half and

22   three months ago, roughly?

23   A.   I want to say maybe late August, September.  I -- or

24   sometime August, September.

25   Q.   So that's several months ago.  You also mentioned that

John Goodman - Cross

1    you left the company two-and-a-half years ago.

2    A.    Roughly.

3    Q.    Okay.  And that two-and-a-half years, what time period

4    would that -- that would be from when you got back involved in

5    August, September, October, two-and-a-half years back from

6    that?

7    A.    No, sir; that would be probably from today.  I would tell

8    you that it was probably Q1 of 2020.  The family asked me

9    to -- the family came in and asked me to resign as the CEO and

10   chairman of the board.  They wanted to bring new management

11   in, which was a former officer at AT&T that was on the board.

12   And they asked him to come in because they believed that he

13   was going to revitalize the company and bring in significant

14   contracts and help the company, which never occurred.

15   Q.    Okay.  So basically, two to two-and-a-half years from

16   today, going backwards, you were not involved with the

17   company; is that correct?

18   A.    I can't say two-and-a-half years from today.  I'd have to

19   look at the exact dates and times, but roughly two to two-and-

20   a-half years.

21   Q.    That's fine.  So roughly two to two-and-a-half years

22   you're saying you were not involved with the company, correct?

23   Yes or no?

24   A.    In the daily management or making any decisions in the

25   company, correct.

John Goodman - Cross

1    Q.   Okay.  You said a few minutes ago, in answer to a

2    question, that you don't understand the AMRR transaction.  And

3    that's a quote.  Is that accurate, you don't understand the

4    AMRR transaction where forty-odd --

5    A.   I understand the transaction.  I don't understand how the

6    transaction was discussed, how it occurred, who approved it.

7    That's what I don't understand.

8    Q.   You don't know the details of the transaction?

9    A.   I can re-look at the documents, but I don't know any of

10   the conversations behind it.  I can see --

11   Q.   Right.

12   A.   -- that they --

13   Q.   And anybody can look at the documents, right?  If we had

14   documents, you could look at them, correct?

15   A.   Correct.

16   Q.   So you have no special knowledge of it, other than what's

17   in the documents; is that right?

18   A.   I do not have any knowledge of any of the conversations

19   that occurred that would have resulted in the transaction with

20   AMRR.

21   Q.   And that was forty-odd million dollars that went out of

22   the company?

23   A.   Based on what I see in the documents, I believe it says

24   forty-four.

25   Q.   Okay.  Now, there's an entity called 18920 that

John Goodman - Cross

1    apparently got fourteen million dollars and some other

2    consideration; are you familiar with that?

3    A.   I've seen some of the documents, so I am somewhat

4    familiar with it, yes, sir.

5         MR. PARHAM:  Your Honor, this has nothing --

6    Q.   But other than --

7         THE COURT:  Just a moment.

8         MR. PARHAM:  I'm sorry.  This has nothing to do with

9    authority.  Again, we're going into --

10        THE COURT:  No one can hear you from there --

11        MR. PARHAM:  I'm sorry.

12        THE COURT:  -- Mr. Parham.

13        MR. PARHAM:  These questions have nothing to do with

14   authority to bring the Chapter 11.  And we're far, far afield

15   from what I thought the purpose of this afternoon was.  So we

16   would ask --

17        MR. SILVERSTEIN:  I have one more follow-up.

18        THE COURT:  I think he --

19        MR. SILVERSTEIN:  One more follow-up question.

20        THE COURT:  I think he's questioning the witness

21   about whether or not he has any special knowledge,

22   essentially --

23        MR. SILVERSTEIN:  Correct.

24        THE COURT:  -- to lead the company through any sort

25   of a bankruptcy.  So I'm going to give him one more question.

John Goodman - Cross

1          Mr. Silverstein?

2          MR. SILVERSTEIN:  Thank you, Your Honor.  And

3    again -- yeah, thank you, Your Honor, and that's exactly where

4    I was going because Mr. Nelms seems to have believed that John

5    Goodman has some particular knowledge.

6    BY MR. SILVERSTEIN:

7    Q.   And I just -- Mr. Goodman isn't accurate that, other than

8    the documents, with respect to the 18920 fourteen or eighteen

9    or whatever million dollars, you just know what the documents

10   say, but you don't know the details?

11   A.   I do not know the details of the conversations that would

12   have occurred between the parties.  I -- I don't have all of

13   the -- I just don't have those details.  I wasn't party to the

14   conversations.  But I do know --

15   Q.   So you --

16   A.   I do know the individuals that are behind 18920.  I've

17   known Jim Frinzi for over twenty years.  I know the people

18   involved; I don't know the details behind them or how they got

19   to the decisions that they made.

20   Q.   And so you don't know how the sixty-odd million dollars

21   just went south, so to speak, right?

22   A.   Sir, I do not.

23   Q.   I think the only other --

24          MR. SILVERSTEIN:  I'm done.  Pass the witness.

25          THE COURT:  Thank you, Mr. Silverstein.



John Goodman - Cross

1          MR. SILVERSTEIN:  Thank you.

2          THE COURT:  All right.  Mr. Langley, any cross-

3    examination for Mr. Goodman?

4          MR. HILLYER:  Good afternoon, Your Honor.

5          THE COURT:  Oh, Mr. Hillyer?

6          MR. HILLYER:  It's Cam Hillyer.  Mr. Langley had to

7    step out for a little bit.

8    CROSS-EXAMINATION

9    BY MR. HILLYER:

10   Q.   Good afternoon, Mr. Goodman.  I just have a couple of

11   questions.  And I will try to keep these very specific to

12   control.  So you were shown a consulting agreement earlier,

13   between the debtor and Goodman MBE Group, that was signed by

14   Samantha Sondrup, chief of staff, on October 4th, 2022.  Do

15   you remember that?

16   A.   I do.

17   Q.   Okay.  And then you had previously said, in either your

18   testimony with Mr. Silverstein, or possibly before, that you

19   were not a CEO, officer, or director of the company until you

20   came back; is that correct?

21   A.   I -- not -- I'm sorry, I want to correct something.  I

22   didn't say until I came back.  I was not -- I -- I had not

23   been an officer or a director of the company since probably

24   January of 2020.  And I'm currently not today.

25   Q.   So when you were hired as a consultant, for the 450,000-

John Goodman - Cross

1   dollar nonrefundable fee, at that time, you were not a

2   shareholder, an officer, director, or executive of the debtor?

3   A.   That's -- I was a shareholder.  I was not an officer or a

4   director.

5   Q.   You were a shareholder of the debtor in October 4th, 2022

6   of this year?

7   A.   Oh, no, that's not right, because I would have not been a

8   shareholder as of September.  So that's incorrect.

9   Q.   Did you sell your shares after the involuntary was filed?

10  A.   No.  No, sir, I sold them before then.  As I was

11  negotiating with the bondholders, because I mentioned earlier

12  the Trust Indenture Act had an issue with affiliates.  Even if

13  the indenture would have been changed to allow me to vote as

14  an affiliate, my personal counsel came back and said that the

15  Trust Indenture Act may -- may create issues for me.

16  Q.   I appreciate that.  My questions aren't going to be

17  directed to any of the bondholder or any of the purchases.

18  I'm mainly looking to the control of the debtor.  And so this

19  involuntary bankruptcy was filed on September 6th of this

20  year; are you aware of that?

21  A.   That sounds right to me.

22  Q.   Okay.  And you were hired as the consultant on October

23  4th of 2022.

24  A.   If that's what the document says, I'm not looking at it,

25  but it sounds right.

John Goodman - Cross

1    Q.   Okay.  And at that time, before you came in as the

2    consultant, pursuant to that consulting agreement, who was at

3    the debtor, other than Samantha Sondrup?

4    A.   Stephanie Elmore would have been.  I can't remember Jim

5    Frinzi's exact resignation date, but to my knowledge, I

6    believe it would have been those two.

7    Q.   Okay.  Are either of those officers, directors, or

8    executives?

9    A.   No, not to my knowledge.

10   Q.   So what I'm asking you is very simple.  So at the time

11   that you came in as a consultant, the debtor had been in an

12   involuntary bankruptcy for a month and had no officers,

13   directors, or executives, correct?

14   A.   Not to my knowledge.  I'd have to look at my brother

15   Jonathan's agreement.  I believe that he retained outside

16   counsel, and he was working on -- I don't -- I don't know if

17   it was ever executed -- that he was going to be the consultant

18   for the MBE Group.  But I can't recall if his agreement was

19   ever executed, because he came to us at a later point, as I

20   mentioned earlier, and said that he didn't think that he was

21   qualified or knew enough to be able to help.  And that's when

22   the family asked me to step in.

23   Q.   Okay.

24   A.   So I'd have to take a look.

25   Q.   Mr. Goodman, do you remember swearing to the

John Goodman - Cross

1   interrogatories that were produced to FedEx, responses to the

2   interrogatories to FedEx?

3   A.   You're going to have to explain to me what that is.

4   Q.   Okay.  Well, my client propounded interrogatories to the

5   debtor, and the debtor responded to them, and you verified

6   them under oath.  Do you remember signing the verification of

7   the interrogatory responses?

8   A.   I -- I don't remember, but if -- but if I signed them,

9   then -- then I did.  I was signing a lot of documents for --

10  for the attorneys.

11       MR. HILLYER:  Okay.  Your Honor, Exhibit 15, to

12  FedEx's objection, I do not believe that's been introduced or

13  admitted.

14       THE COURT:  It has not.

15       MR. HILLYER:  I know Ms. Carson -- okay, thank you,

16  Your Honor.  I know Ms. Carson has copies there, but I think

17  we're in the same boat.  I believe Mr. Langley has stepped

18  back in, and he is going to try to share.

19       THE COURT:  Sure.  If he can't, we can probably pull

20  it up through the docket.  But while it's being pulled up,

21  we're going to reference docket 147-15, Exhibit 15.

22       MR. HILLYER:  That's correct, Your Honor.

23       THE COURT:  FedEx Exhibit 15.

24  Q.   Can you see that, Mr. Goodman?

25  A.   I can.



John Goodman - Cross

1   Q.   Okay.  That is a chart, I'll submit to you, that is

2   Exhibit 2 to your responses, in response to interrogatory

3   number 5, which is "List all executive, directors, officers of

4   the debtor" -- it did not say shareholders; it said -- "of the

5   debtor during the relevant time period."  Okay?  If you look

6   down at the last line, you were the party that verified it as

7   responding to the interrogatories.  You didn't put any dates

8   in for yourself.

9   A.   Can I see -- can I see the last line?  I can't -- I can

10  only see where it says James Frinzi.  Sorry.

11  Q.   Okay.

12  A.   "The start mandates do not apply to this notation.  We

13  had visibility of these records that were managed by our legal

14  counsel."  Can you scroll down?

15  Q.   That's it.

16  A.   I don't see any signature, but -- but --

17  Q.   That is not your verification, Mr. Goodman.  I'm

18  submitting to you that you verified the discovery responses.

19  If that becomes a dispute, where you're saying you did not

20  verify them, then we can address that later.  What I'm asking

21  you is, on this chart, did you prepare that chart?

22  A.   No, I did not prepare that chart.

23  Q.   Who prepared that chart?

24  A.   I do not know.  It would either have been -- my

25  assumption is that it would have been either Stephanie or

John Goodman - Cross

1    Samantha or CFGI.  I do not know who prepared this chart.

2    Q.    Okay.  But you verified it under oath.

3    A.    I would have -- I remember seeing this chart, yes.

4    Q.    Okay.  So it was true and correct, to the best of your

5    knowledge?

6    A.    It -- it -- the dates look -- the dates look reasonable,

7    sure.

8    Q.    Okay.  So again, I'm going to go back.  Mr. Frinzi's date

9    of termination was September 4th of 2022.  Does that sound

10   about right?

11   A.    It sounds about right.

12   Q.    Okay.  I'm just going to have you scroll up and down the

13   columns, because you are -- is there any officers, directors,

14   or executives at the debtor for the entire year of 2022, until

15   you came in as a consultant, which is not an executive?

16   A.    Sure, there is.  There's James Frinzi.

17   Q.    No -- okay, I'm sorry.  That's correct.  Other than Mr.

18   Frinzi, who we discussed today, as CEO, was there any other

19   board of directors, officers, executives at the company?

20   A.    Not that I see on here.

21   Q.    So no one -- Mr. Frinzi had no oversight of any other

22   officers, directors at all?

23   A.    Not that I see on this document, no.

24   Q.    Okay.  So he left on September 4th, and he's the only one

25   on that document, correct?  He's the only -- he's the only one

John Goodman - Cross

1    in 2022 on that document?

2    A.   Per this document, yes.

3    Q.   Okay.  And you were retained as a consultant on October

4    4th of 2022 by Ms. Sondrup, who's not on this document?

5    A.   Correct.

6    Q.   Okay.  When was Akerman retained in this case?

7    A.   I don't know that date, because they would have been

8    retained by Mr. Frinzi.  I'd have to refer to Akerman to the

9    date that they were retained.

10   Q.   Okay.  Well, I'll ask you a more specific question.

11   After Mr. Frinzi left in September 4th, who was controlling

12   the debtor when they filed their answer to the involuntary

13   petition and their motions to dismiss, which was filed on

14   docket -- Your Honor, for the record -- 18 and 19, on

15   September 30th, before you were retained as consultant.  Who

16   was controlling the debtor then?

17   A.   I would have been speaking with Akerman.

18   Q.   What authority did you have with the company before

19   October 4th of 2022, Mr. Goodman?

20   A.   I would have spoken with all of the shareholders and let

21   them know that Jonathan sent us a message that he would not be

22   representing the company, and they asked me to take over as a

23   representative.  We could have been behind on getting the

24   documents completed, but I would have been the one speaking

25   with Akerman at that point.

John Goodman - Cross

1    Q.   Okay.  You said Jonathan Goodman?

2    A.   Jonathan, yes, my brother.

3    Q.   Okay.  Where is Jonathan on that chart that you provided?

4    A.   Jonathan had not been involved with the company for

5    multiple years, sir.  He was only a shareholder in the

6    company.  But I don't believe he was working in an executive

7    office -- I believe these are executive roles.  And he was not

8    working or acting in an executive role for quite some years.

9    He would have been much lower on the list.  But I think this

10   is all executive roles here.

11   Q.   I guess what I'm saying, Mr. Goodman, is I'm looking at

12   this chart and there's -- at the end of 2021 there's three

13   CEOs.  Jason was a CEO.  James was chairman and CEO.  And then

14   actually it overlaps, and James Frinzi would have been at that

15   time overlapping.

16   A.   Well, I can't -- sir, I can't say if -- if this is when

17   their agreements were terminated, but I -- I would be really

18   surprised if each of -- there were three concurrent CEOs in

19   the company.

20   Q.   Okay.  Let's --

21   A.   You know, maybe this document just wasn't updated

22   correctly, or the dates of termination could have been in --

23   put in incorrectly.

24   Q.   Okay.  How did you verify that chart, Mr. Goodman?

25   A.   I -- I'd looked at the chart, and I was actually probably

John Goodman - Cross

1   looking more at the date started than the date terminated.

2   Q.   Okay.  So again, to the best of your knowledge, do you

3   know who signed Akerman's engagement letter?

4   A.   I do not know with certainty, but my assumption is that

5   it was James Frinzi.  But I just do not know.

6        THE COURT:  Your Honor, I'd like that Exhibit 15

7   admitted if there aren't any objections.

8        THE COURT:  All righty.

9        MR. PARHAM:  Your Honor, under optional completeness,

10  I would like him to introduce the interrogatories, because

11  this chart applies to numerous companies, I believe.  I don't

12  have the interrogatories with me, but I believe that they

13  apply to -- so that there are three CEOs, but the question was

14  name directors and officers with multiple companies.  And I

15  think that's the answer, as opposed to suggesting that the

16  charts said there were three CEOs of the debtor.

17       THE COURT:  I feel like I've seen the interrogatories

18  as an exhibit to a pleading, so --

19       MR. HILLYER:  We will be happy to introduce the

20  actual interrogatory question, which just says "See Exhibit

21  2."  There's no verbal -- there's no response to it -- if need

22  be, but that's -- Your Honor, we're stuck in a situation using

23  what discovery we have, on such a limited basis, not being

24  able to use this in a deposition and ask about it.  I think we

25  can certainly file whatever we need to file that shows his

207

John Goodman - Cross

1   response and his verification, for the purposes of the Court

2   determining the issue of control.

3          MR. PARHAM:  Yeah, that's fine.  I just want the

4   definitions in because Goodman Networks --

5          THE COURT:  I understand.

6          MR. PARHAM:  -- is defined as Goodman Networks and

7   its affiliates.

8          THE WITNESS:  I also want to point out that, to my

9   knowledge, that Stephanie and Samantha, and even with the

10  consultant, CFGI, did not have access to all of the HR records

11  and --

12         MR. HILLYER:  Your Honor, I'm going to object.  I'm

13  not asking a question.  He's just --

14         THE WITNESS:  I think it's a relevant point, sir.

15         THE COURT:  Okay.  Everybody, calm down.  Calm down.

16         Mr. Goodman, you are a witness at this time and so,

17  again, if your counsel wants to seek to redirect, at the

18  appropriate time, it's after all of the cross-examination, he

19  can do so.  But I can't allow you to interject at this time.

20         THE WITNESS:  Yes, ma'am, I understand.

21         THE COURT:  I appreciate it.

22         Well, I think what I am remembering, in terms of

23  exhibits, were exhibits to motions to quash and that set of

24  hearings and fights, which were withdrawn.  And so I think I'm

25  mistaken that there would have been a full set of

John Goodman - Cross

1    interrogatories in here.

2          What I am going to ask FedEx to do is, to the extent

3    that you would like me to consider your Exhibit 15, I am going

4    to grant the -- excuse me, I'm going to sustain the objection

5    for optional completeness and ask that you upload, after the

6    hearing, with everybody else, an exhibit that would contain

7    the entirety of those interrogatories, so that I can consider

8    them with the question asked and, again, take a look at the

9    signature verification.  All righty?

10         MR. HILLYER:  Absolutely.  And I only have just a

11   couple more questions.

12   BY MR. HILLYER:

13   Q.   So Mr. Goodman, I believe you were asked, but you didn't

14   directly answer it, who directed Ms. Sondrup to sign your

15   consulting agreement?

16   A.   She would have signed it on her own.  We -- I would have

17   requested that the person in charge of the company sign it.  I

18   don't recall if -- if she was directed by anyone else.  But

19   since she was the chief of staff listed on record, I would

20   have sent it to her and asked her to review it, and would have

21   asked her to sign it, I believe.

22   Q.   So you were asking her to sign it as the person that's

23   being hired, correct?

24   A.   Correct.  I would have asked anybody there, whether it

25   was the CEO or a board member, to sign it based on the fifty-

John Goodman - Cross

1    one percent shareholders' request --

2    Q.    I'm sorry --

3    A.    -- already fixed as law.

4    Q.    But to the best of your knowledge, was there any email

5    sent to Ms. -- communication sent to Ms. Sondrup to tell her

6    to sign that consulting agreement, as chief of staff, or did

7    she do it on her own?

8    A.    I -- I don't recall.  I'd have to look.

9    Q.    Okay.  Is that standard, at Goodman Networks, for a

10   nondirector, or officer, executive, to sign 450,000-dollar

11   nonrefundable consulting agreements?

12   A.    I wouldn't think that would be standard at any company,

13   unless there was no one else in a position to execute

14   documents on behalf of the company, much like she was for all

15   of the attorneys and for the insurance companies and for

16   anybody else that was involved.  She was left in charge by the

17   CEO, Jim Frinzi, to execute documents -- from my

18   understanding, to execute documents and legal documents and

19   settle lawsuits on behalf of the company.  And until someone

20   could be placed in there to help, that had that authority, you

21   know, I feel bad for Ms. Sondrup because she was left in that

22   position.

23   Q.    Okay.  And as of right now, you are not a shareholder,

24   individually, of Goodman Networks?

25   A.    That is correct.



John Goodman - Cross

1   Q.   Are you a shareholder of the Goodman MBE Group, either

2   the LLC or the limited partnership?

3   A.   I am not.

4   Q.   Okay.  Are you a member of Goodman Telecom Holdings, LLC?

5   A.   I am, and it's -- just for reference, the name has been

6   changed to Greater Telecom Holdings.

7   Q.   Greater Telecom?

8   A.   Yes, sir.

9   Q.   Okay.  And how much of that company do you own?

10  A.   On a fully-diluted basis, I -- I'm going to estimate

11  this -- I believe it's around forty-some-odd percent.

12  Q.   Forty or high forties?

13  A.   I'd have to look at the cap table to give you the exact

14  number.

15  Q.   Okay.  Do you control that company?

16  A.   I do.

17      MR. HILLYER:  I don't think I have anything else.

18      THE COURT:  All right.  Thank you, Mr. --

19      MR. HILLYER:  Or I take that back.

20  Q.   Mr. Goodman --

21      MR. HILLYER:  Your Honor, if I may indulge?

22  Q.   -- is that company that you just spoke of, does that

23  entity owe a debt to Goodman Networks?

24  A.   No, it does not.

25  Q.   Okay.  Is there any debt owed related to the preferred



John Goodman - Cross

1   shares?

2   A.   There are no preferred shares, and there's no debt

3   related to those preferred shares.

4   Q.   Okay.  All right.  Well, so if there is an eight-million-

5   dollar value placed on Goodman Networks' consolidated

6   financial statement for Class E preferred units of Goodman

7   Telecom Holdings, LLC, you have no knowledge of that?

8   A.   I do have knowledge of the historical transaction you're

9   talking about, but they hold common shares in the company.

10   There is no -- there are not any preferred E shares.

11       MR. HILLYER:  Can I have a second, Your Honor?

12       I apologize, Your Honor.  I had to have somebody

13   explain to me "preferred units" and what this denotes, with my

14   limited ability to read financial statements.

15   Q.   Are those put options, Mr. Goodman, for the Goodman

16   Telecom Holdings, and have they been called by the debtor?

17   A.   There are no options.  It was a put right by the company

18   to put it personally to me, but there are no options.  That

19   was -- that's actually equity or stock that the company held.

20   And back in 2020, I purchased the Telecom division for forty-

21   two million dollars, in which I paid thirty-three million in

22   cash.  The company held an eight-million-dollar note which was

23   later converted.  As we converted to a C-corp, it was

24   converted to common shares, just as the rest of the

25   independent shareholders converted to all common shares.



John Goodman - Cross

1    Q.    Thank you.  I was simply asking for the purpose of

2    determining what entities you control or do not control and

3    their relationship.

4            MR. HILLYER:  I believe that's all I have, Your

5    Honor.  Thank you.

6            THE COURT:  All righty.  Thank you, Mr. Hillyer.

7            All righty.  Ms. Sixkiller, any cross-examination for

8    Mr. Goodman?

9            MS. SIXKILLER:  Your Honor, Ryan Sullivan is actually

10   going to ask those questions for us.

11           THE COURT:  All righty.

12           MR. SULLIVAN:  I have about an hour-and-a-half of

13   questions.  No, I don't.

14           THE WITNESS:  Oh, great.

15           MR. SULLIVAN:  I do not.  I --

16           THE COURT:  He's got jokes.

17           MR. SULLIVAN:  I have three things I -- it's that

18   time of day.

19   CROSS-EXAMINATION

20   BY MR. SULLIVAN:

21   Q.   Mr. Goodman, I have three things I wanted to ask you, so

22   I will try to be very brief.

23   A.    Sure.

24   Q.    Number one, have you been communicating with anyone, at

25   any point, during today's hearing?



John Goodman - Cross

1    A.    No.

2    Q.    No chat, text, nothing like that?

3    A.    I sent two texts -- or maybe three texts to David during

4    the hearing.

5    Q.    Okay.

6    A.    It specifically said that I didn't agree with some of the

7    way that the family was being characterized because I -- and

8    that -- that a lot of the stuff that was in the creditor's

9    petition is just factually wrong.  I believe it was three

10   texts.  I'd have to look.

11   Q.    Okay.  And have you received any texts or other messages,

12   other communications, at any point during this hearing?

13   A.    No, I have not.

14   Q.    Okay.

15   A.    David and I -- I called David after the first break, and

16   he said he could not advise me on anything, but I would be --

17   I don't know if you call this testifying, but I would be --

18   I'd be on at 2:15, so be prepared.

19   Q.    Okay.  Thank you.  So that was topic number one.  Topic

20   number two, and you just alluded to this.  I believe you

21   testified a few times that you returned to Goodman Networks,

22   Inc. at the request of the family.  Did I hear that correctly?

23   A.    That's correct.

24   Q.    When you say that the family asked you to return, who

25   specifically requested that you come back to Goodman Networks,

John Goodman - Cross

1    Inc.?

2    A.    All four of the existing shareholders.

3    Q.    And just to have things crystal clear, that would be

4    James Goodman, Jonathan Goodman, Joseph Goodman, and Jason

5    Goodman?

6    A.    Yes, sir.  That's correct.

7    Q.    Okay.  And did they all ask you all at once, or how did

8    that request go?

9    A.    No.  Once my brother Jonathan decided that he wasn't the

10   right person -- I don't want to say competent because that's

11   the wrong word -- that he wasn't the right person because he

12   hadn't been involved with the company, he recommended that I

13   do it, because I had the most historical knowledge of the

14   business, at least up until '19, not over the last couple of

15   years.  And the other brothers agreed and asked me if I would

16   do it.  I told them initially no, I didn't want to do it.  I

17   had too much going on.  And I subsequently agreed to do it.

18   Q.    Does this hearing make you second guess that decision?

19   A.    Absolutely, it does.

20   Q.    So --

21   A.    I say that facetiously because I didn't realize it was

22   going to take so much time.  Dealing with a prepack in 2017 is

23   totally different than what I -- what I feel like that I'm

24   involved in now.  It's something that I wasn't expecting,

25   because I didn't have some of the historical knowledge that



John Goodman - Cross

1    has occurred over the last two years.  So it's -- it's a lot

2    different.  It's taken up a significant amount of my time.

3    Q.   Understood.  Just to make sure I understood you

4    correctly, so Jonathan Goodman asked you to return to the

5    company, and then the other three Goodman brothers that we

6    mentioned, they followed up that request and asked that you

7    come back.  Is that right?

8    A.   Or -- no, Jonathan notified the brothers -- and I don't

9    know what order or fashion -- that it wasn't the right thing

10   for him to do.  And I also don't remember the order or fashion

11   that each of the brothers asked me to take on that role.

12   So -- but it occurred something like that.

13   Q.   Okay.  And was this through phone conversations, in

14   person, email, how did it take place?

15   A.   I don't recall.  Most of them probably would have been

16   phone conversations.  I'm not sure about email.  I'd have to

17   look.

18   Q.   Okay.  Thank you.  That was number two.  Third, final

19   topic.  I believe, if I heard correctly, you testified earlier

20   that there were certain actions you believe could be taken

21   with regard to the AMRR transaction to preserve creditor

22   value.  Did I hear that correctly?

23   A.   I think I said something to that extent, not using your

24   words exactly, but sure.

25   Q.   And what actions were you referring to?



John Goodman - Cross

 1   A.   Well, first of all, I think you have to sit down and have

 2   a conversation with the other party, which, you know, once I

 3   was engaged, which I was involved in trying to get the other

 4   party to understand the severity of -- of the situation and

 5   the gravity of -- you know, of the debt that they owed.  And I

 6   thought it had -- it needed to be done in the context of

 7   walking them through what -- what the response -- what their

 8   responsibilities were, what the responsibilities of the

 9   company was to the creditors, and why it was important for

10   them to cooperate with, one, Goodman -- I mean, GNET ATC, I

11   believe, is the debtor to -- is the creditor to AMRR.  And

12   because Goodman Networks is the parent company, while it was

13   important for them to be transparent, to allow the company to

14   enter into a forbearance agreement that would put controls and

15   oversights into the business, and do it in a fashion and in a

16   manner that didn't create conflict.  And I thought that was

17   the best approach.

18        Number two, I believe that you have to have understanding

19   of that business and how it works and how the performance

20   bonds work.  That's a business you can't walk into and start

21   to -- specifically because they're an OTC-traded company.  If

22   you start forcing a foreclosure on that company, I believe --

23   this is my personal opinion -- they'll lose their performance

24   bonds.  They'll also -- because I believe somewhat of the

25   majority of the work they're doing, or a lot of the work

John Goodman - Cross

 1    they're doing is for Lockheed Martin.  Then they'll lose their

 2    top-secret security clearance and then you could destroy the

 3    value of the business because it is a services company.

 4        And based on my historical experience in the last twenty-

 5    five years, service companies have one-year contracts that are

 6    master service agreements.  They can be cancelled for

 7    convenience.  They can be cancelled for any reason.  And they

 8    also sell products to customers.

 9        And my personal opinion is that your customers don't want

10    you involved in any type of litigation or lawsuits that's

11    going to impact the work that you're doing for them, because

12    if that happens, they deem you as a risk, and they'll find

13    someone to replace you.  So it's a very precarious situation.

14    And if you want to preserve that value, you have to -- you

15    have to tread lightly.

16        You also have to understand the business and the end

17    customers.  I've been doing this for twenty-five years, and

18    it's -- you have -- you -- in my opinion, you need to be very

19    careful on how you approach it and how you gain -- you get

20    them to come along with you by explaining the severity and

21    their fiduciary duties.  Their fiduciary duties are to the --

22    to GNET ATC and to its parent company.  And GNET ATC and

23    Multiband and Goodman Networks' fiduciary duties are to its

24    creditors.  And you've just got to get them to understand

25    that.  I don't think that Jim is a very sophisticated business

John Goodman - Cross

1   person, in my mind.  So I just wanted to walk him through

2   those steps.

3   Q.   And when you say "Jim", you're referring to James Frinzi?

4   A.   Yes, I'm sorry, James Frinzi; I've always called him Jim.

5   Q.   Not a problem; just wanted to make sure we had a clear

6   record there.  So of those steps that you just talked about,

7   to preserve creditor value with regard to the AMRR

8   transaction, which of those have you undertaken so far?

9   A.   Very quickly, we filed -- when I got engaged with

10  Akerman, we filed a UCC.  Per the credit agreement that I

11  read, there -- AMRR was supposed to put in place a UCC to

12  protect the interest of Goodman Networks.  They did not do

13  that.  So I asked Akerman to put a UCC in place.  I believe

14  that it gets perfected December 23rd.

15       Then we put together a forbearance agreement that would

16  have given Goodman Networks oversight to the company that

17  would -- that would have put in an independent person, such as

18  a CRO, to oversee all of the daily expenses, any cash that was

19  being spent, and would have to approve any type of actions

20  related to any sale of assets, any transfer of cash.  They

21  would have to abide by a budget put together by a potential

22  CRO that was employed by Goodman, and they would have to

23  report into Goodman Networks -- I don't remember if it was

24  daily or weekly, but it was a very restrictive forbearance

25  agreement that would ensure and preserve the value of that

John Goodman - Cross

1  business and give the company complete transparency and

2  oversight.

3      We also required a -- a waiver fee, and that was -- those

4  were the first actions we had taken.  I continue to

5  communicate with Jim, at least attempted to communicate, I

6  should say, with James Frinzi, on a regular basis to try to

7  get him to understand the severity of what was going on.

8  Q.   And when you say you attempted to communicate with Mr.

9  Frinzi, could you elaborate on that, please?

10  A.   Sometimes he would take my calls, sometimes he would

11  meet, sometimes he wouldn't.  The closer that -- I think the

12  more that -- the closer that we got to trying to get the

13  forbearance signed, the more withdrawn he became and the less

14  he communicated, and eventually quit communicating with me.

15      MR. SULLIVAN:  Thank you very much, Mr. Goodman.

16  I'll pass the witness.

17      THE COURT:  All right.  Thank you very much, Mr.

18  Sullivan.

19      All righty.  It's almost 4:15, and we probably need

20  to figure out where we are in terms of time, and by any

21  estimation, take a break.

22      But before I do that, let me see, Mr. Schaffer, do

23  you have any questions of the witness?

24      MR. SCHAFFER:  No, Your Honor, I do not.

25      THE COURT:  All righty.  Is there anyone else who has

John Goodman - Cross

1    any questions of the witness, any cross-examination?

2            All righty.  How much redirect do you have?

3            MR. PARHAM:  Very little.  Very little.

4            THE COURT:  All right.  I'll allow you to redirect so

5    that Mr. Goodman can step down from the proverbial stand, and

6    then we can talk about what else we have in terms of time.

7            Thank you, Mr. Parham.

8    REDIRECT EXAMINATION

9    BY MR. PARHAM:

10   Q.  Mr. Goodman, very simply, earlier on -- and I just

11   have --

12           MR. PARHAM:  I'm sorry, I get disoriented looking at

13   the screen when I get one of the speakers instead of the

14   witness.

15   Q.  Earlier on you had said you wanted to speak to something.

16   I believe it was during Mr. Silverstein's questioning.  Do you

17   recall what that was?

18   A.  Yes, sir.  It's a litany of items, not just to Mr.

19   Silverstein's comments just but -- a few of those, but also in

20   general, just the original petitioning creditor's response.

21   I --

22           MR. SILVERSTEIN:  Your Honor, objection.  Is this a

23   question?

24           MR. PARHAM:  Yes, Your Honor, I object as well.

25           THE WITNESS:  No, I'm answering --



John Goodman - Redirect

1          MR. PARHAM:  I object, Your Honor, as well.

2          THE WITNESS:  I'm answering --

3          MR. SILVERSTEIN:  Hold on, Mr. Goodman.

4          THE COURT:  Mr. Goodman, we have a number of

5    objections, so I'm going to let Mr. Silverstein go first.

6          MR. SILVERSTEIN:  Objection.  I don't think that's a

7    question.

8          THE COURT:  Okay.

9          MR. SILVERSTEIN:  The question was do you have

10   anything to say, and that's not a question.

11         THE COURT:  Okay.

12         MR. RUKAVINA:  I join that as well, Your Honor.  He's

13   not allowed to testify by narrative.  This is question and

14   answer.

15         THE COURT:  Okay.

16         MR. PARHAM:  Yeah, I'll withdraw the question, Your

17   Honor.

18         THE COURT:  All righty, Mr. Parham.

19   Q.   And so earlier I think you said you had texted over what

20   you conceived as misstatements.  I believe you were listening

21   during the direct because you were -- oh, not -- I'm sorry,

22   not during the direct, but during the opening statements this

23   morning.  Is that correct?

24   A.   That's correct.

25   Q.   Yeah, and you basically disengaged once the testimony

John Goodman - Redirect

1   started, per the Court's instruction, correct?

2   A.    That is correct.

3   Q.    Okay.  And so with respect to the comments regarding the

4   Goodman family that you took issue with, did any of those

5   issues relate to statements regarding how much money had been

6   paid, for example, to the Goodman family?

7   A.    Yes.

8   Q.    Okay.  And can you tell us what it was about that that

9   caused you concern or that you thought was incorrect.

10          MR. SILVERSTEIN:  Objection, Your Honor.  Beyond --

11   Q.    I'm sorry, that you thought was incorrect.

12          MR. SILVERSTEIN:  Objection, Your Honor.  Beyond the

13   scope of direct or cross.

14          MR. RUKAVINA:  I'll join that again, Your Honor.

15   He's rebutting on opening statement.  That's not rebuttable.

16   It's not evidence.

17          THE COURT:  I'm going to overrule the objections

18   because Mr. Sullivan specifically asked him what did you text

19   about, and he explained what he texted about, and now Mr.

20   Parham is further exploring those text communications in Mr.

21   Goodman's prior testimony.  So I'm going to allow it,

22   although, again, I'm going to encourage you, given kind of

23   where we are -- I mean, if you believe this part of the

24   testimony is crucial to the case on the standing and the

25   corporate authority to file --

Colloquy

1          MR. PARHAM:  Your Honor, actually, what I would --

2     I'm going to withdraw the question --

3          THE COURT:  Okay.

4          MR. PARHAM:  -- because I don't want to start yet

5     another round of questions.  And I think that it's better

6     reserved for the next time we come back because I think it

7     really goes to those issues.

8          THE COURT:  Okay.  Thank you, Mr. Parham.  I can't

9     say I disagree with you there.

10          All righty, Mr. Goodman, thank you very, very much

11     for your testimony.  And you may step down from the stand.

12          THE WITNESS:  Thank you.

13          THE COURT:  Your welcome.

14          All righty.  So what do we have further, ladies and

15     gentlemen, in terms of evidence?

16          I'll first go to the debtor.  Any further evidence

17     today?

18          MR. PARHAM:  No, Your Honor.

19          THE COURT:  Okay.  All righty.  And is there anyone

20     else who has any further evidence?

21          MR. RUKAVINA:  Your Honor, the trustee does not, and

22     I expect my part of closing to take between ten and fifteen

23     minutes.

24          THE COURT:  Okay.  I'll come back to you, Mr. Parham.

25          Does anyone on the phone, any of the petitioning

Colloquy

1    creditors, or FedEx, et cetera, have any further evidence?

2         MR. LANGLEY:  Yes, Your Honor.  We would ask that our

3    exhibits that we identified -- let me go through those and

4    make sure we're correct, because I hadn't separated them out

5    between the two hearings.

6         But we would move for Exhibit 4, which is the

7    debtor's asset spreadsheet, which were produced by Akerman on

8    behalf of the debtor, we'd ask that that be entered into the

9    record.  That was the spreadsheet that I referred to at the

10    opening statement.

11         THE COURT:  Any objection to the admission of FedEx's

12    Exhibit 4?

13         MR. PARHAM:  Give me just one second, Your Honor.

14         THE COURT:  Of course.  And that exhibit can also be

15    found at docket 147-4.

16         MR. PARHAM:  Your Honor, again, I think it goes to

17    the next hearing.  But I don't think it goes to this hearing.

18         THE COURT:  Okay.

19         MR. PARHAM:  And so I do object.  I think the fact

20    that he referenced it in opening statement is not grounds for

21    admission.

22         THE COURT:  Let's get to the mic.

23         MR. PARHAM:  I'm sorry.  I think the fact that it may

24    have been referenced in an opening statement is not grounds,

25    in itself, for admission.  I think this is a document that

Colloquy

 1   actually goes to the next hearing.

 2          THE COURT:  Okay.  Mr. Langley?

 3          MR. SILVERSTEIN:  Your Honor, it's -- I'm sorry.

 4          MR. LANGLEY:  Yes, Your Honor.  So one of the

 5   arguments that we will put forward is that this debtor and its

 6   management is hopelessly compromised from making any

 7   independent decision, including its own converting to a

 8   Chapter 11.  And I think this is critical to being able to

 9   have that as part of our evidence.

10          THE COURT:  Okay.  And we'll cover that at a later

11   hearing.  Again, so what I'm talking about today -- so again,

12   in case I was unclear earlier, which I may well have been, is

13   today what we are -- and I know openings went to both cases,

14   but today what I am intending to close evidence on is any

15   argument with respect to standing and any argument with

16   respect to the debtor's authority to seek to convert at this

17   juncture.

18          Anything that deals with futility, cause for

19   converting or not converting to Chapter 11, things that you

20   guys have raised, in terms of fraudulent conveyances and who

21   is more appropriate to control these proceedings, that will be

22   a decision for another day, and I am going to allow for the

23   parties to take the discovery that they requested.

24          And so that's essentially the way I plan on handling

25   this to satisfy, A, the creditors' due process concern, and B,

Colloquy

1    the lack of service on a matrix in this case.

2         So what I'd ask you to do is take a look at those

3    exhibits that you believe go to the issues that are before the

4    Court just for today's ruling.

5         MR. SILVERSTEIN:  Your Honor, just to clarify, so I'm

6    assuming that the issue that's before the Court today is

7    whether or not the debtor had corporate authority to move

8    under Section 706(a) of the Bankruptcy Code, in essence; is

9    that what's before the Court?

10        THE COURT:  Yes, it's each of -- it's the arguments

11   that primarily your clients and FedEx and the trustee have

12   laid out in terms of C.W. Mining, the 706 absolute right, and

13   in addition to corporate authority issues that were laid out

14   by the trustee as well.

15        MR. SILVERSTEIN:  Well, but are we talking about the

16   absolute unconditional right or the absolute right as well, or

17   are we talking about standing, because, I mean, they're two

18   separate issues.  One is corporate authority; the other one is

19   the Supreme Court case law on the McBride (ph.) and --

20        THE COURT:  Right.  We are --

21        MR. SILVERSTEIN:  -- the other --

22        THE COURT:  -- not today going to reach, essentially,

23   the issue of the, let's just say, the Marrama decision as to

24   what else to consider -- if 706(a) does give an absolute

25   right, then is it absolute but with cause, the exceptional

Colloquy

 1   circumstances and extremes, all of that.  We're not reaching

 2   that today.  That's what you're going to get, A) your right to

 3   discovery on, and B) we're going to have a broader service on

 4   the motion to convert at that point.

 5          MR. SILVERSTEIN:  Thank you.  So if the Court finds

 6   that there's no -- that there's no standing, then we're done?

 7          THE COURT:  Yep, if the Court were to so find, yes.

 8          MR. SILVERSTEIN:  Got it.  Thank you.

 9          THE COURT:  You're welcome.

10          All right, sir.

11          MR. LANGLEY:  Your Honor?

12          THE COURT:  Mr. Langley, your exhibits?

13          MR. LANGLEY:  Yes.  With that in mind, and I thank

14   you for the clarification, because I had briefly stepped out

15   on a family emergency --

16          THE COURT:  Oh, I'm sorry to hear that.

17          MR. LANGLEY:  -- and I missed when you said that.

18          No, no, it's okay.

19          The only other exhibit that I think we do need

20   entered is the Konicov deposition that was done under a

21   30(b)(6) for CFGI Networks and GNET.  We would ask that that

22   be introduced under Rule 30 -- again, let me get back -- Rule

23   30(a)(3) as evidence on behalf.

24          MR. KLEINSASSER:  I object to that, Your Honor.  I

25   think it's actually 32(a)(3).  And if you look at the rule,

Colloquy

1   and I didn't want to -- I didn't want to belabor this point

2   earlier, because I understood the Court was simply allowing

3   counsel to argue, to use essentially what the testimony before

4   me was as argument, and obviously, that was a limited purpose.

5   But if you look at 32(a)(3) is sort of -- you have to meet

6   32(a)(1) first.

7         If you look at 32(a)(1), you can use the deposition

8   if the party was present or had notice of it.  If it would be

9   admissible under Federal Rules of Evidence, if the deponent

10  were present and testifying, and if the use is allowed by

11  32(a)(2) through (8).  So the mere fact that you meet (a)(3)

12  doesn't entitle you to get it in on its own.  You still have

13  to meet (a)(1).

14        And the problem that I've got with this is even if

15  it's not hearsay, if you look at 32(a)(1)(B), there's no

16  cross-examination there.  And if the deponent were present, if

17  Howard -- I'm going to mess his last name so I won't try it

18  here, but if he were present and testifying, there would have

19  been a right for cross-examination or clarification by

20  debtor's counsel or whatever you want to term it, and that

21  just didn't happen here.

22        So I also, frankly, just don't think it's super

23  germane to the whole issue of standing.  I think it really

24  goes more to the issue of bad faith.  But regardless, if they

25  want to offer it for that purpose, I just think it's -- I

229

Colloquy

 1    think it's inadmissible under 32(a)(1)(B).

 2            THE COURT:  Okay.  Thank you very much.

 3            MR. PARHAM:  Yeah, we would join in that objection.

 4    I'm sorry, Your Honor.  We would join in that objection.  And

 5    I would just note that the purpose of that discovery was to

 6    determine the qualifications of the various petitioners.

 7    They've expanded that as part of a investigation into

 8    transactions today but that wasn't the scope.  The scope was

 9    supposed to be about the petitioners' qualifying.  But okay,

10    even if it has been expanded, the fact is that that would go

11    to the second prong, the next trial we're going to have.  It's

12    really more an issue of cause, not standing when you -- was

13    the purpose of that deposition.

14            So I would join in Mr. Kleinsasser's objections for

15    the reason that there was no cross-examination or reason to

16    clarify, but I also think that the vast majority of that

17    deposition, which apparently is being offered en masse as

18    opposed to any particular Q and A goes to, again, issues other

19    than standing and corporate authority.

20            THE COURT:  All right.  Thank you very much, Mr.

21    Parham.

22            Mr. Langley, the one question I think that the Court

23    has is -- and obviously I don't have a tendency to admit

24    entire transcripts.  If you want to point me to an excerpt to

25    any particular portion of the transcript that is germane to

Colloquy

1    what is happening today, I'm happy to take a look at it and

2    look -- and see if it should be allowed.  Because although I

3    don't disagree with the debtor and Mr. Kleinsasser that this

4    is, in effect, a partial deposition that the deposition was

5    discontinued.  I'm just not sure, as I sit here today, to

6    figure out if there's anything in here that was important

7    enough to the issues that we've talked about.

8         MR. LANGLEY:  Yes, Your Honor.  And I can point you

9    to it.

10        THE COURT:  Okay.

11        MR. LANGLEY:  There are quite a bit, actually.  Let

12   me start you with page 47, line 15.  There was Mr. Konicov is

13   being asked about a admin individual he referred to, and he

14   identifies her name as Samantha Sondrup.

15        THE COURT:  Okay.

16        MR. LANGLEY:  Spells it out, and then talks about her

17   role.  That is specifically an issue here, because the

18   derivative of all authority for the debtor's motion to convert

19   arrives from Ms. Sondrup acting as chief of staff -- not as

20   officer, not as director, but as this admin individual to

21   authorize the entire position that the debtor has asserted

22   today.

23        So we would assert that that is extremely relevant.

24   We haven't had an opportunity to call Ms. Sondrup.  She's not

25   available.  We, on a shortened notice like this, we couldn't

Colloquy

1   get a subpoena out to her.  So I think this is relevant.  It

2   was admission from the debtor's 30(b)(6).  I think it's very

3   relevant.

4          THE COURT:  Which -- so as I understand it, this

5   entity -- so Howard Konicov works for whom?

6          MR. LANGLEY:  Howard Konicov works for CFGI, Inc. --

7          THE COURT:  Okay.

8          MR. LANGLEY:  -- who was designated by the debtor, by

9   GNET and by CFGI to three separate subpoenas -- or excuse

10  me -- subpoena to GNET and CFGI, but to a 30(b)(6) of the

11  debtor, and he was designated and represented by the same

12  counsel at that deposition.  So he was speaking on behalf of

13  those three entities.

14         MR. RUKAVINA:  Your Honor, may I again reiterate what

15  I said during opening?  This is a corporate deposition of the

16  debtor taken before Mr. Seidel came in.  Mr. Seidel now

17  controls this corporate deposition as far as evidentiary

18  issues go.

19         What Mr. Langley is saying, Mr. Langley is taking the

20  position that is adverse to the estate, adverse to the debtor.

21  Mr. Seidel controls that.  Mr. Seidel wants this transcript

22  in.  I just -- and maybe I'm being too simplistic about it,

23  Your Honor, but I don't understand how the debtor here has any

24  say as to whether this testimony of the debtor's corporate

25  representative is admissible in light of Mr. Seidel

Colloquy

1    controlling any and all things that the debtor can or cannot

2    speak to.

3           THE COURT:  Who represented this deponent for

4    purposes of the deposition?

5           MR. PARHAM:  Your Honor, we represented --

6           MR. LANGLEY:  Ackerman did.

7           THE COURT:  Mr. Parham?

8           MR. PARHAM:  We represented him.

9           THE COURT:  Okay.

10           MR. PARHAM:  We presented the witnesses on the

11    30(b)(6).

12           THE COURT:  Okay.

13           MR. PARHAM:  If I could just respond to --

14           THE COURT:  Please.

15           MR. PARHAM:  -- to Mr. -- to counsel's argument?

16           If we have standing to pursue the motion to convert,

17    then -- and that obviously is an issue the Court's going to

18    decide -- that if we have standing to do that, we certainly

19    have standing in the hearing to make objections.  I mean, it's

20    almost -- it seems obvious that if we can conduct the hearing,

21    we at least control the objections that we make.  That would

22    be the only comment there.

23           THE COURT:  All right.  Thank you very much, Mr.

24    Parham.

25           Okay.  What other portions of the deposition go to



Colloquy

1    the issues that we're hearing today?  Mr. Langley?

2         MR. LANGLEY:  Yes, Your Honor.  I would refer you to

3    page 50 starting at line 22.  And this is a series of pages

4    that go in to discuss the board and who is operating this

5    debtor.  And Mr. Konicov testified,

6    "Q.  You never walked in a board meeting?

7    "A.  No, no, no.

8    "Q.  Are you aware of any board meetings ever taking place?

9    "A.  During my retention?

10        And he says,

11   "Q.  Yes.

12        And the answer is,

13   "A.  During my involvement?  I'm not aware of any board

14   meetings ever [having taken] place.

15   "Q.  Have you see any minutes of ... GNET ATC?

16   "A.  None.

17   "Q.  Switching to Goodman Networks" --

18        It goes through the same thing.

19        We continue on to page 52 and it's, no, I have not seen a

20   board meeting.  No, there hasn't been any financial analysis

21   presented to a board.  Are there any minutes of Goodman

22   Networks?  No.

23        I would suggest that whole line of questioning there from

24   page 50, line 22, to page 52, at least through line 25

25   continue -- excuse me, continue on to the page 53, line 2.



Colloquy

1          THE COURT:  Okay.

2          MR. LANGLEY:  It's, again, very important.  If the

3    debtor was not authorized through a board meeting, we don't

4    understand how they had authority to file the motion to

5    convert, or even contest these joinders that were at issue

6    throughout this involuntary case.

7          THE COURT:  All righty.

8          MR. LANGLEY:  So I then would turn you to -- but

9    turning to page 80 and starting at line 10.  And this was an

10   interjection into a discussion on whether there is sufficient

11   documentation at this company for a lot of the activities that

12   were taken.  And he's --

13         THE COURT:  Yeah, well, that's not -- that's not

14   fodder for today's hearing.  We can -- move to your next.  I

15   mean, when we're talking about movement of money, signing of

16   contracts, if it was important to what we really focused on

17   today, which is the consulting agreement, the retention

18   agreement, and the shareholders' written consent -- and again,

19   obviously, anything else that deals with the standing issues,

20   but this seems to go to a different issue.

21         MR. LANGLEY:  Okay.  Your Honor.  And I mean, the

22   reason we were going to present that is that there was, of

23   course, a dealing throughout many transactions, not just the

24   employment agreements at stake, but I'll move on from that.

25         THE COURT:  Appreciate it.

Colloquy

1        MR. LANGLEY:  Your Honor, with those two issues, I

2  would say Ms. Sondrup's -- the testimony about Ms. Sondrup and

3  the testimony about there not being any board minutes -- any

4  board testimony -- we would limit our production of this

5  Konicov deposition.

6        THE COURT:  All right.  Thank you very much, Mr.

7  Langley.

8        The Court is going to both sustain in part and deny

9  in part the objection to the use of the deposition.  I do

10  believe that the debtor has had an ample opportunity to

11  essentially address the issues of what I'll loosely will call

12  corporate authority regarding the documents that we discussed,

13  and ample opportunity to present any evidence as to the

14  authority, I guess, of Ms. Sondrup at the time that the

15  consulting agreement was entered into with Goodman MBE to

16  prove up that authority.

17        And again, I'm going to allow these two excerpts,

18  namely the excerpts beginning at page 47 and the excerpt

19  beginning at page 50 through 53, I'm going to allow those and

20  admit those into evidence, and that'll be, again, a portion of

21  FedEx's Exhibit 7.

22        If you could mute that line, Ms. Jeng, I appreciate

23  it.

24        THE CLERK:  Um-hum.

25        THE COURT:  Any other exhibits, Mr. Langley?

Colloquy

1              MR. LANGLEY:  No, Your Honor.

2              THE COURT:  All righty.  So anyone else have any

3     exhibits or evidence?

4              All right.  With that, I'm going to quickly take time

5     estimates on closing, and -- so that I can ascertain if we're

6     able to close today.  All righty.

7              Mr. Rukavina, you said ten to fifteen minutes?

8              MR. RUKAVINA:  Correct, Your Honor.

9              THE COURT:  All righty.

10             Mr. Silverstein?

11             MR. SILVERSTEIN:  Five minutes, Your Honor.

12             THE COURT:  Thank you.

13             Mr. Langley?

14             MR. LANGLEY:  Yes, Your Honor.  Ten to fifteen

15    minutes should be sufficient.

16             THE COURT:  All righty.  Thank you.

17             Ms. Sixkiller or Mr. Sullivan?

18             MS. SIXKILLER:  Your Honor, I anticipate we'll mostly

19    be joining in with the closing arguments.  At most, we'll have

20    five minutes.

21             THE COURT:  All righty.  Appreciate it.

22             Mr. Schaffer?

23             MR. SCHAFFER:  At this point, I don't think I have

24    anything I could add, Your Honor.

25             THE COURT:  I appreciate that, Mr. Schaffer.  Thank



Colloquy

1   you for letting me know.

2         Ms. LaManna, if you're still on?

3         All righty.

4         And Mr. Parham?

5         MR. PARHAM:  Your Honor, I think ten minutes  -- ten

6   to fifteen minutes.

7         THE COURT:  Ten minutes.  All righty.  So that's

8   closing and one hour.

9         All righty.  It is -- it's about 4:37.  We're going

10  to take a break until about 4:45, and I'll come back and I'll

11  let you know -- obviously, I need to consult with my staff, we

12  need to consult with the marshals and what so, to see what we

13  got time for.  All righty.

14        THE CLERK:  All rise.

15    (Recess from 4:37 p.m. until 4:47 p.m.)

16        THE CLERK:  All rise.

17        THE COURT:  Please be seated.

18        Thank you very much, ladies and gentlemen.  We're

19  going to go back on the record in case number 22-31641.

20        All righty.  Unfortunately, we can't go past 5 today.

21  We don't have sufficient coverage today.  We do have

22  availability tomorrow.  And again, if folks want to be live,

23  they're welcome to come live, but I also will take Webex

24  appearances including if you appeared live today but you want

25  to appear Webex for the closing.

Colloquy

1          We have an opening -- we have availability tomorrow

2     at either 11 or at 2.  And then if that's not available, we

3     also have availability Thursday late afternoon.  We just have

4     a busy week this week.

5          So I'll put out tomorrow just to keep ourselves

6     consistent to where we are.

7          Is there anyone or any preference for 11 or 2

8     tomorrow or any conflicts to be aware of?

9          MR. RUKAVINA:  Your Honor, I would -- I would urge --

10          THE COURT:  I can hear you.

11          MR. RUKAVINA:  I would urge --

12          THE COURT:  I don't know what she thinks, but I can

13     hear you.

14          MR. RUKAVINA:  Okay.  I am a little loud.

15          Your Honor, I would urge that it be tomorrow at 11.

16     We must remember that the trustee is the trustee, whether he's

17     interim or not, with an ongoing estate.  So the sooner that he

18     knows whether he's going to be a trustee or not, the better.

19          And with Christmas and New Year's coming up, and

20     Chanukah, I would suggest that we get this done as soon as

21     possible.

22          THE COURT:  Okay.  Thank you, Mr. Rukavina.

23          Mr. Parham?

24          MR. PARHAM:  Okay.  If everybody wants to do 11, I

25     can do 11, but my preference would be 2 --

239

Colloquy

1           THE COURT:  Okay.

2           MR. PARHAM:  -- just because I have some other stuff

3   in the morning I have to move.

4           THE COURT:  Okay.  Thank you, Mr. Parham.

5           MR. RUKAVINA:  And Your Honor, Mr. Seidel has 341s in

6   the afternoon.

7           THE COURT:  Okay.  Thank you.

8           Ms. Sixkiller?

9           MS. SIXKILLER:  Your Honor, both Ryan Sullivan and I

10  are available any time tomorrow.

11          THE COURT:  Okay.  Thank you.

12          Mr. Silverstein?

13          MR. SILVERSTEIN:  That's the closing argument we're

14  talking about now?  I missed the beginning.

15          THE COURT:  Yes.  Closing argument, availability for

16  tomorrow, 11 or 2.  We can't do it this evening.

17          MR. SILVERSTEIN:  Whenever you want.

18          THE COURT:  Okay.  Thank you.

19          Mr. Langley?

20          MR. LANGLEY:  We can accommodate the other parties

21  around their schedules.

22          THE COURT:  All righty.

23          And I think Mr. Schaffer said he wouldn't have any.

24  Am I missing anyone?  I don't think so.

25          Mr. Parham, Mr. Rukavina, why don't you all take a



Colloquy

1    moment and see if there is a time you all can agree upon

2    tomorrow.  I don't -- I prefer --

3              MR. PARHAM:  Your Honor, we'll do 11.

4              THE COURT:  You can do 11?

5              MR. PARHAM:  If that works on the Court's, I can do

6    my stuff in the --

7              THE COURT:  Okay.  Well, let me take one more look at

8    the calendar and see if there's -- those are the two times

9    that -- I think Ms. Harden is listening.

10             Ms. Harden, is -- what time are your 341s, Mr.

11   Seidel?

12             MR. SEIDEL:  We have a continued meeting of creditors

13   at 2:30.  We sent a notice out to them.

14             THE COURT:  So 2:30.  Okay.  All righty.

15             MR. SILVERSTEIN:  Your Honor, are we talking about an

16   hour, and this is solely on standing again right?

17             THE COURT:  We are talking about an hour.  It would

18   be the first time folks have ever made a time estimate in

19   their lives, but we are talking about one hour.  I can't wait

20   to hold you to your five minutes.

21             MR. SILVERSTEIN:  I'll take that back.

22             THE COURT:  Just one moment.  Let me see if I can

23   look at the calendar and -- my entire staff is laughing at me,

24   or the thought of me looking at the calendar and knowing what

25   to do with it.  Just one moment.

Colloquy

1          Laughing out loud is rude, Ms. Jeng.  It's just rude.

2    I just want to let you know.

3          THE CLERK:  I'm sorry.

4          THE COURT:  All righty.

5          So the only thing that I could do to accommodate is

6    to move it later in the day, and I think we'll wind up with

7    the same kind of problem.  So unfortunately I think 11 o'clock

8    is probably our best bet.  I apologize if that'll require you

9    to move some things around, Mr. Parham.

10         All right.  So we will continue this to 11 a.m.

11   tomorrow, Mr. -- is that Mr. Nelms?

12         MR. NELMS:  Your Honor, Russell Nelms.

13         May I appear electronically tomorrow?

14         THE COURT:  Of course.

15         MR. NELMS:  I'm trying to get in to see an orthopedic

16   doctor for a month now.  So tomorrow is my appointment.

17         THE COURT:  Okay.  Will 11 still accommodate you?

18         MR. NELMS:  Yes, I think so.

19         THE COURT:  Okay.

20         MR. NELMS:  But I'll be just be getting back.  It's

21   in Fort Worth.

22         THE COURT:  Okay.  No, no, no.  Absolutely electronic

23   appearance.  And again, even if you want to appear by phone on

24   Webex if that's more accommodating.

25         MR. NELMS:  Thank you.



Colloquy

1          THE COURT:  All righty.  So we'll continue it to

2   tomorrow, 11 a.m. for closing arguments, again, on the limited

3   issues relative as we've been talking about to standing and

4   corporate authority.  All righty?

5          MR. PARHAM:  Your Honor, tomorrow, could we also

6   discuss -- I'm sorry.  Tomorrow, could we also discuss when we

7   would come back on the second case -- on the second half of

8   this, assuming that you find standing.  Obviously, if you

9   don't find that we have standing to pursue, then the

10  ballgame's over as, I think, Mr. Silverstein said.  But I

11  would like to get a date, because we want to get back on it as

12  soon as we possibly can for the second half of this before the

13  train gets too far down the road --

14         THE COURT:  Right.

15         MR. PARHAM:  -- and it's rendered.

16         THE COURT:  Here's where we are, and I think this is

17  a good time.

18         I believe that in either event, I may not be ready to

19  rule tomorrow, okay.  I intend to probably do a bench trial

20  ruling, and I don't plan on taking a great deal of time in

21  ruling, but I'm not necessarily -- I'm not necessarily sure as

22  I sit here today that I can -- that I'd be ready to rule at

23  noon or at 12:30 just --

24         MR. PARHAM:  Sure.

25         THE COURT:  -- looking at what the docket looks like

Colloquy

1    and what so.  So I think that if the parties would start to

2    discuss -- because that no matter what, we'll need to get the

3    clock going like you said.

4         MR. PARHAM:  That's my point.

5         THE COURT:  Allow you to fully notice out that motion

6    to creditors, and just allow folks to start looking at the

7    calendar assuming that where we go is the ability to have

8    further discovery on the motion to convert.

9         And so with that, I would say that -- well, I'm not

10   going to put words in the parties' mouths of when they want to

11   start looking at time, but I'm assuming that's going to be

12   something like January 9 or January 16.  I recognize that puts

13   a of time in between now and the next hearing.  I also

14   recognize that the 341 meeting would be January 10th.  But --

15   so I'm going to allow the parties if they could talk before 11

16   or right before the hearing before they ask the follow-up

17   hearing date.

18        MR. PARHAM:  Okay.  Great.  Thank you.

19        THE COURT:  All righty?

20        MR. RUKAVINA:  Your Honor, I just want to

21   respectfully remind everyone so that no one forgets, that we

22   are in a Chapter 7 case.  That means not a penny goes out the

23   door.  We've been assured by the debtor that not a penny will

24   go out the door.  That means funds start getting to the

25   trustee, it means records are preserved, all that stuff.  So I

244

Colloquy

1    just want to make it clear that unless and until the trustee

2    is temporarily excused from his duties, which I'm not

3    suggesting he be, and I don't know how he would do that, let's

4    not forget that the hope of a Chapter 11 doesn't mean that

5    right now and until January 4 through January 10th, January

6    16, we are in a Chapter 7.  The trustee will hold people to

7    their obligations.  I say that with full respect and knowing

8    that the professionals will do that, but just to remind

9    everyone that this ain't no Chapter 11, this ain't no 363(b).

10   This is a -- everything is shut down.  The lights are off.

11   Give everything to the trustee.

12       THE COURT:  I appreciate that, Mr. Rukavina, but I --

13   here's what I want to say, and this is in part for your

14   benefit, because obviously Mr. Seidel was only recently

15   appointed until you only recently joined our party.

16       This has been going on for quite a period of time,

17   and there's been a lot said here today with respect to

18   corporate authority.  And I will definitely hear closing

19   arguments tomorrow, and I'm not pre-judging the matter, okay.

20   If I was going to pre-judge it, we wouldn't need closing

21   arguments.

22       But what I'll tell you was this, there was an issue

23   with the filing of the motion to convert and the order for

24   relief and to a certain extent, they were ships in the night,

25   okay.  And certain of it was based on the communications,

Colloquy

1    because I've said this in open court previously.  There was a

2    communication by the debtors that they no longer, okay, excuse

3    me, intended to pursue the motion to dismiss, and at that

4    point the Court entered the order for relief knowing that

5    there was a motion to convert coming.

6          So I'll be completely candid with all of the parties

7    if you haven't read my face, the fact of something happening

8    twenty minutes before the other thing, is not going to move

9    the needle with me, okay, because I knew the motion to convert

10   was coming, and the Court entered the order for relief.  On

11   the basis of an order to convert from 7 to 11, you're going to

12   be in a 7, okay.  And so I recognize I've read your Basin

13   (ph.) case, and whether or not there is some import to be put

14   on it, we'll look at that in due course.  But I can tell you

15   now that the twenty-minute argument doesn't move the needle

16   for me, okay.

17         Now, with that said, whether I believe that this

18   debtor should stay in a Chapter 7 until we can get to that

19   hearing, that'll be part of the Court's decision.  But I do --

20   I appreciate and -- one of the issues of getting to this 19th,

21   was not wanting to waste Mr. Seidel or any other Chapter 7

22   trustee's time.

23         I recognize that time is a-ticking and there's a

24   whole lot for a Chapter 7 trustee to do in the early stages.

25   And I also recognize that we've got a 341 meeting coming up on

Colloquy

1    the 10th.

2         So the Court will attempt to work quickly towards a

3    bench ruling, and whenever the parties are ready for the next

4    hearing.  So be it -- but again, I'm trying to accommodate two

5    things.

6         Number one, the service issue you raised, which is a

7    good one.  And number two, the due process and discovery

8    issues that the original petitioning creditors, AARIS and

9    FedEx, respectfully beat me over the head with.

10        So with that said, I will see you guys tomorrow live

11   or virtually at 11 a.m. for closing arguments.

12        MR. RUKAVINA:  And just to remind everyone again,

13   being new to the party, the trustee is waiving the privilege.

14   So as far as anything having to do with the involuntary and

15   the motion to convert goes.  So hopefully, there will be no

16   more issues on that.

17        THE COURT:  Thank you, Mr. Rukavina.

18        Anything further, ladies and gentlemen?

19        All right.  Thank you very much for your time.  Thank

20   you for your papers and for your presentations today, and

21   thank you very much to both of the witnesses that testified.

22   See you guys tomorrow.

23        THE CLERK:  All rise.

24        THE COURT:  We are adjourned for the day.

25        UNIDENTIFIED SPEAKER:  Thank you, Your Honor.



Colloquy

1              THE COURT:  You're welcome.

2        (Whereupon these proceedings were concluded at 5:00 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



(973) 406-2250 | operations@escribers.net | www.escribers.net

Colloquy

```
 1                        I N D E X

 2
      WITNESSES:          DIRECT      CROSS           REDIRECT    RECROSS
 3    FOR THE DEBTOR:
      Russell Nelms         66    103,78,121,134,143    143
 4    John Goodman         146    152,192,198,212       220

 5
      EXHIBITS:
 6    No.        Description                    Marked   Admitted
      DEBTOR'S:
 7    3          Russell Nelms Engagement Letter           69
      1          Written Consent of Voting                 77
 8    CREDITOR'S:
      8          Consulting Agreement                      127
 9               Shareholders
      TRUSTEE'S:
10    TA         December 10 Email Sent by                 88
                 Russell Nelms
11    TB         Shareholder Agreement            156
      TC         11/4/22 email between John                168
12               Goodman and Stephanie Elmore

13
      RULINGS:                                    PAGE    LINE
14    Excerpts from Howard Konicov                 235     8
      deposition admitted as a portion of
15    FedEx Exhibit 7

16

17

18

19

20

21

22

23

24

25
```



```
 1                  C E R T I F I C A T I O N

 2

 3          I, Krystal B. Parrish, the court approved

 4    transcriber, do hereby certify the foregoing is a true and

 5    correct transcript from the official electronic sound

 6    recording of the proceedings in the above-entitled matter.

 7

 8

 9                                        December 28, 2022
      Krystal B. Parrish
10    _____          _____
      KRYSTAL B. PARRISH                    DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```