1                  IN  THE  UNITED  STATES  BANKRUPTCY  COURT
                 NORTHERN  DISTRICT  OF  TEXAS  (DALLAS)

2
     In Re:                        )  Case No. 22-31641-mvl7
3                                  )  Dallas, Texas
     GOODMAN NETWORKS, INC., GOODMAN  )
4    NETWORKS, INC. D/B/A GOODMAN   )
     SOLUTIONS                      )  December 20, 2022
5            Debtor.               )  11:04 a.m.
                                   )
6    -------------------------------

7                        TRANSCRIPT OF HEARING ON

8    CLOSING ARGUMENTS RE: MOTION TO CONVERT CASE FROM CHAPTER 7 TO
         11 FILED BY DEBTOR GOODMAN NETWORKS INC D/B/A GOODMAN
9                          SOLUTIONS (133)

10             BEFORE THE HONORABLE MICHELLE V. LARSON

11                 UNITED STATES BANKRUPTCY COURT

12

13

14

15

16

17

18

19

20

21   Transcription Services:          eScribers, LLC
                                      7227 North 16th Street
22                                    Suite #207
                                      Phoenix, AZ 85020
23                                    (973) 406-2250

24   PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25   TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE



```
 1    APPEARANCES:

 2    For the Debtor:           DAVID WILLIAM PARHAM, ESQ.
                                LAURA TAVERAS, ESQ.
 3                              AKERMAN LLP
                                2001 Ross Avenue
 4                              Suite 3600
                                Dallas, TX 75201
 5
      For Chapter 7 Trustee:   DAVOR RUKAVINA, ESQ.
 6                             THOMAS D. BERGHMAN, ESQ.
                               (Telephonically)
 7                             MUNSCH HARDT KOPF & HARR, P.C.
                               500 North Akard Street
 8                             Suite 3800
                               Dallas, TX 75201
 9
      For UMB Bank, National    ERIC A. SCHAFFER, ESQ.
10    Association, as Indenture STONECIPHER LAW FIRM
      Trustee, Creditor:        125 First Avenue
11                              Pittsburgh, PA 15222

12    For Fedex Supply Chain    ADAM M. LANGLEY, ESQ.
      Logistics & Electronics,  ROBERT CAMPBELL HILLYER, ESQ.
13    Inc., Creditor:           GADSON WILLIAM PERRY, ESQ.
                                BUTLER SNOW LLP
14                              6075 Poplar Avenue
                                Suite 500
15                              Memphis, TN 38119

16    For Fedex Supply Logistics CANDICE MARIE CARSON, ESQ.
      & Electronics, Inc., and   BUTLER SNOW LLP
17    Frase Protection, Inc.,    2911 Turtle Creek
      Creditors:                 Suite 1400
18                               Dallas, TX 75219

19    For ARRIS Solutions, Inc., RYAN J. SULLIVAN, ESQ.
      Creditor:                  DLA PIPER LLP (US)
20                               303 Colorado Street
                                 Suite 3000
21                               Austin, TX 78701

22                               LAURA ELIZABETH SIXKILLER, ESQ.
                                 DLA PIPER LLP (US)
23                               2525 East Camelback Road
                                 Suite 1000
24                               Phoenix, AZ 85016

25
```



```
 1    For Alimco Re Ltd.,        PAUL SILVERSTEIN, ESQ.
      Creditor                   BRIAN CLARKE, ESQ.
 2                               HUNTON ANDREWS KURTH LLP
                                 200 Park Avenue
 3                               New York, NY 10166

 4                               PHILIP GUFFY, ESQ.
                                 HUNTON ANDREWS KURTH LLP
 5                               600 Travis Street
                                 Suite 4200
 6                               Houston, TX 77002

 7

 8    Also Present:              Russell Nelms (Telephonically)
                                 Scott Seidel, Chapter 7 Trustee
 9                               (Webex)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



4

Colloquy

1            THE CLERK:  Please be seated.

2            THE COURT:  Good afternoon.  Well, good morning.

3    It's still morning.  Good morning, everyone.  We are here on

4    our 11 o'clock docket.  We have one matter on the docket this

5    morning and that's case number 22-31641 Goodman Networks, Inc.

6    and Goodman Networks.  I'll take appearances for the record,

7    and I'll start with those in the courtroom.

8            MR. PARHAM:  Good morning, Your Honor.  David Parham

9    from Akerman on behalf of the debtor.  Also appearing with me

10   is Laura Taveras.  Mr. Nelms, I believe, is on the telephone,

11   and I think that Mr. Goodman will be joining us.  He had a

12   funeral this morning.  And so he may be dialing in a little

13   bit late.

14           THE COURT:  Okay.  Fair enough.  Thank you very much.

15           MR. RUKAVINA:  Your Honor, good morning.  Davor

16   Rukavina, proposed general counsel for the trustee.  The

17   trustee I believe is on the line, as is my partner Thomas

18   Berghman.

19           THE COURT:  All right.

20           MR. SEIDEL:  Scott Seidel's here on the video, Your

21   Honor.  Thank you.

22           THE COURT:  Good morning.  Me and Mr. Seidel are old

23   friends from the 9:30 docket.

24           Mr. Rudd (ph.), would you like to make an appearance?

25           MR. RUDD:  No, ma'am.

Colloquy

1          THE COURT:  Okay.  Thank you.  All righty.

2          Is there anyone on Webex who would like to make an

3     appearance?

4          MR. SILVERSTEIN:  Good morning, Your Honor.  Paul

5     Silverstein, Brian Clarke, and Philip Guffy from Hunton

6     Andrews Kurth for the original petitioning creditors.

7          THE COURT:  Good morning.

8          UNIDENTIFIED SPEAKER:  Good morning.

9          MS. SIXKILLER:  Your Honor, sorry.  Your Honor, Laura

10     Sixkiller and Ryan Sullivan for ARRIS Solutions.

11          THE COURT:  Good morning.

12          MS. SIXKILLER:  Good morning.

13          MR. LANGLEY:  Good morning, Your Honor.  Adam

14     Langley, Cam Hillyer, Will Perry, and Candice Carson for

15     FedEx.

16          THE COURT:  Good morning.

17          SCHAFFER:  Your Honor, Eric Schaffer for UMB Bank as

18     indenture trustee.

19          THE COURT:  Good morning, Mr. Schaffer.

20          All righty.  Is there anyone else who wishes to make

21     an appearance this morning?  If you're on the phone, you can

22     press star 6 to unmute.  Or if not, you can just unmute your

23     audio.  All righty.  Appears we have all our appearances.

24          I think when we last concluded the hearing

25     yesterday -- seems like so long ago, both parties -- or excuse

Closing Argument - Mr. Rukavina

1    me.  All parties had concluded evidence.  And all that we had

2    left today were closing arguments.  Am I correct?

3          MR. PARHAM:  That's correct.

4          THE COURT:  All righty.  Have the parties discussed

5    at all the order of their presentations?  I would assume the

6    debtor would go last.  Is there any -- have there been any

7    agreements, or does anyone have any proposition in that

8    regard?

9          MR. PARHAM:  We haven't, Your Honor.  We haven't

10   discussed it, but my impression I guess from yesterday -- I'm

11   not sure where I got the impression, was that the debtor would

12   be last, so that's fine with us.

13         THE COURT:  Makes sense.  Okay.

14         MR. RUKAVINA:  Your Honor, then I'll start.

15         MR. SILVERSTEIN:  Your Honor, why is the debtor last?

16         THE COURT:  Why is the debtor --

17         MR. SILVERSTEIN:  Why is the debtor not going first?

18         THE COURT:  Because the debtor is the movant, and the

19   debtor gets to respond to the objections.

20         MR. SILVERSTEIN:  Okay.

21         THE COURT:  All right.  Mr. Rukavina.

22         MR. RUKAVINA:  Thank you, Your Honor.  Let me begin,

23   Your Honor, with the most elemental issue here, which is

24   corporate authority to file a Chapter 11.  So we're going to

25   discuss standing.  We're going to discuss the trustee's role.

Closing Argument - Mr. Rukavina

1    We're going to discuss various other issues, but it seems like

2    to me that the debtor has failed to look at basics.  So first,

3    I think this is a very important conclusion, which is that the

4    debtor bears the burden of proof on eligibility under 109.

5         I don't think that this should be in much dispute,

6    Your Honor, but I pulled some case law, just in case the Court

7    needs it.  There is no binding precedent from the Fifth

8    Circuit.  We have 465 B.R. 507 that talks about certain

9    circuit law as well.  It concludes that a debtor always has

10   The burden on eligibility for 109.  I have 98 B.R. 584, same.

11   And I have 636 B.R. 416, same.

12        I think that the Court will find that the case law is

13   near unanimous.  I only found one opinion, an older opinion to

14   suggest that it's a moving burden.  But the case law is

15   virtually unanimous that the debtor bears the burden of proof

16   on eligibility.  And so it must, and so it does in any case

17   where it filed a petition.

18        If, for example, by way of an absurd proposition the

19   debtor moved to convert to Chapter 9, the Court wouldn't wait

20   for a creditor to come in here and say the debtor is not

21   eligible.  The Court would say what the heck are you doing.

22   Prove that you're a municipality.  So that's the key now.  The

23   debtor must prove that it's eligible.

24        Your Honor, in my objection I went through the

25   statute at issue here.  And if I may approach with a packet,

Closing Argument - Mr. Rukavina

1    Your Honor.

2         THE COURT:  Please.  Thank you very much.

3         MR. RUKAVINA:  Your Honor, we know that the debtor is

4    a Texas corporation.  That's been judicially admitted.  We

5    also know that from the consent of shareholders.

6         Now, Texas statute provides that certain things are

7    waivable and changeable in the articles of incorporation of

8    the bylaws.  I wanted to yesterday to introduce the articles

9    and bylaws and the shareholder agreement.  Your Honor will

10   recall Mr. Goodman didn't know what those were, so I felt like

11   I could not offer their admission.

12        But sitting here today the debtor has not presented

13   the Court with its own bylaws and articles, which I would

14   submit is strange to say the least because the issue of

15   eligibility has been placed into question.

16        But again, going back to the burden of proof, the

17   Court does not have the bylaws or articles before it.

18   Therefore, there is no evidence that Texas statute has been

19   modified or waived.  I'll also tell you as an officer of the

20   court I have those documents.  I would not be making this

21   argument if there was any language in there changing it, so I

22   don't know if that's evidence or not, but I take my Rule 11

23   obligations seriously.  And I would not be making this

24   argument if I knew that factually it was otherwise.

25        So Your Honor, we revert to Texas law Section 21.501.

Closing Argument - Mr. Rukavina

1    This is interesting.  This is a very little-known statute.  A

2    corporation must approve a voluntary winding up in accordance

3    with Chapter 11, not Title 11, Chapter 11 -- not a

4    reorganization but a winding up.  So Texas law says if a

5    corporation is going to liquidate in Chapter 11, it needs

6    special corporate approval as opposed to a Chapter 7, as

7    opposed to a reorganization.

8         And that's obvious because the shareholders need to

9    be protected if there's going to be a liquidation.  Now, how

10   does a corporation go about doing that?  Well, you see here,

11   it talks about the subchapter case.  So now we go to the next

12   statute, 21.502.

13        This is how you approve a winding up, a voluntary

14   winding up in Chapter 11.  Option one is all shareholders of

15   the corporation must consent in writing.  They haven't.  Your

16   Honor knows from Mr. Goodman's testimony that there are other

17   shareholders here.  That's part of what I wanted to introduce

18   yesterday.  There are other shareholders.  We don't know who

19   they are, but Mr. Goodman testified under oath that there are

20   other shareholders than those who signed Exhibit 1.

21        Two, if the corporation has not commenced a

22   business -- well, two is inapplicable.

23        Three, the board of directors of a corporation

24   must -- this is must, this is not may -- must adopt a

25   resolution.  We don't have that.  We do not have a board

Closing Argument - Mr. Rukavina

1    resolution.  I don't think we had a board before Mr. Nelms.

2    And then that resolution must be approved by the shareholders

3    in accordance with Section 21.503.  I'm sure that the Court

4    can see that, Section 21.503.

5        Section 21.503(b) talks about this meeting of

6    shareholders.  Now, I'll concede there need not be a formal

7    meeting of shareholders.  But then 21.503(b) says the

8    shareholders must approve the resolution -- so remember, Your

9    Honor, the nonexisting resolution from a nonexistent board of

10   director -- by the affirmative vote required by 21.364.

11       21.364 is the last statute that I gave Your Honor,

12   and in particular subsection (b).  This is a long statute.

13   The Court can certainly read it.  I'm not misrepresenting what

14   it says.  Section (b), when this vote is required, it requires

15   the affirmative vote of the holders of at least two thirds of

16   the outstanding shares entitled to vote, two thirds, Your

17   Honor.

18       I didn't spring this today.  I didn't spring it

19   yesterday.  It's in my objection over the weekend.  If the

20   debtor had two thirds, the debtor would have presented

21   evidence of that.  The debtor did not.

22       Both Exhibit 1, it says that it's the majority

23   shareholders, not the supermajority, not 66.7 percent.  And

24   Mr. Goodman testified it's 51 percent.  There is no evidence

25   that it's 67 percent.  I don't know if it is or not.  I am not

Closing Argument - Mr. Rukavina

1    making the argument -- I have no evidence that it's not.

2    That's why we go back to the burden of proof, Your Honor.

3    It's the debtor's burden to prove eligibility.  The debtor

4    knew this was a-coming.  The debtor had every opportunity

5    yesterday to present evidence.  It did not.

6         I will not pretend to be a corporate law expert, Your

7    Honor, but I can read the English language, and I've filed

8    plenty of Chapter 11 petitions myself to know where to go

9    looking before I file a Chapter 11.  And perhaps, as Mr.

10   Silverstein said -- perhaps this is why we never saw a signed

11   petition by the debtor because no one knew who would even sign

12   it and whether it was authorized.  There's consequences for

13   filing -- I don't want to say an unlawful petition, but a

14   petition without the requisite corporate authority.

15        So take everything else you're going to hear today

16   aside, Your Honor.  Let's assume that the debtor has standing.

17   Let's assume that Mr. Seidel's role is irrelevant.  This

18   debtor is not eligible under Section 109.  As I briefed,

19   corporate governance is a requirement for debtor eligibility

20   under Section 109, in addition to the other things, like

21   you're not a foreign entity, or you're not an insurance

22   company.

23        706(d) clearly says that you cannot have a conversion

24   where there's no eligibility.  So whether the burden of proof

25   is under 706(d) or 109, it doesn't matter.  Therefore, even if

Closing Argument - Mr. Rukavina

1    the debtor has the absolute right to convert, if they can do

2    it under Rule 9013, if evidence doesn't matter, et cetera, et

3    cetera, we run right into this problem that the debtor does

4    not have the two-thirds-shareholder consent that Texas law

5    requires.  Therefore, it is not eligible under 109, therefore

6    706(d) is triggered, therefore 706(a) is not triggered.

7          I don't know -- unless I really shouldn't be licensed

8    to practice law for gross stupidity, I don't know what I am

9    missing in the statutes or in the evidence that the debtor is

10    going to tell you today to get around that.  And maybe the

11    debtor has something that I'm not aware of.  Maybe I should go

12    to remedial corporate school.  I hope not, but if the debtor

13    cannot rebut in law or in evidence what I've just told you,

14    the discussion's over, the motion is denied.

15          The other issues, Your Honor, need to be addressed as

16    well because Mr. Seidel takes his role and takes this case and

17    takes all of his fiduciary duties seriously.  Mr. Seidel, upon

18    his appointment, upon the order for relief became the

19    management of the debtor.  I understand what Your Honor said

20    yesterday about there being a twenty or thirty-minute gap.

21    I'm not going to make silly arguments that someone did someone

22    wrong because of a twenty or thirty-minute gap.

23          But the debtor simply no longer is managed by a board

24    of directors.  That's in the Weintraub case.  And it's also

25    fundamental and elemental.  Yes, Ms. Seidel is the

Closing Argument - Mr. Rukavina

1    representative of the estate.  And yes, we can argue whether

2    706(a) is a right of a debtor or of an estate.  And we can

3    argue whether voting rights are property of an estate under

4    541(a), which I would submit that they certainly are because

5    the Court looks at it every time we have a cramdown under

6    1129(b) and Supreme Court precedent that talks about control

7    and voting rights are property of the estate.

8         But all of that being in the debtor's favor, the fact

9    remains that when the order for relief was entered, pre-

10   petition management loses all role and ability to manage the

11   debtor, to speak for the debtor.  The trustee speaks for the

12   debtor.  The same as if the debtor was a party in pre-petition

13   litigation outside of this court, it would be inconceivable

14   that the debtor's management would be managing that

15   litigation.  So with Mr. --

16        THE COURT:  How --

17        MR. RUKAVINA:  Pardon me, Your Honor.

18        THE COURT:  Let me stop you right there, Mr.

19   Rukavina.  I understand what Weintraub says.  You know, and

20   obviously, there are a lot of issues, but the Code repeatedly

21   recognizes the distinction between the trustee and the debtor.

22   Okay?  If a debtor under 706(a) may convert to Chapter 11,

23   then doesn't that assume that they're in another chapter, that

24   they're in Chapter 7?

25        MR. RUKAVINA:  It does, of course.



(973) 406-2250 | operations@escribers.net | www.escribers.net

Closing Argument - Mr. Rukavina

1          THE COURT:  So then how can a debtor ever seek to

2     convert if I buy that the Chapter 7 trustee has acceded to all

3     of the rights and management of the debtor?

4          MR. RUKAVINA:  Sure.

5          THE COURT:  Who can ever come in on behalf of the

6     debtor?

7          MR. RUKAVINA:  The trustee can.  The trustee, Mr.

8     Seidel -- Your Honor, I'm not be facetious.  Mr. Seidel may

9     decide and may argue, and in fact, in other cases I've

10    represented him we got under Chapter 7 the right to operate a

11    business.  But he might decide that a Chapter 11 is

12    appropriate.

13         THE COURT:  But he's not the debtor.

14         MR. RUKAVINA:  Your Honor, he makes decisions for the

15    debtor.  Let me ask the question a different way.  We have

16    this from this Court in In re Statepark Building Group, a case

17    that I argued about fifteen years ago with Judge Hale that

18    went to the Fifth.

19         What Your Honor -- suppose that there's a state court

20    receivership in place over the debtor, that there's a general

21    receiver appointed.  Who gets to decide 706(a) in that case?

22    The question again goes not to whether someone's the debtor or

23    not or the estate.  It's who controls, who makes the business

24    decision for a debtor.

25         If a general receiver is appointed, then that general

Closing Argument - Mr. Rukavina

1    receiver makes that decision to the exclusion of management.

2    Similarly here, we don't even know -- there's not even any

3    evidence that anyone authorized this motion to be filed prior

4    to the order for relief, other than Mr. Goodman.

5           Mr. Goodman testified that he instructed Akerman that

6    this motion be filed some time before.  So if the debtor

7    has -- if the debtor exists under 706(a) and pre-petition

8    management controls it, who is that, Your Honor?  We've seen

9    Mr. Goodman was a consultant.  That's not carte blanche

10   authority.  He's not the dictator of the debtor.

11          And that document, Your Honor, was signed by -- I'm

12   sorry, by a secretary.  Nothing wrong with being a secretary,

13   but she doesn't speak for the corporation.  We heard that upon

14   his leaving the prior CEO orally told her why don't you --

15          THE COURT:  I do -- I understand your arguments, Mr.

16   Rukavina.  I interrupt you because the debtor has a lot to

17   answer for in that regard.  Okay?

18          MR. RUKAVINA:  And Your Honor, that's --

19          THE COURT:  the time line of the consultant

20   agreement, to the retention of Mr. Nelms, to the shareholder

21   consent, there's plenty to talk about there.  My question is

22   more elementary.  It's statutory.  There is a definition in

23   the Code of what a debtor is.  There's a definition in the

24   Code of what a trustee is.  And I recognize the changing of

25   the guard upon a Chapter 7.

Closing Argument - Mr. Rukavina

1          What I am trying to understand, and I know that this

2    is in Mr. Langley's papers, and Mr. Silverstein argued

3    something similar as well.  And I'll ask the same of them,

4    which is your argument writes 706(a) out of the Code.

5          MR. RUKAVINA:  It doesn't, Your Honor, because 706(a)

6    applies to individual debtors.  And again, the Court might

7    find it a rarity, but it's not a facetious argument.  The

8    Chapter 7 trustee may decide that he wants to convert the case

9    for various reasons.

10         But let me go back to the issue that we were just

11   discussing.  And I know Your Honor's going to ask Mr. Parham

12   about it at some length.  And it also goes for 706(a).  A

13   corporation can act only through its vice principals.  That's

14   black letter law.  Who as of the order for relief -- because

15   after that it's a little different.  Who were the vice

16   principals of the debtor?  We don't have a director.  We don't

17   have an officer.

18         Again, we have Mr. Goodman.  We have his written

19   engagement agreement.  To me it is inconceivable that someone

20   who's not a director or an officer has the ability to cause a

21   corporation, of which he's not even a shareholder, to file

22   Chapter 11.  That's inconceivable.  Certainly, his retention

23   agreement doesn't mention any such authority, even if the

24   secretary could grant that authority.  And again, I'm not

25   trying to be facetious or play games or be smart.

17

Closing Argument - Mr. Rukavina

1            THE COURT:  No, I don't think you are.  I mean, --

2            MR. RUKAVINA:  It's a crazy situation.

3            THE COURT:  You have a good point there.

4            MR. RUKAVINA:  It's a crazy --

5            THE COURT:  As I have a lot of concern with the

6    consultant --

7            MR. RUKAVINA:  It's a crazy situation.

8            THE COURT:  -- agreement to start with, if whether or

9    not the corporation ever validly entered into that.  And that

10   is a precursor for everything that happens after that.  And I

11   grant you that.

12           MR. RUKAVINA:  And let me finish that -- let me

13   finish the discussion --

14           THE COURT:  Sure.

15           MR. RUKAVINA:  -- with two points that are perhaps

16   best made in the future.  I think that what we saw here

17   today -- and this is going to be I think very important for

18   when the trustee or someone investigates D&O claims.  What we

19   saw today was a rudderless ship for I don't know how long, but

20   before Mr. Goodman got involved here we have a corporation

21   that may not have had directors for a while, that may not have

22   had officers, that may not have been minding the bank.

23           I don't want to say too much because I don't want

24   some insurance coverage lawyer two years from now using my

25   words against me.  But we see a problem.  And I respect Mr.

Closing Argument - Mr. Rukavina

1    Goodman trying to fix it.  I respect Mr. Nelms trying to fix

2    it.  Certainly, the trustee doesn't question the integrity or

3    sincerity of those men, certainly not Mr. Nelms'

4    qualifications.  But we'll talk about the beauty contest next

5    time I guess, if the debtor survives today.

6           But the other point I wanted to make I think also

7    bears mentioning is you have before you substantially all of

8    the largest creditors in this case saying don't convert.  Now,

9    that may or may not be an authority, corporate authority

10   issue, but you heard Mr. Goodman say a hundred times yesterday

11   he's aware that fiduciary duties upon insolvency -- and he

12   said this debtor is hopelessly insolvent.  He may not have

13   used those exact words.  That those fiduciary duties extend to

14   the creditors.  Shouldn't the creditors then have under

15   corporate governance some role?  The equity -- why should the

16   equity?  And that brings me to my final point.

17          This is a complicated point, Your Honor.  But I

18   really ask the Court to bear with me because, again, Mr.

19   Seidel is charged with certain duties.  And therefore, he must

20   look at certain things.

21          Obviously, the automatic stay went into effect the

22   moment that the 303 petition was filed.  The case law

23   virtually unanimously goes like this.  The automatic stay does

24   not prevent the shareholders of a corporation from convening a

25   meeting to try to change the directors post-petition or in

Closing Argument - Mr. Rukavina

1    light of the automatic stay except when they are seeking to

2    control the estate or when they are creditors seeking to

3    enhance their position.

4        Your Honor, I cite as one of the cases here 619 B.R.

5    364, In re Gen Canna Global USA, Inc. (2020).  And it goes

6    through the case law, and it summarizes the case law.  And

7    that is what the vast majority of case law says.

8        I also cite 2012 WL 1098544, which stands for I would

9    think the unremarkable proposition that where an estate holds

10   interests in other entities those other entities and voting

11   rights are property of the estate.

12       So here's what we have, Your Honor.  Mr. Goodman, he

13   would not admit yesterday to filing this motion for control.

14   I think he was very careful not to admit that word.  But all

15   of his testimony confirmed that that's what he and equity

16   want.  They want control.

17       They believe that liquidating through a Chapter 11 is

18   better for the creditors.  Let's put aside whether that's true

19   or not.  They want to control the liquidation.  That's why

20   they brought in their brother.  That's why they brought in Mr.

21   Nelms.  That's why they're now filing this motion.

22       And you heard that James Goodman holds more than

23   thirty million dollars of debt.  You heard that John Goodman

24   has been trying right or wrong to buy bond debt.  Now, he

25   refused to admit that he would have more success doing that in

Closing Argument - Mr. Rukavina

1  Chapter 11. I think the Court can see right through that.

2          So I would submit, Your Honor, all other things being

3  equal, and if Your Honor goes to review the case law which I

4  know she will, you will find that I am right. That the case

5  law says that when shareholders in light of the automatic stay

6  try to change the directors of a company, when they do so

7  because they want control of the estate, then it is a

8  362(a)(3) violation. Any act to gain possession or control --

9  control of the estate. And as such, it should be void or

10  voidable.

11          Your Honor, I have nothing to add. Thank you very

12  much for your time. And I apologize having come in late into

13  this game if I have made any misstatements or offended anyone,

14  like John Goodman yesterday thinking that he was Jonathan.

15          THE COURT: One question for you, Mr. Rukavina. Did

16  the evidence reflect that the shareholder consent occurred

17  after the order for relief?

18          MR. RUKAVINA: Yes, Your Honor. That evidence was

19  unambiguous, confirmed by most -- by both Mr. Nelms and Mr.

20  Goodman, who testified that some of the signatures came in

21  after for relief.

22          THE COURT: Okay.

23          MR. RUKAVINA: The order for relief was -- I'm going

24  off memory. Let's say 1:30 p.m., the volunteer -- not the

25  volunteer petition. The motion to convert to what I call

Closing Argument - Mr. Silverstein

1    Chapter 22 was filed around 5:30 p.m.  I'm going off memory.

2    Mr. Nelms testified that they were still gathering signatures,

3    and he unambiguously testified, as did Mr. Goodman, that one

4    or more of those signatures came in after the order for

5    relief.

6            THE COURT:  Thank you very much.

7            MR. RUKAVINA:  Which I would then submit that it's --

8    that the document was not effective before the order for

9    relief, one, because you don't even have a majority of

10   shareholders at that point.  Forget about the supermajority,

11   you didn't even have a majority of shareholders.  And the

12   document clearly contemplated I would say as a de facto

13   condition precedent that they all signed.  Thank you, Your

14   Honor.

15           THE COURT:  Okay.  Thank you very much.

16           All righty.  Mr. Langley, Mr. Silverstein, who would

17   like to go next?

18           MR. SILVERSTEIN:  I'll go next, if that's all right

19   with everyone else.  It's Paul Silverstein.

20           THE COURT:  Okay.

21           MR. SILVERSTEIN:  Again, for the record, Paul

22   Silverstein, Hunton Andrews Kurth, for the original

23   petitioning creditors.  Can you hear me all right, Your Honor?

24           THE COURT:  I can.  Thank you.

25           MR. SILVERSTEIN:  Great.  Just before I go into my



Closing Argument - Mr. Silverstein

1  closing, and I'm going to try to keep the five minutes that I

2  said I would use.

3          The answer to your question about 706(a) being

4  written out of the statute is 706(b).  706(b) is where in a

5  corporate context a stockholder, a board member, or some

6  (audio interference) interest, and there's an exception to

7  that that I'll get to later -- when there's true insolvency,

8  that's where that comes in.  So the remedy under 706 exists.

9  And nothing is being written out under 706(a).

10          But let me now just get to the substance of our

11  argument on this point.  If there is any confusion about

12  whether Mr. Nelms or Mr. -- or John Goodman (audio

13  interference) 706(a) motion on behalf of the debtor, it stems

14  from the statute, it was the Bankruptcy Code, needing to

15  accommodate both individual debtors and corporate debtors.

16          To clarify this, we need to go back to the text in

17  the statute.  Section 706(a) says, "The debtor may convert a

18  case under this chapter."  Congress knows how to distinguish

19  between debtor and trustee.  You see it all over the Code.  So

20  when Section 706(a) says, "The debtor," it means the debtor.

21  The question here is who is authorized to act for the debtor.

22          In a Chapter 7 case, you have two separate entities,

23  the trustee and the debtor.  The Bankruptcy Code vests all of

24  the debtor's interest and property as of the commencement of

25  eh case solely in the trustee.  The trustee then administers

Closing Argument - Mr. Silverstein

1    those assets.  But the debtor still exists and goes on

2    existing.

3            This raises the question of who can act for the

4    debtor in the bankruptcy case.  If the debtor is an

5    individual, individual can show up at hearings.  They can file

6    motions.  They can object to other motions.  They can file a

7    motion to convert the case because they are the debtor.

8            Corporations are different.  Unlike -- they're

9    different than individual debtors.  Unlike an individual, a

10   corporation cannot (audio interference) itself.  A corporation

11   has to act through those that are legally vested with the

12   authority to act for the corporation.

13           You still have the two separate entities, the trustee

14   and the debtor.  And the trustee acts as the representative of

15   the estate, but the debtor is still there, still a corporate

16   entity.  The question is who has the authority after an order

17   for relief under Chapter 11 and the appointment of a trustee,

18   to act on behalf of the corporate entity?

19           The Supreme Court -- U.S. Supreme Court answered the

20   question Community Futures Trading Commission v. Weintraub.

21   It's the trustee.  As the Supreme Court said in Weintraub,

22   "Corporate officers are completely ousted once a trustee has

23   been appointed."

24           And this makes perfect sense if you consider the

25   different narratives.  The previous management of a

Closing Argument - Mr. Silverstein

1   corporation in a Chapter 7 case can't go out and incur debt on

2   behalf of the corporation or enter into a contract on behalf

3   of the corporation.  Nor could they continue operating the

4   business of the debtor post-petition.

5          In a Chapter 7 case, only the trustee is entitled to

6   operate the business and only upon order of the court under

7   Section 721 of the Code.  That's because as the Supreme Court

8   has said, the Chapter 7 trustee completely ousts the former

9   management when it comes to a Chapter 7 debtor.

10         And again, this is not to say that the debtor's

11  former management or even stockholders have no recourse

12  whatsoever if they think the case belongs in Chapter 11.

13  They're entitled to move to convert under Section 706(b) with,

14  again, I believe one real exception when the corporation is

15  plainly insolvent, as Mr. Goodman conceded yesterday.

16         There is an interesting Second Circuit case that I

17  used to think was a very well-known case, but it's a 1986

18  Second Circuit case called In re Johns-Manville Corporation at

19  801 F.2d 60, where in the context of stockholders seeking to

20  change the board of directors by calling an annual meeting

21  under applicable corporate law, the Second Circuit suggested

22  that stockholders of an insolvent corporation where there's no

23  possible recovery for stockholders were not even parties-in-

24  interest.  And I say that because 706(b) reversed the parties-

25  in-interest.  Second Circuit said, "We note that if Manville

Closing Argument - Mr. Silverstein

1    were determined to be insolvent so that shareholders lack

2    equity in the corporation, denial of the right to call a

3    stockholders meeting would likely be proper because the

4    shareholders would no longer be real parties-in-interest."

5            I think that's really an overriding issue here

6    because you have Mr. Goodman who apparently is not even a

7    shareholder purporting to act on behalf of the corporation

8    because he's just trying to save things because he's a good

9    guy.  I mean, a lot of sarcasm in that statement, Your Honor.

10           In any event, so once you have a Chapter 7 case, old

11   management is out.  The trustee is in, as in the present case.

12   But even assuming that a duly authorized pre-petition agent

13   could act for a corporate debtor in a Chapter 7 case, which we

14   submit it can't, the evidence we heard and saw yesterday makes

15   it clear or indicates clearly that we don't even have that

16   here.

17           Goodman Networks is a Texas for-profit corporation.

18   Under the Texas Business Organizations Code, the board of

19   directors exercises all powers of the corporation and directs

20   the management of the business and affairs of the corporation.

21   This is crystal clear in Section 21.401 of the Texas Business

22   Organizations Code, and it is standard typical corporate law

23   in states through the country.

24           It ensures that the corporation has individuals with

25   fiduciary responsibilities to the organization and its

Closing Argument - Mr. Silverstein

1    stakeholders operating the business.  It's a very simply

2    concept.

3            The testimony and evidence makes clear that

4    throughout much if not all of 2022 Goodman Networks had no

5    board of directors.  Howard Konicov, as the debtor's 30(b)(6)

6    corporate representative, testified he never heard of anyone

7    being on a board of Goodman Networks and never met with a

8    purported board of Goodman Networks.  This is in the Konicov

9    deposition starting at page 51.

10           Mr. Nelms testified that when he was purportedly

11   appointment to the board on December 12, he became the sole

12   director.  If Mr. Nelms became the sole director on or about

13   December 12th, that means the company had no board and indeed

14   no officers at all going back until James Frinzi's resignation

15   in September of 2022.

16           John Goodman could not identify any directors of

17   Goodman Networks and confirmed in his testimony that the

18   company had no officers after James Frinzi resigned in

19   September of 2022, when he was reviewing the list of directors

20   and officers that was produced to him -- that was produced to

21   parties-in-interest on discovery.

22           If there was no board and no officer, there was no

23   one with actual authority to act on behalf of the debtor when

24   it filed a motion to dismiss the voluntary petition, and when

25   it objected to the joinders in fact.  John Goodman was

Closing Argument - Mr. Silverstein

1    purportedly appointed as a consultant in October of 2022.  His

2    appointment to that position is itself highly suspect.

3            We heard that the person who purportedly executed his

4    consulting agreement on behalf of the debtor was James

5    Frinzi's so-called chief (audio interference), even though

6    Frinzi had left the company one month prior. There was no

7    board or officer (audio interference) retention as a

8    consultant.  Nor have we seen a resolution or written consent

9    from the stockholders authorizing his appointment.

10            Indeed, the debtor presented no evidence to establish

11   how John Goodman -- John Goodman's consulting agreement was

12   approved.  And we question whether any such approval would be

13   valid from a corporate governance perspective.

14            A consultant under Texas law has no power to exercise

15   full authority on behalf of a corporation.  That power is

16   vested in the board under Texas corporate law.  There's no

17   provision of Texas corporate law that allows the family, so to

18   speak, to call upon John Goodman and say, hey, come fix this.

19   I mean, that's essentially what the testimony was.

20            If they wanted him to exercise corporate authority on

21   behalf of the corporation, they could have done that in

22   compliance with Texas law, but they didn't.  They created the

23   consultant's role rather than appointing him to the board or

24   making him an officer of the company.  And I think as Your

25   Honor will recall from the testimony from John Goodman, it

Closing Argument - Mr. Silverstein

1    appears that when everything hit the fan here, there was --

2    everybody just skipped town in light of the sixty-odd-million

3    dollars that was stolen, for lack of a better word, from the

4    company.

5            No board, no officers, there was nothing.  If John

6    Goodman never had the requisite authority to act for the

7    debtor, then the order for relief in the involuntary should

8    have been entered long ago, as none of the objections to

9    joinders or motions to dismiss were proper here.  We think

10   they weren't proper.

11           The debtor's shareholders, who are not real parties-

12   in-interest, given the debtor's utter insolvency, should not

13   be permitted to purport to remedy this at this late hour, four

14   months into the case, by appointing Mr. Nelms in order to

15   avoid a trustee, as the documents reflect, or stave off or

16   delay the Chapter 7 and the likely litigation against the

17   Goodmans that is to come.

18           So just in conclusion and I think I'm up to the five

19   minutes, hopefully not longer than that; there's no corporate

20   authority for this motion.  And I think it's really -- it's

21   not -- I think it really is as simple as that when you cut

22   though all the noise here.  Thank you, Your Honor.

23           THE COURT:  Thank you very much, Mr. Silverstein.  I

24   think you doubled your time estimate, so I will disregard the

25   second half of your argument.

Closing Argument - Mr. Silverstein

1          MR. SILVERSTEIN:  I lost the bet I guess.  I didn't

2    realize.  I apologize.

3          THE COURT:  I'm kidding.  I'm kidding of course.  And

4    again, I certainly do understand.  I understand both the

5    trustee's and the original petitioning creditors' authority

6    arguments.  And that is something that the debtor certainly

7    has to answer for.

8          I have -- and again, corporate authority aside, but

9    if I take Weintraub to basically write in to the Code the fact

10   that either A, that 706(a) means individual debtor, which it

11   doesn't say.  It doesn't say -- it says that in 523.  It says

12   that in 362(k).  For example, they talk about individuals.

13   706 does not do that.  It just talks about a debtor.

14         And where I struggle is I don't think that anyone

15   brought it to me, but I did thirty minutes of research.  And I

16   came across no less than seven examples of nonindividual cases

17   in which the debtor was contesting or seeking to convert from

18   seven to eleven.  And there's certainly the possibility that

19   all of those bankruptcy courts and district courts got it

20   wrong, and that this argument wasn't raised.  I will grant you

21   that, but it seems to me that there has to be some opportunity

22   for the debtor to seek to convert under 706.  We've had a lot

23   of --

24         MR. SILVERSTEIN:  706(b).

25         THE COURT:  But it --



Closing Argument - Mr. Silverstein

1          MR. SILVERSTEIN:  706(b).

2          THE COURT:  But in your argument, Mr. Silverstein,

3    you said that those were the management, those were somebody

4    else other than the debtor.  And again, corporate authority

5    aside, we can talk about corporate authority and things of

6    that nature, but I don't understand how the debtor -- what

7    you're arguing is the debtor ceases to exist post-Chapter 7.

8          MR. SILVERSTEIN:  No, I'm not.  I'm not because --

9    not, I'm not.  What I'm arguing is that the debtor -- a

10   corporate debtor can only act through its authorized

11   representatives such as its board and its officers.

12         THE COURT:  Again, so corporate authority --

13         MR. SILVERSTEIN:  That's what I'm -- that's --

14         THE COURT:  -- I'm with you on that argument.  I

15   understand that.  And as I've said, I've heard lots of

16   troubling things in the evidence on that point yesterday.  But

17   if you're saying that all corporate authority went to the

18   Chapter 7 trustee and thus the debtor cannot act, that's where

19   I'm not yet convinced.  And I'll look through the cases.

20         MR. SILVERSTEIN:  Okay.  And this is not -- this is

21   not a situation where -- I know at the very beginning -- I

22   think it might have been at the status conference, Your Honor

23   made a comment about the practice when an involuntary Chapter

24   7 is filed and a debtor -- and pre-order for relief the debtor

25   immediately converts the case to Chapter 11 or files a Chapter

Closing Argument - Mr. Silverstein

1    11.  And it sort of moots effectively the involuntary.  That's

2    what we see most of the time.

3           But this is not that.  This is a debtor who for four

4    months has been fighting an involuntary petition and doing all

5    sorts of things including paying 450,000 dollars to John

6    Goodman who's out there trying to buy some bonds so he can

7    make some money, among other things, and basically stalling

8    discovery.  And this whole concept of converting the case I

9    think came up -- and someone will correct me as they usually

10   do, but I think it first came up when either James Goodman or

11   Mr. Frinzi were trying to avoid being deposed.

12          They said ah, we're going to convert this case.  And

13   that was several -- whatever that was, and it's just a ruse.

14   It's a ruse here.  And I understand the theoretical issue, but

15   I think the theoretical issue is solved when you look at

16   706(a) and 706(b) together.  And that's really all I can say

17   about that.  The Code is not perfect.  I can point you to many

18   provisions where I can conjure up something that doesn't make

19   sense.

20          But it doesn't mean that it really doesn't make sense

21   because here I think it clearly does when we're dealing with

22   the facts of this case.  Which when you look at them are

23   fairly egregious, when you really think about it in terms of

24   what happened here.  That's really all I've got.

25          THE COURT:  Okay.  Thank you, Mr. Silverstein.

32

Closing Argument - Mr. Langley

1              MR. SILVERSTEIN:  Unless Your Honor has anything.

2              THE COURT:  And the record will reflect that you said

3       that Congress wasn't perfect, not me.  All righty.  Well,

4       thank you very much, Mr. Silverstein.

5              Mr. Langley.

6              MR. LANGLEY:  Good morning, Your Honor.

7              THE COURT:  Good morning.

8              MR. LANGLEY:  And let me frame it this way.  There

9       are two issues on authority to file.  I think one of them is

10      the federal issue that we've been kind of debating back and

11      forth day, and the second one is a state law issue where, if

12      you assume that the federal law issue doesn't apply, did they

13      have state law authority to get to where they are.

14             And I think it's probably more helpful to start with

15      the state-law-authority one.  And let me cite you to Franchise

16      Services of North America.  That's 891 F.3rd 198.  That's a

17      2018 Fifth Circuit decision.  It was cited in the trustee's

18      brief.  And it says a corporation cannot act on its own.  It

19      can act only if authorized by appropriate agents.

20             And so it continues if the petitioners lack

21      authorization under state law, the bankruptcy court has no

22      alternate but to dismiss the petition.  And it's that citing

23      the Supreme Court precedent Price v. Gurney.  And then it

24      continues, "It is not enough that those who seek to speak for

25      the corporation may have the right to obtain that authority."

Closing Argument - Mr. Langley

1    Rather they must have it at the time of filing.  Absent a duly

2    authorized petition, the bankruptcy court has no power to

3    shift management of a corporation from one group to another,

4    to settle intercompany disputes, and to adjust intercorporate

5    claims.

6           And that case went on to hold that although the board

7    of directors had approved that filing for a bankruptcy debtor

8    to file a Chapter 11 case, there was a minority shareholder

9    that had a veto right that did not exercise that veto right,

10   and therefore there wasn't authority to file that individual

11   Chapter 11 -- or excuse me, the corporate Chapter 11 case.

12          And we would suggest the facts here are pretty

13   remarkable in that there is no board action here.  And as my

14   two co-counsels have already identified, the Texas Bus Org

15   Code at 21.401 requires a corporation to manage its business

16   affairs through a board of directors.

17          So what do we need to see from an authority to file

18   standpoint?  We need a board resolution.  And we don't have

19   that here.  Nothing is in the record about a board resolution.

20   We've seen in Exhibit 5 that FedEx introduced the deposition

21   testimony that Mr. Frinzi very -- or not Mr. Frinzi but Mr.

22   Konicov, on behalf of the debtor as the 30(b)(6) testified,

23   there is no board after James Frinzi and James Goodman were

24   gone.

25          Furthermore, we saw in FedEx's interrogatories

Closing Argument - Mr. Langley

1    responses at 15 -- we saw that there were no board members

2    identified for this entity.  And then in the testimony of Mr.

3    Nelms and Mr. Goodman, neither one of those could identify any

4    officers or board members related to this.

5        So we think as the state law is very conclusive here,

6    there is no authority to file.  And we recognize that the

7    debtor may try to argue that shareholders can rectify or do

8    those type of things in place of a board, but that's not

9    exactly right.  And so if you looked at Texas Bus. Org. Code

10    21-101 (sic), in the unique situation which is unprecedented

11    here because there hasn't been an elimination of the board of

12    directors, but if the board of directors were eliminated by a

13    resolution of the shareholders, that has to be done in one

14    forum and one forum only.  And that is under subsection (b)

15    again of Texas Bus. Org. 21-101 (sic), which requires a

16    shareholder's agreement -- I'm quoting now, "authorized by

17    this section must be continued in a certificate of formation

18    of bylaws, if approved by" -- and this is the important

19    part -- "all of the shareholders at the time of the

20    agreement."

21        All of the shareholders have to do this.  So the idea

22    that only the Goodmans as fifty one percent-majority

23    shareholders could come in and authorize this type of action,

24    that's not appropriate.  And the way -- and I'm going to get a

25    little corny here, but the way I think of this is kind of an

Closing Argument - Mr. Langley

1  illusion to a Christmas time movie.  And I think of the Will

2  Ferrell Elf, where he hears, "Santa.  I know him.  I know

3  him."  I know Judge Nelms.  Right?  We know who Judge Nelms

4  is.

5         But then you go up to him and you say wait a second.

6  Pull on the beard; you're not Judge Nelms.  You're John

7  Goodman.  How did you get here?  And you say well, I have a

8  consulting agreement.  Well, how'd you have a consulting

9  agreement?

10        And he points to the person next him, and he says

11 that person in the green hat, that Sandra Sondrup (sic) is my

12 administrative assistant that authorized my consulting

13 agreement, which in effect says that he has no company

14 oversight.  I would ask the Court to spend considerable time

15 looking at that consulting agreement and say it doesn't raise

16 red flags that a consultant can be hired to run a multi-

17 million-dollar business or what was a multi-million-dollar

18 business and do so without any governance authority from the

19 board or any governance authority from shareholders.  That is

20 remarkable.  It's shocks the conscience remarkable.

21        And I would ask that you spend some time looking at

22 that.  That is Exhibit 8 that FedEx introduced.  And only

23 through that consulting agreement was Mr. Nelms' engagement,

24 the Debtor Exhibit 3 executed.  So at this point, we are

25 literally relying on Ms. Sondra as the chief of staff, which

Closing Argument - Mr. Langley

1    Mr. Konicov in the deposition transcript at Exhibit 5 of FedEx

2    admitted was an administrative assistant to Mr. Frinzi, who is

3    no longer there.

4         This company, this motion to convert all originated

5    from a chief of staff administrative assistant acting on

6    behalf of a company.  And that is not valid corporate

7    formality.  That is simple -- under the Franchise Services of

8    North America case in the Fifth Circuit, this Court has --

9    again, I will cite.  This Court has no alternate but to

10   dismiss the petition, here the motion to convert.

11        So we think the state law question is overwhelmingly

12   against the debtor here.  We think that this has to be done

13   under state law.  It wasn't done under state law, and that is

14   conclusive.  Moving to the federal question.

15        THE COURT:  Mr. Langley.

16        MR. LANGLEY:  Which again --

17        THE COURT:  Mr. Langley --

18        MR. LANGLEY:  Sure.

19        THE COURT:  Before you go on, I've flipped a few

20   times to find the full citation for Franchise Services of

21   North America.  I think that I wrote down 891 F.3d 198.  Is

22   that correct?

23        MR. LANGLEY:  That's correct, yes, Your Honor.

24        THE COURT:  Okay.  Thank you very much.  Please

25   proceed.



Closing Argument - Mr. Langley

1          MR. LANGLEY:  And to be fairly candid, I know that

2    case well because I was the debtor's attorney that got slapped

3    on the hand for filing it.  So I have been in Mr. Parham's

4    shoes before.  It's uncomfortable but you live to move on.

5          THE COURT:  Do as I say not as I do.

6          MR. LANGLEY:  That's exactly right.  So I think the

7    state law question based on the evidence we heard, it's

8    obviously a more difficult -- because it's an evidentiary

9    question here.  But I think it's very conclusive based on the

10   record that you saw that you can decide that without even

11   getting to this federal question.

12         But if you do get to the federal question that you've

13   been wrestling with today, I would suggest this, that 706(b)

14   does authorize only the debtor to file that type of motion to

15   convert.  And I recognize that you say he'll be written out of

16   the Code if the trustee was the only one.  But I actually can

17   cite you a case in the Northern District of Texas where the

18   trustee did move to convert under 706(a).

19         And that's the Acis Cap Management, L.P. case, 604

20   B.R. 484.  And that one's pretty fresh.  That's a 2019

21   decision of the bankruptcy court that was affirmed on appeal.

22   And that came back where the trustee -- after being put into a

23   Chapter 7, the debtor was determined to need to be in a

24   Chapter 11 because it had a business to operate and it needed

25   to reorganize.

Closing Argument - Mr. Langley

1          So there was a time when a chapter 7 trustee will do

2     what's right and put that company into a Chapter 11.  So is it

3     rare?  Yes.  I would suggest it is very rare.  But other than

4     that rarity with a corporate debtor, it's not rare for an

5     individual.

6          An individual should be able to because they have

7     personal rights.  And I think we go back to the Weintraub

8     case, and I think the reason all counsel keeps pointing back

9     to it is it's so important because they talked about a very

10    personal right.  And that's the privilege that every person

11    has related to attorney-client privilege.  That's a very

12    personal right.  That's as personal of a right as moving under

13    706 to convert.  And that personal right was determined by the

14    United States Supreme Court to be held only by the trustee at

15    that point.

16         And so while I recognize yes, there's a desire to

17    provide some type of sympathy to a debtor that's involuntarily

18    forced into Chapter 7, but 706(a) is not that sympathy.  And I

19    do think the Weintraub case, which has again been applied to

20    both corporations in the Weintraub and partnerships in the

21    Fifth Circuit through the Campbell case, those are personal

22    rights that are lost.

23         The debtor is not the trustee.  I agree with Mr.

24    Silverstein on that, but here, the debtor can only act through

25    the trustee.  And we know that through Rule 6009.  Again, I

Closing Argument - Mr. Langley

1    pointed to that yesterday.  I would ask again that the Court

2    spend some time looking at the statutory -- not the statutory

3    language, but the rule's text.  And it very clearly says the

4    trustee may prosecute or may enter an appearance and defend

5    any pending action or proceeding by or against the debtor.

6           That's not the estate.  That's 323.  And then the

7    second part of that sentence does talk about prosecute any

8    action or proceeding in behalf of the estate before any

9    tribunal.  So it's twofold.   The trustee has two rights.

10   They administer the estate and represent the estate, but the

11   trustee also carries on and conducts the debtor's business if

12   that's what it's to do.

13          And that's very clear from Rule 6009.  And I think

14   there's no counter-response to Rule 6009.  The only thing I

15   heard is as a counter-response in opening statements was

16   Section 341(d), which talks about a debtor appearing at the

17   meeting of creditors.  The argument was how does a debtor

18   appear at the meeting of creditors if it's the trustee.  And

19   that's actually a pretty fair point.

20          Except when you look at 341(d).  341(d) is specific

21   to individuals.  It talks about discharge.  It talks about

22   reaffirmation agreements.  We all know as regular

23   practitioners in bankruptcy court that a corporation doesn't

24   receive a discharge in Chapter 7.

25          So all those issues under 341(d) are just



40

Closing Argument - Mr. Langley

1    inapplicable to a corporation.  So Congress didn't screw up.

2    It simply provided a statute that's irrelevant to a corporate

3    debtor that doesn't receive a discharge or need to reaffirm

4    any agreements.

5        We think that the federal rule that has been adopted

6    by this point by three different panels of court of appeals,

7    the Tenth Circuit in C.W. Mining, the Tenth Circuit in Bear

8    Creek, and the Fourth Circuit the -- I apologize.  I've got it

9    here somewhere, the Public-Sector Solutions case.

10       THE COURT:  Right.

11       MR. LANGLEY:  I don't have that in my brief, so if

12   you need the citation that's 602 F.App'x 929.

13       THE COURT:  You gave that one to me yesterday.

14       MR. LANGLEY:  You really have to -- okay.  Yeah, you

15   really have to go to the underlying memorandum decision from

16   the district court to get to how that was decided because it

17   was a pretty much summary affirmance.  But at this point,

18   we've seen now nine different court of appeals judges hold

19   that a debtor in a Chapter 7 case is the trustee.

20       And I think Mr. Silverstein was also right, like what

21   is the sympathetic situation?  What if a debtor is placed in

22   an involuntary Chapter 7 and really should be in a Chapter 11,

23   but we have a hardheaded trustee that only wants to keep it in

24   Chapter 7?  The answer to that is 706(b).  And that's where

25   any party-in-interest including debtor's former management can

Closing Argument - Mr. Langley

1  move and show cause to say hey, this is not appropriately a

2  Chapter 7 case.  I know the petitioning creditors want it

3  here.  I know that they thought it was a good place for it to

4  be.  But let me demonstrate cause and why this should be a

5  Chapter 11 case and show why it can be reorganized and why

6  it's not hopelessly insolvent.

7          Yesterday, we heard testimony from Mr. Goodman that

8  he thinks his business can reorganize.  He had no evidence for

9  that.  There are no business assets.  There hasn't been

10  business assets.  There hasn't been a board of directors.

11  There hasn't been anybody other than an administrative

12  assistant acting for this company at certain points in time.

13          This is a remarkable case.  It is the extraordinary

14  exception.  It is the atypical case for a corporate debtor to

15  come in here and not have any governance.  That is remarkable.

16          And I think the evidence that was put forward

17  yesterday demonstrates under state law they couldn't file this

18  motion to convert.  And I think that issue's even moot because

19  federal law has been decided by three different panels.  Nine

20  different court of appeals judges have all held that.

21          And I recognize that prior to Marrama there were

22  cases out there that did hold, based on 706(a), that a debtor

23  could come in and convert to Chapter 11 in that situation.

24  The debtor cited one in their brief.  That was the -- if I can

25  get to it.  I don't have it here, but I think it was like

Closing Argument - Mr. Langley

1    Premier or something, along that line.

2           THE COURT:  Yes.

3           MR. LANGLEY:  That they cited.

4           THE COURT:  Yes.

5           MR. LANGLEY:  Eastern District of Texas case.

6           THE COURT:  Yes.

7           MR. LANGLEY:  But if you look real closely at that

8    case, it made the same error that the debtor did in the motion

9    to convert saying that there's absolutely right to convert.

10   The Marrama conclusively overheld.

11          So the idea of the debtor's case there being support

12   for its position is citing to a Nebraska Bankruptcy Court that

13   was pre-Marrama and had an absolute right.  If there is no

14   absolute right to convert, 706(a) doesn't make any sense for

15   the purpose of where we are here today and the purpose of that

16   case.

17          And so we would suggest that Marrama clearly held

18   there is no absolute right to convert.  So this is a pretty

19   easy question then.  There always have to be some type of

20   analysis whether there is cause to convert.  Either it's the

21   debtor's burden under 706(b), or it's the opposing party's

22   burden under 706(a).

23          Your Honor's going to hear that at a later date if

24   she -- if you don't decide to resolve this on standing

25   grounds.  We think you should.  But we think that the evidence

Closing Argument - Mr. Langley

1    that you've already seen is going to make it even more

2    overwhelming once we have time to get in and see bank

3    statements and all the other stuff that was done during this

4    period.

5         We don't think there's a need for all that discovery.

6    It's going to be expensive on all our parties to do that.  We

7    think the evidence clearly states there's no state law

8    authority here for this motion to convert.  We think that

9    federal law is conclusive that there is no federal authority

10   here because the trustee is the only party, after its

11   appointment and the order for relief, to do that.

12        Again, the debtor's former management is not out of

13   luck.  They can move.  Mr. Parham is fully capable of moving

14   on behalf of debtor's former management under 706(b) and

15   demonstrating cause, again, that this is not hopelessly

16   insolvent and that there is reorganization.  We just don't

17   think it's appropriate that the opposing creditors are

18   forced -- even the trustee are forced to carry that burden

19   under 706(a).

20        And with that, Your Honor, I will conclude, unless

21   you have any further questions.

22        THE COURT:  Thank you, Mr. Langley.  You're an

23   incredibly skilled oralist.  I'm not sure if you ever breathed

24   during that presentation.  So I do have a few questions for

25   you.  You argue with amazing rapidity.  So here are my

Closing Argument - Mr. Langley

1    questions for you.

2         You cited to me 341(d).  Looking at 341(d)(2), it

3    says prior to the conclusion of the meeting of creditors, the

4    trustee shall orally examine the debtor to ensure that the

5    debtor in a case under Chapter 11 of this title is aware of --

6    number (2) the debtor's ability to file a petition under a

7    different chapter of this title.  So corporate authority aside

8    because we will talk about corporate authority a great deal.

9    Or shall I say the debtor and I will talk about corporate

10   authority a great deal.

11        How is that consistent with your argument that after

12   the order for relief is entered and a Chapter 7 is filed that

13   the debtor cannot move to convert and cannot seek to file

14   under a new chapter?

15        MR. LANGLEY:  So I would turn to 341(d)(1) and

16   suggest that that -- excuse me, (d)(2) the ability to file

17   under a different chapter is not related to the context we're

18   in.  That's related to a Chapter 7 case where you have a means

19   test and you have to go through the means test and determine

20   whether they should more appropriately be in a Chapter 13

21   case.

22        So I think that's what that is contemplating.  It's

23   not really the U.S. Trustee or the Chapter 7 trustee trying to

24   figure out whether this debtor should have been put in Chapter

25   11 or Chapter 7 case.  That could be done through other means.

Closing Argument - Mr. Langley

1      Really, the purpose Congress was intending through

2   this provision, again, was it's something that has to occur

3   related to the meeting of creditors is that means test to

4   figure out whether they are even eligible for Chapter 7.  So I

5   think it's more focused on whether there's eligibility to

6   begin with for the Chapter 7 case, not trying to figure out if

7   there's another more beneficial chapter that might be

8   voluntarily sought after.

9      And so that I think is just sort of a distraction.  I

10  don't think it gets to the fact that this estate under 323 is

11  very clearly administered by the debtor.  I don't think

12  that -- I don't know how you read Rule 6009 any differently

13  than to say that there's two obligations of the trustee.  One

14  is on behalf of the debtor, and one is on behalf of the

15  estate.

16      Again, I would point you back to the Tenth Circuit

17  case.

18      THE COURT:  My reading of 6009 -- my reading of 6009

19  basically is that its applicability is to pending actions when

20  the case is filed.  So the debtor can be in a pending action

21  in a variety of instances when a case is filed.  And this says

22  that the trustee may enter an appearance and defend any

23  pending action by or against the debtor.  That's where the

24  trustee can step on.  That's what this means.

25      MR. LANGLEY:  Your Honor, and that may be true, but

Closing Argument - Mr. Langley

1    doesn't that ask the next question?  If the trustee can take

2    over pre-petition litigation where clearly there was

3    authorization on behalf of the former management to act,

4    doesn't that very conclusively evidence that after the fact

5    that would be the same situation?

6         Why could the debtor take over clearly authorized

7    actions outside of bankruptcy but not take over unauthorized

8    actions within the bankruptcy?  That's -- it seems to suggest

9    the same rule for both positions.

10        THE COURT:  Right.  And again, not arguing with you

11   on corporate authority.  Questioning your proposition that

12   this debtor may not seek to convert under 706(a), again,

13   because that right is only in the hands of the trustee.  And

14   again, in the Acis case, I know that the trustee -- the

15   Chapter 7 trustee moved to convert that case.  But I don't

16   recall any portion of that decision saying that the debtor

17   could not have so moved.

18        MR. LANGLEY:  You're correct.  That wasn't ever put

19   at issue in that case.  And I don't know the cases that you

20   have otherwise read, but I'm not sure this has been put

21   forward in any of those other cases.  But what I do know --

22        THE COURT:  Well, actually, a lot of them you've

23   cited.

24        MR. LANGLEY:  -- is if --

25        THE COURT:  Interestingly enough, a lot of them you

Closing Argument - Mr. Langley

1   actually cited, Mr. Langley, because -- and let me -- I'll get

2   you there.  That's not where I found them, but when I was just

3   flipping through your brief looking for that cite, I just saw

4   them.  I thought that was interesting.

5        So at footnote 2, you cite the Mercury Data decision,

6   the George Love decision, the Broad Creek Edgewater decision.

7   I think in your brief you also cite, if I'm not mistaken,

8   Euro-American decision.  Let's see, you also --

9        MR. LANGLEY:  Yes, Your Honor.  And let me address --

10       THE COURT:  And there --

11       MR. LANGLEY:  Let me address those.

12       THE COURT:  But there are a variety of decisions that

13   also add to that, Breakwell, which you also cited.  And

14   there's at least one or two others including FMO Associates

15   II, which is an Eastern District of New York decision at 402

16   B.R. 546

17       The long story short is that each of these -- in each

18   of these cases, there was an involuntary, and the bankruptcy

19   court allowed the debtor to be heard on whether or not that

20   debtor should convert to another chapter.  Again, corporate

21   authority aside, in each of those cases -- and Judge Clark

22   said the same thing in Premier General Holdings, which I do

23   believe technically was post-Marrama because Marrama is 2007

24   and Judge Clark's decision in Premier General Holdings was

25   Western District of Texas 2010.

Closing Argument - Mr. Langley

1          So in each of these cases -- in fact, Judge Clark --

2     I'll read to you what he says.  He says, "What is more, even

3     if an order for relief is entered on a petitioning creditor's

4     involuntary Chapter 7 petition, the debtor has a near

5     unbridled right to convert to Chapter 11."

6          I grant you Marrama says no absolute right and gives

7     the circumstances.  He says, "The House Report observes that

8     'the policy of the provision is that a debtor should always be

9     given the opportunity to repay his debts...'  Not

10    surprisingly, the Rules contemplate that, while a conversion

11    under 706 is accomplished by motion, it is not a contested

12    matter, and a court may rule on a motion without a hearing.

13         "The debtor's choice of chapter thus ought to be

14    honored, even if that choice is expressed as a voluntary

15    petition filed after petitioning creditors have filed an

16    involuntary" -- and then he quotes the Nebraska decision that

17    you cited.

18         But he says -- let's see -- "There is little

19    practical reason to deny a debtor, the subject of an

20    involuntary, the preference it has expressed for a given

21    chapter, whether by the filing of a motion to convert or by

22    the filing of a voluntary petition under a given chapter in

23    the face of an involuntary.  There is every reason, to the

24    contrary, to honor that choice, given the intentions of

25    Congress expressed in both the structure of the Code and the

Closing Argument - Mr. Langley

1    legislative history to the Code."

2         So again, we all agree that Marrama applies.  Supreme

3    Court wins every single time.  We can agree upon that.  But

4    what I'm saying is that this case and at least six other

5    bankruptcy cases that I came to within thirty minutes all say

6    a corporate debtor has the right to try.

7         Now, again, corporate authority aside, everything

8    that we've talked about with the Texas statutes, everything

9    we've talked about with the issues with the consulting

10   agreement, the shareholder agreement, et cetera, those may

11   carry the day.  But I am struggling mightily with not giving a

12   debtor with proper corporate authority the ability to seek to

13   convert.

14        MR. LANGLEY:  Yes, Your Honor.  And let me briefly

15   address some of the cases you cited.  So the George Love case

16   was pre-Marrama.  The Broad Creek Edgewater was pre-Marrama.

17   The Woodruff case -- or excuse me, the -- you cited another

18   case that wasn't post-Marrama.  I don't know the specifics on

19   that.  The Euro American Lodging, again was pre-Marrama.  I

20   believe most of the authority you cited was all pre-Marrama.

21   And that gets back to this absolute right.

22        If there's an absolute right to convert, it does seem

23   like a different world that we're in than we are today with

24   Marrama.  If the debtor has a absolute right to convert --

25        THE COURT:  Do I have the wrong date of the Marrama

Closing Argument - Mr. Langley

1    decision?  The Marrama decision came down -- am I incorrect it

2    was February 2007?

3              MR. LANGLEY:  I believe it was 2007.  That's correct.

4              THE COURT:  And George Love is March --

5              MR. LANGLEY:  Those other cases --

6              THE COURT:  -- 2007, Broad Creek is July 2007, Euro-

7    American is April 2007, Mercury Data is 2018, FMO Associates

8    II is 2009, Eugene Alexander, Inc. -- well, that's way early,

9    and Breakwell's 2010.  Am I missing something?

10             MR. LANGLEY:  Your Honor, and again, I'm not prepared

11   to go through the specifics but those all are decided right at

12   or around the time of Marrama then.  And I think, you know,

13   the old saying is old habits die slow.  They die hard.  And I

14   think the Premier case that you cited in the Eastern District

15   of Texas is that type of example where he's still citing back

16   to pre-Marrama decisions.  He's still relying on pre-Marrama

17   practice.

18             And I don't think there's any statutory basis for

19   that.  And I turn you again -- I think those Tenth Circuit

20   cases are extraordinarily well reasoned.  And I cite the Bear

21   Creek Trail case now.  The Bankruptcy Code makes no provision

22   within the structure of Chapter 7 for former management to

23   appear in the proceeding and attempt to assert a separate

24   interest on behalf of the debtor.  I mean --

25             THE COURT:  And so am I correct --



Closing Argument - Mr. Langley

1          MR. LANGLEY:  -- there could not be a more conclusive

2     statement.

3          THE COURT:  Am I correct that Bear Creek -- because I

4     did have an opportunity to sit with C.W. Mining for quite a

5     bit, given your heavy reliance upon it in your papers.  C.W.

6     Mining is an appellate decision dealing with a person

7     aggrieved test, which is an appellate policy.  Okay?  And I'm

8     quoting from C.W. Mining.

9          But this circuit has adopted the rule that appellate

10     review of a bankruptcy court order is limited to persons

11     aggrieved by that order.  To qualify as a person aggrieved, a

12     person's rights or interests must be directly and adversely

13     affected pecuniarily by the decree or order of the bankruptcy

14     court.   Accordingly, unless the estate is solvent and an

15     excess will eventually go to the debtor, or unless the matter

16     involves rights unique to the debtor, the debtor is not a

17     party aggrieved by orders affecting the administration of the

18     bankruptcy estate.

19          That's an appellate policy.  How does that affect

20     whether the debtor can act within the bankruptcy?  Whether or

21     not the debtor is going to have the authority to appeal any

22     order of this bankruptcy court, I am sure that the creditors

23     will -- creditors will beat the debtor over the head with C.W.

24     Mining.  But how does that affect what's going on inside the

25     bankruptcy court?

Closing Argument - Mr. Langley

1          MR. LANGLEY:  Yes, Your Honor.  If you look at C.W.

2    Mining, it's a little bit more intricate than that.  That was

3    the question presented, whether there was person aggrieved

4    standing for the debtor to so move and appeal.

5          But what the Tenth Circuit did is it actually backed

6    away from that question and said no, no, we're going to

7    address a different question.  And that's does the person

8    that's here even have authority to make the appeal.  And

9    that's what they decided.  It wasn't a standing question they

10   decided.  It was an authority question.  And they said no.

11         THE COURT:  Standing on appeal.

12         MR. LANGLEY:  This has to -- I'm sorry?

13         THE COURT:  Standing on appeal, no?

14         MR. LANGLEY:  No, Your Honor.  That is not what was

15   decided.  It was an authority question not a standing question

16   that ended up being decided in that case.  And the authority

17   question was does the debtor even get -- is the debtor even

18   represented here.  And the answer was no because it wasn't the

19   Chapter 7 trustee, and so they dismissed it because the

20   debtor -- the purported debtor hadn't filed the motion.

21   That's different than standing whether the debtor itself can

22   appeal.

23         And so that's where I think we've got to focus on it,

24   and the C.W. Mining case makes that very clear distinction in

25   its later findings is we aren't saying the debtor can't

Closing Argument - Mr. Langley

1    appeal.  It can appeal.  But the debtor can't appeal through

2    the purported authority of its former management because, at

3    the time of an order for relief and the appointment of a

4    Chapter 7 trustee, there no longer is authority in that former

5    management because they have been completed ousted under the

6    Weintraub decision and placed in the hands of a trustee.

7          So I'm squibbling on a small technicality, but I

8    think it's an important technicality that the C.W. Mining case

9    did not decide standing.  It decided the authority question

10    that's at issue.  And that's where I think the case is the

11    exact same situation.

12          We aren't arguing that the debtor can move under

13    706(a).  It can.  There is standing for a debtor to move under

14    706(a).  The question is who has that authority.  That's a

15    different question than standing.  And the authority here is

16    clearly vested in the trustee.  And it clearly was not vested

17    in whoever purported to act on behalf of the debtor here.

18          And so that's the distinction I think that's hard to

19    make but it is the distinction we're trying to make is this is

20    not a standing under 706(a).  There is standing by the debtor

21    under 706(a), but who is the debtor?  An inanimate objection

22    cannot act on its own.  It has to authorize -- act through

23    authorized agents.  That's the FSNA case.  And we know that

24    only authorized agent after filing of a Chapter 7 order for

25    relief is the trustee, and that's the position we're taking.

Closing Argument - Mr. Langley

1          Again, it is a technical, it is a legal position.  It

2    is not an easy decision.  It involves corporate law and

3    bankruptcy law, and they often don't intermingle very easily.

4    But I think that's why C.W. Mining, Bear Creek were decided to

5    well is I think they actually did blend those two areas really

6    well together.

7          THE COURT:  So essentially -- so obviously, C.W.

8    Mining is in the instance of a conversion from an 11 to a 7.

9    Right?  And so the Tenth Circuit says essentially it was the

10   debtor's obligation to seek to appeal before the Chapter 7

11   trustee was appointed.

12         MR. LANGLEY:  So the facts -- the facts in CWR that

13   an involuntary 11 was filed and immediately there was a motion

14   to convert to 7 that was granted, and the debtor tried to

15   challenge the involuntary bankruptcy on appeal.  And so that

16   was the issue that was brought up.

17         And the position was prior to the conversion when it

18   was a Chapter 11 they probably could have challenged that on

19   appeal.  But after the Chapter 7 trustee was appointed, there

20   was a complete ouster of that former chapter's management.

21   Therefore, the involuntary could no longer be challenged.

22   That's essentially what we're suggesting is the position here.

23   It's on appellate standing issue, but it's an authority to

24   file question that would apply in that case in C.W. Mining and

25   in the same motion to convert that we have here.

55

Closing Argument - Mr. Langley

1           And you see -- and I apologize, I don't have the

2   exact cites, but it's later on in that opinion.  I think it's

3   section 3 that talks about debtor's management.

4           THE COURT:  It's section --

5           MR. LANGLEY:  And it goes through that analysis.

6           THE COURT:  Yeah.  I have it.  It's right above

7   section 3.  Right.

8           MR. LANGLEY:  Yeah.

9           THE COURT:  Oh, I see there's a 3 subsection as well.

10  Yes, I got you.  Under those facts, I see the nuance where the

11  court is basically saying you had an opportunity --

12  essentially, the debtor had an opportunity during the case,

13  and it didn't appeal that -- it didn't appeal that order.  It

14  says the corporate -- it's again the corporate managers, which

15  is a little different than what we have here, but it says the

16  corporate managers failed to appeal the conversion to Chapter

17  7.

18          Okay.  Well, like you said, I will sit with it for

19  some time.  But I certainly appreciate your arguments, Mr.

20  Langley.  Thank you very much.

21          MR. LANGLEY:  Thank you, Your Honor.

22          Ms. Sixkiller.

23          MS. SIXKILLER:  Yes, Your Honor.  In the interest of

24  brevity and keeping with my five-minute maximum that I

25  promised, ARRIS has nothing to add to the closing statements

Closing Argument - Mr. Langley

1    that have already been presented by the interim trustee's

2    proposed counsel and the other creditors.

3            THE COURT:  Okay.  Thank you very much, Ms.

4    Sixkiller.

5            MS. SIXKILLER:  You're welcome.

6            THE COURT:  Mr. Schaffer, anything to add today?

7            MR. SCHAFFER:  Your Honor, true to my word, I have

8    nothing do add.

9            THE COURT:  Okay.  Thank you very much, Mr. Schaffer.

10           MR. RUKAVINA:  Your Honor, before Mr. Parham gets the

11   last word, may I have a minute to address a question that you

12   had for Mr. Silverstein?

13           THE COURT:  Okay.

14           MR. RUKAVINA:  Thank you.  The Court asked quite

15   rightfully that why doesn't 706(a) say the individual debtor

16   because the Code does in certain instances say individual

17   debtor.  But the Court I don't think would be surprised

18   because I know the Court knows Chapter 12 and 13 very well;

19   those don't say individual debtor.  Those say debtor.  The

20   debtor shall file a plan.  The debtor may move to convert.

21           It's inconceivable that the word of the debtor in

22   Chapters 12 and 13 would refer to a corporation.  Chapter 9

23   talks about the debtor -- debtor, debtor, debtor.  It's

24   inconceivable that a human being would be a Chapter 9 debtor.

25           So we need to look at the context.  In other words,

Closing Argument - Mr. Langley

1    Congress, as wise and precise as it may be sometimes says duh,

2    of course we mean individual debtor in Chapter 13 because

3    that's all it can be.  So let's go back to 706(a), and before

4    we read 706(a), Your Honor, there are three possibilities.

5    The debtor can be only an individual debtor, the debtor can be

6    only a corporate debtor, or the debtor may be both.

7         706(a) says the debtor may convert a case under this

8    chapter to a case under Chapter 11, 12, or 13.  The only

9    possible definition as between those three that works in each

10   of those is an individual debtor because a corporate debtor

11   can never be a debtor under 12 or 13.  So using logic, trying

12   to avoid ambiguity, I would urge -- and I would agree with Mr.

13   Silverstein that only an individual debtor has a right under

14   706(a).

15        And as I've put in my objection, this motion really

16   is filed under 706(b), which is a different standard.  So I

17   would urge, again, to avoid contextual problems, to avoid

18   ambiguity, that the Court read it as such.  Mr. Seidel also

19   wanted me to tell the Court I think very correctly all those

20   cases that the Court mentioned, and the Court noted that

21   perhaps the issue wasn't raised; cases where issues are not

22   raised should not be precedential, Your Honor.

23        We are raising the issue today.  We don't know why it

24   wasn't raised in other cases.  But to us, it became a very

25   obvious issue.



Closing Argument - Mr. Langley

1        And the final point I'd like to make, we touched upon

2    it yesterday.  Again, I don't want to steal Mr. Parham's

3    thunder.  I know he's going to go last.  But if the Court is

4    inclined to take some time, short time, and then if the Court

5    is inclined to find what we call standing and schedule an

6    evidentiary hearing later, the Court mentioned yesterday that

7    we'll talk about what Mr. Seidel's role may be or not.

8        THE COURT:  Sure.

9        MR. RUKAVINA:  I just want to add that ambiguity

10   ought to be avoided at all cost.  I think that if the case is

11   in Chapter 7, it should remain clearly in that, so that

12   everyone knows what their roles are, so that debtors aren't

13   opening DIP accounts, so that there's no 363(b) and subsequent

14   questions as to what is an ordinary course transaction, so

15   there's no 549.

16       If we're going to wait until sometime in January for

17   the evidentiary portion, then Mr. Seidel humbly suggests even

18   if he has to kick the 341 down the road a little bit that he

19   wants to know what his duties are.  And because they're still

20   in the state to protect, everyone's best served by it staying

21   in a 7 unless and until the Court actually orders otherwise.

22   Thank you, Your Honor.

23       THE COURT:  Thank you, Mr. Rukavina.  I appreciate

24   that.

25       MR. SILVERSTEIN:  Your Honor, can I have ten seconds

Closing Argument - Mr. Langley

1    just to clarify something that counsel just said?  I think he

2    misspoke a drop.  May I?

3            THE COURT:  You think he misspoke?

4            MR. SILVERSTEIN:  I think he inadvertently misspoke

5    because when he was talking about who has authority to act for

6    a corporate debtor under 706(a), there needs to be the

7    distinction between pre-entry of order for relief and post-

8    entry of order for relief.

9            Pre-entry of order for relief, as we typically see in

10   a voluntary is before the order for relief is entered.  The

11   debtor has corporate authority, assuming it exercises it

12   properly.  It's post -- it's after the order for relief where

13   there's the -- where the debtor does not have authority, and

14   the trustee retains that authority.

15           THE COURT:  Okay.

16           MR. SILVERSTEIN:  That's all I wanted to make sure

17   the record was clear on.

18           THE COURT:  Okay.  Thank you very much, Mr.

19   Silverstein.

20           All righty, Mr. Parham.

21           MR. PARHAM:  Your Honor, could we just take a five-

22   minute break before we start with this?

23           THE COURT:  All righty.  That's fine.  We'll take

24   a -- it's 12:25.  We'll be on recess until 12:30.

25           THE CLERK:  All rise.



Closing Argument - Mr. Parham

1          UNIDENTIFIED SPEAKER:  Your Honor, I didn't hear --

2   I'm sorry.  I didn't hear what Mr. Parham said.

3          THE COURT:  Mr. Parham asked for a short recess, so

4   we're going to recess from 12:25 to 12:30.

5          UNIDENTIFIED SPEAKER:  Okay.  Thank you.

6          THE COURT:  You're welcome.

7          THE CLERK:  All rise.

8       (Recess from 12:25 p.m. until 12:33 p.m.)

9          THE CLERK:  All rise.

10          THE COURT:  Please be seated.  All right, ladies and

11   gentlemen, we're going to go back on the record in case number

12   22-31641, Goodman Networks.  I think when we -- before the

13   break we had concluded closing arguments primarily with

14   respect to the objecting creditors.  And I'll now hear from

15   the debtor.

16          Mr. Parham.

17          MR. PARHAM:  Well, the arguments, Your Honor, have

18   morphed as we've gone along here.  We started with the

19   question as to whether or not the debtor lost the ability to

20   continue with an involuntary.  And somehow that's moved on to

21   state law issues which were raised just Sunday, in addition

22   not what we'll call the federal issues under 706.

23          You know, as we said yesterday, and I'll start with

24   706.  And I understand the Court's got some corporate

25   authority issues that we're going to be discussing here

Closing Argument - Mr. Parham

1    shortly.  But to start with under 706(a), we do think it's a

2    plain reading of the statute.  And it says debtor, and just

3    like I think the Court noted that there's a difference between

4    trustee and debtor, there are plenty of sections of the

5    Bankruptcy Code, plenty of provisions that talk about

6    individual debtor, distinguishing individual debtor from

7    debtor.

8         And it's not surprising that in Chapters 12 or 13,

9    which are only individuals, that you would talk about the

10   debtor -- or 13 in particular, or 9, which is a municipality.

11   You talk about the debtor because there's no debtors other

12   than a municipality.

13        But the Court -- Congress clearly knows how to make a

14   distinction, and it didn't make the distinction in Section

15   706(a).  The other point I would make with respect to 706(a)

16   is that it says that the debtor may convert a case under this

17   chapter to -- at any time.  It doesn't say prior to the

18   appointment of a trustee, prior to the entry of an order for

19   relief.

20        The statute says that the debtor may convert a case

21   under this chapter at any time.  And if you can convert, then

22   certainly it means that you can file a motion to convert.

23   Certainly, it means you can go to a contested hearing on a

24   motion to convert particularly in the aftermath of Miramar.

25        So to me, to us it's clear that we have a right under

Closing Argument - Mr. Parham

1    the federal statutes to move to convert and to prosecute the

2    motion, notwithstanding the appointment of a trustee.  I think

3    the Court was right that C.W. Mining deals with the ability on

4    an appeal as opposed to -- where you were talking about

5    appellate rights versus what you can do in the bankruptcy

6    case.  And if we got to an appeal, then we would address

7    those.

8         But what they're doing -- what they're asking the

9    Court to do is to take an extreme minority position at this

10   point.  One which is contrary to the practice in this

11   district, when you look at Foster and you look at Brake Bill

12   (ph.).  And in those cases you have trustees appointed and the

13   debtors are prosecuting motions to convert.  In Miramar in

14   front of the Supreme Court, the debtor is prosecuting a motion

15   to convert over the objection of a trustee.

16        And the argument, frankly, that you can't consider

17   cases where issues aren't raised, such as the standing

18   issue -- cases where the standing issue wasn't raised ignore

19   the fact that courts always have the obligation to look at

20   jurisdiction.  And what they're basically arguing is that

21   there's no jurisdiction for a debtor to bring a motion to

22   convert once a trustee has been appointed.

23        And it's not clear to me at this point -- at one

24   point in time, I thought they were arguing that we didn't have

25   the motion -- the authority to file the motion to convert.

Closing Argument - Mr. Parham

1    Then it seemed that they were saying well, you lost it once a

2    trustee was appointed.  So you could file it, but you can't

3    prosecute it.

4         I would argue that we can file it and we can

5    prosecute it.  And I'm not sure which way -- and obviously, it

6    doesn't make a whole huge difference here which way the -- you

7    know, because either way, if we're out, we're out.  But we

8    shouldn't be out.

9         And with respect to the cases they cited, I would

10   just note that the Fourth Circuit opinion they cited was

11   unpublished.  It was all of about one paragraph long.  Bear

12   Creek basically just followed C.W. Mining.

13        And again there, I think it's significant that it was

14   an 11 that was converted to 7.  And so we are talking on

15   appeal, which was the first point in time at which a Chapter 7

16   trustee would have appeared.

17        So we think that under the case law, under the

18   practice, under the plain reading of the statute -- and I know

19   the Court spend a lot of time with it, and I won't spend a lot

20   of time with it.  It's very clear that we have standing to be

21   here and to prosecute a motion to convert back to Chapter 11.

22        And frankly, and contrary to counsels' argument, the

23   debtor gets to choose the chapters generally speaking, unless

24   there's a cause otherwise.  The cause isn't a creditor vote,

25   as Mr. Rukavina seemed to suggest that we all these creditors

64

Closing Argument - Mr. Parham

1  who don't want it in Chapter 11, so we shouldn't do it.   But

2  it's not a creditors' vote.  The debtor does have that option.

3       So with that, I will turn to the corporate

4  eligibility issue.  And the first thing I would note is that

5  Mr. Rukavina handed up Texas statutes earlier today.  These

6  statutes, when it refers to Chapter 11 it's referring to

7  Chapter 11 of the TBOC, not Chapter 11 of the Bankruptcy Code.

8  This whole section deals with a voluntary winding up under

9  state law.  It has zero applicability to Chapter 11

10  bankruptcy.

11       And I think the Court would note that to the extent

12  it was suggested that you needed shareholder votes to file a

13  Chapter 11, I think the Court knows that is not what happens.

14  So at the outset, I would simply say that they completely

15  missed on that.  And those statutes are not applicable to

16  Chapter 11 bankruptcy cases.

17       So going along, so what is the evidence on corporate

18  authority?  The evidence is that Mr. Nelms was appointed as a

19  director, sole director.  That Mr. Nelms approved filing the

20  motion to convert.  That was his testimony.  And so you do

21  have the sole board member approving the filing of the motion

22  to convert.  So to the extent that board approval -- and in

23  that capacity, which is the only capacity he had with the

24  company, so you do have board approval of filing the motion to

25  convert.

Closing Argument - Mr. Parham

1          If you're talking about the testimony with respect --

2    the consent obviously is in evidence, the consent of the

3    shareholders reciting the bylaws.  And we've proved up all the

4    signatures were received.  The timing of the signatures I

5    don't believe is in evidence.  What is -- what was discussed

6    was the timing I think of Mr. Goodman sending the signed

7    consents to Mr. Nelms.

8          Whether those consents have been signed -- well, they

9    obviously were signed prior to that time.  But the exact time

10   that they were signed I don't believe is in evidence.  And I

11   would argue that, in fact, that's in essence the ships passing

12   in the night that the Court indicated yesterday.  I mean, it

13   all happened within a very short period of time, within --

14   frankly, within a few minutes of each other one way or the

15   other.

16         But the consents were in place before the motion to

17   convert was filed.  So you have a duly appointed director, who

18   had -- who authorized the filing of the motion to convert, if,

19   in fact, you would equate a motion to convert with the

20   petition.  So you have that.

21         In terms of the retention of Mr. Nelms, which was

22   signed by Mr. Goodman, Mr. Goodman --

23         THE COURT:  Signed by Goodman MBE.

24         MR. PARHAM:  Right.  Goodman MBE, which was the

25   majority shareholder of the debtor.  But then you also had the

Closing Argument - Mr. Parham

1    consent appointing him, so I think it's a little bit of belt

2    and suspenders between the two.

3              THE COURT:  Is it belt and suspenders?

4              MR. PARHAM:  I think it is.  I mean, he was

5    appointed, which -- and then do you have to have an employment

6    agreement?  Not necessarily.  I mean, I think it's very common

7    if you do, but I don't think there's any -- I don't think

8    there's any requirement that any employee or -- in Texas

9    necessarily would have an employment agreement.

10             THE COURT:  Okay.  So let's take a step back, and

11   let's take these in order.

12             MR. PARHAM:  Okay.

13             THE COURT:  First, we have the consulting agreement

14   that was admitted as FedEx's 8.  That consulting agreement,

15   how is that a valid document?

16             MR. PARHAM:  Well, okay, Sondra (sic) Sondrup, if

17   I've pronounced the name correctly.

18             THE COURT:  Correct.

19             MR. PARHAM:  The testimony is that she was given the

20   authority by the company, by Mr. Frinzi when he was the

21   director and CEO to sign contracts on behalf of the company.

22   And that that authority continued.  I mean --

23             THE COURT:  Was she -- okay.  Let's -- I understood

24   Mr. -- and I will go back and listen to the testimony again.

25   I understood Mr. Goodman's testimony to be he assumed Mr.

Closing Argument - Mr. Parham

1    Frinzi gave her authority.  This was his assistant.  This was

2    his personal assistant who was executing on behalf of the

3    corporation a consultant agreement --

4            MR. PARHAM:  I think that --

5            THE COURT:  -- with Goodman MBE, not with Mr. Goodman

6    but with Goodman MBE to the tune of 450,000 dollars.  Okay?

7    Is she -- she's not an officer, we know.  Correct?

8            MR. PARHAM:  She was not an officer.

9            THE COURT:  Okay.  How does she have authority to do

10   this?

11           MR. PARHAM:  Well, I come back to she was given

12   authority by Mr. Frinzi.  And I believe the testimony was that

13   he was -- she was given that authority, that that's what she

14   was.  I mean, we can all I suspect go back and listen to

15   whether that was assumed or whether that was the case.

16           THE COURT:  Sure.

17           MR. PARHAM:  But I believe the testimony is that that

18   was, in fact, the case.  And, in fact, she was signing, and

19   she was -- had been.  I think the testimony also was that she

20   was dealing with lawyers.  She was dealing with insurance

21   companies.  She was dealing with all manner of people who were

22   dealing with the corporation.  So in practice, certainly, she

23   was necessarily executing and conducting business on behalf of

24   the corporation.

25           THE COURT:  So at a time when there were no -- I

Closing Argument - Mr. Parham

1     mean, where I'm struggling, Mr. Parham, is this.  A company

2     does not act through its shareholders.  A company does not act

3     through its directors.  A company acts through its officers

4     and its employees.

5          MR. PARHAM:  Okay.

6          THE COURT:  Okay?  So we'll have to assume, first of

7     all, that this employee had authority to enter into a

8     consultant agreement, and it's an insider transaction.  Okay?

9          MR. PARHAM:  Yeah.

10         THE COURT:  It is a transaction between the company

11    and its -- I think what's been described to me as its majority

12    shareholder.  Correct?

13         MR. PARHAM:  Um-hum.

14         THE COURT:  And its majority shareholder.  And this

15    is at a time when there is no office of the company -- there

16    is no officer of the company today.  Okay?  Who is going to

17    act for the company?

18         MR. PARHAM:  The consent gives Mr. Nelms, I think,

19    the ability to execute any and all documents.  In essence,

20    he's appointed the director.  He's also given wide latitude,

21    and he's given wide latitude to appoint someone to carry out

22    those tasks.

23         But I'll go back to -- and let's just talk about what

24    the situation was with Goodman.  Mr. Frinzi was the sole

25    director and the sole officer until his resignation.  And from

Closing Argument - Mr. Parham

1    that point on, the company mainly was scrambling to replace

2    him.  And there was a period where it looked like it'd be

3    Jonathan Goodman, then it became John Goodman.  And John

4    Goodman stepped in and began effectively running the affairs

5    of the corporation.

6             THE COURT:  But is it John Goodman, Mr. Parham?  Or

7    is it an entity -- the consultant that was named was an

8    entity.

9             MR. PARHAM:  Well, I think MBE --

10            THE COURT:  Was the majority shareholder.

11            MR. PARHAM:  Well, the answer is MBE essentially

12   appointed Mr. Goodman to do that, to be the individual who

13   would carry that task out.

14            THE COURT:  Where do we have that in evidence?

15       (Pause)

16            MR. PARHAM:  Well, I believe it would have to -- it's

17   not in the consulting agreement that I can see.  I believe it

18   comes from -- oh, wait, wait, here it is.  I'm sorry.  We do

19   have it.

20            THE COURT:  Which agreement?

21            MR. PARHAM:  The consulting agreement itself.

22            THE COURT:  Okay.

23            MR. PARHAM:  I was thinking that was a big mess.  If

24   you go down to paragraph 2 compensation, little (i), John

25   Goodman will serve as representative for the MBE Group and

Closing Argument - Mr. Parham

 1    will be the sole recipient of the consultant fee and will be

 2    responsible for all taxes associated with the consultant fee.

 3            THE COURT:  Okay.  Thank you.

 4            MR. PARHAM:  So they do appoint -- they do say John

 5    Goodman is going to be the person --

 6            THE COURT:  Okay.

 7            MR. PARHAM:  -- who's handling it.

 8            THE COURT:  Okay.

 9            MR. PARHAM:  And, in fact, he was.  And I think the

10    testimony is that he was, in fact, acting in this capacity

11    before this agreement finally got executed on September 4th.

12    And, in fact, you'll notice that the MBE Group signed it on

13    September 23rd.  So it was -- had been in the works for some

14    period of time before Samantha -- Sondra finally signed it on

15    October the 4th.

16            So he was effectively directing it.  And at the time,

17    for example, that the objections to the involuntary petition

18    were filed, and the agreement -- the agreement trailed, but

19    the agreement basically what had been represented it would be

20    him, and what the MBE Group had signed.  And that's how that

21    worked, and it did designate that Mr. Goodman would be the

22    representative.  And that's the capacity in which he signed

23    the engagement letter.

24            THE COURT:  But again, so now we are to understand

25    that a consultant to the corporation hired the independent

Closing Argument - Mr. Parham

1    director?

2           MR. PARHAM:  He entered into the engagement agreement

3    with Mr. Nelms.  The shareholders appointed the director.  I

4    don't think that Mr. Goodman could have appointed him.  But he

5    did sign as in the capacity as the representative of the

6    manager, pursuant to the consulting agreement.  He did sign

7    the engagement letter.  It's not the most common.

8           THE COURT:  Sure.

9           MR. PARHAM:  But the notion that nobody was running

10   the ship, no one had authority is just not true.  And --

11          THE COURT:  Is it?

12          MR. PARHAM:  Well, you had a --

13          THE COURT:  I mean, what is a secretary -- their

14   CEO's former secretary?  And again, like Mr. Rukavina said,

15   I'm not being -- I'm not being derogatory, but essentially the

16   CEO left the company and left his personal assistant in

17   charge?

18          MR. PARHAM:  Well, the chief of staff.

19          THE COURT:  Okay.  Okay.

20          MR. PARHAM:  I mean, we can debate the title.

21          THE COURT:  We can debate the title --

22          MR. PARHAM:  We can debate the title.

23          THE COURT:  -- chief of staff.

24          MR. PARHAM:  But there was a person.  There was a

25   person, and that person --

Closing Argument - Mr. Parham

1          THE COURT:  Who was not an officer and not a

2     director.

3          MR. PARHAM:  Right.

4          THE COURT:  And at the time she entered into it,

5     there were no directors of this company.  There were no

6     officers, and there were no directors.  The company was

7     rudderless.

8          MR. PARHAM:  At the time that she entered into the

9     consulting agreement, it's true there were no officers or

10    directors.  And she was operating under the authority that had

11    been given to her by the director --

12         THE COURT:  Is that reflected anywhere?

13         MR. PARHAM:  Huh?

14         THE COURT:  Is that authority directed -- reflected

15    anywhere?

16         MR. PARHAM:  Well, the evidence is Mr. Goodman's

17    testimony.

18         THE COURT:  All righty.

19         MR. PARHAM:  Do we have a -- no, we don't have a

20    formal corporate document.

21         THE COURT:  Are there bylaws, Mr. Parham?

22         MR. PARHAM:  The corporation has bylaws, certainly,

23    yes.

24         THE COURT:  And did the bylaws say that the -- what

25    do the bylaws for the -- and I recognize they're not in

Closing Argument - Mr. Parham

1   evidence, but I'm assuming these bylaws say that essentially

2   the shareholders have appointed a board.  And the board has

3   appointed officers.  And that the affairs of the corporation

4   will be handled by its officers.  Am I incorrect?

5          MR. PARHAM:  I don't know is the answer.  They're

6   not -- the bylaws are not in evidence.  To the extent that

7   there's a reference to it, it is in the consent agreement

8   which references the bylaws.  So they do have bylaws.  And

9   those bylaws call for a majority shareholder of the -- for

10  appointment of a director.

11         THE COURT:  But how do I know that these shareholders

12  have the authority to act?

13         MR. PARHAM:  Well, the only evidence is the testimony

14  that these shareholders are the majority.  And the reference

15  in the consent to the bylaws talks in terms of majority -- the

16  majority of the shareholders consenting as validity for the --

17  well, look, as the validity for the act.  If you go to --

18         THE COURT:  I mean, I recognized, Mr. Parham, that --

19         MR. PARHAM:  In the lead in -- in the lead -- I'm

20  sorry.

21         THE COURT:  Okay.  I'm listening.

22         MR. PARHAM:  Yeah, just in the lead in to the written

23  consent, the undersigned shareholders holding a majority of

24  the issued and outstanding shares -- so you have that, and you

25  have Mr. Goodman's testimony.

Closing Argument - Mr. Parham

1          THE COURT:  Mr. Goodman testified that he had never

2     seen them.  He's not a shareholder.

3          MR. PARHAM:  No, he said -- he testified he knew who

4     the shareholders were.  He had been a shareholder.  He

5     testified he knew who the shareholders were.  That Goodman MBE

6     Group was itself held a majority interest because that was

7     necessary in order for it to be a minority-owned business

8     enterprise.  And that the others also were shareholders.  And

9     MBE alone would have been a majority of the issued and

10    outstanding shares.  That testimony is in the record.

11         THE COURT:  I'm having a hard time, Mr. Parham,

12    taking the testimony of a former shareholder who at best

13    entered into a transaction with an insider in appointing him

14    as a consultant at a time when there was no officer or

15    director.  I'm having trouble taking that as the debtor's best

16    evidence that this written consent of the voting -- of

17    shareholders, again, is an appropriate act to A, ratify that

18    consulting agreement; B, appoint a director.  Because of

19    course I don't know what majority of shareholders are needed

20    to appoint a director.  I don't know who the directors ever

21    were and what the proper process is for their replacement.  I

22    don't have any of that in front of me.

23         MR. PARHAM:  Well, I think the testimony and the

24    evidence is that Mr. Frinzi resigned.  And that there were no

25    directors until the consent.  There's no evidence of any other

Closing Argument - Mr. Parham

1    directors, and there were no other directors.  And then --

2        THE COURT:  Okay, so prior to -- so this company has

3    never had any directors?

4        MR. PARHAM:  No.  No, that's not true.

5        THE COURT:  Okay.  Who were they?

6        MR. PARHAM:  Mr. -- well, Mr. Frinzi was a director.

7        THE COURT:  He was a director?  Okay.

8        MR. PARHAM:  Mr. James Goodman was a director.

9        THE COURT:  Okay.

10       MR. PARHAM:  I think if you go to Exhibit 15, and I

11   don't have the Exhibit 15 that was introduced that talks about

12   a number of -- unfortunately, it also meshes a number of

13   companies, so I can't look at that and tell you who all the

14   directors were.  But I know that at one point in time, and I

15   think until the end of 2021, James Goodman was the director.

16   And then Mr. Frinzi was the director throughout 20 -- 2022

17   until his resignation.  And it his tenure may have started as

18   a director earlier.

19       So I mean, the company's been around for a decade,

20   and they had directors throughout and boards and whatnot.  I'm

21   looking at Frinzi.  Frinzi became a director -- CEO 10/20 /21.

22   It doesn't say when he became a director, but he was a

23   director in 2022.  I'm looking for James Goodman, board of

24   directors from 10/1 2020 to 12/31 2021.  I'm sure if we go

25   back into the corporate records -- I wasn't aware I'd need --

Closing Argument - Mr. Parham

1    this company's been around since what, 2013 or so.

2          THE COURT:  Well, I just note that there has been no

3    director --

4          MR. PARHAM:  And the --

5          THE COURT:  -- in this company since October of 2021,

6    according to its interrogatories.

7          MR. PARHAM:  No, that's not true.

8          THE COURT:  Oh, okay.  Well, then show me where I'm

9    mistaken.

10          MR. PARHAM:  According to the interrogatories, Mr. --

11    the interrogatory answer shows James Frinzi -- well, he didn't

12    say he was director, but he was the director.  And if that is

13    incorrect -- but he was the director until his resignation.

14          MR. SILVERSTEIN:  Your Honor.  Your Honor, is Mr.

15    Parham testifying?  I apologize to interrupt, but he just

16    said -- Mr. Parham just said the documents don't say that, but

17    he was.  So --

18          THE COURT:  Thank you, Mr. Silverstein.

19          MR. PARHAM:  Well, the testimony is that Mr. Frinzi

20    was the director until -- I mean, just say it that way.  So if

21    the interrogatory --

22          MR. SILVERSTEIN:  It's not clear, by the way, that he

23    was ever a director.

24          THE COURT:  Mr. Silverstein, I'm going to ask that

25    you not interrupt during Mr. Parham's closing.

Closing Argument - Mr. Parham

1          MR. SILVERSTEIN:  I apologize.

2          THE COURT:  Thank you.

3          Mr. Parham.

4          MR. PARHAM:  I mean, that is the testimony that Mr.

5    Frinzi was the director up until his resignation in September

6    of 2022.

7          THE COURT:  And you're saying that that was Mr.

8    Goodman's testimony?

9          MR. PARHAM:  It was Mr. Goodman's testimony.

10         THE COURT:  Okay.

11         MR. PARHAM:  As a practical matter, if you go back

12   into the history of this company, of course, it went through a

13   Chapter 11 in October of '17.  And it had been around for a

14   number of years before that.  Obviously, it existed and

15   operated with directors and with the board and whatnot.  It

16   was -- to the extent that it was in a wind-down mode in 2022,

17   you were down to one director and one officer until that

18   person resigned.  And then what do you do?  I mean, you move

19   to replace him, which is what happened.

20         THE COURT:  And so rather than replacing Mr. Frinzi

21   as what I can only assume was the then sole officer of the

22   company, because there's no evidence there was another officer

23   of the company immediately prior to the involuntary, the

24   thought was to make Mr. John Goodman a consultant.  But again,

25   he's not an officer.

Closing Argument - Mr. Parham

1          MR. PARHAM:  That's correct.

2          THE COURT:  Okay.  And so we're -- or are we not --

3     we're still in the exact same situation as we sit here today.

4     There are no officers of this company with authority to act.

5          MR. PARHAM:  I think what you have is a director

6     whose authorities -- basically, if you look at what his

7     authorities are, they essentially encompass many of the

8     obligations or the responsibilities and abilities of an

9     officer because he has the ability to -- under the consent, he

10    has the ability with respect to this case.  And again --

11         THE COURT:  I think Mr. Nelms' testimony was that

12    essentially the consultant, Mr. Goodman, would act under his

13    direction.

14         MR. PARHAM:  He said -- he did say that Mr. Goodman,

15    to the extent he was acting would be acting under his

16    direction.  The paragraph in the consent that talks about his

17    abilities to act, said the independent director shall, acting

18    alone in each case and without necessity of any other action

19    or approval of the voting shareholders or any other person,

20    have the power and authority in the name and on behalf of the

21    corporation to make or cause to be made and to execute and

22    deliver all such agreements, documents, instruments,

23    certifications, and to do and cause to be done all such acts

24    and things, and to take all such steps as may at any time or

25    times be deemed advisable, expedient, convenient, necessary,

Closing Argument - Mr. Parham

1    or proper for or on behalf of the corporation and/or the

2    subsidiaries in connection with or related to the involuntary

3    bankruptcy case, which is this case.  This is the last

4    paragraph on the first page of the consent.

5          THE COURT:  Right.  And that is not unlike a lot of

6    corporate resolutions.

7          MR. PARHAM:  Right.

8          THE COURT:  Where a director would put the company

9    in.

10          MR. PARHAM:  Right.

11          THE COURT:  So what we've got here is a situation

12    where a director is being appointed.  But again, the company

13    doesn't act through a director.  The company acts through an

14    officer.

15          MR. PARHAM:  Well --

16          THE COURT:  Or no?  I mean, correct me if I'm wrong.

17          MR. PARHAM:  What you have is you have a director

18    who's basically been given the scope of his authority extends

19    to, in essence, types of actions that you might otherwise

20    expect of an officer.  And so that is -- I mean, it's a valid

21    corporate document, and it may not be the way it always is,

22    the way it always happens, but it basically gives him and

23    Mr. -- the designee, if he decides to designate someone.  He

24    could appoint an officer to take any and all actions on behalf

25    of the corporation and in connection with these cases,

Closing Argument - Mr. Parham

1    including to execute -- in the next paragraph, execute and

2    file schedules.

3            It's a fairly standard resolution basically giving

4    the director the same powers that you might typically give an

5    officer or designate to a CRO, for example.  And it's not

6    inconsistent, frankly, with the engagement, which gives Mr.

7    Nelms the powers of a Chapter 11 trustee basically.

8            So obviously, it was the intent of the shareholders

9    that he be given wide authority, not only as a director but,

10   in essence, the duties of an officer if it didn't go so far as

11   to specify that you were also the CEO.  I mean, because in

12   essence that is -- if you look at this, that is how he's

13   acting.  And that is the authority that he's granted under

14   here.

15           And I would suggest that failing to put a title on it

16   shouldn't be fatal.  That is form over substance.  When you

17   look at the substance of what he's been authorized to do, it's

18   clear that this is not a rudderless ship.  You have a director

19   who has basically been given the powers of an officer as well

20   as the powers of a director.

21           THE COURT:  Thank you, Mr. Parham.

22           MR. PARHAM:  Okay.  Let me see if there's anything

23   else.  I really feel like I've --

24           THE COURT:  Take your time.

25           MR. PARHAM:  -- said my piece.  Yeah, there are just

Closing Argument - Mr. Parham

1    a couple of comments that were made.  The idea -- Mr.

2    Silverstein's comments he's made that it was all a ruse, the

3    motion to convert.  I think the Court is aware from -- because

4    you've been here and you've seen the filings, there were a

5    number of joinders filed last week.  And up until that time,

6    the debtor's intent was to contest the involuntary filings.

7    The joinders obviously brought about a change of strategy.  It

8    wasn't a desire to delay discovery or prevent anyone's

9    discovery.  And in fact, the -- a corporate designee and Mr.

10    Konicov for CFGI was in his deposition when the order for

11    relief was entered, which -- at the request of the petitioning

12    creditors.

13        We never sought to put off or delay John Goodman's

14    deposition.  The fact is that I think it was Federal Express

15    that wanted more time to review documents in order to -- so we

16    rescheduled it.

17        James Goodman, who is not John -- James, independent,

18    and Mr. Frinzi for their own reasons sought to continue their

19    depositions.  But we never even requested Mr. Goodman's

20    deposition be continued and, in fact, had the order for relief

21    not been entered, I'm sure he would have gone forward on his

22    deposition on that Tuesday or the week before, had it not been

23    rescheduled to give parties more time to review the documents

24    that we produced.

25        It's not a ruse.  It was simply that there was a

82

Closing Argument - Mr. Parham

1    change of strategy based on an avalanche, quite frankly, of

2    additional joinders that relate to Mr. Langley's credit I

3    think that he recruited.  So there is that.

4           I would also note that, again -- that this whole

5    state law issue of -- was something that arose Sunday.  And in

6    fact, it doesn't appear in any of the briefs other than Mr.

7    Rukavina's brief, which, for the most part, said we don't

8    know.  And that was really about all it said with respect to

9    state law authorities and was mainly centered on the argument

10   that Mr. Langley has advanced that once Mr. Seidel was

11   appointed we lost all authority to go forward.

12          So those were the -- and that's really been the focus

13   of our response here on this particular issue.

14          But I do think it is not perhaps -- there's a word

15   I'm searching for, standard, customary the way this all came

16   down.  But I think they got there on the state law issues.  I

17   think that is the testimony that you have -- the consulting

18   agreement was executed on behalf of the corporation by someone

19   who was given authority to execute documents on behalf of the

20   corporation, that the MBE group designated Mr. Goodman as

21   their S&E (ph.).  The Board -- I mean, the shareholders -- a

22   majority of the shareholders, as the evidence, appointed a

23   director.  And the director had expanded powers and included

24   in those powers were the powers to direct the filing of the

25   motion to convert.

Closing Argument - Mr. Parham

1          So I think we get there.  We just don't necessarily

2     get there the same way that you might see in most other cases.

3          THE COURT:  Thank you, Mr. Parham.

4          All right.  Have the parties had an opportunity to

5     confer on the hearing that will be set for what we'll just

6     call the next stage on the motion to convert?

7          MR. PARHAM:  We have not.  I'm sorry.

8          THE COURT:  Please.

9          MR. PARHAM:  I know I need to step up here.  I guess

10    my voice just doesn't carry in my old age.

11         THE COURT:  Yeah, you do have a soft voice, Mr.

12    Parham.

13         MR. PARHAM:  In my old age.

14         THE COURT:  Mr. Rukavina, you do not, in case there

15    was any question.

16         MR. PARHAM:  He can go to the back of the room

17    probably and talk.

18         THE COURT:  And actually, I suffer from the same

19    affliction that he does.  It's a rarity that someone didn't

20    hear me.

21         MR. PARHAM:  Yeah.  So I mean, I think the Court

22    threw out the date January 9th yesterday as a possible date.

23         THE COURT:  Which is a Monday.

24         MR. PARHAM:  Which is a Monday, and we would be happy

25    with that.  We think that gives the parties ample time.  As a

Closing Argument - Mr. Parham

1    practical matter, a lot of the discovery has been done already

2    I think, and the issues were framed.  I think everybody --

3    everybody who was a combatant so to speak showed up here

4    yesterday pretty much ready to go forward.  I understand that

5    they may want some additional discovery, but we would as that

6    we could do this on an expedited -- not an expedited but a

7    prompt basis I guess is the best way to say it.

8           THE COURT:  Okay.  I'm trying to get to my calendar.

9           MR. RUKAVINA:  And I'll just say, Your Honor, this

10    case is not about me.  But I'll be coming back from Europe

11    from -- coming on the 15th of January.  I've already -- first

12    time in a long time I'm not going for Christmas in years

13    because I got court, so if the Court and the parties can do

14    January 16th.  If the Court can't, then of course Mr. Berghman

15    will handle it from the trustee's perspective, but I will be

16    in Europe until January the 15th.  I'll leave January the 5th.

17           THE COURT:  All right.  Let me hear from the

18    creditors.

19           MR. SILVERSTEIN:  Your Honor, Paul Silverstein, first

20    before that issue, is there any opportunity to very briefly

21    respond to some of the things Mr. Parham was attempting to

22    say, or are we done with that?

23           THE COURT:  Do you have something --

24           MR. SILVERSTEIN:  I mean, I would need two minutes

25    to --



Closing Argument - Mr. Parham

1          THE COURT:  -- new and different, Mr. Silverstein?

2          MR. SILVERSTEIN:  Is it new?  I mean, new and

3     different is subjective but let me --

4          THE COURT:  Do you think that what you are about to

5     say I think is new and different?

6          MR. SILVERSTEIN:  I think so, but as you know, I've

7     been wrong before.  The state law issues arose because the

8     debtor introduced no evidence that they had valid corporate

9     authorization for any of the things that they have done in

10    this Chapter 7.  That's number one.

11         Two, there was no testimony or other documents saying

12    that Frinzi was ever a director.  Everything they've given us

13    says that Frinzi was an officer.  I don't recall seeing any

14    documents or hearing anyone say Frinzi was a director until

15    today. And if you look at the attached Exhibit 15, which they

16    gave to FedEx, or the attached C suite or board of directors

17    info that they gave to us, Frinzi is not listed as a director.

18    These two attachments were produced in response to

19    interrogatories.  They're verified by John Goodman and under

20    penalty of perjury.

21         And finally, there is no evidence that Frinzi's chief

22    of staff or administrative assistant, or whatever the fancy

23    title is today because remember, secretary is not used anymore

24    today, which I learn every day when I use it.  I think it's

25    executive professional assistant is the new title.  There's no

Closing Argument - Mr. Parham

1    evidence that Frinzi's so-called chief of staff had authority

2    to enter into agreements on behalf of the company.

3          John Goodman's testimony was that he -- Frinzi gave

4    her this authority, and that's not evidence.  It's pure

5    speculation with no documents to support it.  And similarly,

6    there's no documentary evidence that the shareholder

7    resolutions are proper.  The company's governance documents

8    are not in evidence.  Testimony about what those documents say

9    is pure speculation and it's -- it's not -- I think Your Honor

10   can give it zero weight.

11         And the debtor has given us nothing to go on other

12   than speculative testimony that any of the actions taken to

13   file the motion to convert were proper.  So I think on all

14   those points there's an absolute lack of corporate authority

15   beginning with the fact that the instrument that purportedly

16   imposed -- by which Mr. John Goodman imposed himself as the

17   consultant -- if it's not a valid agreement, then there's no

18   ability for him to retain properly Mr. Nelms as a so-called

19   director.  And that's it.

20         THE COURT:  Thank you, Mr. Silverstein.  When would

21   you like the hearing to be, Mr. Silverstein, the next hearing?

22         MR. SILVERSTEIN:  I think that -- well, first of all,

23   I would hope there's no hearing because I hope you rule the

24   way I hope you rule.  But if there -- in the event that you

25   don't rule the way I hope you rule, I think that there's a lot

Closing Argument - Mr. Parham

1    of discovery that we were essentially stopped from completing

2    that needs to be done.  I don't -- I think at least the 16th

3    of January should be the earliest.  I don't want -- we had

4    people lined up to take those depositions.  We were prepped

5    for those depositions.  I don't want to jam that guy in during

6    a Christmas break for depositions.  Nor do I think the parties

7    are going to deal with that very well.  So I would think no

8    sooner than the 16th and maybe later.  That's my only comment.

9              THE COURT:  Okay.  Well, the 16th is Martin Luther

10   King Day, and so it would --

11             MR. SILVERSTEIN:  17th.

12             THE COURT:  -- be the 18th if -- having Ms. Harden

13   listening and judging me.  She's telling me that we would have

14   the 18th open, so if it was going to be during that week, it

15   would be the week of the 18th.  I mean, excuse, me, it would

16   be the week of the 16th.  It would be January 18th if we did

17   it that week because that's the day that we have -- just one

18   second.

19             Ms. Harden is asking me for a time estimate.  I'm

20   telling her all day.  I'm not even going to ask.

21             MR. RUKAVINA:  And Your Honor, in support of that

22   date, the trustee is going to be serving discovery.  I'm sure

23   Mr. Parham will cooperate.  We are going to go into the

24   privilege, so not only do we have Christmas and New Year's and

25   my personal travel plans, which are secondary, but we are

Closing Argument - Mr. Parham

1   going to want -- Mr. Silverstein has got some discovery.

2   We've got none.  So again, I would urge that the Court -- if

3   we're going to have an all-day evidentiary hearing, the 18th

4   would be probably the earliest that it can reasonably be done.

5         THE COURT:  Okay.  Thank you, Mr. Rukavina.

6         MR. PARHAM:  I agree with --

7         THE COURT:  Right.  Because one of the issues I was

8   looking at is the week of January 9th is very, very hard

9   because obviously you have Hanukah is ongoing.  You have the

10   Christmas holidays.  You have New Year's, et cetera.

11         All righty.  Mr. Langley, thoughts on --

12         MR. LANGLEY:  Yes, Your Honor, and if I may take just

13   a brief liberty to address one correction I heard from Mr.

14   Parham, so that -- it won't take me even a minute.  But he

15   referenced 21.501 as having been the trustee.  He said that

16   Chapter 11 was referring not to Chapter 11 of the Bankruptcy

17   Code but the Texas statute.  I want to be clear that FedEx is

18   not relying on that provision.  We're relying on 21.401 and

19   21.101, and those two provisions say that the board of

20   directors has to act.  And if you act through shareholders, it

21   has to be done through all the shareholders.  So it's not just

22   the majority, it's all the shareholders, and that's 21.401 and

23   21.101.  They have no application to the argument that was

24   advanced by Mr. Parham.

25         THE COURT:  Okay.  Thank you.



Closing Argument - Mr. Parham

| | |
|---|---|
| 1 | MR. LANGLEY:  And then for -- as far as the timing |
| 2 | goes, I would say January 18th would be the earliest we could |
| 3 | do it.  One question I did have for the Court on that.  Are we |
| 4 | going to reintroduce all the evidence we did today because I |
| 5 | think there was a good-cause factor based on the evidence |
| 6 | we've already put forward on this authority issue to not |
| 7 | convert.  Are we going to redo that or are we going to just |
| 8 | proceed under other bases for cause? |
| 9 | THE COURT:  I would assume at an evidentiary |
| 10 | hearing -- obviously, if you wanted to rely upon something |
| 11 | previously admitted at the hearing, you could so move.  But -- |
| 12 | and certainly, the evidence and the questioning meandered from |
| 13 | time to time from the authority and standing issues that we |
| 14 | were here to discuss and touched upon cause.  But I would |
| 15 | assume that the parties should be prepared to put on their |
| 16 | case on what we'll loosely call cause.  Or essentially, the |
| 17 | test on -- as Marrama put out on whether or not a debtor |
| 18 | should have an absolute right to convert or the issues related |
| 19 | to evidence of bad faith, evidence of futility, et cetera. |
| 20 | MR. LANGLEY:  Yes, Your Honor. |
| 21 | MR. PARHAM:  Your Honor, this is -- |
| 22 | THE COURT:  Just one moment, Mr. Langley. |
| 23 | Mr. Parham, come to the podium please. |
| 24 | MR. PARHAM:  I would just suggest with respect to the |
| 25 | evidence that was presented yesterday, we should be able to |

Closing Argument - Mr. Parham

1  work on determining in advance specifically what evidence

2  would carry over.  And we're certainly open to that if Mr.

3  Langley has designations.  We may as well.

4         I don't want to sit here and be four hours of

5  testimony just be repetitive.  I do agree that we should all

6  put on our cases in full, but to the extent that there was

7  testimony yesterday that one or the other of us would use, I

8  would hope that we could just designate that and let the Court

9  know with specificity, not just the transcript.

10         THE COURT:  No, again, if parties wanted to basically

11  take -- similar the way that people would do with deposition

12  transcripts for a hearing.  If they want to get the transcript

13  of the hearing yesterday and then designate what portions of

14  testimony they intend to rely upon.  Of course, it's not

15  stopping the debtor or the creditors or the trustee from

16  putting on their case that day.

17         MR. PARHAM:  Right.

18         THE COURT:  But to streamline that trial, I would

19  certainly entertain transcript excerpts from -- or testimonial

20  excerpts as well as -- we only admitted, if my memory serves,

21  maybe six or ten exhibits.

22         MR. PARHAM:  A handful of those.

23         THE COURT:  Yeah.

24         MR. PARHAM:  Right.

25         THE COURT:  Not that many even.  And so those I think

Closing Argument - Mr. Parham

1   could certainly carry to the next hearing.

2       MR. LANGLEY:  Okay.  We'll work with Mr. Parham on

3   that then.  And then from a standpoint of what we'll have to

4   take to get to the hearing, I would say that we are going to

5   investigate a number of significant transfers that were made

6   by the debtor related to this entity, to transfer cash and

7   other assets out.

8       I will tell you from our experience in this case

9   already we -- as you can see from by the authority issue, we

10  struggle to find somebody that could do the document searches,

11  somebody that could act for the debtor.  And that's probably

12  why you saw a lot of pre-petition discovery -- or pre-order

13  for relief discovery disputes.  I don't know how that's going

14  to resolve, but I just bring that to light.  There may be

15  additional problems given the state of the debtor at this

16  point.

17      THE COURT:  Well, Obviously, I won't prejudge those.

18  All I'll say that if the debtor wants to be in Chapter 11 it

19  has to have an -- it has to have the ability to at least

20  engage in discovery and get a hold of its operative documents

21  and put up witnesses for deposition.  So I am sure that will

22  be the case.

23      I would say if we -- and again, I'm not going to

24  stand in the way, if folks want to -- if folks can reach an

25  otherwise agreement, and maybe there can't be one, but if

Closing Argument - Mr. Parham

1    folks can reach an otherwise agreement I'd be willing to

2    entertain that.

3              But absent that, I do expect that the hearing, if we

4    all agree on the 18th, would be an in-person hearing.  I just

5    think it's going to be a lot easier to deal with witnesses and

6    exhibits at an in-person hearing, especially something that's

7    as critical as this one, so I'd say that.  So whatever date we

8    agree on, just make sure that folks can be here.

9              Now, that doesn't stop anyone who doesn't have a

10   primary intent to participate -- excuse me, an intent to

11   participate in the hearing on a primary basis.  So for

12   example, if Mr. Schaffer, for example, simply wanted to

13   monitor the proceedings and didn't expect to Q&A witnesses and

14   things of that nature, if he wanted to appear via Webex, that

15   would be allowed.  But if you want to make primary arguments,

16   if you want to question witnesses and introduce evidence, I'd

17   ask that you be here live for that particular hearing.

18             MR. SCHAFFER:  Understood.

19             THE COURT:  Thank you, Mr. Schaffer.

20             Ms. Sixkiller, any input on the date of the next

21   hearing?

22             MS. SIXKILLER:  Yes, Your Honor.  The 18th is not

23   ideal, but I can move things if that's the date that works for

24   everyone.  Otherwise, for Mr. Sullivan and myself, we have the

25   19th, 20th, 23rd, and 24th also available.

Closing Argument - Mr. Parham

1          THE COURT:  So the 20th is a Friday.  I also have

2     that date open if parties prefer that date.

3          MR. SILVERSTEIN:  Your Honor, just as an addendum --

4          MR. PARHAM:  We are concerned we don't want the train

5     to get too far down the road.  It gets hard if we win to put

6     the genie back in the box.

7          THE COURT:  Okay.

8          MR. PARHAM:  So our strong preference is the 9th.  If

9     we have to go to the 18th, and I hear what everybody's

10    saying -- if we have to go to that week of the 16th, with all

11    due respect to Ms. Sixkiller, we would like to do the 18th and

12    then have the 20th as a reserve date in case this --

13         THE COURT:  In case time estimates are wrong.

14         MR. PARHAM:  -- goes over.  Yeah, because it could go

15    long.  I mean, our status conference went two and a half

16    hours, so I'm guessing that -- and our one hour closing

17    arguments now we've been going for two and a half hours I

18    think today.  So history is --

19         THE COURT:  Is that why my stomach is grumbling?

20         MR. PARHAM:  History's not on our side.

21         THE COURT:  From the 1:30 docket?

22         MR. PARHAM:  History is not on our side.

23         THE COURT:  All right.  Thank you very much, Mr.

24    Parham.

25         MR. LANGLEY:  Your Honor --



Closing Argument - Mr. Parham

1          MS. SIXKILLER:  Your Honor, yes, I can -- I can move

2    the 18th.  It's an office litigation training.  I can just

3    miss it and not -- and designate another host.  The 9th is

4    also available, but I am concerned about getting the

5    depositions done in time.

6          THE COURT:  Right.  I think the 9th, given the

7    holidays --

8          MR. LANGLEY:  Your Honor --

9          THE COURT:  -- would be hard.  And I think that we

10   would have more discovery disputes than we would have

11   agreements at that point.  All righty.

12         Someone was seeking to --

13         MR. LANGLEY:  Your Honor.

14         THE COURT:  Mr. Langley.

15         MR. LANGLEY:  I apologize.  I went through my

16   schedule.  I actually have a confirmation hearing where I am

17   presenting the debtor's plan of confirmation on the 17th.

18         THE COURT:  Okay.

19         MR. LANGLEY:  In person here in Memphis.  So I'm not

20   sure it's feasible for me to A, prepare but B, to get to

21   Dallas on the 18th.  So I apologize for ruining the plans

22   everybody's just about -- that they have made.  But I just

23   don't think that's feasible.

24         THE COURT:  All righty.

25         MR. LANGLEY:  I could do the 19th or the 20th if

Closing Argument - Mr. Parham

1       those were available.

2              THE COURT:  We have confirmation set on the 19th.  We

3       can't do the 19th.  We can do the 20th, which is not ideal,

4       but is doable.  All righty.

5              Any conflicts on the 20th?  All righty.  Here's what

6       we'll do.  The Court will set the follow-up hearing, which

7       essentially will be the cause portion or the extraordinary

8       circumstances portion of the hearing.  We're going to set that

9       for January 20th, 2023 at 9:30 a.m.

10             Again, that'll be an in-person hearing with the

11      caveats that I discussed if -- same rules apply as if one

12      attorney is going to be doing the primary questioning and

13      another attorney wants to sit back and monitor on Webex, we'll

14      keep the Webex open in that way.

15             And so that'll be doable.

16             Pending number one this Court's ruling, which I

17      believe will be a bench ruling but don't hold me to that.  I

18      may issue a written order.  Pending the ruling on standing,

19      corporate authority, and all of the issues that we have

20      discussed today, this case shall remain in a Chapter 7.  And

21      obviously, the duly appointed and acting Chapter 7 trustee,

22      Mr. Seidel, shall remain in place.

23             I note that we have a 341 meeting that would be set

24      for the 10th.  Right, which is obviously ten days ahead of

25      this next hearing.  Mr. Parham, is there any reason for this

Closing Argument - Mr. Parham

1    341 meeting not to go forward?

2         MR. PARHAM:  We really haven't focused on it, to be

3    honest with you.

4         THE COURT:  Okay.

5         MR. PARHAM:  I suppose not.  I suppose not.

6         THE COURT:  Okay.

7         MR. PARHAM:  Other than the fact that it'd just be

8    conducted by trustee as I guess it would anyway.

9         THE COURT:  Right.

10        Mr. Rukavina, or Mr. Seidel, if he wants to speak up

11   personally.

12        MR. RUKAVINA:  Well, I think, Your Honor,

13   certainly --

14        THE COURT:  Okay, please.

15        MR. RUKAVINA:  Yeah, certainly, I have to defer to my

16   client who's the actual trustee.  I can see there being

17   benefits to getting that 341 done.  I don't want it to turn

18   into a free for all or a deposition.  Of course, we'll be

19   deposing the debtor.  I'm sure the other creditors will, and I

20   think that Mr. Seidel will certainly open up the floor to

21   other creditors or parties that might have normal 341

22   questions.

23        But Mr. Seidel, I don't know if you have anything to

24   add.  I think as long as we all understand that it's not going

25   to be a 2004 of the debtor that's going to take place all day,

Closing Argument - Mr. Parham

1    I think we might as well get her done.

2         MR. SEIDEL:  I would agree with that, but parties

3    should be flexible on that because they set those with a bunch

4    of other ones, so what I typically do is adjourn it and then

5    pick up like at 1 o'clock so we can get a couple hours of

6    uninterrupted question and answers in.

7         I would ask that the debtor's counsel -- it seemed to

8    me they recently filed additional creditors.  Obviously, the

9    notice of meeting of creditors has already gone out, so I'd

10   avail upon debtor's counsel to make sure this notice of

11   creditors goes to any and all creditors, parties-in-interest,

12   and gets mailed out by debtor's counsel because the Court's

13   already done its mailing.  Thank you.

14        THE COURT:  Thank you, Mr. Seidel.

15        So again, I do believe that Mr. Rukavina raises a

16   good point.  I am sure that all practitioners at some point

17   have attempted to use a 341 as its own 2004.  And I don't

18   think the rules prohibit that, but I don't believe in this

19   particular instance, if the questions were going to be of the

20   nature that would be raised at a hearing only ten days later,

21   and if these same person or persons have already sat for a

22   deposition or are scheduled to do so.

23        I think there's probably good reasons to both

24   streamline the 341 and allow for the participation of

25   creditors that are not already actively participating in these

Closing Argument - Mr. Parham

1    cases and on these issues.  That's just my two cents.  But

2    again, 341's not conducted by the Court.  It's conducted by

3    the trustee.

4          With that, Mr. Seidel, I'll leave it to you.  I

5    believe that a 341 meeting is going to have to take place,

6    whether or not it's conducted by you or someone with -- a

7    trial attorney with the United States Trustee's Office.  So I

8    am not going to require you to reschedule it at all.  I'll

9    leave that to your discretion.  But like I said, pending the

10   next hearing, the Court -- excuse me, the case will stay in

11   Chapter 7.  And I think that's all we -- that's all we need

12   for today.

13         The only thing I will remind you is if you haven't

14   done so already, for those parties where I asked you to upload

15   any exhibits that were not already found on the docket during

16   the hearing to please do so.

17         All righty.  Any questions, any concerns, folks?

18         MR. LANGLEY:  Thank you, Your Honor.

19         THE COURT:  All right.  Hearing none --

20         UNIDENTIFIED SPEAKER:  Thank you.

21         THE COURT:  -- the Court will -- the Court will move

22   to the 1:30 docket, but the Judge does need to get her prep

23   for the 1:30 docket.  Winging it is frowned upon, so the Court

24   is going to stand in recess until 1:40.

25   (Whereupon these proceedings were concluded at 1:35 p.m.)

```
 1                            I N D E X

 2

 3    CLOSING ARGUMENT:                          Pages

 4    Mr. Rukavina                               6-21

 5    Mr. Silverstein                            21-32

 6    Mr. Langley                                32-55

 7    Mr. Parham                                 60-83

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```


(973) 406-2250 | operations@escribers.net | www.escribers.net

1                      C E R T I F I C A T I O N

2

3           I, Tamara Bentzur, the court approved transcriber, do

4    hereby certify the foregoing is a true and correct transcript

5    from the official electronic sound recording of the

6    proceedings in the above-entitled matter.

7

8

9                                                January 28, 2023

10   TAMARA BENTZUR, CET-824              DATE

11   AAERT Certified Transcriber

12

13

14

15

16

17

18

19

20

21

22

23

24

25

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net