Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

ATTORNEYS FOR SCOTT M. SEIDEL, TRUSTEE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re: § | |
| § | Chapter 7 |
| GOODMAN NETWORKS, INC., § | |
| § | Case No. 22-31641-mvl-7 |
| Debtor. § | |

**TRUSTEE'S MOTION TO COMPEL
COMPLIANCE WITH SUBPOENA ON
MBG HOLDINGS, INC. F/K/A
<u>AMERICAN METALS RECOVERY AND RECYCLING INC.</u>**

TO THE HONORABLE MICHELLE V. LARSON, U.S. BANKRUPTCY JUDGE:

COMES NOW Scott M. Seidel (the "<u>Trustee</u>"), the duly appointed chapter 7 trustee of the bankruptcy estate (the "<u>Estate</u>") of Goodman Networks, Inc. (the "<u>Debtor</u>"), the debtor in the above styled and numbered bankruptcy case (the "<u>Bankruptcy Case</u>"), and files this his *Motion to Compel Compliance with Subpoena on MBG Holdings, Inc. f/k/a American Metals Recovery and Recycling, Inc.* (the "<u>Motion</u>"), seeking an order compelling compliance by MBG Holdings, Inc. f/k/a American Metals Recovery and Recycling, Inc. ("<u>AMRR</u>") with that certain Bankruptcy Rule 2004 Subpoena issued by the trustee (the "<u>Subpoena</u>"), respectfully stating as follows:

I. **SUMMARY**

1. As the Trustee predicted, AMRR sought the issuance of a subpoena not for any purpose of personal jurisdiction, but solely in order to seek to delay and to limit its production

using the subpoena objection process. As the Court warned AMRR, however, Rule 2004 is far broader than the normal rules of discovery. That the Subpoena is broad is only because a broad examination of an operating, publicly-traded company is necessary in order for the Trustee to properly understand his options. Indeed, the Court has already decided the issues and has ordered the examination of AMRR; AMRR does not get a second bite at the apple.

2. In the end, James Frinzi, the Debtor's CEO, caused the Debtor to transfer $44 million to AMRR, which funds AMRR used to buy substantially all of its assets. AMRR never made a payment back. *And*, Frinzi caused another $500,000 to be transferred outright which he used to purchase AMRR itself, *and* an additional $4.4 million to capitalize his new Multiband company (through which he purchased AMRR), which he then used to buy a lakehouse and other property for his family trust. Frinzi transferred $48,900.000 effectively to himself in the span of weeks, not a penny of which has been repaid, in what are massive breaches of fiduciary duty. The Trustee has every right to see what has been done with these funds, including Frinzi flying around on private jets and leading a lavish lifestyle on AMRR's nickel or, more appropriately, the Estate's recovery. Not only is an examination under Rule 2004 warranted and appropriate, but it should be as comprehensive as the law permits. That the examination may be intrusive, or burdensome, or broad is the result of Frinzi's actions and torts: there need to be consequences for something like this and the Trustee needs to be able to assess his options before Frinzi melts the ice cube any more than he has already.

## II. ARGUMENT

### A. SCOPE OF EXAMINATION

3. Attached hereto as Exhibit "A" is a true and correct copy of the Subpoena served by the Trustee on AMRR, together with the Requests for Production attached thereto. Attached hereto as Exhibit "B" is a true and correct copy of AMRR's objections and responses to the

Subpoena.[1] Because AMRR has served its objections, Rule 9016(d)(2)(B)(i) provides that the proper procedure is for the Trustee to file this Motion. Notwithstanding that this is the Trustee's Motion, AMRR has the burden of proof and persuasion with respect to its objections to the Subpoena. *See, e.g., Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004). The Trustee otherwise relies on the record developed during the interim hearing on his Rule 2004 motion.

4. AMRR's primary objection to the Subpoena, asserted in response to multiple Requests for Production, is that the Subpoena requests information that is outside the permissible scope of Rule 2004. Rule 2004 permits an "examination of an entity [that] may relate only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate." FED. R. BANKR. P. 2004(b). Here, the Estate's rights against AMRR are potentially the largest assets of the Estate, and monetizing those assets is exceedingly complicated since any monetization necessarily involves investigating the going concern of AMRR or the value of its assets which, in turn, consist of business lines as opposed to physical, saleable property, hence necessitating a deep dive into the value of those businesses.

5. At a minimum, AMRR owes the Estate $44 million. AMRR is an operating business, presumably with some going concern value, and with expenses, revenue, etc. Any lender, much less the senior secured lender, is entitled to know the finances and operations of its borrower, and in this case its borrower is a publicly traded one at that which has not filed its SEC financials. The Trustee has options, including suing AMRR, filing an involuntary petition, selling his position, foreclosing under the UCC, and likely other possible ways to monetize the assets.

---

[1] AMRR has started producing certain documents to the Trustee and has indicated that it will produce more. As of this filing, however, AMRR's production is woefully deficient and incomplete.

Each of these, however, entails burden, risk, expense, and a whole host of other considerations. AMRR's finances, expenses, profitability, potential breach of duty claims, and other assets and liabilities are key to the Trustee considering his options.[2] And, the Trustee is investigating multiple claims and causes of action against Frinzi and others, as should be obvious to all. It must also be remembered that the Trustee sought to obtain information from AMRR voluntarily for months, with nothing, not a *single* document or financial record, being provided. Thus, unlike in the usual borrower-secured creditor relationship, where the creditor has significant insight into its borrower's operations, here the Trustee has almost no information to guide his decision making.

6.  There should therefore be no question that the Requests for Production relate to "property . . . of the debtor" in the form of its secured debt claims and other claims and causes of action against AMRR and its subsidiaries (and potentially directors and officers), and to "the administration of the debtor's estate" in the form of the Trustee's manifest need for information in order to determine how to administer these assets, potentially the largest of the Estate. This is especially the case because AMRR has retained restructuring counsel and a financial advisor, thus strongly suggesting that the Trustee will soon be called upon to make decisions with respect to the Estate's claims and rights; the Trustee should not be required to make potentially important decisions like these without sufficient information.

7.  That the scope of Rule 2004 is "extremely broad" is beyond debate. *See In re Lufkin*, 255 B.R. 204, 208 (Bankr. E.D. Tenn. 2000); *Bank One, Columbus, N.A. v. Hammond (In re Hammond)*, 140 B.R. 197, 201 (S.D. Ohio 1992). Apecific case law on a situation such as the one at present is admittedly sparse. However, an old opinion considered similar facts. *See In re*

---

[2] The Trustee has been informed that AMRR has retained a Chief Restructuring Officer, who is likely going through the same information request process as the Trustee and who the Trustee suspects is interested in much if not all of the same information as part of his duties. This should greatly ameliorate any burden on AMRR and should also bolster the *bona fides* of the Trustee's own examination.

*Fixen & Co.*, 96 F. 748 (S.D. Cal. 1899). In that case, it was alleged that the debtor conspired with others to transfer substantially all business property to a newly created company. *See id*. at 749. The receiver sought to examine the books and records of the new company pursuant to the court's bankruptcy powers. Among other things, the person in possession of the books and records of the new company argued "that the books which the witness was required to produce were irrelevant" and that it was outside the power of the referee to order the examination into the new company's books and records. *See id*. at 753. The court noted that:

> Legal proceedings are sometimes the only means whereby the property of bankrupts can be preserved. Suppose that an estate consists of personal property, which has come into the hands of wrongdoers, who are about to secrete it or carry it beyond the jurisdiction of the court. Can it be seriously claimed in such a case that the receiver must sit quietly by and suffer the property to be irretrievably lost, on the ground that his functions are limited to the receipt of such property as may be voluntarily surrendered to him?

*Id*. at 754.

8. The court concluded that the proper scope of a receiver's examination (predecessor to Rule 2004) was "the acts, conduct, or property of a bankrupt, whose estate is in process of administration," and that the order to produce the books and records of the new company was consistent with this standard:

> The examinations thus provided for are not intended as means of producing testimony pertinent to issues then on trial, but their object is to afford to the creditors, and the officer charged with administering the trust, full information touching the bankrupt's estate, in order that necessary steps may be taken for its possession and preservation.

*Id*. at 755.

9. The foregoing opinion is analogous to the issues now before the Court. In that opinion, the receiver did not need to review the new company's books and records in order to prove his claims against that company, just as here the Trustee does not need AMRR's books and records to prove the Estate's claims. Rather, the receiver needed those books and records in order

to analyze what the new company was doing with its business, whether it was secreting assets, and what its value may have been. So here, the Trustee needs AMRR's books and records in order to better understand his assets and to be able to make informed decisions as to how to monetize those assets. It would be easy for the Trustee to simply foreclose, file an involuntary petition, or sue AMRR and others and seek prejudgment remedies. But, that may prejudice AMRR's business and ultimate value to the Trustee; hence the need for as full and complete analysis of AMRR as possible *before* the Trustee takes potential action or is asked by AMRR to grant concessions as part of a restructuring. That is precisely the role that Rule 2004 plays, and the Requests for Production are well within its scope.

10.   The Trustee will add one final and obvious point: he holds a perfected, first-priority lien and security interest against all assets of AMRR, including its books and records and general intangibles. In seeking to discover what those assets are and what their value may be, the Trustee, as any reasonable secured creditor would, is seeking to determine the scope and extent of his collateral. To argue that that is outside the scope of Rule 2004 is unprecedented.

B.   **REQUESTS FOR PRODUCTION**

11.   Request 2. This request seeks *historical* periodic financial records, employing standard definitions as furnished by the Trustee's proposed financial advisor. Nothing about the request is vague or ambiguous. And, the objection that the request is "overly broad" is without merit, since it goes back only to January 1, 2022 and covers only AMRR and its subsidiaries. These basic financial documents certainly exist, since AMRR is a publicly traded company, and it is neither broad nor burdensome to simply produce what already exists.

12.   Request 3. This request seeks *current* financial records, employing standard definitions as furnished by the Trustee's proposed financial advisor. Nothing about the request is vague or ambiguous. And, the objection that the request is "overly broad" is without merit, since

it goes back only to January 1, 2022, and covers only AMRR and its subsidiaries. These basic financial documents certainly exist, since AMRR is a publicly traded company, and it is neither broad nor burdensome.

13. <u>Request 5</u>. This request seeks internal management reports, including budgets, financial plans, budget-to-actual reports, key performance indicators, and sales reports. AMRR objects on the grounds that this is outside the scope of Rule 2004. It is not: these reports are needed to assess the value of AMRR, the value of its businesses, the desirability of it continuing as a going concern, and to inform the Trustee of his options with respect to the Estate's assets.

14. <u>Request 6</u>. This request seeks any data room used in connection with AMRR's purchase of the OnePath Integrated Services business to AMRR. First, AMRR objects to this on the grounds that the transaction "did not involve an entity named 'OnePath Integrated Services.'" This is bad faith: the selling entity OnePath Systems, LLC sold AMR Resources, LLC, after it merged its OnePath "integrated services business" into AMR Recourses, LLC. AMRR certainly knows what this transaction was, since it used the Debtor's $44 million to effectuate it. With respect to scope, this information is needed to test the value of the AMR business that was acquired and to review potential causes of action against third parties, including the seller for an overly-inflated sales price and potential breach of fiduciary duty claims if, as the Trustee has been reliably informed, AMRR grossly overpaid for the assets.

15. <u>Request 7</u>. This request seeks valuation reports. AMRR objects on the ground that it exceeds Rule 2004's scope. It does not: the Trustee has a right to know what the value of the Estate's collateral is.

16. <u>Request 8</u>. This request seeks documents regarding any related-party transaction between AMRR and Frinzi. AMRR objects on the ground that it exceeds Rule 2004's scope. It does not: the Trustee is the largest creditor of AMRR and has a right to know if AMRR has

committed any fraudulent transfers or other avoidable transactions with Frinzi, not only for potential creditor remedies, but for potential fiduciary duty claims held by AMRR.

17. <u>Request 10</u>.  This request seeks redacted payroll records and pay registers.  AMRR objects on the ground that it exceeds Rule 2004's scope.  It does not: the Trustee has sound reason to believe and is reliably informed that AMRR is overloaded with payroll, including to insiders and to friends and family of Frinzi, which directly affect its cash flow and its profitability.  This is standard information that any secured creditor would want of its borrower.

18. <u>Request 13</u>.  This request seeks depreciation and amortization schedules and copies of all tax returns.  AMRR objects to depreciation and amortization schedules as "vague" and "ambiguous."  This objection is made in bad faith, since every company like AMRR maintains a depreciation or amortization schedule both as part of its internal accounting and as part of its tax returns.  The Trustee has a legitimate right to this information because it may be the best record of the actual assets owned by AMRR and its subsidiaries and may give a fair indication of the value of those assets.

19. <u>Request 14</u>.  This request seeks a copy of AMRR's current accounting system.  First, AMRR objects that this is outside the scope of Rule 2004.  It is not.  The Trustee and his professionals have a legitimate need for this information to assess the value and sustainability of AMRR and to assess the Estate's options, and additionally to investigate whether AMRR properly and correctly maintains its financial records.  AMRR also objects that this request is overly broad, unduly burdensome, and harassing.  It is not: the information can be produced electronically in likely a matter of minutes and is the kind of information that is needed by any financial advisor or secured creditor to determine its options.

20. <u>Request 15</u>.  The Trustee will withdraw this request, without prejudice to taking further discovery regarding the same.

21. <u>Request 16</u>. This request seeks the identification of each individual and firm that has maintained control or custody of AMRR's business and accounting records. AMRR objects on the grounds that this request exceeds the scope of Rule 2004. It does not: who held or holds, or maintained or maintains, the financial and business records of a publicly traded company is appropriate information, let alone information rightly given to one's secured creditor. AMRR also objects on the basis that this is a disguised interrogatory. It need not be: if there are documents (such as a contract with an outside firm or an employment letter to an internal employee) that identify the subject matter of the request, then those can be produced.

22. <u>Request 17</u>. This request seeks the production of customer contracts, leases, material contracts, and notices or communications related to any potential default. AMRR objects on the basis that this request exceeds the scope of Rule 2004. It does not: knowing what contracts AMRR has, and assessing their potential profitability and desirability, and learning whether any are alleged to be in default, goes to the heart of the Trustee's ability to decide how to administer the Estate's rights against AMRR, including a potential involuntary filing—especially because the Trustee holds the first-priority lien on those contracts and assets. AMRR also objects as overly broad, burdensome, and harassing. The request is none of these things: AMRR has a financial advisor in place who has certainly requested the same information, and surely AMRR has been analyzing this information as part of its own internal review of its profitability and a potential bankruptcy filing. That some of the documents may have confidentiality provisions is likely, but the Court has entered a protective order and AMRR can and should produce the same pursuant to that order. Again, this is the Trustee's direct collateral and he has a right to know what that collateral is.

23. <u>Request 18</u>. This requests documents related to any other loans or security agreements of AMRR. AMRR objects on the basis that "all notices and communications related

to or referencing any alleged default . . . and any forbearance agreement" is vague, overly broad, and burdensome. It is none of the foregoing: if AMRR is alleged to be in default, then the Trustee has the right to know that information.

24.     Requests 19, 20, and 21. These requests seek information related to AMRR's credit cards, bank statements, and use of a private jet. AMRR objects on the grounds that the requests exceed the scope of Rule 2004. They do not: these requests go to the heart of AMRR's profitability and the desirability of maintaining present management, and its large overhead and expenses, as noted on its public filings. This is particularly true of Frinzi, who it appears has been using AMRR as his piggy bank while he travels around the world living lavishly.

25.     Request 22. This request seeks non-privileged board minutes. AMRR objects on the basis that the request exceeds the scope of Rule 2004. It does not: the minutes of the board—indeed, whether there is even a functioning board—is important information for the Trustee to have concerning how the board views the debt to the Debtor, what options the board has considered for repaying it, what the board has done about cost controls, and whether AMRR may have breach of fiduciary duty or other claims that may be of value to its largest creditor.

26.     Request 23. This request seeks communications and information provided by AMRR to its outside auditors. AMRR objects on the basis that the request exceeds the scope of Rule 2004. It does not: information provided to outside auditors goes to the heart of the value, profitability, and desirability of AMRR and its business, and communications related to the Debtor and to the underlying transactions go to the heart of the Trustee's rights against AMRR. AMRR also objects that this "would require MBGH to conduct unwieldy and unnecessary searches of emails and other electronic files of multiple custodians over a multi-year period." That is not so. All that AMRR need do is identify who at its auditors it would have communicated with, search those people's e-mail folders, and search those people's correspondence files. Nor is this a "multi-

year" period. The transactions occurred less than fifteen (15) months ago in January, 2022. Instead, the Trustee suspects that AMRR is simply trying to hide something.

27. Request 24. This request seeks communications between AMRR and 18920 NW 11th, LLC—an entity that purportedly holds one-half of the $44 million promissory note from AMRR, in what is another Frinzi-orchestrated scheme that breached his fiduciary duties and transferred some $12 million to $14 million to James Goodman using 18920 as an intermediary. Insofar as 18920 "owns" half the debt, the Trustee has a right to see what the communications between these parties have been, especially since it appears that 18920 may have been complicit in Frinzi's breaches of fiduciary duty (and with respect to which the Trustee is also investigating claims against 18920 and James Frinzi, thus further supporting the scope of the request). AMRR's objection that this request exceeds the scope of Rule 2004 is baseless. As is its objection that "if this Document Request is read literally, it would require MBGH to conduct unwieldy and unnecessary searches of emails and other electronic files of multiple custodians over a multi-year period." There are not more than one or two people at 18920 who would have had communications, and January, 2022 is not a "multi-year" period. Instead, the Trustee suspects that AMRR is simply trying to hide something.

28. Request 25. This request addresses letters of resignation from any board member, any officer, or any auditor—of key interest in that at least one board member, and a CFO, and the auditor all resigned from AMRR in the past few weeks. While AMRR lodges an objection as to scope, it then states that "it will produce." The Trustee wishes only to ensure that AMRR will in fact produce responsive documents notwithstanding the objection.

29. Request 26. This request addresses contracts between AMRR and any director or officer since January, 2022. AMRR objects on the basis that this is outside the scope of Rule 2004. It is not: what the agreements and compensation are of the persons who run a company that owes

at least $44 million to the Debtor are very relevant, especially insofar as the Trustee is trying to assess the value of AMRR and its desirability of continuing as a going concern. And, that AMRR is a publicly traded company, suggests all the more that this information should be produced.

30. <u>Request 27</u>. This request addresses expense reimbursement forms of directors and offices, including Frinzi. AMRR objects on the basis that this is outside the scope of Rule 2004. All that one need do is review Frinzi's social media accounts to see how frequently and lavishly he has been traveling, even while AMRR does not pay even a penny back to the Debtor, to see that this is well within the scope of Rule 2004, as it goes to the heart of AMRR's profitability and desirability of continuing as a going concern, whether changes to management are warranted, how much money Frinzi or his friends may have sucked out of AMRR as he did from the Debtor and its subsidiaries from his breaches of fiduciary duty, and whether AMRR (and, consequently, the Trustee) have claims on account of the same. This request is perhaps more intrusive than normal, but someone who transferred almost $50 million of Debtor funds to himself ought to be required to demonstrate how he used some of that money.

### III.　<u>CONCLUSION</u>

31. The scope of Rule 2004 is broad indeed, and an entity that received $44 million of Debtor funds and has not repaid a penny, and its boss, who received another $5 million without repaying a penny, should not be surprised to now be facing a Rule 2004 examination after bankrupting the Debtor. This is not a normal Rule 2004 examination or request and for AMRR to pretend that it is is preposterous. The gravity of the torts and transfers at question—and the need to preserve whatever value may still be there—justify the broad relief requested by the Trustee.

RESPECTFULLY SUBMITTED this 15th day of May, 2023.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75201
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

**COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 15th day of May, 2023, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including James W. Bartless, Esq., counsel for AMRR.

By: /s/ Davor Rukavina
Davor Rukavina, Esq.