**BUTLER SNOW LLP**
Adam M. Langley (admitted *pro hac vice*)
R. Campbell Hillyer (admitted *pro hac vice*)
6075 Poplar Avenue, Suite 500
Memphis, TN 38119
Telephone: (901) 680-7316
adam.langley@butlersnow.com

and

Candice Carson (TX Bar No. 24074006)
2911 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219
Telephone: (469) 680-5502
candice.carson@butlersnow.com

*Counsel for FedEx Supply Chain*
*Logistics & Electronics, Inc.*

**DLA PIPER LLP (US)**
Noah M. Schottenstein (TX Bar No. 24100661)
1900 N. Pearl Street, Suite 2200
Dallas, Texas 75201
Telephone: (214) 743-4500
noah.m.schottenstein@us.dlapiper.com

and

Amy L. Ruhland (Rudd) (admitted *pro hac vice*)
Ryan Sullivan (admitted *pro hac vice*)
303 Colorado Street, Suite 3000
Austin, Texas 78701
Telephone: (512) 457-7000
Amy.Ruhland@us.dlapiper.com
Ryan.Sullivan@us.dlapiper.com

and

Laura Sixkiller (admitted *pro hac vice*)
2525 East Camelback Road, Suite 1000
Phoenix, Arizona 85016
Telephone: (480) 606-5161
laura.sixkiller@us.dlapiper.com

*Counsel for ARRIS Solutions, Inc.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

--------------------------------------

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| GOODMAN NETWORKS, INC. | § | Case No. 22-31641 (MVL) |
| | § | |
| Debtor. | § | **Relates to Docket No. 226** |
| | § | |

....................................................................

### JOINT RESPONSE AND OBJECTION OF FEDEX SUPPLY CHAIN LOGISTICS & ELECTRONICS, INC. AND ARRIS SOLUTIONS, INC. TO TRUSTEE'S AMENDED MOTION FOR APPROVAL OF COMPROMISE AND SETTLEMENT WITH PROSPERITY BANK AND UMB BANK, NATIONAL ASSOCIATION

69491629.v4

FedEx Supply Chain Logistics & Electronics, Inc. ("FSCLE") and ARRIS Solutions, Inc.

("ARRIS") (FSCLE and ARRIS together are the "Objectors") file this joint response and objection

to the *Trustee's Settlement Motion under Bankruptcy Rule 9019 for Approval of Settlement and*

*Compromise with Prosperity Bank and UMB Bank, National Association* (the "Settlement

Motion") [Doc. No. 261] filed by Scott Seidel as chapter 7 trustee (the "Trustee") of the estate of

Goodman Networks, Inc. (the "Debtor").  Objectors would show as follows:

## INTRODUCTORY STATEMENT

1.      The settlement upends and disregards bankruptcy law and the commercial code and

should be denied because the settlement (i) is not based on a valid factual and legal basis, (ii) causes

unencumbered claims of the estate to be settled with no realizable value given to unsecured

creditors, and (iii) grants a global release that is overbroad. The Trustee has not met his burden to

show the settlement is based on an adequate and accurate factual foundation; instead, the Trustee

relies on conclusory statements and unsubstantiated representations from counterparties to the

settlement. The settlement includes three components: (i) settlement of an avoidance claim related

to the Prosperity Payments ($513,742.92);[1] (ii) settlement of an avoidance claim[2] related to the

Subject Funds ($4,463,804.68); and (iii) a global release of all claims of the estate against Prosperity

Bank ("Prosperity"). The settlement is neither fair for unsecured creditors nor reasonable based on

the law and facts presented by the Trustee.

---

[1] The Prosperity Payments are defined as the $513,742.92 that Prosperity received from the
Debtor's bank accounts from January 2021 to August 2022 on account of Genesis Borrowers
obligations to Prosperity and for which the Debtor had no liability or obligation.  The Settlement
Motion states that the Prosperity Payments are constructively fraudulent transfers which can be
avoided by the Trustee.
[2] The Trustee characterizes the claim for the Subject Funds as a turnover action, but this
characterization has no factual support.

2.      First, the entire settlement is premised on a fundamental error: the Trustee believes the Subject Funds, which are funds held by Prosperity at Prosperity in an account solely in its own name, are property of the estate subject to the Bondholder's deposit account control agreement ("DACA") on a deposit account that does not hold the funds. But, the Trustee has not presented any valid factual or legal basis to support his position that the Subject Funds are property of the estate or that UMB Bank, National Association, as Collateral Agent and Indenture Trustee, and the Majority Noteholder Group (collectively, the "Bondholders") would prevail in establishing a perfected security interest in the Subject Funds.  To be perfected under the UCC, the funds must be in an account of the debtor that is subject to the DACA or an "authenticated record" that would confer control.  And it is now undisputed that the Subject Funds are held in an account in the name of Prosperity and there is no authenticated record to effectuate perfection. When the Subject Funds were transferred prepetition out of the Debtor's deposit account *3992 (the "DACA Account"), which is controlled by the DACA, the Debtor and the Bondholders lost control and thus perfection of the Subject Funds pursuant to the applicable sections of Article 9 of the Texas Business & Commercial Code ("TX Article 9").

3.      Second, the second and third components of settlement do not generate any value for unsecured creditors and, thus, are neither equitable nor beneficial to the estate.  Despite alleging that the security and perfection issue is a close call, the Trustee proposes the release of a $4.4 million claim in exchange for a mere $150,000 – 3% of the potential recovery – in the form of a surcharge to cover his own administrative expenses.  The Trustee has not been appointed to administer property for the benefit of secured creditors.  If the Trustee believes these claims are only worth a paltry $150,000, he should abandon them to unsecured creditors to pursue.

3

4.      The estate should be recovering $4,463,804.68 for the benefit of the estate and its unsecured creditors on an avoidance claim, and, separately, the Bondholders should be recovering outside of this bankruptcy proceeding for Prosperity's wrongful actions that damaged the Bondholders and breached their DACA. While arising from the same set of facts, these are distinct and independent causes of action. And, each cause of action is entitled to a distinct and independent recovery. The unsecured creditors will receive nothing from this component of the settlement, and nothing falls beneath the lowest point in the range of reasonableness.

5.      In return for settlement of the avoidance claim related to the Prosperity Payments, the Trustee is now receiving $200,000 in the Settlement Motion after not having received any consideration in the original settlement motion.[3] Objectors do not separately challenge the Prosperity Payments component of the settlement, except to the extent it is contingent on the other two components as part of the settlement as a whole.

6.      Finally, the Trustee has not presented any factual basis for a global release of all claims against Prosperity. Similar to the concession that was given regarding the settlement with John Goodman, the release, if any, should be specifically tailored to only the claims at issue. Prosperity should not be given a broad and complete release of all claims while investigations are continuing into funds missing from the Debtor's deposit accounts at Prosperity.

## **RELEVANT BACKGROUND FACTS**

7.      The Bondholders hold a valid and perfected security interest in funds of the Debtor held in the DACA Account by virtue of the DACA dated May 31, 2017, and which was specific to only account number x3992.  The DACA is attached hereto as *Exhibit 1*.

---

[3] The $200,000 was obtained by the Trustee only after the Objectors informally provided their objection to the original settlement motion. The Trustee presented the original settlement to the Court proposing to receive no consideration for this claim as well.

69491629.v4

8.      Prosperity loaned almost $5,000,000 to Genesis Networks Telecom Services, LLC ("Genesis Telecom" a.k.a. Genesis-ATC) and Genesis Networks Global Services, LLC ("Genesis Global") (together the "Genesis Borrowers") in July and August 2020.

9.      The Debtor was not an obligor or guarantor for the Genesis Borrowers debt to Prosperity.

10.     In October 2021, the Debtor executed in favor of Prosperity an Assignment of Deposit Account (the "Assignment"), which granted Prosperity a security interest in DACA Account to secure the obligations of the Genesis Borrowers to Prosperity. There was no consideration for the Assignment or reasonably equivalent value to the Debtor as the Debtor had no financial obligation for the Genesis Borrowers' debt to Prosperity.

11.     From January 2021 to August 2022, the Debtor paid $513,742.92 (the "Prosperity Payments") to Prosperity on account of the Genesis Borrowers' debt.

12.     The Settlement Motion is silent as to why the Bondholders allowed the Prosperity Payments to be made from the DACA Account for over an eight (8) month period.

13.     On August 15, 2022, $4,463,804.68 of funds (the "Subject Funds") from the DACA Account were transferred and applied to the Genesis Borrowers' debt owed to Prosperity. Approximately $202,903 remained in the DACA Account.

14.     The Subject Funds were not returned to the DACA Account. The August and September 2022 bank statements for the DACA Account are hereto attached as *Exhibit 2*.

15.     The Objectors have no knowledge of the factual allegations of paragraph 15 of the Settlement Motion as to Bondholder notice to Prosperity or of the subsequent segregation of the Subject Funds into any purported "escrow account." No notice by Bondholders or any statement of account at Prosperity is attached to the Settlement Motion.

69491629.v4

16.     There is no authenticated record acknowledging Prosperity held the Subject Funds in its possession in the purported "escrow account" for the Bondholder's benefit. Prosperity in fact held the Subject Funds for its own benefit. *See* Prosperity Letter at Exhibit 3 (identifying the funds in an account in the name of Prosperity).[4]

17.     On September 6, 2022 (the "Petition Date"), an involuntary petition was filed by the Bondholders against the Debtor.

18.     On the Petition Date, the Subject Funds remained in the possession and control of Prosperity purportedly in the "escrow account" with "no escrow agreement" and still "pending further proceedings."

19.     On the Petition Date, there is no instrument or record indicating the Debtor had possession or control and, therefore, ownership over the Subject Funds, and the Trustee affirms: "the account is one at Prosperity used for its own account, which is not held in the name of the Debtor." *See* Settlement Motion at ¶ 15, fn. 3.

20.     On the Petition Date, there was no authenticated record or any executed acknowledgment that the Subject Funds were being held by Prosperity for the exclusive benefit of the Bondholders. *See* Settlement Motion at ¶ 15, fn. 2.

21.     Without any factual or legal basis, the Trustee filed the Settlement Motion and stated the Subject Funds are (A) property of the estate, (B) subject to the Bondholder's liens, and (C) perfected by the DACA. In fact, the opposite is true. The Subject Funds are in the exclusive

---

[4] Objectors received the Prosperity Letter shortly before filing this Objection and have not conducted any discovery into the nature or type of the account identified in the Prosperity Letter as account number *0188. Objectors reserve all rights to supplement all statements related to account number *0188 after discovery is conducted.

possession and control of Prosperity, the Bondholders' relevant lien only attached to funds in the DACA Account, and the DACA was limited to the DACA Account.

22.    The Settlement Motion seeks to release the estate's claims related to the Prosperity Payments and the Subject Funds. First, the estate's claim related to the Prosperity Payments arise under Section 548 of the Bankruptcy Code and may assert that the $513,742.92 paid by the Debtor on the Genesis Borrower's debt to Prosperity was constructively fraudulent. Prosperity is the ultimate transferee and is liable under Section 550 of the Bankruptcy Code. The estate is receiving an approximately 40% recovery for releasing its claim against Prosperity valued at $513,742.92. This claim is not complex and has a near certain probability of success as an insolvent debtor may not use its limited resources to pay the debts of another entity.

23.    Second, the estate's claim related to the Subject Funds similarly arises under Section 548 of the Bankruptcy Code. The estate may assert that the $4,463,804.68 paid by the Debtor on the Genesis Borrowers' debt to Prosperity was constructively fraudulent. Prosperity again is the ultimate transferee and is liable under Section 550 of the Bankruptcy Code. The Trustee is receiving a surcharge of $150,000, but otherwise no distributable proceeds for the estate, as consideration for releasing its claim against Prosperity valued at $4,463,804.68.

24.    While the claim related to the Subject Funds may be ever so slightly more complex because Prosperity purportedly reversed application of the Subject Funds and is now internally holding the Subject Funds "pending further proceedings," the claims at issue here are still very straightforward and present a strong likelihood of success.  The internal accounting at a bank "pending further proceedings" is not a deposit account in the name of the Debtor subject to the control of either the Debtor or the Bondholders. The transfer of the Subject Funds from the DACA

7

Account to Prosperity's own internal accounts was a constructively fraudulent transfer that is avoidable for the benefit of the estate.

## ARGUMENT

### A.    Legal Standard

25.    The Court "may approve a compromise or settlement" only in accordance with the standards applied under Bankruptcy Rule 9019. FED. R. BANKR. P. 9019 (emphasis added). Rule 9019 affords the Court discretion to determine whether a settlement "is right and equitable under the circumstances and the law[] and directed by the reason and conscience of the judge to a just result." *Matter of AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1984) (*quoting Langnes v. Greene*, 282 U.S. 531, 541 (1931)). In exercising this discretion, the Court weighs "(1) The probability of success in the litigation, with due consideration for the uncertainty in fact and law, (2) The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of the compromise." *Matter of Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) (*quoting Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968)).

26.    A judge "must 'compare the terms of the compromise with the likely rewards of litigation.'" *Jackson Brewing*, 624 F.2d at 602 (*quoting TMT Trailer*, 390 U.S. at 425). And, a settlement should not be approved when it "fall[s] below the lowest point in the range of reasonableness." *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991). "An approval of a compromise, absent a sufficient factual foundation, inherently constitutes an abuse of discretion." *AWECO*, 725 F.2d at 299. The Court must become informed on the requisite factual background to determine whether one class of creditors is not endangered and prejudiced to the benefit of a separate class of creditors that is not entitled to priority. *Id*. Where

"gaping holes" of fact exist on background information necessary to make an informed decision, a settlement cannot be approved. *Id.*

**B.      The Settlement is unreasonable and not in the best interest of the estate and its unsecured creditors.**

**(1)      The Subject Funds are neither property of the estate nor subject to the Bondholders' DACA.**

27.      The Subject Funds were not returned to the DACA Account pre- or post-petition and are not otherwise in the possession or control of the Debtor or the Bondholders. The Subject Funds are held by Prosperity in its own accounts, which the Settlement Motion wrongly characterizes as an "escrow account."[5]  The Subject Funds are not property of the Debtor and are simply held by Prosperity at Prosperity in an account in its own name. There is no authenticated record, as required by TX Article 9 for perfection, which would have given the Bondholders control over the Subject Funds held by Prosperity, as a third party, in the purported "escrow account." Neither the Debtor nor Bondholders had possession or control of the Subject Funds on the Petition Date and therefore, the Subject Funds at the Petition Date were none of (a) property of the estate, (b) subjected to the Bondholders' security, or (c) perfected by Bondholders. The transfer of funds from a debtor's deposit account to a third party causes a change in ownership and defeats any security in funds transferred. Tex. Bus. & Com. Code §§ 9.332(b) ("A transferee of funds from a deposit account takes the funds free of a security interest in the deposit account unless the transferee acts in collusion with the debtor in violating the rights of the secured party."); 9.401(b) ("An agreement between the debtor and secured party which prohibits a transfer of the debtor's rights in collateral or makes the transfer a default does not prevent the transfer from taking effect.").

---

[5] Prior to the filing this Objection, counsel for FSCLE consulted with counsel for the Trustee and the Bondholders and was advised that there is no escrow account or escrow agreement and that the reference to an escrow account was shorthand to refer to Prosperity's internal accounting.

Collusion is an exception to this rule, but the Settlement Motion makes no allegation or even suggestion of collusion and, therefore, this exception has been waived as a basis for the settlement.

28.     The settlement involves the release of the estate's avoidance action against Prosperity for the application of the Subject Funds from the DACA Account to the debt of the Genesis Borrowers (hereinafter defined) owed to Prosperity. This is a federal bankruptcy claim arising from the Bankruptcy Code. The settlement also involves the Bondholders' release of their claim for Prosperity's breach of the DACA.  The estate should be recovering $4,463,804.68 for the benefit of the estate and its unsecured creditors on an avoidance claim, and, separately, the Bondholders should be recovering outside of this bankruptcy proceeding for Prosperity's wrongful actions that damaged the Bondholders and breached their DACA. While arising from the same set of facts, these are distinct and independent causes of action. And, each cause of action is entitled to a distinct and independent recovery.

29.     It is unreasonable for the estate to release this claim without receiving material distributable proceeds as consideration. Moreover, this component of the settlement has no factual basis to support the Trustee's statement that the Bondholders are entitled to the proceeds of the settlement to the exclusion of the estate's unsecured creditors. It would be a factual error and mistake of law to determine that Subject Funds in the possession and control of Prosperity remain property of the estate subject to the Bondholders' lien absent an *authenticated record* evidencing that Prosperity was holding the Subject Funds as the Debtor's property subject to the control of the Bondholders.

30.     The settlement related to the Subject Funds is entirely premised on a mistake of law regarding whether the Debtor or the Bondholders had control and possession over a deposit account at Prosperity in Prosperity's own name. They did not.  The Trustee states he reviewed the security

10

documents of the Bondholders with respect to the Subject Funds and concluded that the Bondholders hold a valid, perfected, unavoidable first priority security interest in the Subject Funds. Settlement Motion at ¶ 16. But that statement has no supporting documentation or analysis conducted and relies only upon conclusory statements about whom had control and possession of the Subject Funds on the Petition Date.  The entire rationale of the settlement of the claim related to the Subject Funds is predicated on the mistake of law that the Bondholders remain secured and perfected in the Subject Funds outside of the DACA Account. This mistake of law explains why the Trustee is not receiving a material recovery for the estate and also undermines the credibility of the settlement. It should not be approved.

31.     Objectors do not dispute that the Bondholders hold a valid and perfected security interest on the DACA Account pursuant to the DACA. But, the Subject Funds are not in the DACA Account or otherwise in the possession and control of the Debtor or the Bondholders. The DACA is exclusive to the DACA Account and does not control any other deposit accounts of the Debtor and certainly does not control funds in the exclusive possession and control of Prosperity.  Objectors requested that the Trustee and the Bondholders disclose any evidence of control of the Subject Funds at Prosperity prior to the Petition Date. Neither the Trustee nor the Bondholders have any evidence of control or possession. This absence in the factual record shows the Court should disapprove the settlement because it cannot make the necessary finding that the settlement is fair and reasonable based on the factual record.

32.     Even ignoring the absence of any factual support for the Trustee's statements, the bald statements of the Bondholders' security interest in the funds at Prosperity are not correct as a matter of law. A security interest in a deposit account may be perfected only by control and a security interest in money may be perfected only by the secured party taking possession.  Tex. Bus.

& Com. Code §§ 9.312(b)(1) and (3), 9.313, 9.314.[6] TX Article 9 makes plain: "A security interest in deposit accounts, electronic chattel paper, virtual currencies, letter-of-credit rights, or electronic documents is perfected by control under Section 7.106, 9.104, 9.105, 9.107, or 9.1071 when the secured party obtains control <u>and remains perfected by control only while the secured party retains control</u>." Tex. Bus. & Com. Code § 9.314(b) (emphasis added).

33.     A secured party has control of a deposit account if the debtor, secured party, and bank have agreed in an authenticated record that the bank will comply with instructions originated by the secured party directing disposition of the funds in the deposit account without further consent by the debtor.  Tex. Bus. & Com. Code § 9.104(a)(2). The DACA meets the requirements of § 9.104(a)(2) but only as to funds in the DACA Account.

34.     The Subject Funds are not in the DACA Account. Therefore, the DACA and its control over the DACA Account are no longer relevant to the Subject Funds. The Subject Funds are not in a deposit account in the name of the Debtor and, instead, are in the sole possession and control of Prosperity.

35.     Because the Debtor did not have an interest in, possession of, or control over the Subject Funds at the Petition Date, the Bondholders likewise did not have an interest in, possession of, or control over the Subject Funds as a security interest. It is fundamental that a security interest is derivative of the underlying interest of the Debtor. The Debtor's loss of control and possession of the Subject Funds was also the Bondholders' loss of control and possession.

36.     Moreover, the Settlement Motion is self-refuting on control. If the Bondholders have control over the Subject Funds, they may direct the use of the Subject Funds without need for

---

[6] The local law of a bank's jurisdiction governs perfection and the DACA expressly states that Prosperity's jurisdiction for purposes of the Uniform Commercial Code is Texas.  *See* DACA ¶ 10 and Tex. Bus. & Com. Code § 9.304(a) and (b)(1).

69491629.v4

a Settlement Motion resolving and releasing disputed claims.[7] The legal basis and facts presented in the Settlement Motion do not support the statement that the Bondholders are perfected by control in the Subject Funds.  As previously stated, the Subject Funds are not in any account in the name of the Debtor, and despite the Settlement Motion using the phrase "escrow account," the Subject Funds are simply held "by the bank at the bank" in an internal account in the name of Prosperity that is not collateralizable and perfectible.

37.    The Settlement Motion adopts the general proposition that because the Subject Funds were at one time held in the DACA Account and perfected, the Subject Funds (or any other funds in the DACA Account) can leave the DACA Account and maintain their perfected status. But, that is a mistake of law as to perfection under TX Article 9. Possession and control are the only authorized means of perfecting a lien on monies and deposit accounts. Ignoring possession and control would substantially rewrite TX Article 9 and render fraudulent transfer actions under sections 548, and whom they benefit under 552(a) of the Bankruptcy Code, meaningless because a secured creditor would never lose perfection upon a fraudulent transfer and the recovering avoidance action would not benefit the estate.

38.    The Trustee and the Bondholders' lack of evidence of legal control and possession at the Petition Date causes the settlement to be unfair, inequitable, and unreasonable. The Trustee and Bondholders failed to present any documentary evidence supporting control and possession after the Subject Funds were removed from the DACA Account.  Prosperity, as a third party in possession of the Subject Funds, did not authenticate a record pre-petition in the ordinary course of

---

[7] The Settlement Motion states that the Bondholders did in fact exercise control over the DACA Account and directed Prosperity to transfer approximately $202,902, the funds remaining in the DACA Account, to the Bondholders on August 22, 2022, which is a week after the Subject Funds were withdrawn from the DACA Account.  *See* Settlement Motion ¶ 15 and Exhibit 2 – DACA Account Statement August 2022.

the Debtor's business acknowledging that it holds possession of the Subject Funds for the Bondholders' benefit. Tex. Bus. & Com. Code § 9.313 (c)(1). In the absence of such an authenticated record by Prosperity, it is a mistake of law for the Trustee to reach the legal conclusion that the Bondholders are perfected as to the Subject Funds.

39.     Finally, a transferee of funds from a deposit account takes the funds free of a security interest in the deposit account unless the transferee acts in collusion with the debtor in violating the rights of the secured party. Tex. Bus. & Com. Code § 9.332(b). There are no allegations in the Settlement Motion that Prosperity colluded with the Debtor regarding the transfers of the Prosperity Payments or the Subject Funds. Absent collusion, this provision is fatal to the proposition that the Bondholders have a perfected lien in the Subject Funds transferred out of the DACA Account.

**(2)     The $150,000 Carve-out for the Trustee's Administrative Costs Is Not a Benefit to the Estate**

40.     Because the settlement of the estate's claim related to the Subject Funds is based on a mistake of law and no factual support, the estate is not receiving any material benefit from the settlement. The Court cannot rely on the Trustee's mistake of law and, instead, "must apprise itself of the relevant facts and law so it can make an informed and intelligent decision." *In re Age Ref. Inc.*, 801 F.3d 530, 541 (5th Cir. 2015) (internal quotation omitted). Because the Debtors and the Bondholders lost possession and control over the Subject Funds when Prosperity took them from the DACA Account, the Subject Funds are neither property of the estate nor subject to the security interest of the Bondholders. Instead, the Subject Funds must be recovered from Prosperity as an avoidable fraudulent transfer under section 548 of the Bankruptcy Code. And, section 552(a) of the Bankruptcy Code allows the recovery of a fraudulent transfer to be brought into the estate without

14

being subjected to the Bondholders' liens. The settlement is not fair and reasonable because it releases a claim with a high likelihood of success of recovering $4,463,804.68 in return for no material recovery for the estate while allowing the Bondholders to recover funds they are not entitled to receive. The Bondholders may pursue Prosperity outside of bankruptcy for the breach of the DACA.

41.     "If the sale or carve-out will not result in a meaningful distribution to creditors, the trustee must abandon the asset." Handbook for Chapter 7 Trustee, https://www.justice.gov/ust/page/file/762521/download, at 4-14.  He cannot pursue a settlement solely to cover his own costs. The Sixth Circuit in a published decision recently affirmed the denial of a trustee's administrative fees because the settlement recovery did not return value to the unsecured creditors. *In re Vill. Apothecary, Inc.*, 45 F.4th 940 (6th Cir. 2022). If the Trustee believes the avoidance claim related to the Subject Funds has no value for unsecured creditors, he should abandon the claim to FedEx and ARRIS so that it may be diligently pursued.

42.     Remarkably, instead, of pursuing the claim or abandoning it to the unsecured creditors, he states it is a close call and a matter of first impression while recovering nothing for unsecured creditors. If it is a close call, why are Bondholders getting 97% of the value, the Trustee getting 3%, and unsecured creditors getting nothing?  Bankruptcy Courts approve settlements of close calls all the time. It is the nature of motions under Rule 9019. However, those settlements ordinarily involve material consideration given to both sides of the close call. Here, Objectors dispute that it is a close call because fraudulent transfer recoveries are always reserved for unsecured creditors under section 552(a). Nonetheless, assuming the Trustee's argument of a close call, the Trustee should be obtaining a 50% recovery or something in the range of reasonableness

15

near 50%. Instead, this settlement attributes no value to the estate's claim. The Court should deny the settlement as being unreasonable.

43.     Furthermore, the Court should deny this settlement because no unsecured creditors support this settlement. FedEx and ARRIS hold over $110 million in claims against the estate. They are by far the largest creditors of this estate. Their views are required by Fifth Circuit precedent to be given weight on whether a settlement is reasonable. "While the desires of the creditors are not binding, a court 'should carefully consider the wishes of the majority of the creditors.'" *Matter of Foster Mortg. Corp.*, 68 F.3d 914, 917 (5th Cir. 1995) (quoting *In re Transcontinental Energy Corp.*, 764 F.2d 1296 (9th Cir.1985)). In *Foster Mortg.*, the Fifth Circuit disapproved a settlement that would have brought $1.65 million into the estate and found an abuse of discretion where "nearly unanimous creditor opposition" existed. *Id.* A bankruptcy court must consider "the paramount interest of creditors and the nature of negotiations" as factors bearing on the wisdom of the compromise. *Id.* Here, Objectors, the key unsecured creditors holding an overwhelming majority of the claims, oppose the settlement as against their interests. No unsecured creditors were involved in settlement negotiations, and, here, Objectors only found out about the settlement when it was presented to the Court.

## C.     A General Release of Prosperity Is Inappropriate

44.     Apart from settling two discrete claims regarding the Prosperity Payments and the Subject Funds, the Trustee proposes granting Prosperity a global release of all claims – not just claims related to the Prosperity Payments and the Subject Funds. This is inappropriate.

45.     Prosperity may or may not have liability beyond the claims regarding Prosperity Payments and the Subject Funds, but it should not be able to absolve itself of any and all liability early in this case, especially where tens of millions of dollars in the Debtor's accounts at Prosperity are missing under suspicious circumstances outside the ordinary course of the Debtor's business.

16

*See* FedEx's Proof of Claim No. 32, Addendum, ¶¶ 39-41. The Trustee should investigate whether Prosperity conspired with or aided and abetted such unauthorized transfers. Here, the Court is being asked to approve a global release of Prosperity without being provided any relevant information to demonstrate that $200,000 is proper consideration for the granting of the global release. "[T]he bankruptcy court must be apprised of all relevant information that will enable it to determine what course of action will be in the best interest of the estate." *In re Martin*, 91 F.3d 389, 394 (3d Cir. 1996). Nothing in the Settlement Motion apprises the Court of relevant information regarding Prosperity and whether it acted in good faith and in accordance with the law regarding the Prosperity Accounts. The Court cannot conclude a global release is in the best interest of the estate without relevant information, and none has been provided in the Settlement Motion.

46.     For example, the Trustee does not apprise the Court that Prosperity was the primary depository bank of the Debtor. Nor does the Trustee apprise the Court that Prosperity was the primary depository bank of related parties of the Debtor that are also targets of fraudulent transfers and intermingled funds and obligations (e.g., Genesis Networks Telecom Services, LLC, and Genesis Networks Enterprises, LLC). The Debtor and its subsidiaries maintained at least ten accounts at Prosperity (the "<u>Prosperity Accounts</u>"). And, James Goodman, who dominated the Debtor, had a long-time relationship with Bater Bates, a key manager at Prosperity.

47.     Beginning in September 2019, Bater Bates and James Goodman took steps to remove key controls on the Prosperity Accounts so that Jason Goodman and James Goodman were given authority over all the Prosperity Accounts; whereas, prior to this change, the Prosperity Accounts maintained ordinary controls, including having independent signatories from the Debtor. Prosperity made these changes to the Prosperity Accounts despite lacking proper corporate

authorization from the Debtor for such changes.[8] In October 2021, Bater Bates and James Goodman discussed moving money around. In November 2021, James Goodman and James Frinzi determined to again change account controls on all the Prosperity Accounts allowing accounts to wire monies to third parties and making Jim Frinzi the sole signatory. On December 13, 2021, Prosperity again allowed the controls on the Prosperity Accounts to be changed without proper corporate authorization from the Debtor, putting Jim Frinzi in control of the Prosperity Accounts. Three days later on December 16, 2021, Jim Frinzi began to take money from the Prosperity Accounts and funnel it to himself and his related companies and to James Goodman and his related companies. Between December 16, 2021, and March 11, 2022, at least $75 million was taken from the Prosperity Accounts and conveyed outside of the ordinary course to persons associated with James Goodman and Jim Frinzi.[9]

48.     And, Prosperity, who as a depository bank held funds subject to account controls defined by contract and applicable law, was not a silent bystander to this raiding of the Prosperity Accounts. As examples of red flags, on February 2, 2022, Prosperity raised the single day transaction limit on account *4345 to $17.5 million for two days so that Jim Frinzi could transfer $17 million to various entities for the benefit of James Goodman and Shalom Auerbach, the best man in Frinzi's wedding. Prosperity advised the Debtor that this special authorization came from "the top of the house." And, when apprised that John Goodman[10] was asking Prosperity to pay back

---

[8] The Debtor's bylaws required its Board to consist of at least three members. At the time of the changes, the Debtor's Board was not properly constituted and could not give authorization for these changes.

[9] The foregoing information was obtained through document production previously produced in discovery related to the Debtor contesting the involuntary petition.  See Bates #:  GNE 0000506, GNE   0000611,   GNE   0000001,   GTH_JohnGoodman   004567,   Goodman000199, Goodman_007677, and FedEx_073924.   All the foregoing document production is subject to a stipulated protective order and is now in the hands of the Trustee as an authorized recipient.

[10] John Goodman is James Goodman's younger brother.

18

Case 22-31641-mvl7    Doc 269    Filed 05/25/23    Entered 05/25/23 18:06:06    Desc Main
Document    Page 19 of 28

the Subject Funds after the involuntary petition was filed, Bater Bates told James Goodman in a

private email that "we need to visit. This is not going in a good direction with your brother." *See*

FN 10.

49.     Moreover, whether a global release is appropriate must be based on the financial

circumstances regarding the settling parties. For example, a global release was found appropriate

in *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 47 (Bankr. S.D.N.Y. 1998), only because of the

settling party's financial difficulties. The settling defendant would not have been able to satisfy a

larger settlement amount. *Id*. Here, the circumstances are dramatically different because Prosperity

is a bank with sufficient resources to satisfy the full amount of damages owed to the estate and the

Bondholders. Prosperity's Annual Report shows it has an annual allowance for credit losses equal

to \$281,576,000.[11] Thus, a complete loss on this litigation for Prosperity would only represent 3%

of the allowance that it has already set aside for loan losses.

50.     It is unconscionable that the Trustee is granting Prosperity a global release of all

claims in exchange for \$200,000 where Prosperity may have conspired with or aided and abetted

the Debtor, James Goodman, Jim Frinzi, and related entities to cause fraudulent transfers in excess

of \$75 million. Even if it did not conspire with the Debtor and its insiders and related parties,

Prosperity may have liability to the Debtor because it allowed James Goodman and Jim Frinzi to

take actions that were not authorized by the policies, account controls, or bylaws of either Prosperity

or the Debtor. A global release is inappropriate at this time because the Trustee is currently

investigating the Debtor's affairs, including the transfers out of the Prosperity Accounts. A global

release of Prosperity would only be appropriate after (a) such investigations are complete, (b)

---

[11]     *See* Prosperity Bancshares, Inc., 2002 Annual Report, https://www.prosperitybankusa.com/ContentDocumentHandler.ashx?documentId=76681, at 111-115.

69491629.v4

potential liability and claims are known, and (c) adequate consideration in relation to Prosperity's

potential liability is given. Absent a completed investigation and evaluation of claims against

Prosperity, a global release is premature and unsound, and return consideration is grossly

inadequate.

**D.    The Settlement Motion contains numerous other unsubstantiated statements that should be disregarded by the Court.**

51.    Many of the statements in the Settlement Motion lack merit and factual background

and do not meet the Trustee' burden of proof, including the following:

> a.    "While Trustee asserts that the Subject Funds are property of the Estate, he recognizes that Prosperity may have a competing claim to the Subject Funds which would require litigation by the Trustee to adjudicate . . ." (Settlement Motion at pp. 8).

52.    This is not a credible dispute. The transferee of funds from a deposit account takes

the funds free absent collusion. Tex. Bus. & Com. Code §§ 9.332(b). Here, the facts are that James

Goodman directed Prosperity to apply the Debtor's funds in the DACA Account to the Genesis

Borrowers' debt to Prosperity. And, Prosperity did that. The funds left the DACA Account and

were applied to the debt owed to Prosperity. The funds are not property of the estate under these

facts. In its place, the estate has a claim against Prosperity for the fraudulent transfer. This is

rudimentary.

> b.    "The Trustee, after a thorough review, has agreed that the Collateral Agent holds a valid, perfected, first-priority security interest in the Subject Funds, as part of the overall consideration for the Proposed Settlement." (Settlement Motion at pp. 9).

53.    Tex. Bus. & Com. Code §§ 9.332(b) plainly refutes this statement as a matter of

law.

> c.    "The Trustee's review of the case law suggests that this matter is one of first impression, on which the Court would be called to decide whether the 'finality of payment' policy of the U.C.C. . . . would apply even though the

funds are still at Prosperity and the rights of third parties . . .are not implicated." (Settlement Motion at pp. 9).

54.    This is misdirection. Funds from the Debtor's DACA Account were applied to the debt of a third party. The rights of third parties are directly affected and the finality rule of Tex. Bus. & Com. Code §§ 9.332(b) applies. Prosperity was the ultimate recipient of a fraudulent transfer. The Trustee cannot ignore that a transfer occurred. *See* Prosperity Letter, Exhibit 3 ("We write . . . concerning *the transfer of $4,463,804.68*" . . . "Prosperity honored the instructions or directions of James Elmer Goodman Jr. . . . with respect to *the transfer of the subject funds* from the Deposit Account." . . . "Prosperity *transferred the subject funds* from the Deposit Account to pay off business loan numbers [XXXX] of Genesis Networks Telecom Services LLC.") (emphasis added). Funds originated in a deposit account of the Debtor held at Prosperity and were transferred for the benefit of the Genesis Borrowers to Prosperity. *See* 11 U.S.C. § 101(54), defining "transfer" broadly.[12] Prosperity and the Genesis Borrowers are both transferees under Bankruptcy Code § 550.

        d.      "the Collateral Agent did nothing wrong"

55.    Whether the Bondholders did anything wrong is irrelevant. "An agreement between the debtor and secured party which prohibits a transfer of the debtor's rights in collateral or makes the transfer a default does not prevent the transfer from taking effect." Tex. Bus. & Com. Code § 9.401(b). The Bondholders have been wronged by the Debtor's transfer of funds to Prosperity for the benefit of the Genesis Borrowers. They have a non-bankruptcy claim against Prosperity for the

---

[12] *Barnhill v. Johnson*, 503 U.S. 393, 400 (1992) ("We acknowledge that § 101(54) adopts an expansive definition of transfer, one that includes 'every mode ... absolute or conditional ... of disposing of or parting with property or with an interest in property.'" Here, there is no dispute that funds in a deposit account were transferred out of the deposit account and applied to the Genesis Borrower's debt to Prosperity.

69491629.v4

damage caused by Prosperity's violation of the DACA. This settlement in effect inappropriately allows Prosperity to convert liability on two independent claims into liability on one claim.

> e.    "the Estate faces the potential of having to pay postpetition default interest on the funds and the Collateral Agent's attorney's fees. Ultimately, because the Subject Funds (less the surcharge) are being used to pay down legitimate debt and the debt intended to be repaid by the same, the Trustee believes that the resolution of this issue mostly in favor of the Collateral Agent is reasonable." (Settlement Motion at pp. 9).

> f.    "The Collateral Agent and Majority Noteholders have asserts that the claims under the Notes are oversecured and, on a preliminary basis, it appears to the Trustee this may be correct." (Settlement Motion at pp. 9-10).

56.    These statements are undeveloped and should be considered waived. They effectively assume that the Bondholders are fully secured creditors without any analysis or factual background. The Objectors and other creditors also hold "legitimate debt." It is alarming that one creditor, the Bondholders, would leapfrog every other creditor without a proper foundation that the Bondholders are entitled to such priority. The Bondholders purport to be owed approximately $18.7 million. (POC No. 25). Neither the Bondholders nor the Trustee purports to marshal assets subject to the Bondholders' security instrument and valued anywhere close to $18.7 million. And, the Bondholders have already stated that they are not fully secured when they filed the involuntary petition and filed a motion for summary judgment asking the Court to find that they are creditors qualified to petition for an order for relief. (ECF No. 80) ("the Debtor provided the Petitioning Creditors with a financial presentation, which valued all of the Debtor's assets at $12.9 million, significantly less than the approximately $18 million outstanding on the Notes." (¶ 11); "[T]he secured portion of the claim is equal to value of the debtor's estate's interest in the property securing the claim." (¶ 19 (citing 11 U.S.C. §506(a))). The Bondholders hold significant unsecured claims

69491629.v4

as determinable under Bankruptcy Code § 506(a) and consistent with their representations that they

qualified under Bankruptcy Code § 303(b)(1).[13]

> g.    "Because the Subject Funds are not in a Debtor-named account, the Collateral Agent will argue that the Trustee cannot resort to his 'strong arm' powers because the underlying property may arguably not be property of the Estate and section 550 would prevent a recovery when not for the benefit of the Estate." (Settlement Motion at pp. 9).

57.    This statement does not make sense. The Subject Funds were an interest of the

Debtor in property when those funds were in the DACA Account pre-petition. Those funds were

transferred out of the DACA Account and applied to a debt of the Genesis Borrowers. And, again,

this was done pre-petition. The Debtor received no value for that transfer. A recovery under section

548 is not subject to any lien of the Bondholders. 11 U.S.C. § 552(a). Only property that has been

transferred (i.e., it is no longer property of the estate) may be recovered under section 548.

> h.    "the Collateral Agent has asserted that the Subject Funds are its 'cash collateral' under the Bankruptcy Code." (Settlement Motion at pp. 9).

58.    This statement is also not supported by any evidence. The estate holds a claim under

section 548 against Prosperity. And, a claim is not cash collateral because it is not "cash, negotiable

instruments, documents of title, securities, deposit accounts, or other cash equivalents" as is

required under section 363(a) to be cash collateral.

> i.    "Prosperity has asserted good faith defenses and has stated its intention of defending against the Trustee's claims." (Settlement Motion at pp. 10).

59.    The Trustee has not identified any good faith defenses of Prosperity. Prosperity

knew the source of payment on the Genesis Borrowers' debt was from the Debtor because it used

the Debtor's DACA Account. Moreover, Prosperity is a signatory party to the DACA. The Trustee

---

[13] Section 303(b)(1) only allows unsecured claims to qualify as a petitioning creditor.

states Prosperity did not give any value to the estate. (Settlement Motion at pp. 9). This statement does not support the conclusion that Prosperity is a good faith transferee for value.

      j.     "The Trustee is not aware of any other claims or causes of action that the Estate may hold against Prosperity." (Settlement Motion at pp. 10).

60.     The Trustee has admitted in open court that millions of dollars went missing from the Debtor's deposit accounts at Prosperity. FedEx in its proof of claim at ¶ 41 identified $76,104,141.98 of unauthorized transfers from the Debtor's accounts at Prosperity. The Trustee has represented to FedEx that it is currently investigating these unauthorized transfers and that no final determinations have been made. Some of these transfers exceeded the maximum daily transfer limit and at least one is already the subject of pending litigation for a fraudulent transfer. *See* Adv. Proc. 22-03036. There are real concerns that either (1) James Goodman and Jim Frinzi conspired with Prosperity to accomplish the unauthorized transfers or (2) Prosperity breached its duty and contract to the Debtor by allowing its controls to be disregarded to accomplish these transfers from the Prosperity Accounts. These unauthorized transfers must be investigated. Indeed, the Trustee is investigating them because he has sought the Rule 2004 exam regarding the $44 million that was transferred to AMRR (now known as MBG). *See* ECF No. [234].

      k.     "The Trustee must initiate at least two lawsuits" (Settlement Motion at pp. 10).

61.     This is incorrect and again a result of the Trustee's confusion on the causes of action held by the estate and the Bondholders. The Trustee need only file one lawsuit – a section 548 action against Prosperity. The Bondholders would not be a party to that lawsuit. The Bondholders would instead bring their own cause of action for breach of the DACA. Any Bondholder suit would be brough in a non-bankruptcy forum, and the Trustee would not be a party. Prosperity may be liable on both causes of action and would have to defend both. A recovery in one would not affect recovery in the other because they are independent claims. The purported "second" lawsuit to "test

whether the Collateral Agent is perfected with respect to the Subject Funds" is erroneous because it presumes in error that only one recovery is available from the set of facts at issue. Prosperity is fully liable on both claims, and the Bondholders do not have any right to the recovery of a section 548 action other than as a pro rata, unsecured creditor alongside the other unsecured creditors.

           l.     The surcharge is fair and reasonable consideration. (Settlement Motion at pp. 10).

    62.    The Trustee has not submitted any billing statements showing that he spent $150,000 let alone reasonable and necessary costs. Objectors contend that $150,000 would have been sufficient to try the entire section 548 claim to judgment. This is not a complicated claim, and it most likely would have been resolved on summary judgment. Regardless, the Trustee should not pursue causes of action whereby he is the only beneficiary. The Sixth Circuit in a recently reported decision denied the Trustee's administrative fees where the settlement proceeds obtained were only enough to cover his administrative costs. *In re Vill. Apothecary, Inc.*, 45 F.4th 940 (6th Cir. 2022).

## CONCLUSION

    The Settlement Motion does not represent a reasonable and equitable settlement with Prosperity where the Bondholders and the Trustee receive all monetary benefits to the exclusion of the estate's unsecured creditors. The Bondholders, who have failed to present evidence of a security interest in the Subject Funds, are taking the entire settlement proceeds except a 3% agreed surcharge for the Trustee's administrative expenses which the Trustee would be entitled to anyway pursuant to 11 U.S.C. § 506(c). All parties to the Settlement Motion receive a monetary benefit proportionate to the claims being settled except the estate and the unsecured creditors. This is neither fair nor reasonable.

    The Settlement Motion is based upon and then driven by the mistake of law that the Subject Funds are property of the estate and that the Bondholders have a valid and perfected security

interest in the Subject Funds; although, the burden has not been carried to prove this, leaving gaping holes in the factual presentation. Perfection is a technical term of art that is based upon the statutory language of TX Article 9. The law of perfection must be strictly followed and cannot be subverted by a cursory analysis that it "seems right" that the Bondholders stay perfected because they were previously. No party has possession and control over the Subject Funds except for Prosperity. It is patently clear that the Debtor's and Bondholders' possession and control over the Subject Funds is lacking. It is not fair and reasonable for one unsecured creditor, the Bondholders, to receive the settlement proceeds from the avoidance action on the Subject Funds to the exclusion of the entire class of unsecured creditors.

WHEREFORE, the Objectors objects to the Settlement Motion and respectfully requests the Court deny the Settlement Motion and enter such other relief as is just and reasonable under the circumstances of this case.

Dated: May 25, 2023

Respectfully submitted,

**BUTLER SNOW LLP**

*/s/ Adam M. Langley*
Adam M. Langley (admitted *pro hac vice*)
R. Campbell Hillyer (admitted *pro hac vice*)
6075 Poplar Avenue, Suite 500
Memphis, TN  38119
Telephone: (901) 680-7316
adam.langley@butlersnow.com
cam.hillyer@butlersnow.com
will.perry@butlersnow.com

Candice Carson (TX Bar No. 24074006)
2911 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219
Telephone: (469) 680-5502
candice.carson@butlersnow.com

69491629.v4

*Counsel for FedEx Supply Chain Logistics
& Electronics, Inc.*

**DLA PIPER LLP (US)**

*/s/ Noah M. Schottenstein*
Noah M. Schottenstein
Texas Bar No. 24100661
1900 N. Pearl Street, Suite 2200
Dallas, Texas 75201
Telephone: (214) 743-4500
Facsimile: (214) 743-4545
noah.m.schottenstein@us.dlapiper.com

and

Amy L. Ruhland (Rudd) (admitted *pro hac vice*)
Texas Bar No.24043561
Ryan Sullivan (admitted pro *hac vice*)
Texas Bar No.24102548
303 Colorado Street, Suite 3000
Austin, Texas 78701
Telephone: (512) 457-7000
Facsimile: (512) 457-7001
Amy.Ruhland@us.dlapiper.com
Ryan.Sullivan@us.dlapiper.com

And

Laura Sixkiller (admitted *pro hac vice*)
Arizona Bar No. 022014
2525 East Camelback Road, Suite 1000
Phoenix, Arizona 85016
Telephone: (480) 606-5161
Facsimile: (480) 323-2419
laura.sixkiller@us.dlapiper.com

*Counsel for ARRIS Solutions, Inc.*

69491629.v4

## CERTIFICATE OF SERVICE

I, Adam M. Langley, certify that the foregoing pleading was filed electronically through the Court's ECF system and served electronically on all parties enlisted to receive service electronically in this case.

Dated: May 25, 2023

/s/ Adam M. Langley
Adam M. Langley

69491629.v4