IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | | |
|---|---|---|
| IN RE: | . | Case No. 22-31641-MVL-7 |
| | . | |
| | . | |
| GOODMAN NETWORKS, INC., | . | U.S. Bankruptcy Court |
| D/B/A GOODMAN SOLUTIONS, | . | 1100 Commerce Street |
| | . | Dallas, Texas 75242 |
| | . | |
| Debtor. | . | Wednesday, April 26, 2023 |
| . . . . . . . . . . . . . . . | . | 9:42 A.M. |

TRANSCRIPT OF CONTINUED HEARING ON
EXPEDITED MOTION FOR 2004 EXAMINATION OF MBG HOLDINGS, INC.
F/K/A AMERICAN METALS RECOVERY AND RECYCLING, INC.
FILED BY TRUSTEE SCOTT M. SEIDEL (234)

**BEFORE THE HONORABLE MICHELLE V. LARSON**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES ON NEXT PAGE.

Audio Operator:     Caitlynne Smith

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail:  DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

APPEARANCES:

For the Trustee:          Munsch Hardt Kopf & Harr PC
                          BY:  THOMAS DANIEL BERGHMAN, ESQUIRE
                               DAVOR RUKAVINA, ESQUIRE
                          500 North Akard Street, Suite 3800
                          Dallas, Texas 75201

                          Seidel Law Firm
                          BY:  SCOTT M. SEIDEL, ESQUIRE
                          6505 West Park Boulevard, Suite 306
                          Plano, Texas 75093


For MBG Holdings Inc. Okin Adams Bartlett Curry LLP
f/k/a American Metals BY:  MATTHEW OKIN, ESQUIRE
Recovery and          1113 East Vine Street, Suite 240
Recycling Inc.:       Houston, Texas 77002


APPEARANCES VIA WEBEX:

For MBG Holdings Inc. Okin Adams Bartlett Curry LLP
f/k/a American Metals BY:  JAMES W. BARTLETT, JR., ESQUIRE
Recovery and          1113 East Vine Street, Suite 240
Recycling Inc.:       Houston, Texas 77002


For FedEx Supply      Butler Snow LLP
Chain Logistics and   BY: ADAM M. LANGLEY, ESQUIRE
Electronics, Inc.     2911 Turtle Creek Boulevard, Suite 1400
                      Dallas, Texas 75219


For UMB Bank as       Hunton Andrews Kurth LLP
Indentured Trustee    BY: PHILIP MICHAEL GUFFY, ESQUIRE
and the Majority      600 Travis Street, Suite 4200
Noteholder Group:     Houston, Texas 77002

                      Hunton Andrews Kurth LLP
                      BY:  BRIAN M. CLARK, ESQUIRE
                      200 Park Avenue
                      New York, New York 10166

3

APPEARANCES (CONTINUED):

For John Goodman:        Haynes and Boone LLP
                         BY:  JAROM YATES, ESQUIRE
                         2323 Victory Avenue, Suite 700
                         Dallas, Texas 75219

For ARRIS Solutions,     DLA Piper, LLP
Inc.:                    BY:  RYAN SULLIVAN, ESQUIRE
                         303 Colorado Street, Suite 3000
                         Austin, Texas 78701

4

# **I N D E X**

Page

Expedited Motion for 2004 examination of
MBG Holdings Inc. f/k/a American Metals Recovery and
Recycling Inc. Filed by Trustee Scott M. Seidel

**Court's Ruling - Granted**                    118

<u>WITNESSES</u>:

<u>FOR THE TRUSTEE</u>:

JOHN GOODMAN

  Direct Examination by Mr. Rukavina             57
  Cross-Examination by Mr. Okin                  65
  Cross-Examination by Mr. Langley               67

SCOTT SEIDEL

  Direct Examination by Mr. Rukavina             69
  Cross-Examination by Mr. Okin                  90
  Cross-Examination by Mr. Langley              102
  Redirect Examination by Mr. Rukavina          107
  Recross-Examination by Mr. Okin               110

<u>EXHIBITS</u>:                                  <u>ID</u>   <u>EVD</u>

<u>FOR THE TRUSTEE</u>:

A through G                                  115   115

J through M                                  115   115

**WWW.LIBERTYTRANSCRIPTS.COM**

5

1      (Proceedings commenced at 9:34 a.m.)

2            THE COURT:  Good morning.  Give me one second to log

3   on.

4            All righty.  while my system is coming up, I'll go

5   ahead and call the only matter we have on our 9:30 docket

6   today, which is Case Number 22-31641, Goodman Networks, Inc.

7   and Goodman Networks.

8            I'll take appearances for the record, and I'll start

9   with those in the courtroom.

10           MR. RUKAVINA:  Good morning, Your Honor.

11           Davor Rukavina and Thomas Berghman, counsel for Scott

12   Seidel who is the Trustee.  Mr. Seidel is also present.

13           THE COURT:  Good morning.

14           MS. OKIN:  Good morning, Your Honor.

15           Matthew Okin of Okin Adams, O-K-I-N, on behalf of MBG

16   Holdings, Inc.

17           THE COURT:  Good morning.

18           Okay.  I don't have any -- give me a moment, my

19   downstream doesn't seem to be working.

20       (Pause)

21           THE COURT:  Okay.  Let me take a brief recess, and

22   we'll see if IT can get my downstream working.

23           THE CLERK:  All rise.

24       (Recess at 9:44 a.m./Reconvened at 9:46 a.m.)

25           THE CLERK:  All rise.

1          THE COURT:  Please be seated.

2          All righty.  We'll go back on the record in Case

3  Number 22-31641, Goodman Networks.  I apologize for the delay.

4          I'll go ahead and complete appearances, taking

5  appearances from WebEx.

6          MR. LANGLEY:  Good morning, Your Honor.

7          Adam Langley with Butler Snow on behalf of FedEx

8  Supply Chain Logistics and Electronics, Inc.

9          THE COURT:  Good morning, Mr. Langley.

10          MR. LANGLEY:  Thank you.

11          THE COURT:  Always a mouthful.

12          MR. GUFFY:  Good morning, Your Honor.

13          Good morning, Your Honor.  Philip Guffy from Hunton

14  Andrews Kurth on behalf of UMB Bank as Indentured Trustee and

15  the Majority Noteholder Group.  Also joining me on the line is

16  my colleague, Brian Clark.

17          THE COURT:  Good morning to you both.

18          MR. SULLIVAN:  Ryan Sullivan on behalf of ARRIS.

19  Nice and easy, just ARRIS.

20          MR. YATES:  Your Honor, Jarom Yates on behalf of John

21  Goodman.  And, Your Honor, John Goodman is also on the video.

22          THE COURT:  Yes, thank you very much, Mr. Yates.

23          Is there anyone else who wishes to make an appearance

24  this morning?

25          (No audible response)

1          THE COURT:  All righty.  Okay.  Again, I apologize

2    for the stop and start there this morning.

3          I have had an opportunity to review all the pleadings

4    including the objection that was filed by MBG yesterday as well

5    as the reply that was filed by the Trustee yesterday evening.

6    And so with that, I'm ready when you are.

7          MR. RUKAVINA:  Thank you, Your Honor.  I'll try not

8    to be long-winded, but since the theme today seems to be

9    unreasonableness, I think it behooves all of us to understand

10   certain of the background facts.

11         So in about December 2021, the debtor had or asserted

12   to have almost $60 million cash, 6-0.  By that time, Mr.

13   Frinzi, the debtor's CEO, knew that the debtor was going to

14   lose its biggest contract for non-renewal.  In other words, the

15   debtor was going to lose most of its business revenue.  So what

16   to do with this some $60 million that's in the bank?  Do they

17   pay down their creditors?  Do they pay FedEx?  Do they pay the

18   senior bondholders?

19         What they decide to do, what Mr. Frinzi does is he

20   loans, has the debtor loan $44 million to what we've all called

21   AMRR.  It's MBG.  I'm going to call it AMRR because, Your

22   Honor, that's how I've called it for the last few months.

23         So what we have, Your Honor, is we have our CEO

24   loaning $44 million to AMRR that he is the CEO of, as well.

25   Insider transaction when the debtor is insolvent.  Now Mr.

1  Frinzi says that our director, Mr. James Goodman knew about

2  this and authorized it.  James Goodman says, no, he never did.

3  We're not here to decide what's right, what's wrong.  The

4  Trustee takes no position on that.  But we have an insider

5  transaction of $44 million.

6          At about the same time -- oh, and, Your Honor, AMRR

7  which is a sale, public sale, uses that money to acquire actual

8  business assets of an entity called Onepath.  So AMRR uses most

9  but not all of that $44 million to acquire these assets.  How

10 does Mr. Frinzi acquire the majority stake, the majority

11 ownership of AMRR?  It appears, although the details are murky,

12 that another $4.5 million is loaned, and again, now I'm using

13 quotation marks, is loaned by the debtor to an entity

14 controlled by Mr. Frinzi that he's the sole member of,

15 Multiband Global.  We can talk about it later one, but it's

16 another entity.

17         Now there's no promissory note, so we're not sure

18 whether this is a loan or not.  Details are murky, but we see

19 the wire going out.  In any event, with the debtor's money, Mr.

20 Frinzi ends up as the majority owner of AMRR which with the

21 debtor's money purchases these assets Onepath.  On that

22 promissory note, not a single payment has been made.

23         There was a $700,000 payment made last year for

24 probably a forbearance.  We're not sure.  It was never papered

25 up.  But there was never a monthly payment made.  On the

9

1  separate transaction, the $4.5 million one, there was never a

2  payment made.  So that's the background here, Your Hon.or

3        When we talk about promissory notes, obviously, we're

4  also talking about other claims and causes of action, most

5  obviously for breach of fiduciary duty by the directors and

6  officers.  You're going to hear some evidence and testimony

7  today regarding whether the debtor or its wholly-owned

8  subsidiary owns this promissory note.

9        The wholly-owned subsidiary, pardon me, Your Honor,

10 is not in bankruptcy.  Mr. Seidel is the sole shareholder.  It

11 is GNET ATC, LLC.  That's the sub.  It is the Trustee's

12 position, although again we're not here to try that today, that

13 the debtor owns this promissory note and related security

14 agreement because there is no such entity as GNET ATC Inc which

15 is the payee on the promissory note.  So some sort of

16 reformation is required.  The 44 million float directly from

17 the debtor's bank account to AMRR.  And, Your Honor, we have

18 that bank statement today.

19       Mr. Frinzi signed a contract shortly thereafter

20 wherein he represented that the debtor owned this promissory

21 note, and there is no agreement between the debtor and its

22 subsidiary reflecting this transaction.  Again, we're not here

23 to resolve that today, but suffice it to say that that is an

24 issue that will have to be resolved and it's an issue that

25 merits an investigation of its own.

1    Another transaction you're going to hear about, Your

2  Honor, that is related to this involves an entity called 18920.

3  The details are murky, but somehow 18920 purportedly ended up

4  owning half of this note.  It appears that Mr. James Goodman,

5  and it may not be him directly, it may be entities affiliated

6  with him, he owned certain stock in the debtor which he

7  believed had a redemption right.  In other words, that the

8  debtor could be forced to pay money to redeem the stock.  There

9  was no such redemption right.

10    In order to facilitate a transaction, Mr. James

11  Goodman, again, or entities controlled by him, sold his stock

12  to 18920.  18920 made a redemption demand and in round numbers

13  $16 million on top of the 50 I've already mentioned left the

14  debtor.  This is February 2022.  18920 got this redemption

15  right and $16 million of which some 14.5 was paid back to James

16  Goodman.

17    But that wasn't enough.  That wasn't enough to pay

18  off the redemption, so they did a purported settlement

19  agreement by which to pay the balance of the redemption.  They

20  transferred half of the interest in this note as well as the

21  license agreement, certain IP and certain other things.  That

22  all merits an investigation.

23    So right now, it appears that we own half the note,

24  although I don't think it will be very hard to demonstrate that

25  we owned the whole of the note if and when litigation is

1  enacted.

2          You're going to hear from Mr. John Goodman today that

3  when John Goodman came on board last Friday as a consultant to

4  try to get the debtor going, he investigated this AMRR

5  transaction, had multiple discussions with Mr. Frinzi.  Mr.

6  Frinzi indicated that he would cooperate, and then Mr. Frinzi

7  went radio silent on him.

8          You're going to hear the same thing from the Trustee.

9  You're going to hear how we met in February with Mr. Frinzi.

10 We were promised cooperation.  We were promised disclosures.

11 We were promised that this was a mutual problem that Mr. Frinzi

12 wanted to resolve and that we just needed an NDA to discuss

13 financial data, even though AMRR is a publicly-traded company.

14         We agreed to an NDA.  Opposing counsel and I sent

15 some forms back.  Ultimately, after delays, AMRR required

16 insertions into an NDA that was not satisfactory or acceptable

17 to the Trustee.  And let's remember, an NDA doesn't obligate

18 AMRR to provide any documents.  You're going to hear from the

19 Trustee that AMRR did not want him to be able to discuss

20 confidential or other matters with any of the Goodmans

21 basically.  Well, how can he do his job if he can't do that?

22         Now we go to early March of this year where we

23 thought we had good news, AMRR calls us saying that it has the

24 source of funding that it can pay off the note for a reduced

25 price.  Those are settlement negotiations.  We don't have to go

12

1  into that.  What is not going to be a settlement negotiation is

2  that again we meet, we talk about a forbearance agreement, we

3  talk about an NDA, and we agree on two forbearance payments,

4  one of $500,000 by April the 3rd and one of $500,000 shortly

5  thereafter.

6       MR. OKIN:  Your Honor, I really hate to interrupt,

7  but Mr. Rukavina said he wasn't going into settlement

8  negotiations.  There is no signed settlement agreement.  The

9  allegation is that there's a breach of a settlement agreement

10 that might be admissible here, but agreements, negotiations,

11 and preliminary agreements are inadmissible and I don't think

12 it's appropriate to even be talking about them in an opening at

13 this point.

14      MR. RUKAVINA:  You will hear that there was an

15 agreement on the forbearance terms.

16      THE COURT:  That there was an agreement?

17      MR. RUKAVINA:  That there was.  Not --

18      MR. OKIN:  There's no signed document.

19      MR. RUKAVINA:  Because you're going to hear why.

20      THE COURT:  Okay.  Well, I mean I would prefer not to

21 go into the terms of anything that's 408 adjacent.  But I do

22 understand the greater part of the Trustee's argument which is

23 essentially you're explaining to me in narrative terms how we

24 got here.  So that's fine, but I would prefer that we stay

25 clear of settlement negotiations.

1        MR. RUKAVINA:  The point is, Your Honor, that

2   representations were made.  You're going to hear agreements

3   were made not on a full resolution, and you'll see that my

4   document is redacted on that.  And, again, nothing from AMRR.

5        We sent a draft over.  We got an email back that it

6   seemed draconian but that Mr. Frinzi is yet again out of the

7   country and apparently nothing can be done.  April 3rd comes

8   and goes.  Nothing from them, no money, no forbearance

9   agreement, no document.  They're still just saying, you know

10  what, Mr. Seidel, execute the NDA and we'll give you what you

11  want.  Again, that unacceptable NDA --

12       THE COURT:  Ms. Smith, could you mute line that

13  starts with 202, ends in 57?  Thank you.  I appreciate it.

14       Please go ahead.

15       MR. RUKAVINA:  Again, promises and promises.

16       Why an NDA is even required for basic financial

17  information is beyond me.  This is an entity that admits it

18  owes us $44 million.  So you're going to hear from Mr. Seidel

19  and you're going to hear from Mr. Goodman that all that is just

20  a stalling tactic.

21       This is what motivated Mr. Seidel to seek relief from

22  the Court because they're not going to stall an order from this

23  Court.  The Court can protect them.  The Court can decide

24  what's reasonable.  But unless they file their own chapter

25  proceeding, they're going to have to comply.

14

1    And for an entity that hasn't paid us a single
2 scheduled payment in over a year on an insider transaction, to
3 withhold from its senior secured creditor non-confidential,
4 non-military secret information is shocking.

5    Fast forward a little bit more, Your Honor, to late
6 March and early April and AMRR doesn't tell this, we find this
7 out on our own by looking at the SEC filings.  The outside
8 auditor resigns, the CFO resigns, two directors resign, and
9 AMRR states to the SEC that it's going to be unable to file its
10 annual numbers for last year.  So not only do we have an entity
11 that hasn't paid us a dime, that couldn't pay or wouldn't pay
12 even $500,000 for a forbearance, but we have one that is --

13    MR. GOODMAN:  I'm sorry.  I lost audio.  Did anybody
14 else lose audio?

15    UNIDENTIFIED SPEAKER:  Yeah, I lost it as well.

16    THE COURT:  Okay, just one moment.  The Court can
17 hear you.  So let me see if we can -- all right.

18    UNIDENTIFIED SPEAKER:  Your Honor, I lost it too, but
19 it's back now.

20    THE COURT:  Yes, thank you very much.  The good news
21 is we have folks that -- from the court staff and they tell us
22 that we have it again.  Let's make sure we have audio from your
23 mic.

24    MR. RUKAVINA:  Can you hear me, Jim?

25    MR. BARTLETT:  Yes, we can hear you.

1              THE COURT:  Okay.  Excellent.

2              MR. GOODMAN:  Yeah, so can I.  Thank you.

3              MR. RUKAVINA:  Okay.  So --

4              THE COURT:  All right.  The gremlins have moved one

5    step to the left.  All righty.

6              MR. RUKAVINA:  So, Your Honor, again, not only do we

7    have repeated what we believe are defaults and failures to

8    cooperate, we have what seems like a melting ice cube from SEC

9    filings.

10             May I approach real quick?

11             THE COURT:  Please.  Thank you very much.

12             MR. RUKAVINA:  And, Your Honor, if you look at

13   Exhibit K, this is an SEC filing.  The last page of Exhibit K.

14             THE COURT:  Mr. Okin, I assume you have the exhibits,

15   as well?

16             MR. OKIN:  I do, Your Honor.

17             THE COURT:  Okay, thank you.

18             MR. RUKAVINA:  Is Your Honor there?

19             THE COURT:  Yes, I am.

20             MR. RUKAVINA:  These are the whispers of fragments of

21   information that we have.  According to this, in fiscal last

22   year, AMRR lost $8-1/2 million.  What is of particular interest

23   are three things on here.  There's a line item, Gain On Sale Of

24   Assets $1,020,000.  So they sold something and didn't pay us?

25   It's our collateral.

1        The next line item says, Interest Expense 4,459,000.

2    I'm sorry, who are you paying interest to?  You're not paying

3    it to us.  This is of particular concern, Your Honor, because

4    AMRR has a subsidiary called AMRR Resources, LLC, that has UCCs

5    filed against it but not by us.  It appears that we have a lien

6    against the equity of AMRR Resources.  And it appears that that

7    equity is worthless.

8        And the third thing of interest on here is that the

9    selling and G&E expenses exceed the gross profit by several

10   million dollars.  And I don't know if Your Honor looks at

11   Instagram, but we do and what we see is Mr. Frinzi in Europe on

12   a private jet being wined and dined and wining and dining

13   people on a daily basis, fiddling while Rome Burns.

14       So we're out of time.  The Trustee needs to know his

15   options.  That's exactly what Rule 2004 exists for, and I can

16   discuss the legalistics and the subpoena issues at closing.

17       THE COURT:  Thank you very much, Mr. Rukavina.

18       Mr. Okin?

19       MR. OKIN:  Thank you, Your Honor.

20       Thank you for having us this morning.  It's good to

21   be back in Dallas, Your Honor.  I haven't been here in quite a

22   while.

23       THE COURT:  Excellent.

24       MR. OKIN:  So, Your Honor, I'd like to start really

25   first by just addressing what Mr. Rukavina started with and

1  where I thought ultimately this motion ought to be before we

2  started getting pleadings such as the brief filed last night

3  and the exhibits or some of the exhibits for today's hearing

4  which is that this is about whether or not a 2004 exam with

5  regard to the finances of AMRR is appropriate in this Court.

6        It's not about the lengthy transaction history that

7  Mr. Rukavina just went through for the Court.  Quite frankly,

8  it's not about Mr. Frinzi's conduct, although he is the CEO of

9  AMRR and he is a member of the board.  He's not the 100-percent

10 owner of AMRR, and he's not the sole board member of AMRR.

11        So to impute automatically every theoretical or

12 imagined bad act by Mr. Frinzi to AMRR, while inappropriate,

13 really is irrelevant.  From the Trustee's own motion in

14 Paragraph 5, they basically start out by saying and I'll just

15 read it quickly, Your Honor: "The facts of what happened with

16 respect to MBG" -- which is AMRR -- "are unknown and heavily

17 disputed.  It is not necessary to decide those facts at this

18 time, and the Trustee does not intend to invite or permit the

19 transformation of a routine motion for examination into a

20 vehicle to interject all kinds of allegations and facts as to

21 what happened."

22        And then at the end, "For purposes of the motion, all

23 that the court needs to know is the simple fact that MBG is

24 obligated on a presumed first-priority note of $44 million and

25 that the Trustee needs to understand how to monetize that

1  right."

2          Most everything in that brief last night goes way

3  beyond that.  And if I had time, I probably would have

4  considered just filing a motion to strike that pleading.  What

5  the reply itself fails to even acknowledge, Your Honor, is that

6  -- although actually it does mention that there was prior

7  discovery and that AMRR did participate previously in this

8  Court.  We participated in opposing some prior discovery.  The

9  Court eventually ordered that that discovery be conducted.

10          Mr. Frinzi was deposed.  He was deposed by most of

11 the parties that are on at this hearing.  And these topics were

12 explored.  That doesn't mean there isn't further discovery

13 probably that needs to be done with regard to what happened at

14 Goodman Networks.  But the requested documents in the proposed

15 2004 examination don't have anything to do with that.  They

16 have to do entirely with the assets and the operations of AMRR

17 and its two subsidiaries.

18          THE COURT:  Right.  And when Mr. Frinzi was deposed,

19 can I assume that he was -- was he deposed as the former

20 officer of the debtors or was he deposed in his role as the

21 current CEO of AMRR?

22          MR. OKIN:  He was individually subpoenaed I believe,

23 Your Honor.

24          THE COURT:  Okay.  Okay.

25          MR. OKIN:  The company did attend the deposition.  My

1  partner, Mr. Bartlett did attend it.  But I don't know, quite

2  frankly, I wasn't a part of it so I couldn't say for certain

3  whether that distinction was even made.  He was --

4          THE COURT:  Okay.

5          MR. OKIN:  -- he was in his role at AMRR at the time,

6  but most of the questioning did revolve around the events while

7  he was --

8          THE COURT:  While he was debtor.

9          MR. OKIN:  -- either right at Goodman Networks or

10 after, immediately after he left.

11         THE COURT:  Okay.

12         MR. OKIN:  And some of the circumstances around the

13 note.

14         THE COURT:  As I would have expected.

15         MR. OKIN:  But there was no --

16         MR. BARTLETT:  Your Honor, this is Jim Bartlett.  May

17 I clarify?

18         MR. OKIN:  That's my partner, Mr. Bartlett, who was

19 at the --

20         THE COURT:  It's your partner?

21         MR. OKIN:  -- deposition.  Yes.

22         THE COURT:  Well, it seemed like friendly fire, but

23 okay.

24         MR. BARTLETT:  No, I mean Mr. Frinzi was presented in

25 both his individual capacity and I believe as corporate

1  representative of AMRR.  That's what I was going to say.

2          THE COURT:  Oh, okay.  Thank you very much.

3          MR. BARTLETT:  At his deposition.

4          MR. OKIN:  So, Your Honor, our issue here is not that

5  we don't want to allow Mr. Seidel the opportunity to understand

6  the finances of AMRR.  Our problem is that what's happening

7  here is the Trustee and his counsel are using their own

8  bankruptcy really as a sword for overarching discovery against

9  a non-debtor.

10         We're not in bankruptcy.  We're not a party to this

11 bankruptcy.  We have not filed a proof of claim in this

12 bankruptcy.  Our only appearances in this bankruptcy court have

13 been with regard to discovery requested from us.  We did file a

14 notice of appearance so we could track what's happening here,

15 but we have never asked this Court for relief in this case.

16 And we are not seeking anything from the debtor at this time.

17         So to pull the company in so thoroughly where this

18 Court would then be put essentially as the referee over how

19 much disclosure and the depth of disclosure and the details of

20 not just AMRR but its two subsidiaries, books, records, and

21 details, and we can go through some of these requests.  They go

22 far beyond just give me your current financial statements and

23 some --

24         THE COURT:  And we will.  I guess my question for

25 you, Mr. Okin, and appreciating and respecting the separateness

1  of the entities, I guess the question is if a 2004 is not to be

2  used by a Trustee to investigate its primary asset other than

3  litigation, then what else would 2004 be used for?

4          I mean you're certainly separate companies.  You're

5  certainly a third party to the proceeding.  But you represent

6  the holder of the note that is essentially the primary asset,

7  as the Trustee has explained it, of this estate.

8          MR. OKIN:  Your Honor, understood, and I think if we

9  were talking about a piece of real estate and all that was

10 needed was an appraisal or all that was needed was the pro

11 forma --

12         THE COURT:  Sure.

13         MR. OKIN:  -- financials for the next year for the

14 operation of a business on that real estate, then perhaps the

15 line is -- you know, perhaps that is appropriate investigation

16 by the Trustee.  But we're a public company; 23 percent of this

17 company I believe is the number is owned by unrelated

18 individuals to Mr. Frinzi as far as I know.  And --

19         UNIDENTIFIED SPEAKER:  Your Honor, I think we've lost

20 audio again online.

21         THE COURT:  I am so sorry.  Let's -- and I certainly

22 apologize, Mr. Okin.  I can't believe this is happening.

23         Let's take a brief recess because obviously we just

24 waited for it to fix itself last time.  Let's take a brief

25 recess again and see if IT can figure out why this is

22

1   happening.  I apologize.

2           MR. OKIN:  Sure, Your Honor.

3           THE COURT:  I'm so sorry.

4           MR. OKIN:  No problem, Your Honor.  Thank you.

5           THE CLERK:  All rise.

6       (Recess at 10:11 a.m./Reconvened at 10:21 a.m.)

7           THE CLERK:  All rise.

8           THE COURT:  Please be seated.  We'll go back on the

9   record in Case Number 22-31641.  Again, I can't apologize

10  enough, especially to you, Mr. Okin, to interrupt the flow of

11  your presentation.

12          MR. OKIN:  It's all right, Your Honor.  It's always

13  nice to have a few minutes to --

14          THE COURT:  Exactly.

15          MR. OKIN:  -- get yourself back on your notes.

16          MR. GUFFY  Pardon the interruption, but if you can

17  hear us, we do not have audio on WebEx.

18          THE COURT:  Just one moment.

19          MR. GUFFY:  Now we have it.

20          THE COURT:  Okay.  Thank you very much, Mr. Guffy.

21          I tell you what, this is -- we're just going to have

22  to start checking in every few minutes.  Thank you, Mr. Guffy,

23  for letting us know.

24          All righty.  So we haven't done anything yet.  We

25  just have gone back on the record.  So Mr. Okin?

23

1          MR. OKIN:  Your Honor, so when we broke, we were

2    talking about the issue, you raised the issue of wouldn't --

3    shouldn't the Trustee be able to do something to investigate

4    his assets.

5          THE COURT:  Sure.

6          MR. OKIN:  And 2004 obviously is a very broad

7    provision.  But it does still require that the investigation be

8    into the assets of the debtor or the administration of the

9    estate.  And the case law we cited in our objection does point

10   out some of the cases that are out there.  There are limits and

11   there are -- one of my favorites was that it's a fishing

12   expedition but you still have a catch limit.

13         There is still some point where the line has to be

14   drawn on whether you are pushing yourself beyond just trying to

15   understand what assets the Trustee owns and really getting

16   yourself into the business affairs of another entity.  And this

17   2004 exam, Your Honor, cross that line.  And it crosses that

18   line both in the scope of the request and it crosses the line

19   because as you alluded to a little earlier, of some of the

20   technical problems with what the Trustee is doing here.

21         And without beating a dead horse, I'll just run down

22   some of those points, and that's that, first, the security

23   agreement itself doesn't entitle the Trustee to any of these

24   documents.  Admittedly, it's a fairly poorly fleshed-out

25   security agreement in terms of rights of the lender.  But

1  normally, you would have reporting requirements, you would have

2  the obligation to provide financial documents to the lender.

3  That's not in the security agreement.  So there is no written

4  legal right to these documents.

5          I'm not up here telling the Court that because of

6  that, we have to tell them nothing and they get to know nothing

7  about the business's finances.  But as a contractual

8  obligation, it's just not there.

9          THE COURT:  Right.

10          MR. OKIN:  As a contractual obligation, it's also

11  limited to who would even have it.  And that's a little bit of

12  what Mr. Rukavina talked about which is that there is this --

13  it's essentially a four-step process.  Goodman Networks has a

14  wholly-owned subsidiary, GNET.  It's an LLC.  In the note, it

15  does admittedly say Inc.; however the UCC-1 filings that are in

16  Mr. Rukavina's exhibits, if you look at them, they're all filed

17  on behalf of GNET, LLC.  Most of the documentation after those

18  documents were drafted show LLC, and I don't believe -- there

19  is no Inc. entity, so it seems pretty clear that it is the LLC,

20  the wholly-owned subsidiary.  So it's not the debtor, it's not

21  the debtor's assets.  It's an asset of the debtor's assets.

22          In addition, GNET has a security interest in the

23  assets of AMRR, which is a holding company.  And originally, it

24  was essentially a SPAC.  It was a shell company looking for a

25  business to purchase when this note and security agreement were

1  not.  And that's important because the security agreement

2  itself grants a lien in all of the assets of AMRR.  It

3  specifically in a parenthetical excludes the securities

4  purchased after the execution of this document in the ordinary

5  course of AMRR's business.

6       Now we're not here to litigate that issue today, as

7  well.  At a minimum, that is a very large factual issue as to

8  what that means.  It's also probably a legal issue.  But

9  whether or not that means that because AMRR was -- business at

10 the time was to go out and purchase other businesses, whether

11 that parenthetical makes this or prevents this security

12 interest from actually reaching the equity interest in the

13 subsidiaries.

14      And, again, we're not going to litigate that today,

15 Your Honor.  But the point is it's not an absolute certainty

16 that the Trustee even has a lien on the subsidiaries, but it's

17 also -- it's not a lien in the subsidiaries' assets or any of

18 their operations.  It's a lien at a minimum or at a maximum,

19 excuse me, it's a lien on the equity interest in those

20 subsidiaries.  And there's two of them.  They are the sole

21 operating assets of AMRR.

22      And when the Trustee asks for financial information,

23 that's what he wants, that's what he would want, and that's

24 what anybody evaluating AMRR's business would want because

25 that's where the business is.  I don't know what assets the

1  holding company actually has.  But other than those interests,

2  it's probably very little.

3         So we've got this -- we've got to go drop down to

4  GNET, go across to AMRR, and then drop down to the subsidiaries

5  to get to the actual operations that he's seeking discovery on.

6  And we're doing that in the 2004 exam being conducted in a

7  bankruptcy that none of those entities have any involvement in

8  or any contractual obligation to provide the information in.

9  And that's --

10        THE COURT:  Is the debtor the sole member of GNET,

11  the LLC?

12        MR. OKIN:  I believe it is, Your Honor.  And

13  everybody -- I have not investigated that.  Everybody keeps

14  calling it a wholly-owned subsidiary, and we don't have any

15  basis to --

16        THE COURT:  Okay.

17        MR. OKIN:  -- dispute that --

18        THE COURT:  Okay.

19        MR. OKIN:  -- as far as I know.  But as I mentioned,

20  Mr. Frinzi is not the sole owner of AMRR and that is the other

21  point that is sort of the next point in this which is that AMRR

22  is a public company.  It's traded OTC.  It files reports.  We

23  saw one of them when Trustee's counsel was talking.

24        So that means that the information we provide to

25  anybody that's not yet publicly available is problematic.  We

1  can't simply just provide -- we have a draft 10-K that's been

2  prepared.  The auditor did resign.  Before they resigned, there

3  was a draft that was done of the 10-K.  I actually offered it

4  to the Trustee multiple times under an appropriate

5  confidentiality agreement.  But that has to be under a

6  confidentiality agreement.  The 10-K hasn't been issued yet.

7  It will be.  It's been delayed.

8          But those types of detailed information can't simply

9  be turned over to the Trustee.  And the added problem, Your

10 Honor, is, as we can see by the attendance at this hearing at

11 least electronically, it's not just Mr. Seidel that wants this

12 information.  FedEx just filed a pleading yesterday claiming

13 essentially that the money that was loaned to AMRR was not the

14 estate's money in the first place and that it's their money.

15 And they joined in the 2004 request.

16          So they want -- whatever this Court orders us to

17 produce, they're going to want those documents, as well.  It's

18 not on the docket, but the bondholders counsel, or U.S. Bank

19 [sic] contacted us, wanted informally --

20          THE COURT:  UMB?

21          MR. OKIN:  -- to be copied on the same discovery.

22          THE COURT:  When you said U.S. Bank --

23          MR. OKIN:  I'm sorry, not U.S. Bank.

24          THE COURT:  UMB, Mr. Guffy's --

25          MR. OKIN:  Yes, Mr. Guffy's client.

1          THE COURT:  -- and Mr. Clark's clients?

2          MR. OKIN:  Yes, Your Honor.

3          THE COURT:  Okay, thank you.

4          MR. OKIN:  UMB.

5          So they've asked for the documents.  As you heard Mr.

6 Rukavina mention earlier, one of the tripping points on the NDA

7 that we had proposed was that we specifically did not want to

8 allow Mr. Goodman access to that information.  Mr. Goodman's

9 not an employee of the debtor at this point.

10          My understanding is that there's some loose

11 consulting arrangement.  I haven't looked into the details but

12 when I asked about it, I was told that under a settlement

13 agreement, he has an obligation to continue to cooperate with

14 the Trustee.  But he's a third party to the lending

15 relationship at this point and would not be somebody that we

16 would be comfortable sharing non-public information with at

17 all.

18          So once we open this pandora's box of this Court has

19 an interest in seeing documents produced to the Trustee and

20 allowing the Trustee to conduct this investigation and managing

21 this process, now all this information is not just going to the

22 Trustee and perhaps a financial advisor to help him just

23 understand his investment, now it's going to the creditors and

24 other parties in interest and we're going to lose control of

25 the information that, quite frankly, we're legally obligated

1  not to share with third parties when it's not publicly

2  available to market.

3        So there again, there are a lot of reasons to draw

4  this line.  Each one individually may no on its own be King's

5  X, it shouldn't be produced.  But ultimately, the point, Your

6  Honor, is while all of us who do bankruptcy, we see a request

7  like this and this is the type of request that a secured lender

8  would give to a debtor on the first day of a case or before,

9  what a creditors' committee would ask a debtor for in order to

10 evaluate the debtor's business affairs and operations.

11       And, quite frankly, I'm sure this list probably

12 started somewhere on Munsch Hardt from one of those lists.  I

13 probably have one very much like it in my files.  But we're not

14 a debtor in bankruptcy.  We're a third party to this

15 bankruptcy.

16       Now after saying all that, Your Honor, obviously we

17 are willing to cooperate.  And we can go through and we have an

18 exhibit of some of the emails back and forth between us and the

19 Trustee's counsel.  We can argue he said/she said about who

20 didn't do what they said to somebody else.  I'd like to put,

21 quite frankly, Your Honor, the forbearance negotiation to the

22 side because whether or not somebody thinks they had an

23 agreement, a binding agreement for a forbearance or how that

24 negotiation went, quite frankly, I just think that's improper

25 here, it's by the rules irrelevant, and really doesn't --

1   should not factor in.  We're just really talking about have the

2   parties cooperated in discovery.  And we've repeatedly said to

3   the Trustee that we will cooperate voluntarily and provide

4   reasonable financial information to the Trustee on a voluntary

5   basis.  They told us they were planning on retaining William

6   Synder at CR3 to be their financial adviser.

7            THE COURT:  I saw that.

8            MR. OKIN:  I don't know if that's actually happened.

9            THE COURT:  I saw it in the pleadings.

10           MR. OKIN:  But we've offered to once we have some

11  sort of confidentiality agreement in place to allow our

12  financial advisers to communicate directly with CR3 to

13  essentially provide information about our operations.  We're

14  not trying to hide our finances.  We're just trying to avoid

15  the overarching discovery objections that the Trustee is trying

16  to impose upon us and everything that comes with that by doing

17  that in essentially a foreign court to us.

18           So I believe there is a solution that can be had, but

19  I think that solution really has to be cooperative and has to

20  be as much voluntary as possible.  If you just look -- and Your

21  Honor I assume will ask me at some point why can't we just

22  agree to produce the documents under an order and you can limit

23  it and nobody else can have them or we can make them very

24  professional eyes only or things of that nature.

25           THE COURT:  There seems to be a process by which this

1    occurs all the time.

2           MR. OKIN:  There is, Your Honor.

3           Ultimately, our objection is to the need to have this

4    Court do that, just the cost and expense of doing that.

5    Obviously, no offense to the Court and --

6           THE COURT:  Fair enough.

7           MR. OKIN:  But we would prefer that it not be a

8    court-supervised process in a court that it's not the court we

9    chose, it's not our choice to be here.  If it were even to be a

10   court-supervised process, we still think that there needs to be

11   some more limiting procedure here, that these requests need to

12   be scaled way back, that many of the requests that ask for all

13   documents on X, that what they should be is what we would do

14   voluntarily which is documents sufficient to show the current

15   financial status, documents sufficient to show the current

16   governance of AMRR, more sufficient to show rather than every

17   and all document from one day to another date and putting the

18   burden on us that we have to keep producing and do privilege

19   reviews of every document that could or couldn't be responsive.

20          And then there are some that, quite frankly, and we

21   could talk the specifics if you want, Your Honor, but without

22   -- getting us down the path of, okay now, how are we going to

23   do this in this Court because our preference still would be not

24   to.

25          I do think the last piece is important which is that

1  I believe that Rule 9016 still does apply here, that it's made

2  explicitly applicable by Rule 2004.  We're here really, we

3  didn't call it a special appearance, and I don't really want to

4  get into the debate of personal jurisdiction or not.  We're not

5  trying to say that this Court could never acquire jurisdiction

6  over AMRR.  We're a Texas company.

7          But our point really is that we still believe that

8  the proper procedure if the Court does decide to enter an order

9  requiring an examination would be for us to be served with a

10  subpoena with the request attached to it and for us to have the

11  appropriate amount of time to then respond to those requests

12  with objections and claims of privilege.

13          And then if the Trustee has issue, we would then I

14  suppose be dragged back into this Court which is what we're

15  trying to avoid.  But at least we would have those protections.

16          THE COURT:  Well, and I think that that's my issue,

17  Mr. Okin.  I do understand your 9016 argument.  It is plain.

18  It's in 2004(c), and we can talk further about that with

19  respect to legal argument.  But I guess the question is we can

20  certainly argue back and forth whether the Trustee should have

21  just gone the subpoena route straight away with the 2004

22  motion.

23          If I were making little knits on my wall, I would

24  probably say the majority of folks do it the way Mr. Rukavina

25  did it and just file a motion.  But I grant you I've read

33

1  <u>Correa</u> (phonetic), I've read the pleadings, and more important

2  than all that, I've read 2004(c).  So I recognize that a

3  subpoena is probably the way to go.

4         With that said, setting up a fight for another day,

5  we're here.  So if there are arguments to be made, and I

6  appreciate your arguments, I appreciate that we're Goodman to

7  GNET to AMRR and then there's subs underneath that we haven't

8  even named.  But I also know that, I mean 2004 is in the rules,

9  it has some teeth.  And it's used every day by Trustees.

10        And I am hard pressed to fathom if it's not going to

11 be used in a context like this, okay, where you had a human

12 being running the debtor at one point who did a transaction

13 with another entity that he was at the helm of, ownership

14 aside, okay, essentially did another deal somewhere where he

15 was at the helm of, okay, and to say that the Trustee -- and I

16 get it, it's one above, but that entity is the sole manager of

17 the sub.

18        How else but a 2004 would you do it?  I mean do you

19 need new litigation?  Do you need them to sue you on it?

20        MR. OKIN:  Your Honor, that would be one way for them

21 to do it.  I'm not asking that they sue us.  We're willing to

22 cooperate and actually provide the information.  But it is

23 notable the Trustee could have done that for the last two

24 months and hasn't.  In fact, only declared a default under the

25 note in the last three days.

34

1          THE COURT:  Right.  Well, I mean I think that -- and

2     we could do this a number of ways.  I mean if you want to come

3     back and you want to fight the subpoena, I think we're going to

4     get to the same place is what I'm telling you.

5          MR. OKIN:  I'm not asking to fight the subpoena, Your

6     Honor.

7          THE COURT:  Yeah.

8          MR. OKIN:  If you're inclined --

9          THE COURT:  Yeah.

10          MR. OKIN:  -- and I can read the room, it sounds like

11     you are, to require us to produce some documents.

12          THE COURT:  Right.  Now I am certainly willing to go

13     through the RFPs with you and with the parties and just see.  I

14     mean --

15          MR. OKIN:  Quite frankly, what I would suggest and

16     really what we're saying by our subpoena argument is what we

17     would like is an opportunity to just file or serve written

18     objections and responses with documents to the subpoena.  I'm

19     happy to -- we did a meet and confer.  I thought, quite

20     frankly, the Trustee was going to carve back the request and

21     never did.

22          But if we can agree on an appropriate protective

23     order and we can agree on either a scope of request or I can

24     file objections and if the Trustee doesn't agree with the

25     objections, can seek to compel additional production.  As we

35

 1  said in our pleadings, we have documents pulled.  We have

 2  things ready to produce.  I don't think once there's a

 3  protective order in place that it would take very long at all

 4  for us to produce those documents.

 5        The real issue and what I've been -- the ultimate

 6  point of me even being here, Your Honor, is we don't want to be

 7  subject to these overly broad requests and continual fights

 8  with the Trustee over whether we've produced everything in

 9  those requests.  We just want to be sure we can respond with an

10  objection.  And if the Trustee disagrees with an objection or

11  thinks that we've produced doesn't meet the scope of what he's

12  entitled to and we can't come to an agreement on that, that we

13  would then have to be back here over that issue.

14        THE COURT:  Okay.  And I appreciate that, Mr. Okin.

15  It's like I said, and I did have an opportunity to review the

16  request for production.  I think I can see where the issues lie

17  between the parties of what AMRR may think is a bit overbroad

18  or reaching in terms of the RFPs.  And I'm prepared to discuss

19  those.

20        I do believe on the whole that a 2004 is appropriate.

21  Again, we can do a subpoena and you can file your objections,

22  and nothing begrudges obviously you doing that.  But I don't

23  want to bury the lead.  My intent is to approve a 2004

24  examination, but I'm not beyond putting some limits on that and

25  then hearing you out on whether that should be done pursuant to

1  a protective order.

2          Now I'm going to hear from the other creditors that

3  are on the line.  And one of the issues that I think that we

4  all just need to be practical about is a 2004 is what it is in

5  terms of the statute.  It's not a Trustee or a debtor-only

6  statute.  And so I want to be protective of your rights.

7          And I'm not -- based upon kind of the expedition of

8  the hearing and things like that, I don't know  that I'm

9  necessarily going to allow the creditors to co-op the Trustee's

10  motion, so to speak, and cut off your rights to respond in that

11  way as it pertains to the creditors.  But I do want us to all

12  be considerate of the fact of 2004 says on the motion of any

13  party in interest.

14          MR. OKIN:  Your Honor, and that really was the --

15          THE COURT:  Yeah.

16          MR. OKIN:  -- point, which is if you look at -- and

17  you're going to hear from FedEx's lawyer --

18          THE COURT:  Sure.

19          MR. OKIN:  -- next, I presume.  But if you look at

20  their joinder, they're claiming that the money that was loaned

21  to us was not the debtor's in the first place.

22          THE COURT:  Sure.

23          MR. OKIN:  Well, if that's the case, then they have

24  some claim against the debtor.  They may have a claim against

25  us.  I don't want to presume that they do.  But at that point,

1   their discovery over what our assets are or aren't and what our

2   operations look like and the details of our transactions is

3   discovery between two third parties who theoretically have

4   claims against them that maybe doesn't even belong in a

5   bankruptcy court, much less in this specific court.

6           THE COURT:  So it's akin to pre-suit discovery.

7           MR. OKIN:  Essentially, Your Honor.  And that's our

8   problem is if we could discreetly provide information to the

9   Trustee so he can understand what our business works like and

10  he can work with us on a restructuring, we're willing to do

11  that.  But I don't want to turn this into a free-for-all for

12  everybody who thinks they may have a claim against us or

13  anybody else to just get an open-door discovery from us before

14  anybody's asserted a claim.

15          THE COURT:  Okay.  Thank you, Mr. Okin.

16          MR. OKIN:  Thank you, Your Honor.

17          MR. RUKAVINA:  Your Honor, before you go to the other

18  parties, I guess I was going to put on evidence.  It sounds

19  like the Court doesn't necessarily need evidence to dispose of

20  this motion.

21          THE COURT:  Let's put a pin in that, Mr. Rukavina.

22  Let me hear from the other creditors.  I'm not going to stop

23  the Trustee from putting on his evidence.  There's lots of

24  reasons that you put on evidence in a hearing, so I'm not going

25  to stop that.

1          I think the question is whether or not we can get to

2    an agreement.  And if we can't get to an agreement, and Mr.

3    Okin's argument is I can read the room and I know where the

4    Court's going, look, I completely understand that.  But there

5    may still very well be reason that you want to put on your

6    evidence.  So I don't want to just eschew the idea of evidence

7    so far, but I do want to hear from the creditors.

8          And I will start with Mr. Langley.

9          MR. LANGLEY:  Good morning, Your Honor.

10          Adam Langley on behalf of FedEx.  And I'll keep it to

11   FedEx to not butcher it again.  So I apologize for that

12   earlier.

13          But, yes, FedEx has filed a joinder.  It is a limited

14   joinder in the sense that we're not trying to create an

15   document request and really we're not trying to duplicate the

16   examination that the Trustee would have.  We would simply want

17   to participate and supplement that with any additional or any

18   follow-up questioning that might be necessary.

19          I presume -- Mr. Rukavina's done a good job in this

20   case.  I presume he will be sufficient, and we will play a very

21   limited role in that examination other than just participating

22   to the extent we need additional information.

23          I did want to raise the reservation of rights we

24   filed.  And Mr. Rukavina described this case as murky.  I'll

25   put another adjective out there that this is sensitive.  There

1   is an extensive amount of money that transacted under very

2   unusual circumstances in this case.  I don't know right now

3   whether this is going to be a case that enforces a note and

4   security agreement by the debtor.  I don't know if this is

5   going to be a case for a 548 fraudulent transfer of $48

6   million.  Or I don't know if this case is going to be one

7   that's a Texas Civil Theft Act.

8         I think all those things are potentially at play

9   here, and that's why I do think a Rule 2004 examination by the

10  Trustee with FedEx joining is helpful because it will allo the

11  parties to understand the facts, the circumstances, whether

12  assets and property was transferred to AMRR that is still

13  assets and property of the debtor, whether that was FedEx's

14  property, whether that was something subject to a security

15  agreement like it's documented.

16        I don't think we have conclusive evidence right now

17  to be able to assess that, and I think it would be helpful to

18  this estate to be able to understand whether AMRR is holding

19  assets of the debtor, FedEx, its own assets subject to a

20  security agreement, whether those are held by a subsidiary.  I

21  don't think we have that information right now, and that's why

22  I think a Rule 2004 is exactly appropriate.

23        And I would point you, Your Honor, to a case that had

24  very similar facts as this in that there was a lot of money to

25  move through shell companies, and that's In re Enron Corp, 281

40

1  B.R. 836,840.  And it states that Rule 2004 examinations are

2  appropriate for revealing the nature and extent of the

3  bankruptcy estate, and then it goes on, for discovering assets,

4  examining transactions, and determining whether wrongdoing

5  occurred.

6         That's exactly what we're doing here.  We have a

7  situation where there are shell companies.  Their assets have

8  been moved around.  We need to figure out what has gone on.  We

9  need to understand those transactions.  This is not an

10 immaterial issue.  FedEx is owed $81 million; $44 million went

11 directly out of an account from the debtor to AMRR.  And there

12 appear to be very murky and sensitive issues related to how

13 that money left.

14        As far as some of the issues that MBG raised about

15 the breadth and the broadness of this, it's a little concerning

16 to us that on December 31st, 2021, just days before the $44

17 million went into AMRR, they filed a public report that showed

18 that they had $138 of assets.  That's not a rounding.  That's

19 not the zeroes are left off, $138 of assets.  And so the

20 question that I think naturally follows that is this $44

21 million that was inputted by Goodman Networks was the sole

22 material asset of this estate and is the -- we believe the sole

23 funding source for all the operations of AMRR and its

24 subsidiaries.

25        So the extent that there is, for example, a

41

fraudulent transfer, those subsidiaries may be the ultimate
recipient of that fraudulent transfer.  And that's something
that I think needs to be examined here with AMRR and something
that should be able to come out in a general and very targeted
Rule 2004 examination.

        And so with that, we support the Trustee's motion.
We reserve our rights as to characterization of the facts and
ask that any findings be very limited here because of the murky
and sensitive nature of the factual issues at play.  And with
that, we would support again the Trustee's motion.

        THE COURT:  Okay, Mr. Langley.  To be clear, you are
asking to participate in that examination, and I use that
broadly to be the deposition of the representative of AMRR.
Are you also asking by your joinder to participate in the
discovery?

        MR. LANGLEY:  Yes, Your Honor.  We're asking to
participate in the examination as the full participant, again,
following up on the Trustee allowing them to lead their own
examination first.

        And then as far as the document requests, we join in
each of the requests that the Trustee has made.  And we would
be happy to participate alongside the Trustee in negotiating
that and, quite frankly, would lean on him to negotiate those.

        THE COURT:  Okay, thank you, Mr. Langley.

        Mr. Guffy, Mr. Clark, anything from UMB and the

42

1  majority noteholders?

2          MR. GUFFY:  Yes, Your Honor.

3          The bondholders should also be included in this

4  discovery, the full examination, and any negotiations that go

5  along with it.  The bondholders through their collateral agent

6  have valid enforceable perfected liens on all the assets of the

7  debtor as well as its subsidiaries.  Whether this note is an

8  asset of the debtor or an asset of GNET, it's still part of our

9  collateral.

10         We also have liens on trademarks that were

11 purportedly transferred to AMRR including the Multiband name

12 itself.  The transfers of the funds and other assets to AMRR

13 are also part and parcel of the series of transactions

14 conducted by the debtor that ended up transferring

15 substantially all of its assets away.  That may give rise to

16 state law successor liability claims, claims under the

17 indenture, claims under the collateral documents.

18         Additionally, prior to the petition date on August

19 26th, 2022, the collateral agent actually sent a notice under

20 UCC Section 9-607 demanding that AMRR account to the collateral

21 agent rather than the debtor or GNET on account of a note that,

22 if you recall, the debtor defaulted on its obligation under the

23 bonds in May, at the end of May of 2022.

24         And as a result of that, the collateral agent is

25 entitled to enforce its rights and its collateral including the

43

1  AMRR note.  That notice was acknowledged by AMRR's general

2  counsel, although no payments were made to the collateral agent

3  just like no payments were made to the debtor.

4          And, additionally, on September 29th, there was a

5  follow-up notice sent by the collateral agent to AMRR informing

6  them that they were under default under the AMRR note as well

7  as their obligations to remit payments to the collateral agent

8  under UCC 9-607.

9          As Mr. Okin mentioned, I did speak with one of his

10 colleagues yesterday.  It was a good discussion.  We said --

11 laid out our position that we think we should be involved with

12 this because of our interest in this asset.  And we're willing

13 to sign on to whatever protective order, whatever makes them

14 feel comfortable.  We've been under an agreed protective order

15 in this case through the discovery that we've been so far.

16          This has been a collective process from the

17 beginning.  We initiated this with the involuntary.  We joined

18 with FedEx; we joined with ARRIS.  We worked with them all

19 through the entry of the order of relief, all through the

20 discovery on the motion to convert.  This should remain a

21 collective process.

22          Ultimately, the creditors are the ones, the parties

23 in interest here.  And we should be -- we should have

24 visibility in this, we should see what the assets of the estate

25 are so we can make our decisions, figure out what claims we may

1  or may not have, is this something that's a security interest,

2  is it a direct claim, is it a fraudulent transfer claim, all

3  the issues that Mr. Langley laid out.

4       The creditors need to be able to see this information

5  so that they can determine how best to enforce their rights as

6  well alongside the Trustee.

7       And, finally, and I think this is a very important

8  point, and Mr. Rukavina alluded to this as well that there has

9  been a pattern in this case not just with AMRR but with the

10  debtor before of promise followed by delay and then the deal

11  falls apart.  And that has been the kind of consistent them

12  from day one with this deal.  Every offer that's been made,

13  whether it's for forbearance or to hire a chief restructuring

14  officer and run a real Chapter 11 process or to purchase bonds

15  or any kind of settlement agreement, and now apparently these

16  proposals that the Trustee has had with AMRR.  It all comes to

17  nothing.

18       And so in light of that, it's critical that the

19  creditors be able to have visibility and be a part of this

20  process so that we know what's going on in this case and we

21  have that transparency.  So we would also ask to be included in

22  whatever 2004 examination takes place, document discovery, in

23  depositions.  And we think that the discovery that the Trustee

24  seeks is appropriate here in this case.

25       Thank you, Your Honor.

45

1              THE COURT:  Thank you, Mr. Guffy.

2              All righty.  Mr. Sullivan, anything on behalf of

3   ARRIS?

4              MR. SULLIVAN:  I second everything that Mr. Langley

5   and Mr. Guffy said.  We'd certainly want to participate in the

6   examination.  I doubt that there would be much for us, ARRIS,

7   to cover beyond what would be covered by the other -- by the

8   Trustee and the other creditors.  But certainly, we'd like to

9   participate.

10             THE COURT:  Okay.  Thank you, Mr. Sullivan.

11             All righty.  Mr. Rukavina?

12             MR. RUKAVINA:  Your Honor, I want to convey to you

13  something that's a little hard to convey.  Everyone on that TV

14  there and on this half of the courtroom is angry.  And I would

15  use a different word if I wasn't in court to describe the level

16  of our anger.

17             THE COURT:  I think I've heard you say the word

18  before.

19             MR. RUKAVINA:  You have, Your Honor.  You have.

20             Forget about the insider nature of the transaction,

21  our CEO transferring $49 million so that he can own all the

22  goodies, forget about the fact that he hasn't paid a dollar in

23  a year.  Forget about all that.

24             But today, we now learn that there are two

25  subsidiaries instead of one.  Today we learn from Mr. Okin that

46

1  it looks like our security agreement doesn't attach to

2  anything.  Today we learn that Mr. Frinzi wired this in such a

3  way that he can go there and sit there and go nana-nana-nana.

4  That's what we learned today.  Can you imagine what more would

5  be learned from an examination?

6          And you know why I'm personally angry, Your Honor?

7  This was a $44 million transaction with a two-page promissory

8  note, not even a right of acceleration.  This is a $44 million

9  transaction with what is a three-page security agreement.  No

10 reporting.  As Mr. Okin said, no right of access.  No nothing,

11 on a $44 million transaction.

12          And I am charged by my client to go get this money,

13 and that's what I have, a one-and-a-half page promissory note.

14 The only reason we have not sued AMRR yet, as tempting and

15 gratifying, as satisfying as it would be, is because we know it

16 would lead to an immediate Chapter 11.  And before we do that,

17 if that is the inevitable result, the Trustee doesn't want to

18 think about revenge.

19          The Trustee wants to think about business resolution.

20 That's why we've met with Mr. Frinzi.  That's why we relied on

21 him for two months, three months just to have that now thrown

22 in our face.  That's why we've met with the gentleman.  That's

23 why we communicated to try to figure out a business resolution.

24          And until today, even when Mr. Okin started -- Mr.

25 Okin's a professional, he's a gentleman.  He comes across as

1   just words of wisdom and responsibility and respect.  He is all

2   that.  His client is not.  That's why I am raising my voice.  I

3   want you to see through Mr. Okin's reputation and to see the

4   facts, because until today, we have had meets and confers.

5   Don't think that we've ignored him.  The answer from AMRR, we

6   will not subject ourselves to coercive court order.

7           For the first time today, it sounds like perhaps

8   that's a possibility subject to protections.  And, of course,

9   they're entitled to certain protections for certain

10  information.  It's been a moving target even today.  And that's

11  what good counsels do.  They read the tea leaves.  They read

12  the courtroom.  But I don't want the Court to think that this

13  veneer of, oh sure, we'll act voluntarily doesn't mean, well,

14  we'll act voluntarily to the extent we want to.

15          They took 49 -- $44 million from us.  This is the

16  cost of poker.  I am prepared to introduce evidence if the

17  Court needs any.  The evidence would go to the delay and

18  stalling tactics.  But if the Court believes the cause is met

19  and if the issue now turns to the scope and protections, then

20  we can avoid that evidence.  But I just don't want the Court to

21  be thinking that somehow everyone on our side, including

22  everyone on that TV monitor, is overreacting here today or

23  picking a fight where none need be fought.

24          So I guess I seek the Court's guidance on whether

25  evidence is beneficial or necessary.  But I believe that the

48

1  Court can make a finding of cause based on -- well, based on

2  the representations and what the Court knows about the case.

3  And we can move the discussion to scope and protections.

4          THE COURT:  Okay.  Thank you, Mr. Rukavina.

5          Mr. Okin, please.

6          MR. OKIN:  Just a couple of quick things, Your Honor.

7          THE COURT:  Please.

8          MR. OKIN:  First, I did want to address Mr. Langley's

9  comments.  I don't believe the 2004 request requests an

10 examination.  I think at this point it's a document request.

11 And as I mentioned earlier, I did want to make sure that the

12 Court appreciated it, there has been a deposition and they -- I

13 understand Mr. Rukavina's passion about the money leaving the

14 company and the circumstances around it.

15         THE COURT:  And I don't want to cut you off, Mr.

16 Okin, but I'm looking at the prayer paragraph in the original

17 expedited motion.  They would like the Court to enter an order

18 granting the motion ordering the examination and ordering MBG

19 to produce responsive documents.

20         So I think that there is a request for both.

21         MR. OKIN:  Well, Your Honor, now that's --

22         THE COURT:  Am I wrong, Mr. Rukavina?

23         MR. RUKAVINA:  Yes, Your Honor.

24         THE COURT:  Okay.

25         MR. RUKAVINA:  That's my port draftsmanship.  No, we

49

1  are not seeking the deposition.

2          THE COURT: Okay.  Thank you.

3          MR. RUKAVINA:  Reserving our rights for that in the

4  future.  We are seeking documents.  I will just point out

5  because I was there and Mr. Okin was not.  Yes, there was a

6  deposition of Frinzi and AMRR.  It did not go into the finances

7  and business operations of AMRR pursuant to I forget, maybe

8  someone can help me, either a protective order or an agreement.

9          THE COURT:  Okay.

10         MR. OKIN:  And I agree with that, Your Honor.

11         THE COURT:  Thank you, Mr. Okin.

12         MR. OKIN:  That was really my point, which is the

13  outrage is centered around how did this transaction come to be.

14  And I wasn't a part -- I haven't been a part of this case.  I

15  can't share in it.  But that's the outrage, and that's what

16  already discovery has already been done about.

17         The Court shouldn't mix those two issues of then the

18  finances of this I believe even the Trustee would acknowledge

19  legitimate business.  I mean regardless of what you think about

20  the transaction that gave rise to the purchase of these assets,

21  it was a purchase from an existing operation, the business

22  still does run and still does operate.  We're not talking about

23  some sham business here.  So they're two separate issues.

24         I think we've already headed down the path of there

25  will be some exam, but what I really wanted to do was rise to

50

1  for some document requests.  When I see exam in that context, I

2  think of just examination for the purposes -- a deposition or

3  written questions to get documents or something of that nature.

4  But I think what I would really urge the Court to do and if our

5  arguments have had any impact, if the Court has at least had

6  any concerns about granting this request, I'd ask you to at

7  least look at how this is done so that this doesn't just become

8  an out-of-control discovery process where AMRR is now

9  essentially just a free-for-all in discovery in this case.

10       If we're to produce a limited set of documents

11 related to our finances to a limited group under a careful

12 protective order, obviously, we'll do as the Court orders.  But

13 if this is the beginning of, okay, now we need more documents,

14 we're going to do another request, and now we want another

15 deposition, now we want to depose other parties related to

16 AMRR's business so we can investigate the rest of their

17 operations, now we're just doing a full-on 341 examination of a

18 non-debtor entity.

19       And so what I don't want to have happen here is the

20 Court's obvious preference for us to produce some documents to

21 become just an open door for and then anything else anybody

22 thinks is necessary, there's no more argument that this is the

23 beyond the scope of 2004, or that we shouldn't be a party to it

24 because we're a third party to this bankruptcy.  We've already

25 given documents, we've already given a deposition, so now

51

1  what's more discovery.

2          So really, what I would like just to urge the court

3  is that this be of limited --

4          THE COURT:  Have we lost --

5          MR. OKIN:  We lost --

6          MR. RUKAVINA:  And I'm sorry.  I think we're frozen

7  --

8          MR. OKIN:  Yeah, he's very still.

9          MR. RUKAVINA:  -- because his fan is not running.

10         UNIDENTIFIED SPEAKER:  His fan is usually moving.

11         THE COURT:  Yeah, they would be more fidgety.

12         MR. OKIN:  I've put people to sleep before, but not

13  like that.

14         THE COURT:  Okay, just one second.  Yes.

15         Oh goodness, what a day.

16         UNIDENTIFIED SPEAKER:  We can hear you over the line.

17         THE COURT:  So you can hear?

18         UNIDENTIFIED SPEAKER:  We did not lose audio if

19  that's the issue.

20         THE COURT:  Okay.  Could you ask IT to return and to

21  not leave?

22         THE CLERK:  Yes, ma'am.

23         THE COURT:  Thank you.

24         All righty.  Given that we're kind of at the argument

25  stage and I understand that the folks on WebEx can hear us,

1  we'll continue and then we'll get some folks to come and help

2  us with the downstreams.  I am so sorry.

3              MR. OKIN:  That's okay, Your Honor.

4              Really I was wrapping up.  Again, going back to Mr.

5  Langley's argument, he mentioned civil theft.  He mentioned

6  548.

7              THE COURT:  Sure.

8              MR. OKIN:  Those are all, again, investigations of

9  the original transaction and what happened.  And I don't think

10  that's even what we're talking about here.  We're talking about

11  the assets and liabilities of AMRR.  So I guess I would submit

12  that I understand, although I somewhat disagree, that the

13  Trustee in this context needs to use 2004 to get some

14  information about our business affairs.  I don't -- I still

15  would ask the Court to limit who actually has access to that

16  information.

17              I don't think every creditor in this estate or

18  especially FedEx who's appears to be a co-competitor for the

19  money and, quite frankly, based on Mr. Guffy's statement in the

20  notice they sent under the UCC, they seem to believe they're

21  entitled to direct payment from us, as well.  I don't think

22  every competitor for the funds is entitled to open books from

23  AMRR just because of the existence of this bankruptcy.

24              And I'd ask the Court to consider that in however you

25  hopefully split the baby a little bit here.

53

1          THE COURT:  And so that I understand AMRR's argument,

2   your client doesn't want to consent to the creditors being

3   involved in the discovery process pursuant to the Trustee's

4   motion?

5          MR. OKIN:  I would -- yes, I would say it two ways,

6   Your Honor.  We don't want to consent to a continued discovery

7   process.  We did want to consent to this.  But if the Court's

8   going to order it, we don't want to consent to anything beyond

9   just this document request --

10         THE COURT:  Okay.

11         MR. OKIN:  -- with it carved back.  And we would ask

12  that the Court limit it to just production to the Trustee.

13         THE COURT:  Just the Trustee, okay.

14         MR. OKIN:  Yes.

15         THE COURT:  And so even pursuant to a protective

16  order, your client objects to production to FedEx and UMB and

17  ARRIS?

18         MR. OKIN:  Yes, Your Honor.

19         THE COURT:  Okay.  All righty.

20         So in terms of evidence, I guess the issue is as

21  follows, Mr. Rukavina.  It's always the Trustee's case to put

22  on.  And I mean I think that at this juncture, the Trustee

23  should put on whatever evidence he believes is necessary to

24  prove up the entitlement to and the scope of the examination,

25  and when we say examination, the discovery that he wants in

54

1  this case, because if not, if the issue obviously, as you know,

2  goes up on appeal, then it will be what evidence did the Court

3  have.

4        MR. RUKAVINA:  Yes, Your Honor.  I was going to call

5  John Goodman.  Let me --

6        THE COURT:  Okay.  So if that's where we're going

7  next, then --

8        MR. RUKAVINA:  Well, let me tell you what I was going

9  to do and then -- so Mr. Goodman filed a declaration yesterday

10  --

11        THE COURT:  Right.

12        MR. RUKAVINA:  -- on Docket 244.

13        THE COURT:  Right.

14        MR. RUKAVINA:  Obviously, he has to be open for

15  cross-examination.  So perhaps, I can call him after Mr.

16  Seidel.

17        THE COURT:  Okay.

18        MR. RUKAVINA:  But would the Court accept the

19  declaration subject to the cross-examination?

20        THE COURT:  Okay.  Any objection to the Court's --

21  essentially the admission of the declaration of John Goodman as

22  -- that would be his direct, I assume?

23        MR. RUKAVINA:  Yes, Your Honor.

24        THE COURT:  Okay.

25        MR. OKIN:  One second, Your Honor.  Let me just --

1           THE COURT:  Take your time.

2           MR. OKIN:  There were some statements in here that I

3   --

4           THE COURT:  Sure, take your time.

5           MR. OKIN:  -- think we had issues with.

6       (Court and Clerk confer briefly)

7           THE COURT:  So for those of you on WebEx, we're going

8   to reset our system.  You just stay put.  And in this time, Mr.

9   Okin is reviewing the declaration.  Thank you.

10      (Pause)

11          MR. OKIN:  Your Honor, I do have issue with it.  The

12  basic facts which they're trying to establish of Mr. Frinzi's

13  position and things of that nature, we would stipulate to.  But

14  really, the bulk of Paragraph 3 of the declaration, the

15  discussion about Mr. Goodman's conversations with Mr. Frinzi

16  about whether there would be a forbearance and his

17  characterizations of the communications I think is irrelevant.

18  Some of it is just speculation.

19          And if he's going to testify about it, I think he

20  needs to just testify and we can -- I can make objections to

21  the specific questions as they come up rather than lawyer-

22  drafted sentences that are a bit compound and compounded and --

23          MR. RUKAVINA:  That's fine, Your Honor.  I don't know

24  if -- I see Mr. John Goodman.

25          THE COURT:  Well, he's still connected.  He may have

1  stepped away for a second, so.  I think that what I -- is there

2  a portion of the declaration that you can agree to as part of

3  direct and just --

4          MR. RUKAVINA:  Your Honor, if we can't enter it, then

5  I would just respectfully submit I can just --

6          THE COURT:  Okay.

7          MR. RUKAVINA:  -- direct him rather than --

8          THE COURT:  You'll just direct him, okay.

9          MR. RUKAVINA: -- have a confusing record.  But if

10 he's not there, I need to know what happened to him.

11         THE COURT:  Well, that's a bigger issue.

12         MR. RUKAVINA:  Yeah.  Mr. Yates is his attorney.

13         MR. YATES:  I believe he may have just stepped away.

14 I don't know.  He may have just stepped away to --

15         THE COURT:  Okay.

16         MR. YATES:  -- to go to the restroom or something

17 because of the technical issue I suspect is the --

18         MR. RUKAVINA:  Then why don't I call Mr. Seidel first

19 so that we don't waste time.

20         THE COURT:  Okay.

21         MR. RUKAVINA:  Your Honor, I'll call Scott Seidel.

22         THE COURT:  Okay.  Mr. Seidel.

23         MR. RUKAVINA:  And, Mr. Yates, if you can make sure

24 that Mr. Goodman will be back, please.

25         THE COURT:  There he is.

Goodman - Direct/Rukavina                              57

1          MR. YATES:  Yeah, he's back.

2          THE COURT:  Right.

3          MR. RUKAVINA:  Oh, okay.  Then I'll call Mr. John

4   Goodman.

5          THE COURT:  Okay.

6          MR. RUKAVINA:  Mr. Goodman, what happened in your

7   absence was that your declaration was objected to, so I'm going

8   to call you live on direct, sir.

9          MR. GOODMAN:  Okay.  I apologize.  I had to run to

10  the restroom --

11         THE COURT:  You're fine, sir.

12         MR. GOODMAN:  -- before I was going to get started.

13         THE COURT:  Yeah.  We'll just say that you had

14  technical difficulties.  The word of the day, so you're fine.

15  And so I'll go ahead now and swear you in.

16         If you can raise your right hand.  Thank you.

17              JOHN GOODMAN, Trustee'S WITNESS, SWORN

18         THE COURT:  Thank you very much.

19                    DIRECT EXAMINATION

20  BY MR. RUKAVINA:

21  Q    Sir, what's your name for the record, please?

22  A    John Goodman.

23  Q    And, obviously, you're familiar with Goodman Networks,

24  Inc.?

25  A    Yes.

Goodman - Direct/Rukavina                    58

1  Q    Did you have any role with or affiliation with Goodman

2  Networks, Inc., in the fall of last year?

3  A    Yes, sir.

4  Q    What was that role or affiliation if you can describe

5  briefly?

6  A    I was a consultant for the MBE Group that was asked to

7  come in and assist with operating their company after Mr.

8  Frinzi's resignation as CEO.

9  Q    And you're familiar with Mr. James Frinzi?

10 A    I am, yes.

11 Q    Have you known him for --

12 A    I've known him --

13 Q    Have you known him for some period of time?

14 A    I have known him, yes, for at least 10 years or 12 years.

15 Q    So when you came back to try to assist the company, the

16 debtor that is, did you learn of any kind of promissory note

17 between anyone and AMRR?

18 A    I did.

19 Q    Were you trying to do anything on behalf of the company

20 with respect to that promissory note?

21 A    I was.

22      I was working on behalf of the company and spoke with Jim

23 Frinzi, AMRR, consistently and constantly trying to work

24 through.  After consulting with Goodman Networks counsel, we

25 put together a forbearance agreement.

Goodman - Direct/Rukavina                    59

1      Prior to that, I had multiple multiple discussions with

2 him trying to work out a solution in reference to what I viewed

3 as a default on the note or forthcoming default on the security

4 agreement.

5      I did not get anywhere, so I worked with Goodman Networks

6 counsel.  We put together a forbearance agreement.  I discussed

7 it with Jim, and when I say Jim, I'm also referencing AMRR Jim

8 as their representative to me, multiple multiple times.  We

9 sent over the forbearance --

10 Q    Let me pause you, Mr. Goodman.  In those multiple --

11 A    Okay.

12 Q    In those multiple multiple discussions you had with Jim

13 Frinzi, did you ask him for any financial or other

14 documentation and books and records of AMRR?

15 A    I asked him for every bit of information.  I don't recall

16 exactly what I asked him, but I did ask him for financial

17 information.  I asked him for financial status.  I asked him to

18 provide documents, none of which I could get directly from

19 AMRR.

20 Q    Did Mr. Frinzi indicate to you whether he would or would

21 not provide those documents?

22 A    He consistently indicated that he would provide them and

23 that he would cooperate and work out a solution that would be

24 -- that would be equitable for what we were asking for.

25 Q    Did you ever get any of the documents you requested out of

Goodman - Direct/Rukavina                    60

1  AMRR?

2  A      None.

3  Q      What about from Mr. Frinzi?

4  A      None.

5  Q      Did you ever get a forbearance agreement?

6             MR. OKIN:  Objection, Your Honor.

7             THE WITNESS:  We --

8             MR. OKIN:  I don't see the relevance.

9             THE COURT:  Just one moment, Mr. Goodman.

10             MR. OKIN:  I don't understand the relevance of this

11  testimony.

12             THE COURT:  Come to the podium.

13             MR. OKIN:  I object to the relevance at this point.

14  I thought the purpose of what we were doing was the scope of

15  the document request.  I don't know what -- we got a little

16  background on the prior discussions, but I don' t know what the

17  difficulty of getting of previous forbearance negotiations has

18  to do with whether or not the Trustee's entitled to the payroll

19  records of AMRR, for example.

20             THE COURT:  Well, here's what I'll say, and obviously

21  normally I would go to Mr. Rukavina.  I think the Trustee is

22  putting on this evidence essentially at the -- not at the

23  Court's request but if AMRR is willing to forego the Trustee

24  putting on his evidence as to why he believed the 2004 is

25  necessary and why not just wait and allow AMRR to produce this

Goodman - Direct/Rukavina                          61

1  voluntarily or informally, if you are willing to -- I'm trying

2  to find the right word.

3         MR. RUKAVINA:  Well, consent.

4         THE COURT:  Not contest that the Trustee's pursuing

5  this in essentially a court-ordered way and consent to the 2004

6  itself, then that's one thing.  Then, yes, then we can forego

7  the discussions of any prior attempts at forbearance or prior

8  attempts of getting the documents.

9         I think essentially that's what the Trustee is aiming

10 for in terms of this particular line of questioning, so.

11        MR. RUKAVINA:  Your Honor, I'm certainly willing to

12 discuss scope and protections, but as I understood from Mr.

13 Okin, they are putting us to the test on whether cause exists.

14 If I'm wrong about that, then we don't need evidence.

15        MR. OKIN:  Well, Your Honor, we did intend to put

16 them to the test as to whether cause exists.  I don't -- I

17 thought where we had gone before this was even short of

18 evidence, that Your Honor was inclined to order documents to be

19 produced of some nature.  I think we're at the point now where

20 we would be willing to agree to a limited 2004 requesting

21 documents as long as our agreement to do that is not a waiver

22 of future -- of the ability to object of future requests or the

23 request by other parties for the same or additional

24 information.

25        MR. RUKAVINA:  And then the next question, Your

Goodman - Direct/Rukavina                                    62

1  Honor, is what about Rule 9016.

2          THE COURT:  And the subpoena.

3          MR. OKIN:  Well, Your Honor, I think we're -- maybe

4  everybody's talking past each other.  The actual issuance of a

5  subpoena is really second to the point.  The point is

6  ultimately that 9016's protections need to apply in terms of

7  our ability to then object to specific requests.

8          As long as that remains, I've got to confirm it with

9  my client, but I seriously doubt that I wouldn't be able to

10 just accept service or waive the actual -- I mean it's not a

11 very difficult thing but the signing of the subpoena form.  But

12 we would want 9016 to apply in terms of the procedure

13 thereafter.

14         MR. RUKAVINA:  Your Honor, in that case, I would

15 respectfully request to continue presenting my case.  And this

16 is relevant because as you will see, hearing from AMRR that

17 we'll cooperate and we'll be reasonable has never come to

18 fruition before, hence, the relevance.

19         And I apologize, Your Honor, and I'm not meaning this

20 in a negative way.  What I heard was double talk.  So we're all

21 here today.  We've got a lot of lawyers here.  We've kicked

22 this hearing so they had full 21 days' notice.  Your Honor, if

23 I have to put on my case today, then I will do so.

24         I was hoping that we could forego the 9016, forego

25 the cause, and just talk about scope and protections.  I don't

Goodman - Direct/Rukavina                                    63

1  hear Mr. Okin saying that, which means that I've got to make my

2  case and do it the hard way, and the Court will rule with or

3  against me.

4           THE COURT:  Mr. Okin, I think I am going to overrule

5  the objection.  I'm going to allow the Trustee to put his case

6  on.  I mean as I often say in the courtroom that the Court

7  definitely distinguishes between argument and evidence, and

8  I've got a lot of argument thus far.  And so now I'll take the

9  evidence as to essentially what led to the 2004 and the nature

10 of the need for the particular process and documents.  So I'm

11 going to overrule the objection.

12          MR. OKIN:  Thank you.

13          THE COURT:  So, Mr. Rukavina, please proceed.

14 BY MR. RUKAVINA:

15 Q   Mr. Goodman, I believe my question of you was, and I could

16 be wrong, but maybe it's a different question.

17      Did you ever receive a draft forbearance agreement from

18 Mr. Frinzi or AMRR?

19 A   We received a redline copy I believe.  And I'm looking

20 over my email from Goodman Networks attorney at the time, and

21 to the best of my recollection, I believe it was in -- on

22 December -- I'm sorry, I can't remember the date, but --

23 Q   Well, let me ask --

24 A   I know that --

25          MR. OKIN:  Objection, Your Honor.

Goodman - Direct/Rukavina                              64

1          THE COURT:  We have an objection.

2          MR. OKIN:  If the witness is testifying from

3  documents that we're not even seeing to refresh his

4  recollection, I think we have a right under the Rules to review

5  what he's refreshing his recollection from.

6          MR. RUKAVINA:  And let me ask a different question.

7          THE COURT:  Okay.

8  BY MR. RUKAVINA:

9  Q    Did AMRR ever sign a forbearance agreement?

10 A    No, sir.

11 Q    Okay.  Did there come a time when Mr. Frinzi or AMRR

12 ceased communications with you?

13 A    Yes.

14 Q    Did you try to communicate with AMRR or Mr. Frinzi after

15 that?

16 A    I did through Goodman Networks counsel.  I continued to

17 try to reach personally, and the message came back from AMRR's

18 counsel that they would not --

19         MR. OKIN:  Objection, Your Honor.

20         THE WITNESS:  -- communicate with me.

21         MR. OKIN:  Objection.  Hearsay, lacks direct

22 knowledge and foundation --

23         THE COURT:  Okay.

24         MR. OKIN:  -- for the statement.

25         THE COURT:  Two things.  When you have the obhection,

Goodman - Cross/Okin                          65

1  please do --

2              MR. OKIN:  Okay.

3              THE COURT: -- approach the podium because it's a

4  little bit hard for us to pick it up from the microphone if

5  there's any distance between the microphone and the speaker.

6  And then I'll let you give your objection, and then Mr.

7  Rukavina can respond.

8              MR. OKIN:  Hearsay, lacks foundation.

9              MR. RUKAVINA:  We can stop, Your Honor, his answer

10  with when he said no.

11             THE COURT:  Okay.

12             MR. RUKAVINA:  No further communications.

13             THE COURT:  No further communications.  Thank you.

14             MR. RUKAVINA: Mr. Goodman, thank you for your time.

15             I'll pass the witness, Your Honor.

16             THE COURT:  Okay.  Thank you very much, Mr. Rukavina.

17             Mr. Okin, when you're ready.

18                        CROSS-EXAMINATION

19  BY MR. OKIN:

20  Q    Mr. Goodman, hi, I'm  Matthew Okin, counsel for MBG and

21  AMRR.

22  A    Hello.

23  Q    Mr. Goodman, are you currently employed by the Trustee on

24  behalf of the estate in any capacity?

25  A    I am not an employee.  I don't know how to answer that.

1  I'd have to have my counsel, Jarom, answer -- help me answer

2  that because I'm not aware if and I don't recall if my

3  consulting agreement's still in place.

4  Q    You're not an employee, though, correct?  You just --

5  A    No, I'm not an employee.

6  Q    Do you -- have you received payment from the Trustee for

7  any services in the last three months?

8  A    No.

9  Q    And the last time you acted on behalf of Goodman Networks

10  or the bankruptcy estate was when?

11  A    I believe when we withdraw the motion for the Chapter 11.

12  I'm not -- I'm not 100 percent sure, but I believe that may

13  have been the last time that I acted on behalf of the company

14  itself.

15  Q    And that would have been late last year.  Is that right?

16  A    I believe it was in 2023 in February, wasn't it?

17  Q    Early this year, then.  Okay.

18       And you have not been involved in any of the discussions

19  between Mr. Seidel and his counsel and AMRR or its counsel with

20  regard to production of documents since Mr. Seidel became

21  Trustee?

22  A    I have not been involved in any conversations between

23  them.

24            MR. OKIN:  Pass the witness, Your Honor.

25            THE COURT:  Thank you very much, Mr. Okin.

Goodman - Cross/Langley                               67

1            Is there anyone else who wishes to cross-examine Mr.

2   Goodman?

3            MR. LANGLEY:  Yes, Your Honor.  I have brief two

4   questions.

5            THE COURT:  Mr. Langley.

6            MR. LANGLEY:  Yes.

7                          CROSS-EXAMINATION

8   BY MR. LANGLEY:

9   Q    Good morning, Mr. Goodman.

10  A    Good morning.

11  Q    You testified earlier about a promissory note with AMRR

12  and a security agreement with AMRR.  And are you familiar with

13  those documents?

14  A    I have reviewed them.  Yes, sir.

15  Q    Okay.  What role or affiliation did you have in the making

16  of those two documents?

17  A    None.

18  Q    Were you at Goodman Networks when those documents were

19  made?

20  A    No.

21  Q    Do you know whether those documents are authentic?

22  A    No.

23            MR. LANGLEY:  With that, I'll conclude my

24  examination.

25            THE COURT:  Okay.  Thank you very much, Mr. Langley.

68

1          Mr. Guffy, Mr. Sullivan, any cross-examination for

2   Mr. Goodman?

3          MR. GUFFY:  No, Your Honor.

4          MR. SULLIVAN:  None from us.

5          THE COURT:  Thank you very much.

6          All righty.  Mr. Rukavina, redirect?

7          MR. RUKAVINA:  No, Your Honor.  I'd ask that the

8   witness be excused and I thank him for his time.

9          THE COURT:  Okay.  Thank you very much.

10         THE WITNESS:  Thank you.

11         THE COURT:  Thank you, Mr. Goodman, for testifying.

12         THE WITNESS:  Thank you.

13         THE COURT:  I appreciate it.  All righty.

14         MR. RUKAVINA:  Your Honor, I'll call Scott Seidel.

15         THE COURT:  All right.  Mr. Seidel, if you could take

16  the stand, the witness stand.  I'll dispense with the oath

17  given that Mr. Seidel is an officer of the Court.

18         MR. SEIDEL:  Thank you, Your Honor.

19         THE COURT:  You're welcome.

20         MR. GOODMAN:  Your Honor, can I stay on or do I need

21  to log off?

22         THE COURT:  Yes, you may.  You may stay on.

23                      DIRECT EXAMINATION

24  BY MR. RUKAVINA:

25  Q    Sir, please state your name.

Seidel - Direct/Rukavina                         69

1  A    Scott Seidel.

2  Q    And what is your role in this bankruptcy case?

3  A    I'm the Trustee that was appointed in this case.

4  Q    And how long have you been a Chapter 7 Trustee?  Not in

5  this case, but in your life?

6  A    Longer than I'd like to admit, but over 30 years.

7  Q    Okay.  Before we begin, did you ever know before counsel's

8  opening arguments today that AMRR had more than one subsidiary?

9  A    The first I heard of it today.

10 Q    Did you hear anything before opening arguments today that

11 there was some possible defect with respect to the security

12 interest against AMRR?

13 A    Not before today.

14 Q    Okay.  Are you familiar with a man named James Frinzi?

15 A    I am.

16 Q    Have you ever met him?

17 A    I met him.  Yes, I've met him.

18 Q    Tell us about the first time that you met him.

19 A    I believe the first time I met him was at your offices

20 with his lawyers and my lawyers.  We had a sit-down to discuss

21 a pending motion to convert in money that his entity or his

22 alleged entity, AMRR, owed to the tune of $44 million.

23 Q    Is that in early February or so of this year?

24 A    Yes, sir.

25 Q    Okay.  You discussed that promissory note with Mr. Frinzi?

Seidel - Direct/Rukavina                    70

1  A    Yes, sir.

2  Q    Did Mr. Frinzi say anything to the effect of that

3  promissory note was unenforceable?

4  A    No.  He -- he acknowledged the promissory note.  He

5  acknowledged the security agreement, was here to --

6  Q    Did Mr. Frinzi say anything to lead you to suspect that

7  some entity other than your estate owned that promissory note?

8  A    No.

9  Q    Did Mr. Frinzi appear to be cooperative with you at that

10 meeting?

11 A    Yes, he played that game for sure.

12 Q    Okay.  Did you ask anything from Mr. Frinzi at that

13 meeting, with respect to AMRR?

14 A    I'm trying to recall.  It seems like at that point in

15 time, we needed documents with regard to AMRR.  We wanted to

16 understand that entity and then we had subsequent meetings.

17 Q    Okay.  So let's focus on that meeting.  Can you turn to

18 Exhibit A?

19 A    Yes, sir.

20 Q    Have you seen this document before?

21 A    Yes, sir.   That's the secured promissory note dated

22 January 30 -- I'm sorry, 21st, 2022 between AMRR.

23 Q    Did you discuss this promissory note with Mr. Frinzi at

24 that February meeting?

25 A    Yes, sir.

Seidel - Direct/Rukavina                    71

1  Q    Mr. Frinzi acknowledged that this was that promissory

2  note?

3  A    Yes, sir.

4  Q    Have you -- do you have any understanding of who the

5  lender there is, a company called GNET ATC, Inc.?

6  A    There's a GNET ATC that's a subsidiary of my debtor, but

7  I'm not real familiar with GNET ATC, Inc.

8  Q    To your knowledge, does GNET ATC, Inc. even exist?

9  A    To my knowledge, it does not exist.

10 Q    What is the whatever you call it, the thing after the

11 comma for your GNET ATC?  What type of entity is it?

12 A    I believe it's a LLC, I believe.

13 Q    Did you discuss with Mr. Frinzi whether AMRR had made any

14 payments on this Exhibit A?

15 A    I did.

16 Q    What did he say?

17 A    He said that there had been a forbearance payment in his

18 mind of about $700,000, and he wanted credit for that.  But

19 other than that, no payments.

20 Q    Did you agree to give him that credit?

21 A    I told -- talked to -- I told him we would definitely talk

22 to him about that and give him credit if we could get to an

23 arrangement.

24 Q    Just to be clear, you were appointed Trustee going off

25 memory around December 12th last year?

Seidel - Direct/Rukavina                                72

1  A    Sounds right.

2  Q    Okay.  Since that time, has AMRR made a single payment on

3  this note?

4  A    No, sir.  Not one penny.

5  Q    Either to you or to the sub?

6  A    Not one penny.

7  Q    Okay.  Exhibit B, do you recognize this document?

8  A    That's the security agreement that is referenced in the

9  agreement we were just discussing.

10 Q    Okay.  Did you discuss this with Mr. Frinzi at the

11 February meeting?

12 A    Yes, sir.

13 Q    Did Mr. Frinzi acknowledge that this was the security

14 agreement?

15 A    Yes, he did.

16 Q    Did he -- I think I asked you this already.  Did he voice

17 any defenses or issues to this security agreement?

18 A    Not at all.

19 Q    Okay.  So, again, both of these documents talk about GNET

20 ATC, Inc.  Do you agree or do you believe that the funds are

21 owing necessarily -- strike that.

22     Have you decided as the Trustee who the funds under A and

23 B are owing to?

24 A    Not at this point.

25 Q    Is there some dispute or some ambiguity?

Seidel - Direct/Rukavina                          73

1  A    There is.

2  Q    Okay.  Do you believe that the estate, that the debtor

3  might own these rights?

4  A    Yes.

5  Q    Can you tell the Court -- I know we're not here today to

6  try that, but can you tell the Court why you think that that

7  may be?

8  A    Well, because it's bank statements that show wires out to

9  AMRR to the tune of $44 million out of the debtor's account.

10 Q    Anything else?

11      Let me ask you this.  Are you aware of any agreement

12 between the debtor and the subsidiary regarding this

13 transaction?

14 A    I can't recall one.

15 Q    Okay.  Have you ever seen any promissory note or loan

16 agreement between the debtor and the subsidiary regarding this

17 transaction?

18 A    Not that I recall, no, sir.

19 Q    Any document to the effect that the debtor was

20 capitalizing the subsidiary with this transaction?

21 A    No, sir.

22 Q    And just so we're clear, $44 million went from Goodman --

23 from the debtor's bank account directly to AMRR?

24 A    Yes, sir.

25 Q    Okay.  And if you'll look, please, real quick at Exhibit E

Seidel - Direct/Rukavina                                    74

1  Edward, have you seen this document before?

2  A    Yes, sir.

3  Q    And we'll talk about the March meeting, but just to fast

4  forward a little bit, have you met with representatives of

5  18920 and Mr. Frinzi?

6  A    Yes.

7  Q    Okay.  Was this the document that they both told you

8  affected their rights, in other words, that this was a true and

9  correct copy?

10 A    Yes.

11 Q    Okay.  And who is the assigor defined in this Exhibit E?

12 A    My debtor, Goodman Networks, Inc.

13 Q    Okay.  And read the first "whereas" into the record.

14 A    "Whereas, the assignor" -- which I'll tell you is Goodman

15 Networks, Inc., the debtor in this case -- "is the holder of

16 that certain secured promissory note issued by American Metal

17 Recovery & Recycling, Inc. (AMRR) in the principal amount of

18 $44 million.  The AMRR note."

19 Q    And who signed this document on behalf of your debtor?

20 A    On behalf of the debtor, it purported to be signed by

21 James Frinzi, CEO.

22 Q    Okay.  Are you a little surprised to hear in the filing

23 yesterday and today that the debtor does not own any rights in

24 these promissory notes and security agreements?

25 A    Yes, sir.

Seidel - Direct/Rukavina                              75

1  Q    Okay.  So you mentioned that you're looking at Exhibit A

2  and B, the promissory note and the security agreement.  Are you

3  investigating any other claims or causes of action that your

4  estate might have regarding this transaction?

5  A    Yes, sir.  All kinds of -- all kinds of actions, breach of

6  fiduciary duty, avoidance actions, et cetera.

7  Q    Do you have an understanding of whether there's D&O

8  insurance in place in this case?

9  A    My understanding there is.

10  Q    And what's the amount?

11  A    I think it's in the $25 million range.

12  Q    Okay.  Let's go back to the February meeting when you met

13  with Mr. Frinzi.

14  A    In your offices?

15  Q    Yes.  Did you discuss with Mr. Frinzi or ask him why AMRR

16  is not paying on that note?

17  A    Yes.

18  Q    And what did he say?

19  A    He said that it was cash-strapped.  He had a startup

20  business, and then there was -- he didn't have the ability to

21  pay at that point in time.

22  Q    Did you and Mr. Frinzi discuss the execution of a non-

23  disclosure agreement, an NDA, at that meeting?

24  A    Yes.

25  Q    What would be the purpose of that NDA?

Seidel - Direct/Rukavina                    76

1  A    So that we could understand and verify what he's saying

2  with regard to the entity.

3  Q    About being cash-strapped and --

4  A    Right.

5  Q    Did you agree to execute an NDA?

6  A    Yes.

7  Q    Okay.  Go to Exhibit F, please.  And you can forget my

8  email, but attached to Exhibit F is what's labeled as a

9  confidentiality and non-disclosure agreement.  Do you see that?

10  A    Yes, sir.

11  Q    And it's signed by you -- well, it's signed by me with

12  your permission.

13  A    Right.

14  Q    Do you see that?

15  A    Yes, sir.

16  Q    And did you give me permission to sign it?

17  A    I did.

18  Q    Okay.  Did you ever receive this version signed back from

19  AMRR?

20  A    No, sir.

21  Q    Okay.  And if you'll go to Exhibit G, Exhibit G is a

22  little bit later.

23  A    Right.

24  Q    And understanding you might not have seen the email, but

25  did you see the proposed changes to the NDA attached to that

Seidel - Direct/Rukavina                         77

1  email?

2  A    I came to understand --

3            MR. OKIN:  Objection, Your Honor.

4            THE WITNESS:  I'm sorry.

5            THE COURT:  Just one moment.

6            MR. RUKAVINA:  Your Honor?

7            MR. OKIN:  I think on its face, the question lacks

8  foundation.  He acknowledged he hasn't seen the email and then

9  asked him whether he ever saw the document that's referenced in

10 the email that's attached.  I mean --

11           THE CLERK:  I need you to move just a little bit

12 closer.

13           MR. OKIN:  Closer?

14           THE CLERK:  Thank you.

15           THE COURT:  Thank you.

16           MR. OKIN:  It lacks foundation on its face.  If the

17 witness is not -- has never read the email and hasn't and

18 wasn't copied on it, he can't authenticate the document that's

19 attached to it.

20           THE COURT:  Okay.  I'm going to sustain the

21 objection.

22           MR. RUKAVINA: Your Honor, I'm --

23           THE COURT:  If you can ask a better question, please

24 do.

25           MR. RUKAVINA:  I will, but I am listed as a witness,

Seidel - Direct/Rukavina                          78

1  Your Honor, and for authentication purposes only and for

2  hearsay purposes.  So if I have to, I'll call myself.

3  BY MR. RUKAVINA:

4  Q    But, Mr. Seidel, did you come to understand that AMRR at

5  some point sent a proposed different version of a

6  confidentiality agreement?

7  A    Yes, sir.

8  Q    And did you review what you understood them to have sent?

9  A    Yes.

10 Q    Did you agree to their changes?

11 A    I did not.

12 Q    Was there any reason that you recall why you did not agree

13 to their changes?

14 A    Well, one of the more major reasons was they were starting

15 to handcuff me with regard to who I could share information

16 with which was Mr. Goodman who has a lot of institutional

17 knowledge with regard to the transaction and the entity, et

18 cetera.

19 Q    Was an NDA ever signed by both parties?

20 A    No.

21 Q    Okay.  Did you meet with Mr. Frinzi after the February

22 meeting in my offices?

23 A    I did.

24 Q    And tell the Court about that meeting?

25 A    We were called by him to meet.  He said that he had a line

Seidel - Direct/Rukavina                              79

1  on getting some financing to -- to get us some money and it was

2  urgent.  And there was a day in particular he could meet and a

3  place in particular he could meet.  So we traveled and met with

4  him and his lawyers, 18920 representative.  Other lawyers were

5  on the phone; we were in person.

6  Q    Okay.  This was in Miami?

7  A    Yes, sir.

8  Q    March 9th of this year?

9  A    Yes, sir.

10  Q    Okay.  And, again, AMRR had its lawyer there?

11  A    Yes, sir.

12  Q    And Mr. Frinzi had his personal lawyer there?

13  A    Yes, sir.

14  Q    Okay.  Did you discuss the concept of a forbearance at

15  that agreement -- at that meeting?

16  A    Yes.

17  Q    And did you discuss at the same time a potential reduced

18  payoff that AMRR could negotiate?

19  A    Yes, sir.

20  Q    Okay.  And we're not going to go into the details of the

21  second half, okay.

22  A    Okay.

23  Q    But without going into the details, did you have an

24  understanding that Mr. Frinzi was working on the potential

25  reduced payoff?

Seidel - Direct/Rukavina                           80

1  A    Yes.

2  Q    Okay.  Did he state that his capital was upstairs in the

3  hotel room waiting to meet with him?

4  A    That's what he said.  That's why we were there.  That's

5  why we traveled.  That's why we did that day.

6  Q    Did you come to an agreement on a forbearance with Mr.

7  Frinzi on that day?

8  A    We did.

9  Q    Okay.  What were the terms of the forbearance?

10 A    Two payments.

11        MR. OKIN:  Objection, Your Honor.  There is no

12 forbearance agreement.  If we were talking about the terms of

13 an actual signed settlement agreement, that would be one thing.

14 But there is no signed settlement agreement.  It's barred under

15 408.  It's not relevant.

16        THE COURT:  Thank you very much, Mr. Okin.

17        Mr. Rukavina?

18        MR. RUKAVINA:  Your Honor, there's no evidence, first

19 of all, that -- there's no evidence that 408 was invoked.  Mr.

20 Frinzi is not here to testify.  And he said that there was an

21 agreement.  This was an oral agreement.  There's no evidence

22 that it had to be reduced to a written agreement.  So he's

23 allowed to testify about an agreement reached.

24        And, yes, 408 was invoked that day.  I'm not going to

25 fib to the Court.  That was on the LOI.  Now if he wants to

Seidel - Direct/Rukavina                        81

1  call Mr. Frinzi here who, again, this gentleman didn't bother

2  to be here today, then he can put on contrary evidence.  But we

3  had an agreement on that day on the forbearance

4  (indiscernible) testimony.

5          MR. OKIN:  Your Honor, I don't think 408 has to be

6  invoked to actually apply.  I think at the end of the day, 408

7  bars settlement negotiations so parties can discuss what they

8  may or may not be willing to do without fear that it's going to

9  be thrown in front of a court at a later date to prove that

10 they were willing to do something or, quite frankly, that they

11 thought they might be willing to do something and ultimately

12 couldn't agree to it for one reason or another.

13         The fact that there is no binding agreement is in and

14 of itself proof that it was just settlement negotiations and

15 should not be admissible at all.  We're actually past that

16 point here already, but --

17         MR. RUKAVINA:  I don't understand, Your Honor.  He

18 said that there was an agreement reached on the forbearance.

19 There's no contrary evidence that there was no agreement

20 reached.

21         If he wants to impeach the credibility of the

22 witness, he can or put on contrary evidence.  But I get to go

23 and I get to tell a court that I agree to purchase that car for

24 X money and the other person said okay and then he didn't

25 deliver.  That's not a settlement negotiation.

1      MR. RUKAVINA:  This is -- this was an agreement

2  reached on the terms of a forbearance.

3      MR. OKIN:  It's a $44 million debt, Your Honor, of a

4  written note.  I don't believe it can just be modified through

5  an oral agreement between the parties.  That's the whole

6  purpose of why it needs to be in writing, so we don't have

7  disputes as to whether there's a binding agreement or not.

8      They're not here trying to enforce an agreement.

9  They're just trying to use the fact that we had a conversation

10  about a potential deal, and that that deal never got done, as

11  evidenced somehow that they get far reaching discovery into our

12  finances.  I don't see the relevance generally.

13      THE COURT:  Thank you, Mr. Okin.

14      MR. RUKAVINA:  Your Honor, Rule 408 says that

15  evidence of negotiations et cetera, is not admissible to prove

16  or disprove the validity or amount of a disputed claim.  (b)

17  says the court may admit this evidence for any other purpose

18  such as negating a contention of undue delay.  There is no

19  evidence that Rule 408 even applies.  If it does, this is not

20  subject to Rule 408.

21      THE COURT:  Anything further, Mr. Okin?

22      MR. OKIN:  Your Honor, I think 408 does apply.

23  Obviously, bankruptcy doesn't always fit neatly into the rules

24  of civil procedure and evidence.  But that is exactly the same

25  -- the bankruptcy version of what Mr. Rukavina just read, but

Seidel - Direct/Rukavina                              84

1  I'll add that it also was irrelevant under 404 as inappropriate

2  character evidence.

3         This is all an attempt to show somehow that because

4  Mr. Seidel was unhappy with the way negotiations have gone with

5  Mr. Frinzi, that somehow I guess that he can't be trusted,

6  although the Courts can enter an order.  So the issue is really

7  just how broad ranging the discovery needs to be.  It's just --

8  it's irrelevant under any number.  Rule 401, for that matter.

9         MR. RUKAVINA:  Your Honor, would you like to see the

10  return email where Mr. Bartlett responds to me agreed.  I mean,

11  come on, we had an agreement on the forbearance.

12         THE COURT:  Well, I think this is -- you know, what

13  the Court's going to do, having a hard time figuring out if

14  this is overruled or sustained.  I think that what we've done

15  is we've established that the Trustee believed that there was

16  an agreement in place.  The Trustee believed that there were

17  the terms of forbearance agreement in place, and that from the

18  Trustee's perspective, that that agreement has been breached in

19  some way.

20         Obviously, from the standpoint of AMRR, there's a

21  question of whether or not those were the settlement

22  negotiations that were never put into writing.  But I think

23  from this -- from an evidentiary standpoint, the Trustee has

24  proven what he sought to prove today, which were there were

25  various promises or agreements that have been made along the

Seidel - Direct/Rukavina                          85

1  way, and that you believe that breaches of those promises

2  necessitate a court ordered process rather than a just give me

3  an NDA and we'll work it out process.  So sustained and

4  overruled as need be to expedite further evidence.

5          MR. RUKAVINA:  I'll be just a couple of follow-up

6  questions that are hopefully non-controversial.

7  BY MR. RUKAVINA:

8  Q    At that meeting, did Mr. Frinzi state that he was signing

9  an agreement that would obligate AMRR to produce financial

10 records to you?

11 A    Yes.

12 Q    Did he ever sign such an agreement?

13 A    No.

14 Q    At that meeting, did Mr. Frinzi state that AMRR would be

15 paying $500,000 towards its debt within a couple of weeks?

16 A    Yes.

17 Q    Did AMRR do so?

18 A    No.

19 Q    Was a forbearance agreement ever signed?

20 A    No.

21 Q    Okay.  Did you send them a draft -- did you ever counsel,

22 send them a draft forbearance agreement?

23 A    Yes, sir.

24 Q    Did you ever get a redline back?

25 A    No, sir.

Seidel - Direct/Rukavina                    86

1  Q    I'm going to just ask you this.  Sitting here today, do

2  you have a single document from AMRR regarding its finances,

3  operations?  Anything?

4  A    That's what's so baffling.  I don't have a document.  I

5  mean, I hear over and over again, we'll cooperate.  But no, I

6  don't have a document.

7         MR. OKIN:  Objection.  Nonresponsive, Your Honor.

8         THE WITNESS:  I don't have a document.

9         MR. OKIN:  I think it was -- okay.

10 BY MR. RUKAVINA:

11 Q    Does that that baffle you?

12 A    It baffles.

13 Q    Why?

14 A    Because we're at this point in time in this case with this

15 amount of money involved with sophisticated counsel, and I

16 don't even have public documents for a publicly traded company.

17 I've got -- they're not even doing their SEC filings.

18         MR. RUKAVINA:  Your Honor, I think we can walk

19 through Exhibits J, K, and L quickly.  These are SEC filings.

20 I might just lead a little bit to expedite matters.

21 BY MR. RUKAVINA:

22 Q    Mr. Seidel, are you aware that recently the auditor, the

23 CFO, and two directors of AMRR resigned?

24 A    Yes, sir.

25 Q    Does that cause you any concern?

Seidel - Direct/Rukavina                    87

1  A    Yes, sir.

2  Q    Why is that?

3  A    Because it looks like there's a loss of control.  The

4  people that are responsible aren't being answered.

5  Q    Did Mr. Frinzi or AMRR inform you of this fact?

6  A    Absolutely not.

7  Q    How did you learn of it?

8  A    I learned it through counsel doing homework.

9  Q    Okay.  Just to lead you a little bit.  Are you aware of a

10 public filing whereby AMRR informed the SEC it would not be

11 able to timely file its 2022 financials?

12 A    Yes, sir.

13 Q    Does that cause you any concern?

14 A    Yes, sir.

15 Q    Why so?

16 A    Because they're not even doing the basics.

17 Q    And Exhibit K, Mr. Seidel, this is one of those SEC

18 filings.  If you'll go to the last page there.  So this -- let

19 me ask you this.  Whatever this is, it looks like a

20 consolidated statements of income.  Is this the extent of the

21 financial information you have on AMRR?

22 A    This is it as of today.

23 Q    Okay.  And does this cause you any concern?

24 A    Yes, because they're losing money.

25 Q    And a gain on assets, a gain on sale of assets,

Seidel - Direct/Rukavina                          88

1  $1,020,000.

2  A    No one told me anything about that, and nothing has been

3  disclosed to me about this.

4  Q    Okay.  Ultimately, Exhibit M, this is a notice of default

5  and intent to accelerate.  Do you see that?

6  A    Yes, sir.

7  Q    Okay.  Did you cause this document to be sent?

8  A    I did after learning all of this and being kept in the

9  dark.  Yes.

10 Q    Is it fair to say that AMRRs credibility is done with you?

11 A    Yes, sir.

12 Q    Okay.  Is it fair to say that you tried to do it the easy

13 way, and it didn't work?

14 A    Bent over backwards to do it the easy way.

15 Q    Is it fair to say that you are now being criticized for

16 trying to do it the easy way?

17 A    Yes, sir.

18      MR. RUKAVINA:  Why do you need to take an

19 investigation -- or strike that.

20 BY MR. RUKAVINA:

21 Q    Why do you want to take an investigation of AMRR?

22 A    Because this is the major asset of this estate, in my mind

23 or one of them, and we need to understand the lay of the land

24 with AMRR to protect the estate's interests.

25 Q    Are you exploring potential options with respect to what

1  to do?

2  A    Yes, sir.

3  Q    Are you in the process of retaining William Snyder

4  (phonetic) and CRP to assist?

5  A    Yes, sir.

6  Q    Are you exploring potential options to sell the paper?

7  A    Yes, sir.

8  Q    Are you exploring potential options to allow sales of AMRR

9  assets for reduced payments?

10 A    Yes, sir.

11 Q    Are you exploring potential litigation claims?

12 A    Yes, sir.

13 Q    Are you exploring claims against 18920?

14 A    Yes, sir.

15 Q    Do you feel like you and Mr. Snyder can make an informed

16 decision without knowing basic financials and operations of

17 AMRR?

18 A    No, we need the information.

19 Q    In all that -- in all those communications you've had with

20 Mr. Frinzi, did he give you any oral -- any information about

21 the finances of AMRR other than that it can't pay you a penny?

22 A    That's it.

23         MR. RUKAVINA:  Thank you.

24         THE COURT:  Thank you, Mr. Rukavina.

25         Cross-examination, Mr. Okin?

Seidel - Cross/Okin                         90

1          MR. OKIN:  Yes, Your Honor.  One second.  I'll need

2   the exhibits.

3          MR. RUKAVINA:  Yeah, keep those.

4          MR. OKIN:  Okay.

5                      CROSS-EXAMINATION

6   BY MR. OKIN:

7   Q    So Mr. Seidel.

8   A    Yes, sir.

9   Q    First, you were aware of name issue in the note and

10  security agreement.  That's not something that you think was

11  hidden from you, was it?

12  A    Could you repeat that?

13  Q    Are aware that the lender under the note and the security

14  agreement is GNET, not Goodman Network, correct?

15  A    I became aware of that.  Yes.

16  Q    But that -- you became aware of it when you read the note

17  and security agreement, I assume, right?

18  A    When I read the note and security agreement.

19  Q    You were aware that that was in there.  That wasn't hidden

20  from you by Mr. Frinzi?

21  A    Mr. Frinzi never articulated this to me.

22  Q    It's on its face, correct?  You know you're not --

23  A    It's sitting there.

24  Q    Yeah.  I mean, you're not Trustee of GNET ACC, correct?

25  A    That's correct.

Seidel - Cross/Okin                                    91

1  Q    And did you review the loan documents when you became

2  Trustee?

3  A    At some point in time.

4  Q    And you reviewed the UCC-1's that were filed in the

5  Secretary of State's offices perfecting that lien that GNET

6  has?

7  A    Yes.

8  Q    And if we look at Exhibit C in that book, that's the UCC-1

9  filed in the State of Texas one by GNET?

10 A    Correct.

11 Q    Are you aware of any UCC-1s filed by Goodman Network?

12 A    I am not.

13 Q    Okay.  So if Goodman's the lender, then Goodman doesn't

14 have a perfected lien against the assets like GNET does?

15        MR. RUKAVINA:  Objection, Your Honor.  Legal

16 conclusion.

17        MR. OKIN:  I'll ask another question, Your Honor.

18        THE COURT:  Thank you.

19 BY MR. OKIN:

20 Q    If you look at Exhibit D, that's the UCC-1 filed in the

21 State of Nevada.

22 A    I'm with you.

23 Q    You reviewed that?

24 A    Yes.

25 Q    Okay.  And you saw that that was also filed by GNET ATC.

Seidel - Cross/Okin                                    92

1  A    I see that.  Yes, or I saw that.

2  Q    Okay.  So you were aware that the Nevada lien was also

3  perfected in the name of GNET ATC?

4  A    I'm aware.

5  Q    And now flip back with me if you would to Exhibit B.

6  A    D as in dog?

7  Q    B as in boy.

8  A    B as in boy.  Sorry.

9  Q    That's the security agreement that you eventually

10 reviewed?

11 A    Yep.

12 Q    Did you read it?

13 A    I don't know that I read every single sentence of the

14 document.

15 Q    But you are aware, turn with me if you would in the first

16 page you know turn to Page 1, Paragraph 2(a).  Where it says

17 the --

18 A    Paragraph 2(a)?

19 Q    -- grant of security interest.

20 A    Okay.

21 Q    Did you read the actual grant of security interest at the

22 time where it says that -- and I'll just start at -- see if we

23 can find where a sentence starts here.  Well, we'll just do the

24 whole thing.  "For value received grantor hereby grants the

25 secured party to secure the payment and performance in full of

Seidel - Cross/Okin                                    93

1  the secured obligations as defined in this agreement, a

2  security interest in and to all grantors properties, assets,

3  and rights, wherever located where the grantor now has or

4  hereafter acquires an ownership for other interests or power to

5  transfer and all proceeds and products thereof and all books

6  and records relating thereto (the definition of collateral

7  specifically excludes all securities or shares of grantor, as

8  well as any securities or shares the grantor hereafter acquires

9  in the ordinary course of business.) (All the same being

10 hereafter called the collateral.)"

11 A    I've read that.

12 Q    Did you read that at the time that you were reviewing the

13 loan documents to understand what it was you had?

14 A    I'm sure I did.

15 Q    So you could have been aware of this issue that we've

16 pointed out today well before we pointed it out to you today.

17 A    I could have been aware?  Is that what you're saying?

18 Q    It was -- you read the document.  You were capable of

19 reading this issue in this -- the grant of secured -- of

20 collateral at the time that you read it.

21 A    I'm capable of reading the document.

22 Q    You didn't need us to point it out to you.

23 A    No.

24 Q    Did you read the previous 10-K that the debtor filed in

25 the prior year?

Seidel - Cross/Okin                    94

1  A    I don't recall.

2  Q    I'm sorry.  The debtor.  Old habit.  The AMRR filing.

3  A    I don't recall.

4  Q    Have you read any of the documents related to AMRR that

5  are out there publicly that --

6  A    Yes.

7  Q    -- describe this business?  And you weren't aware that

8  there was more than one subsidiary?

9  A    I was not.

10 Q    Do you know if your counsel was aware of whether there was

11 more than one subsidiary?

12 A    I'm sorry?

13 Q    Do you know if your counsel was aware of whether there was

14 more than one --

15 A    I hate to speak for my counsel.  I'm not sure that they

16 were aware though.

17 Q    They never mentioned it to you?

18 A    No.  Not that I recall.

19 Q    Okay.  I'll just read you quickly Requests for Production

20 Number 2 that we're here about today.  "For each monthly,

21 quarterly, and annual period commencing January 1, 2022, each

22 balance sheet, income statements, statement of cash flows and

23 statement of changes in inequity of MBG and each of its

24 subsidiaries on" a consolidated -- "a deconsolidated basis."

25 When your counsel put each of its subsidiaries here, do you

Seidel - Cross/Okin                                        95

1  know how many subsidiaries they were referring to?

2  A    I'm sure that's just a form, but I don't know.  No, I

3  don't.

4  Q    Now, when you were talking to your counsel earlier, you

5  said you reviewed a draft forbearance agreement?

6  A    Yes.

7  Q    And you sent it, and he -- you had your counsel send it to

8  counsel for AMRR, my partner?

9  A    I think that's right.

10 Q    Okay.  He asked you whether you ever got back a redline or

11 a markup.  And you didn't.

12 A    I was -- is that the email you're talking about that I

13 wasn't copied on?  Is that what you're saying?

14 Q    No, no.  Mr. Rukavina asked you whether or not we have --

15 you ever received back a markup of that draft forbearance

16 agreement, and you said no I believe.

17 A    I thought that was a timing issue with regard to we were

18 discussing that first round, prior to what you're talking about

19 now.  But I do see that there's a redline here, if that's what

20 you're saying.

21 Q    No, no.  I really -- all I'm getting at, Mr. Seidel, is

22 when you sent -- when your counsel sent -- we're not talking

23 about the confident -- non-disclosure agreement.  We're talking

24 about the forbearance.

25 A    Okay.

Seidel - Cross/Okin                                    96

1  Q    We'll get to the nondisclosure.  You had your counsel send

2  -- after the meeting in Florida, you had your counsel send a

3  draft forbearance agreement to us, correct?

4  A    Correct.

5  Q    And you expected to get back a markup of that forbearance

6  agreement.

7  A    Or a signed copy.

8  Q    Have you ever really sent a draft document of something

9  and gotten it back fully executed without any markup to it?

10 A    It happens.

11 Q    But not with --

12 A    Not with Houston lawyers, but it happens.

13 Q    It wouldn't have been out of the realm of your normal

14 expectations that you were going to get a markup back of that

15 forbearance agreement?

16 A    I'm not going to quibble with you about that.  Back and

17 forth a lot of times.

18 Q    Right.  And there was never an agreement actually signed.

19 A    There was not an agreement signed.  There were emails back

20 and forth that said we have a deal.

21 Q    And you knew that this $500,000 payment that you mentioned

22 over the forbearance itself, that Mr. Frinzi had told you that

23 he wanted -- that he was able to do that, because he was

24 meeting with a source of capital, and he was going to get some

25 money that was going to enable him to be able to make that

Seidel - Cross/Okin                          97

1  payment, right?

2  A    He told me -- we told him that day, don't tell me anything

3  you can't do.  And he said I can do this.  And he said he'd do

4  it.

5  Q    But you know it was part of --he was meeting with capital

6  source upstairs after the meeting.

7  A    I know he was trying to get a broader deal, a bigger deal.

8  Q    Okay.

9  A    And he needed that in place to get the broader, bigger

10 deal.

11 Q    Let's look at Exhibit F, if you would.

12 A    You're saying F?  My hearing is not the best.

13 Q    F like Frank.

14 A    Thanks.

15 Q    Now, that is -- the top email in that chain is February

16 28th, a little over two months -- just about two months ago,

17 and that is from your counsel to my partner, Jim Bartlett,

18 sending back a markup of the NDA adding in and/or his

19 representatives, correct?

20 A    Yes, sir.

21 Q    And that was your request.  You wanted to be able to --

22 you said earlier, you wanted to be able to share information

23 with John Goodman, and that was your chance to be able to do

24 that.

25 A    Yes, sir.

Seidel - Cross/Okin                          98

1  Q    And did your counsel tell you that we actually sent back

2  -- Mr. Bartlett actually sent back a markup, taking that out

3  because we wouldn't agree to allowing that change?

4           MR. RUKAVINA:  Objection, Your Honor.  Obviously

5  privileged.  Did your counsel tell you.

6  BY MR. OKIN:

7  Q    Are you aware of whether --

8           THE COURT:  Sustained.

9  BY MR. OKIN:

10 Q    Whether that was an issue for us?

11 A    I can't recall.

12 Q    Are you aware that for at least a month now, or since the

13 time that this 2004 motion was first filed, so maybe not quite

14 a month, that we have been offering to provide documents

15 subject to an NDA, and that your counsel had -- and maybe

16 counsel hasn't sent a draft?

17 A    I'm aware we don't have a document as of today, be it

18 public or otherwise from y'all.

19 Q    And is it your experience with public companies that they

20 readily share information with third parties, even lenders?

21 A    Public --

22 Q    Without some requirement of confidentiality?

23 A    Public information I would think they would.

24 Q    Okay.  Are you looking for just public information?

25 A    I'm looking for anything.  I've got nothing.

Seidel - Cross/Okin                                          99

1  Q    Well, if it's public, wouldn't it be available to you

2  already?

3  A    You're not giving me anything that's not out there on the

4  internet, so to speak.

5  Q    So things that are not readily available, though, you

6  understand --

7  A    Readily available is fair.

8  Q    Excuse me?

9  A    Readily available is fair.  Same as what you just said.

10 Q    But ultimately my question to you is you recognize that

11 public companies can't share nonpublic information with parties

12 without some restriction on how that information is used?

13 A    That may be correct.

14 Q    And recognizing that fact, did you insist that your

15 lawyers work to try to get an agreement like that in place?

16 A    I told my lawyers to try to do whatever we could to make

17 sure that we could get the information.

18 Q    So would you consider three weeks between us sending a

19 draft of an NDA and getting back a response would that change

20 being -- working doing whatever they can to get the

21 information?

22 A    No.  I think the delay is if not 100 percent on your side

23 or your client's side, 85 percent on your client's side.  That

24 delay was we were taking a position we don't need to have this

25 particular aspect of it in there, and then it went silent.

Seidel - Cross/Okin                                    100

1  Q    How long was it between when you made those changes and

2  when we originally sent you the NDA?

3  A    I don't know.

4  Q    So how can you say that it's 100 percent on our side?

5  A    Because we're sitting here today having this exercise.

6  Q    Did your -- are you aware that upon filing the motion and

7  your counsel meeting and conferring with us over the motion,

8  that your counsel offered to draft a confidentiality agreement

9  in the interim three weeks ago and still has not provided one

10 to us?

11 A    Could you repeat your question?

12 Q    Yes.  Are you aware that three weeks ago when we had our

13 first meet and confer about the scope of this 2004 exam, that

14 your counsel agreed to draft a confidentiality agreement, but

15 that one has still never been provided to us?

16 A    My understanding of that is there was not a meeting of the

17 minds on what that confidentiality agreement would entail.  So

18 it would probably be a waste of time.

19 Q    So did you instruct your counsel not to send one because

20 it would be a waste of time?

21 A    I didn't instruct them not to send one.

22 Q    You know they didn't send one though, right?

23 A    That's right.

24 Q    So the three weeks between when this motion was first

25 filed and now, that delay is not 100 percent due to AMRR.

**WWW.LIBERTYTRANSCRIPTS.COM**

Seidel - Cross/Okin                          101

1  A    I don't know what AMRR did to try to bridge the gap of

2  what the discrepancy was, or the problem between getting one

3  done was.

4  Q    Well, did your counsel ever prepare a draft one that AMRR

5  could review?

6  A    I'm not aware.

7  Q    One was never shown to you?

8  A    I'm not aware.

9  Q    Did you read our objection to your 2004 motion?

10 A    Yes.

11 Q    So you did read at least before today you were aware that

12 there was more than one sub.  And that there was this issue in

13 the security agreement with regard to the collab, or you at

14 least read that yesterday, right?

15 A    Right.  Didn't you file it yesterday?

16 Q    It was yesterday.

17 A    Yeah.  So I think I was reading it during the Stars game.

18 I wasn't paying --

19 Q    And you weren't aware of from prior conversations with

20 your counsel that --

21        MR. RUKAVINA:  We can stop right there, Your Honor.

22 It's obviously privilege.

23        MR. OKIN:  I'm sorry, I misphrased it.

24 BY MR. OKIN:

25 Q    You weren't aware that in prior conversations with your

Seidel - Cross/Langley                    102

1  counsel, we told them that there was more than one subsidiary

2  --

3          MR. RUKAVINA:  Objection, Your Honor.

4  BY MR. OKIN:

5  Q    -- and that there was an issue with the security interest.

6          MR. RUKAVINA:  Your Honor, that's a ridiculous

7  question.  if Mr. Okin will take the standard and put that into

8  the record, he can.  Otherwise, it assume facts not in evidence

9  and lack of personal knowledge.

10          THE WITNESS:  I don't know if any of that's true.

11          MR. OKIN:  I think that he answered it, so --

12          THE COURT:  Okay.

13          MR. RUKAVINA:  I think the answer is fine.

14          THE COURT:  All righty.

15          MR. OKIN:  I'll pass the witness.

16          THE COURT:  Barely need me.  I love it.  All right.

17  Just pause for a moment, Mr. Rukavina.  Is there anyone who

18  wishes to cross-examine Mr. Seidel?

19          Mr. Langley?

20          MR. LANGLEY:  Yes, Your Honor.  This is Adam Langley.

21  Yeah.

22                      CROSS-EXAMINATION

23  BY MR. LANGLEY:

24  Q    Good afternoon, Mr. Seidel.

25  A    Hello, sir.

Seidel - Cross/Langley                    103

1  Q    I'm going to ask just some quick questions.  You

2  identified the promissory note and the security agreement.  I

3  think they are Exhibits A and B, correct?

4  A    Yes, sir.

5  Q    And do you have firsthand knowledge of whether those are

6  authentic?

7  A    I absolutely do not.

8  Q    Have you been made aware of allegations at least that they

9  may not be authentic?

10  A    I have.

11  Q    And are you investigating the state's contractual claims

12  related to those two instruments?

13  A    Yes, sir.

14  Q    And are you examining and investigating tort claims

15  related to those instruments and the transfer of the $44

16  million?

17  A    All kinds of claims.  Yes.

18  Q    What about fraud related claims?

19       MR. RUKAVINA:  Well, Your Honor.  I think, Your

20  Honor, now we're crossing into what is going to be privileged

21  attorney work.  And I would ask that the Court stop this.

22  That's now we're going into too much detail.

23       THE COURT:  Mr. Langley.

24       MR. RUKAVINA:  Mr. Seidel cannot answer that question

25  without going into his and my discussions and my work product.

Seidel - Cross/Langley                    104

1 And I would actually ask Mr. Langley if he would consider

2 withdrawing that question.

3          THE COURT:  Mr. Langley, response?

4          MR. LANGLEY:  Yes.  I'll withdraw it.  There's no

5 need for us to get into a quarrel over it.

6 BY MR. LANGLEY:

7 Q    But let me ask this, Mr. Seidel, in this manner.  Have you

8 ruled out that there are contract tort fraud, civil theft, or

9 542 turnover actions related to the 44 million?  The security

10 instruments that you see in Exhibit A and B?

11          MR. OKIN:  Objection, Your Honor.  Assumes facts not

12 in evidence.  There's all kinds of things he probably hasn't

13 ruled out.  But we have no evidence beyond the little bit

14 that's been said here that there's any reason to investigate

15 all of those issues.  And without going into a lengthy

16 examination on the underlying facts and the basis of the

17 allegations, it just assumes just general facts not in

18 evidence.

19          THE COURT:  Thank you, Mr. Okin.

20          Mr. Langley?

21          MR. LANGLEY:  Yes, Your Honor.  Here, I'm seeking to

22 establish it very plainly that this is an ongoing investigation

23 of numerous types of claims against AMRR related to the $44

24 million at issue, the noted issue, the security agreement at

25 issue.  Those security agreement, the note, the $44 million

Seidel - Cross/Langley                          105

1  have already been testified to.  We're at 2004 trying to

2  determine the scope of that examination in the document

3  request.  It's highly relevant the nature of what could

4  potentially be out there and what is being investigated.

5       MR. OKIN:  Your Honor, I'll just add one more thing.

6  If Mr. Langley wants to point to specific requests that I even

7  go to those issues, then I might withdraw the objection.  But

8  I'll throw in a relevance objection as well.  There's no

9  request in the request sought by the Trustee that has anything

10 to do with that.  That's been my point all day.  But these go

11 to the assets of AMRR, not the underlying transactions that

12 gave rise to the note.

13      THE COURT:  Thank you, Mr. Okin.

14      Mr. Langley, I think that what I'm going to do is I'm

15 going to sustain the objection at this time, because I do

16 believe that we've taken sufficient evidence thus far as to the

17 nature of the facts that are on the table that from the

18 Trustee's position that he doesn't know if the documents are

19 authentic.

20      He does know that the debtor is the entity that sent

21 the money out, but that the documents say GNET.  And that the

22 investigation is ongoing, and that there is examination of any

23 and all potential causes of action.  So I think that you've

24 established your point that as we've said, that the facts are

25 murky, and that because the facts are murky that we haven't

Seidel - Redirect/Rukavina                    106

1  really just kind of honed in on what the potential claims,

2  causes of action, et cetera, might be yet.

3            MR. LANGLEY:  Okay.  Thank you, Your Honor.

4  BY MR. LANGLEY:

5  Q    And Mr. Seidel, are you aware under 704(a)(7), that the

6  Trustee shall unless the court orders otherwise, furnish such

7  information concerning the estate and the estate's

8  administration as requested by a party of interest?

9  A    I'm aware.

10 Q    And has FedEx been an active participant in requesting

11 information from the Trustee?

12 A    I think that's fair.

13 Q    And have the bondholders been active participants

14 requesting information from the Trustee?

15 A    I think that's fair.

16 Q    And is currently a court order in place limiting the

17 information that you can share with FedEx and the bondholders?

18 A    I'm not positive.

19 Q    Are you aware of any basis for a nondisclosure agreement

20 that would exclude FedEx or the bondholders from receiving

21 information about AMRR?

22 A    I don't think so.

23 Q    Is there any reason from your perspective as the Trustee,

24 why that information could not be shared with FedEx and the

25 bondholders?

Seidel - Redirect/Rukavina                    107

1  A     Without having the benefit of discussing with counsel, I'm

2  not aware.

3           MR. LANGLEY:  No further questions, Your Honor.

4           THE COURT:  Thank you, Mr. Langley.

5           Mr. Guffy, Mr. Clark, any further questioning?

6           MR. GUFFY:  No, Your Honor.

7           THE COURT:  Okay.  Thank you, Mr. Guffy.

8           Mr. Sullivan?

9           MR. SULLIVAN:  Nothing from ARRIS.

10           THE COURT:  Okay.  Thank you very much.

11           Redirect, Mr. Rukavina?

12           MR. RUKAVINA:  Your Honor, thank you.  I'll try to be

13  brief.

14                    REDIRECT EXAMINATION

15  BY MR. RUKAVINA:

16  Q    Mr. Seidel, you were asked by Mr. Okin that a few weeks

17  ago your counsel, actually my partner, Brenda Funk, stated that

18  she will be drafting a confidentiality agreement.  Remember

19  that?

20  A    I do.

21  Q    You were asked whether you knew whether one was ever sent?

22  Do you remember that?

23  A    I do.

24  Q    Okay.  Are you aware that even in consideration for that,

25  we requested that AMRR contractually commit to produce

Seidel - Redirect/Rukavina                    108

1  documents?

2  A    That was my --

3           MR. OKIN:  Objection.  Leading.

4           MR. RUKAVINA:  I'll rephrase it.

5  BY MR. RUKAVINA:

6  Q    Were you -- did you request anything in return from AMRR

7  in exchange for us going down again the confidentiality route?

8  A    Right.  That they would show their good faith regarding

9  going forward.

10  Q    By being contractually bound to produce?

11  A    Yes.

12  Q    Did they ever agree, to your knowledge?

13  A    Not to my knowledge.

14  Q    Go back to Exhibit F.  You were asked about this.

15  A    F?

16  Q    Yeah.  F as in Frank.

17  A    Okay.

18  Q    So first, I want you to focus on the top email.  You see

19  where I write, "The only change that Scott wanted was the

20  addition of the and/or his representatives language in the last

21  clause of Section 2."  Do you see that, Mr. Seidel?

22  A    I do.

23  Q    Now, let's go to the last clause of Section 2.  Why don't

24  you read that last sentence into the record?

25  A    "Recipient agrees that recipient will cause his

Seidel - Recross/Okin                                    109

1  representatives to observe all terms of this agreement, and

2  that the recipient and/or his representatives will be

3  responsible for any breach of this agreement by any of

4  recipient's representatives."

5  Q    So in adding that or changing that clause, were you trying

6  to permit documents to be given to the Goodman's as your

7  representatives?

8  A    Can you repeat that?

9  Q    Yeah.  Were you trying to use that language to be able to

10 share documents with the Goodman's, or were you trying to

11 ensure that your representatives would be liable if they

12 breached this agreement?

13 A    The latter.

14 Q    Okay.  You were asked about alleged -- and I mean, alleged

15 infirmities with the estate's lien position.  Just to be clear,

16 in all of your discussions with Mr. Frinzi, did he ever raise

17 that?

18 A    He didn't never -- he never raised any kind of problems.

19 Q    Would you have expected him to do so in those discussions

20 if there were an issue?

21 A    Yes.

22 Q    Is that why perhaps you were caught a little bit off guard

23 and unawares when you saw it yesterday?

24 A    Yes.

25 Q    Okay.  Now, let's go to those two use UCCs, please.  C and

Seidel - Recross/Okin                    110

1  D.   Okay.

2  A    Okay.

3  Q    What is the date of the Texas UCC?

4  A    9/23/2022.

5  Q    Okay.  What's the date of the Nevada UCC?

6  A    9/23/2022.

7  Q    Can you think of a reason on God's green earth why Mr.

8  Frinzi wouldn't have filed these while he was CEO and waited

9  nine months?

10        MR. OKIN:  Objection, Your Honor.  Lacks foundation.

11  It's argumentative.

12        MR. RUKAVINA:  I'll withdraw the question, Your

13  Honor.

14        THE COURT:  Thank you.

15        MR. RUKAVINA:  I'll pass the witness.

16        THE COURT:  All right.  Anything further based on the

17  redirect?

18                    RECROSS-EXAMINATION

19  BY MR. OKIN:

20  Q    Mr. Seidel, if you will turn to your Exhibit G, please.

21  So --

22  A    Hold on a second.  Is this G you're saying --

23  Q    Yes, G.

24  A    -- with the back and forth?

25  Q    Well, actually, let's start with F.

Seidel - Recross/Okin                    111

1  A    Let's start with F.

2  Q    Yeah.

3  A    F.  I have it.

4  Q    So that was the one you were just talking to your counsel

5  about.  That's dated February 28th?

6  A    It is.

7  Q    And that is the changes you asked your counsel to make to

8  this nondisclosure agreement?

9  A    Yes.

10 Q    In order to get documents from us?

11 A    Yes.

12 Q    Okay.  And then if you'll look at Exhibit G, that is a

13 email dated March 8th --

14        MR. RUKAVINA:  Your Honor, I'll just object to

15 Exhibit G.  Counsel objected to Exhibit G and the Court

16 sustained his objection.  So unless counsel wants to let G in,

17 I'll make the same objection that he did.  This is the one you

18 sustained, Your Honor.

19        THE COURT:  We haven't sought to admit any documents

20 yet.  So we can get to those at the end.  You know, because we

21 haven't moved for admission or had any documents admitted or

22 denied admission, so --

23        MR. OKIN:  And I will note, Your Honor, that it's

24 their exhibit.  I assume for authentication purposes that I

25 shouldn't have to authenticate their exhibit.

Seidel - Recross/Okin                    112

1          THE COURT:  I'm going to allow the question because I

2     don't think we have a question on the table yet.

3          MR. OKIN:  No, we don't.

4          THE COURT:  All righty.

5     BY MR. OKIN:

6     Q    Mr. Seidel, this is an email from my partner, Jim Bartlett

7     to your counsel, Mr. Rukavina.  But I assume he put it in here

8     because he knows it's a authentic exhibit.  In that email, Mr.

9     Bartlett is sending back revisions to the NDA.  So you, in

10    fact, got the changes to the one that Mr. Rukavina sent eight

11    days later, correct?

12    A    That's what appears.  Yes.

13    Q    Did your counsel ever respond to this email and these

14    changes made by Mr. Bartlett?

15    A    I'm sure that there was discussions, but I don't have

16    anything here.

17    Q    You had an email or an exhibit --

18    A    No.

19    Q    -- that shows that there was no response?

20    A    Nope.

21    Q    Do you have any reason to disagree with our statement that

22    there was no response to this email?

23    A    I don't know.

24    Q    Does that show diligence by your side in trying to get the

25    documents from us in ignoring an email since March 8th?

113

1  A    My side has been diligent in this matter.

2  Q    Does this email show that diligence?

3  A    I don't know what this email shows.  You tell me.

4  Q    It shows that we sent you changes within a week of you

5  having sent us changes and then we never got a response.

6  A    I don't know that that's true.

7          MR. OKIN:  Pass the witness.

8          THE COURT:  Thank you.  Any further redirect?

9          MR. RUKAVINA:  Nothing further, Your Honor.

10          THE COURT:  All righty.  Thank you.  You may step

11  down, Mr. Seidel.  Thank you very much for your testimony.

12          MR. SEIDEL:  Thank you, Your Honor.

13      (Witness excused)

14          MR. RUKAVINA:  Your Honor, I'd move for the admission

15  of A, B -- well, I move for the admission of A through M and

16  then I can address any discrete issues.

17          THE COURT:  Okay.

18          MR. RUKAVINA:  So I'm not moving for the admission of

19  the Frinzi deposition, just A through M.

20          THE COURT:  All right.  Any objection to the

21  admission of A through M?

22          Take your time with that, Mr. Okin.  And then for

23  sake of the record, the Exhibits A through M will be contained

24  at Docket Number 241.

25          MR. OKIN:  Your Honor, the only objections we have at

1  this point are to Exhibits H and I, which are essentially email

2  exchanges revolving around the forbearance agreement.  There

3  was testimony about it.  I --

4          MR. RUKAVINA:  That's okay, Your Honor.  I'll

5  withdraw H and I.

6          THE COURT:  Okay.

7          MR. OKIN:  Everything through M is fine otherwise.

8          THE COURT:  All right.  Thank you.  Anyone else have

9  any --

10          MR. LANGLEY:  Your Honor.

11          THE COURT:  Yes.

12          MR. LANGLEY:  Your Honor, only a limited objection.

13  I don't have any issue with Exhibits A and B entered in for the

14  limited purpose of the A/R document that is in the corporate

15  records of this debtor.  But I would have the limitation be

16  that nothing's been evidenced that they are authentic or that

17  they were actually entered into by the persons that they were

18  there.  So I would -- given that limitation, I have no other

19  objection to that.

20          THE COURT:  Thank you, Mr. Langley.

21          MR. RUKAVINA:  Of course, Your Honor, we're not

22  asking the Court to make any findings of fact today on the

23  underlying documents or issues.  The only finding of fact the

24  Court needs is cause.

25          THE COURT:  Okay.  Thank you.

1    All right.  For sake of the record without objection,

2  the Court will admit from Docket, again, 241 for sake of the

3  record, Exhibits A through G, and then Exhibits J through M as

4  in Mary.  Each of those documents is admitted for sake of the

5  record today with the proviso that Exhibits A and B are not

6  admitted to show any authenticity as to the nuts and bolts of

7  the transaction.

8    But essentially, this is the promissory note and the

9  security agreement upon which -- excuse me -- the source of the

10  investigation sought pursuant to the 2004.

11    (Trustee's Exhibits A through G and Exhibits J through M

12  admitted into evidence)

13    MR. RUKAVINA:  Your Honor, I have no further

14  evidence.

15    THE COURT:  Thank you.  Let me get my notes.  Just

16  one moment.  All righty.

17    Mr. Okin, do you have any evidence to put on of

18  AMRR's own accord, or are we proceeding to closing arguments?

19    MR. OKIN:  We'll just proceed to argument, Your

20  Honor.

21    THE COURT:  Okay.  Thank you very much.  And does

22  FedEx have any evidence today?

23    MR. LANGLEY:  Your Honor, the only thing we would ask

24  is the Court take notice of the public filings that are cited

25  in our joinder.  Other than that, we have no evidence to

1  introduce today.

2          THE COURT:  Okay.  Just one second.  And that is --

3  that's AMRR's 10-Q?

4          MR. LANGLEY:  Yes, Your Honor.  It's AMRR's third

5  quarter 10-Q and AMRRs 10-K from the prior year.

6          THE COURT:  Okay.  All right.

7          MR. LANGLEY:  And that would be limited to those two

8  documents.

9          THE COURT:  Okay.  Any objection to the Court taking

10  judicial notice of AMRRs 10-K for the year ending December

11  31st, 2021.  And AMRRs 10-Q for the quarter ended September

12  30th, 2022.  Any objection?

13          MR. RUKAVINA:  No, Your Honor.

14          THE COURT:  Okay.

15          MR. OKIN:  Your Honor, yes.  I guess I'm not really

16  clear on what the -- what is counsel's seeking to have that do.

17  Are we admitting those into evidence?  Or is there something

18  specific in the 10-K or 10-Q that the Court's supposed to take

19  judicial notice of?  Just taking judicial notice of the

20  existence of two documents obviously doesn't get us anywhere.

21  So I'm not really sure the net effect of that.

22          THE COURT:  Mr. Langley?

23          MR. LANGLEY:  Yes, Your Honor.  We're taking very --

24  briefly, we've asserted that there is $138 of assets in AMRs

25  possession at the end of 2021.  Obviously, that 44 million came

1  into AMRR.  It's significant for purposes of the 2004

2  investigation to figure out where those assets are, where they

3  went.

4           And so the purpose of introducing these exhibits is

5  to demonstrate that there has been a significant change in the

6  financial condition of AMRR based on assets of the debtor that

7  came into their possession.  So that is part of the

8  investigation that demonstrates a scope should be broad in this

9  investigation.

10          MR. OKIN:  Just so Your Honor, it's not part of the

11 investigation.  The 2004 doesn't go to most of those issues.

12 But if the whole issue is so that the Court needs to take

13 notice that the -- what the beginning balance of assets was at

14 the beginning of 2022, I suppose we don't have an objection to

15 it.  Whatever the 10-K says, the 10-K says.

16          THE COURT:  All righty.  Thank you.

17          Again, I think that the Court will take judicial

18 notice of the filing of -- excuse me -- of the 10-K for AMRR

19 for the year ending December 31st, 2021, and the 10-Q for the

20 quarter ending September 30th, 2022.  The citations for each of

21 these are given in the response filed by FedEx at Docket 246,

22 and the Court will weigh those as appropriate.  Thank you.

23          Okay.  So in terms of closing arguments and kind of

24 where we go from here, obviously, we have a few things left to

25 determine.  We've got the 2004 itself, which I don't think is a

secret.  The Court is prepared to grant the Trustee's request

for a 2004 examination, which at this juncture has been

proposed as to be a production of documents.  The Court will

require that the Trustee comport with 9016 in requesting those

documents.  So I'm giving you that essentially preliminary

ruling so as to allow the parties to get to the next part.

Based upon the evidence, the Court finds that there

is good cause for the examination itself.  I think that this

fits squarely within the realm of what 2004 otherwise requires

and allows for, which is to allow a Trustee to investigate the

property and the assets of this debtor, which is very much an

important part, essentially, the promissory note, again, as

admitted into evidence and security agreement at A and B, which

provides for the payment of $44 million to the debtor.

I think that what we still need to discuss is next

steps: number one, the scope of the of the RFPs themselves; and

then, number two, what that means for the creditors.  And I'm

willing to take argument on that.  Obviously, the creditors

would like access to the documents.  AMRR's position is that

only the Trustee should have access to those documents.  And so

we can talk about these issues further at this juncture, or

I'll take direction from the parties.

MR. RUKAVINA:  Your Honor, here's on issue one, I

think it's binary.  I believe that we can and should resolve

any subpoena scope protection issues today.  The issues are

1  live, the Court has a record, the issue has been joined.  And

2  that then would be res judicata, and I will serve a subpoena,

3  but I will seek sanctions based on res judicata, if then they

4  object.

5         The alternative, Your Honor, is we not take up that

6  issue today.  I serve my subpoena.  We have a hearing next

7  week.  The Court order Mr. Frinzi to be here, and we get down

8  to the bottom of it fast.  So that there's no more delays and

9  games that there have been.  Your Honor saw that the UCC wasn't

10 even filed until September when Mr. Frinzi was no longer our

11 CEO.  That's the scope.  That's the character of the people

12 we're dealing with.

13        So I'm prepared to have the Court rule today.  And if

14 I lose on certain issues, I lose.  I won't relitigate them.  If

15 that goes for the gander, then I'm the goose.  Or I would ask

16 for a very quick -- remember, Your Honor, just so you don't

17 think I'm being unfair.  We're now three weeks since the motion

18 was filed.  So it was filed as an expedite.  But we've now had

19 three weeks.

20        These are very sophisticated lawyers.  These issues

21 are known.  There's no reason why we now need to wait for them

22 to file an objection to a subpoena, need to file a motion, we

23 can set a hearing next Friday, next Thursday.  Have Mr. Frinzi

24 here and get to it right away.  So I'm okay with either one.

25        As far as the creditor issues and protections, I

1  understand that certain of the information that I hope the

2  Court will give us, needs to be protected.  I have no problem

3  sharing it with the creditors as long as that does not hinder

4  the Trustee's ability to get open kimono.  And if the creditors

5  are willing to be on a strict confidentiality order, I don't

6  see why everyone can't benefit.  That's all I have to say.

7       THE COURT:  Thank you, Mr. Rukavina.

8       Mr. Okin?

9       MR. OKIN:  I'll try not to overly repeat myself, Your

10  Honor.  I think I've said most of this already, but --

11       THE COURT:  It's fine.  Take your time.

12       MR. OKIN:  I just don't think that Mr. Rukavina's

13  suggestion of how to do this is how it works, but if Your Honor

14  wants to stand here, and we can go -- and I've done this with

15  other judges, so it's painful, but we could go through each

16  request.  We can -- I can assert our objection orally and the

17  Court can rule on each one.  But there's still a process in

18  production under 9016 that has to be followed, which is we're

19  going to produce documents.

20       Mr. Rukavina next act can't be to file a motion for

21  sanctions.  It needs to be to contact us, tell us what he

22  thinks we're supposed to produce that we didn't, and then we

23  meet and confer about it.  He files a motion to compel.  We

24  respond.  And if the Court thinks its sanctionable, then the

25  Court can take appropriate action.

1          I think -- I hope that the examination at least made

2    one thing clear, Your Honor.  And that's that we will do, at

3    least my firm will do what it can to respond quickly and

4    correctly, and do what we say we're going to do.  And I don't

5    believe that that's been the case since we've been involved,

6    that we've done otherwise.  And I don't expect that it'll be

7    the case going forward.

8          That said, there's a lot of bad blood here.  So maybe

9    my suggestion that we can still do this somewhat cooperatively,

10   and therefore more cheaply, is just going to fall on deaf ears.

11   But my suggestion would be that the Court enter a protective

12   order.  I have not reviewed the one that's currently in place.

13         I don't know if it would work as written or if there

14   needs to be any changes to it.  But it may be that we can

15   release work off of that fairly quickly.  But that you give us

16   a deadline to submit an agreed protective order.  Or if we

17   can't agree, the Court can just take two versions and pick the

18   one it likes.

19         In the meantime, once that protective order's

20   entered, we're happy to start producing, but if they will serve

21   us with the subpoena with the documents, we'll agree to a

22   shortened response time for serving objections and documents.

23   I think it's 14 days in the rule.  I don't really want to go

24   much shorter than that.  But we can.  And then we -- you know,

25   I'm hoping at that point where we can work out -- we've worked

1  out our differences.

2          But what I will just make the Court aware of and, you

3  know, there are -- our view of this is that more than half of

4  these responses are inappropriate.  It starts off more

5  reasonable and works its way down from there, for the most

6  part.  But like I said, we've collected a significant portion

7  of the ones that are -- exist or are reasonable.  But as far as

8  the third parties go, Your Honor, we just -- once I recognize

9  what Rule 704 says.

10         But I think the Court can modify that requirement.

11 And unless the goal here is just to give every party that

12 thinks they have a claim against my client or my client's

13 principles, even though we're not the debtor in this

14 bankruptcy.

15         We're -- they're just going to -- we're just giving

16 them discovery into collectability and everything else about

17 our business.  It's not going to be used solely to determine

18 what assets the Trustee has and how he liquidates them.  That's

19 not their interest.

20         I mean, FedEx has stated that their interest is

21 contrary to the Trustee.  That they believe the funds that were

22 paid to us belong to them.  By definition, they can't then be

23 taking that information and using it as part of a cooperative

24 process within the estate.  They're going to use it for their

25 own ends.  Similarly, the bondholders have already asserted

1  their right to direct payment.

2          So it just -- I would urge the Court, in addition to

3  entering a protective order, to modify the effects of Rule 704,

4  to not require that things produced pursuant to that protective

5  order that are marked confidential, have to be produced to

6  third parties.

7          THE COURT:  Thank you, Mr. Okin.

8          Mr. Langley, I'll start with you.

9          MR. LANGLEY:  Yes, Your Honor.  Addressing the first

10  issue, I agree with what Mr. Rukavina said and support that

11  fully.  And to give some context, I'm referring to the case

12  management manual for United States bankruptcy judges, second

13  edition.

14          The procedure under Rule 2004 ordinarily is brought

15  by a motion and it can be brought ex parte in a lot of

16  situations.  And that's the ordinary procedure that I

17  understand the Northern District uses and most other districts

18  across the U.S. use as well.

19          What typically happens then if a party is a third

20  party is not present for the proceeding, you would then take

21  that order that is granted the Rule 3004 motion, attach it to a

22  subpoena and send that subpoena out to a party that's not

23  present.  They could then come object and make all the

24  presentation they need to.

25          That's not what we have here.  We have a party that

124

1  actually has filed a notice of appearance.  Has sought relief,

2  a motion to quash.  Has done other activities in this case and

3  is in the courtroom today on the very issue that's are in the

4  motion.

5        We think that going through the subpoena role, and

6  allowing further objections down the road is again, further

7  delay, further ability to get to assets and understand them,

8  that may be depreciating and disappearing on us.  We don't know

9  that.  And we don't think there's a benefit to delaying this

10 out.  We would ask, as Mr. Rukavina said, that this gets

11 resolved today and get -- do so conclusively.

12       As to the second issue about the participation of

13 creditors.  I just don't think excluding FedEx and the

14 bondholders is practical.  And here's why.  Let's assume the

15 Trustee reaches -- gets these documents, reaches a settlement

16 with AMRR.  They would then have to present that 9019 motion to

17 the Court and have to get parties of interest could then

18 object.

19       Well, FedEx, if we're not given the information at

20 that point in time, we would have to do substantial discovery

21 on a Rule 9019 motion to figure out if we even agree that the

22 proposal is reasonable.  We have no ability right now based on

23 the information of this estate and what we have with AMRR to

24 determine what would be a fair and reasonable settlement,

25 whether we would go along.  Whether we agree that this is a

1  promissory note that should be enforced.  Whether we think

2  there are fraud claims that should be enforced.  We don't have

3  that information at present.

4          I think that the two parties, the Trustee and MBG,

5  both today have signaled that they think FedEx may assert some

6  type of independent claim.  We haven't done so at this point in

7  time.  So it's all speculative.  It's all hypothetical.  It's

8  not something that should dictate how this Court should rule.

9  We should be entitled under 704(a)(7) to the information that

10 Trustee gets.

11         We're willing to enter into the protective order that

12 has governed this case already.  There's no reason we can't

13 hold that confidential.  FedEx is holding numerous confidential

14 information, including confidential information from Goodman

15 Networks related to the relationship that goes back many, many

16 years.  So we think that that is a practical and protective way

17 to proceed to allow this information to be produced to the

18 Trustee and parties to the protective order.

19         THE COURT:  Thank you, Mr. Langley.

20         Mr. Guffy.

21         MR. GUFFY:  Thank you, Your Honor.

22         The Trustee -- I'm sorry, the Trustee and the

23 majority know who the group -- don't really have a strong

24 position on procedurally how we proceed from this point.  Like

25 Mr. Langley, we'll agree to whatever confidentiality

1 restrictions are appropriate here.  Whatever the Trustee agrees

2 to with AMRR, we'll sign on to that as well.

3        With respect to our participation, I would 100

4 percent echo Mr. Langley's comments.  You know, ultimately, if

5 there is any kind of settlement that is presented here, and we

6 don't have access to the underlying information that led to

7 that settlement, we will -- you know, we'll probably have to

8 object to that.  The indenture Trustee has a fiduciary duty to

9 its holders.  And if the indenture Trustee is not aware of the

10 underlying facts behind the settlement, it can't make a

11 recommendation to its holders as to whether that settlement

12 should be approved or not.

13        The AMRR note is our collateral, and at the end of

14 the day, any settlement of our collateral is going to require

15 us to be on board with that deal.  And so either we get the

16 information now as part of an efficient, collaborative,

17 process, or we get it later as part of a contested process.

18 And we think that the most efficient and practical way to

19 proceed is to have the bondholders and all the major creditors

20 participate in the discovery process as we've been doing thus

21 far this entire case.  Thank you, Your Honor.

22        THE COURT:  Thank you very much, Mr. Guffy.

23        Mr. Sullivan.

24        MR. SULLIVAN:  Thank you, Your Honor.

25        Just to piggyback on what Mr. Guffy said, I think as

1   long as we are willing to enter into a confidentiality

2   protective order, which I think the Court has heard from all

3   the creditors that we're willing to do so, and if there is one

4   in place with regard to discovery, there's simply no reason to

5   somehow cut us out the assets the debtor are going to be used

6   to pay the creditors.  And frankly, in the interest of

7   efficiency, if we're cut out, there will be more disputes back

8   in this Court, motions practice, more hearings like this eating

9   up resources and time that just doesn't serve anyone frankly,

10  in this matter.

11          So if for no other reason than trying to make this as

12  smooth and efficient as possible, while preserving all the

13  assets of the estate to maximize return to creditors, it makes

14  no sense to cut the creditors out of this discovery.  Thank

15  you.

16          THE COURT:  Okay.  Thank you very much.  All righty.

17  What I'm aiming to be is practical here, okay.  We've slightly

18  gone past our one hour time estimate, and even with gremlins, I

19  think that's been blown.  But I don't think -- normally I'd be

20  willing to roll my sleeves up and go through RFPs.  It's not my

21  first love, I must say, but I'm certainly willing to do it.  I

22  also think that it's something that's better done one of two

23  ways.  The parties can do it amicably outside of this Court.

24  Or we can draw out the objections through the subpoena process

25  and see if there can be an attempt made to narrow those, and

1  then go forward.

2          I think the same rule applies to what I'll basically

3  kind of put to the side into a separate box, which is the

4  creditors need for are rights to the information.  As I see it,

5  I certainly give credence to Mr. Okin's arguments.  You know,

6  essentially, I've got a two-party dispute right now, between

7  the Trustee and perhaps a four-party dispute the way you put

8  it.

9          We have that now, but the creditors request, I have

10 one joinder.  And, of course, I have two other creditors who

11 have been very active in this process that says, well, if you

12 give it to them, give it to us.  In fact, we all want it.  So

13 there's a number of ways that this can happen.

14         This can either happen amicably through a protective

15 order process, which I'll allow the parties to consider.  And

16 if not, I think that what we would need candidly, for just a

17 proper process, is a separate 2004 motion by the creditors.

18 And I mean, because there's more than one way to tee this up.

19 You know, I'm looking to the parties to do this, like I said,

20 as amicably as possible, but if it's not, if it's a fight, it's

21 a fight.

22         So what I think makes sense is, again, the Court is

23 prepared to grant the 2004 examination.  The Court will again

24 require that the Trustee comport with 9016 in doing so.  And

25 perhaps the best thing to do at this point, is to get a hearing

1  on the books for any disputes.

2      Essentially, if there will be a response to the
3  subpoena, there will be objection.  If there's any objections
4  to the individual RFPs, let's get a hearing on the books to
5  deal with those.  That will give the parties time to enter into
6  any form of protective order that they wish and to essentially
7  deal with the objections.

8      Likewise, if there is no agreement between the
9  parties -- and when I say the parties, I mean AMRR and the
10 creditors, I'll basically recommend that that same hearing be
11 used by the creditors.  File any 2004 examination that you
12 want, and you know, if you just want to piggyback, but then
13 again, file that motion.  And so essentially we can hear it at
14 that time.

15     In terms of future hearing dates, what I have now, my
16 trial week is currently open.  So I have hearing times
17 available for May 10th and May 11th.  And we also already have
18 an afternoon setting on Goodman on May 18th at 1:30.  So we can
19 -- you can look at those dates but, of course, we're backing --
20 we're having to put into there the service of the subpoena, the
21 response to the subpoena and, again, any agreement or otherwise
22 motions to be filed by the creditor.  And obviously, I can go a
23 couple of weeks out from that, as well.

24     MR. RUKAVINA:  Your Honor, I predicted the afternoon
25 or May the 18th will be one, perhaps two contested hearings.  I

1 would strongly urge the Court to set May 10th. I don't think

2 Mr. Okin is authorized to accept service of the subpoena.

3 Maybe he's had a chance to ask Mr. Frinzi.

4          In the meantime, I can get the subpoena down. I

5 mean, and if they do so, I'll hold them before this Court

6 assuming that the officers and/or directors aren't evading

7 service, I'll be happy to spend $1,000 and have a process

8 server coming to each one of their houses at 11 p.m. and at 4

9 a.m. and at their kindergartens. I'm happy to do so. But I

10 could do that tomorrow.

11          THE COURT: Something tells me you would be happy to

12 do that.

13          MR. RUKAVINA: And obviously, I'm being a little bit

14 facetious. And I hope I'm not trying the Court's patience.

15 But if that's the game we're going to play, I know how to play

16 that game. And the subpoenas will be served tomorrow. That

17 gives -- and again, this has been pending for three weeks, so

18 if tomorrow's a Thursday. What day of the week Ms. Thomas, May

19 10th?

20          THE COURT: Wednesday. It's Wednesday, the 10th,

21 Thursday the 11th.

22          MR. RUKAVINA: Then by that Friday, they can lodge

23 objections, or maybe Monday, noon at the latest. And we'll

24 just be back here. I have no problem with that, Your Honor.

25 But I do strongly encourage AMRR as a sign of good faith in

1  light of what they've done to at least save me the cost of

2  $5,000 in server fees.

3          THE COURT:  Mr. Okin.

4          MR. OKIN:  I'm not in position to agree to it right

5  now.  I will certainly discuss it with my client, Your Honor.

6          THE COURT:  I would ask that your client consider

7  that there has been an appearance in this matter.

8          MR. OKIN:  We will definitely do that.

9          THE COURT:  Okay.  Thank you.

10         MR. OKIN:  Your Honor, I think the 10th is a little

11 too short.  Because that's really 14 days essentially, from

12 today.  So I just -- I had offered to shorten the response time

13 on the subpoena.  And quite frankly, if we can get an agreed

14 protective order done, and then if the existing one is

15 acceptable, then we can sign on to it.

16         If there need to be some minor changes, we can get

17 that done.  We'll start producing documents before the response

18 date.  But I need -- I think we ought to at least build in --

19 what I would suggest is just early the following week.  I'm

20 actually unavailable on the 18th.  So I wish --

21         THE COURT:  Okay.

22         MR. OKIN:  -- I'd prefer we do it sooner than the

23 18th.

24         THE COURT:  Well, that's a family member's birthday,

25 so I should probably not try to --

1          MR. OKIN:  You already have hearings that day, Your

2    Honor.

3          THE COURT:  Yeah, yeah.  To pile it on.  So let me

4    look at what we have after that.  So my system decided to fight

5    me.  Just one moment.  Sorry, I'm trying to pull up the court

6    calendar, and Ms. Harden is doing the same.  I also have the

7    Fifth Circuit Judicial Conference in that time period, so I'm

8    trying to pull it up.  Just one moment.

9          MR. BARTLETT:  Your Honor?

10          THE COURT:  Mr. Bartlett?

11          MR. BARTLETT:  Can you hear me, Your Honor?

12          THE COURT:  I can.

13          MR. BARTLETT:  Yes.  Yes, Your Honor.  Sorry about

14    chiming in, because I know I haven't made an appearance, but

15    I've gotten confirmation from client that we, Okin Adams, can

16    accept the subpoena on behalf of AMRR, MBG, Your Honor,

17    formerly known as AMRR.

18          MR. RUKAVINA:  I greatly appreciate that, Mr.

19    Bartlett.

20          THE COURT:  Thank you very much, Mr. Bartlett.

21          MR. LANGLEY:  Your Honor.  While we're on that topic,

22    let me let me clarify what kind of a position FedEx is in

23    having filed a former joinder to the Trustee's motion and not

24    seeking anything beyond the Trustee's motion.  Can we -- are we

25    expected to serve a separate subpoena, a separate motion?  What

1   was contemplated by the Court related to that?

2            THE COURT:  Well, what is contemplated by the Court

3   at this juncture?  I mean, obviously, Mr. Langley, you filed a

4   joinder.  So again, if it's going to be considered a motion

5   that you filed, you filed it without leave to expedite.  Okay.

6   So you filed it on the 25th, we are the 26th.  I think it's a

7   wee bit short notice for AMRR to be expected to respond with

8   respect to a 2004 by any of the creditors.

9            Now, I want to give time for either there to be an

10  agreement that documents can be shared with the creditors

11  pursuant to a protective order.  And if that agreement can't be

12  reached, I want the creditors to tee it up properly, which is

13  that FedEx, the bondholders, and ARRIS, if any or all of them

14  wish to request access to the documents, initiate their own

15  2004 process.

16           I think if we tee it up at the same time that we're

17  dealing with any objections to the RFPs themselves, it's

18  probably the best time to get it all out there. And so if it

19  can't be worked out between the parties, I'd ask that the

20  creditors file their own 2004 motion(s), which at that point, I

21  think that AMRR would have sufficient time to respond to.

22           MR. LANGLEY:  Okay, Your Honor.  Thank you.

23           THE COURT:  Oh, you're welcome.  Okay.  So I have a

24  three-week trial -- a three-day trial the week of the 18th.  So

25  --

134

1          MR. BARTLETT:  Your Honor, I'm sorry, I didn't hear.

2   Is March the 10th and 11th -- May the 10th and 11th longer

3   available?

4          THE COURT:  No, no, no.  May the 10th is available.

5   Mr. Okin said that it's a bit quick.

6          MR. RUKAVINA:  Your Honor, it's been three weeks

7   since I served this motion on them.  Let's not go into late May

8   and June and let them buy another 30 days, please.

9          THE COURT:  Okay.  And you said you can get the

10  subpoena out today or tomorrow?

11         MR. RUKAVINA:  Well, so now the counsel has

12  graciously agreed, I will get it out today.

13         THE COURT:  Okay.  Mr. Okin, do you have availability

14  on the 10th or the 11th of May?

15         MR. OKIN:  I don't have the 11th, Your Honor.  But I

16  do on the 10th.

17         THE COURT:  On the 10th.  Okay.

18         MR. OKIN:  Your Honor, may I just say the way the

19  process is setting up.  I mean, so we have not drafted

20  objections.  We'll take a few days to do that.  But if we do

21  this by the 10th, I think you're just setting up an automatic

22  -- there's going to be a hearing -- a contested hearing over

23  the scope of these requests.

24         Because there's not time for us to serve our

25  responses, and then really try to work something out with the

**WWW.LIBERTYTRANSCRIPTS.COM**

1  Trustee over that scope.  Or at least I guess, I'm not sure

2  when you're contemplating we would actually serve our responses

3  under that -- under this scenario or whether that's --

4        THE COURT:  Okay.  Well, Mr. Okin, I'm a little

5  confused now.  I mean, the subpoena process aside, okay?  A

6  2004 motion is filed.  The RFPs are attached to it.  If you

7  want to argue the RFPs today, we can get them done today.

8  Okay.  And then all you're going to have at the end of the day,

9  you've got to realize, is a fairly limited objection process,

10  right?  Because the subpoena process will be in place.  But the

11  Rule 26 process not so much because it's a 2004.

12        So I want to give you some time here, but I don't

13  want this to become an outsized fight for what's left to be

14  discussed, which again you've had the RFPs for a while.  I

15  understood your objection to be, hey, Judge, these RFPs says

16  that MBG and each of its subs' information should be turned

17  over.  Okay.  So like, how are they reaching the subs, Your

18  Honor, because you only have a note between MBG and GNET, the

19  sub of the debtor?

20        Well, we can certainly talk about that.  Because at

21  that juncture, we could argue, well, what is in MBG's

22  possession?  If you take a look at the security agreement, if

23  they have an interest in the books and records what does that

24  mean?

25        I mean, obviously, you've raised one issue with the

136

security agreement and that exclusion.  But if you read the

entirety of the security agreement, I think there's another

argument there.  So you know, I want to give you some time, and

I want to be respectful of AMRR's rights.  But I'm not going to

set up for a fight to have another fight to have another fight.

MR. OKIN:  I was actually -- Your Honor, I thought I

was suggesting it in a way that tried to avoid that.

THE COURT:  Yeah.  But how much time do you need?  I

mean, let's be honest.

MR. OKIN:  I don't need that much, Your Honor.

MR. RUKAVINA:  And Your Honor, we've had -- just so

Your Honor knows, we've had multiple meetings --

THE COURT:  Mr. Rukavina, let Mr. Okin --

MR. OKIN:  And we haven't had multiple meetings --

meet and confer.  We met once to talk about the scope of the

request.  I've told the Trustee what our issues were.  I've

never received a suggestion back as to any reduction in those

requests.  My hope in insisting on the subpoena process was not

to try to avoid service.  It was not to evade jurisdiction.

It's not to make the Trustee go to the trouble of even filling

out a subpoena form.

It's to give us time for okay, it's to say, okay, the

clock starts today, whatever date that is.  Whether it's seven

days, ten days, 14 days, like the rule requires, we give you

our response.  These are the -- these are our objections to

137

1  your requests.  And here are some documents responsive to the

2  ones we don't object to.

3           Now, if you think some of those requests, some of

4  those objections are over -- you know, are too much, and that

5  you can't live with them, then we have a meet and confer.  We

6  try to work it out.  If we can't work it out, we come in front

7  of the Court and have a fight.

8           To me, that reduces the fights, it doesn't increase

9  them.  If we come back, we can come back next week.  But we'll

10 just be back having this fight.  I'm hoping that if we push it,

11 I'm not even really asking for more than another four days or

12 so.  If we push it a little pass that following week --

13          THE COURT:  The problem is, I can't push it just a

14 few days.

15          MR. OKIN:  If the Court's calendar does --

16          THE COURT:  Right.  It's because --

17          MR. OKIN:  Unfortunately, I've got a few trips too so

18 --

19          THE COURT:  Yeah.  I've got -- Mr. Rukavina, are you

20 available the morning of 18th?

21          MR. RUKAVINA:  Your Honor, I am.

22          THE COURT:  Okay.  Was not available for you, Mr.

23 Okin?

24          MR. OKIN:  It's not, Your Honor.

25          THE COURT:  Okay.

138

1          MR. OKIN:  But I take it if the Court doesn't have

2    the earlier in that week, I suppose given my travel schedule, I

3    just have to agree to that time.

4          THE COURT:  Right.  I don't have the 15th, 16th, or

5    17th to give.  I have three days of trial that day.

6          MR. OKIN:  Then I think we have to take that.

7          THE COURT:  I could give some time on the 18th.  I've

8    got a status conference on a Sub V case at 9:30, so I can give

9    you 10 to 12:30 in the morning and then we'll come back and be

10   all Goodman all the time in the afternoon.

11         MR. OKIN:  Your Honor, I will be out of town and I'm

12   just going to do this over the phone and put him on the spot.

13   If Mr. Bartlett's available and wants to cover it.  Otherwise.

14         THE COURT:  Mr. Bartlett, are you available?

15   Mr. Bartlett?

16         MR. OKIN:  He wasn't supposed to be covering this.

17   So that might be --

18         MR. BARTLETT:  I'm sorry, Your Honor.  I had to look

19   at my calendar and I apologize for not being on video, but I'm

20   not suitably dressed.

21         THE COURT:  You're fine.

22         MR. BARTLETT:  Okay.  I'm going to turn on the video

23   then, if you don't mind.  I have 18th open as of now.

24         THE COURT:  Okay.  So, again, I think that'll allow

25   us to more easily set deadlines.  So what we'll do is we'll set

1 this for May 18th at 10 a.m.  And again, I could set it at

2 9:30, but you'd just be waiting behind another matter anyway.

3 So I'll just be a little bit more respectful of your time

4 there.  We'll set this for May 18 at 10 a.m.

5         And what I'll do is I'll ask that the Trustee get his

6 subpoena out today with the RFPs.  Again, I'm very appreciative

7 of AMRR allowing its counsel to accept service.  I'll ask that

8 those objections be filed by the -- if you can get it out today

9 -- by the 11th.  And what I want to do is I want to give the

10 parties some time to essentially have the ability to confer

11 with the creditors as to whether or not it makes sense for them

12 to just join into this process, address it by a protective

13 order.

14         If there is no agreement reached, I'm going to ask

15 that any creditor that wishes to participate in the process,

16 file its own motion, and I'll allow them to file one motion if

17 they can so agree and to so join.  They can follow that motion

18 by the 9th -- May 9th, and I'll expedite that to May 18th, as

19 well.  And I will allow -- again, absent an agreement, I'll

20 allow for AMRR to respond to those -- to any 2004 filed by the

21 creditors.  You can -- or respond to that by the 16th.

22         MR. RUKAVINA:  Let's understand, Your Honor, what I'm

23 trying to avoid here.  So the way that I read the rule, if they

24 object, then it's my duty under Rule 45(d)(2)(b)(1) to move to

25 compel.  So may I have my setting on May 18th for my motion to

compel?  Because otherwise, it's going to be another 30 days.
In other words, sometimes I do the rules a little different.
You had to go get an order.  But the way that I read the rule
now, all that AMRR has to do is object and then the burden
shifts on to me.

MR. OKIN:  I'm not trying to make it any harder, Your
Honor, and I insist that it even be in the form of a motion to
compel.  All we would ask is that sometime more than a day
before the 18th, we just be made aware of what responses the
Trustee seeks to force us to further respond on.

In other words, there's 23 requests in there now.  If
we respond on seven of them or if we respond to ten of them,
and the others we have partial objections and produce a few
documents.  I just want to know where our issues are or dispute
are and see them in writing so we have a clearer picture of
what they are.  It could be -- it could just be a response to
our objection.  I don't care about the form, I just want
notice.

THE COURT:  So in terms of a response to objection,
and if you want to call that a motion to compel or whatever we
want to do so that we can essentially decide the issue on the
18th, do you want to respond by the 15th, Mr. Rukavina?

MR. RUKAVINA:  Yes, Your Honor.  That's fine.

THE COURT:  Okay.

MR. OKIN:  And Your Honor, one other thing.  I just

1  -- I really am not trying to make this more complicated.  On

2  the protective order.  Like I said, I haven't read the one

3  that's in place.

4          THE COURT:  Right.

5          MR. OKIN:  I suspect there's going to be some things

6  we want to change.

7          THE COURT:  Sure.

8          MR. OKIN:  I assume or maybe I should just ask.

9  Without having a hearing on it, is it possible for us if we

10 agree on it, I assume we can just submit an agreed order and

11 the Court will enter it.

12         THE COURT:  Of course.

13         MR. OKIN:  But if we don't agree on it, what I'd like

14 to set up is some way for us just to get competing orders in

15 front of you and get them entered.  Because what I do want to

16 do, and I mean this, is I do want to produce documents before

17 the 18th.

18         So I don't want to come in court again on the 18th,

19 and first we're arguing about a protective order and not

20 produce anything.  Because we're not producing much of anything

21 without the protective order in place.  So the sooner we can

22 get that done, as far as I'm concerned, the better.  That's

23 (indiscernible 1:03:44).

24         MR. RUKAVINA:  Well, Your Honor, let's discuss that.

25 Because the other question I had was, what are we setting for

1  the 18th?  So what about that the Court grant the 2004 today.

2  The Court require a 9016 and AMRR reserves its rights, but we

3  have as amongst us a confidentiality protection in the order,

4  and it wouldn't involve the creditors just yet, but at least

5  that way we can start getting information to the Trustee.  And

6  then for the 18th, do we set a status, or is there an interim

7  order on a 2004 and we set it for a final?  In other words, I

8  think the creditors should decide --

9         THE COURT:  You're hard to help today, Mr. Rukavina.

10  I got to tell you.

11         MR. RUKAVINA:  I'm sorry, Your Honor?  I have not

12  been of any help today?  I'm saying I don't think that we have

13  a problem amongst ourselves on a confidentiality order.  The

14  problem is to third parties.

15         THE COURT:  If you have an agreement amongst

16  yourselves and you want to put it into a 2004 order, I'm happy

17  to, and then at that juncture, if that form of order is

18  something that the other folks can eventually sign on to, to

19  alleviate the need for further 2004 motions, then so be it.

20  But you know, if -- I'm hearing from Mr. Okin he wants to know

21  what the terms of that proposed protective order are.

22         MR. RUKAVINA:  Of course, of course, of course.  I'm

23  not suggesting that as amongst ourselves, there's no reason why

24  within 48 hours, we can't have an -- this is not rocket science

25  -- on a protective order.  But again, I'm seeking guidance.  Do

143

1    we propose an interim order on the 2004?  What does the Court

2    want us to do?  And then what are we putting on the notice of

3    hearing on the docket for the 18th?

4         THE COURT:  Okay.  So I think that that does make

5    sense that it's an interim order with respect to the 2004, to

6    the extent the parties want to begin producing documents, and

7    they want to do so pursuant to a protective order.  What we can

8    do is two things.

9         If absent that agreement, I can basically look at two

10   forms of that interim order with the protective order language

11   in it.  Okay.  And I will pick one or modify it and enter it.

12   And then that way, the flow of information can begin.  Then we

13   will set the 2004 along with any issues that once the responses

14   to the subpoena, and the objections are raised, I think we'll

15   have to just notice those up.  I think at that point, when you

16   file your response, that's what will be set on the docket.

17        MR. RUKAVINA:  Okay.

18        THE COURT:  Okay.  That would be obviously from our

19   perspective, everybody that's been participating will know

20   what's been going on.  But other than that, we'd be looking at

21   a motion to compel and expediting that, and that's just more

22   ink.

23        MR. RUKAVINA:  Okay, Your Honor.  I think I

24   understand.

25        THE COURT:  I think so, too.

1          MR. OKIN:  We'll find out when we start drafting.

2          THE COURT:  Okay.  So from the Court's perspective,

3  what I've got down in my notes is a May 18th, 10 a.m. follow-up

4  hearing on the 2004, at which time, we will also take up any

5  issues related to objections to the subpoena and the RFPs

6  themselves.  The Court will enter an interim order granting the

7  2004, subject to the subpoena being issued today and with any

8  form of protective order or confidentiality restrictions that

9  the Trustee and AMRR can agree to at this juncture.

10          Again, the Trustee will serve the subpoena and the

11  RFPs today.  Any objections thereto will be provided and

12  followed by AMRR on the 11th.  The Trustee will file any

13  response that it wishes on the 15th and AMRR -- the 15th?  Is

14  that right?  Yes.  On the 15th.

15          And AMRR will be -- oh, excuse me -- and the other

16  process is absent an agreement with the creditors, the

17  creditors will file their own motions for a 2004 exam on the

18  9th.  That will be expedited pursuant to this Court's oral

19  order today, agreeing to the expedition of those motions, and

20  that response by AMRR will be due on May 16th.  And that they

21  will be heard on May 18th.

22          MR. RUKAVINA:  One final question, Your Honor.  We

23  usually don't do this.  And it's because -- honestly, because

24  my godson is going to have his first communion.  Can we have

25  the 511 and 515 responses be 5 p.m.?

1          THE COURT:  Of course.

2          MR. RUKAVINA:  Thank you, Your Honor.

3          THE COURT:  That's fine.

4          MR. RUKAVINA:  Thank you, Your Honor.

5          THE COURT:  All right.  And I will make every attempt

6   to capture all that in my minutes.  All righty.

7          Anything further, Mr. Guffy?  I see you're unmuted.

8          MR. GUFFY:  I just wanted to offer up to everyone.

9   We do have the agreed protective order that we've been using in

10  this case at Docket Number 74.  That protective order does have

11  a procedure for parties to join to it.  I believe the Trustee

12  and all the creditors are already signed on to that protective

13  order.  So if that is something that does work for AMRR, it

14  could significantly streamline the process of getting the

15  confidentiality order in place.

16         MR. RUKAVINA:  We will look at that, Your Honor.

17         MR. GUFFY:  I know Mr. Okin said he hadn't had a

18  chance to look at it.  But I just wanted to point specifically,

19  it's at Docket 74.  And it does have a procedure for parties to

20  join to it.

21         THE COURT:  Thank you.

22         MR. LANGLEY:  And not to piggyback, but I will also

23  represent that AMRR has actually already joined that protective

24  order.

25         MR. GUFFY:  I think we did produce pursuant to that

1  before.

2          THE COURT:  Okay.

3          MR. GUFFY:  I just -- all I said was I don't know

4  what it says.

5          THE COURT:  Right, exactly.  Yeah.  So take a look at

6  that.  That's probably a good form of precedent to begin from

7  for purposes of your agreement, given that that's existing in

8  the case.

9          MR. OKIN:  I think the one thing we would want to

10  have without looking at it.  The one thing I know we probably

11  want to add that's probably not in there is on an interim

12  basis, at least until we hear the creditor issues, we're going

13  to want a provision that obviates the Trustee's obligation

14  under 704 to provide the information even to party -- other

15  parties that are subject to the protective order, at least

16  until the Court rules on that issue.

17          THE COURT:  Yeah.  Until further hearing.

18          MR. OKIN:  Yeah.

19          THE COURT:  Okay.  Anything else, gentlemen?

20          MR. RUKAVINA:  Your Honor, thank you for your time.

21  And I apologize about the gross underestimated timing.  Thank

22  you very much for your time, Your Honor.

23          THE COURT:  You're very welcome.

24      (Proceedings adjourned at 1:11 p.m.)

25                          *  *  *  *  *

147

1        **C E R T I F I C A T I O N**

2            I, DIPTI PATEL, court approved transcriber, certify

3    that the foregoing is a correct transcript from the official

4    electronic sound recording of the proceedings in the above-

5    entitled matter, and to the best of my ability.

6

7    /s/ Dipti Patel

8    DIPTI PATEL, CET-997

9    LIBERTY TRANSCRIPTS                    DATE: May 9, 2023

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25