Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-31641-mvl-7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE; and | § | |
| GNET ATC, LLC, | § | |
| | § | |
| | § | ADVERSARY PROCEEDING |
| Plaintiffs, | § | NO: |
| | § | |
| v. | § | |
| | § | |
| 18920 NW 11th, LLC; JAMES GOODMAN; | § | |
| JAMES FRINZI; STEVEN | § | |
| ZAKHARYAYEV; EVELINA | § | |
| PINKHASOVA; PEOPLE NQ INC.; | § | |
| JJC & PEOPLE LLC; GDMN FAMILY | § | |
| INVESTMENTS 2, LLC, | § | |
| | § | |
| Defendants. | § | |

## <u>ORIGINAL COMPLAINT</u>

TO THE HONORABLE MICHELLE V. LARSON, U.S. BANKRUPTCY JUDGE:

COMES NOW Scott M. Seidel, Trustee (the "<u>Trustee</u>"), the trustee of Goodman Networks,

Inc. (the "<u>Debtor</u>"), the debtor in the above styled and numbered chapter 7 bankruptcy case (the

"<u>Bankruptcy Case</u>"), and GNET ATC, LLC ("<u>GNET</u>," with the Trustee, the "<u>Plaintiffs</u>"), and file

this *Original Complaint* (the "Complaint"), complaining of 18920 NW 11th, LLC ("18920"), James Goodman ("Goodman"), James Frinzi ("Frinzi"), Steven Zakharyayev ("Zakharyayev"), Evelina Pinkhasova ("Pinkhasova"), People NQ Inc. ("People NQ"), JJC & People LLC ("JJC"), and GDMN Family Investments 2, LLC ("GDMN," with People and JJC, the "Goodman Entities," and the Goodman Entities, with 18920, Goodman, Frinzi, Zakharyayev, and Pinkhasova, collectively, the "Defendants"), and, for cause and action, would respectfully show as follows:

## I.    INTRODUCTION

1.    By March 2022, the Debtor was insolvent – owing tens of millions of dollars to secured and unsecured creditors.  Employing misrepresentation, concealment, fraud, and other tortious conduct, and in breach of various duties to the Plaintiffs, the Defendants participated in a convoluted transaction that stripped the Plaintiffs of at least $13.5 million and other valuable assets in March 2022.  The Plaintiffs received nothing of value and the Defendants executed the dual purpose of removing Plaintiffs' valuable assets from the reach of creditors and to enrich certain of the Defendants.

2.    Specifically, Goodman, through the Goodman Entities, owned a large number of the Debtor's then worthless preferred shares.  Looking for an opportunity to monetize those shares, Goodman, Zakharyayev and Frinzi concocted a plan to have the preferred shares transferred to 18920, have 18920 demand redemption of the preferred shares by the Debtor, and then settle that demand for the transfer of cash and valuable assets.  To make everything appear legitimate, the plan was based on a purported obligation of the Debtor to mandatorily redeem or liquidate the preferred shares.  Under the Debtor's operative corporate documents in 2022, such an obligation did not exist.  Indeed, if such a mandatory redemption right had existed, Goodman and the Goodman Entities could have capitalized on it without the need for a middle-man.  Thus, 18920 agreed to purchase the shares—not with its money or at its risk, but rather with the Debtor's

money—then made a fraudulent redemption demand on shares that it did not own, which Frinzi

then honored by transferring cash and other assets pursuant to a "settlement" with 18920.

3.      Following the transaction, the Plaintiffs had received no value, Goodman and the

Goodman Entities had received $10 million for worthless preferred shares, and 18920 (controlled

by Zakharyayev and Pinkhasova) held onto cash of approximately $3.5 million and the other

valuable assets in consideration for its role as a conduit to perpetuate the fraud and torts further

detailed in this Complaint.  Frinzi, through breaches of his duties of loyalty and care, facilitated

and permitted all of this.

4.      The Trustee therefore files this Complaint to avoid these transactions, obtain

monetary and other relief, and hold the conspirators accountable.

## II.      PROCEDURAL BACKGROUND

5.      On September 6, 2022 (the "Petition Date"), various petitioning creditors filed an

involuntary petition against the Debtor, thereby initiating the Bankruptcy Case and creating the

Debtor's bankruptcy estate (the "Estate").

6.      The Court entered an order for relief against the Debtor on December 12, 2022.

7.      The Trustee is the duly appointed trustee of the Debtor and the Estate.

8.      The Court has jurisdiction over this Complaint under 28 U.S.C. § 1334.  Such

jurisdiction is core under 28 U.S.C. § 157(b)(2).  To the extent that any matter in this Adversary

Proceeding is not core, the Trustee consents to this Court's entry of a final judgment over any and

all such matters.

9.      Venue of this Adversary Proceeding before this Court is proper under 28 U.S.C. §§

1408 and 1409.

## II.    **PARTIES**

10.    The Trustee is the Chapter 7 trustee of the Debtor and the Estate and files this Complaint in such capacity only.

11.    GNET is a Texas limited liability company, the sole member and owner of which is the Debtor.  In that the Trustee controls the Debtor, and the Debtor is the sole member of GNET, the Trustee has all necessary authority to cause GNET to file this Complaint and to direct its actions in this matter as the sole member.

12.    18920 is a limited liability company organized and existing under the laws of the State of Florida.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), 18920 may be served with process in this Adversary Proceeding by and through its registered agent, Evelina Pinkhasova, as follows: 18920 NW 11th LLC, c/o Evelina Pinkhasova, Registered Agent, 2719 Hollywood Blvd., Hollywood, FL 33020.

13.    Goodman is an individual and a resident of the State of Texas.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Goodman may be served with process in this Adversary Proceeding anywhere he may be found, including his home at: James Goodman, 103 Tomahawk Trail, San Antonio, TX 78232, or where he regularly transacts business: James E. Goodman, Genesis Networks, 1354 N. Loop 1604 E, Suite 103, San Antonio, TX 78232.

14.    Frinzi is an individual and a resident of the State of Texas.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Frinzi may be served with process in this Adversary Proceeding anywhere he may be found, including his home, as follows: James Frinzi, 9204 Eddy Cv., Austin, TX 78735.

15.    Zakharyayev is an individual and a resident of the State of New Jersey.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Zakharyayev may be served with process in

this Adversary Proceeding anywhere he may be found, including his home, as follows: Steven Zakharyayev, 43 West Canadian Woods Road, Marlboro, NJ, 07746.

16.    Pinkhasova is an individual and the wife of Zakharyayev.  Upon information and belief, and pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Pinkhasova may be served with process in this Adversary Proceeding anywhere she may be found, including her home, as follows: Evelina Pinkhasova, 43 West Canadian Woods Road, Marlboro, NJ, 07746.

17.    People NQ is a corporation organized and existing under the laws of the State of Texas.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), People NQ may be served with process in this Adversary Proceeding by and through its registered agent, Capital Corporate Services, Inc., as follows: People NQ Inc., c/o Capital Corporate Services, Inc., Registered Agent, 1501 S Mopac Expy Suite 220, Austin, TX 78746.

18.    JJC is a limited liability company organized and existing under the laws of the State of Texas.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), JJC may be served with process in this Adversary Proceeding by and through its registered agent, James Goodman, as follows: JJC & People, LLC, c/o James Goodman, Registered Agent, 205 Crest Trl, San Antonio, TX 78232.

19.    GDMN is a limited liability company organized and existing under the laws of the State of Texas.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), GDMN may be served with process in this Adversary Proceeding by and through its registered agent, John Goodman, as follows: GDMN Family Investments 2, LLC, c/o John Goodman, Registered Agent, 2801 Network Blvd, Suite 300, Frisco, TX 75034.

### III.   FACTS

#### A.   THE PLAYERS

20.     At all times material to this Complaint, Frinzi was the Chief Executive Officer of the Debtor, owing fiduciary duties to the Debtor.

21.     At all times material to this Complaint, Frinzi was the Chief Executive Officer of GNET, owing fiduciary duties to the Debtor and GNET.

22.     Goodman was a director of the Debtor prior to his resignation as such on February 1, 2022.  Upon information and belief, Goodman controlled the majority shareholder group of the Debtor.  Furthermore, Goodman continued to communicate with Frinzi as though Goodman was in charge, and Frinzi continued to act as though Goodman was in charge.

23.     At all times material to this Complaint, Goodman was an insider of the Debtor: as the person who controlled the majority of the Debtor's stock, and as the person who controlled Frinzi even after the time that he may have resigned as a director, and whose instructions Frinzi followed regardless of whether Goodman was a director or not.

24.     People NQ is, upon information and belief, owned and controlled by Goodman.

25.     At all times material hereto, People was an insider of the Debtor, through their common ownership and control by Goodman.

26.     JJC is, upon information and belief, owned and controlled by Goodman.

27.     At all times material hereto, JJC was an insider of the Debtor, through their common ownership and control by Goodman.

28.     GDMN is controlled, and at all times material hereto was controlled, by John Goodman.  Upon information and belief, Goodman owns an interest in GDMN.  John Goodman and Goodman are brothers.  Thus, because Goodman was an insider of the Debtor, and John

Goodman was an insider of Goodman, and John Goodman was an insider of GDMN, GDMN was an insider of the Debtor.

29.     Zakharyayev is an attorney, upon information and belief licensed to practice law in the State of New York and the State of Florida.

30.     Upon information and belief, Zakharyayev and Pinkhasova own and control 18920.

**B.     THE DEBTOR**

31.     As of March 1, 2022, and at all times material hereto, the Debtor was insolvent.

32.     Among other things, the Debtor lost its largest customer in October 2021, had stopped paying FedEx Supply Chain Logistics & Electronics, Inc. ("FedEx") (a major creditor which was owed tens of millions of dollars), had stopped paying other large creditors and vendors, faced numerous lawsuits, and knew that it would soon be unable to make the final principal payment on its Bonds (defined below) due in May 2022.

33.     As of March 1, 2022, the Debtor owed at least $47 million on its 8% Senior Secured Notes (the "Bonds"), though it was in the process of attempting to retire approximately $30 million of Bonds in advance of an interest payment due in April 2022.  GNET was a guarantor of the Bonds.

34.     As of March, 2022, the Debtor had few remaining assets.  The Debtor and/or GNET[1] held, as payee, a secured promissory note in the amount of $44 million (the "AMRR Note") payable by American Metals Recovery and Recycling, Inc. n/k/a MBG Holdings, Inc. ("AMRR"), an entity indirectly owned, and directly controlled, by Frinzi.[2]  The Debtor also held a License

---

[1] The AMRR Note is nominally payable to GNET.  However, because the $44 million of funds transferred to AMRR came from the Debtor, and because the parties repeatedly referenced the note as the property of the Debtor, and not GNET, the Trustee and GNET maintain that the identification of GNET as the payee was a mistake and that the correct payee under the AMRR Note was always intended to be, and always was, the Debtor.

[2] The Trustee has large claims and causes of action against AMRR, Frinzi, and others related to the AMRR Note and other transactions, none of which are asserted in this Complaint and all of which are preserved.  Furthermore, the Trustee reserves the right to question the legitimacy of the AMRR Note.

granted by Tiger Athletic Foundation to use and access certain property at LSU Tiger Stadium (the "LSU License"). Further, the Debtor owned certain trademarks that it and its subsidiaries had used in conducting business (the "Trademarks").

35.      By March 1, 2022, the Debtor had insufficient assets to satisfy obligations to its creditors.

36.      The Debtor issued shares of Series A-1 Preferred Stock in connection with its emergence from a prior chapter 11 case in 2017. The Debtor's Series A-1 Preferred Stock had no mandatory redemption right in 2022. The Debtor's *Third Amended and Restated Certificate of Formation* filed with the Texas Secretary of State on May 26, 2017 (the "Third Amendment") contained an optional redemption right and a mandatory redemption obligation with respect to the Series A-1 Preferred Stock. The mandatory redemption obligation was subject to multiple contingencies, including that it was subject to any limitation in the Debtor's Bond documents, that it could be done "to the extent it [the Debtor] may lawfully do so," and only the amount of "Excess Net Cash" as of the end of the calendar quarter preceding any redemption demand.

37.      On September 17, 2020, the Debtor filed with the Texas Secretary of State its *Sixth Amended and Restated Certificate of Formation* (the "Sixth Amendment"). The Sixth Amendment replaced and superseded the Third Amendment's (and other prior amendment's) provisions regarding redemption rights. The Sixth Amendment removed the mandatory redemption provision for Series A-1 Preferred Stock, and retained only an optional redemption right to be exercised in the Debtor's discretion, pursuant to certain requirements and metrics. The Debtor's audited financial statements for the year ending December 31, 2020, the year in which the mandatory redemption obligation was removed, do not reflect a liability for accrued and unpaid mandatory redemption of preferred stock.

38.     The Goodman Entities cumulatively owned more than 4.5 million shares of Series A-1 Preferred Stock as of December 31, 2019.

**C.    THE PLAN AND THE 18920 TRANSACTION**

39.     From late 2021 through early 2022, the Debtor had amassed tens of millions of dollars in cash, mainly because it stopped paying its largest creditors, including FedEx.  Over $65 million in cash had already been removed from the Debtor between December 2022 and February 2022 via various insider transactions that are not the subject of this Complaint.  One question for Goodman was how to exploit the remaining cash and other assets.  Another question for Goodman was how to monetize his, and the Goodman Entities', equity in the Debtor.  Goodman sought Frinzi's advice and assistance on these questions.

40.     Frinzi proposed to Goodman that he seek to sell some or all of the Series A-1 Preferred Stock held by the Goodman Entities.  Frinzi identified Zakharyayev to be the third party to purchase a negotiated amount of the Series A-1 Preferred Stock (the "Transaction Shares") and introduced Zakharyayev to Goodman.  18920 was identified by Zakharyayev as the entity that would purchase the Transaction Shares.

41.     Various of the Defendants implemented the plan in a nefarious manner, employing concealment and misleading documents in an attempt to "paper up" something they knew to be nefarious and tortious.  In broad strokes, with further detail below, the plan was as follows:  (i) the Goodman Entities would transfer the Transaction Shares to 18920; (ii) 18920 would demand redemption of the Transaction Shares from the Debtor; and (iii) the Debtor would use cash and other assets to satisfy the (in fact non-existent) redemption demand.

42.     On March 9, 2022, Goodman and Zakharyayev agreed to the number of Transaction Shares that would be sold from the Goodman Entities to 18920 and the price per share to be paid by 18920 for the Transaction Shares.

43.     On or about March 9, 2022, JJC, as seller, and 18920, as buyer, entered into that certain *Share Purchase Agreement* (the "JJC Purchase Agreement"), pursuant to which JJC agreed to sell 750,837 of the Debtor's Series A-1 Preferred Stock to 18920 for $1.65 per share, or $1,238,881.05.

44.     On or about March 9, 2022, GDMN, as seller, and 18920, as buyer, entered in that certain *Share Purchase Agreement* (the "GDMN Purchase Agreement"), pursuant to which GDMN agreed to sell 2,574,326 of the Debtor's Series A-1 Preferred Stock to 18920 for $4.05 per share, or $10,426,020.30.

45.     On or about March 9, 2022, People, as seller, and 18920, as buyer, entered in that certain *Share Purchase Agreement* (the "People Purchase Agreement," together with the JJC Purchase Agreement and the GDMN Purchase Agreement, the "Purchase Agreements"), pursuant to which People agreed to sell 707,755 of the Debtor's Series A-1 Preferred Stock to 18920 for $1.00 per share, or $707,755.00.

46.     In each of the Purchase Agreements, 18920 represents that "it is aware of, and Seller has fully disclosed to Buyer, the current financial and operational condition of the Company, including that the Company's liabilities exceed the Company's assets, and that the Company may be considered insolvent." The "Company" referenced in the foregoing sentence is the Debtor.

47.     Furthermore, in each of the three Purchase Agreements, 18920 affirmatively represents that it will have on the "Closing Date" immediately available funds to pay the purchase price under each agreement to the seller under each agreement. The "Closing Date" was the date of execution of the Purchase Agreements; *i.e.* March 9, 2022. This representation was false. Upon information and belief, 18920 did not have the funds that it represented that it had and, instead, was counting on the Debtor making a future payment to it, which it would then use to pay. Upon

further information and belief, Goodman and the Goodman Entities knew this representation to be false.

48.    On March 9, 2022, the total purchase price agreed by 18920 as reflected in the Purchase Agreements was $12,372,656.35.  The total number of Transaction Shares reflected in the Purchase Agreements was 4,032,918.  18920 did not deliver the purchase price for the Transaction Shares on March 9, 2022.  The transfer of the Transaction Shares to 18920 did not occur on March 9, 2022.  As of March 14, 2022, 18920 had not submitted the documentation to the Debtor's transfer agent, American Stock Transfer, to effect the transfer of the Transaction Shares to 18920.  As of March 14, 2022, 18920 had not remitted payment for the Transaction Shares to the Goodman Entities.

49.    On March 9, 2022, Pinkhasova, on behalf of 18920 as the "owner of 4,032,918 Series A-1 Preferred Shares", demanded redemption of the Transaction Shares.  Such demand states that, "[a]s you know, the Preferred Shares are subject to mandatory redemptions at their liquidation value on a quarterly basis."  At the time this demand was made, 18920 had not paid for or received the Transaction Shares.  At the time this demand was made, 18920 did not own the Transaction Shares.  At the time the demand was made, no mandatory redemption obligation was included in the Debtor's then current certificate of formation.

50.    On March 9, 2022—the same day as the redemption demand—Frinzi, on behalf of the Debtor, and Zakharyayev, on behalf of 18920, agreed to settle 18920's redemption demand in exchange for a $50 million promissory note issued by the Debtor to 18920 (the "$50 Million Note").  The Trustee has been provided an unsigned copy of the $50 Million Note.  The Trustee is not aware if the $50 Million Note was executed.  Frinzi did not have the corporate authority to bind the Debtor to the $50 Million Note.

51.     The next day, March 10, 2022, 18920, through Pinkhasova, and the Debtor, through Frinzi, executed that certain *Settlement Agreement* (the "Settlement Agreement"). Frinzi did not have the corporate authority to bind the Debtor to the Settlement Agreement.

52.     Under the Settlement Agreement, 18920 and the Debtor state that 18920 holds the $50 Million Note which, upon information and belief, had not been signed.

53.     Under the Settlement Agreement, and in satisfaction of the $50 Million Note, the Debtor and 18920 agreed as follows:

(i)     the Debtor would pay 18920 $14,500,000;

(ii)    the Debtor would assign to 18920 one-half of the AMRR Note (such half representing $22 million) (the "Half AMRR Note"),

(iii)   the Debtor would assign to 18920 the LSU License; and

(iv)    the Debtor would assign to 18920 the Trademarks (the Trademarks, the LSU License and the Half AMRR Note, collectively, the "Transferred Assets").

54.     On March 11, 2022, GNET, from its funds held at East West Bank in account number ending in 0690, held in the name of GNET, transferred $3,976,000.00 to 18920 (the "GNET Transfer").

55.     On March 11, 2022, the Debtor, from its funds held at Prosperity Bank in account number ending in 1838, held in the Debtor's name, transferred $7,498,075.00 to 18920.[3]

56.     On March 15, 2022, the Debtor, from funds it held at RBC Capital Markets, LLC, or its affiliates or subsidiaries in account number ending 1568, transferred $2,000,000.00 to 18920 (together with the $7,498,075.00 transfer, the "Debtor Transfers").

---

[3] The Trustee understands that FedEx takes the position that the funds in question constituted its property or property in held in trust for it, and that the proceeds of such funds are or should be held in constructive trust for its benefit. Nothing in this Complaint is intended to prejudice any such claims, arguments, or rights, or the Trustee's objections to the same. The funds subject of this Complaint originated from a bank account held in the Debtor's name, and in which the Debtor unquestionably held an interest. That is all that is necessary for the Court to adjudicate the Trustee's claims, and it is not necessary to consider, or adjudicate, at this time, whether such funds or any proceeds were held in any kind of trust for FedEx.

57.     Thus, in total, the Debtor and GNET transferred at least $13,474,075 to 18920 (the "Cash Transfers").

58.     Frinzi caused each of the Cash Transfers and the transfers of the Transferred Assets to be made.

59.     The Settlement Agreement suggests that $14,500,000.00 was transferred by the Debtor to 18920.  To the extent that is the amount of the Transfer, the Trustee reserves all of his rights with respect to the same.

60.     The timing of the above transactions further evidences the fraudulent scheme between Goodman, the Goodman Entities, 18920, Zakharyayev, and Pinkhasova: on March 9, when 18920 does not even own the Transaction Shares, it makes its fraudulent redemption demand knowing that the Debtor cannot possibly pay it; on the same day the $50 Million Note is prepared; on the next day the parties execute the Settlement Agreement; and the day after the Debtor and GNET commence transferring millions of dollars to 18920.  Clearly, it was always the intent of the conspirators that this would be the course and sequence of events.  No reasonable buyer of the Transaction Shares would pay millions of dollars (not that 18920 paid anything) to buy a redemption right that it knew (as 18920 acknowledged it did in the Purchase Agreements) the Debtor could not honor, unless the plan all along was to use these fictitious transactions and documents as a predicate to strip the Debtor of its assets.  In other words, it is one thing to just take money and assets out of the Debtor, which would certainly raise multiple red flags and likely lead to prompt litigation, but it is another to clothe the true transaction with the appearance of consideration, all papered up through fraudulent documents, which was the true intent of the conspirators and the reason why a middle-man in the form of 18920 was used.

61.     In April, 2022, Zakharyayev and Frinzi exchanged a revised version of the Settlement Agreement which included the transfer of a $4.5 million note payable by Multiband

Global Resources, LLC, a company owned by Frinzi, to Multiband Field Services, Inc., a wholly-owned subsidiary of the Debtor. The Trustee does believe this revised Settlement Agreement was fully executed. To the extent it was, the Trustee reserves all of his rights, on behalf of the Debtor and Multiband Field Services with respect to the transfer of the note payable by Multiband Global Resources, LLC as one of the Transferred Assets.

62.    18920 only paid the Goodman Entities $10 million as opposed to the $12,372,656.35 provided for in the Purchase Agreements, thus further demonstrating the fraudulent nature of the true transaction, for 18920 could count on Goodman not seeking legal redress against it when the whole transaction was a sham and was fraudulent. On June 8, 2022, after consulting with Goodman's counsel, Zakharyayev revised the GDMN Purchase Agreement to lower the number of Transaction Shares sold by GDMN to 18920 from 2,574,326 to 1,988,484 to match the $10 million. 18920 did not reduce the amount of the $50 Million Note. 18920 did not reduce the consideration to be paid by the Debtor under the Settlement Agreement. 18920 did not refund any of the Cash Transfers or return any of the Transferred Assets.

63.    Upon information and belief, only after 18920 received at least $10 million from the Plaintiffs, combined, did it transfer $10 million to the Goodman Entities.

64.    Thus, 18920, without putting in a penny of its own funds, not having any funds to put in, not even owning the Transaction Shares, and using only the Cash Transfers, pocketed at least $3,474,075 and the Transferred Assets. In other words, based on a non-existent redemption obligation for the Transaction Shares, which themselves had no value and which 18920 paid nothing for, various of the Defendants conspired to create a non-existent $50 Million Note, and then "settled" such non-existent redemption obligation and note with the transfer, to 18920, of actual and valuable property of the Plaintiffs.

D.    **MOTIVES**

1.    **FRINZI**

65.    Upon information and belief, Goodman informed Frinzi that the Transaction Shares had a redemption right.  Upon further information and belief, Frinzi believed Goodman.  Frinzi had only recently been made CEO (in October 2021) and Goodman, unlike Frinzi, had historical and institutional knowledge regarding the Plaintiffs.  Upon further information and belief, Frinzi undertook no investigation or analysis as to whether there was an obligation for the Debtor to redeem the Transaction Shares.  Upon information and belief, Frinzi did not seek legal counsel regarding the redemption demand by 18920 or review the operative corporate documents that would have addressed any potential redemption obligation of the Debtor.  Rather, Frinzi simply took Goodman at his word, motivated by his desire to get his boss and majority shareholder money, even if it came at the expense of the Debtor.

66.    By March 1, 2022, Frinzi knew of the Debtor's insolvency and its inability to pay its debts as they came due.  Frinzi should have known, as any reasonably prudent CEO should have known, that the financial or other metrics required for a Texas corporation to redeem the Transaction Shares could not be satisfied by the Debtor at the time, if they even existed in the first place.  At a minimum, a reasonably prudent CEO would have sought legal and/or financial counsel regarding the alleged redemption rights, certainly before causing tens of millions of dollars of Debtor and GNET property to be transferred.

2.    **GOODMAN**

67.    Upon information and belief, Goodman knew that the Transaction Shares had no redemption right.  Otherwise, he would have caused the Goodman Entities to make the redemption demand and be paid directly by the Debtor.  Goodman was a shareholder, director, and officer of the Debtor at the time the Debtor filed the Sixth Amendment with the Texas Secretary of State.

Upon information and belief, Goodman would have known about and would have been required to approve the adoption of the Sixth Amendment. The Goodman Entities were also shareholders of the Debtor at the time of the filing of the Sixth Amendment. Furthermore, a reasonably prudent businessman like Goodman, who has been, and is, a director and officer of multiple business organizations, would have known that no reasonable redemption right could have been exercised when a company was insolvent. Goodman knew that the Debtor was insolvent.

### 3. 18920, ZAKHARYAYEV AND PINKHASOVA

68. Upon information and belief, Zakharyayev, Pinkhasova, and 18920 undertook no due diligence of whether a mandatory or other redemption right existed. Upon information and belief Zakharyayev, Pinkhasova, and 18920 relied on an old summary of the Third Amendment provided by Goodman. This is evident from the text of the redemption demand which states that "the Preferred Shares are subject to mandatory redemption rights at their liquidation value on a quarterly basis," which tracks the language in the Third Amendment. There is no such or equivalent language in the Sixth Amendment.

69. Any reasonable investor or other person in the shoes of Zakharyayev (a transactional attorney), Pinkhasova, and 18920 would have undertaken basic due diligence to confirm the existence of the mandatory redemption obligation were they to use their own $10 million to purchase the stock and prior to making a written demand on the Debtor to pay tens of millions of dollars. Such diligence, however, was not performed because they were not putting their own money at risk in the transaction. They knew that the Debtor would be transferring, through them, the money to the Goodman Entities to pay for the Transaction Shares. That is further evidence of their knowledge of the nefarious and tortious nature of the transaction because they were not acting as a reasonable, innocent investor would have.

70.     In each Purchase Agreement, 18920 represents that "it is aware of, and Seller has fully disclosed to Buyer, the current financial and operational condition of the Company, including that the Company's liabilities exceed the Company's assets, and that the Company may be considered insolvent."

71.     Nor was the above representation a mistake or misunderstanding.  By e-mail dated March 2, 2022, concerning the negotiation of the Purchase Agreements, Zakharyayev accepted the insolvency language but struck the following language: "[including] without limitation, that the Company has no material assets, employees or operations."  Whether Zakharyayev accepted this language or not, he was certainly made aware of these facts.

72.     Zakharyayev, a transactional attorney, should not have believed that there was any value to the Transaction Shares, much less the value of the Cash Transfers and Transferred Assets, when he represented that he knew, on behalf of 18920, that the liabilities of the Debtor exceeded its assets.  Hence the reason why neither he nor 18290 put even a penny of their own funds into the purchase.

73.     It is inconceivable that Zakharyayev, an attorney, would reasonably believe or rely on any representation that such worthless Transaction Shares could conceivably have a redemption right.  When a company cannot even pay its debts, any return on an equity security, whether preferential or not, is *per se* a constructively fraudulent transfer.  Furthermore, that Zakharyayev undertook no due diligence and instead relied on Frinzi and/or Goodman for the existence of the redemption right, demonstrates that he willfully did not investigate or want to know, further evidencing his nefarious intent and participation in a transaction that he knew or should have known, as should any reasonably prudent investor or attorney, to be tortious.

74.     Furthermore, in each Purchase Agreement, 18920 purchases the Shares on a "where is, as is" basis, and acknowledges that its purchase is "based solely upon its working knowledge

of Company's business . . . and not in reliance upon any representations or warranties of Seller other than those contains in this Agreement." Zakharyayev cannot in good faith claim to have relied on any representations made by Goodman and/or Frinzi, again demonstrating that he knew or should have known that he was participating in something fraudulent, nefarious, or tortious.

75.      Furthermore, as noted above, in each of the three Purchase Agreements, 18920 affirmatively represents that it will have on the "Closing Date" immediately available funds to pay the purchase price under each agreement to the seller under each agreement. The "Closing Date" was the date of execution of the Purchase Agreements; *i.e.* March 9, 2022. This representation was false. Upon information and belief, 18920 did not have the funds that it represented that it had and, instead, was counting on the Debtor making a future payment to it, which it would then use to pay. Upon further information and belief, Goodman and the Goodman Entities knew this representation to be false, since they were not paid at any "closing" yet permitted 18920 to pretend that it owned the Transaction Shares.

76.      That 18920 made these false representations and that Goodman and the Goodman Entities knew they were false yet proceeded is further evidence of a nefarious intent, and that false and misleading documents were prepared and signed with the knowledge of Goodman, Zakharyayev, Pinkhasova, 18920, and the Goodman Entities, that they were participating in a nefarious, misleading, and tortious transaction, the truth of which needed to be concealed.

77.      Upon further information and belief, the intent was always that 18920 not pay a penny of any purchase price, knowing that 18920 did not have those funds, but rather to cause the Debtor to fund the purchase price while hiding this fact in the documents and then using subsequent documents to further conceal the truth and perpetuate the fraud.

78.      Namely, on March 9, 2022, 18920, through a written document signed by Pinkhasova, transmitted to the Debtor a demand to redeem 4,032,918 Series A-1 Preferred Shares

now owned by 18920. Such demand states that, "[a]s you know, the Preferred Shares are subject to mandatory redemptions at their liquidation value on a quarterly basis."

79.     This is further proof of Zakharyayev's, Pinkhasova's, and 18920's knowledge of the nefarious and tortious nature of the transaction: if the Transaction Shares are subject to a liquidation value on a quarterly basis, as opposed to some outright, stated amount, and Zakharyayev, Pinkhasova, and 18920 knew that the liabilities of the Debtor exceeded its assets, then no reasonable person, especially one of Zakharyayev's sophistication, could have believed that there was any redemption right or any value to that.

80.     Upon information and belief, the $50 Million Note was fraudulently agreed to in order to justify transfers in satisfaction of this "debt," to attempt to engineer and paper-up a fraud, and to conceal the truth. It is inconceivable that Zakharyayev and/or 18920 could possibly have expected to make a profit of $40 million from the Transaction Shares *in one day* without having put in a penny of their own funds or having undertaken any risk to purchase the Transaction Shares.

81.     As final evidence of the nefarious and tortious nature of the transactions, and the parties' knowledge of their complicity in the same, because 18920 only paid the Goodman Entities $10 million as opposed to the $12,372,656.35 provided for in the Purchase Agreements, on June 8, 2022—well after the transactions and the documents—and "[t]o keep it simple," Zakharyayev revised the GDMN Purchase Agreement to lower the number of Shares sold by GDMN to 18920 from 2,574,326 to 1,988,484. Yet 18920 did not inform the Debtor to lower the consideration the Debtor had paid under the Settlement Agreement. And GDMN did not demand its bargained-for consideration. Instead, Zakharyayev and Pinkhasova simply decided to keep more of the "loot" for themselves and their coconspirator, Goodman, could do nothing about it because any resort to judicial remedies would have exposed the whole illegitimate scheme.

## IV.   CAUSES OF ACTION

**COUNT 1 :**   **BANKRUPTCY CODE FRAUDULENT TRANSFER (18920 AND GOODMAN ENTITIES)**

82.     The Trustee incorporates his allegations above.

83.     The Debtor was insolvent when it entered into the $50 Million Note and the Settlement Agreement, and when it made the Debtor Transfers and transfers of the Transferred Assets.

84.     There was no mandatory redemption obligation owed by the Debtor in respect of the Transaction Shares.

85.     The Debtor received no value, much less reasonably equivalent value, for honoring a non-existent mandatory redemption obligation and, therefore, in turn for the $50 Million Note, and, in turn, for the Settlement Agreement, and, in turn, for the Debtor Transfers and the Transferred Assets.  Among other things, the Debtor was not relieved of any liability and the Debtor received no other consideration, since there was no mandatory redemption obligation with respect to the Transaction Shares for the Debtor to pay.  Even if there was an optional redemption, which was not the parties' understanding, the Debtor would have received no return consideration.

86.     18920 is the initial transferee of each of the above transfers.

87.     The Goodman Entities were the immediate transferees of such transfers to the extent of $10 million.  Because the knowledge of Goodman is imputed to the Goodman Entities, in addition to their independent knowledge, the Goodman Entities did not take such transfers in good faith, they did not take for value, and they did not take without knowledge of the voidability of the transfers.

88.     Accordingly, pursuant to section 548 of the Bankruptcy Code, the Trustee requests the avoidance of any obligation of the Debtor for the mandatory redemption, the $50 Million Note,

and the Settlement Agreement, and the avoidance of the Debtor Transfers and the transfers of the

Transferred Assets.

**COUNT 2:      TUFTA[4] FRAUDULENT TRANSFER (18920 AND GOODMAN ENTITIES)**

89.      The Trustee incorporates his allegations above.

90.      Pursuant to section 544 of the Bankruptcy Code, the Trustee stands in the shoes of,

and may avoid, a prepetition transfer by the Debtor that an unsecured creditor could avoid.

91.      As of March 1, 2022, the Debtor had multiple unsecured creditors who remain

unpaid.

92.      The Debtor was insolvent when it entered into the $50 Million Note and the

Settlement Agreement, and when it made the Debtor Transfers and transfers of the Transferred

Assets.

93.      There was no mandatory redemption obligation owed by the Debtor in respect of

the Transaction Shares.

94.      The Debtor received no value, much less reasonably equivalent value, for honoring

a non-existent mandatory redemption obligation and, therefore, in turn for the $50 Million Note,

and, in turn, for the Settlement Agreement, and, in turn, for the Debtor Transfers, and the

Transferred Assets.  Among other things, the Debtor was not relieved of any liability and the

Debtor received no other consideration, since there was no mandatory redemption obligation with

respect to the Transaction Shares for the Debtor to pay.  Even if there was an optional redemption,

which was not the parties' understanding, the Debtor would have received no return consideration.

95.      18920 is the initial transferee of each of the above transfers.

96.      The Goodman Entities were the immediate transferees of such transfers to the

extent of $10 million.  Because the knowledge of Goodman is imputed to the Goodman Entities,

---

[4] The Texas Uniform Fraudulent Transfer Act, TEX. BUS. & COMM. CODE §§ 24.001 *et. seq.*

in addition to their independent knowledge, the Goodman Entities did not take such transfers in good faith, they did not take for value, and they did not take without knowledge of the voidability of the transfers.

97.    Accordingly, pursuant to section 24.006 of TUFTA, the Trustee requests the avoidance of any obligation of the Debtor for the mandatory redemption, the $50 Million Note, and the Settlement Agreement, and the avoidance of the Debtor Transfers and the transfers of the Transferred Assets.

98.    The Trustee further requests his reasonable costs and attorney's fees in avoiding and recovering the same under section 24.013 of TUFTA.

**COUNT 3:**    **TUFTA FRAUDULENT TRANSFER (GNET V. 18920 AND GOODMAN ENTITIES)**

99.    The Trustee incorporates his allegations above.

100.    Prior to and after the transactions alleged in this Complaint, the Debtor was a creditor of GNET, whose claims remain unsatisfied.  The Trustee asserts Count 3 of this Complaint as such.

101.    GNET was insolvent when it made the GNET Transfer, or the making of such transfer rendered it insolvent.

102.    GNET received no value, much less reasonably equivalent value, for making the GNET Transfer.  Not only was there no mandatory redemption right in the Transaction Shares, but in no event could or would GNET have been liable to pay any such mandatory redemption right or optional redemption because it was not the issuer of the Transaction Shares.

103.    18920 is the initial transferee of the GNET Transfer.

104.    The Goodman Entities were the immediate transferees of the GNET Transfer. Because the knowledge of Goodman is imputed to the Goodman Entities, in addition to their

independent knowledge, the Goodman Entities did not take such transfer in good faith, they did not take for value, and they did not take without knowledge of the voidability of the transfer.

105.    Accordingly, pursuant to section 24.006 of TUFTA, the Trustee requests the avoidance of the GNET Transfer.

106.    The Trustee further requests his reasonable costs and attorney's fees in avoiding and recovering the same under section 24.013 of TUFTA.

**COUNT 4:**   **RECOVERY OF AVOIDED TRANSFERS**

107.    The Trustee incorporates his allegations above.

108.    Pursuant to section 550 of the Bankruptcy Code and any applicable provision of TUFTA, the Trustee, to recover on certain of the avoided transfers above, requests a money judgment against 18920 in the amount of the Debtor Transfers ($9,498,075.00), jointly and severally with the Goodman Entities (as such amount is less than $10 million).

109.    Pursuant to section 550 of the Bankruptcy Code and any applicable provision of TUFTA, the Trustee requests the turnover of the Half AMRR Note and any benefits or proceeds on account of the same, and any security instruments or liens on account of the same.

110.    Pursuant to section 550 of the Bankruptcy Code and any applicable provision of TUFTA, the Trustee requests a money judgment against 18920 for the value of the LSU License and for any proceeds, payments, or benefits that 18920 may have obtained on account of the same.

111.    Pursuant to section 550 of the Bankruptcy Code and any applicable provision of TUFTA, the Trustee requests a money judgment against 18920 for the value of the Trademarks and for any proceeds, payments, or benefits that 18920 may have obtained on account of the same.

112.    Pursuant to TUFTA, the Trustee seeks the recovery of the GNET Transfer, by money judgment against 18920 and the Goodman Entities, jointly and severally (but the Goodman Entities overall joint and several liability capped at $10 million), in the amount of $3,976,000.00.

**COUNT 5:    BREACH OF FIDUCIARY DUTY (TRUSTEE V. FRINZI)[5]**

113.    The Trustee incorporates his allegations above.

114.    Frinzi owed fiduciary duties to the Debtor, including the duty of loyalty and the duty of care.

115.    In agreeing to the foregoing transactions, including honoring the mandatory redemption demand, entering into the $50 Million Note, entering into the Settlement Agreement, and making the transfers provided for in the Settlement Agreement, Frinzi was not looking to the best interests of the Debtor but instead to enrich Goodman, through the Goodman Entities, at the expense of the Debtor, which lost assets worth tens of millions of dollars that it needed to pay its legitimate creditors.  In so doing, he breached his duty of loyalty.

116.    In agreeing to honor an otherwise non-existent mandatory redemption obligation, without any due diligence, review of documents, advice or counsel, or common sense, Frinzi acted recklessly and committed gross negligence.  No reasonably prudent officer would transfer tens of millions of dollars of desperately needed assets without significant due diligence, and only one acting recklessly to benefit Goodman would have done so.  In so doing, Frinzi breached his duty of care.  The documents and transfers he executed and orchestrated are the direct result of such breaches and constitute additional breaches of the duty of care: entering into the $50 Million Note to satisfy a liability that did not exist, entering into the Settlement Agreement to satisfy a liability and $50 Million Note that did not exist, and compromising and settling nothing, and making the Debtor Transfers, and the transfers of the Transferred Assets, to satisfy such non-existent settlement of such non-existent note, of such non-existent redemption obligation.

---

[5] The Trustee and Estate and GNET hold other claims and causes of action against Frinzi, including for breaches of fiduciary duty, not directly related to the facts of this Complaint, and the Trustee reserves and preserves all such other claims and causes of action.  Nothing herein shall prejudice the same.

117.    The Debtor was damaged by the foregoing breaches of fiduciary duty through the loss of tens of millions of dollars in cash and property.

118.    Accordingly, the Trustee seeks a money judgment for breach of fiduciary duty against Frinzi in the amount of the Debtor Transfers ($9,498,075.00), the value of the LSU License and Trademarks in an amount to be proven at trial, and the attorney's fees incurred herein to avoid and recover the Half AMRR Note.[6]

**COUNT 6:    BREACH OF FIDUCIARY DUTY (GNET V. FRINZI)**

119.    The Trustee incorporates his allegations above.

120.    Frinzi owed fiduciary duties to GNET, including the duty of loyalty and the duty of care.

121.    For similar reasons as stated in Count 5, Frinzi breached his fiduciary duties to GNET: causing to be made the GNET Transfer to benefit someone other than GNET and at the expense of GNET, and causing GNET to make a payment for which it had absolutely no liability and for which it received absolutely no benefit.

122.    GNET was damaged by Frinzi's breaches of duty in that GNET transferred and lost $3,976,000.00 of its funds for no return benefit whatsoever.

123.    Accordingly, the Trustee seeks a money judgment for breach of fiduciary duty against Frinzi in the amount of the GNET Transfer ($3,976,000.00).

**COUNT 7:    CONSPIRACY (GOODMAN, ZAKHARYAYEV AND PINKHASOVA)**

124.    The Trustee incorporates his allegations above.

---

[6] While attorney's fees may not usually be direct damages under Texas law, they are when incurred to fix or address or mitigate the results of someone's tort.

125.    A civil conspiracy consists of a combination of two or more persons, seeking to accomplish a shared object or course of action, a meeting of the minds on such object or course of action, one or more unlawful, overt acts in pursuance thereof, and resulting damages.

126.    Each of Goodman, Zakharyayev, and Pinkhasova conspired to deprive the Plaintiffs of valuable assets, based on a non-existent mandatory redemption obligation which each knew, or should have known, did not exist and would be asserted wrongfully and fraudulently to cause the Debtor and GNET to make such large and valuable transfers.

127.    Each of Goodman, Zakharyayev, and Pinkhasova knew that Frinzi, as the CEO of the Debtor and GNET, owed fiduciary duties to the Debtor and GNET.  Each of Goodman, Zakharyayev, and Pinkhasova knew that Frinzi was unsophisticated and unexperienced as a CEO and was naive, and that could easily be manipulated, especially by his friends in the person of Goodman and Zakharyayev.  Each of Goodman, Zakharyayev, and Pinkhasova knew that the Debtor was insolvent, and that only by conspiring to cause Frinzi to breach his fiduciary duties based on false, misleading, concealed, and fraudulent claims and demands, would Frinzi breach his fiduciary duties.

128.    Each of Goodman, Zakharyayev, and Pinkhasova, actively participated in said conspiracy: Goodman by orchestrating it and having Frinzi pay on a non-existing mandatory redemption obligation, Pinkhasova by fraudulently asserting such mandatory redemption obligation in writing and on account of shares that 18920 did not even own, and Zakharyayev by entering into the subsequent negotiations and documents with Frinzi to cause Frinzi to transfer the Cash Transfers and the Transferred Assets.

129.    The conspiracy, agreement, and overt actions of Goodman, Zakharyayev, and Pinkhasova caused Frinzi to make the large transfers from the Debtor and GNET that he did and, in the process, to breach his fiduciary duties to the Debtor and to GNET.

130.     Accordingly, the Trustee and GNET request a money judgment holding each of Goodman, Zakharyayev, and Pinkhasova jointly and severally liable with Frinzi for all damages awarded to the Trustee and GNET herein for Frinzi's breaches of fiduciary duty.

**COUNT 8:**     **FRAUD (PINKHASOVA)**

131.     The Trustee incorporates his allegations above.

132.     The elements of fraud are (1) a material false representation, (2) that was made with knowledge or recklessness as to its falsity, (3) with the intent to induce reliance, and (4) that the other party actually and justifiably relied upon, causing him injury.

133.     In making her demand for the Debtor to pay the mandatory redemption demand, Pinkhasova made two false representations; *i.e.* that there was a mandatory redemption obligation and that 18920 owned the Transaction Shares which, according to the Purchase Agreements and other contemporaneous evidence, it did not because it had not paid for them.

134.     She made these false representations with knowledge of their falsity or recklessness as to their falsity, for the reasons discussed above (including the lack of any due diligence and the rational impossibility for an equity redemption when the Debtor was known and admitted to be insolvent), the knowledge of her husband and of 18920 being imputed to her to the extent she lacked personal knowledge, and her own knowledge that 18920 had not paid for, and therefore did not own, the Transaction Shares.

135.     She made these false representations intending to induce reliance on the part of Frinzi; *i.e.* to cause him to pay tens of millions of dollars in consideration on account of the non-existing redemption right under the Transaction Shares that 18920 did not own.

136.     Frinzi actually relied on these representations because he caused the resulting transfers to be made by the Debtor and GNET.

137.    Notwithstanding Frinzi's own recklessness and breaches of duty, or in the alternative thereto, Frinzi's reliance on these representations was justified under the circumstances. While Frinzi did no due diligence of his own, Goodman had told him that there was a mandatory redemption right, and Zakharyayev, who Frinzi knew to be a lawyer, and who he knew to represent 18920, as well as Zakharyayev's wife, would not be making a fraudulent demand.

138.    As a result of the fraud, the Debtor was damaged by the Debtor Transfers and other documents and transfers that Frinzi executed and delivered as a result of the fraudulent mandatory redemption demand, and GNET was damaged by the GNET Transfer.

139.    18920, meaning Zakharyayev and Pinkhasova, received $3.5 million cash and other valuable assets for acting as a conduit for only a few days, without putting in any of their own money or risk.  Any reasonable person would or should know that making such a large profit, for no capital and no risk, and in only a few days, is not legitimate and that the money is the payoff for facilitating the fraud.

140.    Accordingly, the Trustee and GNET request a money judgment against Pinkhasova in an amount to be proven at trial.

**<u>COUNT 9</u>:**    **AIDING AND ABETTING (ZAKHARYAYEV)**

141.    The Trustee incorporates his allegations above.

142.    The elements of aiding and abetting are: (1) the primary actor committed a tort; (2) the defendant had knowledge that the primary actor's conduct constituted a tort; (3) defendant had intent to assist the primary actor; (4) defendant gave the primary actor assistance or encouragement; and (5) defendant's conduct was a substantial factor in causing the tort.

143.    As pled in Count 8, Pinkhasova committed the tort of fraud with respect to the transactions discussed in this Complaint.

144.    As the plan between Goodman and Zakharyayev was always that 18920 make a demand on the Debtor to pay the mandatory redemption for the Shares, and then for 18920 to transfer most of those funds to the Goodman Entities, both Goodman and Zakharyayev knew that Pinkhasova would be committing a tort when she made the mandatory redemption demand.  Both Goodman and Zakharyayev intended to assist Pinkhasova with respect to the same, by each leading her to make the demand, and both gave her assistance and encouragement in doing so.  Goodman's and Zakharyayev's conduct was a substantial factor in causing Pinkhasova to commit fraud because, upon information and belief, she undertook no due diligence herself with respect to the mandatory redemption demand but instead relied on Goodman and her husband.

145.    Accordingly, the Trustee seeks a money judgment against Goodman and Zakharyayev holding them jointly and severally liable for all damages awarded herein to the Trustee for Pinkhasova's fraud.

## V.    **PRAYER**

WHEREFORE, PREMISES CONSIDERED, the Trustee and GNET request that the Defendants be cited to appear and to answer this Complaint and that they have judgment as follows:

(i)      avoidance of all transfers requested herein;

(ii)     recovery of all transfers requested herein;

(iii)    money judgment against Frinzi for his breaches of fiduciary duty;

(iv)     money judgment against Goodman, Zakharyayev, and Pinkhasova for their conspiracy;

(v)      money judgment against Pinkhasova for fraud;

(vi)     money judgment against Goodman and Zakharyayev for aiding and abetting Pinkhasova's fraud;

(vii)    reasonable attorney's fees to the extent provided for by applicable law;

(viii)    prejudgment and postjudgment interest to the extent provided by applicable law; and

(ix)    such other and further relief as may be appropriate.

RESPECTFULLY SUBMITTED this 5th day of August, 2023.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Thomas D. Berghman, Esq.
    Texas Bar No. 24082683
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas  75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email: drukavina@munsch.com
           tberghman@munsch.com

**COUNSEL FOR SCOTT SEIDEL, CHAPTER 7 TRUSTEE**