Philip M. Guffy
**HUNTON ANDREWS KURTH LLP**
600 Travis Street, Suite 4200
Houston, Texas  77002
Tel:	713-220-4200
Email:  pguffy@huntonak.com

-and-

Paul N. Silverstein
Brian Clarke
**HUNTON ANDREWS KURTH LLP**
200 Park Avenue
New York, NY 10166
Tel:	(212) 309-1000
Email: psilverstein@huntonak.com
       brianclarke@huntonak.com

*Special Counsel to UMB Bank, National
Association, as Indenture Trustee, and
Counsel to the Majority Noteholder Group*

Eric A. Schaffer
**STONECIPHER LAW FIRM**
125 First Avenue
Pittsburgh, PA 15222
Tel:	412-391-8510
Email: eschaffer@stonecipherlaw.com

*Counsel to UMB Bank, National
Association, as Indenture Trustee*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>GOODMAN NETWORKS, INC.,<br><br>Debtor. | Chapter 7<br><br>Case No. 22-31641 (MVL)<br><br>**Relates to Docket No. 320** |

**OBJECTION TO TRUSTEE'S EXPEDITED MOTION TO APPROVE
TRANSACTION WITH AMRR AND ALLIANCE GLOBAL SOLUTIONS, LLC**

UMB Bank, National Association, as indenture trustee (the "**Indenture Trustee**") and the

Majority Noteholder Group[1] (together with the Indenture Trustee, the "**Bondholders**") for their

---

[1]  The Majority Noteholder Group consists of investment advisers or managers of funds that hold (with such investment advisers and managers acting on behalf of such holders), or are beneficial holders of, a majority of the 8% Senior Secured Notes due 2022 issued by Goodman Networks, Inc., and include JLP Credit Opportunity Master Fund Ltd., JLP Credit Opportunity IDF Series Interests of the SALI Multi-Series Fund, L.P., JLP

objection to the *Trustee's Expedited Motion to Approve Transaction with AMRR and Alliance Global Solutions, LLC* (the "**Motion**") [Docket No. 320],[2] respectfully represent:

### PRELIMINARY STATEMENT

1. Pursuant to the Motion, the Trustee seeks authority to release AMRR from $4,516,000 of its obligations in respect of the AMRR Note in exchange for (i) $150,000 cash, (ii) a proposed $4,350,000 Secured Promissory Note (the "**Alliance Note**") issued by Alliance Global Solutions, LLC ("**Alliance Global**"), and (iii) a 10% equity stake in Alliance (the "**Alliance Equity Stake**").

2. The Trustee submits that these transactions are permissible under Section 363 of the Bankruptcy Code. As a threshold matter, the Bondholders do not believe that Section 363 permits the Trustee to exchange an asset that is encumbered by a security interest for other assets. Even if Section 363 is applicable, the Trustee makes no showing whatsoever that the elements of Section 363 have been satisfied. The Trustee glosses over the fact that the AMRR Note is part of the Bondholders' collateral package and simply states that the Bondholders' interests would attach to the Alliance Note "subject to the Trustee's rights and defenses regarding whether those liens extend to the [Alliance Note]." This does not come close to satisfying Section 363's requirements for selling assets that are subject to a lien.[3] To be clear, if Section 363 applies, no portion of the

---

Institutional Credit Master Fund LP, Alimco Re Ltd., Marli B. Miller Trust A4, Miller Family Education and Medical Trust, Susan F Miller Spousal IRA, Susan F. Miller Spousal Trust A4, DuPont Pension Trust, and Hilltop Securities, Inc.

[2] Capitalized terms used but not defined herein have the meanings given in the Motion.

[3] The Trustee further states that whether the Bondholders' lien would extend to the Alliance Note "would likely require an analysis of the validity of the AMRR Note and whether the [Alliance Note] is given as partial consideration for the debt represented by the AMRR Note (in which case the bondholders' liens would likely extend to the [Alliance Note]), or whether the [Alliance Note] is given as partial consideration for business torts and causes of action (in which case the Trustee would argue that the bondholders' liens do not extend to the [Alliance Note])." *See* Motion, at ¶ 14. The Trustee's equivocation on this point makes no sense – because the AMRR Note principal balance is proposed to be reduced at closing by the amount of the principal balance of the

2

AMRR Note can be exchanged for other assets absent compliance with the adequate protection provisions of Section 363(e) and one of the preconditions set forth in Section 363(f)(1) – (5). The Trustee makes no effort to show that the Bondholders' interest will be adequately protected under Section 363(e) if the proposed transaction is consummated, likely because no such showing would be possible. As discussed herein, Alliance is a newly formed entity with no operating history and no capital from which to demonstrate that the Bondholders would be adequately protected by the Alliance Note and Alliance Equity Stake. Moreover, none of the conditions of Section 363(f) are or can be satisfied under the circumstances.

3. In addition to the fact that the transaction does not satisfy Sections 363(e) or (f), the facts and circumstances of the proposed transaction are alarming and call for heightened discovery and disclosure, not an expedited hearing to rush the transaction through to approval. As set forth in the Motion, Alliance Global is a newly formed acquisition vehicle that is purportedly owned and controlled by Shalom Auerbach. Mr. Auerbach has an extensive history with the Goodmans and James Frinzi and is a beneficiary of at least one avoidable prepetition transaction with the Debtor and its affiliates. The Bondholders' expectation is that Alliance Global is coordinating with the Goodmans and/or Mr. Frinzi on the proposed acquisition of the Fiber Business from AMRR.

4. In addition to the fact that the Fiber Business is proposed to be sold to an individual against whom the Debtor's estate may have significant claims, the financial terms of the transaction are grossly inappropriate and should be rejected by the Court. In essence, Alliance is acquiring a free option on the Fiber Business' upside in exchange for a mere $150,000 in cash and

---

Alliance Note plus the $150,000 cash consideration, it is clear that both the Alliance Note and the $150,000 are given as consideration for the debt represented by the AMRR Note.

3

by issuing a "hope note" from a special purpose vehicle with no capital, no operating history, and no assets beyond those it proposes to acquire from AMRR. The Alliance Note will bear interest at a well below-market 5.00% per annum and not mature for four years. For context, this is less than the rate the United States government pays on one year treasury securities.

5. Because the $150,000 cash payment, Alliance Note, and Alliance Equity Stake are all proceeds of the AMRR Note, each will be Bondholder collateral if the Motion is approved. The Trustee, therefore, is seeking to coerce the Bondholders to provide the financing represented by the Alliance Note without the Bondholders' consent. Rather than make specific factual and legal representations demonstrating compliance with Section 363(e) and 363(f) of the Bankruptcy Code, the Trustee appeals almost entirely to the alleged dire straits of AMRR as justification for the proposed transactions with Alliance Global. The Bondholders submit that AMRR's financial situation is entirely irrelevant to the Court's analysis of whether Section 363 even applies and, if it does, whether Section 363(e) and (f) have been satisfied. Even if the Trustee's financial advisors are correct that the dollar amount of the purchase price is fair consideration for the Fiber Business, the Motion ignores the fact that the form of the consideration is not fair to the Bondholders and cannot be approved without the consent of the Bondholders. If Mr. Auerbach (individually or with unnamed partners) wants to purchase the Fiber Business by paying part of AMRR's obligation under the AMRR Note, he will need to do so in cash payable to the Bondholders at closing.

**BACKGROUND**

A.  **The Goodman Notes and the AMRR Note**

6. On or about May 31, 2017, Goodman Networks, Inc. ("**Goodman Networks**") issued the 8% Senior Secured Notes due 2022 (the "**Goodman Notes**") pursuant to that certain indenture dated as of May 31, 2017 (as amended, restated, or otherwise modified from time to

4

time, the "**Indenture**") by and among Goodman Networks, as Issuer; the Indenture Trustee, as trustee; and U.S. Bank, National Association, as Collateral Agent (the "**Collateral Agent**"), in the original principal amount of $112,500,000.[4] In addition to the Indenture, Goodman Networks and the Collateral Agent also executed that certain Pledge and Security Agreement dated as of May 31, 2017 (as amended, restated, or otherwise modified from time to time, the "**Pledge and Security Agreement**,"[5] and together with the Indenture and other related documents, the "**Loan Documents**") by and among the Debtor, each of the Grantors from time to time party thereto, and the Collateral Agent. Additionally, GNET ATC LLC ("**GNET**"), a wholly-owned subsidiary of Goodman Networks, guaranteed the Goodman Notes and also pledged all of its assets as security for the Goodman Notes through a pledge supplement (the "**Pledge Supplement**").[6]

7. Under the Pledge and Security Agreement and Pledge Supplement, Goodman Networks and GNET granted the Collateral Agent, for the benefit of the Trustee and the holders of the Goodman Notes, security interests in, and liens on, substantially all of Goodman Networks and GNET's personal property, including, whether now or hereafter existing: (a) Accounts; (b) Chattel Paper; (c) Documents; (d) Payment Intangibles; (e) General Intangibles; (f) Goods (including, Inventory and Equipment); (g) Instruments; (h) Insurance; (i) Intellectual Property; (j) Investment Related Property (including Deposit Accounts); (k) Letters of Credit and Letter-of-Credit Rights; (l) Money, cash, and cash equivalents; (m) Receivables and Receivable Records; (n) Commercial Tort Claims; (o) accessions to, substitutions for, and replacements, proceeds of the Collateral, and products of the foregoing, and any General Intangibles related to any of the

---

[4] A copy of the Indenture is attached here as **Exhibit 1**.

[5] A copy of the Pledge and Security Agreement is attached here as **Exhibit 2**.

[6] A copy of the Pledge Supplement is attached here as **Exhibit 3**. Additional subsidiaries of Goodman Networks further guaranteed the Goodman Notes, as provided in the Loan Documents.

foregoing; (p) all other personal property of any kind and all Collateral Records, Collateral Support and Supporting Obligations relating to any of the foregoing; and (q) all Proceeds, products, accessions, rents, and profits of or in respect of any of the foregoing (collectively, the "**Collateral**").[7]

8. The Collateral Agent filed UCC financing statements to notify the public of its priority lien on all of the Collateral, which secures the obligations due under the Loan Documents. For example, on September 20, 2019, the Collateral Agent filed a UCC financing statement with the Texas Secretary of State listing GNET as the debtor.[8] The financing statement listed the Collateral Agent's collateral as, "All assets of the Debtor whether now owned or hereafter acquired, arising or existing, and wherever located, including all accessions to, substitutions for, and all replacements, products and proceeds of the foregoing."

9. These assets include a $44 million secured promissory note from AMRR. AMRR gave GNET a secured promissory note in the amount of $44 million dated January 21, 2022 (the "**AMRR Note**"), which bears interest at 10% per annum.[9] The maturity date of the AMRR Note is January 21, 2025. The principal was to paid in equal monthly installments beginning on September 23, 2022, with the final principal payment and all interest due on maturity. In addition to the AMRR Note, AMRR and GNET also entered into a security agreement (the "**AMRR Security Agreement**"), dated as of January 21, 2022.[10] Under the AMRR Security Agreement, AMRR pledged substantially all its assets to GNET as security for the AMRR Note.

---

[7] Additional subsidiaries of Goodman Networks further agreed to pledge Collateral as security for the Goodman Notes, as provided in the Loan Documents.

[8] A copy of this UCC-1 financing statement is attached here as **Exhibit 4**.

[9] A copy of the AMRR Note is attached here as **Exhibit 5**.

[10] A copy of the AMRR Security Agreement is attached here as **Exhibit 6**.

DMS 303646388

10. On May 31, 2022, the Goodman Notes became due and payable under the terms of the Indenture. Goodman and GENT, however, failed to pay the outstanding balance due on the Goodman Notes when they matured. Neither Goodman Networks nor GNET has made any payments on the Goodman Notes since the Maturity Date.

11. On August 26, 2022, the Collateral Agent sent a letter to AMRR pursuant to section 9-607 of the Uniform Commercial Code (Tex. Bus. & Com. Code Ann. § 9.607) (the "**9-607 Notice**").[11] The 9-607 Notice informed AMRR that Goodman Networks and GNET were in default under the Loan Documents, and that AMRR was directed to make all payments due under the AMRR Note directly to the Collateral Agent rather than GNET.

12. On September 23, 2022, the first payment under the AMRR Note came due. AMRR, however, failed to make that payment to the Collateral Agent. On September 29, 2022, the Collateral Agent sent AMRR a letter stating that AMRR was default under the AMRR Note, demanding payment, and reserving all rights.[12] AMRR did not make the payment that was due on September 23, 2022, and has since failed to pay each monthly payment that has come due since that date.

B.   **Shalom Auerbach's Prepetition Dealings with the Goodmans and Mr. Frinzi**.

13. Shalom Auerbach is good friends with both John Goodman and James Frinzi and was the witness for Mr. Frinzi's wedding in June of 2022. On March 14, 2022, Mr. Auerbach was

---

[11] A copy of the 9-607 Notice is attached here as **Exhibit 7**. The AMRR Note and AMRR Security Agreement both provide that they are governed by the laws of the State of Texas.

[12] A copy of that letter is attached here as **Exhibit 8**.

appointed to the board of directors of AMRR.[13] He served on the AMRR board until August 4, 2022.[14]

14. In February 2022, Mr. Auerbach was involved in a transaction where an entity owned or controlled by him or members of his family purportedly purchased Goodman Notes from James Goodman for approximately $11 million and then immediately sold them to the Debtor for $17 million. James Goodman and James Frinzi controlled and orchestrated this transaction. Mr. Frinzi introduced Mr. Goodman to Mr. Auerbach, and Mr. Goodman directed Mr. Frinzi to execute the transfer on behalf of the Debtor for his own benefit. According to Mr. Frinzi, this was done because it would look bad for a principal of the Debtor to get cashed out on his Goodman Notes while others were not getting paid. And in exchange for helping to conceal this transaction, Mr. Auerbach, his affiliates, and/or family pocketed $6 million, for which the Estate did not receive reasonably equivalent value.

15. Mr. Auerbach also played a role in the Debtor's transaction with 18920 NW 11th, LLC. That transaction forms the basis for the claims asserted by the Trustee in his complaint filed in *Seidel et al. v. 18920 NW 11th, LLC*, Adv. Pro. No. 23-3072-mvl, whereby the Trustee seeks to avoid at least $13.5 million in fraudulent transfers to 18920 NW 11th, LLC.[15] Mr. Auerbach, who may or may not have an economic interest in 18920 NW 11th, LLC, was the individual responsible for bringing this transaction to 18920 NW 11th, LLC.

---

[13] *See* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001488638/000121465922009740/r882208k.htm

[14] *See* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001488638/000121465922004189/j3182228k.htm.

[15] Mr. Auerbach is not named as a defendant in this action.

DMS 303646388

**ARGUMENT**

16. By the Motion, the Trustee seeks to release AMRR from $4,516,000 of its obligations in respect of the AMRR Note in exchange for (i) $150,000 cash, (ii) the Alliance Note, and (iii) the Alliance Equity Stake. As set forth herein, the AMRR Note is Bondholder collateral, and the $150,000 cash payment, Alliance Note, and Alliance Equity Stake are therefore proceeds of Bondholder collateral and would be Bondholder collateral if the Motion is approved.

17. While framed as a motion under Section 363 of the Bankruptcy Code, the Trustee seeks to substitute or exchange Bondholder collateral, a portion of the AMRR Note, for other property. The Court cannot approve such a swap or exchange under Section 363. In *In re EQK Bridgeview Plaza, Inc.*, Judge Jernigan declined to approve a motion bought under Section 363 seeking approval for the exchange of property incumbered by a lien for replacement property, holding that the debtor had not presented authority demonstrating that a "transfer" of one asset for another was a "sale" under Section 363. *See id.* at, 447 B.R. 775, 783-84 (Bankr. N.D. Tex. 2011) (distinguishing "transfer" from "sale" and analyzing why a transfer of one item of collateral for another may be permissible under a chapter 11 plan but not Section 363).

18. Judge Jernigan further held that, even if Section 363 were applicable to a transfer of collateral for replacement collateral, the debtor had not made a showing that the secured creditor was adequately protected. *See id.*, at 784. Here, if Section 363 applies, the Trustee has likewise made no showing that the Bondholders' interests are adequately protected if the transaction is approved. On the closing date, the principal balance of the AMRR Note will be reduced in anticipation of payments on the Alliance Note that might never be made. Moreover, according to the Trustee, Alliance Global is a newly formed entity with no operating history. Alliance Global

9

is owned and controlled by an individual that is the direct or indirect recipient of avoidable transfers from the Debtor and its affiliates.

19. To the extent that the Motion is not denied outright, expedited consideration of the Motion is not appropriate as it prevents the Bondholders from conducting discovery as to the capitalization, creditworthiness, and good faith of Alliance Global. There is no exception in Section 363(e) for situations where the seller is in financial distress, and the Bondholders will not be forced to accept the Alliance Note and Alliance Equity Stake and acquiesce to Mr. Auerbach taking control of the Fiber Business simply because the Trustee believes the Fiber Business may soon shut down. If that is the case, and Mr. Auerbach believes the Fiber Business is a good investment, he can arrange to pay the full purchase price in cash so that the reduction of the principal balance on the AMRR Note on the closing date is in exchange for real consideration.

20. In addition to the fact that Section 363(e) is not satisfied, Section 363(f) is not satisfied. The Trustee has made no showing that either Section 363(f)(1) or (f)(5) are or could be applicable. Section 363(f)(2) is not satisfied because the Bondholders do not consent to the proposed transaction. The Bondholders are not receiving cash in exchange for the portion of the AMRR Note that is proposed to be released. Accordingly, the Bondholders submit that Section 363(f)(3) cannot be satisfied as the transaction is structured currently. Lastly, there is no bona fide dispute that the AMRR Note is Bondholder collateral, thus Section 363(f)(4) is not satisfied. *See In re Patriot Place, Ltd.*, 486 B.R. 773, 815 (Bankr. W.D. TX. 2013) (stating that "many courts have defined 'bona fide dispute' as when there is an objective basis for a factual or legal dispute as to the validity of the asserted interest") (internal citations omitted). Here, there is no objective basis for any factual or legal dispute that the Goodman Notes are valid indebtedness of the Debtor and GNET, or that the AMRR Note is Bondholder collateral. The Trustee has not asserted any

objective basis for any factual or legal dispute as to the Bondholders' interest in the AMRR Note, but simply reserves the right to do so. This is not sufficient for purposes of Section 363(f)(4).

### CONCLUSION

21.  For the reasons set forth herein, the Motion cannot be approved. To the extent the Court declines to deny approval of the Motion at the September 5, 2023 hearing, the Bondholders request an adjournment to permit discovery of Mr. Auerbach and Alliance Global.

Dated: August 31, 2023

Respectfully submitted,

| | |
|---|---|
| /s/ Philip M. Guffy | Eric A. Schaffer |
| Philip M. Guffy (TX Bar No. 24113705) | **STONECIPHER LAW FIRM** |
| **HUNTON ANDREWS KURTH LLP** | 125 First Avenue |
| 600 Travis Street, Suite 4200 | Pittsburgh, PA 15222 |
| Houston, Texas 77002 | Tel: 412-391-8510 |
| Tel: 713-220-4200 | Email: eschaffer@stonecipherlaw.com |
| Fax: 713-220-4285 | |
| Email: pguffy@huntonak.com | *Counsel to UMB Bank, National Association, as Indenture Trustee* |

-and-

Paul N. Silverstein
Brian Clarke
**HUNTON ANDREWS KURTH LLP**
200 Park Avenue
New York, NY 10166
Tel: (212) 309-1000
Email: psilverstein@huntonak.com
brianclarke@huntonak.com

*Special Counsel to UMB Bank, National Association, as Indenture Trustee, and Counsel to the Majority Noteholder Group*

11

DMS 303646388

**CERTIFICATE OF SERVICE**

      I certify that on August 31, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

                                                */s/ Philip M. Guffy*
                                                Philip M. Guffy

DMS 303646388