**BUTLER SNOW LLP**

Adam M. Langley (admitted *pro hac vice*)

R. Campbell Hillyer (admitted *pro hac vice*)

6075 Poplar Avenue, Suite 500

Memphis, TN 38119

Telephone: (901) 680-7316

adam.langley@butlersnow.com

and

Candice Carson (TX Bar No. 24074006)

2911 Turtle Creek Blvd., Suite 1400

Dallas, Texas 75219

Telephone: (469) 680-5502

candice.carson@butlersnow.com

*Counsel for FedEx Supply Chain*
*Logistics & Electronics, Inc.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| GOODMAN NETWORKS, INC. | § | Case No. 22-31641 (MVL) |
| | § | |
| Debtor. | § | **Relates to Docket No. 226** |
| | § | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**OBJECTION AND RESERVATION OF RIGHTS OF FEDEX SUPPLY CHAIN LOGISTICS &**
**ELECTRONICS, INC. TO TRUSTEE'S EXPEDITED MOTION TO APPROVE**
**TRANSACTION WITH AMRR AND ALLIANCE GLOBAL SOLUTIONS, LLC**
**(ECF NOS. 320 and 321).**

FedEx Supply Chain Logistics & Electronics, Inc. ("FSCLE") files this Objection and

Reservation of Rights to the *Trustee's Expedited Motion to Approve Transaction with AMRR and*

*Alliance Global Solutions, LLC* (the "Objection" to the "Motion") (ECF Nos. 310 AND 321).

FSCLE respectfully states the following:

1

## PRELIMINARY STATEMENT

1.      FSCLE agrees with the Trustee that AMRR needs to be monetized to repay creditors of Goodman Networks. AMRR and its subsidiaries are nothing more than the proceeds of a sophisticated fraudulent scheme that has damaged FSCLE and Goodman Networks. Both FSCLE and Goodman Networks have been damaged by the tortious and fraudulent conduct of the below defined Co-Conspirators, among others. Upon information from the Trustee, the fraudulent scheme extends to AMRR, which has operated since February 2022 with an unconscionable amount of overhead that included significant payments and personal expenditures for at least some of the Co-Conspirators. The situation is indeed dire.

2.      However, a dire situation should not lead to a panicked and rushed decision that further benefits the Co-Conspirators' fraud. Any sale of the Fiber Business should be based upon adequate information and sound commercial practices. The Trustee has not yet furnished adequate information to either the parties in interest or the Court.[1] The Trustee has not demonstrated that the proposed transaction is commercially reasonable. In fact, the proposed transaction contains terms that are plainly unreasonable (e.g., 5% interest rate, no guaranty or hard asset pledge from Shalom Auerbach, and lack of minority protections within the governance rights of Alliance). FSCLE is willing and open to considering this transaction and, perhaps, supporting it, but the current posture is problematic absent adequate information and commercially reasonable terms.

---

[1] The lack of adequate information may be caused by AMRR, Alliance, and Shalom Auerbach. Each of those entities should be required to make financial disclosures to the parties in interest and the Court.

2

## BACKGROUND FACTS

3.      In the fall of 2021, a Nevada company named American Metals Recovery and Recycling Inc. ("AMRR") had long ago ceased its business operations and was sitting as defunct public shell company with $138.00 in assets.[2]

4.      At that same time, Goodman Networks had lost its material contracts and already sold off its businesses to insiders at below market prices.[3] On September 1, 2021, Goodman Networks had $3,786,815.32 in its bank accounts.[4]

5.      What remained at the Debtor was a Master Service Agreement with FSCLE that involved logistics and resale services for FSCLE and an automated payment system. (ECF Claim 32-1, Part 2). Pursuant to this agreement, FSCLE and Goodman Networks conducted approximately $8-28 million in transactions per month, but Goodman Networks was entitled to revenues equaling 0.2% of those transactions.[5] On September 1, 2021, Goodman Networks held

---

[2]    AMRR Form 10-K for the fiscal year ended December 31, 2021, https://www.sec.gov/ix?doc=/Archives/edgar/data/0001488638/000121465922007525/g5262201 0k.htm.

[3] On June 30, 2020, Goodman Networks sold its infrastructure and professional services businesses to Greater Tech Holdings, Inc. ("Greater Tech"), which was new entity controlled by John Goodman. The sale price was approximately $41 million with $32,825,107.14 payable in cash and $8,000,000 in the form of the issuance of 1,516,519 Class E Units in Greater Tech. Houlihan Capital Advisors, LLC, performed a valuation of Greater Tech as of June 30, 2022, and valued the business at approximately $130 million. Goodman Networks did not receive reasonably equivalent value in return for the sale of its primary business units.

In addition, on June 4, 2021, Goodman Networks sold its e-commerce business to Unified Field Services, which was a new entity controlled by James Goodman. James Goodman provided no cash consideration for the sale and, instead, exchanged Goodman Networks notes with a face value of $10 million. As of May 31, 2022, UFS owes Goodman Networks $6,618,639.09 related to transition services and other adjustments related to the sale. This amount has not been collected by Goodman Networks. After the sale of the e-commerce business, Goodman Networks had no material businesses other than isolated contracts like the Master Services Agreement with FSCLE.
[4] See Exhibit A.
[5] *Id.*

approximately $1,215,066.91 of funds related to the Master Service Agreement but only was legally entitled to keep $2,425.24 of those funds. As James Goodman testified, "You know, that was FedEx's money."[6]

6.      In October 2021, James Goodman and his brothers caused Jim Frinzi to be appointed as the CEO for Goodman Networks and its subsidiaries.[7] This was an odd appointment because Mr. Frinzi was a long-time political consultant to James and John Goodman and other Republican politicians, but he was not a businessman. What happened next is a textbook fraudulent scheme to defraud FSCLE and abscond with all available funds of the Debtor.

7.      Mr. Frinzi and Shalom Auerbach, a "personal friend" of Frinzi, who was in his 2022 wedding,[8] conspired with the Goodman brothers, James, John, Jason, Jody, and Jonathan, (the "Co-Conspirators"), among others, to defraud FSCLE and Goodman Networks for their personal benefit. They would conceal Goodman Networks' dire situation from FSCLE while unilaterally disrupting the automated payment system that facilitated the Master Service Agreement transactions. From October 2021 through February 2022, the Co-Conspirators embezzled approximately $80 million from FSCLE, and then from December 2021 to March 2022, embezzled the same money from Goodman Networks for their own benefit. To do this they employed various schemes and enterprises, including the use of shell companies and fraudulent and forged documents.[9]

8.      Beginning on or about October 3, 2021, the Co-Conspirators through newly created limited liability companies, GNET Partners LLC and Multiband Global Resources, LLC

---

[6] James Goodman (Feb. 1, 2023) Tr. at 54:15.
[7] Unanimous Written Consent of Goodman Networks Board of Directors, dated October 20, 2021. *See* Goodman000204.
[8] Jim Frinzi Tr. at 99:18-100:12.
[9] *See* footnote 17.

4

("MGR"), conspired to purchase AMRR, funnel the embezzled money from FedEx to AMRR, and cause AMRR to purchase businesses from OnePath Systems, LLC.

9.     On or about December 10, 2021, the Co-Conspirators using Goodman Networks' and its subsidiaries' bank accounts caused $500,000 to be transferred to MGR for the purchase of AMRR.[10]

10.     On or about December 13, 2021, the Co-Conspirators using Goodman Networks' and its subsidiaries' bank accounts caused $500,000 to be transferred to the Stauber Law Offices, who was believed to be acting on behalf of AMRR's majority owners at the time.[11]

11.     On December 20, 2021, MGR acquired the majority interest in AMRR.[12]

12.     On or about December 30, 2021, the Co-Conspirators using Goodman Networks' and its subsidiaries' bank accounts caused $962,000 to be transferred to MGR.[13]

13.     On or about January 4, 2022, the Co-Conspirators using Goodman Networks' and its subsidiaries' bank accounts caused $4.4 million to be transferred to MGR.[14]

14.     Between January 11, 2022, and January 28, 2022, the Co-Conspirators using Goodman Networks' bank accounts caused $44,000,000 to be transferred to AMRR. As evidence of the fraudulent nature, these transactions were made at or about the daily transfer limit of $8 million rather than as a single funding transfer.[15]

15.     On January 21, 2022, and after the prior identified cash[16] had already been transferred, an entity that does not exist, "GNET ATC Inc.", and AMRR purported to enter into a

---

[10] Goodman_001065.
[11] Goodman_007678.
[12] AMRR For 8-K, dated December 27, 2021,
https://www.sec.gov/ix?doc=/Archives/edgar/data/0001488638/000121465921013659/r12272138k.htm.
[13] Goodman_007678.
[14] Goodman_008405; Goodman_001065; Goodman_007536.
[15] Goodman_008421.
[16] Excluding $4,075,000 to be transferred on January 28, 2022.

Secured Promissory Note and Security Agreement (the "AMRR Documents"), which obligated AMRR to repay GNET ATC Inc. $44 million and granted GNET ATC Inc. a security interest in all assets held by AMRR.[17] The AMRR Documents were purportedly signed by Jim Frinzi on behalf of AMRR, even though he was the CEO at Goodman Networks and its subsidiaries, and by James Goodman on behalf of GNET ATC Inc. James Goodman testified the AMRR Documents containing his signature were "forged" and that he reported the forgery to the FBI.[18] There are no documents evidencing that Goodman Networks' board approved the AMRR Documents.

16.    On or about February 1, 2022, AMRR acquired 100% of the membership interests of AMR Resources, LLC ("AMR Resources") for $38,000,000 in cash plus additional consideration from OnePath Systems, LLC.[19] AMR Resources was created for purposes of this transaction.

17.    The Co-Conspirators intentionally caused AMRR to acquire AMR Resources as an equity purchase rather than an asset purchase because the purported lien granted in the AMRR Documents would not attach to the OnePath assets in the hands of AMR Resources. This structuring would allow AMR Resources to later sell its business assets to the Co-Conspirators without concern that the purported lien granted to Goodman Networks would hinder subsequent transactions.

18.    In January 2022, Shalom Auerbach was appointed as a member of the AMRR board.[20] Jim Frinzi, Jeremie Peterkin, Angela Paxton, and Antonio Munoz were also appointed to the AMRR Board in January 2022.[21]

---

[17] 18920-0000342; 18920-0000344.
[18] James Goodman Tr. 73:9-74:6.
[19] AMRR Form 8-K, dated February 2, 2022,
https://www.sec.gov/ix?doc=/Archives/edgar/data/0001488638/000121465922001818/g232218k.htm.
[20] AMRR Form 10-K, dated as of December 31, 2021,
https://www.sec.gov/ix?doc=/Archives/edgar/data/0001488638/000121465922004189/j3182228k.htm.
[21] *Id*.

19.    On or about February 3, 2022, the Co-Conspirators using Goodman Networks' bank accounts caused $17,032,060 to be transferred to entities controlled by James Goodman, John Goodman, Shalom Auerbach, and Neil Auerbach in exchange for debt held by James and John Goodman's related entities.[22] Of the $17,032,060, the Goodman related entities received $11,131,953 and the Auerbach related entities received $5,900,107.[23]

20.    Between February 24, 2022, and March 11, 2022, the Co-Conspirators using Goodman Networks' and its subsidiaries' bank accounts caused at least $13,474,075 to be transferred to a newly formed Florida limited liability company called 18920 NW 11th, LLC ("18920 NW") in exchange for 18920 NW releasing a fictious $50 million claim against Goodman Networks.[24] In addition, the Co-Conspirators caused other business assets of Goodman Networks and its subsidiaries to be transferred to 18920 NW, including trademarks, licenses, and half of the forged note included in the AMRR Documents.[25]

21.    On or about August 16, 2022, the Co-Conspirators caused AMRR and 18920 NW to enter into a *Trademark Acquisition Agreement*; whereby, AMRR acquired the Goodman Networks trademarks and licenses in return for stock in AMRR.[26]

22.    On September 6, 2022, this involuntary bankruptcy was commenced by petition (the "Petition Date"). (ECF No. 1).

23.    After the Petition Date, the Co-Conspirators, acting through John Goodman but with no actual authority, caused Goodman Networks to contest the involuntary petition. (ECF Nos. 19, 43, 77).

---

[22] Goodman_008415.
[23] Hudson_0012.
[24] Goodman_006996; Goodman_008415; Goodman_0011933; 18920-0000353.
[25] 18920-0000353.
[26] SONDRUP0040.

24.     On September 26, 2022, the Co-Conspirators caused AMRR and 18920 NW to entered into a *Confidential Settlement Agreement and Release* whereby 18920 NW received stock in AMRR in return for the cancellation of half the purported debt memorialized in the forged AMRR Documents.[27]

25.     On October 4, 2022, the Co-Conspirators caused Greater Tech, an entity created and controlled by John Goodman that acquired the majority of Goodman Networks' business assets, and AMRR to enter into a Non-Disclosure and Confidentiality Agreement for "exploring a potential business relationship."[28]  On October 19, 2022, the Co-Conspirators caused Greater Tech to offer to purchase the Fiber Business of AMR Resources for $1.8 million.[29]

26.     On December 12, 2022, the Court entered the Order for Relief on the involuntary petition. (ECF No. 132).

27.     From December 12, 2022, through February 25, 2023, the Co-Conspirators, acting through John Goodman but with no actual authority, caused Goodman Networks to attempt to convert the chapter 7 case to chapter 11. (ECF No. 133). A settlement was reached to keep the case in chapter 7. (ECF No. 214, 232)

28.     Now, the Trustee files the Motion seeking to approve AMRR's sale of the same business sought by one Co-Conspirator, John Goodman, to another Co-Conspirator, Shalom Auerbach. Upon information and belief, AMRR has received another but less favorable offer for the Fiber Business from James Goodman. It is concerning to FSCLE that all parties seeking to benefit from AMRR's assets are insiders to the Debtor and AMRR.

---

[27] SONDRUP0040.
[28] AMRR_000141.
[29] AMRR_000138.

29.     The terms of this proposed sale are stated in the Trustee's Motion, and the Trustee seeks relief under Section 363(b) of the Bankruptcy Code. In return for seeking approval of the sale, the Trustee will recover for the estate the "Alliance Note," as described in the Motion, and 10% interest in Alliance (the "Alliance Equity").

30.     UMB Bank, National Association, as indenture trustee and the Majority Noteholder Group (together the "Bondholders") filed an Objection to the Motion (ECF No. 324) and, therein, asserted a lien on the forged AMRR Documents and argued the Motion could not be granted without their consent.

## OBJECTIONS AND RESERVATION OF RIGHTS

31.     FSCLE objects to the form of the Motion. The Trustee is seeking a partial settlement of any claims the estate may have against AMRR in return for the Alliance Note and Alliance Equity. The Trustee does not appropriately seek relief involving the use, sale, or lease of property of the estate under Section 363(b) of the Bankruptcy Code. Instead, he seeks to grant a partial release of any estate claims against AMRR, whether those claims arise in contract, tort, or otherwise, in exchange for consideration from Alliance in the form of the Alliance Note and Alliance Equity. The settlement proposed by the Trustee is governed by Bankruptcy Rule 9019 – not Section 363(b). Approval under Bankruptcy Rule 9019 requires 21-day notice and a hearing pursuant to Bankruptcy Rule 2002(a)(3).

32.     FSCLE objects to the Motion to the extent it or the relief it seeks characterizes the AMRR Documents as valid instruments subject to the Bondholders' security interest or liens. FSCLE disputes that the Bondholders have any security interest or lien related to the bankruptcy estate's claims against AMRR or AMR Resources. FSCLE reserves the right to assert that AMRR, AMR Resources and their assets are the proceeds of the Co-Conspirators' fraud and theft from

FSCLE and that any recovery related to AMRR and AMR Resources (i) is the property of FSCLE,

(ii) should be held in trust for FSCLE, and (iii) is not collateral of the Bondholders. As the Trustee

requests in the Motion, the Court should not make a final determination on FSCLE's, the

Bondholders', or the estate's rights related to any recovery made within this contested matter and

should reserve those disputes for a later time.

33.     FSCLE objects to the expedited hearing of the Motion given the Trustee has not

produced material documents to the transaction, including (i) Alliance's financial statements; (ii)

an executed Asset Purchase Agreement, (iii) Alliance's executed governance documents,

including but not limited to any certificates of formation, operating statements, bylaws, and

member agreements; (iii) a personal financial statement for Shalom Auerbach; (iv) any security

agreements; (v) any valuations, appraisals, or analysis of the Fiber Business or its assets; (vi) the

Fiber Business' financial statements, and (vii) a disclosure of the material contracts of the Fiber

Business. Neither the Court nor the parties in interest can adequately assess the Motion and its

fairness and reasonableness absent this material information.

34.     FSCLE objects that the terms of the settlement with AMRR and Alliance are not

fair and reasonable for the following reasons:

a.     Shalom Auerbach and his father, Neil Auerbach, own or control a portfolio
of businesses, which include private equity groups that have billions of
dollars under management. The $150,000 of upfront cash is grossly
unreasonable and should be substantially increased.

b.     The 5% interest is *per se* unreasonable in today's rate environment. As of
September 1, 2023, the Fed Funds Rate (i.e., no risk) is 5.5% and the WSJ
Prime Rate (i.e, the most creditworthy customers) is 8.5%. Fair and
reasonable interest on this type of transaction would be Prime Plus. Given
the extreme risks surrounding Shalom Auerbach, his failed management at
AMRR, the use of a special purpose entity, Alliance, with no assets, and no
guaranties or other pledges of collateral, this Alliance Note must be
considered high risk and low creditworthiness. Under the circumstances, the
risk factor should be at minimum five basis points above the Prime Rate,
which here would be 13.5%.

c. The $4,516,500 note should be backed by a full collateral pledge, and the Trustee should be required to demonstrate that the collateral pledge is based on hard assets that have a substantial likelihood of recovery upon any default of the Alliance Note. Indeed, Shalom Auerbach made similar pledges related to the 18920 NW and AMRR transactions, whereby he pledged his portfolio at Advance Service Group, LLC.

d. Shalom Auerbach should be required to make an unconditional funding contribution to Alliance to cover the first year of working capital for the Fiber Business.

e. Shalom Auerbach should be required to guaranty the Alliance Note.

f. The Trustee should be required to evidence the expected future value of the Alliance Equity, and Shalom Auerbach should be required to grant a put right on the Alliance Equity equal to the expected future value. The put should be triggered upon the earlier of default on the Alliance Note or four years. This will assure that the Alliance Equity is monetizable for the Estate's creditors and that this interest will not be subject to a future fire sale like the present circumstances at AMRR. This put right can be modeled after the put right John Goodman gave Goodman Networks related to the Greater Tech transaction.

g. Absent the above concessions, the Alliance Equity should be increased to an amount significantly greater than 10%.

h. The Alliance Equity should have blocking rights and other minority protections, including a golden share, prohibitions on related party transactions, anti-dilutive protections, limitations on financing and related-party compensation, approval rights related to officers and directors, approval rights related to company governance documents, and approval rights related to major decisions. In addition, the Alliance Equity holder should be granted the exclusive right to appoint the Treasurer with traditional treasury functions, which will provide additional control on cash management.

i. The Alliance Equity should be entitled to appoint a CRO with exclusive management control of Alliance upon any default or anticipated default on the Alliance Note.

j. The Estate should neither grant any releases to AMRR, Alliance, or Shalom Auerbach nor stipulate that the claims against AMRR are limited to $44 million or any other amount. FSCLE has a claim in excess of $81 million against Goodman Networks related to the Co-Conspirators' and AMRR's actions, and Goodman Networks likely has contribution claims and other tort claims against AMRR and the Co-Conspirators that exceed $44 million.

35.     FSCLE further reserves its rights to pursue Alliance as the recipient of the proceeds

of the Co-Conspirators' fraud and theft, notwithstanding the proposed settlement presented in the

Motion. The Trustee cannot settle, and the Court should not approve, any transaction between the

Estate and Alliance that limits FSCLE's independent claims against AMRR, AMR Resources,

Alliance, Shalom Auerbach, or any other entities involved in the frauds and thefts, including claims

related to successor liability, trust, alter ego, veil piercing, or similar equitable rights, because the

proposed transaction does not involve Goodman Networks' estate assets being sold to Alliance.

Neither AMRR nor AMR Resources is a bankruptcy debtor; therefore, neither is entitled to the

benefits of Section 363(f) of the Bankruptcy Code.

## CONCLUSION

36.     For the reasons set forth herein, the Motion cannot be approved in its current form

and under its current terms.

Respectfully submitted,

**BUTLER SNOW LLP**

*/s/ Adam M. Langley*
Adam M. Langley (admitted *pro hac vice*)
R. Campbell Hillyer (admitted *pro hac vice*)
6075 Poplar Avenue, Suite 500
Memphis, TN  38119
Telephone: (901) 680-7316
adam.langley@butlersnow.com
cam.hillyer@butlersnow.com

and

Candice Carson (TX Bar No. 24074006)
2911 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219
Telephone: (469) 680-5502
candice.carson@butlersnow.com

## CERTIFICATE OF SERVICE

I, Adam M. Langley, certify that the foregoing pleading was filed electronically through the Court's ECF system and served electronically on all parties enlisted to receive service electronically in this case.

Dated: September 4, 2023

*/s/ Adam M. Langley*

## EXHIBIT A

| Account | Holder | Use | Amount | REF |
|---------|--------|-----|--------|-----|
| PB*1838 | Goodman Networks | Operating | $3,785,120.89 | FedEx_000644 |
| PB*4352 | Goodman Networks | Cash related to FSCLE Master Service Agreement | $0 | Goodman_008425 |
| PB*3992 | Goodman Networks | Money Market Account | $995.84 | Goodman_006348 |
| PB*1846 | Goodman Networks | Collection Account | $0 | Goodman_006402 |
| PB*1853 | Goodman Networks | Disbursement Account | $0 | Goodman_006317 |
| EW*5481 | Goodman Networks | Unknown | -14.00 | Goodman_007365 |
| EW*7280 | Goodman Networks | Money Market Account | $112.59 | Goodman_007217 |
| | | TOTAL | $3,786,215.32 | |

82141724.v1