Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

ATTORNEYS FOR
SCOTT M. SEIDEL, TRUSTEE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | Case No. 22-31641-mvl-7 |
| Debtor. | § | |

**TRUSTEE'S REPLY IN SUPPORT OF HIS
EXPEDITED MOTION TO APPROVE TRANSACTION WITH AMRR
AND ALLIANCE GLOBAL SOLUTIONS, LLC**

TO THE HONORABLE MICHELLE V. LARSON, U.S. BANKRUPTCY JUDGE:

COMES NOW Scott M. Seidel (the "Trustee"), the duly appointed trustee for the estate (the "Estate") of Goodman Networks, Inc. (the "Debtor") in the above-styled bankruptcy case (the "Bankruptcy Case") and files this *Reply In Support* (the "Reply") *of his Expedited Motion to Approve Transaction with AMRR and Alliance Global Solutions, LLC* (the "Motion"), respectfully stating as follows:

1. The Trustee files this Reply largely in response to the Court's comments at the beginning of the hearing that the Trustee may have understated his burden for seeking approval of the Motion. As the Trustee hopes he will be able to demonstrate below, the standard for the Motion should be the Trustee's sound business judgment without any principles of section 363(e) of 363(f) of the Bankruptcy Code. The Trustee had predicated the Motion on his view that the Court need

not make any determination, even a preliminary one, of the extent of the Bondholders' liens against the underlying assets the subject of the Motion. It is the Bondholders, however, who have interjected that issue, and the Trustee will now substantively respond. The Trustee still believes that the Court need not make any determination on the alleged lien to decide the Motion; if anything, the Trustee hopes that this Reply will assist the Court in agreeing that the rights of the Bondholders—whatever those rights may be—may still be preserved for a subsequent adjudication but that those alleged rights do not stand in the way of the relief sought in the Motion.

2. The arguments raised by the Bondholders are not straight forward or easy, only because of the unique nature of the present transaction where the Trustee is a creditor and not the seller or buyer. An analysis of the issues from a fundamental bankruptcy perspective employing fundamental bankruptcy principles is therefore helpful. At its core, the basic flaw with the Bondholders' argument is that the Trustee is seeking to transfer property that is subject to their perfected lien. He is not. The Bondholders do not have a lien, much less a perfected one, against the Estate's claims against AMRR, or its subsidiary AMR Resources, or its property, the Fiber Business, and there is no sale, transfer, or "swap" involved. The only change is to the identity of the entity responsible for $4.5 million of the Estate's claims. Whatever that may be under section 363(b), it is not a sale, transfer, "swap" or anything else with respect to collateral, and it is properly a question for Bankruptcy Rule 9019.

3. If anything, the correct way to analyze the transaction is that AMRR is repaying the Estate $4.5 million of AMRR's liability by using the proceeds of the sale of one of its subsidiaries. Surely, if AMRR simply wrote the Trustee a check for $4.5 million for a credit against its debt, there would be no dispute and everyone would agree that it would be the course of business of the Debtor, as a creditor, to accept the payment and to credit the debt, even if the

cash payment may have to be turned over to a secured creditor. No one would suggest that the payment and resulting credit would be a sale, transfer, or "swap."

4.      Here, AMRR is repaying the Trustee not with cash, but with a new party issuing a secured promissory note to the Estate. It may not be cash, but it is a payment, and a payment is not a sale, transfer, or "swap." The only legitimate issue, as the Trustee stated at opening, is whether the new note is reasonably worth the $4.5 million credit. But this itself is not really an issue because: (i) the new entity is paying the $4.5 million over time; and (ii) the same underlying assets valued at $4.5 million will be pledged as security for the repayment. That is the proper way to view the transaction; not as a change in the identity of the borrower, but in a payment on account of debt where the only question is the value of the payment.

5.      First, it is true that the Bondholders have a perfected security interest against the Estate's general intangibles and other assets, which would include promissory notes. Here, the AMRR Note may or may not be legitimate, and the Trustee takes no position on the issue at this time. That being said, there is a signed note and security agreement that, under the U.C.C., are valid and enforceable unless and until proven otherwise. In other words, the Trustee cannot simply ignore the existence of the AMRR note. Assuming that the AMRR Note is legitimate, then the Bondholders would have a perfected security interest in the AMRR Note and the underlying collateral securing the AMRR Note. But that note is from AMRR only, and only AMRR pledges its property as collateral; the Fiber Business belongs to AMR Resources, a subsidiary of AMRR. At best, the AMRR Note grants a lien against AMRR's equity interests in AMR Resources, and the Bondholders have a lien against that lien. But that underlying lien—and hence the Bondholder's potential collateral—is not being sold or transferred for the simple reason that the Trustee is not selling the AMRR Note or the collateral; he is merely accepting a partial payment.

6. Second, the AMRR Note is not the property Debtor or to the Estate; under no analysis is it subject to section 363 of the Bankruptcy Code as property of the Estate. The AMRR Note belongs to GNET ATC, LLC, the wholly owned subsidiary—the subsidiary is property of the Estate, not its underlying property. That is why the Trustee phrased his Motion as relief under section 363(b) of the Bankruptcy Code: because he is dealing with property of the Estate in the context of his management; *i.e.* "use," under section 363(b), of the subsidiary that *is* property of the Estate, as opposed to his "use" of the underlying property itself, the AMRR Note, that is *not* property of the Estate. And this assumes that the AMRR Note, made payable to GNET ATC, Inc., an entity that does not exist, is even property of GNET ATC, LLC.

7. The Trustee will return to the topic of the AMRR Note but, third, it is necessary to discuss what property of the Estate is actually involved in the underlying transaction to see why the relief the Trustee seeks is actually relief under Bankruptcy Rule 9019, as the Trustee also referenced in his Motion. Namely, why do AMRR and Alliance need an agreement from the Trustee to do their transaction (and it is their transaction, after all)? Because no buyer of the Fiber Business is going to want that business and its assets unless they obtain it free of the Estate's $44 million-plus claims, whether those claims are in the nature of lien interests or equitable ownership. The Fiber Business is mired in the Estate's claims at present, and no reasonable buyer is going to want to purchase those assets only to have a subsequent determination that AMR Resources did not own them in the first place, or that the assets are subject to $44 million of claims, or that the buyer is a subsequent transferee of a fraudulent transfer (as indeed the Trustee has placed potential buyers on notice that they would be).

8. That undeniable conclusion begs the question of the nature of the Estate's interests against the Fiber Business. The business is owned by AMR Resources, the stock of which is

owned by AMRR. Neither the Estate nor its subsidiary have a promissory note from AMR Resources or a security agreement from AMR Resources. Neither the Estate nor its subsidiary have a contract or security interest claim against AMR Resources or, more importantly, against its assets. So why would AMRR not simply sell the business to Alliance and why would Alliance be concerned about obtaining an agreement with the Trustee?

9. The answer is because the Estate *does* have other claims against the assets of AMR Resources, in the nature of equitable liens and trusts. The Court need not decide any cause of action at this time, of course, and it is necessary only to address the nature of the Estate's claims. As the Court knowns, this all began when Frinzi caused the Debtor to transfer its $44 million (subject to FedEx's equitable claims but <u>not</u> the Bondholder's direct liens, as they had no DACA over these funds) to AMRR, $38 million of which AMRR then used to purchase its subsidiaries, including AMR Resources. The Trustee maintains that this was a breach by Frinzi of his fiduciary duties and also a constructively fraudulent transfer.[1]

10. Texas law permits the imposition of a resulting trust (a trust arising *ab initio* by operation of law) or a constructive trust (a trust imposed by a court) for a breach of fiduciary duty when the fiduciary obtains ill-gotten gains from the breach, for unjust enrichment, and when the purchase price is paid by another. *See, e.g., Troxel v. Bishop*, 201 S.W.3d 290, 298 (Tex. App. – Dallas 2006); *In re Estate of Arrendell*, 213 S.W.3d 496, 504 (Tex. App. – Texarkana 2006). With respect to a fraudulent transfer, the Trustee may also pursue the transfer as against a subsequent transferee and the assets transferred, and the law of fraudulent transfer itself gives rise to principles

---

[1] To state the obvious, the Debtor did not receive anything close to $44 million in return even if the AMRR Note is valid, since the value of a note is not its face amount but the ability of the borrower to repay, and AMRR never had a chance of repaying anything close to the AMRR Note, never repaid a penny, was insolvent from the beginning, and in less than a year's time was out of cash and facing liquidation. The Trustee reserves his rights on actual fraudulent transfer.

and remedies of equitable lien and constructive trust. *See, e.g.,* TEX. BUS. & COMM. CODE ANN. § 24.008(3); *see generally In re Primera Energy LLC*, 579 B.R. 75 (Bankr. W.D. Tex. 2017).

11. It is therefore because of the Trustee's breach of fiduciary duty and constructively fraudulent transfer claims that the Estate has claims against AMRR, and against AMR Resources and the Fiber Business at all (again, GNET ATC may have a claim under the AMRR Note, but not the Estate), and it is the presence of those claims that necessitates that Alliance or any other buyer address and resolve those claims. Alliance wants the Trustee's agreement to resolve those claims in exchange for a payment by it of $4.5 million structured over time and AMRR is willing to permit the Trustee to obtain the purchase price in exchange for a reduction of its liability by $4.5 million, all without litigation: that is the Trustee's business judgment.

12. From that lead two conclusions. First, the transaction is a settlement of the Estate's *in personam* and *in rem* claims against AMR Resources and its property—a Bankruptcy Rule 9019 issue. Second, no creditor has a security interest or lien against these claims. These claims are undeniably commercial tort claims, subject to special rules of granting and perfection under the UCC. *See* TEX. BUS. & COMM. CODE ANN. § 9.102(a)(13). While the Bondholders' security instrument grants a security interest in commercial tort claims, it does not list or describe any such claims, as will be demonstrated at the continued hearing. Nor does the Bondholders' UCC financing statement. As such, the Bondholders have neither a security interest in the Estate's claims against AMR Resources or the Fiber Business, and any such alleged security interest is not perfected. *See id*. at § 9.108(e)(1). An after-acquired provision in a security instrument is insufficient for a security interest to attach to a commercial tort claim, and the claim must be in existence at the time of the grant. *See id*. at § 9.204(b)(2). Finally, while it is *possible* that the proceeds of a commercial tort claim could be "proceeds" under the U.C.C., that is only when the

commercial tort involves property in which the creditor was otherwise perfected. *See, e.g., In re American Cartage Inc.*, 656 F.3d 82, 88-89 (1st Cir. 2011). Here, the $44 million was not subject to the Bondholders' security interests,[2] meaning that under no theory could the Estate's resulting breach of fiduciary duty and fraudulent transfer claims be considered the "proceeds" of the Bondholders' original collateral.

13. The Bondholders therefore have no lien, much less a perfected lien, on what is actually at issue in the transaction. They may not even have a lien against the AMRR Note, and the AMRR Note is not even property of the Estate, but there are two Estate considerations involved: first, the Trustee's "use" of property of the Estate in the form of his use of the subsidiary, even though its assets are not themselves property of the Estate, and second, the Trustee's use of property of the Estate in the form of his claims and causes of action against AMRR, AMR Resources, and its property. The Bondholders have a perfected lien on neither of these things.

14. Returning to the issue of the AMRR Note, it is true that the Trustee is agreeing to release AMRR of $4.5 million of obligations, including under that note on behalf of GNET ATC and including with respect to the Estate's $44 million claims against AMRR (again commercial tort claims not subject to the Bondholders' liens), because AMRR is paying the Trustee the $4.5 million consideration that it is getting for the Fiber Business. So, the true interest of the Bondholders is with respect to their liens against the subsidiary. They have direct liens against GNET ATC but, frankly, nothing in the Bankruptcy Code prevents the Trustee from directly transferring, using, or otherwise disposing of its property for the simple reason that it is not property of the Estate, and nothing under Texas law prevents the Trustee from releasing a portion

---

[2] To the extent they had a security interest, it was unperfected because there was no account control agreement. Pursuant to the Trustee's strong arm powers, the Estate has the superior lien against the funds and any unperfected lien of the Bondholders is either avoided or is transferred to the Estate.

TRUSTEE'S REPLY IN SUPPORT OF HIS EXPEDITED MOTION TO APPROVE TRANSACTION WITH AMRR AND ALLIANCE GLOBAL SOLUTIONS, LLC—Page 7

of the GNET ATC note, albeit the Bondholders' liens against that note (to the extent valid) would attach to the proceeds. The Bondholders' resort would have been to seek a TRO and preliminary injunction against GNET ATC to stop the transaction, which they have not done and which they would lose because they cannot possibly claim irreparable injury, since the transaction only benefits them to the extent they even have a lien against GNET's lien, and because they cannot demonstrate a substantial likelihood of prevail on the merits.

15. The Court may also consider the situation from the perspective of what the situation would be if the Bondholders had a perfected lien against the Estate's claims against AMRR. Those claims are now approaching $50 million, if not more. The value of AMRR's obligations to the Estate is far, far less than that, for the obvious reason that AMRR is dead as a going concern and has only the value of its assets, themselves seriously impaired, perhaps in the $10 million range. A secured creditor is secured only to the extent of the value of its security. *See* 11 U.S.C. § 506(a). Thus, if the Bondholders have a perfected lien against the Estate's claims against AMRR, the secured portion is far, far less than the face amount of $44 million. That the Trustee may be reducing AMRR's obligations by $4.5 million does not implicate the secured interests of the Bondholders—he could reduce it by tens of millions of dollars and the value of the Bondholders' collateral would still not be impaired, since the value of that collateral would be determined not by the face amount of the note but rather the value of any collateral securing the note.

16. Nor is there any transfer of the Bondholders' collateral under this analysis: the Estate's liens and trust claims against the Fiber Business are not being sold, transferred, or anything else, they remain under the transaction, and if anything are improved because Alliance will provide first priority, valid, and perfected security interests to the Estate. The Estate merely accepts a payment of $4.5 million from AMRR, which the evidence has and will demonstrate is a fair credit.

17. The decision tree, therefore, is as follows:

(i) the Bondholders have no lien rights against the Estate's claims against AMR Resources and the Fiber Business, because the Estate's claims arise by virtue of commercial tort claims;

(ii) the AMRR Note is not property of the Estate and is therefore not subject to section 363 of the Bankruptcy Code itself, even if the Trustee's management of GNET is itself subject to section 363(b), at least with respect to material transactions that do affect the Estate;

(iii) the Estate has claims against AMRR that it is reducing by $4.5 million, but the Bondholders have no lien against those claims because those claims too arise as commercial tort claims, while GNET ATC is free as a non-debtor and under non-bankruptcy law to reduce its claim against AMRR by the same amount;

(iv) even if the Bondholders have a lien against the Estate's claims against AMRR, the reduction of those claims by $4.5 million does not affect or impair their collateral because the value of those claims is far less than this reduction, while the underlying assets, if any, that may secure the claims are being retained;

(v) no portion of the Estate's claims against AMRR are being sold, transferred, or swapped, as every penny of the collateral and the claim remains, albeit that Alliance is assuming $4.5 million of the claims: the same debt of $44 million remains and the same Fiber Business that stands as security for that debt remains; and

(vi) all that is happening is that AMRR is repaying the Estate $4.5 million of its obligations to the Estate, and the only question is whether this is a fair valuation for the value of the Fiber Business.

18. Under the very best analysis for the Bondholders, they have a lien against the Estate's lien against AMRR and its subsidiaries and their assets, but the Estate's liens themselves (as against the Fiber Business) are not being sold, transferred, or lessened (the liens arise *in rem* irrespective of who owns the Fiber Business) and the only effect on them is that the Estate' claims against AMRR are being reduced from $44 million to $39.5 million (without taking into account interest). Even under that very best scenario, the question is section 363(e) of the Bankruptcy Code providing for adequate protection, and the record has and will demonstrate that the Bondholders are being more than adequately protected to the extent of their interests: what is

presently worthless with respect to the Fiber Business will pay at least $300,000, result in a secured promissory note, and a 10% interest in a capitalized, operating entity.

19. The Bondholders are simply wrong that the Trustee is proposing "to exchange an asset that is encumbered by a security interest for other assets." The same debt is involved and does not diminish (a portion is paid by AMRR by way of assumption by Alliance) and the same assets (the Fiber Business) remain impressed with the Estate's interests and rights. There is no "exchange." $44 million is and remains owing, and the Fiber Business is and remains as collateral. There is simply a settlement under Bankruptcy Rule 9019 that reduces the liabilities of AMRR by $4.5 million for return consideration from Alliance in the form of assuming that obligation.

20. The Bondholders are likewise wrong that the Trustee is proposing to "sell[] assets that are subject to a lien." The Trustee is not selling anything; he is not selling any interest in the AMRR Note, any of the Estate's claims against AMRR, or the Fiber Business. If the Bondholders have any point on this issue, however, then the Trustee's response is simple and takes three (3) forms. First, their alleged lien against the underlying assets is certainly in *bona fide* dispute and is therefore capable of being transferred free and clear under section 363(f). For all of the reasons discussed above, the Bondholders have no lien against the Estate's interests against AMRR, AMR Resources, or its property, since all of those arise as a result of commercial torts. And, while they may have a lien against the AMRR Note, that note is not property of the Estate. Second, if the Bondholders have an interest, they are free to credit bid and the Trustee will consider assigning to them $4.5 million of the Estate's rights for a credit bid in that amount, and they can then prosecute those rights against the Fiber Business and obtain the business for themselves. Third, they are adequately protected because their interests will attach to all proceeds of the proposed transaction, which proceeds are more than any conceivable value the Estate has from the Fiber Business today.

21. Finally, the Bondholders rely on *In re EQK Bridgeview Plaza, Inc.*, 447 B.R. 775 (Bankr. N.D. Tex. 2011). In that case, the debtor owned four (4) parcels of real property, three of which were transferred to the debtor right before the petition date. *See id*. at 777. The debtor proposed to carve-off 12 acres of one of those parcels and exchange it for another 12 acres down the road. *See id*. at 779. The secured creditor objected, believing that the value of its collateral would not be preserved but would be lowered. *See id*. at 780. The question before the court was whether the debtor could swap one piece of collateral for another over the secured creditor's objection. The court found that the proposed swap was not for the same value or for more value—an important finding going to the core of adequate protection. *See id*. at 782-83. The court analyzed the Bankruptcy Code for whether the swap was permissible, finding that it might be under a Chapter 11 plan, but not under section 363 of the Bankruptcy Code. *See id*. at 783-84. The court concluded that the swap may not be a sale under section 363 but, even if it was, the secured creditor would not be adequately protected. *See id*. at 784-85.

22. *In re EQK Bridgeview Plaza* is simply not instructive for the situation now faced by the Court. That creditor held a lien against the 12 acres; the Bondholders do not hold a lien against the Estate's interests against AMRR, AMR Recourses, or the Fiber Business. That debtor was seeking to swap one asset for another. Here, the Trustee is not swapping an asset: the debt stays, only with a new borrower, and the underlying collateral securing the debt stays. That debtor was arguing that it was seeking to effectuate a sale. The Trustee is not selling anything. That debtor was transferring property from itself to another. The Trustee is not transferring anything. That debtor failed to demonstrate adequate protection. Here, the evidence is overwhelming that, without immediate action, whatever interests the Bondholders may claim will be lost, while the

value of those interests will only be improved under the transaction. The only change is that a new borrower will be responsible for $4.5 million of the old debt. That is not a sale, transfer, or swap.

23. AMRR could have told the Trustee that he has no contract claims against AMRR, AMR Resources, of the Fiber Business, and that he could go file litigation if he wanted to prove otherwise. To his credit, Mr. Baum has not done that. Rather, Mr. Baum has agreed to compromise his rights in exchange for the Trustee compromising his: AMRR will pay over the proceeds of the Alliance transaction to the Trustee, and in exchange the Trustee will give immediate credit of $4.5 million and will continue to work with Mr. Baum instead of filing an involuntary petition and seeking a receiver for the subsidiaries. Wise and calm insolvency professionals have found the best course to address, at least in part, a situation that was not of their making. That is a matter under Bankruptcy Rule 9019 and potentially section 363(b), where the business judgment rule applies, and not one for section 363(f) of the Bankruptcy Code.

24. The Court, the Trustee, and all bankruptcy professionals find our cases as they come to us. Everyone strives for the best result possible, even in unique facts as are present here and throughout this Bankruptcy Case. The people behind these and other transfers in this Bankruptcy Case could not have made more of a mess of it had they tried—perhaps they did and perhaps that is the point. The Bankruptcy Code and the Bankruptcy Rules must be flexible enough to permit everyone to do their job, and the Trustee to do what he can to save value of $4.5 million for the benefit of all.

25. The creditors may disagree with the Trustee's business judgment—although they have yet to offer a meaningful alternative—but the Bondholders are simply not secured by the assets at issue and there is no sale or transfer of any of their collateral or even of Estate property, all of which means the heightened standards applicable to a sale of collateral do not apply and

instead the Trustee's business judgment, whether under section 363(b) or Bankruptcy Rule 9019, applies. Any concerns the Court may otherwise have are readily addressed by attaching all alleged rights to all proceeds of the proposed transaction: monetize the melting asset first and decide who obtains the benefits second.

WHEREFORE, PREMISES CONSIDERED, the Trustee respectfully requests that the Court grant the Motion as requested and as orally amended at the prior hearing with respect to additional consideration being paid by Alliance.

RESPECTFULLY SUBMITTED this 6th day of September, 2023.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75201
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

**ATTORNEYS FOR
SCOTT M. SEIDEL, TRUSTEE**

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that, on this the 6th day of September, 2023, true and correct copies of this document were served by the Court's ECF system on parties entitled to notice thereof, including on counsel for the Bondholders.

                                               By: /s/ Davor Rukavina
                                                       Davor Rukavina