# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of [August 31, 2023], is entered into between [MBG Holdings, Inc., a Texas Corporation f/k/a American Metals Recovery and Recycling Inc] ("**Multiband**"), AMR Resources, LLC, a Delaware Limited Liability Company (both together, "**Seller**"), and Alliance Global Solutions, LLC, a Delaware limited liability company ("**Buyer**").

## RECITALS

**WHEREAS**, Seller is, amongst other business endeavors, engaged in the business of providing fiber-optic network connections and last-mile "fiber-to-the-home" installation services (the "**Business**," which for the avoidance of doubt shall include all fiber-optic related business of Seller); and

**WHEREAS**, Multiband is currently the borrower on a secured promissory note (the "**Original Note**") between it and [GNET ATC, LLC]  a [Texas] [limited liability company] (together with its parent company, Goodman Networks, Inc., ("**Goodman**"), the "**Lenders**"), with a principal amount of $44,000,000 (the "**Original Principal**"), dated January 21, 2022, and is also party to a security agreement of the same date granting Lender a security interest in all of Multiband's assets (the "**Original Security Agreement**"); and

**WHEREAS**, Seller wishes to sell and assign to Buyer free and clear of all claims or encumbrance by Lender, in exchange for an assumption of a portion of the Original Principal and certain other consideration as set forth herein, and Buyer wishes to purchase and assume from Seller, substantially all the assets of the Business, subject to the terms and conditions set forth herein (the "**Purchase**"); and

**WHEREAS**, Goodman is currently in bankruptcy and under the supervision of Scott M. Seidel, a court-appointed trustee (the "**Trustee**"), but will consent to the Purchase and obtain the necessary judicial consent or court orders to approve the same; and

**WHEREAS,** contemporaneously with the execution of this Agreement, Buyer and Lenders will enter into a new secured promissory note (the "**New Note**"), a new security agreement (the "**New Security Agreement**"), and an "**Operating Agreement**," and Seller and Lenders will enter into a "**Payoff Letter**," all dated as of the date hereof and which, along with this Agreement and the other Transaction Documents (as defined herein), will effect the transactions contemplated hereby.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01   Purchase and Sale of Assets.** Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, convey, assign, transfer, and deliver to Buyer, and Buyer

EXHIBIT D

shall purchase from Seller, all of Seller's right, title, and interest in, to, and under all of the tangible and intangible assets, properties, and rights of every kind and nature and wherever located, which relate to, or are used or held for use in connection with, the Business (collectively, the "**Purchased Assets**"), including the following (to the extent they relate to the Business):

      (a)    all accounts receivable held by Seller in respect of the Material Customers ("**Accounts Receivable**");

      (b)    all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts, and other inventories ("**Inventory**");

      (c)    all Contracts (the "**Assigned Contracts**") (i) set forth on Schedule A, including any amendments, renewals, assignments, successor agreements, or any other Contracts related thereto,  or (ii) otherwise relating to the Business. The term "**Contracts**" means all contracts, leases, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures, and all other agreements, commitments, and legally binding arrangements, whether written or oral;

      (d)    all intellectual property assets;

      (e)    all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones, and other tangible personal property (the "**Tangible Personal Property**"), which shall include for the avoidance of doubt;

          (i)    all Tangible Personal Property located at (or supposed to be located at) 1020 Winchester Road, Huntsville, Alabama, 125 3rd Ave. N, Franklin, TN, and 7365 Carnelian Street, Suite 222H, Rancho Cucamonga, CA;

          (ii)    the cellphones and associated plans with Verizon Wireless listed on Schedule B;

          (iii)    the vehicles listed on Schedule C and any associated leases, and any Tangible Personal Property associated with such vehicles or the drivers thereof;

          (iv)    the information technology assets listed on Schedule D; and

          (v)    the equipment and assets listed on Schedule E.

      (f)    all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums, and fees (including any such item relating to the payment of Taxes);

      (g)    all of Seller's rights under warranties, indemnities, and all similar rights against third parties to the extent related to any Purchased Assets;

      (h)    all insurance benefits, including rights and proceeds, arising from or relating to the Business, the Purchased Assets, or the Assumed Liabilities;

(i)      originals or, where not available, copies, of all books and records, including books of account, ledgers, and general, financial, and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records, and data (including all correspondence with any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any arbitrator, court, or tribunal of competent jurisdiction (collectively, "**Governmental Authority**")), sales material and records, strategic plans and marketing, and promotional surveys, material, and research ("**Books and Records**"); and

(j)      all goodwill and the going concern value of the Purchased Assets and the Business.

**Section 1.02   Assumed Liabilities.**

(a)      Subject to the terms and conditions set forth herein, aside from the obligation to pay the New Note as part of the Purchase Price, Buyer shall assume and agree to pay, perform, and discharge only the following Liabilities of Seller (collectively, the "**Assumed Liabilities**"), and no other Liabilities:

(i)      the trade accounts payable of Seller to third parties in respect of the Material Suppliers that remain unpaid  as of the Closing Date;  and

(ii)      all Liabilities in respect of the Assigned Contracts but only to the extent that such Liabilities thereunder are required to be performed after the Closing Date, were incurred in the ordinary course of business, and do not relate to any failure to perform, improper performance, warranty, or other breach, default, or violation by Seller on or prior to the Closing;

For purposes of this Agreement, "**Liabilities**" means liabilities, obligations, or commitments of any nature whatsoever, whether asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured, or otherwise.

(b)      Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be responsible to pay, perform, or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "**Excluded Liabilities**"). For purposes of this Agreement: (i) "**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person; and (ii) the term "**control**" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

**Section 1.03    Purchase Price.** The aggregate purchase price for the Purchased Assets shall be $4,516,500 (the "**Purchase Price**"), which shall be paid in the form of (i) Buyer's assumption of the obligation to pay Lenders $4,350,000 under the New Note, (ii) a payment of $150,000 to Lenders, (the "**Cash Amount**") (iii) the grant of a 10% membership interest in Buyer to Lenders under the Operating Agreement (together with (i) and (ii) the "**Lender Consideration**"), and (iv) Lenders' contemporaneous foregoing of an amount of the Original Principal equal to the Purchase Price pursuant to the Payoff Letter, plus Buyer's assumption of the Assumed Liabilities. Buyer shall pay the Cash Amount of the Purchase Price by wire transfer to Lenders in immediately available funds in accordance with the written instructions of the Lenders.

**Section 1.04    Treatment of the Purchase Price.** The parties agree to treat the transactions hereunder for all purposes (including Tax and financial accounting) (i) as if full payment of the Purchase Price were first made to Seller and then immediately remitted to Lenders in exchange for its foregoing of an equivalent amount under the Payoff Letter and (ii) as constituting a fair exchange, negotiated at arm's length, for equal value to the Purchased Assets.

**Section 1.05    Allocation of Purchase Price.** The Purchase Price and the Assumed Liabilities shall be allocated among the Purchased Assets for all purposes (including Tax and financial accounting) as shown on [Schedule [X]] (the "**Allocation Schedule**"). The Allocation Schedule shall be prepared in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended. Buyer and Seller shall file all returns, declarations, reports, information returns and statements, and other documents relating to Taxes (including amended returns and claims for refund) ("**Tax Returns**") in a manner consistent with the Allocation Schedule.

**Section 1.06    Withholding Tax.** Buyer shall be entitled to deduct and withhold from the Purchase Price all Taxes that Buyer may be required to deduct and withhold under any provision of Tax Law or that may be owing under the Tax Clearance Certificates. All such withheld amounts shall be treated as delivered to Seller hereunder.

**Section 1.07    Contingency on Lender Release and Consent.** This Agreement and the obligations of the parties hereunder shall be entirely contingent upon Lenders' simultaneously entering into the Payoff Letter, the New Note, the New Security Agreement, and the Operating Agreement, and its (i) release of any security interest in, and all claims it may have to, the Purchased Assets whether under the Original Security Agreement or any other agreement, right, or cause of action, (ii) provision of full consent, and obtaining of judicial consent to the extent necessary, to the transactions contemplated hereunder so as to permit Buyer to purchase the Purchased Assets free and clear of all encumbrances of any type by Lenders and to permit Buyer and Seller to perform all their other obligations hereunder; and (iii) release of all claims against any vendors, suppliers, or other parties that are party to any contracts or agreements, howsoever created, that form a part of the Purchased Assets, in favor of Buyer.

**Section 1.08    Third-Party Consents.** To the extent that Seller's rights under any Purchased Asset may not be assigned to Buyer without the consent of another Person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and Seller, at its expense, shall use its reasonable best efforts to obtain any such required consent(s) as promptly

as possible. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the Purchased Asset in question so that Buyer would not in effect acquire the benefit of all such rights, Seller, to the maximum extent permitted by Law and the Purchased Asset, shall act after the Closing as Buyer's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by Law and the Purchased Asset, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer.

**ARTICLE II**
**CLOSING**

**Section 2.01    Closing.** Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place remotely by exchange of documents and signatures (or their electronic counterparts), at or about 12:00 PM EST [on August 31, 2023], simultaneously with the execution of this Agreement, or at such other time or place or in such other manner as Seller and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date**."

**Section 2.02    Closing Deliverables.**

(a)    At the Closing, Seller shall deliver to Buyer the following:

(i)    a bill of sale (the "**Bill of Sale**") duly executed by Seller, transferring the Tangible Personal Property included in the Purchased Assets to Buyer;

(ii)    an "**Assignment and Assumption Agreement**" duly executed by Seller, effecting the assignment to and assumption by Buyer of the Purchased Assets and the Assumed Liabilities;

(iii)    a "**Transition Services Agreement**" duly executed by Seller;

(iv)    the Payoff Letter duly executed by Seller;

(v)    "**Tax Clearance Certificates**" from the taxing authorities for the states of [Georgia, Alabama, Tennessee, Pennsylvania, Florida, California] and any other jurisdictions that impose Taxes on Seller or where Seller has a duty to file Tax Returns in connection with the transactions contemplated by this Agreement and evidence of the payment in full or other satisfaction of any Taxes owed by Seller in those jurisdictions;

(vi)    a certificate of the Secretary (or equivalent officer) of Seller certifying as to (A) the resolutions of the board of directors , which authorize the execution, delivery, and performance of this Agreement, the Bill of Sale, the Assignment and Assumption Agreement, the Transition Services Agreement, Payoff Letter, and the other agreements, instruments, and documents required to

be delivered in connection with this Agreement or at the Closing (collectively, and together with the [New Note, Payoff Letter, New Security Agreement, and the Operating Agreement] the "**Transaction Documents**") and the consummation of the transactions contemplated hereby and thereby, and (B) the names and signatures of the officers of Seller authorized to sign this Agreement and the other Transaction Documents to which it is a party;

(vii)    such other customary instruments of transfer or assumption, filings, or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to the transactions contemplated by this Agreement; and

(viii)   [completed copies of any Uniform Commercial Code filings or any other filings necessary to release Lenders' security interests in the Purchased Assets.][1]

(b)    At the Closing, Buyer shall deliver to Seller the following:

(i)     the Assignment and Assumption Agreement duly executed by Buyer; and

(ii)    the Transition Services Agreement duly executed by Buyer.

(c)    At the Closing, Buyer shall deliver to Lenders:

(i)     the Lender Consideration;

(ii)    the New Security Agreement duly executed by Buyer; and

(iii)   the Operating Agreement duly executed by Buyer and its members.

(d)    At the Closing, Seller shall deliver to Lenders the Payoff Letter duly executed by Seller.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that the statements contained in this ARTICLE III are true and correct as of the date hereof.

**Section 3.01   Organization and Authority of Seller.** Multiband is a corporation duly organized, validly existing, and in good standing under the Laws of the State of [Texas], and AMR Resources LLC is a limited liability company duly organized, validly existing, and in good standing under the Laws of the State of Delaware. Seller has full corporate power and authority

---

[1] [Note to Lender's counsel: Please confirm whether there are any such filings needed/any liens that will travel with the assets directly.]

to enter into this Agreement and the other Transaction Documents to which Seller is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Seller of this Agreement and any other Transaction Document to which Seller is a party, the performance by Seller of its obligations hereunder and thereunder, and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate, board, and shareholder action on the part of Seller. This Agreement and the Transaction Documents to which Seller is a party constitute legal, valid, and binding obligations of Seller enforceable against Seller in accordance with their respective terms.

**Section 3.02   No Conflicts or Consents.** The execution, delivery, and performance by Seller of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with any provision of the certificate of incorporation, by-laws, or other governing documents of Seller; (b) violate or conflict with any provision of any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, other requirement, or rule of law of any Governmental Authority (collectively, "**Law**") or any order, writ, judgment, injunction, decree, stipulation, determination, penalty, or award entered by or with any Governmental Authority ("**Governmental Order**") applicable to Seller, the Business, or the Purchased Assets; (c) other than the consent of the Lenders provided hereby and the Judicial Consents, require the consent, notice, declaration, or filing with or other action by any individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity ("**Person**") or require any permit, license, or Governmental Order; (d) violate or conflict with, result in the acceleration of, or create in any party the right to accelerate, terminate, modify, or cancel any Contract to which Seller is a party or by which Seller or the Business is bound or to which any of the Purchased Assets are subject (including any Assigned Contract); or (e) result in the creation or imposition of any charge, claim, pledge, equitable interest, lien, security interest, restriction of any kind, or other encumbrance ("**Encumbrance**") on the Purchased Assets.

**Section 3.03   Financial Statements.** Complete copies of the financial statements consisting of the balance sheet of the Business and the related statements of income and retained earnings, shareholders' equity, and cash flow for 2022 and 2023 through [April 30, 2023] (the "**Financial Statements**") have been delivered to Buyer. The Financial Statements have been prepared in accordance with generally accepted accounting principles in effect in the United States from time to time, applied on a consistent basis throughout the period involved. The Financial Statements fairly present the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated. The most recent balance sheet of the Business as of [April 30, 2023] is referred to herein as the "**Balance Sheet**" and the date thereof as the "**Balance Sheet Date**".

**Section 3.04   Undisclosed Liabilities.** Seller has no Liabilities with respect to the Business, except (a) those which are adequately reflected or reserved against in the Balance Sheet as of the Balance Sheet Date, and (b) those which have been incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date and which are not, individually or in the aggregate, material in amount.

**Section 3.05   Absence of Certain Changes, Events, and Conditions.** Since the Balance Sheet Date, the Business has been conducted in the ordinary course of business consistent with past practice and there has not been any change, event, condition, or development that is, or could reasonably be expected to be, individually or in the aggregate, materially adverse to: (a) the business, results of operations, condition (financial or otherwise), or assets of the Business; or (b) the value of the Purchased Assets.

**Section 3.06   Assigned Contracts.** Each Assigned Contract is valid and binding on Seller in accordance with its terms and is in full force and effect. Neither Seller nor, to Seller's knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of any intention to terminate, any Assigned Contract. No event or circumstance has occurred that would constitute an event of default under any Assigned Contract or result in a termination thereof. Complete and correct copies of each Assigned Contract (including all modifications, amendments, and supplements thereto and waivers thereunder) have been made available to Buyer. There are no disputes pending or threatened under any Assigned Contract.

**Section 3.07   Title to Purchased Assets.** Seller has good and valid title to, or a valid leasehold interest in, all the Purchased Assets, free and clear of Encumbrances other than (i) those of Lenders that are being released under the Transaction Documents, and (ii) those which arise from the lease agreements listed in Schedule A.

**Section 3.08   Condition and Sufficiency of Assets.** Each item of Tangible Personal Property is structurally sound, is in good operating condition and repair, and is adequate for the uses to which it is being put, and no item of Tangible Personal Property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost. The Purchased Assets are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing and constitute all of the rights, property, and assets necessary to conduct the Business as currently conducted. None of the Excluded Assets are material to the Business.

**Section 3.09   Inventory.** All Inventory, whether or not reflected in the Balance Sheet, consists of a quality and quantity usable and salable in the ordinary course of business consistent with past practice, except for obsolete, damaged, defective, or slow-moving items that have been written off or written down to fair market value or for which adequate reserves have been established.

**Section 3.10   Accounts Receivable.** The Accounts Receivable: (a) have arisen from bona fide transactions entered into by Seller involving the sale of goods or the rendering of services in the ordinary course of business consistent with past practice; (b) constitute only valid, undisputed claims of Seller not subject to claims of set-off or other defenses or counterclaims other than normal cash discounts accrued in the ordinary course of business consistent with past practice; and (c) are collectible in full within ninety (90) days after billing.

**Section 3.11   Material Customers and Suppliers.**

(a)     Schedule A sets forth the material customer Contracts of the Business (collectively, the "**Material Customers**"). Seller has not received any notice, and has no reason to believe, that any of the Material Customers has ceased, or intends to cease after the Closing, to use the goods or services of the Business or to otherwise terminate or materially reduce its relationship with the Business.

(b)     Schedule A also sets forth the material supplier Contracts of the Business (collectively, the "**Material Suppliers**"). Seller has not received any notice, and has no reason to believe, that any of the Material Suppliers has ceased, or intends to cease, to supply goods or services to the Business or to otherwise terminate or materially reduce its relationship with the Business.

**Section 3.12   Legal Proceedings; Governmental Orders.**

(a)     Other than those of Lenders being released under the Transaction Documents, there are no claims, actions, causes of action, demands, lawsuits, arbitrations, inquiries, audits, notices of violation, proceedings, litigation, citations, summons, subpoenas, or investigations of any nature, whether at law or in equity (collectively, "**Actions**") pending or, to Seller's knowledge, threatened against or by Seller: (i) relating to or affecting the Business, the Purchased Assets, or the Assumed Liabilities; or (ii) that challenge or seek to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

(b)     There are no outstanding Governmental Orders against, relating to, or affecting the Business or the Purchased Assets.

**Section 3.13   Compliance with Laws.** Seller is in compliance with all Laws applicable to the conduct of the Business as currently conducted or to the ownership and use of the Purchased Assets.

**Section 3.14   Taxes.** All Taxes due and owing by Seller have been, or will be, timely paid. No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of Seller. All Tax Returns with respect to the Business required to be filed by Seller for any tax periods prior to Closing have been, or will be, timely filed, and copies of the same have been provided to Buyer. Seller files state taxes [in Georgia, Alabama, Tennessee, Pennsylvania, Florida, and California], and no Taxes are owing in such jurisdictions, and Seller has provided complete and accurate Tax Clearance Certificates to Buyer evidencing the same. Such Tax Returns are, or will be, true, complete, and correct in all respects. The term "**Taxes**" means all federal, state, local, foreign, and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, withholding, payroll, employment, unemployment, excise, severance, stamp, occupation, premium, property (real or personal), customs, duties, or other taxes, fees, assessments, or charges of any kind whatsoever, together with any interest, additions, or penalties with respect thereto.

**Section 3.15   State Taxes.** Seller files state taxes in the state

**Section 3.16   Brokers.** No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Seller.

**Section 3.17   Full Disclosure.** No representation or warranty by Seller in this Agreement and no statement contained in Schedules to this Agreement or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this ARTICLE IV are true and correct as of the date hereof.

**Section 4.01   Organization and Authority of Buyer.** Buyer is a limited liability company duly organized, validly existing, and in good standing under the Laws of the State of Delaware. Buyer has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder, and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement and the Transaction Documents to which Buyer is a party constitute legal, valid, and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

**Section 4.02   No Conflicts; Consents.** The execution, delivery, and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with any provision of the certificate of incorporation, by-laws, or other organizational documents of Buyer; (b) violate or conflict with any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice, declaration, or filing with or other action by any Person or require any permit, license, or Governmental Order.

**Section 4.03   Brokers.** No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Buyer.

**Section 4.04   Legal Proceedings.** There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer that challenge or seek to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**ARTICLE V**
**COVENANTS**

**Section 5.01 Confidentiality.** From and after the Closing, Seller shall, and shall cause its Affiliates to, hold, and shall use its reasonable best efforts to cause its or their respective directors, officers, employees, consultants, counsel, accountants, and other agents ("**Representatives**") to hold, in confidence any and all information, whether written or oral, concerning the Business, except to the extent that Seller can show that such information: (a) is generally available to and known by the public through no fault of Seller, any of its Affiliates, or their respective Representatives; or (b) is lawfully acquired by Seller, any of its Affiliates, or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual, or fiduciary obligation. If Seller or any of its Affiliates or their respective Representatives are compelled to disclose any information by Governmental Order or Law, Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which is legally required to be disclosed, *provided that* Seller shall use reasonable best efforts to obtain as promptly as possible an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

**Section 5.02 Public Announcements.** Unless otherwise required by applicable Law, no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby without the prior written consent of the other parties (which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate as to the timing and contents of any such announcement.

**Section 5.03 Bulk Sales Laws.** The parties hereby waive compliance with the provisions of any bulk sales, bulk transfer, or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer. Any Liabilities arising out of the failure of Seller to comply with the requirements and provisions of any bulk sales, bulk transfer, or similar Laws of any jurisdiction which would not otherwise constitute Assumed Liabilities shall be treated as Excluded Liabilities.

**Section 5.04 Receivables.** From and after the Closing, if Seller or any of its Affiliates receives or collects any funds relating to any Accounts Receivable or any other Purchased Asset, Seller or its Affiliate shall (i) hold such funds in trust on behalf of Buyer and use its best efforts to ensure they are paid directly to, or if the same is not commercially feasible, place them promptly upon receipt in, a separate trust account for the benefit of Buyer, and (ii) remit such funds to Buyer within five (5) business days after its receipt thereof. From and after the Closing, if Buyer or its Affiliate receives or collects any funds relating to any Excluded Asset, Buyer or its Affiliate shall remit any such funds to Seller within five (5) business days after its receipt thereof.

**Section 5.05 Transfer Taxes.** All sales, use, registration, and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other Transaction Documents, if any, shall be borne and paid by Seller when due. Seller shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Buyer shall cooperate with respect thereto as necessary).

**Section 5.06   Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

## ARTICLE VI
## INDEMNIFICATION

**Section 6.01   Survival.** All representations, warranties, covenants, and agreements contained herein and all related rights to indemnification shall survive the Closing.

**Section 6.02   Indemnification by Seller.** Subject to the other terms and conditions of this ARTICLE VI, from and after Closing, Seller shall indemnify and defend each of Buyer and its Affiliates and their respective Representatives (collectively, the "**Buyer Indemnitees**") against, and shall hold each of them harmless from and against, any and all losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees (collectively, "**Losses**"), incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of, or with respect to:

(a)    any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement, any other Transaction Document to which it is a party, or any schedule, certificate, or exhibit related thereto, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(b)    any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by Seller pursuant to this Agreement, any other Transaction Document to which it is a party, or any schedule, certificate, or exhibit related thereto;

(c)    any Excluded Asset or any Excluded Liability; or

(d)    any Third-Party Claim based upon, resulting from, or arising out of the business, operations, properties, assets, or obligations of Seller or any of its Affiliates (other than the Purchased Assets or Assumed Liabilities) conducted, existing, or arising on or prior to the Closing Date. For purposes of this Agreement, "**Third-Party Claim**" means notice of the assertion or commencement of any Action made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing.

**Section 6.03   Indemnification by Buyer.** Subject to the other terms and conditions of this ARTICLE VI, from and after Closing, Buyer shall indemnify and defend each of Seller and its Affiliates and their respective Representatives (collectively, the "**Seller Indemnitees**") against, and shall hold each of them harmless from and against any and all Losses incurred or

sustained by, or imposed upon, the Seller Indemnitees based upon, arising out of, or with respect to:

(a)     any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement, any other Transaction Document to which it is a party, or any schedule, certificate, or exhibit related thereto, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(b)     any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by Buyer pursuant to this Agreement; or

(c)     any Assumed Liability.

**Section 6.04   Indemnification Procedures.** Whenever any claim shall arise for indemnification hereunder, the party entitled to indemnification (the "**Indemnified Party**") shall promptly provide written notice of such claim to the other party (the "**Indemnifying Party**"). In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any Action by a Person who is not a party to this Agreement, the Indemnifying Party, at its sole cost and expense and upon written notice to the Indemnified Party, may assume the defense of any such Action with counsel reasonably satisfactory to the Indemnified Party. The Indemnified Party shall be entitled to participate in the defense of any such Action, with its counsel and at its own cost and expense. If the Indemnifying Party does not assume the defense of any such Action, the Indemnified Party may, but shall not be obligated to, defend against such Action in such manner as it may deem appropriate, including settling such Action, after giving notice of it to the Indemnifying Party, on such terms as the Indemnified Party may deem appropriate and no action taken by the Indemnified Party in accordance with such defense and settlement shall relieve the Indemnifying Party of its indemnification obligations herein provided with respect to any damages resulting therefrom. The Indemnifying Party shall not settle any Action without the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld or delayed).

**Section 6.05   Cumulative Remedies.** The rights and remedies provided in this ARTICLE VI are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

# ARTICLE VII
# MISCELLANEOUS

**Section 7.01   Notices.** All notices, claims, demands, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient, or (d) on the third day after

the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 7.01):

| | |
|---|---|
| **If to Seller:** | [SELLER ADDRESS]<br>Email: [EMAIL ADDRESS]<br>Attention: [TITLE OF OFFICER TO RECEIVE NOTICES] |
| with a copy to: | [SELLER LAW FIRM]<br>[SELLER LAW FIRM ADDRESS]<br>Email: [EMAIL ADDRESS]<br>Attention: [ATTORNEY NAME] |
| **If to Buyer:** | 15 Margaret Ave.<br>Lawrence, NY 11559<br>Email: shalom@milrosecap.com<br>Attention: Shalom Auerbach |
| with a copy to: | Lieberman and Klestzick, LLP<br>PO Box 356<br>Cedarhurst, NY 11516<br>Email: Jgerstel@LandKlegal.com<br>CC: Joe@LandKlegal.com<br>Attention: Joe Lieberman |

**Section 7.02   Interpretation; Headings.** This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. For purposes of this Agreement (a) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole. The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms. Unless the context otherwise requires, references herein to: (x) Schedules, Exhibits, and Sections mean the Schedules, Exhibits, and Sections of this Note; (y) an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (z) a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 7.03   Severability.** If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement.

**Section 7.04   Entire Agreement.** This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the

subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, [the Exhibits,] and the Schedules, the statements in the body of this Agreement will control.

Section 7.05   **Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. No party may assign its rights or obligations hereunder without the prior written consent of the party that is the obligor in respect of such rights or the beneficiary of such obligations, which consent shall not be unreasonably withheld or delayed. Any purported assignment in violation of this Section shall be null and void. No assignment shall relieve the assigning party of any of its obligations hereunder.

Section 7.06   **Amendment and Modification; Waiver.** This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No failure to exercise, or delay in exercising, any right or remedy arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy.

Section 7.07   **Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

(a)      All matters arising out of or relating to this Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction). Any legal suit, action, proceeding, or dispute arising out of or related to this Agreement, the other Transaction Documents, or the transactions contemplated hereby or thereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, proceeding, or dispute.

(b)      EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY EXHIBITS AND SCHEDULES ATTACHED TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT: (I) NO REPRESENTATIVE OF ANOTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE OTHER PARTY WOULD NOT SEEK

TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION; (II) EACH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER; (III) EACH PARTY MAKES THIS WAIVER KNOWINGLY AND VOLUNTARILY; AND (IV) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 7.08   Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their duly authorized representatives.

**Seller**

MBG Holdings, Inc.


By_____
[NAME]
[TITLE]

and

AMR Resources, LLC


By_____
[NAME]
[TITLE]


**Buyer**

Alliance Global Solutions, LLC,


By_____
Shalom Auerbach
Managing Member

## Schedule A – Assigned Contracts

**Supplier Contracts**

1. Master Services Agreement between Insight Global, LLC and OnePath Systems, LLC dated February 22, 2019

2. Safety and Health Consulting Agreement between SMART Profitability Solutions, LLC and OnePath Systems, LLC dated February 13, 2018

3. Service Agreement between HireRight, LLC and Multiband Global executed on August 9, 2022

4. Master Services Agreement between OnePath Systems, LLC and Consolidated Wiring, LLC executed on November 10, 2017

5. Lease agreement between Colin Thomas Power, LLC and OnePath Systems, LLC (referred to as OnePath in the agreement) dated November 15, 2017

6. Lease agreement between AB Family LP and AMR Resources, LLC dated with effective date of September 1, 2022

7. Lease agreement between Exchange Professional Center, LLC and OnePath Systems, LLC dated September 21, 2018

8. Eagle Rental rental contract signed by Shawn M. Miller date out of December 9, 2021

9. Master Equity Lease Agreement between Enterprise FM Trust and Endeavor Investors, Inc. and its Subsidiaries dated August 25, 2015 and associated Maintenance Agreement of same date with same parties

10. [Master Equity Lease Agreement between Enterprise FM Trust and AMR Resources, LLC dated August 8, 2022]

11. Full Maintenance Agreement between Enterprise Fleet Management, Inc. and AMR Resources, LLC dated August 10, 2022

12. Maintenance Management and Fleet Rental Agreement between Enterprise Fleet Management, Inc. and AMR Resources, LLC dated August 10, 2022

**Customer Contracts**

13. Agreement for Outside Plant Services between Lumos Telephone LLC and AMR Resources LLC dated July 6, 2023

14. Master Contractor Agreement between Shenandoah Cable Television, LLC and OnePath Systems, LLC dated August 27, 2021

15. Master Services Agreement between Google Fiber Inc. and OnePath Systems, LLC with an effective date of December 13, 2019

**Schedule B – Cellphone List**

**Schedule C – Vehicle List**

**<u>Schedule D – IT Assets List</u>**

**<u>Schedule E – Warehouse Equipment and Assets List</u>**