**BUTLER SNOW LLP**
Adam M. Langley (admitted *pro hac vice*)
R. Campbell Hillyer (admitted *pro hac vice*)
6075 Poplar Avenue, Suite 500
Memphis, TN 38119
Telephone: (901) 680-7316
adam.langley@butlersnow.com

and

Candice Carson (TX Bar No. 24074006)
2911 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219
Telephone: (469) 680-5502
candice.carson@butlersnow.com

*Counsel for FedEx Supply Chain
Logistics & Electronics, Inc.*

**DLA PIPER LLP (US)**
Noah M. Schottenstein (TX Bar No. 24100661)
James Muenker (TX Bar No. 24002659)
1900 N. Pearl Street, Suite 2200
Dallas, Texas 75201
Telephone: (214) 743-4500
noah.m.schottenstein@us.dlapiper.com
james.muenker@us.dlapiper.com

*Counsel for ARRIS Solutions, Inc.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| GOODMAN NETWORKS, INC. | § | Case No. 22-31641 (MVL) |
| | § | |
| | § | **Relates to Docket No. 226, 260, 300** |
| | § | |

## JOINT SUR-REPLY OF FEDEX SUPPLY CHAIN LOGISTICS & ELECTRONICS, INC. AND ARRIS SOLUTIONS, INC. TO TRUSTEE'S SECOND AMENDED MOTION FOR APPROVAL OF COMPROMISE AND SETTLEMENT WITH PROSPERITY BANK AND UMB BANK, NATIONAL ASSOCIATION

FedEx Supply Chain Logistics & Electronics, Inc. ("FSCLE") and ARRIS Solutions, Inc.

("ARRIS", collectively with FSCLE, the "Objectors") file this Sur-Reply in support of its

Objection to the Trustee's *Second Amended Motion for Approval of Compromise and Settlement*

with *Prosperity Bank and UMB Bank, National Association* (the "9019 Motion"). Objectors respectfully state the following:

## PRELIMINARY STATEMENT

1.      This bankruptcy case is complex, but the fraudulent transfer claim at issue in this contested matter is not. Funds totaling $5,003,751.85 were transferred from the Debtor's deposit accounts to pay the Genesis Borrowers'[1] loan to Prosperity. The Debtor was insolvent and received no value for this loan payoff. The transfer of $5,003,751.85 was constructively fraudulent.[2] Chapter 5 of the Bankruptcy Code allows the Trustee to recover fraudulent transfers for the benefit of the estate and free of existing liens. 11 U.S.C. §§ 544(a), 548, 550, 551, 552(a). The Trustee should be recovering $5,003,751.85 from Prosperity for the estate. The costs of filing such a suit would not be expensive, and it would be expected to be finally determined on summary judgment.

2.      Instead, the Trustee chose not to file a lawsuit and, without consulting any unsecured creditors, filed the original settlement motion settling the $5,003,751.85 fraudulent transfer claim in return for no recovery to the estate, a $100,000 surcharge to cover the Trustee's own fees and costs, and the granting of a global release to Prosperity. The Objectors, who hold more than $110 million in claims (close to 90% of the unsecured claims pool), then drafted an objection to the Trustee's original motion, submitted it to him informally, and asked that he withdraw the motion. The Trustee refused. Instead, he went back to Prosperity and the Bondholders and asked them to give more money. He obtained $200,000 more from Prosperity, and $50,000 more as a surcharge from the Bondholders. Today, the Trustee proposes the estate release its $5,003,751.85 fraudulent transfer claims against Prosperity for $350,000. This settlement is not fair and equitable to the estate.

---

[1] The Genesis Borrowers are defined in the Statements of Fact.

[2] It may also be actually fraudulent.

3.      Where does the complexity come from? The Bondholders.[3] Independent of the estate's fraudulent transfer claims, the Bondholders may hold claims against Prosperity for its breach of their DACA on the 3992 Account.[4] Of the $5,003,751.85 transferred from the Debtor's deposit accounts, $4,463,804.68 was transferred in one lump sum. This lump sum payment was made just days before the Bondholders delivered Prosperity a Notice of Exclusive Control on the 3992 Account. Recognizing that their Notice came too late, the Bondholders took two actions: (1) they demanded Prosperity pay them the equivalent of the lump sum payment and (2) they filed petitions commencing this involuntary case. The second action gave rise to the Trustee's chapter 5 claims.

4.      Upon entry of the Order for Relief and the appointment of the Trustee, the Bondholders immediately demanded the Trustee get the lump sum payment back from Prosperity. The Trustee, new to the case, complied without any investigation so long as he was paid a "surcharge" and he got to run the entire transfer through estate so that he could claim a commission. He was told that the funds taken from the 3992 Account were sitting in an escrow account awaiting a determination as to who owned what was called the "Subject Funds." In reality, Prosperity was holding funds equal in amount to the lump sum payment in a deposit account in its own name as "cash collateral" for the Genesis Loans while it attempted to restructure those loans. There was not an escrow account, an escrow agreement, or any other authenticated record showing the Bondholders controlled that deposit account.

5.      The Bondholders, the Trustee, and Prosperity entered into a settlement; whereby, Prosperity would pay $4,663,804.68 to the Trustee so that he could earn his commission, the

---

[3] The Bondholders means US Bank, N.A., as collateral agent, UMB, as indenture trustee, and the Majority Bondholder Group, as defined by those parties in their papers.
[4] The DACA and the 3992 Account are defined in the Statements of Fact.

Trustee would then transfer the $4,313,804.68 to the Bondholders while retaining $350,000 to cover his own administrative expenses. The "settlement" really is two merged settlements: (1) the settlement of the estate's chapter 5 avoidance actions for $200,000 and (2) the settlement of the Bondholders' non-bankruptcy claims for $4,463,804.68 with the Trustee pocketing $150,000 as a surcharge and getting to route the settlement monies through the estate so that he could earn a commission of approximately $162,000. The estate and its unsecured creditors received nothing. Indeed, the original Proposed Settlement was net negative ($100,000 received for a surcharge while imposing a $162,000 commission on the estate). The latest iteration only marginally improves the net negative deal, and the Trustee admits none of the recovery will go to anything other than administrative expenses.[5]

      6.      This Court should find that a 4% recovery on a straightforward fraudulent transfer claim is not fair and reasonable. The Court should not concern itself with unwinding the Subject Funds and the Bondholders' non-bankruptcy claims. They are red herrings. The Subject Funds once transferred to payoff the Genesis Loans were funds possessed and controlled by Prosperity, which are the same as all other funds possessed and controlled by Prosperity – non-debtor property. The Bondholders may pursue Prosperity outside of bankruptcy and seek to recoup its damages, if any. Here, the Trustee should have foregone the Bondholders' settlement and surcharge and, instead, pursued the chapter 5 avoidance actions for the benefit of the estate and its unsecured creditors. Since the Trustee will not do so, the Court should grant Objectors derivative standing to pursue the claims on the estate's behalf.

---

[5] Seidel Transcript (rough), Exhibit 1. These excerpts are taken from the rough draft of the Trustee deposition obtained from the court reported on September 17, 2023, as no formal transcript its yet available. Objectors will supplement Exhibit 81 upon receipt of the final transcript.

## STATEMENT OF FACTS

7.    There are no genuine disputes regarding the following facts, which establish the

Estate's avoidance actions against Prosperity:

a. On July 3, 2020, Genesis Networks Telecom Services, LLC, and Genesis Networks Global Services LLC (the "Genesis Borrowers") took out a revolving line of credit with Prosperity subject to a $3 million limit (the "RLOC Loan").[6] The RLOC Loan was secured by the accounts receivable of the Genesis Borrowers.[7]

b. On August 31, 2020, the Genesis Borrowers took out a term loan for $1,948,427.94 with Prosperity (the "Term Loan," and together with the RLOC Loan, the "Genesis Loans").[8] The Term Loan was secured by all assets of the Genesis Borrowers,[9] James Goodman's pledge of his interests in the Goodman MBE Group, and John Goodman's pledge of his interests in the Goodman MBE Group.[10]

c. In the fall of 2021, the Genesis Borrowers were beginning efforts to restructure their businesses. This restructuring would lead to the Genesis Borrowers transferring their assets to an entity called Endeavor Managed Systems, Inc. ("Endeavor"). However, Prosperity would not agree to the Genesis Borrowers' transfer of its collateral absent replacement collateral.

d. On October 13, 2021, AT&T terminated its contract with Goodman Networks, and Goodman Networks had no remaining revenue source, making it insolvent.[11]

e. On October 25, 2021, James Goodman, acting on behalf of Goodman Networks, caused Goodman Networks to assign its deposit account ending in *3992 and located at Prosperity (the "3992 Account") as collateral for the Genesis Loans (the "Assignment").[12] A hold amount of $4,660,000 was placed on the 3992 Account.

f. The 3992 Account did not have sufficient funds on hand to satisfy the hold amount of $4,660,000. On October 31, 2021, James Goodman, acting on behalf of Goodman Networks, caused Goodman Networks to take $236,883.48 of funds in the deposit account ending in *4352 and located at Prosperity (the "4352 Account") and transfer it into the 3992 Account.[13] The 4352 Account was funds from FedEx held by Goodman Networks pursuant to a Master Service Agreement. FedEx did not consent to this transfer.[14]

---

[6] Prosperity000001; Prosperity000023.
[7] Prosperity000029.
[8] Prosperity000151; Prosperity000169.
[9] Prosperity000175.
[10] Prosperity000184; Prosperity000238.
[11] FRINZI01708.
[12] Prosperity000123.
[13] Prosperity000119; FedEx_000631.
[14] FedEx_000631; FSCLE Proof of Claim No. 32.

g.  Neither the Genesis Borrowers nor Prosperity gave Goodman Networks value for the Assignment.[15]

h.  Sometime after October 25, 2021, and before August 15, 2022, the Genesis Borrowers transferred all of their assets to Endeavor or related companies, leaving no material assets at the Genesis Borrowers.

i.  On or before August 15, 2022, funds totaling $5,003,751.85 (the "Fraudulent Transfers") were transferred from the Debtor's deposit accounts at Prosperity to repay the Genesis Loans.

j.  The Debtor's deposit accounts at Prosperity relevant to the Fraudulent Transfers were subject to a DACA in favor of US Bank, N.A., as agent for the Bondholders.[16] The DACAs are passive or springing DACAs, meaning Goodman Networks had the ability to "transfer or withdraw[] funds from the Deposit Account, including paying or transferring the funds to Company or any other person or entity" until U.S. Bank delivered a "Notice of Exclusive Control", which is a "written notice" effectuating a termination of the Goodman Network's "access to the funds in any Deposit Account."[17] Prosperity did not have records of the DACA on the 3992 Account.[18]

k.  While Objectors do not see a material difference between the Fraudulent Transfers, the Trustee has classified the earlier Fraudulent Transfers, totaling $539,974.17, as the "Prosperity Payments" and a lump sum Fraudulent Transfer of $4,463,804.68 as the "Subject Funds."

l.  The lump sum payment was made on August 15, 2022, out of the 3992 Account.

m. On August 16, 2022, U.S Bank delivered at Notice of Exclusive Control.[19] All of the Fraudulent Transfers occurred prior to Prosperity's receipt of the Notice of Exclusive Control.

n.  In response to the Notice of Exclusive Control, Prosperity transferred the remaining funds in the 3992 Account to U.S. Bank on August 19, 2022.[20]

8.    Objectors assert the Assignment and the Fraudulent Transfers are avoidable under

11 U.S.C. §§ 544 and 548, and that the Genesis Borrowers and Prosperity are liable for

$5,003,751.85 of Fraudulent Transfers under 11 U.S.C. § 550. Any avoidance of the Assignment

---

[15] Prosperity Tr: 56:2-6.
[16] Prosperity017076. The 4352 Account is not subject to a DACA in favor of the Bondholders.
[17] *Id*. at § 4.
[18] Prosperity Tr. 145:22-146:8, Exhibit 14.
[19] Prosperity000387.
[20] Prosperity000418.

and the Fraudulent Transfers are preserved for the benefit of unsecured creditors consistent with

11 U.S.C. §§ 551 and 552.

9.    The following facts establish the events that led to the current Proposed

Settlements:

a.  After receiving only $420,260.40 in response to its Notice of Exclusive Control, US Bank sent an August 22, 2022 letter demanding an understanding into the funds that had previously been in the 3992 Account, specifically the Subject Funds.[21]

b.  Recognizing its potential liability exposure, on August 30, 2022, Prosperity reserved and set aside $4,463,804.68 in a *deposit account* ending in *0188 (the "0188 Account"), which is held by Prosperity in the name of "Prosperity Bank" and subject to Prosperity's exclusive control, including a "legal hold."[22] The source of these funds was an advance on the Genesis Loans.[23]

c.  On August 31, 2022, Prosperity responded to US Bank and indicated that the Fraudulent Transfers were authorized by James Goodman, who had authority on behalf of Goodman Networks to make transfers from the 3992 Account.[24] Prosperity further noted the Fraudulent Transfers occurred prior the Notice of Exclusive Control. Prior to the Notice of Exclusive Control, Prosperity was obligated to honor demands on deposit account made by authorized agents of Goodman Networks. Thus, the Fraudulent Transfers are avoidable under the Bankruptcy Code but the Fraudulent Transfers did not violate the Bondholders' DACA on the 3992 Account because they preceded the Notice of Exclusive Control.

d.  After receiving Prosperity's August 31 letter, counsel for US Bank responded by email requesting the $4,463,804.68 in the 0188 Account be transferred back to the 3992 Account so that the funds would remain subject to the DACA.[25]

e.  The $4,463,804.68 was not returned to the 3992 Account; instead, the Bondholders commenced this involuntary case on September 6, 2022 (the "Petition Date"), claiming the Bonds were undersecured. (Dkt. Nos. 1-10; 80).

f.  The 0188 Account, holding $4,463,804.68, was held by Prosperity as "cash collateral" for the Genesis Loans.[26] A security interest in a deposit account is perfected

---

[21] Prosperity000418.

[22] Prosperity000420; Prosperity Tr. 86:22-89:7; 126:3-128:14; 123:10-124:12.

[23] Prosperity017060.

[24] Prosperity000420.

[25] Prosperity012474.

[26] Prosperity015367 (Until a credit restructure or repayment [on the Genesis Loans] is completed, the money is pledged."); Prosperity015369 ("the funds were placed in a Prosperity Bank escrow account (fbo GNET) which still secures our loan."); Prosperity015989; Prosperity016117); Prosperity016486 (calling the funds "cash collateral").

by control, which is exists where the bank maintains the deposit account. Tex. Bus. & Com. Code §§ 9.104(a)(1), 9.312(b)(1).

g.  On October 28, 2022, John Goodman, acting on behalf of the Debtor, demanded the return of the Subject Funds to pay insurance obligations of the Debtor, but Prosperity refused claiming "the money is pledged" to the Genesis Loans and cannot be released until the Genesis Loans are restructured or repaid.[27]

h.  Another demand was made on October 29, 2022, copying the Debtor's bankruptcy counsel.[28] This demand was refused by Prosperity on October 31, 2022. David Parham, as Debtor's counsel then explained that Goodman Networks asserts the Fraudulent Transfers are avoidable and funds need to be returned to the Debtor.

i.  On December 9, 2022, John Goodman requested the funds be released to either "Goodman Networks or to the bond trustee."[29] Prosperity again refused because the Genesis Loans had not yet been restructured.

j.  On December 12, 2022, the Court entered its Order for Relief. (Dkt. No. 132).

k.  Shortly thereafter, the Debtor, acting at the direction of John Goodman, filed a motion to convert the case from chapter 7 to chapter 11 (the "Motion to Convert"). (Dkt. No. 133). This motion was heavily opposed by the petitioning creditors.

l.  On December 14, 2022, Scott Seidel was appointed the chapter 7 trustee. (Dkt. No. 141).

m. On January 7, 2023, the Debtor under signature of John Goodman filed its schedules and listed as an asset a checking account at Prosperity having $4,463,804.68 in funds, but, unlike all other deposit accounts of the Debtor, this "checking" account was not identified by account number. (Dkt. No. 184 at Item 3.14).

n.  On January 31, 2023, Prosperity again represented to John Goodman that the $4,463,804.68 cannot be released until the Genesis Loans are restructured with Endeavor.[30]

o.  On Wednesday, February 15, 2023, the Court held a hearing on the Motion to Convert, and the Trustee announced a settlement to keep the case in chapter 7. (Dkt. No. 208).

p.  The Bondholders immediately reached out to the Trustee on Thursday, February 16, 2023, to request the $4,463,804.68 be turned over to the Bondholders.[31]

---

[27] Prosperity015367.
[28] Prosperity015369.
[29] Prosperity015989.
[30] Prosperity016117.
[31] Trustee_Prosperity_000016.

q. Trustee' counsel appears to have spoken with Prosperity on Thursday, February 16, 2023.[32]

r. Later that night on February 16, 2023, the Trustee, having conducted no material investigation and relying on oral statements from Prosperity, responded to Bondhodlers: "I understand that the funds, which began in a money market account, were not subject to an account control agreement, and I don't think anyone can have a perfected lien in a Chapter 5 (although maybe TUFTA is a business tort)."

s. On Saturday, February 18, 2023, Bondholders provided the Trustee's counsel with a copy of the DACA on the 3992 Account to refute his February 16 statement regarding no DACA.[33]

t. Thirty-two minutes after receiving the DACA, Trustee's counsel requested Prosperity provide documents.[34]

u. On Monday, February 20, 2023, Trustee's counsel provided the DACA to Prosperity and again requested documents.[35]

v. On February 21, 2023, at 12:31 am, Prosperity sent the Trustee's counsel loan documents related to the Genesis Loans.[36] These documents were very limited and did not include any communications or anything regarding the Subject Funds or the 0188 Account.[37]

w. On Tuesday, February 21, 2023 at 10:19 am (3 business days after resolution of the highly contested Motion to Convert, which tied up all parties' resources, and the same morning as having received limited documents from Prosperity), the Trustee's counsel proposed alternative settlements to the Bondholders related to the Subject Funds (the "Surcharge Offer").[38] The first alternative sought a $1 million surcharge from the Subject Funds that would cover administrative costs to pursue assets in the case, including related to AMRR. Implicit in this first offer was an agreement that the $1 million would be the sole surcharge against the Bondholders' collateral. The second alternative sought a $500,000 surcharge from the Subject Funds but reserved for future surcharges against the Bondholders collateral. The Trustee's counsel erroneously stated that he thought the Bondholders were "oversecured" without any material investigation and despite the inherent contradiction to them being petitioning creditors.

x. At the time of the Surcharge Offer, the Trustee had conducted no material investigation into the Fraudulent Transfers or the Subject Funds and was relying on

---

[32] Trustee_Prosperity_000039.
[33] Trustee_Prosperity_000020.
[34] Trustee_Prosperity_000039.
[35] Trustee_Prosperity_000040.
[36] Trustee_Prosperity_000069.
[37] The documents produced by Prosperity are Trustee_Prosperity_000073 to Trustee_Prosperity_000339.
[38] Trustee_Prosperity_000341.

oral statements from adverse parties, Prosperity and the Bondholders, and limited documents that included the DACA and Prosperity's loan documents.

y. On Wednesday, February 22, 2023, Trustee's counsel called Prosperity's counsel and delivered an "ultimatum," which appears to have been a demand to turnover the $4,463,804.68 in order to avoid a lawsuit to be commenced by the Trustee and the Bondholders.[39] Trustee's counsel stated unequivocally: "I pointed out [to Prosperity] that I do not see a principled defense, and they had no answer." He also requested the Bondholders to respond to the Surcharge Offer.

z. By March 1, 2023, Prosperity had not responded to the Trustee's ultimatum, and the Trustee's counsel reached out to Bondholders' counsel, stated "we are preparing to sue the bank" and asked "Where are we on a potential compromise of our issues that also releases a large portion of the funds for immediate payment to you?"[40]

aa. On March 6, 2023, Trustee's counsel emailed Bondholders' counsel asking "do you have any docs showing the $4.6MM transfer from Goodman to Prosperity?"[41] Thus, after making the Surcharge Offer and offering "a large portion of the funds for immediate payment," the Trustee still had not materially investigated the facts and was relying on oral statements from adverse parties.

bb.      On March 6, 2023, Prosperity emailed John and James Goodman saying Prosperity intended to "motion the court to release the cash collateral back to us to satisfy the loan."[42]

cc. On March 7, 2023, Trustee's counsel emailed Prosperity's counsel threatening suit and attaching a draft complaint.[43] He stated: "Please let us know right away if Prosperity . . . has any principled defense to the Trustee's claims. We have not heard of one and are not aware of one."

dd.      The draft complaint alleged chapter 5 avoidance actions related to the Fraudulent Transfers and Assignment.[44] Paragraph 34 of the draft complaint stated the Trustee's understanding, which contains several errors: "During the Summer of 2022, upon information and belief, UMB sent one or more notifications or demands to Prosperity regarding the Account. Upon further information and belief, at that time Prosperity transferred the funds in the Account to a new account ending in 10188 and styled as an "escrow account" (the "Escrow Funds"). The Debtor did not enter into any escrow or other agreement with Prosperity regarding the same: Prosperity transferred the funds in the Account to the Escrow Funds without the Debtor's

---

[39] Trustee_Prosperity_000390.
[40] Trustee_Prosperity_000409.
[41] Trustee_Prosperity_000419.
[42] Prosperity016486.
[43] Trustee_Prosperity_000424.
[44] Trustee_Prosperity_000425.

approval and, upon information and belief, while it sought to work issues out with UMB."

ee. Counsel for Prosperity immediately responded to Trustee's counsel and obfuscated the fact that Prosperity was preparing a motion to have the "cash collateral" released to repay the Genesis Loans.[45] The Trustee's counsel correctly "smell[ed] stalling."

ff. On March 7, 2023, Bondholders' counsel disclaimed any interest in the Prosperity Payments.[46]

gg.      On March 8, 2023, Prosperity with a change of heart gave a "green light" to a settlement; although, no settlement offer had been communicated in writing.[47] The terms appear to be that Prosperity would turnover the $4,463,804.68 in the 0188 Account in return for a global release.

hh.      On March 8, 2023, Trustee's counsel emailed the Trustee reporting the good news about Prosperity and indicating he would push Bondholders' counsel to respond to the Surcharge Offer, which he did within the minute.[48]

ii. The Bondholders' counsel drafted the first draft of the Proposed Settlement, which was amended by Prosperity on March 10, 2022.[49] Neither draft identified any payments to the bankruptcy estate or a surcharge. Indeed, the draft of the Proposed Settlement stated the funds "are not property of the Estate." Thus, On March 10, 2022, the Bondholders and Prosperity both agreed that the funds were not property of the estate and that the funds would go in their entirety to the Bondholders.

jj. Trustee's counsel responded "now's the time to cut a deal on the surcharge."[50]

kk.      On March 14, 2022, having made no progress on a surcharge, the Trustee's counsel emailed that "there is a fundamental disagreement between the Trustee and the Bondholders as to what was being proposed and settled." [51] The Trustee realized he was being cut out of the deal. He sent revisions to the draft Proposed Settlement that for the first time stated the funds are property of the estate and should be turned over to the Trustee.[52]

ll. Prosperity responded that it would only release funds if it received a "global" release.[53]

---

[45] Trustee_Prosperity_000444.
[46] Trsutee_Prosperity_000450.
[47] Trustee_Prosperity_000461.
[48] Trustee_Prosperity_000463; Trustee_Prosperity_000465.
[49] Trustee_Prosperity_000470; Trustee_Prosperity_000472.
[50] Trustee_Prosperity_000481.
[51] Trustee_Prosperity_000513.
[52] Trustee_Prosperity_000516.
[53] Trustee_Prosperity_000538.

mm.    Later that day, Trustee's counsel requested the Bondholders to "walk [him] through" how the Bondholders were entitled to post-petition interest and attorney's fees (i.e., how they are oversecured).[54]

nn.    Rather than get cut out of the deal completely, the Trustee proposed a $100,000 surcharge so long as the entire funds were routed through the bankruptcy estate and not directly transferred to the Bondholders. [55] As Bondholders' counsel noted, the purpose of this routing was "to make sure the payment is in the trustee's commission denominator."[56] The parties agreed to the Trustee's requests and the Proposed Settlement was consummated.

oo.    Shortly thereafter on March 20, 2023, Prosperity sent the Genesis Borrowers a Notice of Default.[57] James Goodman responded "I thought this was resolved."[58]

pp.    The Trustee filed the Original 9019 Motion and the Proposed Settlement on March 22, 2023 at 3:16 pm. (Dkt. No. 226).

qq.    On March 24, 2023, Prosperity responded to James Goodman's "I thought this was resolved" comment by stating: "we have filed a motion for an agreed order to release the cash held in escrow to the bankruptcy trustee on advice of counsel."[59] Prosperity then continued to negotiate a restructuring of the Genesis Loans with James Goodman and Endeavor.

10.    The Original 9019 Motion contained the following misstatements:

| Original 9019 Motion Statements | Actual Facts |
|---|---|
| "Prosperity . . . segregated $4,463,804.68 into an escrow account pending further proceedings (the 'Subject Funds')." (Pp. 5). | Prosperity reserved and segregated new funds totaling $4,463,804.68 into the 0188 Account, which is a deposit account for the benefit of Prosperity. |
| "Prosperity disputes these [fraudulent transfer] allegations." (Pp. 5). | As the Trustee confirmed to the Bondholders: "I pointed out [to Prosperity] that I do not see a principled defense, and they had no answer." [60] |
| "As of the Petition Date, the Subject Funds remained in the escrow account, subject to the claims of the Trustee, Prosperity, and the Collateral Agent, and further subject to the automatic stay." (Pp. 6). | The Subject Funds had been applied to the Genesis Loans. Prosperity then reserved and segregated new funds totaling $4,463,804.68 into the 0188 Account, which is a deposit account for the benefit of Prosperity. |

---

[54] Trustee_Prosperity_000534.
[55] Trustee_Prosperity_000550.
[56] Trustee_Prosperity_000555.
[57] Prosperity016491; Prosperity016492
[58] Prosperity016494.
[59] Prosperity016495.
[60] Trustee_Prosperity_000390.

| | |
|---|---|
| | Prosperity treated the 0188 Account as their "cash collateral." |
| "the Subject Funds are property of the Estate" (Pp. 6). | The $4,463,804.68 in the 0188 Account was property of Prosperity as the deposit account holder. |
| "the Collateral Agent holds valid, perfected, unavoidable first priority security interests in the Subject Funds" (Pp. 6). | There are no authenticated records reflecting Bondholders' control of the Subject Funds. |
| "all parties agree, and the Court finds, that the Subject Funds are property of the Estate." (Pp. 6). | Prosperity and the Bondholders did not agree that the Subject Funds are property of the estate, which is evidenced by the first draft of the Proposed Settlement. The stipulation as to property of the estate was intended to provide the Trustee a commission. |
| "Trustee releases Prosperity from any and all claims and causes of actions, including on account of the Prosperity Payments" (Pp. 7). | The Trustee had not materially investigated any actions of Prosperity when he entered into this global release. |
| "Trustee knows of no claim as to why the Collateral Agent's security interests in the Subject Funds would be subject to dispute or avoidance, and no creditor or other party has informed him of any such claim." (Pp. 8). | The Trustee had not materially investigated the Subject Funds and had not notified creditors of the Proposed Settlement. |
| "The Collateral Agent and Majority Noteholders have asserted that the claims under the Notes are oversecured and, on a preliminary basis, it appears to the Trustee that this may be correct." (Pp. 9). | The Trustee had not materially investigated whether the Bondholders are oversecured. The Bondholders are not oversecured, and they acknowledged this unsecured status by acting as petitioning creditors. |
| "Trustee is not aware of any basis to recover his litigation against Prosperity, even if he succeeds on his claims against Prosperity under sections 542 and 548 of the Bankruptcy Code." (Pp. 9). | Prosperity is a moneyed financial institution with sufficient resources to satisfy a fraudulent transfer judgment. |
| "The Trustee is not aware of any other claims or causes of action that the Estate may hold against Prosperity." (Pp. 9). | The Trustee was aware that FSCLE was asserting that approximately $81 million was unlawfully taken from the 4352 Account at Prosperity. |
| "The amount of the Agreed Surcharge is fair and reasonable and compensates the Estate for its expenses and burdens in assisting with the Proposed Settlement" (Pp. 9). | The Trustee had done no material investigation and had spent approximately $20,000 to $30,000 at the time. |

11.     Upon the filing of the Original 9019 Motion, Objectors immediately reached out to the Trustee to have him withdraw the Original 9019 Motion. Rather than create a contested matter by filing a formal objection, Objectors prepared a draft objection, informally submitted the draft

objection to the Trustee, and requested that he withdraw the Original 9019 Motion so that the

claims could be pursued.

12.    The following facts progressed from the Objectors' involvement.

a.  On March 22, 2023, Objectors setup and had a call with the Trustee communicating their dissatisfaction with the Proposed Settlement.

b.  On March 22, 2023 at 5:00pm, Trustee's counsel emailed all the relevant documents in the Trustee's possession.[61] These documents were very limited and contained only loan documents for the Genesis Loans and the DACA on the 3992 Account. The Objectors requested documentation regarding the "escrow account" at Prosperity that was purportedly Bondholders' valid and perfected security. Objectors explained that a proper collateral analysis can only be done with documentation of the actual collateral being analyzed.

c.  On March 22, 2023 at 5:30 pm in response to Objectors request for documentation on the 0188 Account, the Trustee's counsel requested from Prosperity "account statement and account history for our records."[62]

d.  On April 3, 2023, Prosperity had not provided any documents related to the 0188 Account and Trustee's counsel asked for an update on the production.[63]

e.  On Friday, April 7, 2023, Objectors informally provided the Trustee a draft objection and requested "the Trustee to withdraw the Prosperity 9019 motion at this time without need for filing the objection."[64]

f.  On Thursday April 13, 2023, the Trustee's counsel had still not received documents from Prosperity and she asked Prosperity's counsel "are you getting my emails?"[65] The parties continued to communicate into the next day where it was clear that the Trustee's counsel did not have any communications related to Fraudulent Transfers, the Subject Funds, or the 0188 Account in addition to the account documentation still not produced.

g.  Without documentation, Trustee's counsel then scheduled a call with Bondholders' counsel on Saturday, April 15, 2023, to understand the Bondholders' security status for the first time.[66] The Trustee appears to have farmed out his analysis to the Bondholders, an adverse party, and not done any independent analysis.

---

[61] B. Funk email to C. Hillyer, dated March 22, 2023.
[62] Trustee_Prosperity_001035.
[63] Trustee_Prosperity_001108.
[64] C. Hillyer email to D. Rukavina, dated April 7, 2023.
[65] Trustee_Prosperity_001124.
[66] Trustee_Prosperity_001128.

h. Between Saturday, April 15, 2023 and Tuesday, April 18, 2023, the Bondholders prepared an outline memorandum providing their own analysis of their secured status.[67]

i. The Bondholders' analysis[68] contained numerous misstatements and inconsistencies with the Original 9019 Motion, including the following:

| Bondholder Analysis Statements | Actual Facts |
|---|---|
| "when the petition was filed, the Subject Funds belonged to the Collateral Agent and did not become property of the Estate." | The $4,463,804.68 was held by Prosperity in a deposit account as the Bank's cash collateral. |
| "The 0188 Account, an internal account at Prosperity, is not a deposit account of the Debtor." | The 0188 Account is a deposit account. |
| "The DACA on the 3992 Account applies to the 0188 Account." | The DACA plainly states it only applies to the 3992 Account. |
| "Statements and actions with regard to the 0188 Account show that the parties intended for the DACA to such an account." | Nothing in the record suggests this. Indeed, Prosperity was holding the 0188 Account as its "cash collateral." |
| "the August 31, 2022 letter is an authenticated record (signed document) showing that the Collateral Agent had control of the 0188 Account." | The August 31, 2022 letter was only signed by Prosperity and was a letter in response to a litigation demand made by the Bondholders. It did not have a signature from either the Debtor or the Bondholders and did not state that the Bank will comply with instructions originated by the Bondholders directing disposition of the funds in the 0188 Account without further consent by the Debtor, as is required by Tex. Bus. & Com. Code 9.105(a)(2). |
| "the Collateral Agent is perfected because it is a customer of Prosperity under Tex. Bus. & Com. Code § 9.104(a)(3) with respect to the 0188 Account." | The 0188 Account is in the name of Prosperity – not the Bondholders. |
| "the transfer reflects collusion to violate the Collateral Agent's rights." | The transfer from the 3992 Account to payoff the Genesis Loans was made prior to the Bondholders' Notice of Exclusive Control; therefore, there was no action in violation of the Bondholders' rights because the Bondholders had not yet exercised their rights. |

j. On April 19, 2023, Prosperity's counsel responded to the Trustee's document request and indicated the Trustee had originally only asked for "loan documents."[69]

---

[67] Trustee_Prosperity_001128.
[68] Trustee_Prosperity_001131.
[69] Trustee_Prosperity_001134.

15

k.  In response to the Bondholders' analysis, the Trustee's counsel had Jeff Dunn speak with Bondholders' counsel on April 28, 2023.[70] Mr. Dunn specializes in UCC law. This same offer was not extended to Objectors until after the filing of the Second Amended 9019 Motion, despite repeated requests by Objectors.

l.  On May 2, 2023, the Bondholders' counsel again started to put pressure on the Trustee.[71]

m. On May 4, 2023 at 9:42 am, the Trustee's counsel responded that the Bondholders are "trying to push the Trustee in an unfair way" and requested the Bondholders to increase the $100,000 surcharge to $250,000.[72] Finally, he threatened to allow the Objectors "to take over the litigation."

n.  On May 4, 2023 at 9:48 am, while the surcharge request was pending to Bondholders, the Trustee's counsel made an offer to Objectors to have them pay $100,000 for the right to litigate the claims on behalf of the estate.[73] This was not an offer to buy the claim or an offer to have the Objectors take over the litigation. It was a payment demand to have Objectors pay him the surcharge he would lose if the Proposed Settlement was withdrawn. Moreover, this offer was plainly inconsistent with the simultaneous offer made to Bondholders. The Trustee was playing both sides, rather than acting in a fiduciary capacity for the Objectors and other beneficiaries of the estate.

o.  Objectors immediately responded rejecting the offer to pay the Trustee a $100,000 in exchange for them performing his fiduciary duty.[74]

p.  Bondholders responded to the surcharge demand offering to pay $150,000.[75] The surcharge from the Bondholders was coming out of money being paid by Prosperity; whereas, the demand on Objectors asked them to come out of pocket to fund their own pursuit of the Fraudulent Transfers. The Trustee responded requesting $200,000 and promising to spend it wisely. Clearly, this was not a surcharge because he was promising future performance to the Bondholders rather than the actual costs related to disposing of the Subject Funds.

q.  On May 9, 2023, Bondholders' counsel responded to the surcharge demand and stated the following: (1) Trustee had estimated spending $20-30,000; (2) as further consideration to the Trustee, the $4,463,804.68 would flow through the estate in order to provide the Trustee a commission; (3) the surcharge was being paid to "defend[] the settlement from objections"; (4) the Bondholders would agree to carry the Trustee's

---

[70] Trustee_Prosperity_001138.
[71] Trustee_Prosperity_001139.
[72] Trustee_Prosperity_001140.
[73] Trustee_Prosperity_001142.
[74] Trustee_Prosperity_001142.
[75] Trustee_Prosperity_001150.

burden on the UCC Article 9 arguments; and (5) the $150,000 surcharge was the final and best offer.[76]

r.  After seeing surcharge limited to $150,000, the Trustee on the same day turned to Prosperity and sought new monies by offering a new alternative proposal: (1) carve out the Prosperity Payments from global release or (2) pay $200,000 to the estate free and clear of the Bondholders.[77] The second alternative proposed by the Trustee offered to settle a claim with "no principled defense" for an approximately 37% recovery.

s.  On May 10, 2023 at 12:30 pm, the Bondholders' counsel asked Trustee's counsel if they had received any documents from Prosperity that were requested on March 22, 2023, and Trustee's counsel responded: "nothing."[78]

t.  Later on May 10, 2023 at 6:29 pm, the Trustee responded to Bondholders' counsel and stated "these aggressive tactics from late today are not going to be well received."[79] This email implies that aggressive phone calls were had between the Bondholders' counsel and Trustee's counsel during the afternoon.

u.  On May 11, 2023, Prosperity asked for documentation related to the Prosperity Payments.[80] The Trustee responded with surprise and stated that he was "confused as to what is going on internally" at the Bank.

v.  On May 12, 2023, Objectors sent Trustee and Bondholders correspondence seeking to coordinate a unified front against Prosperity.[81]

w.  Trustee responded that he had given Prosperity a Monday, May 15, 2023 deadline to respond to an offer or else the Original 9019 Motion was being withdrawn.[82] The offer to Prosperity was not communicated to the Objectors.

x.  May 15, 2023 passed, and on May 16, 2023, Prosperity countered the Trustee's $200,000 proposal with $100,000.[83] But, the Trustee held firm and Prosperity agreed to the $200,000.

y.  The Trustee then emailed Objectors and relayed the terms of the amended Proposed Settlement and represented the 9019 Motion would go forward and that the issues are "purely legal."[84] Again, the Trustee had not received any additional documentation from Prosperity and had not conducted his own independent analysis of the

---

[76] Trustee_Prosperity_001159.
[77] Trustee_Prosperity_001160.
[78] Trustee_Prosperity_001164.
[79] Trustee_Propsierty_001166.
[80] Trustee_Prosperity_001176.
[81] Trustee_Prosperity_001188.
[82] Trustee_Prosperity_001188.
[83] Trustee_Prosperity_001202.
[84] Trustee_Prosperity_001235.

Bondholders' collateral argument. The Bondholders responded with "Good work by the Trustee" and stated he did not know "[w]hat discovery would be relevant here"

z.  On May 16, 2023, the Trustee, Bondholders, and Prosperity circulated an amended 9019 Motion. The draft contained a statement that the collateral determination was a "close call," which the Trustee has since reaffirmed as his current position on the 9019 Motion.[85] The Bondholders requested the reference to the "close call" be omitted from the amended 9019 Motion, and the Trustee complied.[86]

aa. Objectors responded to the amended Proposed Settlement: "One issue that I will raise in advance is the question of whether this is a pure legal dispute. Our understanding without discovery is that monies were in an account of the Debtor subject to a DACA and then left that account. The monies now are held by Prosperity and are not in an account of the Debtor and are not subject to any other instrument securing the funds. If there are instruments out there other than the DACA, we'd welcome knowing that. We'd also like factual knowledge on where the funds are now and the tracing exercise of how they got there. Legal rights will all derive from these facts. We should also discuss whether informally sharing analyses would be beneficial so that everyone has eyes wide open and can reasonably discuss avoiding a contested matter."[87]

bb.      Despite Objectors attempt to get a factual understanding and avoid a contested matter, the Trustee and Bondholders chose to obfuscate.[88] It is unclear how the Trustee and Bondholders thought this was "purely legal" given they had not even seen documents from Prosperity.

cc. On May 17, 2023, the Trustee filed the First Amended 9019 Motion. (Dkt. No. 261).

13.    The First Amended 9019 Motion contained several changes in position:

| First Amended 9019 Motion Statements | Actual Facts |
|---|---|
| "given that the Subject Funds are not in a Debtor-account, there is a question of whether the Trustee may resort to section 542 to begin with." (Pp. 7). | At this time, the Trustee has not seen any documentation of the 0188 Account. The $4,463,804.68 in a deposit account in the name of Prosperity. |
| "The Trustee, after a thorough review, has agreed that the Collateral Agent holds a valid, perfected, first-priority security interest in the Subject Funds, as part of the overall consideration for the Proposed Settlement." (Pp. 9). | The Trustee has not done a thorough review because he did not have account documents from Prosperity and because he was relying on the analysis from Bondholders, an adverse party. Moreover, the "agreed" nature of this statement reflects a bargain rather than actual facts. |

---

[85] Trustee_Prosperity_001294.
[86] Trustee_Prosperity_001301.
[87] Trustee_Prosperity_001296.
[88] Trustee_Prosperity_001296.

| | |
|---|---|
| The only reason why there is a dispute regarding the perfection of the Collateral Agent's lien is because the funds left the account subject to the DACAs and were returned into an account not expressly subject to the DACAs by account number. (Pp. 9). | The Subject Funds were not "returned" to the 3992 Account or to the Debtor. Instead, Prosperity funded the 0188 Account from a loan advance to serve as its cash collateral while the Genesis Loans were restructured with Endeavor. |
| "The Trustee's review of the case law suggests that this matter is one of first impression, on which the Court would be called to decide whether the "finality of payment" policy of the U.C.C., suggesting that funds leaving a DACA account become free and clear, would apply even though the funds are still at Prosperity and the rights of third parties (such as vendors paid with the funds) are not implicated. While the Trustee cannot predict how the Court would decide this issue, he believes that the Collateral Agent has a strong argument that perfection remained against the Subject Funds precisely because they remained at Prosperity due to a unilateral action by Prosperity in returning the funds into a new account, the Collateral Agent did nothing wrong with respect to the same, and no rights of innocent third parties are involved." (Pp. 9). | The Subject Funds were applied to the Genesis Loans, which are third parties. This is not a novel case. |
| "the Collateral Agent has asserted that the Subject Funds are its "cash collateral" under the Bankruptcy Code." (Pp. 9). | This argument is based on the August 31, 2023 letter. But, the August 31, 2023 letter is not an authenticated record, and the argument to the contrary is not genuine. |
| While the Trustee strongly believes he can avoid and recover the approximately $513,000 in prepetition transfers to Prosperity, Prosperity has asserted good faith defenses and has stated its intention of defending against the Trustee's claims." (Pp. 10). | The Trustee clearly stated there are "no principled defenses." |
| "The alternative is that the Trustee must initiate at least two lawsuits: one to test whether the Collateral Agent is perfected with respect to the Subject Funds, and a second against Prosperity to recover constructively fraudulent transfers." (Pp. 10). | There would be only one suit and it involves common fraudulent transfer claims. |

14.     On May 18, 2023, the Court held a status conference. The Court set expedited deadlines to try the First Amended 9019 Motion. (Dkt. No. 262).

19

15.     On May 25, 2023, Objectors filed their Objection. (Dkt. No. 269).

16.     On May 30 and 31, 2023, Objectors served written discovery on the Trustee, Prosperity, and the Bondholders, and requested responses by June 6, 2023.

17.     On June 2, 2023, the Bondholders and Prosperity filed separate Replies. (Dkt. No. 277 and 278). The Trustee abstained from filing a reply, which was consistent with his agreement with the Bondholders that they would carry the UCC Article 9 arguments. The Replies contained numerous statements that showed inconsistent factual positions between Prosperity and the Bondholders and also showed inconsistencies between the First Amended 9019 Motion and the Replies.

18.     On June 11, 2023, the Trustee served his discovery responses. Those responses contain statements plainly inconsistent with the First Amended 9019 Motion.

a. The First Amended 9019 Motion identified the 0188 Account as an "escrow account," but now the Trustee admitted it was not an escrow account.[89]

b. The Trustee was without sufficient information regarding whether "Prosperity setoff the Subject Funds against the Genesis Borrower's loans."[90] This clearly evidences the Trustee had not investigated the material facts supporting the Proposed Settlement.

c. The Trustee denied that there was no authenticated record related to the 0188 Account and that the Bondholders did not have control of the 0188 Account and stated the August 31, 2023 letter "may be construed as an authenticated record, a proposition with which the Trustee does not necessarily agree . . ."[91] At this time, the Trustee had not seen the August 31, 2023 letter.

d. The Trustee admitted that his investigation was limited to reviewing bank statements for the 3992 Account and discovery related to the involuntary dispute.[92] He had not materially investigated the material facts supporting the Proposed Settlement.

---

[89] Response to RFA No. 3.
[90] Response to RFA No. 5.
[91] Response to RFA No. 6; Response to Interrogatory No. 1
[92] Response to Interrogatory No. 6.

e. The Trustee admitted that he is "not aware of any such assets" securing the Bondholders that are known, liquidated, or uncontested.[93]

19.    On June 15, 2023, the Bondholders served their discovery responses. They stated as follows:

a. The Bondholders are "unable to admit or deny" whether they are unsecured or oversecured.[94]

b. They admitted the Subject Funds are not located in a deposit account of the Debtor and that they "lack knowledge or information regarding the precise nature of the Prosperity account ending in *0188."[95]

c. They lacked knowledge or information regarding the setoff of the Subject Funds to the Genesis Loans.[96]

d. They asserted control of the 0188 Account through the August 31, 2023 letter.[97]

e. They admitted their claims against Prosperity were non-bankruptcy claims that may be brought independent of any avoidance actions of the estate.[98]

20.    Prosperity did not timely respond to Objectors discovery requests.

21.    In an in person meeting with FSCLE, Trustee and Trustee's counsel affirmatively represented that they had given Prosperity a June 27, 2023 deadline to produce documents that they had requested on March 22, 2023, and to produce documents in response to Objectors' discovery requests or else the Trustee would withdraw the First Amended 9019 Motion. FSCLE asked if they could rely on that representation, and both affirmed.

22.    June 27, 2023 passed with nothing from Prosperity.

23.    On July 29, 2023 late at night (30 days after service), Prosperity served responses to Objectors RFAs but did not produce documents or respond to Interrogatories.

---

[93] Response to Interrogatory No. 7.
[94] Response to RFA No. 1.
[95] Responses to RFA Nos. 3 and 4.
[96] Response to RFA No. 6.
[97] Responses to RFA Nos. 7, 8, and 10.
[98] Responses to RFA Nos. 11 and 12.

24.     On Friday June 30, 2023, Objectors emailed Trustee and stated that Prosperity had not met the Trustee's deadline and that they were relying on his representation that the First Amended 9019 Motion was withdrawn, which allowed them to leave for Fourth of July holiday weekend.

25.     Late into the night on June 30, 2023 after Objectors were on vacation, Prosperity served responses to RFPs and Interrogatories but did not produce documents.

26.     On Wednesday July 5, 2023, Prosperity finally produced documents after withholding them for months.

27.     Rather than withdraw the First Amended 9019 Motion as he represented, the Trustee saw another opportunity to retrade the deal with Prosperity and the Bondholders.

28.     Without material involvement from the Objectors, the Trustee negotiated the removal of the global release for Prosperity, and on June 28, 2023, filed the Second Amended 9019 Motion. (Dkt. No. 300). Trustee now stated that he no longer believed the Bondholders were oversecured and he removed all references to an escrow account. He also stated that he was agreeing to the Bondholders being validly secured and perfected "only as part of the Proposed Settlement." 9019 Motion at pp. 6. He maintains the security issue is a "close call."[99]

29.     The Trustee stipulated that collusion did not factor into his business judgment. (Dkt. No. 317).

30.     Additional discovery was conducted, and Objectors took the Rule 30(b)(6) deposition of Prosperity and the deposition of Scott Seidel.

31.     Objectors sought discovery into the Trustee's independent analysis of the facts and law supporting the Proposed Settlement (i.e., the likelihood of success, the complexity of the

---

[99] Seidel Transcript (rough), Exhibit 1.

22

issues, and the risks and costs of litigations). The Trustee has refused to state his independent analysis and claims it is protected by attorney-client privilege and the work product doctrine.

32.     After the close of written discovery and the deposition of Prosperity, the Bondholders filed a Motion to Strike the stipulation entered into by the Trustee seeking to raise collusion as a new justification for approval of the Proposed Settlement. (Dkt. No. 326). The Objectors oppose this Moton to Strike.

33.     Objectors maintain their Objection and make the following arguments in support.

## **ARGUMENT**

**A.     Business Judgment must be based on objective facts and give deference to creditors' reasonable views.**

34.     A trustee's business judgment is not self-affirming. "Trustees must do more than parrot the standards or announce that they are satisfied . . .. they must present a cogent and detailed factual explanation, discussing how the factors apply to the specific litigation and proposed settlement." *In re Olson*, No. 04-01210-TLM, 2006 WL 2433448, at *2 (Bankr. D. Idaho July 24, 2006).  "A chapter 7 trustee is required to reach an informed judgment, after diligent investigation, as to whether it would be prudent to eliminate the inherent risks, delays and expense of prolonged litigation in an uncertain cause." *In re Thompson*, 965 F.2d 1136, 1145 (1st Cir. 1992), as amended (May 4, 1992) (aff'd *In re Solomon*, 129 F.3d 608 (5th Cir. 1997)).

35.     A key element for determining whether a settlement is objectively reasonable is the "paramount interest of creditors," which "requires deference to [creditors'] reasonable views concerning proposed settlements." *In re Moore*, 608 F.3d 253, 266 (5th Cir. 2010). "A bankruptcy court may not ignore creditors' overwhelming opposition to a settlement." *Id*. Here, creditors

holding approximately 90% of the claims pool object to the Proposed Settlement. Their objections are principled, reasoned, and based on the objective facts.

36.     A trustee must offer an explanation and evidence on important elements of the claims at issue. *In re Wilson*, No. 11-50396-RLJ-7, 2015 WL 3799557, at *3 (Bankr. N.D. Tex. June 17, 2015). In the *Wilson* case, the trustee offered no explanation or evidence as to why a litigation claim for the recovery of a section 548 fraudulent transfer should be discounted for good faith defenses. *Id*. The court recognized that, if there was evidence of good faith or the lack thereof, that could swing the value of the litigation, but without it there was no objective basis to determine whether such a discount was reasonable. *Id*. And, the court identified red flags that gave credibility to the argument that there are not good faith defenses. *Id*.

37.     Just like the settlement in *Wilson*, the settlement presented here is underbaked. For example, the 9019 Motion, like the motion in *Wilson* states: "Prosperity has asserted good faith defenses and has stated its intention of defending against the Trustee's claims." 9019 Motion at pp. 10. However, the Trustee does not identify those good faith defenses, discuss the probability of success of those defenses, explain the complexity of those defenses, or value the defenses. Indeed, he stated the opposite – there is "no principled defense." And, there are red flags like in *Wilson*. Prosperity argues it was a good faith transferee when it relied on the apparent authority of James Goodman (Prosperity Reply at ¶ 12), but Prosperity does not argue that it was a good faith transferee who "*gave value to the debtor*," which is the standard for a good faith defense under sections 548(c) and 550(b)(1) of the Bankruptcy Code.[100] Indeed, Prosperity admitted it gave no value.[101] There are no good faith, *for value* defenses.

---

[100] 11 U.S.C. § 548(c) (". . . a transferee . . . takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee . . . gave value to the debtor in exchange for such transfer[.]"
[101] Prosperity Tr. 133:14-18.

38.     Moreover, the Proposed Settlement was entered into based on incorrect facts, as shown above in the Statement of Facts. The Subject Funds were applied to the Genesis Loans – not transferred to an escrow account. The funds held in the 0188 Account, a deposit account in the name of "Prosperity Bank," were being held as Prosperity's "cash collateral" – not as funds controlled by either the Trustee or the Bondholders. The Bondholders are not oversecured. The August 31, 2022 letter is not an authenticated record within the meaning of Tex. Bus. & Com. Code 9.105(a)(2). The factual record presented to the Court does not justify the Proposed Settlement. Just like in *Matter of AWECO, Inc.*, 725 F.2d 293, 299 (5th Cir. 1984), this settlement should be denied because of "gaping holes in the background of information regarding [the] settlement."

**B.      The Trustee is settling avoidance claims valued at $5,003,751.85 – not resolving rights in "Subject Funds" held by a third party.**

39.     Each of the Trustee, the Bondholders, and Prosperity attempt a false equivalency fallacy by arguing that this settlement regards distribution of the Subject Funds; whereas, the settlement involves a straightforward avoidance action preserved for the estate and its unsecured creditors. The parties to the settlement attempt to have this Court believe the settlement concerns the *res* of the 0188 Account and a declaration as to whom it should be distributed. But, the 0188 Account is a distraction from the fact that the estate holds an avoidance claim against Prosperity – not a property interest in the *res* of the 0188 Account. An unliquidated litigation claim is not funds in a deposit account, monies, or a payment intangible.

40.     Prosperity possesses and controls the funds in the 0188 Account and in its other internal and external accounts. Chapter 5 of the Bankruptcy Code does not direct the source that must be tapped to satisfy the liability of a transferee of an avoidable transfer. Whether Prosperity

Case 22-31641-mvl7    Doc 354    Filed 09/18/23    Entered 09/18/23 18:53:58    Desc Main
Document        Page 26 of 43

uses the funds in its 0188 Account or in any other of its internal and external accounts to satisfy

the estate's avoidance claim or pay any Bondholders' claims for liability related to the DACA has

no bearing on this settlement.

41.    The "settlement" really is two settlements: (1) the settlement of the estate's

avoidance actions against Prosperity valued at $5,003,751.85 in return for $200,000 – a bankruptcy

claim and recovery, and (2) the settlement of the Bondholders' claims for breach of the DACA for

$4,463,804.68, less a $150,000 surcharge given to the Trustee's professionals – a non-bankruptcy

claim and recovery. There is no reason for the Bondholders' settlement to be before the Court.

42.    The Court should disregard the Bondholders' recovery and arguments about the

Subject Funds and, instead, ask whether $200,000 is a reasonable recovery for the estate's release

of the specific avoidance actions against Prosperity valued at $5,003,751.85. In this posture, the

settlement is grossly unreasonable. The estate is recovering only 4% on an avoidance action that

is likely to succeed, if tried. And, the claims are not complicated or difficult to try because, again,

the claims are textbook fraudulent transfers. Objectors would expect the Court to determine the

fraudulent transfer claims on summary judgment after limited discovery.

43.    The Bondholders accuse the Objectors of trying to "get an effective double

recovery from Prosperity," and, on its face, an unsophisticated observer might find appeal in that

that type of equitable argument. But, the purported double recovery is nothing more than a red

herring. There is no double recovery, whatever that means.

44.    The estate has claims under chapter 5 avoidance actions under the Bankruptcy Code

against Prosperity for the avoidance of fraudulent transfers. $5,003,751.85 of the Debtor's funds

were transferred to Prosperity on account of the Genesis Borrowers' debts, a non-debtor third

party. The Debtor received nothing in return for the transfer of $5,003,751.85. That Prosperity also

received an Assignment of the Deposit Account (the "Assignment") related to the Debtor's 3992 Account is of no meaning because the Assignment was also constructively fraudulent. Prosperity gave nothing to the Debtor for the $5,003,751.85 in payments or the Assignment. At all times relevant, the Debtor was insolvent. These are textbook fraudulent transfers.

45.    A fundamental feature of the Bankruptcy Code is the Trustee's powers to avoid fraudulent transfers both under section 548 and pursuant to his strong-arm powers under section 544. 11 U.S.C. §§ 544 and 548. And, section 550 makes the initial, immediate, or mediate transferees liable. *Id*. § 550(a). The Trustee is entitled to "only a single satisfaction" against all the transferees. *Id*. at § 550(d). Section 551 preserves the avoided transfer "for the benefit of the estate." *Id*. at § 551. And, section 552(a) provides that "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered by the debtor before the commencement of the case." *Id*. at § 552(a). Altogether, recoveries of chapter 5 avoidance actions are preserved for the estate's unsecured creditors.

46.    The Trustee, therefore, is entitled on behalf of the estate to recover $5,003,751.85 pursuant to chapter 5 of the Bankruptcy Code. Prosperity and the Genesis Borrowers are both transferees that are fully liable for the $5,003,751.85. This liability is to the estate – not to the Bondholders.

47.    Separate from the estate's chapter 5 avoidance actions, the Bondholders may have a separate claim against Prosperity resulting from either the breach of the DACA or Prosperity's tortious actions. Any liability to the Bondholders on those claims has no relevancy to whether the estate has chapter 5 avoidance claims that are recoverable. Any Bondholders' claims are not bankruptcy claims, and the Court should not let the Bondholders try their claims in a Bankruptcy 9019 contested matter.

**C.**     **Neither the estate nor the Bondholders have an interest in the Subject Funds because**
**they are funds in a deposit account held and controlled by Prosperity.**

48.     The parties to the settlement have not agreed on the nature of the 0188 Account,
which the Bondholders argue is their collateral and the Trustee apparently agrees "only as part of
the Proposed Settlement." A collateral assessment under the Commercial Code requires the
collateral to be identified with particularity. The Trustee called the 0188 Account an "escrow
account." But, there is no escrow agreement. The Bondholders call the 0188 Account "an internal
account held in the name of Prosperity." But, there is a designated account holding funds with a
named account holder, "Prosperity Bank," with an assigned account number, *0188.  Prosperity,
the depository bank with possession and control over the account, admits the 0188 Account is "a
deposit account." Objectors agree with Prosperity.

49.     Deposit accounts are easily identifiable because they are accounts maintained with
a bank. The Commercial Code defines a "deposit account" to be "a demand, time, savings,
passbook, or similar _account maintained with a bank_." Tex. Bus. & Com. Code § 9.102(29)
(emphasis added). It does not include "accounts evidenced by an instrument." _Id_. There is no
genuine dispute that the 0188 Account is an account maintained with a bank because Prosperity is
a regulated depository bank. The 0188 Account plainly falls within the definition of deposit
account. This is an important point because deposit accounts are perfected by "control," and only
Prosperity had control over the 0188 Account. _See_ Tex. Bus. & Com. Code §§ 9.104(a);
9.203(b)(2) and (3)(D). Thus, the argument that the Bondholders had collateral in the 0188
Account has no merit.

50.     The 0188 Account is a deposit account of Prosperity – not the Debtor. The 0188
Account is controlled by Prosperity – not the Debtor or the Bondholders. There is not an

authenticated record (e.g., a deposit account control agreement) governing control of the 0188 Account. The Subject Funds were not transferred from the Debtor's 3992 Account to Prosperity's 0188 Account. Instead, the Subject Funds were applied to the Genesis Borrowers' debts. The Subject Funds are gone. Prosperity's subsequent readvancing of the Genesis Loans and segregating of funds equal in amount to the Subject Funds into the 0188 Account is irrelevant because Prosperity did not give the Debtor or the Bondholders' control over the 0188 Account and maintained those funds as its "cash collateral." The estate and the Bondholders do not have a claim to the *res* in the 0188 Account. Instead, both the estate and Bondholders have independent litigation claims against Prosperity.

51. Despite the Debtor and the Bondholders having no interest in the *res* of the 0188 Account, the parties present several alternative arguments from the Commercial Code that are addressed below in turn.

**(1) The Commercial Code requires the debtor to have rights in the collateral for a security interest to be enforceable, and the Debtor has no rights to the 0188 Account.**

52. The Debtor does not have any rights in the 0188 Account and cannot transfer rights in the 0188 Account; therefore, a security interest cannot attach to the 0188 Account. The Commercial Code is clear: a security interest is not enforceable if "the debtor does not have rights in the collateral or the power to transfer rights in the collateral to a secured party." Tex. Bus. & Com. Code § 9.203(b)(2). Nothing in the record suggest the Debtor has rights in the 0188 Account, which is a deposit account held by and in the name of Prosperity.

**(2) Account 0188 is not proceeds controlled by the Debtor.**

53. The Bondholders and Prosperity (not the Trustee) incorrectly argue that the *res* in the 0188 Account is "proceeds" of the 3992 Account.

54.     First, they incorrectly rely on Tex. Bus. & Com. Code § 9.315. Section 9.315, a general provision regarding proceeds is inapplicable because Tex. Bus. & Com. Code § 9.332(b) is the specific provision that applies to deposit accounts.

55.     A fundamental cannon of statutory interpretation is the specific prevails over the general.[102] A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 183-188 (2012). The Texas Business sand Commercial Code unequivocally follows this rule. Section 9.332 governs specific types of collateral – "money" and "deposit accounts." And, section 9.315 governs general collateral not otherwise governed by a specific, standalone section. The Official Comment to section 9.315 makes this clear: "Subsection (a)(1) . . . contains the general rule that a security interest survives disposition of the collateral. . . . This Article contains serval provisions under which a transferee takes free of a security interest or agricultural lien. . . . Section 9.332 enables most transferees (including non-purchasers) of funds from a deposit account and most transferees of money to take free of a perfected security interest in the deposit account or money." Thus, section 9.332 – not section 9.315 – governs the deposit account at issue here. And, here, the funds were transferred from the deposit account prepetition resulting in the transferee "tak[ing] the funds free of a security interest in the deposit account unless the transferee act[ed] in collusion with the debtor in violating the rights of the secured party." Tex. Bus. & Com. Code § 9.332(b).

56.     Second, the Bondholders and Prosperity mischaracterize the transactions at issue in an attempt to make it look like funds were taken from the 3992 Account and immediately deposited in the 0188 Account. The *res* of the 0188 Account is not proceeds of the 3992 Account. The debiting of the 3992 Account and corresponding crediting against the Genesis Borrowers' loan

---

[102] The General/Specific Canon has historically been referred to by its ancient Latin root, *generalia specialibus non derogant*.

was a transfer and a payment that resulted in no value being returned to the Debtor. There is no value or proceeds at the Debtor.

57.     Fundamental to something being "proceeds" is that the something is a property interest of the Debtor. Here, the 3992 Account was property of the Debtor. It was a deposit account in the name of the Debtor. But, the funds in the 3992 Account were transferred to Prosperity and applied to the Genesis Borrowers' debts in return for no consideration or value (i.e., nothing – not something).

58.     The Debtor did not "acquire" something upon the disposition of the funds in the 3992 Account. *See* Tex. Bus. & Com. Code § 3.102(64)(A) (defining "Proceeds" as "whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral"). Similarly, the Debtor did not "collect" something or receive a "distribution" of something upon the disposition of the funds in the 3992 Account. *See* Tex. Bus. & Com. Code § 3.102(64)(B) (defining "Proceeds" as "whatever is collected on, or distributed on account of, collateral"). If the Debtor had acquired, collected, or received a distribution of something upon the disposition of the funds in the 3992 Account, that something would be proceeds. But, nothing is not something.

59.     Moreover, no rights arise out of the disposition of the funds in the 3992 Account. *See* Tex. Bus. & Com. Code § 3.102(64)(C) (defining "Proceeds" as "rights arising out of collateral"). And, there are no claims for loss of collateral value or insurance related to the 3992 Account. *See* Tex. Bus. & Com. Code § 3.102(64)(D) and (E) (defining "Proceeds" as "claims arising out of the loss, nonconformity, or interference with the use of, defects or infringements of rights in, or damage to, the collateral" or "insurance payable by reason of the loss or nonconformity of, defects, or infringement of rights in, or damage to, the collateral.").

60.     Altogether, there is not something possessed or controlled by the Debtor that can be proceeds under the section 9.102(64) definition. The 0188 Account is something, but it something possessed and controlled by Prosperity. It is not definable "proceeds" of the 3992 Account.

61.     The Bondholders argue that the Debtor retained a "general intangible" and that this general intangible is the something that meets the Commercial Code's definition of proceeds. While a general intangible may be proceeds, a deposit account of a non-debtor is not a general intangible. A "general intangible" is "any personal property, including things in action, other than accounts, . . . deposit accounts, . . . [or] money . . ." Tex. Bus. & Com. Code § 9.102(42).

62.     Bondholders, ignoring the express exclusion of deposit accounts in the definition of general intangible, then argue that whatever the Debtor retained was a chose in action and cite to *In re 3PL4PL, LLC*, 619 B.R. 441 (Bankr. D. Colo. 2020). But, this Colorado case expressly stated "[a] chose in action . . . is not a deposit account." *Id*. at 463. It defines "chose in action" as "a right to receive or recover a debt, or money, or damages for breach of contract, or for a tort connected with contract, but which cannot be enforced without action." *Id*. at 462. In the Colorado case, the debtor had a contractual right to the monies in its lawyer's trust account subject to having to enforce that right. Here, the Debtor has no contractual right related to the 0188 Account. Instead, the Trustee upon the filing of the Bankruptcy Petition had the right to bring a fraudulent transfer claim. Very plainly, a fraudulent transfer claim does not arise from contractual rights. The Bondholders' and Prosperity's arguments and case law are unavailing.

(3)     **A transfer from the 3992 Account occurred.**

63.     The Bondholders argue that taken together the lump sum payment from Account 3992 and Prosperity's subsequent segregation of monies in the same amount as the lump sum

payment equals no transfer. Bondholder Response at ¶ 27 ("the Objecting Creditors overlook that the transfer they would seek to avoid already has been unwound because Prosperity recognized the transfer was done in error and corrected its error. Prosperity reversed the transfer to pay down the Genesis loans is not holding the Subject Funds as a transferee, but as a custodian. Accordingly, there is currently no transferee for the Chapter 7 Trustee to recover from."). The Bondholders gloss over several relevant, undisputed facts: (1) the Subject Funds have not been returned to the 3992 Account and (2) there is not an authenticated record evidencing the Bondholders have control over the 0188 Account, which is required to show that Prosperity was a custodian of the Debtor's funds for the benefit of the Bondholders.

64.    First, Prosperity's "error" of applying funds from the 3992 Account to the Genesis Borrowers' debt was not corrected. This is obvious because the Debtor does not have any funds in the 3992 Account. Neither the Trustee nor the Bondholders have identified any deposit account of the Debtor holding the Subject Funds. The Subject Funds are no more. The fraudulent transfer occurred when the funds were transferred and applied to the Genesis Borrowers' debts. Contrary to Bondholders' correction argument, the Subject Funds have not been put back.

65.    Instead, funds equal to $4,463,804.68 have been placed in a deposit account in the name of Prosperity, being the 0188 Account. Two facts are important: (1) the 0188 Account is not an account of the Debtor, and (2) the 0188 Account is not subject to any authenticated record giving control to someone other than Prosperity.

66.    A transfer occurred from the 3992 Account. Prior to the transfer, the Debtor, as account holder, and UMB, as secured party under the DACA, had control over the Subject Funds in the 3992 Account. After the transfer, Prosperity has both possession and control over the Subject Funds, wherever they might be. And, the segregating of new monies into the 0188 Account, an

account exclusively held by Prosperity, does not return control or possession to the Debtor or the Bondholders. Prosperity was the transferee of the Subject Funds when the Subject Funds were applied to the Genesis Borrowers' debt.

67.     Second, the Bondholders err by arguing that Prosperity is the custodian of the Subject Funds for their benefit pursuant to an authenticated record, being a letter dated August 31, 2022. But, this is not true. None of the Debtor, the Trustee, or Prosperity have identified any authenticated record related to the 0188 Account. An authenticated record is a term of art when related to a deposit account. Tex. Bus. & Com. Code § 9.104(a)(2) specifies that a secured party has control of a deposit account if "the debtor, secured party, and bank have agreed in an authenticated record that the bank will comply with instructions originated by the secured party directing disposition of the funds in the deposit account without further consent by the debtor." To "authenticate" means "to sign; or with present intent to adopt or accept a record, to attach to or logically associate with the record an electronic sound, symbol, or process." Tex. Bus. & Com. Code § 9.102(7). And, "record" means "information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form." Put together, an authenticated record related to a deposit account did not exist as of the Petition Date because the Debtor, Prosperity, and the Bondholders did not sign a tangible document that expressed that (a) the Debtor had possession and control over the 0188 Account, (b) the Debtor consented to and authorized Prosperity to allow the Bondholders to have control over 0188 Account, and (c) Prosperity acknowledged that it would comply with instructions from the Bondholders "without further consent by the debtor."

68.     Here, the 0188 Account is held by Prosperity without any possession or control given to the Debtor, so the discussion on an authenticated record is irrelevant because the Debtor

did not have any authority over the 0188 Account to consent to, and authorize, an authenticated record over the 0188 Account for the benefit of the Bondholders.

69.     Moreover, no document exists that purports to show that the Debtor, if it did have possession and control over the 0188 Account, consented to, and authorized, Prosperity granting control of the 0188 Account to the Bondholders. Instead, the August 31 Letter is only correspondence from Prosperity to the Bondholders. There is not an authenticated signature from the Debtor.

70.     And, this correspondence does not acknowledge that Prosperity would comply with the instructions from the Bondholders "without further consent by the debtor." It states the opposite. It states there are conflicting claims that need to be resolved before it will comply with anyone's instructions. August 31 Letter ("The subject funds have been deposited into secured account number XXXX0188, and the funds will remain in that secured account pending resolution of the conflicting instructions, notices and directions from Company and Controlling Agent with respect to the transfer of funds."). And, a competing claim comes from the Debtor, who is identified as "Company" in the correspondence. Very clearly, Prosperity did not believe the Debtor had consented to the Bondholders exercising exclusive control over the 0188 Account. Indeed, there is nothing in the factual record from Prosperity affirming that the August 31 Letter is an authenticated record under Section 9.104(a)(2). Prosperity was not a custodian because there is not an authenticated record related to the deposit account. And, Prosperity's course of dealing after the August 31 Letter plainly evidences multiple requests to turn over the funds of the 0188 Account to either the estate or the bond trustee, and Prosperity's refusal to do so.

71.     A transfer from a deposit account to a non-debtor transferee occurred. Section 9.332(b) applies. The facts here are distinct from the two exceptions to section 9.332(b) identified

35

in the Official Comment: "this section does not cover [A] the case in which a debtor withdraws money (currency) from its deposit account or [B] the case in which a bank debits an encumbered account and credits another account it maintains for the debtor." Tex. Bus. & Com. Code § 9.332(b), Official Comment 2, discussing "Scope of This Section" (bracket lettering added). In both of those exceptions to section 9.332(b), the debtor retains possession (over the monies) or control (over the deposit account).

72.    Here, there are no monies (i.e., currency) in the possession of the Debtor because the funds in the 3992 Account were never converted to money currency and, instead, were transferred from the Debtor to Prosperity by debiting the 3992 Account and crediting the loan of the Genesis Borrowers.

73.    Furthermore, the subsequent credit of funds to Prosperity's 0188 Account did not create money currency because monies represented by funds in a deposit account are intermingled at depository banks and loaned to banks' loan customers, among other bank uses. Funds in a deposit account are not monies possessed by the account holder or the depository bank. The Commercial Code recognizes this technical nuance, which is not understood by most, by requiring perfection over monies to be by possession under section 9.312(b)(3) and requiring perfection over deposit accounts to be by control under section 9.312(b)(1).

74.    Additionally, the subsequent crediting of funds into the 0188 Account is not a credit to an account that Prosperity "maintains for the debtor." The holder and controller of the 0188 Account is Prosperity. Moreover, there was not a debit from the Debtor's 3992 Account and a credit to Prosperity's 0188 Account. Instead, the funds in the Debtor's 3992 Account were debited with a resulting credit to the Genesis Borrower's debts. The funds were applied to loans. There was not a transfer of funds between accounts. After 16 days and threats of litigation, only then did

Prosperity credit funds to its 0188 Account. It is inaccurate as a matter of fact or law to say the funds in the 0188 Account are "monies" from the 3992 Account or the Subject Funds. The intermediary application of the funds from the 3992 Account to the third-party debt made 9.332(b) applicable. The exceptions in the Official Comment to section 9.332(b) do not apply because the transfer at issue here was the application of Subject Funds to the Genesis Borrowers' debts.

**D.     Collusion did not factor into the Trustee's business judgment.**

75.     The Trustee's 9019 Motion does not identify "collusion" as a basis for his business judgment. The 9019 Motion lacks any reference to collusion, as did the Original Motion. Now, in reply to a motion they did not file, the Bondholders argue collusion. Bondholders Reply at ¶¶ 17-20, 31-32. The Trustee has waived any argument that he considered collusion and has stipulated to as much. Moreover, none of the documents produced in discovery evidence any investigation into collusion or that collusion factored into settlement discussions. The Court should not entertain post hoc allegations of collusion.

76.     Moreover, the Bondholders cannot show collusion to violate their rights. At the time of the Fraudulent Transfers, they had not exercised exclusive control of the Debtor's deposit accounts. The DACA on the 3992 Account is clear. The Debtor had the ability to "transfer or withdraw[] funds from the Deposit Account, including paying or transferring the funds to Company or any other person or entity" until U.S. Bank delivered a Notice of Exclusive Control. Thus, Bondholders had the right to exercise exclusive control and failed to do so until after the Debtor's funds had been transferred. While the circumstances evidence that a constructively fraudulent transfer occurred, the transfer did not impair the Bondholders' rights under the DACA. Upon receipt of the Notice of Exclusive Control, all evidence shows that Prosperity honored the Bondholders' rights – not violated those rights.

77.     The Bondholders may be able to articulate a separate claim against Prosperity related to the breach of the DACA, but they cannot show collusion related to the Fraudulent Transfers because nothing in the DACA prevented those transfers prior to the Notice of Exclusive Control. Prosperity appears to have honored a disbursement request by an authorized account user (at least from the Bank's perspective). While these facts do not violate the Bondholders' rights under the DACA, the same facts support a constructive fraudulent transfer claim under chapter 5 of the Bankruptcy Code.

E.     **The Bondholders and Trustee incorrectly use dicta of this Court from *In re Essential Fin. Educ., Inc.*, 629 B.R. 401, 421 (Bankr. N.D. Tex. 2021).**

78.     The Bondholders cite dicta from *In re Essential Fin. Educ., Inc.*, 629 B.R. 401 (Bankr. N.D. Tex. 2021), a decision of this Court, and the Trustee indicated his concern regarding this purported defense. The Court in *Essential Fin. Educ.* stated: "Although it is beyond dispute that Essential had legal title to the property at the time of the transfer, bare legal title is insufficient for a debtor to have an interest in property—the debt must have an equitable interest in the property transferred." *In re Essential Fin. Educ., Inc.*, 629 B.R. at 421 (citing *In re Ramba, Inc.*, 437 F.3d 457, 460–61 (5th Cir. 2006)). This quote is dicta because the Court found the lienholder was not perfected so there was no need to assess whether a fully encumbered asset is property of the estate for section 548 purposes. Indeed, the Court did not make that assessment in *Essential Fin. Educ.*, as the quote is made in passing and not as a basis for the opinion.

79.     The Court's dicta cited the *Ramba* decision, which was based on section 547 preference avoidance actions – not avoidance actions in general and not section 548 avoidance actions. The exact quote from *Ramba* is: "There can be <u>*no preference*</u> when a debtor transfers property in which the debtor has no equitable interest." *In re Ramba, Inc.*, 437 F.3d 457, 460 (5th

Cir. 2006) (emphasis added). Section 547(b)(5) requires a preference creditor to receive more than

such creditor would receive in a liquidation had the transfer not been made. Section 548 does not

contain similar language. Thus, the *Ramba* holding applies in some circumstances to section 547

avoidance actions but not to sections 544 or 548 avoidance actions.

80.    Another quote from *Ramba* plainly shows its holding is limited to preference

analysis:

> In *In re Maple Mortgage, Inc.*, 81 F.3d 592, 595 (5th Cir.1996), we held that funds
> *at issue in a preference dispute* must have been available for distribution to general
> creditors. "[I]f funds cannot be used to pay the debtor's creditors, then they
> generally are not deemed an asset of the debtor's estate *for preference purposes*."
> *Id*. While *Maple Mortgage* did not specifically address whether a debtor's
> bankruptcy estate includes fully encumbered property, it recognized the common
> sense reasoning that funds must be available to pay creditors.

*In re Ramba, Inc.*, 437 F.3d at 460 (emphasis added).

81.    Even if *Ramba* was applied to fraudulent transfer actions, the facts in *Ramba*, where

the Debtor did not have access and use of the funds*,* are distinguishable from the present facts,

where the Debtor did have access and use of the funds because the DACA was passive. *Ramba*

involved the sale of a business pursuant to an APA whereby Citibank, a secured creditor of *Ramba*,

agreed to release its security interest in the assets subject to the APA in return for being paid out

of the sale and allowing $10 million of the sale proceeds to go to other creditors, even though

Citibank was entitled to the full amount of the sale proceeds. The Trustee was seeking to avoid the

$10 million paid to the other creditors as a preferential transfer. But, the Court held "[t]he

consideration from the sale of Citibank's collateral belonged to Citibank, the secured lender." *In

re Ramba, Inc.*, 437 F.3d at 460–61. Therefore, the transfer to the other creditors was treated as

part of the APA and a condition of Citibank's release. Although, the sale did involve Ramba

nominally transferring sale proceeds to the other creditors, Ramba did so as part of the APA that

released Citibank's security and, therefore, equitably the transfers of the $10 million came from

Citibank. Absent the release, Ramba had no equity or funds available, and, absent the transfer to other creditors, there was no release.

82.     This fact pattern is wholly different from Goodman Networks. Here, the Bondholders entered into a "passive" or "springing" DACA (as compared to an "active" DACA). The passive DACA allowed Goodman Networks to use its funds to pay creditors and other parties. In contrast, an active DACA only allows a debtor to make transfers/payments after approval of the DACA holder. Section 4 of the DACA lays out the passive nature of this DACA: ". . . unless and until Depository Bank receives the Controlling Agent's Notice of Exclusive Control, as defined below, pursuant to which Company's access to the funds in any Deposit Account shall be terminated, Depository Bank shall honor Company's instructions, notices and directions with respect to the transfer or withdrawal of funds from the Deposit Account, including paying or transferring the funds to Company or any other person or entity." In the context of a passive DACA, the Debtor had equity and use of the funds until such time as a Notice of Exclusive Control is given. Here, that Notice was given after the transfers at issue.

83.     *Ramba* should not be made the rule on passive DACAs because the Debtor retains an equitable interest in the funds until a Notice of Exclusive Control; otherwise, in cases where lenders have deposit accounts as collateral subject to passive DACAs (virtually every case), there would be no fraudulent transfers or preferential transfers because everything transferred would have been subject to the lenders' security interests. This would create an odd situation where the creditor cannot recover because the DACA was not violated, and the estate cannot recover because of the DACA previously encumbering the transferred funds. Sections 547, 548, 550, 551 and 552 of the Bankruptcy Code would have little meaning and transferees would avoid liability to both the debtor and the DACA holder.

**F.      The Proposed Settlement cannot be approved absent FSCLE's consent or  in a manner impairing FSCLE's rights to certain Subject Funds.[103]**

84.      FSCLE is not a party to the Proposed Settlement. The Proposed Settlement seeks to settle claims related to the Fraudulent Transfers. Discovery has uncovered that a portion of the funds making up the Fraudulent Transfers, $236,883.48 (the "FedEx Funds"), came from the 4352 Account, which is an account that exclusively held funds received from FSCLE pursuant to a Master Service Agreement. FSCLE asserts the FedEx Funds and their proceeds were its property or the Debtor's property subject to an express, constructive, or resulting trust for the benefit of FSCLE. The FedEx Funds were paid to either Prosperity or the Bondholders, and FSCLE has claims against anyone knowingly receiving the FedEx Funds or participating in their taking. But, those are questions for another day after due process plays out. The Court cannot approve the Proposed Settlement to the extent it attempts to release Prosperity, the Genesis Borrowers, or the Bondholders from FSCLE's claims related to the FedEx Funds because FSCLE is not a party to the Proposed Settlement. Only FSCLE can release its claims. FSCLE, therefore, objects to the Proposed Settlement, and the Court should expressly state that the Proposed Settlement cannot release any party of liability related to the FedEx Funds.

## CONCLUSION

85.      For the foregoing reasons, the Court should deny the Proposed Settlement and grant Objectors derivative standing to pursue the Fraudulent Transfers.

---

[103] ARRIS takes no position on this argument.

41

Respectfully submitted,

**DLA PIPER LLP (US)**

*/s/ Noah M. Schottenstein*
Noah M. Schottenstein (TX Bar No. 24100661)
James Muenker (TX Bar No. 24002659)
1900 N. Pearl Street, Suite 2200
Dallas, Texas 75201
Telephone: (214) 743-4500
noah.m.schottenstein@us.dlapiper.com
james.muenker@us.dlapiper.com

*Counsel for ARRIS Solutions, Inc.*

**BUTLER SNOW LLP**

*/s/ Adam M. Langley*
Adam M. Langley (admitted *pro hac vice*)
R. Campbell Hillyer (admitted *pro hac vice*)
6075 Poplar Avenue, Suite 500
Memphis, TN  38119
Telephone: (901) 680-7316
adam.langley@butlersnow.com
cam.hillyer@butlersnow.com

and

Candice Carson (TX Bar No. 24074006)
2911 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219
Telephone: (469) 680-5502
candice.carson@butlersnow.com

*Counsel for FedEx Supply Chain Logistics &
Electronics, Inc.*

## CERTIFICATE OF SERVICE

I, Adam M. Langley, certify that the foregoing pleading was filed electronically through the Court's ECF system and served electronically on all parties enlisted to receive service electronically in this case.

Dated: September 18, 2023

*/s/ Adam M. Langley*

80079813.v2