**Execution Version**

GOODMAN NETWORKS INCORPORATED

8.000% SENIOR SECURED NOTES DUE 2022

INDENTURE

Dated as of May 31, 2017

UMB BANK, NATIONAL ASSOCIATION,

as Trustee,

and

U.S. BANK NATIONAL ASSOCIATION,

as Collateral Agent

UMB-000001

EXHIBIT
BH 1

## CROSS-REFERENCE TABLE*

| *Trust Indenture Act Section* | *Indenture Section* |
|---|---|
| 310(a)(1) | 7.10 |
| (a)(2) | 7.10 |
| (a)(3) | N.A. |
| (a)(4) | N.A. |
| (a)(5) | 7.10 |
| (b) | 7.10 |
| 311(a) | 7.11 |
| (b) | 7.11 |
| (c) | N.A. |
| 312(a) | 2.05 |
| (b) | 14.03 |
| 313(a) | 7.06 |
| (b)(1) | 10.08 |
| (b)(2) | 7.06; 7.07 |
| (c) | 7.06; 10.08; 14.02 |
| (d) | 7.06 |
| 314(a) | 4.03; 14.02; 14.05 |
| (b) | N.A. |
| (c)(1) | 14.05 |
| (c)(2) | 14.05 |
| (c)(3) | N.A. |
| (d) | 10.08 |

UMB-000002

| | |
|---|---|
| (e) | 14.05 |
| (f) | N.A. |
| 315(a) | 7.01 |
| (b) | 7.05; 14.02 |
| (c) | 7.01 |
| (d) | 7.01 |
| (e) | 6.11 |
| 316(a) (last sentence) | 2.09 |
| (a)(1)(A) | 6.05 |
| (a)(1)(B) | 6.04 |
| (a)(2) | N.A. |
| (b) | 6.07; 10.05 |
| (c) | 2.12 |
| 317(a)(1) | 6.08 |
| (a)(2) | 6.09 |
| (b) | 2.04 |
| 318(a) | 14.01 |
| (b) | N.A. |
| (c) | 14.01 |

N.A. means not applicable.

\*      This Cross Reference Table is not part of the Indenture.

UMB-000003

## **TABLE OF CONTENTS**

Page

ARTICLE 1
DEFINITIONS AND INCORPORATION BY REFERENCE

| | | |
|---|---|---|
| Section 1.01 | *Definitions* | *1* |
| Section 1.02 | *Other Definitions* | *30* |
| Section 1.03 | *Incorporation by Reference of Trust Indenture Act* | *31* |
| Section 1.04 | *Rules of Construction* | *31* |
| Section 1.05 | *Intercreditor Agreement* | *32* |

ARTICLE 2
THE NOTES

| | | |
|---|---|---|
| Section 2.01 | *Form and Dating* | *33* |
| Section 2.02 | *Execution and Authentication* | *33* |
| Section 2.03 | *Registrar and Paying Agent* | *34* |
| Section 2.04 | *Paying Agent to Hold Money in Trust* | *34* |
| Section 2.05 | *Holder Lists* | *35* |
| Section 2.06 | *Transfer and Exchange* | *35* |
| Section 2.07 | *Replacement Notes* | *39* |
| Section 2.08 | *Outstanding Notes* | *39* |
| Section 2.09 | *Treasury Notes* | *39* |
| Section 2.10 | *Temporary Notes* | *40* |
| Section 2.11 | *Cancellation* | *40* |
| Section 2.12 | *Defaulted Interest* | *40* |
| Section 2.13 | *Global Notes* | *40* |
| Section 2.14 | *CUSIP and ISIN Numbers* | *40* |

ARTICLE 3
REDEMPTION AND PREPAYMENT

| | | |
|---|---|---|
| Section 3.01 | *Notices to Trustee* | *41* |
| Section 3.02 | *Selection of Notes to Be Redeemed or Purchased* | *41* |
| Section 3.03 | *Notice of Redemption* | *41* |
| Section 3.04 | *Effect of Notice of Redemption* | *42* |
| Section 3.05 | *Deposit of Redemption or Purchase Price* | *42* |
| Section 3.06 | *Notes Redeemed or Purchased in Part* | *43* |
| Section 3.07 | *Optional Redemption* | *43* |
| Section 3.08 | *[Reserved]* | *44* |
| Section 3.09 | *Offer to Purchase by Application of Excess Proceeds* | *44* |

ARTICLE 4
COVENANTS

| | | |
|---|---|---|
| Section 4.01 | *Payment of Notes* | *46* |
| Section 4.02 | *Maintenance of Office or Agency* | *47* |

i

Section 4.03    *Reports* .................................................................................................. 47
Section 4.04    *Compliance Certificate* ....................................................................... 48
Section 4.05    *Taxes* ...................................................................................................... 49
Section 4.06    *Stay, Extension and Usury Laws* ...................................................... 49
Section 4.07    *Restricted Payments* ............................................................................ 50
Section 4.08    *Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries* 51
Section 4.09    *Incurrence of Indebtedness and Issuance of Preferred Stock* ........ 53
Section 4.10    *Asset Sales* ............................................................................................ 57
Section 4.11    *Transactions with Affiliates* ............................................................... 60
Section 4.12    *Liens* ....................................................................................................... 61
Section 4.13    *Business Activities* ................................................................................ 61
Section 4.14    *Corporate Existence* ............................................................................. 62
Section 4.15    *Offer to Repurchase Upon Change of Control* ............................... 62
Section 4.16    *Payments for Consent* .......................................................................... 64
Section 4.17    *Additional Note Guarantees; Further Assurances* .......................... 64
Section 4.18    *Designation of Restricted and Unrestricted Subsidiaries* .............. 68
Section 4.19    *Excess Cash Flow Redemption* ........................................................... 68
Section 4.20    *Replacement of Noteholder Directors* ............................................... 69

ARTICLE 5
SUCCESSORS

Section 5.01    *Merger, Consolidation or Sale of Assets* ........................................ 72
Section 5.02    *Successor Corporation Substituted* .................................................. 73
Section 5.03    *Reincorporation from Texas to Delaware* ....................................... 73

ARTICLE 6
DEFAULTS AND REMEDIES

Section 6.01    *Events of Default* .................................................................................. 73
Section 6.02    *Acceleration* .......................................................................................... 76
Section 6.03    *Other Remedies* ..................................................................................... 77
Section 6.04    *Waiver of Past Defaults* ...................................................................... 77
Section 6.05    *Control by Majority* ............................................................................. 77
Section 6.06    *Limitation on Suits* ............................................................................... 78
Section 6.07    *Rights of Holders of Notes to Receive Payment* ............................. 78
Section 6.08    *Collection Suit by Trustee or the Notes Representative and the Collateral Agent*
                79
Section 6.09    *Trustee or the Notes Representative and the Collateral Agent May File Proofs of Claim* .... 79
Section 6.10    *Priorities* ............................................................................................... 80
Section 6.11    *Undertaking for Costs* ......................................................................... 80

ARTICLE 7
TRUSTEE

Section 7.01    *Duties of Trustee* .................................................................................. 80
Section 7.02    *Rights of Trustee* .................................................................................. 82
Section 7.03    *Individual Rights of Trustee* ............................................................... 83

UMB-000005

| Section 7.04 | *Trustee's Disclaimer* | *83* |
| Section 7.05 | *Notice of Defaults* | *83* |
| Section 7.06 | *Reports by Trustee to Holders of the Notes* | *83* |
| Section 7.07 | *Compensation and Indemnity* | *84* |
| Section 7.08 | *Replacement of Trustee* | *84* |
| Section 7.09 | *Successor Trustee by Merger, etc.* | *85* |
| Section 7.10 | *Eligibility; Disqualification* | *86* |
| Section 7.11 | *Preferential Collection of Claims Against Company* | *86* |

### ARTICLE 8
### LEGAL DEFEASANCE AND COVENANT DEFEASANCE

| Section 8.01 | *Option to Effect Legal Defeasance or Covenant Defeasance* | *86* |
| Section 8.02 | *Legal Defeasance and Discharge* | *86* |
| Section 8.03 | *Covenant Defeasance* | *87* |
| Section 8.04 | *Conditions to Legal or Covenant Defeasance* | *87* |
| Section 8.05 | *Deposited Money and Government Securities to be Held in Trust; Other Miscellaneous Provisions* | *89* |
| Section 8.06 | *Repayment to Company* | *89* |
| Section 8.07 | *Reinstatement* | *90* |

### ARTICLE 9
### AMENDMENT, SUPPLEMENT AND WAIVER

| Section 9.01 | *Without Consent of Holders of Notes* | *90* |
| Section 9.02 | *With Consent of Holders of Notes* | *91* |
| Section 9.03 | *Compliance with Trust Indenture Act* | *93* |
| Section 9.04 | *Revocation and Effect of Consents* | *93* |
| Section 9.05 | *Notation on or Exchange of Notes* | *94* |
| Section 9.06 | *Trustee to Sign Amendments, etc.* | *94* |

### ARTICLE 10
### COLLATERAL SECURITY

| Section 10.01 | *Security Interest* | *94* |
| Section 10.02 | *Intercreditor Agreement* | *95* |
| Section 10.03 | *[Reserved]* | *95* |
| Section 10.04 | *[Reserved]* | *95* |
| Section 10.05 | *Release of Liens in Respect of Notes* | *95* |
| Section 10.06 | *Relative Rights* | *96* |
| Section 10.07 | *Further Assurances; Insurance* | *96* |
| Section 10.08 | *Release of Collateral* | *97* |

### ARTICLE 11
### NOTE GUARANTEES

| Section 11.01 | *Guarantee* | *98* |
| Section 11.02 | *Limitation on Guarantor Liability* | *99* |
| Section 11.03 | *Execution and Delivery of Note Guarantee* | *99* |

UMB-000006

Section 11.04    *Guarantors May Consolidate, etc., on Certain Terms*..................................... *100*
Section 11.05    *Releases*......................................................................................... *101*

### ARTICLE 12
### SATISFACTION AND DISCHARGE

Section 12.01    *Satisfaction and Discharge* .............................................................. *102*
Section 12.02    *Application of Trust Money* .............................................................. *103*

### ARTICLE 13
### COLLATERAL AGENT

Section 13.01    *Appointment; Powers of the Collateral Agent* ................................. *103*
Section 13.02    *For Sole and Exclusive Benefit of the Holders* ............................... *104*
Section 13.03    *No Implied Duty* ............................................................................. *104*
Section 13.04    *Appointment of Agents and Advisors* ............................................. *104*
Section 13.05    *Other Agreements* .......................................................................... *105*
Section 13.06    *Solicitation of Instructions* ............................................................. *105*
Section 13.07    *Limitation of Liability* .................................................................... *105*
Section 13.08    *Entitled to Rely* .............................................................................. *105*
Section 13.09    *Default*........................................................................................... *106*
Section 13.10    *Actions by Collateral Agent* ........................................................... *106*
Section 13.11    *Security and Indemnity in Favor of the Collateral Agent*............... *106*
Section 13.12    *Rights of the Collateral Agent*......................................................... *106*
Section 13.13    *Limitations on Duty of Collateral Agent in Respect of Collateral* ................ *106*
Section 13.14    *Assumption of Rights, No Assumption of Duties*............................. *107*
Section 13.15    *No Liability for Clean Up of Hazardous Materials* ........................ *108*
Section 13.16    *Resignation or Removal of Collateral Agent* .................................. *108*
Section 13.17    *Appointment of Successor Collateral Agent* ................................... *108*
Section 13.18    *Succession* ..................................................................................... *109*
Section 13.19    *Merger, Conversion or Consolidation of Collateral Agent*............ *109*

### ARTICLE 14
### MISCELLANEOUS

Section 14.01    *Trust Indenture Act Controls* ......................................................... *109*
Section 14.02    *Notices*........................................................................................... *110*
Section 14.03    *Communication by Holders of Notes with Other Holders of Notes*................ *111*
Section 14.04    *Certificate and Opinion as to Conditions Precedent*...................... *111*
Section 14.05    *Statements Required in Certificate or Opinion*............................... *112*
Section 14.06    *Rules by Trustee and Agents* .......................................................... *112*
Section 14.07    *No Personal Liability of Directors, Officers, Employees and Stockholders* .. *112*
Section 14.08    *Governing Law*............................................................................... *113*
Section 14.09    *No Adverse Interpretation of Other Agreements* ........................... *113*
Section 14.10    *Successors* ..................................................................................... *113*
Section 14.11    *Severability* ................................................................................... *113*
Section 14.12    *Counterpart Originals* ................................................................... *113*
Section 14.13    *Table of Contents, Headings, etc.* ................................................. *113*
Section 14.14    *Waiver of Jury Trial*...................................................................... *113*

UMB-000007

Section 14.15     *Force Majeure* ................................................................................................. *113*

SCHEDULE

Schedule 1.01(a)        LIST OF COMPETITORS

EXHIBITS

Exhibit A        FORM OF NOTE
Exhibit B        [RESERVED]
Exhibit C        [RESERVED]
Exhibit D        [RESERVED]
Exhibit E        FORM OF NOTATION OF GUARANTEE
Exhibit F        FORM OF SUPPLEMENTAL INDENTURE
Exhibit G        [RESERVED]
Exhibit H        FORM OF INTERCREDITOR AGREEMENT
Exhibit I        FORM OF PLEDGE AND SECURITY AGREEMENT

UMB-000008

INDENTURE dated as of May 31, 2017 by and among Goodman Networks Incorporated, a Texas corporation, UMB Bank, National Association, as Trustee, and U.S. Bank National Association, as Collateral Agent.

The Company, the Trustee and the Collateral Agent agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders (as defined) of the 8.000% Senior Secured Notes due 2022 (the "*Notes*"):

ARTICLE 1
DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01    *Definitions*.

"*ABL Priority Collateral*" has the meaning set forth in the Intercreditor Agreement.

"*ABL Representative*" has the meaning set forth in the Intercreditor Agreement.

"*Act of Required Holders*" means, as to any matter, a direction in writing delivered to the Collateral Agent by the Holders representing more than 50% of the aggregate principal amount of the Notes then outstanding voting as a single class.

"*Acquired Debt*" means, with respect to any specified Person:

(1)    Indebtedness of any other Person existing at the time such other Person is merged with or into or became a Subsidiary of such specified Person, whether or not such Indebtedness is incurred in connection with, or in contemplation of, such other Person merging with or into, or becoming a Restricted Subsidiary of, such specified Person; and

(2)    Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"*Additional Notes*" means additional Notes (other than the Initial Notes) issued under this Indenture in accordance with Sections 2.02 and 4.09 hereof, as part of the same series as the Initial Notes.

"*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise; *provided* that beneficial ownership of 10% or more of the Voting Stock of a Person will be deemed to be control. For purposes of this definition, the terms "*controlling*," "*controlled by*" and "*under common control with*" have correlative meanings.

"*Agent*" means any Registrar, co-registrar, Paying Agent or additional paying agent.

"*Applicable Period*" means each fiscal quarter of the Company, commencing with the first full fiscal quarter that begins following May 31, 2017.

1

UMB-000009

"*Applicable Premium*" means, with respect to any Note on any redemption date, the greater of:

(1)     1.0% of the principal amount of the Note; or

(2)     the excess of:

(a) the present value at such redemption date of (i) the redemption price of the Note at the third anniversary of the date of this Indenture, (such redemption price being set forth in the table appearing in Section 3.07 hereof) plus (ii) all required interest payments due on the Note through the third anniversary of the date of this Indenture, (excluding accrued but unpaid interest to the redemption date), computed using a discount rate equal to the Treasury Rate as of such redemption date plus 50 basis points; over

(b) the principal amount of the Note.

"*Applicable Procedures*" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the Depositary, Euroclear and Clearstream that apply to such transfer or exchange.

"*Asset Sale*" means:

(1)     any Casualty Event or (ii) the sale, lease, conveyance or other disposition of any assets or rights by the Company or any of the Company's Restricted Subsidiaries; provided that the sale, lease, conveyance or other disposition of all or substantially all of the assets of the Company and its Restricted Subsidiaries taken as a whole will be governed by Section 4.15 hereof and/or Section 5.01 hereof, and not by Section 4.10 hereof; and

(2)     the issuance of Equity Interests by any of the Company's Restricted Subsidiaries or the sale by the Company or any of the Company's Restricted Subsidiaries of Equity Interests in any of the Company's Subsidiaries.

Notwithstanding the preceding, none of the following items will be deemed to be an Asset Sale:

(1)     any single transaction or series of related transactions that involves assets having a Fair Market Value of less than $2.5 million;

(2)     a transfer of assets between or among the Company and its Restricted Subsidiaries that are Guarantors;

(3)     an issuance of Equity Interests by a Restricted Subsidiary of the Company to the Company or to a Restricted Subsidiary of the Company that is a Guarantor;

2

UMB-000010

(4)      the sale, lease or other transfer of products, services, inventory or accounts receivable in the ordinary course of business and any sale or other disposition of damaged, worn-out or obsolete assets in the ordinary course of business (including the abandonment or other disposition of intellectual property that is, in the reasonable judgment of the Company, no longer economically practicable to maintain or useful in the conduct of the business of the Company and its Restricted Subsidiaries taken as whole);

(5)      licenses and sublicenses by the Company or any of its Restricted Subsidiaries of software or intellectual property or other general intangibles in the ordinary course of business;

(6)      any surrender or waiver of contract rights or settlement, release, recovery on or surrender of contract, tort or other claims in the ordinary course of business;

(7)      the granting of Liens not prohibited by Section 4.12 hereof;

(8)      the sale or other disposition of cash or Cash Equivalents;

(9)      a Restricted Payment that does not violate Section 4.07 hereof or a Permitted Investment;

(10)     dispositions of Investments or receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings and exclusive of factoring or similar arrangements; and

(11)     the sale of receivables resulting from that certain supplier agreement with the Company, as supplier, and Citibank, N.A., or other financial institutions from time to time parties to such agreement or similar supplier agreements, in each case with respect to certain receivables from AT&T Services, Inc. or its Affiliates, on terms and conditions substantially similar to the terms and conditions of such agreements in existence on the date hereof.

"*Bankruptcy Code*" means the United States Bankruptcy Code (11 U.S.C. § 101 et seq.), as amended from time to time.

"*Beneficial Owner*" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular

UMB-000011

"person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time.  The terms "Beneficially Owns" and "Beneficially Owned" have a corresponding meaning.

"*Board of Directors*" means:

(1)     with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

(2)     with respect to a partnership, the board of directors of the general partner of the partnership;

(3)     with respect to a limited liability company, the managing member or members or any controlling committee of managing members thereof; and

(4)     with respect to any other Person, the board or committee of such Person serving a similar function.

"*Business Day*" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"*Capital Lease Obligation*" means, at the time any determination is to be made, the amount of the liability in respect of a capital lease that would at that time be required to be capitalized on a balance sheet prepared in accordance with GAAP, and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be prepaid by the lessee without payment of a penalty.

"*Capital Stock*" means:

(1)     in the case of a corporation, corporate stock;

(2)     in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)     in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(4)     any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing clauses (1) through (4) any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"*Cash Equivalents*" means:

UMB-000012

(1)       United States dollars;

(2)       securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality of the United States government (*provided* that the full faith and credit of the United States is pledged in support of those securities) having maturities of not more than six months from the date of acquisition;

(3)       certificates of deposit and eurodollar time deposits with maturities of six months or less from the date of acquisition, bankers' acceptances with maturities not exceeding six months and overnight bank deposits, in each case, with any domestic commercial bank having capital and surplus in excess of $500.0 million and a Thomson Bank Watch Rating of "B" or better;

(4)       repurchase obligations with a term of not more than seven days for underlying securities of the types described in clauses (2) and (3) above entered into with any financial institution meeting the qualifications specified in clause (3) above;

(5)       commercial paper having one of the two highest ratings obtainable from Moody's or S&P and, in each case, maturing within six months after the date of acquisition; and

(6)       money market funds at least 95% of the assets of which constitute Cash Equivalents of the kinds described in clauses (1) through (5) of this definition.

"*Casualty Event*" means any taking under power of eminent domain or similar proceeding and any insured loss, in each case relating to property or other assets that constituted Collateral.

"*CFC*" means "controlled foreign corporation" as defined in Section 957 of the Internal Revenue Code.

"*CFC Holdco*" means any Subsidiary (i) that is a disregarded entity for U.S. federal income tax purposes and (ii) substantially all of the assets of which consist of Capital Stock of one or more CFC Holdcos or Controlled Foreign Corporations.

"*Change of Control*" means the occurrence of any of the following:

(1)       the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of the Company and its Subsidiaries taken as a whole to any Person (including any "person" (as that term is used in Section 13(d)(3) of the Exchange Act));

(2)       the adoption of a plan relating to the liquidation or dissolution of the Company;

(3)       the consummation of any transaction (including, without limitation, any merger or consolidation), the result of which is that any Person (including any "person"

5

UMB-000013

(as defined above)), other than the Principals and their Related Parties, becomes the Beneficial Owner, directly or indirectly, of more than 50% of the Voting Stock of the Company, measured by voting power rather than number of shares;

(4)     the Company consolidates with, or merges with or into, any Person, or any Person consolidates with, or merges with or into, the Company, in any such event pursuant to a transaction in which any of the outstanding Voting Stock of the Company or such other Person is converted into or exchanged for cash, securities or other property, other than any such transaction where the Voting Stock of the Company outstanding immediately prior to such transaction constitutes or is converted into or exchanged for a majority of the outstanding shares of the Voting Stock of such surviving or transferee Person (immediately after giving effect to such transaction); or

(5)     the first day on which a majority of the members of the Board of Directors of the Company are not Continuing Directors.

"*Clearstream*" means Clearstream Banking, S.A.

"*Collateral*" means all assets, whether now owned or hereafter acquired by Company or any Guarantor, in which a Lien is granted or purported to be granted to any Secured Party as security for any Notes Obligations (including, but not limited to, Accounts, Chattel Paper, Documents, General Intangibles, Instruments, Intellectual Property (as defined in the Notes Security Agreement), Insurance (as defined in the Notes Security Agreement), Inventory, Investment Related Property (as defined in the Notes Security Agreement), Letters of Credit and Letter-of-Credit Rights, Payment Intangibles,  Receivables (as defined in the Notes Security Agreement), Receivables Records (as defined in the Notes Security Agreement), Supporting Obligations, Deposit Accounts, Money, cash and cash equivalents, Commercial Tort Claims, Equipment, Goods, and accessions to, substitutions for, and replacements, proceeds of Notes Collateral (as defined in the Intercreditor Agreement ) and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts, and other computer materials and records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing, and all other assets of Company and each Guarantor now or hereafter as set forth in the Security Documents), to the extent not otherwise included above, all other personal property of any kind and all Collateral Records, Collateral Support and Supporting Obligations relating to any of the foregoing, and to the extent not otherwise included above, all Proceeds, products, accessions, rents and profits of or in respect of any of the foregoing, excluding, for the avoidance of doubt, Excluded Assets.  Capitalized terms used in this definition but not otherwise defined in this Indenture shall have the respective meaning given to such term in the Uniform Commercial Code as in effect from time to time in the State of New York (and, if defined in more than one Article thereof, shall have the meaning given in Article 9 thereof).

"*Collateral Agent*" means U.S. Bank National Association, in its capacity as collateral agent hereunder and under the Security Documents and under the Intercreditor Agreement, together with its successors in such capacity.

6

UMB-000014

"*Collateral Proceeds Account*" means one or more deposit accounts or securities accounts established or maintained by the Company, any Guarantor or the Collateral Agent or its agent for the sole purpose of holding the proceeds of any sale or other disposition of any Notes Priority Collateral that are required to be held in trust in such account or accounts pursuant to the terms of any Notes Document.

"*Company*" means Goodman Networks Incorporated, a Texas corporation, and any and all successors thereto.

"*Competitor*" means a Person that is currently, or to the knowledge of the Board of Directors, has taken reasonable steps to be in the business of providing any of the following services: (1) onsite installation, upgrade or maintenance of satellite television systems, digital cable television, high speed internet, video surveillance, home security, home and business internet of things solutions, commercial audio/video solutions, digital media solutions or related activities; (2) outside plant engineering or design, engineering, construction, installation, deployment or maintenance of wireless, small cell, DAS or wireline networks; and (3) any material line of business into which the Company or its Subsidiaries enter as determined by the Board of Directors in good faith (at which time the Company shall update the list of Competitors maintained and published on its secure website); *provided*, *however*, that Genesis Networks Enterprises, LLC and its Affiliates shall not be deemed to be a Competitor; *provided further*, *however*, that private investors, money managers and registered investment advisers shall not be deemed to be a Competitor unless they control, are controlled by, or are under common control with, a Competitor.  Holders of, and prospective investors in, the Notes, common stock and PIK Preferred Stock of the Company are entitled to rely on a list of Competitors in the form of Schedule 1.01(a) maintained and published by the Company on its secure website and such Schedule may be modified from time to time by the Board of Directors.   As of the date hereof, the list of Competitors is set forth on Schedule 1.01(a) hereto.

"*Competitor Affiliate*" means, with respect to any Competitor, any Person which directly or indirectly controls, is controlled by or is under common control with, such Competitor. For purposes of this definition, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Competitor, whether through ownership of voting securities, by contract or otherwise. Without limiting the foregoing, a Person shall be deemed to control a Competitor if it (i) has the contractual right to appoint, elect or cause the election of, a majority of the directors, managers or other managing authority, or (ii) beneficially owns, directly or indirectly, at least a majority of the outstanding equity securities or other ownership interests entitled to vote for the election of, or appoint, directors, managers or other managing authority.

"*Consolidated EBITDA*" means, with respect to any specified Person for any period, the Consolidated Net Income of such Person for such period plus, without duplication:

(1)     an amount equal to any extraordinary loss plus any net loss realized by such Person or any of its Restricted Subsidiaries in connection with an Asset Sale, to the extent such losses were deducted in computing such Consolidated Net Income; plus

7

(2)     provision for taxes based on income or profits and state, franchise and similar taxes and foreign withholding taxes of such Person and its Restricted Subsidiaries for such period, to the extent that such provision for taxes was deducted in computing such Consolidated Net Income; plus

(3)     all consolidated interest expense of such Person and its Restricted Subsidiaries, determined in accordance with GAAP, for such period to the extent that such consolidated interest expense was deducted in computing such Consolidated Net Income; plus

(4)     all Fixed Charges of such Persons and its Restricted Subsidiaries, to the extent that such Fixed Charges were deducted in computing such Consolidated Net Income; plus

(5)     any foreign currency translation losses (including losses related to currency remeasurements of Indebtedness) of such Person and its Restricted Subsidiaries for such period, to the extent that such losses were taken into account in computing such Consolidated Net Income; plus

(6)     any expense or deduction taken related to expenses or fees to enter into this Indenture and the Existing ABL Agreement; plus

(7)     depreciation, amortization (including amortization of intangibles but excluding amortization of prepaid cash expenses that were paid in a prior period) and other non-cash charges and expenses (excluding any such non-cash charge or expense to the extent that it represents an accrual of or reserve for cash charges or expenses in any future period or amortization of a prepaid cash charge or expense that was paid in a prior period) of such Person and its Restricted Subsidiaries for such period to the extent that such depreciation, amortization and other non-cash charges or expenses were deducted in computing such Consolidated Net Income; plus

(8)     [reserved]; plus

(9)     [reserved]; plus

(10)     [reserved]; plus

(11)     any fees and expenses (including reasonable legal fees) relating to the consummation of any acquisition or the making of Investments permitted hereunder; plus

(12)     any fees and expenses relating to the issuance of Equity Interests or Indebtedness permitted hereunder; plus

(13)     any extraordinary, exceptional, unusual or non-recurring restructuring redundancy or severance loss, charge or expense, to the extent such losses, charges or expenses were deducted in computing such Consolidated Net Income; minus

8

(14)     any foreign currency translation gains (including gains related to currency remeasurements of Indebtedness) of such Person and its Restricted Subsidiaries for such period, to the extent that such gains were taken into account in computing such Consolidated Net Income; minus

(15)     non-cash items increasing such Consolidated Net Income for such period, other than the accrual of revenue in the ordinary course of business, in each case, on a consolidated basis and determined in accordance with GAAP.

Notwithstanding the preceding, the provision for taxes based on the income or profits of, and the depreciation and amortization and other non-cash expenses of, a Restricted Subsidiary of the Company will be added to Consolidated Net Income to compute Consolidated EBITDA of the Company only to the extent that a corresponding amount would be permitted at the date of determination to be dividended to the Company by such Restricted Subsidiary without prior governmental approval (that has not been obtained), and without direct or indirect restriction pursuant to the terms of its charter and all agreements, instruments, judgments, decrees, orders, statutes, rules and governmental regulations applicable to that Restricted Subsidiary or its stockholders.

"*Consolidated Net Income*" means, with respect to any specified Person for any period, the aggregate of the net income (loss) of such Person and its Restricted Subsidiaries for such period, on a consolidated basis (excluding the net income (loss) of any Unrestricted Subsidiary of such Person), determined in accordance with GAAP and without any reduction in respect of preferred stock dividends; *provided* that:

(1)     all extraordinary gains (but not losses) and all gains (but not losses) realized in connection with any Asset Sale or the disposition of securities or the early extinguishment of Indebtedness, together with any related provision for taxes on any such gain, will be excluded;

(2)     the net income (but not loss) of any Person that is not a Restricted Subsidiary or that is accounted for by the equity method of accounting will be included only to the extent of the amount of dividends or similar distributions paid in cash to the specified Person or a Restricted Subsidiary of the Person;

(3)     the net income (but not loss) of any Restricted Subsidiary will be excluded to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of that net income is not at the date of determination permitted without any prior governmental approval (that has not been obtained) or, directly or indirectly, by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders, unless such restriction with respect to the payment of dividends or similar distributions has been legally waived; provided, that the Consolidated Net Income of such Person shall be, increased by the amount of dividends or similar distributions that are actually paid in cash to such Person in respect of such period, to the extent not already included therein; and

9

(4)     the cumulative effect of a change in accounting principles will be excluded.

"*Consolidated Tangible Assets*" means of any Person as of any date means the total assets of such Person and its Restricted Subsidiaries as of the most recent fiscal quarter end for which a consolidated balance sheet of such Person and its Restricted Subsidiaries is available, minus total goodwill and other intangible assets of such Person and its Subsidiaries reflected on such balance sheet, all calculated on a consolidated basis in accordance with generally accepted accounting principles.

"*continuing*" means, with respect to any Default or Event of Default, that such Default or Event of Default has not been cured or waived.

"*Continuing Directors*" means, as of any date of determination, any member of the Board of Directors of the Company who:

(1)     was a member of such Board of Directors on the date of this Indenture; or

(2)     was nominated for election or elected to such Board of Directors with the approval of a majority of the Continuing Directors who were members of such Board of Directors at the time of such nomination or election.

"*Corporate Trust Office of the Collateral Agent*" will be at the address of the Collateral Agent specified in Section 14.02 hereof or such other address to which the Collateral Agent may give notice to the Company and Trustee.

"*Corporate Trust Office of the Trustee*" will be at the address of the Trustee specified in Section 14.02 hereof or such other address as to which the Trustee may give notice to the Company and Collateral Agent.

"*Credit Facilities*" means one or more debt facilities (including, without limitation, the Existing ABL Agreement), credit agreements, commercial paper facilities, note purchase agreements, indentures, or other agreements, in each case with banks, lenders, purchasers, investors, trustees, agents or other representatives of any of the foregoing, providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables or interests in receivables to such lenders or other persons or to special purpose entities formed to borrow from such lenders or other persons against such receivables or sell such receivables or interests in receivables), letters of credit, Notes or other borrowings or other extensions of credit, including any Notes, mortgages, guarantees, collateral documents, instruments and agreements executed in connection therewith, in each case, as amended, restated, modified, renewed, refunded, restructured, increased, supplemented, replaced or refinanced in whole or in part from time to time, including any replacement, refunding or refinancing facility or agreement that increases the amount permitted to be borrowed thereunder or alters the maturity thereof or adds entities as additional borrowers or guarantors thereunder and whether by the same or any other agent, lender, group of lenders, or otherwise.

"*Custodian*" means the Trustee, as custodian with respect to the Notes in global form, or any successor entity thereto.

10

UMB-000018

"*Default*" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"*Definitive Note*" means a certificated Note registered in the name of the Holder thereof and issued in accordance with Section 2.06 hereof, substantially in the form of Exhibit A hereto except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Exchanges of Interests in the Global Note" attached thereto.

"*Depositary*" means, with respect to the Notes issuable or issued in whole or in part in global form, the Person specified in Section 2.03 hereof as the Depositary with respect to the Notes, and any and all successors thereto appointed as depositary hereunder and having become such pursuant to the applicable provision of this Indenture.

"*Designated Non-cash Consideration*" means the Fair Market Value of non-cash consideration received by the Company or any of its Restricted Subsidiaries in connection with an Asset Sale that is so designated as Designated Non-cash Consideration pursuant to an Officers' Certificate, setting forth the basis of such valuation, less the amount of cash or Cash Equivalents received in connection with a subsequent sale, redemption or repurchase of or collection or payment on such Designated Non-cash Consideration.

"*Disqualified Stock*" means any Capital Stock that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case, at the option of the holder of the Capital Stock), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder of the Capital Stock, in whole or in part, on or prior to the date that is 91 days after the date on which the Notes mature.  Notwithstanding the preceding sentence, any Capital Stock that would constitute Disqualified Stock solely because the holders of the Capital Stock have the right to require the Company to repurchase such Capital Stock upon the occurrence of a Change of Control or an Asset Sale will not constitute Disqualified Stock if the terms of such Capital Stock provide that the Company may not repurchase or redeem any such Capital Stock pursuant to such provisions unless such repurchase or redemption complies with Section 4.07 hereof.  The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Indenture will be the maximum amount that the Company and its Restricted Subsidiaries may become obligated to pay upon the maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock, exclusive of accrued dividends.

"*Domestic Subsidiary*" means any Restricted Subsidiary of the Company that was formed under the laws of the United States or any state of the United States or the District of Columbia or that guarantees or otherwise provides direct credit support for any Indebtedness of the Company or any Guarantor.

 "*Equity Interests*" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"*Equity Offering*" means a public or private sale either (1) of Equity Interests of the Company by the Company (other than Disqualified Stock and other than to a Subsidiary of the

UMB-000019

Company) or (2) of Equity Interests of a direct or indirect parent entity of the Company (other than to the Company or a Subsidiary of the Company) to the extent that the net proceeds therefrom are contributed to the common equity capital of the Company.

"*Euroclear*" means Euroclear Bank, S.A./N.V., as operator of the Euroclear system.

"*Excess Cash Flow*" means, for any Applicable Period, the remainder (if positive) of

(a)      the sum of, without duplication:

(i)      Consolidated EBITDA for such Applicable Period;

(ii)      the decrease, if any, in working capital of the Company and its Restricted Subsidiaries on a consolidated basis from the first day to the last day of such Applicable Period;

(iii)      the proceeds of Asset Sales during such Applicable Period to the extent (x) not reinvested (or committed to be reinvested) by the Company or a Restricted Subsidiary pursuant to the terms hereof and (y) the Company has made an Asset Sale Offer pursuant to Section 4.10 hereof that has not been accepted by Holders of Notes and Excess Proceeds remain therefrom; and

(iv)      cash that is released from escrow during such Applicable Period and restricted cash on hand at the beginning of such Applicable Period that is released from being restricted cash during such Applicable Period; *minus*

(b)      the sum of, without duplication:

(i)      the aggregate amount of all capital expenditures made by the Company and its Restricted Subsidiaries during such Applicable Period to the extent funded with internally generated cash in an amount not to exceed $1.5 million per Applicable Period;

(ii)      the increase, if any, in working capital of the Company and its Restricted Subsidiaries on a consolidated basis from the first day to the last day of such Applicable Period;

(iii)      the aggregate amount of consolidated interest expense of the Company and its Restricted Subsidiaries for such Applicable Period actually paid in cash during such Applicable Period;

(iv)      the aggregate amount of taxes actually paid in cash by the Company and its Restricted Subsidiaries to the extent funded with internally generated cash during such Applicable Period;

(v)      the aggregate amount of dividends in respect of the PIK Preferred Stock actually paid in cash by the Company and its Restricted Subsidiaries during such Applicable Period;

(vi)      any amounts that are applied to redeem the PIK Preferred Stock by the Company during such Applicable Period up to an aggregate amount of $10.0 million for all Applicable Periods; and

UMB-000020

(vii)    an amount equal to expenses that were added back in calculating Consolidated EBITDA to the extent such expenses were actual cash expenditures during such Applicable Period.

"*Excess Cash Flow Amount*" means for any Applicable Period, an amount equal to the lesser of (i) the applicable Excess Cash Flow Percentage for such Applicable Period *multiplied by* the Excess Cash Flow during such Applicable Period and (ii) Excess Net Cash on the last day of such Applicable Period; *provided*, that if the Excess Cash Flow Amount is less than or equal to $1.0 million during any Applicable Period, the Company shall not be required to make an Excess Cash Flow Offer in respect of the Notes during such Applicable Period and such Excess Cash Flow Amount shall be added to the Excess Cash Flow Amount for each subsequent Applicable Period until the Excess Cash Flow Amount for any one Applicable Period exceeds $1.0 million; *provided*, *further*, that the foregoing proviso shall not apply to Excess Cash Flow Amounts applied to the redemption of the PIK Preferred Stock.

"*Excess Cash Flow Percentage*" means (a) on or prior to the date upon which the PIK Preferred Stock has been redeemed in full, (i) (A) 75% of Excess Cash Flow or (B) at the option of the Company, a percentage greater than 75% and not to exceed 100%, in each case if the Leverage Ratio is greater than or equal to 3.50 to 1.00 and (ii) (B) 50% of Excess Cash Flow or (B) at the option of the Company, a percentage greater than 50% and not to exceed 100%, in each case if the Leverage Ratio is less than 3.50 to 1.00 and (b) after the date upon which the PIK Preferred Stock has been redeemed in full, 50% of Excess Cash Flow or, at the option of the Company, any amount greater than 50% and not to exceed 100%.

"*Excess Net Cash*" means, as of any date, Net Cash *minus* $15,000,000.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Excluded Assets*" means any general intangibles of Company or any Guarantor to the extent that (i) such general intangibles are not assignable or capable of being encumbered as a matter of law or under the terms of any license or other agreement applicable thereto (but solely to the extent that any such restriction shall be enforceable under applicable law) without the consent of the licensor thereof or other applicable party thereto and (ii) such consent has not been obtained.

"*Excluded Domestic Holdco*" means a Domestic Subsidiary substantially all of the assets of which consist of Capital Stock of one or more Excluded Domestic Holdcos, CFCs or CFC Holdcos.

"*Existing ABL Agreement*" means that certain Credit and Security Agreement dated as of the date hereof (as hereafter amended, restated, adjusted, waived, renewed, extended, supplemented or otherwise modified from time to time) by and among the Company, as a borrower, Multiband Field Services, Inc., as a borrower, Goodman Network Services, LLC, as a borrower, MidCap Financial Trust, as agent or any successor agent thereto (the "*ABL Agent*") and lender, certain financial institutions and other entities from time to time party thereto.

UMB-000021

"*Existing Indebtedness*" means all Indebtedness of the Company and its Subsidiaries (other than Indebtedness described in clauses (1) and (3) of the definition of Permitted Debt) in existence on the date of this Indenture, until such amounts are repaid.

"*Existing Indenture*" means that certain Indenture, dated as of June 23, 2011 (as amended prior to the date hereof), between the Company and Wells Fargo Bank, National Association, as trustee.

"*Fair Market Value*" means the value that would be paid by a willing buyer to an unaffiliated willing seller in a transaction not involving distress or necessity of either party, determined in good faith by the Board of Directors of the Company (unless otherwise provided in this Indenture).

"*Fixed Charge Coverage Ratio*" means with respect to any specified Person for any period, the ratio of (a) the Consolidated EBITDA of such Person for such period *minus* non-financed capital expenditures (including capital expenditures financed with the proceeds of any Indebtedness) paid or payable currently in cash by the Company or any of its Subsidiaries for such period to (b) the Fixed Charges of such Person for such period.  In the event that the specified Person or any of its Restricted Subsidiaries incurs, assumes, guarantees, repays, repurchases, redeems, defeases or otherwise discharges any Indebtedness (other than ordinary working capital borrowings) or issues, repurchases or redeems preferred stock subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated and on or prior to the date on which the event for which the calculation of the Fixed Charge Coverage Ratio is made (the "*Calculation Date*"), then the Fixed Charge Coverage Ratio will be calculated giving pro forma effect (in accordance with Regulation S-X under the Securities Act) to such incurrence, assumption, Guarantee, repayment, repurchase, redemption, defeasance or other discharge of Indebtedness, or such issuance, repurchase or redemption of preferred stock, and the use of the proceeds therefrom, as if the same had occurred at the beginning of the applicable four-quarter reference period.

In addition, for purposes of calculating the Fixed Charge Coverage Ratio:

(1)    acquisitions that have been made by the specified Person or any of its Restricted Subsidiaries, including through mergers or consolidations, or any Person or any of its Restricted Subsidiaries acquired by the specified Person or any of its Restricted Subsidiaries, and including all related financing transactions and including increases in ownership of Restricted Subsidiaries, during the four-quarter reference period or subsequent to such reference period and on or prior to the Calculation Date, or that are to be made on the Calculation Date, will be given pro forma effect (in accordance with Regulation S-X under the Securities Act) as if they had occurred on the first day of the four-quarter reference period;

(2)    the Consolidated EBITDA attributable to discontinued operations, as determined in accordance with GAAP, and operations or businesses (and ownership interests therein) disposed of prior to the Calculation Date, will be excluded;

14

UMB-000022

(3)      the Fixed Charges attributable to discontinued operations, as determined in accordance with GAAP, and operations or businesses (and ownership interests therein) disposed of prior to the Calculation Date, will be excluded, but only to the extent that the obligations giving rise to such Fixed Charges will not be obligations of the specified Person or any of its Restricted Subsidiaries following the Calculation Date;

(4)      any Person that is a Restricted Subsidiary on the Calculation Date will be deemed to have been a Restricted Subsidiary at all times during such four-quarter period;

(5)      any Person that is not a Restricted Subsidiary on the Calculation Date will be deemed not to have been a Restricted Subsidiary at any time during such four-quarter period; and

(6)      if any Indebtedness bears a floating rate of interest, the interest expense on such Indebtedness will be calculated as if the rate in effect on the Calculation Date had been the applicable rate for the entire period.

"*Fixed Charges*" means, with respect to any specified Person for any period, the sum, without duplication, of:

(1)      all scheduled amortization payments of principal paid or due and payable during such period by the Company or any of its Restricted Subsidiaries in respect of any Indebtedness (including scheduled payments of the principal portion of Capital Lease Obligations); plus

(2)      the consolidated interest expense of such Person and its Restricted Subsidiaries for such period, whether paid or accrued, including, without limitation, amortization of debt issuance costs and original issue discount, non-cash interest payments, the interest component of any deferred payment obligations, the interest component of all payments associated with Capital Lease Obligations, commissions, discounts and other fees and charges incurred in respect of letter of credit or bankers' acceptance financings; plus

(3)      the consolidated interest expense of such Person and its Restricted Subsidiaries that was capitalized during such period, plus

(4)      any interest on Indebtedness of another Person that is guaranteed by such Person or one of its Restricted Subsidiaries or secured by a Lien on assets of such Person or one of its Restricted Subsidiaries, whether or not such Guarantee or Lien is called upon; plus

(5)      all Restricted Payments made by such Person and its Restricted Subsidiaries during such period, including payments in respect of the PIK Preferred Stock (whether in the form of redemption of the PIK Preferred Stock or cash dividends or pay-in-kind accretion in respect of the PIK Preferred Stock); *provided, however*, that the first $10.0 million in the aggregate for the term of this Indenture paid in respect of redemptions of the PIK Preferred Stock shall be excluded from the calculation of Fixed Charges for the period or periods during which such redemptions are made; plus

15

(6)    the aggregate amount of federal, state, local and foreign income taxes and franchise and similar taxes paid by such Person and its Restricted Subsidiaries paid in cash during such period; plus

(7)    to the extent not already included in the foregoing clauses (5) and (6), the product of (a) all dividends, whether paid or accrued and whether or not in cash, on any series of preferred stock of such Person or any of its Restricted Subsidiaries, other than dividends on Equity Interests paid prior to the date of this Indenture or payable solely in Equity Interests of the Company (other than Disqualified Stock) or to the Company or a Restricted Subsidiary of the Company, times (b) a fraction, the numerator of which is one and the denominator of which is one minus the then current combined federal, state and local statutory tax rate of such Person, expressed as a decimal, in each case, determined on a consolidated basis in accordance with GAAP.

 "*Foreign Subsidiary*" means any Restricted Subsidiary of the Company that is not a Domestic Subsidiary.

"*GAAP*" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect on the date of this Indenture.

"*Global Note Legend*" means the legend set forth in Section 2.06(d) hereof, which is required to be placed on all Global Notes issued under this Indenture.

"*Global Notes*" means, individually and collectively, each of the Global Notes deposited with or on behalf of and registered in the name of the Depository or its nominee, substantially in the form of Exhibit A hereto and that bears the Global Note Legend and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, issued in accordance with Section 2.01 hereof.

"*Government Securities*" means direct obligations of, or obligations guaranteed by, the United States of America, and the payment for which the United States pledges its full faith and credit.

"*Guarantee*" means a guarantee other than by endorsement of negotiable instruments for collection in the ordinary course of business, direct or indirect, in any manner including, without limitation, by way of a pledge of assets or through letters of credit or reimbursement agreements in respect thereof, of all or any part of any Indebtedness (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take or pay or to maintain financial statement conditions or otherwise).

"*Guarantors*" means any Subsidiary of the Company that executes a Note Guarantee in accordance with the provisions of this Indenture, and their respective successors and assigns, in each case, until the Note Guarantee of such Person has been released in accordance with the provisions of this Indenture.

UMB-000024

"*Hedging Obligations*" means, with respect to Company or any Guarantor, any obligations of such Company or Guarantor owed to any ABL Creditor (or any of its affiliates) in respect of any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"*Holder*" means a Person in whose name a Note is registered.

"*Immaterial Subsidiary*" means, as of any date, any Restricted Subsidiary whose total assets, as of that date, are less than $100,000 and whose total revenues for the most recent 12-month period do not exceed $100,000; *provided* that a Restricted Subsidiary will not be considered to be an Immaterial Subsidiary if it, directly or indirectly, guarantees or otherwise provides direct credit support for any Indebtedness of the Company or any Guarantor.

"*Indebtedness*" means, with respect to any specified Person, any Indebtedness of such Person (excluding accrued expenses and trade payables), whether or not contingent:

(1)     in respect of borrowed money;

(2)     evidenced by bonds, Notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof);

(3)     in respect of banker's acceptances;

(4)     representing Capital Lease Obligations;

(5)     representing the balance deferred and unpaid of the purchase price of any property or services due more than six months after such property is acquired or such services are completed; or

(6)     representing any Hedging Obligations,

if and to the extent any of the preceding items (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet of the specified Person prepared in accordance with GAAP.  In addition, the term "Indebtedness" includes all Indebtedness of others secured by a Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person) and, to the extent not otherwise included, the Guarantee by the specified Person of any Indebtedness of any other Person.  Indebtedness shall be calculated without giving effect to the effects of Statement of Financial Accounting Standards No. 133 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Indenture as a result of accounting for any embedded derivatives created by the terms of such Indebtedness.

"*Indenture*" means this Indenture, as amended or supplemented from time to time.

17

UMB-000025

"*Indirect Participant*" means a Person who holds a beneficial interest in a Global Note through a Participant.

"*Initial Notes*" means the first $112.5 million aggregate principal amount of Notes issued under this Indenture on the date hereof.

"*Insolvency Proceeding*" means:

(1)      any case commenced by or against Company or any Guarantor under the Bankruptcy Code or any similar federal, state or foreign law for the relief of debtors, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of Company or any Guarantor, any receivership or assignment for the benefit of creditors relating to Company or any Guarantor or any similar case or proceeding relative to Company or any Guarantor or its creditors, as such, in each case whether or not voluntary;

(2)      any liquidation, dissolution, marshalling of assets or liabilities or other winding up of, or relating to, Company or any Guarantor, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency, unless otherwise permitted by the ABL Documents and the Notes Documents;

(3)      any proceeding seeking the appointment of a trustee, receiver, liquidator, custodian or other insolvency official with similar powers with respect to Company or any Guarantor or any of their respective assets;

(4)      any other proceeding of any type or nature in which substantially all claims of creditors of Company or any Guarantor are determined and any payment or distribution is or may be made on account of such claims; or

(5)      an analogous procedure or step in any jurisdiction.

"*Intercreditor Agreement*" means the Intercreditor Agreement, substantially in the form attached hereto as Exhibit H, dated as of the date of this Indenture, among Company, the Guarantors, MidCap Financial Trust, as ABL Agent, and the Collateral Agent, as amended, modified, supplemented, replaced, restated or amended and restated from time to time.

"*Investments*" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the forms of loans (including Guarantees or other obligations), advances or capital contributions (excluding commission, travel and similar advances to Officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.  If the Company or any Restricted Subsidiary of the Company sells or otherwise disposes of any Equity Interests of any direct or indirect Restricted Subsidiary of the Company such that, after giving effect to any such sale or disposition, such Person is no longer a Restricted Subsidiary of the Company, the Company will be deemed to have made an Investment on the date of any such sale or disposition equal to the Fair Market Value of the Company's Investments in such Subsidiary that were not sold or disposed of in an amount determined as provided in the

18

UMB-000026

final paragraph of Section 4.07 hereof.  The acquisition by the Company or any Restricted Subsidiary of the Company of a Person that holds an Investment in a third Person will be deemed to be an Investment by the Company or such Restricted Subsidiary in such third Person in an amount equal to the Fair Market Value of the Investments held by the acquired Person in such third Person in an amount determined as provided in the final paragraph of Section 4.07 hereof Except as otherwise provided in this Indenture, the amount of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value.

"*Leverage Ratio*" means, for any Applicable Period of the Company and its Restricted Subsidiaries, the ratio of (x) the sum of (i) the aggregate principal balance of Indebtedness under the Notes and (ii) the aggregate amount of PIK Preferred Stock, in each case outstanding on the last day of such Applicable Period to (y) the Consolidated EBITDA of the Company and its Restricted Subsidiaries for the four consecutive fiscal quarters ending on the last day of such Applicable Period, with such adjustments to the amount of Indebtedness and Consolidated EBITDA as are consistent with the adjustment provisions set forth in the definition of "Fixed Charge Coverage Ratio."

"*Lien*" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction.

"*Moody's*" means Moody's Investors Service, Inc.

"*Mortgages*" means the mortgages, deeds of trust, deeds to secure the Notes Obligations or other similar documents securing Liens on the premises, as well as the other Collateral secured by and described in the mortgages, deeds of trust, deeds to secure Indebtedness or other similar documents.

"*Net Cash*" means, as of any date, unrestricted cash of the Company and its Restricted Subsidiaries *minus* borrowings in an amount not to exceed $15.0 million under any Credit Facilities permitted pursuant to Section 4.09(b)(1).

"*Net Proceeds*" means the aggregate cash proceeds and Cash Equivalents received by the Company or any of its Restricted Subsidiaries in respect of any Asset Sale (including, without limitation, any cash or Cash Equivalents received upon the sale or other disposition of any non-cash consideration received in any Asset Sale), net of the direct costs relating to such Asset Sale, including, without limitation, legal, accounting and investment banking fees, and sales commissions, and any relocation expenses incurred as a result of the Asset Sale, taxes paid or payable as a result of the Asset Sale, in each case, after taking into account any available tax credits or deductions and any reasonable tax sharing arrangements, to be applied to the repayment of Indebtedness other than any reserve for adjustment or indemnification obligations in respect of the sale price of such asset or assets established in accordance with GAAP.

"*Non-Recourse Debt*" means Indebtedness:

19

UMB-000027

(1)      as to which neither the Company nor any of its Restricted Subsidiaries (a) provides credit support of any kind (including any undertaking, agreement or instrument that would constitute Indebtedness) or (b) is directly or indirectly liable as a guarantor or otherwise; and

(2)      as to which the lenders have been notified in writing that they will not have any recourse to the stock or assets of the Company or any of its Restricted Subsidiaries (other than the Equity Interests of an Unrestricted Subsidiary).

"*Note Guarantee*" means the Guarantee by each Guarantor of the Company's obligations under this Indenture and the Notes, executed pursuant to the provisions of this Indenture.

"*Notes*" has the meaning assigned to it in the preamble to this Indenture.  The Initial Notes and the Additional Notes shall be treated as a single class for all purposes under this Indenture; *provided, however,* that if such Additional Notes are issued under the same CUSIP, either (i) such Additional Notes must constitute the "same issue" as the Initial Notes within the meaning of U.S.  Treasury Regulation Section 1.1275-1(f) or a "qualified reopening" pursuant to U.S.  Treasury Regulation Section 1.1275-2(k) or (ii) the Initial Notes and such Additional Notes must be issued with no more than a *de minimis* amount of original issue discount for U.S. federal income tax purposes.  Unless the context otherwise requires, all references to the Notes shall include the Initial Notes and any Additional Notes.

 "*Notes Documents*" means the Indenture, the Notes, the Notes Guarantee and each Security Document.

"*Notes Obligations*" means (a) all principal of and interest (including without limitation any post-petition interest) and premium (if any) on all Indebtedness under this Indenture, (b) all guarantee obligations, indemnities, fees, expenses and other amounts payable from time to time pursuant to the Notes Documents, in each case whether or not allowed or allowable in an Insolvency Proceeding and (c) all other Obligations in respect thereof.

"*Notes Priority Collateral*" has the meaning set forth in the Intercreditor Agreement.

"*Notes Representative*" has the meaning set forth in the Intercreditor Agreement and shall mean the Collateral Agent as directed by the Trustee who is acting in accordance with the direction of the Holders pursuant to Act of Required Holders.

"*Notes Security Agreement*" means that certain Pledge and Security Agreement, dated as of the date hereof, by and among the Company, each of the grantors parties thereto and U.S. Bank National Association, as Collateral Agent, as amended, modified, supplemented, replaced, restated or amended and restated from time to time.

"*Obligations*" means (a) any principal (including reimbursement obligations with respect to letters of credit whether or not drawn), interest (including, to the extent legally permitted, all interest accrued thereon after the commencement of any Insolvency Proceeding at the specified rate, including the post-default rate hereunder (if applicable) and any applicable post-default rate specified in the ABL Documents, even if such interest is not enforceable, allowable or allowed as a claim in such proceeding), premium (if any), fees, indemnifications, reimbursements, expenses

UMB-000028

and other liabilities payable under the documentation governing any Indebtedness and (b) the due and punctual performance of all covenants, agreements, obligations and liabilities of Company and the Guarantors under the documentation governing any Indebtedness.

"*Officer*" means the Chairman of the Board, the Chief Executive Officer, the Chief Operating Officer, the General Counsel, the Chief Financial Officer, the President, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of the Company.

"*Officers' Certificate*" means a certificate signed on behalf of the Company by two Officers of the Company, one of whom must be the chief executive officer, the chief financial officer, the treasurer or the principal accounting officer of the Company, that meets the requirements of Section 14.05 hereof.

"*Opinion of Counsel*" means an opinion from legal counsel who is reasonably acceptable to the Trustee, that meets the requirements of Section 14.05 hereof to the extent applicable.  The counsel may be counsel to the Company, any Subsidiary of the Company or the Trustee.

"*Participant*" means, with respect to the Depositary, Euroclear or Clearstream, a Person who has an account with the Depositary, Euroclear or Clearstream, respectively (and, with respect to DTC, shall include Euroclear and Clearstream).

"*Permitted Business*" means any business that is the same as, or reasonably related, ancillary or complementary to, any of the businesses in which the Company and its Restricted Subsidiaries are engaged on the date of this Indenture.

"*Permitted Investments*" means:

(1)     any Investment in the Company or in a Restricted Subsidiary of the Company that is a Guarantor;

(2)     any Investment in Cash Equivalents;

(3)     any Investment by the Company or any Restricted Subsidiary of the Company in a Person, if as a result of such Investment:

(a)     such Person becomes a Restricted Subsidiary of the Company that is a Guarantor; or

(b)     such Person is merged, consolidated or amalgamated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Company or a Restricted Subsidiary of the Company that is a Guarantor;

(4)     any Investment made as a result of the receipt of non-cash consideration from an Asset Sale that was made pursuant to and in compliance with Section 4.10 hereof;

UMB-000029

(5)    any acquisition of assets or Capital Stock solely in exchange for the issuance of Equity Interests (other than Disqualified Stock) of the Company;

(6)    any Investments received in compromise or resolution of (A) obligations of trade creditors or customers that were incurred in the ordinary course of business of the Company or any of its Restricted Subsidiaries, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer; or (B) litigation, arbitration or other disputes;

(7)    [reserved];

(8)    loans or advances to employees made in the ordinary course of business of the Company or any Restricted Subsidiary of the Company in an aggregate principal amount not to exceed $1.0 million at any one time outstanding; *provided*, that no individual employee of the Company shall receive loans and advances in an aggregate amount in excess of $25,000;

(9)    repurchases of the Notes;

(10)    any guarantee of Indebtedness permitted to be incurred by Section 4.09 hereof other than a guarantee of Indebtedness of an Affiliate of the Company that is not a Restricted Subsidiary of the Company;

(11)    any Investment existing on, or made pursuant to binding commitments existing on, the date of this Indenture and any Investment consisting of an extension, modification or renewal of any Investment existing on, or made pursuant to a binding commitment existing on, the date of this Indenture; provided that the amount of any such Investment may be increased (a) as required by the terms of such Investment as in existence on the date of this Indenture or (b) as otherwise permitted under this Indenture;

(12)    Investments acquired after the date of this Indenture as a result of the acquisition by the Company or any Restricted Subsidiary of the Company of another Person, including by way of a merger, amalgamation or consolidation with or into the Company or any of its Restricted Subsidiaries in a transaction that is not prohibited by the covenant described above under Section 5.01 hereof after the date of this Indenture to the extent that such Investments were not made in contemplation of such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(13)    other Investments in any Person other than an Affiliate of the Company that is not a Subsidiary of the Company having an aggregate Fair Market Value (measured on the date each such Investment was made and without giving effect to subsequent changes in value), when taken together with all other Investments made pursuant to this clause (13) that are at the time outstanding not to exceed $5.0 million;

(14)    receivables owing to, the Company or any Restricted Subsidiary created or acquired in the ordinary course of business;

UMB-000030

(15)     Investments in the nature of deposits with respect to lease provided to third parties in the ordinary course of business; and

(16)     prepaid expenses, deposits, advances, or extensions of trade credit in the ordinary course of business by the Company or any of its Restricted Subsidiaries.

"*Permitted Liens*" means:

(1)     Liens held by the Collateral Agent on the Collateral securing the Notes Obligations;

(2)     Liens on the Collateral securing Indebtedness incurred pursuant to clause (1) of the definition of Permitted Debt, so long as such Liens on the Notes Priority Collateral are subordinated to the Liens on the Notes Priority Collateral securing the Notes Obligations pursuant to the Intercreditor Agreement;

(3)     Liens in favor of the Company or any Restricted Subsidiary that is a Guarantor;

(4)     Liens on property or Capital Stock of a Person existing at the time such Person is acquired by, merged with or into or consolidated, combined or amalgamated with the Company or any Restricted Subsidiary of the Company; *provided* that such Liens were in existence prior to and were not incurred in connection with or in contemplation of, such merger, acquisition, consolidation, combination or amalgamation and do not extend to any assets other than those of the Person acquired by or merged into or consolidated, combined or amalgamated with the Company or the Restricted Subsidiary;

(5)     Liens on property existing at the time of acquisition thereof by the Company or any Restricted Subsidiary of the Company; *provided* that such Liens were in existence prior to and were not incurred in connection with or in contemplation of, such acquisition and de not extend to any property other than the property so acquired by the Company or the Restricted Subsidiary;

(6)     Liens to secure the performance of statutory obligations, insurance, surety or appeal bonds, workers compensation obligations, performance bonds or other obligations of a like nature incurred in the ordinary course of business (including Liens to secure letters of credit issued to, assure payment of such obligations);

(7)     Liens to secure Indebtedness (including Capital Lease Obligations) permitted by clause (4) of Section 4.09(b) hereof covering only the assets acquired with or financed by such Indebtedness;

(8)     Liens existing on the date of this Indenture, other than liens set forth in clauses (1) and (2) above;

(9)     Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings

23

promptly instituted and diligently concluded; provided that any reserve or other appropriate provision as is required in conformity with GAAP has been made therefor;

(10)     Liens imposed by law (other than with respect to tax), such as carriers', warehousemen's, landlord's and mechanics' Liens, in each case, incurred in the ordinary course of business;

(11)     survey exceptions, easements or reservations of, or rights of others for, Licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real property that were not incurred in connection with Indebtedness and that do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(12)     Liens to secure any Permitted Refinancing Indebtedness permitted to be incurred under this Indenture (other than with respect to Indebtedness incurred pursuant to clauses (1) or (3) of the definition of Permitted Debt); *provided* that (a) the new Lien shall be limited to all or part of the same property and assets that secured the original Lien, and (b) the Indebtedness secured by the new Lien is not increased to any amount greater than the sum of (i) the outstanding principal amount or, if greater, committed amount of the Indebtedness renewed, refunded, refinanced, replaced, defeased or discharged with such Permitted Refinancing Indebtedness, and (ii) an amount necessary to pay any fees and expenses, including premiums, related to such renewal, refunding, refinancing, replacement, defeasance or discharge;

(13)     Liens on insurance policies and proceeds thereof, or other deposits, to secure insurance premium financings;

(14)     filing of Uniform Commercial Code financing statements as a precautionary measure in connection with operating leases;

(15)     bankers' Liens, rights of setoff, Liens arising out of judgments or awards not constituting an Event of Default and notices of *lis pendens* and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made;

(16)     Liens on cash, Cash Equivalents or other property arising in connection with the defeasance, discharge or redemption of Indebtedness;

(17)     Liens on specific items of inventory or other goods (and the proceeds thereof) of any Person securing such Person's obligations in respect of bankers' acceptances issued or created in the ordinary course of business for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(18)     grants of software and other technology licenses in the ordinary course of business;

24

UMB-000032

(19)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business;

(20)     Liens incurred in the ordinary course of business of the Company or any Restricted Subsidiary of the Company with respect to obligations that do not exceed $5.0 million at any one time outstanding;

(21)     Liens on leases, subleases or sublicenses granted to others in the ordinary course of business that do not interfere in any material respect to the business of the Company or any Restricted Subsidiary; and

(22)     Liens incurred in the ordinary course of business of the Company or any Restricted Subsidiary of the Company with respect to obligations arising under that certain Home Services Provider Agreement, between the Company and DirectTV, in existence on the date of this Indenture, and any other similar agreements, including any master service agreements, entered into with DirectTV after the date of this Indenture (collectively, the "*HSP Agreements*"), in an aggregate amount not to exceed, at any one time outstanding, the greater of (x) $25.0 million and (y) 7.5% of revenue of the Company and its Restricted Subsidiaries on a consolidated basis attributable to the HSP Agreements for the last twelve months.

"*Permitted Prior Liens*" means:

(1)     Liens on the ABL Priority Collateral described in clause (2) of the definition of "Permitted Liens;"

(2)     Liens described in clauses (4), (5), (7), (8) or (11) of the definition of "Permitted Liens;" and

(3)     Permitted Liens that arise by operation of law and are not voluntarily granted, to the extent entitled by law to priority over the Liens created by the Security Documents.

"*Permitted Refinancing Indebtedness*" means any Indebtedness of the Company or any of its Restricted Subsidiaries issued in exchange for, or the net proceeds of which are used to renew, refund, refinance, replace, defease or discharge other Indebtedness of the Company or any of its Restricted Subsidiaries (other than intercompany Indebtedness); *provided* that:

(1)     the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness renewed, refunded, refinanced, replaced, defeased or discharged (plus all accrued interest on the Indebtedness and the amount of all fees and expenses, including premiums, incurred in connection therewith);

(2)     such Permitted Refinancing Indebtedness has a final maturity date later than the final maturity date of, and has a Weighted Average Life to Maturity that is (a) equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being

25

renewed, refunded, refinanced, replaced, defeased or discharged or (b) more than 90 days after the final maturity date of the Notes;

(3)     if the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged is subordinated in right of payment to the Notes, such Permitted Refinancing Indebtedness is subordinated in right of payment to the Notes on terms at least as favorable to the holders of Notes as those contained in the documentation governing the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged; and

(4)     such Indebtedness is incurred either by the Company or by the Restricted Subsidiary of the Company that was the obligor on the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged and is guaranteed only by Persons who were obligors on the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged.

"*Person*" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity.

"*PIK Preferred Stock*" means, collectively, three series of new payment-in-kind preferred stock issued by the Company having an initial liquidation value of (a) $80,000,000, in respect of the holders of senior secured notes of the Company under the Existing Indenture, (b) $20,000,000, in respect of certain Principals and (c) $5,000,000, in respect of the management incentive plan of the Company, which preferred stock shall, in the case of clause (a), be issued by the Company on the date of this Indenture.

"*Plan*" means, with respect to the Company, the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization filed on March 13, 2017, as may be amended or modified from time to time and including all exhibits and supplements thereto.

"*Principals*" means any member of the Goodman family who is a shareholder of the Company on the date of this Indenture.

"*Public Equity Offering*" means an offer and sale of Capital Stock (other than Disqualified Stock) of the Company or any direct or indirect parent company thereof, as the case may be, pursuant to a registration statement that has been declared effective by the SEC pursuant to the Securities Act (other than a registration statement on Form S-8 or otherwise relating to equity securities issuable under any employee benefit plan of the Company or any direct or indirect parent company thereof).

"*Reincorporation*" means the reincorporation of the Company from a Texas domiciled corporation to a Delaware domiciled corporation, which reincorporation is to be accomplished by the conversion of the Company from a Texas corporation into a Delaware corporation.

"*Replacement Assets*" means (1) tangible assets that will be used or useful in a Permitted Business or (2) substantially all the assets of a Permitted Business or a majority of the Voting

UMB-000034

Stock of any Person engaged in a Permitted Business that will become on the date of acquisition thereof a Restricted Subsidiary.

"*Responsible Officer*" when used with respect to the Trustee or the Collateral Agent, means any officer within the corporate trust department of the Trustee, including any vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of the Trustee or the Collateral Agent who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Indenture.

"*Restricted Investment*" means an Investment other than a Permitted Investment.

"*Restricted Subsidiary*" of a Person means any Subsidiary of the referent Person that is not an Unrestricted Subsidiary.

"*S&P*" means Standard & Poor's Ratings Group.

"*Sale of a Guarantor*" means (1) any Asset Sale to the extent involving a sale, lease, conveyance or other disposition of a majority of the Capital Stock of a Guarantor or (2) the issuance of Equity Interests by a Guarantor, other than (a) an issuance of Equity Interests by a Guarantor to the Company or another Guarantor and (b) an issuance of directors' qualifying shares.

"*Sale of Notes Priority Collateral*" means any Asset Sale to the extent involving a sale, lease, conveyance or other disposition of Notes Priority Collateral.

"*SEC*" means the Securities and Exchange Commission.

"*Secured Parties*" means the Trustee, the Collateral Agent, the Holders any other holders of the Notes Obligations.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Security Documents*" means the Notes Security Agreement, all security agreements, pledge agreements, collateral assignments, mortgages, deeds of trust, collateral agency agreements, control agreements or other grants or transfers for security executed and delivered by Company or any Guarantor creating (or purporting to create) a Lien upon Collateral in favor of the Collateral Agent, for the benefit of any of the Secured Parties, in each case, as amended, supplemented, modified, renewed, restated or replaced, in whole or in part, from time to time, in accordance with its terms.

"*Senior Interest Coverage Ratio*" means with respect to the Company and its Subsidiaries on a consolidated basis for any period, the ratio of (a) Consolidated EBITDA for such period to (b) Senior Interest Expense for such period, with such adjustments to the amount of Consolidated EBITDA and Senior Interest Expense as are consistent with the adjustment provisions set forth in the definition of "Fixed Charge Coverage Ratio."

UMB-000035

"*Senior Interest Expense*" means with respect to the Company and its Subsidiaries for any period, consolidated interest expense for such period to the extent such amounts are paid in cash for such period in respect of (a) the Notes and (b) the Credit Facilities incurred pursuant to Section 4.09(b)(1), excluding pay-in-kind interest expense or other non-cash interest expense.

"*Senior Secured Leverage Ratio*" means, for any Applicable Period of the Company and its Restricted Subsidiaries, the ratio of (x) the sum of (i) the aggregate principal balance of Indebtedness under the Notes and (ii) the aggregate principal balance of Indebtedness incurred pursuant to Section 4.09(b)(1), in each case outstanding on the last day of such Applicable Period to (y) the Consolidated EBITDA of the Company and its Restricted Subsidiaries for the four consecutive fiscal quarters ending on the last day of such Applicable Period, with such adjustments to the amount of Indebtedness and Consolidated EBITDA as are consistent with the adjustment provisions set forth in the definition of "Fixed Charge Coverage Ratio."

"*Significant Subsidiary*" means any Restricted Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1 -02 of Regulation S-X, promulgated pursuant to the Securities Act, as such Regulation is in effect on the date of this Indenture.

"*Stated Maturity*" means, with respect to any installment of interest or principal on any series of Indebtedness, the date on which the payment of interest or principal was scheduled to be paid in the documentation governing such Indebtedness as of the date of this Indenture, and will not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof.

"*Subsidiary*" means, with respect to any specified Person:

(1)      any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees of the corporation, association or other business entity is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and

(2)      any partnership or limited liability company of which (a) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general and limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof, whether in the form of membership, general, special or limited partnership interests or otherwise, and (b) such Person or any Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"*TIA*" means the Trust Indenture Act of 1939, as amended (15 U.S.C. §§ 77aaa-77bbbb).

"*Treasury Rate*" means, as of any redemption date, the yield to maturity as of such redemption date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to the redemption date (or, if such Statistical

28

Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the redemption date to the third anniversary of the date of this Indenture; *provided*, *however*, that if the period from the redemption date to the third anniversary of the date of this Indenture is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.  The Company will (a) calculate the Treasury Rate at least two Business Days prior to the applicable redemption date and (b) prior to such redemption date file with the Trustee an Officers' Certificate setting forth the Applicable Premium and the Treasury Rate and showing the calculation of each in reasonable detail.

"*Trustee*" means UMB Bank, National Association, until a successor replaces it in accordance with the applicable provisions of this Indenture and thereafter means the successor serving hereunder.

"*Uniform Commercial Code*" means the Uniform Commercial Code as in effect from time to time in the applicable jurisdiction.

"*Unrestricted Subsidiary*" means any Subsidiary of the Company that is designated by the Board of Directors of the Company as an Unrestricted Subsidiary pursuant to a resolution of the Board of Directors, but only to the extent that such Subsidiary:

(1)     has no Indebtedness other than Non-Recourse Debt;

(2)     except as permitted by Section 4.11 hereof, is not party to any agreement, contract, arrangement or understanding with the Company or any Restricted Subsidiary of the Company unless the terms of any such agreement, contract, arrangement or understanding are no less favorable to the Company or such Restricted Subsidiary than those that might be obtained at the time from Persons who are not Affiliates of the Company;

(3)     is a Person with respect to which neither the Company nor any of its Restricted Subsidiaries has any direct or indirect obligation (a) to subscribe for additional Equity Interests or (b) to maintain or preserve such Person's financial condition or to cause such Person to achieve any specified levels of operating results; and

(4)     has not guaranteed or otherwise directly or indirectly provided credit support for any Indebtedness of the Company or any of its Restricted Subsidiaries.

"*Voting Stock*" of any specified Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness at any date, the number of years obtained by dividing:

(1)     the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect of the Indebtedness, by (b) the

UMB-000037

number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by

(2) the then outstanding principal amount of such Indebtedness.

Section 1.02 *Other Definitions*.

| Term | Defined in Section |
|------|--------------------|
| "*Affiliate Transaction*" | 4.11 |
| "*Asset Sale Offer*" | 3.09 |
| "*Authentication Order*" | 2.02 |
| "*Ballot Notice*" | 4.20 |
| "*Change of Control Offer*" | 4.15 |
| "*Change of Control Payment*" | 4.15 |
| "*Change of Control Payment Date*" | 4.15 |
| "*Covenant Defeasance*" | 8.03 |
| "*DTC*" | 2.03 |
| "*Event of Default*" | 6.01 |
| "*Excess Cash Flow Redemption*" | 4.19 |
| "*Excess Proceeds*" | 4.10 |
| "*Holder Beneficiary Sections*" | 4.20 |
| "*incur*" | 4.09 |
| "*Legal Defeasance*" | 8.02 |
| "*MBE-Qualified Director*" | 4.20 |
| "*Nomination Deadline*" | 4.20 |
| "*Noteholder Director Nominee*" | 4.20 |
| "*Noteholder Director Notice*" | 4.20 |
| "*Noteholder Director Vacancy Notice*" | 4.20 |

UMB-000038

| | |
|---|---|
| "*Noteholder Directors*" | 4.20 |
| "*Offer Amount*" | 3.09 |
| "*Offer Period*" | 3.09 |
| "*Paying Agent*" | 2.03 |
| "*Permitted Debt*" | 4.09 |
| "*Payment Default*" | 6.01 |
| "*Purchase Date*" | 3.09 |
| "*Registrar*" | 2.03 |
| "*Restricted Payments*" | 4.07 |
| "*Shareholders' Agreement*" | 4.20 |
| "*Successor Guarantor*" | 11.04 |
| "*Voting Deadline*" | 4.20 |

Section 1.03   *Incorporation by Reference of Trust Indenture Act*.

Whenever this Indenture refers to a provision of the TIA, the provision is incorporated by reference in and made a part of this Indenture.

The following TIA term used in this Indenture has the following meaning: "*obligor*" on the Notes and the Note Guarantees means the Company and the Guarantors, respectively, and any successor obligor upon the Notes and the Note Guarantees, respectively.

All other terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule under the TIA have the meanings so assigned to them.

Section 1.04   *Rules of Construction*.

Unless the context otherwise requires:

(1)    a term has the meaning assigned to it;

(2)    an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(3)    "or" is not exclusive;

UMB-000039

(4)      words in the singular include the plural, and in the plural include the singular;

(5)      "will" shall be interpreted to express a command;

(6)      provisions apply to successive events and transactions; and

(7)      references to sections of or rules under the Securities Act will be deemed to include substitute, replacement of successor sections or rules adopted by the SEC from time to time;

(8)      unless the context otherwise requires, any reference to an "Article," "Section" or "clause" refers to an Article, Section or clause, as the case may be, of this Indenture;

(9)      words used herein implying any gender shall apply to both genders;

(10)     the words "including," "includes" and similar words shall be deemed to be followed by "without limitation"; and

(11)     the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole and not any particular Article, Section, clause or other subdivision.

Section 1.05   *Intercreditor Agreement*.

(a)      Each Holder, by accepting a Note, agrees, and the Trustee and Collateral Agent each agree, that this Indenture is subject to the terms of the Intercreditor Agreement, that such Holder's and the respective rights and benefits of each of the Trustee and Collateral Agent hereunder are limited accordingly, that such Holder's and the Trustee's and the Collateral Agent's respective rights and benefits are subject to all relevant provisions of the Intercreditor Agreement and that such Holder shall comply with the provisions of the Intercreditor Agreement applicable to such Holder in its capacity as such as if such Holder were a party thereto.  In the event of any conflict between the terms of this Indenture and the Intercreditor Agreement with respect to the rights, privileges, protections, indemnities and exemptions of the Trustee (in any of its capacities hereunder) or the Collateral Agent, the terms of this Indenture shall control.  The Trustee acknowledges that it shall be treated as a Notes Secured Party in accordance with the Intercreditor Agreement.  For the avoidance of doubt, the Collateral Agent, acting as Notes Representative, is the only party authorized to take actions on behalf of the Notes Secured Parties under the Intercreditor Agreement.  In the event of a conflict between this Indenture and the Intercreditor Agreement with respect to an Enforcement Action (as defined in the Intercreditor Agreement) against the Collateral or with respect to the release of any Junior Lien (as defined in the Intercreditor Agreement) on the ABL Priority Collateral, the Intercreditor Agreement shall control.

(b)      Each Holder, by accepting a Note, hereby:

(1)      authorizes and directs the Collateral Agent to execute and deliver:

(A)      the Intercreditor Agreement;

UMB-000040

(B)     the Pledge and Security Agreement substantially in the form attached hereto as Exhibit I;

(C)     each applicable Trademark Security Agreement substantially in the form attached to the Pledge and Security Agreement as Exhibit E thereto;

(D)     each applicable Deposit Account Control Agreement substantially in the form attached to the Pledge and Security Agreement as Exhibit D thereto (or such other agreement in form and substance reasonably satisfactory to the Collateral Agent); and

(E)     each other Security Document as contemplated thereby; and

(2)     agrees to be bound by the terms of the Intercreditor Agreement.

ARTICLE 2
THE NOTES

Section 2.01     *Form and Dating.*

(a)     *General.*  The Notes and the Trustee's certificate of authentication will be substantially in the form of Exhibit A.  The Notes may have notations, legends or endorsements required by law, stock exchange rule or usage.  Each Note will be dated the date of its authentication.  The Notes shall be in integral multiples of $1.00.

The terms and provisions contained in the Notes will constitute, and are hereby expressly made, a part of this Indenture and the Company, the Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.  However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

(b)     *Global Notes.*  Notes issued in global form will be substantially in the form of Exhibit A hereto (including the Global Note Legend thereon and the "Schedule of Exchanges of Interests in the Global Note" attached thereto).  Notes issued in definitive form will be substantially in the form of Exhibit A hereto (but without the Global Note Legend thereon and without the "Schedule of Exchanges of Interests in the Global Note" attached thereto).  Each Global Note will represent such of the outstanding Notes as will be specified therein and each shall provide that it represents the aggregate principal amount of outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges and redemptions.  Any endorsement of a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby will be made by the Trustee or the Custodian, at the direction of the Trustee, in accordance with instructions given by the Holder thereof as required by Section 2.06 hereof.

Section 2.02     *Execution and Authentication.*

At least one Officer must sign the Notes for the Company by manual or facsimile signature.

33

UMB-000041

If an Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated, the Note will nevertheless be valid.

A Note will not be valid until authenticated by the manual signature of the Trustee. The signature will be conclusive evidence that the Note has been authenticated under this Indenture.

The Trustee will, upon receipt of a written order of the Company signed by two Officers (an "*Authentication Order*"), authenticate Notes for original issue that may be validly issued under this Indenture, including any Additional Notes. The aggregate principal amount of Notes outstanding at any time may not exceed the aggregate principal amount of Notes authorized for issuance by the Company pursuant to one or more Authentication Orders, except as provided in Section 2.07 hereof.

The Trustee may appoint an authenticating agent acceptable to the Company to authenticate Notes. An authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as an Agent to deal with Holders or an Affiliate of the Company.

Section 2.03   *Registrar and Paying Agent*.

The Company will maintain an office or agency where Notes may be presented for registration of transfer or for exchange ("*Registrar*") and an office or agency where Notes may be presented for payment ("*Paying Agent*"). The Registrar will keep a register of the Notes and of their transfer and exchange. The Company may appoint one or more co-registrars and one or more additional paying agents. The term "Registrar" includes any co-registrar and the term "Paying Agent" includes any additional paying agent. The Company may change any Paying Agent or Registrar without notice to any Holder. The Company will notify the Trustee in writing of the name and address of any Agent not a party to this Indenture. If the Company fails to appoint or maintain another entity as Registrar or Paying Agent, the Trustee shall act as such. The Company or any of its Subsidiaries may act as Paying Agent or Registrar.

The Company initially appoints The Depository Trust Company ("*DTC*") to act as Depositary with respect to the Global Notes.

The Company initially appoints the Trustee to act as the Registrar and Paying Agent and to act as Custodian with respect to the Global Notes.

Section 2.04   *Paying Agent to Hold Money in Trust*.

The Company will require each Paying Agent other than the Trustee to agree in writing that the Paying Agent will hold in trust for the benefit of Holders or the Trustee all money held by the Paying Agent for the payment of principal of, premium on, if any, or interest on the Notes, and will notify the Trustee of any default by the Company in making any such payment. While any such default continues, the Trustee may require a Paying Agent to pay all money held by it to the Trustee. The Company at any time may require a Paying Agent to pay all money held by it to the Trustee. Upon payment over to the Trustee, the Paying Agent (if other than the Company or a Subsidiary) will have no further liability for the money. If the Company or a Subsidiary acts as

34

UMB-000042

Paying Agent, it will segregate and hold in a separate trust fund for the benefit of the Holders all money held by it as Paying Agent.  Upon any bankruptcy or reorganization proceedings relating to the Company, the Trustee will serve as Paying Agent for the Notes.

Section 2.05   *Holder Lists*.

The Trustee will preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of all Holders and shall otherwise comply with TIA §312(a).  If the Trustee is not the Registrar, the Company will furnish to the Trustee at least seven Business Days before each interest payment date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Holders of Notes and the Company shall otherwise comply with TIA §312(a).

Section 2.06   *Transfer and Exchange*.

(a)      *Transfer and Exchange of Global Notes.*  A Global Note may not be transferred except as a whole by the Depositary to a nominee of the Depositary, by a nominee of the Depositary to the Depositary or to another nominee of the Depositary, or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary.  All Global Notes will be exchanged by the Company for Definitive Notes if:

(1)      the Company delivers to the Trustee notice from the Depositary that it is unwilling or unable to continue to act as Depositary or that it is no longer a clearing agency registered under the Exchange Act and, in either case, a successor Depositary is not appointed by the Company within 120 days after the date of such notice from the Depositary;

(2)      the Company in its sole discretion determines that the Global Notes (in whole but not in part) should be exchanged for Definitive Notes and delivers a written notice to such effect to the Trustee; or

(3)      there has occurred and is continuing a Default or Event of Default with respect to the Notes.

Upon the occurrence of either of the preceding events in (1) or (2) above, Definitive Notes shall be issued in such names as the Depositary shall instruct the Trustee.  Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.07 and 2.10 hereof.  Every Note authenticated and delivered in exchange for, or in lieu of, a Global Note or any portion thereof, pursuant to this Section 2.06 or Section 2.07 or 2.10 hereof, shall be authenticated and delivered in the form of, and shall be, a Global Note.  A Global Note may not be exchanged for another Note other than as provided in this Section 2.06(a), however, beneficial interests in a Global Note may be transferred and exchanged as provided in Section 2.06(b) hereof.

(b)      *Transfer and Exchange of Beneficial Interests in the Global Notes.*  The transfer and exchange of beneficial interests in the Global Notes will be effected through the Depositary, in accordance with the provisions of this Indenture and the Applicable Procedures.  Transfers of beneficial interests in the Global Notes also will require compliance with either subparagraph (1)

35

UMB-000043

or (2) below, as applicable, as well as one or more of the other following subparagraphs, as applicable:

(1)      *All Transfers and Exchanges of Beneficial Interests in Global Notes.*  In connection with all transfers and exchanges of beneficial interests, the transferor of such beneficial interest must deliver to the Registrar either:

(A)      both:

(1)      a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged; and

(2)      instructions given in accordance with the Applicable Procedures containing information regarding the Participant account to be credited with such increase; or

(B)      both:

(1)      a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to cause to be issued a Definitive Note in an amount equal to the beneficial interest to be transferred or exchanged; and

(2)      instructions given by the Depositary to the Registrar containing information regarding the Person in whose name such Definitive Note shall be registered to effect the transfer or exchange referred to in (1) above.

(c)      *Transfer and Exchange of Definitive Notes for Definitive Notes.*  If Definitive Notes are issued hereunder, upon request by a Holder of Definitive Notes and such Holder's compliance with the provisions of this Section 2.06(c), the Registrar will register the transfer or exchange of Definitive Notes.  Prior to such registration of transfer or exchange, the requesting Holder must present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar duly executed by such Holder or by its attorney, duly authorized in writing.  In addition, the requesting Holder must provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.06(c).

(d)      *Legends.*  The following legend will appear on the face of all Global Notes and Definitive Notes issued under this Indenture unless specifically stated otherwise in the applicable provisions of this Indenture.

"THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (1) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO

36

UMB-000044

SECTION 2.06 OF THE INDENTURE, (2) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.06(a) OF THE INDENTURE, (3) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (4) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE COMPANY.

UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.  UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO.  OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO.  OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN."

(e)        *Cancellation and/or Adjustment of Global Notes.*  At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note will be returned to or retained and canceled by the Trustee in accordance with Section 2.11 hereof.  At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note will be reduced accordingly and an endorsement will be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note will be increased accordingly and an endorsement will be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such increase.

(f)        *General Provisions Relating to Transfers and Exchanges*.

(1)        To permit registrations of transfers and exchanges, the Company will execute and the Trustee will authenticate Global Notes and Definitive Notes upon receipt of an Authentication Order in accordance with Section 2.02 hereof or at the Registrar's request.

(2)        No service charge will be made to a Holder of a beneficial interest in a Global Note or to a Holder of a Definitive Note for any registration of transfer or exchange, but the

UMB-000045

Company may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange or transfer pursuant to Sections 2.10, 3.06, 3.09, 4.10, 4.15, 4.19 and 9.05 hereof).

(3)     The Registrar will not be required to register the transfer of or exchange of any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part.

(4)     All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes will be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(5)     Neither the Registrar nor the Company will be required:

(A)     to issue, to register the transfer of or to exchange any Notes during a period beginning at the opening of business 15 days before the day of any selection of Notes for redemption under Section 3.02 hereof and ending at the close of business on the day of selection;

(B)     to register the transfer of or to exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part; or

(C)     to register the transfer of or to exchange a Note between a record date and the next succeeding interest payment date.

(6)     Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Company may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest on such Notes and for all other purposes, and none of the Trustee, any Agent or the Company shall be affected by notice to the contrary.

(7)     The Trustee will authenticate Global Notes and Definitive Notes in accordance with the provisions of Section 2.02 hereof.

(8)     All certifications, certificates and Opinions of Counsel required to be submitted to the Registrar pursuant to this Section 2.06 to effect a registration of transfer or exchange may be submitted by facsimile.

(9)     The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Note (including any transfers between or among Participants or an Indirect Participant) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by the terms of, this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.  The Trustee shall have

UMB-000046

no obligation or duty to monitor the Company's compliance with state and federal securities laws.

Section 2.07   *Replacement Notes*.

If any mutilated Note is surrendered to the Trustee or the Company and the Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Note, the Company will issue and the Trustee, upon receipt of an Authentication Order, will authenticate a replacement Note if the Trustee's requirements are met.  If required by the Trustee or the Company, an indemnity bond must be supplied by the Holder that is sufficient in the judgment of the Trustee and the Company to protect the Company, the Trustee, any Agent and any authenticating agent from any loss that any of them may suffer if a Note is replaced.  The Company may charge for its expenses in replacing a Note.

Every replacement Note is an additional obligation of the Company and will be entitled to all of the benefits of this Indenture equally and proportionately with all other Notes duly issued hereunder.

Section 2.08   *Outstanding Notes*.

The Notes outstanding at any time are all the Notes authenticated by the Trustee except for those canceled by it, those delivered to it for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those described in this Section 2.08 as not outstanding.  Except as set forth in Section 2.09 hereof, a Note does not cease to be outstanding because the Company or an Affiliate of the Company holds the Note.

If a Note is replaced pursuant to Section 2.07 hereof, it ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replaced Note is held by a protected purchaser.

If the principal amount of any Note is considered paid under Section 4.01 hereof, it ceases to be outstanding and interest on it ceases to accrue.

If the Paying Agent (other than the Company, a Subsidiary or an Affiliate of any thereof) holds, on a redemption date or maturity date, money sufficient to pay Notes payable on that date, then on and after that date such Notes will be deemed to be no longer outstanding and will cease to accrue interest.

Section 2.09   *Treasury Notes*.

In determining whether the Holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by the Company or any Guarantor, or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company or any Guarantor, will be considered as though not outstanding, except that for the purposes of determining whether the Trustee will be protected in relying on any such direction, waiver or consent, only Notes that a Responsible Officer of the Trustee actually knows are so owned will be so disregarded.

UMB-000047

Section 2.10    *Temporary Notes*.

Until certificates representing Notes are ready for delivery, the Company may prepare and the Trustee, upon receipt of an Authentication Order, will authenticate temporary Notes. Temporary Notes will be substantially in the form of certificated Notes but may have variations that the Company considers appropriate for temporary Notes and as may be reasonably acceptable to the Trustee.  Without unreasonable delay, the Company will prepare and the Trustee will authenticate definitive Notes in exchange for temporary Notes.

Holders of temporary Notes will be entitled to all of the benefits of this Indenture.

Section 2.11    *Cancellation*.

The Company at any time may deliver Notes to the Trustee for cancellation.  The Registrar and Paying Agent will forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment.  The Trustee and no one else will cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and will destroy canceled Notes (subject to the record retention requirement of the Exchange Act). Certification of the destruction of all canceled Notes will be delivered to the Company.  The Company may not issue new Notes to replace Notes that it has paid or that have been delivered to the Trustee for cancellation.

Section 2.12    *Defaulted Interest*.

If the Company defaults in a payment of interest on the Notes, it will pay the defaulted interest in any lawful manner plus, to the extent lawful, interest payable on the defaulted interest, to the Persons who are Holders on a subsequent special record date, in each case at the rate provided in the Notes and in Section 4.01 hereof.  The Company will notify the Trustee in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment.  The Company will fix or cause to be fixed each such special record date and payment date; *provided* that no such special record date may be less than 10 days prior to the related payment date for such defaulted interest.  At least 15 days before the special record date, the Company (or, upon the written request of the Company, the Trustee in the name and at the expense of the Company) will mail or cause to be mailed to Holders a notice that states the special record date, the related payment date and the amount of such interest to be paid.

Section 2.13    *Global Notes*.

Neither the Trustee nor any Agent shall have any responsibility for any actions taken or not taken by the Depositary.

Section 2.14    *CUSIP and ISIN Numbers*.

The Company in issuing the Notes may use "CUSIP" and corresponding "ISIN" numbers (if then generally in use), and, if so, the Trustee shall use "CUSIP" and corresponding "ISIN" numbers in notices of redemption as a convenience to Holders; *provided* that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of a redemption and that reliance may be placed only

40

on the other identification numbers printed on the Notes, and any such redemption shall not be affected by any defect in or omission of such numbers.  The Company will promptly notify the Trustee in writing of any change in the "CUSIP" and corresponding "ISIN" numbers.

ARTICLE 3
REDEMPTION AND PREPAYMENT

Section 3.01    *Notices to Trustee*.

If the Company elects to redeem Notes pursuant to the optional redemption provisions of Section 3.07 hereof or is required to redeem the Notes in accordance with Section 4.10 or 4.19 hereof, it must furnish to the Trustee, at least 30 days but not more than 60 days before a redemption date, an Officers' Certificate setting forth:

(1)    the clause of this Indenture pursuant to which the redemption shall occur;

(2)    the redemption date;

(3)    the principal amount of Notes to be redeemed; and

(4)    the redemption price.

Section 3.02    *Selection of Notes to Be Redeemed or Purchased*.

If less than all of the Notes are to be redeemed or purchased in an offer to purchase at any time, the Trustee will select Notes for redemption or purchase on a *pro rata* basis (or, in the case of Notes issued in global form pursuant to Article 2 hereof, based on a method that most nearly approximates a *pro rata* selection as the Trustee deems fair and appropriate) unless otherwise required by law or applicable stock exchange or depositary requirements.

In the event of partial redemption or purchase by lot, the particular Notes to be redeemed or purchased will be selected, unless otherwise provided herein, not less than 30 nor more than 60 days prior to the redemption or purchase date by the Trustee from the outstanding Notes not previously called for redemption or purchase.

The Trustee will promptly notify the Company in writing of the Notes selected for redemption or purchase and, in the case of any Note selected for partial redemption or purchase, the principal amount thereof to be redeemed or purchased.  Notes and portions of Notes selected will be in integral multiples of $1.00.  Except as provided in the preceding sentence, provisions of this Indenture that apply to Notes called for redemption or purchase also apply to portions of Notes called for redemption or purchase.

Section 3.03    *Notice of Redemption*.

Subject to the provisions of Section 3.09 hereof, at least 30 days but not more than 60 days before a redemption date, the Company will mail or cause to be mailed, by first class mail or, if the Notes are held in global book-entry form, post with DTC, a notice of redemption to each Holder whose Notes are to be redeemed at its registered address, except that redemption

41

UMB-000049

notices may be mailed more than 60 days prior to a redemption date if the notice is issued in connection with a defeasance of the Notes or a satisfaction and discharge of this Indenture pursuant to Articles 8 or 12 hereof.

The notice will identify the Notes to be redeemed and will state:

(1)     the redemption date;

(2)     the redemption price;

(3)     if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the redemption date upon surrender of such Note, a new Note or Notes in principal amount equal to the unredeemed portion will be issued upon cancellation of the original Note;

(4)     the name and address of the Paying Agent;

(5)     that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

(6)     that, unless the Company defaults in making such redemption payment, interest on Notes called for redemption ceases to accrue on and after the redemption date;

(7)     the paragraph of the Notes and/or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed;

(8)     the CUSIP number, if any, printed on the Notes being redeemed;

(9)     that no representation is made as to the correctness or accuracy of the CUSIP number, if any, listed in such notice or printed on the Notes; and

(10)    that Notes called for redemption become due on the date fixed for redemption.

At the Company's request, the Trustee will give the notice of redemption in the Company's name and at its expense; *provided, however,* that the Company has delivered to the Trustee, at least 45 days prior to the redemption date, an Officers' Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph.

Section 3.04     *Effect of Notice of Redemption*.

Once notice of redemption is mailed in accordance with Section 3.03, 3.07, 4.10 or 4.19 hereof, Notes called for redemption become irrevocably due and payable on the redemption date at the redemption price.  A notice of redemption may not be conditional.

Section 3.05     *Deposit of Redemption or Purchase Price*.

One Business Day prior to the redemption or purchase date, the Company will deposit with the Trustee or with the Paying Agent money sufficient to pay the redemption or purchase

UMB-000050

price of accrued interest on all Notes to be redeemed or purchased on that date.  The Trustee or the Paying Agent will promptly return to the Company any money deposited with the Trustee or the Paying Agent by the Company in excess of the amounts necessary to pay the redemption or purchase price of and accrued interest on all Notes to be redeemed or purchased.

If the Company complies with the provisions of the preceding paragraph, on and after the redemption or purchase date, interest will cease to accrue on the Notes or the portions of Notes called for redemption or purchase.  If a Note is redeemed or purchased on or after an interest record date but on or prior to the related interest payment date, then any accrued and unpaid interest shall be paid to the Person in whose name such Note was registered at the close of business on such record date.  If any Note called for redemption or purchase is not so paid upon surrender for redemption or purchase because of the failure of the Company to comply with the preceding paragraph, interest shall be paid on the unpaid principal, from the redemption or purchase date until such principal is paid, and to the extent lawful on any interest not paid on such unpaid principal, in each case at the rate provided in the Notes and in Section 4.01 hereof.

Section 3.06    *Notes Redeemed or Purchased in Part*.

Upon surrender of a Note that is redeemed or purchased in part, the Company will issue and, upon receipt of an Authentication Order, the Trustee will authenticate for the Holder at the expense of the Company a new Note equal in principal amount to the unredeemed or unpurchased portion of the Note surrendered.

Section 3.07    *Optional Redemption*.

(a)    At any time prior to the third anniversary of the date of this Indenture, the Company may on any one or more occasions redeem up to 35% of the aggregate principal amount of Notes originally issued under this Indenture, upon not less than 30 nor more than 60 days' notice, at a redemption price equal to 108.000% of the principal amount of the Notes redeemed, plus accrued and unpaid interest to the date of redemption (subject to the rights of Holders of Notes on the relevant record date to receive interest on the relevant interest payment date), with the net cash proceeds of an Equity Offering by the Company or a contribution to the Company's common equity capital made with the net cash proceeds of a concurrent Equity Offering by the Company's direct or indirect parent; *provided* that:

(1)    at least 65% of the aggregate principal amount of Notes originally issued under this Indenture (excluding Notes held by the Company and its Subsidiaries) remains outstanding immediately after the occurrence of such redemption;

(2)    the redemption occurs within 120 days of the date of the closing of such Equity Offering; and

(3)    the Company furnishes an Officers' Certificate certifying that such redemption is being effectuated pursuant to this Section 3.07(a) and that such Equity Offering complies with the terms of this Section 3.07(a).

(b)    At any time prior to the third anniversary of the date of this Indenture, the Company may on any one or more occasions redeem all or a part of the Notes, upon not less than

UMB-000051

30 nor more than 60 days' notice, at a redemption price equal to 100% of the principal amount of the Notes redeemed, plus the Applicable Premium as of, and accrued and unpaid interest to the date of redemption, subject to the rights of Holders of Notes on the relevant record date to receive interest due on the relevant interest payment date; *provided*, the Company shall furnish an Officers' Certificate certifying that such redemption is being effectuated pursuant to this Section 3.07(b).

(c)      Except pursuant to the preceding paragraph, the Notes will not be redeemable at the Company's option prior to the third anniversary of the date of this Indenture. Notwithstanding the foregoing, the Company shall be permitted to refinance the Notes in full at par on or prior to the first anniversary of the date of this Indenture with the proceeds of other Indebtedness; *provided*, the Company shall furnish an Officers' Certificate certifying that such redemption is being effectuated pursuant to the second sentence of this Section 3.07(c).

(d)      On or after the third anniversary of the date of this Indenture, the Company may on any one or more occasions redeem all or a part of the Notes, upon not less than 30 nor more than 60 days' notice, at the redemption prices (expressed as percentages of principal amount) set forth below, plus accrued and unpaid interest on the Notes redeemed, to the applicable redemption date, if redeemed during the period indicated below, subject to the rights of Holders of Notes on the relevant record date to receive interest on the relevant interest payment date; *provided*, the Company shall furnish an Officers' Certificate setting forth the relevant percentage below and certifying that such redemption is being effectuated pursuant to this Section 3.07(d):

| For the period below | Percentage |
|---|---|
| On or after the third anniversary of the date of this Indenture and before the fourth anniversary of the date of this Indenture | 102.000% |
| On or after the fourth anniversary of the date of this Indenture and before November 30, 2021 | 101.000% |
| On or after November 30, 2021 | 100.000% |

Unless the Company defaults in the payment of the redemption price, interest will cease to accrue on the Notes or portions thereof called for redemption on the applicable redemption date.

(e)      Any redemption pursuant to this Section 3.07 shall be made pursuant to the provisions of Sections 3.01 through 3.06 hereof.

Section 3.08   *[Reserved]*.

Section 3.09   *Offer to Purchase by Application of Excess Proceeds*.

44

UMB-000052

In the event that pursuant to clause (a)(i) of Section 4.10 hereof, the Company is required to commence an offer to all Holders to purchase Notes (an "*Asset Sale Offer*") it will follow the procedures specified below.

The Asset Sale Offer shall be made to all Holders.  The Asset Sale Offer will remain open for a period of at least 20 Business Days following its commencement and not more than 30 Business Days, except to the extent that a longer period is required by applicable law (the "*Offer Period*")*.*  No later than three Business Days after the termination of the Offer Period (the "*Purchase Date*")*,* the Company will apply all Excess Proceeds (the "*Offer Amount*") to the purchase of Notes (on a substantially *pro rata* basis based on the principal amount of Notes tendered) or, if less than the Offer Amount has been tendered, all Notes tendered in response to the Asset Sale Offer.  Payment for any Notes so purchased will be made in the same manner as interest payments are made.

If the Purchase Date is on or after an interest record date and on or before the related interest payment date, any accrued and unpaid interest will be paid to the Person in whose name a Note is registered at the close of business on such record date, and no additional interest will be payable to Holders who tender Notes pursuant to the Asset Sale Offer.

Upon the commencement of an Asset Sale Offer, the Company will send, by first class mail, or, if the Notes are held in global book-entry form, post with DTC, a notice to the Trustee and each of the Holders, with a copy to the Trustee.  The notice will contain all instructions and materials necessary to enable such Holders to tender Notes pursuant to the Asset Sale Offer.  The notice, which will govern the terms of the Asset Sale Offer, will state:

(1)     that the Asset Sale Offer is being made pursuant to this Section 3.09 and Section 4.10 hereof, as applicable, and the length of time the Asset Sale Offer will remain open;

(2)     the Offer Amount, the purchase price and the Purchase Date;

(3)     that any Note not tendered or accepted for payment will continue to accrue interest;

(4)     that, unless the Company defaults in making such payment, any Note accepted for payment pursuant to the Asset Sale Offer will cease to accrue interest after the Purchase Date;

(5)      [reserved];

(6)     that Holders electing to have Notes purchased pursuant to any Asset Sale Offer will be required to tender the Note, with the form entitled "Option of Holder to Elect Purchase" attached to the Notes completed, or transfer by book-entry transfer, to the Company, a Depositary, if appointed by the Company, or a Paying Agent at the address specified in the notice at least three days before the Purchase Date;

(7)     that Holders will be entitled to withdraw their election if the Company, the Depositary or the Paying Agent, as the case may be, receives, not later than the expiration of the Offer Period, a telegram, telex, facsimile transmission or letter setting forth the name of the

UMB-000053

Holder, the principal amount of the Note the Holder delivered for purchase and a statement that such Holder is withdrawing his election to have such Note purchased;

(8)      that, if the aggregate principal amount of Notes tendered by holders thereof exceeds the Offer Amount, the Company will select the Notes to be purchased on a *pro rata* basis based on the principal amount of Notes tendered; and

(9)      that Holders whose Notes were purchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes tendered (or transferred by book-entry transfer).

On or before the Purchase Date, the Company will, to the extent lawful, accept for payment, on a *pro rata* basis to the extent necessary, the Offer Amount of Notes or portions thereof tendered pursuant to the Asset Sale Offer or if less than the Offer Amount has been tendered, all Notes tendered, and will deliver or cause to be delivered to the Trustee the Notes properly accepted together with an Officers' Certificate stating that such Notes or portions thereof were accepted for payment by the Company in accordance with the terms of this Section 3.09.  The Company, the Depositary or the Paying Agent, as the case may be, will promptly (but in any case not later than five days after the Purchase Date) mail or deliver via DTC to each tendering Holder an amount equal to the purchase price of the Notes tendered by such Holder and accepted by the Company for purchase, and the Company will promptly issue a new Note, and the Trustee, upon written request from the Company, will authenticate and mail or deliver (or cause to be transferred by book entry) such new Note to such Holder, in a principal amount equal to any unpurchased portion of the Note tendered.  Any Note not so accepted shall be promptly mailed or delivered by the Company to the Holder thereof.  The Company will publicly announce the results of the Asset Sale Offer on the Purchase Date.

Other than as specifically provided in this Section 3.09, any purchase pursuant to this Section 3.09 shall be made pursuant to the provisions of Sections 3.01 through 3.06 hereof.  For the avoidance of doubt, the premiums set forth in Section 3.07 shall not be applicable to any purchase made pursuant to this Section 3.09.

ARTICLE 4
COVENANTS

Section 4.01      *Payment of Notes*.

The Company will pay or cause to be paid the principal of, premium on, if any, and interest on the Notes on the dates and in the manner provided in the Notes.  Principal, premium, if any, and interest will be considered paid on the date due if the Paying Agent, if other than the Company or a Subsidiary thereof, holds as of 10:00 a.m.  Eastern Time on the due date money deposited by the Company in immediately available funds and designated for and sufficient to pay all principal, premium, if any, and interest, if any, then due.

The Company will pay interest (including post-petition interest in any proceeding under the Bankruptcy Code) on overdue principal at a rate that is 2% higher than the then applicable interest rate on the Notes to the extent lawful; it will pay interest (including post-petition interest

UMB-000054

in any proceeding under the Bankruptcy Code) on overdue installments of interest (without regard to any applicable grace period), at the same rate to the extent lawful.

Section 4.02    *Maintenance of Office or Agency*.

The Company will maintain an office or agency (which may be an office of the Trustee or an affiliate of the Trustee, Registrar or co-registrar) where Notes may be surrendered for registration of transfer or for exchange and where notices and demands to or upon the Company in respect of the Notes and this Indenture may be served.  The Company will give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency.  If at any time the Company fails to maintain any such required office or agency or fails to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee.

The Company may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided, however,* that no such designation or rescission will in any manner relieve the Company of its obligation to maintain an office or agency for such purposes.  The Company will give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

The Company hereby designates the Corporate Trust Office of the Trustee as one such office or agency of the Company in accordance with Section 2.03 hereof.

Section 4.03    *Reports*.

(a)    Whether or not required by the rules and regulations of the SEC, so long as any Notes are outstanding, the Company will furnish to the Holders of Notes and the Trustee within the time periods specified in the SEC's rules and regulations (except that items included in annual reports will not be required to be furnished until 120 days after the Company's fiscal year end):

(1)    The "Management Discussion and Analysis of Financial Condition and Results of Operations",  financial statements and notes thereto that would be required to be included in all quarterly and annual reports that would be required to be filed with the SEC on Forms 10-Q and 10-K if the Company were required to file reports; and

(2)    all current reports that would be required to be filed with the SEC on Form 8-K if the Company were required to file such reports.

All such reports will be prepared in all material respects in accordance with all of the rules and regulations applicable to such sections provided of such reports.  Each annual report will include a report on the Company's consolidated financial statements by the Company' s certified independent accountants.  The Company will at all times comply with TIA §314(a).

The Company will post such reports on a password-protected company website no later than the date the Company is required to furnish such reports to the Trustee and the Holders of

UMB-000055

the Notes and maintain such posting for so long as any Notes remain outstanding; *provided*, *however*, that the 10-K of the Company for the fiscal year ended December 31, 2016 shall be furnished and posted no later than the date that is 60 days after the date of this Indenture.  The Persons that may be entitled to access such reports on such company website may be limited to the Trustee, Holders of the Notes, Beneficial Owners of the Notes, bona fide prospective investors (which investors may not be Competitors or Competitor Affiliates), securities analysts and market makers.

Delivery of such reports, information or documents to the Trustee is for informational purposes only and the Trustee's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officers' Certificates).

The Company will, for so long as any Notes remain outstanding, use its commercially reasonable efforts to hold and participate in quarterly conference calls with the Holders of the Notes, Beneficial Owners of the Notes, bona fide prospective investors (which investors may not be Competitors or Competitor Affiliates), securities analysts and market makers to discuss such financial information and material developments with respect to the Company and its business no later than ten (10) Business Days after distribution of such financial information.

(b)    If the Company has designated any of its Subsidiaries as Unrestricted Subsidiaries, then the quarterly and annual financial information required by paragraph (a) of this Section 4.03 will include a reasonably detailed presentation, either on the face of the financial statements or in the footnotes thereto, and in "Management's Discussion and Analysis of Financial Condition and Results of Operations," of the financial condition and results of operations of the Company and its Restricted Subsidiaries separate from the financial condition and results of operations of the Unrestricted Subsidiaries of the Company.

(c)    For so long as any Notes remain outstanding, the Company will furnish to the Holders of Notes, Beneficial Owners of the Notes, bona fide prospective investors (which investors may not be Competitors or Competitor Affiliates), securities analysts and market makers, upon their request, the reports described above.

Section 4.04    *Compliance Certificate*.

(a)    The Company and each Guarantor (to the extent that such Guarantor is so required under the TIA) shall deliver to the Trustee, (i) within 90 days after the end of each fiscal year (beginning with the fiscal year ending December 31, 2017) and (ii) within 45 days after the last day of the fiscal quarter ending September 30, 2017, an Officers' Certificate stating that a review of the activities of the Company and its Subsidiaries during the preceding fiscal year (or the fiscal quarter ending September 30, 2017, solely with respect to the foregoing clause (ii)) has been made under the supervision of the signing Officers with a view to determining whether the Company has kept, observed, performed and fulfilled its obligations under this Indenture and the Security Documents, and further stating, as to each such Officer signing such certificate, that to the best of his or her knowledge the Company has kept, observed, performed and fulfilled each and every covenant contained in this Indenture and the Security Documents and is not in default

48

in the performance or observance of any of the terms, provisions and conditions of this Indenture or the Security Documents (or, if a Default or Event of Default has occurred, describing all such Defaults or Events of Default of which he or she may have knowledge and what action the Company is taking or proposes to take with respect thereto) and that to the best of his or her knowledge no event has occurred and remains in existence by reason of which payments on account of the principal of, premium on, if any, or interest on the Notes is prohibited or if such event has occurred, a description of the event and what action the Company is taking or proposes to take with respect thereto.  Such certificate delivered within 90 days after the end of each fiscal year set forth in the foregoing clause (i) shall additionally confirm that the Company has taken all necessary actions to maintain the security interests and maintain perfection of the Collateral and shall be accompanied by an Opinion of Counsel as to the maintenance of the security interests and continued perfection of the Collateral.  Such certificate and Opinions of Counsel shall be jointly addressed to the Trustee and the Collateral Agent.

(b)     So long as not contrary to the then current recommendations of the American Institute of Certified Public Accountants, the year-end financial statements delivered pursuant to Section 4.03 above shall be accompanied by a written statement of the Company's independent public accountants (who shall be a firm of established national reputation) that in making the examination necessary for certification of such financial statements, nothing has come to their attention that would lead them to believe that the Company has violated any provisions of Article 4 or Article 5 hereof or, if any such violation has occurred, specifying the nature and period of existence thereof, it being understood that such accountants shall not be liable directly or indirectly to any Person for any failure to obtain knowledge of any such violation.

(c)     So long as any of the Notes are outstanding, the Company will deliver to the Trustee, forthwith upon any Officer becoming aware of any Default or Event of Default, an Officers' Certificate specifying such Default or Event of Default and what action the Company is taking or proposes to take with respect thereto.

Section 4.05   *Taxes*.

The Company will pay, and will cause each of its Subsidiaries to pay, prior to delinquency, all federal income and other material taxes, assessments, charges and governmental levies except any such tax, assessment, charge or levy whose amount, applicability or validity is being contested in good faith and by appropriate proceedings promptly instituted and diligently conducted, provided that any reserve or other appropriate provision as is required in conformity with GAAP has been made therefor.

Section 4.06   *Stay, Extension and Usury Laws*.

The Company and each of the Guarantors covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Company and each of the Guarantors (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but

UMB-000057

will suffer and permit the execution of every such power as though no such law has been enacted.

Section 4.07   *Restricted Payments*.

(a)     The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly:

(1)     declare or pay any dividend or make any other payment or distribution on account of the Company's or any of its Restricted Subsidiaries' Equity Interests (including, without limitation, any payment in connection with any merger or consolidation involving the Company or any of its Restricted Subsidiaries) or to the direct or indirect holders of the Company's or any of its Restricted Subsidiaries' Equity Interests in their capacity as such (other than dividends or distributions payable in Equity Interests (other than Disqualified Stock) of the Company and other than dividends or distributions payable to the Company or a Restricted Subsidiary of the Company);

(2)     purchase, redeem or otherwise acquire or retire for value (including, without limitation, in connection with any merger or consolidation involving the Company) any Equity Interests of the Company or any direct or indirect parent of the Company (other than purchases, redemptions, defeasances and other acquisitions or retirements of Equity Interests, in each case held by a Restricted Subsidiary);

(3)     make any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value any Indebtedness of the Company or any Guarantor that is unsecured, secured only by a Lien that is junior to the Liens securing the Notes or any Note Guarantee or contractually subordinated to the Notes or to any Note Guarantee (excluding any intercompany Indebtedness between or among the Company and any of its Restricted Subsidiaries), except a payment of interest or principal at the Stated Maturity thereof; or

(4)     make any Restricted Investment (all such payments and other actions set forth in these clauses (1) through (4) above being collectively referred to as "*Restricted Payments*").

(b)     The provisions of Section 4.07(a) hereof will not prohibit:

(1)     [reserved];

(2)     [reserved];

(3)     so long as no Default or Event of Default has occurred and is continuing, the declaration and payment of dividends in an aggregate amount per annum not to exceed 6% of the net cash proceeds received by, or contributed to, the Company in connection with any Public Equity Offering occurring after the date of this Indenture;

(4)     the repurchase, redemption, defeasance or other acquisition or retirement for value of Indebtedness of the Company or any Guarantor that is unsecured, secured only by a Lien that is junior to the Liens securing the Notes or any Note Guarantee or contractually

UMB-000058

subordinated to the Notes or to any Note Guarantee with the net cash proceeds from a substantially concurrent incurrence of Permitted Refinancing Indebtedness;

(5)    [reserved];

(6)    [reserved];

(7)    the issuance of the PIK Preferred Stock by the Company and pay-in-kind accretion in respect thereof;

(8)    payments of cash, dividends, distributions, advances or other Restricted Payments by the Company or any of its Restricted Subsidiaries to allow the payment of cash in lieu of the issuance of fractional shares upon (i) the exercise of options or warrants or (ii) the conversion or exchange of Capital Stock of any such Person;

(9)    so long as no Default or Event of Default has occurred and is continuing, other Restricted Payments in an aggregate amount not to exceed $2.5 million since the date of this Indenture; and

(10)    (i) redemptions of PIK Preferred Stock with Excess Cash Flow pursuant to the terms of the PIK Preferred Stock to the extent not otherwise prohibited by the terms of this Indenture or by applicable law, (ii) payments of non-cash dividends in respect of the PIK Preferred Stock and (iii) payments of cash dividends in respect of the PIK Preferred Stock if the Senior Interest Coverage Ratio for the Company's most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date such dividend is made is greater than or equal to 2.50 to 1.00, determined on a pro forma basis (including the payment of such dividends).

In determining whether any Restricted Payment is permitted by the covenant described under this Section 4.07, the Company and its Restricted Subsidiaries may allocate all or any portion of such Restricted Payment among the categories described in clauses (1) through (10) of Section 4.07(b) or among such categories and the types of Restricted Payments described in Section 4.07(a) (including categorization as a Permitted Investment).

Section 4.08    *Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries*.

(a)    The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create or permit to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary to:

(1)    pay dividends or make any other distributions on its Capital Stock to the Company or any of its Restricted Subsidiaries, or with respect to any other interest or participation in, or measured by, its profits, or pay any Indebtedness owed to the Company or any of its Restricted Subsidiaries;

(2)    make loans or advances to the Company or any of its Restricted Subsidiaries; or

UMB-000059

(3)      sell, lease or transfer any of its properties or assets to the Company or any of its Restricted Subsidiaries.

(b)      The restrictions in Section 4.08(a) hereof will not apply to encumbrances or restrictions existing under or by reason of:

(1)      agreements governing Existing Indebtedness and Credit Facilities as in effect on the date of this Indenture and any amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings of those agreements; *provided* that the amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings are not materially more restrictive, taken as a whole, with respect to such dividend and other payment restrictions than those contained in those agreements on the date of this Indenture;

(2)      this Indenture, the Notes, the Note Guarantees and the Security Documents;

(3)      agreements governing other Indebtedness permitted to be incurred under Section 4.09 hereof and any amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings of those agreements; *provided* that the restrictions therein are not materially more restrictive, taken as a whole, than those contained in this Indenture, the Notes and the Note Guarantees;

(4)      applicable law, rule, regulation or order;

(5)      any instrument governing Indebtedness or Capital Stock of a Person acquired by the Company or any of its Restricted Subsidiaries as in effect at the time of such acquisition (except to the extent such Indebtedness or Capital Stock was incurred in connection with or in contemplation of such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person, or the property or assets of the Person, so acquired; *provided* that, in the case of Indebtedness, such Indebtedness was permitted by the terms of this Indenture to be incurred;

(6)      customary non-assignment provisions in contracts and licenses entered into in the ordinary course of business;

(7)      purchase money obligations for property acquired in the ordinary course of business and Capital Lease Obligations that impose restrictions on the property purchased or leased of the nature described in clause (3) of Section 4.08(a) hereof;

(8)      any agreement for the sale or other disposition of a Restricted Subsidiary that restricts distributions by that Restricted Subsidiary pending its sale or other disposition;

(9)      Permitted Refinancing Indebtedness; *provided* that the restrictions contained in the agreements governing such Permitted Refinancing Indebtedness are not materially more restrictive, taken as a whole, than those contained in the agreements governing the Indebtedness being refinanced;

UMB-000060

(10)    Liens permitted to be incurred under the provisions of Section 4.12 hereof that limit the right of the debtor to dispose of the assets subject to such Liens;

(11)    provisions limiting the disposition or distribution of assets or property in joint venture agreements, asset sale agreements, sale-leaseback agreements, stock sale agreements and other similar agreements (including agreements entered into in connection with a Restricted Investment) entered into with the approval of the Company's Board of Directors, which limitation is applicable only to the assets that are the subject of such agreements;

(12)    restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(13)    any encumbrance or restriction in connection with an acquisition of property, so long as such encumbrance or restriction relates solely to the property so acquired and was not created in anticipation of such acquisition;

(14)    provisions in agreements or instruments which prohibit the payment of dividends or the making of other distribution with respect to any class of Capital Stock of a Person other than on a pro rata basis;

(15)    any restrictions on the transfer of assets subject to any lien permitted under this Indenture imposed by the holder of such lien;

(16)    customary provision in partnership agreements, limited liability company organizational governance documents, joint venture agreements and other similar agreements that restrict the transfer of ownership interests in such partnership, limited liability company, joint venture of similar Person; and

(17)    any encumbrances or restrictions imposed by any amendment, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancing of the contracts, instruments, or obligations referred to in clauses (1) through (16) above; *provided* that the encumbrances or restrictions in such amendments, modifications, restatements, renewals, increases supplements, refundings, replacements or refinancing are not materially more restrictive, in the good faith of the Board of Directors of the Company, taken as a whole, than the encumbrances or restrictions prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

Section 4.09    *Incurrence of Indebtedness and Issuance of Preferred Stock.*

(a)    The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to (collectively, "*incur*") any Indebtedness (including Acquired Debt), and the Company will not issue any Disqualified Stock and will not permit any of its Restricted Subsidiaries to issue any shares of preferred stock; *provided, however,* that the Company may incur Indebtedness (including Acquired Debt) or issue Disqualified Stock, and the Guarantors may incur Indebtedness (including Acquired Debt) or issue preferred stock, if the Fixed Charge Coverage Ratio for the Company's most recently ended four full fiscal quarters for which internal financial statements are available immediately

53

preceding the date on which such additional Indebtedness is incurred or such Disqualified Stock or such preferred stock is issued, as the case may be, would have been at least 2.50 to 1.0, determined on a pro forma basis (including a pro forma application of the net proceeds therefrom), as if the additional Indebtedness had been incurred or the Disqualified Stock or the preferred stock had been issued, as the case may be, at the beginning of such four-quarter period.

(b)    The provisions of Section 4.09(a) hereof will not prohibit the incurrence of any of the following items of Indebtedness (collectively, "*Permitted Debt*"):

(1)    the incurrence by the Company and any Guarantor of Indebtedness and letters of credit under Credit Facilities in an aggregate principal amount at any one time outstanding under this clause (1) (with letters of credit being deemed to have a principal amount equal to the maximum potential liability of the Company and its Restricted Subsidiaries thereunder) not to exceed the greater of (x) $25.0 million and (y) 20.0% of Consolidated Tangible Assets;

(2)    the incurrence by the Company and its Restricted Subsidiaries of the Existing Indebtedness;

(3)    the incurrence by the Company and the Guarantors of Indebtedness represented by the Notes and the related Note Guarantees to be issued on the date of this Indenture;

(4)    the incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness represented by Capital Lease Obligations, mortgage financings or purchase money obligations, in each case, incurred for the purpose of financing all or any part of the purchase price or cost of design, construction, installation or improvement of property, plant or equipment used in the business of the Company or any of its Restricted Subsidiaries, in an aggregate principal amount, including all Permitted Refinancing Indebtedness incurred to renew, refund, refinance, replace, defease or discharge any Indebtedness incurred pursuant to this clause (4), not to exceed $5.0 million at any time outstanding;

(5)    the incurrence by the Company or any of its Restricted Subsidiaries of Permitted Refinancing Indebtedness in exchange for, or the net proceeds of which are used to renew, refund, refinance, replace, defease or discharge any Indebtedness (other than intercompany Indebtedness) that was permitted by this Indenture to be incurred under Section 4.09(a) hereof or clauses (2), (3), (4), (5), (13) or (15) of this Section 4.09(b);

(6)    the incurrence by the Company or any of its Restricted Subsidiaries of intercompany Indebtedness between or among the Company and any of its Restricted Subsidiaries; *provided, however,* that:

(A)    if the Company or any Guarantor is the obligor on such Indebtedness and the payee is not the Company or a Guarantor, such Indebtedness must be unsecured and expressly subordinated to the prior payment in full in cash of all Obligations then due with respect to the Notes, in the case of the Company, or the Note Guarantee, in the case of a Guarantor; and

(B)    (1) any subsequent issuance or transfer of Equity Interests that results in any such Indebtedness being held by a Person other than the Company or a Restricted

UMB-000062

Subsidiary of the Company and (2) any sale or other transfer of any such Indebtedness to a Person that is not either the Company or a Restricted Subsidiary of the Company,

will be deemed, in each case, to constitute an incurrence of such Indebtedness by the Company or such Restricted Subsidiary, as the case may be, that was not permitted by this clause (6);

(7)      the issuance by any of the Company's Restricted Subsidiaries to the Company or to any of its Restricted Subsidiaries of shares of preferred stock; *provided, however,* that:

(A)      any subsequent issuance or transfer of Equity Interests that results in any such preferred stock being held by a Person other than the Company or a Restricted Subsidiary of the Company; and

(B)      any sale or other transfer of any such preferred stock to a Person that is not either the Company or a Restricted Subsidiary of the Company, will be deemed, in each case, to constitute an issuance of such preferred stock by such Restricted Subsidiary that was not permitted by this clause (7);

(8)      the issuance of the PIK Preferred Stock by the Company;

(9)      the guarantee by the Company or any of the Guarantors of Indebtedness of the Company or a Restricted Subsidiary of the Company and the guarantee by any Foreign Subsidiary of Indebtedness of another Foreign Subsidiary, in each case, to the extent that the guaranteed Indebtedness was permitted to be incurred by another provision of this Section 4.09; *provided* that if the Indebtedness being guaranteed is subordinated to or *pari passu* with the Notes, then the Guarantee must be subordinated or *pari passu,* as applicable, to the same extent as the Indebtedness guaranteed;

(10)      the incurrence by the Company or any of its Restricted of Indebtedness in respect of workers' compensation claims, self-insurance obligations, bankers' acceptances, performance and surety bonds in the ordinary course of business;

(11)      the incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds, so long as such Indebtedness is covered within five Business Days;

(12)      Indebtedness of the Company or any Restricted Subsidiary consisting of guarantees, indemnities or obligations in respect of purchase price adjustments, earn-outs or similar obligations in connection with the acquisition or disposition of assets or a Subsidiary;

(13)      Indebtedness or Disqualified Stock of Persons (other than Indebtedness or Disqualified Stock incurred in anticipation of such acquisition or merger) that are acquired by the Company or any Restricted Subsidiary or merged into the Company or a Restricted Subsidiary in accordance with the terms of this Indenture; *provided* that after giving effect to such acquisition, either (a) the Company would be permitted to incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio as provided under this Section 4.09 or (b) the Fixed

UMB-000063

Charge Coverage Ratio would be greater than such Fixed Charge Coverage Ratio immediately prior to such acquisition;

(14)   the incurrence by the Company or any of the Guarantors of additional Indebtedness in an aggregate principal amount (or accreted value, as applicable) at any one time outstanding, including all Permitted Refinancing Indebtedness incurred to renew, refund, refinance, replace, defease or discharge any Indebtedness incurred pursuant to this clause (14), not to exceed $5.0 million at any one time outstanding;

(15)   any incurrence of Indebtedness that may deemed to be incurred in the ordinary course of business of the Company or any Restricted Subsidiary of the Company with respect to obligations arising under the HSP Agreements, in an aggregate amount not to exceed, at any one time outstanding, the greater of (x) $25.0 million and (y) 7.5% of revenue of the Company and its Restricted Subsidiaries on a consolidated basis attributable to the HSP Agreements for the last twelve months;

(16)   any guarantee of the obligations of any Restricted Subsidiary in connection with lease expenses, obligations under customary supplier or services contracts arising in the ordinary course of business or any incurrence of debt not otherwise prohibited hereunder; and

(17)   the financing of insurance premiums in the ordinary course of business.

The Company will not incur, and will not permit any Guarantor to incur, any Indebtedness (including Permitted Debt) that is contractually subordinated in right of payment to any other Indebtedness of the Company or such Guarantor unless such Indebtedness is also contractually subordinated in right of payment to the Notes and the applicable Note Guarantee on substantially identical terms; *provided, however,* that no Indebtedness will be deemed to be contractually subordinated in right of payment to any other Indebtedness solely by virtue of being unsecured or by virtue of being secured on a junior priority basis.

For purposes of determining compliance with this Section 4.09, in the event that an item of Indebtedness meets the criteria of more than one of the categories of Permitted Debt described in clauses (1) through (17) above, or is entitled to be incurred pursuant to Section 4.09(a) hereof, the Company will be permitted to classify such item of Indebtedness on the date of its incurrence in any manner that complies with this Section 4.09.  Indebtedness under Credit Facilities (including under the Existing ABL Agreement) in effect on the date on which Notes are first issued and authenticated under this Indenture will be deemed to have been incurred in reliance on the exception provided by clause (1) of the definition of Permitted Debt.

The accrual of interest or preferred stock dividends, the accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms and the payment of dividends on preferred stock or Disqualified Stock in the form of additional shares of the same class of preferred stock or Disqualified Stock will not be deemed to be an incurrence of Indebtedness or an issuance of preferred stock or Disqualified Stock for purposes of this Section 4.09; *provided,* in each such case, that the amount thereof is included in Fixed Charges of the Company as accrued.

The amount of any Indebtedness outstanding as of any date will be:

UMB-000064

(1)     the accreted value of the Indebtedness, in the case of any Indebtedness issued with original issue discount;

(2)     the principal amount of the Indebtedness, in the case of any other Indebtedness; and

(3)     in respect of Indebtedness of another Person secured by a Lien on the assets of the specified Person, the lesser of:

(A)     the Fair Market Value of such assets at the date of determination; and

(B)     the amount of the Indebtedness of the other Person.

Section 4.10    *Asset Sales*.

The Company will not, and will not permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless:

(1)     with respect to any Asset Sale not constituting a Casualty Event, the Company (or the Restricted Subsidiary, as the case may be) receives consideration at the time of the Asset Sale at least equal to the Fair Market Value (measured as of the date of the definitive agreement with respect to such Asset Sale) of the assets or Equity Interests issued or sold or otherwise disposed of;

(2)     with respect to any Asset Sale not constituting a Casualty Event, at least 75% of the consideration received in the Asset Sale by the Company or such Restricted Subsidiary, as the case may be, is in the form of cash or Cash Equivalents.  For purposes of this provision, each of the following will be deemed to be cash:

(A)     any liabilities, as shown on the Company's most recent consolidated balance sheet, of the Company or any Restricted Subsidiary (other than contingent liabilities, liabilities that are by their terms subordinated to the Notes or any Note Guarantee and liabilities that are unsecured or secured by Liens that are junior to the Liens securing the Notes) that are assumed by the transferee of any such assets pursuant to a customary novation or indemnity agreement that releases the Company or such Restricted Subsidiary from or indemnifies against further liability;

(B)     any securities, notes or other obligations received by the Company or any such Restricted Subsidiary from such transferee that are within 60 days of the Asset Sale and subject to ordinary settlement periods, converted by the Company or such Restricted Subsidiary into cash, to the extent of the cash received in that conversion;

(C)     [reserved]; and

(D)     any Designated Non-cash Consideration received by the Company or any Restricted Subsidiary in such Asset Sale having an aggregate Fair Market Value, taken together with all other Designated Non-cash Consideration received pursuant to this clause (D) that is at that time outstanding, not to exceed $5.0 million at the time of the

57

UMB-000065

receipt of such Designated Non-cash Consideration, with the Fair Market Value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value; and

(3)      in the case of an Asset Sale that constitutes a Sale of Notes Priority Collateral, the Company or the applicable Restricted Subsidiary, as the case may be, promptly deposits the Net Proceeds therefrom immediately upon receipt thereof as Collateral into one or more Collateral Proceeds Accounts held by or under the "control" of (within the meaning of the Uniform Commercial Code) the Collateral Agent or its agent as security for the Notes pursuant to arrangements reasonably satisfactory to the Collateral Agent pending application in accordance with the following paragraphs; *provided* that no such deposit will be required except to the extent the aggregate Net Proceeds from all sales of Notes Priority Collateral that are not held in a Collateral Proceeds Account exceeds $5.0 million.

Within 360 days after the receipt of any Net Proceeds from an Asset Sale other than (1) a Sale of Notes Priority Collateral, or (2) a Sale of a Guarantor, the Company or such Restricted Subsidiary may apply such Net Proceeds at its option and to the extent it so elects:

(1)      to repay any Indebtedness and other Obligations that are secured by a Permitted Prior Lien solely to the extent required by the terms of such Indebtedness;

(2)      to repay Indebtedness and other obligations of a Restricted Subsidiary that is not a Guarantor, other than Indebtedness owed to the Company or a Restricted Subsidiary of the Company;

(3)      to acquire all or substantially all of the assets of, or any Capital Stock of, another Permitted Business, if, after giving effect to any such acquisition of Capital Stock, the Permitted Business is or becomes a Restricted Subsidiary of the Company;

(4)      to make an Investment in Replacement Assets or make a capital expenditure in or that is used or useful in a Permitted Business; or

(5)      any combination of the foregoing;

*provided* that the Company will be deemed to have complied with the provisions described in clauses (3) and (4) of this paragraph if and to the extent that, within 360 days after the Asset Sale that generated the Net Proceeds, the Company has entered into and not abandoned or rejected a binding agreement to acquire the assets or Capital Stock of a Permitted Business, make an Investment in Replacement Assets or make a capital expenditure in compliance with the provision described in clauses (3) and (4) of this paragraph, and that acquisition, purchase or capital expenditure is thereafter completed within 180 days after the end of such 360-day period. Pending the final application of any such Net Proceeds, the Company may invest such Net Proceeds in any manner that is not prohibited by this Indenture.

Within 360 days after the receipt of any Net Proceeds from an Asset Sale that constitutes (1) a Sale of Notes Priority Collateral or (2) a Sale of a Guarantor, the Company (or the applicable Restricted Subsidiary, as the case may be) may apply an amount equal to such Net Proceeds:

UMB-000066

(1)	to make an Investment in other assets or property that would constitute Notes Priority Collateral;

(2)	to make an Investment in Capital Stock of another Permitted Business if, after giving effect to such Investment, the Permitted Business becomes a Guarantor or is merged into or consolidated with the Company or any Guarantor;

(3)	to make a capital expenditure with respect to assets that constitute Notes Priority Collateral;

(4)	to repay Indebtedness secured by a Permitted Prior Lien on any Notes Priority Collateral that was sold in such Asset Sale solely to the extent required by the terms of such Indebtedness; or

(5)	any combination of the foregoing;

*provided* that the Company will be deemed to have complied with the provisions described in clauses (1), (2) and (3) of this paragraph if, and to the extent that, within 360 days after the Asset Sale that generated the Net Proceeds, the Company has entered into and not abandoned or rejected a binding agreement to make an Investment in assets or property that would constitute Notes Priority Collateral or make an Investment in Capital Stock of another Permitted Business or to make a capital expenditure with respect to assets that constitute Notes Priority Collateral in compliance with the provisions described in clauses (1), (2) and (3) of this paragraph, and that purchase or capital expenditure is thereafter completed within 180 days after the end of such 360-day period.  Upon completion of such Investment in assets or property that constitutes Notes Priority Collateral or Capital Stock, the Company shall enter into appropriate Security Documents or amend existing Security Documents, as applicable, with the Collateral Agent creating and perfecting a Lien on such Notes Priority Collateral or Capital Stock, as applicable, in favor of the Collateral Agent and deliver any such Capital Stock accompanied by share transfer powers or other instruments of transfer to the Collateral Agent.

Any Net Proceeds from Asset Sales that are not applied or invested as provided in the second and third paragraphs of this Section 4.10 will constitute "*Excess Proceeds.*" Within 15 Business Days after the aggregate amount of Excess Proceeds exceeds $2.5 million, the Company will perform one of the following:

(a)	if the Senior Secured Leverage Ratio, calculated on a pro forma basis giving effect to such Asset Sale, is less than or equal to 3.50 to 1.00 (i) make an Asset Sale Offer to all Holders of Notes to purchase, prepay or redeem the maximum principal amount of Notes that may be purchased, prepaid or redeemed out of the Excess Proceeds or (ii) redeem the PIK Preferred Stock with the Excess Proceeds; or

(b)	if the Senior Secured Leverage Ratio, calculated on a pro forma basis giving effect to such Asset Sale, is greater than 3.50 to 1.00, make an Asset Sale Offer to all Holders of Notes to purchase, prepay or redeem the maximum principal amount of Notes that may be purchased, prepaid or redeemed out of the Excess Proceeds.

UMB-000067

The offer price for the Notes in any Asset Sale Offer will be equal to 100% of the principal amount of the Notes, plus accrued and unpaid interest on the Notes to the date of purchase, prepayment or redemption, subject to the rights of Holders of Notes on the relevant record date to receive interest due on the relevant interest payment date, and will be payable in cash.  If any Excess Proceeds remain after consummation of an Asset Sale Offer, the Company may use such Excess Proceeds for any purpose expressly permitted by this Indenture.  If the aggregate principal amount of Notes tendered into such Asset Sale Offer exceeds the amount of Excess Proceeds, the Notes shall be purchased on a pro rata basis based on the principal amount of Notes tendered.  Upon completion of each Asset Sale Offer, the amount of Excess Proceeds shall be reset at zero.

For the avoidance of doubt, the premiums set forth in Section 3.07 shall not be applicable to any redemption made pursuant to this Section 4.10.

The Company will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws and regulations are applicable in connection with each repurchase of Notes pursuant to an Asset Sale Offer.  To the extent that the provisions of any securities laws or regulations conflict with the provisions of Section 3.09 hereof or this Section 4.10, the Company will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under Section 3.09 hereof or this Section 4.10 by virtue of such compliance.

Section 4.11    *Transactions with Affiliates*.

(a)    The Company will not, and will not permit any of its Restricted Subsidiaries to, make any payment to or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Company (each, an "*Affiliate Transaction*"), unless:

(1)    the Affiliate Transaction is on terms that are no less favorable to the Company or the relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Company or such Restricted Subsidiary with an unrelated Person; and

(2)    the Company delivers to the Trustee:

(A)    with respect to any Affiliate Transaction or series of related Affiliate Transactions, a resolution of the Board of Directors of the Company set forth in an Officers' Certificate certifying that such Affiliate Transaction complies with clause (1) of this Section 4.11(a) and that such Affiliate Transaction has been approved by a majority of the disinterested members of the Board of Directors of the Company; and

(B)    with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $10.0 million, an opinion as to the fairness to the Company or such Subsidiary of such Affiliate Transaction from a financial point of view issued by an accounting, appraisal or investment banking firm of national standing.

60

(b)    The following items will not be deemed to be Affiliate Transactions and, therefore, will not be subject to the provisions of Section 4.11(a) hereof:

(1)    any employment agreement, employee benefit plan, Officer or director indemnification agreement or any similar arrangement entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of business and payments pursuant thereto, other than with respect to any Principal;

(2)    transactions between or among the Company and/or its Restricted Subsidiaries;

(3)    transactions with a Person (other than an Unrestricted Subsidiary of the Company) that is an Affiliate of the Company solely because the Company owns, directly or through a Restricted Subsidiary, an Equity Interest in, or controls, such Person;

(4)    payment of reasonable and customary fees and reimbursements of expenses (pursuant to indemnity arrangements or otherwise) of Officers, directors, employees or consultants of the Company or any of its Restricted Subsidiaries;

(5)    any issuance of Equity Interests (other than Disqualified Stock) of the Company to Affiliates of the Company;

(6)    Restricted Payments that do not violate Section 4.07 hereof;

(7)    loans or advances to employees in the ordinary course of business not to exceed $1.0 million in the aggregate at any one time outstanding; *provided*, that no individual employee of the Company shall receive loans and advances in an aggregate amount in excess of $25,000;

(8)    any transaction pursuant to any agreement in existence on the date of this Indenture or any amendment or replacement thereof that, taken in its entirety, is no less favorable to the Company than the agreement as in effect of the date of this Indenture; and

(9)    transactions with customers, clients, suppliers, or purchasers or sellers of goods, in each case, in the ordinary course of business, provided that as determined in good faith by the Board of Directors or senior management of the Company, such transactions are on terms that are no materially less favorable, taken as a whole, to the Company or the relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Company or such Restricted Subsidiary with an unrelated Person.

Section 4.12    *Liens*.

The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind securing Indebtedness or trade payables on any asset now owned or hereafter acquired, except Permitted Liens.

Section 4.13    *Business Activities*.

UMB-000069

The Company will not, and will not permit any of its Restricted Subsidiaries to, engage in any business other than Permitted Businesses, except to such extent as would not be material to the Company and its Restricted Subsidiaries taken as a whole.

Section 4.14   *Corporate Existence*.

Subject to Article 5 hereof, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect:

(1)      its corporate existence, and the corporate, partnership or other existence of each of its Subsidiaries, in accordance with the respective organizational documents (as the same may be amended from time to time) of the Company or any such Subsidiary; *provided*, that the Company shall be permitted to effect the Reincorporation upon delivering (w) at least thirty (30) days' prior written notice to the Trustee and the Collateral Agent of the proposed Reincorporation, (x) evidence to the Trustee and the Collateral Agent that (i) the Company's common stockholders have validly approved the Reincorporation and (ii) the Reincorporation shall have occurred and become effective under applicable law, accompanied by an Officers' Certificate and Opinion of Counsel (which Opinion of Counsel shall include legal opinions (A) as to the enforceability of the Notes Documents against the Company and its Subsidiaries (in each case, after giving effect to the Reincorporation), (B) that the supplemental indenture entered into in connection with the Reincorporation has been duly and validly authorized, executed and delivered and that all conditions precedent to such supplemental indenture have been complied with, (C) that all Notes Obligations under this Indenture and the other Notes Documents are, and continue to be, legal, valid and binding obligations of the re-incorporated Company and its Subsidiaries and (D) that all necessary actions, including all filings, have been taken or made by the Company and its Subsidiaries to maintain the perfection of the security interests in favor of the Secured Parties in the Collateral), (y) true, correct and complete copies of the related amendment to the Company's certificate of incorporation and the related Reincorporation documents filed with the States of Texas and Delaware to accomplish the Reincorporation and (z) a supplemental indenture to the Trustee and Collateral Agent, duly executed and delivered by the Company, which supplemental indenture shall state, *inter alia*, that the re-incorporated Company shall have all duties, rights and responsibilities of the Company under this Indenture and the other Notes Documents, with the same effect as if it had been named originally herein and therein, and that the re-incorporated Company shall assume all of the obligations of the Company under this Indenture and the other Notes Documents; and

(2)      the rights (charter and statutory), licenses and franchises of the Company and its Subsidiaries; *provided, however,* that the Company shall not be required to preserve any such right, license or franchise, or the corporate, partnership or other existence of any of its Subsidiaries, if the Board of Directors shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Company and its Subsidiaries, taken as a whole, and that the loss thereof is not adverse in any material respect to the Holders of the Notes.

Section 4.15   *Offer to Repurchase Upon Change of Control*.

(a)      Upon the occurrence of a Change of Control, the Company will make an offer (a "*Change of Control Offer*") to each Holder to repurchase all or any part of that Holder's Notes

UMB-000070

at a purchase price in cash equal to 101% of the aggregate principal amount of Notes repurchased, plus accrued and unpaid interest on the Notes repurchased to the date of purchase (the "*Change of Control Payment*")*,* subject to the rights of Holders of Notes on the relevant record date to receive interest due on the relevant interest payment date; *provided*, that for the avoidance of doubt, the premiums set forth in Section 3.07 shall not be applicable to any redemption made pursuant to this Section 4.15.  Within 30 days following any Change of Control, the Company will mail a notice to each Holder describing the transaction or transactions that constitute the Change of Control and stating:

(1)     that the Change of Control Offer is being made pursuant to this Section 4.15 and that all Notes tendered will be accepted for payment;

(2)     the purchase price and the purchase date, which shall be no earlier than 30 days and no later than 60 days from the date such notice is mailed or, if the Notes are held in global book-entry form, post with DTC, (the "*Change of Control Payment Date*");

(3)     that any Note not tendered will continue to accrue interest;

(4)     that, unless the Company defaults in the payment of the Change of Control Payment, all Notes accepted for payment pursuant to the Change of Control Offer will cease to accrue interest after the Change of Control Payment Date;

(5)     that Holders electing to have any Notes purchased pursuant to a Change of Control Offer will be required to surrender the Notes, with the form entitled "Option of Holder to Elect Purchase" attached to the Notes completed, or transfer by book-entry transfer, to the Paying Agent at the address specified in the notice prior to the close of business on the third Business Day preceding the Change of Control Payment Date;

(6)     that Holders will be entitled to withdraw their election if the Paying Agent receives, not later than the close of business on the second Business Day preceding the Change of Control Payment Date, a telegram, telex, facsimile transmission or letter setting forth the name of the Holder, the principal amount of Notes delivered for purchase, and a statement that such Holder is withdrawing his election to have the Notes purchased; and

(7)     that Holders whose Notes are being purchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered, which unpurchased portion must be in integral multiples of $1.00.

The Company will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent those laws and regulations are applicable in connection with the repurchase of the Notes as a result of a Change in Control. To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Section 4.15, the Company will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this Section 4.15 by virtue of such compliance.

(b)     On the Change of Control Payment Date, the Company will, to the extent lawful:

UMB-000071

(1)      accept for payment all Notes or portions of Notes properly tendered pursuant to the Change of Control Offer;

(2)      deposit with the Paying Agent an amount equal to the Change of Control Payment in respect of all Notes or portions of Notes properly tendered; and

(3)      deliver or cause to be delivered to the Trustee the Notes properly accepted together with an Officers' Certificate stating the aggregate principal amount of Notes or portions of Notes being purchased by the Company.

The Paying Agent will promptly mail, or if the Notes are held in global book-entry form, post with DTC, (but in any case not later than five days after the Change of Control Payment Date) to each Holder of Notes properly tendered the Change of Control Payment for such Notes, and the Trustee will promptly authenticate and mail (or cause to be transferred by book entry) to each Holder a new Note equal in principal amount to any unpurchased portion of the Notes surrendered, if any.  The Company will publicly announce the results of the Change of Control Offer on or as soon as practicable after the Change of Control Payment Date.

(c)      Notwithstanding anything to the contrary in this Section 4.15, the Company will not be required to make a Change of Control Offer upon a Change of Control if (1) a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in this Section 4.15 and purchases all Notes properly tendered and not withdrawn under the Change of Control Offer, or notice of redemption has been given pursuant to Section 3.07 hereof, unless and until there is a default in payment of the applicable redemption price.

(d)      Notwithstanding anything to the contrary contained herein, a Change of Control Offer may be made in advance of a Change of Control, conditioned upon the consummation of such Change of Control, if a definitive agreement is in place for the Change of Control at the time the Change of Control Offer is made.

Section 4.16   *Payments for Consent*.

The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, pay or cause to be paid any consideration to or for the benefit of any Holder of Notes for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Indenture or the Notes unless such consideration is offered to be paid and is paid to all Holders of the Notes that consent, waive or agree to amend in the time frame set forth in the solicitation documents relating to such consent, waiver or agreement.

Section 4.17   *Additional Note Guarantees; Further Assurances*.

(a)      If the Company or any of its Restricted Subsidiaries acquires or creates another Domestic Subsidiary after the date of this Indenture, then the Company will cause that newly acquired or created Domestic Subsidiary to provide a Note Guarantee pursuant to a supplemental indenture in substantially the form of Exhibit F hereto to the Trustee and the Collateral Agent and deliver an Opinion of Counsel to the Trustee and the Collateral Agent within twenty (20) Business Days of the date on which it was acquired or created to the effect that such

64

supplemental indenture has been duly authorized, executed and delivered by that Domestic Subsidiary and constitutes a valid and binding agreement of that Domestic Subsidiary, enforceable in accordance with its terms (subject to customary exceptions); *provided* that any Domestic Subsidiary that constitutes an Immaterial Subsidiary need not become a Guarantor until such time as it ceases to be an Immaterial Subsidiary. It shall be the sole responsibility of the Company to ensure compliance with the delivery of supplemental indentures as required by this covenant. Within twenty (20) Business Days following the formation or acquisition of such new Domestic Subsidiary (other than an Immaterial Subsidiary), the Company shall (i) pledge, have pledged or cause or have caused to be pledged to the Collateral Agent pursuant to a joinder to the Notes Security Agreement, all of the outstanding shares of equity interests or other equity interests of such new Domestic Subsidiary owned directly or indirectly by the Company and, subject to the terms of the Intercreditor Agreement, deliver all certificates representing such equity interests along with, delivery of undated stock or equivalent powers for such certificates, executed in blank, together with an Opinion of Counsel that confirms that all necessary perfection steps have been taken in respect of such pledge; (ii) cause the new Domestic Subsidiary to take such other actions (including entering into or joining any Security Documents) as are necessary or advisable in accordance with the advice received in the Opinion of Counsel that will be opining on the perfection of the pledge as set forth in the foregoing clause (i) in order to grant the Collateral Agent, acting on behalf of the Secured Parties, a first-priority Lien (subject to the terms and conditions of the Intercreditor Agreement) on all real property with fair market value (as determined in good faith by the Company's Board of Directors) or an appraised value in excess of $1.0 million and all personal property in which a lien may be perfected by filing a financing statement of such Subsidiary in existence as of such date and in all after acquired property, which first-priority Liens are required to be granted pursuant to this Indenture, together with an Opinion of Counsel that confirms that all necessary perfection steps have been taken in connection with the grant of such security interest; (iii) cause such new Domestic Subsidiary to become a Guarantor hereunder with joint and several liability for all obligations of the Company and the Guarantors hereunder and under the other Notes Documents; and (iv) cause the new Domestic Subsidiary to deliver certified copies of such Subsidiary's certificate or articles of incorporation, certificate of formation or certificate of limited partnership (as the case may be), together with good standing certificates, by-laws (or other operating agreement or governing documents), resolutions of the Board of Directors or other governing body, approving and authorize the execution and delivery of the Security Documents, incumbency certificates and to execute and/or deliver such other documents and legal opinions as are necessary to effectuate such Subsidiary becoming a Guarantor hereunder. Notwithstanding anything herein to the contrary, in no event shall the Collateral include or the security interest granted hereunder attach to (a) any of the issued and outstanding voting Capital Stock of any CFC or CFC Holdco in excess of sixty-five percent (65%) of the voting power of all classes of Capital Stock of such CFC or CFC Holdco entitled to vote; *provided* that immediately upon an amendment of the Internal Revenue Code to allow the pledge of a greater percentage of the voting power of Capital Stock in a CFC or CFC Holdco without adverse tax consequences, the Company shall, at its own cost and expense, take all further acts such that the Collateral shall include, and the security interest granted by the Company and its Subsidiaries shall attach to, such greater percentage of Capital Stock of each Controlled Foreign Corporation, or (b) any direct or indirect Subsidiary of a Controlled Foreign Corporation.

UMB-000073

(b)      The Company will, and will cause each Restricted Subsidiary to, at its own cost and expense, promptly and duly take, execute, acknowledge and deliver all such further acts, documents and assurances as may from time to time be necessary or as the Trustee or the Collateral Agent may from time to time reasonably request in order to carry out the intent and purposes of the Notes Documents and the transactions contemplated thereby, including all such actions to (i) establish, create, preserve, protect, record and perfect a first-priority Lien (subject only to Permitted Liens and the Intercreditor Agreement) in favor of the Collateral Agent for itself and for the benefit of the Secured Parties on the Collateral (including Collateral acquired after the date hereof), and (ii) cause all Subsidiaries (subject to the terms and conditions of this Indenture other than Immaterial Subsidiaries) of the Company to be jointly and severally obligated with the Company under all covenants and obligations under this Indenture, including the obligation to repay the Notes Obligations.  Without limiting the generality of the foregoing, (x) the Company shall, at the time of the delivery of any Compliance Certificate disclosing the ownership, filing or acquisition by the Company or any of its Restricted Subsidiaries of any registered intellectual property or application for the registration of intellectual property, deliver to the Collateral Agent a duly completed and executed supplement to the applicable entity's intellectual property security agreement or such other documents as required by the Notes Security Agreement, and (y) following the disclosure by the Company on any Compliance Certificate of the acquisition by the Company or any Restricted Subsidiary of any rights under a license as a licensee with respect to any registered intellectual property or application for the registration of any intellectual property owned by another Person, the Company shall execute any documents required to establish, create, preserve, protect, record and perfect a first-priority lien (subject to the terms of the Intercreditor Agreement) in favor of the Collateral Agent, to the extent legally possible, in the Company's or such Restricted Subsidiary's rights under such license and shall use their commercially reasonable best efforts to obtain the written consent of the licensor which such license to the granting in favor of the Collateral Agent of a Lien on the Company's or such Restricted Subsidiary's rights as licensee under such license.  For the avoidance of doubt, it shall be the sole responsibility of the Company and each Restricted Subsidiary to take all necessary actions to maintain, record and preserve a perfected first-priority security interest in the Collateral (subject only to Permitted Liens and the Intercreditor Agreement).

(c)      The Company and its Restricted Subsidiaries shall use commercially reasonable efforts to obtain a landlord waiver, collateral access agreement or mortgagee agreement, as applicable, from the lessor of each leased property or mortgagee of owned property with respect to any business location where any portion of the Collateral, or the records relating to such Collateral and/or software and equipment relating to such records or Collateral, is stored or located, but only to the extent such lessor or mortgagee has provided a landlord waiver, collateral access agreement or mortgagee agreement to the ABL Agent (or any successor agent of the credit facility incurred pursuant to clause (1) of the definition of Permitted Debt); provided that in the case where such lease is a lease in existence on the date of this Indenture, the Company or Restricted Subsidiary that is the lessee thereunder shall have 90 days from the date of this Indenture to satisfy the requirement set forth in this Section 4.17(c).  For the avoidance of doubt, if the Company or any Restricted Subsidiary fails to enter into a landlord waiver, collateral access agreement or mortgagee agreement after using commercially reasonable efforts (it being understood that the Company shall determine in good faith whether it has used commercially reasonable efforts, which determination shall be set forth in an Officers' Certificate delivered to

UMB-000074

the Trustee and the Collateral Agent (upon which the Trustee and the Collateral Agent may rely)), the Company shall notify the Holders of such event.  Neither the Collateral Agent nor the Trustee shall have any obligation to enter into such an agreement and shall have the right to decline signing such an agreement if, after being advised by counsel, the Trustee or Collateral Agent determines in good faith that such action would adversely affect its rights, duties, liabilities or immunities under this Indenture or the Notes Documents.  The Company and its Restricted Subsidiaries shall timely and fully pay and perform their respective obligations under all leases and other related agreements with respect to each leased location where any Collateral, or any records related thereto, is or may be located, except for breaches or defaults that have not resulted, and will not result, in a default or event of default under the credit facility incurred pursuant to clause (1) of the definition of Permitted Debt or have otherwise been waived by the ABL Agent.

(d)    Subject to Permitted Liens, the terms of the Security Documents, upon the acquisition by the Company or any Guarantor after the date hereof of any after-acquired owned real property, which has a fair market value (as determined in good faith by the Company's Board of Directors) or appraised value of $1.0 million or greater at the time of acquisition, the Company or such Guarantor shall execute and deliver:

(1)    such Mortgages and financing statements;

(2)    a mortgagee's customary title insurance policy insuring a first-priority lien with respect to each such property, subject to Section 10.07(c)(4);

(3)    customary surveys, phase one environmental reports, appraisals and other material due diligence; and

(4)    a customary opinion of local counsel relating to the enforceability of the Mortgages;

in each case, as may be necessary to vest in the Collateral Agent a perfected security interest, subject only to Permitted Liens, in such after-acquired owned real property and to have such after-acquired owned real property added to the Collateral, and thereupon all provisions of this Indenture, the Notes, the Intercreditor Agreement, and the Security Documents relating to the Collateral shall be deemed to relate to such after-acquired property to the same extent and with the same force and effect.

(e)    Notwithstanding the foregoing, if the Company or any Restricted Subsidiary of the Company provides a guarantee and/or grants a security interest in any real or personal property, in each case, for the benefit of the secured parties under the Credit Facilities incurred pursuant to Section 4.09(b)(1), the Company will, and will cause each applicable Subsidiary, to execute and deliver concurrently documentation to guarantee the Notes and grant such security interest in favor of the Secured Parties hereunder.

(f)    For the avoidance of doubt, it shall be the sole responsibility of the Company to ensure that the pledge and security interests granted pursuant to this Section 4.17 are fully perfected and that such perfection continues to be maintained.

UMB-000075

Section 4.18   *Designation of Restricted and Unrestricted Subsidiaries*.

The Board of Directors of the Company may designate any Restricted Subsidiary to be an Unrestricted Subsidiary if that designation would not cause a Default.  If a Restricted Subsidiary is designated as an Unrestricted Subsidiary, the aggregate Fair Market Value of all outstanding Investments owned by the Company and its Restricted Subsidiaries in the Subsidiary designated as Unrestricted will be deemed to be an Investment made as of the time of the designation and will reduce the amount available for Restricted Payments under Section 4.07 hereof or under one or more clauses of the definition of Permitted Investments, as determined by the Company.  That designation will only be permitted if the Investment would be permitted at that time and if the Restricted Subsidiary otherwise meets the definition of an Unrestricted Subsidiary.  The Board of Directors of the Company may redesignate any Unrestricted Subsidiary to be a Restricted Subsidiary if that redesignation would not cause a Default.

Any designation of a Subsidiary of the Company as an Unrestricted Subsidiary will be evidenced to the Trustee and the Collateral Agent by filing with the Trustee and the Collateral Agent a certified copy of a resolution of the Board of Directors giving effect to such designation and an Officers' Certificate certifying that such designation complied with the preceding conditions and was permitted by Section 4.07 hereof.  If, at any time, any Unrestricted Subsidiary would fail to meet the preceding requirements as an Unrestricted Subsidiary, it will thereafter cease to be an Unrestricted Subsidiary for purposes of this Indenture and any Indebtedness of such Subsidiary will be deemed to be incurred by a Restricted Subsidiary of the Company as of such date and, if such Indebtedness is not permitted to be incurred as of such date under Section 4.09 hereof, the Company will be in default of such covenant.  The Board of Directors of the Company may at any time designate any Unrestricted Subsidiary to be a Restricted Subsidiary of the Company; *provided* that such designation will be deemed to be an incurrence of Indebtedness by a Restricted Subsidiary of the Company of any outstanding Indebtedness of such Unrestricted Subsidiary, and such designation will only be permitted if (1) such Indebtedness is permitted under Section 4.09 hereof, calculated on a pro forma basis as if such designation had occurred at the beginning of the applicable reference period; and (2) no Default or Event of Default would be in existence following such designation.  Any Unrestricted Subsidiary shall become a Restricted Subsidiary for all purposes of this Indenture and the other Note Documents upon the delivery to the Trustee and the Collateral Agent of a certified copy of the resolutions of the Board of Directors giving effect to such designation and an Officers' Certificate of the Company certifying that such designation complied with the preceding conditions.

Section 4.19   *Excess Cash Flow Redemption*.

To the extent that the Excess Cash Flow Amount for any Applicable Period cannot be applied to the redemption of the PIK Preferred Stock pursuant to the terms of such PIK Preferred Stock in effect on the issue date under applicable law, pursuant to the terms of the Credit Facilities, or cannot be applied in a manner consistent with the PIK Preferred Stock documentation as in effect on the issue date, such Excess Cash Flow Amount shall be used to redeem the Notes at a price of 100% pursuant to the terms of this Section 4.19.  Once the PIK Preferred Stock has been redeemed in full, the Excess Cash Flow Amount shall be applied in its entirety to redeem the Notes pursuant to this Section 4.19.

UMB-000076

Within five Business Days following the date of the delivery of the Company's quarterly or annual, as applicable, financial statements with respect to the most recently ended Applicable Period, the Company shall (a) redeem Notes in an amount equal to the Excess Cash Flow Amount to purchase Notes at a redemption price equal to 100% of the aggregate principal amount thereof plus accrued and unpaid interest to, but not including, the date of purchase and (b) deliver to the Trustee an Officers' Certificate setting forth the calculations in reasonable detail in connection with the Excess Cash Flow redemption in respect of such Applicable Period, including, without limitation, the relevant Excess Cash Flow Amount and relevant Excess Cash Flow Percentage (with reference to the clause within the definition of Excess Cash Flow Percentage that is being relied upon for such Applicable Period).

Any redemption pursuant to this Section 4.19 shall be made pursuant to the provisions of Sections 3.01 through 3.06 hereof, accompanied by an Officers' Certificate certifying that such redemption is being made pursuant to this Section 4.19.  For the avoidance of doubt, the premiums set forth in Section 3.07 shall not be applicable to any redemption made pursuant to this Section 4.19.

Section 4.20   *Replacement of Noteholder Directors.*

(a)   *Holder Right to Appoint Members of the Board of Directors of the Company*.  For so long as the Notes are outstanding, the Holders shall have the right to appoint two (2) members to the Board of Directors of the Company (the "*Noteholder Directors*") in accordance with the terms of this Section 4.20.  Each Holder is, and at all times while the Notes are outstanding shall be, a third-party beneficiary of Sections 13, 15-17, 19-29 and 31 (the "*Holder Beneficiary Sections*"), in each case as set forth in Section 31, of the Sixth Amended and Restated Shareholders' Agreement (as amended or restated from time to time, the "*Shareholders' Agreement*"), dated as of May 31, 2017, by and among the Company and the individuals and entities who are parties thereto.  Without the prior written consent of the Holders of a majority in aggregate principal amount of the then outstanding Notes, the Company shall not amend, or permit the amendment of, the Shareholders' Agreement in any way that adversely affects any of the Holder Beneficiary Sections in any material respect.  The initial Noteholder Directors shall be Sherman K. Edmiston III and Rocco Romanella, as appointed pursuant to the Plan, who shall serve on the Board of Directors until their successors have been duly elected or until their earlier removal or resignation.

(b)   *Company Notice of Vacancies and Expected Vacancies; Ballots*.

1.   No later than (A) the date that is sixty (60) calendar days prior to the expiration of a Noteholder Director's term and (B) four (4) Business Days following the removal, resignation or death of a Noteholder Director, the Company shall submit a notice (each, a "*Noteholder Director Vacancy Notice*") to the Trustee for distribution pursuant to Section 7.01(g); *provided,* however, *that* if (x) a Noteholder Director has been serving as a director for less than two (2) years and (y) such Noteholder Director has not given notice to the Company or the Board of Directors that he or she does not wish to stand for reelection, then the Company need not give a Noteholder Director Vacancy Notice pursuant

69

to clause (A) of this sentence with respect to such Noteholder Director and such Noteholder Director shall automatically be a Noteholder Director Nominee pursuant to Section 4.20(d) upon expiration of his or her term for reasons other than his or her removal, resignation or death. Such notice shall be posted with DTC for all Notes issued in global book-entry form. The Noteholder Director Vacancy Notice shall set forth the following information:

a.    Information regarding the reason for the Noteholder Director Vacancy Notice, including whether the Noteholder Director Vacancy Notice is being sent out in connection with the expiration of a Noteholder Director's term or in response to a Noteholder Director's removal, resignation or death;

b.    Information regarding the identity of the Noteholder Director whose term is expiring or who was removed, resigned or died, including whether such Noteholder Director was included on the Company's application to maintain its status as a minority-controlled business or a minority business with the National Minority Supplier Development Council (or such successor organization) (such a Noteholder Director, a "*MBE-Qualified Director*"); and

c.    Instructions on how and where Holders may submit nominations for the Noteholder Director(s) vacancy(ies) to be filled, which shall include (1) if the Noteholder Director vacancy to be filled is for a MBE-Qualified Director, a description on the requirements such nominee must meet to qualify as a MBE-Qualified Director, (2) a list of information Holders must submit in order to nominate a Noteholder Director, which information shall include a general description of the nominee's background and experience, which will be included in the Ballot Notice (as defined below) and (3) the deadline (the "*Nomination Deadline*") for Holders to submit nominees for the Noteholder Director(s) vacancy(ies) to be filled.  The Nomination Deadline shall be no more than twenty (20) Business Days after the Noteholder Director Vacancy Notice is delivered to the Trustee by the Company and no less than fifteen (15) Business Days after the Noteholder Director Vacancy Notice is delivered to the Trustee by the Company.

(c)    If nominations for a sufficient number of qualified persons to fill all Noteholder Director vacancies set forth on a Noteholder Director Vacancy Notice have not been received by the Nomination Deadline, the Company shall promptly repeat the process set forth in Section 4.20(b) one (1) time (with the Nomination Deadline being extended by a period fifteen (15) Business Days). If nominations for a sufficient number of qualified persons to fill all Noteholder Director vacancies set forth on a Noteholder Director Vacancy Notice have been received or the

UMB-000078

Company has repeated the process set forth in Section 4.20(b) one (1) time, within five (5) Business Days after the Nomination Deadline, the Company shall submit a notice (a "*Ballot Notice*") to the Trustee for distribution pursuant to Section 7.01(g), which the Trustee shall post with DTC in the Company's name and at the Company's sole expense.  The Ballot Notice shall set forth the following information:

1.   The names of each nominee that was submitted to the Company by a Holder in response to the Noteholder Director Vacancy Notice; *provided, however,* that, in the event that the Noteholder Director vacancy to which the Noteholder Director Vacancy Notice relates was in respect of a MBE-Qualified Director, the Company shall only include such nominees on the Ballot Notice that meet the requirements to be a MBE-Qualified Director;

2.   The descriptions of each nominee's background and experience provided by the Holder who nominated such nominee;

3.   Instructions on how Holders may cast a vote for a nominee included on the Ballot Notice, including the deadline (the "*Voting Deadline*") for Holders to cast their votes.  The Voting Deadline shall be no more than twenty (20) Business Days after the Ballot Notice is delivered to the Trustee by the Company and no less than fifteen (15) Business Days after the Ballot Notice is delivered to the Trustee by the Company.

(d)      Promptly after the Voting Deadline, the Company shall calculate which of the nominees included on the Ballot Notice received the greatest number of votes (as represented by the aggregate principal amount of the Notes then outstanding voting as a single class) (each such nominee, a "*Noteholder Director Nominee*") and (1) take such actions as necessary to permit the holders of the Company's Common Stock to vote for such Noteholder Director Nominee as required in the Shareholders Agreement and (2) submit a notice (the "*Noteholder Director Notice*") to the Trustee for distribution pursuant to Section 7.01(g) that identifies the nominee who received the most votes and is the new Noteholder Director.  To the extent that no votes are cast, the Company shall promptly select the Noteholder Director Nominee from the pool of available nominees.  To the extent there is a tie between two or more Noteholder Director Nominees, the Company shall select the Noteholder Director Nominee who was nominated by the Holder with the greatest aggregate principal amount of Notes then outstanding.

(e)      *Right of Holders to Remove Noteholder Directors*.  At all times while the Notes are outstanding, the Holders shall be permitted to remove, through an Act of Required Holders, any Noteholder Director for any reason, or for no reason, by submitting a direction to the Trustee to be forwarded to the Company instructing the Company to take the actions necessary to effectuate such removal.  Upon receipt of such consent, the Company shall take such actions as necessary to permit the holders of the Company's common stock to remove such Noteholder Director.  Following the removal of such Noteholder Director, the Company shall comply with the provisions of this Section 4.20 to replace such Noteholder Director.

UMB-000079

ARTICLE 5
SUCCESSORS

Section 5.01    *Merger, Consolidation or Sale of Assets.*

The Company will not, directly or indirectly: (1) consolidate or merge with or into another Person (whether or not the Company is the surviving corporation); or (2) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Company and its Restricted Subsidiaries taken as a whole, in one or more related transactions, to another Person, unless:

(1)    either:

(A)    the Company is the surviving corporation; or

(B)    the Person formed by or surviving any such consolidation or merger (if other than the Company) or to which such sale, assignment, transfer, conveyance or other disposition has been made is an entity organized or existing under the laws of the United States, any state of the United States or the District of Columbia; and, if such entity is not a corporation, a co-obligor of the Notes is a corporation organized or existing under any such laws;

(2)    the Person formed by or surviving any such consolidation or merger (if other than the Company) or the Person to which such sale, assignment, transfer, conveyance or other disposition has been made assumes all the Notes Obligations of the Company under the Notes, this Indenture and the Security Documents, pursuant to agreements reasonably satisfactory to the Trustee;

(3)    immediately after such transaction, no Default or Event of Default exists; and

(4)    the Company or the Person formed by or surviving any such consolidation or merger (if other than the Company), or to which such sale, assignment, transfer, conveyance or other disposition has been made would, on the date of such transaction after giving pro forma effect thereto and any related financing transactions as if the same had occurred at the beginning of the applicable four-quarter period (i) be permitted to incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4.09(a) hereof; or (ii) have had a Fixed Charge Coverage Ratio greater than the actual Fixed Charge Coverage Ratio for the Company for such four-quarter period.

In addition, the Company will not, directly or indirectly, lease all or substantially all of the properties and assets of it and its Restricted Subsidiaries taken as a whole, in one or more related transactions, to any other Person.  This Section 5.01 will not apply to any sale, assignment, transfer, conveyance, lease or other disposition of assets between or among the Company and the Guarantors.  Clauses (3) and (4) of this Section 5.01 will not apply to (1) any merger or consolidation of the Company with or into one of its Restricted Subsidiaries for any purpose or (2) with or into an Affiliate solely for the purpose of reincorporating the Company in another jurisdiction.

72

UMB-000080

Section 5.02    *Successor Corporation Substituted*.

Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the properties or assets of the Company in a transaction that is subject to, and that complies with the provisions of, Section 5.01 hereof, the successor Person formed by such consolidation or into or with which the Company is merged or to which such sale, assignment, transfer, lease, conveyance or other disposition is made shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, the provisions of this Indenture referring to the "Company" shall refer instead to the successor Person and not to the Company), and may exercise every right and power of the Company under this Indenture with the same effect as if such successor Person had been named as the Company herein; *provided, however,* that the predecessor Company shall not be relieved from the obligation to pay the principal of, premium on, if any, and interest on, the Notes except in the case of a sale of all of the Company's assets in a transaction that is subject to, and that complies with the provisions of, Section 5.01 hereof.

Section 5.03    *Reincorporation from Texas to Delaware*.

Notwithstanding the foregoing, the Company shall be permitted to consummate the Reincorporation.

ARTICLE 6
DEFAULTS AND REMEDIES

Section 6.01    *Events of Default*.

Each of the following is an "*Event of Default*":

(1)    default for 30 days in the payment when due of interest on the Notes;

(2)    default in the payment when due (at maturity, upon redemption or otherwise) of the principal of, or premium on, if any, the Notes;

(3)    failure by the Company or any of its Restricted Subsidiaries to comply with the provisions of Sections 4.10, 4.14, 4.15, 4.19 or 5.01 hereof;

(4)    failure by the Company or any of its Restricted Subsidiaries for 30 days after notice to the Company by the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding voting as a single class to comply with Sections 4.07, 4.09 or 4.12 hereof;

(5)    failure by the Company or any of its Restricted Subsidiaries for 60 days after notice to the Company by the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding voting as a single class to comply with any of the other agreements in this Indenture;

73

(6)      default under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness for money borrowed by the Company or any of its Restricted Subsidiaries (or the payment of which is guaranteed by the Company or any of its Restricted Subsidiaries), whether such Indebtedness or Guarantee now exists, or is created after the date of this Indenture, if that default:

(A)      is caused by a failure to pay principal of, premium on, if any, or interest on, if any, such Indebtedness prior to the expiration of the grace period provided in such Indebtedness on the date of such default (a "*Payment Default*")*;* or

(B)      results in the acceleration of such Indebtedness prior to its express maturity,

and, in each case, the principal amount of any such Indebtedness, together with the principal amount of any other such Indebtedness under which there has been a Payment Default or the maturity of which has been so accelerated, aggregates $5.0 million or more;

(7)      failure by the Company or any of its Restricted Subsidiaries to pay final judgments entered by a court or courts of competent jurisdiction aggregating in excess of $5.0 million, which judgments are not paid, discharged or stayed, for a period of 60 days;

(8)      the occurrence of any of the following:

(A)      any Security Document for the benefit of Holders of the Notes is held in any judicial proceeding to be unenforceable or invalid or ceases for any reason to be in full force and effect in any material respect, other than in accordance with the terms of the relevant Security Documents; *provided,* however, that it shall not be an Event of Default under this clause (8) (A) if the sole result of the failure of one or more Security Documents to be fully enforceable is that any Lien purported to be granted under such Security Document on Collateral, individually or in the aggregate having a Fair Market Value of not more than $2.5 million ceases to be an enforceable and perfected security interest, not subject to any Liens prior to the Liens other than Permitted Prior Liens; or

(B)      except as permitted by this Indenture, any Lien for the benefit of Holders of the Notes purported to be granted under any Security Document for the benefit of Holders of the Notes on Collateral, individually or in the aggregate, having a Fair Market Value in excess of $2.5 million ceases to be an enforceable and perfected first-priority Lien in any material respect, subject only to Permitted Prior Liens, and such condition continues for 60 days after written notice by the Trustee of failure to comply with such requirement; provided that it will not be an Event of Default under this clause 8(B) if such condition results from the action or inaction of the Trustee; or

(C)      the Company or any Significant Subsidiary that is a Guarantor (or any such Guarantors that together would constitute a Significant Subsidiary), or any Person acting on behalf of any of them, denies or disaffirms, in writing, any material obligation of the Company or such Significant Subsidiary that is a Guarantor (or such Guarantors

74

that together constitute a Significant Subsidiary) set forth in or arising under any Security Document for the benefit of Holders of the Notes;

(9) the Company or any of its Restricted Subsidiaries that is a Significant Subsidiary or any group of Restricted Subsidiaries of the Company that, taken together, would constitute a Significant Subsidiary pursuant to or within the meaning of Bankruptcy Code:

(A) commences a voluntary case,

(B) consents to the entry of an order for relief against it in an involuntary case,

(C) consents to the appointment of a custodian of it or for all or substantially all of its property,

(D) makes a general assignment for the benefit of its creditors, or

(E) generally is not paying its debts as they become due;

(10) a court of competent jurisdiction enters an order or decree under the Bankruptcy Code that:

(A) is for relief against the Company or any of its Restricted Subsidiaries that is a Significant Subsidiary or any group of Restricted Subsidiaries of the Company that, taken together, would constitute a Significant Subsidiary in an involuntary case;

(B) appoints a custodian of the Company or any of its Restricted Subsidiaries that is a Significant Subsidiary or any group of Restricted Subsidiaries of the Company that, taken together, would constitute a Significant Subsidiary or for all or substantially all of the property of the Company or any of its Restricted Subsidiaries that is a Significant Subsidiary or any group of Restricted Subsidiaries of the Company that, taken together, would constitute a Significant Subsidiary; or

(C) orders the liquidation of the Company or any of its Restricted Subsidiaries that is a Significant Subsidiary or any group of Restricted Subsidiaries of the Company that, taken together, would constitute a Significant Subsidiary;

and the order or decree remains unstayed and in effect for 60 consecutive days; or

(11) except as permitted by this Indenture, any Note Guarantee is held in any judicial proceeding to be unenforceable or invalid or ceases for any reason to be in full force and effect, or any Guarantor, or any Person acting on behalf of any Guarantor, denies or disaffirms its obligations under its Note Guarantee.

UMB-000083

Section 6.02     *Acceleration.*

In the case of an Event of Default specified in clause (9) or (10) of Section 6.01 hereof, with respect to the Company, any Restricted Subsidiary of the Company that is a Significant Subsidiary or any group of Restricted Subsidiaries of the Company that, taken together, would constitute a Significant Subsidiary, all outstanding Notes will become due and payable immediately without further action or notice.  Following any Event of Default, the outstanding principal amount of the Notes shall bear interest at the rate that is 2% higher than the then applicable interest rate on the Notes.  If any Event of Default (other than the Events of Default specified in the first sentence of this paragraph) occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of the then outstanding Notes may declare all the Notes to be due and payable immediately.

Upon any such declaration, the Notes shall become due and payable immediately.

In the event of a declaration of acceleration of the Notes because an Event of Default has occurred and is continuing as a result of the acceleration of any Indebtedness described in clause (6) of Section 6.01 hereof, the declaration of the acceleration of the Notes shall be automatically annulled if the holders of any Indebtedness described in clause (6) of Section 6.01 hereof have rescinded the declaration of acceleration in respect of such Indebtedness within 60 days of the date of such declaration and if (1) the annulment of the acceleration of the Notes would not conflict with any judgment or decree of a court of competent jurisdiction, (2) all existing Events of Default, except nonpayment of principal or interest on the Notes that became due solely because of the acceleration of the Notes, have been cured or waived and (3) remedies have not been taken with respect to Notes Priority Collateral securing such Indebtedness.

The Holders of a majority in aggregate principal amount of the then outstanding Notes by written notice to the Trustee may, on behalf of all of the Holders of all the Notes, rescind an acceleration and its consequences hereunder, if the rescission would not conflict with any judgment or decree and if all existing Events of Default (except nonpayment of principal of, premium on, if any, or interest on the Notes that has become due solely because of the acceleration) have been cured or waived.  The Holders of a majority in aggregate principal amount of the then outstanding Notes shall send a copy of any and all notices they send to the Trustee under this Section 6.02 to the Collateral Agent.

In the event the Notes are accelerated or otherwise become due prior to maturity, in each case, in respect of any Event of Default (including, but not limited to, upon the occurrence of an Event of Default arising under clause (9) or (10) of Section 6.01 hereof (including the acceleration of claims by operation of law)), the premium (including (x) the Applicable Premium that would have been due on such date with respect to an optional redemption pursuant to Section 3.07(b), if such date occurs prior to the third anniversary of the date of this Indenture, or (y) the relevant premium that would have been due on such date pursuant to Section 3.07(d), if such date occurs on or after the third anniversary of the date of this Indenture) of the Notes will also be due and payable as though the Notes were optionally redeemed and shall constitute part of the Notes Obligations, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Holder's lost profits as a result thereof. The foregoing premium shall be presumed to be the

76

liquidated damages sustained by each Holder as the result of the early redemption and the Company agrees that it is reasonable under the circumstances currently existing. The foregoing premium shall also be payable in the event the Notes (and/or this Indenture) are satisfied or released by foreclosure (whether by power of judicial proceeding), deed in lieu of foreclosure or by any other means. THE COMPANY EXPRESSLY WAIVES (TO THE FULLEST EXTENT IT MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING PREMIUM IN CONNECTION WITH ANY SUCH ACCELERATION. The Company expressly agrees (to the fullest extent it may lawfully do so) that: (A) the foregoing premium is reasonable and is the product of an arm's-length transaction between sophisticated business people, ably represented by counsel; (B) the foregoing premium shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between Holders and the Company giving specific consideration in this transaction for such agreement to pay the foregoing premium; and (D) the Company shall be estopped hereafter from claiming differently than as agreed to in this paragraph. The Company expressly acknowledges that its agreement to pay the foregoing premium to Holders as herein described is a material inducement to Holders to purchase the Notes.

Section 6.03   *Other Remedies*.

If an Event of Default occurs and is continuing, the Trustee or the Notes Representative or the Collateral Agent may pursue any available remedy to collect the payment of principal of, premium on, if any, or interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

The Trustee or the Notes Representative or the Collateral Agent may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding.  A delay or omission by the Trustee, the Notes Representative or the Collateral Agent or any Holder of a Note in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default.  All remedies are cumulative to the extent permitted by law.

Section 6.04   *Waiver of Past Defaults*.

The Holders of a majority in aggregate principal amount of the then outstanding Notes by written notice to the Trustee, the Notes Representative and the Collateral Agent may, on behalf of the Holders of all of the Notes waive any existing Default or Event of Default and its consequences hereunder, except a continuing Default or Event of Default in the payment of principal of, premium on, if any, or interest on the Notes (including in connection with an offer to purchase); *provided, however,* that the Holders of a majority in aggregate principal amount of the then outstanding Notes may rescind an acceleration and its consequences, including any related payment default that resulted from such acceleration.  Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

Section 6.05   *Control by Majority*.

UMB-000085

Holders of a majority in aggregate principal amount of the then outstanding Notes may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or the Notes Representative or the Collateral Agent or exercising any trust or power conferred on it.  However, the Trustee, the Notes Representative and the Collateral Agent may refuse to follow any direction that conflicts with law or this Indenture that the Trustee, the Notes Representative or the Collateral Agent, as applicable, determines may be unduly prejudicial to the rights of other Holders of Notes or that may involve the Trustee, the Notes Representative or the Collateral Agent, as applicable, in personal liability or if the Holders do not provide indemnity and security satisfactory to the Trustee, the Notes Representative and the Collateral Agent, as applicable, in respect of such direction.

Section 6.06   *Limitation on Suits*.

No Holder of a Note may pursue any remedy with respect to this Indenture or the Notes unless:

(1)      such Holder has previously given to the Trustee or the Notes Representative and the Collateral Agent written notice that an Event of Default is continuing;

(2)      Holders of at least 25% in aggregate principal amount of the then outstanding Notes make a written request to the Trustee or the Notes Representative and the Collateral Agent to pursue the remedy;

(3)      such Holder or Holders offer and, if requested, provide to the Trustee, the Notes Representative or the Collateral Agent security or indemnity satisfactory to the Trustee, the Notes Representative or the Collateral Agent, as applicable, against any loss, liability or expense;

(4)      the Trustee, the Notes Representative or the Collateral Agent does not comply with such request within 60 days after receipt of the request and the offer of security or indemnity; and

(5)      during such 60-day period, Holders of a majority in aggregate principal amount of the then outstanding Notes do not give the Trustee or the Notes Representative or the Collateral Agent a direction inconsistent with such request.

A Holder of a Note may not use this Indenture to prejudice the rights of another Holder of a Note or to obtain a preference or priority over another Holder of a Note (it being understood that neither the Trustee, the Notes Representative nor the Collateral Agent has an affirmative duty to ascertain whether or not such by a Holder use prejudices the rights of, or obtains a preference or priority over, another Holder).

Section 6.07   *Rights of Holders of Notes to Receive Payment*.

Notwithstanding any other provision of this Indenture, the right of any Holder of a Note to receive payment of principal of, premium on, if any, or interest on the Note, on or after the respective due dates expressed in the Note (including in connection with an offer to purchase), or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder; *provided* that a Holder shall not have

UMB-000086

the right to institute any such suit for the enforcement of payment if and to the extent that the institution or prosecution thereof or the entry of judgment therein would, under applicable law, result in the surrender, impairment, waiver or loss of the Lien of this Indenture upon any property subject to such Lien.

Section 6.08    *Collection Suit by Trustee or the Notes Representative and the Collateral Agent*.

If an Event of Default specified in Section 6.01(1) or (2) hereof occurs and is continuing, the Trustee is authorized to recover judgment in its own name and as trustee of an express trust against the Company for the whole amount of principal of, premium on, if any, and interest remaining unpaid on, the Notes and interest on overdue principal and, to the extent lawful, interest and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee and its agents and counsel.

Section 6.09    *Trustee or the Notes Representative and the Collateral Agent May File Proofs of Claim*.

The Trustee or the Notes Representative and the Collateral Agent are authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee or the Notes Representative and the Collateral Agent, as applicable, (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee or the Notes Representative and the Collateral Agent, as applicable, and its agents and counsel) and the Holders of the Notes allowed in any judicial proceedings relative to the Company (or any other obligor upon the Notes), its creditors or its property and shall be entitled and empowered to collect, receive and distribute any money or other property payable or deliverable on any such claims and any custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee or the Notes Representative and the Collateral Agent, as applicable, and in the event that the Trustee or the Notes Representative and the Collateral Agent, as applicable, shall consent to the making of such payments directly to the Holders, to pay to the Trustee or the Notes Representative and the Collateral Agent, as applicable, any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee or the Notes Representative and the Collateral Agent, as applicable, and its agents and counsel, and any other amounts due the Trustee or the Notes Representative and the Collateral Agent, as applicable, under Section 7.07 hereof.  To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee or the Notes Representative and the Collateral Agent, as applicable, under Section 7.07 hereof out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.  Nothing herein contained shall be deemed to authorize the Trustee or the Notes Representative and the Collateral Agent, as applicable, to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee or the Notes Representative and the Collateral Agent, as applicable, to vote in respect of the claim of any Holder in any such proceeding.

79

UMB-000087

Section 6.10     *Priorities*.

If the Trustee or the Notes Representative and the Collateral Agent collect any money pursuant to this Article 6, it shall pay out the money in the following order:

> *First:* to the Trustee, the Notes Representative and the Collateral Agent, as applicable, and its agents and attorneys for amounts due under Section 7.07 hereof, including payment of all compensation, expenses and liabilities incurred, and all advances made, by the Trustee, the Notes Representative and the Collateral Agent, as applicable, and the costs and expenses of collection due and owing under this Indenture, the Pledge and Security Agreement and the Intercreditor Agreement; *provided*, that, for the avoidance of doubt, such expenses shall include expenses incurred by the Trustee in connection with providing assistance to the Collateral Agent in getting direction from the Holders pursuant to an Act of Required Holders;

> *Second:* to Holders of Notes for amounts due and unpaid on the Notes for principal, premium, if any, and interest ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, premium, if any, and interest respectively; and

> *Third:* to the Company or to such party as a court of competent jurisdiction shall direct.

The Trustee may fix a record date and payment date for any payment to Holders of Notes pursuant to this Section 6.10.

Section 6.11     *Undertaking for Costs*.

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee, the Notes Representative or the Collateral Agent, as applicable, for any action taken or omitted by it in its respective capacity as a Trustee, Notes Representative or Collateral Agent, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 6.11 does not apply to a suit by the Trustee, the Notes Representative or the Collateral Agent or a suit by a Holder of a Note pursuant to Section 6.07 hereof, or a suit by Holders of more than 10% in aggregate principal amount of the then outstanding Notes.

ARTICLE 7
TRUSTEE

Section 7.01     *Duties of Trustee*.

(a)     If an Event of Default has occurred and is continuing, the Trustee will exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and

UMB-000088

skill in its exercise, as a prudent person would exercise or use under similar circumstances in the conduct of such person's own affairs.

(b)     Except during the continuance of an Event of Default:

(1)     the duties of the Trustee will be determined solely by the express provisions of this Indenture and the Trustee need perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(2)     in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; but in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(c)     The Trustee may not be relieved from liabilities for its own grossly negligent action, its own grossly negligent failure to act, or its own willful misconduct, except that:

(1)     this paragraph does not limit the effect of paragraph (b) of this Section 7.01;

(2)     the Trustee will not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(3)     the Trustee will not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05 hereof.

(d)     Whether or not therein expressly so provided, every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b), and (c) of this Section 7.01.

(e)     No provision of this Indenture will require the Trustee to expend or risk its own funds or incur any liability.  The Trustee will be under no obligation to exercise any of its rights and powers under this Indenture at the request of any Holder, unless such Holder has offered to the Trustee security and indemnity satisfactory to the Trustee against any loss, liability or expense.

(f)     The Trustee will not be liable for interest on any money received by it except as the Trustee may agree in writing with the Company.  Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(g)     Within two (2) Business Days of receiving a Noteholder Director Vacancy Notice, a Ballot Notice or a Noteholder Director Notice from the Company, the Trustee shall mail such

UMB-000089

Noteholder Director Vacancy Notice, such Ballot Notice or such Noteholder Director Notice to the Holders.

Section 7.02    *Rights of Trustee*.

(a)    The Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any document believed by it to be genuine and to have been signed or presented by the proper Person.  The Trustee need not investigate any fact or matter stated in the document.

(b)    Before the Trustee acts or refrains from acting, it may require an Officers' Certificate or an Opinion of Counsel or both.  The Trustee will not be liable for any action it takes or omits to take in good faith in reliance on such Officers' Certificate or Opinion of Counsel.  The Trustee may consult with counsel and the advice of such counsel or any Opinion of Counsel will be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c)    The Trustee may act through its attorneys and agents and will not be responsible for the misconduct or negligence of any attorney or agent appointed with due care.

(d)    The Trustee will not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within the rights or powers conferred upon it by this Indenture.

(e)    Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Company will be sufficient if signed by an Officer of the Company.

(f)    The Trustee will be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders unless such Holders have offered to the Trustee indemnity or security satisfactory to the Trustee against the losses, liabilities and expenses that might be incurred by it in compliance with such request or direction.

(g)    In no event shall the Trustee be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(h)    The Trustee shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee received written notice of any event which is in fact such a default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Note and this Indenture.

(i)    The rights, privileges, protections, immunities and benefits given to the Trustee under Article 7 and this Indenture generally, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

UMB-000090

(j)      The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder.

(k)      The Trustee shall not be required to take any other action that would violate a law or regulation to which it is subject.

Section 7.03   *Individual Rights of Trustee*.

The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Company or any Affiliate of the Company with the same rights it would have if it were not Trustee.  However, in the event that the Trustee acquires any conflicting interest it must eliminate such conflict within 90 days, apply to the SEC for permission to continue as trustee (if this Indenture has been qualified under the TIA) or resign. Any Agent may do the same with like rights and duties.  The Trustee is also subject to Sections 7.10 and 7.11 hereof.

Section 7.04   *Trustee's Disclaimer*.

The Trustee will not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes, it shall not be accountable for the Company's use of the proceeds from the Notes or any money paid to the Company or upon the Company's direction under any provision of this Indenture, it will not be responsible for the use or application of any money received by any Paying Agent other than the Trustee, and it will not be responsible for any statement or recital herein or any statement in the Notes or any other document in connection with the sale of the Notes or pursuant to this Indenture other than its certificate of authentication.

Section 7.05   *Notice of Defaults*.

If a Default or Event of Default occurs and is continuing and if it is known to the Trustee, the Trustee will mail to Holders of Notes, the Notes Representative and the Collateral Agent a notice of the Default or Event of Default within 90 days after it occurs.  Except in the case of a Default or Event of Default in payment of principal of, premium on, if any, or interest on any Note, the Trustee may withhold the notice, and shall be protected in withholding such notice, if and so long as the board of directors, the executive committee or a trust committee of directors or Responsible Officers of the Trustee in good faith determines that the withholding of such notice is in the interest of the Holders of the Notes.

Section 7.06   *Reports by Trustee to Holders of the Notes*.

(a)      Within 60 days after each May 15 beginning with the May 15 following the date of this Indenture, and for so long as Notes remain outstanding, the Trustee will mail to the Holders of the Notes a brief report dated as of such reporting date that complies with TIA §313(a) (but if no event described in TIA §313(a) has occurred within the twelve months preceding the reporting date, no report need be transmitted).  The Trustee also will comply with TIA §313(b)(2).  The Trustee will also transmit by mail all reports as required by TIA §313(c).

(b)      A copy of each report at the time of its mailing to the Holders of Notes will be mailed by the Trustee to the Company.

UMB-000091

Section 7.07    *Compensation and Indemnity*.

(a)    The Company will pay to the Trustee from time to time such compensation as the Company and the Trustee shall from time to time agree in writing for all services rendered by it hereunder.  The Trustee's compensation will not be limited by any law on compensation of a trustee of an express trust.  The Company will reimburse the Trustee promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it in addition to the compensation for its services.  Such expenses will include the reasonable compensation, disbursements and expenses of the Trustee's agents and counsel.

(b)    The Company and the Guarantors will, jointly and severally, indemnify the Trustee and its officers, directors, employees and agents against any and all losses, liabilities or expenses incurred by it arising out of or in connection with the acceptance or administration of its duties under this Indenture, including the costs and expenses of enforcing this Indenture against the Company and the Guarantors (including this Section 7.07) and defending itself against any claim (whether asserted by the Company, the Guarantors, any Holder or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, except to the extent any such loss, liability or expense may be attributable to its gross negligence or willful misconduct.  The Trustee will notify the Company promptly of any claim for which it may seek indemnity.  Failure by the Trustee to so notify the Company will not relieve the Company or any of the Guarantors of their obligations hereunder.  The Company or such Guarantor will defend the claim and the Trustee will cooperate in the defense.  The Trustee may have separate counsel and the Company will pay the reasonable fees and expenses of such counsel.  Neither the Company nor any Guarantor need pay for any settlement made without its consent, which consent will not be unreasonably withheld.

(c)    The obligations of the Company and the Guarantors under this Section 7.07 will survive any satisfaction, discharge or termination of this Indenture, including any termination under the Bankruptcy Code.

(d)    To secure the Company's and the Guarantors' payment obligations in this Section 7.07, the Trustee will have a Lien prior to the Notes on all money or property held or collected by the Trustee, except that held in trust to pay principal of, premium on, if any, or interest on particular Notes.  Such Lien will survive the satisfaction and discharge of this Indenture.

(e)    When the Trustee incurs expenses or renders services after an Event of Default specified in Section 6.01(9) or (10) hereof occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under the Bankruptcy Code.

(f)    The Trustee will comply with the provisions of TIA §313(b)(2) to the extent applicable.

Section 7.08    *Replacement of Trustee*.

84

UMB-000092

(a)      A resignation or removal of the Trustee and appointment of a successor Trustee will become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.08.

(b)      The Trustee may resign in writing at any time and be discharged from the trust hereby created by so notifying the Company.  The Holders of a majority in aggregate principal amount of the then outstanding Notes may remove the Trustee by so notifying the Trustee and the Company in writing.  The Company may remove the Trustee if:

(1)      the Trustee fails to comply with Section 7.10 hereof;

(2)      the Trustee is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee under the Bankruptcy Code;

(3)      a custodian or public officer takes charge of the Trustee or its property; or

(4)      the Trustee becomes incapable of acting.

(c)      If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Company will promptly appoint a successor Trustee.  Within one year after the successor Trustee takes office, the Holders of a majority in aggregate principal amount of the then outstanding Notes may appoint a successor Trustee to replace the successor Trustee appointed by the Company.

(d)      If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee, the Company, or the Holders of at least 10% in aggregate principal amount of the then outstanding Notes may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(e)      If the Trustee, after written request by any Holder who has been a Holder for at least six months, fails to comply with Section 7.10 hereof, such Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(f)      A successor Trustee will deliver a written acceptance of its appointment to the retiring Trustee and to the Company.  Thereupon, the resignation or removal of the retiring Trustee will become effective, and the successor Trustee will have all the rights, powers and duties of the Trustee under this Indenture.  The successor Trustee will mail a notice of its succession to Holders.  The retiring Trustee will promptly transfer all property held by it as Trustee to the successor Trustee; *provided* all sums owing to the Trustee hereunder have been paid and subject to the Lien provided for in Section 7.07 hereof.  Notwithstanding replacement of the Trustee pursuant to this Section 7.08, the Company's obligations under Section 7.07 hereof will continue for the benefit of the retiring Trustee

(g)      The indemnity given to the retiring Trustee under Section 7.07 will survive the resignation of the retiring Trustee and any satisfaction, discharge or any other termination of this Indenture, including any termination under the Bankruptcy Code.

Section 7.09    *Successor Trustee by Merger, etc.*

UMB-000093

If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation, the successor corporation without any further act will be the successor Trustee.

Section 7.10    *Eligibility; Disqualification*.

There will at all times be a Trustee hereunder that is a corporation organized and doing business under the laws of the United States of America or of any state thereof that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities and that has a combined capital and surplus of at least $100.0 million as set forth in its most recent published annual report of condition.

This Indenture will always have a Trustee who satisfies the requirements of TIA §310(a)(1), (2) and (5).  The Trustee is subject to TIA §310(b).

Section 7.11    *Preferential Collection of Claims Against Company*.

The Trustee is subject to TIA §311(a), excluding any creditor relationship listed in TIA §311(b).  A Trustee who has resigned or been removed shall be subject to TIA §311(a) to the extent indicated therein.

ARTICLE 8
LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 8.01    *Option to Effect Legal Defeasance or Covenant Defeasance*.

The Company may at any time, at the option of its Board of Directors evidenced by a resolution set forth in an Officers' Certificate, elect to have either Section 8.02 or 8.03 hereof be applied to all outstanding Notes upon compliance with the conditions set forth below in this Article 8.

Section 8.02    *Legal Defeasance and Discharge*.

Upon the Company's exercise under Section 8.01 hereof of the option applicable to this Section 8.02, the Company and each of the Guarantors will, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be deemed to have been discharged from their obligations with respect to all outstanding Notes (including the Note Guarantees) on the date the conditions set forth below are satisfied (hereinafter, "*Legal Defeasance*").  For this purpose, Legal Defeasance means that the Company and the Guarantors will be deemed to have paid and discharged the entire Indebtedness represented by the outstanding Notes (including the Note Guarantees), which will thereafter be deemed to be "outstanding" only for the purposes of Section 8.05 hereof and the other Sections of this Indenture referred to in clauses (1) and (2) below, and to have satisfied all their other obligations under such Notes, the Note Guarantees and this Indenture (and the Trustee, on demand of and at the expense of the Company, shall execute proper instruments acknowledging the same), except for the following provisions which will survive until otherwise terminated or discharged hereunder:

UMB-000094

(1)      the rights of Holders of outstanding Notes to receive payments in respect of the principal of, premium on, if any, or interest on such Notes when such payments are due from the trust referred to in Section 8.04 hereof;

(2)      the Company's obligations with respect to such Notes under Article 2 and Section 4.02 hereof;

(3)      the rights, powers, trusts, duties and immunities of the Trustee hereunder and the Company's and the Guarantors' obligations in connection therewith; and

(4)      this Article 8.

Subject to compliance with this Article 8, the Company may exercise its option under this Section 8.02 notwithstanding the prior exercise of its option under Section 8.03 hereof.

Section 8.03    *Covenant Defeasance*.

Upon the Company's exercise under Section 8.01 hereof of the option applicable to this Section 8.03, the Company and each of the Guarantors will, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be released from each of their obligations under the covenants contained in Sections 4.07, 4.08, 4.09, 4.10, 4.11, 4.12, 4.13, 4.15, 4.16, 4.17, 4.18, 4.19 hereof and clause (4) of Section 5.01 hereof with respect to the outstanding Notes on and after the date the conditions set forth in Section 8.04 hereof are satisfied (hereinafter, "*Covenant Defeasance*")*,* and the Notes will thereafter be deemed not "outstanding" for the purposes of any direction, waiver, consent or declaration, act of Holders or Act of Required Holders (and the consequences of any thereof) in connection with such covenants, but will continue to be deemed "outstanding" for all other purposes hereunder (it being understood that such Notes will not be deemed outstanding for accounting purposes).  For this purpose, Covenant Defeasance means that, with respect to the outstanding Notes and Note Guarantees, the Company and the Guarantors may omit to comply with and will have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly, by reason of any reference elsewhere herein to any such covenant or by reason of any reference in any such covenant to any other provision herein or in any other document and such omission to comply will not constitute a Default or an Event of Default under Section 6.01 hereof, but, except as specified above, the remainder of this Indenture and such Notes and Note Guarantees will be unaffected thereby.  In addition, upon the Company's exercise under Section 8.01 hereof of the option applicable to this Section 8.03, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, Sections 6.01(3), (4), (5), (6), (7), (8) and (11)hereof will not constitute Events of Default.

Section 8.04    *Conditions to Legal or Covenant Defeasance*.

In order to exercise either Legal Defeasance or Covenant Defeasance under either Section 8.02 or 8.03 hereof:

(1)      the Company must irrevocably deposit with the Trustee, in trust, for the benefit of the Holders, cash in U.S. dollars, non-callable Government Securities, or a combination thereof, in such amounts as will be sufficient, in the opinion of a nationally recognized investment bank,

UMB-000095

appraisal firm, or firm of independent public accountants, to pay the principal of, premium on, if any, and interest on the outstanding Notes on the stated date for payment thereof or on the applicable redemption date, as the case may be, and the Company must specify whether the Notes are being defeased to such stated date for payment or to a particular redemption date;

(2)    in the case of an election under Section 8.02 hereof, the Company must deliver to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee confirming that:

(A)    the Company has received from, or there has been published by, the Internal Revenue Service a ruling; or

(B)    since the date of this Indenture, there has been a change in the applicable U.S. federal income tax law,

in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, the Holders of the outstanding Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Legal Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(3)    in the case of an election under Section 8.03 hereof, the Company must deliver to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee confirming that the Holders of the outstanding Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Covenant Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(4)    no Default or Event of Default shall have occurred and is continuing on the date of such deposit (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit (and any similar concurrent deposit relating to other Indebtedness), and the granting of Liens to secure such borrowings);

(5)    such Legal Defeasance or Covenant Defeasance will not result in a breach or violation of, or constitute a default under, any material agreement or instrument (other than this Indenture and the agreements governing any other Indebtedness being defeased, discharged or replaced) to which the Company or any of the Guarantors is a party or by which the Company or any of the Guarantors is bound;

(6)    the Company must deliver to the Trustee an Officers' Certificate stating that the deposit was not made by the Company with the intent of preferring the Holders of Notes over the other creditors of the Company with the intent of defeating, hindering, delaying or defrauding any creditors of the Company or others; and

(7)    the Company must deliver to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent relating to the Legal Defeasance or the Covenant Defeasance have been complied with.

UMB-000096

Notwithstanding anything to the contrary contained herein, the Company's obligation to the Trustee, the Notes Representative and the Collateral Agent under Section 7.07 shall survive any satisfaction, discharge or any other termination of this Indenture, including any termination under the Bankruptcy Code.

Section 8.05    *Deposited Money and Government Securities to be Held in Trust; Other Miscellaneous Provisions*.

Subject to Section 8.06 hereof, all money and non-callable Government Securities (including the proceeds thereof) deposited with the Trustee (or other qualifying trustee, collectively for purposes of this Section 8.05, the "*Trustee*") pursuant to Section 8.04 hereof in respect of the outstanding Notes will be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Company acting as Paying Agent) as the Trustee may determine, to the Holders of such Notes of all sums due and to become due thereon in respect of principal, premium, if any, and interest, but such money need not be segregated from other funds except to the extent required by law.

The Company will pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the cash or non- callable Government Securities deposited pursuant to Section 8.04 hereof or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of the outstanding Notes.

Notwithstanding anything in this Article 8 to the contrary, the Trustee will deliver or pay to the Company from time to time upon the request of the Company any money or non-callable Government Securities held by it as provided in Section 8.04 hereof which, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee (which may be the opinion delivered under Section 8.04(1) hereof), are in excess of the amount thereof that would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance.

Section 8.06    *Repayment to Company*.

Any money deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment of the principal of, premium on, if any, or interest on any Note and remaining unclaimed for two years after such principal, premium, if any, or interest has become due and payable shall be paid to the Company on its request or (if then held by the Company) will be discharged from such trust; and the Holder of such Note will thereafter be permitted to look only to the Company for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Company as trustee thereof, will thereupon cease; *provided, however,* that the Trustee or such Paying Agent, before being required to make any such repayment, may at the expense of the Company cause to be published once, in the New York Times and The Wall Street Journal (national edition), notice that such money remains unclaimed and that, after a date specified therein, which will not be less than 30 days from the date of such notification or publication, any unclaimed balance of such money then remaining will be repaid to the Company.

UMB-000097

Section 8.07    *Reinstatement*.

If the Trustee or Paying Agent is unable to apply any U.S. dollars or non-callable Government Securities in accordance with Section 8.02 or 8.03 hereof, as the case may be, by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, then the Company's and the Guarantors' obligations under this Indenture and the Notes and the Note Guarantees will be revived and reinstated as though no deposit had occurred pursuant to Section 8.02 or 8.03 hereof until such time as the Trustee or Paying Agent is permitted to apply all such money in accordance with Section 8.02 or 8.03 hereof, as the case may be; *provided, however,* that, if the Company makes any payment of principal of, premium on, if any, or interest on any Note following the reinstatement of its obligations, the Company will be subrogated to the rights of the Holders of such Notes to receive such payment from the money held by the Trustee or Paying Agent.

ARTICLE 9
AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01    *Without Consent of Holders of Notes*.

Notwithstanding Section 9.02 of this Indenture, without the consent of any Holder of Notes, the Company, the Guarantors, the Trustee and the Collateral Agent may amend or supplement this Indenture, the Notes, the Note Guarantees or the Security Documents:

(1)    to cure any ambiguity, defect or inconsistency that does not adversely affect the legal rights hereunder of any Holder in any material respect;

(2)    to provide for uncertificated Notes in addition to or in place of certificated Notes;

(3)    to provide for the assumption of the Company's or a Guarantor's obligations to the Holders of the Notes and Note Guarantees by a successor to the Company or such Guarantor pursuant to Article 5 or Article 10 hereof;

(4)    to make any change that would provide any additional rights or benefits to the Holders of the Notes or that does not adversely affect the legal rights hereunder of any Holder in any material respect;

(5)    to comply with the requirements of the SEC in order to effect or maintain the qualification of this Indenture under the TIA;

(6)    to enter into a supplemental indenture to evidence the Reincorporation of the Company as permitted by the Plan upon receipt of an Officers' Certificate from the Company confirming that shareholders holding at least 25 percent of the issued and outstanding common shares of the Company have approved the Reincorporation pursuant to the General Corporation Law of the State of Delaware;

(7)    to enter into additional or supplemental Security Documents;

UMB-000098

(8)      to release Collateral in accordance with Section 10.05 of this Indenture and the Security Documents, except as set forth in Section 9.02 of this Indenture;

(9)      to provide for the issuance of Additional Notes in accordance with the limitations set forth in this Indenture as of the date hereof;

(10)      to evidence and provide for the acceptance and appointment (x) under this Indenture of a successor Trustee thereunder or (y) under the Security Documents of a successor Collateral Agent thereunder;

(11)      to make any amendment to the provisions of this Indenture relating to the transfer and legending of the Notes as permitted by this Indenture, including, without limitation, to facilitate the issuance and administration of the Notes; *provided, however,* that (i) compliance with this Indenture as so amended would not result in the Notes being transferred in violation of the Securities Act or any applicable securities laws and (ii) such amendment does not materially and adversely affect the rights of the Holders of the Notes to transfer the Notes;

(12)      to make, complete or confirm any grant of Collateral permitted or required by this Indenture or any of the Security Documents or any release of Collateral that becomes effective as set forth in this Indenture or any of the Security Documents;

(13)      to allow any Guarantor to execute a supplemental indenture and/or a Note Guarantee with respect to the Notes;

(14)      to modify the Security Documents to reflect additional extensions of credit and additional secured creditors holding secured obligations, so long as such secured obligations are not prohibited by this Indenture or any other security document; or

(15)      to the extent required by the Intercreditor Agreement.

Upon the request of the Company accompanied by a resolution of its Board of Directors authorizing the execution of any such amended or supplemental indenture, and upon receipt by the Trustee of the documents described in Section 7.02 hereof, the Trustee will join with the Company and the Guarantors in the execution of any amended or supplemental indenture authorized or permitted by the terms of this Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee will not be obligated to enter into such amended or supplemental indenture that affects its own rights, duties or immunities under this Indenture or otherwise.

Section 9.02    *With Consent of Holders of Notes.*

Except as provided below in this Section 9.02, the Company, the Guarantors, the Trustee and the Collateral Agent may amend or supplement this Indenture (including, without limitation, Section 3.09, 4.10, 4.15 and 4.19 hereof), the Notes, the Note Guarantees and the Security Documents with the consent of the Holders of at least a majority in aggregate principal amount of the then outstanding Notes (including, without limitation, Additional Notes, if any) voting as a single class (including, without limitation, consents obtained in connection with a tender offer or exchange offer for, or purchase of, the Notes), and, subject to Sections 6.04 and 6.07 hereof, any

UMB-000099

existing Default or Event of Default (other than a Default or Event of Default in the payment of the principal of, premium on, if any, or interest on the Notes, except a payment default resulting from an acceleration that has been rescinded) or compliance with any provision of such documents may be waived with the consent of the Holders of a majority in aggregate principal amount of the then outstanding Notes (including, without limitation, Additional Notes, if any) voting as a single class (including, without limitation, consents obtained in connection with a tender offer or exchange offer for, or purchase of, the Notes). Section 2.09 hereof shall determine which Notes are considered to be "outstanding" for purposes of this Section 9.02.

Upon the request of the Company accompanied by a resolution of its Board of Directors authorizing the execution of any such amended or supplemental indenture, and upon the filing with the Trustee of evidence satisfactory to the Trustee of the consent of the Holders of Notes as aforesaid, and upon receipt by the Trustee of the documents described in Section 7.02 hereof, the Trustee will join with the Company and the Guarantors in the execution of such amended or supplemental indenture unless such amended or supplemental indenture directly affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but will not be obligated to, enter into such amended or supplemental Indenture.

It is not necessary for the consent of the Holders of Notes under this Section 9.02 to approve the particular form of any proposed amendment, supplement or waiver, but it is sufficient if such consent approves the substance thereof.

After an amendment, supplement or waiver under this Section 9.02 becomes effective, the Company will mail or post via DTC to the Holders of Notes affected thereby a notice briefly describing the amendment, supplement or waiver. Any failure of the Company to mail or post via DTC such notice, or any defect therein, will not, however, in any way impair or affect the validity of any such amended or supplemental indenture or waiver. Subject to Sections 6.04 and 6.07 hereof, the Holders of a majority in aggregate principal amount of the Notes then outstanding voting as a single class may waive compliance in a particular instance by the Company with any provision of this Indenture, the Notes or the Note Guarantees. However, without the consent of each Holder affected, an amendment, supplement or waiver under this Section 9.02 may not (with respect to any Notes held by a non-consenting Holder):

      (1)     reduce the principal amount of Notes whose Holders must consent to an amendment, supplement or waiver;

      (2)     reduce the principal of or change the fixed maturity of any Note or alter or waive any of the provisions with respect to the redemption of the Notes (except as provided above with respect to Sections 3.09, 4.10, 4.15 and 4.19 hereof);

      (3)     reduce the rate of or change the time for payment of interest, including default interest, on any Note;

      (4)     waive a Default or Event of Default in the payment of principal of, premium on, if any, or interest on, the Notes (except a rescission of acceleration of the Notes by the Holders of at least a majority in aggregate principal amount of the then

UMB-000100

outstanding Notes and a waiver of the payment default that resulted from such acceleration);

     (5)     make any Note payable in money other than that stated in the Notes;

     (6)     make any change in the provisions of this Indenture relating to waivers of past Defaults or the rights of Holders of Notes to receive payments of principal of, premium on, if any, or interest on, the Notes;

     (7)     waive a redemption payment with respect to any Note (other than a payment required by Sections 3.09, 4.10, 4.15 or 4.19 hereof);

     (8)     release any Guarantor from any of its obligations under its Note Guarantee or this Indenture, except in accordance with the terms of this Indenture; or

     (9)     make any change in the preceding amendment and waiver provisions.

In addition, any amendment to, or waiver of, the provisions of this Indenture or any Security Document that has the effect of releasing Collateral, other than releasing Collateral governed by Sections 10.05(1), (2), (3), (5) and (6), from the Liens securing the Notes, shall require the consent of the Holders of at least 66-2/3% in aggregate principal amount of the Notes then outstanding.

Notwithstanding anything set forth herein to the contrary, the Notes held by Affiliates of the Company shall not be included in determining whether the requisite percentages set forth in this Section 9.02 have been met for (i) any amendment, modification, waiver, consent or other action with respect to any of the terms of this Indenture, any Note Guarantee or any Security Document or any departure by the Company or any Subsidiary therefrom, or any plan of reorganization pursuant to the Bankruptcy Code or (ii) directing or requiring the Trustee or any other party to undertake any action (or refrain from taking any action) with respect to or under this Indenture, any Note Guarantee or any Security Document.

Section 9.03   *Compliance with Trust Indenture Act*.

Every amendment or supplement to this Indenture or the Notes will be set forth in an amended or supplemental indenture that complies with the TIA as then in effect.

Section 9.04   *Revocation and Effect of Consents*.

Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder of a Note is a continuing consent by the Holder of a Note and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note.  However, any such Holder of a Note or subsequent Holder of a Note may revoke the consent as to its Note if the Trustee receives written notice of revocation before the date the amendment, supplement or waiver becomes effective. An amendment, supplement or waiver becomes effective in accordance with its terms and thereafter binds every Holder.

UMB-000101

Section 9.05   *Notation on or Exchange of Notes.*

The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated.  The Company in exchange for all Notes may issue and the Trustee shall, upon receipt of an Authentication Order, authenticate new Notes that reflect the amendment, supplement or waiver.

Failure to make the appropriate notation or issue a new Note will not affect the validity and effect of such amendment, supplement or waiver.

Section 9.06   *Trustee to Sign Amendments, etc.*

The Trustee and the Collateral Agent will sign any amended or supplemental indenture authorized pursuant to this Article 9 if the amendment or supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee, Notes Representative and Collateral Agent.  The Company may not sign an amended or supplemental indenture until the Board of Directors of the Company approves it.  In executing any amended or supplemental indenture, the Trustee and the Collateral Agent will be entitled to receive and (subject to Section 7.01 hereof) will be fully protected in relying upon, in addition to the documents required by Section 14.04 hereof, an Officers' Certificate and an Opinion of Counsel stating that all conditions precedent relating to the execution and delivery of such amended or supplemental indenture have been complied with and the such supplemental indenture constitutes the legal, valid and binding obligation of the Company and the Guarantors subject to customary exceptions.

ARTICLE 10
COLLATERAL SECURITY

Section 10.01  *Security Interest*

The due and punctual payment of the principal of, premium on, and if any, interest on, the Notes when and as the same shall be due and payable, whether on an interest payment date, at maturity, by acceleration, repurchase, redemption or otherwise, and interest on the overdue principal of, premium on, if any, and interest (to the extent permitted by law), on the Notes and performance of all other Notes Obligations of the Company to the Holders of Notes or the Trustee under this Indenture and the Notes (including, without limitation, the Note Guarantees), according to the terms hereunder or thereunder, are secured as provided in the Security Documents.  Each Holder of Notes, by its acceptance thereof, consents and agrees to the terms of the Intercreditor Agreement and the Security Documents (including, without limitation, the provisions providing for foreclosure and release of Collateral) as the same may be in effect or may be amended from time to time in accordance with its terms and authorizes and directs the Collateral Agent to enter into the Intercreditor Agreement and the Security Documents and to perform its obligations and exercise its rights thereunder in accordance therewith.  The Company will deliver to the Trustee copies of all documents delivered to the Collateral Agent pursuant to the Intercreditor Agreement and the Security Documents, and will do or cause to be done all such acts and things as may be necessary or proper, or as may be required by the provisions of the Intercreditor Agreement and Security Documents, to assure and confirm to the Trustee and the Collateral Agent the security interest in the Collateral contemplated hereby, by the Intercreditor

94

UMB-000102

Agreement and the Security Documents or any part thereof, as from time to time constituted, so as to render the same available for the security and benefit of this Indenture and of the Notes. The Company will take, and will cause its Subsidiaries to take, upon request of the Trustee, any and all actions reasonably required to cause the Intercreditor Agreement and the Security Documents to create and maintain, as security for the Notes Obligations, a valid and enforceable perfected first-priority Lien in and on all the Collateral, in favor of the Collateral Agent for the benefit of the Holders of Notes and the Trustee superior to and prior to the rights of all third Persons and subject to no other Liens than Permitted Liens. Notwithstanding anything to the contrary contained herein, it shall be the sole responsibility of the Company to maintain perfection of such security interest. Neither the Trustee, the Notes Representative nor the Collateral Agent shall be responsible for maintaining perfection of such security interest.

Section 10.02 *Intercreditor Agreement*.

This Article 10 and the provisions of each other Security Document are subject to the terms, conditions and benefits set forth in the Intercreditor Agreement. The Company and each Guarantor consent to, and agree to be bound by, the terms of the Intercreditor Agreement, as the same may be in effect from time to time, and to perform their respective obligations thereunder in accordance with the terms therewith.

Section 10.03 *[Reserved]*.

Section 10.04 *[Reserved]*.

Section 10.05 *Release of Liens in Respect of Notes*.

The Collateral Agent's Liens upon the Collateral will no longer secure the Notes outstanding under this Indenture or any other Notes Obligations under this Indenture, and the right of the Holders of the Notes and such Notes Obligations to the benefits and proceeds of the Collateral Agent's Liens on the Collateral will terminate and be discharged:

(1) upon the satisfaction and discharge of this Indenture, in accordance with Article 13 hereof;

(2) upon a Legal Defeasance or Covenant Defeasance of the Notes in accordance with Article 8 hereof;

(3) upon payment in full and discharge of all Notes outstanding under this Indenture and all other Notes Obligations that are outstanding, due and payable under this Indenture at the time the Notes are paid in full in cash and discharged;

(4) in whole or in part, with, if applicable, the consent of the Holders of the requisite percentage of Notes in accordance with Section 9.02 hereof;

(5) as to any Collateral (including, for the avoidance of doubt, any Capital Stock of any Guarantor and, in the case of a sale of all of the Capital Stock of a Guarantor, all of such Guarantor's assets) that is sold, transferred or otherwise disposed of by the Company or any Guarantor to a Person that is not (either before or after such sale, transfer or disposition) the

UMB-000103

Company or a Restricted Subsidiary of the Company in a transaction or other circumstances that either (i) does not constitute an Asset Sale or (ii) otherwise complies with Section 4.10 of this Indenture, at the time of such sale, transfer or other disposition or to the extent of the interest sold, transferred or otherwise disposed of; *provided* that, the Collateral Agent's Liens upon the Collateral will not be released if the sale or disposition is subject to Section 5.01 of this Indenture;

(6)      if and to the extent required by the Intercreditor Agreement.  For the avoidance of doubt, the release of any Liens of the Notes Representative, acting in its capacity as the Junior Representative (as defined in the Intercreditor Agreement), in the ABL Priority Collateral shall be automatic under the Intercreditor Agreement and shall not require the consent of any Holders.

Each Holder, by its agreement to hold the Notes, and each subsequent Holder, by its acquisition of Notes, hereby consents to and agrees to the terms of the Intercreditor Agreement and acknowledges that this consent is intended to be the consent required by TIA §316(b) for purposes of agreeing to the terms and conditions of the Intercreditor Agreement.

Section 10.06 *Relative Rights*.

Nothing in the Notes Document will:

(1)      impair, as between the Company and the Holders of Notes, the obligation of the Company to pay principal of, premium and interest on the Notes in accordance with their terms or any other obligation of the Company or any Guarantor;

(2)      affect the relative rights of Holders of Notes as against any other creditors of the Company or any Guarantor (other than holders of Permitted Prior Liens);

(3)      restrict the right of any Holder of Notes to sue for payments that are then due and owing (but not enforce any judgment in respect thereof against any Collateral to the extent specifically prohibited by the Intercreditor Agreement);

(4)      restrict or prevent any holder of Notes or other Notes Obligations or the Collateral Agent from exercising any of its rights or remedies upon a Default or Event of Default not specifically restricted or prohibited by the Intercreditor Agreement; or

(5)      restrict or prevent any holder of Notes or other Notes Obligations or the Collateral Agent from taking any lawful action in an Insolvency Proceeding not specifically restricted or prohibited by the Intercreditor Agreement.

Section 10.07 *Further Assurances; Insurance*.

(a)      The Company and each of the Guarantors shall do or cause to be done all acts and things that may be required, or that the Collateral Agent from time to time may reasonably request, to assure and confirm that the Collateral Agent holds, for the benefit of the holders of Notes Obligations, duly created and enforceable and perfected Liens upon the Collateral (including any property or assets that are acquired or otherwise become Collateral after the Notes

UMB-000104

are issued), in each case, as contemplated by, and with the Lien priority required under, the Notes Documents.

(b)     The Company and the Guarantors will:

(1)     keep their properties adequately insured at all times by financially sound and reputable insurers;

(2)     maintain such other insurance, to such extent and against such risks (and with such deductibles, retentions and exclusions), including fire and other risks insured against by extended coverage and coverage for acts of terrorism, as is customary with companies in the same or similar businesses operating in the same or similar locations, including public liability insurance against claims for personal injury or death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by them;

(3)     maintain such other insurance as may be required by law;

(4)     maintain title insurance on all real property Collateral insuring the Collateral Agent's Lien on that property, subject only to Permitted Prior Liens and other exceptions to title approved by the Collateral Agent; provided that title insurance need only be maintained on any particular parcel of real property having a Fair Market Value of more than $1.0 million; and

(5)     maintain such other insurance as may be required by the Security Documents.

(c)     Upon the request of the Collateral Agent, the Company and the Guarantors will furnish to the Collateral Agent full information as to their property and liability insurance carriers.  Holders of Notes Obligations, as a class, will be named as additional insureds, with a waiver of subrogation, on all insurance policies of the Company and the Guarantors and the Collateral Agent will be named as loss payee, with 30 days' notice of cancellation or material change, on all property and casualty insurance policies of the Company and the Guarantors.

Section 10.08 *Release of Collateral*.

(a)     The Collateral subject to the Security Documents may be released from the Lien and security interest created by the Security Documents at any time or from time to time in accordance with the provisions of this Indenture, in particular Sections 9.02 and 10.05 hereof, the Security Documents and the Intercreditor Agreement.

(b)     The release of any Collateral shall not be deemed to impair the security in contravention of the provisions of this Indenture if and to the extent such assets are released pursuant to the terms of this Indenture, the Security Documents or the Intercreditor Agreement.

(c)     In the event that the Company seeks to release the Collateral, the Company shall deliver an Officers' Certificate and an Opinion of Counsel to the Collateral Agent stating that all conditions precedent relating to the release have been complied with.

UMB-000105

(d)     Subject to the terms and conditions of the relevant Security Documents and the Intercreditor Agreement, the Collateral Agent at the direction of the Trustee in accordance with an Act of Required Holders shall, if so requested by the Company in writing and based solely upon the Officers' Certificate and Opinion of Counsel delivered to the Collateral Agent in preceding clause (c) above, authorize the Collateral Agent to execute, deliver or acknowledge any necessary or proper instruments of termination, satisfaction or release to evidence the release of any Collateral permitted to be released pursuant to this Indenture or the Security Documents, and the Intercreditor Agreement.

## ARTICLE 11
## NOTE GUARANTEES

Section 11.01 *Guarantee*.

The Guarantors agree as follows upon becoming a party to this Indenture:

(a)     Subject to this Article 11, each of the Guarantors hereby, jointly and severally, unconditionally guarantees to each Holder of a Note authenticated and delivered by the Trustee and to the Trustee and its successors and assigns, irrespective of the validity and enforceability of this Indenture, the Notes or the Notes Obligations of the Company hereunder or thereunder, that:

(1)     the principal of, premium on, if any, and interest on, the Notes will be promptly paid in full when due, whether at maturity, by acceleration, redemption or otherwise, and interest on the overdue principal of, premium on, if any, and interest on, the Notes, if lawful, and all other obligations of the Company to the Holders or the Trustee and the Collateral Agent hereunder or thereunder will be promptly paid in full or performed, all in accordance with the terms hereof and thereof; and

(2)     in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise.

Failing payment when due of any amount so guaranteed or any performance so guaranteed for whatever reason, the Guarantors will be jointly and severally obligated to pay the same immediately. Each Guarantor agrees that this is a guarantee of payment and not a guarantee of collection.

(b)     The Guarantors hereby agree that their obligations hereunder are unconditional, irrespective of the validity, regularity or enforceability of the Notes or this Indenture, the absence of any action to enforce the same, any waiver or consent by any Holder of the Notes with respect to any provisions hereof or thereof, the recovery of any judgment against the Company, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor. Each Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Company, any right to require a proceeding first against the Company, protest, notice and all demands whatsoever and covenant that this Note Guarantee will not be discharged except by complete performance of the obligations contained in the Notes and this Indenture.

UMB-000106

(c)      If any Holder or the Trustee is required by any court or otherwise to return to the Company, the Guarantors or any custodian, trustee, liquidator or other similar official acting in relation to either the Company or the Guarantors, any amount paid by either to the Trustee or such Holder, this Note Guarantee, to the extent theretofore discharged, will be reinstated in full force and effect.

(d)      Each Guarantor agrees that it will not be entitled to any right of subrogation in relation to the Holders in respect of any obligations guaranteed hereby until payment in full of all obligations guaranteed hereby.  Each Guarantor further agrees that, as between the Guarantors, on the one hand, and the Holders and the Trustee, on the other hand, (1) the maturity of the obligations guaranteed hereby may be accelerated as provided in Article 6 hereof for the purposes of this Note Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed hereby, and (2) in the event of any declaration of acceleration of such obligations as provided in Article 6 hereof, such obligations (whether or not due and payable) will forthwith become due and payable by the Guarantors for the purpose of this Note Guarantee.  The Guarantors will have the right to seek contribution from any non-paying Guarantor so long as the exercise of such right does not impair the rights of the Holders under the Note Guarantee.

Section 11.02 *Limitation on Guarantor Liability*.

Each Guarantor, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Note Guarantee of such Guarantor not constitute a fraudulent transfer or conveyance for purposes of Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal or state law to the extent applicable to any Note Guarantee.  To effectuate the foregoing intention, the Trustee, the Holders and the Guarantors hereby irrevocably agree that the obligations of such Guarantor will be limited to the maximum amount that will, after giving effect to such maximum amount and all other contingent and fixed liabilities of such Guarantor that are relevant under such laws, and after giving effect to any collections from, rights to receive contribution from or payments made by or on behalf of any other Guarantor in respect of the obligations of such other Guarantor under this Article 11, result in the obligations of such Guarantor under its Note Guarantee not constituting a fraudulent transfer or conveyance.

Section 11.03 *Execution and Delivery of Note Guarantee*.

To evidence its Note Guarantee set forth in Section 11.01 hereof, each Guarantor hereby agrees that a notation of such Note Guarantee substantially in the form attached as Exhibit E hereto will be endorsed by an Officer of such Guarantor on each Note authenticated and delivered by the Trustee and that this Indenture will be executed on behalf of such Guarantor by one of its Officers.

Each Guarantor hereby agrees that its Note Guarantee set forth in Section 11.01 hereof will remain in full force and effect notwithstanding any failure to endorse on each Note a notation of such Note Guarantee.

UMB-000107

If an Officer whose signature is on this Indenture or on the Note Guarantee no longer holds that office at the time the Trustee authenticates the Note on which a Note Guarantee is endorsed, the Note Guarantee will be valid nevertheless.

The delivery of any Note by the Trustee, after the authentication thereof hereunder, will constitute due delivery of the Note Guarantee set forth in this Indenture on behalf of the Guarantors.

In the event that the Company or any of its Restricted Subsidiaries creates or acquires any Domestic Subsidiary after the date of this Indenture, if required by Section 4.17 hereof, the Company will cause such Domestic Subsidiary to comply with the provisions of Section 4.17 hereof and this Article 11, to the extent applicable.

Section 11.04  *Guarantors May Consolidate, etc., on Certain Terms*.

Except as otherwise provided in Section 11.05 hereof, no Guarantor may sell or otherwise dispose of all or substantially all of its assets to, or consolidate with or merge with or into (whether or not such Guarantor is the surviving Person) another Person, other than the Company or another Guarantor, unless:

(1) immediately after giving effect to such transaction, no Default or Event of Default exists; and

(2) either:

(a)      (i) the Person acquiring the property in any such sale or disposition or the Person formed by or surviving any such consolidation or merger (the "*Successor Guarantor*") unconditionally assumes all the obligations of that Guarantor under its Note Guarantee, this Indenture and the Security Documents pursuant to a supplemental indenture and appropriate Security Documents satisfactory to the Trustee; (ii) the Successor Guarantor causes such amendments, supplements or other instruments to be executed, delivered, filed and recorded in such jurisdictions as may be required by applicable law to preserve and protect the Liens under the applicable Security Documents on the Collateral owned by or transferred to the Successor Guarantor, together with such financing statements as may be required to perfect any security interests in such Collateral which may be perfected by the filing of a financing statement under the Uniform Commercial Code of the relevant jurisdiction and Opinions of Counsel confirming such perfection; (iii) the Collateral owned by or transferred to the Successor Guarantor shall: (A) continue to constitute Collateral under this Indenture and the applicable Security Documents, (B) be subject to Liens in favor of the Collateral Agent for the benefit of the Holders of the Notes and any other Notes Obligations and (C) not be subject to any Lien other than Permitted Liens; and (iv) the property and assets of the Person which is merged or consolidated with or into the Successor Guarantor, to the extent that they are property or assets of the types which would constitute Collateral under the applicable Security Documents, shall be treated as after-acquired property and the Successor Guarantor shall take such action as may be reasonably necessary to cause such property and assets to be made subject to the Lien of the applicable Security Documents in the manner and to the extent required in this Indenture and the Security Documents; or

UMB-000108

(b)      the Net Proceeds of such sale or other disposition are applied in accordance with the applicable provisions of this Indenture, including without limitation, Section 4.10 hereof.

In case of any such consolidation, merger, sale or conveyance and upon the assumption by the successor Person, by supplemental indenture, executed and delivered to the Trustee and satisfactory in form to the Trustee, of the Note Guarantee endorsed upon the Notes and the due and punctual performance of all of the covenants and conditions of this Indenture to be performed by the Guarantor, such successor Person will succeed to and be substituted for the Guarantor with the same effect as if it had been named herein as a Guarantor.  Such successor Person thereupon may cause to be signed any or all of the Note Guarantees to be endorsed upon all of the Notes issuable hereunder which theretofore shall not have been signed by the Company and delivered to the Trustee.  All the Note Guarantees so issued will in all respects have the same legal rank and benefit under this Indenture as the Note Guarantees theretofore and thereafter issued in accordance with the terms of this Indenture as though all of such Note Guarantees had been issued at the date of the execution hereof.

Except as set forth in Articles 4 and 5 hereof, and notwithstanding clauses 2(a) and (b) above, nothing contained in this Indenture or in any of the Notes will prevent any consolidation or merger of a Guarantor with or into the Company or another Guarantor, or will prevent any sale or conveyance of the property of a Guarantor as an entirety or substantially as an entirety to the Company or another Guarantor.

Section 11.05 *Releases*.

(a)      In the event of any sale or other disposition of all or substantially all of the assets of any Guarantor, by way of merger, consolidation or otherwise, to a Person that is not (either before or after giving effect to such transaction) the Company or a Restricted Subsidiary of the Company, then the corporation acquiring the property will be released and relieved of any Notes Obligations under the Note Guarantee;

(b)      In the event of any sale or other disposition of Capital Stock of such Guarantor to a Person that is not (either before or after giving effect to such transaction) the Company or a Restricted Subsidiary of the Company and such Guarantor ceases to be a Restricted Subsidiary of the Company as a result of the sale or other disposition, then such Guarantor will be released and relieved of any Notes Obligations under its Note Guarantee;

*provided,* in both cases, that (x) the consent provisions set forth in Section 9.02, if applicable, are met and (y) the Net Proceeds of such sale or other disposition are applied in accordance with the applicable provisions of this Indenture, including without limitation Section 4.10 hereof, if applicable.  Upon delivery by the Company to the Trustee of an Officers' Certificate and an Opinion of Counsel stating that all conditions precedent relating to the release have been complied with, the Trustee will execute any documents reasonably required in order to evidence the release of any Guarantor from its obligations under its Note Guarantee.

(c)      Upon designation of any Restricted Subsidiary that is a Guarantor as an Unrestricted Subsidiary in accordance with the terms of this Indenture, such Guarantor will be

101

UMB-000109

automatically released and relieved of any Notes Obligations under its Note Guarantee.  The Company will send notice of such release to the Trustee and Collateral Agent.

(d)      Upon Legal Defeasance or Covenant Defeasance in accordance with Article 8 hereof or satisfaction and discharge of this Indenture in accordance with Article 12 hereof, each Guarantor will be released and relieved of any Notes Obligations under its Note Guarantee.

(e)      Upon the dissolution of a Guarantor if its assets are distributed to the Company or another Guarantor, such Guarantor will be released and relieved of any Notes Obligations under its Note Guarantee.

Any Guarantor not released from its obligations under its Note Guarantee as provided in this Section 11.05 will remain liable for the full amount of principal of, premium on, if any, and interest on, the Notes and for the other Notes Obligations of any Guarantor under this Indenture as provided in this Article 11.

ARTICLE 12
SATISFACTION AND DISCHARGE

Section 12.01  *Satisfaction and Discharge*.

This Indenture will be discharged and will cease to be of further effect as to all Notes issued hereunder, when:

(1) either:

(a)      all Notes that have been authenticated, except lost, stolen or destroyed Notes that have been replaced or paid and Notes for whose payment money has been deposited in trust and thereafter repaid to the Company, have been delivered to the Trustee for cancellation; or

(b)      all Notes that have not been delivered to the Trustee for cancellation have become due and payable by reason of the mailing of a notice of redemption or otherwise or will become due and payable within one year and the Company or any Guarantor has irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust solely for the benefit of the Holders, cash in U.S. dollars, non- callable Government Securities, or a combination thereof, in such amounts as will be sufficient, without consideration of any reinvestment of interest, to pay and discharge the entire Indebtedness on the Notes not delivered to the Trustee for cancellation for principal, premium, if any, and interest to the date of maturity or redemption;

(2)      in respect of subclause (b) of clause (1) of this Section 12.01, no Default or Event of Default has occurred and is continuing on the date of the deposit (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit and any similar deposit relating to other Indebtedness and, in each case, the granting of Liens to secure such borrowings) and the deposit will not result in a breach or violation of, or constitute a default under, any other instrument to which the Company or any Guarantor is a party or by which the Company or any Guarantor is bound (other than with respect to the borrowing of funds to be applied concurrently to make the deposit required to effect such satisfaction and discharge and

UMB-000110

any similar concurrent deposit relating to other Indebtedness, and in each case the granting of Liens to secure such borrowings);

(3)     the Company or any Guarantor has paid or caused to be paid all sums payable by it under this Indenture; and

(4)     the Company has delivered irrevocable instructions to the Trustee under this Indenture to apply the deposited money toward the payment of the Notes at maturity or on the redemption date, as the case may be.

In addition, the Company must deliver an Officers' Certificate and an Opinion of Counsel to the Trustee stating that all conditions precedent to satisfaction and discharge have been satisfied.

Notwithstanding the satisfaction and discharge of this Indenture, if money has been deposited with the Trustee pursuant to subclause (b) of clause (1) of this Section 12.01, the provisions of Sections 12.02 and 8.06 hereof will survive.  In addition, nothing in this Section 12.01 will be deemed to discharge those provisions of Section 7.07 hereof, that, by their terms, survive the satisfaction and discharge of this Indenture.

Section 12.02  *Application of Trust Money*.

Subject to the provisions of Section 8.06 hereof, all money deposited with the Trustee pursuant to Section 12.01 hereof shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Company acting as its own Paying Agent) as the Trustee may determine, to the Persons entitled thereto, of the principal, premium, if any, and interest for whose payment such money has been deposited with the Trustee; but such money need not be segregated from other funds except to the extent required by law.

If the Trustee or Paying Agent is unable to apply any money or Government Securities in accordance with Section 12.01 hereof by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Company's and any Guarantor's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 12.01 hereof; *provided* that if the Company has made any payment of principal of, premium on, if any, or interest on any Notes because of the reinstatement of its obligations, the Company shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or Government Securities held by the Trustee or Paying Agent.

## ARTICLE 13
## COLLATERAL AGENT

Section 13.01  *Appointment; Powers of the Collateral Agent*.

(a)     The Company and each holder of a Note by their acceptance thereof hereby designates and appoints U.S. Bank National Association to act as Collateral Agent under this

UMB-000111

Indenture, and hereby authorizes the Collateral Agent to take such actions on their behalf under the provisions of this Indenture, the Intercreditor Agreement, and the other Security Documents to which it is a party and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of this Indenture.  For the avoidance of doubt, the Collateral Agent, acting as Notes Representative, is the only party authorized to take actions on behalf of the Notes Secured Parties under the Intercreditor Agreement.

(b)      The Collateral Agent is irrevocably authorized and empowered to enter into and perform its obligations and protect, perfect, exercise and enforce its interest, rights, powers and remedies under the Security Documents and applicable law and in equity and to act as set forth in this Article 13 or, subject to the other provisions of this Indenture, as requested in any lawful directions given to it from time to time by the Company or in respect of any matter by an Act of Required Holders, except for those actions requiring consent specifically enumerated by Section 9.02, which shall require a greater percentage of consent of the Holders of an aggregate principal amount of the Notes then outstanding voting as a single class, as set forth in Section 9.02.

Section 13.02  *For Sole and Exclusive Benefit of the Holders*.

The Collateral Agent will accept, hold, administer and enforce all Liens on the Collateral at any time transferred or delivered to it and all other interests, rights, powers and remedies at any time granted to or enforceable by the Collateral Agent and all other Collateral solely and exclusively for the benefit of itself and the present and future Holders and any other holders of present and future Note Obligations, and will distribute all proceeds received by it in realization thereon or from enforcement thereof solely and exclusively pursuant to the provisions of the Intercreditor Agreement and under this Indenture in accordance with Section 6.10 hereof.

Section 13.03  *No Implied Duty*.

The Collateral Agent will not have any fiduciary duties nor will it have responsibilities or obligations other than those expressly assumed by it in this Indenture, the Intercreditor Agreement and the other Notes Documents to which it is a party in its capacity as Collateral Agent. The Collateral Agent will not be required to take any action that is contrary to applicable law or any provision of this Indenture, the Intercreditor Agreement or the other Notes Documents to which it is a party in its capacity as Collateral Agent. The permissive right of the Collateral Agent to take or refrain from taking any actions enumerated in this Indenture, the Intercreditor Agreement or any other Notes Document to which it is a party in its capacity as Collateral Agent shall not be construed as a duty.

The Collateral Agent shall have all of the rights, privileges, immunities and indemnities granted to the Trustee in Article 7 of the Indenture, including without limitation, those specifically set forth in Section 7.07 and Section 7.08(g), as if fully set forth herein which are in addition to those set forth in this Article 13.

Section 13.04  *Appointment of Agents and Advisors*.

The Collateral Agent may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, attorneys, accountants, appraisers or

UMB-000112

other experts or advisors selected by it in good faith as it may reasonably require and will not be responsible for any misconduct or negligence on the part of any of them.

Section 13.05  *Other Agreements*.

The Collateral Agent has accepted its appointment as Collateral Agent hereunder and is bound by the Security Documents executed by it as of the date of this Indenture and, as directed by an Act of Required Holders, the Collateral Agent shall execute additional Security Documents delivered to it after the date of this Indenture; *provided, however*, that such additional Security Documents do not adversely affect the rights, privileges, benefits and immunities of the Collateral Agent. The Collateral Agent will not otherwise be bound by, or be held obligated by, the provisions of any credit agreement, indenture or other agreement governing the Notes Obligations (other than this Indenture, the Intercreditor Agreement and the other Notes Documents to which it is a party).

Section 13.06  *Solicitation of Instructions*.

*No written direction given to the Collateral Agent by the Trustee acting at the direction of an Act of Required Holders that in the reasonable good faith judgment of the Collateral Agents imposes or would reasonably be expected to impose upon the Collateral Agent any obligation or liability not set forth in or arising under this Indenture, the Intercreditor Agreement and the other Security Documents will be binding upon the Collateral Agent unless the Collateral Agent elects, at its sole option, to accept such direction and it is provided indemnity and security satisfactory to it.*

Section 13.07  *Limitation of Liability*.

The Collateral Agent will not be responsible or liable for any action taken or omitted to be taken by it hereunder, the Intercreditor Agreement or under any other Security Document, except for its own gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction.

Section 13.08  *Entitled to Rely*.

The Collateral Agent may seek and rely upon, and shall be fully protected in relying upon, any judicial order or judgment, upon any advice, opinion or statement of legal counsel, independent consultants and other experts selected by it in good faith and upon any certification, instruction, notice or other writing delivered to it by Company or any Guarantor in compliance with the provisions of this Indenture, the Intercreditor Agreement and the other Security Documents or delivered to it by the Notes Representative as to the Holders and any other holders of Notes Obligations for whom it acts, or a direction from the Trustee acting at the direction of an Act of Required Holders, without being required to determine the authenticity thereof or the correctness of any fact stated therein or the propriety or validity of service thereof. The Collateral Agent may act in reliance upon any instrument comporting with the provisions of this Indenture, the Intercreditor Agreement and the other Security Documents or any signature reasonably believed by it to be genuine and may assume that any Person purporting to give notice or receipt or advice or make any statement or execute any document in connection with the provisions hereof or the other Security Documents has been duly authorized to do so. To the extent an

105

Officers' Certificate or Opinion of Counsel is required or permitted under this Indenture, the Intercreditor Agreement or the other Security Documents to be delivered to the Collateral Agent in respect of any matter, the Collateral Agent may rely conclusively on an Officers' Certificate or Opinion of Counsel as to such matter and such Officers' Certificate or Opinion of Counsel shall be full warranty and protection to the Collateral Agent for any action taken, suffered or omitted by it under the provisions of this Indenture, the Intercreditor Agreement and the other Security Documents.

Section 13.09   *Default*.

The Collateral Agent will not be required to inquire as to the occurrence or absence of any Default hereunder or under the Intercreditor Agreement and will not be affected by or required to act upon any notice or knowledge as to the occurrence of any Default unless and until it receives written notice of such Default from the Required Holders and is directed by the Trustee acting in accordance with an Act of Required Holders and if required by the Collateral Agent, an indemnity and security satisfactory to it is provided under Section 13.11 hereof.

Section 13.10   *Actions by Collateral Agent*.

As to any matter not expressly provided for by this Indenture or the other Security Documents, the Collateral Agent will act or refrain from acting as directed by the Trustee acting in accordance with an Act of Required Holders and will be fully protected if it does so, and any action taken, suffered or omitted pursuant hereto or thereto shall be binding on the Holders and any other holders of Notes Obligations.

Section 13.11   *Security and Indemnity in Favor of the Collateral Agent*.

The Collateral Agent will not be required to take any action at the direction of the Holders or any other holders of Notes Obligations, to advance or expend any funds or otherwise incur any financial liability in the performance of its duties or the exercise of its powers or rights hereunder unless it has been provided with pre-funding, security and indemnity reasonably satisfactory to it against any and all cost, loss, liability or expense which may be incurred by it by reason of taking or continuing to take such action.

Section 13.12   *Rights of the Collateral Agent*.

In the event there is any bona fide, good faith disagreement between the other parties to this Indenture, the Intercreditor Agreement or any of the other Security Documents resulting in adverse claims being made in connection with Collateral held by the Collateral Agent and the terms of this Indenture, the Intercreditor Agreement or any of the other Security Documents do not unambiguously mandate the action the Collateral Agent is to take or not to take in connection therewith under the circumstances then existing, or the Collateral Agent is in doubt as to what action it is required to take or not to take hereunder or under the other Security Documents, it will be entitled to refrain from taking any action (and will incur no liability for doing so) until directed otherwise (subject to Section 13.11) in writing by a request signed jointly by the parties hereto entitled to give such direction or by order of a court of competent jurisdiction.

Section 13.13   *Limitations on Duty of Collateral Agent in Respect of Collateral*.

UMB-000114

(a)    Beyond the exercise of reasonable care in the custody of Notes Collateral in its possession, the Collateral Agent will have no duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and the Collateral Agent will not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any Liens on the Notes Collateral; it shall be the sole responsibility of the Company to take any necessary action to preserve, protect or perfect the security interests granted to the Collateral Agent; *provided*, *however*, that, notwithstanding the foregoing, the Collateral Agent will execute, file or record UCC-3 continuation statements and other documents and instruments to preserve, protect or perfect the security interests granted to the Collateral Agent (subject to the priorities set forth herein) if it shall receive a specific written request to execute, file or record the particular continuation statement or other specific document or instrument by an Act of Required Holders. The Collateral Agent will be deemed to have exercised reasonable care in the custody of the Notes Collateral in its possession if the Notes Collateral is accorded treatment substantially equal to that which it accords its own property, and the Collateral Agent will not be liable or responsible for any loss or diminution in the value of any of the Notes Collateral by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Collateral Agent with due care.  Pursuant to applicable law, if the Company and the Guarantors fail to take any necessary action to preserve, protect or perfect the security interests granted to the Collateral Agent, the Company and the Guarantors authorize the Collateral Agent to file or record financing statements and other filing or recording documents or instruments without the signature of Company or such Guarantor, as directed by an Act of Required Holders in such form and in such offices as may be necessary or as so directed or by an Opinion of Counsel, in each case as is appropriate to perfect the security interests of the Collateral Agent in the Collateral under the Security Documents. This authorization, however, shall not relieve Company or the Guarantors from their obligations to perfect or maintain the perfection of any Liens on the Collateral as may be required hereby or by any of the Notes Documents.

(b)    The Collateral Agent will not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence or willful misconduct on the part of the Collateral Agent, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of Company or any Guarantor to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Collateral Agent hereby disclaims any representation or warranty to the present and future Holders or any other holders of the Notes Obligations concerning the perfection of the Liens granted to it or in the value of any of the Collateral.

Section 13.14 *Assumption of Rights, No Assumption of Duties*.

Notwithstanding anything to the contrary contained herein: (a) each of the parties thereto will remain liable under each of the Security Documents (other than this Indenture) to the extent set forth therein to perform all of their respective duties and obligations thereunder to the same

107

extent as if this Indenture had not been executed; (b) the exercise by the Collateral Agent of any of its rights, remedies or powers hereunder will not release such parties from any of their respective duties or obligations under the other Security Documents; and (c) the Collateral Agent will not be obligated to perform any of the obligations or duties of any of the parties thereunder other than those of the Collateral Agent.

Section 13.15 *No Liability for Clean Up of Hazardous Materials*.

In the event that the Collateral Agent is required to acquire title to an asset for any reason, or take any managerial action of any kind in regard thereto, in order to carry out any fiduciary or trust obligation for the benefit of another, which in the Collateral Agent's sole discretion may cause the Collateral Agent to be considered an "owner or operator" under any environmental laws or otherwise cause the Collateral Agent to incur, or be exposed to, any environmental liability or any liability under any other federal, state or local law, the Collateral Agent reserves the right, instead of taking such action, either to resign as Collateral Agent or to arrange for the transfer of the title or control of the asset to a court appointed receiver. The Collateral Agent will not be liable to any Person for any environmental liability or any environmental claims or contribution actions under any federal, state or local law, rule or regulation by reason of the Collateral Agent's actions and conduct as authorized, empowered and directed hereunder or relating to any kind of discharge or release or threatened discharge or release of any hazardous materials into the environment.

Section 13.16 *Resignation or Removal of Collateral Agent*.

Subject to the appointment of a successor Collateral Agent as provided in Section 13.17 and the acceptance of such appointment by the successor Collateral Agent:

(a)      the Collateral Agent may resign at any time by giving not less than 30 days' notice of resignation to each of the Trustee and the Company, *provided* that such notice period may be waived with the consent of both the Trustee and the Company; and

(b)      the Collateral Agent may be removed at any time, with or without cause, by an Act of Required Holders.

Section 13.17 *Appointment of Successor Collateral Agent*.

Upon any such resignation or removal, a successor Collateral Agent may be appointed by an Act of Required Holders. If no successor Collateral Agent has been so appointed and accepted such appointment within 30 days after the predecessor Collateral Agent gave notice of resignation or was removed, Company shall appoint a successor Collateral Agent. If such appointment has not been made within such 30 day period, Company and/or the Collateral Agent may petition a court of competent jurisdiction for appointment of a successor Collateral Agent. Each successor Collateral Agent must be a bank or trust company:

(a)      authorized to exercise corporate trust powers;

(b)      having a combined capital and surplus of at least $50,000,000; and

108

UMB-000116

(c)       that is not the Company or its Affiliates.

The Collateral Agent will fulfill its obligations hereunder until a successor Collateral Agent meeting the requirements of this Section 13.17 has accepted its appointment as Collateral Agent and the provisions of Section 13.18 have been satisfied.

Section 13.18 *Succession*.

When the Person so appointed as successor Collateral Agent accepts such appointment:

(a)       such Person will succeed to and become vested with all the rights, powers, privileges and duties of the predecessor Collateral Agent, upon the payment of any and all amounts due and owing to the predecessor Collateral Agent and the predecessor Collateral Agent will be discharged from its duties and obligations hereunder; and

(b)       the predecessor Collateral Agent will (at the expense of Company) promptly transfer all Liens and collateral security and other Collateral within its possession or control to the possession or control of the successor Collateral Agent and will execute instruments and assignments as may be necessary or reasonably requested by the successor Collateral Agent to transfer to the successor Collateral Agent all Liens, interests, rights, powers and remedies of the predecessor Collateral Agent in respect of the Security Documents or the Collateral.

Thereafter, the predecessor Collateral Agent will remain entitled to enforce the immunities granted to it in this Article 13 of the Indenture and these protections, immunities and indemnities given to the predecessor Collateral Agent shall survive the resignation, removal and any termination of this Indenture including any termination under the Bankruptcy Code.

Section 13.19 *Merger, Conversion or Consolidation of Collateral Agent*.

Any business entity into which the Collateral Agent may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, conversion or consolidation to which the Collateral Agent shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Collateral Agent shall be the successor of the Collateral Agent pursuant to Section 13.18, without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto, except where an instrument of transfer or assignment is required by law to effect such succession; *provided*, *however*, that anything herein to the contrary notwithstanding, such entity satisfies the eligibility requirements specified in clauses (a) through (c) of Section 13.17. The Collateral Agent shall use commercially reasonable efforts to notify the Company and any other Notes Representative prior to any such merger, conversion or consolidation; *provided*, *however*, that any failure to do so shall not limit or prevent the effectiveness of the successor described herein.

ARTICLE 14
MISCELLANEOUS

Section 14.01 *Trust Indenture Act Controls*.

109

If any provision of this Indenture limits, qualifies or conflicts with the duties imposed by TIA §318(c), the imposed duties will control.

 Section 14.02 *Notices*.

Any notice or communication by the Company, any Guarantor or the Trustee and Collateral Agent to the others is duly given if in writing and delivered in Person or by first class mail (registered or certified, return receipt requested) (or, if the Notes are held in global book-entry form, posted with DTC), facsimile transmission or overnight air courier guaranteeing next day delivery, to the others' address:

If to the Company and/or any Guarantor:

Goodman Networks Incorporated
2801 Network Blvd., Suite 300
Frisco, TX 75034
Facsimile No.: (972) 421-5753
Attention: John Debus, Interim Chief Financial Officer
Email: jdebus@goodmannetworks.com

With a copy to:
Haynes and Boone, LLP
2323 Victory Avenue, Suite 700
Dallas, TX 75219 -7672
Facsimile No.: (214) 200-0677
Attention: Monika Singh Sanford, Esq.
Email: monika.sanford@haynesboone.com

If to the Trustee:
UMB Bank, National Association
140 Broadway, Suite 4624
New York, NY 10005
Facsimile No.: (314) 612-8499
Attention: Julius R. Zamora
Email: Julius.Zamora@umb.com

With a copy to:
Reed Smith LLP
1301 K Street, N.W.
Suite 1000 - East Tower
Washington, D.C. 20005-3373
Facsimile No.: (202) 414-9299
Attention: Michele D. Ross, Esq.
Email: mross@reedsmith.com

If to the Collateral Agent:
U.S. Bank National Association

UMB-000118

8 Greenway Plaza, Suite 1100
Houston, Texas  77046
Facsimile No.: (713) 212-3718
Attention: Steven A. Finklea
E-mail: steven.finklea@usbank.com

With a copy to:
McGuire, Craddock & Struther, P.C.
2501 N. Harwood Street, Suite 1800
Dallas, Texas  75201
Facsimile No.:  (214) 954-6868
Attention: Charles J. McGuire, Esq.
Email:  cmcguire@mcslaw.com

The Company, any Guarantor, the Trustee or the Collateral Agent, by notice to the others, may designate additional or different addresses for subsequent notices or communications.

All notices and communications (other than those sent to Holders) will be deemed to have been duly given: at the time delivered by hand, if personally delivered; five Business Days after being deposited in the mail, postage prepaid, if mailed; when receipt acknowledged, if transmitted by facsimile; and the next Business Day after timely delivery to the courier, if sent by overnight air courier guaranteeing next day delivery.  All notices and communications to the Holders of global book-entry Notes will be deemed to be given when delivered to DTC in accordance with its customary procedures.

Any notice or communication to a Holder will be mailed by first class mail, certified or registered, return receipt requested, or by overnight air courier guaranteeing next day delivery to its address shown on the register kept by the Registrar or, if the Notes are held in global book-entry form, posted with DTC.  Any notice or communication will also be so mailed to any Person described in TIA §313(c), to the extent required by the TIA.  Failure to mail a notice or communication to a Holder or any defect in it will not affect its sufficiency with respect to other Holders.

If a notice or communication is mailed in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.

If the Company mails a notice or communication to Holders, it will mail a copy to the Trustee and each Agent at the same time.

Section 14.03  *Communication by Holders of Notes with Other Holders of Notes*.

Holders may communicate pursuant to TIA §312(b) with other Holders with respect to their rights under this Indenture or the Notes.  The Company, the Trustee, the Registrar and anyone else shall have the protection of TIA §312(c).

Section 14.04  *Certificate and Opinion as to Conditions Precedent*.

111

Upon any request or application by the Company to the Trustee to take any action under this Indenture, the Company shall furnish to the Trustee:

(1)      an Officers' Certificate in form and substance reasonably satisfactory to the Trustee (which must include the statements set forth in Section 14.05 hereof) stating that, in the opinion of the signers, all conditions precedent and covenants, if any, provided for in this Indenture relating to the proposed action have been satisfied; and

(2)      an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which must include the statements set forth in Section 14.05 hereof, to the extent applicable) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been satisfied.

Section 14.05 *Statements Required in Certificate or Opinion*.

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture (other than a certificate provided pursuant to TIA §314(a)(4)) must comply with the provisions of TIA §314(e) and must include:

(1)      a statement that the Person making such certificate or opinion has read such covenant or condition;

(2)      a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3)      a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been satisfied; and

(4)      a statement as to whether or not, in the opinion of such Person, such condition or covenant has been satisfied.

Section 14.06 *Rules by Trustee and Agents*.

The Trustee may make reasonable rules for action by or at a meeting of Holders.  The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions.

Section 14.07 *No Personal Liability of Directors, Officers, Employees and Stockholders*.

No director, officer, employee, incorporator or stockholder of the Company or any Guarantor, as such, will have any liability for any obligations of the Company or the Guarantors under the Notes, this Indenture, the Note Documents, the Note Guarantees or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder of Notes by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Notes.  The waiver may not be effective to waive liabilities under the federal securities laws.

112

Section 14.08 *Governing Law*.

THIS INDENTURE, THE NOTES AND THE NOTE GUARANTEES SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

Section 14.09 *No Adverse Interpretation of Other Agreements*.

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Company or its Subsidiaries or of any other Person.  Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

Section 14.10 *Successors*.

All agreements of the Company in this Indenture and the Notes will bind its successors. All agreements of the Trustee in this Indenture will bind its successors.  All agreements of each Guarantor in this Indenture will bind its successors, except as otherwise provided in Section 11.05 hereof.

Section 14.11 *Severability*.

In case any provision in this Indenture or in the Notes is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.

Section 14.12 *Counterpart Originals*.

The parties may sign any number of copies of this Indenture.  Each signed copy will be an original, but all of them together represent the same agreement.

Section 14.13 *Table of Contents, Headings, etc.*

The Table of Contents, Cross-Reference Table and Headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and will in no way modify or restrict any of the terms or provisions hereof.

Section 14.14 *Waiver of Jury Trial*.

EACH OF THE COMPANY, EACH GUARANTOR, THE TRUSTEE AND THE COLLATERAL AGENT HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES OR THE TRANSACTION CONTEMPLATED HEREBY.

Section 14.15 *Force Majeure*.

In no event shall the Trustee be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces

113

beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services.

[Signatures on following page]

UMB-000122

SIGNATURES

Dated as of _____May 31_____, 2017

Goodman Networks Incorporated

By: _____

Name: John Debus
Title: Interim Chief Financial Officer

*[Signature Page to Indenture]*

UMB-000123

UMB BANK, NATIONAL ASSOCIATION,

as Trustee

By: _____

Name: Julius R. Zamora
Title: Vice President

*[Signature Page to Indenture]*

UMB-000124

U.S. BANK NATIONAL ASSOCIATION,
as Collateral Agent

By: _____
Name: Steven A. Finklea
Title: Vice President

*[Signature Page to Indenture]*

UMB-000125

SCHEDULE 1.01(a)

LIST OF COMPETITORS

Ansco & Associates, LLC
Bechtel Corporation
Black & Veatch Holding Company
BlueStream Professional Services
Clear Sky
Digital Satellite, Inc.
DirectSat/Unitek Global Services
DW Direct
Dycom Industries, Inc.
Empath
Empire Telecom
Erickson
Jacobs Engineering Group
Mastec
Nexius Solutions, Inc.
Parsons Corporation
Science Applications International Corporation (SAIC)
Starlight STM
Velocitel, Inc.

UMB-000126

EXHIBIT A

[*Insert DTC Global Legend*]

[Face of Note]

CUSIP/ISIN:

8.000% Senior Secured Notes due 2022

$____

No.____

## GOODMAN NETWORKS INCORPORATED

promises to pay to ____ or registered assigns,

the principal sum of ____ DOLLARS

on ____, 20__.

Interest Payment Dates: October 15 and April 15

Record Dates: October 1 and April 1

Dated: ____

GOODMAN NETWORKS INCORPORATED

By: _____
       Name:  John Debus
       Title:   Interim Chief Financial Officer

This is one of the Notes referred to
in the within-mentioned Indenture:

UMB BANK, NATIONAL ASSOCIATION,

as Trustee

By: _____
      Authorized Signatory

A-1

UMB-000127

[Back of Note]
8.000% Senior Secured Notes due 2022

*[Insert the Global Note Legend, if applicable pursuant to the provisions of the Indenture]*

Capitalized terms used herein have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

(1)     *INTEREST.*  Goodman Networks Incorporated, a Texas corporation (the "*Company*"), promises to pay or cause to be paid interest on the principal amount of this Note at 8.000% per annum from May 31, 2017 until maturity.  The Company will pay interest semi-annually in arrears on October 15 and April 15 of each year, or if any such day is not a Business Day, on the next succeeding Business Day (each, an "*Interest Payment Date*").  Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of issuance; *provided further* that the first Interest Payment Date shall be October 15, 2017.  The Company will pay interest (including post-petition interest in any proceeding under the Bankruptcy Code) on overdue principal at a rate that is 2% higher than the then applicable interest rate on the Notes to the extent lawful; it will pay interest (including post-petition interest in any proceeding under the Bankruptcy Code) on overdue installments of interest (without regard to any applicable grace period), at the same rate to the extent lawful.

Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

(2)     *METHOD OF PAYMENT.*  The Company will pay interest on the Notes (except defaulted interest) to the Persons who are registered Holders of Notes at the close of business on October 1 and April 1 immediately preceding the Interest Payment Date, even if such Notes are canceled after such record date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest.  The Notes will be payable as to principal, premium, if any, and interest at the office or agency of the Paying Agent and Registrar, or, at the option of the Company, payment of interest may be made by check mailed to the Holders at their addresses set forth in the register of Holders; *provided* that payment by wire transfer of immediately available funds will be required with respect to principal of, premium on, if any, and interest on all Global Notes and all other Notes the Holders of which will have provided wire transfer instructions to the Company or the Paying Agent.  Such payment will be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

A-2

UMB-000128

(3)     *PAYING AGENT AND REGISTRAR.*  Initially, UMB Bank, National Association, the Trustee under the Indenture, will act as Paying Agent and Registrar.  The Company may change the Paying Agent or Registrar without prior notice to the Holders of the Notes.  The Company or any of its Subsidiaries may act as Paying Agent or Registrar.

(4)     *INDENTURE AND SECURITY DOCUMENTS.*  The Company issued the Notes under an Indenture dated as of May 31, 2017 (the "*Indenture*") between the Company and the Trustee.  The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the TIA.  The Notes are subject to all such terms, and Holders are referred to the Indenture and such Act for a statement of such terms.  To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling.  The Notes are secured obligations of the Company and are secured pursuant to the Security Documents referred to in the Indenture.

(5)     *OPTIONAL REDEMPTION.*

(a)     At any time prior to the third anniversary of the date of the Indenture, the Company may on any one or more occasions redeem up to 35% of the aggregate principal amount of Notes originally issued under the Indenture, upon not less than 30 nor more than 60 days' notice, at a redemption price equal to 108.000% of the principal amount of the Notes redeemed, plus accrued and unpaid interest to the date of redemption (subject to the rights of Holders of Notes on the relevant record date to receive interest on the relevant Interest Payment Date) with the net cash proceeds of an Equity Offering by the Company or a capital contribution to the Company's common equity made with the net cash proceeds of a concurrent Equity Offering by the Company's direct or indirect parent; *provided* that:

(A)     at least 65% of the aggregate principal amount of Notes originally issued under the Indenture (excluding Notes held by the Company and its Subsidiaries) remains outstanding immediately after the occurrence of such redemption;

(B)     the redemption occurs within 120 days of the date of the closing of such Equity Offering; and

(C)     the Company furnishes an Officers' Certificate certifying that such redemption is being effectuated pursuant to Section 3.07(a) and that such Equity Offering complies with the terms of Section 3.07(a).

A-3

UMB-000129

(b)      At any time prior to the third anniversary of the date of the Indenture, the Company may on any one or more occasions redeem all or a part of the Notes, upon not less than 30 nor more than 60 days' notice, at a redemption price equal to 100% of the principal amount of the Notes redeemed, plus the Applicable Premium as of, and accrued and unpaid interest to the applicable date of redemption, subject to the rights of Holders on the relevant record date to receive interest due on the relevant Interest Payment Date; *provided*, the Company shall furnish an Officers' Certificate certifying that such redemption is being effectuated pursuant to Section 3.07(b).

(c)      Except pursuant to the preceding paragraphs, the Notes will not be redeemable at the Company's option prior to the third anniversary of the date of the Indenture.  Notwithstanding the foregoing, the Company shall be permitted to refinance the Notes in full at par on or prior to the first anniversary of the date of this Indenture with the proceeds of other Indebtedness; *provided*, the Company shall furnish an Officers' Certificate certifying that such redemption is being effectuated pursuant to the second sentence of Section 3.07(c).

(d)      On or after the third anniversary of the date of the Indenture, the Company may on any one or more occasions redeem all or a part of the Notes, upon not less than 30 nor more than 60 days' notice, at the redemption prices (expressed as percentages of principal amount) set forth below, plus accrued and unpaid interest on the Notes redeemed, to the applicable redemption date, if redeemed during the period indicated below, subject to the rights of Holders on the relevant record date to receive interest on the relevant Interest Payment Date; *provided*, the Company shall furnish an Officers' Certificate setting forth the relevant percentage below and certifying that such redemption is being effectuated pursuant to Section 3.07(d):

| For the period below | Percentage |
| --- | --- |
| On or after the third anniversary of the date of the Indenture and before the fourth anniversary of the date of the Indenture | 102.000% |
| On or after the fourth anniversary of the date of the Indenture and before November 30, 2021 | 101.000% |
| On or after November 30, 2021 | 100.000% |

A-4

UMB-000130

Unless the Company defaults in the payment of the redemption price, interest will cease to accrue on the Notes or portions thereof called for redemption on the applicable redemption date.

(6)     *REPURCHASE AT THE OPTION OF HOLDER IN CONNECTION WITH CHANGE OF CONTROL OFFER*.

If there is a Change of Control, the Company will be required to make an offer (a "*Change of Control Offer*") to each Holder to repurchase all or any part (in integral multiples of $1.00) of each Holder's Notes at a purchase price in cash equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest thereon to the date of purchase (the "*Change of Control Payment*")*,* subject to the rights of Holders on the relevant record date to receive interest due on the relevant interest payment date; *provided*, that for the avoidance of doubt, the premiums set forth in Section 3.07 shall not be applicable to any redemption made pursuant to Section 4.15.  Within 30 days following any Change of Control, the Company will mail a notice to each Holder setting forth the procedures governing the Change of Control Offer as required by the Indenture.

(7)     *REPURCHASE AT THE OPTION OF HOLDER BY APPLICATION OF EXCESS PROCEEDS*.  If the Company or a Restricted Subsidiary of the Company consummates any Asset Sales, within 15 Business Days after the aggregate amount of Excess Proceeds exceeds $2.5 million, the Company will perform one of the following:

(a)     if the Senior Secured Leverage Ratio, calculated on a pro forma basis giving effect to such Asset Sale, is less than or equal to 3.50 to 1.00 (i) make an Asset Sale Offer to all Holders of Notes to purchase, prepay or redeem the maximum principal amount of Notes that may be purchased, prepaid or redeemed out of the Excess Proceeds or (ii) redeem the PIK Preferred Stock with the Excess Proceeds; or

(b)     if the Senior Secured Leverage Ratio, calculated on a pro forma basis giving effect to such Asset Sale, is greater than 3.50 to 1.00, make an Asset Sale Offer to all Holders of Notes to purchase, prepay or redeem the maximum principal amount of Notes that may be purchased, prepaid or redeemed out of the Excess Proceeds.

The Company will follow the notice procedures set forth in Section 3.09 of the Indenture.  The offer price for the Notes in any Asset Sale Offer will be equal to 100% of the principal amount of the Notes purchased, plus accrued and unpaid interest on the Notes to the date of purchase, prepayment or redemption, subject to the rights of Holders

A-5

UMB-000131

of Notes on the relevant record date to receive interest due on the relevant interest payment date, and will be payable in cash.  If any Excess Proceeds remain after consummation of an Asset Sale Offer, the Company may use such Excess Proceeds for any purpose expressly permitted by the Indenture.  If the aggregate principal amount of Notes tendered into such Asset Sale Offer exceeds the amount of Excess Proceeds, the Notes shall be purchased on a pro rata basis based on the principal amount of Notes tendered and remaining Excess Proceeds shall be used for any purpose expressly permitted by the Indenture.  Holders of Notes that are the subject of an offer to purchase will receive an Asset Sale Offer from the Company prior to any related purchase date and may elect to have such Notes purchased by completing the form entitled "Option of Holder to Elect Purchase" attached to the Notes.

(8)   *EXCESS CASH FLOW REDEMPTION*.  To the extent that the Excess Cash Flow Amount for any Applicable Period cannot be applied to the redemption of the PIK Preferred Stock pursuant to the terms of such PIK Preferred Stock in effect on the issue date under applicable law, pursuant to the terms of the Credit Facilities, or cannot be applied in a manner consistent with the PIK Preferred Stock documentation as in effect on the issue date, such Excess Cash Flow Amount shall be used to redeem the Notes at a price of 100% pursuant to Section 4.19.  Once the PIK Preferred Stock has been redeemed in full, the Excess Cash Flow Amount shall be applied in its entirety to redeem the Notes pursuant to Section 4.19.

Within five Business Days following the date of the delivery of the Company's quarterly or annual, as applicable, financial statements with respect to the most recently ended Applicable Period, the Company shall (a) redeem Notes in an amount equal to the Excess Cash Flow Amount to purchase Notes at a redemption price equal to 100% of the aggregate principal amount thereof plus accrued and unpaid interest to, but not including, the date of purchase and (b) deliver to the Trustee an Officers' Certificate setting forth the calculations in reasonable detail in connection with the Excess Cash Flow redemption in respect of such Applicable Period, including, without limitation, the relevant Excess Cash Flow Amount and relevant Excess Cash Flow Percentage (with reference to the clause within the definition of Excess Cash Flow Percentage that is being relied upon for such Applicable Period).  Any redemption pursuant to Section 4.19 shall be made pursuant to the provisions of Sections 3.01 through 3.06 hereof, accompanied by an Officers' Certificate certifying that such redemption is being made pursuant to Section 4.19.  For the avoidance of doubt, the premiums set forth in Section 3.07 shall not be applicable to any redemption made pursuant to Section 4.19.

(9)   *NOTICE OF REDEMPTION*.  Subject to Section 3.09, at least 30 days but not more than 60 days before a redemption date, the Company will mail or cause to be mailed, by first class mail (or post with DTC, as applicable), a notice of redemption to

A-6

each Holder whose Notes are to be redeemed at its registered address, except that redemption notices may be mailed more than 60 days prior to a redemption date if the notice is issued in connection with a defeasance of the Notes or a satisfaction and discharge of the Indenture pursuant to Articles 8 or 12 thereof.  Notes and portions of Notes selected will be in integral multiples of $1.00; except that if all of the Notes of a Holder are to be redeemed or purchased, the entire outstanding amount of Notes held by such Holder shall be redeemed or purchased.

(10)    *DENOMINATIONS, TRANSFER, EXCHANGE.*  The Notes are in registered form in minimum denominations of $1.00 and integral multiples thereof.  The transfer of Notes may be registered and Notes may be exchanged as provided in the Indenture.  The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Company may require a Holder to pay any taxes and fees required by law or permitted by the Indenture.  The Company need not exchange or register the transfer of any Note or portion of a Note selected for redemption, except for the unredeemed portion of any Note being redeemed in part.  Also, the Company need not exchange or register the transfer of any Notes for a period of 15 days before a selection of Notes to be redeemed or during the period between a record date and the next succeeding Interest Payment Date.

(11)    *PERSONS DEEMED OWNERS.*  The registered Holder of a Note may be treated as the owner of such Note for all purposes.  Only registered Holders have rights under the Indenture.

(12)    *AMENDMENT, SUPPLEMENT AND WAIVER.*  Subject to certain exceptions, the Indenture, the Notes, the Note Guarantees and the Security Documents may be amended or supplemented with the consent of the Holders of at least a majority in aggregate principal amount of the then outstanding Notes including Additional Notes, if any, voting as a single class, and any existing Default or Event of Default or compliance with any provision of such documents may be waived with the consent of the Holders of a majority in aggregate principal amount of the then outstanding Notes including Additional Notes, if any, voting as a single class.  Without the consent of any Holder of Notes, the Indenture, the Notes, the Note Guarantees or the Security Documents may be amended or supplemented to cure any ambiguity, defect or inconsistency that does not adversely affect the legal rights hereunder of any Holder in any material respect, to provide for uncertificated Notes in addition to or in place of certificated Notes, to provide for the assumption of the Company's or a Guarantor's obligations to the Holders of the Notes and Note Guarantees by a successor to the Company or such Guarantor pursuant to Article 5 or Article 10 of the Indenture, to make any change that would provide any additional rights or benefits to the Holders of the Notes or that does not adversely affect the legal rights under the Indenture of any Holder in all material respects, to comply with

A-7

the requirements of the SEC in order to effect or maintain the qualification of the Indenture under the TIA, to enter into a supplemental indenture to evidence the Reincorporation of the Company as permitted by the Plan upon receipt of an Officers' Certificate from the Company confirming that shareholders holding at least 25 percent of the issued and outstanding common shares of the Company have approved the Reincorporation pursuant to the General Corporation Law of the State of Delaware, to enter into additional or supplemental Security Documents, to release Collateral in accordance with Section 10.05 of the Indenture and the Security Documents, except as set forth in Section 9.02 of the Indenture, to provide for the issuance of Additional Notes in accordance with the limitations set forth in the Indenture, to evidence and provide for the acceptance and appointment (x) under the Indenture of a successor Trustee or Collateral Agent thereunder or (y) under the Security Documents of a successor Collateral Agent thereunder, to make any amendment to the provisions of the Indenture relating to the transfer and legending of the Notes as permitted by the Indenture, including, without limitation, to facilitate the issuance and administration of the Notes (*provided, however,* that (i) compliance with the Indenture as so amended would not result in the Notes being transferred in violation of the Securities Act or any applicable securities laws and (ii) such amendment does not materially and adversely affect the rights of the Holders of the Notes to transfer the Notes), to make, complete or confirm any grant of Collateral permitted or required by the Indenture or any of the Security Documents or any release of Collateral that becomes effective as set forth in the Indenture or any of the Security Documents, to allow any Guarantor to execute a supplemental indenture and/or a Note Guarantee with respect to the Notes, to modify the Security Documents to reflect additional extensions of credit and additional secured creditors holding secured obligations, so long as such secured obligations are not prohibited by the Indenture or any other security document, or to the extent required by the Intercreditor Agreement.

(13)    *DEFAULTS AND REMEDIES.* The Notes are subject to the Defaults and Events of Default set forth in Section 6.01 of the Indenture.  In the case of an Event of Default arising from certain events of bankruptcy or insolvency with respect to the Company, any Restricted Subsidiary of the Company that is a Significant Subsidiary or any group of Restricted Subsidiaries of the Company that, taken together, would constitute a Significant Subsidiary, all outstanding Notes will become due and payable immediately without further action or notice.  If any other Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of the then outstanding Notes may declare all the Notes to be due and payable.  Holders may not enforce the Indenture or the Notes except as provided in the Indenture.  Subject to certain limitations, Holders of a majority in aggregate principal amount of the then outstanding Notes may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or the Notes Representative or the

A-8

UMB-000134

Collateral Agent or exercising any trust or power conferred on it.  The Trustee may withhold from Holders, the Notes Representative, and the Collateral Agent  notice of any continuing Default or Event of Default (except a Default or Event of Default relating to the payment of principal, premium, if any, or interest) if it determines that withholding notice is in the Holders' interest.  The Holders of a majority in aggregate principal amount of the then outstanding Notes by written notice to the Trustee may, on behalf of all the Holders, (a) rescind an acceleration and its consequences under the Indenture, if the rescission would not conflict with any judgment or decree and if all existing Events of Default (except nonpayment of principal of, premium on, if any, or interest on the Notes that has become due solely because of the acceleration) have been cured or waived and (b) waive an existing Default or Event of Default and its consequences under the Indenture except a continuing Default or Event of Default in the payment of principal of, premium on, if any, or interest on the Notes (including in connection with an offer to purchase).  The Company is required to deliver to the Trustee annually a statement regarding compliance with the Indenture, and the Company is required, upon becoming aware of any Default or Event of Default, to deliver to the Trustee a statement specifying such Default or Event of Default.

(14)    *TRUSTEE DEALINGS WITH COMPANY.*  The Trustee, in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the Company or its Affiliates, and may otherwise deal with the Company or its Affiliates, as if it were not the Trustee.

(15)    *NO RECOURSE AGAINST OTHERS.*  No director, officer, employee, incorporator or stockholder of the Company or any Guarantor, as such, will have any liability for any obligations of the Company or the Guarantors under the Notes, the Indenture, the Note Guarantees or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Notes by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Notes.  The waiver may not be effective to waive liabilities under the federal securities laws.

(16)    *AUTHENTICATION.*  This Note will not be valid until authenticated by the manual signature of the Trustee or an authenticating agent.

(17)    *ABBREVIATIONS.*  Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

(18)    [*Reserved*].

A-9

(19)   *CUSIP AND ISIN NUMBERS.*   Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP and corresponding ISIN numbers to be printed on the Notes, and the Trustee may use CUSIP and corresponding ISIN numbers in notices of redemption as a convenience to Holders.   No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption, and reliance may be placed only on the other identification numbers placed thereon.

(20)   *GOVERNING LAW.*   THIS NOTE, THE NOTE GUARANTEES AND THE INDENTURE WILL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

The Company will furnish to any Holder upon written request and without charge a copy of the Indenture.   Requests may be made to:

Goodman Networks Incorporated
2801 Network Blvd., Suite 300
Frisco, Texas 75034
Attention: Chief Financial Officer

A-10

UMB-000136

ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to: _____

(Insert assignee's legal name)

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____
_____
_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____to transfer this Note on the books of the

Company.  The agent may substitute another to act for him.

Date: _____

Your Signature: _____

(Sign exactly as your name appears on the face of this Note)

Signature Guarantee*: _____

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

A-11

UMB-000137

REDEMPTION OR REPURCHASE OF NOTE

If this Note is being redeemed or purchased by the Company pursuant to Section 3.07(a), Section 3.07(b), Section 3.07(c), Section 3.07(d), Section 4.10, Section 4.15 or Section 4.19 of the Indenture, please check the appropriate box below:

☐ Section 3.07(a)    ☐ Section 3.07(b)    ☐ Section 3.07(c)    ☐ Section 3.07(d)

☐ Section 4.10    ☐ Section 4.15    ☐ Section 4.19

OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have all or only part of the Note purchased by the Company pursuant to Section 4.10 or Section 4.15 of the Indenture, state the amount you elect to have purchased:

$_____

Date: _____

Your Signature: _____
(Sign exactly as your name appears on the face of this Note)

Tax Identification No.: _____

Signature Guarantee*: _____

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

A-12

UMB-000138

SCHEDULE OF EXCHANGES OF INTERESTS in THE GLOBAL NOTE *

    The following exchanges of a part of this Global Note for an interest in another Global Note or a Definitive Note, or exchanges of a part of another Global Note or Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease (or increase) | Signature of authorized officer of Trustee or Custodian |
| --- | --- | --- | --- | --- |

\*    *This schedule should be included only if the Note is issued in global form.*

A-13

UMB-000139

EXHIBIT B

[RESERVED]

B-1

UMB-000140

EXHIBIT C

[RESERVED]

C-1

UMB-000141

EXHIBIT D

[RESERVED]

D-1

UMB-000142

EXHIBIT E

## FORM OF NOTATION OF GUARANTEE

For value received, each Guarantor (which term includes any successor Person under the Indenture) has, jointly and severally, unconditionally guaranteed, to the extent set forth in the Indenture and subject to the provisions in the Indenture dated as of May 31, 2017 (the "*Indenture*") by and among Goodman Networks Incorporated (the "*Company*"), UMB Bank, National Association, as trustee (the "*Trustee*")*, and U.S. Bank National Association, as collateral agent, (a) the due and punctual payment of the principal of, premium on, if any, and interest on the Notes, whether at maturity, by acceleration, redemption or otherwise, the due and punctual payment of interest on overdue principal of, premium on, if any, and interest on the Notes, if any, if lawful, and the due and punctual performance of all other obligations of the Company to the Holders or the Trustee all in accordance with the terms of the Indenture and (b) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise.  The obligations of the Guarantors to the Holders of Notes and to the Trustee pursuant to the Note Guarantee and the Indenture are expressly set forth in Article 11 of the Indenture and reference is hereby made to the Indenture for the precise terms of the Note Guarantee.

Capitalized terms used but not defined herein have the meanings given to them in the Indenture.

[NAME OF GUARANTOR(S)]

By: _____
        Name:
        Title:

E-1

EXHIBIT F

FORM OF SUPPLEMENTAL INDENTURE
TO BE DELIVERED BY SUBSEQUENT GUARANTORS

SUPPLEMENTAL INDENTURE (this "*Supplemental Indenture*")*,* dated as of _____, among _____ (the "*Guaranteeing Subsidiary*"), a subsidiary of Goodman Networks Incorporated (or its permitted successor), a Texas corporation (the "*Company*")*,* the Company, the other Guarantors (as defined in the Indenture referred to herein), UMB Bank, National Association, as trustee under the Indenture referred to below (the "*Trustee*") and U.S. Bank National Association, as collateral agent under the Indenture referred to below (the "*Collateral Agent*").

W I T N E S S E T H

WHEREAS, the Company has heretofore executed and delivered to the Trustee and the Collateral Agent an indenture (the "*Indenture*")*,* dated as of May 31, 2017 providing for the issuance of 8.000% Senior Secured Notes due 2022 (the "*Notes*")*;*

WHEREAS, the Indenture provides that under certain circumstances the Guaranteeing Subsidiary shall execute and deliver to the Trustee and Collateral Agent a supplemental indenture pursuant to which the Guaranteeing Subsidiary shall unconditionally guarantee all of the Company's Obligations under the Notes and the Indenture on the terms and conditions set forth herein (the "*Note Guarantee*")*;* and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee and the Collateral Agent are authorized to execute and deliver this Supplemental Indenture.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Guaranteeing Subsidiary, the Trustee and the Collateral Agent mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

1.      CAPITALIZED TERMS.  Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2.      AGREEMENT TO GUARANTEE.  The Guaranteeing Subsidiary hereby agrees to provide an unconditional Guarantee on the terms and subject to the conditions set forth in the Note Guarantee and in the Indenture including but not limited to Article 11 thereof.

3.      NO RECOURSE AGAINST OTHERS.  No director, officer, employee, incorporator or stockholder of the Company or any Guarantor, as such, will have any liability for any obligations of the Company or the Guarantors under the Notes, this Indenture, the Note Guarantees or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder of Notes by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Notes.  The waiver may not be effective to waive liabilities under the federal securities laws.

UMB-000144

4.     GOVERNING LAW.  THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

5.     COUNTERPARTS.  The parties may sign any number of copies of this Supplemental Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.

6.     EFFECT OF HEADINGS.  The Section headings herein are for convenience only and shall not affect the construction hereof.

7.     THE TRUSTEE AND THE COLLATERAL AGENT.  Neither the Trustee nor the Collateral Agent shall be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals are made solely by the Guaranteeing Subsidiary and the Company.

*[Remainder of page intentionally left blank.]*

F-2

UMB-000145

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed and attested, all as of the date first above written.

[NEW GUARANTEEING SUBSIDIARY]

By: _____
       Name:
       Title:

GOODMAN NETWORKS INCORPORATED

By: _____
       Name:
       Title:

MULTIBAND FIELD SERVICES, INCORPORATED

By: _____
       Name:
       Title:

GOODMAN NETWORKS SERVICES, LLC

By: _____
       Name:
       Title:

[ADDITIONAL GUARANTORS IN EXISTENCE PRIOR TO THE DATE HEREOF]

By: _____
       Name:
       Title:

UMB BANK, NATIONAL ASSOCIATION, as

Trustee

By: _____
       Authorized Signatory

U.S. BANK NATIONAL ASSOCIATION, as

Collateral Agent

By: _____
       Authorized Signatory

[*Signature Page to Supplemental Indenture*]

EXHIBIT G

[RESERVED]

UMB-000147

EXHIBIT H

FORM OF INTERCREDITOR AGREEMENT

[Attached]

UMB-000148

**INTERCREDITOR AGREEMENT,**

**dated as of May 31, 2017**

**among**

**MidCap Financial Trust, as the ABL Representative for the ABL Secured Parties**

**and**

**U.S. Bank National Association,**
**as the Collateral Agent and Notes Representative for the Notes Secured Parties,**

**and the Grantors Parties Hereto**

UMB-000149

# TABLE OF CONTENTS

**Page**

**SECTION 1.** Definitions; Rules of Construction.....................................................2
   1.1   UCC Definitions ...................................................................................2
   1.2   Defined Terms .....................................................................................2
   1.3   Rules of Construction .......................................................................13

**SECTION 2.** Lien Priority...............................................................................14
   2.1   Lien Subordination ...........................................................................14
   2.2   Prohibition on Contesting Liens ......................................................14
   2.3   Nature of Obligations .......................................................................14
   2.4   No New Liens ....................................................................................15
   2.5   Separate Grants of Security and Separate Classification ................15
   2.6   Agreements Regarding Actions to Perfect Liens.............................16

**SECTION 3.** Enforcement Rights.....................................................................17
   3.1   Exclusive Enforcement .....................................................................17
   3.2   Standstill and Waivers ......................................................................18
   3.3   Judgment Creditors...........................................................................19
   3.4   Cooperation; Sharing of Information and Access ............................20
   3.5   No Additional Rights For the Grantors Hereunder...........................22
   3.6   Actions Upon Breach .......................................................................22

**SECTION 4.** Application of Proceeds of Senior Collateral; Dispositions and Releases
   of Lien; Notices and Insurance. .............................................................22
   4.1   Application of Proceeds ....................................................................22
   4.2   Releases of Liens ..............................................................................23
   4.3   Insurance...........................................................................................24
   4.4   Option to Purchase ABL Obligations ..............................................24

**SECTION 5.** Insolvency Proceedings.................................................................27
   5.1   Filing of Motions .............................................................................27
   5.2   Financing Matters.............................................................................27
   5.3   Relief From the Automatic Stay ......................................................29
   5.4   No Contest ........................................................................................29
   5.5   Avoidance Issues .............................................................................30
   5.6   Asset Dispositions in an Insolvency Proceeding.............................30
   5.7   Other Matters ...................................................................................30
   5.8   Effectiveness in Insolvency Proceedings ........................................30

**SECTION 6.** Notes Documents and ABL Documents.........................................30

**SECTION 7.** **[RESERVED.]**............................................................................31

**SECTION 8.** Reliance; Waivers; etc. ...............................................................31
   8.1   Reliance ............................................................................................31
   8.2   No Warranties or Liability ...............................................................32
   8.3   No Waivers .......................................................................................32

i

UMB-000150

**SECTION 9.**   Obligations Unconditional ..................................................................32

**SECTION 10.**   Miscellaneous. ..................................................................................32
    10.1   Rights of Subrogation.................................................................32
    10.2   Further Assurances ....................................................................33
    10.3   Conflicts ....................................................................................33
    10.4   Continuing Nature of Provisions ...............................................33
    10.5   Amendments; Waivers...............................................................33
    10.6   Information Concerning Financial Condition of the Grantors ............................34
    10.7   Governing Law ..........................................................................35
    10.8   Submission to Jurisdiction; JURY TRIAL WAIVER ........................................35
    10.9   Notices.......................................................................................36
    10.10   Successors and Assigns .............................................................36
    10.11   Headings ....................................................................................36
    10.12   Severability................................................................................36
    10.13   Other Remedies .........................................................................36
    10.14   Counterparts; Integration; Effectiveness ...................................36
    10.15   Additional Grantors ...................................................................36

UMB-000151

## INTERCREDITOR AGREEMENT

Intercreditor Agreement (this "Agreement"), dated as of May 31, 2017, among MIDCAP FINANCIAL TRUST, as Administrative Agent (in such capacity, with its successors and assigns, and as more specifically defined below, the "ABL Representative") for the ABL Secured Parties (as defined below), U.S. Bank National Association, as collateral agent for the Notes Secured Parties (as defined below) (in such capacity, with its successors and assigns, and as more specifically defined below, the "Notes Representative"), and each of the Grantors (as defined below) party hereto.

WHEREAS Goodman Networks Incorporated, a Delaware corporation ("Company"), the ABL Representative and certain financial institutions and other entities are parties to that certain Credit and Security Agreement dated as of the date hereof (as heretofore and hereafter amended, restated, adjusted, waived, renewed, extended, supplemented or otherwise modified from time to time, the "Existing ABL Agreement"), pursuant to which such financial institutions and other entities have agreed to make loans and extend other financial accommodations to the Grantors;

WHEREAS Company, UMB Bank, National Association, as the trustee (the "Trustee"), and U.S. Bank National Association, as collateral agent (the "Collateral Agent"), are parties to that certain Indenture dated as of the date hereof pursuant to which Company shall issue 8.000% Senior Secured Notes due 2022 in an initial aggregate principal amount of $112,500,000 (as amended, restated, adjusted, waived, renewed, extended, supplemented or otherwise modified from time to time, the "Indenture");

WHEREAS, pursuant to the Indenture generally and Article 13 of the Indenture, each Holder (as defined in the Indenture) (1) appointed U.S. Bank National Association as the Collateral Agent to act as Notes Representative for the Trustee under the Indenture on behalf of the Holders (as defined therein), this Agreement and the other Notes Security Documents, (2) consented and agreed to the terms of this Agreement, (3) authorized and directed the Collateral Agent to enter into this Intercreditor Agreement and to perform its obligations and exercise its rights hereunder in accordance herewith, and (4) agreed that the rights, privileges, protections, immunities and benefits given to the Collateral Agent under the Indenture including, without limitation, its right, to be indemnified by the Holders (as defined in the Indenture) and the Company, are extended to, and shall be enforceable by, the Collateral Agent in its capacity as the Notes Representative when acting under this Intercreditor Agreement.

WHEREAS, Company has granted to the ABL Representative security interests in the ABL Collateral as security for payment and performance of the ABL Obligations (as defined below); and

WHEREAS, Company has granted to the Notes Representative security interests in the Notes Collateral as security for payment and performance of the Notes Obligations (as defined below).

NOW THEREFORE, in consideration of the foregoing and the mutual covenants herein contained and other good and valuable consideration, the existence and sufficiency of which is expressly recognized by all of the parties hereto, the parties agree as follows:

1

UMB-000152

**SECTION 1.**   *Definitions; Rules of Construction.*

1.1   <u>UCC Definitions</u>.   The following terms which are defined in the Uniform Commercial Code are used herein as so defined:  Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, Equipment, General Intangibles, Goods, Instruments, Inventory, Investment Property, Letter of Credit, Letter-of-Credit Rights, Payment Intangibles, Records and Supporting Obligations.

1.2   <u>Defined Terms</u>.   The following terms, as used herein, have the following meanings:

"<u>ABL Agreement</u>" means the collective reference to (a) the Existing ABL Agreement and any agreement with respect to ABL DIP Financing, (b) any Additional ABL Agreement and (c) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any indebtedness or other financial accommodation that has been incurred to extend, replace, refinance or refund in whole or in part the indebtedness and other obligations outstanding under the ABL Agreement (regardless of whether such replacement, refunding or refinancing is a "working capital" facility, asset-based facility or otherwise), any Additional ABL Agreement or any other agreement or instrument referred to in this clause (c) provided that the Notes Representative and the ABL Representative shall have received on or prior to entry into any such other agreement or instrument referred to in this clause (c) (i) an officers' certificate from Company stating that such other agreement or instrument is permitted by the Indenture or the Existing ABL Agreement, as applicable, or to the extent a consent is otherwise required to permit such other agreement or instrument under any Secured Debt Document, Company and each other Grantor have obtained the requisite consent, it being agreed that the Notes Representative and the ABL Representative may conclusively rely on such certificate and (ii) a Lien Sharing and Priority Confirmation Joinder from an authorized agent, trustee or other representative on behalf of the holders or lenders of any indebtedness under any such other agreement or instrument unless such agreement or instrument expressly provides that it is not intended to be and is not an ABL Agreement hereunder (a "<u>Replacement ABL Agreement</u>").  Any reference to the ABL Agreement hereunder shall be deemed a reference to any ABL Agreement then extant.

"<u>ABL Collateral</u>" means all assets, whether now owned or hereafter acquired by any Grantor, in which a Lien is granted or purported to be granted at any time to any ABL Secured Party as security for any ABL Obligation (including, but not limited to, Accounts, Chattel Paper, Intellectual Property, Documents, General Intangibles, Instruments, Inventory, Investment Property, Letters of Credit and Letter-of-Credit Rights, Supporting Obligations, Deposit Accounts, cash or cash equivalents, Commercial Tort Claims, Equipment, Goods, money, and accessions to, substitutions for, and replacements, Proceeds of ABL Collateral and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts, and other computer materials and records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing, and all other assets of each Grantor now or hereafter as set forth in the ABL Security Documents).

"<u>ABL Creditors</u>" means the "Lenders" as defined in the ABL Agreement.

2

"ABL DIP Financing" has the meaning set forth in Section 5.2(a).

"ABL Documents" means the ABL Agreement, each ABL Security Document, each ABL Guarantee and each of the other "Financing Documents" as defined in the ABL Agreement.

"ABL Guarantee" means any guarantee by any Grantor of any or all of the ABL Obligations.

"ABL Lien" means any Lien created, or intended to be created, pursuant to the ABL Security Documents.

"ABL Obligations" means (a) all principal of and interest (including without limitation any Post-Petition Interest) and premium (if any) on all loans made pursuant to the ABL Agreement by the ABL Creditors, (b) all reimbursement obligations (if any) and interest thereon (including without limitation any Post-Petition Interest) with respect to any letter of credit or similar instruments issued pursuant to the ABL Agreement, (c) all Swap Obligations, (d) all Banking Services Obligations, (e) all guarantee obligations, indemnities, fees, expenses and other amounts payable from time to time pursuant to the ABL Documents and (f) all other Obligations (as defined in the ABL Agreement), in each case whether or not allowed or allowable in an Insolvency Proceeding; provided that the aggregate principal amount of ABL Principal Debt that constitutes ABL Obligations for purposes of this Agreement shall in no event exceed the ABL Principal Debt Cap. To the extent any payment with respect to any ABL Obligation (whether by or on behalf of any Grantor, as Proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any Notes Secured Party, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the ABL Secured Parties and the Notes Secured Parties, be deemed to be reinstated and outstanding as if such payment had not occurred.

"ABL Obligations Payment Date" means the first date on which (a) all ABL Obligations (other than those that constitute Unasserted Contingent Obligations) have been indefeasibly paid in cash in full (or cash collateralized or defeased in accordance with the terms of the ABL Documents), (b) all commitments to extend credit under the ABL Documents have been terminated, (c) there are no outstanding letters of credit or similar instruments issued under the ABL Documents (other than such as have been cash collateralized or defeased in accordance with the terms of the ABL Documents), and (d) so long as the Notes Obligations Payment Date shall not have occurred, the ABL Representative has delivered a written notice to the Notes Representative stating that the events described in clauses (a), (b) and (c) have occurred to the satisfaction of the ABL Secured Parties.

"ABL Post-Petition Assets" has the meaning set forth in Section 5.2(b).

"ABL Principal Debt" means the principal amount of indebtedness for borrowed money and letters of credit incurred under the ABL Documents (with letters of credit being

UMB-000154

deemed to have a principal amount equal to the maximum potential liability of Company and its Subsidiaries thereunder).

"ABL Principal Debt Cap" means the greater of (x) $25,000,000 and (y) 20% of Consolidated Tangible Assets (as defined in the Indenture as in effect on the date hereof).

"ABL Priority Collateral" means all Collateral consisting of the following:

(1)     Accounts;

(2)     Inventory;

(3)     Payment Intangibles;

(4)     Instruments, Documents and Chattel Paper evidencing or substituted for or otherwise related to the foregoing;

(5)     all Deposit Accounts with any bank or other financial institution (including all cash, cash equivalents, financial assets, negotiable instruments and other evidence of payment, and other funds on deposit therein or credited thereto), in each case, other than any Notes Collateral Proceeds Account (including all cash, cash equivalents, financial assets, negotiable instruments and other evidence of payment, and other funds on deposit therein or credited thereto);

(6)     all Securities Accounts with any securities intermediary (including any and all Investment Property held therein or credited thereto);

(7)     all accessions to, substitutions for and replacements of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing; and

(8)     to the extent not otherwise included, all Proceeds of ABL Collateral (including without limitation, all insurance proceeds), Supporting Obligations of ABL Collateral and products of any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing;

provided, however, that, any Collateral, regardless of type, received in exchange for ABL Priority Collateral pursuant to an Enforcement Action in accordance with the terms of the Existing ABL Agreement and this Agreement shall be treated as ABL Priority Collateral under this Agreement, the Notes Security Documents and the ABL Security Documents; provided, further, that any Collateral of the type that constitutes ABL Priority Collateral, if received in exchange for Notes Priority Collateral pursuant to an Enforcement Action in accordance with the terms of the Indenture and this Agreement, shall be treated as Notes Priority Collateral under this Agreement, the Notes Security Documents and the ABL Security Documents; provided, further, that ABL Priority Collateral shall exclude, however, all Notes Priority Collateral (other than Notes Priority Collateral which is treated as ABL Priority Collateral as set forth in the first proviso above), it being understood and agreed that the ABL Secured Parties remain entitled to

4

the benefit of their second priority Lien in any such Collateral; and, provided, further, however, that "ABL Priority Collateral" shall include proceeds from the disposition of any Notes Priority Collateral permitted by the ABL Agreement and the Notes Secured Debt Agreement to the extent such proceeds would otherwise constitute ABL Priority Collateral and are not required to be applied to the mandatory prepayment of the Notes Obligations pursuant to the Notes Documents (other than any proceeds directed to the Notes Collateral Proceeds Account), unless such proceeds arise from a disposition of Notes Priority Collateral resulting from any Enforcement Action taken by the Notes Secured Parties permitted by this Agreement.

"ABL Purchase Closing Date," "ABL Purchase Obligations," "ABL Purchase Option," "ABL Purchase Notice," and "ABL Purchase Notice Period," each has the meaning set forth in Section 4.4.

"ABL Representative" has the meaning set forth in the introductory paragraph hereof or, in the case of any Replacement ABL Agreement, the ABL Representative shall be the Person identified as such in the applicable Lien Sharing and Priority Confirmation Joinder.

"ABL Secured Parties" means the ABL Representative, the ABL Creditors and any other holders of the ABL Obligations.

"ABL Security Documents" means the ABL Agreement and any of the other Financing Documents (as defined in the ABL Agreement) which create or otherwise affect the rights of the ABL Secured Parties in the ABL Collateral, and any other documents that create Liens to secure the ABL Obligations.

"Access Period" means, with respect to each parcel or item of Notes Priority Collateral, the period, following the commencement of any Enforcement Action, which begins on the earlier of (a) the day on which the ABL Representative provides the Notes Representative with the notice of its election to request access to such parcel or item of Notes Priority Collateral pursuant to Section 3.4(c) and (b) the fifth Business Day after the Notes Representative provides the ABL Representative with notice that the Notes Representative (or its agent) has obtained possession or control of such parcel or item of Notes Priority Collateral and ends on the earliest of (i) the day which is 180 days after the date (the "Initial Access Date") on which the ABL Representative initially obtains the ability to take physical possession of, remove or otherwise control physical access to, or actually uses, such parcel or item of Notes Priority Collateral plus such number of days, if any, after the Initial Access Date that it is stayed or otherwise prohibited by law or court order from exercising remedies with respect to associated ABL Priority Collateral, (ii) the date on which all or substantially all of the ABL Priority Collateral associated with such parcel or item of Notes Priority Collateral is sold, collected or liquidated, (iii) the ABL Obligations Payment Date and (iv) the date on which the default which resulted in such Enforcement Action has been cured or waived in writing.

"Additional ABL Agreement" means one or more debt facilities, commercial paper facilities or indentures for which the requirements of Section 10.5(b) of this Agreement have been satisfied, in each case with banks, other lenders or trustees, providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from such lenders against such

5

receivables), letters of credit, notes or other borrowings, in each case, as amended, restated, adjusted, waived, extended, modified, renewed, refunded, restated, restructured, increased, supplemented, replaced or refinanced in whole or in part from time to time in accordance with each applicable Secured Debt Document; *provided* that neither the Indenture, any Additional Notes Secured Debt Agreement nor any Replacement Notes Secured Debt Agreement shall constitute an Additional ABL Agreement at any time.

"Additional Notes Secured Debt Agreement" means one or more debt facilities, commercial paper facilities or indentures for which the requirements of Section 10.5(b) of this Agreement have been satisfied, in each case with banks, other lenders or trustees, providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from such lenders against such receivables), letters of credit, notes or other borrowings, in each case, as amended, restated, adjusted, waived, extended, modified, renewed, refunded, restated, restructured, increased, supplemented, replaced or refinanced in whole or in part from time to time in accordance with each applicable Secured Debt Document; *provided* that neither the Existing ABL Agreement, any Additional ABL Agreement nor any Replacement ABL Agreement shall constitute an Additional Notes Secured Debt Agreement at any time.

"Banking Services Obligations" means, with respect to any Grantor, any obligations of such Grantor owed to any ABL Secured Party (or any of its affiliates) in respect of treasury management services (including, without limitation, controlled disbursement, automated clearinghouse transactions, return items, overdrafts and interstate depository network services), credit card services, stored value card services or other cash management services.

"Bankruptcy Code" means the United States Bankruptcy Code (11 U.S.C. §101 et seq.), as amended from time to time.

"Bond Guarantee" means any guarantee by any Grantor of any or all of the Notes Obligations.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"Collateral" means, collectively, all ABL Collateral and all Notes Collateral.

"Common Collateral" means, all Collateral that constitutes both ABL Collateral and Notes Collateral.

"Company" has the meaning set forth in the first WHEREAS clause above.

"Comparable Security Document" means, in relation to any Senior Collateral subject to any Senior Security Document, that Junior Security Document that creates a security interest in the same Senior Collateral, granted by the same Grantor, as applicable.

"Copyright Licenses" means any and all agreements granting any right in, to or under Copyrights (whether a Grantor is licensee or licensor thereunder).

6

UMB-000157

"Copyrights" means all United States, state and foreign copyrights, including but not limited to copyrights in software and databases, and all "Mask Works" (as defined under 17 U.S.C. 901 of the U.S. Copyright Act), whether registered or unregistered, now or hereafter in force, owned or used in the business of any Grantor, and with respect to any and all of the foregoing:  (i) all registrations and applications therefor, (ii) all extensions and renewals thereof, (iii) all rights corresponding thereto throughout the world, (iv) all rights to sue for past, present and future infringements thereof, (v) all licenses, claims, damages and proceeds of suit arising therefrom, and (vi) all payments and royalties and rights to payments and royalties arising out of the sale, lease, license, assignment, or other disposition thereof.

"Eligible ABL Facility Purchaser" has the meaning set forth in Section 4.4(a).

"Enforcement Action" means, with respect to the ABL Obligations or the Notes Obligations, the exercise of any rights and remedies with respect to any Common Collateral securing such obligations or the commencement or prosecution of enforcement of any of the rights and remedies under, as applicable, the ABL Documents or the Notes Documents, or applicable law, including without limitation the exercise of any rights of set-off or recoupment, and the exercise of any rights or remedies of a secured creditor under the Uniform Commercial Code of any applicable jurisdiction or under the Bankruptcy Code.

"Existing ABL Agreement" has the meaning set forth in the first WHEREAS clause of this Agreement.

"Grantor" means Company and each direct or indirect affiliate or shareholder (or equivalent) of Company or any of its affiliates that is now or hereafter becomes a party to any ABL Document or Notes Document.  All references in this Agreement to any Grantor shall include such Grantor as a debtor-in-possession and any receiver or trustee for such Grantor in any Insolvency Proceeding.

"Insolvency Proceeding" means:

(a)     any case commenced by or against Company or any other Grantor under the Bankruptcy Code or any similar federal, state or foreign law for the relief of debtors, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of Company or any other Grantor, any receivership or assignment for the benefit of creditors relating to Company or any other Grantor or any similar case or proceeding relative to Company or any other Grantor or its creditors, as such, in each case whether or not voluntary;

(b)     any liquidation, dissolution, marshalling of assets or liabilities or other winding up of, or relating to, Company or any other Grantor, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency, unless otherwise permitted by the ABL Documents and the Notes Documents;

(c)     any proceeding seeking the appointment of a trustee, receiver, liquidator, custodian or other insolvency official with similar powers with respect to Company or any other Grantor or any of their respective assets;

7

UMB-000158

(d)    any other proceeding of any type or nature in which substantially all claims of creditors of Company or any other Grantor are determined and any payment or distribution is or may be made on account of such claims; or

(e)    an analogous procedure or step in any jurisdiction.

"Indenture" has the meaning set forth in the second WHEREAS clause of this Agreement.

"Intellectual Property" means, collectively, Copyrights, Copyright Licenses, Patents, Patent Licenses, Trademarks, Trademark Licenses, Trade Secrets, and Trade Secret Licenses.

"Junior Collateral" shall mean with respect to any Junior Secured Party, any Collateral on which it has a Junior Lien.

"Junior Documents" shall mean, collectively, with respect to any Junior Obligation, any provision pertaining to such Junior Obligation in any Secured Debt Document or any other document, instrument or certificate evidencing or delivered in connection with such Junior Obligation.

"Junior Liens" shall mean (a) with respect to any ABL Priority Collateral, all Liens securing the Notes Obligations and (b) with respect to any Notes Priority Collateral, all Liens securing the ABL Obligations.

"Junior Obligations" shall mean (a) with respect to any ABL Priority Collateral, all Notes Obligations and (b) with respect to any Notes Priority Collateral, all ABL Obligations.

"Junior Representative" shall mean (a) with respect to any ABL Obligations or any ABL Priority Collateral, the Notes Representative and (b) with respect to any Notes Obligations or any Notes Priority Collateral, the ABL Representative.

"Junior Secured Parties" shall mean (a) with respect to the ABL Priority Collateral, all Notes Secured Parties and (b) with respect to the Notes Priority Collateral, all ABL Secured Parties.

"Junior Security Documents" shall mean with respect to any Junior Secured Party, the Security Documents that secure the Junior Obligations.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, deed to secure debt, lien, pledge, hypothecation, assignment, assignation, debenture, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

UMB-000159

"Lien Priority" means with respect to any Lien of the ABL Representative or Notes Representative in the Common Collateral, the order of priority of such Lien specified in Section 2.1.

"Lien Sharing and Priority Confirmation Joinder" means an agreement substantially in the form of Annex 2.

"Notes Collateral" means all assets, whether now owned or hereafter acquired by any Grantor, in which a Lien is granted or purported to be granted to any Notes Secured Party as security for any Notes Obligation (including, but not limited to, Accounts, Chattel Paper, Intellectual Property, Documents, General Intangibles, Instruments, Inventory, Investment Property, Letters of Credit and Letter-of-Credit Rights, Supporting Obligations, Deposit Accounts, cash or cash equivalents, Commercial Tort Claims, Equipment, Goods, money and accessions to, substitutions for, and replacements, Proceeds of Notes Collateral and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts, and other computer materials and records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing, and all other assets of each Grantor now or hereafter as set forth in the Notes Security Documents).

"Notes Collateral Proceeds Account" means one or more deposit accounts or securities accounts established or maintained by the Company or any other Grantor or the Notes Representative or its agent for the sole purpose of holding the proceeds of any sale or other disposition of any Notes Priority Collateral that are required to be held in trust in such account or accounts pursuant to the terms of any Notes Document.

"Notes Creditors" means the "Holders," "Trustee" and "Collateral Agent", in each case as defined in the Indenture.

"Notes DIP Financing" has the meaning set forth in Section 5.2(b).

"Notes Documents" means the Indenture and each Security Document as defined in the Indenture.

"Notes Lien" means any Lien created, or intended to be created, pursuant to the Notes Security Documents.

"Notes Obligations" means (a) all principal of and interest (including without limitation any Post-Petition Interest) and premium (if any) on all indebtedness under any Notes Secured Debt Agreement by the Notes Creditors, (b) all reimbursement obligations (if any) and interest thereon (including without limitation any Post-Petition Interest) with respect to any letter of credit or similar instruments issued pursuant to the Notes Secured Debt Agreement and (c) all guarantee obligations, indemnities, fees, expenses and other amounts payable from time to time pursuant to the Notes Documents, in each case whether or not allowed or allowable in an Insolvency Proceeding and any and all obligations to the "Trustee" and "Collateral Agent" as defined in the Indenture and acting under the Indenture and this Agreement; provided that the aggregate amount of Notes Principal Debt that constitutes Notes Obligations for purposes of this Agreement shall in no event exceed the Notes Principal Debt Cap.  To the extent any payment with respect to any Notes Obligation (whether by or on behalf of any Grantor, as Proceeds of

UMB-000160

security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any ABL Secured Party, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the ABL Secured Parties and the Notes Secured Parties, be deemed to be reinstated and outstanding as if such payment had not occurred.

"Notes Obligations Payment Date" means the first date on which (a) all Notes Obligations (other than those that constitute Unasserted Contingent Obligations) have been indefeasibly paid in cash in full, (b) all commitments to extend credit under the Notes Documents have been terminated, and (c) so long as the ABL Obligations Payment Date shall not have occurred, the Notes Representative has delivered a written notice to the ABL Representative stating that the events described in clauses (a) and (b) have occurred to the satisfaction of the Notes Secured Parties.

"Notes Principal Debt" means the principal amount of indebtedness for borrowed money incurred under the Notes Documents.

"Notes Principal Debt Cap" means $112,500,000.

"Notes Priority Collateral" means all Notes Collateral (including, for the avoidance of doubt, each Notes Collateral Proceeds Account) other than ABL Priority Collateral.

"Notes Representative" has the meaning set forth in the introductory paragraph hereof or, in the case of any Replacement Notes Secured Debt Agreement, the Notes Representative shall be the Person identified as such in the applicable Lien Sharing and Priority Confirmation Joinder.

"Notes Secured Debt Agreement" means the collective reference to (a) the Indenture, (b) any Additional Notes Secured Debt Agreement and (c) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any indebtedness or other financial accommodation that has been incurred to extend, replace, refinance or refund in whole or in part the indebtedness and other obligations outstanding under the Indenture, any Additional Notes Secured Debt Agreement or any other agreement or instrument referred to in this clause (c) provided that the Notes Representative and the ABL Representative shall have received on or prior to entry into any such other agreement or instrument referred to in this clause (c) (i) an officers' certificate from Company stating that such other agreement or instrument is permitted by the Indenture or the Existing ABL Agreement, as applicable, or to the extent a consent is otherwise required to permit such other agreement or instrument under any Secured Debt Document, Company and each other Grantor have obtained the requisite consent and (ii) a Lien Sharing and Priority Confirmation Joinder from an authorized agent, trustee or other representative on behalf of the holders or lenders of any indebtedness under any such other agreement or instrument unless such agreement or instrument expressly provides that it is not intended to be and is not a Notes Secured Debt Agreement hereunder (a "Replacement Notes Secured Debt Agreement").  Any reference to the Notes Secured Debt Agreement hereunder shall be deemed a reference to any Notes Secured Debt Agreement then extant.

UMB-000161

"Notes Secured Parties" means the Notes Representative, the Notes Creditors and any other holders of the Notes Obligations.

"Notes Security Documents" means any Security Document (as defined in the Indenture) and any other documents that create Liens to secure the Notes Obligations.

"Patent License" means all agreements granting any right in, to, or under Patents (whether any Grantor is licensee or licensor thereunder).

"Patents" means all United States and foreign patents and certificates of invention, or similar industrial property rights, now or hereafter in force, owned or used in the business of any Grantor, and with respect to any and all of the foregoing, (i) all applications therefore, (ii) all reissues, divisions, continuations, continuations-in-part, extensions, renewals, and reexaminations thereof, (iii) all rights corresponding thereto throughout the world, (iv) all inventions and improvements described therein, (v) all rights to sue for past, present and future infringements thereof, (vi) all licenses, claims, damages, and proceeds of suit arising therefrom, and (vii) all payments and royalties and rights to payments and royalties arising out of the sale, lease, license, assignment, or other disposition thereof.

"Person" means any person, individual, sole proprietorship, partnership, joint venture, corporation, limited liability company, unincorporated organization, association, institution, entity, party, including any government and any political subdivision, agency or instrumentality thereof.

"Post-Petition Interest" means any interest or entitlement to fees or expenses or other charges that accrues after the commencement of any Insolvency Proceeding (or would accrue but for the commencement of an Insolvency Proceeding), whether or not allowed or allowable in any such Insolvency Proceeding.

"Priority Collateral" means the ABL Priority Collateral or the Notes Priority Collateral, as the context may require.

"Proceeds" means (a) all "proceeds," as defined in Article 9 of the Uniform Commercial Code, with respect to the Common Collateral, and (b) whatever is recoverable or recovered when any Common Collateral is sold, exchanged, collected, or disposed of, whether voluntarily or involuntarily.

"Real Property" means any right, title or interest in and to real property, including any fee interest, leasehold interest, easement, or license and any other right to use or occupy real property, including any right arising by contract.

"Replacement ABL Agreement" has the meaning set forth in the definition of "ABL Agreement", as amended, restated, adjusted, waived, renewed, extended, supplemented or otherwise modified from time to time.

"Replacement Notes Secured Debt Agreement" has the meaning set forth in the definition of "Notes Secured Debt Agreement", as amended, restated, adjusted, waived, renewed, extended, supplemented or otherwise modified from time to time.

UMB-000162

"<u>Secured Debt Documents</u>" shall mean, collectively, the ABL Documents and the Notes Documents.

"<u>Secured Obligations</u>" shall mean the ABL Obligations and the Notes Obligations.

"<u>Secured Parties</u>" means the ABL Secured Parties and the Notes Secured Parties.

"<u>Security Documents</u>" means, collectively, the ABL Security Documents and the Notes Security Documents.

"<u>Senior Collateral</u>" shall mean with respect to any Senior Secured Party, any Collateral on which it has a Senior Lien.

"<u>Senior Documents</u>" shall mean, collectively, with respect to any Senior Obligation, any provision pertaining to such Senior Obligation in any Secured Debt Document or any other document, instrument or certificate evidencing or delivered in connection with such Senior Obligation.

"<u>Senior Liens</u>" shall mean (a) with respect to the ABL Priority Collateral, all Liens securing the ABL Obligations and (b) with respect to the Notes Priority Collateral, all Liens securing the Notes Obligations.

"<u>Senior Obligations</u>" shall mean (a) with respect to any ABL Priority Collateral, all ABL Obligations and (b) with respect to any Notes Priority Collateral, all Notes Obligations.

"<u>Senior Obligations Payment Date</u>" shall mean (a) with respect to ABL Obligations, the ABL Obligations Payment Date and (b) with respect to any Notes Obligations, the Notes Obligations Payment Date.

"<u>Senior Representative</u>" shall mean (a) with respect to any ABL Priority Collateral, the ABL Representative and (b) with respect to any Notes Priority Collateral, the Notes Representative.

"<u>Senior Secured Parties</u>" shall mean (a) with respect to the ABL Priority Collateral, all ABL Secured Parties and (b) with respect to the Notes Priority Collateral, all Notes Secured Parties.

"<u>Senior Security Documents</u>" shall mean with respect to any Senior Secured Party, the Security Documents that secure the Senior Obligations.

"<u>Swap Obligations</u>" means, with respect to any Grantor, any obligations of such Grantor owed to any ABL Creditor (or any of its affiliates) in respect of any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

12

"<u>Trade Secret Licenses</u>" means any and all agreements granting any right in or to Trade Secrets (whether a Grantor is licensee or licensor thereunder).

"<u>Trade Secrets</u>" means all trade secrets and all other confidential or proprietary information and know-how, whether or not reduced to a writing or other tangible form, now or hereafter in force, owned or used in, or contemplated at any time for use in, the business of any Grantor, including with respect to any and all of the foregoing:  (i) all documents and things embodying, incorporating, or referring in any way thereto, (ii) all rights to sue for past, present and future infringement thereof, (iii) all licenses, claims, damages, and proceeds of suit arising therefrom, and (iv) all payments and royalties and rights to payments and royalties arising out of the sale, lease, license, assignment, or other dispositions thereof.

"<u>Trademark Licenses</u>" means any and all agreements granting any right in or to Trademarks (whether a Grantor is licensee or licensor thereunder).

"<u>Trademarks</u>" means all United States, state and foreign trademarks, service marks, certification marks, collective marks, trade names, corporate names, d/b/as, business names, fictitious business names, Internet domain names, trade styles, logos, other source or business identifiers, designs and general intangibles of a like nature, rights of publicity and privacy pertaining to the names, likeness, signature and biographical data of natural persons, now or hereafter in force, owned or used in the business of any Grantor, and, with respect to any and all of the foregoing:  (i) all registrations and applications therefor, (ii) the goodwill of the business symbolized thereby, (iii) all rights corresponding thereto throughout the world, (iv) all rights to sue for past, present and future infringement or dilution thereof or for any injury to goodwill, (v) all licenses, claims, damages, and proceeds of suit arising therefrom, and (vi) all payments and royalties and rights to payments and royalties arising out of the sale, lease, license assignment or other disposition thereof.

"<u>Unasserted Contingent Obligations</u>" shall mean, at any time, ABL Obligations or Notes Obligations, as applicable, for taxes, costs, indemnifications, reimbursements, damages and other liabilities (excluding (a) the principal of, and interest and premium (if any) on, and fees and expenses relating to, any ABL Obligation or Notes Obligation, as applicable, and (b) contingent reimbursement obligations in respect of amounts that may be drawn under outstanding letters of credit) in respect of which no assertion of liability (whether oral or written) and no claim or demand for payment (whether oral or written) has been made (and, in the case of ABL Obligations or Notes Obligations, as applicable, for indemnification, no notice for indemnification has been issued by the indemnitee) at such time.

"<u>Uniform Commercial Code</u>" shall mean the Uniform Commercial Code as in effect from time to time in the applicable jurisdiction.

1.3    <u>Rules of Construction</u>.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement,

13

UMB-000164

instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

**SECTION 2.**   *Lien Priority.*

2.1   <u>Lien Subordination</u>.   Notwithstanding the date, manner or order of grant, attachment or perfection of any Junior Lien in respect of any Collateral or of any Senior Lien in respect of any Collateral and notwithstanding any provision of the UCC, any applicable law, any Security Document, any alleged or actual defect or deficiency in any of the foregoing or any other circumstance whatsoever, the Junior Representative, on behalf of each Junior Secured Party, in respect of such Collateral hereby agrees that:

(a)   any Senior Lien in respect of such Collateral, regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be and shall remain senior and prior to any Junior Lien in respect of such Collateral (whether or not such Senior Lien is subordinated to any Lien securing any other obligation); and

(b)   any Junior Lien in respect of such Collateral, regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to any Senior Lien in respect of such Collateral.

2.2   <u>Prohibition on Contesting Liens</u>.   In respect of any Collateral, the Junior Representative, on behalf of each Junior Secured Party, in respect of such Collateral agrees that it shall not, and hereby waives any right to:

(a)   contest, or support any other Person in contesting, in any proceeding (including any Insolvency Proceeding), the priority, validity or enforceability of any Senior Lien on such Collateral; or

(b)   demand, request, plead or otherwise assert or claim the benefit of any marshalling, appraisal, valuation or similar right which it may have in respect of such Collateral or the Senior Liens on such Collateral, except to the extent that such rights are expressly granted in this Agreement.

2.3   <u>Nature of Obligations</u>.   Each of the Notes Representative, on behalf of itself and the other Notes Secured Parties, and the ABL Representative, on behalf of itself and the other ABL Secured Parties, acknowledges that a portion of the ABL Obligations and the Notes Obligations either does now or may in the future represent debt that is revolving in nature and that the amount thereof that may be outstanding at any time or from time to time may be

14

UMB-000165

increased or reduced and subsequently reborrowed, and that the terms of the ABL Obligations and the Notes Obligations, as the case may be, may be modified, extended or amended from time to time, and that (x) the aggregate amount of the ABL Obligations may be increased, replaced or refinanced, in each event, subject to the ABL Principal Debt Cap and without notice to or consent by the Notes Secured Parties and without affecting the provisions hereof and (y) the aggregate amount of the Notes Obligations may be increased, replaced or refinanced, in each event, subject to the Notes Principal Debt Cap and without notice to or consent by the ABL Secured Parties and without affecting the provisions hereof.  The Lien Priorities provided in Section 2.1 shall not be altered or otherwise affected by any such amendment, modification, supplement, extension, repayment, reborrowing, increase, replacement, renewal, restatement or refinancing of either the ABL Obligations or the Notes Obligations, or any portion thereof.

2.4    No New Liens.  (a) Until the ABL Obligations Payment Date, no Notes Secured Party shall acquire or hold any Lien on any assets of any Grantor securing any Notes Obligation which assets are not also subject to the Lien of the ABL Representative under the ABL Documents, subject to the Lien Priority set forth herein.  If any Notes Secured Party shall (nonetheless and in breach hereof) acquire or hold any Lien on any assets of any Grantor securing any Notes Obligation which assets are not also subject to the Lien of the ABL Representative under the ABL Documents, subject to the Lien Priority set forth herein, then the Notes Representative (or the relevant Notes Secured Party) shall, without the need for any further consent of any other Notes Secured Party and notwithstanding anything to the contrary in any other Notes Document be deemed to also hold and have held such Lien for the benefit of the ABL Representative as security for the ABL Obligations (subject to the Lien Priority and other terms hereof) and shall promptly notify the ABL Representative in writing of the existence of such Lien.

(b)    Until the Notes Obligations Payment Date, no ABL Secured Party shall acquire or hold any Lien on any assets of any Grantor securing any ABL Obligation which assets are not also subject to the Lien of the Notes Representative under the Notes Documents, subject to the Lien Priority set forth herein.  If any ABL Secured Party shall (nonetheless and in breach hereof) acquire or hold any Lien on any assets of any Grantor securing any ABL Obligation which assets are not also subject to the Lien of the Notes Representative under the Notes Documents, subject to the Lien Priority set forth herein, then the ABL Representative (or the relevant ABL Secured Party) shall, without the need for any further consent of any other ABL Secured Party and notwithstanding anything to the contrary in any other ABL Document be deemed to also hold and have held such Lien for the benefit of the Notes Representative as security for the Notes Obligations (subject to the Lien Priority and other terms hereof) and shall promptly notify the Notes Representative in writing of the existence of such Lien.

2.5    Separate Grants of Security and Separate Classification.  Each Secured Party acknowledges and agrees that (i) the grants of Liens pursuant to the ABL Security Documents and the Notes Security Documents constitute two separate and distinct grants of Liens and (ii) because of, among other things, their differing rights in the Common Collateral, the Notes Obligations are fundamentally different from the ABL Obligations and should be separately classified in any plan of reorganization proposed or adopted in an Insolvency Proceeding.  To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the ABL Secured Parties and the Notes Secured Parties in respect of the

15

Common Collateral constitute claims in the same class (rather than separate classes of senior and junior secured claims), then the ABL Secured Parties and the Notes Secured Parties hereby acknowledge and agree that all distributions shall be made as if there were separate classes of ABL Obligation claims and Notes Obligation claims against the Grantors (with the effect being that, to the extent that the aggregate value of the ABL Priority Collateral or Notes Priority Collateral is sufficient (for this purpose ignoring all claims held by the other Secured Parties), the ABL Secured Parties or the Notes Secured Parties, respectively, shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of Post-Petition Interest that is available from each pool of Priority Collateral for each of the ABL Secured Parties and the Notes Secured Parties, respectively, before any distribution is made in respect of the claims held by the other Secured Parties, with the other Secured Parties hereby acknowledging and agreeing to turn over to the respective other Secured Parties amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the aggregate recoveries.

2.6    Agreements Regarding Actions to Perfect Liens.

(a)    The ABL Representative agrees, on behalf of itself and the other ABL Secured Parties, with respect to the ABL Security Documents, on the one hand, and the Notes Representative agrees, on behalf of itself and the other Notes Secured Parties, with respect to the Notes Security Documents, on the other hand, that each such Security Document granting any security interest in the Collateral will contain the following legend (or a legend substantially similar thereto):

"Reference is made to that certain Intercreditor Agreement, dated as of May 31, 2017, among MIDCAP FINANCIAL TRUST, as the ABL Representative (as defined therein), **U.S. BANK NATIONAL ASSOCIATION**, as the Notes Representative (as defined therein), GOODMAN NETWORKS INCORPORATED ("Company") and the subsidiaries of Company named therein (the "Intercreditor Agreement"). Each Person that benefits from the security hereunder, by accepting the benefits of the security provided hereby, (i) consents (or is deemed to consent), to the subordination of Liens provided for in the Intercreditor Agreement, (ii) agrees (or is deemed to agree) that it will be bound by, and will take no actions contrary to, the provisions of the Intercreditor Agreement, (iii) authorizes (or is deemed to authorize) the [ABL Representative] [Notes Representative] on behalf of such Person to enter into, and perform under, the Intercreditor Agreement and (iv) acknowledges (or is deemed to acknowledge) that a copy of the Intercreditor Agreement was delivered, or made available, to such Person.

Notwithstanding any other provision contained herein, this Agreement, the Liens created hereby and the rights, remedies, duties and obligations provided for herein are subject in all respects to the provisions of the Intercreditor Agreement.  In the event of any conflict or inconsistency

UMB-000167

between the provisions of this Agreement and the Intercreditor Agreement, the provisions of the Intercreditor Agreement shall control."

(b)    Each of the ABL Representative and the Notes Representative hereby acknowledges that, to the extent that it holds, or a third party holds on its behalf, physical possession of or "control" (as defined in the Uniform Commercial Code) over Common Collateral pursuant to the ABL Security Documents or the Notes Security Documents, as applicable, whether as bailee for perfection or otherwise, such possession or control is also for the benefit of the Notes Representative and the other Notes Secured Parties or the ABL Representative and the other ABL Secured Parties, as applicable, solely to the extent required to perfect their security interest in such Common Collateral.  Nothing in the preceding sentence shall be construed to impose any duty on the ABL Representative or the Notes Representative (or any third party acting on either such Person's behalf) with respect to such Common Collateral or provide the Notes Representative, any other Notes Secured Party, the ABL Representative or any other ABL Secured Party, as applicable, with any rights with respect to such Common Collateral beyond those specified in this Agreement, the ABL Security Documents and the Notes Security Documents, as applicable, provided that subsequent to the occurrence of the ABL Obligations Payment Date (so long as the Notes Obligations Payment Date shall not have occurred), the ABL Representative shall (i) deliver to the Notes Representative, at the Grantors' sole cost and expense, the Common Collateral in its possession or control together with any necessary endorsements to the extent required by the Notes Documents or (ii) direct and deliver such Common Collateral as a court of competent jurisdiction otherwise directs; provided, further, that subsequent to the occurrence of the Notes Obligations Payment Date (so long as the ABL Obligations Payment Date shall not have occurred), the Notes Representative shall (i) deliver to the ABL Representative, at the Grantors' sole cost and expense, the Common Collateral in its possession or control together with any necessary endorsements to the extent required by the ABL Documents or (ii) direct and deliver such Common Collateral as a court of competent jurisdiction otherwise directs.  The provisions of this Agreement are intended solely to govern the respective Lien priorities as between the ABL Secured Parties and the Notes Secured Parties and shall not impose on the ABL Secured Parties or the Notes Secured Parties any obligations in respect of the disposition of any Common Collateral (or any Proceeds thereof) that would conflict with prior perfected Liens or any claims thereon in favor of any other Person that is not a Secured Party.

**SECTION 3.**    *Enforcement Rights.*

3.1    <u>Exclusive Enforcement</u>.  Until the Senior Obligations Payment Date has occurred, whether or not an Insolvency Proceeding has been commenced by or against any Grantor, the Senior Secured Parties shall have the exclusive right to take and continue any Enforcement Action (including the right to credit bid their debt) with respect to the Senior Collateral, without any consultation with or consent of any Junior Secured Party, but subject to the proviso set forth in <u>Section 5.1</u>.  Upon the occurrence and during the continuance of a default or an event of default under the Senior Documents, the Senior Representative and the other Senior Secured Parties may take and continue any Enforcement Action with respect to the Senior Obligations and the Senior Collateral in such order and manner as they may determine in their sole discretion in accordance with the terms and conditions of the Senior Documents, subject to Section 3.4.

17

3.2    <u>Standstill and Waivers</u>.  Each Junior Representative, on behalf of itself and the other Junior Secured Parties, agrees that, until the Senior Obligations Payment Date has occurred, but subject to the proviso set forth in <u>Section 5.1</u> and the last sentence in this Section 3.2:

(i)    they will not take or cause to be taken any action, the purpose or effect of which is to make any Lien on any Senior Collateral that secures any Junior Obligation pari passu with or senior to, or to give any Junior Secured Party any preference or priority relative to, the Liens on the Senior Collateral securing the Senior Obligations;

(ii)    they will not contest, oppose, object to, interfere with, hinder or delay, in any manner, whether by judicial proceedings (including without limitation the filing of an Insolvency Proceeding) or otherwise, any foreclosure, sale, lease, exchange, transfer or other disposition of the Senior Collateral by any Senior Secured Party or any other Enforcement Action taken (or any forbearance from taking any Enforcement Action) in respect of the Senior Collateral by or on behalf of any Senior Secured Party;

(iii)    they have no right to (x) direct either the Senior Representative or any other Senior Secured Party to exercise any right, remedy or power with respect to the Senior Collateral or pursuant to the Senior Security Documents in respect of the Senior Collateral or (y) consent or object to the exercise by the Senior Representative or any other Senior Secured Party of any right, remedy or power with respect to the Senior Collateral or pursuant to the Senior Security Documents with respect to the Senior Collateral or to the timing or manner in which any such right is exercised or not exercised (or, to the extent they may have any such right described in this clause (iii), whether as a junior lien creditor in respect of the Senior Collateral or otherwise, they hereby irrevocably waive such right);

(iv)    they will not institute any suit or other proceeding or assert in any suit, Insolvency Proceeding or other proceeding any claim against any Senior Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise, with respect to, and no Senior Secured Party shall be liable for, any action taken or omitted to be taken by any Senior Secured Party with respect to the Senior Collateral or pursuant to the Senior Documents in respect of the Senior Collateral;

(v)    they will not commence judicial or nonjudicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of any Senior Collateral, exercise any right, remedy or power with respect to, or otherwise take any action to enforce their interest in or realize upon, the Senior Collateral; and

(vi)    they will not seek, and hereby waive any right, to have the Senior Collateral or any part thereof marshaled upon any foreclosure or other disposition of the Senior Collateral.

Notwithstanding the foregoing, any Junior Representative may, but shall not be required to, (i) take all such actions as it shall deem necessary to (A) perfect or continue the perfection of

18

its Junior Liens or (B) create or preserve (but not enforce) the Junior Liens on any Collateral, and (ii) subject at all times to the provisions of Section 4 of this Agreement, enforce or exercise any or all such rights and remedies as to any Junior Collateral commencing one hundred eighty (180) days after the date of the receipt by the Senior Representative of written notice from the Junior Representative of the declaration by the Junior Secured Parties of an event of default under the applicable Junior Documents in accordance with the terms of such Junior Documents that is continuing and the written demand by the Junior Secured Parties of the immediate payment in full of all of the applicable Junior Obligations (such 180-day period being referred to herein as the "Junior Standstill Period"), *provided* that

(i)     in the event that at any time after the Junior Representative has sent a notice to the Senior Representative to commence the Junior Standstill Period, the event of default that was the basis for such notice is cured or waived or otherwise ceases to exist and no other events of default under the applicable Junior Documents have occurred and are then continuing, then the notice shall automatically and without further action of the parties be deemed rescinded and no Junior Standstill Period shall be deemed to have been commenced;

(ii)     the Junior Standstill Period shall be tolled for any period during which the Senior Representative is stayed from exercising rights or remedies pursuant to an Insolvency Proceeding or court order, so long as the Senior Representative has used its commercially reasonable efforts to have such stay lifted;

(iii)     prior to taking any action to enforce or exercise any or all such rights and remedies after the end of the Junior Standstill Period, the Junior Representative shall give the Senior Representative not more than ten (10) Business Days' and not less than five (5) Business Days' prior written notice of the intention of Junior Representative to exercise its rights and remedies, including specifying the rights and remedies that it intends to exercise, which notice may be sent prior to the end of the Junior Standstill Period and in the event that Junior Representative shall not take any action to enforce or exercise any or all of such rights within ninety (90) days after the end of the Junior Standstill Period, then the notice to commence such Junior Standstill Period shall automatically and without further action of the parties be deemed rescinded and no Junior Standstill Period shall be deemed to have been commenced; and

(iv)     notwithstanding anything to the contrary contained in this Section 3.2, the Junior Representative and the other Junior Secured Parties may not exercise any rights and remedies against any specific item or items of Junior Collateral after the end of the Junior Standstill Period, if and for so long as the Senior Representative or any other Senior Secured Party is diligently pursuing in good faith the exercise of its enforcement rights or remedies against the Grantors and/or all or any material portion of the Senior Collateral.

3.3     Judgment Creditors.   In the event that any Notes Secured Party becomes a judgment lien creditor in respect of Common Collateral as a result of its enforcement of its rights as an unsecured creditor, such judgment lien shall be subject to the terms of this Agreement for all purposes (including in relation to the ABL Liens and the ABL Obligations) to the same extent

19

as all other Liens securing the Notes Obligations are subject to the terms of this Agreement.  In the event that any ABL Secured Party becomes a judgment lien creditor in respect of Common Collateral as a result of its enforcement of its rights as an unsecured creditor, such judgment lien shall be subject to the terms of this Agreement for all purposes (including in relation to the Notes Liens and the Notes Obligations) to the same extent as all other Liens securing the ABL Obligations are subject to the terms of this Agreement.

3.4   Cooperation; Sharing of Information and Access.  (a) The Notes Representative, on behalf of itself and the other Notes Secured Parties, agrees that each of them shall take such actions as the ABL Representative shall request in writing in connection with the exercise by the ABL Secured Parties of their rights set forth herein in respect of the ABL Priority Collateral. The ABL Representative, on behalf of itself and the other ABL Secured Parties, agrees that each of them shall take such actions as the Notes Representative shall request in writing in connection with the exercise by the Notes Secured Parties of their rights set forth herein in respect of the Notes Priority Collateral.

(b)   In the event that the ABL Representative shall, in the exercise of its rights under the ABL Security Documents or otherwise, receive possession or control of any books and Records of any Grantor which contain information identifying or pertaining to any of the Notes Priority Collateral, the ABL Representative shall promptly notify the Notes Representative of such fact and, upon request from the Notes Representative and as promptly as practicable thereafter, either make available to the Notes Representative such books and Records for inspection and duplication or provide to the Notes Representative copies thereof.  In the event that the Notes Representative shall, in the exercise of its rights under the Notes Security Documents or otherwise, receive possession or control of any books and Records of any Grantor which contain information identifying or pertaining to any of the ABL Priority Collateral, the Notes Representative shall promptly notify the ABL Representative of such fact and, upon request from the ABL Representative and as promptly as practicable thereafter, either make available to the ABL Representative such books and Records for inspection and duplication or provide the ABL Representative copies thereof.  The Notes Representative hereby irrevocably grants the ABL Representative a non-exclusive worldwide license or right to use, to the maximum extent permitted by applicable law and to the extent of the Notes Representative's interest therein, exercisable without payment of royalty or other compensation, to use any of the Intellectual Property now or hereafter owned by, licensed to, or otherwise used by the Grantors in order for ABL Representative and ABL Secured Parties to purchase, use, market, repossess, possess, store, assemble, manufacture, process, sell, transfer, distribute or otherwise dispose of any asset included in the ABL Priority Collateral in connection with the liquidation, disposition or realization upon the ABL Priority Collateral in accordance with the terms and conditions of the ABL Security Documents and the other ABL Documents.  Until the ABL Obligations Payment Date, the Notes Representative agrees that any sale, transfer or other disposition of any of the Grantors' Intellectual Property (whether by foreclosure or otherwise) will be subject to the ABL Representative's rights as set forth in this Section 3.4.

(c)   If the Notes Representative, or any agent or representative of the Notes Representative, or any receiver, shall, after the commencement of any Enforcement Action, obtain possession or physical control of any of the Notes Priority Collateral, the Notes Representative shall promptly notify the ABL Representative in writing of that fact, and the ABL

20

Representative shall, within thirty (30) Business Days thereafter, notify the Notes Representative in writing as to whether the ABL Representative desires to exercise access rights under this Agreement. In addition, if the ABL Representative, or any agent or representative of the ABL Representative, or any receiver, shall obtain possession or physical control of any of the Notes Priority Collateral in connection with an Enforcement Action, then the ABL Representative shall promptly notify the Notes Representative that the ABL Representative is exercising its access rights under this Agreement and its rights under Section 3.4 under either circumstance. Upon delivery of such notice by the ABL Representative to the Notes Representative, the parties shall confer in good faith to coordinate with respect to the ABL Representative's exercise of such access rights, with such access rights to apply to any parcel or item of Notes Priority Collateral access to which is reasonably necessary to enable the ABL Representative during normal business hours: (i) to convert ABL Priority Collateral consisting of raw materials and work-in-process into saleable finished goods; (ii) to complete any service or project required for the practical realization of the benefits of the ABL Priority Collateral; (iii) to transport such ABL Priority Collateral to a point where such conversion can occur; (iv) to otherwise prepare ABL Priority Collateral for sale; and/or (v) to arrange or effect the sale of ABL Priority Collateral, all in accordance with the manner in which such matters are completed in the ordinary course of business.

Consistent with the definition of "Access Period," access rights will apply to differing parcels or items of Notes Priority Collateral at differing times, in which case, a differing Access Period will apply to each such parcel or items. During any pertinent Access Period, the ABL Representative and its agents, representatives and designees shall have an irrevocable, non-exclusive right to have access to, and a rent-free right to use, the relevant parcel or item of Notes Priority Collateral for the purposes described above. The ABL Representative shall take proper and reasonable care under the circumstances of any Notes Priority Collateral that is used by the ABL Representative during the Access Period and repair and replace any damage (ordinary wear-and-tear excepted) caused by the ABL Representative or its agents, representatives or designees and the ABL Representative shall comply with all applicable laws in all material respects in connection with its use or occupancy or possession of the ABL Priority Collateral. The ABL Representative shall indemnify and hold harmless the Notes Representative and the Notes Creditors for any injury or damage to Persons or property (ordinary wear-and-tear excepted) caused by the acts or omissions of Persons under its control; provided, however, that the ABL Representative and the ABL Creditors will not be liable for any diminution in the value of Notes Priority Collateral caused by the absence of the ABL Priority Collateral therefrom. The ABL Representative and the Notes Representative shall cooperate and use reasonable efforts to ensure that their activities during the Access Period as described above do not interfere materially with the activities of the other as described above, including the right of Notes Representative to show the Notes Priority Collateral to prospective purchasers and to ready the Notes Priority Collateral for sale. Consistent with the definition of the term "Access Period," if any order or injunction is issued or stay is granted or is otherwise effective by operation of law that prohibits the ABL Representative from exercising any of its rights hereunder, then the Access Period granted to the ABL Representative under this Section 3.4 shall be stayed during the period of such prohibition and shall continue thereafter for the number of days remaining as required under this Section 3.4. The Notes Representative shall not foreclose or otherwise sell, remove or dispose of any of the Notes Priority Collateral during the Access Period with respect

21

to such Collateral if such Collateral is reasonably necessary to enable the ABL Representative to convert, transport or arrange to sell the ABL Priority Collateral as described above.

3.5  <u>No Additional Rights For the Grantors Hereunder</u>.  Except as provided in <u>Section 3.6</u> hereof, if any ABL Secured Party or Notes Secured Party shall enforce its rights or remedies in violation of the terms of this Agreement, no Grantor shall be entitled to use such violation as a defense to any action by any ABL Secured Party or Notes Secured Party, nor to assert such violation as a counterclaim or basis for set off or recoupment against any ABL Secured Party or any Notes Secured Party.

3.6  <u>Actions Upon Breach</u>.  (a) If any ABL Secured Party or any Notes Secured Party, contrary to this Agreement, commences or participates in any action or proceeding against any Grantor or the Common Collateral, such Grantor, with the prior written consent of the ABL Representative or the Notes Representative, as applicable, may interpose as a defense or dilatory plea the making of this Agreement, and any ABL Secured Party or Notes Secured Party, as applicable, may intervene and interpose such defense or plea in its or their name or in the name of such Grantor.

(b)  Should any ABL Secured Party or Notes Secured Party, contrary to this Agreement, in any way take, attempt to or threaten to take any action with respect to the Common Collateral (including, without limitation, any attempt to realize upon or enforce any remedy with respect to this Agreement), or fail to take any action required by this Agreement, any ABL Secured Party or any Notes Secured Party (in its own name or in the name of the relevant Grantor), as applicable, or the relevant Grantor, may obtain relief against such ABL Secured Party or Notes Secured Party, as applicable, by injunction, specific performance and/or other appropriate equitable relief, it being understood and agreed by each of the ABL Representative on behalf of each ABL Secured Party and the Notes Representative on behalf of each Notes Secured Party that (i) the ABL Secured Parties' or Notes Secured Parties', as applicable, damages from its actions may at that time be difficult to ascertain and may be irreparable, and (ii) each Notes Secured Party or each ABL Secured Party, as applicable, waives any defense that the Grantors and/or the Notes Secured Parties and/or ABL Secured Parties, as applicable, cannot demonstrate damage and/or be made whole by the awarding of damages.

**SECTION 4.**  *Application of Proceeds of Senior Collateral; Dispositions and Releases of Lien; Notices and Insurance.*

4.1  <u>Application of Proceeds</u>.

(a)  <u>Application of Proceeds of Senior Collateral</u>.  The Senior Representative and Junior Representative hereby agree that all Senior Collateral, and all Proceeds thereof, received by either of them in connection with the collection, sale or disposition of Senior Collateral in an Enforcement Action shall be applied,

<u>first</u>, to the payment of costs and expenses (including reasonable attorneys' fees and expenses and court costs) of the Senior Representative in connection with such Enforcement Action,

22

UMB-000173

<u>second</u>, to the payment of the Senior Obligations in accordance with the Senior Documents until the Senior Obligations Payment Date,

<u>third</u>, to the payment of costs and expenses (including reasonable attorneys' fees and expenses and court costs) of the Junior Representative in connection with such Enforcement Action,

<u>fourth</u>, to the payment of the Junior Obligations in accordance with the Junior Documents until the Junior Obligations Payment Date, and

<u>fifth</u>, the balance, if any, to the Grantors or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

(b)      <u>Limited Obligation or Liability</u>.  In exercising remedies, whether as a secured creditor or otherwise, the Senior Representative shall have no obligation or liability to the Junior Representative or to any Junior Secured Party, regarding the adequacy of any Proceeds or for any action or omission, save and except solely for an action or omission that breaches the express obligations undertaken by each party under the terms of this Agreement.

(c)      <u>Segregation of Collateral</u>.  Until the occurrence of the Senior Obligations Payment Date, any Senior Collateral that may be received by any Junior Secured Party in violation of this Agreement shall be segregated and held in trust and promptly paid over to the Senior Representative, for the benefit of the Senior Secured Parties, in the same form as received, with any necessary endorsements, and each Junior Secured Party hereby authorizes the Senior Representative to make any such endorsements as agent for the Junior Representative (which authorization, being coupled with an interest, is irrevocable).

4.2      <u>Releases of Liens</u>.  Upon any release, sale or disposition of Senior Collateral that is permitted pursuant to the terms of the Senior Documents or is effected by any sale or other disposition pursuant to any Enforcement Action, and that results in the release of the Senior Lien on any Senior Collateral (other than release of the Senior Lien due to the occurrence of the Senior Obligations Payment Date), the Junior Lien on such Senior Collateral (excluding any portion of the Proceeds of such Senior Collateral remaining after the Senior Obligations Payment Date occurs) shall be automatically and unconditionally released with no further consent or action of any Person, it being specifically agreed and acknowledged by the Notes Representative that the automatic release of any such Notes Lien that constitutes a Junior Lien on the ABL Priority Collateral will not impair the security under the Indenture or any other Notes Secured Debt Agreement in contravention of the provisions thereof and that any independent engineer, appraiser or other expert required to deliver a certificate to the Indenture Trustee in connection with any such release shall be entitled to rely on the provisions set forth in this Section 4.2.  The Junior Representative shall promptly execute and deliver such release documents and instruments and shall take such further actions as the Senior Representative shall request to evidence any release of the Junior Lien described in this <u>Section 4.2</u>.  The Junior Representative hereby appoints the Senior Representative and any officer or duly authorized person of the Senior Representative, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power of attorney in the place and stead of the Junior Representative and in the name of the Junior Representative or in the Senior Representative's own name, from time to

23

time, in the Senior Representative's sole discretion, for the purposes of carrying out the terms of this Section 4.2, to take any and all appropriate action and to execute and deliver any and all documents and instruments as may be necessary or desirable to accomplish the purposes of this Section 4.2, including, without limitation, any financing statements, endorsements, assignments, releases or other documents or instruments of transfer (which appointment, being coupled with an interest, is irrevocable).

4.3    Insurance.    Proceeds of Common Collateral include insurance proceeds and therefore the Lien Priority shall govern the ultimate disposition of casualty insurance proceeds. The ABL Representative shall be named as additional insured or loss payee, as applicable, with respect to all insurance policies relating to ABL Priority Collateral and the Notes Representative shall be named as additional insured or loss payee, as applicable, with respect to all insurance policies relating to Notes Priority Collateral.  Prior to the ABL Obligations Payment Date, the ABL Representative shall have the sole and exclusive right, as between the Notes Representative on the one hand and the ABL Representative on the other hand, to adjust settlement of insurance claims in the event of any covered loss, theft or destruction of ABL Priority Collateral.  Prior to the Notes Obligations Payment Date, the Notes Representative shall have the sole and exclusive right, as between the ABL Representative on the one hand and the Notes Representative on the other hand, to adjust settlement of insurance claims in the event of any covered loss, theft or destruction of Notes Priority Collateral.  All proceeds of such insurance shall be remitted to the ABL Representative or the Notes Representative, as the case may be, and each of the Notes Representative and ABL Representative shall cooperate (if necessary) in a reasonable manner in effecting the payment of insurance proceeds in accordance with Section 4.1.

4.4    Option to Purchase ABL Obligations.

(a) Without prejudice to the enforcement of remedies by the ABL Representative, the ABL Secured Parties or the Notes Secured Parties, the Person or Persons  that are holders of Notes Obligations and that are designated by the holders of more than 50% in aggregate outstanding principal amount of the Notes Obligations (such Person or Persons collectively, the "Eligible ABL Facility Purchaser") shall have the right to purchase in accordance with the terms and conditions of this Section 4.4 (the "ABL Purchase Option") by way of assignment (and shall thereby also assume all commitments and duties of the then extant ABL Secured Parties under the ABL Documents), on the ABL Purchase Closing Date, all, but not less than all, of the ABL Obligations, including all principal of and accrued and unpaid interest and fees on and all prepayment or acceleration fees and premiums in respect of all ABL Obligations outstanding at the time of purchase excluding Unasserted Contingent Obligations and obligations cash collateralized in accordance with clause (i)(B) and clause (i)(D) below (the "ABL Purchase Obligations").  Any purchase pursuant to this Section 4.4 shall be made as follows:

(i)    for a purchase price (the "ABL Purchase Price") equal to the full amount of the ABL Purchase Obligations including, but not limited to:

(A) in the case of all loans, advances or other similar extensions of credit that constitute ABL Purchase Obligations (including unreimbursed amounts drawn in respect of letters of credit) the principal amount thereof, all accrued and unpaid interest thereon through the date of purchase (including, without

24

limitation, interest that has accrued at the default rate and any Post-Petition Interest, and breakage costs set forth in the ABL Documents),

(B) in the case of any Banking Services Obligations, cash collateral in such amounts as the ABL Representative reasonably determines is necessary to secure the ABL Representative and the other ABL Secured Parties in connection with such Banking Services Obligations,

(C) in the case of any Swap Obligations, the aggregate amount then owing to each swap counterparty that is an ABL Secured Party thereunder pursuant to the terms of the respective Swap Obligation documentation, including all amounts owing to such ABL Secured Party as a result of the termination (or early termination) thereof (in each case, to the extent of its interest as an ABL Secured Party),

(D) in the case of the undrawn amount of then outstanding letters of credit, cash collateral in an amount equal to the percentage of the aggregate undrawn amount of such letters of credit and the aggregate facing and similar fees which will accrue thereon through the stated maturity of the letters of credit (assuming no drawings thereon before stated maturity) required pursuant to the terms of the ABL Documents then in effect, and

(E) without duplication, all other accrued and unpaid fees, charges, costs, expenses, indemnities and other amounts through the date of purchase (including, without limitation, deferred revolving loan origination fees and prepayments (each determined as if the Revolving Credit Commitment (as that term is defined in the ABL Agreement) had terminated on the date of purchase), unused line fees, audit fees, and wire fees and further including, without limitation, reasonable attorneys' fees and expenses and court costs); it being understood and agreed that:

(1) if at any time those amounts (if any) then on deposit with the ABL Representative as described in clause (D) above exceed the percentage of the sum of the aggregate undrawn amount of all then outstanding letters of credit and the aggregate facing and similar fees accrued thereon before stated maturity required pursuant to the terms of the ABL Documents then in effect, such excess shall be returned to the Eligible ABL Facility Purchaser,

(2) at such time as all letters of credit have been cancelled, expired or been fully drawn, as the case may be, any excess cash collateral deposited as described above in clause (D) (and not previously applied or released as provided above) shall be returned to the Eligible ABL Facility Purchaser, and

(3) at such time as all Banking Services Obligations have been terminated, any excess cash collateral deposited as described above in clause (B) (and not previously applied or released as provided above) shall

25

UMB-000176

be returned to the Eligible ABL Facility Purchaser. It is understood and agreed that (x) at the time any fees are owing to an issuer with respect to any letter of credit, the ABL Representative may apply amounts deposited with it as described above to pay the same and (y) upon any drawing under any letter of credit, the ABL Representative shall apply amounts deposited with it as described above to repay the respective unpaid drawing;

(ii)     with the ABL Purchase Price described in preceding clause (a)(i) payable by federal wire transfer in immediately available funds on the ABL Purchase Closing Date in consideration for the assignment of the ABL Purchase Obligations to the Eligible ABL Facility Purchaser; and

(iii)     with all amounts payable to the various ABL Secured Parties in respect of the assignments described above to be distributed to them by the ABL Representative in accordance with their respective holdings of the various ABL Purchase Obligations.

(b)     The right to exercise the ABL Purchase Option shall be exercisable and legally enforceable by at least ten (10) Business Days' prior written notice of exercise by the Eligible ABL Facility Purchaser to the ABL Representative  received by the ABL Representative during the ABL Purchase Notice Period (the "ABL Purchase Notice"). The ABL Purchase Notice shall (A) state that the Persons signing the notice are collectively the Eligible ABL Facility Purchaser, (B) state that the notice is irrevocable and fully binding on the Eligible ABL Facility Purchaser (except as set forth in the proviso set forth in clause (c) below) and (C) shall specify a date of purchase not less than five (5) Business Days, nor more than twenty (20) calendar days, after the date of the receipt by the ABL Representative of such notice) given to the ABL Representative by the Eligible ABL Facility Purchaser (the "ABL Purchase Closing Date"). Unless, and subject to such terms and conditions as, the ABL Representative expressly agrees otherwise in writing, if on ABL Purchase Closing Date the Eligible ABL Facility Purchaser has not purchased the ABL Purchase Obligations in accordance with the terms and conditions of this Section 4.4, the ABL Purchase Option shall terminate and be of no further force or effect.

(c)   The ABL Purchase Option may be exercised by giving the ABL Purchase Notice during the period (the "ABL Purchase Notice Period") that (1) begins on the date occurring three (3) Business Days after the first to occur of (x) the date of the acceleration of the final maturity of the loans under the ABL Agreement, (y) the occurrence of the final maturity of the loans under the ABL Agreement or (z) the occurrence of an Insolvency Proceeding with respect to the Company or any Grantor which constitutes an event of default under the ABL Agreement (provided, however, in each case, so long as the acceleration, failure to pay amounts due at final maturity or such Insolvency Proceeding constituting an event of default has not been rescinded or cured within ten (10) Business Days after any such event, and so long as any unpaid amounts constituting ABL Purchase Obligations remain owing) and (2) ends on the tenth (10th) Business Day after the start of the period described in clause (1) above. Unless, and subject to such terms and conditions as, the ABL Representative expressly agrees otherwise in writing, if the ABL Purchase Notice has not been given within the ABL Purchase Notice Period, the ABL Purchase Option shall terminate and be of no further force or effect.

UMB-000177

(c)     Each Grantor irrevocably consents to any assignment effected to one or more Eligible ABL Facility Purchasers pursuant to this Section 4.4 for purposes of all ABL Documents and hereby agrees that no further consent to any such assignment pursuant to this Section 4.4 from such Grantor shall be required.

(d)     SUCH PURCHASE OF THE ABL PURCHASE OBLIGATIONS SHALL BE EXPRESSLY MADE WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND BY ANY OF THE ABL SECURED PARTIES OR THE ABL REPRESENTATIVE AS TO THE ABL PURCHASE OBLIGATIONS OR OTHERWISE AND WITHOUT RECOURSE TO ANY OF THE ABL SECURED PARTIES OR THE ABL REPRESENTATIVE, except that each of the ABL Secured Parties shall represent and warrant: (a) as to the amount of the ABL Purchase Obligations being purchased from such ABL Secured Party, (b) that such ABL Secured Party owns such ABL Purchase Obligations free and clear of any liens or encumbrances and (c) that such ABL Secured Party has the right to assign such ABL Purchase Obligations and the assignment is duly authorized.

(e)     The transfer of the ABL Purchase Obligations shall be effected by an assignment agreement, endorsements  and  such other documents as Notes Representative may reasonably request from time to time, all in form and substance reasonably satisfactory to ABL Representative and the Notes Representative, whereby the Eligible ABL Facility Purchaser will assume any applicable funding commitments and obligations of ABL Secured Parties under the Senior Loan Documents and ABL Representative will convey all right, title and interest of the ABL Representative in and to the ABL Purchase Obligations.

**SECTION 5.**  *Insolvency Proceedings.*

5.1     <u>Filing of Motions</u>.  Until the Senior Obligations Payment Date has occurred, the Junior Representative agrees on behalf of itself and the other Junior Secured Parties that no Junior Secured Party shall, in or in connection with any Insolvency Proceeding, file any pleadings or motions, take any position at any hearing or proceeding of any nature, or otherwise take any action whatsoever, in each case in respect of any of the Senior Collateral, including, without limitation, with respect to the determination of any Liens or claims held by the Senior Representative (including the validity and enforceability thereof) or any other Senior Secured Party in respect of any Senior Collateral or the value of any claims of such parties under Section 506(a) of the Bankruptcy Code or otherwise; <u>provided</u> that the Junior Representative may (i) file a proof of claim in an Insolvency Proceeding, and (ii) file any necessary responsive or defensive pleadings in opposition of any motion or other pleadings made by any Person objecting to or otherwise seeking the disallowance of any Person objecting to or otherwise seeking the disallowance of the claims of the Junior Secured Parties on the Senior Collateral, subject to the limitations contained in this Agreement and only if consistent with the terms and the limitations on the Junior Representative imposed hereby.

5.2     <u>Financing Matters</u>.  (a) If any Grantor becomes subject to any Insolvency Proceeding in the United States at any time prior to the ABL Obligations Payment Date, and if the ABL Representative or other ABL Secured Parties desire to consent (or not object) to the use of cash collateral under the Bankruptcy Code or to provide financing to any Grantor under the Bankruptcy Code or to consent (or not object) to the provision of such financing to any Grantor

27

by any third party (any such financing, "ABL DIP Financing"), then the Notes Representative agrees, on behalf of itself and the other Notes Secured Parties, that each Notes Secured Party (i) will be deemed to have consented to, will raise no objection to, nor support any other Person objecting to, the use of such cash collateral or to such ABL DIP Financing on the grounds of a failure to provide "adequate protection" for the Notes Representative's Lien on the Notes Collateral to secure the Notes Obligations or on any other grounds (and will not request any adequate protection solely as a result of such ABL DIP Financing) and (ii) will subordinate (and will be deemed hereunder to have subordinated) the Notes Liens on any ABL Priority Collateral (A) to such ABL DIP Financing on the same terms as the ABL Liens are subordinated thereto (and such subordination will not alter in any manner the terms of this Agreement), (B) to any adequate protection provided to the ABL Secured Parties and (C) to any "carve-out" agreed to by the ABL Representative or the other ABL Secured Parties, so long as (x) the financing is not made in conjunction with the use of cash collateral consisting of Notes Priority Collateral and the Notes Representative retains its Lien on the Notes Collateral to secure the Notes Obligations (in each case, including Proceeds thereof arising after the commencement of the case under the Bankruptcy Code) and, as to the Notes Priority Collateral only, such Lien has the same priority as existed prior to the commencement of the case under the Bankruptcy Code and any Lien securing such ABL DIP Financing is junior and subordinate to the Lien of the Notes Representative on the Notes Priority Collateral, (y) all Liens on ABL Priority Collateral securing any such ABL DIP Financing shall be senior to or on a parity with the Liens of the ABL Representative and the other ABL Secured Parties securing the ABL Obligations on ABL Priority Collateral and (z) if the ABL Representative receives a replacement or adequate protection Lien on post-petition assets of the debtor to secure the ABL Obligations, and such replacement or adequate protection Lien is on any of the Notes Priority Collateral, (1) such replacement or adequate protection Lien on such post-petition assets which are part of the Notes Priority Collateral (the "Notes Post-Petition Assets") is junior and subordinate to the Lien in favor of the Notes Representative on the Notes Priority Collateral and (2) the Notes Representative also receives a replacement or adequate protection Lien on such Notes Post-Petition Assets of the debtor to secure the Notes Obligations.  In no event will any of the ABL Secured Parties seek to obtain a priming Lien on any of the Notes Priority Collateral and nothing contained herein shall be deemed to be a consent by Notes Secured Parties to any adequate protection payments using Notes Priority Collateral.

(b)     If any Grantor becomes subject to any Insolvency Proceeding in the United States at any time prior to the Notes Obligations Payment Date and if the Notes Representative or the other Notes Secured Parties desire to consent (or not object) or to provide financing to any Grantor under the Bankruptcy Code or to consent (or not object) to the provision of such financing to any Grantor by any third party (any such financing, "Notes DIP Financing"), then the ABL Representative agrees, on behalf of itself and the other ABL Secured Parties, that each ABL Secured Party (a) will be deemed to have consented to, will raise no objection to, nor support any other Person objecting to such Notes DIP Financing on the grounds of a failure to provide "adequate protection" for the ABL Representative's Lien on the ABL Collateral to secure the ABL Obligations or on any other grounds (and will not request any adequate protection solely as a result of such Notes DIP Financing) and (b) will subordinate (and will be deemed hereunder to have subordinated) the ABL Liens on any Notes Priority Collateral (A) to such Notes DIP Financing on the same terms as the Notes Liens are subordinated thereto (and such subordination will not alter in any manner the terms of this Agreement), (B) to any

28

adequate protection provided to the Notes Secured Parties and (C) to any "carve-out" agreed to by the Notes Representative or the other Notes Secured Parties, so long as (x) the financing is not made in conjunction with the use of cash collateral consisting of ABL Priority Collateral and the ABL Representative retains its Lien on the ABL Collateral to secure the ABL Obligations (in each case, including Proceeds thereof arising after the commencement of the case under the Bankruptcy Code) and, as to the ABL Priority Collateral only, such Lien has the same priority as existed prior to the commencement of the case under the Bankruptcy Code and any Lien securing such Notes DIP Financing is junior and subordinate to the Lien of the ABL Representative on the ABL Priority Collateral, (y) all Liens on Notes Priority Collateral securing any such Notes DIP Financing shall be senior to or on a parity with the Liens of the Notes Representative and the other Notes Secured Parties securing the Notes Obligations on Notes Priority Collateral and (z) if the Notes Representative receives a replacement or adequate protection Lien on post-petition assets of the debtor to secure the Notes Obligations, and such replacement or adequate protection Lien is on any of the ABL Priority Collateral, (1) such replacement or adequate protection Lien on such post-petition assets which are part of the ABL Priority Collateral (the "ABL Post-Petition Assets") is junior and subordinate to the Lien in favor of the ABL Representative on the ABL Priority Collateral and (2) the ABL Representative also receives a replacement or adequate protection Lien on such ABL Post-Petition Assets of the debtor to secure the ABL Obligations.  In no event will any of the Notes Secured Parties seek to obtain a priming Lien on any of the ABL Priority Collateral and nothing contained herein shall be deemed to be a consent by the ABL Secured Parties to any adequate protection payments using ABL Priority Collateral.

(c)    All Liens granted to the Notes Representative or the ABL Representative in any Insolvency Proceeding, whether as adequate protection or otherwise, are intended to be and shall be deemed to be subject to the Lien Priority and the other terms and conditions of this Agreement.

5.3    Relief From the Automatic Stay.  Until the ABL Obligations Payment Date, the Notes Representative agrees, on behalf of itself and the other Notes Secured Parties, that none of them will seek relief from the automatic stay or from any other stay in any Insolvency Proceeding or take any action in derogation thereof, in each case in respect of any ABL Priority Collateral, without the prior written consent of the ABL Representative.  Until the Notes Obligations Payment Date, the ABL Representative agrees, on behalf of itself and the other ABL Secured Parties, that none of them will seek relief from the automatic stay or from any other stay in any Insolvency Proceeding or take any action in derogation thereof, in each case in respect of any Notes Priority Collateral, without the prior written consent of the Notes Representative. Notwithstanding the foregoing, Junior Secured Parties may seek such relief to the extent it is conditioned and coextensive with the relief sought and granted to the Senior Secured Parties and the exercise of such relief to the Junior Secured Parties is subject to the continuing terms of this Agreement.

5.4    No Contest.  The Junior Representative, on behalf of itself and the Junior Secured Parties, agrees that, prior to the Senior Obligations Payment Date, none of them shall contest (or support any other Person contesting) (a) any request by the Senior Representative or any Senior Secured Party for adequate protection of its interest in the Senior Collateral (unless in contravention of Section 5.2(a) or (b), as applicable), or (b) any objection by the Senior

29

Representative or any Senior Secured Party to any motion, relief, action, or proceeding based on a claim by the Senior Representative or any Senior Secured Party that its interests in the Senior Collateral (unless in contravention of <u>Section 5.2 (a) or (b)</u>, as applicable) are not adequately protected (or any other similar request under any law applicable to an Insolvency Proceeding), so long as any Liens granted to the Senior Representative as adequate protection of its interests are subject to this Agreement.

5.5     <u>Avoidance Issues</u>.   If any Senior Secured Party is required in any Insolvency Proceeding or otherwise to disgorge, turn over or otherwise pay to the estate of any Grantor, because such amount was avoided or ordered to be paid or disgorged for any reason, including without limitation because it was found to be a fraudulent or preferential transfer, any amount (a "<u>Recovery</u>"), whether received as Proceeds of security, enforcement of any right of set-off or otherwise, then the Senior Obligations shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such payment had not occurred and the Senior Obligations Payment Date shall be deemed not to have occurred.   If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto.

5.6     <u>Asset Dispositions in an Insolvency Proceeding</u>.     Neither the Junior Representative nor any other Junior Secured Party shall, in an Insolvency Proceeding or otherwise, oppose any sale or disposition of any Senior Collateral that is supported by the Senior Secured Parties, and the Junior Representative and each other Junior Secured Party will be deemed to have consented under Section 363 of the Bankruptcy Code (and otherwise) to any sale of any Senior Collateral supported by the Senior Secured Parties and to have released their Liens on such assets.

5.7     <u>Other Matters</u>.  To the extent that the Senior Representative or any Senior Secured Party has or acquires rights under Section 363 or Section 364 of the Bankruptcy Code with respect to any of the Junior Collateral, the Senior Representative agrees, on behalf of itself and the other Senior Secured Parties, not to assert any of such rights without the prior written consent of the Junior Representative; <u>provided</u> that if requested by the Junior Representative, the Senior Representative shall timely exercise such rights in the manner requested by the Junior Representative, including any rights to payments in respect of such rights.

5.8     <u>Effectiveness in Insolvency Proceedings</u>.   This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under section 510(a) of the Bankruptcy Code, shall be effective before, during and after the commencement of an Insolvency Proceeding.

**SECTION 6.**   *Notes Documents and ABL Documents.*

(a)     Each Grantor and the Notes Representative, on behalf of itself and the Notes Secured Parties, agrees that it shall not at any time execute or deliver any amendment or other modification to any of the Notes Documents inconsistent with or in violation of this Agreement.

30

(b)    Each Grantor and the ABL Representative, on behalf of itself and the ABL Secured Parties, agrees that it shall not at any time execute or deliver any amendment or other modification to any of the ABL Documents inconsistent with or in violation of this Agreement or that add, amend or modify any provision of the Senior Documents to prohibit the Company or any Subsidiary thereof from making any payments with respect to the Senior Obligations; <u>provided</u> that this subsection shall not prohibit the Senior Secured Parties from agreeing to any addition, amendment or modification which has the indirect effect of restricting the ability of the Company or any Subsidiary to pay Junior Obligations or otherwise restricts such payments in accordance with the terms of this Agreement by restricting the use the Senior Collateral or the use of loan proceeds to pay Junior Obligations during the continuance of an event of default under the Senior Documents.

(c)    In the event the Senior Representative enters into any amendment, waiver or consent in respect of any of the Senior Security Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any Senior Security Document or changing in any manner the rights of any parties thereunder, in each case solely with respect to any Senior Collateral, then such amendment, waiver or consent shall apply automatically to any comparable provision of the Comparable Security Document without the consent of or action by any Junior Secured Party (with all such amendments, waivers and modifications subject to the terms hereof); <u>provided</u> that, (i) no such amendment, waiver or consent shall have the effect of removing assets subject to the Lien of any Junior Security Document, except to the extent that a release of such Lien is permitted by <u>Section 4.2</u>, (ii) any such amendment, waiver or consent that adversely affects the rights of the Junior Secured Parties and does not affect the Senior Secured Parties in a like or similar manner shall not apply to the Junior Security Documents without the consent of the Junior Representative, (iii) no such amendment, waiver or consent with respect to any provision applicable to the Junior Representative under the Junior Documents shall be made without the prior written consent of the Junior Representative and (iv) notice of such amendment, waiver or consent shall be given to the Junior Representative no later than 30 days after its effectiveness, <u>provided</u> that the failure to give such notice shall not affect the effectiveness and validity thereof.

**SECTION 7.   [RESERVED.]**.

**SECTION 8.**   *Reliance; Waivers; etc.*

8.1    <u>Reliance</u>.  The ABL Documents are deemed to have been executed and delivered, and all extensions of credit thereunder are deemed to have been made or incurred, in reliance upon this Agreement.  The Notes Representative, on behalf of it itself and the other Notes Secured Parties, expressly waives all notice of the acceptance of and reliance on this Agreement by the ABL Representative and the other ABL Secured Parties.  The Notes Documents are deemed to have been executed and delivered, and all extensions of credit thereunder are deemed to have been made or incurred, in reliance upon this Agreement.  The ABL Representative, on behalf of itself and the other ABL Secured Parties, expressly waives all notices of the acceptance of and reliance on this Agreement by the Notes Representative and the other Notes Secured Parties.

UMB-000182

8.2    No Warranties or Liability.    The Notes Representative and the ABL Representative acknowledge and agree that neither has made any representation or warranty with respect to the execution, validity, legality, completeness, collectibility or enforceability of any other ABL Document or any other Notes Document.    Except as otherwise provided in this Agreement, the Notes Representative and the ABL Representative will be entitled to manage and supervise the respective extensions of credit to any Grantor in accordance with law and their usual practices, modified from time to time as they deem appropriate.

8.3    No Waivers.    No right or benefit of any party hereunder shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of such party or any other party hereto or by any noncompliance by any Grantor with the terms and conditions of any of the ABL Documents or the Notes Documents.

**SECTION 9.**    *Obligations Unconditional.*    All rights, interests, agreements and obligations hereunder of the Senior Representative and the Senior Secured Parties in respect of any Collateral and the Junior Representative and the Junior Secured Parties in respect of such Collateral shall remain in full force and effect regardless of:

(a)    any lack of validity or enforceability of any Senior Document or any Junior Document and regardless of whether the Liens of the Senior Representative and Senior Secured Parties are not perfected or are voidable for any reason;

(b)    any change in the time, manner or place of payment of, or in any other terms of, all or any of the Senior Obligations or Junior Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any Senior Document or any Junior Document;

(c)    any exchange, release or lack of perfection of any Lien on any Collateral or any other asset, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the Senior Obligations or Junior Obligations or any guarantee thereof;

(d)    the commencement of any Insolvency Proceeding in respect of any Grantor; or

(e)    any other circumstances which otherwise might constitute a defense available to, or a discharge of, any Grantor in respect of any Secured Obligation or of any Junior Secured Party in respect of this Agreement.

**SECTION 10.** *Miscellaneous.*

10.1    Rights of Subrogation.    The Notes Representative, for and on behalf of itself and the Notes Secured Parties, agrees that no payment to the ABL Representative or any other ABL Secured Party pursuant to the provisions of this Agreement shall entitle the Notes Representative or any other Notes Secured Party to exercise any rights of subrogation in respect thereof until the ABL Obligations Payment Date.    Following the ABL Obligations Payment Date, the ABL Representative agrees to execute such documents, agreements, and instruments as the Notes Representative or any other Notes Secured Party may reasonably request to evidence the transfer

UMB-000183

by subrogation to any such Person of an interest in the ABL Obligations resulting from payments to the ABL Representative by such Person, so long as all costs and expenses (including all reasonable legal fees and disbursements) incurred in connection therewith by the ABL Representative are paid by such Person upon request for payment thereof.  The ABL Representative, for and on behalf of itself and the other ABL Secured Parties, agrees that no payment to the Notes Representative or any other Notes Secured Party pursuant to the provisions of this Agreement shall entitle the ABL Representative or any other ABL Secured Party to exercise any rights of subrogation in respect thereof until the Notes Obligations Payment Date. Following the Notes Obligations Payment Date, the Notes Representative agrees to execute such documents, agreements, and instruments as the ABL Representative or any other ABL Secured Party may reasonably request to evidence the transfer by subrogation to any such Person of an interest in the Notes Obligations resulting from payments to the Notes Representative by such Person, so long as all costs and expenses (including all reasonable legal fees and disbursements) incurred in connection therewith by the Notes Representative are paid by such Person upon request for payment thereof.

10.2  <u>Further Assurances</u>.   Each of the Notes Representative and the ABL Representative will, at their own expense and at any time and from time to time, promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that the other party may reasonably request, in order to protect any right or interest granted or purported to be granted hereby or to enable the ABL Representative or the Notes Representative to exercise and enforce its rights and remedies hereunder; <u>provided</u>, <u>however</u>, that no party shall be required to pay over any payment or distribution, execute any instruments or documents, or take any other action referred to in this <u>Section 10.2</u>, to the extent that such action would contravene any law, order or other legal requirement or any of the terms or provisions of this Agreement, and in the event of a controversy or dispute, such party may interplead any payment or distribution in any court of competent jurisdiction, without further responsibility in respect of such payment or distribution under this <u>Section 10.2</u>.

10.3  <u>Conflicts</u>.  In the event of any conflict between the provisions of this Agreement and the provisions of any ABL Document or any Notes Document, the provisions of this Agreement shall govern.

10.4  <u>Continuing Nature of Provisions</u>.  Subject to <u>Section 5.5</u>, this Agreement shall continue to be effective, and shall not be revocable by any party hereto, until the earlier of (i) the ABL Obligations Payment Date and (ii) the Notes Obligations Payment Date.  This is a continuing agreement and the ABL Secured Parties and the Notes Secured Parties may continue, at any time and without notice to the other parties hereto, to extend credit and other financial accommodations, lend monies and provide indebtedness to, or for the benefit of, any Grantor on the faith hereof.

10.5  <u>Amendments; Waivers</u>.   (a) No amendment or modification of any of the provisions of this Agreement shall be effective unless the same shall be in writing and signed by the ABL Representative and the Notes Representative, and, in the case of amendments or modifications of <u>Sections 3.5</u>, <u>3.6</u>, <u>10.7</u> or <u>10.8</u> that directly affect the rights or duties of any Grantor, such Grantor.

33

(b)     It is understood and agreed that Company and the other applicable Grantors will be permitted to designate as an additional holder of Secured Obligations hereunder each Person who is, or who becomes, the registered holder of ABL Principal Debt or Notes Principal Debt or other Secured Obligations incurred by Company or such other Grantor after the date of this Agreement in accordance with the terms of the Indenture, the Existing ABL Agreement or any other Secured Debt Document then in effect, as applicable. Company or any other applicable Grantor may effect such designation by delivering to the Notes Representative and the ABL Representative each of the following:

(i)     an officers certificate stating that Company or such other Grantor intends to incur additional ABL Principal Debt and/or Notes Principal Debt and/or other Secured Obligations ("Additional Secured Debt") which will be (A) ABL Principal Debt or other ABL Obligations permitted by the Indenture or any other Secured Debt Document then in effect or the Existing ABL Agreement to be incurred and secured by an ABL Lien equally and ratably with all previously existing and future ABL Obligations subject, in the case of ABL Principal Debt, to the ABL Principal Debt Cap, or (B) Notes Principal Debt or other Notes Obligations permitted by the Existing ABL Agreement or any other Secured Debt Document then in effect to be incurred and secured by a Notes Lien equally and ratably with all previously existing and future Notes Obligations, provided, however, that to the extent the Additional Secured Debt will consist in whole or in part of any revolving credit debt, such officers certificate shall only be required in connection with entering into the applicable Secured Debt Documents with such additional holder of Secured Obligations hereunder;

(ii)     written evidence that an authorized agent, trustee or other representative on behalf of the holders or lenders of any Additional Secured Debt (or, in the case of any ABL Obligations consisting of Swap Obligations, the provider of such Swap Obligations) have been designated as an additional holder of Secured Obligations hereunder and must, prior to such designation, sign and deliver on behalf of the holders or lenders of such Additional Secured Debt (or, in the case of any ABL Obligations consisting of Swap Obligations, on its own behalf) a Lien Sharing and Priority Confirmation Joinder; and

(iii)     evidence that Company or such other Grantor has duly authorized, executed (if applicable) and recorded (or caused to be recorded) in each appropriate governmental office all relevant filings and recordations deemed necessary by Company or other Grantor and the holder of such Additional Secured Debt, or its Secured Debt Representative, to ensure that the Additional Secured Debt is secured by the Collateral in accordance with the ABL Security Documents and the Notes Security Documents.

Notwithstanding the foregoing, nothing in this Agreement will be construed to allow Company or any other Grantor to incur additional indebtedness unless otherwise permitted by the terms of the Indenture, the Existing ABL Agreement or any other Secured Debt Document then in effect, as applicable.

10.6     Information Concerning Financial Condition of the Grantors.  Each of the Notes Representative and the ABL Representative hereby assume responsibility for keeping itself informed of the financial condition of the Grantors and all other circumstances bearing upon the

UMB-000185

risk of nonpayment of the ABL Obligations or the Notes Obligations.  The Notes Representative and the ABL Representative hereby agree that no party shall have any duty to advise any other party of information known to it regarding such condition or any such circumstances (except as otherwise provided in the ABL Documents and Notes Documents).  In the event the Notes Representative or the ABL Representative, in its sole discretion, undertakes at any time or from time to time to provide any information to any other party to this Agreement, it shall be under no obligation (a) to provide any such information to such other party or any other party on any subsequent occasion, (b) to undertake any investigation not a part of its regular business routine, or (c) to disclose any other information.

10.7    <u>Governing Law</u>.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

10.8    <u>Submission to Jurisdiction; JURY TRIAL WAIVER</u>.  (a) Each ABL Secured Party, each Notes Secured Party and each Grantor hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each such party hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each such party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that the any ABL Secured Party or Notes Secured Party may otherwise have to bring any action or proceeding against any Grantor or its properties in the courts of any jurisdiction.

(b)    Each ABL Secured Party, each Notes Secured Party and each Grantor hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so (i) any objection it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (a) of this Section and (ii) the defense of an inconvenient forum to the maintenance of such action or proceeding.

(c)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in <u>Section 10.9</u>.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

(d)    EACH PARTY HERETO HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS.  EACH PARTY HERETO REPRESENTS THAT IT HAS REVIEWED THIS WAIVER AND IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL

UMB-000186

RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

10.9    Notices.  Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, telecopied, or sent by overnight express courier service or United States mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of a telecopy or five days after deposit in the United States mail (certified, with postage prepaid and properly addressed).  For the purposes hereof, the addresses of the parties hereto (until notice of a change thereof is delivered as provided in this Section 10.9) shall be as set forth below each party's name on the signature pages hereof, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

10.10    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and each of the ABL Secured Parties and Notes Secured Parties and their respective successors and assigns, and nothing herein is intended, or shall be construed to give, any other Person any right, remedy or claim under, to or in respect of this Agreement or any Collateral.

10.11    Headings.  Section headings used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

10.12    Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

10.13    Other Remedies.  For avoidance of doubt, it is understood that nothing in this Agreement shall prevent any ABL Secured Party or any Notes Secured Party from exercising any available remedy to accelerate the maturity of any indebtedness or other obligations owing under the ABL Documents or the Notes Documents, as applicable, or to demand payment under any guarantee in respect thereof.

10.14    Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.  This Agreement shall become effective when it shall have been executed by each party hereto.

10.15    Additional Grantors.  Company shall cause each Person that becomes a Grantor after the date hereof to become a party to this Agreement by execution and delivery by such Person of a Joinder Agreement in the form of Annex 1 hereto.

[SIGNATURE PAGES TO FOLLOW]

UMB-000187

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**MIDCAP FINANCIAL TRUST**, as ABL Representative for and on behalf of the ABL Secured Parties

By:     Apollo Capital Management, L.P.,
        its investment manager

By:     Apollo Capital Management GP, LLC,
        its general partner
        By: _____ (SEAL)
        Name:  Maurice Amsellem
        Title:   Authorized Signatory


Address for Notices:

c/o MidCap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 200
Bethesda, Maryland 20814
Attn:  Account Manager for Goodman Networks transaction
Facsimile:  301-941-1450

Copying, for notice purposes only:

c/o MidCap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 200
Bethesda, Maryland 20814
Attn:  General Counsel
Facsimile:  301-941-1450

Intercreditor Agreement – Goodman Networks Incorporated

UMB-000188

U.S. Bank National Association, as Collateral Agent
and as Notes Representative for and on behalf of the
Notes Secured Parties

By: _____

Name:

Title:

Address for Notices:

U.S. Bank National Association
8 Greenway Plaza, Suite 1100
Houston, TX 77046
Attention: Steven A. Finklea, Vice President
Facsimile No.: (713) 212-3718
E-mail: steven.finklea@usbank.com

With a copy to:
McGuire, Craddock & Struther, P.C.
2501 N. Harwood Street, Suite 1800
Dallas, Texas 75201
Attention: Charles J. McGuire, Esq.
Facsimile No.: (214) 954-6868
Email: cmcguire@mcslaw.com

Intercreditor Agreement – Goodman Networks Incorporated

UMB-000189

**GOODMAN NETWORKS INCORPORATED**

By: _____
Name:   John Debus
Title:   Interim Chief Financial Officer

**GOODMAN NETWORKS SERVICES, LLC**

By: _____
Name:   John Debus
Title:   Interim Chief Financial Officer

**MULTIBAND FIELD SERVICES, INCORPORATED**

By: _____
Name:   John Debus
Title:   Interim Chief Financial Officer

Address for Notices:

Goodman Networks Incorporated
2801 Network Blvd., Suite 300
Frisco, TX 75034
Facsimile No.: (972) 421-5753
Attention: John Debus, Interim Chief Financial Officer

with a copy to:

Haynes and Boone, LLP
2323 Victory Avenue, Suite 700
Dallas, TX 75219 -7672
Facsimile No.: (214) 200-0677
Attention: Monika Singh Sanford, Esq.

Intercreditor Agreement – Goodman Networks Incorporated

UMB-000190

ANNEX 1

JOINDER AGREEMENT

THIS JOINDER AGREEMENT (this "<u>Agreement</u>"), dated as of _____ ____, 20__, is executed by _____, a _____ (the "<u>New Subsidiary</u>") in favor of MIDCAP FINANCIAL TRUST ("<u>ABL Representative</u>") and **U.S. BANK NATIONAL ASSOCIATION** ("<u>Notes Representative</u>"), in their capacities as ABL Representative and Notes Representative, respectively, under that certain Intercreditor Agreement (the "<u>Intercreditor Agreement</u>"), dated as of May 31, 2017 among the ABL Representative, the Collateral Agent and Notes Representative, Goodman Network Incorporated and each of the other Grantors party thereto.  All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Intercreditor Agreement.

The New Subsidiary, for the benefit of the ABL Representative and the Notes Representative, hereby agrees as follows:

1.      The New Subsidiary hereby acknowledges the Intercreditor Agreement and acknowledges, agrees and confirms that, by its execution of this Agreement, the New Subsidiary will be deemed to be a Grantor under the Intercreditor Agreement and shall have all of the obligations of a Grantor thereunder as if it had executed the Intercreditor Agreement as of the date thereof.  The New Subsidiary hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Intercreditor Agreement.

2.      The address of the New Subsidiary for purposes of Section 10.9 of the Intercreditor Agreement is as follows:

_____
_____
_____

3.      THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE NEW SUBSIDIARY HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

UMB-000191

IN WITNESS WHEREOF, the New Subsidiary has caused this Agreement to be duly executed by its authorized officer, as of the day and year first above written.

[NEW SUBSIDIARY]

By:_____

Name: _____

Title: _____

UMB-000192

### [FORM OF]
### Lien Sharing and Priority Confirmation Joinder

Reference is made to the Intercreditor Agreement, dated as of May 31, 2017 (as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "*Intercreditor Agreement*") among MIDCAP FINANCIAL TRUST, as the ABL Representative (as defined therein), **U.S. BANK NATIONAL ASSOCIATION**, as the Notes Representative (as defined therein), GOODMAN NETWORKS INCORPORATED ("*Company*") and the subsidiaries of Company named therein.

Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Intercreditor Agreement.  This Lien Sharing and Priority Confirmation Joinder is being executed and delivered [pursuant to Section 10.5(b) of][in accordance with the definition of [ABL Agreement][Notes Secured Debt Agreement] as set forth in] the Intercreditor Agreement as a condition precedent to the debt for which the undersigned is acting as representative being entitled to the rights and obligations of being additional secured debt under the Intercreditor Agreement.

1.    <u>Joinder</u>.    The undersigned, [          ], a [          ], (the "*New Representative*") as [trustee] [notes agent] [administrative agent] [collateral agent] [hedge provider] under that certain [*describe applicable indenture, credit agreement, hedge agreement or other document governing the additional secured debt*] (the "*New Debt Facility*") hereby:

(a)    represents that the New Representative [is authorized to become a party to the Intercreditor Agreement] [has been authorized to become a party to the Intercreditor Agreement on behalf of the [ABL Secured Parties under a Replacement ABL Agreement][ABL Secured Parties under the Additional ABL Agreement][Notes Secured Parties under the Replacement Notes Secured Debt Agreement][Notes Secured Parties under the Additional Notes Secured Debt Agreement] as [an ABL Representative under a Replacement ABL Agreement] [a Notes Representative under a Replacement Notes Secured Debt Agreement] under the Intercreditor Agreement for all purposes thereof on the terms set forth therein, and to be bound by the terms of the Intercreditor Agreement as fully as if the undersigned had executed and delivered the Intercreditor Agreement as of the date thereof; and

(b)    agrees that its address for receiving notices pursuant to the Intercreditor Agreement shall be as follows:

[Address];

2.    <u>Lien Sharing and Priority Confirmation</u>.

[*Option A:  to be used if Additional Secured Debt constitutes <u>ABL Principal Debt or other ABL Obligations</u>*] The undersigned New Representative, on behalf of itself [and each holder of ABL Obligations for which the undersigned is acting as [*administrative agent*]], hereby agrees, for the benefit of all Secured Parties and each future Secured Debt Representative, and as a condition to being treated as ABL Obligations under the Intercreditor Agreement, that:

(a)      all ABL Obligations will be and are secured equally and ratably by all ABL Liens at any time granted by Company or any other Grantor to secure ABL Obligations, whether or not upon property otherwise constituting Collateral for ABL Obligations arising under the New Debt Facility, and that all such ABL Liens will be enforceable by the ABL Representative with respect to such ABL Obligations for the benefit of all holders of ABL Obligations equally and ratably;

(b)      the New Representative [and each holder of ABL Obligations for which the undersigned is acting as [*administrative agent*]] are bound by the provisions of the Intercreditor Agreement, including the provisions relating to the ranking of ABL Liens and the order of application of proceeds from enforcement of ABL Liens; and

(c)      the New Representative [and each holder of ABL Obligations for which the undersigned is acting as [*administrative agent*]] appoints the ABL Representative and consents to the terms of the Intercreditor Agreement and the performance by the ABL Representative of, and directs the ABL Representative to perform, its obligations under the Intercreditor Agreement, together with all such powers as are reasonably incidental thereto.  **[or]**

[*Option B: to be used if Additional Secured Debt constitutes Notes Principal Debt or other Notes Obligations*] The undersigned New Representative, on behalf of itself [and each holder of Notes Obligations for which the undersigned is acting as [*Secured Debt Representative*]], hereby agrees, for the benefit of all Secured Parties and each future Secured Debt Representative, and as a condition to being treated as Notes Obligations under the Intercreditor Agreement, that:

(a)      all Notes Obligations will be and are secured equally and ratably by all Notes Liens at any time granted by Company or any other Grantor to secure Notes Obligations, whether or not upon property otherwise constituting Collateral for Notes Obligations arising under the New Debt Facility, and that all such Notes Liens will be enforceable by the Notes Representative with respect to such Notes Obligations for the benefit of all holders of Notes Obligations equally and ratably;

(b)      the New Representative [and each holder of Notes Obligations for which the undersigned is acting as [*Secured Debt Representative*]] are bound by the provisions of the Intercreditor Agreement, including the provisions relating to the ranking of Notes Liens and the order of application of proceeds from enforcement of Notes Liens; and

(c)      the New Representative [and each holder of Notes Obligations for which the undersigned is acting as [Secured Debt Representative]] appoints the Notes Representative and consents to the terms of the Intercreditor Agreement and the performance by the Notes Representative of, and directs the Notes Representative to perform, its obligations under the Intercreditor Agreement and the Notes Agreement, together with all such powers as are reasonably incidental thereto.

3.      Governing Law and Miscellaneous Provisions.  The provisions of Sections 10.7 and 10.8 of the Intercreditor Agreement will apply with like effect to this Lien Sharing and Priority Confirmation Joinder.

IN WITNESS WHEREOF, the parties hereto have caused this Lien Sharing and Priority Confirmation Joinder to be executed by their respective officers or representatives as of [_____, 20____].

[insert name of New Representative]

By:_____
Name:
Title:

The Notes Representative hereby acknowledges receipt of this Lien Sharing and Priority Confirmation Joinder [and agrees to act as Notes Representative for the New Representative and the holders of the Obligations represented thereby]:

_____ ,
as Notes Representative

By:_____ ,
Name:
Title:

The ABL Representative hereby acknowledges receipt of this Lien Sharing and Priority Confirmation Joinder [and agrees to act as ABL Representative for the New Representative and the holders of the Obligations represented thereby]:

_____
as ABL Representative

By:
Name:
Title:

EXHIBIT I

FORM OF PLEDGE AND SECURITY AGREEMENT

[Attached]

UMB-000196

EXHIBIT I

**PLEDGE AND SECURITY AGREEMENT**

dated as of May 31, 2017

by and among

**GOODMAN NETWORKS INCORPORATED,**
EACH OF THE GRANTORS FROM TIME TO TIME PARTY HERETO

and

**U.S. BANK NATIONAL ASSOCIATION, AS COLLATERAL AGENT**

UMB-000197

# TABLE OF CONTENTS

**PAGE**

1.  DEFINITIONS; GRANT OF SECURITY .................................................................... 2
    1.1  General Definitions ........................................................................................ 2
    1.2  Definitions; Interpretation ............................................................................. 7

2.  GRANT OF SECURITY ........................................................................................... 8
    2.1  Grant of Security ............................................................................................ 8
    2.2  Certain Limited Exclusions ........................................................................... 9

3.  SECURITY FOR NOTES OBLIGATIONS; GRANTORS REMAIN LIABLE ............... 9
    3.1  Security for Notes Obligations ...................................................................... 9
    3.2  Continuing Liability Under Collateral ........................................................... 9

4.  CERTAIN PERFECTION REQUIREMENTS ........................................................... 10
    4.1  Delivery Requirements ................................................................................ 10
    4.2  Control Requirements .................................................................................. 10
    4.3  Intellectual Property Recording Requirements ........................................... 11
    4.4  Other Actions .............................................................................................. 11
    4.5  Timing and Notice ....................................................................................... 12

5.  REPRESENTATIONS AND WARRANTIES ........................................................... 12
    5.1  Grantor Information & Status ...................................................................... 12
    5.2  Collateral Identification, Special Collateral ................................................ 13
    5.3  Ownership of Collateral and Absence of Other Liens .................................. 13
    5.4  Status of Security Interest ........................................................................... 14
    5.5  Goods & Receivables ................................................................................... 14
    5.6  Pledged Equity Interests, Investment Related Property ............................... 15
    5.7  Intellectual Property .................................................................................... 15
    5.8  Miscellaneous .............................................................................................. 16

6.  COVENANTS AND AGREEMENTS ....................................................................... 17
    6.1  Grantor Information & Status ...................................................................... 17
    6.2  Collateral Identification; Special Collateral ................................................ 17
    6.3  Ownership of Collateral and Absence of Other Liens .................................. 17
    6.4  Status of Security Interest ........................................................................... 18
    6.5  Goods & Receivables ................................................................................... 18
    6.6  Pledged Equity Interests, Investment Related Property ............................... 19
    6.7  Intellectual Property .................................................................................... 21

7.  ACCESS; RIGHT OF INSPECTION AND FURTHER ASSURANCES; ADDITIONAL
    GRANTORS .......................................................................................................... 23
    7.1  Access; Right of Inspection ......................................................................... 23
    7.2  Further Assurances ...................................................................................... 23
    7.3  Additional Grantors ..................................................................................... 24

8.  COLLATERAL AGENT APPOINTED ATTORNEY-IN-FACT ................................. 24
    8.1  Power of Attorney ....................................................................................... 24
    8.2  No Duty on the Part of Collateral Agent or Secured Parties ........................ 25
    8.3  Appointment Pursuant to Indenture. ........................................................... 25

9.  REMEDIES ........................................................................................................... 25
    9.1  Generally ..................................................................................................... 25

UMB-000198

9.2 Application of Proceeds ...................................................................................... 27
9.3 Sales on Credit ..................................................................................................... 27
9.4 Investment Related Property ................................................................................ 27
9.5 Grant of Intellectual Property License ................................................................ 28
9.6 Intellectual Property ............................................................................................. 28
9.7 Cash Proceeds; Deposit Accounts ....................................................................... 30

10. COLLATERAL AGENT ......................................................................................... 30

11. CONTINUING SECURITY INTEREST; TRANSFER OF LOANS ........................... 30

12. STANDARD OF CARE; COLLATERAL AGENT MAY PERFORM ....................... 30

13. MISCELLANEOUS ................................................................................................ 31

14. INTERRELATIONSHIP WITH INTERCREDITOR AGREEMENT ......................... 32

**SCHEDULES**

SCHEDULE 5.1  General Information
SCHEDULE 5.2  Collateral Identification
SCHEDULE 5.2(e) Material Excluded Assets
SCHEDULE 5.4  Financing Statements
SCHEDULE 5.5  Location of Equipment and Inventory

**EXHIBITS**

EXHIBIT A  Pledge Supplement
EXHIBIT B  Uncertificated Securities Control Agreement
EXHIBIT C  Securities Account Control Agreement
EXHIBIT D  Deposit Account Control Agreement
EXHIBIT E  Trademark Security Agreement
EXHIBIT F  Patent Security Agreement
EXHIBIT G  Copyright Security Agreement

UMB-000199

**REFERENCE IS MADE TO THE INTERCREDITOR AGREEMENT, DATED AS OF MAY 31, 2017, BY AND AMONG MIDCAP FINANCIAL TRUST, AS THE ABL REPRESENTATIVE (AS DEFINED THEREIN), U.S. BANK NATIONAL ASSOCIATION, AS NOTES REPRESENTATIVE (AS DEFINED THEREIN), GOODMAN NETWORKS INCORPORATED ("*COMPANY*") AND THE SUBSIDIARIES OF COMPANY NAMED THEREIN (THE "*INTERCREDITOR AGREEMENT*").   EACH PERSON THAT BENEFITS FROM THE SECURITY HEREUNDER, BY ACCEPTING THE BENEFITS OF THE SECURITY PROVIDED HEREBY, (I) CONSENTS (OR IS DEEMED TO CONSENT), TO THE SUBORDINATION OF LIENS PROVIDED FOR IN THE INTERCREDITOR AGREEMENT AND (II) AGREES (OR IS DEEMED TO AGREE) THAT IT WILL BE BOUND BY, AND WILL TAKE NO ACTIONS CONTRARY TO, THE PROVISIONS OF THE INTERCREDITOR AGREEMENT.**

**NOTWITHSTANDING ANY OTHER PROVISION CONTAINED HEREIN, THIS AGREEMENT, THE LIENS CREATED HEREBY AND THE RIGHTS, REMEDIES, DUTIES AND OBLIGATIONS PROVIDED FOR HEREIN ARE SUBJECT IN ALL RESPECTS TO THE PROVISIONS OF THE INTERCREDITOR AGREEMENT.   IN THE EVENT OF ANY CONFLICT OR INCONSISTENCY BETWEEN THE PROVISIONS OF THIS AGREEMENT AND THE INTERCREDITOR AGREEMENT, THE PROVISIONS OF THE INTERCREDITOR AGREEMENT SHALL CONTROL.**

This **PLEDGE AND SECURITY AGREEMENT**, dated as of May 31, 2017 (as it may be amended, restated, supplemented or otherwise modified from time to time, this "*Agreement*"), by and among **GOODMAN NETWORKS INCORPORATED**, a Texas corporation ("*Company*") and each of the subsidiaries of Company party hereto from time to time, whether as an original signatory hereto or as an Additional Grantor (as herein defined) (together with Company, the "*Grantors*" and each, a "*Grantor*"), and **U.S. BANK NATIONAL ASSOCIATION**, acting as the Notes Representative and collateral agent for the Secured Parties (as herein defined) (together with its successors and permitted assigns, the "*Collateral Agent*").

### RECITALS:

**WHEREAS**, Company, UMB Bank, National Association, as trustee (the "*Trustee*"), and the Collateral Agent have, in connection with the execution and delivery of this Agreement, entered into that certain Indenture, dated as of the date hereof (as amended, supplemented, amended and restated or otherwise modified and in effect from time to time, the "*Indenture*"), with respect to Company's 8.000% Senior Secured Notes due 2022 (together with any additional notes issued under the Indenture, the "*Notes*");

**WHEREAS**, pursuant to the Indenture, U.S. Bank National Association has been appointed to serve as Collateral Agent for the current and future holders of the Notes Obligations;

**WHEREAS**, each Grantor (other than Company), if any, has, pursuant to the Indenture, unconditionally guaranteed the payment and performance of the principal of, premium, if any, and interest on the Notes and all other obligations of Company to the Holders (as defined in the Indenture) of the Notes or the Trustee under the Indenture;

**WHEREAS**, Grantors will receive substantial benefits from the execution, delivery and performance of the obligations under the Indenture and the other Notes Documents (as defined in the Indenture) and each is, therefore, willing to enter into this Agreement;

**WHEREAS**, each Grantor is or, as to Collateral acquired by such Grantor after the date hereof, will be the legal and/or beneficial owner of the Collateral pledged by it hereunder; and

**WHEREAS**, this Agreement is given by each Grantor in favor of the Collateral Agent for the benefit of the Holders including all obligations under the Notes and the Indenture.

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, each Grantor and the Collateral Agent agree as follows:

1. **DEFINITIONS; GRANT OF SECURITY**.

    1.1    **General Definitions**.  In this Agreement, the following terms shall have the following meanings:

    "***Act of Required Holders***" shall have the meaning assigned to such term in the Indenture.

    "***Additional Grantors***" shall have the meaning assigned in ***Section 7.3***.

    "***Agreement***" shall have the meaning set forth in the preamble.

    "***Business Day***" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

    "***Cash Proceeds***" shall have the meaning assigned in ***Section 9.7***.

    "***CFC Holdco***" means any Subsidiary (i) that is a disregarded entity for U.S. federal income tax purposes and (ii) substantially all of the assets of which consist of Capital Stock of one or more CFC Holdcos or Controlled Foreign Corporations.

    "***Closing Date***" shall have the meaning assigned to such term in the Indenture.

    "***Collateral***" shall have the meaning assigned in ***Section 2.1***.

    "***Collateral Account***" shall mean any account established by the Collateral Agent.

    "***Collateral Agent***" shall have the meaning set forth in the Recitals.

    "***Collateral Records***" shall mean books, records, ledger cards, files, correspondence, customer lists, supplier lists, blueprints, technical specifications, manuals, computer software and related documentation, computer printouts, tapes, disks and other electronic storage media and related data processing software and similar items that at any time evidence or contain information relating to any of the Collateral or are otherwise necessary or helpful in the collection thereof or realization thereupon.

    "***Collateral Support***" shall mean all property (real or personal) assigned, hypothecated or otherwise securing any Collateral and shall include any security agreement or other agreement granting a lien or security interest in such real or personal property.

    "***Control***" shall mean: (1) with respect to any Deposit Accounts, control within the meaning of *Section 9-104* of the UCC, (2) with respect to any Securities Accounts, Security Entitlements, Commodity Contract or Commodity Account, control within the meaning of *Section 9-106* of the UCC, (3) with respect to any Uncertificated Securities, control within the meaning of *Section 8-106(c)* of the UCC,

UMB-000201

(4) with respect to any Certificated Security, control within the meaning of *Section 8-106(a)* or *(b)* of the UCC, (5) with respect to any Electronic Chattel Paper, control within the meaning of *Section 9-105* of the UCC, (6) with respect to Letter-of-Credit Rights, control within the meaning of *Section 9-107* of the UCC and (7) with respect to any "*transferable record*"(as that term is defined in *Section 201* of the Federal Electronic Signatures in Global and National Commerce Act or in *Section 16* of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction), control within the meaning of *Section 201* of the Federal Electronic Signatures in Global and National Commerce Act or in *Section 16* of the Uniform Electronic Transactions Act as in effect in the jurisdiction relevant to such transferable record.

"***Controlled Foreign Corporation***" shall mean "*controlled foreign corporation*" as defined in Section 957 of the Internal Revenue Code.

"***Copyright Licenses***" shall mean any and all contracts, agreements, licenses and covenants providing for the granting of any right or interest in or to any Copyright or otherwise providing for a covenant not to sue for infringement or other violation of any Copyright (whether such Grantor is licensee or licensor thereunder) including, without limitation, each agreement required to be listed in ***Schedule 5.2(II)*** under the heading "*Copyright Licenses*" (as such schedule may be amended or supplemented from time to time).

"***Copyrights***" shall mean all United States and foreign copyrights (whether or not the underlying works of authorship have been published), including but not limited to copyrights in software and all rights in and to databases, all designs (including but not limited to industrial designs, Protected Designs within the meaning of 17 U.S.C. 1301 *et seq.* and Community designs), all Mask Works (as defined under 17 U.S.C. 901 of the U.S. Copyright Act), and other qualifying works of authorship, whether registered or unregistered, as well as all moral rights, reversionary interests, and termination rights, and, with respect to any and all of the foregoing: (i) all registrations and applications therefor including, without limitation, the registrations and applications required to be listed in ***Schedule 5.2(II)*** under the heading "*Copyrights*" (as such schedule may be amended or supplemented from time to time), (ii) all extensions and renewals thereof, (iii) the right to sue or otherwise recover for any past, present and future infringement or other violation thereof, (iv) all Proceeds of the foregoing, including, without limitation, license fees, royalties, income, payments, claims, damages and proceeds of suit now or hereafter due and/or payable with respect thereto, and (v) all other rights of any kind accruing thereunder or pertaining thereto throughout the world.

"***Excluded Assets***" shall mean any general intangibles of Grantors to the extent that (i) such general intangibles are not assignable or capable of being encumbered as a matter of law or under the terms of any license or other agreement applicable thereto (but solely to the extent that any such restriction shall be enforceable under applicable law) without the consent of the licensor thereof or other applicable party thereto and (ii) such consent has not been obtained.

"***Governmental Authority***" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity, officer or examiner exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government.

"***Grantors***" shall have the meaning set forth in the preamble.

"***Immaterial Subsidiary***" shall mean, as of any date, any Subsidiary of Company whose total assets, as of that date, are less than $100,000 and whose total revenues for the most recent twelve (12)-month period do not exceed $100,000; *provided* that a Subsidiary of Company will not be

considered to be an Immaterial Subsidiary if it, directly or indirectly, guarantees or otherwise provides direct credit support for any Indebtedness of Company or any Grantor.

"*Indenture*" shall have the meaning set forth in the Recitals.

"*Insurance*" shall mean (i) all insurance policies covering any or all of the Collateral (regardless of whether the Collateral Agent is the loss payee thereof) and (ii) any key man life insurance policies.

"*Intellectual Property*" shall mean, the collective reference to all rights, interests, priorities and privileges relating to intellectual property and industrial property, whether arising under the United States, multinational or foreign laws or otherwise, including without limitation, Copyrights, Copyright Licenses, Patents, Patent Licenses, Trademarks, Trademark Licenses, Trade Secrets, and Trade Secret Licenses, and the right to sue or otherwise recover for any past, present and future infringement, dilution, misappropriation, or other violation or impairment thereof, including the right to receive all Proceeds therefrom, including without limitation license fees, royalties, income, payments, claims, damages and proceeds of suit, now or hereafter due and/or payable with respect thereto.

"*Intellectual Property Security Agreement*" shall mean each intellectual property security agreement executed and delivered by the applicable Grantors, substantially in the form set forth in *Exhibit E*, *Exhibit F* and *Exhibit G*, as applicable.

"*Intercreditor Agreement*" shall mean the Intercreditor Agreement, dated as of May 31, 2017, among MidCap Financial Trust, as ABL Representative (as defined therein), U.S. Bank National Association, as Notes Representative (as defined therein) and each of the Grantors from time to time party thereto, as amended, supplemented or otherwise modified from time to time.

"*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"*Investment Accounts*" shall mean the Collateral Account, Securities Accounts, Commodity Accounts and Deposit Accounts.

"*Investment Related Property*" shall mean: (i) all "*investment property*" (as such term is defined in *Article 9* of the UCC) and (ii) all of the following (regardless of whether classified as investment property under the UCC): all Pledged Equity Interests, Pledged Debt, the Investment Accounts and certificates of deposit.

"*Material Adverse Effect*" means a material adverse effect on and/or material adverse developments with respect to (i) the business, operations, properties, assets or financial condition of Company and its Subsidiaries taken as a whole; (ii) the ability of any Grantor to fully and timely perform its respective Notes Obligations; (iii) the legality, validity, binding effect or enforceability against a Grantor of a Security Document to which it is a party; or (iv) the rights, remedies and benefits available to, or conferred upon, any Secured Party under any Security Document.

"*Material Contract*" means any customer contract or other business arrangement to which any Grantor is a party (other than the Security Documents) for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect.

"*Material Intellectual Property*" shall mean any Intellectual Property included in the Collateral consisting of Intellectual Property arising under United States law and material foreign registrations and issuances of and applications for Patents, Trademarks, and Copyrights owned by each Grantor, in each

case that is material or necessary to the conduct of the business of any Grantor or is otherwise of material value.

"***Non-Assignable Contract***" shall mean any agreement, contract or license to which any Grantor is a party that by its terms purports to restrict or prevent the assignment or granting of a security interest therein (either by its terms or by any federal or state statutory prohibition or otherwise irrespective of whether such prohibition or restriction is enforceable under *Section 9-406* through *409* of the UCC).

"***Patent Licenses***" shall mean all contracts, agreements, licenses and covenants providing for the granting of any right or interest in or to any Patent or otherwise providing for a covenant not to sue for infringement or other violation of any Patent (whether such Grantor is licensee or licensor thereunder) including, without limitation, each agreement required to be listed in ***Schedule 5.2(II)*** under the heading "*Patent Licenses*" (as such schedule may be amended or supplemented from time to time).

"***Patents***" shall mean all United States and foreign issued patents and applications for any of the foregoing, including, without limitation: (i) each patent and patent application required to be listed in ***Schedule 5.2(II)*** under the heading "*Patents*" (as such schedule may be amended or supplemented from time to time), (ii) all reissues, divisions, continuations, continuations-in-part, extensions, renewals, and reexaminations thereof, (iii) all patentable inventions and improvements/enhancements thereto, (iv) the right to sue or otherwise recover for any past, present and future infringement or other violation thereof, (v) all Proceeds of the foregoing, including, without limitation, license fees, royalties, income, payments, claims, damages, and proceeds of suit now or hereafter due and/or payable with respect thereto, and (vi) all other rights of any kind accruing thereunder or pertaining thereto throughout the world.

"***Permitted Lien***" means Liens which, under each of the Security Documents, are permitted to be incurred.

"***Pledge Supplement***" shall mean any supplement to this Agreement in substantially the form of ***Exhibit A***.

"***Pledged Debt***" shall mean all indebtedness for borrowed money owed to such Grantor, whether or not evidenced by any Instrument, including, without limitation, all indebtedness described on ***Schedule 5.2(I)*** under the heading "*Pledged Debt*" (as such schedule may be amended or supplemented from time to time), issued by the obligors named therein, the instruments, if any, evidencing such any of the foregoing, and all interest, cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the foregoing.

"***Pledged Equity Interests***" shall mean all Pledged Stock, Pledged LLC Interests, Pledged Partnership Interests and any other interests in any equity or profits of any business entity including, without limitation, any trust and all management rights relating to any entity whose equity interests are included as Pledged Equity Interests.

"***Pledged LLC Interests***" shall mean all interests in any limited liability company and each series thereof including, without limitation, all limited liability company interests listed on ***Schedule 5.2(I)*** under the heading "*Pledged LLC Interests*" (as such schedule may be amended or supplemented from time to time) and the certificates, if any, representing such limited liability company interests and any interest of such Grantor on the books and records of such limited liability company or on the books and records of any securities intermediary pertaining to such interest and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such limited liability company interests and all rights as a member of the related limited liability company.

"***Pledged Partnership Interests***" shall mean all interests in any general partnership, limited partnership, limited liability partnership or other partnership including, without limitation, all partnership interests listed on **Schedule 5.2(I)** under the heading "*Pledged Partnership Interests*" (as such schedule may be amended or supplemented from time to time) and the certificates, if any, representing such partnership interests and any interest of such Grantor on the books and records of such partnership or on the books and records of any securities intermediary pertaining to such interest and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such partnership interests and all rights as a partner of the related partnership.

"***Pledged Stock***" shall mean all shares of Capital Stock owned by such Grantor, including, without limitation, all shares of Capital Stock described on **Schedule 5.2(I)** under the heading "*Pledged Stock*" (as such schedule may be amended or supplemented from time to time), and the certificates, if any, representing such shares and any interest of such Grantor in the entries on the books of the issuer of such shares or on the books of any securities intermediary pertaining to such shares, and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares.

"***Receivables***" shall mean all rights to payment, whether or not earned by performance, for goods or other property sold, leased, licensed, assigned or otherwise disposed of, or services rendered or to be rendered, including, without limitation all such rights constituting or evidenced by any Account, Chattel Paper, Instrument, General Intangible or Investment Related Property, together with all of Grantor's rights, if any, in any goods or other property giving rise to such right to payment and all Collateral Support and Supporting Obligations related thereto and all Receivables Records.

"***Receivables Records***" shall mean (i) all original copies of all documents, instruments or other writings or electronic records or other Records evidencing the Receivables, (ii) all books, correspondence, credit or other files, Records, ledger sheets or cards, invoices, and other papers relating to Receivables, including, without limitation, all tapes, cards, computer tapes, computer discs, computer runs, record keeping systems and other papers and documents relating to the Receivables, whether in the possession or under the control of Grantor or any computer bureau or agent from time to time acting for Grantor or otherwise, (iii) all evidences of the filing of financing statements and the registration of other instruments in connection therewith, and amendments, supplements or other modifications thereto, notices to other creditors, secured parties or agents thereof, and certificates, acknowledgments, or other writings, including, without limitation, lien search reports, from filing or other registration officers, (iv) all credit information, reports and memoranda relating thereto and (v) all other written or non-written forms of information related in any way to the foregoing or any Receivable.

"***Securities***" shall mean any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "*securities*" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"***Trademark Licenses***" shall mean any and all contracts, agreements, licenses and covenants providing for the granting of any right or interest in or to any Trademark or otherwise providing for a covenant not to sue for infringement dilution or other violation of any Trademark or permitting co-existence with respect to a Trademark (whether such Grantor is licensee or licensor thereunder)

including, without limitation, each agreement required to be listed in *Schedule 5.2(II)* under the heading "*Trademark Licenses*" (as such schedule may be amended or supplemented from time to time).

"*Trademarks*" shall mean all United States and foreign trademarks, trade names, trade dress, corporate names, company names, business names, fictitious business names, Internet domain names, service marks, certification marks, collective marks, logos, other source or business identifiers, designs and general intangibles of a like nature, whether or not registered, and with respect to any and all of the foregoing: (i) all registrations and applications therefor including, without limitation, the registrations and applications required to be listed in *Schedule 5.2(II)* under the heading "*Trademarks*" (as such schedule may be amended or supplemented from time to time), (ii) all extensions or renewals of any of the foregoing, (iii) all of the goodwill of the business connected with the use of and symbolized by any of the foregoing, (iv) the right to sue or otherwise recover for any past, present and future infringement, dilution or other violation of any of the foregoing or for any injury to the related goodwill, (v) all Proceeds of the foregoing, including, without limitation, license fees, royalties, income, payments, claims, damages, and proceeds of suit now or hereafter due and/or payable with respect thereto, and (vi) all other rights of any kind accruing thereunder or pertaining thereto throughout the world.

"*Trade Secret Licenses*" shall mean any and all contracts, agreements and licenses providing for the granting of any right or interest in or to Trade Secrets (whether such Grantor is licensee or licensor thereunder) including, without limitation, each agreement required to be listed in *Schedule 5.2(II)* under the heading "*Trade Secret Licenses*" (as such schedule may be amended or supplemented from time to time).

"*Trade Secrets*" shall mean all trade secrets, know-how, processes, business methods, vendor/customer lists, marketing forecasts and strategies, information and data, and all other confidential or proprietary information and know-how whether or not the foregoing has been reduced to a writing or other tangible form, including all documents and things embodying, incorporating, or referring in any way to the foregoing, and with respect to any and all of the foregoing: (i) the right to sue or otherwise recover for any past, present and future misappropriation or other violation thereof, (ii) all Proceeds of the foregoing, including, without limitation, license fees, royalties, income, payments, claims, damages, and proceeds of suit now or hereafter due and/or payable with respect thereto; and (iii) all other rights of any kind accruing thereunder or pertaining thereto throughout the world.

"*Trustee*" shall have the meaning set forth in the Recitals.

"*UCC*" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that in the event that, by reason of mandatory provisions of law, any or all of the perfection or priority of, or remedies with respect to, any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "*UCC*" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions hereof relating to such perfection, priority or remedies.

"*United States*" shall mean the United States of America.

1.2     **Definitions; Interpretation**.

(a)     In this Agreement, the following capitalized terms shall have the meaning given to them in the UCC (and, if defined in more than one Article of the UCC, shall have the meaning given in *Article 9* thereof): Account, Account Debtor, As-Extracted Collateral, Bank, Certificated Security, Chattel Paper, Consignee, Consignment, Consignor, Commercial Tort Claims, Commodity Account, Commodity Contract, Commodity Intermediary, Deposit Account,

UMB-000206

Document, Entitlement Order, Equipment, Electronic Chattel Paper, Farm Products, Fixtures, General Intangibles, Goods, Health-Care-Insurance Receivable, Instrument, Inventory, Letter-of-Credit Right, Manufactured Home, Money, Payment Intangible, Proceeds, Record, Securities Account, Securities Intermediary, Security Certificate, Security Entitlement, Supporting Obligations, Tangible Chattel Paper and Uncertificated Security.

(b)    All other capitalized terms used herein (including the preamble and recitals hereto) and not otherwise defined herein shall have the meanings ascribed thereto in the Indenture and the Intercreditor Agreement.  The incorporation by reference of terms defined in the Indenture shall survive any termination of the Indenture until this Agreement is terminated as provided in *Section 11* hereof.  Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.  References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided.  The use herein of the word "*include*" or "*including*", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "*without limitation*" or "*but not limited to*" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.  The terms lease and license shall include sub- lease and sub-license, as applicable.  If any conflict or inconsistency exists between this Agreement and the Indenture, the Indenture shall govern.  All references herein to provisions of the UCC shall include all successor provisions under any subsequent version or amendment to any Article of the UCC.

2.    **GRANT OF SECURITY**.

2.1    **Grant of Security**.  Each Grantor hereby grants to the Collateral Agent, for the benefit of the Secured Parties, a security interest in and continuing lien on all of such Grantor's right, title and interest in, to and under all personal property of such Grantor including, but not limited to the following, in each case whether now or hereafter existing or in which any Grantor now has or hereafter acquires an interest and wherever the same may be located (all of which being hereinafter collectively referred to as the "*Collateral*"):

(a)    Accounts;

(b)    Chattel Paper;

(c)    Documents;

(d)    Payment Intangibles;

(e)    General Intangibles;

(f)    Goods (including, without limitation, Inventory and Equipment);

(g)    Instruments;

(h)    Insurance;

(i)    Intellectual Property;

(j)        Investment Related Property (including, without limitation, Deposit Accounts);

(k)        Letters of Credit and Letter-of-Credit Rights;

(l)        Money, cash and cash equivalents;

(m)        Receivables and Receivable Records;

(n)        Commercial Tort Claims now or hereafter described on *Schedule 5.2*;

(o)        accessions to, substitutions for, and replacements, proceeds of the Collateral and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts, and other computer materials and records related thereto and any General Intangibles at any time evidencing or related to any of the foregoing;

(p)        to the extent not otherwise included above, all other personal property of any kind and all Collateral Records, Collateral Support and Supporting Obligations relating to any of the foregoing; and

(q)        to the extent not otherwise included above, all Proceeds, products, accessions, rents and profits of or in respect of any of the foregoing.

2.2        **Certain Limited Exclusions**.  Notwithstanding anything herein to the contrary, in no event shall the Collateral include or the security interest granted under *Section 2.1* hereof attach to (a) any Excluded Assets; (b) any of the issued and outstanding voting Capital Stock of any Controlled Foreign Corporation or CFC Holdco in excess of sixty-five percent (65%) of the voting power of all classes of Capital Stock of such Controlled Foreign Corporation or CFC Holdco entitled to vote, provided that immediately upon the amendment of the Internal Revenue Code to allow the pledge of a greater percentage of the voting power of Capital Stock in a Controlled Foreign Corporation or CFC Holdco without adverse tax consequences, the Collateral shall include, and the security interest granted by each Grantor shall attach to, such greater percentage of Capital Stock of each Controlled Foreign Corporation; (c) any direct or indirect Subsidiary of a Controlled Foreign Corporation; or (d) the Capital Stock of any Immaterial Subsidiary.

3.        **SECURITY FOR NOTES OBLIGATIONS; GRANTORS REMAIN LIABLE**.

3.1        **Security for Notes Obligations**.  This Agreement secures, and the Collateral is collateral security for, the prompt and complete payment or performance in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under *Section 362(a)* of the Bankruptcy Code, 11 U.S.C. §362(a) (and any successor provision thereof)), of all Notes Obligations.

3.2        **Continuing Liability Under Collateral**.  Notwithstanding anything herein to the contrary, (i) each Grantor shall remain liable for all obligations under the Collateral and nothing contained herein is intended or shall be a delegation of duties to the Collateral Agent or any other Secured Party, (ii) each Grantor shall remain liable under each of the agreements included in the Collateral, including, without limitation, any agreements relating to Pledged Partnership Interests or Pledged LLC Interests, to perform all of the obligations undertaken by it thereunder all in accordance with and pursuant to the terms and provisions thereof and neither the Collateral Agent nor any Secured Party shall have any obligation or liability under any of such agreements by reason of or arising out of this Agreement or any other document related thereto nor shall the Collateral Agent nor any have any obligation to make any inquiry

as to the nature or sufficiency of any payment received by it or have any obligation to take any action to collect or enforce any rights under any agreement included in the Collateral, including, without limitation, any agreements relating to Pledged Partnership Interests or Pledged LLC Interests, and (iii) the exercise by the Collateral Agent of any of its rights hereunder shall not release any Grantor from any of its duties or obligations under the contracts and agreements included in the Collateral.

4.      **CERTAIN PERFECTION REQUIREMENTS**.

    4.1      **Delivery Requirements**.

        (a)      With respect to any Certificated Securities included in the Collateral, each Grantor shall deliver to the Collateral Agent the Security Certificates evidencing such Certificated Securities duly indorsed by an effective indorsement (within the meaning of *Section 8-107* of the UCC), or accompanied by share transfer powers or other instruments of transfer duly endorsed by such an effective endorsement, in each case, to the Collateral Agent or in blank.  In addition, each Grantor shall cause any certificates evidencing any Pledged Equity Interests, including, without limitation, any Pledged Partnership Interests or Pledged LLC Interests, to be similarly delivered to the Collateral Agent regardless of whether such Pledged Equity Interests constitute Certificated Securities.

        (b)      With respect to any Instruments or Tangible Chattel Paper included in the Collateral, each Grantor shall deliver to the Collateral Agent all such Instruments or Tangible Chattel Paper to the Collateral Agent duly indorsed in blank.

    4.2      **Control Requirements**.

        (a)      With respect to any Deposit Accounts, Securities Accounts, Security Entitlements, Commodity Accounts and Commodity Contracts included in the Collateral, each Grantor shall use commercially reasonable efforts to ensure that the Collateral Agent has Control thereof.  With respect to any Securities Accounts or Securities Entitlements, such Control shall be accomplished by the Grantor using commercially reasonable efforts to cause the Securities Intermediary maintaining such Securities Account or Security Entitlement to enter into an agreement substantially in the form of ***Exhibit C*** hereto (or such other agreement in form and substance reasonably satisfactory to the Collateral Agent) pursuant to which the Securities Intermediary shall agree to comply with the Collateral Agent's Entitlement Orders without further consent by such Grantor.  With respect to any Deposit Account, each Grantor shall use commercially reasonable efforts to cause the depositary institution maintaining such account to enter into an agreement substantially in the form of ***Exhibit D*** hereto (or such other agreement in form and substance reasonably satisfactory to the Collateral Agent), pursuant to which the Bank shall agree to comply with the Collateral Agent's instructions with respect to disposition of funds in the Deposit Account without further consent by such Grantor.  With respect to any Commodity Accounts or Commodity Contracts each Grantor shall use commercially reasonable efforts to cause Control in favor of the Collateral Agent in a manner reasonably acceptable to the Collateral Agent.

        (b)      With respect to any Uncertificated Security included in the Collateral (other than any Uncertificated Securities credited to a Securities Account), each Grantor shall cause the issuer of such Uncertificated Security to either (i) register the Collateral Agent as the registered owner thereof on the books and records of the issuer or (ii) execute an agreement substantially in the form of ***Exhibit B*** hereto (or such other agreement in form and substance reasonably satisfactory to the Collateral Agent), pursuant to which such issuer agrees to comply with the

Collateral Agent's instructions with respect to such Uncertificated Security without further consent by such Grantor.

(c)  With respect to any Letter-of-Credit Rights included in the Collateral (other than any Letter-of-Credit Rights constituting a Supporting Obligation for a Receivable in which the Collateral Agent has a valid and perfected security interest), Grantor shall ensure that Collateral Agent has Control thereof by obtaining the written consent of each issuer of each related letter of credit to the assignment of the proceeds of such letter of credit to the Collateral Agent.

(d)  With respect to any Electronic Chattel Paper or "*transferable record*" (as that term is defined in *Section 201* of the Federal Electronic Signatures in Global and National Commerce Act or in *Section 16* of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction) included in the Collateral, Grantor shall ensure that the Collateral Agent has Control thereof.

4.3    **Intellectual Property Recording Requirements**.

(a)  In the case of any Collateral (whether now owned or hereafter acquired) consisting of issued U.S. Patents and applications therefor, each Grantor shall execute and deliver to the Collateral Agent a Patent Security Agreement in substantially the form of **Exhibit F** hereto (or a supplement thereto) covering all such Patents in appropriate form for recordation with the U.S. Patent and Trademark Office with respect to the security interest of the Collateral Agent.

(b)  In the case of any Collateral (whether now owned or hereafter acquired) consisting of registered U.S. Trademarks and applications therefor, each Grantor shall execute and deliver to the Collateral Agent a Trademark Security Agreement in substantially the form of **Exhibit E** hereto (or a supplement thereto) covering all such Trademarks in appropriate form for recordation with the U.S. Patent and Trademark Office with respect to the security interest of the Collateral Agent.

(c)  In the case of any Collateral (whether now owned or hereafter acquired) consisting of registered U.S. Copyrights and exclusive Copyright Licenses in respect of registered U.S. Copyrights for which any Grantor is the licensee, each Grantor shall execute and deliver to the Collateral Agent a Copyright Security Agreement in substantially the form of **Exhibit G** hereto (or a supplement thereto) covering all such Copyrights and Copyright Licenses in appropriate form for recordation with the U.S. Copyright Office with respect to the security interest of the Collateral Agent.

4.4    **Other Actions**.

(a)  If any issuer of any Pledged Equity Interest is organized under a jurisdiction outside of the United States, each Grantor shall take such additional actions, including, without limitation, causing the issuer to register the pledge on its books and records or making such filings or recordings in the appropriate governmental offices, in each case as may be necessary, under the laws of such issuer's jurisdiction to insure the validity, perfection and priority of the security interest of the Collateral Agent.

(b)  With respect to any Pledged Partnership Interests and Pledged LLC Interests included in the Collateral, if the Grantors own less than one hundred percent (100%) of the equity interests in any issuer of such Pledged Partnership Interests or Pledged LLC Interests, Grantors shall use their commercially reasonable efforts to obtain the consent of each other holder of

partnership interest or limited liability company interests in such issuer to the security interest of the Collateral Agent hereunder and following an Event of Default, the transfer of such Pledged Partnership Interests and Pledged LLC Interests to the Collateral Agent of its designee, and to the substitution of the Collateral Agent or its designee as a partner or member with all the rights and powers related thereto.  Each Grantor consents to the grant by each other Grantor of a Lien in all Investment Related Property to the Collateral Agent and without limiting the generality of the foregoing consents to the transfer of any Pledged Partnership Interest and any Pledged LLC Interest to the Collateral Agent or its designee following an Event of Default and to the substitution of the Collateral Agent or its designee as a partner in any partnership or as a member in any limited liability company with all the rights and powers related thereto.

4.5    **Timing and Notice**.  With respect to any Collateral in existence on the Closing Date, each Grantor shall comply with the requirements of ***Section 4*** on the date hereof and, with respect to any Collateral hereafter owned or acquired, such Grantor shall comply with such requirements within thirty (30) days of Grantor acquiring rights therein or such other time frame as may be provided in the Indenture, including, without limitation, *Section 4.17* of the Indenture.  Each Grantor shall inform the Collateral Agent within thirty (30) days of its acquisition of any Collateral for which any action is required by ***Section 4*** hereof (including, for the avoidance of doubt, the filing of any applications for, or the issuance or registration of, any Patents, Copyrights or Trademarks).

5.    **REPRESENTATIONS AND WARRANTIES**.  Each Grantor hereby represents and warrants that:

5.1    **Grantor Information & Status**.

(a)    ***Schedule 5.1(A)*** and ***(B)*** (as such schedule may be amended or supplemented from time to time) sets forth under the appropriate headings: (1) the full legal name of such Grantor, (2) all trade names or other names under which such Grantor currently conducts business, (3) the type of organization of such Grantor, (4) the jurisdiction of organization of such Grantor, (5) its organizational identification number, if any, and (6) the jurisdiction where the chief executive office or its sole place of business (or the principal residence if such Grantor is a natural person) is located;

(b)    except as provided on ***Schedule 5.1(C)*** (as such schedule may be amended or supplemented from time to time), it has not changed its name, jurisdiction of organization, chief executive office or sole place of business (or principal residence if such Grantor is a natural person) or its corporate structure in any way (e.g., by merger, consolidation, change in corporate form or otherwise) and has not done business under any other name, in each case, within the past five (5) years;

(c)    it has not within the last five (5) years become bound (whether as a result of merger or otherwise) as debtor under a security agreement entered into by another Person, which has not heretofore been terminated (other than with respect to any security agreement that is permitted by the Security Documents);

(d)    such Grantor has been duly organized and is validly existing as an entity of the type as set forth opposite such Grantor's name on ***Schedule 5.1(A)*** solely under the laws of the jurisdiction as set forth opposite such Grantor's name on ***Schedule 5.1(A)*** and remains duly existing as such.  Such Grantor has not filed any certificates of dissolution or liquidation, any certificates of domestication, transfer or continuance in any other jurisdiction; and

UMB-000211

(e)     no Grantor is a "*transmitting utility*" (as defined in *Section 9-102(a)(80)* of the UCC).

5.2   **Collateral Identification, Special Collateral**.

(a)     *Schedule 5.2* (as such schedule may be amended or supplemented from time to time) sets forth under the appropriate headings all of such Grantor's: (1) Pledged Equity Interests, (2) Pledged Debt, (3) Securities Accounts, (4) Deposit Accounts, (5) Commodity Contracts and Commodity Accounts, (6) United States and material foreign registrations and issuances of and applications for Patents, Trademarks, and Copyrights owned by each Grantor, (7) Patent Licenses, Trademark Licenses, Trade Secret Licenses and Copyright Licenses constituting Material Intellectual Property, (8) Commercial Tort Claims, (9) Letter-of-Credit Rights for letters of credit, (10) the name and address of any warehouseman, bailee or other third party in possession of any Inventory, Equipment and other tangible personal property, and (11) Material Contracts;

(b)     none of the Collateral constitutes, or is the Proceeds of, (1) Farm Products, (2) As-Extracted Collateral, (3) Manufactured Homes, (4) Health-Care-Insurance Receivables; (5) timber to be cut, or (6) aircraft, aircraft engines, satellites, ships or railroad rolling stock.  No material portion of the Collateral consists of motor vehicles or other goods subject to a certificate of title statute of any jurisdiction;

(c)     all information supplied by any Grantor with respect to any of the Collateral (in each case taken as a whole with respect to any particular Collateral) is accurate and complete in all material respects;

(d)     not more than ten percent (10%) of the value of all personal property included in the Collateral is located in any country other than the United States; and

(e)     no Excluded Asset is material to the business of such Grantor other than the contracts set forth on *Schedule 5.2(e)* hereto (as such schedule may be amended or supplemented from time to time).

5.3   **Ownership of Collateral and Absence of Other Liens**.

(a)     it owns the Collateral purported to be owned by it or otherwise has the rights it purports to have in each item of Collateral and, as to all Collateral whether now existing or hereafter acquired, developed or created (including by way of lease or license), will continue to own or have such rights in each item of the Collateral (except as otherwise permitted by the Security Documents), in each case free and clear of any and all Liens, rights or claims of all other Persons, including, without limitation, liens arising as a result of such Grantor becoming bound (as a result of merger or otherwise) as debtor under a security agreement entered into by another Person other than, in the case of priority only, any Permitted Liens; and

(b)     other than any financing statements filed in favor of the Collateral Agent, no effective financing statement, fixture filing or other instrument similar in effect under any applicable law covering all or any part of the Collateral is on file in any filing or recording office except for (x) financing statements for which duly authorized proper termination statements have been delivered to the Collateral Agent for filing and (y) financing statements filed in connection with Permitted Liens.  Other than the Collateral Agent and any automatic control in favor of a Bank, Securities Intermediary or Commodity Intermediary maintaining a Deposit Account,

Securities Account or Commodity Contract, no Person is in Control of any Collateral other than the ABL Representative (as defined in the Intercreditor Agreement) as further set forth in the Intercreditor Agreement.

5.4     **Status of Security Interest**.

(a)     upon the filing of financing statements naming each Grantor as "*debtor*" and the Collateral Agent as "*secured party*" and describing the Collateral in the filing offices set forth opposite such Grantor's name on *Schedule 5.4* hereof (as such schedule may be amended or supplemented from time to time), the security interest of the Collateral Agent in all Collateral that can be perfected by the filing of a financing statement under the Uniform Commercial Code as in effect in any jurisdiction will constitute a valid, perfected, first priority Lien subject in the case of priority only, to any Permitted Liens with respect to Collateral.  Each agreement purporting to give the Collateral Agent Control over any Collateral is effective to establish the Collateral Agent's Control of the Collateral subject thereto;

(b)     to the extent perfection or priority of the security interest therein is not subject to *Article 9* of the UCC, upon recordation of the security interests granted hereunder in Patents, Trademarks, U.S. Copyrights and exclusive Copyright Licenses in the applicable intellectual property registries, including but not limited to the United States Patent and Trademark Office and the United States Copyright Office, the security interests granted to the Collateral Agent hereunder shall constitute valid, perfected, first priority Liens (subject, in the case of priority only, to Permitted Liens);

(c)     no authorization, consent, approval or other action by, and no notice to or filing with, any Governmental Authority or regulatory body or any other Person is required for either (i) the pledge or grant by any Grantor of the Liens purported to be created in favor of the Collateral Agent hereunder or (ii) the exercise by Collateral Agent of any rights or remedies in respect of any Collateral (whether specifically granted or created hereunder or created or provided for by applicable law), except (A) for the filings contemplated by *clause (a)* above and (B) as may be required, in connection with the disposition of any Investment Related Property, by laws generally affecting the offering and sale of Securities; and

(d)     each Grantor is in compliance with its obligations under *Section 4* hereof.

5.5     **Goods & Receivables**.

(a)     each Receivable (a) is and will be the legal, valid and binding obligation of the Account Debtor in respect thereof, representing an unsatisfied obligation of such Account Debtor, (b) is and will be enforceable in accordance with its terms, (c) is not and will not be subject to any credits, rights of recoupment, setoffs, defenses, taxes, counterclaims (except with respect to refunds, returns and allowances in the ordinary course of business with respect to damaged merchandise) and (d) is and will be in compliance with all applicable laws, whether federal, state, local or foreign except where failure to do so would be a Material Adverse Effect;

(b)     no Receivable requires the consent of the Account Debtor in respect thereof in connection with the security interest hereunder, except any consent which has been obtained;

(c)     no Goods now or hereafter produced by any Grantor and included in the Collateral have been or will be produced in violation of the requirements of the Fair Labor Standards Act, as amended, or the rules and regulations promulgated thereunder; and

UMB-000213

(d)    other than any Inventory or Equipment in transit, all of the Equipment and Inventory included in the Collateral is located only at the locations specified in **Schedule 5.5** (as such schedule may be amended or supplemented from time to time).

5.6    **Pledged Equity Interests, Investment Related Property**.

(a)    it is the record and beneficial owner of the Pledged Equity Interests free of all Liens, rights or claims of other Persons and there are no outstanding warrants, options or other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any Pledged Equity Interests;

(b)    no consent of any Person including any other general or limited partner, any other member of a limited liability company, any other shareholder or any other trust beneficiary is necessary or desirable in connection with the creation, perfection or first priority status of the security interest of the Collateral Agent in any Pledged Equity Interests or the exercise by the Collateral Agent of the voting or other rights provided for in this Agreement or the exercise of remedies in respect thereof except such as have been obtained; and

(c)    none of the Pledged LLC Interests or Pledged Partnership Interests are or represent interests that by their terms provide that they are Securities governed by the Uniform Commercial Code of an applicable jurisdiction.

5.7    **Intellectual Property**.

(a)    it is the sole and exclusive owner of the entire right, title, and interest in and to all Intellectual Property listed on **Schedule 5.2(II)** (as such schedule may be amended or supplemented from time to time), and owns or has the valid right to use, assign and encumber such Intellectual Property, and, where such Grantor does so, sublicense others to use, all other Intellectual Property used in or necessary to conduct its business, free and clear of all Liens, claims and licenses, except for, in the case of priority only, Permitted Liens and the licenses set forth on **Schedule 5.2(II)** (as such schedule may be amended or supplemented from time to time);

(b)    all Material Intellectual Property of such Grantor is valid, subsisting and has not been adjudged invalid or unenforceable, in whole or in part, nor, in the case of Patents, is any of the Material Intellectual Property the subject of a reexamination proceeding, and such Grantor has performed all acts and has paid all renewal, maintenance, and other fees and taxes required to maintain each and every registration and application of Copyrights, Patents and Trademarks of such Grantor constituting Material Intellectual Property in full force and effect;

(c)    no holding, decision, ruling, or judgment has been rendered in any action or proceeding before any court or administrative authority challenging the validity, enforceability, or scope of, or such Grantor's right to register, own or use, any Material Intellectual Property owned by such Grantor, and no such action or proceeding is pending or, to the best of such Grantor's knowledge, threatened;

(d)    all registrations, issuances and applications for Copyrights, Patents and Trademarks of such Grantor constituting Material Intellectual Property are standing in the name of such Grantor, and none of the Trademarks, Patents, Copyrights or Trade Secrets owned by such Grantor constituting Material Intellectual Property has been licensed by such Grantor to any Affiliate or third party, except as disclosed in **Schedule 5.2(II)** (as such schedule may be

amended or supplemented from time to time), and all exclusive Copyright Licenses constituting Material Intellectual Property in respect of registered Copyrights have been properly recorded in the U.S. Copyright Office or, where appropriate, any foreign counterpart;

(e) all Copyrights owned by such Grantor that constitute Material Intellectual Property have been registered with the United States Copyright Office or, where appropriate, any foreign counterpart.

(f) such Grantor has not made a previous assignment, sale, transfer, exclusive license, or encumbrance constituting a present or future assignment, sale, transfer, exclusive license or similar arrangement of any Material Intellectual Property that has not been terminated or released;

(g) such Grantor has been using, including through any licensees, appropriate statutory notice of registration in connection with its use of registered Trademarks, proper marking practices in connection with its use of Patents, and appropriate notice of copyright in connection with the publication of Copyrights constituting Material Intellectual Property;

(h) such Grantor has taken commercially reasonable steps to protect the confidentiality of its Trade Secrets in accordance with industry standards to the extent Grantor deems it necessary and to the best of such Grantor's knowledge no Trade Secrets have been subject to any unauthorized disclosure, access or use;

(i) such Grantor controls the nature and quality in accordance with industry standards of all products sold and all services rendered under or in connection with all Trademarks of such Grantor, in each case consistent with industry standards, and has taken all action necessary to insure that all licensees of the Trademarks owned by such Grantor comply with such Grantor's standards of quality;

(j) to the best of such Grantor's knowledge, the conduct of such Grantor's business does not infringe, misappropriate, dilute or otherwise violate any Intellectual Property right of any other Person; no claim has been made that the use of any Intellectual Property owned or used by such Grantor (or any of its respective licensees) infringes, misappropriates, dilutes or otherwise violates the asserted rights of any other Person, and no demand that such Grantor enter into a license or co-existence agreement has been made but not resolved;

(k) to the best of such Grantor's knowledge, no Person is infringing, misappropriating, diluting or otherwise violating any rights in any Intellectual Property owned, licensed or used by such Grantor, or any of its respective licensees; and

(l) no settlement or consents, covenants not to sue, co-existence agreements, non-assertion assurances, or releases have been entered into by such Grantor or bind such Grantor in a manner that could adversely affect such Grantor's rights to own, license or use any Intellectual Property.

5.8 **Miscellaneous**. No Material Contract prohibits assignment or requires consent of or notice to any Person in connection with the assignment to the Collateral Agent hereunder, except such as has been given or made or as otherwise set forth on ***Schedule 5.2(e)***.

UMB-000215

6.      **COVENANTS AND AGREEMENTS**.  Each Grantor hereby covenants and agrees that:

6.1     **Grantor Information & Status**.  Without limiting any prohibitions or restrictions on mergers or other transactions set forth in the Security Documents, it shall not change such Grantor's name, identity, corporate structure (e.g.  by merger, consolidation, change in corporate form or otherwise), sole place of business (or principal residence if such Grantor is a natural person), chief executive office, type of organization or jurisdiction of organization or establish any trade names unless it shall have (a) notified the Collateral Agent in writing at least thirty (30) days prior to any such change or establishment, identifying such new proposed name, identity, corporate structure, sole place of business (or principal residence if such Grantor is a natural person), chief executive office, jurisdiction of organization or trade name and providing such other information in connection therewith as the Collateral Agent may reasonably request and (b) taken all actions necessary or advisable to maintain the continuous validity, perfection and the same or better priority of the Collateral Agent's security interest in the Collateral granted or intended to be granted and agreed to hereby, which in the case of any merger or other change in corporate structure shall include, without limitation, executing and delivering to the Collateral Agent a completed Pledge Supplement together with all Supplements to Schedules thereto, upon completion of such merger or other change in corporate structure confirming the grant of the security interest hereunder.

6.2     **Collateral Identification; Special Collateral**.

(a)     in the event that it hereafter acquires any Collateral of a type described in **Section 5.2(b)(b)** hereof, it shall promptly, and in any event within thirty (30) days (or such shorter period as required by **Section 4.17** of the Indenture), notify the Collateral Agent thereof in writing and take such actions and execute such documents and make such filings all at Grantor's expense as the Collateral Agent may reasonably request in order to ensure that the Collateral Agent has a valid, perfected, first priority security interest in such Collateral, subject in the case of priority only, to any Permitted Liens.

(b)     in the event that it hereafter acquires or has any Commercial Tort Claim it shall deliver to the Collateral Agent a completed Pledge Supplement together with all Supplements to Schedules thereto, identifying such new Commercial Tort Claims.

6.3     **Ownership of Collateral and Absence of Other Liens**.

(a)     except for the security interest created by this Agreement, it shall not create or suffer to exist any Lien upon or with respect to any of the Collateral, other than Permitted Liens, and such Grantor shall defend the Collateral against all Persons at any time claiming any interest therein;

(b)     upon such Grantor or any officer of such Grantor obtaining knowledge thereof, it shall promptly notify the Collateral Agent in writing of any event that may have a Material Adverse Effect on the value of the Collateral or any portion thereof, the ability of any Grantor or the Collateral Agent to dispose of the Collateral or any portion thereof, or the rights and remedies of the Collateral Agent in relation thereto, including, without limitation, the levy of any legal process against the Collateral or any portion thereof; and

(c)     it shall not sell, transfer or assign or exclusively license to another Person any Collateral except as otherwise permitted by the Indenture.

UMB-000216

6.4    **Status of Security Interest**.

(a)    Subject to the limitations set forth in ***subsection (b)*** of this ***Section 6.4***, each Grantor shall maintain the security interest of the Collateral Agent hereunder in all Collateral as valid, perfected, first priority Liens (subject, in the case of priority only, to Permitted Liens) and shall notify the Collateral Agent of any change to, formation of or acquisition of Collateral of such Grantor within thirty (30) days of such change, acquisition or formation, in each case which would require action to be taken to create or maintain valid, perfected, first priority Liens (subject, in the case of priority only, to Permitted Liens) in the Collateral.

(b)    Notwithstanding the foregoing, no Grantor shall be required to take any action to perfect any Collateral that can only be perfected by (i) Control, (ii) foreign filings with respect to Intellectual Property, or (iii) filings with registrars of motor vehicles or similar governmental authorities with respect to goods covered by a certificate of title, in each case except as and to the extent specified in ***Section 4*** hereof.

6.5    **Goods & Receivables**.

(a)    it shall not deliver any Document evidencing any Equipment and Inventory to any Person other than the issuer of such Document to claim the Goods evidenced therefor or the Collateral Agent or as may be permitted in the Indenture;

(b)    if any Equipment or Inventory is in possession or control of any warehouseman, bailee or other third party (other than a Consignee under a Consignment for which such Grantor is the Consignor), each Grantor shall notify the third party of the Collateral Agent's security interest and use reasonable best efforts to obtain an acknowledgment from the third party that it is holding the Equipment and Inventory for the benefit of the Collateral Agent and shall permit the Collateral Agent to have access to Equipment or Inventory for purposes of inspecting such Collateral or, following an Event of Default, to remove same from such premises if the Collateral Agent is so directed by an Act of Required Holders; and with respect to any Goods subject to a Consignment for which such Grantor is the Consignor, Grantor shall file appropriate financing statements against the Consignee and take such other action as may be necessary to ensure that the Grantor has a first priority perfected security interest in such Goods.

(c)    it shall keep the Equipment, Inventory and any Documents evidencing any Equipment and Inventory in the locations specified on ***Schedule 5.5*** (as such schedule may be amended or supplemented from time to time) unless it shall have notified the Collateral Agent in writing, by executing and delivering to the Collateral Agent a completed Pledge Supplement together with all Supplements to Schedules thereto, at least ten (10) days prior to any change in locations, identifying such new locations;

(d)    it shall keep and maintain at its own cost and expense satisfactory and complete records of the Receivables, including, but not limited to, copies of all documentation with respect to all Receivables and records of all payments received and all credits granted on the Receivables, all merchandise returned and all other dealings therewith;

(e)    other than in the ordinary course of business or as permitted by the ABL Agreement (i) it shall not amend, modify, terminate or waive any provision of any Receivable in any manner which could reasonably be expected to have a material adverse effect on the value of such Receivable; (ii) following and during the continuation of an Event of Default, such Grantor shall not (w) grant any extension or renewal of the time of payment of any Receivable,

(x) compromise or settle any dispute, claim or legal proceeding with respect to any Receivable for less than the total unpaid balance thereof, (y) release, wholly or partially, any Person liable for the payment thereof, or (z) allow any credit or discount thereon; and

(f)     the Collateral Agent shall have the right at any time after and during the continuation of an Event of Default to notify, or require any Grantor to notify, any Account Debtor of the Collateral Agent's security interest in the Receivables and any Supporting Obligation and, in addition, at any time following the occurrence and during the continuation of an Event of Default, the Collateral Agent may: (i) direct the Account Debtors under any Receivables to make payment of all amounts due or to become due to such Grantor thereunder directly to the Collateral Agent; (ii) notify, or require any Grantor to notify, each Person maintaining a lockbox or similar arrangement to which Account Debtors under any Receivables have been directed to make payment to remit all amounts representing collections on checks and other payment items from time to time sent to or deposited in such lockbox or other arrangement directly to the Collateral Agent; and (iii) enforce, at the expense of such Grantor, collection of any such Receivables and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as such Grantor might have done. If the Collateral Agent notifies any Grantor that it has elected to collect the Receivables in accordance with the preceding sentence, any payments of Receivables received by such Grantor shall be forthwith (and in any event within five (5) Business Days) deposited by such Grantor in the exact form received, duly indorsed by such Grantor to the Collateral Agent if required, in the Collateral Account maintained under the sole dominion and control of the Collateral Agent, and until so turned over, all amounts and proceeds (including checks and other instruments) received by such Grantor in respect of the Receivables, any Supporting Obligation or Collateral Support shall be received in trust for the benefit of the Collateral Agent hereunder and shall be segregated from other funds of such Grantor and such Grantor shall not adjust, settle or compromise the amount or payment of any Receivable, or release wholly or partly any Account Debtor or obligor thereof, or allow any credit or discount thereon. All actions under this **_Section_** shall be taken in accordance with the Indenture and the Intercreditor Agreement.

6.6     **Pledged Equity Interests, Investment Related Property**.

(a)     except as provided in the next sentence, in the event such Grantor receives any dividends, interest or distributions on any Pledged Equity Interest or other Investment Related Property, upon the merger, consolidation, liquidation or dissolution of any issuer of any Pledged Equity Interest or Investment Related Property, then (a) such dividends, interest or distributions and securities or other property shall be included in the definition of Collateral without further action and (b) such Grantor shall promptly take all steps, if any, necessary or advisable to ensure the validity, perfection (subject to Permitted Liens), priority and, if applicable, Control of the Collateral Agent over such Investment Related Property (including, without limitation, delivery thereof to the Collateral Agent) and pending any such action such Grantor shall be deemed to hold such dividends, interest, distributions, securities or other property in trust for the benefit of the Collateral Agent and shall segregate such dividends, distributions, Securities or other property from all other property of such Grantor. Notwithstanding the foregoing, so long as no Event of Default shall have occurred and be continuing, the Collateral Agent authorizes each Grantor to retain all ordinary cash dividends and distributions paid in the normal course of the business of the issuer and all scheduled payments of interest;

(b)      **Voting.**

(i)      So long as no Event of Default shall have occurred and be continuing, except as otherwise provided under the covenants and agreements relating to Investment Related Property in this Agreement or elsewhere herein or in the Indenture, each Grantor shall be entitled to exercise or refrain from exercising any and all voting and other consensual rights pertaining to the Investment Related Property or any part thereof for any purpose not inconsistent with the terms of this Agreement or the Indenture; *provided*, no Grantor shall exercise or refrain from exercising any such right if the Collateral Agent shall have notified such Grantor that the Collateral Agent is requiring such action at the direction of an Act of Required Holders or such action would have a Material Adverse Effect on the value of the Investment Related Property or any part thereof; and *provided further*, such Grantor shall give the Collateral Agent at least five (5) Business Days prior written notice of the manner in which it intends to exercise, or the reasons for refraining from exercising, any such right; it being understood, however, that neither the voting by such Grantor of any Pledged Stock for, or such Grantor's consent to, the election of directors (or similar governing body) at a regularly scheduled annual or other meeting of stockholders or with respect to incidental matters at any such meeting, nor such Grantor's consent to or approval of any action otherwise permitted under this Agreement and the Indenture, shall be deemed inconsistent with the terms of this Agreement or the Indenture within the meaning of this **Section 6.6(b)(i)** and no notice of any such voting or consent need be given to the Collateral Agent; and

(ii)      Upon the occurrence and during the continuation of an Event of Default and upon two (2) Business Days prior written notice from the Collateral Agent to such Grantor of the Collateral Agent's intention to exercise such rights:

(A)      all rights of each Grantor to exercise or refrain from exercising the voting and other consensual rights which it would otherwise be entitled to exercise pursuant hereto shall cease and all such rights shall thereupon become vested in the Collateral Agent who shall thereupon have the sole right to exercise such voting and other consensual rights; and

(B)      in order to permit the Collateral Agent to exercise the voting and other consensual rights which it may be entitled to exercise pursuant hereto and to receive all dividends and other distributions which it may be entitled to receive hereunder: (1) each Grantor shall promptly execute and deliver (or cause to be executed and delivered) to the Collateral Agent all proxies, dividend payment orders and other instruments as the Collateral Agent may from time to time reasonably request and (2) each Grantor acknowledges that the Collateral Agent may utilize the power of attorney set forth in **Section 8.1**.

(c)      except as expressly permitted by the Indenture, without prior notice to the Collateral Agent, it shall not vote to enable or take any other action to: (i) amend or terminate any partnership agreement, limited liability company agreement, certificate of incorporation, by-laws or other organizational documents in any way that materially or adversely affects the validity, perfection or priority of the Collateral Agent's security interest, (ii) permit any issuer of any Pledged Equity Interest to issue any additional stock, partnership interests, limited liability company interests or other equity interests of any nature or to issue securities convertible into or granting the right of purchase or exchange for any stock or other equity interest of any nature of such issuer, (iii) permit any issuer of any Pledged Equity Interest to dispose of all or a material

portion of their assets, (iv) waive any default under or breach of any terms of organizational document relating to the issuer of any Pledged Equity Interest or the terms of any Pledged Debt, (v) cause any issuer of any Pledged Partnership Interests or Pledged LLC Interests which are not securities (for purposes of the UCC) on the date hereof to elect or otherwise take any action to cause such Pledged Partnership Interests or Pledged LLC Interests to be treated as securities for purposes of the UCC or (vi) cause any issuer of any Pledged Equity which is not a certificated security (for purposes of the UCC) on the date hereof to elect or otherwise take any action to cause such Pledged Equity to be treated as a certificated security for purposes of the UCC; *provided, however*, notwithstanding the foregoing, if any issuer of any Pledged Partnership Interests or Pledged LLC Interests takes any such action in violation of the foregoing in this *clause (c)*, such Grantor shall promptly notify the Collateral Agent in writing of any such election or action and, in such event, shall take all steps necessary or advisable to establish the Collateral Agent's perfection and, if applicable, "*control*" thereof; and

(d)     except as expressly permitted by the Indenture, without the prior written consent of the Collateral Agent, it shall not permit any issuer of any Pledged Equity Interest to merge or consolidate unless (i) such issuer creates a security interest that is perfected by a filed financing statement (that is not effective solely under *Section 9-508* of the UCC) in collateral in which such new debtor has or acquires rights, (ii) all the outstanding Capital Stock or other equity interests of the surviving or resulting corporation, limited liability company, partnership or other entity is, upon such merger or consolidation, pledged hereunder and no cash, securities or other property is distributed in respect of the outstanding equity interests of any other constituent Grantor; provided that if the surviving or resulting Grantors upon any such merger or consolidation involving an issuer which is a Controlled Foreign Corporation, then such Grantor shall only be required to pledge equity interests in accordance with *Section 2.2* and (iii) Grantor promptly complies with the delivery and control requirements of *Section 4* hereof.

6.7     **Intellectual Property**.

(a)     it shall not do any act or omit to do any act whereby any of the Material Intellectual Property may lapse, or become abandoned, canceled, dedicated to the public, forfeited, unenforceable or otherwise impaired, or which would adversely affect the validity, grant, or enforceability of the security interest granted therein, unless it determines in its commercially reasonable discretion that such Material Intellectual Property is no longer material to its business;

(b)     it shall not, with respect to any Trademarks constituting Material Intellectual Property, cease the use of any of such Trademarks unless it determines in its commercially reasonable discretion that such Material Intellectual Property is no longer material to its business, or fail to maintain the level of the quality of products sold and services rendered under any of such Trademark at a level at least substantially consistent with the quality of such products and services as of the date hereof, and such Grantor shall take all steps necessary to insure that licensees of such Trademarks use such consistent standards of quality;

(c)     it shall, within thirty (30) days of the creation or acquisition or exclusive license of any copyrightable work that is included in the Material Intellectual Property, apply to register the Copyright in the United States Copyright Office or, where appropriate, any foreign counterpart and, in the case of an exclusive Copyright License in respect of a registered Copyright, record such license, in the United States Copyright Office or, where appropriate, any foreign counterpart;

(d)      it shall promptly notify the Collateral Agent if it knows or has reason to know that any item of Material Intellectual Property may become (i) abandoned or dedicated to the public or placed in the public domain, (ii) invalid or unenforceable, (iii) subject to any adverse determination or development regarding such Grantor's ownership, registration or use or the validity or enforceability of such item of Intellectual Property (including the institution of, or any adverse development with respect to, any action or proceeding in the United States Patent and Trademark Office, the United States Copyright Office, or any state registry, or any foreign counterpart of the foregoing, or any court) or (iv) the subject of any reversion or termination rights;

(e)      it shall take all commercially reasonable steps, including in any proceeding before the United States Patent and Trademark Office, the United States Copyright Office, any state registry or any foreign counterpart of the foregoing, to pursue any application and maintain any registration or issuance of each Trademark, Patent, and Copyright owned by or exclusively licensed to any Grantor, including, but not limited to, those items on *Schedule 5.2(II)* (as such schedule may be amended or supplemented from time to time), unless it determines in its commercially reasonable discretion that such Trademark, Patent, or Copyright is no longer material to its business;

(f)      it shall use commercially reasonable efforts so as not to permit the inclusion in any contract to which it hereafter becomes a party of any provision that could or may in any way materially impair or prevent the creation of a security interest in, or the assignment of, such Grantor's rights and interests in any property included within the definitions of any Material Intellectual Property acquired under such contracts;

(g)      in the event that any Intellectual Property owned by or exclusively licensed to any Grantor is infringed, misappropriated, diluted or otherwise violated by a third party, such Grantor shall promptly take all reasonable actions to stop such infringement, misappropriation, dilution or other violation and protect its rights in such Intellectual Property, including, as appropriate, the initiation of a suit for injunctive relief and to recover damages;

(h)      it shall take all steps commercially reasonably necessary to protect the secrecy of all Trade Secrets, including, without limitation, entering into confidentiality agreements with employees and consultants and labeling and restricting access to secret information and documents;

(i)      it shall use proper statutory notice in connection with its use of any of the Material Intellectual Property; and

(j)      it shall continue to collect, at its own expense, all amounts due or to become due to such Grantor in respect of the Intellectual Property or any portion thereof.  In connection with such collections, such Grantor may take (and, at the Collateral Agent's reasonable direction, shall take) such action as such Grantor or, during the continuance of an Event of Default, the Collateral Agent may deem reasonably necessary or advisable to enforce collection of such amounts. Notwithstanding the foregoing, the Collateral Agent shall have the right at any time, to notify, or require any Grantor to notify, any obligors with respect to any such amounts of the existence of the security interest created hereby.

UMB-000221

7. **ACCESS; RIGHT OF INSPECTION AND FURTHER ASSURANCES; ADDITIONAL GRANTORS**.

7.1 **Access; Right of Inspection**.  The Collateral Agent shall at all times have full and free access during normal business hours to all the books, correspondence and records of each Grantor, and the Collateral Agent and its representatives may examine the same, take extracts therefrom and make photocopies thereof, and each Grantor agrees to render to the Collateral Agent, at such Grantor's reasonable cost and expense, such clerical and other assistance as may be reasonably requested with regard thereto.  The Collateral Agent and its representatives shall at all reasonable times, upon prior notice to Grantor, also have the right to enter any premises of each Grantor and inspect any property of each Grantor where any of the Collateral of such Grantor granted pursuant to this Agreement is located for the purpose of inspecting the same, observing its use or otherwise protecting its interests therein.

7.2 **Further Assurances**.

(a) Each Grantor agrees that from time to time, at the expense of such Grantor, that it shall promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary in order to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to enable the Collateral Agent to exercise and enforce its rights and remedies hereunder with respect to any Collateral.  Without limiting the generality of the foregoing, each Grantor shall:

(i) file such financing or continuation statements, or amendments thereto, record security interests in Intellectual Property and execute and deliver such other agreements, instruments, endorsements, powers of attorney or notices, as may be necessary in order to effect, reflect, perfect and preserve the security interests granted or purported to be granted hereby;

(ii) take all actions necessary to ensure the recordation of appropriate evidence of the liens and security interest granted hereunder in any Intellectual Property with any intellectual property registry in which said Intellectual Property is registered or issued or in which an application for registration or issuance is pending, including, without limitation, the United States Patent and Trademark Office, the United States Copyright Office, the various Secretaries of State and the foreign counterparts of any of the foregoing;

(iii) at any reasonable time, upon request by the Collateral Agent, assemble the Collateral and allow inspection of the Collateral by the Collateral Agent, or Persons designated by the Collateral Agent;

(iv) at the Collateral Agent's request, appear in and defend any action or proceeding in which the Collateral Agent's security interest in all or any part of the Collateral is materially impaired; and

(v) furnish the Collateral Agent with such information regarding the Collateral, including, without limitation, the location thereof, as the Collateral Agent may reasonably request from time to time.

(b) Each Grantor hereby authorizes the Collateral Agent to file a Record or Records, including, without limitation, financing or continuation statements, Intellectual Property Security Agreements and amendments and supplements to any of the foregoing, in any jurisdictions and

with any filing offices as the Collateral Agent may determine, in its sole discretion, as are necessary or advisable to perfect or otherwise protect the security interest granted to the Collateral Agent herein.  Such financing statements may describe the Collateral in the same manner as described herein or may contain an indication or description of collateral that describes such property in any other manner as the Collateral Agent may determine, in its sole discretion, is necessary, advisable or prudent to ensure the perfection of the security interest in the Collateral granted to the Collateral Agent herein, including, without limitation, describing such property as "*all assets, whether now owned or hereafter acquired, developed or created*" or words of similar effect.  Each Grantor shall furnish to the Collateral Agent from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Collateral Agent may reasonably request, all in reasonable detail.

(c)  Each Grantor hereby authorizes the Collateral Agent to modify this Agreement after obtaining such Grantor's approval of or signature to such modification by amending **Schedule 5.2** (as such schedule may be amended or supplemented from time to time) to include reference to any right, title or interest in any existing Intellectual Property or any Intellectual Property acquired or developed by any Grantor after the execution hereof or to delete any reference to any right, title or interest in any Intellectual Property in which any Grantor no longer has or claims any right, title or interest.

7.3  **Additional Grantors**.  From time to time subsequent to the date hereof, additional Persons may become parties hereto as additional Grantors (each, an "***Additional Grantor***"), by executing a Pledge Supplement.  Upon delivery of any such Pledge Supplement to the Collateral Agent, notice of which is hereby waived by Grantors, each Additional Grantor shall be a Grantor and shall be as fully a party hereto as if Additional Grantor were an original signatory hereto.  Each Grantor expressly agrees that its obligations arising hereunder shall not be affected or diminished by the addition or release of any other Grantor hereunder, nor by any election of Collateral Agent not to cause any Subsidiary of Company to become an Additional Grantor hereunder.  This Agreement shall be fully effective as to any Grantor that is or becomes a party hereto regardless of whether any other Person becomes or fails to become or ceases to be a Grantor hereunder.

8.  **COLLATERAL AGENT APPOINTED ATTORNEY-IN-FACT**.

8.1  **Power of Attorney**.  Each Grantor hereby irrevocably appoints the Collateral Agent (such appointment being coupled with an interest) as such Grantor's attorney-in-fact, with full authority in the place and stead of such Grantor and in the name of such Grantor, the Collateral Agent or otherwise, from time to time at the Collateral Agent's discretion or at the direction of and in accordance with an Act of Required Holders to take any action and to execute any instrument that the Collateral Agent may deem reasonably necessary or advisable to accomplish the purposes of this Agreement, including, without limitation, the following:

(a)  upon the occurrence and during the continuance of any Event of Default, to obtain and adjust insurance required to be maintained by such Grantor or paid to the Collateral Agent pursuant to the Indenture;

(b)  upon the occurrence and during the continuance of any Event of Default, to ask for, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral;

UMB-000223

(c)     upon the occurrence and during the continuance of any Event of Default, to receive, endorse and collect any drafts or other instruments, documents and chattel paper in connection with *clause (b)* above;

(d)     upon the occurrence and during the continuance of any Event of Default, to file any claims or take any action or institute any proceedings that the Collateral Agent may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of the Collateral Agent with respect to any of the Collateral;

(e)     to prepare and file any UCC financing statements against such Grantor as debtor;

(f)     to prepare, sign, and file for recordation in any intellectual property registry, appropriate evidence of the lien and security interest granted herein in any Intellectual Property in the name of such Grantor as debtor;

(g)     to take or cause to be taken all actions necessary to perform or comply or cause performance or compliance with the terms of this Agreement, including, without limitation, access to pay or discharge taxes or Liens (other than Permitted Liens) levied or placed, as applicable, upon the Collateral and which are past due and not being contested in good faith by Grantor; and

(h)     upon the occurrence and during the continuance of any Event of Default, generally to sell, transfer, lease, license, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Collateral Agent were the absolute owner thereof for all purposes, and to do, at the Collateral Agent's option and such Grantor's expense, at any time or from time to time, all acts and things that the Collateral Agent deems reasonably necessary to protect, preserve or realize upon the Collateral and the Collateral Agent's security interest therein in order to effect the intent of this Agreement, all as fully and effectively as such Grantor might do.

8.2     **No Duty on the Part of Collateral Agent or Secured Parties**.  The powers conferred on the Collateral Agent hereunder are solely to protect the interests of the Secured Parties in the Collateral and shall not impose any duty upon the Collateral Agent or any other Secured Party to exercise any such powers.  The Collateral Agent and the other Secured Parties shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct.

8.3     **Appointment Pursuant to Indenture**.  The Collateral Agent has been appointed as collateral agent pursuant to the Indenture.  The rights, duties, privileges, immunities and indemnities of the Collateral Agent thereunder are subject to the provisions of the Indenture and the Intercreditor Agreement.  For the avoidance of doubt, if directed by an Act of the Required Holders, the Collateral Agent shall take such actions hereunder in compliance with such Act of Required Holders.

9.     **REMEDIES**.

9.1     **Generally**.

(a)     If any Event of Default shall have occurred and be continuing, the Collateral Agent may exercise in respect of the Collateral, in addition to all other rights and remedies provided for herein or otherwise available to it at law or in equity, all the rights and remedies of

the Collateral Agent on default under the UCC (whether or not the UCC applies to the affected Collateral) to collect, enforce or satisfy any Notes Obligations then owing, whether by acceleration or otherwise, and also may pursue any of the following separately, successively or simultaneously:

(i)        require any Grantor to, and each Grantor hereby agrees that it shall at its expense and promptly upon request of the Collateral Agent forthwith, assemble all or part of the Collateral as directed by the Collateral Agent and make it available to the Collateral Agent at a place to be designated by the Collateral Agent that is reasonably convenient to both parties;

(ii)       enter onto the property where any Collateral is located and take possession thereof with or without judicial process;

(iii)      prior to the disposition of the Collateral, store, process, repair or recondition the Collateral or otherwise prepare the Collateral for disposition in any manner to the extent the Collateral Agent deems appropriate; and

(iv)      without notice except as specified below or under the UCC, sell, assign, lease, license (on an exclusive or nonexclusive basis) or otherwise dispose of the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Collateral Agent's offices or elsewhere, for cash, on credit or for future delivery, at such time or times and at such price or prices and upon such other terms as the Collateral Agent may deem commercially reasonable.

(b)       The Collateral Agent or any other Secured Party may be the purchaser of any or all of the Collateral at any public or private (to the extent to the portion of the Collateral being privately sold is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations) sale in accordance with the UCC and the Collateral Agent, on behalf of itself and the other Secured Parties, shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or made in accordance with the UCC, to use and apply any of the Notes Obligations as a credit on account of the purchase price for any Collateral payable by the Collateral Agent at such sale. Each purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of any Grantor, and each Grantor hereby waives (to the extent permitted by applicable law) all rights of redemption, stay and/or appraisal which it now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. Each Grantor agrees that, to the extent notice of sale shall be required by law, at least ten (10) days' notice to such Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Collateral Agent shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Each Grantor agrees that it would not be commercially unreasonable for the Collateral Agent to dispose of the Collateral or any portion thereof by using Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets. Each Grantor hereby waives any claims against the Collateral Agent arising by reason of the fact that the price at which any Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale, even if the Collateral Agent accepts the first offer received and does not offer such Collateral to more than one offeree. If the proceeds of any

26

sale or other disposition of the Collateral are insufficient to pay all the Notes Obligations, Grantors shall be liable for the deficiency and the fees of any attorneys employed by the Collateral Agent to collect such deficiency.  Each Grantor further agrees that a breach of any of the covenants contained in this *Section* will cause irreparable injury to the Collateral Agent, that the Collateral Agent has no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this *Section* shall be specifically enforceable against such Grantor, and such Grantor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no default has occurred giving rise to the Notes Obligations becoming due and payable prior to their stated maturities.  Nothing in this *Section* shall in any way limit the rights of the Collateral Agent hereunder.

(c)     Each of the Grantors hereto and each of the Secured Parties, by their acceptance of the benefits of this Agreement, agree that the Collateral Agent shall be entitled, for the purposes of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any sale or foreclosure proceeding in respect of the Collateral, including without limitation, sales occurring pursuant to *Section 363* of the Bankruptcy Code or included as part of any plan subject to confirmation under *Section 1129(b)(2)(A)(iii)* of the Bankruptcy Code, to use and apply any of the Notes Obligations as a credit on account of the purchase price for any Collateral payable by the Collateral Agent at such sale or foreclosure proceeding, if applicable.

(d)     The Collateral Agent may sell the Collateral without giving any warranties as to the Collateral.  The Collateral Agent may specifically disclaim or modify any warranties of title or the like.  This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

(e)     The Collateral Agent shall have no obligation to marshal any of the Collateral.

9.2     **Application of Proceeds**.  All proceeds received by the Collateral Agent in respect of any sale of, any collection from, or other realization upon all or any part of the Collateral shall be applied in full or in part by the Collateral Agent in accordance with the provisions of the Indenture and the Intercreditor Agreement.

9.3     **Sales on Credit**.  If Collateral Agent sells any of the Collateral upon credit, Grantor will be credited only with payments actually made by purchaser and received by Collateral Agent and applied to indebtedness of the purchaser.  In the event the purchaser fails to pay for the Collateral, Collateral Agent may resell the Collateral and Grantor shall be credited with proceeds of the sale.

9.4     **Investment Related Property**.  Each Grantor recognizes that, by reason of certain prohibitions contained in the Securities Act and applicable state securities laws, the Collateral Agent may be compelled, with respect to any sale of all or any part of the Investment Related Property conducted without prior registration or qualification of such Investment Related Property under the Securities Act and/or such state securities laws, to limit purchasers to those who will agree, among other things, to acquire the Investment Related Property for their own account, for investment and not with a view to the distribution or resale thereof.  Each Grantor acknowledges that any such private sale may be at prices and on terms less favorable than those obtainable through a public sale without such restrictions (including a public offering made pursuant to a registration statement under the Securities Act) and, notwithstanding such circumstances, each Grantor agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that the Collateral Agent shall have no obligation to engage in public sales and no obligation to delay the sale of any Investment Related Property for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under

UMB-000226

the Securities Act or under applicable state securities laws, even if such issuer would, or should, agree to so register it.  If the Collateral Agent determines to exercise its right to sell any or all of the Investment Related Property, upon written request, each Grantor shall and shall cause each issuer of any Pledged Stock to be sold hereunder, each partnership and each limited liability company from time to time to furnish to the Collateral Agent all such information as the Collateral Agent may request in order to determine the number and nature of interest, shares or other instruments included in the Investment Related Property which may be sold by the Collateral Agent in exempt transactions under the Securities Act and the rules and regulations of the Securities and Exchange Commission thereunder, as the same are from time to time in effect.

9.5     **Grant of Intellectual Property License**.  For the purpose of enabling the Collateral Agent, during the continuance of an Event of Default, to exercise rights and remedies under *Section 9* hereof at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, each Grantor hereby grants to the Collateral Agent, to the extent assignable, an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to such Grantor), subject, in the case of Trademarks, to sufficient rights to quality control and inspection in favor of such Grantor to avoid the risk of invalidation of such Trademarks, to use, assign, license or sublicense any of the Intellectual Property now owned or hereafter acquired, developed or created by such Grantor, wherever the same may be located.  Such license shall include access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout hereof.

9.6     **Intellectual Property**.

(a)     Anything contained herein to the contrary notwithstanding, in addition to the other rights and remedies provided herein, upon the occurrence and during the continuation of an Event of Default:

(i)     the Collateral Agent shall have the right (but not the obligation), including as directed by an Act of Required Holders, to bring suit or otherwise commence any action or proceeding in the name of any Grantor, the Collateral Agent or otherwise, in the Collateral Agent's sole discretion, to enforce any Intellectual Property rights of such Grantor, in which event such Grantor shall, at the request of the Collateral Agent, do any and all lawful acts and execute any and all documents required by the Collateral Agent in aid of such enforcement, and such Grantor shall promptly, upon demand, reimburse and indemnify the Collateral Agent as provided in *Section 12* hereof in connection with the exercise of its rights under this *Section 9.6*, and, to the extent that the Collateral Agent shall elect not to bring suit to enforce any Intellectual Property rights as provided in this *Section 9.6*, each Grantor agrees to use all reasonable measures, whether by action, suit, proceeding or otherwise, to prevent the infringement, misappropriation, dilution or other violation of any of such Grantor's rights in the Intellectual Property by others and for that purpose agrees to diligently maintain any action, suit or proceeding against any Person so infringing, misappropriating, diluting or otherwise violating as shall be necessary to prevent such infringement, misappropriation, dilution or other violation;

(ii)     upon written demand from the Collateral Agent, each Grantor shall grant, assign, convey or otherwise transfer to the Collateral Agent or such Collateral Agent's designee all of such Grantor's right, title and interest in and to any Intellectual Property and shall execute and deliver to the Collateral Agent such documents as are necessary or appropriate to carry out the intent and purposes of this Agreement;

UMB-000227

(iii)     each Grantor agrees that such an assignment and/or recording shall be applied to reduce the Notes Obligations outstanding only to the extent that the Collateral Agent (or any other Secured Party) receives cash proceeds in respect of the sale of, or other realization upon, any such Intellectual Property;

(iv)     within five (5) Business Days after written notice from the Collateral Agent, each Grantor shall use reasonable best efforts to make available to the Collateral Agent, to the extent within such Grantor's power and authority, such personnel in such Grantor's employ on the date of such Event of Default as the Collateral Agent may reasonably designate, by name, title or job responsibility, to permit such Grantor to continue, directly or indirectly, to produce, advertise and sell the products and services sold or delivered by such Grantor under or in connection with any Trademarks or Trademark Licenses, such persons to be available to perform their prior functions on the Collateral Agent's behalf and to be compensated by the Collateral Agent at such Grantor's expense on a per diem, pro-rata basis consistent with the salary and benefit structure applicable to each as of the date of such Event of Default; and

(v)     the Collateral Agent shall have the right, subject to the Intercreditor Agreement, to notify, or require each Grantor to notify, any obligors with respect to amounts due or to become due to such Grantor in respect of any Intellectual Property of such Grantor, of the existence of the security interest created herein, to direct such obligors to make payment of all such amounts directly to the Collateral Agent, and, upon such notification and at the expense of such Grantor, to enforce collection of any such amounts and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as such Grantor might have done;

(A)     all amounts and proceeds (including checks and other instruments) received by Grantor in respect of amounts due to such Grantor in respect of the Collateral or any portion thereof shall be received in trust for the benefit of the Collateral Agent hereunder, shall be segregated from other funds of such Grantor and shall be forthwith paid over or delivered to the Collateral Agent in the same form as so received (with any necessary endorsement) to be held as cash Collateral and applied as provided by ***Section 9.7*** hereof; and

(B)     Grantor shall not adjust, settle or compromise the amount or payment of any such amount or release wholly or partly any obligor with respect thereto or allow any credit or discount thereon.

(b)     If (i) an Event of Default shall have occurred and, by reason of cure, waiver, modification, amendment or otherwise, no longer be continuing, (ii) no other Event of Default shall have occurred and be continuing, (iii) an assignment or other transfer to the Collateral Agent of any rights, title and interests in and to any Intellectual Property of such Grantor shall have been previously made and shall have become absolute and effective, and (iv) the Notes Obligations shall not have become immediately due and payable, upon the written request of any Grantor, the Collateral Agent shall promptly execute and deliver to such Grantor, at such Grantor's sole cost and expense, such assignments or other transfer as may be necessary to reassign to such Grantor any such rights, title and interests as may have been assigned to the Collateral Agent as aforesaid, subject to any disposition thereof that may have been made by the Collateral Agent; provided, after giving effect to such reassignment, the Collateral Agent's security interest granted pursuant hereto, as well as all other rights and remedies of the Collateral Agent granted hereunder, shall continue to be in full force and effect; and provided further, the rights, title and interests so

reassigned shall be free and clear of any other Liens granted by or on behalf of the Collateral Agent and the Secured Parties.

9.7     **Cash Proceeds; Deposit Accounts**.  (a) If any Event of Default shall have occurred and be continuing, in addition to the rights of the Collateral Agent specified in *Section 6.5* with respect to payments of Receivables, all proceeds of any Collateral received by any Grantor consisting of cash, checks and other near-cash items (collectively, "*Cash Proceeds*") shall be held by such Grantor in trust for the Collateral Agent, segregated from other funds of such Grantor, and shall, forthwith upon receipt by such Grantor, be turned over to the Collateral Agent in the form received by such Grantor or the cash equivalent thereof (duly indorsed by such Grantor to the Collateral Agent, if required) and held by the Collateral Agent.  Any Cash Proceeds received by the Collateral Agent (whether from a Grantor or otherwise) may, in the sole discretion of the Collateral Agent, (1) be held by the Collateral Agent for the ratable benefit of the Secured Parties, as collateral security for the Notes Obligations (whether matured or unmatured) and/or (2) then or at any time thereafter may be applied by the Collateral Agent against the Notes Obligations then due and owing.

(b)     If any Event of Default shall have occurred and be continuing, the Collateral Agent may apply the balance from any Deposit Account or instruct the bank at which any Deposit Account is maintained to pay the balance of any Deposit Account to or for the benefit of the Collateral Agent.

10.     **COLLATERAL AGENT**.  The Collateral Agent has been appointed to act as Collateral Agent pursuant to the Indenture.  The Collateral Agent shall be obligated, and shall have the right hereunder, to make demands, to give notices, to exercise or refrain from exercising any rights, and to take or refrain from taking any action (including, without limitation, the release or substitution of Collateral), solely in accordance with this Agreement, the Indenture and the other Security Documents.  In furtherance of the foregoing provisions of this *Section*, each Secured Party, by its acceptance of the benefits hereof, agrees that it shall have no right individually to realize upon any of the Collateral hereunder, it being understood and agreed by such Secured Party that all rights and remedies hereunder may be exercised solely by the Collateral Agent for the benefit of Secured Parties in accordance with the terms of this *Section 10* .  The provisions of the Indenture relating to the Collateral Agent including, without limitation, the provisions relating to resignation or removal of the Collateral Agent and the powers and duties and immunities of the Collateral Agent are incorporated herein by reference and shall survive any termination of the Indenture. In connection with any conflict between this Agreement and the Indenture, the Indenture shall control with respect to the duties, protections, immunities and indemnity of the Collateral Agent.

11.     **CONTINUING SECURITY INTEREST; TRANSFER OF LOANS**.  This Agreement shall create a continuing security interest in the Collateral and shall remain in full force and effect until the payment in full of all Notes Obligations.  Upon any such termination of this Agreement, the Collateral Agent shall, at the Grantors' expense, execute and deliver to the Grantors or otherwise authorize the filing of such documents as the Grantors shall reasonably request, including financing statement amendments to evidence such termination.  Upon any disposition of property permitted by the Indenture, the Liens granted herein shall be deemed to be automatically released and such property shall automatically revert to the applicable Grantor with no further action on the part of any Person.  The Collateral Agent shall, at the applicable Grantor's expense, execute and deliver or otherwise authorize the filing of such documents as such Grantor shall reasonably request, in form and substance reasonably satisfactory to the Collateral Agent, including financing statement amendments to evidence such release.

12.     **STANDARD OF CARE; COLLATERAL AGENT MAY PERFORM**.  The powers conferred on the Collateral Agent hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers.  Except for the exercise of reasonable care in the custody of

any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Collateral Agent shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral. The Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Collateral Agent accords its own property. Neither the Collateral Agent nor any of its directors, officers, employees or agents shall be liable for failure to demand, collect or realize upon all or any part of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Grantor or otherwise. If any Grantor fails to perform any agreement contained herein, the Collateral Agent may itself perform, or cause performance of, such agreement, and the expenses of the Collateral Agent incurred in connection therewith shall be payable by each Grantor pursuant to the Indenture. It is the sole responsibility of the Grantors to take all of the necessary actions and filings necessary to maintain the perfection of all of the security interests granted hereunder. Whenever the Collateral Agent acts hereunder, it is acting with all of the rights, protections, immunities and indemnities set forth in the Indenture as if they were fully set forth herein. Notwithstanding anything to the contrary contained herein, the Collateral Agent shall have no duty whatsoever to maintain the security interests granted hereunder.

13.     **MISCELLANEOUS**. Any notice required or permitted to be given under this Agreement shall be given in accordance with *Section 14.02* of the Indenture. No failure or delay on the part of the Collateral Agent in the exercise of any power, right or privilege hereunder or under any other Security Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege. All rights and remedies existing under this Agreement and the other Security Documents are cumulative to, and not exclusive of, any rights or remedies otherwise available. In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby. All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of an Event of Default if such action is taken or condition exists. This Agreement shall be binding upon and inure to the benefit of the Collateral Agent and the Grantors and their respective successors and assigns. No Grantor shall, without the prior written consent of the Collateral Agent given in accordance with the Indenture, assign any right, duty or obligation hereunder. This Agreement embodies the entire agreement and understanding between the Grantors and the Collateral Agent and supersede all prior agreements and understandings between such parties relating to the subject matter hereof and thereof. Accordingly, this Agreement may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties. This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document.

        THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND ALL CLAIMS AND CONTROVERSIES ARISING OUT OF THE SUBJECT MATTER HEREOF WHETHER SOUNDING IN CONTRACT LAW, TORT LAW OR OTHERWISE SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

UMB-000230

THE PROVISIONS OF THE INDENTURE UNDER THE HEADING "*WAIVER OF JURY TRIAL*" ARE INCORPORATED HEREIN BY THIS REFERENCE AND SUCH INCORPORATION SHALL SURVIVE ANY TERMINATION OF THE INDENTURE.

14.     **INTERRELATIONSHIP WITH INTERCREDITOR AGREEMENT**.     Notwithstanding anything in this Agreement to the contrary, so long as any ABL Obligations (as defined in the Intercreditor Agreement) are outstanding, the requirements for delivery of Collateral to the Collateral Agent under this Agreement shall be deemed to have been satisfied by delivery of such Collateral constituting ABL Priority Collateral (as defined in the Intercreditor Agreement) to the ABL Representative (as defined in the Intercreditor Agreement).

[**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURE PAGE(S) TO FOLLOW.**]

**IN WITNESS WHEREOF**, the Grantors and the Collateral Agent have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**GRANTORS:**

**GOODMAN NETWORKS INCORPORATED**, a Texas corporation

By: _____
    Name:
    Title:

**MULTIBAND FIELD SERVICES, INCORPORATED**, a Delaware corporation

By: _____
    Name:
    Title:

**GOODMAN NETWORKS SERVICES, LLC**, a Delaware limited liability company

By:   Goodman Networks Incorporated, its sole manager

By: _____
    Name:
    Title:

**COLLATERAL AGENT:**

**U.S. BANK NATIONAL ASSOCIATION**, a national banking association

By: _____
    Name:
    Title:

UMB-000232

*EXHIBIT A*

## PLEDGE SUPPLEMENT

This **PLEDGE SUPPLEMENT**, dated [mm/dd/yy], is delivered by [**NAME OF GRANTOR**] a [Name of State of Incorporation] [Corporation] (the "*Grantor*") pursuant to the Pledge and Security Agreement, dated as of [mm/dd/yy] (as it may be from time to time amended, restated, modified or supplemented, the "*Security Agreement*"), by and among Goodman Networks Incorporated, the other Grantors named therein, and U.S. Bank National Association, as the Collateral Agent.  Capitalized terms used herein not otherwise defined herein shall have the meanings ascribed thereto in the Security Agreement.

Grantor hereby confirms the grant to the Collateral Agent set forth in the Security Agreement of, and does hereby grant to the Collateral Agent, a security interest in all of Grantor's right, title and interest in, to and under all Collateral to secure the Notes Obligations, in each case whether now or hereafter existing or in which Grantor now has or hereafter acquires an interest and wherever the same may be located.  Grantor represents and warrants that the attached Supplements to Schedules accurately and completely set forth all additional information required to be provided pursuant to the Security Agreement and hereby agrees that such Supplements to Schedules shall constitute part of the Schedules to the Security Agreement.

THIS PLEDGE SUPPLEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND ALL CLAIMS AND CONTROVERSIES ARISING OUT OF THE SUBJECT MATTER HEREOF WHETHER SOUNDING IN CONTRACT LAW, TORT LAW OR OTHERWISE SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

**IN WITNESS WHEREOF**, Grantor has caused this Pledge Supplement to be duly executed and delivered by its duly authorized officer as of [mm/dd/yy].

[**NAME OF GRANTOR**]

By: _____

Name:
Title:

*SUPPLEMENT TO SCHEDULE 5.1*

Additional Information:

## GENERAL INFORMATION

(A)     Full Legal Name, Type of Organization, Jurisdiction of Organization, Chief Executive Office/Sole Place of Business (or Residence if Grantor is a Natural Person) and Organizational Identification Number of each Grantor:

| Full Legal Name | Type of Organization | Jurisdiction of Organization | Chief Executive Office/Sole Place of Business (or Residence if Grantor is a Natural Person) | Organization I.D.# |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

(B)     Other Names (including any Trade Name or Fictitious Business Name) under which each Grantor currently conducts business:

| Full Legal Name | Trade Name or Fictitious Business Name |
|---|---|
|  |  |
|  |  |
|  |  |

(C)     Changes in Name, Jurisdiction of Organization, Chief Executive Office or Sole Place of Business (or Principal Residence if Grantor is a Natural Person) and Corporate Structure within past five (5) years:

| Grantor | Date of Change | Description of Change |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

*SUPPLEMENT TO SCHEDULE 5.2*

### COLLATERAL IDENTIFICATION

I.    **INVESTMENT RELATED PROPERTY**

   (A)    Pledged Stock:

| Grantor | Stock Issuer | Class of Stock | Certificated (Y/N) | Stock Certificate No. | Par Value | No. of Pledged Stock | Percentage of Outstanding Stock of the Stock Issuer |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

Pledged LLC Interests:

| Grantor | Limited Liability Company | Certificated (Y/N) | Certificate No. (if any) | No. of Pledged Units | Percentage of Outstanding LLC Interests of the Limited Liability Company |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |

Pledged Partnership Interests:

| Grantor | Partnership | Type of Partnership Interests (e.g., general or limited) | Certificated (Y/N) | Certificate No. (if any) | Percentage of Outstanding Partnership Interests of the Partnership |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |

Pledged Trust Interests:

| Grantor | Trust | Class of Trust Interests | Certificated (Y/N) | Certificate No. (if any) | Percentage of Outstanding Trust Interests of the Trust |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |

Pledged Debt:

| Grantor | Issuer | Original Principal Amount | Outstanding Principal Balance | Issue Date | Maturity Date |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |

Securities Account:

| Grantor | Share of Securities Intermediary | Account Number | Account Name |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

Deposit Accounts:

| Grantor | Name of Depositary Bank | Account Number | Account Name |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

Commodities Accounts:

| Grantor | Name of Commodities Intermediary | Account Number | Account Name |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

(B)

| Grantor | Date of Acquisition | Description of Acquisition |
|---|---|---|
|  |  |  |
|  |  |  |

## II.    INTELLECTUAL PROPERTY

(A)    Copyrights:

| Grantor | Jurisdiction | Title of Work | Registration Number (if any) | Registration Date (if any) |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

(B)    Copyright Licenses:

| Grantor | Description of Copyright License | Registration Number (if any) of underlying Copyright | Name of Licensor |
|---|---|---|---|
|  |  |  |  |

(C)    Patents:

| Grantor | Jurisdiction | Title of Patent | Patent Number/(Application Number) | Issue Date/(Filing Date) |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

(D)    Patent Licenses:

| Grantor | Description of Patent License | Patent Number of underlying Patent | Name of Licensor |
|---|---|---|---|

| | | | |
|---|---|---|---|
| | | | |
| | | | |

(E)    Trademarks:

| Grantor | Jurisdiction | Trademark | Registration Number/(Serial Number) | Registration Date/(Filing Date) |
|---|---|---|---|---|
| | | | | |
| | | | | |

(F)    Trademark Licenses

| Grantor | Description of Trademark License | Registration Number of underlying Trademark | Name of Licensor |
|---|---|---|---|
| | | | |
| | | | |

(G)    Trade Secret Licenses:

## III.    COMMERCIAL TORT CLAIMS

| Grantor | Commercial Tort Claims |
|---|---|
| | |
| | |
| | |

## IV.    LETTER-OF-CREDIT RIGHTS

| Grantor | Description of Letters of Credit |
|---|---|
| | |
| | |
| | |

## V.    WAREHOUSEMAN, BAILEES AND OTHER THIRD PARTIES IN POSSESSION OF COLLATERAL

| Grantor | Description of Property | Name and Address of Third Party |
|---|---|---|
| | | |
| | | |
| | | |

## VI.    MATERIAL CONTRACTS

| Grantor | Description of Material Contract |
|---|---|
| | |
| | |
| | |

*SUPPLEMENT TO SCHEDULE 5.4*

**FINANCING STATEMENTS**

| Grantor | Filing Jurisdiction(s) |
|---------|------------------------|
|         |                        |
|         |                        |

*SUPPLEMENT TO SCHEDULE 5.5*

### ADDITIONAL INFORMATION

| Name of Grantor | Location of Equipment and Inventory |
|---|---|
|  |  |

*EXHIBIT B*

### UNCERTIFICATED SECURITIES CONTROL AGREEMENT

This Uncertificated Securities Control Agreement dated as of [_____], 20[__] among Goodman Networks Incorporated (the "***Pledgor***"), U.S. Bank National Association, as Collateral Agent for the Secured Parties, (the "***Collateral Agent***") and [_____], a [_____] [corporation] (the "***Issuer***").  Capitalized terms used but not defined herein shall have the meaning assigned in the Pledge and Security Agreement dated [as of the date hereof], among the Pledgor, the other Grantors party thereto and the Collateral Agent (the "***Security Agreement***").  All references herein to the "***UCC***" shall mean the Uniform Commercial Code as in effect in the State of New York.

Section 1.        **Registered Ownership of Shares**.  The Issuer hereby confirms and agrees that as of the date hereof the Pledgor is the registered owner of [_____] shares of the Issuer's [common] stock (the "***Pledged Shares***") and the Issuer shall not change the registered owner of the Pledged Shares without the prior written consent of the Collateral Agent.

Section 2.        **Instructions**.  If at any time the Issuer shall receive instructions originated by the Collateral Agent relating to the Pledged Shares, the Issuer shall comply with such instructions without further consent by the Pledgor or any other person.

Section 3.        **Additional Representations and Warranties of the Issuer**.  The Issuer hereby represents and warrants to the Collateral Agent:

(a)        It has not entered into, and until the termination of this agreement will not enter into, any agreement with any other person relating the Pledged Shares pursuant to which it has agreed to comply with instructions issued by such other person; and

(b)        It has not entered into, and until the termination of this agreement will not enter into, any agreement with the Pledgor or the Collateral Agent purporting to limit or condition the obligation of the Issuer to comply with Instructions as set forth in ***Section 2*** hereof.

(c)        Except for the claims and interest of the Collateral Agent and of the Pledgor in the Pledged Shares, the Issuer does not know of any claim to, or interest in, the Pledged Shares. If any person asserts any lien, encumbrance or adverse claim (including any writ, garnishment, judgment, warrant of attachment, execution or similar process) against the Pledged Shares, the Issuer will promptly notify the Collateral Agent and the Pledgor thereof.

(d)        This Uncertificated Securities Control Agreement is the valid and legally binding obligation of the Issuer.

Section 4.        **Choice of Law**.  This Agreement shall be governed by, and construed and enforced in accordance with the laws of the State of [New York].

Section 5.        **Conflict with Other Agreements**.  In the event of any conflict between this Agreement (or any portion thereof) and any other agreement now existing or hereafter entered into, the terms of this Agreement shall prevail.  No amendment or modification of this Agreement or waiver of any right hereunder shall be binding on any party hereto unless it is in writing and is signed by all of the parties hereto.

Section 6.        **Voting Rights**.  Until such time as the Collateral Agent shall otherwise instruct the Issuer in writing, the Pledgor shall have the right to vote the Pledged Shares.

Section 7.        **Successors; Assignment**.  The terms of this Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective corporate successors or heirs and personal representatives who obtain such rights solely by operation of law.  The Collateral Agent may assign its rights hereunder only with the express written consent of the Issuer and by sending written notice of such assignment to the Pledgor.

Section 8.        **Indemnification of Issuer**.  The Pledgor and the Collateral Agent hereby agree that (a) the Issuer is released from any and all liabilities to the Pledgor and the Collateral Agent arising from the terms of this Agreement and the compliance of the Issuer with the terms hereof, except to the extent that such liabilities arise from the Issuer's negligence and (b) the Pledgor, its successors and assigns shall at all times indemnify and save harmless the Issuer from and against any and all claims, actions and suits of others arising out of the terms of this Agreement or the compliance of the Issuer with the terms hereof, except to the extent that such arises from the Issuer's negligence, and from and against any and all liabilities, losses, damages, costs, charges, counsel fees and other expenses of every nature and character arising by reason of the same, until the termination of this Agreement.

Section 9.        **Notices**.  Any notice, request or other communication required or permitted to be given under this Agreement shall be in writing and deemed to have been properly given when delivered in person, or when sent by telecopy or other electronic means and electronic confirmation of error free receipt is received or two (2) days after being sent by certified or registered United States mail, return receipt requested, postage prepaid, addressed to the party at the address set forth below.

Pledgor:                Goodman Networks Incorporated
                        2801 Network Blvd., Suite 300
                        Frisco, TX 75034
                        Facsimile No.:  (972) 421-5753
                        Attention: John Debus

                        With a copy to:

                        Haynes and Boone, LLP
                        2323 Victory Avenue, Suite 700
                        Dallas, TX 75219
                        Attention: Monika Sanford, Esq.

Collateral Agent:       U.S. Bank National Association
                        8 Greenway Plaza, Suite 1100
                        Houston, Texas 77046
                        Attention: Steven A. Finklea
                        Facsimile No.: (713) 212-3718

                        With a copy to:

                        McGuire, Craddock & Strother, P.C.
                        2501 N. Harwood St., Suite 1800
                        Dallas, Texas 75201
                        Facsimile No.: 214-954-6868
                        Attention: Charles J. McGuire, Esq.

Issuer:                    [Insert Name and Address of Issuer]
                           Attention:  [_____]
                           Telecopier:  [_____]

Any party may change its address for notices in the manner set forth above.

Section 10.     **Termination**.  The obligations of the Issuer to the Collateral Agent pursuant to this Control Agreement shall continue in effect until the security interests of the Collateral Agent in the Pledged Shares have been terminated pursuant to the terms of the Security Agreement and the Collateral Agent has notified the Issuer of such termination in writing.  The Collateral Agent agrees to provide Notice of Termination in substantially the form of ***Exhibit A*** hereto to the Issuer upon the request of the Pledgor on or after the termination of the Collateral Agent's security interest in the Pledged Shares pursuant to the terms of the Security Agreement.  The termination of this Control Agreement shall not terminate the Pledged Shares or alter the obligations of the Issuer to the Pledgor pursuant to any other agreement with respect to the Pledged Shares.

Section 11.     **Counterparts**.  This Agreement may be executed in any number of counterparts, all of which shall constitute one and the same instrument, and any party hereto may execute this Agreement by signing and delivering one or more counterparts.

**GOODMAN NETWORKS INCORPORATED**, as Pledgor

By:   _____
      Name:
      Title:

**U.S. BANK NATIONAL ASSOCIATION**, as Collateral Agent

By:   _____
      Name:
      Title:

[**NAME OF ISSUER**], as Issuer

By:   _____
      Name:
      Title:

*Exhibit A*

[Letterhead of Collateral Agent]

[Date]

[Name and Address of Issuer]
Attention:  [_____]

Re:    Termination of Control Agreement

You are hereby notified that the Uncertificated Securities Control Agreement between you, Goodman Networks Incorporated (the "***Pledgor***") and the undersigned (a copy of which is attached) is terminated and you have no further obligations to the undersigned pursuant to such Agreement. Notwithstanding any previous instructions to you, you are hereby instructed to accept all future directions with respect to Pledged Shares (as defined in the Uncertificated Control Agreement) from the Pledgor. This notice terminates any obligations you may have to the undersigned with respect to the Pledged Shares, however nothing contained in this notice shall alter any obligations which you may otherwise owe to the Pledgor pursuant to any other agreement.

You are instructed to deliver a copy of this notice by facsimile transmission to the Pledgor.

Very truly yours,

**U.S. BANK NATIONAL ASSOCIATION**, as
Collateral Agent

By:    _____
          Name:
          Title:

*EXHIBIT C*

**SECURITIES ACCOUNT CONTROL AGREEMENT**

This **SECURITIES ACCOUNT CONTROL AGREEMENT** dated as of [_____], 20[__] (this "*Agreement*") among Goodman Networks Incorporated (the "*Debtor*"), **U.S. BANK NATIONAL ASSOCIATION**, as Collateral Agent for the Secured Parties (together with its successors and assigns, the "*Collateral Agent*") and [_____], in its capacity as a "*securities intermediary*" as defined in *Section 8-102(a)(14)* of the UCC (in such capacity, the "*Securities Intermediary*"). Capitalized terms used but not defined herein shall have the meaning assigned thereto in the Pledge and Security Agreement, dated [as of the date hereof], among the Debtor, the other Grantors party thereto and the Collateral Agent (as amended, restated, supplemented or otherwise modified from time to time, the "*Security Agreement*"). All references herein to the "*UCC*" shall mean the Uniform Commercial Code as in effect in the State of New York.

Section 1.        **Establishment of Securities Account**. The Securities Intermediary hereby confirms and agrees that:

(a)        The Securities Intermediary has established account number [Identify Account Number] in the name "*[Identify Exact Title of Account]*" (such account and any successor account, the "*Securities Account*") and the Securities Intermediary shall not change the name or account number of the Securities Account without the prior written consent of the Collateral Agent;

(b)        All securities or other property underlying any financial assets credited to the Securities Account shall be registered in the name of the Securities Intermediary, indorsed to the Securities Intermediary or in blank or credited to another securities account maintained in the name of the Securities Intermediary and in no case will any financial asset credited to the Securities Account be registered in the name of the Debtor, payable to the order of the Debtor or specially indorsed to the Debtor except to the extent the foregoing have been specially indorsed to the Securities Intermediary or in blank;

(c)        All property delivered to the Securities Intermediary pursuant to the Security Agreement will be promptly credited to the Securities Account; and

(d)        The Securities Account is a "*securities account*" within the meaning of *Section 8-501* of the UCC.

Section 2.        **"Financial Assets" Election**. The Securities Intermediary hereby agrees that each item of property (including, without limitation, any investment property, financial asset, security, instrument, general intangible or cash) credited to the Securities Account shall be treated as a "*financial asset*" within the meaning of *Section 8-102(a)(9)* of the UCC.

Section 3.        **Control of the Securities Account**. If at any time the Securities Intermediary shall receive any order from the Collateral Agent directing transfer or redemption of any financial asset relating to the Securities Account, the Securities Intermediary shall comply with such entitlement order without further consent by the Debtor or any other person. If the Debtor is otherwise entitled to issue entitlement orders and such orders conflict with any entitlement order issued by the Collateral Agent, the Securities Intermediary shall follow the orders issued by the Collateral Agent.

Exhibit C – Page 1
UMB-000244

Section 4. **Subordination of Lien; Waiver of Set-Off**. In the event that the Securities Intermediary has or subsequently obtains by agreement, by operation of law or otherwise a security interest in the Securities Account or any security entitlement credited thereto, the Securities Intermediary hereby agrees that such security interest shall be subordinate to the security interest of the Collateral Agent. The financial assets and other items deposited to the Securities Account will not be subject to deduction, set-off, banker's lien, or any other right in favor of any person other than the Collateral Agent (except that the Securities Intermediary may set off (i) all amounts due to the Securities Intermediary in respect of customary fees and expenses for the routine maintenance and operation of the Securities Account and (ii) the face amount of any checks which have been credited to such Securities Account but are subsequently returned unpaid because of uncollected or insufficient funds).

Section 5. **Choice of Law**. This Agreement and the Securities Account shall each be governed by the laws of the State of [New York]. Regardless of any provision in any other agreement, for purposes of the UCC, [New York] shall be deemed to be the Securities Intermediary's jurisdiction (within the meaning of *Section 8-110* of the UCC) and the Securities Account (as well as the securities entitlements related thereto) shall be governed by the laws of the State of [New York].

Section 6. **Conflict with Other Agreements**.

(a) In the event of any conflict between this Agreement (or any portion thereof) and any other agreement now existing or hereafter entered into, the terms of this Agreement shall prevail;

(b) No amendment or modification of this Agreement or waiver of any right hereunder shall be binding on any party hereto unless it is in writing and is signed by all of the parties hereto;

(c) The Securities Intermediary hereby confirms and agrees that:

(i) There are no other control agreements entered into between the Securities Intermediary and the Debtor with respect to the Securities Account;

(ii) It has not entered into, and until the termination of this Agreement, will not enter into, any agreement with any other person relating to the Securities Account and/or any financial assets credited thereto pursuant to which it has agreed to comply with entitlement orders (as defined in *Section 8-102(a)(8)* of the UCC) of such other person; and

(iii) It has not entered into, and until the termination of this Agreement, will not enter into, any agreement with the Debtor or the Collateral Agent purporting to limit or condition the obligation of the Securities Intermediary to comply with entitlement orders as set forth in **Section 3** hereof.

Section 7. **Adverse Claims**. Except for the claims and interest of the Collateral Agent and of the Debtor in the Securities Account, the Securities Intermediary does not know of any claim to, or interest in, the Securities Account or in any "*financial asset*" (as defined in *Section 8-102(a)(9)* of the UCC) credited thereto. If any person asserts any lien, encumbrance or adverse claim (including any writ, garnishment, judgment, warrant of attachment, execution or similar process) against the Securities Account or in any financial asset carried therein, the Securities Intermediary will promptly notify the Collateral Agent and the Debtor thereof.

Exhibit C – Page 2
UMB-000245

Section 8.     **Maintenance of Securities Account**.  In addition to, and not in lieu of, the obligation of the Securities Intermediary to honor entitlement orders as agreed in ***Section 3*** hereof, the Securities Intermediary agrees to maintain the Securities Account as follows:

(a)     **Notice of Sole Control**.  If at any time the Collateral Agent delivers to the Securities Intermediary a Notice of Sole Control in substantially the form set forth in ***Exhibit A*** hereto, the Securities Intermediary agrees that after receipt of such notice, it will take all instruction with respect to the Securities Account solely from the Collateral Agent.

(b)     **Voting Rights**.  Until such time as the Securities Intermediary receives a Notice of Sole Control pursuant to ***subsection (a)*** of this ***Section 8***, the Debtor shall direct the Securities Intermediary with respect to the voting of any financial assets credited to the Securities Account.

(c)     **Permitted Investments**.  Until such time as the Securities Intermediary receives a Notice of Sole Control signed by the Collateral Agent, the Debtor shall direct the Securities Intermediary with respect to the selection of investments to be made for the Securities Account; provided, however, that the Securities Intermediary shall not honor any instruction to purchase any investments other than investments of a type described on ***Exhibit B*** hereto.

(d)     **Statements and Confirmations**.  The Securities Intermediary will promptly send copies of all statements, confirmations and other correspondence concerning the Securities Account and/or any financial assets credited thereto simultaneously to each of the Debtor and the Collateral Agent at the address for each set forth in ***Section 12*** of this Agreement.

(e)     **Tax Reporting**.  All items of income, gain, expense and loss recognized in the Securities Account shall be reported to the Internal Revenue Service by the Securities Intermediary and all state and local taxing authorities under the name and taxpayer identification number of the Debtor.

Section 9.     **Representations, Warranties and Covenants of the Securities Intermediary**. The Securities Intermediary hereby makes the following representations, warranties and covenants:

(a)     The Securities Account has been established as set forth in ***Section 1*** above and such Securities Account will be maintained in the manner set forth herein until termination of this Agreement; and

(b)     This Agreement is the valid and legally binding obligation of the Securities Intermediary.

Section 10.     **Indemnification of Securities Intermediary**.  The Debtor and the Collateral Agent hereby agree that (a) the Securities Intermediary is released from any and all liabilities to the Debtor and the Collateral Agent arising from the terms of this Agreement and the compliance of the Securities Intermediary with the terms hereof, except to the extent that such liabilities arise from the Securities Intermediary's negligence and (b) the Debtor, its successors and assigns shall at all times indemnify and save harmless the Securities Intermediary from and against any and all claims, actions and suits of others arising out of the terms of this Agreement or the compliance of the Securities Intermediary with the terms hereof, except to the extent that such arises from the Securities Intermediary's negligence, and from and against any and all liabilities, losses, damages, costs, charges, counsel fees and other expenses of every nature and character arising by reason of the same, until the termination of this Agreement.

Exhibit C – Page 3
UMB-000246

Section 11.    **Successors; Assignment**.  The terms of this Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective corporate successors or heirs and personal representatives who obtain such rights solely by operation of law.  The Collateral Agent may assign its rights hereunder only with the express written consent of the Securities Intermediary and by sending written notice of such assignment to the Debtor.

Section 12.    **Notices**.  Any notice, request or other communication required or permitted to be given under this Agreement shall be in writing and deemed to have been properly given when delivered in person, or when sent by telecopy or other electronic means and electronic confirmation of error free receipt is received or two (2) days after being sent by certified or registered United States mail, return receipt requested, postage prepaid, addressed to the party at the address set forth below.

Debtor:              Goodman Networks Incorporated
                     2801 Network Blvd., Suite 300
                     Frisco, TX 75034
                     Facsimile No.:  (972) 421-5753
                     Attention: John Debus

                     With a copy to:

                     Haynes and Boone, LLP
                     2323 Victory Avenue, Suite 700
                     Dallas, TX 75219
                     Attention:  Monika Sanford, Esq.

Collateral Agent:    U.S. Bank National Association
                     8 Greenway Plaza, Suite 1100
                     Houston, Texas 77046
                     Attention: Steven A. Finklea
                     Facsimile No.: (713) 212-3718

                     With a copy to:

                     McGuire, Craddock & Strother, P.C.
                     2501 N. Harwood St., Suite 1800
                     Dallas, Texas 75201
                     Facsimile No.: 214-954-6868
                     Attention: Charles J. McGuire, Esq.

Securities Intermediary: [Name and Address of Securities Intermediary]
                     Attention: [_____]
                     Telecopier: [_____]

Any party may change its address for notices in the manner set forth above.

Section 13.    **Termination**.  The obligations of the Securities Intermediary to the Collateral Agent pursuant to this Agreement shall continue in effect until the security interest of the Collateral Agent in the Securities Account has been terminated pursuant to the terms of the Security Agreement and the Collateral Agent has notified the Securities Intermediary of such termination in writing.  The Collateral Agent agrees to provide Notice of Termination in substantially the form of ***Exhibit C*** hereto to the Securities Intermediary upon the request of the Debtor on or after the termination of the Collateral

Exhibit C – Page 4
UMB-000247

Agent's security interest in the Securities Account pursuant to the terms of the Security Agreement.  The termination of this Agreement shall not terminate the Securities Account or alter the obligations of the Securities Intermediary to the Debtor pursuant to any other agreement with respect to the Securities Account.

       Section 14.    **Counterparts**.  This Agreement may be executed in any number of counterparts, all of which shall constitute one and the same instrument, and any party hereto may execute this Agreement by signing and delivering one or more counterparts.

Exhibit C – Page 5
UMB-000248

   **IN WITNESS WHEREOF**, the parties hereto have caused this Securities Account Control Agreement to be executed as of the date first above written by their respective officers thereunto duly authorized.

             **GOODMAN NETWORKS INCORPORATED**, as
             Debtor

             By: _____
               Name:
               Title:

             **U.S. BANK NATIONAL ASSOCIATION**, as
             Collateral Agent

             By: _____
               Name:
               Title:

             [**NAME OF SECURITIES INTERMEDIARY**], as
             Securities Intermediary

             By: _____
               Name:
               Title:

EXHIBIT A
TO SECURITIES ACCOUNT CONTROL AGREEMENT

[Letterhead of Collateral Agent]

[Date]

[Name and Address of Securities Intermediary]
Attention:  [_____]

Re:      Notice of Sole Control

Ladies and Gentlemen:

As referenced in the Securities Account Control Agreement dated as of [_____], 20[__] among Goodman Networks Incorporated (the "***Debtor***"), you and the undersigned (a copy of which is attached), we hereby give you notice of our sole control over securities account number [_____] (the "***Securities Account***") and all financial assets credited thereto.  You are hereby instructed not to accept any direction, instructions or entitlement orders with respect to the Securities Account or the financial assets credited thereto from any person other than the undersigned, unless otherwise ordered by a court of competent jurisdiction.

You are instructed to deliver a copy of this notice by facsimile transmission to the Debtor.

Very truly yours,

**U.S. BANK NATIONAL ASSOCIATION**, as
Collateral Agent

By:  _____
      Name:
      Title:

cc:      Goodman Networks Incorporated

EXHIBIT B
TO SECURITIES ACCOUNT CONTROL AGREEMENT

**PERMITTED INVESTMENTS**

[TO COME]

EXHIBIT C
TO SECURITIES ACCOUNT CONTROL AGREEMENT

[Letterhead of the Collateral Agent]

[Date]

[Name and Address of Securities Intermediary]
Attention: [_____]

      Re:     Termination of Securities Account Control Agreement

You are hereby notified that the Securities Account Control Agreement dated as of [_____], 20[__] among you, Goodman Networks Incorporated (the "**_Debtor_**") and the undersigned (a copy of which is attached) is terminated and you have no further obligations to the undersigned pursuant to such Agreement.  Notwithstanding any previous instructions to you, you are hereby instructed to accept all future directions with respect to account number(s) [_____] from the Debtor.  This notice terminates any obligations you may have to the undersigned with respect to such account, however nothing contained in this notice shall alter any obligations which you may otherwise owe to the Debtor pursuant to any other agreement.

You are instructed to deliver a copy of this notice by facsimile transmission to the Debtor.

Very truly yours,

**U.S. BANK NATIONAL ASSOCIATION**, as
Collateral Agent

By: _____
       Name:
       Title:

Exhibit C to Securities Account Control Agreement
UMB-000252

*EXHIBIT D*

## DEPOSIT ACCOUNT CONTROL AGREEMENT

This Deposit Account Control Agreement dated as of [_____], 20[__] (this "***Agreement***") among Goodman Networks Incorporated (the "***Debtor***"), U.S. Bank National Association, as Collateral Agent for the Secured Parties (together with its successors and assigns, the "***Collateral Agent***") and [_____], in its capacity as a "*bank*" as defined in *Section 9-102(a)(8)* of the UCC (in such capacity, the "***Financial Institution***"). Capitalized terms used but not defined herein shall have the meaning assigned thereto in the Pledge and Security Agreement, dated [as of the date hereof], by and among the Debtor, the other Grantors party thereto and the Collateral Agent (as amended, restated, supplemented or otherwise modified from time to time, the "***Security Agreement***"). All references herein to the "***UCC***" shall mean the Uniform Commercial Code as in effect in the State of [New York].

Section 1.        **Establishment of Deposit Account**. The Financial Institution hereby confirms and agrees that:

(a)        The Financial Institution has established account number [Identify Account Number] in the name "***[Identify Exact Title of Account]***" (such account and any successor account, the "***Deposit Account***") and the Financial Institution shall not change the name or account number of the Deposit Account without the prior written consent of the Collateral Agent and, prior to delivery of a Notice of Sole Control in substantially the form set forth in ***Exhibit A*** hereto, the Debtor; and

(b)        The Deposit Account is a "*deposit account*" within the meaning of *Section 9-102(a)(29)* of the UCC.

Section 2.        **Control of the Deposit Account**. If at any time the Financial Institution shall receive any instructions originated by the Collateral Agent directing the disposition of funds in the Deposit Account, the Financial Institution shall comply with such instructions without further consent by the Debtor or any other person. The Financial Institution hereby acknowledges that it has received notice of the security interest of the Collateral Agent in the Deposit Account and hereby acknowledges and consents to such lien. If the Debtor is otherwise entitled to issue instructions and such instructions conflict with any instructions issued the Collateral Agent, the Financial Institution shall follow the instructions issued by the Collateral Agent.

Section 3.        **Subordination of Lien; Waiver of Set-Off**. In the event that the Financial Institution has or subsequently obtains by agreement, by operation of law or otherwise a security interest in the Deposit Account or any funds credited thereto, the Financial Institution hereby agrees that such security interest shall be subordinate to the security interest of the Collateral Agent. Money and other items credited to the Deposit Account will not be subject to deduction, set-off, banker's lien, or any other right in favor of any person other than the Collateral Agent (except that the Financial Institution may set off (i) all amounts due to the Financial Institution in respect of customary fees and expenses for the routine maintenance and operation of the Deposit Account and (ii) the face amount of any checks which have been credited to such Deposit Account but are subsequently returned unpaid because of uncollected or insufficient funds).

Section 4.        **Choice of Law**. This Agreement and the Deposit Account shall each be governed by the laws of the State of [New York]. Regardless of any provision in any other agreement, for purposes of the UCC, [New York] shall be deemed to be the Financial Institution's jurisdiction

(within the meaning of *Section 9-304* of the UCC) and the Deposit Account shall be governed by the laws of the State of [New York].

Section 5.    **Conflict with Other Agreements**.

(a)    In the event of any conflict between this Agreement (or any portion thereof) and any other agreement now existing or hereafter entered into, the terms of this Agreement shall prevail;

(b)    No amendment or modification of this Agreement or waiver of any right hereunder shall be binding on any party hereto unless it is in writing and is signed by all of the parties hereto; and

(c)    The Financial Institution hereby confirms and agrees that:

(i)    There are no other agreements entered into between the Financial Institution and the Debtor with respect to the Deposit Account [other than _____]; and

(ii)    It has not entered into, and until the termination of this Agreement, will not enter into, any agreement with any other person relating the Deposit Account and/or any funds credited thereto pursuant to which it has agreed to comply with instructions originated by such persons as contemplated by *Section 9-104* of the UCC.

Section 6.    **Adverse Claims**.  The Financial Institution does not know of any liens, claims or encumbrances relating to the Deposit Account.  If any person asserts any lien, encumbrance or adverse claim (including any writ, garnishment, judgment, warrant of attachment, execution or similar process) against the Deposit Account, the Financial Institution will promptly notify the Collateral Agent and the Debtor thereof.

Section 7.    **Maintenance of Deposit Account**.  In addition to, and not in lieu of, the obligation of the Financial Institution to honor instructions as set forth in *Section 2* hereof, the Financial Institution agrees to maintain the Deposit Account as follows:

(a)    **Notice of Sole Control**.  If at any time the Collateral Agent delivers to the Financial Institution a Notice of Sole Control in substantially the form set forth in *Exhibit A* hereto, the Financial Institution agrees that after receipt of such notice, it will take all instruction with respect to the Deposit Account solely from the Collateral Agent.

(b)    **Statements and Confirmations**.  The Financial Institution will promptly send copies of all statements, confirmations and other correspondence concerning the Deposit Account simultaneously to each of the Debtor and the Collateral Agent at the address for each set forth in *Section 11* of this Agreement; and

(c)    **Tax Reporting**.  All interest, if any, relating to the Deposit Account, shall be reported to the Internal Revenue Service and all state and local taxing authorities under the name and taxpayer identification number of the Debtor.

Section 8.    **Representations, Warranties and Covenants of the Financial Institution**. The Financial Institution hereby makes the following representations, warranties and covenants:

(a)     The Deposit Account has been established as set forth in **Section 1** and such Deposit Account will be maintained in the manner set forth herein until termination of this Agreement; and

(b)     This Agreement is the valid and legally binding obligation of the Financial Institution.

Section 9.     **Indemnification of Financial Institution**.  The Debtor and the Collateral Agent hereby agree that (a) the Financial Institution is released from any and all liabilities to the Debtor and the Collateral Agent arising from the terms of this Agreement and the compliance of the Financial Institution with the terms hereof, except to the extent that such liabilities arise from the Financial Institution's negligence and (b) the Debtor, its successors and assigns shall at all times indemnify and save harmless the Financial Institution from and against any and all claims, actions and suits of others arising out of the terms of this Agreement or the compliance of the Financial Institution with the terms hereof, except to the extent that such arises from the Financial Institution's negligence, and from and against any and all liabilities, losses, damages, costs, charges, counsel fees and other expenses of every nature and character arising by reason of the same, until the termination of this Agreement.

Section 10.     **Successors; Assignment**.  The terms of this Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective corporate successors or heirs and personal representatives who obtain such rights solely by operation of law.  The Collateral Agent may assign its rights hereunder only with the express written consent of the Financial Institution and by sending written notice of such assignment to the Debtor.

Section 11.     **Notices**.  Any notice, request or other communication required or permitted to be given under this Agreement shall be in writing and deemed to have been properly given when delivered in person, or when sent by telecopy or other electronic means and electronic confirmation of error free receipt is received or two (2) days after being sent by certified or registered United States mail, return receipt requested, postage prepaid, addressed to the party at the address set forth below.

Debtor:                    Goodman Networks Incorporated
                           2801 Network Blvd., Suite 300
                           Frisco, TX 75034
                           Facsimile No.:  (972) 421-5753
                           Attention: John Debus

                           With a copy to:

                           Haynes and Boone, LLP
                           2323 Victory Avenue, Suite 700
                           Dallas, TX 75219
                           Attention:  Monika Sanford, Esq.

Collateral Agent:          U.S. Bank National Association
                           8 Greenway Plaza, Suite 1100
                           Houston, Texas 77046
                           Attention: Steven A. Finklea
                           Facsimile No.: (713) 212-3718

                           With a copy to:

McGuire, Craddock & Strother, P.C.
2501 N. Harwood St., Suite 1800
Dallas, Texas 75201
Facsimile No.: 214-954-6868
Attention: Charles J. McGuire, Esq.

Financial Institution:    [Name and Address of Financial Institution]
Attention:  [_____]
Telecopier:  [_____]

Any party may change its address for notices in the manner set forth above.

Section 12.    **Termination**.  The obligations of the Financial Institution to the Collateral Agent pursuant to this Agreement shall continue in effect until the security interest of the Collateral Agent in the Deposit Account has been terminated pursuant to the terms of the Security Agreement and the Collateral Agent has notified the Financial Institution of such termination in writing.  The Collateral Agent agrees to provide Notice of Termination in substantially the form of ***Exhibit A*** hereto to the Financial Institution upon the request of the Debtor on or after the termination of the Collateral Agent's security interest in the Deposit Account pursuant to the terms of the Security Agreement.  The termination of this Agreement shall not terminate the Deposit Account or alter the obligations of the Financial Institution to the Debtor pursuant to any other agreement with respect to the Deposit Account.

Section 13.    **Counterparts**.  This Agreement may be executed in any number of counterparts, all of which shall constitute one and the same instrument, and any party hereto may execute this Agreement by signing and delivering one or more counterparts.

**IN WITNESS WHEREOF**, the parties hereto have caused this Deposit Account Control Agreement to be executed as of the date first above written by their respective officers thereunto duly authorized.

**GOODMAN NETWORKS INCORPORATED**, as Debtor

By:  _____
    Name:
    Title:

**U.S. BANK NATIONAL ASSOCIATION**, as Collateral Agent

By:  _____
    Name:
    Title:

**[NAME OF FINANCIAL INSTITUTION]**, as Financial Institution

By: _____

Name:

Title:

EXHIBIT A
TO DEPOSIT ACCOUNT CONTROL AGREEMENT

[Letterhead of Collateral Agent]

[Date]

[Name and Address of Financial Institution]
Attention:  [_____]

      Re:     Notice of Sole Control

Ladies and Gentlemen:

      As referenced in the Deposit Account Control Agreement dated as of [_____], 20[__] among Goodman Networks Incorporated (the "***Debtor***"), you and the undersigned (a copy of which is attached), we hereby give you notice of our sole control over deposit account number [_____] (the "***Deposit Account***") and all financial assets credited thereto.  You are hereby instructed not to accept any direction, instructions or entitlement orders with respect to the Deposit Account or the financial assets credited thereto from any person other than the undersigned, unless otherwise ordered by a court of competent jurisdiction.

      You are instructed to deliver a copy of this notice by facsimile transmission to the Debtor.

      Very truly yours,

      **U.S. BANK NATIONAL ASSOCIATION**, as Collateral Agent

      By: _____
           Name:
           Title:

cc:    Goodman Networks Incorporated

EXHIBIT B
TO DEPOSIT ACCOUNT CONTROL AGREEMENT

[Letterhead of the Collateral Agent]

[Date]

[Name and Address of Financial Institution]
Attention: [_____]

Re:      Termination of Deposit Account Control Agreement

You are hereby notified that the Deposit Account Control Agreement dated as of [_____], 20[__] among Goodman Networks Incorporated (the "***Debtor***"), you and the undersigned (a copy of which is attached) is terminated and you have no further obligations to the undersigned pursuant to such Agreement.  Notwithstanding any previous instructions to you, you are hereby instructed to accept all future directions with respect to account number(s) [_____] from the Debtor.  This notice terminates any obligations you may have to the undersigned with respect to such account, however nothing contained in this notice shall alter any obligations which you may otherwise owe to the Debtor pursuant to any other agreement.

You are instructed to deliver a copy of this notice by facsimile transmission to the Debtor.

Very truly yours,

**U.S. BANK NATIONAL ASSOCIATION**, as
Collateral Agent

By: _____
Name:
Title:

*EXHIBIT E*

## FORM OF TRADEMARK SECURITY AGREEMENT

This **TRADEMARK SECURITY AGREEMENT**, dated as of [_____], 20[__] (as it may be amended, restated, supplemented or otherwise modified from time to time, this "***Agreement***"), is made by the entities identified as grantors on the signature pages hereto (collectively, the "***Grantors***") in favor of **U.S. BANK NATIONAL ASSOCIATION**, as Collateral Agent for the Secured Parties (in such capacity, together with its successors and permitted assigns, the "***Collateral Agent***").

**WHEREAS**, the Grantors are party to a Pledge and Security Agreement dated as of May 31, 2017 (the "***Pledge and Security Agreement***") by and among each of the Grantors and the other grantors party thereto and the Collateral Agent pursuant to which the Grantors granted a security interest to the Collateral Agent in the Trademark Collateral (as defined below) and are required to execute and deliver this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and subject to the Pledge and Security Agreement, the Grantors hereby agree with the Collateral Agent as follows:

SECTION 1.   **Defined Terms**.

Unless otherwise defined herein, terms defined in the Pledge and Security Agreement and used herein have the meaning given to them in the Pledge and Security Agreement.

SECTION 2.   **Grant of Security Interest in Trademark Collateral**.

SECTION 2.1   **Grant of Security**.  Each Grantor hereby grants to the Collateral Agent, for the benefit of the Secured Parties, a security interest in and continuing lien on all of such Grantor's right, title and interest in, to and under the following, in each case whether now owned or existing or hereafter acquired, developed, created or arising and wherever located (collectively, the "***Trademark Collateral***"):

all United States, and foreign trademarks, trade names, trade dress, corporate names, company names, business names, fictitious business names, Internet domain names, service marks, certification marks, collective marks, logos, other source or business identifiers, designs and general intangibles of a like nature, whether or not registered, and with respect to any and all of the foregoing: (i) all registrations and applications therefor including, without limitation, the registrations and applications listed or required to be listed in ***Schedule A*** attached hereto, (ii) all extensions or renewals of any of the foregoing, (iii) all of the goodwill of the business connected with the use of and symbolized by any of the foregoing, (iv) the right to sue or otherwise recover for any past, present and future infringement, dilution or other violation of any of the foregoing or for any injury to the related goodwill, (v) all Proceeds of the foregoing, including, without limitation, license fees, royalties, income, payments, claims, damages, and proceeds of suit now or hereafter due and/or payable with respect thereto, and (vi) all other rights of any kind accruing thereunder or pertaining thereto throughout the world.

SECTION 2.2   **Certain Limited Exclusions**.  Notwithstanding anything herein to the contrary, in no event shall the Trademark Collateral include or the security interest granted under ***Section 2.1*** hereof attach to any "*intent-to-use*" application for registration of a Trademark filed pursuant to *Section 1(b)* of the Lanham Act, 15 U.S.C. § 1051, prior to the filing of a "*Statement of Use*" pursuant to

*Section 1(d)* of the Lanham Act or an "*Amendment to Allege Use*" pursuant to **Section 1(c)** of the Lanham Act with respect thereto, solely to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of any registration that issues from such intent-to-use application under applicable federal law.

SECTION 3.   **Security Agreement**.

The security interest granted pursuant to this Agreement is granted in conjunction with the security interest granted to the Collateral Agent for the Secured Parties pursuant to the Pledge and Security Agreement, and the Grantors hereby acknowledge and affirm that the rights and remedies of the Collateral Agent with respect to the security interest in the Trademark Collateral made and granted hereby are more fully set forth in the Pledge and Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.   In the event that any provision of this Agreement is deemed to conflict with the Pledge and Security Agreement, the provisions of the Pledge and Security Agreement shall control.

SECTION 4.   **Governing Law**.

THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND ALL CLAIMS AND CONTROVERSIES ARISING OUT OF THE SUBJECT MATTER HEREOF WHETHER SOUNDING IN CONTRACT LAW, TORT LAW OR OTHERWISE SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 5.   **Counterparts**.

This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

[Remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, each Grantor has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

**GOODMAN NETWORKS INCORPORATED**

By: _____

Name:

Title:

[**ADD SIGNATURE BLOCKS FOR ANY OTHER GRANTORS**]

UMB-000262

Accepted and Agreed:

**U.S. BANK NATIONAL ASSOCIATION**, as
Collateral Agent

By: _____

      Name:

      Title:

SCHEDULE A
TO TRADEMARK SECURITY AGREEMENT

**TRADEMARK REGISTRATIONS AND APPLICATIONS**

| Mark | Serial No. | Filing Date | Registration No. | Registration Date |
|------|-----------|-------------|------------------|-------------------|
|      |           |             |                  |                   |
|      |           |             |                  |                   |
|      |           |             |                  |                   |
|      |           |             |                  |                   |
|      |           |             |                  |                   |

*EXHIBIT F*

## FORM OF PATENT SECURITY AGREEMENT

This **PATENT SECURITY AGREEMENT**, dated as of [_____], 20[__] (as it may be amended, restated, supplemented or otherwise modified from time to time, this "***Agreement***"), is made by the entities identified as grantors on the signature pages hereto (collectively, the "***Grantors***") in favor of **U.S. BANK NATIONAL ASSOCIATION**, as Collateral Agent for the Secured Parties (in such capacity, together with its successors and permitted assigns, the "***Collateral Agent***").

**WHEREAS**, the Grantors are party to a Pledge and Security Agreement dated as of May 31, 2017 (the "***Pledge and Security Agreement***") by and among each of the Grantors and the other grantors party thereto and the Collateral Agent pursuant to which the Grantors granted a security interest to the Collateral Agent in the Patent Collateral (as defined below) and are required to execute and deliver this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and subject to the Pledge and Security Agreement, the Grantors hereby agree with the Collateral Agent as follows:

SECTION 1.    **Defined Terms**.

Unless otherwise defined herein, terms defined in the Pledge and Security Agreement and used herein have the meaning given to them in the Pledge and Security Agreement.

SECTION 2.    **Grant of Security Interest**.

Each Grantor hereby grants to the Collateral Agent, for the benefit of the Secured Parties, a security interest in and continuing lien on all of such Grantor's right, title and interest in, to and under the following, in each case whether now owned or existing or hereafter acquired, developed, created or arising and wherever located (collectively, the "***Patent Collateral***"):

all United States and foreign patents and certificates of invention, or similar industrial property rights, and applications for any of the foregoing, including, but not limited to: (i) each patent and patent application listed or required to be listed in ***Schedule A*** attached hereto, (ii) all reissues, divisions, continuations, continuations-in-part, extensions, renewals, and reexaminations thereof, (iii) all patentable inventions and improvements thereto, (iv) the right to sue or otherwise recover for any past, present and future infringement or other violation thereof, (v) all Proceeds of the foregoing, including, without limitation, license fees, royalties, income, payments, claims, damages, and proceeds of suit now or hereafter due and/or payable with respect thereto, and (vi) all other rights of any kind accruing thereunder or pertaining thereto throughout the world.

SECTION 3.    **Security Agreement**.

The security interest granted pursuant to this Agreement is granted in conjunction with the security interest granted to the Collateral Agent for the Secured Parties pursuant to the Pledge and Security Agreement, and the Grantors hereby acknowledge and affirm that the rights and remedies of the Collateral Agent with respect to the security interest in the Patent Collateral made and granted hereby are more fully set forth in the Pledge and Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.  In the event that any provision of this

Agreement is deemed to conflict with the Pledge and Security Agreement, the provisions of the Pledge and Security Agreement shall control.

SECTION 4.    **Governing Law**.

THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND ALL CLAIMS AND CONTROVERSIES ARISING OUT OF THE SUBJECT MATTER HEREOF WHETHER SOUNDING IN CONTRACT LAW, TORT LAW OR OTHERWISE SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 5.    **Counterparts**.

This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

[Remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, each Grantor has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

**GOODMAN NETWORKS INCORPORATED**

By: _____

     Name:

     Title:

[**ADD SIGNATURE BLOCKS FOR ANY OTHER GRANTORS**]

Accepted and Agreed:

**U.S. BANK NATIONAL ASSOCIATION**, as
Collateral Agent

By: _____
      Name:
      Title:

SCHEDULE A
TO PATENT SECURITY AGREEMENT

**PATENTS AND PATENT APPLICATIONS**

| Title | Application No. | Filing Date | Patent No. | Issue Date |
|-------|----------------|-------------|------------|------------|
|       |                |             |            |            |
|       |                |             |            |            |
|       |                |             |            |            |
|       |                |             |            |            |
|       |                |             |            |            |

*EXHIBIT G*

**FORM OF COPYRIGHT SECURITY AGREEMENT**

This **COPYRIGHT SECURITY AGREEMENT**, dated as of [_____], 20[__] (as it may be amended, restated, supplemented or otherwise modified from time to time, this "*Agreement*"), is made by the entities identified as grantors on the signature pages hereto (collectively, the "*Grantors*") in favor of **U.S. BANK NATIONAL ASSOCIATION**, as Collateral Agent for the Secured Parties (in such capacity, together with its successors and permitted assigns, the "*Collateral Agent*").

**WHEREAS**, the Grantors are party to a Pledge and Security Agreement dated as of May 31, 2017 (the "*Pledge and Security Agreement*") by and among each of the Grantors and the other grantors party thereto and the Collateral Agent pursuant to which the Grantors granted a security interest to the Collateral Agent in the Copyright Collateral (as defined below) and are required to execute and deliver this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and subject to the Pledge and Security Agreement, the Grantors hereby agree with the Collateral Agent as follows:

SECTION 1.     **Defined Terms**.

Unless otherwise defined herein, terms defined in the Pledge and Security Agreement and used herein have the meaning given to them in the Pledge and Security Agreement.

SECTION 2.     **Grant of Security Interest**.

Each Grantor hereby grants to the Collateral Agent, for the benefit of the Secured Parties, a security interest in and continuing lien on all of such Grantor's right, title and interest in, to and under the following, in each case whether now owned or existing or hereafter acquired, developed, created or arising and wherever located (collectively, the "*Copyright Collateral*"):

(a)     all United States, and foreign copyrights (whether or not the underlying works of authorship have been published), including but not limited to copyrights in software and all rights in and to databases, all designs (including but not limited to industrial designs, Protected Designs and Community designs), and all Mask Works (as defined under 17 U.S.C. 901 of the U.S. Copyright Act), whether registered or unregistered, as well as all moral rights, reversionary interests, and termination rights, and, with respect to any and all of the foregoing: (i) all registrations and applications therefor including, without limitation, the registrations and applications listed or required to be listed in *Schedule A* attached hereto, (ii) all extensions and renewals thereof, (iii) the right to sue or otherwise recover for any past, present and future infringement or other violation thereof, (iv) all Proceeds of the foregoing, including, without limitation, license fees, royalties, income, payments, claims, damages and proceeds of suit now or hereafter due and/or payable with respect thereto, and (v) all other rights of any kind accruing thereunder or pertaining thereto throughout the world; and

(b)     any and all agreements, licenses and covenants providing for the granting of any exclusive right to such Grantor in or to any registered Copyright including, without limitation, each agreement required to be listed in *Schedule A* attached hereto, and the right to sue or otherwise recover for past, present and future infringement or other violation or impairment thereof, including the right to receive all Proceeds therefrom, including without limitation license

fees, royalties, income, payments, claims, damages and proceeds of suit, now or hereafter due and/or payable with respect thereto.

SECTION 3.   **Security Agreement**.

The security interest granted pursuant to this Agreement is granted in conjunction with the security interest granted to the Collateral Agent for the Secured Parties pursuant to the Pledge and Security Agreement, and the Grantors hereby acknowledge and affirm that the rights and remedies of the Collateral Agent with respect to the security interest in the Copyright Collateral made and granted hereby are more fully set forth in the Pledge and Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.   In the event that any provision of this Agreement is deemed to conflict with the Pledge and Security Agreement, the provisions of the Pledge and Security Agreement shall control.

SECTION 4.   **Governing Law**.

THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND ALL CLAIMS AND CONTROVERSIES ARISING OUT OF THE SUBJECT MATTER HEREOF WHETHER SOUNDING IN CONTRACT LAW, TORT LAW OR OTHERWISE SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 5.   **Counterparts**.

This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

[Remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, each Grantor has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

**GOODMAN NETWORKS INCORPORATED**

By: _____

       Name:
       Title:

STATE OF                 )
                           )  ss.
COUNTY OF             )

       On this ___ day of _____, 20__ before me personally appeared _____, proved to me on the basis of satisfactory evidence to be the person who executed the foregoing instrument on behalf of _____, who being by me duly sworn did depose and say that he/she is an authorized officer of said corporation, that the said instrument was signed on behalf of said corporation as authorized by its Board of Directors and that he/she acknowledged said instrument to be the free act and deed of said corporation.

_____
Notary Public

**[NAME OF GRANTOR]**

By: _____

       Name:
       Title:

STATE OF                 )
                           )  ss.
COUNTY OF             )

       On this ___ day of _____, 20__ before me personally appeared _____, proved to me on the basis of satisfactory evidence to be the person who executed the foregoing instrument on behalf of _____, who being by me duly sworn did depose and say that he/she is an authorized officer of said corporation, that the said instrument was signed on behalf of said corporation as authorized by its Board of Directors and that he/she acknowledged said instrument to be the free act and deed of said corporation.

**[ADD SIGNATURE BLOCKS AND NOTARY BLOCKS FOR ANY OTHER GRANTORS]**

Accepted and Agreed:

**U.S. BANK NATIONAL ASSOCIATION**, as
Collateral Agent


By: _____
    Name:
    Title:

SCHEDULE A
TO COPYRIGHT SECURITY AGREEMENT

**COPYRIGHT REGISTRATIONS AND APPLICATIONS**

| Title | Application No. | Filing Date | Registration No. | Registration Date |
|-------|----------------|-------------|------------------|-------------------|
|       |                |             |                  |                   |
|       |                |             |                  |                   |
|       |                |             |                  |                   |
|       |                |             |                  |                   |
|       |                |             |                  |                   |

**EXCLUSIVE COPYRIGHT LICENSES**

| Description of Copyright License | Name of Licensor | Registration Number of underlying Copyright |
|----------------------------------|------------------|---------------------------------------------|
|                                  |                  |                                             |
|                                  |                  |                                             |
|                                  |                  |                                             |
|                                  |                  |                                             |
|                                  |                  |                                             |