

1          UNITED STATES BANKRUPTCY COURT

           NORTHERN DISTRICT OF TEXAS

2              DALLAS DIVISION

3    _____

4    In Re:

5    GOODMAN NETWORKS, INC.,

6              Debtor.    Chapter 7

7                         Case No. 22-31641 (MVL)

8    _____

9          THE DEPOSITION OF SCOTT SEIDEL

              September 13, 2023

10

11

12

13

14

15

16

17

18

19

20

21

22

23   Reported by:

24   PATRICIA A. NILSEN, RMR, CRR, CRC

     Texas CSR 11813

25

                                          Page 1

EXHIBIT
BH 73

1         The deposition of SCOTT SEIDEL, taken on behalf of

2    the FedEx Supply Chain Logistics & Electronics, Inc.,

3    pursuant to Notice on September 13, 2023, beginning at

4    approximately 10:19 a.m. taken remotely.

5         This deposition is taken in accordance with the

6    terms and provisions of the Federal Rules of Civil

7    Procedure.  All objections are reserved except as to

8    form, and all sides stipulate to the swearing of the

9    witness remotely.

10        The signature of the witness was not requested.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

```
 1                    APPEARANCES (via Zoom)
 2
          For the Trustee:
 3
          DAVOR RUKAVINA
 4        THOMAS D. BERGHMAN
          Attorneys at Law
 5        MUNSCH HARDT KOPF & HARR, P.C.
          3800 Ross Tower
 6        500 N. Akard Street
          Dallas, Texas 75201
 7        (214) 855-7500
          drukavina@munsch.com
 8        tberghman@munsch.com
 9        For FedEx Supply Chain Logistics & Electronics,
          Inc.:
10
          R. CAMPBELL HILLYER
11        ADAM M. LANGLEY
          Attorneys at Law
12        BUTLER SNOW LLP
          6075 Poplar Avenue, Suite 500
13        Memphis, TN 38119
          (901) 680-7316
14        cam.hillyer@butlersnow.com
          adam.langley@butlersnow.com
15
          For ARRIS Solutions, Inc.:
16
          NOAH M. SCHOTTENSTEIN
17        Attorney at Law
          DLA PIPER LLP
18        1900 N. Pearl Street, Suite 2200
          Dallas, Texas 75201
19        (214) 743-4500
          noah.schottenstein@dlapiper.com
20
          For Prosperity Bank:
21
          BRUCE J. RUZINSKY
22        Attorney at Law
          JACKSON WALKER LLP
23        1401 McKinney, Suite 1900
          Houston, TX 77010
24        713-752-4334
          bruzinsky@jw.com
25
```

Alpha Reporting                              800-556-8974
A Veritext Company                         www.veritext.com

```
 1                  APPEARANCES (continued)
 2        For UMB Bank, National Association:
 3        PHILIP M. GUFFY
          BRIAN CLARKE
 4        Attorneys at Law
          HUNTON ANDREWS KURTH
 5        600 Travis Street, Suite 4200
          Houston, TX 77002
 6        713-220-3802
          pguffy@huntonak.com
 7        brianclarke@huntonak.com
 8        Stenographically Reported By:
 9        PATRICIA A. NILSEN, RMR, CRR, CRC
          Texas CSR 11813
10
          Videotaped By: Tom Tracy
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

```
 1                        INDEX

 2
      WITNESS:                              PAGE
 3
            SCOTT SEIDEL
 4
 5    Examination
       By Mr. Hillyer                          9
 6
 7                     EXHIBITS
 8    NUMBER               DESCRIPTION        PAGE
 9    EXHIBIT NO. 1   Notice of deposition     10
10    EXHIBIT NO. 2   Letter from Prosperity Bank    14
11            dated August 31, 2022
12    EXHIBIT NO. 3   e-mail chain, beginning with   14
13            e-mail from Davor Rukavina dated
14            February 16, 2023
15    EXHIBIT NO. 4   e-mail chain, beginning with   19
16            e-mail from Davor Rukavina dated
17            February 21, 2023
18    EXHIBIT NO. 5   e-mail from Paul Silverstein   24
19            dated February 22, 2023
20    EXHIBIT NO. 6   e-mail chain, beginning with   29
21            e-mail from Davor Rukavina dated
22            February 23, 2023
23    EXHIBIT NO. 7   e-mail chain, beginning with   37
24            e-mail from Victoria Argeroplos
25            dated March 1, 2023
```

Page 5

```
 1    EXHIBIT NO. 8   e-mail from Davor Rukavina      52

 2              dated March 1, 2023

 3    EXHIBIT NO. 9   e-mail chain, beginning with    52

 4              e-mail from Eric Schaffer dated

 5              March 2, 2023

 6    EXHIBIT NO. 10  e-mail from Davor Rukavina      64

 7              dated March 6, 2023

 8    EXHIBIT NO. 11  e-mail from Eric Schaffer       65

 9              dated March 6, 2023

10    EXHIBIT NO. 12  e-mail from Davor Rukavina      68

11              dated March 7, 2023

12    EXHIBIT NO. 13  Trustee's Original Complaint    68

13    EXHIBIT NO. 14  e-mail chain, beginning with    79

14              e-mail from Eric Schaffer dated

15              March 7, 2023

16    EXHIBIT NO. 15  e-mail from Victoria            87

17              Argeroplos dated March 8, 2023

18    EXHIBIT NO. 16  e-mail chain, beginning with    97

19              e-mail from Davor Rukavina dated

20              March 15, 2023

21    EXHIBIT NO. 17  e-mail chain, beginning with   107

22              e-mail from Brenda Funk dated

23              March 22, 2023

24    EXHIBIT NO. 18  e-mail chain, beginning with   108

25              e-mail from Brenda Funk dated
```

Page 6

1            March 22, 2023

2   EXHIBIT NO. 20   e-mail chain, beginning with    162

3            e-mail from Davor Rukavina dated

4            May 9, 2023

5   EXHIBIT NO. 21   Prosperity Bank's Reply        168

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Alpha Reporting                800-556-8974
A Veritext Company            www.veritext.com

1              VIDEOGRAPHER:   Good morning.   We are now

2    on the record.   The time is approximately -- time

3    10:19 a.m. on September 13, 2023.

4              Please note that this deposition is being

5    conducted virtually.   The quality of the recording

6    depends on the quality of the camera and Internet

7    connection of participants.   What is seen from the

8    witness and heard on the screen is what will be

9    recorded.   Audio and video recording will continue to

10   take place unless all parties agree to go off the

11   record.

12             This is the videotaped deposition of Scott

13   Seidel, in the matter of In Re: Goodman Networks, Inc.,

14   Goodman Solutions, filed in the U.S. Bankruptcy Court in

15   the District of Texas, Case Number 22-311641.

16             This deposition is being conducted

17   remotely.   My name is Tom Tracy.   I represent Veritext;

18   I'm your videographer.   The court reporter is Patricia

19   Nilsen, also with Veritext.   I am not related to any

20   party in this action, nor am I financially interested in

21   the outcome.

22             If there are any objections to the

23   proceedings, please state them at the time of your

24   appearance.

25             Counsel and all present will now state

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    their appearance and affiliations for the record,

2    beginning with the noticing attorney.

3                    MR. HILLYER:  Good morning.  Cam Hillyer

4    and Adam Langley on behalf of FedEx.

5                    MR. RUKAVINA:  Davor Rukavina and Thomas

6    Berghman for Mr. Scott Seidel, the deponent.

7                    MR. RUZINSKY:  Bruce Ruzinsky, with

8    Jackson Walker, for Prosperity Bank.

9                    MR. SCHOTTENSTEIN:  Noah Schottenstein for

10   ARRIS.

11                   MR. GUFFY:  Philip Guffy, Hunton Andrews

12   Kurth, on behalf of UMB Bank, National Association, as

13   venture trustee and the majority bondholder group.

14                   VIDEOGRAPHER:  Thank you, Counsel.

15                   The court reporter may swear in the

16   witness, and we can proceed.

17                            *   *   *

18                   SCOTT SEIDEL,

19   was called as a witness, and after having been duly

20   sworn, testified as follows:

21                       EXAMINATION

22       Q.   (BY MR. HILLYER) Good morning, Mr. Seidel.

23       A.   Good morning, sir.

24       Q.   Thank you for making time for this deposition

25   today.

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1               Let's do a test run.  Can you see the very

2    first published exhibit?

3        A.    I only see myself.

4               MR. RUKAVINA:  Go off the record.

5               VIDEOGRAPHER:  We're going off the record.

6    The time is approximately 10:22 a.m.

7               (Recess)

8               (EXHIBIT NO. 1, notice of deposition, was

9               marked for identification and attached

10              hereto.)

11              VIDEOGRAPHER:  We're going back on the

12   record.  The time is approximately 10:24 a.m.

13       Q.    (BY MR. HILLYER) Mr. Seidel, do you see

14   Exhibit 1, notice of deposition?

15       A.    I do.

16       Q.    Okay.  That's a good start.

17              So, Mr. Seidel, you are the duly appointed

18   Chapter 7 trustee in the case of In Re Goodman Networks;

19   is that correct?

20       A.    Yes, sir.

21       Q.    Okay.  And this is a notice of deposition that

22   was sent to your counsel on behalf of FedEx and ARRIS,

23   who are the objecting creditors to a 9019 settlement

24   motion which you filed.  Correct?

25       A.    Yes.  Yes, sir.

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1      Q.    Okay.  Okay.  Let's initially start, is -- so

2   what's your full name?

3      A.    My full name is Scott Mahlon, M-A-H-L-O-N,

4   Seidel, S-E-I-D-E-L.

5      Q.    Okay.  And how long have you been a licensed

6   attorney, Mr. Seidel?

7      A.    '84.  Since 1984, sir.

8      Q.    Okay.  And -- and how long have you been

9   serving in the role as a Chapter 7 trustee?

10      A.    I believe approximately 30 years or so.

11      Q.    Okay.  Have you been a Chapter 7 trustee in

12   commercial and consumer cases?

13      A.    Yes, sir.

14      Q.    Okay.  Have you ever been a Chapter 11 trustee?

15      A.    Yes, I have.

16      Q.    Okay.  Have you ever been a Chapter 11 debtor's

17   counsel?

18      A.    Yes.

19      Q.    Okay.

20      A.    It was a long time, though.

21      Q.    I understand.

22            And I'm assuming -- have you ever been a

23   Chapter 7 debtor's counsel?

24      A.    Yes, sir.

25      Q.    Okay.  And when you said 30 years, you're on a

Alpha Reporting                    800-556-8974
A Veritext Company            www.veritext.com

1   panel of Chapter 7 trustees?

2       A.   I am.  I'm on the panel of the Northern

3   District of Texas, Dallas Division, panel of trustees.

4       Q.   Okay.  And how long have you been on that

5   panel?

6       A.   More than 30 years.

7       Q.   Okay.  Well, I'm going to skip through all the

8   formalities for the sake of this, about -- I know you've

9   been in depositions before; I know you've taken them.  I

10  will try to let you fully answer all your questions --

11  all your answers.  I won't speak over you; don't speak

12  over me.  If I say anything that you can't understand,

13  or you need clarified, please ask.  And other than that,

14  I'm sure this will go smoothly.

15            Do you know the approximate date of your

16  appointment as Chapter 7 trustee in this case?

17      A.   I'm sorry, I could -- I can be refreshed by

18  looking at it, but no, I don't offhand know the exact

19  date of my appointment.

20      Q.   Okay.  So once you were appointed, when did you

21  contact counsel to represent you in this matter?

22      A.   I would assume, thinking back, it would be in

23  the first days, if not the first day of being -- being

24  appointed.

25      Q.   Okay.  And not being specific about the date of

Page 12

1    appointment, just tell me briefly, once you were

2    appointed, what did you do or undertake as the Chapter 7

3    trustee to become advised of the current status of the

4    case and everything that had -- had occurred up to that

5    point?

6        A.   I think I reached out to Mr. Parham; I believe

7    he was debtor's counsel.  I was available to be

8    contacted by any creditors, creditor counsel.  I may

9    have reached out to creditor's counsel; I don't recall

10   exactly when or who, etc.  Kind of pulling this together

11   at this point in time, all this time later.

12       Q.   Okay.

13            CERTIFIED STENOGRAPHER:  Can you keep your

14   voice up, Mr. Seidel, please.

15            THE WITNESS:  Yes, ma'am.

16       Q.   (BY MR. HILLYER) And so, Mr. Seidel, do you

17   happen to know an approximate time of when you initially

18   looked at or started assessing what I'm going to call

19   the subject matter of our -- the subject of the

20   contested matter, being the Prosperity Bank --

21   Prosperity payments and subject funds, as they're

22   defined in your motions?

23       A.   I think the counsel for the bondholders reached

24   out to my counsel.  And I don't have a tremendous memory

25   of that, but it might have been February.  I'm not

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

```
 1    positive.
 2        Q.   Okay.
 3              MR. HILLYER:  Adam, go ahead and publish
 4    Trustee Prosperity 16.
 5                (EXHIBIT NO. 2, letter from Prosperity
 6                Bank dated August 31, 2022, was marked for
 7                identification and attached hereto.)
 8              MR. HILLYER:  I think Adam might have -- I
 9    think that one may be a mistake.  Exhibit 16 instead of
10    Document 16.  Sorry.  I think we published Exhibit 16,
11    not Bates stamp 16.  That was my error.  I apologize.
12              MR. LANGLEY:  It's there now as Exhibit 3.
13    Exhibit 3.
14                (EXHIBIT NO. 3, e-mail chain, beginning
15                with e-mail from Davor Rukavina dated
16                February 16, 2023, was marked for
17                identification and attached hereto.)
18              MR. HILLYER:  I guess the new one will be
19    Exhibit 3.
20              THE WITNESS:  Okay.  Let me try to get
21    that where I can see it.
22              Okay.  I see -- I see -- I have it up.
23    I'm trying to look at it.
24              What can I do for you?
25        Q.   (BY MR. HILLYER) Okay.  So this is an e-mail
```

Page 14

1    from your counsel, dated Thursday, February 16th, with

2    Mr. Silverstein, Mr. Clarke, Mr. Guffy, Mr. Berghman,

3    and your -- and yourself.

4              Does that look correct?

5        A.   That looks correct.

6        Q.   Okay.  And so look at the -- just the top part

7    of the page, is what I'm going to be asking you about.

8              Is -- so basically this is a lead -- this

9    says "The trustee is going to go after the Prosperity

10   Bank money right away."

11             So does this refresh -- refresh your

12   recollection about the time period about when this --

13   settlement negotiations began?

14       A.   Well, this is when we're starting to talk --

15   this Prosperity is starting to be on the radar, and I

16   was correct, it was in February.  And, yes, it refreshes

17   my recollection with regard to this e-mail.

18       Q.   Okay.  Would you have done anything before

19   February 16th regarding the decision that the trustee is

20   going to go after the Prosperity Bank money right away?

21       A.   I -- I don't recall.  I'm sorry.

22       Q.   And staying in that same paragraph, it states

23   that as part of your negotiation -- as part of the

24   trustee -- trustee's negotiating with you, meaning --

25   I'm going to call that -- "you" being all the counsel

Alpha Reporting                           800-556-8974
A Veritext Company                     www.veritext.com

1    that represents the bondholders, and "the bank" being

2    Prosperity Bank, regarding the funds -- you ask

3    bondholder counsel for an understanding that their claim

4    for the funds that you're proposing to recover would be

5    their perfected collateral.  And "perfected" is

6    italicized.  Is that correct?

7        A.    I'm trying to find it.

8              Yes.  Yes, I see it.

9        Q.    Okay.  And your counsel states, the last -- we

10   can read the whole sentence:  "In particular, I

11   understand the funds, which began in a money market

12   account, were not subject to an account control

13   agreement, and I don't think anyone can have a perfected

14   lien in a Chapter 5 (although maybe TUFTA is a business

15   tort)."

16             And what I'm going to ask you is -- so in

17   February -- on February 16th, have you already begun

18   looking into not only the funds that you are -- the

19   Prosperity Bank money that you're proposing to go after;

20   have you already begun doing a lien assessment as to

21   those funds?

22       A.    I believe our team is doing that.

23       Q.    Okay.  Do you know what documents you would

24   have had on February 16 of 2023 to look into that?

25       A.    I'm not positive anything and everything the

Alpha Reporting                          800-556-8974
A Veritext Company                    www.veritext.com

1    team had at that point -- at that exact date.  Sorry.

2         Q.   Okay.  But sitting here today, you can't -- are

3    you able to say what -- any documents that -- that you

4    had, that you were using at this point in time regarding

5    this, or was this just -- strike that.  I'll rephrase

6    it.

7              Is this just the intro e-mail to -- to the

8    bondholders to start negotiations?

9         A.   I'm not positive.  It very well could be.  But

10   I'm just not positive.  I don't have the -- the litany

11   of what may have been before or after.

12        Q.   Okay.  Well, it -- then I'll ask you this

13   question:  You produced all documents in your possession

14   or your counsel's possession to us in response to our

15   request for production of documents.  Correct?

16        A.   Yes.

17        Q.   So if there are no e-mails in that production

18   that predate February 16th regarding the Prosperity Bank

19   money and the bondholders' asserted perfected

20   collateral, then this would be the first discussion that

21   you had?

22        A.   It would appear so, from what -- yeah.  I mean,

23   in other words, this is the e-mail -- you asked for the

24   e-mails; this is the e-mail.  It looks like the initial

25   e-mail was from Mr. Silverstein.  You had the time to

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    discuss, you know, this matter, etc.  So I -- I don't

2    have any reason to think there's other e-mail contact.

3         Q.   Sure.  Thank you.

4              And the bank's -- the bank or the bank's

5    counsel is not on this particular e-mail chain, correct?

6         A.   Correct.

7         Q.   Okay.  So at this time are you negotiating

8    independently with the bondholders -- obviously by this

9    e-mail -- are you also communicating with Prosperity

10   Bank regarding going after the money?

11        A.   Sorry.  I just don't recall --

12        Q.   Okay.

13        A.   -- whether on February 16th we were already

14   talking to Prosperity as well at that point.

15        Q.   Okay.  Well, I -- and I'm -- I'm certainly not

16   trying to trip you up on it.  I'm just basically asking,

17   did -- did you -- did the negotiations start with the

18   bondholders first and then the bank second, or did you

19   reach out to the bank first and then now you're reaching

20   out to the bondholders?

21        A.   My general recollection for the team -- and we

22   had several of us working on this, but -- was that we

23   were contacted by Mr. Silverstein about money at

24   Prosperity.  And so we initiated that contact and

25   started talking with them.  And then probably as a

Alpha Reporting                          800-556-8974
A Veritext Company                    www.veritext.com

1    consequence Prosperity got looped in to the conversation

2    vis-à-vis the bondholders.

3                    And that's how it probably progressed.

4    But I stand to be corrected, if you show me e-mails that

5    say something different.

6        Q.    I appreciate that clarification.

7                    MR. HILLYER:  Adam, go ahead and

8    publish -- this is going to be Bates stamp 341.

9                    (EXHIBIT NO. 4, e-mail chain, beginning

10                   with e-mail from Davor Rukavina dated

11                   February 21, 2023, was marked for

12                   identification and attached hereto.)

13       Q.    (BY MR. HILLYER) This should be published as

14   Exhibit 4.

15       A.    Okay.

16       Q.    Do you have that?

17       A.    I have it.  I'm --

18       Q.    Okay.

19       A.    -- almost getting it where I can read it.

20                   Okay.  "We're having a meeting late

21   today."

22       Q.    Yes.  Correct.  Okay.  So this is approximately

23   five days after the e-mail that you just looked at, of

24   February 16th, that was Exhibit 3.  And this e-mail

25   is -- again, this is your counsel to Mr. Schaffer -- who

Alpha Reporting                              800-556-8974
A Veritext Company                      www.veritext.com

1    was not on the first e-mail -- Mr. Silverstein, and

2    Mr. Guffy.  Correct?

3        A.   Yes, sir.

4        Q.   Okay.  And you were not on this e-mail?

5        A.   No, sir.  Not that I see.

6        Q.   Okay.  And this e-mail, as you already read,

7    says "We're having a meeting late today."

8             I'm going to ask you a question:  Do you

9    know who was meeting?  With the understanding that

10   you're not on this e-mail.

11       A.   Let me read the e-mail, then, okay?

12       Q.   Sure.

13            Mr. Seidel, I certainly wasn't making --

14   trying to make you read the whole thing.  The bottom of

15   the page may be insightful.

16       A.   Okay.  That's helpful, yeah.  Okay.  So the

17   bottom of the page.

18            Eric Schaffer.  Okay.  So I'm just not

19   positive, but -- that's your question?  Who's meeting?

20       Q.   Yes.  I'm sorry, I'll repeat it.

21            Based on reading the bottom of the page,

22   is that a fair assumption that Mr. Rukavina is saying

23   that -- that he is meeting with counsel for Prosperity

24   Bank later in the day?

25       A.   Could be.  Yes, sir.

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    Q.   Okay.  And going down the e-mail, Mr. Rukavina

2    proposes an agreed surcharge amount to bondholder

3    counsel.  And he proposes a first alternative of

4    $1 million out of the Prosperity funds, although -- and

5    knowing full well that is not a defined term in this

6    e-mail, so I don't want to make that an issue.

7              But it is a first alternative of -- of

8    $1 million, and a full release of any surcharges in the

9    future; or a second alternative of $500,000 with no

10   waiver of future potential surcharge claims.

11             Does that look accurate?

12   A.   That's what it appears to say, yes.

13   Q.   Okay.  And is that a decision that you made at

14   this point?

15   A.   Mr. Rukavina and I were talking daily about the

16   matter.  So we were -- we were in lockstep on that.

17   Q.   Okay.  And I'm going to ask you:  You're

18   proposing a surcharge from the bondholders.  Are you

19   implying in this e-mail that you want a surcharge of

20   collateral?

21   A.   Surcharge of collateral.

22   Q.   Okay.  So what I'm asking you is on

23   February 21, have you made a determination about your

24   inquiry from Exhibit 3, which is, "We would like an

25   understanding that the funds would be your perfected

Page 21

1   collateral"?

2        A.   It was ongoing.  I don't know that we had

3   reached a conclusion.

4        Q.   Okay.  So you're asking them for a surcharge,

5   but you have not made any determination if the

6   Prosperity funds are their collateral at this time?

7        A.   I don't recall.

8        Q.   Okay.  Hang on one second.

9             All right.  Before we go off this, I

10  just -- I know you can't recall, but I'm just asking:

11  You have extensive bankruptcy experience, correct?

12       A.   Yes.

13       Q.   Okay.  You know what a surcharge is?

14       A.   Yes.

15       Q.   Okay.  I'm asking you, how can -- how can you

16  help me read this that if you're asking for a surcharge,

17  that you're not making the statement that it is the

18  bondholder's collateral?

19       A.   You can -- you can take that assumption in

20  there with that, but I don't -- I don't know that we

21  make a definitive statement to that effect.

22       Q.   Okay.  One sec.  Okay.

23             I guess what I'm asking is, why did you

24  call it a surcharge?  Or why did your counsel call it a

25  surcharge?

                                            Page 22

1      A.   If the bondholders were taking a position

2    they -- it was their collateral, there's a lot of

3    negotiations going on back and forth at the beginning,

4    since everybody's trying to feel each other out, figure

5    out where everybody is.

6      Q.   Okay.  And -- and that's where I wanted to go,

7    Mr. Seidel.  So on February -- I've got a first e-mail

8    where you're reaching out to them -- strike that.

9           You're reaching out to bondholder counsel

10   on February 16th.  And then five days later, you are

11   asking for a surcharge.  So I'm going to ask you:  What

12   changed between February 16th, where you want their

13   understanding of the, quote, "perfected collateral," and

14   your counsel's statement, "I don't think anyone can have

15   a perfected lien in a Chapter 5," to then asking for a

16   surcharge five days later?

17     A.   My assumption -- like I said, I'm not sure in

18   that five-day period, the dates that you're mentioning.

19   But at some point in time my team was looking at various

20   documentation with regard to the bondholders' claims and

21   visiting with the bondholders with regard to their

22   claims.

23     Q.   Okay.  What documents were you reviewing during

24   that five days?

25     A.   I -- I don't recall.  I can't -- I can't tell

1   you under oath that on February 16th of '20, I looked at

2   such-and-such a document from such-and-such a bank.

3   I -- I just can't.  My team may have, but I -- I just

4   don't know.

5       Q.   Okay.  So -- but if your team is looking in at

6   documents and then making proposals to the bondholders,

7   you're being kept abreast of what they are doing and

8   what they are reviewing, and you are authorizing the

9   proposals, correct?

10      A.   Correct.

11      Q.   Okay.  And so I guess what I'm asking you is if

12  you don't recall, but this is your counsel, so are you,

13  you know, essentially adopting this e-mail as sent on

14  your behalf?

15      A.   That e-mail is sent on my behalf.

16      Q.   Okay.  But to be clear, sitting here today, you

17  don't know what documents you had in your possession on

18  February 21st of 2023?

19      A.   I can't testify to what documents I had in my

20  possession on February 21st, 2023.

21      Q.   All right.  Let's move on.

22           MR. HILLYER:  Adam, can you put Exhibit --

23  this will be Exhibit 5.  It's Bates stamp 368.

24           (EXHIBIT NO. 5, e-mail from Paul

25           Silverstein dated February 22, 2023, was

Page 24

1                          marked for identification and attached

2                          hereto.)

3                          MR. HILLYER:   It should be populated.

4                          MR. RUKAVINA:   We're not hitting the

5      button that says "Refresh."   There it is.

6          A.   Okay, Counsel.

7          Q.   (BY MR. HILLYER) And --

8                          MR. RUKAVINA:   This is --

9                          THE WITNESS:   Notice of -- notice of the

10     deposition?   Is that what we're ...

11                         MR. RUKAVINA:   Cam, which one were you

12     publishing?   Exhibit 5?

13                         MR. HILLYER:   Exhibit 5.   It will be

14     trustee's --

15                         MR. RUKAVINA:   We got it.

16                         THE WITNESS:   We're catching up to you.

17     We'll figure this out by the end of the day.

18         Q.   (BY MR. HILLYER) I was about -- you stole --

19     you stole my statement, not question, that I promise

20     you, you pick up speed going through this.   So by the

21     time at the end, we are going to be fluent in

22     exhibit share.

23                         So this -- this appears to be an e-mail

24     from Mr. Silverstein to Mr. Rukavina, copying

25     Mr. Schaffer and Mr. Guffy, one day later, advising you

                                                    Page 25

1    that "Unless there's a quick and easy resolution," that

2    you, being the trustee, "are making a mistake not having

3    John Goodman demand that Prosperity release the funds,

4    as I requested."

5              So what I'm asking is --

6        A.   I'm going to stand up so I can read the -- the

7    document, real quick.

8        Q.   Sure.

9        A.   Okay.  I've read it now.  Thank you.  I'm

10   sorry, this is -- anyway, I'm with you.

11             MR. RUKAVINA:  Hold on a second.  Could we

12   maximize this screen?  Just give us a second.  "View

13   full screen."

14             THE WITNESS:  Yeah, that's better.

15       A.   Okay.  I'm with you, sir.

16       Q.   (BY MR. HILLYER) All right.  Thank you.

17             So this is a one-day turnaround from

18   Mr. Silverstein to Mr. Rukavina's e-mail requesting the

19   alternatives for surcharge.  And again, Mr. Silverstein

20   says that "you're making a mistake not having John

21   Goodman demand Prosperity release the funds."

22             And so I'm just going to ask generically,

23   what is being -- to the best of your knowledge, what is

24   being discussed right now, in February of '22, in

25   conjunction with -- the previous e-mail is a surcharge

Alpha Reporting                    800-556-8974
A Veritext Company                 www.veritext.com

1    demand, and then this is about demanding a release of

2    the funds.  Help me understand what negotiations are

3    going on.

4       A.   There's negotiations by and between us and the

5    bondholders with regard to bringing up them -- what they

6    assert is their money at Prosperity, and whether or not

7    we can't -- that money can flow in that direction.

8       Q.   Okay.  And I will ask you the same question as

9    before:  So are these -- and I'm using the word

10   "bifurcated," because I haven't seen e-mails yet with

11   all accounts, with both settling parties involved.

12           So are -- is your team dealing exclusively

13   with the bondholders, and then your team dealing

14   independently with Prosperity, working both parties but

15   not simultaneously a three-way discussion?

16      A.   Could you repeat that question?  I apologize.

17      Q.   No, I'm sure -- I'll clarify.

18           I'm just asking, the bondholders are

19   asking for a report on a call with Prosperity.  Let's

20   just stop there.  Were you on that call?

21      A.   I don't believe I was on that particular call.

22      Q.   Okay.  Would it be a safe assumption that the

23   bondholder counsel was not on that call, since they're

24   asking for an update?

25      A.   It would be a safe assumption on my -- I would

Page  27

 1   think on our part.

 2       Q.   Okay.  So then my question is, is are you -- at

 3   this point, in February of '22, your team is negotiating

 4   separately with the bondholders and separately with

 5   calls with Prosperity Bank, but the three parties have

 6   not been brought together at this point?

 7       A.   It would appear so, from the --

 8       Q.   Okay.

 9            MR. HILLYER:  Let's introduce Exhibit 6,

10   which is going to be Trustee Bates starting at 390.

11            MR. RUKAVINA:  Let's see if it pops up by

12   itself.

13            MR. HILLYER:  You have to be a little bit

14   patient on -- on the -- on the population.  By the

15   time -- it takes a second.  It should be in there now.

16            THE WITNESS:  Thank you.

17            MR. RUKAVINA:  Give us a second.  We'll

18   see if it pops up.

19            THE WITNESS:  I don't think it ever pops

20   up.

21            MR. RUKAVINA:  It did last time.  Didn't

22   it last time?

23            THE WITNESS:  It populated, but you still

24   have to open it, from my understanding.

25            I don't think it ever pops up, does it,

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    Cam?

2                MR. HILLYER:  I don't believe it will

3    automatically pop up, but I am -- I am not the person

4    that you should be asking that question to.

5                Adam is shaking his head "no," it will not

6    pop up, so I'm going to -- I'm going to take that.

7                     (EXHIBIT NO. 6, e-mail chain, beginning

8                     with e-mail from Davor Rukavina dated

9                     February 23, 2023, was marked for

10                    identification and attached hereto.)

11               MR. RUKAVINA:  And you're -- and you're

12   going to populate, or whatever, publish Exhibit 6,

13   right?

14               MR. HILLYER:  Yes, but Exhibit 6 should be

15   in there.

16               MR. RUKAVINA:  My problem, Cam, is it's no

17   longer giving me the option to refresh.  I don't -- I

18   don't understand it, so we'll just give it another

19   minute.

20               MR. HILLYER:  I'll tell you what:  Let's

21   just jump off the record real quick and make sure that

22   Veritext can help you.  There shouldn't be that big of a

23   lag.  There -- there's normally a -- you know.

24               VIDEOGRAPHER:  We're going off the record.

25               Hold on.  Hold on.

Alpha Reporting                    800-556-8974
A Veritext Company            www.veritext.com

```
 1                    THE WITNESS:  Now we got it.

 2                    MR. RUKAVINA:  Yeah.  We got it now, Cam.

 3                    THE WITNESS:  It -- it just takes a while.

 4                    MR. RUKAVINA:  Yeah.  It just takes a

 5      while.  Okay.  We'll just be patient.

 6                    Are we off the record?

 7                    MR. HILLYER:  No.  We don't need to go off

 8      the record at this point, if you -- if you got it.

 9                    MR. RUKAVINA:  Okay.  There we go.

10                    THE WITNESS:  It takes a minute.  I'll try

11      to be patient.

12          A.   Okay.  I have this particular document.

13          Q.   (BY MR. HILLYER) This should be -- I believe

14      it's a three -- three-page exhibit, with the third page

15      essentially being meaningless, signatories.

16                    But if you'll flip to the second

17      page, 391.

18          A.   391.  Okay, that's helpful.  Okay.  From

19      Silverstein to Davor, with Schaffer copied, etc.?

20          Q.   Yes, on the bottom.

21                    So that -- "Davor:  We'd like a reporter

22      on your call with Prosperity that you're indicating you

23      were having."  Okay.

24                    That is -- if you'd like to flip back, or

25      you can take my representation -- that is the singular
```

Alpha Reporting                    800-556-8974
A Veritext Company               www.veritext.com

1    e-mail that was Exhibit 5.  So this, starting at 390, is

2    the next e-mails in the chain, from Bates number 368,

3    where they are -- where the bondholders' counsel is

4    asking for a report.

5                    And your counsel -- and your counsel says

6    "I will inquire again."  And then Mr. Silver --

7    Mr. Silverstein, going to -- this is on the first page

8    of it -- says he does not understand Mr. Rukavina's

9    response -- or doesn't understand the message, and again

10   asks for a call -- a report on the call discussion with

11   Prosperity.

12                   And we go up to the top part of the

13   e-mail, where Mr. Rukavina apparently -- it looks as if

14   he gave an update to bondholders' counsel.  And I'll let

15   you take a second and read that top paragraph.  I don't

16   believe you're copied on this e-mail.

17       A.    I've read it.

18       Q.    Okay.  So on the first part, Mr. Rukavina

19   recaps the meeting with Prosperity's lawyer at Jackson

20   Walker.  Says "I delivered our ultimatum and informed

21   them that, if we don't have a deal next week, we will be

22   filing suit (as coplaintiffs) by next Friday."

23                   What ultimatum did you give Prosperity's

24   counsel on February 22nd?

25       A.    Something to the effect of turning over the

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

```
 1    funds at -- at Prosperity.

 2        Q.    Okay.  Do you -- do you -- is that the extent

 3    of the ultimatum?

 4        A.    I don't recall.

 5        Q.    Okay.  So did you approve the ultimatum?

 6        A.    Yes.  We were -- I was in contact with

 7    Mr. Rukavina about the negotiation process.  I wasn't in

 8    every single -- I mean, as you know, there was hundreds

 9    of back and forth with regard to all this.  But there

10    was a range at that time; we were talking about where we

11    were going to file complaints, etc.

12        Q.    Okay.  So if I represent to you that there

13    is -- as of February 23rd, in your production, there is

14    no e-mail chain with Prosperity regarding an ultimatum,

15    what would you say to that?

16        A.    Well, let me look at this again.

17              And I'm sorry, I -- I don't understand

18    the -- the question itself.  I mean, the fact that there

19    wasn't an e-mail with an ultimatum doesn't mean that

20    there wasn't an e-mail -- I mean, an ultimatum that was

21    conveyed.

22        Q.    Okay.  Well, let me ask you, following that

23    line is was the ultimatum -- is it your understanding

24    that the ultimatum was made at the meeting with

25    Prosperity?
```

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1     A.    That's what it seems like, according to this

2  e-mail.

3     Q.    Okay.  But there -- but if it's not in your

4  production, there is no e-mail or documentation of an

5  ultimatum.

6     A.    Okay.

7     Q.    The second line says "We will be filing suit

8  (as coplaintiffs)."

9           Can you explain that to me?

10     A.    Yeah.  We were contemplating filing suit as

11  coplaintiffs with regard to getting money out of

12  Prosperity.

13     Q.    Okay.  Can you explain to me -- strike that.

14           What would the legal basis be for the

15  trust -- Chapter 7 trustee and the bondholders being

16  coplaintiffs?  What would you be trying to recover as

17  Chapter 7 trustee?

18     A.    The moneys in the Prosperity account.

19     Q.    What would the bondholders be trying to recover

20  as coplaintiff?

21     A.    The moneys in the Prosperity account.

22     Q.    So both plaintiffs would be trying to recover

23  the same funds?

24     A.    Correct.

25     Q.    Okay.  And did you -- okay.  Were you involved

Alpha Reporting                    800-556-8974
A Veritext Company            www.veritext.com

1    in any discussions with bondholders' counsel regarding

2    this coplaintiff lawsuit?

3        A.    I really don't recall, sitting here today, back

4    at that point in time, whether I was involved.  I had

5    contact with Mr. Silverstein, had e-mails, had talked to

6    him, but I can't swear under oath that -- I don't know.

7        Q.    Your counsel states, in the middle of the

8    paragraph, "I pointed out that I do not see a principled

9    defense, and they had no answer."

10               Do you see that?

11       A.    Yes, sir.

12       Q.    Okay.  So at -- on February 23rd, is it your

13   position that Prosperity Bank had no principled defense

14   to your demand for the money?

15       A.    "They mumbled some defense to the bond

16   trustee's claim to the effect that they did no wrong

17   after the UCC" -- "pointed out that I do not see a

18   principled defense, and they had no answer."

19               CERTIFIED STENOGRAPHER:  I'm sorry, I'm

20   sorry.  If you're reading, your hand is in front of your

21   face.

22               THE WITNESS:  I'm sorry.  You're

23   absolutely right.

24       A.    No defense -- no principled defense to turning

25   over the money, is what I see.

                                        Page 34

1          Q.    (BY MR. HILLYER) Thank you.

2                The last line of the e-mail says, "Please

3    respond to the trustee's agreed 506(c) offer."

4                Do you see that?

5          A.    I see that.

6          Q.    Okay.  And to be clear, that's relating to the

7    e-mail in which you proposed two options for a

8    surcharge.

9          A.    I think that's fair.

10         Q.    Okay.  And at this point, you -- you haven't

11   had a response from the bondholders.  That would be

12   fair?

13         A.    I think that's fair.

14         Q.    Okay.  Just to help me out, why are you

15   negotiating with Prosperity in answering to

16   Mr. Silverstein with updates at this point?

17         A.    I think we were contemplating a united front on

18   this with regard to Prosperity.

19         Q.    And to be clear, you're talking about a united

20   front between the Chapter 7 trustee of Goodman Networks

21   and the bondholders who are asserting a perfected

22   secured claim in the collateral?

23         A.    I believe we were contemplating that at that

24   time.

25         Q.    At this point --

Alpha Reporting                         800-556-8974
A Veritext Company                      www.veritext.com

1      A.    In other words -- I'm sorry.  In other words, I

2   believe that Prosperity thought that the money either

3   belonged to the bondholders or the trustee, and so we

4   were trying to show Prosperity that -- let's have some

5   type of agreement, obviate a bunch of attorneys' fees,

6   etc., and work through this.

7               I think that's what -- the general

8   consensus of what's going on right now, Counsel.  Just

9   trying to help you.

10     Q.    And I'll ask you again:  You're asking about a

11  surcharge.  So at this point you said a united front.

12  And I want to understand, is -- is that united front

13  based on the premise that the bondholders have a

14  perfected lien on these funds and that you are going to

15  get a surcharge?  Is that the -- what the basis of the

16  united front is?

17     A.    No.  There was -- I don't know all of the

18  elements that went into it, Counsel.  But -- but what

19  we're trying to do is get the money out of Prosperity in

20  kind of a three -- three-legged agreement.  And so

21  there's -- there was negotiations that went into all

22  that, how that was all going to roll out.

23     Q.    Okay.

24     A.    In other words, we had Prosperity -- if we --

25  if we had the trustee saying "give me all the money,"

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    and we had Prosperity saying "give me all the money,"

2    Prosperity was going to do nothing, right?  So we were

3    trying to formulate a plan to knock down debt, to roll

4    out money and obviate fees.

5        Q.    Okay.

6        A.    Boil it -- boil it down, see what we can do

7    to -- got 100 things going on.  Focus on the bad guys.

8                So -- I'm sorry if I just kind of waxed

9    eloquent.

10       Q.    That's fine.

11       A.    But you're -- you seem to be asking for kind of

12    that overlay of the situation.

13       Q.    I appreciate your answer.  Thank you.

14                MR. HILLYER:  Let's go to Exhibit 7.  No,

15    no, I'm sorry; this will be Exhibit 7.  It is

16    Bates-stamped 406.

17                I apologize.  I've got to stop saying

18    that.

19                (EXHIBIT NO. 7, e-mail chain, beginning

20                with e-mail from Victoria Argeroplos dated

21                March 1, 2023, was marked for

22                identification and attached hereto.)

23                MR. HILLYER:  Exhibit 7 is published.

24       Q.    (BY MR. HILLYER) Do you have it now?

25       A.    No.

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

```
 1              CERTIFIED STENOGRAPHER:  If you're using
 2   an Internet browser, you can just refresh the browser.
 3              THE WITNESS:  Yeah, you're talking to a
 4   bunch of idiots --
 5              MR. RUKAVINA:  You're -- you're assuming I
 6   know how to refresh a browser.
 7              THE WITNESS:  You've got two computer
 8   idiots here.
 9              I can do it on mine, and at the break,
10   I'll pull mine up.  It might be faster.
11              MR. RUKAVINA:  What button refreshes the
12   browser?  Got to download that exhibit, too?  There it
13   is.
14              THE WITNESS:  There you go.  Let's hear
15   it.
16              Trying to make it where I can read it.
17        A.   Okay.  I'm with you, Counsel.
18        Q.   (BY MR. HILLYER) This should be a three-page
19   exhibit.
20        A.   This is -- this is from Victoria, Wednesday,
21   March 1, 2023, to Davor, Brenda, carbon copy Scott,
22   "Goodman Prosperity escrow."  Correct?
23        Q.   Yes.  That is the first e-mail chain.  So what
24   I -- what I would like you to do is actually -- it's an
25   e-mail chain, obviously, in reverse chronological order.
```

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1   So if you'll go to the end, which is 408.

2       A.   Okay, I will.

3            That's 407.  Here's 408.  Okay.  You want

4   me on Brenda Funk's signature.

5       Q.   Okay.  So this is a -- I apologize for the page

6   breaks, but this is a rollover from the previous page.

7   This is an e-mail from Brenda Funk to Victoria

8   Argeroplos, who is an attorney at Jackson Walker and

9   represents Prosperity Bank, thanking her again for the

10  call on Thursday and asking, "Do you have an ETA on the

11  documents you are going to send us?"

12           Do you see that?

13      A.   I do.

14      Q.   Okay.  What documents are outstanding on

15  February 18th that you have requested?

16      A.   I don't recall.

17      Q.   I'm not looking for specifics here, Mr. Seidel,

18  like a -- an agreement number.  What are -- you

19  don't have -- sitting here today, you don't have any

20  idea what documents you were requesting from the bank?

21      A.    I don't have any idea what documents my

22  counsel, Ms. Funk, is requesting of Victoria in her

23  e-mail of February 18, 2023, at 4:17.

24      Q.   All right.  Moving up the e-mail chain, it

25  looks like Ms. Funk provides Ms. Argeroplos a DACA.  Do

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    you see that?

2        A.    Okay.  "Hi Victoria - moving this to the top of

3    your inbox."

4               Yeah, I see the word "DACA."

5               "Also, in case you do not have a copy,

6    attached is the DACA for the account."  Is that what

7    you're talking about?

8        Q.    Yes.

9        A.    Yes, sir.

10       Q.    So your -- so your counsel is providing

11   documents to Prosperity Bank at the same time?

12       A.    On February 20th, to Victoria.  Correct.

13       Q.    Okay.  And then go to the first page of it,

14   which is 406.

15       A.    406.  Okay.

16       Q.    And start at the bottom, please.

17              It's Ms. Argeroplos checking in with

18   Ms. Funk, and again stating, please let her know if

19   there are issues providing the discovery materials

20   because "I know that will be important for the bank to

21   understand both this situation and the situation that

22   they are in now -- now in with the affiliates."

23              Do you see that?

24       A.    I see that.

25       Q.    Okay.  And I will ask you again, to the best of

Page 40

1    your knowledge right now, what discovery materials are

2    you -- is the -- is trustee and trustee's counsel

3    providing to Prosperity Bank at this point?

4        A.   I don't recall.

5        Q.   Okay.  Go up to the middle of the page, and

6    said -- your counsel advises Prosperity's counsel that

7    "we" -- being you -- "are preparing the complaint."

8                   Do you see that?

9        A.   I see it.

10       Q.   Okay.  And at the very top of the page, bank

11   counsel responds to Mr. Rukavina and says that the bank

12   needs more time -- no, I'm sorry, that she needs more

13   time in order to recommend to the bank that they accept

14   your settlement proposal.

15                  Do you see that?

16                  THE WITNESS:  Is that it?

17                  MR. RUKAVINA:  Yeah, but it's easier if

18   you look up here.

19                  You're dealing with two people, Cam, that

20   can't see up close and that can't see up far.

21       A.   Okay.  Are you talking about the one -- "Thanks

22   Davor, As I said, I need some time"?  Is that what you

23   want me to read, sir?

24       Q.   (BY MR. HILLYER) No, I -- I don't need you to

25   read it, Mr. Seidel.  I tried to just read it to me.  It

Alpha Reporting                          800-556-8974
A Veritext Company                   www.veritext.com

1  says that -- it says "recommend to the bank that they

2  accept your settlement proposal."

3                Do you see that?

4     A.   That's what I'm looking for.  No, that --

5     Q.   It's the very first line of the e-mail.

6     A.   I -- I overlooked it; I was going too fast.

7  You're right.  That's what it says.

8                Yes, sir.  I see it.

9     Q.   Okay.  What are the terms of that settlement,

10  and when was it proposed?

11    A.   I don't recall, on March 1, 2023, what the

12  exact terms of that proposed settlement were, sitting

13  here today.  There's a lot of back-and-forth.  I don't

14  recall.

15    Q.   Mr. Seidel, I -- I guess -- this is

16  Bates-stamped 406, and is March 1st.  What I'll

17  represent to you is there is not a settlement proposal

18  e-mail chain in this.  And I believe we discussed this

19  earlier, is -- who is making settlement proposals, and

20  what were the terms of that proposal, if they're not

21  documented at all?

22    A.   That -- that's what I'm saying.  They were

23  being conveyed by me through my counsel, and I don't

24  recall the exact nature of this particular proposal at

25  this point in time, sitting here today.

Alpha Reporting
A Veritext Company

800-556-8974
www.veritext.com

1      Q.    Okay.  Bank's counsel advises that she talked

2  to Eric Schaffer yesterday and discussed the preparation

3  of a global 9019.

4      A.    Okay.

5      Q.    So now all -- all three parties are talking

6  together at this point, on March 1st.  Is that a fair

7  assumption?

8      A.    I don't know if they're talking together, but

9  they're all kind of moving in the same direction, it

10 seems.

11     Q.    Well, trustee's counsel is talking to the bank

12 and to the bondholders.

13     A.    Right.

14     Q.    The bank -- the bank is talking to you and the

15 bondholders, and the bondholders are talking to the bank

16 and to the trustee's office.  So everyone is

17 communicating simultaneously now.  No parties are being

18 excluded from communicating with another party, is what

19 I'm asking.

20     A.    I don't think we ever excluded any parties.

21 But yeah, at this point in time, it looks like

22 everyone's running together.

23     Q.    And so again, sitting here today -- let me ask

24 you this, Mr. Seidel.  So if you've conveyed a

25 settlement -- settlement proposal to the bank, okay, you

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    don't know, right, sitting here today, what the

2    settlement proposal that you made, or your counsel made,

3    on or before March 1 is.  Is that correct?

4        A.   I can't recall the exact terms of this

5    particular settlement proposal, sitting here today.

6        Q.   Okay.  Would they -- would they be the same

7    terms that -- strike that.

8             Would they be the same terms that were

9    incorporated into the first settlement motion that you

10   filed?

11       A.   That would be a fair assumption.  I don't

12   recall that there was a lot of modifications, but I'm

13   under oath, so I want to make sure I'm accurate.

14       Q.   Okay.

15       A.   But I don't have a problem making that

16   assumption.  I think that was the deal.  But I want you

17   to know that's my general recollection.

18       Q.   Okay.  So -- so just general terms of the first

19   offer you would have made.  Or better yet --

20       A.   Yeah.

21       Q.   -- what's your understanding of the general

22   terms of the first offer that you made as Chapter 7

23   trustee?

24       A.   Well, I think it -- I'm sure -- the first offer

25   I made to anyone with regard to anything with regard to

Alpha Reporting                          800-556-8974
A Veritext Company                      www.veritext.com

1   any of this?  Is that what you're saying?

2      Q.   I'm sorry, say that again?

3      A.   I'm sorry.  Will you just re-ask your question?

4   That way --

5      Q.   Sure.

6           What -- on March 1st, what is your

7   understanding of the general terms of the first offer

8   that you made to Prosperity Bank?

9      A.   See, I'm not sure if March 1st was the first

10  offer.  But the offer that I think is being contemplated

11  in the March 1st e-mail is along the lines of what was

12  envisioned in the 9019 that was originally filed.

13     Q.   Okay.  And if you are making that offer on or

14  before March 1st, then you -- is it fair to say that you

15  concluded all your investigation and analysis regarding

16  this settlement that was proposed by March 1st?

17     A.   I don't know -- I don't know about that.

18  That's an ongoing process, a settlement negotiation.

19     Q.   Okay.  But do you typically, as a Chapter 7

20  trustee, propose settlements before you've done an

21  investigation?

22     A.   There's -- it's an ongoing process with regard

23  to settlements, and that's going on, you're talking

24  about settlement as you're looking at documents, as

25  you're hearing positions.  It's all an ongoing process

                                              Page 45

1    until the judge gavels it down.

2         Q.   Okay.  I guess, if you proposed a settlement,

3    and they respond "accepted," then you have a settlement.

4    Is that your understanding of how it works?

5         A.   No.  Not with me.  I always put in my 9019 the

6    trustee may withdraw from this settlement at any time

7    for any reason, if he decides, at his discretion, that

8    it's in his best interest to do so.

9              So it's -- with me, it's always an ongoing

10   process.  Hearing from creditors, taking input from

11   others, on and on and on.  And somebody may walk in at

12   the last minute with a better deal.  I -- I can always

13   get out.  I always put that in my motions, and I'm fine.

14        Q.   I understand.  Thank you.

15             So let me ask it in a different way:

16   Is -- if you -- well, let me start with this:  Do you

17   have any reason to dispute that you have made a

18   settlement proposal, on or before March 1st, to the

19   Prosperity Bank?

20        A.   I don't recall on the set dates of when the

21   settlement proposal -- can we take a break?  We've been

22   going --

23             MR. RUKAVINA:  Yeah, Cam, when you -- when

24   you come to a convenient stop, we'll take a break.

25   We've been going an hour and a half.

Alpha Reporting                          800-556-8974
A Veritext Company                   www.veritext.com

 1                    MR. HILLYER:  Sure.  How long a break do

 2     you need?

 3                    MR. RUKAVINA:  Ten minutes is fine.

 4                    MR. HILLYER:  Ten minutes is good.  All

 5     right.  Thank you.

 6                    VIDEOGRAPHER:  We're going off the record.

 7     The time is approximately 11:28 a.m.

 8                    (Recess)

 9                    VIDEOGRAPHER:  We're going back on the

10     record.  The time is approximately 11:43 a.m.

11                    THE WITNESS:  I don't hear anyone, but I'm

12     ready.

13                    MR. HILLYER:  Talking to myself on mute.

14     My bad.

15                    THE WITNESS:  Davor picked up on that.  He

16     said, "I think Cam's talking."

17                    MR. HILLYER:  All right.  Apologies.

18         Q    (By Mr. Hillyer) Mr. Seidel, we're still on

19     Exhibit 7, which is the Bates stamp 406 through 408.

20     I'm trying to get a general understanding -- we've

21     talked about the settlement proposal and the terms.  And

22     I'll ask a question a different way, with a preface that

23     this e-mail chain -- and you're welcome to look at it --

24     is Ms. Funk is asking the bank for documents that they

25     have not sent to trustee's counsel.  Your counsel is

1    sending the bank documents that they should have.  And

2    then the bank is then replying that -- "Please provide

3    the discovery materials that's important for the bank to

4    understand this situation."

5                    And so I'm going to ask you, in light of

6    all that, what is your understanding of what information

7    you had at this time?

8        A.    We had the DACA.  We had the bondholders' input

9    with regard to the situation.  We had Prosperity's input

10    with regard to the situation.  I -- I don't know what

11    else.

12        Q.    Okay.

13        A.    Bank statement.

14        Q.    Okay.  So again, I'm going to ask you, just to

15    clarify, a DACA is a -- is a written document executed,

16    correct?

17        A.    Correct.

18        Q.    Okay.  Bank statements are actual documents

19    that you would have in your possession that are bank

20    statements as the Chapter 7 trustee, correct?

21        A.    Yes.

22        Q.    Okay.  The other items that you -- my

23    understanding of what you just said is "input"; is that

24    written input and documents that had been produced?  Or

25    are you talking about all of these phone calls that

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1   are -- that are mentioned in these e-mails we've looked

2   at?

3        A.   I think primarily in addition to what you just

4   mentioned, majority is phone calls.

5        Q.   Okay.  So your understanding is you had a DACA,

6   bank statements, and input from phone calls, as of

7   March 1?

8        A.   I don't know what else.  I mean, that's

9   honestly a pretty tough question.  For a time --

10  specific time, date, some months ago, what documents I

11  had at that time, you should have them.  We should have

12  shared them with you.  But that's my recollection,

13  generally speaking.

14       Q.   All right.  What I'm -- it is -- it's certainly

15  not a trick question, Mr. Seidel.  I'm -- I'm trying to

16  assess --

17       A.   I understand.

18       Q.   I'm trying to assess what your understanding is

19  of what you had when this first settlement proposal

20  was -- was made.  And just to the extent is -- other

21  than what you've just said, you're not aware of -- of

22  anything else that you would have had, as of March 1st,

23  when the settlement proposal was made?

24       A.   I think that's generally -- and I don't recall

25  any.

Alpha Reporting                        800-556-8974
A Veritext Company                  www.veritext.com

1    Q.   Okay.  Well, I'm not asking if you -- I'm

2   saying, as your understanding, you don't know if you had

3   anything else?

4    A.   I'm not positive, under oath, that I had

5   anything else, no.

6    Q.   All right.  Well, if you had anything else as

7   of March 1, you would have produced it in the request

8   for production, correct?

9    A.   I would have thought so, yes.

10    Q.   Okay.  And so still looking at the -- the first

11   line, but we can move off of this e-mail.

12         So you've made a settlement, your

13   office -- or your counsel has made a settlement offer to

14   Prosperity Bank, at least as of March 1.  The previous

15   e-mail, without having you to go back, is as of

16   February 23rd, your offer delivered an ultimatum, which

17   is -- I think we read the e-mail -- delivered an

18   ultimatum to the bank.

19         Do you know right now, with this line, the

20   preparation of a global 9019, where are -- where are you

21   in your discussions with the bondholders right now?

22    A.   That was ongoing.

23    Q.   Okay.  So as of March 1st, you had not resolved

24   the issue of your proposed surcharge?

25    A.   I think that's fair.

Page 50

1      Q.   Okay.  How -- without resolving that surcharge

2   issue, how do you make a settlement proposal to the

3   bank?

4      A.   We're trying to get money in, to have something

5   to wrestle about.  And so it's all -- you know, it --

6   you're spinning plates.  So we're trying to -- trying to

7   get this one in the boat, get that money in the boat,

8   then we got -- then we talk to the -- if we're sitting

9   on $4.4 million in bondholders' money, and I hold it,

10  got to be able to make change, trying to get the money

11  in.

12     Q.   What was your --

13          CERTIFIED STENOGRAPHER:  I'm sorry, could

14  you repeat that?  It was very low.

15          THE WITNESS:  Yes, ma'am.  I'm so sorry.

16          We're trying -- we're trying to get the

17  money in, the 4.4 million into the estate.  Dynamics may

18  change in that scenario, and we might be able to

19  bootstrap our argument with the bondholders, and/or

20  increase our argument, if we have the money in.

21     Q.   (BY MR. HILLYER) Okay.  So this is going to be

22  certainly a very inarticulate way of looking at it.  So

23  as of March 1, you're still working both sides.

24  You're -- you're trying to work a settlement with the

25  bondholders and trying to work a settlement with

Page 51

1    Prosperity.  Is that a fair statement?

2       A.   I think that's probably a fair statement.

3       Q.   Give me one second.

4       A.   Am I being videoed?  Can I -- am I being

5    videoed right now?  Can I take off my coat, or am I

6    being videoed, or what's going on?

7       Q.   You are being videoed, and you are welcome to

8    take off your coat.  I believe last -- in the last -- in

9    the last deposition, everyone lost their coats at the

10   break.  But you're -- you're welcome to make -- you're

11   welcome to make yourself comfortable, Mr. Seidel.

12      A.   I appreciate it.

13      Q.   All right.  Let's -- can you publish -- it will

14   be 409 and 410.

15               MR. LANGLEY:  Do you want one or the

16   other?

17               MR. HILLYER:  Are they separate in there?

18               Okay.  Publish them both.  One is

19   Exhibit 8, and one is Exhibit 9.  They should open

20   together.

21               (EXHIBIT NO. 8, e-mail from Davor Rukavina

22               dated March 1, 2023, was marked for

23               identification and attached hereto.)

24               (EXHIBIT NO. 9, e-mail chain, beginning

25               with e-mail from Eric Schaffer dated

                                        Page 52

1                    March 2, 2023, was marked for

2                    identification and attached hereto.)

3              THE WITNESS:  Are we on 8?

4      Q.  (BY MR. HILLYER) We are on 8, and -- and we

5  also put in a 9.  It's back-to-back pages, and I don't

6  know why they -- they were separated out in PDF.  And

7  apologies for that.

8      A.   No worries.  I've got 8.  There's 9.  Okay.  Do

9  you want me to hit 8 first?

10     Q.   8 -- 8 first, please.

11             So, Mr. Seidel, this is an e-mail from

12  Mr. Rukavina to Mr. Schaffer, which is --

13             MR. RUKAVINA:  Wait.  I think we've got to

14  click -- don't click that check button; just click the

15  exhibit.

16             THE WITNESS:  Okay.

17             MR. RUKAVINA:  And then it goes up into

18  that screen.

19             THE WITNESS:  Okay.  Great.

20             You got two monkeys here trying to teach

21  each other how to do this.

22     Q.  (BY MR. HILLYER) Feel your pain.

23     A.   Okay.  I've got this, from Davor Rukavina to

24  Eric Schaffer, re Prosperity, Wednesday, March 1st.

25     Q.   Right.  And I'll represent to you, without

                                              Page 53

1    having you to go back and look at Exhibit 7, that this

2    e-mail is the same date, approximately 12 minutes after

3    the bank updates Mr. Rukavina that they don't have an

4    answer to your settlement proposal.

5              And this e-mail states that the trustee --

6    and I'm going to paraphrase it, and when he says "we," I

7    know he's speaking on your behalf -- "we are preparing

8    to sue the bank without a meaningful offer this week."

9    And -- and I guess I'll stop right there.

10             Was your understanding that you were going

11   to get a -- a counteroffer, or -- do you have any -- do

12   you have any knowledge of -- of where the settlement --

13   strike that.  That's a horrible question.

14             At this point, had you made a decision

15   to -- to potentially sue the bank?  And was that -- is

16   that decision the coplaintiff decision, or is that a

17   different decision, where it is just the trustee suing

18   the bank?

19       A.   We were prepared to sue the bank.  The trustee

20   was.

21       Q.   Okay.  So -- I did a horrible job of asking it.

22             When you say "we," or when Mr. Rukavina

23   says "we," he means "we" as in the trustee and

24   Mr. Rukavina, not "we" and the bondholders?

25       A.   Correct.

Page 54

1      Q.   Okay.  The second line of the e-mail says

2    "Where are we" -- and this time it's "we" being the

3    bondholders and the trustee -- "on a potential

4    compromise of our issues that also releases a large

5    portion of the funds for immediate payment to you?"

6    Okay?

7               What is your understanding of the

8    "potential compromise of our issues"?

9      A.   Trying to get money into the estate, surcharge

10   type.

11     Q.   Okay.  Is it exclusively the surcharge issue,

12   or are there other issues?

13     A.   I don't recall other issues, sitting here

14   today, with regard to the March 1st; but I would -- I

15   would think it was the surcharge issues.

16     Q.   Okay.  And the second half of the line says

17   "that releases a large portion of the funds for

18   immediate payment to you."

19               So has the decision been made on March 1st

20   that if the surcharge issue can be resolved, that you

21   are committed to get -- that all the -- the large

22   portion of the funds goes to the bondholders?

23     A.   I'm committed to seeking Court approval to

24   doing all that, and to ruling that out.

25               But that was -- that's what we're talking

Alpha Reporting                         800-556-8974
A Veritext Company                   www.veritext.com

1    about here.  I -- obviously representing trustees, like

2    you do, you know, wouldn't do anything without 9019

3    court approval, etc.

4         Q.    Right.  So again, I'll ask it to you, is --

5    understanding the 9019 approval, and the Court's role in

6    that, am I correct that on March 1st, in this e-mail

7    from Mr. Rukavina, that you as the trustee are committed

8    that if the surcharge issue is resolved, that you would

9    seek court approval to release the funds to them?

10        A.    Generally speaking, yes.

11        Q.    Okay.  So at that -- as of March 1st, have you

12   completed all analysis regarding why the bondholders are

13   entitled to the large portion of the funds?

14        A.    I believe so.

15        Q.    Okay.

16        A.    Or my team has.

17        Q.    Okay.  And again, you wouldn't --

18        A.    Oh.

19        Q.    In your experience as a -- as a Chapter 7

20   trustee -- strike that.

21              So if you had concluded that analysis,

22   what was your determination, as of March 1, about the

23   bondholders and their entitlement to a large portion of

24   the funds?

25        A.    That they were -- appeared to be entitled to a

Alpha Reporting                              800-556-8974
A Veritext Company                        www.veritext.com

1    large portion of the funds.

2         Q.    Why?

3         A.    Well, it -- various reasons.  First, they had

4    asserted a DACA account.  Second, the way the money

5    flowed back in could be considered general intangible.

6    Third, they were making noise about collusion.  Fourth,

7    I didn't see where -- well, the money was always at

8    Prosperity, so I wasn't sure what, if any, harm to other

9    independent third parties might be done by virtue of

10   ignoring their prepetition claim.

11             And the case law was pretty silent on such

12   a situation, and the fact that the bank had put the

13   money back in the account.

14        Q.    Okay.  Well, let's stop right there.  I

15   understand that is your -- is -- is that your analysis,

16   what -- all of those issues that you said, is -- that's

17   your testimony, sitting here today, on September 13th.

18             What I'm asking you is, if you completed

19   your analysis, is it your testimony that the general

20   intangible collusion money flowed back to an account,

21   everything -- we could read it all back -- you knew all

22   of that and had assessed all of that on March 1?

23        A.    I -- I can't testify to at what -- on what date

24   all that occurred, sir.

25        Q.    Okay.  Well --

Alpha Reporting                                    800-556-8974
A Veritext Company                              www.veritext.com

1      A.   I thought you were asking for the

2    overarching -- the overarching analysis.

3      Q.   I'm sorry I wasn't specific.  I'll be very

4    specific.

5      A.   I apologize if I misunderstood your question.

6            But on March 1st, I can't quantify each

7    and every element at that point in time, no more than I

8    could on March 2nd, no more than I could on any date.

9      Q.   Okay.  Well, then let me rephrase it.

10           Your previous testimony, I believe, was

11   that you had a DACA, and bank statements, and phone

12   calls with the bondholders and the bank, as of

13   March 1st.

14     A.   Okay.  Yes.

15     Q.   Okay?  And then I believe you just testified

16   you had completed your analysis and your determination

17   of the bondholders' entitlement to those funds on

18   March 1st, when you sent this e-mail?

19     A.   No.  I don't -- if I did, I misspoke.  Like I

20   said before, it's always the ongoing process.  And I

21   don't know that we had completed on March 1st the

22   complete analysis of each and every element.

23           I mean, it's -- it's an ongoing process

24   until the judge gavels it down.

25     Q.   Well, I understand that.  And I -- and I -- I

Alpha Reporting                          800-556-8974
A Veritext Company                    www.veritext.com

```
 1    appreciate that.  Let me rephrase it, then.
 2              Why were you willing to make the proposal
 3    to Prosperity and the proposal to the bondholders for a
 4    surcharge?  Why did you make both of those proposals if
 5    it was still ongoing at this time, your investigation
 6    and determination?
 7         A.   I tried to get some momentum going in paying
 8    down creditors, freeing up money and getting money into
 9    the estate, and obviating fees.
10         Q.   Go ahead and look at the next exhibit, which is
11    Exhibit 9.
12         A.   Okay, Counsel.  I have it.
13         Q.   Okay.  I'm just interested in the last line --
14    that's from Mr. Schaffer to Mr. Rukavina.
15              Just the last line, that says "I would
16    like to know where things stand with regard to the
17    different claims."
18              What does that mean?
19              MR. RUKAVINA:  Objection.  Speculation.
20         A.   I do not know.
21         Q.   (BY MR. HILLYER) Okay.  What is your
22    understanding of the different claims Mr. Schaffer is
23    talking about?
24              MR. RUKAVINA:  Same objection.
25         A.   I do not know.
```

Page 59

1     Q.   (BY MR. HILLYER) And so to the best of your

2   knowledge, it -- so now we are -- I'm trying to -- if

3   you can't tell, Mr. Seidel, I'm trying to keep -- keep

4   this chronologically, so it -- so that it's easier for

5   you and it's easier for me to go through this process.

6              So we're -- we're now on March --

7   basically March 2nd.  You've extended an offer to the

8   Prosperity Bank.  It has -- a settlement offer.  It has

9   not been answered.  And you have extended a -- I'm not

10   going to call it a settlement offer; it's a potential

11   compromise of claims to the bank in exchange for the

12   surcharge.  And you've gotten no answers as of

13   the 1st of March.  Does that sound correct?

14     A.   On March 2nd, at 7:32 a.m., it looks like -- I

15   don't know.

16     Q.   Okay.  Now --

17     A.   Proceeded --

18     Q.   Okay.  And so at this point, what is your --

19   what is your understanding about the claims that you are

20   being -- that are being resolved in the settlement

21   proposals?

22     A.   The claims that would be resolved in the

23   settlement proposal would be the release of the funds

24   that Prosperity is holding over to the estate, and

25   that -- any claims the estate may have with regard to

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

```
 1    those funds, generally speaking, would be my

 2    understanding.

 3        Q.   Okay.  And when you say "the funds," at

 4    Prosperity, you're talking about the subject funds that

 5    are in a bank account at Prosperity?

 6        A.   Correct.

 7        Q.   Okay.  You're not talking about -- or are you

 8    also talking about the Prosperity payments -- you -- you

 9    understand what that term means, correct?

10        A.   Right.

11        Q.   Okay.  So when you say "the funds," are you

12    talking about the subject funds, or are you talking

13    about the Prosperity payments, too?

14        A.   I believe both.

15        Q.   Okay.  So let me ask you a -- a question that

16    will probably carry through a part, is why did you

17    decide to pursue the subject funds and the Prosperity

18    payments lumped together?

19        A.   Prosperity, one -- one target.

20        Q.   Okay.

21        A.   One -- one -- one party, one -- one potential

22    target.

23        Q.   Okay.  And what is your understanding of the

24    difference between the Prosperity payments and the

25    subject funds on March 1st?
```

Alpha Reporting                          800-556-8974
A Veritext Company                    www.veritext.com

1    A.    Well, that there was 4-point-whatever million

2    sitting there, and then there was, in addition, some

3    payments that were made to Prosperity, in the

4    neighborhood of 500,000, from my recollection, sitting

5    here months later.

6    Q.    Okay.  And had -- had you -- again, I'm going

7    to ask you:  Had you made the determination that the --

8    the payments of the 500,000 was a claim of the estate

9    that was not subject to the bondholder lien?

10    A.    I believe so.

11    Q.    Okay.  And -- and what was your understanding

12    as of March 1st that you had proposed -- what was the

13    estate receiving for releasing that claim for $513,000?

14    A.    Not much of anything, from what I recall.

15    Q.    And when you say that, you -- zero dollars?

16    A.    I think that's probably fair.

17    Q.    Okay.  And as of March 1st, what did -- what

18    was your understanding of any defenses that Prosperity

19    Bank had to the $513,000 Prosperity payments?

20    A.    I -- I can't quantify it as to March 1st, but I

21    can tell you what I understand their defenses to be.

22    Q.    Okay.  Well --

23    A.    I can't -- I can't.

24    Q.    We can go back to the previous e-mail, but I

25    would rather just try to -- do you remember, your

Page 62

1    counsel stated, "I don't see a principled defense, and

2    they" -- the bank -- "had no answer"?  Do you remember

3    that from the e-mail?

4        A.   I do.

5        Q.   Okay.  So that e-mail was -- I'll represent to

6    you, that was -- that's Exhibit 6.  You don't have to

7    go -- go back to it.  That was Thursday, February 23rd.

8    And we're talking about March 1st, a week later.

9             As of March 1st, do you know of any

10   principled defense that -- that the bank had?

11       A.   Not that I recall.  But not at --

12       Q.   Okay.

13       A.   -- such a date and time.

14       Q.   Understood.  Okay.

15             What investigation did -- sorry.

16             At this time, had you done an

17   investigation as to where the funds -- the subject funds

18   were located at Prosperity Bank?

19       A.   My recollection is my team had.

20       Q.   Okay.  And what is your understanding of what

21   investigation your team had done at this point, or what

22   is your recollection -- I'm sorry.  I should have let

23   you finish.

24             What is your recollection that your team

25   did an investigation based on?

                                              Page 63

1    A.   I would imagine conversations with my team.

2    Q.   Okay.

3              MR. HILLYER:  Let's go ahead and

4    introduce -- it will be Bates stamp 419.  Adam, you'll

5    have to tell me, are those two separate e-mails?  Just

6    do 419.

7              THE WITNESS:  You know what may help is

8    that when -- when Adam tells me they're published, then

9    I'll refresh.

10              MR. HILLYER:  Yeah, that's what I -- going

11    forward, I'll request it, and when Adam says it's out

12    there and has a number, then -- then you can start

13    looking.

14              MR. LANGLEY:  Exhibit 10 is published as

15    one page.

16              (EXHIBIT NO. 10, e-mail from Davor

17              Rukavina dated March 6, 2023, was marked

18              for identification and attached hereto.)

19              THE WITNESS:  Now we've got a system.

20              Okay, I have it up, Counsel.

21    Q.   (BY MR. HILLYER) All right.  I'm sorry, you

22    have -- you have to bear with me.  That was Exhibit 10.

23              MR. HILLYER:  We -- we can skip that and

24    go straight to Exhibit 11, which should be published at

25    this point.  I just realized that it was two e-mails

Page 64

1   that were separated in your production, instead of a

2   chain.

3                    (EXHIBIT NO. 11, e-mail from Eric Schaffer

4                    dated March 6, 2023, was marked for

5                    identification and attached hereto.)

6        A.   No worries.  I'm getting the hang of it, and

7   I'm having fun.

8                    Okay.  This is from Eric Schaffer to

9   Davor.

10       Q.   (BY MR. HILLYER) Yes.

11                   So the previous exhibit was Mr. Rukavina's

12  e-mail at the bottom.  So this is March 6th,

13  Mr. Rukavina asking Mr. Schaffer, does he have any

14  documents showing the $4.6 million transfer from Goodman

15  to Prosperity?  Is there any other document/agreement

16  evidencing the same?  Okay?

17       A.   Okay.

18       Q.   So my -- my obvious question is, is your

19  counsel is -- on March 6th is requesting any documents

20  showing the transfer.  So is it a fair assumption at

21  this point that you and your counsel don't have any

22  documents showing the $4.6 million transfer from Goodman

23  to Prosperity?

24       A.   No, sir.

25       Q.   "No, sir," as in you're asking for something

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    that you have?

2        A.   No, sir.  We're asking for the universe of

3    documents, collecting documents.  We've got more than

4    Mr. Rukavina working on the matter; we have Brenda Funk,

5    and I think there were other counsel involved.

6             So they -- you're asking me to try to make

7    heads or tails of this, it seems to me like -- trying

8    get the universe of documents.

9        Q.   Okay.  And Mr. Schaffer responds that he

10   doesn't have anything showing the funds going to the

11   bank.  Presumably monthly bank statements show the

12   transfers to Prosperity.

13       A.   That's what it says, sir.

14       Q.   Okay.  So did you have the bank statements?

15       A.   I believe we did, but I'm testifying under

16   oath, so I don't -- I'm not --

17       Q.   Okay.  Would it be --

18       A.   I'm not positive.

19       Q.   Would it be a reasonable assumption that as the

20   Chapter 7 trustee, that you have the bank statements of

21   Goodman Networks?

22       A.   I would think so.

23       Q.   Okay.  As a more general question, this looks

24   like an investigation into the subject fund's transfer

25   is still going on on March 6th.  Is that a fair

Alpha Reporting                    800-556-8974
A Veritext Company            www.veritext.com

1    statement?

2         A.    I don't think I'd argue with you about that,

3    that it was an ongoing process.

4         Q.    What is your understanding -- this is now a

5    week later, after the settlement proposal and

6    ultimatum -- two weeks after the ultimatum has been made

7    to the bank, one week after the settlement proposal was

8    made, and I'll call it over -- almost a -- close to

9    three weeks after a surcharge proposal has been made to

10   the bondholders.

11             To the best of your recollection, where

12   were you about on -- on March 7th?

13        A.    Where was I?

14        Q.    Anytime on March 7th.

15        A.    I'm sorry, Counsel.  Can you ask me a different

16   question?  I don't understand "where was I."

17        Q.    Okay.  What's your understanding of the status

18   of the deal?  Any of your settlement proposals right

19   now, when you're still requesting documents on

20   March 6th.  Do you have a done deal?

21        A.    I don't know that we have a done deal at this

22   point in time.

23        Q.    Do you have a deal with either Prosperity or

24   the bondholders at this time?

25        A.    I don't recall.

Alpha Reporting                           800-556-8974
A Veritext Company                      www.veritext.com

1          Q.    Mr. Seidel, did -- did you have your team draft

2     a complaint to sue Prosperity Bank?

3          A.    I believe we did.

4          Q.    Okay.  And in that complaint, was that a

5     coplaintiff complaint, that we looked at earlier with

6     the bondholders, or was that a singular plaintiff

7     complaint?

8          A.    My recollection was singular.

9          Q.    Okay.

10                MR. HILLYER:  Let's go ahead and introduce

11    what we've Bates-stamped 424.  And the next -- you can

12    publish them together -- the next is the actual draft

13    complaint that goes to ...

14                MR. LANGLEY:  Exhibit 12 is published.

15                (EXHIBIT NO. 12, e-mail from Davor

16                Rukavina dated March 7, 2023, was marked

17                for identification and attached hereto.)

18                MR. HILLYER:  Okay.  We've just published

19    Exhibit 12 and 13.  Exhibit 12 is going to be an e-mail;

20    13 is going to be the attachment.

21                (EXHIBIT NO. 13, Trustee's Original

22                Complaint, was marked for identification

23                and attached hereto.)

24          A.    Which one you want me to look at first?

25          Q.    (BY MR. HILLYER) 12.

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1      A.    I've got it.

2      Q.    Okay.  This is an e-mail from Mr. Rukavina to

3    Prosperity Bank, and copying bondholder counsel, with a

4    copy of a -- you can see attachments, "Complaint

5    Prosperity.pdf."

6            This is dated Tuesday, March 7th.  It

7    says:  "Victoria:  We have not heard anything...  We

8    will be filing the attached tonight.  Please let us know

9    right away if Prosperity is prepared to accept the

10   trustee's settlement offer or if it believes it has any

11   principled defense to the trustee's claims.  We have not

12   heard of one and are not aware of one."  Please know

13   that if the complaint is attached, settlement offer is

14   off the table.

15           Fair and accurate reading of that?

16     A.    Yes, sir.

17     Q.    Okay.  So let's go ahead and -- and look at

18   your -- well, before we get off this is -- again, this

19   is now the third e-mail I believe we've looked at, is --

20   your counsel is repeating that Prosperity Bank has no

21   principled defense to the trustee's claim; has requested

22   it, not aware of one; and again stated that you do not

23   know of any principled defense.

24           Is there anything that has changed, that

25   Prosperity Bank has any defense that you have an

1    understanding of at this time?

2        A.   Not at this time, apparently.

3        Q.   Okay.  Let's go to the original complaint.

4             I'm sorry, that'll be -- that'll be 13.

5        A.   Okay.  Give me a second, please.

6             Yeah, is it published?

7        Q.   It should be.

8        A.   Okay.  I've got it.  And I'll tell you when

9    it's up, and then we'll all know where we all are.

10            I've got it up.

11       Q.   Okay.

12       A.   Exhibit is -- is loaded.  "Trustee's Original

13   Complaint."

14       Q.   Okay.  Have you read that draft complaint

15   before?

16       A.   I have before.  It's been some time.

17       Q.   Okay.  And I say "draft"; this complaint was

18   not filed, was it?

19       A.   Not to my recollection.

20       Q.   Okay.  I'm going to try to not have you go

21   through this whole -- whole complaint.  This is you

22   bringing an AP case on behalf of the estate against

23   Prosperity Bank, Genesis, and Genesis Networks Global

24   Services.  Is that correct?

25       A.   Yes, sir.

Page 70

1      Q.   Okay.  And we can skip through all the -- the

2   factual recitations that mirror the substance,

3   essentially, of your 9019 motions.  Let's just go -- go

4   to 429, which will be page 5 of the complaint.

5      A.   And when I go to 429, does it come across your

6   screen, or is it just my screen?

7      Q.   It will just be -- once it's published, you

8   control your own exhibit.

9      A.   I'm on 429.

10     Q.   Okay.  Just quickly, paragraphs 30 and 32.  You

11  state that debtor received no consideration, no

12  reasonably equivalent -- "no consideration and no

13  reasonably equivalent consideration for the assignment,"

14  and that is the assignment of deposit account.

15          And you also state, "The assignment and

16  the resolution reference that the debtor received

17  consideration for the assignment.  That reference is

18  false."

19          Is it your position -- is it your position

20  at this time that the assignment of the deposit account,

21  and the granting of that by Goodman Networks, was a

22  clear fraudulent transfer?

23     A.   I believe so.

24     Q.   Okay.  Give me one second.

25     A.   No worries.

Alpha Reporting                         800-556-8974
A Veritext Company                   www.veritext.com

1      Q.   All right.  I was just making sure I -- so

2  going to page 7 of the complaint.  Again --

3      A.   I have that.  What paragraph?

4      Q.   39, 40, 41.

5      A.   Okay.  That's helpful.  39, 40, 41.

6               Okay.  I have them up; I haven't read

7  them.

8      Q.   Okay.  And I will reference to you the

9  payments -- the capitalized term "Payments," in 39, is

10  the $513,000 itemized on paragraph 36.  If you can see

11  that.

12     A.   I'm with you.

13     Q.   Okay.

14     A.   I'm with you.

15     Q.   And the complaint makes the statement, no --

16  the debtor received no value, no reasonably equivalent

17  value.  Debtor was insolvent, or in the transfer -- or

18  obligation effectuated rendered the debtor insolvent.

19  "The debtor was insolvent at the time that it made these

20  payments."

21               Is that still your position today?

22     A.   Sure.

23     Q.   Okay.  And your accounts -- I'm not going to

24  make you go -- go through them all -- you asked for

25  declaratory judgment to void the assignment.  You asked

                                          Page 72

1   for a 548(a)(1)(B) avoidance of the assignment.  And you

2   asked for an -- also a 548(a)(1)(B) avoidance of both --

3   it says avoid -- avoids each of the payments.

4            And so the question is, at -- at this

5   point, I'm looking at this -- are -- are you just going

6   exclusively after the $513,000 at this point?  Is that

7   what you're threatening Prosperity?

8            MR. RUKAVINA:  Why don't you take your

9   time and read all of those counts before you answer that

10  question.

11       Q.   (BY MR. HILLYER) Please.

12       A.   It's going to take me a minute.

13            Okay.  Declaratory judgment.

14       Q.   For the sake of expediting this, Mr. Seidel,

15  I -- I wasn't -- I did not mean for you to have to read

16  it; I was not going to try to trick you, and that I was

17  going to go straight to the prayer for relief.

18            MR. RUKAVINA:  Can we agree that the

19  document speaks -- can we agree that the document speaks

20  for itself?

21            MR. HILLYER:  We -- we can -- we can

22  absolutely agree the document speaks for itself.

23       Q.   (BY MR. HILLYER) So, Mr. Seidel, what I'm

24  asking for is that basically your complaint that you

25  drafted is seeking a 548 judgment against Prosperity

1    Bank for the payments, and then you were also asking for

2    a turnover and/or a money judgment against the

3    defendants for the account and escrow funds, which are

4    detailed separately.

5         A.   I think that's true.

6         Q.   Okay.  So what I'm going to ask you now is

7    that -- is just a general question, is -- you're

8    pursuing -- this draft complaint appears to be a 548

9    with a lien avoidance and a turnover of property of the

10   estate.  The bondholders aren't involved in this at all.

11   How does this complaint affect your proposed global

12   settlement at that time?

13        A.   I'm not sure I understand how it would affect

14   that aspect of it.

15        Q.   Okay.  No, I -- I'm not -- I probably shouldn't

16   have gotten that technical.

17             What I'm asking is, is this complaint

18   essentially a joint venture on behalf of the

19   bondholders?  Or are you stating that "I'm filing this

20   complaint on behalf of the estate if we cannot get a

21   deal done"?  Like the global -- the global settlement is

22   off, and you're going with this complaint.  That's what

23   I'm asking you.

24        A.   I think it was closer to the latter.

25        Q.   Okay.

Alpha Reporting                    800-556-8974
A Veritext Company               www.veritext.com

1     A.    It was not a joint.

2     Q.    Give me one second.

3           CERTIFIED STENOGRAPHER:  I'm sorry, if

4  you're talking, I don't know if you're on the record.

5           THE WITNESS:  Sorry.  I'm just mumbling

6  over here.  We're making a joke.

7     Q.    (BY MR. HILLYER) All right.  And Mr. Seidel,

8  I'm going to go back to using the motion terminology

9  versus the complaint terminology.  When I say

10  "prosperity payments," I mean the $513,000; and when I

11  say "subject funds," I mean the 4.4 million, going

12  forward.

13    A.    Okay.  I'll try to stick with that -- I'll try

14  to stick with that.  Yes, sir.

15    Q.    So is -- is it your understanding, have -- have

16  the bondholders ever asserted a lien as to the $513,000

17  Prosperity payments?

18    A.    Not that I recall.

19    Q.    Okay.  Do you -- do you recall the bondholders

20  giving you confirmation that they weren't asserting

21  claims with regard to the $513,000?

22    A.    I can't recall, sitting here.  I'm sorry.  I

23  don't recall.

24    Q.    Okay.  Is it your understanding that the

25  bondholders have not asserted any claim to the 5 -- any

Alpha Reporting                                          800-556-8974
A Veritext Company                                    www.veritext.com

1    secured claim to the $513,000 Prosperity payments?

2         A.   I don't recall it.  They've been generally

3    aggressive in asserting claims to everything.

4         Q.   And I'm -- I'm certainly not -- not trying to

5    be argumentative.  I'm not asking for a recollection;

6    I'm asking, what is your current understanding today?

7              Do you understand -- your understanding

8    today -- are they asserting a claim -- are the

9    bondholders asserting a claim to the $513,000 Prosperity

10   payments?

11        A.   I'm not sure.  I know this:  If some money fell

12   in my lap today from some other thing that nobody knows

13   about, I guarantee the bondholders would be in here

14   saying it's their money.

15        Q.   All right.  So as you sit here today, you don't

16   know if the bondholders are asserting a claim to the

17   $513,000 Prosperity payments that are identified in your

18   motion?

19        A.   I'm uncertain.

20        Q.   Well, if your motion says that that money is to

21   go to the estate, don't you have to know if someone is

22   asserting a claim against it?

23        A.   No.  I mean, people can either have claims, not

24   have claims, waive claims.  It's part of the -- part of

25   the entirety of the deal.

Alpha Reporting                          800-556-8974
A Veritext Company                    www.veritext.com

1      Q.   But you do know that the bondholders are

2   asserting a secured claim as to the subject funds?

3      A.   Yes -- yes, sir, I believe they do.

4      Q.   You believe they do, or you believe they are

5   asserting a secured claim?

6      A.   Are asserting a secured claim.

7      Q.   Okay.  But you don't know if they are asserting

8   a secured claim to the $513,000 Prosperity payments that

9   you're settling?

10      A.   Uncertain.

11      Q.   So, Mr. Seidel, are we sitting here today

12   saying that every single consideration in your current

13   settlement may be subject to the bondholders' claim,

14   secured -- a secured claim of the bondholders?

15      A.   No.  I think the settlement speaks to that, and

16   that they're not going to participate to the tune of

17   $350,000.

18      Q.   Okay.  Well, again, we'll -- we'll get to that

19   figure later on.  But that 350 is a $150,000 surcharge

20   and a $200,000 settlement payment for the -- for the

21   avoidance action for the Prosperity payments, correct?

22      A.   Correct.

23      Q.   Okay.  So let's not lump them together for

24   the 350.

25           Are the bondholders asserting a secured

Page 77

1   claim to the $200,000 that you're proposing to receive

2   for settling the Prosperity -- the $513,000 Prosperity

3   payments?

4        A.   Not as couched in the settlement agreement, and

5   if approved, not in the deal we have.

6        Q.   Okay.

7        A.   I don't know who's getting alerts, but that

8   comes across really loudly here.

9             MR. RUKAVINA:  It might be the projector.

10            THE WITNESS:  Oh, okay.  It may be no

11   one's fault on here.

12       A.   Go ahead.

13       Q.   (BY MR. HILLYER) Okay.  Have they ever asserted

14   a claim to any of the Prosperity payments, meaning the

15   $513,000, to the best of your knowledge?

16            MR. RUKAVINA:  Objection.  Asked and

17   answered multiple times now.  Unnecessarily repetitive.

18       Q.   (BY MR. HILLYER) You can answer.

19       A.   I think they claim every penny of everything,

20   from everything I've seen, from the bondholders.  In my

21   discussions with them, it's proved that it's not our

22   collateral.  Generally speaking.

23            MR. HILLYER:  All right.  We can

24   introduce -- this will be Bates-stamped 450.

25            MR. LANGLEY:  The exhibit's been

1    introduced.

2                    (EXHIBIT NO. 14, e-mail chain, beginning

3                    with e-mail from Eric Schaffer dated

4                    March 7, 2023, was marked for

5                    identification and attached hereto.)

6        Q.   (BY MR. HILLYER) Exhibit 14 has been

7    introduced.  It should be a three-page e-mail,

8    Bates-stamped 450 to 452.

9        A.   Okay.

10       Q.   And look on the second page.

11       A.   Okay.

12       Q.   And that's Prosperity Bank's counsel asking

13   your counsel that they have requested deposition

14   transcripts.

15       A.   I see that.

16       Q.   What's your understanding of why they're

17   requesting deposition transcripts?

18                    MR. RUKAVINA:  Objection.  Speculation.

19       A.   I do not know.

20       Q.   (BY MR. HILLYER) Go to the first page, please,

21   sir.

22       A.   Yes, sir.  Will do.

23       Q.   Okay.  Just look at the top of the page,

24   please.  That's Mr. Schaffer to Mr. Rukavina.

25       A.   Correct.  I was not copied.

Page 79

```
 1         Q.   Okay.  It says "No surprises in the complaint."

 2              I'm assuming he's referencing to the draft

 3    complaint that we just went through.

 4              "If litigation proceeds, I would expect to

 5    intervene to assert additional claims against the bank.

 6    Among other things, the deposit account control

 7    agreement contains an express subordination by the bank.

 8    I don't think UMB would assert any claims with regard to

 9    the 513.  I would hope to resolve cash collateral issues

10    on an agreed basis."

11              So does that refresh your recollection

12    that -- is the bank asserting any claims as to the 513?

13         A.   I would -- I wouldn't -- I wouldn't rely on

14    that as saying the bank asserts no claims.  First of

15    all, I wasn't copied on that, so it doesn't -- you know,

16    I'm reading this -- I don't know if it's for the first

17    time, but I don't know that I've seen this before, A.

18              And B, the sentence "I don't think UMB

19    would assert any claims with regard to the 513," I don't

20    think that's the beginning, end, and -- story of that

21    deal.

22         Q.   I -- I believe that's a -- that's a fair

23    statement, Mr. Seidel.  So I'll rephrase it.

24              Have you ever been told that they are

25    asserting claims to the $513,000, Prosperity payments?
```

Alpha Reporting                          800-556-8974
A Veritext Company                   www.veritext.com

1      A.    I don't recall.

2      Q.    You don't recall whether or not the secured

3   creditor is asserting -- you've been told whether

4   they're asserting claims?   That's a pretty material

5   point.

6            MR. RUKAVINA:   Objection.   Is there a

7   question there, or is that a statement?

8            MR. HILLYER:   Well, I -- okay.

9      Q.    (BY MR. HILLYER) If they are asserting a claim

10  against the Prosperity payment proceeds, doesn't that --

11  does that not materially change your motion, Motions 1,

12  2, and 3, as they're represented?

13     A.    No, because the deal is the deal.   We're going

14  to end up -- the estate's going to end up with the 350,

15  regardless of any claims they would have.

16            In other words, to me, it cements this

17  sentence, of "I don't think UMB would assert any

18  claims."

19            Pursuant to the deal, they won't be

20  asserting any claims with regard to the moneys we

21  receive out of that deal.

22     Q.    Again, going back to your draft complaint,

23  what's the likelihood of success of that complaint?

24     A.    I -- I have never answered a question like that

25  in my life.   I've had clients ask me things like that.

                        Alpha Reporting              800-556-8974
                        A Veritext Company        www.veritext.com

1    What's our likelihood of success?  What --

2              MR. RUKAVINA:  I'm going to have to

3    object, to the extent that it calls for attorney-client

4    privilege.

5       Q.   (BY MR. HILLYER) Do you understand likelihood

6    of success is a factor a court uses in an analysis of

7    settlements?

8       A.   I do.

9       Q.   And you -- and you've been a Chapter 7 trustee

10   for 30 years, and you've never made statements about the

11   likelihood of success?

12      A.   I'm not going to give you a percentage.  I

13   thought you were asking for like percentages, etc.

14              And so can you re-ask me your question?

15      Q.   Sure.

16              What is the likelihood of success of that

17   draft complaint to recover the $513,000 Prosperity

18   payments -- either using percentages or words:  High,

19   medium, low?  Scale of 1 to 10?

20              I'm not -- certainly not trying to -- not

21   trying to badger you, but you -- you have to be able to

22   give me something, Mr. Seidel.

23      A.   I -- I think it's not bad.  I think it's --

24   it's in the range of "okay" to "decent."  But there has

25   been defenses raised, etc.  And there's also costs,

Alpha Reporting                           800-556-8974
A Veritext Company                    www.veritext.com

1    delay, and expense of litigation.

2              I would tell you that it's not the worst

3    complaint I've ever seen, for sure; but I also -- in my

4    experience, there's no laydowns either.  Especially with

5    a bank.

6         Q.   Okay.  We already went through the e-mails

7    about the "no principled defenses."  So again, I'll ask

8    you, when you said "defenses," do you know of any

9    defenses, as you sit here today?

10        A.   Yes.

11        Q.   What are the defenses?

12        A.   Well, there's a line of cases with regard to

13   the fact that the funds were subject to a DACA, no

14   equity for the estate, and therefore any recovery would

15   be --

16        Q.   I'm sorry, Mr. Seidel, I don't mean to cut you

17   off.  I wasn't talking about the subject funds.  I was

18   talking about the Prosperity payments, $513,000.

19        A.   I think it's the same.  I don't know the

20   difference.

21        Q.   You couldn't make a distinction --

22              MR. RUKAVINA:  Can the gentleman answer

23   your question?

24              MR. HILLYER:  Sure.

25        A.   I'm sorry, I was in -- yeah, there were dollars

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    at Prosperity, in the -- in the debtor's account, and

2    some -- some of those funds went to Prosperity as well.

3        Q.    (BY MR. HILLYER) Okay.  What defenses does

4    Prosperity Bank have to a fraudulent transfer claim as

5    to the $513,000 Prosperity payments?

6        A.    I -- I would think they would assert the

7    claims, the -- the Ninth Circuit law with regard to the

8    fact that we're talking about encumbered funds, and the

9    Judge Larson well-reasoned opinion that hits on that

10   topic as well.

11              I'm not sure what other defenses.  You

12   know, I remember your -- your questions of the bank

13   representative, etc.  But there's some case law out

14   there that's not helpful in that regard.

15       Q.    Okay.  Are these your defenses that you've come

16   up with, or are these defenses Prosperity Bank has

17   raised?

18       A.    They're defenses that exist.

19       Q.    All right.  So when your counsel sent the

20   e-mail "they have no principled defenses," you're

21   disagreeing with your counsel's e-mail?

22       A.    Like I said, it's been a constant changing

23   dynamic, as people come up with defenses, as people

24   research deeper, as people dig deeper, people look into

25   things harder, etc.

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1      Q.   Okay.  Do you think -- based on the allegations

2   in your draft complaint, did Prosperity give the debtor

3   any value?

4      A.   Not that I recall.

5      Q.   Okay.  And are you telling me the defenses that

6   you just enumerated, and the case law that -- I guess we

7   can get that from your counsel later; you're saying

8   that -- that those defenses are applicable in this case

9   with the bank statement that they didn't give new value,

10   and your position that they didn't give new value?

11      A.   I would think they'd be asserted.

12      Q.   Okay.  Give me one second.

13      A.   Sure.

14            It's so hard to use this thing.  And then

15   it goes all over the place.

16      Q.   All right.  So just -- I apologize to ask

17   again, because I'm trying to write these down.  So other

18   than the -- are you -- I believe we just took care of

19   the value aspect of a defense, okay?  Can you just

20   briefly just tell me, so that -- what are the other

21   available defenses to Prosperity -- of Prosperity Bank

22   to the defenses to a fraudulent transfer claim for the

23   $513,000?

24            MR. RUKAVINA:  Objection.  Asked and

25   answered.

1      Q.  (BY MR. HILLYER) Well, you said a Ninth Circuit

2  decision; what decision is that?

3      A.  I'm sorry, Counsel, I don't have that in my

4  memory banks.  I'm glad to supply it to you.

5      Q.  Okay.  You said Judge Larson's reasoned

6  opinion.  What -- what opinion is that?

7      A.  Essence -- essential essence, something like

8  that.  I'll get that to you as well.

9      Q.  Okay.  Is there any other -- is there any

10  noncase law you're citing, is there any other statutory

11  defense -- 550, anything that you're -- that you know

12  of, as you sit here today?

13      A.  Not that I'm sitting here today wanting to --

14  to feed to a potential target in the instance that this

15  doesn't get approved and we'd end up going forward with

16  litigation.

17          But no, I'm not aware of anything else.

18      Q.  Okay.  So do you recall when you reached a

19  global settlement with Prosperity Bank and the

20  bondholders?

21      A.  No.  I stand to be refreshed on that, but I

22  don't recall when exactly, days, etc.

23      Q.  Okay.

24          MR. HILLYER:  Let's go ahead and

25  introduce 461.

Alpha Reporting                    800-556-8974
A Veritext Company                 www.veritext.com

1          MR. LANGLEY:  Exhibit 15's published.

2          MR. HILLYER:  It should be in there now.

3          THE WITNESS:  Refreshing.

4          It is in there now.  We are bringing it

5     up, and I see an e-mail.

6          (EXHIBIT NO. 15, e-mail from Victoria

7          Argeroplos dated March 8, 2023, was marked

8          for identification and attached hereto.)

9          THE WITNESS:  By Brenda and Davor.

10     Q.   (BY MR. HILLYER) Yes.  So this is Prosperity

11     Bank's counsel to your counsel, and copying bondholder

12     counsel -- you are not copied on this -- that she has

13     "received the green light from Prosperity to proceed

14     with the proposed settlement."

15          Do you see that?

16     A.   Yes.

17     Q.   Okay.  And I'm going to ask you the same

18     question I did about the March 1 e-mail:  What are the

19     terms of this proposed settlement that she's accepting?

20     A.   I think it's still a work in progress.  But let

21     me read the e-mail.  Do you mind?

22     Q.   No, I don't at all.  Go ahead.

23     A.   Thank you, sir.

24          Yeah.  Okay.  That's it.  That's all

25     that's in it.  Yeah, I've read it.

Alpha Reporting                                    800-556-8974
A Veritext Company                              www.veritext.com

1     Q.   Okay.  And I'll represent to you, this is a

2   stand-alone e-mail in your production.

3     A.   Okay.

4     Q.   So I'll ask you again:  What are the terms --

5   strike that.

6            Prosperity just -- I'm going to say

7   "accepted," where it says "green-lighted," "proceed with

8   the proposed settlement."  What are the terms of the

9   proposed settlement that have essentially been

10  green-lighted, subject to global releases, the trustee,

11  the debtor, bondholders, and anyone else that has

12  interest in the funds?

13    A.   I think it's something along the lines -- I'm

14  trying to recall.  But, you know, at this point in time,

15  like I said, it's always been a moving target.  But I

16  don't think there was a deal done at this point in time

17  with bondholders.  But with regard to Prosperity, I

18  think it was something along the lines of turning over

19  of money to the estate.

20    Q.   And I'll represent to you, Mr. Seidel, we're

21  now on Bates stamp 461, if you can see on the bottom of

22  that.  I certainly don't want you to take the time to go

23  through your own production, but there is not a

24  settlement e-mail, settlement terms e-mail, or a

25  confidential settlement, up to this point.

Alpha Reporting                           800-556-8974
A Veritext Company                    www.veritext.com

1          So you have to bear with me when I ask

2    you, a settlement has been proposed, and the settlement

3    has apparently been green-lighted, and there is not a

4    single settlement e-mail in your production.

5          So I ask you this:  Do you consider that

6    normal, in your practice, settling a -- claims of

7    $4.9 million, and we can't even determine what the

8    settlement was proposed and was accepted?

9    A.   Constant back-and-forth, Counsel, constant --

10   you know, if we're dealing with lawyers that we know and

11   trust, it -- you know, we get to the general terms of

12   what the deal would look like.  We can say, "We've got a

13   deal," and then always the devil's in the details as you

14   try to work that deal and get to the exact, you know,

15   releases up -- the language of the deal.

16         Because it's, in my view, wasteful for

17   counsel to spend a bunch of time scrivenering an

18   agreement that the two sides haven't said, "Okay, that

19   sounds like a deal; let's do it."

20   Q.   So this is --

21   A.   In my recollection --

22             MR. RUKAVINA:  Were you done answering?

23             THE WITNESS:  No.

24   A.   In my experience, we keep calling:  What about

25   this?  What about that?  What about this?  Okay, that'll

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    work.  Okay, that may work.  Okay, well, let's see how

2    that looks.  Okay, let's do a deal.

3                At that point in time, then we get busy

4    with the scriveners, so we're not wasting time going

5    back and forth.

6        Q.   (BY MR. HILLYER) So -- so again, this is a

7    settlement between the estate and Prosperity at this

8    point.  Is that a correct statement?

9        A.   True.  True.

10       Q.   Okay.  And so I'm just going to ask you your

11   understanding -- well, let me ask you this, is -- do you

12   have a settlement -- does the estate have a settlement

13   at this point with the bondholders?

14       A.   Not -- not that I recall.

15       Q.   Okay.  So --

16       A.   Not at this point in time on this particular

17   day.

18       Q.   Okay.  So this is between the estate and

19   Prosperity.  And so I'm going to ask you a specific as

20   to your understanding at this time:  What is Prosperity

21   getting, and what is the estate getting, related to

22   Prosperity's acceptance of your proposed settlement?

23       A.   My general recollection at this point in time,

24   subject to being revised by someone showing me something

25   different, is that the estate is going to take in the

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    $4.4 million and change, the subject funds, and

2    Prosperity would get a release.  Something to that

3    effect.

4        Q.   Okay.  So there's no surcharge part of that

5    deal, and there's no Prosperity payments part of that

6    deal?

7        A.   I believe that's correct, sir.

8        Q.   Okay.  So -- but what is your understanding

9    about the claims that are being settled?  The claim to

10   the subject funds and the Prosperity payments were being

11   settled by the turnover of just the subject funds?

12       A.   I believe that's correct.

13       Q.   Okay.  Okay.  So without getting to the

14   specifics, so when I talked about the claims for the --

15   for the Prosperity payments and the claims for the --

16   the subject funds, are you making a distinction; when I

17   say "claims," are you settling a 548 claim?  Are you

18   settling a 542 turnover claim?  What was your

19   understanding of the actual claims being settled with

20   Prosperity?

21       A.   All of the above.

22       Q.   So when you say "all of the above," would it be

23   a fair statement that it's everything that you put in

24   the draft complaint?

25       A.   I believe so, sir.

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1        Q.    Okay.

2                    MR. RUKAVINA:  It's almost 1:00, Cam.

3     I don't want to cut you off.  Let's find a convenient

4     point, please.

5                    MR. HILLYER:  Okay.  And y'all's hearing

6     is at 1:30, and you all need time to jump on it?

7                    THE WITNESS:  Yeah, and -- and grab a

8     sandwich.

9                    MR. RUKAVINA:  Sure.  And talk to Thomas.

10                   I think, Cam, we can -- we can target

11    for 2:00, and -- and you just keep me informed about how

12    much longer Larson has, if that's okay.

13                   MR. HILLYER:  Okay.  Well --

14                   MR. RUKAVINA:  Let's go off the record.

15                   MR. HILLYER:  Yeah, let's go off the

16    record.  I was going to say, if you're targeting for

17    2:00, then it makes sense to go ahead and break now and

18    just do a one-hour from 1:00 to 2:00 now.

19                   MR. RUKAVINA:  Yeah.  That's -- that's

20    what -- that's what we were thinking.  Yeah, that's what

21    we were thinking.  That way we can grab a quick sandwich

22    before he has to appear in court.  And then, again, I'm

23    thinking this will be done by 2:00; but -- but either

24    way, we'll keep you informed.

25                   THE WITNESS:  If we're running late, I'll

Alpha Reporting                    800-556-8974
A Veritext Company                www.veritext.com

```
 1   e-mail you, Cam, or Thomas will, or --
 2            MR. RUKAVINA:  Yeah, Thomas will e-mail
 3   me, and I'll e-mail this group.
 4            UNIDENTIFIED SPEAKER:  I'll be a little
 5   surprised --
 6            VIDEOGRAPHER:  Let me -- let me go off the
 7   record.
 8            We're going off the record.  The time is
 9   12:58 p.m.
10            (Recess)
11            VIDEOGRAPHER:  We're going back on the
12   record.  The time is approximately 2:34 p.m.
13       Q.   (BY MR. HILLYER) Welcome back, Mr. Seidel.
14       A.   I apologize for the delay.
15       Q.   Not -- not a problem.
16            So I'm not going to catch us up to where
17   we are.  But with -- the last exhibits that I introduced
18   were e-mails, and Prosperity Bank has green-lighted a
19   settlement with the trustee that you proposed.  Do you
20   remember that?
21       A.   I do.
22       Q.   Okay.  And I previously asked you, did -- at
23   that time that Prosperity green-lighted it, did you have
24   a settlement in place with the bondholders?  And I
25   believe you testified you did not think so; everything
```

Page 93

1    was ongoing.  Is that correct?

2        A.   I believe that's correct.

3                 THE WITNESS:  Can we get back to the

4    exhibits?

5                 MR. RUKAVINA:  There you go.

6        A.   I'm with you, Counsel.

7        Q.   (BY MR. HILLYER) Okay.  So jumping right in --

8    so you agreed to a $100,000 surcharge; is that correct?

9        A.   I believe that's true.

10       Q.   Okay.  And you had previously offered a

11   $1 million surcharge with a waiver and a $500,000

12   surcharge without a waiver for future requests for

13   surcharge.  Is that correct?

14       A.   Sounds -- that sounds right.

15       Q.   Okay.  Mr. Seidel, how did you end up at

16   $100,000, based off of your first two settlement offers

17   to the bondholders?

18       A.   The -- I guess the level of defenses raised,

19   and the articulation that defenses -- on and on, that

20   the power -- the wherewithal of that group, etc.

21   That's -- that's how we -- we got down to that.

22       Q.   Okay.  I'm not sure I understand that -- that

23   answer.  You're saying defenses of the bondholders?

24       A.   Well, I mean, the -- the entirety of the

25   transaction.  In other words, the defenses raised, the

Alpha Reporting                    800-556-8974
A Veritext Company               www.veritext.com

1    documents provided, on and on.  The cost expense, delay

2    of litigation.

3                Look, you come out of the blocks asking

4    for the world -- at least I do -- and then you start

5    seeing the lay of the land.

6        Q.   Okay.  So -- so at some point you agreed to

7    $100,000 for a surcharge to recover the subject funds

8    and hand them -- hand all the subject funds, less

9    $100,000, to the bondholders; is that correct?

10       A.   I think that's correct.

11       Q.   Okay.  And your negotiated surcharge was based

12   upon defenses that were articulated -- and I believe you

13   just said in documents.  What documents did you assess

14   to negotiate that $100,000 surcharge?

15       A.   So I said "and documents."  And the documents

16   involved would have been any Prosperity documents we had

17   at the time.

18       Q.   Okay.  And do you know what Prosperity

19   documents you had at the time you agreed to the

20   surcharge, the $100,000 surcharge?

21       A.   Like I said, I believe we had bank account

22   statement information and/or DACA information, etc.

23       Q.   Okay.  So the -- the DACA -- and when you

24   say -- when you say the DACA, that is the DACA for

25   Account 3992, correct?

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1        A.    Correct.

2        Q.    Okay.  And when you say "bank statements,"

3   that's the bank statements for 3992, correct?

4        A.    Correct.

5        Q.    Okay.  And do you have any -- when you agreed

6   to this surcharge, did you have any documents about

7   where the subject funds were being held at that time?

8        A.    I can't testify under oath that we had those,

9   but I believe we did.

10       Q.    You believe you did.  And what -- what leads

11  you to believe that?

12       A.    I'm uncertain whether or not we do.

13       Q.    All right.  So sitting here today, you don't

14  know if you had any information regarding -- and I'm

15  going to go ahead and call it by its correct name -- the

16  Account 0188.  Are you familiar with that account?

17       A.    Yes, sir.

18       Q.    Okay.  And so -- and so you agreed to a

19  $100,000 surcharge, but the money had to come in to the

20  estate, and then the surcharge taken out, and then the

21  funds remitted to the bondholders; is that correct?

22       A.    That was going to be the omnibus deal being

23  contemplated, if we could get the bondholders on board,

24  etc.

25       Q.    Get the bondholders on board for what?

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    A.   For this tripartite agreement we were trying to

2   reach.

3    Q.   Okay.  Is there any reason why Prosperity would

4   not remit the subject funds in the settlement directly

5   to the bondholders, and then they would remit to the

6   estate your $100,000 surcharge?

7    A.   I -- I think that the bank wanted agreement

8   from the -- I think the bank put the funds in an account

9   for the benefit -- or to be held pending court order or

10   agreement of the bondholders and the trustee.  So I

11   don't know about how that would have rolled if they

12   tried to do it that way.

13    Q.   Okay.  Well --

14         MR. HILLYER:  Adam, can you introduce

15   Bates number 558.

16         Adam will tell us shortly what exhibit

17   number that is.

18         MR. LANGLEY:  Exhibit 16 is introduced.

19         THE WITNESS:  Thank you.  I'm looking for

20   it now.

21         (EXHIBIT NO. 16, e-mail chain, beginning

22              with e-mail from Davor Rukavina dated

23              March 15, 2023, was marked for

24              identification and attached hereto.)

25         THE WITNESS:  I have it.  I'm tapping on

Page 97

```
 1    it.

 2              Okay.

 3       Q.   (BY MR. HILLYER) Look at the first page, at the

 4    bottom.  And that is from your counsel, that says

 5    "Gentlemen, the trustee will agree to the $100,000.  He

 6    will not agree to a direct transfer; the order will

 7    require him to immediately transfer the funds to Eric

 8    less the 100.  Do we have a deal?"

 9              Do you see that?

10       A.   Yes.

11       Q.   Okay.  So in fact it's you that were asking --

12    or insisting that the funds come into the estate and

13    then go out of the estate, not conversely, what you just

14    said?

15       A.   I didn't mean to imply that conversely

16    anything.

17              But yes, that's -- that's what that says.

18       Q.   Okay.  Why did you want the funds to come in to

19    the estate and then be disbursed out of the estate?

20       A.   Because it's property of the estate.

21              CERTIFIED STENOGRAPHER:  I'm sorry?

22       A.   I'm sorry.  Because it's property of the

23    estate.

24       Q.   (BY MR. HILLYER) Okay.  And look at the -- the

25    middle line of that e-mail from Mr. Silverstein:  "I
```

Page 98

1   assume that is to make sure the payment is in the

2   trustee's commission denominator, which we appreciate.

3   So long as we are not at any risk, I think we can get

4   comfortable with that."

5            Do you see that?

6       A.   I see that.

7       Q.   Okay.  Do you understand what that e-mail

8   means, Mr. Seidel?

9       A.   I'm not positive.

10      Q.   Okay.  Well, look at your counsel's response on

11  the top:  "I will not ratify that assumption but I am

12  thinking we have an all-around deal then that puts to

13  rest Prosperity?"

14      A.   Okay.

15      Q.   Okay?  So what I'm going to ask you now is, are

16  you seeking a commission for disbursing the 4.4

17  recovered less the $100,000 to the bondholders?

18      A.    Not at this time, no.

19      Q.   Do you -- okay, well, that's -- not at this

20  time.  Are you waiving any commission to that

21  $4.3 million?

22      A.    No, sir.  I'm not waiving.  I'm not asserting

23  that it's coming in, that it's all a trustee commission,

24  etc.  It's coming in the estate, and we'll see how

25  things shake out at the end of the day.

Alpha Reporting                    800-556-8974
A Veritext Company            www.veritext.com

1    Q.   Okay.  Do you know approximately how much your

2    commission would be on disbursing $4.3 million to the

3    bondholders?

4    A.   I would guess in that range.

5    Q.   In what range?

6    A.   150,000 or so.  I'm not positive.  I don't have

7    a calculator in front of me.

8    Q.   Okay.  So if I did the calculations and it was

9    $162,000 off of using the scaled commissions, you

10   wouldn't have any reason to dispute that?

11   A.   If you're looking at the scale commission the

12   way it's properly done, I'm not going to argue with you.

13   It might be in that range.  I don't have it in front of

14   me.  I don't have the computer program up.

15   Q.   Okay.  So in your -- in this current

16   settlement, you are only receiving $100,000, correct?

17   A.   The --

18   Q.   When you say --

19   A.   -- total.

20   Q.   I'm sorry?

21   A.   In -- in the -- in the settlement that's

22   proposed to the Court, we're receiving 350, 100 of which

23   is this.

24   Q.   I'm not talking about what's currently.  I'm

25   talking about I am in -- I'm in March of 2023.  I'm

Page 100

1    talking about Settlement Motion 1.

2        A.   Okay.

3        Q.   That's been filed.

4             In that motion, you were receiving

5    $100,000 of a surcharge, and that is all that you were

6    receiving, or the estate is receiving.  Is that correct?

7        A.   That's my recollection, yes, sir.

8        Q.   Okay.  And what amount of that $100,000 -- it

9    obviously is a surcharge for fees and expenses.  At this

10   point, how much money have you -- has your -- strike

11   that.

12            At -- at this point, after 50 days of

13   doing this, how much fees has your counsel run up doing

14   this proposed settlement with Prosperity Bank and the

15   bondholders?

16       A.   I do not know.

17       Q.   Do you have any idea?

18       A.   It would be a guess.

19       Q.   What is your guess?

20       A.   My guess would be in the $50,000 range or so.

21       Q.   Okay.  Okay.  And so of the $100,000 surcharge,

22   would it be a fair assumption that $50,000 has already

23   been spent pursuing this motion that hasn't been filed

24   yet?

25       A.   I would think so.

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1      Q.    Okay.  That leaves $50,000, correct?

2      A.    Yes, sir.

3      Q.    Okay.  If you seek a commission of $160,000,

4   how does that work, Mr. Seidel?  Where's that money

5   coming from, if you only get 100, 50 of it's already

6   spent; you only have 50, but you want 160 commission?

7      A.    You say I want 160 commission.  I haven't seen

8   that.  I haven't asserted that.  I haven't claimed that.

9   And that hasn't been approved by the Court.

10     Q.    Okay.  Well, I'm -- I'm not asking you whether

11  it's been approved.  I asked you, do you think

12  that that, based on the scale, is a reasonable figure?

13              We -- we can go through the numbers, if

14  you want to, of the -- of the 25 percent, 10 percent,

15  5 percent, 3 percent, over a million.  I'm telling you

16  I've done it, and it's roughly $160,000.  And you've

17  done this for 30 years.

18              And then what I've asked you is, "Are you

19  seeking a commission?"

20              And you said, "Not at this time."

21              And I said, "Are you waiving it?"

22              And you said, "I'm not waiving it."

23              What I -- so again, I'm going to ask you

24  the question:  If you seek a commission, then this is a

25  negative transaction for the estate.  Do you understand

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    that?

2        A.   If I sought a full commission on this

3    transaction, claiming the 4.4 million and claiming a

4    full commission of 162, that would be a negative

5    transaction.  And I've never done a negative

6    transaction.

7        Q.   Okay.  Okay.

8        A.   Ever.

9        Q.   Okay.  So I'm going to ask you again:  At this

10    point, as you sit here, you're -- you're not prepared to

11    say that you're not seeking a commission on the 4.4?

12            MR. RUKAVINA:  Objection.  Asked and

13    answered.  Badgering.

14        A.   Question again?

15        Q.   (BY MR. HILLYER) Okay.  Is it your testimony

16    today that you are not prepared to waive any commission

17    for the $4.4 million subject funds that is proposed to

18    be recovered?

19            MR. RUKAVINA:  Same objections.

20        A.   I haven't agreed to seek it; I haven't agreed

21    to waive it.  We'll see how things shake out.  Years

22    from now, who knows what's going on?

23        Q.   (BY MR. HILLYER) Then I'll -- I'll ask you more

24    directly; maybe get an answer.

25            Why are you insisting, at the bottom of

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    the page, that the money be essentially run through the

2    estate and not paid directly to the -- to the

3    bondholders?

4              MR. RUKAVINA:   Objection.   Asked and

5    answered.

6        A.   I think I answered that:   Because it's property

7    of the estate, and that's how things roll.   I don't --

8    I don't pay creditors or watch creditors get paid

9    outside of a bankruptcy estate.   There needs to be

10   accountings, etc.

11       Q    (By MR. HILLYER) Okay.   Well, let's talk about

12   the -- the general motion.   So you've -- you've reached

13   an agreement with the trustee -- I mean, an agreement

14   with the bondholders for the carve-out, and you've

15   reached a settlement on March 15th, and you've reached a

16   settlement -- "green light," I believe it said -- with

17   Prosperity Bank.   And you filed Motion Number 1 on

18   March 22nd.   Is that correct?

19       A.   That's correct, sir.

20       Q.   On or about -- okay.

21       A.   Yes, sir.

22       Q.   So what are the terms of Settlement Motion 1

23   that you filed?

24       A.   Well, if you show me the motion, that would be

25   helpful.

                                        Page 104

1           But my general recollection of -- of that

2    was that there was going to be a general release:

3    bondholder, Prosperity, trustee.  Moneys would come in,

4    go out.  There would be paydown, substantial paydown on

5    the bondholder debt, and the estate would have $100,000.

6        Q.   Okay.  So I'm going to ask you again, with

7    those terms in mind, if you seek a commission, you did

8    propose a negative transaction?

9           MR. RUKAVINA:  Objection.  Argumentative.

10   Badgering.  Asked and answered.

11       Q.   (BY MR. HILLYER) You can answer.

12       A.   I haven't sought one.

13           I haven't sought one.

14       Q.   Okay.  So the only money coming in to the

15   estate is the $100,000 surcharge, and you estimated your

16   counsel, in March of 2023, had already spent a -- I'll

17   call it a guesstimate of $50,000.  Is that correct?

18       A.   Yes.

19       Q.   Okay.  And in this proposed settlement, the

20   estate -- you were proposing to accept zero dollars in

21   exchange for the $513,000 Prosperity payments that were

22   itemized in your motion?

23       A.   Yes.

24       Q.   Okay.  Give me one second.

25       A.   You bet.

Alpha Reporting                          800-556-8974
A Veritext Company                    www.veritext.com

1      Q.   And Mr. Seidel, we -- we are going to look at

2   the motion.  But I want to -- I want to follow up on

3   what you said earlier and what has been asked in

4   different points of this:  What knowledge and what

5   documents you had.

6            So Motion 1 is filed on March 22nd.  You

7   have previously identified -- I'm keeping a separate

8   list over here -- of bank statement for 3992, DACA for

9   3992, and conversations that you've had.

10            Do you know of -- at this point, when the

11   motion is filed, do you know of any other documents that

12   you or your counsel had in their possession that you

13   used in assessing your business judgment to determine --

14   to file that motion?

15      A.   I can't -- I can't speak to the exact time and

16   when -- when we had bank statements on the other

17   account, etc.  So I -- I don't know.

18      Q.   Okay.  Give me one second.

19            I'm going to ask you a little bit about --

20   do you think it is in good business judgment -- I

21   apologize; I thought -- I thought you were leaving.

22            Do you think it is in good business

23   judgment to file a 9019 settlement motion if you were

24   not in possession of any other documents than the bank

25   accounts for 3992 and the DACA for 3992?

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1      A.   I'm not sure.

2      Q.   You're not sure that -- strike that.

3           I want to make sure I phrase this

4  correctly:  You're not sure that it's good business

5  judgment, or you're not sure that those were the only

6  documents that you had?

7      A.   I'm not sure that's all the documents we had.

8  We felt like we had information sufficient to do a deal,

9  or propose a compromise to the creditor body and see how

10 things looked.  To get some movement forward in the

11 case.

12     Q.   Mr. Langley is going to -- I believe it will

13 say "Funk e-mail," March 22nd, 3/22.

14               MR. LANGLEY:  March 22nd?

15               MR. HILLYER:  Yes.

16               THE WITNESS:  He'll tell me when it's

17 published.

18               MR. LANGLEY:  Exhibit 17 is published.

19               (EXHIBIT NO. 17, e-mail chain, beginning

20               with e-mail from Brenda Funk dated

21               March 22, 2023, was marked for

22               identification and attached hereto.)

23               THE WITNESS:  Thank you.  I'll pull it up.

24               I'm trying to get it bigger.

25     A.   Okay.  Okay, I have it up.

Page 107

1    Q.   (BY MR. HILLYER) Okay.  Do you want to take

2  a -- do you want to take a second to review it?

3    A.   Sure.  It looks pretty long.  I'll review it.

4  Hold on.

5              THE WITNESS:  It will take me a second --

6  unless you want to come over here.  Yeah, it's -- it's

7  like outrageous, but that's what you have to hit.

8              MR. HILLYER:  I'm sorry.  I -- I think

9  we're looking at the wrong exhibit.

10             MR. RUKAVINA:  We have a very long

11 exhibit.

12             MR. HILLYER:  Yeah, that's --

13             MR. RUKAVINA:  12 pages.

14             MR. HILLYER:  That's not it.

15             MR. RUKAVINA:  Okay.

16             THE WITNESS:  I'm waiting on you to put

17 the exhibit up, correct?

18             MR. HILLYER:  The correct one should be

19 Funk e-mail, Exhibit 18.

20             (EXHIBIT NO. 18, e-mail chain, beginning

21             with e-mail from Brenda Funk dated

22             March 22, 2023, was marked for

23             identification and attached hereto.)

24             THE WITNESS:  And y'all let me know when

25 it's been published.

Page 108

1      Q.    (BY MR. HILLYER) It has been published.

2      A.    Okay.  I'll look for it now.

3      Q.    This one should be a three-page.

4      A.    Thank you.

5            Okay, I see a Funk e-mail.  Three pages,

6      and I'll look at it.

7      Q.    Are you ready, Mr. Seidel?

8      A.    Yes.  I'm -- I'm reading the last little part.

9      "I snuck a request."

10           Okay.

11     Q.    Okay.  So this is an e-mail between Brenda

12     Funk, Mr. Rukavina, Adam Langley, and myself.  And this

13     e-mail chain starts on Wednesday, March 22nd, at

14     5:00 p.m.

15           And I'll represent to you, this is after

16     you have filed the motion on March 22nd.

17     A.    I'm with you.

18     Q.    Okay.  And before we get into this e-mail, I

19     would also -- so to -- as you're -- strike that.

20           So this is the first communications with

21     counsel from FedEx that's in the production.  Did you

22     ever, or your counsel ever discuss the -- I'm going to

23     call it "Motion 1," that was filed on 3/22 -- did you

24     ever discuss that with FedEx or ARRIS, as the two

25     largest unsecured creditors, before filing it?

                                        Page 109

1      A.    I do not recall doing that.

2      Q.    Okay.  Do you know if -- did your counsel ever

3   discuss with FedEx or ARRIS?

4      A.    I -- not that I recall.  I don't -- I do not

5   recall.

6      Q.    Okay.  Then I'll ask it to you this way:  If

7   you didn't communicate with FedEx or ARRIS before filing

8   this motion, do you feel that that is normal for the

9   two -- in a -- in a Chapter 7 case with the two largest

10   unsecured creditors?

11      A.    It depends on a -- a lot of moving parts and a

12   lot of things.  It just -- it varies from time to time

13   in terms of the overlay of everything happening.

14      Q.    Okay.  Well, going back -- and I won't make you

15   go through the exhibits in discovery, but this

16   negotiation that you've had with the bondholders has

17   been going on since early February, and with Prosperity

18   Bank, and is now March 22nd.  So it's well over a month.

19           Do you think, during that month-period

20   time where you're negotiating, is there any reason why

21   you wouldn't reach out to the largest two unsecured

22   creditors to tell them what you're doing, or proposing?

23      A.    It wouldn't be hidden from them, first of all.

24           Second of all, we didn't have a deal in

25   that -- that length of time, and -- you know, once we

Alpha Reporting                           800-556-8974
A Veritext Company                      www.veritext.com

1    had a deal, we flew it up the flagpole.

2         Q.   What does that mean, "flew it up the flagpole"?

3         A.   Sent it out to the world.  There's a jillion

4    creditors in this case, of which, as you pointed out,

5    FedEx and ARRIS are apparently the largest.

6         Q.   Mr. Seidel, do you know the size of FedEx's

7    claim in this case?

8         A.   I'm fascinated by it.  But I've heard that it's

9    in the 50- to 80-million-dollar range.  I for the life

10   of me can't understand that, but I don't have -- that's

11   not my issue today, about what -- why that claim is in

12   that nature.  I'm just trying to bring in money right

13   now.

14        Q.   Okay.  Well, let me rephrase the question.

15             Are you aware -- have you assessed the

16   claims pool?

17        A.   I have not done a claims analysis, because we

18   don't -- we're administratively insolvent.

19        Q.   Okay.  So would -- would it surprise you that

20   FedEx and ARRIS have over $110 million worth of filed

21   claims that represent over 85 -- 88 percent of the

22   entire unsecured claim pool?

23        A.   No.  Obviously the number is shocking, but --

24   you know, a lot of misdeeds done here prepetition.

25             But no, I think you've articulated to

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    me -- you or Adam, or maybe Noah, or my counsel -- have

2    articulated to me numbers in that range.

3        Q.   Okay.  So again, with the numbers as I guess

4    the foundation, is there any reason during this time

5    period when you are proposing settlements, negotiating

6    surcharges, and then filing a motion to run up the

7    flagpole, is there any reason why your office, you or

8    your office would not reach out to known counsel for the

9    two largest unsecured creditors?

10       A.   Other than there was -- you know, it's

11   complicated enough.  There were plenty of cooks in the

12   kitchen.

13             But, you know, as a matter of course,

14   it's -- I don't always reach out to general unsecured

15   creditor counsel when contemplating settlements in every

16   situation.

17       Q.   Okay.  So let's go back to Ms. Funk's e-mail.

18       A.   Okay.

19       Q.   I will represent to you -- so this is the

20   result of -- (overspeaking)

21             CERTIFIED STENOGRAPHER:  I'm sorry?

22             THE WITNESS:  Sorry; I'm -- I'm making

23   sure I've got the right one.  But I'll -- I'll wait and

24   let him articulate it.  I -- I stepped on him, I think.

25   Sorry.

Alpha Reporting                          800-556-8974
A Veritext Company                       www.veritext.com

1      Q    (By MR. HILLYER) It -- it'll be Exhibit 18, the

2   three-page one.

3      A.   Yeah.

4      Q.   Okay.

5      A.   What date?

6      Q.   March 22nd.

7      A.   I'm with you, Counsel.

8      Q.   Okay.  So Ms. Funk sends to counsel for FedEx a

9   zip file with the documents from Prosperity and a DACA

10   in your counsel's possession from the bond trustee.

11           Do you see that, at the bottom?

12      A.   I do.

13      Q.   Okay.  And do you know what that zip file with

14   documents from Prosperity is?

15      A.   I would be guessing.

16      Q.   What is your guess?

17           MR. RUKAVINA:  Objection.  Speculation.

18      A.   Whatever documents we received from Prosperity,

19   vis-à-vis bank statements, account statements, deposit

20   agreements, etc.

21      Q.   (BY MR. HILLYER) Okay.  Well, Mr. Seidel, look

22   at the top of that page.  And there's Ms. Funk's reply

23   to my e-mail that -- in the -- and focus in the middle

24   of the page, I'm sorry, right now -- that basically, "We

25   acknowledge the DACA exclusive to 3992.  Do you know any

Alpha Reporting                          800-556-8974
A Veritext Company                    www.veritext.com

1   files or folders that has the current information on the

2   account at Prosperity where the funds are being held?"

3               Is that what it says?  Okay.

4       A.    That's what it says.

5       Q.    And Ms. Funk's response is "I was looking and I

6   don't believe we received that information.  Our request

7   for documents was specifically related to the Genesis

8   loan and the granting of collateral by GNI," which --

9   Goodman Networks -- "in October of 2021.

10              "While we were talking, I located the

11  Prosperity account statements for 3992.  They are

12  attached."

13              Do you see that?

14      A.    I do.

15      Q.    Okay.  So I'll represent to you, the -- the

16  zip file is all the loan documents from October of 2021

17  related to the Genesis loans, in addition to account

18  statements from 3992 and the DACA from 3992.  Okay?

19              And what I'm asking you is, Mr. Seidel,

20  that actually comports with what you testified to

21  earlier, when you articulated you knew you had the

22  account statements for 3992 and the DACA for 3992.  You

23  also were in possession of the Genesis loan documents

24  from a year earlier, in October of 2021.

25              Okay.  My question is, Ms. Funk -- you can

1   go to the first page, and I'll be direct about this.  I

2   asked specifically, "Why don't you have any other

3   documents?"

4              And Ms. Funk responds, "I snuck in a

5   request for current account statements and account

6   history into a chain with Prosperity.  I'll send you

7   what I get.  As Davor said, we want to get the money in

8   (and wouldn't have this" -- have -- "and wouldn't have

9   this settlement absent a release by the bond trustee),

10  and we welcome all discussions regarding how the funds

11  should be rightly distributed."

12             Okay.  So I will go back to the first part

13  of that sentence.  Ms. Funk's statement is saying you

14  did not have any documents or information about

15  Account 0188.  Isn't that what that says?

16       A.   No.

17       Q.   Okay.

18       A.   Unless she requests it further.

19             To me, it's saying she's requesting

20  further account statement information, account history.

21  I don't see where it says "We don't have any information

22  on any specific account."

23       Q.   Okay.  Mr. Seidel, I'll ask you to go back to

24  page 2.  I said "Where are the documents from account

25  where it's being held?"

                                              Page 115

1            And Ms. Funk says "I was looking, and I

2     don't believe we received that information."

3            I'm not trying to fight with you.

4            MR. RUKAVINA:  I'll object for the obvious

5     reasons -- go ahead.

6            I'll object for the obvious reasons, that

7     you're asking this witness to speculate and testify

8     about a discussion that you had with Ms. Funk that he's

9     not copied on.  All of this is speculation, and now

10    you're starting to harass him.

11           MR. HILLYER:  Okay.

12    Q.   (BY MR. HILLYER) I'll ask you directly:  Did

13    you have documents and account information regarding

14    Account 0188 on March 22nd of 2023?

15    A.   I am not sure.

16    Q.   Would this e-mail make -- lead you to believe

17    that you didn't have that information?

18           MR. RUKAVINA:  Speculation.  Objection.

19    Q.   (BY MR. HILLYER) Okay.  Is there any -- I'll

20    rephrase it.

21           Is there any reason why you would

22    withhold -- or fail to give FedEx and ARRIS that

23    information on March 22nd of 2023, after you filed the

24    motion?

25    A.   Not that I can think of.

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1        Q.   Okay.  Let's go back to what Mr. Langley

2    erroneously introduced as Exhibit 17, which is the Funk

3    e-mail, which is -- I'll submit I was not counting on

4    having two Funk e-mails, March 22nd, labeled the exact

5    same.  But it should be Exhibit 17.

6        A.   And that's the really lengthy one, right?

7             MR. RUKAVINA:  It's the lengthy one.

8    Maybe it only starts halfway up.

9        A.   Okay.  I'll let you direct me to what -- what

10   you want.

11            MR. RUKAVINA:  You have the right to read

12   the whole thing.

13            THE WITNESS:  Yeah.

14            MR. HILLYER:  Give me one second.  It's

15   not coming up on my screen.

16            MR. RUKAVINA:  When it does, Cam, to

17   expedite matters, just point us to where this is

18   different from a prior chain, if you can.

19       Q.   (BY MR. HILLYER) I really am only looking at

20   the first line, and I apologize for the lengthy e-mail.

21            So that is an e-mail from Ms. Funk to

22   Ms. Argeroplos.

23       A.   The one that says, "Can you send me an

24   account"?  I'm sorry.

25       Q.   Yes.  Yes.  I'm sorry.  This -- it's an e-mail

Alpha Reporting                    800-556-8974
A Veritext Company            www.veritext.com

1    from Ms. Funk to Ms. Argeroplos, and it -- it's -- it is

2    at the time of the e-mails with Ms. Funk and me and

3    Mr. Langley.  And Ms. Funk then asks the bank to "send

4    an account statement and account history for our

5    records."

6                    Do you see that?

7        A.   I do.

8        Q.   So I'm just going to ask you simply:  I asked

9    you, did you have that information; you said you don't

10    know.  Based on your reading of this, is there any

11    reason why you would have it, and be asking for it

12    again, after counsel for FedEx asked for it?

13        A.   You never know.  You know, you could be asking

14    for account statements to make sure you've got

15    everything; you may already have it.

16                    I just don't know -- I'm not trying to be

17    cute or argumentative with you.  I just don't know what

18    Ms. Funk had.  She's asking for account statement, an

19    account history, to make sure she's got her complete

20    file, it seems to me.

21        Q.   Okay.  And then --

22                    MR. RUKAVINA:  Cam, can I interject?  If

23    it can help, is this the subject of our e-mail exchange

24    from a couple weeks ago?

25                    MR. HILLYER:  No, it is not.

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1          MR. RUKAVINA:  Okay.

2          MR. HILLYER:  We will -- we will discuss

3   that when we -- when we get to it.  But I understand

4   your question.

5     Q.   (BY MR. HILLYER) What I'm -- what I'm asking

6   is, if you had account information from 0188, including

7   the statements and the history, you would have produced

8   those to us in response to our requests for admission,

9   wouldn't you have?

10    A.   You would think so, yes.

11    Q.   Okay.  And if you did not, and they are not in

12   there, then they were not in your possession.  Would

13   that be a fair statement?

14    A.   That should be the way the game is played.

15    Q.   Okay.  So -- I'm not trying to re-ask you.  So

16   if you didn't produce it in your request for production,

17   you did not have that information?

18    A.   That's fair.

19    Q.   Thank you.

20    A.   Yes, sir.

21    Q.   This whole line of questioning about

22   the 0188 account was precipitated by my questioning --

23   the line of questioning related to filing Motion 1 and

24   your business judgment.  And I asked the question, do

25   you consider that good business judgment, to file a

                                          Page 119

1    settlement motion when you are not in possession of the

2    documents showing where the subject funds are located?

3    And you answered, "I'm not sure we didn't have it."

4              I'm asking you now, is if you didn't

5    produce it, and Ms. Funk said that -- was asking for it

6    again, I'll re-ask the business judgment:  Do you think

7    that is good business judgment, to settle this claim

8    and -- settle these claims, and file that motion,

9    lacking that information?

10   A.   It could be, yes.

11   Q.   Okay.  It could be good business judgment?  I'm

12   sorry, you -- you have to explain that.

13   A.   Yep.

14   Q.   Okay.

15   A.   Yeah, I mean, depending on the universe of

16   knowledge of my counsel, as they related to me, with

17   regard to the underlying circumstances and facts

18   surrounding the transactions.

19   Q.   Okay.  I'll ask you a related question.  How

20   can you possibly conduct any analysis about the subject

21   funds if you don't know where they're located,

22   Mr. Seidel?

23   A.   I don't know that we didn't know where they

24   were located.  I think we knew they were located at

25   Prosperity.  I know that -- you know, we had these

Alpha Reporting                          800-556-8974
A Veritext Company                    www.veritext.com

1    double accounts.  And it's obvious from what you're

2    pointing out that apparently, at this point in time, we

3    did not have the documentation with regard to one of the

4    accounts, perhaps.

5        Q.   Okay.  So if you don't have documentation, are

6    you relying on -- I'll call it hearsay.  Is this --

7    who's providing you this information without

8    documentation about the location of the current account?

9        A.   I'm not positive if it came from bondholders,

10   Prosperity, FedEx.  I don't know who was communicating

11   with my team with regard to that.  I just can't testify

12   to that.

13       Q.   Okay.  So your -- when you say your team, it's

14   Mr. Rukavina, Ms. Funk, Mr. Berghman, correct?

15       A.   That's -- that's pretty much the team.

16       Q.   Okay.  So your team is communicating with

17   counsel for the bank and the bondholders, and then

18   communicating that information, without documentation,

19   to you.  Is that what you're saying?

20       A.   I'm saying some -- they may have not had some

21   documentation, but they were communicating with me.

22       Q.   Okay.  And I'll ask you again:  If Ms. Funk

23   sent to FedEx, "This is what we have in our possession,"

24   would that not be exactly what they -- strike that.

25                   If -- if your counsel can only send a DACA

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    and an account statement for 3992 in Genesis loan

2    documents from October of 2021 to counsel for FedEx and

3    ARRIS after the motion is filed, what could possibly

4    lead you to believe that you had other documentation?

5        A.    I -- I don't know if she -- I mean, I've made a

6    mistake before.  I don't know.  But I would think

7    that -- when she says "We're sending you everything

8    we've got in terms of documentation," she did so.

9        Q.    I understand.

10            Look -- the last line of Exhibit 17 -- I

11    mean, the Exhibit 17 we were looking at, Ms. Funk says,

12    we are welcome -- "and we welcome all discussion

13    regarding how the funds should be rightly distributed."

14            What's your understanding of that?

15        A.    Let me get to it.

16            That sounds to me like she's reaching out

17    for comments with regard to the compromise.  That's what

18    it sounds like to me.

19        Q.    Have you read it?

20        A.    Oh.  Show me where it is.

21        Q.    I'm sorry.  It's the -- it's the last sentence

22    of -- of the very top of the Exhibit 18.

23        A.    Okay.  I'm on the top of 18.  That's "Can you

24    send an account statement."  Then you want me to go

25    down?

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    Q.   No.  You're on Exhibit 17.  I'm sorry.

2    A.   I apologize.  I apologize.

3    Q.   It's all right.

4    A.   Exhibit 18, you want me to look at.

5              And "As Davor said" -- "we welcome all

6    discussion regarding how the funds should be rightly

7    disbursed."

8    Q.   That's correct.  That's what my question was,

9    is what is your understanding of what that means?

10   A.   My understanding is we're reaching out to FedEx

11   with regard to what they think about the -- the funds,

12   and how they think that should roll.

13   Q.   Okay.  So I'll ask you:  This is post filing of

14   the motion, and you said that you didn't reach out to

15   FedEx before filing the motion.  So my question is, what

16   are you asking -- or what is your counsel asking --

17   haven't you made the decision of how you're going to

18   distribute the funds?  Because that's the actual terms

19   of the settlement you proposed?

20   A.   No.  We're asking for input on the deal that --

21   proposed.

22   Q.   Okay.  So are you asking FedEx if they have a

23   claim to the funds?

24   A.   "We welcome all discussion."  I think -- "all

25   discussion."  That's -- that's how I read it.  I don't

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    know what she meant with -- with regard to the remainder

2    of that sentence.

3        Q.    Okay.  So my confusion, Mr. Seidel, is that I

4    believe you already testified at this point, when you

5    have filed the motion, you've already done your analysis

6    as to who you think should receive the subject funds.  I

7    believe that's what you testified to earlier.

8        A.    Okay.

9        Q.    Okay.  So if you've done your analysis, and

10   your analysis led you to believe that the bondholder

11   should receive all of the subject funds, less a

12   surcharge, and in your business judgment you chose to

13   file that motion, why are you reaching out to unsecured

14   creditors after the filing, asking for their input, if

15   it would be opposite of what your analysis showed?

16       A.    To make sure we didn't -- we didn't leave any

17   stone unturned.

18       Q.    Okay.  Did you have concerns about your

19   analysis at the time you filed the motion?

20       A.    I don't recall that I had concerns.

21       Q.    Okay.  Okay.  And so let's talk about that.

22   Is -- your analysis as to the subject funds, what did

23   your analysis say, or what was your understanding of

24   that analysis on March 22nd, when you filed Motion 1?

25                  MR. RUKAVINA:  Objection.  Vague.

Alpha Reporting                                800-556-8974
A Veritext Company                          www.veritext.com

1      A.    Can you hit me again?

2      Q.    (BY MR. HILLYER)  Sure.  I'll restate it.

3            On March 22nd, when you filed this motion,

4    what was your analysis as to the subject funds and how

5    the funds should be rightly distributed?

6      A.    Basically that they were -- should be

7    distributed to the bondholders, according to our

8    analysis.

9      Q.    Okay.  Who is all -- when you say "our

10   analysis," are you including other people in that?

11     A.    Well, my -- my team, my lawyers.

12     Q.    Okay.  And who provided you that analysis?

13     A.    That would be Mr. Rukavina, Ms. Funk -- I don't

14   know if Mr. Berghman was involved at that point in time

15   or not.  I don't know if there are other lawyers at

16   Munsch.  But suffice to say the two people in these

17   e-mails were on point.

18     Q.    Okay.

19     A.    That would be Mr. Rukavina -- Mr. Rukavina and

20   Ms. Funk were on point.

21     Q.    Okay.  And did Mr. Rukavina and Ms. Funk

22   provide you a written analysis regarding the subject

23   funds and their distribution?

24            MR. RUKAVINA:  Object, based on the

25   privilege.

Alpha Reporting                          800-556-8974
A Veritext Company                       www.veritext.com

1          And I'll instruct you not to answer that

2      question.

3               MR. HILLYER:  I'm not asking the subject

4      matter of it.  I'm just asking if he provided written or

5      unwritten.

6               MR. RUKAVINA:  No, sir.  You're not going

7      to get the answer, not without a court order, not after

8      you threatened to breach the attorney-client privilege

9      based on his prior interrogatory response.

10               So we're going to tread

11      hyperconservatively regarding the privilege.  And if we

12      need to go to the judge on that, we can.

13               MR. HILLYER:  Okay.  So for the record,

14      you're instructing him not to answer the question of did

15      his counsel provide him a written analysis regarding the

16      subject funds?

17               MR. RUKAVINA:  Yes.

18               MR. HILLYER:  Okay.  We can take that up

19      later.

20               MR. RUKAVINA:  No, let's take it up now.

21      If I've got to stop the deposition or if you've got to,

22      let's take it up now.

23               MR. HILLYER:  Okay.

24               MR. RUKAVINA:  Unless you guys want to

25      agree that he can talk about this and not waive the

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1   privilege, in light of your recent communication to me

2   that you think that the privilege has already been

3   waived, like I say, I'm not going to take any chances

4   today.

5          MR. HILLYER:  Okay.  Give me one second,

6   let me think about that.

7          (Pause)

8          MR. RUKAVINA:  It's been about an hour.

9   Do you want to take a quick break?

10         MR. HILLYER:  All right.

11      Q.   (BY MR. HILLYER) Well, let me ask you this

12   question, which may impact:  Did you do any independent

13   analysis of the subject funds and how they should be

14   distributed?

15         MR. RUKAVINA:  Let me -- let me just

16   interject again.  What you are trying to do here is

17   trying to get him to admit that he adopted his counsel's

18   recommendation or advice.  You argue that the -- hold

19   on.

20         You asked that he adopt -- I'm sorry.  You

21   argued that the act of adoption waives the

22   attorney-client privilege.  You are now going into

23   questions, the sole purpose of which is to waive the

24   attorney-client privilege.

25         So I'm not going to let you answer that

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    question either, Mr. Seidel.  Not without going to seek

2    a protective order.  Not unless you guys are willing to

3    back off your threat that the attorney-client privilege

4    has or will be waived.

5              THE WITNESS:  I'm ready for a break.  I

6    don't know about anybody else.

7              MR. HILLYER:  Okay.  Well, let's hold on

8    this point, because I -- I think we can think about

9    this.

10              I'm -- the question about the independent

11   analysis is spot on with what your attorney just said,

12   is -- if you did or did not do -- if you did, I'll ask

13   you about your independent analysis; if you did not,

14   then we need to -- then I -- we can take a short break,

15   and I need to consider about agreeing to limit privilege

16   that -- so that you can discuss the analysis, if you

17   didn't conduct any of your own.

18              So let's take a short five-minute break,

19   and then we'll come back.

20              THE WITNESS:  We'll be on break?  Are we

21   off the record?

22              VIDEOGRAPHER:  We're going off the record.

23   The time is approximately 3:32 p.m.

24              (Recess)

25              VIDEOGRAPHER:  We're going back on the

Alpha Reporting                              800-556-8974
A Veritext Company                        www.veritext.com

1    record.  The time is approximately 3:52 p.m.

2        Q.   (BY MR. HILLYER) All right, Mr. Seidel, let's

3    try to clarify for the record where we are.

4             I asked the question, did your legal

5    counsel provide you a written analysis regarding the

6    subject funds and any liens attached to them and how the

7    funds should be distributed?  And your counsel objected

8    as to privilege.

9             MR. HILLYER:  Is that correct, Davor?

10            MR. RUKAVINA:  And I instructed him not to

11   answer.

12            MR. HILLYER:  Okay.  So the -- so the

13   question of whether they provided a written analysis is

14   off the table.

15       Q.   (BY MR. HILLYER) Second question is,

16   Mr. Seidel, did you independently do a legal analysis --

17   factual and legal analysis of the subject funds as

18   defined in your motion, their current location, any

19   lien, perfection, secured or unsecured, or Article 9

20   analysis independently?

21            MR. RUKAVINA:  I'm going to object to that

22   question as multifaceted and vague.  It's five questions

23   in one.  I ask counsel to rephrase.

24       Q.   (BY MR. HILLYER) Did you do an independent

25   analysis -- an independent factual and legal analysis,

Alpha Reporting                          800-556-8974
A Veritext Company                    www.veritext.com

1    pursuant to Article 9, as to the subject funds as

2    defined in your motion?

3                    MR. RUKAVINA:  And I instruct you not to

4    answer that question.

5                    That is a setup question to buck the

6    attorney-client privilege, and you yourself are a

7    lawyer; I would take it providing yourself some limited

8    legal analysis.

9                    So I instruct the witness not to answer

10   that question.

11                   MR. HILLYER:  So he will not -- I'm

12   confused why we went back on the record.  So -- so he's

13   not going to answer the question of if he did an

14   independent analysis?

15                   MR. RUKAVINA:  No.  You just asked a

16   question that had two parts:  Did you do a factual and a

17   legal analysis under Article 9 of the UCC?  That

18   question, that, I'm not going to let him answer.

19                   Again, you can try to be more specific.

20   For example, did he do a factual analysis?

21                   MR. HILLYER:  Okay.  But you're -- you're

22   telling him not to answer that based on what?

23   Privilege?

24                   MR. RUKAVINA:  Yes.

25                   MR. HILLYER:  Okay.

Alpha Reporting                              800-556-8974
A Veritext Company                       www.veritext.com

1      Q.   (BY MR. HILLYER) Mr. Seidel, did you do a

2  factual analysis of the subject funds, pursuant to

3  Article 9, before you filed the motion?

4      A.   Yes.

5      Q.   Okay.  And before we get to the next question,

6  I'll ask you, how did you do a factual analysis of the

7  subject funds if you did not have documents or know

8  where the subject funds were located?

9      A.   From information from my counsel, information

10  that they gleaned either through document production

11  and/or through conversations with counsel.

12      Q.   Okay.

13      A.   And/or parties.

14      Q.   Okay.  We'll come back to that.

15             MR. HILLYER:  So, Davor, here's the second

16  part to your question.

17      Q.   (BY MR. HILLYER) Mr. Seidel, did you do a legal

18  Article 9 analysis of the subject funds at the time that

19  you filed the motion?

20             MR. RUKAVINA:  And I'll object and

21  instruct the witness not to answer that question, based

22  on privilege.

23             MR. HILLYER:  Okay.  And I'm being --

24  trying to be clear, granular, as you said.

25      Q.   (BY MR. HILLYER) I'm asking, did you do an

1    analysis apart from your attorneys?  I should have

2    limited that because of the former objection.

3              If it changes your answer, is -- did you

4    do a legal analysis pursuant to Article 9 about the

5    subject funds, apart from your attorneys?

6        A.   You asked me different questions here.

7              MR. RUKAVINA:  You're asking different

8    questions --

9              THE WITNESS:  Three different questions.

10             MR. RUKAVINA:  -- but I'm still going to

11   object, based on the attorney-client privilege, and

12   instruct you not to answer.

13             MR. HILLYER:  To be clear, that's what I

14   was trying to limit it, with "apart from the attorneys."

15   I'm only asking Mr. Seidel about whether -- I'll make

16   clear, is Mr. Seidel independently, apart from any of

17   his counsel, do a legal analysis of the subject funds,

18   and -- does your objection still stand?

19             MR. RUKAVINA:  Yes.

20             MR. HILLYER:  Okay.  And that objection is

21   privilege?

22             MR. RUKAVINA:  Privilege, relevance, and I

23   would also assert you're starting to harass this

24   witness.

25             MR. HILLYER:  Okay.  Well, I will

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1   respectfully -- if it's relevance, he can go ahead and

2   answer.  If it's privilege, you can instruct him not to

3   answer.

4           MR. RUKAVINA:  I'm warning you once again,

5   and as we talked during -- off the record, I believe

6   that your questions are not asked in good faith, to find

7   facts, but are asked for the sole purpose of busting the

8   privilege.  And I am prepared -- and will, if you

9   continue down this road -- seek a motion for protective

10  order under both the privilege, and generally, your --

11  your conduct of these questions is not being asked in a

12  good faith basis to find facts.

13          I state again, this witness --

14          MR. HILLYER:  Okay.  Well --

15          MR. RUKAVINA:  -- is not an expert.

16  This -- this witness is not -- this witness is not

17  stating that the bank -- that the bondholders are or are

18  not perfected.

19          MR. HILLYER:  I understand.  And just for

20  the record -- and we'll reserve our rights to take this

21  up with the judge.  But at this point, it's -- it's

22  Wednesday, September 13th, and we've moved this

23  deposition twice at your request, so we're a little out

24  of time to go proceed to the Court at this point with a

25  briefing deadline of Monday.  So we need to go forward.

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1          MR. SCHOTTENSTEIN:  Sorry, just -- Cam, I

2   do want to put on the record that I do believe we're

3   being materially prejudiced by the conduct here, by the

4   continual delays, and that -- you know, in addition to

5   the privilege, you know, we're going to reserve our

6   rights to seek other relief.

7          MR. RUKAVINA:  Can counsel please identify

8   what delay he's referring to?  My memory is that we

9   pushed Monday, at everyone's request, to allow our

10  continuing negotiations to continue.  That was not our

11  request.  And what prior delay and push are you

12  referring to, please?

13         MR. SCHOTTENSTEIN:  Well, we --

14         MR. HILLYER:  Let's go -- let's go off

15  the -- let's go off the record --

16         MR. SCHOTTENSTEIN:  Yeah.

17         MR. HILLYER:  -- and -- and be -- and be

18  clear.

19         MR. RUKAVINA:  I don't want to go -- no,

20  if my client and I are being threatened with other forms

21  of relief, then -- then let's stop this deposition and

22  take it in front of the judge, or let's set forth what

23  our arguments are.

24         I don't recall there being a prior delay.

25  I recall us trying to negotiate this motion with you,

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    and it being a joint decision -- Sunday maybe, Saturday;

2    I forget when -- that we pushed Monday's deposition.  I

3    don't recall asking for that.

4                    MR. HILLYER:  You know what?  Well, Davor,

5    for the record, I mean, we had -- there's no reason this

6    has to be anything but, you know, obviously

7    professional.

8                    Your client called me directly and asked

9    me, "What flexibility do you have for Monday?"  Because

10   Monday had gotten out of control with the AMRR.

11                   And I said, "I'm very flexible."  And I

12   talked about --

13                   MR. RUKAVINA:  That's true.

14                   MR. HILLYER:  -- I said, "Tuesday or -- or

15   Wednesday?"

16                   And then he said, "Let's do Tuesday or

17   Wednesday."

18                   You can ask your client if he called me

19   and asked that.  So that was your request, and the

20   e-mail I sent said that the trustee had requested it.

21   And I was trying to be -- I was trying to be very

22   accommodating, and that's why we moved it.  But I didn't

23   ask that it be moved.  I didn't ask that it be moved off

24   the Friday.

25                   So -- so let's just do it.  All I was

Alpha Reporting                    800-556-8974
A Veritext Company                 www.veritext.com

1   saying is I don't want to run out of time.  I want to

2   just get through the rest of this deposition and get it

3   done, and we can all reserve our rights.

4               MR. RUKAVINA:  You're not going to --

5   you're not going to run out of time.  We can come back

6   tomorrow; we can come back Friday; we can push the

7   hearing to the 28th, if need be.

8               I'm just telling you that I question your

9   sincerity and good faith in asking these questions.  Ask

10  him any question of fact you want; he's here to -- he's

11  here to answer you that.  But I respectfully -- and I've

12  known you now for eight months; I know you to be a man

13  of honor.  I think that you are asking questions the

14  sole purpose of which is to set him up to waive the

15  privilege.

16              MR. HILLYER:  Well, I'm -- I'm sorry you

17  feel that way.  I -- I feel like I -- I have not had an

18  ulterior motive in anything at this point to the extent

19  it's being imputed to me because of the conflict of our

20  clients, but that's not.  I really want to -- to be

21  clear, and so we can -- if we have to take it before the

22  judge, I really just want to know what the analysis is.

23              We can disagree on relevance, but let's --

24  let's press forward with -- as Mr. Schottenstein said,

25  with the full reservation of right, and go into the

1    motion, the terms of the motion.

2              MR. RUKAVINA:  That's fine.  That's fine.

3        Q.   (BY MR. HILLYER) So, Mr. Seidel, in -- in

4    Motion 1 -- and I'm going to try to say, just for the

5    record, Motion 1 was filed on March 22nd; Motion 2 was

6    filed on May 17th; and Motion 3 was filed on July 28.

7              To make it easier for us, I'm going to

8    call them Motion 1, Motion 2, and Motion 3.  Is that

9    acceptable for you?

10       A.   That's fine.

11       Q.   Okay.

12             MR. RUKAVINA:  Just trying to see if --

13   see if you have it in front of you.

14       A.   Do you have them to show to me, as you're

15   asking me about them?

16       Q.   (BY MR. HILLYER) Okay.

17             MR. RUKAVINA:  I just want to make sure --

18   Motion 1 is the March 22nd; Motion 2 is the first

19   amended?  Right, Cam?

20             MR. HILLYER:  No.  So basically this is

21   going to be Docket 226.  It's the March 22nd motion.

22             MR. RUKAVINA:  That's Motion 1.  Okay.

23             MR. HILLYER:  Yeah.

24             MR. RUKAVINA:  And what's Motion 2, Cam?

25             MR. HILLYER:  Motion 2 is Docket 261.

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1          MR. RUKAVINA:  Hold on a sec.  Hold on.

2     Hold on.  Hold on.  Let me get there.

3          MR. HILLYER:  I'm going to introduce it

4     later on.

5          MR. RUKAVINA:  Okay.  I just want to make

6     sure -- yep.  I'm with you.  261.  That's the first

7     amended.  Okay.

8          And then the -- and the Motion 3 is the

9     second amended, right?  Okay.  We're with you.

10          MR. LANGLEY:  Exhibit 19 is the original

11     motion.

12          MR. HILLYER:  So Exhibit 19 is the

13     original motion filed on March 22, 2023.

14          THE WITNESS:  Let me get back to exhibits.

15          MR. RUKAVINA:  Hold on.  You're on full

16     screen.  Got to get out of full screen.

17          MR. HILLYER:  If you have a copy of it,

18     you can -- I'm happy to use hard copies of filed

19     pleadings.

20          MR. RUKAVINA:  There it is.

21     A.   I've got that motion in front of me,

22     Exhibit 19.

23     Q.   (BY MR. HILLYER) Good to go?

24     A.   Yeah, I've -- I've got it up.  I've got that

25     exhibit on the display, Exhibit 19.

Alpha Reporting          800-556-8974
A Veritext Company       www.veritext.com

1    Q.    Okay.  And I -- I believe we already discussed

2    this previously.  The terms of that motion -- you're

3    welcome to go through it, if need be -- is that there is

4    a recovery by the estate of $4.463 million.  There is an

5    agreed $100,000 surcharge.  The remainder of the 4.363

6    is remitted to the bondholders, and Prosperity Bank

7    keeps the $513,000 Prosperity payments, and Prosperity

8    Bank is provided a global release related to the -- the

9    subject funds, the Prosperity payments, and any other

10   funds that could have come from the debtor's accounts.

11   Is that correct?

12   A.    That's a fair overview of it, in my

13   recollection.

14   Q.    Okay.  And let's first start with the --

15   the 513.  And basically -- I'm going to direct you to

16   paragraph 12 and 13 of your motion.

17               Are you there?

18   A.    Yeah, I'm reading it.

19   Q.    Okay.

20   A.    Okay.

21   Q.    Would you agree with me that paragraph 12

22   and 13 essentially mirror the same language, that the

23   debtor received no return consideration and no

24   reasonably equivalent value for the assignment of the

25   deposit account, as well as no -- no consideration and

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    no value for the Prosperity payments?

2         A.    Seems to be.

3         Q.    Okay.  And you assert -- or the trustee asserts

4    the assignment can be avoided by him for the benefit of

5    the estate.

6         A.    Yes.

7         Q.    Do you believe that statement to be true?

8         A.    Yes.

9         Q.    Okay.  You -- the trustee -- in paragraph 13,

10   "The trustee asserts that he may avoid the Prosperity

11   payments as constructively fraudulent transfers because

12   the debtor was not obligated to pay Prosperity, received

13   no reasonably equivalent value for the Prosperity

14   payments, and because James Goodman caused the debtor to

15   make the Prosperity payments in order to benefit the

16   Genesis borrowers and himself."

17        A.    Yes.

18        Q.    Is that a true -- do you believe that to be a

19   true statement?

20        A.    Yes.

21        Q.    Okay.  So you have now asserted in the motion

22   that you can avoid the assignment, and you can avoid the

23   Prosperity payments as constructively fraudulent

24   transfers, in consecutive paragraphs, correct?

25        A.    That I may avoid them.

Page 140

1       Q.   Well, let's go back.  You said the assignment

2   can be avoided, and you said the trustee asserts that he

3   may avoid.  Are you making a distinction between those

4   two?

5       A.   Two different words, to me.  The trustee

6   asserts that he may avoid; that's what it says.  And

7   that's what we assert.

8       Q.   Okay.  Well, I'm asking you, are you saying

9   that you are making a distinction between "can avoid"

10   the assignment, and "may avoid" the Prosperity payments;

11   does that mean two different things to you?  Or do they

12   mean the same thing?

13       A.   Show me where the word "can" is.

14            MR. RUKAVINA:  You have to scroll.

15            THE WITNESS:  Scroll up?

16       Q    (By MR. HILLYER) Yeah, it's right above it.

17   Sorry.  Look at January 22nd, and go straight up.

18            MR. RUKAVINA:  Scroll down.

19            THE WITNESS:  Yep.

20       A.   That he can avoid.  It can be avoided by him.

21   That's what it says.

22       Q.   (BY MR. HILLYER) Right.  So my question was --

23   I'm just trying to make sure that you're not -- we're

24   not parsing words.

25            Are you saying that there is a

1    significance to "can be avoided" versus "may avoid"?

2         A.    I'm not sure.  I don't -- I don't think so.

3         Q.    You don't think so.  Okay.

4               So would it be a fair statement to say

5    those are the exact same allegations with different

6    verbiage, nonmaterial verbiage, that was in the draft

7    complaint that you sent to Prosperity Bank?

8         A.    I believe so.

9         Q.    Okay.

10        A.    I'll take your word for it.

11        Q.    Okay.  Well, I'll make it -- Mr. Seidel, in the

12   draft complaint, you were seeking a declaratory judgment

13   to avoid the assignment, and you were seeking to recover

14   the Prosperity payments as a fraudulent transfer,

15   correct?

16        A.    Correct.

17        Q.    Okay.  And that is -- that is essentially what

18   paragraphs 12 and 13 are -- are reiterating?  12 and 13

19   of Motion 1?

20        A.    Correct.

21        Q.    Okay.  And so I'll ask you again, in the

22   context of your motion that was asked in the draft

23   complaint, is when you put those statements in there,

24   and you said "can be avoided" and "may avoid," did you

25   assess the likelihood of success that you could avoid

Alpha Reporting                              800-556-8974
A Veritext Company                      www.veritext.com

1    the assignment, or that you may avoid the Prosperity

2    payments?

3          A.    I -- yes.

4          Q.    Okay.  And I believe earlier you stated that

5    you did not want to use percentages, and I believe you

6    said "decent," or "not bad."  Is that correct?

7          A.    Yes.

8          Q.    Okay.  Does it stand -- is it -- your opinion

9    the same in the context of the motion that you think the

10    likelihood of the -- success of the two allegations put

11    in paragraph 12 and 13 are decent or not bad?

12          A.    Sure.

13          Q.    Okay.  And so I will then ask you, this motion

14    proposes -- this motion proposes a payment of zero

15    dollars in exchange for the release of liability for the

16    Prosperity payments.  Is that correct?

17          A.    Yes.

18          Q.    Okay.  So explain to me how decent or not bad

19    claims are worth zero dollars in a settlement.

20          A.    Well, at this scenario, from what I recall, we

21    were under the impression that -- that the bondholders

22    were oversecured.  We had a $22 million offer on the

23    table from Frinzi.  We had this 4 million.  We had

24    millions owed under the insurance policies, etc.

25                     And so we were trying to move the ball

Page 143

1    forward with regard to flowing money.  Get the

2    bondholders out, to get Prosperity untangled, and to

3    focus on the bad guys, and not spend a bunch of money --

4    and not spend a bunch of money litigating.

5        Q.    Okay.  Well, you threw a lot of -- a lot of

6    concepts in that answer that are -- that are outside the

7    scope of your motion related to AMRR.  What I'm asking

8    you is, do you think that is reasonable for the estate

9    to release a fraudulent transfer claim that is decent,

10   or not bad, in exchange for zero dollars?

11       A.    I did at the time.

12       Q.    I'll ask again:  Why would you think that zero

13   dollars for a claim -- or strike that.

14            A zero dollar recovery on a fraudulent

15   transfer claim for the estate is what you're proposing.

16   Why would you think that is reasonable or in your good

17   business judgment?

18       A.    Because the lay of the land at that point in

19   time -- because the way -- let's see.  Hold on.  Let me

20   look at the complaint.

21            It says, as is indicated in the motion,

22   "The collateral agent and majority noteholders have

23   asserted the claim under the notes were oversecured,"

24   and like it says there, "on a preliminary basis, it

25   appears to the trustee that this may be correct."

Page 144

1              "Would be able to claim postpetition

2     interest, default interest, attorney's fees" -- all

3     kinds of fees that we were contemplating having to pay

4     that were ticking with the bondholders.  We were trying

5     to stop that clock, default interest, etc.  Also

6     minimizing the cost of litigation.

7         Q.   Okay.  So we'll address each part of -- of what

8     you just said.  So basically -- so am I correct that

9     you're making this about timing; that settling for zero

10    dollars on this fraudulent transfer claim was reasonable

11    because you felt that the bondholders were oversecured,

12    and therefore the reduction of their alleged secured

13    interest in this justified giving up the fraudulent

14    transfer, the estate's claim for a fraudulent transfer

15    for the 513?

16        A.   That's a component, just like I said.

17        Q.   Okay.  Well, let's fast-forward.  You don't

18    believe the bondholders are oversecured right now, do

19    you?

20        A.   Does not appear so.

21        Q.   Okay.  So what analysis did you do in March

22    of 22nd that led you to rely on them being oversecured

23    as a basis for this motion that has changed in a later

24    reiteration of the motion?

25        A.   Dealt with Mr. Frinzi, would be the major.

Page 145

1      Q.   I'm not sure I understand.  "Dealt with

2   Mr. Frinzi"?

3      A.   Right.  He had $22 million on the table,

4   supposedly.  That vanished.  That's a -- that's a

5   different dynamic.  It was a change in the landscape.

6      Q.   So were you -- were you -- strike that.

7           So as part of that -- I'm trying to

8   understand is -- Mr. Frinzi's $22 million, you assessed

9   that as collateral of the bank, and which would have

10  made them oversecured?  Am I understanding that right?

11     A.   I think you've got it.  In other words, that

12  money could have been utilized to get them -- help get

13  them out of the picture, stop that run, and focus --

14  begin to be able to focus on unsecured, etc.

15     Q.   Okay.  What is your legal basis that the

16  bondholders were secured by Mr. Frinzi's $22 million

17  offer?

18           MR. RUKAVINA:  Can you answer that

19  question without attorney-client privilege?

20           THE WITNESS:  No.

21           MR. RUKAVINA:  Then I instruct you not to

22  answer.

23     Q.   (BY MR. HILLYER) To be clear, are you -- you're

24  saying you can't answer that question without divulging

25  attorney-client privilege?

Page 146

1     A.   Correct.

2     Q.   Okay.  Well, then, let's ask the same question:

3  Were you provided an analysis by your legal counsel as

4  to the bondholders' oversecured or undersecured position

5  when you filed this motion?

6          MR. RUKAVINA:  I'll object to that as

7  necessarily invading the attorney-client privilege, and

8  I'll instruct the witness not to answer.

9     Q.   (BY MR. HILLYER) Mr. Seidel, you say that in

10 Motion 1 -- let me find the exact line.  Be patient with

11 me.  All right.  Thank -- thank you for the -- the

12 second; Adam needed to find it in the small, single

13 print.

14          Turn to page 9 of the motion.

15    A.   Page nine.  I've got part of it up.

16    Q.   Okay.  Top bullet point.

17    A.   "The collateral agent and majority

18 noteholders"?  That part?

19    Q.   Yes.

20    A.   Okay.

21    Q.   It says "The collateral agent and majority

22 noteholders have asserted that the claims under the

23 notes are oversecured and, on a preliminary basis, it

24 appears to the trustee that this may be correct."  Okay?

25          So I'm going to ask you, that is your

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    actual statement in this motion.  What do you base that

2    statement on?  What knowledge?

3        A.   The knowledge of what this estate looked like

4    at that point in time, in terms of the $22 million offer

5    on the table, the claims of the estate assets, etc.

6        Q.   Okay.  And when you say that, I'm asking in the

7    context of your saying that the bondholders are

8    oversecured.  So when you talk about claims and assets,

9    you're talking about -- secured assets would be the only

10   relevant assets or claims, correct?

11       A.   It would -- it would follow.

12       Q.   I'm sorry.  Did you say "it would flow"?

13       A.   Sorry.  Yeah, it would follow, yes.

14       Q.   Okay.  Okay.  So at the time that you made that

15   statement in the motion, did you have a list of what you

16   considered the bondholders' secured collateral?

17       A.   I don't recall if I had a list.

18       Q.   Okay.  Well, let me ask it more generally:

19   Were you just speculating with that sentence?

20       A.   I don't believe I was just speculating.  I

21   think we were looking at the lay of the land at that

22   point in time, and that's what -- that was the apparent

23   lay of the land there.

24       Q.   Okay.  And when you say "lay of the land,"

25   you're talking about a proposed settlement with Frinzi,

Alpha Reporting                                    800-556-8974
A Veritext Company                              www.veritext.com

1    and what else?

2        A.   Claims of the estate, be it insurance

3    reimbursements, etc.  At subsidiary levels, and on and

4    on.

5        Q.   Okay.  So I'm going to ask you this.  So you

6    previously testified you do not believe they are

7    oversecured at this point?

8        A.   I believe -- I believe that's a fair statement.

9        Q.   Okay.  And do you know approximately at what

10   point in this process you made that determination?

11       A.   I don't recall a date.

12       Q.   Okay.  After Motion 1?

13       A.   Yes.

14       Q.   Okay.  After Motion 2 or before Motion 2?

15       A.   I believe before Motion 2.

16       Q.   Okay.  So what I'm going to ask you is, with

17   the knowledge that -- that you believe they are not

18   oversecured, going back to the original question about

19   the Prosperity payments, which you then based on timing,

20   if they are not -- they -- if the bondholders are not

21   oversecured, was there any reason to rush this

22   settlement because of timing, and receive zero dollars

23   for the Prosperity payments?

24       A.   I don't think it was rushed.  It was just -- it

25   was then -- that was some momentum we were trying to

Alpha Reporting                          800-556-8974
A Veritext Company                       www.veritext.com

1    build with a creditor to get the creditor paid to stop

2    that run of fees, interest, attorneys fees, etc., and to

3    move the ball forward.

4        Q.   Okay.  When you say "creditors," you mean

5    secured creditors?

6        A.   Well, yeah, that would flow, that it -- that

7    secured creditor body.

8        Q.   Right.  Because no unsecured --

9        A.   Creditors.

10       Q.   I'm sorry.

11            No unsecured creditors are receiving any

12   money from Motion Number 1; is that correct?

13       A.   It's going into the estate.

14       Q.   Okay.  So your surcharge is going into the

15   estate.

16            And I guess I'll ask you this question:

17   Do you believe a -- of the $100,000 that you were

18   proposing to take, would the prepetition unsecured

19   creditors have seen one penny of that $100,000?

20       A.   I -- I doubt it.

21       Q.   Okay.  Give me one second.

22            So, Mr. Seidel, I'm -- I'm going to try to

23   separate out -- we're using the term "Prosperity

24   payments" and "subject funds."  Okay?  And we've asked a

25   lot of questions about the Prosperity payments.  And my

Page 150

1    question is, why did you not independently, without the

2    bondholders, pursue the Prosperity payments on behalf of

3    the estate, under the 548, and try to recover funds?

4        A.   It didn't seem like the highest and best use of

5    the time, effort, energy of the estate at the time.

6        Q.   So --

7        A.   Picking a fight -- I'm sorry.

8                 Picking a fight with a big bank at that

9    point in time, when we're trying to get the 4.4 million,

10   that -- that just -- that just didn't seem like -- seem

11   like the way to go.

12                They were jumping up and down that they

13   would defend it.  We know about suing banks; time,

14   delay, expense, risk, etc.

15       Q.   So correct me if I'm wrong:  So your primary

16   concern was the subject funds and the Prosperity

17   payments -- was it just a minor or collateral issue?

18   I'm trying to understand why you're focusing on the

19   subject funds aspect.

20                So I'll re-ask the question:  Are you

21   scared of suing a bank under a 548 constructively

22   fraudulent transfer claim?

23       A.   No.

24       Q.   Okay.  And how many -- how many 548 claims have

25   you filed in your career?

1      A.    Hundreds.

2      Q.    Okay.  Have you ever filed a 548 claim and

3    settled for zero?

4      A.    Yes.

5      Q.    You filed -- you filed a 548 complaint and

6    filed a 9019 motion with the Court for a zero dollar

7    settlement?

8      A.    I'm sure I have abandoned it.

9      Q.    Okay.  That's not what I asked.  I didn't say

10   "abandoned it."  I'm saying -- I'm saying you -- I

11   didn't ask you if you ultimately received zero dollars.

12   I'm asking, is -- have you ever sued anyone on a 548,

13   and they have offered you zero dollars as a settlement

14   payment, and you have taken that?

15     A.    Have they ever offered me zero dollars, and

16   I've taken that?

17     Q.    Yes.

18     A.    That would -- that would be in the -- in the

19   ballpark of abandonment.  In other words, you get into a

20   lawsuit with someone, you understand that the -- the

21   pain that they're going to inflict upon you, the

22   expense, the delay, etc., is it worth it?  Whether or

23   not the offer is zero, they've said they're not going to

24   give you anything.

25           So I've abandoned adversaries before that

Page 152

1    I've brought, that aren't -- aren't going to be

2    beneficial to continue to prosecute.

3        Q.   Okay.  So in this case, in this motion, when

4    you're receiving zero dollars, are you also viewing that

5    as essentially an abandonment of the Prosperity

6    payments?

7        A.   No.  This is a compromise with -- you know,

8    this -- this is a little different than that scenario.

9    You had asked me if I sued and received zero dollars;

10   and, yes, that happens.

11            But in this scenario, I didn't sue to

12   receive zero dollars.  I did an omnibus compromise with

13   regard to additional 4.4 million that was going to come

14   in and come through the estate, get the bondholders paid

15   down, stop that clock, hopefully -- or at least reduce

16   that -- and then the 500, that would be -- that would go

17   away.

18       Q.   Okay.  Well, let me ask you, so if you were

19   prepared to take $100,000 for the surcharge for the

20   4.4 million, I'll ask it again:  Why did these have to

21   be inextricably tied, just because of the parties?  Why

22   could you not have taken $100,000 surcharge related to

23   the subject funds, that could have been its own dispute,

24   and why could you have not gone and settled the

25   Prosperity payments claim for some value other than

Page 153

1   zero?

2        A.   My recollection is Prosperity wanted the

3   general release.

4        Q.   Okay.  I'm not sure I -- you mean -- "general";

5   you mean global release?

6        A.   Global.  Sorry.  I misspoke.  Global.

7        Q.   Okay.  Well, I -- I guess that's what I'm

8   asking you is, it's your claims to pursue, Mr. Seidel.

9   Is Prosperity telling you that "We don't want to settle

10  with you," and then have to do a separate settlement?

11            I'm trying to understand why you feel like

12  you were forced into this settlement posture where the

13  Prosperity payments had to be included for zero dollars.

14  I mean, that's as -- as concise as I can put it.

15       A.   Prosperity -- I don't know -- I don't know what

16  your background is when dealing with banks, but when

17  you're doing a deal with a bank, my experience is they

18  want the global release if you're going to do any kind

19  of deal with them.  And that's what -- that's what the

20  course was here.

21       Q.   Okay.  And I'll go back to my question of, were

22  you scared to sue the bank?  And you answered no.

23       A.   Not scared of them.  But I do understand the

24  cost delay risks of litigation, and litigating with a

25  bank.  And the amount of money, while $500,000 is

Page 154

1    nothing to sneeze at, we all can see how you can run

2    100, 150, $200,000 in fees real quick.

3        Q.   So --

4        A.   And then not have any assurance of recovery.

5        Q.   So did you ever -- before filing Motion 1, did

6    you ever ask Prosperity Bank to put money into the

7    estate for the Prosperity payments?

8        A.   I don't recall.

9        Q.   You don't recall if you made a settlement offer

10   that they rejected with zero?

11       A.   I don't recall.  I mean, I asked for

12   $1 million; you saw -- I mean, asking everybody for

13   every penny.  But I don't -- I don't have an independent

14   recollection, sitting here today right now, of that.

15       Q.   Okay.  I'm having trouble understanding that,

16   Mr. Seidel.  Are you saying that you weren't involved?

17   Or are you saying that you were involved and you don't

18   recall?

19       A.   The latter.

20       Q.   Okay.  And so sitting here today, you don't

21   know if you asked them to put in money -- "them" being

22   Prosperity Bank -- to put in money for the Prosperity

23   payments, and they told you zero.  You don't know that;

24   you can't remember that?

25       A.   I'd have to go back and look at notes, e-mails,

Alpha Reporting                    800-556-8974
A Veritext Company               www.veritext.com

```
 1    etc.  I -- I don't remember, at that point in time,
 2    March 22, 2023, what the demand -- the ask and the
 3    response was on that particular issue.
 4         Q.   Okay.  Okay.  Give me one second.
 5              So, Mr. Seidel, after Motion 1 was filed,
 6    you received from FedEx and ARRIS a draft objection; is
 7    that correct?
 8         A.   That's my recollection.  Yes, sir.
 9         Q.   Okay.  And at that time, was a fair statement
10    that you went back to the bondholders and Prosperity and
11    retraded on the deal?
12         A.   I think that -- you broke up just a little bit,
13    but I think that's generally true.  We tried to leverage
14    that -- we tried to leverage that -- the points that
15    FedEx was helping with.
16         Q.   So we previously discussed that FedEx and
17    ARRIS, you had no communications with them before the
18    motion was filed, correct?
19         A.   My recollection is I didn't recall any, but
20    I -- I don't know that I said we had no communication.
21    But I don't recall -- I don't recall it.
22         Q.   Okay.  Did you discuss at any point, with FedEx
23    or your counsel, the second -- I'll call it Motion 2,
24    the first amended motion, that changed the financial
25    terms, before it was filed?
```

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    A.   I'm -- I'm sorry.  I can't give you a

2    definitive answer on that.  I -- I don't know if I or

3    any of my team spoke with FedEx counsel prior to filing

4    Number 2.

5        Q.   Okay.

6        A.   I'm just -- I'm just unsure.  I stand to be

7    corrected.  I can look at e-mails.  I just don't have

8    that time frame solid in my mind.

9        Q.   Well, I guess what I'm asking you is, you have

10   the two largest unsecured creditors that have now given

11   you a draft objection and are requesting documents -- we

12   saw that in the e-mails, okay?  And then you go and

13   retrade the deal.

14            And I'm asking you is, would that shock

15   you, that you didn't consult with FedEx or ARRIS about

16   the change in the terms of the settlement before

17   Motion 2 was filed?

18       A.   I would think that their input -- their input

19   was taken -- taken in to account.  Through counsel,

20   there was probably telephone calls and/or e-mails

21   exchanged, I would guess, between counsel for me,

22   counsel for that creditor, that sent a proposed form of

23   objection.

24            But I can't testify that I talked to them.

25       Q.   Okay.  So I guess what I'm asking is, let's be

Page 157

1    specific:  So Motion Number 2, the surcharge went up to

2    $150,000?

3        A.    Right.

4        Q.    And Prosperity Bank kicked in 200 -- an

5    additional $200,000 on account of the Prosperity

6    payments, 513; is that correct?

7        A.    That's correct, sir.

8        Q.    Okay.  And the global release stayed the same?

9        A.    That's correct, sir.

10       Q.    Okay.  And what I'm asking you is, did you or

11   anyone on your team consult with FedEx and ARRIS counsel

12   before agreeing to the $200,000 change with Prosperity,

13   or the 100 to $150,000 surcharge change, those two

14   material terms?  Was that ever discussed with FedEx and

15   ARRIS counsel?

16       A.    I don't know that the exact numbers were

17   exchanged, but we utilized -- visited with FedEx

18   counsel, ARRIS counsel.  Like I said, leveraged that

19   with the parties, and the creditors were helpful in

20   getting this new, better deal.

21              And I don't know that they -- that we got

22   an absolute agreement on the numbers from them, or

23   approval from FedEx and/or ARRIS, prior to filing

24   Number 2.

25       Q.    Do you think that you ever presented 200,000

Page 158

1    and 150 change to FedEx or ARRIS, or your counsel did?

2         A.   I know we heard them out on what they thought

3    and what their analysis was on that.  It was very

4    helpful in helping us sweeten this deal for the estate.

5              But to answer your question, I do not -- I

6    am not positive, sitting here today, before filing

7    Motion Number 2, that we had FedEx and ARRIS's consent

8    to do that deal.

9         Q.   Okay.  So let's talk about the gap.  So

10   May 22nd, Motion 1; March 17th, Motion 2.  Okay?  During

11   that time period, are you --

12        A.   I'm sorry, I'm sorry.  Can you give it to me

13   again?  Give me the dates again?

14        Q.   Motion 1 is March 22nd.  And Motion 2 is

15   May 17th.

16        A.   Okay.  Thank you.

17        Q.   Okay.  So -- so within that -- I'm going to

18   approximate it:  March to April, April to May.  It's

19   five days short of two months.  Okay?  Would you agree?

20        A.   Yes, sir.

21        Q.   Okay.  So --

22        A.   Yes, sir.

23        Q.   -- within that approximate two-month period,

24   other than retrading the financial terms with the

25   bondholders and Prosperity, are you still doing

Page 159

1    investigations?

2        A.    I would think that that's a never-ending

3    process, investigations.  That never stops.  I'm always

4    open to investigating and looking and seeing if we

5    missed anything, etc.

6        Q.    So do you know what documents you had or had

7    reviewed at the time of the filing of the second motion?

8        A.    That would have been the documents I -- I

9    referenced before, and any documents that FedEx and/or

10   ARRIS may have provided to assist us in those endeavors.

11       Q.    Okay.  But -- and I can certainly say you

12   produced your first request for production of documents

13   to FedEx and ARRIS on June 11th, I believe.  And so what

14   I'm asking --

15       A.    Okay.

16       Q.    So what I'm asking you is, anything that you

17   had at the time of the filing of the second motion, that

18   would have been in your production as well?

19       A.    I would assume so, yes, sir.

20       Q.    Okay.  And -- give me one second.

21       A.    Yes, sir.

22       Q.    So I'll ask you, just in general, at the time

23   you filed the second motion, with the changed financial

24   terms, okay, and -- at the time that you filed that, did

25   you still believe Motion Number 1 was reasonable and in

Alpha Reporting                          800-556-8974
A Veritext Company                    www.veritext.com

1    your best business judgment?

2        A.   I believe that Number 2 was reasonable, and

3    Number 1, at that point in time, like I testified

4    before, dynamics, and the landscape had changed.

5        Q.   So on May 17th, you believe Motion Number 1

6    would not have been reasonable?

7        A.   I think on May 17th, I think Number 2 was more

8    reasonable.

9        Q.   Well, say that again?  I'm sorry?  Was more

10   reasonable?

11       A.   I think Number 2 -- I think Number 2 was more

12   reasonable than Number 1 would have been at that point

13   in time.

14       Q.   Okay.  And when you negotiated Number 2, how

15   much did you ask Prosperity Bank to kick in for the

16   settlement of the Prosperity payments?

17       A.   We typically ask for the whole boat, to start

18   with.

19       Q.   Okay.  So you believe you asked for 513?

20       A.   I don't know that we did.  I don't know.  You

21   know, we probably took something off of it for fees, so

22   we might have asked for 400.  Sitting here today, I'm

23   not positive.

24       Q.   Give me one sec.

25            Mr. Seidel, I apologize for the delay.

Page 161

1    I'm going to show you what's going to be introduced

2    as -- it's Bates stamp 1160.  I'll tell you when it's

3    populated.

4                    MR. RUKAVINA:  It will be Number 20, and

5    you'll tell me when it's in there?

6                    (EXHIBIT NO. 20, e-mail chain, beginning

7                    with e-mail from Davor Rukavina dated

8                    May 9, 2023, was marked for identification

9                    and attached hereto.)

10                   MR. LANGLEY:  Exhibit 20 is introduced.

11   A.    Okay.  It's here, and I'm bringing it up.

12   Q.    (BY MR. HILLYER) Okay.

13   A.    Do you want me to read it?

14   Q.    No.

15                   Sir, that's a May 9th e-mail from your

16   counsel to Prosperity Bank counsel; that's approximately

17   eight days before the second motion was filed.  You can

18   just go down to -- your counsel proposed no release for

19   the Prosperity funds, or Prosperity pays $200,000.  Do

20   you see that?

21   A.    Yes.

22   Q.    Okay.  I believe you just testified you ask for

23   the moon and start high.  Do you want to -- does this

24   change your opinion?

25   A.    Yeah.  Looks like we were -- looks like this is

Page 162

1    what we asked for.

2        Q.   Okay.  So you asked -- you asked for --

3    for 200, and you got 200?

4        A.   Yeah.  I don't know if there was prior

5    communications asking for more, but that's what this

6    says.

7        Q.   Okay.

8        A.   Might have been many oral communications.  I

9    don't know.

10       Q.   Okay.  But if there were communications asking

11   for more than 200, they would be in your discovery,

12   correct?

13       A.   If they were written.

14       Q.   Okay.

15       A.   I don't know -- I do things on the phone all

16   the time:  Feeling out the opponent, seeing how much

17   they'll pay, get a feel for it -- "Hey, how about five?

18   How about you pay for the whole thing?  Ha ha ha."

19             I've never done that.  A settlement is not

20   paying everything.  And then back and forth.

21             But this written document talks about 200.

22       Q.   Okay.  So go ahead and take your time to read

23   it.  Does this -- does that e-mail reference or

24   insinuate a previous offer at all?

25       A.   I do not see that.

Alpha Reporting                          800-556-8974
A Veritext Company                    www.veritext.com

1      Q.    Okay.  What would make you think that this

2    isn't your first offer, the trustee's first offer of

3    $200,000?

4      A.    I don't know what would make me think that.

5      Q.    Okay.  So again, when you came back to the bank

6    on the 513 Prosperity payment settlement, why did you --

7    why did you offer 200 -- why did you authorize an offer

8    of $200,000?

9      A.    Because we thought that was a range of

10   reasonableness for a resolution of this particular

11   claim, in light of the -- the landscape of the case and

12   everything else going on.

13     Q.    So given what we've discussed about the

14   likelihood of success and your testimony about "decent,"

15   "not bad," and now we're at $200,000; and that, I would

16   say, is -- I did the math for you.  It's 38.9 percent.

17   It's a 39 percent settlement on the $513,000.

18     A.    Okay.

19     Q.    Sound correct?  Okay.

20     A.    Sounds correct.

21     Q.    Okay.  And I'm going to jump forward ahead for

22   a second.  So is it my understanding that the Prosperity

23   payment amount that is being part of your third motion

24   is $539,000?

25     A.    I did not understand that.  Can you give me

Page 164

1   that again?

2        Q.    Sure.

3              The Prosperity payment defined amount, did

4   it change from 513 to 539 from Motion 2 to Motion 3?

5        A.    I think that's right.  I think that's my

6   recollection.

7        Q.    Okay.  So again, I'm -- I'm asking you -- I'm

8   going to use the actual number, 539.  So that is a --

9   it's a 37 percent recovery on the Prosperity payments.

10  Does that sound right?

11       A.    Yes.

12       Q.    Okay.  What makes --

13       A.    Yes.

14       Q.    Okay.  Given what you know now, what makes

15  37 percent a reasonable settlement payment for the

16  Prosperity payments?

17       A.    Cost of litigation.  The costs that have been

18  incurred by parties in this case.  Risk of litigation.

19  Defenses raised.  The Ninth Circuit line of cases with

20  regard to what happens with fully collateralized

21  payments out, and whether or not they come back in

22  subject to liens, etc.  The Judge Larson opinion that

23  seems to indicate that may be her thinking on the

24  subject as well.

25       Q.    Okay.  So let's go through each of those,

Alpha Reporting                                    800-556-8974
A Veritext Company                              www.veritext.com

1    instead of just going all the way through.

2            So -- so you think 37 percent, that

3    payment -- and before I ask that question, I should say

4    this:  Would you have ever gotten that $200,000 payment

5    from Prosperity but for the objection of FedEx and

6    ARRIS?

7        A.   I think I mentioned earlier that FedEx and

8    ARRIS were instrumental in assisting us leverage that

9    money.  And I don't know that we would have gotten it

10   without -- without their input and good help.

11       Q.   Okay.  Well, I -- I want to clarify:  Do you --

12   what do you consider "good help," when you say that?

13       A.   Being able to go to Prosperity and tell them

14   that "We're not going to be able to get this across the

15   finish line because I've got creditors that say you need

16   to pay."

17       Q.   Okay.  So --

18       A.   "And this is not -- this is not going to get

19   done, and we need money in here, and whether you like it

20   or not, whether or not you think you've got defenses,

21   you're going to have to pay to get out of this."

22       Q.   So again I ask you, if FedEx, you deem it good

23   help, with that -- why wouldn't -- why wasn't FedEx or

24   ARRIS involved in any way regarding the $200,000 change

25   to the settlement motion?

Page 166

1    A.    I don't know that they were or were not on

2    that.

3    Q.    Okay.  Well, do you normally communicate and

4    have an -- offers in status with someone that you

5    consider being great help?

6    A.    I mean, in this case, I think we tried to

7    keep -- you know, there was a while there where we were

8    having calls with the parties, all the various

9    creditors, etc., trying to keep people informed of

10   what's going on.  There's a hundred things going on, as

11   you know in this case, with regard to AMRR, etc.  And we

12   tried to keep parties up to date.

13             We've got two -- we've got one trustee.

14   We've got Davor Rukavina, who's probably the busiest

15   lawyer in town.  And we do the best we can.

16   Q.    Okay.  So let's -- you went through a laundry

17   list, Mr. Seidel, of risks:  Ninth Circuit, Larson, and

18   you did that before, and we tried to -- I'll revisit it.

19             So what -- settling for the $200,000 for

20   the Prosperity payments of three -- 539 that we know

21   now, okay, what are -- when you say "risks," can you

22   give me the risks of filing suit against Prosperity,

23   related to that, with your knowledge of the deposition

24   testimony that you sat through last Wednesday.

25   A.    Yeah, the risks are that Ninth Circuit line of

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    cases, like I mentioned.  The Judge Larson opinion.  The

2    fact that though the -- you -- you asked the banker with

3    regard to defenses, and he -- I don't remember him

4    saying -- talking about any.  But we all know, at the

5    end of the day, it's the lawyers that speak on these

6    deals.  And then the costs, delay, and risks, etc.

7         Q.   Mr. Seidel, we can pull this up.  So the

8    bank -- Prosperity Bank filed a reply that was an

9    exhibit in their deposition.  And we can populate it, if

10   you -- if you want.

11                  MR. HILLYER:  Let's go ahead and do that,

12   Adam.  Docket 278.

13                  MR. RUKAVINA:  Hey, Tim, it's 5:00; we're

14   probably going into the end game.  Can we take a

15   restroom break?

16                  MR. HILLYER:  Yeah.  That -- that's --

17                  MR. RUKAVINA:  Are we on mute?

18                  MR. HILLYER:  No, I'm off.  I was trying

19   to help out.

20                  It's Exhibit 21.

21                  (EXHIBIT NO. 21, Prosperity Bank's Reply,

22                  was marked for identification and attached

23                  hereto.)

24                  VIDEOGRAPHER:  Okay.  We're going off the

25   record.  The time is approximately 4:57 p.m.

Alpha Reporting                                800-556-8974
A Veritext Company                          www.veritext.com

```
 1                    (Recess)

 2                    VIDEOGRAPHER:  We're going back on the

 3      record.  The time is approximately 5:13 p.m.

 4         Q    (By MR. HILLYER) All right.  Mr. Seidel, thank

 5      you for the break.

 6                    What we've -- what I'm going to say is --

 7      is we -- I believe we've reached an agreement.  We're

 8      going to break right now.  We're going to continue --

 9      leave your deposition open, and we're going to continue

10      it until 1:00 tomorrow, September 14th, at 1:00 p.m.

11      Central Time to reconvene.

12                    Is that acceptable to you?

13         A.   Yes, sir.

14         Q.   Okay.

15                    MR. HILLYER:  Is that acceptable to all --

16      all other counsel?

17                    MR. SCHOTTENSTEIN:  Yes.

18                    MR. RUKAVINA:  Yes.

19                    UNIDENTIFIED SPEAKER:  Yes.

20                    MR. HILLYER:  All right.  Thank you so

21      much for your consideration.

22                    We'll consider this -- let's go off the

23      record and go take care of our stuff, and we'll

24      reconvene tomorrow.  And thank you for your time, and

25      good luck on the hearing.
```

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1              MR. RUKAVINA:  I take it we're going to

2    get a different link from Veritext?

3              MR. HILLYER:  I don't know that.  That's

4    way outside of my scope.

5              VIDEOGRAPHER:  Yeah, I'm going to call

6    them as well.

7              This concludes the videotaped deposition.

8    The time is approximately 5:14 p.m.

9              (Deposition adjourned at 5:14 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

```
 1              CERTIFICATE OF REPORTER
 2              I, the undersigned, a Registered Merit
 3      Reporter, do hereby certify:
 4              That the foregoing proceedings were taken
 5      before me at the time and place herein set forth;
 6      that any witnesses in the foregoing proceedings,
 7      prior to testifying, were administered an oath; that
 8      a record of the proceedings was made by me using
 9      machine shorthand which was thereafter transcribed
10      under my direction; that the foregoing transcript is
11      a true record of the testimony given.
12              That before the completion of the
13      deposition, review of the transcript [  ]was [x ]was
14      not requested.  If requested, any changes made by
15      the deponent (and provided to the reporter) during
16      the period allowed are appended hereto.
17              I further certify that I am neither
18      financially interested in the action nor a relative
19      or employee of any attorney or any party to this
20      action.
21              IN WITNESS WHEREOF, I have this date
22      subscribed my name.
23      Dated:  September 25, 2023
24                                  PATRICIA NILSEN
                                    CSR No. 11813
25
```

Page 171

```
 1              DECLARATION OF PENALTY OF PERJURY

 2

 3        I, SCOTT SEIDEL, do hereby certify under penalty of

 4        perjury that I have read the foregoing transcript of

 5        my deposition taken on September 13, 2023; that I

 6        have made such corrections as appear noted herein;

 7        that my testimony as contained herein, as corrected,

 8        is true and correct.

 9

10

11        DATED this _____ day of _____, 20_____, at

12        _____, _____.

13

14

15                            _____

16                            SCOTT SEIDEL

17

18

19

20

21

22

23

24

25
```

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1              DEPOSITION ERRATA SHEET

2        Page No._____Line No._____Change to:_____

3        _____

4        Reason for Change:_____

5        Page No._____Line No._____Change to:_____

6        _____

7        Reason for Change:_____

8        Page No._____Line No._____Change to:_____

9        _____

10       Reason for Change:_____

11       Page No._____Line No._____Change to:_____

12       _____

13       Reason for Change:_____

14       Page No._____Line No._____Change to:_____

15       _____

16       Reason for Change:_____

17       Page No._____Line No._____Change to:_____

18       _____

19       Reason for Change:_____

20       Page No._____Line No._____Change to:_____

21       _____

22       Reason for Change:_____

23

24       SIGNATURE:_____DATE:_____

25            SCOTT SEIDEL

Page 173

1      DEPOSITION ERRATA SHEET

2      Page No._____Line No._____Change to:_____

3      _____

4      Reason for Change:_____

5      Page No._____Line No._____Change to:_____

6      _____

7      Reason for Change:_____

8      Page No._____Line No._____Change to:_____

9      _____

10     Reason for Change:_____

11     Page No._____Line No._____Change to:_____

12     _____

13     Reason for Change:_____

14     Page No._____Line No._____Change to:_____

15     _____

16     Reason for Change:_____

17     Page No._____Line No._____Change to:_____

18     _____

19     Reason for Change:_____

20     Page No._____Line No._____Change to:_____

21     _____

22     Reason for Change:_____

23

24     SIGNATURE:_____DATE:_____

25          SCOTT SEIDEL

Page 174

**[& - 2]**

| & | | | |
|---|---|---|---|
| **&**   2:2 3:5,9 | | | |

**0**

**0188**   96:16
115:15 116:14
119:6,22

**1**

**1**   5:9,25 6:2
10:8,14 21:4,8
37:21 38:21
42:11 44:3
49:7 50:7,14
51:23 52:22
56:22 57:22
73:1,2 81:11
82:19 87:18
94:11 101:1
104:17,22
106:6 109:23
119:23 124:24
137:4,5,8,18,22
142:19 147:10
149:12 150:12
155:5,12 156:5
159:10,14
160:25 161:3,5
161:12
**10**   5:9 6:6
64:14,16,22
82:19 102:14
**100**   37:7 98:8
100:22 102:5
155:2 158:13

**100,000**   94:8,16
95:7,9,14,20
96:19 97:6
98:5 99:17
100:16 101:5,8
101:21 105:5
105:15 139:5
150:17,19
153:19,22
**107**   6:21
**108**   6:24
**10:19**   2:4 8:3
**10:22**   10:6
**10:24**   10:12
**11**   6:8 11:14,16
64:24 65:3
**110**   111:20
**1160**   162:2
**11813**   1:24 4:9
171:24
**11:28**   47:7
**11:43**   47:10
**11th**   160:13
**12**   6:10 54:2
68:14,15,19,19
68:25 108:13
139:16,21
142:18,18
143:11
**12:58**   93:9
**13**   1:9 2:3 6:12
8:3 68:19,20
68:21 70:4
139:16,22
140:9 142:18

142:18 143:11
172:5
**13th**   57:17
133:22
**14**   5:10,12 6:13
79:2,6
**1401**   3:23
**14th**   169:10
**15**   6:16,20 87:6
97:23
**15's**   87:1
**150**   155:2
159:1
**150,000**   77:19
100:6 158:2,13
**15th**   104:15
**16**   5:14 6:18
14:4,9,10,10,11
14:16 16:24
97:18,21
**160**   102:6,7
**160,000**   102:3
102:16
**162**   7:2 103:4
**162,000**   100:9
**168**   7:5
**16th**   15:1,19
16:17 17:18
18:13 19:24
23:10,12 24:1
**17**   6:21 107:18
107:19 117:2,5
122:10,11
123:1

**17th**   137:6
159:10,15
161:5,7
**18**   6:24 39:23
108:19,20
113:1 122:22
122:23 123:4
**18th**   39:15
**19**   5:15 138:10
138:12,22,25
**1900**   3:18,23
**1984**   11:7
**1:00**   92:2,18
169:10,10
**1:30**   92:6
**1st**   42:16 43:6
45:6,9,11,14,16
46:18 49:22
50:23 53:24
55:14,19 56:6
56:11 58:6,13
58:18,21 60:13
61:25 62:12,17
62:20 63:8,9

| 2 | | | |
|---|---|---|---|

**2**   5:10 6:5 14:5
53:1 81:12
115:24 137:5,8
137:18,24,25
149:14,14,15
156:23 157:4
157:17 158:1
158:24 159:7
159:10,14
161:2,7,11,11

**[2 - 407]**

161:14 165:4
**20** 7:2 24:1
162:4,6,10
172:11
**200** 158:4
163:3,3,11,21
164:7
**200,000** 77:20
78:1 155:2
158:5,12,25
162:19 164:3,8
164:15 166:4
166:24 167:19
**2021** 114:9,16
114:24 122:2
**2022** 5:11 14:6
**2023** 1:9 2:3
5:14,17,19,22
5:25 6:2,5,7,9
6:11,15,17,20
6:23 7:1,4 8:3
14:16 16:24
19:11 24:18,20
24:25 29:9
37:21 38:21
39:23 42:11
52:22 53:1
64:17 65:4
68:16 79:4
87:7 97:23
100:25 105:16
107:21 108:22
116:14,23
138:13 156:2
162:8 171:23

172:5
**20th** 40:12
**21** 5:17 7:5
19:11 21:23
168:20,21
**214** 3:7,19
**21st** 24:18,20
**22** 5:19 6:23
7:1 24:25
26:24 28:3
107:21 108:22
138:13 143:22
146:3,8,16
148:4 156:2
**22-311641** 8:15
**22-31641** 1:7
**2200** 3:18
**226** 137:21
**22nd** 31:24
104:18 106:6
107:13,14
109:13,16
110:18 113:6
116:14,23
117:4 124:24
125:3 137:5,18
137:21 141:17
145:22 159:10
159:14
**23** 5:22 29:9
**23rd** 32:13
34:12 50:16
63:7
**24** 5:18

**25** 102:14
171:23
**261** 137:25
138:6
**26637** 171:23
**278** 168:12
**28** 137:6
**28th** 136:7
**29** 5:20
**2:00** 92:11,17
92:18,23
**2:34** 93:12
**2nd** 58:8 60:7
60:14

**3**

**3** 5:12 14:12,13
14:14,19 19:24
21:24 81:12
102:15 137:6,8
138:8 165:4
**3/22** 107:13
109:23
**30** 11:10,25
12:6 71:10
82:10 102:17
**31** 5:11 14:6
**32** 71:10
**341** 19:8
**350** 77:19,24
81:14 100:22
**350,000** 77:17
**36** 72:10
**368** 24:23 31:2
**37** 5:23 165:9
165:15 166:2

**38.9** 164:16
**3800** 3:5
**38119** 3:13
**39** 72:4,5,9
164:17
**390** 28:10 31:1
**391** 30:17,18
**3992** 95:25
96:3 106:8,9
106:25,25
113:25 114:11
114:18,18,22
114:22 122:1
**3:32** 128:23
**3:52** 129:1

**4**

**4** 5:15 19:9,14
62:1 143:23
**4.3** 99:21 100:2
**4.363** 139:5
**4.4** 51:9,17
75:11 91:1
99:16 103:3,11
103:17 151:9
153:13,20
**4.463** 139:4
**4.6** 65:14,22
**4.9** 89:7
**40** 72:4,5
**400** 161:22
**406** 37:16
40:14,15 42:16
47:19
**407** 39:3

**[408 - able]**

| | | | |
|---|---|---|---|
| **408** 39:1,3 47:19 | 164:6 165:4 | **65** 6:8 | 87:7 |
| **409** 52:14 | **513,000** 62:13 | **68** 6:10,12 | **80** 111:9 |
| **41** 72:4,5 | 62:19 72:10 | **680-7316** 3:13 | **84** 11:7 |
| **410** 52:14 | 73:6 75:10,16 | **6th** 65:12,19 | **85** 111:21 |
| **419** 64:4,6 | 75:21 76:1,9 | 66:25 67:20 | **855-7500** 3:7 |
| **4200** 4:5 | 76:17 77:8 | | **87** 6:16 |
| **424** 68:11 | 78:2,15 80:25 | **7** | **88** 111:21 |
| **429** 71:4,5,9 | 82:17 83:18 | **7** 1:6 5:23 6:11 | **9** |
| **450** 78:24 79:8 | 84:5 85:23 | 6:15 10:18 | **9** 5:5 6:3 7:4 |
| **452** 79:8 | 105:21 139:7 | 11:9,11,23 | 52:19,24 53:5 |
| **461** 86:25 88:21 | 164:17 | 12:1,16 13:2 | 53:8 59:11 |
| **4:17** 39:23 | **52** 6:1,3 | 33:15,17 35:20 | 129:19 130:1 |
| **4:57** 168:25 | **539** 165:4,8 167:20 | 37:14,15,19,23 | 130:17 131:3 |
| **5** | **539,000** 164:24 | 44:22 45:19 | 131:18 132:4 |
| **5** 5:18 16:14 | **542** 91:18 | 47:19 48:20 | 147:14 162:8 |
| 23:15 24:23,24 | **548** 73:1,2,25 | 54:1 56:19 | **901** 3:13 |
| 25:12,13 31:1 | 74:8 91:17 | 66:20 68:16 | **9019** 10:23 |
| 71:4 75:25 | 151:3,21,24 | 72:2 79:4 82:9 | 43:3 45:12 |
| 102:15 | 152:2,5,12 | 110:9 | 46:5 50:20 |
| **50** 101:12 | **550** 86:11 | **713-220-3802** | 56:2,5 71:3 |
| 102:5,6 111:9 | **558** 97:15 | 4:6 | 106:23 152:6 |
| **50,000** 101:20 | **5:00** 109:14 | **713-752-4334** | **97** 6:18 |
| 101:22 102:1 | 168:13 | 3:24 | **9th** 162:15 |
| 105:17 | **5:13** 169:3 | **743-4500** 3:19 | **a** |
| **500** 3:6,12 | **5:14** 170:8,9 | **75201** 3:6,18 | **a.m.** 2:4 8:3 |
| 153:16 | **6** | **77002** 4:5 | 10:6,12 47:7 |
| **500,000** 21:9 | **6** 5:20 6:7,9 | **77010** 3:23 | 47:10 60:14 |
| 62:4,8 94:11 | 28:9 29:7,12 | **79** 6:13 | **abandoned** |
| 154:25 | 29:14 63:6 | **7:32** 60:14 | 152:8,10,25 |
| **506** 35:3 | 64:17 65:4 | **7th** 67:12,14 | **abandonment** |
| **513** 80:9,12,19 | **600** 4:5 | 69:6 | 152:19 153:5 |
| 139:15 145:15 | **6075** 3:12 | **8** | **able** 17:3 51:10 |
| 158:6 161:19 | **64** 6:6 | **8** 6:1,17 52:19 | 51:18 82:21 |
| | | 52:21 53:3,4,8 | 145:1 146:14 |
| | | 53:9,10,10 | |

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

[able - akard]

166:13,14
**above** 91:21,22
141:16
**abreast** 24:7
**absent** 115:9
**absolute**
158:22
**absolutely**
34:23 73:22
**accept** 41:13
42:2 69:9
105:20
**acceptable**
137:9 169:12
169:15
**acceptance**
90:22
**accepted** 46:3
88:7 89:8
**accepting**
87:19
**accommodati...**
135:22
**accordance** 2:5
**account** 16:12
16:12 33:18,21
40:6 57:4,13
57:20 61:5
71:14,20 74:3
80:6 84:1
95:21,25 96:16
96:16 97:8
106:17 113:19
114:2,11,17,22
115:5,5,15,20

115:20,22,24
116:13,14
117:24 118:4,4
118:14,18,19
119:6,22 121:8
122:1,24
139:25 157:19
158:5
**accountings**
104:10
**accounts** 27:11
72:23 106:25
121:1,4 139:10
**accurate** 21:11
44:13 69:15
**acknowledge**
113:25
**act** 127:21
**action** 8:20
77:21 171:18
171:20
**actual** 48:18
68:12 91:19
123:18 148:1
165:8
**actually** 38:24
114:20
**adam** 3:11 9:4
14:3,8 19:7
24:22 29:5
64:4,8,11
97:14,16
109:12 112:1
147:12 168:12

**adam.langley**
3:14
**addition** 49:3
62:2 114:17
134:4
**additional** 80:5
153:13 158:5
**address** 145:7
**adjourned**
170:9
**administered**
171:7
**administrativ...**
111:18
**admission**
119:8
**admit** 127:17
**adopt** 127:20
**adopted** 127:17
**adopting** 24:13
**adoption**
127:21
**adversaries**
152:25
**advice** 127:18
**advised** 13:3
**advises** 41:6
43:1
**advising** 25:25
**affect** 74:11,13
**affiliates** 40:22
**affiliations** 9:1
**agent** 144:22
147:17,21

**aggressive** 76:3
**ago** 49:10
118:24
**agree** 8:10
73:18,19,22
98:5,6 126:25
139:21 159:19
**agreed** 21:2
35:3 80:10
94:8 95:6,19
96:5,18 103:20
103:20 139:5
**agreeing**
128:15 158:12
**agreement**
16:13 36:5,20
39:18 65:15
78:4 80:7
89:18 97:1,7
97:10 104:13
104:13 158:22
169:7
**agreements**
113:20
**ahead** 14:3
19:7 59:10
64:3 68:10
69:17 78:12
86:24 87:22
92:17 96:15
116:5 133:1
163:22 164:21
168:11
**akard** 3:6

[alerts - arguments]

alerts 78:7
allegations
85:1 142:5
143:10
alleged 145:12
allow 134:9
allowed 171:16
alternative
21:3,7,9
alternatives
26:19
amended
137:19 138:7,9
156:24
amount 21:2
101:8 154:25
164:23 165:3
amrr 135:10
144:7 167:11
analysis 45:15
56:12,21 57:15
57:19 58:2,16
58:22 82:6
111:17 120:20
124:5,9,10,15
124:19,22,23
124:24 125:4,8
125:10,12,22
126:15 127:13
128:11,13,16
129:5,13,16,17
129:20,25,25
130:8,14,17,20
131:2,6,18
132:1,4,17

136:22 145:21
147:3 159:3
andrews 4:4
9:11
answer 12:10
34:9,18 37:13
54:4 63:2 73:9
78:18 83:22
94:23 103:24
105:11 126:1,7
126:14 127:25
129:11 130:4,9
130:13,18,22
131:21 132:3
132:12 133:2,3
136:11 144:6
146:18,22,24
147:8 157:2
159:5
answered 60:9
78:17 81:24
85:25 103:13
104:5,6 105:10
120:3 154:22
answering
35:15 89:22
answers 12:11
60:12
anybody 128:6
anytime 67:14
anyway 26:10
ap 70:22
apart 132:1,5
132:14,16

apologies 47:17
53:7
apologize 14:11
27:16 37:17
39:5 58:5
85:16 93:14
106:21 117:20
123:2,2 161:25
apparent
148:22
apparently
31:13 70:2
89:3 111:5
121:2
appear 17:22
28:7 92:22
145:20 172:6
appearance
8:24 9:1
appearances
3:1 4:1
appeared 56:25
appears 21:12
25:23 74:8
144:25 147:24
appended
171:16
applicable 85:8
appointed
10:17 12:20,24
13:2
appointment
12:16,19 13:1
appreciate 19:6
37:13 52:12

59:1 99:2
approval 55:23
56:3,5,9
158:23
approve 32:5
approved 78:5
86:15 102:9,11
approximate
12:15 13:17
159:18,23
approximately
2:4 8:2 10:6,12
11:10 19:22
47:7,10 54:2
93:12 100:1
128:23 129:1
149:9 162:16
168:25 169:3
170:8
april 159:18,18
argeroplos
5:24 6:17
37:20 39:8,25
40:17 87:7
117:22 118:1
argue 67:2
100:12 127:18
argued 127:21
argument
51:19,20
argumentative
76:5 105:9
118:17
arguments
134:23

[arris - attached]

**arris**   3:15 9:10
10:22 109:24
110:3,7 111:5
111:20 116:22
122:3 156:6,17
157:15 158:11
158:15,18,23
159:1 160:10
160:13 166:6,8
166:24
**arris's**   159:7
**article**   129:19
130:1,17 131:3
131:18 132:4
**articulate**
112:24
**articulated**
95:12 111:25
112:2 114:21
**articulation**
94:19
**asked**   17:23
72:24,25 73:2
78:16 85:24
93:22 102:11
102:18 103:12
104:4 105:10
106:3 115:2
118:8,12
119:24 127:20
129:4 130:15
132:6 133:6,7
133:11 135:8
135:19 142:22
150:24 152:9

153:9 155:11
155:21 161:19
161:22 163:1,2
163:2 168:2
**asking**   15:7
18:16 21:22
22:4,10,15,16
22:23 23:11,15
24:11 26:5
27:18,19,24
29:4 31:4
36:10 37:11
39:10 43:19
47:24 50:1
54:21 57:18
58:1 65:13,25
66:2,6 73:24
74:1,17,23
76:5,6 79:12
82:13 95:3
98:11 102:10
114:19 116:7
118:11,13,18
119:5 120:4,5
123:16,16,20
123:22 124:14
126:3,4 131:25
132:7,15 135:3
136:9,13
137:15 141:8
144:7 148:6
152:12 154:8
155:12 157:9
157:14,25
158:10 160:14

160:16 163:5
163:10 165:7
**asks**   31:10
118:3
**aspect**   74:14
85:19 151:19
**assert**   27:6 80:5
80:8,19 81:17
84:6 132:23
140:3 141:7
**asserted**   17:19
57:4 75:16,25
78:13 85:11
102:8 140:21
144:23 147:22
**asserting**   35:21
75:20 76:3,8,9
76:16,22 77:2
77:5,6,7,25
80:12,25 81:3
81:4,9,20
99:22
**asserts**   80:14
140:3,10 141:2
141:6
**assess**   49:16,18
95:13 142:25
**assessed**   57:22
111:15 146:8
**assessing**   13:18
106:13
**assessment**
16:20
**assets**   148:5,8,9
148:10

**assignment**
71:13,14,15,17
71:20 72:25
73:1 139:24
140:4,22 141:1
141:10 142:13
143:1
**assist**   160:10
**assisting**   166:8
**association**   4:2
9:12
**assume**   12:22
99:1 160:19
**assuming**   11:22
38:5 80:2
**assumption**
20:22 22:19
23:17 27:22,25
43:7 44:11,16
65:20 66:19
99:11 101:22
**assurance**
155:4
**attached**   10:9
14:7,17 19:12
25:1 29:10
37:22 40:6
52:23 53:2
64:18 65:5
68:17,23 69:8
69:13 79:5
87:8 97:24
107:22 108:23
114:12 129:6
162:9 168:22

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

[attachment - based]

**attachment**
68:20
**attachments**
69:4
**attorney** 3:17
3:22 9:2 11:6
39:8 82:3
126:8 127:22
127:24 128:3
128:11 130:6
132:11 146:19
146:25 147:7
171:19
**attorney's**
145:2
**attorneys** 3:4
3:11 4:4 36:5
132:1,5,14
150:2
**audio** 8:9
**august** 5:11
14:6
**authorize**
164:7
**authorizing**
24:8
**automatically**
29:3
**available** 13:7
85:21
**avenue** 3:12
**avoid** 73:3
140:10,22,22
140:25 141:3,6
141:9,10,20

142:1,13,24,25
143:1
**avoidance** 73:1
73:2 74:9
77:21
**avoided** 140:4
141:2,20 142:1
142:24
**avoids** 73:3
**aware** 49:21
69:12,22 86:17
111:15

**b**

**b** 73:1,2 80:18
**back** 10:11
12:22 23:3
30:24 32:9
34:3 42:13
47:9 50:15
53:5,5 54:1
57:5,13,20,21
62:24 63:7
75:8 81:22
89:9 90:5
93:11,13 94:3
110:14 112:17
115:12,23
117:1 128:3,19
128:25 130:12
131:14 136:5,6
138:14 141:1
149:18 154:21
155:25 156:10
163:20 164:5
165:21 169:2

**background**
154:16
**bad** 37:7 47:14
82:23 143:6,11
143:18 144:3
144:10 164:15
**badger** 82:21
**badgering**
103:13 105:10
**ball** 143:25
150:3
**ballpark**
152:19
**bank** 3:20 4:2
5:10 9:8,12
13:20 14:6
15:10,20 16:1
16:2,19 17:18
18:4,10,18,19
20:24 24:2
28:5 34:13
39:9,20 40:11
40:20 41:3,10
41:11,13 42:1
43:11,14,14,15
43:25 45:8
46:19 47:24
48:1,2,3,13,18
48:19 49:6
50:14,18 51:3
54:3,8,15,18,19
57:12 58:11,12
60:8,11 61:5
62:19 63:2,10
63:18 66:11,11

66:14,20 67:7
68:2 69:3,20
69:25 70:23
74:1 80:5,7,12
80:14 83:5
84:4,12,16
85:9,21 86:19
93:18 95:21
96:2,3 97:7,8
101:14 104:17
106:8,16,24
110:18 113:19
118:3 121:17
133:17 139:6,8
142:7 146:9
151:8,21
154:17,22,25
155:6,22 158:4
161:15 162:16
164:5 168:8,8
**bank's** 7:5 18:4
18:4 43:1
79:12 87:11
168:21
**banker** 168:2
**bankruptcy** 1:1
8:14 22:11
104:9
**banks** 86:4
151:13 154:16
**base** 148:1
**based** 20:21
36:13 63:25
85:1 94:16
95:11 102:12

**[based - bondholders]**

| | | | |
|---|---|---|---|
| 118:10 125:24 | **begun** 16:17,20 | **believes** 69:10 | 23:9 27:23 |
| 126:9 130:22 | **behalf** 2:1 9:4 | **belonged** 36:3 | 62:9 69:3 |
| 131:21 132:11 | 9:12 10:22 | **beneficial** | 87:11 105:3,5 |
| 149:19 | 24:14,15 54:7 | 153:2 | 124:10 |
| **basically** 15:8 | 70:22 74:18,20 | **benefit** 97:9 | **bondholder's** |
| 18:16 60:7 | 151:2 | 140:4,15 | 22:18 |
| 73:24 113:24 | **believe** 11:10 | **berghman** 3:4 | **bondholders** |
| 125:6 137:20 | 13:6 16:22 | 9:6 15:2 | 13:23 16:1 |
| 139:15 145:8 | 27:21 29:2 | 121:14 125:14 | 17:8,19 18:8 |
| **basis** 33:14 | 30:13 31:16 | **best** 26:23 | 18:18,20 19:2 |
| 36:15 80:10 | 35:23 36:2 | 40:25 46:8 | 21:18 23:1,20 |
| 133:12 144:24 | 42:18 52:8 | 60:1 67:11 | 23:21 24:6 |
| 145:23 146:15 | 56:14 58:10,15 | 78:15 151:4 | 27:5,13,18 |
| 147:23 | 61:14 62:10 | 161:1 167:15 | 28:4 31:3,14 |
| **bates** 14:11 | 66:15 68:3 | **bet** 105:25 | 33:15,19 34:1 |
| 19:8 24:23 | 69:19 71:23 | **better** 26:14 | 35:11,21 36:3 |
| 28:10 31:2 | 77:3,4,4 80:22 | 44:19 46:12 | 36:13 43:12,15 |
| 37:16 42:16 | 85:18 91:7,12 | 158:20 | 43:15 48:8 |
| 47:19 64:4 | 91:25 93:25 | **bifurcated** | 50:21 51:9,19 |
| 68:11 78:24 | 94:2,9 95:12 | 27:10 | 51:25 54:24 |
| 79:8 88:21 | 95:21 96:9,10 | **big** 29:22 151:8 | 55:3,22 56:12 |
| 97:15 162:2 | 96:11 104:16 | **bigger** 107:24 | 56:23 58:12,17 |
| **bear** 64:22 89:1 | 107:12 114:6 | **bit** 28:13 | 59:3 67:10,24 |
| **began** 15:13 | 116:2,16 122:4 | 106:19 156:12 | 68:6 74:10,19 |
| 16:11 | 124:4,7,10 | **blocks** 95:3 | 75:16,19,25 |
| **beginning** 2:3 | 133:5 134:2 | **board** 96:23,25 | 76:9,13,16 |
| 5:12,15,20,23 | 139:1 140:7,18 | **boat** 51:7,7 | 77:1,13,14,25 |
| 6:3,13,18,21,24 | 142:8 143:4,5 | 161:17 | 78:20 86:20 |
| 7:2 9:2 14:14 | 145:18 148:20 | **body** 107:9 | 88:11,17 90:13 |
| 19:9 23:3 29:7 | 149:6,8,8,15,17 | 150:7 | 93:24 94:17,23 |
| 37:19 52:24 | 150:17 160:13 | **boil** 37:6,6 | 95:9 96:21,23 |
| 79:2 80:20 | 160:25 161:2,5 | **bond** 34:15 | 96:25 97:5,10 |
| 97:21 107:19 | 161:19 162:22 | 113:10 115:9 | 99:17 100:3 |
| 108:20 162:6 | 169:7 | **bondholder** | 101:15 104:3 |
| | | 9:13 16:3 21:2 | 104:14 110:16 |

[bondholders - certified]

| | | **c** | capitalized |
|---|---|---|---|
| 121:9,17 125:7 | briefly 13:1 | | 72:9 |
| 133:17 139:6 | 85:20 | c 35:3 | carbon 38:21 |
| 143:21 144:2 | bring 111:12 | calculations | care 85:18 |
| 145:4,11,18 | bringing 27:5 | 100:8 | 169:23 |
| 146:16 147:4 | 70:22 87:4 | calculator | career 151:25 |
| 148:7,16 | 162:11 | 100:7 | carry 61:16 |
| 149:20 151:2 | broke 156:12 | call 13:18 | carve 104:14 |
| 153:14 156:10 | brought 28:6 | 15:25 22:24,24 | case 1:7 8:15 |
| 159:25 | 153:1 | 27:19,20,21,23 | 10:18 12:16 |
| bootstrap | browser 38:2,2 | 30:22 31:10,10 | 13:4 40:5 |
| 51:19 | 38:6,12 | 39:10 60:10 | 57:11 70:22 |
| borrowers | bruce 3:21 9:7 | 67:8 96:15 | 84:13 85:6,8 |
| 140:16 | bruzinsky 3:24 | 105:17 109:23 | 107:11 110:9 |
| bottom 20:14 | buck 130:5 | 121:6 137:8 | 111:4,7 153:3 |
| 20:17,21 30:20 | build 150:1 | 156:23 170:5 | 164:11 165:18 |
| 40:16 65:12 | bullet 147:16 | called 9:19 | 167:6,11 |
| 88:21 98:4 | bunch 36:5 | 135:8,18 | cases 11:12 |
| 103:25 113:11 | 38:4 89:17 | calling 89:24 | 83:12 165:19 |
| breach 126:8 | 144:3,4 | calls 28:5 48:25 | 168:1 |
| break 38:9 | busiest 167:14 | 49:4,6 58:12 | cash 80:9 |
| 46:21,24 47:1 | business 16:14 | 82:3 157:20 | catch 93:16 |
| 52:10 92:17 | 106:13,20,22 | 167:8 | catching 25:16 |
| 127:9 128:5,14 | 107:4 119:24 | cam 9:3 25:11 | caused 140:14 |
| 128:18,20 | 119:25 120:6,7 | 29:1,16 30:2 | cements 81:16 |
| 168:15 169:5,8 | 120:11 124:12 | 41:19 46:23 | central 169:11 |
| breaks 39:6 | 144:17 161:1 | 92:2,10 93:1 | certainly 18:15 |
| brenda 6:22,25 | busting 133:7 | 117:16 118:22 | 20:13 49:14 |
| 38:21 39:4,7 | busy 90:3 | 134:1 137:19 | 51:22 76:4 |
| 66:4 87:9 | butler 3:12 | 137:24 | 82:20 88:22 |
| 107:20 108:21 | butlersnow.c... | cam's 47:16 | 160:11 |
| 109:11 | 3:14,14 | cam.hillyer | certificate |
| brian 4:3 | button 25:5 | 3:14 | 171:1 |
| brianclarke 4:7 | 38:11 53:14 | camera 8:6 | certified 13:13 |
| briefing 133:25 | | campbell 3:10 | 34:19 38:1 |

**[certified - collateralized]**

51:13 75:3
98:21 112:21
**certify** 171:3,17
172:3
**chain** 2:2 3:9
5:12,15,20,23
6:3,13,18,21,24
7:2 14:14 18:5
19:9 29:7 31:2
32:14 37:19
38:23,25 39:24
42:18 47:23
52:24 65:2
79:2 97:21
107:19 108:20
109:13 115:6
117:18 162:6
**chances** 127:3
**change** 51:10
51:18 81:11
91:1 146:5
157:16 158:12
158:13 159:1
162:24 165:4
166:24 173:2,4
173:5,7,8,10,11
173:13,14,16
173:17,19,20
173:22 174:2,4
174:5,7,8,10,11
174:13,14,16
174:17,19,20
174:22
**changed** 23:12
69:24 145:23

156:24 160:23
161:4
**changes** 132:3
171:14
**changing** 84:22
**chapter** 1:6
10:18 11:9,11
11:14,16,23
12:1,16 13:2
16:14 23:15
33:15,17 35:20
44:22 45:19
48:20 56:19
66:20 82:9
110:9
**check** 53:14
**checking** 40:17
**chose** 124:12
**chronological**
38:25
**chronologica...**
60:4
**circuit** 84:7
86:1 165:19
167:17,25
**circumstances**
120:17
**citing** 86:10
**civil** 2:6
**claim** 16:3
34:16 35:22
57:10 62:8,13
69:21 75:25
76:1,8,9,16,22
77:2,5,6,8,13

77:14 78:1,14
78:19 81:9
84:4 85:22
91:9,17,18
111:7,11,22
120:7 123:23
144:9,13,15,23
145:1,10,14
151:22 152:2
153:25 164:11
**claimed** 102:8
**claiming** 103:3
103:3
**claims** 21:10
23:20,22 59:17
59:22 60:11,19
60:22,25 69:11
75:21 76:3,23
76:24,24 80:5
80:8,12,14,19
80:25 81:4,15
81:18,20 84:7
89:6 91:9,14
91:15,17,19
111:16,17,21
120:8 143:19
147:22 148:5,8
148:10 149:2
151:24 154:8
**clarification**
19:6
**clarified** 12:13
**clarify** 27:17
48:15 129:3
166:11

**clarke** 4:3 15:2
**clear** 24:16
35:6,19 71:22
131:24 132:13
132:16 134:18
136:21 146:23
**click** 53:14,14
53:14
**client** 82:3
126:8 127:22
127:24 128:3
130:6 132:11
134:20 135:8
135:18 146:19
146:25 147:7
**clients** 81:25
136:20
**clock** 145:5
153:15
**close** 41:20
67:8
**closer** 74:24
**coat** 52:5,8
**coats** 52:9
**collateral** 16:5
17:20 21:20,21
22:1,6,18 23:2
23:13 35:22
78:22 80:9
114:8 144:22
146:9 147:17
147:21 148:16
151:17
**collateralized**
165:20

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

[collecting - contains]

collecting  66:3
collusion  57:6
  57:20
come  46:24
  71:5 84:15,23
  95:3 96:19
  98:12,18 105:3
  108:6 128:19
  131:14 136:5,6
  139:10 153:13
  153:14 165:21
comes  78:8
comfortable
  52:11 99:4
coming  99:23
  99:24 102:5
  105:14 117:15
comments
  122:17
commercial
  11:12
commission
  99:2,16,20,23
  100:2,11 102:3
  102:6,7,19,24
  103:2,4,11,16
  105:7
commissions
  100:9
committed
  55:21,23 56:7
communicate
  110:7 167:3
communicating
  18:9 43:17,18

121:10,16,18
121:21
communication
  127:1 156:20
communicati...
  109:20 156:17
  163:5,8,10
complaint  6:12
  41:7 68:2,4,5,7
  68:13,22 69:4
  69:13 70:3,13
  70:14,17,21
  71:4 72:2,15
  73:24 74:8,11
  74:17,20,22
  75:9 80:1,3
  81:22,23 82:17
  83:3 85:2
  91:24 142:7,12
  142:23 144:20
  152:5
complaints
  32:11
complete  58:22
  118:19
completed
  56:12 57:18
  58:16,21
completion
  171:12
complicated
  112:11
component
  145:16

comports
  114:20
compromise
  55:4,8 60:11
  107:9 122:17
  153:7,12
computer  38:7
  100:14
concepts  144:6
concern  151:16
concerns
  124:18,20
concise  154:14
concluded
  45:15 56:21
concludes
  170:7
conclusion  22:3
conduct  120:20
  128:17 133:11
  134:3
conducted  8:5
  8:16
confidential
  88:25
confirmation
  75:20
conflict  136:19
confused
  130:12
confusion
  124:3
conjunction
  26:25

connection  8:7
consecutive
  140:24
consensus  36:8
consent  159:7
consequence
  19:1
consider  89:5
  119:25 128:15
  166:12 167:5
  169:22
consideration
  71:11,12,13,17
  77:12 139:23
  139:25 169:21
considered
  57:5 148:16
constant  84:22
  89:9,9
constructively
  140:11,23
  151:21
consult  157:15
  158:11
consumer
  11:12
contact  12:21
  18:2,24 32:6
  34:5
contacted  13:8
  18:23
contained
  172:7
contains  80:7

Alpha Reporting
A Veritext Company

**[contemplated - counteroffer]**

contemplated
45:10 96:23
contemplating
33:10 35:17,23
112:15 145:3
contested 13:20
context 142:22
143:9 148:7
continual 134:4
continue 8:9
133:9 134:10
153:2 169:8,9
continued 4:1
continuing
134:10
control 16:12
71:8 80:6
135:10
convenient
46:24 92:3
conversation
19:1
conversations
64:1 106:9
131:11
conversely
98:13,15
conveyed 32:21
42:23 43:24
cooks 112:11
copied 30:19
31:16 79:25
80:15 87:12
116:9

copies 138:18
coplaintiff
33:20 34:2
54:16 68:5
coplaintiffs
31:22 33:8,11
33:16
copy 38:21
40:5 69:4
138:17
copying 25:24
69:3 87:11
correct 10:19
10:24 15:4,5
15:16 16:6
17:15 18:5,6
19:22 20:2
22:11 24:9,10
33:24 38:22
40:12 44:3
48:16,17,20
50:8 54:25
56:6 60:13
61:6,9 70:24
77:21,22 79:25
90:8 91:7,12
94:1,2,8,13
95:9,10,25
96:1,3,4,15,21
100:16 101:6
102:1 104:18
104:19 105:17
108:17,18
121:14 123:8
129:9 139:11

140:24 142:15
142:16,20
143:6,16
144:25 145:8
147:1,24
148:10 150:12
151:15 156:7
156:18 158:6,7
158:9 163:12
164:19,20
172:8
corrected 19:4
157:7 172:7
corrections
172:6
correctly 107:4
cost 95:1 145:6
154:24 165:17
costs 82:25
165:17 168:6
couched 78:4
counsel 8:25
9:14 10:22
11:17,23 12:21
13:7,8,9,23,24
15:1,25 16:3,9
18:5 19:25
20:23 21:3
22:24 23:9
24:12 25:6
27:23 31:3,5,5
31:14,24 34:1
34:7 36:8,18
38:17 39:22
40:10 41:2,6,6

41:11 42:23
43:1,11 44:2
47:25,25 50:13
59:12 63:1
64:20 65:19,21
66:5 67:15
69:3,20 79:12
79:13 84:19
85:7 86:3
87:11,11,12
89:9,17 94:6
98:4 101:13
105:16 106:12
109:21,22
110:2 112:1,8
112:15 113:7,8
118:12 120:16
121:17,25
122:2 123:16
126:15 129:5,7
129:23 131:9
131:11 132:17
134:7 147:3
156:23 157:3
157:19,21,22
158:11,15,18
158:18 159:1
162:16,16,18
169:16
counsel's 17:14
23:14 84:21
99:10 113:10
127:17
counteroffer
54:11

Alpha Reporting          800-556-8974
A Veritext Company          www.veritext.com

[counting - decide]

counting 117:3
counts 73:9
couple 118:24
course 112:13
154:20
court 1:1 8:14
8:18 9:15
55:23 56:3,9
82:6 92:22
97:9 100:22
102:9 126:7
133:24 152:6
court's 56:5
crc 1:24 4:9
creditor 13:8
81:3 107:9
112:15 150:1,1
150:7 157:22
creditor's 13:9
creditors 10:23
13:8 46:10
59:8 104:8,8
109:25 110:10
110:22 111:4
112:9 124:14
150:4,5,9,11,19
157:10 158:19
166:15 167:9
crr 1:24 4:9
csr 1:24 4:9
171:24
current 13:3
76:6 77:12
100:15 114:1
115:5 121:8

129:18
currently
100:24
cut 83:16 92:3
cute 118:17

**d**

d 3:4 11:4
daca 39:25
40:4,6 48:8,15
49:5 57:4
58:11 83:13
95:22,23,24,24
106:8,25 113:9
113:25 114:18
114:22 121:25
daily 21:15
dallas 1:2 3:6
3:18 12:3
date 12:15,19
12:25 17:1
49:10 54:2
57:23 58:8
63:13 113:5
149:11 167:12
171:21 173:24
174:24
dated 5:11,13
5:16,19,21,25
6:2,4,7,9,11,14
6:17,19,22,25
7:3 14:6,15
15:1 19:10
24:25 29:8
37:20 52:22,25
64:17 65:4

68:16 69:6
79:3 87:7
97:22 107:20
108:21 162:7
171:23 172:11
dates 23:18
46:20 159:13
davor 3:3 5:13
5:16,21 6:1,6
6:10,19 7:3 9:5
14:15 19:10
29:8 30:19,21
38:21 41:22
47:15 52:21
53:23 64:16
65:9 68:15
87:9 97:22
115:7 123:5
129:9 131:15
135:4 162:7
167:14
day 12:23
20:24 23:18
25:17,25 26:17
90:17 99:25
168:5 172:11
days 12:23
19:23 23:10,16
23:24 86:22
101:12 159:19
162:17
deadline
133:25
deal 31:21
44:16 46:12

67:18,20,21,23
74:21 76:25
78:5 80:21
81:13,13,19,21
88:16 89:12,13
89:14,15,19
90:2 91:5,6
96:22 98:8
99:12 107:8
110:24 111:1
123:20 154:17
154:19 156:11
157:13 158:20
159:4,8
dealing 27:12
27:13 41:19
89:10 154:16
deals 168:6
dealt 145:25
146:1
debt 37:3 105:5
debtor 1:6
71:11,16 72:16
72:17,18,19
85:2 88:11
139:23 140:12
140:14
debtor's 11:16
11:23 13:7
84:1 139:10
decent 82:24
143:6,11,18
144:9 164:14
decide 61:17

[decides - dispute]

| | | | |
|---|---|---|---|
| **decides** 46:7 | **definitive** 22:21 | 136:2 167:23 | **directly** 97:4 |
| **decision** 15:19 | 157:2 | 168:9 169:9 | 103:24 104:2 |
| 21:13 54:14,16 | **delay** 83:1 | 170:7,9 171:13 | 116:12 135:8 |
| 54:16,17 55:19 | 93:14 95:1 | 172:5 173:1 | **disagree** |
| 86:2,2 123:17 | 134:8,11,24 | 174:1 | 136:23 |
| 135:1 | 151:14 152:22 | **depositions** | **disagreeing** |
| **declaration** | 154:24 161:25 | 12:9 | 84:21 |
| 172:1 | 168:6 | **description** 5:8 | **disbursed** |
| **declaratory** | **delays** 134:4 | **detailed** 74:4 | 98:19 123:7 |
| 72:25 73:13 | **delivered** 31:20 | **details** 89:13 | **disbursing** |
| 142:12 | 50:16,17 | **determination** | 99:16 100:2 |
| **deem** 166:22 | **demand** 26:3 | 21:23 22:5 | **discovery** |
| **deeper** 84:24 | 26:21 27:1 | 56:22 58:16 | 40:19 41:1 |
| 84:24 | 34:14 156:2 | 59:6 62:7 | 48:3 110:15 |
| **default** 145:2,5 | **demanding** | 149:10 | 163:11 |
| **defend** 151:13 | 27:1 | **determine** 89:7 | **discretion** 46:7 |
| **defendants** | **denominator** | 106:13 | **discuss** 18:1 |
| 74:3 | 99:2 | **devil's** 89:13 | 109:22,24 |
| **defense** 34:9,13 | **depending** | **difference** | 110:3 119:2 |
| 34:15,18,24,24 | 120:15 | 61:24 83:20 | 128:16 156:22 |
| 63:1,10 69:11 | **depends** 8:6 | **different** 19:5 | **discussed** 26:24 |
| 69:21,23,25 | 110:11 | 46:15 47:22 | 42:18 43:2 |
| 85:19 86:11 | **deponent** 9:6 | 54:17 59:17,22 | 139:1 156:16 |
| **defenses** 62:18 | 171:15 | 67:15 90:25 | 158:14 164:13 |
| 62:21 82:25 | **deposit** 71:14 | 106:4 117:18 | **discussion** |
| 83:7,8,9,11 | 71:20 80:6 | 132:6,7,9 | 17:20 27:15 |
| 84:3,11,15,16 | 113:19 139:25 | 141:5,11 142:5 | 31:10 116:8 |
| 84:18,20,23 | **deposition** 1:9 | 146:5 153:8 | 122:12 123:6 |
| 85:5,8,21,22 | 2:1,5 5:9 8:4 | 170:2 | 123:24,25 |
| 94:18,19,23,25 | 8:12,16 9:24 | **dig** 84:24 | **discussions** |
| 95:12 165:19 | 10:8,14,21 | **direct** 98:6 | 34:1 50:21 |
| 166:20 168:3 | 25:10 52:9 | 115:1 117:9 | 78:21 115:10 |
| **defined** 13:22 | 79:13,17 | 139:15 | **display** 138:25 |
| 21:5 129:18 | 126:21 133:23 | **direction** 27:7 | **dispute** 46:17 |
| 130:2 165:3 | 134:21 135:2 | 43:9 171:10 | 100:10 153:23 |

Alpha Reporting          800-556-8974

A Veritext Company          www.veritext.com

**[distinction - e]**

| | | | |
|---|---|---|---|
| **distinction** | **documents** | 154:13 | 25:23 26:18,25 |
| 83:21 91:16 | 16:23 17:3,13 | **double** 121:1 | 27:10 29:7,8 |
| 141:3,9 | 17:15 23:23 | **doubt** 150:20 | 31:1,2,13,16 |
| **distribute** | 24:6,17,19 | **download** | 32:14,19,20 |
| 123:18 | 39:11,14,20,21 | 38:12 | 33:2,4 34:5 |
| **distributed** | 40:11 45:24 | **draft** 68:1,12 | 35:2,7 37:19 |
| 115:11 122:13 | 47:24 48:1,18 | 70:14,17 74:8 | 37:20 38:23,25 |
| 125:5,7 127:14 | 48:24 49:10 | 80:2 81:22 | 39:7,23,24 |
| 129:7 | 65:14,19,22 | 82:17 85:2 | 42:5,18 45:11 |
| **distribution** | 66:3,3,8 67:19 | 91:24 142:6,12 | 47:23 49:1 |
| 125:23 | 95:1,13,13,15 | 142:22 156:6 | 50:11,15,17 |
| **district** 1:1 | 95:15,16,19 | 157:11 | 52:21,24,25 |
| 8:15 12:3 | 96:6 106:5,11 | **drafted** 73:25 | 53:11 54:2,5 |
| **division** 1:2 | 106:24 107:6,7 | **drukavina** 3:7 | 55:1 56:6 |
| 12:3 | 113:9,14,18 | **duly** 9:19 10:17 | 58:18 62:24 |
| **divulging** | 114:7,16,23 | **dynamic** 84:23 | 63:3,5 64:5,16 |
| 146:24 | 115:3,14,24 | 146:5 | 64:25 65:3,12 |
| **dla** 3:17 | 116:13 120:2 | **dynamics** | 68:15,19 69:2 |
| **dlapiper.com** | 122:2 131:7 | 51:17 161:4 | 69:19 79:2,3,7 |
| 3:19 | 157:11 160:6,8 | **e** | 83:6 84:20,21 |
| **docket** 137:21 | 160:9,12 | **e** 5:12,13,15,16 | 87:5,6,18,21 |
| 137:25 168:12 | **doing** 16:20,22 | 5:18,20,21,23 | 88:2,24,24 |
| **document** | 24:7 55:24 | 5:24 6:1,3,4,6,8 | 89:4 93:1,2,3 |
| 14:10 24:2 | 101:13,13 | 6:10,13,14,16 | 93:18 97:21,22 |
| 26:7 30:12 | 110:1,22 | 6:18,19,21,22 | 98:25 99:7 |
| 48:15 65:15 | 154:17 159:25 | 6:24,25 7:2,3 | 107:13,19,20 |
| 73:19,19,22 | **dollar** 111:9 | 11:4,4 14:14 | 108:19,20,21 |
| 131:10 163:21 | 144:14 152:6 | 14:15,25 15:17 | 109:5,11,13,18 |
| **documentation** | **dollars** 62:15 | 17:7,17,23,24 | 112:17 113:23 |
| 23:20 33:4 | 83:25 105:20 | 17:24,25 18:2 | 116:16 117:3,4 |
| 121:3,5,8,18,21 | 143:15,19 | 18:5,9 19:4,9 | 117:20,21,25 |
| 122:4,8 | 144:10,13 | 19:10,23,24 | 118:2,23 |
| **documented** | 145:10 149:22 | 20:1,4,6,10,11 | 125:17 135:20 |
| 42:21 | 152:11,13,15 | 21:1,6,19 23:7 | 155:25 157:7 |
| | 153:4,9,12 | 24:13,15,24 | 157:12,20 |

Alpha Reporting 800-556-8974
A Veritext Company www.veritext.com

[e - exhibit]

162:6,7,15
163:23
**earlier** 42:19
68:5 106:3
114:21,24
124:7 143:4
166:7
**early** 110:17
**easier** 41:17
60:4,5 137:7
**easy** 26:1
**effect** 22:21
31:25 34:16
91:3
**effectuated**
72:18
**effort** 151:5
**eight** 136:12
162:17
**either** 36:2
67:23 76:23
82:18 83:4
92:23 128:1
131:10
**electronics** 2:2
3:9
**element** 58:7
58:22
**elements** 36:18
**eloquent** 37:9
**employee**
171:19
**encumbered**
84:8

**endeavors**
160:10
**energy** 151:5
**entire** 111:22
**entirety** 76:25
94:24
**entitled** 56:13
56:25
**entitlement**
56:23 58:17
**enumerated**
85:6
**envisioned**
45:12
**equity** 83:14
**equivalent**
71:12,13 72:16
139:24 140:13
**eric** 6:4,8,14
20:18 43:2
52:25 53:24
65:3,8 79:3
98:7
**errata** 173:1
174:1
**erroneously**
117:2
**error** 14:11
**escrow** 38:22
74:3
**especially** 83:4
**essence** 86:7,7
**essential** 86:7
**essentially**
24:13 30:15

71:3 74:18
88:9 104:1
139:22 142:17
153:5
**estate** 51:17
55:9 59:9
60:24,25 62:8
62:13 70:22
74:10,20 76:21
83:14 88:19
90:7,12,18,21
90:25 96:20
97:6 98:12,13
98:19,19,20,23
99:24 101:6
102:25 104:2,7
104:9 105:5,15
105:20 139:4
140:5 144:8,15
148:3,5 149:2
150:13,15
151:3,5 153:14
155:7 159:4
**estate's** 81:14
145:14
**estimated**
105:15
**eta** 39:10
**everybody** 23:5
155:12
**everybody's**
23:4
**everyone's**
43:22 134:9

**evidencing**
65:16
**exact** 12:18
17:1 42:12,24
44:4 89:14
106:15 117:4
142:5 147:10
158:16
**exactly** 13:10
86:22 121:24
**examination**
5:5 9:21
**example**
130:20
**except** 2:7
**exchange** 60:11
105:21 118:23
143:15 144:10
**exchanged**
157:21 158:17
**excluded** 43:18
43:20
**exclusive**
113:25
**exclusively**
27:12 55:11
73:6
**executed** 48:15
**exhibit** 5:9,10
5:12,15,18,20
5:23 6:1,3,6,8
6:10,12,13,16
6:18,21,24 7:2
7:5 10:2,8,14
14:5,9,10,12,13

**[exhibit - felt]**

14:14,19 19:9
19:14,24 21:24
24:22,23,24
25:12,13,22
28:9 29:7,12
29:14 30:14
31:1 37:14,15
37:19,23 38:12
38:19 47:19
52:19,19,21,24
53:15 54:1
59:10,11 63:6
64:14,16,22,24
65:3,11 68:14
68:15,19,19,21
70:12 71:8
79:2,6 87:1,6
97:16,18,21
107:18,19
108:9,11,17,19
108:20 113:1
117:2,5 122:10
122:11,22
123:1,4 138:10
138:12,22,25
138:25 162:6
162:10 168:9
168:20,21
**exhibit's** 78:25
**exhibits** 5:7
93:17 94:4
110:15 138:14
**exist** 84:18
**expect** 80:4

**expedite**
117:17
**expediting**
73:14
**expense** 83:1
95:1 151:14
152:22
**expenses** 101:9
**experience**
22:11 56:19
83:4 89:24
154:17
**expert** 133:15
**explain** 33:9,13
120:12 143:18
**express** 80:7
**extended** 60:7
60:9
**extensive** 22:11
**extent** 32:2
49:20 82:3
136:18

**f**

**face** 34:21
**fact** 32:18
57:12 83:13
84:8 98:11
136:10 168:2
**factor** 82:6
**facts** 120:17
133:7,12
**factual** 71:2
129:17,25
130:16,20
131:2,6

**fail** 116:22
**fair** 20:22 35:9
35:12,13 43:6
44:11 45:14
50:25 52:1,2
62:16 65:20
66:25 69:15
80:22 91:23
101:22 119:13
119:18 139:12
142:4 149:8
156:9
**faith** 133:6,12
136:9
**false** 71:18
**familiar** 96:16
**far** 41:20
**fascinated**
111:8
**fast** 42:6
145:17
**faster** 38:10
**fault** 78:11
**february** 5:14
5:17,19,22
13:25 14:16
15:1,16,19
16:17,17,24
17:18 18:13
19:11,24 21:23
23:7,10,12
24:1,18,20,25
26:24 28:3
29:9 31:24
32:13 34:12

39:15,23 40:12
50:16 63:7
110:17
**federal** 2:6
**fedex** 2:2 3:9
9:4 10:22
109:21,24
110:3,7 111:5
111:20 113:8
116:22 118:12
121:10,23
122:2 123:10
123:15,22
156:6,15,16,22
157:3,15
158:11,14,17
158:23 159:1,7
160:9,13 166:5
166:7,22,23
**fedex's** 111:6
**feed** 86:14
**feel** 23:4 53:22
110:8 136:17
136:17 154:11
163:17
**feeling** 163:16
**fees** 36:5 37:4
59:9 101:9,13
145:2,3 150:2
150:2 155:2
161:21
**fell** 76:11
**felt** 107:8
145:11

Alpha Reporting
A Veritext Company

[fight - frinzi's]

| | | | |
|---|---|---|---|
| **fight**  116:3 | 123:15 124:14 | 164:2,2 | **formalities** |
| 151:7,8 | 155:5 157:3 | **five**  19:23 | 12:8 |
| **figure**  23:4 | 158:23 159:6 | 23:10,16,18,24 | **former**  132:2 |
| 25:17 77:19 | 160:7,17 | 128:18 129:22 | **forms**  134:20 |
| 102:12 | 167:22 | 159:19 163:17 | **formulate**  37:3 |
| **file**  32:11 | **financial** | **flagpole**  111:1 | **forth**  23:3 32:9 |
| 106:14,23 | 156:24 159:24 | 111:2 112:7 | 42:13 89:9 |
| 113:9,13 | 160:23 | **flew**  111:1,2 | 90:5 134:22 |
| 114:16 118:20 | **financially**  8:20 | **flexibility** | 163:20 171:5 |
| 119:25 120:8 | 171:18 | 135:9 | **forward**  64:11 |
| 124:13 | **find**  16:7 92:3 | **flexible**  135:11 | 75:12 86:15 |
| **filed**  8:14 10:24 | 133:6,12 | **flip**  30:16,24 | 107:10 133:25 |
| 44:10 45:12 | 147:10,12 | **flow**  27:7 | 136:24 144:1 |
| 70:18 101:3,23 | **fine**  37:10 | 148:12 150:6 | 145:17 150:3 |
| 104:17,23 | 46:13 47:3 | **flowed**  57:5,20 | 164:21 |
| 106:6,11 | 137:2,2,10 | **flowing**  144:1 | **foundation** |
| 109:16,23 | **finish**  63:23 | **fluent**  25:21 | 112:4 |
| 111:20 116:23 | 166:15 | **focus**  37:7 | **fourth**  57:6 |
| 122:3 124:5,19 | **first**  10:2 12:23 | 113:23 144:3 | **frame**  157:8 |
| 124:24 125:3 | 12:23 17:20 | 146:13,14 | **fraudulent** |
| 131:3,19 137:5 | 18:18,19 20:1 | **focusing** | 71:22 84:4 |
| 137:6,6 138:13 | 21:3,7 23:7 | 151:18 | 85:22 140:11 |
| 138:18 147:5 | 31:7,18 38:23 | **folders**  114:1 | 140:23 142:14 |
| 151:25 152:2,5 | 40:13 42:5 | **follow**  106:2 | 144:9,14 |
| 152:5,6 156:5 | 44:9,18,22,24 | 148:11,13 | 145:10,13,14 |
| 156:18,25 | 45:7,9 49:19 | **following**  32:22 | 151:22 |
| 157:17 160:23 | 50:10 53:9,10 | **follows**  9:20 | **freeing**  59:8 |
| 160:24 162:17 | 57:3 68:24 | **forced**  154:12 | **friday**  31:22 |
| 168:8 | 79:20 80:14,16 | **foregoing** | 135:24 136:6 |
| **files**  114:1 | 94:16 98:3 | 171:4,6,10 | **frinzi**  143:23 |
| **filing**  31:22 | 109:20 110:23 | 172:4 | 145:25 146:2 |
| 33:7,10 69:8 | 115:1,12 | **forget**  135:2 | 148:25 |
| 74:19 109:25 | 117:20 137:18 | **form**  2:8 | **frinzi's**  146:8 |
| 110:7 112:6 | 138:6 139:14 | 157:22 | 146:16 |
| 119:23 123:13 | 156:24 160:12 | | |

[front - go]

**front** 34:20
35:17,20 36:11
36:12,16 100:7
100:13 134:22
137:13 138:21
**full** 11:2,3 21:5
21:8 26:13
103:2,4 136:25
138:15,16
**fully** 12:10
165:20
**fun** 65:7
**fund's** 66:24
**funds** 13:21
16:2,4,11,18,21
21:4,25 22:6
26:3,21 27:2
32:1 33:23
36:14 55:5,17
55:22 56:9,13
56:24 57:1
58:17 60:23
61:1,3,4,11,12
61:17,25 63:17
63:17 66:10
74:3 75:11
77:2 83:13,17
84:2,8 88:12
91:1,10,11,16
95:7,8 96:7,21
97:4,8 98:7,12
98:18 103:17
114:2 115:10
120:2,21
122:13 123:6

123:11,18,23
124:6,11,22
125:4,5,23
126:16 127:13
129:6,7,17
130:1 131:2,7
131:8,18 132:5
132:17 139:9
139:10 150:24
151:3,16,19
153:23 162:19
**funk** 6:22,25
39:7,22,25
40:18 47:24
66:4 107:13,20
108:19,21
109:5,12 113:8
114:25 115:4
116:1,8 117:2
117:4,21 118:1
118:2,3,18
120:5 121:14
121:22 122:11
125:13,20,21
**funk's** 39:4
112:17 113:22
114:5 115:13
**further** 115:18
115:20 171:17
**future** 21:9,10
94:12

**g**

**game** 119:14
168:14

**gap** 159:9
**gavels** 46:1
58:24
**general** 18:21
36:7 44:17,18
44:21 45:7
47:20 57:5,19
66:23 74:7
89:11 90:23
104:12 105:1,2
112:14 154:3,4
160:22
**generally** 49:13
49:24 56:10
61:1 76:2
78:22 133:10
148:18 156:13
**generically**
26:22
**genesis** 70:23
70:23 114:7,17
114:23 122:1
140:16
**gentleman**
83:22
**gentlemen** 98:5
**getting** 19:19
33:11 59:8
65:6 78:7
90:21,21 91:13
158:20
**give** 26:12
28:17 29:18
31:23 36:25
37:1 52:3 70:5

71:24 75:2
82:12,22 85:2
85:9,10,12
105:24 106:18
116:22 117:14
127:5 150:21
152:24 156:4
157:1 159:12
159:13 160:20
161:24 164:25
167:22
**given** 157:10
164:13 165:14
171:11
**giving** 29:17
75:20 145:13
**glad** 86:4
**gleaned** 131:10
**global** 43:3
50:20 70:23
74:11,21,21
86:19 88:10
139:8 154:5,6
154:6,18 158:8
**gni** 114:8
**go** 8:10 10:4
12:14 14:3
15:9,20 16:19
19:7 22:9 23:6
30:7,9 31:12
37:14 38:14
39:1 40:13
41:5 50:15
54:1 59:10
60:5 62:24

Alpha Reporting
A Veritext Company

800-556-8974
www.veritext.com

**[go - guys]**

63:7,7 64:3,24
68:10 69:17
70:3,20 71:3,3
71:5 72:24,24
73:17 75:8
76:21 78:12
79:20 86:24
87:22 88:22
92:14,15,17
93:6 94:5
96:15 98:13
102:13 105:4
110:15 112:17
115:1,12,23
116:5 117:1
122:24 126:12
133:1,24,25
134:14,14,15
134:19 136:25
138:23 139:3
141:1,17
151:11 153:16
154:21 155:25
157:12 162:18
163:22 165:25
166:13 168:11
169:22,23
**goes** 53:17
55:22 68:13
85:15
**going** 10:5,11
12:7 13:18
15:7,9,20,25
16:16 18:10
19:8 20:8 21:1

21:17 23:3,11
25:20,21 26:6
26:22 27:3
28:10 29:6,6
29:12,24 31:7
32:11 36:8,14
36:22 37:2,7
39:11 42:6
45:23 46:22,25
47:6,9 48:5,14
51:21 52:6
54:6,10 59:7
60:10 62:6
64:10 66:10,25
68:19,20 70:20
72:2,23 73:5
73:12,16,17
74:6,22 75:8
75:11 77:16
81:13,14,22
82:2,12 86:15
87:17 88:6
90:4,10,19,25
92:16 93:8,11
93:16 96:15,22
99:15 100:12
102:23 103:9
103:22 105:2,6
106:1,19
107:12 109:22
110:14,17
118:8 123:17
126:6,10 127:3
127:22,25
128:1,22,25

129:21 130:13
130:18 132:10
134:5 136:4,5
137:4,7,21
138:3 139:15
147:25 149:5
149:16,18
150:13,14,22
152:21,23
153:1,13
154:18 159:17
162:1,1 164:12
164:21 165:8
166:1,14,18,21
167:10,10
168:14,24
169:2,6,8,8,9
170:1,5
**good** 8:1 9:3,22
9:23 10:16
47:4 106:20,22
107:4 119:25
120:7,11 133:6
133:12 136:9
138:23 144:16
166:10,12,22
169:25
**goodman** 1:5
8:13,14 10:18
26:3,21 35:20
38:22 65:14,22
66:21 71:21
114:9 140:14
**gotten** 60:12
74:16 135:10

166:4,9
**grab** 92:7,21
**granting** 71:21
114:8
**granular**
131:24
**great** 53:19
167:5
**green** 87:13
88:7,10 89:3
93:18,23
104:16
**group** 9:13
93:3 94:20
**guarantee**
76:13
**guess** 14:18
22:23 24:11
42:15 46:2
54:9 85:6
94:18 100:4
101:18,19,20
112:3 113:16
150:16 154:7
157:9,21,25
**guessing**
113:15
**guesstimate**
105:17
**guffy** 4:3 9:11
9:11 15:2 20:2
25:25
**guys** 37:7
126:24 128:2
144:3

## [h - honestly]

| h | | | |
|---|---|---|---|
| **h** 11:3 | **hearsay** 121:6 | 14:18,25 19:7 | 128:7 129:2,9 |
| **ha** 163:18,18 | **held** 96:7 97:9 | 19:13 24:22 | 129:12,15,24 |
| 163:18 | 114:2 115:25 | 25:3,7,13,18 | 130:11,21,25 |
| **half** 46:25 | **help** 22:16 27:2 | 26:16 28:9,13 | 131:1,15,17,23 |
| 55:16 | 29:22 35:14 | 29:2,14,20 | 131:25 132:13 |
| **halfway** 117:8 | 36:9 64:7 | 30:7,13 35:1 | 132:20,25 |
| **hand** 34:20 | 118:23 146:12 | 37:14,23,24 | 133:14,19 |
| 95:8,8 | 166:10,12,23 | 38:18 41:24 | 134:14,17 |
| **hang** 22:8 65:6 | 167:5 168:19 | 47:1,4,13,17,18 | 135:4,14 |
| **happen** 13:17 | **helpful** 20:16 | 51:21 52:17 | 136:16 137:3 |
| **happening** | 30:18 72:5 | 53:4,22 59:21 | 137:16,20,23 |
| 110:13 | 84:14 104:25 | 60:1 64:3,10 | 137:25 138:3 |
| **happens** | 158:19 159:4 | 64:21,23 65:10 | 138:12,17,23 |
| 153:10 165:20 | **helping** 156:15 | 68:10,18,25 | 141:16,22 |
| **happy** 138:18 | 159:4 | 73:11,21,23 | 146:23 147:9 |
| **harass** 116:10 | **hereto** 10:10 | 75:7 78:13,18 | 162:12 168:11 |
| 132:23 | 14:7,17 19:12 | 78:23 79:6,20 | 168:16,18 |
| **hard** 85:14 | 25:2 29:10 | 81:8,9 82:5 | 169:4,15,20 |
| 138:18 | 37:22 52:23 | 83:24 84:3 | 170:3 |
| **harder** 84:25 | 53:2 64:18 | 86:1,24 87:2 | **history** 115:6 |
| **hardt** 3:5 | 65:5 68:17,23 | 87:10 90:6 | 115:20 118:4 |
| **harm** 57:8 | 79:5 87:8 | 92:5,13,15 | 118:19 119:7 |
| **harr** 3:5 | 97:24 107:22 | 93:13 94:7 | **hit** 53:9 108:7 |
| **he'll** 107:16 | 108:23 162:9 | 97:14 98:3,24 | 125:1 |
| **head** 29:5 | 168:23 171:16 | 103:15,23 | **hits** 84:9 |
| **heads** 66:7 | **hey** 163:17 | 104:11 105:11 | **hitting** 25:4 |
| **hear** 38:14 | 168:13 | 107:15 108:1,8 | **hold** 26:11 |
| 47:11 | **hi** 40:2 | 108:12,14,18 | 29:25,25 51:9 |
| **heard** 8:8 69:7 | **hidden** 110:23 | 109:1 113:1,21 | 108:4 127:18 |
| 69:12 111:8 | **high** 82:18 | 116:11,12,19 | 128:7 138:1,1 |
| 159:2 | 162:23 | 117:14,19 | 138:2,2,15 |
| **hearing** 45:25 | **highest** 151:4 | 118:25 119:2,5 | 144:19 |
| 46:10 92:5 | **hillyer** 3:10 5:5 | 125:2 126:3,13 | **holding** 60:24 |
| 136:7 169:25 | 9:3,3,22 10:13 | 126:18,23 | **honestly** 49:9 |
| | 13:16 14:3,8 | 127:5,10,11 | |

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

[honor - internet]

| | | | |
|---|---|---|---|
| **honor** 136:13 | **identify** 134:7 | **independently** | **inquiry** 21:24 |
| **hope** 80:9 | **idiots** 38:4,8 | 18:8 27:14 | **insightful** |
| **hopefully** | **ignoring** 57:10 | 129:16,20 | 20:15 |
| 153:15 | **imagine** 64:1 | 132:16 151:1 | **insinuate** |
| **horrible** 54:13 | **immediate** 55:5 | **index** 5:1 | 163:24 |
| 54:21 | 55:18 | **indicate** 165:23 | **insisting** 98:12 |
| **hour** 46:25 | **immediately** | **indicated** | 103:25 |
| 92:18 127:8 | 98:7 | 144:21 | **insolvent** 72:17 |
| **houston** 3:23 | **impact** 127:12 | **indicating** | 72:18,19 |
| 4:5 | **imply** 98:15 | 30:22 | 111:18 |
| **hundred** | **implying** 21:19 | **inextricably** | **instance** 86:14 |
| 167:10 | **important** | 153:21 | **instruct** 126:1 |
| **hundreds** 32:8 | 40:20 48:3 | **inflict** 152:21 | 130:3,9 131:21 |
| 152:1 | **impression** | **information** | 132:12 133:2 |
| **hunton** 4:4 | 143:21 | 48:6 95:22,22 | 146:21 147:8 |
| 9:11 | **imputed** | 96:14 107:8 | **instructed** |
| **huntonak.com** | 136:19 | 114:1,6 115:14 | 129:10 |
| 4:6,7 | **inarticulate** | 115:20,21 | **instructing** |
| **hyperconserv...** | 51:22 | 116:2,13,17,23 | 126:14 |
| 126:11 | **inbox** 40:3 | 118:9 119:6,17 | **instrumental** |
| | **included** | 120:9 121:7,18 | 166:8 |
| **i** | 154:13 | 131:9,9 | **insurance** |
| **idea** 39:20,21 | **including** 119:6 | **informed** 31:20 | 143:24 149:2 |
| 101:17 | 125:10 | 92:11,24 167:9 | **intangible** 57:5 |
| **identification** | **incorporated** | **initial** 17:24 | 57:20 |
| 10:9 14:7,17 | 44:9 | **initially** 11:1 | **interest** 46:8 |
| 19:12 25:1 | **increase** 51:20 | 13:17 | 88:12 145:2,2 |
| 29:10 37:22 | **incurred** | **initiated** 18:24 | 145:5,13 150:2 |
| 52:23 53:2 | 165:18 | **input** 46:10 | **interested** 8:20 |
| 64:18 65:5 | **independent** | 48:8,9,23,24 | 59:13 171:18 |
| 68:17,22 79:5 | 57:9 127:12 | 49:6 123:20 | **interject** |
| 87:8 97:24 | 128:10,13 | 124:14 157:18 | 118:22 127:16 |
| 107:22 108:23 | 129:24,25 | 157:18 166:10 | **internet** 8:6 |
| 162:8 168:22 | 130:14 155:13 | **inquire** 31:6 | 38:2 |
| **identified** | | | |
| 76:17 106:7 | | | |

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

[interrogatory - know]

| | | | |
|---|---|---|---|
| **interrogatory** 126:9 | **it'll** 113:1 | **jumping** 94:7 151:12 | 51:5 53:6 54:7 56:2 58:21 |
| **intervene** 80:5 | **italicized** 16:6 | **june** 160:13 | 59:16,20,25 |
| **intro** 17:7 | **itemized** 72:10 105:22 | **justified** 145:13 | 60:15 63:9 |
| **introduce** 28:9 64:4 68:10 78:24 86:25 97:14 138:3 | **items** 48:22 | **jw.com** 3:24 | 64:7 67:21 69:8,12,23 70:9 75:4 |

**j**

**k**

| | | | |
|---|---|---|---|
| **introduced** 79:1,7 93:17 97:18 117:2 162:1,10 | **j** 3:21 | **keep** 13:13 60:3 60:3 89:24 92:11,24 167:7 167:9,12 | 76:11,16,21 77:1,7 78:7 79:19 80:15,16 |
| **invading** 147:7 | **jackson** 3:22 9:8 31:19 39:8 | | 80:17 83:8,19 |
| **investigating** 160:4 | **james** 140:14 | **keeping** 106:7 | 84:12 86:11 |
| **investigation** 45:15,21 59:5 63:15,17,21,25 66:24 | **january** 141:17 | **keeps** 139:7 | 88:14 89:10,10 |
| | **jillion** 111:3 | **kept** 24:7 | 89:11,14 95:18 |
| | **job** 54:21 | **kick** 161:15 | 96:14 97:11 |
| | **john** 26:3,20 | **kicked** 158:4 | 100:1 101:16 |
| | **joint** 74:18 75:1 135:1 | **kind** 13:10 36:20 37:8,11 43:9 154:18 | 106:10,11,17 108:24 110:2 |
| **investigations** 160:1,3 | **joke** 75:6 | **kinds** 145:3 | 110:25 111:6 |
| **involved** 27:11 33:25 34:4 66:5 74:10 95:16 125:14 155:16,17 166:24 | **judge** 46:1 58:24 84:9 86:5 126:12 133:21 134:22 136:22 165:22 168:1 | **kitchen** 112:12 | 111:24 112:10 |
| | | **knew** 57:21 114:21 120:24 | 112:13 113:13 |
| | | **knock** 37:3 | 113:25 118:10 |
| | | **know** 12:8,9,15 12:18 13:17 16:23 18:1 20:9 22:2,10 22:13,20 24:4 24:13,17 29:23 32:8 34:6 36:17 38:6 40:18,20 43:8 44:1,17 45:17 45:17 48:10 49:8 50:2,19 | 118:13,13,16 118:17 120:21 120:23,23,25 120:25 121:10 122:5,6 124:1 125:14,15 128:6 131:7 134:4,5 135:4 135:6 136:12 136:22 149:9 151:13 153:7 154:15,15 155:21,23 |
| **issue** 21:6 50:24 51:2 55:11,20 56:8 111:11 151:17 156:3 | **judgment** 72:25 73:13,25 74:2 106:13,20 106:23 107:5 119:24,25 120:6,7,11 124:12 142:12 144:17 161:1 | | |
| **issues** 40:19 55:4,8,12,13,15 57:16 80:9 | **july** 137:6 | | |
| | **jump** 29:21 92:6 164:21 | | |

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

**[know - link]**

156:20 157:2
158:16,21
159:2 160:6
161:20,20,21
163:4,9,15
164:4 165:14
166:9 167:1,7
167:11,20
168:4 170:3
**knowing** 21:5
**knowledge**
26:23 41:1
54:12 60:2
78:15 106:4
120:16 148:2,3
149:17 167:23
**known** 112:8
136:12
**knows** 76:12
103:22
**kopf** 3:5
**kurth** 4:4 9:12

**l**

**l** 11:3,4
**labeled** 117:4
**lacking** 120:9
**lag** 29:23
**land** 95:5
144:18 148:21
148:23,24
**landscape**
146:5 161:4
164:11
**langley** 3:11
9:4 14:12

52:15 64:14
68:14 78:25
87:1 97:18
107:12,14,18
109:12 117:1
118:3 138:10
162:10
**language** 89:15
139:22
**lap** 76:12
**large** 55:4,17
55:21 56:13,23
57:1
**largest** 109:25
110:9,21 111:5
112:9 157:10
**larson** 84:9
92:12 165:22
167:17 168:1
**larson's** 86:5
**late** 19:20 20:7
92:25
**laundry** 167:16
**law** 3:4,11,17
3:22 4:4 57:11
84:7,13 85:6
86:10
**lawsuit** 34:2
152:20
**lawyer** 31:19
130:7 167:15
**lawyers** 89:10
125:11,15
168:5

**lay** 95:5 144:18
148:21,23,24
**laydowns** 83:4
**lead** 15:8
116:16 122:4
**leads** 96:10
**leave** 124:16
169:9
**leaves** 102:1
**leaving** 106:21
**led** 124:10
145:22
**legal** 33:14
129:4,16,17,25
130:8,17
131:17 132:4
132:17 146:15
147:3
**legged** 36:20
**length** 110:25
**lengthy** 117:6,7
117:20
**letter** 5:10 14:5
**level** 94:18
**levels** 149:3
**leverage**
156:13,14
166:8
**leveraged**
158:18
**liability** 143:15
**licensed** 11:5
**lien** 16:14,20
23:15 36:14
62:9 74:9

75:16 129:19
**liens** 129:6
165:22
**life** 81:25 111:9
**light** 48:5 87:13
104:16 127:1
164:11
**lighted** 88:7,10
89:3 93:18,23
**likelihood**
81:23 82:1,5
82:11,16
142:25 143:10
164:14
**limit** 128:15
132:14
**limited** 130:7
132:2
**line** 32:23 33:7
35:2 42:5
50:11,19 55:1
55:16 59:13,15
83:12 98:25
117:20 119:21
119:23 122:10
147:10 165:19
166:15 167:25
173:2,5,8,11,14
173:17,20
174:2,5,8,11,14
174:17,20
**lines** 45:11
88:13,18
**link** 170:2

**[list - mail]**

**list** 106:8
148:15,17
167:17
**litany** 17:10
**litigating** 144:4
154:24
**litigation** 80:4
83:1 86:16
95:2 145:6
154:24 165:17
165:18
**little** 28:13 93:4
106:19 109:8
133:23 153:8
156:12
**llp** 3:12,17,22
**loaded** 70:12
**loan** 114:8,16
114:23 122:1
**loans** 114:17
**located** 63:18
114:10 120:2
120:21,24,24
131:8
**location** 121:8
129:18
**lockstep** 21:16
**logistics** 2:2 3:9
**long** 11:5,8,20
12:4 47:1 99:3
108:3,10
**longer** 29:17
92:12
**look** 14:23 15:4
15:6 16:24

21:11 32:16
41:18 47:23
54:1 59:10
68:24 69:17
79:10,23 84:24
89:12 95:3
98:3,24 99:10
106:1 109:2,6
113:21 122:10
123:4 141:17
144:20 155:25
157:7
**looked** 13:18
19:23 24:1
49:1 68:5
69:19 107:10
148:3
**looking** 12:18
16:18 23:19
24:5 39:17
42:4 45:24
50:10 51:22
64:13 73:5
97:19 100:11
108:9 114:5
116:1 117:19
122:11 148:21
160:4
**looks** 15:5
17:24 31:13
39:25 43:21
60:14 66:23
90:2 108:3
162:25,25

**looped** 19:1
**lost** 52:9
**lot** 23:2 42:13
44:12 110:11
110:12 111:24
144:5,5 150:25
**loudly** 78:8
**low** 51:14
82:19
**luck** 169:25
**lump** 77:23
**lumped** 61:18

**m**

**m** 3:11,16 4:3
11:3
**ma'am** 13:15
51:15
**machine** 171:9
**made** 21:13,23
22:5 32:24
44:2,2,19,22,25
45:8 46:17
49:20,23 50:12
50:13 54:14
55:19 62:3,7
67:6,8,9 72:19
82:10 122:5
123:17 146:10
148:14 149:10
155:9 171:8,14
172:6
**mahlon** 11:3
**mail** 5:12,13,15
5:16,18,20,21
5:23,24 6:1,3,4

6:6,8,10,13,14
6:16,18,19,21
6:22,24,25 7:2
7:3 14:14,15
14:25 15:17
17:7,23,24,25
18:2,5,9 19:9
19:10,23,24
20:1,4,6,10,11
21:1,6,19 23:7
24:13,15,24
25:23 26:18,25
29:7,8 31:1,13
31:16 32:14,19
32:20 33:2,4
35:2,7 37:19
37:20 38:23,25
39:7,23,24
42:5,18 45:11
47:23 50:11,15
50:17 52:21,24
52:25 53:11
54:2,5 55:1
56:6 58:18
62:24 63:3,5
64:16 65:3,12
68:15,19 69:2
69:19 79:2,3,7
84:20,21 87:5
87:6,18,21
88:2,24,24
89:4 93:1,2,3
97:21,22 98:25
99:7 107:13,19
107:20 108:19

**[mail - memphis]**

108:20,21
109:5,11,13,18
112:17 113:23
116:16 117:3
117:20,21,25
118:23 135:20
162:6,7,15
163:23
**mails** 17:17,24
19:4 27:10
31:2 34:5 49:1
64:5,25 83:6
93:18 117:4
118:2 125:17
155:25 157:7
157:12,20
**major** 145:25
**majority** 9:13
49:4 144:22
147:17,21
**make** 20:14
21:6 22:21
29:21 38:16
44:13 51:2,10
52:10,11 59:2
59:4 66:6
72:24 83:21
99:1 107:3
110:14 116:16
118:14,19
124:16 132:15
137:7,17 138:5
140:15 141:23
142:11 164:1,4

**makes** 72:15
92:17 165:12
165:14
**making** 9:24
20:13 22:17
24:6 26:2,20
42:19 44:15
45:13 57:6
72:1 75:6
91:16 112:22
141:3,9 145:9
**man** 136:12
**march** 5:25 6:2
6:5,7,9,11,15
6:17,20,23 7:1
37:21 38:21
42:11,16 43:6
44:3 45:6,9,11
45:14,16 46:18
49:7,22 50:7
50:14,23 51:23
52:22 53:1,24
55:14,19 56:6
56:11,22 57:22
58:6,8,13,18,21
60:6,7,13,14
61:25 62:12,17
62:20 63:8,9
64:17 65:4,12
65:19 66:25
67:12,14,20
68:16 69:6
79:4 87:7,18
97:23 100:25
104:15,18

105:16 106:6
107:13,14,21
108:22 109:13
109:16 110:18
113:6 116:14
116:23 117:4
124:24 125:3
137:5,18,21
138:13 145:21
156:2 159:10
159:14,18
**marked** 10:9
14:6,16 19:11
25:1 29:9
37:21 52:22
53:1 64:17
65:4 68:16,22
79:4 87:7
97:23 107:21
108:22 162:8
168:22
**market** 16:11
**material** 81:4
158:14
**materially**
81:11 134:3
**materials** 40:19
41:1 48:3
**math** 164:16
**matter** 8:13
12:21 13:19,20
18:1 21:16
66:4 112:13
126:4

**matters** 117:17
**maximize**
26:12
**mckinney** 3:23
**mean** 17:22
32:8,18,19,20
49:8 58:23
59:18 73:15
75:10,11 76:23
83:16 94:24
98:15 104:13
111:2 120:15
122:5,11 135:5
141:11,12
150:4 154:4,5
154:14 155:11
155:12 167:6
**meaning** 15:24
78:14
**meaningful**
54:8
**meaningless**
30:15
**means** 54:23
61:9 99:8
123:9
**meant** 124:1
**medium** 82:19
**meeting** 19:20
20:7,9,19,23
31:19 32:24
**memory** 13:24
86:4 134:8
**memphis** 3:13

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

[mentioned - movement]

| | | | |
|---|---|---|---|
| **mentioned** 49:1 | **mirror** 71:2 | 144:4 146:12 | 137:8,8,8,18,18 |
| 49:4 166:7 | 139:22 | 150:12 154:25 | 137:21,22,24 |
| 168:1 | **misdeeds** | 155:6,21,22 | 137:25 138:8 |
| **mentioning** | 111:24 | 166:9,19 | 138:11,13,21 |
| 23:18 | **missed** 160:5 | **moneys** 33:18 | 139:2,16 |
| **merit** 171:2 | **misspoke** 58:19 | 33:21 81:20 | 140:21 142:19 |
| **message** 31:9 | 154:6 | 105:3 | 142:22 143:9 |
| **middle** 34:7 | **mistake** 14:9 | **monkeys** 53:20 | 143:13,14 |
| 41:5 98:25 | 26:2,20 122:6 | **month** 110:18 | 144:7,21 |
| 113:23 | **misunderstood** | 110:19 159:23 | 145:23,24 |
| **million** 21:4,8 | 58:5 | **monthly** 66:11 | 147:5,10,14 |
| 51:9,17 62:1 | **modifications** | **months** 49:10 | 148:1,15 |
| 65:14,22 75:11 | 44:12 | 62:5 136:12 | 149:12,14,14 |
| 89:7 91:1 | **momentum** | 159:19 | 149:15 150:12 |
| 94:11 99:21 | 59:7 149:25 | **moon** 162:23 | 152:6 153:3 |
| 100:2 102:15 | **monday** 133:25 | **morning** 8:1 | 155:5 156:5,18 |
| 103:3,17 111:9 | 134:9 135:9,10 | 9:3,22,23 | 156:23,24 |
| 111:20 139:4 | **monday's** | **motion** 10:24 | 157:17 158:1 |
| 143:22,23 | 135:2 | 44:9 75:8 | 159:7,10,10,14 |
| 146:3,8,16 | **money** 15:10 | 76:18,20 81:11 | 159:14 160:7 |
| 148:4 151:9 | 15:20 16:11,19 | 101:1,4,23 | 160:17,23,25 |
| 153:13,20 | 17:19 18:10,23 | 104:12,17,22 | 161:5 162:17 |
| 155:12 | 27:6,7 33:11 | 104:24 105:22 | 164:23 165:4,4 |
| **millions** 143:24 | 34:14,25 36:2 | 106:2,6,11,14 | 166:25 |
| **mind** 87:21 | 36:19,25 37:1 | 106:23 109:16 | **motions** 13:22 |
| 105:7 157:8 | 37:4 51:4,7,9 | 109:23 110:8 | 46:13 71:3 |
| **mine** 38:9,10 | 51:10,17,20 | 112:6 116:24 | 81:11 |
| **minimizing** | 55:9 57:4,7,13 | 119:23 120:1,8 | **motive** 136:18 |
| 145:6 | 57:20 59:8,8 | 122:3 123:14 | **move** 24:21 |
| **minor** 151:17 | 74:2 76:11,14 | 123:15 124:5 | 50:11 143:25 |
| **minute** 29:19 | 76:20 88:19 | 124:13,19,24 | 150:3 |
| 30:10 46:12 | 96:19 101:10 | 125:3 129:18 | **moved** 133:22 |
| 73:12 128:18 | 102:4 104:1 | 130:2 131:3,19 | 135:22,23,23 |
| **minutes** 47:3,4 | 105:14 111:12 | 133:9 134:25 | **movement** |
| 54:2 | 115:7 144:1,3 | 137:1,1,4,5,5,6 | 107:10 |

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

**[moving - objections]**

**moving** 39:24
40:2 43:9
88:15 110:11
**multifaceted**
129:22
**multiple** 78:17
**mumbled** 34:15
**mumbling** 75:5
**munsch** 3:5
125:16
**munsch.com**
3:7,8
**mute** 47:13
168:17
**mvl** 1:7

**n**

**n** 3:6,18 11:3
**name** 8:17 11:2
11:3 96:15
171:22
**national** 4:2
9:12
**nature** 42:24
111:12
**necessarily**
147:7
**need** 12:13 30:7
41:22,24 47:2
92:6 126:12
128:14,15
133:25 136:7
139:3 166:15
166:19
**needed** 147:12

**needs** 41:12,12
104:9
**negative**
102:25 103:4,5
105:8
**negotiate** 95:14
134:25
**negotiated**
95:11 161:14
**negotiating**
15:24 18:7
28:3 35:15
110:20 112:5
**negotiation**
15:23 32:7
45:18 110:16
**negotiations**
15:13 17:8
18:17 23:3
27:2,4 36:21
134:10
**neighborhood**
62:4
**neither** 171:17
**networks** 1:5
8:13 10:18
35:20 66:21
70:23 71:21
114:9
**never** 81:24
82:10 103:5
118:13 160:2,3
163:19
**new** 14:18 85:9
85:10 158:20

**nilsen** 1:24 4:9
8:19 171:24
**nine** 147:15
**ninth** 84:7 86:1
165:19 167:17
167:25
**noah** 3:16 9:9
112:1
**noah.schotte...**
3:19
**noise** 57:6
**noncase** 86:10
**nonmaterial**
142:6
**normal** 89:6
110:8
**normally** 29:23
167:3
**northern** 1:1
12:2
**note** 8:4
**noted** 172:6
**noteholders**
144:22 147:18
147:22
**notes** 144:23
147:23 155:25
**notice** 2:3 5:9
10:8,14,21
25:9,9
**noticing** 9:2
**number** 5:8
8:15 31:2
39:18 64:12
97:15,17

104:17 111:23
150:12 157:4
158:1,24 159:7
160:25 161:2,3
161:5,7,11,11
161:12,14
162:4 165:8
**numbers**
102:13 112:2,3
158:16,22

**o**

**o** 11:3
**oath** 24:1 34:6
44:13 50:4
66:16 96:8
171:7
**object** 82:3
116:4,6 125:24
129:21 131:20
132:11 147:6
**objected** 129:7
**objecting** 10:23
**objection** 59:19
59:24 78:16
79:18 81:6
85:24 103:12
104:4 105:9
113:17 116:18
124:25 132:2
132:18,20
156:6 157:11
157:23 166:5
**objections** 2:7
8:22 103:19

**[obligated - okay]**

| | | | |
|---|---|---|---|
| **obligated** | **oh** 56:18 78:10 | 50:23 51:1,21 | 91:13,13 92:1 |
| 140:12 | 122:20 | 52:18 53:8,16 | 92:5,12,13 |
| **obligation** | **okay** 10:16,21 | 53:19,23 54:21 | 93:22 94:7,10 |
| 72:18 | 11:1,1,5,8,11 | 55:1,6,11,16 | 94:15,22 95:6 |
| **obviate** 36:5 | 11:14,16,19,25 | 56:11,15,17 | 95:11,18,23 |
| 37:4 | 12:4,7,20,25 | 57:14,25 58:9 | 96:2,5,18 97:3 |
| **obviating** 59:9 | 13:12 14:2,20 | 58:14,15 59:12 | 97:13 98:2,11 |
| **obvious** 65:18 | 14:22,25 15:6 | 59:13,21 60:16 | 98:18,24 99:7 |
| 116:4,6 121:1 | 15:18 16:9,23 | 60:18 61:3,7 | 99:10,14,15,19 |
| **obviously** 18:8 | 17:2,12 18:7 | 61:11,15,20,23 | 100:1,8,15 |
| 38:25 56:1 | 18:12,15 19:15 | 62:6,11,17,22 | 101:2,8,21,21 |
| 101:9 111:23 | 19:18,20,22 | 63:5,12,14,20 | 102:1,3,10 |
| 135:6 | 20:4,6,11,16,16 | 64:2,20 65:8 | 103:7,7,9,15 |
| **occurred** 13:4 | 20:18 21:1,13 | 65:16,17 66:9 | 104:11,20 |
| 57:24 | 21:17,22 22:4 | 66:14,17,23 | 105:6,14,19,24 |
| **october** 114:9 | 22:8,13,15,22 | 67:17 68:4,9 | 106:18 107:25 |
| 114:16,24 | 22:22 23:6,23 | 68:18 69:2,17 | 107:25 108:1 |
| 122:2 | 24:5,11,16 | 70:3,5,8,11,14 | 108:15 109:2,5 |
| **offer** 35:3 | 25:6 26:9,15 | 70:17,20 71:1 | 109:10,11,18 |
| 44:19,22,24 | 27:8,22 28:2,8 | 71:10,24 72:5 | 110:2,6,14 |
| 45:7,10,10,13 | 30:5,9,12,18,18 | 72:6,8,13,23 | 111:14,19 |
| 50:13,16 54:8 | 30:23 31:18 | 73:13 74:6,15 | 112:3,17,18 |
| 60:7,8,10 | 32:2,5,12,22 | 74:25 75:13,19 | 113:4,8,13,21 |
| 69:10,13 | 33:3,6,13,25,25 | 75:24 77:7,18 | 114:3,15,18,25 |
| 143:22 146:17 | 34:12 35:6,10 | 77:23 78:6,10 | 115:12,17,23 |
| 148:4 152:23 | 35:14 36:23 | 78:13 79:9,11 | 116:11,19 |
| 155:9 163:24 | 37:5 38:17 | 79:23 80:1 | 117:1,9 118:21 |
| 164:2,2,7,7 | 39:2,3,5,14 | 81:8 82:24 | 119:1,11,15 |
| **offered** 94:10 | 40:2,13,15,25 | 83:6 84:3,15 | 120:11,14,19 |
| 152:13,15 | 41:5,10,21 | 85:1,5,12,19 | 121:5,13,16,22 |
| **offers** 94:16 | 42:9 43:1,4,25 | 86:5,9,18,23 | 122:23 123:13 |
| 167:4 | 44:6,14,18 | 87:17,24 88:1 | 123:22 124:3,8 |
| **offhand** 12:18 | 45:13,19 46:2 | 88:3 89:18,25 | 124:9,18,21,21 |
| **office** 43:16 | 48:12,14,18,22 | 90:1,1,2,10,15 | 125:9,12,18,21 |
| 50:13 112:7,8 | 49:5 50:1,10 | 90:18 91:4,8 | 126:13,18,23 |

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

**[okay - paragraph]**

127:5 128:7
129:12 130:21
130:25 131:5
131:12,14,23
132:20,25
133:14 137:11
137:16,22
138:5,7,9
139:1,14,19,20
140:3,9,21
141:8 142:3,9
142:11,17,21
143:4,8,13,18
144:5 145:7,17
145:21 146:15
147:2,16,20,24
148:6,14,14,18
148:24 149:5,9
149:12,14,16
150:4,14,21,24
151:24 152:2,9
153:3,18 154:4
154:7,21
155:15,20
156:4,4,9,22
157:5,12,25
158:8,10 159:9
159:10,16,17
159:19,21
160:11,15,20
160:24 161:14
161:19 162:11
162:12,22
163:2,7,10,14
163:22 164:1,5

164:18,19,21
165:7,12,14,25
166:11,17
167:3,16,21
168:24 169:14
**omnibus** 96:22
153:12
**once** 12:20 13:1
71:7 110:25
133:4
**one's** 78:11
**ongoing** 22:2
45:18,22,25
46:9 50:22
58:20,23 59:5
67:3 94:1
**open** 28:24
52:19 160:4
169:9
**opinion** 84:9
86:6,6 143:8
162:24 165:22
168:1
**opponent**
163:16
**opposite**
124:15
**option** 29:17
**options** 35:7
**oral** 163:8
**order** 38:25
41:13 97:9
98:6 126:7
128:2 133:10
140:15

**original** 6:12
68:21 70:3,12
138:10,13
149:18
**originally**
45:12
**outcome** 8:21
**outrageous**
108:7
**outside** 104:9
144:6 170:4
**outstanding**
39:14
**overarching**
58:2,2
**overlay** 37:12
110:13
**overlooked**
42:6
**oversecured**
143:22 144:23
145:11,18,22
146:10 147:4
147:23 148:8
149:7,18,21
**overspeaking**
112:20
**overview**
139:12
**owed** 143:24
**own** 71:8 88:23
128:17 153:23

**p**

**p.c.** 3:5
**p.m.** 93:9,12
109:14 128:23
129:1 168:25
169:3,10 170:8
170:9
**page** 5:2,8 15:7
20:15,17,21
30:14,14,17
31:7 38:18
39:5,6 40:13
41:5,10 64:15
71:4 72:2 79:7
79:10,20,23
98:3 104:1
109:3 113:2,22
113:24 115:1
115:24 147:14
147:15 173:2,5
173:8,11,14,17
173:20 174:2,5
174:8,11,14,17
174:20
**pages** 53:5
108:13 109:5
**paid** 104:2,8
150:1 153:14
**pain** 53:22
152:21
**panel** 12:1,2,3
12:5
**paragraph**
15:22 31:15
34:8 72:3,10

Alpha Reporting    800-556-8974

A Veritext Company    www.veritext.com

**[paragraph - played]**

139:16,21
140:9 143:11
**paragraphs**
71:10 140:24
142:18
**paraphrase**
54:6
**parham** 13:6
**parsing** 141:24
**part** 15:6,23,23
28:1 31:12,18
61:16 76:24,24
91:4,5 109:8
115:12 131:16
145:7 146:7
147:15,18
164:23
**participants**
8:7
**participate**
77:16
**particular**
16:10 18:5
27:21 30:12
42:24 44:5
90:16 156:3
164:10
**parties** 8:10
27:11,14 28:5
43:5,17,20
57:9 131:13
153:21 158:19
165:18 167:8
167:12

**parts** 110:11
130:16
**party** 8:20
43:18 61:21
171:19
**patient** 28:14
30:5,11 147:10
**patricia** 1:24
4:9 8:18
171:24
**paul** 5:18 24:24
**pause** 127:7
**pay** 104:8
140:12 145:3
163:17,18
166:16,21
**paydown** 105:4
105:4
**paying** 59:7
163:20
**payment** 55:5
55:18 77:20
81:10 99:1
143:14 152:14
164:6,23 165:3
165:15 166:3,4
**payments**
13:21 61:8,13
61:18,24 62:3
62:8,19 72:9,9
72:20 73:3
74:1 75:10,17
76:1,10,17
77:8,21 78:3
78:14 80:25

82:18 83:18
84:5 91:5,10
91:15 105:21
139:7,9 140:1
140:11,14,15
140:23 141:10
142:14 143:2
143:16 149:19
149:23 150:24
150:25 151:2
151:17 153:6
153:25 154:13
155:7,23 158:6
161:16 165:9
165:16,21
167:20
**pays** 162:19
**pdf** 53:6
**pearl** 3:18
**penalty** 172:1,3
**pending** 97:9
**penny** 78:19
150:19 155:13
**people** 41:19
76:23 84:23,23
84:24,24
125:10,16
167:9
**percent** 102:14
102:14,15,15
111:21 164:16
164:17 165:9
165:15 166:2
**percentage**
82:12

**percentages**
82:13,18 143:5
**perfected** 16:5
16:5,13 17:19
21:25 23:13,15
35:21 36:14
133:18
**perfection**
129:19
**period** 15:12
23:18 110:19
112:5 159:11
159:23 171:16
**perjury** 172:1,4
**person** 29:3
**pguffy** 4:6
**philip** 4:3 9:11
**phone** 48:25
49:4,6 58:11
163:15
**phrase** 107:3
**pick** 25:20
**picked** 47:15
**picking** 151:7,8
**picture** 146:13
**piper** 3:17
**place** 8:10
85:15 93:24
171:5
**plaintiff** 68:6
**plaintiffs** 33:22
**plan** 37:3
**plates** 51:6
**played** 119:14

[pleadings - prior]

pleadings
138:19
please 8:4,23
12:13 13:14
35:2 40:16,18
48:2 53:10
69:8,12 70:5
73:11 79:20,24
92:4 134:7,12
plenty 112:11
point 13:5,11
17:1,4 18:14
21:14 23:19
28:3,6 30:8
34:4 35:10,16
35:25 36:11
41:3 42:25
43:6,21 54:14
58:7 60:18
62:1 63:21
64:25 65:21
67:22 73:5,6
81:5 88:14,16
88:25 90:3,8
90:13,16,23
92:4 95:6
101:10,12
103:10 106:10
117:17 121:2
124:4 125:14
125:17,20
128:8 133:21
133:24 136:18
144:18 147:16
148:4,22 149:7

149:10 151:9
156:1,22 161:3
161:12
pointed 34:8,17
111:4
pointing 121:2
points 106:4
156:14
policies 143:24
pool 111:16,22
pop 29:3,6
poplar 3:12
pops 28:11,18
28:19,25
populate 29:12
168:9
populated 25:3
28:23 162:3
population
28:14
portion 55:5,17
55:22 56:13,23
57:1
position 23:1
34:13 71:19,19
72:21 85:10
147:4
positions 45:25
positive 14:1
16:25 17:9,10
20:19 50:4
66:18 99:9
100:6 121:9
159:6 161:23

possession
17:13,14 24:17
24:20 48:19
106:12,24
113:10 114:23
119:12 120:1
121:23
possibly 120:20
122:3
post 123:13
postpetition
145:1
posture 154:12
potential 21:10
55:3,8 60:10
61:21 86:14
potentially
54:15
power 94:20
practice 89:6
prayer 73:17
precipitated
119:22
predate 17:18
preface 47:22
prejudiced
134:3
preliminary
144:24 147:23
premise 36:13
preparation
43:2 50:20
prepared 54:19
69:9 103:10,16
133:8 153:19

preparing 41:7
54:7
prepetition
57:10 111:24
150:18
present 8:25
presented
158:25
press 136:24
presumably
66:11
pretty 49:9
57:11 81:4
108:3 121:15
previous 26:25
39:6 50:14
58:10 62:24
65:11 163:24
previously
93:22 94:10
106:7 139:2
149:6 156:16
primarily 49:3
primary
151:15
principled 34:8
34:13,18,24
63:1,10 69:11
69:21,23 83:7
84:20
print 147:13
prior 117:18
126:9 134:11
134:24 157:3
158:23 163:4

Alpha Reporting
A Veritext Company

**[prior - prosperity]**

171:7
**privilege** 82:4
125:25 126:8
126:11 127:1,2
127:22,24
128:3,15 129:8
130:6,23
131:22 132:11
132:21,22
133:2,8,10
134:5 136:15
146:19,25
147:7
**probably** 18:25
19:3 52:2
61:16 62:16
74:15 157:20
161:21 167:14
168:14
**problem** 29:16
44:15 93:15
**procedure** 2:7
**proceed** 9:16
87:13 88:7
133:24
**proceeded**
60:17
**proceedings**
8:23 171:4,6,8
**proceeds** 80:4
81:10
**process** 32:7
45:18,22,25
46:10 58:20,23
60:5 67:3

149:10 160:3
**produce** 119:16
120:5
**produced**
17:13 48:24
50:7 119:7
160:12
**production**
17:15,17 32:13
33:4 50:8 65:1
88:2,23 89:4
109:21 119:16
131:10 160:12
160:18
**professional**
135:7
**program**
100:14
**progress** 87:20
**progressed**
19:3
**projector** 78:9
**promise** 25:19
**properly**
100:12
**property** 74:9
98:20,22 104:6
**proposal** 41:14
42:2,17,20,24
43:25 44:2,5
46:18,21 47:21
49:19,23 51:2
54:4 59:2,3
60:23 67:5,7,9

**proposals** 24:6
24:9 42:19
59:4 60:21
67:18
**propose** 45:20
105:8 107:9
**proposed** 35:7
42:10,12 45:16
46:2 50:24
62:12 74:11
87:14,19 88:8
88:9 89:2,8
90:22 93:19
100:22 101:14
103:17 105:19
123:19,21
148:25 157:22
162:18
**proposes** 21:2,3
143:14,14
**proposing** 16:4
16:19 21:18
78:1 105:20
110:22 112:5
144:15 150:18
**prosecute**
153:2
**prosperity** 3:20
5:10 7:5 9:8
13:20,21 14:4
14:5 15:9,15
15:20 16:2,19
17:18 18:9,14
18:24 19:1
20:23 21:4

22:6 26:3,21
27:6,14,19
28:5 30:22
31:11 32:1,14
32:25 33:12,18
33:21 34:13
35:15,18 36:2
36:4,19,24
37:1,2 38:22
39:9 40:11
41:3 45:8
46:19 50:14
52:1 53:24
57:8 59:3 60:8
60:24 61:4,5,8
61:13,17,19,24
62:3,18,19
63:18 65:15,23
66:12 67:23
68:2 69:3,9,20
69:25 70:23
73:7,25 75:10
75:17 76:1,9
76:17 77:8,21
78:2,2,14
79:12 80:25
81:10 82:17
83:18 84:1,2,4
84:5,16 85:2
85:21,21 86:19
87:10,13 88:6
88:17 90:7,19
90:20 91:2,5
91:10,15,20
93:18,23 95:16

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

**[prosperity - range]**

95:18 97:3
99:13 101:14
104:17 105:3
105:21 110:17
113:9,14,18
114:2,11 115:6
120:25 121:10
139:6,7,7,9
140:1,10,12,13
140:15,23
141:10 142:7
142:14 143:1
143:16 144:2
149:19,23
150:23,25
151:2,16 153:5
153:25 154:2,9
154:13,15
155:6,7,22,22
156:10 158:4,5
158:12 159:25
161:15,16
162:16,19,19
164:6,22 165:3
165:9,16 166:5
166:13 167:20
167:22 168:8
168:21
**prosperity's**
31:19,23 41:6
48:9 90:22
**prosperity.pdf.**
69:5
**protective**
128:2 133:9

**proved** 78:21
**provide** 48:2
125:22 126:15
129:5
**provided** 95:1
125:12 126:4
129:13 139:8
147:3 160:10
171:15
**provides** 39:25
**providing**
40:10,19 41:3
121:7 130:7
**provisions** 2:6
**publish** 14:3
19:8 29:12
52:13,18 68:12
**published** 10:2
14:10 19:13
37:23 64:8,14
64:24 68:14,18
70:6 71:7 87:1
107:17,18
108:25 109:1
**publishing**
25:12
**pull** 38:10
107:23 168:7
**pulling** 13:10
**purpose** 127:23
133:7 136:14
**pursuant** 2:3
81:19 130:1
131:2 132:4

**pursue** 61:17
151:2 154:8
**pursuing** 74:8
101:23
**push** 134:11
136:6
**pushed** 134:9
135:2
**put** 24:22 46:5
46:13 53:5
57:12 91:23
97:8 108:16
134:2 142:23
143:10 154:14
155:6,21,22
**puts** 99:12

**q**

**quality** 8:5,6
**quantify** 58:6
62:20
**question** 17:13
20:8,19 25:19
27:8,16 28:2
29:4 32:18
45:3 47:22
49:9,15 54:13
58:5 61:15
65:18 66:23
67:16 73:4,10
74:7 81:7,24
82:14 83:23
87:18 102:24
103:14 111:14
114:25 119:4
119:24 120:19

123:8,15 126:2
126:14 127:12
128:1,10 129:4
129:13,15,22
130:4,5,10,13
130:16,18
131:5,16,21
136:8,10
141:22 146:19
146:24 147:2
149:18 150:16
151:1,20
154:21 159:5
166:3
**questioning**
119:21,22,23
**questions** 12:10
84:12 127:23
129:22 132:6,8
132:9 133:6,11
136:9,13
150:25
**quick** 26:1,7
29:21 92:21
127:9 155:2
**quickly** 71:10
**quote** 23:13

**r**

**r** 3:10
**radar** 15:15
**raised** 82:25
84:17 94:18,25
165:19
**range** 32:10
82:24 100:4,5

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

**[range - record]**

| | | | |
|---|---|---|---|
| 100:13 101:20 | **ready** 47:12 | 22:7,10 23:25 | **recent** 127:1 |
| 111:9 112:2 | 109:7 128:5 | 24:12 32:4 | **recess** 10:7 |
| 164:9 | **real** 26:7 29:21 | 34:3 39:16 | 47:8 93:10 |
| **rather** 62:25 | 155:2 | 41:4 42:11,14 | 128:24 169:1 |
| **ratify** 99:11 | **realized** 64:25 | 42:24 44:4,12 | **recitations** 71:2 |
| **reach** 18:19 | **really** 34:3 78:8 | 46:20 49:24 | **recollection** |
| 97:2 110:21 | 117:6,19 | 55:13 62:14 | 15:12,17 18:21 |
| 112:8,14 | 136:20,22 | 63:11 67:25 | 44:17 49:12 |
| 123:14 | **reason** 18:2 | 75:18,19,22,23 | 62:4 63:19,22 |
| **reached** 13:6,9 | 46:7,17 97:3 | 76:2 81:1,2 | 63:24 67:11 |
| 13:23 22:3 | 100:10 110:20 | 85:4 86:18,22 | 68:8 70:19 |
| 86:18 104:12 | 112:4,7 116:21 | 88:14 90:14 | 76:5 80:11 |
| 104:15,15 | 118:11 135:5 | 110:1,4,5 | 89:21 90:23 |
| 169:7 | 149:21 173:4,7 | 124:20 134:24 | 101:7 105:1 |
| **reaching** 18:19 | 173:10,13,16 | 134:25 135:3 | 139:13 154:2 |
| 23:8,9 122:16 | 173:19,22 | 143:20 148:17 | 155:14 156:8 |
| 123:10 124:13 | 174:4,7,10,13 | 149:11 155:8,9 | 156:19 165:6 |
| **read** 16:10 | 174:16,19,22 | 155:11,18 | **recommend** |
| 19:19 20:6,11 | **reasonable** | 156:19,21,21 | 41:13 42:1 |
| 20:14 22:16 | 66:19 102:12 | **recaps** 31:19 | **recommendat...** |
| 26:6,9 31:15 | 144:8,16 | **receive** 78:1 | 127:18 |
| 31:17 38:16 | 145:10 160:25 | 81:21 124:6,11 | **reconvene** |
| 41:23,25,25 | 161:2,6,8,10,12 | 149:22 153:12 | 169:11,24 |
| 50:17 57:21 | 165:15 | **received** 71:11 | **record** 8:2,11 |
| 70:14 72:6 | **reasonableness** | 71:16 72:16 | 9:1 10:4,5,12 |
| 73:9,15 87:21 | 164:10 | 87:13 113:18 | 29:21,24 30:6 |
| 87:25 117:11 | **reasonably** | 114:6 116:2 | 30:8 47:6,10 |
| 122:19 123:25 | 71:12,13 72:16 | 139:23 140:12 | 75:4 92:14,16 |
| 162:13 163:22 | 139:24 140:13 | 152:11 153:9 | 93:7,8,12 |
| 172:4 | **reasoned** 84:9 | 156:6 | 126:13 128:21 |
| **reading** 20:21 | 86:5 | **receiving** 62:13 | 128:22 129:1,3 |
| 34:20 69:15 | **reasons** 57:3 | 100:16,22 | 130:12 133:5 |
| 80:16 109:8 | 116:5,6 | 101:4,6,6 | 133:20 134:2 |
| 118:10 139:18 | **recall** 13:9 | 150:11 153:4 | 134:15 135:5 |
| | 15:21 18:11 | | 137:5 168:25 |

Alpha Reporting
A Veritext Company

800-556-8974
www.veritext.com

[record - represent]

| | | | |
|---|---|---|---|
| 169:3,23 171:8 | refreshing 87:3 | reiteration | remember |
| 171:11 | regard 15:17 | 145:24 | 62:25 63:2 |
| recorded 8:9 | 23:20,21 27:5 | rejected 155:10 | 84:12 93:20 |
| recording 8:5,9 | 32:9 33:11 | related 8:19 | 155:24 156:1 |
| records 118:5 | 35:18 44:25,25 | 90:21 114:7,17 | 168:3 |
| recover 16:4 | 45:22 48:9,10 | 119:23 120:16 | remit 97:4,5 |
| 33:16,19,22 | 55:14 59:16 | 120:19 139:8 | remitted 96:21 |
| 82:17 95:7 | 60:25 75:21 | 144:7 153:22 | 139:6 |
| 142:13 151:3 | 80:8,19 81:20 | 167:23 | remotely 2:4,9 |
| recovered | 83:12 84:7,14 | relating 35:6 | 8:17 |
| 99:17 103:18 | 88:17 120:17 | relative 171:18 | rendered 72:18 |
| recovery 83:14 | 121:3,11 | release 21:8 | repeat 20:20 |
| 139:4 144:14 | 122:17 123:11 | 26:3,21 27:1 | 27:16 51:14 |
| 155:4 165:9 | 124:1 144:1 | 56:9 60:23 | repeating |
| reduce 153:15 | 153:13 165:20 | 91:2 105:2 | 69:20 |
| reduction | 167:11 168:3 | 115:9 139:8 | repetitive |
| 145:12 | regarding | 143:15 144:9 | 78:17 |
| reference 71:16 | 15:19 16:2 | 154:3,5,18 | rephrase 17:5 |
| 71:17 72:8 | 17:4,18 18:10 | 158:8 162:18 | 58:9 59:1 |
| 163:23 | 32:14 34:1 | releases 55:4 | 80:23 111:14 |
| referenced | 45:15 56:12 | 55:17 88:10 | 116:20 129:23 |
| 160:9 | 96:14 115:10 | 89:15 | reply 7:5 |
| referencing | 116:13 122:13 | releasing 62:13 | 113:22 168:8 |
| 80:2 | 123:6 125:22 | relevance | 168:21 |
| referring 134:8 | 126:11,15 | 132:22 133:1 | replying 48:2 |
| 134:12 | 129:5 166:24 | 136:23 | report 27:19 |
| refresh 15:11 | regardless | relevant 148:10 | 31:4,10 |
| 15:11 25:5 | 81:15 | relief 73:17 | reported 1:23 |
| 29:17 38:2,6 | registered | 134:6,21 | 4:8 |
| 64:9 80:11 | 171:2 | rely 80:13 | reporter 8:18 |
| refreshed | reimburseme... | 145:22 | 9:15 30:21 |
| 12:17 86:21 | 149:3 | relying 121:6 | 171:1,3,15 |
| refreshes 15:16 | reiterating | remainder | represent 8:17 |
| 38:11 | 142:18 | 124:1 139:5 | 12:21 32:12 |
| | | | 42:17 53:25 |

Page 36

**[represent - rukavina]**

63:5 88:1,20
109:15 111:21
112:19 114:15
**representation**
30:25
**representative**
84:13
**represented**
81:12
**representing**
56:1
**represents** 16:1
39:9
**request** 17:15
50:7 64:11
109:9 114:6
115:5 119:16
133:23 134:9
134:11 135:19
160:12
**requested** 2:10
26:4 39:15
69:21 79:13
135:20 171:14
171:14
**requesting**
26:18 39:20,22
65:19 67:19
79:17 115:19
157:11
**requests** 94:12
115:18 119:8
**require** 98:7
**research** 84:24

**reservation**
136:25
**reserve** 133:20
134:5 136:3
**reserved** 2:7
**resolution** 26:1
71:16 164:10
**resolve** 80:9
**resolved** 50:23
55:20 56:8
60:20,22
**resolving** 51:1
**respectfully**
133:1 136:11
**respond** 35:3
46:3
**responds** 41:11
66:9 115:4
**response** 17:14
31:9 35:11
99:10 114:5
119:8 126:9
156:3
**rest** 99:13
136:2
**restate** 125:2
**restroom**
168:15
**result** 112:20
**retrade** 157:13
**retraded**
156:11
**retrading**
159:24

**return** 139:23
**reverse** 38:25
**review** 108:2,3
171:13
**reviewed** 160:7
**reviewing**
23:23 24:8
**revised** 90:24
**revisit** 167:18
**right** 15:10,20
22:9 24:21
26:16,24 29:13
34:23 36:8
37:2 39:24
41:1 42:7
43:13 44:1
47:5,17 49:14
50:6,19,21
52:5,13 53:25
54:9 56:4
57:14 61:10
64:21 67:18
69:9 72:1 75:7
76:15 78:23
84:19 85:16
94:7,14 96:13
111:12 112:23
113:24 117:6
117:11 123:3
127:10 129:2
136:25 137:19
138:9 141:16
141:22 145:18
146:3,10
147:11 150:8

155:14 158:3
165:5,10 169:4
169:8,20
**rightly** 115:11
122:13 123:6
125:5
**rights** 133:20
134:6 136:3
**risk** 99:3
151:14 165:18
**risks** 154:24
167:17,21,22
167:25 168:6
**rmr** 1:24 4:9
**road** 133:9
**role** 11:9 56:5
**roll** 36:22 37:3
104:7 123:12
**rolled** 97:11
**rollover** 39:6
**ross** 3:5
**roughly** 102:16
**rukavina** 3:3
5:13,16,21 6:1
6:6,10,19 7:3
9:5,5 10:4
14:15 19:10
20:22 21:1,15
25:4,8,11,15,24
26:11 28:11,17
28:21 29:8,11
29:16 30:2,4,9
31:13,18 32:7
38:5,11 41:11
41:17 46:23

Alpha Reporting
A Veritext Company

[rukavina - second]

47:3 52:21
53:12,13,17,23
54:3,22,24
56:7 59:14,19
59:24 64:17
65:13 66:4
68:16 69:2
73:8,18 78:9
78:16 79:18,24
81:6 82:2
83:22 85:24
89:22 92:2,9
92:14,19 93:2
94:5 97:22
103:12,19
104:4 105:9
108:10,13,15
109:12 113:17
116:4,18 117:7
117:11,16
118:22 119:1
121:14 124:25
125:13,19,19
125:21,24
126:6,17,20,24
127:8,15
129:10,21
130:3,15,24
131:20 132:7
132:10,19,22
133:4,15 134:7
134:19 135:13
136:4 137:2,12
137:17,22,24
138:1,5,15,20

141:14,18
146:18,21
147:6 162:4,7
167:14 168:13
168:17 169:18
170:1
**rukavina's**
  26:18 31:8
  65:11
**rules** 2:6
**ruling** 55:24
**run** 10:1
  101:13 104:1
  112:6 136:1,5
  146:13 150:2
  155:1
**running** 43:22
  92:25
**rush** 149:21
**rushed** 149:24
**ruzinsky** 3:21
  9:7,7

---

**s**

**s** 11:4
**safe** 27:22,25
**sake** 12:8 73:14
**sandwich** 92:8
  92:21
**sat** 167:24
**saturday** 135:1
**saw** 155:12
  157:12
**saying** 20:22
  36:25 37:1,17
  42:22 45:1

50:2 76:14
77:12 80:14
85:7 94:23
115:13,19
121:19,20
136:1 141:8,25
146:24 148:7
152:10,10
155:16,17
168:4
**says** 15:9 20:7
  25:5 26:20
  31:5,8,20 33:7
  35:2 41:11
  42:1,1,7 54:6
  54:23 55:1,16
  59:15 64:11
  66:13 69:7
  73:3 76:20
  80:1 88:7 98:4
  98:17 114:3,4
  115:15,21
  116:1 117:23
  122:7,11 141:6
  141:21 144:21
  144:24 147:21
  163:6
**scale** 82:19
  100:11 102:12
**scaled** 100:9
**scared** 151:21
  154:22,23
**scenario** 51:18
  143:20 153:8
  153:11

**schaffer** 6:4,8
  6:14 19:25
  20:18 25:25
  30:19 43:2
  52:25 53:12,24
  59:14,22 65:3
  65:8,13 66:9
  79:3,24
**schottenstein**
  3:16 9:9,9
  134:1,13,16
  136:24 169:17
**scope** 144:7
  170:4
**scott** 1:9 2:1
  5:4 8:12 9:6,18
  11:3 38:21
  172:3,16
  173:25 174:25
**screen** 8:8
  26:12,13 53:18
  71:6,6 117:15
  138:16,16
**scrivenering**
  89:17
**scriveners** 90:4
**scroll** 141:14
  141:15,18
**sec** 22:22 138:1
  161:24
**second** 18:18
  21:9 22:8
  26:11,12 28:15
  28:17 30:16
  31:15 33:7

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

**[second - settlement]**

| | | | |
|---|---|---|---|
| 52:3 55:1,16 | 107:9 109:5 | 53:11 60:3 | **sentence** 16:10 |
| 57:4 70:5 | 113:11 114:13 | 68:1 73:14,23 | 80:18 81:17 |
| 71:24 75:2 | 115:21 118:6 | 75:7 77:11 | 115:13 122:21 |
| 79:10 85:12 | 137:12,13 | 80:23 82:22 | 124:2 148:19 |
| 105:24 106:18 | 144:19 155:1 | 83:16 88:20 | **separate** 52:17 |
| 108:2,5 110:24 | 162:20 163:25 | 93:13 94:15 | 64:5 106:7 |
| 117:14 127:5 | **seeing** 95:5 | 99:8 102:4 | 150:23 154:10 |
| 129:15 131:15 | 160:4 163:16 | 106:1 109:7 | **separated** 53:6 |
| 138:9 147:12 | **seek** 56:9 102:3 | 111:6 113:21 | 65:1 |
| 150:21 156:4 | 102:24 103:20 | 114:19 115:23 | **separately** 28:4 |
| 156:23 160:7 | 105:7 128:1 | 120:22 124:3 | 28:4 74:4 |
| 160:17,20,23 | 133:9 134:6 | 128:1 129:2,16 | **september** 1:9 |
| 162:17 164:22 | **seeking** 55:23 | 131:1,17 | 2:3 8:3 57:17 |
| **secured** 35:22 | 73:25 99:16 | 132:15,16 | 133:22 169:10 |
| 76:1 77:2,5,6,8 | 102:19 103:11 | 137:3 142:11 | 171:23 172:5 |
| 77:14,14,25 | 142:12,13 | 147:9 150:22 | **services** 70:24 |
| 81:2 129:19 | **seem** 37:11 | 154:8 155:16 | **serving** 11:9 |
| 145:12 146:16 | 151:4,10,10 | 156:5 161:25 | **set** 46:20 |
| 148:9,16 150:5 | **seems** 33:1 | 167:17 168:7 | 134:22 136:14 |
| 150:7 | 43:10 66:7 | 169:4 172:3,16 | 171:5 |
| **see** 10:1,3,13 | 118:20 140:2 | 173:25 174:25 | **settle** 120:7,8 |
| 14:21,22,22 | 165:23 | **send** 39:11 | 154:9 |
| 16:8 20:5 | **seen** 8:7 27:10 | 115:6 117:23 | **settled** 91:9,11 |
| 28:11,18 34:8 | 78:20 80:17 | 118:3 121:25 | 91:19 152:3 |
| 34:10,17,25 | 83:3 102:7 | 122:24 | 153:24 |
| 35:4,5 37:6 | 150:19 | **sending** 48:1 | **settlement** |
| 39:12 40:1,4 | **seidel** 1:9 2:1 | 122:7 | 10:23 15:13 |
| 40:23,24 41:8 | 5:4 8:13 9:6,18 | **sends** 113:8 | 41:14 42:2,9 |
| 41:9,15,20,20 | 9:22 10:13,17 | **sense** 92:17 | 42:12,17,19 |
| 42:3,8 45:9 | 11:4,6 13:14 | **sent** 10:22 | 43:25,25 44:2 |
| 57:7 63:1 69:4 | 13:16 20:13 | 24:13,15 47:25 | 44:5,9 45:16 |
| 72:10 79:15 | 23:7 39:17 | 58:18 84:19 | 45:18,24 46:2 |
| 87:5,15 88:21 | 41:25 42:15 | 111:3 121:23 | 46:3,6,18,21 |
| 90:1 98:9 99:5 | 43:24 47:18 | 135:20 142:7 | 47:21 49:19,23 |
| 99:6,24 103:21 | 49:15 52:11 | 157:22 | 50:12,13 51:2 |

Alpha Reporting
A Veritext Company

[settlement - sorry]

51:24,25 54:4
54:12 60:8,10
60:20,23 67:5
67:7,18 69:10
69:13 74:12,21
77:13,15,20
78:4 86:19
87:14,19 88:8
88:9,24,24,25
89:2,2,4,8 90:7
90:12,12,22
93:19,24 94:16
97:4 100:16,21
101:1,14
104:15,16,22
105:19 106:23
115:9 120:1
123:19 143:19
148:25 149:22
152:7,13
154:10,12
155:9 157:16
161:16 163:19
164:6,17
165:15 166:25
**settlements**
45:20,23 82:7
112:5,15
**settling** 27:11
77:9 78:2 89:6
91:17,18 145:9
167:19
**setup** 130:5
**several** 18:22

**shake** 99:25
103:21
**shaking** 29:5
**share** 25:22
**shared** 49:12
**sheet** 173:1
174:1
**shock** 157:14
**shocking**
111:23
**short** 128:14,18
159:19
**shorthand**
171:9
**shortly** 97:16
**show** 19:4 36:4
66:11 104:24
122:20 137:14
141:13 162:1
**showed** 124:15
**showing** 65:14
65:20,22 66:10
90:24 120:2
**sides** 2:8 51:23
89:18
**signatories**
30:15
**signature** 2:10
39:4 171:23
173:24 174:24
**significance**
142:1
**silent** 57:11
**silver** 31:6

**silverstein** 5:18
15:2 17:25
18:23 20:1
24:25 25:24
26:18,19 30:19
31:7 34:5
35:16 98:25
**simply** 118:8
**simultaneously**
27:15 43:17
**sincerity** 136:9
**single** 32:8
77:12 89:4
147:12
**singular** 30:25
68:6,8
**sir** 9:23 10:20
10:25 11:7,13
11:24 20:3,5
20:25 26:15
34:11 40:9
41:23 42:8
57:24 65:24,25
66:2,13 69:16
70:25 75:14
77:3 79:21,22
87:23 91:7,25
96:17 99:22
101:7 102:2
104:19,21
119:20 126:6
156:8 158:7,9
159:20,22
160:19,21
162:15 169:13

**sit** 76:15 83:9
86:12 103:10
**sitting** 17:2
24:16 34:3
39:19 42:12,25
43:23 44:1,5
51:8 55:13
57:17 62:2,4
75:22 77:11
86:13 96:13
155:14,20
159:6 161:22
**situation** 37:12
40:21,21 48:4
48:9,10 57:12
112:16
**size** 111:6
**skip** 12:7 64:23
71:1
**small** 147:12
**smoothly** 12:14
**sneeze** 155:1
**snow** 3:12
**snuck** 109:9
115:4
**sole** 127:23
133:7 136:14
**solid** 157:8
**solutions** 3:15
8:14
**somebody**
46:11
**sorry** 12:17
14:10 15:21
17:1 18:11

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

**[sorry - stop]**

| | | | |
|---|---|---|---|
| 20:20 26:10 | **speaking** 49:13 | **stand** 19:4 26:6 | 148:1,2,15 |
| 32:17 34:19,20 | 54:7 56:10 | 59:16 86:21 | 149:8 156:9 |
| 34:22 36:1 | 61:1 78:22 | 88:2 132:18 | **statements** |
| 37:8,15 41:12 | **speaks** 73:19 | 143:8 157:6 | 48:18,20 49:6 |
| 45:2,3 51:13 | 73:19,22 77:15 | **start** 10:16 | 58:11 66:11,14 |
| 51:15 58:3 | **specific** 12:25 | 11:1 17:8 | 66:20 82:10 |
| 63:15,22 64:21 | 49:10 58:3,4 | 18:17 40:16 | 96:2,3 106:16 |
| 67:15 70:4 | 90:19 115:22 | 46:16 64:12 | 113:19,19 |
| 75:3,5,22 | 130:19 158:1 | 95:4 139:14 | 114:11,18,22 |
| 83:16,25 86:3 | **specifically** | 161:17 162:23 | 115:5 118:14 |
| 98:21,22 | 114:7 115:2 | **started** 13:18 | 119:7 142:23 |
| 100:20 108:8 | **specifics** 39:17 | 18:25 | **states** 1:1 15:22 |
| 112:21,22,25 | 91:14 | **starting** 15:14 | 16:9 34:7 54:5 |
| 113:24 117:24 | **speculate** 116:7 | 15:15 28:10 | **stating** 40:18 |
| 117:25 120:12 | **speculating** | 31:1 116:10 | 74:19 133:17 |
| 122:21 123:1 | 148:19,20 | 132:23 | **status** 13:3 |
| 127:20 134:1 | **speculation** | **starts** 109:13 | 67:17 167:4 |
| 136:16 141:17 | 59:19 79:18 | 117:8 | **statutory** 86:10 |
| 148:12,13 | 113:17 116:9 | **state** 8:23,25 | **stayed** 158:8 |
| 150:10 151:7 | 116:18 | 71:11,15 | **staying** 15:22 |
| 154:6 157:1 | **speed** 25:20 | 133:13 | **stenographer** |
| 159:12,12 | **spend** 89:17 | **stated** 63:1 | 13:13 34:19 |
| 161:9 | 144:3,4 | 69:22 143:4 | 38:1 51:13 |
| **sought** 103:2 | **spent** 101:23 | **statement** | 75:3 98:21 |
| 105:12,13 | 102:6 105:16 | 22:17,21 23:14 | 112:21 |
| **sound** 60:13 | **spinning** 51:6 | 25:19 48:13 | **stenographic...** |
| 164:19 165:10 | **spoke** 157:3 | 52:1,2 67:1 | 4:8 |
| **sounds** 89:19 | **spot** 128:11 | 72:15 80:23 | **stepped** 112:24 |
| 94:14,14 | **stamp** 14:11 | 81:7 85:9 90:8 | **stick** 75:13,14 |
| 122:16,18 | 19:8 24:23 | 91:23 95:22 | **stipulate** 2:8 |
| 164:20 | 47:19 64:4 | 106:8 115:13 | **stole** 25:18,19 |
| **speak** 12:11,11 | 88:21 162:2 | 115:20 118:4 | **stone** 124:17 |
| 106:15 168:5 | **stamped** 37:16 | 118:18 119:13 | **stop** 27:20 |
| **speaker** 93:4 | 42:16 68:11 | 122:1,24 140:7 | 37:17 46:24 |
| 169:19 | 78:24 79:8 | 140:19 142:4 | 54:9 57:14 |

**[stop - take]**

126:21 134:21
145:5 146:13
150:1 153:15
**stops**   160:3
**story**   80:20
**straight**   64:24
73:17 141:17
**street**   3:6,18
4:5
**strike**   17:5 23:8
33:13 44:7
54:13 56:20
88:5 101:10
107:2 109:19
121:24 144:13
146:6
**stuff**   169:23
**subject**   13:19
13:19,21 16:12
61:4,12,17,25
62:9 63:17
66:24 75:11
77:2,13 83:13
83:17 88:10
90:24 91:1,10
91:11,16 95:7
95:8 96:7 97:4
103:17 118:23
120:2,20 124:6
124:11,22
125:4,22 126:3
126:16 127:13
129:6,17 130:1
131:2,7,8,18
132:5,17 139:9

150:24 151:16
151:19 153:23
165:22,24
**submit**   117:3
**subordination**
80:7
**subscribed**
171:22
**subsidiary**
149:3
**substance**   71:2
**substantial**
105:4
**success**   81:23
82:1,6,11,16
142:25 143:10
164:14
**sue**   54:8,15,19
68:2 153:11
154:22
**sued**   152:12
153:9
**suffice**   125:16
**sufficient**   107:8
**suing**   54:17
151:13,21
**suit**   31:22 33:7
33:10 167:22
**suite**   3:12,18,23
4:5
**sunday**   135:1
**supply**   2:2 3:9
86:4
**supposedly**
146:4

**surcharge**   21:2
21:10,18,19,21
22:4,13,16,24
22:25 23:11,16
26:19,25 35:8
36:11,15 50:24
51:1 55:9,11
55:15,20 56:8
59:4 60:12
67:9 77:19
91:4 94:8,11
94:12,13 95:7
95:11,14,20,20
96:6,19,20
97:6 101:5,9
101:21 105:15
124:12 139:5
150:14 153:19
153:22 158:1
158:13
**surcharges**
21:8 112:6
**sure**   12:14 18:3
20:12 23:17
26:8 27:17
29:21 44:13,24
45:5,9 47:1
57:8 72:1,22
74:13 76:11
82:15 83:3,24
84:11 85:13
92:9 94:22
99:1 107:1,2,3
107:4,5,7
108:3 112:23

116:15 118:14
118:19 120:3
124:16 125:2
137:17 138:6
141:23 142:2
143:12 146:1
152:8 154:4
165:2
**surprise**   111:19
**surprised**   93:5
**surprises**   80:1
**surrounding**
120:18
**swear**   9:15
34:6
**swearing**   2:8
**sweeten**   159:4
**sworn**   9:20
**system**   64:19

### t

**table**   69:14
129:14 143:23
146:3 148:5
**tails**   66:7
**take**   8:10 22:19
29:6 30:25
31:15 46:21,24
52:5,8 73:8,12
88:22 90:25
108:1,2,5
126:18,20,22
127:3,9 128:14
128:18 130:7
133:20 134:22
136:21 142:10

Alpha Reporting
A Veritext Company

**[take - think]**

150:18 153:19
163:22 168:14
169:23 170:1
**taken** 2:1,4,5
12:9 96:20
152:14,16
153:22 157:19
157:19 171:4
172:5
**takes** 28:15
30:3,4,10
**talk** 15:14 51:8
92:9 104:11
124:21 126:25
148:8 159:9
**talked** 34:5
43:1 47:21
91:14 133:5
135:12 157:24
**talking** 18:14
18:25 21:15
32:10 35:19
38:3 40:7
41:21 43:5,8
43:11,14,15
45:23 47:13,16
48:25 55:25
59:23 61:4,7,8
61:12,12 63:8
75:4 83:17,18
84:8 100:24,25
101:1 114:10
148:9,25 168:4
**talks** 163:21

**tapping** 97:25
**target** 61:19,22
86:14 88:15
92:10
**targeting** 92:16
**tberghman** 3:8
**teach** 53:20
**team** 16:22
17:1 18:21
23:19 24:3,5
27:12,13 28:3
56:16 63:19,21
63:24 64:1
68:1 121:11,13
121:15,16
125:11 157:3
158:11
**technical** 74:16
**telephone**
157:20
**tell** 13:1 23:25
29:20 60:3
62:21 64:5
70:8 83:2
85:20 97:16
107:16 110:22
162:2,5 166:13
**telling** 85:5
102:15 130:22
136:8 154:9
**tells** 64:8
**ten** 47:3,4
**term** 21:5 61:9
72:9 150:23

**terminology**
75:8,9
**terms** 2:6 42:9
42:12,20 44:4
44:7,8,18,22
45:7 47:21
87:19 88:4,8
88:24 89:11
104:22 105:7
110:13 122:8
123:18 137:1
139:2 148:4
156:25 157:16
158:14 159:24
160:24
**test** 10:1
**testified** 9:20
58:15 93:25
114:20 124:4,7
149:6 161:3
162:22
**testify** 24:19
57:23 96:8
116:7 121:11
157:24
**testifying** 66:15
171:7
**testimony**
57:17,19 58:10
103:15 164:14
167:24 171:11
172:7
**texas** 1:1,24 3:6
3:18 4:9 8:15
12:3

**thank** 9:14,24
18:3 26:9,16
28:16 35:1
37:13 46:14
47:5 87:23
97:19 107:23
109:4 119:19
147:11,11
159:16 169:4
169:20,24
**thanking** 39:9
**thanks** 41:21
**thing** 20:14
76:12 85:14
117:12 141:12
163:18
**things** 37:7
59:16 80:6
81:25 84:25
99:25 103:21
104:7 107:10
110:12 141:11
163:15 167:10
**think** 13:6,23
14:8,9,10
16:13 18:2
23:14 28:1,19
28:25 35:9,13
35:17 36:7
43:20 44:16,24
45:10 47:16
49:3,24 50:17
50:25 52:2
53:13 55:15
62:16 66:5,22

Alpha Reporting
A Veritext Company

**[think - top]**

| | | | |
|---|---|---|---|
| 67:2 74:5,24 | **thomas** 3:4 9:5 | 43:21 46:6 | **times** 78:17 |
| 77:15 78:19 | 92:9 93:1,2 | 47:7,10 48:7 | **timing** 145:9 |
| 80:8,18,20 | **thought** 36:2 | 49:9,10,11 | 149:19,22 |
| 81:17 82:23,23 | 50:9 58:1 | 55:2 58:7 59:5 | **tn** 3:13 |
| 83:19 84:6 | 82:13 106:21 | 63:13,16 67:22 | **today** 9:25 17:2 |
| 85:1,11 87:20 | 106:21 159:2 | 67:24 70:1,2 | 19:21 20:7 |
| 88:13,16,18 | 164:9 | 70:16 71:20 | 24:16 34:3 |
| 92:10 93:25 | **threat** 128:3 | 72:19 73:9 | 39:19 42:13,25 |
| 95:10 97:7,8 | **threatened** | 74:12 80:17 | 43:23 44:1,5 |
| 99:3 101:25 | 126:8 134:20 | 88:14,16,22 | 55:14 57:17 |
| 102:11 104:6 | **threatening** | 89:17 90:3,4 | 72:21 76:6,8 |
| 106:20,22 | 73:7 | 90:16,20,23 | 76:12,15 77:11 |
| 108:8 110:19 | **three** 27:15 | 92:6 93:8,12 | 83:9 86:12,13 |
| 111:25 112:24 | 28:5 30:14,14 | 93:23 95:17,19 | 96:13 103:16 |
| 116:25 119:10 | 36:20,20 38:18 | 96:7 99:18,20 | 111:11 127:4 |
| 120:6,24 122:6 | 43:5 67:9 79:7 | 102:20 106:15 | 155:14,20 |
| 123:11,12,24 | 109:3,5 113:2 | 110:12,12,20 | 159:6 161:22 |
| 124:6 127:2,6 | 132:9 167:20 | 110:25 112:4 | **together** 13:10 |
| 128:8,8 136:13 | **threw** 144:5 | 118:2 121:2 | 28:6 43:6,8,22 |
| 142:2,3 143:9 | **thursday** 15:1 | 124:19 125:14 | 52:20 61:18 |
| 144:8,12,16 | 39:10 63:7 | 128:23 129:1 | 68:12 77:23 |
| 146:11 148:21 | **ticking** 145:4 | 131:18 133:24 | **told** 80:24 81:3 |
| 149:24 156:12 | **tied** 153:21 | 136:1,5 144:11 | 155:23 |
| 156:13 157:18 | **tim** 168:13 | 144:19 148:4 | **tom** 4:10 8:17 |
| 158:25 160:2 | **time** 8:2,2,23 | 148:14,22 | **tomorrow** |
| 161:7,7,11,11 | 9:24 10:6,12 | 151:5,5,9,13 | 136:6 169:10 |
| 164:1,4 165:5 | 11:20 13:11,11 | 156:1,9 157:8 | 169:24 |
| 165:5 166:2,7 | 13:17 15:12 | 159:11 160:7 | **tonight** 69:8 |
| 166:20 167:6 | 17:4,25 18:7 | 160:17,22,24 | **took** 85:18 |
| **thinking** 12:22 | 22:6 23:19 | 161:3,13 | 161:21 |
| 92:20,21,23 | 25:21 28:15,21 | 163:16,22 | **top** 15:6 31:12 |
| 99:12 165:23 | 28:22 32:10 | 168:25 169:3 | 31:15 40:2 |
| **third** 30:14 | 34:4 35:24 | 169:11,24 | 41:10 79:23 |
| 57:6,9 69:19 | 40:11 41:12,13 | 170:8 171:5 | 99:11 113:22 |
| 164:23 | 41:22 42:25 | | 122:22,23 |

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

**[top - two]**

147:16
**topic** 84:10
**tort** 16:15
**total** 100:19
**tough** 49:9
**tower** 3:5
**town** 167:15
**tracy** 4:10 8:17
**transaction**
94:25 102:25
103:3,5,6
105:8
**transactions**
120:18
**transcribed**
171:9
**transcript**
171:10,13
172:4
**transcripts**
79:14,17
**transfer** 65:14
65:20,22 66:24
71:22 72:17
84:4 85:22
98:6,7 142:14
144:9,15
145:10,14,14
151:22
**transfers** 66:12
140:11,24
**travis** 4:5
**tread** 126:10
**tremendous**
13:24

**trick** 49:15
73:16
**tried** 41:25
59:7 97:12
156:13,14
167:6,12,18
**trip** 18:16
**tripartite** 97:1
**trouble** 155:15
**true** 74:5 90:9
90:9 94:9
135:13 140:7
140:18,19
156:13 171:11
172:8
**trust** 33:15
89:11
**trustee** 3:2 9:13
10:18 11:9,11
11:14 12:16
13:3 14:4 15:9
15:19,24 26:2
28:10 33:15,17
35:20 36:3,25
41:2 44:23
45:20 46:6
48:20 54:5,17
54:19,23 55:3
56:7,20 66:20
82:9 88:10
93:19 97:10
98:5 99:23
104:13 105:3
113:10 115:9
135:20 140:3,9

140:10 141:2,5
144:25 147:24
167:13
**trustee's** 6:12
15:24 25:14
34:16 35:3
41:2 43:11,16
47:25 68:21
69:10,11,21
70:12 99:2
164:2
**trustees** 12:1,3
56:1
**try** 12:10 14:20
30:10 62:25
66:6 70:20
73:16 75:13,13
89:14 129:3
130:19 137:4
150:22 151:3
**trying** 14:23
16:7 18:16
20:14 23:4
33:16,19,22
36:4,9,19 37:3
38:16 47:20
49:15,18 51:4
51:6,6,10,16,16
51:24,25 53:20
55:9 60:2,3
66:7 76:4
82:20,21 85:17
88:14 97:1
107:24 111:12
116:3 118:16

119:15 127:16
127:17 131:24
132:14 134:25
135:21,21
137:12 141:23
143:25 145:4
146:7 149:25
151:9,18
154:11 167:9
168:18
**tuesday** 69:6
135:14,16
**tufta** 16:14
**tune** 77:16
**turn** 147:14
**turnaround**
26:17
**turning** 31:25
34:24 88:18
**turnover** 74:2,9
91:11,18
**twice** 133:23
**two** 35:7 38:7
41:19 53:20
64:5,25 67:6
89:18 94:16
109:24 110:9,9
110:21 112:9
117:4 125:16
130:16 141:4,5
141:11 143:10
157:10 158:13
159:19,23
167:13

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

[tx - victoria]

**tx**  3:23 4:5
**type**  36:5 55:10
**typically**  45:19
  161:17

**u**

**u.s.**  8:14
**ucc**  34:17
  130:17
**ulterior**  136:18
**ultimately**
  152:11
**ultimatum**
  31:20,23 32:3
  32:5,14,19,20
  32:23,24 33:5
  50:16,18 67:6
  67:6
**umb**  4:2 9:12
  80:8,18 81:17
**uncertain**
  76:19 77:10
  96:12
**under**  24:1
  34:6 44:13
  50:4 66:15
  96:8 130:17
  133:10 143:21
  143:24 144:23
  147:22 151:3
  151:21 171:10
  172:3
**underlying**
  120:17
**undersecured**
  147:4

**undersigned**
  171:2
**understand**
  11:21 12:12
  16:11 27:2
  29:18 31:8,9
  32:17 36:12
  40:21 46:14
  48:4 49:17
  57:15 58:25
  61:9 62:21
  67:16 74:13
  76:7 82:5
  94:22 99:7
  102:25 111:10
  119:3 122:9
  133:19 146:1,8
  151:18 152:20
  154:11,23
  164:25
**understanding**
  16:3 20:9
  21:25 23:13
  28:24 32:23
  44:21 45:7
  46:4 47:20
  48:6,23 49:5
  49:18 50:2
  54:10 55:7
  56:5 59:22
  60:19 61:2,23
  62:11,18 63:20
  67:4,17 70:1
  75:15,24 76:6
  76:7 79:16

**90**:11,20 91:8
  91:19 122:14
  123:9,10
  124:23 146:10
  155:15 164:22
**understood**
  63:14
**undertake**  13:2
**unidentified**
  93:4 169:19
**united**  1:1
  35:17,19 36:11
  36:12,16
**universe**  66:2,8
  120:15
**unnecessarily**
  78:17
**unsecured**
  109:25 110:10
  110:21 111:22
  112:9,14
  124:13 129:19
  146:14 150:8
  150:11,18
  157:10
**unsure**  157:6
**untangled**
  144:2
**unturned**
  124:17
**unwritten**
  126:5
**update**  27:24
  31:14

**updates**  35:16
  54:3
**use**  85:14
  138:18 143:5
  151:4 165:8
**used**  106:13
**uses**  82:6
**using**  17:4 27:9
  38:1 75:8
  82:18 100:9
  150:23 171:8
**utilized**  146:12
  158:17

**v**

**vague**  124:25
  129:22
**value**  72:16,17
  85:3,9,10,19
  139:24 140:1
  140:13 153:25
**vanished**  146:4
**varies**  110:12
**various**  23:19
  57:3 167:8
**venture**  9:13
  74:18
**verbiage**  142:6
  142:6
**veritext**  8:17,19
  29:22 170:2
**versus**  75:9
  142:1
**victoria**  5:24
  6:16 37:20
  38:20 39:7,22

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

[victoria - witness]

40:2,12 69:7
87:6
**video** 8:9
**videoed** 52:4,5
52:6,7
**videographer**
8:1,18 9:14
10:5,11 29:24
47:6,9 93:6,11
128:22,25
168:24 169:2
170:5
**videotaped**
4:10 8:12
170:7
**view** 26:12
89:16
**viewing** 153:4
**virtually** 8:5
**virtue** 57:9
**vis** 19:2,2
113:19,19
**visited** 158:17
**visiting** 23:21
**voice** 13:14
**void** 72:25

**w**

**wait** 53:13
112:23
**waiting** 108:16
**waive** 76:24
103:16,21
126:25 127:23
136:14

**waived** 127:3
128:4
**waiver** 21:10
94:11,12
**waives** 127:21
**waiving** 99:20
99:22 102:21
102:22
**walk** 46:11
**walker** 3:22 9:8
31:20 39:8
**want** 21:6,19
23:12 36:12
39:3 41:23
44:13,16 52:15
53:9 68:24
88:22 92:3
98:18 102:6,7
102:14 106:2,2
107:3 108:1,2
108:6 115:7
117:10 122:24
123:4 126:24
127:9 134:2,19
136:1,1,10,20
136:22 137:17
138:5 143:5
154:9,18
162:13,23
166:11 168:10
**wanted** 23:6
97:7 154:2
**wanting** 86:13
**warning** 133:4

**wasteful** 89:16
**wasting** 90:4
**watch** 104:8
**waxed** 37:8
**way** 27:15 45:4
46:15 47:22
51:22 57:4
92:21,24 97:12
100:12 110:6
119:14 136:17
144:19 151:11
166:1,24 170:4
**we've** 46:21,25
47:20 49:1
53:13 64:19
66:3 68:11,18
69:19 89:12
122:8 133:22
150:24 164:13
167:13,13,14
169:6,7
**wednesday**
38:20 53:24
109:13 133:22
135:15,17
167:24
**week** 31:21
54:8 63:8 67:5
67:7
**weeks** 67:6,9
118:24
**welcome** 47:23
52:7,10,11
93:13 115:10
122:12,12

123:5,24 139:3
**went** 36:18,21
80:3 83:6 84:2
130:12 156:10
158:1 167:16
**whereof** 171:21
**wherewithal**
94:20
**willing** 59:2
128:2
**withdraw** 46:6
**withhold**
116:22
**witness** 2:9,10
5:2 8:8 9:16,19
13:15 14:20
25:9,16 26:14
28:16,19,23
30:1,3,10
34:22 38:3,7
38:14 41:16
47:11,15 51:15
53:3,16,19
64:7,19 75:5
78:10 87:3,9
89:23 92:7,25
94:3 97:19,25
107:16,23
108:5,16,24
112:22 116:7
117:13 128:5
128:20 130:9
131:21 132:9
132:24 133:13
133:16,16

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

**[witness - à]**

| | x | 144:12,14 |
|---|---|---|
| 138:14 141:15 | | 145:9 149:22 |
| 141:19 146:20 | **x**  171:13 | 152:3,6,11,13 |
| 147:8 171:21 | y | 152:15,23 |
| **witnesses**  171:6 | | 153:4,9,12 |
| **word**  27:9 40:4 | **y'all**  108:24 | 154:1,13 |
| 141:13 142:10 | **y'all's**  92:5 | 155:10,23 |
| **words**  17:23 | **yeah**  17:22 | **zip**  113:9,13 |
| 36:1,1,24 | 20:16 26:14 | 114:16 |
| 81:16 82:18 | 30:2,4 33:10 | **zoom**  3:1 |
| 94:25 141:5,24 | 38:3 40:4 | à |
| 146:11 152:19 | 41:17 43:21 | |
| **work**  36:6 | 44:20 46:23 | **à**  19:2 113:19 |
| 51:24,25 87:20 | 64:10 70:6 | |
| 89:14 90:1,1 | 83:25 87:24,25 | |
| 102:4 | 92:7,15,19,20 | |
| **working**  18:22 | 93:2 108:6,12 | |
| 27:14 51:23 | 113:3 117:13 | |
| 66:4 | 120:15 134:16 | |
| **works**  46:4 | 137:23 138:24 | |
| **world**  95:4 | 139:18 141:16 | |
| 111:3 | 148:13 150:6 | |
| **worries**  53:8 | 162:25 163:4 | |
| 65:6 71:25 | 167:25 168:16 | |
| **worst**  83:2 | 170:5 | |
| **worth**  111:20 | **year**  114:24 | |
| 143:19 152:22 | **years**  11:10,25 | |
| **wrestle**  51:5 | 12:6 82:10 | |
| **write**  85:17 | 102:17 103:21 | |
| **written**  48:15 | **yep**  120:13 | |
| 48:24 125:22 | 138:6 141:19 | |
| 126:4,15 129:5 | **yesterday**  43:2 | |
| 129:13 163:13 | z | |
| 163:21 | | |
| **wrong**  34:16 | **zero**  62:15 | |
| 108:9 151:15 | 105:20 143:14 | |
| | 143:19 144:10 | |

Alpha Reporting          800-556-8974
A Veritext Company       www.veritext.com

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS

## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.