1          IN THE UNITED STATES BANKRUPTCY COURT

2          FOR THE NORTHERN DISTRICT OF TEXAS

3                    DALLAS DIVISION

4     _____

5     In re:                        Chapter 7

6     GOODMAN NETWORKS, INC.,        Case No.

7             Debtor.                22-31641 (MVL)

8     _____

9          VIDEOTAPED DEPOSITION OF

10       CHAPTER 7 TRUSTEE SCOTT SEIDEL

11                    VOLUME II

12    DATE:          Thursday, September 14, 2023

13    TIME:          1:11 p.m. Central Daylight Time

14    LOCATION:      Remote Proceeding

15                   Memphis, TN 38103

16    REPORTED BY:   Shawn Byron Hunt

17    JOB NO.:       6106194

18

19

20

21

22

23

24

**EXHIBIT**

**BH 74**

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

```
1                    A P P E A R A N C E S

2      ON BEHALF OF CHAPTER 7 TRUSTEE SCOTT SEIDEL:

3          DAVOR RUKAVINA, ESQUIRE (by videoconference)

4          Munsch Hardt Kopf and Harr, PC

5          700 Milam Street, Suite 800

6          Houston, TX 77002

7          drukavina@munsch.com

8          (713) 222-1470

9

10         THOMAS BERGHMAN, ESQUIRE (by videoconference)

11         Munsch Hardt Kopf and Harr, PC

12         500 North Akard Street, Suite 4000

13         Dallas, TX 75201

14         tberghman@munsch.com

15         (214) 855-7554

16

17

18

19

20

21

22

23

24
```

Page 176

1              A P P E A R A N C E S (Cont'd)

2       ON BEHALF OF FEDEX SUPPLY CHAIN LOGISTICS &

3       ELECTRONICS, INC.:

4              ROBERT CAMPBELL HILLYER, ESQUIRE (by

5              videoconference)

6              ADAM LANGLEY, ESQUIRE (by videoconference)

7              Butler Snow LLP

8              6075 Poplar Avenue, Suite 500

9              Memphis, TN 38119

10             cam.hillyer@butlersnow.com

11             adam.langley@butlersnow.com

12             (901) 680-7200

13

14      ON BEHALF OF ARRIS SOLUTIONS, INC.:

15             NOAH SCHOTTENSTEIN, ESQUIRE (by videoconference)

16             DLA Piper LLP

17             1900 North Pearl Street, Suite 2200

18             Dallas, TX 75201

19             noah.schottenstein@us.dlapiper.com

20             (214) 743-4514

21

22

23

24

                                      Page 177

```
1              A P P E A R A N C E S (Cont'd)

2      ON BEHALF OF UMB BANK NATIONAL ASSOCIATION AS

3      INDENTURED TRUSTEE AND THE MAJORITY NOTEHOLDER GROUP:

4           PHILIP MICHAEL GUFFY, ESQUIRE (by

5           videoconference)

6           Hunton Andrews Kurth LLP

7           600 Travis Street, Suite 4200

8           Houston, TX 77002

9           pguffy@huntonak.com

10          (713) 220-3802

11

12          BRIAN M. CLARKE, ESQUIRE (by videoconference)

13          Hunton Andrews Kurth LLP

14          200 Park Avenue

15          New York, NY 10166

16          brianclarke@huntonak.com

17          (212) 850-2825

18

19      ALSO PRESENT:

20          Tom Tracy, Videographer, Veritext Legal

21          Solutions, LLC (by videoconference)

22

23

24
```

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

```
1                    I N D E X

2    EXAMINATION:                                  PAGE

3         By Mr. Hillyer                           183

4         By Mr. Schottenstein                     253

5

6                  E X H I B I T S

7    NO.             DESCRIPTION                   PAGE

8    Exhibit 22      Second Amended Motion         193

9    Exhibit 23      Document 1143                 205

10   Exhibit 24      Document 1299, Email          217

11   Exhibit 25      First Amended Motion          219

12   Exhibit 26      Responses to First Set of

13                   Requests for Admissions       220

14   Exhibit 27      Trustee's Responses and Answers to

15                   Joint First Set of Interrogatories 224

16   Exhibit 28      Letter, August 31             229

17   Exhibit 29      Document 1164, Email, May 10  240

18   Exhibit 30      Second Set of Requests for

19                   Admissions Responses          245

20   Exhibit 31      Second Set of Interrogatory

21                   Responses                     245

22

23

24
```

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1               QUESTIONS INSTRUCTED NOT TO ANSWER

2                        PAGE        LINE

3                        209          5

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 180

```
1                    P R O C E E D I N G S

2                    THE VIDEOGRAPHER:  Good afternoon.  We

3        are now on the record.  The time is approximately 1:11

4        p.m. on September 14, 2023.

5                    Go ahead there, Shawn.

6                    THE REPORTER:  Good afternoon.  My name

7        is Shawn Hunt; I am the reporter assigned by Veritext

8        to take the record of this proceeding.  We are now on

9        the record at 1:11 p.m. Central Time.

10                   This is the deposition of Chapter 7

11       Trustee Scott Seidel in the case of Goodman Networks

12       d/b/a Goodman Solutions on September the 14th, 2023,

13       via Zoom.

14                   I am a notary authorized to take

15       acknowledgments and administer oaths in Tennessee.

16       Parties agree that I will swear in the witness

17       remotely.

18                   Additionally, absent an objection on

19       the record before the witness is sworn, all parties

20       and the witness understand and agree that any

21       certified transcript produced from the recording of

22       this proceeding:

23                        - is intended for all uses permitted

24                          under applicable procedural and
```

Alpha Reporting                    800-556-8974
A Veritext Company                 www.veritext.com

```
 1                      evidentiary rules and laws in the

 2                      same manner as a deposition recorded

 3                      by stenographic means; and

 4                  - shall constitute written stipulation

 5                      of such.

 6              At this time will everyone in

 7      attendance please identify yourself for the record.

 8              MR. HILLYER:  Cam Hillyer and Adam

 9      Langley on behalf of FedEx.

10              MR. RUKAVINA:  Davor Rukavina and

11      Thomas Berghman on behalf of Mr. Seidel.

12              MR. SEIDEL:  Scott Seidel.  I'm the

13      trustee.

14              MR. SCHOTTENSTEIN:  Noah Schottenstein

15      for ARRIS.

16              MR. GUFFY:  Philip Guffy and Brian

17      Clarke for UMB Bank National Association as indentured

18      trustee and the majority noteholder group.

19              THE REPORTER:  Okay.  Is that everyone?

20      Okay.  Thank you.  Hearing no objection, I will now

21      swear in the witness.

22              If you would, please raise your right

23      hand.

24      //
```

Page 182

```
 1     WHEREUPON,

 2                     SCOTT SEIDEL,

 3     called as a witness and having been first duly sworn

 4     to tell the truth, the whole truth, and nothing but

 5     the truth, was examined and testified as follows:

 6                     THE REPORTER:  All right.  You may

 7     proceed.

 8                     EXAMINATION

 9     BY MR. HILLYER:

10          Q    All right.  Good afternoon, Mr. Seidel.

11     Thank you so much for coming back.

12          A    Good afternoon.

13          Q    So I'm going to try to pick up midstride

14     where we left it when we continued it yesterday.  I

15     believe you had just been asked about the risk factors

16     that you had assessed in your business judgment

17     related to the Prosperity payments.  Do you remember

18     that?

19          A    Sure.

20          Q    Okay.  And you had stated that a -- you had

21     referred to a Ninth Circuit ruling and a Judge Larson

22     ruling.  Do you remember that?

23          A    I do.

24          Q    Okay.  To the best of your knowledge, has
```

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    Prosperity Bank ever asserted any Ninth Circuit case

2    law defense?

3         A    I believe they have.

4         Q    Okay.  And where do you recall seeing --

5         A    It would be --

6         Q    -- that defense?

7         A    Sorry.  It would be in conversations with

8    counsel.

9         Q    Conversations you had with counsel?

10        A    No.  Conversations my counsel may have had

11   with their counsel with regard to Ninth Circuit

12   authority related to Prosperity accounts.

13        Q    Okay.  For clarity, so are you saying that

14   Prosperity Bank told your attorney and your attorney

15   told you about a Ninth Circuit ruling?

16        A    That occurred.

17        Q    Okay.  And when did that happen?

18        A    I believe early on in all of this.  But I

19   don't know the date.

20        Q    Let me ask you:  Has Prosperity Bank ever

21   asserted a Ninth Circuit defense to the Prosperity

22   payments claim in any pleading they have filed?

23        A    Not that I know of.

24        Q    Okay.  Do you know why that they would not

Page 184

```
 1    assert in a pleading, but would assert it orally with

 2    your counsel?

 3                    MR. RUKAVINA:  Objection.  Speculation.

 4         A    No.

 5         Q    Okay.  And so I'm going to ask you -- I

 6    believe I asked you.  Do you know what the case name

 7    is?

 8         A    It escapes me.  And I could have looked at

 9    it, but it's not with me.

10         Q    Okay.  What are the underlying -- and I'm

11    not asking you to go through an entire reported

12    opinion.  What are the underlying facts?  What is the

13    claim, the facts, and the holding of that case?

14         A    The upshot of that case is when -- if

15    there's a transfer out of a DACA type account -- in

16    other words, if there's a transfer of funds that the

17    debtor has no equity in, the debtor's ability and/or

18    the trustee's ability to recover under avoidance

19    actions is therefore limited, if not expunged, by

20    virtue of the fact that the debtor had no equity in

21    the funds.

22         Q    Okay.

23         A    Fully encumbered.

24         Q    Okay.  So when you say an avoidance action,
```

Alpha Reporting                          800-556-8974
A Veritext Company                       www.veritext.com

1    let's be specific.  You're familiar with all the

2    avoidance actions.  Was it a preference claim?  A

3    fraudulent transfer claim?

4         A    I can't remember.  I can't remember which it

5    was.  It was an avoidance action.

6         Q    Okay.  And do you know any details

7    about -- you said was there a -- there was a DACA in

8    that particular case?

9         A    I'm glad to -- I don't believe there was a

10   DACA.  I was talking about the fact that it

11   was -- there was not equity in the property that was

12   transferred.  In other words, fully encumbered and,

13   you know, I'll get you the case cite.  I apologize we

14   didn't get it to you last night.

15        Q    Okay.  And you said again that's from the

16   Ninth Circuit.  Do you have anything from the Fifth

17   Circuit?

18        A    Nope.

19        Q    Okay.  Let's talk about Judge Larson's

20   opinion.  Do you know what case that was?

21        A    I haven't looked at it since I talked about

22   it yesterday.  I remember the word "immanence" or

23   "essent."  I think it was "immanence."  But I don't

24   know if that's the name of the case.  But again I can

Alpha Reporting                    800-556-8974
A Veritext Company                 www.veritext.com

1    get that to you too.  My --

2         Q    Okay.  Do you know sitting here --

3         A    -- counsel will get it to you actually.

4         Q    Okay.  Do you know sitting here today, the

5    same questions you just answered about the Ninth

6    Circuit case.  Do you know any underlying facts?  Do

7    you know what --

8         A    I think it --

9         Q    -- the claim was?

10        A    Sorry.  I think it was the general upshot of

11   what I just articulated.  That being that the

12   avoidance action wasn't available in light of the fact

13   that the debtor's interest in the asset had no equity.

14        Q    Okay.  And the same question back to you.

15   Was there a DACA involved in that matter?

16        A    I do not think so, but I'm not positive.  I

17   can't remember.

18        Q    Okay.  Do you know if that was a preference

19   claim or a fraudulent transfer claim?

20        A    It was an avoidance action, I believe.

21        Q    But you don't know which one it is?

22        A    I can't remember.

23        Q    Okay.  And you relied upon these two

24   defenses -- being the Ninth Circuit and Judge Larson's

Page 187

Case 22-31641-mvl7   Doc 397-74   Filed 10/06/23   Entered 10/06/23 11:37:01   Desc
Exhibit 74   Page 14 of 158

```
 1    opinion -- in your business judgment?

 2         A    That was involved in my business judgment.

 3    Yes.

 4         Q    Okay.  And so I asked you a question and

 5    you -- that I said had they -- do you know what

 6    defense Prosperity has actually asserted in a pleading

 7    filed with the court?

 8         A    I'm not positive sitting here right now

 9    unless you want to show me the pleading.

10         Q    Okay.  Well, let me ask you this.  If they

11    asserted a good faith defense, what does that mean to

12    you?

13         A    That they took -- they took the funds in

14    good faith without -- just the typical good faith

15    defense you would raise.  That I'm just a good faith

16    recipient of funds.

17         Q    Okay.  Are you familiar with 550(b)(1)?

18         A    I don't have it in front of me.  I don't

19    have it memorized.

20         Q    Okay.  Well, then let me ask you just

21    generally.  You've prosecuted avoidance actions and

22    fraudulent transfer claims for 30 years.  Correct?

23         A    I have.

24         Q    Okay.  Is it your understanding that a good
```

Alpha Reporting                                800-556-8974
A Veritext Company                          www.veritext.com

1    faith defense is a good faith for value?  Or just good

2    faith?

3         A    I'd have to go look at the code section.

4         Q    Give me one second.  Okay.  Would you have

5    any reason to dispute that 550(b)(1) says the trustee

6    may not recover --

7         A    Can I go get my code if we're going

8    to -- I'll get the code and we'll read the code

9    together.

10        Q    Sure.

11        A    You want to tell me where you are?

12        Q    550(b)(1).

13        A    550(b)(1).  Okay.

14        Q    Okay.  "The trustee may not recover under

15   Section (a)(2) of this section from a transferee that

16   takes for value, including satisfaction or securing of

17   a present or antecedent debt, in good faith, and

18   without knowledge of the voidability of the transfer

19   avoided."  Is that what it says?

20        A    That's what it says.

21        Q    Okay.  So again, I certainly didn't want you

22   to read the code.  I'm asking you:  A good faith

23   defense for a fraudulent transfer is someone that

24   takes in good faith for value.  Isn't that your

Page 189

```
 1    understanding?

 2         A    Yes.

 3         Q    Okay.  So then the next question that I have

 4    for you is do you believe Prosperity gave value?

 5         A    I'm going to take the position that it did

 6    not because I want to preserve this cause of action.

 7         Q    Okay.  I'll make it easier.  In both your

 8    draft complaint that you sent to Prosperity and in

 9    your filed motions, you have both -- you say the

10    trustee asserted that Prosperity gave no value to the

11    debtor.  Is that correct?

12         A    That's what I just -- yes.  That's what I'm

13    saying.  We're preserving --

14         Q    Okay.  And you sat through in Prosperity

15    Bank corporate rep's deposition last week.  Correct?

16         A    Yes.

17         Q    And did you hear that corporate rep answer

18    no to the question of what value did you -- did give

19    any -- did the Bank give any value to Goodman

20    Networks?

21         A    Yes.

22         Q    Okay.  Given in light of your position in

23    the motion and the Prosperity Bank's deposition, can

24    you sit here today and say that Prosperity Bank has a
```

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    defense under 550(b)(1)?

2         A    I'm not going to spoon-feed a potential

3    target such an admission.  I do not believe they have

4    good faith value defense for value.

5         Q    Okay.  That's all I needed.

6         A    The danger of this exercise here.

7         Q    Is it a close call about that defense?

8         A    No.  I don't think so, but.

9         Q    All right.  Mr. Seidel, let's move forward

10   to the second part of your motion.  And for the sake

11   of clarity, if I say the motion, I mean motion 1, 2,

12   and 3 in total.  I'm not specifically talking about

13   one specific.  Otherwise, I will identify motion 1, 2,

14   or 3.  Okay?

15        A    I've got the Trustee's Second Amended Motion

16   in front of me, which is the one pending.  So just

17   tell me what you want to know.

18        Q    Okay.  We can look at the Second Amended

19   Motion.  So is it correct, the only difference between

20   the trustee's second motion and the trustee's third

21   motion was the removal of a global release for

22   Prosperity Bank?

23        A    Correct.

24        Q    Okay.  There was no changing of monetary

Alpha Reporting                    800-556-8974
A Veritext Company                 www.veritext.com

1    figures?

2        A    Correct.

3        Q    Okay.  So in the Trustee's Seconded Amended

4    Motion, so if the -- when I say the subject funds,

5    that is the 4.46.  Let's just call it "four four" for

6    the sake of identifying it.  That is the money that is

7    currently sitting at Prosperity Bank.  Correct?

8        A    Correct.

9        Q    Okay.  And that is the funds that you have

10    agreed to take a $150,000 surcharge out of.  Correct?

11        A    Correct.

12        Q    Okay.  And as part of your motion, if you've

13    got the Second Amended Motion in front of you, I

14    believe the statement is in there.  If you want to go

15    to page 6.

16        A    Do you have it as an exhibit so my counsel

17    can see it too?  You got it?

18                    MR. RUKAVINA:  I've got it.

19                    THE WITNESS:  You've got it.

20                    MR. HILLYER:  Sure.

21                    THE WITNESS:  He's got it.  He's got it

22    he said.

23                    MR. HILLYER:  No.  You're right, Mr.

24    Seidel.  We should probably introduce it.

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1          MR. LANGLEY:  The Second Amended?

2          MR. HILLYER:  The Second Amended

3     Motion.

4          MR. LANGLEY::  Okay.  Let me introduce

5     it.  Give me a second.  This will be Exhibit 22 and

6     it's introduced.

7               (Exhibit 22 was marked for

8               identification.)

9          MR. RUKAVINA:  He said page 6?

10         THE WITNESS:  I don't remember where he

11    was going.  He said something six.

12              We've got it.  We're ready.

13    BY MR. HILLYER:

14    Q    Okay.  Just looking generally, before we go

15    into this.  So clearly you know that FedEx and ARRIS

16    have provided you both their objection and an analysis

17    in which the objecting creditors contest the fact that

18    the bondholders are secured and perfected in the

19    subject funds?

20    A    Yes.

21    Q    Okay.  And you understand that?

22    A    Yes, sir.

23    Q    Okay.  And you understand the bondholders

24    conversely have asserted that they are secured,

Page 193

1    perfected, and unavoidable in the subject funds?

2         A    Yes.

3         Q    Okay.  And in your motion it states "The

4    trustee after extensive review of the issues and

5    only" --

6         A    Can you tell me where you are?

7         Q    In the middle of page 6.

8         A    I heard you say 6, but I never heard what

9    you're saying.  Okay.  I apologize for interrupting

10   you.  You're on page 6?

11        Q    It's paragraph 16 continued from page 5.

12        A    I'm with you.

13        Q    Okay.  Smack in the middle.  "The trustee

14   after extensive review of the issues and only as part

15   of the proposed settlement in the form of the proposed

16   order agrees that the collateral agent's liens and

17   security interest in the subject funds are perfected

18   as part of the overall consideration for the proposed

19   settlement in order to avoid the large risk, large

20   costs, and extensive delays that would result from

21   litigating the issue and in order to pay down the

22   collateral agent's secured debt."

23        A    That's what it says.

24        Q    Okay.  So you have had -- you and your

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    counsel have had extensive conversations with FedEx

2    over the perfection issue of the subject funds.

3    Correct?

4         A    Yes.

5         Q    Okay.  And I believe you have called it a

6    close call.  Is that correct?

7         A    Yes.  It's difficult.  Yes.

8         Q    Again, Mr. Seidel, close versus difficult is

9    different.  Did you call it a close call?

10        A    Close call.

11        Q    Okay.  And the way the numbers work out

12   right now, Mr. Seidel, is of the 4.4 million dollars

13   less the $150,000 surcharge, that is a 97 percent to 3

14   percent split of the subject funds.  Correct?

15        A    Correct.

16        Q    Okay.  And I believe we've already

17   extensively gone through it that the $150,000

18   surcharge has almost all -- all of those funds have

19   been spoken for, for administrative fees and costs at

20   this point.  Correct?

21        A    Most likely.

22        Q    Okay.  Well, sitting here today, do you

23   believe that one dollar of that 150 is going to any

24   pre-petition unsecured creditor?

Page 195

1          A      I wouldn't think so.

2          Q      Okay.  So how is the 97 to 3 splitting of

3     the subject funds with the surcharge reflective of a

4     close call?

5          A      It really factors in more on the costs,

6     delay, risks of litigation, and finding counsel to

7     litigate on and on.

8          Q      Okay.  So the percentage split is not

9     reflective of the close call regarding the perfection

10    issue?

11         A      You have made that point.  Yes, sir.

12         Q      Okay.  And you just said finding counsel.

13    And are you talking about pursuing litigation?

14         A      Yeah.  In the instance that we take your

15    approach of pursuing litigation.

16         Q      Okay.  So let's talk about the close call.

17    Tell me what in your opinion -- what is the close call

18    that you are assessing when it relates to this issue?

19         A      Whether or not the bondholders remain

20    secured pursuant to various interests they have in the

21    account as-is, where-is, now at Prosperity.

22         Q      Okay.  And like I said, FedEx has provided

23    you their analysis as to that.  And the bondholders

24    have provided you their analysis as to that issue.

Page 196

1    Correct?

2         A    Correct.

3         Q    Okay.  And you have your own analysis.

4    Correct?

5         A    Correct.

6         Q    Okay.  And so I'm trying to rectify is the

7    cost of the litigation and the risk factors that you

8    just articulated such as the finding counsel.  Okay?

9    If the settlement was not approved, I believe you

10   said, those would be the factors that you would

11   consider trying to avoid.

12        A    I don't believe that's what I said.  What I

13   said was all of this goes into the settlement that we

14   came up with.  I mean, all of what I just mentioned.

15        Q    Okay.  Let me just ask you a general

16   question.

17        A    Sure.

18        Q    When you have a fraudulent transfer claim

19   and let's say that somebody has a defense to it, and

20   you think it's a close call, have you ever settled

21   something for 97/3?

22        A    I don't believe so.

23        Q    Okay.  Why are you doing this now?

24        A    In light of the benefit of paying down

Page 197

1    creditor.  In light of the amount in controversy, the

2    expense, the delays.  Trying to find counsel to handle

3    such a matter and trying to move the case forward.

4         Q    Okay.  How many times approximately have

5    counsel for FedEx and ARRIS asked you not to pursue

6    this motion and to allow them to pursue it for the

7    benefit of the estate and unsecured creditors?

8         A    Now that's an interesting question you just

9    asked.  Can you ask that question one more time?

10        Q    Sure.  How many times have FedEx and ARRIS

11   counsel asked you to withdraw this motion?

12        A    They've asked me to withdraw this motion.

13        Q    How many times?

14        A    I'm sure more than a couple.

15        Q    Okay.  And we went through this yesterday.

16   FedEx and ARRIS are the overwhelming majority, if not

17   almost supermajority, of the unsecured pre-petition

18   filed claims?

19        A    Correct.

20        Q    Okay.  Why are you not taking into account

21   the wishes of FedEx and ARRIS as it relates to this

22   claim of the estate?

23        A    Because I don't understand.  I'm trying to

24   do a reasonable settlement here.

Alpha Reporting                                    800-556-8974
A Veritext Company                            www.veritext.com

1          Q     Okay.  Do you understand the position that

2     FedEx and ARRIS do not think it's reasonable related

3     to the subject funds because they are going to receive

4     zero dollars out of the subject funds?

5          A     I do understand that they believe it's not

6     reasonable because they're going to receive zero

7     dollars.

8          Q     Don't you think a close call would

9     have -- or is normally resolved in some range other

10    than 97/3 percent?

11         A     I would hope so.

12         Q     Why were you only able to get the estate

13    or -- why were you only able to get a $150,000

14    surcharge?

15         A     That was the lawyers for myself, the estate,

16    and Prosperity, and negotiations back and forth.

17    That's all we could get.

18         Q     Give me one second.

19         A     I said Prosperity.  I meant bondholders.

20         Q     Mr. Seidel, why not recover the 4.4 million

21    dollars from Prosperity and fight about the lien

22    priority or who is entitled to the funds at a later

23    point?

24                    MR. RUKAVINA:  Objection.

Page 199

1    Hypothetical.  Assumes facts not in evidence.

2        A    I don't know how I could do that.

3        Q    Okay.  Well, didn't you just recover money

4    in the AMRR settlement last week in which the

5    bondholders asserted a lien?

6        A    Yes.

7        Q    Okay.  And didn't you ask the court to

8    recover -- to authorize you to recover that money and

9    then everyone reserve their rights and fight about it

10   later?

11       A    Yes.  I did.

12       Q    Okay.  Why are you not doing that now?

13       A    Because Prosperity and the bondholders have

14   indicated that they would fight such a matter, and

15   it's going to be expensive and we're administratively

16   insolvent.

17       Q    Okay.  Explain that.  The bondholders would

18   fight it how?

19       A    They would say that that money is theirs.

20       Q    Didn't they just do that in AMRR?

21       A    They did.

22       Q    Okay.  And they objected?

23       A    They and you objected.  Yes.

24       Q    Okay.  And what was the outcome of that?

Page 200

1          A     We took the money into the estate.  And

2     we'll sort it out later.

3          Q     Okay.  So I'll ask you again.  How was that

4     any different than what you're doing right now?

5          A     I think it's a -- I think their claim in

6     this instance is a little different.

7          Q     How so?

8          A     Because I think the judge is going to have

9     to get into all the intricacies of all the arguments

10    that are being articulated here.  The bondholders will

11    be screaming for their money to try -- Prosperity will

12    be also wanting releases.  And the bondholders would

13    not agree to that transaction.  So I've got another

14    fight on my hands.

15         Q     Okay.  So --

16         A     I'm trying to -- I'm trying to --

17         Q     So I believe you listened to the Prosperity

18    deposition.  Didn't you hear the corporate

19    representative say they just want to pay the money to

20    someone?

21         A     I did hear that.

22         Q     Okay.  So why aren't you that someone?

23         A     Because they're not going to do anything

24    unless the bondholders consent.

Page 201

1          Q     Prosperity is not going to turn over the

2     money unless the bondholders consent to the turnover

3     of the money?

4          A     Correct.  They're not going to -- they're

5     not going to hand the funds to me in light of the

6     bondholders saying it's their money.  And the

7     bondholders have made it abundantly clear they want

8     their money now -- yesterday -- and they will fight to

9     the ends of the earth to grab it now if not yesterday.

10         Q     And again but doesn't that threat also still

11    hang out there on the AMRR?

12         A     The threat, we've wired around that by

13    virtue of the fact that the money is going to come

14    into the estate on the AMRR, and we'll see what's

15    what.

16         Q     Let's go back to -- have FedEx and ARRIS

17    asked you to allow them to take over this litigation

18    against Prosperity?

19         A     No.  They --

20         Q     FedEx --

21         A     Go ahead.

22         Q     FedEx and ARRIS's counsel have not asked you

23    to allow them to pursue the 548 claims against

24    Prosperity Bank for the Prosperity payments and

Page 202

1      subject funds?

2           A     The way it went forward was I suggested to

3      FedEx and/or ARRIS that they could buy the cause of

4      action if they wanted.  I think at the time it was

5      like 150 grand.  No progress on that front.

6                I offered to deputize them and engage them

7      as special counsel, your firm, you and Mr. Langley.

8      That was not something that y'all were interested in

9      doing on behalf of the estate.

10          Q     All right.  Well, let's go in order.

11          A     I'm answering your question.  Then we talked

12     about -- let's talk about doing some kind of

13     arrangement because you guys said this is the easiest

14     adversary in the history of the world.  It should be

15     able to be done for 50 grand.  I said okay.  Y'all do

16     it for 50 grand.  Y'all wouldn't do it for 50 grand,

17     FedEx and ARRIS.

18               You came back at 150 grand, from what my

19     recollection was, to do the easiest adversary laydown

20     in the history of the world.  Maybe 200.  I can't

21     remember, but 150 in that range is what you wanted for

22     legal fees you thought.

23               In addition, you wanted the lion's share of

24     any proceeds and were also unwilling to protect the

Page 203

1    estate to make sure we have the same deal or at least

2    as good a deal as we have right now which is $350,000

3    coming into the estate.

4           ARRIS and FedEx were unwilling to do that.

5    They wanted the estate to take the risk, and they

6    wanted to end up with the lion's share in the event

7    there was a recovery.  And frankly, I haven't struck

8    claims.  I don't know how in the world Federal Express

9    is owed $80,000,000.  I don't know what that's all

10   about.  And I hopefully never have to get into that.

11          But I know sitting here today they filed a

12   claim for that amount.  And I'm not looking into that

13   right now.  I know the way the creditor body sits.

14   It's as you described.  But to answer your question,

15   there was a lot of bells and whistles and conditions

16   pursuant to my suggestion that you guys step in and

17   take it forward and/or buy the cause of action.

18   Q    All right.  Thank you.  I was not trying to

19   cut you off.  I was trying to go part by part so we

20   don't have to go back.

21          So all of that you just said was probably

22   discussions over a period from May to the present.

23   It's been at least four months of discussions.

24   Correct?

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1        A     It's been ongoing discussions for months.

2    That's fair to say.

3        Q     Okay.  And let's start about the first offer

4    that you said is you said you offered for FedEx and

5    ARRIS to buy the claim.  Correct?

6        A     Correct.

7        Q     Okay.  And your offer was for FedEx and

8    ARRIS to pay you, the estate, $100,000 for the claim?

9        A     I don't remember if it was 100, 150.

10   Something in that range, sir.  And then you would have

11   the beautiful claim that you're so enamored with

12   without having to share with anyone else.

13       Q     Okay.  And FedEx would pay you a hundred, a

14   hundred and fifty thousand dollars.  And then FedEx

15   and ARRIS would go pursue it and keep all the money?

16       A     I can't remember.  I think there was a

17   split.  I'm trying to remember.  I'd have to go back

18   and look.

19       Q     Okay.  Well, let's look at Document 1143.

20                 MR. LANGLEY:  Exhibit 23.

21                 (Exhibit 23 was marked for

22                 identification.)

23                 THE WITNESS:  We don't have it yet I

24   don't think.

Alpha Reporting          800-556-8974
A Veritext Company       www.veritext.com

1          MR. HILLYER:  It's up there.

2          MR. LANGLEY:  It's published now.

3          MR. HILLYER:  Exhibit 23.

4          THE WITNESS:  Okay.

5     BY MR. HILLYER:

6          Q    All right.  Just go to the second page which

7     is 1143.

8          A    Wait.  There's a big deletion on the -- we

9     can't see.

10         Q    I believe that's your redaction.

11         A    Okay.  Okay.  I just wanted to make sure

12    that everybody knew that there was a big redaction.

13         MR. RUKAVINA:  113?  1143?  There it

14    is.  Can you blow it up?

15         MR. LANGLEY:  Sure.

16         THE WITNESS:  Okay.  Okay.  I'm with

17    you.

18    BY MR. HILLYER:

19         Q    Okay.  You proposed trustee withdraws the

20    9019.  FedEx and ARRIS get standing to sue Prosperity

21    and the bondholders on a 544 strong-arm and the

22    Genesis transferees.  But for the benefit of the

23    estate and all flowing through the estate.

24         A    Right.

Page 206

1          Q     You pay $100,000 to the estate to compensate

2     the estate for the 9019 consideration.

3          A     Right.

4          Q     Your fees and costs are paid off the top,

5     and you are paid a success fee of 15 of the

6     proceeds --

7          A     Yeah.

8          Q     -- to be applied to your debts.  Okay?

9          A     As you know there was a lot of -- a lot of

10    back and forth, a lot of negotiation.  We were

11    trying -- I was trying to work -- we were trying to

12    work together to see if we could come up with a

13    concept.  But yes.  This has refreshed my recollection

14    on that first -- what may be the first offer.  I don't

15    recall.

16         Q     Okay.  And I would ask you, Mr. Seidel, did

17    you agree that's a far cry from selling the claim for

18    $100,000 in which they benefit?

19         A     True.  I -- I got overexcited there.  Sorry.

20         Q     It's all right.  So look at line item 3.

21    You pay $100,000 to the estate to compensate the

22    estate for the 9019 consideration.

23         A     Right.

24         Q     Okay.  And this is May 4th.

Page 207

```
 1          A      Right.

 2          Q      On May 4th, you had agreed to a $100,000

 3    surcharge with the bondholders.  Correct?

 4          A      Correct.

 5          Q      Okay.  And so you were asking FedEx and

 6    ARRIS to come out of pocket -- not from the recovery,

 7    but to come out of pocket -- $100,000 to pay you for

 8    the surcharge that you were being guaranteed by the

 9    bondholders in the 9019?

10                 MR. RUKAVINA:  I'm going to object to

11    this line of questioning.  This is -- I don't

12    understand what relevance this has to anything

13    regarding the settlement discussions.  We're not

14    trying this on September the 28th.  You're making a

15    strong-man argument just for the future on argument.

16                 You're here to ask this witness factual

17    questions about his business judgment and the 9019.  I

18    suggest you go back to that.  Your clock is ticking.

19                 MR. HILLYER:  All right.  Thank you for

20    that objection.

21                 You can answer, Mr. Seidel.

22                 THE WITNESS:  I was asking for

23    the -- that the parties to protect the estate to the

24    tune of $100,000.  Yes.
```

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    BY MR. HILLYER:

2        Q    Okay.  So sitting here today, are you still

3    willing for FedEx and ARRIS to take over the

4    litigation against Prosperity Bank?

5                    MR. RUKAVINA:  He's not going to answer

6    that question.  This is not a negotiation.  This is a

7    deposition.  We can move on.  We're not going to

8    answer that question.

9                    THE WITNESS:  We're having a phone

10   call.  Why are we doing this -- deposition.

11                   MR. RUKAVINA:  You can't answer that

12   question without invading your own work product.

13                   Move on, please, Cam.

14                   MR. HILLYER:  I'm sorry.  What is the

15   objection?

16                   MR. RUKAVINA:  The objection is, one,

17   that that is utterly irrelevant because this is a

18   deposition.  This is not a transcribed negotiation.

19   And, two, he can't answer that question without

20   invading work product and his strategy.

21                   You want to have a phone call?  We can

22   have a phone call.  But I'm really going to start

23   stopping this deposition if you're going to be asking

24   about settlement discussions that have no relevance to

Page 209

1    the hearing at hand.

2                    MR. HILLYER:  Respectfully, this entire

3    discussion since the beginning has been all settlement

4    discussions because this is a settlement motion.  And

5    everything that factored into his business judgment of

6    who he settled with and this email you produced.

7                    And I guess I would ask that question.

8    Why did you produce this email to us if it's not

9    relevant?  I don't understand.

10                   MR. RUKAVINA:  You're --

11                   MR. HILLYER:  We can move on.

12                   MR. RUKAVINA:  Was I not required by

13   your RFPs to produce all communications with all

14   parties?  You are now asking him about -- you are

15   asking him about questions as to a potential

16   settlement that he did not take which was, I believe,

17   a 408 communication.

18                   You can ask him about that if you want.

19   I'm reminding you your clock is ticking.  And I'm

20   reminding you that this is not relevant for the 28th.

21   But if you keep asking him to negotiate with you on

22   the record, I will stop this deposition.

23                   You're incurring $5,000 in combined

24   hourly fees here for the lawyers to negotiate with the

Alpha Reporting                    800-556-8974
A Veritext Company                www.veritext.com

1    man on the record.  That is inappropriate.

2    BY MR. HILLYER:

3        Q    Now I'm going to ask the questions.  You

4    sent this email offer.  I'll ask you an easiest

5    question.  Are you still in negotiations with FedEx

6    and ARRIS on this topic?

7        A    Am I still in negotiations with FedEx and

8    ARRIS?  I haven't heard from them in a long time with

9    regard to negotiations.

10       Q    What does that mean, Mr. Seidel?

11       A    We had spoken about concepts of how to

12   obviate this hearing and protect the estate.

13       Q    Okay.  As early as this week.  During this

14   week we had discussions.

15       A    Yeah.  Yeah.  So --

16       Q    Okay.  That's fine.

17       A    If you'd let me finish, I'm always open to

18   discussions.  Always.  I mean, if somebody wants to

19   walk in here and guarantee me something or protect the

20   estate, et cetera, not abandon to this cause of action

21   to two creditors.

22       Q    Again, I'll rephrase it.  I'm not trying --

23       A    Go ahead.

24       Q    I'm not trying to open settlement

Page 211

1      negotiations right now.  I'm just asking --

2                  MR. RUKAVINA:  You've blown that door

3      open.  I'm sorry.  You've blown that door open.

4                  THE WITNESS:  You just asked me the

5      question of would I do this deal?

6                  MR. HILLYER:  Davor, you're not the

7      deponent.  That's not even an objection.  You're just

8      talking.  Please don't do it.  You can hold all of

9      your objections.

10                 MR. RUKAVINA:  Why don't we take --

11                 MR. HILLYER:  I'm just asking --

12                 MR. RUKAVINA:  Why don't we take a

13     five-minute break and talk on the phone and calm down?

14                 MR. HILLYER:  No.  I'm just asking --

15                 MR. RUKAVINA:  I'm going to go to the

16     judge for a protective order.  This is unprecedented.

17     BY MR. HILLYER:

18         Q    I'm asking are you opposed -- because it's

19     one of the factors to consider, are you opposed at

20     this point for FedEx and ARRIS taking over this

21     litigation that they've asked you to let them take

22     over?  That's all I'm asking.

23         A    Am I opposed to letting them take over the

24     litigation?

```
 1                    MR. RUKAVINA:  What?  For no
 2      consideration?
 3                    THE WITNESS:  For no consideration and
 4      all money goes to them?  I mean, I don't understand
 5      what you're saying.  We've talked about this concept
 6      with 27 bells and whistles attached.
 7                    MR. HILLYER:  Right.
 8                    THE WITNESS:  I don't understand what
 9      you're proposing.  If they want to take over the
10      litigation, fund it, which was my question.  You guys
11      fund it.  Are you saying they'll fund it and all money
12      will -- and all proceeds will go to the estate and be
13      paid out?  That's something to talk about.
14                    MR. HILLYER:  Okay.  Let's move on.
15      Give me one second.
16                    Let's take a five-minute break and come
17      back at two.
18                    MR. RUKAVINA:  Let's make it ten
19      minutes.  He has to sign the AMRR docs if you don't
20      mind.
21                    MR. HILLYER:  Okay.
22                    THE VIDEOGRAPHER:  All right.  We're
23      going off the record.  The time is approximately 1:56
24      p.m.
```

Page 213

1                    (Off the record.)

2                    THE VIDEOGRAPHER:  We're going back on

3     the record.  The time is approximately 2:06 p.m.

4                    MR. HILLYER:  Are we back on?

5                    THE VIDEOGRAPHER:  We are.

6                    MR. HILLYER:  Okay.  I'm sorry.  My

7     screen froze for a second.

8     BY MR. HILLYER:

9          Q    Okay.  Mr. Seidel, I just have one follow-up

10    question just for clarification of the record.  You

11    said you offered to deputize FedEx and ARRIS.  And

12    what I'm going to ask you is I'm not familiar with

13    that term in the bankruptcy context of a Chapter 7

14    trustee.  Can you clarify what you meant by deputize?

15         A    Okay.  I pitched a whole laundry list of

16    ideas that we have used before over here when

17    creditors don't like a deal, some of which is to hire

18    the counsel for the creditor.  That's what we've done

19    before.  And that was that pitch that you referenced

20    there that I would employ counsel.  And I'm sorry.  I

21    thought we had this phone call.

22              But I would employ the counsel that FedEx

23    and ARRIS enjoy and are confident with as counsel for

24    the trustee.  There would be a kicker off the top

Page  214

1    to -- and I don't have the deal in front of me right

2    now because he's working on our ARRIS closing

3    documents.

4            But there would be a kicker off the top to

5    ARRIS and/or FedEx of 15 percent, as I recall, which

6    is what I've done before, of any recovery.  Then the

7    attorney's fees that were incurred would be reimbursed

8    to ARRIS counsel and FedEx counsel in pursuit of the

9    adversary contemplated.  And then the funds would go

10   into the estate.

11           And then if it turns out the way that FedEx

12   and ARRIS thinks it will turn out, there'll be a

13   $3,000,000 recovery -- three point something million

14   dollar recovery for FedEx and ARRIS, by virtue of the

15   fact that they're the 85 percent creditor by the end

16   of the deal.  Rough math I'm talking about.

17           But that was the concept of deputize that

18   hey, I'll put you guys right in here unless you -- I

19   don't understand we're not working together.

20   That's -- but that was the concept there.

21      Q    All right.  Thank you.  I'm trying not to

22   interrupt you.  I appreciate you going through all

23   that.  I was just trying to get the basic parameters.

24   When you mean deputize, you mean hiring FedEx and

Alpha Reporting                    800-556-8974
A Veritext Company            www.veritext.com

1    ARRIS's counsel to represent you, not represent FedEx

2    and ARRIS.

3          And so they would be the estate filing a

4    claim, but not through your attorneys; through

5    different attorneys.  And that's different than

6    selling the claim that ARRIS and FedEx would be

7    pursuing it through their own counsel.  That's all I

8    needed clarification.

9          And just one question.  On that deputize,

10    because we looked at that previous email, is your

11    understanding about that -- and I'm using your term,

12    deputize -- is FedEx and ARRIS would have to pay the

13    estate some amount of money to have their attorneys be

14    deputized?  Is that correct?

15        A    In this offer -- you understand everything

16    is a negotiation --

17        Q    Right.

18        A    -- I was trying to protect the estate to the

19    tune of the 100,000 that the estate stood to gain.

20        Q    I understand.

21        A    So yes.  There would be the protection of

22    the estate for the 100.  That was that -- that was the

23    ask.  That was the ask.

24        Q    I understand.

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1            MR. HILLYER:  All right.  Adam, why

2       don't you upload 1299?

3            MR. LANGLEY:  This is Exhibit 24.

4            (Exhibit 24 was marked for

5            identification.)

6            MR. HILLYER:  You should have it

7       populated now.

8            THE WITNESS:  Okay.  Are you agreed on

9       removing close call.

10           MR. HILLYER:  Right.  I apologize.  I

11      probably should have brought this up when we were

12      talking about it earlier.

13      BY MR. HILLYER:

14      Q    So this is a one-page email.  This is your

15      counsel has circulated a draft of the amended motion

16      that's on the bottom.  This date is May 16th.  And I

17      believe we've already covered that the amended motion

18      was filed on May -- the second amended -- make sure I

19      get my dates right.  May 22nd.

20           Or I'm sorry.  May 17th was your amended

21      motion, which is motion Number 2.  And this is on May

22      16th.  And it states that Eric Schaffer, who is

23      counsel for the bondholders, adds a just one comment.

24      They want -- and I'm going to paraphrase it.  You can

Page 217

1    read it.

2              That you have put in paragraph 16 that the

3    trustee for the purposes of this motion has reviewed

4    the loan documents.  And while the subject funds are

5    property of the estate, the collateral agent holds

6    perfected unavoidable first priority security interest

7    in the subject funds.

8              Although it's a close call and hence part of

9    the reason for the proposed settlement.  And they want

10   close call out of the motion.  Do you see that?

11        A    I do.

12        Q    Okay.  And you took it out.  Didn't you?

13                   MR. RUKAVINA:  Show me the motion.

14                   THE WITNESS:  Show me the motion.

15                   MR. HILLYER:  Okay.

16                   THE WITNESS:  I remember seeing close

17   call somewhere, but I don't remember.

18                   MR. LANGLEY:  Exhibit 22.  It's the

19   Second Amended Motion.

20                   THE WITNESS:  Okay.  Second Amended

21   Motion in -- I don't know that close call is in the

22   Second Amended Motion.

23                   MR. LANGLEY:  Maybe it's the first

24   then.  This will be out there, and everybody can have

Page 218

 1    it.

 2    BY MR. HILLYER:

 3         Q    So yes.  So paragraph 16 is different in

 4    the -- what you're looking at is the Second Amended

 5    Motion.  This email predates the First Amended Motion.

 6                   MR. LANGLEY:  Can I introduce it?

 7                   MR. HILLYER:  Sure.  Go ahead and

 8    introduce that.

 9                   MR. LANGLEY:  This will be Exhibit 25.

10    It's been introduced.

11                   (Exhibit 25 was marked for

12                   identification.)

13                   THE WITNESS:  We have it.  We're

14    bringing it up.  Okay.

15                   I'm glad to take your word for it that

16    the word close is not in there.

17    BY MR. HILLYER:

18         Q    Would you like to go to paragraph 16?

19         A    I'll do whatever you want, Mr. Hillyer.

20    You're running the --

21         Q    Okay.  I'll just ask the question.  Did you

22    take the phrase "it is a close call" out of this

23    motion at the request of the bondholders?

24         A    It would appear so.

1        Q    Okay.  Why?

2        A    I canceled it.  It was a request -- it was

3    the request of the settling party with regard to the

4    language in there, in the proposed 9019.

5        Q    Okay.  But you testified earlier that in

6    your opinion it is a close call?

7        A    I believe we were in front of a judge, Judge

8    Larson.  And judge -- I mean, judge.  My counsel, Mr.

9    Rukavina, said this is a tough one.  This is close,

10   et cetera.  I mean, yes.  But no.  The word close is

11   not in the motion now at the request of one of the

12   settling parties apparently.

13       Q    Okay.  Mr. Seidel, let's go to your

14   responses to requests for admission and responses to

15   interrogatories.  Give me one second to make sure.

16            All right.  You should have Exhibit 26 which

17   is your responses to the first set of requests for

18   admissions.

19                 (Exhibit 26 was marked for

20                  identification.)

21       A    We're bringing it up.  Okay.

22       Q    Okay.  And these are dated June 11, 2023.

23   Correct?

24       A    Correct.

Alpha Reporting                          800-556-8974
A Veritext Company                    www.veritext.com

1          Q    Okay.  Request 6.  Are you there?

2          A    I'm reading it.  Okay.

3          Q    Okay.  And you denied that request for

4     admission?

5          A    Yes.

6          Q    Okay.  Is your answer the same sitting here

7     today?

8          A    I believe so.

9          Q    Okay.  And what authenticated record do they

10    have?

11         A    I believe there was a letter involved, an

12    August letter from Prosperity.

13         Q    Can you be more specific?

14         A    It was an August letter from Prosperity --

15         Q    Okay.  And when you answered that

16    interrogatory -- I'm sorry.  When you answered that

17    request for admission, were you in possession of the

18    authenticated record you're referring to?

19         A    I don't believe so.

20         Q    You don't believe so?

21         A    I don't believe so.

22         Q    Okay.  So had you seen an authenticated

23    record?

24         A    I think my counsel had.  I don't -- I

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    don't -- I'm not positive.

2         Q    Did you review these requests for admission?

3         A    I did.

4         Q    Okay.  And I'll ask you the question.  If

5    your counsel had an authenticated record on June 11,

6    2023, you would have produced that.  Correct?

7         A    Correct.

8         Q    Okay.  And if you produced no letter from

9    Prosperity that you're referring to, then you didn't

10   have it?

11        A    That would make sense.

12        Q    Okay.  Help me reconcile this.  If you and

13   your counsel don't have a letter from Prosperity on

14   June 11th, how do you have sufficient information to

15   admit or deny that?

16        A    I believe it -- I believe that was in

17   conversations and/or with my counsel and Prosperity

18   counsel.

19        Q    So you're telling me other counsel told you

20   that an authenticated record existed, and you relied

21   upon that in answering request for admission?

22        A    I'm trying to recall.  I think that may be

23   the case.

24        Q    All right.  Go to request 9, please.

Page 222

1          A      Request 9.

2          Q      Okay.  Admit that the bondholders do not

3     have control over the Prosperity account ending in

4     0188.  Denied.  Correct?

5          A      Correct.

6          Q      Okay.  Is that still your answer sitting

7     here today?

8          A      I believe so.

9          Q      Okay.  Did you sit through -- oh.  Strike

10    that.

11              In the Prosperity 30(b)(6) deposition, did

12    you hear their corporate rep state no one has control

13    over that account except for Prosperity Bank's legal

14    department?

15         A      I may have missed that particular answer,

16    that particular question.

17         Q      Are you saying you didn't hear that?

18         A      I'm saying I may have missed it.

19         Q      Okay.  Well, then I'll make -- I'll ask you

20    this.  Do you have any -- do you have any reason to

21    dispute that Prosperity Bank's corporate

22    representative stated under oath no one has control

23    over the 0188 account except for Prosperity Bank's

24    legal department?

1          A      The only thing I would say in response to

2     that is the August letter from Prosperity Bank's

3     counsel that talks about the fact that the bond -- the

4     account is being held pending the bondholder and/or

5     the debtor's consensual -- joint consensual

6     instruction on what to do.

7          Q      The same letter that you did not have when

8     you answered this request for admission?

9          A      That's right.

10         Q      Okay.  Let's go -- you might want to be able

11    to flip back that.

12                    MR. HILLYER:  Let's enter the -- admit

13    the interrogatories next.

14                    MR. LANGLEY:  Exhibit 27.  And it is

15    introduced.

16                    (Exhibit 27 was marked for

17                    identification.)

18                    MR. HILLYER:  27 should pop up right

19    now.

20                    THE WITNESS:  We're bringing it up

21    right now.  Trustee's Responses and Answers to Joint

22    First Set of Interrogatories.

23    BY MR. HILLYER:

24         Q      Okay.  And look at interrogatory Number 1.

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1     This is your factual basis for responses to each RFA,

2     request for admission, that was a denial.  Very bottom

3     of the page is admission 6.  And admission request 6 I

4     will read to you so you don't have to flip back.

5          That was the "Admit that the bondholders do

6     not have an authenticated record related to the

7     Prosperity account ending in 0188" that you said you

8     denied, but that you based that denial on an August

9     letter from Prosperity Bank.  Is that correct?

10         A    Correct.  The proposition with which the

11    trustee does not necessarily agree and reserves all

12    his rights and your exhibit sticker is on it covering

13    some of the words there, but.

14         Q    Oh.  I apologize.  We'll see if we can --

15              MR. LANGLEY:  Do you want me to reissue

16    it?

17              MR. HILLYER:  Well, I can read it.

18    BY MR. HILLYER:

19         Q    The letter from Prosperity informing the

20    bondholders of the new account may be construed as an

21    authenticated record, a proposition with which the

22    trustee does not necessarily agree and reserves all of

23    his rights with respect thereto.  Okay?

24         A    Yes.

Page  225

1        Q    Okay.  So that is a specific reference to a

2    letter from Prosperity.  And I'll ask you again.  Do

3    you know what letter you're referring to?

4        A    I believe that August letter that I've

5    referred to before.

6        Q    Okay.  Do you know of more than one letter

7    from Prosperity in August?

8        A    I'm not positive.

9        Q    Are you referring to an August 31st letter

10    from Prosperity?

11        A    Now that you mention that date, that sounds

12    familiar.

13        Q    Okay.  And so I want to ask you this.  So is

14    it your common practice to respond specifically in

15    interrogatories to documents that you don't have in

16    your possession, but you're willing to make a

17    statement under oath about?

18              MR. RUKAVINA:  I object to that

19    question.  He was referring to an admission that is

20    not filed or signed under oath.

21    BY MR. HILLYER:

22        Q    Okay.  I'm asking you swore to your

23    interrogatories.  Correct?

24        A    I did.

Page 226

1        Q    Okay.  And you swore to the factual basis

2    that the letter from Prosperity informing the

3    bondholders of the new account may be construed as an

4    authenticated record?

5                   MR. RUKAVINA:  No.  He swore to why he

6    denied your admission.  Come on, Cam.

7                   MR. HILLYER:  Okay.  You've already --

8                   MR. RUKAVINA:  Stop trying to imply

9    perjury.  You asked him to admit or deny.  He denied.

10   And he told you why he denied.

11                  MR. HILLYER:  Davor, object, please, or

12   not.  But these are just speaking objections.  You

13   can't answer for him.

14   BY MR. HILLYER:

15       Q    What I'm asking is, to be clear, Mr. Seidel,

16   you didn't have the letter that you're referring to in

17   admission 6.  We can make it that -- interrogatory 1,

18   response to admission 6, the letter that you're

19   referring to in that response, you did not have and

20   you had not seen?

21       A    I don't know that.

22       Q    Okay.  If you had it or had seen it, you

23   would have produced it.  Correct?

24       A    I would have instructed by counsel to

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    produce it.

2         Q    Okay.  Do you have any reason to believe

3    that you had the August 31st letter in your

4    possession, and you failed to produce it?

5         A    I don't know if that -- for instance you

6    found that there was an email from Baxter Bates, or

7    whatever his name is, that I didn't get to you.  I

8    mean, things happen like that.

9         Q    Okay.  Things happen as in --

10        A    That's a common practice.  I've been doing

11   this 35 years.  I can't remember the last time I got

12   interrogatories and requests for admissions in a 9019.

13        Q    Okay.  Well, again, I'm going to ask you.

14   Would you agree with me that this August 31st letter

15   that you're referring to -- and we will introduce it

16   as an exhibit -- it's a pretty significant document in

17   this current dispute?  Is it not?

18        A    It is an important document.

19        Q    Okay.  Do you think that you would miss

20   producing an important document that was specifically

21   referenced in interrogatories?

22        A    I would hope not.

23        Q    Okay.  Give me one second.

24             MR. LANGLEY:  We introduced the other

                                              Page 228

```
 1      one, didn't we?

 2                      MR. HILLYER:  Yeah.

 3                      MR. LANGLEY:  It's Exhibit 16 for

 4      Prosperity.  I got it.

 5                      MR. HILLYER:  Okay.  So we're going to

 6      bring up the letter that we're referencing.  And it's

 7      already to be marked Prosperity 16.  But I think we'll

 8      remark it as --

 9                      MR. LANGLEY:  Trustee 28.

10                      MR. HILLYER:  Trustee 28.

11                      (Exhibit 28 was marked for

12                      identification.)

13                      UNIDENTIFIED SPEAKER:  Do you want me

14      to scroll down?

15                      THE WITNESS:  Yes.

16                      UNIDENTIFIED SPEAKER:  Do you want me

17      to scroll?

18                      THE WITNESS:  Mm-hmm.  Okay.  We have

19      it up.

20                      MR. HILLYER:  Okay.

21                      UNIDENTIFIED SPEAKER:  Do you want to

22      see the attachment?

23                      THE WITNESS:  Sure.

24                      MR. HILLYER:  Are you ready, Mr.
```

Alpha Reporting                          800-556-8974
A Veritext Company                      www.veritext.com

1    Seidel?

2                    THE WITNESS:  Yeah.  I have it up.

3    BY MR. HILLYER:

4         Q    Okay.  So is this the letter that you were

5    referring to in your interrogatories?

6         A    I believe so.  Yes.

7         Q    Okay.  And I believe that in the request

8    number 9 which I'll read to you again, which was admit

9    the bondholders do not have control over the

10   Prosperity account ending in 0188.  You denied that.

11              And your interrogatory response was the

12   letter from Prosperity, was referenced to the letter

13   of Prosperity informing about the new account may be

14   construed as an authenticated record.  So now that we

15   have the letter up is -- can you show me in this

16   letter where Prosperity Bank gives control of the 0188

17   account to the bondholders?

18                   UNIDENTIFIED SPEAKER:

19   Signatures -- signatures.

20                   THE WITNESS:  "The funds will remain

21   that secured account pending resolution of the

22   conflicting instructions, notices, and directions from

23   the company and controlling agent with respect to the

24   transfer of the funds.  Attached is a document showing

Page  230

1    the funds in the secured account."

2    BY MR. HILLYER:

3        Q    Okay.  So are you saying that line is -- you

4    construe that line as giving control over the 0188

5    account to the bondholders?

6        A    I construe that line as yes.  That I can't

7    go grab that money.

8        Q    Okay.  Do you construe that line that the

9    bondholders can go grab that money?

10       A    I don't know.  I'm not their lawyer.

11       Q    Okay.  But you construe that line that you,

12   as trustee, cannot go grab that money?  I mean, isn't

13   that what you just said?

14       A    That's what I just said.

15       Q    Okay.  But you're saying you're not sure if

16   the bondholders can go grab that money.  Is that what

17   you're saying?

18       A    I don't know what their appetite and/or

19   their positions with regard to all that are.  I don't

20   know what their rights and remedies are.  I'm not a

21   banking lawyer.  But I'm just telling you I can't go

22   get it.  And my --

23       Q    Okay.  Well -- sorry.

24       A    Sorry.  And at the end of my answer there,

Page 231

1     it's not -- I don't necessarily agree with that.

2          Q    You don't agree with what?

3          A    That proposition.  If you go back and read

4     what we read before.  I don't have it up.  Do you want

5     to bring it back up?

6                    MR. RUKAVINA:  Was it the

7     interrogatory?

8                    THE WITNESS:  Mm-hmm.

9                    MR. RUKAVINA:  Do you remember what

10    exhibit it is?

11                   THE WITNESS:  No.  I don't remember

12    what exhibit it was.

13                   MR. RUKAVINA:  Twenty-seven.

14                   THE WITNESS:  Twenty-seven.

15                   MR. RUKAVINA:  Is that it?

16                   THE WITNESS:  Yeah.  There it is.  The

17    proposition.  The letter from Prosperity informing the

18    bondholders.  What we read before.  May be construed

19    as an authenticated record, a proposition with which

20    the trustee does not necessarily agree and reserves

21    all rights.

22    BY MR. HILLYER:

23         Q    All right.  So I'll rephrase that.  Do you

24    believe this August 31st letter is an authenticated

1    record?

2        A    I'm not sure that it is.

3        Q    Okay.  Do you sitting here today believe

4    that this letter gives the bondholders control over

5    account 0188?

6               MR. RUKAVINA:  Objection to the extent

7    that calls for a legal conclusion.

8        A    They have some control.

9        Q    What control do they have?

10        A    They can prevent me from grabbing the money.

11        Q    Okay.  So their control was to prevent you.

12    But do they have any ability to go unilaterally

13    withdraw funds from 0188?

14        A    I'm not a banking lawyer.  I don't know.

15    I'm just telling you they have some right of control

16    there.  I can't go grab the money as if it were any

17    debtor account.  That to me is control.

18        Q    Okay.  So do you think that this letter is

19    important in an analysis of the bondholders perfection

20    in those funds?

21        A    I don't know that it is.

22        Q    Why would you say that?

23        A    Because I don't know that it is.

24        Q    Do you know that it's not?  Let me -- strike

1    that.  We'll rephrase it.

2         Do you think authenticated records are

3    important in determining perfection in bank accounts?

4         A    Yeah.

5         Q    Okay.  Do you think this letter is important

6    in determining the bondholders perfection in a bank

7    account?

8         A    Not necessarily.

9         Q    Okay.  Did you or your team consider this

10   letter in their analysis?

11                   MR. RUKAVINA:  I object.

12                   And instruct you not to answer to your

13   team portion of that.  You can answer to the extent

14   you considered it in your analysis.

15                   THE WITNESS:  I looked at the letter,

16   but it's not, as you mentioned, an authenticated

17   document.

18                   MR. HILLYER:  Can we jump off the

19   record real quick so I can talk to Davor?

20                   THE VIDEOGRAPHER:  We are going off the

21   record.  The time is approximately 2:38 p.m.

22                   (Off the record.)

23                   THE VIDEOGRAPHER:  We are going back on

24   the record.  The time is approximately 2:44 p.m.

Alpha Reporting                          800-556-8974
A Veritext Company                    www.veritext.com

1          MR. HILLYER:  All right.  Mr. Seidel,

2     thank you for that short break.  For the sake of

3     brevity and everyone's time to make this faster, I

4     believe we've reached a stipulation with you and your

5     counsel.  And I'll state it for the record subject to

6     your counsel or your input.

7          There were a number of exhibits used in

8     the Prosperity Bank 30(b)(6) conducted on September

9     6th.  A portion of those exhibits -- or a portion of

10    those exhibits were not included in any production

11    that we received from the trustee.

12         And we are asking the trustee to

13    stipulate at this time that if there is an

14    exhibit -- for example, an email from a Michelle Ross

15    on August 18 --

16         MR. RUKAVINA:  Stop.  Stop.  Stop.

17    Stop.  Cam, you're making this again overly

18    complicated.

19         MR. HILLYER:  Okay.  Then what --

20         MR. RUKAVINA:  Whatever is an exhibit

21    to the Prosperity deposition that was not produced to

22    you by the trustee as of June 11, 2023, was not in his

23    possession.

24         MR. HILLYER:  Okay.

Page 235

```
 1                    MR. RUKAVINA:  Other than
 2      possibly -- and we don't know right now -- the August
 3      31 letter.  Would that work?
 4                    MR. HILLYER:  Okay.  Exactly.  Okay.
 5                    MR. RUKAVINA:  To that the trustee
 6      stipulates.
 7      BY MR. HILLYER:
 8          Q    So with the same caveat as to the August
 9      31st letter which you're reserving your rights to some
10      future consideration, if you did not have them in your
11      possession or your counsel did not have them in your
12      possession, then you could not consider any of those
13      documents in your business judgment decision as of
14      June 11th?
15                    MR. RUKAVINA:  We're not prepared to
16      stipulate to that.
17                    THE WITNESS:  No.
18      BY MR. HILLYER:
19          Q    Okay.  Well let me ask you.  If you didn't
20      have an email, how could you consider that email in
21      your business judgment as of June 11?
22          A    Various conversations with counsel, with the
23      parties, et cetera.  We can understand the positions
24      back and forth, what may or may not have been sent,
```

Page 236

1    similar to other things that we considered prior to

2    having them.

3              When people tell us their position that

4    there's an email that's -- et cetera.  And we may not

5    have it yet.  But we understand that that's their

6    position and that's what they've told us exists,

7    et cetera.

8         Q    I understand.  So I'll ask you a follow-up

9    question including the August 31st letter or any of

10   the other communications.  Okay?  Do you know of a

11   reason why you would not have had those in your

12   possession on June 11th?

13        A    I'm not positive.

14        Q    Okay.  Well, let me ask it a different way.

15   Do you usually settle a 4.4 million dollar claim

16   without getting all of the documentation?

17        A    I usually try to have the lay of the land

18   when I do a settlement and get -- and documents,

19   et cetera.

20        Q    Okay.  If you believe something is a close

21   call, wouldn't that give you heightened scrutiny to

22   make sure that you had all the documentation and

23   communications necessary?

24        A    Not necessarily.  If somebody had a silver

1    bullet, they could send it to me.  I don't have that

2    silver bullet.  People are telling me what's what.

3         Q    I'm not sure I understood.  What are you

4    talking about, a silver bullet?

5         A    In other words, if you've got a silver

6    bullet that says here is the document that showed

7    evidence of "A," and that everybody else is all wet no

8    matter what it is with regard to the contemplated

9    litigation, that's what is -- what I would call the

10   critical silver bullet, email, or piece of information

11   that you want to make sure you have.

12        All these parties were highly motivated to

13   send us documentation to the effect that would support

14   their position or not.  And so if anyone had such a

15   silver bullet, I would talk them and have them send it

16   to us.

17        Q    Okay.  Well, then I'll ask it to you this

18   way.  Why would an adverse party send you a silver

19   bullet as a Chapter 7 trustee?

20        A    Well, because they're going to

21   get -- they're going to have to eventually disclose

22   any and all documents.  So we operate with the people

23   we know around here.  We get the documents.  It's a

24   little more informal.

Page 238

1      Q    Okay.  Did you send any formal document

2    request to Prosperity Bank?

3      A    I don't recall.

4      Q    Okay.  Do you have any personal knowledge of

5    document requests sent to Prosperity Bank?

6      A    I can't remember.

7      Q    Okay.  Well, I believe you just said we're

8    going to get all that documentation.  Who is going to

9    do that, Mr. Seidel?

10     A    My counsel.

11     Q    Did they do that?

12     A    I believe they got documents from Prosperity

13   Bank.

14     Q    Okay.  When did they get -- well, let me

15   rephrase that.

16          Your counsel received voluminous documents

17   from Prosperity Bank when they were copied on

18   responses to FedEx and ARRIS's request for production.

19   So that's what I'm asking you specific is:  Did you

20   specifically or your counsel request documentation on

21   behalf of the trustee before you did the settlement?

22     A    I don't believe I did.  And Ms. Funk who was

23   running point on this matter at this time, I believe,

24   was getting documents in from Prosperity.

Page 239

1          Q    Give me one second.  All right.  Mr. Seidel,

2     I'm going to publish what's 1164.

3          A    That's no one's published.

4                    MR. LANGLEY:  Exhibit 29.  It is

5     published.

6                    (Exhibit 29 was marked for

7                    identification.)

8                    MR. RUKAVINA:  I need your help.  I

9     need your help, Adam.  I lost the exhibits.

10                   MR. HILLYER:  Which folder did you

11    lose?

12                   MR. RUKAVINA:  We got it back.  It's

13    back now.  Did Adam say Exhibit 21?

14                   THE WITNESS:  Did you say 21?

15                   MR. LANGLEY:  Twenty-nine.

16                   MR. HILLYER:  Twenty-nine.

17                   MR. RUKAVINA:  Oh.  Ours stops at 21.

18                   THE WITNESS:  We're done at 21.

19                   MR. HILLYER:  Are you in the Prosperity

20    exhibits folder?  Or were you in the trustee folder?

21                   THE WITNESS:  Where is the Prosperity?

22    Oh.  There it is.  You don't see Prosperity?

23                   MR. RUKAVINA:  But he wants me to go to

24    yours.

                                        Page 240

```
 1                    THE WITNESS:  No.  He wants to go to

 2      Prosperity.

 3                    MR. RUKAVINA:  Oh.  He wants to go to

 4      Prosperity.

 5                    THE WITNESS:  Yeah.  And then you said

 6      Prosperity documents.  Right?

 7                    MR. LANGLEY:  Y'all should be in the

 8      trustee deposition for the 13th.

 9                    MR. RUKAVINA:  It stops at 21.

10                    THE WITNESS:  Twenty-one.

11                    MR. HILLYER:  Okay.  Then I guess we

12      need to go off the record and get it fixed.  So what

13      is the last exhibit --

14                    MR. RUKAVINA:  Cam, does anyone else

15      have it -- or is just my lack of knowledge?

16                    MR. HILLYER:  I don't know.  If anyone

17      else can respond.

18                    UNIDENTIFIED SPEAKER:  I have Exhibit

19      29 up in front of me.

20                    MR. RUKAVINA:  Then the problem is on

21      my side.

22                    UNIDENTIFIED SPEAKER:  I have 29 up.

23                    MR. RUKAVINA:  Give us a second.  Yeah.

24      Let's go off the record so we're not burning any of
```

Page 241

1    his time.

2                    THE VIDEOGRAPHER:  We're going off the

3    record.  The time is approximately 2:54 p.m.

4                    (Off the record.)

5                    THE VIDEOGRAPHER:  We're going back on

6    the record.  The time is approximately 2:55 p.m.

7    BY MR. HILLYER:

8         Q    Okay.  So, Mr. Seidel, this is an email from

9    bond counsel to your counsel asking did Brenda -- I'm

10   assuming that's Brenda Funk -- get all the documents

11   she had requested from Victoria?  And that would be

12   Victoria Argeroplos, counsel for Prosperity Bank.  And

13   your counsel responds nothing.  Do you see that?

14        A    Let me look.  Yes.  That's what that says.

15        Q    Okay.  So I'm going to ask you, this is

16   dated May 10th.  This is a significant time after you

17   had filed a settlement motion and were in negotiations

18   with the bondholders and Prosperity.  Why don't you or

19   your attorneys have documents you've requested?  And

20   why did you go forward with a settlement when you

21   didn't get documents you requested?

22        A    I think my counsel did have documents.

23        Q    Okay.  Then help me understand "nothing."

24   Your counsel --

                                              Page 242

1          A     I'd have to ask Mr. Rukavina.  I don't know.

2     I wasn't in that email.  I'm not copied on that email.

3          Q     Okay.  What's your understanding of that

4     email?

5          A     I don't have an understanding of that email.

6          Q     Okay.  Do you think it's a very complex

7     sentence to say did trustee's counsel get all the

8     documents you had requested from Prosperity, and the

9     answer is nothing?  Doesn't that lead you to believe

10    that your counsel received nothing they had requested?

11                MR. RUKAVINA:  Objection.

12         A     No.

13                MR. RUKAVINA:  Speculation.

14         A     No.  Maybe they were requesting something

15    more particular, more precise, more -- one document or

16    another that they're looking for.  I don't know.  I

17    wasn't there.  I'm not even copied on this.  So go

18    ahead.  I mean, I'm sure we can get the phone and you

19    can talk to Mr. Rukavina, and he can walk you through

20    what that means.

21         Q     Okay.  So what is your understanding of the

22    documents that you had on May 10th?  Do you know?

23         A     We had a laundry list of documents.

24         Q     Okay.  Generically, what are they?

Alpha Reporting                           800-556-8974
A Veritext Company                     www.veritext.com

```
 1          A     I don't know.

 2          Q     Okay.  So sitting here today, you don't know

 3     what you had?

 4          A     I cannot recall what all documents we had on

 5     the date specific that you mentioned from Prosperity.

 6     What all documents we had exactly, et cetera.  Now if

 7     you want me to -- well, no.  Never mind.

 8          Q     And do you know what any specific documents

 9     that you would have requested but not received at this

10     point that would have been referenced in this letter?

11          A     I don't recall what that would have been.

12          Q     Give me one quick second.

13                    MR. RUKAVINA:  Cam?

14                    MR. HILLYER:  Yes.  We're --

15                    MR. RUKAVINA:  Can we take a restroom

16     break in the next 15 minutes, please?

17                    MR. HILLYER:  Yeah.  We're going quick

18     now.  All right.

19                    Okay.  Let's bring up the second

20     request for admission and the second set of

21     interrogatories.

22                    MR. LANGLEY:  Want to put up at the

23     same time?

24                    MR. HILLYER:  Sure.  Go ahead and
```

Page  244

1    publish them both at the same time so we can go back

2    and forth.

3                    MR. LANGLEY:   Exhibit 30 is being

4    introduced.   It's the second set of

5    interrogatory -- or second set of RFA responses.

6                    (Exhibit 30 was marked for

7                    identification.)

8                    And Exhibit 31 is being introduced.

9    It's the second set of interrogatory responses.

10                   (Exhibit 31 was marked for

11                   identification.)

12                   Both are published.

13                   THE WITNESS:   Okay.

14   BY MR. HILLYER:

15        Q    Okay.   Look at request for admission 22.

16        A    Okay.

17        Q    So, Mr. Seidel -- hold on.   So this request

18   is basically admit that you did not have the August

19   31st letter from Prosperity prior to entering the

20   proposed settlement and the -- and you denied it.   Is

21   that still your answer today?

22        A    I'm not positive.   But I don't see where it

23   says August 31st here.   But it says the letter from

24   Prosperity.   But --

                                        Page 245

1      Q    Okay.  Well, then clarify.  That quoted

2  language is from your previous response.

3      A    Right.

4      Q    I believe we've clarified the letter from

5  Prosperity is the August 31st letter?

6      A    Okay.

7      Q    Okay.  Did you have a copy of that August

8  31st letter when you entered into the proposed

9  settlement that you presented?  And the proposed

10  settlement is defined as beginning at motion 1, March

11  22nd.

12      A    Wait a second.  What?  Where is it?

13      Q    Hold on one second.

14           MR. LANGLEY:  I can pull it up if you

15  want.  It would be faster.

16  BY MR. HILLYER:

17      Q    Okay.  Well, let's go to -- the proposed

18  settlement, I believe, is defined as at this juncture,

19  is you going through motion 1 and motion 2.  Okay?

20  And so I guess my question is, is let's use at each

21  motion, you denied that you had -- that you didn't

22  have that letter.  Okay?

23           And I guess what I'm asking you is did you

24  have that letter on March 22nd when you filed the

1    motion?  The motion 1?

2         A    I'm not positive.

3         Q    Okay.  Did you have that motion -- did you

4    have that letter when you filed the second motion on

5    March 22nd?

6         A    I'm not positive.

7                   MR. RUKAVINA:  March?  You mean May

8    22nd?

9                   MR. HILLYER:  May 22nd.  That's

10   correct.  I apologize.

11                  THE WITNESS:  I'm not positive.

12   BY MR. HILLYER:

13        Q    Okay.  Request Number 23.  Admit that you

14   did not investigate whether the letter informing the

15   bondholders in their account is an authenticated

16   record prior to entering the proposed settlement.

17   Same question.  Did you investigate the August 31st

18   letter prior to March 22nd?

19        A    I believe so.  I --

20        Q    Okay.  How did -- I'm sorry.  I apologize.

21        A    Ask me the question again, would you?

22        Q    Okay.  How did you investigate it if you did

23   not have it?

24        A    If I didn't have it, I wouldn't have

Page 247

1    investigated.

2         Q    Okay.  Well, let me ask you a general

3    question.  Is it possible to investigate an email or a

4    communication or a letter if you are not in possession

5    of it?

6         A    Yes.

7         Q    How is that?

8         A    You can hear about it.  You can have

9    conversations about I sent you a letter to this

10   effect.  Here's what it says basically, that this and

11   this happened, et cetera.

12        Q    Okay.  And so again, Prosperity Bank and the

13   bondholders are adverse parties to you that you're

14   settling with?

15        A    Correct.

16        Q    Okay.  So again I ask is, you were taking

17   their oral statements and investigating oral

18   statements rather than documents or communications?

19        A    I think we can do all of the above.

20        Q    Okay.  Request 24.  Admit that you did not

21   investigate the nature of the Prosperity account

22   ending in 0188 prior to entering the proposed

23   settlement.  Denied.  Is that still your answer today?

24        A    Yes.

Page 248

1       Q      Okay.  And so how did you investigate

2    account 0188 prior to March 22nd?

3       A      Conversations with counsel, my counsel,

4    their counsel.

5       Q      Okay.  Motion 1 and motion 2 you called it

6    an escrow account.  Do you recall that?

7       A      I'm not positive.  You can show it to me.

8       Q      Well, I guess I'm asking you is, when did

9    you become aware that it is actually a bank account

10   with a number?

11      A      I don't recall.

12      Q      0188.

13      A      I don't recall the exact date it had been.

14      Q      Okay.  Did you know that before you filed

15   motion 1 on March 22nd?

16      A      I believe we did.

17      Q      Why would you call it an escrow account

18   rather than call it a bank account and use the number?

19   Why would you do that in a motion?

20      A      I would think it would show that that's how

21   the parties were treating it.

22      Q      Do you think it's an escrow account?

23      A      Sitting here today?

24      Q      Yes.

Page 249

```
 1        A    I don't think it's an escrow account sitting

 2   here today.

 3        Q    Okay.  Do you think it's a deposit account?

 4        A    I'm not positive.  I'm not a -- I'm not a

 5   bank lawyer.

 6        Q    Okay.  Did you hear the bank representative

 7   call it a deposit account?

 8        A    I did.

 9        Q    Okay.

10              MR. RUKAVINA:  Remember that restroom

11   break coming up soon, Cam.

12              MR. HILLYER:  I know I promised it to

13   you.  I'm looking at my clock.  I'm trying to finish

14   up.

15              MR. RUKAVINA:  I know.  Just find a

16   convenient spot.  I don't want to stop you in the

17   middle of a line of questions.

18              THE WITNESS:  Do you mind if I sign

19   these documents while you look for the page --

20              MR. HILLYER:  Sorry?

21              THE WITNESS:  I'm going to sign these

22   documents while you're looking.

23              MR. HILLYER:  Oh.  Please.

24              THE WITNESS:  Okay.  But I'm ready for
```

                                        Page 250

1      you whenever you say.

2      BY MR. HILLYER:

3           Q     One more question, Mr. Seidel, and I think

4      we're done.  The second set of interrogatories and the

5      second set of requests for admission are both dated

6      8/25/23.

7           A     I think that's right.

8           Q     Okay.  And on the same date, counsel for

9      FedEx and ARRIS received a letter from your counsel

10     stating that with respect to non-privileged documents

11     and communication responsive to the request, the

12     trustee has no new documents and communications to

13     produce separate and apart from what he previously

14     produced.  Is that your understanding to be correct?

15                    MR. RUKAVINA:  Let's pull up the

16     letter.

17                    MR. HILLYER:  Okay.

18                    MR. RUKAVINA:  I can find the letter,

19     or you can put it up on the --

20                    MR. HILLYER:  I'll put it up.

21                    MR. LANGLEY:  Tell me something about

22     it.

23                    MR. HILLYER:  It will be

24     third -- second set RFP.

Page 251

1          MR. LANGLEY:  Okay.  It's ready.

2          MR. RUKAVINA:  Okay.  He said it's

3    coming.  Is that 32?

4          THE WITNESS:  Thirty-two?

5          MR. RUKAVINA:  Yeah.  There it is.

6    BY MR. HILLYER:

7      Q    I'm literally just looking just at the first

8    paragraph.  It's just, for the record, that you stated

9    that you had no new documents to produce in the second

10   RFP.  And that any document that you came into your

11   possession is the result of the production of

12   Prosperity.

13          I was just asking you confirm is everything

14   that you gave us on June 11th to the request for

15   admission, that is all the documents that you

16   independently obtained and anything else would have

17   been obtained from production from Prosperity.  Is

18   that correct?

19     A    First of all, I didn't say anything.  I'm

20   not even copied on this.  So when you say you, my

21   counsel sent this letter and that might be a fair

22   rendition of what you're referring to paraphrasing

23   that paragraph.

24     Q    Okay.  And your counsel is responding on

Page 252

1    your behalf to a request for production of documents?

2         A    That's right.

3                   MR. HILLYER:  Okay.  Mr. Seidel, thank

4    you so much for yesterday and today.  And I'll pass

5    you to Mr. Schottenstein.

6                   MR. RUKAVINA:  Let's go on break?

7                   THE WITNESS:  My pleasure.

8                   MR. HILLYER:  Oh.  Yeah, yeah.  I

9    promised Davor.  Yeah.  Let's go off the record and

10   take a quick break.

11                  THE VIDEOGRAPHER:  We're going off the

12   record.  The time is approximately 3:13 p.m.

13                       (Off the record.)

14                  THE VIDEOGRAPHER:  We're going back on

15   the record.  The time is approximately 3:29 p.m.

16                  MR. SCHOTTENSTEIN:  All right.  Thank

17   you, Mr. Seidel.

18                  And for the reporter, this is Noah

19   Schottenstein for ARRIS.

20                       EXAMINATION

21   BY MR. SCHOTTENSTEIN:

22        Q    I've got just a few broad narrative

23   questions here for you, Mr. Seidel.

24        A    Yes, sir.

Page 253

1          Q     So I would just, kind of -- I'd like you to

2     walk me through, you know, how you think this

3     settlement is going to impact your administration of

4     the estate.  Like what are the practical consequences

5     of this from your view?

6          A     We're going to get $350,000 in.  We're going

7     to pay down secured debt substantially to the tune of

8     4.4-ish.  We're going to avoid a massive fight by and

9     among bondholder, Prosperity, and the administratively

10    insolvent estate.

11              And we're going to be able to focus our

12    efforts on the folks that created this mess for all

13    the creditors.  And we've been very distracted with

14    this deal.

15         Q     So I guess my question -- one of my

16    questions here -- is why this fight now?  I mean, have

17    you explored ways to table this until, you know,

18    you've had a chance to look at, you know, some of the

19    more evident bad guys?  You know, the Frinzi and

20    Goodman, et al.?

21         A     We're moving on all fronts, you know, which

22    you hate to do.  And I'm glad to have any kind of

23    strategy session with you off or on the record.  And I

24    don't want this out there for the world.  But we are

Page 254

1    moving on all fronts against the bad guys.

2            With regard to tabling this, the bondholders

3    have been more than insistent that this matter move

4    forward, or they're going to bring it to the court's

5    attention which would gin all this up.  Prosperity

6    obviously is not going to do anything at this point in

7    time with regard to any of this.

8            So it's just I hear what you're saying on,

9    you know, hey, why don't we just kick this to the curb

10   and go do other matters.  But this was a matter was

11   there.  It's ripe.  It's ready to go.  Let's pay

12   creditors.  Let's get money in.

13           Let's continue -- continue to march against

14   the bad actors is what I'd like to do.  That's

15   generally without trying to divulge a lot

16   of -- because like I said --

17       Q    Sure.  And I don't want any specifics about

18   that, of course.

19       A    Yeah.  Of course.

20       Q    And so I guess my question then following on

21   from that is after the first motion, the objection,

22   and this got more complicated, why not -- and I guess

23   I want to -- you know, I'm not asking for

24   conversations with your counsel.

                                              Page 255

1          But I want to know, did you consider just

2    letting the bondholders file their objection and

3    letting everyone else fight it out?

4          A    That was a consideration.  Yes.

5          Q    Okay.  And so what -- I'm really just -- I'm

6    trying to understand here.  What have you -- in the

7    past, have you encountered these types of situations

8    before?  What's your experience with this specific

9    with -- you know, with this type of, you know, I'd

10   call it an interpleader in an ordinary district court

11   sense.

12         You know, can you tell me about similar

13   situations you've had in the past about being between,

14   you know, two different parties like this.

15         A    In my career, and I'm getting to be an old

16   man.  Everybody reminds me all the time.  I've never

17   seen anything like this with regard to a 9019 kind of

18   a Rambo -- not you, sir.  But kind of, the venom.  And

19   I don't understand it.  For the life of me, I don't

20   understand the apparent ignoring of the cost and

21   expense of all of this.

22         You're asking me if I've experienced this

23   before.  So I'm telling you I have not seen anything

24   like this ever.  Never even heard of it.  But it just,

Page 256

1       for me, I don't understand.  I don't understand it.

2       But it is where it is.  You know, I've tried to move

3       the matter forward.

4               I would hope that we've got a motion pending

5       now that is there for approval, and is there for

6       anyone to shoot at that can come up with a better

7       concept for the estate albeit someone wanted to buy

8       the action that benefits the estate and perhaps

9       benefits themselves.  That's greatness.  And that, I

10      think, would be a great answer trying to move that

11      ball forward.

12              If someone wants to step up and fund it,

13      that would be a great answer and would change dynamics

14      perhaps.  So filing this motion is pushing the matter

15      forward, pushing things forward, so that we're not

16      languishing.  I'm supposed to be liquidating assets

17      and moving balls forward.

18              So I don't know if that answered your

19      question, sir, but that's, kind of, you're

20      getting -- getting some knee jerk reaction from me.

21          Q    Sure.  And so, I guess, does it -- what's

22      your -- I'm sorry.  Strike that.

23          A    Yes, sir.

24          Q    You know, in your experience as a Chapter 7

Page 257

1    trustee, how many cases have you seen where

2    the -- where estimated -- you know, again I

3    understand, you know, you haven't done your claims

4    analysis yet.  But where it looks like you've got such

5    a heavy concentration of two creditors at the top of

6    the claims pool.

7         A    Yes.

8         Q    Can you tell me about other cases you've had

9    with a similar set-up?

10        A    Yeah.  There was a case called Terra, and we

11   had some other cases, Jupiter.  And Terra had a 99

12   percent creditor body.  We had some others like that.

13   And, you know, sometimes they're on board, and

14   sometimes they're not.  And to give deference to

15   reasonable views.

16             And you know, for example, in this scenario

17   here, the AMRR deal.  I'm scratching my head on that.

18   I did not understand the objection.  It didn't make

19   financial sense to me to object to that.  I don't

20   understand it.  But again I pushed -- pushed forward

21   to try to get money in here and save a melting ice

22   cube so to speak.

23             So to answer your question, you know,

24   sometimes it might be other dynamics at play that I

Page 258

1    can't make sense of for the -- for the benefit of the

2    estate.  Sometimes people want to roll the dice

3    because it's not enough.

4              In other words, we do a settlement.  The

5    creditor body doesn't think it's enough.  Hey, go

6    swing for the fences.  You guys go do all the work.

7    You guys go expend all the money.  You guys take all

8    the risk because there's not enough in this for me at

9    the end of the day.

10             And you know, like you know, good old Judge

11   Emerson [ph] used to say, you can fund it or you can

12   buy it.  And whether that's the 99 percent creditor or

13   whatever.  So I'm sorry.  I, kind of, just went off

14   there.

15       Q    Sure.  So do you want to tell me -- again

16   have you -- you know, you mentioned the Jupiter case.

17   So you know, what happened in that case that's

18   relevant to what happened here with AMRR -- sorry.

19   Not AMRR.  Strike that.  ARRIS and FedEx?

20       A    It was a -- it was a very, very ugly

21   involuntary petition.  A lot of money went out and,

22   you know, we were in charge of going forth and trying

23   to make sure that creditors were paid and to the

24   extent we could.

Page 259

1             And so the similarity is creditors were very

2     anxious to, you know, turn over every rock.  And we

3     brought lots of actions.  But then at the end of the

4     day we did a settlement.  It was fair and reasonable

5     in the mind of the judge.  And so it got approved.  I

6     guess it's why that one jumped to my mind.

7          Q    And how much was in dispute there?

8          A    It was millions.  I can't remember.

9          Q    Just you know, ballpark it for me.

10         A    I think 45, 50 million.  Something like

11    that.  I --

12         Q    Okay.  And you --

13         A    Sorry.

14         Q    And were your creditors on board there?

15         A    My creditors in that instance were not on

16    board with anything for a long while.  And as time

17    went by at the end of the day once the deal came

18    around they were -- they ended up being silent.

19         Q    All right.  And can you tell me have you

20    ever had any previous experience with this type

21    of -- you know, administering this type of secured

22    asset?  I'm talking about the subject funds just to be

23    clear here.

24         A    I was just going to go back to Jupiter for a

Page 260

1    second.  But let me hear your question again.

2         Q    No.  Sorry.  If you want to, go forward with

3    Jupiter.  I'm wondering about that one as well.  Sure.

4         A    That one had an interesting dynamic as well

5    because it's a little bit like the AMRR deal.  There

6    was a bunch of oil sitting in a refinery.  First, you

7    know, just like these involuntary cases that you're

8    familiar with, the debtor's counsel tells me there's

9    nothing here.

10        And then it pops up on the schedules that

11   there's millions of dollars worth of oil in a refinery

12   down near Houston that supposedly belonged to the

13   debtor.  So there was a big wrestling match over that

14   as we're trying to unearth everything and figure out

15   everything.

16        And of course, with my luck, the judge

17   wanted us to sell oil.  And one day it went negative

18   and it, kind of, went to garbage.  But there was a lot

19   of moving pieces and a lot of angry creditors.  Angry

20   creditor disputes like we're seeing here between FedEx

21   and the bondholders.  I don't know so much about

22   ARRIS.  But that's another part of that.

23        But I don't know that that's that germane to

24   what you're asking, but I thought it was relevant.  So

Page 261

```
 1        I'm sorry.  Your next question?
 2           Q     Actually, you mentioned it.  Let me just
 3     explore that.  Tell me about you said there was an
 4     inter-creditor dispute similar in the Jupiter case?
 5           A     Well, there was creditors fighting over the
 6     oil much like -- you know, now the reason it popped in
 7     my mind is we had, kind of, a tripartite fight over
 8     whose oil it was, whether it was the people that were
 9     storing it; whether it was the supplier of the oil; or
10     whether it was the debtor's oil.
11              And so it was everyone was upset much like
12     here.  Everyone was upset.  You know, bad actors that
13     left everybody high and dry much like here.  And --
14           Q     So tell me.  How did that play out?  Just
15     from the beginning --
16           A     Yeah.  I'm sorry.
17           Q     No.  From the beginning, right?  You know,
18     day one or, you know, whatever that first day is you
19     realized you're -- you know, there's this disputed
20     oil.  Lots of people are asserting rights to it.  Walk
21     me through, you know, how you got from, you know,
22     start to finish on that dispute.
23           A     Well, my practice is -- we haven't worked
24     together a lot, sir, but my practice is to get on the
```

Page 262

1    phone with the impacted parties and try to understand

2    where everybody is coming from and form some kind of

3    consensus and not have litigation.  I mean, I

4    just -- I don't know.

5              I'll tell you I've been doing this so long

6    and I try at all costs to avoid the litigation trap

7    because I know how expensive and the risk of it and

8    the delays of it.  And so I've just seen much go

9    wrong.

10             So to answer your question, I try to get on

11   the phone with everyone and especially if you've got

12   some major creditors like that are impacted in that

13   scenario and see if reasonable minds can prevail to

14   try to obviate a bunch of attorney's fees being spent.

15             And honestly I typically bend over backwards

16   to try to do that.  But the end result on that one was

17   we brought some litigation.  We're trying to settle

18   litigation still to this day.  We've mediated.  We've

19   brought litigation.

20             It got very ugly again just like other cases

21   do, protracted and expensive, because like you know

22   the people that skate with this stuff -- with the

23   money -- now they have money to fight you with.  So we

24   continue to fight.  And we fight and fight and fight

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    until the other side eventually throws in the towel.

2    When --

3         Q     So how long did you --

4         A     I'm talking about the bad guys on that.

5         Q     Yeah.  How long did it take you to work that

6    out?

7         A     I don't know.  A few years.  Two years

8    unfortunately.  And I really tried to get everybody to

9    work together to sell that oil right away when oil was

10   going down.  It wasn't at zero and it wasn't negative.

11   But I could not get a consensus until the judge said

12   enough.  We're selling it today even though oil is

13   negative, so.  It kind of all went into the wall.

14        Q     All right.  So tell me about your experience

15   administering intangible assets.  You know, how many

16   cases or how often do you see these types of accounts?

17        A     The types of accounts that we have here with

18   the DACA and all of the rigamarole with regard to

19   that, we don't see that a lot.

20              You know, the typical scenario, sir, is

21   that, you know, the bank account is in the debtor's

22   name.  Trustee sends demand for the turnover of funds.

23   It comes unless it's at the bank that's claiming a

24   security interest and then we have a little wrestling

Alpha Reporting                    800-556-8974
A Veritext Company                 www.veritext.com

1    match, et cetera.

2           But the scenario we had here is not an

3    ordinary scenario for sure.  And this whole scenario

4    with take the money, put the money back, we've looked

5    into that.  My lawyers have researched it.  It's a

6    matter of first impression like we've talked about

7    apparently.

8           Q    All right.  So tell me about your

9    administration of other secured assets.  What's the

10   most common thing that you administer?

11          A    The most common thing I administer, you

12   know, I swim in the shallow water a lot of times.

13   We'll have a business that shuts down.  It may -- the

14   bank may have a lien on some collateral that may have

15   equity in it.  We sell that, disburse out, go on down

16   the road.  Things like that.

17          Then we'll look at, you know, preferences,

18   fraudulent transfers, et cetera -- D&O policies.

19   Things like that.  So to answer your question, that

20   would be a pretty standard case.

21          Q    Okay.  And do you have a standard process or

22   procedure that you use, you know, when you're looking

23   at administering a secured asset?

24          A    Yeah.  Making sure that there's return to

Page 265

1  unsecured creditors in the deal.  Carve-outs for the

2  unsecureds.  And making sure that that's -- you know,

3  the professionals are protected.  The auctioneer, that

4  he doesn't get burned.  Things of that nature.

5      Q    All right.  And so how do you go about

6  valuing something that looks like it's secured as a

7  matter of your general business practice?

8      A    Well, now in the scenario that I was

9  mentioning, I would get the auctioneer in there and

10  say what do you think we're going to get at the end of

11  the day after your expenses?  And he would give me a

12  number.

13        And I would tell the bank that that's what

14  the number looks like, but we've got to make sure

15  we've got sufficient funds for unsecureds and for

16  auctioneer, et cetera.  So we've got to do carve-outs

17  to make sure that happens.  That would be a typical

18  scenario if that's not too general.

19      Q    Am I correct in understanding based on your

20  earlier testimony that you have not done that here

21  with respect to the bondholders' claims?

22      A    I'm not sure I understand that question.

23      Q    So have you engaged in some sort of

24  valuation process with respect to the bondholders?

Page 266

1    You know, they're asserting they're secured to some

2    extent and from what I recall -- and I apologize.  I

3    was not involved in the case at the early stage here.

4          But there was some sort of change from them

5    looking to be oversecured to then being under-secured.

6    You testified about that, I believe it was yesterday.

7          A    Yes, sir.

8          Q    Yes.  So can you tell me how that evolved?

9          A    Oh, my gosh.  Quite the -- quite the mess.

10    Let me try to get you where I think you're going, and

11    you can let me know if I'm responding.

12          Initially in this case there was all kinds

13    of hanging fruit one of which was this transfer with

14    regard to AMRR by the insiders of the debtor after

15    they basically helped themselves to $44,000,000, Mr.

16    Frinzi, 38 of which went to this AMRR aspect.  And so

17    there was an offer on the table on that for

18    22,000,000.  We had a handshake deal on that.

19          It was early in the case.  We had millions

20    in various other venues supposedly.  And so everything

21    was looking pretty rosy.  And then that picture

22    changed by virtue of the fact that Frinzi did not pay

23    a dollar on the $44,000,000 note, et cetera.  And we

24    had to sell it as you know the other day.  So that

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    dynamic changed with regard to the bondholders and the

2    estate.

3         Q    So is it your view now that there is no, you

4    know, risk that the bondholders are oversecured, and

5    thus would be incurring attorney's fees and interest

6    or, you know, all the other things that are 502 that

7    you get for being oversecured?

8         A    Yeah.  Never say never, you know.  But I

9    don't see -- I don't see it now sitting here today.  I

10   did initially, and I don't now.  So that's a change

11   that I've mentioned to everyone.  And I'm glad to

12   mention to you.

13        Q    Okay.  And so I'm looking at this deal now,

14   this settlement.  And what is your projected return

15   for unsecureds on this on the current value of the

16   deal, assuming this third motion goes through?

17        A    I don't know.  I don't know what it would

18   be, if any.

19        Q    All right.  Do you have a sense of your

20   current attorney's fees on the matter?

21        A    I'm sure it's astronomical.  I'm sure it's

22   high.  This has been a very, very litigious case.

23   There's a lot going on.

24        Q    But today you haven't sat down and looked at

Page 268

1    that to your recent recollection?

2         A    I'm sure it's in -- I'm sure it's

3    $1,000,000.  Here again, you know, I hate to start

4    showing the world what's going on and the targets,

5    et cetera.  But I'm glad to visit with y'all off the

6    phone or on the phone or on the record.  However, you

7    want to go.

8         Q    Okay.  Yeah.  I'm not asking for, you know,

9    anything specific here.

10        A    I hear you.

11        Q    I'm just trying to get a sense of --

12        A    I hear you.  I just hate -- some of this

13   stuff on the record.

14        Q    Sure.  Sure.  I understand that.  And so

15   what -- have you assessed whether there are any

16   collateral -- well, strike that.  I also -- sorry.  I

17   want to phrase this not to draw an objection from

18   Davor here.

19        A    He's ready.  He's like --

20        Q    I know he is.

21        A    He is.

22        Q    I'm trying to bring down the temperature a

23   little bit this afternoon.

24        A    Yeah.  He's much mellower right now.

Page 269

1          Q     All right.  Without saying what they

2     are -- all right?  I'm not asking for specifics.  But

3     I do want to know whether you've assessed, you know,

4     the different potential litigation options and other

5     recovery actions, you know, for this estate.

6               Like, has that occurred?  I don't need -- I

7     don't want you to disclose, you know, other potential

8     defendants besides, you know, the Frinzis and Goodmans

9     we've talked about here.

10               MR. RUKAVINA:  Are you asking about

11     other causes of action related to the Prosperity funds

12     or any and all claims the estate might have?

13               MR. SCHOTTENSTEIN:  Any and all claims.

14     BY MR. SCHOTTENSTEIN:

15          Q     Any and all claims.  And again, I'm not

16     asking -- I'm not asking you to list them out.  But I

17     want to know, you know, what kind of work have you

18     done on those -- you know, on the other parts of this

19     case?

20          A     Yes.  We've looked into many, many avenues

21     of recovery and potential litigation.  Yes, sir.

22     Many, many.

23          Q     Okay.

24          A     We're moving forward -- we're moving forward

Page 270

1    on several.  I don't know if you're monitoring those

2    or not, but.  And I don't know -- you know, it's funny

3    these days whether or not it always hits the general

4    case when we file an adversary.  For instance, you

5    know, the recent adversary we filed, whether or not

6    that's hitting the major case.

7         Q    Okay.  Well, I mean, I'm aware there's some

8    shell corporation lawsuit y'all just filed.

9    Without -- you know, again, I don't want you to tell

10   me targets.  But you know, can you give me a rough

11   estimate of, you know, what you're looking at in terms

12   of numbers of actions?

13        A    Can you repeat that question?

14        Q    So about how many different actions are

15   y'all looking at outside of I know there's a newly

16   filed one against the shell company?  And again I

17   don't want you to -- I'm not trying to solicit, you

18   know, who the targets are of course.  But can you give

19   me a rough estimate of how many different actions you

20   are looking at for this case?

21        A    At least ten if not more.

22        Q    Okay.  Can you give me a rough estimate of

23   what the estimated recovery is on those cases?

24        A    I --

Page 271

```
 1              MR. RUKAVINA:  That's very dangerous.
 2   We can, I think, talk about that offline.  That's very
 3   dangerous.
 4              THE WITNESS:  I'm glad to visit with
 5   you about that offline.  I'm happy to.  In fact, I'll
 6   tell you, and we can go into some detail and all that.
 7   I'm happy to do that.  But I'm just reluctant to do it
 8   on the record, I'm afraid.
 9   BY MR. SCHOTTENSTEIN:
10        Q    All right.  I have a bunch of follow-up
11   questions on that, but I think that's maybe best
12   handled off the record.
13        A    We are at your disposal on that.  I promise.
14        Q    Yeah.
15        A    And if we don't -- we don't come through for
16   you, we can come right back here.  I promise.
17        Q    All right.  So give me just a minute here to
18   reorganize my notes here.  Sorry.  One second.
19        A    You're fine.
20        Q    All right.  So without getting into
21   specifics of any particular claim here, you know, I'd
22   like to hear about how you customarily evaluate
23   litigation claims.  And I guess to be a little more
24   specific, you know, I guess my real question here is,
```

Page 272

1    you know, how do you or if you do market test them at

2    all.

3         A    I sometimes market test things in terms of I

4    see if lawyers want to come in and handle matters for

5    the estate on a contingency basis and/or whether or

6    not there's a funding possibility and/or someone wants

7    to buy a cause of action for a price.

8         Q    And so have you explored all of your

9    customary steps with respect to the dispute with

10   Prosperity and the subject funds?

11        A    Yes, sir.

12        Q    Okay.  Can you tell me how many claim

13   sellers did you speak to?

14        A    To --

15             MR. RUKAVINA:  You mean claim buyers.

16             THE WITNESS:  Claim buyers you mean?

17             MR. SCHOTTENSTEIN:  Sorry.  Yes.  Yes.

18   Sorry.  Thanks.  Claim buyers.

19             THE WITNESS:  I spoke to a couple.

20   BY MR. SCHOTTENSTEIN:

21        Q    And I'm not looking for specifics, but you

22   know, I want to confirm that the people you spoke

23   with, you know, are appropriate and customary buyers

24   for this type of claim.  Are, you know, the people

Page  273

1    that you shopped this to -- I mean, have you ever

2    successfully sold claims to them before?

3         A    That's a fair question.  I may have

4    misspoken now that I'm thinking about claims buyers.

5    I don't know that I've -- the claims buyers I was

6    mentioning or that stuck in my mind there -- it's

7    getting late -- are more in line with the AMRR deal

8    than with regard to this piece of litigation.

9              I don't know that I've sold litigation to an

10   independent third party before.  I'm trying to

11   remember if I've done that, Counsel.  Typically, it's

12   the parties that are involved in the case that come

13   through and want to buy the litigation or produce

14   someone that wants to buy the litigation.

15        Q    Okay.  What about litigation funding?

16        A    I spoke with litigation funding early on.

17   You could ask me the name.  I could get it for you.

18   I'm glad to do that.  I've never done that, had any

19   success in that.  And lawyers I've spoken to on the

20   litigation funding told me you'd better hang onto your

21   wallet when you do that because they're going to grab

22   up all your assets.

23             And sure enough that litigation funding

24   group wanted liens on all our recoveries, D&O,

Page  274

1   anything they could possibly get to make sure that

2   they come out okay at the end of the day.  And then

3   they went away when I said I can't.  I can't do that.

4   So that's the litigation funding experiment.  And I

5   don't know if you want me to go to the third.

6        Q   Before you do, just have you ever done

7   litigation funding with anyone before?

8        A   I've done -- yes.  I've done it.  Typically

9   when I've done it, sir, it's been the creditors that

10  have stepped up as I proposed in this deal and funded

11  their lawyers to take the matter forward in litigation

12  funding agreements.  I've done several of those.

13  That's why I tried that here.

14           And have had some real success in getting

15  that done because it appeases the creditor.  The

16  creditor is putting their money where their mouth is.

17  And they're comfortable with their counsel, and

18  they're highly motivated because they've been scummed.

19           And so it really facilitates everything.

20  And that's why I was hopeful I could get that done in

21  this instance.  And it's been -- it's been -- it's

22  worked really well.  In fact, we got appealed to the

23  Fifth Circuit in one of my litigation funding

24  agreements, and we were -- the litigation funding

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

```
 1    agreement was upheld by the Fifth Circuit.

 2            And because the debtor and the targets

 3    didn't like the fact that we were coming for them, and

 4    they knew that they had left the estate in such a

 5    fashion that it was going to be difficult to engage

 6    counsel.

 7       Q    All right.  Let's move on to Number 3.

 8       A    Yes, sir.

 9       Q    Continue to counsel.

10       A    Right.  So I spoke with my current counsel,

11    Mr. Rukavina, and his firm.  Got interested in

12    handling it on a contingency.  This is a little too

13    big for my little shop -- favorite lawyer in town so

14    I'm not obviously interest in it.

15            I spoke with the Passman & Jones firm.  Not

16    interested.  I spoke with the Neligan firm.  Not

17    interested.  Spoke with the Quilling firm.  Not

18    interested.  Spoke with -- oh, God.  I can't remember.

19    Keith Aurzada.  I can't remember the name of his firm.

20               MR. RUKAVINA:  Bryan Cave.

21               THE WITNESS:  Bryan Cave.  Not

22    interested.  And then he --

23               MR. RUKAVINA:  Actually, he --

24               THE WITNESS:  Okay.  I can't remember
```

Page 276

1    what firm, but.  And I'm not sure of others.  Oh,

2    yeah.  I offered to the Butler Snow firm to handle on

3    a contingency basis.  Not interested.  I think

4    that's -- I think that's the lay of the land on that.

5    BY MR. SCHOTTENSTEIN:

6         Q    All right.

7         A    Also I asked Butler Snow to provide me

8    somebody if they would do it on a contingency basis.

9    They do trustee work.  Crickets.  Nothing.  Zero.

10   Nada.

11        Q    Okay.  So can I ask why -- my, kind of,

12   final question here is, you know, as this thing has

13   continued to blown up -- I mean, look.  I'll just be

14   frank with you, Scott.  Like you know, I

15   personally -- you know, we're kind of deeply concerned

16   about, you know, the deepening administrative

17   insolvency here.

18             You know, and I think, you know -- I hope,

19   you know, you agree with me, there comes a point where

20   the juice isn't worth the squeeze, so to speak.

21   Correct?

22        A    Sometimes.

23        Q    Sometimes.  Yeah.  Just as a general

24   principle.  Right?

                                        Page  277

1         A     That's correct.

2         Q     All right.  And you know, and given that,

3    you know, FedEx and my client both are deeply

4    concerned about, you know, how this is going and

5    again, you know, the impact on the estate, you know,

6    have you, you know, actually, you know, sat down and

7    considered whether it's even worth continuing to push

8    this?

9               Or just to, you know, let it go and let

10   everyone else fight about it?

11        A     That consideration always is in play.

12        Q     Have you in the past ever, you know, put the

13   brakes on midway, so to speak?

14        A     Depends the scenario.  What's going on, so.

15        Q     Can you tell me about any experiences in the

16   past that you've had where you have, you know, pulled

17   out after, you know, starting a process where it just

18   seemed like it was getting too expensive to maintain?

19        A     You know, I don't know that.  I try not to

20   get bullied around.  I try not to, you know, have the

21   reputation of folding.  If someone just tries to make

22   our life difficult or tries to embarrass us, trying to

23   keep what's best for the estate in mind.

24               And when I've changed direction -- the times

Page 278

1    I remember -- it's for the benefit of the estate.  In

2    other words, if something comes before a court, come

3    to the hearing.  Somebody doesn't want something to

4    happen.  They think it might happen, they pay more

5    money.  Something happens.  They provide lawyers.

6    Something happens.

7          So to answer your question, I don't know

8    that I've been -- I've been bullied out of proceeding.

9    Q    Well, I certainly don't want to -- I'm not

10   saying that you've been, you know, bullied out of

11   anything.  Right?

12   A    And I'm not -- I'm not accusing ARRIS and

13   you, sir, of doing any of that kind of thing.  But

14   anyway, I interrupted you, sir.

15   Q    Yeah.  You know, again, I mean, I think

16   sometimes you start shopping something and you put

17   some money into it.  And then, you know, it seems like

18   you're not going to get anything out of it, you know,

19   transactionally.

20          Is that, you know -- again you take a lot of

21   property.  It looks like you may have something to,

22   you know, build on and sell.  It doesn't work out.

23   Have you had any experiences like that?  You know,

24   just taking it out of the immediate litigation

Page  279

1    context.

2         A    Yes, sir.  That occurs.

3         Q    All right.  Can you just tell me about, you

4    know, when that's happened in the past for you?

5         A    Oh.  If you -- you know, if you have a piece

6    of property that you think -- the broker thinks he can

7    get a bunch of money for, and we're going to pay

8    everybody and everybody is going to have a big time.

9    And it just turns out that that's not the case.

10              And after marketing and trying it, it

11   just -- it's not coming to be.  And then you have all

12   kinds of other issues, insurance, things of that

13   nature come.  So it becomes burdensome.

14        Q    Can you name any cases specifically where

15   that's happened?

16        A    Oh, my gosh.  Don't test my memory.  I'm

17   sure it has.  Nothing springs to mind.  But it

18   definitely occurs.  Or like, I was mentioning, you

19   know, the other day when you send preference demand

20   letters out.

21              Cam asked me about settling for zero.  And

22   in thinking about it last night, I was, like, yeah.  I

23   did settle some for zero.  You know, I'm sure I'm a

24   little weak or lower than some, but they provided

Page 280

1    defenses and that they hadn't provided prior to the

2    suit, et cetera.

3              And our analysis of -- the accountant's

4    analysis pre-suit came back to be incorrect.  So we

5    settled for zero because they know that they -- I

6    don't believe that they owed the estate monies.  So to

7    answer your question, those kinds of things happen.

8              MR. SCHOTTENSTEIN:  All right.  I think

9    that's all I have on the record right now.

10             THE WITNESS:  I'm glad to set up a call

11   with you for Friday or Monday, whenever.

12             MR. RUKAVINA:  I'm available most of

13   tomorrow.

14             THE WITNESS:  Most of tomorrow is

15   pretty good with us if you want to just email.  I'm

16   glad to visit with you.

17             MR. SCHOTTENSTEIN:  We can coordinate

18   offline.  That's fine.

19             THE WITNESS:  Yeah.  Look forward to

20   talking to you.

21             MR. SCHOTTENSTEIN:  All right.  I'll

22   pass the witness.

23             UNIDENTIFIED SPEAKER:  The bondholders

24   are not going to have any questions at this time.

Page 281

```
 1                    UNIDENTIFIED SPEAKER:  No questions

 2     from the Bank.

 3                    THE WITNESS:  Are we out?

 4                    MR. RUKAVINA:  I think we're out if

 5     we're done.

 6                    THE WITNESS:  I appreciate everybody.

 7     It's always good to see y'all.

 8                    MR. HILLYER:  All right.  Thank you.

 9                    THE WITNESS:  Thank you.

10                    MR. RUKAVINA:  We've got to

11     order -- Thomas, are you order -- Thomas, are you

12     there?  You know how to do this better.  Will you

13     order a transcript for me?

14                    MR. BERGHMAN:  Yeah.

15                    MR. RUKAVINA:  You know how I like it.

16     Right?

17                    MR. BERGHMAN:  Yep.

18                    THE VIDEOGRAPHER:  All right.  Go off

19     the record.  This concludes the videotaped deposition.

20     Time is approximately 4:17 p.m.

21                    THE WITNESS:  Thank you, Veritext.

22     That went very smoothly.  We finally figured it out

23     after a couple days.  Appreciate you.

24                    MR. RUKAVINA:  Other than the
```

Page 282

1      unbeknownst to us passcode.

2                      THE WITNESS:  Yeah.  You've got to stop

3      the passcode though.  Nobody going to sneak in there.

4                      All right.  See y'all.

5                      THE REPORTER:  All right.  Thank you.

6      So for the court reporter, every one is still on?

7                      MR. HILLYER:  Okay.  So explain -- Mr.

8      Guffy.  Philip, you still on?

9                      MR. GUFFY:  Yeah.  I'm here.

10                     MR. HILLYER:  So following back up

11     yesterday with what, you know, we -- I guess, rolled

12     our rough request over to this, until we got

13     concluded.  So I guess we would like a rough of the

14     depo.  And then I guess when can we have that rough?

15                     THE REPORTER:  Oh, gosh.  I can submit

16     the order and get that generated.  I would say -- I

17     don't want to speak out of turn.  I don't know

18     how -- I don't know how many previous volumes there

19     are on this or this is my first day on this case.

20                     But I'd be more than glad to drop that

21     out there and try to get -- put an expedite order on

22     that and see if we can't get it out to you ASAP.

23                     MR. HILLYER:  Okay.  Because I think,

24     Philip, when we asked yesterday and I think the answer

Page 283

1    was -- I forgot what her name was.  But, Philip,

2    didn't you ask?  You said if we order it from you now

3    or if we order the rough tomorrow, that we could get

4    it?  But what was the answer?  I'm just trying to

5    remember.

6              MR. GUFFY:  Yeah.  No.  I was just

7    confirming that, you know, we could ask for the rough

8    from today's session and also get yesterday's session

9    included in it as well.

10             That we didn't need to ask for a rough

11   yesterday to get yesterday's session.  That y'all

12   would have access to yesterday's session and could

13   combine it with this session, and produce a rough

14   transcript.

15             THE REPORTER:  Okay.

16             MR. HILLYER:  Right.  But we didn't

17   talk about days or anything like that.

18             MR. GUFFY:  We did not talk about

19   timing.  No.

20             MR. HILLYER:  Okay.

21             THE REPORTER:  Yeah.  I would say I

22   would be more than glad to get the order put in there

23   ASAP, and try to get everybody involved you know with

24   the rough.  I mean, you know, that's not an issue

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1    there.  I just can't speak for transcription.  You've

2    got to understand where I'm coming from.  I can't

3    speak for another department.

4              But typically they do get on these

5    pretty quick, especially, you know -- especially if we

6    put the -- we're scheduling everybody else on the job

7    as far as, trying to put some pressure on this thing.

8    But how many roughs are we going to need?

9              MR. HILLYER:  FedEx and ARRIS need one.

10             THE REPORTER:  Okay.  ARRIS needs one.

11             MR. GUFFY:  One for the bondholders.

12             THE REPORTER:  Bondholders.  Bear with

13   me.  Okay.  Bondholders.  Okay.  And does FedEx need

14   one as well?

15             MR. HILLYER:  Yeah.  FedEx and ARRIS.

16   This is a joint deposition.

17             THE REPORTER:  Oh.  Okay.

18             MR. HILLYER:  And I guess it's -- so

19   FedEx and ARRIS need one together.

20             THE REPORTER:  I'm sorry.  I'm still

21   trying to get in mind who is who in this situation

22   because I didn't even get a notice.  So bear with me.

23   Okay.  We're going to combine days and try to get a

24   rough ASAP.  And that will be two rough orders.  All

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1     right.

2                     Okay.  Anything else I can go over for

3     you guys, while we're on the conference?

4                     MR. HILLYER:  Do we want to talk about

5     if the rough?  What do you think as far as -- I guess

6     the timing on the rough affects the timing on the full

7     transcript.

8                     THE REPORTER:  Right.  Okay.

9                     MR. HILLYER:  What do you think we

10    should do?  What is an expedited?

11                    Philip, what do you think?  I mean, I

12    guess we need it -- I mean, I'm trying to figure out

13    so we don't roll over and, like, we get a rough at,

14    you know, sometime next week.  And then the real

15    transcript --

16                    MR. GUFFY:  I mean, y'all are the ones

17    who've got the filing deadline coming up.  So I don't

18    know if you were wanting to file before Monday or what

19    your timing was.

20                    MR. HILLYER:  Yeah.  I mean, I guess we

21    need it expedited because we have a briefing deadline

22    on Monday.

23                    THE REPORTER:  You need it by Monday.

24    Okay.

Alpha Reporting                    800-556-8974
A Veritext Company            www.veritext.com

```
 1                    MR. HILLYER:  Before Monday.

 2                    THE REPORTER:  Okay.  Before.  All

 3      right.  I'll be sure to put that in the order as well.

 4      And I'll pass that onto the transcription.  And I'm

 5      sure they can get someone on it, someone on it ASAP.

 6      And, like I said, that shouldn't be an issue for them.

 7                    MR. HILLYER:  All right.  Thank you.

 8                    THE REPORTER:  Anything else I can do

 9      for you folks today?

10                    MR. HILLYER:  No, sir.  Have a great

11      day.

12                    THE REPORTER:  Okay.  Thank you so

13      much.  All right.  And we'll go ahead and sign off.

14                    Thank you, sir.  Appreciate you.

15                    Okay.  Good bye.

16                    (Signature reserved.)

17                    (Whereupon, at 4:17 p.m., the

18                    proceeding was concluded.)

19

20

21

22

23

24
```

Page 287

```
 1              CERTIFICATE OF DEPOSITION OFFICER

 2              I, SHAWN BYRON HUNT, the officer before whom

 3      the foregoing proceedings were taken, do hereby

 4      certify that any witness(es) in the foregoing

 5      proceedings, prior to testifying, were duly sworn;

 6      that the proceedings were recorded by me and

 7      thereafter reduced to typewriting by a qualified

 8      transcriptionist; that said digital audio recording of

 9      said proceedings are a true and accurate record to the

10      best of my knowledge, skills, and ability; that I am

11      neither counsel for, related to, nor employed by any

12      of the parties to the action in which this was taken;

13      and, further, that I am not a relative or employee of

14      any counsel or attorney employed by the parties

15      hereto, nor financially or otherwise interested in the

16      outcome of this action.

17                              SHAWN BYRON HUNT

18                              Certified Reporter in and for the

19                              State of Tennessee

20

21      [X] Review of the transcript was requested.

22

23

24

                                        Page 288
```

1                 CERTIFICATE OF TRANSCRIBER

2         I, JULIE WHEELAND, do hereby certify that

3   this transcript was prepared from the digital audio

4   recording of the foregoing proceeding, that said

5   transcript is a true and accurate record of the

6   proceedings to the best of my knowledge, skills, and

7   ability; that I am neither counsel for, related to,

8   nor employed by any of the parties to the action in

9   which this was taken; and, further, that I am not a

10   relative or employee of any counsel or attorney

11   employed by the parties hereto, nor financially or

12   otherwise interested in the outcome of this action.

13

14

15                        JULIE WHEELAND

16

17

18

19

20

21

22

23

24

Alpha Reporting           800-556-8974
A Veritext Company      www.veritext.com

1   In Re Goodman Networks, Inc., D/B/A Goodman Solutions v.

2   Chapter 7 Trustee Scott Seidel , Vol II Job No. 6106194

3                    E R R A T A   S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____    _____

24  Chapter 7 Trustee Scott Seidel Vol II  Date

Page 290

1       In Re Goodman Networks, Inc., D/B/A Goodman Solutions v.

2       Chapter 7 Trustee Scott Seidel , Vol II 6106194

3                       ACKNOWLEDGEMENT OF DEPONENT

4     I, Chapter 7 Trustee Scott SeidelVol II, do hereby declare that I

5       have read the foregoing transcript, I have made any

6       corrections, additions, or changes I deemed necessary as

7       noted above to be appended hereto, and that the same is

8       a true, correct and complete transcript of the testimony

9       given by me.

10

11      _____    _____

12      Chapter 7 Trustee Scott Seidel , Vol II   Date

13      *If notary is required

14                          SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                          _____ DAY OF _____, 20____.

16

17

18                          _____

19                          NOTARY PUBLIC

20

21

22

23

24

                                              Page 291

1    drukavina@munsch.com

2                        September 26, 2023

3    RE: In Re Goodman Networks, Inc., D/B/A Goodman Solutions v.

4    DEPOSITION OF: Chapter 7 Trustee Scott Seidel , Vol II 6106194

5         The above-referenced witness transcript is

6    available for read and sign.

7         Within the applicable timeframe, the witness

8    should read the testimony to verify its accuracy. If

9    there are any changes, the witness should note those

10   on the attached Errata Sheet.

11        The witness should sign and notarize the

12   attached Errata pages and return to Veritext at

13   errata-tx@veritext.com.

14        According to applicable rules or agreements, if

15   the witness fails to do so within the time allotted,

16   a certified copy of the transcript may be used as if

17   signed.

18                        Yours,

19                        Veritext Legal Solutions

20

21

22

23

24

                                        Page 292

**[& - 30]**

| & |
| --- |
| **&**   177:2 276:15 |

| 0 |
| --- |
| **0188**   223:4,23 225:7 230:10 230:16 231:4 233:5,13 248:22 249:2 249:12 |

| 1 |
| --- |
| **1**   188:17 189:5 189:12,13 191:1,11,13 224:24 227:17 246:10,19 247:1 249:5,15 |
| **1,000,000**   269:3 |
| **10**   179:17 |
| **100**   205:9 216:22 |
| **100,000**   205:8 207:1,18,21 208:2,7,24 216:19 |
| **10166**   178:15 |
| **10th**   242:16 243:22 |
| **11**   220:22 222:5 235:22 236:21 |
| **113**   206:13 |
| **1143**   179:9 205:19 206:7 206:13 |

**1164**   179:17 240:2
**11th**   222:14 236:14 237:12 252:14
**1299**   179:10 217:2
**13th**   241:8
**14**   175:12 181:4
**14th**   181:12
**15**   207:5 215:5 244:16
**150**   195:23 203:5,18,21 205:9
**150,000**   192:10 195:13,17 199:13
**16**   194:11 218:2 219:3,18 229:3,7
**16th**   217:16,22
**17th**   217:20
**18**   235:15
**183**   179:3
**1900**   177:17
**193**   179:8

| 2 |
| --- |
| **2**   189:15 191:11,13 217:21 246:19 249:5 |
| **20**   291:15 |

**200**   178:14 203:20
**2023**   175:12 181:4,12 220:22 222:6 235:22 292:2
**205**   179:9
**209**   180:3
**21**   240:13,14,17 240:18 241:9
**212**   178:17
**214**   176:15 177:20
**217**   179:10
**219**   179:11
**22**   179:8 193:5 193:7 218:18 245:15
**22,000,000** 267:18
**22-31641**   175:7
**220**   179:13
**220-3802** 178:10
**2200**   177:17
**222-1470**   176:8
**224**   179:15
**229**   179:16
**22nd**   217:19 246:11,24 247:5,8,9,18 249:2,15
**23**   179:9 205:20,21 206:3 247:13

**24**   179:10 217:3,4 248:20
**240**   179:17
**245**   179:19,21
**25**   179:11 219:9,11
**253**   179:4
**26**   179:12 220:16,19 292:2
**26830**   289:14
**27**   179:14 213:6 224:14 224:16,18
**28**   179:16 229:9,10,11
**28th**   208:14 210:20
**29**   179:17 240:4,6 241:19 241:22
**2:06**   214:3
**2:38**   234:21
**2:44**   234:24
**2:54**   242:3
**2:55**   242:6

| 3 |
| --- |
| **3**   191:12,14 195:13 196:2 207:20 276:7 |
| **3,000,000** 215:13 |
| **30**   179:18 188:22 223:11 235:8 245:3,6 |

[30691 - accurate]

| | | | |
|---|---|---|---|
| **30691** 288:16 | **5** | **700** 176:5 | **a** |
| **31** 179:16,20 | **5** 180:3 194:11 | **713** 176:8 | **abandon** |
| 236:3 245:8,10 | **5,000** 210:23 | 178:10 | 211:20 |
| **31st** 226:9 | **50** 203:15,16,16 | **743-4514** | **ability** 185:17 |
| 228:3,14 | 260:10 | 177:20 | 185:18 233:12 |
| 232:24 236:9 | **500** 176:12 | **75201** 176:13 | 288:10 289:7 |
| 237:9 245:19 | 177:8 | 177:18 | **able** 199:12,13 |
| 245:23 246:5,8 | **502** 268:6 | **77002** 176:6 | 203:15 224:10 |
| 247:17 | **544** 206:21 | 178:8 | 254:11 |
| **32** 252:3 | **548** 202:23 | **8** | **above** 248:19 |
| **35** 228:11 | **550** 188:17 | **8/25/23** 251:6 | 291:7 292:5 |
| **350,000** 204:2 | 189:5,12,13 | **80,000,000** | **absent** 181:18 |
| 254:6 | 191:1 | 204:9 | **abundantly** |
| **38** 267:16 | **6** | **800** 176:5 | 202:7 |
| **38103** 175:15 | **6** 192:15 193:9 | **85** 215:15 | **access** 284:12 |
| **38119** 177:9 | 194:7,8,10 | **850-2825** | **account** 185:15 |
| **3:13** 253:12 | 221:1 223:11 | 178:17 | 196:21 198:20 |
| **3:29** 253:15 | 225:3,3 227:17 | **855-7554** | 223:3,13,23 |
| **4** | 227:18 235:8 | 176:15 | 224:4 225:7,20 |
| **4.4** 195:12 | **600** 178:7 | **9** | 227:3 230:10 |
| 199:20 237:15 | **6075** 177:8 | **9** 222:24 223:1 | 230:13,17,21 |
| 254:8 | **6106194** 175:17 | 230:8 | 231:1,5 233:5 |
| **4.46.** 192:5 | 290:2 291:2 | **901** 177:12 | 233:17 234:7 |
| **4000** 176:12 | 292:4 | **9019** 206:20 | 247:15 248:21 |
| **408** 210:17 | **680-7200** | 207:2,22 208:9 | 249:2,6,9,17,18 |
| **4200** 178:7 | 177:12 | 208:17 220:4 | 249:22 250:1,3 |
| **44,000,000** | **6th** 235:9 | 228:12 256:17 | 250:7 264:21 |
| 267:15,23 | **7** | **97** 195:13 | **accountant's** |
| **45** 260:10 | **7** 175:5,10 | 196:2 | 281:3 |
| **4:17** 282:20 | 176:2 181:10 | **97/3** 197:21 | **accounts** |
| 287:17 | 214:13 238:19 | 199:10 | 184:12 234:3 |
| **4th** 207:24 | 257:24 290:2 | **99** 258:11 | 264:16,17 |
| 208:2 | 290:24 291:2,4 | 259:12 | **accuracy** 292:8 |
| | 291:12 292:4 | | **accurate** 288:9 |
| | | | 289:5 |

[accusing - answer]

accusing
279:12
acknowledge...
291:3
acknowledg...
181:15
action  185:24
186:5 187:12
187:20 190:6
203:4 204:17
211:20 257:8
270:11 273:7
288:12,16
289:8,12
actions  185:19
186:2 188:21
260:3 270:5
271:12,14,19
actors  255:14
262:12
actually  187:3
188:6 249:9
262:2 276:23
278:6
adam  177:6
182:8 217:1
240:9,13
adam.langley
177:11
addition
203:23
additionally
181:18
additions  291:6

adds  217:23
administer
181:15 265:10
265:11
administering
260:21 264:15
265:23
administration
254:3 265:9
administrative
195:19 277:16
administrativ...
200:15 254:9
admission
191:3 220:14
221:4,17 222:2
222:21 224:8
225:2,3,3
226:19 227:6
227:17,18
244:20 245:15
251:5 252:15
admissions
179:13,19
220:18 228:12
admit  222:15
223:2 224:12
225:5 227:9
230:8 245:18
247:13 248:20
adversary
203:14,19
215:9 271:4,5
adverse  238:18
248:13

affects  286:6
afraid  272:8
afternoon
181:2,6 183:10
183:12 269:23
agent  218:5
230:23
agent's  194:16
194:22
agree  181:16
181:20 201:13
207:17 225:11
225:22 228:14
232:1,2,20
277:19
agreed  192:10
208:2 217:8
agreement
276:1
agreements
275:12,24
292:14
agrees  194:16
ahead  181:5
202:21 211:23
219:7 243:18
244:24 287:13
akard  176:12
al  254:20
albeit  257:7
allotted  292:15
allow  198:6
202:17,23
amended  179:8
179:11 191:15

191:18 192:3
192:13 193:1,2
217:15,17,18
217:20 218:19
218:20,22
219:4,5
amount  198:1
204:12 216:13
amrr  200:4,20
202:11,14
213:19 258:17
259:18,19
261:5 267:14
267:16 274:7
analysis  193:16
196:23,24
197:3 233:19
234:10,14
258:4 281:3,4
andrews  178:6
178:13
angry  261:19
261:19
answer  180:1
190:17 204:14
208:21 209:5,8
209:11,19
221:6 223:6,15
227:13 231:24
234:12,13
243:9 245:21
248:23 257:10
257:13 258:23
263:10 265:19
279:7 281:7

[answer - attorney]

| | | | |
|---|---|---|---|
| 283:24 284:4 | applied 207:8 | 214:23 215:2,5 | aspect 267:16 |
| **answered** | **appreciate** | 215:8,12,14 | **assert** 185:1,1 |
| 187:5 221:15 | 215:22 282:6 | 216:2,6,12 | **asserted** 184:1 |
| 221:16 224:8 | 282:23 287:14 | 251:9 253:19 | 184:21 188:6 |
| 257:18 | **approach** | 259:19 261:22 | 188:11 190:10 |
| **answering** | 196:15 | 279:12 285:9 | 193:24 200:5 |
| 203:11 222:21 | **appropriate** | 285:10,15,19 | **asserting** |
| **answers** 179:14 | 273:23 | **arris's** 202:22 | 262:20 267:1 |
| 224:21 | **approval** 257:5 | 216:1 239:18 | **assessed** 183:16 |
| **antecedent** | **approved** | **articulated** | 269:15 270:3 |
| 189:17 | 197:9 260:5 | 187:11 197:8 | **assessing** |
| **anxious** 260:2 | **approximately** | 201:10 | 196:18 |
| **anyway** 279:14 | 181:3 198:4 | **asap** 283:22 | **asset** 187:13 |
| **apart** 251:13 | 213:23 214:3 | 284:23 285:24 | 260:22 265:23 |
| **apologize** | 234:21,24 | 287:5 | **assets** 257:16 |
| 186:13 194:9 | 242:3,6 253:12 | **asked** 183:15 | 264:15 265:9 |
| 217:10 225:14 | 253:15 282:20 | 185:6 188:4 | 274:22 |
| 247:10,20 | **argeroplos** | 198:5,9,11,12 | **assigned** 181:7 |
| 267:2 | 242:12 | 202:17,22 | **association** |
| **apparent** | **argument** | 212:4,21 227:9 | 178:2 182:17 |
| 256:20 | 208:15,15 | 277:7 280:21 | **assumes** 200:1 |
| **apparently** | **arguments** | 283:24 | **assuming** |
| 220:12 265:7 | 201:9 | **asking** 185:11 | 242:10 268:16 |
| **appealed** | **arm** 206:21 | 189:22 208:5 | **astronomical** |
| 275:22 | **arrangement** | 208:22 209:23 | 268:21 |
| **appear** 219:24 | 203:13 | 210:14,15,21 | **attached** 213:6 |
| **appeases** | **arris** 177:14 | 212:1,11,14,18 | 230:24 292:10 |
| 275:15 | 182:15 193:15 | 212:22 226:22 | 292:12 |
| **appended** | 198:5,10,16,21 | 227:15 235:12 | **attachment** |
| 291:7 | 199:2 202:16 | 239:19 242:9 | 229:22 |
| **appetite** 231:18 | 203:3,17 204:4 | 246:23 249:8 | **attendance** |
| **applicable** | 205:5,8,15 | 252:13 255:23 | 182:7 |
| 181:24 292:7 | 206:20 208:6 | 256:22 261:24 | **attention** 255:5 |
| 292:14 | 209:3 211:6,8 | 269:8 270:2,10 | **attorney** |
| | 212:20 214:11 | 270:16,16 | 184:14,14 |

Alpha Reporting 800-556-8974
A Veritext Company www.veritext.com

**[attorney - believe]**

288:14 289:10
**attorney's**
215:7 263:14
268:5,20
**attorneys** 216:4
216:5,13
242:19
**auctioneer**
266:3,9,16
**audio** 288:8
289:3
**august** 179:16
221:12,14
224:2 225:8
226:4,7,9
228:3,14
232:24 235:15
236:2,8 237:9
245:18,23
246:5,7 247:17
**aurzada** 276:19
**authenticated**
221:9,18,22
222:5,20 225:6
225:21 227:4
230:14 232:19
232:24 234:2
234:16 247:15
**authority**
184:12
**authorize**
200:8
**authorized**
181:14

**available**
187:12 281:12
292:6
**avenue** 177:8
178:14
**avenues** 270:20
**avoid** 194:19
197:11 254:8
263:6
**avoidance**
185:18,24
186:2,5 187:12
187:20 188:21
**avoided** 189:19
**aware** 249:9
271:7

**b**

**b** 179:6 181:12
188:17 189:5
189:12,13
191:1 223:11
235:8 290:1
291:1 292:3
**back** 183:11
187:14 199:16
202:16 203:18
204:20 205:17
207:10 208:18
213:17 214:2,4
224:11 225:4
232:3,5 234:23
236:24 240:12
240:13 242:5
245:1 253:14
260:24 265:4

272:16 281:4
283:10
**backwards**
263:15
**bad** 254:19
255:1,14
262:12 264:4
**ball** 257:11
**ballpark** 260:9
**balls** 257:17
**bank** 178:2
182:17 184:1
184:14,20
190:15,19,24
191:22 192:7
202:24 209:4
225:9 230:16
234:3,6 235:8
239:2,5,13,17
242:12 248:12
249:9,18 250:5
250:6 264:21
264:23 265:14
266:13 282:2
**bank's** 190:23
223:13,21,23
224:2
**banking** 231:21
233:14
**bankruptcy**
175:1 214:13
**based** 225:8
266:19
**basic** 215:23

**basically**
245:18 248:10
267:15
**basis** 225:1
227:1 273:5
277:3,8
**bates** 228:6
**baxter** 228:6
**bear** 285:12,22
**beautiful**
205:11
**beginning**
210:3 246:10
262:15,17
**behalf** 176:2
177:2,14 178:2
182:9,11 203:9
239:21 253:1
**believe** 183:15
184:3,18 185:6
186:9 187:20
190:4 191:3
192:14 195:5
195:16,23
197:9,12,22
199:5 201:17
206:10 210:16
217:17 220:7
221:8,11,19,20
221:21 222:16
222:16 223:8
226:4 228:2
230:6,7 232:24
233:3 235:4
237:20 239:7

**[believe - called]**

239:12,22,23
243:9 246:4,18
247:19 249:16
267:6 281:6
**bells**  204:15
213:6
**belonged**
261:12
**bend**  263:15
**benefit**  197:24
198:7 206:22
207:18 259:1
279:1
**benefits**  257:8
257:9
**berghman**
176:10 182:11
282:14,17
**best**  183:24
272:11 278:23
288:10 289:6
**better**  257:6
274:20 282:12
**big**  206:8,12
261:13 276:13
280:8
**bit**  261:5
269:23
**blow**  206:14
**blown**  212:2,3
277:13
**board**  258:13
260:14,16
**body**  204:13
258:12 259:5

**bond**  224:3
242:9
**bondholder**
224:4 254:9
**bondholders**
193:18,23
196:19,23
199:19 200:5
200:13,17
201:10,12,24
202:2,6,7
206:21 208:3,9
217:23 219:23
223:2 225:5,20
227:3 230:9,17
231:5,9,16
232:18 233:4
233:19 234:6
242:18 247:15
248:13 255:2
256:2 261:21
266:21,24
268:1,4 281:23
285:11,12,13
**bottom**  217:16
225:2
**brakes**  278:13
**break**  212:13
213:16 235:2
244:16 250:11
253:6,10
**brenda**  242:9
242:10
**brevity**  235:3

**brian**  178:12
182:16
**brianclarke**
178:16
**briefing**  286:21
**bring**  229:6
232:5 244:19
255:4 269:22
**bringing**
219:14 220:21
224:20
**broad**  253:22
**broker**  280:6
**brought**  217:11
260:3 263:17
263:19
**bryan**  276:20
276:21
**build**  279:22
**bullet**  238:1,2,4
238:6,10,15,19
**bullied**  278:20
279:8,10
**bunch**  261:6
263:14 272:10
280:7
**burdensome**
280:13
**burned**  266:4
**burning**  241:24
**business**
183:16 188:1,2
208:17 210:5
236:13,21
265:13 266:7

**butler**  177:7
277:2,7
**butlersnow.c...**
177:10,11
**buy**  203:3
204:17 205:5
257:7 259:12
273:7 274:13
274:14
**buyers**  273:15
273:16,18,23
274:4,5
**bye**  287:15
**byron**  175:16
288:2,17

**c**

**c**  176:1 177:1
178:1 181:1
**call**  191:7
192:5 195:6,9
195:9,10 196:4
196:9,16,17
197:20 199:8
209:10,21,22
214:21 217:9
218:8,10,17,21
219:22 220:6
237:21 238:9
249:17,18
250:7 256:10
281:10
**called**  183:3
195:5 249:5
258:10

**[calls - come]**

| | | | |
|---|---|---|---|
| **calls** 233:7 | **cave** 276:20,21 | 181:10 214:13 | **clarified** 246:4 |
| **calm** 212:13 | **caveat** 236:8 | 238:19 257:24 | **clarify** 214:14 |
| **cam** 182:8 | **central** 175:13 | 290:2,24 291:2 | 246:1 |
| 209:13 227:6 | 181:9 | 291:4,12 292:4 | **clarity** 184:13 |
| 235:17 241:14 | **certainly** | **charge** 259:22 | 191:11 |
| 244:13 250:11 | 189:21 279:9 | **circuit** 183:21 | **clarke** 178:12 |
| 280:21 | **certificate** | 184:1,11,15,21 | 182:17 |
| **cam.hillyer** | 288:1 289:1 | 186:16,17 | **clear** 202:7 |
| 177:10 | **certified** | 187:6,24 | 227:15 260:23 |
| **campbell** 177:4 | 181:21 288:18 | 275:23 276:1 | **clearly** 193:15 |
| **canceled** 220:2 | 292:16 | **circulated** | **client** 278:3 |
| **career** 256:15 | **certify** 288:4 | 217:15 | **clock** 208:18 |
| **carve** 266:1,16 | 289:2 | **cite** 186:13 | 210:19 250:13 |
| **case** 175:6 | **cetera** 211:20 | **claim** 184:22 | **close** 191:7 |
| 181:11 184:1 | 220:10 236:23 | 185:13 186:2,3 | 195:6,8,9,10 |
| 185:6,13,14 | 237:4,7,19 | 187:9,19,19 | 196:4,9,16,17 |
| 186:8,13,20,24 | 244:6 248:11 | 197:18 198:22 | 197:20 199:8 |
| 187:6 198:3 | 265:1,18 | 201:5 204:12 | 217:9 218:8,10 |
| 222:23 258:10 | 266:16 267:23 | 205:5,8,11 | 218:16,21 |
| 259:16,17 | 269:5 281:2 | 207:17 216:4,6 | 219:16,22 |
| 262:4 265:20 | **chain** 177:2 | 237:15 272:21 | 220:6,9,10 |
| 267:3,12,19 | **chance** 254:18 | 273:12,15,16 | 237:20 |
| 268:22 270:19 | **change** 257:13 | 273:18,24 | **closing** 215:2 |
| 271:4,6,20 | 267:4 268:10 | **claiming** | **code** 189:3,7,8 |
| 274:12 280:9 | 290:4,7,10,13 | 264:23 | 189:8,22 |
| 283:19 | 290:16,19 | **claims** 188:22 | **collateral** |
| **cases** 258:1,8 | **changed** | 198:18 202:23 | 194:16,22 |
| 258:11 261:7 | 267:22 268:1 | 204:8 258:3,6 | 218:5 265:14 |
| 263:20 264:16 | 278:24 | 266:21 270:12 | 269:16 |
| 271:23 280:14 | **changes** 291:6 | 270:13,15 | **combine** |
| **cause** 190:6 | 292:9 | 272:23 274:2,4 | 284:13 285:23 |
| 203:3 204:17 | **changing** | 274:5 | **combined** |
| 211:20 273:7 | 191:24 | **clarification** | 210:23 |
| **causes** 270:11 | **chapter** 175:5 | 214:10 216:8 | **come** 202:13 |
| | 175:10 176:2 | | 207:12 208:6,7 |

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

[come - corporate]

| | | | |
|---|---|---|---|
| 213:16 227:6 | complicated | consent 201:24 | 263:24 276:9 |
| 257:6 272:15 | 235:18 255:22 | 202:2 | continued |
| 272:16 273:4 | concentration | consequences | 183:14 194:11 |
| 274:12 275:2 | 258:5 | 254:4 | 277:13 |
| 279:2 280:13 | concept 207:13 | consider | continuing |
| comes 264:23 | 213:5 215:17 | 197:11 212:19 | 278:7 |
| 277:19 279:2 | 215:20 257:7 | 234:9 236:12 | control 223:3 |
| comfortable | concepts | 236:20 256:1 | 223:12,22 |
| 275:17 | 211:11 | consideration | 230:9,16 231:4 |
| coming 183:11 | concerned | 194:18 207:2 | 233:4,8,9,11,15 |
| 204:3 250:11 | 277:15 278:4 | 207:22 213:2,3 | 233:17 |
| 252:3 263:2 | concluded | 236:10 256:4 | controlling |
| 276:3 280:11 | 283:13 287:18 | 278:11 | 230:23 |
| 285:2 286:17 | concludes | considered | controversy |
| comment | 282:19 | 234:14 237:1 | 198:1 |
| 217:23 | conclusion | 278:7 | convenient |
| common | 233:7 | constitute | 250:16 |
| 226:14 228:10 | conditions | 182:4 | conversations |
| 265:10,11 | 204:15 | construe 231:4 | 184:7,9,10 |
| communication | conducted | 231:6,8,11 | 195:1 222:17 |
| 210:17 248:4 | 235:8 | construed | 236:22 248:9 |
| 251:11 | conference | 225:20 227:3 | 249:3 255:24 |
| communicati... | 286:3 | 230:14 232:18 | conversely |
| 210:13 237:10 | confident | cont'd 177:1 | 193:24 |
| 237:23 248:18 | 214:23 | 178:1 | coordinate |
| 251:12 | confirm 252:13 | contemplated | 281:17 |
| company | 273:22 | 215:9 238:8 | copied 239:17 |
| 230:23 271:16 | confirming | contest 193:17 | 243:2,17 |
| compensate | 284:7 | context 214:13 | 252:20 |
| 207:1,21 | conflicting | 280:1 | copy 246:7 |
| complaint | 230:22 | contingency | 292:16 |
| 190:8 | consensual | 273:5 276:12 | corporate |
| complete 291:8 | 224:5,5 | 277:3,8 | 190:15,17 |
| complex 243:6 | consensus | continue | 201:18 223:12 |
| | 263:3 264:11 | 255:13,13 | 223:21 |

**[corporation - days]**

| | | | |
|---|---|---|---|
| **corporation** 271:8 | 214:23 215:8,8 216:1,7 217:15 217:23 220:8 221:24 222:5 222:13,17,18 222:19 224:3 227:24 235:5,6 236:11,22 239:10,16,20 242:9,9,12,13 242:22,24 243:7,10 249:3 249:3,4 251:8 251:9 252:21 252:24 255:24 261:8 274:11 275:17 276:6,9 276:10 288:11 288:14 289:7 289:10 | **creditor** 195:24 198:1 204:13 214:18 215:15 258:12 259:5 259:12 261:20 262:4 275:15 275:16 | **d&o** 265:18 274:24 |
| **correct** 188:22 190:11,15 191:19,23 192:2,7,8,10,11 195:3,6,14,15 195:20 197:1,2 197:4,5 198:19 202:4 204:24 205:5,6 208:3 208:4 216:14 220:23,24 222:6,7 223:4 223:5 225:9,10 226:23 227:23 247:10 248:15 251:14 252:18 266:19 277:21 278:1 291:8 | | **creditors** 193:17 198:7 211:21 214:17 254:13 255:12 258:5 259:23 260:1,14,15 261:19 262:5 263:12 266:1 275:9 | **daca** 185:15 186:7,10 187:15 264:18 |
| | | **crickets** 277:9 | **dallas** 175:3 176:13 177:18 |
| | | **critical** 238:10 | **danger** 191:6 |
| | | **cry** 207:17 | **dangerous** 272:1,3 |
| | | **cube** 258:22 | **date** 175:12 184:19 217:16 226:11 244:5 249:13 251:8 290:24 291:12 |
| | | **curb** 255:9 | |
| | | **current** 228:17 268:15,20 276:10 | **dated** 220:22 242:16 251:5 |
| **corrections** 291:6 | **couple** 198:14 273:19 282:23 | | **dates** 217:19 |
| **cost** 197:7 256:20 | **course** 255:18 255:19 261:16 271:18 | **currently** 192:7 | **davor** 176:3 182:10 212:6 227:11 234:19 253:9 269:18 |
| **costs** 194:20 195:19 196:5 207:4 263:6 | **court** 175:1 188:7 200:7 256:10 279:2 283:6 | **customarily** 272:22 | **day** 259:9 260:4,17 261:17 262:18 262:18 263:18 266:11 267:24 275:2 280:19 283:19 287:11 291:15 |
| | | **customary** 273:9,23 | |
| **counsel** 184:8,9 184:10,11 185:2 187:3 192:16 195:1 196:6,12 197:8 198:2,5,11 202:22 203:7 214:18,20,22 | **court's** 255:4 | **cut** 204:19 | |
| | **covered** 217:17 | **d** | |
| | **covering** 225:12 | **d** 179:1 181:1 181:12 290:1 291:1 292:3 | **daylight** 175:13 |
| | **created** 254:12 | | **days** 271:3 282:23 284:17 285:23 |

**[deadline - document]**

deadline
  286:17,21
deal  204:1,2
  212:5 214:17
  215:1,16
  254:14 258:17
  260:17 261:5
  266:1 267:18
  268:13,16
  274:7 275:10
debt  189:17
  194:22 254:7
debtor  175:7
  185:17,20
  190:11 233:17
  261:13 267:14
  276:2
debtor's  185:17
  187:13 224:5
  261:8 262:10
  264:21
debts  207:8
decision  236:13
declare  291:4
deemed  291:6
deepening
  277:16
deeply  277:15
  278:3
defendants
  270:8
defense  184:2,6
  184:21 188:6
  188:11,15
  189:1,23 191:1

191:4,7 197:19
defenses
  187:24 281:1
deference
  258:14
defined  246:10
  246:18
definitely
  280:18
delay  196:6
delays  194:20
  198:2 263:8
deletion  206:8
demand  264:22
  280:19
denial  225:2,8
denied  221:3
  223:4 225:8
  227:6,9,10
  230:10 245:20
  246:21 248:23
deny  222:15
  227:9
department
  223:14,24
  285:3
depends  278:14
depo  283:14
deponent  212:7
  291:3
deposit  250:3,7
deposition
  175:9 181:10
  182:2 190:15
  190:23 201:18

209:7,10,18,23
  210:22 223:11
  235:21 241:8
  282:19 285:16
  288:1 292:4
deputize  203:6
  214:11,14
  215:17,24
  216:9,12
deputized
  216:14
described
  204:14
description
  179:7
detail  272:6
details  186:6
determining
  234:3,6
dice  259:2
difference
  191:19
different  195:9
  201:4,6 216:5
  216:5 219:3
  237:14 256:14
  270:4 271:14
  271:19
difficult  195:7
  195:8 276:5
  278:22
digital  288:8
  289:3
direction
  278:24

directions
  230:22
disburse
  265:15
disclose  238:21
  270:7
discussion
  210:3
discussions
  204:22,23
  205:1 208:13
  209:24 210:4
  211:14,18
disposal  272:13
dispute  189:5
  223:21 228:17
  260:7 262:4,22
  273:9
disputed
  262:19
disputes  261:20
distracted
  254:13
district  175:2
  256:10
division  175:3
divulge  255:15
dla  177:16
docs  213:19
document
  179:9,10,17
  205:19 228:16
  228:18,20
  230:24 234:17
  238:6 239:1,5

**[document - estate]**

243:15 252:10
**documentation**
237:16,22
238:13 239:8
239:20
**documents**
215:3 218:4
226:15 236:13
237:18 238:22
238:23 239:12
239:16,24
241:6 242:10
242:19,21,22
243:8,22,23
244:4,6,8
248:18 250:19
250:22 251:10
251:12 252:9
252:15 253:1
**doing** 197:23
200:12 201:4
203:9,12
209:10 228:10
263:5 279:13
**dollar** 195:23
215:14 237:15
267:23
**dollars** 195:12
199:4,7,21
205:14 261:11
**door** 212:2,3
**draft** 190:8
217:15
**draw** 269:17

**drop** 283:20
**drukavina**
176:7 292:1
**dry** 262:13
**duly** 183:3
288:5
**dynamic** 261:4
268:1
**dynamics**
257:13 258:24

**e**

**e** 176:1,1 177:1
177:1 178:1,1
179:1,6 181:1
181:1 290:3,3
290:3
**earlier** 217:12
220:5 266:20
**early** 184:18
211:13 267:3
267:19 274:16
**earth** 202:9
**easier** 190:7
**easiest** 203:13
203:19 211:4
**effect** 238:13
248:10
**efforts** 254:12
**electronics**
177:3
**email** 179:10
179:17 210:6,8
211:4 216:10
217:14 219:5
228:6 235:14

236:20,20
237:4 238:10
242:8 243:2,2
243:4,5 248:3
281:15
**embarrass**
278:22
**emerson**
259:11
**employ** 214:20
214:22
**employed**
288:11,14
289:8,11
**employee**
288:13 289:10
**enamored**
205:11
**encountered**
256:7
**encumbered**
185:23 186:12
**ended** 260:18
**ends** 202:9
**engage** 203:6
276:5
**engaged** 266:23
**enjoy** 214:23
**enter** 224:12
**entered** 246:8
**entering**
245:19 247:16
248:22
**entire** 185:11
210:2

**entitled** 199:22
**equity** 185:17
185:20 186:11
187:13 265:15
**eric** 217:22
**errata** 292:10
292:12,13
**es** 288:4
**escapes** 185:8
**escrow** 249:6
249:17,22
250:1
**especially**
263:11 285:5,5
**esquire** 176:3
176:10 177:4,6
177:15 178:4
178:12
**essent** 186:23
**estate** 198:7,22
199:12,15
201:1 202:14
203:9 204:1,3
204:5 205:8
206:23,23
207:1,2,21,22
208:23 211:12
211:20 213:12
215:10 216:3
216:13,18,19
216:22 218:5
254:4,10 257:7
257:8 259:2
268:2 270:5,12
273:5 276:4

Alpha Reporting          800-556-8974
A Veritext Company          www.veritext.com

[estate - familiar]

278:5,23 279:1
281:6
**estimate**
271:11,19,22
**estimated**
258:2 271:23
**et** 211:20
220:10 236:23
237:4,7,19
244:6 248:11
254:20 265:1
265:18 266:16
267:23 269:5
281:2
**evaluate**
272:22
**event** 204:6
**eventually**
238:21 264:1
**everybody**
206:12 218:24
238:7 256:16
262:13 263:2
264:8 280:8,8
282:6 284:23
285:6
**everyone's**
235:3
**evidence** 200:1
238:7
**evident** 254:19
**evidentiary**
182:1
**evolved** 267:8

**exact** 249:13
**exactly** 236:4
244:6
**examination**
179:2 183:8
253:20
**examined**
183:5
**example**
235:14 258:16
**except** 223:13
223:23
**exercise** 191:6
**exhibit** 179:8,9
179:10,11,12
179:14,16,17
179:18,20
192:16 193:5,7
205:20,21
206:3 217:3,4
218:18 219:9
219:11 220:16
220:19 224:14
224:16 225:12
228:16 229:3
229:11 232:10
232:12 235:14
235:20 240:4,6
240:13 241:13
241:18 245:3,6
245:8,10
**exhibits** 235:7
235:9,10 240:9
240:20

**existed** 222:20
**exists** 237:6
**expedite**
283:21
**expedited**
286:10,21
**expend** 259:7
**expense** 198:2
256:21
**expenses**
266:11
**expensive**
200:15 263:7
263:21 278:18
**experience**
256:8 257:24
260:20 264:14
**experienced**
256:22
**experiences**
278:15 279:23
**experiment**
275:4
**explain** 200:17
283:7
**explore** 262:3
**explored**
254:17 273:8
**express** 204:8
**expunged**
185:19
**extensive** 194:4
194:14,20
195:1

**extensively**
195:17
**extent** 233:6
234:13 259:24
267:2

**f**

**facilitates**
275:19
**fact** 185:20
186:10 187:12
193:17 202:13
215:15 224:3
267:22 272:5
275:22 276:3
**factored** 210:5
**factors** 183:15
196:5 197:7,10
212:19
**facts** 185:12,13
187:6 200:1
**factual** 208:16
225:1 227:1
**failed** 228:4
**fails** 292:15
**fair** 205:2
252:21 260:4
274:3
**faith** 188:11,14
188:14,15
189:1,1,2,17,22
189:24 191:4
**familiar** 186:1
188:17 214:12
226:12 261:8

**[far - front]**

| | | | |
|---|---|---|---|
| far 207:17 | fifty 205:14 | fine 211:16 | follows 183:5 |
| 285:7 286:5 | fight 199:21 | 272:19 281:18 | foregoing |
| fashion 276:5 | 200:9,14,18 | finish 211:17 | 288:3,4 289:4 |
| faster 235:3 | 201:14 202:8 | 250:13 262:22 | 291:5 |
| 246:15 | 254:8,16 256:3 | firm 203:7 | forgot 284:1 |
| favorite 276:13 | 262:7 263:23 | 276:11,15,16 | form 194:15 |
| federal 204:8 | 263:24,24,24 | 276:17,19 | 263:2 |
| fedex 177:2 | 263:24 278:10 | 277:1,2 | formal 239:1 |
| 182:9 193:15 | fighting 262:5 | first 179:11,12 | forth 199:16 |
| 195:1 196:22 | figure 261:14 | 179:15 183:3 | 207:10 236:24 |
| 198:5,10,16,21 | 286:12 | 205:3 207:14 | 245:2 259:22 |
| 199:2 202:16 | figured 282:22 | 207:14 218:6 | forward 191:9 |
| 202:20,22 | figures 192:1 | 218:23 219:5 | 198:3 203:2 |
| 203:3,17 204:4 | file 256:2 271:4 | 220:17 224:22 | 204:17 242:20 |
| 205:4,7,13,14 | 286:18 | 252:7,19 | 255:4 257:3,11 |
| 206:20 208:5 | filed 184:22 | 255:21 261:6 | 257:15,15,17 |
| 209:3 211:5,7 | 188:7 190:9 | 262:18 265:6 | 258:20 261:2 |
| 212:20 214:11 | 198:18 204:11 | 283:19 | 270:24,24 |
| 214:22 215:5,8 | 217:18 226:20 | five 212:13 | 275:11 281:19 |
| 215:11,14,24 | 242:17 246:24 | 213:16 | found 228:6 |
| 216:1,6,12 | 247:4 249:14 | fixed 241:12 | four 192:5,5 |
| 239:18 251:9 | 271:5,8,16 | flip 224:11 | 204:23 |
| 259:19 261:20 | filing 216:3 | 225:4 | frank 277:14 |
| 278:3 285:9,13 | 257:14 286:17 | flowing 206:23 | frankly 204:7 |
| 285:15,19 | final 277:12 | focus 254:11 | fraudulent |
| fee 207:5 | finally 282:22 | folder 240:10 | 186:3 187:19 |
| feed 191:2 | financial | 240:20,20 | 188:22 189:23 |
| fees 195:19 | 258:19 | folding 278:21 | 197:18 265:18 |
| 203:22 207:4 | financially | folks 254:12 | friday 281:11 |
| 210:24 215:7 | 288:15 289:11 | 287:9 | frinzi 254:19 |
| 263:14 268:5 | find 198:2 | follow 214:9 | 267:16,22 |
| 268:20 | 250:15 251:18 | 237:8 272:10 | frinzis 270:8 |
| fences 259:6 | finding 196:6 | following | front 188:18 |
| fifth 186:16 | 196:12 197:8 | 255:20 283:10 | 191:16 192:13 |
| 275:23 276:1 | | | 203:5 215:1 |

**[front - going]**

220:7 241:19
**fronts** 254:21
255:1
**froze** 214:7
**fruit** 267:13
**full** 286:6
**fully** 185:23
186:12
**fund** 213:10,11
213:11 257:12
259:11
**funded** 275:10
**funding** 273:6
274:15,16,20
274:23 275:4,7
275:12,23,24
**funds** 185:16
185:21 188:13
188:16 192:4,9
193:19 194:1
194:17 195:2
195:14,18
196:3 199:3,4
199:22 202:5
203:1 215:9
218:4,7 230:20
230:24 231:1
233:13,20
260:22 264:22
266:15 270:11
273:10
**funk** 239:22
242:10
**funny** 271:2

**further** 288:13
289:9
**future** 208:15
236:10

**g**

**g** 181:1
**gain** 216:19
**garbage** 261:18
**general** 187:10
197:15 248:2
266:7,18 271:3
277:23
**generally** 188:21 193:14
255:15
**generated** 283:16
**generically** 243:24
**genesis** 206:22
**germane** 261:23
**getting** 237:16
239:24 256:15
257:20,20
272:20 274:7
275:14 278:18
**gin** 255:5
**give** 189:4
190:18,19
193:5 199:18
213:15 220:15
228:23 237:21
240:1 241:23
244:12 258:14

266:11 271:10
271:18,22
272:17
**given** 190:22
278:2 291:9
**gives** 230:16
233:4
**giving** 231:4
**glad** 186:9
219:15 254:22
268:11 269:5
272:4 274:18
281:10,16
283:20 284:22
**global** 191:21
**go** 181:5
185:11 189:3,7
192:14 193:14
202:16,21
203:10 204:19
204:20 205:15
205:17 206:6
208:18 211:23
212:15 213:12
215:9 219:7,18
220:13 222:24
224:10 231:7,9
231:12,16,21
232:3 233:12
233:16 240:23
241:1,3,12,24
242:20 243:17
244:24 245:1
246:17 253:6,9
255:10,11

259:5,6,7
260:24 261:2
263:8 265:15
266:5 269:7
272:6 275:5
278:9 282:18
286:2 287:13
**god** 276:18
**goes** 197:13
213:4 268:16
**going** 183:13
185:5 189:7
190:5 191:2
193:11 195:23
199:3,6 200:15
201:8,23 202:1
202:4,5,13
208:10 209:5,7
209:22,23
211:3 212:15
213:23 214:2
214:12 215:22
217:24 228:13
229:5 234:20
234:23 238:20
238:21 239:8,8
240:2 242:2,5
242:15 244:17
246:19 250:21
253:11,14
254:3,6,6,8,11
255:4,6 259:22
260:24 264:10
266:10 267:10
268:23 269:4

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

**[going - hillyer]**

274:21 276:5
278:4,14
279:18 280:7,8
281:24 283:3
285:8,23
**good** 181:2,6
183:10,12
188:11,14,14
188:15,24
189:1,1,17,22
189:24 191:4
204:2 259:10
281:15 282:7
287:15
**goodman** 175:6
181:11,12
190:19 254:20
290:1,1 291:1
291:1 292:3,3
**goodmans**
270:8
**gosh** 267:9
280:16 283:15
**grab** 202:9
231:7,9,12,16
233:16 274:21
**grabbing**
233:10
**grand** 203:5,15
203:16,16,18
**great** 257:10,13
287:10
**greatness** 257:9
**group** 178:3
182:18 274:24

**guarantee**
211:19
**guaranteed**
208:8
**guess** 210:7
241:11 246:20
246:23 249:8
254:15 255:20
255:22 257:21
260:6 272:23
272:24 283:11
283:13,14
285:18 286:5
286:12,20
**guffy** 178:4
182:16,16
283:8,9 284:6
284:18 285:11
286:16
**guys** 203:13
204:16 213:10
215:18 254:19
255:1 259:6,7
259:7 264:4
286:3

**h**

**h** 179:6 290:3
**hand** 182:23
202:5 210:1
**handle** 198:2
273:4 277:2
**handled** 272:12
**handling**
276:12

**hands** 201:14
**handshake**
267:18
**hang** 202:11
274:20
**hanging** 267:13
**happen** 184:17
228:8,9 279:4
279:4 281:7
**happened**
248:11 259:17
259:18 280:4
280:15
**happens**
266:17 279:5,6
**happy** 272:5,7
**hardt** 176:4,11
**harr** 176:4,11
**hate** 254:22
269:3,12
**head** 258:17
**hear** 190:17
201:18,21
223:12,17
248:8 250:6
255:8 261:1
269:10,12
272:22
**heard** 194:8,8
211:8 256:24
**hearing** 182:20
210:1 211:12
279:3
**heavy** 258:5

**heightened**
237:21
**held** 224:4
**help** 222:12
240:8,9 242:23
**helped** 267:15
**hereto** 288:15
289:11 291:7
**hey** 215:18
255:9 259:5
**high** 262:13
268:22
**highly** 238:12
275:18
**hillyer** 177:4
179:3 182:8,8
183:9 192:20
192:23 193:2
193:13 206:1,3
206:5,18
208:19 209:1
209:14 210:2
210:11 211:2
212:6,11,14,17
213:7,14,21
214:4,6,8
217:1,6,10,13
218:15 219:2,7
219:17,19
224:12,18,23
225:17,18
226:21 227:7
227:11,14
229:2,5,10,20
229:24 230:3

Alpha Reporting
A Veritext Company

800-556-8974
www.veritext.com

231:2 232:22
234:18 235:1
235:19,24
236:4,7,18
240:10,16,19
241:11,16
242:7 244:14
244:17,24
245:14 246:16
247:9,12
250:12,20,23
251:2,17,20,23
252:6 253:3,8
282:8 283:7,10
283:23 284:16
284:20 285:9
285:15,18
286:4,9,20
287:1,7,10
**hire** 214:17
**hiring** 215:24
**history** 203:14
203:20
**hits** 271:3
**hitting** 271:6
**hmm** 229:18
232:8
**hold** 212:8
245:17 246:13
**holding** 185:13
**holds** 218:5
**honestly**
263:15
**hope** 199:11
228:22 257:4

277:18
**hopeful** 275:20
**hopefully**
204:10
**hourly** 210:24
**houston** 176:6
178:8 261:12
**hundred**
205:13,14
**hunt** 175:16
181:7 288:2,17
**hunton** 178:6
178:13
**huntonak.com**
178:9,16
**hypothetical**
200:1

**i**

**ice** 258:21
**ideas** 214:16
**identification**
193:8 205:22
217:5 219:12
220:20 224:17
229:12 240:7
245:7,11
**identify** 182:7
191:13
**identifying**
192:6
**ignoring**
256:20
**ii** 175:11 290:2
290:24 291:2,4
291:12 292:4

**immanence**
186:22,23
**immediate**
279:24
**impact** 254:3
278:5
**impacted** 263:1
263:12
**imply** 227:8
**important**
228:18,20
233:19 234:3,5
**impression**
265:6
**inappropriate**
211:1
**included**
235:10 284:9
**including**
189:16 237:9
**incorrect** 281:4
**incurred** 215:7
**incurring**
210:23 268:5
**indentured**
178:3 182:17
**independent**
274:10
**independently**
252:16
**indicated**
200:14
**informal**
238:24

**information**
222:14 238:10
**informing**
225:19 227:2
230:13 232:17
247:14
**initially** 267:12
268:10
**input** 235:6
**insiders** 267:14
**insistent** 255:3
**insolvency**
277:17
**insolvent**
200:16 254:10
**instance** 196:14
201:6 228:5
260:15 271:4
275:21
**instruct** 234:12
**instructed**
180:1 227:24
**instruction**
224:6
**instructions**
230:22
**insurance**
280:12
**intangible**
264:15
**intended**
181:23
**inter** 262:4
**interest** 187:13
194:17 218:6

**[interest - know]**

| | | | |
|---|---|---|---|
| 264:24 268:5 | 219:6,8 228:15 | **joint** 179:15 | **kind** 203:12 |
| 276:14 | **introduced** | 224:5,21 | 254:1,22 |
| **interested** | 193:6 219:10 | 285:16 | 256:17,18 |
| 203:8 276:11 | 224:15 228:24 | **jones** 276:15 | 257:19 259:13 |
| 276:16,17,18 | 245:4,8 | **judge** 183:21 | 261:18 262:7 |
| 276:22 277:3 | **invading** | 186:19 187:24 | 263:2 264:13 |
| 288:15 289:12 | 209:12,20 | 201:8 212:16 | 270:17 277:11 |
| **interesting** | **investigate** | 220:7,7,8,8 | 277:15 279:13 |
| 198:8 261:4 | 247:14,17,22 | 259:10 260:5 | **kinds** 267:12 |
| **interests** | 248:3,21 249:1 | 261:16 264:11 | 280:12 281:7 |
| 196:20 | **investigated** | **judgment** | **knee** 257:20 |
| **interpleader** | 248:1 | 183:16 188:1,2 | **knew** 206:12 |
| 256:10 | **investigating** | 208:17 210:5 | 276:4 |
| **interrogatories** | 248:17 | 236:13,21 | **know** 184:19 |
| 179:15 220:15 | **involuntary** | **juice** 277:20 | 184:23,24 |
| 224:13,22 | 259:21 261:7 | **julie** 289:2,15 | 185:6 186:6,13 |
| 226:15,23 | **involved** | **jump** 234:18 | 186:20,24 |
| 228:12,21 | 187:15 188:2 | **jumped** 260:6 | 187:2,4,6,7,18 |
| 230:5 244:21 | 221:11 267:3 | **juncture** | 187:21 188:5 |
| 251:4 | 274:12 284:23 | 246:18 | 191:17 193:15 |
| **interrogatory** | **irrelevant** | **june** 220:22 | 200:2 204:8,9 |
| 179:20 221:16 | 209:17 | 222:5,14 | 204:11,13 |
| 224:24 227:17 | **ish** 254:8 | 235:22 236:14 | 207:9 218:21 |
| 230:11 232:7 | **issue** 194:21 | 236:21 237:12 | 226:3,6 227:21 |
| 245:5,9 | 195:2 196:10 | 252:14 | 228:5 231:10 |
| **interrupt** | 196:18,24 | **jupiter** 258:11 | 231:18,20 |
| 215:22 | 284:24 287:6 | 259:16 260:24 | 233:14,21,23 |
| **interrupted** | **issues** 194:4,14 | 261:3 262:4 | 233:24 236:2 |
| 279:14 | 280:12 | | 237:10 238:23 |
| **interrupting** | **item** 207:20 | **k** | 241:16 243:1 |
| 194:9 | | **keep** 205:15 | 243:16,22 |
| **intricacies** | **j** | 210:21 278:23 | 244:1,2,8 |
| 201:9 | **jerk** 257:20 | **keith** 276:19 | 249:14 250:12 |
| **introduce** | **job** 175:17 | **kick** 255:9 | 250:15 254:2 |
| 192:24 193:4 | 285:6 290:2 | **kicker** 214:24 | 254:17,18,19 |
| | | 215:4 | |

Alpha Reporting
A Veritext Company

**[know - line]**

254:21 255:9
255:23 256:1,9
256:9,12,14
257:2,18,24
258:2,3,13,16
258:23 259:10
259:10,16,17
259:22 260:2,9
260:21 261:7
261:21,23
262:6,12,17,18
262:19,21,21
263:4,7,21
264:7,15,20,21
265:12,17,22
266:2 267:1,11
267:24 268:4,6
268:8,17,17
269:3,8,20
270:3,3,5,7,8
270:17,17,18
271:1,2,2,5,9
271:10,11,15
271:18 272:21
272:24 273:1
273:22,23,24
274:5,9 275:5
277:12,14,15
277:16,18,18
277:19 278:2,3
278:4,5,5,6,6,9
278:12,16,17
278:19,19,20
279:7,10,15,17
279:18,20,22

279:23 280:4,5
280:19,23
281:5 282:12
282:15 283:11
283:17,18
284:7,23,24
285:5 286:14
286:18
**knowledge**
183:24 189:18
239:4 241:15
288:10 289:6
**kopf**  176:4,11
**kurth**  178:6,13

**l**

**lack**  241:15
**land**  237:17
277:4
**langley**  177:6
182:9 193:1,4
203:7 205:20
206:2,15 217:3
218:18,23
219:6,9 224:14
225:15 228:24
229:3,9 240:4
240:15 241:7
244:22 245:3
246:14 251:21
252:1
**language**  220:4
246:2
**languishing**
257:16

**large**  194:19,19
**larson**  183:21
220:8
**larson's**  186:19
187:24
**late**  274:7
**laundry**  214:15
243:23
**law**  184:2
**laws**  182:1
**lawsuit**  271:8
**lawyer**  231:10
231:21 233:14
250:5 276:13
**lawyers**  199:15
210:24 265:5
273:4 274:19
275:11 279:5
**lay**  237:17
277:4
**laydown**
203:19
**lead**  243:9
**left**  183:14
262:13 276:4
**legal**  178:20
203:22 223:13
223:24 233:7
292:19
**letter**  179:16
221:11,12,14
222:8,13 224:2
224:7 225:9,19
226:2,3,4,6,9
227:2,16,18

228:3,14 229:6
230:4,12,12,15
230:16 232:17
232:24 233:4
233:18 234:5
234:10,15
236:3,9 237:9
244:10 245:19
245:23 246:4,5
246:8,22,24
247:4,14,18
248:4,9 251:9
251:16,18
252:21
**letters**  280:20
**letting**  212:23
256:2,3
**lien**  199:21
200:5 265:14
**liens**  194:16
274:24
**life**  256:19
278:22
**light**  187:12
190:22 197:24
198:1 202:5
**likely**  195:21
**limited**  185:19
**line**  180:2
207:20 208:11
231:3,4,6,8,11
250:17 274:7
290:4,7,10,13
290:16,19

[lion's - mean]

**lion's** 203:23
204:6
**liquidating**
257:16
**list** 214:15
243:23 270:16
**listened** 201:17
**literally** 252:7
**litigate** 196:7
**litigating**
194:21
**litigation** 196:6
196:13,15
197:7 202:17
209:4 212:21
212:24 213:10
238:9 263:3,6
263:17,18,19
270:4,21
272:23 274:8,9
274:13,14,15
274:16,20,23
275:4,7,11,23
275:24 279:24
**litigious** 268:22
**little** 201:6
238:24 261:5
264:24 269:23
272:23 276:12
276:13 280:24
**llc** 178:21
**llp** 177:7,16
178:6,13
**loan** 218:4

**location** 175:14
**logistics** 177:2
**long** 211:8
260:16 263:5
264:3,5
**look** 189:3
191:18 205:18
205:19 207:20
224:24 242:14
245:15 250:19
254:18 265:17
277:13 281:19
**looked** 185:8
186:21 216:10
234:15 265:4
268:24 270:20
**looking** 193:14
204:12 219:4
243:16 250:13
250:22 252:7
265:22 267:5
267:21 268:13
271:11,15,20
273:21
**looks** 258:4
266:6,14
279:21
**lose** 240:11
**lost** 240:9
**lot** 204:15
207:9,9,10
255:15 259:21
261:18,19
262:24 264:19
265:12 268:23

279:20
**lots** 260:3
262:20
**lower** 280:24
**luck** 261:16

**m**

**m** 178:12
**made** 196:11
202:7 291:5
**maintain**
278:18
**major** 263:12
271:6
**majority** 178:3
182:18 198:16
**make** 190:7
204:1 206:11
213:18 217:18
220:15 222:11
223:19 226:16
227:17 235:3
237:22 238:11
258:18 259:1
259:23 266:14
266:17 275:1
278:21
**making** 208:14
235:17 265:24
266:2
**man** 208:15
211:1 256:16
**manner** 182:2
**march** 246:10
246:24 247:5,7
247:18 249:2

249:15 255:13
**marked** 193:7
205:21 217:4
219:11 220:19
224:16 229:7
229:11 240:6
245:6,10
**market** 273:1,3
**marketing**
280:10
**massive** 254:8
**match** 261:13
265:1
**math** 215:16
**matter** 187:15
198:3 200:14
238:8 239:23
255:3,10 257:3
257:14 265:6
266:7 268:20
275:11
**matters** 255:10
273:4
**mean** 188:11
191:11 197:14
211:10,18
213:4 215:24
215:24 220:8
220:10 228:8
231:12 243:18
247:7 254:16
263:3 271:7
273:15,16
274:1 277:13
279:15 284:24

Alpha Reporting
A Veritext Company

800-556-8974
www.veritext.com

**[mean - necessarily]**

286:11,12,16
286:20
**means** 182:3
243:20
**meant** 199:19
214:14
**mediated**
263:18
**mellower**
269:24
**melting** 258:21
**memorized**
188:19
**memory** 280:16
**memphis**
175:15 177:9
**mention** 226:11
268:12
**mentioned**
197:14 234:16
244:5 259:16
262:2 268:11
**mentioning**
266:9 274:6
280:18
**mess** 254:12
267:9
**michael** 178:4
**michelle** 235:14
**middle** 194:7
194:13 250:17
**midstride**
183:13
**midway** 278:13

**milam** 176:5
**million** 195:12
199:20 215:13
237:15 260:10
**millions** 260:8
261:11 267:19
**mind** 213:20
244:7 250:18
260:5,6 262:7
274:6 278:23
280:17 285:21
**minds** 263:13
**minute** 212:13
213:16 272:17
**minutes** 213:19
244:16
**missed** 223:15
223:18
**misspoken**
274:4
**mm** 229:18
232:8
**monday** 281:11
286:18,22,23
287:1
**monetary**
191:24
**money** 192:6
200:3,8,19
201:1,11,19
202:2,3,6,8,13
205:15 213:4
213:11 216:13
231:7,9,12,16
233:10,16

255:12 258:21
259:7,21
263:23,23
265:4,4 275:16
279:5,17 280:7
**monies** 281:6
**monitoring**
271:1
**months** 204:23
205:1
**motion** 179:8
179:11 190:23
191:10,11,11
191:13,15,19
191:20,21
192:4,12,13
193:3 194:3
198:6,11,12
210:4 217:15
217:17,21,21
218:3,10,13,14
218:19,21,22
219:5,5,23
220:11 242:17
246:10,19,19
246:21 247:1,1
247:3,4 249:5
249:5,15,19
255:21 257:4
257:14 268:16
**motions** 190:9
**motivated**
238:12 275:18
**mouth** 275:16

**move** 191:9
198:3 209:7,13
210:11 213:14
255:3 257:2,10
276:7
**moving** 254:21
255:1 257:17
261:19 270:24
270:24
**munsch** 176:4
176:11
**munsch.com**
176:7,14 292:1
**mvl** 175:7

**n**

**n** 176:1 177:1
178:1 179:1
181:1
**nada** 277:10
**name** 181:6
185:6 186:24
228:7 264:22
274:17 276:19
280:14 284:1
**narrative**
253:22
**national** 178:2
182:17
**nature** 248:21
266:4 280:13
**near** 261:12
**necessarily**
225:11,22
232:1,20 234:8
237:24

Page 20

**[necessary - okay]**

**necessary**
237:23 291:6
**need** 240:8,9
241:12 270:6
284:10 285:8,9
285:13,19
286:12,21,23
**needed** 191:5
216:8
**needs** 285:10
**negative**
261:17 264:10
264:13
**negotiate**
210:21,24
**negotiation**
207:10 209:6
209:18 216:16
**negotiations**
199:16 211:5,7
211:9 212:1
242:17
**neither** 288:11
289:7
**neligan** 276:16
**networks** 175:6
181:11 190:20
290:1 291:1
292:3
**never** 194:8
204:10 244:7
256:16,24
268:8,8 274:18
**new** 178:15
225:20 227:3

230:13 251:12
252:9
**newly** 271:15
**night** 186:14
280:22
**nine** 240:15,16
**ninth** 183:21
184:1,11,15,21
186:16 187:5
187:24
**noah** 177:15
182:14 253:18
**noah.schotte...**
177:19
**non** 251:10
**nope** 186:18
**normally** 199:9
**north** 176:12
177:17
**northern** 175:2
**notarize** 292:11
**notary** 181:14
291:13,19
**note** 267:23
292:9
**noted** 291:7
**noteholder**
178:3 182:18
**notes** 272:18
**notice** 285:22
**notices** 230:22
**number** 217:21
224:24 230:8
235:7 247:13
249:10,18

266:12,14
276:7
**numbers**
195:11 271:12
**ny** 178:15

**o**

**o** 181:1
**oath** 223:22
226:17,20
**oaths** 181:15
**object** 208:10
226:18 227:11
234:11 258:19
**objected**
200:22,23
**objecting**
193:17
**objection**
181:18 182:20
185:3 193:16
199:24 208:20
209:15,16
212:7 233:6
243:11 255:21
256:2 258:18
269:17
**objections**
212:9 227:12
**obtained**
252:16,17
**obviate** 211:12
263:14
**obviously**
255:6 276:14

**occurred**
184:16 270:6
**occurs** 280:2,18
**offer** 205:3,7
207:14 211:4
216:15 267:17
**offered** 203:6
205:4 214:11
277:2
**officer** 288:1,2
**offline** 272:2,5
281:18
**oh** 223:9
225:14 240:17
240:22 241:3
250:23 253:8
267:9 276:18
277:1 280:5,16
283:15 285:17
**oil** 261:6,11,17
262:6,8,9,10,20
264:9,9,12
**okay** 182:19,20
183:20,24
184:4,13,17,24
185:5,10,22,24
186:6,15,19
187:2,4,14,18
187:23 188:4
188:10,17,20
188:24 189:4
189:13,14,21
190:3,7,14,22
191:5,14,18,24
192:3,9,12

**[okay - paragraph]**

193:4,14,21,23
194:3,9,13,24
195:5,11,16,22
196:2,8,12,16
196:22 197:3,6
197:8,15,23
198:4,15,20
199:1 200:3,7
200:12,17,22
200:24 201:3
201:15,22
203:15 205:3,7
205:13,19
206:4,11,11,16
206:16,19
207:8,16,24
208:5 209:2
211:13,16
213:14,21
214:6,9,15
217:8 218:12
218:15,20
219:14,21
220:1,5,13,21
220:22 221:1,2
221:3,6,9,15,22
222:4,8,12
223:2,6,9,19
224:10,24
225:23 226:1,6
226:13,22
227:1,7,22
228:2,9,13,19
228:23 229:5
229:18,20

230:4,7 231:3
231:8,11,15,23
233:3,11,18
234:5,9 235:19
235:24 236:4,4
236:19 237:10
237:14,20
238:17 239:1,4
239:7,14
241:11 242:8
242:15,23
243:3,6,21,24
244:2,19
245:13,15,16
246:1,6,7,17,19
246:22 247:3
247:13,20,22
248:2,12,16,20
249:1,5,14
250:3,6,9,24
251:8,17 252:1
252:2,24 253:3
256:5 260:12
265:21 268:13
269:8 270:23
271:7,22
273:12 274:15
275:2 276:24
277:11 283:7
283:23 284:15
284:20 285:10
285:13,13,17
285:23 286:2,8
286:24 287:2
287:12,15

**old** 256:15
259:10
**once** 260:17
**one's** 240:3
**ones** 286:16
**ongoing** 205:1
**open** 211:17,24
212:3,3
**operate** 238:22
**opinion** 185:12
186:20 188:1
196:17 220:6
**opposed** 212:18
212:19,23
**options** 270:4
**oral** 248:17,17
**orally** 185:1
**order** 194:16
194:19,21
203:10 212:16
282:11,11,13
283:16,21
284:2,3,22
287:3
**orders** 285:24
**ordinary**
256:10 265:3
**outcome**
200:24 288:16
289:12
**outs** 266:1,16
**outside** 271:15
**overall** 194:18
**overexcited**
207:19

**overly** 235:17
**oversecured**
267:5 268:4,7
**overwhelming**
198:16
**owed** 204:9
281:6
**own** 197:3
209:12 216:7

**p**

**p** 176:1,1 177:1
177:1 178:1,1
181:1
**p.m.** 175:13
181:4,9 213:24
214:3 234:21
234:24 242:3,6
253:12,15
282:20 287:17
**page** 179:2,7
180:2 192:15
193:9 194:7,10
194:11 206:6
217:14 225:3
250:19 290:4,7
290:10,13,16
290:19
**pages** 292:12
**paid** 207:4,5
213:13 259:23
**paragraph**
194:11 218:2
219:3,18 252:8
252:23

Alpha Reporting
A Veritext Company

800-556-8974
www.veritext.com

**[parameters - possession]**

| | | | |
|---|---|---|---|
| **parameters** 215:23 | **past** 256:7,13 278:12,16 280:4 | 233:19 234:3,6 **period** 204:22 | 188:6,9 **please** 182:7,22 |
| **paraphrase** 217:24 | **pay** 194:21 | **perjury** 227:9 **permitted** | 209:13 212:8 222:24 227:11 |
| **paraphrasing** 252:22 | 201:19 205:8 205:13 207:1 | 181:23 **personal** 239:4 | 244:16 250:23 **pleasure** 253:7 |
| **park** 178:14 | 207:21 208:7 | **personally** | **pocket** 208:6,7 |
| **part** 191:10 | 216:12 254:7 | 277:15 | **point** 195:20 |
| 192:12 194:14 | 255:11 267:22 | **petition** 195:24 | 196:11 199:23 |
| 194:18 204:19 | 279:4 280:7 | 198:17 259:21 | 212:20 215:13 |
| 204:19 218:8 | **paying** 197:24 | **pguffy** 178:9 | 239:23 244:10 |
| 261:22 | **payments** | **ph** 259:11 | 255:6 277:19 |
| **particular** | 183:17 184:22 | **philip** 178:4 | **policies** 265:18 |
| 186:8 223:15 | 202:24 | 182:16 283:8 | **pool** 258:6 |
| 223:16 243:15 | **pc** 176:4,11 | 283:24 284:1 | **pop** 224:18 |
| 272:21 | **pearl** 177:17 | 286:11 | **poplar** 177:8 |
| **parties** 181:16 | **pending** 191:16 | **phone** 209:9,21 | **popped** 262:6 |
| 181:19 208:23 | 224:4 230:21 | 209:22 212:13 | **pops** 261:10 |
| 210:14 220:12 | 257:4 | 214:21 243:18 | **populated** |
| 236:23 238:12 | **people** 237:3 | 263:1,11 269:6 | 217:7 |
| 248:13 249:21 | 238:2,22 259:2 | 269:6 | **portion** 234:13 |
| 256:14 263:1 | 262:8,20 | **phrase** 219:22 | 235:9,9 |
| 274:12 288:12 | 263:22 273:22 | 269:17 | **position** 190:5 |
| 288:14 289:8 | 273:24 | **pick** 183:13 | 190:22 199:1 |
| 289:11 | **percent** 195:13 | **picture** 267:21 | 237:3,6 238:14 |
| **parts** 270:18 | 195:14 199:10 | **piece** 238:10 | **positions** |
| **party** 220:3 | 215:5,15 | 274:8 280:5 | 231:19 236:23 |
| 238:18 274:10 | 258:12 259:12 | **pieces** 261:19 | **positive** 187:16 |
| **pass** 253:4 | **percentage** | **piper** 177:16 | 188:8 222:1 |
| 281:22 287:4 | 196:8 | **pitch** 214:19 | 226:8 237:13 |
| **passcode** 283:1 | **perfected** | **pitched** 214:15 | 245:22 247:2,6 |
| 283:3 | 193:18 194:1 | **play** 258:24 | 247:11 249:7 |
| **passman** | 194:17 218:6 | 262:14 278:11 | 250:4 |
| 276:15 | **perfection** | **pleading** | **possession** |
| | 195:2 196:9 | 184:22 185:1 | 221:17 226:16 |

Alpha Reporting                    800-556-8974
A Veritext Company                www.veritext.com

**[possession - prosperity]**

228:4 235:23
236:11,12
237:12 248:4
252:11
**possibility**
273:6
**possible** 248:3
**possibly** 236:2
275:1
**potential** 191:2
210:15 270:4,7
270:21
**practical** 254:4
**practice** 226:14
228:10 262:23
262:24 266:7
**pre** 195:24
198:17 281:4
**precise** 243:15
**predates** 219:5
**preference**
186:2 187:18
280:19
**preferences**
265:17
**prepared**
236:15 289:3
**present** 178:19
189:17 204:22
**presented**
246:9
**preserve** 190:6
**preserving**
190:13

**pressure** 285:7
**pretty** 228:16
265:20 267:21
281:15 285:5
**prevail** 263:13
**prevent** 233:10
233:11
**previous**
216:10 246:2
260:20 283:18
**previously**
251:13
**price** 273:7
**principle**
277:24
**prior** 237:1
245:19 247:16
247:18 248:22
249:2 281:1
288:5
**priority** 199:22
218:6
**privileged**
251:10
**probably**
192:24 204:21
217:11
**problem**
241:20
**procedural**
181:24
**procedure**
265:22
**proceed** 183:7

**proceeding**
175:14 181:8
181:22 279:8
287:18 289:4
**proceedings**
288:3,5,6,9
289:6
**proceeds**
203:24 207:6
213:12
**process** 265:21
266:24 278:17
**produce** 210:8
210:13 228:1,4
251:13 252:9
274:13 284:13
**produced**
181:21 210:6
222:6,8 227:23
235:21 251:14
**producing**
228:20
**product** 209:12
209:20
**production**
235:10 239:18
252:11,17
253:1
**professionals**
266:3
**progress** 203:5
**projected**
268:14
**promise** 272:13
272:16

**promised**
250:12 253:9
**property**
186:11 218:5
279:21 280:6
**proposed**
194:15,15,18
206:19 218:9
220:4 245:20
246:8,9,17
247:16 248:22
275:10
**proposing**
213:9
**proposition**
225:10,21
232:3,17,19
**prosecuted**
188:21
**prosperity**
183:17 184:1
184:12,14,20
184:21 188:6
190:4,8,10,14
190:23,24
191:22 192:7
196:21 199:16
199:19,21
200:13 201:11
201:17 202:1
202:18,24,24
206:20 209:4
221:12,14
222:9,13,17
223:3,11,13,21

**[prosperity - reason]**

| | | | |
|---|---|---|---|
| 223:23 224:2 | **public**   291:19 | 190:3,18 | **r** |
| 225:7,9,19 | **publish**   240:2 | 197:16 198:8,9 | **r**   176:1 177:1 |
| 226:2,7,10 | 245:1 | 203:11 204:14 | 178:1 181:1 |
| 227:2 229:4,7 | **published** | 209:6,8,12,19 | 290:3,3 |
| 230:10,12,13 | 206:2 240:3,5 | 210:7 211:5 | **raise**   182:22 |
| 230:16 232:17 | 245:12 | 212:5 213:10 | 188:15 |
| 235:8,21 239:2 | **pull**   246:14 | 214:10 216:9 | **rambo**   256:18 |
| 239:5,12,17,24 | 251:15 | 219:21 222:4 | **range**   199:9 |
| 240:19,21,22 | **pulled**   278:16 | 223:16 226:19 | 203:21 205:10 |
| 241:2,4,6 | **purposes**   218:3 | 237:9 246:20 | **rather**   248:18 |
| 242:12,18 | **pursuant** | 247:17,21 | 249:18 |
| 243:8 244:5 | 196:20 204:16 | 248:3 251:3 | **reached**   235:4 |
| 245:19,24 | **pursue**   198:5,6 | 254:15 255:20 | **reaction**   257:20 |
| 246:5 248:12 | 202:23 205:15 | 257:19 258:23 | **read**   189:8,22 |
| 248:21 252:12 | **pursuing** | 261:1 262:1 | 218:1 225:4,17 |
| 252:17 254:9 | 196:13,15 | 263:10 265:19 | 230:8 232:3,4 |
| 255:5 270:11 | 216:7 | 266:22 271:13 | 232:18 291:5 |
| 273:10 | **pursuit**   215:8 | 272:24 274:3 | 292:6,8 |
| **protect**   203:24 | **push**   278:7 | 277:12 279:7 | **reading**   221:2 |
| 208:23 211:12 | **pushed**   258:20 | 281:7 | **ready**   193:12 |
| 211:19 216:18 | 258:20 | **questioning** | 229:24 250:24 |
| **protected** | **pushing**   257:14 | 208:11 | 252:1 255:11 |
| 266:3 | 257:15 | **questions**   180:1 | 269:19 |
| **protection** | **put**   215:18 | 187:5 208:17 | **real**   234:19 |
| 216:21 | 218:2 244:22 | 210:15 211:3 | 272:24 275:14 |
| **protective** | 251:19,20 | 250:17 253:23 | 286:14 |
| 212:16 | 265:4 278:12 | 254:16 272:11 | **realized**   262:19 |
| **protracted** | 279:16 283:21 | 281:24 282:1 | **really**   196:5 |
| 263:21 | 284:22 285:6,7 | **quick**   234:19 | 209:22 256:5 |
| **provide**   277:7 | 287:3 | 244:12,17 | 264:8 275:19 |
| 279:5 | **putting**   275:16 | 253:10 285:5 | 275:22 |
| **provided** | **q** | **quilling**   276:17 | **reason**   189:5 |
| 193:16 196:22 | | **quite**   267:9,9 | 218:9 223:20 |
| 196:24 280:24 | **qualified**   288:7 | **quoted**   246:1 | 228:2 237:11 |
| 281:1 | **question** | | 262:6 290:6,9 |
| | 187:14 188:4 | | |

[reason - remote]

| | | | |
|---|---|---|---|
| 290:12,15,18 | 233:1 234:19 | 230:12 244:10 | **relative** 288:13 |
| 290:21 | 234:21,22,24 | 292:5 | 289:10 |
| **reasonable** | 235:5 241:12 | **referencing** | **release** 191:21 |
| 198:24 199:2,6 | 241:24 242:3,4 | 229:6 | **releases** 201:12 |
| 258:15 260:4 | 242:6 247:16 | **referred** 183:21 | **relevance** |
| 263:13 | 252:8 253:9,12 | 226:5 | 208:12 209:24 |
| **recall** 184:4 | 253:13,15 | **referring** | **relevant** 210:9 |
| 207:15 215:5 | 254:23 269:6 | 221:18 222:9 | 210:20 259:18 |
| 222:22 239:3 | 269:13 272:8 | 226:3,9,19 | 261:24 |
| 244:4,11 249:6 | 272:12 281:9 | 227:16,19 | **relied** 187:23 |
| 249:11,13 | 282:19 288:9 | 228:15 230:5 | 222:20 |
| 267:2 | 289:5 | 252:22 | **reluctant** 272:7 |
| **receive** 199:3,6 | **recorded** 182:2 | **refinery** 261:6 | **remain** 196:19 |
| **received** | 288:6 | 261:11 | 230:20 |
| 235:11 239:16 | **recording** | **reflective** 196:3 | **remark** 229:8 |
| 243:10 244:9 | 181:21 288:8 | 196:9 | **remedies** |
| 251:9 | 289:4 | **refreshed** | 231:20 |
| **recent** 269:1 | **records** 234:2 | 207:13 | **remember** |
| 271:5 | **recover** 185:18 | **regard** 184:11 | 183:17,22 |
| **recipient** | 189:6,14 | 211:9 220:3 | 186:4,4,22 |
| 188:16 | 199:20 200:3,8 | 231:19 238:8 | 187:17,22 |
| **recollection** | 200:8 | 255:2,7 256:17 | 193:10 203:21 |
| 203:19 207:13 | **recoveries** | 264:18 267:14 | 205:9,16,17 |
| 269:1 | 274:24 | 268:1 274:8 | 218:16,17 |
| **reconcile** | **recovery** 204:7 | **regarding** | 228:11 232:9 |
| 222:12 | 208:6 215:6,13 | 196:9 208:13 | 232:11 239:6 |
| **record** 181:3,8 | 215:14 270:5 | **reimbursed** | 250:10 260:8 |
| 181:9,19 182:7 | 270:21 271:23 | 215:7 | 274:11 276:18 |
| 210:22 211:1 | **rectify** 197:6 | **reissue** 225:15 | 276:19,24 |
| 213:23 214:1,3 | **redaction** | **related** 183:17 | 279:1 284:5 |
| 214:10 221:9 | 206:10,12 | 184:12 199:2 | **reminding** |
| 221:18,23 | **reduced** 288:7 | 225:6 270:11 | 210:19,20 |
| 222:5,20 225:6 | **reference** 226:1 | 288:11 289:7 | **reminds** 256:16 |
| 225:21 227:4 | **referenced** | **relates** 196:18 | **remote** 175:14 |
| 230:14 232:19 | 214:19 228:21 | 198:21 | |

**[remotely - right]**

| | | | |
|---|---|---|---|
| **remotely** | **request** 219:23 | **resolved** 199:9 | **rfa** 225:1 245:5 |
| 181:17 | 220:2,3,11 | **respect** 225:23 | **rfp** 251:24 |
| **removal** 191:21 | 221:1,3,17 | 230:23 251:10 | 252:10 |
| **removing** | 222:21,24 | 266:21,24 | **rfps** 210:13 |
| 217:9 | 223:1 224:8 | 273:9 | **rigamarole** |
| **rendition** | 225:2,3 230:7 | **respectfully** | 264:18 |
| 252:22 | 239:2,18,20 | 210:2 | **right** 182:22 |
| **reorganize** | 244:20 245:15 | **respond** 226:14 | 183:6,10 188:8 |
| 272:18 | 245:17 247:13 | 241:17 | 191:9 192:23 |
| **rep** 190:17 | 248:20 251:11 | **responding** | 195:12 201:4 |
| 223:12 | 252:14 253:1 | 252:24 267:11 | 203:10 204:2 |
| **rep's** 190:15 | 283:12 | **responds** | 204:13,18 |
| **repeat** 271:13 | **requested** | 242:13 | 206:6,24 207:3 |
| **rephrase** | 242:11,19,21 | **response** 224:1 | 207:20,23 |
| 211:22 232:23 | 243:8,10 244:9 | 227:18,19 | 208:1,19 212:1 |
| 234:1 239:15 | 288:21 | 230:11 246:2 | 213:7,22 215:1 |
| **reported** | **requesting** | **responses** | 215:18,21 |
| 175:16 185:11 | 243:14 | 179:12,14,19 | 216:17 217:1 |
| **reporter** 181:6 | **requests** | 179:21 220:14 | 217:10,19 |
| 181:7 182:19 | 179:13,18 | 220:14,17 | 220:16 222:24 |
| 183:6 253:18 | 220:14,17 | 224:21 225:1 | 224:9,18,21 |
| 283:5,6,15 | 222:2 228:12 | 239:18 245:5,9 | 232:23 233:15 |
| 284:15,21 | 239:5 251:5 | **responsive** | 235:1 236:2 |
| 285:10,12,17 | **required** | 251:11 | 240:1 241:6 |
| 285:20 286:8 | 210:12 291:13 | **restroom** | 244:18 246:3 |
| 286:23 287:2,8 | **researched** | 244:15 250:10 | 251:7 253:2,16 |
| 287:12 288:18 | 265:5 | **result** 194:20 | 260:19 262:17 |
| **represent** | **reserve** 200:9 | 252:11 263:16 | 264:9,14 265:8 |
| 216:1,1 | **reserved** | **return** 265:24 | 266:5 268:19 |
| **representative** | 287:16 | 268:14 292:12 | 269:24 270:1,2 |
| 201:19 223:22 | **reserves** 225:11 | **review** 194:4 | 272:10,16,17 |
| 250:6 | 225:22 232:20 | 194:14 222:2 | 272:20 276:7 |
| **reputation** | **reserving** 236:9 | 288:21 | 276:10 277:6 |
| 278:21 | **resolution** | **reviewed** 218:3 | 277:24 278:2 |
| | 230:21 | | 279:11 280:3 |

**[right - second]**

281:8,9,21
282:8,16,18
283:4,5 284:16
286:1,8 287:3
287:7,13
**rights** 200:9
225:12,23
231:20 232:21
236:9 262:20
**ripe** 255:11
**risk** 183:15
194:19 197:7
204:5 259:8
263:7 268:4
**risks** 196:6
**road** 265:16
**robert** 177:4
**rock** 260:2
**roll** 259:2
286:13
**rolled** 283:11
**ross** 235:14
**rosy** 267:21
**rough** 215:16
271:10,19,22
283:12,13,14
284:3,7,10,13
284:24 285:24
285:24 286:5,6
286:13
**roughs** 285:8
**rukavina** 176:3
182:10,10
185:3 192:18
193:9 199:24

206:13 208:10
209:5,11,16
210:10,12
212:2,10,12,15
213:1,18
218:13 220:9
226:18 227:5,8
232:6,9,13,15
233:6 234:11
235:16,20
236:1,5,15
240:8,12,17,23
241:3,9,14,20
241:23 243:1
243:11,13,19
244:13,15
247:7 250:10
250:15 251:15
251:18 252:2,5
253:6 270:10
272:1 273:15
276:11,20,23
281:12 282:4
282:10,15,24
**rules** 182:1
292:14
**ruling** 183:21
183:22 184:15
**running** 219:20
239:23

| s |
| --- |

**s** 176:1 177:1
178:1 179:6
181:1 290:3

**sake** 191:10
192:6 235:2
**sat** 190:14
268:24 278:6
**satisfaction**
189:16
**save** 258:21
**saying** 184:13
190:13 194:9
202:6 213:5,11
223:17,18
231:3,15,17
255:8 270:1
279:10
**says** 189:5,19
189:20 194:23
238:6 242:14
245:23,23
248:10
**scenario**
258:16 263:13
264:20 265:2,3
265:3 266:8,18
278:14
**schaffer** 217:22
**schedules**
261:10
**scheduling**
285:6
**schottenstein**
177:15 179:4
182:14,14
253:5,16,19,21
270:13,14
272:9 273:17

273:20 277:5
281:8,17,21
**scott** 175:10
176:2 181:11
182:12 183:2
277:14 290:2
290:24 291:2,4
291:12 292:4
**scratching**
258:17
**screaming**
201:11
**screen** 214:7
**scroll** 229:14
229:17
**scrutiny** 237:21
**scummed**
275:18
**second** 179:8
179:18,20
189:4 191:10
191:15,18,20
192:13 193:1,2
193:5 199:18
206:6 213:15
214:7 217:18
218:19,20,22
219:4 220:15
228:23 240:1
241:23 244:12
244:19,20
245:4,5,9
246:12,13
247:4 251:4,5
251:24 252:9

Alpha Reporting
A Veritext Company

800-556-8974
www.veritext.com

**[second - signature]**

| | | | |
|---|---|---|---|
| 261:1 272:18 | 183:2,10 191:9 | **september** | **seven** 232:13 |
| **seconded** 192:3 | 192:24 195:8 | 175:12 181:4 | 232:14 |
| **section** 189:3 | 195:12 199:20 | 181:12 208:14 | **several** 271:1 |
| 189:15,15 | 207:16 208:21 | 235:8 292:2 | 275:12 |
| **secured** 193:18 | 211:10 214:9 | **session** 254:23 | **shallow** 265:12 |
| 193:24 194:22 | 220:13 227:15 | 284:8,8,11,12 | **share** 203:23 |
| 196:20 230:21 | 230:1 235:1 | 284:13 | 204:6 205:12 |
| 231:1 254:7 | 239:9 240:1 | **set** 179:12,15 | **shawn** 175:16 |
| 260:21 265:9 | 242:8 245:17 | 179:18,20 | 181:5,7 288:2 |
| 265:23 266:6 | 251:3 253:3,17 | 220:17 224:22 | 288:17 |
| 267:1,5 | 253:23 290:2 | 244:20 245:4,5 | **sheet** 292:10 |
| **securing** | 290:24 291:2 | 245:9 251:4,5 | **shell** 271:8,16 |
| 189:16 | 291:12 292:4 | 251:24 258:9 | **shoot** 257:6 |
| **security** 194:17 | **seidelvol** 291:4 | 281:10 | **shop** 276:13 |
| 218:6 264:24 | **sell** 261:17 | **settle** 237:15 | **shopped** 274:1 |
| **see** 192:17 | 264:9 265:15 | 263:17 280:23 | **shopping** |
| 202:14 206:9 | 267:24 279:22 | **settled** 197:20 | 279:16 |
| 207:12 218:10 | **sellers** 273:13 | 210:6 281:5 | **short** 235:2 |
| 225:14 229:22 | **selling** 207:17 | **settlement** | **show** 188:9 |
| 240:22 242:13 | 216:6 264:12 | 194:15,19 | 218:13,14 |
| 245:22 263:13 | **send** 238:1,13 | 197:9,13 | 230:15 249:7 |
| 264:16,19 | 238:15,18 | 198:24 200:4 | 249:20 |
| 268:9,9 273:4 | 239:1 280:19 | 208:13 209:24 | **showed** 238:6 |
| 282:7 283:4,22 | **sends** 264:22 | 210:3,4,16 | **showing** 230:24 |
| **seeing** 184:4 | **sense** 222:11 | 211:24 218:9 | 269:4 |
| 218:16 261:20 | 256:11 258:19 | 237:18 239:21 | **shuts** 265:13 |
| **seemed** 278:18 | 259:1 268:19 | 242:17,20 | **side** 241:21 |
| **seems** 279:17 | 269:11 | 245:20 246:9 | 264:1 |
| **seen** 221:22 | **sent** 190:8 | 246:10,18 | **sign** 213:19 |
| 227:20,22 | 211:4 236:24 | 247:16 248:23 | 250:18,21 |
| 256:17,23 | 239:5 248:9 | 254:3 259:4 | 287:13 292:6 |
| 258:1 263:8 | 252:21 | 260:4 268:14 | 292:11 |
| **seidel** 175:10 | **sentence** 243:7 | **settling** 220:3 | **signature** |
| 176:2 181:11 | **separate** | 220:12 248:14 | 287:16 288:16 |
| 182:11,12,12 | 251:13 | 280:21 | 289:14 |

[signatures - stenographic]

signatures
230:19,19
signed 226:20
292:17
significant
228:16 242:16
silent 260:18
silver 237:24
238:2,4,5,10,15
238:18
similar 237:1
256:12 258:9
262:4
similarity
260:1
sir 193:22
196:11 205:10
253:24 256:18
257:19,23
262:24 264:20
267:7 270:21
273:11 275:9
276:8 279:13
279:14 280:2
287:10,14
sit 190:24
223:9
sits 204:13
sitting 187:2,4
188:8 192:7
195:22 204:11
209:2 221:6
223:6 233:3
244:2 249:23
250:1 261:6

268:9
situation
285:21
situations
256:7,13
six 193:11
skate 263:22
skills 288:10
289:6
smack 194:13
smoothly
282:22
sneak 283:3
snow 177:7
277:2,7
sold 274:2,9
solicit 271:17
solutions
177:14 178:21
181:12 290:1
291:1 292:3,19
somebody
197:19 211:18
237:24 277:8
279:3
soon 250:11
sorry 184:7
187:10 207:19
209:14 212:3
214:6,20
217:20 221:16
231:23,24
247:20 250:20
257:22 259:13
259:18 260:13

261:2 262:1,16
269:16 272:18
273:17,18
285:20
sort 201:2
266:23 267:4
sounds 226:11
speak 258:22
273:13 277:20
278:13 283:17
285:1,3
speaker 229:13
229:16,21
230:18 241:18
241:22 281:23
282:1
speaking
227:12
special 203:7
specific 186:1
191:13 221:13
226:1 239:19
244:5,8 256:8
269:9 272:24
specifically
191:12 226:14
228:20 239:20
280:14
specifics
255:17 270:2
272:21 273:21
speculation
185:3 243:13
spent 263:14

split 195:14
196:8 205:17
splitting 196:2
spoke 273:19
273:22 274:16
276:10,15,16
276:17,18
spoken 195:19
211:11 274:19
spoon 191:2
spot 250:16
springs 280:17
squeeze 277:20
stage 267:3
standard
265:20,21
standing
206:20
start 205:3
209:22 262:22
269:3 279:16
starting 278:17
state 223:12
235:5 288:19
stated 183:20
223:22 252:8
statement
192:14 226:17
statements
248:17,18
states 175:1
194:3 217:22
stating 251:10
stenographic
182:3

[step - talking]

| | | | t |
|---|---|---|---|
| step 204:16 | subject 192:4 | supposedly | |
| 257:12 | 193:19 194:1 | 261:12 267:20 | t 179:6 290:3,3 |
| stepped 275:10 | 194:17 195:2 | surcharge | table 254:17 |
| steps 273:9 | 195:14 196:3 | 192:10 195:13 | 267:17 |
| sticker 225:12 | 199:3,4 203:1 | 195:18 196:3 | tabling 255:2 |
| stipulate | 218:4,7 235:5 | 199:14 208:3,8 | take 181:8,14 |
| 235:13 236:16 | 260:22 273:10 | sure 183:19 | 190:5 192:10 |
| stipulates | submit 283:15 | 189:10 192:20 | 196:14 202:17 |
| 236:6 | subscribed | 197:17 198:10 | 204:5,17 209:3 |
| stipulation | 291:14 | 198:14 204:1 | 210:16 212:10 |
| 182:4 235:4 | substantially | 206:11,15 | 212:12,21,23 |
| stood 216:19 | 254:7 | 217:18 219:7 | 213:9,16 |
| stop 210:22 | success 207:5 | 220:15 229:23 | 219:15,22 |
| 227:8 235:16 | 274:19 275:14 | 231:15 233:2 | 244:15 253:10 |
| 235:16,16,17 | successfully | 237:22 238:3 | 259:7 264:5 |
| 250:16 283:2 | 274:2 | 238:11 243:18 | 265:4 275:11 |
| stopping | sue 206:20 | 244:24 255:17 | 279:20 |
| 209:23 | sufficient | 257:21 259:15 | taken 288:3,12 |
| stops 240:17 | 222:14 266:15 | 259:23 261:3 | 289:9 |
| 241:9 | suggest 208:18 | 265:3,24 266:2 | takes 189:16,24 |
| storing 262:9 | suggested | 266:14,17,22 | talk 186:19 |
| strategy 209:20 | 203:2 | 268:21,21 | 196:16 203:12 |
| 254:23 | suggestion | 269:2,2,14,14 | 212:13 213:13 |
| street 176:5,12 | 204:16 | 274:23 275:1 | 234:19 238:15 |
| 177:17 178:7 | suit 281:2,4 | 277:1 280:17 | 243:19 272:2 |
| strike 223:9 | suite 176:5,12 | 280:23 287:3,5 | 284:17,18 |
| 233:24 257:22 | 177:8,17 178:7 | swear 181:16 | 286:4 |
| 259:19 269:16 | supermajority | 182:21 | talked 186:21 |
| strong 206:21 | 198:17 | swim 265:12 | 203:11 213:5 |
| 208:15 | supplier 262:9 | swing 259:6 | 265:6 270:9 |
| struck 204:7 | supply 177:2 | swore 226:22 | talking 186:10 |
| stuck 274:6 | support 238:13 | 227:1,5 | 191:12 196:13 |
| stuff 263:22 | supposed | sworn 181:19 | 212:8 215:16 |
| 269:13 | 257:16 | 183:3 288:5 | 217:12 238:4 |
| | | 291:14 | 260:22 264:4 |

[talking - today]

281:20
talks 224:3
target 191:3
targets 269:4
271:10,18
276:2
tberghman
176:14
team 234:9,13
tell 183:4
189:11 191:17
194:6 196:17
237:3 251:21
256:12 258:8
259:15 260:19
262:3,14 263:5
264:14 265:8
266:13 267:8
271:9 272:6
273:12 278:15
280:3
telling 222:19
231:21 233:15
238:2 256:23
tells 261:8
temperature
269:22
ten 213:18
271:21
tennessee
181:15 288:19
term 214:13
216:11
terms 271:11
273:3

terra 258:10,11
test 273:1,3
280:16
testified 183:5
220:5 267:6
testifying 288:5
testimony
266:20 291:8
292:8
texas 175:2
thank 182:20
183:11 204:18
208:19 215:21
235:2 253:3,16
282:8,9,21
283:5 287:7,12
287:14
thanks 273:18
theirs 200:19
thereto 225:23
thing 224:1
265:10,11
277:12 279:13
285:7
things 228:8,9
237:1 257:15
265:16,19
266:4 268:6
273:3 280:12
281:7
think 186:23
187:8,10,16
191:8 196:1
197:20 199:2,8
201:5,5,8

203:4 205:16
205:24 221:24
222:22 228:19
229:7 233:18
234:2,5 242:22
243:6 248:19
249:20,22
250:1,3 251:3
251:7 254:2
257:10 259:5
260:10 266:10
267:10 272:2
272:11 277:3,4
277:18 279:4
279:15 280:6
281:8 282:4
283:23,24
286:5,9,11
thinking 274:4
280:22
thinks 215:12
280:6
third 191:20
251:24 268:16
274:10 275:5
thirty 252:4
thomas 176:10
182:11 282:11
282:11
thought 203:22
214:21 261:24
thousand
205:14
threat 202:10
202:12

three 215:13
throws 264:1
thursday
175:12
ticking 208:18
210:19
time 175:13,13
181:3,9 182:6
198:9 203:4
211:8 213:23
214:3 228:11
234:21,24
235:3,13
239:23 242:1,3
242:6,16
244:23 245:1
253:12,15
255:7 256:16
260:16 280:8
281:24 282:20
292:15
timeframe
292:7
times 198:4,10
198:13 265:12
278:24
timing 284:19
286:6,6,19
tn 175:15 177:9
today 187:4
190:24 195:22
204:11 209:2
221:7 223:7
233:3 244:2
245:21 248:23

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

**[today - tx]**

249:23 250:2
253:4 264:12
268:9,24 287:9
**today's** 284:8
**together** 189:9
207:12 215:19
262:24 264:9
285:19
**told** 184:14,15
222:19 227:10
237:6 274:20
**tom** 178:20
**tomorrow**
281:13,14
284:3
**took** 188:13,13
201:1 218:12
**top** 207:4
214:24 215:4
258:5
**topic** 211:6
**total** 191:12
**tough** 220:9
**towel** 264:1
**town** 276:13
**tracy** 178:20
**transaction**
201:13
**transactionally**
279:19
**transcribed**
209:18
**transcriber**
289:1

**transcript**
181:21 282:13
284:14 286:7
286:15 288:21
289:3,5 291:5
291:8 292:5,16
**transcription**
285:1 287:4
**transcriptionist**
288:8
**transfer** 185:15
185:16 186:3
187:19 188:22
189:18,23
197:18 230:24
267:13
**transferee**
189:15
**transferees**
206:22
**transferred**
186:12
**transfers**
265:18
**trap** 263:6
**travis** 178:7
**treating** 249:21
**tried** 257:2
264:8 275:13
**tries** 278:21,22
**tripartite** 262:7
**true** 207:19
288:9 289:5
291:8

**trustee** 175:10
176:2 178:3
181:11 182:13
182:18 189:5
189:14 190:10
194:4,13
206:19 214:14
214:24 218:3
225:11,22
229:9,10
231:12 232:20
235:11,12,22
236:5 238:19
239:21 240:20
241:8 251:12
258:1 264:22
277:9 290:2,24
291:2,4,12
292:4
**trustee's**
179:14 185:18
191:15,20,20
192:3 224:21
243:7
**truth** 183:4,4,5
**try** 183:13
201:11 237:17
258:21 263:1,6
263:10,14,16
267:10 278:19
278:20 283:21
284:23 285:23
**trying** 197:6,11
198:2,3,23
201:16,16

204:18,19
205:17 207:11
207:11,11
208:14 211:22
211:24 215:21
215:23 216:18
222:22 227:8
250:13 255:15
256:6 257:10
259:22 261:14
263:17 269:11
269:22 271:17
274:10 278:22
280:10 284:4
285:7,21
286:12
**tune** 208:24
216:19 254:7
**turn** 202:1
215:12 260:2
283:17
**turnover** 202:2
264:22
**turns** 215:11
280:9
**twenty** 232:13
232:14 240:15
240:16 241:10
**two** 187:23
209:19 211:21
213:17 252:4
256:14 258:5
264:7 285:24
**tx** 176:6,13
177:18 178:8

Alpha Reporting
A Veritext Company

**[tx - volume]**

292:13
**type** 185:15
256:9 260:20
260:21 273:24
**types** 256:7
264:16,17
**typewriting**
288:7
**typical** 188:14
264:20 266:17
**typically**
263:15 274:11
275:8 285:4

**u**

**ugly** 259:20
263:20
**umb** 178:2
182:17
**unavoidable**
194:1 218:6
**unbeknownst**
283:1
**under** 181:24
185:18 189:14
191:1 223:22
226:17,20
267:5
**underlying**
185:10,12
187:6
**understand**
181:20 193:21
193:23 198:23
199:1,5 208:12
210:9 213:4,8

215:19 216:15
216:20,24
236:23 237:5,8
242:23 256:6
256:19,20
257:1,1 258:3
258:18,20
263:1 266:22
269:14 285:2
**understanding**
188:24 190:1
216:11 243:3,5
243:21 251:14
266:19
**understood**
238:3
**unearth** 261:14
**unfortunately**
264:8
**unidentified**
229:13,16,21
230:18 241:18
241:22 281:23
282:1
**unilaterally**
233:12
**united** 175:1
**unprecedented**
212:16
**unsecured**
195:24 198:7
198:17 266:1
**unsecureds**
266:2,15
268:15

**unwilling**
203:24 204:4
**upheld** 276:1
**upload** 217:2
**upset** 262:11
262:12
**upshot** 185:14
187:10
**us.dlapiper.c...**
177:19
**use** 246:20
249:18 265:22
**used** 214:16
235:7 259:11
292:16
**uses** 181:23
**using** 216:11
**usually** 237:15
237:17
**utterly** 209:17

**v**

**v** 290:1 291:1
292:3
**valuation**
266:24
**value** 189:1,16
189:24 190:4
190:10,18,19
191:4,4 268:15
**valuing** 266:6
**various** 196:20
236:22 267:20
**venom** 256:18
**venues** 267:20

**verify** 292:8
**veritext** 178:20
181:7 282:21
292:12,19
**veritext.com.**
292:13
**versus** 195:8
**victoria** 242:11
242:12
**videoconfere...**
176:3,10 177:5
177:6,15 178:5
178:12,21
**videographer**
178:20 181:2
213:22 214:2,5
234:20,23
242:2,5 253:11
253:14 282:18
**videotaped**
175:9 282:19
**view** 254:5
268:3
**views** 258:15
**virtue** 185:20
202:13 215:14
267:22
**visit** 269:5
272:4 281:16
**voidability**
189:18
**vol** 290:2,24
291:2,12 292:4
**volume** 175:11

[volumes - wrestling]

| | | | |
|---|---|---|---|
| **volumes** 283:18 | **wanted** 203:4 | 264:13 267:16 | 250:18,21,24 |
| **voluminous** | 203:21,23 | 275:3 282:22 | 252:4 253:7 |
| 239:16 | 204:5,6 206:11 | **wet** 238:7 | 272:4 273:16 |
| | 257:7 261:17 | **wheeland** | 273:19 276:21 |
| **w** | 274:24 | 289:2,15 | 276:24 281:10 |
| **wait** 206:8 | **wanting** 201:12 | **whistles** 204:15 | 281:14,19,22 |
| 246:12 | 286:18 | 213:6 | 282:3,6,9,21 |
| **walk** 211:19 | **wants** 211:18 | **who've** 286:17 | 283:2 288:4 |
| 243:19 254:2 | 240:23 241:1,3 | **willing** 209:3 | 292:5,7,9,11,15 |
| 262:20 | 257:12 273:6 | 226:16 | **wondering** |
| **wall** 264:13 | 274:14 | **wired** 202:12 | 261:3 |
| **wallet** 274:21 | **water** 265:12 | **wishes** 198:21 | **word** 186:22 |
| **want** 188:9 | **way** 195:11 | **withdraw** | 219:15,16 |
| 189:11,21 | 203:2 204:13 | 198:11,12 | 220:10 |
| 190:6 191:17 | 215:11 237:14 | 233:13 | **words** 185:16 |
| 192:14 201:19 | 238:18 | **withdraws** | 186:12 225:13 |
| 202:7 209:21 | **ways** 254:17 | 206:19 | 238:5 259:4 |
| 210:18 213:9 | **we've** 193:12 | **witness** 181:16 | 279:2 |
| 217:24 218:9 | 195:16 202:12 | 181:19,20 | **work** 195:11 |
| 219:19 224:10 | 213:5 214:18 | 182:21 183:3 | 207:11,12 |
| 225:15 226:13 | 217:17 235:4 | 192:19,21 | 209:12,20 |
| 229:13,16,21 | 246:4 254:13 | 193:10 205:23 | 236:3 259:6 |
| 232:4 238:11 | 257:4 263:18 | 206:4,16 | 264:5,9 270:17 |
| 244:7,22 | 263:18 265:4,6 | 208:16,22 | 277:9 279:22 |
| 246:15 250:16 | 266:14,15,16 | 209:9 212:4 | **worked** 262:23 |
| 254:24 255:17 | 270:9,20 | 213:3,8 217:8 | 275:22 |
| 255:23 256:1 | 282:10 | 218:14,16,20 | **working** 215:2 |
| 259:2,15 261:2 | **weak** 280:24 | 219:13 224:20 | 215:19 |
| 269:7,17 270:3 | **week** 190:15 | 229:15,18,23 | **world** 203:14 |
| 270:7,17 271:9 | 200:4 211:13 | 230:2,20 232:8 | 203:20 204:8 |
| 271:17 273:4 | 211:14 286:14 | 232:11,14,16 | 254:24 269:4 |
| 273:22 274:13 | **went** 198:15 | 234:15 236:17 | **worth** 261:11 |
| 275:5 279:3,9 | 203:2 259:13 | 240:14,18,21 | 277:20 278:7 |
| 281:15 283:17 | 259:21 260:17 | 241:1,5,10 | **wrestling** |
| 286:4 | 261:17,18 | 245:13 247:11 | 261:13 264:24 |

Alpha Reporting    800-556-8974

A Veritext Company    www.veritext.com

**[written - zoom]**

| | |
|---|---|
| **written**  182:4 | 253:4 267:6 |
| **wrong**  263:9 | 283:11,24 |
| **x** | 284:11 |
| **x**  179:1,6 | **yesterday's** |
| 288:21 | 284:8,11,12 |
| **y** | **york**  178:15 |
| **y'all**  203:8,15 | **z** |
| 203:16 241:7 | **zero**  199:4,6 |
| 269:5 271:8,15 | 264:10 277:9 |
| 282:7 283:4 | 280:21,23 |
| 284:11 286:16 | 281:5 |
| **yeah**  196:14 | **zoom**  181:13 |
| 207:7 211:15 | |
| 211:15 229:2 | |
| 230:2 232:16 | |
| 234:4 241:5,23 | |
| 244:17 252:5 | |
| 253:8,8,9 | |
| 255:19 258:10 | |
| 262:16 264:5 | |
| 265:24 268:8 | |
| 269:8,24 | |
| 272:14 277:2 | |
| 277:23 279:15 | |
| 280:22 281:19 | |
| 282:14 283:2,9 | |
| 284:6,21 | |
| 285:15 286:20 | |
| **years**  188:22 | |
| 228:11 264:7,7 | |
| **yep**  282:17 | |
| **yesterday** | |
| 183:14 186:22 | |
| 198:15 202:8,9 | |

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

Tennessee Rules of Civil Procedure

Depositions Upon Oral Examination

Rule 30

Rule 30.05: Submission to Witness; Changes;
Signing.

When the testimony is fully transcribed the
deposition shall be submitted to the witness for
examination and shall be read to or by the witness,
unless such examination and reading are waived by
the witness and by the parties. Any changes in form
or substance which the witness desires to make
shall be entered upon the deposition by the officer
with a statement of the reasons given by the
witness for making them. The deposition shall then
be signed by the witness, unless the parties by
stipulation waive the signing or the witness is ill
or cannot be found or refuses to sign. If the
deposition is not signed by the witness within 30
days of its submission, the officer shall sign it
and state on the record the fact of the waiver or
of the illness or absence of the witness or the
fact of the refusal to sign together with the
reason, if any, given therefor; and the deposition

may then be used as fully as though signed unless
on a motion to suppress under Rule 32.04(4) the
court holds that the reasons given for the refusal
to sign require rejection of the deposition in
whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.


Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.