1                IN THE UNITED STATES BANKRUPTCY COURT

                 FOR THE NORTHERN DISTRICT OF TEXAS

2                         DALLAS DIVISION

3

4        In Re:                        )

                                       )

5        Goodman Networks, Inc.,       )Case No. 22-31641 (MVL)

                                       )

6                Debtor.               )

         _____)

7

8

9

10

11

12

13          VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

           CORPORATE REPRESENTATIVE OF PROSPERITY BANK

14

               WITNESS LOCATION:  Houston, Texas

15

                  Wednesday, September 6, 2023

16

17

18

19

20

21

22

23

24

25       REPORTED BY:

         Katherine West, LCR No. 791, RPR

                                              Page 1

**Page 2**

```
1        Videotaped videoconference deposition of
2 CORPORATE REPRESENTATIVE OF PROSPERITY BANK, beginning
3 at 9:36 a.m. CDT, and ending at 2:51 p.m. CDT, on
4 Wednesday, September 6, 2023, before Katherine West, LCR
5 No. 791, RPR, reporting remotely via videoconference.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1        A P P E A R A N C E S
2
3 FOR PROSPERITY BANK:
4      JACKSON WALKER LLP
         By:  Victoria Argeroplos, Esq.
5        (via videoconference)
         1401 McKinney
6        Suite 1900
         Houston, Texas 77010
7        713.752.4334
         vargeroplos@jw.com
8
  FOR FEDEX SUPPLY CHAIN LOGISTICS & ELECTRONICS, INC.:
9
      BUTLER SNOW LLP
10     By:  R. Campbell Hillyer, Esq.
         Adam M. Langley, Esq.
11       (via videoconference)
         6075 Poplar Avenue
12       Suite 500
         Memphis, Tennessee 38119
13       901.680.7316
         cam.hillyer@butlersnow.com
14       adam.langley@butlersnow.com
15 FOR ARRIS SOLUTIONS, INC.:
16     DLA PIPER LLP (US)
         By:  Noah M. Schottenstein, Esq.
17       (via videoconference)
         1900 North Pearl Street
18       Suite 2200
         Dallas, Texas 75201
19       214.743.4500
         noah.m.schottenstein@us.dlapiper.com
20
  FOR UMB BANK, NATIONAL ASSOCIATION AS INDENTURE TRUSTEE
21 AND THE MAJORITY NOTEHOLDER GROUP:
22     HUNTON ANDREWS KURTH
         By:  Philip M. Guffy, Esq.
23       (via videoconference)
         600 Travis Street
24       Suite 4200
         Houston, Texas 77002
25       713.220.3802
         pguffy@huntonak.com
```

**Page 4**

```
1        A P P E A R A N C E S
         (continued)
2
3 FOR SCOTT SEIDEL, TRUSTEE:
4      MUNSCH HARDT KOPF & HARR, P.C.
         By:  Davor Rukavina, Esq.
5        (via videoconference)
         500 North Akard Street
6        Suite 3800
         Dallas, Texas 75201
7        214.855.7587
         drukavina@munsch.com
8
9 ALSO PRESENT VIA VIDEOCONFERENCE:
10     Scott Seidel
11     Charlotte Rasche
12     Domenico Martorello, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
1        E X A M I N A T I O N
         I N D E X
2
3 WITNESS:  DAVID MONTGOMERY, CORPORATE REPRESENTATIVE OF
         PROSPERITY BANK
4
5 EXAMINATION BY:                PAGE
6    MR. HILLYER                 9
7    MR. GUFFY                   134
8    MS. ARGEROPLOS              145
9
10     E X H I B I T
         I N D E X
11
   EXHIBIT        DESCRIPTION           PAGE
12
   Exhibit 1   Notice to Take Deposition of      10
13     Prosperity Pursuant to Fed. R.
         Civ. P. 26 and Fed. R. Bankr. P.
14     7030
15 Exhibit 2   Attachment A: Definitions and     11
         Topics for Examination
16
   Exhibit 3   Prosperity Bank Business Records  14
17     Affidavit
18 Exhibit 4   Deposit Account Control Agreement  15
19 Exhibit 5   Loan Agreement dated 7/3/2020     22
20 Exhibit 6   Promissory Note dated 7/3/2020    23
21 Exhibit 7   Loan Agreement dated 8/31/2020    24
22 Exhibit 8   Promissory Note dated 8/31/2020   26
23 Exhibit 9   Security Agreement dated     26
         8/31/2020
24
   Exhibit 10   Security Agreement dated 7/3/2020  28
25
```

2 (Pages 2 - 5)

EXHIBIT
INDEX
(continued)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 11 | Pledge and Security Agreement dated 8/31/2020 | 29 |
| Exhibit 12 | Pledge and Security Agreement dated 1/8/2021 | 31 |
| Exhibit 13 | Assignment of Deposit Account | 34 |
| Exhibit 14 | Prosperity Bank Statement dated 10/31/2021 | 39 |
| Exhibit 15 | Prosperity Bank Statement dated 10/31/2021 | 44 |
| Exhibit 16 | Letter from Jessica Freedson to Michele Ross and Eric Schaffer dated 8/31/2022 | 51 |
| Exhibit 17 | Loan Statement for Loan Account 1087915 | 60 |
| Exhibit 18 | Notice of Exclusive Control, Account Control Agreement, dated 8/16/2022 | 64 |
| Exhibit 19 | Email Chain; Top Email from Michele Ross to Jordan Yenne, Bater Bates, cc: Kathleen LaManna, Susan Jacobsen, Michael Doty, and Gavin Wilkinson, dated 8/19/2022, Subject: "RE: Goodman DACAs" | 65 |
| Exhibit 20 | Letter from Michele Ross to Prosperity Bank, Attn: Jordan Yenne, dated 8/22/2022 | 84 |

Page 6

EXHIBIT
INDEX
(continued)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 27 | Email from Bater Bates to John Goodman, cc: James Goodman, Zachary Wiebe, and Taylor Burns, dated 1/31/2023, Subject: "Term Loan" | 114 |
| Exhibit 28 | Email Chain; Top Email from David Montgomery to James Goodman and John Goodman dated 3/6/2023, Subject: "Re: EXTERNAL: Endeavor/Goodman - Due Diligence Items" | 117 |
| Exhibit 29 | Email Chain; Top Email from David Montgomery to James Goodman dated 3/24/2023, Subject: "RE: EXTERNAL: Prosperity Bank - Notice of Default" | 120 |
| Exhibit 30 | Prosperity Bank Procedure - Critical Alert Add, Change or Delete | 123 |
| Exhibit 31 | Prosperity Bank Proof Daily Transaction Journal | 124 |
| Exhibit 32 | Prosperity Bank's Responses to FedEx Supply Chain Logistics & Electronics, Inc.'s and ARRIS Solutions, Inc.'s Requests for Admission and Interrogatories | 129 |

Page 8

EXHIBIT
INDEX
(continued)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 21 | Prosperity Bank's Reply to the Joint Response and Objection of FedEx Supply Chain Logistics & Electronics, Inc., and ARRIS Solutions, Inc., to Trustee's Amended Motion for Approval of Compromise and Settlement with Prosperity Bank and UMB Bank, National Association | 88 |
| Exhibit 22 | Email from Michele Ross to Jessica Freedson and Joel Mattson, cc: Eric Schaffer and Kathleen LaManna dated 8/31/2022, Subject: "Goodman Networks" | 96 |
| Exhibit 23 | Email Chain; Top Email from Bater Bates to John Goodman, cc: David Parham and Andrea Hartley, dated 10/31/2022, Subject: "RE: Goodman - Extension Instructions of D&O coverage" | 101 |
| Exhibit 24 | Email Chain; Top Email from David Parham to Bater Bates and jg@goodmannetworks.net, cc: Andrea Hartley, dated 10/31/2022, Subject: "RE: Goodman funds at Prosperity" | 106 |
| Exhibit 25 | Email Chain; Top Email from David Parham to Bater Bates and jg@goodmannetworks.net, cc: Andrea Hartley, dated 10/31/2022, Subject: "RE: Goodman funds at Prosperity" (Re-stamped) | 106 |
| Exhibit 26 | Email Chain; Top Email from John Goodman to Bater Bates dated 1/4/2023, Subject: "Re: Prosperity Funds" | 110 |

Page 7

HOUSTON, TEXAS; WEDNESDAY, SEPTEMBER 6, 2023

9:36 a.m. CDT - 2:51 p.m. CDT

* * * * * * * * *

THE VIDEOGRAPHER:  It's Wednesday, September 6, 2023.  We are on the record at 9:36 a.m.

This is the video-recorded deposition of corporate representative of Prosperity Bank, David Montgomery, taken in the matter of In Re:  Goodman Networks, Inc.

This deposition is being held remotely via Zoom.  My name is Domenico Martorello.  I'm the videographer representing Veritext.

At this time, I'll now turn it over to our court reporter to swear in the witness.

DAVID MONTGOMERY, the witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. HILLYER:

Q  Good morning, Mr. Montgomery.  My name is Cam Hillyer with the law firm of Butler Snow, and I represent FedEx.  I appreciate you making time for us this morning.

As an initial matter, I'm going to publish the notice of -- I'm sorry.  It's already published, the

Page 9

1 notice of deposition.
2     (Exhibit 1 was marked for identification.)
3 BY MR. HILLYER:
4   Q   Can you see that?
5   A   Yes, sir.  I've seen it.
6   Q   Okay.  And this is a Rule 30(b)(6) deposition
7 of Prosperity Bank, and it's my understanding that you
8 had been designated by the bank to testify on the
9 matters that had been identified that we'll go through
10 in a second.
11     Is that correct?
12   A   Yes, sir.  That's true.
13   Q   Okay.  Before we get into the topics, can you
14 state your full name.
15   A   David Robert Montgomery.
16   Q   Okay.  And, Mr. Montgomery, what is your
17 position at the bank?
18   A   Senior vice president and director of special
19 assets.
20   Q   Okay.  How long have you worked at the bank,
21 Mr. Montgomery?
22   A   Since the merger with LegacyTexas.  It will be
23 four years in November.
24   Q   And let me stop before I go further.
25     Have you ever testified in a deposition
                                                    Page 10

1 before?
2   A   Yes, sir.
3   Q   Okay.  So I won't talk over you.  You don't
4 talk over me.  No hand gestures, anything like that.  If
5 you ever need me -- or don't understand a question, just
6 ask me and I'll repeat it.
7   A   Understood.
8   Q   Okay.  And what's your education,
9 Mr. Montgomery?
10   A   I have a bachelor's.
11   Q   From?
12   A   Southwest Texas State in finance.
13   Q   Okay.  And how long have you been working in
14 the banking industry?
15   A   Since July of 2015.  Prior to that, I was with
16 the Texas Department of Banking as a banking regulator
17 for a little more than ten years.
18   Q   So you've been in the banking world for almost
19 two decades?
20   A   Yes.
21     (Exhibit 2 was marked for identification.)
22 BY MR. HILLYER:
23   Q   The next topic -- the next exhibit is the
24 30(b)(6) topics.  Can you see those?  It's Exhibit 2.
25   A   Okay.  Yes, sir.  I can see those.
                                                    Page 11

1   Q   Okay.  And I'll direct you to page 2 of
2 Exhibit 2.
3   A   Yes, sir.  I'm on that page.
4   Q   Okay.  You see there are 20 enumerated topics
5 for examination on that; is that correct?
6   A   Yes, sir.
7   Q   Okay.  Have you gone over all 20 topics with
8 your counsel?
9   A   Yes, sir, I have.
10   Q   Okay.  Are you prepared to testify today as to
11 all of those 20 topics?
12   A   Yes, sir, I am.
13   Q   Okay.  Are there any topics on which you are
14 not prepared to testify?
15   A   No, sir.  I don't believe so.
16   Q   Okay.  Thank you.
17     Let's talk about your preparation for this
18 deposition, and I'll start with a disclaimer.  When I
19 ask you if you spoke with your attorney, I'm not asking
20 you for the substance of that conversation.  I'm just
21 asking you for a yes or no, did you speak with your
22 attorney.
23     Is that clear?
24   A   Understood.
25   Q   Okay.  Who did you speak with in preparation
                                                    Page 12

1 of this deposition for the 20 topics?
2   A   With Victoria who is counsel representing the
3 bank from Jackson Walker; with internal counsel, general
4 counsel, Charlotte Rasche, and Jessica Freedson, her
5 colleague; and primarily with two folks at the bank,
6 Bater Bates and Ana McCollum.
7   Q   Okay.  Is there anyone else at the bank that
8 you spoke with regarding these topics?
9   A   No, sir.  Not beyond --
10   Q   I'm sorry.
11   A   I'm sorry.
12   Q   I'm sorry.  I meant to clarify.  Nonlegal.
13   A   No, sir.  Nothing beyond we had this today and
14 I'll be out of the bank.
15   Q   Okay.  So -- but you spoke with other people
16 about being absent today, but you spoke with Bater Bates
17 and Ana McCollum about the substance of the topics; is
18 that correct?
19   A   Yes, sir.  Yes, sir.  You have that correct.
20   Q   Okay.  Thank you.
21     So, Mr. Montgomery, as everything in this
22 case, it's a little convoluted.  I'm going to try to go
23 chronologically.  It's the best way for us to stay
24 organized.  I will apologize in advance if I jump around
25 with the exhibits, but I will try to make it as
                                                    Page 13

Alpha Reporting                        800-556-8974
A Veritext Company                  www.veritext.com

1 seamlessly as possible chronologically.
2      Before we get into our first substantive
3 exhibit, I'm going to introduce an affidavit, business
4 records affidavit from the bank, as Exhibit 3.
5      (Exhibit 3 was marked for identification.)
6 BY MR. HILLYER:
7   Q   Do you see that?
8      MR. LANGLEY: It's not there yet.
9      MR. HILLYER: Oh. Apologize.
10      MR. LANGLEY: Should be there now.
11 BY MR. HILLYER:
12   Q   It should be published now.
13   A   Okay, sir. I've seen it.
14   Q   Okay. And that affidavit -- are you familiar
15 with Jill Lindsey?
16   A   Yes, sir, I am. She's in our information
17 technology department.
18   Q   Okay. And this is an affidavit from the
19 custodian of records that relates to specific, I will
20 call them -- are you familiar with Bates numbered?
21   A   Yes, sir.
22   Q   Okay. Specific batches of Bates numbers
23 starting with Prosperity 1 through 16 thousand 77 -- or
24 16775; Prosperity 17051 and 17060; and the third batch
25 is 17207 and through 17220.
Page 14

1      Is that correct?
2   A   Yes, sir.
3   Q   Okay.
4   A   Yes.
5   Q   With respect to the gaps in there between
6 166 -- 16775 and 17051, do you have an understanding why
7 those documents are excluded from the custodial
8 affidavit?
9   A   No, sir.
10   Q   Okay. Do you have any knowledge of why 17060
11 to 17207 is excluded from the custodial affidavit?
12   A   No, sir.
13   Q   Okay. I'll introduce the next exhibit, which
14 will be 4, and it will be Bates number 17181, which is a
15 deposit account control agreement.
16      (Exhibit 4 was marked for identification.)
17 BY MR. HILLYER:
18   Q   It should be there now.
19   A   Yes, sir. I see it.
20   Q   And for the record, I incorrectly stated the
21 Bates number. It's 17076.
22      And have you seen this document before?
23   A   Yes, sir.
24   Q   Pardon me. Give me one second. Apologize.
25      And this document is Bates-stamped 17076, and
Page 15

1 that appears to be a number that is outside of the
2 custodial affidavit that we just looked at which stops
3 at 17060 and restarts at 17207.
4      Do you see that?
5   A   First page is 017076. You can go back to --
6 that was the custodial -- give us one second, please.
7   Q   Sure.
8      MS. ARGEROPLOS: Cam, I can explain this if
9 you want me to. It's not something that David would
10 know. But --
11      MR. HILLYER: Okay.
12      MS. ARGEROPLOS: I'm happy to clear that up if
13 I need to.
14      MR. HILLYER: Well, okay. Just hold that for
15 a second.
16 BY MR. HILLYER:
17   Q   The question I was going to ask Mr. Montgomery
18 is is this deposit account control agreement a document
19 that is -- was kept in the records of Prosperity in the
20 regular course of business and should be included on
21 that affidavit?
22   A   That's my understanding, yes.
23   Q   Okay. And this deposit control agreement is
24 dated May 31, 2017; is that correct?
25   A   Yes, sir.
Page 16

1   Q   Okay. And I'll ask you a broad question. Are
2 you familiar with the deposit account control
3 agreements?
4   A   Yes, sir.
5   Q   Okay. And you see the depository bank for
6 this, and I'm going to use the term "DACA" just for --
7 to shorten it.
8      For this deposit account control agreement for
9 Account Number 3992, the depository bank is LegacyTexas
10 Bank; is that correct?
11   A   Yes, sir.
12   Q   Okay. Were you at LegacyTexas Bank in
13 May 31st of 2017?
14   A   Yes, sir. I joined the bank in July of 2015.
15   Q   Okay. Do you -- were you involved with this
16 DACA in 2017, either the review of it or the execution
17 of it?
18   A   No, sir.
19   Q   Okay. Did you have any knowledge of this DACA
20 in May of 2017?
21   A   No, sir.
22   Q   Okay. While you were at LegacyTexas Bank,
23 what was your position?
24   A   I was in a similar role there. I can't
25 remember my exact title. I think it was chief
Page 17

1 operational risk officer, but the scope of the duties
2 were largely the same as the ones I have now.
3    Q    Okay.  Did you have any involvement with
4 Goodwin -- Goodman Networks, Incorporated, while at
5 LegacyTexas?
6    A    Maybe in a limited credit approval or review
7 role, but otherwise, no.
8    Q    Okay.
9    A    And just to clear it, I'm not sure that
10 Goodman Networks, Incorporated, was ever a borrower at
11 LegacyTexas.  I know they were a depositor.
12    Q    Okay.  But you weren't involved with Goodman
13 Networks' deposit accounts at LegacyTexas?
14    A    No, sir.
15    Q    Okay.  And you understand that the first lien
16 secured party is US Bank National Association in this
17 DACA for Account 3992?
18    A    Yes, sir.
19    Q    Okay.  And in your experience at the bank,
20 what is the bank's role in executing a DACA agreement?
21    A    I would say it's primarily acknowledgment that
22 it exists.
23    Q    Does -- I'm sorry.  An acknowledgment that
24 what exists?
25    A    That there's a deposit account control

Page 18

1    Do you understand what that means?
2    A    Yes, sir, I do.  And I would go further to say
3 that I would call that customary in a situation like
4 this.
5    Q    Okay.  Well, what does that mean to you in
6 terms of the bank's position as to the first lien
7 secured party?
8    A    Exactly what the subsection said.  It's
9 subordinate.
10    Q    Okay.  Let's fast-forward to -- to July of
11 2020.  In July of 2020, were you at Prosperity Bank?
12    A    Yes, sir.
13    Q    Okay.  And are you familiar with loans made by
14 Prosperity Bank to what I will identify or use as
15 forward -- going forward the Genesis parties, but I'm
16 speaking specifically as to Genesis Networks Telecom
17 Services, LLC, and Genesis Networks Global Services,
18 LLC?
19    A    Yes, sir.  I'm familiar.
20    Q    Okay.  Were you involved in those loans?
21    A    I believe I was involved in the approval of
22 those loans.  Yes, sir.
23    Q    Okay.  And when you say "loans," you
24 understand there are two separate loans?
25    A    Yes, sir.  There's a $3 million revolving

Page 20

1 agreement in favor of a secured party by a company or a
2 depositor.
3    Q    Okay.  In your experience, does a depository
4 bank that executes a DACA take on duties pursuant to
5 that --
6    A    Yes, sir.  We're party to the agreement.
7    Q    Oh, okay.  And what are some of the duties
8 that the depository bank has under a DACA -- or, I'm
9 sorry, this specific DACA?
10    MS. ARGEROPLOS:  Objection.  Form.
11    You can go ahead and answer.
12    THE WITNESS:  I would call them fiduciary.
13 BY MR. HILLYER:
14    Q    In this particular DACA, I'll direct you to
15 page 2, paragraph 5.  And if you need to review it.
16    A    Just to clarify, not to interrupt, paragraph 5
17 or Section 5?
18    Q    Numbered paragraph 5, "Subordination by
19 Depository Bank."
20    A    Thank you.  Okay.
21    Q    Okay.  And direct you to the second sentence
22 in that.  "Depository bank hereby subordinates any
23 statutory or contractual right or claim of offset or
24 lien resulting from any transaction which involves the
25 deposit account."

Page 19

1 credit facility, and there was a slightly less than
2 $2 million term loan facility, is my understanding.
3    Q    Okay.  And what would your role be, I believe
4 you said, as approval?
5    A    Myself with one other party, Sam Duff, would
6 review the loan and approve it or decline it.
7    Q    Okay.  And who at the bank would be the
8 primary person responsible for bringing that loan --
9 those two loans to you for approval?
10    A    The loan officer would bring a loan for
11 approval.
12    Q    Okay.  And who was the loan officer on those
13 two loans?
14    A    Bater Bates.
15    Q    Okay.
16    A    He's a managing director in our
17 entrepreneurial finance group.
18    Q    Okay.
19    A    Not to interrupt you, Cam.  I may have his
20 title slightly off, but I'm in the ballpark.
21    Q    Understand.
22    And so when these loans -- and I'm just going
23 to call them -- and please ask me to be more specific.
24 I'm going to call them "the Genesis loans."
25    To your understanding, one loan was in

Page 21

1 July 3rd of 2020 and one loan was August 31st of 2020.
2      Does that sound about right?
3   A   Yes, sir.  That time frame sounds correct.
4   Q   Okay.  And when you approve -- you said --
5 what was the aggregate amount of these two loans?
6   A   Slightly less than $5 million.
7   Q   Okay.  Let's talk about Loan 1 first, which is
8 the loan dated July 3, 2020.
9      MR. HILLYER:  Can you mark the Prosperity 1?
10     MR. LANGLEY:  Exhibit 5.
11     (Exhibit 5 was marked for identification.)
12 BY MR. HILLYER:
13  Q   You should have Exhibit 5.
14  A   Okay.  Thank you.  I've got it.
15  Q   Okay.  And this is a loan agreement between
16 Prosperity Bank dated July 3, 2020, with Genesis
17 Networks Telecom and Genesis Networks Global as the
18 borrowers and James Goodman as the guarantor.
19     Is that correct?
20  A   Yes, sir, that's correct.
21  Q   Okay.  And you said this loan is approximately
22 how much?
23  A   On page -- page 4, 1.19, the maximum loan
24 amount was $3 million.
25  Q   Okay.  And so when you approve this loan, do

Page 22

1 give me a second as we go to get familiar with the
2 document a little bit.
3   Q   Absolutely.  Take as much time as you want.
4   A   Okay.  I have it.  Go ahead.
5   Q   Okay.  Is that the promissory note for
6 $3 million that evidences the proposed indebtedness from
7 the loan agreement which was Exhibit 5?
8   A   Yes, sir.  Appears to be so.
9   Q   Okay.  And the date on this is July 3, 2020.
10  A   Yes, sir.
11  Q   Okay.  Now, do you know at the time this loan
12 was made, Loan 1 in July of 2020, was this a secured
13 promissory note or an unsecured promissory note?
14  A   It was secured.  You can tell that by the
15 section I referenced earlier, 1.19, has a lesser amount,
16 so the loan was subject to a borrowing base, and the
17 borrowing base would have been generated from the
18 accounts receivable due to your obligor parties here,
19 Genesis Networks Telecom and Genesis Networks Global.
20  Q   Okay.  So it's your understanding that on
21 July 3rd of 2020, this was a secured loan?
22  A   Yes, sir.  I believe that to be true.
23  Q   The next publish will be Prosperity 00151.
24     (Exhibit 7 was marked for identification.)
25     THE WITNESS:  I can toggle between exhibits if

Page 24

1 you meet with anyone from Genesis Networks Telecom or
2 Genesis Networks Global?
3   A   As a matter of form, I mean, I could meet with
4 a borrower ahead of time or not.  Specific to this
5 transaction, I did not.
6   Q   Did you discuss this transaction with
7 James Goodman?
8   A   No, sir.  Not at this time.
9   Q   Okay.
10  A   I don't come to interact with James on a
11 personal level until probably early this year or late
12 last year.
13  Q   I'm sorry.  Say that again.
14  A   I've never actually met James, but I don't
15 come to talk with him or communicate with him directly
16 until either late last year or very early this year,
17 2023.
18  Q   Thank you.
19     So the next exhibit, which will be Exhibit 6,
20 will be the Prosperity 00023.
21     (Exhibit 6 was marked for identification.)
22 BY MR. HILLYER:
23  Q   Just let me know when you get it.  Sometimes
24 it takes a little while for it to publish.
25  A   Yes, sir.  Understood.  And if you'll just

Page 23

1 I want?
2      MS. ARGEROPLOS:  Yeah.
3      THE WITNESS:  Okay.  Thank you.
4      MR. LANGLEY:  7 is published.
5      THE WITNESS:  Just one second.  It hasn't
6 populated.
7 BY MR. HILLYER:
8   Q   Some days the internet is slow.
9   A   Okay.  Thank you.
10  Q   Okay.  And, Mr. Montgomery, that is also a
11 loan agreement between Prosperity Bank and Genesis
12 Networks Telecom and Genesis Networks Global and James
13 Goodman as guarantor but with a different date of
14 August 31, 2020; is that correct?
15  A   Yes, sir.
16  Q   Okay.  And do you know -- do you know why a
17 second loan agreement was done approximately, I'm going
18 to say, 60 days after the first loan agreement was done?
19  A   I can't speak to the difference in timing.  I
20 can tell you that it was my understanding that both the
21 loans were being negotiated simultaneously.
22  Q   But you -- you agree that the two loans are
23 approximately 57 days apart?
24  A   Yes, sir.
25  Q   Okay.

Page 25

7 (Pages 22 - 25)

1        MR. HILLYER:  Go ahead and publish 000168,
2   please.
3        (Exhibit 8 was marked for identification.)
4   BY MR. HILLYER:
5   Q   Can you see Exhibit 8, Mr. Montgomery?
6   A   Just pulling that up now, sir.  Yes, sir.
7   This looks to be the promissory note that corresponds to
8   the prior exhibit's agreement -- loan agreement.
9   Q   So this is a promissory note for
10  $1.948 million dated August 31st of 2020, and you're
11  saying that it corresponds with the loan agreement that
12  was Exhibit 7?
13  A   Yes, sir.  I believe that to be true.
14  Q   Okay.
15       MR. HILLYER:  Go ahead and publish Prosperity
16  000174, please.  This will be Exhibit 9.
17       (Exhibit 9 was marked for identification.)
18  BY MR. HILLYER:
19  Q   Do you see that?
20  A   Still waiting for it to populate on our end.
21  I see that.
22  Q   Okay.  And that's the security agreement;
23  correct?
24  A   Yes, sir.
25  Q   Okay.  And that's the security agreement dated

Page 26

1   August 31st of 2020?
2   A   Yes, sir.
3   Q   Okay.  And the collateral for the security
4   agreement is all business assets of the debtor, without
5   limitation, all accounts, equipment, inventory, chattel
6   paper, contract rights, and general intangibles; is that
7   correct?
8   A   Yes, sir.
9   Q   Okay.  And what is the obligation for the
10  security agreement as set forth in the "Obligation"
11  section at the bottom of page 1?
12  A   I guess I don't fully understand the question.
13  Q   Okay.  The obligation for this security
14  agreement says "Note:  Date:  August 31, 2020.  Amount:
15  1,948,427."  Is that correct?
16  A   Yes, sir.
17  Q   Okay.  This is not a security agreement which
18  identifies Loan 1 -- is that correct? -- for the
19  $3 million?
20  A   No, sir.  This security agreement would tie to
21  the prior two exhibits.
22  Q   Okay.  Do you know -- is there a security
23  agreement dated July 3, 2020, that corresponds with
24  Loan 1?
25  A   I don't know.  I would assume there would be,

Page 27

1   but I don't think you need a security agreement in all
2   matters, and we defined what our collateral was in the
3   loan agreement as well.
4   Q   Okay.  You're going to have to -- you're
5   saying you don't need a security agreement in all
6   matters?
7   A   I don't think all loans have security
8   agreements, no.  But that doesn't mean that the first
9   one did or didn't.  I just don't know.
10  Q   Give me one second.
11       All right.  Let's go ahead -- we're looking
12  for that security agreement right now.
13  A   Understood.
14  Q   Let's go ahead and -- hold on.  Give me one
15  second.  Apologize for the delay.  We're trying to
16  upload that security agreement you referenced.
17  A   You don't need to apologize to me for
18  technological delays.  I get it.
19  Q   Appreciate that.
20       (Exhibit 10 was marked for identification.)
21  BY MR. HILLYER:
22  Q   Exhibit 10 should be available now.
23  A   Okay.  I have it.
24  Q   All right.  And in that security agreement,
25  that date corresponds with Loan 1; is that correct?

Page 28

1   A   Yes, sir.
2   Q   Okay.  And what is the collateral identified
3   in that security agreement?
4   A   You want to point me in the direction of the
5   collateral definition?
6   Q   You can either look on the front page of the
7   security agreement, "Classification of Collateral,"
8   which will also refer to the schedule at the end.
9   A   Looks like it's specifically defined as the
10  accounts receivable of the borrowing entities.
11  Q   Okay.  Thank you.
12       Let's go next to Prosperity 000184.
13       (Exhibit 11 was marked for identification.)
14  BY MR. HILLYER:
15  Q   It will be Exhibit 11.
16  A   Yes, sir.  It just populated on our end.
17       Okay.  I have that document.
18  Q   Okay.  And that's a pledge and security
19  agreement between Prosperity Bank and James Goodman Jr.;
20  is that correct?
21  A   Yes, sir.
22  Q   And is dated August 31, 2020, which is the
23  same date as Loan Number 2; is that correct?
24  A   Yes, sir.
25  Q   Okay.  And in this pledge and security

Page 29

8 (Pages 26 - 29)

1 agreement, Mr. Goodman pledges his partnership interest
2 in Goodman MBE Group LP, a Texas limited partnership; is
3 that correct?
4    A   Yes, sir.
5    Q   Okay.  Are you familiar with Goodman MBE Group
6 LP?
7    A   No, sir.  That's not an entity I'm familiar
8 with.
9    Q   Okay.
10   A   If I had to guess just based on experience, it
11 very well could have been the entity that owned the two
12 secured parties, but that's just speculation.
13   Q   That owned the two secured parties?
14   A   Obligors, better said.
15   Q   Okay.  So let's take a snap -- a snapshot
16 picture.  So August 31, 2020, is the date that Loan
17 Number 2 was issued by the bank; is that correct?
18   A   Yes, sir.
19   Q   Okay.  So as of August 31, 2020 -- or let's
20 use one day in advance, September 1 of 2020, you've got
21 two loans outstanding for roughly $4.95 million
22 combined, and the borrowers are two Genesis entities
23 with a guarantor of James Goodman; is that correct?
24   A   Yes, sir.
25   Q   Okay.  And the collateral at that time would

Page 30

1 be all assets of the Genesis borrowers pursuant to the
2 Security Agreement Number 1 and also all accounts of the
3 borrowers pursuant to Security Agreement Number 2?
4    A   Yes, sir.  I mean, the security agreement on
5 Number 2 is just a broad UCC-1 filing, is what it looks
6 like.
7    Q   Okay.  Okay.  In addition to the collateral
8 given by the Genesis entities, there is also a pledge
9 and security agreement from Mr. James Goodman, the
10 guarantor, of his membership interest in Goodman MBE
11 Group?
12   A   Yes, sir.
13   Q   Okay.  Let's go ahead and publish Prosperity
14 000238.
15       (Exhibit 12 was marked for identification.)
16 BY MR. HILLYER:
17   Q   It will be Exhibit 12.
18   A   Okay.  I have that document.
19   Q   Okay.  And that is also a pledge and security
20 agreement with Prosperity Bank, but this time it's with
21 John Goodman; is that correct?
22   A   Yes, sir.
23   Q   Okay.  And it's dated January 8, 2021.
24   A   Yes, sir.
25   Q   Okay.  And that's approximately five months

Page 31

1 after Loan 2 was -- Loan 1 and Loan 2 were consummated.
2       Do you agree with that?
3    A   Yes, sir.
4    Q   Okay.  Do you have any knowledge -- I have not
5 seen it.  Is John Goodman obligated on the either Loan 1
6 or Loan 2?
7    A   No, sir, he was not.
8    Q   Okay.  Do you know why John Goodman would
9 pledge his interest in Goodman MBE Group?
10      MS. ARGEROPLOS:  Objection.  Form.
11      THE WITNESS:  I mean, it might be good to give
12 a little background on kind of the relationship between
13 John and James.  Obviously, brothers.  But kind of that
14 gave arise to some of this debt.  Would that be helpful?
15 BY MR. HILLYER:
16   Q   Sure.  Well, let me ask this.  I thought you
17 said that you did not know James Goodman until late last
18 year.  Are you familiar with John Goodman?
19   A   Yes, sir.  Again, didn't talk to him until
20 probably late last year as well, but I -- give me a
21 little leeway here, Cam, and I'll fill in a little gap
22 here that I think you may be having.
23   Q   Okay.  Please explain to me January 2021 and
24 what's going on with these loans.
25   A   I mean, this particular document looks like a

Page 32

1 cleanup document.  To me, it appears that John owns some
2 of Goodman MBE as well based on the nature of Section 1
3 of that agreement.
4       The bank had an obligation for the exact
5 amount of the term loan to Mr. Goodman's trust, which
6 owned a variety of his business investments.  That
7 relationship and that note performance was strained at
8 or around the time we did the two facilities to the
9 Genesis entities.  And James took on John's trust
10 obligation as part of that transaction.
11      So, for me, John was generally uncooperative
12 throughout, call it, 2020 and even before.  It doesn't
13 surprise me that we have a cleanup document.  John would
14 go radio-silent or missing for big periods of time.
15      Also, obviously in this time frame, our
16 majority interaction on a lending basis is with James.
17      So I'm not giving you a whole lot of factual
18 circumstance here, but it doesn't surprise me that we're
19 not talking to John and we had a document that we
20 potentially needed and just because our primary
21 interaction is with James and with James's entities.
22   Q   Okay.  Thank you for that explanation.
23      So were you talking with John Goodman in the
24 2020 and 2021 -- early 2021 time period?
25   A   No, sir.

Page 33

9 (Pages 30 - 33)

1    Q   Okay.  Who would have been talking with John
2  Goodman?
3    A   Primarily Bater and his team.  Bater or Jordan
4  Yenne or Taylor Burns would comprise the lending team of
5  that group.
6    Q   Okay.  As promised, chronologically, let's
7  move forward to 000123.
8       (Exhibit 13 was marked for identification.)
9  BY MR. HILLYER:
10    Q   You should see Exhibit 13 now.
11    A   Yes, sir.  We're still waiting for that to
12  populate.
13       Okay.  I see that document.
14    Q   Okay.  And that's an assignment of deposit
15  account; correct?
16    A   Yes, sir.
17    Q   Okay.  And the grantor of this assignment is
18  Goodman Networks, Incorporated?
19    A   Yes, sir.
20    Q   Is that correct?  Okay.
21       Goodman Networks, Incorporated, was not a
22  borrower or guarantor of the Genesis Loans 1 or 2; is
23  that correct?
24    A   Correct.
25    Q   Okay.  And in this assignment of deposit

Page 34

1  account, the collateral description is what?  The third
2  line down.
3    A   Checking Account Number 70173992.
4    Q   With lender with a hold amount of $4,660,000?
5    A   Yes, sir.
6    Q   Okay.  And do you know how this assignment --
7  strike that.
8       What do you know was going on in October 25th
9  of 2021 with the Genesis Loans 1 or 2?
10    A   Both loans are performing as agreed, the
11  revolver and the term loan.
12       At or around kind of the third quarter of this
13  year, James approached the bank and had interest in
14  moving some or all of assets that secured our Genesis
15  Networks facilities into a new entity, and Endeavor I
16  believe was the name of that entity.
17       I think at or around this time, one of our two
18  obligors was also being sold.  And so the bank -- when
19  we looked at these two entities, I believe, again, under
20  one holding company, one had a meaningful amount of cash
21  flow and one had a meaningful amount of collateral just
22  based on how they did their internal accounting.
23       And when one was to be sold and the remaining
24  assets of another were to be transferred, the bank had
25  blocking rights over that transaction just by the nature

Page 35

1  of our security agreement, UCC and whatnot.
2       And in exchange for allowing those things to
3  happen, we took an assignment of this deposit account
4  as, effectively, substitution collateral.
5    Q   Thank you.
6       So you can go back and look at the document if
7  you're not sure.  So the Checking Account 3992, that's
8  the same account that's subject to the DACA, which was
9  Exhibit 3; is that correct?
10    A   Yes, sir.
11    Q   Okay.  And let's talk specifically about the
12  3992 account but in bank operational terms.
13       When an account is subject to a DACA, how is
14  it reflected on that account internally at the bank?
15    A   So everything happens in the core system.
16  Just think about that as our primary system of record.
17  There will be a flag.  I don't know if that's a yes, no,
18  or 1, 0, but it's something like that that indicates the
19  presence of a DACA on an account.
20    Q   So would Prosperity have known at this time
21  that the collateral described was subject to a DACA?
22    A   I would tell you we should have known, but if
23  you'll grant me a little bit of leniency again, I'll
24  fill in some blanks here.
25    Q   Okay.  Well, I'll ask the question.  Just yes

Page 36

1  or no.  Did you know?
2    A   We did not know at the time that the account
3  was subject to DACA.  It wasn't on our system as such.
4    Q   Why was it not on your system?
5    A   I don't know that we have a great answer to
6  that.  So the legal close of the Legacy-Prosperity
7  merger was November 1 of 2019, and we did a system
8  conversion, I believe, around May of 2020.
9       For whatever reason, the flag, we believe, was
10  removed from this particular account.  Our research on
11  that indicates there may or may not have been kind of a
12  lot of coming and going with who deposit accounts were
13  pledged to and for the benefit of.  So because that
14  account was designated with, again, I'll just call it a
15  "no" field on the deposit account control agreement, it
16  came over in May of 2020 with that same "no" field.
17       And so when this account was offered as
18  substitution collateral, we went to look to see if it
19  was subject to a variety of controls; right?  Holds on
20  other loans, a deposit account control agreement.  It
21  could be a variety of reasons that had a flag that
22  indicated a hold.  But at the time we did this, our
23  records didn't have any evidence of that.
24    Q   Okay.  And who would have negotiated this
25  assignment of deposit account in October of 2021 on

Page 37

Alpha Reporting          800-556-8974
A Veritext Company       www.veritext.com

1 behalf of Prosperity?
2    A    Deposit account control agreements are
3 typically form and substance negotiated by the lending
4 team.
5    Q    Okay.  Well, this isn't a deposit account
6 control agreement.  Specifically talking about this
7 assignment of deposit account by Goodman Networks, who
8 at Prosperity would have negotiated that with Goodman
9 Networks?
10    A    The same.  The lending team.
11    Q    And that is Bater Bates?
12    A    Yeah.  I think just probably the lending team
13 would be Bater, a gentleman named Jordan Yenne, and a
14 gentleman named Taylor Burns.  They're very much a team,
15 so one could be working on one thing with respect to a
16 transaction while another could be working on another
17 aspect of it.
18        So just for the court reporter and the record,
19 if I say "the lending team," I think we can narrow that
20 down to those three persons.
21    Q    Okay.  And so is there any significance to the
22 figure of 4,660,000 in the assignment of deposit
23 account?
24    A    I'd have to confirm, but I believe that was
25 the then-outstanding balance of the aggregate Genesis

Page 38

1    Q    Okay.  So this is a bank statement that has
2 a -- looks like there's a deposit on October 29, 2021,
3 that says "Deposit Genesis 1087915/ Collateral Transfer/
4 YHSA" in an amount of 236,883 and 48 cents; is that
5 correct?
6    A    Yes, sir.
7    Q    Okay.  And why does it have the collateral
8 transfer designated on the 399 -- in the description,
9 I'm sorry?
10    A    I can't speak with certainty to that, but just
11 looking at the amount and the dollar amounts, this was
12 very likely in support of the prior exhibit to get to
13 the minimum hold amount.
14        So it looks like James from one of his --
15 James or a party or representative of his from one of
16 the Genesis accounts here at the bank added to this
17 particular Goodman Networks account to meet the
18 requirement of the assignment.
19    Q    Okay.  And what is YHSA?
20    A    I don't know, Cam.  I can't answer that.
21    Q    Give me one second.
22    A    Normally, I'd fathom a guess if I had one and
23 tell you it was a guess, but I don't even have that in
24 this instance.
25    Q    And go back to it says "Description, Deposit,"

Page 40

1 parties' debt.  So in this case, the term loan had
2 reduced some since we originally had done that
3 transaction in 2020, and so the amount you see reflected
4 on the assignment is what was left.
5    Q    Okay.  And what does it mean, "with a hold
6 amount"?  I'm reading specifically:  "Checking account
7 with lender with a hold amount of 4.66."
8    A    So what we would do if we took an assignment
9 of a deposit account is, again, we would flag the
10 account that it had a hold, not dissimilar to what a
11 flag for a DACA would look like.  It's probably a yes/no
12 type field.
13        And then we would indicate that amount also in
14 the system of record, and that just tells anyone who
15 goes to look at this account that we've got a hold on
16 that particular account internally for that amount.
17    Q    Thank you.
18        Let's go ahead and publish 000119.
19        (Exhibit 14 was marked for identification.)
20 BY MR. HILLYER:
21    Q    You should see Exhibit 14.
22    A    Yes, sir.  We're pulling that up now.
23        Okay.  I have that in front of me.
24    Q    Are you ready?
25    A    Yes, sir.

Page 39

1 and that's a Genesis loan number; is that correct?
2    A    I don't believe that's a loan number.  And my
3 reason for saying that is the term loan facility did not
4 have any drawing capacity.  Maybe this is a draw on the
5 revolver as opposed to a transfer.
6        I mean, I'm sure we have the loan number for
7 the revolving facility and we could double-check that,
8 but one way that he could effect this is to draw on that
9 facility again subject to the borrowing base and make a
10 deposit in this account.  I'm just not sure which he
11 did.
12        But if we can tell me if 1087915 is a loan
13 number deposit account, I could answer that with more
14 certainty.  I think we've also discovered the loan
15 histories on both accounts.
16    Q    Okay.  Again, I'm just asking do you know the
17 source of that 23 -- $236,000?
18    A    I don't.  Again, I think the only two things
19 it could be is a draw on the revolving facility or a
20 transfer from a Genesis deposit account.  And as soon as
21 we source what that account number is, I could answer it
22 with more certainty.
23    Q    Just give me one second.  Well, I'll ask the
24 question.  If you -- if this is collateral for the loans
25 and you draw on the loan to deposit money for the

Page 41

11 (Pages 38 - 41)

1 collateral, that doesn't make a lot of sense to me
2 because it would keep increasing the debt. It would
3 increase the collateral.
4      Am I wrong?
5   A   I would say that that may happen more
6 frequently than you think. But in this specific
7 instance, he's asking us to release some of the
8 collateral that we have today; right? So if he's
9 supported on the loan side with accounts receivable and
10 it can, quote-unquote, facilitate the draw and the
11 deposit into the replacement collateral or substitute
12 collateral, however you want to think about that issue,
13 I mean, it wouldn't be unreasonable, in my opinion, for
14 him to do that as he's working on whatever the broader
15 transaction was at the time.
16   Q   Okay. Thank you. And we may come back to
17 that.
18      The question that I have is you've referenced,
19 I believe, twice in my notes is when the assignment of
20 deposit account -- I'm sorry, when the assignment of
21 deposit account was granted on October 25, 2021, by
22 Goodman Networks.
23      Did Prosperity release other collateral that
24 would be a collateral transfer?
25   A   I think that was our intent. I think we had a

Page 42

1 little bit of a bust internally. I'm not sure that we
2 ever terminated that UCC. That was kind of an
3 administrative issue because the issues internally.
4      But the intent would have been to release
5 collateral, and that would be customary in a situation
6 like this.
7   Q   We're going to publish Exhibit 15, and it will
8 be Bates -- give me one second.
9   A   By the way, just to clarify the last issue, I
10 can't say for certainty whether we did or didn't release
11 the UCC. I've never researched the issue to its
12 conclusion. But in conversations internally, I think we
13 may or may not have.
14   Q   Okay. Before we go on to Exhibit 15, I want
15 some -- I'll ask for clarification on that.
16      Are you saying as you sit here today, you
17 don't know what the collateral is for the Genesis loans?
18   A   I'm of the opinion that the deposit accounts
19 will eventually be remitted to the trustee and that the
20 collateral for those loans is effectively unsecured at
21 this point. I mean, I have -- I may have an all-assets
22 filing on an entity that doesn't have any assets at this
23 point.
24   Q   Okay. But --
25   A   If we're specific to that exact time frame,

Page 43

1 you know, we were, in our minds, allowing the transfer
2 of any existing collateral we had because we were
3 replacing that with this deposit account.
4   Q   Okay. I'm going to publish Exhibit 15.
5      (Exhibit 15 was marked for identification.)
6 BY MR. HILLYER:
7   Q   Do you see it?
8   A   Yes, sir.
9   Q   Okay. Look all the way down to "Other Debits"
10 and look at the October 29, 2021, entry.
11   A   Okay.
12   Q   Do you see where it says "Withdrawal Genesis,"
13 has that same number, has the same collateral transfer,
14 and has the same YHSA as the previous statement we just
15 looked at on Exhibit 14?
16   A   Yes, sir.
17   Q   Okay. And do you see the amount out to the
18 side of it that is the $236,883.48?
19   A   Yes, sir. The amounts seem like.
20   Q   Okay. And doesn't that match the deposit that
21 was made on Exhibit 14 to the newly pledged 3992 account
22 to the penny?
23   A   Again, the amounts are the same. I'm trying
24 to follow the flow of funds here if you'll give me one
25 second.

Page 44

1   Q   Sure.
2   A   Yeah. I think that's correct. I think the
3 funds originally sourced in this account went to the
4 exhibit prior and then ultimately into the 3992 account.
5   Q   Looking at Exhibit 15, that's Account
6 Number 4352; correct?
7   A   Yes, sir.
8   Q   And that is another account in the name of
9 Goodman Networks, Inc.; correct?
10   A   Yes, sir.
11   Q   Okay. Underneath the Goodman Networks, Inc.,
12 it says "Controlled Disbursement Account."
13   A   Yes, sir. That's how it's noted.
14   Q   Okay. What does "Controlled Disbursement
15 Account" mean to you?
16   A   I don't know for sure how this is categorized,
17 but I'm assuming it would be similar to like a deposit
18 account control agreement or a hold, some of the other
19 stuff we've been talking about. There's some rights
20 subject to this account.
21   Q   Okay. Do you know whose rights those would
22 be?
23   A   I don't, sir. No. Not without researching it
24 further.
25   Q   Okay. Well, look down under "Deposits/Other

Page 45

1 Credits."  Do you see where all the deposits are coming
2 from?
3    A    From FedEx Supply.
4    Q    Is that what you're reading it as?
5    A    Yes, sir.  That's what it says in the
6 "Deposits/Other Credits" section.
7    Q    Okay.
8    A    We've got deposits on 10/6, 10/13, 10/20,
9 10/22, and 10/27 all from that same party, it appears.
10    Q    In preparing for this deposition, did you look
11 at Account 4352?
12    A    No, sir, I didn't.
13    Q    Okay.  Are you familiar with Account 4352?
14    A    No, sir, I'm not.
15    Q    Okay.  I will go back to Exhibit 2.
16    A    Okay.
17    Q    Okay.  Look at Topic Number 9, please.
18    A    Okay.
19    Q    Okay.  That says "The 4352 Account, including
20 related contracts, controls, authorizations, security
21 agreements, assignments, policies, purposes, and
22 procedures."
23        Is that correct?
24    A    Yes, sir.
25    Q    Okay.  I just asked you a second ago did you

Page 46

1 look at 4352 and are you familiar with 4352, and I
2 believe your answer was no.
3    A    That's correct.
4    Q    Okay.  Are you prepared to talk and testify
5 about Topic Number 9?
6    A    I can just do my best for you, Cam.  That's
7 the first I've seen the account.
8    Q    Okay.  I'm sorry, but did you -- did you
9 discuss -- I don't want the substance of it.  Did you
10 discuss or prepare for Account 4352 topic with your
11 counsel?
12    A    No, sir.
13    Q    Okay.  Did you talk with anybody at the bank
14 regarding Account 4352?
15    A    No, sir.
16    Q    Okay.  So I'll ask you again:  You said your
17 testimony earlier was you're prepared to talk about
18 every single -- testify as to every single topic.  Would
19 you like to revise that?  Are there any topics that you
20 can't testify about?
21    A    Sure, Cam.  I'm not familiar with 4352.
22    Q    Okay.  We'll revisit that.
23    A    Would you like to ask some questions around
24 that so I can learn as we go?
25    Q    Not right now.

Page 47

1    A    Okay.
2        MR. HILLYER:  Why don't we take -- it's 10:45.
3 Why don't we take a quick ten-minute break and then come
4 back.  Is everyone fine with that?
5        MS. ARGEROPLOS:  Sure.
6        THE VIDEOGRAPHER:  Okay.  10:45 a.m.  Off the
7 record.
8        (Off the record.)
9        THE VIDEOGRAPHER:  10:56 a.m.  On the record.
10 BY MR. HILLYER:
11    Q    Thank you, Mr. Montgomery.  I'll ask you just
12 one more time at Exhibit 15.
13    A    Yes, sir.  We have that up.
14    Q    Okay.  That was not a document produced by
15 Prosperity Bank, hence the no Bates number.
16        Do you have any reason to believe that's not a
17 true and accurate bank statement from Prosperity Bank?
18    A    No, sir.  The form and substance looks like
19 what I would expect to see.
20    Q    Okay.  Do you have any reason -- strike that.
21        Looking at Exhibit 14 and 15 together, which
22 are the two bank statements, do you have any reason to
23 doubt that the $236,883.48 that was deposited in
24 Account 3992 on October 29th was the same $236,883.48
25 withdrawn from Account 4352 on October 29th of 2022 -- I

Page 48

1 mean of 2021?
2    A    No, sir.  I think I said before the break it
3 appears that the funds sourced in Account 4352 went to
4 account 7915 and then ultimately into 3992, and I expect
5 if we had the statement for 7915, we'd see two entries,
6 one as a deposit and one as a debit for the 236.83.
7    Q    Okay.  And I -- I guess, Mr. Montgomery, that
8 goes back to the other question, is looking at those two
9 statements, 14 and 15, the question that I have is are
10 you saying that you think Genesis 1087915 is a bank
11 account?
12    A    I wish I had my laptop.  I could look that up
13 pretty quick.  But I think it would be atypical for a
14 deposit account to a loan account back to a deposit
15 account, but I just can't say for sure.
16    Q    Okay.
17    A    And, again, we should have statements on the
18 loan account, and we've probably discovered all of
19 Genesis's operating accounts, so I feel like this is a
20 pretty easy issue to resolve if we could just
21 exhibit one or both of those things.
22    Q    Okay.  And just for the record, look at
23 Exhibit 2 again.
24    A    Yes, sir.
25    Q    Look at Topic 10, please.

Page 49

13 (Pages 46 - 49)

1 A  Yes, sir.

2 Q  It says "The October 29, 2021, transfer of

3 $236,883.48 from the Account 4352" -- or "from the 4352

4 Account to the 3992 Account."

5    Is that correct?

6 A  Yes, sir.

7 Q  Okay.  Did you prepare for this topic with

8 your counsel?

9 A  We broadly discussed the treasury management

10 group.  I think I referenced I discussed earlier I had

11 sat down with Ana McCollum.  We talked about there was a

12 variety of deposit accounts throughout the life of this.

13    I mean, we're spanning, you know, probably a

14 decade, honestly.  A limited amount for this matter, but

15 trying to understand who the parties were, how many

16 accounts we had, who was the beneficiary of the DACA,

17 that was a pretty broad task to prepare for with the

18 amount of time you gave us from the notice.

19    And then specific to 10, I've already told you

20 that it seems pretty obvious to me how the funds flowed

21 between those accounts, so I think I'm giving you

22 certain answers and honest answers, which aligns with

23 the spirit of what we're doing.

24 Q  Mr. Montgomery, if I represent to you that we

25 will look in a later exhibit that -- from Prosperity

Page 50

1 Bank that says Genesis business loan numbers 1087915 and

2 1087916 of Genesis Networks Telecom, would that refresh

3 your recollection that those are loan numbers, not

4 account numbers?

5 A  If you had an exhibit where it was clear to me

6 to see what the account number was and the nature of

7 what was going on, I could give you certainty, yes.

8 Q  Okay.  Let's -- I'm breaking with my

9 chronological.  Go ahead and publish Prosperity 420.

10    (Exhibit 16 was marked for identification.)

11 BY MR. HILLYER:

12 Q  That will be Exhibit 16.

13 A  Yes, sir.  We're just waiting for that to

14 populate on our end.

15    Okay.  This looks like a letter from in-house

16 counsel in response to something around the DACA.

17 Q  Okay.  And we're not going to be discussing

18 this letter right now.  I just --

19 A  Okay.

20 Q  Look at the last -- second to last sentence of

21 the letter of page 1.

22 A  It definitely appears by the nature of this

23 letter that 1087915 and 1087916 are loans.

24 Q  Okay.

25 A  We'll call it to the Genesis parties.

Page 51

1 Q  Okay.  With that knowledge, does that clarify

2 what the description of the withdrawal and the deposit

3 on the Exhibit 14 and 15?

4    THE WITNESS:  Can you write that loan number

5 down for me?  I want to make sure I get this right.

6    Yes.  As similar to what I was saying, call it

7 five minutes ago, call the funds based on these loan numbers,

8 specifically the 236,000, let's call it, as the funds

9 left Account 4352 were applied to a Loan Number 1087915.

10 And then it looks like there was a corresponding draw on

11 that loan back into --

12    (Simultaneous speaking.)

13    (Reporter clarification.)

14    THE WITNESS:  -- with the funds deposited in

15 Account 3992.

16 BY MR. HILLYER:

17 Q  And, Mr. Montgomery, are you speculating on

18 that?  Do you have any -- do you have -- what are you

19 looking at to evidence the intermediary transaction of a

20 loan-funding loan draw?

21 A  It would be impossible for a loan account

22 number and a deposit account number to be like, and so

23 the fact that I have 1087915 on both deposit accounts

24 and I have another document that references that exact

25 number as a loan would tell me that that's a loan

Page 52

1 account.

2 Q  Have you looked at a loan statement for

3 1087915?

4 A  Yeah, we have.

5 Q  Okay.  Did you see a credit of 236,883.48 and

6 then an immediate withdrawal of 236,883.48?

7 A  I have not reviewed loan histories for

8 individual entries, but I do believe we've discovered

9 those and can speak to what they might say.  I would

10 expect to see exactly that on the loan statement for

11 1087915.

12 Q  But I'll --

13 A  It's the same date, I believe.

14 Q  But I'll ask you again.  Did you review a loan

15 statement or loan history for Loan 1087915 in

16 preparation of this deposition?

17 A  Yes, sir.

18 Q  We may revisit that.

19    Trying to move off this topic.  You mentioned

20 the Endeavor earlier.  What's your understanding of

21 Endeavor?

22 A  I would call Endeavor the primary investment

23 for Mr. Goodman, James Goodman, today.

24 Q  Okay.  And please correct me if I'm wrong.

25 You're saying that there was some aspect with Endeavor

Page 53

1 in October 25th of 2021 when the assignment of deposit
2 account was made?
3    A    Yes, sir.  I believe in -- there were two kind
4 of corresponding transactions.  There was a sale of a
5 company, and I want to say it was one of the obligor
6 parties on our debts.
7        And there was a transfer of assets to a new
8 entity that Mr. James Goodman had majority ownership and
9 controlled.
10        And, again, his willingness and interest to do
11 either of those things was originally precluded by our
12 security interest, effectively, as a way to effect what
13 he was wanting to do from a business perspective.  He
14 offered the deposit funds as a substitution of
15 collateral, and I would say that that's releasing a
16 piece of collateral and taking a new piece of collateral
17 to allow for something like that is relatively standard
18 in banking.
19    Q    And at the time that the assignment of deposit
20 account was made, and I believe that's -- it was signed
21 by James Goodman on behalf of both borrowers and Goodman
22 Networks.  You can look at Exhibit 13.
23    A    I'm there.
24    Q    Is that correct?
25    A    Yes, sir.

Page 54

1    Q    Okay.  And Mr. Goodman was --
2    A    I'm sorry.  Not to interrupt you here.  Your
3 question was specifically that Mr. Goodman signed and
4 authorized that transaction?
5    Q    Yes, it was.
6    A    Yes, sir.  That's true.
7    Q    Okay.  Thank you.
8        And what value did Goodman Networks,
9 Incorporated, receive for granting an assignment of a
10 $4.66 million deposit account?
11    A    Mr. Goodman represented at the time that he
12 had loaned a significant amount of money to the Goodman
13 Networks entity and that it was our understanding that
14 he also was in control of that entity at the time.  So,
15 in our opinion, the consideration was the loan and his
16 ability to transact was in his capacity as an authorized
17 agent for both Genesis and for Goodman.
18    Q    Okay.  I appreciate that, but my question was
19 what value did Goodman Networks, not James Goodman,
20 receive for the granting of the assignment?
21    A    It's our understanding that James either
22 personally or through his entity loaned something like
23 $20 million to Goodman Networks.
24    Q    And who told you that?
25    A    James told us that.  And I believe we've

Page 55

1 discovered that email as well.
2    Q    Okay.  Let me rephrase the question.  What
3 value did Prosperity give Goodman Networks in exchange
4 for that assignment?
5    A    I don't know that there was a direct benefit
6 from Prosperity to Goodman Networks.
7    Q    Thank you.
8        Last -- last question.  Do you know whether
9 assets -- strike that.
10        I believe your previous testimony is it was
11 your understanding that there was a contemplated
12 transfer of Genesis assets to Endeavor.
13        Sitting here today, do you know if Genesis
14 transferred assets that were encumbered by Prosperity to
15 Endeavor?
16    A    Not with certainty, no, but realistically I
17 believe that that did happen.  So, I mean, maybe a
18 little clarity to that point.  Once we're taking this
19 assignment, right, we're -- I think as a bank we're not
20 particularly concerned anymore with what the assets are
21 doing or where they're going.
22        In our mind, our primary collateral was the
23 deposit account.  And not dissimilar to any other loan
24 where we've released collateral, it's, you know, your
25 right as owner to do with it what you may.

Page 56

1    Q    Okay.  Do you know if you released the UCCs
2 against either Genesis entity on or around the time of
3 the assignment of deposit account?
4    A    Yes, sir.  I kind of referenced that point
5 earlier.  I'm not sure if we did or didn't.  For
6 certain, our intent would have been to do so as it would
7 be to release any UCC or deed filings that we had on any
8 collateral that we were no longer relying on to secure a
9 loan.
10    Q    Did you release James Goodman and John
11 Goodman's interest in MBE Group?
12    A    I don't know the answer to that.
13    Q    Okay.
14    A    It would follow the same process; right?
15 Either we released everything we had and accepted the
16 deposit in substitution or we have that kind of same
17 administrative bust.
18        I'm presuming that that same security interest
19 would have been secured by a UCC filing on the equity of
20 that entity consistent with the security agreement that
21 we looked at earlier this morning, I guess.
22    Q    Okay.  And when you look into a loan file,
23 Mr. Montgomery, where would you see a UCC-1?
24    A    So in our core system -- we've talked about
25 the core system as kind of the bank's official system of

Page 57

1 record -- one of the things that we're able to do is
2 look at whatever loan documents are associated or any
3 deposit documents on a deposit account are associated
4 with that loan number.
5 So if I wanted to try to see did we file a
6 UCC-1 or was it subsequently released, that would be one
7 way I could do it.
8 Another way would be we have a loan operations
9 staff which supports exactly these functions, and I
10 could email them and say, hey, where are we at on, in
11 this case, the existence of a UCC filing and whether
12 that's ongoing, been terminated, or whatever other
13 disposition we might do after an original filing.
14 Q Okay. And in preparation for this deposition,
15 did you look into the Genesis loan files on your core
16 system and look at any UCC filings and any applicable
17 releases, UCC-3s?
18 A Look, I looked at the loan files quite a bit.
19 I think I've testified to the same earlier. The
20 information that we may or may not have actually
21 effected the release of the UCC came in discussion and
22 preparation, and I just simply didn't have time to
23 follow that all the way to its end.
24 Q Okay. So as you sit here today, you do not
25 know if any of the collateral, Genesis collateral or the

Page 58

1 James Goodman and John Goodman interest collateral, has
2 been released?
3 A I do not know, no.
4 Q And just the last -- sitting here today, do
5 you know for certain whether the Endeavor transfer of
6 Genesis entities assets occurred?
7 A No, sir. Again, once -- once, in our minds,
8 we've released the collateral and moved on, it wouldn't
9 be our practice to continue to monitor the other --
10 follow what, if any, ownership changes might have
11 occurred or anything of the kind.
12 Q And I will ask you this: You just said you
13 don't know if you've released the collateral. Was that
14 your testimony?
15 A So those are two separate issues, in my mind.
16 The first around release is administrative. If we had
17 done what we intended to do and were supposed to do, we
18 would have executed a termination.
19 The second issue of was I now trying to
20 understand what, if anything, was happening with what in
21 my mind was formerly our collateral, no.
22 Q Do you know a date of any -- an approximate
23 date of any Genesis asset transfer to Endeavor?
24 A No, sir. But if that had happened, my
25 expectation would be it would be right around the time

Page 59

1 of this assignment because that's when a lot of the
2 other associated business transactions were supposedly
3 occurring.
4 Q Thank you.
5 Let's -- one second, please. Give me one
6 second.
7 All right. I'm going to publish what is
8 Exhibit 17.
9 (Exhibit 17 was marked for identification.)
10 THE WITNESS: Okay. I have that in front of
11 me.
12 BY MR. HILLYER:
13 Q Okay.
14 MS. ARGEROPLOS: Do you want this just in
15 case?
16 THE WITNESS: No. This is fine.
17 BY MR. HILLYER:
18 Q Let me know when you're ready.
19 A I'm ready.
20 Q Okay. And does that look like a loan
21 statement or loan inquiry for Loan 7915?
22 A Yes, sir, it does.
23 Q Okay. And the date that we were looking at
24 earlier on Exhibit 14 and Exhibit 15 was August -- I
25 mean October 29th of 2021; is that correct?

Page 60

1 A Yes, sir.
2 Q Okay. Do you see it on that statement?
3 A I see the date. I don't see the transaction.
4 Q Okay. Do you see any transaction for that
5 loan in the amount of the 200 -- 236,883.48?
6 A No. There's a renewal that's same dated, I
7 believe, so I don't see any transaction that posted, but
8 there presumably is supporting information around what
9 the flow of funds was in the renewal, and I would want
10 to see that to speak with full certainty. But to
11 directly answer your question, no, that transaction
12 doesn't appear on the loan history.
13 Q Okay. Why would that transaction not appear
14 on loan history?
15 A I'm giving you the answer that I think most
16 logical, that something happened on the same date with
17 respect to renewal, and there was some broader flowing
18 of funds that occurred within that, and I don't know if
19 this loan was matured or not matured. Effective 10/3
20 makes you think it was matured already. But there
21 should be broader support for -- just like any
22 transaction, whether it be business or real estate, for
23 how funds flowed on that particular date.
24 Q Okay. Well, then I'll ask you. Going back to
25 the descriptions on the bank statement, is that a

Page 61

16 (Pages 58 - 61)

1 description entered -- is that a description inputted by
2 the bank is that an actual transfer in information?
3    A   I'm not trying to be evasive to your question.
4 It could happen either way.  It could be descriptions
5 that are automatically populated with electronic
6 transactions, or it could be if there's a person
7 involved like in loan operations and a renewal where
8 they're trying to clarify what happened at the time.  It
9 could be either one.
10    Q   But as you sit here now, you see one bank
11 statement, Exhibit 14, and one bank statement,
12 Exhibit 15, that has a withdrawal from an account and
13 then has a deposit into another account in the exact
14 same amount; correct?
15    A   Yes, sir.
16    Q   And you have a loan history report that does
17 not have that amount at all in the loan history; is that
18 correct?
19    A   Yes, sir.  I think I've answered your
20 questions around the topic.
21    Q   Okay.  Thank you.
22        Mr. Montgomery, let's move forward from
23 October of 2021 to August of 2022.
24        Generally speaking, do you have any
25 understanding what was happening with the Genesis loans

Page 62

1 on or around August 1 of 2022?
2    A   So generally speaking, they were performing.
3 I don't know that -- again, on a deposit account secured
4 loan, we're not particularly worried about our
5 situation, normally.
6        I do know that kind of prior to, so call it
7 first quarter and second quarter, James asked us to
8 consider loaning directly to his holding company or to
9 the entity that we've referred to as Endeavor funds.
10 That entity, in our opinion, didn't have cash flow or
11 collateral that would warrant that loan request.
12        Separate and apart from that, at the time
13 we're thinking we're deposit account secured, so why
14 would we do anything more risky, better said.
15        And so that's kind of the lead-up into
16 October 2022 about what discussions had occurred with
17 James and how the bank was thinking about the nature of
18 the relationship.
19    Q   I believe you said October of 2022.  Do you
20 mean August of 2022?
21    A   Yes, sir, into around when we become aware
22 that there is a DACA in place.
23    Q   Okay.  Let's start there.  When did you become
24 aware there was a DACA on Account 3992?
25    A   Probably September or October of 2022.

Page 63

1    Q   You were not aware of a DACA in August of
2 2022?
3    A   No, sir.  But since, I've come to believe that
4 there was one in place.
5    Q   Okay.  Was anyone at the bank aware of the
6 DACA -- of a DACA for Account 3992 in August of 2022?
7    A   Not to my knowledge.  I mean, again, we
8 referenced this a little bit earlier.  The presence of a
9 DACA is typically flagged on our core system.  We didn't
10 have such a flag, so anyone who would go to look at or
11 around that time to see if one was in place, that is
12 likely where they would look.  That would be the normal
13 course of business, and a negative flag on that issue
14 would lead whomever to believe there was not one.
15    Q   All right.  I'm going to introduce Prosperity
16 387.
17        (Exhibit 18 was marked for identification.)
18        THE WITNESS:  I have it up.  Yes, sir.
19 BY MR. HILLYER:
20    Q   Do you see that?
21    A   Yes, sir.
22    Q   Okay.  Do you know what that is?
23    A   Yes, sir.  I've seen the document.
24    Q   Okay.  And what is the date of that document?
25    A   August 16, 2022.

Page 64

1    Q   Okay.  And it references a deposit account
2 control agreement for Account 3992; is that correct?
3    A   Yes, sir.
4    Q   Okay.  So at a minimum, on August 16, 2022,
5 Prosperity Bank was aware of a DACA; is that correct?
6    A   I think it's clear on this date we became
7 aware one existed.  Yes, sir.
8    Q   Okay.  Let's go to -- give me one second.
9        Let's introduce Prosperity 12330.
10        (Exhibit 19 was marked for identification.)
11 BY MR. HILLYER:
12    Q   This will be Exhibit 19.
13        THE WITNESS:  Do you know if we can set it so
14 the most recent one goes at the top?  I think when you
15 refresh it, it kills that sort.  Yeah.
16        Okay.  I have that document in front of me.
17 BY MR. HILLYER:
18    Q   Just look at the very top of page 1.  This
19 appears to be an email from Michele Ross to Mr. Yenne;
20 is that correct?
21    A   Yenne is the correct pronunciation of his
22 name, but that's correct.
23    Q   Say it one more time.
24    A   Yenne.  Carry the E at the end.
25    Q   Thank you.

Page 65

17 (Pages 62 - 65)

1 So the email is to Jordan Yenne, Bater Bates,
2 and I believe that is it for Prosperity.
3 Look at the second paragraph. It says "On
4 August 11, 2022, you confirmed to US Bank that
5 Prosperity Bank had the following amounts on deposit:
6 $4,666,707.03 in account ending in 3992 and $218,735.57
7 in account ending in 1838."
8 Is that correct?
9 A Yes, sir. That's what the email says.
10 Q Okay. And just as a preliminary question, is
11 that common practice for Prosperity Bank to give out
12 account information to an attorney for another bank?
13 A That's a huge "it depends" question, but I
14 don't know that it's uncommon.
15 Q Okay.
16 A There's just a lot of circumstance around
17 that.
18 Q Okay. What would be the circumstances on
19 August 11th that -- is it Mr. -- Mr. Yenne would provide
20 customer information to a third party?
21 MS. ARGEROPLOS: Objection. Form.
22 THE WITNESS: It could be that he's familiar
23 with Ms. Ross and that Ms. Ross is also involved in
24 lending or borrowing to these entities. It could be on
25 the direction of James or John or their counsel. I

Page 66

1 with information that was to the contrary, we reacted
2 accordingly.
3 Q Sitting here today, what date was Prosperity
4 Bank aware of the DACA for Account 3992?
5 A My personal opinion is that's the date we were
6 noticed, the 16th.
7 Q I'm not asking for your personal opinion,
8 Mr. Montgomery. I'm asking you as the corporate
9 representative of the bank.
10 What date was the bank aware of the DACA? Do
11 you know that?
12 A The 16th. The answer is the same.
13 Q Thank you.
14 And that 16th corresponds with Exhibit 18, the
15 notice of exclusive control agreement that we looked at
16 earlier; is that correct?
17 A Yes, sir.
18 Q Okay.
19 A And, I mean, just to clarify, the 16th, when
20 we get a notice like that, we're -- we're going to start
21 to go look at our records and what we have and what
22 exists to try to confirm same.
23 Q Okay. Well -- in or -- give me one second.
24 Let's go to the August 31, 2022, letter from
25 Prosperity Bank that we looked at. We marked earlier as

Page 68

1 mean, it could be a variety of things.
2 BY MR. HILLYER:
3 Q Do you think Jordan Yenne and Bater Bates are
4 aware of the DACA on August 11, 2022?
5 A I honestly don't believe they are, but I can't
6 speak to that with certainty. That's only informed on
7 my education on the matter and my discussions with them
8 since.
9 Q Okay. Have you -- okay. Have you asked Bater
10 Bates if he was aware of the DACA on August 11, 2022?
11 A I mean, I don't think I've directly asked him
12 that question, no.
13 Q Okay. Have you --
14 A Again, I think -- I think we're -- we're
15 dealing with kind of a week of time here; right? The
16 11th through, call it, the 18th.
17 I think we got up to speed very quickly on
18 whether or not there was a DACA and what, if any, rights
19 were associated with that. And I would tell you that
20 since the date of this email or the conversation that's
21 referenced, which I couldn't speak to, obviously, we
22 believe there was one in place.
23 And that's consistent with what I mentioned
24 earlier. We don't have a flag on it, and we don't think
25 there is one. And, you know, once we were presented

Page 67

1 an exhibit simply to show the loan number. I believe
2 it's 16. Could be wrong.
3 A Yes, sir. I have that.
4 Q Okay. And I'll ask you first: Who is Jessica
5 Lee Freedson?
6 A Legal counsel. Internal legal counsel for the
7 bank.
8 Q Okay. And I'll read -- read the first line --
9 well, let me ask you this: Have you read this letter
10 before?
11 A Yes, sir. I've seen the letter in preparation
12 for this.
13 Q Okay.
14 A Yep.
15 Q Okay. And is it inaccurate to say
16 Ms. Freedson is emailing the attorneys for the
17 bondholders where it says regarding DACA transaction
18 requests? And I believe it -- that states is there was
19 a transfer of $4,463,804.68 from Account 3992 on
20 August 15, 2022.
21 Is that correct?
22 A Yes, sir.
23 Q Okay. And tell me: What do you know about
24 that transfer of money out of the 3992 account?
25 A That Mr. Bates initiated a transaction against

Page 69

18 (Pages 66 - 69)

Alpha Reporting
A Veritext Company

800-556-8974
www.veritext.com

1 that account to credit the loan numbers referenced in
2 this letter as well. The Genesis loans I think is how
3 we've been describing them.
4    Q    Okay. And you said who initiated the
5 transfer?
6    A    Mr. Bates. And I don't -- he gave that
7 direction. If someone else actually effected the
8 transaction, I'm not sure. But...
9    Q    Okay. So have you looked at the transfer
10 authorization for that transaction?
11    A    I have not. I'm not sure if one exists.
12    Q    Say that again, please.
13    A    I don't know if one exists.
14    Q    Okay. How does -- so your understanding is
15 when you say Mr. Bates, Bater Bates initiated a transfer
16 of $4,463,000 from the 3992 deposit account to pay off
17 the Genesis loans; is that correct?
18    A    Yes, sir. That's my understanding.
19    Q    Okay. And aside from the actual transfer, do
20 you have any knowledge of why that transfer was
21 requested? Strike that. That's a bad question.
22        Why were these loans paid off on August 15,
23 2022?
24    A    Mr. Bates says that was at the direction of
25 James Goodman.

Page 70

1    Q    Do you know why?
2    A    No, sir. I mean, I think it's -- it's a
3 little odd for people to be calling in about deposit
4 accounts that they don't have security interest.
5        My belief and I think the bank's position is
6 that we were not authorized or should have done that,
7 and when we came to that conclusion with a broader
8 audience, we immediately reversed the transaction
9 because we felt like that was the right and correct
10 thing to do.
11    Q    Well, I'm not there yet. But I appreciate --
12 so is -- on August 15th of 2022, were either Genesis
13 loans in default?
14    A    They may have been slightly delinquent on
15 payments. I'm not certain of that. But my personal
16 opinion is that, no, they were not in default. They had
17 not been noticed same, and any action that we may or may
18 not have taken in response to a defaulted loan weren't
19 appropriated.
20    Q    One second, please.
21        Going back to your testimony earlier -- and I
22 don't want to mischaracterize it -- is was this
23 August 15, 2022, transfer related in any way to an
24 Endeavor transaction or you said -- I believe you
25 testified James Goodman had requested funds for

Page 71

1 Endeavor?
2    A    No, sir. I don't think anything we did was in
3 relationship to that.
4    Q    So sitting here today, you think this was just
5 a random $4.4 million loan payoff on August 15th of
6 2022?
7    A    I mean, again, we had -- we had passed on
8 earlier in the year any sort of new relationship with
9 James or Endeavor in large part because we were deposit
10 account secured. I think, just honestly, when people
11 started calling on our collateral and we didn't have
12 good records of DACAs and stuff, we panicked a little
13 bit and applied it.
14    Q    Okay. When you said you panicked a little bit
15 and applied it, did the bank -- I believe that's what
16 you just said. Is that --
17    A    Yes, sir.
18    Q    -- correct? Okay. So did the bank apply it,
19 or did James Goodman request the bank to apply it?
20    A    I don't know that we have great records on
21 that issue, to be honest. I think if you ask James,
22 he'd tell you one thing. If you asked Bater, he'd tell
23 you another.
24        The fact of the matter is we did what we did,
25 and as I've said a few times, I don't think we should

Page 72

1 have done it, and when we became aware at a broader
2 level that we had done it, we immediately reversed it.
3    Q    Okay. Well, let's start there. So on
4 August 15th, the money is taken out of the 3992 DACA
5 account. Okay?
6        And between -- and I believe if you pull up
7 that Exhibit 16, it looks like that $4,463,804.68, which
8 is the same amount as on line 2, is deposited in Secured
9 Account Number 0188.
10        Is that correct?
11    A    Yes, sir.
12    Q    Okay. So between August 15th and the deposit
13 on August 30th, where was that $4,463,000 located?
14    A    I mean, it had paid off the loan. So, I mean,
15 the loan is an asset on the bank's liabilities. The
16 deposit is a liability on the bank's balance sheet. And
17 so kind of just standard accounting. If you reduce an
18 asset, you have to reduce a liability. So
19 accountingwise, that's what happened.
20    Q    But did the bank record, I guess, cash on its
21 ledger for that transaction? How was it -- how was it
22 reported when you take 4 million out of -- 4.4 million
23 out of an account?
24    A    That question is pretty overly broad. Can you
25 narrow it down for what you're trying to ask about?

Page 73

1    Q   What I'm asking is -- so we'll talk big
2  picture first.  So on August 15th, Genesis's loans are
3  zeroed out; is that correct?
4    A   Yes, sir.
5    Q   Okay.  So that loan balance is zero.
6    A   Yes, sir.
7    Q   Okay.  Are the loans marked satisfied?  How is
8  it denoted in your system when a loan is paid off?
9    A   Just that.  Paid off.
10    Q   Okay.
11    A   And, again, the asset of the bank goes down.
12  The loan amount goes from the 44, call it, to zero, and
13  the deposit account similarly reduces by the same
14  amount.  So that -- I mean, that's the accounting entry.
15  That's how the funds travel on the core system, and
16  that's the end effect of that transaction.
17    Q   Okay.  Well, let's be specific, then.  You
18  asked for a question.  So when you say assets and
19  liabilities, so the loan is an asset of the bank;
20  correct?
21    A   Yes, sir.
22    Q   Okay.  So when that loan is paid off with
23  money from a deposit account, that entry, is that not a
24  cash asset of the bank; the $4 million becomes a cash
25  asset which extinguishes the loan asset?

Page 74

1    A   No, sir.  You couldn't -- you couldn't have
2  two entries on the asset side of that transaction.  So,
3  again, assets equal liabilities plus equity.  That's
4  true really in any business.
5    Q   Okay.  So --
6    A   So -- I'm sorry.
7    Q   I'm sorry.  I didn't mean to cut you off.
8    A   So a reduction in assets requires either an
9  increase in assets or a reduction in liabilities or
10  equity.  The two are mutually exclusive.  You couldn't
11  do one and the other because the account wouldn't -- the
12  transaction wouldn't balance.
13    Q   Okay.  More specifically, so is there any
14  account that the 4.4 million was in from August 15th to
15  August 30th?
16    A   No, sir.  It was applied to the loan.
17    Q   So what does that -- where is that -- where
18  is -- where are those funds?  Just it's not in an
19  account?  It's a -- you're saying it's just a book
20  entry?
21    A   I'm not trying to be evasive.  We -- we need
22  the cash that is represented by the amount on deposit.
23  That's our liability; right?  You write a check out of
24  your deposit account.  We owe you that money, and we pay
25  that check.

Page 75

1    It's not any dissimilar to this.  The cash,
2  which we are in this case owed to the 4 -- or the 3992
3  account, that reduction could either be a reduction in
4  our own cash position, which would occur if you sent
5  that money, let's say, to your mortgagee -- right? --
6  when you pay your mortgage, or it can go to reducing the
7  loan account.  And in this particular situation, it went
8  to reduce the loan account.
9    There's no -- there's no cash at that point in
10  the -- really at any point in that transaction.  I'm not
11  trying to be evasive on your question.  I just don't
12  know how to answer it differently.  The bank never sees
13  cash in that transaction, and the funds that are on
14  deposit are no longer there because they've paid down
15  the loan.
16    Q   I understand.  And I appreciate the high level
17  and the specific.  I guess what I'm asking you is when
18  the bank takes the money out of Account 3992, they're
19  taking cash; is that a correct statement?
20    A   No, sir, because cash is an asset on our
21  balance sheet, and we're talking about a deposit
22  account, which is a liability.  I've kind of tried to
23  note that earlier.  If I want to reduce an asset, i.e.,
24  a loan account -- right? -- the only two ways to do that
25  on a bank's balance sheet is to increase an asset or, in

Page 76

1  your question, cash, or to reduce a liability, which in
2  this case was the deposit account.
3    Q   Okay.  Did the bank recognize revenue on
4  August 15th from the application of the funds from
5  Account 3992?
6    A   We would have recognized whatever accrued
7  interest.  And if there had been any fees associated
8  with the loan account, that would have been standard to
9  any loan payoff.
10    Q   And the revenue would have been cash; correct?
11    A   I mean, that's a long way to get from paid
12  down a loan to recognized interest income to get to
13  cash.  But, I mean, eventually, I guess you could say
14  that, but I mean, we'd have to look at what accrued
15  interest was at this time, but just ballparking on these
16  loan balances, you're probably talking about maybe 25 to
17  30 thousand on average, something like that.
18    Q   Okay.  So let's talk about the effect of the
19  loan payoff on August 15th.
20    So after that loan -- the two loans were paid
21  off, was the assignment of deposit account released?
22    A   I mean, that again would have been normal
23  course of business, but I don't think that we ever
24  effectuated that transaction.  I mean, I think that
25  requires an entry on our part that there's no longer a

Page 77

20 (Pages 74 - 77)

1 hold on that account. We spoke a little bit about that
2 earlier. When we take the assignment, the effect of
3 that on our system is we release the hold.
4 Q So what's -- were any UCCs released?
5 A Again, that goes back to where we were in the
6 UCCs. We talked about, you know, form over substance.
7 But in our minds, the UCCs at that time are released, so
8 we don't have a need to release. They were replaced
9 back in 2021 with the assignment of the deposit account.
10 Q Has the bank done a UCC search on Genesis
11 entities?
12 A I haven't. And just to be honest, my personal
13 belief is there's no assets in the Genesis entities, so
14 even if I do have a valid lien, I've got nothing to get.
15 Q Why do you think that or how do you have
16 knowledge to form that opinion?
17 A Well, kind of specific to the transaction that
18 we've been discussing, we -- we took those funds and
19 placed them in a segregated and secured account here at
20 the bank, so they're no longer for the benefit of either
21 of the Genesis entities.
22 And at or around the time we were taking the
23 assignment of the deposit account, we weren't really
24 paying attention to what our collateral was prior to. I
25 mean, we talked about that already as well. We weren't

Page 78

1 tracking it anymore.
2 So I don't know that I've seen a balance sheet
3 recently on either of the Genesis entities, but I
4 don't -- they might internally show the cash still while
5 this proceeding is ongoing, but other than that, I don't
6 know what they would show. And since my collateral is
7 all assets, effectively, and I don't believe we have any
8 collateral, then I viewed those facilities as unsecured,
9 effectively.
10 Q Okay. Well, in that answer, you just said
11 that there's no assets on the Genesis balance sheet. I
12 believe that's what you just said.
13 How do you have knowledge of that?
14 A Well, Genesis was an obligor, so I mean, we've
15 still been trying to administer that loan. I have not
16 pulled a recent financial statement or anything on them.
17 I just -- not trying to evade your question again. I
18 just don't know what it would show. I can request one.
19 Q Well, but I mean, have you reviewed a balance
20 sheet of Genesis?
21 A Not since --
22 Q What is your foundation for saying that
23 Genesis has no assets?
24 A Not since 2022 in August time frame. We've
25 spent the entirety of the time since that date trying to

Page 79

1 understand the deposit account control agreement and
2 what, if any, rights we may have to what we thought was
3 our collateral as well as try to figure out a resolution
4 with Mr. Goodman.
5 Q Well --
6 A Again, he is -- his main operating entity now
7 is Endeavor. The intent back in 2021 was to sell a
8 business and transfer some assets. I have seen balance
9 sheets and income statements on Endeavor. That's a real
10 company, in my opinion, with assets and earnings, and my
11 focus ever since I've been involved is trying to
12 understand where we were with respect to the transaction
13 that you're questioning around August of 2022 and
14 understand how we can be repaid.
15 Q Okay. Why have you seen any balance sheets of
16 Endeavor?
17 A I've been trying to work out a transaction
18 with Mr. Goodman to address the now deficiency in my
19 collateral, this DACA and the cash that we've been
20 remitted to a secured account and how we can get repaid.
21 Q Okay. So if you've seen Endeavor's balance
22 sheet, does Endeavor have the assets of Genesis? Does
23 Endeavor have any assets that were transferred from
24 Genesis?
25 A I don't know how I could answer that. It's

Page 80

1 not going to say "assets of Genesis" or "contracts of
2 Genesis." It says things like "accounts receivable" and
3 "cash" and "net worth," and it's -- it's not how it
4 would be designated.
5 Q All right. Well, I'm trying -- so you're
6 saying you -- Genesis -- the Genesis entities owe
7 Prosperity $4.5 million; is that correct?
8 A I think that number's lower but not
9 meaningfully lower. I mean, there's been payments on
10 the term loan since at around this time.
11 THE WITNESS: Do you have a history for what
12 we're owed today?
13 BY MR. HILLYER:
14 Q So I'll ask you just specifically. So --
15 A Just give me one second, please. I want to
16 try to give you a real answer to that question as
17 opposed to the one I just gave you.
18 Q What are you looking at from your attorney,
19 Mr. Montgomery?
20 A I'm looking at the --
21 MS. ARGEROPLOS: I've got --
22 THE WITNESS: -- account history that you
23 presented as an exhibit.
24 BY MR. HILLYER:
25 Q Okay.

Page 81

1          MS. ARGEROPLOS:  Cam, I've got Exhibit, I
2  think it's, 17.  I have a printout of it in front of me.
3  That's all.  I'm just looking at this.
4          MR. HILLYER:  Okay.
5          MS. ARGEROPLOS:  It's the one history you had
6  on the screen a second ago.
7          THE WITNESS:  If you'd like, I can pull my
8  iPad out and get you an exact number of what we're owed.
9  BY MR. HILLYER:
10  Q    That's not important.
11        What I'm asking you is assume it's
12  $4.4 million, so you have a borrower that owes
13  Prosperity Bank $4.4 million.  Okay?
14  A    Yes, sir.
15  Q    And you are -- what was your role at special
16  assets?
17  A    Yes, sir.
18  Q    No.  I mean, what was your title at special
19  assets?
20  A    Director of special assets.
21  Q    Okay.  So you're the head of special assets?
22  A    Yes, sir.
23  Q    Are you saying that you do or do not know what
24  assets your borrowers have as you sit here today?
25  A    I'm telling you I don't, and I've told you and

Page 82

1  answered where my focus is.  We've been trying to effect
2  a workout strategy, and we're doing so with the entity
3  that Mr. Goodman, James Goodman, is currently operating.
4  Q    Okay.  So -- so as you sit here today, you do
5  not know what assets Genesis has or does not have.
6        Is that a correct statement?
7  A    I've answered that question three times the
8  same way.  Do I need to answer it a fourth for you?
9  Q    No.  I'm going back to --
10  A    I don't know what assets or liabilities it has
11  beyond my debt, and I don't know what, if any, equity it
12  has.  No, I do not.
13  Q    Okay.  So let's just -- your statement that
14  Genesis has no assets on its balance sheet, you do not
15  know that for a fact?
16  A    No, sir.
17        MR. HILLYER:  Okay.  Let's go -- before we go
18  further, do y'all want to -- since we're close to noon,
19  do you want to go ahead and break for lunch now before
20  going into the next area?
21        MS. ARGEROPLOS:  Yeah.  Let's do that.
22        MR. HILLYER:  Okay.  What time would y'all
23  like to come back?  1:00?  12:45?
24        MS. ARGEROPLOS:  Let's do 12:45.
25        MR. HILLYER:  12:45 it is.  Is that fine with

Page 83

1  everyone else?
2          THE VIDEOGRAPHER:  All right.  11:57 a.m.  Off
3  the record.
4          (Off the record.)
5          THE VIDEOGRAPHER:  12:47 p.m.  On the record.
6  BY MR. HILLYER:
7  Q    Mr. Montgomery, we have published what is
8  Exhibit 20 that should be in your Exhibit Share.
9          (Exhibit 20 was marked for identification.)
10        THE WITNESS:  Okay.  I have that in front of
11  me.
12  BY MR. HILLYER:
13  Q    Okay.  And this is a letter from Michele Ross
14  to Prosperity Bank dated August 22, 2022; correct?
15  A    Yes, sir.
16  Q    Okay.  Have you reviewed this letter?
17  A    I don't know that I have seen this letter
18  before, but I feel comfortable discussing its content.
19  Q    Okay.  I will direct you to page 2 of the
20  letter, specifically the very last line before the
21  signature.
22  A    Yes, sir.
23  Q    Okay.  And Michele Ross asks Prosperity to
24  freeze the 4 point -- I'm sorry, $4.446 million in funds
25  and return them to the deposit accounts from where they

Page 84

1  were transferred from on August 15, 2022.
2        Do you see that?
3  A    I'm sorry.  You pointed me to the last letter
4  which references a transfer outside the company.  Is
5  that what your question refers to?
6  Q    Second to last sentence.  I'm sorry.
7  A    Yes, sir.  I see her request for same.
8  Q    Okay.  And did Prosperity return any funds to
9  the 3992 account?
10  A    No, sir, we did not.  Our reversing entry was
11  to a segregated account in our legal department's
12  control.
13  Q    Okay.  Well, that's not what my question was.
14  My question was did you return the funds to
15  Account 3992?
16  A    No.
17  Q    Okay.  And going back to Exhibit 16.
18  A    I have that in front of me.
19  Q    Okay.  And that letter, again, is from Jessica
20  Freedson to Michele Ross dated August 31, 2022; correct?
21  A    Yes, sir, it is.
22  Q    Okay.  And it says "The subject funds have
23  been deposited into secured account number 0188, and the
24  funds will remain in that secured account pending
25  resolution of the conflicting instructions, notices, and

Page 85

22 (Pages 82 - 85)

1 directions from Company and Controlling Agent with
2 respect to the transfer of funds."
3    A   Yes, sir.
4    Q   Okay.  And so I'll ask you now:  Why did
5 Prosperity put the funds into Account 0188 and not into
6 3992?
7    A   I would say that at this exact moment in time,
8 there were kind of two things happening that informed
9 our action.
10        One, we were trying to confirm to the best of
11 our knowledge that we didn't have a claim on the
12 account.  I think at or around the time of the letter,
13 we were relatively confident that we didn't or at least
14 couldn't produce conflicting information that we did.
15        Separately, at or around this time, the
16 representatives of the debtor itself were seeking for
17 release and for us to allow use of funds for a variety
18 of issues, and so we -- rather than send them one way or
19 the other, we just put them into an account under our
20 legal control until we could, for lack of a better term,
21 get a referee.
22    Q   Okay.  And Account 0188 is a deposit account;
23 correct?
24    A   I don't think it's technically a deposit
25 account.  We have accounts within the GL system of the

Page 86

1 bank that, I mean, you can use to clear transactions or
2 hold funds or that sort of stuff.  So, I mean, it's just
3 an account that's within the company that is subject to
4 the control at the discretion of our legal department.
5    Q   Okay.  Well, I'll ask you again.  Is it -- is
6 0188 a deposit account?
7    A   I can't tell you with certainty if it is or
8 isn't technically styled a deposit account.  It's an
9 account within the bank that we hold funds in.
10    Q   So I can produce it, but it -- would it
11 surprise you if the bank has filed a pleading with the
12 court that says the segregated account is a deposit
13 account and was created for the purpose of segregating
14 the subject funds from other cash held at Prosperity?
15    A   No, sir.  That wouldn't surprise me.
16    Q   Okay.  So is your testimony today that it is
17 or is not a deposit account?
18    A   My personal belief is that whether it is or
19 isn't isn't particularly relevant.  It's an account that
20 we're holding the funds in and segregating.  Like, I
21 don't know why we're stuck on if it's a deposit account.
22 It's not relevant.
23    Q   Well, Mr. Montgomery, you don't get to make an
24 objection.  I'd ask you to answer the question.  It's a
25 yes or no.

Page 87

1    A   I've answered the question.
2    Q   Is it a deposit --
3    A   I don't think it is, but I don't know.
4    Q   How do you not know?  You're the bank
5 representative.  You don't know what an account is?
6    A   Can we just exhibit what you're looking at?
7 Let's clear it up that way.
8    Q   Sure.
9    A   Thank you.
10    Q   Sure.
11        MR. HILLYER:  Can you bring up the Prosperity
12 Bank reply?
13        MR. LANGLEY:  Yep.  Just a second.
14        (Exhibit 21 was marked for identification.)
15 BY MR. HILLYER:
16    Q   You should have Exhibit 21.
17    A   Pulling it up now.  We've got that in front of
18 us.
19    Q   Okay.  Look at page 9, paragraph 20.
20    A   Looks like we say it's a deposit account.
21    Q   Is that your testimony today?
22    A   Sure.
23    Q   Okay.  And that deposit account -- you can go
24 back to Exhibit 16.
25    A   I'm sorry.  I'm there.

Page 88

1    Q   Okay.  Go to the attachments past the letter,
2 please.
3    A   Yes, sir.
4    Q   Okay.  And go to -- it will be Prosperity 423.
5 It should be the last page of that.
6    A   Okay.
7    Q   Okay.  And that is an account statement, or
8 what would you describe that as, Mr. Montgomery?
9    A   So, I mean, that's where my comments on is it
10 a deposit account or is it an "an" account,
11 quote-unquote.  I know you didn't like my answer, but
12 the account's styled in our name which is intended to
13 imply it belongs to no one else at the moment.  We've
14 designated that it's held funds per legal related to the
15 Goodman Networks matter, and you can see a couple of
16 entries in the history.
17    Q   Okay.  And, again, that -- my question was is
18 this a screenshot of an account within your internal
19 system?
20    A   Yes, sir.
21    Q   Okay.  And what system would generate this
22 screenshot?
23    A   Our core system we've talked about, you know,
24 an official version of record -- it's out of Precision.
25    Q   Okay.  And the -- who was the account owner of

Page 89

1 0188?

2    A    The bank.

3    Q    Okay.  And look down on the bottom.  There's a
4 blue line and a white line that says "Deposit,"
5 "Deposit," and the two deposits total $4,463,804.68; is
6 that correct?

7    A    Yes, sir.

8    Q    Okay.  The very -- the third to last column,
9 I'll call it, "Reference," they both say -- or I'm
10 sorry.  One says "Advance 018795" and one says "Advance
11 0187916"; is that correct?

12    A    Yes, sir.  I see that reference.

13    Q    Okay.  So what was the source of the
14 $4.463 million that was deposited in 0188?

15    A    Reversing entry to the two Genesis loan
16 accounts.

17    Q    Okay.  I'm going to ask you to be specific.
18 I'm not saying reversal.

19        Was that an advance made on those loans?

20    A    Yes.  We readvanced, I guess you could say.  I
21 mean, a reversing entry just basically says take us back
22 to where we were before something happened.  And so in
23 this case, I think we spent some time before lunch on
24 our application of the funds, but once we decided that
25 was not the appropriate action, we reversed that entry,

Page 90

1 on the authority of someone in our legal department can
2 do anything with.

3    Q    Okay.  So, again, I appreciate that answer.
4 What -- what I'm asking you is you keep using the term
5 "reverse."  And so you reversed the loan paydown to a
6 loan advance.  Is that what you're saying?

7    A    We basically said the paydown never happened.

8    Q    Okay.  And so was your -- was the bank's
9 intent to put all the parties back in the same position
10 as before August 15th?

11    A    The bank's intent was twofold.  One, we didn't
12 believe at the time that we should have any benefit to
13 the funds.  Two, we wanted to make sure the funds were
14 someplace where no one could get them until we
15 determined whom the rightful holder should be.

16    Q    Okay.  So are you -- is it your testimony
17 today that on August 31st, Prosperity Bank was not
18 claiming an interest in the funds in Account 0188?

19    A    I would say we were still trying to research
20 if we did have a termination sort of event on the DACA
21 that would preserve our interest in the funds, but we
22 thought it was more likely than not at that point that
23 we were not going to be able to produce that or dispute
24 the DACA claim.  And as a result, we felt like the right
25 and correct action was to reverse the entry and not have

Page 92

1 quote-unquote, took the loans back to the same place we
2 were prior to having done it before, and put the funds
3 in this 188 account.  Sorry.  The picture quality is not
4 great here but --

5    Q    Okay.  So what authority does the bank have to
6 make -- strike that.

7        Was the advance on the two Genesis loans done
8 with Genesis's permission?

9    A    The readvance?  No.  I mean, we would have
10 made that decision on our own.

11    Q    Okay.  So sitting here today, the bank has the
12 authority to readvance or -- you said readvance or
13 advance $4 million on a loan that was previously paid
14 off without the permission of the borrower?

15    A    Again, the purpose of a reversing entry is to
16 take you back to where you were before something
17 happened, and because we thought there was an erroneous
18 decision to apply funds, we corrected that erroneous
19 decision, in our opinion, with this entry here.

20    Q    Okay.

21    A    And, again, we didn't want to -- we didn't
22 want to put it in the 3992 account.  We didn't want to
23 send it anywhere where the Goodman Networks folks were
24 trying to send it.  We wanted a referee at the time, and
25 this is an account that only someone in Prosperity Bank

Page 91

1 a benefit of a loan paydown.

2    Q    Okay.  Well, I'll ask you one more time.  Was
3 Prosperity Bank claiming an interest in the funds in
4 0188 on August 31, 2022?

5    A    I'll answer it this way, I guess:  I don't
6 know.  I've kind of tried to say if I thought we could,
7 I would like to have an interest in these funds --
8 right? -- because they're an easy way to get my Genesis
9 loan paid off, especially if I thought I had rightful
10 collateral once when we did that transaction.

11        But I think just the mere action of reversing
12 the entry is Prosperity's representation that we don't
13 think we do have any -- at least a senior interest,
14 priority interest in the funds.

15    Q    You keep saying "reverse," and I'm going to
16 ask you this question:  If you truly reverse a
17 transaction, would money not go back into the account
18 that it was taken out of?

19    A    I would say more likely than not, that's
20 exactly what does happen.  More often than not, better
21 said.

22        Again, specific to these funds, there appeared
23 to us to be a dispute over ownership, and neither of the
24 parties that were claiming ownership were us at the
25 time, so we took a somewhat atypical path and reversed

Page 93

24 (Pages 90 - 93)

1 them into this particular segregated account.
2    Q    Okay.  So is -- the $4.46 million that was
3 used to pay off the Genesis loans came from Account 3992
4 and was the funds of Goodman Networks?
5    A    Yes, sir.  And we've talked about --
6    Q    Okay.
7    A    -- the assignment document that it was those
8 funds.
9    Q    Okay.  And the $4.46 million that was
10 deposited into Account 0188 was from a loan advance on
11 two Genesis loans?
12    A    It was -- I mean, I guess the way I would
13 think about it is it was the funds of 3992 just being
14 moved over to this account.
15    Q    Well, I appreciate what you're saying, but
16 that account statement says the source of funds was the
17 advance on Genesis loans.
18        Was that the source of funds for 0188?
19    A    Again, the reversal entry takes you back to
20 where you were before.  The only way to reverse a
21 paydown would be to readvance the funds, and that's what
22 we did.  I have to unwind the original transaction.
23        MR. HILLYER:  Can you pull up the loan
24 statement sheet?
25        MR. LANGLEY:  17?

Page 94

1        MR. HILLYER:  Yes.
2 BY MR. HILLYER:
3    Q    Look at Exhibit 17, please.
4    A    Yes, sir.  I have that now.
5    Q    Okay.  Go to -- it will be Prosperity 17052.
6    A    Okay.
7    Q    Okay.  And look on that where it says
8 8/30/2022.
9    A    Okay.
10    Q    Okay.  And what is that advance of?  I mean
11 what is that amount that was advanced on the loan?
12    A    So there's four entries that are categorized
13 as loan payoff.  I don't have a calculator with me, but
14 my expectation would be the late charge payment, the fee
15 payment, the interest, and the principal payment would
16 total the 2,996,799.46.
17        So those are the four entries we would have
18 made when we applied the funds from the deposit account.
19 I think I had told you probably it would have been
20 something like 20 or 25 thousand of interest on average.
21 This is only a portion of that -- right? -- because
22 we're talking about the revolving line of credit.
23    Q    Right.
24    A    And then there's a couple other interest and
25 late charge-looking things.

Page 95

1    Q    Okay.  But I'm asking you what I hope is a
2 simple question.  On 8/30/2022, an advance of 2.996 was
3 made to Genesis Loan 7915.
4        That's what that says; correct?
5    A    Yes, sir.  Again, we're reversing the items
6 immediately -- let me finish, please.  We're reversing
7 the items immediately precedent to that which are pay
8 off that loan.
9    Q    Okay.  And on 8/30/2022, 2,996,789.46 was
10 deposited into the Deposit Account 0188; is that
11 correct?
12    A    Yes, sir.  There were --
13    Q    Okay.
14    A    -- two deposits on that date.
15    Q    Okay.  Let's bring up -- publish the next
16 exhibit.  12474.
17        (Exhibit 22 was marked for identification.)
18 BY MR. HILLYER:
19    Q    It will be Exhibit 22.
20    A    We're working on it.
21        I have that email in it front of me.
22    Q    Okay.  And this is an email from Michele Ross
23 to Jessica Freedson in response to the August 31st
24 letter sent by Ms. Freedson, which was Exhibit 16.
25        Do you understand that to be accurate?

Page 96

1    A    Can you say that one more time?  I'm sorry.  I
2 haven't made you repeat much, but I didn't follow you.
3    Q    Okay.  So it says -- the first line says
4 "Thank you for your letter earlier today."
5    A    Okay.  Thank you.  I've got that piece.
6    Q    Okay.  And that letter is Exhibit 16, which we
7 looked at earlier.
8    A    Yes, sir.  Thank you.
9    Q    Okay.  Okay.  I would direct you to this is --
10 Ms. Ross writes "We believe it is appropriate for the
11 funds to be held in and not distributed from the
12 original Account Number 3992, subject to the terms of
13 the DACA.  We believe your goal is to maintain the
14 status quo pending such resolution.  Holding the funds
15 in that account will serve to limit or eliminate any
16 argument that the transfer impaired the rights of
17 US Bank National Association and UMB Bank, National
18 Association."
19        Is that what it says?
20    A    Yes, sir.
21    Q    Okay.  And, again, why did Prosperity not put
22 the funds into 3992 and leave them in Account 0188?
23    A    It's my opinion that the funds were still in
24 dispute and, frankly, still are.
25    Q    Okay.  Who -- when you say "in dispute,"

Page 97

25 (Pages 94 - 97)

1 dispute -- dispute between who?
2     A    Again, we had a claim from this party.  We
3 also had the Goodman Networks entities saying that the
4 deposits should be made available and returned to them.
5 This letter is asking us to put a hold on those accounts
6 so that nothing can happen.  I mean, we --
7     Q    Okay.
8     A    We honestly didn't know who the funds
9 rightfully belonged to.  I've answered the question that
10 we did not think it was us reasonably at the time.
11 That's why they were there.
12        We -- I now believe they were subject to the
13 DACA and should be returned to the benefit of those
14 holders, but I mean, we're -- we're in a bankruptcy now,
15 and we're just waiting on someone to tell us what to do
16 with these funds, and I believe we've offered a
17 settlement.  We'll do that almost immediately upon
18 getting that direction.
19     Q    Okay.  So, again, to be clear, the dispute
20 that you're talking about is a dispute between the
21 bondholders and the debtor, not a dispute between the
22 bondholders, the debtor, and Prosperity?
23     A    Prosperity did not reasonably believe the
24 funds were or could be for the benefit of us at that
25 time.  If I -- if I had subsequent to any of these

Page 98

1 deposited in 0188, did the debtor ask Prosperity to put
2 the money back into 3992?
3     A    There's emails that we've provided in
4 discovery that will help certain the time frame.  I'm
5 telling you that, yes, we had inbound emails from
6 Goodman Networks requesting the funds, and I just want
7 to be sure of the timing of those requests.
8     Q    Okay.  So I guess my question is sitting here
9 right now -- and we can go through emails -- did the
10 debtor request Prosperity to put the money back in 3992
11 after August 31st?
12     A    I can't say that for certainty.  We're trying
13 to find a document that will address your question,
14 though.
15     Q    I'm not -- I'm just saying at any time.
16     A    Yes.
17     Q    I'm --
18     A    The answer to that question is yes.  At any
19 time in this process while the funds were -- we were
20 trying to figure out what to do, and while other people
21 were making claim on the funds, yes, Goodman Networks
22 was asking for the funds.
23     Q    No.  Goodman Networks was asking for the funds
24 to be put back in the 3992 account, was the question.
25     A    I can't tell you exactly where they were

Page 100

1 emails found a termination of the DACA, we would be in
2 this proceeding fighting that those are our collateral.
3 We have not been able to locate that, which likely means
4 it doesn't exist at this point.
5        I would also say since the date of this
6 correspondence, the dispute on the funds has broadened,
7 and we're simply trying to get someone to tell us what
8 we should do with the funds.
9     Q    Okay.  So we already looked at Ms. Ross's
10 email.  The bondholders wanted Prosperity to put the
11 funds into 3992; correct?
12     A    Yes, they did.
13     Q    Okay.  And you said the debtor -- or I'm
14 sorry, Goodman Networks.  Where did Goodman Networks
15 want Prosperity to put the -- put the subject funds?
16     A    So, I mean, they were basically -- and I'm not
17 sure where their bankruptcy filing happens in relation
18 to this time frame exactly, but they were wanting to
19 satisfy some of their creditors and expenses, and
20 obviously they would have had use of those funds prior
21 to August 16th.  So they're telling us, "Hey, those are
22 our funds.  We want to be able to access them" around
23 this time as well.
24     Q    Okay.  Well, I'm saying after August 30 -- I'm
25 saying after August 31st, which is when the funds were

Page 99

1 asking to put it.  That's why I want the email.  I want
2 to be able to answer these with certainty.  They were
3 asking for us to do something with the funds that were
4 for the benefit of them and what they wanted to do with
5 them.
6        MR. HILLYER:  Can we go ahead and publish
7 15367?
8        MR. LANGLEY:  Exhibit 23.
9        (Exhibit 23 was marked for identification.)
10 BY MR. HILLYER:
11     Q    Exhibit 23.
12     A    I have that document in front of me.
13     Q    Okay.  And give me one second to see how many
14 pages are in that Exhibit 23.
15     A    I just have two in what you've provided to the
16 site.
17     Q    Okay.  It's two pages.  So let's just look on
18 the email in the middle of the page, John Goodman to
19 Bater Bates on October 28, 2022.
20        "Hey, Bater.  Let's please discuss this --
21 this one of many invoices I need to get paid -- get" --
22 let's start over.
23        "Hi, Bater.  Let's please discuss this as one
24 of -- this is one in one of many invoices that I need to
25 get paid in order to keep the company operating at a

Page 101

1 bare minimum. We need some capital released out of that
2 account at Prosperity. There isn't any cash inside the
3 company. Can you, myself, and David from Akerman speak
4 on Monday morning?"
5      Okay. And Bater Bates responds, "No, I cannot
6 do this, John. Until a credit restructure or repayment
7 is completed, the money is pledged."
8      Do you see that?
9   A   Yes, sir.
10  Q   Okay. "If we reached a restructure and the
11 money was released, as I informed you on Friday, the
12 money would go back into the account and would be
13 subject to the notice of control by the bondholders,"
14 quotations, "they would pull the funds. Unless you have
15 gotten something done with the note repurchase, this is
16 not a viable option."
17      Okay. So my question is what is Mr. Bates
18 talking about?
19  A   I honestly don't know. There's a reference on
20 a note repurchase. Best of my knowledge, we're not
21 discussing any note repurchase, quote-unquote, with my
22 debt.
23      My recollection at or around this time is John
24 was asserting control of the now-bankrupt Goodman
25 Networks. I believe he was trying to buy the

Page 102

1 claiming an interest in the funds in 0188, but please
2 disagree with me.
3      That's not what Mr. Bates is saying two months
4 after that letter; isn't that correct?
5   A   [Indiscernible.]
6      (Reporter clarification.)
7      THE WITNESS: That's not what he was saying,
8 no.
9 BY MR. HILLYER:
10  Q   Do you think that that email from Bater Bates
11 is a misrepresentation?
12      MS. ARGEROPLOS: Objection. Form.
13      THE WITNESS: It's hard to say what he's
14 thinking. Again, and I don't -- y'all can pull this.
15      My understanding is that John was trying to
16 negotiate something with the bondholders at that time,
17 and it could be a restructure; that he's probably just
18 telling John no because John's probably emailing with
19 some persistence and saying, "I need the money. I need
20 the money," and a way to let John know that we're not
21 going to do anything with the money is maybe the words
22 that he chose.
23      But I honestly believe in my heart of hearts
24 that we had that money segregated. And ever since the
25 day we have sent that letter, we've asserted that we're

Page 104

1 bondholders at a discount, but I'm not for certain of
2 that.
3      But long story short, he comes around the hoop
4 right around the time we're dealing with this and is
5 wanting the money, at least in this case, to pay some
6 bills.
7      I don't know why Bater said we would have
8 returned the money. We wouldn't have done that.
9   Q   Okay.
10  A   And, again, those funds are in a legal hold at
11 that time. He couldn't have done anything without
12 legal.
13  Q   Okay. Let's talk about the first line.
14 "Until a credit restructure or repayment is completed,
15 the money is pledged."
16      A payment -- "a credit restructure or
17 repayment is completed." Does that mean with Genesis?
18  A   Probably, yeah.
19  Q   Okay. And then it says "the money is
20 pledged." To Prosperity?
21  A   That appears to be what he meant. I don't
22 think that's the official position of the company as we
23 sit on 10/31 or as we sit here today.
24  Q   Okay. Well, that's my next question,
25 Mr. Montgomery, is you said that the bank was not

Page 103

1 not going to do anything with it.
2 BY MR. HILLYER:
3   Q   Give me one second.
4      I'm trying to reconcile what you just said,
5 Mr. Montgomery, with -- is it a fair reading that -- of
6 this email that here Bates is saying the money in 0188
7 will not be released to anyone by Prosperity until the
8 Genesis loan restructure or repayment is completed?
9   A   I've kind of answered this question. I can't
10 tell you what he was thinking. I can only tell you that
11 we were thinking, and that being me and others on the
12 executive team.
13      We -- we had zero intent of doing anything
14 with that money, whether that loan was paid in full,
15 whether it was restructured, whether it was charged off
16 or anything else, and that remains our position today,
17 and it's supported by all of our actions since we put
18 those funds in that account.
19  Q   Okay. I'll ask you this question: So this
20 email is Bater Bates, John Goodman, David Parham, and
21 Andrea Hartley, who are attorneys at Akerman.
22      Is anyone other than Bater Bates speaking
23 with -- this is post-petition, Mr. Montgomery. This is
24 once the bankruptcy case has started.
25      Is anyone in legal after sending all --

Page 105

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1 Jessica Freedson or anyone at the bank? What is Bater
2 Bates doing communicating with debtor's counsel?
3     A  I can't answer that.
4     Q  Let's go on to publish 15369.
5     A  I will say that email is in response to a
6 direct email from John to Bater without debtor's
7 counsel, so someone added those. Presumably Bater.
8         MR. HILLYER: Do we have 15369?
9         MR. LANGLEY: That will be Exhibit 24.
10        MR. HILLYER: Okay.
11        (Exhibit 24 was marked for identification.)
12 BY MR. HILLYER:
13    Q  You should have Exhibit 24.
14    A  I have it.
15    Q  Okay.
16    A  I guess for context, can I have two minutes to
17 look at the 23 exhibit?
18    Q  Sure.
19    A  Okay. Thank you.
20    Q  Okay. I believe we published it as
21 Exhibit 24, an email, and then we just republished it as
22 Exhibit 25 because of the stamp covering up some of the
23 substance.
24        (Exhibit 25 was marked for identification.)
25        THE WITNESS: Give us one second to go to the

Page 106

1 new one.
2     Okay.
3 BY MR. HILLYER:
4     Q  And this is a different email chain from the
5 Exhibit 23. You'll see by the subject line, previously
6 it was "Goodman - Extension of Instructions of D&O
7 coverage," and this is "Goodman funds at Prosperity."
8     Do you see that?
9     A  Yes, sir. That's what makes the multiple
10 exhibits hard. It looks like two simultaneous chains
11 are going on.
12    Q  Right. And so on this chain, this is going
13 back to -- go to August -- Saturday, October 29th, and
14 this is a chain from John Goodman to Bater Bates and
15 copying counsel for the debtor and asks Bater Bates "Can
16 you please provide an update to Goodman's counsel the
17 status of the funds on deposit with Prosperity? Last we
18 spoke, I understood the company requested the funds be
19 moved into escrow and that the bondholders were
20 attempting to get control or lock up the funds. The
21 company has very little cash and is attempting to keep
22 professional paid as we work through the involuntary
23 Chapter 7 filing and needs capital to do so."
24    Okay. And Mr. Bates responds two days later.
25 And before I look at the substance, so when Mr. Bates

Page 107

1 gets an email from lawyers, what is the bank's policy
2 about lawyer communications?
3     A  I don't know that there is one.
4     Q  Okay. So are you saying -- does this email go
5 to legal?
6     A  No. The bank's policy is not that every email
7 that includes someone's legal counsel also gets a
8 corresponding cc from bank counsel, either internal or
9 external.
10    Q  Okay. Go to the bottom of the first page of
11 Exhibit 24. And Mr. Bates writes "In negotiating with
12 the bondholder's counsel, the loan was readvanced and
13 the funds were placed in a Prosperity Bank escrow
14 account (fbo GNet) which still secures our loan." And
15 this is October 31st.
16    Do you agree with that statement?
17    A  That's what the email says.
18    Q  That's not what I asked you, what it says. I
19 said does the bank agree with that statement?
20    A  I feel like I've kind of already spoken to
21 that. I mean, again, there was a 2 percent chance we'd
22 figure it out, but we remitted it to the 118 account
23 because we didn't think we had a reasonable and good
24 claim to the funds.
25    Q  Okay. So let's talk about that. So this is

Page 108

1 two months after the letter came from Ms. Freedson at
2 Prosperity and the money was put into Account 0188.
3     Is it your testimony today that two months
4 later, the bank had not made a decision whether it --
5 the funds in the 0188 account was its collateral and
6 they asserted an interest in it?
7     A  That would be in direct conflict from the
8 first four times I answered that question. Once we put
9 it back in 1188 back in August, the bank reasonably did
10 not believe we had an interest in the funds. At
11 least --
12    Q  Okay.
13    A  -- a similar secured interest. And that's not
14 relevant either but --
15    Q  Okay. And that position is directly opposite
16 to what Mr. Bates writes: "which still secures our
17 loan."
18    A  That's fair.
19    Q  Okay. And at the top of Exhibit 24, that is a
20 letter from an attorney to Mr. Bates alleging that the
21 transfer of funds from Goodman Networks for security for
22 a loan to Genesis was without consideration and we
23 believe it's a fraudulent transfer and the funds need to
24 be returned.
25    Okay? Isn't that what it says?

Page 109

28 (Pages 106 - 109)

1  A  Yes, sir.
2  Q  Okay.  Does that go to legal?
3  A  My personal opinion was it should have once
4 someone started saber-rattling on this level, but again,
5 I don't think we have a consistent policy for same.
6  Q  Okay.  Do you know if this email went to
7 legal?
8  A  My understanding is it did not.
9  Q  Okay.  Give me one second.
10  MR. HILLYER: Let's publish 15989.
11  (Exhibit 26 was marked for identification.)
12  THE WITNESS: Will that be 26 on our end?
13 BY MR. HILLYER:
14  Q  Yes.  I'm sorry.  Yeah.  Exhibit 26.  Bear
15 with us.  We're having trouble with the stamps.
16  A  You're fine.
17  Q  Okay.  Mr. Montgomery, we're now in December
18 of 2022, which is another almost six weeks after the
19 previous October emails.
20  And John Goodman asks Bater Bates at the
21 bottom of the page, "I would like to request the funds
22 being held at Prosperity be moved to Goodman Networks or
23 to the bond trustee.  Can you please provide me a
24 response on Prosperity's ability?"
25  Isn't that what it says?

Page 110

1  A  Yes, sir.
2  Q  Okay.  So this is John Goodman asking that the
3 money be sent to either Goodman Networks or the bond
4 trustees, either/or; correct?
5  A  Yes, sir.
6  Q  Okay.  And Bater Bates responds two days
7 later: "We are not in a position to do that yet.  The
8 restructure of the debt was delayed on the Genesis side.
9 We hope to have it approved and finish documenting early
10 next week.  The 3mm line that is.  Your debt is later in
11 the week."
12  Mr. Montgomery, it sounds like Mr. -- the
13 request has been made, that there's no longer a dispute,
14 that the debtor is asking send it to the bond trustee or
15 send it to us.  You're saying that the bank claims no
16 interest in the funds in 0188, but Mr. Bates says you're
17 not in a position to do that until a Genesis loan is
18 restructured.
19  Can you explain that?
20  A  No, sir.
21  Q  I'm sorry?
22  A  I said no.  I can't explain what he's trying
23 to represent here.  This is different from anything we
24 were discussing on a much broader basis within the
25 company at the time.

Page 111

1  Q  Okay.  Would you agree with me it sounds like
2 the money is being held in 0188 not because of a dispute
3 between any of the parties about where the funds go but
4 rather that the bank is holding that money as
5 essentially a -- a leverage position to get a Genesis
6 loan restructure done?
7  A  I mean, that's what the email says, but I'm
8 telling you that's just not what we were doing.
9  Q  Okay.  When you say, "I wouldn't have done
10 that," are you saying the bank or are you saying you
11 personally, Mr. Montgomery?
12  A  As corporate representative for the bank, I
13 can say that with certainty.  I, we, the bank, wouldn't
14 have done it.
15  Q  Did anyone at the bank communicate with
16 Goodman Networks other than Bater Bates?
17  A  That's a pretty broad question.  Can you
18 narrow it?
19  Q  Okay.  On or around this time that Bater Bates
20 is responding that Prosperity will not release the money
21 in 0188, is anyone at the bank other than Bater Bates
22 discussing --
23  A  I mean --
24  Q  -- this matter with Goodman Networks or their
25 attorneys?

Page 112

1  A  I don't -- I just don't know the answer to
2 that, to be honest with you.  I don't believe so, but
3 who knows.  I mean, Bater at this time is trying to work
4 on a restructure of the Genesis debt for sure.  I don't
5 know what he believes John's involvement in that to be
6 other than the brothers have always represented some of
7 the debt to the other one.  The legal says much
8 different.
9  John -- I mean, we've had a long relationship
10 with John and the trust which I referenced earlier in
11 the deposition that goes back a lot of years at this
12 point, more than five.
13  John doesn't seem like a businessman that's
14 really astute and, at least from what I've seen from
15 afar, hasn't really done what he's said he's going to
16 do.
17  I think there's probably some level of Bater
18 just trying to make him go away and leave him alone.
19 But, again, we are working on a restructure of the
20 Genesis debt.  Whether Bater thought some promise to do
21 something on the funds was part of that, I don't know.
22  But I can tell you, I mean, I come into this
23 situation sometime in Q1 of '23 and take over
24 administration of the loan, and there's not going to be
25 a single document, I don't believe, that involves me

Page 113

Alpha Reporting          800-556-8974
A Veritext Company        www.veritext.com

1 where we ever represent that the funds can be part of
2 any restructure.
3        I think I've had cursory review, you know,
4 discussions with John. But, again, my opinion of John
5 was he didn't handle his business as agreed and he
6 wasn't obligated on the debt I was trying to
7 restructure, so I didn't have much cause to negotiate
8 meaningfully with him.
9    Q    All right. Thank you.
10       Let's go to Prosperity 16117.
11       (Exhibit 27 was marked for identification.)
12       THE WITNESS: Cam, do you mind if I grab a
13 bottle of water while we're doing that?
14 BY MR. HILLYER:
15    Q    Not at all. Please. If you ever need a
16 break, just say it.
17    A    Don't need a break. Just some more water.
18       Thank you.
19       I don't know what your temperature is, but
20 we're on like our 75th day of 100 here.
21    Q    If it helps, you and I both lost our jackets
22 at the break.
23    A    I was very glad to see you take yours off.
24    Q    It's unbearably hot.
25       MS. ARGEROPLOS: The transcript.
Page 114

1       THE WITNESS: Y'all kidding about prior
2 transcript --
3 BY MR. HILLYER:
4    Q    Okay. Do you have Exhibit 20--
5       MS. ARGEROPLOS: 27.
6 BY MR. HILLYER:
7    Q    -- 27? Okay.
8       Mr. Montgomery, this is -- now we're into late
9 January of -- January 31, 2023, the last day of the
10 month, and Mr. Bates is now writing to John Goodman,
11 James Goodman, Zachary Wiebe at Genesis, and Taylor
12 Burns at Prosperity is on the email now, and the subject
13 is "Term Loan."
14       "We are still trying to get the debt of
15 Genesis Telecom (3 million revolver and 1.4 term loan)
16 restructured so the GNet cash in escrow can be released,
17 but we're not there yet. Attached is an overview of a
18 term loan that would be extended to you with the support
19 of Endeavor and James."
20       So, again, I ask you: Now we are way beyond
21 days. We're months from the August 31st and the October
22 emails and the early December emails and we're
23 essentially into February, and Bater Bates is still
24 saying that the funds cannot be released until the
25 Genesis Telecom debt is restructured.
Page 115

1       Do you see -- I mean, is there any -- is there
2 any other way to read that, Mr. Montgomery?
3    A    I don't think I've tried to defend this course
4 of action yet in the deposition of what he was saying.
5 I don't intend to start right now.
6    Q    I understand but --
7    A    I continue to disagree. I continue to think
8 that was not correct, and any indication that we were
9 going to do anything different with the funds that were
10 in the 118 account was just a misrepresentation. The
11 bank --
12    Q    Okay.
13    A    We were never considering this.
14    Q    Understand.
15       So now Taylor Burns is on. It's someone other
16 than Bater Bates -- in addition to Bater Bates. I'm
17 sorry.
18       And what is Taylor Burns' relationship with
19 Bater Bates? Where is the hierarchy within the bank?
20    A    Taylor would be a subordinate to Bater. And I
21 had mentioned earlier there were a couple members of
22 Bater's -- I think I called them the lending team,
23 Taylor and Jordan Yenne.
24       Just so we can put this to bed, I guess
25 Mr. Yenne's wife has died prior to this email, and I
Page 116

1 believe he's either just left the bank or is just about
2 to, so the fact that he's not around on this email is,
3 in my opinion, probably linked to that event.
4    Q    Okay. Let's go next to Prosperity 16486.
5       (Exhibit 28 was marked for identification.)
6       THE WITNESS: See? I broke it already.
7 BY MR. HILLYER:
8    Q    It will be Exhibit 28. Do you see it?
9    A    We're pulling it up now.
10    Q    Okay.
11    A    Okay.
12    Q    Okay. Let's go just to the top line,
13 Mr. Montgomery. This is now March 6, 2023, and this
14 time it's from you to James Goodman and John Goodman,
15 and you said, "We are planning to motion the court to
16 release the cash collateral back to us to satisfy the
17 loan."
18       Is that what it says?
19    A    Yes, sir.
20    Q    Okay. You testified earlier that the bank is
21 not asserting an interest in that money.
22       How does that -- how do you explain that
23 email?
24    A    I'm just trying to negotiate a workout at that
25 point, to be honest with you. I don't know what the
Page 117

Alpha Reporting                          800-556-8974
A Veritext Company                   www.veritext.com

1 circumstances around our pleadings were around that
2 time. I know this is at or around the time kind of end
3 winter. I think we thought about doing that. I don't
4 know if we actually did, but we discussed whether or not
5 we would be able to do that. That's internally with
6 counsel.
7    Q   Well, I'll ask you specifically. So on
8 March 6, 2023, do you think the funds in the 0188
9 account is Prosperity's cash collateral?
10   A   No, sir.
11   Q   Okay. Are you intentionally misrepresenting
12 it in an email to James Goodman and John Goodman?
13   A   That's not my intent, sir. No. I think what
14 I'm intending to say here is we were, I think, around
15 this time trying to give the money back to the court.
16 This has got to be around the time that we're actively
17 engaged in multiple versions of a settlement agreement
18 where we were agreeing to do same.
19   Q   Okay.
20   A   Satisfy the loans. Probably a misstatement.
21   Q   But, Mr. Montgomery, it says "release the cash
22 collateral back to us to satisfy the loan."
23       Were you talking about the Genesis loan?
24   A   I'm sure I was. That's what we're negotiating
25 at this point, and we've obviously transitioned or are

Page 118

1 transitioning at this time administration of the credit
2 to special assets.
3    Q   So I'll ask you just specific. If you don't
4 claim an interest and you don't think it's your
5 collateral, where is the truthfulness in that email to
6 the Goodmans?
7    A   You can call it factually incorrect or
8 untruthful or whatever you'd like. I can't tell you
9 exactly what I was thinking on 3/6.
10   Q   Okay. Well, I'll ask you this: Are you
11 disclaiming that statement like you -- like the bank is
12 disclaiming Mr. Bates' statements in the previous
13 emails?
14   A   Sure.
15   Q   Okay. So as the corporate representative of
16 Prosperity, you're disclaiming your own email?
17   A   I'm telling you at this time we're trying to
18 work out the cash position. This is clearly sent from
19 my iPad or iPhone. It's probably on the fly.
20   Q   Give me one second.
21   A   I mean, we're doing two things in this email.
22 We're trying to resolve the cash situation with the
23 court, and we're trying to work out the loan. So...
24       MR. HILLYER: All right. Let's publish 16495.
25 16495. Give me one second.

Page 119

1    All right. I think we're good.
2       (Exhibit 29 was marked for identification.)
3 BY MR. HILLYER:
4    Q   Okay. Exhibit 29. Do you see it now?
5    A   Yes, sir.
6    Q   Okay. So the subject line is "Prosperity
7 Bank - Notice of Default."
8    A   Yes, sir.
9    Q   Okay. And so this is an email chain that
10 starts with your counsel emailing James Goodman, copying
11 you and a -- another attorney at Jackson Walker that
12 says "Please see attached notice of default regarding
13 the Prosperity loans to Genesis Networks Telecom."
14       And Mr. James Goodman responds: "Let me get
15 with Zach. I thought this was resolved."
16       And you respond: "As I'm sure you are already
17 aware, we have filed a motion for an agreed order to
18 release the cash held in escrow to the bankruptcy
19 trustee on advice of counsel. As such, we consider that
20 issue closed as it relates to the Genesis debt and your
21 personal guaranty."
22       Can you explain that for me? What issue was
23 closed as related to the Genesis debt and personal
24 guaranty?
25   A   Again, James and John are trying to figure out

Page 120

1 what to do. They're asking us to do something with the
2 cash collateral too. We're getting more and more up to
3 speed on where we're at on that, and I'm basically
4 telling him anything that involves that account isn't
5 realistic at this point.
6       We've filed a motion. He's obviously party to
7 anything that's going on in the bankruptcy situation.
8 And this kind of goes to my email earlier. At or
9 around -- or my comments earlier. At or around this
10 time, we're petitioning the money back to the court or
11 trying to get it back there.
12   Q   Okay. And the second line is "Please be
13 further advised that I have requested your deposition
14 transcript from that case as well. The trustee has made
15 certain representations as to its content that, if true,
16 create a troubling fact set for your business and
17 relationship with Prosperity, as well as the legitimacy
18 of any asset transfer from Endeavor to Genesis."
19       Okay. Can you give me some background on your
20 knowledge of the deposition transcript from the trustee?
21   A   It's been a while, probably the end of the
22 first quarter, but through our counsel I requested a
23 copy of it and I read it. It's about 450 pages.
24   Q   Right. I'm asking in this email you don't
25 have the transcript yet. You just said you've been

Page 121

Alpha Reporting                    800-556-8974
A Veritext Company                 www.veritext.com

1 advised of representations.
2      Who told you about James Goodman's deposition
3 and representations that create a troubling fact?
4      A   Bank counsel.
5      Q   Okay.  And the last line says "as well as the
6 legitimacy of any asset transfer to Endeavor from
7 Genesis."
8      So I'll try not to revisit or reopen that
9 line, but correct me if I'm wrong.  I believe you
10 testified earlier that you are not certain if assets
11 were transferred from Genesis to Endeavor.
12      Is that your prior testimony?
13      A   That's true.  That's my testimony today, and
14 that's how I felt on 3/24/23.
15      Q   Okay.  So you were saying as a -- you don't
16 know if there was any assets transfer from Endeavor to
17 Genesis when you wrote that?
18      A   At this point in the workout, I'm coming up to
19 speed on the deal.  I haven't had a ton of interaction
20 with James or John.  I don't really want to have any
21 with John because of prior dealings.  Again, I think I
22 referenced wasn't quite sure.
23      I'm trying to see in this email that's kind of
24 a salvo to see if James is a good or a bad guy and
25 telling him I'm going to pull his Genesis deposition and

Page 122

1 telling him I might look to see if he did illegitimate
2 things is intended to put him on notice that that's
3 where we're going.
4      Q   Okay.  Give me one second.
5      All right.  I'm going to introduce -- it's
6 Prosperity 17056.
7      MR. LANGLEY:  It will be Exhibit 30.
8      (Exhibit 30 was marked for identification.)
9 BY MR. HILLYER:
10      Q   It will be Exhibit 30.  I'll represent to you,
11 Mr. Montgomery, this is an -- a Prosperity document for
12 the procedures for adding critical alerts, and this was
13 produced by your counsel in response to restrictions
14 placed on the 0188 account.
15      Are you familiar with these procedures or --
16      A   Yes.
17      Q   Okay.  And so you go to page 2 that deals with
18 deposit accounts.  Okay?  And it's six -- "Demand
19 Deposit Accounts."  Six events that qualify for critical
20 alerts.
21      If you'll look at the fourth bullet point
22 down, "Legal alerts," is that what is currently on
23 Account 0188?
24      A   Yes, sir.
25      Q   Okay.  And once it's put -- once a legal alert

Page 123

1 on a deposit account is put in place, who has the
2 authority to take any action on that account?
3      A   I mean, nobody until they're advised by legal
4 what, if anything, to do.
5      Q   Okay.  For -- I don't want to get into
6 hypotheticals but -- so if you call up and say, "Hey,
7 transfer a million dollars of that 0188 to the
8 bondholders."  You can't do that without legal's
9 approval.
10      A   No, sir.
11      Q   Is that correct?
12      A   That's true.
13      Q   Okay.  So -- all right.  Let's put in 17060.
14      MR. LANGLEY:  31.
15      (Exhibit 31 was marked for identification.)
16 BY MR. HILLYER:
17      Q   It should be Exhibit 31.
18      A   I have that in front of me.
19      Q   You have it in front of you?
20      A   Yes, sir.
21      Q   Okay.  So this says it's a proof daily
22 transaction journal.  Is this something that's generated
23 from the core system that you referenced earlier?
24      A   My gut is no because it doesn't look like
25 anything that I would take from the core system, but

Page 124

1 that said, I mean, I don't know if there is, like,
2 behind-the-scenes reporting.  I'm sure there probably
3 is.  And I don't know if this is referencing that or
4 something in our accounting software.  But either way,
5 it's somewhere in that part of the daily processing.
6      Q   Okay.  And, again, I believe we've covered
7 some of this, so this looks like four line entries:
8 two debits, two credits.
9      Would that be correct?
10      A   I don't see anything that notes it as a debit
11 or a credit, so it's hard to answer that, sir.
12      Q   Okay.  Well, I'll say this:  It has two
13 entries for -- with the 7915 and 7916, which are the
14 loans.
15      A   Yes, sir.
16      Q   And they say "Advance."  And then it has a
17 similar line entry with both selection 151 out to the
18 side for deposits into the 0188 account.
19      Am I reading that correctly?
20      A   I mean, I believe that to be true just because
21 of what we've seen prior to this document, but I can't
22 interpret this document as same.  I don't know what
23 "BP."  I'm assuming that's batch processing.  I don't
24 know what 5 and 438 codes are.  I don't -- this is
25 pretty far in the weeds.

Page 125

Alpha Reporting                                   800-556-8974
A Veritext Company                              www.veritext.com

1  Q   That was going to be my next question is do
2  you know what "Sel 151, 501, 517, 151" -- do you know
3  what that means?
4  A   The only thing I would be willing to say with
5  any certainty is "Seq" is sequence, and those are the
6  order that they were ran, potentially.
7       But, I mean, again, this is -- this is
8  probably happening either behind the scenes in our core
9  processing system or in the transition from our core
10 processing system into our general ledger, and I just
11 can't give you a ton of color on what any of that would
12 mean with effect to what's happening behind the scenes.
13 Q   Okay.  So do you know what Y -- "User YECJ"
14 means?
15 A   No, sir.  I mean, I think we have that
16 designation on the deposit accounts, and I don't think I
17 knew then either.  I mean, the time this is running is
18 12:43 a.m., so I mean, that's --
19 Q   Is that a person?
20 A   I just don't know.
21 Q   Who would have -- if you don't have the
22 information or do not know the information related to
23 the selections and sequencing on the loan numbers and
24 the 0188 account numbers, who would have that intimate
25 knowledge, information about this transaction journal?
Page 126

1  Q   Okay.  And if that legal hold was lifted on
2  0188, who has control over that account?
3       MS. ARGEROPLOS:  Objection.
4       THE WITNESS:  I don't know the answer to that.
5  I don't think there would be authorized signers or, I
6  mean, presumably there's some level of, like, deposit
7  operations personnel that are senior enough to effect a
8  transaction.
9       But I just -- it's not like a regular deposit
10 account -- right? -- where authorized signers can effect
11 actions or anything like that.  It's an internal
12 Prosperity account, so people that could make entries
13 would be limited to something like, you know, senior
14 deposit operations folks and senior accounting folks.
15 BY MR. HILLYER:
16 Q   Okay.  All of those people are internal at
17 Prosperity; correct?
18 A   Yes, sir.  I don't believe anyone outside of
19 the company would have any ability to transact on this
20 account.
21 Q   Even if the legal hold was not there?
22 A   Yes, sir.
23 Q   Okay.
24 A   Just to be clear, even absent the legal hold
25 could someone outside the company transact on this
Page 128

1  A   Our IT department.
2  Q   Give me one second.
3       Okay.  So I believe your testimony earlier was
4  so the 0188 account is a deposit account at Prosperity
5  Bank and the account owner is Prosperity Bank; is that
6  correct?
7  A   Just to be clear, the only thing that makes me
8  think it's a deposit account for sure is our letter
9  response, which I think is true.  But, yes, it's an
10 account in the name of Prosperity at Prosperity.
11 Q   Okay.  And we can discuss it as much as you
12 want, Mr. Montgomery, but I'm going to ask you about
13 control.
14      So who has control over that account right
15 now?
16      MS. ARGEROPLOS:  Objection.  Form.
17      THE WITNESS:  The legal department.  That's
18 the whole nature of the hold.
19 BY MR. HILLYER:
20 Q   Okay.  And what is your basis for that
21 knowledge or basis for that statement?
22 A   That one of the previous exhibits we looked at
23 noted it as a legal hold.
24 Q   Okay.
25 A   I think it was a screenshot of the account.
Page 127

1  account, and the answer is no.
2  Q   Give me one second.
3       Give me one second.
4       Mr. Montgomery, so is there any -- that you
5  know of, any deposit account control agreement that 0188
6  is subject to?
7  A   I don't think there would be.  I mean, there's
8  not multiple parties involved in the administration of
9  that account -- right? -- or at least any outside
10 Prosperity.
11      I mean, just as a matter of substance, you
12 know, I'm a pretty senior person in the organization,
13 and if I see legal hold, that tells me don't do a darn
14 thing until general counsel tells me I can.
15 Q   Thank you.
16      Give me one second.
17      MR. HILLYER:  Can you publish the request for
18 admission?  Or it will be request for admission and
19 interrogatories.  It will be Number 1 dated June 29,
20 2023.
21      (Exhibit 32 was marked for identification.)
22 BY MR. HILLYER:
23 Q   You should have Exhibit 32 now.
24 A   Yes, sir.  We're still trying to populate
25 that.
Page 129

33 (Pages 126 - 129)

Page 130

```
 1    Q   Yep.
 2    A   Okay.  We've got it pulled up.
 3    Q   Okay.  Look just specifically at Request 9.
 4    A   Okay.
 5    Q   It says "Admit" -- I'm sorry.  I didn't mean
 6  to interrupt you.  Are you there?
 7    A   Yes, sir, I am.  No apologies needed.
 8    Q   Okay.  "Admit that the bondholders do not have
 9  control over the Prosperity account ending in 0188."
10  Denied.
11        I believe you just testified that no one had
12  control over 0188 except Prosperity.
13    A   I don't understand your question, Cam.
14    Q   Okay.  So you --
15    A   "Admit that the bondholders do not have
16  control."
17    Q   I'll rephrase it.  Do the bondholders have
18  control over Prosperity Account 0188?
19        MS. ARGEROPLOS:  Objection.
20        THE WITNESS:  That's a better question.  And
21  as of now, no.
22  BY MR. HILLYER:
23    Q   Okay.  All right.  Just give me one second.
24  Let's -- tell you what.  It's --
25    A   Cam, can I clarify one thing before we move to
```

Page 131

```
 1  a break, which is I think where you're heading?
 2        Even if we decided today that the bondholders
 3  should have access to the funds that are in that
 4  account, they would not ever get access to the account
 5  itself.  We would operate at the direction of the court
 6  and whomever the party is that's entitled to the funds
 7  to put them where they wanted, how they wanted.
 8    Q   Okay.
 9    A   I don't want to make it sound like someone
10  could get access to that account later.
11        MR. HILLYER:  Okay.  Let's take a quick
12  five-minute break until 3:00 Central.
13        MS. ARGEROPLOS:  Okay.
14        THE WITNESS:  We've got 2:04 Central here,
15  Cam.
16        MR. LANGLEY:  2:05 right now.  It's 2:05.
17        MR. HILLYER:  Oh, okay.  My watch is now
18  reset.
19        THE WITNESS:  Five minutes is fine, though.
20        MR. HILLYER:  No.  No.  No.  We're not taking
21  a 55-minute short break.  Let's take a ten-minute break
22  to 2:15 if everyone is fine with that.
23        MS. ARGEROPLOS:  Okay.
24        THE VIDEOGRAPHER:  2:05 p.m.  Off the record.
25        (Off the record.)
```

Page 132

```
 1        THE VIDEOGRAPHER:  2:16 p.m.  On the record.
 2  BY MR. HILLYER:
 3    Q   Okay.  Mr. Montgomery, thank you so much for
 4  your time today.  I've got one, maybe two, short
 5  questions to wrap it up.
 6        So are you familiar if I use the term
 7  "Prosperity payments" as they were identified in the
 8  motions for settlement by the trustee and in
 9  Prosperity's reply?
10    A   Yes, sir.  I believe that maybe just to make
11  sure we're on the same page, there's about 550-ish
12  thousand dollars' worth of payments that were subject to
13  the pleadings and the settlement agreement.
14    Q   Okay.  Yes.  It's $513,000 and 740 --
15  $513,742.42 of payments from January of 2021 to August
16  of 2022 that were paid to Prosperity from Goodman
17  Networks for the Genesis loans.
18        Is that your understanding?
19    A   Yes, sir.  I think we're talking about the
20  same thing.
21    Q   Okay.  And those funds were paid -- do you
22  know what account those funds were paid from?
23    A   I don't know the exact account.  My
24  understanding is that they were from a Goodman Networks
25  account to the Genesis term loan account.
```

Page 133

```
 1    Q   Okay.  But it's your understanding that those
 2  payments did not come from Account 3992?
 3    A   Do we have that pleading where I can see if
 4  we -- I just don't know which Goodman account they came
 5  from.  I really don't.
 6    Q   Okay.  That's fine.  That's not going to
 7  affect my question.
 8    A   I believe they came from a Goodman account,
 9  which I think is reasonable.
10    Q   That's my question.  It was a payment from
11  Goodman Networks to Prosperity Bank on -- to be applied
12  to the Genesis Loans 1 and 2?
13    A   That's my understanding.  Yes, sir.
14    Q   Okay.  And what value did Prosperity Bank give
15  Goodman Networks in exchange for those payments?
16        MS. ARGEROPLOS:  Objection.  Form.
17        THE WITNESS:  I don't believe we gave any
18  value.
19  BY MR. HILLYER:
20    Q   Okay.  All right.  I appreciate all your time
21  this morning and afternoon.
22        MR. HILLYER:  And I will pass the witness to
23  Mr. Schottenstein.
24        MR. SCHOTTENSTEIN:  Well, give me a couple
25  minutes.  Maybe -- sorry.  I just wasn't quite prepped
```

34 (Pages 130 - 133)

1 yet to start.
2        MS. ARGEROPLOS:  Like five minutes?  I mean,
3 what are you saying?
4        MR. SCHOTTENSTEIN:  Yeah.  Fine.  Just a
5 couple minutes.  Sorry.
6        MS. ARGEROPLOS:  Okay.
7        THE VIDEOGRAPHER:  Would you like to go off
8 the record?
9        MR. HILLYER:  Yeah.  Let's just go off the
10 record for five minutes.  I apologize.  I would have
11 asked that question and then gone off the record for our
12 break, but let's go off the record for another five
13 minutes.
14        THE VIDEOGRAPHER:  It's 2:19 p.m.  Off the
15 record.
16        (Off the record.)
17        THE VIDEOGRAPHER:  It's 2:26 p.m.  On the
18 record.
19              EXAMINATION
20 BY MR. GUFFY:
21    Q    Good afternoon, Mr. Montgomery.  My name is
22 Philip Guffy.  I represent UMB Bank as the indenture
23 trustee and the majority bondholder group.  Just a few
24 questions for you today.
25        Mr. Hillyer asked you a bunch of questions

Page 134

1 kind of about the mechanics of how various transfers
2 work that we're talking about here.
3        Is it fair so say that when we're talking
4 about these transactions, they're basically just
5 accounting entries in a ledger at this point?  Is that
6 fair?
7    A    Yes, sir.  That's how I think about them.
8        MR. HILLYER:  Object.  Hold on.  I'm going to
9 go ahead and object.  Is this -- you know, I don't know.
10 Maybe I didn't get it.  Did you cross-notice any topics
11 or anything?
12        MR. GUFFY:  No.  I'm just inquiring within the
13 scope of your inquiry.
14        MR. HILLYER:  Okay.  And I would ask
15 Prosperity's counsel:  Is that your understanding that
16 your witness is going to be available to other -- other
17 parties?
18        MS. ARGEROPLOS:  I think he can be asked
19 questions that are within the scope of what -- the
20 questions that you asked, and I'm certainly entitled to
21 redirect or recross or however we need to think about it
22 if I want to.  So I expect Davor to ask him some
23 questions as well.  As long as it's all within the scope
24 of your notice.
25        MR. HILLYER:  Well, just for the record, I

Page 135

1 would object to the asking of questions without a
2 cross-notice like we did previously and that you're not
3 a party to the motion.  But, anyway, we'll reserve that
4 and take it up at a later time.  Go ahead.
5        MR. GUFFY:  Thank you.
6 BY MR. GUFFY:
7    Q    So nobody is actually moving cash from one
8 place to another when the loans are -- when funds are
9 applied to loan account or debited from the 3992
10 account; is that correct?
11    A    No.  And I tried to kind of walk through that
12 logic several times earlier.  It's -- you know, it's
13 accounting.  It's assets equal liabilities and equity,
14 and you have to balance on each side to effect a
15 transaction, but it doesn't always involve actual cash.
16 Yeah.
17    Q    And within the system -- and you called it the
18 core system that Prosperity uses -- there are certain
19 types of entries or transaction types that are
20 hard-wired into the system; right?
21    A    Yes.  We would have things that you would
22 typically expect to see, and they would have transaction
23 codes that could be replicated.
24    Q    Right.  So if you wanted to apply funds to a
25 loan, you'd use, like, a payoff code.  Is that a fair

Page 136

1 way of describing it?
2    A    Yes, sir, you could.  I don't know if you
3 would -- I mean, it could be a payment or a payoff code.
4 I don't know if there are unique identifiers for those,
5 but yes.
6    Q    So payment or payoff, but something that's
7 coded in your system as we're reducing the balance
8 itself?
9    A    Yes, sir.
10        MR. HILLYER:  I'll object to speculation.
11 BY MR. GUFFY:
12    Q    And then the same thing would apply if you
13 were going to increase the balance of a loan like you
14 would use an advance code in the system to do that?
15    A    Yes, sir.
16    Q    Okay.
17        MR. HILLYER:  Same objection as to
18 speculation.
19 BY MR. GUFFY:
20    Q    And within the funds moving from the 3992
21 account to paying off being applied to the Genesis loans
22 and then moving to the 0188 account, these are all steps
23 that occurred within Prosperity Bank; correct?
24    A    Yes, sir.
25    Q    Okay.  At no point was an account belonging to

Page 137

1 a third party, you know, advanced funds or credited
2 funds during this process; correct?
3    A   No, sir.
4    Q   You're saying -- sorry.  Would you say what I
5 said was incorrect?
6    A   No.  I said no, sir.  That's correct.
7    Q   Okay.  Thank you.
8        Then moving to the 0188 account, I think you
9 probably covered this, but I just want to confirm.
10       No one outside of Prosperity Bank could
11 conduct any transactions on the account.  That's what
12 you -- that was your testimony; correct?
13   A   Correct.
14   Q   So Goodman Networks could not deposit funds in
15 that account; correct?
16   A   No, sir.
17   Q   They couldn't withdraw funds from that
18 account?
19   A   No, sir.
20   Q   They couldn't direct Prosperity to transfer
21 funds from that account to another account?
22   A   No, sir.
23   Q   As far as Goodman Networks was concerned, they
24 had really no connection to this account other than the
25 funds that were there once were in an account that
Page 138

1 belonged to them?
2        MR. HILLYER:  Object to form.
3        THE WITNESS:  I can't speak -- yeah.  I can't
4 speak to what Goodman Networks thought about the
5 account.
6 BY MR. GUFFY:
7    Q   Sorry.  Let me rephrase that.
8        From the point of view of Prosperity Bank,
9 Goodman Networks had no ability to access the 0188
10 account?
11   A   Correct.
12   Q   Okay.  What is special assets?
13   A   The working out of problem loans is probably
14 the most concise way to say that.
15   Q   So is it fair to say if a loan ends up on your
16 desk, something has gone wrong?
17   A   Yes, sir.
18   Q   Okay.  And --
19   A   Can I clarify that?  Can I clarify that
20 question, please?
21   Q   Sure.
22   A   So I would call my duties kind of fifty-fifty
23 at the bank right now, half on actual new loan
24 origination, credit approval, half on director of
25 special assets with a team that works out loans.  If it
Page 139

1 comes to my desk in the latter capacity, then that would
2 be indicative that there's a problem with the loan.
3    Q   Understood.
4        So you kind of serve two roles at Prosperity
5 Bank:  one on the front end of loans where you do kind
6 of credit verification; and then on the back end, if
7 there's a problem with a loan, it could come to you too?
8    A   Yes, sir.  Thank you.
9    Q   Okay.  And so within your duties as director
10 of special assets, if a loan comes to you in that
11 capacity, it's fair to say something has gone wrong?
12   A   Yes, sir.
13   Q   Okay.  I think you testified earlier that
14 Bater Bates was the loan officer on the Genesis loan; is
15 that correct?
16   A   Yes, sir.
17   Q   And you also testified that at least as of
18 August 2022, the loans were performing?
19   A   Yes, sir.  And there was only a brief spell
20 around year end where I would say they weren't
21 performing.  The why of that is we were thinking there
22 would be a restructure; but otherwise, they've performed
23 since their inception.
24   Q   And you mentioned at the end of the year
25 because they were restructuring, but you also did end up
Page 140

1 sending a default notice on the Genesis loans; is that
2 correct?
3    A   We had sent one at one point.  That was in the
4 first quarter, though; right?  I don't know if we have
5 the actual notice.
6    Q   I believe we showed -- it was Exhibit 29.  If
7 you look at that, was an email from your counsel
8 attaching a notice regarding the Genesis Networks, and
9 the title is "Prosperity Bank - Notice of Default."
10   A   Yeah.  We sent that, it looks like, on the
11 20th.
12   Q   Okay.  So at some point you did send a notice
13 of default on the Genesis loans.  In fact, you sent it
14 on March 20, 2023; correct?
15   A   Yes, sir.  And that's -- I mean, that's at or
16 around the time where I'm taking over the loan.  I mean,
17 it could be a week or two on either side of that date
18 but --
19   Q   Okay.  And so at some point you did take over
20 the Genesis loans from Bater Bates?
21   A   Yes, sir.
22   Q   Within Prosperity, is it generally
23 considered -- as a loan officer, is that something you
24 want to avoid, having your loan being taken over by
25 special assets?
Page 141

36 (Pages 138 - 141)

| | |
|---|---|
| 1 A Yeah. Probably. If you're in that role, you | 1 in particular earlier in the matter. |
| 2 know, not in all cases, but it typically signifies the | 2 Q Okay. Do you recall reviewing any emails that |
| 3 end of the relationship. There's times where if | 3 were sent by an individual who works at US Bank named |
| 4 everyone kind of does what they say they're going to do, | 4 Michael Doty, D-o-t-y? |
| 5 that's not always the case. But it also -- it creates a | 5 A Yes. I think Cam included some of those in |
| 6 less amicable client experience which, if you're a loan | 6 his questions. |
| 7 officer, you care about. | 7 Q Did you recall seeing an email sent by |
| 8 Q So would it be fair to say, in your experience | 8 Mr. Doty to Mr. Yenne stating that he had sent the |
| 9 with the bank, that loan officers like Bater Bates will | 9 deposit account control agreements of various accounts |
| 10 be trying to take steps to prevent the loan from going | 10 at Prosperity Bank belonging to Goodman Networks on |
| 11 to special assets? | 11 August 10, 2023? |
| 12 MS. ARGEROPLOS: Objection. Form. | 12 MR. HILLYER: I'll object that that's not in |
| 13 THE WITNESS: I would say yes, and they're -- | 13 the record. |
| 14 they're typically a little Pollyanna about their | 14 MR. GUFFY: I'm just asking if he recalls |
| 15 situation as well. | 15 seeing the emails prior to his preparation. |
| 16 BY MR. GUFFY: | 16 THE WITNESS: I don't at this point. No. |
| 17 Q Could you expand on that a little more, | 17 BY MR. GUFFY: |
| 18 please? | 18 Q Okay. I don't have anything further. Thank |
| 19 A They're overly optimistic. | 19 you, Mr. Montgomery. |
| 20 Q So you think that based on your experience, | 20 A Thank you. |
| 21 loan officers will tend to paint a rosier picture of the | 21 MS. ARGEROPLOS: Davor, do you have anything |
| 22 situation that the loan is in than the actual facts | 22 before I redirect? |
| 23 reflect? | 23 MR. RUKAVINA: No. This is Davor. I don't |
| 24 A Both on the client-facing side and on the | 24 know if you can see me. Good afternoon. Trustee has no |
| 25 bank-facing side, yes. | 25 questions. Reserves questions for court. Thank you. |
| Page 142 | Page 144 |

| | |
|---|---|
| 1 Q Because they want the loan to succeed; right? | 1 MS. ARGEROPLOS: Okay. I just have a few |
| 2 A It looks bad if you have a loan that goes bad | 2 questions. |
| 3 and you're the officer, yes. | 3 EXAMINATION |
| 4 Q Okay. Let me just check to make sure I don't | 4 BY MS. ARGEROPLOS: |
| 5 have anything further. | 5 Q Okay. Earlier in your testimony when you were |
| 6 In your preparation, you said you spoke to | 6 being asked -- sorry. This is Victoria Argeroplos. |
| 7 several people. I think I heard you testify earlier | 7 Just doing some redirect. |
| 8 that Jordan Yenne had left the bank because of personal | 8 Earlier in your testimony, you were asked |
| 9 circumstances. | 9 about whether or not a security agreement existed for |
| 10 Did you have a chance to talk with Mr. Yenne | 10 the revolving line of credit, and you said, "I don't |
| 11 in preparation at any point? | 11 think all loans need a security agreement." |
| 12 A No, sir. | 12 Were you saying that you don't think all loans |
| 13 Q Okay. | 13 need a separate document in order to be secured? |
| 14 A I mean, I may have talked to Jordan back in | 14 A Yeah. That's right. I mean, you can cover |
| 15 2022 or 2021 at some point when we were, you know, | 15 the same concepts in loan agreements and deed of trusts. |
| 16 working through the various things we've discussed in | 16 Q Okay. And talking about the collateral, are |
| 17 this, but since 2023 and in preparation -- or in | 17 these loans -- are the two loans to Genesis -- to the |
| 18 preparation for this matter, no. | 18 Genesis borrowers, are they cross-collateralized? |
| 19 Q Okay. Were you aware of -- in conducting your | 19 A I don't know the answer to that, but the |
| 20 review in preparation for this, were you -- did you | 20 presence of the UCC-1 would be an all-assets filing, so |
| 21 review emails between members of the loan team? Either | 21 I think we would share assets on the two facilities. |
| 22 Mr. Yenne, Mr. Bates, or Ms. McCollum or anyone else who | 22 Q Okay. Fast-forward to the May 2020 conversion |
| 23 was involved in the Genesis loans, did you review any of | 23 from LegacyTexas Bank to Prosperity. We were talking |
| 24 their emails during the period of August 2022? | 24 about the flag of the 3992 account having a DACA |
| 25 A I mean, yes. I think we actually spoke to one | 25 attached to it. |
| Page 143 | Page 145 |

Alpha Reporting

A Veritext Company

800-556-8974

www.veritext.com

1    When -- when the account -- when the 3992
2 account was transferred to Prosperity, was that flag
3 attached to the account?
4    A   I don't believe so, no.
5    Q   And so is it your belief that the flag -- the
6 DACA flag dropped off the account while the account was
7 still at LegacyTexas Bank?
8    A   Yes.  I do believe that.
9    Q   Okay.  When the 3992 account was pledged to
10 the Genesis loans, the -- we are looking at the
11 assignment of deposit account document that indicated a
12 hold amount of about 4.6 million.
13    What does the hold mean?  Does that mean a
14 minimum balance?
15    A   Yes.  So whomever a signer is on that account
16 could transact on funds above that level, but any
17 transactions that dropped the balance below the hold
18 level would be rejected.
19    Q   Okay.  I'm just kind of going in order of what
20 the questions were before.
21    After this, we talked about the 4352 account
22 that's a Goodman Networks account, and you were asked
23 about your preparation and your review of the account
24 documents.
25    Did you review and discuss with bank personnel

Page 146

1 generally the entire Goodman Networks account
2 relationship?
3    A   Yeah.  We did.  And, I mean, we had -- I think
4 I referenced Ana McCollum earlier.  She came in and
5 talked about her role and her history.  And so, yes, I
6 mean, we talked about the overall relationship and
7 the -- both in terms of scope and tenure.
8    Q   But did you memorize every single line item
9 transaction in every single account?
10    A   No.  I'm not good at that.
11    Q   When the pledge of the 3992 account was made
12 for -- as collateral for the Genesis loans, did you
13 understand James Goodman to be -- to be organizing a
14 transactions within -- transactions within the Goodman
15 Networks cash management system that he controlled?
16    A   Yes.
17    MR. HILLYER:  Object to form.
18 BY MS. ARGEROPLOS:
19    Q   Do you -- do you understand that Goodman
20 Networks benefited at all from or the Goodman Networks
21 enterprise benefited at all from the assignment of the
22 3992 account to Prosperity as collateral for the Genesis
23 loans?
24    MR. HILLYER:  Object to form.
25    THE WITNESS:  Yeah.  I made reference to that

Page 147

1 earlier.  I mean, but at least on the initial
2 transaction.
3 BY MS. ARGEROPLOS:
4    Q   Around the time that the 3992 account was
5 pledged, there were questions earlier about whether or
6 not there was other Genesis collateral that was
7 released.
8    Do you remember seeing an executed termination
9 statement or termination agreement with respect to any
10 of the Genesis collateral?
11    A   No.
12    Q   So since the 3992 account came to Prosperity
13 with no DACA flag, I think you stated earlier that
14 Prosperity didn't believe that a DACA existed regarding
15 that account until August of 2022; is that right?
16    A   I don't think we would ever make a loan
17 secured by a deposit account subject to a deposit
18 account control agreement.
19    Q   And so based on the communications that you
20 reviewed, is it your belief that Prosperity didn't have
21 a record of that particular DACA existing on the 3992
22 account?
23    A   This is in 2021; correct?
24    Q   In August of 2022.
25    A   No.  I don't -- I don't think we really

Page 148

1 research that issue until we get the notice.
2    Q   Did Prosperity have a reason to search for a
3 DACA that it didn't think existed at the time?
4    MR. HILLYER:  Object to form.
5    MS. ARGEROPLOS:  I'll rephrase.
6 BY MS. ARGEROPLOS:
7    Q   Did Prosperity have a reason to search for a
8 DACA on an account before US Bank inquired about it?
9    A   No.
10    Q   Until receiving a copy of that DACA on the
11 3992 account, did the bank have a copy of it?
12    A   Not to my knowledge, no.
13    Q   Okay.  So moving to the paydown of the Genesis
14 loans, could Bater have instructed that paydown
15 without -- without getting -- or without some type of
16 writing?
17    A   I mean, probably, yeah.
18    Q   Okay.
19    A   He could pick up the phone and say to effect
20 the transaction.
21    Q   Okay.  So talking about -- well, so you said
22 earlier that the bank's position is that the bank does
23 not have an interest in the funds in the 0188 account;
24 right?
25    A   Yes.  I believe that to be true.

Page 149

Alpha Reporting                800-556-8974
A Veritext Company            www.veritext.com

1   Q   And after the bankruptcy case was filed, did
2   Prosperity believe that it had the authority to do
3   anything with the funds in that account?
4   A   I don't think we did.  I think at that point
5   we're waiting on instruction from the trustee.  And the
6   settlement negotiations and documents that have
7   circulated would indicate same.
8   Q   And are you aware of the automatic stay that
9   applies in a bankruptcy case?
10   A   Yes.
11   Q   Okay.  And is that part of the reason that
12   Prosperity did not do anything with the funds after the
13   bankruptcy case was filed?
14       MR. HILLYER:  Object to foundation.
15   BY MS. ARGEROPLOS:
16   Q   You can still answer.
17   A   Yes.
18   Q   We looked at some communications -- sorry --
19   between Bater and -- between Bater and James and John
20   Goodman where Bater stated or made statements about what
21   the bank's intentions were.
22       Did the bank authorize him to say what the
23   bank's intentions were with respect to the 0188 account
24   at that time?
25   A   No.

Page 150

1   Q   Looking back at his conduct, does the bank
2   approve of that -- of those statements today?
3   A   I mean, I've kind of alluded to that in my
4   earlier testimony.  We weren't ever considering doing
5   anything like that regardless of what happened with
6   James or John.
7   Q   Okay.  You also were asked about who has
8   control over -- over the 0188 account, and I believe you
9   responded saying that legal is the -- the legal
10   department has control over the account; is that right?
11   A   Yes.
12   Q   And are you talking about the legal definition
13   of control under the UCC when you made those statements?
14       MR. HILLYER:  Object to form.
15   BY MS. ARGEROPLOS:
16   Q   Do you know what the legal definition is?
17   A   I don't.  No.
18       MR. HILLYER:  Object.
19   BY MS. ARGEROPLOS:
20   Q   Okay.  So when you were talking about who has
21   control over the account, what perspective are you
22   speaking from?
23   A   Whom in the organization can direct any
24   activity on the account with legal hold.
25   Q   And does the bank still agree with the

Page 151

1   statements in the August 31, 2022, letter from
2   Ms. Freedson to US Bank that the money would stay in the
3   0188 account until further instructions?
4   A   Yes.
5   Q   Okay.  No further questions.
6       THE COURT REPORTER:  Let me know if we're
7   ready to conclude, Counsel, or if anyone else needs to
8   speak.
9       MS. ARGEROPLOS:  Sounds like we're done.
10       THE VIDEOGRAPHER:  Okay.  Kat, do you need to
11   take orders on the record, or do you want to go off
12   first?
13       THE COURT REPORTER:  We can go off the record.
14       THE VIDEOGRAPHER:  Okay.  2:51 p.m.  Off the
15   record.
16       (Whereupon, at 2:51 p.m. the deposition was
17       concluded.)
18
19
20
21
22
23
24
25

Page 152

1           COURT REPORTER'S CERTIFICATE
2
3       I, the undersigned Licensed Court Reporter, holding
4   a valid and current license issued by the State of
5   Tennessee, do hereby certify:
6       That said proceedings were taken down by me in
7   shorthand at the time and place therein set forth and
8   thereafter transcribed under my direction and
9   supervision.
10       I further certify that I am neither counsel for nor
11   related to any party to said action, nor in any way
12   interested in the outcome thereof.
13       Before completion of the deposition, review of the
14   transcript [   ]was [ X ]was not requested.
15       IN WITNESS WHEREOF, I have subscribed my name on
16   this date: 1           .
17
18
     Katherine West
19   LCR No. 791, RPR
     Expiration:  June 30, 2024
20
21
22
23
24
25

Page 153

**[& - 16117]**

**&**

**&** 3:8 4:4 7:5
8:18

**0**

**0** 36:18
**000119** 39:18
**000123** 34:7
**000168** 26:1
**000174** 26:16
**000184** 29:12
**00023** 23:20
**000238** 31:14
**00151** 24:23
**017076** 16:5
**0187916** 90:11
**018795** 90:10
**0188** 73:9
85:23 86:5,22
87:6 90:1,14
92:18 93:4
94:10,18 96:10
97:22 100:1
104:1 105:6
109:2,5 111:16
112:2,21 118:8
123:14,23
124:7 125:18
126:24 127:4
128:2 129:5
130:9,12,18
137:22 138:8
139:9 149:23
150:23 151:8
152:3

**1**

**1** 5:12 10:2
14:23 22:7,9
24:12 27:11,18
27:24 28:25
30:20 31:2,5
32:1,5 33:2
34:22 35:9
36:18 37:7
51:21 57:23
58:6 63:1
65:18 129:19
133:12 145:20
**1,948,427** 27:15
**1.19** 22:23
24:15
**1.4** 115:15
**1.948** 26:10
**1/31/2023** 8:6
**1/4/2023** 7:24
**1/8/2021** 6:6
**10** 5:12,24
28:20,22 49:25
50:19 144:11
**10/13** 46:8
**10/20** 46:8
**10/22** 46:9
**10/27** 46:9
**10/3** 61:19
**10/31** 103:23
**10/31/2021** 6:9
6:10
**10/31/2022**
7:14,18,21

**10/6** 46:8
**100** 114:20
**101** 7:13
**106** 7:16,20
**1087915** 6:14
40:3 41:12
49:10 51:1,23
52:9,23 53:3
53:11,15
**1087916** 51:2
51:23
**10:45** 48:2,6
**10:56** 48:9
**11** 5:15 6:4
29:13,15 66:4
67:4,10
**110** 7:23
**114** 8:4
**117** 8:7
**118** 108:22
116:10
**1188** 109:9
**11:57** 84:2
**11th** 66:19
67:16
**12** 6:6 31:15,17
**120** 8:11
**123** 8:14
**12330** 65:9
**124** 8:16
**12474** 96:16
**129** 8:17
**12:43** 126:18
**12:45** 83:23,24
83:25

**12:47** 84:5
**13** 6:7 34:8,10
54:22
**134** 5:7
**13th** 153:16
**14** 5:16 6:8
39:19,21 44:15
44:21 48:21
49:9 52:3
60:24 62:11
**1401** 3:5
**145** 5:8
**15** 5:18 6:10
43:7,14 44:4,5
45:5 48:12,21
49:9 52:3
60:24 62:12
69:20 70:22
71:23 85:1
**151** 125:17
126:2,2
**15367** 101:7
**15369** 106:4,8
**15989** 110:10
**15th** 71:12 72:5
73:4,12 74:2
75:14 77:4,19
92:10
**16** 6:11 14:23
51:10,12 64:25
65:4 69:2 73:7
85:17 88:24
96:24 97:6
**16117** 114:10

**[16486 - 27]**

| | | | |
|---|---|---|---|
| **16486** 117:4 | **2** | **2021** 31:23 | **214.743.4500** |
| **16495** 119:24 | | 32:23 33:24,24 | 3:19 |
| 119:25 | **2** 5:15 11:21,24 | 35:9 37:25 | **214.855.7587** |
| **166** 15:6 | 12:1,2 19:15 | 40:2 42:21 | 4:7 |
| **16775** 14:24 | 21:2 29:23 | 44:10 49:1 | **218,735.57** 66:6 |
| 15:6 | 30:17 31:3,5 | 50:2 54:1 | **22** 5:19 7:9 |
| **16th** 68:6,12,14 | 32:1,1,6 34:22 | 60:25 62:23 | 84:14 96:17,19 |
| 68:19 99:21 | 35:9 46:15 | 78:9 80:7 | **22-31641** 1:5 |
| **17** 6:13 60:8,9 | 49:23 73:8 | 132:15 143:15 | **2200** 3:18 |
| 82:2 94:25 | 84:19 108:21 | 148:23 | **23** 5:20 7:13 |
| 95:3 | 123:17 133:12 | **2022** 48:25 | 41:17 101:8,9 |
| **17051** 14:24 | **2,996,789.46** | 62:23 63:1,16 | 101:11,14 |
| 15:6 | 96:9 | 63:19,20,25 | 106:17 107:5 |
| **17052** 95:5 | **2,996,799.46.** | 64:2,6,25 65:4 | 113:23 |
| **17056** 123:6 | 95:16 | 66:4 67:4,10 | **236,000** 41:17 |
| **17060** 14:24 | **2.996** 96:2 | 68:24 69:20 | 52:8 |
| 15:10 16:3 | **20** 6:21 12:4,7 | 70:23 71:12,23 | **236,883** 40:4 |
| 124:13 | 12:11 13:1 | 72:6 79:24 | **236,883.48** |
| **17076** 15:21,25 | 55:23 84:8,9 | 80:13 84:14 | 44:18 48:23,24 |
| **17181** 15:14 | 88:19 95:20 | 85:1,20 93:4 | 50:3 53:5,6 |
| **17207** 14:25 | 115:4 141:14 | 101:19 110:18 | 61:5 |
| 15:11 16:3 | **200** 61:5 | 132:16 140:18 | **236.83.** 49:6 |
| **17220** 14:25 | **2015** 11:15 | 143:15,24 | **24** 5:21 7:16 |
| **18** 6:15 64:17 | 17:14 | 148:15,24 | 106:9,11,13,21 |
| 68:14 | **2017** 16:24 | 152:1 | 108:11 109:19 |
| **1838** 66:7 | 17:13,16,20 | **2023** 1:15 2:4 | **25** 7:20 42:21 |
| **188** 91:3 | **2019** 37:7 | 9:1,5 23:17 | 77:16 95:20 |
| **18th** 67:16 | **2020** 20:11,11 | 115:9 117:13 | 106:22,24 |
| **19** 6:17 65:10 | 22:1,1,8,16 | 118:8 129:20 | **25th** 35:8 54:1 |
| 65:12 | 24:9,12,21 | 141:14 143:17 | **26** 5:13,22,23 |
| **1900** 3:6,17 | 25:14 26:10 | 144:11 153:16 | 7:23 110:11,12 |
| **1:00** 83:23 | 27:1,14,23 | **2024** 153:19 | 110:14 |
| | 29:22 30:16,19 | **20th** 141:11 | **26652** 153:18 |
| | 30:20 33:12,24 | **21** 7:4 88:14,16 | **27** 8:4 114:11 |
| | 37:8,16 39:3 | | 115:5,7 |
| | 145:22 | | |

**[28 - 600]**

**28**  5:24 8:7
101:19 117:5,8
**29**  6:4 8:11
40:2 44:10
50:2 120:2,4
129:19 141:6
**29th**  48:24,25
60:25 107:13
**2:04**  131:14
**2:05**  131:16,16
131:24
**2:15**  131:22
**2:16**  132:1
**2:19**  134:14
**2:26**  134:17
**2:51**  2:3 9:2
152:14,16

**3**

**3**  5:16 14:4,5
20:25 22:8,16
22:24 24:6,9
27:19,23 36:9
115:15
**3/24/2023**  8:12
**3/24/23**  122:14
**3/6**  119:9
**3/6/2023**  8:8
**30**  8:14 10:6
11:24 77:17
99:24 123:7,8
123:10 153:19
**30th**  73:13
75:15
**31**  6:6 8:16
16:24 25:14

27:14 29:22
30:16,19 68:24
85:20 93:4
115:9 124:14
124:15,17
152:1
**31st**  17:13 22:1
26:10 27:1
92:17 96:23
99:25 100:11
108:15 115:21
**32**  8:17 129:21
129:23
**34**  6:7
**3800**  4:6
**38119**  3:12
**387**  64:16
**39**  6:8
**399**  40:8
**3992**  17:9
18:17 36:7,12
44:21 45:4
48:24 49:4
50:4 52:15
63:24 64:6
65:2 66:6 68:4
69:19,24 70:16
73:4 76:2,18
77:5 85:9,15
86:6 91:22
94:3,13 97:12
97:22 99:11
100:2,10,24
133:2 136:9
137:20 145:24

146:1,9 147:11
147:22 148:4
148:12,21
149:11
**3:00**  131:12
**3mm**  111:10
**3rd**  22:1 24:21
**3s**  58:17

**4**

**4**  5:18 15:14,16
22:23 73:22
74:24 76:2
84:24 91:13
**4,463,000**  70:16
73:13
**4,463,804.68**
69:19 73:7
90:5
**4,660,000**  35:4
38:22
**4,666,707.03**
66:6
**4.4**  72:5 73:22
75:14 82:12,13
**4.446**  84:24
**4.46**  94:2,9
**4.463**  90:14
**4.5**  81:7
**4.6**  146:12
**4.66**  55:10
**4.66.**  39:7
**4.95**  30:21
**420**  51:9
**4200**  3:24

**423**  89:4
**4352**  45:6
46:11,13,19
47:1,1,10,14,21
48:25 49:3
50:3,3 52:9
146:21
**438**  125:24
**44**  6:10 74:12
**450**  121:23
**48**  40:4

**5**

**5**  5:19 19:15,16
19:17,18 22:6
22:10,11,13
24:7 125:24
**500**  3:12 4:5
**501**  126:2
**51**  6:11
**513,000**  132:14
**513,742.42**
132:15
**517**  126:2
**55**  131:21
**550**  132:11
**57**  25:23

**6**

**6**  1:15 2:4 5:20
9:1,5 10:6
11:24 23:19,21
117:13 118:8
**60**  6:13 25:18
**600**  3:23

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

**[6075 - account]**

| | | | |
|---|---|---|---|
| **6075** 3:11 | **8/30/2022** 95:8 | 139:9 | 74:13,23 75:11 |
| **64** 6:15 | 96:2,9 | **account** 5:18 | 75:14,19,24 |
| **65** 6:17 | **8/31/2020** 5:21 | 6:7,13,15 | 76:3,7,8,18,22 |
| **7** | 5:22,23 6:5 | 15:15 16:18 | 76:24 77:2,5,8 |
| **7** 5:21 24:24 | **8/31/2022** 6:12 | 17:2,8,9 18:17 | 77:21 78:1,9 |
| 25:4 26:12 | 7:11 | 18:25 19:25 | 78:19,23 80:1 |
| 107:23 | **84** 6:21 | 34:15 35:1,3 | 80:20 81:22 |
| **7/3/2020** 5:19 | **88** 7:4 | 36:3,7,8,12,13 | 85:9,11,15,23 |
| 5:20,24 | **9** | 36:14,19 37:2 | 85:24 86:5,12 |
| **70173992** 35:3 | **9** 5:6,23 26:16 | 37:10,14,15,17 | 86:19,22,22,25 |
| **7030** 5:14 | 26:17 46:17 | 37:20,25 38:2 | 87:3,6,8,9,12 |
| **713.220.3802** | 47:5 88:19 | 38:5,7,23 39:6 | 87:13,17,19,21 |
| 3:25 | 130:3 | 39:9,10,15,16 | 88:5,20,23 |
| **713.752.4334** | **901.680.7316** | 40:17 41:10,13 | 89:7,10,10,18 |
| 3:7 | 3:13 | 41:20,21 42:20 | 89:25 91:3,22 |
| **740** 132:14 | **96** 7:9 | 42:21 44:3,21 | 91:25 92:18 |
| **75201** 3:18 4:6 | **9:36** 2:3 9:2,5 | 45:3,4,5,8,12 | 93:17 94:1,3 |
| **75th** 114:20 | **a** | 45:15,18,20 | 94:10,14,16 |
| **77** 14:23 | **a.m.** 2:3 9:2,5 | 46:11,13,19 | 95:18 96:10 |
| **77002** 3:24 | 48:6,9 84:2 | 47:7,10,14 | 97:12,15,22 |
| **77010** 3:6 | 126:18 | 48:24,25 49:3 | 100:24 102:2 |
| **791** 1:25 2:5 | **ability** 55:16 | 49:4,11,14,14 | 102:12 105:18 |
| 153:19 | 110:24 128:19 | 49:15,18 50:3 | 108:14,22 |
| **7915** 49:4,5 | 139:9 | 50:4,4 51:4,6 | 109:2,5 116:10 |
| 60:21 96:3 | **able** 58:1 92:23 | 52:9,15,21,22 | 118:9 121:4 |
| 125:13 | 99:3,22 101:2 | 53:1 54:2,20 | 123:14,23 |
| **7916** 125:13 | 118:5 | 55:10 56:23 | 124:1,2 125:18 |
| **8** | **above** 146:16 | 57:3 58:3 | 126:24 127:4,4 |
| **8** 5:22 26:3,5 | **absent** 13:16 | 62:12,13 63:3 | 127:5,8,10,14 |
| 31:23 | 128:24 | 63:13,24 64:6 | 127:25 128:2 |
| **8/16/2022** 6:16 | **absolutely** 24:3 | 65:1,2 66:6,7 | 128:10,12,20 |
| **8/19/2022** 6:19 | **accepted** 57:15 | 66:12 68:4 | 129:1,5,9 |
| **8/22/2022** 6:22 | **access** 99:22 | 69:19,24 70:1 | 130:9,18 131:4 |
| | 131:3,4,10 | 70:16 72:10 | 131:4,10 |
| | | 73:5,9,23 | 132:22,23,25 |

**[account - agreement]**

| | | | |
|---|---|---|---|
| 132:25 133:2,4 | 86:25 90:16 | **address** 80:18 | **agent** 55:17 |
| 133:8 136:9,10 | 98:5 123:18,19 | 100:13 | 86:1 |
| 137:21,22,25 | 126:16 144:9 | **administer** | **aggregate** 22:5 |
| 138:8,11,15,18 | **accrued** 77:6 | 79:15 | 38:25 |
| 138:21,21,24 | 77:14 | **administration** | **ago** 46:25 52:7 |
| 138:25 139:5 | **accurate** 48:17 | 113:24 119:1 | 82:6 |
| 139:10 144:9 | 96:25 | 129:8 | **agree** 25:22 |
| 145:24 146:1,2 | **acknowledg...** | **administrative** | 32:2 108:16,19 |
| 146:3,6,6,9,11 | 18:21,23 | 43:3 57:17 | 112:1 151:25 |
| 146:15,21,22 | **action** 71:17 | 59:16 | **agreed** 35:10 |
| 146:23 147:1,9 | 86:9 90:25 | **admission** 8:19 | 114:5 120:17 |
| 147:11,22 | 92:25 93:11 | 129:18,18 | **agreeing** |
| 148:4,12,15,17 | 116:4 124:2 | **admit** 130:5,8 | 118:18 |
| 148:18,22 | 153:11 | 130:15 | **agreement** 5:18 |
| 149:8,11,23 | **actions** 105:17 | **advance** 13:24 | 5:19,21,23,24 |
| 150:3,23 151:8 | 128:11 | 30:20 90:10,10 | 6:4,6,15 15:15 |
| 151:10,21,24 | **actively** 118:16 | 90:19 91:7,13 | 16:18,23 17:8 |
| 152:3 | **activity** 151:24 | 92:6 94:10,17 | 18:20 19:1,6 |
| **account's** 89:12 | **actual** 62:2 | 95:10 96:2 | 22:15 24:7 |
| **accounting** | 70:19 136:15 | 125:16 137:14 | 25:11,17,18 |
| 35:22 73:17 | 139:23 141:5 | **advanced** | 26:8,8,11,22,25 |
| 74:14 125:4 | 142:22 | 95:11 138:1 | 27:4,10,14,17 |
| 128:14 135:5 | **actually** 23:14 | **advice** 120:19 | 27:20,23 28:1 |
| 136:13 | 58:20 70:7 | **advised** 121:13 | 28:3,5,12,16,24 |
| **accountingwi...** | 118:4 136:7 | 122:1 124:3 | 29:3,7,19 30:1 |
| 73:19 | 143:25 | **afar** 113:15 | 31:2,3,4,9,20 |
| **accounts** 18:13 | **adam** 3:10 | **affect** 133:7 | 33:3 36:1 |
| 24:18 27:5 | **adam.langley** | **affidavit** 5:17 | 37:15,20 38:6 |
| 29:10 31:2 | 3:14 | 14:3,4,14,18 | 45:18 57:20 |
| 37:12 40:16 | **add** 8:14 | 15:8,11 16:2 | 65:2 68:15 |
| 41:15 42:9 | **added** 40:16 | 16:21 | 80:1 118:17 |
| 43:18 49:19 | 106:7 | **afternoon** | 129:5 132:13 |
| 50:12,16,21 | **adding** 123:12 | 133:21 134:21 | 145:9,11 148:9 |
| 52:23 71:4 | **addition** 31:7 | 144:24 | 148:18 |
| 81:2 84:25 | 116:16 | | |

[agreements - argeroplos]

| | | | |
|---|---|---|---|
| **agreements** 17:3 28:8 38:2 46:21 144:9 145:15 | 73:8 74:12,14 75:22 95:11 146:12 | **apart** 25:23 63:12 | **appropriated** 71:19 |
| **ahead** 19:11 23:4 24:4 26:1 26:15 28:11,14 31:13 39:18 51:9 83:19 101:6 135:9 136:4 | **amounts** 40:11 44:19,23 66:5 **ana** 13:6,17 50:11 147:4 **andrea** 7:14,18 7:21 105:21 **andrews** 3:22 **answer** 19:11 | **apologies** 130:7 **apologize** 13:24 14:9 15:24 28:15,17 134:10 **appear** 61:12 61:13 **appeared** 93:22 | **approval** 7:7 18:6 20:21 21:4,9,11 124:9 139:24 **approve** 21:6 22:4,25 151:2 **approved** 111:9 |
| **akard** 4:5 **akerman** 102:3 105:21 **alert** 8:14 123:25 | 37:5 40:20 41:13,21 47:2 57:12 61:11,15 68:12 76:12 79:10 80:25 | **appears** 16:1 24:8 33:1 46:9 49:3 51:22 65:19 103:21 | **approximate** 59:22 **approximately** 22:21 25:17,23 31:25 |
| **alerts** 123:12 123:20,22 **aligns** 50:22 **alleging** 109:20 **allow** 54:17 86:17 | 81:16 83:8 87:24 89:11 92:3 93:5 100:18 101:2 106:3 113:1 125:11 128:4 129:1 145:19 | **applicable** 58:16 **application** 77:4 90:24 **applied** 52:9 72:13,15 75:16 95:18 133:11 136:9 137:21 | **area** 83:20 **argeroplos** 3:4 5:8 16:8,12 19:10 25:2 32:10 48:5 60:14 66:21 81:21 82:1,5 |
| **allowing** 36:2 44:1 **alluded** 151:3 **amended** 7:7 **amicable** 142:6 **amount** 22:5,24 24:15 27:14 33:5 35:4,20 35:21 39:3,6,7 39:13,16 40:4 40:11,13 44:17 50:14,18 55:12 61:5 62:14,17 | 150:16 **answered** 62:19 83:1,7 88:1 98:9 105:9 109:8 **answers** 50:22 50:22 **anybody** 47:13 **anymore** 56:20 79:1 **anyway** 136:3 | **applies** 150:9 **apply** 72:18,19 91:18 136:24 137:12 **appreciate** 9:22 28:19 55:18 71:11 76:16 92:3 94:15 133:20 **approached** 35:13 **appropriate** 90:25 97:10 | 83:21,24 104:12 114:25 115:5 127:16 128:3 130:19 131:13,23 133:16 134:2,6 135:18 142:12 144:21 145:1,4 145:6 147:18 148:3 149:5,6 150:15 151:15 151:19 152:9 |

Alpha Reporting
A Veritext Company

**[argument - available]**

**argument**
97:16
**arris** 3:15 7:6
8:18
**aside** 70:19
**asked** 46:25
63:7 67:9,11
72:22 74:18
108:18 134:11
134:25 135:18
135:20 145:6,8
146:22 151:7
**asking** 12:19,21
41:16 42:7
68:7,8 74:1
76:17 82:11
92:4 96:1 98:5
100:22,23
101:1,3 111:2
111:14 121:1
121:24 136:1
144:14
**asks** 84:23
107:15 110:20
**aspect** 38:17
53:25
**asserted** 104:25
109:6
**asserting**
102:24 117:21
**asset** 59:23
73:15,18 74:11
74:19,24,25,25
75:2 76:20,23
76:25 121:18

122:6
**assets** 10:19
27:4 31:1
35:14,24 43:21
43:22 54:7
56:9,12,14,20
59:6 74:18
75:3,8,9 78:13
79:7,11,23
80:8,10,22,23
81:1 82:16,19
82:20,21,24
83:5,10,14
119:2 122:10
122:16 136:13
139:12,25
140:10 141:25
142:11 145:20
145:21
**assignment** 6:7
34:14,17,25
35:6 36:3
37:25 38:7,22
39:4,8 40:18
42:19,20 54:1
54:19 55:9,20
56:4,19 57:3
60:1 77:21
78:2,9,23 94:7
146:11 147:21
**assignments**
46:21
**associated** 58:2
58:3 60:2
67:19 77:7

**association**
3:20 7:8 18:16
97:17,18
**assume** 27:25
82:11
**assuming** 45:17
125:23
**astute** 113:14
**attached**
115:17 120:12
145:25 146:3
**attaching** 141:8
**attachment**
5:15
**attachments**
89:1
**attempting**
107:20,21
**attention** 78:24
**attn** 6:21
**attorney** 12:19
12:22 66:12
81:18 109:20
120:11
**attorneys** 69:16
105:21 112:25
**atypical** 49:13
93:25
**audience** 71:8
**august** 22:1
25:14 26:10
27:1,14 29:22
30:16,19 60:24
62:23 63:1,20
64:1,6,25 65:4

66:4,19 67:4
67:10 68:24
69:20 70:22
71:12,23 72:5
73:4,12,13
74:2 75:14,15
77:4,19 79:24
80:13 84:14
85:1,20 92:10
92:17 93:4
96:23 99:21,24
99:25 100:11
107:13 109:9
115:21 132:15
140:18 143:24
144:11 148:15
148:24 152:1
**authority** 91:5
91:12 92:1
124:2 150:2
**authorization**
70:10
**authorizations**
46:20
**authorize**
150:22
**authorized**
55:4,16 71:6
128:5,10
**automatic**
150:8
**automatically**
62:5
**available** 28:22
98:4 135:16

[avenue - batches]

avenue 3:11
average 77:17
95:20
avoid 141:24
aware 63:21,24
64:1,5 65:5,7
67:4,10 68:4
68:10 73:1
120:17 143:19
150:8

**b**

b 5:10 6:1 7:1
8:1 10:6 11:24
bachelor's
11:10
back 16:5 36:6
40:25 42:16
46:15 48:4
49:8,14 52:11
61:24 71:21
78:5,9 80:7
83:9,23 85:17
88:24 90:21
91:1,16 92:9
93:17 94:19
100:2,10,24
102:12 107:13
109:9,9 113:11
117:16 118:15
118:22 121:10
121:11 140:6
143:14 151:1
background
32:12 121:19

bad 70:21
122:24 143:2,2
balance 38:25
73:16 74:5
75:12 76:21,25
79:2,11,19
80:8,15,21
83:14 136:14
137:7,13
146:14,17
balances 77:16
ballpark 21:20
ballparking
77:15
bank 1:13 2:2
3:3,20 5:3,16
6:8,10,21 7:8,8
8:12,14,16 9:7
10:7,8,17,20
13:3,5,7,14
14:4 17:5,9,10
17:12,14,22
18:16,19 19:4
19:8,19,22
20:11,14 21:7
22:16 25:11
29:19 30:17
31:20 33:4
35:13,18,24
36:12,14 40:1
40:16 47:13
48:15,17,17,22
49:10 51:1
56:19 61:25
62:2,10,11

63:17 64:5
65:5 66:4,5,11
66:12 68:4,9
68:10,25 69:7
72:15,18,19
73:20 74:11,19
74:24 76:12,18
77:3 78:10,20
82:13 84:14
87:1,9,11 88:4
88:12 90:2
91:5,11,25
92:17 93:3
97:17,17
103:25 106:1
108:8,13,19
109:4,9 111:15
112:4,10,12,13
112:15,21
116:11,19
117:1,20
119:11 120:7
122:4 127:5,5
133:11,14
134:22 137:23
138:10 139:8
139:23 140:5
141:9 142:9,25
143:8 144:3,10
145:23 146:7
146:25 149:8
149:11,22
150:22 151:1
151:25 152:2

bank's 7:4 8:17
18:20 20:6
57:25 71:5
73:15,16 76:25
92:8,11 108:1
108:6 149:22
150:21,23
banking 11:14
11:16,16,18
54:18
bankr 5:13
bankrupt
102:24
bankruptcy 1:1
98:14 99:17
105:24 120:18
121:7 150:1,9
150:13
bare 102:1
base 24:16,17
41:9
based 30:10
33:2 35:22
52:7 142:20
148:19
basically 90:21
92:7 99:16
121:3 135:4
basis 33:16
111:24 127:20
127:21
batch 14:24
125:23
batches 14:22

**[bater - bottle]**

**bater** 6:18 7:13
7:17,20,24 8:4
13:6,16 21:14
34:3,3 38:11
38:13 66:1
67:3,9 70:15
72:22 101:19
101:20,23
102:5 103:7
104:10 105:20
105:22 106:1,6
106:7 107:14
107:15 110:20
111:6 112:16
112:19,21
113:3,17,20
115:23 116:16
116:16,19,20
140:14 141:20
142:9 149:14
150:19,19,20
**bater's** 116:22
**bates** 6:18 7:13
7:17,20,24 8:4
13:6,16 14:20
14:22 15:14,21
15:25 21:14
38:11 43:8
48:15 66:1
67:3,10 69:25
70:6,15,15,24
101:19 102:5
102:17 104:3
104:10 105:6
105:20,22

106:2 107:14
107:15,24,25
108:11 109:16
109:20 110:20
111:6,16
112:16,19,21
115:10,23
116:16,16,19
119:12 140:14
141:20 142:9
143:22
**bear** 110:14
**bed** 116:24
**beginning** 2:2
**behalf** 38:1
54:21
**belief** 71:5
78:13 87:18
146:5 148:20
**believe** 12:15
20:21 21:3
24:22 26:13
35:16,19 37:8
37:9 38:24
41:2 42:19
47:2 48:16
53:8,13 54:3
54:20 55:25
56:10,17 61:7
63:19 64:3,14
66:2 67:5,22
69:1,18 71:24
72:15 73:6
79:7,12 92:12
97:10,13 98:12

98:16,23
102:25 104:23
106:20 109:10
109:23 113:2
113:25 117:1
122:9 125:6,20
127:3 128:18
130:11 132:10
133:8,17 141:6
146:4,8 148:14
149:25 150:2
151:8
**believes** 113:5
**belonged** 98:9
139:1
**belonging**
137:25 144:10
**belongs** 89:13
**beneficiary**
50:16
**benefit** 37:13
56:5 78:20
92:12 93:1
98:13,24 101:4
**benefited**
147:20,21
**best** 13:23 47:6
86:10 102:20
**better** 30:14
63:14 86:20
93:20 130:20
**beyond** 13:9,13
83:11 115:20
**big** 33:14 74:1

**bills** 103:6
**bit** 24:2 36:23
43:1 58:18
64:8 72:13,14
78:1
**blanks** 36:24
**blocking** 35:25
**blue** 90:4
**bond** 110:23
111:3,14
**bondholder**
134:23
**bondholder's**
108:12
**bondholders**
69:17 98:21,22
99:10 102:13
103:1 104:16
107:19 124:8
130:8,15,17
131:2
**book** 75:19
**borrower**
18:10 23:4
34:22 82:12
91:14
**borrowers**
22:18 30:22
31:1,3 54:21
82:24 145:18
**borrowing**
24:16,17 29:10
41:9 66:24
**bottle** 114:13

**[bottom - changes]**

**bottom**  27:11
90:3 108:10
110:21
**bp**  125:23
**break**  48:3 49:2
83:19 114:16
114:17,22
131:1,12,21,21
134:12
**breaking**  51:8
**brief**  140:19
**bring**  21:10
88:11 96:15
**bringing**  21:8
**broad**  17:1
31:5 50:17
73:24 112:17
**broadened**
99:6
**broader**  42:14
61:17,21 71:7
73:1 111:24
**broadly**  50:9
**broke**  117:6
**brothers**  32:13
113:6
**bullet**  123:21
**bunch**  134:25
**burns**  8:5 34:4
38:14 115:12
116:15,18
**business**  5:16
14:3 16:20
27:4 33:6 51:1
54:13 60:2

61:22 64:13
75:4 77:23
80:8 114:5
121:16
**businessman**
113:13
**bust**  43:1 57:17
**butler**  3:9 9:21
**butlersnow.c...**
3:13,14
**buy**  102:25

**c**

**c**  3:1 4:1
**calculator**
95:13
**call**  14:20
19:12 20:3
21:23,24 33:12
37:14 51:25
52:6,8 53:22
63:6 67:16
74:12 90:9
119:7 124:6
139:22
**called**  116:22
136:17
**calling**  71:3
72:11
**cam**  9:20 16:8
21:19 32:21
40:20 47:6,21
82:1 114:12
130:13,25
131:15 144:5

**cam.hillyer**
3:13
**campbell**  3:10
**capacity**  41:4
55:16 140:1,11
**capital**  102:1
107:23
**care**  142:7
**carry**  65:24
**case**  1:5 13:22
39:1 58:11
60:15 76:2
77:2 90:23
103:5 105:24
121:14 142:5
150:1,9,13
**cases**  142:2
**cash**  35:20
63:10 73:20
74:24,24 75:22
76:1,4,9,13,19
76:20 77:1,10
77:13 79:4
80:19 81:3
87:14 102:2
107:21 115:16
117:16 118:9
118:21 119:18
119:22 120:18
121:2 136:7,15
147:15
**categorized**
45:16 95:12
**cause**  114:7

**cc**  6:18 7:10,13
7:17,21 8:5
108:8
**cdt**  2:3,3 9:2,2
**central**  131:12
131:14
**cents**  40:4
**certain**  50:22
57:6 59:5
71:15 100:4
103:1 121:15
122:10 136:18
**certainly**
135:20
**certainty**  40:10
41:14,22 43:10
51:7 56:16
61:10 67:6
87:7 100:12
101:2 112:13
126:5
**certificate**
153:1
**certify**  153:5,10
**chain**  3:8 6:17
7:5,13,16,20,23
8:7,11,18
107:4,12,14
120:9
**chains**  107:10
**chance**  108:21
143:10
**change**  8:14
**changes**  59:10

**[chapter - conclusion]**

**chapter** 107:23
**charge** 95:14
  95:25
**charged** 105:15
**charlotte** 4:11
  13:4
**chattel** 27:5
**check** 41:7
  75:23,25 143:4
**checking** 35:3
  36:7 39:6
**chief** 17:25
**chose** 104:22
**chronological**
  51:9
**chronologica...**
  13:23 14:1
  34:6
**circulated**
  150:7
**circumstance**
  33:18 66:16
**circumstances**
  66:18 118:1
  143:9
**civ** 5:13
**claim** 19:23
  86:11 92:24
  98:2 100:21
  108:24 119:4
**claiming** 92:18
  93:3,24 104:1
**claims** 111:15
**clarification**
  43:15 52:13

104:6
**clarify** 13:12
  19:16 43:9
  52:1 62:8
  68:19 130:25
  139:19,19
**clarity** 56:18
**classification**
  29:7
**cleanup** 33:1
  33:13
**clear** 12:23
  16:12 18:9
  51:5 65:6 87:1
  88:7 98:19
  127:7 128:24
**clearly** 119:18
**client** 142:6,24
**close** 37:6
  83:18
**closed** 120:20
  120:23
**code** 136:25
  137:3,14
**coded** 137:7
**codes** 125:24
  136:23
**collateral** 27:3
  28:2 29:2,5,7
  30:25 31:7
  35:1,21 36:4
  36:21 37:18
  40:3,7 41:24
  42:1,3,8,11,12
  42:23,24 43:5

43:17,20 44:2
  44:13 54:15,16
  54:16 56:22,24
  57:8 58:25,25
  59:1,8,13,21
  63:11 72:11
  78:24 79:6,8
  80:3,19 93:10
  99:2 109:5
  117:16 118:9
  118:22 119:5
  121:2 145:16
  147:12,22
  148:6,10
**collateralized**
  145:18
**colleague** 13:5
**color** 126:11
**column** 90:8
**combined**
  30:22
**come** 23:10,15
  42:16 48:3
  64:3 83:23
  113:22 133:2
  140:7
**comes** 103:3
  140:1,10
**comfortable**
  84:18
**coming** 37:12
  46:1 122:18
**comments** 89:9
  121:9

**common** 66:11
**communicate**
  23:15 112:15
**communicating**
  106:2
**communicati...**
  108:2 148:19
  150:18
**company** 19:1
  35:20 54:5
  63:8 80:10
  85:4 86:1 87:3
  101:25 102:3
  103:22 107:18
  107:21 111:25
  128:19,25
**completed**
  102:7 103:14
  103:17 105:8
**completion**
  153:13
**comprise** 34:4
**compromise**
  7:7
**concepts**
  145:15
**concerned**
  56:20 138:23
**concise** 139:14
**conclude** 152:7
**concluded**
  152:17
**conclusion**
  43:12 71:7

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

**[conduct - counsel]**

| | | | |
|---|---|---|---|
| conduct 138:11 | continued 4:1 | conversion | 69:21 70:17 |
| 151:1 | 6:2 7:2 8:2 | 37:8 145:22 | 71:9 72:18 |
| conducting | contract 27:6 | convoluted | 73:10 74:3,20 |
| 143:19 | contracts 46:20 | 13:22 | 76:19 77:10 |
| confident 86:13 | 81:1 | copy 121:23 | 81:7 83:6 |
| confirm 38:24 | contractual | 149:10,11 | 84:14 85:20 |
| 68:22 86:10 | 19:23 | copying 107:15 | 86:23 90:6,11 |
| 138:9 | contrary 68:1 | 120:10 | 92:25 96:4,11 |
| confirmed 66:4 | control 5:18 | core 36:15 | 99:11 104:4 |
| conflict 109:7 | 6:15,15 15:15 | 57:24,25 58:15 | 111:4 116:8 |
| conflicting | 16:18,23 17:2 | 64:9 74:15 | 122:9 124:11 |
| 85:25 86:14 | 17:8 18:25 | 89:23 124:23 | 125:9 127:6 |
| connection | 37:15,20 38:2 | 124:25 126:8,9 | 128:17 136:10 |
| 138:24 | 38:6 45:18 | 136:18 | 137:23 138:2,6 |
| consider 63:8 | 55:14 65:2 | corporate 1:13 | 138:12,13,15 |
| 120:19 | 68:15 80:1 | 2:2 5:3 9:7 | 139:11 140:15 |
| consideration | 85:12 86:20 | 68:8 112:12 | 141:2,14 |
| 55:15 109:22 | 87:4 102:13,24 | 119:15 | 148:23 |
| considered | 107:20 127:13 | correct 10:11 | corrected 91:18 |
| 141:23 | 127:14 128:2 | 12:5 13:18,19 | correctly |
| considering | 129:5 130:9,12 | 15:1 16:24 | 125:19 |
| 116:13 151:4 | 130:16,18 | 17:10 22:3,19 | corresponden... |
| consistent | 144:9 148:18 | 22:20 25:14 | 99:6 |
| 57:20 67:23 | 151:8,10,13,21 | 26:23 27:7,15 | corresponding |
| 110:5 | controlled | 27:18 28:25 | 52:10 54:4 |
| consummated | 45:12,14 54:9 | 29:20,23 30:3 | 108:8 |
| 32:1 | 147:15 | 30:17,23 31:21 | corresponds |
| contemplated | controlling | 34:15,20,23,24 | 26:7,11 27:23 |
| 56:11 | 86:1 | 36:9 40:5 41:1 | 28:25 68:14 |
| content 84:18 | controls 37:19 | 45:2,6,9 46:23 | counsel 12:8 |
| 121:15 | 46:20 | 47:3 50:5 | 13:2,3,4 47:11 |
| context 106:16 | conversation | 53:24 54:24 | 50:8 51:16 |
| continue 59:9 | 12:20 67:20 | 60:25 62:14,18 | 66:25 69:6,6 |
| 116:7,7 | conversations | 65:2,5,20,21,22 | 106:2,7 107:15 |
| | 43:12 | 66:8 68:16 | 107:16 108:7,8 |

Alpha Reporting
A Veritext Company

**[counsel - debtor]**

108:12 118:6
120:10,19
121:22 122:4
123:13 129:14
135:15 141:7
152:7 153:10
**couple** 89:15
95:24 116:21
133:24 134:5
**course** 16:20
64:13 77:23
116:3
**court** 1:1 9:14
38:18 87:12
117:15 118:15
119:23 121:10
131:5 144:25
152:6,13 153:1
153:3
**cover** 145:14
**coverage** 7:15
107:7
**covered** 125:6
138:9
**covering**
106:22
**create** 121:16
122:3
**created** 87:13
**creates** 142:5
**credit** 18:6 21:1
53:5 70:1
95:22 102:6
103:14,16
119:1 125:11

139:24 140:6
145:10
**credited** 138:1
**creditors** 99:19
**credits** 46:1,6
125:8
**critical** 8:14
123:12,19
**cross** 135:10
136:2 145:18
**current** 153:4
**currently** 83:3
123:22
**cursory** 114:3
**custodial** 15:7
15:11 16:2,6
**custodian**
14:19
**customary** 20:3
43:5
**customer** 66:20
**cut** 75:7

### d

**d** 5:1,10 6:1 7:1
8:1 144:4
**d&o** 7:15 107:6
**daca** 17:6,16,19
18:17,20 19:4
19:8,9,14 36:8
36:13,19,21
37:3 39:11
50:16 51:16
63:22,24 64:1
64:6,6,9 65:5
67:4,10,18

68:4,10 69:17
73:4 80:19
92:20,24 97:13
98:13 99:1
145:24 146:6
148:13,14,21
149:3,8,10
**dacas** 6:20
72:12
**daily** 8:16
124:21 125:5
**dallas** 1:2 3:18
4:6
**darn** 129:13
**date** 24:9 25:13
27:14 28:25
29:23 30:16
53:13 59:22,23
60:23 61:3,16
61:23 64:24
65:6 67:20
68:3,5,10
79:25 96:14
99:5 141:17
153:16
**dated** 5:19,20
5:21,22,23,24
6:5,6,8,10,12
6:15,19,22
7:11,14,18,21
7:24 8:6,8,11
16:24 22:8,16
26:10,25 27:23
29:22 31:23
61:6 84:14

85:20 129:19
**david** 5:3 7:13
7:16,20 8:7,11
9:7,15 10:15
16:9 102:3
105:20
**davor** 4:4
135:22 144:21
144:23
**day** 30:20
104:25 114:20
115:9 153:16
**days** 25:8,18,23
107:24 111:6
115:21
**deal** 122:19
**dealing** 67:15
103:4
**dealings** 122:21
**deals** 123:17
**debit** 49:6
125:10
**debited** 136:9
**debits** 44:9
125:8
**debt** 32:14 39:1
42:2 83:11
102:22 111:8
111:10 113:4,7
113:20 114:6
115:14,25
120:20,23
**debtor** 1:6 27:4
86:16 98:21,22
99:13 100:1,10

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

[debtor - differently]

| | | | |
|---|---|---|---|
| 107:15 111:14 | demand 123:18 | 77:2,21 78:9 | deposits 45:25 |
| debtor's 106:2 | denied 130:10 | 78:23 80:1 | 46:1,6,8 90:5 |
| 106:6 | denoted 74:8 | 84:25 86:22,24 | 96:14 98:4 |
| debts 54:6 | department | 87:6,8,12,17,21 | 125:18 |
| decade 50:14 | 11:16 14:17 | 88:2,20,23 | describe 89:8 |
| decades 11:19 | 87:4 92:1 | 89:10 90:4,5 | described |
| december | 127:1,17 | 95:18 96:10 | 36:21 |
| 110:17 115:22 | 151:10 | 107:17 123:18 | describing 70:3 |
| decided 90:24 | department's | 123:19 124:1 | 137:1 |
| 131:2 | 85:11 | 126:16 127:4,8 | description |
| decision 91:10 | depends 66:13 | 128:6,9,14 | 5:11 6:3 7:3 |
| 91:18,19 109:4 | deposit 5:18 | 129:5 138:14 | 8:3 35:1 40:8 |
| decline 21:6 | 6:7 15:15 | 144:9 146:11 | 40:25 52:2 |
| deed 57:7 | 16:18,23 17:2 | 148:17,17 | 62:1,1 |
| 145:15 | 17:8 18:13,25 | deposited | descriptions |
| default 8:13 | 19:25 34:14,25 | 48:23 52:14 | 61:25 62:4 |
| 71:13,16 120:7 | 36:3 37:12,15 | 73:8 85:23 | designated |
| 120:12 141:1,9 | 37:20,25 38:2 | 90:14 94:10 | 10:8 37:14 |
| 141:13 | 38:5,7,22 39:9 | 96:10 100:1 | 40:8 81:4 |
| defaulted 71:18 | 40:2,3,25 | deposition 1:13 | 89:14 |
| defend 116:3 | 41:10,13,20,25 | 2:1 5:12 9:6,10 | designation |
| deficiency | 42:11,20,21 | 10:1,6,25 | 126:16 |
| 80:18 | 43:18 44:3,20 | 12:18 13:1 | desk 139:16 |
| defined 28:2 | 45:17 49:6,14 | 46:10 53:16 | 140:1 |
| 29:9 | 49:14 50:12 | 58:14 113:11 | determined |
| definitely 51:22 | 52:2,22,23 | 116:4 121:13 | 92:15 |
| definition 29:5 | 54:1,14,19 | 121:20 122:2 | died 116:25 |
| 151:12,16 | 55:10 56:23 | 122:25 152:16 | difference |
| definitions 5:15 | 57:3,16 58:3,3 | 153:13 | 25:19 |
| delay 28:15 | 62:13 63:3,13 | depositor 18:11 | different 25:13 |
| delayed 111:8 | 65:1 66:5 | 19:2 | 107:4 111:23 |
| delays 28:18 | 70:16 71:3 | depository 17:5 | 113:8 116:9 |
| delete 8:15 | 72:9 73:12,16 | 17:9 19:3,8,19 | differently |
| delinquent | 74:13,23 75:22 | 19:22 | 76:12 |
| 71:14 | 75:24 76:14,21 | | |

Alpha Reporting          800-556-8974
A Veritext Company        www.veritext.com

[diligence - education]

diligence  8:9
direct  12:1
  19:14,21 56:5
  84:19 97:9
  106:6 109:7
  138:20 151:23
direction  29:4
  66:25 70:7,24
  98:18 131:5
  153:8
directions  86:1
directly  23:15
  61:11 63:8
  67:11 109:15
director  10:18
  21:16 82:20
  139:24 140:9
disagree  104:2
  116:7
disbursement
  45:12,14
disclaimer
  12:18
disclaiming
  119:11,12,16
discount  103:1
discovered
  41:14 49:18
  53:8 56:1
discovery
  100:4
discretion  87:4
discuss  23:6
  47:9,10 101:20
  101:23 127:11

146:25
discussed  50:9
  50:10 118:4
  143:16
discussing
  51:17 78:18
  84:18 102:21
  111:24 112:22
discussion
  58:21
discussions
  63:16 67:7
  114:4
disposition
  58:13
dispute  92:23
  93:23 97:24,25
  98:1,1,19,20,21
  99:6 104:14
  111:13 112:2
dissimilar
  39:10 56:23
  76:1
distributed
  97:11
district  1:1
division  1:2
dla  3:16
document
  15:22,25 16:18
  24:2 29:17
  31:18 32:25
  33:1,13,19
  34:13 36:6
  48:14 52:24

64:23,24 65:16
  94:7 100:13
  101:12 113:25
  123:11 125:21
  125:22 145:13
  146:11
documenting
  111:9
documents
  15:7 58:2,3
  146:24 150:6
doing  50:23
  56:21 83:2
  105:13 106:2
  112:8 114:13
  118:3 119:21
  145:7 151:4
dollar  40:11
dollars  124:7
  132:12
domenico  4:12
  9:11
doty  6:19 144:4
  144:8
double  41:7
doubt  48:23
draw  41:4,8,19
  41:25 42:10
  52:10,20
drawing  41:4
dropped  146:6
  146:17
drukavina  4:7
due  8:9 24:18

duff  21:5
duly  9:16
duties  18:1
  19:4,7 139:22
  140:9

e

e  3:1,1 4:1,1 5:1
  5:1,10,10 6:1,1
  7:1,1 8:1,1
  65:24
earlier  24:15
  47:17 50:10
  53:20 57:5,21
  58:19 60:24
  64:8 67:24
  68:16,25 71:21
  72:8 76:23
  78:2 97:4,7
  113:10 116:21
  117:20 121:8,9
  122:10 124:23
  127:3 136:12
  140:13 143:7
  144:1 145:5,8
  147:4 148:1,5
  148:13 149:22
  151:4
early  23:11,16
  33:24 111:9
  115:22
earnings  80:10
easy  49:20 93:8
education  11:8
  67:7

[effect - exact]

**effect** 41:8
54:12 74:16
77:18 78:2
83:1 126:12
128:7,10
136:14 149:19
**effected** 58:21
70:7
**effective** 61:19
**effectively** 36:4
43:20 54:12
79:7,9
**effectuated**
77:24
**either** 17:16
23:16 29:6
32:5 54:11
55:21 57:2,15
62:4,9 71:12
75:8 76:3
78:20 79:3
108:8 109:14
111:3,4 117:1
125:4 126:8,17
141:17 143:21
**electronic** 62:5
**electronics** 3:8
7:6 8:18
**eliminate** 97:15
**email** 6:17,17
7:9,13,13,16,16
7:20,20,23,23
8:4,7,7,11,11
56:1 58:10
65:19 66:1,9

67:20 96:21,22
99:10 101:1,18
104:10 105:6
105:20 106:5,6
106:21 107:4
108:1,4,6,17
110:6 112:7
115:12 116:25
117:2,23
118:12 119:5
119:16,21
120:9 121:8,24
122:23 141:7
144:7
**emailing** 69:16
104:18 120:10
**emails** 99:1
100:3,5,9
110:19 115:22
115:22 119:13
143:21,24
144:2,15
**encumbered**
56:14
**endeavor** 8:9
35:15 53:20,21
53:22,25 56:12
56:15 59:5,23
63:9 71:24
72:1,9 80:7,9
80:16,22,23
115:19 121:18
122:6,11,16
**endeavor's**
80:21

**ends** 139:15
**engaged** 118:17
**entered** 62:1
**enterprise**
147:21
**entire** 147:1
**entirety** 79:25
**entities** 29:10
30:22 31:8
33:9,21 35:19
59:6 66:24
78:11,13,21
79:3 81:6 98:3
**entitled** 131:6
135:20
**entity** 30:7,11
35:15,16 43:22
54:8 55:13,14
55:22 57:2,20
63:9,10 80:6
83:2
**entrepreneurial**
21:17
**entries** 49:5
53:8 75:2
89:16 95:12,17
125:7,13
128:12 135:5
136:19
**entry** 44:10
74:14,23 75:20
77:25 85:10
90:15,21,25
91:15,19 92:25
93:12 94:19

125:17
**enumerated**
12:4
**equal** 75:3
136:13
**equipment**
27:5
**equity** 57:19
75:3,10 83:11
136:13
**eric** 6:12 7:10
**erroneous**
91:17,18
**escrow** 107:19
108:13 115:16
120:18
**especially** 93:9
**esq** 3:4,10,10
3:16,22 4:4
**essentially**
112:5 115:23
**estate** 61:22
**evade** 79:17
**evasive** 62:3
75:21 76:11
**event** 92:20
117:3
**events** 123:19
**eventually**
43:19 77:13
**evidence** 37:23
52:19
**evidences** 24:6
**exact** 17:25
33:4 43:25

Alpha Reporting          800-556-8974
A Veritext Company       www.veritext.com

**[exact - familiar]**

52:24 62:13
82:8 86:7
132:23
**exactly** 20:8
53:10 58:9
93:20 99:18
100:25 119:9
**examination**
5:5,15 9:18
12:5 134:19
145:3
**examined** 9:17
**except** 130:12
**exchange** 36:2
56:3 133:15
**excluded** 15:7
15:11
**exclusive** 6:15
68:15 75:10
**executed** 59:18
148:8
**executes** 19:4
**executing**
18:20
**execution**
17:16
**executive**
105:12
**exhibit** 5:11,12
5:15,16,18,19
5:20,21,22,23
5:24 6:3,4,6,7,8
6:10,11,13,15
6:17,21 7:3,4,9
7:13,16,20,23

8:3,4,7,11,14
8:16,17 10:2
11:21,23,24
12:2 14:3,4,5
15:13,16 22:10
22:11,13 23:19
23:19,21 24:7
24:24 26:3,5
26:12,16,17
28:20,22 29:13
29:15 31:15,17
34:8,10 36:9
39:19,21 40:12
43:7,14 44:4,5
44:15,21 45:4
45:5 46:15
48:12,21 49:21
49:23 50:25
51:5,10,12
52:3 54:22
60:8,9,24,24
62:11,12 64:17
65:10,12 68:14
69:1 73:7
81:23 82:1
84:8,8,9 85:17
88:6,14,16,24
95:3 96:16,17
96:19,24 97:6
101:8,9,11,14
106:9,11,13,17
106:21,22,24
107:5 108:11
109:19 110:11
110:14 114:11

115:4 117:5,8
120:2,4 123:7
123:8,10
124:15,17
129:21,23
141:6
**exhibit's** 26:8
**exhibits** 13:25
24:25 27:21
107:10 127:22
**exist** 99:4
**existed** 65:7
145:9 148:14
149:3
**existence** 58:11
**existing** 44:2
148:21
**exists** 18:22,24
68:22 70:11,13
**expand** 142:17
**expect** 48:19
49:4 53:10
135:22 136:22
**expectation**
59:25 95:14
**expenses** 99:19
**experience**
18:19 19:3
30:10 142:6,8
142:20
**expiration**
153:19
**explain** 16:8
32:23 111:19
111:22 117:22

120:22
**explanation**
33:22
**extended**
115:18
**extension** 7:15
107:6
**external** 8:9,12
108:9
**extinguishes**
74:25

**f**

**facilitate** 42:10
**facilities** 33:8
35:15 79:8
145:21
**facility** 21:1,2
41:3,7,9,19
**facing** 142:24
142:25
**fact** 52:23
72:24 83:15
117:2 121:16
122:3 141:13
**facts** 142:22
**factual** 33:17
**factually** 119:7
**fair** 105:5
109:18 135:3,6
136:25 139:15
140:11 142:8
**familiar** 14:14
14:20 17:2
20:13,19 24:1
30:5,7 32:18

**[familiar - functions]**

46:13 47:1,21
66:22 123:15
132:6
**far** 125:25
138:23
**fast** 20:10
145:22
**fathom** 40:22
**favor** 19:1
**fbo** 108:14
**february**
115:23
**fed** 5:13,13
**fedex** 3:8 7:5
8:18 9:22 46:3
**fee** 95:14
**feel** 49:19 84:18
108:20
**fees** 77:7
**felt** 71:9 92:24
122:14
**fiduciary** 19:12
**field** 37:15,16
39:12
**fifty** 139:22,22
**fighting** 99:2
**figure** 38:22
80:3 100:20
108:22 120:25
**file** 57:22 58:5
**filed** 87:11
120:17 121:6
150:1,13
**files** 58:15,18

**filing** 31:5
43:22 57:19
58:11,13 99:17
107:23 145:20
**filings** 57:7
58:16
**fill** 32:21 36:24
**finance** 11:12
21:17
**financial** 79:16
**find** 100:13
**fine** 48:4 60:16
83:25 110:16
131:19,22
133:6 134:4
**finish** 96:6
111:9
**firm** 9:21
**first** 9:16 14:2
16:5 18:15
20:6 22:7
25:18 28:8
47:7 59:16
63:7 69:4,8
74:2 97:3
103:13 108:10
109:8 121:22
141:4 152:12
**five** 31:25 52:7
113:12 131:12
131:19 134:2
134:10,12
**flag** 36:17 37:9
37:21 39:9,11
64:10,13 67:24

145:24 146:2,5
146:6 148:13
**flagged** 64:9
**flow** 35:21
44:24 61:9
63:10
**flowed** 50:20
61:23
**flowing** 61:17
**fly** 119:19
**focus** 80:11
83:1
**folks** 13:5
91:23 128:14
128:14
**follow** 44:24
57:14 58:23
59:10 97:2
**following** 66:5
**follows** 9:17
**form** 19:10
23:3 32:10
38:3 48:18
66:21 78:6,16
104:12 127:16
133:16 139:2
142:12 147:17
147:24 149:4
151:14
**formerly** 59:21
**forth** 27:10
153:7
**forward** 20:10
20:15,15 34:7
62:22 145:22

**found** 99:1
**foundation**
79:22 150:14
**four** 10:23
95:12,17 109:8
125:7
**fourth** 83:8
123:21
**frame** 22:3
33:15 43:25
79:24 99:18
100:4
**frankly** 97:24
**fraudulent**
109:23
**freedson** 6:11
7:10 13:4 69:5
69:16 85:20
96:23,24 106:1
109:1 152:2
**freeze** 84:24
**frequently** 42:6
**friday** 102:11
**front** 29:6
39:23 60:10
65:16 82:2
84:10 85:18
88:17 96:21
101:12 124:18
124:19 140:5
**full** 10:14 61:10
105:14
**fully** 27:12
**functions** 58:9

[funding - go]

| | | | |
|---|---|---|---|
| **funding** 52:20 | 131:3,6 132:21 | 51:1,2,25 | **gestures** 11:4 |
| **funds** 7:18,22 | 132:22 136:8 | 55:17 56:12,13 | **getting** 98:18 |
| 7:25 44:24 | 136:24 137:20 | 57:2 58:15,25 | 121:2 149:15 |
| 45:3 49:3 | 138:1,2,14,17 | 59:6,23 62:25 | **give** 15:24 16:6 |
| 50:20 52:7,8 | 138:21,25 | 70:2,17 71:12 | 24:1 28:10,14 |
| 52:14 54:14 | 146:16 149:23 | 78:10,13,21 | 32:11,20 40:21 |
| 61:9,18,23 | 150:3,12 | 79:3,11,14,20 | 41:23 43:8 |
| 63:9 71:25 | **further** 10:24 | 79:23 80:22,24 | 44:24 51:7 |
| 74:15 75:18 | 20:2 45:24 | 81:1,2,6,6 83:5 | 56:3 60:5 65:8 |
| 76:13 77:4 | 83:18 121:13 | 83:14 90:15 | 66:11 68:23 |
| 78:18 84:24 | 143:5 144:18 | 91:7 93:8 94:3 | 81:15,16 |
| 85:8,14,22,24 | 152:3,5 153:10 | 94:11,17 96:3 | 101:13 105:3 |
| 86:2,5,17 87:2 | | 103:17 105:8 | 106:25 110:9 |
| 87:9,14,20 | **g** | 109:22 111:8 | 118:15 119:20 |
| 89:14 90:24 | **gap** 32:21 | 111:17 112:5 | 119:25 121:19 |
| 91:2,18 92:13 | **gaps** 15:5 | 113:4,20 | 123:4 126:11 |
| 92:13,18,21 | **gavin** 6:19 | 115:11,15,25 | 127:2 129:2,3 |
| 93:3,7,14,22 | **general** 13:3 | 118:23 120:13 | 129:16 130:23 |
| 94:4,8,13,16,18 | 27:6 126:10 | 120:20,23 | 133:14,24 |
| 94:21 95:18 | 129:14 | 121:18 122:7 | **given** 31:8 |
| 97:11,14,22,23 | **generally** 33:11 | 122:11,17,25 | **giving** 33:17 |
| 98:8,16,24 | 62:24 63:2 | 132:17,25 | 50:21 61:15 |
| 99:6,8,11,15,20 | 141:22 147:1 | 133:12 137:21 | **gl** 86:25 |
| 99:22,25 100:6 | **generate** 89:21 | 140:14 141:1,8 | **glad** 114:23 |
| 100:19,21,22 | **generated** | 141:13,20 | **global** 20:17 |
| 100:23 101:3 | 24:17 124:22 | 143:23 145:17 | 22:17 23:2 |
| 102:14 103:10 | **genesis** 20:15 | 145:18 146:10 | 24:19 25:12 |
| 104:1 105:18 | 20:16,17 21:24 | 147:12,22 | **gnet** 108:14 |
| 107:7,17,18,20 | 22:16,17 23:1 | 148:6,10 | 115:16 |
| 108:13,24 | 23:2 24:19,19 | 149:13 | **go** 10:9,24 |
| 109:5,10,21,23 | 25:11,12 30:22 | **genesis's** 49:19 | 13:22 16:5 |
| 110:21 111:16 | 31:1,8 33:9 | 74:2 91:8 | 19:11 20:2 |
| 112:3 113:21 | 34:22 35:9,14 | **gentleman** | 24:1,4 26:1,15 |
| 114:1 115:24 | 38:25 40:3,16 | 38:13,14 | 28:11,14 29:12 |
| 116:9 118:8 | 41:1,20 43:17 | | 31:13 33:14 |
| | 44:12 49:10 | | |

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

**[go - gut]**

| | | | |
|---|---|---|---|
| 36:6 39:18 | 81:1 83:9,20 | 56:3,6 57:10 | **grab**  114:12 |
| 40:25 43:14 | 85:17 90:17 | 59:1,1 70:25 | **grant**  36:23 |
| 46:15 47:24 | 92:23 93:15 | 71:25 72:19 | **granted**  42:21 |
| 51:9 64:10 | 104:21 105:1 | 80:4,18 83:3,3 | **granting**  55:9 |
| 65:8 68:21,24 | 107:11,12 | 89:15 91:23 | 55:20 |
| 76:6 83:17,17 | 113:15,24 | 94:4 98:3 | **grantor**  34:17 |
| 83:19 88:23 | 116:9 121:7 | 99:14,14 100:6 | **great**  37:5 |
| 89:1,4 93:17 | 122:25 123:3,5 | 100:21,23 | 72:20 91:4 |
| 95:5 100:9 | 126:1 127:12 | 101:18 102:24 | **group**  3:21 |
| 101:6 102:12 | 133:6 135:8,16 | 105:20 107:6,7 | 21:17 30:2,5 |
| 106:4,25 | 137:13 142:4 | 107:14 109:21 | 31:11 32:9 |
| 107:13 108:4 | 142:10 146:19 | 110:20,22 | 34:5 50:10 |
| 108:10 110:2 | **good**  9:20 | 111:2,3 112:16 | 57:11 134:23 |
| 112:3 113:18 | 32:11 72:12 | 112:24 115:10 | **guarantor** |
| 114:10 117:4 | 108:23 120:1 | 115:11 117:14 | 22:18 25:13 |
| 117:12 123:17 | 122:24 134:21 | 117:14 118:12 | 30:23 31:10 |
| 134:7,9,12 | 144:24 147:10 | 118:12 120:10 | 34:22 |
| 135:9 136:4 | **goodman**  1:5 | 120:14 132:16 | **guaranty** |
| 152:11,13 | 6:19 7:11,13 | 132:24 133:4,8 | 120:21,24 |
| **goal**  97:13 | 7:14,18,22,24 | 133:11,15 | **guess**  27:12 |
| **goes**  39:15 49:8 | 8:5,5,8,8,9,11 | 138:14,23 | 30:10 40:22,23 |
| 65:14 74:11,12 | 9:8 18:4,10,12 | 139:4,9 144:10 | 49:7 57:21 |
| 78:5 113:11 | 22:18 23:7 | 146:22 147:1 | 73:20 76:17 |
| 121:8 143:2 | 25:13 29:19 | 147:13,14,19 | 77:13 90:20 |
| **going**  9:24 | 30:1,2,5,23 | 147:20 150:20 | 93:5 94:12 |
| 13:22 14:3 | 31:9,10,21 | **goodman's** | 100:8 106:16 |
| 16:17 17:6 | 32:5,8,9,17,18 | 33:5 57:11 | 116:24 |
| 20:15 21:22,24 | 33:2,23 34:2 | 107:16 122:2 | **guffy**  3:22 5:7 |
| 25:17 28:4 | 34:18,21 38:7 | **goodmannet...** | 134:20,22 |
| 32:24 35:8 | 38:8 40:17 | 7:17,21 | 135:12 136:5,6 |
| 37:12 43:7 | 42:22 45:9,11 | **goodmans** | 137:11,19 |
| 44:4 51:7,17 | 53:23,23 54:8 | 119:6 | 139:6 142:16 |
| 56:21 60:7 | 54:21,21 55:1 | **goodwin**  18:4 | 144:14,17 |
| 61:24 64:15 | 55:3,8,11,12,17 | **gotten**  102:15 | **gut**  124:24 |
| 68:20 71:21 | 55:19,19,23 | | |

[guy - identification]

| guy  122:24 | held  9:10 87:14 | 105:2 106:8,10 | 129:13 135:8 |
|---|---|---|---|

**h**

**h**  5:10 6:1 7:1
8:1
**half**  139:23,24
**hand**  11:4
**handle**  114:5
**happen**  36:3
42:5 56:17
62:4 93:20
98:6
**happened**
59:24 61:16
62:8 73:19
90:22 91:17
92:7 151:5
**happening**
59:20 62:25
86:8 126:8,12
**happens**  36:15
99:17
**happy**  16:12
**hard**  104:13
107:10 125:11
136:20
**hardt**  4:4
**harr**  4:4
**hartley**  7:14,18
7:21 105:21
**head**  82:21
**heading**  131:1
**heard**  143:7
**heart**  104:23
**hearts**  104:23

89:14 97:11
110:22 112:2
120:18
**help**  100:4
**helpful**  32:14
**helps**  114:21
**hey**  58:10
99:21 101:20
124:6
**hi**  101:23
**hierarchy**
116:19
**high**  76:16
**hillyer**  3:10 5:6
9:19,21 10:3
11:22 14:6,9
14:11 15:17
16:11,14,16
19:13 22:9,12
23:22 25:7
26:1,4,15,18
28:21 29:14
31:16 32:15
34:9 39:20
44:6 48:2,10
51:11 52:16
60:12,17 64:19
65:11,17 67:2
81:13,24 82:4
82:9 83:17,22
83:25 84:6,12
88:11,15 94:23
95:1,2 96:18
101:6,10 104:9

106:12 107:3
110:10,13
114:14 115:3,6
117:7 119:24
120:3 123:9
124:16 127:19
128:15 129:17
129:22 130:22
131:11,17,20
132:2 133:19
133:22 134:9
134:25 135:8
135:14,25
137:10,17
139:2 144:12
147:17,24
149:4 150:14
151:14,18
**histories**  41:15
53:7
**history**  53:15
61:12,14 62:16
62:17 81:11,22
82:5 89:16
147:5
**hold**  16:14
28:14 35:4
37:22 39:5,7
39:10,15 40:13
45:18 78:1,3
87:2,9 98:5
103:10 127:18
127:23 128:1
128:21,24

146:12,13,17
151:24
**holder**  92:15
**holders**  98:14
**holding**  35:20
63:8 87:20
97:14 112:4
153:3
**holds**  37:19
**honest**  50:22
72:21 78:12
113:2 117:25
**honestly**  50:14
67:5 72:10
98:8 102:19
104:23
**hoop**  103:3
**hope**  96:1
111:9
**hot**  114:24
**house**  51:15
**houston**  1:14
3:6,24 9:1
**huge**  66:13
**hunton**  3:22
**huntonak.com**
3:25
**hypotheticals**
124:6

**i**

**i.e.**  76:23
**identification**
10:2 11:21
14:5 15:16

**[identification - internal]**

22:11 23:21
24:24 26:3,17
28:20 29:13
31:15 34:8
39:19 44:5
51:10 60:9
64:17 65:10
84:9 88:14
96:17 101:9
106:11,24
110:11 114:11
117:5 120:2
123:8 124:15
129:21
**identified** 10:9
29:2 132:7
**identifiers**
137:4
**identifies** 27:18
**identify** 20:14
**illegitimate**
123:1
**immediate** 53:6
**immediately**
71:8 73:2 96:6
96:7 98:17
**impaired** 97:16
**imply** 89:13
**important**
82:10
**impossible**
52:21
**inaccurate**
69:15

**inbound** 100:5
**inc.'s** 8:18,19
**inception**
140:23
**included** 16:20
144:5
**includes** 108:7
**including** 46:19
**income** 77:12
80:9
**incorporated**
18:4,10 34:18
34:21 55:9
**incorrect** 119:7
138:5
**incorrectly**
15:20
**increase** 42:3
75:9 76:25
137:13
**increasing** 42:2
**indebtedness**
24:6
**indenture** 3:20
134:22
**indicate** 39:13
150:7
**indicated** 37:22
146:11
**indicates** 36:18
37:11
**indication**
116:8
**indicative**
140:2

**indiscernible**
104:5
**individual** 53:8
144:3
**industry** 11:14
**information**
14:16 58:20
61:8 62:2
66:12,20 68:1
86:14 126:22
126:22,25
**informed** 67:6
86:8 102:11
**initial** 9:24
148:1
**initiated** 69:25
70:4,15
**inputted** 62:1
**inquired** 149:8
**inquiring**
135:12
**inquiry** 60:21
135:13
**inside** 102:2
**instance** 40:24
42:7
**instructed**
149:14
**instruction**
150:5
**instructions**
7:15 85:25
107:6 152:3
**intangibles**
27:6

**intend** 116:5
**intended** 59:17
89:12 123:2
**intending**
118:14
**intent** 42:25
43:4 57:6 80:7
92:9,11 105:13
118:13
**intentionally**
118:11
**intentions**
150:21,23
**interact** 23:10
**interaction**
33:16,21
122:19
**interest** 30:1
31:10 32:9
35:13 54:10,12
57:11,18 59:1
71:4 77:7,12
77:15 92:18,21
93:3,7,13,14
95:15,20,24
104:1 109:6,10
109:13 111:16
117:21 119:4
149:23
**interested**
153:12
**intermediary**
52:19
**internal** 13:3
35:22 69:6

**[internal - kidding]**

89:18 108:8
128:11,16
**internally**
36:14 39:16
43:1,12 79:4
118:5
**internet** 25:8
**interpret**
125:22
**interrogatories**
8:19 129:19
**interrupt** 19:16
21:19 55:2
130:6
**intimate**
126:24
**introduce** 14:3
15:13 64:15
65:9 123:5
**inventory** 27:5
**investment**
53:22
**investments**
33:6
**invoices** 101:21
101:24
**involuntary**
107:22
**involve** 136:15
**involved** 17:15
18:12 20:20,21
62:7 66:23
80:11 129:8
143:23

**involvement**
18:3 113:5
**involves** 19:24
113:25 121:4
**ipad** 82:8
119:19
**iphone** 119:19
**ish** 132:11
**issue** 42:12
43:3,9,11
49:20 59:19
64:13 72:21
120:20,22
149:1
**issued** 30:17
153:4
**issues** 59:15
86:18
**item** 147:8
**items** 8:10 96:5
96:7

**j**

**jackets** 114:21
**jackson** 3:4
13:3 120:11
**jacobsen** 6:18
**james** 8:5,8,11
22:18 23:7,10
23:14 25:12
29:19 30:23
31:9 32:13,17
33:9,16,21
35:13 40:14,15
53:23 54:8,21
55:19,21,25

57:10 59:1
63:7,17 66:25
70:25 71:25
72:9,19,21
83:3 115:11,19
117:14 118:12
120:10,14,25
122:2,20,24
147:13 150:19
151:6
**james's** 33:21
**january** 31:23
32:23 115:9,9
132:15
**jessica** 6:11
7:10 13:4 69:4
85:19 96:23
106:1
**jg** 7:17,21
**jill** 14:15
**joel** 7:10
**john** 7:13,23
8:4,8 31:21
32:5,8,13,18
33:1,11,13,19
33:23 34:1
57:10 59:1
66:25 101:18
102:6,23
104:15,18,20
105:20 106:6
107:14 110:20
111:2 113:9,10
113:13 114:4,4
115:10 117:14

118:12 120:25
122:20,21
150:19 151:6
**john's** 33:9
104:18 113:5
**joined** 17:14
**joint** 7:5
**jordan** 6:17,21
34:3 38:13
66:1 67:3
116:23 143:8
143:14
**journal** 8:16
124:22 126:25
**jr** 29:19
**july** 11:15
17:14 20:10,11
22:1,8,16 24:9
24:12,21 27:23
**jump** 13:24
**june** 129:19
153:19
**jw.com** 3:7

**k**

**kat** 152:10
**katherine** 1:25
2:4 153:18
**kathleen** 6:18
7:11
**keep** 42:2 92:4
93:15 101:25
107:21
**kept** 16:19
**kidding** 115:1

**[kills - letter]**

**kills** 65:15
**kind** 32:12,13
  35:12 37:11
  43:2 54:3 57:4
  57:16,25 59:11
  63:6,15 67:15
  73:17 76:22
  78:17 86:8
  93:6 105:9
  108:20 118:2
  121:8 122:23
  135:1 136:11
  139:22 140:4,5
  142:4 146:19
  151:3
**knew** 126:17
**know** 16:10
  18:11 23:23
  24:11 25:16,16
  27:22,25 28:9
  32:8,17 35:6,8
  36:17 37:1,2,5
  40:20 41:16
  43:17 44:1
  45:16,21 50:13
  56:5,8,13,24
  57:1,12 58:25
  59:3,5,13,22
  60:18 61:18
  63:3,6 64:22
  65:13 66:14
  67:25 68:11
  69:23 70:13
  71:1 72:20
  76:12 78:6

79:2,6,18
80:25 82:23
83:5,10,11,15
84:17 87:21
88:3,4,5 89:11
89:23 93:6
98:8 102:19
103:7 104:20
108:3 110:6
113:1,5,21
114:3,19
117:25 118:2,4
122:16 125:1,3
125:22,24
126:2,2,13,20
126:22 128:4
128:13 129:5
129:12 132:22
132:23 133:4
135:9,9 136:12
137:2,4 138:1
141:4 142:2
143:15 144:24
145:19 151:16
152:6
**knowledge**
  15:10 17:19
  32:4 52:1 64:7
  70:20 78:16
  79:13 86:11
  102:20 121:20
  126:25 127:21
  149:12
**known** 36:20
  36:22

**knows** 113:3
**kopf** 4:4
**kurth** 3:22

**l**

**lack** 86:20
**lamanna** 6:18
  7:11
**langley** 3:10
  14:8,10 22:10
  25:4 88:13
  94:25 101:8
  106:9 123:7
  124:14 131:16
**laptop** 49:12
**large** 72:9
**largely** 18:2
**late** 23:11,16
  32:17,20 95:14
  95:25 115:8
**law** 9:21
**lawyer** 108:2
**lawyers** 108:1
**lcr** 1:25 2:4
  153:19
**lead** 63:15
  64:14
**learn** 47:24
**leave** 97:22
  113:18
**ledger** 73:21
  126:10 135:5
**lee** 69:5
**leeway** 32:21
**left** 39:4 52:9
  117:1 143:8

**legacy** 37:6
**legacytexas**
  10:22 17:9,12
  17:22 18:5,11
  18:13 145:23
  146:7
**legal** 37:6 69:6
  69:6 85:11
  86:20 87:4
  89:14 92:1
  103:10,12
  105:25 108:5,7
  110:2,7 113:7
  123:22,25
  124:3 127:17
  127:23 128:1
  128:21,24
  129:13 151:9,9
  151:12,16,24
**legal's** 124:8
**legitimacy**
  121:17 122:6
**lender** 35:4
  39:7
**lending** 33:16
  34:4 38:3,10
  38:12,19 66:24
  116:22
**leniency** 36:23
**lesser** 24:15
**letter** 6:11,21
  51:15,18,21,23
  68:24 69:9,11
  70:2 84:13,16
  84:17,20 85:3

Alpha Reporting
A Veritext Company

**[letter - locate]**

| | | | |
|---|---|---|---|
| 85:19 86:12 | 90:4,4 95:22 | 51:1,3 52:4,7,9 | 141:16,23,24 |
| 89:1 96:24 | 97:3 103:13 | 52:11,20,20,21 | 142:6,9,10,21 |
| 97:4,6 98:5 | 107:5 111:10 | 52:25,25 53:2 | 142:22 143:1,2 |
| 104:4,25 109:1 | 117:12 120:6 | 53:7,10,14,15 | 143:21 145:15 |
| 109:20 127:8 | 121:12 122:5,9 | 53:15 55:15 | 148:16 |
| 152:1 | 125:7,17 | 56:23 57:9,22 | **loaned** 55:12 |
| **level** 23:11 73:2 | 145:10 147:8 | 58:2,4,8,15,18 | 55:22 |
| 76:16 110:4 | **linked** 117:3 | 60:20,21,21 | **loaning** 63:8 |
| 113:17 128:6 | **little** 11:17 | 61:5,12,14,19 | **loans** 20:13,20 |
| 146:16,18 | 13:22 23:24 | 62:7,16,17 | 20:22,23,24 |
| **leverage** 112:5 | 24:2 32:12,21 | 63:4,11 69:1 | 21:9,13,22,24 |
| **liabilities** 73:15 | 32:21 36:23 | 70:1 71:18 | 22:5 25:21,22 |
| 74:19 75:3,9 | 43:1 56:18 | 72:5 73:14,15 | 28:7 30:21 |
| 83:10 136:13 | 64:8 71:3 | 74:5,8,12,19,22 | 32:24 34:22 |
| **liability** 73:16 | 72:12,14 78:1 | 74:25 75:16 | 35:9,10 37:20 |
| 73:18 75:23 | 107:21 142:14 | 76:7,8,15,24 | 41:24 43:3,17 |
| 76:22 77:1 | 142:17 | 77:8,9,12,16,19 | 43:20 51:23 |
| **license** 153:4 | **llc** 20:17,18 | 77:20 79:15 | 62:25 70:2,17 |
| **licensed** 153:3 | **llp** 3:4,9,16 | 81:10 90:15 | 70:22 71:13 |
| **lien** 18:15 | **loan** 5:19,21 | 91:13 92:5,6 | 74:2,7 77:20 |
| 19:24 20:6 | 6:13,13 8:6 | 93:1,9 94:10 | 90:19 91:1,7 |
| 78:14 | 21:2,6,8,10,10 | 94:23 95:11,13 | 94:3,11,17 |
| **life** 50:12 | 21:12,25 22:1 | 96:3,8 105:8 | 118:20 120:13 |
| **lifted** 128:1 | 22:7,8,15,21,23 | 105:14 108:12 | 125:14 132:17 |
| **likely** 40:12 | 22:25 24:7,11 | 108:14 109:17 | 133:12 136:8 |
| 64:12 92:22 | 24:12,16,21 | 109:22 111:17 | 137:21 139:13 |
| 93:19 99:3 | 25:11,17,18 | 112:6 113:24 | 139:25 140:5 |
| **limit** 97:15 | 26:8,11 27:18 | 115:13,15,18 | 140:18 141:1 |
| **limitation** 27:5 | 27:24 28:3,25 | 117:17 118:22 | 141:13,20 |
| **limited** 18:6 | 29:23 30:16 | 118:23 119:23 | 143:23 145:11 |
| 30:2 50:14 | 32:1,1,1,5,6 | 126:23 132:25 | 145:12,17,17 |
| 128:13 | 33:5 35:11 | 136:9,25 | 146:10 147:12 |
| **lindsey** 14:15 | 39:1 41:1,2,3,6 | 137:13 139:15 | 147:23 149:14 |
| **line** 35:2 69:8 | 41:12,14,25 | 139:23 140:2,7 | **locate** 99:3 |
| 73:8 84:20 | 42:9 49:14,18 | 140:10,14,14 | |

**[located - mean]**

located  73:13
location  1:14
lock  107:20
logic  136:12
logical  61:16
logistics  3:8 7:5
  8:18
long  10:20
  11:13 77:11
  103:3 113:9
  135:23
longer  57:8
  76:14 77:25
  78:20 111:13
look  29:6 36:6
  37:18 39:11,15
  44:9,10 45:25
  46:10,17 47:1
  49:12,22,25
  50:25 51:20
  54:22 57:22
  58:2,15,16,18
  60:20 64:10,12
  65:18 66:3
  68:21 77:14
  88:19 90:3
  95:3,7 101:17
  106:17 107:25
  123:1,21
  124:24 130:3
  141:7
looked  16:2
  35:19 44:15
  53:2 57:21
  58:18 68:15,25

70:9 97:7 99:9
127:22 150:18
looking  28:11
  40:11 45:5
  48:21 49:8
  52:19 60:23
  81:18,20 82:3
  88:6 95:25
  146:10 151:1
looks  26:7 29:9
  31:5 32:25
  40:2,14 48:18
  51:15 52:10
  73:7 88:20
  107:10 125:7
  141:10 143:2
lost  114:21
lot  33:17 37:12
  42:1 60:1
  66:16 113:11
lower  81:8,9
lp  30:2,6
lunch  83:19
  90:23

**m**

m  3:10,16,22
  5:1
made  20:13
  24:12 44:21
  54:2,20 90:19
  91:10 95:18
  96:3 97:2 98:4
  109:4 111:13
  121:14 147:11
  147:25 150:20

151:13
main  80:6
maintain  97:13
majority  3:21
  33:16 54:8
  134:23
make  13:25
  41:9 42:1 52:5
  87:23 91:6
  92:13 113:18
  128:12 131:9
  132:10 143:4
  148:16
makes  61:20
  107:9 127:7
making  9:22
  100:21
management
  50:9 147:15
managing
  21:16
march  117:13
  118:8 141:14
mark  22:9
marked  10:2
  11:21 14:5
  15:16 22:11
  23:21 24:24
  26:3,17 28:20
  29:13 31:15
  34:8 39:19
  44:5 51:10
  60:9 64:17
  65:10 68:25
  74:7 84:9

88:14 96:17
101:9 106:11
106:24 110:11
114:11 117:5
120:2 123:8
124:15 129:21
martorello  4:12
  9:11
match  44:20
matter  9:8,24
  23:3 50:14
  67:7 72:24
  89:15 112:24
  129:11 143:18
  144:1
matters  10:9
  28:2,6
mattson  7:10
matured  61:19
  61:19,20
maximum
  22:23
mbe  30:2,5
  31:10 32:9
  33:2 57:11
mccollum  13:6
  13:17 50:11
  143:22 147:4
mckinney  3:5
mean  20:5 23:3
  28:8 31:4
  32:11,25 39:5
  41:6 42:13
  43:21 45:15
  49:1 50:13

**[mean - morning]**

| | | | |
|---|---|---|---|
| 56:17 60:25 | **meant** 13:12 | 90:14 91:13 | 103:5,8,15,19 |
| 63:20 64:7 | 103:21 | 94:2,9 115:15 | 104:19,20,21 |
| 67:1,11 68:19 | **mechanics** | 124:7 146:12 | 104:24 105:6 |
| 71:2 72:7 | 135:1 | **mind** 56:22 | 105:14 109:2 |
| 73:14,14 74:14 | **meet** 23:1,3 | 59:15,21 | 111:3 112:2,4 |
| 75:7 77:11,13 | 40:17 | 114:12 | 112:20 117:21 |
| 77:14,22,24 | **members** | **minds** 44:1 | 118:15 121:10 |
| 78:25 79:14,19 | 116:21 143:21 | 59:7 78:7 | 152:2 |
| 81:9 82:18 | **membership** | **minimum** | **monitor** 59:9 |
| 87:1,2 89:9 | 31:10 | 40:13 65:4 | **montgomery** |
| 90:21 91:9 | **memorize** | 102:1 146:14 | 5:3 8:8,11 9:8 |
| 94:12 95:10 | 147:8 | **minute** 48:3 | 9:15,20 10:15 |
| 98:6,14 99:16 | **memphis** 3:12 | 131:12,21,21 | 10:16,21 11:9 |
| 103:17 108:21 | **mentioned** | **minutes** 52:7 | 13:21 16:17 |
| 112:7,23 113:3 | 53:19 67:23 | 106:16 131:19 | 25:10 26:5 |
| 113:9,22 116:1 | 116:21 140:24 | 133:25 134:2,5 | 48:11 49:7 |
| 119:21 124:3 | **mere** 93:11 | 134:10,13 | 50:24 52:17 |
| 125:1,20 126:7 | **merger** 10:22 | **mischaracteri...** | 57:23 62:22 |
| 126:12,15,17 | 37:7 | 71:22 | 68:8 81:19 |
| 126:18 128:6 | **met** 23:14 | **misrepresent...** | 84:7 87:23 |
| 129:7,11 130:5 | **michael** 6:18 | 104:11 116:10 | 89:8 103:25 |
| 134:2 137:3 | 144:4 | **misrepresenti...** | 105:5,23 |
| 141:15,16 | **michele** 6:12,17 | 118:11 | 110:17 111:12 |
| 143:14,25 | 6:21 7:9 65:19 | **missing** 33:14 | 112:11 115:8 |
| 145:14 146:13 | 84:13,23 85:20 | **misstatement** | 116:2 117:13 |
| 146:13 147:3,6 | 96:22 | 118:20 | 118:21 123:11 |
| 148:1 149:17 | **middle** 101:18 | **moment** 86:7 | 127:12 129:4 |
| 151:3 | **million** 20:25 | 89:13 | 132:3 134:21 |
| **meaningful** | 21:2 22:6,24 | **monday** 102:4 | 144:19 |
| 35:20,21 | 24:6 26:10 | **money** 41:25 | **month** 115:10 |
| **meaningfully** | 27:19 30:21 | 55:12 69:24 | **months** 31:25 |
| 81:9 114:8 | 55:10,23 72:5 | 73:4 74:23 | 104:3 109:1,3 |
| **means** 20:1 | 73:22,22 74:24 | 75:24 76:5,18 | 115:21 |
| 99:3 126:3,14 | 75:14 81:7 | 93:17 100:2,10 | **morning** 9:20 |
| | 82:12,13 84:24 | 102:7,11,12 | 9:23 57:21 |

**[morning - notices]**

| | | | |
|---|---|---|---|
| 102:4 133:21 | narrow 38:19 | net 81:3 | noah.m.schot... |
| mortgage 76:6 | 73:25 112:18 | networks 1:5 | 3:19 |
| mortgagee 76:5 | national 3:20 | 7:12 9:9 18:4 | nonlegal 13:12 |
| motion 7:7 | 7:8 18:16 | 18:10,13 20:16 | noon 83:18 |
| 117:15 120:17 | 97:17,17 | 20:17 22:17,17 | normal 64:12 |
| 121:6 136:3 | nature 33:2 | 23:1,2 24:19 | 77:22 |
| motions 132:8 | 35:25 51:6,22 | 24:19 25:12,12 | normally 40:22 |
| move 34:7 | 63:17 127:18 | 34:18,21 35:15 | 63:5 |
| 53:19 62:22 | need 11:5 16:13 | 38:7,9 40:17 | north 3:17 4:5 |
| 130:25 | 19:15 28:1,5 | 42:22 45:9,11 | northern 1:1 |
| moved 59:8 | 28:17 75:21 | 51:2 54:22 | notated 45:13 |
| 94:14 107:19 | 78:8 83:8 | 55:8,13,19,23 | note 5:20,22 |
| 110:22 | 101:21,24 | 56:3,6 89:15 | 24:5,13,13 |
| moving 35:14 | 102:1 104:19 | 91:23 94:4 | 26:7,9 27:14 |
| 136:7 137:20 | 104:19 109:23 | 98:3 99:14,14 | 33:7 76:23 |
| 137:22 138:8 | 114:15,17 | 100:6,21,23 | 102:15,20,21 |
| 149:13 | 135:21 145:11 | 102:25 109:21 | noted 127:23 |
| multiple 107:9 | 145:13 152:10 | 110:22 111:3 | noteholder |
| 118:17 129:8 | needed 33:20 | 112:16,24 | 3:21 |
| munsch 4:4 | 130:7 | 120:13 132:17 | notes 42:19 |
| munsch.com | needs 107:23 | 132:24 133:11 | 125:10 |
| 4:7 | 152:7 | 133:15 138:14 | notice 5:12 |
| mutually 75:10 | negative 64:13 | 138:23 139:4,9 | 6:15 8:13 9:25 |
| mvl 1:5 | negotiate | 141:8 144:10 | 10:1 50:18 |
| **n** | 104:16 114:7 | 146:22 147:1 | 68:15,20 |
| n 3:1 4:1 5:1,1 | 117:24 | 147:15,20,20 | 102:13 120:7 |
| 5:1,10 6:1 7:1 | negotiated | never 23:14 | 120:12 123:2 |
| 8:1 | 25:21 37:24 | 43:11 76:12 | 135:10,24 |
| name 9:11,20 | 38:3,8 | 92:7 116:13 | 136:2 141:1,5 |
| 10:14 35:16 | negotiating | new 35:15 54:7 | 141:8,9,12 |
| 45:8 65:22 | 108:11 118:24 | 54:16 72:8 | 149:1 |
| 89:12 127:10 | negotiations | 107:1 139:23 | noticed 68:6 |
| 134:21 153:15 | 150:6 | newly 44:21 | 71:17 |
| named 38:13 | neither 93:23 | noah 3:16 | notices 85:25 |
| 38:14 144:3 | 153:10 | | |

**[november - okay]**

| | | | |
|---|---|---|---|
| **november** 10:23 37:7 | 142:12 | 142:7 143:3 | 32:8,23 33:22 |
| **number** 15:14 15:21 16:1 17:9 29:23 30:17 31:2,3,5 35:3 41:1,2,6 41:13,21 44:13 45:6 46:17 47:5 48:15 51:6 52:4,9,22 52:22,25 58:4 69:1 73:9 82:8 85:23 97:12 129:19 | **obligated** 32:5 114:6 | **officers** 142:9 142:21 | 34:1,6,13,14,17 34:20,25 35:6 |
| | **obligation** 27:9 27:10,13 33:4 33:10 | **official** 57:25 89:24 103:22 | 36:11,25 37:24 38:5,21 39:5 |
| | **obligor** 24:18 54:5 79:14 | **offset** 19:23 | 39:23 40:1,7 40:19 41:16 |
| | **obligors** 30:14 35:18 | **oh** 14:9 19:7 131:17 | 42:16 43:14,24 44:4,9,11,17,20 |
| | **obvious** 50:20 | **okay** 10:6,13 10:16,20 11:3 11:8,13,25 12:1,4,7,10,13 12:16,25 13:7 13:15,20 14:13 14:14,18,22 15:3,10,13 16:11,14,23 17:1,5,12,15,19 17:22 18:3,8 18:12,15,19 19:3,7,20,21 20:5,10,13,20 20:23 21:3,7 21:12,15,18 22:4,7,14,15,21 22:25 23:6,9 24:4,5,9,11,20 25:3,9,10,16,25 26:14,21,22,25 27:3,9,13,17,22 28:4,23 29:2 29:11,17,18,25 30:5,9,15,19,25 31:7,7,13,18,19 31:23,25 32:4 | 45:11,14,21,25 46:7,13,15,16 |
| **number's** 81:8 | **obviously** 32:13 33:15 67:21 99:20 118:25 121:6 | | 46:17,18,19,25 47:4,8,13,16,22 |
| **numbered** 14:20 19:18 | **occur** 76:4 | | 48:1,6,14,20 49:7,16,22 |
| **numbers** 14:22 51:1,3,4 52:7 70:1 126:23,24 | **occurred** 59:6 59:11 61:18 63:16 137:23 | | 50:7 51:8,15 51:17,19,24 |
| | **occurring** 60:3 | | 52:1 53:5,24 55:1,7,18 56:2 |
| **o** | **october** 35:8 37:25 40:2 42:21 44:10 48:24,25 50:2 54:1 60:25 62:23 63:16,19 63:25 101:19 107:13 108:15 110:19 115:21 | | 57:1,13,22 58:14,24 60:10 |
| **o** 5:1 144:4 | | | 60:13,20,23 61:2,4,13,24 |
| **object** 135:8,9 136:1 137:10 139:2 144:12 147:17,24 149:4 150:14 151:14,18 | | | 62:21 63:23 64:5,22,24 |
| | | | 65:1,4,8,16 66:10,15,18 67:9,9,13 |
| | **odd** 71:3 | | 68:18,23 69:4 69:8,13,15,23 |
| **objection** 7:5 19:10 32:10 66:21 87:24 104:12 127:16 128:3 130:19 133:16 137:17 | **offered** 37:17 54:14 98:16 | | 70:4,9,14,19 72:14,18 73:3 |
| | **officer** 18:1 21:10,12 140:14 141:23 | | 73:5,12 74:5,7 74:10,17,22 75:5,13 77:3 |

[okay - ownership]

| | | | |
|---|---|---|---|
| 77:18 79:10 | 117:20 118:11 | 105:24 109:8 | **organized** |
| 80:15,21 81:25 | 118:19 119:10 | 110:3 123:25 | 13:24 |
| 82:4,13,21 | 119:15 120:4,6 | 123:25 138:25 | **organizing** |
| 83:4,13,17,22 | 120:9 121:12 | **ones**  18:2 | 147:13 |
| 84:10,13,16,19 | 121:19 122:5 | **ongoing**  58:12 | **original**  58:13 |
| 84:23 85:8,13 | 122:15 123:4 | 79:5 | 94:22 97:12 |
| 85:17,19,22 | 123:17,18,25 | **operate**  131:5 | **originally**  39:2 |
| 86:4,22 87:5 | 124:5,13,21 | **operating** | 45:3 54:11 |
| 87:16 88:19,23 | 125:6,12 | 49:19 80:6 | **origination** |
| 89:1,4,6,7,17 | 126:13,21 | 83:3 101:25 | 139:24 |
| 89:21,25 90:3 | 127:3,11,20,24 | **operational** | **outcome** |
| 90:8,13,17 | 128:1,16,23 | 18:1 36:12 | 153:12 |
| 91:5,11,20 | 130:2,3,4,8,14 | **operations**  58:8 | **outside**  16:1 |
| 92:3,8,16 93:2 | 130:23 131:8 | 62:7 128:7,14 | 85:4 128:18,25 |
| 94:2,6,9 95:5,6 | 131:11,13,17 | **opinion**  42:13 | 129:9 138:10 |
| 95:7,9,10 96:1 | 131:23 132:3 | 43:18 55:15 | **outstanding** |
| 96:9,13,15,22 | 132:14,21 | 63:10 68:5,7 | 30:21 38:25 |
| 97:3,5,6,9,9,21 | 133:1,6,14,20 | 71:16 78:16 | **overall**  147:6 |
| 97:25 98:7,19 | 134:6 135:14 | 80:10 91:19 | **overly**  73:24 |
| 99:9,13,24 | 137:16,25 | 97:23 110:3 | 142:19 |
| 100:8 101:13 | 138:7 139:12 | 114:4 117:3 | **overview** |
| 101:17 102:5 | 139:18 140:9 | **opposed**  41:5 | 115:17 |
| 102:10,17 | 140:13 141:12 | 81:17 | **owe**  75:24 81:6 |
| 103:9,13,19,24 | 141:19 143:4 | **opposite** | **owed**  76:2 |
| 105:19 106:10 | 143:13,19 | 109:15 | 81:12 82:8 |
| 106:15,19,20 | 144:2,18 145:1 | **optimistic** | **owes**  82:12 |
| 107:2,24 108:4 | 145:5,16,22 | 142:19 | **own**  76:4 91:10 |
| 108:10,25 | 146:9,19 | **option**  102:16 | 119:16 |
| 109:12,15,19 | 149:13,18,21 | **order**  101:25 | **owned**  30:11 |
| 109:25 110:2,6 | 150:11 151:7 | 120:17 126:6 | 30:13 33:6 |
| 110:9,17 111:2 | 151:20 152:5 | 145:13 146:19 | **owner**  56:25 |
| 111:6 112:1,9 | 152:10,14 | **orders**  152:11 | 89:25 127:5 |
| 112:19 115:4,7 | **once**  56:18 59:7 | **organization** | **ownership**  54:8 |
| 116:12 117:4 | 59:7 67:25 | 129:12 151:23 | 59:10 93:23,24 |
| 117:10,11,12 | 90:24 93:10 | | |

**[owns - phone]**

| | | | |
|---|---|---|---|
| **owns** 33:1 | 66:3 88:19 | **passed** 72:7 | **performed** |
| **p** | **pardon** 15:24 | **past** 89:1 | 140:22 |
| **p** 3:1,1 4:1,1 | **parham** 7:14 | **path** 93:25 | **performing** |
| 5:13,13 | 7:17,20 105:20 | **pay** 70:16 | 35:10 63:2 |
| **p.c.** 4:4 | **part** 33:10 72:9 | 75:24 76:6 | 140:18,21 |
| **p.m.** 2:3 9:2 | 77:25 113:21 | 94:3 96:7 | **period** 33:24 |
| 84:5 131:24 | 114:1 125:5 | 103:5 | 143:24 |
| 132:1 134:14 | 150:11 | **paydown** 92:5 | **periods** 33:14 |
| 134:17 152:14 | **particular** | 92:7 93:1 | **permission** |
| 152:16 | 19:14 32:25 | 94:21 149:13 | 91:8,14 |
| **page** 5:5,11 6:3 | 37:10 39:16 | 149:14 | **persistence** |
| 7:3 8:3 12:1,3 | 40:17 61:23 | **paying** 78:24 | 104:19 |
| 16:5 19:15 | 76:7 94:1 | 137:21 | **person** 21:8 |
| 22:23,23 27:11 | 144:1 148:21 | **payment** 95:14 | 62:6 126:19 |
| 29:6 51:21 | **particularly** | 95:15,15 | 129:12 |
| 65:18 84:19 | 56:20 63:4 | 103:16 133:10 | **personal** 23:11 |
| 88:19 89:5 | 87:19 | 137:3,6 | 68:5,7 71:15 |
| 101:18 108:10 | **parties** 20:15 | **payments** | 78:12 87:18 |
| 110:21 123:17 | 24:18 30:12,13 | 71:15 81:9 | 110:3 120:21 |
| 132:11 | 39:1 50:15 | 132:7,12,15 | 120:23 143:8 |
| **pages** 101:14 | 51:25 54:6 | 133:2,15 | **personally** |
| 101:17 121:23 | 92:9 93:24 | **payoff** 72:5 | 55:22 112:11 |
| **paid** 70:22 | 112:3 129:8 | 77:9,19 95:13 | **personnel** |
| 73:14 74:8,9 | 135:17 | 136:25 137:3,6 | 128:7 146:25 |
| 74:22 76:14 | **partnership** | **pearl** 3:17 | **persons** 38:20 |
| 77:11,20 91:13 | 30:1,2 | **pending** 85:24 | **perspective** |
| 93:9 101:21,25 | **party** 18:16 | 97:14 | 54:13 151:21 |
| 105:14 107:22 | 19:1,6 20:7 | **penny** 44:22 | **petition** 105:23 |
| 132:16,21,22 | 21:5 40:15 | **people** 13:15 | **petitioning** |
| **paint** 142:21 | 46:9 66:20 | 71:3 72:10 | 121:10 |
| **panicked** 72:12 | 98:2 121:6 | 100:20 128:12 | **pguffy** 3:25 |
| 72:14 | 131:6 136:3 | 128:16 143:7 | **philip** 3:22 |
| **paper** 27:6 | 138:1 153:11 | **percent** 108:21 | 134:22 |
| **paragraph** | **pass** 133:22 | **performance** | **phone** 149:19 |
| 19:15,16,18 | | 33:7 | |

**[pick - priority]**

| | | | |
|---|---|---|---|
| **pick**  149:19 | **pledged**  37:13 | 109:15 111:7 | **preserve**  92:21 |
| **picture**  30:16 | 44:21 102:7 | 111:17 112:5 | **president**  10:18 |
| 74:2 91:3 | 103:15,20 | 119:18 149:22 | **presumably** |
| 142:21 | 146:9 148:5 | **possible**  14:1 | 61:8 106:7 |
| **piece**  54:16,16 | **pledges**  30:1 | **post**  105:23 | 128:6 |
| 97:5 | **plus**  75:3 | **posted**  61:7 | **presuming** |
| **piper**  3:16 | **point**  29:4 | **potentially** | 57:18 |
| **place**  63:22 | 43:21,23 56:18 | 33:20 126:6 | **pretty**  49:13,20 |
| 64:4,11 67:22 | 57:4 76:9,10 | **practice**  59:9 | 50:17,20 73:24 |
| 91:1 124:1 | 84:24 92:22 | 66:11 | 112:17 125:25 |
| 136:8 153:7 | 99:4 113:12 | **precedent**  96:7 | 129:12 |
| **placed**  78:19 | 117:25 118:25 | **precision**  89:24 | **prevent**  142:10 |
| 108:13 123:14 | 121:5 122:18 | **precluded** | **previous**  44:14 |
| **planning** | 123:21 135:5 | 54:11 | 56:10 110:19 |
| 117:15 | 137:25 139:8 | **preliminary** | 119:12 127:22 |
| **pleading**  87:11 | 141:3,12,19 | 66:10 | **previously** |
| 133:3 | 143:11,15 | **preparation** | 91:13 107:5 |
| **pleadings** | 144:16 150:4 | 12:17,25 53:16 | 136:2 |
| 118:1 132:13 | **pointed**  85:3 | 58:14,22 69:11 | **primarily**  13:5 |
| **please**  16:6 | **policies**  46:21 | 143:6,11,17,18 | 18:21 34:3 |
| 21:23 26:2,16 | **policy**  108:1,6 | 143:20 144:15 | **primary**  21:8 |
| 32:23 46:17 | 110:5 | 146:23 | 33:20 36:16 |
| 49:25 53:24 | **pollyanna** | **prepare**  47:10 | 53:22 56:22 |
| 60:5 70:12 | 142:14 | 50:7,17 | **principal**  95:15 |
| 71:20 81:15 | **poplar**  3:11 | **prepared**  12:10 | **printout**  82:2 |
| 89:2 95:3 96:6 | **populate**  26:20 | 12:14 47:4,17 | **prior**  11:15 |
| 101:20,23 | 34:12 51:14 | **preparing** | 26:8 27:21 |
| 104:1 107:16 | 129:24 | 46:10 | 40:12 45:4 |
| 110:23 114:15 | **populated**  25:6 | **prepped** | 63:6 78:24 |
| 120:12 121:12 | 29:16 62:5 | 133:25 | 91:2 99:20 |
| 139:20 142:18 | **portion**  95:21 | **presence**  36:19 | 115:1 116:25 |
| **pledge**  6:4,6 | **position**  10:17 | 64:8 145:20 | 122:12,21 |
| 29:18,25 31:8 | 17:23 20:6 | **present**  4:9 | 125:21 144:15 |
| 31:19 32:9 | 71:5 76:4 92:9 | **presented** | **priority**  93:14 |
| 147:11 | 103:22 105:16 | 67:25 81:23 | |

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

**[probably - put]**

| | | | |
|---|---|---|---|
| **probably** 23:11 | **promised** 34:6 | 98:22,23 99:10 | **publish** 9:24 |
| 32:20 38:12 | **promissory** | 99:15 100:1,10 | 23:24 24:23 |
| 39:11 49:18 | 5:20,22 24:5 | 102:2 103:20 | 26:1,15 31:13 |
| 50:13 63:25 | 24:13,13 26:7 | 105:7 107:7,17 | 39:18 43:7 |
| 77:16 95:19 | 26:9 | 108:13 109:2 | 44:4 51:9 60:7 |
| 103:18 104:17 | **pronunciation** | 110:22 112:20 | 96:15 101:6 |
| 104:18 113:17 | 65:21 | 114:10 115:12 | 106:4 110:10 |
| 117:3 118:20 | **proof** 8:16 | 117:4 119:16 | 119:24 129:17 |
| 119:19 121:21 | 124:21 | 120:6,13 | **published** 9:25 |
| 125:2 126:8 | **proposed** 24:6 | 121:17 123:6 | 14:12 25:4 |
| 138:9 139:13 | **prosperity** 1:13 | 123:11 127:4,5 | 84:7 106:20 |
| 142:1 149:17 | 2:2 3:3 5:3,13 | 127:10,10 | **pull** 73:6 82:7 |
| **problem** | 5:16 6:8,10,21 | 128:12,17 | 94:23 102:14 |
| 139:13 140:2,7 | 7:4,8,19,22,25 | 129:10 130:9 | 122:25 |
| **procedure** 8:14 | 8:12,14,16,17 | 130:12,18 | **pulled** 79:16 |
| **procedures** | 9:7 10:7 14:23 | 132:7,16 | 130:2 |
| 46:22 123:12 | 14:24 16:19 | 133:11,14 | **pulling** 26:6 |
| 123:15 | 20:11,14 22:9 | 136:18 137:23 | 39:22 88:17 |
| **proceeding** | 22:16 23:20 | 138:10,20 | 117:9 |
| 79:5 99:2 | 24:23 25:11 | 139:8 140:4 | **purpose** 87:13 |
| **proceedings** | 26:15 29:12,19 | 141:9,22 | 91:15 |
| 153:6 | 31:13,20 36:20 | 144:10 145:23 | **purposes** 46:21 |
| **process** 57:14 | 37:6 38:1,8 | 146:2 147:22 | **pursuant** 5:13 |
| 100:19 138:2 | 42:23 48:15,17 | 148:12,14,20 | 19:4 31:1,3 |
| **processing** | 50:25 51:9 | 149:2,7 150:2 | **put** 86:5,19 |
| 125:5,23 126:9 | 56:3,6,14 | 150:12 | 91:2,22 92:9 |
| 126:10 | 64:15 65:5,9 | **prosperity's** | 97:21 98:5 |
| **produce** 86:14 | 66:2,5,11 68:3 | 93:12 110:24 | 99:10,15,15 |
| 87:10 92:23 | 68:25 81:7 | 118:9 132:9 | 100:1,10,24 |
| **produced** | 82:13 84:14,23 | 135:15 | 101:1 105:17 |
| 48:14 123:13 | 85:8 86:5 | **provide** 66:19 | 109:2,8 116:24 |
| **professional** | 87:14 88:11 | 107:16 110:23 | 123:2,25 124:1 |
| 107:22 | 89:4 91:25 | **provided** 100:3 | 124:13 131:7 |
| **promise** 113:20 | 92:17 93:3 | 101:15 | |
| | 95:5 97:21 | | |

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

**[q1 - reducing]**

| q |
|---|
| **q1** 113:23 |
| **qualify** 123:19 |
| **quality** 91:3 |
| **quarter** 35:12 |
| 63:7,7 121:22 |
| 141:4 |
| **question** 11:5 |
| 16:17 17:1 |
| 27:12 36:25 |
| 41:24 42:18 |
| 49:8,9 55:3,18 |
| 56:2,8 61:11 |
| 62:3 66:10,13 |
| 67:12 70:21 |
| 73:24 74:18 |
| 76:11 77:1 |
| 79:17 81:16 |
| 83:7 85:5,13 |
| 85:14 87:24 |
| 88:1 89:17 |
| 93:16 96:2 |
| 98:9 100:8,13 |
| 100:18,24 |
| 102:17 103:24 |
| 105:9,19 109:8 |
| 112:17 126:1 |
| 130:13,20 |
| 133:7,10 |
| 134:11 139:20 |
| **questioning** |
| 80:13 |
| **questions** 47:23 |
| 62:20 132:5 |
| 134:24,25 |

135:19,20,23
136:1 144:6,25
144:25 145:2
146:20 148:5
152:5
**quick** 48:3
49:13 131:11
**quickly** 67:17
**quite** 58:18
122:22 133:25
**quo** 97:14
**quotations**
102:14
**quote** 42:10
89:11 91:1
102:21

| r |
|---|
| **r** 3:1,10 4:1 |
| 5:13,13 |
| **radio** 33:14 |
| **ran** 126:6 |
| **random** 72:5 |
| **rasche** 4:11 |
| 13:4 |
| **rather** 86:18 |
| 112:4 |
| **rattling** 110:4 |
| **reached** 102:10 |
| **reacted** 68:1 |
| **read** 69:8,8,9 |
| 116:2 121:23 |
| **reading** 39:6 |
| 46:4 105:5 |
| 125:19 |

**readvance** 91:9
91:12,12 94:21
**readvanced**
90:20 108:12
**ready** 39:24
60:18,19 152:7
**real** 61:22 80:9
81:16
**realistic** 121:5
**realistically**
56:16
**really** 75:4
76:10 78:23
113:14,15
122:20 133:5
138:24 148:25
**reason** 37:9
41:3 48:16,20
48:22 149:2,7
150:11
**reasonable**
108:23 133:9
**reasonably**
98:10,23 109:9
**reasons** 37:21
**recall** 144:2,7
**recalls** 144:14
**receivable**
24:18 29:10
42:9 81:2
**receive** 55:9,20
**receiving**
149:10
**recent** 65:14
79:16

**readvance** 91:9
**recently** 79:3
**recognize** 77:3
**recognized**
77:6,12
**recollection**
51:3 102:23
**reconcile** 105:4
**record** 9:5
15:20 36:16
38:18 39:14
48:7,8,9 49:22
58:1 73:20
84:3,4,5 89:24
131:24,25
132:1 134:8,10
134:11,12,15
134:16,18
135:25 144:13
148:21 152:11
152:13,15
**recorded** 9:6
**records** 5:16
14:4,19 16:19
37:23 68:21
72:12,20
**recross** 135:21
**redirect** 135:21
144:22 145:7
**reduce** 73:17
73:18 76:8,23
77:1
**reduced** 39:2
**reduces** 74:13
**reducing** 76:6
137:7

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

**[reduction - repurchase]**

**reduction** 75:8
75:9 76:3,3
**refer** 29:8
**referee** 86:21
91:24
**reference** 90:9
90:12 102:19
147:25
**referenced**
24:15 28:16
42:18 50:10
57:4 64:8
67:21 70:1
113:10 122:22
124:23 147:4
**references**
52:24 65:1
85:4
**referencing**
125:3
**referred** 63:9
**refers** 85:5
**reflect** 142:23
**reflected** 36:14
39:3
**refresh** 51:2
65:15
**regarding** 13:8
47:14 69:17
120:12 141:8
148:14
**regardless**
151:5
**regular** 16:20
128:9

**regulator** 11:16
**rejected** 146:18
**related** 46:20
71:23 89:14
120:23 126:22
153:11
**relates** 14:19
120:20
**relation** 99:17
**relationship**
32:12 33:7
63:18 72:3,8
113:9 116:18
121:17 142:3
147:2,6
**relatively** 54:17
86:13
**release** 42:7,23
43:4,10 57:7
57:10 58:21
59:16 78:3,8
86:17 112:20
117:16 118:21
120:18
**released** 56:24
57:1,15 58:6
59:2,8,13
77:21 78:4,7
102:1,11 105:7
115:16,24
148:7
**releases** 58:17
**releasing** 54:15
**relevant** 87:19
87:22 109:14

**relying** 57:8
**remain** 85:24
**remained** 43:3
**remaining**
35:23
**remains** 105:16
**remember**
17:25 148:8
**remitted** 43:19
80:20 108:22
**remotely** 2:5
9:10
**removed** 37:10
**renewal** 61:6,9
61:17 62:7
**reopen** 122:8
**repaid** 80:14,20
**repayment**
102:6 103:14
103:17 105:8
**repeat** 11:6
97:2
**rephrase** 56:2
130:17 139:7
149:5
**replaced** 78:8
**replacement**
42:11
**replacing** 44:3
**replicated**
136:23
**reply** 7:4 88:12
132:9
**report** 62:16

**reported** 1:25
73:22
**reporter** 9:14
38:18 52:13
104:6 152:6,13
153:3
**reporter's**
153:1
**reporting** 2:5
125:2
**represent** 9:22
50:24 111:23
114:1 123:10
134:22
**representation**
93:12
**representations**
121:15 122:1,3
**representative**
1:13 2:2 5:3
9:7 40:15 68:9
88:5 112:12
119:15
**representatives**
86:16
**represented**
55:11 75:22
113:6
**representing**
9:12 13:2
**republished**
106:21
**repurchase**
102:15,20,21

Alpha Reporting
A Veritext Company

**[request - rights]**

| | | | |
|---|---|---|---|
| **request** 63:11 | 80:12 86:2 | **resulting** 19:24 | **revolving** 20:25 |
| 72:19 79:18 | 148:9 150:23 | **return** 84:25 | 41:7,19 95:22 |
| 85:7 100:10 | **respond** 120:16 | 85:8,14 | 145:10 |
| 110:21 111:13 | **responded** | **returned** 98:4 | **right** 19:23 |
| 129:17,18 | 151:9 | 98:13 103:8 | 22:2 28:11,12 |
| 130:3 | **responding** | 109:24 | 28:24 37:19 |
| **requested** | 112:20 | **revenue** 77:3 | 42:8 47:25 |
| 70:21 71:25 | **responds** 102:5 | 77:10 | 51:18 52:5 |
| 107:18 121:13 | 107:24 111:6 | **reversal** 90:18 | 56:19,25 57:14 |
| 121:22 153:14 | 120:14 | 94:19 | 59:25 60:7 |
| **requesting** | **response** 7:5 | **reverse** 92:5,25 | 64:15 67:15 |
| 100:6 | 51:16 71:18 | 93:15,16 94:20 | 71:9 75:23 |
| **requests** 8:19 | 96:23 106:5 | **reversed** 71:8 | 76:5,24 81:5 |
| 69:18 100:7 | 110:24 123:13 | 73:2 90:25 | 84:2 92:24 |
| **requirement** | 127:9 | 92:5 93:25 | 93:8 95:21,23 |
| 40:18 | **responses** 8:17 | **reversing** 85:10 | 100:9 103:4 |
| **requires** 75:8 | **responsible** | 90:15,21 91:15 | 107:12 114:9 |
| 77:25 | 21:8 | 93:11 96:5,6 | 116:5 119:24 |
| **research** 37:10 | **restarts** 16:3 | **review** 17:16 | 120:1 121:24 |
| 92:19 149:1 | **restrictions** | 18:6 19:15 | 123:5 124:13 |
| **researched** | 123:13 | 21:6 53:14 | 127:14 128:10 |
| 43:11 | **restructure** | 114:3 143:20 | 129:9 130:23 |
| **researching** | 102:6,10 | 143:21,23 | 131:16 133:20 |
| 45:23 | 103:14,16 | 146:23,25 | 136:20,24 |
| **reserve** 136:3 | 104:17 105:8 | 153:13 | 139:23 141:4 |
| **reserves** 144:25 | 111:8 112:6 | **reviewed** 53:7 | 143:1 145:14 |
| **reset** 131:18 | 113:4,19 114:2 | 79:19 84:16 | 148:15 149:24 |
| **resolution** 80:3 | 114:7 140:22 | 148:20 | 151:10 |
| 85:25 97:14 | **restructured** | **reviewing** | **rightful** 92:15 |
| **resolve** 49:20 | 105:15 111:18 | 144:2 | 93:9 |
| 119:22 | 115:16,25 | **revise** 47:19 | **rightfully** 98:9 |
| **resolved** | **restructuring** | **revisit** 47:22 | **rights** 27:6 |
| 120:15 | 140:25 | 53:18 122:8 | 35:25 45:19,21 |
| **respect** 15:5 | **result** 92:24 | **revolver** 35:11 | 67:18 80:2 |
| 38:15 61:17 | | 41:5 115:15 | 97:16 |

[risk - see]

| | | | |
|---|---|---|---|
| **risk** 18:1 | **saying** 26:11 | **scenes** 125:2 | 121:12 123:4 |
| **risky** 63:14 | 28:5 41:3 | 126:8,12 | 127:2 129:2,3 |
| **robert** 10:15 | 43:16 49:10 | **schaffer** 6:12 | 129:16 130:23 |
| **role** 17:24 18:7 | 52:6 53:25 | 7:10 | **section** 19:17 |
| 18:20 21:3 | 75:19 79:22 | **schedule** 29:8 | 24:15 27:11 |
| 82:15 142:1 | 81:6 82:23 | **schottenstein** | 33:2 46:6 |
| 147:5 | 90:18 92:6 | 3:16 133:23,24 | **secure** 57:8 |
| **roles** 140:4 | 93:15 94:15 | 134:4 | **secured** 18:16 |
| **rosier** 142:21 | 98:3 99:24,25 | **scope** 18:1 | 19:1 20:7 |
| **ross** 6:12,17,21 | 100:15 104:3,7 | 135:13,19,23 | 24:12,14,21 |
| 7:9 65:19 | 104:19 105:6 | 147:7 | 30:12,13 35:14 |
| 66:23,23 84:13 | 108:4 111:15 | **scott** 4:3,10 | 57:19 63:3,13 |
| 84:23 85:20 | 112:10,10 | **screen** 82:6 | 72:10 73:8 |
| 96:22 97:10 | 115:24 116:4 | **screenshot** | 78:19 80:20 |
| **ross's** 99:9 | 122:15 134:3 | 89:18,22 | 85:23,24 |
| **roughly** 30:21 | 138:4 145:12 | 127:25 | 109:13 145:13 |
| **rpr** 1:25 2:5 | 151:9 | **seamlessly** 14:1 | 148:17 |
| 153:19 | **says** 27:14 40:3 | **search** 78:10 | **secures** 108:14 |
| **rukavina** 4:4 | 40:25 44:12 | 149:2,7 | 109:16 |
| 144:23 | 45:12 46:5,19 | **second** 10:10 | **security** 5:23 |
| **rule** 10:6 | 50:2 51:1 66:3 | 15:24 16:6,15 | 5:24 6:4,6 |
| **running** 126:17 | 66:9 69:17 | 19:21 24:1 | 26:22,25 27:3 |
| **s** | 70:24 81:2 | 25:5,17 28:10 | 27:10,13,17,20 |
| | 85:22 87:12 | 28:15 40:21 | 27:22 28:1,5,7 |
| **s** 3:1 4:1 | 90:4,10,10,21 | 41:23 43:8 | 28:12,16,24 |
| **saber** 110:4 | 94:16 95:7 | 44:25 46:25 | 29:3,7,18,25 |
| **sale** 54:4 | 96:4 97:3,3,19 | 51:20 59:19 | 31:2,3,4,9,19 |
| **salvo** 122:24 | 103:19 108:17 | 60:5,6 63:7 | 36:1 46:20 |
| **sam** 21:5 | 108:18 109:25 | 65:8 66:3 | 54:12 57:18,20 |
| **sat** 50:11 | 110:25 111:16 | 68:23 71:20 | 71:4 109:21 |
| **satisfied** 74:7 | 112:7 113:7 | 81:15 82:6 | 145:9,11 |
| **satisfy** 99:19 | 117:18 118:21 | 85:6 88:13 | **see** 10:4 11:24 |
| 117:16 118:20 | 120:12 122:5 | 101:13 105:3 | 11:25 12:4 |
| 118:22 | 124:21 130:5 | 106:25 110:9 | 14:7 15:19 |
| **saturday** | | 119:20,25 | 16:4 17:5 26:5 |
| 107:13 | | | |

Alpha Reporting        800-556-8974
A Veritext Company    www.veritext.com

**[see - sir]**

26:19,21 34:10
34:13 37:18
39:3,21 44:7
44:12,17 46:1
48:19 49:5
51:6 53:5,10
57:23 58:5
61:2,3,3,4,7,10
62:10 64:11,20
85:2,7 89:15
90:12 101:13
102:8 107:5,8
114:23 116:1
117:6,8 120:4
120:12 122:23
122:24 123:1
125:10 129:13
133:3 136:22
144:24
**seeing**  144:7,15
148:8
**seeking**  86:16
**seem**  44:19
113:13
**seems**  50:20
**seen**  10:5 14:13
15:22 32:5
47:7 64:23
69:11 79:2
80:8,15,21
84:17 113:14
125:21
**sees**  76:12
**segregated**
78:19 85:11

87:12 94:1
104:24
**segregating**
87:13,20
**seidel**  4:3,10
**sel**  126:2
**selection**
125:17
**selections**
126:23
**sell**  80:7
**send**  86:18
91:23,24
111:14,15
141:12
**sending**  105:25
141:1
**senior**  10:18
93:13 128:7,13
128:14 129:12
**sense**  42:1
**sent**  76:4 96:24
104:25 111:3
119:18 141:3
141:10,13
144:3,7,8
**sentence**  19:21
51:20 85:6
**separate**  20:24
59:15 63:12
145:13
**separately**
86:15
**september**  1:15
2:4 9:1,5 30:20

63:25 153:16
**seq**  126:5
**sequence**  126:5
**sequencing**
126:23
**serve**  97:15
140:4
**services**  20:17
20:17
**set**  27:10 65:13
121:16 153:7
**settlement**  7:7
98:17 118:17
132:8,13 150:6
**several**  136:12
143:7
**share**  84:8
145:21
**sheet**  73:16
76:21,25 79:2
79:11,20 80:22
83:14 94:24
**sheets**  80:9,15
**short**  103:3
131:21 132:4
**shorten**  17:7
**shorthand**
153:7
**show**  69:1 79:4
79:6,18
**showed**  141:6
**side**  42:9 44:18
75:2 111:8
125:18 136:14
141:17 142:24

142:25
**signature**  84:21
153:18
**signed**  54:20
55:3
**signer**  146:15
**signers**  128:5
128:10
**significance**
38:21
**significant**
55:12
**signifies**  142:2
**silent**  33:14
**similar**  17:24
45:17 52:6
109:13 125:17
**similarly**  74:13
**simple**  96:2
**simply**  58:22
69:1 99:7
**simultaneous**
52:12 107:10
**simultaneously**
25:21
**single**  47:18,18
113:25 147:8,9
**sir**  10:5,12 11:2
11:25 12:3,6,9
12:12,15 13:9
13:13,19,19
14:13,16,21
15:2,9,12,19,23
16:25 17:4,11
17:14,18,21

**[sir - specific]**

| | | | |
|---|---|---|---|
| 18:14,18 19:6 | 82:22 83:16 | 142:22 | **sort** 65:15 72:8 |
| 20:2,12,19,22 | 84:15,22 85:7 | **six** 110:18 | 87:2 92:20 |
| 20:25 22:3,20 | 85:10,21 86:3 | 123:18,19 | **sound** 22:2 |
| 23:8,25 24:8 | 87:15 89:3,20 | **slightly** 21:1,20 | 131:9 |
| 24:10,22 25:15 | 90:7,12 94:5 | 22:6 71:14 | **sounds** 22:3 |
| 25:24 26:6,6 | 95:4 96:5,12 | **slow** 25:8 | 111:12 112:1 |
| 26:13,24 27:2 | 97:8,20 102:9 | **snap** 30:15 | 152:9 |
| 27:8,16,20 | 107:9 110:1 | **snapshot** 30:15 | **source** 41:17,21 |
| 29:1,16,21,24 | 111:1,5,20 | **snow** 3:9 9:21 | 90:13 94:16,18 |
| 30:4,7,18,24 | 117:19 118:10 | **software** 125:4 | **sourced** 45:3 |
| 31:4,12,22,24 | 118:13 120:5,8 | **sold** 35:18,23 | 49:3 |
| 32:3,7,19 | 123:24 124:10 | **solutions** 3:15 | **southwest** |
| 33:25 34:11,16 | 124:20 125:11 | 7:6 8:19 | 11:12 |
| 34:19 35:5 | 125:15 126:15 | **someone's** | **spanning** 50:13 |
| 36:10 39:22,25 | 128:18,22 | 108:7 | **speak** 12:21,25 |
| 40:6 44:8,16 | 129:24 130:7 | **someplace** | 25:19 40:10 |
| 44:19 45:7,10 | 132:10,19 | 92:14 | 53:9 61:10 |
| 45:13,23 46:5 | 133:13 135:7 | **somewhat** | 67:6,21 102:3 |
| 46:12,14,24 | 137:2,9,15,24 | 93:25 | 139:3,4 152:8 |
| 47:12,15 48:13 | 138:3,6,16,19 | **soon** 41:20 | **speaking** 20:16 |
| 48:18 49:2,24 | 138:22 139:17 | **sorry** 9:25 | 52:12 62:24 |
| 50:1,6 51:13 | 140:8,12,16,19 | 13:10,11,12 | 63:2 105:22 |
| 53:17 54:3,25 | 141:15,21 | 18:23 19:9 | 151:22 |
| 55:6 57:4 59:7 | 143:12 | 23:13 40:9 | **special** 10:18 |
| 59:24 60:22 | **sit** 43:16 58:24 | 42:20 47:8 | 82:15,18,20,21 |
| 61:1 62:15,19 | 62:10 82:24 | 55:2 75:6,7 | 119:2 139:12 |
| 63:21 64:3,18 | 83:4 103:23,23 | 84:24 85:3,6 | 139:25 140:10 |
| 64:21,23 65:3 | **site** 101:16 | 88:25 90:10 | 141:25 142:11 |
| 65:7 66:9 | **sitting** 56:13 | 91:3 97:1 | **specific** 14:19 |
| 68:17 69:3,11 | 59:4 68:3 72:4 | 99:14 110:14 | 14:22 19:9 |
| 69:22 70:18 | 91:11 100:8 | 111:21 116:17 | 21:23 23:4 |
| 71:2 72:2,17 | **situation** 20:3 | 130:5 133:25 | 42:6 43:25 |
| 73:11 74:4,6 | 43:5 63:5 76:7 | 134:5 138:4 | 50:19 74:17 |
| 74:21 75:1,16 | 113:23 119:22 | 139:7 145:6 | 76:17 78:17 |
| 76:20 82:14,17 | 121:7 142:15 | 150:18 | 90:17 93:22 |

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

**[specific - supposedly]**

| | | | |
|---|---|---|---|
| 119:3 | **started** 72:11 | **stop** 10:24 | **subsection** 20:8 |
| **specifically** | 105:24 110:4 | **stops** 16:2 | **subsequent** |
| 20:16 29:9 | **starting** 14:23 | **story** 103:3 | 98:25 |
| 36:11 38:6 | **starts** 120:10 | **strained** 33:7 | **subsequently** |
| 39:6 52:8 55:3 | **state** 10:14 | **strategy** 83:2 | 58:6 |
| 75:13 81:14 | 11:12 153:4 | **street** 3:17,23 | **substance** |
| 84:20 118:7 | **stated** 15:20 | 4:5 | 12:20 13:17 |
| 130:3 | 148:13 150:20 | **strike** 35:7 | 38:3 47:9 |
| **speculating** | **statement** 6:8 | 48:20 56:9 | 48:18 78:6 |
| 52:17 | 6:10,13 40:1 | 70:21 91:6 | 106:23 107:25 |
| **speculation** | 44:14 48:17 | **stuck** 87:21 | 129:11 |
| 30:12 137:10 | 49:5 53:2,10 | **stuff** 45:19 | **substantive** |
| 137:18 | 53:15 60:21 | 72:12 87:2 | 14:2 |
| **speed** 67:17 | 61:2,25 62:11 | **styled** 87:8 | **substitute** |
| 121:3 122:19 | 62:11 76:19 | 89:12 | 42:11 |
| **spell** 140:19 | 79:16 83:6,13 | **subject** 6:19 | **substitution** |
| **spent** 79:25 | 89:7 94:16,24 | 7:11,14,18,22 | 36:4 37:18 |
| 90:23 | 108:16,19 | 7:24 8:6,9,12 | 54:14 57:16 |
| **spirit** 50:23 | 119:11 127:21 | 24:16 36:8,13 | **succeed** 143:1 |
| **spoke** 12:19 | 148:9 | 36:21 37:3,19 | **suite** 3:6,12,18 |
| 13:8,15,16 | **statements** | 41:9 45:20 | 3:24 4:6 |
| 78:1 107:18 | 48:22 49:9,17 | 85:22 87:3,14 | **supervision** |
| 143:6,25 | 80:9 119:12 | 97:12 98:12 | 153:9 |
| **spoken** 108:20 | 150:20 151:2 | 99:15 102:13 | **supply** 3:8 7:5 |
| **staff** 58:9 | 151:13 152:1 | 107:5 115:12 | 8:18 46:3 |
| **stamp** 106:22 | **states** 1:1 69:18 | 120:6 129:6 | **support** 40:12 |
| **stamped** 7:22 | **stating** 144:8 | 132:12 148:17 | 61:21 115:18 |
| 15:25 | **status** 97:14 | **subordinate** | **supported** 42:9 |
| **stamps** 110:15 | 107:17 | 20:9 116:20 | 105:17 |
| **standard** 54:17 | **statutory** 19:23 | **subordinates** | **supporting** |
| 73:17 77:8 | **stay** 13:23 | 19:22 | 61:8 |
| **start** 12:18 | 150:8 152:2 | **subordination** | **supports** 58:9 |
| 63:23 68:20 | **steps** 137:22 | 19:18 | **supposed** 59:17 |
| 73:3 101:22 | 142:10 | **subscribed** | **supposedly** |
| 116:5 134:1 | | 153:15 | 60:2 |

**[sure - testified]**

| sure | t | |
|---|---|---|

**sure** 16:7 18:9
32:16 36:7
41:6,10 43:1
45:1,16 47:21
48:5 49:15
52:5 57:5 70:8
70:11 88:8,10
88:22 92:13
99:17 100:7
106:18 113:4
118:24 119:14
120:16 122:22
125:2 127:8
132:11 139:21
143:4
**surprise** 33:13
33:18 87:11,15
**susan** 6:18
**swear** 9:14
**sworn** 9:16
**system** 36:15
36:16 37:3,4,7
39:14 57:24,25
57:25 58:16
64:9 74:8,15
78:3 86:25
89:19,21,23
124:23,25
126:9,10
136:17,18,20
137:7,14
147:15

**t**

**t** 5:1,10 6:1 7:1
8:1 144:4
**take** 5:12 19:4
24:3 30:15
48:2,3 73:22
78:2 90:21
91:16 113:23
114:23 124:2
124:25 131:11
131:21 136:4
141:19 142:10
152:11
**taken** 9:8 71:18
73:4 93:18
141:24 153:6
**takes** 23:24
76:18 94:19
**talk** 11:3,4
12:17 22:7
23:15 32:19
36:11 47:4,13
47:17 74:1
77:18 103:13
108:25 143:10
**talked** 50:11
57:24 78:6,25
89:23 94:5
143:14 146:21
147:5,6
**talking** 33:19
33:23 34:1
38:6 45:19
76:21 77:16
95:22 98:20

102:18 118:23
132:19 135:2,3
145:16,23
149:21 151:12
151:20
**task** 50:17
**taylor** 8:5 34:4
38:14 115:11
116:15,18,20
116:23
**team** 34:3,4
38:4,10,12,14
38:19 105:12
116:22 139:25
143:21
**technically**
86:24 87:8
**technological**
28:18
**technology**
14:17
**telecom** 20:16
22:17 23:1
24:19 25:12
51:2 115:15,25
120:13
**tell** 24:14 25:20
36:22 40:23
41:12 52:25
67:19 69:23
72:22,22 87:7
98:15 99:7
100:25 105:10
105:10 113:22
119:8 130:24

**telling** 82:25
99:21 100:5
104:18 112:8
119:17 121:4
122:25 123:1
**tells** 39:14
129:13,14
**temperature**
114:19
**ten** 11:17 48:3
131:21
**tend** 142:21
**tennessee** 3:12
153:5
**tenure** 147:7
**term** 8:6 17:6
21:2 33:5
35:11 39:1
41:3 81:10
86:20 92:4
115:13,15,18
132:6,25
**terminated**
43:2 58:12
**termination**
59:18 92:20
99:1 148:8,9
**terms** 20:6
36:12 97:12
147:7
**testified** 9:17
10:25 58:19
71:25 117:20
122:10 130:11
140:13,17

Alpha Reporting
A Veritext Company

**[testify - timing]**

| | | | |
|---|---|---|---|
| **testify** 10:8 | 132:20 137:12 | 122:21 126:15 | 33:15,24 35:17 |
| 12:10,14 47:4 | **things** 36:2 | 126:16 127:8,9 | 36:20 37:2,22 |
| 47:18,20 143:7 | 41:18 49:21 | 127:25 128:5 | 42:15 43:25 |
| **testimony** | 54:11 58:1 | 129:7 131:1 | 48:12 50:18 |
| 47:17 56:10 | 67:1 81:2 86:8 | 132:19 133:9 | 54:19 55:11,14 |
| 59:14 71:21 | 95:25 119:21 | 135:7,18,21 | 57:2 58:22 |
| 87:16 88:21 | 123:2 136:21 | 138:8 140:13 | 59:25 62:8 |
| 92:16 109:3 | 143:16 | 142:20 143:7 | 63:12 64:11 |
| 122:12,13 | **think** 17:25 | 143:25 144:5 | 65:23 67:15 |
| 127:3 138:12 | 28:1,7 32:22 | 145:11,12,21 | 77:15 78:7,22 |
| 145:5,8 151:4 | 35:17 36:16 | 147:3 148:13 | 79:24,25 81:10 |
| **texas** 1:1,14 3:6 | 38:12,19 41:14 | 148:16,25 | 83:22 86:7,12 |
| 3:18,24 4:6 9:1 | 41:18 42:6,12 | 149:3 150:4,4 | 86:15 90:23 |
| 11:12,16 30:2 | 42:25,25 43:12 | **thinking** 63:13 | 91:24 92:12 |
| **thank** 12:16 | 45:2,2 49:2,10 | 63:17 104:14 | 93:2,25 97:1 |
| 13:20 19:20 | 49:13 50:10,21 | 105:10,11 | 98:10,25 99:18 |
| 22:14 23:18 | 56:19 58:19 | 119:9 140:21 | 99:23 100:4,15 |
| 25:3,9 29:11 | 61:15,20 62:19 | **third** 14:24 | 100:19 102:23 |
| 33:22 36:5 | 65:6,14 67:3 | 35:1,12 66:20 | 103:4,11 |
| 39:17 42:16 | 67:11,14,14,17 | 90:8 138:1 | 104:16 111:25 |
| 48:11 55:7 | 67:24 70:2 | **thought** 32:16 | 112:19 113:3 |
| 56:7 60:4 | 71:2,5 72:2,4 | 80:2 91:17 | 117:14 118:2,2 |
| 62:21 65:25 | 72:10,21,25 | 92:22 93:6,9 | 118:15,16 |
| 68:13 88:9 | 77:23,24 78:15 | 113:20 118:3 | 119:1,17 |
| 97:4,5,8 | 81:8 82:2 | 120:15 139:4 | 121:10 126:17 |
| 106:19 114:9 | 86:12,24 88:3 | **thousand** 14:23 | 132:4 133:20 |
| 114:18 129:15 | 90:23 93:11,13 | 77:17 95:20 | 136:4 141:16 |
| 132:3 136:5 | 94:13 95:19 | 132:12 | 148:4 149:3 |
| 138:7 140:8 | 98:10 103:22 | **three** 38:20 | 150:24 153:7 |
| 144:18,20,25 | 104:10 108:23 | 83:7 | **times** 72:25 |
| **thereof** 153:12 | 110:5 113:17 | **tie** 27:20 | 83:7 109:8 |
| **thing** 38:15 | 114:3 116:3,7 | **time** 9:13,22 | 136:12 142:3 |
| 71:10 72:22 | 116:22 118:3,8 | 22:3 23:4,8 | **timing** 25:19 |
| 126:4 127:7 | 118:13,14 | 24:3,11 30:25 | 100:7 |
| 129:14 130:25 | 119:4 120:1 | 31:20 33:8,14 | |

Alpha Reporting    800-556-8974
A Veritext Company    www.veritext.com

**[title - trying]**

| | | | |
|---|---|---|---|
| **title**  17:25 | **topics**  5:15 | **transcribed** | 136:11 |
| 21:20 82:18 | 10:13 11:24 | 153:8 | **trouble**  110:15 |
| 141:9 | 12:4,7,11,13 | **transcript** | **troubling** |
| **today**  12:10 | 13:1,8,17 | 114:25 115:2 | 121:16 122:3 |
| 13:13,16 42:8 | 47:19 135:10 | 121:14,20,25 | **true**  10:12 |
| 43:16 53:23 | **total**  90:5 95:16 | 153:14 | 24:22 26:13 |
| 56:13 58:24 | **tracking**  79:1 | **transfer**  40:3,8 | 48:17 55:6 |
| 59:4 68:3 72:4 | **transact**  55:16 | 41:5,20 42:24 | 75:4 121:15 |
| 81:12 82:24 | 128:19,25 | 44:1,13 50:2 | 122:13 124:12 |
| 83:4 87:16 | 146:16 | 54:7 56:12 | 125:20 127:9 |
| 88:21 91:11 | **transaction** | 59:5,23 62:2 | 149:25 |
| 92:17 97:4 | 8:16 19:24 | 69:19,24 70:5 | **truly**  93:16 |
| 103:23 105:16 | 23:5,6 33:10 | 70:9,15,19,20 | **trust**  33:5,9 |
| 109:3 122:13 | 35:25 38:16 | 71:23 80:8 | 113:10 |
| 131:2 132:4 | 39:3 42:15 | 85:4 86:2 | **trustee**  3:20 4:3 |
| 134:24 151:2 | 52:19 55:4 | 97:16 109:21 | 43:19 110:23 |
| **together**  48:21 | 61:3,4,7,11,13 | 109:23 121:18 | 111:14 120:19 |
| **toggle**  24:25 | 61:22 69:17,25 | 122:6,16 124:7 | 121:14,20 |
| **told**  50:19 | 70:8,10 71:8 | 138:20 | 132:8 134:23 |
| 55:24,25 82:25 | 71:24 73:21 | **transferred** | 144:24 150:5 |
| 95:19 122:2 | 74:16 75:2,12 | 35:24 56:14 | **trustee's**  7:6 |
| **ton**  122:19 | 76:10,13 77:24 | 80:23 85:1 | **trustees**  111:4 |
| 126:11 | 78:17 80:12,17 | 122:11 146:2 | **trusts**  145:15 |
| **took**  33:9 36:3 | 93:10,17 94:22 | **transfers**  135:1 | **truthfulness** |
| 39:8 78:18 | 124:22 126:25 | **transition** | 119:5 |
| 91:1 93:25 | 128:8 136:15 | 126:9 | **try**  13:22,25 |
| **top**  6:17 7:13 | 136:19,22 | **transitioned** | 58:5 68:22 |
| 7:16,20,23 8:7 | 147:9 148:2 | 118:25 | 80:3 81:16 |
| 8:11 65:14,18 | 149:20 | **transitioning** | 122:8 |
| 109:19 117:12 | **transactions** | 119:1 | **trying**  28:15 |
| **topic**  11:23 | 54:4 60:2 62:6 | **travel**  74:15 | 44:23 50:15 |
| 46:17 47:5,10 | 87:1 135:4 | **travis**  3:23 | 53:19 59:19 |
| 47:18 49:25 | 138:11 146:17 | **treasury**  50:9 | 62:3,8 73:25 |
| 50:7 53:19 | 147:14,14 | **tried**  76:22 | 75:21 76:11 |
| 62:20 | | 93:6 116:3 | 79:15,17,25 |

Alpha Reporting
A Veritext Company

**[trying - viable]**

80:11,17 81:5
83:1 86:10
91:24 92:19
99:7 100:12,20
102:25 104:15
105:4 111:22
113:3,18 114:6
115:14 117:24
118:15 119:17
119:22,23
120:25 121:11
122:23 129:24
142:10
**turn**   9:13
**twice**   42:19
**two**   11:19 13:5
20:24 21:9,13
22:5 25:22
27:21 30:11,13
30:21,22 33:8
35:17,19 41:18
48:22 49:5,8
54:3 59:15
75:2,10 76:24
77:20 86:8
90:5,15 91:7
92:13 94:11
96:14 101:15
101:17 104:3
106:16 107:10
107:24 109:1,3
111:6 119:21
125:8,8,12
132:4 140:4
141:17 145:17

145:21
**twofold**   92:11
**type**   39:12
149:15
**types**   136:19,19
**typically**   38:3
64:9 136:22
142:2,14

### u

**ucc**   31:5 36:1
43:2,11 57:7
57:19,23 58:6
58:11,16,17,21
78:10 145:20
151:13
**uccs**   57:1 78:4
78:6,7
**ultimately**   45:4
49:4
**umb**   3:20 7:8
97:17 134:22
**unbearably**
114:24
**uncommon**
66:14
**uncooperative**
33:11
**under**   19:8
35:19 45:25
86:19 151:13
153:8
**underneath**
45:11
**undersigned**
153:3

**understand**
11:5 18:15
20:1,24 21:21
27:12 50:15
59:20 76:16
80:1,12,14
96:25 116:6,14
130:13 147:13
147:19
**understanding**
10:7 15:6
16:22 21:2,25
24:20 25:20
53:20 55:13,21
56:11 62:25
70:14,18
104:15 110:8
132:18,24
133:1,13
135:15
**understood**
11:7 12:24
23:25 28:13
107:18 140:3
**unique**   137:4
**united**   1:1
**unquote**   42:10
89:11 91:1
102:21
**unreasonable**
42:13
**unsecured**
24:13 43:20
79:8

**untruthful**
119:8
**unwind**   94:22
**update**   107:16
**upload**   28:16
**us.dlapiper.c...**
3:19
**use**   17:6 20:14
30:20 86:17
87:1 99:20
132:6 136:25
137:14
**used**   94:3
**user**   126:13
**uses**   136:18
**using**   92:4

### v

**valid**   78:14
153:4
**value**   55:8,19
56:3 133:14,18
**vargeroplos**
3:7
**variety**   33:6
37:19,21 50:12
67:1 86:17
**various**   135:1
143:16 144:9
**verification**
140:6
**veritext**   9:12
**version**   89:24
**versions**   118:17
**viable**   102:16

[vice - workout]

**vice** 10:18
**victoria** 3:4
　13:2 145:6
**video** 9:6
**videoconfere...**
　1:13 2:1,5 3:5
　3:11,17,23 4:5
　4:9
**videographer**
　4:12 9:4,12
　48:6,9 84:2,5
　131:24 132:1
　134:7,14,17
　152:10,14
**videotaped**
　1:13 2:1
**view** 139:8
**viewed** 79:8

**w**

**waiting** 26:20
　34:11 51:13
　98:15 150:5
**walk** 136:11
**walker** 3:4 13:3
　120:11
**want** 16:9 24:3
　25:1 29:4
　42:12 43:14
　47:9 52:5 54:5
　60:14 61:9
　71:22 76:23
　81:15 83:18,19
　91:21,22,22
　99:15,22 100:6
　101:1,1 122:20

124:5 127:12
131:9 135:22
138:9 141:24
143:1 152:11
**wanted** 58:5
　91:24 92:13
　99:10 101:4
　131:7,7 136:24
**wanting** 54:13
　99:18 103:5
**warrant** 63:11
**watch** 131:17
**water** 114:13
　114:17
**way** 13:23 41:8
　43:9 44:9
　54:12 58:7,8
　58:23 62:4
　71:23 77:11
　83:8 86:18
　88:7 93:5,8
　94:12,20
　104:20 115:20
　116:2 125:4
　137:1 139:14
　153:11
**ways** 76:24
**we've** 39:15
　41:14 45:19
　46:8 49:18
　53:8 55:25
　56:24 57:24
　59:8 63:9 70:3
　78:18 79:14,24
　80:19 83:1

88:17 89:13,23
94:5 98:16
100:3 104:25
113:9 118:25
121:6 125:6,21
130:2 131:14
143:16
**wednesday**
　1:15 2:4 9:1,4
**weeds** 125:25
**week** 67:15
　111:10,11
　141:17
**weeks** 110:18
**went** 37:18
　45:3 49:3 76:7
　110:6
**west** 1:25 2:4
　153:18
**whatnot** 36:1
**whereof** 153:15
**white** 90:4
**wiebe** 8:5
　115:11
**wife** 116:25
**wilkinson** 6:19
**willing** 126:4
**willingness**
　54:10
**winter** 118:3
**wired** 136:20
**wish** 49:12
**withdraw**
　138:17

**withdrawal**
　44:12 52:2
　53:6 62:12
**withdrawn**
　48:25
**witness** 1:14
　5:3 9:14,16
　19:12 24:25
　25:3,5 32:11
　52:4,14 60:10
　60:16 64:18
　65:13 66:22
　81:11,22 82:7
　84:10 104:7,13
　106:25 110:12
　114:12 115:1
　117:6 127:17
　128:4 130:20
　131:14,19
　133:17,22
　135:16 139:3
　142:13 144:16
　147:25 153:15
**words** 104:21
**work** 80:17
　107:22 113:3
　119:18,23
　135:2
**worked** 10:20
**working** 11:13
　38:15,16 42:14
　96:20 113:19
　139:13 143:16
**workout** 83:2
　117:24 122:18

**[works - zoom]**

| | |
|---|---|
| **works** 139:25 | 147:25 149:17 |
|   144:3 | **year** 23:11,12 |
| **world** 11:18 |   23:16,16 32:18 |
| **worried** 63:4 |   32:20 35:13 |
| **worth** 81:3 |   72:8 140:20,24 |
|   132:12 | **years** 10:23 |
| **wrap** 132:5 |   11:17 113:11 |
| **write** 52:4 | **yecj** 126:13 |
|   75:23 | **yenne** 6:17,22 |
| **writes** 97:10 |   34:4 38:13 |
|   108:11 109:16 |   65:19,21,24 |
| **writing** 115:10 |   66:1,19 67:3 |
|   149:16 |   116:23 143:8 |
| **wrong** 42:4 |   143:10,22 |
|   53:24 69:2 |   144:8 |
|   122:9 139:16 | **yenne's** 116:25 |
|   140:11 | **yep** 69:14 |
| **wrote** 122:17 |   88:13 130:1 |

**x**

**x** 5:1,1,10,10
6:1,1 7:1,1 8:1
8:1 153:14

**yhsa** 40:4,19
44:14

**z**

**y**

**y** 126:13 144:4
**y'all** 83:18,22
104:14 115:1
**yeah** 25:2
38:12 45:2
53:4 65:15
83:21 103:18
110:14 134:4,9
136:16 139:3
141:10 142:1
145:14 147:3

**zach** 120:15
**zachary** 8:5
115:11
**zero** 74:5,12
105:13
**zeroed** 74:3
**zoom** 9:11

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.