1        IN THE UNITED STATES BANKRUPTCY COURT

         FOR THE NORTHERN DISTRICT OF TEXAS

2               DALLAS DIVISION

3   In re:                    Chapter 7

4   GOODMAN NETWORKS, INC.    Case No.:

       Debtor.                22-31641(MVL)

5

6

       **************************************************

7            ORAL AND VIDEOTAPED DEPOSITION OF

8                   JAMES GOODMAN

9                  FEBRUARY 1, 2023

10                (REPORTED REMOTELY)

       **************************************************

11

12       ORAL AND VIDEOTAPED DEPOSITION OF JAMES GOODMAN,

13   produced as a witness at the instance of the Original

14   Petitioning Creditors, and duly sworn, was taken in the

15   above-styled and numbered cause on February 1, 2023,

16   from 9:58 a.m. to 7:08 p.m., before Donna Wright, CSR

17   in and for the State of Texas, reported by machine

18   shorthand and remotely via Zoom, pursuant to the

19   Federal Rules of Civil Procedure, the 22nd Emergency

20   Order Regarding the COVID-19 State of Disaster, and any

21   stipulations or agreements stated on the record or

22   attached hereto.

23

24

25

1                    A P P E A R A N C E S
2

    FOR THE PETITIONING CREDITORS:
3        Mr. Ryan P. Phair
         HUNTON ANDREWS KURTH
4        2200 Pennsylvania Avenue, NW
         Washington, DC 20037
5        (202) 955-1921
         rphair@huntonak.com
6
              -and-
7
         Mr. Brian M. Clarke
8        HUNTON ANDREWS KURTH
         200 Park Avenue
9        New York, New York 10166
         (212) 850-2825
10       brianclarke@huntonak.com
11            -and-
12       Mr. Philip Michael Guffy
         HUNTON ANDREW KURTH
13       600 Travis Street
         Suite 4200
14       Houston, Texas 77002
         (713) 220-4200
15       pguffy@huntonak.com
16

    FOR JAMES GOODMAN:
17       Mr. Matthias Kleinsasser
         Ms. Sahrish Soleja
18       WINSTEAD, P.C.
         300 Throckmorton Street
19       Suite 1700
         Fort Worth, Texas 76102
20       (817) 420-8281
         mkleinsasser@winstead.com
21       ssoleja@winstead.com
22
23
24
25

```
 1    FOR ARRIS SOLUTIONS, INC.:
           Mr. Ryan J. Sullivan
 2         Ms. Amy Ruhland
           Ms. Abigail Griffith
 3         DLA PIPER
           303 Colorado Street
 4         Suite 3000
           Austin, Texas 78701
 5         (512) 457-7000
           ryan.sullivan@dlapiper.com
 6         amy.ruhland@dlapiper.com
           abigail.griffith@dlapiper.com
 7
                 -and-
 8
           Ms. Laura Elizabeth Sixkiller
 9         DLA PIPER
           2525 East Camelback Road
10         Suite 1000
           Phoenix, Arizona 85016
11         (480) 606-5100
           laura.sixkiller@us.dlapiper.com
12
13    FOR FEDEX SUPPLY CHAIN LOGISTICS & ELECTRONICS, INC.:
           Mr. Robert Campbell Hillyer
14         Mr. Adam Langley
           BUTLER SNOW
15         6075 Poplar Avenue
           Suite 500
16         Memphis, Tennessee 38119
           (901) 680-7322
17         cam.hillyer@butlersnow.com
           adam.langley@butlersnow.com
18
                 -and-
19
           Ms. Candice M. Carson
20         BUTLER SNOW
           2911 Turtle Creek Boulevard
21         Suite 1400
           Dallas, Texas 75219
22         (469) 680-5505
           candice.carson@butlersnow.com
23
24
25
```

```
 1    FOR GOODMAN NETWORKS, INC.:
           Ms. Andrea S. Hartley
 2         AKERMAN LLP
           98 Southeast Seventh Street
 3         Suite 1100
           Miami, Florida 33131
 4         (305) 982-5682
           andrea.hartley@akerman.com
 5
                   -and-
 6
           Mr. David W. Parham
 7         AKERMAN LLP
           2001 Ross Avenue, Suite 3600
 8         Dallas, Texas 75201
           (214) 720-4300
 9         andrea.hartley@akerman.com
           david.parham@akerman.com
10
11    FOR UMB BANK, N.A., AS INDENTURE TRUSTEE:
           Mr. Eric A. Schaffer
12         STONECIPHER LAW FIRM
           125 First Avenue
13         Pittsburgh, Pennsylvania 15222
           (412) 391-8510
14         eschaffer@stonecipherlaw.com
15
      FOR SCOTT SEIDEL, CHAPTER 7 TRUSTEE:
16         Mr. Davor Rukavina
           Ms. Brenda L. Funk
17         MUNSCH HARDT KOPF & HARR, P.C.
           700 Milam Street
18         Suite 800
           Houston, Texas 77002
19         drukavina@munsch.com
           bfunk@munsch.com
20
21    ALSO PRESENT:
           Don Harris - Videographer
22         Allan Brown, Mike Gabel, Kevin Gormly, and Thomas
           Quinlen - In-House Counsel for FedEx Supply Chain
23         Logistics & Electronics, Inc.
           Rebecca Dominguez
24         Scott Seidel
           Terri Weisman
25
```

Page 5

1                              INDEX
2
3      Appearances.....................................    2
4
5
6    JAMES GOODMAN
7
       Examination by Mr. Phair........................    7
8      Examination by Mr. Schaffer....................  182
       Examination by Mr. Langley.....................  203
9      Examination by Mr. Sullivan....................  262
       Examination by Mr. Rukavina....................  268
10     Examination by Mr. Kleinsasser.................  317
11     Witness' Signature Page........................  323
       Reporter's Certificate.........................  325
12
13
                              EXHIBITS
14
     NUMBER            DESCRIPTION                    PAGE
15
       Exhibit 1     ..............................    62
16                   James Goodman Notice of
                     Production Subpoena
17     Exhibit 2     ..............................    62
                     Goodman_000142 - AMRR Note
18     Exhibit 3     ..............................    68
                     Goodman001295 - James G.
19                   Resignation 2/1/22
       Exhibit 4     ..............................    93
20                   Goodman000368 - James G. Bond
                     Purchase
21     Exhibit 5     ..............................    97
                     Hudson_0067 - Bond Purchase
22                   Agreement
       Exhibit 6     ..............................   106
23                   Goodman000372 - James G./Shalom
                     Bond Purchase
24     Exhibit 7     ..............................   113
                     Goodman000374 - James G. e-mail
25                   May 2022

Page 6

1    Exhibit 8      ..............................   125
                    Goodman000590 - 18920 Share
2                   Purchase e-mail
     Exhibit 9      ..............................   128
3                   Goodman_000140 - 18920 Preferred
                    Shares Letter
4    Exhibit 10     ..............................   131
                    Goodman_000638 - 18920 NW
5                   Settlement Agreement
     Exhibit 11     ..............................   150
6                   Goodman No. 4 - Payment Chart
     Exhibit 12     ..............................   161
7                   Goodman_007648 - Frinzi Texts
                    re AMRR wires and more
8    Exhibit 13     ..............................   171
                    CFGI Presentation 6/8/22
9    Exhibit 14     ..............................   203
                    James Goodman - Amended
10                  Deposition Subpoena with
                    attachment 2/1/23
11   Exhibit 15     ..............................   205
                    Rao e-mail re Goodman Networks
12                  Board Members 1/4/23
     Exhibit 16     ..............................   209
13                  FSCLE Ex. 15 - Debtor's Sworn
                    Response to Interrogatory No. 5
14   Exhibit 17     ..............................   221
                    Goodman_002739 - Goodman
15                  Networks and Subs Consolidated
                    Financials
16   Exhibit 18     ..............................   224
                    Goodman000530 - Goodman
17                  Repurchase of Shares of Common
                    Stock
18   Exhibit 19     ..............................   237
                    Hudson_0012 Flow of Funds
19   Exhibit 20     ..............................   238
                    Acct. No. 4352 Prosperity Bank
20                  Statements
     Exhibit 21     ..............................   257
21                  AMRR Press Release
     Exhibit 22     ..............................   265
22                  James Goodman's Response to
                    ARRIS's First Set of
23                  Interrogatories 3/28/22
24
25

Page 7

1                    THE VIDEOGRAPHER:  On the record at

2        9:58 a.m.  My name is Don Harris, representing

3        Veritext.  The date today is February 1st, 2023.

4        Please note that this deposition is being conducted

5        virtually.  Quality of recording depends on the quality

6        of camera and Internet connection of participants.

7        What is seen from the witness and heard on the screen

8        is what will be recorded.  Audio and video recording

9        will continue to take place unless all parties agree to

10       go off the record.

11                   This is the video-recorded deposition of

12       James Goodman in the matter of Re: Goodman Networks,

13       Inc., filed in the United States Bankruptcy Court for

14       the Northern District of Texas, Dallas Division, Case

15       No. 22-31641 (MVL).

16                   THE REPORTER:  Is that it?  Okay.  Are

17       you ready for me to swear in the witness?

18                   THE VIDEOGRAPHER:  Yes.

19                   THE REPORTER:  Okay.

20                   Okay.  Mr Goodman, will you please raise

21       your right hand?

22                        JAMES GOODMAN,

23       having being first duly sworn, testified as follows:

24                        EXAMINATION

25       BY MR. PHAIR:

Page 8

1      Q.   Good morning, Mr. Goodman.  My name is

2   Ryan Phair.  I'm an attorney at Hunton Andrews Kurth in

3   Washington, DC.  Before we get started I believe

4   there's someone who wants to make a statement for the

5   record, and now would be the time to do so.

6              MR. RUKAVINA:  Yes.  Thank you, Ryan.

7   This is Davor Rukavina.  Just a few preliminary matters

8   to address.  I represent Scott Seidel, who is the

9   trustee.  With me is Ms. Brenda Funk.  If I lose

10  connectivity, which I'm liable to do, please continue

11  without me.  Ms. Funk will take over for me.

12              Second, as the parties know --

13  Mr. Goodman may not know -- the trustee has waived the

14  privilege through December 12th of last year for

15  anything having to do with the involuntary, including

16  the decision whether to contest it or not.  The trustee

17  has not waived the privilege otherwise.

18              Mr. Goodman, as a former director, I've

19  asked your counsel to please confer with him if you

20  think a question would invade that privilege, and I

21  would ask Mr. Kleinsasser then to communicate with me.

22              I would also confirm for the record on

23  behalf of the trustee that we agree to the protective

24  order that Mr. Kleinsasser has in place and we will be

25  signing it.

1          Thank you for your time.

2               MR. PHAIR:  Great.

3     Q.   Mr. Goodman, as I said, my name is Ryan Phair.

4     I'm an attorney at Hunton Andrews Kurth here in

5     Washington, DC, and I'm counsel for the original

6     petitioning creditors, holders of the majority of 8

7     percent senior secured notes issued by Goodman

8     Networks, Inc.

9               THE REPORTER:  Can you speak up a little

10    bit, Ryan?  I don't know --

11              MR. PHAIR:  Sure.

12              THE REPORTER:  Okay.

13    Q.   Mr. Goodman, could you please state your full

14    name for the record?

15    A.   James E. Goodman, Jr.

16    Q.   And what's your middle name?

17    A.   Elmer.

18    Q.   Where do you currently reside?

19    A.   San Antonio, Texas.

20    Q.   What's your address?

21    A.   103 Tomahawk Trail.

22    Q.   Do you have any other residences?

23    A.   Not primary residence, no.

24    Q.   Do you have any secondary residences?

25    A.   I do.

Page 10

1      Q.    Where is that?

2      A.    College Station, Texas.

3      Q.    And what's the address in College Station,

4   Texas?

5      A.    3311 Willow Ridge.

6      Q.    Okay.  Are there any other secondary or

7   tertiary residences?

8      A.    No, there's not.

9      Q.    Are you currently employed?

10     A.    I am.

11     Q.    Who is your current employer?

12     A.    Myself.

13     Q.    Do you have a business entity that -- that

14   you -- that you have incorporated yourself?

15     A.    I do.  It's Goodman Investments.

16     Q.    And what is your role in Goodman Investments?

17     A.    I'm the owner.

18     Q.    Do you have any other roles either as an

19   officer, director, or anything like that?

20     A.    I do -- I do not.

21     Q.    Other than Goodman Investments, are you

22   employed by any other company at this time?

23     A.    I'm not.

24     Q.    Have you ever been deposed before?

25     A.    I have.

Page 11

1      Q.   How many times?

2      A.   Two to three times.

3      Q.   Okay.  And in what connection were you deposed

4   previously?

5      A.   I'm sorry, what was the question?

6      Q.   In what capacity were you deposed previously?

7      A.   I was a witness or a defendant.

8      Q.   Defendant in a lawsuit?

9      A.   Yes.

10      Q.   And when was that?

11      A.   I don't know.  I can't recall the dates.

12      Q.   Was it five years ago, ten years ago, 20 years

13   ago?

14      A.   Five years ago.

15      Q.   All right.  And what was that lawsuit about?

16      A.   It was an employment contract.

17      Q.   And you were deposed in connection with that

18   lawsuit?

19      A.   Yes.

20      Q.   The employment, was it -- did that relate to

21   Goodman Networks or some other entity?

22      A.   No, it was for another entity.

23      Q.   Which entity?

24      A.   It was for Genesis Networks.

25      Q.   Okay.  Other than that instance, have you been

Page 12

1    sued previously?

2        A.   Yes.

3        Q.   What other lawsuits have you been involved in?

4        A.   There was another employment contract.

5        Q.   And what company was that with?

6        A.   It was Genesis Networks Integration.

7        Q.   Okay.  Other than the two lawsuits where you

8    were a defendant in employment litigation against

9    Genesis, were there any other lawsuits that you were

10   involved in?

11       A.   Oh, there's -- I think there's a couple of

12   others.  But, again, they were contract disputes, and

13   they were within the last five years.

14       Q.   Did any of them involve Goodman Networks,

15   Inc.?

16       A.   No.

17       Q.   Did any of them involve Genesis?

18       A.   Yes.

19       Q.   Other than the two that we mentioned, were

20   any -- were there any other lawsuits involving Genesis?

21       A.   Not that I can recall.

22       Q.   Have you ever been involved in a lawsuit where

23   someone has accused you of fraud?

24       A.   Not that I can recall, no.

25       Q.   Have you ever been subject to a government

Page 13

1    investigation?

2        A.   No.

3        Q.   Okay.  I'm sure your counsel has given you an

4    overview of what to expect today, but just briefly I

5    want to just kind of walk through sort of the ground

6    rules of how we'll conduct the examination today.

7              My name is Ryan, and I'll be conducting

8    the examination for a significant portion of the time.

9    There will be other attorneys or different counsel that

10   will come in after me today that will also ask you

11   questions.  So I'll ask you questions, you'll give me

12   answers.  A court reporter is here to take and

13   transcribe all of that.  We have a videographer here

14   who's also taking a video of all of that.  Do you

15   understand?

16       A.   Yes.

17       Q.   A couple just, you know, practical things that

18   I just want to touch on.  When I ask you a question, I

19   would appreciate it if you would just, you know, maybe

20   take a beat before you answer, just to give your

21   counsel and anyone else who has an objection time to

22   interpose that objection.  That would be helpful and I

23   think the court reporter would appreciate it.

24             Also, we would ask that you give us a

25   verbal response.  The court reporter can't take down,

Page 14

1   you know, if I ask you a question and you shake your

2   head yes or no.  We need to have a live answer.

3                   We will be taking breaks throughout the

4   day.  You can tell us at any point if you want to take

5   a break.  The only stipulation is that if there's a

6   question pending we ask that you answer the question

7   before we take a break; is that fair?

8       A.   Yes, sir.

9       Q.   Is there any reason why you can't testify --

10                  MR. KLEINSASSER:  James just let him

11  finish just so we -- sorry, Ryan.

12                  James, let him -- let him finish so that

13  we have a clear record.

14                  THE WITNESS:  Okay.

15                  MR. KLEINSASSER:  So just do a -- that's

16  what he's saying.  Do a pause after his question just

17  so I can object or y'all don't overlap on question and

18  answer, okay?

19                  THE WITNESS:  Okay.

20                  MR. KLEINSASSER:  Thanks.

21                  THE VIDEOGRAPHER:  Hey, while we're

22  stopped down here, Mr. Phair, your audio -- I need to

23  work on your audio, so we need to go off the record for

24  just a second --

25                  MR. PHAIR:  Okay.

Page 15

1           THE VIDEOGRAPHER:  -- before we get going

2    much further.

3           Off the record at 10:07 a.m.

4      (Recess from 10:07 a.m. to 10:10 a.m.)

5           THE VIDEOGRAPHER:  On the record at

6    10:10 a.m.

7           MR. PHAIR:  Great.  Thank you.

8      Q.   (BY MR. PHAIR)  Mr. Goodman, are you familiar

9    with a company called Goodman Networks, Inc.?

10     A.   I am.

11     Q.   What business is Goodman Networks, Inc. in?

12     A.   None.

13     Q.   You mean currently?

14     A.   Currently, yes.

15     Q.   What do you mean by "none"?  Like it no longer

16   is an operating business entity, is that what you're

17   saying?

18     A.   They currently don't have a customer.

19     Q.   Is it currently an operating business entity,

20   though?

21     A.   It is, yes.

22     Q.   Does it have any ongoing revenues?

23     A.   I don't know.

24     Q.   Does it have a board?

25     A.   I don't know.

Page 16

1     Q.    Does it have any officers?

2     A.    I do not know.

3     Q.    What is your relationship with Goodman

4  Networks, Inc.?

5     A.    I'm a shareholder.

6     Q.    How did you come to be involved with Goodman

7  Networks, Inc.?

8     A.    I was a founding member.

9     Q.    When did you found Goodman Networks, Inc.?

10    A.    I think in 2001.

11    Q.    And what was your original role with Goodman

12  Networks, Inc. in 2001?

13    A.    I cannot recall.

14    Q.    Were you ever an officer of Goodman Networks,

15  Inc.?

16    A.    Yes.

17    Q.    What role did you have as an officer of

18  Goodman Networks, Inc.?

19    A.    President.  I can't remember.

20    Q.    And what time period were you president of

21  Goodman Networks, Inc.?

22    A.    2001.

23    Q.    2001 until when?

24    A.    I don't recall.

25    Q.    All right.  Were you the president of Goodman

Page 17

1    Networks, Inc. at any point after 2001?

2         A.   No.

3         Q.   So the only time that you ever held an officer

4    role at Goodman Networks, Inc. was in 2001?

5         A.   In -- as president, because that was the

6    question that you asked me?

7         Q.   Yes, sir.

8         A.   As president or another officer role?

9         Q.   Did you have another officer role at some

10   point in time?

11        A.   I was an interim CEO, non-officer interim CEO

12   in like 2022 or 20 --

13        Q.   So did you have any other role other than as a

14   shareholder with Goodman Networks, Inc. other than when

15   you were president in 2001 and when were you interim

16   CEO in 2022?

17        A.   I could have.  I just don't recall.

18        Q.   When you were interim CEO, what was your role?

19        A.   Just as a board member.

20        Q.   Were you --

21        A.   The interim role was -- was just to try to

22   look for -- to try to help the company.

23        Q.   When did you begin as interim CEO?

24        A.   In 2022.  It would have been -- I'm not

25   sure -- the third quarter or fourth quarter.

Page 18

1      Q.   Was there a formal written agreement

2   appointing you as interim CEO?

3      A.   I'm not sure.  I can't recall.

4      Q.   Did you ever sign an employment agreement?

5      A.   Probably not -- no.  Not an employment

6   agreement, no.

7      Q.   Why did you become interim CEO in the third or

8   fourth quarter of 2022?

9      A.   When AT&T canceled the contract, the existing

10   or previous CEO and, you know, other staff started

11   resigning and leaving the company.

12      Q.   You mentioned a contract with AT&T.  What was

13   that?

14      A.   The contract was for the DirecTV installation.

15      Q.   And was that the primary source of Goodman

16   Networks, Inc.'s business?

17      A.   It was.

18      Q.   Do you know how much revenue, ballpark, the

19   company would derive from the AT&T contract?

20            MR. KLEINSASSER:  Objection to form.

21      A.   I do not.

22      Q.   Who was the CEO who preceded you?

23      A.   It was Mark Keiffer.

24            THE REPORTER:  Was that Keiffer?

25            THE WITNESS:  Keiffer, yes.

Page 19

1           THE REPORTER:  Keiffer.

2      Q.   When did AT&T cancel the contract?

3      A.   I want to say it was December of '21.

4      Q.   And then I assume that the resignation

5  happened in --

6           MR. LANGLEY:  This is Adam Langley,

7  Butler Snow.  We just lost our primary internet

8  connection, so I've been out for the last five minutes.

9  I'm on a hotspot now, so -- we can keep going, but I

10  just want to make that known on the record that we were

11  absent for the last five minutes.

12           MR. PHAIR:  Great.  Thank you, Adam.

13      Q.   So the resignation that you talked about,

14  those primarily occurred in Q1-Q2 2022 after the

15  cancellation of the AT&T contract in December of 2021?

16      A.   I can't recall.

17      Q.   How many people resigned?

18      A.   Five, six.

19      Q.   And how did it come to be that you were

20  appointed as the interim CEO?

21           MR. KLEINSASSER:  Objection, form.

22      A.   Yeah, I don't recall.

23           THE REPORTER:  Who was that that just

24  objected?

25           MR. KLEINSASSER:  Matthias Kleinsasser.

Page 20

1    I'm Mr. Goodman's counsel.

2              THE REPORTER:  Oh, okay.  I didn't -- all

3    right.

4              MR. KLEINSASSER:  And I'm sorry, ma'am.

5    Are you -- if you're having trouble hearing me, let me

6    know.

7              THE REPORTER:  No, I hear you.  I just

8    was --

9              MR. KLEINSASSER:  Okay.  Thank you.

10       Q.   So this would have been six months ago where

11   you assumed the role as interim CEO; is that correct?

12       A.   Could you say that again?

13       Q.   You said that you were -- took on the role of

14   interim CEO in Q3-Q4 of 2022.  So that would have been

15   approximately six, seven months ago, right?

16       A.   Yeah.  I would have to look to be sure of the

17   exact dates.

18       Q.   Okay.  So what were the circumstances that led

19   to you becoming interim CEO?

20       A.   The previous CEO resigned and left.  You know,

21   no one else at the company, you know, wanted to assume

22   the position, the role, so that's why I was appointed

23   the interim CEO.

24       Q.   Who appointed you interim CEO?

25       A.   It would have had to have been the board.

1      Q.   And who was on the board at the time?

2      A.   I can't recall.

3      Q.   This would have been six, seven months ago.

4   Can you recall any of the members who were on the board

5   six, seven months ago that appointed you as interim CEO

6   of Goodman Networks?

7      A.   It -- you know, I'm not sure if Mark Keiffer

8   was still on the board or if he already left or if it

9   was just him and I.  But, no, I would have to go back

10  and look to see who was on the board at that time.

11     Q.   All right.  So let's -- let's just take the

12  last year, 2022.  Can you name for me, besides

13  yourself, anyone else who you're aware of sitting here

14  today that was on the board of Goodman Networks, Inc.?

15     A.   At what time?

16     Q.   In any of 2022.

17     A.   It would have been Mark Keiffer, myself.

18  There was one other gentleman.  I can't recall his

19  name, but he was on the board for, you know, just a few

20  months before he resigned.

21     Q.   And what can you -- describe for me this

22  gentleman.

23     A.   He was the -- the previous executive at AT&T.

24     Q.   Do you know what his role was at AT&T?

25     A.   I guess he was the CEO or the CFO for the

Page 22

1    telecom division.

2        Q.    And when was he on the board?

3        A.    I want to say in 2022, like early, second

4    quarter.

5        Q.    Okay.  So other than Mr. Keiffer, yourself,

6    and this gentleman from AT&T, is there anyone else

7    sitting here today that you could identify as being on

8    the board of Goodman Networks, Inc. in 2022?

9        A.    Yeah, Jim Frinzi would have joined the board.

10       Q.    Anyone else?

11       A.    I think my son was on the board for, you know,

12   a few months.

13       Q.    What's your son's name?

14       A.    Jake Goodman.

15       Q.    Anyone else?

16       A.    Not that I can recall, no.

17       Q.    Where would I look to find out who the members

18   of the board were?  Was there something in Goodman

19   Networks, Inc.'s records that would indicate who was

20   and was not on the board?

21       A.    Yeah, the minutes, the corporate minutes would

22   have it.

23       Q.    Were there resolutions that were adopted to

24   appoint members to the board?

25       A.    There should have been, yes.

Page 23

1    Q.   And what about in terms of resignations?  Were

2    there resignation letters generally resigning from the

3    board?

4    A.   Typically, yes.

5    Q.   Okay.  So let's take those individuals

6    separately.  So Mr. Keiffer at some point in 2022 was

7    on the board.  I assume he was no longer on the board

8    after he resigned his position as CEO; is that fair?

9    A.   That's fair.

10              MR. KLEINSASSER:  Objection, form.

11    Q.   When did Mr. Keiffer resign from the board?

12    A.   I'm not sure.  I would have to go back and

13    look.

14    Q.   Putting aside specifics, I mean, are we

15    talking more Q1 2022, Q4 2022?  Just ballpark it for

16    me.

17    A.   Just taking a guess, I would say second

18    quarter of 2022.

19    Q.   And was there a reason why Mr. Keiffer left

20    the board?

21    A.   You would have to ask him.

22    Q.   Did he ever express to you a reason why he

23    left the board?

24    A.   I can't recall.

25    Q.   Have you ever been in communication with

Page 24

1    Mr. Keiffer?

2        A.   Maybe once or twice a year I'll --

3        Q.   And did the -- so yourself.  The AT&T

4    gentleman, when did he join the board?

5        A.   I can't remember.  The -- you know, I would

6    really have to go back, look at the minutes, and then I

7    could tell you the date whenever he joined and

8    resigned.

9        Q.   Is the -- did he resign after AT&T terminated

10   the contract?

11               MR. KLEINSASSER:  Objection, form.

12       A.   He did.

13       Q.   Okay.  And then Jake Goodman, your son, when

14   was your son appointed to the board?

15       A.   I think it was in that second quarter, that

16   first quarter or second quarter.

17       Q.   And why was he appointed to the board?

18       A.   Just for experience.

19       Q.   And who was on the board when you were

20   appointed as interim CEO?

21       A.   Mark Keiffer, and I can't recall who else.  It

22   that would have been in 2019.

23       Q.   I'm sorry, I thought you said that you were

24   appointed interim CEO in 2022.

25       A.   That's correct, yeah.

Page 25

1      Q.   So who was on the board when you were

2   appointed interim CEO in 2022?

3      A.   Oh, sorry.  It would have been probably just

4   Mark Keiffer.  I'm not sure if there was somebody else

5   on there.  There probably was.  I would just have to go

6   back and look.

7      Q.   And was there a formal resolution appointing

8   you as interim CEO?

9      A.   I'm not sure.

10      Q.   And then when did you step down as interim CEO

11   of Goodman Networks, Inc.?

12              MR. KLEINSASSER:  Objection, form.

13      Q.   Let me rephrase that.

14              Did you -- are you currently still the

15   interim CEO of Goodman Networks, Inc.?

16      A.   No.

17      Q.   Why not?

18      A.   I have other business interests.

19      Q.   Did you formally resign from Goodman Networks,

20   Inc. as interim CEO?

21      A.   I did.

22      Q.   When did you do that?

23      A.   It would have been in the third quarter

24   of 2022.

25      Q.   And why did you resign?

Page 26

1      A.   I had other business interests.

2      Q.   And who replaced you?

3      A.   Well, I'm not sure if Jim Frinzi stepped in as

4   CEO at that time or if it was somebody else.  I would

5   have to go back and look.

6      Q.   Are you still on the board of Goodman

7   Networks, Inc.?

8      A.   No.

9      Q.   Did you resign from the board of Goodman

10  Networks, Inc.?

11     A.   I did.

12     Q.   Why did you resign?

13     A.   I had other business interests.

14     Q.   When did you resign from the board of Goodman

15  Networks, Inc.?

16     A.   So I gave a verbal in December of 2021, and

17  then I sent -- and then there was a written resignation

18  in -- I think it was like February of 2022.

19     Q.   And did you have any continuing role with the

20  company after your resignation from the board in

21  February of 2022?

22     A.   No.

23     Q.   So you didn't have any communication with the

24  company or anything like that after February 2022?

25     A.   Yes, I would have.

Page 27

1        Q.    And who would you have been communicating with

2    after leaving the company in February 2022?

3        A.    Jim Frinzi.

4        Q.    Okay.  Are you a current shareholder of

5    Goodman Networks, Inc.?

6        A.    Yes.

7        Q.    And do you know what your ownership percentage

8    is, roughly?

9        A.    I'll say -- I'm guessing -- 21 percent,

10   22 percent.

11       Q.    And do you hold that individually or through

12   companies or entities?

13       A.    It would be individually and possibly through

14   a company.  I would have to go back and check.

15       Q.    And are you familiar with a company called

16   Goodman MBE Group, GP, LLC?

17       A.    Yes.

18       Q.    What is that?

19       A.    It's the entity that was created to hold the

20   five brothers' common shares.

21       Q.    And when you say "the five brothers' common

22   shares," what are you referring to?

23       A.    My other four brothers.

24       Q.    And what are their names?

25       A.    It's Jason Goodman, Jonathan Goodman,

Page 28

1    Jody Goodman, John Goodman, and myself, James Goodman.

2        Q.    Do you have a role as manager of Goodman MBE

3    Group, GP, LLC?

4        A.    No.

5        Q.    Are you familiar with a group called Goodman

6    MBE Group, LP?

7        A.    Is that not the same company?

8        Q.    One is -- so two companies, Goodman MBE Group,

9    GP, LLC and Goodman MBE Group, LP.  Are you familiar

10    with both of those companies?

11        A.    Maybe.

12        Q.    Have you ever heard of those companies before?

13        A.    Well, I don't know the structure of how they

14    structured the -- you know, the company, if one is the

15    general partner and the other is, you know, the

16    managing partner.  But, you know, I would have probably

17    referred to them as the same entity.

18        Q.    And who would know that?  Who would know that

19    structure?

20        A.    I, you know, would have to go back and say,

21    "Go look and see who the secretary is," or maybe just

22    ask one of my brothers.

23        Q.    Is there one brother who is most involved in

24    managing the affairs of the two entities?

25        A.    No.

Page 29

1    Q.   Do you have an interest in Goodman MBE Group,

2    LP?

3              MR. KLEINSASSER:  Objection, form.

4    A.   What do you mean?

5    Q.   Like do you have a financial interest in

6    Goodman MBE Group, LP?

7    A.   No, they're -- they don't operate.  Those

8    companies don't operate.  They're just -- they were

9    there just to -- for the common shares to be held in

10   the -- to be held.

11   Q.   Do you have shares in Goodman MBE Group, LP?

12   A.   I should, yes.

13   Q.   And does Goodman MBE Group, LP have shares in

14   Goodman Networks, Inc.?

15   A.   Yes.

16   Q.   Do you know how many?

17   A.   They should have 51 percent.

18   Q.   And does Goodman MBE Group, GP, LLC have

19   shares in Goodman Networks, Inc.?

20   A.   Only one of them should have it.  So if it's

21   not the LP, it's the GP if it's the general partner.

22   But only one of those entities are going to have the

23   51 percent.

24   Q.   After you resigned from the board in February

25   of 2022, were you still being consulted on strategic

Page 30

1  decisions of the company?

2            MR. KLEINSASSER:  Objection, form.

3     A.    Could you ask me the question again, please?

4     Q.    Sure.  After you resigned from the board of

5  Goodman Networks, Inc. in February of 2022, what was

6  the nature of your communications with the company

7  after that?

8            MR. KLEINSASSER:  Objection, form.

9     A.    Yeah, there was no official -- there was no

10  official role or responsibility with the company.

11     Q.    Are you familiar with the bonds that were

12  outstanding from Goodman Networks, Inc.?

13            MR. KLEINSASSER:  Objection, form.

14     A.    Yes.

15     Q.    And what do you understand about the bonds

16  that were outstanding of Goodman Networks, Inc.?

17            MR. KLEINSASSER:  Objection, form.

18     A.    That they're -- they're still owed.  The

19  company still has an obligation to -- to retire those

20  bonds or to buy them.

21     Q.    Okay.  And after your resignation from the

22  board in February 2022, did you play any role or have

23  any communications in how the company would repay the

24  bonds?

25            MR. KLEINSASSER:  Objection, form.

Page 31

1      A.   Not officially, no.  As a shareholder, you

2   know, I would inquire about the bonds.

3      Q.   Did you ever have any communication with

4   Goodman Networks, Inc.'s auditors about how Goodman

5   Networks, Inc. should repay the bonds after your

6   resignation from the board in February 2022?

7              MR. KLEINSASSER:  Objection, form.

8      A.   No.

9      Q.   Did you have any communications with

10  Mr. Frinzi about how the company should repay the bonds

11  after your resignation from the board in February 2022?

12             MR. KLEINSASSER:  Objection, form.

13     A.   Yes.

14     Q.   And what was the nature of those

15  communications?

16     A.   I would ask him if he's reached an agreement

17  with the bondholders, where is he at, you know, with

18  the communication with the bondholders.

19             MR. KLEINSASSER:  And I'm just going to

20  jump in.  Mr. Goodman, to the extent that any of the

21  communications you're referring to might potentially be

22  privileged with Goodman Networks or -- or otherwise,

23  just, you know, be aware of that and let us know if

24  that's the case.

25             THE WITNESS:  Okay.

Page 32

1       Q.   Did you ever receive status updates on the

2   outstanding bonds from Goodman Networks, Inc.'s

3   auditors after you resigned from the board in February

4   2022?

5               MR. KLEINSASSER:  Objection, form.

6       A.   No.

7       Q.   Are you familiar with a company called Genesis

8   Networks?

9       A.   Yes.

10      Q.   What is Genesis Networks?

11      A.   It's a telecommunications company.

12      Q.   What does it -- what does it do?  What's its

13  business?

14      A.   It has no business.

15      Q.   What business did it have when it existed?

16      A.   Which company?

17      Q.   Genesis Networks.

18      A.   Okay.  Well, we're -- Genesis Networks

19  Integration, it was just a holding company.  It had no

20  business.

21      Q.   What other Genesis entities?

22      A.   There was Genesis Networks Telecom.

23      Q.   What was its business?

24      A.   It was a VAR, value-added resale, and services

25  company.

Page 33

1      Q.   Any other Genesis entities?

2      A.   There was Genesis Networks Integration

3   Services.  And it's been -- it hasn't operated for, you

4   know, probably five years.  And then was Genesis

5   Network Global Services, and it was an IT staffing

6   company.

7      Q.   And did you have an officer role in any of

8   these companies?

9      A.   Typically, no.  They were always ran by

10   other -- by other people.

11      Q.   But at any point in time, did you have an

12   officer role at any of the Genesis Networks companies?

13      A.   I could have.

14      Q.   And what would that role have been?

15      A.   It would have been like president or, you

16   know, an interim CEO position.

17      Q.   What about as a director, were you ever a

18   director of any of the Genesis Networks entities?

19      A.   Yes.

20      Q.   Which one?

21      A.   Probably all of them.

22      Q.   And for -- during what time period?

23      A.   I'm not sure.

24      Q.   And did you own a percentage of the Genesis

25   Networks entities?

Page 34

1        A.   So the Genesis Networks Enterprises Company

2    would have owned -- owned the shares of the other

3    entities, and then I was the majority shareholder of

4    the -- GNE, the Genesis Networks Enterprise Company.

5        Q.   Did Genesis Networks have a business

6    relationship with Goodman Networks?

7        A.   It did not.

8             MR. KLEINSASSER:  Objection, form.

9        Q.   Did any of the Genesis Networks entities have

10   a business relationship with any of the Goodman

11   Networks entities?

12            MR. KLEINSASSER:  Objection, form.

13       A.   Not that I can recall.

14       Q.   Do you know a company named People NQ, Inc.?

15       A.   I do.

16       Q.   What is that company?

17       A.   It's just a clearinghouse entity for me.  It's

18   where I pay bills out of.

19       Q.   Do you have an officer --

20            THE REPORTER:  Can you repeat the name of

21   that company?

22            MR. PHAIR:  People NQ, Inc., Capital N,

23   Capital Q.

24            THE REPORTER:  Okay.

25       Q.   So do you have an officer or director role in

Page 35

1    People NQ, Inc.?

2        A.   Yes.

3        Q.   Which?

4        A.   A board member, CEO.

5        Q.   Are there any other board members of

6    People NQ, Inc.?

7        A.   No.

8        Q.   Are there any other officers of People NQ,

9    Inc.?

10       A.   No.

11       Q.   Are you familiar with a company called World

12   Conquest, LLC?

13       A.   Yes.

14       Q.   What is that company?

15       A.   I believe it's a company Jim Frinzi owns.

16       Q.   And what does it do?

17       A.   I do not know.

18       Q.   Have you ever been an officer or director of

19   World Conquest, LLC?

20       A.   No.

21       Q.   What's your relationship with the World

22   Conquest, LLC?

23       A.   None.

24       Q.   We spoke about Mr. Frinzi.  When did you first

25   meet Mr. Frinzi?

1      A.   I don't know.  2006, whenever he was an

2    employee for Goodman.  I'm not sure of the year.  I

3    can't remember.

4      Q.   And you said he was an employee of Goodman

5    back in the 2006 -- I'm not holding you to specifics.

6    I just -- just ballparking it for me.

7               So circa 2006 he was an employee.  What

8    role did he have at Goodman Networks, Inc.?

9      A.   I don't know.  I wasn't involved with the

10    company, so I wasn't sure what his role was.  I just

11    met him.

12      Q.   And did you know him before he had an employee

13    role with the company?

14      A.   No.

15      Q.   So the first time you met him was when he

16    was -- he became an employee in circa 2006 of Goodman

17    Networks, Inc.?

18      A.   Yes, yes.

19      Q.   And how long was he an employee of Goodman

20    Networks, Inc.?

21      A.   I don't know.

22      Q.   What was his role in 2006?

23      A.   I don't know.  I just met him.  I wasn't

24    involved with the company.

25      Q.   Has he been with the company since 2006

Page 37

1    continuously?

2        A.   No.

3        Q.   At what point did he leave the company?

4        A.   I don't know.

5        Q.   Is it your understanding that at some point

6    Mr. Frinzi became CEO of Goodman Networks, Inc.?

7        A.   Yes.

8             MR. KLEINSASSER:  Objection, form.

9        A.   Yes.

10       Q.   Could you explain the circumstances by which

11   Mr. Frinzi became the CEO of Goodman Networks, Inc.?

12            MR. KLEINSASSER:  Objection, form.

13       A.   So, you know, Jim was doing consulting work

14   and I asked him if he could, you know, help the

15   company, you know, find investment money.

16       Q.   Why was the company looking for investment

17   money?

18       A.   It needed to reinvent, you know, its business.

19   It needed to shift into the E-commerce business.

20       Q.   And the -- you said you asked him to come in.

21   Was -- was that your decision or were there other

22   people involved in that decision?

23            MR. KLEINSASSER:  Objection, form.

24       A.   I can't recall.

25       Q.   Who negotiated with him to bring him in to

Page 38

1    Goodman Networks, Inc.?

2              MR. KLEINSASSER:  Objection, form.

3         A.   Yeah, I can't recall.

4         Q.   Do you know when he came in as CEO of Goodman

5    Networks, Inc., roughly?

6         A.   I would guess it would have been the summer or

7    the -- of 2022.

8         Q.   Okay.  And were you involved in the board

9    discussions -- well, let me step back.

10              Were there any board-level discussions

11   about bringing in Mr. Frinzi as CEO?

12        A.   I can't recall.

13        Q.   Does the board of Goodman Networks, Inc. meet

14   regularly?

15              MR. KLEINSASSER:  Objection, form.

16        A.   So when there, you know, was a decision that

17   had to be -- that needed board approval it would meet.

18        Q.   Would it meet in person?

19        A.   No, not necessarily.

20        Q.   So over the past year, going into 2022, can

21   you recall any in-person meeting of the Goodman

22   Networks' board?

23        A.   I cannot, no.

24        Q.   So how would the Goodman Networks, Inc. board

25   meet?  Would it be virtual, by telephone, how would

Page 39

1    that work?

2         A.   Typically it was by telephone.

3         Q.   Do you recall any telephonic discussions with

4    other board members about bringing Mr. Frinzi in as CEO

5    of Goodman Networks, Inc.?

6              MR. KLEINSASSER:  Objection, form.

7         A.   I cannot recall, no.

8         Q.   Sitting here today, can you identify any other

9    board member of Goodman Networks, Inc. who you

10   discussed retaining Mr. Frinzi as CEO of Goodman

11   Networks, Inc. with?

12             MR. KLEINSASSER:  Objection.  Objection.

13        A.   Yeah, not board members.  I would have

14   discussed it with other, you know, members at -- you

15   know, at the company.

16        Q.   So you said "not board members."  Who are the

17   other members that you're referring to?

18        A.   It would have been like Scott Runke.  He was

19   at the company.  You know, I would have -- Joe Hart.

20        Q.   And who are they?

21        A.   Scott was -- you know, like -- I believe he

22   was VP of strategy and Joe Hart was the -- he was the

23   acting COO of the company.

24        Q.   Okay.  So you can recall discussions with some

25   of the officers of the company, but not with any board

Page 40

1      members of the company; is that correct?

2              MR. KLEINSASSER:  Objection, form.

3          A.   Yes, that's correct.

4          Q.   And sitting here today, can you tell me who

5      the board members were at the time that Mr. Frinzi was

6      selected as CEO?

7          A.   I can't recall.  I mean, it could have just

8      been me.  You know, I just don't know if anyone else

9      was added.  I would have to go back and look.

10         Q.   And what was the scope of Mr. Frinzi's

11     authority as CEO of Goodman Networks, Inc.?

12             MR. KLEINSASSER:  Objection, form.

13         A.   To -- to wind down the company.

14         Q.   Was that his -- so that was his task that you

15     charged him with, was winding down the company?

16             MR. KLEINSASSER:  Objection, form.

17         A.   Well, I didn't charge him, you know, with

18     that.  You know, my initial discussion with Jim is, you

19     know, to help me go find new money, raise new money,

20     transition the company along with the other officers

21     and employees to a -- you know, an E-commerce business.

22         Q.   Did Mister -- as the CEO of Goodman Networks,

23     Inc., did Mr. Goodman have the authority to control the

24     company's payments and -- payments and checking and

25     savings accounts and all that?

Page 41

1               MR. KLEINSASSER:  Objection, form.

2        A.   Yes.

3        Q.   Did anyone else have control over that?

4               MR. KLEINSASSER:  Objection, form.

5        A.   You know -- I mean, your controller, you know,

6   your CFO.

7        Q.   But who had ultimate decisionmaking authority

8   on what got paid out of the company's coffers?

9               MR. KLEINSASSER:  Objection, form.

10       A.   Yeah, I don't know.

11       Q.   Well, when you were on the board of Goodman

12  Networks, Inc., what was your understanding of who had

13  the authority to direct who made payments out of

14  Goodman Networks, Inc.'s accounts?

15              MR. KLEINSASSER:  Objection, form.

16       A.   Yeah, that was the focus of a board member.

17  That would have been daily operations.

18       Q.   Did Mr. Frinzi ever discuss with you any

19  payments that were made by Goodman Networks, Inc.?

20       A.   No.

21              MR. KLEINSASSER:  Objection, form.

22       Q.   Did the Goodman Networks, Inc. board provide

23  Mr. Frinzi with any direction?

24              MR. KLEINSASSER:  Objection, form.

25       A.   You know, early on I'm sure there would have

Page 42

1    been, you know, discussions.

2        Q.   Discussions of what, sir?

3        A.   Just responsibilities, responsibility to the

4    creditors, responsibility, you know, to shareholders.

5        Q.   Did Mr. Frinzi ever make a presentation to the

6    Goodman Networks, Inc. board?

7             MR. KLEINSASSER:  Objection, form.

8        A.   Yes, he did.

9        Q.   On which occasions?

10       A.   Well, you know, I don't even know if he made

11   it to the board.  I better -- you know, I would need to

12   go back and check to see if it was the board.  But I

13   remember him, you know, sending me a document of, you

14   know, kind of the plan forward.

15       Q.   So other than this -- it sounds like a

16   strategic plan that Mr. Frinzi sent to you, were there

17   any other plans, documents that Mr. Frinzi sent the

18   board of Goodman Networks, Inc. while you were on it?

19            MR. KLEINSASSER:  Objection, form.

20       A.   I would have to go back and look.  I can't

21   recall.

22       Q.   Okay.  So -- but sitting here today, you know,

23   after you acquired Mr. Frinzi, did the Goodman

24   Networks, Inc. board provide him with any direction

25   other than the general direction that you just

Page 43

1    mentioned?

2              MR. KLEINSASSER:  Objection, form.

3         A.   Well, the -- the direction would have been,

4    you know, the role and responsibility, you know, to

5    manage, you know, creditors and shareholders and, you

6    know, that would have been the main focus and

7    discussions with Jim.

8         Q.   Anything else?

9              MR. KLEINSASSER:  Objection, form.

10        A.   There could have been other discussions, you

11   know.  I can't recall them.  You know, once Jim stepped

12   in, you know, we tried everything with -- to maintain

13   the contract with AT&T, going out, finding money,

14   trying to transition the company to, you know, an

15   E-commerce business, look at, you know, different

16   options the company would have had.

17              And, you know, at that time then for Jim

18   to step in it would have been to -- you know, to manage

19   the obligations the company has to, you know, the

20   bondholders, creditors, and shareholders.

21        Q.   And while you were a member of the board and

22   Mr. Frinzi was doing this, were you generally aware of

23   what Goodman Networks, Inc. was doing?

24              MR. KLEINSASSER:  Objection, form.

25        A.   Can you clarify the question, please?

Page 44

1      Q.   As a member of the Goodman Networks, Inc.

2    board, were you generally aware of what Goodman

3    Networks, Inc. was doing?

4                   MR. KLEINSASSER:  Objection, form.

5      A.   So, you know, the responsibility or the

6    direction was, you know, to communicate with the

7    bondholders, communicate with the -- the creditors

8    and -- and, you know, wind down the company.  That's

9    the instruction, that's, you know, the oversight

10   that -- you know, that I would have communicated or

11   talked with Jim about.

12     Q.   So other than the sort of general directions,

13   were you aware as a member of the board about any sort

14   of meaningful expenditures, for example, that

15   Mr. Frinzi directed to be made -- paid during his

16   tenure?

17                  MR. KLEINSASSER:  Objection, form.

18     A.   No.

19     Q.   Did you get any kind of regular reports from

20   Mr. Frinzi?

21     A.   No.

22                  MR. KLEINSASSER:  Objection, form.

23     Q.   As a member of the board, were you aware of

24   material expenditures that were made by Goodman

25   Networks, Inc.?

Page 45

1          MR. KLEINSASSER:  Objection, form.

2     A.   What do you mean by "material"?

3     Q.   Maybe I should ask you.  I mean, so what -- as

4  a member of the board you said you gave Mr. Frinzi

5  general direction.  Did you generally understand when

6  he would make material expenditures, commitments,

7  decisions, would he consult with you on that?

8          MR. KLEINSASSER:  Objection, form.

9     A.   So, you know, the only item that I would talk

10  with Jim about would be if there was a severance or if

11  there was a -- a consulting, you know, agreement that

12  had to be paid.  And then it would have been, you know,

13  about, you know, the bondholders -- you know,

14  communicating, talking with the bondholders and the --

15  and the other creditors.

16     Q.   Did the board of Goodman Networks, Inc. have

17  an audit committee?

18     A.   No.

19     Q.   What type of controls did the board of Goodman

20  Networks, Inc. have in place?

21          MR. KLEINSASSER:  Objection, form.

22     A.   Yeah, they would -- in regular course of

23  business they would have overseen new opportunities,

24  obligations, new initiatives.

25     Q.   So -- but I'm talking about while were you on

Page 46

1    the board of Goodman Networks Inc., what type of

2    controls were in place over the expenditure of money by

3    Goodman Networks, Inc.?

4                MR. KLEINSASSER:  Objection, form.

5        A.   Well, that would have been Jim's

6    responsibility for the -- to oversee the expenditures.

7        Q.   Are you aware -- as a board member of Goodman

8    Networks, Inc., are you aware of any internal controls

9    that existed at Goodman Networks, Inc. regarding the

10   expenditure of money?

11               MR. KLEINSASSER:  Objection, form.

12       A.   So -- yeah, the -- there would have been

13   controls there.  A controller or CFO would have -- you

14   know, would have had to make decisions or look for

15   guidance, you know, from the CEO or -- you know, or

16   from, you know, the COO.  That's typically how they get

17   their direction and guidance.  So those are the

18   controls that are in the company.

19       Q.   But what controls did you then exercise as a

20   member of the board of Goodman Networks, Inc. over

21   Mr. Frinzi and the controller and CFO?

22               MR. KLEINSASSER:  Objection, form.

23       A.   It would have been to -- to start

24   communicating with the bondholders and the creditors to

25   start to wind down the company.

Page 47

1      Q.   So I'm not asking about communications.  I'm

2   asking about payment of money from Goodman Networks,

3   Inc.  And my question is, as a board member of Goodman

4   Networks, Inc., what controls did you have in place to

5   oversee Mr. Frinzi, the controller, and the CFO with

6   regard to the expenditure of company money?

7                MR. KLEINSASSER:  Objection, form.

8      A.   So I -- I mean, the company would have had,

9   you know, standard processes and procedures that he

10   would have had to follow.  And so, you know -- and a

11   course of -- if there was a major decision that had to

12   be made Jim would have had a protocol and a process to

13   follow to bring to the board to ask for permission.

14      Q.   And during his tenure, did Mr. Frinzi ever

15   bring a major decision to the board?

16                MR. KLEINSASSER:  Objection, form.

17      A.   Yeah, not that I can recall.

18      Q.   And, again, I'm not asking what it is.  I'm

19   asking what specific controls that you put in place as

20   a member of the board of Goodman Networks, Inc. to

21   control the expenditure of money by Mr. Frinzi, the

22   CFO, and the controller?

23                MR. KLEINSASSER:  Objection, form.

24      A.   So those procedures would have already been in

25   place long before I was ever there.  They would have

Page 48

1    been, you know, the company's, you know, operating

2    agreement or bylaws.  But they would have been in place

3    before I got there.

4         Q.   Other than whatever was in existence before

5    you got there, were there any other internal controls

6    that you as a member of the board exercised over

7    Mr. Frinzi, the CFO, and the controller with regard to

8    the expenditure of money?

9         A.   Not that I --

10                   MR. KLEINSASSER:  Objection, form.

11   Objection, form.

12        A.   Not that I recall.

13        Q.   Were you in communication with Mr. Frinzi on a

14   regular basis?

15        A.   You know, I would communicate with him, yes, I

16   would.

17        Q.   How would you communicate with him?

18        A.   I would typically call him on the phone.

19        Q.   Did you ever e-mail him?

20        A.   Yes, I would have e-mailed him.

21        Q.   Do you have a Goodman Networks, Inc. e-mail

22   account?

23        A.   I do not.

24        Q.   Do you have a personal e-mail account?

25        A.   I have my Genesis e-mail account that I would

Page 49

1    have used.

2        Q.   Any other e-mail accounts that you would use

3    for communications with Mr. Frinzi?

4        A.   I would have done, you know, text messages

5    or -- but those are typically the -- text message,

6    e-mail, or a phone call.

7        Q.   Did you ever communicate with Mr. Frinzi via

8    other messaging apps like WhatsApp?

9        A.   No, I would have by Signal.  There would have

10   been, you know, communication.

11       Q.   And why were you communicating with Mr. Frinzi

12   by Signal?

13       A.   It was just convenient.  It was -- he had the

14   app, so it was a convenient way to communicate.

15       Q.   Any other means by which you communicated with

16   Mr. Frinzi?

17       A.   No.

18       Q.   Do you use Snapchat with him?

19       A.   I do not.

20       Q.   Do you use social media?

21       A.   I do not.

22       Q.   So e-mail, text, and Signal accounts is how

23   you communicated with Mr. Frinzi; is that correct?

24       A.   And telephone.

25       Q.   And telephone.  Any other ways in which you

Page 50

1    communicated with him?

2        A.    I would have met him face-to-face as well.

3        Q.    Any other means of communication?

4        A.    Not that I can recall.

5        Q.    The Signal account -- what is your Signal

6    account?  Do you have a user name?

7        A.    I would have to look at it.  It should just be

8    your phone number, right?

9        Q.    And why would you use Signal rather than just

10   sending him a text or picking up the phone and calling

11   him?

12       A.    Just another form of communication.

13       Q.    Signal is an encrypted form of communication,

14   is it not?

15              MR. KLEINSASSER:  Objection, form.

16       A.    Aren't they all?

17       Q.    Whose idea was to it to use Signal to

18   communicate with each other, yours or Mr. Frinzi?

19              MR. KLEINSASSER:  Objection, form.

20       A.    Oh, I don't recall.

21       Q.    How many messages would you send to Mr. Frinzi

22   using Signal?

23       A.    I don't recall.

24       Q.    Have you preserved any of your e-mails with

25   Mr. Frinzi?

Page 51

1    A.    All of my e-mails would have been preserved.

2    Q.    Have you preserved your text messages with

3    Mr. Frinzi?

4    A.    All of the text messages, you know, should

5    be -- anything that I have would be -- I mean, all we

6    would have to do is go to AT&T to get them.  I don't --

7    I don't typically keep my next messages.

8    Q.    Have you deleted any text messages with

9    Mr. Frinzi?

10                MR. KLEINSASSER:  Objection, form.

11    A.    Yeah, not that I recall.  I just -- you know,

12    I have it set where it auto deletes.

13    Q.    So after you send a text message it would have

14    automatically deleted?

15    A.    No.  It's typically within a 24-hour period.

16    Q.    Sitting here today, do you think you have any

17    text messages with Mr. Frinzi?

18    A.    I'm not sure.

19    Q.    Have you looked?

20    A.    No.

21    Q.    What about Signal, do you have any Signal

22    messages with Mr. Frinzi?

23    A.    I would have to look.  I don't recall.

24    Q.    Did you save any Signal messages with

25    Mr. Frinzi?

Page 52

1      A.   I would have saved any that -- whenever --

2    after the subpoena or once I was notified.

3      Q.   And did you delete any Signal messages with

4    Mr. Frinzi?

5      A.   They're -- it's set for auto delete, so --

6      Q.   And did you suspend the auto delete feature of

7    your Signal and text messages after the lawsuit was

8    filed?

9              MR. KLEINSASSER:   Objection, form.

10     A.   I stopped communicating with Jim.

11     Q.   That wasn't my question, sir.   My question was

12   did you stop the auto deletion policy that you have on

13   your text messages and Signal messages after this

14   lawsuit was filed?

15             MR. KLEINSASSER:   Objection, form.   What

16   lawsuit are you talking about, Ryan?

17             MR. PHAIR:   The bankruptcy proceeding.

18             MR. KLEINSASSER:   Okay.   Thank you for

19   clarifying that.

20     A.   I would have to check.

21     Q.   But sitting here today, you don't know whether

22   or not you suspended your auto delete policy?

23     A.   I do not know.

24     Q.   Have you ever taken a screen shot of texts or

25   Signal messages with Mr. Frinzi?

Page 53

1       A.   I typically do not, no.

2       Q.   Do you have any such screen shots of texts or

3    Signal messages with Mr. Frinzi?

4       A.   I would have to check.

5       Q.   Who's Brad Kozma?

6       A.   He was the CFO for Goodman.

7       Q.   While you were a member of the board of

8    Goodman Networks, Inc. did Mr. Kozma provide you with

9    periodic reports?

10      A.   He would.

11      Q.   And how would he communicate that to you?

12      A.   E-mail.

13      Q.   Any other way?

14      A.   I can't recall.

15      Q.   What kind of reports would Mr. Kozma send you?

16      A.   They were typically, you know, company updates

17   and financial updates.

18      Q.   Did he send you reports of large expenditures?

19           MR. KLEINSASSER:  Objection, form.

20      A.   I would have to go check.

21      Q.   And what kind of reports would Mr. Frinzi send

22   you?

23      A.   I would need to go check.  I can't recall what

24   Jim would send me.

25      Q.   When was the last time you communicated with

Page 54

1    Mr. Frinzi?

2        A.   It's been a time.

3        Q.   I'm sorry?

4        A.   It's been a few months.

5        Q.   And is there a reason why you haven't

6    communicated with Mr. Frinzi lately?

7        A.   Yes.

8        Q.   What is that reason?

9        A.   The loan that he gave to AMRR.

10       Q.   And what about the loan that he gave to AMRR

11   caused you to cut off communications with Mr. Frinzi?

12       A.   I just wasn't comfortable with the -- with

13   what he did.

14       Q.   Why not?

15       A.   You know, that was FedEx's money.

16       Q.   Okay.  Before you cut off communications with

17   Mr. Frinzi -- well, did you ever have a social

18   relationship with Mr. Frinzi?

19       A.   I wouldn't call it a social.  I mean, I would,

20   you know, meet him for -- you know, for lunch.  He did

21   consulting work for me before, you know, he ever worked

22   for -- when he came back, before he stepped back in at

23   Goodman he did consulting work for me.

24       Q.   Have you ever gone on a trip with Mr. Frinzi?

25       A.   No.

Page 55

1    Q.   Have you ever had dinner with Mr. Frinzi?

2    A.   Yes, yes.

3    Q.   How many times?

4    A.   I can't recall.

5    Q.   Is Mr. Frinzi -- does he -- is he friendly

6    with members of your family?

7    A.   No.  Wait.  Personal family or the Goodman

8    family?

9    Q.   Yes, personal family.

10   A.   No.

11   Q.   What about the Goodman family?

12   A.   I think he may -- he may talk to John, but

13   that's it.

14   Q.   Is Mr. Frinzi's relationship primarily with

15   you, John, or someone else?

16   A.   It would be -- it would be both of us.

17   Q.   Is John Goodman talking to Mr. Frinzi right

18   now?

19   A.   I don't know.

20   Q.   Does Mr. Frinzi know that you were unhappy

21   about the AMRR transaction?

22   A.   Yes.

23   Q.   And how does he know that?

24   A.   With my communication with him.

25   Q.   Okay.  And what was your communication with

Page 56

1    him?

2         A.   That -- you know, that -- you know, has he

3    communicated -- you know, what has he done with, you

4    know, the bondholders, the shareholders.  And then, you

5    know, he brought up that he talked with his lawyers,

6    you know, and they said that they -- you know, that the

7    company had the right to loan the money as long as they

8    got, you know, a fair -- you know, as long as they got

9    the money back and it benefited the company, and I

10   didn't agree with that.

11        Q.   And did you express your unhappiness to

12   Mr. Frinzi about the AMRR note?

13        A.   I just -- I told him that, you know, he

14   couldn't do that.  And he said he checked with his

15   lawyers, so -- I was no longer a board member at that

16   time or, you know, associated with the company.  And --

17        Q.   And was this in your last conversation with

18   Mr. Frinzi?

19        A.   It would have been, yes.

20        Q.   Have you had any communication with Mr. Frinzi

21   over the past four months?

22        A.   Yes.  Probably four months ago, you know,

23   before all of this happened I went to his wedding.

24        Q.   Where was his wedding?

25        A.   It was in Austin.

Page 57

1      Q.   And when was that?

2      A.   I don't recall.  I would have to look at the

3    date.

4      Q.   September, October, sometime in that

5    timeframe?

6      A.   I can't recall.

7      Q.   Did you -- and that was the last time you

8    communicated with Mr. Frinzi?

9      A.   I mean, I might have talked to him after that.

10   I just -- I can't recall.  I just started separating,

11   you know, myself from him to let him manage the

12   business.

13     Q.   So the AMRR note that we're talking about,

14   that was a $44 million loan that Mr. Frinzi

15   orchestrated from Goodman Networks, Inc. to American

16   Metals Recovery and Recycling, correct?

17     A.   Yes.

18     Q.   And you were upset about that loan, correct?

19     A.   Yes, yes.

20     Q.   And you expressed that to Mr. Frinzi?

21     A.   I did.

22     Q.   And then you still went to his wedding?

23     A.   No, the wedding was before that.  The wedding

24   was -- I don't know.  I can't remember when his wedding

25   was.  And then the -- he did the loan, you know,

Page 58

1   like -- you know, months after that.  So --

2       Q.   So I'm sorry.  I just want to make sure I get

3   the timeline.  His wedding was, you're saying, three or

4   four months ago?

5       A.   No, his wedding was longer than that.  It

6   was -- I would have to go back and look at the actual

7   dates, because the question you had to me is when was

8   the last time that -- you know, that I talked to him

9   and then, you know, if I had any social -- did anything

10  social with him.  So I was referring to his wedding as

11  a social engagement.

12              The last communication would have been,

13  you know, about the loan, the AMRR loan, and that would

14  have been, you know, just a couple months ago.

15      Q.   So was that like -- you're saying like before

16  Thanksgiving?

17      A.   Yeah, it would have been somewhere in there.

18      Q.   And Mister -- how did this communication take

19  place?  Was this a telephone call, a meeting?

20      A.   It would have been a telephone call.

21      Q.   And was there anyone else on the telephone

22  call?

23      A.   No.

24      Q.   Was this the first time you expressed your

25  displeasure to Mr. Frinzi about the AMRR loan?

Page 59

1      A.   Well, I didn't know -- at the time it was just

2   a discussion.  It was, you know, him -- he brought up,

3   you know, that -- that he could do the loan from the

4   company as long as the company could benefit from it.

5   So it wasn't the actual loan at that time.  And that's

6   whenever I brought up to him that, you know, "I don't

7   think you can do that."  And he discussed that he

8   talked to his lawyers.  And then, you know, it wasn't

9   until, you know, a couple months after that that I

10  found out that he actually did the loan.

11     Q.   So wait.  When he says he talked to his

12  lawyers, do you understand him to mean the company's

13  lawyers or his own personal lawyers?

14     A.   I don't know.  I don't know who it was.

15     Q.   So, I'm sorry.  This telephone conversation

16  that you had with Mr. Frinzi, you're saying this was a

17  couple months ago?

18     A.   No, it was -- when was it?  It was probably

19  the December timeframe, if I have my times right,

20  December or late --

21     Q.   Of '21 or December of 2022?

22     A.   No, '22, '22.

23     Q.   So last month?

24     A.   Well, or -- you know, or it was in November,

25  like around the Thanksgiving timeframe.

Page 60

1      Q.   Okay.  So sometime in the past two months you

2   had a conversation with Mr. Frinzi?  That's the last

3   time you spoke with him, correct?

4      A.   Yes, yes.

5      Q.   And on that conversation -- how long did that

6   conversation last?

7      A.   About two minutes, three minutes.

8      Q.   And did you call him or did he call you?

9      A.   I can't recall.

10     Q.   Were you on a landline or on your cell phone?

11     A.   My cell phone.

12     Q.   And in this conversation is when you expressed

13  some displeasure with the AMRR loan; is that correct?

14     A.   Well, there wasn't a loan at -- not that I'm

15  aware of at that time.  It was a discussion that he was

16  going to -- that the company could loan AMRR the money

17  per his lawyers.  And my reaction, was, "No, I don't

18  think you can do that."

19          And you know, his comment was that, you

20  know, he checked with the lawyers and as long as the

21  company could get benefit from it, then -- and that was

22  the discussion.  And that was my, you know, discomfort

23  on telling Jim, "No, I don't think you can do that,

24  Jim."

25     Q.   And that happened two months ago, you're

Page 61

1    saying, sometime in the past two -- one or two months?

2        A.   I believe so, yes.

3        Q.   And other than saying that you don't believe

4    that you could do that, did you tell him that you

5    believed that that was inappropriate or anything like

6    that?

7        A.   Yes.

8                MR. KLEINSASSER:  Objection, form.

9        Q.   Did you accuse him of fraud?

10               MR. KLEINSASSER:  Objection, form.

11       A.   Well, there was no loan at that time.  It

12   was -- he just told me what his lawyers told him.

13       Q.   All right.  Well, let's back up.  So as of

14   January 2022, right, so exactly one year ago, you were

15   a board member of Goodman Networks, Inc., correct?

16               MR. KLEINSASSER:  Objection, form.

17       A.   What date?

18       Q.   January 2022.

19       A.   Yes.

20               MR. KLEINSASSER:  Objection, form.

21       Q.   Yes, correct?

22       A.   Yes, I believe so.

23       Q.   Okay.

24               MR. PHAIR:  Philip, can you bring up the

25   AMRR note?

Page 62

1           And for the court reporter, we'll mark it

2    as James Goodman Exhibit 1.  Normally I would just use

3    the last name, but there are lots of Goodmans being

4    deposed in this case, so we'll do James Goodman

5    Exhibit 1.

6               MR. GUFFY:  It's actually marked 2

7    because I had previously put the subpoena in there

8    as --

9               MR. PHAIR:  Oh, sorry.  My bad.  Yep.

10              MR. GUFFY:  All right.  There it is.

11              (Exhibits 1 and 2 marked)

12       Q.   Okay.  Mr. Goodman, I'm pulling up on the

13   screen what's been marked as James Goodman Exhibit 2.

14   Do you see that on the screen?

15       A.   I do.  But can -- can you enlarge it?

16       Q.   Yes, sir.

17              MR. PHAIR:  Philip, are you able to zoom

18   in on that?

19              MR. GUFFY:  I did zoom in.  Does it not

20   show up as zoomed?

21       Q.   Mr. Goodman, are you able to see it zoomed in,

22   or do you need more?

23       A.   No, but let me see if I can't -- but, I mean,

24   I can read it.  I've just got to squint a little bit.

25       Q.   All right.  So do you recognize this document?

Page 63

1      A.   I do not.

2      Q.   Have you ever seen this document before?

3      A.   We pulled it from the AMRR, their public

4  filings.

5      Q.   So you have seen this document before?

6      A.   I believe so, yes.

7      Q.   When was the first time you saw this document?

8      A.   Probably about 30 days ago.

9      Q.   And you said you pulled it from the AMRR's

10  public filings.  Why did you pull it from AMRR's public

11  filings?

12     A.   Well, I didn't pull it.  You know, I can't

13  remember who shared it with me, but it -- but that was

14  the first time I saw it.

15     Q.   So then how did you have a conversation with

16  Mr. Goodman in November if you didn't see this until

17  30 days ago?

18          MR. KLEINSASSER:  Objection, form.

19     A.   Okay.  So, look, I -- you know, I think I'm

20  getting my -- you know, my years mixed up here, you

21  know, with this loan being, you know, the January 2022

22  and, you know, we're into '23, so it would have been

23  in, you know, 2021, you know, two months or, you know,

24  before this loan happened that I would have had the

25  discussion with Jim, not just two months ago.

Page 64

1    Q.   Got it.  All right.  So, first of all, this

2    is the -- James Goodman Exhibit 2 is the AMRR note that

3    we've been talking about, correct?

4    A.   Yes.

5    Q.   And so when we were talking earlier about your

6    discussions with Mr. Frinzi, you're saying that those

7    discussions preceded January 2022; is that correct?

8              MR. KLEINSASSER:  Objection, form.

9    A.   So, yes, they would have been December 2021.

10   Q.   Okay.  So that would have been when you were

11   on the board of Goodman Networks, Inc., correct?

12   A.   That's correct.

13   Q.   And this secured promissory note you see is

14   dated January 21st, 2022, correct?

15   A.   Yes.

16   Q.   And that also would have been when you were on

17   the board of Goodman Networks, Inc., correct?

18             MR. KLEINSASSER:  Objection, form.

19   A.   Yes.

20   Q.   Okay.  When was the first time that Mr. Frinzi

21   discussed this AMRR note with you?

22             MR. KLEINSASSER:  Objection, form.

23   A.   He never discussed it with me.

24   Q.   I thought you said that there was a call in

25   November, December of 2021 where you told him that --

Page 65

1    you expressed that you didn't think that this was

2    appropriate?

3              MR. KLEINSASSER:  Objection, form.

4         A.   Of borrowing the money, not the note.

5         Q.   All right.  Explain to me the difference.

6         A.   Borrowing the money, you know, he said that he

7    had a discussion with the lawyers that -- that AMRR --

8    you know, that Goodman could loan that money as long as

9    they got benefit back from it.

10        Q.   And did you agree with that?

11        A.   I did not.

12        Q.   And this was prior to the note in

13   January 2022, correct?

14        A.   That's correct.

15        Q.   And which entity made the $44 million loans to

16   AMRR?

17        A.   It says here the GNET ATC, Inc.

18        Q.   Okay.  And -- but is that your understanding

19   that the GNET ATC, Inc. was the lender or was it

20   Goodman Networks, Inc.?

21             MR. KLEINSASSER:  Objection, form.

22        A.   Well, I didn't have an understanding of the

23   note.  I wasn't aware of it.

24        Q.   Sir, you were on the board of Goodman

25   Networks, Inc. at the time, correct?

Page 66

1          MR. KLEINSASSER:  Objection, form.

2      A.    So I should have been, yes.

3      Q.    And you weren't aware of a $44 million loan

4    that the CEO of your company gave to another company

5    that he controlled?

6          MR. KLEINSASSER:  Objection, form.

7      A.    Because I -- I resigned from the Goodman board

8    in December.  I did a verbal resignation with Jim in

9    December of 2021 and then did a written resignation

10   February 2022.

11     Q.    Okay.  So as of February 20 -- as of January

12   2022, no matter what you said to him verbally, you did

13   not officially resign from the Goodman Networks, Inc.

14   board, correct?

15         MR. KLEINSASSER:  Objection, form.

16   That's mischaracterizing his testimony.  You're doing a

17   lot of that, Ryan.

18         MR. PHAIR:  Well, bring it up.

19         MR. KLEINSASSER:  Well, just to be clear,

20   every time I say "objection, form" I'm trying not to

21   interrupt your depo.  I'm trying not to make speaking

22   objections.  That counts for leading, that counts for

23   form, that counts for calls for speculation, that

24   counts for foundation.  I just want to be clear.  I'm

25   trying not to slow you down because I'm trying to keep

Page 67

1    us in the rules of Federal 30, which basically says

2    make things concise.

3                    But I want to be clear.  When I say

4    "objection, form," you know, if you are

5    mischaracterizing his testimony or something like that

6    I'm going to bring up that objection later.  So if you

7    need me to make a speaking objection, I'll do it.  I'm

8    trying to avoid doing that right now.

9                    MR. PHAIR:  You're more than willing to

10   continue to make your objections.  They're noted,

11   they're on the record, and the court can, you know,

12   deal with it as it must.

13                   MR. KLEINSASSER:  Yeah.  I'm just saying

14   "objection, form" includes a lot of stuff.  It's not

15   simply leading.

16                   MR. PHAIR:  I've been doing it for a long

17   time.  I understand what "objection, form" means.

18                   MR. KLEINSASSER:  All right.

19                   MR. PHAIR:  It's objection, form to the

20   question.

21                   MR. LANGLEY:  Ryan, I apologize.  I need

22   to take a restroom break.  Can we take a break off the

23   record for just a moment and let Matthias talk about,

24   you know, what the questioning is?

25                   MR. PHAIR:  Yeah, let's do that.  Let's

Page 68

1    take a 10-minute break and we'll come back to this.

2                    THE VIDEOGRAPHER:  Off the record at

3    11:22 a.m.

4              (Recess from 11:22 a.m. to 11:34 a.m.)

5                    THE VIDEOGRAPHER:  On the record at

6    11:34 a.m.

7                    MR. PHAIR:  Great.  Thank you.

8         Q.   (BY MR. PHAIR)  Mr. Goodman, before the break

9    we were talking about the AMRR note and your position

10   on the board of Goodman Networks, Inc.  I want to just

11   make sure we're clear on some of the dates.  And

12   actually I think it would be helpful --

13                   MR. PHAIR:  Phil, could you bring up

14   Mr. Goodman's resignation letter?  And we'll mark that

15   as James Goodman Exhibit 3.

16                   (Exhibit 3 marked)

17                   MR. GUFFY:  Do you see it?

18                   MR. PHAIR:  Yes.

19        Q.   Mr. Goodman, do you see that?

20        A.   I do.

21        Q.   I'm handing you -- or I'm showing on the

22   screen what's been marked as James Goodman Exhibit 3.

23   Do you recognize this document?

24        A.   I do.

25        Q.   What is it?

Page 69

1        A.    It's my resignation, written resignation from

2    Goodman Networks.

3                    MR. PHAIR:   And I'm sorry, Phil.   It just

4    crashed.   Can you bring it back up again?

5                    MR. GUFFY:   Sorry.   The Zoom is having

6    some issues with screen share.

7        Q.    And can you see that now, Mr. Goodman?

8        A.    I can.

9        Q.    And this is the resignation letter that you

10   submitted to Goodman Networks, Inc. resigning your

11   chairmanship for the board of directors; is that

12   correct?

13       A.    My resignation, yes.

14       Q.    Okay.   And who did you send this to?

15       A.    I sent it to the Goodman attorney, I think

16   Jennifer -- I can't remember.   I would have sent it to

17   the -- to Goodman's attorney.

18       Q.    In-house attorney?

19       A.    No, external attorney.

20       Q.    Okay.   Why didn't you send it to the other

21   board members?

22       A.    First, I didn't -- you know, I can't recall if

23   there was any other board members, and I was asking

24   them for it from back in November and then in December

25   whenever I resigned from the board, and in January

Page 70

1    also.

2        Q.    So sitting here today, as of January or

3    February 2022 you can't recall any other board members

4    of Goodman Networks, Inc.; is that correct?

5        A.    Well, I mean, you know, I think I need to see

6    if Jim Frinzi was a board member.

7        Q.    But other than you and possibly Mr. Frinzi,

8    was there anyone else on the Goodman Networks' board

9    that you could have sent your resignation letter to?

10       A.    Yeah, I don't know.  I would have to check.

11       Q.    Okay.  But sitting here today, you can't

12   identify any other board member of Goodman Networks,

13   Inc. as of February 1, 2022, correct?

14       A.    Well, without, you know, going and looking at

15   the minutes to see if there was another board member.

16   So, you know, I'm not sure.

17       Q.    Yeah, no.  And I understand that.  But we have

18   one deposition here today, so all I'm asking for is

19   your recollection and what you can recall.

20             And as of February 1, 2022, essentially

21   one year ago today, there -- you can't recall any other

22   board member of Goodman Networks, Inc. other than

23   perhaps Mr. Frinzi; is that correct?

24       A.    Yeah, I don't recall.

25       Q.    All right.  The -- and is that your signature

1   at the end of the resignation letter?

2       A.   Yes.

3       Q.   And is that your handwritten signature or is

4   that an e-signature?

5       A.   It's an e-signature.

6       Q.   And do you have a standard e-signature that

7   you use?

8       A.   I do, yes.

9       Q.   Okay.  And who controls that?  Do you have an

10  administrative assistant?

11      A.   I do not.

12      Q.   So how would this document get signed by you

13  using an e-signature?

14      A.   I would have put my electronic signature on it

15  and sent it back to Jennifer.

16      Q.   Okay.  And you would have done that yourself

17  personally?

18      A.   Yes.

19      Q.   Okay.  And the date of this resignation letter

20  is February 1st, 2022, correct?

21      A.   Yes.

22      Q.   And that was the day you submitted it,

23  correct?

24      A.   I don't know.

25      Q.   Do you have any reason sitting here today to

Page 72

1    believe it was later than February 1st, 2022?

2         A.    Not later.  I mean, it could have been

3    earlier.  But, no, I --

4         Q.    The letter that you signed is dated

5    February 1st, 2022, correct?

6         A.    That's correct.

7         Q.    And that was the day that you officially gave

8    your notice of resignation to the Goodman Networks'

9    board, correct?

10                   MR. KLEINSASSER:  Objection, form.

11        A.    No, I gave my notice early January of 2021.

12        Q.    Did you send a letter early January 2021?

13        A.    No, it was a communication to Jennifer and

14   then and to Jim also.

15        Q.    Okay.  But the only time that you sent a

16   written notice of resignation was on February 1st,

17   2022, correct?

18        A.    Yes.

19        Q.    All right.  The -- let's go back to Goodman

20   Exhibit 2, the AMRR note.

21                   MR. PHAIR:  And, Philip, if you can bring

22   that up, that would be great.

23        Q.    So, sir, this is the exhibit we were looking

24   at earlier, James Goodman Exhibit 2, the AMRR note that

25   we were discussing before the break, correct?

Page 73

1      A.    Yes.

2      Q.    And the date on this is January 21st, 2022,

3   correct?

4      A.    Yes.

5      Q.    And that would have been ten days before you

6   submitted your written resignation to the Goodman

7   Networks, Inc. board of directors, correct?

8      A.    Yes.

9      Q.    And this secured promissory note, if you

10  scroll to the second page, that that was signed by you,

11  correct?

12     A.    No.

13     Q.    Is that not your signature there, sir?

14     A.    No, that's not my signature.

15     Q.    So who signed your name to this document?

16     A.    I do not know.

17     Q.    Your testimony is that you never signed this

18  document, correct?

19     A.    That's right.

20     Q.    When was the first time you saw this document?

21     A.    About three weeks ago, four weeks ago.

22     Q.    And were you upset that -- to learn that

23  someone had signed your name to a document?

24     A.    Yes, yes.

25     Q.    And what did you do to investigate who signed

Page 74

1    your name to the document?

2              MR. KLEINSASSER:  Objection, form.

3         A.    So I contacted the FBI.

4         Q.    And what did you say to the FBI?

5         A.    That I've got a forged document for

6    $44 million.

7         Q.    And when did you contact the FBI?

8         A.    I can't recall the day.

9         Q.    Well, it -- so you just learned about this, it

10   sounds like, what, a month or two ago.  So would it

11   have been in the past two months?

12        A.    Yes, it would have been.

13        Q.    Was it in the past month?  Was it in January?

14        A.    I can't recall.

15        Q.    Have you been in contact with the FBI?

16        A.    No.

17        Q.    How did you communicate to the FBI?

18        A.    Through my attorney.

19        Q.    Have you yourself contacted the FBI?

20        A.    I have not.

21        Q.    And have you spoken with the FBI or anyone

22   affiliated with the FBI?

23        A.    I have not.

24        Q.    Have you spoken with any government official

25   about this?

Page 75

1     A.    No.

2     Q.    Have you spoken with Mr. Frinzi about this?

3     A.    No.

4     Q.    Have you made any inquiry of anyone at Goodman

5  Networks about why your name was signed to this?

6     A.    No.

7          MR. KLEINSASSER:  Objection, form.

8     Q.    Have you asked the auditors of Goodman

9  Networks why your name was signed to this?

10    A.    I don't know who they are, the auditors.

11    Q.    Has the FBI responded to you?

12    A.    I don't know.

13    Q.    Are there any other documents that you believe

14  were forged -- where your signature was forged?

15    A.    I don't know.  I don't know.

16    Q.    Are you aware of any -- sitting here today, of

17  any other documents where your signature was allegedly

18  forged?

19    A.    Not that I'm aware of.

20    Q.    Do you have any suspicion as to who forged

21  your signature?

22    A.    I do not.

23    Q.    Is that something that you have tried to

24  figure out?

25    A.    No.  I'm going to let the authorities do that.

Page 76

1      Q.   Have you contacted Mr. Frinzi and asked him

2   whether he forged your signature on this document?

3      A.   I have not.

4      Q.   What did you do when you found out that your

5   signature was forged?

6      A.   I was floored.  I was upset.

7      Q.   And, you know, this bankruptcy was filed -- I

8   mean, this is -- this document has been around for a

9   year.  Why did it take you only up until about a month

10   or two to look at this document?

11          MR. KLEINSASSER:  Objection, form.

12      A.   I didn't know it was -- I didn't know there

13   was a loan.  I didn't know there was my signature on a

14   document.  It doesn't even have the right company name

15   on it.

16      Q.   What do you mean by that?

17      A.   It -- GNET ATC is not an Inc.  It's an LLC.

18      Q.   And what is the significance of that?

19      A.   I don't know.  I'm -- I just -- I was just

20   pointing it out.  I mean, wrong company name and my

21   forged signature, you know, on the document.

22      Q.   Are you familiar with the company -- with

23   American Metals Recovery and Recycling, Inc.?

24      A.   Yes.

25      Q.   What is that company?

Page 77

1          A.    What do you mean?

2          Q.    Like what do you know about that company?

3          A.    Just the name.

4          Q.    And are you aware of Mr. Frinzi's role at

5     American Metals Recovery and Recycling, Inc., AMRR?

6          A.    Yes.

7          Q.    What is his role?

8          A.    He's the owner.

9          Q.    Of AMRR?

10         A.    Yes, yes.

11         Q.    And at the time this loan was made in January

12    of 2022, was Mr. Frinzi the CEO of Goodman Networks?

13         A.    I don't know.  I don't know if he resigned

14    already or -- so I'm not sure.

15         Q.    So -- but do you know that this loan occurred?

16         A.    I did not know the loan occurred, no.

17         Q.    Do you know whether Goodman Networks ever paid

18    AMRR $44 million?

19               MR. KLEINSASSER:  Objection, form.

20         A.    I do not know.

21         Q.    Do you know whether Goodman Networks paid

22    American -- AMRR any money at any time?

23         A.    I do not.

24               MR. KLEINSASSER:  Objection, form.

25         Q.    Was that something -- I mean, you're a

Page 78

1    significant shareholder of Goodman Networks, correct?

2              MR. KLEINSASSER:  Objection, form.

3         A.   Yes.

4         Q.   And your signature was allegedly forged on

5    this $44 million loan, correct?

6         A.   Yes.

7         Q.   So wouldn't that be something that you would

8    want to investigate as a significant shareholder of

9    Goodman Networks, Inc., whether or not that loan was

10   actually made?

11             MR. KLEINSASSER:  Objection, form.

12        A.   If I would have known about it, yes.

13        Q.   Well, but now you know about it.  So have you

14   made any effort to talk to the leadership of Goodman

15   Networks, Inc. to figure out whether or not this was

16   made?

17        A.   No.

18             MR. KLEINSASSER:  Objection, form.

19        Q.   You mentioned a conversation with Mr. Frinzi

20   prior to this note being executed in January 2022,

21   correct?

22        A.   Yes.

23        Q.   And we -- you were saying that conversation

24   was November, December of 2021; is that right?

25        A.   I believe so, yes.

Page 79

1      Q.   And so that was a telephone conversation

2   between you and Mr. Frinzi; is that correct?

3      A.   Yes.

4      Q.   And can you just -- and how did that come up?

5   Was that the first time that you learned about the

6   potential of this loan?

7      A.   It was.

8      Q.   And did -- on that phone call, was that the

9   first time that Mr. Frinzi mentioned this to you?

10     A.   I believe so, yes.

11     Q.   And what did you say when he mentioned it to

12  you?

13     A.   I said, "I don't think you can do this.  You

14  know, the company has to get, you know, significant

15  benefit, you know, which would have to go back to the

16  bondholders and share -- and -- and any of the

17  creditors."

18          So my initial response is, "I don't think

19  you can do that, you know.  Have you talked to the

20  attorneys?"

21     Q.   And did you have any subsequent -- oh, I'm

22  sorry.  Before we get there, did Mr. Frinzi respond to

23  that comment that you made?

24     A.   I can't recall.  He might have said, "I'll go

25  back and talk to the attorneys," but I can't remember

Page 80

1    what he said.  I was -- it's been too long.

2        Q.   Did you have any subsequent conversations with

3    Mr. Frinzi about the AMRR note after that initial

4    conversation?

5        A.   No.

6        Q.   Okay.  So it was just the one conversation in

7    November, December of 2021 where you discussed it with

8    Mr. Frinzi.  And did you instruct him at that time not

9    to pursue it or was it an open question?

10       A.   I can't recall.  You know, my response -- I do

11   remember saying that, you know, "I don't think you can

12   do that," you know, "You need to check with the

13   attorneys."

14       Q.   Did you ever instruct him not to do that?

15            MR. KLEINSASSER:  Objection, form.

16       A.   Yeah, I don't recall.

17       Q.   Did the Goodman Networks, Inc. board ever

18   consider this $44 million loan from Goodman to AMRR?

19       A.   Never.

20            MR. KLEINSASSER:  Objection, form.

21       Q.   Were you involved in this transaction at all

22   in any way other than the one conversation with

23   Mr. Frinzi?

24       A.   I was not.

25       Q.   Did the Goodman Networks' board approve of

Page 81

1    this transaction?

2        A.   I don't know.  Not when I was there, no.

3        Q.   So just help me with this.  How could

4    Mr. Frinzi spend $44 million of Goodman Networks, Inc.

5    money without the Goodman Networks, Inc. board knowing

6    about it?

7             MR. KLEINSASSER:  Objection, form.

8        A.   Because he had oversight of the company.  I

9    resigned from the company, the board, in December of

10   2021, and separated, you know, from the company.  So --

11   you know, so I would have -- no longer have had

12   oversight or participation, you know, with the company.

13       Q.   But, sir, your resignation letter is dated

14   February 1st, 2022, which is ten days after this note

15   was allegedly signed.  So is a $44 million loan -- how

16   could he loan $44 million to his own company without

17   the Goodman Networks, Inc. board being aware of that?

18            MR. KLEINSASSER:  Objection, form.

19       A.   Because they weren't notified.  No one was

20   aware of it.  There could have been a lot of reasons,

21   but I wasn't on the board so I can't answer that

22   question.

23       Q.   But, sir, again, your resignation letter is

24   dated February 1st, 2022, ten days before this note was

25   allegedly signed.  How can it be that in a company, the

Page 82

1  CEO could loan his -- another one of his companies $44

2  million without there being some kind of controls in

3  the company to prevent that from happening?

4          MR. KLEINSASSER:  Objection, form.

5      A.   I'm not -- I don't know.

6      Q.   Well, what kind of controls did you have in

7  place that would prevent the CEO of the company from

8  loaning $44 million to himself?

9          MR. KLEINSASSER:  Objection, form.

10     A.   The company would have had previous controls

11  and measures in place, you know, in a standard

12  operating entity.  So there would have been controls in

13  place that would have, you know, prevented that.  But

14  there was no -- you know, there was -- so in a typical

15  operating company they would have had to get the board

16  approval for that.  And so --

17     Q.   Sir, I'm not asking you about what a typical

18  operating company is.  You were the chairman of the

19  board of Goodman Networks, Inc.  What I want to know is

20  what internal controls did you have in place and ensure

21  were in place to prevent the CEO of the company from

22  loaning $44 million to himself?

23         MR. KLEINSASSER:  Objection, form.

24     A.   Well, there was no loan done whenever I was a

25  board member.  I resigned in December of 2021, and all

Page 83

1    of the controls would have been previously -- you know,

2    been in place.  So there would have been controls in

3    place if the company would have been in normal

4    operating, you know, day-to-day, you know, with

5    multiple board members.  And -- but I was no longer

6    there.

7        Q.   Sir, again, your resignation is dated

8    February 1st, 2022.  So officially that is the day that

9    you resigned from the company.

10            And my question to you is that you were

11   the chairman of the board of Goodman Networks, Inc.,

12   and I don't want to know what standard companies do.  I

13   want to know what you had in place at Goodman Network

14   as the chairman of the board to prevent the CEO from

15   loaning himself $44 million.

16            MR. KLEINSASSER:  Hold on a second.

17   Ryan, you've asked that question now like six or

18   seven times.  Move on.  I know you don't like his

19   answer, but he's answered you like six times now, okay?

20            MR. PHAIR:  He didn't answer it.

21            MR. KLEINSASSER:  No, no.

22            MR. PHAIR:  Yes.

23            MR. KLEINSASSER:  You need to move on.

24   We're done with this.  You're harassing him.

25            MR. PHAIR:  No, we're not done with this.

Page 84

1    If you're going to instruct him on privilege, Matthias,

2    you can --

3            MR. KLEINSASSER:  No, I can instruct him.

4    If you are harassing him I can make a motion to

5    terminate this deposition under Rule 30.  You've asked

6    the same question six times.

7            MR. PHAIR:  Well, do it.

8            MR. KLEINSASSER:  Move on.

9            MR. PHAIR:  Make your motion.

10           MR. KLEINSASSER:  I'm going to do it

11   right now.

12           MR. PHAIR:  Until you make a motion --

13           MR. KLEINSASSER:  I'm telling you, I'm

14   instructing him --

15           MR. PHAIR:  Until you make a motion he

16   can answer the question.

17       Q.   And my question is, sir, you were the chairman

18   of the board of Goodman Networks, Inc., and I want to

19   know what specific controls that you ensured were in

20   place that prevented the CEO of the company from

21   loaning $44 million to himself.

22       A.   So I --

23           MR. KLEINSASSER:  James, hold on a

24   second.  You've -- unless your answer is something

25   different, then you don't need to answer that question.

Page 85

1    If you have an additional answer, go ahead.

2                Do we need to ask it eight times now,

3    Ryan?

4                MR. PHAIR:  No.  He has given me an

5    answer that says, "This is what typical operating

6    companies do."  That's not my question.

7        Q.   My question is, as the chairman of the board

8    of Goodman Networks, Inc., what did you do for this

9    company to ensure that controls were in place to make

10   sure that the CEO could not loan himself

11   $44 million?

12               MR. PHAIR:  That question has not been

13   answered and I'm entitled to an answer to that

14   question.

15               MR. KLEINSASSER:  Okay.  Let's unpack

16   this for a second, okay, since you're going to harass

17   the witness.  Number one, he has not stated that he was

18   chairman of the board during that time.  He stated he

19   was not.  I understand that you don't like that and you

20   think that a legal document that was purportedly sent

21   on February 1st --

22               MR. PHAIR:  Matthias, we're not sitting

23   here arguing.  This is not -- I'm not deposing you.

24   You can either instruct him not to answer, make a

25   Rule 30 motion, or he can answer.  That's the way a

Page 86

1    deposition works.

2                 MR. KLEINSASSER:  I --

3                 MR. PHAIR:  Either make your motion or

4    stop making speaking objections.  This is not your

5    deposition.

6                 MR. KLEINSASSER:  I'm telling you to move

7    on from this question.

8                 MR. PHAIR:  He can answer my question and

9    then I will move on.  That's the way it works.

10                MR. KLEINSASSER:  Ask your question one

11   more time, and beyond this I'm going to make a motion

12   because this will be -- this will be the eighth time

13   you've asked this question.  Go ahead.

14        Q.   My question is as the chairman of the board of

15   Goodman Networks, Inc., what did you do to ensure that

16   the company had internal controls in place for this

17   company, this specific company, to ensure that the CEO

18   could not loan himself $44 million?

19                MR. KLEINSASSER:  Objection, form.

20        A.   So I was no longer a board member whenever the

21   loan took place and there would have been measures in

22   place that the company would -- you know, would have

23   had in place prior to me being a board member.  But I

24   was no longer a board member when this loan took place.

25        Q.   What were the measures?  You said that the

Page 87

1    company had measures in place.  What were those

2    measures?

3        A.   I don't know.  I would have to look at the

4    shareholder agreement, the bylaws and see what process

5    and procedures they had in place.

6        Q.   But sitting here today, you can't identify

7    any?

8        A.   That's correct.

9        Q.   Have you had any discussions with Mr. Frinzi

10   about the AMRR notes after your resignation from the

11   board?

12       A.   Not that I can recall.

13       Q.   Have you had any discussions with anyone

14   associated with Goodman Networks, Inc. about the AMRR

15   note after your resignation?

16       A.   Not that I can --

17            MR. KLEINSASSER:  Objection, form.

18       Q.   Okay.  And then I just want to make sure we're

19   clear on this.

20            When was the last time that you spoke

21   with Mr. Frinzi about anything, like when was the last

22   time you had any kind of communication with him?

23       A.   So it would have been -- you know, I can't

24   recall the last time that the memory -- as far as an

25   exact date.  It would have been in 2021.  We

Page 88

1    communicated in, you know, 2022, but -- but it had

2    nothing to do with, you know, the company after I

3    separated.

4         Q.   What did it have to do with?

5         A.   I can't recall.

6         Q.   So -- but just take the past three months.

7    Have you had any communications with Mr. Frinzi at all

8    in the past three months?

9         A.   I can't recall.

10        Q.   Is it possible that you've had communications

11   with Mr. Frinzi in the past three months?

12        A.   Probably not.

13        Q.   Is it possible that you've had communications

14   with Mr. Frinzi in the past six months?

15        A.   It's possible.

16        Q.   And do you recall any conversations with

17   Mr. Frinzi in the past six months?

18        A.   I do not.

19        Q.   Are you aware that AMRR defaulted on this

20   note?

21             MR. KLEINSASSER:  Objection, form.

22        A.   No, I'm not.

23        Q.   Do you have any ownership interest in AMRR?

24        A.   I do not.

25        Q.   Did you have any in the past?

Page 89

1      A.    I did not, no.

2      Q.    Do you have any ownership interest in

3   Multiband Global Resources?

4      A.    Is this the Goodman company, Multiband?

5      Q.    Yes.

6             MR. KLEINSASSER:  Objection, form.

7      Q.    Are you familiar with a company called

8   Multiband Global Resources?

9      A.    If this is the Goodman company.  I mean, it

10   was just a wholly-owned subsidiary of Goodman, so my

11   common shares would have -- there would have been

12   ownership at -- you know, indirectly to it.  But -- but

13   not directly, no, I don't have any shares from

14   Multiband USA or Global.  I don't have any shares from

15   that company.

16      Q.    Do you have any other relationship to AMRR?

17      A.    I do not.

18      Q.    What about to Multiband Global Resources?

19      A.    I do not.

20      Q.    You mentioned GNET ATC, Inc., and you pointed

21   out in the AMRR note that that was the entity that is

22   there.  Are you familiar with GNET ATC, Inc?

23      A.    I am.

24      Q.    What is that company?

25      A.    They're a wholly-owned subsidiary of Goodman

Page 90

1  Networks.

2      Q.   And do you have any ownership interest in GNET

3  ATC, Inc.?

4      A.   I do not.

5      Q.   Do you have any officer, director, or other

6  role with GNET ATC, Inc.?

7      A.   I do not.

8      Q.   Did you have any other conversations with

9  anyone else besides Mr. Frinzi about the AMRR's note?

10     A.   Not that I can recall.

11     Q.   Have you had any conversations with CFGI about

12  the AMRR note?

13     A.   No, no.

14     Q.   Never?

15     A.   Not that I can recall, no.

16     Q.   Are you aware of any other loans that Goodman

17  Networks, Inc. made to companies controlled by its

18  officers and directors?

19     A.   Can you say the question again?

20     Q.   Are you aware of any other loans that Goodman

21  Networks, Inc. made to companies controlled by its

22  officers or directors?

23              MR. KLEINSASSER:  Objection, form.

24     A.   I don't recall.

25     Q.   Did you or any company you control receive any

Page 91

1    payments from any source in connection with the AMRR

2    loan?

3        A.    No.

4        Q.    Was any portion of the 44 million transferred

5    to you or a company under your control?

6        A.    No.

7        Q.    You're familiar with the 8 percent secured

8    notes issued by Goodman Networks in May 2017, correct?

9                MR. KLEINSASSER:    Objection, form.

10       Q.    Sir, are you familiar with the 8 percent in

11   senior secured notes issued by Goodman Networks, Inc.

12   in May 2017?

13       A.    Yes.    The bondholders?

14       Q.    Yes, sir.

15       A.    Yes.

16       Q.    And -- well, I'll refer to that as the bond

17   issue.    I can bring it up if you want to look at the

18   indenture.    But do you understand what I talk about

19   when I talk about the bond issuance?

20       A.    I do.

21       Q.    Did you or any company you control purchase

22   any of the notes or bonds at any time?

23                MR. KLEINSASSER:    Objection, form.

24       A.    I did.

25       Q.    I'm sorry?

Page 92

1      A.    Yes.

2      Q.    Okay.  From which -- who -- let me rephrase

3   that.  Which of the companies that you control

4   purchased some of the notes or bonds that were issued

5   as part of the May 2017 issuance?

6                MR. KLEINSASSER:  Objection, form.

7      A.    What was the question?

8      Q.    I asked you whether any company that you

9   controlled purchased any of the bonds, and you said

10  yes.

11     A.    Yes.

12     Q.    And what I'm trying to ask is, which of the

13  companies that you control purchased the bonds?

14                MR. KLEINSASSER:  Objection, form.

15     A.    Goodman Investments.

16     Q.    And how many of the bonds did Goodman

17  Investments purchase?

18     A.    You know, it was -- you know, I can't recall

19  the exact amount.  You know, I think it was like 18

20  million of the bonds, the --

21     Q.    And any other entity besides Goodman

22  investments -- did any other entity purchase the bonds

23  beside Goodman Investments?

24     A.    Not that I can recall.

25     Q.    And who did they purchase the bonds from?

1      A.   It was from the open market.  Yeah, whoever

2   sells them, wherever you have to go to to buy the

3   bonds.

4      Q.   Do you still own any of the bonds?

5      A.   I do not.

6      Q.   When did you sell them?

7      A.   I don't recall.  It was in 2022.

8      Q.   How much did you sell?

9      A.   I sold $18 million worth of them.

10     Q.   Did you sell any of the bonds to Mr. Frinzi

11  in 2022?

12     A.   I did not.

13     Q.   Did Mr. Frinzi try to buy any bonds from you?

14     A.   He did not.

15          MR. PHAIR:  Philip, if you could bring up

16  Goodman -- the document Bates stamped as Goodman368.

17              (Exhibit 4 marked)

18     Q.   Mr. Goodman, I'm handing you what's been

19  marked as Goodman Exhibit 4.  And this is, I will

20  represent to you, an e-mail exchange that was produced

21  to us in discovery dated January 31st, 2022, in which

22  you and Mr. Frinzi are both copied.  Do you see that?

23     A.   I see it, but can you blow it up where I

24  can -- okay.  I see it.

25     Q.   Okay.  And if you scroll down to the bottom,

Page 94

1    this is Mr. Frinzi sending an e-mail dated

2    January 31st, 2022 at 1:40 p.m., correct?

3        A.   Yes.

4        Q.   And he sends that to some folks at San Blas

5    Securities and yourself, correct?

6        A.   Yes.

7        Q.   And this would have been ten days after the

8    note -- the AMRR note and one day before you sent the

9    written resignation to the board, correct?

10       A.   Yes.

11       Q.   And in this e-mail Mr. Frinzi says that -- if

12   you look at the second paragraph, "I would like to buy

13   James Goodman's bonds for $.35 each and I would like to

14   close tomorrow or Wednesday at the latest."

15               Do you see that?

16       A.   I do.

17       Q.   Do you recall this discussion with Mr. Frinzi?

18       A.   I do not.

19       Q.   And if you could scroll up.  You respond to

20   Mr. Frinzi's e-mails, to the securities folks, and you

21   say -- you ask them, "I need to transfer my bonds from

22   my bank to you and then sell them."

23               And you ask them what they would charge

24   to do this.  Do you see that?

25       A.   I do, yes.

Page 95

1      Q.   Okay.  And you sent that e-mail, correct?

2      A.   Yes.

3      Q.   If we go further up they asked you how much it

4   would be, and you say it will be $9 million worth of

5   bonds, correct?

6      A.   Yes.

7      Q.   That would have been half of the 18 million

8   that you were talking about, correct?

9      A.   I would have to check the exact amount, but --

10   you know, what I had or what was being sold.

11      Q.   Okay.  And then if you scroll further up, he

12   quotes you a price of 19,500 for it, and then you

13   respond, "Ok, that works for me."

14           Do you see that?

15      A.   I do.

16      Q.   And you sent that e-mail, right, sir?

17      A.   I did.

18      Q.   Okay.

19           THE WITNESS:  So, Matthias, would this be

20   privileged information with Toby being copied on it?

21           MR. KLEINSASSER:  Well --

22           MR. PHAIR:  No, there's a --

23           MR. KLEINSASSER:  No, because there's

24   a -- yeah.  No, it wouldn't have been.

25      Q.   Do you see that, sir?

Page 96

1      A.   I do, yes.

2      Q.   So did you sell these bonds to Mr. Frinzi?

3      A.   No.

4      Q.   Do you recall this discussion?

5      A.   I do not.

6      Q.   How do you know whether or not you actually

7  sold these bonds to Mr. Frinzi or not?

8      A.   Jim didn't buy the bonds.  It was another --

9  it was another group that purchased the bonds, not Jim.

10     Q.   Why were you discussing selling the bonds with

11 Mr. Frinzi?

12     A.   I have no idea.

13     Q.   Who ended up buying the bonds?

14     A.   I'll think of his name in a minute, but it was

15 a third party who purchased the bonds.  It wasn't Jim

16 or AMRR who purchased the bonds.

17     Q.   Okay.  And if you --

18          MR. PHAIR:  Phil, can you bring the

19 document back up again for a second?  If you scroll

20 down to the bottom there of Goodman Exhibit 4.

21     Q.   Mr. Frinzi says, "I would like to buy

22 James Goodman's bonds for $.35 each."

23          Do you see that?

24     A.   I do.

25     Q.   And then that's what you're discussing in this

1    e-mail chain, is a transaction for approximately

2    $9 million worth of bonds at 35 cents each, correct?

3        A.   Yes.

4             MR. KLEINSASSER:  Objection, form.

5        Q.   How did you arrive at the valuation of

6    35 cents each?

7             MR. KLEINSASSER:  Objection, form.

8        A.   It would have been -- you know, it probably

9    would have been what the -- you know, what the bonds

10   were selling for.

11       Q.   Selling for where?

12       A.   On the market, on the open market.

13       Q.   Okay.  Did you sell any bonds to Goodman

14   Networks or any of its affiliated entities?

15       A.   I did not.

16       Q.   Did you sell any bonds to a company called

17   Alliance Texas Holdings?

18       A.   Alliance Tech Holdings?

19       Q.   Alliance Texas Holdings.

20       A.   Not that I recall.

21       Q.   Okay.

22             MR. PHAIR:  Phil, if you could bring

23   up -- what is it -- the bond purchase agreement.

24             MR. GUFFY:  Give me one moment here.

25             (Exhibit 5 marked)

Page 98

1      Q.   Sir, while we're bringing that up, what's your

2   position at Goodman Investment Holdings?

3      A.   I'm the owner.

4      Q.   I'll represent to you that this is a bond

5   purchase agreement that was produced to us in discovery

6   dated February 3rd, 2022 between Goodman Investment

7   Holdings, Genesis Networks, and Alliance Texas

8   Holdings, LLC.  Do you see that?

9      A.   I do.

10      Q.   And did you, in fact, enter into this bond

11   purchase agreement?

12      A.   Is my signature on it?

13      Q.   Sure.

14           MR. PHAIR:  Let's go down to the bottom.

15   One more down.

16      Q.   That's your signature, correct, sir?

17      A.   Yes.

18      Q.   And if you go down for Genesis Networks,

19   that's also your signature, correct, sir?

20      A.   That's correct.

21      Q.   So this is a bond purchase agreement that you

22   executed on February 3rd, 2022, correct?

23           MR. KLEINSASSER:  Objection, form.

24      A.   Yes.

25      Q.   And, again, that would have been two days

Page 99

1    after you submitted your written resignation to the

2    Goodman Networks' board of directors, correct?

3        A.   Yes.

4        Q.   And this bond purchase agreement indicates

5    that the purchaser, Alliance Texas Holdings, intends to

6    purchase from Goodman Investment Holdings 30 million in

7    face amount of the bonds, correct?

8                    MR. KLEINSASSER:  Objection, form.

9                    James, do you need to review this

10   agreement to answer that question?

11                   THE WITNESS:  I have not, no.

12                   MR. KLEINSASSER:  I'm asking if you need

13   time to review it.

14                   THE WITNESS:  Yes.  Yeah, sure.

15       Q.   So I'll represent to you I don't think we

16   need to -- really just the "whereas" clause is all

17   we're talking about here for purposes of this

18   conversation.  All I want to ask about is the -- the

19   sale of 30 million in Goodman Networks bonds for the

20   purchase price of 10.57 to Alliance Texas Holdings.

21       A.   Yeah, I would have let the attorneys handle

22   it.  I mean, I didn't know this company.  They were

23   just third-party buyers, just like other bondholders,

24   you know, would have been.  Who else signed this

25   document?

Page 100

1      Q.   Neil Auerbach.  Do you know who Neil Auerbach

2   is?

3      A.   Not Neil.  Is that Shalom, Shalom?

4      Q.   Nope.  The document is signed by

5   Neil Auerbach.

6      A.   Okay.  So I don't know who the buyer was.

7      Q.   You've never heard of Neil Auerbach?

8      A.   Neil?  No, I have not.

9      Q.   You do know Shalom Auerbach, though, correct?

10     A.   Yes.

11     Q.   Who is Shalom Auerbach?

12     A.   He purchased the bonds from me.

13     Q.   And is Neil his son?

14     A.   I do not know.

15     Q.   Object.  Are you familiar with an entity known

16   as Alliance Texas Holdings?

17     A.   I am not.

18     Q.   So you did a bond purchase agreement for

19   $10 million with an entity that you're not familiar

20   with?

21     A.   Yes.

22          MR. KLEINSASSER:  Objection, form.

23     Q.   Okay.  And why did you sell the bonds?

24     A.   Other bondholders were selling their bonds.

25   And I had a buyer who was interested in buying the

Page 101

1    bonds, so, you know, I sold them like the other

2    bondholders, you know, were selling -- buying and

3    selling their bonds.

4        Q.   Okay.  And you sold approximately 31 million

5    worth of bonds for approximately 11 million, correct?

6        A.   Is that what it says on the document?

7        Q.   Yes, sir.

8        A.   Yes.

9        Q.   And that's about 35 cents on the dollar,

10   correct?

11       A.   If that's what it comes out to, yes.

12       Q.   And as we looked at earlier, that was the same

13   price that Mr. Frinzi wanted to pay for the bonds,

14   correct?

15       A.   Yes.

16       Q.   How did you arrive at the sale price for the

17   bonds to Alliance Texas Holdings?

18            MR. KLEINSASSER:  Objection, form.

19       A.   I would have looked at the -- what the current

20   trades -- where the bonds were trading at online, you

21   know.  It's -- and got a price from the -- from what

22   the other bonds were selling at.

23       Q.   Going back a second to Shalom Auerbach, what's

24   your relationship with Shalom Auerbach?

25       A.   There's no relationship.

Page 102

1      Q.   How do you know Mr. Auerbach?

2      A.   I don't know him.  I met him one time.

3      Q.   When did you meet him?

4      A.   It was probably mid-year 2022.  I don't recall

5    the exact date.

6      Q.   And where did you meet him?

7      A.   In Florida.

8      Q.   Where?

9      A.   In Miami.

10     Q.   Where?

11     A.   I can't recall where.

12     Q.   Was it a hotel, was it at his house, was

13   it dinner --

14     A.   No, I -- it was like at a -- it was at a

15   restaurant.  I just can't recall where it was or where

16   it was at.

17     Q.   Okay.  And that's the only time you've ever

18   met with Mr. Auerbach in person?

19     A.   That's correct, yes.

20     Q.   Have you met with any other members of the

21   Auerbach family?

22     A.   I have not, no.

23     Q.   Have you ever had telephone conversations with

24   Mr. Auerbach?

25     A.   I could have, yes.

Page 103

1      Q.   Have you ever had text messages with

2   Mr. Auerbach?

3      A.   Not that I can recall.  I mean, I could have,

4   but none that I recall.

5      Q.   Have you ever had -- have you ever used a

6   messaging app like we discussed earlier using Signal to

7   communicate with Mr. Auerbach?

8      A.   Not that I'm aware of.

9      Q.   How did you -- what gave you the idea to sell

10  the bonds to Alliance Texas Holdings?

11           MR. KLEINSASSER:  Objection, form.

12     A.   I didn't have the idea.  You know, someone

13  approached me.  I involved, you know, my legal counsel

14  and -- and if they wanted to buy them, then, you know,

15  I would sell them.

16     Q.   Who approached you?

17     A.   I don't recall.

18     Q.   Was it Mr. Auerbach?

19     A.   You know, I just can't remember.

20     Q.   Is it your understanding that Goodman Networks

21  eventually purchased these bonds and retired them?

22     A.   I do not know.

23     Q.   Do you know one way or another whether Goodman

24  Networks ultimately purchased these bonds?

25     A.   I do not know.

1           MR. KLEINSASSER:  Objection, form.

2      Q.   Do you know whether Goodman Networks ever

3   purchased bonds from Hudson Clean Energy Enterprises?

4      A.   I do not know.

5      Q.   Have you ever heard of a company called Hudson

6   Clean Energy Enterprises?

7      A.   No.

8      Q.   Do you know whether Mr. Frinzi knows

9   Mr. Auerbach?

10     A.   I believe so.

11     Q.   And what is your understanding of Mr. Frinzi's

12  relationship with Mr. Auerbach?

13     A.   I don't know their relationship.  I just know

14  that they know each other.

15     Q.   Who introduced you to Mr. Auerbach?

16     A.   Jim would have probably introduced me to him.

17     Q.   How long have you known Mr. Auerbach?

18     A.   That was the first time I ever met him, so,

19  you know, five, six months.

20     Q.   And when you had this dinner at the restaurant

21  with Mr. Auerbach in Miami, was there anyone else with

22  you or was it just the two of you?

23     A.   It was just the two of us.

24     Q.   Okay.  And what were you discussing during

25  that dinner?

Page 105

1      A.   We were discussing an investment in a company.

2      Q.   Which company?

3      A.   I don't recall.

4      Q.   Will you be surprised to learn that Goodman

5   Networks eventually purchased the bonds that you sold

6   to Mr. Auerbach and Alliance Texas Holdings?

7             MR. KLEINSASSER:  Objection, form.

8      A.   Yes.

9      Q.   You would?

10     A.   Yes.

11     Q.   Why?

12     A.   Why would they -- why would Goodman, you know,

13   buy the bonds?

14     Q.   Would it surprise you to learn that Goodman

15   Networks purchased the bonds from Mr. Auerbach and

16   Alliance Texas Holdings for more than you sold it to

17   them?

18     A.   Yes.

19             MR. KLEINSASSER:  Objection, form.

20     Q.   Why would that surprise you?

21     A.   Why would Goodman buy the bonds?  There was,

22   you know, no need for them to -- you know, to purchase

23   the bonds.

24     Q.   After the sale in February of 2022 to Alliance

25   Texas Holdings and Mr. Auerbach, did you discuss any

Page 106

1  other sales of the bonds with Mr. Auerbach?

2      A.   No.  I mean, I could have.  I -- you know, I

3  just can't recall.

4              MR. PHAIR:  Phil, if you could bring up

5  Goodman372.  If you could pull that up so it's easy to

6  see.

7                   (Exhibit 6 marked)

8      Q.   Mr. Goodman, I'm showing you on my screen what

9  we've marked as James Goodman Exhibit 6.  Do you see

10  that?

11      A.   I do.

12      Q.   Okay.  I'll represent to you that this is an

13  e-mail that was produced to us in discovery dated

14  May 3rd, 2022.  And you can see that this is an e-mail

15  exchange between you and some others, including

16  Mr. Auerbach.  Do you see that?

17      A.   I do.

18      Q.   All right.  And the first e-mail on May 2nd at

19  9:27 p.m. you write to Mr. Auerbach and you say,

20  "Shalom, The banks have released the bonds.  Where do

21  you want the remaining bonds sent?  James Goodman."

22              Do you see that?

23      A.   I do.

24      Q.   What bonds are you referring to there?

25      A.   It would have been the ones that he purchased

Page 107

1   or his company purchased.

2       Q.   So this is a subsequent purchase, an

3   additional purchase Mr. Shalom made of bonds from you,

4   correct?

5              MR. KLEINSASSER:  Objection, form.

6       A.   I don't think so.

7       Q.   So your testimony is that the bonds that are

8   being discussed in this e-mail relate to the bond

9   purchase agreement dated February 3rd?

10      A.   Yes.

11      Q.   Why did it take three months to orchestrate a

12  transfer of the bonds?

13      A.   I don't know.  I can't remember.

14      Q.   Do you have any recollection about this

15  transaction with Mr. Auerbach?

16      A.   No.  I know that there was -- there was a

17  hang-up somewhere with San Blas or there was something

18  that -- you know, that -- that needed to be done,

19  but -- but it was from that original purchase.

20      Q.   Okay.  And Mr. Auerbach's e-mail here is at

21  "milrosecap."  What is Milrose Capital?

22      A.   I do not know.

23      Q.   Where did you get Mr. Auerbach's e-mail?

24      A.   I gave them -- they -- it would have been

25  something that was sent to me, and I just responded to

Page 108

1    an e-mail chain.

2        Q.    Okay.  And if you go further up the e-mail

3    chain, there's a reference to Cathy Kincy at Genesis

4    Networks.  Do you know Cathy Kincy?

5        A.    I do.

6        Q.    Who's she?

7        A.    She was the CFO of the company, of Genesis.

8        Q.    Okay.  And she says, "I have sent the

9    directive to the Texas Partners' Investment team."

10                Do you see that?

11       A.    I do.

12       Q.    Who's Texas Partners?

13       A.    They would have been our bank, my bank.

14       Q.    Your bank for what?

15       A.    To -- where I have business account.

16       Q.    Okay.  What about personal accounts?  Where do

17   you keep your personal accounts?

18       A.    It would have been there also with the Texas

19   Capital Bank.

20       Q.    So all of your personal accounts are at Texas

21   Capital Bank?

22       A.    No.

23       Q.    What other banks do you use?

24       A.    Bank of America, Chase Bank.

25       Q.    How many accounts do you have, just three or

Page 109

1   more?

2       A.   I can't recall.

3       Q.   Can you recall any other banks or accounts

4   that you have?

5       A.   No.

6       Q.   Do you have any accounts that are offshore?

7       A.   I do not.

8               MR. PHAIR:  You know what?  If we could

9   take just a -- we're at 1:30.  This actually probably

10  is a good time to break because it's 12:30 your time,

11  right?  It's an hour difference?  So should we break

12  now.

13              MR. RUKAVINA:  This is Davor, Ryan.  I

14  have an emergency hearing at 1:30 Central that

15  shouldn't take but half an hour.  If everyone could

16  accommodate me, I would ask that you maybe go another

17  half an hour and then we take a break.

18              MR. PHAIR:  Sure.  Happy to.

19              MR. RUKAVINA:  Is that okay with you,

20  Matthias?

21              MR. KLEINSASSER:  Yeah, it's fine with

22  me.

23              Are you okay, James?

24              THE WITNESS:  Yes, yeah.

25              MR. RUKAVINA:  Can we take a -- take a

Page 110

1    restroom break if you need one.  I would just ask if we

2    could.  That way, you know, I'll be on the whole time.

3    But thank you for your accommodation, everyone.

4                    MR. PHAIR:  Fair enough.  If we could

5    take just a quick restroom break because I really need

6    to run -- like five minutes, and then we can knock out

7    another 30 minutes before lunch.

8                    THE VIDEOGRAPHER:  Off the record at

9    12:29 p.m.

10                   (Recess from 12:29 p.m. to 12:44 p.m.)

11                   THE VIDEOGRAPHER:  On the record at

12   12:44 p.m.

13        Q.   (BY MR. PHAIR)  Mr. Goodman, earlier we were

14   talking about your call to the FBI about your alleged

15   forged signature on the AMRR note.  Do you recall that?

16        A.   Yes.

17        Q.   Do you believe that Mr. Frinzi committed fraud

18   in connection with the AMRR note?

19        A.   I do not know.

20                   MR. KLEINSASSER:  Objection, form.

21        Q.   Have you investigated that?

22                   MR. KLEINSASSER:  Objection, form.

23        A.   I'm going to let the authorities do that.

24        Q.   Well, but if someone defrauded Goodman

25   Networks, the company, have you considered a lawsuit

Page 111

1    against whoever forged your signature?

2        A.   Yes, sir.

3               MR. KLEINSASSER:  Objection, form.

4        A.   Yes.

5        Q.   And have you put anyone on notice of your

6    intent to file a lawsuit?

7               MR. KLEINSASSER:  Objection, form.

8        A.   Just been in discussion with my attorney.

9        Q.   I don't want to get into your discussions with

10   your attorneys.  But my question is, have you provided

11   anyone with notice that you intend to initiate a

12   lawsuit?

13              MR. KLEINSASSER:  Objection, form.

14       A.   No.

15       Q.   And have you taken any steps to initiate a

16   lawsuit apart from speaking with your attorneys?

17              MR. KLEINSASSER:  Objection, form.

18       A.   Just, you know, contacting the FBI to see what

19   needs to be done first.

20       Q.   Okay.  But, as of today, Goodman Networks,

21   Inc. hasn't done anything to recover the $44 million

22   that you allege was associated with your forged

23   signature on the AMRR note; is that correct?

24              MR. KLEINSASSER:  Objection, form.

25       A.   No.  You know, I haven't talked to the Goodman

Page 112

1    attorney, you know, or the -- you know, the new company

2    representatives.  So they may have already started

3    something, but I'm not aware of anything.

4        Q.    Okay.  Are you aware of the company's efforts

5    to repay the bonds?

6        A.    Yes.

7        Q.    And what is -- what is your awareness of that?

8        A.    Well, I mean, I tried to buy the bonds from

9    the bondholders and they wouldn't sell.  And, you know,

10   Jim tried to buy the bonds, make enough -- you know,

11   directly and indirectly make offers to the bondholders

12   at a fair market price, and they wouldn't sell.  And so

13   that's my understanding.

14       Q.    So there was about 112 million in bonds

15   outstanding under the indenture, correct?

16       A.    No.

17       Q.    How much was outstanding -- not outstanding.

18   The principal amount was about 112 million, correct?

19       A.    The original amount was.  I think

20   what's outstanding today, I'm not sure what that amount

21   is.

22       Q.    Okay.  Were you aware and were you keeping

23   track of -- well, let me ask, were you being kept

24   apprised and getting status updates of the company's

25   efforts to buy back the bonds?

Page 113

1      A.    No.

2                  MR. KLEINSASSER:  Objection, form.

3                  MR. PHAIR:  Philip, if you could bring up

4      Goodman374.

5                  (Exhibit 7 marked)

6      Q.    Do you see that, Mr. Goodman?

7      A.    I do.

8      Q.    And I believe this is Goodman Exhibit 7.

9                  MR. PHAIR:  Is that correct, Phil?

10                 MR. GUFFY:  Yes, it's 7.

11                 MR. PHAIR:  Okay.

12     Q.    I'm showing you on the screen what's been

13     marked as James Goodman Exhibit 7.  I'll represent to

14     you that this is an e-mail produced to us in discovery

15     dated May 24th, 2022 between you, Mr. Frinzi, and some

16     of the folks at CFGI.  Do you see that?

17     A.    I do.

18     Q.    And who is CFGI?

19     A.    It was a restructure company that -- that

20     Goodman hired.

21     Q.    And when did Goodman hire them?

22     A.    I don't know.

23     Q.    Was it 2022, 2018?

24     A.    Yeah, I don't know.

25     Q.    Did they hire them when you were on the board?

Page 114

1    A.   Not when I was there, no.

2    Q.   Have you ever spoken with Mr. Konicov?

3    A.   Who is that?  No.  What was the name, again?

4    Q.   Howard Konicov.

5    A.   No, I have not.

6    Q.   Have you ever spoken with Joseph Baum?

7    A.   I have.

8    Q.   And how do you know Joseph Baum?

9    A.   I don't know him.

10   Q.   What's your relationship with Mr. Baum?

11   A.   I don't have a relationship.  I've just met

12   him one time and talked to him on the phone one time.

13   Q.   When did you meet with him?

14   A.   I can't recall.  It was in Texas.

15   Q.   Last year, two years, five years ago?

16   A.   Oh, no.  It would have been last year.

17   Q.   And how did you -- how were you introduced to

18   Mr. Baum?

19   A.   Jim Frinzi.

20   Q.   Do you have an understanding of how Mr. Baum

21   knew Mr. Frinzi?

22   A.   I do not.

23   Q.   And when you met with him, was it a meeting in

24   an office, was it a dinner?

25   A.   No, it was a lunch.  It was a lunch meeting.

1      Q.   And that's in Houston?

2      A.   No, it was in -- it was in Horseshoe Bay,

3   Texas.

4      Q.   At a restaurant?

5      A.   It was, yes.

6      Q.   Who else was there?

7      A.   Jim Frinzi.

8      Q.   Anyone else?

9      A.   No.

10      Q.   Have you ever met Howard Konicov?

11      A.   I have not, no.

12      Q.   Okay.  If you scroll down on this document,

13   you see -- this is Mr. Baum, correct, sending you -- an

14   e-mail to both you and Mr. Goodman and Mr. Frinzi,

15   correct?

16      A.   Yes.

17      Q.   And he says good morning to the both of you,

18   and then he provides you with what he quotes a status

19   update on the outstanding bonds and the request to

20   extend the maturity date.  Do you see that?

21      A.   Yes.

22      Q.   Does that refresh your recollection of

23   receiving status updates from CFGI on the effort to

24   repurchase the bonds?

25      A.   No.

Page 116

1          Q.    Was Mr. Baum -- strike that.

2                    Mr. Baum here is giving you a status

3     update, correct?

4          A.    No.

5          Q.    He says, "Following is a status update,"

6     correct?

7          A.    That's what he's calling it.  He just -- he

8     copied me on an e-mail.

9          Q.    He sent the e-mail to you and Mr. Frinzi --

10         A.    Okay.

11         Q.    -- correct?

12         A.    Okay.

13         Q.    They're not copied on it.  You're the

14    addressee of the e-mail, correct?

15         A.    I think Jim is.  I think I'm just copied on

16    it.

17         Q.    You're the first name in the "To" line, sir;

18    isn't that correct?

19         A.    That's his preference.

20         Q.    Okay.  So Mr. Baum sent an e-mail on May 4th,

21    2022, addressing it to you and Mr. Frinzi, correct?

22         A.    Yes.

23         Q.    And that e-mail says, "Here's the status

24    update on the outstanding bonds and the request to

25    extend the maturity date," correct?

Page 117

1      A.    Yes.

2      Q.    And he tells you that there is status of

3  2.5 million of the outstanding bonds rejected the

4  offer, 2.5 million accepted, and that there's

5  13 million remaining, correct?

6      A.    Yes.

7      Q.    So collectively there's about 18 million that

8  remained outstanding as of May 24th, 2022, correct?

9      A.    Yes.

10      Q.    And the company had bought up already all

11  the -- the other bonds that were out on the market,

12  correct?

13             MR. KLEINSASSER:  Objection, form.

14      A.    I don't know.

15      Q.    Okay.  But the -- the shares that you had sold

16  to Texas Alliance Partners, those have been retired by

17  this point, correct?

18             MR. KLEINSASSER:  Objection, form.

19      A.    I don't know.

20      Q.    Well, you sold more shares than 18 million,

21  correct, sir?

22             MR. KLEINSASSER:  Objection, form.

23      A.    I don't recall.

24      Q.    All right.  If we can go back to the bond

25  agreement.  The -- if you scroll up, you respond to

Page 118

1    Mr. Baum, correct?

2        A.    Yes.

3        Q.    And this is response to his question where

4    he's saying, "I recommend an all hands call, including

5    the companies' bankruptcy counsel, to decide on the

6    companies next steps."

7              Do you see that?

8        A.    I do.

9        Q.    And then you say, "Then I would pay the extra

10   payment to whoever accepted and did not object and did

11   not respond."

12             Do you see that?

13       A.    I do.

14       Q.    What did you mean by that?

15       A.    I don't recall.

16       Q.    Okay.  And then Mr. Baum responds to your

17   suggestion and he says, "Well, if we do that we'll be

18   put into default," correct?

19       A.    Where is that at?

20       Q.    It's the e-mail right above, 12:28:23 p.m.

21       A.    I see that, yes.

22       Q.    Okay.  And that's what Mr. Baum told you,

23   correct?

24       A.    I think that's what he told everybody on the

25   e-mail.

Page 119

1      Q.   Okay.  But this is him responding to your

2    question three minutes earlier, correct?

3      A.   Yes.

4      Q.   And then you respond to him, you know, 20,

5    30 minutes later at 2:15 p.m., and you say, "My option

6    is they would look to us to resolve the bonds payment."

7              Do you see that?

8      A.   I do.

9      Q.   What did you mean by that?

10      A.   I don't know.  I can't remember.

11      Q.   Next line you say, "The company has a

12    $40m dollar asset in GNET ATC."

13              Do you see that?

14      A.   I do.

15      Q.   What was that asset?

16      A.   I do not know.

17      Q.   Sir, you can't recall what a $40 million asset

18    of Goodman Networks, Inc. was seven months ago?

19      A.   No.

20      Q.   So how did you think it would be, quote, hard

21    to put the company in bankruptcy when it has the

22    ability to pay?

23      A.   I don't recall.

24      Q.   What happens -- you know, the company,

25    obviously, is now in bankruptcy.  What happened between

Page 120

1    your e-mail on May 24th, 2022, and the filing of the

2    bankruptcy that put the company in a position where it

3    doesn't have the ability to pay?

4              MR. KLEINSASSER:   Objection, form.

5         A.   I do not know.

6         Q.   So your testimony today is that you don't know

7    what the $40 million asset of GNET ATC was when you

8    were referring to it with your auditors and Mr. Frinzi

9    on May 24th, 2022?

10             MR. KLEINSASSER:   Objection, form.

11        A.   What auditors?

12        Q.   CFGI.   Sorry.   Your bankruptcy counsel.

13        A.   So what's your question?

14        Q.   So -- well, let me ask it this way.   Is the

15   $40 million asset in GNET ATC the AMRR note?

16        A.   I don't know.

17        Q.   Well, sir, I'm just quoting your words.

18        A.   Yeah.   I --

19        Q.   I'm just asking you what you were saying in a

20   very important e-mail about a $40 million asset.   What

21   did you mean?

22             MR. KLEINSASSER:   Ryan, he's answered the

23   question like five times now.

24             MR. PHAIR:   I'm asking him whether or not

25   that was the AMRR note.

Page 121

1          MR. KLEINSASSER:  He just said, "I don't

2     know."

3          MR. PHAIR:  Okay.

4     Q.   Is it possible that it was the AMRR note?

5     A.   I don't know.

6     Q.   I'm not asking whether you know.  I'm just

7     asking whether it's possible or not?

8     A.   I don't know.  The AMRR note was 44 million.

9     This is 40 million.  I mean, I could have been -- I

10    don't know what I was thinking, you know, except for

11    the -- you know, the GNET ATC had cash, you know.  That

12    money was still sitting there.  I mean, I could have

13    been referring to it, not a note.  So I don't recall

14    what that 40 million was.

15    Q.   Are there any other possibilities other than

16    the AMRR note and the cash?  Is there any other

17    possibilities about what you could have been referring

18    to?

19         MR. KLEINSASSER:  Objection, form.

20    A.   No.

21    Q.   Did GNET ATC have $40 million in cash as of

22    May 24th, 2022?

23    A.   I don't know.  I knew the company had

24    $60 million, you know, of cash before I left.

25    Q.   Why do you think GNET ATC having a $40 million

Page 122

1   asset would make it hard to put the company in

2   bankruptcy?

3            MR. KLEINSASSER:  Objection, form.

4        A.   I would have to go back and, you know, try to

5   remember what my context was.  The company had assets.

6   You know, Jim's job and responsibility was to try to

7   reach a reasonable agreement with the -- you know, with

8   the bondholders, satisfy the bondholders and work with

9   the other creditors.

10       Q.   So -- but -- so there was a -- the due date of

11   the bonds was May 31st, 2022, correct?

12       A.   I don't know.

13       Q.   We can pull up the indenture, but, I mean, do

14   you have any reason to believe that it wasn't May 31st,

15   2022?

16       A.   I have no reason not to believe that.

17       Q.   Okay.  The -- why would a GNET ATC asset help

18   Goodman Networks avoid bankruptcy?

19            MR. KLEINSASSER:  Objection, form.

20       A.   I don't know.

21       Q.   Are you familiar with a company called

22   18920 NW 11th, LLC?

23       A.   I'm not.

24       Q.   Have you ever heard that before,

25   18920 NW 11th, LLC?

Page 123

1      A.   I have heard it.

2      Q.   In what context have you heard that?

3      A.   In a preferred stock purchase -- or not

4   stock -- a preferred purchase.

5      Q.   And did you or your companies sell any

6   preferred shares in Goodman Networks to 18920 NW 11th?

7      A.   I did.

8      Q.   How many?

9      A.   I can't recall.

10              MR. PHAIR:   Phil, if we could bring up

11   Goodman375.

12              MR. GUFFY:   Sorry.  Did you say 375?

13              MR. PHAIR:   Yeah.  Let me -- no.  One

14   second.  It's mis-marked.  Goodman590.

15              MR. GUFFY:   590.  Okay.  Okay.  I got it.

16      Q.   And while he's bringing this up, so when you

17   sold the shares to 18920 NW 11th, LLC, what was your

18   understanding of, you know, who the principals of the

19   company were?

20              MR. KLEINSASSER:   Objection, form.

21      A.   I didn't know who they were.

22      Q.   Do you know who owns 18920 NW 11th?

23      A.   I do not.

24      Q.   Do you know whether any of the Auerbachs owns

25   18920 NW 11th?

Page 124

1      A.   I do not know.

2      Q.   Would you be surprised to learn that the

3   Auerbachs had ownership interest in 18920 NW 11th?

4           MR. KLEINSASSER:  Objection, form.

5      A.   Yes, I would be.

6      Q.   The Auerbachs are the same people who

7   purchased your bonds, correct?

8      A.   Yes.

9      Q.   Do you know who Steven Zakharyayev is?

10     A.   I do not.

11     Q.   Have you ever communicated with someone named

12  Steven Zakharyayev?

13     A.   It's possible.

14     Q.   Do you have any recollection of communicating

15  with Steven Zakharyayev?

16     A.   I would have to look at my e-mails and see.

17     Q.   Do you know whether 18920 NW 11th was a

18  preferred shareholder with Goodman Networks?

19     A.   Before, or what's your question?

20     Q.   At any point in time.

21     A.   Oh, I don't know.

22     Q.   To your recollection as a former chairman of

23  the board 18920 -- strike that.

24           As a former chairman of the board of

25  Goodman Networks and a significant shareholder, do you

Page 125

1   have any recollection or awareness of 19820 NW 11th

2   ever being a preferred shareholder of Goodman Networks,

3   Inc.?

4        A.   No.

5                    (Exhibit 8 marked)

6        Q.   Okay.  I've brought up on the screen what's

7   been marked as Goodman Exhibit 8.  Do you see that,

8   Mr. Goodman?

9        A.   I do.

10       Q.   Okay.  I'll represent to you that this is an

11  e-mail that was produced to us by the company in

12  discovery.  It looks like an e-mail exchange between

13  you and some other folks, including Steven Zakharyayev

14  from March 2022.  Do you see that?

15       A.   Yes.

16       Q.   Okay.  And I'll give you a second to scroll

17  through it, but this e-mail is referring to -- is

18  discussing an effort to sell shares to 18920 NW 11th,

19  correct?

20       A.   Yes.

21       Q.   And under the terms of this deal, if you look

22  to the page -- I'm going to use -- there's a term

23  called Bates stamp.  It's the numbers at the bottom

24  where it says Goodman and then it has some numbers

25  thereafter.  It just helps us refer to pages within a

Page 126

1    document.  Do you see that, sir?

2         A.   I do.

3         Q.   So I'm going to refer you to the page that's

4    marked Goodman593, which is the next page from what

5    we're showing you right now.  But scroll up.  Oh, you

6    know what?  It's different in my print.  There we go.

7                   And you see the -- the e-mail that

8    Mr. Zakharyayev sends to you on March 9th, 2022.

9                   MR. PHAIR:  Actually, if you can scroll

10   up just a little bit more, Phil.

11        Q.   On March 9th, 2022 at 1:23 p.m.

12   Mr. Zakharyayev sends you an e-mail at your Genesis

13   account regarding the preferred sale, correct?

14        A.   Yes.

15        Q.   And he attaches a table essentially of the

16   number of preferred shares that would be sold.  Do you

17   see that?

18        A.   I do.

19        Q.   And if you look at the total on the last line

20   of Mr. Zakharyayev's e-mail, the total number of shares

21   that were proposed to be sold was 4,032,918 to

22   18920 NW 11th, correct?

23        A.   Yes.

24        Q.   Okay.  And that's the same amount of -- well,

25   let me go back to that.  Does this refresh your

Page 127

1    recollection of who Mr. Zakharyayev is?

2         A.   Just the transaction.  I mean, I've never met

3    him.

4         Q.   Why were you communicating with him?

5         A.   He was interested in buying my shares.

6         Q.   Okay.  And was he shareholder, is he a lawyer,

7    accountant?

8         A.   I don't know what he is.

9         Q.   And the purchase price for the shares that you

10   were going to sell to 18920 NW 11th, looking at that

11   table, was going to be $12,381,602, correct?

12        A.   Yes.

13        Q.   Was it your money that this money would -- I'm

14   sorry.  Strike that.

15             Was it your understanding that this money

16   would come from Goodman Networks?

17        A.   No.

18             MR. KLEINSASSER:  Objection, form.

19        Q.   Where would the money come from?

20        A.   I don't know.  That's up to them.

21        Q.   Did this transaction close?

22        A.   It did.

23        Q.   When did it close?

24        A.   I don't know.

25        Q.   Are there deal documents reflecting this

Page 128

1    transaction?

2        A.   There should be.

3        Q.   And who was the party that sold the

4    4,032,918 shares to 18920 NW 11th?

5        A.   I don't know.  I would have to look at the --

6    I would have to look at the document.

7        Q.   Did 18920 NW 11th ever loan any money to

8    Goodman Networks?

9        A.   I do not know.

10       Q.   When you were chairman of the board, were you

11   ever aware of any loan from 18920 NW 11th to Goodman

12   Networks?

13       A.   No.

14       Q.   Would it surprise you to learn that there was

15   a $50 million loan from 18920 NW 11th to Goodman

16   Networks?

17       A.   Yes.

18       Q.   Why?

19       A.   Because I've never heard of them.

20              MR. PHAIR:  If we could bring up

21   Goodman140.

22                  (Exhibit 9 marked)

23       Q.   Sir, this is what we have marked as Goodman

24   Exhibit 9.  And I'll represent to you that this is

25   another document that was produced to us in discovery.

Page 129

1    This is a letter dated March 9th, 2022 purporting to be

2    from Evelina Pinkhasova to Goodman Networks, Inc.   Do

3    you see that?

4         A.   I do.

5         Q.   And Ms. Pinkhasova, the title of her e-mail to

6    the company is "Redemption of Preferred Shares,"

7    correct?

8         A.   Yes.

9         Q.   And she says, "As you know, 18920 NW 11th is

10   the owner of 4,032,918 Series A-1 Preferred Shares,"

11   correct?

12        A.   Yes.

13        Q.   And that's the same number of shares that you

14   were discussing with Mr. Zakharyayev in Goodman

15   Exhibit 8, correct?

16        A.   Yes.

17        Q.   And she says, "As you know, the Preferred

18   Shares are subject to mandatory redemptions at their

19   liquidation value on a quarterly basis.  As such,

20   please accept this letter as the Shareholder's demand

21   for redemption of the Preferred Shares."

22              Do you see that?

23        A.   I do.

24        Q.   And that letter is addressed to Goodman

25   Networks, Inc., correct?

Page 130

1        A.    Yes.

2        Q.    And that is dated March 9th, 2022, correct?

3        A.    Yes.

4        Q.    Which if we go back to Goodman 8, Exhibit 8,

5    the e-mail that you exchanged with Mr. Zakharyayev,

6    that is also dated March 9th, 2022, correct?

7        A.    Yes.

8        Q.    And both the e-mail that you exchanged with

9    Mr. Zakharyayev and the letter that Ms. Pinkhasova sent

10   to Goodman Networks on the same date used the exact

11   same number of shares, 4,032,918 shares, correct?

12       A.    Yes.

13       Q.    Okay.  Do you know what Ms. Pinkhasova's

14   relationship is to Mr. Zakharyayev?

15       A.    I do not know.

16       Q.    Would it surprise you to learn that it's his

17   wife?

18       A.    Yes.

19       Q.    Have you ever met Evelina Pinkhasova?

20       A.    I have not.

21       Q.    Has 18920 NW 11th, to your knowledge, ever

22   asserted a claim against Goodman Networks, Inc?

23       A.    I do not know.

24       Q.    Are you aware of a settlement agreement

25   between Goodman Networks, Inc. and 18920 NW 11th?

Page 131

1      A.   I am not.

2               MR. PHAIR:  Philip, if we could bring up

3      Goodman638.

4               MR. GUFFY:  One moment, please.

5               (Exhibit 10 marked)

6      Q.   Sir, while we're doing that, so I'm clear, is

7      the Goodman family the largest shareholder in Goodman

8      Networks, Inc.?

9      A.   Yes.

10              MR. KLEINSASSER:  Objection, form.

11     A.   Yes.

12     Q.   What percentage of shares in Goodman Networks,

13     Inc. is controlled by you or the Goodman family?

14              MR. KLEINSASSER:  Objection, form.

15     A.   So combined it would be over 51 percent.

16     Q.   So the Goodman family is the majority

17     shareholder in Goodman Networks, Inc., correct?

18     A.   Yes.

19     Q.   I'm handing you -- or I'm showing you what's

20     been marked as Goodman Exhibit 10.  Do you see that?

21     A.   I do.

22     Q.   Again, I'll represent to you that this was a

23     document that was produced to us in discovery, and it's

24     entitled "Settlement Agreement."

25     A.   I do.

Page 132

1      Q.   And this is a settlement agreement made

2   between Goodman Networks, Inc. in favor of

3   19820 NW 11th, LLC.  Do you see that?

4      A.   I do.

5      Q.   Have you ever seen this document before?

6      A.   I have not.

7      Q.   Sitting here today is the first time you've

8   seen this settlement agreement?

9      A.   It is.

10      Q.   In this settlement agreement -- and if you

11   scroll to the back, this is dated March 10th, 2022.  Do

12   you see that?

13      A.   I do.

14      Q.   Signed by Mr. Frinzi, correct?

15      A.   Yes.

16      Q.   And signed by Evelina Pinkhasova, correct?

17      A.   Yes.

18      Q.   And that's the same Ms. Pinkhasova who sent

19   the preferred share redemption letter to Goodman

20   Networks, Inc. the day before on March 9th, 2022,

21   correct?

22      A.   I don't know.

23      Q.   Do you have any reason to believe that there's

24   different Evelina Pinkhasovas representing

25   18920 NW 11th?

Page 133

1        A.    I have no idea.

2        Q.    Sir, is it your testimony today that you

3   don't -- you believe that there is one

4   Evelina Pinkhasova who sent a share redemption letter

5   to Goodman Networks, Inc. on March 9th, 2022 and then

6   another who signed a settlement agreement on

7   March 10th, 2022?

8                MR. KLEINSASSER:  Ryan, this is

9   harassing.  Move on.

10               MR. PHAIR:  I'm trying to get his

11  testimony here.

12               MR. KLEINSASSER:  You know that's not his

13  testimony.  Come on.  Move on.

14               MR. PHAIR:  He says he doesn't know.  I

15  want to know if there are two different

16  Evelina Pinkhasovas.

17       A.    I don't know.

18               MR. KLEINSASSER:  He says he doesn't

19  know.  He answered your question.  Move on.

20       A.    Maybe you know.  You can tell me.  I don't

21  know who she is.  I didn't communicate with her.  I

22  didn't work with her.  I haven't seen this document

23  before.  So I don't know who she is or who communicated

24  with Goodman Networks.

25       Q.    Would it surprise you if it was the case that

Page 134

1    there were two Evelina Pinkhasovas that were sending

2    different letters to the company one day after the --

3    each other?

4        A.   I have no idea.

5        Q.   Sir, if we go back up to the top, here the

6    assignor refers to Goodman Networks, Inc., correct?

7        A.   Yes.

8        Q.   And if you look at the second -- first

9    "whereas" clause, it's referring to the AMRR note,

10   correct?

11       A.   Yes.

12       Q.   And then there's -- the third clause says that

13   Goodman Networks, Inc., the assignor, is the holder of

14   a promissory note issued by the assignor in the amount

15   of $50 million, the 18920 note, correct?

16       A.   Is it saying that, the assignor of the -- is

17   the holder of a promissory note?  Who's the holder?

18   Who's the --

19       Q.   The assignor in the agreement is referred to

20   Goodman Networks, Inc., correct?

21       A.   Okay.

22       Q.   So it says, whereas, the Goodman Networks,

23   Inc. is the holder of promissory note issued by

24   assignor in the amount of $50 million.  Do you see

25   that?

Page 135

1      A.   I do.

2      Q.   Are you aware of any note held by Goodman

3   Networks, Inc. in the amount of 15 -- $50 million?

4      A.   I am not.

5      Q.   Are you aware of any note held by

6   18920 NW 11th in the amount of $50 million?

7      A.   No.

8      Q.   Are you aware of any note that -- with 18920

9   at all?

10     A.   No, I'm not.

11     Q.   Would it surprise you to learn that Goodman

12  Networks, Inc. loaned $50 million to an entity that

13  you've never heard of?

14     A.   Yes.

15     Q.   Were you aware of any settlement discussions

16  with 18920 NW 11th?

17     A.   None.

18     Q.   Have you ever seen the 18920 note referred to

19  in here?

20     A.   No, I have not.

21     Q.   Have you ever had any discussions with

22  Mr. Frinzi about 18920 NW 11th?

23     A.   No.

24     Q.   Would it surprise you to learn that

25  18920 NW 11th is owned by the Auerbachs, the same

Page 136

1    people who purchased your bonds?

2        A.    Yes.

3            MR. RUKAVINA:  Hey, guys, this is Davor.

4    If it's a convenient time for a lunch break, I would

5    appreciate it.  If not, no problem.

6            MR. PHAIR:  Yeah, I think I just need two

7    more -- two more minutes, Davor, and then we can break.

8            MR. RUKAVINA:  Thank you.

9        Q.    Do you think Goodman Networks has any claims

10    against 18920 NW related to the settlement agreement

11    reflected in Goodman Exhibit 10?

12            MR. KLEINSASSER:  Objection, form.

13        A.    You know, I'm not a lawyer, I'm not a board

14    member.  You know, as a shareholder, you know, I would

15    say yes, you know, the company should have a claim.

16    But, you know, I would have to check with my attorney.

17        Q.    But as the former chairman of the board and

18    the largest majority shareholder in Goodman Networks,

19    Inc., does it surprise you to learn that Mr. Frinzi

20    transferred -- or had a promissory note of $50 million

21    with 18920 NW 11th?

22            MR. KLEINSASSER:  Objection, form.

23        A.    Yes.

24        Q.    Did you authorize any payment at all to

25    18920 NW 11th on behalf of Goodman Networks, Inc.?

Page 137

1        A.    Never.

2        Q.    Are you aware as the largest majority

3    shareholder in Goodman Networks Inc. of any payment to

4    18920 NW 11th?

5        A.    No.

6                    MR. KLEINSASSER:  Objection, form.

7        A.    No.

8                    MR. PHAIR:  All right.  We can break.

9                    THE VIDEOGRAPHER:  Off the record at

10   1:20 p.m.

11       (Lunch recess from 1:20 p.m. to 2:06 p.m.)

12                    THE VIDEOGRAPHER:  On the record at

13   2:06 p.m.

14       Q.    (BY MR. PHAIR)  Mr. Goodman, do you or any of

15   your companies owe any money to Goodman Networks, Inc.?

16                    MR. KLEINSASSER:  Objection, form.

17       A.    Yes.

18       Q.    Which of your companies owe money to Goodman

19   Networks, Inc.?

20                    MR. KLEINSASSER:  Objection, form.

21                    THE REPORTER:  I couldn't hear you.

22       A.    UFS, Unified Field Communications -- sorry.

23   Unified Field Services, UFS.

24       Q.    How much does UFS owe Goodman Networks?

25       A.    I don't know.

Page 138

1    Q.   Is it 100,000, a million, 10 million?

2    A.   I think it's a million.  It's in the millions.

3    Q.   And what is that debt attributable to?

4    A.   Shared services fee, accounting support.

5    Q.   Like back office work?

6    A.   Yes.

7    Q.   Is there a written agreement between UFS and

8    Goodman Networks, Inc.?

9    A.   I think there is, yes.

10   Q.   Is it a -- does Goodman Networks, Inc. -- I'm

11   sorry.  Just so I'm clear, UFS owes that money to

12   Goodman Networks, Inc.?

13   A.   Yes.

14   Q.   And that's because Goodman Networks, Inc. is

15   providing shared services and accounting to UFS; is

16   that right?

17   A.   No.  They did in 2021.

18   Q.   Okay.  So it's like a legacy debt?

19   A.   It is.

20   Q.   Is there any current relationship between UFS

21   and Goodman Networks, Inc.?

22   A.   None.

23   Q.   Do any of your other companies owe money to

24   Goodman Networks, Inc.?

25              MR. KLEINSASSER:  Objection, form.

1     A.    No.

2     Q.    Do you -- I already asked you.  Do you or any

3  of your companies owe money to GNI?

4     A.    No.

5     Q.    Do you or any of your companies owe money to

6  Unified Field Services?

7     A.    No.

8     Q.    You mentioned the Unified Field Services, UFS.

9  Is there a receivable owed to them?  If so, is that the

10  couple million that you're talking about?

11     A.    I don't think it's a receivable.  I'm not sure

12  how it's structured.  I would have to, you know -- I

13  would have to have the lawyers look at it.

14     Q.    Okay.  Did you personally or any part of the

15  company controlled by you guarantee any obligations of

16  Goodman Networks?

17           MR. KLEINSASSER:  Objection, form.

18     A.    I don't understand your question.

19     Q.    Did you personally or any company controlled

20  by you guarantee any obligations of Goodman Networks?

21           MR. KLEINSASSER:  Objection, form.

22     A.    No.

23     Q.    Did you personally or any company controlled

24  by you guarantee any obligations of GNF?

25           MR. KLEINSASSER:  Objection, form.

Page 140

1        A.    No.

2        Q.    Did you personally or any company controlled

3    by you guarantee any obligations of multi field

4    services?

5        A.    No.

6             MR. KLEINSASSER:  Objection, form.

7        Q.    Did you or any company controlled by you

8    guarantee any preferred stocks of Goodman Networks?

9             MR. KLEINSASSER:  Objection, form.

10       A.    What was the question, again?

11       Q.    Did you or any company controlled by you

12   guarantee any preferred stock of Goodman Networks?

13            MR. KLEINSASSER:  Objection, form.

14       A.    I don't understand.  Guarantee, what do you

15   mean?

16       Q.    Like if they -- if they default that you would

17   step into place and pay it.

18       A.    Oh, no.

19       Q.    Did you or any company controlled by you ever

20   guarantee any security issues by Goodman Networks, Inc.

21   or any of its employees?

22            MR. KLEINSASSER:  Objection, form.

23       A.    No.

24       Q.    Do you believe that you or any of your

25   companies have claims against Goodman Networks, Inc.?

Page 141

1          MR. KLEINSASSER:  Objection, form.

2          THE REPORTER:  What was the answer to

3     that?  Can you please wait just one second until he

4     objects?  I didn't get the answer.

5     Q.    Let me ask the question again so we're clear.

6     Do you believe that you or any of your companies have

7     claims against Goodman Networks, Inc.?

8          MR. KLEINSASSER:  Objection, form.

9     A.    Yes.

10    Q.    What claims do you believe you have against

11    Goodman Networks, Inc.?

12    A.    Goodman owns Genesis for back office support,

13    accounting support, shared services calls.

14    Q.    Which Genesis entity does it own?

15    A.    Genesis Networks Telecom.

16    Q.    Is there a written agreement between Genesis

17    Network Telecom and Goodman for such services?

18    A.    I believe so, yes.

19    Q.    How much is owed?

20    A.    I'm not sure.  About 350,000, 400,000.  I

21    can't remember.

22    Q.    Have you asserted a claim on behalf Genesis

23    Networks Telecom against Goodman Networks, Inc.?

24    A.    I have not.

25    Q.    Putting aside the Genesis Networks Telecom,

Page 142

1    are there any other claims that you or your companies

2    have against Goodman Networks, Inc.?

3                    MR. KLEINSASSER:  Objection, form.

4        A.   Not at this time.

5        Q.   Are you anticipating claims against Goodman

6    Networks, Inc. in the future?

7                    MR. KLEINSASSER:  Objection, form.

8        A.   I believe so, yes.

9        Q.   What claims are you anticipating?

10       A.   I'm not sure at this time.

11       Q.   What would be the nature of the claims that

12   you're anticipating?

13       A.   I'm not sure.  I would have to talk with

14   counsel.

15       Q.   Well, I'm not asking you what type of claim,

16   but what conduct are you thinking in your head would be

17   potentially actionable?

18       A.   I'm not sure.

19       Q.   So when you say you're thinking about claims,

20   like what are you thinking about?

21       A.   I'm thinking I need to talk to my attorney, go

22   through the suggestions and get a recommendation from

23   them if there is -- you know, if there is action to be

24   taken.

25       Q.   Action based on what facts?

Page 143

1      A.   I would have to discuss it with them.  I don't

2  have the facts.  I don't have the information.  It's

3  something that we would have to formulate.

4      Q.   So other than just a metaphysical idea that

5  you might have claims, is there anything that you

6  actually have in your head as a potential claim?

7           MR. KLEINSASSER:  Objection, form.

8      A.   Well, yes.  I have an idea, but I don't -- I

9  haven't formulated it.  I haven't clearly thought it

10  out.

11      Q.   That's fine.  I just need to know what your

12  idea is.

13      A.   I'm not sure what the idea is.

14      Q.   So you said you have been considering future

15  claims.  You said you have an idea about it.  Other

16  than just the fact that there is a claim, what idea do

17  you have in your head?

18           MR. PHAIR:  Is he froze for everyone

19  else?

20           MR. KLEINSASSER:  Yes.

21           MR. PHAIR:  Let's go off the record while

22  we get him back.

23           THE VIDEOGRAPHER:  Off the record at

24  2:11 p.m.

25                (Technical difficulties)

Page 144

1          (Recess from 2:11 p.m. to 2:6 p.m.)

2              THE VIDEOGRAPHER:  On the record at

3     2:16 p.m.

4          Q.   (BY MR. PHAIR)  Mr. Goodman, before the break

5     I had asked you whether or not you had -- you or your

6     companies have claims against Goodman Networks, Inc.,

7     and you said that you thought you might and that you

8     had an idea.  We were talking about that.  Do you

9     recall that recollection?

10         A.   I do.

11         Q.   And what is the idea that you have?  Like I'm

12    not asking you whether it's fraud or anything else.

13    Like what is the facts and circumstances that you think

14    might give rise to a claim?  What is that idea?

15         A.   I'm not sure.

16         Q.   So when you say "an idea," is this just a --

17    like I'm sitting here today, metaphysically I have an

18    idea that I might have a claim, or is there anything

19    that backs that up?

20         A.   I might have a claim.

21         Q.   What type of claim?

22         A.   I don't know.

23         Q.   Have you given any thought as to whether there

24    are any facts or circumstances that would support it?

25         A.   No.

Page 145

1      Q.   Have you ever asserted a claim against anyone?

2                MR. KLEINSASSER:  Objection, form.

3      A.   No.

4      Q.   Have you asked your attorneys whether or not

5   you have a claim against Goodman Networks, Inc.?

6                MR. KLEINSASSER:  That's privileged.

7   Don't answer.

8                MR. PHAIR:  It's a yes or no question.

9                MR. KLEINSASSER:  It's privileged, Ryan.

10  Move on.

11               MR. PHAIR:  You're going to instruct him

12  not to answer?

13               MR. KLEINSASSER:  Yep.

14               MR. PHAIR:  Instruct him then.

15               MR. KLEINSASSER:  I just did.

16     Q.   Are you going to take your counsel's

17  instruction?

18     A.   Yes.

19     Q.   Okay.  We'll review that.

20               Do you have any facts available to you

21  that might give rise for a claim by you or any of your

22  companies against Goodman Networks?

23               MR. KLEINSASSER:  Objection, form.

24     A.   What was your question?

25     Q.   Sitting here today, are you -- strike that.

Page 146

1              Sitting here today, are you aware of any

2      facts or any circumstances that might give rise to a

3      claim by you or any of your companies against Goodman

4      Networks, Inc.?

5                   MR. KLEINSASSER:  How many times are you

6      going to ask this question?  This is like number five,

7      six maybe.

8                   MR. PHAIR:  Objection, form, then,

9      Matthias.

10                  MR. KLEINSASSER:  No, it's harassing.

11     You're making a great record of harassment for the

12     court.

13                  MR. PHAIR:  Make your motion.  Otherwise

14     keep your mouth shut, Matthias.  Objection, form.  Move

15     on.

16                  MR. KLEINSASSER:  Let me explain to you

17     how the rules work.

18                  MR. PHAIR:  I don't need a lecture.  I

19     don't need you burning time.

20                  MR. KLEINSASSER:  I don't need to make a

21     motion, Ryan.

22                  MR. PHAIR:  Call the court.  Go ahead.

23                  MR. KLEINSASSER:  That's not how it

24     works, Ryan.

25                  MR. PHAIR:  Do whatever you're going to

Page 147

1    do and just do it.

2              MR. KLEINSASSER:  I'm trying to ask you

3    to move on.  He has answered this question six times.

4              MR. PHAIR:  No, he is not answering my

5    question.  He can say, "yes," "no," "I don't know."

6    That's fine.

7              MR. KLEINSASSER:  He has already

8    answered.  He says he doesn't know.

9              MR. PHAIR:  Let's see.

10              MR. KLEINSASSER:  He said he doesn't

11    know.

12              MR. PHAIR:  I don't need you to answer,

13    Matthias.  I need the witness to answer.  You're not

14    testifying today.  The witness is.

15              MR. KLEINSASSER:  Ryan, you're harassing

16    him.

17              MR. PHAIR:  I am not.

18    Q.   I'm going to ask one more time and we'll see

19    what your answer is.

20              MR. KLEINSASSER:  One more time.

21    Q.   Sitting here today, sir, are you aware of any

22    facts or circumstances that you or your companies think

23    you have claim against Goodman Networks, Inc.?

24              MR. KLEINSASSER:  Objection, form.

25    A.   I don't know.

Page 148

1              MR. KLEINSASSER:  Are we going for

2    number seven now, Ryan?

3       A.   Sitting here today, are you aware of any facts

4    or circumstances that you believe would give rise to

5    you or your companies having a claim against GNET?

6              MR. KLEINSASSER:  Objection, form.  You

7    have already asked him this.

8              MR. PHAIR:  I haven't asked him about

9    GNET.

10             MR. KLEINSASSER:  You did.  You've asked

11   about all of these companies already.  Go ahead.

12      A.   Yeah, I don't know.

13      Q.   Sitting here today, are you aware of any

14   claims, any facts or circumstances that would give rise

15   to claims on behalf of you or your companies against

16   Multi Land Field Services?

17             MR. KLEINSASSER:  Objection, form.

18      A.   I don't know.

19      Q.   Have you considered whether you or any of your

20   companies have claims against any of these three

21   entities that I just named?

22             MR. KLEINSASSER:  Objection, form.

23      A.   Yes.

24      Q.   What have you done to consider?

25      A.   Just think about it.

Page 149

1      Q.   Think about what?

2      A.   What options.

3      Q.   And what options have you thought about?

4      A.   Nothing.  I need to confer with an attorney.

5      Q.   Do you believe that UFS has a claim against

6   Goodman Networks, Inc.?

7              MR. KLEINSASSER:  Objection, form.

8      A.   I don't know.  I would need to speak to my

9   attorney.

10     Q.   Are you aware of any facts or circumstances

11  that might give rise to a claim against Goodman

12  Networks, Inc., by UFS?

13             MR. KLEINSASSER:  Objection, form.

14     A.   Not at this time.

15     Q.   Within the last two years, did you receive any

16  payments from Goodman Networks, Inc.?

17     A.   Just for my consulting and our board seat.

18     Q.   How much did you get paid for that?

19     A.   I can't recall.

20     Q.   Let's bring up what -- Exhibit No. 4, the

21  payment chart.  Did we get exhibit share working,

22  Mr. Goodman?

23     A.   I'm trying to find it again.

24     Q.   Go to the folder.  There should be one labeled

25  marked "Exhibits."

Page 150

1      A.   No, I've got to pull it back up because

2   whenever -- whenever I lost the Internet, then it --

3   okay, I have it.

4      Q.   Exhibit 11.  When you click on that it should

5   pull it up for you.

6      A.   Yes, I have it.

7      Q.   I'll just put it up on the screen.

8      A.   Mr. Goodman, I'm sharing on the screen what's

9   been marked as James Goodman Exhibit 11.

10                    (Exhibit 11 marked)

11     Q.   I'll represent to you that this was an

12  interrogatory response that we received from Goodman

13  Networks, Inc.  There is an attachment to it.  It was a

14  verified interrogatory response by John Goodman.  And

15  if you look at -- if you scroll down, this is -- this

16  interrogatory response is a series of payments made by

17  Goodman Networks, Inc. to various entities.  Do you see

18  that?

19     A.   I do.

20     Q.   If you look --

21               MR. PHAIR:  Philip, I don't know if you

22  can highlight, but there is a series of payments --

23  sorry.  That's my daughter.  I apologize.

24     Q.   There is a series -- there is a series of

25  payments made by Goodman Networks, Inc. to you in 2021.

Page 151

1    Do you see that?

2        A.    I do.

3        Q.    And it's labeled as payroll.  Do you see that?

4        A.    I do.

5        Q.    And some of the payroll payments are in the

6    amount of 1,368, correct?

7        A.    Yes.

8        Q.    And some are made in the amount of $7,696.  Do

9    you see that?

10       A.    I do, yes.

11       Q.    And are these the payments that you received

12   from Goodman Networks, Inc. in 2021?

13       A.    I'm not sure.

14       Q.    Do you have any reason to believe that you did

15   not receive these payments from Goodman Networks, Inc.

16   in 2021?

17       A.    No.

18       Q.    The 7,696, was -- do you have any

19   understanding of why you were receiving the $7,000

20   payment versus the $1,368 payment?

21       A.    I do not know.

22       Q.    Within the last two years have you received

23   any payments from GNF?

24       A.    No.

25       Q.    Have you received any payments from Multi

Page 152

1     Field Services?

2         A.   No.

3         Q.   Have you received anything of value from the

4     Goodman Networks or Multi Field Services during the

5     past few years?

6         A.   Not that I'm aware of, no.

7         Q.   Within the last year has any company that you

8     owned, controlled, served as an officer, director of

9     received any payments from Goodman Networks, Inc.?

10                    MR. KLEINSASSER:  Objection, form.

11                    MR. PHAIR:  He froze again.

12                    THE VIDEOGRAPHER:  Off the record at

13    2:25 p.m.

14                    (Technical difficulties)

15               (Recess from 2:25 p.m. to 2:28 p.m.)

16                    THE VIDEOGRAPHER:  On the record at

17    2:28 p.m.

18        Q.   (BY MR. PHAIR)  Mr. Goodman, within the past

19    two years did any company that you own or control

20    receive any payments from Goodman Networks?

21                    MR. KLEINSASSER:  Objection, form.

22        A.   You said in the last few years?

23        Q.   The last two.

24        A.   The last two years, yes.

25        Q.   Which entities have received payment from

Page 153

1    Goodman Networks, Inc.?

2        A.   It would have been -- let me look at the

3    exhibit -- Genesis Network Global Services, Genesis

4    Telecom Services and People NQ.

5        Q.   I'll come back to that in a second.

6                  Were there any others that received

7    payment from Goodman Networks, Inc.?

8        A.   Not that I'm aware of.

9        Q.   Within the past two years did any company you

10   own or control receive any payments from GNF?

11                  MR. KLEINSASSER:  Objection, form.

12       A.   Not that I'm aware of.

13       Q.   In the past two years did any company you own

14   or control receive any payments from Multi Field

15   Services?

16                  MR. KLEINSASSER:  Objection, form.

17       A.   Not that I'm aware of.

18       Q.   Let's talk about the Genesis payment.  If you

19   could go back to Goodman Exhibit 11.

20                  MR. PHAIR:  If you could pull that back

21   up again.

22       Q.   You will see that there are three payments

23   made to Genesis Networks.  One is a December 6, '21

24   payment for 64,000 from Goodman Networks, Inc. to

25   Genesis Network Global Services, LLC.  Do you see that?

Page 154

1      A.   Yes.

2      Q.   What was that payment for?

3      A.   I don't know.

4      Q.   Also on December 6th, 2021 there was a payment

5   for 16,000 from GNET, LLC to Genesis Network Global

6   Services, LLC.  Do you see that?

7      A.   I do.

8      Q.   What was that payment for?

9      A.   I don't know.

10     Q.   Do you have any justification for either

11  payment?

12     A.   We would have to ask accounting.

13     Q.   On June 14, 2022 Goodman Networks, Inc. also

14  paid Genesis Networks $128,420.99.  Do you see that?

15     A.   I do.

16     Q.   What was that for?

17     A.   It says for legal reimbursement.

18     Q.   And why is Goodman Networks, Inc. paying

19  Genesis Networks for legal reimbursement?

20     A.   It's supposed to indemnify me and pay for my

21  expenses, whenever I was a board member.

22     Q.   Why is that being paid then to Genesis

23  Networks, LLC instead of you personally?

24     A.   I don't know.

25     Q.   If you would scroll further down to the next

Page 155

1    page.  Actually there is a series of payments to People

2    NQ, Inc.  Do you see that?

3         A.    I do.

4         Q.    What is People NQ, Inc.?

5         A.    It's a company I own that I do consulting out

6    of and manage some of my accounts through them.

7         Q.    What type of -- do you have a director or

8    officer position at People NQ?

9         A.    I do.

10        Q.    What position do you have?

11        A.    I'm the owner, single member LLC.

12        Q.    Are there any other employees at People NQ,

13   Inc.?

14        A.    No.

15        Q.    On December 13, '21, GNET ATC makes a payment

16   of $200,000 to People NQ, Inc.  Do you see that?

17        A.    Okay.

18        Q.    What was that for?

19        A.    Consulting.

20        Q.    What type of consulting?

21        A.    Advisement, support, help, consulting.

22        Q.    Do you submit bills to GNET ATC for your

23   consulting role?

24        A.    I'm not sure.

25        Q.    Is there a written agreement between GNET ATC

Page 156

1    and People NQ for your consulting role?

2         A.   I'm not sure.  I would have to check.

3         Q.   Is there a flat fee arrangement between the

4    two companies?

5         A.   I'm not sure.  I would have to check.

6         Q.   Sitting here today, are you aware of any

7    documentation between GNET ATC and People NQ regarding

8    your consulting role?

9              MR. KLEINSASSER:  Objection, form.

10        A.   I would have to check.  I'm not sure.

11        Q.   On December 23, '21 there is another $100,000

12   payment 10 days later from GNET ATC to People N2, Inc.

13   Do you see that?

14        A.   I do.

15        Q.   What was that for?

16        A.   Consulting.

17        Q.   And same question.  Do you have any

18   documentation that supports that $100,000 payment?

19        A.   I would have to check.

20             MR. KLEINSASSER:  Objection, form.

21        A.   I'm not sure.

22        Q.   Did you submit bills or invoices of any kind

23   to GNET ATC documenting the work that you did?

24        A.   I'm not sure.  I would have to check.

25        Q.   Are you aware -- sitting here today, are you

Page 157

1    aware of any invoices that you have ever submitted to

2    GNET ATC on behalf of People NQ that included

3    descriptions of the work that you did?

4              MR. KLEINSASSER:  Objection, form.

5         A.   I'm not sure.  I would have to check.

6         Q.   There is also a series of payments made in '21

7    on behalf of Goodman Networks, Inc. to People NQ, Inc.

8    Do you see those?

9         A.   I do.

10        Q.   Generally between 15- and $60,000 in '21.  Do

11   you see that?

12        A.   I do.

13        Q.   Do know what those were for?

14        A.   Consulting.

15        Q.   Does Goodman Networks, Inc. have a written

16   agreement with People NQ, Inc.?

17        A.   I'm not sure.  I would have to check.

18        Q.   Are you aware of any invoices or bills or any

19   other descriptions of the time you spent on consulting

20   that were submitted to Goodman Networks, Inc. on your

21   behalf from People NQ?

22             MR. KLEINSASSER:  Objection, form.

23        A.   I'm not sure.  I would have to check.

24        Q.   What would you check?

25        A.   I would go back to Goodman and see if there is

Page 158

1    a -- if there is a consulting agreement.

2        Q.   Would People NQ, Inc. have a consulting

3    agreement if there was one?

4        A.   It's possible.

5        Q.   Where would you check to see if you had any

6    invoices?

7        A.   I would have to check with accounting.

8        Q.   I thought you said you were the only employee

9    of People NQ, Inc.

10       A.   I am.

11       Q.   So where would you check within People NQ,

12   Inc. to see if there is there any documentation for any

13   of these consulting charges?

14       A.   I would go to Goodman and ask them to look.

15       Q.   Are there any records that are kept of People

16   NQ, Inc.'s invoices that are sent to Goodman Networks

17   Inc.?

18               MR. KLEINSASSER:  Objection, form.

19       A.   I'm not sure.  I would have to check.

20       Q.   Where would you check?

21       A.   I would go back and, you know, check for

22   invoices, I would check my e-mail.  That's where I

23   would check.

24       Q.   Did Goodman Networks, Inc. --

25       A.   What's the question?

Page 159

1      Q.   Did Goodman Networks, Inc. ever pay any of

2   your credit card bills?

3      A.   Not that I'm aware of.

4      Q.   Are you aware of Goodman Networks, Inc. ever

5   paying any of the credit card bills of your family?

6      A.   Not that I'm aware of.

7      Q.   Who is Jake Goodman?

8      A.   He is my son.

9      Q.   How old is he?

10     A.   He is 28 years old.

11     Q.   And what is his occupation?

12     A.   He is a freelance investor research analyst.

13     Q.   Does he work for any of the Goodman companies?

14     A.   Goodman Networks?

15     Q.   Yes.

16     A.   No.

17     Q.   Did he work for any of your other companies?

18          MR. KLEINSASSER:  Objection, form.

19     A.   He does.

20     Q.   We need to have him -- we keep getting the

21   objection over the answer.  So, Mr. Goodman, if you

22   could give just a second to let your counsel interpose

23   an objection before you answer so we have it clear on

24   the record I would appreciate it.

25     A.   Okay.

Page 160

1      Q.   I forgot the question.

2             MR. PHAIR:   So can the court reporter

3      please read the question back?

4             (The requested testimony was read)

5      A.   So what other companies?

6      Q.   Any of the other companies that you own or

7      control.

8      A.   I'm not sure.  I would have to check.

9      Q.   Did your son, Jake Goodman, did he ever do any

10     work for Goodman Networks, Inc.?

11     A.   For consulting, yes.

12     Q.   What type of consulting did he do?

13     A.   He would do research.

14     Q.   Research on what?

15     A.   Investments market.

16     Q.   When was he doing this consulting work for

17     Goodman Networks, Inc.?

18     A.   I'm not sure.  I would have to go back and

19     check.

20     Q.   If we look, did he ever do any consulting work

21     for GNET ATC?

22     A.   I'm not sure.  I would have to check.

23     Q.   If you go back to Exhibit 11, Goodman

24     Exhibit 11, you will see there is two payments that are

25     made to Jake Goodman, one for $100,000 from GNET ATC to

Page 161

1    Jake Goodman on December 23, '21 and one for $150,000

2    on January 28, '22 from GNET ATC to Jake Goodman.  Do

3    you see those?

4        A.   Yes.

5        Q.   That's a total of $250,000 that was paid to

6    Jake Goodman at the end of '21, beginning of '22,

7    correct?

8        A.   Yes.

9        Q.   What was that for?

10       A.   Consulting.

11       Q.   And what type of consulting was he doing at

12   this time for GNET ATC?

13       A.   I'm not sure.  I would have to check.

14       Q.   Did you ever tell Mr. Frinzi to wire your son,

15   Jake Goodman, money?

16       A.   If it was for consulting I may have asked him.

17       Q.   If you can bring up Jim Frinzi's text

18   messages.

19            MR. PHAIR:  Philip, that's in the exhibit

20   share folder now.  That's Exhibit 12.

21            (Exhibit 12 marked)

22            MR. PHAIR:  Can you share that on the

23   screen so we can see it?  Here we are.  If you can

24   scroll down to the page marked Goodman 7652.

25       Q.   And I'll represent to you this was also a

Page 162

1    document that was produced in discovery by the company

2    and this is a text e-mail exchange from Mr. Frinzi.  Do

3    you see that?

4        A.   I do.

5        Q.   Up at the top?

6        A.   I do.

7        Q.   And so his responses are in the white bubbles

8    to the left.  Do you see that?

9        A.   I do.

10       Q.   And someone sends a text to Mr. Frinzi on

11   January 28, at 10:27 a.m. and says, "I entered a wire

12   to Jay Goodman for 150K."  Do you see that?

13       A.   I do.

14       Q.   There is a message saying "wire confirmed.  We

15   wired 100K on 12-23."  Do you see that?

16       A.   I do.

17       Q.   And then Jim Frinzi said, "James said he only

18   got 50.  Well, James wants us to pay another 50.  Let's

19   do that tomorrow morning out of the East West."

20               Do you see that?

21       A.   I do.

22       Q.   Why did you want Mr. Frinzi to pay your son

23   $150,000?

24       A.   He was owed that money for consulting and it

25   should have been paid.

Page 163

1       Q.   Where in the text messages does it say

2    anything being owed to him for consulting?

3       A.   I can't read the entire --

4               (TECHNICAL DIFFICULTIES)

5            (Recess from 2:43 p.m. to 3:00 p.m.)

6               THE VIDEOGRAPHER:  We're on the record at

7    3:00 p.m.

8       Q.   (BY MR. PHAIR)  Mr. Frinzi -- Mr. Goodman,

9    before we went off the record we were talking about

10   Mr. Frinzi's text exchanges about the payment to your

11   son, Jacob.  Do you recall that?

12      A.   Yes.

13      Q.   And, you know --

14              MR. PHAIR:  If you could pull that back

15   up, Philip.

16      Q.   Do you see that, Mr. Goodman?

17      A.   I do.

18      Q.   Okay.  And then looking in the e-mail chain --

19   I'm sorry -- the text chains, it says they entered a

20   wire to Jake Goodman for 150K expired, and the next

21   message is "sending you wire to confirm.  We just lost

22   it.  We wired 100,000 on December 23rd."  Do you see

23   that?

24      A.   I do.

25      Q.   And then Mr. Frinzi responds and says, "James

Page 164

1    said he only got 50 and he says James wants us to pay

2    another 50."  Do you see that?

3         A.    I do.

4         Q.    Why did you want Mr. Frinzi to pay your son

5    another $150,000?

6         A.    I'm not sure.  I would have to go back and

7    check.  I'm sure it had to do with his consulting.

8         Q.    This doesn't say "we owe Jake money for his

9    consulting."  He says that, "James," his father, "wants

10   us to pay him 150,000."

11              Why did you want Mr. Frinzi to pay him

12   150,000 to your son?

13              MR. KLEINSASSER:  Objection, form.

14        A.    Well, I would say it was due for consulting.

15        Q.    You were the one who directed Mr. Frinzi to

16   pay the $150,000.  Why were you directing Mr. Frinzi to

17   pay your son $150,000?

18              MR. KLEINSASSER:  Objection, form.

19        A.    I wasn't asking James.  I was asking him if he

20   paid it.  I don't know -- I don't control what Jim puts

21   in his text messages.

22        Q.    Well, at least according to Jim's text

23   messages he is saying that you want Goodman Networks,

24   Inc. to pay another $150,000.

25              My question is, why are you involved at

Page 165

1    all?

2              MR. KLEINSASSER:  Objection, form.

3         A.   I don't know if I am involved.  This is the

4    text messages from Jim Frinzi.  I don't know what I'm

5    saying.  Jim can write anything he wants to here.  So

6    I'm not directing anybody.

7              I'm just reading a text message and, you

8    know, if I did say something to Jim it was -- you know,

9    it was an inquiry, but certainly not directing him.

10        Q.   So is your testimony today that Mr. Frinzi's

11   contemporaneous recollection that you wanted Goodman

12   Networks, Inc. to pay your son $150,000 is incorrect?

13             MR. KLEINSASSER:  Objection, form.

14        A.   I don't know what this text is saying except

15   for what Jim put down, and I don't know what Jim is

16   thinking.

17        Q.   Have you ever had a conversation with

18   Mr. Frinzi about payments to your son?

19        A.   I'm not sure.

20        Q.   Do you have any reason to disbelieve what

21   Mr. Frinzi says here contemporaneously that you wanted

22   Goodman Networks, Inc. to pay another $150,000 to your

23   son?

24             MR. KLEINSASSER:  Objection, form.

25        A.   I would have to see the text chain.  I don't

Page 166

1    know what Jim is thinking.

2        Q.   Well, we have the text chain right in front of

3    you.  Do you want to review the rest of it?

4        A.   That's your call.

5        Q.   I mean, you're welcome to do it if you think

6    it makes a difference.

7        A.   I don't know if it makes a difference.  This

8    is a text message to Jim Frinzi and somebody else.  I

9    don't know, you know, what he's thinking or, you know,

10   I'm not directing him to write anything.  He is doing

11   this, you know, on his own to somebody else.

12       Q.   Okay.  Do you know what "East West" is, the

13   reference to East West is there?

14       A.   I do.

15       Q.   What is it?

16       A.   It's the East West Bank.

17       Q.   And what is East West Bank?

18       A.   They were Goodman's bank.

19       Q.   So we're clear, so this would be a total of

20   $250,000 that Goodman Networks, Inc. paid to your son,

21   who is 28 years old, for consulting services?

22            MR. KLEINSASSER:  Objection, form.

23       A.   That's what it says.

24       Q.   That's your testimony today?  Earlier you

25   talked about your brother, John Goodman, coming back

Page 167

1    into the company.  Do you recall that discussion?

2        A.    I do not.

3        Q.    At some point in time did John Goodman come

4    back into Goodman Networks, Inc.?

5        A.    I'm not sure.

6        Q.    Are you aware of any role that John Goodman

7    ever held at Goodman Networks, Inc.?

8        A.    Yes.

9        Q.    What role is that?

10       A.    CEO.  Chairman, CEO, chief strategy officer.

11   Different roles in the company.

12       Q.    When did he hold those roles?

13       A.    I'm not sure.

14       Q.    Well, let me make this more simple and more

15   recent.  Has Mr. Goodman, your brother, John Goodman,

16   held any role at Goodman Networks, Inc. in the past

17   two years?

18       A.    I'm not sure.

19       Q.    Do you recall earlier testifying about how

20   John Goodman was asked to come back and help the

21   company?

22       A.    I do not.

23       Q.    Do you have any contemporaneous recollection

24   of Mr. Goodman being asked to come back and help the

25   company?

Page 168

1        A.    I do not.

2        Q.    Did you ever ask Mr. Goodman to come back and

3    help the company?

4        A.    No.

5        Q.    Did you have any discussion with your brother,

6    John Goodman, about Goodman Networks, Inc. over the

7    past year?

8        A.    Yes.

9        Q.    What did you ask questions about?

10       A.    Ask him what's going on, does he know

11   anything.

12       Q.    Why were you asking him?

13       A.    Because -- see if he has heard anything, see

14   if he has talked to the Goodman counsel, I believe,

15   David Parham.

16       Q.    Okay.  Were you ever involved in the

17   preparation of financial statements for Goodman

18   Networks and its subsidiaries?

19       A.    No.

20       Q.    As the majority shareholder, did you review

21   the financial statements of Goodman Networks, Inc.

22   regularly?

23       A.    No.

24       Q.    Why not?

25       A.    Didn't have a need to.  It was done by the

Page 169

1  CEO, you know, the CEO or the CFO of the company.

2      Q.   So over the past two years have you ever

3  reviewed a financial statement for Goodman Networks,

4  Inc.?

5      A.   I'm not sure.

6      Q.   When you were chairman of the board of Goodman

7  Networks Inc., before your resignation in February of

8  2022, did you ever review a financial statement from

9  Goodman Networks, Inc.?

10                MR. KLEINSASSER:  Objection, form.

11     A.   I'm not sure.

12     Q.   Sitting here today, can you recall a single

13  financial statement that you ever reviewed of Goodman

14  Networks, Inc.?

15                MR. KLEINSASSER:  Objection, form.

16     A.   Not that I can recall.

17     Q.   At the time that you left Goodman Networks,

18  Inc., at the time of your resignation in February of

19  2022, were you aware of its financial status and

20  health?

21                MR. KLEINSASSER:  Objection, form.

22     A.   Yes.

23     Q.   What was your awareness?

24     A.   That the company had debt, that AT&T was

25  terminating the company's contract and it needed to

1    make a transition.

2        Q.   And what was your impression of its financial

3    health and ability to survive as a stand-alone company?

4        A.   With the AT&T contract, you know, it would

5    have been -- you know, it would have been able to

6    survive.  You know, plus the $25 million that I loaned

7    the company, you know, plus the millions of dollars of

8    debt I reduced for them, you know, buying in the bonds.

9            So if they would have maintained the AT&T

10   contract, you know, they would have -- they would have

11   been able to survive.

12       Q.   I want to talk specifically as of the date you

13   submitted your resignation letter on February 1st,

14   2022.

15           What was your impression of the financial

16   health of the company at that time?

17       A.   I don't recall.

18       Q.   Were you involved at all in the presentation

19   that Goodman Networks, Inc. gave to the bondholder?

20           MR. KLEINSASSER:  Objection, form.

21       A.   I would have to see it.  I don't think so.

22       Q.   If you could bring up the June 8, 2022

23   presentation, please.

24           Mr. Goodman, we're showing you on the

25   screen what's been marked as Goodman Exhibit 13.  Do

Page 171

1    you see that?

2         A.   I do.

3              (Exhibit 13 marked)

4         Q.   I'll represent to you that this is a document

5    we received entitled the Goodman Networks financial

6    presentation to bondholders dated June 8, 2022.  Do you

7    see that?

8         A.   I do.

9         Q.   In the top left corner it says "CFGI."  Do you

10   see that?

11        A.   I do.

12        Q.   And who is CFGI, again?

13        A.   They were the restructuring company Goodman

14   hired.

15        Q.   Were you involved in their retention?

16        A.   I was not.

17        Q.   If we could go down to the financial

18   statements, the assets and liabilities, please, sir.

19   Right there.

20              So these were the financial statements

21   that CFGI, on behalf of Goodman Networks, Inc.,

22   provided to the bondholders.  And do you see that the

23   total amount of assets as of December 31, 2021 was

24   $108.65 million?

25        A.   Where is that at?

Page 172

1      Q.   The bottom line, assets as of year end of

2    12/31/21, total assets.

3      A.   And what was the amount, again?

4      Q.   $108,650,421.

5      A.   Yes, I see it.

6      Q.   And do you have any reason to believe that

7    that wasn't the total amount of assets of the company

8    as of December 31, 2021?

9      A.   I don't know.  I didn't put it together.

10     Q.   But sitting here today, you don't have any

11   reason to doubt the numbers that CFGI presented to the

12   bondholders?

13          MR. KLEINSASSER:  Objection, form.

14     A.   I don't know.  I didn't put it together.  I

15   don't know what assets they are referring to, so I

16   can't make -- I'm not a CFO.

17     Q.   Do you have faith in CFGI's ability to present

18   numbers accurately?

19          MR. KLEINSASSER:  Objection, form.

20          Did you answer the question?

21          THE WITNESS:  I don't know.

22     A.   Do I have faith in their ability to put

23   something together?  They seemed like a professional

24   organization.  They should be able to put documents

25   together.

Page 173

1    Q.   Okay.  But apart from the specifics, sitting

2    here today, you don't have any reason to doubt that the

3    total assets of the company were --

4    A.   I don't know what they are referring to.

5              MR. KLEINSASSER:  Objection, form.

6    A.   I don't know what they are referring to on

7    this document.

8    Q.   See, I only get to depose you once,

9    Mr. Goodman, so I need to know if you're going to come

10   back and say you don't think that number is right.  I

11   need to know that now.  So what I'm asking you is,

12   based on your present knowledge sitting here today, do

13   you have any reason to doubt that there was

14   $108.654 million in assets at the company as of

15   December 31, 2021?

16             MR. KLEINSASSER:  Objection, form.

17   A.   I can't answer that question.  I don't know

18   what assets they are referring to to get to that total

19   asset number.

20   Q.   You were the chairman of the board at Goodman

21   Networks, Inc. on December 31, 2021, correct?

22   A.   No.

23   Q.   You didn't send a resignation for two more

24   months, correct?

25             MR. KLEINSASSER:  Objection, form.

Page 174

1          A.    I resigned in December as a board member.

2          Q.    And your testimony is you didn't know what the

3     assets of the company were in December when you

4     resigned?

5                    MR. KLEINSASSER:  Objection, form.

6          A.    I can't recall that.

7          Q.    But sitting here today, is there any reason

8     that you can think of off the top of your head why that

9     number might be inaccurate?

10                   MR. KLEINSASSER:  Ryan, how many times

11    are you going to ask this question?

12                   MR. PHAIR:  I'm trying to get the

13    answers.

14                   MR. KLEINSASSER:  You have gotten the

15    answer.

16                   MR. PHAIR:  I have not.

17                   MR. KLEINSASSER:  I think we're clear.  I

18    think you just don't like the answer.

19                   MR. PHAIR:  Fine.  Objection, form is

20    your objection.

21                   MR. KLEINSASSER:  I'm objecting to you

22    harassing the witness.

23                   MR. PHAIR:  I'm not harassing the

24    witness.  Can you stop with this amateur hour,

25    Matthias?  I mean, really.

Page 175

1              MR. KLEINSASSER:  Okay.  Listen, so here

2    is the deal.  Stop harassing the witness.  You have

3    asked him the same question like six times.

4         Q.   I'm trying to get his knowledge as of today.

5    He doesn't want to answer it, but that's what I'm

6    entitled to as of today.

7              MR. KLEINSASSER:  No, you're entitled to

8    have him answer the question if he's got it.  Ask it

9    one more time and see if he answers the same thing and

10   let's move on.

11        Q.   Mr. Goodman, as of December 31, 2021, before

12   you sent your resignation as chairman of the board,

13   when you were the majority shareholder, do you have any

14   reason at all to believe that $108.654 million in

15   assets was in the company, yes or no?

16             MR. KLEINSASSER:  Objection, form.

17        A.   I don't know what these assets are referring

18   to.  I didn't put it together.  I would need to see a

19   detailed comparison.  So I don't know if those assets

20   are -- you know, if they are valid assets or not.

21        Q.   So cash, if you look at -- I mean, the details

22   are right here, right?  This is the assets and

23   liabilities statement, right?  So let's just go one by

24   one, current assets, cash, $66.19 million.  Do you have

25   any reason to doubt that the company had cash of

Page 176

1    $66.19 million as of December 31, 2021?

2                MR. KLEINSASSER:  Objection, form.

3        A.   I didn't know what their cash balance was.

4        Q.   That wasn't something that was important for

5    you to know as the majority shareholder?

6                MR. KLEINSASSER:  Objection, form.

7        Q.   I'm sorry.  Was that important for you to know

8    as the majority shareholder?

9                MR. KLEINSASSER:  Objection, form.

10       A.   They weren't my job or responsibility.  This

11   was delegated, you know, to other -- other people.

12       Q.   So let's say as of December, when you said you

13   had this conversation with Mr. Frinzi, and you were

14   still chairman of the board of directors of Goodman

15   Networks Inc., what was your understanding of how much

16   cash was in the company?

17               MR. KLEINSASSER:  Objection, form.

18       A.   I wasn't sure how much cash was in the

19   company.

20       Q.   You didn't think that it was important for you

21   to know as the chairman of the board of directors of

22   Goodman Networks, Inc. how much assets were in the

23   company?

24               MR. KLEINSASSER:  Same objection.

25       Q.   Let me ask it a different way.  Do you believe

Page 177

1    it is important for directors of the company to know

2    the financial health of the company that they are

3    overseeing?

4                MR. KLEINSASSER:  Objection, form.

5        A.   They are active directors, but I was already

6    resigned.

7        Q.   Fine.  Let's take November.  As of November

8    how much cash was in the company, November of 2021?

9                MR. KLEINSASSER:  Objection, form.

10       A.   I don't know.

11       Q.   I want to have your understanding of what your

12   duties are as a board member.  What is your

13   understanding of what your duties and responsibilities

14   were as a board member of Goodman Networks, Inc.?

15               MR. KLEINSASSER:  Objection, form.

16       A.   To help the company.

17       Q.   Did you have a duty to keep yourself informed

18   about the financial health of the company?

19               MR. KLEINSASSER:  Objection, form.

20       A.   I don't have a duty for that.  The company has

21   a duty for it, so that would --

22       Q.   Sir, go ahead.

23       A.   So that would have been the -- you know,

24   someone else's responsibility.

25       Q.   Do you have a duty as a director of a company

Page 178

1   to ensure that there are adequate internal controls

2   within the company?

3               MR. KLEINSASSER:  Objection, form.

4       A.   We're not operators, we're not officers.  We

5   are not looking at the controls that are in place.  You

6   know, those are officers of the company that manage day

7   in and day out of the company.

8       Q.   Let's scroll down to the cash listing.  So,

9   Mr. Goodman, I'll represent to you that this was the

10  cash listing that CFGI, on behalf of Goodman Networks,

11  presented to the bondholders on June 8, 2022.  You will

12  see that they advised the bondholders that there was

13  $66,490,666 million in unrestricted cash within the

14  company on January 1st, 2022.  Do you see that?

15      A.   I do.

16      Q.   And that as of May 31, 2022, there was

17  unrestricted cash of only $435,645.  Do you see that?

18      A.   I do.

19      Q.   So according to CFGI's presentation to the

20  bondholders, 65 million -- over 65 million in

21  unrestricted cash was drained from the company between

22  January 1st, 2022 and May 31, 2022.  Do you see that?

23              MR. KLEINSASSER:  Objection, form.

24      A.   I see two balances.  I don't know what

25  happened to the money.

1      Q.   Does that surprise you to learn that over

2    $65 million in cash exited the company between

3    January 1, 2022 and May 31, 2022?

4            MR. KLEINSASSER:   Objection, form.

5      A.   Yes.

6      Q.   Why?

7      A.   It's a lot of money.

8      Q.   Do you have any explanation for how the

9    company that you are the majority shareholder in went

10   from having 66 million in unrestricted cash on

11   January 1st, 2022 to having only 435,000 in cash on

12   May 31, 2022?

13           MR. KLEINSASSER:   Objection, form.

14     Q.   What is your question?

15     A.   Do you have any explanation for how

16   $65 million was drained from the company between

17   January 1st, 2022 and May 31, 2022?

18           MR. KLEINSASSER:   Objection, form.

19     A.   No.

20     Q.   Sir, do you understand that -- have you

21   done -- strike that.

22           You understand that May 31, 2022, the

23   significance of that date is the date that the notes,

24   the bonds, were due to be paid back to the bondholders,

25   correct?

Page 180

1      A.    No.

2      Q.    I'm sorry?

3      A.    No, I was not aware of that significant date.

4      Q.    When you go look at the indenture, do you

5   doubt that that was the date?

6      A.    I don't doubt it.

7      Q.    So have you done -- as the majority

8   shareholder of Goodman Networks, Inc. have you done any

9   investigation to determine why $65 million was drained

10  from the company between January 1st, 2022 and May 31,

11  2022?

12                MR. KLEINSASSER:  Objection, form.

13     A.    No.

14     Q.    Does that concern you that that much money was

15  drained from the company that you are the majority

16  shareholder of between January 1st, 2022 and May 31,

17  2022?

18                MR. KLEINSASSER:  Objection, form.

19     A.    Yes, it concerns me.

20     Q.    Why?

21     A.    It's lot of money.

22     Q.    Do you believe that fraud was involved?

23                MR. KLEINSASSER:  Objection, form.

24     A.    I'm not a lawyer or a police officer.  I can't

25  answer that.

Page 181

1      Q.   I'm trying to understand why it is that you

2   don't seem more upset about $65 million being drained

3   from the company that you are the majority shareholder

4   of.

5             MR. KLEINSASSER:  Objection, form.

6      A.   Because I wasn't aware of it.

7      Q.   But is that something that makes you angry

8   right now, sitting here today?

9             MR. KLEINSASSER:  Objection, form.

10     A.   It's troubling to see that.  We need to find

11  out why.

12     Q.   So that's what I'm getting at is, what are you

13  doing to find out why?

14     A.   I'm letting the trustee do his job and the

15  lawyers for Goodman do their job to find out, you know,

16  what happened.

17     Q.   So you believe that you should just let the

18  trustee do his job to find out what happened.  Is that

19  fair?

20            MR. KLEINSASSER:  Objection, form.

21     A.   I think everybody should do their job to find

22  out, you know, what happened.  But currently the

23  trustee has full control, and so we need to let him and

24  the lawyers, you know, communicate and provide answers

25  for all of this.

Page 182

1        Q.   No further questions from me.  Thank you,

2    Mr. Goodman, for your time today.

3              MR. PHAIR:  I'm going to pass the

4    remaining time.  Do we have an agreement on who is

5    going next?

6              MR. SCHAFFER:  I'm happy to jump in.

7              MR. PHAIR:  Thank you, Mr. Goodman,

8    again.

9              Mr. Schaffer, it's all you.

10             MR. SCHAFFER:  Thank you very much.

11             MR. RUKAVINA:  This is Davor real quick.

12   Can we just have an update of how much time has been

13   used?

14             MR. SCHAFFER:  Sure.

15             THE VIDEOGRAPHER:  I have to go off the

16   record to find out the time.

17             MR. LANGLEY:  Let's do go off the record

18   and get coordinated if we're changing parties.

19             THE VIDEOGRAPHER:  Off the record at

20   3:26 p.m.

21         (Recess from 3:26 p.m. to 3:35 p.m.)

22             THE VIDEOGRAPHER:  On the record at

23   3:35 p.m.

24                    EXAMINATION

25   BY MR. SCHAFFER:

Page 183

1          Q.   Good afternoon, Mr. Goodman.  My name is

2     Eric Schaffer.  I represent UMB Bank.  UMB is the

3     indenture trustee for the 8 percent secured senior

4     notes.  I know you have testified a little bit about

5     those notes and I will try not to go over ground that's

6     already been covered.

7                    I think you understand -- let me change

8     that.  Do you understand that the notes matured the end

9     of May in 2022?

10         A.   Yes.

11         Q.   And do you understand that the debtor failed

12    to make payment then?

13         A.   Yes.

14         Q.   And the outstanding notes still have not been

15    paid; is that correct?

16         A.   I'm not sure if they haven't been paid.

17         Q.   Okay.  Do you understand that Goodman and

18    certain of its affiliates -- and let me say when I

19    refer to "Goodman" I'm referring to Goodman Networks,

20    Inc.

21         A.   Okay.

22         Q.   So do you understand that Goodman and certain

23    of its affiliates granted security interests for liens

24    to secure payment of the notes?

25         A.   I'm not aware of it.  It's just in the

Page 184

1  documents.

2      Q.   Okay.  Are you aware that there was collateral

3  for the notes, that they were secured?

4          MR. KLEINSASSER:  Objection to the extent

5  it calls for a legal conclusion.

6      Q.   Are you aware that the documents granted

7  security interest to secure payment of the notes?

8      A.   I'm not sure.

9      Q.   Are you aware that the notes to trustee and

10 notes to collateral agent had an interest in certain

11 bank accounts of Goodman?

12          MR. KLEINSASSER:  Objection, form.

13          Go ahead, James.

14     A.   Yeah, I'm learning that now.  I wasn't aware

15 of it before.

16     Q.   Okay.  A lot of my questions are going to

17 really get into the bank accounts and, with that in

18 mind, did you have any role in opening accounts of

19 Goodman at any banks?

20     A.   Not that I can recall.

21     Q.   Are you aware of accounts at East West Bank,

22 at BTH Bank, and Prosperity Bank?

23     A.   At East West Bank, yes, and at Prosperity,

24 yes.

25     Q.   Did you have any involvement ever in

 1    requesting or directing transfers from the accounts at

 2    East West or Prosperity Bank?

 3        A.   No.

 4        Q.   Did you ever discuss those accounts with

 5    anyone at either of those banks?

 6        A.   What do you mean?

 7        Q.   Did you know any account officers or other

 8    personnel at East West Bank?  Had you communicated with

 9    any of them?

10        A.   Yes.

11        Q.   And with whom?

12        A.   I don't recall the gentleman's name.

13        Q.   And do you recall the topics on which you

14    might have communicated with somebody at the East West

15    Bank?

16        A.   It would have been just on the business.  It

17    would have been on like looking for a Main Street loan,

18    but not transfer the money.

19        Q.   The same questions then for Prosperity.  Did

20    you ever talk with any account officers, anyone else at

21    Prosperity?

22        A.   Yes.

23        Q.   With whom would you talk there?

24        A.   Bater Bates; B-a-t-e-s, Bater Bates.

25        Q.   And what was Mr. Bates' role at Prosperity

Page 186

1    Bank, if you know?

2         A.   I don't know.

3         Q.   Was he the account officer for Goodman

4    Networks, Inc.?

5         A.   I think so.

6         Q.   Was he the account officer for any other

7    entities with which you were involved?

8         A.   Yes.

9         Q.   And which entities would those be?

10        A.   It would be Genesis Networks Telecom Services.

11        Q.   Uh-huh.

12        A.   And Endeavor.

13        Q.   That's it?

14        A.   I think so, yes.

15        Q.   All right.  And how often would you

16   communicate with Mr. Bates?

17        A.   It would be random.  Sometimes it would be

18   once a month.  You know, others it would be -- you

19   know, it could be several times a month.

20        Q.   I think you said you were not involved with

21   opening the account at Prosperity Bank for Goodman.  Do

22   you know the purpose -- purposes for which Goodman

23   maintained accounts at Prosperity Bank?

24        A.   I do not know.

25        Q.   Had you ever heard reference to funds in

Page 187

1    accounts at Prosperity Bank being restricted to cash?

2        A.   Yes.

3        Q.   And when did you hear that?

4        A.   It would have been last year.

5        Q.   When you say "last year," are we talking in

6    the first half of the year, later in the year?

7        A.   I can't recall.

8        Q.   What's your understanding of the term

9    "restrictive cash"?

10       A.   It's for, you know, certain purposes only.

11       Q.   So were you aware that certain funds at

12   Prosperity Bank were restricted cash?

13       A.   Yes.

14       Q.   And which funds were restricted cash?  Were

15   there particular accounts, particular funds?

16       A.   I don't know.

17       Q.   For what purposes were they restricted?

18       A.   I don't know.  It was Goodman's money.

19       Q.   So how, then, did you come to know that funds

20   were restricted cash?

21       A.   By talking with Bater.

22       Q.   And do you recall anything he told you about

23   the nature of the restrictions?

24       A.   No.

25       Q.   Did he tell you anything was pledged to

Page 188

1    support the bonds or that it was security for the

2    bonds?

3        A.   Not that I can recall.

4        Q.   Did Goodman have any relationships with

5    Prosperity Bank other than bank accounts?

6        A.   I don't know.

7        Q.   Did Genesis have bank accounts with Prosperity

8    Bank?

9             MR. KLEINSASSER:  Objection, form.  Eric,

10   can you just clarify what you mean by "Genesis," so

11   we're all clear?

12            MR. SCHAFFER:  Sure.

13       Q.   Mr. Goodman, you referred to Prosperity Bank

14   providing services for Genesis and Endeavor.  Forgive

15   me if I don't have the precise Genesis entity.

16       A.   Yes, it would have been, you know, Genesis

17   Telecom.

18       Q.   And with that clarification, did Genesis

19   Telecom have any relationships with Prosperity Bank

20   other than maintaining bank accounts?

21       A.   What do you mean?

22       Q.   Well, did it have any loans, letters of

23   credit, lines of credit?  Did it have any other

24   relationships beyond the --

25       A.   Yes, it had a loan with Prosperity Bank.

Page 189

1    Q.   Was there also a line of credit?

2    A.   There was a line of credit also, yes.

3    Q.   Did Bater Bates serve as the account officer

4    for Genesis Telecom in its business as well as in

5    Goodman's business with Prosperity Bank?

6    A.   I believe so.

7    Q.   Okay.  Over the last year, have you had any

8    personal relationship with Prosperity Bank, any

9    accounts, any loans, any other transactions?

10    A.   No, not that I can recall.

11    Q.   Can you describe the two facilities that

12    Genesis Telecom had with Prosperity Bank, the loan and

13    the line of credit?

14    A.   So, yes.  One was a loan for the company.  It

15    was -- I believe it was an operating account, and then

16    the line of credit, you know, was a note that we made

17    an assumption on.

18    Q.   When you say "an assumption," I don't

19    understand what you mean there.

20    A.   It was a loan that, you know -- that Bater was

21    able to transfer to Genesis Networks.

22    Q.   Transferred?  From whom was it transferred --

23    from whom and to whom was it transferred?

24    A.   From like Genesis Telecom to Endeavor.  I

25    would have to double-check.  I can't -- I can't

Page 190

1    remember, Eric.

2        Q.   Okay.

3        A.   But there was two notes there, two notes were

4    with Prosperity.

5        Q.   All right.  And what was the size of the loan?

6    What was the total?

7        A.   Yeah.  One was $3 million and the other one

8    was like 1.9 million.

9        Q.   Okay.  And as of -- as of the first half of

10   2022, do you know approximately how much was

11   outstanding on each of those facilities?

12       A.   I'm not sure.

13       Q.   Would the totals owed then be around the

14   3 million and the 1.9 million?

15       A.   I believe so.

16       Q.   Focusing on the $3 million loan, when were

17   principal and interest payable?

18       A.   I'm not sure.

19       Q.   Would it be payable -- would there be monthly

20   payments on the loan?

21       A.   I'm not sure.  I would have to check.

22       Q.   On the line of credit, the same questions.

23   When would the loan be payable, when would interest be

24   payable?

25       A.   Yeah, I'm not sure.  It would, you know,

Page 191

1    depend on how the bank wanted to structure them.

2        Q.   So going back to, I think it was, Exhibit 11

3    that you looked at earlier, there were monthly payments

4    being made to Prosperity, and I think they referenced

5    in Exhibit 11.  As I'm pulling it up it refers to the

6    Genesis loan.  It looks like there were payments on or

7    about the first of every month.

8        A.   That's correct.

9        Q.   And the payments were $26,231.25.  Were those

10   payments on the loan, the line of credit, or both?

11       A.   I believe it was on the line of credit.

12       Q.   Do you know how that number was calculated or

13   what it represented?

14       A.   Yes.  It was John Goodman's severance from the

15   company.

16       Q.   So these are payments on the line of credit.

17   Are you saying the line of credit was taken out for the

18   purpose of funding his severance?

19       A.   No.

20       Q.   Forgive me.  I'm a little confused.  Why was

21   Goodman making payments of 26,231 around the first of

22   every month to Prosperity Bank for application against

23   the Genesis line of credit?

24       A.    It was John's severance and that's where we

25   delegated the cash went to.

Page 192

1      Q.   When you say "we delegated," is it "we"

2   Genesis or "we" Goodman?

3      A.   No.  This would have been a Goodman decision.

4      Q.   But the line of credit was a Genesis line of

5   credit?

6      A.   It was.

7      Q.   Why would Genesis have a line of credit to pay

8   your brother's severance from Goodman Networks?

9      A.   It wasn't to pay my brother's severance.  It

10  was my brother's note, and his severance was just going

11  to pay that down, pay that note down.

12     Q.   Okay.  I think I follow.  So did the 26,000

13  represent just interest or was it amortizing?  What

14  went into the 26,000?

15     A.   I don't know.

16     Q.   Did Genesis grant any kind of liens or

17  security interest to Prosperity Bank to secure the loan

18  or the line of credit?

19     A.   What's the question?

20     Q.   Genesis had a loan and a line of credit with

21  Prosperity Bank.  Were those facilities secured in any

22  fashion?

23     A.   I would have to check the note.  I'm not sure.

24     Q.   Do you or does Genesis have documentation for

25  these facilities?

Page 193

1      A.   We should, yes.

2      Q.   All right.

3           MR. SCHAFFER:  Matthias, I'm requesting

4    copies of that documentation.  Obviously, I'm not going

5    to get it during the deposition, but I would appreciate

6    it if we could get copies of that.  If you want to do

7    it under the protective order of course that's

8    satisfactory.

9           MR. KLEINSASSER:  Thank you.  We will

10   look into that.

11     Q.   Okay.  Were you individually a guarantor on

12   either of those facilities?

13     A.   I'm not sure.  I would have to check.

14     Q.   Again, if there is any documentation we would

15   ask for that.

16           What did Goodman get in exchange for

17   making these payments to Prosperity Bank to pay down

18   the Genesis line of credit?

19     A.   So the company had an obligation to pay a

20   severance and that's all they were doing.  They were

21   just paying an individual severance.  So the company

22   would have received no, you know, benefit for an

23   obligation they had to pay.

24     Q.   When you would communicate with Mr. Bates,

25   would it typically be by phone or by e-mail, by text

Page 194

1    message, by Signal, or a combination of those?

2         A.   No, it would have been by phone call or

3    e-mail.

4         Q.   With regard to the monthly payments, I'm

5    looking at the Goodman Networks' schedules, and it

6    appears that monthly payments were made starting

7    September 30, 2021 and up through August 1, and then

8    there was a final payment on August 15.  Does that

9    sound right to you?

10        A.   Yes.

11        Q.   And my understanding is that all of the

12   monthly payments up through August 1 were in the amount

13   of $26,231.25 that we have seen; is that correct?

14        A.   Yes.

15        Q.   And my understanding is that there was a final

16   payment or payments on August 15 totaling in excess of

17   $4 million.  Does that sound correct also?

18        A.   A payment for what, a $4 million payment for

19   what?

20        Q.   There was a transfer in the Prosperity

21   accounts of Goodman to pay Genesis facilities, to pay

22   one or both of these facilities on August 15.

23        A.   I'm not aware of that.  To pay the note?

24        Q.   To pay down to satisfy the debt.

25        A.   I still have the notes at the bank.  They are

Page 195

1    still there.

2        Q.   Okay.  So prior to just now, you have never

3    heard anything about Prosperity Bank having been paid

4    off on the Genesis loans?

5        A.   Paid off, no.  We had these notes outstanding.

6        Q.   Okay.  And approximately how much is

7    outstanding now, to the best of your knowledge?

8        A.   I'm not sure.  I would have to check.

9        Q.   Do you think it's still in the neighborhood of

10   3 million on the one facility and 1.9 on the other?

11       A.   It would be close.  I would have to see.  I

12   would have to check.  It could be a little less, but

13   I'm not sure.

14       Q.   Somewhere between 4 and 4.9 million, you

15   believe?

16       A.   No.  What numbers are you saying?  You're

17   saying 3 million and 1.9?

18       Q.   You had said that the two facilities were

19   3 million and 1.9 and that they are still outstanding.

20   I'm trying to get a ballpark on how much is still owed.

21       A.   I'm not sure.  I would have to check with the

22   bank.

23       Q.   But you believe it would be in excess of

24   4 million still?

25       A.   Yes.

Page 196

1        Q.    Okay.  What process would the bank follow with

2     regard to the monthly payments of 26,231.25?  Would

3     there be any regular communications with you?

4        A.    No.

5        Q.    Would there be, to your knowledge, any regular

6     communications with anyone at Goodman?

7        A.    Not to my knowledge.

8        Q.    To your knowledge, is this something that the

9     bank was doing on its own without any specific

10    direction from you?

11       A.    No.

12       Q.    Let me rephrase.  Were you directing the bank

13    with regard to any of the monthly payments?

14       A.    No.

15       Q.    Forgive me if this seems redundant.  You never

16    directed the back to apply funds in a Goodman account

17    to pay off the loan -- the line of credit; is that

18    correct?

19       A.    Not that I recall, no.

20       Q.    Did the bank know that payments were coming

21    from the Goodman accounts to pay down the Genesis

22    loans?

23       A.    I'm sure they would have seen it.  It was

24    electronic payment.

25       Q.    And Mr. Bates would know how the Genesis loans

Page 197

1   were being serviced.  Do you agree with that?

2        A.   No.  I don't know what Bater saw.

3        Q.   Did Mr. Bates ever contact you with regard to

4   payments being made out of the Goodman account?

5        A.   No.  That was John's discretion.  It was his

6   severance.  John could use that money and however he

7   wanted.

8        Q.   So do you know whether John gave any direction

9   for funds to be taken from the Goodman Networks'

10  account and applied to these facilities, to the Genesis

11  facilities?

12       A.   I would not know.

13       Q.   Okay.  To the best of your knowledge, would

14  the bank just move funds from the Goodman account and

15  apply it against the Genesis Telecom account on its

16  own?

17       A.   I would not know.

18       Q.   Forgive me.  I'm going through my notes.  If I

19  spend a couple minutes going through this it means I'm

20  getting rid of some of the questions.

21            So you testified that the two facilities

22  are still outstanding.  Has the bank accelerated

23  payment on either the loan or the line of credit?

24       A.   Not that I'm aware of.

25       Q.   Has it made any -- did it ever make a demand

Page 198

1    for pay off of those two facilities?

2         A.   I'm not sure.  I would have to check.

3         Q.   How would you go about checking?

4         A.   I would ask the accounting department and I

5    would contact Bater and ask him if there is an

6    acceleration.

7         Q.   Well, you said the accounting department.

8    This is the accounting department for Genesis?

9         A.   For Endeavor.

10        Q.   For Endeavor.  What's the relationship between

11   Endeavor and Genesis?

12        A.   There is none.  It's a separate company.

13        Q.   But did Endeavor assume the obligations on the

14   Genesis loan and the Genesis line of credit?

15        A.   I don't know.  I would have to go check.

16        Q.   Do you think that that would be something

17   documented between the two companies?

18        A.   If it happened.  I would have to check and

19   see.

20        Q.   There again, I would ask your counsel if we

21   could get those documents, that would be appreciated.

22             At any time after May 31, when the notes

23   came due, did you have any concern that UMB, as

24   trustee, who are the collateral agent for the notes,

25   might exercise any remedies against the accounts at

Page 199

1    Prosperity?

2        A.    What's your question?

3        Q.    The notes matured on May 31.  Once they

4    matured, do you understand that the trustee or the

5    collateral agent for the trustee might exercise

6    remedies to try and collect on the notes?

7        A.    I'm not aware of any of that.  So, no.  I

8    mean, I viewed all assets of Goodman belonged to the

9    bondholders and the creditors.

10        Q.    Did you ever have any conversations with

11    Mr. Bates or anyone at Prosperity Bank about remedies

12    that might need to be exercised by the trustee for the

13    notes or by the collateral agent for the notes?

14        A.    Not that I can recall.

15        Q.    Again, forgive me.  I'm trying to figure out

16    which questions I've already asked and I don't need to

17    ask again.

18        A.    Okay.

19        Q.    Do you still have regular communications with

20    Mr. Bates or anyone at Prosperity Bank with regard to

21    the Genesis facilities?

22        A.    Not regularly.  Once or twice a month.

23        Q.    So you continued to have those conversations

24    once or twice a month going back to August, if not

25    earlier?

Page 200

1        A.    No.   I had a conversation, you know, with

2    Bater because he is the officer on our account.

3        Q.    And have you talked with him in the last two

4    or three months?

5        A.    Yes.

6        Q.    Has he ever told you anything about claims of

7    UMB Bank as trustee or claims of the note holders

8    relating to accounts at Prosperity Bank?

9        A.    I can't recall.

10       Q.    Did he ever tell you that the trustee or the

11   collateral agent -- by the trustee, I mean UMB as the

12   indenture trustee for the notes.  Did they ever tell

13   you that the trustee or the collateral agent had

14   exercised their rights with regard to any of the

15   Prosperity Bank accounts' equipment?

16       A.    Not that I recall.

17       Q.    And you say that he never spoke to you at all

18   about wanting to apply funds in the Prosperity accounts

19   of Goodman to pay off the two Genesis facilities?

20       A.    I cannot recall.

21       Q.    To the best of your knowledge, you have never

22   had any such conversation with him or anyone at

23   Prosperity?

24       A.    I can't remember.  I would talk to Bater about

25   our notes.

Page 201

1        Q.    What did he tell you about your notes?

2        A.    Just what's remaining, what's owed, our -- you

3    know, our obligation.

4        Q.    So has Goodman made any payments since August,

5    to your knowledge?

6        A.    I'm not aware.

7        Q.    Has Genesis made any payments on these

8    facilities since August?

9        A.    I would have to check with our accounting.

10       Q.    Do you have -- do you have any understanding?

11   Do you think that payments have been made by Genesis

12   since August?

13       A.    I don't know.  I would need to check with

14   accounting.

15       Q.    There again, I would ask your counsel if you

16   could follow up and check with accounting.

17              I think you said you are not a personal

18   guarantor in any way on the Genesis notes; is that

19   correct?

20       A.    I'm not sure.

21       Q.    Has Prosperity Bank at any time asked that you

22   or Genesis Telecom or Endeavor indemnify the bank with

23   regard to the Goodman accounts?

24       A.    I'm not aware.

25       Q.    Was anyone at the bank aware that you had

Page 202

1    resigned from Goodman as an officer or director

2    informally in December of '21, and then confirming it

3    in writing February 1st of '22?

4                    MR. KLEINSASSER:  Objection, form.

5        A.   I do not know.

6        Q.   Did Mr. Bates know that you were no longer

7    associated with Goodman Networks either as an officer

8    or a director?

9        A.   I do not know.

10       Q.   Did you ever share that information with him?

11       A.   Not that I recall.

12       Q.   Would you have had any authority to direct

13   payments out of the Prosperity Bank accounts after your

14   resignation?

15       A.   No.

16       Q.   Would it surprise you to hear that the bank

17   had advised UMB that funds were transferred at the

18   direction of James Elmer Goodman, Jr.?

19       A.   Yes.

20       Q.   That's because, in fact, you never directed

21   any transfers out of the Goodman Networks accounts at

22   Prosperity Bank?

23       A.   I don't recall any.

24       Q.   I have no further questions for you.  Thank

25   you.

Page 203

EXAMINATION

BY MR. LANGLEY:

1

2

3     Q.   Mr. Goodman, I'm Adam Langley.  I'm counsel

4     for FedEx Supply Chain Logistics & Electronics, Inc.  I

5     know you are going through the third round of

6     questioning, so thank you for being here.  And I'll try

7     to keep it on point.

8               MR. LANGLEY:  Will you introduce as

9     Exhibit 14 FedEx's amended subpoena?

10              (Exhibit 14 marked)

11    Q.   Mr. Goodman, you understand that FedEx,

12    alongside Mr. Phair's clients, also subpoenaed you

13    today for the deposition and sought documents?

14    A.   Yes.

15              MR. LANGLEY:  And, Terry, is that

16    available at this point?

17              EXHIBIT TECH:  It is.

18    Q.   Mr. Goodman, can you pull up Exhibit 14?  Do

19    you have it before you?

20    A.   I do, yes.

21    Q.   Have you been presented with a subpoena that

22    was served upon your counsel?

23    A.   Yes.

24    Q.   And is there any reason today you cannot

25    testify truthfully and fully in this deposition?  To

Page 204

1   give you an example, like medicine or medical condition

2   or anything along those sorts?

3        A.    No.  I mean, I've got high blood pressure, but

4   nothing that's stopping me from doing this deposition.

5        Q.    No problem.  That's just what I ask everybody

6   when we get started, so thank you.

7              Do you know Mr. Anthony Rao?

8        A.    I do, yes.

9        Q.    And what role did Mr. Rao play at Goodman

10  Networks?

11       A.    He was their in-house counsel.

12       Q.    Okay.  And after he left Goodman Networks,

13  where did he go to work?

14       A.    He went to work for UFS.

15       Q.    Okay.  And UFS, is that Unified Field

16  Services?

17       A.    It is, yes.

18       Q.    And is that a company that you control?

19       A.    It is, yes.

20       Q.    And is Mr. Rao continuing to work with UFS

21  today?

22       A.    No.  He works for Endeavor.

23       Q.    And is Endeavor an entity that you do control?

24            MR. KLEINSASSER:  Objection.

25       A.    Yes.

Page 205

1          MR. KLEINSASSER:  Objection.

2          MR. LANGLEY:  Will you introduce

3    Exhibit 15?  It's an e-mail from Mr. Rao dated

4    January 4, 2023.

5        Q.   You should have it in just a second,

6    Mr. Goodman.

7          EXHIBIT TECH:  It's introduced.

8          (Exhibit 15 marked)

9          MR. LANGLEY:  Thank you.

10       Q.   Mr. Goodman, see if you can pull it up now.  I

11   can see it, so hopefully you can, too.

12       A.   What exhibit is it?

13       Q.   This is Exhibit 15.

14       A.   Yes, I see it.

15       Q.   I'll represent to you this is an e-mail that

16   we received from Anthony Rao.  And I say "we," FedEx

17   and also the trustee's counsel, Mr. Thomas Bergman.

18   And he was responding to our request to identify the

19   board members.

20            Is it your expectation that Mr. Rao would

21   have knowledge of the board members at Goodman Networks

22   while he was there?

23       A.   Yes, while he was there.

24       Q.   And please look at this e-mail.  You should be

25   able to control it.  Look at that and see if what he

Page 206

1    has represented there as the board members through

2    his -- I believe when he left in August of 2021, if

3    that's accurate based upon your recollection as well?

4        A.   Yes, this looks correct.

5        Q.   Okay.  And so based on this document that

6    Mr. Rao provided, it doesn't look like after

7    Mr. Keiffer resigned on September 20, 2020, that any

8    person other than a Goodman last name was acting on the

9    board for Goodman Networks; is that correct?

10       A.   Yes.

11       Q.   And after August 2021, did anybody other than

12   somebody with the Goodman last name sit on the board of

13   Goodman Networks?

14       A.   Yes.

15       Q.   Who would that have been?

16       A.   Jim Frinzi.

17       Q.   Anyone else?

18       A.   Not that I can recall.

19       Q.   Okay.  And do you know when -- let's take that

20   last category, when it says Item 6.  Do you recall when

21   Jake Goodman would have resigned?

22       A.    It would have been, you know, shortly after he

23   came onto the board.  It was not long after -- you

24   know, like Dan Fete, whenever Dan Fete left, I think,

25   you know, Jake left after that.

Page 207

1      Q.   So this indicates that Mr. Fete left in

2   September of 2020, and that Jake was not even a board

3   member at that time.   How do you reconcile that?

4      A.   I don't.

5      Q.   So do you have an understanding of when Jake

6   would have served on the board?

7      A.   Well, from this document I would, and that was

8   September 20, 2020.

9      Q.   Do you know when he would have ended his term?

10      A.   No, I'm not sure.

11      Q.   Okay.  And what about Jody Goodman?   It

12   indicates he became the executive chair sometime around

13   March 22, 2021.  Is that -- is that correct with your

14   understanding as well?

15      A.   If it's on this document, then yes.

16      Q.   And do you know when Jody would have left the

17   board?

18      A.   I do not.

19      Q.   Do you know the circumstances for why he would

20   have left the board?

21      A.   I do not.

22      Q.   Okay.  And I didn't ask.  I apologize to go

23   back, but do you know the circumstances for why Jake

24   left the board?

25      A.   Just, you know, the -- he was there for

Page 208

1    experience and so, you know, it wasn't providing, you

2    know, the support or, you know -- and that's why he

3    would have left.  I'm not sure.  I would have to go

4    back and check.

5        Q.    Okay.  And what about Jason Goodman, do you

6    know when he left the board?

7        A.    I do not know.

8        Q.    Do you know the circumstances why he left the

9    board?

10       A.    I do not know.

11       Q.    Did Jake serve on any board of any entity that

12   you're affiliated with after he left the board at

13   Goodman Networks?

14       A.    He has served on other boards.

15       Q.    What entities would those be?

16       A.    I'm not sure.  I would have to check.

17       Q.    Do you have an idea of kind of a network of

18   entities that he would have been a part of?

19       A.    No.

20       Q.    Are we thinking Genesis?

21       A.    Yes.  Genesis, yes.

22       Q.    What about Endeavor?

23       A.    I'm not sure.  I would have to check.

24       Q.    What about Unified Field Services?

25       A.    I'm not sure.  I will would have to go check.

Page 209

1    Q.   What about Goodman Investment Holdings?

2    A.   I'm not sure.  I would have to go check.

3    Q.   Okay.  What about your brother, John?  Does he

4    serve on any of those -- let me correct that.

5              Your brother, John, does he serve in an

6    officer or director capacity for any entity that you

7    control?

8    A.   No.

9    Q.   What about Jason?

10   A.   No.

11   Q.   What about Jody?

12   A.   No.

13   Q.   What about Jonathan?

14   A.   No.

15   Q.   Let me pull up the interrogatories that were

16   given to FedEx earlier in this case.  It was

17   Exhibit 15, so I'm not sure how you have got it marked

18   in the exhibit share.  Sorry.  That's Exhibit 15 from

19   an earlier thing.  Let me know when you -- what exhibit

20   it is.

21              EXHIBIT TECH:  Exhibit 16.

22              (Exhibit 16 marked)

23   Q.   It was Exhibit 15 at the earlier hearing and

24   Exhibit 16 for this deposition.  Sorry it's confusing.

25   You should be able to see that now.

Page 210

1          A.   Yes, I have it.

2          Q.   This was, I'll represent to you, a response

3     given by Goodman Networks and GNET ATC in response to

4     FedEx's interrogatories where they asked for

5     identification of the officers and directors of Goodman

6     Networks and GNET ATC.  We asked for it separately, but

7     it was provided to us together.  So I want to work you

8     through this and get your understanding.

9               Do you have an understanding -- please

10    review it -- whether this is true, to your knowledge,

11    or if there is any discrepancies that you note?

12         A.   Okay.  Are you waiting on me?

13         Q.   Yes.  I have asked you to identify whether you

14    believe this is accurate to the best of your knowledge?

15         A.   Yeah, I'm not sure.  I would have to go verify

16    the dates or get the information from Tony.

17         Q.   You think Tony would be the custodian of that

18    information?

19         A.   He should be until he left.

20         Q.   Who would have been the custodian of that

21    information after he left?

22         A.   I don't know.

23         Q.   Was anybody custodian of that information

24    after he left?

25         A.   I would have to check and see.

Page 211

1      Q.   In your dealings as a board member, did you

2   have any communication with anybody that was a

3   custodian of the company's books and records?

4      A.   Tony Rao.

5      Q.   After Tony left, who in your capacity as a

6   board director would have -- you would have had

7   communications with that had possession of the books

8   and records of Goodman Networks?

9      A.   I'm not sure.

10      Q.   Was there anybody else on the board that would

11   have had that knowledge?

12      A.   Not that I'm aware of.

13      Q.   Based on this document, it seems to indicate

14   that as of September 17, 2021 there was no longer an

15   officer at Goodman Networks or GNET ATC that did not

16   have the last name of Goodman or Frinzi.  Is that

17   correct, based on your knowledge?

18      A.   That sounds correct, yes.

19      Q.   So in September -- at the end of September

20   2021, was Goodman Networks controlled by somebody with

21   the last name Goodman or Frinzi?

22           MR. KLEINSASSER:  Objection, form.

23      A.   I think the governance, you know, for Goodman

24   was there, but for control there would have been an

25   obligation or, you know, standard process or procedure

Page 212

1    and, you know, direction from, you know, from whatever

2    outside counsel, you know, Goodman had.

3         Q.   At the end of September 2021, who would have

4    been operating in the governance for capacity for

5    Goodman Networks?

6         A.   I'm not sure.  I would have to check.

7         Q.   Who do you believe, based on the information

8    you have today, would have been operating in that

9    capacity?

10        A.   I'm not sure.

11        Q.   Okay.  Were you?

12        A.   No.  I had a delegated authority from my board

13   seat that I delegated, you know, my -- my position to

14   John Debus and then the CEO or the CFO.

15        Q.   In September 2021, who was the CFO?

16        A.   It would have been Brad Kozma; is that right?

17        Q.   This document suggests that he resigned on

18   September 8th, 2021.  Who would have been the CFO after

19   him?

20        A.   I'm not sure.  I would have to go check.

21        Q.   Is it true that Goodman Networks did not have

22   a CFO after September 9, 2021?

23        A.   That could be the case or -- I would have to

24   check and see if there was an interim, you know, CFO or

25   an outside independent.  I just can't recall right now.

Page 213

1      Q.   Okay.  But based on your recollection as a

2  board member of Goodman Networks, you do not know who

3  the CFO was after September 8th, 2021?

4      A.   I'm not saying that.  I'm saying I would need

5  to go check to see if there was a -- you know, a temp

6  CFO or if someone was, you know, appointed interim CFO.

7      Q.   I understand.  And if there are documents out

8  there that would refresh your memory, so be it.  But

9  sitting here today, you do not know as a board member

10  of Goodman Networks whether there was a CFO after

11  September 8, 2021; is that correct?

12      A.   I would have to check and see.

13      Q.   It's a yes or no question.  Do you know or not

14  know here in this deposition?

15      A.   I'm not sure.

16      Q.   Again, it's a yes or no question.  I would ask

17  that you answer it.

18      A.   What's your question?

19      Q.   Do you, sitting here today, have knowledge, as

20  a board member of Goodman Networks whether there was a

21  CFO in place after September 8th, 2021?

22      A.   So I'm not sure.  I don't recall there being a

23  CFO.

24      Q.   And is it fair to say, then, that, no, today

25  you don't have knowledge of whether there was a CFO

1    after September 8th, 2021?

2         A.   I'm saying I can't recall one.

3              MR. KLEINSASSER:  Objection, form.

4         Q.   We will move on.  What about a controller --

5    there is no controller identified at Goodman Networks

6    on this list.  Do you know whether after September 31,

7    2021 whether there was a controller at Goodman

8    Networks?

9         A.   Again, I would have to go check and see, to

10   see who was still at the company to see if there was a

11   controller there.

12        Q.   Would it be reasonable, based on your

13   knowledge, for there not to have been a controller at

14   that point in time?

15             MR. KLEINSASSER:  Objection, form.

16        A.   I'm not sure.  I didn't operate the company

17   from day to day, so I would have to go and see if there

18   was a controller in place.

19        Q.   Sure.  So this document identifies

20   James Frinzi started as CEO on October 20, 2021.  Do

21   you believe that was correct?

22        A.   I would have to check.

23        Q.   Do you have any reason to believe it wasn't

24   correct?

25        A.   No.

Page 215

1      Q.   Okay.  And from looking at this chart, it

2    doesn't look like there was a CFO of -- excuse me -- a

3    CEO of Goodman Networks other than Jason Goodman.  Was

4    Jason Goodman operating as the CEO of Goodman Networks?

5      A.   I'm not sure.  I would have to go back and

6    check.

7      Q.   Mr. Goodman, as a board member, I would have

8    an expectation that I would know who my officers are.

9    Is there a reason you can't recall who the officers of

10   Goodman Networks was?

11            MR. KLEINSASSER:  Objection, form.

12     A.   Yeah, there was a lot of disruption.  It's not

13   my primary business.  I was the largest investor, and

14   so it wasn't -- it wasn't my primary focus.  I mean, it

15   wasn't -- so, yes, there was a lot going on.  There was

16   a lot of disruption and a lot of people leaving, you

17   know, a lot of temporary roles that were being -- you

18   know, that people had to fool, you know, at the

19   company.  And so, yes, it's hard to remember

20   three years ago or two years ago.

21     Q.   And I appreciate that there was disruption, so

22   I appreciate that.

23            Let me ask this then.  In a period of

24   disruption like was occurring at Goodman Networks, is

25   that an opportunity for the board to step in and

Page 216

1     exercise greater control over the entity?

2              MR. KLEINSASSER:  Objection, form.

3        A.   Before -- I don't understand your question.

4        Q.   Did Goodman Networks -- excuse me.  Did you,

5     as a board member of Goodman Networks in this period of

6     disruption exercise heightened control over Goodman

7     Networks to assure that it made it through this period

8     of disruption?

9              MR. KLEINSASSER:  Objection, form.

10       A.   We hired Jim Frinzi for that.

11       Q.   So Mr. Frinzi, was that one of his roles,

12    then, to deal with this disruption?

13             MR. KLEINSASSER:  Objection, form.  I

14    apologize.  I couldn't hear you with the objection.

15       A.   I can't recall.

16       Q.   I believe you testified earlier that -- and

17    correct me if I'm wrong -- but that you hired

18    Mr. Frinzi -- excuse me --that Goodman Networks hired

19    Mr. Frinzi to wind down the company, find new money and

20    then transition the company to an E-commerce basis; is

21    that correct?

22       A.   No.

23             MR. KLEINSASSER:  Objection, form.

24       A.   I originally hired him as a consultant, you

25    know, to help go and find new investors, which he did,

Page 217

1   talked to other companies about, you know,

2   transitioning, you know, the company, you know, from

3   AT&T into E-commerce.  And once he successfully did

4   that, then that's whenever he then became CEO of the

5   company.

6         Q.   Okay.  And was Goodman Networks operating in

7   the E-commerce business in 2021?

8         A.   I believe so, yes.

9         Q.   Okay.  When did Goodman Networks stop

10   operating in the E-commerce business?

11         A.   Whenever they sold the -- whenever they sold

12   the Amazon business.

13         Q.   Okay.  And who was that Amazon business sold

14   to?

15         A.   UFS.

16         Q.   Again, that's Unified Field Services that you

17   control; is that correct?

18         A.   Yes.

19               MR. KLEINSASSER:  Objection, form.

20         A.   Yes, that's correct.

21         Q.   And did that sale occur in June of 2021?

22         A.   I'm not sure.  I would have to go back and

23   look.  I would have to go back and look.

24         Q.   Does that sound correct to you?

25         A.   I just can't remember.

1          MR. KLEINSASSER:  Objection, form.

2     A.    I'm sorry.  I can't remember the dates.

3     Q.    I understand.  And did the sale of UFS occur

4    before Mr. Frinzi was hired?

5     A.    I can't recall.

6     Q.    Do you know who would have that type of

7    knowledge about the entity, Goodman Networks?

8     A.    Tony should have it.  Tony Rao should, you

9    know, have this information.  The company should have

10   this information, yes.

11    Q.    And when you say "the company," it's a little

12   difficult because a company typically has custodians

13   and persons acting for that company.  Who would you say

14   is the persons at the company that would be when you

15   identify the company?  That's a little bit convoluted.

16   I apologize.

17    A.    Okay.  It would be the trustee, the trustee of

18   the company.

19    Q.    "The trustee" being who?

20    A.    Whoever the court appointed trustee of Goodman

21   Networks.

22    Q.    Sure.  So you are saying the bankruptcy

23   trustee would be the person today?

24    A.    Sure.  He should have that information or he

25   could go find that information from the company.

Page 219

1       Q.   Okay.  And from August of 2021, when Mr. Rao

2   left, through September of 2021, when this involuntary

3   position -- in 2022, when the involuntary petition was

4   filed, who would have been the custodians?

5       A.   Jim Frinzi.

6       Q.   Okay.  Anybody other than Jim Frinzi?

7       A.   I'm not sure.

8       Q.   Okay.  So if you were going to look for

9   documents, who would you have contacted?

10           MR. KLEINSASSER:  Objection, form.

11      A.   Today or --

12      Q.   I'm sorry.  In the same context, between

13  August of 2021 and September of 2022, who would you

14  have contacted to find governance documents for Goodman

15  Networks?

16      A.   If Tony Rao was still there I would have

17  contacted him.  If he was already gone, then, you know,

18  Goodman's IT would have been able to find those

19  documents and provide them to whoever requested them.

20      Q.   And after Mr. Frinzi resigned, do you have

21  knowledge of who would have had custody of any books

22  and records in Goodman Networks?

23      A.   I do not.

24      Q.   What role does MBE Group, that I believe you

25  and your brothers are shareholders or members of, play

Page 220

1   in the governance of Goodman Networks?

2       A.   None for shareholders, shareholders.

3       Q.   Has Goodman MBE Group -- I understand there is

4   two entities, but can we refer to them as just one,

5   this MBE Group here?

6       A.   Yes.

7       Q.   What directions or governance has MBE Group

8   exercised in the year 2022?

9               MR. KLEINSASSER:  Objection, form.

10      A.   I'm sorry.  Ask that question again.

11      Q.   Sure.  Has MBE Group given any directions to

12  Goodman Networks during 2022?

13              MR. KLEINSASSER:  Objection, form.

14      A.   I'm not sure.  I would have to go check.

15      Q.   Have you participated in any decision-making

16  at MBE Group regarding any governance action at Goodman

17  Networks?

18      A.   It would have to go back and check because the

19  MBE Group does have rights.  I would just have to check

20  and see what those rights are.

21              MR. KLEINSASSER:  Adam, I need to take a

22  break soon.  I'm not trying to interrupt you.  How much

23  longer do you think you have with this line of

24  questioning?

25              MR. LANGLEY:  If you need a break I'm

Page 221

1    happy to give you a break right now.  We can jump off

2    for -- what do you need, five minutes?

3                    MR. KLEINSASSER:  Five minutes is fine.

4                    THE VIDEOGRAPHER:  Off the record at

5    4:32 p.m.

6              (Recess from 4:32 p.m. to 4:40 p.m.)

7                    THE VIDEOGRAPHER:  We're on the record at

8    4:40 p.m.

9                    MR. LANGLEY:  Thank you.

10    Q.   (BY MR. LANGLEY)  Mr. Goodman, on December 23,

11    2020 I understand that the company received written

12    notice of the termination of the AT&T and DirecTV

13    contract.  Is that correct based on your understanding?

14    A.   It sounds correct.  I would have to look at

15    the document to be sure.

16    Q.   Okay.  Let's do that.

17                    MR. LANGLEY:  Terry, if you can, I've got

18    Bates No. Goodman_0002739.  It's the 2020 Goodman

19    Networks financial statements.  What exhibit are we at,

20    17?  It's 17.

21                    EXHIBIT TECH:  Exhibit 17 has been

22    published.

23                    MR. LANGLEY:  Thank you.

24              (Exhibit 17 marked)

25    Q.   Are you able to see that?

Page 222

1      A.   I'm pulling it up now.  Exhibit 17?

2      Q.   Yes, it should be the financial statements for

3   the year 2020.

4      A.   Okay.  I have it.

5      Q.   Okay.  And do you -- you can look at it just

6   previously.  Do you recognize these as the Goodman

7   Networks financial statements for December 31, 2020?

8      A.   I don't recall them, but it looks correct.

9      Q.   Okay.  Would you turn to Page 17 of the

10   financial statements?  It's Note 2 once you get to

11   Page 17.

12      A.   I'm there.

13      Q.   It talks about a going concern.  Can you read

14   that first sentence after Note 2, "Going Concern."

15      A.   Yes, "Going Concern."  "On December the 23rd,

16   2020, the company received written notice of

17   termination of contract for major customer AT&T to

18   DirecTV, which represents approximately 84 to

19   94 percent of the company's revenue.  For continuing

20   operation of the years ended December 31, 2020 and

21   2019, respectively, as a result this contract will

22   terminate on January 1st, 2022."

23      Q.   You can stop there.  Is that correct based on

24   your knowledge?

25      A.   It looks correct.

Page 223

1      Q.   And at this time of December 23, 2020, were

2  you the holder of 25 million in face value preferred

3  shares of stock in Goodman Networks?

4      A.   I'm not sure.  I would have to go and check.

5      Q.   Does that sound correct to you?

6      A.   It does.

7      Q.   And on December 23, 2020 were you the holder

8  of at least 40 million of face value bonds in Goodman

9  Networks?

10     A.   It sounds correct.

11     Q.   And when there is a going concern like this

12  that the business not -- may not be able to continue as

13  a preferred shareholder and bondholder, were you

14  concerned whether there was payment of those

15  obligations?

16     A.   I was.

17     Q.   What steps did you take regarding the

18  preferred shares to try to monetize those?

19            MR. KLEINSASSER:  Objection, form.

20     A.   Probably none.  I didn't take any steps.

21     Q.   Okay.  Have you taken any steps since

22  December 23, 2020, to monetize those preferred shares?

23     A.   Not --

24            MR. KLEINSASSER:  Objection, form.

25     A.   Not directly.  Not until someone contacted me

Page 224

1    interested in buying them.

2        Q.   And who was that?

3        A.   Good Lord, I don't know.  Can you pull up that

4    document?  I can't find -- the purchaser of the

5    proposed shares.

6        Q.   Is that -- let me see if I can recollect to

7    answer your question.  Is that 18920?

8        A.   Yes, that's correct.

9        Q.   And so that occurred in early '22, correct?

10       A.   Yes.

11       Q.   Okay.

12              MR. LANGLEY:   Terry, can you publish as

13   Exhibit 18 Goodman 000530?

14       Q.   You should be able to see Exhibit 18 there

15   now.

16       A.   Let me refresh.  Yes, I see it.

17              (Exhibit 18 marked)

18       Q.   Do you recognize this document?

19       A.   I do.

20       Q.   What is it?

21       A.   It's a purchase -- a repurchase of shares of

22   common stock.

23       Q.   And who wrote this letter?

24       A.   I'm not sure.

25       Q.   Again, you're welcome to look at it, the

Page 225

1    signature line, whatever else you need to, to state if

2    you know who wrote this letter.

3        A.   I'm not sure what law firm wrote it or if, you

4    know, Tony put it together and went to outside counsel.

5    I'm not sure who wrote it.

6        Q.   Whose signature is on this letter?

7        A.   It's mine.

8        Q.   Is that a true signature of yours?

9        A.   It doesn't look like it, but it could be.  It

10   could be.

11       Q.   Okay.  Do you believe this is a forged

12   signature?

13       A.   No.  No.

14       Q.   Do you believe that you directed the signature

15   be put on this letter?

16       A.   Yes.

17       Q.   Is it fair to characterize this as a letter

18   from you?

19       A.   No, it would not be.

20       Q.   Who would this be a letter from?

21       A.   From Goodman -- I'm assuming it would have

22   been from Goodman's legal counsel.

23       Q.   Can you explain that because the signature

24   line says, "Very truly yours, Genesis Networks

25   Enterprises, LLC," signed by James Goodman, chief

Page 226

1    executive officer.

2              So how, given that signature line, does

3    it come from Goodman's legal counsel?

4        A.    Because this is Goodman wanting to buy, you

5    know, preferred shares, so it would have came from

6    Goodman.

7        Q.    Okay.  Who at Goodman would have directed this

8    letter to be written?

9        A.    I'm not sure.

10       Q.    On September 15, 2021, we already went through

11   the org charts provided by Mr. Rao and under oath from

12   Goodman Networks, and it didn't appear that there was

13   anybody at the company as an officer or director other

14   than you or another Goodman.  Is that true?

15       A.    I would have to look at the document again.

16       Q.    Who is the "Dear Mr. Goodman" this letter is

17   directed to?

18       A.    It would be me.

19       Q.    So you were addressing a letter to you from

20   you?

21       A.    No, I did not draft this letter.

22       Q.    Mr. Goodman, this is your signature on this

23   letter.  We have already been through that, correct?

24       A.    Yes.

25       Q.    So it is your testimony, then, that you signed

1    letters that are not from you?

2              MR. KLEINSASSER:  Objection, form.

3         A.   I'm not saying that.  You're asking me who

4    drafted this letter and it has my signature on the

5    bottom.  I'm telling you I don't know who drafted this.

6    This looks like it came from Goodman or Goodman's

7    outside counsel, and I'm telling you that's my

8    signature on the bottom.

9         Q.   Okay.  And to be clear, we may have had some

10   miscommunication.  I'm not asking for who drafted this

11   letter.  I'm asking who sent this letter.  Who is this

12   letter on behalf?

13        A.   It's on behalf of Goodman Networks.

14        Q.   So your testimony today is that Goodman

15   Networks sent Goodman Networks a letter to repurchase

16   the shares that you owned individually?

17        A.   If I'm reading this correctly, that's not how

18   it's drafted.  It's drafted from Goodman Networks to

19   Mr. Goodman, you know, about purchasing the preferred

20   shares and with my signature on the bottom.

21        Q.   Is this letter from Genesis -- a Genesis

22   entity?

23        A.   Is this letter from a Genesis entity?

24        Q.   Yes.

25        A.   No, not that I'm aware of.

1      Q.   Why is the signature line identified Genesis

2   Networks Enterprises, LLC as the entity?

3      A.   That's how all legal documents are typically

4   drafted, both the buyer and the seller or the

5   two entities that are going to go into a binding

6   agreement.

7      Q.   Did this get executed?

8      A.   I don't recall.  I would have to go and see if

9   Goodman's signature is on it and, you know, if there

10   was a transfer.  But it's over two years ago.  I would

11   have to go back and verify it.

12      Q.   Mr. Goodman, the purchase price it identifies

13   in Paragraph 1 is $25 million.  Do you see that?

14      A.   I need to pull it back up.  Where are you

15   referring me to?

16      Q.   In the paragraph marked with the numeral one

17   it says, "Repurchase of repurchased shares purchase

18   price," and then it identifies in the body a

19   $25 million purchase price.  Do you see that?

20      A.   Yes.

21      Q.   Is it your testimony today that you can't

22   recall whether a $25 million repurchase of preferred

23   shares occurred or didn't occur?

24           MR. KLEINSASSER:  Objection, form.

25      A.   Yeah, that's correct.  I mean, it would be on

Page 229

1    Goodman's balance sheet.  This is not anything that I

2    would have tried to -- I mean -- you know, we would

3    need to look at Goodman's records.  We would have to

4    look at their cap table to see if they were transferred

5    and then go back and look at their financials and see

6    if there was, you know, a transfer made.

7        Q.   Is $25 million, in your opinion, material to

8    you?

9               MR. KLEINSASSER:  Objection, form.

10       A.   I think it's -- yes, it would be material to

11   me.

12       Q.   Is it material to Genesis Networks

13   Enterprises?

14              MR. KLEINSASSER:  Objection, form.

15       A.   Yeah, sure, if this transaction occurred.

16       Q.   In your opinion, is it material to Goodman

17   Networks?

18              MR. KLEINSASSER:  Objection, form.

19       A.   Yeah, it would have been material to Goodman.

20       Q.   Who would have knowledge, then, whether this

21   deal was executed to your clients?

22       A.   I mean, if Tony Rao was still there Tony would

23   know.  And, you know, any -- or any counsel that

24   drafted this document, they would know.  And then, you

25   know, this would have shown up on -- this would have

1    shown up on a -- you know, on a financial statement, on

2    Goodman's financial statement.  So, you know, the -- we

3    could go back and look at those as well.

4        Q.    Okay.  It says on the top in the signature

5    line who it's addressed to, "Attention

6    Madison Goodman."  Who is Madison Goodman?

7        A.    She's my niece.

8        Q.    Okay.  Who is she the daughter of?

9        A.    Jody.

10       Q.    And what role does she play at Goodman

11   Networks?

12       A.    She was in-house counsel with Tony Rao.

13       Q.    Okay.  We went through earlier and Tony

14   resigned in August of 2021.  Would Madison have been

15   the custodian after Mr. Rao's resignation?

16       A.    Maybe.  I would have to go back and check.

17       Q.    You testified earlier that you were approached

18   by the 18920 entity, and that was the first time that

19   you considered selling your share to preferred stock.

20   When I say "yours," I understand you and your

21   affiliated companies.

22             This is dated September 15, 2021 and it

23   has your signature on it.  Is it true that this was an

24   earlier consideration of selling preferred stocks?

25             MR. KLEINSASSER:  Objection, form.

Page 231

1        A.   I think this is a -- I'm not sure.  You know,

2    this is a -- you know, this could just be a proposal to

3    the company, you know, to see if -- you know, if the

4    company has an interest in it.  I would have to go back

5    and look at the context and what's behind this and if

6    it was even a transaction.  You know, it could have

7    been just a discussion.

8        Q.   Okay.  Is a company that has a going concern

9    from its auditors, RSM, as we saw in the financial

10   statements, should it be re-buy at face value,

11   preferred stock?

12              MR. KLEINSASSER:  Objection, form.

13       A.   I'm not the officer or the CFO of the company.

14   I -- I wouldn't be able to make that decision.

15       Q.   Okay.  What about -- is this the type of

16   discussion that would be made by the board of Goodman

17   Networks?

18       A.   It would be if they wanted -- you know, if it

19   was purchased or if it was a serious consideration.

20       Q.   Was this proposal ever made to the board of

21   Goodman Networks?

22       A.   I do not know.

23       Q.   What basis did you do to investigate this

24   purchase?

25              MR. KLEINSASSER:  Objection, form.

Page 232

1        A.    Well, do you know that it's a purchase?

2        Q.    Mr. Goodman, I'm asking the questions here.

3    This is a document that I have been provided by Goodman

4    Networks.

5        A.    So I don't know if that's a purchase, so I

6    can't answer that question.

7        Q.    Okay.  And so it's your testimony that a

8    letter that's dated repurchase of shares of common

9    stock would not be a purchase?  Is that your testimony?

10       A.    That's correct.

11             MR. KLEINSASSER:  Objection, form.

12       A.    It's a purchase whenever both parties sign the

13   document.

14       Q.    Okay.  That's fair.  So is this a proposed

15   purchase by Goodman Networks from Genesis Networks

16   Enterprises?

17             MR. KLEINSASSER:  Objection, form.

18       A.    I don't know.

19       Q.    You don't know?

20       A.    No, I don't know who drafted this document and

21   who sent it over or who provided it.

22       Q.    If that's your testimony that you don't have

23   any knowledge of the $25 million proposal to purchase

24   the preferred shares over an entity that you control,

25   we will move on.

Page 233

1          MR. KLEINSASSER:  Object to the sidebar,

2     obviously.

3     Q.   On -- we went back and you identified that you

4     had over $40 million in face value of bonds in Goodman

5     Networks as of December 2020, correct?

6          MR. KLEINSASSER:  Object to form.

7     A.   I cannot recall.

8     Q.   Okay.  I believe that was your testimony

9     earlier.  Do you still hold -- or you or affiliates of

10    you hold those bonds today?

11    A.   No.

12    Q.   What happened to those bonds?

13    A.   They were purchased.

14    Q.   Who were they purchased by?

15    A.   The bonds?

16    Q.   Yes.

17    A.   They were purchased by -- I can't recall the

18    name of the company.  The document that was presented

19    earlier.

20    Q.   Were any of those bonds exchanged in the

21    transfer for Unified Field Services obtaining assets

22    from Goodman Networks?

23          MR. KLEINSASSER:  Objection, form.

24    A.   What's your question?

25    Q.   Sure.  Were any of the bonds that you or your

 1    affiliates held exchanged as consideration for the

 2    purchase of assets of Goodman Networks to Unified Field

 3    Services?

 4         A.   Yes.

 5              MR. KLEINSASSER:  Objection, form.

 6         Q.   Do you -- was that -- excuse me.  Strike that.

 7              Was the amount -- the face value amount

 8    of that 10 million in bonds?

 9         A.   It was.

10         Q.   Was any other consideration given?

11              MR. KLEINSASSER:  Objection, form.

12         A.   I cannot recall.

13         Q.   Okay.  Would you dispute that no other

14    consideration was given?

15              MR. KLEINSASSER:  Objection, form.

16         A.   You would have to check with the company.

17         Q.   Okay.  But if we went and looked at the asset

18    purchase agreement and it said that only an exchange of

19    debt was made, you wouldn't dispute that, correct?

20              MR. KLEINSASSER:  Objection, form.

21         A.   If that's what's on the document.  I would

22    have to see it.

23         Q.   Okay.  So you have no knowledge outside of the

24    document itself?

25              MR. KLEINSASSER:  Objection, form.

Page 235

1        A.   I can't recall.  It was over two years ago.

2        Q.   Okay.  And then the remainder of the bonds,

3    did they all go to this transaction that we discussed

4    earlier with Mr. Phair about Alliance Texas Holdings,

5    LLC, which I believe was testified as an entity treated

6    to the Auerbachs?

7             MR. KLEINSASSER:  Objection, form.

8        A.   I believe.

9        Q.   Okay.  And are you aware that at the same time

10   that those bonds were -- let me strike that.

11            Are you aware of what the source of funds

12   was for the purchase of the bonds by Alliance Texas

13   Holdings, LLC?

14       A.   I was not.

15       Q.   Would you dispute that the source of the funds

16   for that purchase came from Goodman Networks?

17            MR. KLEINSASSER:  Objection, form.

18       A.   I do not know.

19       Q.   Would you dispute that?

20       A.   I don't --

21            MR. KLEINSASSER:  Objection.

22       A.   I can't respond because I don't know.

23       Q.   Based on the information that you have in this

24   deposition, would you dispute that?

25            MR. KLEINSASSER:  Objection, form.  Stop

Page 236

1    asking the same question, Adam.  Move on.

2         A.   I don't know.  I don't manage their money.  I

3    don't know where their money came from.

4         Q.   So your testimony, then, just to clarify --

5                   MR. LANGLEY:  And, Matthias, I understand

6    you don't want to have repeat questions.  I just want

7    to make sure we understand correctly.

8         Q.   You don't have knowledge in this deposition on

9    the source of funds that was used to acquire the bonds

10   from you or your affiliates; is that correct?

11                  MR. KLEINSASSER:  Objection, form.  Hold

12   on a second.  I'm sorry.  Adam, I'm going to have to

13   have you ask it again.

14                  James, let's slow down a little bit

15   because my objections are, you know, conflicting with

16   what you're saying.

17                  So, Adam, do you mind repeating your

18   question?

19                  MR. LANGLEY:  Sure.

20        Q.   So -- and I apologize if I'm repeating.  There

21   is a lot of moving parts, Mr. Goodman, and you and I

22   are both trying to figure out this as we go.

23                  Is it your testimony that you do not know

24   the source of funds that was used to purchase over

25   $30 million in bonds from you and your affiliates?

Page 237

1        A.    That's correct.

2              MR. KLEINSASSER:   Objection, form.

3        Q.    Who would know that source of funds?

4        A.    The Auerbachs.

5        Q.    The Auerbachs.   Do you think anybody that was

6   an agent of you or your affiliates would know that?

7        A.    No.

8        Q.    What about your counsel?

9        A.    No.

10       Q.    What about anybody acting on your behalf?

11       A.    Not that I can think of, no.

12       Q.    Okay.

13             MR. LANGLEY:   Terry, can you publish

14   Exhibit 9, or -- excuse me.   It's Hudson Document 12.

15   So it's a Bates No. Hudson_12.   This will be

16   Exhibit 19.

17             (Exhibit 19 marked)

18       Q.    Can you see it, Mr. Goodman?

19       A.    Yes.

20       Q.    Let's see if I can get there, too.   Have you

21   ever seen this document?

22       A.    No.

23       Q.    I'll represent to you that this was a document

24   we obtained from Hudson Clean Energy related to a FedEx

25   subpoena and this was part of a closing binder of

Page 238

1    documents that we received from them.

2                It appeared to be in the possession of

3    both your counsel and of Hudson Clean Energy's counsel

4    and Texas -- I apologize --  Alliance Texas Holdings

5    Inc., and I'll represent that.  Do you have any reason

6    to believe that your counsel was not in possession of

7    this flow of funds?

8         A.    No.

9         Q.    Okay.  Looking at those flow of funds, who

10   paid the $17 million worth of consideration?

11        A.    I don't know.

12        Q.    Who is GNI?

13        A.    I do not know.

14        Q.    Have you ever heard those initials used to

15   reference any of the Goodman entities?

16        A.    No, not GNI.

17        Q.    Okay.  Have you ever heard GNI used to

18   reference Goodman Networks, Incorporated?

19        A.    No.  Typically, it was always just Genesis --

20   or Goodman Networks.

21        Q.    Terry, will you publish what is the series of

22   Prosperity Bank statements for the account 4352?  The

23   first Bates number is FedEx 075484.

24                (Exhibit 20 marked)

25        Q.    This is Exhibit 20.

Page 239

1      A.   Okay.

2      Q.   Mr. Goodman, are you familiar with the

3   Prosperity Bank account that ends in digits 4352 and

4   styled Goodman Networks, Inc., control disbursement

5   account?

6      A.   No.

7      Q.   And I'll represent to you that I have looked

8   through this series of documents.  You're welcome to as

9   well.  It looks to appear that there is a series of

10  regular transactions with the FedEx Supply Chain

11  incoming wire transfers or ACH deposits.  Are you

12  familiar with ACH deposits occurring regularly from

13  FedEx Supply Chain?

14          MR. KLEINSASSER:  Objection, form.

15     A.   No.

16     Q.   Are you familiar with the master services

17  agreement that was entered into by a Genesis entity and

18  a predecessor to FedEx Supply Chain?

19          MR. KLEINSASSER:  Objection, form.

20     A.   Yes.

21     Q.   Okay.  And is that the agreement that FedEx

22  Supply Chain was operating on when Genesis transferred

23  their business to Goodman Networks?

24          MR. KLEINSASSER:  Objection, form.

25     A.   I do not know that.

Page 240

1      Q.   Did a master service agreement with FedEx

2  Supply Chain get transferred from Genesis ATC to

3  Goodman Networks?

4             MR. KLEINSASSER:  Objection, form.

5      A.   I do not know.  I don't know if FedEx drafted

6  a new agreement once they were notified and accepted

7  the transfer or -- I'm not sure what their protocol

8  was.

9      Q.   Okay.  Do you know who would have had signing

10 authority on this Prosperity Bank account?

11     A.   I do not know.

12     Q.   In October of 2021, we already looked -- there

13 were no other officers other than James Frinzi at that

14 time.  And you have already represented there were no

15 other board members except for Goodman last named

16 individuals.  Who would have had signing authority for

17 this account?

18             MR. KLEINSASSER:  Objection, form.

19     A.   I'm not sure.  I would have to go back and

20 check.

21     Q.   Would you be surprised if you had signing

22 authority for these accounts?

23             MR. KLEINSASSER:  Objection, form.

24     A.   No, I wouldn't be surprised.

25     Q.   Would you be surprised that Mr. Frinzi had

Page 241

1    signing authority for these accounts?

2        A.   No, I would not.

3        Q.   Let's go to -- go down to the -- what is the

4    February 28, '22 statement.  It's going to be probably

5    the fifth or sixth document in this packet.  I think

6    it's the sixth document.

7        A.   For February?

8        Q.   Yes, for February.

9        A.   Yes, I have it.

10       Q.   Do you see on the line item that's dated

11   February 3rd, 2022, under other debits that there is a

12   $17,032,060 dollar amount for a transfer of the Hudson

13   Clean Energy Enterprises?

14       A.   February 3; is that right?  Is that the one

15   I'm looking for?

16       Q.   Yes.

17       A.   Yes.  Yes, I have seen this.

18       Q.   Okay.  And if you need to, write that number

19   down so because we're going to go to different

20   documents.

21       A.   Okay.

22       Q.   Do you have any knowledge of what that $17

23   million transfer was for Hudson Clean Energy?

24       A.   I do not.

25       Q.   Let's go back to Exhibit 19.  Are you there?

Page 242

1      A.    I'm getting there right now.  Okay.

2      Q.    Look at the top dollar cash amount in this

3   flow of funds.  Does that match what we just saw on

4   that bank statement?

5      A.    It does.

6      Q.    Okay it.  Is that 17 million that we see in

7   this flow of funds, do you believe that to be the same

8   17 million that came from the Goodman Networks' bank

9   account?

10                MR. KLEINSASSER:  Objection, form.

11      A.    I don't know.

12      Q.    Okay.  It identifies an account name that was

13   the recipient of that 17 million.  Who was the named

14   entity for that account that received the 17 million?

15      A.    The account name is Citizens Commercial.

16      Q.    Look below that.  I think that's the bank

17   name.  What is the account name just below that?

18      A.    Hudson Clean Energy Enterprises.

19      Q.    If you need to, you can go back to Exhibit 20.

20   Was that the same entity that was identified in the

21   bank statements of the Prosperity Bank account ending

22   in 4352?

23      A.    Yes.

24      Q.    Do you have any reason to dispute that this

25   same dollar amount, same entity, was the transfer we

Page 243

1    just saw from Goodman Networks?

2              MR. KLEINSASSER:  Objection, form.

3        A.   Yes, it could be.

4        Q.   Okay.  And who are the beneficiaries of that

5    $17 million?  Based on this flow of funds it doesn't

6    state Hudson Clean Energy.  Can you identify who

7    received that 17 million?

8              MR. KLEINSASSER:  Objection, form.

9        A.   Well, I can go to step two and, you know, read

10   what's on step two.

11       Q.   Okay, sure.  Who received those funds?

12       A.   There was -- I don't know what the Alliance

13   agent for 10,570,912.

14       Q.   Okay.  And who was the account name that those

15   10 million 570 was to flow to?

16       A.   It was Goodman Investment Holdings.

17       Q.   Okay.  And that's the Goodman Investment

18   Holdings that you control, correct?

19       A.   Yes.

20              MR. KLEINSASSER:  Objection, form.

21       Q.   Moving to the next number, there is a 561,000

22   and change number.  Who was the beneficiary of that

23   transfer?

24       A.   To Alliance agent, Auerbach Partners.

25       Q.   Again, there is an account named there, and it

Page 244

1    says Genesis Global Services.  Who is Genesis Global

2    Services?

3         A.   Genesis Global Services, one of the Genesis

4    companies.

5         Q.   And is that, again, an entity that you

6    control?

7         A.   It is, yes.

8         Q.   And the last one -- it's completely blacked

9    out.  But there is a $5.9 million dollar and change

10   transfer.  It says Auerbach Partners?

11        A.   Yes.

12        Q.   Do you know who that is?

13        A.   Just by name.

14        Q.   Okay.  Is that an entity you control?

15        A.   No.

16        Q.   Okay.  So based on what we have seen here, is

17   it fair to say, then, that both Goodman Investment

18   Holdings and Genesis received over $11 million from

19   Goodman Networks related to the sale of these bonds?

20        A.   No.

21             MR. KLEINSASSER:  Objection, form.

22        A.   No.

23        Q.   Why not?

24             MR. KLEINSASSER:  Objection, form.

25        A.   Because who purchased my bonds came from

Page 245

1   Shalom Auerbach, or whatever the name of his company

2   was.

3        Q.   So you're disputing at the time this

4   transaction occurred that you had no beneficial

5   interest through Goodman Investment Holdings for that

6   $10.5 million shown on this flow of funds?

7             MR. KLEINSASSER:   Objection, form.

8        A.   I had a benefit from it.   But I'm disputing

9   where the money came from.

10       Q.   Okay.   So you do dispute that Goodman Networks

11  paid Hudson Clean Energy the 17 million?

12            MR. KLEINSASSER:   Objection, form.

13       A.   I'm sorry.

14       Q.   You do dispute that Hudson -- excuse me --

15  that Goodman Networks paid Hudson Clean Energy that 17

16  million and change?

17            MR. KLEINSASSER:   Objection, form.

18       A.   I'm not disputing it.   I'm just reading what's

19  on the piece of paper.   I don't know what the flow of

20  funds --

21       Q.   Okay.

22       A.   Because it doesn't say what dates are on this.

23  It could have been a week later, it could have been a

24  month later.   I don't know what the dates are on this.

25       Q.   Okay.   Who would have that knowledge, either

Page 246

1    you or one of one of your affiliates?

2                MR. KLEINSASSER:   Objection, form.

3        A.   Whoever provided you this document should have

4    that information.

5        Q.   That's not my question.  Who at -- who among

6    you and your agents or your affiliates had knowledge on

7    this transaction?

8                MR. KLEINSASSER:   Objection, form.

9        A.   The bank would have had knowledge of this,

10   whoever sent the money, the Auerbachs, or the name of

11   their entity would have that information.  Texas

12   Partner Bank would have the information whenever they

13   received that money.

14       Q.   Is there anybody at Goodman Investments, LLC

15   that was responsible for this transaction?

16       A.   No.

17       Q.   No?  I apologize.  I may have misheard you.

18       A.   You said was there anybody at Goodman

19   Investment Holdings that is responsible for making this

20   payment?  Is that what you're asking me?

21       Q.   Who had oversight at Goodman Investment

22   Holdings for this transaction?

23       A.   Nobody.  Nobody at Goodman Investment.  This

24   would have been through Auerbachs' company who had

25   control of disbursing the money.

Page 247

1      Q.   And here it seems to indicate that $10.5

2   million went to the Goodman Investment Holdings, LLC.

3   Who at Goodman Investment Holdings, LLC would have had

4   knowledge or responsibility related to that receipt of

5   funds?

6      A.   The bank.  After the deposit was made I would

7   have been -- I would have had visibility to it.

8      Q.   Okay.  Who would have negotiated the documents

9   that led to the receipt of these $10.5 million in

10  bonds?

11                  MR. KLEINSASSER:  Objection, form.

12     A.   My attorney.

13     Q.   Who is your attorney?

14     A.   It was Winstead.

15     Q.   Winstead had possession of the deal documents

16  related to this receipt of $10.5 million?

17     A.   Yes.

18     Q.   And, Matthias, I don't know if you have turned

19  this over because we haven't gone through the documents

20  we received last night.  Are these documents that you

21  have turned over to either us or the trustee?

22                  MR. KLEINSASSER:  Are you asking me if

23  this is in there?

24     Q.   Yes, I'm asking if have you turned in the

25  documents that relate to this transaction that

Page 248

1    apparently you controlled on behalf of Mr. Goodman.

2              MR. KLEINSASSER:  Look, I don't know what

3    transactions -- I was involved in.  So I don't know if

4    we turned over documents related to the transaction or

5    not.  I don't recall turning over this particular

6    document.  I have never seen this before.

7              MR. LANGLEY:  Can I ask you on behalf of

8    Winstead and James Goodman and to the extent that you

9    also represented Goodman Investment Holdings or Genesis

10   Global Services that y'all do a review of the documents

11   that you have in your possession and turn over any

12   documents related to these transactions or identified

13   in this flow of funds?

14             MR. KLEINSASSER:  I'll look into this.

15   I'm noting your request obviously on the record.  And

16   let me look internally and I'll see what I can run

17   down.

18       Q.   Mr. Goodman, is it fair to characterize, then,

19   that at the time of December 2020 when there was a

20   going concern that was identified by the RSM auditors

21   for Goodman Networks, you held over $60 million in face

22   value in either preferred shares or bonds of Goodman

23   Networks?

24             MR. KLEINSASSER:  Objection, form.

25       A.   I don't recall the amount.

Page 249

1      Q.   Is that a fair characterization that it was

2   over -- let's say 50 million in face value?

3      A.   I don't recall.

4      Q.   Do you hold any of those bonds today?

5      A.   Not that I'm aware of.

6      Q.   Do you hold any of those preferred shares

7   today?

8      A.   Not that I'm aware of.

9      Q.   Did you or your affiliates receive any

10  consideration for those preferred shares?

11             MR. KLEINSASSER:  Objection, form.

12     A.   Yes, from the company Auerbach owned and that

13  other company who purchased the shares.

14     Q.   And did any of that consideration come from

15  Goodman Networks?

16     A.   No.

17     Q.   Did you receive consideration for the bonds

18  that you held in December 2020?

19             MR. KLEINSASSER:  Objection, form.

20     Q.   I'll ask you a better question.  The bonds

21  that you held in December 2020, that you no longer

22  hold, did you or your affiliates receive consideration

23  for those bonds?

24             MR. KLEINSASSER:  Objection, form.

25     A.   What do you mean by consideration.

Page 250

1    Q.   Did you receive any money or other proceeds?

2    A.   Just what all the bond holders received and

3    that was the -- you know, whatever payment Goodman made

4    to all of those bondholders then we would receive

5    payment like the other bondholders.

6    Q.   No, I'm not talking about -- I'm talking about

7    in the transaction that appears to have gone through

8    this Alliance agent of Hudson Clean Energy Enterprises.

9    Was that offered to -- let me strike that.

10        Was the offer that occurred with the

11   Auerbachs and Hudson Clean Energy, was that offer made

12   to all bondholders?

13   A.   It could have been.  I don't know.  They could

14   have went and bought anybody's bonds and preferred

15   shares.

16   Q.   Okay.  But you have zero bonds outstanding

17   today, correct?

18   A.   I'm not sure.  I would have to check.

19   Q.   Do you have any bonds outstanding today?

20   A.   Not that I'm aware of.  I just have to check.

21   Q.   And are there bonds outstanding at Goodman

22   Networks?

23   A.   There are.

24   Q.   So how could this have been a pro rate

25   distribution to all creditors -- if you're paid in full

Page 251

1    but others are not?

2                MR. KLEINSASSER:  Objection, form.

3        A.    It's open to the public.  The bond holders buy

4    and share bonds every single day.

5        Q.    Is the source of funds usually Goodman

6    Networks for those purchases?

7        A.    I don't know.

8                MR. KLEINSASSER:  Objection, form.

9        Q.    I would like to go back to Exhibit 20.  Let's

10   go back to that February transaction we were looking at

11   for the 17 million.  Do you remember the date of that

12   transaction?

13       A.    What date?

14       Q.    I believe it was February 3, 2022.  Do you see

15   that?

16       A.    Yes, I do.

17       Q.    How many days after your written resignation

18   from Goodman Networks board was this transaction made?

19                MR. KLEINSASSER:  Objection, form.

20       A.    From my written, it was two days later.

21       Q.    Okay.  Did your written resignation have

22   anything to do with this transaction?

23       A.    No.

24       Q.    You indicated that you gave a verbal

25   resignation from the Goodman Networks board, correct.

Page 252

1    A.   Yes.

2    Q.   When was that made?

3    A.   December 2021.

4    Q.   Who was it made to?

5    A.   It was made to Jim Frinzi.

6    Q.   Why as a board member would you give notice of

7    your resignation to Jim Frinzi?

8    A.   Because he would have been the remaining, you

9    know, board member and CEO of the company.

10   Q.   Did you give any notice to any person or the

11   entity in MBE Group?

12   A.   No.

13   Q.   Did Mr. Frinzi memorialize your resignation in

14   December 2021?

15            MR. KLEINSASSER:  Objection, form.

16   A.   Not that I'm aware of, no.

17   Q.   Why after you gave a verbal resignation did

18   you feel obligated to give a written resignation in

19   February of 2022?

20            MR. KLEINSASSER:  Objection, form.

21   A.   Because I kept asking, you know, Goodman's

22   counsel and Jim if they could draft a document and send

23   it to me and, you know, they didn't do it.  So I just

24   stayed after them until I got the document.

25   Q.   Okay.  Who at Goodman Networks had knowledge

Page 253

1   of this $17 million transfer on February 3rd?

2       A.   I don't know.

3       Q.   Who as an officer or director was left at

4   Goodman Networks that could have knowledge of this

5   transaction on February 3, 2022?

6       A.   Jim Frinzi.

7       Q.   Anyone else?

8       A.   Not that I'm aware of.

9       Q.   Are you aware of any communications as a

10  member of the Goodman MBE related to this $17 million

11  transfer?

12      A.   No.

13      Q.   Let's go back a month and look at the January

14  transfers.

15      A.   Okay.

16      Q.   Do you see under other debits that there is a

17  series of six different transfers to American Metals

18  Recovery & Recycling?

19      A.   Yes, I see that.

20      Q.   And do you know -- I believe it's your

21  testimony you believe that Mr. Frinzi is associated

22  with American Metals Recycling -- Recovery & Recycling;

23  is that correct?

24      A.   AMRR is -- what's your question?

25      Q.   Is this entity American Metals Recovery &

Page 254

1    Recycling the AMRR entity that we have been talking

2    about?

3         A.   I believe so.  I'm not sure.

4         Q.   Okay.  And we just looked at the prior month

5    and we said that only Jim Frinzi was an officer or

6    director that had control over that account and could

7    have made that transfer.

8              Who in January of 2022 could have made

9    these transfers to AMRR?

10        A.   I do not know.

11        Q.   You have not given your written resignation.

12   Did you give any communications regarding these AMRR

13   transfers?

14        A.   I did not.

15        Q.   Did you direct any actions related to these

16   AMRR transfers?

17        A.   I did not.

18        Q.   Did you have any knowledge of these AMRR

19   transfers?

20        A.   I did not.

21        Q.   Did you communicate with Mr. Frinzi about

22   these AMRR transfers?

23        A.   No.

24        Q.   Did he communicate with you regarding these

25   transfers?

Page 255

1      A.   No.

2      Q.   So in the month of January, 2022, you took no

3  action related to these transfers?

4      A.   I wasn't aware --

5           MR. KLEINSASSER:  Objection, form.

6      Q.   In January of 2022, did you have any knowledge

7  of these transfers?

8      A.   No.

9           MR. KLEINSASSER:  Objection, form.

10     Q.   Does anyone that is an agent or affiliate of

11 you have knowledge of these transactions?

12     A.   No.

13     Q.   Are you familiar with an entity called

14 OnePath?

15     A.   Yes.

16     Q.   What is OnePath?

17     A.   It was a -- it was a company Jim was talking

18 to, you know, about partnering with them.

19     Q.   Did any Genesis entity acquire any assets from

20 OnePath?

21     A.   Yes.

22     Q.   What entity?

23     A.   Genesis Telecom.

24     Q.   Does Genesis Telecom still own those assets?

25     A.   No.

Page 256

1        Q.   Who owns those assets?

2        A.   Endeavor.

3        Q.   Endeavor owns those assets?

4        A.   Yes.

5        Q.   You said Mr. Frinzi was discussing OnePath and

6    acquiring the assets.  Does that relate to the assets

7    Endeavor owns it?

8             MR. KLEINSASSER:  Objection, form.

9        A.   No.  No, the assets that we received from

10   OnePath, they gave it away.  There was no monetary

11   payment.  It was a part of their business that they

12   were no longer interested in.

13       Q.   Okay.  And so you gave -- and I used

14   consideration as money or other proceeds.  I said you.

15   But Genesis Telecom gave no consideration to OnePath

16   for those assets?

17            MR. KLEINSASSER:  Objection, form.

18       A.   The consideration would have been the

19   employees.  That would have been the only

20   consideration.

21       Q.   Okay.  Are you aware that AMRR acquired

22   significant business assets from OnePath?

23       A.   Yes, I am.

24       Q.   When did you become aware of that?

25       A.   You know, I can't recall.  It was in 2022.

Page 257

1    Q.   Okay.  Would it have been in February of 2022?

2    A.   I can't recall.

3    Q.   Terry, will you publish the website that is

4    the AMRR notice?  This would be document 21.

5              (Exhibit 21 marked)

6    A.   I have it.

7    Q.   Okay.  And you can look at this.  Have you

8    ever seen this press release?

9    A.   I have not, no.

10   Q.   Would you have had knowledge of this

11   transaction within a month of February 4, 2022?

12   A.   I cannot recall.

13   Q.   Okay.  You indicated that you did have

14   knowledge of AMRR acquiring OnePath assets.  When --

15   give me an estimate, but when did you have that

16   knowledge?

17   A.   I did not have that knowledge.  I said I knew

18   of OnePath and that Jim was talking to them.

19   Q.   When did you have knowledge that AMRR had

20   acquired assets for OnePath, if you can give me an

21   estimate?

22   A.   I can't remember.  I would have to go look.  I

23   can't remember when.

24   Q.   Okay.  I'll represent to you that FedEx has

25   knowledge that those assets of OnePath were acquired

Page 258

1    for $40.5 million from AMRR, and that's based on the

2    public records that AMRR releases through the SEC.  Do

3    you have any reason to dispute that OnePath received

4    $40.5 million from AMRR?

5         A.    No.

6         Q.    Do you have any reason -- do you know what the

7    source of that $40.5 million was?

8         A.    I do not know.

9         Q.    Do you believe it was the funds that were

10   transferred out of that Prosperity Bank account that we

11   just looked at that totaled up to be 44 million?

12        A.    I do not know.

13        Q.    Is it your testimony, then, that a Genesis

14   entity received OnePath assets for no consideration and

15   that AMRR paid $40.5 million for other OnePath assets?

16              MR. KLEINSASSER:  Objection, form.

17        A.    Yeah, it was two years prior.

18        Q.    That is your testimony, correct?

19        A.    What was your question, again?

20        Q.    I think we have already got it.  I won't ask

21   you repeat it.

22              Do you have any knowledge today whether

23   AMRR still owes these OnePath --

24        A.    I do not know.

25        Q.    Do you know if any of your brothers have

Page 259

1    knowledge regarding that?

2       A.   I do not know.

3       Q.   Have you negotiated with AMRR related to the

4    $44 million that was transferred to them?

5       A.   No.

6       Q.   Have any of your brothers?

7       A.   Not that I'm aware of.

8       Q.   Hold on one second.  I may be done.  Let me

9    confer.

10              Can you ask how much time we have taken

11   at this point?

12              THE VIDEOGRAPHER:  I need to go off the

13   record to do that.

14      Q.   I have got a couple questions and I think I

15   will be finished, Mr. Goodman.  We have seen an e-mail

16   that you have used that has a domain server of Genesis

17   net.com.  Are you familiar with that domain server?

18      A.   Yes.

19      Q.   Who is in control of that domain server?

20      A.   Microsoft.

21      Q.   That's probably very fair.  Who at -- who owns

22   that domain, I guess, would be a better question?

23      A.   It would be Genesis Networks.

24      Q.   And does Genesis Networks have access to

25   whatever is on that server?

Page 260

1        A.   We should, yes.

2        Q.   Okay.  When you say Genesis networks, do you

3    know the specific entity that would be who you are

4    referring to?

5        A.   I mean, I would initially refer to it as

6    Genesis Networks Enterprises as GNE.  That's who I

7    would refer to it.

8        Q.   And so you believe Genesis Networks

9    Enterprises would have control and possession of that

10   server, whether it's at Microsoft or somewhere else?

11       A.   Yes.

12       Q.   And then you identified a Jennifer that

13   received a written resignation.  Do you know to who

14   that Jennifer was?

15       A.   It was a Goodman attorney.  I think Jennifer

16   Clands.  I would have to go and, you know -- just look

17   it up.

18       Q.   Do you know if it was an in-house counsel?

19       A.   I don't believe so.  I believe she was outside

20   counsel.

21       Q.   Do you know what law firm?

22       A.   Clands, C-L-A-N-D-S.

23       Q.   Okay.  That's a law firm name.

24            MR. KLEINSASSER:  I'll just tell you it's

25   commonly referred to as Schumacher.  Clands is the

Page 261

1   abbreviation on the e-mail.  It's an abbreviation.  But

2   it's Jennifer Lee at Connolly Schumacher.

3       Q.   Okay.  Just another follow-up question.  Do

4   you know who as outside counsel would have the

5   corporate records for Goodman Networks?

6       A.   I don't know.  I would have to ask Tony.

7       Q.   Who would have been -- just to give me a

8   range, in late 2021, like third, fourth quarter 2021,

9   end of 2022, who would have been outside counsel for

10  Goodman Networks?  I know there is a lot of entities

11  floating around.

12      A.   There is -- you know, Goodman used three

13  different firms.  So I don't know.  I would have to go

14  back and look at them.  I know they used three

15  different, you know, firms.  Jennifer, you know, was

16  another one and then there was Stephanie in Dallas

17  also.  There was another firm.  I just don't know the

18  dates on them.

19      Q.   Okay.  That's fair.  And who would be those

20  three firms.

21      A.   I can't recall.  I would recognize it if I had

22  the document.  But I just -- I can't recall it.

23      Q.   Okay.  Is Haynes and Boone one of those?

24      A.   No.

25      Q.   Alston & Bird?

Page 262

1      A.    Yes.

2      Q.    Winstead?

3      A.    Not for Goodman, no.

4      Q.    Okay.  And Jennifer Lee's firm was one of

5    those three as well?

6      A.    I believe so, yes.

7      Q.    Okay.  So at least we know Alston and her firm

8    were two of those three.  Okay.  With that, I think

9    we're done with our questions and we will pass to

10   either ARRIS or the trustee.  Thank you, Mr. Goodman.

11            MR. RUKAVINA:  Mr. Goodman and Matthias,

12   let's take a break.  Now, before we start, though, it's

13   been a long day, Mr. Goodman.  We can finish it up

14   today or if you are willing to come back fairly

15   quickly, we can finalize it.  You decide.

16     A.    Let's do it.

17     Q.    Let's take five.

18            THE VIDEOGRAPHER:  Off the record at

19   5:35 p.m.

20          (Recess from 5:35 p.m. to 5:42 p.m.)

21            THE VIDEOGRAPHER:  On the record at

22   5:42 p.m.

23                    EXAMINATION

24   BY MR. SULLIVAN:

25     Q.    Good afternoon, Mr. Goodman.  My name is Ryan

Page 263

1    Sullivan.  I'm counsel for ARRIS.  How are you doing?

2         A.   Good.

3         Q.   I just wanted to clarify a couple things.  So

4    I believe you testified earlier that you were president

5    of Goodman Networks incorporated in 2001; is that

6    right?

7         A.   I don't recall.

8         Q.   Okay.  Goodman Networks, Incorporated is also

9    known as Goodman Solutions; is that right?

10        A.   Yes, that's correct.

11        Q.   So if I talk about Goodman Solutions you will

12   understand what I'm talking about, Goodman Networks,

13   Incorporated?

14        A.   Yes.

15        Q.   I believe you also testified that you were the

16   interim CEO, a non-officer in the third and fourth

17   quarter of 2022; is that right?

18        A.   Yes.

19        Q.   And then you resigned from the board of

20   directors of Goodman Solutions verbally in December of

21   2021; is that right?

22        A.   Yes.

23        Q.   And then you resigned in writing in February

24   2022?

25        A.   Yes.

Page 264

1      Q.   And that as a board member you had no role in

2   Goodman Solutions operation; is that right?

3      A.   Yes.

4      Q.   Mr. Goodman, you are also a defendant in the

5   state court lawsuit brought by ARRIS; is that right.

6      A.   Yes.

7      Q.   In that lawsuit do you recall receiving

8   interrogatories from ARRIS?

9      A.   Probably, yes.

10     Q.   Let me clarify.  Those are written questions

11  that are to be responded to in writing.  Do you recall

12  that?

13     A.   I don't recall that.  I would have to go look

14  at it.  I'm sure y'all sent it.

15     Q.   Okay.  I'm not going to use the exhibit -- I'm

16  going to share with you what we will mark as Exhibit

17  22.

18          MR. KLEINSASSER:  Ryan, real quick, I'm

19  sorry, I just got dropped out of this for some reason

20  and I had to log back in.  How long have we been going?

21          MR. SULLIVAN:  How long have we been

22  going?

23          MR. KLEINSASSER:  Yeah.

24          MR. SULLIVAN:  30 seconds.

25          MR. KLEINSASSER:  Let me just make sure

Page 265

1    that my co-counsel was on.

2              MR. RUKAVINA:  There were questions

3    asked, but none of substance.

4              MR. SULLIVAN:  Clarifying prior

5    testimony.

6              MR. KLEINSASSER:  Okay.  Go ahead, Ryan.

7              (Exhibit 22 marked)

8       Q.   I'm sharing on my screen what we will mark as

9    Exhibit 22.  Do you see this on your screen, Mr.

10   Goodman?

11      A.   I do.

12      Q.   And do you see that these are the -- first

13   off, that this is dated March 28, 2022?

14      A.   Yes.

15      Q.   The top corner.  And as we go down, these are

16   your objections and answers to the interrogatories from

17   ARRIS in the state court lawsuit?

18      A.   Okay.

19      Q.   Do you see that?

20      A.   I do.

21      Q.   And it's signed by your counsel,

22   Mr. Kleinsasser, who is here defending your deposition.

23   Do you see that?

24      A.   I do.

25      Q.   Okay.  Let's go down to Interrogatory No. 2

Page 266

1    where you are asked to specify your past and current

2    positions at Goodman Solutions, including the dates

3    which you held -- are you following along with me, sir?

4        A.    Yes.

5        Q.    And your answer is that you had been a member

6    of Goodman Solutions board of directors since June 24,

7    2019 to the present.  Again, this is March 28, 2022.

8    And that you've been executive chairman since February

9    14, 2020.  Do you see that?

10       A.    I do.

11       Q.    And that you were chief executive officer from

12   September 10, 2020 through March 22, 2021.  Do you see

13   that?

14       A.    I do.

15       Q.    And that you were a consultant for the company

16   from since before January 1st, 2019 through June 23,

17   2019.  Do you see that?

18       A.    I do.

19       Q.    Okay.  Did you review these answers before

20   your counsel served them?

21       A.    I'm sure I probably, you know, had to provide

22   the answers.

23       Q.    Okay.  So when were you on the board of

24   directors?  Was it through March of 2022 or until

25   December of 2021?

Page 267

1          A.    You know, if we could go back to that exhibit

2     that showed the dates of the board members, I think we

3     could, you know, clarify this.

4          Q.    So you would rely on that exhibit then?

5          A.    Yes, yes.

6          Q.    Okay.  I also see there is no mention of you

7     serving as a consultant after 2019.  Do you see that?

8          A.    I do.

9          Q.    Okay.  So when we asked you about this in

10    state court you didn't mention any consulting work in

11    2021.

12         A.    It would have just been an oversight on my

13    part.

14         Q.    Okay.  What consulting work did you perform in

15    2021?

16         A.    For who?

17         Q.    For Goodman Solutions.

18         A.    It would have been, you know, advisement,

19    helping them find money, trying to find strategic

20    partnerships.  It could have been a lot of different

21    stuff.

22         Q.    Can you give me examples of things you did?

23         A.    Went and talked to investors.  Went and talked

24    to ARRIS about doing a joint venture.  It would have

25    been, you know, talking to other potential investors.

Page 268

1    That would have been an example of it.

2        Q.    Okay.  I have no further questions.  Thanks

3    very much.

4                          EXAMINATION

5    BY MR. RUKAVINA:

6        Q.    Mr. Goodman, good afternoon.  Can you hear me?

7        A.    Yes.

8        Q.    My name is Davor Rukavina.  I represent the

9    bankruptcy trustee.  Do you know who the bankruptcy

10   trustee is?

11       A.    I do not.

12       Q.    His name is Scott Seidel.  Are you aware that

13   an involuntary position was filed against Goodman, the

14   debtor, on or about September the 6th, 2022?

15       A.    Yes.

16       Q.    How did you come to learn of that?

17       A.    The subpoena.  I can't remember exactly how.

18   Probably once I got the subpoena that -- but I don't

19   recall the exact day or --

20       Q.    Was it shortly after September the 6th, do you

21   know?

22       A.    I don't know.  I can't remember.

23       Q.    Mr. Frinzi hadn't discussed the involuntary

24   filing with you before he got the subpoena?

25       A.    No.

Page 269

1      Q.   John Goodman hadn't discussed it with you?

2      A.   No.

3      Q.   Okay.  Did you ever discuss with anyone,

4   including counsel for the debtor, whether Goodman

5   should fight the involuntary petition?

6      A.   I don't recall.

7      Q.   You never had a conversation with Mr. Frinzi

8   as to how Goodman, the alleged debtor, ought to

9   respond?

10     A.   I can't respond.  I don't remember if I had a

11  conversation with him about it or not.

12     Q.   Okay.  Do you have any memory that Mr. Frinzi

13  was of the opinion that the company should admit to

14  being bankrupt?

15     A.   Ask your question again.

16     Q.   Sure.  Do you remember ever having a

17  conversation in which Mr. Frinzi suggested that the

18  company should go ahead and admit to being bankrupt and

19  move to convert to Chapter 11?

20     A.   No, I don't remember a conversation like that.

21     Q.   Did you ever have a conversation before

22  September 2022 with Mr. Frinzi about whether the

23  company should file a Chapter 11, the company being

24  Goodman?

25     A.   Not with Jim, no.

1      Q.   No -- okay.  Did you ever have a discussion

2    with him about whether Goodman should file a lawsuit

3    against AT&T related to the termination?

4      A.   I could have, yes.

5      Q.   What do you remember about that conversation,

6    if anything?

7      A.    I'm speculating, but it was, you know, AT&T

8    offered us where we could keep the contract if we

9    contributed, you know, another $8 million.  So of

10   course I said yes, you know, that we would do that.

11   And then AT&T began talking with Mostech, and then

12   they, you know, arbitrarily withdrew the offer and I

13   thought that AT&T was obligated at that point that all

14   I had to do was provide the additional $8 million and

15   we would have kept the contract.  So it would have been

16   around that, you know, that discussion.

17     Q.   Did that discussion include the potential of

18   the company filing a Chapter 11 to avoid the

19   termination by AT&T?

20     A.   Not that I recall.

21     Q.   Okay.  Did you ultimately decide not to pursue

22   a lawsuit against AT&T?

23     A.   No.  I'm still considering it.  AT&T told us

24   if we told Goodman Networks that if they reduced their

25   debt, brought in new equity that they would give them

Page 271

1    new business and more business and that's what I did.

2    I brought in, you know, the new equity.  I was able to

3    reduce their debt and then consult and talk with AT&T

4    for Goodman to keep the contract, which they initially

5    said yes, and then just, you know, arbitrarily withdrew

6    the offer.

7        Q.   What new equity did you bring in that you are

8    referring to, sir?

9        A.    No, AT&T asked if we would bring in eight

10   additional million dollars to support the company so I

11   was going to bring in the additional $8 million.

12       Q.    And you referenced also that AT&T asked you to

13   reduce the company's debt and that you did.  What were

14   you referring to, sir?

15       A.    The bond debt, buying the bonds.

16       Q.    Now, if memory serves, you bought the bonds

17   for 35 cents on the dollar?

18       A.    I can't remember what the number was.

19       Q.    Okay.  Do you recall that the copy eventually

20   paid more to buy or redeem the bonds -- do you recall,

21   sir, the company --

22            THE REPORTER:  Wait, it cut out.

23       Q.    Let me start again.  Do you recall that the

24   company paid about $17 million to purchase or retire

25   those bonds, whatever the correct terminology is?

1    A.   I don't know that.  I --

2    Q.   Let me ask you this.  Did you personally or

3    any family members of yours or any company members that

4    you control make any profit from Goodman's purchase or

5    retirement of those bonds?

6    A.   My bonds were purchased from the Auerbach

7    company, not from Goodman Networks.

8    Q.   We might get back to that, then.  Let's go

9    back to the circumstances surrounding the involuntary.

10        After the involuntary was filed and you

11   learned about it, did you discuss with any of your

12   brothers how the company should respond to the

13   involuntary position?

14   A.   Yeah.  I could have discussed it with my

15   brother, John Goodman.

16   Q.   What do you recall discussing with him?

17   A.   Just, you know, the -- you know, just trying

18   to understand what happened and then, you know, what's

19   the Goodman attorney doing, you know, what's their

20   response.  I mean, it just would have been high level,

21   nothing strategic or -- so it would have been around

22   that.

23   Q.   Did anyone ask you for your view as to whether

24   the company should fight the involuntary?

25   A.   No.

Page 273

1      Q.   Did you ever volunteer your view?

2      A.   I could have, yes.

3      Q.   And what do you remember about volunteering,

4   if anything?

5      A.   That, you know, the -- the -- the petition

6   should be a Chapter 11 because there is assets, enough

7   assets, you know, to pay the bondholders at a market

8   rate, you know, not at par value and then a -- you

9   know, a way for the OEMs to, you know, to get their

10  money.  But, again, not anything strategic.  Just high

11  level.

12     Q.   So what is your understanding as to why the

13  company didn't try to convert the involuntary to a

14  voluntary Chapter 11, if any?

15     A.   I can't recall.  I would have to check with

16  the Goodman attorney.

17     Q.   Who would that be, in your mind?

18     A.   David Parham.

19     Q.   Parham.  Okay.  David Parham.

20          Did you discuss with John Goodman or Mr.

21  Frinzi or David Parham that the company shouldn't be in

22  bankruptcy because the trustee would be looking at

23  insider transactions?

24     A.   No.  No.

25     Q.   Did you have any such concern in your own

Page 274

1  head?

2      A.   None whatsoever.

3      Q.   Are you familiar with a gentleman named

4  Russell Nelms?

5      A.   I am not, no.

6           THE REPORTER:  Was that Russell Nimms?  I

7  couldn't hear.

8           MR. RUKAVINA:  Nelms, N-E-L-M-S.  Am I

9  speaking too softly because usually I'm accused of

10  yelling.

11     Q.   Do you recall being presented a resolution for

12  a shareholder consent appointing Mr. Nelms as a

13  director?

14     A.   Well, who is he first?

15     Q.   Well, sir, do you recall at some point in time

16  in December being approached about the company

17  appointing a so-called independent director?

18     A.   God, you know what, I think there was

19  something that was sent to the -- you know the MBE

20  Group asking if we could, you know, assign him, you

21  know, as a trustee.  I would have to go back and look

22  at the exact -- there was something that was sent out.

23     Q.   Do you remember, sir, on December 12th, of

24  last year signing a document appointing Russell Nelms

25  as the sole independent director of the company?

Page 275

1      A.   Was that through the MBE Group?

2      Q.   Sir, I don't have it in front of me.  But this

3    was only some six week weeks ago.  I just want to know

4    what you remember.

5      A.   I could have.  I don't know.

6      Q.   Did you ever talk to Mr. Nelms in any

7    capacity?

8      A.   No.

9      Q.   Okay.  Now, are you aware that the company

10   reportedly hired John Goodman or his company as a

11   consultant?

12     A.   No.  I knew that John, you know, stepped back

13   in or, you know, was going to try to help the company,

14   you know, find a trustee or find somebody that could

15   represent the company.

16     Q.   Did you participate in any way in John

17   stepping in to fill that role, like discuss it with him

18   or any of your siblings?

19     A.   No, not that I recall.

20     Q.   Do you know whose idea it was that John come

21   back in and try to help the company?

22     A.   I don't, but it was a good idea.  John is very

23   business astute and he could help the company.

24     Q.   Okay.  Did you know that the company

25   purportedly paid a nonrefundable $450,000 consulting to

Page 276

1    John and his company?

2        A.   No.

3        Q.   Okay.  Did anyone ever tell you that before I

4    did just now?

5        A.   No.

6        Q.   Okay.  When you --

7                 THE REPORTER:  You froze up there.

8                 MR. RUKAVINA:  Where did you lose me,

9    Donna?

10                 THE REPORTER:  You froze.

11                 MR. RUKAVINA:  Okay.  Please let me talk

12    for a moment.

13                 THE REPORTER:  You're freezing.

14                 MR. RUKAVINA:  I don't -- I see everyone

15    and hear everyone perfect.  Where did you lose me,

16    Donna?

17                 THE REPORTER:  In the middle of that

18    question.

19                 MR. RUKAVINA:  Okay.

20        Q.   I think my question was, did you know about

21    the $450,0000 payment at any time prior to today?

22        A.   No.

23        Q.   Okay.  Did anyone seek your consent in any way

24    with respect to that payment?

25        A.   Not that I recall.

Page 277

1      Q.   Okay.  Who was in charge, to your

2   understanding, of Goodman Networks in October and

3   November 2022?

4      A.   Jim Frinzi.

5      Q.   Okay.  Do you remember Mr. Frinzi -- strike

6   that.

7           To your knowledge, did Mr. Frinzi resign

8   or was he fired?

9      A.   I don't recall.  I think there was, you know,

10  the -- you know, the discussion to terminate him, but I

11  don't remember.

12     Q.   Okay.  Do you remember approximately when he

13  was terminated or was no longer a director or officer?

14     A.   I don't.

15     Q.   Okay.  After he left or was removed, do you

16  have an understanding whether anyone assumed the

17  directorship or management of the debtor?  You do know

18  who the -- what the debtor is when I say that, by the

19  way?

20     A.   Goodman Networks?

21     Q.   Yes, sir.  Do you know when Mr. Frinzi was no

22  longer there and before John Goodman came onboard who

23  was in charge?

24     A.   I -- we had a discussion and, you know, I

25  talked to one of my brothers if they would be

Page 278

1   interested in doing it because, you know, we, you know,

2   couldn't find anybody else and, you know -- but none of

3   them felt that, you know, they were the right person

4   for the job, so there was discussions going on.

5       Q.   Did those discussions include whether you guys

6   should appoint a new director or directors?

7       A.   You know, the discussion probably, you know,

8   was going back with the attorney to ask for their

9   advice on what -- you know, what should be done.

10      Q.   Which attorney?

11      A.   I'm sorry.

12      Q.   Which attorney, Mr. Goodman?

13      A.   I -- I can't recall.  I would have to go back

14  and go check.

15      Q.   A bankruptcy attorney?

16      A.   It could be.  You know, Goodman had, you know,

17  multiple ones, so --

18      Q.   Did anyone suggest to you that you might want

19  to become a director again?

20      A.   No.

21      Q.   Okay.  Do you understand that the company now

22  wants to convert this case to a Chapter 11?

23      A.   Yes.

24      Q.   Okay.  Do you have an opinion on whether

25  that's in the best interest of the company?

Page 279

1    A.    I do.

2    Q.    What is your opinion?

3    A.    That it should be converted to a Chapter 11.

4    Q.    Why?

5    A.    Because it has the assets to pay the

6    bondholders and a plan to repay the OEMs.

7    Q.    What assets does it have to repay the

8    bondholders?

9    A.    It has cash, you know, the money at Prosperity

10   Bank and then the money at AIG.

11   Q.    Okay.  Ballpark those sums for me to the best

12   of your recollection.

13   A.    8 million, $9 million.

14   Q.    Okay.  And what's the plan to repay back the

15   OEMs that you just referenced?

16   A.    I'm not sure.  I would need to, you know,

17   either talk to the trustee or the Goodman attorney.

18   Q.    Are you aware that Mr. Parham, David Parham,

19   represents the debtor right now?

20   A.    Yes.

21   Q.    Who, to your understanding, is giving him

22   instructions on behalf of --

23   A.    Today?

24   Q.    Yes, on behalf of the debtor.  Who today is

25   instructing Mr. Parham on behalf of the debtor?

Page 280

1          A.   I'm not sure.  The trustee, you.

2          Q.   Were you aware that Mr. Nelms resigned his

3     role as independent director?

4          A.   Yes.

5          Q.   Okay.  You were given any reason by anyone

6     other than your personal lawyer why that was?

7          A.   No.

8          Q.   Are you aware of who William -- sometimes he

9     goes by Bill Schneider -- is?

10         A.   Just the name.

11         Q.   What do you know about the name?

12         A.   That he was hired as the new representative

13    for Goodman.

14         Q.   Okay.  What do you mean -- or what's your

15    understanding of "representative"?

16         A.   You know, I don't know if he's -- you know, if

17    he's an officer or the -- you know, or the corporate

18    rep, you know, for the company.  I'm not sure what his

19    official title is.

20         Q.   Do you know --

21              MR. KLEINSASSER:  Davor, real quick,

22    Dave Parham just texted me and said he lost his

23    connection.  I want to make sure Andrea or someone is

24    still on from Akerman.

25              MR. RUKAVINA:  Akerman, anyone?

Page 281

1              THE VIDEOGRAPHER:  I do not see

2     Ms. Andrea on,

3              MR. RUKAVINA:  I see Andrea.  She's

4     right -- she's here.

5              THE VIDEOGRAPHER:  Oh, I stand corrected.

6     She's here.

7              MR. RUKAVINA:  Andrea, do you want us to

8     pause or are you capable of defending Akerman in the

9     debtor's interests?

10              I'm not hearing anything.

11              I feel very uncomfortable asking you

12     questions, sir, without the company's lawyer there.

13              Matthias, what do you want to do?

14              MR. KLEINSASSER:  Yeah, I mean, I'm

15     trying to e-mail Dave and ask if he wants to -- us to

16     go off the record while he -- he tries to get back on.

17     I think we should probably just do that.  At least --

18     whatever you're comfortable with at the end of the day,

19     but I think that makes sense.

20              MR. RUKAVINA:  I misunderstood.  Take a

21     little break you think?  Is that what you're saying?

22              MR. KLEINSASSER:  Probably, especially if

23     you don't feel comfortable asking your questions.

24              MR. RUKAVINA:  No, I don't feel

25     comfortable asking questions when the guy's lawyer or

Page 282

1    the company's lawyer is off.  So why don't we just

2    group in five and see what happens.

3                    THE VIDEOGRAPHER:  We are off the record

4    at 6:07 p.m.

5               (Recess from 6:07 p.m. to 6:10 p.m.)

6                    THE VIDEOGRAPHER:  We are on the record

7    at 6:10 p.m.

8        Q.   (BY MR. RUKAVINA)  Mr. Goodman, do you know

9    whether Mr. Parham's firm is being paid for its current

10   services?

11       A.   I do not know.

12       Q.   Do you know whether there is an agreement to

13   pay his firm for its current services from any source?

14       A.   There should be.

15       Q.   Okay.  I believe you mentioned that you noted

16   there's a plan to try to pay back the OEM creditors,

17   but you didn't know what that plan is.  Did I get that

18   correct?

19       A.   No, I don't know if there's an official plan.

20   I was -- the plan I was referring to was just my

21   opinion, my thoughts.

22       Q.   Okay.  And I guess that since you didn't know

23   that John Goodman's company had been hired as a

24   consultant, you wouldn't be able to tell me what he was

25   hired to be a consultant for.  Am I correct in that

Page 283

1    assumption?

2         A.   Well, to help the company, I'm sure, but I

3    don't know the terms of his agreement.

4         Q.   Do you have any understanding of how it came

5    to be that John Goodman last year was purportedly hired

6    as a consultant by the company?

7         A.   I do not know.

8         Q.   I'm going to ask a question that

9    Mr. Kleinsasser might have a problem with, so your

10   answer needs to be limited to a yes or no.  Do you

11   know, sir, whether you or anyone on your behalf has

12   sent any letter to a carrier of a directors and

13   officers policy of Goodman Networks?

14        A.   Not that I'm aware of.

15        Q.   Okay.  You had some answers earlier about your

16   communications with Mr. Frinzi, and I believe you

17   referenced some program called Signal.  Did I get that

18   correctly?

19        A.   Yes, that's correct.

20        Q.   What is -- explain to me what -- what Signal

21   is to your understanding.

22        A.   It's a video and texting app.

23        Q.   Okay.  Was there any particular reason why you

24   used this with Mr. Frinzi?

25        A.   No, no particular reason.

Page 284

1      Q.   Okay.  Do you use it for other business

2   purposes with other officers or business relations of

3   yours?

4      A.   I use it for other relationships and other

5   accounts, yes.

6      Q.   And I believe you mentioned that it was

7   encrypted, or did I hear a lawyer say that?  Is that

8   correct?

9      A.   A lawyer said that.

10      Q.   Okay.  Do you -- did you have an understanding

11   of whether it's encrypted?

12      A.   My comment was they're all encrypted, you

13   know, even your text messages are encrypted.

14      Q.   Okay.  And I believe I understood you to say

15   that either you had set this Signal up to auto delete

16   or that it automatically auto deleted.  Can you -- can

17   you refresh my memory or elaborate?

18      A.   No.  What I said is that I have it set it up

19   for auto delete.  But I do that for all of my, you

20   know, text messages or messages just because I get too

21   many.

22      Q.   Okay.  So let me understand.  And I'm only

23   asking about the debtor now.  I'm not trying to go into

24   your other business.  As the director of the debtor why

25   would you not want to preserve your communications with

Page 285

1      its chief executive officer?

2          A.    It was preserved by e-mail.

3          Q.    I'm talking about just the Signal

4      communications now, sir.  Why would you not want those

5      preserved?

6          A.    Well, I don't know if there was any

7      communication, you know, about the company on that --

8      on the Signal account.

9          Q.    Okay.  Did you always -- strike that.

10              How did you decide whether to communicate

11     with Mr. Frinzi by e-mail or text?  How did you decide,

12     or was it just ad hoc?

13              MR. KLEINSASSER:  Hey, Davor, you broke

14     up.  Would you mind repeating that?

15              MR. RUKAVINA:  Sure.  Can you hear me,

16     Matthias?

17              MR. KLEINSASSER:  Yeah, you're good now.

18     We just lost part of it.

19         Q.    So my question to you, Mr. Goodman, is --

20     maybe it's a two-part question, which is, how did you

21     decide when talking to Mr. Frinzi to use either e-mail,

22     text or Signal if it was even a conscious decision?

23         A.    Typically it's not a conscious decision, just

24     whatever is most convenient.

25         Q.    Okay.  Did you ever communicate with

Page 286

1    Mr. Frinzi by Signal, doing so knowing that that

2    communication could not be retrieved in the future?

3        A.    I think they all can be retrieved.  But, no,

4    that was not the intent.

5        Q.    And, forgive me, I'm a little younger than

6    you, but older than most of the people here.  How do

7    you think that Signal can be retrieved?

8        A.    It goes on a server just like your AT&T and

9    Verizon messages.  They're stored for seven years, I

10   think is what they're required to -- to keep.

11       Q.    Did you try to retrieve any of those Signal

12   messages in response to any of the subpoenas for today?

13       A.    I looked on my phone, if I had any, so that I

14   could screen shot them and send them, but I didn't have

15   any.

16       Q.    Same question for text messages.  Did you try

17   to retrieve any of those?

18       A.    I looked on my phone for any text messages,

19   but there wasn't any.

20       Q.    Did you ever write to Mr. Frinzi by text or

21   Signal to ensure that the messages were being deleted

22   on his end?

23       A.    Not that I recall.

24       Q.    Okay.  Do you recall Mr. Frinzi, whether he

25   ever wrote to you asking the same question basically,

Page 287

1    "James, make sure that these aren't being preserved"?

2        A.   Not that I recall, No.

3        Q.   So we were talking -- or not we.  Someone else

4    was asking you about the AMRR transaction, and you

5    referred to (audio cut out) the money went to AMRR.  I

6    wrote down that you said it was FedEx's --

7                    THE REPORTER:  You cut out.

8        Q.   -- money.  Do you remember saying something

9    like that?

10                   THE VIDEOGRAPHER:  Hey, Davor, can you

11   ask the question again?

12                   THE REPORTER:  You cut out.

13                   MR. RUKAVINA:  I will.  I'm sorry.  I

14   don't know what's going on.  I see and hear everyone

15   perfectly.  I mean, I've cut out all of my other Wi-Fi

16   devices.

17                   (Discussion off the record)

18                   MR. RUKAVINA:  Well, let's just try to

19   get through it and we'll see.

20       Q.   Mr. Goodman, I had been referencing what I

21   thought was your prior testimony that you referred to

22   the $44 million or so that went to AMRR as FedEx's

23   money.  Did I remember that correctly?

24       A.   I don't recall.

25       Q.   Okay.  Where -- do you have an understanding

1    of where the $44 million or so that the debtor had in

2    its accounts at that time came from?

3        A.    It came from FedEx.

4        Q.    Okay.  And you've testified that your -- your

5    signature on the document was not your signature or

6    authorized by you, correct?

7        A.    That's correct.

8        Q.    And you testified that you had discussed the

9    possibility of the AMRR transaction with Mr. Frinzi,

10   but that you never authorized it and you were surprised

11   to learn that he did it afterwards.  Is that generally

12   correct?

13       A.    No.

14       Q.    Okay.  What did I misstate there, sir?

15       A.    So Jim talked to me about, you know, where the

16   company could, you know, use the money as long as it

17   gave benefit, you know, to the company, the

18   shareholders, and the creditors.  And my comment was,

19   you know, that I -- that doesn't sound right.  You

20   know, "You need to check with the attorneys," or, "Have

21   you checked with the attorneys?"

22       Q.    Okay.  Is that the extent of your recollection

23   of what you discussed with Mr. Frinzi?

24       A.    Yes, yes.

25       Q.    You cut out again.  Did you answer yes?

Page 289

1       A.   To what?

2       Q.   I asked -- you cut out right as you were

3   beginning to answer my question.  My question was, is

4   that the extent of your memory about your

5   communications regarding this matter with Mr. Frinzi?

6       A.   Yes.

7       Q.   Okay.  So, obviously, the trustee is

8   interested in how it came to be that the company

9   transferred something like $60 million in only a few

10  months.  And it sounds like about 44 million of that

11  was done without your authority, correct?

12      A.   No.  It would be all -- you know, all the

13  money or any of the money that was transferred from,

14  you know, Goodman was, you know, without my knowledge.

15      Q.   Okay.  But you knew that the company at one

16  point in time in December '01 or January -- I'm

17  sorry -- December '21 or January '22 had something like

18  $60 million, right?

19      A.   I don't recall.

20      Q.   Okay.  Well, was there ever a discussion of

21  why not use whatever cash or liquidity the company had

22  to pay its creditors back?

23      A.   Well, that was -- you know, that was the

24  intent.  It should have been the responsibility of the

25  company to go and do that, you know, to communicate

Page 290

1    with the bondholders.  I think that's what Jim was

2    doing to try to reach a settlement and then, you know,

3    talk to the other creditors and, you know, as well try

4    to reach settlement or a solution.

5         Q.   Okay.  When you were having any of these

6    discussions with Mr. Frinzi, did he ever mention the

7    name AMRR to you?

8         A.   He mentioned AMRR to me.  I was looking for a

9    company to buy, but -- but, yes it did come up before.

10        Q.   When you say you were looking for a company to

11   buy, do you mean the debtor or you or some other entity

12   of yours?

13        A.   It would have been an entity of mine.

14        Q.   Okay.  When you were having those discussions

15   was Mr. Frinzi, did he mention OnePath to you?

16        A.   No.  We just -- we were talking about a public

17   entity, somebody that -- you know, some type of company

18   that was out there that -- that I could go out and

19   acquire.

20        Q.   Okay.  Sitting here today -- and, again --

21   strike that.

22             When you just said "I," you meant you or

23   your other companies, not Goodman?

24        A.   That's correct.

25        Q.   Okay.  So sitting here today, what

Page 291

1   understanding, if any, do you have of the AMRR and

2   OnePath (audio cut out) engaged in?

3        A.   That they happened.  That's about all I know,

4   that -- you know, that Jim owns AMRR and AMRR went and

5   purchased OnePath.

6        Q.   Well, AMRR is a publicly-traded company.  Are

7   you aware of that?

8        A.   Yes, I am.

9        Q.   Did you ever discuss with Mr. Frinzi

10  purchasing a public shell?

11       A.   I did, yes.

12       Q.   Okay.  In reference to the debtor or in

13  reference to something else?

14       A.   No, just as me as an individual.

15       Q.   And I'm not going to pry into your personal

16  business.  Were you aware that the debtor funded the

17  purchase of that public shell by Mr. Frinzi?

18       A.   I am, yes.

19       Q.   You're aware of it now.  When did you become

20  aware of it, to the best of your recollection?

21       A.   Yeah, I don't recall.

22       Q.   And I believe you said that you don't own any

23  interest in AMRR; is that correct?

24       A.   That's correct.

25       Q.   Does any relative or company affiliated with

Page 292

1    you own any interest in AMRR?

2         A.    No.

3         Q.    Does Mr. Frinzi own any of his stock in AMRR

4    pursuant to some secret agreement with you?

5         A.    No.

6         Q.    Does he own any interest in AMRR in trust for

7    you or any of your family members?

8         A.    No.

9         Q.    Okay.  Any of your trusts that you may have?

10        A.    No.

11        Q.    Okay.  Did you or any family member of

12   company -- or company of yours financially benefit in

13   any way from of the AMRR transaction?

14        A.    No.

15        Q.    Okay.  When did you learn that Mr. Frinzi had

16   done this AMRR transaction?

17        A.    Oh, God.  I don't know.  I would have to go

18   back and look.  It's -- I'm not sure.

19        Q.    Can you tell me whether it was while you were

20   still a director to the best of your recollection?

21        A.    Yeah, it was not.

22        Q.    It was after you were a director?

23        A.    After, after I separated from the company,

24   resigned as a director.

25        Q.    Okay.  Did you discuss with Mr. Frinzi any

1    financials of OnePath?

2         A.    Not that I can recall, no.

3         Q.    No EBITDA or multiples of EBITDA or revenue

4    for valuation purposes?

5         A.    You know, he might have -- he -- I mean, we

6    might have talked about it.  He might have mentioned

7    it, but I just -- I don't recall the -- I just remember

8    the conversation was a short, you know, conversation

9    about OnePath.  And I knew of them because, you know,

10   of the year, two years prior, you know, where they gave

11   us, you know, a division of theirs that was a small --

12   a small group.  And it was a cashless transaction, so

13   that's the only reason I knew about the name OnePath.

14        Q.    Okay.  Do you recall through which means or

15   median you might have had these discussions regarding

16   One Path's financials or valuation with Mr. Frinzi?

17        A.    It would have been by phone.

18        Q.    Okay.  So do you know how much AMRR paid for

19   the assets of OnePath?

20        A.    I do not know.

21        Q.    Okay.  Did you or any entity affiliated with

22   you or family member of yours receive any of those

23   funds directly or indirectly that were paid to OnePath

24   for the purchase of its assets?

25        A.    No.

Page 294

1      Q.   Do you have any recollection of who owned

2   OnePath that might have received some of the proceeds

3   of that sale?

4      A.   I do not know.

5      Q.   Why were you against the debtor doing the

6   transaction that Mr. Frinzi had outlined to you?

7      A.   What was that?  I'm --

8      Q.   Sir, and we're all very tired.  It's 6:30.  I

9   only have about a half an hour to go, but if you would

10   rather, again, resume tomorrow morning?

11      A.   No, no, no, no.  Let's do it tonight.  I don't

12   understand the question.  Can you -- can you help me?

13      Q.   Sure.  Sure.  So we've established that

14   Mr. Frinzi had some discussions with you about some

15   AMRR/One Path transaction, right?

16      A.   No, not about a transaction.  Just about the

17   company.

18      Q.   So you never discussed with him purchasing a

19   publicly-held traded shell in order to purchase the

20   assets of OnePath?

21      A.   No, no, not -- not as a strategy.  I mean, I

22   could have talked to him about it whenever I was

23   looking for a public entity, a public shell, to, you

24   know, put an entity in.

25      Q.   But, obviously, you would not have used the

Page 295

1    money of the debtor to do so, right?

2        A.   Absolutely not.

3        Q.   Okay.  Do you think that what Mr. Frinzi did

4    was bad for the debtor?

5        A.   Well, I mean, you know, that's kind of a tough

6    question.  I mean if he pays back the money to the --

7    you know, to the debtor and to the -- you know, to the

8    creditors, to the bondholders and -- you know, I think

9    that's what everybody, you know, wants, is -- but --

10   but, you know, there's -- you can't be self-dealing,

11   you know, as an individual, so -- you know, so if

12   that's the intent, which I don't know, then, you know,

13   that wouldn't, you know, be professional.  It wouldn't

14   be the right thing to do, you know, from the debtor.

15   But I don't know if he intends to pay back the money

16   and go to the creditors.  You know, I haven't talked to

17   Jim about that.

18       Q.   Well, if he had come to you with this proposal

19   in your capacity as a director, do you have an opinion

20   sitting here today as to whether you would have

21   approved it or rejected it?

22       A.   Well, I would have -- if it -- if the benefit

23   would have been for the bondholders and creditors, I

24   would have approved it.  I would have, you know, asked

25   him to go to the bondholders and, you know, go to the

Page 296

1    creditors and get their approval because it would have

2    been a public entity.  They could have, you know, all

3    had public stock, you know.  It would have been an

4    asset on everybody's books.  The bondholders, I'm sure,

5    would have been, you know, satisfied with cash and, you

6    know, public stock as well.  The creditors, you know,

7    would have had a path to get all of their money back.

8                So -- but that's what I would have done

9    if he would have approached -- you know, talked with me

10   about it.  I would have said, "Well, let's go talk to

11   the -- you know, go talk to the creditors and talk to

12   the bondholders and, you know, get everybody's buy-in."

13       Q.   Okay.  Without going into the detail of any

14   discussion that may have been had, did you or, to your

15   knowledge, anyone else ask the debtor's lawyer to look

16   at whether what Mr. Frinzi did with AMRR was

17   appropriate or not?

18       A.   Well, I mean, we didn't know about it or I

19   didn't know about it until it already, you know,

20   happened.  And, you know, once it happened, then I

21   think we all started asking questions.  You know, I

22   asked my attorneys, the --

23       Q.   Well, don't go into what you asked your

24   attorneys.  I'm looking for an answer to this question

25   if one is possible.  Why after you learned what

Page 297

1    happened didn't someone immediately on behalf of the

2    debtor file a lawsuit against AMRR or Mr. Frinzi?

3        A.   You know, I would have to -- you know, I -- I

4    don't recall right now.  I mean, maybe we did have that

5    discussion, but, you know, it's -- I just have to go

6    back and look.  I mean, I remotely remember talking

7    to -- you know, talking to my attorneys about, you

8    know --

9                MR. KLEINSASSER:  Let's be -- let's not

10   go into what we -- what he and I discussed.

11       Q.   No, I'm interested -- I'm interested,

12   Mr. Goodman, only for the debtor's attorneys.  Did you

13   ever end up purchasing a public shell like you had been

14   discussing with Mr. Frinzi?

15       A.   I did not, no.

16       Q.   Okay.  Without going into any personal

17   specifics, was there a particular reason that you can

18   give us at a high level as to why not?

19       A.   Oh, I just decided to, you know, sell the

20   entity that -- that I was interested in and going down

21   the public route.  And then we were acquiring, you

22   know, other companies, so I just didn't have the time

23   and interest to do it anymore.

24       Q.   Okay.  Do you recall if those discussions with

25   Mr. Frinzi he brought up to you that AMRR might be the

Page 298

1    public shell that you purchase?

2         A.   Well, I looked at AMRR, you know, to purchase

3    it before -- you know, before Jim did and passed on it.

4    But that -- so, yeah, we would have had a discussion

5    before he ever purchased it.

6         Q.   Do you recall whether it was you in the first

7    instance or he that mentioned that name, AMRR?

8         A.   No, I would have -- it would have been Jim.  I

9    would have asked for his help to -- you know, if he

10   could -- you know, if he knew of a public company or if

11   he could go through, you know, any of his contacts.

12   But -- so I think he was able to locate it, share it

13   with me, and then, you know, we went and looked at --

14   looked at it and then decided to pass on it.

15        Q.   Now, if we go back in time a little bit, did I

16   understand that you had originally brought Mr. Frinzi

17   on to be the CEO of the debtor?

18        A.   That's correct.

19        Q.   Okay.  Why him?

20        A.   You know, he was a consultant.  I used him in

21   the past.  He was successful.  Whenever he came into

22   Goodman as a consultant, he -- he found $58 million,

23   you know, new -- you know, new equity, you know, that

24   someone was interested in providing.  And plus he found

25   another entity that the company could have done a joint

1    venture with, a partnership that was in the E-commerce

2    business.

3              So him being successful, finding those

4    two, you know, the opportunities just led me to believe

5    that -- you know, that he could help -- you know, help

6    the company.

7        Q.   What $58 million are you referring to, sir?

8        A.   It was -- you know, it was a private equity

9    group that, you know, provided -- you know, it was a

10   nonbinding LOI to help the company transition, you

11   know, into the E-commerce business.

12       Q.   Did that transaction ever proceed?

13       A.   No, it did not.  AT&T -- AT&T never gave us

14   the time to -- you know, for -- to acquire -- to make

15   the transition.

16       Q.   My understanding of Mr. Frinzi's background is

17   that he's a lobbyist.  Did you understand that?

18       A.   Yes, that's correct.

19       Q.   Okay.  When -- when the board retained him as

20   CEO, did you have any knowledge of qualifications that

21   would enable him to run a company of this size?

22       A.   Well, there was no business in the company.

23   So -- and, you know, he had the ability, the -- and the

24   contacts to communicate and reach out to different

25   organizations and different groups.  And he

Page 300

1    demonstrated that, you know, finding that -- that

2    nonbinding LOI and finding a company that could have

3    done a joint venture with Goodman.  So he did

4    demonstrate the ability to -- you know, to help the

5    company.

6         Q.   I thought that the company brought Mr. Frinzi

7    on back when it was still operating under the AT&T

8    contract.  Was I mistaken?

9         A.   Okay, wait.  What's your question?

10        Q.   When did -- when did the company, to your

11   recollection, retain Mr. Frinzi as the CEO?

12        A.   In 2022.  It would have been in 2022 and 2021,

13   late 2021.  That's whenever AT&T notified the company

14   that they were terminating the contract.

15        Q.   As the chief executive officer, did you expect

16   Mr. Frinzi to apply independent judgment or to just do

17   your --

18             THE REPORTER:  "Do your" -- it cut out.

19             MR. RUKAVINA:  Let me --

20             THE REPORTER:  It looks like "apply

21   independent judgement or do your" --

22             MR. RUKAVINA:  Can you hear me?  Can you

23   hear me, Donna?

24             THE REPORTER:  Yes, now I can.

25             They're out there trying to pick up all

Page 301

1     these trees.  Okay, yes.

2                    MR. RUKAVINA:  Let me ask a different

3     question and strike the last one.

4          Q.   When Mr. Frinzi was brought on to chief -- was

5     brought on as the chief executive officer, what did you

6     expect him to do as the CEO?

7          A.   To communicate with the bondholders and the

8     creditors and to, you know, wind down the company.

9     That was the expectation, or create value for the

10    company if there was, you know, an opportunity for

11    the -- you know, if there was an opportunity for the

12    company.  But primarily to communicate with the

13    bondholders, the creditors, and, you know, help wind

14    down the company.

15         Q.   Okay.  I think there is a word in the Jewish

16    language called a shill.  Have you ever heard of such a

17    thing?

18         A.   No.  I have heard of the maven, you know, a

19    maven.

20         Q.   I don't -- I don't know that.  But here is my

21    question.

22                    Did you and Mr. Frinzi ever have a

23    discussion that basically, as the CEO, he would just be

24    doing whatever you wanted and not applying any

25    independent judgment?

Page 302

1      A.   No, because I separated myself, you know, from

2  the company.  And, you know, Jim knew, you know, the

3  steps, what needed to take place to wind down the

4  company, how much money the company had, you know, and

5  then, you know, let the lawyers give direction and

6  advice on what the best thing to do and communicate

7  that with the creditors and the bondholders.

8      Q.   And did those discussions include the company

9  filing a Chapter 11 early in 2022?

10     A.   No, it did not.

11     Q.   Okay.  You never told him that the company is

12 not to file a Chapter 11 in early 2022 back when you

13 were a director?

14     A.   Not that I can recall.

15     Q.   You never discussed with him that the company

16 shouldn't file a Chapter 11 because someone would look

17 at insider transactions?

18     A.   Not that I can recall, no.

19     Q.   In the last four years, did you personally get

20 any money out of Goodman by way of equity distribution?

21     A.   Can you ask the question again?  Equity, like

22 selling my shares equity or --

23     Q.   No, no, no.  I'm asking -- I'm asking about

24 the company paying any dividend or distribution on

25 account of common stock.

Page 303

1    A.   No.

2    Q.   Okay.  To your knowledge, did any of your

3  family members in the last four years get any such

4  distribution?

5    A.   Not that I'm aware of.

6    Q.   Okay.  No entity or trust affiliated with you?

7    A.   No.

8    Q.   Is it fair to say that the only money you got

9  was these preferential shares that you were talking

10  about earlier?

11    A.   No, I didn't get anything from the company.

12           MR. RUKAVINA:  Matthias, is that your

13  kid?

14           MR. KLEINSASSER:  That is not me for

15  once.  My daughter did appear earlier, but they are out

16  of the house right now.

17    Q.   Okay.  Mr. Goodman, changing topics, you

18  mentioned that you had some telephone conversations

19  with Mr. Frinzi.  Did you record any of them?

20    A.   I did not.

21    Q.   Okay.  Do you know whether Mr. Frinzi or

22  someone else recorded them?

23    A.   Not that I'm aware of.

24    Q.   Did you and Mr. Frinzi ever discuss

25  undertaking any action or protocol to ensure that your

Page 304

1    communications would not be preserved?

2        A.    No, not that I recall.

3        Q.    At the time that Mr. Frinzi was the chief

4    executive officer of the debtor, was he providing other

5    services to you or any companies or trusts with which

6    you may be involved?

7        A.    No.

8        Q.    Okay.  Did the company, debtor, pay a

9    severance to your son, Jake?

10       A.    Not a severance.  It paid him a consulting

11   fee.

12       Q.    Okay.  Are you sure that it wasn't a

13   severance?

14       A.    I would have to go back and look.  I thought

15   it was a consulting fee that had to be paid.

16       Q.    Did you have any communications with Mr.

17   Frinzi urging him to pay that consulting fee or

18   severance, whatever it might be?

19       A.    Yes, from the -- I'm sure I would have --

20   would have talked to Jim about, you know, paying it.

21       Q.    Other than him being your son, why would the

22   company be paying him?

23       A.    For his consulting services.

24       Q.    Which consists of what, sir?

25       A.    Research, analytics.  It could have been a

Page 305

1     number of reasons.

2          Q.   Who -- do you know (inaudible)?

3          A.   I'm sorry, you cut out.

4          Q.   Yes.  Do you know who, on behalf of the

5     debtor, decided to retain your son, Jake Goodman, as a

6     consultant?

7          A.   I do not.

8          Q.   Okay.  Was it you?

9          A.   It could have been.  I'm not sure.

10         Q.   Do you recall any process that the debtor or

11    you took to find out whether he would be worth it, for

12    lack of a better term?

13         A.   I'm not sure.  I don't know.

14         Q.   Okay.  Were you ever paid by the debtor for

15    your services as a director?

16         A.   I should have, yes.

17         Q.   Do you recall if it was just a nominal amount

18    or was it a sizeable amount?  Can you give me an

19    understanding?

20         A.   I don't recall.  I would have to go back and

21    look at it.

22         Q.   Okay.  Were you ever paid by the debtor, let's

23    say in the last two years, as a consultant or officer

24    or for anything else other than a director?

25         A.   Yes.

Page 306

1       Q.   Okay.  Tell me about that, sir, please.

2       A.   As a consultant, I was paid as a consultant.

3       Q.   Okay.  Between when and when and how much,

4    approximately?

5       A.   I don't recall.  I don't recall the dates.  I

6    don't recall the amount.  It was presented earlier --

7       Q.   Was it --

8       A.   -- in the exhibit.

9       Q.   Okay.  Was it the same time that you were a

10   director?

11      A.   I don't know.  I can't remember.

12      Q.   Okay.  And it might have been when I had that

13   emergency hearing.  So if you have already gone over

14   this, Matthias can just tell me to move on.

15           What consulting services did you provide?

16      A.   Providing Goodman with $25 million and

17   another, you know, $20 million to reduce debt, to help

18   them find a joint venture, a partnership between -- you

19   know, a discussion with ARRIS, you know, FedEx, to talk

20   with AT&T about retaining -- keeping the contract and

21   bringing additional capital to the company.  And so it

22   would have been that -- it would have been that type of

23   consulting service.

24      Q.   Okay.  Do you know what the word "schedules"

25   filed in the bankruptcy means if I use that word,

Page 307

1    "schedules"?

2         A.   You would have to (inaudible).

3         Q.   Okay.  Do you know what the word SOFA, or

4    statement of financial affairs, would mean?

5         A.   No.

6         Q.   Okay.  Do you know whether you have seen the

7    schedules or SOFA filed by this debtor in the

8    bankruptcy case?

9         A.   I don't recall seeing it.

10        Q.   Do you recall whether anyone asked you about

11   information that they would use to populate the

12   schedules and SOFA?

13        A.   It doesn't ring a bell.  I don't remember.

14        Q.   In the last six weeks, did anyone ask you to

15   help provide some background or historical financial

16   data about the debtor?

17        A.   Would that have been the subpoena?

18        Q.   No, sir.  No, sir.  Other than the subpoena.

19        A.   Not that I recall, no.

20        Q.   Did you discuss with your brother, John

21   Goodman, anything having to do with the debtor's

22   historical or financial data?

23        A.   No.

24        Q.   Okay.

25        A.   I mean, we always just try to stay away from

Page 308

1   the -- you know, the bankruptcy and let the attorneys

2   handle it.  I mean, we talk high level about stuff, but

3   nothing in detail.

4       Q.   Are you aware -- and feel free to speculate.

5   You are fair to speculate.

6            Are you aware today of any lawsuits that

7   you think the debtor might have against the third

8   parties?

9       A.   Can you help me with that?  So the debtor

10  would -- lawsuits that the debtor would have with who?

11      Q.   Against -- against someone else.

12      A.   Not that I'm aware of.  I'm not aware of

13  Goodman filing a lawsuit on somebody.

14      Q.   Okay.  Now, I think we discussed earlier a

15  sale by the debtor to Unified Field -- Field Services,

16  right?

17      A.   Yes.

18      Q.   And that was its -- of its E-commerce business

19  to June 2021?

20      A.   Yes.

21      Q.   And that was for $10 million?

22      A.   It -- yes, it was a bond transfer.

23      Q.   Isn't it true, sir, that Unified Field

24  Services issued a promissory note of $3.6 million to

25  the debtor?

Page 309

1     A.   I don't recall.  They could have.

2     Q.   Okay.  Do you recall whether that promissory

3   note, if it ever existed, was canceled or forgiven by

4   the debtor?

5     A.   I don't think it was.

6     Q.   Do you recall ever instructing that it be

7   removed from the debtor's books and records?

8     A.   I mean, I could have.  You know, paying

9   $10 million for a -- you know, a business that's

10  already lost, you know, $14 million and -- but I don't

11  recall.  I mean, I could have.

12    Q.   Okay.  Do you have any understanding, sitting

13  here today, about whether Unified Field Services owes

14  any money to the debtor?

15    A.   It does.

16    Q.   Okay.  Tell me about your understanding,

17  please.

18    A.   That it owes money to the debtor.  I just

19  don't know what the exact amount or the terms of it

20  are.

21    Q.   Okay.  And is that amount owing to the debtor,

22  whatever it is, still lingering from the sale of the

23  E-commerce business?

24    A.   I don't know.

25    Q.   Okay.  Do you know of any other reason why UFS

1    might owe money to the debtor?

2        A.   I do not, no.

3        Q.   Okay.  Now, is it fair -- strike that.

4             Did Genesis or you or any other entity

5    affiliated with you sell certain contracts or line of

6    businesses to the debtor in 2019?

7        A.   We sold a business in 2019 to -- to the

8    debtor.

9        Q.   And was it for $20 million?

10       A.   That sounds correct.

11       Q.   Do you recall if it was cash money paid by the

12   debtor or something else?

13       A.   I don't recall.

14       Q.   Okay.  Were you a director of the debtor at

15   that time?

16       A.   I would have to go back and look.  I can't

17   remember.

18       Q.   Do you recall if any third-party valuation was

19   done of the line of business sold to the debtor?

20       A.   You would need to ask Goodman.  That would

21   have been their decision.

22       Q.   Okay.  Well, Genesis sold it to the debtor,

23   right?

24       A.   Yes, yes.

25       Q.   So do you have any recollection of how the

1    $20 million purchase consideration was arrived at?

2         A.   I do not.

3         Q.   Okay.  Do you recall whether you made a

4    decision or shared in a decision made by the debtor to

5    go ahead and buy that line of business?

6         A.   No.  I would have removed myself from that

7    discussion or that decision.

8         Q.   Okay.  You were asked this before, but I want

9    to ask it again.

10              When you resigned as the director of the

11   debtor, did it have anything to do with you removing

12   yourself in order to avoid any appearance of

13   self-dealing?

14        A.   It could have.  You know, I was very sensitive

15   about that, wanted to do everything by the book.

16        Q.   But to be clear, you were not involved in the

17   AMRR/Frinzi transaction at all, right?

18        A.   That's correct.

19        Q.   But you were involved in some capacity

20   with 18920, right?

21        A.   As a seller just selling, you know, an asset

22   to them, but not -- I didn't direct it, I didn't go to

23   them, I didn't find them, I didn't know who they were.

24        Q.   Are -- are you telling me that it's someone

25   else who introduced Mr. Auerbach to you?

Page 312

1        A.    Yes, that's correct.

2        Q.    Okay.  It was not you who introduced

3   Mr. Auerbach to someone else?

4        A.    I don't understand your question.

5        Q.    How did you first learn the name of Shalom

6   Auerbach?

7        A.    I was introduced to him, you know, from --

8   from Jim, from Jim Frinzi.

9        Q.    Okay.  And you had not heard of Shalom

10  Auerbach before Mr. Frinzi introduced him to you?

11       A.    That's correct.  I have never met him before.

12       Q.    Okay.  And if I understand, you sold certain

13  preferred stock that you owned to 18920, right?

14       A.    Yes.

15       Q.    Okay.  And that preferred stock had some legal

16  right to have it be paid by the debtor right away,

17  right?

18       A.    I don't recall.

19       Q.    Okay.  Did you get any money out of that?

20       A.    When I sold the preferred shares?

21       Q.    Yes.

22       A.    The -- the Goodman investments got the money

23  for it.

24       Q.    How much, just ballpark from your memory?

25       A.    I don't recall.

Page 313

1      Q.   Did you instruct Mr. Frinzi to honor that

2   preferred -- preferential, whatever that legal

3   requirement is on behalf of the debtor?

4      A.   No.

5      Q.   Did you discuss with Mr. Frinzi whether the

6   debtor might decline because of its financial situation

7   to honor that preferential demand?

8      A.   No.

9      Q.   Did you have any role with respect to the

10  debtor's decision to go ahead and send out

11  $14.5 million in cash for that?

12     A.   No.

13     Q.   Did you have any role in the debtor's decision

14  to transfer half of the AMRR note in partial

15  consideration of that preferential demand?

16     A.   No.

17     Q.   Did you resign as a director in order not to

18  have to make that decision on behalf of the debtor?

19     A.   No.

20     Q.   Okay.

21          MR. RUKAVINA:   I think we have only about

22  five minutes left, so let's do this.   Let me take a

23  five-minute break to talk to my client and then we will

24  conclude this.   Is that acceptable, Matthias?

25          MR. KLEINSASSER:   Yeah.   Well, I think

Page 314

1   Dave Parham may want to ask questions.  I'm not sure

2   what his position is on that.

3              MR. RUKAVINA:  Okay.  Well, I'm told that

4   I'm approaching five minutes to --

5              MR. PARHAM:  I'm good.  Yeah, I'm good on

6   what I've heard.  I don't know what happened while I

7   was gone.

8              THE VIDEOGRAPHER:  Off the record at

9   6:53 p.m.

10         (Recess from 6:53 p.m. to 6:59 p.m.)

11             THE VIDEOGRAPHER:  On the record at

12  6:59 p.m.

13     Q.   (BY MR. RUKAVINA)  Mr. Goodman, you referenced

14  that you were trying to help the company retire about

15  $20 million in debt.  What were you referring to?

16     A.   The bond obligation the company had.

17     Q.   The one that the company paid $17 million on?

18     A.   No, the one that the Auerbach company paid

19  for.

20     Q.   Okay.  So you did help the company retire that

21  debt?

22     A.   That and the $25 million that I brought into

23  the company in addition to that.

24     Q.   How did you bring the $25 million in?

25     A.   Through one of my investors.

Page 315

1    Q.   Okay.  Was it an equity contribution or how

2   did -- what $25 million are you referring to?

3    A.   It ended up being an equity contribution.

4    Q.   When?

5    A.   I don't know.

6    Q.   Okay.

7    A.   We can -- I'm sure we can go look it up.  It

8   was the equity contribution and the bond contribution,

9   you know, taking AT&T's advice.

10    Q.   And it's your testimony that you in no way

11   profited directly or indirectly from the Auerbach

12   transaction?

13    A.   Well, no, I didn't profit directly or

14   indirectly from a Goodman purchase.  You know, my

15   company, you know, did profit -- or not profit -- was

16   able to sell its, you know, bonds to the Auerbach

17   company, not the Goodman company.

18    Q.   But it sold them to the Auerbach company for

19   less money than the Auerbach company got out of

20   Goodman, correct?

21    A.   I don't know.  We would have to go back and

22   look at it.

23    Q.   You don't remember there being a $6 million

24   markup?

25    A.   I wasn't aware of it.

Page 316

1      Q.   Okay.  Do you have any understanding or

2    explanation for how it is that the company had a large

3    cash position by December of 2021?

4      A.   Yes.

5      Q.   What's your understanding?

6      A.   That that was FedEx's money.

7      Q.   Okay.  Did you have any discussion with

8    Mr. Frinzi about converting those liquid funds into

9    some other mechanism so that they would not be

10   available to be seized by a creditor?

11     A.   No.

12     Q.   Okay.  No discussion of that kind at all?

13     A.   No.

14     Q.   Okay.  Are you -- were you aware that in

15   June 2020, the debtor sold the Goodman Telecom

16   Services -- I'm sorry -- sold to Goodman Telecom

17   Services some of its business units?

18     A.   Yes.

19     Q.   For $30 million in cash and some Class E

20   units?

21     A.   Yes.

22     Q.   And did -- that company, Goodman Telecom

23   Services, was controlled or owned by John Goodman, your

24   brother?

25     A.   Yes.

Page 317

1      Q.   Did you, as a board member, consider and/or

2    approve that transaction?

3      A.   I'm not sure.  I would have to go back and see

4    if I recused myself from that vote.

5      Q.   Do you recall whether those Class E units had

6    a put option?

7      A.   I can't recall.

8      Q.   Okay.  Do you recall if the company paid

9    approximately $4 to $8 million on that put option?

10     A.   I don't know.  I'm not aware.

11     Q.   Sir, have I been courteous and professional to

12   you?

13     A.   Yes, yes.

14     Q.   You have been likewise.  Thank you.

15          MR. RUKAVINA:  I'll pass the witness.

16          MR. KLEINSASSER:  Dave -- Dave Parham, I

17   just want to clarify you have no questions before I

18   start.

19          MR. PARHAM:  Yeah, no, I have no

20   questions.

21          MR. KLEINSASSER:  Okay.

22                    EXAMINATION

23   BY MR. KLEINSASSER:

24     Q.   So, James, I'm just going to ask a couple

25   quick follow-up questions to clarify a couple things

Page 318

1    for the record.

2              Do you recall earlier there was a little

3    bit of testimony regarding whether you owned an

4    interest in Multiband Global Resources, which I believe

5    the -- or there was -- there were questions about was

6    it affiliated with James Frinzi?  Do you recall that

7    testimony?

8         A.   I do.

9         Q.   Okay.  So fair to say there were two Multiband

10   entities, right?

11        A.   That's correct.

12        Q.   One is a subsidiary of the debtor, Goodman

13   Networks, and that's Multiband Field Services or

14   something to that effect, right?

15        A.   Yes.

16        Q.   Okay.  And then there is a separate entity, as

17   you understand it, called Multiband Global Resources,

18   which has some affiliation with James Frinzi one way or

19   the other, right?

20        A.   Yes.

21        Q.   Okay.  Do you own an interest in the Multiband

22   entity that's affiliated with James Frinzi?

23        A.   I do not, no.

24        Q.   Okay.  Have you had any business dealings with

25   that entity at all?

Page 319

1    A.   No.

2    Q.   Okay.  So we're just clarifying, obviously,

3  for the record that when you were asked if you own an

4  interest in the entity, you were thinking that it was

5  the subsidiary of the debtor, Multiband Field Services,

6  not Multiband Global Resources, correct?

7    A.   Yes, that's correct.

8    Q.   Okay.  Thank you for clarifying that.

9         I believe there were some questions by

10  Mr. Phair earlier regarding when you were interim CEO,

11  and I believe you had testified that was in 2022.  And

12  we may have gotten that date wrong; it's been a long

13  day.  But I believe your testimony was that you were

14  CEO after Mark Keiffer; is that correct?

15    A.   I can't remember, Matthias.  I really need to

16  look it up.

17    Q.   That's fine.  Let me just short-circuit this.

18         You verbally resigned from the board in

19  December 2021, correct?

20    A.   Yes, correct.

21    Q.   And then -- and then -- sorry.  And there was

22  a written notice of resignation subsequently sent on or

23  around February 1st of 2022, right?

24    A.   Yes.

25    Q.   Okay.  So given that you were not even on the

Page 320

1   board after -- you resigned from the board after

2   December 2021, you were not the CEO of Goodman Networks

3   in 2022, correct?

4       A.   That's correct.

5       Q.   Okay.  We may have just misstated that.

6            Okay.  Last question.  When you were

7   on -- when you were an officer or a director of Goodman

8   Networks, did you rely on the advice of counsel,

9   whether in-house or outside counsel, to carry out your

10  duties?

11      A.   I did.

12      Q.   Okay.  And we just established that you

13  verbally resigned from the board of Goodman Networks in

14  December 2021 and that you sent a written notice on or

15  about February 1st, 2022, right?

16      A.   Yes.

17           MR. LANGLEY:  Objection to form.

18      Q.   Sure.  So it -- and that's -- so that's -- you

19  have not been on the board --

20           THE REPORTER:  Who objected?  Who

21  objected there?  I'm sorry.  I didn't see who objected.

22           MR. LANGLEY:  I apologize.  That was Adam

23  Langley for FedEx.

24           THE REPORTER:  Oh, okay, Adam.

25      Q.   It sounds -- it sounds from that timeline that

Page 321

1    you have not been on the board of Goodman Networks for

2    over a year, correct?

3        A.   Yes.

4        Q.   Do you believe that the time period since you

5    have been on the board could possibly have affected

6    your memory as to some of the questions you have been

7    asked today?

8        A.   Can you ask me that again?

9        Q.   Yes.  Is it fair to say that some things that

10   you may have known in, say, November of 2021 as a board

11   member, you don't remember now because it's been over a

12   year since then?

13       A.   That's correct, yes.

14              MR. RUKAVINA:  Object to form.

15       Q.   But at the time -- is it fair to say that when

16   you were a director of Goodman Networks, you attempted

17   to fulfill -- fulfill to the best of your abilities any

18   duties in good faith relying on counsel to carry out

19   the --

20              MR. SULLIVAN:  Objection to form.

21              MR. KLEINSASSER:  Can I -- let me just

22   ask the question again because you're cutting me off.

23       Q.   Did you attempt to carry out your duties at

24   the time you were a director to the best of your

25   ability and to be fully informed?

Page 322

1        A.    I did.

2                     MR. KLEINSASSER:  I'm going to reserve

3        any further questions.

4                     THE REPORTER:  Who just objected just

5        right in between there?  Adam, that wasn't you again,

6        right, in between there?

7                     MR. SULLIVAN:  I think Davor objected to

8        the prior question and I objected to the question just

9        before the last one.

10                    MR. SULLIVAN:  That was Ryan Sullivan

11       objecting to the prior question.

12                    THE REPORTER:  Oh, okay.

13                    MR. SULLIVAN:  Yeah, Davor did not

14       object.

15                    THE REPORTER:  I couldn't see you.

16                    MR. SULLIVAN:  I apologize.

17                    THE REPORTER:  I was trying to guess.

18                    MR. KLEINSASSER:  Okay.  So I think we're

19       done, right?

20                    THE VIDEOGRAPHER:  Off the record

21       at 7:08 p.m.

22                    MR. LANGLEY:  I think FedEx wants a rough

23       on this one.

24                    MR. GUFFY:  This is Philip Guffy from

25       Hunton Andrews Kurth.  We will want a rough as well.

Page 323

1            MR. SULLIVAN:  As will ARRIS.

2            THE REPORTER:  Who was that?  ARRIS?

3            MR. SULLIVAN:  Yes, this is Ryan Sullivan

4    for ARRIS.  ARRIS would like a rough, please.

5            THE REPORTER:  Okay.  Yeah.

6            MS. FUNK:  Munsch Hardt would also like a

7    rough for the trustee.  Thank you.

8            MR. KLEINSASSER:  Same for James

9    Goodman's counsel, Matthias Kleinsasser.  I would like

10   a rough draft as well.

11           (Proceedings concluded at 7:09 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 324

1                      CHANGES AND SIGNATURE

2       WITNESS NAME:  JAMES GOODMAN

3      DATE OF DEPOSITION:  FEBRUARY 1, 2023

4      PAGE          LINE          CHANGE              REASON

5      _____

6      _____

7      _____

8      _____

9      _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19     _____

20     _____

21     _____

22     _____

23     _____

24     _____

25     _____

Page 325

1       I, JAMES GOODMAN, have read the foregoing

2    deposition and hereby affix my signature that same is

3    true and correct, except as noted above.

4                         _____

                          JAMES GOODMAN

5

6    THE STATE OF _____ )

7    COUNTY  OF  _____ )

8       Before me,  _____, on this day personally

9    appeared JAMES GOODMAN, known to me (or proved to

10   me under oath or through _____) (description

11   of identity card or other document) to be the

12   person whose name is subscribed to the foregoing

13   instrument and acknowledged to me that he executed

14   the same for the purposes and consideration therein

15   expressed.

16

17      Given under my hand and seal of office, this

18   _____ day of _____, _____.

19

20                         _____

                          NOTARY PUBLIC IN AND FOR

21                        THE STATE OF _____

22

23   My commission expires:  _____

24    _____ No Changes Made  _____ Amendment Sheet(s) Attached

25

Page 326

1              IN THE UNITED STATES BANKRUPTCY COURT

                FOR THE NORTHERN DISTRICT OF TEXAS

2                        DALLAS DIVISION

3   IN RE:                      CHAPTER 7

4   GOODMAN NETWORKS, INC.      CASE NO.:

        DEBTOR.                 22-31641(MVL)

5

6

              REPORTER'S CERTIFICATION OF THE ORAL

7               DEPOSITION OF JAMES GOODMAN

                     FEBRUARY 1, 2023

8                    (REPORTED REMOTELY)

9        I, Donna Wright, a Certified Shorthand

10  Reporter and Notary Public in and for the State of

11  Texas, hereby certify to the following:

12       That the witness, JAMES GOODMAN, was remotely

13  duly sworn by the officer and that the transcript of

14  the oral deposition is a true record of the testimony

15  given by the witness;

16       That the original deposition was delivered to

17  Mr. Matthias Kleinsasser.

18       That a copy of this certificate was served on

19  all parties and/or the witness shown herein on

20  _____;

21       I further certify that pursuant to FRCP Rule

22  30(3) that the signature of the deponent:

23       __X__ was requested by the deponent or a party

24  before the completion of the deposition and that the

25  signature is to be before any notary public and

Page 327

1   returned within 30 days from date of receipt of the

2   transcript.  If returned, the attached Changes and

3   Signature Page contains any changes and the reasons

4   therefore:

5          ____ was not requested by the deponent or a

6   party before the completion of the deposition.

7          I further certify that I am neither counsel

8   for, related to, nor employed by any of the parties or

9   attorneys in the action in which this proceeding was

10  taken, and further that I am not financially or

11  otherwise interested in the outcome of the action.

12         Certified to by me on this, the 3rd day of

13  February, 2023.

14

15

16

17

         *Donna Wright*

         DONNA WRIGHT, Texas CSR 1971

18       Expiration Date:  11/30/24

         VERITEXT LEGAL SOLUTIONS

19

20

21

22

23

24

25

Page 328

1   COUNTY OF TRAVIS  )

2   STATE OF TEXAS   )

3      I hereby certify that the witness was notified

4   on _____ that the witness has 30 days or

5   (_____ days per agreement of counsel) after being

6   notified by the officer that the transcript is

7   available for review by the witness and if there are

8   changes in the form or substance to be made, then the

9   witness shall sign a statement reciting such changes

10   and the reasons given by the witness for making them;

11      That the witness' signature was/was not returned as

12   of _____.

13      Subscribed and sworn to on this, the _____ day

14   of _____, 2023.

15

16

17

_____

18              VERITEXT LEGAL SOLUTIONS

19

20

21

22

23

24

25

Page 329

1   Mr. Matthias Kleinsasser, Esq., mkleinsasser@winstead.com

2                        February 3, 2023

3   RE: In Re Goodman Networks, Inc., D/B/A Goodman Solutions

4   DEPOSITION OF: James Goodman (# 5688689)

5        The above-referenced witness transcript is

6   available for read and sign.

7        Within the applicable timeframe, the witness

8   should read the testimony to verify its accuracy. If

9   there are any changes, the witness should note those

10  on the attached Errata Sheet.

11       The witness should sign and notarize the

12  attached Errata pages and return to Veritext at

13  calendar-pa@veritext.com.

14       According to applicable rules or agreements, if

15  the witness fails to do so within the time allotted,

16  a certified copy of the transcript may be used as if

17  signed.

18                             Yours,

19                             Veritext Legal Solutions

20

21

22

23

24

25

**[& - 17]**                                                                 Page 1

| & |
| --- |
| **&**   3:13 4:17,23 |
| 203:4 253:18 |
| 253:22,25 |
| 261:25 |

| 0 |
| --- |
| **000140**   6:3 |
| **000142**   5:17 |
| **0002739**   221:18 |
| **000530**   224:13 |
| **000638**   6:4 |
| **0012**   6:18 |
| **002739**   6:14 |
| **0067**   5:21 |
| **007648**   6:7 |
| **01**   289:16 |
| **075484**   238:23 |

| 1 |
| --- |
| **1**   1:9,15 5:15 |
| 62:2,5,11 |
| 70:13,20 |
| 129:10 179:3 |
| 194:7,12 |
| 228:13 324:3 |
| 326:7 |
| **1,368**   151:6,20 |
| **1.9**   190:8,14 |
| 195:10,17,19 |
| **1/4/23**   6:12 |
| **10**   6:4 68:1 |
| 100:19 131:5 |
| 131:20 136:11 |
| 138:1 156:12 |
| 234:8 243:15 |

266:12 308:21
309:9
**10,570,912**
243:13
**10.5**   245:6
247:1,9,16
**10.57**   99:20
**100,000**   138:1
156:11,18
160:25 163:22
**1000**   3:10
**100k**   162:15
**10166**   2:9
**103**   9:21
**106**   5:22
**108,650,421**
172:4
**108.65**   171:24
**108.654**   173:14
175:14
**10:07**   15:3,4
**10:10**   15:4,6
**10:27**   162:11
**10th**   132:11
133:7
**11**   6:5 101:5
150:4,9,10
153:19 160:23
160:24 191:2,5
244:18 269:19
269:23 270:18
273:6,14
278:22 279:3
302:9,12,16

**11/30/24**
327:18
**1100**   4:3
**112**   112:14,18
**113**   5:24
**11:22**   68:3,4
**11:34**   68:4,6
**11th**   122:22,25
123:6,17,22,25
124:3,17 125:1
125:18 126:22
127:10 128:4,7
128:11,15
129:9 130:21
130:25 132:3
132:25 135:6
135:16,22,25
136:21,25
137:4
**12**   6:6 161:20
161:21 237:14
237:15
**12,381,602**
127:11
**12-23**   162:15
**12/31/21**   172:2
**125**   4:12 6:1
**128**   6:2
**128,420.99.**
154:14
**12:28:23**
118:20
**12:29**   110:9,10
**12:30**   109:10

**12:44**   110:10
110:12
**12th**   8:14
274:23
**13**   6:8 117:5
155:15 170:25
171:3
**131**   6:4
**14**   6:9 154:13
203:9,10,18
266:9 309:10
**14.5**   313:11
**1400**   3:21
**15**   6:11,13
135:3 157:10
194:8,16,22
205:3,8,13
209:17,18,23
226:10 230:22
**150**   6:5
**150,000**   161:1
162:23 164:5
164:10,12,16
164:17,24
165:12,22
**150k**   162:12
163:20
**15222**   4:13
**16**   6:12 209:21
209:22,24
**16,000**   154:5
**161**   6:6
**17**   6:14 211:14
221:20,20,21
221:24 222:1,9

**[17 - 2022]**                                                    Page 2

222:11 238:10
241:22 242:6,8
242:13,14
243:5,7 245:11
245:15 251:11
253:1,10
271:24 314:17
**17,032,060**
241:12
**1700**   2:19
**171**   6:8
**18**   6:16 92:19
93:9 95:7
117:7,20
224:13,14,17
**182**   5:8
**18920**   6:1,3,4
122:22,25
123:6,17,22,25
124:3,17,23
125:18 126:22
127:10 128:4,7
128:11,15
129:9 130:21
130:25 132:25
134:15 135:6,8
135:16,18,22
135:25 136:10
136:21,25
137:4 224:7
230:18 311:20
312:13
**19**   1:20 6:18
237:16,17
241:25

**19,500**   95:12
**19082**   327:17
**1971**   327:17
**19820**   125:1
132:3
**1:20**   137:10,11
**1:23**   126:11
**1:30**   109:9,14
**1:40**   94:2
**1st**   7:3 71:20
72:1,5,16
81:14,24 83:8
85:21 170:13
178:14,22
179:11,17
180:10,16
202:3 222:22
266:16 319:23
320:15

**2**

**2**   5:3,17 62:6
62:11,13 64:2
72:20,24
222:10,14
265:25
**2.5**   117:3,4
**2/1/22**   5:19
**2/1/23**   6:10
**20**   6:19 11:12
17:12 66:11
119:4 206:7
207:8 214:20
238:24,25
242:19 251:9
306:17 310:9

311:1 314:15
**200**   2:8
**200,000**   155:16
**2001**   4:7 16:10
16:12,22,23
17:1,4,15
263:5
**20037**   2:4
**2006**   36:1,5,7
36:16,22,25
**2017**   91:8,12
92:5
**2018**   113:23
**2019**   24:22
222:21 266:7
266:16,17
267:7 310:6,7
**202**   2:5
**2020**   206:7
207:2,8 221:11
221:18 222:3,7
222:16,20
223:1,7,22
233:5 248:19
249:18,21
266:9,12
316:15
**2021**   19:15
26:16 63:23
64:9,25 66:9
72:11,12 78:24
80:7 81:10
82:25 87:25
138:17 150:25
151:12,16

154:4 171:23
172:8 173:15
173:21 175:11
176:1 177:8
194:7 206:2,11
207:13 211:14
211:20 212:3
212:15,18,22
213:3,11,21
214:1,7,20
217:7,21 219:1
219:2,13
226:10 230:14
230:22 240:12
252:3,14 261:8
261:8 263:21
266:12,25
267:11,15
300:12,13
308:19 316:3
319:19 320:2
320:14 321:10
**2022**   5:25
17:12,16,24
18:8 19:14
20:14 21:12,16
22:3,8 23:6,15
23:15,18 24:24
25:2,24 26:18
26:21,24 27:2
29:25 30:5,22
31:6,11 32:4
38:7,20 59:21
61:14,18 63:21
64:7,14 65:13

**[2022 - 300]**

66:10,12 70:3
70:13,20 71:20
72:1,5,17 73:2
77:12 78:20
81:14,24 83:8
88:1 93:7,11
93:21 94:2
98:6,22 102:4
105:24 106:14
113:15,23
116:21 117:8
120:1,9 121:22
122:11,15
125:14 126:8
126:11 129:1
130:2,6 132:11
132:20 133:5,7
154:13 169:8
169:19 170:14
170:22 171:6
178:11,14,16
178:22,22
179:3,3,11,12
179:17,17,22
180:10,11,16
180:17 183:9
190:10 219:3
219:13 220:8
220:12 222:22
241:11 251:14
252:19 253:5
254:8 255:2,6
256:25 257:1
257:11 261:9
263:17,24

265:13 266:7
266:24 268:14
269:22 277:3
300:12,12
302:9,12
319:11,23
320:3,15
**2023**   1:9,15 7:3
205:4 324:3
326:7 327:13
328:14 329:2
**203**   5:8 6:9
**205**   6:11
**209**   6:12
**21**   6:20 19:3
27:9 59:21
153:23 155:15
156:11 157:6
157:10 161:1,6
202:2 257:4,5
289:17
**212**   2:9
**214**   4:8
**21st**   64:14 73:2
**22**   6:21 27:10
59:22,22 161:2
161:6 202:3
207:13 224:9
241:4 264:17
265:7,9 266:12
289:17
**22-31641**   1:4
7:15 326:4
**220-4200**   2:14

**2200**   2:4
**221**   6:14
**224**   6:16
**22nd**   1:19
**23**   63:22
156:11 161:1
221:10 223:1,7
223:22 266:16
**237**   6:18
**238**   6:19
**23rd**   163:22
222:15
**24**   51:15 266:6
**24th**   113:15
117:8 120:1,9
121:22
**25**   170:6 223:2
228:13,19,22
229:7 232:23
306:16 314:22
314:24 315:2
**250,000**   161:5
166:20
**2525**   3:9
**257**   6:20
**26,000**   192:12
192:14
**26,231**   191:21
**26,231.25**
194:13 196:2
**26,231.25.**
191:9
**262**   5:9
**265**   6:21

**268**   5:9
**28**   159:10
161:2 162:11
166:21 241:4
265:13 266:7
**2911**   3:20
**2:06**   137:11,13
**2:11**   143:24
144:1
**2:15**   119:5
**2:16**   144:3
**2:25**   152:13,15
**2:28**   152:15,17
**2:43**   163:5
**2:6**   144:1
**2nd**   106:18

**3**

**3**   5:18 68:15,16
68:22 190:7,14
190:16 195:10
195:17,19
241:14 251:14
253:5 326:22
329:2
**3.6**   308:24
**3/28/22**   6:23
**30**   63:8,17 67:1
84:5 85:25
99:6,19 110:7
119:5 194:7
236:25 264:24
316:19 326:22
327:1 328:4
**300**   2:18

**[3000 - 6th]**                                                    Page 4

| | | | |
|---|---|---|---|
| **3000**   3:4 | **4** | 111:21 121:8 | **5:42**   262:20,22 |
| **303**   3:3 | **4**   5:19 6:6 | 258:11 259:4 | **6** |
| **305**   4:4 | 93:17,19 96:20 | 287:22 288:1 | **6**   5:22 106:7,9 |
| **31**   101:4 | 149:20 194:17 | 289:10 | 153:23 206:20 |
| 171:23 172:8 | 194:18 195:14 | **450,000**   275:25 | 315:23 |
| 173:15,21 | 195:24 205:4 | **450,0000** | **6/8/22**   6:8 |
| 175:11 176:1 | 257:11 317:9 | 276:21 | **60**   121:24 |
| 178:16,22 | **4,032,918** | **457-7000**   3:5 | 248:21 289:9 |
| 179:3,12,17,22 | 126:21 128:4 | **469**   3:22 | 289:18 |
| 180:10,16 | 129:10 130:11 | **480**   3:11 | **60,000**   157:10 |
| 198:22 199:3 | **4.9**   195:14 | **4:32**   221:5,6 | **600**   2:13 |
| 214:6 222:7,20 | **40**   119:17 | **4:40**   221:6,8 | **606-5100**   3:11 |
| **317**   5:10 | 120:7,15,20 | **4th**   116:20 | **6075**   3:15 |
| **31st**   93:21 94:2 | 121:9,14,21,25 | **5** | **62**   5:15,17 |
| 122:11,14 | 223:8 233:4 | **5**   5:21 6:13 | **64,000**   153:24 |
| **323**   5:11 | **40.5**   258:1,4,7 | 97:25 | **65**   178:20,20 |
| **325**   5:11 | 258:15 | **5.9**   244:9 | 179:2,16 180:9 |
| **3311**   10:5 | **400,000**   141:20 | **50**   128:15 | 181:2 |
| **33131**   4:3 | **40m**   119:12 | 134:15,24 | **66**   179:10 |
| **35**   94:13 96:22 | **412**   4:13 | 135:3,6,12 | **66,490,666** |
| 97:2,6 101:9 | **420-8281**   2:20 | 136:20 162:18 | 178:13 |
| 271:17 | **4200**   2:13 | 162:18 164:1,2 | **66.19**   175:24 |
| **350,000**   141:20 | **435,000**   179:11 | 249:2 | 176:1 |
| **3600**   4:7 | **435,645**   178:17 | **500**   3:15 | **68**   5:18 |
| **375**   123:12 | **4352**   6:19 | **51**   29:17,23 | **680-5505**   3:22 |
| **38119**   3:16 | 238:22 239:3 | 131:15 | **680-7322**   3:16 |
| **391-8510**   4:13 | 242:22 | **512**   3:5 | **6:07**   282:4,5 |
| **3:00**   163:5,7 | **44**   57:14 65:15 | **561,000**   243:21 | **6:10**   282:5,7 |
| **3:26**   182:20,21 | 66:3 74:6 | **5688689**   329:4 | **6:30**   294:8 |
| **3:35**   182:21,23 | 77:18 78:5 | **570**   243:15 | **6:53**   314:9,10 |
| **3rd**   98:6,22 | 80:18 81:4,15 | **58**   298:22 | **6:59**   314:10,12 |
| 106:14 107:9 | 81:16 82:1,8 | 299:7 | **6th**   154:4 |
| 241:11 253:1 | 82:22 83:15 | **590**   123:15 | 268:14,20 |
| 327:12 | 84:21 85:11 | **5:35**   262:19,20 | |
| | 86:18 91:4 | | |

| 7 | **8th** 212:18 | 321:25 | 186:21 189:3 |
|---|---|---|---|

**7** 1:3 4:15 5:7
5:24 113:5,8
113:10,13
326:3
**7,000** 151:19
**7,696** 151:8,18
**700** 4:17
**713** 2:14
**720-4300** 4:8
**75201** 4:8
**75219** 3:21
**76102** 2:19
**7652** 161:24
**77002** 2:14
4:18
**78701** 3:4
**7:08** 1:16
322:21
**7:09** 323:11

**8**

**8** 6:1 9:6 91:7
91:10 125:5,7
129:15 130:4,4
170:22 171:6
178:11 183:3
213:11 270:9
270:14 271:11
279:13 317:9
**800** 4:18
**817** 2:20
**84** 222:18
**850-2825** 2:9
**85016** 3:10

**8th** 212:18
213:3,21 214:1

**9**

**9** 6:2 95:4 97:2
128:22,24
212:22 237:14
279:13
**901** 3:16
**93** 5:19
**94** 222:19
**955-1921** 2:5
**97** 5:21
**98** 4:2
**982-5682** 4:4
**9:27** 106:19
**9:58** 1:16 7:2
**9th** 126:8,11
129:1 130:2,6
132:20 133:5

**a**

**a.m.** 1:16 7:2
15:3,4,4,6 68:3
68:4,4,6
162:11
**abbreviation**
261:1,1
**abigail** 3:2
**abigail.griffith**
3:6
**abilities** 321:17
**ability** 119:22
120:3 170:3
172:17,22
299:23 300:4

321:25
**able** 62:17,21
170:5,11
172:24 189:21
205:25 209:25
219:18 221:25
223:12 224:14
231:14 271:2
282:24 298:12
315:16
**above** 1:15
118:20 325:3
329:5
**absent** 19:11
**absolutely**
295:2
**accelerated**
197:22
**acceleration**
198:6
**accept** 129:20
**acceptable**
313:24
**accepted** 117:4
118:10 240:6
**access** 259:24
**accommodate**
109:16
**accommodati...**
110:3
**account** 48:22
48:24,25 50:5
50:6 108:15
126:13 185:7
185:20 186:3,6

186:21 189:3
189:15 196:16
197:4,10,14,15
200:2 238:22
239:3,5 240:10
240:17 242:9
242:12,14,15
242:17,21
243:14,25
254:6 258:10
285:8 302:25
**accountant**
127:7
**accounting**
138:4,15
141:13 154:12
158:7 198:4,7
198:8 201:9,14
201:16
**accounts** 40:25
41:14 49:2,22
108:16,17,20
108:25 109:3,6
155:6 184:11
184:17,18,21
185:1,4 186:23
187:1,15 188:5
188:7,20 189:9
194:21 196:21
198:25 200:8
200:15,18
201:23 202:13
202:21 240:22
241:1 284:5
288:2

| | | | |
|---|---|---|---|
| **acct** 6:19 | **actually** 59:10 | **adopted** 22:23 | **agents** 246:6 |
| **accuracy** 329:8 | 62:6 68:12 | **advice** 278:9 | **ago** 11:12,12,13 |
| **accurate** 206:3 | 78:10 96:6 | 302:6 315:9 | 11:14 20:10,15 |
| 210:14 | 109:9 126:9 | 320:8 | 21:3,5 56:22 |
| **accurately** | 143:6 155:1 | **advised** 178:12 | 58:4,14 59:17 |
| 172:18 | **ad** 285:12 | 202:17 | 60:25 61:14 |
| **accuse** 61:9 | **adam** 3:14 19:6 | **advisement** | 63:8,17,25 |
| **accused** 12:23 | 19:12 203:3 | 155:21 267:18 | 70:21 73:21,21 |
| 274:9 | 220:21 236:1 | **affairs** 28:24 | 74:10 114:15 |
| **ach** 239:11,12 | 236:12,17 | 307:4 | 119:18 215:20 |
| **acknowledged** | 320:22,24 | **affected** 321:5 | 215:20 228:10 |
| 325:13 | 322:5 | **affiliate** 255:10 | 235:1 275:3 |
| **acquire** 236:9 | **adam.langley** | **affiliated** 74:22 | **agree** 7:9 8:23 |
| 255:19 290:19 | 3:17 | 97:14 208:12 | 56:10 65:10 |
| 299:14 | **added** 32:24 | 230:21 291:25 | 197:1 |
| **acquired** 42:23 | 40:9 | 293:21 303:6 | **agreement** 5:22 |
| 256:21 257:20 | **addition** | 310:5 318:6,22 | 6:5 18:1,4,6 |
| 257:25 | 314:23 | **affiliates** | 31:16 45:11 |
| **acquiring** | **additional** 85:1 | 183:18,23 | 48:2 87:4 |
| 256:6 257:14 | 107:3 270:14 | 233:9 234:1 | 97:23 98:5,11 |
| 297:21 | 271:10,11 | 236:10,25 | 98:21 99:4,10 |
| **acting** 39:23 | 306:21 | 237:6 246:1,6 | 100:18 107:9 |
| 206:8 218:13 | **address** 8:8 | 249:9,22 | 117:25 122:7 |
| 237:10 | 9:20 10:3 | **affiliation** | 130:24 131:24 |
| **action** 142:23 | **addressed** | 318:18 | 132:1,8,10 |
| 142:25 220:16 | 129:24 230:5 | **affix** 325:2 | 133:6 134:19 |
| 255:3 303:25 | **addressee** | **afternoon** | 136:10 138:7 |
| 327:9,11 | 116:14 | 183:1 262:25 | 141:16 155:25 |
| **actionable** | **addressing** | 268:6 | 157:16 158:1,3 |
| 142:17 | 116:21 226:19 | **agent** 184:10 | 182:4 228:6 |
| **actions** 254:15 | **adequate** 178:1 | 198:24 199:5 | 234:18 239:17 |
| **active** 177:5 | **administrative** | 199:13 200:11 | 239:21 240:1,6 |
| **actual** 58:6 | 71:10 | 200:13 237:6 | 282:12 283:3 |
| 59:5 | **admit** 269:13 | 243:13,24 | 292:4 328:5 |
| | 269:18 | 250:8 255:10 | |

[agreements - answers]

**agreements**
    1:21 329:14
**ahead**   85:1
    86:13 146:22
    148:11 177:22
    184:13 265:6
    269:18 311:5
    313:10
**aig**   279:10
**akerman**   4:2,7
    280:24,25
    281:8
**akerman.com**
    4:4,9,9
**allan**   4:22
**allege**   111:22
**alleged**   110:14
    269:8
**allegedly**   75:17
    78:4 81:15,25
**alliance**   97:17
    97:18,19 98:7
    99:5,20 100:16
    101:17 103:10
    105:6,16,24
    117:16 235:4
    235:12 238:4
    243:12,24
    250:8
**allotted**   329:15
**alongside**
    203:12
**alston**   261:25
    262:7

**amateur**
    174:24
**amazon**   217:12
    217:13
**amended**   6:9
    203:9
**amendment**
    325:24
**america**   108:24
**american**   57:15
    76:23 77:5,22
    253:17,22,25
**amortizing**
    192:13
**amount**   92:19
    95:9 99:7
    112:18,19,20
    126:24 134:14
    134:24 135:3,6
    151:6,8 171:23
    172:3,7 194:12
    234:7,7 241:12
    242:2,25
    248:25 305:17
    305:18 306:6
    309:19,21
**amrr**   5:17 6:7
    6:21 54:9,10
    55:21 56:12
    57:13 58:13,25
    60:13,16 61:25
    63:3 64:2,21
    65:7,16 68:9
    72:20,24 77:5
    77:9,18,22

    80:3,18 87:10
    87:14 88:19,23
    89:16,21 90:12
    91:1 94:8
    96:16 110:15
    110:18 111:23
    120:15,25
    121:4,8,16
    134:9 253:24
    254:1,9,12,16
    254:18,22
    256:21 257:4
    257:14,19
    258:1,2,4,15,23
    259:3 287:4,5
    287:22 288:9
    290:7,8 291:1
    291:4,4,6,23
    292:1,3,6,13,16
    293:18 294:15
    296:16 297:2
    297:25 298:2,7
    311:17 313:14
**amrr's**   63:9,10
    90:9
**amy**   3:2
**amy.ruhland**
    3:6
**analyst**   159:12
**analytics**
    304:25
**andrea**   4:1
    280:23 281:2,3
    281:7

**andrea.hartley**
    4:4,9
**andrew**   2:12
**andrews**   2:3,8
    8:2 9:4 322:25
**angry**   181:7
**answer**   13:20
    14:2,6,18
    81:21 83:19,20
    84:16,24,25
    85:1,5,13,24,25
    86:8 99:10
    141:2,4 145:7
    145:12 147:12
    147:13,19
    159:21,23
    172:20 173:17
    174:15,18
    175:5,8 180:25
    213:17 224:7
    232:6 266:5
    283:10 288:25
    289:3 296:24
**answered**
    83:19 85:13
    120:22 133:19
    147:3,8
**answering**
    147:4
**answers**   13:12
    174:13 175:9
    181:24 265:16
    266:19,22
    283:15

**anthony** 204:7 205:16
**anticipating** 142:5,9,12
**antonio** 9:19
**anybody** 165:6 206:11 210:23 211:2,10 219:6 226:13 237:5 237:10 246:14 246:18 278:2
**anybody's** 250:14
**anymore** 297:23
**apart** 111:16 173:1
**apologize** 67:21 150:23 207:22 216:14 218:16 236:20 238:4 246:17 320:22 322:16
**app** 49:14 103:6 283:22
**apparently** 248:1
**appear** 226:12 239:9 303:15
**appearance** 311:12
**appearances** 5:3
**appeared** 238:2 325:9

**appears** 194:6 250:7
**applicable** 329:7,14
**application** 191:22
**applied** 197:10
**apply** 196:16 197:15 200:18 300:16,20
**applying** 301:24
**appoint** 22:24 278:6
**appointed** 19:20 20:22,24 21:5 24:14,17 24:20,24 25:2 213:6 218:20
**appointing** 18:2 25:7 274:12,17,24
**appreciate** 13:19,23 136:5 159:24 193:5 215:21,22
**appreciated** 198:21
**apprised** 112:24
**approached** 103:13,16 230:17 274:16 296:9

**approaching** 314:4
**appropriate** 65:2 296:17
**approval** 38:17 82:16 296:1
**approve** 80:25 317:2
**approved** 295:21,24
**approximately** 20:15 97:1 101:4,5 190:10 195:6 222:18 277:12 306:4 317:9
**apps** 49:8
**arbitrarily** 270:12 271:5
**arguing** 85:23
**arizona** 3:10
**arrangement** 156:3
**arris** 3:1 262:10 263:1 264:5,8 265:17 267:24 306:19 323:1,2,4,4
**arris's** 6:22
**arrive** 97:5 101:16
**arrived** 311:1
**aside** 23:14 141:25

**asked** 8:19 17:6 37:14,20 75:8 76:1 83:17 84:5 86:13 92:8 95:3 139:2 144:5 145:4 148:7,8 148:10 161:16 167:20,24 175:3 199:16 201:21 210:4,6 210:13 265:3 266:1 267:9 271:9,12 289:2 295:24 296:22 296:23 298:9 307:10 311:8 319:3 321:7
**asking** 47:1,2 47:18,19 69:23 70:18 82:17 99:12 120:19 120:24 121:6,7 142:15 144:12 164:19,19 168:12 173:11 227:3,10,11 232:2 236:1 246:20 247:22 247:24 252:21 274:20 281:11 281:23,25 284:23 286:25 287:4 296:21 302:23,23

**asserted**  130:22
141:22 145:1
**asset**  119:12,15
119:17 120:7
120:15,20
122:1,17
173:19 234:17
296:4 311:21
**assets**  122:5
171:18,23
172:1,2,7,15
173:3,14,18
174:3 175:15
175:17,19,20
175:22,24
176:22 199:8
233:21 234:2
255:19,24
256:1,3,6,6,9
256:16,22
257:14,20,25
258:14,15
273:6,7 279:5
279:7 293:19
293:24 294:20
**assign**  274:20
**assignor**  134:6
134:13,14,16
134:19,24
**assistant**  71:10
**associated**
56:16 87:14
111:22 202:7
253:21

**assume**  19:4
20:21 23:7
198:13
**assumed**  20:11
277:16
**assuming**
225:21
**assumption**
189:17,18
283:1
**assure**  216:7
**astute**  275:23
**at&t**  18:9,12,19
19:2,15 21:23
21:24 22:6
24:3,9 43:13
51:6 169:24
170:4,9 217:3
221:12 222:17
270:3,7,11,13
270:19,22,23
271:3,9,12
286:8 299:13
299:13 300:7
300:13 306:20
**at&t's**  315:9
**atc**  65:17,19
76:17 89:20,22
90:3,6 119:12
120:7,15
121:11,21,25
122:17 155:15
155:22,25
156:7,12,23
157:2 160:21

160:25 161:2
161:12 210:3,6
211:15 240:2
**attached**  1:22
325:24 327:2
329:10,12
**attaches**  126:15
**attachment**
6:10 150:13
**attempt**  321:23
**attempted**
321:16
**attention**  230:5
**attorney**  8:2
9:4 69:15,17
69:18,19 74:18
111:8 112:1
136:16 142:21
149:4,9 247:12
247:13 260:15
272:19 273:16
278:8,10,12,15
279:17
**attorneys**  13:9
79:20,25 80:13
99:21 111:10
111:16 145:4
288:20,21
296:22,24
297:7,12 308:1
327:9
**attributable**
138:3
**audio**  7:8 14:22
14:23 287:5

291:2
**audit**  45:17
**auditors**  31:4
32:3 75:8,10
120:8,11 231:9
248:20
**auerbach**  100:1
100:1,5,7,9,11
101:23,24
102:1,18,21,24
103:2,7,18
104:9,12,15,17
104:21 105:6
105:15,25
106:1,16,19
107:15 243:24
244:10 245:1
249:12 272:6
311:25 312:3,6
312:10 314:18
315:11,16,18
315:19
**auerbach's**
107:20,23
**auerbachs**
123:24 124:3,6
135:25 235:6
237:4,5 246:10
246:24 250:11
**august**  194:7,8
194:12,16,22
199:24 201:4,8
201:12 206:2
206:11 219:1
219:13 230:14

**austin** 3:4
56:25
**authorities**
75:25 110:23
**authority** 40:11
40:23 41:7,13
202:12 212:12
240:10,16,22
241:1 289:11
**authorize**
136:24
**authorized**
288:6,10
**auto** 51:12 52:5
52:6,12,22
284:15,16,19
**automatically**
51:14 284:16
**available**
145:20 203:16
316:10 328:7
329:6
**avenue** 2:4,8
3:15 4:7,12
**avoid** 67:8
122:18 270:18
311:12
**aware** 21:13
31:23 43:22
44:2,13,23
46:7,8 60:15
65:23 66:3
75:16,19 77:4
81:17,20 88:19
90:16,20 103:8

112:3,4,22
128:11 130:24
135:2,5,8,15
137:2 146:1
147:21 148:3
148:13 149:10
152:6 153:8,12
153:17 156:6
156:25 157:1
157:18 159:3,4
159:6 167:6
169:19 180:3
181:6 183:25
184:2,6,9,14,21
187:11 194:23
197:24 199:7
201:6,24,25
211:12 227:25
235:9,11 249:5
249:8 250:20
252:16 253:8,9
255:4 256:21
256:24 259:7
268:12 275:9
279:18 280:2,8
283:14 291:7
291:16,19,20
303:5,23 308:4
308:6,12,12
315:25 316:14
317:10
**awareness**
112:7 125:1
169:23

**b**

**b** 185:24 329:3
**back** 21:9
23:12 24:6
25:6 26:5
27:14 28:20
36:5 38:9 40:9
42:12,20 54:22
54:22 56:9
58:6 61:13
65:9 68:1 69:4
69:24 71:15
72:19 79:15,25
96:19 101:23
112:25 117:24
122:4 126:25
130:4 132:11
134:5 138:5
141:12 143:22
150:1 153:5,19
153:20 157:25
158:21 160:3
160:18,23
163:14 164:6
166:25 167:4
167:20,24
168:2 173:10
179:24 191:2
196:16 199:24
207:23 208:4
215:5 217:22
217:23 220:18
228:11,14
229:5 230:3,16
231:4 233:3

240:19 241:25
242:19 251:9
251:10 253:13
261:14 262:14
264:20 267:1
272:8,9 274:21
275:12,21
278:8,13
279:14 281:16
282:16 289:22
292:18 295:6
295:15 296:7
297:6 298:15
300:7 302:12
304:14 305:20
310:16 315:21
317:3
**background**
299:16 307:15
**backs** 144:19
**bad** 62:9 295:4
**balance** 176:3
229:1
**balances**
178:24
**ballpark** 18:18
23:15 195:20
279:11 312:24
**ballparking**
36:6
**bank** 4:11 6:19
94:22 108:13
108:13,14,19
108:21,24,24
166:16,17,18

183:2 184:11
184:17,21,22
184:22,23
185:2,8,15
186:1,21,23
187:1,12 188:5
188:5,7,8,13,19
188:20,25
189:5,8,12
191:1,22
192:17,21
193:17 194:25
195:3,22 196:1
196:9,12,20
197:14,22
199:11,20
200:7,8,15
201:21,22,25
202:13,16,22
238:22 239:3
240:10 242:4,8
242:16,21,21
246:9,12 247:6
258:10 279:10
**bankrupt**
269:14,18
**bankruptcy** 1:1
7:13 52:17
76:7 118:5
119:21,25
120:2,12 122:2
122:18 218:22
268:9,9 273:22
278:15 306:25
307:8 308:1

326:1
**banks** 106:20
108:23 109:3
184:19 185:5
**based** 142:25
173:12 206:3,5
211:13,17
212:7 213:1
214:12 221:13
222:23 235:23
243:5 244:16
258:1
**basically** 67:1
286:25 301:23
**basis** 48:14
129:19 216:20
231:23
**bater** 185:24,24
187:21 189:3
189:20 197:2
198:5 200:2,24
**bates** 93:16
125:23 185:24
185:24,25
186:16 189:3
193:24 196:25
197:3 199:11
199:20 202:6
221:18 237:15
238:23
**baum** 114:6,8
114:10,18,20
115:13 116:1,2
116:20 118:1
118:16,22

**bay** 115:2
**beat** 13:20
**becoming**
20:19
**began** 270:11
**beginning**
161:6 289:3
**behalf** 8:23
136:25 141:22
148:15 157:2,7
157:21 171:21
178:10 227:12
227:13 237:10
248:1,7 279:22
279:24,25
283:11 297:1
305:4 313:3,18
**believe** 8:3
35:15 39:21
61:2,3,22 63:6
72:1 75:13
78:25 79:10
104:10 110:17
113:8 122:14
122:16 132:23
133:3 140:24
141:6,10,18
142:8 148:4
149:5 151:14
168:14 172:6
175:14 176:25
180:22 181:17
189:6,15
190:15 191:11
195:15,23

206:2 210:14
212:7 214:21
214:23 216:16
217:8 219:24
225:11,14
233:8 235:5,8
238:6 242:7
251:14 253:20
253:21 254:3
258:9 260:8,19
260:19 262:6
263:4,15
282:15 283:16
284:6,14
291:22 299:4
318:4 319:9,11
319:13 321:4
**believed** 61:5
**bell** 307:13
**belonged** 199:8
**beneficial**
245:4
**beneficiaries**
243:4
**beneficiary**
243:22
**benefit** 59:4
60:21 65:9
79:15 193:22
245:8 288:17
292:12 295:22
**benefited** 56:9
**bergman**
205:17

**best** 195:7
197:13 200:21
210:14 278:25
279:11 291:20
292:20 302:6
321:17,24
**better** 42:11
249:20 259:22
305:12
**beyond** 86:11
188:24
**bfunk** 4:19
**bill** 280:9
**bills** 34:18
155:22 156:22
157:18 159:2,5
**binder** 237:25
**binding** 228:5
**bird** 261:25
**bit** 9:10 62:24
126:10 183:4
218:15 236:14
298:15 318:3
**blacked** 244:8
**blas** 94:4
107:17
**blood** 204:3
**blow** 93:23
**board** 6:12
15:24 17:19
20:25 21:1,4,8
21:10,14,19
22:2,8,9,11,18
22:20,24 23:3
23:7,7,11,20,23

24:4,14,17,19
25:1 26:6,9,14
26:20 29:24
30:4,22 31:6
31:11 32:3
35:4,5 38:8,10
38:13,17,22,24
39:4,9,13,16,25
40:5 41:11,16
41:22 42:6,11
42:12,18,24
43:21 44:2,13
44:23 45:4,16
45:19 46:1,7
46:20 47:3,13
47:15,20 48:6
53:7 56:15
61:15 64:11,17
65:24 66:7,14
68:10 69:11,21
69:23,25 70:3
70:6,8,12,15,22
72:9 73:7
80:17,25 81:5
81:9,17,21
82:15,19,25
83:5,11,14
84:18 85:7,18
86:14,20,23,24
87:11 94:9
99:2 113:25
124:23,24
128:10 136:13
136:17 149:17
154:21 169:6

173:20 174:1
175:12 176:14
176:21 177:12
177:14 205:19
205:21 206:1,9
206:12,23
207:2,6,17,20
207:24 208:6,9
208:11,12
211:1,6,10
212:12 213:2,9
213:20 215:7
215:25 216:5
231:16,20
240:15 251:18
251:25 252:6,9
263:19 264:1
266:6,23 267:2
299:19 317:1
319:18 320:1,1
320:13,19
321:1,5,10
**boards** 208:14
**body** 228:18
**bond** 5:20,21
5:23 91:16,19
97:23 98:4,10
98:21 99:4
100:18 107:8
117:24 250:2
251:3 271:15
308:22 314:16
315:8
**bondholder**
170:19 223:13

**bondholders**
31:17,18 43:20
44:7 45:13,14
46:24 56:4
79:16 91:13
99:23 100:24
101:2 112:9,11
122:8,8 171:6
171:22 172:12
178:11,12,20
179:24 199:9
250:4,5,12
273:7 279:6,8
290:1 295:8,23
295:25 296:4
296:12 301:7
301:13 302:7
**bonds** 30:11,15
30:20,24 31:2
31:5,10 32:2
91:22 92:4,9
92:13,16,20,22
92:25 93:3,4
93:10,13 94:13
94:21 95:5
96:2,7,8,9,10
96:13,15,16,22
97:2,9,13,16
99:7,19 100:12
100:23,24
101:1,3,5,13,17
101:20,22
103:10,21,24
104:3 105:5,13
105:15,21,23

106:1,20,21,24
107:3,7,12
112:5,8,10,14
112:25 115:19
115:24 116:24
117:3,11 119:6
122:11 124:7
136:1 170:8
179:24 188:1,2
223:8 233:4,10
233:12,15,20
233:25 234:8
235:2,10,12
236:9,25
244:19,25
247:10 248:22
249:4,17,20,23
250:14,16,19
250:21 251:4
271:15,16,20
271:25 272:5,6
315:16
**book** 311:15
**books** 211:3,7
219:21 296:4
309:7
**boone** 261:23
**borrowing** 65:4
65:6
**bottom** 93:25
96:20 98:14
125:23 172:1
227:5,8,20
**bought** 117:10
250:14 271:16

**boulevard** 3:20
**brad** 53:5
212:16
**break** 14:5,7
67:22,22 68:1
68:8 72:25
109:10,11,17
110:1,5 136:4
136:7 137:8
144:4 220:22
220:25 221:1
262:12 281:21
313:23
**breaks** 14:3
**brenda** 4:16
8:9
**brian** 2:7
**brianclarke**
2:10
**briefly** 13:4
**bring** 37:25
47:13,15 61:24
66:18 67:6
68:13 69:4
72:21 91:17
93:15 96:18
97:22 106:4
113:3 123:10
128:20 131:2
149:20 161:17
170:22 271:7,9
271:11 314:24
**bringing** 38:11
39:4 98:1
123:16 306:21

**broke** 285:13
**brother** 28:23
166:25 167:15
168:5 209:3,5
272:15 307:20
316:24
**brother's** 192:8
192:9,10
**brothers** 27:20
27:21,23 28:22
219:25 258:25
259:6 272:12
277:25
**brought** 56:5
59:2,6 125:6
264:5 270:25
271:2 297:25
298:16 300:6
301:4,5 314:22
**brown** 4:22
**bth** 184:22
**bubbles** 162:7
**burning** 146:19
**business** 10:13
15:11,16,19
18:16 25:18
26:1,13 32:13
32:14,15,20,23
34:5,10 37:18
37:19 40:21
43:15 45:23
57:12 108:15
185:16 189:4,5
215:13 217:7
217:10,12,13

223:12 239:23
256:11,22
271:1,1 275:23
284:1,2,24
291:16 299:2
299:11,22
308:18 309:9
309:23 310:7
310:19 311:5
316:17 318:24
**businesses**
310:6
**butler** 3:14,20
19:7
**butlersnow.c...**
3:17,17,22
**buy** 30:20 93:2
93:13 94:12
96:8,21 103:14
105:13,21
112:8,10,25
226:4 231:10
251:3 271:20
290:9,11
296:12 311:5
**buyer** 100:6,25
228:4
**buyers** 99:23
**buying** 96:13
100:25 101:2
127:5 170:8
224:1 271:15
**bylaws** 48:2
87:4

**c**

c  2:1 260:22
calculated
  191:12
calendar
  329:13
call  48:18 49:6
  54:19 58:19,20
  58:22 60:8,8
  64:24 79:8
  110:14 118:4
  146:22 166:4
  194:2
called  15:9
  27:15 28:5
  32:7 35:11
  89:7 97:16
  104:5 122:21
  125:23 255:13
  274:17 283:17
  301:16 318:17
calling  50:10
  116:7
calls  66:23
  141:13 184:5
cam.hillyer
  3:17
camelback  3:9
camera  7:6
campbell  3:13
cancel  19:2
canceled  18:9
  309:3
cancellation
  19:15

candice  3:19
candice.carson
  3:22
cap  229:4
capable  281:8
capacity  11:6
  209:6 211:5
  212:4,9 275:7
  295:19 311:19
capital  34:22
  34:23 107:21
  108:19,21
  306:21
card  159:2,5
  325:11
carrier  283:12
carry  320:9
  321:18,23
carson  3:19
case  1:4 7:14
  31:24 62:4
  133:25 209:16
  212:23 278:22
  307:8 326:4
cash  121:11,16
  121:21,24
  175:21,24,25
  176:3,16,18
  177:8 178:8,10
  178:13,17,21
  179:2,10,11
  187:1,9,12,14
  187:20 191:25
  242:2 279:9
  289:21 296:5

310:11 313:11
  316:3,19
cashless  293:12
category
  206:20
cathy  108:3,4
cause  1:15
caused  54:11
cell  60:10,11
central  109:14
cents  97:2,6
  101:9 271:17
ceo  17:11,11,16
  17:18,23 18:2
  18:7,10,22
  19:20 20:11,14
  20:19,20,23,24
  21:5,25 23:8
  24:20,24 25:2
  25:8,10,15,20
  26:4 33:16
  35:4 37:6,11
  38:4,11 39:4
  39:10 40:6,11
  40:22 46:15
  66:4 77:12
  82:1,7,21
  83:14 84:20
  85:10 86:17
  167:10,10
  169:1,1 212:14
  214:20 215:3,4
  217:4 252:9
  263:16 298:17
  299:20 300:11

301:6,23
  319:10,14
  320:2
certain  183:18
  183:22 184:10
  187:10,11
  310:5 312:12
certainly  165:9
certificate  5:11
  326:18
certification
  326:6
certified  326:9
  327:12 329:16
certify  326:11
  326:21 327:7
  328:3
cfgi  6:8 90:11
  113:16,18
  115:23 120:12
  171:9,12,21
  172:11 178:10
cfgi's  172:17
  178:19
cfo  21:25 41:6
  46:13,21 47:5
  47:22 48:7
  53:6 108:7
  169:1 172:16
  212:14,15,18
  212:22,24
  213:3,6,6,10,21
  213:23,25
  215:2 231:13

**chain** 3:13 4:22
97:1 108:1,3
163:18 165:25
166:2 203:4
239:10,13,18
239:22 240:2
**chains** 163:19
**chair** 207:12
**chairman**
82:18 83:11,14
84:17 85:7,18
86:14 124:22
124:24 128:10
136:17 167:10
169:6 173:20
175:12 176:14
176:21 266:8
**chairmanship**
69:11
**change** 183:7
243:22 244:9
245:16 324:4
**changes** 324:1
325:24 327:2,3
328:8,9 329:9
**changing**
182:18 303:17
**chapter** 1:3
4:15 269:19,23
270:18 273:6
273:14 278:22
279:3 302:9,12
302:16 326:3
**characterizati...**
249:1

**characterize**
225:17 248:18
**charge** 40:17
94:23 277:1,23
**charged** 40:15
**charges** 158:13
**chart** 6:6
149:21 215:1
**charts** 226:11
**chase** 108:24
**check** 27:14
42:12 52:20
53:4,20,23
70:10 80:12
95:9 136:16
156:2,5,10,19
156:24 157:5
157:17,23,24
158:5,7,11,19
158:20,21,22
158:23 160:8
160:19,22
161:13 164:7
189:25 190:21
192:23 193:13
195:8,12,21
198:2,15,18
201:9,13,16
208:4,16,23,25
209:2 210:25
212:6,20,24
213:5,12 214:9
214:22 215:6
220:14,18,19
223:4 230:16

234:16 240:20
250:18,20
273:15 278:14
288:20
**checked** 56:14
60:20 288:21
**checking** 40:24
198:3
**chief** 167:10
225:25 266:11
285:1 300:15
301:4,5 304:3
**circa** 36:7,16
**circuit** 319:17
**circumstances**
20:18 37:10
144:13,24
146:2 147:22
148:4,14
149:10 207:19
207:23 208:8
272:9
**citizens** 242:15
**civil** 1:19
**claim** 130:22
136:15 141:22
142:15 143:6
143:16 144:14
144:18,20,21
145:1,5,21
146:3 147:23
148:5 149:5,11
**claims** 136:9
140:25 141:7
141:10 142:1,5

142:9,11,19
143:5,15 144:6
148:14,15,20
200:6,7
**clands** 260:16
260:22,25
**clarification**
188:18
**clarify** 43:25
188:10 236:4
263:3 264:10
267:3 317:17
317:25
**clarifying**
52:19 265:4
319:2,8
**clarke** 2:7
**class** 316:19
317:5
**clause** 99:16
134:9,12
**clean** 104:3,6
237:24 238:3
241:13,23
242:18 243:6
245:11,15
250:8,11
**clear** 14:13
66:19,24 67:3
68:11 87:19
131:6 138:11
141:5 159:23
166:19 174:17
188:11 227:9
311:16

**clearinghouse**
34:17
**clearly** 143:9
**click** 150:4
**client** 313:23
**clients** 203:12
229:21
**close** 94:14
127:21,23
195:11
**closing** 237:25
**coffers** 41:8
**collateral** 184:2
184:10 198:24
199:5,13
200:11,13
**collect** 199:6
**collectively**
117:7
**college** 10:2,3
**colorado** 3:3
**combination**
194:1
**combined**
131:15
**come** 13:10
16:6 19:19
37:20 68:1
79:4 127:16,19
133:13 153:5
167:3,20,24
168:2 173:9
187:19 226:3
249:14 262:14
268:16 275:20

**comes** 101:11
290:9 295:18
**comfortable**
54:12 281:18
281:23,25
**coming** 166:25
196:20
**comment** 60:19
79:23 284:12
288:18
**commerce**
37:19 40:21
43:15 216:20
217:3,7,10
299:1,11
308:18 309:23
**commercial**
242:15
**commission**
325:23
**commitments**
45:6
**committed**
110:17
**committee**
45:17
**common** 6:17
27:20,21 29:9
89:11 224:22
232:8 302:25
**commonly**
260:25
**communicate**
8:21 44:6,7
48:15,17 49:7

49:14 50:18
53:11 74:17
103:7 133:21
181:24 186:16
193:24 254:21
254:24 285:10
285:25 289:25
299:24 301:7
301:12 302:6
**communicated**
44:10 49:15,23
50:1 53:25
54:6 56:3 57:8
88:1 124:11
133:23 185:8
185:14
**communicating**
27:1 45:14
46:24 49:11
52:10 124:14
127:4
**communication**
23:25 26:23
31:3,18 48:13
49:10 50:3,12
50:13 55:24,25
56:20 58:12,18
72:13 87:22
211:2 285:7
286:2
**communicati...**
30:6,23 31:9
31:15,21 47:1
49:3 54:11,16
88:7,10,13

137:22 196:3,6
199:19 211:7
253:9 254:12
283:16 284:25
285:4 289:5
304:1,16
**companies**
27:12 28:8,10
28:12 29:8
33:8,12 82:1
83:12 85:6
90:17,21 92:3
92:13 118:5,6
123:5 137:15
137:18 138:23
139:3,5 140:25
141:6 142:1
144:6 145:22
146:3 147:22
148:5,11,15,20
156:4 159:13
159:17 160:5,6
198:17 217:1
230:21 244:4
290:23 297:22
304:5
**company** 10:22
12:5 15:9
17:22 18:11,19
20:21 26:20,24
27:2,14,15
28:7,14 30:1,6
30:10,19,23
31:10 32:7,11
32:16,19,25

| | | | |
|---|---|---|---|
| 33:6 34:1,4,14 | 139:19,23 | 270:18 271:10 | 222:19 271:13 |
| 34:16,21 35:11 | 140:2,7,11,19 | 271:21,24 | 281:12 282:1 |
| 35:14,15 36:10 | 152:7,19 153:9 | 272:3,7,12,24 | **comparison** |
| 36:13,24,25 | 153:13 155:5 | 273:13,21 | 175:19 |
| 37:3,15,16 | 162:1 167:1,11 | 274:16,25 | **completely** |
| 39:15,19,23,25 | 167:21,25 | 275:9,10,13,15 | 244:8 |
| 40:1,13,15,20 | 168:3 169:1,24 | 275:21,23,24 | **completion** |
| 43:14,16,19 | 170:3,7,16 | 276:1 278:21 | 326:24 327:6 |
| 44:8 46:18,25 | 171:13 172:7 | 278:25 280:18 | **concern** 180:14 |
| 47:6,8 53:16 | 173:3,14 174:3 | 282:23 283:2,6 | 198:23 222:13 |
| 56:7,9,16 59:4 | 175:15,25 | 285:7 288:16 | 222:14,15 |
| 59:4 60:16,21 | 176:16,19,23 | 288:17 289:8 | 223:11 231:8 |
| 66:4,4 76:14 | 177:1,2,8,16,18 | 289:15,21,25 | 248:20 273:25 |
| 76:20,22,25 | 177:20,25 | 290:9,10,17 | **concerned** |
| 77:2 79:14 | 178:2,6,7,14,21 | 291:6,25 | 223:14 |
| 81:8,9,10,12,16 | 179:2,9,16 | 292:12,12,23 | **concerns** |
| 81:25 82:3,7 | 180:10,15 | 294:17 298:10 | 180:19 |
| 82:10,15,18,21 | 181:3 189:14 | 298:25 299:6 | **concise** 67:2 |
| 83:3,9 84:20 | 191:15 193:19 | 299:10,21,22 | **conclude** |
| 85:9 86:16,17 | 193:21 198:12 | 300:2,5,6,10,13 | 313:24 |
| 86:17,22 87:1 | 204:18 214:10 | 301:8,10,12,14 | **concluded** |
| 88:2 89:4,7,9 | 214:16 215:19 | 302:2,4,4,8,11 | 323:11 |
| 89:15,24 90:25 | 216:19,20 | 302:15,24 | **conclusion** |
| 91:5,21 92:8 | 217:2,5 218:9 | 303:11 304:8 | 184:5 |
| 97:16 99:22 | 218:11,12,13 | 304:22 306:21 | **condition** 204:1 |
| 104:5 105:1,2 | 218:14,15,18 | 314:14,16,17 | **conduct** 13:6 |
| 107:1 108:7 | 218:25 221:11 | 314:18,20,23 | 142:16 |
| 110:25 112:1 | 222:16 226:13 | 315:15,17,17 | **conducted** 7:4 |
| 113:19 117:10 | 231:3,4,8,13 | 315:18,19 | **conducting** |
| 119:11,21,24 | 233:18 234:16 | 316:2,22 317:8 | 13:7 |
| 120:2 121:23 | 245:1 246:24 | **company's** | **confer** 8:19 |
| 122:1,5,21 | 249:12,13 | 40:24 41:8 | 149:4 259:9 |
| 123:19 125:11 | 252:9 255:17 | 48:1 59:12 | **confirm** 8:22 |
| 129:6 134:2 | 266:15 269:13 | 112:4,24 | 163:21 |
| 136:15 139:15 | 269:18,23,23 | 169:25 211:3 | |

**confirmed**
162:14
**confirming**
202:2
**conflicting**
236:15
**confused**
191:20
**confusing**
209:24
**connection** 7:6
11:3,17 19:8
91:1 110:18
280:23
**connectivity**
8:10
**connolly** 261:2
**conquest** 35:12
35:19,22
**conscious**
285:22,23
**consent** 274:12
276:23
**consider** 80:18
148:24 317:1
**consideration**
230:24 231:19
234:1,10,14
238:10 249:10
249:14,17,22
249:25 256:14
256:15,18,20
258:14 311:1
313:15 325:14

**considered**
110:25 148:19
230:19
**considering**
143:14 270:23
**consists** 304:24
**consolidated**
6:15
**consult** 45:7
271:3
**consultant**
216:24 266:15
267:7 275:11
282:24,25
283:6 298:20
298:22 305:6
305:23 306:2,2
**consulted**
29:25
**consulting**
37:13 45:11
54:21,23
149:17 155:5
155:19,20,21
155:23 156:1,8
156:16 157:14
157:19 158:1,2
158:13 160:11
160:12,16,20
161:10,11,16
162:24 163:2
164:7,9,14
166:21 267:10
267:14 275:25
304:10,15,17

304:23 306:15
306:23
**contact** 74:7,15
197:3 198:5
**contacted** 74:3
74:19 76:1
219:9,14,17
223:25
**contacting**
111:18
**contacts** 298:11
299:24
**contains** 327:3
**contemporan...**
165:11 167:23
**contemporan...**
165:21
**contest** 8:16
**context** 122:5
123:2 219:12
231:5
**continue** 7:9
8:10 67:10
223:12
**continued**
199:23
**continuing**
26:19 204:20
222:19
**continuously**
37:1
**contract** 11:16
12:4,12 18:9
18:12,14,19
19:2,15 24:10

43:13 169:25
170:4,10
221:13 222:17
222:21 270:8
270:15 271:4
300:8,14
306:20
**contracts** 310:5
**contributed**
270:9
**contribution**
315:1,3,8,8
**control** 40:23
41:3 47:21
90:25 91:5,21
92:3,13 152:19
153:10,14
160:7 164:20
181:23 204:18
204:23 205:25
209:7 211:24
216:1,6 217:17
232:24 239:4
243:18 244:6
244:14 246:25
254:6 259:19
260:9 272:4
**controlled** 66:5
90:17,21 92:9
131:13 139:15
139:19,23
140:2,7,11,19
152:8 211:20
248:1 316:23

**controller** 41:5
46:13,21 47:5
47:22 48:7
214:4,5,7,11,13
214:18
**controls** 45:19
46:2,8,13,18,19
47:4,19 48:5
71:9 82:2,6,10
82:12,20 83:1
83:2 84:19
85:9 86:16
178:1,5
**convenient**
49:13,14 136:4
285:24
**conversation**
56:17 59:15
60:2,5,6,12
63:15 78:19,23
79:1 80:4,6,22
99:18 165:17
176:13 200:1
200:22 269:7
269:11,17,20
269:21 270:5
293:8,8
**conversations**
80:2 88:16
90:8,11 102:23
199:10,23
303:18
**convert** 269:19
273:13 278:22

**converted**
279:3
**converting**
316:8
**convoluted**
218:15
**coo** 39:23 46:16
**coordinated**
182:18
**copied** 93:22
95:20 116:8,13
116:15
**copies** 193:4,6
**copy** 271:19
326:18 329:16
**corner** 171:9
265:15
**corporate**
22:21 261:5
280:17
**correct** 20:11
24:25 40:1,3
49:23 57:16,18
60:3,13 61:15
61:21 64:3,7
64:11,12,14,17
65:13,14,25
66:14 69:12
70:4,13,23
71:20,23 72:5
72:6,9,17,25
73:3,7,11,18
78:1,5,21 79:2
87:8 91:8 94:2
94:5,9 95:1,5,8

97:2 98:16,19
98:20,22 99:2
99:7 100:9
101:5,10,14
102:19 107:4
111:23 112:15
112:18 113:9
115:13,15
116:3,6,11,14
116:18,21,25
117:5,8,12,17
117:21 118:1
118:18,23
119:2 122:11
124:7 125:19
126:13,22
127:11 129:7
129:11,15,25
130:2,6,11
131:17 132:14
132:16,21
134:6,10,15,20
151:6 161:7
173:21,24
179:25 183:15
191:8 194:13
194:17 196:18
201:19 206:4,9
207:13 209:4
211:17,18
213:11 214:21
214:24 216:17
216:21 217:17
217:20,24
221:13,14

222:8,23,25
223:5,10 224:8
224:9 226:23
228:25 232:10
233:5 234:19
236:10 237:1
243:18 250:17
251:25 253:23
258:18 263:10
271:25 282:18
282:25 283:19
284:8 288:6,7
288:12 289:11
290:24 291:23
291:24 298:18
299:18 310:10
311:18 312:1
312:11 315:20
318:11 319:6,7
319:14,19,20
320:3,4 321:2
321:13 325:3
**corrected** 281:5
**correctly**
227:17 236:7
283:18 287:23
**counsel** 4:22
8:19 9:5 13:3,9
13:21 20:1
103:13 118:5
120:12 142:14
159:22 168:14
198:20 201:15
203:3,22
204:11 205:17

212:2 225:4,22
226:3 227:7
229:23 230:12
237:8 238:3,3
238:6 252:22
260:18,20
261:4,9 263:1
265:1,21
266:20 269:4
320:8,9 321:18
323:9 327:7
328:5
**counsel's**
145:16
**counts** 66:22
66:22,23,24
**county** 325:7
328:1
**couple** 12:11
13:17 58:14
59:9,17 139:10
197:19 259:14
263:3 317:24
317:25
**course** 45:22
47:11 193:7
270:10
**court** 1:1 7:13
13:12,23,25
62:1 67:11
146:12,22
160:2 218:20
264:5 265:17
267:10 326:1

**courteous**
317:11
**covered** 183:6
**covid** 1:20
**crashed** 69:4
**create** 301:9
**created** 27:19
**credit** 159:2,5
188:23,23
189:1,2,13,16
190:22 191:10
191:11,16,17
191:23 192:4,5
192:7,18,20
193:18 196:17
197:23 198:14
**creditor** 316:10
**creditors** 1:14
2:2 9:6 42:4
43:5,20 44:7
45:15 46:24
79:17 122:9
199:9 250:25
282:16 288:18
289:22 290:3
295:8,16,23
296:1,6,11
301:8,13 302:7
**creek** 3:20
**csr** 1:16 327:17
**current** 10:11
27:4 101:19
138:20 175:24
266:1 282:9,13

**currently** 9:18
10:9 15:13,14
15:18,19 25:14
181:22
**custodian**
210:17,20,23
211:3 230:15
**custodians**
218:12 219:4
**custody** 219:21
**customer** 15:18
222:17
**cut** 54:11,16
271:22 287:5,7
287:12,15
288:25 289:2
291:2 300:18
305:3
**cutting** 321:22

**d**

**d** 260:22 329:3
**daily** 41:17
**dallas** 1:2 3:21
4:8 7:14
261:16 326:2
**dan** 206:24,24
**data** 307:16,22
**date** 7:3 24:7
57:3 61:17
71:19 73:2
87:25 102:5
115:20 116:25
122:10 130:10
170:12 179:23
179:23 180:3,5

251:11,13
319:12 324:3
327:1,18
**dated** 64:14
72:4 81:13,24
83:7 93:21
94:1 98:6
106:13 107:9
113:15 129:1
130:2,6 132:11
171:6 205:3
230:22 232:8
241:10 265:13
**dates** 11:11
20:17 58:7
68:11 210:16
218:2 245:22
245:24 261:18
266:2 267:2
306:5
**daughter**
150:23 230:8
303:15
**dave** 280:22
281:15 314:1
317:16,16
**david** 4:6
168:15 273:18
273:19,21
279:18
**david.parham**
4:9
**davor** 4:16 8:7
109:13 136:3,7
182:11 268:8

280:21 285:13
287:10 322:7
322:13

**day** 14:4 71:22
72:7 74:8 83:4
83:4,8 94:8
132:20 134:2
178:6,7 214:17
214:17 251:4
262:13 268:19
281:18 319:13
325:8,18
327:12 328:13

**days** 63:8,17
73:5 81:14,24
94:7 98:25
156:12 251:17
251:20 327:1
328:4,5

**dc** 2:4 8:3 9:5

**deal** 67:12
125:21 127:25
175:2 216:12
229:21 247:15

**dealing** 295:10
311:13

**dealings** 211:1
318:24

**dear** 226:16

**debits** 241:11
253:16

**debt** 138:3,18
169:24 170:8
194:24 234:19
270:25 271:3

271:13,15
306:17 314:15
314:21

**debtor** 1:4
183:11 268:14
269:4,8 277:17
277:18 279:19
279:24,25
284:23,24
288:1 290:11
291:12,16
294:5 295:1,4
295:7,14 297:2
298:17 304:4,8
305:5,10,14,22
307:7,16 308:7
308:9,10,15,25
309:4,14,18,21
310:1,6,8,12,14
310:19,22
311:4,11
312:16 313:3,6
313:18 316:15
318:12 319:5
326:4

**debtor's** 6:13
281:9 296:15
297:12 307:21
309:7 313:10
313:13

**debus** 212:14

**december** 8:14
19:3,15 26:16
59:19,20,21
64:9,25 66:8,9

69:24 78:24
80:7 81:9
82:25 153:23
154:4 155:15
156:11 161:1
163:22 171:23
172:8 173:15
173:21 174:1,3
175:11 176:1
176:12 202:2
221:10 222:7
222:15,20
223:1,7,22
233:5 248:19
249:18,21
252:3,14
263:20 266:25
274:16,23
289:16,17
316:3 319:19
320:2,14

**decide** 118:5
262:15 270:21
285:10,11,21

**decided** 297:19
298:14 305:5

**decision** 8:16
37:21,22 38:16
47:11,15 192:3
220:15 231:14
285:22,23
310:21 311:4,4
311:7 313:10
313:13,18

**decisionmaki...**
41:7

**decisions** 30:1
45:7 46:14

**decline** 313:6

**default** 118:18
140:16

**defaulted** 88:19

**defendant** 11:7
11:8 12:8
264:4

**defending**
265:22 281:8

**defrauded**
110:24

**delegated**
176:11 191:25
192:1 212:12
212:13

**delete** 52:3,5,6
52:22 284:15
284:19

**deleted** 51:8,14
284:16 286:21

**deletes** 51:12

**deletion** 52:12

**delivered**
326:16

**demand** 129:20
197:25 313:7
313:15

**demonstrate**
300:4

**demonstrated**
300:1

**department**
198:4,7,8
**depend** 191:1
**depends** 7:5
**depo** 66:21
**deponent**
326:22,23
327:5
**depose** 173:8
**deposed** 10:24
11:3,6,17 62:4
**deposing** 85:23
**deposit** 247:6
**deposition** 1:7
1:12 6:10 7:4
7:11 70:18
84:5 86:1,5
193:5 203:13
203:25 204:4
209:24 213:14
235:24 236:8
265:22 324:3
325:2 326:7,14
326:16,24
327:6 329:4
**deposits** 239:11
239:12
**derive** 18:19
**describe** 21:21
189:11
**description**
5:14 325:10
**descriptions**
157:3,19

**detail** 296:13
308:3
**detailed** 175:19
**details** 175:21
**determine**
180:9
**devices** 287:16
**difference** 65:5
109:11 166:6,7
**different** 13:9
43:15 84:25
126:6 132:24
133:15 134:2
167:11 176:25
241:19 253:17
261:13,15
267:20 299:24
299:25 301:2
**difficult** 218:12
**difficulties**
143:25 152:14
163:4
**digits** 239:3
**dinner** 55:1
102:13 104:20
104:25 114:24
**direct** 41:13
202:12 254:15
311:22
**directed** 44:15
164:15 196:16
202:20 225:14
226:7,17
**directing**
164:16 165:6,9

166:10 185:1
196:12
**direction** 41:23
42:24,25 43:3
44:6 45:5
46:17 196:10
197:8 202:18
212:1 302:5
**directions**
44:12 220:7,11
**directive** 108:9
**directly** 89:13
112:11 223:25
293:23 315:11
315:13
**director** 8:18
10:19 33:17,18
34:25 35:18
90:5 152:8
155:7 177:25
202:1,8 209:6
211:6 226:13
253:3 254:6
274:13,17,25
277:13 278:6
278:19 280:3
284:24 292:20
292:22,24
295:19 302:13
305:15,24
306:10 310:14
311:10 313:17
320:7 321:16
321:24

**directors** 69:11
73:7 90:18,22
99:2 176:14,21
177:1,5 210:5
263:20 266:6
266:24 278:6
283:12
**directorship**
277:17
**directv** 18:14
221:12 222:18
**disaster** 1:20
**disbelieve**
165:20
**disbursement**
239:4
**disbursing**
246:25
**discomfort**
60:22
**discovery**
93:21 98:5
106:13 113:14
125:12 128:25
131:23 162:1
**discrepancies**
210:11
**discretion**
197:5
**discuss** 41:18
105:25 143:1
185:4 269:3
272:11 273:20
275:17 291:9
292:25 303:24

307:20 313:5
**discussed** 39:10
39:14 59:7
64:21,23 80:7
103:6 107:8
235:3 268:23
269:1 272:14
288:8,23
294:18 297:10
302:15 308:14
**discussing**
72:25 96:10,25
104:24 105:1
125:18 129:14
256:5 272:16
297:14
**discussion**
40:18 59:2
60:15,22 63:25
65:7 94:17
96:4 111:8
167:1 168:5
231:7,16 270:1
270:16,17
277:10,24
278:7 287:17
289:20 296:14
297:5 298:4
301:23 306:19
311:7 316:7,12
**discussions**
38:9,10 39:3
39:24 42:1,2
43:7,10 64:6,7
87:9,13 111:9

135:15,21
278:4,5 290:6
290:14 293:15
294:14 297:24
302:8
**displeasure**
58:25 60:13
**dispute** 234:13
234:19 235:15
235:19,24
242:24 245:10
245:14 258:3
**disputes** 12:12
**disputing** 245:3
245:8,18
**disruption**
215:12,16,21
215:24 216:6,8
216:12
**distribution**
250:25 302:20
302:24 303:4
**district** 1:1
7:14 326:1
**dividend**
302:24
**division** 1:2
7:14 22:1
293:11 326:2
**dla** 3:3,9
**dlapiper.com**
3:5,6,6
**document**
42:13 62:25
63:2,5,7 68:23

71:12 73:15,18
73:20,23 74:1
74:5 76:2,8,10
76:14,21 85:20
93:16 96:19
99:25 100:4
101:6 115:12
126:1 128:6,25
131:23 132:5
133:22 162:1
171:4 173:7
206:5 207:7,15
211:13 212:17
214:19 221:15
224:4,18
226:15 229:24
232:3,13,20
233:18 234:21
234:24 237:14
237:21,23
241:5,6 246:3
248:6 252:22
252:24 257:4
261:22 274:24
288:5 325:11
**documentation**
156:7,18
158:12 192:24
193:4,14
**documented**
198:17
**documenting**
156:23
**documents**
42:17 75:13,17

127:25 172:24
184:1,6 198:21
203:13 213:7
219:9,14,19
228:3 238:1
239:8 241:20
247:8,15,19,20
247:25 248:4
248:10,12
**doing** 37:13
43:22,23 44:3
66:16 67:8,16
131:6 160:16
161:11 166:10
181:13 193:20
196:9 204:4
263:1 267:24
272:19 278:1
286:1 290:2
294:5 301:24
**dollar** 101:9
119:12 241:12
242:2,25 244:9
271:17
**dollars** 170:7
271:10
**domain** 259:16
259:17,19,22
**dominguez**
4:23
**don** 4:21 7:2
**donna** 1:16
276:9,16
300:23 326:9
327:17

**[double - ended]**                                                  Page 24

| | | | |
|---|---|---|---|
| double 189:25 | 71:13 93:20 | 233:9,19 235:4 | electronics |
| doubt 172:11 | 94:1,11,20 | 263:4 283:15 | 3:13 4:23 |
| 173:2,13 | 95:1,16 97:1 | 303:10,15 | 203:4 |
| 175:25 180:5,6 | 106:13,14,18 | 306:6 308:14 | elizabeth 3:8 |
| draft 226:21 | 107:8,20,23 | 318:2 319:10 | elmer 9:17 |
| 252:22 323:10 | 108:1,2 113:14 | early 22:3 | 202:18 |
| drafted 227:4,5 | 115:14 116:8,9 | 41:25 72:11,12 | else's 177:24 |
| 227:10,18,18 | 116:14,20,23 | 224:9 302:9,12 | emergency |
| 228:4 229:24 | 118:20,25 | east 3:9 162:19 | 1:19 109:14 |
| 232:20 240:5 | 120:1,20 | 166:12,13,16 | 306:13 |
| drained 178:21 | 124:16 125:11 | 166:17 184:21 | employed 10:9 |
| 179:16 180:9 | 125:12,17 | 184:23 185:2,8 | 10:22 327:8 |
| 180:15 181:2 | 126:7,12,20 | 185:14 | employee 36:2 |
| dropped | 129:5 130:5,8 | easy 106:5 | 36:4,7,12,16,19 |
| 264:19 | 158:22 162:2 | ebitda 293:3,3 | 158:8 |
| drukavina 4:19 | 163:18 185:24 | effect 318:14 | employees |
| due 122:10 | 193:25 194:3 | effort 78:14 | 40:21 140:21 |
| 164:14 179:24 | 205:3,15,24 | 115:23 125:18 | 155:12 256:19 |
| 198:23 | 216:20 217:3,7 | efforts 112:4,25 | employer 10:11 |
| duly 1:14 7:23 | 217:10 259:15 | eight 85:2 | employment |
| 326:13 | 261:1 274:8 | 271:9 | 11:16,20 12:4 |
| duties 177:12 | 281:15 285:2 | eighth 86:12 | 12:8 18:4,5 |
| 177:13 320:10 | 285:11,21 | either 10:18 | enable 299:21 |
| 321:18,23 | 299:1,11 | 85:24 86:3 | encrypted |
| duty 177:17,20 | 308:18 309:23 | 154:10 185:5 | 50:13 284:7,11 |
| 177:21,25 | 316:19 317:5 | 193:12 197:23 | 284:12,13 |
| **e** | earlier 64:5 | 202:7 245:25 | endeavor |
| e 2:1,1 5:24 6:2 | 72:3,24 101:12 | 247:21 248:22 | 186:12 188:14 |
| 6:11 9:15 | 103:6 110:13 | 262:10 279:17 | 189:24 198:9 |
| 37:19 40:21 | 119:2 166:24 | 284:15 285:21 | 198:10,11,13 |
| 43:15 48:19,20 | 167:19 191:3 | elaborate | 201:22 204:22 |
| 48:21,24,25 | 199:25 209:16 | 284:17 | 204:23 208:22 |
| 49:2,6,22 | 209:19,23 | electronic | 256:2,3,7 |
| 50:24 51:1 | 216:16 230:13 | 71:14 196:24 | ended 96:13 |
| 53:12 71:4,5,6 | 230:17,24 | | 207:9 222:20 |

315:3
ends 239:3
energy 104:3,6
  237:24 241:13
  241:23 242:18
  243:6 245:11
  245:15 250:8
  250:11
energy's 238:3
engaged 291:2
engagement
  58:11
enlarge 62:15
ensure 82:20
  85:9 86:15,17
  178:1 286:21
  303:25
ensured 84:19
enter 98:10
entered 162:11
  163:19 239:17
enterprise 34:4
enterprises
  34:1 104:3,6
  225:25 228:2
  229:13 232:16
  241:13 242:18
  250:8 260:6,9
entire 163:3
entities 27:12
  28:24 29:22
  32:21 33:1,18
  33:25 34:3,9
  34:11 97:14
  148:21 150:17

152:25 186:7,9
  208:15,18
  220:4 228:5
  238:15 261:10
  318:10
entitled 85:13
  131:24 171:5
  175:6,7
entity 10:13
  11:21,22,23
  15:16,19 27:19
  28:17 34:17
  65:15 82:12
  89:21 92:21,22
  100:15,19
  135:12 141:14
  188:15 204:23
  208:11 209:6
  216:1 218:7
  227:22,23
  228:2 230:18
  232:24 235:5
  239:17 242:14
  242:20,25
  244:5,14
  246:11 252:11
  253:25 254:1
  255:13,19,22
  258:14 260:3
  290:11,13,17
  293:21 294:23
  294:24 296:2
  297:20 298:25
  303:6 310:4
  318:16,22,25

319:4
equipment
  200:15
equity 270:25
  271:2,7 298:23
  299:8 302:20
  302:21,22
  315:1,3,8
eric 4:11 183:2
  188:9 190:1
errata 329:10
  329:12
eschaffer 4:14
especially
  281:22
esq 329:1
essentially
  70:20 126:15
established
  294:13 320:12
estimate
  257:15,21
evelina 129:2
  130:19 132:16
  132:24 133:4
  133:16 134:1
eventually
  103:21 105:5
  271:19
everybody
  118:24 181:21
  204:5 295:9
everybody's
  296:4,12

ex 6:13
exact 20:17
  87:25 92:19
  95:9 102:5
  130:10 268:19
  274:22 309:19
exactly 61:14
  268:17
examination
  5:7,8,8,9,9,10
  7:24 13:6,8
  182:24 203:1
  262:23 268:4
  317:22
example 44:14
  204:1 268:1
examples
  267:22
except 121:10
  165:14 240:15
  325:3
excess 194:16
  195:23
exchange 93:20
  106:15 125:12
  162:2 193:16
  234:18
exchanged
  130:5,8 233:20
  234:1
exchanges
  163:10
excuse 215:2
  216:4,18 234:6
  237:14 245:14

**executed** 78:20
98:22 228:7
229:21 325:13
**executive** 21:23
207:12 226:1
266:8,11 285:1
300:15 301:5
304:4
**exercise** 46:19
198:25 199:5
216:1,6
**exercised** 48:6
199:12 200:14
220:8
**exhibit** 5:15,17
5:18,19,21,22
5:24 6:1,2,4,5,6
6:8,9,11,12,14
6:16,18,19,20
6:21 62:2,5,13
64:2 68:15,16
68:22 72:20,23
72:24 93:17,19
96:20 97:25
106:7,9 113:5
113:8,13 125:5
125:7 128:22
128:24 129:15
130:4 131:5,20
136:11 149:20
149:21 150:4,9
150:10 153:3
153:19 160:23
160:24 161:19
161:20,21

170:25 171:3
191:2,5 203:9
203:10,17,18
205:3,7,8,12,13
209:17,18,18
209:19,21,21
209:22,23,24
221:19,21,21
221:24 222:1
224:13,14,17
237:14,16,17
238:24,25
241:25 242:19
251:9 257:5
264:15,16
265:7,9 267:1
267:4 306:8
**exhibits** 5:13
62:11 149:25
**existed** 32:15
46:9 309:3
**existence** 48:4
**existing** 18:9
**exited** 179:2
**expect** 13:4
300:15 301:6
**expectation**
205:20 215:8
301:9
**expenditure**
46:2,10 47:6
47:21 48:8
**expenditures**
44:14,24 45:6
46:6 53:18

**expenses**
154:21
**experience**
24:18 208:1
**expiration**
327:18
**expired** 163:20
**expires** 325:23
**explain** 37:10
65:5 146:16
225:23 283:20
**explanation**
179:8,15 316:2
**express** 23:22
56:11
**expressed**
57:20 58:24
60:12 65:1
325:15
**extend** 115:20
116:25
**extent** 31:20
184:4 248:8
288:22 289:4
**external** 69:19
**extra** 118:9

**f**

**face** 50:2,2 99:7
223:2,8 231:10
233:4 234:7
248:21 249:2
**facilities**
189:11 190:11
192:21,25
193:12 194:21

194:22 195:18
197:10,11,21
198:1 199:21
200:19 201:8
**facility** 195:10
**fact** 98:10
143:16 202:20
**facts** 142:25
143:2 144:13
144:24 145:20
146:2 147:22
148:3,14
149:10
**failed** 183:11
**fails** 329:15
**fair** 14:7 23:8,9
56:8 110:4
112:12 181:19
213:24 225:17
232:14 244:17
248:18 249:1
259:21 261:19
303:8 308:5
310:3 318:9
321:9,15
**fairly** 262:14
**faith** 172:17,22
321:18
**familiar** 15:8
27:15 28:5,9
30:11 32:7
35:11 76:22
89:7,22 91:7
91:10 100:15
100:19 122:21

239:2,12,16
255:13 259:17
274:3
**family** 55:6,7,8
55:9,11 102:21
131:7,13,16
159:5 272:3
292:7,11
293:22 303:3
**far** 87:24
**fashion** 192:22
**father** 164:9
**favor** 132:2
**fbi** 74:3,4,7,15
74:17,19,21,22
75:11 110:14
111:18
**feature** 52:6
**february** 1:9,15
7:3 26:18,21
26:24 27:2
29:24 30:5,22
31:6,11 32:3
66:10,11 70:3
70:13,20 71:20
72:1,5,16
81:14,24 83:8
85:21 98:6,22
105:24 107:9
169:7,18
170:13 202:3
241:4,7,8,11,14
251:10,14
252:19 253:1,5
257:1,11

263:23 266:8
319:23 320:15
324:3 326:7
327:13 329:2
**federal** 1:19
67:1
**fedex** 3:13 4:22
203:4,11
205:16 209:16
237:24 238:23
239:10,13,18
239:21 240:1,5
257:24 288:3
306:19 320:23
322:22
**fedex's** 54:15
203:9 210:4
287:6,22 316:6
**fee** 138:4 156:3
304:11,15,17
**feel** 252:18
281:11,23,24
308:4
**felt** 278:3
**fete** 206:24,24
207:1
**fi** 287:15
**field** 137:22,23
139:6,8 140:3
148:16 152:1,4
153:14 204:15
208:24 217:16
233:21 234:2
308:15,15,23
309:13 318:13

319:5
**fifth** 241:5
**fight** 269:5
272:24
**figure** 75:24
78:15 199:15
236:22
**file** 111:6
269:23 270:2
297:2 302:12
302:16
**filed** 7:13 52:8
52:14 76:7
219:4 268:13
272:10 306:25
307:7
**filing** 120:1
268:24 270:18
302:9 308:13
**filings** 63:4,10
63:11
**fill** 275:17
**final** 194:8,15
**finalize** 262:15
**financial** 29:5
53:17 168:17
168:21 169:3,8
169:13,19
170:2,15 171:5
171:17,20
177:2,18
221:19 222:2,7
222:10 230:1,2
231:9 307:4,15
307:22 313:6

**financially**
292:12 327:10
**financials** 6:15
229:5 293:1,16
**find** 22:17
37:15 40:19
149:23 181:10
181:13,15,18
181:21 182:16
216:19,25
218:25 219:14
219:18 224:4
267:19,19
275:14,14
278:2 305:11
306:18 311:23
**finding** 43:13
299:3 300:1,2
**fine** 109:21
143:11 147:6
174:19 177:7
221:3 319:17
**finish** 14:11,12
262:13
**finished** 259:15
**fired** 277:8
**firm** 4:12 225:3
260:21,23
261:17 262:4,7
282:9,13
**firms** 261:13,15
261:20
**first** 4:12 6:22
7:23 24:16
35:24 36:15

[first - form]                                                                    Page 28

58:24 63:7,14
64:1,20 69:22
73:20 79:5,9
104:18 106:18
111:19 116:17
132:7 134:8
187:6 190:9
191:7,21
222:14 230:18
238:23 265:12
274:14 298:6
312:5
**five** 11:12,14
12:13 19:8,11
19:18 27:20,21
33:4 104:19
110:6 114:15
120:23 146:6
221:2,3 262:17
282:2 313:22
313:23 314:4
**flat** 156:3
**floating** 261:11
**floored** 76:6
**florida** 4:3
102:7
**flow** 6:18 238:7
238:9 242:3,7
243:5,15 245:6
245:19 248:13
**focus** 41:16
43:6 215:14
**focusing**
190:16

**folder** 149:24
161:20
**folks** 94:4,20
113:16 125:13
**follow** 47:10,13
192:12 196:1
201:16 261:3
317:25
**following** 116:5
266:3 326:11
**follows** 7:23
**fool** 215:18
**foregoing**
325:1,12
**forged** 74:5
75:14,14,18,20
76:2,5,21 78:4
110:15 111:1
111:22 225:11
**forgive** 188:14
191:20 196:15
197:18 199:15
286:5
**forgiven** 309:3
**forgot** 160:1
**form** 18:20
19:21 23:10
24:11 25:12
29:3 30:2,8,13
30:17,25 31:7
31:12 32:5
34:8,12 37:8
37:12,23 38:2
38:15 39:6
40:2,12,16

41:1,4,9,15,21
41:24 42:7,19
43:2,9,24 44:4
44:17,22 45:1
45:8,21 46:4
46:11,22 47:7
47:16,23 48:10
48:11 50:12,13
50:15,19 51:10
52:9,15 53:19
61:8,10,16,20
63:18 64:8,18
64:22 65:3,21
66:1,6,15,20,23
67:4,14,17,19
72:10 74:2
75:7 76:11
77:19,24 78:2
78:11,18 80:15
80:20 81:7,18
82:4,9,23
86:19 87:17
88:21 89:6
90:23 91:9,23
92:6,14 97:4,7
98:23 99:8
100:22 101:18
103:11 104:1
105:7,19 107:5
110:20,22
111:3,7,13,17
111:24 113:2
117:13,18,22
120:4,10
121:19 122:3

122:19 123:20
124:4 127:18
131:10,14
136:12,22
137:6,16,20
138:25 139:17
139:21,25
140:6,9,13,22
141:1,8 142:3
142:7 143:7
145:2,23 146:8
146:14 147:24
148:6,17,22
149:7,13
152:10,21
153:11,16
156:9,20 157:4
157:22 158:18
159:18 164:13
164:18 165:2
165:13,24
166:22 169:10
169:15,21
170:20 172:13
172:19 173:5
173:16,25
174:5,19
175:16 176:2,6
176:9,17 177:4
177:9,15,19
178:3,23 179:4
179:13,18
180:12,18,23
181:5,9,20
184:12 188:9

202:4 211:22
214:3,15
215:11 216:2,9
216:13,23
217:19 218:1
219:10 220:9
220:13 223:19
223:24 227:2
228:24 229:9
229:14,18
230:25 231:12
231:25 232:11
232:17 233:6
233:23 234:5
234:11,15,20
234:25 235:7
235:17,25
236:11 237:2
239:14,19,24
240:4,18,23
242:10 243:2,8
243:20 244:21
244:24 245:7
245:12,17
246:2,8 247:11
248:24 249:11
249:19,24
251:2,8,19
252:15,20
255:5,9 256:8
256:17 258:16
320:17 321:14
321:20 328:8
**formal**   18:1
25:7

**formally**   25:19
**former**   8:18
124:22,24
136:17
**formulate**
143:3
**formulated**
143:9
**fort**   2:19
**forward**   42:14
**found**   16:9
59:10 76:4
298:22,24
**foundation**
66:24
**founding**   16:8
**four**   27:23
56:21,22 58:4
73:21 302:19
303:3
**fourth**   17:25
18:8 261:8
263:16
**fraud**   12:23
61:9 110:17
144:12 180:22
**frcp**   326:21
**free**   308:4
**freelance**
159:12
**freezing**   276:13
**friendly**   55:5
**frinzi**   6:7 22:9
26:3 27:3
31:10 35:15,24

35:25 37:6,11
38:11 39:4,10
40:5 41:18,23
42:5,16,17,23
43:22 44:15,20
45:4 46:21
47:5,14,21
48:7,13 49:3,7
49:11,16,23
50:18,21,25
51:3,9,17,22,25
52:4,25 53:3
53:21 54:1,6
54:11,17,18,24
55:1,5,17,20
56:12,18,20
57:8,14,20
58:25 59:16
60:2 64:6,20
70:6,7,23 75:2
76:1 77:12
78:19 79:2,9
79:22 80:3,8
80:23 81:4
87:9,21 88:7
88:11,14,17
90:9 93:10,13
93:22 94:1,11
94:17 96:2,7
96:11,21
101:13 104:8
110:17 113:15
114:19,21
115:7,14 116:9
116:21 120:8

132:14 135:22
136:19 161:14
162:2,10,17,22
163:8,25 164:4
164:11,15,16
165:4,18,21
166:8 176:13
206:16 211:16
211:21 214:20
216:10,11,18
216:19 218:4
219:5,6,20
240:13,25
252:5,7,13
253:6,21 254:5
254:21 256:5
268:23 269:7
269:12,17,22
273:21 277:4,5
277:7,21
283:16,24
285:11,21
286:1,20,24
288:9,23 289:5
290:6,15 291:9
291:17 292:3
292:15,25
293:16 294:6
294:14 295:3
296:16 297:2
297:14,25
298:16 300:6
300:11,16
301:4,22
303:19,21,24

304:3,17
311:17 312:8
312:10 313:1,5
316:8 318:6,18
318:22
**frinzi's** 40:10
55:14 77:4
94:20 104:11
161:17 163:10
165:10 299:16
**front** 166:2
275:2
**froze** 143:18
152:11 276:7
276:10
**fscle** 6:13
**fulfill** 321:17
321:17
**full** 9:13 181:23
250:25
**fully** 203:25
321:25
**funded** 291:16
**funding** 191:18
**funds** 6:18
186:25 187:11
187:14,15,19
196:16 197:9
197:14 200:18
202:17 235:11
235:15 236:9
236:24 237:3
238:7,9 242:3
242:7 243:5,11
245:6,20 247:5

248:13 251:5
258:9 293:23
316:8
**funk** 4:16 8:9
8:11 323:6
**further** 15:2
95:3,11 108:2
154:25 182:1
202:24 268:2
322:3 326:21
327:7,10
**future** 142:6
143:14 286:2

**g**

**g** 5:18,20,23,24
**gabel** 4:22
**general** 28:15
29:21 42:25
44:12 45:5
**generally** 23:2
43:22 44:2
45:5 157:10
288:11
**genesis** 11:24
12:6,9,17,20
32:7,10,17,18
32:21,22 33:1
33:2,4,12,18,24
34:1,4,5,9
48:25 98:7,18
108:3,7 126:12
141:12,14,15
141:16,22,25
153:3,3,18,23
153:25 154:5

154:14,19,22
186:10 188:7
188:10,14,15
188:16,18
189:4,12,21,24
191:6,23 192:2
192:4,7,16,20
192:24 193:18
194:21 195:4
196:21,25
197:10,15
198:8,11,14,14
199:21 200:19
201:7,11,18,22
208:20,21
225:24 227:21
227:21,23
228:1 229:12
232:15 238:19
239:17,22
240:2 244:1,1
244:3,3,18
248:9 255:19
255:23,24
256:15 258:13
259:16,23,24
260:2,6,8
310:4,22
**gentleman**
21:18,22 22:6
24:4 274:3
**gentleman's**
185:12
**getting** 63:20
112:24 159:20

181:12 197:20
242:1
**give** 13:11,20
13:24 97:24
125:16 144:14
145:21 146:2
148:4,14
149:11 159:22
204:1 221:1
252:6,10,18
254:12 257:15
257:20 261:7
267:22 270:25
297:18 302:5
305:18
**given** 13:3 85:4
144:23 209:16
210:3 220:11
226:2 234:10
234:14 254:11
280:5 319:25
325:17 326:15
328:10
**giving** 116:2
279:21
**global** 33:5
89:3,8,14,18
153:3,25 154:5
244:1,1,3
248:10 318:4
318:17 319:6
**gne** 34:4 260:6
**gnet** 65:17,19
76:17 89:20,22
90:2,6 119:12

120:7,15
121:11,21,25
122:17 148:5,9
154:5 155:15
155:22,25
156:7,12,23
157:2 160:21
160:25 161:2
161:12 210:3,6
211:15
**gnf** 139:24
151:23 153:10
**gni** 139:3
238:12,16,17
**go** 7:10 14:23
21:9 23:12
24:6 25:5 26:5
27:14 28:20,21
40:9,19 42:12
42:20 51:6
53:20,23 58:6
72:19 79:15,24
85:1 86:13
93:2 95:3
98:14,18 108:2
109:16 117:24
122:4 126:6,25
130:4 134:5
142:21 143:21
146:22 148:11
149:24 153:19
157:25 158:14
158:21 160:18
160:23 164:6
171:17 175:23

177:22 180:4
182:15,17
183:5 184:13
198:3,15
204:13 207:22
208:3,25 209:2
210:15 212:20
213:5 214:9,17
215:5 216:25
217:22,23
218:25 220:14
220:18 223:4
228:5,8,11
229:5 230:3,16
231:4 235:3
236:22 240:19
241:3,3,19,25
242:19 243:9
251:9,10
253:13 257:22
259:12 260:16
261:13 264:13
265:6,15,25
267:1 269:18
272:8 274:21
278:13,14
281:16 284:23
289:25 290:18
292:17 294:9
295:16,25,25
296:10,11,23
297:5,10
298:11,15
304:14 305:20
310:16 311:5

311:22 313:10
315:7,21 317:3
**god** 274:18
292:17
**goes** 280:9
286:8
**going** 15:1 19:9
29:22 31:19
38:20 43:13
60:16 67:6
70:14 75:25
84:1,10 85:16
86:11 101:23
110:23 125:22
126:3 127:10
127:11 145:11
145:16 146:6
146:25 147:18
148:1 168:10
173:9 174:11
182:3,5 184:16
191:2 192:10
193:4 197:18
197:19 199:24
203:5 215:15
219:8 222:13
222:14,15
223:11 228:5
231:8 236:12
241:4,19
248:20 264:15
264:16,20,22
271:11 275:13
278:4,8 283:8
287:14 291:15

296:13 297:16
297:20 317:24
322:2
**good** 8:1
109:10 115:17
183:1 224:3
262:25 263:2
268:6 275:22
285:17 314:5,5
321:18
**goodman** 1:4,8
1:12 2:16 4:1
5:6,16,17 6:3,4
6:6,7,9,11,14
6:14,16 7:12
7:12,20,22 8:1
8:13,18 9:3,7
9:13,15 10:15
10:16,21 11:21
12:14 15:8,9
15:11 16:3,6,9
16:11,14,18,21
16:25 17:4,14
18:15 21:6,14
22:8,14,18
24:13 25:11,15
25:19 26:6,9
26:14 27:5,16
27:25,25 28:1
28:1,1,2,5,8,9
29:1,6,11,13,14
29:18,19 30:5
30:12,16 31:4
31:4,20,22
32:2 34:6,10

**[goodman - goodman]**    Page 32

| | | | |
|---|---|---|---|
| 36:2,4,8,16,19 | 92:21,23 93:16 | 144:4,6 145:5 | 183:22 184:11 |
| 37:6,11 38:1,4 | 93:18,19 96:20 | 145:22 146:3 | 184:19 186:3 |
| 38:13,21,24 | 97:13 98:2,6 | 147:23 149:6 | 186:21,22 |
| 39:5,9,10 | 99:2,6,19 | 149:11,16,22 | 188:4,13 |
| 40:11,22,23 | 103:20,23 | 150:8,9,12,14 | 191:21 192:2,3 |
| 41:11,14,19,22 | 104:2 105:4,12 | 150:17,25 | 192:8 193:16 |
| 42:6,18,23 | 105:14,21 | 151:12,15 | 194:5,21 196:6 |
| 43:23 44:1,2 | 106:8,9,21 | 152:4,9,18,20 | 196:16,21 |
| 44:24 45:16,19 | 110:13,24 | 153:1,7,19,24 | 197:4,9,14 |
| 46:1,3,7,9,20 | 111:20,25 | 154:13,18 | 199:8 200:19 |
| 47:2,3,20 | 113:6,8,13,20 | 157:7,15,20,25 | 201:4,23 202:1 |
| 48:21 53:6,8 | 113:21 115:14 | 158:14,16,24 | 202:7,18,21 |
| 54:23 55:7,11 | 119:18 122:18 | 159:1,4,7,13,14 | 203:3,11,18 |
| 55:17 57:15 | 123:6 124:18 | 159:21 160:9 | 204:9,12 205:6 |
| 61:15 62:2,4 | 124:25 125:2,7 | 160:10,17,23 | 205:10,21 |
| 62:12,13,21 | 125:8,24 | 160:25 161:1,2 | 206:8,9,12,13 |
| 63:16 64:2,11 | 127:16 128:8 | 161:6,15,24 | 206:21 207:11 |
| 64:17 65:8,20 | 128:11,15,23 | 162:12 163:8 | 208:5,13 209:1 |
| 65:24 66:7,13 | 129:2,14,24 | 163:16,20 | 210:3,5 211:8 |
| 68:8,10,15,19 | 130:4,10,22,25 | 164:23 165:11 | 211:15,16,20 |
| 68:22 69:2,7 | 131:7,7,12,13 | 165:22 166:20 | 211:21,23 |
| 69:10,15 70:4 | 131:16,17,20 | 166:25 167:3,4 | 212:2,5,21 |
| 70:8,12,22 | 132:2,19 133:5 | 167:6,7,15,15 | 213:2,10,20 |
| 72:8,19,24 | 133:24 134:6 | 167:16,20,24 | 214:5,7 215:3 |
| 73:6 75:4,8 | 134:13,20,22 | 168:2,6,6,14,17 | 215:3,4,4,7,10 |
| 77:12,17,21 | 135:2,11 136:9 | 168:21 169:3,6 | 215:24 216:4,5 |
| 78:1,9,14 | 136:11,18,25 | 169:9,13,17 | 216:6,18 217:6 |
| 80:17,18,25 | 137:3,14,15,18 | 170:19,24,25 | 217:9 218:7,20 |
| 81:4,5,17 | 137:24 138:8 | 171:5,13,21 | 219:14,22 |
| 82:19 83:11,13 | 138:10,12,14 | 173:9,20 | 220:1,3,12,16 |
| 84:18 85:8 | 138:21,24 | 175:11 176:14 | 221:10,18,18 |
| 86:15 87:14 | 139:16,20 | 176:22 177:14 | 222:6 223:3,8 |
| 89:4,9,10,25 | 140:8,12,20,25 | 178:9,10 180:8 | 224:13 225:21 |
| 90:16,20 91:8 | 141:7,11,12,17 | 181:15 182:2,7 | 225:25 226:4,6 |
| 91:11 92:15,16 | 141:23 142:2,5 | 183:1,17,19,19 | 226:7,12,14,16 |

226:22 227:6
227:13,14,15
227:18,19
228:12 229:16
229:19 230:6,6
230:10 231:16
231:21 232:2,3
232:15 233:4
233:22 234:2
235:16 236:21
237:18 238:15
238:18,20
239:2,4,23
240:3,15 242:8
243:1,16,17
244:17,19
245:5,10,15
246:14,18,21
246:23 247:2,3
248:1,8,9,18,21
248:22 249:15
250:3,21 251:5
251:18,25
252:25 253:4
253:10 259:15
260:15 261:5
261:10,12
262:3,10,11,13
262:25 263:5,8
263:9,11,12,20
264:2,4 265:10
266:2,6 267:17
268:6,13 269:1
269:4,8,24
270:2,24 271:4

272:7,15,19
273:16,20
275:10 277:2
277:20,22
278:12,16
279:17 280:13
282:8 283:5,13
285:19 287:20
289:14 290:23
297:12 298:22
300:3 302:20
303:17 305:5
306:16 307:21
308:13 310:20
312:22 314:13
315:14,17,20
316:15,16,22
316:23 318:12
320:2,7,13
321:1,16 324:2
325:1,4,9
326:4,7,12
329:3,3,4
**goodman's**
20:1 68:14
69:17 94:13
96:22 166:18
187:18 189:5
191:14 219:18
225:22 226:3
227:6 228:9
229:1,3 230:2
252:21 272:4
282:23 323:9

**goodman000...**
5:20
**goodman000...**
5:23
**goodman000...**
5:24
**goodman000...**
6:16
**goodman000...**
6:1
**goodman001...**
5:18
**goodman140**
128:21
**goodman368**
93:16
**goodman372**
106:5
**goodman374**
113:4
**goodman375**
123:11
**goodman590**
123:14
**goodman593**
126:4
**goodman638**
131:3
**goodmans** 62:3
**goodman's**
6:22
**gormly** 4:22
**gotten** 174:14
319:12

**governance**
211:23 212:4
219:14 220:1,7
220:16
**government**
12:25 74:24
**gp** 27:16 28:3,9
29:18,21
**grant** 192:16
**granted** 183:23
184:6
**great** 9:2 15:7
19:12 68:7
72:22 146:11
**greater** 216:1
**griffith** 3:2
**ground** 13:5
183:5
**group** 27:16
28:3,5,6,8,9
29:1,6,11,13,18
96:9 219:24
220:3,5,7,11,16
220:19 252:11
274:20 275:1
282:2 293:12
299:9
**groups** 299:25
**guarantee**
139:15,20,24
140:3,8,12,14
140:20
**guarantor**
193:11 201:18

**[guess - hold]** Page 34

| | | | |
|---|---|---|---|
| **guess** 21:25 | 181:18,22 | **hear** 20:7 | 298:9 299:5,5 |
| 23:17 38:6 | 198:18 233:12 | 137:21 187:3 | 299:10 300:4 |
| 259:22 282:22 | 272:18 291:3 | 202:16 216:14 | 301:13 306:17 |
| 322:17 | 296:20,20 | 268:6 274:7 | 307:15 308:9 |
| **guessing** 27:9 | 297:1 314:6 | 276:15 284:7 | 314:14,20 |
| **guffy** 2:12 62:6 | **happening** 82:3 | 285:15 287:14 | **helpful** 13:22 |
| 62:10,19 68:17 | **happens** | 300:22,23 | 68:12 |
| 69:5 97:24 | 119:24 282:2 | **heard** 7:7 28:12 | **helping** 267:19 |
| 113:10 123:12 | **happy** 109:18 | 100:7 104:5 | **helps** 125:25 |
| 123:15 131:4 | 182:6 221:1 | 122:24 123:1,2 | **hereto** 1:22 |
| 322:24,24 | **harass** 85:16 | 128:19 135:13 | **hey** 14:21 |
| **guidance** 46:15 | **harassing** | 168:13 186:25 | 136:3 285:13 |
| 46:17 | 83:24 84:4 | 195:3 238:14 | 287:10 |
| **guy's** 281:25 | 133:9 146:10 | 238:17 301:16 | **high** 204:3 |
| **guys** 136:3 | 147:15 174:22 | 301:18 312:9 | 272:20 273:10 |
| 278:5 | 174:23 175:2 | 314:6 | 297:18 308:2 |
| **h** | **harassment** | **hearing** 20:5 | **highlight** |
| | 146:11 | 109:14 209:23 | 150:22 |
| **half** 95:7 | **hard** 119:20 | 281:10 306:13 | **hillyer** 3:13 |
| 109:15,17 | 122:1 215:19 | **heightened** | **hire** 113:21,25 |
| 187:6 190:9 | **hardt** 4:17 | 216:6 | **hired** 113:20 |
| 294:9 313:14 | 323:6 | **held** 17:3 29:9 | 171:14 216:10 |
| **hand** 7:21 | **harr** 4:17 | 29:10 135:2,5 | 216:17,18,24 |
| 325:17 | **harris** 4:21 7:2 | 167:7,16 234:1 | 218:4 275:10 |
| **handing** 68:21 | **hart** 39:19,22 | 248:21 249:18 | 280:12 282:23 |
| 93:18 131:19 | **hartley** 4:1 | 249:21 266:3 | 282:25 283:5 |
| **handle** 99:21 | **haynes** 261:23 | 294:19 | **historical** |
| 308:2 | **head** 14:2 | **help** 17:22 | 307:15,22 |
| **hands** 118:4 | 142:16 143:6 | 37:14 40:19 | **hoc** 285:12 |
| **handwritten** | 143:17 174:8 | 81:3 122:17 | **hold** 27:11,19 |
| 71:3 | 274:1 | 155:21 167:20 | 83:16 84:23 |
| **hang** 107:17 | **health** 169:20 | 167:24 168:3 | 167:12 233:9 |
| **happened** 19:5 | 170:3,16 177:2 | 177:16 216:25 | 233:10 236:11 |
| 56:23 60:25 | 177:18 | 275:13,21,23 | 249:4,6,22 |
| 63:24 119:25 | | 283:2 294:12 | 259:8 |
| 178:25 181:16 | | | |

**holder** 134:13
134:17,17,23
223:2,7
**holders** 9:6
200:7 250:2
251:3
**holding** 32:19
36:5
**holdings** 97:17
97:18,19 98:2
98:7,8 99:5,6
99:20 100:16
101:17 103:10
105:6,16,25
209:1 235:4,13
238:4 243:16
243:18 244:18
245:5 246:19
246:22 247:2,3
248:9
**honor** 313:1,7
**hopefully**
205:11
**horseshoe**
115:2
**hotel** 102:12
**hotspot** 19:9
**hour** 51:15
109:11,15,17
174:24 294:9
**house** 4:22
69:18 102:12
204:11 230:12
260:18 303:16
320:9

**houston** 2:14
4:18 115:1
**howard** 114:4
115:10
**hudson** 5:21
6:18 104:3,5
237:14,15,24
238:3 241:12
241:23 242:18
243:6 245:11
245:14,15
250:8,11
**huh** 186:11
**hunton** 2:3,8
2:12 8:2 9:4
322:25
**huntonak.com**
2:5,10,15

**i**

**idea** 50:17
96:12 103:9,12
133:1 134:4
143:4,8,12,13
143:15,16
144:8,11,14,16
144:18 208:17
275:20,22
**identification**
210:5
**identified**
214:5 228:1
233:3 242:20
248:12,20
260:12

**identifies**
214:19 228:12
228:18 242:12
**identify** 22:7
39:8 70:12
87:6 205:18
210:13 218:15
243:6
**identity** 325:11
**immediately**
297:1
**important**
120:20 176:4,7
176:20 177:1
**impression**
170:2,15
**inaccurate**
174:9
**inappropriate**
61:5
**inaudible** 305:2
307:2
**inc.'s** 18:16
22:19 31:4
32:2 41:14
158:16
**include** 270:17
278:5 302:8
**included** 157:2
**includes** 67:14
**including** 8:15
106:15 118:4
125:13 266:2
269:4

**incoming**
239:11
**incorporated**
10:14 238:18
263:5,8,13
**incorrect**
165:12
**indemnify**
154:20 201:22
**indenture** 4:11
91:18 112:15
122:13 180:4
183:3 200:12
**independent**
212:25 274:17
274:25 280:3
300:16,21
301:25
**index** 5:1
**indicate** 22:19
211:13 247:1
**indicated**
251:24 257:13
**indicates** 99:4
207:1,12
**indirectly**
89:12 112:11
293:23 315:11
315:14
**individual**
193:21 291:14
295:11
**individually**
27:11,13
193:11 227:16

individuals
23:5 240:16
informally
202:2
information
95:20 143:2
202:10 210:16
210:18,21,23
212:7 218:9,10
218:24,25
235:23 246:4
246:11,12
307:11
informed
177:17 321:25
initial 40:18
79:18 80:3
initially 260:5
271:4
initials 238:14
initiate 111:11
111:15
initiatives
45:24
inquire 31:2
inquiry 75:4
165:9
insider 273:23
302:17
installation
18:14
instance 1:13
11:25 298:7
instruct 80:8
80:14 84:1,3

85:24 145:11
145:14 313:1
instructing
84:14 279:25
309:6
instruction
44:9 145:17
instructions
279:22
instrument
325:13
integration
12:6 32:19
33:2
intend 111:11
intends 99:5
295:15
intent 111:6
286:4 289:24
295:12
interest 29:1,5
88:23 89:2
90:2 124:3
184:7,10
190:17,23
192:13,17
231:4 245:5
278:25 291:23
292:1,6 297:23
318:4,21 319:4
interested
100:25 127:5
224:1 256:12
278:1 289:8
297:11,11,20

298:24 327:11
interests 25:18
26:1,13 183:23
281:9
interim 17:11
17:11,15,18,21
17:23 18:2,7
19:20 20:11,14
20:19,23,24
21:5 24:20,24
25:2,8,10,15,20
33:16 212:24
213:6 263:16
319:10
internal 46:8
48:5 82:20
86:16 178:1
internally
248:16
internet 7:6
19:7 150:2
interpose 13:22
159:22
interrogatories
6:23 209:15
210:4 264:8
265:16
interrogatory
6:13 150:12,14
150:16 265:25
interrupt 66:21
220:22
introduce
203:8 205:2

introduced
104:15,16
114:17 205:7
311:25 312:2,7
312:10
invade 8:20
investigate
73:25 78:8
231:23
investigated
110:21
investigation
13:1 180:9
investment
37:15,16 98:2
98:6 99:6
105:1 108:9
209:1 243:16
243:17 244:17
245:5 246:19
246:21,23
247:2,3 248:9
investments
10:15,16,21
92:15,17,22,23
160:15 246:14
312:22
investor 159:12
215:13
investors
216:25 267:23
267:25 314:25
invoices 156:22
157:1,18 158:6
158:16,22

**involuntary**
8:15 219:2,3
268:13,23
269:5 272:9,10
272:13,24
273:13
**involve** 12:14
12:17
**involved** 12:3
12:10,22 16:6
28:23 36:9,24
37:22 38:8
80:21 103:13
164:25 165:3
168:16 170:18
171:15 180:22
186:7,20 248:3
304:6 311:16
311:19
**involvement**
184:25
**involving** 12:20
**issuance** 91:19
92:5
**issue** 91:17
**issued** 9:7 91:8
91:11 92:4
134:14,23
308:24
**issues** 69:6
140:20
**item** 45:9
206:20 241:10

**j**

**j** 3:1
**jacob** 163:11
**jake** 22:14
24:13 159:7
160:9,25 161:1
161:2,6,15
163:20 164:8
206:21,25
207:2,5,23
208:11 304:9
305:5
**james** 1:8,12
2:16 5:6,16,18
5:20,23,24 6:9
6:22 7:12,22
9:15 14:10,12
28:1 62:2,4,13
64:2 68:15,22
72:24 84:23
94:13 96:22
99:9 106:9,21
109:23 113:13
150:9 162:17
162:18 163:25
164:1,9,19
184:13 202:18
214:20 225:25
236:14 240:13
248:8 287:1
317:24 318:6
318:18,22
323:8 324:2
325:1,4,9
326:7,12 329:4

**january** 61:14
61:18 63:21
64:7,14 65:13
66:11 69:25
70:2 72:11,12
73:2 74:13
77:11 78:20
93:21 94:2
161:2 162:11
178:14,22
179:3,11,17
180:10,16
205:4 222:22
253:13 254:8
255:2,6 266:16
289:16,17
**jason** 27:25
208:5 209:9
215:3,4
**jay** 162:12
**jennifer** 69:16
71:15 72:13
260:12,14,15
261:2,15 262:4
**jewish** 301:15
**jim** 22:9 26:3
27:3 35:15
37:13 40:18
43:7,11,17
44:11 45:10
47:12 52:10
53:24 60:23,24
63:25 66:8
70:6 72:14
96:8,9,15

104:16 112:10
114:19 115:7
116:15 161:17
162:17 164:20
165:4,5,8,15,15
166:1,8 206:16
216:10 219:5,6
252:5,7,22
253:6 254:5
255:17 257:18
269:25 277:4
288:15 290:1
291:4 295:17
298:3,8 302:2
304:20 312:8,8
**jim's** 46:5
122:6 164:22
**job** 122:6
176:10 181:14
181:15,18,21
278:4
**jody** 28:1
207:11,16
209:11 230:9
**joe** 39:19,22
**john** 28:1 55:12
55:15,17
150:14 166:25
167:3,6,15,20
168:6 191:14
197:6,8 209:3
209:5 212:14
269:1 272:15
273:20 275:10
275:12,16,20

275:22 276:1
277:22 282:23
283:5 307:20
316:23
**john's** 191:24
197:5
**join** 24:4
**joined** 22:9
24:7
**joint** 267:24
298:25 300:3
306:18
**jonathan** 27:25
209:13
**joseph** 114:6,8
**jr** 9:15 202:18
**judgement**
300:21
**judgment**
300:16 301:25
**jump** 31:20
182:6 221:1
**june** 154:13
170:22 171:6
178:11 217:21
266:6,16
308:19 316:15
**justification**
154:10

**k**

**keep** 19:9 51:7
66:25 108:17
146:14 159:20
177:17 203:7
270:8 271:4

286:10
**keeping** 112:22
306:20
**keiffer** 18:23
18:24,25 19:1
21:7,17 22:5
23:6,11,19
24:1,21 25:4
206:7 319:14
**kept** 112:23
158:15 252:21
270:15
**kevin** 4:22
**kid** 303:13
**kincy** 108:3,4
**kind** 13:5 42:14
44:19 53:15,21
82:2,6 87:22
156:22 192:16
208:17 295:5
316:12
**kleinsasser**
2:17 5:10 8:21
8:24 14:10,15
14:20 18:20
19:21,25,25
20:4,9 23:10
24:11 25:12
29:3 30:2,8,13
30:17,25 31:7
31:12,19 32:5
34:8,12 37:8
37:12,23 38:2
38:15 39:6,12
40:2,12,16

41:1,4,9,15,21
41:24 42:7,19
43:2,9,24 44:4
44:17,22 45:1
45:8,21 46:4
46:11,22 47:7
47:16,23 48:10
50:15,19 51:10
52:9,15,18
53:19 61:8,10
61:16,20 63:18
64:8,18,22
65:3,21 66:1,6
66:15,19 67:13
67:18 72:10
74:2 75:7
76:11 77:19,24
78:2,11,18
80:15,20 81:7
81:18 82:4,9
82:23 83:16,21
83:23 84:3,8
84:10,13,23
85:15 86:2,6
86:10,19 87:17
88:21 89:6
90:23 91:9,23
92:6,14 95:21
95:23 97:4,7
98:23 99:8,12
100:22 101:18
103:11 104:1
105:7,19 107:5
109:21 110:20
110:22 111:3,7

111:13,17,24
113:2 117:13
117:18,22
120:4,10,22
121:1,19 122:3
122:19 123:20
124:4 127:18
131:10,14
133:8,12,18
136:12,22
137:6,16,20
138:25 139:17
139:21,25
140:6,9,13,22
141:1,8 142:3
142:7 143:7,20
145:2,6,9,13,15
145:23 146:5
146:10,16,20
146:23 147:2,7
147:10,15,20
147:24 148:1,6
148:10,17,22
149:7,13
152:10,21
153:11,16
156:9,20 157:4
157:22 158:18
159:18 164:13
164:18 165:2
165:13,24
166:22 169:10
169:15,21
170:20 172:13
172:19 173:5

| | | | |
|---|---|---|---|
| 173:16,25 | 244:24 245:7 | 24:5 27:7 | 60:19,20,22 |
| 174:5,10,14,17 | 245:12,17 | 28:13,14,15,16 | 63:12,19,20,21 |
| 174:21 175:1,7 | 246:2,8 247:11 | 28:18,18,20 | 63:21,22,23,23 |
| 175:16 176:2,6 | 247:22 248:2 | 29:16 31:2,17 | 63:23 65:6,8 |
| 176:9,17,24 | 248:14,24 | 31:23,23 33:4 | 67:4,11,24 |
| 177:4,9,15,19 | 249:11,19,24 | 33:16 34:14 | 69:22 70:5,10 |
| 178:3,23 179:4 | 251:2,8,19 | 35:17 36:1,9 | 70:14,16 71:24 |
| 179:13,18 | 252:15,20 | 36:12,21,23 | 73:16 75:10,12 |
| 180:12,18,23 | 255:5,9 256:8 | 37:4,13,14,15 | 75:15,15 76:7 |
| 181:5,9,20 | 256:17 258:16 | 37:18 38:4,16 | 76:12,12,13,19 |
| 184:4,12 188:9 | 260:24 264:18 | 39:14,15,19,21 | 76:21 77:2,13 |
| 193:9 202:4 | 264:23,25 | 40:8,8,17,18,19 | 77:13,15,16,17 |
| 204:24 205:1 | 265:6,22 | 40:21 41:5,5 | 77:20,21 78:13 |
| 211:22 214:3 | 280:21 281:14 | 41:10,25 42:1 | 79:14,14,15,19 |
| 214:15 215:11 | 281:22 283:9 | 42:4,10,10,11 | 80:10,11,12 |
| 216:2,9,13,23 | 285:13,17 | 42:13,14,22 | 81:2,10,11,12 |
| 217:19 218:1 | 297:9 303:14 | 43:4,4,5,6,11 | 82:5,11,13,14 |
| 219:10 220:9 | 313:25 317:16 | 43:11,12,14,15 | 82:19 83:1,4,4 |
| 220:13,21 | 317:21,23 | 43:17,18,19 | 83:12,13,18 |
| 221:3 223:19 | 321:21 322:2 | 44:5,6,8,9,10 | 84:19 86:22 |
| 223:24 227:2 | 322:18 323:8,9 | 45:9,11,12,13 | 87:3,23 88:1,2 |
| 228:24 229:9 | 326:17 329:1 | 45:13 46:14,15 | 89:12 92:18,18 |
| 229:14,18 | **knew** 114:21 | 46:15,16 47:9 | 92:19 95:10 |
| 230:25 231:12 | 121:23 257:17 | 47:10 48:1,1 | 96:6 97:8,9 |
| 231:25 232:11 | 275:12 289:15 | 48:15 49:4,10 | 99:22,24 100:1 |
| 232:17 233:1,6 | 293:9,13 | 51:4,11 52:21 | 100:6,9,14 |
| 233:23 234:5 | 298:10 302:2 | 52:23 53:16 | 101:1,2,21 |
| 234:11,15,20 | **knock** 110:6 | 54:15,20,20,21 | 102:1,2 103:12 |
| 234:25 235:7 | **know** 8:12,13 | 55:19,20,23 | 103:13,14,19 |
| 235:17,21,25 | 9:10 11:11 | 56:2,2,3,4,5,6,6 | 103:22,23,25 |
| 236:11 237:2 | 13:17,19 14:1 | 56:8,8,13,16,22 | 104:2,4,8,13,13 |
| 239:14,19,24 | 15:23,25 16:2 | 57:11,24,25 | 104:14,19 |
| 240:4,18,23 | 18:10,18 20:6 | 58:1,8,9,13,14 | 105:12,22,22 |
| 242:10 243:2,8 | 20:20,21 21:7 | 59:1,2,3,6,8,9 | 106:2 107:13 |
| 243:20 244:21 | 21:19,24 22:11 | 59:14,14,24 | 107:16,18,22 |

**[know - know]**

| | | | |
|---|---|---|---|
| 108:4 109:8 | 165:8,8,14,15 | 212:1,1,2,13,24 | 262:7 266:21 |
| 110:2,19 | 166:1,7,9,9,9 | 213:2,5,6,9,13 | 267:1,3,18,25 |
| 111:18,25 | 166:11,12 | 213:14 214:6 | 268:9,21,22 |
| 112:1,1,9,10 | 168:10 169:1 | 215:8,17,18,18 | 270:7,9,10,12 |
| 113:22,24 | 170:4,5,6,7,8 | 216:25 217:1,2 | 270:16 271:2,5 |
| 114:8,9 117:14 | 170:10 172:9 | 217:2 218:6,9 | 272:1,17,17,18 |
| 117:19 119:4 | 172:14,15,21 | 219:17 224:3 | 272:19 273:5,7 |
| 119:10,16,24 | 173:4,6,9,11,17 | 225:2,4 226:5 | 273:8,9,9 |
| 120:5,6,16 | 174:2 175:17 | 227:5,19 228:9 | 274:18,19,20 |
| 121:2,5,6,8,10 | 175:19,20 | 229:2,6,23,23 | 274:21 275:3,5 |
| 121:10,11,11 | 176:3,5,7,11,21 | 229:24,25 | 275:12,13,14 |
| 121:23,24 | 177:1,10,23 | 230:1,2 231:1 | 275:20,24 |
| 122:4,6,7,12,20 | 178:6,24 | 231:2,3,3,6,18 | 276:20 277:9 |
| 123:18,21,22 | 181:15,22,24 | 231:22 232:1,5 | 277:10,17,21 |
| 123:24 124:1,9 | 183:4 185:7 | 232:18,19,20 | 277:24 278:1,1 |
| 124:17,21 | 186:1,2,18,19 | 235:18,22 | 278:2,3,7,7,9 |
| 126:6 127:8,20 | 186:22,24 | 236:2,3,15,23 | 278:16,16 |
| 127:24 128:5,9 | 187:10,16,18 | 237:3,6 238:11 | 279:9,16 |
| 129:9,17 | 187:19 188:6 | 238:13 239:25 | 280:11,16,16 |
| 130:13,15,23 | 188:16 189:16 | 240:5,5,9,11 | 280:16,17,18 |
| 132:22 133:12 | 189:20 190:10 | 242:11 243:9 | 280:20 282:8 |
| 133:14,15,17 | 190:25 191:12 | 243:12 244:12 | 282:11,12,17 |
| 133:19,20,21 | 192:15 193:22 | 245:19,24 | 282:19,22 |
| 133:23 136:13 | 196:20,25 | 247:18 248:2,3 | 283:3,7,11 |
| 136:14,14,15 | 197:2,8,12,17 | 250:3,13 251:7 | 284:13,20 |
| 136:16 137:25 | 198:15 200:1 | 252:9,21,23 | 285:6,7 287:14 |
| 139:12 142:23 | 201:3,13 202:5 | 253:2,20 | 288:15,16,17 |
| 143:11 144:22 | 202:6,9 203:5 | 254:10 255:18 | 288:19,20 |
| 147:5,8,11,25 | 204:7 206:19 | 256:25 258:6,8 | 289:12,14,14 |
| 148:12,18 | 206:22,24,25 | 258:12,24,25 | 289:23,25 |
| 149:8 150:21 | 207:9,16,19,23 | 259:2 260:3,13 | 290:2,3,17 |
| 151:21 154:3,9 | 207:25 208:1,2 | 260:16,18,21 | 291:3,4 292:17 |
| 154:24 157:13 | 208:2,6,7,8,10 | 261:4,6,10,12 | 293:5,8,9,10,11 |
| 158:21 163:13 | 209:19 210:22 | 261:13,14,15 | 293:18,20 |
| 164:20 165:3,4 | 211:23,25 | 261:15,17 | 294:4,24 295:5 |

295:7,7,8,9,10
295:11,11,12
295:12,13,14
295:15,16,24
295:25 296:2,3
296:5,6,6,9,11
296:12,18,19
296:19,20,21
297:3,3,5,7,8
297:19,22
298:2,3,9,10,11
298:13,20,23
298:23,23
299:4,5,5,8,9,9
299:11,14,23
300:1,4 301:8
301:10,11,13
301:18,20
302:1,2,2,4,5
303:21 304:20
305:2,4,13
306:11,17,19
306:19,24
307:3,6 308:1
309:8,9,10,19
309:24,25
311:14,21,23
312:7 314:6
315:5,9,14,15
315:16,21
317:10
**knowing**  81:5
286:1
**knowledge**
130:21 173:12

175:4 195:7
196:5,7,8
197:13 200:21
201:5 205:21
210:10,14
211:11,17
213:19,25
214:13 218:7
219:21 222:24
229:20 232:23
234:23 236:8
241:22 245:25
246:6,9 247:4
252:25 253:4
254:18 255:6
255:11 257:10
257:14,16,17
257:19,25
258:22 259:1
277:7 289:14
296:15 299:20
303:2
**known**  19:10
78:12 100:15
104:17 263:9
321:10 325:9
**knows**  104:8
**konicov**  114:2
114:4 115:10
**kopf**  4:17
**kozma**  53:5,8
53:15 212:16
**kurth**  2:3,8,12
8:2 9:4 322:25

**l**

**l**  4:16 260:22
274:8
**labeled**  149:24
151:3
**lack**  305:12
**land**  148:16
**landline**  60:10
**langley**  3:14
5:8 19:6,6
67:21 182:17
203:2,3,8,15
205:2,9 220:25
221:9,10,17,23
224:12 236:5
236:19 237:13
248:7 320:17
320:22,23
322:22
**language**
301:16
**large**  53:18
316:2
**largest**  131:7
136:18 137:2
215:13
**late**  59:20
261:8 300:13
**lately**  54:6
**latest**  94:14
**laura**  3:8
**laura.sixkiller**
3:11
**law**  4:12 225:3
260:21,23

**lawsuit**  11:8,15
11:18 12:22
52:7,14,16
110:25 111:6
111:12,16
264:5,7 265:17
270:2,22 297:2
308:13
**lawsuits**  12:3,7
12:9,20 308:6
308:10
**lawyer**  127:6
136:13 180:24
280:6 281:12
281:25 282:1
284:7,9 296:15
**lawyers**  56:5
56:15 59:8,12
59:13,13 60:17
60:20 61:12
65:7 139:13
181:15,24
302:5
**leadership**
78:14
**leading**  66:22
67:15
**learn**  73:22
105:4,14 124:2
128:14 130:16
135:11,24
136:19 179:1
268:16 288:11
292:15 312:5

**learned** 74:9
79:5 272:11
296:25
**learning**
184:14
**leave** 37:3
**leaving** 18:11
27:2 215:16
**lecture** 146:18
**led** 20:18 247:9
299:4
**lee** 261:2
**lee's** 262:4
**left** 20:20 21:8
23:19,23
121:24 162:8
169:17 171:9
204:12 206:2
206:24,25
207:1,16,20,24
208:3,6,8,12
210:19,21,24
211:5 219:2
253:3 277:15
313:22
**legacy** 138:18
**legal** 85:20
103:13 154:17
154:19 184:5
225:22 226:3
228:3 312:15
313:2 327:18
328:18 329:19
**lender** 65:19

**letter** 6:3 68:14
69:9 70:9 71:1
71:19 72:4,12
81:13,23 129:1
129:20,24
130:9 132:19
133:4 170:13
224:23 225:2,6
225:15,17,20
226:8,16,19,21
226:23 227:4
227:11,11,12
227:15,21,23
232:8 283:12
**letters** 23:2
134:2 188:22
227:1
**letting** 181:14
**level** 38:10
272:20 273:11
297:18 308:2
**liabilities**
171:18 175:23
**liable** 8:10
**liens** 183:23
192:16
**likewise** 317:14
**limited** 283:10
**line** 116:17
119:11 126:19
172:1 189:1,2
189:13,16
190:22 191:10
191:11,16,17
191:23 192:4,4

192:7,18,20
193:18 196:17
197:23 198:14
220:23 225:1
225:24 226:2
228:1 230:5
241:10 310:5
310:19 311:5
324:4
**lines** 188:23
**lingering**
309:22
**liquid** 316:8
**liquidation**
129:19
**liquidity**
289:21
**list** 214:6
**listen** 175:1
**listing** 178:8,10
**litigation** 12:8
**little** 9:9 62:24
126:10 183:4
191:20 195:12
218:11,15
236:14 281:21
286:5 298:15
318:2
**live** 14:2
**llc** 27:16 28:3,9
29:18 35:12,19
35:22 76:17
98:8 122:22,25
123:17 132:3
153:25 154:5,6

154:23 155:11
225:25 228:2
235:5,13
246:14 247:2,3
**llp** 4:2,7
**loan** 54:9,10
56:7 57:14,18
57:25 58:13,13
58:25 59:3,5
59:10 60:13,14
60:16 61:11
63:21,24 65:8
66:3 76:13
77:11,15,16
78:5,9 79:6
80:18 81:15,16
82:1,24 85:10
86:18,21,24
91:2 128:7,11
128:15 185:17
188:25 189:12
189:14,20
190:5,16,20,23
191:6,10
192:17,20
196:17 197:23
198:14
**loaned** 135:12
170:6
**loaning** 82:8,22
83:15 84:21
**loans** 65:15
90:16,20
188:22 189:9
195:4 196:22

**[loans - mail]** Page 43

196:25
**lobbyist** 299:17
**locate** 298:12
**log** 264:20
**logistics** 3:13
4:23 203:4
**loi** 299:10
300:2
**long** 36:19
47:25 56:7,8
59:4 60:5,20
65:8 67:16
80:1 104:17
206:23 262:13
264:20,21
288:16 319:12
**longer** 15:15
23:7 56:15
58:5 81:11
83:5 86:20,24
202:6 211:14
220:23 249:21
256:12 277:13
277:22
**look** 17:22
20:16 21:10
22:17 23:13
24:6 25:6 26:5
28:21 40:9
42:20 43:15
46:14 50:7
51:23 57:2
58:6 63:19
76:10 87:3
91:17 94:12

119:6 124:16
125:21 126:19
128:5,6 134:8
139:13 150:15
150:20 153:2
158:14 160:20
175:21 180:4
193:10 205:24
205:25 206:6
215:2 217:23
217:23 219:8
221:14 222:5
224:25 225:9
226:15 229:3,4
229:5 230:3
231:5 242:2,16
248:2,14,16
253:13 257:7
257:22 260:16
261:14 264:13
274:21 292:18
296:15 297:6
302:16 304:14
305:21 310:16
315:7,22
319:16
**looked** 51:19
101:12,19
191:3 234:17
239:7 240:12
254:4 258:11
286:13,18
298:2,13,14
**looking** 37:16
70:14 72:23

127:10 163:18
178:5 185:17
194:5 215:1
238:9 241:15
251:10 273:22
290:8,10
294:23 296:24
**looks** 125:12
191:6 206:4
222:8,25 227:6
239:9 300:20
**lord** 224:3
**lose** 8:9 276:8
276:15
**lost** 19:7 150:2
163:21 280:22
285:18 309:10
**lot** 66:17 67:14
81:20 179:7
180:21 184:16
215:12,15,16
215:16,17
236:21 261:10
267:20
**lots** 62:3
**lp** 28:6,9 29:2,6
29:11,13,21
**lunch** 54:20
110:7 114:25
114:25 136:4
137:11

**m**

**m** 2:7 3:19
274:8

**ma'am** 20:4
**machine** 1:17
**made** 41:13,19
42:10 44:15,24
47:12 65:15
75:4 77:11
78:10,14,16
79:23 90:17,21
107:3 132:1
150:16,25
151:8 153:23
157:6 160:25
189:16 191:4
194:6 197:4,25
201:4,7,11
216:7 229:6
231:16,20
234:19 247:6
250:3,11
251:18 252:2,4
252:5 254:7,8
311:3,4 325:24
328:8
**madison** 230:6
230:6,14
**mail** 5:24 6:2
6:11 48:19,21
48:24,25 49:2
49:6,22 53:12
93:20 94:1,11
95:1,16 97:1
106:13,14,18
107:8,20,23
108:1,2 113:14
115:14 116:8,9

116:14,20,23
118:20,25
120:1,20
125:11,12,17
126:7,12,20
129:5 130:5,8
158:22 162:2
163:18 193:25
194:3 205:3,15
205:24 259:15
261:1 281:15
285:2,11,21
**mailed** 48:20
**mails** 50:24
51:1 94:20
124:16
**main** 43:6
185:17
**maintain** 43:12
**maintained**
170:9 186:23
**maintaining**
188:20
**major** 47:11,15
222:17
**majority** 9:6
34:3 131:16
136:18 137:2
168:20 175:13
176:5,8 179:9
180:7,15 181:3
**make** 8:4 19:10
42:5 45:6
46:14 58:2
66:21 67:2,7

67:10 68:11
84:4,9,12,15
85:9,24 86:3
86:11 87:18
112:10,11
122:1 146:13
146:20 167:14
170:1 172:16
183:12 197:25
231:14 236:7
264:25 272:4
280:23 287:1
299:14 313:18
**makes** 155:15
166:6,7 181:7
281:19
**making** 86:4
146:11 191:21
193:17 220:15
246:19 328:10
**manage** 43:5
43:18 57:11
155:6 178:6
236:2
**management**
277:17
**manager** 28:2
**managing**
28:16,24
**mandatory**
129:18
**march** 125:14
126:8,11 129:1
130:2,6 132:11
132:20 133:5,7

207:13 265:13
266:7,12,24
**mark** 18:23
21:7,17 24:21
25:4 62:1
68:14 264:16
265:8 319:14
**marked** 62:6
62:11,13 68:16
68:22 93:17,19
97:25 106:7,9
113:5,13
123:14 125:5,7
126:4 128:22
128:23 131:5
131:20 149:25
150:9,10
161:21,24
170:25 171:3
203:10 205:8
209:17,22
221:24 224:17
228:16 237:17
238:24 257:5
265:7
**market** 93:1
97:12,12
112:12 117:11
160:15 273:7
**markup** 315:24
**master** 239:16
240:1
**match** 242:3
**material** 44:24
45:2,6 229:7

229:10,12,16
229:19
**matter** 7:12
66:12 289:5
**matters** 8:7
**matthias** 2:17
19:25 67:23
84:1 85:22
95:19 109:20
146:9,14
147:13 174:25
193:3 236:5
247:18 262:11
281:13 285:16
303:12 306:14
313:24 319:15
323:9 326:17
329:1
**matured** 183:8
199:3,4
**maturity**
115:20 116:25
**maven** 301:18
301:19
**mbe** 27:16 28:2
28:6,8,9 29:1,6
29:11,13,18
219:24 220:3,5
220:7,11,16,19
252:11 253:10
274:19 275:1
**mean** 15:13,15
23:14 29:4
40:7 41:5 45:2
45:3 47:8 51:5

54:19 57:9
59:12 62:23
70:5 72:2 76:8
76:16,20 77:1
77:25 89:9
99:22 103:3
106:2 112:8
118:14 119:9
120:21 121:9
121:12 122:13
127:2 140:15
166:5 174:25
175:21 185:6
188:10,21
189:19 199:8
200:11 204:3
215:14 228:25
229:2,22
249:25 260:5
272:20 280:14
281:14 287:15
290:11 293:5
294:21 295:5,6
296:18 297:4,6
307:4,25 308:2
309:8,11
**meaningful**
44:14
**means** 49:15
50:3 67:17
197:19 293:14
306:25
**meant** 290:22
**measures** 82:11
86:21,25 87:1

87:2
**mechanism**
316:9
**media** 49:20
**median** 293:15
**medical** 204:1
**medicine** 204:1
**meet** 35:25
38:13,17,18,25
54:20 102:3,6
114:13
**meeting** 38:21
58:19 114:23
114:25
**member** 16:8
17:19 35:4
39:9 41:16
43:21 44:1,13
44:23 45:4
46:7,20 47:3
47:20 48:6
53:7 56:15
61:15 70:6,12
70:15,22 82:25
86:20,23,24
136:14 154:21
155:11 174:1
177:12,14
207:3 211:1
213:2,9,20
215:7 216:5
252:6,9 253:10
264:1 266:5
292:11 293:22
317:1 321:11

**members** 6:12
21:4 22:17,24
35:5 39:4,13
39:14,16,17
40:1,5 55:6
69:21,23 70:3
83:5 102:20
205:19,21
206:1 219:25
240:15 267:2
272:3,3 292:7
303:3
**memorialize**
252:13
**memory** 87:24
213:8 269:12
271:16 284:17
289:4 312:24
321:6
**memphis** 3:16
**mention** 267:6
267:10 290:6
290:15
**mentioned**
12:19 18:12
43:1 78:19
79:9,11 89:20
139:8 282:15
284:6 290:8
293:6 298:7
303:18
**message** 49:5
51:13 162:14
163:21 165:7
166:8 194:1

**messages** 49:4
50:21 51:2,4,7
51:8,17,22,24
52:3,7,13,13,25
53:3 103:1
161:18 163:1
164:21,23
165:4 284:13
284:20,20
286:9,12,16,18
286:21
**messaging** 49:8
103:6
**met** 36:11,15
36:23 50:2
102:2,18,20
104:18 114:11
114:23 115:10
127:2 130:19
312:11
**metals** 57:16
76:23 77:5
253:17,22,25
**metaphysical**
143:4
**metaphysically**
144:17
**miami** 4:3
102:9 104:21
**michael** 2:12
**microsoft**
259:20 260:10
**mid** 102:4
**middle** 9:16
276:17

| | | | |
|---|---|---|---|
| **mike** 4:22 | 195:14,17,19 | **mind** 184:18 | **monetary** |
| **milam** 4:17 | 195:24 223:2,8 | 236:17 273:17 | 256:10 |
| **million** 57:14 | 228:13,19,22 | 285:14 | **monetize** |
| 65:15 66:3 | 229:7 232:23 | **mine** 225:7 | 223:18,22 |
| 74:6 77:18 | 233:4 234:8 | 290:13 | **money** 37:15 |
| 78:5 80:18 | 236:25 238:10 | **minute** 68:1 | 37:17 40:19,19 |
| 81:4,15,16 | 241:23 242:6,8 | 96:14 313:23 | 43:13 46:2,10 |
| 82:2,8,22 | 242:13,14 | **minutes** 19:8 | 47:2,6,21 48:8 |
| 83:15 84:21 | 243:5,7,15 | 19:11 22:21,21 | 54:15 56:7,9 |
| 85:11 86:18 | 244:9,18 245:6 | 24:6 60:7,7 | 60:16 65:4,6,8 |
| 91:4 92:20 | 245:11,16 | 70:15 110:6,7 | 77:22 81:5 |
| 93:9 95:4,7 | 247:2,9,16 | 119:2,5 136:7 | 121:12 127:13 |
| 97:2 99:6,19 | 248:21 249:2 | 197:19 221:2,3 | 127:13,15,19 |
| 100:19 101:4,5 | 251:11 253:1 | 313:22 314:4 | 128:7 137:15 |
| 111:21 112:14 | 253:10 258:1,4 | **mis** 123:14 | 137:18 138:11 |
| 112:18 117:3,4 | 258:7,11,15 | **mischaracteri...** | 138:23 139:3,5 |
| 117:5,7,20 | 259:4 270:9,14 | 66:16 67:5 | 161:15 162:24 |
| 119:17 120:7 | 271:10,11,24 | **miscommuni...** | 164:8 178:25 |
| 120:15,20 | 279:13,13 | 227:10 | 179:7 180:14 |
| 121:8,9,14,21 | 287:22 288:1 | **misheard** | 180:21 185:18 |
| 121:24,25 | 289:9,10,18 | 246:17 | 187:18 197:6 |
| 128:15 134:15 | 298:22 299:7 | **misstate** 288:14 | 216:19 236:2,3 |
| 134:24 135:3,6 | 306:16,17 | **misstated** | 245:9 246:10 |
| 135:12 136:20 | 308:21,24 | 320:5 | 246:13,25 |
| 138:1,1,2 | 309:9,10 310:9 | **mistaken** 300:8 | 250:1 256:14 |
| 139:10 170:6 | 311:1 313:11 | **mister** 40:22 | 267:19 273:10 |
| 171:24 173:14 | 314:15,17,22 | 58:18 | 279:9,10 287:5 |
| 175:14,24 | 314:24 315:2 | **misunderstood** | 287:8,23 |
| 176:1 178:13 | 315:23 316:19 | 281:20 | 288:16 289:13 |
| 178:20,20 | 317:9 | **mixed** 63:20 | 289:13 295:1,6 |
| 179:2,10,16 | **millions** 138:2 | **mkleinsasser** | 295:15 296:7 |
| 180:9 181:2 | 170:7 | 2:20 329:1 | 302:4,20 303:8 |
| 190:7,8,14,14 | **milrose** 107:21 | **moment** 67:23 | 309:14,18 |
| 190:16 194:17 | **milrosecap** | 97:24 131:4 | 310:1,11 |
| 194:18 195:10 | 107:21 | 276:12 | 312:19,22 |

315:19 316:6
**month** 59:23
74:10,13 76:9
186:18,19
191:7,22
199:22,24
245:24 253:13
254:4 255:2
257:11
**monthly**
190:19 191:3
194:4,6,12
196:2,13
**months** 20:10
20:15 21:3,5
21:20 22:12
54:4 56:21,22
58:1,4,14 59:9
59:17 60:1,25
61:1 63:23,25
74:11 88:6,8
88:11,14,17
104:19 107:11
119:18 173:24
200:4 289:10
**morning** 8:1
115:17 162:19
294:10
**mostech** 270:11
**motion** 84:4,9
84:12,15 85:25
86:3,11 146:13
146:21
**mouth** 146:14

**move** 83:18,23
84:8 86:6,9
133:9,13,19
145:10 146:14
147:3 175:10
197:14 214:4
232:25 236:1
269:19 306:14
**moving** 236:21
243:21
**multi** 140:3
148:16 151:25
152:4 153:14
**multiband** 89:3
89:4,8,14,18
318:4,9,13,17
318:21 319:5,6
**multiple** 83:5
278:17
**multiples** 293:3
**munsch** 4:17
323:6
**munsch.com**
4:19,19
**mvl** 1:4 7:15
326:4

---

**n**

**n** 2:1 34:22
260:22 274:8
**n.a.** 4:11
**n2** 156:12
**name** 7:2 8:1
9:3,14,16 13:7
21:12,19 22:13
34:20 50:6

62:3 73:15,23
74:1 75:5,9
76:14,20 77:3
96:14 114:3
116:17 183:1
185:12 206:8
206:12 211:16
211:21 233:18
242:12,15,17
242:17 243:14
244:13 245:1
246:10 260:23
262:25 268:8
268:12 280:10
280:11 290:7
293:13 298:7
312:5 324:2
325:12
**named** 34:14
124:11 148:21
240:15 242:13
243:25 274:3
**names** 27:24
**nature** 30:6
31:14 142:11
187:23
**necessarily**
38:19
**need** 14:2,22,23
42:11 53:23
62:22 67:7,21
70:5 80:12
83:23 84:25
85:2 94:21
99:9,12,16

105:22 110:1,5
136:6 142:21
143:11 146:18
146:19,20
147:12,13
149:4,8 159:20
168:25 173:9
173:11 175:18
181:10,23
199:12,16
201:13 213:4
220:21,25
221:2 225:1
228:14 229:3
241:18 242:19
259:12 279:16
288:20 310:20
319:15
**needed** 37:18
37:19 38:17
107:18 169:25
302:3
**needs** 111:19
283:10
**negotiated**
37:25 247:8
259:3
**neighborhood**
195:9
**neil** 100:1,1,3,5
100:7,8,13
**neither** 327:7
**nelms** 274:4,8
274:12,24
275:6 280:2

| | | | |
|---|---|---|---|
| **net.com.** | 48:21 53:8 | 138:8,10,12,14 | 205:21 206:9 |
| 259:17 | 57:15 61:15 | 138:21,24 | 206:13 208:13 |
| **network** 33:5 | 64:11,17 65:20 | 139:16,20 | 210:3,6 211:8 |
| 83:13 141:17 | 65:25 66:13 | 140:8,12,20,25 | 211:15,20 |
| 153:3,25 154:5 | 68:10 69:2,10 | 141:7,11,15,23 | 212:5,21 213:2 |
| 208:17 | 70:4,8,12,22 | 141:23,25 | 213:10,20 |
| **networks** 1:4 | 72:8 73:7 75:5 | 142:2,6 144:6 | 214:5,8 215:3 |
| 4:1 6:11,15 | 75:9 77:12,17 | 145:5,22 146:4 | 215:4,10,24 |
| 7:12 9:8 11:21 | 77:21 78:1,9 | 147:23 149:6 | 216:4,5,7,18 |
| 11:24 12:6,14 | 78:15 80:17,25 | 149:12,16 | 217:6,9 218:7 |
| 15:9,11 16:4,7 | 81:4,5,17 | 150:13,17,25 | 218:21 219:15 |
| 16:9,12,14,18 | 82:19 83:11 | 151:12,15 | 219:22 220:1 |
| 16:21 17:1,4 | 84:18 85:8 | 152:4,9,20 | 220:12,17 |
| 17:14 18:16 | 86:15 87:14 | 153:1,7,23,24 | 221:19 222:7 |
| 21:6,14 22:8 | 90:1,17,21 | 154:13,14,18 | 223:3,9 225:24 |
| 22:19 25:11,15 | 91:8,11 97:14 | 154:19,23 | 226:12 227:13 |
| 25:19 26:7,10 | 98:7,18 99:2 | 157:7,15,20 | 227:15,15,18 |
| 26:15 27:5 | 99:19 103:20 | 158:16,24 | 228:2 229:12 |
| 29:14,19 30:5 | 103:24 104:2 | 159:1,4,14 | 229:17 230:11 |
| 30:12,16 31:4 | 105:5,15 108:4 | 160:10,17 | 231:17,21 |
| 31:5,22 32:2,8 | 110:25 111:20 | 164:23 165:12 | 232:4,15,15 |
| 32:10,17,18,22 | 119:18 122:18 | 165:22 166:20 | 233:5,22 234:2 |
| 33:2,12,18,25 | 123:6 124:18 | 167:4,7,16 | 235:16 238:18 |
| 34:1,4,5,6,9,11 | 124:25 125:2 | 168:6,18,21 | 238:20 239:4 |
| 36:8,17,20 | 127:16 128:8 | 169:3,7,9,14,17 | 239:23 240:3 |
| 37:6,11 38:1,5 | 128:12,16 | 170:19 171:5 | 242:8 243:1 |
| 38:13,22,24 | 129:2,25 | 171:21 173:21 | 244:19 245:10 |
| 39:5,9,11 | 130:10,22,25 | 176:15,22 | 245:15 248:21 |
| 40:11,22 41:12 | 131:8,12,17 | 177:14 178:10 | 248:23 249:15 |
| 41:14,19,22 | 132:2,20 133:5 | 180:8 183:19 | 250:22 251:6 |
| 42:6,18,24 | 133:24 134:6 | 186:4,10 | 251:18,25 |
| 43:23 44:1,3 | 134:13,20,22 | 189:21 192:8 | 252:25 253:4 |
| 44:25 45:16,20 | 135:3,12 136:9 | 194:5 197:9 | 259:23,24 |
| 46:1,3,8,9,20 | 136:18,25 | 202:7,21 | 260:2,6,8 |
| 47:2,4,20 | 137:3,15,19,24 | 204:10,12 | 261:5,10 263:5 |

263:8,12
270:24 272:7
277:2,20
283:13 318:13
320:2,8,13
321:1,16 326:4
329:3
**never** 64:23
73:17 80:19
90:14 100:7
127:2 128:19
135:13 137:1
195:2 196:15
200:17,21
202:20 248:6
269:7 288:10
294:18 299:13
302:11,15
312:11
**new** 2:9,9 40:19
40:19 45:23,24
112:1 216:19
216:25 240:6
270:25 271:1,2
271:7 278:6
280:12 298:23
298:23
**niece** 230:7
**night** 247:20
**nimms** 274:6
**nominal** 305:17
**non** 17:11
263:16
**nonbinding**
299:10 300:2

**nonrefundable**
275:25
**nope** 100:4
**normal** 83:3
**normally** 62:2
**northern** 1:1
7:14 326:1
**notarize** 329:11
**notary** 325:20
326:10,25
**note** 5:17 7:4
56:12 57:13
61:25 64:2,13
64:21 65:4,12
65:23 68:9
72:20,24 73:9
78:20 80:3
81:14,24 87:15
88:20 89:21
90:9,12 94:8,8
110:15,18
111:23 120:15
120:25 121:4,8
121:13,16
134:9,14,15,17
134:23 135:2,5
135:8,18
136:20 189:16
192:10,11,23
194:23 200:7
210:11 222:10
222:14 308:24
309:3 313:14
329:9

**noted** 67:10
282:15 325:3
**notes** 9:7 87:10
91:8,11,22
92:4 179:23
183:4,5,8,14,24
184:3,7,9,10
190:3,3 194:25
195:5 197:18
198:22,24
199:3,6,13,13
200:12,25
201:1,18
**notice** 5:16
72:8,11,16
111:5,11
221:12 222:16
252:6,10 257:4
319:22 320:14
**notified** 52:2
81:19 240:6
300:13 328:3,6
**noting** 248:15
**november**
59:24 63:16
64:25 69:24
78:24 80:7
177:7,7,8
277:3 321:10
**nq** 34:14,22
35:1,6,8 153:4
155:2,4,8,12,16
156:1,7 157:2
157:7,16,21
158:2,9,11,16

**number** 5:14
50:8 85:17
126:16,20
129:13 130:11
146:6 148:2
173:10,19
174:9 191:12
238:23 241:18
243:21,22
271:18 305:1
**numbered** 1:15
**numbers**
125:23,24
172:11,18
195:16
**numeral**
228:16
**nw** 2:4 6:4
122:22,25
123:6,17,22,25
124:3,17 125:1
125:18 126:22
127:10 128:4,7
128:11,15
129:9 130:21
130:25 132:3
132:25 135:6
135:16,22,25
136:10,21,25
137:4

| **o** |
|---|

**oath** 226:11
325:10
**object** 14:17
100:15 118:10

233:1,6 321:14
322:14
**objected** 19:24
320:20,21,21
322:4,7,8
**objecting**
174:21 322:11
**objection** 13:21
13:22 18:20
19:21 23:10
24:11 25:12
29:3 30:2,8,13
30:17,25 31:7
31:12 32:5
34:8,12 37:8
37:12,23 38:2
38:15 39:6,12
39:12 40:2,12
40:16 41:1,4,9
41:15,21,24
42:7,19 43:2,9
43:24 44:4,17
44:22 45:1,8
45:21 46:4,11
46:22 47:7,16
47:23 48:10,11
50:15,19 51:10
52:9,15 53:19
61:8,10,16,20
63:18 64:8,18
64:22 65:3,21
66:1,6,15,20
67:4,6,7,14,17
67:19 72:10
74:2 75:7

76:11 77:19,24
78:2,11,18
80:15,20 81:7
81:18 82:4,9
82:23 86:19
87:17 88:21
89:6 90:23
91:9,23 92:6
92:14 97:4,7
98:23 99:8
100:22 101:18
103:11 104:1
105:7,19 107:5
110:20,22
111:3,7,13,17
111:24 113:2
117:13,18,22
120:4,10
121:19 122:3
122:19 123:20
124:4 127:18
131:10,14
136:12,22
137:6,16,20
138:25 139:17
139:21,25
140:6,9,13,22
141:1,8 142:3
142:7 143:7
145:2,23 146:8
146:14 147:24
148:6,17,22
149:7,13
152:10,21
153:11,16

156:9,20 157:4
157:22 158:18
159:18,21,23
164:13,18
165:2,13,24
166:22 169:10
169:15,21
170:20 172:13
172:19 173:5
173:16,25
174:5,19,20
175:16 176:2,6
176:9,17,24
177:4,9,15,19
178:3,23 179:4
179:13,18
180:12,18,23
181:5,9,20
184:4,12 188:9
202:4 204:24
205:1 211:22
214:3,15
215:11 216:2,9
216:13,14,23
217:19 218:1
219:10 220:9
220:13 223:19
223:24 227:2
228:24 229:9
229:14,18
230:25 231:12
231:25 232:11
232:17 233:23
234:5,11,15,20
234:25 235:7

235:17,21,25
236:11 237:2
239:14,19,24
240:4,18,23
242:10 243:2,8
243:20 244:21
244:24 245:7
245:12,17
246:2,8 247:11
248:24 249:11
249:19,24
251:2,8,19
252:15,20
255:5,9 256:8
256:17 258:16
320:17 321:20
**objections**
66:22 67:10
86:4 236:15
265:16
**objects** 141:4
**obligated**
252:18 270:13
**obligation**
30:19 193:19
193:23 201:3
211:25 314:16
**obligations**
43:19 45:24
139:15,20,24
140:3 198:13
223:15
**obtained**
237:24

**obtaining**
233:21
**obviously**
119:25 193:4
233:2 248:15
289:7 294:25
319:2
**occasions** 42:9
**occupation**
159:11
**occur** 217:21
218:3 228:23
**occurred** 19:14
77:15,16 224:9
228:23 229:15
245:4 250:10
**occurring**
215:24 239:12
**october** 57:4
214:20 240:12
277:2
**oem** 282:16
**oems** 273:9
279:6,15
**offer** 117:4
250:10,11
270:12 271:6
**offered** 250:9
270:8
**offers** 112:11
**office** 114:24
138:5 141:12
325:17
**officer** 10:19
16:14,17 17:3

17:8,9,11 33:7
33:12 34:19,25
35:18 90:5
152:8 155:8
167:10 180:24
186:3,6 189:3
200:2 202:1,7
209:6 211:15
226:1,13
231:13 253:3
254:5 263:16
266:11 277:13
280:17 285:1
300:15 301:5
304:4 305:23
320:7 326:13
328:6
**officers** 16:1
35:8 39:25
40:20 90:18,22
178:4,6 185:7
185:20 210:5
215:8,9 240:13
283:13 284:2
**official** 30:9,10
74:24 280:19
282:19
**officially** 31:1
66:13 72:7
83:8
**offshore** 109:6
**oh** 12:11 20:2
25:3 50:20
62:9 79:21
114:16 124:21

126:5 140:18
281:5 292:17
297:19 320:24
322:12
**ok** 95:13
**okay** 7:16,19
7:20 9:12 10:6
11:3,25 12:7
13:3 14:14,18
14:19,25 20:2
20:9,18 22:5
23:5 24:13
27:4 30:21
31:25 32:18
34:24 38:8
39:24 42:22
52:18 54:16
55:25 60:1
61:23 62:12
63:19 64:10,20
65:18 66:11
69:14,20 70:11
71:9,16,19
72:15 80:6
83:19 85:15,16
87:18 92:2
93:24,25 95:1
95:11,18 96:17
97:13,21 100:6
100:23 101:4
102:17 104:24
106:12 107:20
108:2,8,16
109:19,23
111:20 112:4

112:22 113:11
115:12 116:10
116:12,20
117:15 118:16
118:22 119:1
121:3 122:17
123:15,15
125:6,10,16
126:24 127:6
130:13 134:21
138:18 139:14
145:19 150:3
155:17 159:25
163:18 166:12
168:16 173:1
175:1 183:17
183:21 184:2
184:16 189:7
190:2,9 192:12
193:11 195:2,6
196:1 197:13
199:18 204:12
204:15 206:5
206:19 207:11
207:22 208:5
209:3 210:12
212:11 213:1
215:1 217:6,9
217:13 218:17
219:1,6,8
221:16 222:4,5
222:9 223:21
224:11 225:11
226:7 227:9
230:4,8,13

231:8,15 232:7
232:14 233:8
234:13,17,23
235:2,9 237:12
238:9,17 239:1
239:21 240:9
241:18,21
242:1,6,12
243:4,11,14,17
244:14,16
245:10,21,25
247:8 250:16
251:21 252:25
253:15 254:4
256:13,21
257:1,7,13,24
260:2,23 261:3
261:19,23
262:4,7,8
263:8 264:15
265:6,18,25
266:19,23
267:6,9,14
268:2 269:3,12
270:1,21
271:19 273:19
275:9,24 276:3
276:6,11,19,23
277:1,5,12,15
278:21,24
279:11,14
280:5,14
282:15,22
283:15,23
284:1,10,14,22

285:9,25
286:24 287:25
288:4,14,22
289:7,15,20
290:5,14,20,25
291:12 292:9
292:11,15,25
293:14,18,21
295:3 296:13
297:16,24
298:19 299:19
300:9 301:1,15
302:11 303:2,6
303:17,21
304:8,12 305:8
305:14,22
306:1,3,9,12,24
307:3,6,24
308:14 309:2
309:12,16,21
309:25 310:3
310:14,22
311:3,8 312:2
312:9,12,15,19
313:20 314:3
314:20 315:1,6
316:1,7,12,14
317:8,21 318:9
318:16,21,24
319:2,8,25
320:5,6,12,24
322:12,18
323:5
**old** 159:9,10
166:21

**older** 286:6
**onboard**
277:22
**once** 24:2 43:11
52:2 173:8
186:18 199:3
199:22,24
217:3 222:10
240:6 268:18
296:20 303:15
**onepath** 255:14
255:16,20
256:5,10,15,22
257:14,18,20
257:25 258:3
258:14,15,23
290:15 291:2,5
293:1,9,13,19
293:23 294:2
294:20
**ones** 106:25
278:17
**ongoing** 15:22
**online** 101:20
**open** 80:9 93:1
97:12 251:3
**opening** 184:18
186:21
**operate** 29:7,8
214:16
**operated** 33:3
**operating**
15:16,19 48:1
82:12,15,18
83:4 85:5

189:15 212:4,8
215:4 217:6,10
239:22 300:7
**operation**
222:20 264:2
**operations**
41:17
**operators**
178:4
**opinion** 229:7
229:16 269:13
278:24 279:2
282:21 295:19
**opportunities**
45:23 299:4
**opportunity**
215:25 301:10
301:11
**option** 119:5
317:6,9
**options** 43:16
149:2,3
**oral** 1:7,12
326:6,14
**orchestrate**
107:11
**orchestrated**
57:15
**order** 1:20 8:24
193:7 294:19
311:12 313:17
**org** 226:11
**organization**
172:24

**organizations**
299:25
**original** 1:13
9:5 16:11
107:19 112:19
326:16
**originally**
216:24 298:16
**ought** 269:8
**outcome**
327:11
**outlined** 294:6
**outside** 212:2
212:25 225:4
227:7 234:23
260:19 261:4,9
320:9
**outstanding**
30:12,16 32:2
112:15,17,17
112:20 115:19
116:24 117:3,8
183:14 190:11
195:5,7,19
197:22 250:16
250:19,21
**overlap** 14:17
**oversee** 46:6
47:5
**overseeing**
177:3
**overseen** 45:23
**oversight** 44:9
81:8,12 246:21
267:12

**overview** 13:4
**owe** 137:15,18
137:24 138:23
139:3,5 164:8
310:1
**owed** 30:18
139:9 141:19
162:24 163:2
190:13 195:20
201:2
**owes** 138:11
258:23 309:13
309:18
**owing** 309:21
**own** 33:24
59:13 81:16
93:4 141:14
152:19 153:10
153:13 155:5
160:6 166:11
196:9 197:16
255:24 273:25
291:22 292:1,3
292:6 318:21
319:3
**owned** 34:2,2
89:10,25
135:25 152:8
227:16 249:12
294:1 312:13
316:23 318:3
**owner** 10:17
77:8 98:3
129:10 155:11

**ownership** 27:7
88:23 89:2,12
90:2 124:3
**owns** 35:15
123:22,24
141:12 256:1,3
256:7 259:21
291:4

**p**

**p** 2:1,1,3
**p.c.** 2:18 4:17
**p.m.** 1:16 94:2
106:19 110:9
110:10,10,12
118:20 119:5
126:11 137:10
137:11,11,13
143:24 144:1,1
144:3 152:13
152:15,15,17
163:5,5,7
182:20,21,21
182:23 221:5,6
221:6,8 262:19
262:20,20,22
282:4,5,5,7
314:9,10,10,12
322:21 323:11
**pa** 329:13
**packet** 241:5
**page** 5:11,14
73:10 125:22
126:3,4 155:1
161:24 222:9
222:11 324:4

327:3
**pages** 125:25
329:12
**paid** 41:8 44:15
45:12 77:17,21
149:18 154:14
154:22 161:5
162:25 164:20
166:20 179:24
183:15,16
195:3,5 238:10
245:11,15
250:25 258:15
271:20,24
275:25 282:9
293:18,23
304:10,15
305:14,22
306:2 310:11
312:16 314:17
314:18 317:8
**paper** 245:19
**par** 273:8
**paragraph**
94:12 228:13
228:16
**parham** 4:6
168:15 273:18
273:19,19,21
279:18,18,25
280:22 314:1,5
317:16,19
**parham's**
282:9

**park** 2:8
**part** 92:5
  139:14 208:18
  237:25 256:11
  267:13 285:18
  285:20
**partial** 313:14
**participants**
  7:6
**participate**
  275:16
**participated**
  220:15
**participation**
  81:12
**particular**
  187:15,15
  248:5 283:23
  283:25 297:17
**parties** 7:9 8:12
  182:18 232:12
  308:8 326:19
  327:8
**partner** 28:15
  28:16 29:21
  246:12
**partnering**
  255:18
**partners** 108:9
  108:12 117:16
  243:24 244:10
**partnership**
  299:1 306:18
**partnerships**
  267:20

**parts** 236:21
**party** 96:15
  99:23 128:3
  310:18 326:23
  327:6
**pass** 182:3
  262:9 298:14
  317:15
**passed** 298:3
**past** 38:20
  56:21 60:1
  61:1 74:11,13
  88:6,8,11,14,17
  88:25 152:5,18
  153:9,13
  167:16 168:7
  169:2 266:1
  298:21
**path** 294:15
  296:7
**path's** 293:16
**pause** 14:16
  281:8
**pay** 34:18
  101:13 118:9
  119:22 120:3
  140:17 154:20
  159:1 162:18
  162:22 164:1,4
  164:10,11,16
  164:17,24
  165:12,22
  192:7,9,11,11
  193:17,19,23
  194:21,21,23

  194:24 196:17
  196:21 198:1
  200:19 273:7
  279:5 282:13
  282:16 289:22
  295:15 304:8
  304:17
**payable** 190:17
  190:19,23,24
**paying** 154:18
  159:5 193:21
  302:24 304:20
  304:22 309:8
**payment** 6:6
  47:2 118:10
  119:6 136:24
  137:3 149:21
  151:20,20
  152:25 153:7
  153:18,24
  154:2,4,8,11
  155:15 156:12
  156:18 163:10
  183:12,24
  184:7 194:8,16
  194:18,18
  196:24 197:23
  223:14 246:20
  250:3,5 256:11
  276:21,24
**payments**
  40:24,24 41:13
  41:19 91:1
  149:16 150:16
  150:22,25

  151:5,11,15,23
  151:25 152:9
  152:20 153:10
  153:14,22
  155:1 157:6
  160:24 165:18
  190:20 191:3,6
  191:9,10,16,21
  193:17 194:4,6
  194:12,16
  196:2,13,20
  197:4 201:4,7
  201:11 202:13
**payroll** 151:3,5
**pays** 295:6
**pending** 14:6
**pennsylvania**
  2:4 4:13
**people** 19:17
  33:10 34:14,22
  35:1,6,8 37:22
  124:6 136:1
  153:4 155:1,4
  155:8,12,16
  156:1,7,12
  157:2,7,16,21
  158:2,9,11,15
  176:11 215:16
  215:18 286:6
**percent** 9:7
  27:9,10 29:17
  29:23 91:7,10
  131:15 183:3
  222:19

**percentage**
27:7 33:24
131:12
**perfect** 276:15
**perfectly**
287:15
**perform** 267:14
**period** 16:20
33:22 51:15
215:23 216:5,7
321:4
**periodic** 53:9
**permission**
47:13
**person** 38:18
38:21 102:18
206:8 218:23
252:10 278:3
325:12
**personal** 48:24
55:7,9 59:13
108:16,17,20
189:8 201:17
280:6 291:15
297:16
**personally**
71:17 139:14
139:19,23
140:2 154:23
272:2 302:19
325:8
**personnel**
185:8
**persons** 218:13
218:14

**petition** 219:3
269:5 273:5
**petitioning**
1:14 2:2 9:6
**pguffy** 2:15
**phair** 2:3 5:7
7:25 8:2 9:2,3
9:11 14:22,25
15:7,8 19:12
34:22 52:17
61:24 62:9,17
66:18 67:9,16
67:19,25 68:7
68:8,13,18
69:3 72:21
83:20,22,25
84:7,9,12,15
85:4,12,22
86:3,8 93:15
95:22 96:18
97:22 98:14
106:4 109:8,18
110:4,13 113:3
113:9,11
120:24 121:3
123:10,13
126:9 128:20
131:2 133:10
133:14 136:6
137:8,14
143:18,21
144:4 145:8,11
145:14 146:8
146:13,18,22
146:25 147:4,9

147:12,17
148:8 150:21
152:11,18
153:20 160:2
161:19,22
163:8,14
174:12,16,19
174:23 182:3,7
235:4 319:10
**phair's** 203:12
**phil** 68:13 69:3
96:18 97:22
106:4 113:9
123:10 126:10
**philip** 2:12
61:24 62:17
72:21 93:15
113:3 131:2
150:21 161:19
163:15 322:24
**phoenix** 3:10
**phone** 48:18
49:6 50:8,10
60:10,11 79:8
114:12 193:25
194:2 286:13
286:18 293:17
**pick** 300:25
**picking** 50:10
**piece** 245:19
**pinkhasova**
129:2,5 130:9
130:19 132:16
132:18 133:4

**pinkhasova's**
130:13
**pinkhasovas**
132:24 133:16
134:1
**piper** 3:3,9
**pittsburgh** 4:13
**place** 7:9 8:24
45:20 46:2
47:4,19,25
48:2 58:19
82:7,11,13,20
82:21 83:2,3
83:13 84:20
85:9 86:16,21
86:22,23,24
87:1,5 140:17
178:5 213:21
214:18 302:3
**plan** 42:14,16
279:6,14
282:16,17,19
282:20
**plans** 42:17
**play** 30:22
204:9 219:25
230:10
**please** 7:4,20
8:10,19 9:13
30:3 43:25
129:20 131:4
141:3 160:3
170:23 171:18
205:24 210:9
276:11 306:1

309:17 323:4
**pledged** 187:25
**plus** 170:6,7
298:24
**point** 14:4 17:1
17:10 23:6
33:11 37:3,5
117:17 124:20
167:3 203:7,16
214:14 259:11
270:13 274:15
289:16
**pointed** 89:20
**pointing** 76:20
**police** 180:24
**policy** 52:12,22
283:13
**poplar** 3:15
**populate**
307:11
**portion** 13:8
91:4
**position** 20:22
23:8 33:16
68:9 98:2
120:2 155:8,10
212:13 219:3
268:13 272:13
314:2 316:3
**positions** 266:2
**possession**
211:7 238:2,6
247:15 248:11
260:9

**possibilities**
121:15,17
**possibility**
288:9
**possible** 88:10
88:13,15 121:4
121:7 124:13
158:4 296:25
**possibly** 27:13
70:7 321:5
**potential** 79:6
143:6 267:25
270:17
**potentially**
31:21 142:17
**practical** 13:17
**preceded** 18:22
64:7
**precise** 188:15
**predecessor**
239:18
**preference**
116:19
**preferential**
303:9 313:2,7
313:15
**preferred** 6:3
123:3,4,6
124:18 125:2
126:13,16
129:6,10,17,21
132:19 140:8
140:12 223:2
223:13,18,22
226:5 227:19

228:22 230:19
230:24 231:11
232:24 248:22
249:6,10
250:14 312:13
312:15,20
313:2
**preliminary**
8:7
**preparation**
168:17
**present** 4:21
172:17 173:12
266:7
**presentation**
6:8 42:5
170:18,23
171:6 178:19
**presented**
172:11 178:11
203:21 233:18
274:11 306:6
**preserve**
284:25
**preserved**
50:24 51:1,2
285:2,5 287:1
304:1
**president** 16:19
16:20,25 17:5
17:8,15 33:15
263:4
**press** 6:21
257:8

**pressure** 204:3
**prevent** 82:3,7
82:21 83:14
**prevented**
82:13 84:20
**previous** 18:10
20:20 21:23
82:10
**previously** 11:4
11:6 12:1 62:7
83:1 222:6
**price** 95:12
99:20 101:13
101:16,21
112:12 127:9
228:12,18,19
**primarily**
19:14 55:14
301:12
**primary** 9:23
18:15 19:7
215:13,14
**principal**
112:18 190:17
**principals**
123:18
**print** 126:6
**prior** 65:12
78:20 86:23
195:2 254:4
258:17 265:4
276:21 287:21
293:10 322:8
322:11

**private** 299:8
**privilege** 8:14
  8:17,20 84:1
**privileged**
  31:22 95:20
  145:6,9
**pro** 250:24
**probably** 18:5
  25:3,5 28:16
  33:4,21 56:22
  59:18 63:8
  88:12 97:8
  102:4 104:16
  109:9 223:20
  241:4 259:21
  264:9 266:21
  268:18 278:7
  281:17,22
**problem** 136:5
  204:5 283:9
**procedure** 1:19
  211:25
**procedures**
  47:9,24 87:5
**proceed** 299:12
**proceeding**
  52:17 327:9
**proceedings**
  323:11
**proceeds** 250:1
  256:14 294:2
**process** 47:12
  87:4 196:1
  211:25 305:10

**processes** 47:9
**produced** 1:13
  93:20 98:5
  106:13 113:14
  125:11 128:25
  131:23 162:1
**production**
  5:16
**professional**
  172:23 295:13
  317:11
**profit** 272:4
  315:13,15,15
**profited** 315:11
**program**
  283:17
**promissory**
  64:13 73:9
  134:14,17,23
  136:20 308:24
  309:2
**proposal** 231:2
  231:20 232:23
  295:18
**proposed**
  126:21 224:5
  232:14
**prosperity** 6:19
  184:22,23
  185:2,19,21,25
  186:21,23
  187:1,12 188:5
  188:7,13,19,25
  189:5,8,12
  190:4 191:4,22

192:17,21
193:17 194:20
195:3 199:1,11
199:20 200:8
200:15,18,23
201:21 202:13
202:22 238:22
239:3 240:10
242:21 258:10
279:9
**protective** 8:23
  193:7
**protocol** 47:12
  240:7 303:25
**proved** 325:9
**provide** 41:22
  42:24 53:8
  181:24 219:19
  266:21 270:14
  306:15 307:15
**provided**
  111:10 171:22
  206:6 210:7
  226:11 232:3
  232:21 246:3
  299:9
**provides**
  115:18
**providing**
  138:15 188:14
  208:1 298:24
  304:4 306:16
**pry** 291:15
**public** 63:3,10
  63:10 251:3

258:2 290:16
291:10,17
294:23,23
296:2,3,6
297:13,21
298:1,10
325:20 326:10
326:25
**publicly** 291:6
  294:19
**publish** 224:12
  237:13 238:21
  257:3
**published**
  221:22
**pull** 63:10,12
  106:5 122:13
  150:1,5 153:20
  163:14 203:18
  205:10 209:15
  224:3 228:14
**pulled** 63:3,9
**pulling** 62:12
  191:5 222:1
**purchase** 5:20
  5:21,23 6:2
  91:21 92:17,22
  92:25 97:23
  98:5,11,21
  99:4,6,20
  100:18 105:22
  107:2,3,9,19
  123:3,4 127:9
  224:21 228:12
  228:17,19

231:24 232:1,5
232:9,12,15,23
234:2,18
235:12,16
236:24 271:24
272:4 291:17
293:24 294:19
298:1,2 311:1
315:14
**purchased** 92:4
92:9,13 96:9
96:15,16
100:12 103:21
103:24 104:3
105:5,15
106:25 107:1
124:7 136:1
231:19 233:13
233:14,17
244:25 249:13
272:6 291:5
298:5
**purchaser** 99:5
224:4
**purchases**
251:6
**purchasing**
227:19 291:10
294:18 297:13
**purportedly**
85:20 275:25
283:5
**purporting**
129:1

**purpose** 186:22
191:18
**purposes** 99:17
186:22 187:10
187:17 284:2
293:4 325:14
**pursuant** 1:18
292:4 326:21
**pursue** 80:9
270:21
**put** 47:19 62:7
71:14 111:5
118:18 119:21
120:2 122:1
150:7 165:15
172:9,14,22,24
175:18 225:4
225:15 294:24
317:6,9
**puts** 164:20
**putting** 23:14
141:25

**q**

**q1** 19:14 23:15
**q2** 19:14
**q3** 20:14
**q4** 20:14 23:15
**qualifications**
299:20
**quality** 7:5,5
**quarter** 17:25
17:25 18:8
22:4 23:18
24:15,16,16
25:23 261:8

263:17
**quarterly**
129:19
**question** 8:20
11:5 13:18
14:1,6,6,16,17
17:6 30:3
43:25 47:3
52:11,11 58:7
67:20 80:9
81:22 83:10,17
84:6,16,17,25
85:6,7,12,14
86:7,8,10,13,14
90:19 92:7
99:10 111:10
118:3 119:2
120:13,23
124:19 133:19
139:18 140:10
141:5 145:8,24
146:6 147:3,5
156:17 158:25
160:1,3 164:25
172:20 173:17
174:11 175:3,8
179:14 192:19
199:2 213:13
213:16,18
216:3 220:10
224:7 232:6
233:24 236:1
236:18 246:5
249:20 253:24
258:19 259:22

261:3 269:15
276:18,20
283:8 285:19
285:20 286:16
286:25 287:11
289:3,3 294:12
295:6 296:24
300:9 301:3,21
302:21 312:4
320:6 321:22
322:8,8,11
**questioning**
67:24 203:6
220:24
**questions** 13:11
13:11 168:9
182:1 184:16
185:19 190:22
197:20 199:16
202:24 232:2
236:6 259:14
262:9 264:10
265:2 268:2
281:12,23,25
296:21 314:1
317:17,20,25
318:5 319:9
321:6 322:3
**quick** 110:5
182:11 264:18
280:21 317:25
**quickly** 262:15
**quinlen** 4:22
**quote** 119:20

**[quotes - recall]**

**quotes** 95:12
115:18
**quoting** 120:17

**r**

**r** 2:1
**raise** 7:20
40:19
**ran** 33:9
**random** 186:17
**range** 261:8
**rao** 6:11 204:7
204:9,20 205:3
205:16,20
206:6 211:4
218:8 219:1,16
226:11 229:22
230:12
**rao's** 230:15
**rate** 250:24
273:8
**rather** 50:9
294:10
**reach** 122:7
290:2,4 299:24
**reached** 31:16
**reaction** 60:17
**read** 62:24
160:3,4 163:3
222:13 243:9
325:1 329:6,8
**reading** 165:7
227:17 245:18
**ready** 7:17
**real** 182:11
264:18 280:21

**really** 24:6
99:16 110:5
174:25 184:17
319:15
**reason** 14:9
23:19,22 54:5
54:8 71:25
122:14,16
132:23 151:14
165:20 172:6
172:11 173:2
173:13 174:7
175:14,25
203:24 214:23
215:9 238:5
242:24 258:3,6
264:19 280:5
283:23,25
293:13 297:17
309:25 324:4
**reasonable**
122:7 214:12
**reasons** 81:20
305:1 327:3
328:10
**rebecca** 4:23
**recall** 11:11
12:21,24 16:13
16:24 17:17
18:3 19:16,22
21:2,4,18
22:16 23:24
24:21 34:13
37:24 38:3,12
38:21 39:3,7

39:24 40:7
42:21 43:11
47:17 48:12
50:4,20,23
51:11,23 53:14
53:23 55:4
57:2,6,10 60:9
69:22 70:3,19
70:21,24 74:8
74:14 79:24
80:10,16 87:12
87:24 88:5,9
88:16 90:10,15
90:24 92:18,24
93:7 94:17
96:4 97:20
102:4,11,15
103:3,4,17
105:3 106:3
109:2,3 110:15
114:14 117:23
118:15 119:17
119:23 121:13
123:9 144:9
149:19 163:11
167:1,19
169:12,16
170:17 174:6
184:20 185:12
185:13 187:7
187:22 188:3
189:10 196:19
199:14 200:9
200:16,20
202:11,23

206:18,20
212:25 213:22
214:2 215:9
216:15 218:5
222:8 228:8,22
233:7,17
234:12 235:1
248:5,25 249:3
256:25 257:2
257:12 261:21
261:22 263:7
264:7,11,13
268:19 269:6
270:20 271:19
271:20,23
272:16 273:15
274:11,15
275:19 276:25
277:9 278:13
286:23,24
287:2,24
289:19 291:21
293:2,7,14
297:4,24 298:6
302:14,18
304:2 305:10
305:17,20
306:5,5,6
307:9,10,19
309:1,2,6,11
310:11,13,18
311:3 312:18
312:25 317:5,7
317:8 318:2,6

**[receipt - referring]**

**receipt** 247:4,9
247:16 327:1
**receivable**
139:9,11
**receive** 32:1
90:25 149:15
151:15 152:20
153:10,14
249:9,17,22
250:1,4 293:22
**received**
150:12 151:11
151:22,25
152:3,9,25
153:6 171:5
193:22 205:16
221:11 222:16
238:1 242:14
243:7,11
244:18 246:13
247:20 250:2
256:9 258:3,14
260:13 294:2
**receiving**
115:23 151:19
264:7
**recent** 167:15
**recess** 15:4
68:4 110:10
137:11 144:1
152:15 163:5
182:21 221:6
262:20 282:5
314:10

**recipient**
242:13
**reciting** 328:9
**recognize**
62:25 68:23
222:6 224:18
261:21
**recollect** 224:6
**recollection**
70:19 107:14
115:22 124:14
124:22 125:1
127:1 144:9
165:11 167:23
206:3 213:1
279:12 288:22
291:20 292:20
294:1 300:11
310:25
**recommend**
118:4
**recommendat...**
142:22
**reconcile** 207:3
**record** 1:21 7:1
7:10 8:5,22
9:14 14:13,23
15:3,5 19:10
67:11,23 68:2
68:5 110:8,11
137:9,12
143:21,23
144:2 146:11
152:12,16
159:24 163:6,9

182:16,17,19
182:22 221:4,7
248:15 259:13
262:18,21
281:16 282:3,6
287:17 303:19
314:8,11 318:1
319:3 322:20
326:14
**recorded** 7:8
7:11 303:22
**recording** 7:5,8
**records** 22:19
158:15 211:3,8
219:22 229:3
258:2 261:5
309:7
**recover** 111:21
**recovery** 57:16
76:23 77:5
253:18,22,25
**recused** 317:4
**recycling** 57:16
76:23 77:5
253:18,22,22
254:1
**redeem** 271:20
**redemption**
129:6,21
132:19 133:4
**redemptions**
129:18
**reduce** 271:3
271:13 306:17

**reduced** 170:8
270:24
**redundant**
196:15
**refer** 91:16
125:25 126:3
183:19 220:4
260:5,7
**reference** 108:3
166:13 186:25
238:15,18
291:12,13
**referenced**
191:4 271:12
279:15 283:17
314:13 329:5
**referencing**
287:20
**referred** 28:17
134:19 135:18
188:13 260:25
287:5,21
**referring** 27:22
31:21 39:17
58:10 106:24
120:8 121:13
121:17 125:17
134:9 172:15
173:4,6,18
175:17 183:19
228:15 260:4
271:8,14
282:20 299:7
314:15 315:2

**refers** 134:6
191:5
**reflected**
136:11
**reflecting**
127:25
**refresh** 115:22
126:25 213:8
224:16 284:17
**regard** 47:6
48:7 194:4
196:2,13 197:3
199:20 200:14
201:23
**regarding** 1:20
46:9 126:13
156:7 220:16
223:17 254:12
254:24 259:1
289:5 293:15
318:3 319:10
**regular** 44:19
45:22 48:14
196:3,5 199:19
239:10
**regularly** 38:14
168:22 199:22
239:12
**reimbursement**
154:17,19
**reinvent** 37:18
**rejected** 117:3
295:21
**relate** 11:20
107:8 247:25

256:6
**related** 136:10
237:24 244:19
247:4,16 248:4
248:12 253:10
254:15 255:3
259:3 270:3
327:8
**relating** 200:8
**relations** 284:2
**relationship**
16:3 34:6,10
35:21 54:18
55:14 89:16
101:24,25
104:12,13
114:10,11
130:14 138:20
189:8 198:10
**relationships**
188:4,19,24
284:4
**relative** 291:25
**release** 6:21
257:8
**released** 106:20
**releases** 258:2
**rely** 267:4
320:8
**relying** 321:18
**remainder**
235:2
**remained** 117:8
**remaining**
106:21 117:5

182:4 201:2
252:8
**remedies**
198:25 199:6
199:11
**remember**
16:19 24:5
36:3 42:13
57:24 63:13
69:16 79:25
80:11 103:19
107:13 119:10
122:5 141:21
190:1 200:24
215:19 217:25
218:2 251:11
257:22,23
268:17,22
269:10,16,20
270:5 271:18
273:3 274:23
275:4 277:5,11
277:12 287:8
287:23 293:7
297:6 306:11
307:13 310:17
315:23 319:15
321:11
**remotely** 1:10
1:18 297:6
326:8,12
**removed**
277:15 309:7
311:6

**removing**
311:11
**rep** 280:18
**repay** 30:23
31:5,10 112:5
279:6,7,14
**repeat** 34:20
236:6 258:21
**repeating**
236:17,20
285:14
**rephrase** 25:13
92:2 196:12
**replaced** 26:2
**reported** 1:10
1:17 326:8
**reportedly**
275:10
**reporter** 7:16
7:19 9:9,12
13:12,23,25
18:24 19:1,23
20:2,7 34:20
34:24 62:1
137:21 141:2
160:2 271:22
274:6 276:7,10
276:13,17
287:7,12
300:18,20,24
320:20,24
322:4,12,15,17
323:2,5 326:10
**reporter's** 5:11
326:6

**reports** 44:19
53:9,15,18,21
**represent** 8:8
93:20 98:4
99:15 106:12
113:13 125:10
128:24 131:22
150:11 161:25
171:4 178:9
183:2 192:13
205:15 210:2
237:23 238:5
239:7 257:24
268:8 275:15
**representative**
280:12,15
**representatives**
112:2
**represented**
191:13 206:1
240:14 248:9
**representing**
7:2 132:24
**represents**
222:18 279:19
**repurchase**
6:17 115:24
224:21 227:15
228:17,22
232:8
**repurchased**
228:17
**request** 115:19
116:24 205:18
248:15

**requested**
160:4 219:19
326:23 327:5
**requesting**
185:1 193:3
**required**
286:10
**requirement**
313:3
**resale** 32:24
**research**
159:12 160:13
160:14 304:25
**reserve** 322:2
**reside** 9:18
**residence** 9:23
**residences** 9:22
9:24 10:7
**resign** 23:11
24:9 25:19,25
26:9,12,14
66:13 277:7
313:17
**resignation**
5:19 19:4,13
23:2 26:17,20
30:21 31:6,11
66:8,9 68:14
69:1,1,9,13
70:9 71:1,19
72:8,16 73:6
81:13,23 83:7
87:10,15 94:9
99:1 169:7,18
170:13 173:23

175:12 202:14
230:15 251:17
251:21,25
252:7,13,17,18
254:11 260:13
319:22
**resignations**
23:1
**resigned** 19:17
20:20 21:20
23:8 24:8
29:24 30:4
32:3 66:7
69:25 77:13
81:9 82:25
83:9 174:1,4
177:6 202:1
206:7,21
212:17 219:20
230:14 263:19
263:23 280:2
292:24 311:10
319:18 320:1
320:13
**resigning** 18:11
23:2 69:10
**resolution** 25:7
274:11
**resolutions**
22:23
**resolve** 119:6
**resources** 89:3
89:8,18 318:4
318:17 319:6

**respect** 276:24
313:9
**respectively**
222:21
**respond** 79:22
94:19 95:13
117:25 118:11
119:4 235:22
269:9,10
272:12
**responded**
75:11 107:25
264:11
**responding**
119:1 205:18
**responds**
118:16 163:25
**response** 6:13
6:22 13:25
79:18 80:10
118:3 150:12
150:14,16
210:2,3 272:20
286:12
**responses**
162:7
**responsibilities**
42:3 177:13
**responsibility**
30:10 42:3,4
43:4 44:5 46:6
122:6 176:10
177:24 247:4
289:24

**responsible**
   246:15,19
**rest**  166:3
**restaurant**
   102:15 104:20
   115:4
**restricted**
   187:1,12,14,17
   187:20
**restrictions**
   187:23
**restrictive**
   187:9
**restroom**  67:22
   110:1,5
**restructure**
   113:19
**restructuring**
   171:13
**result**  222:21
**resume**  294:10
**retain**  300:11
   305:5
**retained**
   299:19
**retaining**  39:10
   306:20
**retention**
   171:15
**retire**  30:19
   271:24 314:14
   314:20
**retired**  103:21
   117:16

**retirement**
   272:5
**retrieve**  286:11
   286:17
**retrieved**  286:2
   286:3,7
**return**  329:12
**returned**  327:1
   327:2 328:11
**revenue**  18:18
   222:19 293:3
**revenues**  15:22
**review**  99:9,13
   145:19 166:3
   168:20 169:8
   210:10 248:10
   266:19 328:7
**reviewed**  169:3
   169:13
**rid**  197:20
**ridge**  10:5
**right**  7:21
   11:15 16:25
   20:3,15 21:11
   50:8 55:17
   56:7 59:19
   61:13,14 62:10
   62:25 64:1
   65:5 67:8,18
   70:25 72:19
   73:19 76:14
   78:24 84:11
   95:16 106:18
   109:11 117:24
   118:20 126:5

137:8 138:16
166:2 171:19
173:10 175:22
175:22,23
181:8 186:15
190:5 193:2
194:9 212:16
212:25 221:1
241:14 242:1
263:6,9,17,21
264:2,5 278:3
279:19 281:4
288:19 289:2
289:18 294:15
295:1,14 297:4
303:16 308:16
310:23 311:17
311:20 312:13
312:16,16,17
318:10,14,19
319:23 320:15
322:5,6,19
**rights**  200:14
   220:19,20
**ring**  307:13
**rise**  144:14
   145:21 146:2
   148:4,14
   149:11
**road**  3:9
**robert**  3:13
**role**  10:16
   16:11,17 17:4
   17:8,9,13,18,21
   20:11,13,22

21:24 26:19
28:2 30:10,22
33:7,12,14
34:25 36:8,10
36:13,22 43:4
77:4,7 90:6
155:23 156:1,8
167:6,9,16
184:18 185:25
204:9 219:24
230:10 264:1
275:17 280:3
313:9,13
**roles**  10:18
   167:11,12
   215:17 216:11
**ross**  4:7
**rough**  322:22
   322:25 323:4,7
   323:10
**roughly**  27:8
   38:5
**round**  203:5
**route**  297:21
**rphair**  2:5
**rsm**  231:9
   248:20
**ruhland**  3:2
**rukavina**  4:16
   5:9 8:6,7
   109:13,19,25
   136:3,8 182:11
   262:11 265:2
   268:5,8 274:8
   276:8,11,14,19

280:25 281:3,7
281:20,24
282:8 285:15
287:13,18
300:19,22
301:2 303:12
313:21 314:3
314:13 317:15
321:14
**rule** 84:5 85:25
326:21
**rules** 1:19 13:6
67:1 146:17
329:14
**run** 110:6
248:16 299:21
**runke** 39:18
**russell** 274:4,6
274:24
**ryan** 2:3 3:1
8:2,6 9:3,10
13:7 14:11
52:16 66:17
67:21 83:17
85:3 109:13
120:22 133:8
145:9 146:21
146:24 147:15
148:2 174:10
262:25 264:18
265:6 322:10
323:3
**ryan.sullivan**
3:5

**s**

**s** 2:1 4:1 185:24
260:22 274:8
325:24
**sahrish** 2:17
**sale** 99:19
101:16 105:24
126:13 217:21
218:3 244:19
294:3 308:15
309:22
**sales** 106:1
**san** 9:19 94:4
107:17
**satisfactory**
193:8
**satisfied** 296:5
**satisfy** 122:8
194:24
**save** 51:24
**saved** 52:1
**savings** 40:25
**saw** 63:7,14
73:20 197:2
231:9 242:3
243:1
**saying** 14:16
15:17 58:3,15
59:16 61:1,3
64:6 67:13
78:23 80:11
118:4 120:19
134:16 162:14
164:23 165:5
165:14 191:17

195:16,17
213:4,4 214:2
218:22 227:3
236:16 281:21
287:8
**says** 59:11
65:17 67:1
85:5 94:11
96:21 101:6
108:8 115:17
116:5,23
118:17 125:24
129:9,17
133:14,18
134:12,22
147:8 154:17
162:11 163:19
163:25 164:1,9
165:21 166:23
171:9 206:20
225:24 228:17
230:4 244:1,10
**schaffer** 4:11
5:8 182:6,9,10
182:14,25
183:2 188:12
193:3
**schedules**
194:5 306:24
307:1,7,12
**schneider**
280:9
**schumacher**
260:25 261:2

**scope** 40:10
**scott** 4:15,24
8:8 39:18,21
268:12
**screen** 7:7
52:24 53:2
62:13,14 68:22
69:6 106:8
113:12 125:6
150:7,8 161:23
170:25 265:8,9
286:14
**scroll** 73:10
93:25 94:19
95:11 96:19
115:12 117:25
125:16 126:5,9
132:11 150:15
154:25 161:24
178:8
**seal** 325:17
**seat** 149:17
212:13
**sec** 258:2
**second** 8:12
14:24 22:3
23:17 24:15,16
73:10 83:16
84:24 85:16
94:12 96:19
101:23 123:14
125:16 134:8
141:3 153:5
159:22 205:5
236:12 259:8

[secondary - sent]                                                Page 65

| | | | |
|---|---|---|---|
| **secondary** 9:24 | 132:3,12 | 251:14 253:16 | 297:19 310:5 |
| 10:6 | 134:24 147:9 | 253:19 265:9 | 315:16 |
| **seconds** 264:24 | 147:18 150:17 | 265:12,19,23 | **seller** 228:4 |
| **secret** 292:4 | 151:1,3,9 | 266:9,12,17 | 311:21 |
| **secretary** 28:21 | 153:22,25 | 267:6,7 276:14 | **selling** 96:10 |
| **secure** 183:24 | 154:6,14 155:2 | 281:1,3 282:2 | 97:10,11 |
| 184:7 192:17 | 155:16 156:13 | 287:14,19 | 100:24 101:2,3 |
| **secured** 9:7 | 157:8,11,25 | 317:3 320:21 | 101:22 230:19 |
| 64:13 73:9 | 158:5,12 | 322:15 | 230:24 302:22 |
| 91:7,11 183:3 | 160:24 161:3 | **seeing** 307:9 | 311:21 |
| 184:3 192:21 | 161:23 162:3,8 | **seek** 276:23 | **sells** 93:2 |
| **securities** 94:5 | 162:12,15,20 | **seem** 181:2 | **send** 50:21 |
| 94:20 | 163:16,22 | **seemed** 172:23 | 51:13 53:15,18 |
| **security** 140:20 | 164:2 165:25 | **seems** 196:15 | 53:21,24 69:14 |
| 183:23 184:7 | 168:13,13 | 211:13 247:1 | 69:20 72:12 |
| 188:1 192:17 | 170:21 171:1,7 | **seen** 7:7 63:2,5 | 173:23 252:22 |
| **see** 21:10 28:21 | 171:10,22 | 132:5,8 133:22 | 286:14 313:10 |
| 42:12 62:14,21 | 172:5 173:8 | 135:18 194:13 | **sending** 42:13 |
| 62:23 63:16 | 175:9,18 | 196:23 237:21 | 50:10 94:1 |
| 64:13 68:17,19 | 178:12,14,17 | 241:17 244:16 | 115:13 134:1 |
| 69:7 70:5,15 | 178:22,24 | 248:6 257:8 | 163:21 |
| 87:4 93:22,23 | 181:10 195:11 | 259:15 307:6 | **sends** 94:4 |
| 93:24 94:15,24 | 198:19 205:10 | **seidel** 4:15,24 | 126:8,12 |
| 95:14,25 96:23 | 205:11,14,25 | 8:8 268:12 | 162:10 |
| 98:8 106:6,9 | 209:25 210:25 | **seized** 316:10 | **senior** 9:7 |
| 106:14,16,22 | 212:24 213:5 | **selected** 40:6 | 91:11 183:3 |
| 108:10 111:18 | 213:12 214:9 | **self** 295:10 | **sense** 281:19 |
| 113:6,16 | 214:10,10,17 | 311:13 | **sensitive** |
| 115:13,20 | 220:20 221:25 | **sell** 93:6,8,10 | 311:14 |
| 118:7,12,21 | 224:6,14,16 | 94:22 96:2 | **sent** 26:17 |
| 119:7,13 | 228:8,13,19 | 97:13,16 | 42:16,17 69:15 |
| 124:16 125:7 | 229:4,5 231:3 | 100:23 103:9 | 69:16 70:9 |
| 125:14 126:1,7 | 234:22 237:18 | 103:15 112:9 | 71:15 72:15 |
| 126:17 129:3 | 237:20 241:10 | 112:12 123:5 | 85:20 94:8 |
| 129:22 131:20 | 242:6 248:16 | 125:18 127:10 | 95:1,16 106:21 |

**[sent - shares]**

107:25 108:8
116:9,20 130:9
132:18 133:4
158:16 175:12
227:11,15
232:21 246:10
264:14 274:19
274:22 283:12
319:22 320:14
**sentence**
222:14
**separate**
198:12 318:16
**separated**
81:10 88:3
292:23 302:1
**separately** 23:6
210:6
**separating**
57:10
**september** 57:4
194:7 206:7
207:2,8 211:14
211:19,19
212:3,15,18,22
213:3,11,21
214:1,6 219:2
219:13 226:10
230:22 266:12
268:14,20
269:22
**series** 129:10
150:16,22,24
150:24 155:1
157:6 238:21

239:8,9 253:17
**serious** 231:19
**serve** 189:3
208:11 209:4,5
**served** 152:8
203:22 207:6
208:14 266:20
326:18
**server** 259:16
259:17,19,25
260:10 286:8
**serves** 271:16
**service** 240:1
306:23
**serviced** 197:1
**services** 32:24
33:3,5 137:23
138:4,15 139:6
139:8 140:4
141:13,17
148:16 152:1,4
153:3,4,15,25
154:6 166:21
186:10 188:14
204:16 208:24
217:16 233:21
234:3 239:16
244:1,2,3
248:10 282:10
282:13 304:5
304:23 305:15
306:15 308:15
308:24 309:13
316:16,17,23
318:13 319:5

**serving** 267:7
**set** 6:22 51:12
52:5 284:15,18
**settlement** 6:5
130:24 131:24
132:1,8,10
133:6 135:15
136:10 290:2,4
**seven** 20:15
21:3,5 83:18
119:18 148:2
286:9
**seventh** 4:2
**several** 186:19
**severance**
45:10 191:14
191:18,24
192:8,9,10
193:20,21
197:6 304:9,10
304:13,18
**shake** 14:1
**shalom** 5:23
100:3,3,9,11
101:23,24
106:20 107:3
245:1 312:5,9
**share** 6:1 69:6
79:16 132:19
133:4 149:21
161:20,22
202:10 209:18
230:19 251:4
264:16 298:12

**shared** 63:13
138:4,15
141:13 311:4
**shareholder**
16:5 17:14
27:4 31:1 34:3
78:1,8 87:4
124:18,25
125:2 127:6
131:7,17
136:14,18
137:3 168:20
175:13 176:5,8
179:9 180:8,16
181:3 223:13
274:12
**shareholder's**
129:20
**shareholders**
42:4 43:5,20
56:4 219:25
220:2,2 288:18
**shares** 6:3,17
27:20,22 29:9
29:11,13,19
34:2 89:11,13
89:14 117:15
117:20 123:6
123:17 125:18
126:16,20
127:5,9 128:4
129:6,10,13,18
129:21 130:11
130:11 131:12
223:3,18,22

224:5,21 226:5
227:16,20
228:17,23
232:8,24
248:22 249:6
249:10,13
250:15 302:22
303:9 312:20
**sharing** 150:8
265:8
**sheet** 229:1
325:24 329:10
**shell** 291:10,17
294:19,23
297:13 298:1
**shift** 37:19
**shill** 301:16
**short** 293:8
319:17
**shorthand** 1:18
326:9
**shortly** 206:22
268:20
**shot** 52:24
286:14
**shots** 53:2
**show** 62:20
**showed** 267:2
**showing** 68:21
106:8 113:12
126:5 131:19
170:24
**shown** 229:25
230:1 245:6
326:19

**shut** 146:14
**siblings** 275:18
**sidebar** 233:1
**sign** 18:4
232:12 328:9
329:6,11
**signal** 49:9,12
49:22 50:5,5,9
50:13,17,22
51:21,21,24
52:3,7,13,25
53:3 103:6
194:1 283:17
283:20 284:15
285:3,8,22
286:1,7,11,21
**signature** 5:11
70:25 71:3,4,5
71:6,13,14
73:13,14 75:14
75:17,21 76:2
76:5,13,21
78:4 98:12,16
98:19 110:15
111:1,23 225:1
225:6,8,12,14
225:23 226:2
226:22 227:4,8
227:20 228:1,9
230:4,23 288:5
288:5 324:1
325:2 326:22
326:25 327:3
327:17 328:11

**signed** 71:12
72:4 73:10,15
73:17,23,25
75:5,9 81:15
81:25 99:24
100:4 132:14
132:16 133:6
225:25 226:25
265:21 329:17
**significance**
76:18 179:23
**significant** 13:8
78:1,8 79:14
124:25 180:3
256:22
**signing** 8:25
240:9,16,21
241:1 274:24
**simple** 167:14
**simply** 67:15
**single** 155:11
169:12 251:4
**sir** 14:8 17:7
42:2 52:11
62:16 65:24
72:23 73:13
81:13,23 82:17
83:7 84:17
91:10,14 95:16
95:25 98:1,16
98:19 101:7
111:2 116:17
117:21 119:17
120:17 126:1
128:23 131:6

133:2 134:5
147:21 171:18
177:22 179:20
266:3 271:8,14
271:21 274:15
274:23 275:2
277:21 281:12
283:11 285:4
288:14 294:8
299:7 304:24
306:1 307:18
307:18 308:23
317:11
**sit** 206:12
**sitting** 21:13
22:7 39:8 40:4
42:22 51:16
52:21 70:2,11
71:25 75:16
85:22 87:6
121:12 132:7
144:17 145:25
146:1 147:21
148:3,13 156:6
156:25 169:12
172:10 173:1
173:12 174:7
181:8 213:9,19
290:20,25
295:20 309:12
**situation** 313:6
**six** 19:18 20:10
20:15 21:3,5
83:17,19 84:6
88:14,17

104:19 146:7
147:3 175:3
253:17 275:3
307:14
**sixkiller** 3:8
**sixth** 241:5,6
**size** 190:5
299:21
**sizeable** 305:18
**slow** 66:25
236:14
**small** 293:11,12
**snapchat** 49:18
**snow** 3:14,20
19:7
**social** 49:20
54:17,19 58:9
58:10,11
**sofa** 307:3,7,12
**softly** 274:9
**sold** 93:9 95:10
96:7 101:1,4
105:5,16
117:15,20
123:17 126:16
126:21 128:3
217:11,11,13
310:7,19,22
312:12,20
315:18 316:15
316:16
**sole** 274:25
**soleja** 2:17
**solution** 290:4

**solutions** 3:1
263:9,11,20
264:2 266:2,6
267:17 327:18
328:18 329:3
329:19
**somebody** 25:4
26:4 166:8,11
185:14 206:12
211:20 275:14
290:17 308:13
**son** 22:11 24:13
24:14 100:13
159:8 160:9
161:14 162:22
163:11 164:4
164:12,17
165:12,18,23
166:20 304:9
304:21 305:5
**son's** 22:13
**soon** 220:22
**sorry** 11:5
14:11 20:4
24:23 25:3
54:3 58:2
59:15 62:9
69:3,5 79:22
91:25 120:12
123:12 127:14
137:22 138:11
150:23 163:19
176:7 180:2
209:18,24
218:2 219:12

220:10 236:12
245:13 264:19
278:11 287:13
289:17 305:3
316:16 319:21
320:21
**sort** 13:5 44:12
44:13
**sorts** 204:2
**sought** 203:13
**sound** 194:9,17
217:24 223:5
288:19
**sounds** 42:15
74:10 211:18
221:14 223:10
289:10 310:10
320:25,25
**source** 18:15
91:1 235:11,15
236:9,24 237:3
251:5 258:7
282:13
**southeast** 4:2
**speak** 9:9 149:8
**speaking** 66:21
67:7 86:4
111:16 274:9
**specific** 47:19
84:19 86:17
196:9 260:3
**specifically**
170:12
**specifics** 23:14
36:5 173:1

297:17
**specify** 266:1
**speculate** 308:4
308:5
**speculating**
270:7
**speculation**
66:23
**spend** 81:4
197:19
**spent** 157:19
**spoke** 35:24
60:3 87:20
200:17
**spoken** 74:21
74:24 75:2
114:2,6
**squint** 62:24
**ssoleja** 2:21
**staff** 18:10
**staffing** 33:5
**stamp** 125:23
**stamped** 93:16
**stand** 170:3
281:5
**standard** 47:9
71:6 82:11
83:12 211:25
**start** 46:23,25
262:12 271:23
317:18
**started** 8:3
18:10 57:10
112:2 204:6
214:20 296:21

starting 194:6
state 1:17,20
9:13 225:1
243:6 264:5
265:17 267:10
325:6,21
326:10 328:2
stated 1:21
85:17,18
statement 8:4
169:3,8,13
175:23 230:1,2
241:4 242:4
307:4 328:9
statements
6:20 168:17,21
171:18,20
221:19 222:2,7
222:10 231:10
238:22 242:21
states 1:1 7:13
326:1
station 10:2,3
status 32:1
112:24 115:18
115:23 116:2,5
116:23 117:2
169:19
stay 307:25
stayed 252:24
step 25:10 38:9
43:18 140:17
215:25 243:9
243:10

stephanie
261:16
stepped 26:3
43:11 54:22
275:12
stepping
275:17
steps 111:15
118:6 223:17
223:20,21
302:3
steven 124:9,12
124:15 125:13
stipulation
14:5
stipulations
1:21
stock 6:17
123:3,4 140:12
223:3 224:22
230:19 231:11
232:9 292:3
296:3,6 302:25
312:13,15
stocks 140:8
230:24
stonecipher
4:12
stonecipherla...
4:14
stop 52:12 86:4
174:24 175:2
217:9 222:23
235:25

stopped 14:22
52:10
stopping 204:4
stored 286:9
strategic 29:25
42:16 267:19
272:21 273:10
strategy 39:22
167:10 294:21
street 2:13,18
3:3 4:2,17
185:17
strike 116:1
124:23 127:14
145:25 179:21
234:6 235:10
250:9 277:5
285:9 290:21
301:3 310:3
structure 28:13
28:19 191:1
structured
28:14 139:12
stuff 67:14
267:21 308:2
styled 1:15
239:4
subject 12:25
129:18
submit 155:22
156:22
submitted
69:10 71:22
73:6 99:1
157:1,20

170:13
subpoena 5:16
6:10 52:2 62:7
203:9,21
237:25 268:17
268:18,24
307:17,18
subpoenaed
203:12
subpoenas
286:12
subs 6:15
subscribed
325:12 328:13
subsequent
79:21 80:2
107:2
subsequently
319:22
subsidiaries
168:18
subsidiary
89:10,25
318:12 319:5
substance
265:3 328:8
successful
298:21 299:3
successfully
217:3
sued 12:1
suggest 278:18
suggested
269:17

[suggestion - taken]                                            Page 70

suggestion
  118:17
suggestions
  142:22
suggests   212:17
suite   2:13,19
  3:4,10,15,21
  4:3,7,18
sullivan   3:1 5:9
  262:24 263:1
  264:21,24
  265:4 321:20
  322:7,10,10,13
  322:16 323:1,3
  323:3
summer   38:6
sums   279:11
supply   3:13
  4:22 203:4
  239:10,13,18
  239:22 240:2
support   138:4
  141:12,13
  144:24 155:21
  188:1 208:2
  271:10
supports
  156:18
supposed
  154:20
sure   9:11 13:3
  17:25 18:3
  20:16 21:7
  23:12 25:4,9
  26:3 30:4

33:23 36:2,10
41:25 51:18
58:2 68:11
70:16 77:14
85:10 87:18
98:13 99:14
109:18 112:20
139:11 141:20
142:10,13,18
143:13 144:15
151:13 155:24
156:2,5,10,21
156:24 157:5
157:17,23
158:19 160:8
160:18,22
161:13 164:6,7
165:19 167:5
167:13,18
169:5,11
176:18 182:14
183:16 184:8
188:12 190:12
190:18,21,25
192:23 193:13
195:8,13,21
196:23 198:2
201:20 207:10
208:3,16,23,25
209:2,17
210:15 211:9
212:6,10,20
213:15,22
214:16,19
215:5 217:22

218:22,24
219:7 220:11
220:14 221:15
223:4 224:24
225:3,5 226:9
229:15 231:1
233:25 236:7
236:19 240:7
240:19 243:11
250:18 254:3
264:14,25
266:21 269:16
279:16 280:1
280:18,23
283:2 285:15
287:1 292:18
294:13,13
296:4 304:12
304:19 305:9
305:13 314:1
315:7 317:3
320:18
surprise   105:14
  105:20 128:14
  130:16 133:25
  135:11,24
  136:19 179:1
  202:16
surprised
  105:4 124:2
  240:21,24,25
  288:10
surrounding
  272:9

survive   170:3,6
  170:11
suspend   52:6
suspended
  52:22
suspicion   75:20
swear   7:17
sworn   1:14
  6:13 7:23
  326:13 328:13

            t

t   185:24
table   126:15
  127:11 229:4
take   7:9 8:11
  13:12,20,25
  14:4,7 21:11
  23:5 58:18
  67:22,22 68:1
  76:9 88:6
  107:11 109:9
  109:15,17,25
  109:25 110:5
  145:16 177:7
  206:19 220:21
  223:17,20
  262:12,17
  281:20 302:3
  313:22
taken   1:14
  52:24 111:15
  142:24 191:17
  197:9 223:21
  259:10 327:10

**talk**  45:9 55:12
67:23 78:14
79:25 91:18,19
142:13,21
153:18 170:12
185:20,23
200:24 263:11
271:3 275:6
276:11 279:17
290:3 296:10
296:11,11
306:19 308:2
313:23
**talked**  19:13
44:11 56:5
57:9 58:8 59:8
59:11 79:19
111:25 114:12
166:25 168:14
200:3 217:1
267:23,23
277:25 288:15
293:6 294:22
295:16 296:9
304:20
**talking**  23:15
45:14,25 52:16
55:17 57:13
64:3,5 68:9
95:8 99:17
110:14 139:10
144:8 163:9
187:5,21 250:6
250:6 254:1
255:17 257:18

263:12 267:25
270:11 285:3
285:21 287:3
290:16 297:6,7
303:9
**talks**  222:13
**task**  40:14
**team**  108:9
**tech**  97:18
203:17 205:7
209:21 221:21
**technical**
143:25 152:14
163:4
**telecom**  22:1
32:22 141:15
141:17,23,25
153:4 186:10
188:17,19
189:4,12,24
197:15 201:22
255:23,24
256:15 316:15
316:16,22
**telecommuni...**
32:11
**telephone**
38:25 39:2
49:24,25 58:19
58:20,21 59:15
79:1 102:23
303:18
**telephonic**  39:3
**tell**  14:4 24:7
40:4 61:4

133:20 161:14
187:25 200:10
200:12 201:1
260:24 276:3
282:24 292:19
306:1,14
309:16
**telling**  60:23
84:13 86:6
227:5,7 311:24
**tells**  117:2
**temp**  213:5
**temporary**
215:17
**ten**  11:12 73:5
81:14,24 94:7
**tennessee**  3:16
**tenure**  44:16
47:14
**term**  125:22
187:8 207:9
305:12
**terminate**  84:5
222:22 277:10
**terminated**
24:9 277:13
**terminating**
169:25 300:14
**termination**
221:12 222:17
270:3,19
**terminology**
271:25
**terms**  23:1
125:21 283:3

309:19
**terri**  4:24
**terry**  203:15
221:17 224:12
237:13 238:21
257:3
**tertiary**  10:7
**testified**  7:23
183:4 197:21
216:16 230:17
235:5 263:4,15
288:4,8 319:11
**testify**  14:9
203:25
**testifying**
147:14 167:19
**testimony**
66:16 67:5
73:17 107:7
120:6 133:2,11
133:13 160:4
165:10 166:24
174:2 226:25
227:14 228:21
232:7,9,22
233:8 236:4,23
253:21 258:13
258:18 265:5
287:21 315:10
318:3,7 319:13
326:14 329:8
**texas**  1:1,17
2:14,19 3:4,21
4:8,18 7:14
9:19 10:2,4

97:17,19 98:7
99:5,20 100:16
101:17 103:10
105:6,16,25
108:9,12,18,20
114:14 115:3
117:16 235:4
235:12 238:4,4
246:11 326:1
326:11 327:17
328:2
**text** 49:4,5,22
50:10 51:2,4,8
51:13,17 52:7
52:13 103:1
161:17 162:2
162:10 163:1
163:10,19
164:21,22
165:4,7,14,25
166:2,8 193:25
284:13,20
285:11,22
286:16,18,20
**texted** 280:22
**texting** 283:22
**texts** 6:7 52:24
53:2
**thank** 8:6 9:1
15:7 19:12
20:9 52:18
68:7 110:3
136:8 182:1,7
182:10 193:9
202:24 203:6

204:6 205:9
221:9,23
262:10 317:14
319:8 323:7
**thanks** 14:20
268:2
**thanksgiving**
58:16 59:25
**theirs** 293:11
**thing** 175:9
209:19 295:14
301:17 302:6
**things** 13:17
67:2 263:3
267:22 317:25
321:9
**think** 8:20
12:11 13:23
16:10 22:11
24:15 26:18
51:16 55:12
59:7 60:18,23
63:19 65:1
68:12 69:15
70:5 79:13,18
80:11 85:20
92:19 96:14
99:15 107:6
112:19 116:15
116:15 118:24
119:20 121:25
136:6,9 138:2
138:9 139:11
144:13 147:22
148:25 149:1

166:5 170:21
173:10 174:8
174:17,18
176:20 181:21
183:7 186:5,14
186:20 191:2,4
192:12 195:9
198:16 201:11
201:17 206:24
210:17 211:23
220:23 229:10
231:1 237:5,11
241:5 242:16
258:20 259:14
260:15 262:8
267:2 274:18
276:20 277:9
281:17,19,21
286:3,7,10
290:1 295:3,8
296:21 298:12
301:15 308:7
308:14 309:5
313:21,25
322:7,18,22
**thinking**
121:10 142:16
142:19,20,21
165:16 166:1,9
208:20 319:4
**third** 17:25
18:7 25:23
96:15 99:23
134:12 203:5
261:8 263:16

308:7 310:18
**thomas** 4:22
205:17
**thought** 24:23
64:24 143:9
144:7,23 149:3
158:8 270:13
287:21 300:6
304:14
**thoughts**
282:21
**three** 11:2 58:3
60:7 73:21
88:6,8,11
107:11 108:25
119:2 148:20
153:22 200:4
215:20 261:12
261:14,20
262:5,8
**throckmorton**
2:18
**time** 8:5 9:1
10:22 13:8,21
16:20 17:3,10
21:1,10,15
26:4 33:11,22
36:15 40:5
43:17 53:25
54:2 56:16
57:7 58:8,24
59:1,5 60:3,15
61:11 63:7,14
64:20 65:25
66:20 67:17

**[time - transaction]**

72:15 73:20
77:11,22 79:5
79:9 80:8
85:18 86:11,12
87:20,22,24
91:22 99:13
102:2,17
104:18 109:10
109:10 110:2
114:12,12
124:20 132:7
136:4 142:4,10
146:19 147:18
147:20 149:14
157:19 161:12
167:3 169:17
169:18 170:16
175:9 182:2,4
182:12,16
198:22 201:21
207:3 214:14
223:1 230:18
235:9 240:14
245:3 248:19
259:10 274:15
276:21 288:2
289:16 297:22
298:15 299:14
304:3 306:9
310:15 321:4
321:15,24
329:15
**timeframe** 57:5
59:19,25 329:7

**timeline** 58:3
320:25
**times** 11:1,2
55:3 59:19
83:18,19 84:6
85:2 120:23
146:5 147:3
174:10 175:3
186:19
**tired** 294:8
**title** 129:5
280:19
**toby** 95:20
**today** 7:3 13:4
13:6,10 21:14
22:7 39:8 40:4
42:22 51:16
52:21 70:2,11
70:18,21 71:25
75:16 87:6
111:20 112:20
120:6 132:7
133:2 144:17
145:25 146:1
147:14,21
148:3,13 156:6
156:25 165:10
166:24 169:12
172:10 173:2
173:12 174:7
175:4,6 181:8
182:2 203:13
203:24 204:21
212:8 213:9,19
213:24 218:23

219:11 227:14
228:21 233:10
249:4,7 250:17
250:19 258:22
262:14 276:21
279:23,24
286:12 290:20
290:25 295:20
308:6 309:13
321:7
**together** 172:9
172:14,23,25
175:18 210:7
225:4
**told** 56:13
61:12,12 64:25
118:22,24
187:22 200:6
270:23,24
302:11 314:3
**tomahawk** 9:21
**tomorrow**
94:14 162:19
294:10
**tonight** 294:11
**tony** 210:16,17
211:4,5 218:8
218:8 219:16
225:4 229:22
229:22 230:12
230:13 261:6
**took** 20:13
86:21,24 255:2
305:11

**top** 134:5 162:5
171:9 174:8
230:4 242:2
265:15
**topics** 185:13
303:17
**total** 126:19,20
161:5 166:19
171:23 172:2,7
173:3,18 190:6
**totaled** 258:11
**totaling** 194:16
**totals** 190:13
**touch** 13:18
**tough** 295:5
**track** 112:23
**traded** 291:6
294:19
**trades** 101:20
**trading** 101:20
**trail** 9:21
**transaction**
55:21 80:21
81:1 97:1
107:15 127:2
127:21 128:1
229:15 231:6
235:3 245:4
246:7,15,22
247:25 248:4
250:7 251:10
251:12,18,22
253:5 257:11
287:4 288:9
292:13,16

[transaction - two]                                                      Page 74

293:12 294:6
294:15,16
299:12 311:17
315:12 317:2
**transactions**
189:9 239:10
248:3,12
255:11 273:23
302:17
**transcribe**
13:13
**transcript**
326:13 327:2
328:6 329:5,16
**transfer** 94:21
107:12 185:18
189:21 194:20
228:10 229:6
233:21 240:7
241:12,23
242:25 243:23
244:10 253:1
253:11 254:7
308:22 313:14
**transferred**
91:4 136:20
189:22,22,23
202:17 229:4
239:22 240:2
258:10 259:4
289:9,13
**transfers** 185:1
202:21 239:11
253:14,17
254:9,13,16,19

254:22,25
255:3,7
**transition**
40:20 43:14
170:1 216:20
299:10,15
**transitioning**
217:2
**travis** 2:13
328:1
**treated** 235:5
**trees** 301:1
**tried** 43:12
75:23 112:8,10
229:2
**tries** 281:16
**trip** 54:24
**trouble** 20:5
**troubling**
181:10
**true** 210:10
212:21 225:8
226:14 230:23
308:23 325:3
326:14
**truly** 225:24
**trust** 292:6
303:6
**trustee** 4:11,15
8:9,13,16,23
181:14,18,23
183:3 184:9
198:24 199:4,5
199:12 200:7
200:10,11,12

200:13 218:17
218:17,19,20
218:23 247:21
262:10 268:9
268:10 273:22
274:21 275:14
279:17 280:1
289:7 323:7
**trustee's**
205:17
**trusts** 292:9
304:5
**truthfully**
203:25
**try** 17:21,22
93:13 122:4,6
183:5 199:6
203:6 223:18
273:13 275:13
275:21 282:16
286:11,16
287:18 290:2,3
307:25
**trying** 43:14
66:20,21,25,25
67:8 92:12
133:10 147:2
149:23 174:12
175:4 181:1
195:20 199:15
220:22 236:22
267:19 272:17
281:15 284:23
300:25 314:14
322:17

**turn** 222:9
248:11
**turned** 247:18
247:21,24
248:4
**turning** 248:5
**turtle** 3:20
**twice** 24:2
199:22,24
**two** 11:2 12:7
12:19 28:8,24
60:1,7,25 61:1
61:1 63:23,25
74:10,11 76:10
98:25 104:22
104:23 114:15
133:15 134:1
136:6,7 149:15
151:22 152:19
152:23,24
153:9,13 156:4
160:24 167:17
169:2 173:23
178:24 189:11
190:3,3 195:18
197:21 198:1
198:17 200:3
200:19 215:20
220:4 228:5,10
235:1 243:9,10
251:20 258:17
262:8 285:20
293:10 299:4
305:23 318:9

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

**[type - value]**

**type**   45:19 46:1
142:15 144:21
155:7,20
160:12 161:11
218:6 231:15
290:17 306:22
**typical**   82:14
82:17 85:5
**typically**   23:4
33:9 39:2
46:16 48:18
49:5 51:7,15
53:1,16 193:25
218:12 228:3
238:19 285:23

**u**

**ufs**   137:22,23
137:24 138:7
138:11,15,20
139:8 149:5,12
204:14,15,20
217:15 218:3
309:25
**uh**   186:11
**ultimate**   41:7
**ultimately**
103:24 270:21
**umb**   4:11 183:2
183:2 198:23
200:7,11
202:17
**uncomfortable**
281:11
**under**   84:5
91:5 112:15

125:21 193:7
226:11 241:11
253:16 300:7
325:10,17
**understand**
13:15 30:15
45:5 59:12
67:17 70:17
85:19 91:18
139:18 140:14
179:20,22
181:1 183:7,8
183:11,17,22
189:19 199:4
203:11 213:7
216:3 218:3
220:3 221:11
230:20 236:5,7
263:12 272:18
278:21 284:22
294:12 298:16
299:17 312:4
312:12 318:17
**understanding**
37:5 41:12
65:18,22
103:20 104:11
112:13 114:20
123:18 127:15
151:19 176:15
177:11,13
187:8 194:11
194:15 201:10
207:5,14 210:8
210:9 221:13

273:12 277:2
277:16 279:21
280:15 283:4
283:21 284:10
287:25 291:1
299:16 305:19
309:12,16
316:1,5
**understood**
284:14
**undertaking**
303:25
**unhappiness**
56:11
**unhappy**   55:20
**unified**   137:22
137:23 139:6,8
204:15 208:24
217:16 233:21
234:2 308:15
308:23 309:13
**united**   1:1 7:13
326:1
**units**   316:17,20
317:5
**unpack**   85:15
**unrestricted**
178:13,17,21
179:10
**update**   115:19
116:3,5,24
182:12
**updates**   32:1
53:16,17
112:24 115:23

**upset**   57:18
73:22 76:6
181:2
**urging**   304:17
**us.dlapiper.c...**
3:11
**usa**   89:14
**use**   49:2,18,20
50:9,17 62:2
71:7 108:23
125:22 197:6
264:15 284:1,4
285:21 288:16
289:21 306:25
307:11
**used**   49:1 103:5
130:10 182:13
236:9,24
238:14,17
256:13 259:16
261:12,14
283:24 294:25
298:20 329:16
**user**   50:6
**using**   50:22
71:13 103:6
**usually**   251:5
274:9

**v**

**valid**   175:20
**valuation**   97:5
293:4,16
310:18
**value**   32:24
129:19 152:3

**[value - went]**                                                    Page 76

223:2,8 231:10
233:4 234:7
248:22 249:2
273:8 301:9
**var** 32:24
**various** 150:17
**venture** 267:24
299:1 300:3
306:18
**verbal** 13:25
26:16 66:8
251:24 252:17
**verbally** 66:12
263:20 319:18
320:13
**verified** 150:14
**verify** 210:15
228:11 329:8
**veritext** 7:3
327:18 328:18
329:12,19
**veritext.com.**
329:13
**verizon** 286:9
**versus** 151:20
**video** 7:8,11
13:14 283:22
**videographer**
4:21 7:1,18
13:13 14:21
15:1,5 68:2,5
110:8,11 137:9
137:12 143:23
144:2 152:12
152:16 163:6

182:15,19,22
221:4,7 259:12
262:18,21
281:1,5 282:3
282:6 287:10
314:8,11
322:20
**videotaped** 1:7
1:12
**view** 272:23
273:1
**viewed** 199:8
**virtual** 38:25
**virtually** 7:5
**visibility** 247:7
**voluntary**
273:14
**volunteer**
273:1
**volunteering**
273:3
**vote** 317:4
**vp** 39:22

| w |

**w** 4:6
**wait** 55:7 59:11
141:3 271:22
300:9
**waiting** 210:12
**waived** 8:13,17
**walk** 13:5
**want** 13:5,18
14:4 19:3,10
22:3 58:2
66:24 67:3

68:10 78:8
82:19 83:12,13
84:18 87:18
91:17 99:18
106:21 111:9
133:15 162:22
164:4,11,23
166:3 170:12
175:5 177:11
193:6 210:7
236:6,6 275:3
278:18 280:23
281:7,13
284:25 285:4
311:8 314:1
317:17 322:25
**wanted** 20:21
101:13 103:14
165:11,21
191:1 197:7
231:18 263:3
301:24 311:15
**wanting** 200:18
226:4
**wants** 8:4
162:18 164:1,9
165:5 278:22
281:15 295:9
322:22
**washington** 2:4
8:3 9:5
**way** 49:14
53:13 80:22
85:25 86:9
103:23 110:2

120:14 176:25
201:18 273:9
275:16 276:23
277:19 292:13
302:20 315:10
318:18
**ways** 49:25
**we've** 64:3
106:9 294:13
**website** 257:3
**wedding** 56:23
56:24 57:22,23
57:23,24 58:3
58:5,10
**wednesday**
94:14
**week** 245:23
275:3
**weeks** 73:21,21
275:3 307:14
**weisman** 4:24
**welcome** 166:5
224:25 239:8
**went** 56:23
57:22 163:9
179:9 191:25
192:14 204:14
225:4 226:10
230:13 233:3
234:17 247:2
250:14 267:23
267:23 287:5
287:22 291:4
298:13

**west** 162:19
166:12,13,16
166:17 184:21
184:23 185:2,8
185:14
**whatsapp** 49:8
**whatsoever**
274:2
**white** 162:7
**wholly** 89:10
89:25
**wi** 287:15
**wife** 130:17
**william** 280:8
**willing** 67:9
262:14
**willow** 10:5
**wind** 40:13
44:8 46:25
216:19 301:8
301:13 302:3
**winding** 40:15
**winstead** 2:18
247:14,15
248:8 262:2
**winstead.com**
2:20,21 329:1
**wire** 161:14
162:11,14
163:20,21
239:11
**wired** 162:15
163:22
**wires** 6:7

**withdrew**
270:12 271:5
**witness** 1:13
5:11 7:7,17
11:7 14:14,19
18:25 31:25
85:17 95:19
99:11,14
109:24 147:13
147:14 172:21
174:22,24
175:2 317:15
324:2 326:12
326:15,19
328:3,4,7,9,10
328:11 329:5,7
329:9,11,15
**word** 301:15
306:24,25
307:3
**words** 120:17
**work** 14:23
37:13 39:1
54:21,23 122:8
133:22 138:5
146:17 156:23
157:3 159:13
159:17 160:10
160:16,20
204:13,14,20
210:7 267:10
267:14
**worked** 54:21
**working**
149:21

**works** 86:1,9
95:13 146:24
204:22
**world** 35:11,19
35:21
**worth** 2:19
93:9 95:4 97:2
101:5 238:10
305:11
**wright** 1:16
326:9 327:17
**write** 106:19
165:5 166:10
241:18 286:20
**writing** 202:3
263:23 264:11
**written** 18:1
26:17 66:9
69:1 72:16
73:6 94:9 99:1
138:7 141:16
155:25 157:15
221:11 222:16
226:8 251:17
251:20,21
252:18 254:11
260:13 264:10
319:22 320:14
**wrong** 76:20
216:17 319:12
**wrote** 224:23
225:2,3,5
286:25 287:6

**x**

**x** 326:23

**y**

**y'all** 14:17
248:10 264:14
**yeah** 19:22
20:16 22:9,21
24:25 30:9
38:3 39:13
41:10,16 45:22
46:12 47:17
51:11 58:17
67:13,25 70:10
70:17,24 80:16
93:1 95:24
99:14,21
109:21,24
113:24 120:18
123:13 136:6
148:12 184:14
190:7,25
210:15 215:12
228:25 229:15
229:19 258:17
264:23 272:14
281:14 285:17
291:21 292:21
298:4 313:25
314:5 317:19
322:13 323:5
**year** 8:14 21:12
24:2 36:2
38:20 61:14
70:21 76:9
102:4 114:15

**[year - zoomed]**                                      Page 78

114:16 152:7
168:7 172:1
187:4,5,6,6
189:7 220:8
222:3 274:24
283:5 293:10
321:2,12
**years**  11:12,12
11:12,14 12:13
33:4 63:20
114:15,15
149:15 151:22
152:5,19,22,24
153:9,13
159:10 166:21
167:17 169:2
215:20,20
222:20 228:10
235:1 258:17
286:9 293:10
302:19 303:3
305:23
**yelling**  274:10
**yep**  62:9
145:13
**york**  2:9,9
**younger**  286:5

**z**

**zakharyayev**
124:9,12,15
125:13 126:8
126:12 127:1
129:14 130:5,9
130:14

**zakharyayev's**
126:20
**zero**  250:16
**zoom**  1:18
62:17,19 69:5
**zoomed**  62:20
62:21

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.