IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

IN RE:                              .  Case No. 22-31641-MVL-7
                                    .
                                    .
GOODMAN NETWORKS, INC.,             .  U.S. Bankruptcy Court
DBA GOODMAN SOLUTIONS,              .  1100 Commerce Street
                                    .  Dallas, Texas 75242
                                    .
                    Debtor.         .  Wednesday, October 11, 2023
. . . . . . . . . . . . . . . .     .  9:00 A.M.


TRANSCRIPT OF HEARING ON AMENDED MOTION TO COMPROMISE
CONTROVERSY WITH PROSPERITY BANK AND UMB BANK, NATIONAL
ASSOCIATION FILED BY TRUSTEE  SCOTT M. SEIDEL (300), DAY 2
**BEFORE THE HONORABLE MICHELLE V. LARSON**
**UNITED STATES BANKRUPTCY COURT JUDGE**


APPEARANCES ON NEXT PAGE.


Audio Operator:     Hawaii S. Jeng


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**LIBERTY TRANSCRIPTS**
**9107 Topridge Drive**
**Austin, Texas 78750**
**E-mail:  DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

APPEARANCES:

| | |
|---|---|
| For the Chapter 7<br>Trustee: | Munsch Hardt<br>BY:  DAVOR RUKAVINA, ESQUIRE<br>        THOMAS DANIEL BERGHMAN, ESQ.<br>500 North Akard Street, Suite 3800<br>Dallas, Texas 75201 |
| For FedEx Supply<br>Chain Logistics and<br>Electronics, Inc. | Butler Snow LLP<br>BY: ADAM M. LANGLEY, ESQUIRE<br>        R. CAMPBELL "CAM" HILLYER, ESQUIRE<br>6075 Poplar Avenue, Suite 500<br>Memphis, Tennessee 38187 |
| For UMB Bank as<br>Indenture Trustee<br>and the Majority<br>Noteholder Group: | Hunton Andrews Kurth LLP<br>BY: PHILIP MICHAEL GUFFY, ESQUIRE<br>600 Travis Street, Suite 4200<br>Houston, Texas 77002<br><br>Hunton Andrews Kurth LLP<br>BY: BRIAN M. CLARKE, ESQUIRE<br>200 Park Avenue<br>New York, New York 10166 |
| For ARRIS Solutions,<br>Inc: | DLA Piper LLP<br>BY: NOAH SCHOTTENSTEIN, ESQUIRE<br>        JAMES PAUL MUENKER, ESQUIRE<br>1900 North Pearl Street<br>Suite 2200<br>Dallas, Texas 75201 |
| For Prosperity Bank: | Jackson Walker LLP<br>BY:  VICTORIA ARGEROPLOS, ESQUIRE<br>        BRUCE RUZINSKY, ESQUIRE<br>1401 McKinney Street, Suite 1900<br>Houston, Texas 77010<br><br>Prosperity Bank<br>BY: JESSICA LEE FREEDSON, ESQUIRE<br>80 Sugar Creek Center Boulevard<br>Sugar Land, Texas 77478 |
| For James Goodman: | Pulman, Cappuccio & Pullen, LLP<br>BY: RANDY PULMAN, ESQUIRE<br>2161 NW Military Hwy Ste 400<br>San Antonio, Texas 78213 |

3

APPEARANCES (CONTINUED):

For U.S. Bank, National        Shipman & Goodwin, LLP
Association, as               BY: KATHLEEN M. LAMANNA, ESQUIRE
Collateral Agent:             One Constitution Plaza
                              Hartford, Connecticut 06103


APPEARANCES (VIA WEBEX):

For UMB Bank as               Hunton Andrews Kurth LLP
Indenture Trustee             BY: PAUL N. SILVERSTEIN, ESQUIRE
and the Majority              200 Park Avenue
Noteholder Group:             New York, New York 10166

                              Stonecipher Law Firm
                              BY: ERIC A. SCHAFFER, ESQUIRE
                              125 First Avenue
                              Pittsburgh, Pennsylvania 15222

# I N D E X

Page

Amended Motion to compromise controversy with
Prosperity Bank and UMB Bank, National Association.
Filed by Trustee Scott M. Seidel (300)

**Court's Ruling - Matter Taken Under Advisement**      220

WITNESSES:

FOR PROSPERITY BANK:

LAWRENCE MORRIS BATES
  Direct Examination by Ms. Argeroplos              8
  Cross-Examination by Mr. Clarke                  23
  Cross-Examination by Mr. Rukavina                45
  Cross-Examination by Mr. Hillyer                 47
  Cross-Examination Continued by Mr. Clarke        72
  Cross-Examination by Mr. Pulman                  77
  Examination by the Court                         80
  Redirect Examination by Ms. Argeroplos           86

DAVID MONTGOMERY
  Direct Examination by Ms. Argeroplos             90
  Cross-Examination by Mr. Clarke                  95
  Cross-Examination by Mr. Rukavina               104
  Cross-Examination by Mr. Hillyer                106

EXHIBITS:                                     ID    EVD

FOR THE BONDHOLDERS:

48                                            18    26
49                                            26    29
50                                            29    32
51                                            32    35
55                                            36    37
64                                            37    39
65                                            39    40

FOR FEDEX-ARRIS:

22                                            62    64
23                                            62    65
24                                            62    68
25                                            62   111
109                                           70    70
112                                          115   116

1          (Proceedings commenced at 9:00 a.m.)

2          THE CLERK:  All rise.  The United States Bankruptcy

3   Court for the Northern District of Texas Dallas Division is now

4   in session.  The Honorable Michelle Larson presiding.

5          THE COURT:  Please be seated.  Good morning,

6   everyone.  We are here on our 9 o'clock docket.  Oh, so early.

7   All right.  We have one matter on the docket this morning.

8   That's case number 22-31641 Goodman Networks, Inc., and Goodman

9   Networks.  I'll take appearances for the record and I'll start

10  with those in the courtroom.

11         MR. RUKAVINA:  Your Honor, good morning.

12         Davor Rukavina and Thomas Berghman for Mr. Seidel.

13  Mr. Seidel is stuck behind a wreck in North Dallas.  He sends

14  his regrets, but he is on his way.

15         THE COURT:  Okay.

16         MR. RUKAVINA:  Also, with Your Honor's permission,

17  Mr. Berghman will have to leave at 11 for a 341 in the new case

18  he filed.  He'll be back as soon as that's over.

19         THE COURT:  Is it in the Northern District?

20         MR. BERGHMAN:  Jeff Morris, Your Honor.  Yes.

21         THE COURT:  Oh, the wrong division.

22         MR. BERGHMAN:  That's right.

23         THE COURT:  Oh, okay.  All right.

24         MR. BERGHMAN:  My sincerest apologies.

25         THE COURT:  So you may have a little ways to go.  No

6

1   worries.

2            MR. GUFFY:  Good morning, Your Honor.

3            Philip Guffy from Hunton Andrews Kurth.  Along with

4   me is my colleague, Brian Clarke.  Possibly appearing on the

5   phone today will be Mr. Paul Silverstein, as well as Eric

6   Schaffer from the Stonecipher Law Firm for UMB Bank National

7   Association as Indenture Trustee and the Majority Bondholder

8   Group.

9            THE COURT:  Good morning.

10           MS. ARGEROPLOS:  Good morning, Your Honor.

11           Victoria Argeroplos and Bruce Ruzinsky of Jackson

12  Walker on behalf of Prosperity Bank.  With us in the courtroom

13  is two of the Bank's legal department and then our two

14  witnesses, Mr. Bates and Mr. Montgomery are in the conference

15  room next door.

16           THE COURT:  Okay.  Excellent.

17           MS. ARGEROPLOS:  And we'll start with Mr. Bates

18  today.

19           THE COURT:  All right.  Thank you.

20           MR. HILLYER:  Good morning, Your Honor.

21           Cam Hillyer and my partner Adam Langley on behalf of

22  Butler Snow.  And we represent FedEx Supply Chain Logistics and

23  Electronics.

24           THE COURT:  Good morning.

25           MR. BAKER:  Good morning, Your Honor.

7

1          James Baker of DLA Piper on behalf of ARRIS.  I

2  believe I'm also joined this morning via telephone by my

3  colleague Noah Schottenstein.

4          THE COURT:  Good morning.  Is there anyone on WebEx

5  who would like to make an appearance this morning?

6          MS. LaMANNA:  Good morning, Your Honor.

7          Kathleen LaManna of Shipman & Goodwin for US Bank as

8  collateral agent.

9          THE COURT:  Good morning again.

10          All right, ladies and gentlemen.  We're here on the

11  Trustees 9019 with Prosperity Bank and UMB.  I think when we --

12  I'm drawing a blank.  When we last broke, we were in the middle

13  of the direct testimony, as I recall.  I'm losing it.

14          MR. RUKAVINA:  That's okay, Your Honor.  Mr. Seidel's

15  testimony is completed and I have rested my case.

16          THE COURT:  Right.  And --

17          MS. ARGEROPLOS:  And so yeah, we're --

18          THE COURT:  Right.  We didn't start a new witness.

19  I'm sorry.

20          MR. RUKAVINA:  This is what happens at 9 a.m.

21          THE COURT:  Okay.  I was like, why do I not remember

22  the witness's name?  There was none.  There we go.  That

23  explains it.  All right.  Okay.  And so you said we're going to

24  start with Mr. --

25          MS. ARGEROPLOS:  Mr. Bates.

Bates - Direct/Argeroplos                                 8

1                   THE COURT:  Bates.  All right.

2                   MS. ARGEROPLOS:  Prosperity will call Lawrence Bates.

3                   THE COURT:  All right.  That's what y'all get for

4    starting early.

5                   Good morning, Mr. Bates.  If you could take the stand

6    and then raise your right hand for me.  Good morning.

7              LAWRENCE MORRIS BATES, PROSPERITY'S WITNESS, SWORN

8                   THE COURT:  Thank you very much.  Please be seated.

9                   THE WITNESS:  Your Honor, can I go get my glasses?

10   I'm sorry.

11                  THE COURT:  Of course.

12                  THE WITNESS:  Okay.

13                  THE COURT:  Of course.  No worries.

14                            DIRECT EXAMINATION

15   BY MS. ARGEROPLOS:

16   Q    Okay.  Mr. Bates, would you please state your full name

17   for the record?

18   A    Lawrence Morris Bates.

19   Q    And did you listen to Mr. Seidel's testimony yesterday?

20   A    No, I did not.

21   Q    Did you discuss his testimony with anyone?

22   A    No, I did not.

23   Q    Thank you.  What is your title at Prosperity Bank?

24   A    Executive vice president.

25   Q    And what are your duties as executive vice president?

Bates - Direct/Argeroplos                              9

1  A    I run two lending groups for the company and just take

2  care of our clients.

3  Q    Where did you work before Prosperity?

4  A    Our predecessor company was called LegacyTexas that we

5  sold to Prosperity Bank on November 1st of 2019.

6  Q    Great.  And where did you work before then?

7  A    Our predecessor company was called --

8            THE COURT:  Pardon me.

9            MS. ARGEROPLOS:  Speak up?

10           THE COURT:  Okay.

11           MS. ARGEROPLOS:  Apologies, Your Honor.

12           THE COURT:  Oh, no worries.

13 BY MS. ARGEROPLOS:

14 Q    Where did you work before LegacyTexas?

15 A    Our predecessor company before that was ViewPoint

16 Financial Group, which acquired Legacy Bank and we restyled our

17 company LegacyTexas.  And prior to that was a company called

18 Highlands Bank here in Dallas that I was a founder of in 2007

19 that we merged with ViewPoint Financial Group.

20 Q    Great.  And so how long does -- how far back does your

21 relationship go with James Goodman and his entities?

22 A    Back to Highlands Bank.  So probably ten years.

23 Q    There is a small --

24 A    Maybe 12.

25 Q    Thank you.  There's a small binder at the far left of that

Bates - Direct/Argeroplos                    10

1  shelf back there.  Okay.  And would you just flip through the

2  Tabs 1 through 15 and just verify for the Court that you're

3  familiar with the loan documents for the Genesis Networks

4  Telecom Services LLC and Genesis Networks Global Services LLC

5  loans from Prosperity Bank.

6  A     Sure.  Which tab is it?

7  Q     Tabs 1 through 15.

8         THE COURT:  When you have a moment, Mr. Bates, if you

9  could pull the microphone a little closer.

10        THE WITNESS:  Oh sure.

11        THE COURT:  Thank you.

12        THE WITNESS:  Sure.  I'm seeing all letters.  Wrong

13 one?

14        THE COURT:  Should be a thin one.  You'll have to

15 look at the --

16        MS. ARGEROPLOS:  That's the one.

17        THE COURT:  Yeah.  The front page.  Right.

18     (Pause)

19        THE COURT:  And for the record, Ms. Argeroplos, are

20 you having him review Exhibits 1 through 5?

21        MS. ARGEROPLOS:  1 through 15.

22        THE COURT:  1 through 15.  Okay.  All of them.  All

23 right.

24     (Pause)

25        THE WITNESS:  Yes, these look accurate.

Bates - Direct/Argeroplos                     11

1        MS. ARGEROPLOS:   Thank you.

2   BY MS. ARGEROPLOS:

3   Q    So right now, you managed the -- or I guess not right now,

4   but in 2022, you managed the relationship, the loan

5   relationship with the two Genesis borrowers, right?

6   A    Correct.

7   Q    And if I say the Genesis borrowers, you'll know I'm

8   talking about Genesis Networks Telecom Services and Genesis

9   Networks Global Services?

10  A    Correct.

11  Q    Okay.  And were you the only person in -- who manage that

12  relationship from Prosperity?

13  A    No.  Taylor Burns, who works for me, he was involved with

14  it and helped me with it.  That's why he's on some of these

15  loan documents.

16  Q    Anybody else?

17  A    No.

18  Q    What about Jordan Yenne?

19  A    He was more involved in the Goodman Networks relationship.

20  Q    Okay.  Do you remember the execution of deposit account

21  control agreements in favor of the Bondholders in 2017 by

22  Goodman Networks?

23  A    I'm sorry.  Say that again?

24  Q    Are you familiar with the 2017 deposit account control

25  agreements executed by Goodman Networks in favor of the

1  Bondholders?

2  A    Yes, I know about them.  Jordan executed them.

3  Q    And those were executed when the debt was held -- when the

4  Goodman Networks relationship and the -- or it was held by

5  LegacyTexas Bank.  Is that right?

6  A    That's correct.

7  Q    Okay.  Let's see.  And then let's turn to -- actually, I'm

8  going to hand you one of the Trustees exhibits.

9          MS. ARGEROPLOS:  May I approach, Your Honor?

10         THE COURT:  Of course.

11         MS. ARGEROPLOS:  I just pulled Exhibit E and a couple

12  others from the Trustees.  So we don't have binders flying

13  around all over the place.

14  BY MS. ARGEROPLOS:

15  Q    So looking at Exhibit E, had you seen this deposit account

16  control agreement before August of '22?

17  A    I had not.  But Jordan had, I'm sure.

18  Q    Okay.  Would you normally keep track of deposit account

19  control agreements being on the loan side of the Bank?

20  A    No.  Our treasury management group actually does that for

21  us.  And they monitor and flag those accounts.

22  Q    And when you say flag, are you talking about a flag in the

23  Prosperity Bank's account -- deposit account system?

24  A    In LegacyTexas when there was a deposit account control

25  agreement or DACA that existed, a flag was put.  And again,

Bates - Direct/Argeroplos                               13

1  this is not my area of expertise.  But a flag is put on the

2  account so that everyone knows that that exists.

3  Q    And how do you find out if that flag exists on an account?

4  A    I go down the hall on my treasury management group.

5  Q    And did you ask the treasury management group in October

6  of 2021 if there was a DACA in place on the 3992 account that

7  is described in this DACA agreement?

8  A    Yes, I did.

9  Q    Okay.  Would the Bank -- so what did you conclude after

10 that conversation?

11 A    That there were -- there's documentation that there was

12 not a DACA account on 3992 to a money market account.

13 Q    So there was no flag?

14 A    No flag.

15 Q    And so did you think in October of 2021 that the DACA had

16 been released?

17 A    Yes.  That's what I was told.

18 Q    Does Prosperity have a document where the Bondholders

19 released the DACA on the 3992 account?

20 A    We have not been able to locate that document.

21 Q    Would the Bank have taken that pledge of the 3992 account

22 in October 2021 if it thought a DACA existed at that time?

23 A    No.  Never.

24 Q    Nobody wants a second lien, right?

25 A    Right.  It's prohibited.

Bates - Direct/Argeroplos                          14

1  Q    Okay.  So when do you think the DACA flag fell off of the

2  3992 account?  Was that before or after the merger from

3  LegacyTexas into Prosperity?

4  A    It was before.

5  Q    And that merger you said was in November of 2019?

6  A    Correct.

7  Q    So just to back up for a second for some context, what is

8  your -- what was the context for Genesis -- for Prosperity

9  making the Genesis loan, the revolving line of credit.  I'm

10 sorry, the term loan?

11 A    So we're going back to the original one.

12 Q    The origination.

13 A    The two loans were made.

14 Q    Yes.

15 A    A loan was made to Genesis Network Telecoms and Genesis

16 Network Mobile Services to joint borrowers of $3 million in a

17 revolver.  And then a 1.9, roughly million dollar term loan.

18 That term loan was James Goodman assumed a debt of his brother,

19 John Goodman, that we had at LegacyTexas.

20 Q    And so when the Bank took the pledge in October of 2021 of

21 the 3992 account, what precipitated that pledge or caused

22 Prosperity to take it?

23 A    We had two coborrowers on the loan.  And reason we had

24 that was because one had strong cash flow, it was a Genesis

25 entity, and one had strong receivables.  One of those entities

Bates - Direct/Argeroplos                    15

1  was being sold, and we were going to have to take them off as a

2  coborrower.  And so in restructuring the loan to release that,

3  I said we needed, you know, to be paid off, or we needed liquid

4  collateral and just -- it's the way we went forward.

5  Q    Okay.  Did you understand there to be any consideration

6  flowing between the Genesis borrowers and Goodman Networks or

7  -- and Goodman Networks with respect to that pledge of the 3992

8  account?

9  A    Yes.  We, James and I, discussed that.  James Goodman and

10  I discussed it on several occasions.  And he told me that he

11  was going to give Goodman Networks -- that James' holding

12  company had been acquiring debt and equity common and preferred

13  I think, in Goodman Networks for quite a while and became the

14  largest shareholder, I believe.  And he said he was going to

15  give them debt and equity as consideration for that

16  transaction.

17  Q    Did you ever see a document memorializing that

18  arrangement?

19  A    I did not.  Our loan documents do say that that happened.

20  Q    So would you turn to Tab 9 in the Prosperity binder.

21  Is this the pledge of the 3992 account?

22  A    Yes, it is.

23  Q    Okay.

24  A    Yes.

25  Q    And I know it's small, but under collateral description

Bates - Direct/Argeroplos                          16

1  about three inches down, where it says Checking Account Number

2  70173992 with lender with a hold amount of 4.6 million.  What

3  does that hold amount of 4.6 million mean?  Is that a minimum

4  balance requirement?

5  A    That just means that internally a hold -- well, it means

6  that amount in that account is held.  Internally a restriction

7  of that amount is placed on the account.

8  Q    So can the balance of that account go below 4.6 million?

9  A    It can't.

10  Q    And was the balance of that account 4.6 million before

11  this -- before this refinance happened in October of 2021?

12  A    I believe it was higher than that.

13  Q    Will you turn to Tab 22?  So you've got on the first email

14  in this thread it looks like you're telling James that, "We're

15  adjusting the pledge to the other account.  See below.  This

16  will make the balance in the account sufficient to support the

17  entire loan."  So are you sure that the balance was 4.6 million

18  before this restructure -- before this pledge occurred?

19  A    No, I'm not.

20  Q    Okay.  So what's this -- what's described in this bullet

21  point here?

22  A    I believe we were moving money from another account that's

23  not pledged to the 3992 accounts sufficient enough to support

24  the pledge agreement.

25  Q    Okay.  And so James Goodman approved that just on October

Bates - Direct/Argeroplos                    17

1  28th, 2021.  Is that what that says?

2  A    Yes.

3  Q    Okay.  Fast forward to 2022.  Were you attempting in 2022

4  to restructure the Genesis loans with James?

5  A    Yes.  We were in frequent discussions about restructuring

6  the debt to not include -- to a different Genesis entity or a

7  Goodman related entity that did not include the pledge of a

8  deposit account.

9  Q    And when you say Goodman related entity, do you mean James

10  Goodman?

11  A    Yes.

12  Q    And was that the Endeavor entity?

13  A    That's correct.

14  Q    About when did those discussions begin?

15  A    Summer of 2022.

16  Q    And you were dealing with James Goodman on behalf of

17  Genesis borrowers and Endeavor.  Did you also understand that

18  he had decision-making authority for Goodman Networks at that

19  time?

20  A    Yes, I did.

21  Q    Was he a signer on the 3992 account at that time?

22  A    Yes.

23  Q    Was he a signer on the 3992 account in August of 2022?

24  A    Let's see.  August of 20 -- yes, he was.

25  Q    If you turn to Tabs 26, please.  So this is -- so we're

Bates - Direct/Argeroplos                    18

1  looking at an email from Stephanie Elmore on October 5th, 2022.

2  And what is she asking of Ana McCollum in this email chain?

3  A    She was asking to change the signer on the account.

4  Q    So on October 5th, 2022, James Goodman was still a signer

5  on the account?

6  A    Yes.

7  Q    So if James Goodman wanted to initiate a transaction out

8  of that account in August of 2022, would the Bank have had to

9  follow his instructions?

10 A    Yes.

11 Q    On August 10th, 2022, did you receive an email from

12 Michelle Ross at Reed Smith asking about the Goodman Networks

13 deposit accounts?

14 A    Yes, I did.

15        MS. ARGEROPLOS:  Your Honor, may I approach?

16        THE COURT:  Yes, you may.  Thank you.

17        MS. ARGEROPLOS:  I'm going to need a bigger podium.

18        THE COURT:  Actually, there is a bigger podium that

19 is coming.  I have --

20        MR. RUKAVINA:  Taller too, I hope.

21        THE COURT:  I don't know about taller.  It's going to

22 be similar to that which is in Judge Everett and Judge

23 Jernigan's chambers.  I mean, courtrooms not chambers.

24        MS. ARGEROPLOS:  So this is Bondholders' Exhibit 48

25 which is Docket Number 397-48 for the record.

Bates - Direct/Argeroplos                    19

1  BY MS. ARGEROPLOS:

2  Q    Mr. Bates, had you seen this -- or actually, had you ever

3  heard from Michelle Ross prior to August 10th, 2022?

4  A    No, I had not.

5  Q    And like you said earlier, you didn't think that there was

6  a DACA in place on the 3992 account when you got this email on

7  August 10th?

8  A    Correct.

9          MR. HILLYER:  Can you tell us which -- whose exhibit

10  we're looking at?

11          MS. ARGEROPLOS:  Bondholders 48.

12          MR. HILLYER:  Bondholders 48.  Thank you.

13  BY MS. ARGEROPLOS:

14  Q    Did you suspect that the Bondholders were going to try to

15  exercise their rights with respect to the DACA accounts at

16  Prosperity Bank when their counsel reached out on August 10th?

17  A    Yes.

18  Q    Okay.

19  A    We had done this before with them.  Not with her, but with

20  the prior counsel.

21  Q    Okay.  So you didn't recognize Michelle Ross, but you

22  recognized the fact that --

23  A    Correct.

24  Q    -- secured parties can send a notice of control?

25  A    That's correct.

Bates - Direct/Argeroplos                    20

1  Q    Okay.  Did you still think that the Bank had a first lien

2  in the 3992 account at this time?

3  A    Yes, I did.

4  Q    And did that change over the course of the next few days?

5  A    There started to be some doubt in the situation.

6  Q    Doubt in the Bank's lien position?

7  A    The release.

8  Q    And whether the release existed?

9  A    Where it was.

10  Q    And were you still in discussions with James Goodman about

11  restructuring the Genesis loans at that time?

12  A    Yes, I was.

13  Q    How was that going?

14  A    We were -- we needed to get to -- he needed us to get to a

15  place, but we were a little stalled.  And I couldn't get him to

16  engage.

17  Q    Would it be fair to say that he was giving you the

18  runaround around this time about restructuring the loans?

19  A    Yeah.  Just not engaging.

20  Q    Okay.  So then the pay down of the Genesis loans occurred

21  on August 15th, 2022.  Is that right?

22  A    Yes.  That's correct.

23  Q    So what was the decision making process for that?

24  A    As you see here on -- I guess, on August 15th, correct?

25  Q    Right.

1  A    We were getting dialogue from -- we were getting dialogue

2  from Michelle Ross's firm.  My mind started running about a

3  million miles an hour.  A lot of things going through my mind.

4  And quite frankly, looked at the situation and just said, you

5  know, it's something wrong here.  And so --

6  Q    So how did you feel about the Bank's collateral position?

7  A    There was some uncertainty.

8  Q    Were you worried that the Bank's interest in the 3992

9  account wasn't worth what you thought it was back in October of

10 2021?

11 A    I was concerned that the release document was at a

12 predecessor company.  And that I didn't know how we would find

13 it.

14 Q    Did you discuss the pay down of the Genesis loans with

15 James Goodman?

16 A    Yes, I did.

17 Q    How?

18 A    I called James and I said, James, I said, under the terms

19 of the loan agreement we are deeming ourselves insecure.  And

20 we need to repay the loan today.

21 Q    And what was his reaction?

22 A    He did not react.

23 Q    Did he say anything?

24 A    He did not.

25 Q    Is that a normal thing that he would do?

Bates - Direct/Argeroplos                          22

1  A     Yes.  He can be a little cryptic at times.

2  Q     Was there any indication that he opposed the pay down of

3  the Genesis loans?

4  A     There was none.

5  Q     Or that he disagreed with your statements about the Bank's

6  collateral position?

7  A     He did not.

8  Q     And at this time, you still -- the Bank still understood

9  that he had signing authority for the 3992 account?

10 A     Correct.

11 Q     And then so the Bank paid down the loans on the 15th.  And

12 then received the notice of control the next day on August

13 16th, 2022, right?

14 A     That's correct.

15 Q     And then after that, you handed the matter off to your

16 treasury department?

17 A     No.

18 Q     The legal department?

19 A     Yeah.  Legal.

20 Q     Okay.

21 A     Right.

22         MS. ARGEROPLOS:  Okay.  No further questions.

23         MR. CLARKE:  For the record, Brian Clarke, Hunton

24 Andrews Kurth for the Secured Bondholder Group and UMB Bank as

25 Indenture Trustee.

Bates - Cross/Clarke                        23

1        Your Honor, does Mr. Guffy need permission to share

2   his screen?  I thought it might be easier if we do the exhibits

3   on the screen rather than ask Mr. Bates to flip back and forth.

4        THE COURT:  No.  I think that's fine.

5        MR. CLARKE:  Okay.

6        THE COURT:  But obviously, if there comes a time

7   where he needs to see the entirety of a document, if it's

8   easier we can go to the binders, but I don't have any problem

9   with sharing.

10       MR. CLARKE:  Okay.  All right.  Philip, why don't we

11  start with our Exhibit 45?

12                      CROSS-EXAMINATION

13  BY MR. CLARKE:

14  Q    Good morning, Mr. Bates.  My name is Brian Clarke.  I'm

15  counsel for the Secured Bondholder Group and Indenture Trustee

16  in this case.

17       Your counsel asked you a couple questions earlier about

18  this document.  This is titled "Deposit Account Control

19  Agreement Account Number 3992"  And so it sounds like you're

20  familiar with this document?

21  A    Yes, sir.

22  Q    You mentioned one of your colleagues signed it.  Who was

23  that?

24  A    I believe Jordan Yenne signed it.

25  Q    And who is he?

1  A    He's a senior vice president in my group.  He's been with

2  me for 16 years.  He is no longer with me.

3  Q    Okay.  And in relation to you within your firm, is he --

4  does he work for you?  Do you work for him?  Are you

5  colleagues?

6  A    He works for me.  He's two doors down from me.

7  Q    Okay.  I got it.  Thank you.

8           MR. CLARKE:  And just -- Mr. Guffy, I guess just for

9  the record, maybe we can just pull up the signature pages.  I

10 do think Mr. Bates is correct.  That Mr. Yenne is the signatory

11 on these.  Okay, that's right.  So LegacyTexas Bank.  Jordan

12 Yenne is the signatory.  Why don't we go up a couple pages to

13 the notice parties.

14 BY MR. CLARKE:

15 Q    Okay.  So this says, this is the notice section of the

16 agreement.  I'm sure you've seen these before.  And so this

17 designates you, treasury management, Mr. Yenne, and general

18 counsel as the collective notice parties on this DACA.  Is that

19 right?

20 A    That's correct.

21 Q    Okay.

22           MR. CLARKE:  And Mr. Guffy, just why don't we just do

23 this quickly.  We discussed yesterday the control agreements

24 for Account Numbers 1861 and 1838.

25           If these are in evidence already, Your Honor, I was

1  just going to establish the same thing.  If you want we can

2  pull them up.  I don't know if the parties object to --

3         THE COURT:  I probably won't allow the witness to

4  look at them.

5         MR. CLARKE:  Okay.  Yeah.  So why don't we start with

6  Exhibit 10.  So let's go to the notice section.  Okay.  So same

7  parties.  And let's see.  I think Mr. Yenne signed this one

8  also.  Okay.  And then just real quick, let's do Exhibit 13.

9  Okay.  Let's go to the signature page.  Okay.  Thank you.

10  BY MR. CLARKE:

11  Q    So it sounds like for these agreements and I think for all

12  the others, you're the notice party along with a bunch of your

13  colleagues and Mr. Yenne signed these DACAs.

14  A    Correct.

15  Q    Okay.  Counsel asked you some questions about our Exhibit

16  Number 48.

17         MR. CLARKE:  You want to bring that one up.  Okay.

18  Why don't we scroll down to the beginning of the chain.

19  BY MR. CLARKE:

20  Q    This starts with an email from Michelle Ross at the Reed

21  Smith firm.  And it looks like she's looking for contact

22  information to I guess update any address changes that would

23  have occurred when LegacyTexas merged with Prosperity.  Is that

24  fair?

25  A    That's correct.

Bates - Cross/Clarke                         26

1  Q    Okay.  Do you think this email chain is an accurate copy

2  of the exchange you had with Ms. Ross on August 10th and 11th?

3  A    Yes, it is.

4  Q    It hasn't been altered or anything like that?

5  A    No.

6  Q    No.  And you understood from this email, I think your

7  testimony before was you done this exercise.  I don't recall if

8  it was with the Bondholders on this deal or other deals.  Maybe

9  it's both.

10 A    It was this deal.

11 Q    Okay.  It's this deal.  But so you knew what Ms. Ross was

12 asking about on at least the 10th or the 11th regardless of

13 whether anything was flagged internally.  Is it fair to say

14 Prosperity at that point, had a copy of account control

15 agreement for 3992?

16 A    We had been provided one, I believe the day before.

17           MR. CLARKE:  Okay.  Your Honor, I move to admit

18 Exhibit 48.

19           THE COURT:  Is there any objection to the admission

20 of Exhibit 48?  Exhibit 48 is hereby admitted.

21     (Bondholders Exhibit 48 admitted into evidence)

22           MR. CLARKE:  Mr. Guffy, let's pull up 49.

23 Let's scroll to the bottom and get the full chain.

24 BY MR. CLARKE:

25 Q    This is an email from John Goodman copying you and cc'ing

Bates - Cross/Clarke                         27

1  James.  Who is John Goodman?

2  A    John Goodman is James's younger brother.  He was president

3  of Goodman Networks for a very long time.  And was, quite

4  frankly, the person that raised the capital through the

5  Bondholders.  And we'd had a long history with John.  And he

6  had been banking with the company probably going back 14 years.

7  Q    Okay.  And the question here is, "What do you need from me

8  to take over the loan with you?"  What is the loan?  What is he

9  talking about?

10  A    He's talking about the term loan that I referred to

11  earlier that --

12  Q    The Genesis term loan.

13  A    The Genesis term loan his brother assumed and the loan was

14  struggling.

15  Q    Okay.  And I think these are in Prosperity's exhibit

16  binders.  But just for the record, is it your understanding

17  that James Goodman had personal liability, or a guarantee on

18  that loan?

19  A    He did.

20  Q    He did.  Okay.

21        MR. CLARKE:  So let's scroll up.  And so it sounds

22  like -- it looks like your --

23        THE COURT:  For my benefit -- excuse me, Mr. Clarke.

24  For my benefit, the loan on which Mr. James Goodman had

25  personal liability was the Genesis loan?

Bates - Cross/Clarke                                    28

1          THE WITNESS:  Yes, he did.  There were two notes, and

2  he guaranteed both of them.

3          THE COURT:  Okay.  Thank you very much.  Appreciate

4  it.

5  BY MR. CLARKE:

6  Q    Okay.  It sounds like -- so this reads like a reply from

7  you to John copying James proposing one option to, I guess, pay

8  off that loan, right?

9  A    Correct.

10 Q    Okay.  He responds, he says "We're not allowed to do

11 that."  He references MSLP.  This is back in '21 and '22.  So

12 that was a Main Street Lending Program loan.  Do you remember

13 those?

14 A    One thing I didn't say there, is John Goodman has formed

15 another company in Fredericksburg I guess it is, and that's

16 where this dialogue is going.

17 Q    I got you.  Okay.  But is that what he means by MSLP?

18 We're not allowed to add additional debt to that facility?

19 A    That's correct.

20 Q    Okay.

21 A    Used the facility in that manner.

22 Q    Yes, I got it.  Okay.

23         MR. CLARKE:  So let's just go scroll up.  We're

24 almost at the top.  You can keep going.

25 BY MR. CLARKE:

                          Bates - Cross/Clarke                    29

1  Q    Okay.  And so this is just a further exchange of looks

2  like some diligence information about John and his financials

3  that you were looking at to take out the Genesis term loan.  Is

4  that right?

5  A    Correct.

6  Q    Okay.

7  A    James --

8  Q    And so we took a look at this exchange.  Is this an

9  accurate copy of that email exchange?  Hasn't been altered or

10 anything like that?

11 A    It doesn't appear to be.

12 Q    Okay.  And it doesn't leave anything out that you think

13 for the record needs to be in?

14 A    No, it was just working the situation.

15        MR. CLARKE:  Okay.  Your Honor, I'd move to admit

16 Exhibit 49.

17        THE COURT:  Any objection to the admission of 49?

18 Bondholders' 49 is hereby admitted.

19    (Bondholders' Exhibit 49 admitted into evidence)

20        MR. CLARKE:  Okay.  Let's go to Exhibit 50.  Okay.

21 Let's start at the bottom.

22 BY MR. CLARKE:

23 Q    This is an email on August 12th from James to you asking

24 for a six-month loan for five million.  And then he says, "We

25 could service the existing" -- I assume LLC -- "as a letter of

Bates - Cross/Clarke                        30

1  credit and release the Goodman money."  Do you see that?

2  A    Yes, sir.

3            MR. CLARKE:  Okay.  Philip, let's scroll up.

4            MR. LANGLEY:  Just an objection on that.  Is it

5  letter of credit or line of credit?  I think there might be a

6  material difference there.

7            THE WITNESS:  It's a line of credit.

8            MR. CLARKE:  Line of credit?

9            THE WITNESS:  Yes, sir.

10 BY MR. CLARKE:

11 Q    You respond pretty quickly.  It says, "Not under the

12 extremely tight time line we have.  Another option, we could

13 open a new account for Goodman Networks, and move the pledge

14 money over to that account and you sign new pledge documents.

15 Not my favorite option, but would clear things up.  I will call

16 you in a bit on your thoughts below."

17      Do you remember sending that?

18 A    Yes.

19            MR. CLARKE:  Okay.  Philip, this one's

20 (indiscernible).  Can we scroll up to the top?

21 BY MR. CLARKE:

22 Q    Okay.  So this is a reply from James, again, a couple of

23 minutes later.  "Bater, if I'm not mistaken, the Bondholders or

24 the Trustee has not right."  I see that means no right.  Is

25 that how you interpret that?

Bates - Cross/Clarke                              31

1  A    Yes.

2  Q    "Or authority unless Goodman is in default or in

3  bankruptcy.  So all communications has to go through Goodman if

4  the Trustee has any questions.  Jonathan can manage and handle

5  it for Goodman."  Then you reply, "Give me a call."

6       Do you remember that exchange?

7  A    Yes.

8  Q    And is this email thread here accurate?

9  A    Yes.  Given the situation.  I mean, what I would say is

10 that we were already talking about a loan to Endeavor.

11 Q    Okay.

12 A    This was not the first time this was surfaced.

13 Q    Okay.  And I see copied on here of James's last response

14 at the top Tobygalloway@winstead.com.  Who is Toby Galloway?

15 A    I don't know.

16 Q    Okay.  Was he Prosperity counsel?

17 A    No.

18 Q    Okay.  So if anyone, maybe he was James's counsel.  But

19 you don't know.

20 A    Yeah.  I don't know.

21 Q    Okay.  That's fine.

22 A    That's the first I ever seen that.

23 Q    All right.  And so has this exchange been altered?

24 A    Doesn't appear to be.

25          MR. CLARKE:  Okay.  Your Honor, I move to admit

Bates - Cross/Clarke                              32

1  Exhibit 50.

2          THE COURT:  Is there any objection to the admission

3  of Exhibit 50?  Exhibit 50 is hereby admitted.

4      (Bondholders Exhibit 50 admitted into evidence)

5  BY MR. CLARKE:

6  Q    And just a follow-up question before we move off Exhibit

7  50.  The reference here to -- in this exchange to release the

8  Goodman money, that refers to the 3992 account funds, correct?

9  A    That's correct.

10         MR. CLARKE:  All right.  Philip, let's bring up

11 Exhibit 51.

12 BY MR. CLARKE:

13 Q    Okay.  This is an email from Ana McCollum at Prosperity.

14 Who was Ana McCollum?

15 A    She's a senior person in our treasury management group.

16 She's been with us going back to LegacyTexas.

17 Q    Thank you.  And I apologize if that was asked before, but

18 I just wanted to make sure that was in there.  This is shortly

19 after the email exchange that we just went over also on Friday,

20 August 12th.  Do you agree with that?

21 A    I was really included for informational purposes only

22 here.

23 Q    That's fine.  And I'm just looking at the time stamp.  And

24 so --

25 A    Right.

Bates - Cross/Clarke                    33

1  Q    -- we were looking at Exhibit 50.  That was also Friday,

2  August 12th.  Looked to be about an hour and a half before this

3  email from Ana.  Does that ring a bell?

4  A    Yes.

5  Q    And she's saying, "I understand you would like to open a

6  new account as soon as possible."  And look at the subject

7  line.  It says, new account request for Goodman Networks.  Is

8  she referring to a new account to move the 4.6 million into the

9  3992 account?

10 A    I don't know that for sure.

11 Q    Okay.  Based on the email exchange we just read, do you

12 think that's what she's referring to?

13        MR. LANGLEY:  Objection, Your Honor.  The witness has

14 testified he doesn't have knowledge about this.  And he's only

15 --

16        MR. CLARKE:  I just asked him what he thinks based on

17 the prior email.

18        MR. LANGLEY:  -- information.  We think it's hearsay.

19        THE COURT:  Okay.  I'm going to overrule the

20 objection and allow him to explore it.  You may have an

21 objection to a next question down the line.

22        MR. CLARKE:  Okay.

23 BY MR. CLARKE:

24 Q    Based on Exhibit 50, your testimony regarding Exhibit 50.

25 That the suggestion to move the funds to a new account, that

Bates - Cross/Clarke                              34

1  referred to the Goodman 3992 account to move it to some new

2  account within Prosperity.  That was your testimony, correct?

3  A    Yes.

4  Q    And so Ms. McCollum's email, "I understand you would like

5  to open a new account as soon as possible."  And the subject

6  line here is "New Account Request For Goodman Networks."

7       And so do you think she is referring to moving the 3992

8  account proceeds to a new Prosperity account?

9  A    She could be, but I'm not sure (indiscernible).

10 Q    Could be.  Okay.

11 A    This is on the 12th.  Yeah.

12       MR. CLARKE:  All right.  Philip, why don't you scroll

13 up?

14 BY MR. CLARKE:

15 Q    And then James says, "Thanks, Ana.  Let me get Jonathan

16 working on this since he is the Goodman representative."  And

17 you're copied on this email?

18 A    Yes.

19 Q    And so is Alice Lee.  Who is Alice Lee?  She's on both

20 Ana's message and on James's reply.

21 A    She is a junior person that works for Ana McCollum in the

22 treasury management group.

23 Q    Okay.  And so you're copied on this email exchange?  Do

24 you remember this email exchange?

25 A    Yes, I do.

Bates - Cross/Clarke                          35

1  Q    Is it accurate?

2  A    Yes.

3  Q    Does it leave anything out?

4  A    No, not really.

5       MR. CLARKE:  Okay.  Your Honor, I move to admit

6  Exhibit 51.

7       THE COURT:  Is there any objection to the admission

8  of Exhibit 51?  Hearing no objections, Bondholders' 51 is

9  hereby admitted.

10      (Bondholders' Exhibit 51 admitted into evidence)

11      MR. CLARKE:  All right.  Philip, let's pull up

12 Exhibit 52.  And just check my chart.  I think 52 is already in

13 evidence, but I just want to ask a couple questions on it.

14 This is an email from Kathleen LaManna of Shipman & Goodwin.

15 It says at the bottom counsel for US Bank National Association

16 as collateral agent.

17      Just referring back to Exhibit 45.  So just real

18 quickly, we can just quickly switch back to that.  Sorry about

19 that.  Let's just go to the first page.  So that's US Bank

20 National Association as collateral agent.

21 BY MR. CLARKE:

22 Q    So Ms. LaManna here is sending you an email with a notice

23 attached as counsel for US Bank National Association as

24 collateral agent on this control agreement.  Do you agree with

25 that?

Bates - Cross/Clarke                          36

1   A    Yes.

2          MR. CLARKE:  Okay.  Okay.  So Philip, let's go back

3   to 50 -- I'm sorry.  52.

4   BY MR. CLARKE:

5   Q    It says, "Please see attached notice of exclusive control

6   from US Bank National Association as collateral agent relating

7   to the above account."  And the above account in the subject

8   line is Account 3992.  Do you see that?

9   A    Yes.

10  Q    And then our Exhibit 53 which is also already in evidence,

11  is this attachment that's attached here, the 3992 notice of

12  exclusive control.  Do you remember receiving this in the email

13  from Ms. LaManna?

14  A    Yes, I do.

15         MR. CLARKE:  Okay.  All right.  So let's pull up

16  Exhibit 55.

17  BY MR. CLARKE:

18  Q    This is an email from Stephanie Elmore to you on August

19  18th.  Who is Stephanie Elmore?

20  A    Stephanie is the person we've worked with for years given

21  that work.  She was a senior controller at the company and we

22  had our treasury management group specifically had daily

23  dialogue with her.

24  Q    Okay.  Daily dialogue with her?

25  A    She was in more of a consulting role at this time.  Not

Bates - Cross/Clarke                          37

1  working at the company, but still with them.

2  Q    Okay.  And she's asking, "Can you tell me why our accounts

3  are showing zero available balances for all accounts?"

4  A    Correct.

5  Q    And so you reply, "Can you call me?"  Are they showing

6  zero available balances because the notices of exclusive

7  control were sent for all the accounts subject to control

8  agreements?

9  A    Yes.

10         MR. CLARKE:  Okay.  Your Honor.

11 BY MR. CLARKE:

12 Q    Is this an accurate copy of the email exchange you had

13 with Ms. Elmore?

14 A    Yes.

15 Q    Has it been altered?

16 A    No.

17         MR. CLARKE:  Okay.  Your Honor, I moved to admit 55

18 -- I think we're on 55.  55.

19         THE COURT:  Any objection to the admission of Exhibit

20 55?  Hearing no objection, Exhibit 55 on behalf of the

21 Bondholders is admitted.

22    (Bondholders Exhibit 55 admitted into evidence)

23         MR. CLARKE:  Just a few more.  Thank you for being

24 patient.  Let's go to Exhibit 50 -- excuse me.  64.

25 BY MR. CLARKE:

Bates - Cross/Clarke                          38

1   Q     So this is again Stephanie Elmore to you.  Ana McCollum is

2   copied.  Was it your understanding she's inquiring here on why

3   loan payments are being debited from Goodman Networks accounts?

4   A     Yes.

5   Q     Okay.  She says, "I thought it was paid off."  What is she

6   referring to?

7   A     She's talking about the payment on the term loan.

8   Q     The Genesis term loan?

9   A     The Genesis term loan.

10        MR. CLARKE:  Okay.  Let's just scroll up, Philip.

11  BY MR. CLARKE:

12  Q     Okay.  And this is your response to Ms. Elmore.  And so

13  you told her you pulled -- it says, "We pulled the auto debit."

14  A     Correct.

15  Q     "We advanced back up on the loan and put the money into an

16  escrow account as a show of good faith."  What is the money?

17  Is that the 3992 account funds?

18  A     Yes.

19  Q     Is this a -- and this is an accurate copy of this

20  exchange?  Do you recall this exchange?

21  A     Yes.

22  Q     Has it been altered or anything like that?

23  A     Doesn't appear to be.

24        MR. CLARKE:  Your Honor, I move to admit 64.

25        THE COURT:  Any objection to the admission of Exhibit

Bates - Cross/Clarke                          39

1   64?  Hearing no objection, 64 is hereby admitted.

2        (Bondholders Exhibit 64 admitted into evidence)

3            MR. CLARKE:  I think we have just one more.  Philip,

4   why don't we go to Exhibit 65.

5   BY MR. CLARKE:

6   Q    This is an email looks like October 19th, to Zachary --

7   how do you pronounce that last name?

8   A    Zach Wiebe.

9   Q    Okay.  And who is he?

10  A    I guess it's Wiebe?  I thought there was an L.

11  Q    Yeah.

12  A    He came in as the Chief Financial Officer for Genesis

13  Networks Group.

14  Q    Okay.

15  A    Cathy Kincy was in that role for years and Zach had been

16  there for nine months.

17  Q    Okay.  So there's no subject line here.  And it looks like

18  this is -- did you send this to him after a phone call or

19  something like that?

20  A    Yes.

21  Q    Okay.  And you said to Mr. Wiebe -- I hope I'm pronouncing

22  it right.  Apologize to it if I'm not.  "Just to clarify if

23  James and I would not have agreed to move on the debt repayment

24  on that Monday."  I assume this is the money collateral would

25  have been pulled from the account by the Bondholders following

Bates - Cross/Clarke                                    40

1  the notice of control on that Tuesday."

2        Did you send Mr. Wiebe this message?

3  A    Yes, apparently.

4  Q    And has this been altered?

5  A    No.

6            MR. CLARKE:  Your Honor, move to admit 65.

7            THE COURT:  Any objection to the admission of Exhibit

8  65?  It's hereby admitted.

9        (Bondholders Exhibit 65 admitted into evidence)

10           MR. CLARKE:  Thank you.  I have no further questions,

11 just based on the ordering we had.  Hold on one second.  Maybe

12 I'm being corrected.  Okay.  Just one more.  And this will be

13 -- I promise this will be quick.

14           Can we just pull back up Exhibit 45?  This is the

15 control agreement we discussed at the beginning of our

16 conversation.  Can we take a quick look at Section 2?  Philip,

17 I think it's the top of Page 2.

18 BY MR. CLARKE:

19 Q    All right.  So this is the granting clause, Section 2 of

20 the control agreement.  I want to focus on the second sentence.

21       It says, "Company represents and warrants that there are

22 no other effective liens or encumbrances with respect to the

23 deposit account and covenants with secured parties that it

24 shall not enter into any acknowledgment or agreement that gives

25 any other person or entity except the secured party control

Bates - Cross/Clarke                                        41

 1  over or any other security interest lien or title in the

 2  deposit account."

 3       Do you see that?

 4  A    Yes.

 5  Q    And so do you think the company breached this provision?

 6            MS. ARGEROPLOS:  Objection.  Calls for a legal

 7  conclusion.

 8            MR. CLARKE:  And I know you're not -- I know you're

 9  not a lawyer.  But I -- you know, you testified before you're a

10  bank officer.

11  BY MR. CLARKE:

12  Q    Are you generally familiar with deposit account control

13  agreements and how they work?

14  A    Yes.

15            THE COURT:  Before you answer, there's an objection,

16  Mr. Clarke.

17            MS. ARGEROPLOS:  Calls for a legal conclusion.

18            THE COURT:  Okay.

19            MR. CLARKE:  I can ask him questions to establish

20  foundation.  I'm asking for his professional opinion as a bank

21  officer.  You know, we can see if he's familiar with how

22  covenants work, particularly in control agreements, and he can

23  give a nonlegal answer.  I'm not asking for a legal opinion on

24  whether he thinks this provision was violated.

25            MS. ARGEROPLOS:  How does he have a legal or a

Bates - Cross/Clarke                    42

1  professional opinion about whether something's a breach?

2         MR. CLARKE:  Because he's very familiar with -- well,

3  we'll see if he's very familiar with these agreements.

4         THE COURT:  I'm going to sustain the objection as to

5  it being a legal conclusion, but I will allow him to give his

6  lay testimony.

7         MS. ARGEROPLOS:  Thank you, Your Honor.

8         THE COURT:  Mr. Clarke.

9         MR. CLARKE:  Thank you.

10 BY MR. CLARKE:

11 Q    You testified before about the pledge in favor of

12 Prosperity with respect to the 3992 account?  Do you think the

13 grant of that pledge -- if we don't want to use the word

14 breached, we could say implicates this last sentence of Section

15 2?

16 A    I guess I would have to -- in the company here, are we

17 talking about Goodman Networks?

18 Q    Yes.  The company is Goodman Networks.

19 A    Okay.  You're talking about the last sentence?  At the

20 time there was not.

21 Q    It says -- so at the top, so that's a rep and warranty at

22 the beginning.  And then the second half here is a covenant.

23     It says, "Covenants with the secured parties that it shall

24 not enter into any acknowledgment or agreement that gives any

25 other person or entity except a secured party control over any

Bates - Cross/Clarke                                          43

1  other security interest lien or title in the deposit account."

2  So let me rephrase my question.  I'm really focused on the

3  second half of this sentence.

4  A    Okay.

5  Q    Did the grant of a pledge in Account 3992 to Prosperity

6  implicate this covenant?

7  A    Just in that respect, I guess it would, but it had been

8  released.

9  Q    What had been released?

10 A    This DACA was released.

11 Q    When?

12 A    I don't know the exact time frame.  Prior to November of

13 2019.

14 Q    Who released it?

15 A    Our treasury management group.

16 Q    On what authority?

17 A    They got documentation from some legal group.

18 Q    Does that documentation exist?

19 A    We have not been able to find it because our company

20 merged and there was a lot of information that was lost.

21 Q    Okay.  So your testimony is that someone -- we don't know

22 who -- released this control agreement.  But we have no

23 document or other evidence with respect to that release.

24 A    That's true.

25        MR. CLARKE:  Okay.  Can we scroll down to Section 5?

Bates - Cross/Rukavina                              44

1          THE WITNESS:  Okay.  In this -- regarding this

2   document, can I -- Mr. Clarke, can I clarify one thing?  It

3   says on there I'm treasury management services.  I'm not.

4   That's not my title, and it says that on there.  So I just

5   wanted to make sure that I could explain that.  Down there

6   under notifiers.

7          MR. CLARKE: Okay.

8   BY MR. CLARKE:

9   Q    Section 5.  This is titled "Subordination By Bepository

10  Bank."  The first sentence says,

11         "Company and depository bank acknowledge notice of and

12  recognize secured parties continuing security interest in the

13  deposit account and in all items deposited in the deposit

14  account and in the proceeds thereof."

15         Do you see that sentence?

16  A    Yes.

17  Q    The second sentence says, "Depository bank hereby

18  subordinates any statutory or contractual right or claim of

19  offset or lien resulting from any transaction which involves

20  the deposit account."

21         Do you see that sentence?

22  A    Yes.

23         MR. CLARKE:  Your Honor, I have no further questions.

24  So this was -- you remember the arrangement yesterday.  I get

25  -- he was on our witness list and so this is I guess, direct.

Bates - Cross/Rukavina                    45

1  You know, so I guess I reserve the right to cross based on if

2  the Objecting Creditors have him as a witness for their

3  case-in-chief.  Thank you.

4          THE COURT:  Thank you very much.

5                    CROSS-EXAMINATION

6  BY MR. RUKAVINA:

7  Q    Mr. Bates, I represent the Bankruptcy Trustee.  I just

8  have a couple of questions for you.  The funds in the 3992

9  account, they were swept on August the 15th, correct?

10 A    Correct.

11 Q    And temporarily applied to the Genesis debt, correct?

12 A    Correct.

13 Q    And then that was reversed, correct?

14 A    Yes.

15 Q    And then the funds were put into the new account that

16 we're here about today.

17 A    Correct.

18 Q    Did those funds ever leave Prosperity Bank?

19 A    No, they did not.

20 Q    These are just book entries, journal entries that

21 accountants do.

22 A    That's correct.

23 Q    Are the Genesis entities the borrowers -- still borrowers

24 of Prosperity Bank?

25 A    I actually don't know.  I was removed from the

Bates - Cross/Rukavina                              46

1  relationship around year end of that year.

2  Q    Of 2022?

3  A    And Mr. Montgomery, my partner was -- he took over in that

4  role.

5  Q    Well, here's my question.  Do you have any knowledge of

6  whether the Genesis entities transferred their business

7  operations to one or more new entities?  And was that the

8  purpose of their restructuring?  Or what was the purpose of

9  their restructuring that you were talking about with Endeavor?

10 A    Ours was just a restructure of the existing debt.  The

11 Endeavor entity, I don't recall exactly how it worked honestly,

12 but the Endeavor entity was formed out of the remaining

13 companies.

14 Q    The remaining Genesis companies?

15 A    Correct.

16 Q    So as of the end of last year while you were still

17 managing this relationship, were the Genesis entities in

18 existence to your knowledge?

19 A    Yes.

20 Q    Were they still borrowers of the Bank to your knowledge?

21 A    Yes, they were.

22 Q    Had they transferred their business assets to any other

23 entity to your knowledge as of that time?

24 A    I don't think so as of that time.

25 Q    Do you still have any kind of professional or personal or

Bates - Cross/Rukavina                    47

1  banking relationship with James Goodman?

2  A    No, I don't.

3  Q    Why is that?

4  A    It's just the manner in which we handle situations that

5  get challenging like this, and they remove people like me from

6  the dealing with the client.

7           MR. RUKAVINA:  Okay.  Thank you, sir.

8           THE WITNESS:  Sure.

9           THE COURT:  Mr. Hillyer?

10          MR. HILLYER:  Thank you, Your Honor.

11          THE COURT:  Before we start a new line of questioning

12  with Mr. Hillyer, Mr. Bates, do you need a convenience break?

13  Are you ready --

14          THE WITNESS:  I'm okay.

15          THE COURT:  All right.  Everybody still ready?  All

16  right.

17          MR. RUKAVINA:  Your Honor, I might go, but

18  Mr. Berghman can stay here, if that's okay.

19          THE COURT:  Okay.  Thank you.  Just one moment.  My

20  system powered down.  Just one moment.

21          All right.  Ready when you are, Mr. Hillyer.

22          MR. HILLYER:  Okay.  Thank you, Your Honor.

23                        CROSS-EXAMINATION

24  BY MR. HILLYER:

25  Q    Good morning, Mr. Bates.

Bates - Cross/Hillyer                                    48

1  A    Good morning.

2  Q    My name is Cam Hillyer.  I represent FedEx.  Just got a

3  couple questions for you.  Starting with when you say you

4  mentioned flags, what are you talking about electronic flag?  I

5  mean, you're not talking about physical flags or anything on

6  like a hard copy.  This is in your internal system.

7  A    That's correct.

8  Q    Okay.  So just in layman's terms, tell me where does a

9  flag appear on the screen?  Is that when you pull up the

10 computer and there's, like, an actual red flag that shows you

11 or --

12 A    It's in our operating system on the -- I think it's called

13 Precision.  It's in the operating system that controls the

14 depository side of the Bank.  They put a notation on there in,

15 you know, so that you will see it, that that is subject to a

16 deposit account control occurring.

17 Q    Okay.  When you say you, you don't mean me.

18 A    The viewers.

19 Q    You mean the person at the Bank.

20 A    Correct.

21 Q    Okay.  Okay.  So it's internal.  So it doesn't appear on a

22 statement.  Like when you get your bank statement for a deposit

23 account, it won't have a little notation on the top, flagged

24 account.

25 A    I don't know that, Mr. Hillyer.  I don't think so.  But I

Bates - Cross/Hillyer                                    49

1  don't know that.

2  Q    Okay.  And you said that normally a DACA -- well, when I

3  say DACA, I mean deposit account control agreement.  Okay.  So

4  you said normally, if your internal system had notated a DACA

5  for an account, it would appear as a flag on that account in

6  your internal system?

7  A    That's correct.

8  Q    Okay.  And there wasn't a flag on this account?

9  A    That's correct.

10  Q    When I say this account, I mean the 3992 account.

11  A    At the date we're talking about.

12  Q    Okay.  Well, that's what I was going to ask you is, at the

13  time that the Bank took an assignment of deposit account, your

14  system did not notate that flag.

15  A    It did not.

16  Q    Okay.  You weren't aware of the DACA at that time?

17  A    Absolutely not.

18  Q    Okay.

19  A    I couldn't go there.

20  Q    So when an assignment of deposit account is done, is that

21  also a flag?

22  A    The way that works is, is if I were to take a -- make you

23  a cash secured loan, there is -- yes, there is an internal flag

24  that occurs on that account and puts a hold on that account.

25  So that you can -- money can't be released above a certain

Bates - Cross/Hillyer                              50

1   amount to secure your loan with me.

2   Q    Okay.  Well, that's what I was going to ask you.  Is that

3   the assignment created, I believe you testified a hold or a

4   restriction?  I'm going to call it a frozen floor is what I

5   believe what lenders call it.  So that would have been notated

6   on the account, correct?

7   A    Absolutely.

8   Q    Okay.  And when you did -- I'm not going to make you go

9   back through exhibits.  When I talk about the assignment of

10  deposit accounts, you understand what I'm talking about?  The

11  assignment from Goodman Networks?

12  A    Yes, sir.

13  Q    The debtor to Prosperity.  I believe you testified, but I

14  would like you to clarify.  So what was the consideration that

15  the Bank gave Goodman Networks in exchange for taking that

16  assignment of deposit account?

17  A    I didn't give him any consideration.  That was not my

18  role.

19  Q    Okay.  But what -- I don't mean you -- say, did Goodman

20  Networks receive any money?  Did they receive any benefit to

21  your knowledge for assigning that deposit account?

22  A    Yes.

23       I had multiple conversations with James Goodman about

24  that.  And we discussed that consideration.  And he said that

25  -- like I stated earlier, he said that he was going to give

Bates - Cross/Hillyer                          51

1  them debt he had acquired and equity in the company as

2  consideration.  And that he would, you know, put that in place.

3  Q    Okay.  So to be clear, that's what Mr. Goodman is doing.

4  I'm asking, did the Bank give any value to Prosperity?  Did the

5  Bank give any value or consideration to Goodman Networks?

6  A    No, it did not.

7  Q    Let's talk about the phone call with James Goodman and get

8  some clarification.  I believe you testified you called James

9  Goodman, told him that the Bank was insecure.  I'm assuming

10 you're talking about an insecurity clause in a loan agreement.

11 A    Correct.

12 Q    Is that correct?

13 A    Correct.

14 Q    Okay.  And you said that James Goodman gave you no

15 response?

16 A    That's correct.

17 Q    Is that correct?

18 A    Yes.

19 Q    Okay.  And then I believe you said there was silence.

20 A    Yes.

21 Q    Okay.  And did you tell James Goodman that you were taking

22 the money out of the 3992 account?  Or when I say you, I mean

23 the Bank in this context?

24 A    Yes.

25 Q    Okay.

Bates - Cross/Hillyer                          52

1  A    I told him that we considered the -- it to be a default

2  under the loan under the deemed insecure clause, and that we

3  were moving the money to repay the loan.

4  Q    Okay.  So not to put too fine a point on it.  But did

5  James Goodman tell you to take the money out of the account, or

6  did you tell James Goodman, you being the Bank, were taking the

7  money out of the account?

8  A    I told him.

9  Q    Okay.  And I believe Mr. Rukavina asked you earlier, you

10 understand what a sweep is?

11 A    Yeah.

12 Q    A sweep of a bank account.

13 A    Yes.

14 Q    Okay.  And so when I ask you -- and I'll explain it, so in

15 a default sweep of a bank account, I believe you said that

16 that's a unilateral action by the Bank.  Is that correct?

17 A    Yes.

18 Q    Okay.  So you were going to do this whether James Goodman

19 responded?  Was silent?

20 A    I'm not sure if he -- you know, how I would have responded

21 if he would have said no.  I mean, I don't know.

22 Q    Okay.  But he didn't say go ahead and do it.

23 A    He did not say okay, and he did not say don't do it.

24        MR. HILLYER:  Okay.  Let me show you -- may I

25 approach, Your Honor?

Bates - Cross/Hillyer                          53

1            THE COURT:  Yes, you may.

2        (Counsel confer)

3            MR. HILLYER:  Your Honor, I hope y'all get some

4    colder weather because y'all are going to have one heck of a

5    bonfire.  I'm giving you this copy.

6            THE WITNESS:  Oh.

7            MR. HILLYER:  He's trying to find the page for you.

8            THE WITNESS:  No problem.

9            MR. HILLYER:  It's FedEx 105.

10           THE WITNESS:  Okay.

11   BY MR. HILLYER:

12   Q    Mr. Bates, that's FedEx Exhibit 105.  That's a reply brief

13   filed by your counsel.  And I've already turned it to a certain

14   page, but you are certainly willing to flip it back and

15   familiarize yourself.

16           MR. RUKAVINA:  Which page, Cam?

17           MR. HILLYER:  I flipped it to 6 of 25.

18           THE WITNESS:  Mr. Hillyer, so this is a response from

19   our counsel?

20           MR. HILLYER:  Yes.  This is Prosperity Bank's filed

21   pleading.

22           THE WITNESS:  Okay.  Okay.

23   BY MR. HILLYER:

24   Q    Okay.  And so I just want, again, some clarity on Page 6

25   of 25.  Well, start on Page 5 of 25.

Bates - Cross/Hillyer                                54

1  A    Okay.

2  Q    And so where it says Prosperity acted in good -- I'm

3  sorry, all the way at the bottom, Number 12.  "Prosperity acted

4  in good faith and reliance on James Goodman's authority to act

5  on behalf of the debtor, and that James Goodman was the

6  authorized signatory on the deposit accounts."

7       And then if you scroll to the very next page, or flip on

8  your page, and it basically says on -- give me one second.  It

9  says, "The objectors and UMB have alleged that Prosperity

10 colluded with the debtor, but Prosperity was just following the

11 direction of the authorized signatory on the debtors accounts."

12      Do you see that statement?

13 A    Where are you?  I'm sorry?

14 Q    I'm sorry.  At the top of Page 6 of 25.

15 A    Okay.  Page 6, right?

16 Q    Yes.

17 A    Okay.

18 Q    Okay.  So that's -- again to be specific, James Goodman

19 did not direct you to take the money out of the 3992 account,

20 did he?

21 A    No, he did not.

22 Q    Okay.

23 A    He did not object either.

24 Q    Okay.

25 A    And he would object if he didn't want me to do it.

Bates - Cross/Hillyer                    55

1  Q    Did he tell you -- did he authorize you to take the money

2  out of the account?

3  A    I guess technically, no.

4  Q    Okay.  Follow-up question.  Did he need to authorize you

5  to take the money out of the account?

6  A    No, he did not.

7  Q    Okay.  So I understand what you're saying.  But at the

8  time that you took the money out of the account, the 3992

9  account, am I correct in saying that was done unilaterally by

10  the Bank, and it didn't matter who was the signatory on the

11  Bank.  It didn't matter if James Goodman was a signatory, if I

12  was a signatory, or anyone was a signatory.  You didn't have

13  anyone authorize it?  You swept it?

14  A    We swept it.  Yes.

15  Q    Okay.

16  A    I was not acting alone.

17  Q    You were not acting alone.

18  A    Well, I mean, I met with my credit people.

19  Q    Oh, okay.

20  A    Yeah.

21  Q    When you say acting alone, you mean acting alone in --

22  within the Bank?

23  A    Right.

24  Q    Okay.

25  A    Right.

Bates - Cross/Hillyer                        56

1  Q    Okay.  Mr. Bates, you were asked about several emails.

2  And I'm not going to ask you to flip them up.  You remember the

3  Bondholders counsel, Mr. Clarke, showing you emails about

4  setting up a new account and moving money from the 3992

5  account?

6  A    Yes.

7  Q    You remember that?

8  A    Uh-huh.

9  Q    Did that ever happen?

10  A    No, it did not.

11  Q    Okay.  You were asked and shown an exhibit of the notice

12  of exclusive control on August 16th.  Do you remember seeing

13  that?

14  A    Yes.

15  Q    Okay.  Was it your understanding that until the Bank

16  received the notice of exclusive control that the Bank had the

17  right to take the money out of the account?

18  A    Yes, we did.

19  Q    Okay.  You were shown Exhibit Bondholders 64 and -- hang

20  on.  It's not going to be in that one.  That's the wrong

21  binder.

22  A    Yeah.  I was trying to fix this for you.

23  Q    That's Bondholder Exhibit 64, Mr. Bates.  Mr. Clarke was

24  asking you about that.  You remember that exhibit?

25  A    Yes, sir.

Bates - Cross/Hillyer                    57

1  Q    Okay.  I just want clarification on when you said you

2  wrote this email to Ms. Elmore, correct?

3  A    Correct.

4  Q    Okay.  And you said we -- I believe you were asked you put

5  the money into an escrow account as a show of good faith.

6  Okay.  When you say the escrow account, you're talking about

7  the deposit Account 0188, not the deposit Account 3992.  Is

8  that correct?

9  A    Correct.  I did not do that, but that's what occurred.

10 Q    Okay.  But you're --

11 A    Yes.

12 Q    You're aware that there's a separate deposit account?

13 A    Yes.

14 Q    With a separate -- okay.

15 A    Yes.

16 Q    Okay.  And the 0188 is the account that you're referencing

17 in your email?

18 A    Correct.

19 Q    Okay.  So in broad terms, do you understand exactly what

20 happened when the money was taken out of the 3992 account when

21 the Bank swept it?

22 A    Yes.

23 Q    Okay.

24 A    I mean, not technically, you know, but yes, I understand

25 the --

Bates - Cross/Hillyer                    58

1  Q     Okay.

2  A     -- concept of what was going on, I guess is what I mean.

3  Q     Okay.  Well, then, I'm not asking you for hyper technical

4  answers.  So when the money is swept out of the 3992 account --

5  A     Correct.

6  Q      -- okay, it goes where?

7  A     Our treasury -- excuse me.  Our loan servicing group would

8  take the money out of the depository account and apply it to

9  the loan principal and interest.

10 Q     Okay.

11 A     And those entries were just being made and, you know,

12 would reflect immediately.

13 A     Okay.

14 Q     So the loan would go to zero.

15 A     Correct.

16 Q     And the deposit account would be deducted.

17 A     Correct.

18 Q     Okay.  So is that money -- that money is not sitting in

19 any account at that point?

20 A     No, it's not.

21 Q     That money has been zeroed out.

22 A     Yes.

23 Q     Is that what -- okay.

24 A     Yes, it has.

25 Q     Okay.  And then you say escrow account.  I'm going to call

Bates - Cross/Hillyer                              59

1  it Account 0188 to be specific.  Okay.  Then that account about

2  two weeks later.  Is that correct?

3  A    Correct.

4  Q    That account goes -- is created and goes from zero to four

5  point, whatever.  $4.4 million?

6  A    Correct.

7  Q    Okay.  Where does that money come from?

8  A    That money came from readvancing on the loan to Genesis

9  and reversing the transaction that -- the pay down that

10 occurred.

11 Q    Okay.

12 A    And --

13 Q    So --

14 A    Go ahead.  Sorry.

15 Q    I mean to even interrupt you.

16 A    No.

17 Q    Okay.  So for that two weeks, the Genesis loan is zero.

18 A    Correct.

19 Q    And Account 0188 I guess hasn't even been created yet.

20 A    That's correct.

21 Q    Okay.  And then two weeks later, the loan is refunded.  Is

22 that correct?

23 A    Yes.

24 Q    Okay.  Is that something a bank typically does?  I mean,

25 how do you -- your borrower is Genesis, correct?

Bates - Cross/Hillyer                              60

1    A    Correct.

2    Q    Okay.  And so Genesis thinks their balance is zero for two

3    weeks.  Is that a fair statement?

4    A    Yes.

5    Q    Okay.  And then you make their balance 4.4 million again.

6    Is that correct?

7    A    Correct.

8    Q    Okay.  And so you can just make their loan balance

9    whatever you want.  Anywhere from zero to what.

10   A    Well, the underlying entry was reversed.

11   Q    Okay.  So but --

12   A    It was unwound.  The situation was unwound, as opposed to

13   readvancing.

14   Q    Okay.  So that's what I'm asking you.  Is the money that's

15   in the 0188 account, that is loan proceeds from the Genesis

16   loan being taken from zero to $4.4 million around approximately

17   early September.

18   A    Technically, yes.

19   Q    Okay.  So your sworn testimony today is that you believe

20   the DACA was released.

21   A    Yes.

22   Q    And I'm talking about the DACA on 3992.

23   A    Correct.

24   Q    Okay.  And you believe that during all this time period?

25   Is that correct?

Bates - Cross/Hillyer                              61

1  A    Yes.

2  Q    Okay.  And you still believe it today?

3  A    I do.

4  Q    Okay.  What makes you believe the DACA was released?

5  A    We have very capable people.  I'm kind of going back to my

6  predecessor company.  And they took care of this for us.  I

7  don't do the mechanics of what we're talking about here, the

8  DACA.  And someone just didn't come to the office one day and

9  just say, I'm going to mess everybody around and I'm going to

10 release this DACA.  It just didn't happen.  I'm convinced it

11 was released.

12 Q    And you just can't lay your hand on that document right

13 now.

14 A    No.  The research we did.  There's been a lot of purging

15 of the systems with LegacyTexas, and we couldn't get to it.

16 Q    But if that DACA had been released, then that money would

17 have been Prosperity Bank's collateral in the first position.

18 A    That's correct.

19 Q    Okay.  And would still be today.

20 A    Would still be.

21 Q    Okay.

22 A    That's correct.

23 Q    As to the DACA, so the -- had you read the DACA at the

24 time that you did the sweep on August 15th?

25 A    Yes.  I was familiar with the document.  This relationship

Bates - Cross/Hillyer                    62

1  had been in existence for a long time with the Bondholders and

2  the DACAs a number of years.  So yes, I had read it.

3  Q    No.  I meant not did you read it when it was signed in

4  2017.  I meant, when did you get your hands on the DACA in

5  August of 2022?

6  A    Oh.

7  Q    I'm saying did you sit down with a DACA and have the DACA

8  and review it and read it before you swept?

9  A    I can't recall, honestly.

10  Q    All right.  Mr. Bates, this is my last series of questions

11  for you.  I'm going to hand you back FedEx exhibits.

12         THE COURT:  Do you know which one you're reaching

13  for, Mr. Hillyer?

14         MR. HILLYER:  I do.  It's Volume 1.  It's the -- what

15  Your Honor is going to.  Exhibits 22 through 25.

16         THE COURT:  Thank you.

17         MR. HILLYER:  Those were the exhibits that were

18  objected to.  Give me one second, Your Honor.

19     (Pause)

20  BY MR. HILLYER:

21  Q    Are you there, Mr. Bates?

22  A    I'm trying.  I'm trying.  Bear with me just a second.

23  Okay.  Got it.

24  Q    All right.  You're there.  Okay.  So I believe that first

25  is an email between David Parham and yourself and John Goodman.

Bates - Cross/Hillyer                         63

1  Is that correct?  If you scroll down.

2  A    Yes.

3  Q    Okay.  And this is in October.  It starts with John

4  Goodman to you.  And Mr. Goodman is asking for a status of the

5  funds at Prosperity.  You respond to John Goodman that the

6  funds were used to repay a loan the funds were security for.

7       "Bondholders came in and gave us notice and pulled the

8  available funds from all accounts.  Loan was readvanced and the

9  funds placed in" -- well, that's awful.  The exhibit -- "is

10 escrow account still secures our loan."  Okay.  You see -- is

11 that all?

12 A    Yes.

13 Q    Okay.  And so is this an email been altered in any way?

14 A    I don't believe so.

15 Q    Is this a fair and accurate email exchange between you --

16 and you know who David Parham was?

17 A    I didn't.  I mean, just by name.

18 Q    Okay.  You understand he's an attorney at Akerman.

19 A    Right.

20 Q    Okay.

21 A    Was he Goodman's attorney?

22 Q    Normally the questions only go one way, but yes, he was.

23 A    Okay.

24      MR. HILLYER:  Okay.  Your Honor, I'd ask that Exhibit

25 22 be admitted.

Bates - Cross/Hillyer                          64

1        THE COURT:  Any objection to the admission of FedEx's

2  22?  Okay.  No objection.  It is hereby admitted.

3        (FedEx-ARRIS Exhibit 22 admitted into evidence)

4        MR. HILLYER:  Pushing on Exhibit 23, Mr. Bates.

5        THE WITNESS:  Okay.  Okay.

6        MR. HILLYER:  This is --

7        THE COURT:  Wait.  Wait.  Just so I -- okay, yes, I

8  see that now.  Yes, thank you.  Admitted.

9  BY MR. HILLYER:

10 Q    And this is an email exchange between John Goodman and

11 yourself.  Is that correct?

12 A    Yes.

13 Q    Looks like the email chain starts in December and carries

14 through early January of 2023.

15 A    Yes.

16 Q    Is that correct?  Okay.  Does this email look like a --

17 it's been altered in any way?

18 A    No, sir.  No, sir.

19 Q    Okay.  And so to have some context, what -- do you

20 remember what Mr. Goodman is asking you in this email?

21 A    Let me just check with the -- sometime in the fourth

22 quarter of that year, John Goodman got involved with Goodman

23 Networks and was trying to keep them out of bankruptcy, I

24 believe.

25 Q    Okay.  I'm looking specifically at the bottom.  It looks

Bates - Cross/Hillyer                    65

1  like Mr. Goodman is requesting the Bank send the money to

2  Goodman Networks or to the Bond Trustee.  You see that?

3  A    Yes.

4  Q    Okay.  And you respond that we -- does that mean

5  Prosperity Bank?

6  A    Correct.

7  Q    Okay.  "The bank is not in a position to do that yet.  The

8  restructure of the debt was delayed on the Genesis side.  We

9  hope to have it approved and finish documenting early next

10 week, the three million line that is.  Your debt is later in

11 the week."

12       So give me some context.  That is, the bank won't send the

13 funds to the debtor or the Bond Trustee until they get some

14 debt worked out with Genesis?

15 A    Well, he was trying to get in the situation and just

16 asking a lot of questions like he normally does.  And we were

17 working on a debt restructure.  We continue to.

18       MR. HILLYER:  Your Honor, I ask that Exhibit 23 be

19 admitted.

20       THE COURT:  Any objection to the admission of 23?

21 Hearing no objections, it's hereby admitted.

22     (FedEx-ARRIS Exhibit 23 admitted into evidence)

23       MR. HILLYER:  Exhibit 24, Mr. Bates.  We're almost

24 there.

25       THE WITNESS:  Okay.  No problem.

Bates - Cross/Hillyer                    66

1  BY MR. HILLYER:

2  Q     You familiar with that email?

3  A     Yes.

4  Q     Okay.  This is an email that you sent in late January of

5  2023, last day of January.  Is that correct?

6  A     Yes.

7  Q     Okay.  And that's from you to John Goodman, James Goodman,

8  Zach Wiebe, and Taylor Burns, correct?

9  A     Yes.

10 Q     Okay.  And again it says that -- it says GIH 1.4 million

11 transaction summary.  What is GIH?

12 A     I believe GIH is John Goodman's holding company.

13 Q     Okay.  So the first sentence you wrote it says, "We're

14 still trying to get the debt of Genesis restructured so that

15 the escrow can be released, but we're not there."  Is the

16 escrow you're talking about the funds in the 0188 account?

17 A     Correct.

18 Q     Okay.  And this is January.  They were put into the 0188

19 account in August of '22.  Is that correct?

20 A     Yes.

21 Q     So they've been in there, call it almost four months,

22 going on five at this point?

23 A     Yes.

24 Q     Okay.  And the Bank is still holding it until the Genesis

25 loan can be restructured.

Bates - Cross/Hillyer                           67

1  A    Well, we were still holding it while the -- you know, we

2  determined who -- where the money could get -- should go.

3  Q    Okay.  But your sentence says, "The debt of Genesis

4  restructured so the cash in escrow can be released."  So I'm

5  asking you is that a condition?  As the loan gets restructured,

6  the cash gets released?

7  A    No.

8  Q    They're two independent things?

9  A    Yeah.  I was --

10 Q    Okay.  Then let me ask --

11 A    That was a loan.  That was a loan that would not include

12 the pledge of liquidity.

13 Q    Okay.  So let me ask you.  If this is a loan with GIH for

14 $1.4 million, why is the 0188 account and the funds in that

15 account, why is that a part of this email?

16 A    I'm looking at it.  I'm sorry.

17 Q    Sure.

18 A    I believe it goes back to the fact that a piece of this

19 debt was John Goodman's debt originally.  And they were trying

20 to repaper it in that way -- that manner.

21 Q    I'm not sure I follow you.  Let me rephrase the question.

22 How is the 0188 account involved in Goodman GIH's term loan?

23 A    It's not.

24 Q    Okay.

25         MR. HILLYER:  Give me one second, Your Honor.

Bates - Cross/Hillyer                           68

1           THE COURT:  Take your time.

2           MR. HILLYER:  All right.  Your Honor, I would ask

3    that Exhibit 25 be admitted.

4           THE COURT:  We were on 24?

5           MR. HILLYER:  No.  Okay.  That's even better.  Let's

6    stop at 24.  I believe -- Philip, was the very last one 25?

7           MR. GUFFY:  Let me check.  I believe that's --

8           MR. HILLYER:  Was that the objections?

9           MR. GUFFY:  Yes, that's correct.

10          THE COURT:  So that I'm clear, Mr. Hillyer, you're

11   asking for 24 or 25 to be admitted?

12          MR. HILLYER:  24 to be admitted.

13          THE COURT:  Okay.  Any objection to the admission of

14   FedEx -- excuse me.  Yes.  FedEx's 24.  Hearing no objection,

15   it's hereby admitted.

16      (FedEx-ARRIS Exhibit 24 admitted into evidence)

17          MR. HILLYER:  Okay.  And we're actually going to

18   stop.  We're not going to introduce 25.

19          THE COURT:  Okay.

20          MR. HILLYER:  We have to wait on that.  For

21   housekeeping, and I'll rely on Mr. Guffy.  So we've admitted

22   22, 23, and 24 at this point.  That corresponds to -- okay.

23          So Your Honor, I would also ask that FedEx Exhibits

24   108, 109, 110, and 111 be admitted just for housekeeping.

25   Those are duplicative of -- those four exhibits are the same

Bates - Cross/Hillyer                           69

1  three exhibits we just admitted in 22, 23, and 24.  Is that

2  correct?

3           MR. GUFFY:  Yes, that's correct.

4           THE COURT:  So you want to admit them twice?

5           MR. HILLYER:  Well, I'm trying to -- we don't have

6  to.  I was just trying to clear up the whole -- I believe that

7  cleared up all the objections, except for one.  So no.

8  Actually, for housekeeping, we don't have to do that.  They are

9  the exact same.  Let's just go with 22, 23, and 24.  And we'll

10 leave 108 through 111 out.  There's no reason to clog it up.

11          THE COURT:  Okay.  Two things.  We've admitted 22,

12 23, and 24.  Three exhibits.

13          MR. HILLYER:  Yes.

14          THE COURT:  You talked about admitting 108 through

15 111, four exhibits.  Are they tails?

16          MR. HILLYER:  They are.  108 and 109 are the exact

17 same exhibit, but they placed a huge exhibit stamp on the

18 middle of the exhibit so you couldn't read it.  We had to

19 reintroduce it --

20          THE COURT:  Sneaky.

21          MR. HILLYER:  -- as 109.  So that's how three becomes

22 four.

23          THE COURT:  All right.  Okay.

24          MR. HILLYER:  We do not need to admit --

25          THE COURT:  You don't need to admit 108.

Bates - Cross/Hillyer                          70

1              MR. GUFFY:  I just -- to make one suggestion for you.

2    Exhibit 22, which is the same as 108 and 109.  It's actually

3    108 is 22.  And that -- and it has the sticker in on top of the

4    words as you saw when you were using it.  So 109 may be the

5    better one.

6              MR. HILLYER:  Is 109 --

7              MR. GUFFY:  Just throw it out.

8              MR. HILLYER:  -- better than 22?

9              MR. GUFFY:  Because 109 has the exhibit sticker in

10   the spot where it's not covering any of the text.

11             MR. HILLYER:  Okay.

12             MR. GUFFY:  If you want to compare 108 and 109 you

13   can see the difference.

14             MR. HILLYER:  No.  I trust Mr. Guffy.  Your Honor,

15   that --

16             THE COURT:  All right.  That's not -- I see it as

17   well.  So what I will do is we will push to the side 109, 110,

18   and 111.

19             MR. HILLYER:  Yes.

20             THE COURT:  We'll admit -- no, I got that wrong.

21   We're going -- yes.

22             MR. HILLYER:  No 108.

23             THE COURT:  Right.  You got it.

24             MR. HILLYER:  Perfect.

25             THE COURT:  We are going to admit 109.

Bates - Cross/Hillyer                              71

1          (FedEx-ARRIS Exhibit 109 admitted into evidence)

2          THE COURT:  We're not -- all right.  And remind me

3    which one that's the replacement for, Mr. Guffy?

4          MR. GUFFY:  109 is a replacement for 22.

5          THE COURT:  Okay.  Thank you.

6          MR. HILLYER:  And that's all the questions I had for

7    Mr. Bates.

8          THE COURT:  Thank you very much, Mr. Hillyer.

9          MS. ARGEROPLOS:  Real quick redirect, Your Honor.

10         THE COURT:  Before you begin redirect, is there

11   anyone else who wishes to question him for a first time?

12         MR. PULMAN:  I might.

13         THE COURT:  Okay.  All right.

14         Mr. Pulman.

15         MR. PULMAN:  He hadn't said anything yet I want to

16   cross-examine him about.

17         THE COURT:  Okay.  So you're just -- you're putting a

18   pin in it?

19         MR. PULMAN:  Yeah.  Just reserving until the very

20   end.

21         THE COURT:  Okay.  And I'm going to have questions of

22   the witness.  So would you like to ask your questions before or

23   after mine?

24         MS. ARGEROPLOS:  After.

25         THE COURT:  Okay.

Bates - Continued Cross/Clarke                 72

1          MS. ARGEROPLOS:  I'll sit down.  Thank you.

2          MR. CLARKE:  Your Honor, I just have a couple of

3   quick ones.  And if you want, I can go or --

4          THE COURT:  Fair enough.

5          MR. CLARKE:  Mr. Guffy, can you bring up Prosperity

6   Exhibit 9?  Let's scroll to the top.

7                    CROSS-EXAMINATION CONTINUED

8   BY MR. CLARKE:

9   Q    This is titled "Assignment Deposit Account."  Is this the

10  pledge agreement we've been discussing today that grants

11  Prosperity Bank a pledge of Account 3992?

12  A    Yes, it is.

13         MR. CLARKE:  Thanks.  Can we scroll down to the

14  signature page, please?

15  BY MR. CLARKE:

16  Q    This is signed by James E. Goodman, manager of Genesis

17  Networks Enterprises and Genesis Networks Global Services.

18  It's also signed by James Goodman, as chief executive officer

19  of Goodman Networks Incorporated.  Do you see all that?

20  A    Yes, sir.

21  Q    So Goodman Networks Incorporated is the grantor.

22  A    Correct.

23  Q    Okay.  You had mentioned I think you called it a deemed

24  insecure clause.

25         MR. CLARKE:  Philip, could we scroll up?  It's midway

Bates - Continued Cross/Clarke                    73

 1  through the agreement in the default section.  Yeah, it may be

 2  frozen, Philip.  Or you may not have your mouse --

 3          MR. GUFFY:  It's moved on my screen.  I'm just

 4  waiting for the connection.

 5          THE COURT:  Okay.  Just give it a minute.

 6          MR. CLARKE:  Okay.  Here it is.  Philip, maybe you

 7  can --

 8          THE COURT:  Blow it up.

 9          MR. CLARKE:  -- blow it up a little bit.

10  BY MR. CLARKE:

11  Q    And so I think what you meant by deemed insecured in this

12  default section is the adverse change provision, which --

13          MR. CLARKE:  Philip, scroll down just a touch and it

14  should be right here.

15  BY MR. CLARKE:

16  Q    "A material adverse change occurs in borrowers or grantors

17  financial condition, or lender believes the prospect of payment

18  or performance of the indebtedness is impaired."

19      Is that the provision you were referencing?

20  A    Yes.

21  Q    And then we don't need to move the page at all.  But at

22  the bottom here, it says, "Rights and remedies of default.

23  Upon the occurrence of an event of default" -- which is from

24  the section we just read, so it includes adverse change -- "or

25  at any time thereafter, lender may exercise any one or more of

Bates - Continued Cross/Clarke                    74

1  the following rights and remedies."

2      The second remedy there is application of account

3  proceeds, and it says, "Lender may take directly all funds in

4  the account and apply them to the indebtedness."

5      Do you see that?

6  A    Yes.

7  Q    And again, James Goodman signed this in his officer

8  capacity as a Goodman Networks CEO.

9  A    Yes.

10 Q    And as the Genesis Networks -- I forget the title, but as

11 the principal of Genesis.

12 A    Yes.

13 Q    And so your statement before that James didn't authorize

14 Prosperity to take the funds in the 3992 account, is that

15 accurate?  Didn't he authorize you to do it right here?

16 A    Yes, he did.

17 Q    And when you called James on, I guess it would have been

18 August 15th, you said he didn't affirmatively object?

19 A    That's correct.

20 Q    Okay.  So you testified before that he was personally

21 liable on this loan.  And what you're proposing was to take

22 Goodman Networks cash and discharge a liability, a loan on

23 which Mr. Goodman had personal liability.  Is that right?

24 A    Correct.

25 Q    So why in the world would he object to that, when he had

1  already given you permission through this pledge agreement?

2  A    Right.

3  Q    Okay.  You testified about a potential release of the

4  deposit account control agreement.  We talked about some

5  letters and emails before, one from Michelle Ross of Reed

6  Smith.  When you receive correspondence from Ms. Ross, did you

7  or Prosperity ever reply that the DACA had been released?

8  A    I don't recall this far.

9  Q    And when Ms. LaMotta sent a notice of exclusive control,

10 did you or Prosperity ever reply that the DACA had been

11 released?

12 A    No.  I'm trying to think.  I believe we turned it over to

13 our legal group.

14 Q    Okay.  And in connection with this dispute regarding the

15 subject funds, did Prosperity seek discovery from the

16 Bondholders or the Indenture Trustee or the collateral agent to

17 determine if a release had ever been signed and delivered?

18 A    I believe we did.

19 Q    And was anything produced?

20 A    No.

21       MR. CLARKE:  No further questions, Your Honor.

22       THE COURT:  Thank you, Mr. Clarke.  All right.

23 Again, before I turn Prosperity's witness back to Prosperity's

24 counsel, is there anyone else who wishes to ask any questions?

25       Mr. Pulman?  Are you looking for the assignment of

1  the deposit account --

2          MR. PULMAN:  Yes, ma'am.

3          THE COURT:  -- Mr. Pulman?  All right.  That would be

4  Prosperity Exhibit 9.

5          MR. PULMAN:  Make it just a little bit bigger for me.

6  And go down to the default provision.  Yeah, right there.

7          MR. CLARKE:  Your Honor.

8          MS. ARGEROPLOS:  Your Honor.  Yeah.  Well, yeah.  I

9  mean, Mr. Goodman is here because he was subpoenaed to testify

10 by FedEx.  So I understand his counsel's role at this hearing

11 to be defending that testimony.  I don't recall him being a

12 party to this motion or being involved in any of the process at

13 all, or any counsel for James Goodman.

14         I know -- I think there was a substitution.  Mr.

15 Goodman has never been involved.  I don't really understand why

16 Mr. Pulman is trying to ask questions.  I don't think he should

17 be allowed to ask questions.

18         THE COURT:  Thank you.

19         Mr. Pulman.

20         MR. PULMAN:  Your Honor, of course Mr. James E.

21 Goodman is a party in interest.  As a technical matter, that

22 allows me to ask whatever questions on a contested matter,

23 particularly a 9019.

24         As a practical matter, everybody's been talking about

25 Mr. Goodman for two days.  There's a couple of questions that I

Bates - Cross/Pulman                        77

1   would like to ask Mr. Bates about this particular conversation

2   and these documents.  And I think it's completely appropriate.

3                    THE COURT:  Thank you.

4                    Anything further, Ms. Argeroplos?

5                    MS. ARGEROPLOS:  No, Your Honor.  I've said plenty.

6                    THE COURT:  Okay.  Thank you.  I'm going to overrule

7   the objection.  I'm going to give Mr. Pulman a little bit of

8   leeway here.  Mr. Goodman is a party in interest in the

9   proceedings.  And again, I'm going to -- and I think that's

10  what you're getting at.  I'll allow the question to be limited,

11  given that we've already got a lot of things going on.  But

12  I'll let you question him on this document.

13                   MR. PULMAN:  Would you move it down just a little bit

14  for me?

15                         CROSS-EXAMINATION

16  BY MR. PULMAN:

17  Q    Mr. Bates, my name is Randy Pulman.  I'm James E.

18  Goodman's lawyer.  Got retained a week or so ago.  See this

19  provision that's here in Exhibit 41.  Cure provision?

20  A    Yes.

21  Q    I haven't seen all the discovery.  I haven't tried to look

22  through all the documents.  But I haven't seen in front of the

23  Court any default notices, default letters.  Anything that gave

24  Mr. James E. Goodman or Genesis Networks an opportunity to cure

25  your default of an adverse change -- material adverse change in

Bates - Cross/Pulman                                    78

1  condition?  Did you send any of those out?

2  A    No, I did not.

3  Q    And so how would Mr. James E. Goodman or Genesis Networks

4  have known on August the 15th when you offset the deposit

5  account against the loan?  How would they know that that had

6  even happened?

7  A    Because I communicated to him verbally --

8  Q    Verbally.

9  A    -- in a phone conversation.

10 Q    On the evening of the 12th?

11 A    No.

12 Q    After that?  I said the 12th because we were looking at

13 the emails.  That's the email where you say, or Mr. Goodman

14 says, "Let's have a phone call about this."  And I thought it

15 was on the 12th that you said the two of you had talked.  You

16 told him, you deemed yourself insecure and you were calling the

17 note.  And he didn't say anything in response.

18     Is that your testimony?

19 A    That was the 15th that conversation occurred.

20 Q    Oh, that was on the 15th?

21 A    Correct.

22 Q    Okay.  After the 15th, did Goodman, John -- did James

23 Goodman or Genesis, did they get any notes or letters or

24 anything giving them notice that this had actually occurred?

25     MS. ARGEROPLOS:  Objection as to form.  I don't know

Bates - Cross/Pulman                          79

1   how he would know what --

2           MR. PULMAN:  A letter, an email.

3           MS. ARGEROPLOS:  (Indiscernible).

4           MR. PULMAN:  Some writing.

5           THE COURT:  The objection is to whether or not

6   someone received it, I think.  You can rephrase the question.

7   BY MR. PULMAN:

8   Q    Did the Bank send anything to its borrower; a letter, an

9   email, a notice, anything giving the borrower a right to cure,

10  a notice to cure, or letting the borrower know that these --

11  this note and this deposit account had been offset?

12  A    Not in written format.  But I gave verbal communication to

13  James and Zach, as well.

14  Q    That you were going to do that.  That that was your

15  intent.

16  A    And that I had done it.

17  Q    And that had already been done.

18  A    Right.

19  Q    Is what you're saying.

20  A    Right.

21  Q    So before you even talked to Mr. Goodman on the 15th --

22  A    No.

23  Q    -- those --

24  A    I'm sorry.  No.  When I talked to him it had not been done

25  yet.

Bates - Examination/Court                           80

1  Q    Okay.  You did it after you talked to him?

2  A    Correct.

3  Q    Okay.  So when you were talking to him on the 15th, you

4  were telling him that's what you were going to do?

5  A    Correct.

6  Q    Okay.  Hadn't done it yet.

7  A    That's correct.

8  Q    After you did it, after the Bank did it in consultation

9  with the credit department and house counsel and whoever you

10 talked to, did you send him any notice that it had now been

11 done?

12 A    Not in a written format.  In a verbal format.

13 Q    Okay.  And it was -- was that another call after the 15th?

14 A    Yes.  Subsequent calls with me and Zach Weibe as well.

15 Q    Okay.  Let me be very specific.  With James E. Goodman,

16 did you have another call with him after the 15th of August,

17 where you told him we have offset this deposit account against

18 this loan?

19 A    I can't specifically recall that conversation.

20        MR. PULMAN:  Okay.  Thank you, Your Honor.  Thank you

21 for your indulgence.

22        THE COURT:  Thank you.  All right.

23                        EXAMINATION

24 BY THE COURT:

25 Q   Mr. Bates, I have a few questions.  And I apologize.  I'm

Bates - Examination/Court                              81

1  not going to be as organized as counsel when it comes to the

2  exhibits.

3         The first line of questioning that I'd like to explore

4  with you, Mr. Bates, is exactly when you knew that UMB and the

5  Bondholders had a DACA in place.  And I understand based upon

6  your testimony that even as you sit here today that you believe

7  that that DACA was released.

8         Is that accurate?

9  A    Yes, ma'am.

10 Q    All right.  And at any point, if you feel that I'm putting

11 words in your mouth, and it's -- I'm not trying to make your

12 testimony inaccurate at all.  I'm just trying to kind of get to

13 the bottom line of it.

14        During questioning, the -- I'm not sure if it was your

15 counsel, or if it was Mr. Clarke.  You went through a series of

16 emails and exhibits where Ms. Ross, Michelle Ross with Reed

17 Smith, was requesting from your treasury division information

18 on the notice provisions.

19        Do you recall that?

20 A    Yes.

21 Q    Okay.  And I think if I'm not mistaken that that's Exhibit

22 48.

23        THE COURT:  Why thank you, Mr. Guffy.  Okay.

24 BY THE COURT:

25 Q    And I believe at the time that you testified that when you

Bates - Examination/Court                                82

1  received those emails or the day before, you were provided with

2  the DACA.  Is that correct?

3  A    That's correct.

4  Q    Okay.  And so I just want to understand.  If you were

5  provided with the DACA somewhere between it looks like August

6  9th and August 10th, Prosperity swept the funds in the Goodman

7  account after that?

8  A    Yes.

9  Q    Okay.

10  A    On 8/16.  8/15, excuse me, was the sweep.

11  Q    And I guess my question is as simple as this.  Why?

12  A    We had not given notice of control.  The DACA was

13  provided.  And we were convinced that the DACA was released and

14  we would find that release.  And --

15  Q    Other than -- oh, please go on.

16  A    Go ahead.  I'm sorry.

17  Q    Okay.  Other than the missing flag, was there anyone

18  within the Bank that thought -- could basically say, ah, it was

19  released on X date in connection with Y transaction.  Was there

20  anything other than the missing flag that led you to believe it

21  was released?

22  A    I guess what I would say is it was the confidence of my

23  teammates, that it was released.  And they knew specifically it

24  was released.  They're very capable people.

25  Q    So there were DACAs in place.  And I recognize that you

Bates - Examination/Court                                           83

1  weren't here for all of the testimony before, but I think Mr.

2  Clarke took you through two or three different DACA accounts

3  that were held by the Bondholders.

4      Did you believe they were all released?

5  A    No.

6  Q    Just that one.

7  A    Just that one.

8  Q    Okay.

9  A    Yeah, that's correct.

10  Q    All right.  And I believe there's a variety of reasons why

11  people don't ask you very pointed questions with respect to

12  Account 0188.  So I'm going to ask you the pointed question.

13      When you -- I think your testimony was you reversed the

14  transaction.  You reversed essentially, the application of

15  funds from 3992 out -- back out of the Genesis payments, and

16  you put those into 0188.  In your own words, what was

17  Prosperity doing there?

18  A    That was really done by our legal group internally.

19  Q    Okay.

20  A    I was not involved in that process.

21  Q    And again, correct me if I'm wrong.  It was your testimony

22  that your legal group got involved, or you involved the legal

23  group, should I say, after the notice of exclusive control was

24  received?

25  A    Yes.

Bates - Examination/Court                          84

1  Q    Okay.  And how quickly thereafter was the transaction

2  reversed?

3  A    I believe it was a week and a half or so.

4  Q    Okay.

5  A    I'm not sure exactly.

6  Q    You said that at some point that -- and I don't want to

7  put words in your mouth.  I think you said you were removed

8  from the account.  Is that correct?

9  A    Correct.

10 Q    Okay.  And when did that happen?

11 A    It was -- (coughs) excuse me.

12 Q    Take a moment.

13 A     It was somewhere in January and February.

14 Q    Okay.

15 A    Excuse me.

16 Q    Take your time.  And is it correct that you were removed

17 from the Goodman account, but you remained on the Genesis

18 account?

19 A    I was removed from the Genesis account.

20 Q    Removed from the Genesis account.  Okay.  Thank you for

21 the clarification.  And give me one moment.

22     So were you removed from the Genesis account at some point

23 after the January 31st email which was Exhibit 24.  FedEx's 24.

24 There's an email from you to Mr. John Goodman copying Mr. James

25 Goodman, as well as Zach Wiebe.

Bates - Examination/Court                    85

1       And it says, "John, we're still trying to get the debt of

2   Genesis Telecom the $3 million revolver on the $1.4 million

3   term loan restructured so the GNET cash in escrow can be

4   released, but we're not there yet."  Were you still on the

5   account then?

6   A    Yes.

7   Q    Okay.

8   A    I was still involved.

9   Q    All right.  And with respect to that particular email,

10  under Mr. Hillyer's questioning, I believe that you testified

11  that you didn't believe that the restructure of the Genesis

12  debt and the release of what you call in here the cash in

13  escrow, you didn't believe that those were intertwined?

14  A    No.  I was just trying to get the debt restructured.

15  Q    Okay.  And --

16  A    It didn't have anything to do with --

17  Q    Okay.

18  A    -- 1118 [sic].

19  Q    And with respect to my next line of questioning, just with

20  respect to the Account 0188.  Explain to me -- and again, only

21  to your knowledge.  If this is a question better asked to the

22  next witness, just tell me so.  How does Prosperity treat that

23  account internally?

24  A    That would be a question for our legal counsel or the next

25  witness.

Bates - Redirect/Argeroplos                    86

1  Q    Okay.

2  A    I don't know.

3           THE COURT:  Okay.  All right.  Just one moment.

4           All right.  I don't think I have any other questions.

5  Thank you, Mr. Bates.

6           But now, Ms. Argeroplos.

7           MS. ARGEROPLOS:  I'll be very quick, I promise.

8           THE COURT:  Of course.

9                     REDIRECT EXAMINATION

10 BY MS. ARGEROPLOS:

11 Q    So real quick, Mr. Bates.  When there were emails where

12 you used the word "escrow" to describe the 0188 account, but

13 you weren't referring to an escrow agreement or anything,

14 right?

15 A    No.

16 Q    Is that just because it's a familiar term?

17 A    Yeah.  I don't know where I got that term.  It's a holding

18 account, a suspense account.

19 Q    Okay.  And yeah, because you said a minute ago that there

20 -- a few minutes ago that the Bank was holding the money until

21 it was determined where the funds in that 0188 account should

22 go, right?

23 A    That's correct.

24 Q    Okay.  And let's see.  In January and February of 2023,

25 when you were removed from the loan -- from the loan account,

Bates - Redirect/Argeroplos                    87

1   is that because -- what had the Bank done with the loan as far

2   as which department it went?

3   A    There was a point there where the special assets group in

4   our company took over the management of it.

5   Q    Okay.  And who is the person who's managing the loan

6   account right now?

7   A    David Montgomery.

8   Q    Okay.

9          THE COURT:  Could you clarify which account?

10          MS. ARGEROPLOS:  The Genesis Networks loans.

11          THE COURT:  Okay.  Thank you.

12   BY MS. ARGEROPLOS:

13   Q    And is that accurate?

14   A    That's correct.

15   Q    Thank you.  Would you pick up the binder clip packet that

16   I gave you one more time?  These are the Trustees exhibits.

17   It's this one.  I can give you a new one if you need it.

18   A    Got you.  Okay.

19   Q    So looking at the Trustees Exhibit E one more time, could

20   you please turn to -- let's see -- Page 4, and the last

21   paragraph where it says termination.  Would you read that first

22   sentence for the Court up to Romanette 2?

23   A    Okay.  "This agreement may be terminated unilaterally by

24   depository bank for any reason, in its sole discretion upon 30

25   days prior written notice to all parties, provided that

however, the depository bank may terminate this agreement on

five days written notice to secured parties in the event if any

secured party failed to make payments to depository bank, in

accordance with Section 6 above." Excuse me.  Gosh.

Q    Thank you.  So it's possible that the Bank could have

unilaterally -- I'm sorry.  I'll back up.  Depository bank in

this agreement is Prosperity, right?

A    Correct.

Q    LegacyTexas at the time of execution, but now Prosperity.

A    Correct.

Q    So it's possible that the Bank could have unilaterally

terminated the agreement if written notice was given to all

parties.

A    That's true.

Q    But we just don't have any documentation of any of these

events occurring.

A    That's correct.

        MS. ARGEROPLOS:  Okay.  That's all I have, Your

Honor.

        THE COURT:  Thank you, Ms. Argeroplos.

        MS. ARGEROPLOS:  Okay.  Your Honor, I don't think

anybody else is going to ask any more questions.  So I think it

might be time for a quick bathroom break.  But I think based on

all the testimony that's been brought out, I don't think Mr.

Montgomery's is going to be very quick.  So if it's okay with

1  everybody else, we can take a quick break and then just put

2  David on?

3          THE COURT:  Okay.  Just give me one moment.

4          MS. ARGEROPLOS:  Yeah.

5      (Pause)

6          THE COURT:  I don't think I have any questions or any

7  further questions.

8          Thank you very much for your testimony, Mr. Bates.

9          THE WITNESS:  Thank you, ma'am.

10          THE COURT:  Appreciate you being here today.

11          THE WITNESS:  Absolutely.

12          THE COURT:  You may step down and leave your mess.

13      (Witness excused)

14          THE COURT:  All right.  It's 11:11 now.  Do we want

15  to start a new witness?

16          MR. RUKAVINA:  Your Honor, I desperately need to --

17          THE COURT:  After a convenience break.

18          MR. RUKAVINA:  Yeah.  That's the key for me.  Yes.  I

19  just got to go --

20          MS. ARGEROPLOS:  Yeah.  I might have said the wrong

21  word.  I do not think that David Montgomery's testimony will

22  take very long.  So I think we can cover him before lunch.

23          THE COURT:  Fair enough.  All right.  It's 11:11.

24  We'll be in recess until 11:25.

25          THE CLERK:  All rise.

Montgomery - Direct/Argeroplos                    90

```
 1        (Recess at 11:12 a.m./Reconvened at 11:29 a.m.)

 2             THE COURT:  We're going to go back on the record in

 3    Case Number 22-31641.  All right.  When we last broke, we had

 4    concluded Mr. Bates' testimony.

 5             Ms. Argeroplos?

 6             MS. ARGEROPLOS:  Prosperity calls David Montgomery.

 7             THE COURT:  Please.  I'll go ahead and swear you in.

 8    If you could raise your right hand for me.

 9          DAVID MONTGOMERY, PROSPERITY'S WITNESS, SWORN

10             THE COURT:  Thank you very much.  Please be seated.

11             THE WITNESS:  Thanks.

12                       DIRECT EXAMINATION

13    BY MS. ARGEROPLOS:

14    Q    Could you state your full name, please?

15    A    David Robert Montgomery.

16    Q    Did you listen to Mr. Seidel's testimony yesterday?

17    A    No.

18    Q    Has anyone discussed that testimony with you?

19    A    No.

20    Q    Great.  Are the Genesis loans, and you weren't here for

21    this but we've been referring to the Genesis loans as

22    Prosperity's loans to Genesis Networks Telecom Services and

23    Genesis Networks Global Services.  Are those two loans under

24    the control of special assets now?

25    A    Yes.
```

1  Q     When did that occur?

2  A     Midway through the first quarter of this year.

3  Q     And after special assets took over, was Mr. Bates

4  instructed not to communicate with the Genesis borrowers or

5  Goodman Networks after that?

6  A     Yes.

7  Q     And you're familiar with the pay down of the Genesis loans

8  that occurred on August 15th of 2022?

9  A     Yes.

10 Q     And that the transaction was unwound on August 30th of

11 2022.  Is that right?

12 A     Yes.

13 Q     In between -- in that time period, was the Bank looking

14 for a release document that may nor may not have existed?

15 A     I believe that we were, yes.

16 Q     And could the Bank confirm Bater's insistence at that time

17 that there was a release document?

18 A     No.

19 Q     So why were the funds put into the 0188 account instead of

20 the 3992 account?

21 A     For a couple reasons.

22        One, just for control.  We -- that's a bank account or

23 styled in Prosperity's bank name.  So no opportunity for anyone

24 outside the Bank to effect any transactions on the account.

25 And secondly, I think we were just looking for a referee at the

1  time for what we should do with the funds.

2  Q    And nobody -- can anyone inside the Bank access the 0188

3  account?

4  A    Only with approval of our legal department.

5  Q    Okay.  Is it a customer account, the 0188?

6  A    No.  It's styled in the Bank's name.

7  Q    Okay.  In terms of whether it's a deposit account or

8  something like an account receivable, which is it more like?

9  A    It's more like a deposit account.

10  Q    Okay.  And so having the knowledge of everything that went

11  in on August of 2022 now, you know, what is the Bank's position

12  on the pay down of the Genesis loans with funds from the 3992

13  account?

14  A    My opinion is it was -- shouldn't have happened.  It was

15  improper.

16  Q    And why don't you think it was proper?

17  A    I don't think we had a default at the time.  And so

18  applying the funds was not justified, in my opinion.

19  Q    Not a monetary default?

20  A    No.

21  Q    And had the account, the 3992 not been swept, would the

22  Bondholders have gotten the funds after the notice of control

23  was received the very next day?

24  A    Yes, I believe that --

25  Q    Okay.  And do you --

93

1  A    -- would have happened.

2  Q    -- think that's what should have happened?

3  A    I do.

4  Q    And then you recall that this bankruptcy case was filed on

5  September 6th of 2022.  So only a week later, right?

6  A    Yes.

7  Q    And at that time, the funds were in the 0188 account.

8  A    Yes.

9  Q    And so the status quo on September 6th of 2022 was that's

10 where the funds were?

11 A    Yes.

12 Q    And has Prosperity done anything with the funds since

13 then?

14 A    No.

15 Q    Are we just waiting for -- is Prosperity just waiting for

16 the Court to tell them what to do?

17 A    Yes.

18 Q    Do you believe that the Bank has a superior interest in

19 the funds in the 0188 account?

20 A    I do not.

21         MS. ARGEROPLOS:  May I approach?

22         THE COURT:  Of course.

23         MS. ARGEROPLOS:  I'm showing you, it's Docket Number

24 398-54 which is FedEx Exhibit 54.  It's also been marked as

25 Docket Number 399-112.  But the one I've got is docket stamped

94

1  as 398-54, and that's the one that Mr. Montgomery has.

2  BY MS. ARGEROPLOS:

3  Q    Do you remember sending this email on March 24th, 2023, to

4  James Goodman?

5  A    I do.

6  Q    And you're telling him we filed a motion for an agreed

7  order to release the cash held in escrow to the bankruptcy

8  trustee.  Knowing, you know -- looking at that now, was that an

9  accurate statement?

10  A    I believe it was.  Or at least that was in process.

11  Q    And, let's see.  Were you saying that Prosperity was

12  trying to ask the Court to allow Prosperity to keep the cash in

13  that account?

14  A    No.  Not at this time.

15  Q    Okay.  So is that the Bank's position, that were we trying

16  to assert an interest in that cash at this time?

17  A    No.

18  Q    Does the Bank think of the 0188 account as its own

19  collateral for the Genesis loan?

20  A    No.

21  Q    Do you remember testifying in your deposition that was on

22  September 6th of this year, did you testify that the -- let's

23  see.  Did you testify that you didn't think that Goodman

24  Networks received any value from Prosperity in exchange for

25  that pledge of the 3992 account?

Montgomery - Cross/Clarke                    95

1  A    I did.

2  Q    Did you testify that you thought that the Bank acted in

3  bad faith?

4  A    I don't believe I did, no.

5           MS. ARGEROPLOS:  Okay.  That's all I have.

6           THE COURT:  Thank you, Ms. Argeroplos.

7           Cross-examination?  Mr. Clarke?

8                      CROSS-EXAMINATION

9  BY MR. CLARKE:

10  Q    Good morning, Mr. Montgomery.  My name is Brian Clarke.  I

11  represent the Secured Bondholders and UMB Bank as indenture

12  trustee.  I just have a couple questions this morning.

13      Counsel just referenced your deposition on September 6th.

14  Were you the Prosperity Bank Rule 30(b)(6) representative?  Do

15  you remember that term?

16  A    I don't remember the term.  But I was the Bank

17  representative on that matter.  Yes, sir.

18  Q    Okay.  During your deposition testimony, there were a

19  series of questions asked by Mr. Hillyer regarding the

20  application of the subject funds in the 3992 account to the

21  Genesis loan.  And let me just break that down.  The 3992

22  account, you're familiar with that account?

23  A    Yes, sir.

24  Q    And the Genesis loan, those are the Genesis term loans,

25  you're familiar with those loans?

Montgomery - Cross/Clarke                    96

1  A    Yes, sir.

2  Q    Okay.  And the Genesis loans, well so Genesis Networks, is

3  that owned and controlled by James Goodman?

4  A    Yes, sir.  I believe it is.

5  Q    And did he personally guarantee those loans?

6  A    He did.

7  Q    Is it your understanding that at some point, the 3992 was

8  pledged to support the Genesis loans?

9  A    Yes, sir.

10         MR. CLARKE:  Okay.  Just real quick, we've covered

11 this with some others.  But let's take a quick look, Philip, at

12 Exhibit 45.

13         THE COURT:  Are you pulling that up, Mr. Guffy?

14         MR. GUFFY:  I am, as soon as my computer will let me.

15         THE COURT:  Take your time.

16         THE WITNESS:  Is that going to be up here?

17         MR. CLARKE:  Yeah, it's going to come up.

18         THE WITNESS:  Okay.  Thank you, sir.

19         MR. CLARKE:  It'll come up on the screen so you don't

20 have to page turn.

21 BY MR. CLARKE:

22 Q    Let's look at Section 5.  And so this is the deposit

23 account control agreement I just referenced.  You testified a

24 few moments ago that, and correct me if I'm misstating it, I

25 don't have a transcript, you know, that Prosperity doesn't

Montgomery - Cross/Clarke                    97

1  claim an interest in these funds, and that the application of

2  the funds to the Genesis loans, did you says improper?

3  A    I think it was incorrect.  Yes, sir.

4  Q    Incorrect.  Okay.  This Section 5 is titled "Subordination

5  By Depository Bank."  Do you see that?

6  A    Yes, sir.

7  Q    And in your role with special assets within the bank, are

8  you familiar with how deposit account and control agreements

9  work?

10 A    Yes, sir.

11 Q    Have you ever seen a provision like this?

12 A    Yes, sir.

13 Q    The first sentence says that the company and the

14 depository bank acknowledge notice of and receipt and recognize

15 secure parties continuing security interest in the deposit

16 account, and in all items deposited in the deposit account and

17 in the proceeds there of.  And so have you seen a clause like

18 that before?

19 A    Yes, sir.

20 Q    Do you understand that to mean that the Bank is

21 recognizing that the collateral agent is secured by the deposit

22 account as well as the proceeds of that account?

23 A    Yes, sir.

24 Q    The next sentence says that the Bank hereby subordinates

25 any statutory or contractual right or claim of offset or lien

1  resulting from any transaction which involves the deposit

2  account.  Have you ever seen a provision like that before?

3  A    Yes, sir.

4  Q    And so do you understand that to mean that any lien

5  granted by the company, Goodman Networks, to Prosperity Bank

6  over that account would be subordinate to the lien of the

7  collateral agent?

8  A    Yes, sir.

9  Q    Thank you.  And so just touching on your testimony before

10  in your deposition, at one point in the deposition with

11  Mr. Hillyer --

12        MR. CLARKE:  For the record this is at Page 70 to 71

13  of the depo transcript that's been admitted as, I think it's

14  designated as an exhibit by a couple parties.  I don't have the

15  number in front of me.  Just bear with me, for the record.

16        UNIDENTIFIED SPEAKER:  149.

17        MR. CLARKE:  So it's 149 on the Objecting Creditors.

18  And then we have it as Bondholders' 72.

19  BY MR. CLARKE:

20  Q    You testified regarding the application of the subject

21  funds in the 3992 account to the Genesis loan, "My belief, and

22  I think the Bank's position, is that we were not authorized or

23  should have done that.  And when we came to that conclusion

24  with a broader audience, we immediately reversed the

25  transaction because we felt that was the right and correct

Montgomery - Cross/Clarke                    99

1  thing to do."  It sounds like that's still the Bank's position

2  today.

3  A    Yes, sir.

4  Q    Okay.  Shortly after that back and forth with Mr. Hillyer,

5  there was a discussion regarding the internal accounting at

6  Prosperity regarding the application of the subject funds in

7  the 3992 account to the Genesis loan.  Do you recall those

8  questions?

9  A    I do.

10  Q    Is your testimony that no cash ever left the bank when the

11  subject funds in the 3992 account were applied to the Genesis

12  loan?

13  A    That's correct.

14  Q    And did Prosperity receive any cash as a result of that

15  application?

16  A    No.

17  Q    Is it correct to say that in applying the subject funds in

18  the 3992 account to the Genesis loan, you had the removal of a

19  deposit liability on the 3992 account, and the removal of an

20  asset on the Bank's balance sheet that would be represented by

21  the loan interest on the Genesis loan?

22  A    That's correct.

23  Q    And so no change in the Bank's cash?

24  A    No.

25  Q    And no change -- no other accounting change.

Montgomery - Cross/Clarke                    100

1  A    No, sir.

2  Q    There was also a series of questions with Mr. Hillyer as

3  well just now with Ms. Argeroplos about this, the nature of the

4  account and whether it is, "a deposit account."  Do you recall

5  those questions?

6  A    Yes, sir, I do.

7  Q    You said there's no customer on the account.  Is that

8  right?

9  A    Correct.

10  Q    I know you're not a lawyer.  Well, let me ask you.  Are

11  you a lawyer?

12  A    No, I'm not.

13  Q    Okay.  Sorry, I didn't mean to assume.  And I'm not

14  looking at a gotcha here, but are you familiar with the Uniform

15  Commercial Code?

16  A    Yes, sir.

17  Q    You know what it is?  Do you know how the Uniform

18  Commercial Code defines deposit account?

19  A    No, sir.

20  Q    So there's no customer on the account.  Can any party,

21  whether it's the Trustee or, you know, Goodman Networks when

22  that was still an operating business, could they demand the

23  funds from the 0188 account like a typical customer demand

24  deposit account?

25  A    I mean, they could make that request.  But it would have

Montgomery - Cross/Clarke                    101

1  just been --

2  Q    But you wouldn't have --

3  A    -- referred to our --

4  Q    -- to honor it.

5  A    No, sir.

6  Q    Yeah, okay.  And with a regular deposit account, demand

7  deposit account, you would have to honor it because if they

8  were your customer.

9  A    Yeah, subject to authorized signer and availability of

10 funds and such.

11 Q    Correct.  Can anybody deposit anything in that account?

12 A    No, sir.  It would have to be internally initiated.

13 Q    Is it a savings account?  I mean, is anyone earning

14 interest on that account balance?

15 A    I'm not certain on that.

16        MR. CLARKE:  Okay.  Philip, just real quick let's

17 pull up the Bank's responses to the RFAs.  I forget the exhibit

18 number.  Okay.  Why don't we scroll down.  Slow down, slow

19 down, slow down.

20        THE COURT:  This is Bondholders' 116?

21        MR. CLARKE:  I believe it's --

22        MR. GUFFY:  Yes, Your Honor.

23        MR. CLARKE:  I believe it's --

24        MR. GUFFY:  (Indiscernible).

25        MR. CLARKE:  -- FedEx 116.

1          THE COURT:  Okay.  Thank you.

2          MR. CLARKE:  All right.  Scroll up.  I think it's

3   number six.  Maybe it's five.  Oh, go up.  Well, we can start

4   with nine.

5   BY MR. CLARKE:

6   Q    This says admit that the Bondholders --

7          THE COURT:  For identification, Mr. Clarke, are these

8   RFAs that were issued to Prosperity?  They were responses?

9          MR. CLARKE:  I apologize.

10          THE COURT:  Thank you.

11   BY MR. CLARKE:

12   Q    These were issued to Prosperity by the Objecting

13   Creditors.  Have you seen this document?

14   A    I believe I have, yes.

15   Q    Okay.  Request number nine, this says, "Admit that the

16   Bondholders do not have control over the Prosperity account

17   ending in 0188."  And the response here is deny.  Do you recall

18   that?

19   A    I don't recall the discussion around the response, no.

20          MR. CLARKE:  Okay.  Philip, let's scroll up.  It

21   might be at the top.  There's the request of the admission on,

22   it's -- okay, yeah.  It's number one.

23   BY MR. CLARKE:

24   Q    "Admit that the subject funds are located in an account

25   that is not a deposit account of the debtor."  And your

Montgomery - Cross/Clarke                103

1  response is admit.

2  A    That's true.

3  Q    Okay.  Is this, from your understanding, this reference to

4  deposit account, are you talking about just the Bank's internal

5  description, or is this meant to be an answer that it's a

6  deposit account, a UCC-defined deposit account.

7  A    Could you repeat the question?

8  Q    Sure.  I apologize.  From the Bank's perspective, when it

9  characterizes this as a deposit account, is that just the way

10  the Bank describes it internally?

11  A    I mean, I always thought of it as, like, a hold account.

12  I know we had spent some time in the deposition about was it

13  actually a deposit account.  And I think my responses at the

14  start of that was I'm just not sure.  I think we've produced

15  exhibits that would indicate that it was, but --

16  Q    Okay.

17  A    -- you know, in my mind, I don't think of it as a

18  traditional deposit account.  I think of it more as an internal

19  hold account.

20  Q    Right, because there's no customer?

21  A    Correct.

22        MR. CLARKE:  Okay.  Your Honor, I have nothing

23  further for our direct portion.

24        THE COURT:  Thank you very much, Mr. Clarke.

25                    CROSS-EXAMINATION

Montgomery - Cross/Rukavina                    104

1  BY MR. RUKAVINA:

2  Q    Sir, I represent the Bankruptcy Trustee.  We don't know

3  each other.  But anyway, I'm -- that's who I am.  Everyone in

4  this room I think knows what special servicing is in the

5  insolvency world.  But for the record, why don't you tell us

6  what that is?

7  A    Basically when the Bank has doubt on the collectability of

8  the loan, it gets transferred to special assets for

9  administration.

10 Q    Are the Genesis loans currently in default?

11 A    No.

12 Q    Okay.  Were they in default earlier this year?

13 A    Yes, they've been in default previously.

14 Q    Is there a forbearance?

15 A    There's a settlement agreement.

16 Q    Have they been paid off?

17 A    No, sir.  They were -- well, I guess technically the

18 Genesis loans have.  But there's a new loan to an entity called

19 Goodman Investment Holdings.

20 Q    Okay.

21 A    We paid those loans.

22 Q    And do you have Any understanding as to whether the

23 Genesis entities transferred or sold or assigned their

24 businesses?

25 A    I'm not sure, no.  We talked about that some in the

Montgomery - Cross/Rukavina                    105

1  deposition.  I'm not totally sure what happened to those

2  assets.

3  Q    Okay.

4         MR. PULMAN:  Excuse me, Your Honor.  I don't think

5  any of this line of questioning has anything to do with the

6  issues that the Court has for a decision today.  And so I'd ask

7  that this line of questioning be terminated about other

8  transfers, other entities.

9         MR. RUKAVINA:  That's fine, Your Honor.  I got what I

10  needed.  I'm fine.

11        THE COURT:  Okay.  Thank you.

12  BY MR. RUKAVINA:

13  Q    The 4.4 million and change, the account 0188, the Bank,

14  just let's be very clear about it, the Bank disclaims not just

15  the superior interest in those funds, but any interest in those

16  funds, correct?

17  A    Correct.

18  Q    Is it the Bank's position that those funds belong to

19  someone?

20  A    It is.

21  Q    The Bank might not care who, but to whom could they

22  possibly belong, to your understanding?

23  A    Either to the Bondholders subject to the DACA or to the

24  bankruptcy Trustee subject to the bankruptcy.

25        MR. RUKAVINA:  Thank you.

Montgomery - Cross/Hillyer                106

1                         CROSS-EXAMINATION

2    BY MR. HILLYER:

3    Q    Good afternoon, Mr. Montgomery.  I'm Cam Hillyer.  I

4    represent FedEx.  I deposed you earlier.

5    A    Yes, sir.  No D at the end, right?

6    Q    I'm sorry?

7    A    Hillyer, no D in your last name.

8    Q    No, H-I-L-L-Y-E-R.

9    A    Thank you.  I know I've called you Cam all deposition.

10   I'll try to do better.

11   Q    It's quite all right.  I've been called worse.  So I want

12   to just bring some clarity and conclusion to varying answers

13   about the 0188 account.

14   A    Yes, sir.

15   Q    Okay.  So it is in the name of Prosperity Bank.

16   A    Yes, sir.

17   Q    Okay.  No one has control or the ability to do anything

18   with those funds except for the Bank.

19   A    Yes, sir.

20   Q    Okay.  And it's a deposit account.

21   A    Yes, sir.

22   Q    Okay.  I'll ask you, you were asked some questions by I

23   believe Mr. Clarke about the Bank's and the Bondholders'

24   superior interest for liens.  Do you recall that line of

25   questioning?

Montgomery - Cross/Hillyer                    107

1   A    Yes, sir.

2   Q    Okay.  Do -- and you were also asked, and I have to ask

3   you again, you're not a lawyer.

4   A    No, sir.

5   Q    Okay.  Do you have any legal training or any experience,

6   any certification in secured transactions, liens, security

7   interests?

8   A    No, sir.  Not but for the day-to-day experience --

9   Q    Okay.

10  A    -- as a banker.  Yeah.

11  Q    Okay.  So you were previously, you looked at Exhibit 54.

12  Bear with me.

13            THE COURT:  Is this FedEx 54?

14            Mr. HILLYER:  No, that's my --

15            THE COURT:  Bondholders?

16            Mr. HILLYER:  I believe that was Bondholders.

17            THE COURT:  Bondholders.

18            Mr. GUFFY:  Are you talking about the one we used?

19            Mr. HILLYER:  Yes.

20            Mr. GUFFY:  That was your exhibit.

21            Mr. HILLYER:  That was my exhibit.

22            Mr. GUFFY:  Yes.

23            Mr. HILLYER:  Okay.  So if you'll find your FedEx

24  exhibit volume one binder.

25            THE WITNESS:  I guess I don't need this one?

Montgomery - Cross/Hillyer                    108

1           THE COURT:  If it's 54, it will be in volume two,

2    Mr. Hillyer.  But I don't mean to interfere.

3           Mr. GUFFY:  I put it on the screen, too.

4           Mr. RUKAVINA:  Cam, it's on the screen.

5           UNIDENTIFIED SPEAKER:  He's got it up.

6           Mr. HILLYER:  Oh, I'm going to another exhibit.

7           THE WITNESS:  You said number 54, sir?

8    BY Mr. HILLYER:

9    Q    Yes, please.  Okay.  And this is the email that you were

10   looking at earlier, I believe.  And you were asked questions

11   about the motion for an agreed order to release the cash to the

12   bankruptcy Trustee on advice of counsel.  Is that correct?

13   A    Yes, sir.

14   Q    Okay.  And you were asked earlier, so at this point on

15   3/24, is the Bank, Prosperity Bank asserting any claim to those

16   funds in the 0188 account?

17   A    No, sir.

18   Q    Okay.  And when -- did Prosperity ever assert a claim to

19   the 0188 account after they deposited it there in September of

20   2022?

21   A    I mean, we talked about that some in the deposition.  But

22   no, I think that was around the time that we felt like it was

23   more likely than not that we were not going to have a claim.

24   That was ultimately what drove the deposit into the 0188

25   account.

Montgomery - Cross/Hillyer                    109

1  Q    Okay.  So I ask you to turn to Exhibit 25, please.

2  A    This binder starts at 50-something.

3            THE COURT:  Volume one will have 25.

4            THE WITNESS:  You can use the screen if you'd like.

5            Mr. HILLYER:  All right.  You don't have matching

6  binders.

7  BY Mr. HILLYER:

8  Q    Mr. Montgomery, that's Exhibit 25 of the Objecting

9  Parties.  Are you familiar with that?

10 A    Yes, sir.

11 Q    Okay.  And so let's just go all the way to the very top.

12 That's your email to James Goodman on March 6, 2023.

13 A    Yes, sir.

14     (Pause)

15            THE COURT:  Oh, I'm good.

16            Mr. HILLYER:  Oh, okay.  I didn't know if --

17            THE COURT:  No.  I appreciate it, though.

18            Mr. HILLYER:  The binder to binder.

19 BY Mr. HILLYER:

20 Q    Okay.  So on the very top line, March 6, 2023, "We are

21 planning to motion the Court to release the cash collateral

22 back to us to satisfy the loan."  Is that what you wrote?

23 A    Yes, sir.

24 Q    Is that a true and accurate --

25 A    I don't believe that was true, no, sir.

Montgomery - Cross/Hillyer                    110

1  Q    No, I'm asking, is this email true and accurate?

2  A    No, sir.

3  Q    Has it been modified in any way?

4  A    No, sir.  The email, I mean it's composition's accurate.

5  Q    Okay.

6  A    The statement's not.

7  Q    Did you write that line?

8  A    Yes, sir, I did.

9        Mr. HILLYER:  Okay.  Your Honor, I'd ask that Exhibit

10 25 be admitted.

11        THE COURT:  Any objection to the admission of 25?

12        Mr. CLARKE:  Well, Your Honor, I'd object given that

13 he just testified there's an error in it.  And he's here to

14 testify about what he knows.  And so to the extent that he -- I

15 think he should be given an opportunity to answer the question

16 on what this should have said because this doesn't sound like

17 an accurate record of what Prosperity thinks.

18        Mr. HILLYER:  My response would be this is his email,

19 and he just said he wrote it, Your Honor.  He can answer any

20 questions about it, but there's no reason it shouldn't be

21 admitted into evidence.

22        MS. ARGEROPLOS:  He did just say that a section is

23 hearsay within -- is contained within a document.  So I think

24 it's -- I think we can keep it out on that basis.

25        Mr. HILLYER:  Your Honor, I'm happy to listen to --

1   Mr. Montgomery just testified he wrote this email to James --

2            THE COURT:  But --

3            Mr. HILLYER:  -- to James Goodman.

4            THE COURT:  The objections are overruled.  The Court

5   will admit Exhibit 25.

6       (FedEx-ARRIS Exhibit 25 admitted into evidence)

7            THE COURT:  And obviously the other parties have

8   rights to cross-examine him --

9            Mr. HILLYER:  Thank you, Your Honor.

10           THE COURT:  -- with respect to it.

11  BY Mr. HILLYER:

12  Q    All right.  So, Mr. Montgomery, I'll give you every

13  opportunity.  You said it's inaccurate.  So you wrote that.

14  And what you're saying is what you wrote is inaccurate?

15  A    Yes, sir.

16  Q    Okay.  Is that David Montgomery, Bank representative

17  saying that, that David Montgomery the person is inaccurate?

18  A    I think those are both the same person.  But yeah.

19  Q    Okay.  Well, no.  What I'm asking you is you wrote it.

20  And when you wrote that, you clearly are insinuating to

21  Mr. Goodman that the Bank is going to take the money out of the

22  0188 account to satisfy the Genesis loan.

23  A    I understand what it says.

24  Q    Okay.  And please explain to me, what is inaccurate about

25  what it says?

Montgomery - Cross/Hillyer                    112

1  A    Look, I know this came up in the deposition.  I didn't

2  have a good explanation for this email.  This is around the

3  time that I'm taking over the work out.  I'm trying to get up

4  to speed on the loan and what's going on with the deposit

5  account and the bankruptcy.

6       James is probably asking for this as part of whatever he's

7  looking for in some sort of settlement.  So you know, I made

8  the statement.  But I think Bank's actions prior to this email

9  and my own subsequent emails once I had a better understanding

10 of where we were with respect to the cash collateral indicates

11 where the Bank was on the issue.

12 Q    Okay.  So is it a true statement -- strike that, Your

13 Honor.  I'm trying to rectify -- are you saying that -- were

14 you lying to Mr. Goodman when you wrote that?

15 A    I said this statement was inaccurate already.

16 Q    No.  I'm asking you, you said -- so did you intentionally

17 write a false statement?

18 A    I honestly don't recall what I was thinking at the time.

19 And that's consistent with my deposition testimony.  I don't

20 have a better response for you today.

21 Q    All right.  But if you read that email, do you agree with

22 me if you read the email, it sounds like the Bank is asserting

23 an interest in the cash collateral to satisfy the loan.

24 A    It says we're planning to motion the Court.

25 Q    Okay.  You also made the statement yes, the funds never

Montgomery - Cross/Hillyer                     113

1  left the bank earlier when talking about the transfer from the

2  3992 to ultimately into 0188.  Is that correct?

3  A    Yes, sir.  That's what I believe.

4  Q    Okay.  Are you just saying that in the truest sense that

5  if I take funds out of my account and transfer it to your

6  account at the same bank, and they sit there, and then you

7  transfer the funds back to me two weeks later, I guess the

8  funds never left the bank.  Would that be a true statement?

9  A    I agree with that, yeah.

10 Q    Okay.  But the funds went to different places.

11 A    In this case, they went from the 3992 account to pay down

12 the loan.  Yes, sir.

13 Q    Okay.  But the funds aren't in the original location that

14 they came from.  They're just in an account at the same bank,

15 in a different account at the same bank.

16 A    I know -- and I wasn't trying to be evasive in the

17 deposition on this.  But I mean, it's kind of an accounting

18 issue in my bind.  Like, whenever we do something on one side

19 of the balance sheet, which in this case was reduce the deposit

20 account, we have to either increase a liability account or

21 decrease an asset account.  And we decreased an asset account

22 which was the loan account.  So --

23 Q    I understand.  I'll make it clearer.  3992 has a different

24 owner than 0188, correct?

25 A    Yes.

Montgomery - Cross/Hillyer                114

1  Q    Okay.  3992 has a different account number than 0188.

2  A    Yes, sir.

3  Q    Okay.  And the controls over 3992 and 0188 are not the

4  same.

5  A    I agree with that.  Yes, sir.

6  Q    Okay.  Are you -- do you remember in your deposition where

7  we covered an exhibit about the critical alert procedures for

8  accounts?

9  A    Vaguely.

10  Q    Vaguely?

11  A    Yes, sir.

12  Q    Okay.  I'll just draw you to it.  It's 114.  It should be

13  that one down there.  All right.  Do you remember that,

14  Mr. Montgomery?

15  A    Yes, sir.  These look familiar.

16  Q    Okay.  And we'll do it anyway because I don't want to have

17  to ask Mr. Guffy to scroll down back and forth even though he's

18  helping out.  Okay.  And this is Bank's internal procedures,

19  correct?

20  A    It appears so, yes.

21  Q    Okay.  And in -- is this the, on the second page where it

22  says demand deposit accounts, checking and savings?

23  A    I'm at that section.

24  Q    Okay.

25  A    If there's a question, I missed it.

Montgomery - Cross/Hillyer                 115

1  Q    Right.  And it says -- you see down there it says legal

2  alerts?

3  A    Yes, sir, I see that.

4  Q    Okay.  Is that what is -- does 0188 have a legal alert --

5  A    Yes, sir.

6  Q    -- on it?

7  A    That's my understanding.

8  Q    Okay.  And so that's the procedure for a demand deposit

9  account within the Bank for -- tell me what it does.  Does it

10 give the legal department total control?

11 A    Yeah.  So if I was a user and I put that account in and

12 brought it up, there's going to be an item that pops up and

13 says this is a legal alert and you shouldn't do anything

14 without consulting the legal department.

15 Q    Okay.  And has that account -- do you know when the legal

16 alert was put on that account?

17 A    I don't know when it was placed on it.

18         Mr. HILLYER:  Okay.  Your Honor, I would ask that --

19 I believe I ask that Exhibit 25 be admitted.

20         THE COURT:  Yes.  25 is admitted.

21         Mr. HILLYER:  Okay.  And for housekeeping, I believe,

22 that was -- is 112 --

23         THE COURT:  112 is not admitted.

24         UNIDENTIFIED SPEAKER:  Hold on a sec.  Yeah, 112 is

25 also 25.

1          Mr. HILLYER:  Okay.  I believe they have -- some of

2    them have extra chains.  It would have one more.  I would also

3    ask that 112 be admitted.

4          THE COURT:  All right.  Any objection to the

5    admission of 112?  Hearing no objection, it's hereby admitted.

6        (FedEx-ARRIS Exhibit 112 admitted into evidence)

7          THE COURT:  That's FedEx's 112.

8    BY Mr. HILLYER:

9    Q    Okay.  And so I won't make you go through all the emails.

10   The debtor, Goodman Networks, either through counsel or through

11   John Goodman or through anyone, there have been demands made

12   upon Prosperity for the turnover of the funds in 0188.

13   A    From the debtor?

14   Q    Yes.

15   A    Yes, sir.  That happened.

16   Q    Okay.  And the Bank refused to turn the funds over to the

17   debtor.

18   A    That's correct.

19   Q    Okay.  And the Bondholders made demands for the funds in

20   0188.

21   A    I believe that's true, as well.

22   Q    Okay.  And the Bank refused to turn the funds over to the

23   Bondholders.

24   A    Yes, sir.  That's my understanding, as well.

25   Q    Okay.  And so what are the conditions, it's your

Montgomery - Cross/Hillyer                117

1  understanding at the Bank, what is the Bank requiring to

2  release those funds to either the Trustee or to the

3  Bondholders?

4  A     Instruction of the Court.

5  Q     Okay.  Is that it?

6  A     That's my understanding, yes.

7  Q     Okay.  Nothing else?

8  A     I don't believe so, no.

9  Q     No releases?

10  A     I mean, we have a release in the settlement document

11  that's been proposed with the Trustee.  But I mean, that's

12  relatively standard in banking, I think.

13  Q     Okay.  So, but you're saying all the terms.  So the --

14  Prosperity won't turn the funds over to anyone except for the

15  settlement that's proposed that contains a release from the

16  estate and a release from the Bondholders.

17  A     I think we would do whatever the Court instructed at this

18  point.

19  Q     Okay.

20  A     But I don't know if I'm answering your question.

21          Mr. HILLYER:  No, you are.

22          I don't have anything further, Your Honor.

23          THE COURT:  Thank you very much, Mr. Hillyer.

24          Any recross?

25          MS. ARGEROPLOS:  I don't have any redirect.

1          THE COURT:  Okay.  Any redirect?

2          MR. CLARKE:  Nothing further, Your Honor.

3          MR. RUKAVINA:  No, Your Honor.  Thank you.

4          THE COURT:  All right.  Let me double check my notes.

5   I don't have I have any questions of this witness.  Thank you

6   very much for your testimony, sir.

7          THE WITNESS:  Yes, ma'am.  Thank you.

8       (Witness excused)

9          THE COURT:  All right.  It's a little after 12 now.

10  How many more witnesses do we have?

11         MR. LANGLEY:  Just to be clear, have the movants

12  rested y'all's case at this point?

13         MS. ARGEROPLOS:  Prosperity rests, Your Honor.

14         THE COURT:  Okay.

15         MR. CLARKE:  We rest.

16         THE COURT:  Okay.  So each of the movants have

17  rested.  How many more witnesses do we have?

18         MR. HILLYER:  That's what I was going to suggest is

19  if they're all done and we're done with this, maybe right now

20  is to take a short break and figure out, we may not have any

21  witnesses, and we may have a very short one.  So that's what I

22  was trying to regroup.

23         THE COURT:  Okay.  Well, so my question is are you

24  asking for a short recess before lunch, or are you asking to

25  take a lunch and then come back and tell me if there's a

1  witness.

2          MR. HILLYER:  Just take lunch.

3          MR. PULMAN:  Excuse me.  Short recess so I can know

4  whether I have to stay or not would be my preference.  Very

5  short.

6          THE COURT:  Okay.  Well, we will take a five-minute

7  recess.

8      (Recess at 12:07 p.m./Reconvene at 12:16 p.m.)

9          THE COURT:  We will go back on the record in Case

10 Number 22-31641.  Mr. Langley?

11         MR. LANGLEY:  Yes, Your Honor.  On the Objector's

12 side, we have decided to release Mr. James Goodman.  We think

13 his testimony would have been duplicitous of what you've

14 already heard.  But we do have -- we were going to recall Scott

15 Seidel.  And instead of doing so, we have agreed to a

16 stipulation with the Trustee, with the other parties

17 acknowledging it.

18         And that stipulation is that the Trustee, for the

19 first time, learned of the release of the DACA --

20         MR. RUKAVINA:  Alleged release of the DACA.

21         MR. LANGLEY:  -- alleged release of the DACA on the

22 3992 account, and that there was no investigation done related

23 to that release of the DACA.

24         MR. RUKAVINA:  I think you meant to say that he

25 learned of that allegation for the first time today.

1         MR. LANGLEY:  Yeah.  Didn't I say that?

2         MR. RUKAVINA:  No.  So that's the stipulation, Your

3  Honor, yes, that the Trustee learned --

4         THE COURT:  I've got to tell you, I have no idea what

5  you just said.

6         MR. RUKAVINA:  Mr. Langley is asking for a

7  stipulation that we agree as follows: that until the testimony

8  of Mr. Bates today, the Trustee had not heard any allegation

9  that the DACA on the 3992 account had been released, and he did

10 not investigate that issue because he never heard of such a

11 potential release.  Is that satisfactory?

12        MR. LANGLEY:  That is.

13        THE COURT:  So the Trustee never investigated it.

14        MR. LANGLEY:  That's correct.

15        THE COURT:  Thank you.

16        MR. LANGLEY:  And with that, the Objectors don't

17 intend to call any more witnesses.  And so we would close the

18 evidence and move to oral arguments after lunch.

19        THE COURT:  All right.  And how long -- so let's take

20 estimates for closing.

21        MR. RUKAVINA:  Twenty minutes on my end, Your Honor.

22        MS. ARGEROPLOS:  Max 20 minutes for me as well, Your

23 Honor.

24        MR. CLARKE:  We'll aspire to 20, as well.

25        MR. LANGLEY:  And I'll say 30 to 45 just because we

1  have to address three different arguments.

2          THE COURT:  Fair enough.  No.  I'm not trying to cut

3  anyone off.  I'm just trying to figure out about how long we

4  would have.  So I'm going to multiply those for dog time.  And,

5  ARRIS --

6          MR. MUENKER:  I pride myself on my brevity, Your

7  Honor.  I expect to be five or ten minutes.

8          THE COURT:  All right.

9          MR. PULMAN:  Your Honor, Randy Pulman on behalf of

10  James Goodman.  May we be released?

11          THE COURT:  Yes, you may.

12          MR. PULMAN:  It's a pleasure being in front of you

13  the last couple of days.  Good to see you, Judge.

14          THE COURT:  Nice to see you, Mr. Pulman.

15          MR. PULMAN:  Thank you.

16          THE COURT:  So with those estimates, it looks like we

17  have lots of time for the afternoon.  When would the parties

18  like to come back from lunch?  I'll give you guys time to have

19  lunch.

20          MR. RUKAVINA:  1:30?  1:30, Your Honor.

21          THE COURT:  1:30?  Okay.

22          MR. RUKAVINA:  An hour and ten minutes is plenty.

23          THE COURT:  That's fine.  If that's okay with

24  everyone else, okay with me.  The Court will stand in recess

25  until 1:30.

1      (Recess at 12:19 p.m./Reconvene at 1:31 p.m.)

2          THE COURT:  Good afternoon.  We can go back on the

3  record in Case Number 22-31641.  Okay.  And as I recall, prior

4  to lunch everyone rested.  So we are prepared to begin closing

5  arguments.  Have parties agreed upon the order of closing

6  arguments?

7          UNIDENTIFIED SPEAKER:  Same order, same form.

8          THE COURT:  Okay.  Fair enough.  Trustee want to

9  start, or go last?

10          MR. RUKAVINA:  I think both, Your Honor.

11          THE COURT:  Okay.

12          MR. RUKAVINA:  But I will try to be brief.  Did

13  Mr. Seidel -- there it is.  He took my Bankruptcy Code --

14          THE COURT:  How dare he.

15          MR. RUKAVINA:  It even says Munsch Hardt on it.

16          THE COURT:  Charge it to his expenses.

17          MR. RUKAVINA:  Your Honor, thank you for hearing us

18  patiently these last couple of days.  Again, as I said in

19  opening, I have no doubt that the Court has read all of the

20  papers.  There's no need for me to repeat any of that.

21          So let's just get right to the 9019 factors.  I think

22  some of them are very self-evident and don't require much

23  thinking.  For example, the complexity, duration, and expense

24  of the litigation, that being the 542, the 544, the 548.  These

25  are extremely sophisticated defendants with extremely

123

1  sophisticated counsel with limitless pockets.  I like to think

2  that I'm fairly sophisticated, and Mr. Seidel is, as well.  We

3  have empty pockets.

4        This is complex.  These are, in two regards, matters

5  of first impression.  The perfection issue, and we'll talk

6  about that in some detail, is a matter of first impression.

7  The fact that Prosperity put the $4.4 million back, undid what

8  I think was clearly a fraudulent transfer, is a matter of first

9  impression.  In other words, is the Court going to find that

10  Prosperity cured the fraudulent transfer such that there are no

11  damages.  That's an issue under 550, as well.

12        Duration, this is going to go up on appeal.  These

13  are matters that those -- well, the standard in any such

14  litigation, obviously, is a mixed question of fact and law.

15  The fact that there are these issues of law is going to mean a

16  de novo appeal.  And there are at least four more judges that

17  would touch this matter.

18        And of course, expense.  We're dealing with

19  expensive, excellent lawyers.  And although we do not believe

20  that the Bondholders are over secured, no one knows whether

21  that might change or not.

22        For example, if the Court finds that, using very

23  round numbers, the $10 million we're going to get from AMRR

24  hopefully soon with the second transaction that is in the

25  works, if the Court finds that that's their collateral, then

1 they could very well be back into an over secured position.

2 And we don't want to be paying Mr. Silverstein's rates just to

3 lose against him.

4        Your Honor, likewise I don't think there's any

5 question that these were arm's length negotiations.  There's no

6 fraud or collusion.  The Trustee might have had less than

7 perfect information because there were a couple documents that

8 he didn't have.  But he had accurate information.

9        We trust Mr. Ruzinsky.  We trust his colleague, I

10 apologize, that I cannot pronounce her last name.  That is

11 something that I have felt that my whole life.  So hopefully

12 she understands that I sympathize.  And of course, Your Honor,

13 I don't think there's any question of good faith here.  So

14 those factors are all easy.

15        It's really the two remaining factors, the

16 probability of success and the reasonable views of creditors

17 that are at issue here today.  And if we were not having the

18 two largest unsecured creditors objecting, then this would be a

19 much easier 9019, I think.

20        Mr. Seidel, let me reiterate, does not relish

21 litigating with his creditors.  We miss the good old days when

22 everyone was unified in this case.  We hope we'll return to

23 that.  Frankly, part of that is reminding everyone that, as you

24 said, Mr. Seidel is the sheriff.  You may not agree with all

25 that he does, but -- and we respect their objection.  But

1  someone has to make the proposal, the decision.  And then, of

2  course, the Court is the final arbiter of that.  And Mr. Seidel

3  has made his decision.  And it is a wise decision.

4       I think to state the obvious which the Court

5  certainly knows, and hopefully the parties in this courtroom

6  are learning, Mr. Seidel and I are not afraid to litigate.

7  We've litigated many, many things, usually successfully.

8  Mr. Seidel is a premier trustee.  He's not afraid to litigate.

9       But he's also not going to file a greenmail case

10 against another very large creditor just to try to get some

11 more juice out of them.  He's not that kind of a trustee.  He

12 doesn't shoot first and then just let God decide where the

13 bodies fall.

14      So when I look at filing a lawsuit on behalf of

15 Mr. Seidel, or on behalf of anyone, and I have filed many, many

16 lawsuits, I try to, as I think a reasonable lawyer should, try

17 to figure out how am I going to survive a motion to dismiss.

18 And more importantly here, how am I going to survive a motion

19 for summary judgment.

20      I think respectfully, there is no question that this

21 is property of the estate, the 4.4 million.  It was property of

22 the debtor.  As I said in opening, just as a matter of simple

23 logic, these funds have to belong to someone.  We know that the

24 Bondholders didn't effectuate a foreclosure because there was a

25 switcheroo on them.  Therefore, they're the debtors' funds.

1          And as I have always maintained, as you heard

2    Mr. Montgomery testify today, Genesis wasn't even in default.

3    Even if the underlying guarantee and assignment were valid,

4    which I don't think there's any question I could avoid those

5    like that if I wanted to, there was no default.  They had no

6    right to take out the funds.  The funds or a debt or a right of

7    restitution belong to the debtor.  This is property of the

8    estate.

9          That then raises the next logical question in my mind

10   as I'm trying to anticipate a motion for summary judgment.  The

11   UCC has a category for every type of asset out there.  Every

12   type of asset out there falls within one of those buckets.

13         Here, the Bondholders have a perfected blanket lien

14   on everything with a few exceptions.  They don't have a lien on

15   commercial tort claims.  They don't have a lien on cash.  And

16   they don't have a lien on deposit accounts, unless of course

17   they have DACAs.

18         So we have this $4.4 million sitting in 0188 that's

19   property of the estate.  It has to fall into some bucket under

20   the UCC.  Right.  It's not a commercial tort claim.  I don't

21   know what it is.  I don't know if it's a general intangible.

22   I'm not the expert, although I have the benefit of one of the

23   premier experts in the country on this.

24         And obviously, I'm not going to violate privileges

25   and open that can of worms up.  But even if I am not qualified

1  to decide or opine on this, he is.  And of course the Court and

2  superior courts would decide.

3        So is this a deposit account?  Well, of course it's a

4  deposit account.  But that's not the end of the question.  It

5  is not a deposit account of the debtor.  It is not a deposit

6  account in the debtors' name.  That's the trigger under the

7  UCC.  And this is now what I have to respond to in a motion for

8  summary judgment.

9        And I have to be -- and Mr. Seidel can only be

10 ethical and honest and talk to you with candor.  Again, we're

11 fiduciaries, and he's your agent, if you will.

12       How do I respond to that MSJ?  It is a deposit

13 account, but it is not in the name of the debtor.  This was the

14 point of my questioning of Mr. Seidel.  When you have an escrow

15 arrangement or a title company holding money, or me and my firm

16 holding money for the benefit of someone, or even the Court in

17 its registry holding money, those are all deposit accounts.

18       But from the perspective of the claimants, they're

19 not deposit accounts.  This is why the Bondholders' argument

20 that this is a general intangible, I don't know if I can defeat

21 that argument.  From the debtors' perspective, it appears to be

22 a right to funds, and that appears -- a refund of funds,

23 wrongfully taken, that appears to be some kind of general

24 intangible.

25       And again, Mr. Langley is going to get up here and

1  he's going to probably write my MSJ response for me.  He's

2  going to say but it's a deposit account.  But it's not a

3  deposit account in the name of the debtor.  So I don't know how

4  we survive that.

5       That, in turn, suggests that well, maybe it is the

6  Bondholders' funds.  And then we look at the equities.  And we

7  begin with the obvious.  If Prosperity hadn't done what it did,

8  if Mr. Bates hadn't swept the funds, we would not be here

9  today.  I might be looking at a preference against the

10  Bondholders, although it's very hard to preference someone that

11  gets their collateral back.

12       But, but for that let's call it fortuitous adventure,

13  there would be no question that the Bondholders validly

14  exercised their rights and foreclosed on the funds.  So is this

15  a windfall?  Is this a forfeiture?  Courts of equity abhor

16  windfalls.  They abhor forfeitures.

17       And it's like I said during opening, when you have

18  heard nothing to the contrary, the Bondholders did nothing

19  wrong.  Do I want their money? Hell, yeah.  I specialize in

20  it.  But they did nothing wrong.

21       Prosperity, it appears, did something wrong, although

22  inadvertently.  That's the evidence.  The Court can find that

23  credible or not.  But it made it right afterwards.  That's the

24  strongest thing here.  Whether Mr. Bates really believed that

25  there was a release of the DACA or not, we can argue about

1  that.  It doesn't matter.  The Bank, as an institution, made it

2  right 14 days later, or 13 days later.  Not a material period

3  of time.

4        So this is why Mr. Seidel, as he has testified,

5  believes that this is not a winning lawsuit because a court,

6  especially one of equity, dealing with innocent institutional

7  investors who did nothing wrong, a court is going to look for a

8  way to avoid a forfeiture.  And a court, I believe, especially

9  at the Fifth Circuit, is going to look very closely at the

10  equities of the case.

11        And again, we mentioned it today, or yesterday

12  rather.  And we said this is a dangerous hearing.  And one of

13  those reasons is because we talked about 552(a) yesterday.  No

14  one raised 552(a).  But the Trustee certainly thought about it.

15        The Court, in other words, is not powerless.  If the

16  Court feels that the equities of the case warrant it, the Court

17  can reverse 552(a) and apply a pre-petition lien to post-

18  petition property.

19        All of that, Your Honor, suggests that the perfection

20  issue needs to be compromised, and that it's compromised in an

21  appropriate way.  The 97/3 split, it's a red herring.  A

22  hundred percent of the money goes to the estate and goes to a

23  legitimate creditor that's owed at least $4.4 million.

24        Now we look at the fraudulent transfer claims against

25  Prosperity.  I mentioned in opening that we are aware of Your

1  Honor's opinion.  We were not aware of it before.  But it is no

2  matter that we may disagree with that opinion.  We would start

3  548 behind the eight ball because there's no question that when

4  these transfers were made, the Bondholders were perfected.  It

5  was their collateral.

6         I believe that you can 548 fully encumbered assets.

7  But that would be a motion to dismiss.  And I would argue to

8  the very judge that wrote that opinion that she was wrong.

9  That's not an enviable task.  And that's another issue that

10  would go up all the way, maybe all the way because that is an

11  important issue.  It's one that we see in bankruptcy all the

12  time.

13         But even aside from that uncertainty in law, there's

14  the uncertainty in fact.  Prosperity put the money back.  In a

15  different account, okay, but they disclaimed it.  They said

16  it's not ours.  They undid the fraudulent transfer.  There was

17  a fraudulent transfer for 13 days.  I would have to avoid the

18  underlying assignment which, again, I think I can do in a

19  heartbeat, have to avoid the transfers.

20         But what am I avoiding when they put the money back?

21  It's a stinker of a claim on the 4.4 million.  The $540,000,

22  the 539, it's a lay-down.  But for Your Honor's opinion, it's a

23  lay-down.  And $200,000 on that, it's, you know, it's a little

24  bit on the lower side.  But it's in the context of the broader

25  settlement.  It is a negotiate amount.

131

1          And as Mr. Seidel testified, it's an appropriate

2     compromise for risk, delay, and expense.  If we were dealing

3     with $5 million or $10 million, it would cost me more or less

4     the same amount of money to avoid it as the $539,000.  It just

5     is not enough money in controversy to justify litigation

6     against a well-armed, well-funded bank that is going to defend

7     itself, especially because, let's state the obvious, there are

8     possibly reputational issues to be had here.

9          There's allegations that the Bank did something

10    wrong.  The Bank is going to defend itself on that with

11    excellent lawyers.  So at the end of the day, getting $350,000,

12    it's not three percent.  It's not getting a de minimis amount.

13    It's getting something that without the settlement, we could

14    very well not get at all.

15         There's more intangibles which is that we need to

16    move this case forward.  So far, we filed a motion to settle

17    with Mr. John Goodman.  The Bondholders objected.  Again, we're

18    not doing their work.  We've litigated with the bondholders.

19    We filed a motion to settle one of the subsidary worker's comp

20    claims.  The Bondholders objected.  We worked it out.

21         We filed a 9019 with AMRR.  Everyone objected other

22    than ARRIS.  The Bondholders filed a lift stay motion and we

23    objected.  So we're not doing their bidding, for one.  But two,

24    we've got to stop this fratricide.  We've got to move on with

25    this case.

1          That means that Mr. Seidel, unless he makes a

2  decision that is patently wrong, needs to be allowed to do his

3  job.  As a result of this settlement, 4.2, or somewhere around

4  there, million dollars of debt is repaid.  Finally, someone's

5  getting something out of this case.  And the estate gets

6  $350,000 of free and clear money that it desperately needs.  It

7  might be the only free and clear money to fund this case

8  depending on how the Court adjudicates lien and asserted other

9  rights against other assets.

10          Unless the Court has any questions, Your Honor, I

11  really have nothing more to add.

12          THE COURT:  I don't think I have any questions at

13  this time, Mr. Rukavina.

14          MR. RUKAVINA:  Thank you.

15          THE COURT:  I'll be sure to call you back up if I

16  have any other questions.

17          MR. RUKAVINA:  Thank you.

18          THE COURT:  Or if I want to hear my opinions

19  criticized any further.  I'd say you hurt my feelings, but you

20  know better.

21          Mr. Clarke?

22          MR. CLARKE:  Thank you.  Brian Clarke for the record.

23          Your Honor, I'll try not to go back over things the

24  Trustee's hit on.  But given the strength of Mr. Seidel's

25  testimony, the merits of the various legal arguments regarding

1  perfection and control that I'll go over, the testimony of

2  Mr. Montgomery, the testimony of Mr. Bates, and I think the

3  clear value of the collusion claims against the estate and

4  Prosperity that the Bondholders are releasing, as well as the

5  significant cost that the Trustee would need to incur to

6  litigate these claims, I think it's clear the settlement passes

7  any lowest range of reasonableness test by a significant

8  margin.

9       Before I summarize the legal arguments for why the

10 Bondholders would be entitled to these proceeds in any

11 litigation, I want to point out for the record that Mr. Seidel

12 testified to the great lengths he went to to find a firm to

13 prosecute these claims against Prosperity that the Objecting

14 Creditors are going to tell you were such slam dunks.  And in

15 his deposition testimony and in the hearing yesterday, he

16 mentioned the following firm specifically as turning down the

17 opportunity to prosecute these claims on a contingency for the

18 benefit of the estate.

19      Munsch, Hardt, Passman & Jones, Quilling, Selander,

20 Brian Cade (phonetic), and Butler Snow.

21      THE COURT:  Reed Smith.

22      MR. CLARKE:  I'm sorry?

23      THE COURT:  It's Reed Smith, not Brian Cade.

24      MR. RUKAVINA:  He moved.

25      MR. CLARKE:  Oh, he moved.  Oh, well.  Well because

1  Butler Snow also does trustee work, Mr. Seidel testified that

2  he asked Butler Snow to provide some recommendations.

3           THE COURT:  Right.

4           MR. CLARKE:  And his testimony was that Butler Snow's

5  response was, "Crickets, nothing, zero, nada."  Mr. Seidel also

6  described negotiations he had with the Objecting Creditors for

7  them to finance the prosecution of the claims against

8  Prosperity.  And we looked at some emails on that.  There was a

9  lot of back and forth on the negotiations.

10          And you know, the upshot was -- from Mr. Seidel's

11  testimony was that the Objecting Creditors wanted, "the lion's

12  share of any proceeds and were also unwilling to protect the

13  estate to make sure we have the same deal, or at least a good a

14  deal as we have right now which is $350,000 coming into the

15  estate."  Mr. Seidel's efforts to shop these claims or find

16  anybody who was willing to prosecute them I think tells the

17  Court essentially all that it needs to know about the value of

18  these claims from the estate's perspective.

19          Your Honor, in our June 2nd brief in support of the

20  settlement, we briefed a number of legal arguments for why in

21  any litigation between the Bondholders and the estate, the

22  Bondholders would recover the subject funds.  And so I want to

23  summarize those for the record now.  And I'll try not to just

24  read what's in the briefs.

25          First, we know the Trustee disputes this, we think

135

1    it's questionable that the estate holds any property interest

2    in the subject funds.  And the reason for that is when the

3    Bondholders delivered a notice of exclusive control over

4    account 3992, the estate's control and rights to that account

5    were cut off.  That's how the DACA works.

6         There's no evidence or suggestion that the notice of

7    exclusive control was invalid or improper, or should not have

8    been recognized by Prosperity.  And if I might, could we just

9    pull up -- we might pull up a couple of exhibits.  Will you

10   just pull up Exhibit 65?

11        And there was a suggestion today that the DACA was

12   terminated at some point.  There's no evidence of that beyond

13   the suggestion that beyond the suggestion that Mr. Bates thinks

14   it was terminated.  And I want to point out for the record, the

15   party with the real incentive to do this investigation and find

16   that evidence of termination is Prosperity.  And it sounds like

17   they did a thorough one and came up empty.

18        Ms. Ross, Ms. LaManna, Mr. Wilkenson, are attending

19   this hearing, and I think can confirm what I'm about to say.

20   This DACA was never terminated.  And what Exhibit 65 here shows

21   is that Prosperity I think knows that.  I mean, what we have

22   here is the letter from Mr. Bates to the CFO of Genesis Network

23   saying, "If I would not have agreed to move on the debt

24   repayment on that Monday, the money collateral would have been

25   pulled from the account by the Bondholders following the notice

1  of control on that Tuesday.  If there was no DACA, if the DACA

2  had been terminated, there would be no reason to honor the

3  notice of exclusive control."

4       And I think what we see here is they know that notice

5  of exclusive control was valid.  They know the DACA was valid

6  and that the DACA was not terminated.

7       Going back to the estate's interest, had the funds

8  gone into the 3992 account after Prosperity reversed the

9  Genesis payoff, or any other debtor account for which the

10  Bondholders delivered notices of exclusive control, which I

11  believe for the Goodman accounts is all of them, the funds

12  would have immediately been swept to the collateral agent.  So

13  Prosperity didn't do that.

14       For purposes of this settlement only, we've

15  stipulated to the fact that the estate has some interest in the

16  subject funds.  But that stipulation would not be binding on

17  litigation.  And we think on the facts, it's you know, we think

18  we have the better argument that the estate lost any residual

19  interest in the subject funds when the notice of exclusive

20  control was delivered.

21       The Objecting Creditors sort of brushed this aside

22  and said the Court should deny the settlement and have the

23  Bondholders sue Prosperity for breach of the DACA while the

24  estate sues Prosperity for the fraudulent transfer of funds in

25  which the estate and its unsecured creditors had no equitable

137

1   interest.  They assumed that Prosperity will be generous enough

2   to pay damages twice in two separate litigations, and

3   essentially not mount any defense.

4        And the Objecting Creditors here ignore I think two

5   crucial facts.  First, no creditor other than the Bondholders

6   was harmed by what occurred here because the subject funds were

7   Bondholder collateral.  And I think Exhibit 65 is a clear

8   admission of that from Prosperity.

9        You know, if not for the shenanigans prior to the

10  delivery of the notice of exclusive control, the Bondholders

11  would have had the subject funds over a year ago.  They never

12  would have been available to the estate's unsecured creditors,

13  and therefore do not belong as proceeds of the fraudulent

14  transfer claim.

15        I know Mr. Rukavina's mentioned your opinion on this

16  issue, but that's not an outlier.  That's not the only one.

17  See, for example, Bear, Stearns v. Gredd, 275 B.R. 190 where

18  the Southern District of New York says, "The purpose of Section

19  548 also leads to the conclusion that creditors must actually

20  be harmed in order to avoid a fraudulent transfer under that

21  section."

22        The same would apply to any state law fraudulent

23  conveyance claim under Section 544.  As I think everyone here

24  knows, the definition of asset under Texas Uniform Fraudulent

25  Transfer Act specifically excludes property to the extent that

1  it is encumbered by a valid lien.

2       And as Mr. Rukavina just pointed out, the Objecting

3  Creditors ignore that there's no longer a transfer to unwind.

4  And whether there was ever a transfer as that term is defined

5  under the Code I think is unclear, at best.  Mr. Montgomery

6  testified that no cash ever left the bank.  All this was done

7  by accounting entries to different Prosperity accounts.

8       But to the extent that anything was ever transferred

9  here, it's already been unwound.  Prosperity reversed the pay

10 down of the Genesis loans by creating the 0188 legal hold

11 account and holding the subject funds as a custodian rather

12 than a transferee.  Mr. Montgomery's testimony was that they're

13 waiting for a, "referee" to tell them what to do.

14       There is no fraudulent transfer for the Trustee to

15 recover from Prosperity or Genesis.  And if the Objecting

16 Creditors really thought there was a slam dunk fraudulent

17 conveyance recovered here, all they had to do to take over

18 these claims was commit to Mr. Seidel that they would leave the

19 estate no worse off than it would be under this proposed

20 settlement, which I don't think is a high bar to clear.

21 Mr. Seidel said they refuse to do that.

22       And so we don't think the estate has any interest

23 left in the subject funds, or that there's a prospect of

24 duplicative claims.  But to the extent the estate was found to

25 have an interest in the subject funds in litigation with the

1  Bondholders, there are a number of reasons why that interest is

2  subject to the Bondholders' perfected security interests.

3       First, we went over I think with each witness the

4  language of the deposit account control agreement which says

5  that the Bondholders have a lien on the deposit account, and

6  the proceeds thereof.  That's our Exhibit 45, Section 5.  And

7  if the Court views the movement of the subject funds from the

8  3992 account on August 15th as essentially a disposition of

9  collateral or some sort of transfer of collateral, the

10 collateral agent security interest continued.

11      And we think it attaches to the Prosperity 0188

12 account, one just under the language of our DACA.  But two,

13 under 9-315, that is proceeds of our account.  The collateral

14 agent never authorized the disposition of the funds as required

15 under 9-315(a)(1).  In addition, we never authorized the pledge

16 of 3992 to secure loans of Genesis Networks.

17      And just under the clear language of the DACA, even

18 if that pledge is valid, that pledge is subordinate to the

19 collateral agent's lien.  And so we think it's clear that

20 Prosperity is holding the subject funds in the 0188 account,

21 and that those accounts -- that is essentially proceeds of the

22 3992 account.

23      Mr. Rukavina just mentioned this argument, and that's

24 that, you know, the deposit account is not a deposit account of

25 the debtor.  Whether Mr. Montgomery or the Bank call it a

1  deposit account is sort of irrelevant.  It doesn't mean that

2  it's a UCC deposit account.  And Mr. Montgomery and I discussed

3  all the ways in which it is not a UCC deposit account.  There

4  is no one who can withdraw from it.  There is no one who can

5  make a deposit to it.

6          He testified that he doesn't know if anyone's earning

7  interest.  I can represent that I wish the Bondholders were

8  earning interest on it, but my understanding is they are not.

9  The estate does not maintain that account with Prosperity.  And

10 so it just does not meet the UCC definition of a deposit

11 account.  We think that's cut and dry.

12         And so it's a legal hold account.  And to the extent

13 that the estate has an interest in that account, it's a payment

14 intangible or it's a general intangible.  And under the UCC

15 perfection in a payment intangible is done through filing of a

16 financing statement.  The financing statement's filed by the

17 collateral agent with respect to the bonds all cover payment

18 intangibles and general intangibles.

19         And all of our UCC statements in the original

20 indenture and collateral documents granting and perfecting

21 liens on general and payment intangibles are in evidence in

22 this case, and they are uncontroverted.  And so if what the

23 state has is an interest in a general intangible or payment

24 intangible, that is subject to the Bondholders' lien.

25         If you do think, if Your Honor does think that the

1   0188 account is a debtor deposit account, and therefore

2   considers UCC control relevant for purposes of collateral agent

3   security interest in the 0188 account, we think the collateral

4   agent has control.  There's a couple reasons for that.

5          First, on August 31st, 2022, Prosperity confirmed to

6   the collateral agent that the funds would be held in the 0188

7   account pending resolution of the conflicting instructions,

8   notices, and directions from the collateral agent and the

9   company.  The Objecting Creditors point out that the debtor

10  didn't sign this letter and it's therefore not an authenticated

11  record for purposes of the UCC.

12         But I don't understand why there's any need for

13  Prosperity to get the debtor to sign the August 31st, 2022,

14  letter to evidence the collateral agent's control rights to

15  that account.  The letter says that the account is to hold the

16  funds until the resolution of conflicting instructions from the

17  collateral agent and the company.

18         And those conflicting instructions, that I'm aware

19  of, were one, sweep those funds to the collateral agent

20  pursuant to the DACA and the notice of exclusive control.  And

21  two, use the funds as contemplated in this pledge agreement and

22  in discussions with Mr. Bates and Mr. Goodman to satisfy an

23  obligation of Genesis Networks.

24         Mr. Montgomery testified he knows that latter

25  instruction was improper, and that's why they reversed the

142

transaction.  He said, "My belief, and I think the Bank's
position, is that we were not authorized or should have done
that.  And when we came to that conclusion with a broader
audience, we immediately reversed the transaction because we
felt like that was the right and correct thing to do."

And so the idea that Prosperity would need the debtor
to sign or acknowledge the August 31st letter under these
circumstances, you know, we think puts form over function to a
pretty absurd level and should be rejected.

Your Honor, we also think for control purposes that
the DACA that covers 3992 also covers 0188.  And I'll go back
to this language again.  "Prosperity recognizes in the DACA the
collateral agent's continuing security interest in the deposit
account and in all items deposited in the deposit account and
the proceeds thereof.  They do this as part of a subordination
of any contractual or statutory right of offset, set off, or
lien that it may have regarding the funds in the deposit
account."

If Prosperity could simply move the funds from 3992
to another account, it would defeat the purpose of this
contractual subordination.  And the DACA specifically bars this
by having Prosperity recognize that the collateral agent
maintains a lien over proceeds of the account and by
subordinating any Prosperity lien to the collateral agent's
lien.

1          And so to recap these four legal arguments for why

2   the collateral agent would retain the funds in any litigation

3   with the Trustee, first, the estate, you know, may no longer

4   have an interest in the subject funds.  Second, if the funds

5   are considered a disposition of collateral, that disposition

6   was without consent under 9315.  And you know, excuse me --

7   excuse me.  And because the 0188 account is proceeds of the

8   3992 account.

9          Third, if the Court thinks the estate has some

10  property interest in the 0188 account in that interest as a

11  payment intangible, the collateral agent is perfected by his

12  UCC statement, same as a general intangible.

13         And four, alternatively, if the Court considers the

14  0188 account deposit account for purposes of the UCC, that is a

15  debtor deposit account, you know, we think there are a number

16  of reasons for why the collateral agent still has control over

17  that account.  That includes the DACA language, and that

18  includes the Prosperity letter from August 31st.

19         We come now to collusion which is the fifth argument

20  for why the Bondholders are entitled to all the subject funds.

21  And the collusion provision under 9-332(b) we think is meant to

22  short circuit the entire analysis we just went through by

23  saying if a debtor in a bank colludes to deprive a secured

24  party, here the Bondholders, of their rights to funds in an

25  account, then any transfer of those funds is not free and clear

1    of the secured party's lien.

2          I think the Court knows our view there was collusion

3    here.  And they heard the Objecting Creditors' pleas on

4    September 22nd that the Court deem evidence of collusion

5    irrelevant.  And I want to make the point for the record that

6    the Bondholders did not seek collusion discovery from

7    Prosperity.

8          When these negotiations were had back in March, we

9    had indicia of collusion from the involuntary petition

10   discovery, we had a few emails, and we were content to leave it

11   at that.  We didn't think at that point that it was a

12   coincidence that the funds moved from the account a few days

13   after UMB's counsel made contact with Prosperity, provided a

14   copy of the DACA, had discussions with them regarding notice

15   addresses and delivery of notices, and then the funds are gone

16   the day before the notice of exclusive controls delivered.

17         We didn't think that was a coincidence.  But again,

18   we didn't see further discovery on it.  Once all this evidence

19   was produced, we said this on the 22nd, but we think the

20   Objecting Creditors should have done the right thing and

21   withdrawn their objection.

22         And the Court can make its own determination as to

23   the strength of the evidence supporting the Bondholders'

24   collusion claims.  I think the more important point is that not

25   only would Mr. Seidel have to win on all four of the legal

145

arguments for why the Bondholders are entitled to the subject

funds, and I think you just heard from Mr. Rukavina, pretty

confident they'd lose on the payment intangible argument.

He would also have to explain evidence of collusion.

In other words, he would have to argue that James Goodman and

Prosperity did not collude with one another, but instead acted

in good faith to use Goodman Networks funds from the 3992

account in violation of a binding DACA which Prosperity had

full knowledge of no later than August 10th, 2022, if not much

earlier if we're going to say, you know, there's no flag and

something slipped through the cracks in the merger or something

like that.

They had knowledge of it at least five days before

they acted, and then use those funds to pay off a debt incurred

by another James Goodman owned and controlled entity on which

James Goodman had personal liability.  So he has to say that

all that was done in good faith, there was no collusion.

And Mr. Seidel is a very credible witness.  He's a

good Trustee and he's got talented counsel.  But we don't think

they can make that case with a straight face.  I think the

Objecting Creditors know this which is why they fought so hard

to have any consideration of evidence of collusion excluded

from the hearing today.

And Your Honor's decision to reject the Objecting

Creditors' motion in limine seeking to prevent the Bondholders

1  from introducing evidence of collusion and other evidence we

2  think is obviously correct, and any suggestion that Your

3  Honor's decision on that constitutes grounds for an appeal of

4  an order approving this settlement is hard to take seriously.

5  But we have, unfortunately, heard that.  We'll take that up at

6  the appropriate time, if necessary.

7          Just a few more minutes, Your Honor.  But again, we

8  think the evidence before you overwhelmingly supports approval

9  of the settlement motion.  Mr. Seidel's testimony was

10  compelling.  It's very clear that he's considered this matter

11  carefully.  And as to the subject funds, he's reasonably

12  concluded that the proposed settlement is far preferable and

13  fair and equitable for the estate than litigating with the

14  Bondholders and Prosperity.

15          And so the question is why did he conclude that,

16  right?  And so Foster Mortgage tells us that in evaluating

17  whether a settlement is fair and equitable for the estate, the

18  Court should evaluate three factors, the first of which is the

19  probability of success in the litigation with due consideration

20  for uncertainty in fact and law.

21          And while lawyers don't like putting probabilities on

22  legal claims, the Foster Mortgage's Court -- the Foster

23  Mortgage Court's use of that term is important because it

24  suggests that the Trustee in the first instance, and then the

25  Court should have essentially a mathematical understanding of

the potential upsides and down sides of litigation.

And when we were before Your Honor on September 22nd in connection with the pleadings regarding evidence of collusion, we suggested that the existence of evidence of collusion between the debtor and Prosperity combined with the four legal arguments for why the Bondholders are otherwise entitled to the subject funds makes the estate's probability of success in litigation close to zero.

And respectfully, referring to the Trustee's chance of litigation, their chance of success is close to zero, that was not intended to be bluster or hyperbole.  And I just want to walk through that quickly.

The Objecting Creditors, you know, make a big point in their briefs, and including the question of Mr. Seidel yesterday of the close call statement that appeared in versions of the settlement motion.  And they asked him a few questions about that including our wanting to take that language out. And we'll say for the record, we wanted to take it out because it makes no sense.

And we understand the Trustee not wanting to say its prospects of litigation are essentially nil, but yesterday Mr. Seidel acknowledges that he needs to run the table on all of the factual and legal arguments.  If he loses on any, all the subject funds go to the Bondholders.

And so for sake of argument, to put it in terms of

probabilities which <u>Foster Mortgage</u> suggests that we do, let's

assume that each of the five issues is a close call or toss up,

or a 50/50.  For the Trustee to win all five, if my math is

right, that's one out of two times one out of two times one out

of two times one out of two times one out of two, which I

believe equals one out of thirty-two, which implies a three

percent chance of total victory for the Trustee in litigation

with the Bondholders, in other words, right in line with the

split of the subject funds proposed in the settlement motion.

The Court can assign its own does to each of the

perfection arguments and the collusion argument.  It sounds

like Mr. Seidel didn't love our proceeds argument.  They maybe

like our general intangible and payment intangible argument a

little better.  I think the Objecting Creditors think the

collusion argument is a good one for us.  That's why they tried

to exclude it.

But the ultimate point is that the Trustee has to win

on all five.  The Bondholders only have to win one.  And when

you combine the fact that the likelihood of success in

litigation is extremely low, with the cost of litigation and

other factors bearing on the wisdom of the compromise,

including the key fact that the Bondholders were absolutely

blameless in what went on here, and have now had to wait over a

year to get this collateral back, we think that the Trustee's

decision to settle is appropriate.

1          Building out what I just pointed out about the

2   Bondholders being blameless, I just want to repeat something I

3   said earlier, and then I'll be done, and that's that the

4   estate's creditors never had any interest in these funds

5   because they are bondholder collateral.  The Bondholders should

6   have had this cash a year ago.  And to adopt the Objecting

7   Creditors' position again is to assume that Prosperity will pay

8   damages twice even though the unsecured creditors here have

9   suffered zero damages by what went on.

10          The only party with damages are the Bondholders.

11  Their damages have increased significantly due to the tactics

12  of the Objecting Creditors, and we reserve our rights on that

13  front.  The Objecting Creditors are seeking a windfall to which

14  they are not entitled.  The settlement motion should be

15  approved and the Court should reject the arguments of the

16  Objecting Creditors.

17          Thank you.

18          THE COURT:  Thank you, Mr. Clarke.

19          MS. ARGEROPLOS:  Thank you, Your Honor.

20          I'll say that Mr. Clarke had a lot of the same

21  arguments that I was about to say, so I'll try not to repeat

22  them.  And instead, you know, I'll focus on something else.

23  The Objecting Creditors have argued that the Trustee should sue

24  Prosperity because they say that they believe that this is such

25  a slam dunk for the estate.

1          But Your Honor heard hours of testimony about how

2   offers were made, how money has been spent, a lot of attorney's

3   fees have been spent in negotiating those offers.  And it seems

4   that the -- that FedEx and ARRIS are not confident in these

5   causes of action enough to spend, you know, probably less than

6   they've spent in attorneys fees at this point, to buy the

7   claims.

8          And I already thought the deal was heavily negotiated

9   just between the people on Your Honor's right side of the

10  court.  Now I find out yesterday that there was even more.  And

11  so if FedEx and ARRIS really believe that the likelihood of --

12  that the litigation of these merits -- of merits of these

13  causes of action would be a slam dunk, they should have just

14  bought the claims.  It's a completely normal thing to do.

15         And the explanation as to why they didn't do it is

16  not -- is just kind of insufficient.  I mean, there's evidence

17  as to that they won't do it, but not that they can't.  They

18  could have brought a witness to testify as to why they can't if

19  they had some legal reason not to, that they couldn't.  But it

20  was just, you know, the Trustee said he flew up to Memphis to

21  talk about it and they wouldn't engage.

22         It's clear that he has -- that the Trustee has been

23  looking for a way to make a deal that's economic to the estate.

24  The one that's in front of the Court today brings $350,000 into

25  the estate.  And he asked give me one more dollar.  And after

1  all of that, the answer was just well, FedEx doesn't do that.

2  And really?

3         I mean, the only solution that FedEx and ARRIS have

4  to this very weird set of facts is for Prosperity to get sued

5  twice for the same four and a half million dollar transaction

6  that has already been unwound and that we've already promised

7  to give back.  Is that a creditor's reasonable opinion when at

8  least five seasoned bankruptcy litigators won't take the case,

9  including these?

10         The objections of the majority of creditors, the

11 majority of unsecured creditors are very relevant.  They are

12 noted.  But they're absurd.  The marketplace has spoken as to

13 the objectively reasonable opinions of creditors.  This

14 settlement is the right result, and it's a wise choice on a

15 very peculiar set of facts, and it brings more money into the

16 estate than several of the very much explored alternatives.

17         And the Trustee testified yesterday about the close

18 call with respect to the Bondholders' five arguments.  Yeah, I

19 mean, if you compound a 50 percent chance of success and you

20 get three percent, the Trustee clearly understood that.  His

21 testimony showed that.  He understood that the Bondholders have

22 a lien on all of the money or none of it.  So the expected

23 value is three percent of 4.4 million, but it's either 4.4

24 million or it's zero.

25         This settlement is -- it only has to be and based on

152

the evidence, it clearly is within the range of reasonableness

for this case and for the parties' respective rights and their

positions.  It can be at the lowest point in that range of

reasonableness.  It just has to be within the range.

So we've got FedEx and ARRIS arguing that Prosperity

has zero defenses against this litigation.  Well, we're here

defending it right now.  We've been defending it for six

months.  The Bank took funds on August 15th and the next day

they got a notice of control.  And that's when the Bank's legal

department stepped in and had to evaluate what just happened.

And we heard testimony that it was -- the relationship was kind

of under one person's control until the notices of control were

delivered.

And so that evaluation, that analysis took 13, 14,

days by the Bank.  They ended up reversing the transaction.

They put the money in a segregated account.  And the analysis

was ongoing.  The Bank needed to figure out what the right

thing to do was.  The bankruptcy case hadn't been filed yet.

And then it was on filed -- then it was filed.

And so Prosperity isn't on trial today quite, but

it's just a really weird set of facts.  And the Trustee's job

in this situation is not easy, but the unequivocal statement

that this is a slam dunk and Prosperity's got nothing in

defense is just not true.  It's not a guaranteed cheap

litigation win for the estate.  The evidence just doesn't

1  reflect that at all.

2         So the probability of success is really a moving

3  target at best in this case, and it's probably closer to three

4  percent.  Given all of the efforts of the parties to figure out

5  how to unravel this dispute, how to unravel the debtors'

6  finances, the debtors' organization and all of its affiliates,

7  there's different theories under different Chapter V causes of

8  action under different and conflicting case law as to whether

9  the Bondholders' lien sticks or not, whether it was property of

10  the estate.  And if we can't figure out if it's property of the

11  estate after six months, then we should probably settle this

12  case.  And we're still arguing about that today.

13         This has been a really tough case for everyone, and

14  we haven't even really dug into the merits yet.  We've settled

15  this case with the intent of avoiding a lot of the costs that

16  we've incurred up to now, but it's a ton of costs to the estate

17  that comes with a really high risk.  And the Trustee's

18  testified we're not even sure if -- we're not sure what money

19  is in the estate after the 350 comes in.  But there's work to

20  be done.  Let's let the Trustee do his job.

21         This settlement is reasonable in terms of the

22  objective views of creditors and in terms of being fair and

23  reasonable.  It's reasonable in terms of the other Jackson

24  Brewing factors, the probability of success on the merits and

25  the complexity and duration of the litigation and the Foster

1 <u>Mortgage</u> factors.  And it should be approved.  We should --

2 let's let the Trustee do his job and let's be done here.

3          THE COURT:  Thank you very much, Ms. -- now you see,

4 Mr. Rukavina, I had it for a while, I know I did -- Argeroplos.

5          MS. ARGEROPLOS:  Yeah, you guys have been doing

6 great, by the way.

7      (Laughter)

8          MS. ARGEROPLOS:  Argeropols.

9          THE COURT:  I like, Mr. Rukavina, hate to get names

10 wrong.  My maiden name was von Senden, simple German name just

11 like it's spelled but I got every version that you get of a V

12 word, so.

13      (Laughter)

14          THE COURT:  I can say Langley.

15          MR. LANGLEY:  Good English name.

16          Good afternoon, Your Honor.  And I will say with

17 this, this has not been a fun process for FedEx or ARRIS.  This

18 has been an expensive process.  We have no hope of recovery

19 unless this is denied.  And this is a situation where we have

20 strong opinions about 9-332 applying.

21          And <u>Foster</u> advises that the reasonable and objective

22 views of creditors have to be considered.  And <u>Foster</u> goes

23 further.  It says it's never seen a case where you have that

24 many creditors, 95 percent there that support it -- or, excuse

25 me, oppose it, no creditors support it.  And there is an offer

155

1  to take over the litigation, and the Trustee does not do so.

2  And in that situation, <u>Foster</u> denied the settlement as being

3  reasonable and equitable.

4          And I want to turn the Court to Exhibit 20 because I

5  think what is reasonable and objective, you've read our papers.

6  You know what we've been arguing.  You know what the other

7  side's been arguing.  But I want you to hear from the

8  Bondholders' counsel who's not here, the Bondholders' counsel

9  that's actually UCC experts, what they think is reasonable and

10  objective and their real concern about this transaction.

11          So Exhibit 20, it's an email from Michelle Ross to

12  Jessica Friedman [sic] at the Bank.  And Michelle Ross is the

13  Bondholders' counsel.  And Joel Mattson was copied on it at the

14  Bank, as well.  I understand those are legal counsel at the

15  Bank.  Also copied on it was Eric Schaffer and Kathleen

16  LaManna, which I believe are also the UCC experts for the

17  Bondholders.

18          In this email, it says, "Dear Jessica and Joel, thank

19  you for your letter earlier today," and this is August 31st so

20  this is response to the August 31st letter that the Bondholders

21  are asserting is an authenticated record, which we clearly

22  dispute and don't think that's a credible argument.  But

23  they're responding to that letter.

24          "We have a few thoughts, most of which could be

25  addressed later.  One point that we want to address today is

1  how the funds should be held quota you (phonetic) pending

2  resolution of the conflicting instructions, notices, and

3  directions with respect to the funds.  We believe it is

4  appropriate for the funds to be held in and not distributed

5  from the original account number" and it gives the full account

6  and it's 3992.

7          "Subject to the terms of the DACA, we believe your

8  goal is to maintain the status quo pending such resolution.

9  Holding the funds in that account will serve to limit or

10 eliminate any argument that the transfers impair the rights of

11 U.S. Bank National Association and UMB Bank National

12 Association.  We'd be pleased to discuss this in greater detail

13 next week.  Appreciate that Monday is a holiday.  Very Truly

14 Yours, Michelle and Eric."

15         I don't know how we are getting criticized for not

16 being reasonable and objective when the very UCC counsel that

17 the Bondholders have hired to handle this said that this is a

18 risk, this is something that could impair our rights and it's

19 something that every single commercial practitioner knows that

20 9-332 applies to deposit accounts.  And it's because it came in

21 in the Revised Code.

22         9-332 is a unique provision, and deposit accounts are

23 unique collateral.  Deposit accounts are not money.  We all

24 know that.  It doesn't hold money.  It holds a claim to funds

25 that a deposit holder can go to the bank and ask for money to

1  be given.  It's a claim, and that's what it's recognized under

2  the Commercial Code.

3         And so what 9-332 does -- excuse me, what 9-104 does

4  is that deposit accounts could only be made collateral and

5  perfected, it's both of those, when there is control.  And we

6  don't dispute, although we heard testimony today that 3992

7  deposit account may have been released.  I don't know what the

8  story on that is.  That was unique testimony that I hadn't

9  heard.  It hasn't been investigated.  We don't know much about.

10  So clearly if that was released, that changes the dynamics of

11  this, but we won't go there.  You heard the testimony just like

12  we did.

13         THE COURT:  Right, there's no evidence that it was.

14         MR. LANGLEY:  Right.  And so what we heard from it is

15  the 3992 account is original collateral to the Bondholders.  We

16  don't dispute that.  What the 3992 account is not proceeds

17  collateral.  And that's an important distinction because

18  proceeds collateral can flow, right, and that's what we see in

19  two cases cited by the opposition, the HHH Farms case and the

20  Tusa --  and I'm going to have to pull my notes out for this

21  one because I will mispronounce it otherwise.  It's a Fifth

22  Circuit case, In re Tusa-Expo Holdings.  I believe it's cited

23  in Prosperity's brief.

24         Both of those cases talk about not original

25  collateral but proceeds collateral.  And in Tusa, I think it

1   was crop proceeds, and in HHH -- no, maybe I am reversed.   HHH

2   Farms was crop proceeds and Tusa was accounts receivable.   In

3   both of those situations, the collateral was liquidated, placed

4   into -- the funds were then -- the monies were then placed into

5   a deposit account so the lien -- the original collateral lien

6   was not on the deposit account, it was on those other things.

7   And the money that went into the account became funds held by

8   the Bank that was specifically subject to proceeds and 315,

9   9-315.

10          Distinct from that is there was no original

11  collateral in that deposit account.   And what was at issue in

12  both of those cases was not whether the deposit account was

13  subject to a lien.   It was whether the exchange collateral can

14  continue through in that deposit account.   And in those

15  situations, that deposit account does become cash proceeds

16  related to the original collateral.

17          HHH Farms and Tusa do not apply to original

18  collateral in a deposit account, and that's not what those

19  cases were holding.   And that's an important distinction is did

20  the bondholders have collateral and the funds in the deposit

21  account.   The answer is no.   You don't have collateral and

22  funds unless you have proceeds collateral from other collateral

23  that gets funneled into the account.

24          What they had was collateral in a deposit account,

25  and that's where these unique standards get into, 315 doesn't

apply, there is no such thing as proceeds collateral out of a deposit account.  What there is is in a deposit account you have control over that account as the lienholder.

And that control can come in two forms.  It can come in absolute active control where the Bondholders say you have to get our approval to move any money in and out of this account and everybody knows what that means.  That means the Bondholders would have had to get notice and been asked to do it.  And if the Bank and the debtor had authorized a transfer without their approval, that would have been collusion.  That would have been absolutely collusion if that was the case with an active DACA.  This is not an active DACA.

And I'll turn you to the DACA itself.

THE COURT:  So your argument is if there was a restriction requiring consent to a distribution and if that consent was not given and the distribution made, that would have been a default?

MR. LANGLEY:  So, again, it's not a default.  I think we are going to agree that there is a default under the DACA that the Bondholders have with the Bank.  I don't think we're saying that the Bank didn't act wrongful.  I mean we allege that this was constructively fraudulent in our brief.  That was filed before we had any documents from Prosperity.

I think the testimony we've heard raises real concerns with the Bank, right, that we heard today that they

1  unilaterally swept this when they knew that potentially a

2  notice of exclusive control was coming.  So that sounds like

3  there may be wrongful conduct that's damage to Bondholders.  I

4  don't think we dispute that the Bondholders have a really

5  strong claim against the Bank.  What we dispute, though, is

6  that there is a separate res (phonetic) just sitting there

7  waiting for everybody to come get.

8          What was in this state, and I get back to the passive

9  nature, what was sitting in this --

10         THE COURT:  Oh, so let me stop you there, though.

11         MR. LANGLEY:  Sure.

12         THE COURT:  So you think that the Bondholders can sue

13  Prosperity for whether it is the giving of -- excuse me, the

14  taking of the original subordinate lien in violation of the

15  DACA or if it was for the sweep of the funds, you think that

16  the Bondholders could sue Prosperity outside of this court,

17  most likely, and get whatever they're going to get, probably

18  $4.4 million, okay.

19         But then separately, in this case, the Trustee could

20  sue Prosperity for the $4.4 million as property of the estate

21  and not as property of the estate, they could sue them and just

22  get it somehow because it was at one point property of the

23  estate?

24         MR. LANGLEY:  So, yeah.  So let me turn you, there's

25  a couple of ways to address that.

1          THE COURT:  Okay.

2          MR. LANGLEY:  Let me turn you to 9-401 first.

3          THE COURT:  Okay.

4          MR. LANGLEY:  And that deals with the situation we've

5    got here.  It says an agreement between the debtor and a

6    secured party which prohibits a transfer of a debtors' right in

7    collateral or makes the transfer of default, does not prevent

8    the transfer from taking effect.

9          And so that's what we have here.  We have a situation

10   where the Bondholders caused -- excuse me, where the Bank

11   caused money to be transferred out of a deposit account against

12   the subordination agreement that they testified they weren't

13   aware of.  Whether that's accurate or not, we don't know.  But

14   they transferred that money out of the deposit account.  That

15   transfer occurred.

16         And it's that transfer occurring that triggers 9-332.

17   And I've heard a bunch of different arguments of how this

18   transfer didn't occur today.  Oh, well, they put it back.  Oh,

19   well, they did this over here.  Oh, they did that.  It's a

20   debtor account but not really.  It's -- there's so many

21   arguments they've tried to throw at this Court, but we all know

22   a transfer occurred on August 15th.

23         And what 9-401 doesn't do is it doesn't remove

24   liability for that transfer that results in all the damages

25   that happens out of that.  But what they can't get past is

1   9-332 is extremely restrictive.  It's said to be the lowest bar

2   for any transaction in Article 9, meaning that if money leaves

3   the deposit account, there's two exceptions to it not applying.

4            And we've talked about collusion in extent.  I'll get

5   to collusion in just a minute.  But the other one is that it's

6   not -- that it is a transfer to the debtor.  And the UCC 9-

7   332(b) has a lot of comments that are actually really helpful.

8   And while there isn't a whole lot of case support, I will cite

9   a couple of cases in just a moment.

10           I think the statute is clear on its face, and I'll

11  read it.  "A transferee of funds from a deposit account takes

12  the funds free of a security interest in the deposit account

13  unless a transferee acts in collusion with a debtor in

14  violating the rights of the secured party."

15           We think this applies to voluntary, involuntary, and

16  any other type of transfer that can come out of it because a

17  transferee of funds is who the Bank was.  And they have tried

18  to distinguish, hey, the money never left Prosperity, but

19  that's how deposit accounts work.  They don't hold money.

20  There wasn't money at Prosperity.  It was loaned out to

21  somebody else.

22           What we're talking about is a credit to a deposit

23  account.  That transfer was made in the accounting records of

24  the Bank and, for all legal purposes, out of the deposit

25  account and to play off the Genesis loans.  That's a transfer.

We all know it's a transfer.  The Trustee's counsel just admitted it was a fraudulent transfer for 13 days and then it got put back.

So the question is how do we deal with a transfer that goes out.  Did it get put back?  I haven't seen it come back into the 392 account.  Prosperity -- excuse me, the Bondholders' counsel in that email we started out with said they wanted it put back in the 392 account.  Did Prosperity do that?  No.  And today we heard why they didn't do that.  They wanted control.  And why did they want control?  Because they were worried about these liens.

And we've heard testimony today that --

THE COURT:  I think the testimony was it was a legal hold.

MR. LANGLEY:  It is a legal hold.  That's correct.  But he also testified that they wanted control.  That was where he started out with.  And we talked about the legal hold.  That was a document that was introduced by us, and it's a document that says what is a legal hold.  And there's only one thing you can -- or two things you can put a legal hold on on that document.  And one of them was I think like some type of -- I don't know, it was something that was inapplicable.  And the second was a demand deposit account.

So if you have a legal hold from the Bank's perspective based on the procedures they used, it has to be on

1  a demand deposit account.  And we've heard arguments that this

2  isn't a deposit account.  We've heard from the Bank that it is.

3  The Trustee has now admitted it is.  Everybody knows that

4  what's at the bank in the 0188 is a deposit account.  And it's

5  a deposit account that received transfers, transfers from the

6  debtor to Prosperity Bank for the benefit of Genesis.

7         THE COURT:  The transfer didn't come from the debtor

8  under your facts.  The transfer came from the Genesis loan

9  unwinding.  It didn't come from the debtors.

10        MR. LANGLEY:  We agree with that.  We absolutely

11  agree with that.  We think the transfer left the deposit

12  account 392, went to the Bank, and then the Bank made a new

13  transfer to establish this 0188 account.  That new transfer

14  didn't give rights to the Trustee, it didn't give rights to the

15  Bondholders, it didn't give rights to anybody but Prosperity

16  because we've heard that the Trustee's the sheriff in town but

17  we know that Prosperity was the sheriff of 0188.  They had full

18  control.  They had a legal hold.  There was no one other than

19  Prosperity that controlled that account.

20        And control is essential.  Again, remember under 104,

21  control is essential not just to having perfection.  It's to

22  having a lien on that account.  And so to have a lien on that

23  account, there has to be control.  And there has to --

24  perfection, there has to be control.  There is no control over

25  that account or we wouldn't be here fighting.  The money would

have been put back as Bondholders' counsel requested the day
they received the 8/31 letter.

And so I think from a perspective of what we're
dealing with here, we think it's straightforward.  We know that
there's complications because the fact patterns with the Bank
is really bad, and we think that's actually why there's a
really good 548 claim here.  And we agree, this was property of
the estate when it was in the deposit account.

And we've heard about your opinion in, and I
apologize for it, the --

THE COURT:  Essential Financial?

MR. LANGLEY:  Essential Financial.  And we think,
first of all, you didn't decide the case on that point.  That
was made in passing.  You ultimately decided they didn't have
perfected collateral, so there wasn't any reason to get there.

THE COURT:  Correct, there was no perfected security
interest in that case.

MR. LANGLEY:  Right.  So we don't think it's
controlling, but we understand that you thought it was
influential.  And so we want to address it and deal with it.

And so where -- does the estate have interest in
fully encumbered property?  The answer is absolutely yes.  And
under TUFTA, we understand there's a difference, right?  TUFTA
has a difference.  You have to have assets, and assets doesn't
include any liened up property.  But in the Bankruptcy Code,

1  548 just says an interest in property of the debtor.  And,

2  clearly, funds in a deposit account are interest in property of

3  the debtor.

4         And in all the cases that we've seen, the case you

5  dealt with was the sale of assets so there wasn't dealing with

6  a DACA.  The case in <u>Ramba</u> was dealing with the sale of assets.

7  It wasn't dealing with a DACA.  In fact, everything we've seen

8  is something that doesn't deal with a DACA that deals with this

9  principle that you identified in <u>Essential Financial</u> and that

10  <u>Ramba</u> identified on the preference side of things.  And we just

11  don't think it applies in a situation where you have a passive

12  DACA.

13         And why is that?  Because a passive DACA, the debtor

14  has full rights to pay anybody.  And if we go look at the DACA,

15  it says -- they don't even have to have a good-faith reason for

16  the payment.  They could have bought a Ferrari, they could have

17  bought me a plane ticket here, they could do whatever they

18  wanted to do.

19         It doesn't make the transfer right, and it doesn't

20  mean there's no liability for the transfer.  But it does make

21  sense that the transfer occurs.  And so there wasn't anything

22  prohibiting the transfer from occurring here.  And we think

23  from this standpoint, 9-332 has to apply.  And does the estate

24  have an interest?  Absolutely has an interest.  They could have

25  spent this money for whatever reason if they had had that money

1    available to them in the deposit account.  So there --

2            THE COURT:  Until the notice of exclusive control.

3            MR. LANGLEY:  Until the notice of exclusive control.

4    We don't dispute that if a notice of exclusive control had come

5    before the August 15th transfer, there wouldn't be a case.

6            And, again, we think that there may be wrongful

7    conduct by the Bank when they swept this unilaterally.  But

8    that doesn't stop a transfer from occurring, and it doesn't

9    change 9-332.

10           THE COURT:  So you think that there's a possibility

11   that Prosperity would have to pay twice?

12           MR. LANGLEY:  Absolutely.

13           THE COURT:  Okay.

14           MR. LANGLEY:  We don't even think it's a close call.

15           THE COURT:  Okay.

16           MR. LANGLEY:  We think at this point in time there is

17   a fraudulent transfer under 548.  We also think that the Bank,

18   if they don't get the money -- which they won't under a

19   situation of 548 because under 551 and 552, -- it comes back in

20   free and clear.  The Bank will have been damaged by the

21   conduct.  We think that they may be able to prove some type of

22   fraud.  The Bank injured the debtor and injured everybody

23   involved in this thing, including the Bondholders.

24           That's not before the Court today from a standpoint

25   of what you have to decide.  You're deciding is this deal fair

1 and equitable to the unsecured creditors, to the estate.  And

2 if we are right, and, again, the Bondholders, UCC counsel

3 admits that theirs is a real concern.  If we are right, we have

4 a $5-million recovery against Prosperity.

5          And I think we've been talking a lot about the 4.4

6 million, and the 4.4 million is obviously the bigger chunk.

7 But there is no dispute that the 539 needs to be paid.  It is

8 -- we think it's unconscionable given the facts and what

9 Prosperity did and the fact that no value was given for this

10 assignment, no value was given for the payments that went to

11 pay off the Genesis debts.  We think that that 539 is a slam

12 dunk.

13          We've heard no principle defense.  The Trustee's

14 counsel in communications has stated there's no principle

15 defense.  There are inconsistencies in the motions, and I kind

16 of would like to run you through the motions if Your Honor

17 will, and I understand we've got the current motion before us

18 but I think it's helpful to kind of see the history.  And if I

19 may, I've got a demonstrative to show kind of the changes that

20 have come over time.

21          THE COURT:  Thank you.

22          MR. LANGLEY:  May I approach?

23          THE COURT:  Of course.

24          MR. LANGLEY:  There's two copies.

25          THE COURT:  Thank you.

1          MR. LANGLEY:  Do I keep my own copy?  Yes.

2          So what we've done here is we've put on the left

3  column the material terms that were known in the original

4  motion.  We put in the second column anything that changed, and

5  you see the changes in red.  And then the second amended

6  motion, we've done the same thing from the first amended

7  motion.

8          And so let me run you a few of these -- through a few

9  of these things.  What we've really been dealing with these

10 unsecured creditors in this situation where every time we come

11 out with something new we get a new argument thrown at us.  The

12 Trustee asserts that he may avoid the Prosperity payments --

13 again, that's the 539 -- as constructively fraudulent transfers

14 because the debtor was not obligated to Prosperity, received no

15 reasonably equivalent value for the Prosperity payments and

16 because James Goodman caused the debtor to make the Prosperity

17 payments in order to benefit the Genesis borrowers and self.

18         It then continues in the next box, Prosperity

19 disputes these allegations, right.  But at the same time that

20 this motion was filed on March 22nd, he was sending emails to

21 the Bondholders, and it's in the record that there is no

22 principle defense.  I had calls with Prosperity, and they

23 couldn't even state it.  There is no principle defense on the

24 539 or the fraudulent transfer at large, the whole five

25 million.

1          And then what do we see in the first amended motion?

2    After the Bond -- excuse me, I keep confusing all the three

3    parties.  After the Trustee's been made aware of FedEx and

4    ARRIS are going to reject, they haven't yet as of the first

5    amended motion, he filed a new motion and says, Prosperity

6    disputes these allegations.  Prosperity denies the Trustee's

7    claim asserting, among other things, good-faith transferee

8    defenses under Section 548 and 550 of the Bankruptcy Code.

9          Well, 548 and 550 have a "good faith for value"

10   defense.  I think that's what they're citing, right?  And we

11   question both of those.  We don't think that the Bank, as the

12   testimony laid out today, has been acting in very good faith

13   related to anything related to Goodman Networks.  There's a lot

14   of bad issues, a lot of bad facts for the Bank.

15         We also think even more importantly, and leave good

16   faith aside, there wasn't value.  Prosperity received payments

17   from Goodman Networks when the debtor on their notes was

18   Genesis.  And the only reason that that occurred was because

19   there was a relationship between the two companies that

20   involved the Goodmans.  And so the Goodmans were using Goodman

21   Networks to pay the banks of Genesis Networks where there was

22   no value in that situation.

23         There is absolutely a fraudulent transfer claim that

24   should be avoided because no value was given to Goodman

25   Networks when they made those payments.  They're within the

1  two-year period that you can lookback under 548.  They're

2  within the four-year lookback that I think is Texas.  Is that

3  right?  Four-year lookback under TUFTA.

4          So we've got a situation where we think these are

5  easily recoverable under 548.  The 539, and we don't have --

6  that's our lowest bar.  If we went on the 539 and we lose on

7  the 4.4 because there's so many different complicated issues,

8  which we don't think are that complicated under 332, we still

9  have a low bar.  539.  And right now, the consideration coming

10 into the estate is 200,000.  And so I don't know how you get

11 past the fact that we've got a 539 claim that if we go and sue

12 on we can recover it.  And you've heard FedEx and ARRIS say we

13 want to go recover that.  We want to sue.

14         And you've heard -- you saw emails back and forth

15 between the Trustee, me, and other parties.  You heard about

16 discussions offering of this and that.  Those emails are not

17 flattering.  This has not been a happy easy negotiation.  And

18 essentially, we've been asked -- and when I say we, FedEx and

19 ARRIS -- to put the same money that the Bondholders were

20 willing to carve out of the money they were receiving.

21         So they were receiving $4.4 million and carving out

22 of that money.  They didn't put any money upfront.  They

23 weren't paying any money to get this claim.  They were carving

24 out money out of a bigger claim that they were paying back to

25 the Trustee so that he could come litigate this motion and

spend all that 150,000 litigating with any potential creditors.

And there's emails in the record from Paul Silverstein that

says we're giving you this 150,000 to fight with FedEx.  That's

what it says.

MR. CLARKE:  That's not what it says.

UNIDENTIFIED SPEAKER:  That's not true.

MR. CLARKE:  If it's in the record, then it can speak

for itself.  But that's not what it says.  I'm sorry for

speaking away from the microphone.

MR. SILVERSTEIN:  And I never said that.

MR. LANGLEY:  Let's pull it up.

THE COURT:  Let's look at the email, I mean, assuming

it's an admitted exhibit.  I thought I might have seen it as I

was flipping, but let's get to the accurate.

(Pause)

MR. LANGLEY:  So I'll turn, it says Exhibit 68 from

FedEx.  And if you look down, there's not paragraph indentions,

but on the right, you can see the breaks.  It's the third

paragraph at the very end.  It says, "Defending the settlement

from objections is assumed by us to be part of the agreed

carveout."  And this email talks about how they're increasing

it from 100 to 150 to specifically deal with the FedEx and

ARRIS -- or it just says FedEx objections, calls our objection

meritless, and goes on a bunch of different directions.

I don't think that this is what the Trustee was

1  intending to it, but I have full certainty that Paul

2  Silverstein and the Bondholders intended that perspective.  It

3  says so in this document.  And I'll let the Court read it for

4  just a second.

5      (Pause)

6          THE COURT:  Okay, I've read it.  Thank you.

7          MR. LANGLEY:  And so in the context of FedEx's

8  negotiations, this is the difficulty we were faced from the

9  get-go.  This is May 9th.  We hadn't even seen a single

10  document from Prosperity other than Genesis loan documents at

11  this time, and we were already subject to $150,000 war chest to

12  fight our objection.

13          And I don't know how to characterize it any other

14  way, but I suspect that that 150,000 has been spent because I

15  can tell you FedEx and ARRIS has spent that much fighting this.

16  So when we're told we don't think this is valuable, when we

17  don't think that we're negotiating in good faith or have

18  offered anything, that's just not credible.  We're here

19  fighting because we think there's real value to this claim.

20  And we think 9-332 is very clear, and it does deal with a

21  transfer that occurred here on August 15th before the notice of

22  exclusive control.

23          We think that this is, again, not a close call.  I

24  hear the issue on the 0188 account and what it is.  If we had

25  to figure out what that is, if this wasn't a transfer out of a

174

1  debtor account to Prosperity Bank, we would have to figure out

2  what that is.  But it clearly isn't a deposit account at the

3  bank.  The --

4          THE COURT:  No, I was going to say I think their

5  primary -- I mean, excuse me, there's not a primary argument.

6  There's five total arguments, and I think that one of them is

7  that it's either a general or a payment intangible.

8          MR. LANGLEY:  Yeah.  And I will --

9          THE COURT:  Because it's not a deposit account of the

10  debtor, as I understand the argument.

11          MR. LANGLEY:  I understand that.  And I want to be

12  clear.  So when we talk about what assets are, so we look at

13  Prosperity Bank and say what assets are there, it's a deposit

14  account, right?  It's holding that money.  And the general

15  intangible definition explicitly excludes deposit accounts.

16  And you look at the 3PL case, and I confused it with 3PO and

17  all that, but there's a 3PL case that's cited.

18          And that case talks about a payment intangible that

19  existed.  And what it talks about, it's a Colorado case, but

20  there's not many cases out there on this.  It talks about how a

21  payment intangible is a right derived from a contract or tort

22  that is something that's tangible and can be transferred as a

23  chose [sic] of action.  And that's not what we have here.

24          Here we have, again, a transfer that was free and

25  clear, nothing came back to the estate.  That's why it's a

1  fraudulent transfer.  If they had received reasonable

2  equivalent value, there wouldn't be a fraudulent transfer

3  claim.  And we take great issue with the characterization of a

4  548 claim as being a general intangible.  That's not what a 548

5  claim.  It's not a general intangible.  It is a tort claim that

6  arises only under the Bankruptcy Code.

7       And we don't think that there's any basis under any

8  precedent to say this is a general intangible when the issue,

9  the funds that are disputing over are held in a deposit

10  account, the general intangible definition specifically

11  excludes deposit accounts.  And what the debtor has is a 548

12  cause of action.  That's not a payment intangible.  That's not

13  a general intangible.  That's a cause of action that arises

14  under the Bankruptcy Code.

15       And maybe that's helpful for the Court to understand

16  is this case is involuntary.  This case was commenced by the

17  Bondholders at the time they were in this dispute with

18  Prosperity.  They commenced an involuntary case that gave rise

19  to the 548 action without getting the money back.  They didn't

20  have to file the involuntary petition.  They did.  That's how

21  FedEx and ARRIS got here is because we're unsecured creditors.

22       If FedEx is successful on asserting that the money

23  that came into the 4352 account was the product of fraud and

24  embezzlement which we think we will do at some point in time

25  and you will hear that at some time down the road, but FedEx

1 was deprived $81 million; 236 of that ended up in the four --

2 excuse me, in the 3992 account and ultimately was part of the

3 $5 million that was transferred.

4        If FedEx is correct and that the entire $81 million

5 or close to it was fraud, embezzlement, and stolen property,

6 the estate has no legal title because Texas Theft says it

7 remains property of the person that was stolen.  And so if we

8 have title, that means our property has now flown through the

9 4353 account over to the 3992 account and been paid over to

10 Prosperity.  So we do have an interest in whatever has gone

11 over to Prosperity even under the theory that --

12        MR. CLARKE:  Your Honor, is this evidence or, or what

13 is this?  There's no evidence on this.

14        THE COURT:  Mr. Langley?

15        MR. LANGLEY:  There is absolutely evidence.  We put

16 into --

17        MR. CLARKE:  In this hearing?

18        MR. LANGLEY:  May I please?

19        MR. CLARKE:  Go ahead.

20        MR. LANGLEY:  We have put into evidence the 4352

21 account which Your Honor has heard testimony on yesterday.  It

22 showed that an enormous amount of money was coming into that

23 4352 account at the same time that October 2021 period where

24 the assignment was made.  We then saw enormous transfers go out

25 of the 4352 account into the 1838 operating account and were

1 used presumably to operate and do things at the business that

2 were probably unauthorized.

3           We also saw in the testimony that the 236 came out,

4 that that's -- do you have those --

5           THE COURT:  I remember the walkthrough --

6           MR. LANGLEY:  Okay.

7           THE COURT:  -- of the bank statements of the money

8 coming in and out.  And at one juncture, I think it was like

9 4325, those were FedEx monies that came in and then you walked

10 Mr. Bates through where the funds went.  And then on cross,

11 Mr. Clarke challenged when the monies came in and out of

12 whether or not the monies that came in right around 9/1 or 9/2

13 and the monies that came out were the same $5 million.

14          MR. LANGLEY:  And, Your Honor, we're not asking for

15 you to make --

16          THE COURT:  Am I wrong?  Am I mischaracterizing or is

17 the argument different?

18          MR. CLARKE:  That was correct.  It was Mr. Seidel.

19          THE COURT:  I apologize.  Thank you.  Thank you very

20 much.

21          MR. LANGLEY:  So we're not arguing that in this

22 proceeding you should determine whether FedEx has some type of

23 property right, constructive trust, equitable title in that

24 property.  We don't think that's appropriate.  We're objecting

25 to a settlement simply saying this is a basis for why we're

178

1   objecting is we potentially think that the Trustee needs to

2   examine this issue and we need to figure out if there's a

3   resolution.  And if we're right that 236 needs to be

4   investigated and it may need to be turned over to FedEx if

5   money is being turned over.

6         So I don't raise that as an issue other than this

7   settlement doesn't make sense if that's true.  And so the

8   Trustee should have investigated that, resolved that with

9   FedEx, reached out to us and said, hey, we've investigated this

10  as source of funds, it's 236 from FedEx, and the other source

11  of funds we don't know where it came from is what the testimony

12  we heard.  It came through a bunch of accounts, but we don't

13  know how it got into that original account a day before it made

14  its way to 3992.

15        And so we don't know if there are proceeds collateral

16  that would trump the situation of the Bondholders having their

17  original collateral in the 392 account.  If we're correct, our

18  proceeds collateral, which is really proceeds of theft which

19  means we have legal title, actually would be controlling over

20  the Bondholders' original collateral in that deposit account.

21  And we don't know where that original 4.2079, whatever it was

22  that was in the Multiband account, we don't know where that

23  came from.  Is there somebody else out there that has proceeds

24  to that?  We need to have that investigated.

25        And that's where I think we get back to the factor of

1  <u>Foster</u> is, and really a fair and equitable settlement is was

2  there a reasonable and diligent investigation here.  And we can

3  tell you with certainty that that's not the case.  And how do

4  we know that's not the case?  If we turn back to my

5  demonstrative on the third page, we go down to the last line

6  there which is a big line, and go over to the second column, it

7  says, "The Trustee after thorough review has agreed that the

8  collateral agent holds a valid perfected first priority

9  security interest in the subject funds as part of the overall

10 consideration for the proposed settlement."

11        And that's -- the first part, "The Trustee after

12 thorough review, "is really important.  How do we know they

13 didn't do a thorough review?  Because we know they didn't have

14 the documents until July 5th.  When was this amended motion

15 filed?  On May 17th.

16        THE COURT:  I completely understand, Mr. Langley,

17 FedEx and ARRIS' arguments over the course of time.  But at

18 some point we have to get to today.  And so I guess the

19 question that I would ask you is do you dispute today, not

20 beginning in March or beginning in May at which time the

21 settlement may have been much less likely to have been

22 approved, but today do you believe that the Trustee hasn't done

23 the appropriate investigation?

24        MR. LANGLEY:  So we don't.  And part of the reason is

25 what we just talked about, the original source of funds.  Where

1  was that original source of funds?  We know that there was an

2  enormous amount of money from FedEx being taken and used to do

3  all sorts of things.  We can show very clearly it was

4  transferred to AMR and others parties.  We don't know if that

5  4.5, where that came from.  And if it's the source of another

6  fraudulent transfer or some type of other issue that this comes

7  up.

8          The Trustee testified over and over again we need to

9  go after the bad guys, we need to go after the bad guys.  and

10 we agree, and we're supportive.  And what didn't come out is

11 the meeting with FedEx was not about Prosperity and this

12 settlement.  It was about trying to figure out how to go after

13 the bad guys.  We had an agenda set out, and we specifically

14 excluded Prosperity from that agenda.  But we couldn't get the

15 Trustee and Trustee's counsel to move past that.

16          And I don't want to get into all the back and forth

17 that's there.  But I can tell you FedEx wants these things

18 pursued and wants recoveries in this case and is acting to try

19 to maximize its value.  And we have grave concern when the net

20 benefit here is $38,000 to the estate and it's all going to pay

21 administrative expenses.  And that's where I think, again, we

22 turn back to <u>Foster</u> and say there is nothing going to benefit

23 FedEx and ARRIS from this settlement.  There's zero benefit

24 here for the unsecured creditors other than us.

25          And so that's where <u>Foster</u> is important.  It says in

1  those situations, and that's not a lot of situations, but in

2  those situations, you have to give deference to the Objecting

3  Creditors who are receiving nothing out of this.  There was no

4  benefit to the estate.  And --

5        THE COURT:  Does _Foster_ require a deference to the

6  creditors or does _Foster_ require that I give the Objecting

7  Creditors due and fair consideration?

8        It says the bankruptcy court must consider the

9  paramount interest of creditors.  In that case, the Fifth

10  Circuit found that the trial court had made no reference, no

11  findings as to creditor opposition and that the judge had

12  failed to consider what in that case, and I'm using obviously

13  the Fifth Circuit's words, was nearly unanimous creditor

14  opposition to the settlement between what they considered to be

15  a parent and a child.

16        And so I think that -- I understand and not only am I

17  giving due deference to the creditors' opposition, but the

18  question is, is it the only -- is it a fact of it's either yay

19  or nay.  I think at the end of the day, the Court has to give

20  consideration to the Objecting Creditors, but I don't believe

21  that if unsecured creditors say no, thus, the answer is no.

22        MR. LANGLEY:  So what the _Foster_ case says, and it

23  cites what it calls the famous test offered by the Eighth

24  Circuit in _Drexel v. Loomis_.  And it says, The paramount

25  interest of creditors with proper deference to their reasonable

1  views.  And it goes on, it says, This suggests a bankruptcy

2  court may not ignore creditors' overwhelming opposition to a

3  settlement.  We believe a bankruptcy court should consider the

4  amount of creditor support for a compromise settlement as a

5  factor bearing on the wisdom of the compromise as a way to show

6  deference to the reasonable views of creditors.

7           So we do think that you've got to essentially find

8  that -- not that there's a good argument or that it's a close

9  call or this is a matter of first impression that likely falls

10  towards the Bondholders.  We actually think you have to find

11  with certainty that under the UCC, this lien was not stripped,

12  that there is a lien on the 0188 account and we don't think you

13  can do that under 9-332.  We think if it was approved without -

14  - against our deference, we would have a clear error there to

15  say that 9-332 applied, there is no lien here.  It's a dispute

16  that needs to be tried.

17           And really what we heard from a testimony standpoint

18  I think is actually helpful to the Trustee and everybody

19  involved here, I think we heard Prosperity say they'll give the

20  money over if this Court will just tell them to give the money

21  over, which raises questions why are we here on a settlement if

22  they'll just give the money over and let us fight over it.  I

23  don't understand what we're here fighting about.

24           THE COURT:  I think they might be here fighting about

25  the fact that you have told me that they could be sued for $8.8

1 million instead of 4.4

2          MR. LANGLEY:  That's exactly why they're here.

3          THE COURT:  Okay.

4          MR. LANGLEY:  They want the release.  So they don't

5 want to give up control of the funds until they get that

6 release because it is a potential double hit on them.  They

7 have to pay for a 548 and they have to pay for whatever damages

8 the estate recovery is to the Bondholders.  That's why they

9 won't release the funds.

10          If they have control, and they do, they could pay

11 this over right now and let us fight over what to do with those

12 funds but they haven't done so, right.  They have maintained

13 control throughout this whole process and haven't given any

14 right.  We heard this is treated like an interpleader.  It's

15 not an interpleader.  It's in a deposit account in Prosperity

16 Bank with a legal hold.

17          THE COURT:  But is it a deposit account -- again, I

18 think we're skipping a step because, for example, if you make a

19 loan to me, okay, in your hands, that's accounts receivable,

20 okay.  And so what your lender may have a security interest in

21 for you may touch your accounts receivable.  As to me, it's not

22 an accounts receivable.  It's something completely different.

23 And whether or not my lender is going to attach their security

24 interest to what I received from you depends on what account I

25 put it in, it depends on what form it make take.

184

1          And so I guess the question is if it's a deposit

2     account, is it a deposit account of the debtor?

3          MR. LANGLEY:  It is not a deposit account of the

4     debtor because what you look to from a deposit account is who

5     the titleholder of that account is.

6          THE COURT:  Okay.  And so if it's not a deposit

7     account as to the debtor, then what is it as to the debtor?

8          MR. LANGLEY:  We simply think it's irrelevant.

9          THE COURT:  So it's irrelevant?  Then how is the

10    estate reaching it?

11         MR. LANGLEY:  It's not.  We think there's a $5

12    million claim here that is a liability to Prosperity Bank, and

13    that $5 million claim is what needs to be pursued.  Whether

14    they use the 4 million --

15         THE COURT:  So it's a cause of action?

16         MR. LANGLEY:  It's a cause of action under 548.

17         THE COURT:  Okay.

18         MR. LANGLEY:  And I think that's where we've lost

19    track of this piece of litigation and the settlement and lost

20    the road is we've identified a specific res (phonetic) that we

21    think should be paid and that's sophisticated by Prosperity,

22    right.  They have $5 million in liability on the transfers.

23    They set aside 4.4 million related to the most obvious

24    fraudulent transfer and have said, hey, y'all go figure out how

25    to split it as long as y'all give us a release.

185

1          And maybe you don't like that characterization, but

2   that's essentially what we're being asked to is fight over this

3   $4.4 million when really we have, the estate has a $5 million

4   claim that should be paid and, if there are damages to the

5   Bondholders, they have a claim that should be paid.  It's not

6   limited to 4.4 million.  That's a red herring.  We're chasing

7   something that doesn't exist.

8          If there is a lien on that money today, we agree with

9   you that would become relevant.  But because there is no lien

10  because of 9-332, it's not relevant.  It's just --

11          THE COURT:  Do you have any authority for me --

12          MR. LANGLEY:  I do.  I have --

13          THE COURT:  -- that -- no, no.

14          MR. LANGLEY:  I'm sorry.

15          THE COURT:  I probably should tell you what the issue

16  is.  Do you have any authority for me that would show that a

17  transferee should return the funds essentially to the estate

18  and separately return the funds to a lender that was defrauded?

19  And I'm using defrauded in the loosest sense possible, that

20  essentially when two wrongs were committed in your estimation,

21  one of fraudulent transfer and one I assume to be some

22  different kind of fraudulent transfer as to the Bondholders.

23          Do you have any authority that that transferee should

24  return that money twice?

25          MR. LANGLEY:  So if you look at 550 of the Bankruptcy

186

Code, a fraudulent transferee can return collateral that was

transferred fraudulently, right.  If this was equipment, you'd

go get the equipment, right.  But with funds in a deposit

account, again, like you said, it's not money sitting there,

right.  There's no money that we can go and possess and get

back.  It's funds.  It's an accounting entry, as everybody

admitted in this case.

And so what -- how do we go get that money back?  And

before I start rambling, I need to ask you to repeat your

question.

THE COURT:  No, no, no.  I mean so let's look at 550.

MR. LANGLEY:  Yeah.

THE COURT:  550(d) says the Trustee is entitled to a

single satisfaction.

MR. LANGLEY:  Correct.

THE COURT:  Okay.  So I think your argument has to be

that the Trustee would be entitled to a single satisfaction but

separately, the Bondholders have their own cause of action,

okay --

MR. LANGLEY:  Yeah.

THE COURT:  -- because they were damaged to the tune

of $4.4 million and that -- again, the bottom line is the

argument you said that Prosperity should be held to pay $8.8

million.  That is in the realm of possibility.  Where is my

authority for that?

1          MR. LANGLEY:  So I think the authority is this, that

2    there is liability to the estate under 548.  Whether that comes

3    from an account that they've set aside as a reserve, like banks

4    often do, they often reserve internally money to be paid out

5    for potential litigation, for potential loan losses, all those

6    type of things.  That doesn't cause it to be a discreet asset

7    that can be recovered by a 548 action.

8          So under our situation here, we don't think there's

9    anything to go get.  We think there's a judgment to be had and

10   liability on that judgment and that that judgment should be

11   satisfied with money out of the general coffers of Prosperity

12   Bank.  And if the Bondholders want to go argue about the 4.4

13   and do some type of argument over in state court that that

14   somehow is still subject to their lien, let them go do it.

15   We're not a party to that.

16          THE COURT:  I am following you, Mr. Langley, with

17   respect to the 537, okay.  I really am from the standpoint of

18   that seems to be, for lack of a better word, low-hanging fruit,

19   okay.  Now whether or not the Trustee wants to go -- excuse me,

20   whether the Trustee wants to settle it and essentially subtract

21   in his mind the cost of litigation and/or appeals, there is a

22   cost of litigation.  Even if you win, there's a cost to it,

23   okay, and there's a cost to your estate and to your client's

24   pocketbooks.

25          But I am at a loss for how two parties can get that

1  same $4.4 million because I get that the money in the account

2  belonged to the debtor before it was swept and so the Trustee

3  could go after it then.  But it seems like whether they get

4  third-partied in or whether they file their own action, it's

5  the same money.  They're going to say that was my lien, okay.

6  What is the lien worth if not $4.4 million?

7       MR. LANGLEY:  So we don't think the lien has any

8  value today because the Prosperity 392 account has been swept.

9  They got I think about $400,000 out of that account, so that

10  the satisfied the lien on the deposit account.

11       THE COURT:  Swept under what authority?

12       MR. LANGLEY:  Under the notice of exclusive control,

13  the Bank paid over the money that was remaining in the 3992

14  accounts.

15       MR. RUKAVINA:  Your Honor has not heard that, but it

16  is true.  There was some $200,000 remaining.

17       THE COURT:  Okay.  But what about the money that was

18  improperly swept the day before?

19       MR. LANGLEY:  So, again, that's where the transfer is

20  treated free and clear so they don't have an interest in that

21  at this point in time.  They have to pursue legal recourse if

22  they can identify a breach.  I don't actually think that the

23  DACA was breached from that perspective because --

24       THE COURT:   How is the DACA not breached if the --

25  two things, okay.  It was breached because the Bank thought it

1  had a pledge of that collateral.

2         MR. LANGLEY:  I agree with that --

3         THE COURT:  Did it?

4         MR. LANGLEY:  I agree with that breach.

5         THE COURT:  Did it have a pledge of collateral?

6  Because there was a contract that said they couldn't take a

7  pledge of that collateral, so that's number one.

8         And then, number two, they breached it because

9  somebody thought Genesis was in default but Prosperity's

10 witness now tells me, to quote Mr. Rukavina, whoopsie, they

11 weren't in default, okay.  And so we should not have done that,

12 I think was Mr. Montgomery's testimony.  I won't try to put an

13 improper or anything else word in his mouth, okay.

14        And then, number three, it was obviously done at a

15 time when they knew the exclusive notice was coming.  Now

16 granted, maybe it's a "first in time, first to act," but you

17 have to be first in time and first to act with right.

18        Are you telling me that the UCC would be to step in

19 the middle and say it doesn't matter if it's fair or not, it

20 doesn't matter if it was fraudulent or not, it doesn't matter

21 if you had a right to it or not.  A transfer took place.

22        MR. LANGLEY:  Yes, Your Honor.

23        And I have a co-provision I think is helpful.

24        THE COURT:  Okay.

25        MR. LANGLEY:  And it's UCC Code 9-332(c).

1            THE COURT:  I've got it up.

2            MR. LANGLEY:  You've got it up.  Do you have the

3   official comments there?

4            THE COURT:  I will.  I'll pull it up.  Just one

5   second.  I'll pull it up.

6        (Pause)

7            THE COURT:  Yes, sir.  I'm with you.

8            MR. LANGLEY:  Okay.  So at Official Comment 5,

9   there's an example 3, and it talks about transferees who do not

10  take free.  And it gives an example, and it says that this is a

11  really oddball situation, but it gives an example.  It says the

12  facts are in example 2.

13           But in wrongfully moving funds from the deposit

14  account at Bank A to the debtors' deposit account with Bank B,

15  debtor acts in collusion with Bank B.  Bank B does not take the

16  funds free and clear of the security interest under this

17  section, so 332(b) wouldn't apply because there's collusion.

18           If debtors grants a security interest to Bank B,

19  Section 9-327 governs the relative priorities of lender and

20  Bank B.  Under Section 9-327-2, Bank B's security interest in

21  the Bank B deposit account is senior to lender's security

22  interest in the deposit account as proceeds.

23           However Bank B's security interest does not protect

24  Bank B against liability to the lender that might arise for the

25  bank's wrongful conduct. That's what we have here without the

1 | collusion.  But even if we did have collusion, the situation's
2 | exactly the same.  The Bank took this money and put it in their
3 | own deposit account and maintained a lien and we saw evidence
4 | today that they treat it as their cash collateral.  And how did
5 | they do that?  They had an assignment.  They had an assignment
6 | that gave them rights to --

7 | MS. ARGEROPLOS:  Judge, I'm going to object.  This
8 | misrepresents the evidence again.  We didn't assert a lien in
9 | the funds in the 0188 accounts.  There's no evidence of that.

10 | THE COURT:  LEt's let him make his argument.

11 | MS. ARGEROPLOS:  All right.

12 | THE COURT:  Thank you, Ms. Argeroplos.

13 | MR. LANGLEY:  Your Honor, the assignment specifically
14 | says that they can have a replacement lien on a deposit account
15 | at their own place, and we saw through emails and we can go
16 | through those emails again where Bater Bates and Mr. Montgomery
17 | both testified that this is our cash collateral.  We won't turn
18 | it over because it's our cash collateral.  We won't release it
19 | until we get paid on the Genesis loans.  They held control.
20 | They were holding it as their cash collateral.  That's what the
21 | documents say.

22 | Now they've tried to say they disclaim that, but
23 | again we can turn back to the motions, and I think the motions
24 | are helpful in this point.

25 | THE COURT:  And before we turn back to different

1   exhibits, on this example 3, who is Bank B?

2           MR. LANGLEY:  So the debtor maintains a deposit

3   account with Bank A.  The deposit account is subject to a

4   preferred security interest in lender.  At Bank B's suggestion,

5   debtor moves the funds from the account at Bank A to debtor's

6   deposit account with Bank B.  That would bring it into the

7   security interest so that Bank B is a colluding bank that has

8   pulled out of deposit account A at another bank to pull it into

9   their deposit account and be subject to their security

10  interest.

11          The UCC 9-332 says that -- and 9-327 says that that

12  colluding bank's security interest is still superior to the

13  lender's because of the finality rule.

14          THE COURT:  And I appreciate that, and I will

15  certainly engage with this in my decision.  My question for you

16  is if this example is the example at which I am to glean your

17  argument, who is Bank B that is going to be superior to the

18  rights of the lender here?  Is it Prosperity --

19          MR. LANGLEY:  It is --

20          THE COURT:  -- because Prosperity swept and kept?

21          MR. LANGLEY:  That's correct.

22          So it's the transferee.  Here, the transferee wasn't

23  Bank A.  The transferee was the debtors' account -- or, excuse

24  me, not transferee.  The transfer came from the debtors'

25  account, so the debtors' account would be Bank A.  And Bank B

193

1  is Prosperity.  There was a transfer.  We don't think collusion

2  is met because it was unilaterally done by the Bank was the

3  testimony today.  But even if there was collusion, that account

4  would be held by Prosperity as their security.  And it would be

5  superior to the lender's.

6         And it's a weird result.  I agree with Your Honor it

7  doesn't seem equitable, it doesn't seem right in a lot of

8  situations.  But what it says is there is recourse to the

9  lender, right.  That's what we're talking about.  There is

10 recourse in this situation.  They get to sue Bank B.  And

11 that's exactly what --

12        THE COURT:  But Bank B has disclaimed any interest in

13 the funds.

14        MR. LANGLEY:  And that's where --

15        THE COURT:  And I guess the argument is it's the UCC

16 and it doesn't matter if they disclaim it.  It's all about how

17 the UCC works.

18        MR. LANGLEY:  It is and --

19        THE COURT:  Okay.

20        MR. LANGLEY:  -- we dispute the disclaimer.  And let

21 me show you in the motion, turning to Page 2 --

22        THE COURT:  No, I understood the way you took me

23 through the evidence with the emails and the variations of the

24 motions.  But I'm willing to be taken through it, no worries.

25        MR. LANGLEY:  Yeah, I'm going to give you another

1  example, and it's Page 2 of my demonstrative in the second row.

2  It says, "As of the petition date, the subject funds remained

3  in the escrow account subject to the claims of Trustee,

4  Prosperity, and the collateral agent, and further subject to

5  the automatic stay."

6         And so this was on March 22nd which was about less

7  than two weeks after they said they were going to motion the

8  Court to get the cash collateral.  They're saying that this

9  settlement is still subject to the claim -- excuse me, this

10 account -- they called it an escrow account, it's not -- this

11 account is still subject to the claims of Trustee, Prosperity,

12 and the collateral agent.

13        So clearly, there was a dispute over who got this.

14 Prosperity maintained control.  They still maintain control

15 today.  And we just don't find credibility, and you shouldn't

16 find credibility in the idea that they're disclaiming that.  If

17 they're disclaiming that, why are they getting a release?  That

18 alone makes this settlement unfair and unreasonable because

19 they're essentially disclaim something they don't have an

20 interest in and yet they're still taking consideration out of

21 this deal.

22        And so I think there's real concerns here on

23 Prosperity's -- I'm not -- let me be clear.  I think there is

24 real concerns in what we heard from Bater Bates today.  I think

25 you heard that and had concerns with that, too.  I think

1  there's real concerns with what Mr. Montgomery said that he has

2  had an email that said that this is our cash collateral, we're

3  going to motion for the Court to give it back to us and satisfy

4  our loans, and now he's disclaiming that.

5        I think you heard them in their pleading that

6  Mr. Hillyer said in their reply that James Goodman authorized

7  this.  But we heard testimony today that that wasn't the case.

8  They swept this unilaterally.  So there are a number of

9  statements that have been made by Prosperity, including that

10 this is an escrow account subject to all these things, that

11 just aren't credible.  And I don't like to sit here and say

12 that a bank is not credible, but I think they're trying to

13 avoid double liability.  And I think they have always asserted

14 control over the 0188 accounts.  Otherwise, we wouldn't be here

15 because they would have given the money to somebody.

16       And they could have interpled it if they really

17 believed that and for lease control, but they didn't do that

18 either.  And if they had interpled it, they would have had to

19 assert in writing whether they stated a claim to it because

20 that's what's required when you interplead, right.

21       Now they're sitting back under a settlement saying

22 we'll do whatever the Court says as long as you approve our

23 settlement.  And that's a really awkward place to be and an

24 awkward place to put the Court in is say approve this

25 settlement and we'll give money to somebody.  But if you don't

1  approve the settlement, we're going to keep holding on to it.

2          If they really are disclaiming the money, let's

3  figure out how to get it to the estate, figure out how to split

4  it up on a lien dispute under a plenary matter, not under a

5  summary 9019 motion.  Let's have a plenary dispute over liens.

6  That's what we're doing in AMRR.  We've got disputes that FedEx

7  is going to get challenged on its fraud and constructive trust

8  issues, bondholders are going to get challenged on their

9  security issues.  We're going to have a plenary hearing at some

10 point or we're going to have a settlement.  We're already

11 talking settlement.  I won't get into the details.

12          THE COURT:  Please don't.

13          MR. LANGLEY:  But we hope to not bring that back to

14 the Court.

15     (Laughter)

16          MR. LANGLEY:  We're hoping not to bring that back to

17 the Court.  But until we get this issue resolved and Prosperity

18 out of the picture either sued or their money in, we need to

19 figure out what to do.  And right now, we just don't think the

20 posture of a 9019 is the right place to resolve a really

21 complicated lien dispute if this Court were to go and find that

22 0188 is some type of interest that can be liened up, which we

23 don't think it is.

24          And, again, the examples we gave you in 9-332, are

25 really odd situations under the UCC.  We acknowledge that.

1  It's not how I would have written it.

2         And, Mr. Hillyer, do you have the -- I'll offer it

3  for it's worth and do you have the article, law article?

4         THE COURT:  Was it the Markel article?

5         MR. LANGLEY:  No, it's another one.

6         THE COURT:  Okay.

7         MR. LANGLEY:  And I'm going to have to disclaim a lot

8  of things about it.  But I think it will be helpful to Your

9  Honor if you want to have some firm understanding.

10        THE COURT:  I'm actually on Westlaw.  Do you know who

11 wrote it?

12        MR. LANGLEY:  So it's not published, and I'll tell

13 you why.

14        THE COURT:  Oh, okay.  Well, there we go.

15        Mr. Berghman, you're in charge.

16        MR. LANGLEY:  So this is an odd -- if you want an

17 authority on UCC Section 9-332(b), this is a draft, and it's a

18 draft because the person who wrote it died.  But he was the

19 reporter at the convention for the Revised Commercial Code that

20 was involved in all the 9-332(b) discussions.  His name is

21 Steven L. Harris.  You can go -- he's been an expert witness.

22 He's done all these type of things.

23        I'm not offering it as an expert testimony, but if

24 the Court wants to take this for persuasion or whatever it

25 wants to do on that end, we're happy to send it to you and

1  provide a copy.  I'd give you this one, but we have --

2          THE COURT:  Markings on it.

3          MR. LANGLEY:  -- markings on it, so I don't really

4  want to do that.  But it has -- it talks about stuff that's

5  involved in this and how oddball the situation can become under

6  9-332(b).

7          THE COURT:  So how do I get it if it's not published?

8          MR. LANGLEY:  How do you get it?  I'll send it to

9  you.  We were able to --

10          THE COURT:  How does anyone get it is my question?

11          MR. LANGLEY:  So how we got it --

12          MR. HILLYER:  I found it, Your Honor.  I can -- it's

13  on like --

14          UNIDENTIFIED SPEAKER:  Yeah, the title.

15          MR. HILLYER:  Yeah, it's "Making Sense of" --

16          MR. LANGLEY:  "Making Sense of UCC Section 9-332(b)"

17  by Steven L. Harris.  And he was an expert witness in a

18  Minnesota case, and his bio included this as an exhibit in a

19  published -- something that he was working on in progress.

20          THE COURT:  Okay.

21          MR. LANGLEY:  And then he died.  He died during

22  COVID, so I don't know the circumstances.

23          THE COURT:  Okay.

24          MR. LANGLEY:  So we don't think --

25          MR. HILLYER:  I'll source it out, I mean literally

1  Google Law, like when people laugh about that.

2              THE COURT:  Okay.

3              MS. ARGEROPLOS:  What is the source, though, if it is

4  not published?

5              MR. HILLYER:  It's published by his -- the draft is

6  maintained by the law school.  The law school site.

7              UNIDENTIFIED SPEAKER:  Is it the September 1st, 2016

8  draft?

9              MR. HILLYER:  Yes.

10             MR. LANGLEY:  It is the September 1st, 2016 draft.

11 And it's not authoritative.  I can't say it --

12             THE COURT:  I have it.

13             MR. LANGLEY:  Okay.  I can't say you can use it

14 authoritatively, but we offer it for whatever use you think

15 it's helpful, to discard it.

16             THE COURT:  Okay.

17             MR. LANGLEY:  Use it, we offer it out there just as

18 that purpose.

19             THE COURT:  We have it.

20             MR. LANGLEY:  And Your Honor will see that there's

21 been disagreements under the law on different things, but that

22 9-332(b) is one of those weird situations that, as Mr. Davor

23 says, it doesn't strike me as equitable.  It's not necessarily

24 trying to be equitable.  It's trying to create finality of

25 payment.

1           And it's recognizing that deposit accounts are unique

2    collateral that don't hold real money.  They hold a claim

3    against the Bank, and so there's a unique way to deal with

4    them.  They weren't in the UCC Code prior to the revision, and

5    it's something that was added.  And it's -- the collusion

6    exception is extremely stringent, meaning that it's almost

7    impossible to prove.  That's why there's not case law out

8    there.  It's not been done very well.

9           The case law that I do want to offer, Your Honor, is

10   called In re Tuscany Energy, LLC.  It's 581 B.R. 681, a 2018

11   case out of the Southern District of Florida.

12           THE COURT:  So that's 581 B.R. 681?

13           MR. LANGLEY:  681.

14           THE COURT:  Okay.

15           MR. LANGLEY:  And so this is an interesting fact

16   pattern where the debtor's attorney knew of the insolvency and

17   knew of a DACA account on the bank accounts that held funds.

18   And the debtor's attorney said give me the money in that DACA

19   account as my retainer so that I can represent you in a

20   bankruptcy case.  And the lender came in in that situation and

21   said collusion, he knew about our DACA, he knew that there

22   couldn't be a transfer in this situation, and he took the money

23   anyway.  And he shouldn't be allowed to keep it, our lien

24   should attach.  And you go through this case and it gets to the

25   end and it says 9-332 applies.

1          A transferee of funds from a deposit account takes

2    the funds free and clear in the interest of the deposit account

3    unless a transferee acts in collusion with the debtor in

4    violating the secured party's rights.  Thus, the debtor's

5    counsel acted in collusion with the debtor in violating the

6    rights of Armstrong Bank.  Upon payment of the retainer to the

7    debtor's counsel, Armstrong Bank lost a security interest in

8    such funds.

9          So there is authority for applying 9-332(b) in this

10   situation where a lender's collateral is deprived and knowing

11   deprived.  But the bankruptcy court went on to say we can't

12   have debtors that can't use their funds when the DACA is on

13   them.  They've got to be able to use the retainer.  It's not

14   bad faith to take that payment even if you know it.  And that's

15   what I think we have here.

16         Before a notice of exclusive control where they have

17   to get the bank's consent, the debtor could use this for

18   whatever money he -- as Mr. Clarke went through, he thinks the

19   October 21 assignment was authorization for the Bank to sweep.

20   It was James Goodman's authorization for the Bank to sweep.

21         And then if we look to the DACA, the DACA says that

22   the Bank shall honor any request by the company to pay out

23   money.  So if that was an authorization back in October and the

24   DACA authorized to use it for any purpose, how do you get to

25   the fact that there was a breach of the DACA in relation to the

1 transfer?

2        Now, again, we agree that there was a breach related

3 to the subordination provision.  We believe that there may be

4 other breaches.

5        THE COURT:  But isn't that the first breach?

6        MR. LANGLEY:  It is the first breach.

7        THE COURT:  You only have a lien and you only have

8 the ability to sweep and you only have the authority to sweep

9 if you have a proper assignment and pledge.  If you don't have

10 any of those things, then you're sweeping at your own risk.

11        MR. LANGLEY:  That's correct.

12        And 9-401 says it doesn't stop the transfer again.

13 So the transfer still happens, but there are liability claims

14 that arise from that transfer, that wrongful action.  It's

15 essentially either a breach of contract or a tort claim is what

16 the Bondholders have today.  They don't have a claim to the res

17 in the 0188 account and just like the estate doesn't have a

18 claim to the res in the 0188 account.  That is an account in

19 the name of Prosperity Bank.  It's 9-332 applies.

20        We saw in the first exhibit that I gave you that the

21 Bondholders' counsel was specifically worried about this very

22 article, that their rights had been impaired when that transfer

23 occurred so they said put it back in our 3992 account so

24 there's no arguments.

25        Well, we're here having an argument, and we've been

1  doing it for six months.  I am tired.  I know these other

2  parties are tired.  I know Mr. Seidel has been subjected to

3  more than I wish he had to be subjected to in this situation.

4  But we just don't think that the settlement is reasonable here.

5  We think that the net benefit of 38,000 to the estate is not

6  reasonable.  We think if the Trustee were to allow FedEx and

7  ARRIS to pursue this under our proposal, that we will go pursue

8  it vigorously and that we think we'll get a $5-million judgment

9  against Prosperity given the facts we heard today.

10        We understand that the Bondholders may move for

11  relief from stay to try to go get that money at Prosperity, and

12  we can have that fight if we do it.  And, again, FedEx and

13  ARRIS are understanding that it's their obligation if they take

14  over this litigation.  And so that's where I think we turn back

15  to is _Foster_ is we've met the test for _Foster_.  We've satisfied

16  the obligation here that there's overwhelming majority of

17  creditors opposed, creditors have offered to take over the

18  litigation, and creditors will receive nothing absent the

19  litigation.

20        And our views are reasonable and objective based on

21  the counsel's, Bondholders' counsel's own email that said this

22  is a risk, what could happen if we're impaired.  So we

23  understand that the 9-332(b) issue is complicated from a

24  statutory basis.  We don't think the actual fraudulent transfer

25  here is a complicated claim.  So we do think that the 9-332

1  needs to be studied pretty close so that's why we're offering

2  all these extra sources to get there.

3          And unless Your Honor has additional questions, I

4  think I've talked a lot.  And I apologize I talk fast, and

5  Mr. Hillyer tells me to slow down every time so I apologize.

6          THE COURT:  Oh, I'm fine.  Thank you.  I can

7  certainly keep up.

8          I don't think that -- I think we probably talked

9  through the greater points of the Objecting Creditors'

10 arguments.  I mean -- well, let me do this before I yap too

11 much.  Let me hear from Mr. Muenker.

12          MR. LANGLEY:  Very good.  Thank you, Your Honor.

13          THE COURT:  Thank you, Mr. Langley.

14          MR. MUENKER:  Thank you, Your Honor.

15          For the record, James Muenker of DLA Piper on behalf

16 of ARRIS.  I promised that I would be brief, and I will keep my

17 comments as brief as possible.  I'm not going to repeat

18 anything that Mr. Langley said.

19          But I did want to kind of come back a little bit and

20 talk big picture and maybe put this --

21          THE COURT:  Sure.

22          MR. MUENKER:  -- dispute in its proper context.

23          And I want to start by what I think was a small

24 compliment that I got from Mr. -- from the Trustee's counsel,

25 Mr. Rukavina, a little bit earlier when he singled us out from

1  the group that was objecting before Your Honor a few weeks ago

2  or a month ago in the dispute that happened in this Court

3  relating to the AMRR transaction.

4        And maybe it wasn't intended as a compliment.  Maybe

5  he was just thankful that he only had two angry creditors to

6  deal with instead of three.  But I do mention it because we are

7  a little different from the other parties that have been in

8  front of Your Honor in this case.  And our view as it relates

9  to this case is a little bit different.  Obviously, we have

10 joined in the objection that FedEx has filed, and we stand by

11 that position.  And I'm not going to belabor those points that

12 have been made in our papers and in FedEx's counsel's able

13 presentation today.

14        But from our perspective, there was a big distinction

15 between what was going on before Your Honor then and what is

16 happening now.  And that distinction is that in that situation

17 in our view, we agree with the Trustee and we recognize the

18 Trustee was in a very difficult spot.  And I know I don't have

19 to say this in open court in front of you, you know me well,

20 but I'll do it anyway.

21        I have the utmost respect for

22 Mr. Seidel and I have no doubt that he's acted in good faith

23 throughout this entire process.  And he's doing the best job

24 that he thinks that he can do in this case.  There's no dispute

25 about that.

1        In the AMRR dispute, it appeared to us that there was

2 no better alternative, and I think that's ultimately what Your

3 Honor concluded as well and that's what Mr. Seidel concluded.

4 And that was kind of one of those situations that's always a

5 challenge for parties in bankruptcy cases, in particular,

6 bankruptcy judges where you've effectively got the melting ice

7 cube situation, right. Something had to be done, it had to be

8 done on short notice, and there wasn't an obvious way to do

9 something different that would result in a better recovery for

10 the estate.

11        So we didn't object to that. I mean some of the

12 other parties did, and I don't begrudge them for doing that.

13 But that was our view then. We feel very differently about

14 what's going on here because we don't think this is a close

15 call and we don't think any of the factors that normally would

16 warrant approval of a settlement like this exist here.

17        To put it in context, Your Honor, obviously we all

18 know we're here on a 9019 settlement.

19        THE COURT: Sure.

20        MR. MUENKER: But 9019 settlements come before Your

21 Honor in all different kinds of ways and in different kinds of

22 cases. They come before Your Honor in Chapter 11 cases as well

23 as Chapter 7 cases. The standard is the same. Your Honor

24 asked a question of Mr. Langley earlier about the deference to

25 creditors. We don't have a veto right. We're not arguing that

1  we have a veto right.  But it is a factor.

2       And I think the factor takes on extra significance in

3  a case like this that isn't present in other cases.  If we were

4  in a Chapter 11 and the Trustee were bringing you a settlement

5  that saved jobs and provided an ongoing business to preserve,

6  et cetera, et cetera, that would be significant.  None of that

7  is here.  We're also not -- we're not presented with any of the

8  facts that kind of warranted the approval of the AMR

9  transaction, right, where there was clearly that was the only

10 option that was available.  Mr. Seidel has acknowledged, I mean

11 there are significant claims here.

12       I'm not going to talk as much about the Bondholders

13 and Prosperity's position because, quite frankly, they're doing

14 what I would do if I were in their shoes when they've

15 negotiated as great lawyers do really really good settlement

16 terms on behalf of their clients.  They're getting a great

17 deal, an absolutely fantastic deal out of this settlement.

18       You've heard testimony about the different types of

19 claims.  And although it's been presented to you as one

20 settlement, really there's a couple of different settlements

21 that are going on.  Most of the focus has been about the $4-1/2

22 million transfer to Prosperity for which the estate is only

23 receiving $150,000, right.  And we've heard from Mr. Seidel.

24 He's acknowledged these are complicated issues.

25       Now we think they're not quite as complicated.  I

1  think we think we're a little more confident in the strength of

2  the case.  And as you've heard, we've offered to take it on in

3  different ways.  And if the Court were to deny the Trustee's

4  motion today, I'm sure those conversations would continue and

5  I'm sure that the parties would reach an agreement as between

6  us as to the best way to move that forward on behalf of the

7  estate.

8          But they're doing what they should do, which is

9  advocate for their clients.  They're getting a great deal.  The

10  parties who aren't getting a great deal are over here on this

11  side.  And there's been a lot of talk about the estate, and I

12  think it's important, you know, we remember who the estate is

13  and who the beneficiaries of that estate are.  And the

14  overwhelming majority of those parties are sitting over here

15  and they oppose the settlement.

16          And it is our effectively clients who will bear the

17  benefit from these claims, the greatest benefit from these

18  claims, if they are successfully pursued.  And it is our

19  respective clients that will bear the cost of losing the very

20  very minuscule value that is coming in if this settlement is

21  approved.  And we're happy to take that chance and do that

22  swap.

23          And, respectfully, we think the Court in the context

24  of this case, a Chapter 7 where the unsecured creditors are

25  almost unanimous in opposing the settlement, where the estate

1    objectively is just not getting hardly anything, the Court

2    should pass.  The Court should say no.  And, unfortunately, I

3    think what has happened despite the best efforts, I'm sure, of

4    Mr. Seidel is that while the settlement terms have improved

5    over time since that motion was kind of originally filed, like

6    a lot of things, they're a product of a bad beginning.

7           And what happened here was really a rush to a

8    settlement on terms that objectively were just not reasonable

9    on any level with virtually nothing coming back to the estate,

10   you know, with almost $5 million of claims getting released.

11   There have been incremental improvements in that, but it hasn't

12   gotten to the level where again when you factor in the cost of

13   the administrative expenses, there's not going to be any

14   flowthrough to creditors.  And nobody's disputed Mr. Langley's

15   math about what the actual money that might be available at

16   some point to the estate from these claims would be.

17          And I think Your Honor has recognized the strength of

18   just by itself the $550,000 claim that exists against

19   Prosperity.  And I think what we've heard over the last couple

20   of days frankly has only made it more and more clear that these

21   complicated issues as it relates to the $4-1/2 million claim

22   should not be decided in a summary fashion in a mini trial when

23   new critical facts are coming out live on the stand from

24   witnesses that the Trustee was not aware of, that the Trustee

25   has not had an opportunity to investigate.

1        Again, that goes I think in my mind to show that this

2   process is not nearly baked enough to warrant settling at this

3   low dollar amount.  And so, respectfully, Your Honor, we don't

4   think this is a close call.  I do want to make one other

5   comment about the equities that I've heard.

6        And, look, I mean equity is kind of like beauty.

7   It's in the eye of the holder.  This Court is a court of law.

8   And while there are equitable remedies and while there are

9   equitable -- other equitable principles in the law that can be

10  applied, the general notion of equity does not warrant doing

11  something different than what the law requires.

12       We think this is a case about details.  We think it's

13  a case where the details matter because the details themselves

14  have very specific legal consequences that flow from them.

15  We've outlined what we think those are in our pleading, so I'm

16  not going to go through them again with you.  But we don't

17  really see this as an issue about equity.  We see this as an

18  issue where things happened, claims will have arisen and can be

19  prosecuted as a result of the things that happened.

20       Those claims belong to different parties.  They may

21  belong to the Bondholders.  They may belong to the estate.

22  Those claims should be pursued if they have.  They shouldn't be

23  settled now where the estate gets nothing and before these

24  issues can really get fully decided.

25       Unless Your Honor has any other questions, that's all

211

1  I have to say.  We would just encourage Your Honor to deny the

2  motion.  We don't think a denial ends anything.  It doesn't

3  prevent people from continuing to talk.  I know there's always

4  a strong desire to get things done.  But when we're faced with

5  as little to get as we are in this case in a Chapter 7 where

6  all the creditors are opposed, we think it should be denied and

7  we should move forward and find a better path.  Thank you.

8        THE COURT:  Thank you very much.

9        Mr. Rukavina?

10       MR. RUKAVINA:  May I, Your Honor?

11       THE COURT:  Please.

12       MR. RUKAVINA:  The overwhelming majority of creditors

13 oppose this settlement.  It's not true.  There's 14 noteholders

14 that represent 20 in total that support this settlement.  The

15 individual noteholders, they're the creditors.

16       Now their claims aren't $80 million, but they're not

17 chump change either.  So there's at least 14 creditors that

18 support this settlement.  And I think we can assume that the

19 vast majority of the creditors that haven't appeared or filed a

20 single page objection, well, maybe they don't support the

21 settlement, they don't oppose it.

22       I do more Chapter 11 as Your Honor knows, and we know

23 how voting on the Chapter 11 plan goes.  Just the size of claim

24 matters, but so do does numerosity.  And at least in this

25 country, part of what I love about it is that you can be a

212

1    small little guy or the richest guy in the world and when you

2    come to court, your rights are the same.

3            So let's dispel the notion that the overwhelming

4    majority of creditors oppose this.  The two biggest creditors

5    do, and Mr. Seidel takes that very seriously.  And, again, it

6    pains him, it pains him not only to litigate against them but

7    then to have them suggest any kind of ill motive on his part

8    like self-enrichment.  It pains him.  But they're not the

9    overwhelming majority of creditors.

10            Equity.  Counsel spoke very eloquently about equity,

11   and I happen to be a little bit of a historian.  I won't bore

12   the Court but equity started about 100 B.C. in the Roman

13   Republic because some guy --

14            THE COURT:  That's exactly where my law school

15   professor started it.

16            MR. RUKAVINA:  There you go.

17            THE COURT:  We did that for three weeks, but

18   whatever.

19        (Laughter)

20            THE COURT:  If you're going to tell me about the

21   Roman 12 tables --

22            MR. RUKAVINA:  No, no, no.

23            THE COURT:  -- we're going to take a recess.

24            MR. RUKAVINA:  No, no, no, no.  I'm just going to

25   tell you that it started because the details are murky, some

1  guy forgot to slaughter a cow on a particular day and,

2  therefore, was an insult to God and he was taken for execution.

3  And the tribune said, well, why did you forget to slaughter it.

4  Oh, because I was passed out in a coma.

5       So equity began, as we all know, to avoid unjust

6  consequences from hypertechnicalities.  And thank God we have

7  both a court of equity and a court of law.  There's a reason

8  why the English common law was severe and why we changed that.

9       While we're talking about equity, I understand the

10  creditors are saying that they're getting nothing out of this.

11  I understand that.  Again, as someone that works for Trustees

12  and works for debtors in possession, it's my job to get

13  creditors paid.  But it's not fair to suggest that we're

14  getting nothing out of this because of the Trustee's decision.

15       None of these funds, including the 540, would have

16  been theirs, right.  All of those funds were bondholder

17  collateral.  It goes back to something that Mr. Clarke said.

18  The Bondholders are the only ones that have been harmed here.

19  The Trustee has to take that into account.  And I suspect that

20  the Court will take that into account here.

21       Yes, there were $540,000 in monthly payments over the

22  course of more than a year that went to service Genesis, and

23  that's despicable for many reasons.  If those payments had not

24  been made, there would have been $540,000 more in the bank that

25  would have been swept by the Bondholders when pre-petition they

1  swept all funds.  So this is not -- this is perhaps where there

2  is some wisdom in those opinions that limit 548 free and clear

3  assets even though I once again respectfully say that I

4  disagree of those opinions.  I understand the wisdom of that.

5           So, again, it hurts Mr. Seidel.  It hurs me that

6  we're not returning seven figures to the creditors at this

7  time, our two best -- I'm sorry, our two biggest creditors and

8  lawyers that we think very highly of and talk to multiple times

9  a day and might even have a drink with every now and then.  It

10 hurts us that we're not giving them seven figures, but they

11 wouldn't have gotten anything anyway from this.  It's the

12 Bondholders that were injured.

13          And, finally, on this notion of good lawyers, et

14 cetera, there's no reason to be ascribing any kind of negative

15 intent on anyone here.  Now there's a suggestion that perhaps

16 the surcharge was to arm us to go fight against FedEx.  I would

17 ask the Court to just look at a few exhibits, please, during

18 their FedEx exhibits starting at 44.

19          And as Your Honor looks at these exhibits, Your Honor

20 will see that this was a multi-week investigation, multi-week

21 negotiation.  There was no rush, there was no rush to a

22 negotiation here.  But if Your Honor would look at Exhibit 44,

23 this is some of my communications with Mr. Schaffer.

24          "It's time to cut a deal on the surcharge.

25 Otherwise, the Trustee will not agree to pay the funds over to

1    you until the Court decides that issue.  We claim the surcharge

2    for work that we had done, work that we had done during the

3    conversion hearing.  We needed a surcharge to arm ourselves.

4    And we were going to have the Court decide the amount of our

5    surcharge" -- it's okay, Your Honor, you can look at it online

6    here.

7            THE COURT:  Thank you.  Oh, thank you.

8            MR. RUKAVINA:  Mr. Guffy's good enough to --

9            THE COURT:  Thank you, Mr. Guffy.

10           MR. RUKAVINA:  The issue was very simple.  We were

11   going to do the deal without the surcharge and let the Court,

12   you, decide what the amount of that surcharge should be.

13           And this was where I told you, and I think the

14   Trustee testified, when Mr. Silverstein finally said in words

15   that I shouldn't repeat in court, come on, Davor, tell me how

16   you got to 100, I said, well, okay, okay, Paul, I'm not really

17   at 100.  I'm at 20 or 30.  He called my bluff.  That's how the

18   100,000 was reached.

19           Now if you'll go to Exhibit 50, please, Mr. Guffy,

20   Exhibit 50, Your Honor is interesting.  You have to -- I'm

21   sorry, not 50.  Not 50.  Go to 57.  And you have to go to

22   Prosperity 1111.  It's several pages in there.  1111.  Let me

23   know when you're there.

24           Okay, right there.  Right there.  Please stop right

25   there, Mr. Guffy.

1          This is an email from me to Mr. Schaffer and

2    Mr. Silverstein and Mr. Guffy.  Please -- no, you have to stop

3    there, Mr. Guffy.  Just stop it there.

4          It says, "Attached are the documents as filed.  Note

5    the Court set the hearing for April 19th and not the 18th, but

6    I doubt that this will catch an objection."  Then I make a joke

7    at Paul's expense.

8          Why would I be thinking that there's no objection

9    that's going to be filed to this, yet Mr. Silverstein is

10   greasing the wheels to the tune of 100 to arm us to litigate

11   against FedEx?  I would have said, We're going to have the

12   mother of all battles on this 9019.  I need your money to fight

13   it.  This is the best evidence that at least the Trustee and I

14   did not think that this was going to catch an objection

15   because, again, we looked at the perfection issue.  That's

16   where the Trustee, as we said, paused the proceedings when

17   highly capable lawyers said, wait, Scott, you're getting it

18   wrong.

19         And go to Exhibit 65, please, Mr. Guffy.

20         While we're talking about this surcharge issue --

21   zoom in, please.  Thank you.

22         As Your Honor looks at these exhibits, Your Honor,

23   will see multiple emails going back and forth between

24   Mr. Silverstein and Mr. Seidel and Mr. Silverstein and me.  You

25   will see that it's a contentious relationship, okay.  I like

1 Mr. Silverstein, but he's kind of a tough guy and I'm kind of a

2 tough guy.  I have to be very nice and polite to him because I

3 want his surcharge money.  So you'll see some in here where I

4 tell him, you know, I'm not going to ratify his assumptions, et

5 cetera.

6          But this is another interesting little email.  Here

7 is Mr. Silverstein again ascribing motives to the Trustee, et

8 cetera, et cetera, and I have to tell him Scott takes offense

9 at that email below.  It's out of line, is discoverable, and

10 reeks of trying to put the Trustee on unfair weight.  This

11 needs to stop.  We're not (indiscernible) silvers.  We're not

12 doing his bidding for $100,000 for 16 pieces of silver,

13 whatever it was.  We're arguing with him, and we're getting

14 more money from him.

15          Second, if the Bondholders are willing to up the

16 agreed surcharge to 250, we'll proceed.  The added funds take

17 into account risk, added work by the Trustee, and the need to

18 pay Schneider to get him -- I say his -- to get him involved.

19 The surcharge again is to arm the estate with badly needed free

20 and clear money.  Right now at this point in time, a year into

21 this case, we do not yet know if we have any free and clear

22 money.  We think we do, but the Bondholders are going to

23 disagree and eventually that will have to be either resolved by

24 the Court or by agreement.

25          We have many defendants.  We have insurance carriers.

1  We have not a penny from which to pay Mr. Schneider on an

2  interim basis or to me.  That's not true.  I shouldn't say

3  that.  We hold a small retainer that the Trustee was able to

4  give us from GNET ATC.  I don't want to mislead the Court, and

5  we'll supplement our 2016 disclosures at the appropriate time.

6         So I don't want to mislead the Court.  We do have a

7  little bit of a retainer.  Other than that, there's not a

8  dollar of free and clear money in this case.  Maybe there's

9  500,000, maybe the money from AMRR will be resolved, maybe the

10 Court will find that it's free and clear.  That's the purpose

11 of the surcharge, not to fight them but to arm the estate.

12        And, finally, Your Honor, if the Court denies this

13 motion, the Trustee will sue.  There's no need to let FedEx do

14 that.  The Trustee will sue.  I will do my best.  I will be up

15 here pounding the table.  I will do my best.  We think we're

16 going to lose on the perfection issue.  You've heard why.  We

17 think we're going to lose on the 4.4 issue.  I guess

18 Prosperity, you've heard why because they put the money back.

19 We think we're going to win on the $540,000 issue.  Then Your

20 Honor will approve my fees, hopefully, years later in the

21 amount of 200, 250.  And it will be net free 50 that we're

22 getting today.

23        Thank you.

24        THE COURT:  Thank you, Mr. Rukavina.

25        All right.  Thank you all for your arguments.  I had

1 no doubt it would be -- oh, Mr. Clarke?

2        MR. CLARKE:  I just -- I apologize.  I just wanted to

3 respond to one thing or two things, rather if I may.  I know I

4 got up to take a break.  Your Honor, do you need a minute?

5        THE COURT:  No, I don't.

6        MR. CLARKE:  Okay.  All right.

7        First, during Mr. Langley's argument, an example from

8 the comments of the UCC came up and if I saw that correctly, it

9 dealt with a fact pattern where there is a Bank A and a Bank B.

10 We don't have that here.  We have one bank.  It was party to a

11 control agreement with the collateral agent for the Bondholders

12 that specifically governs, and so there's no need to go to

13 9-327 to figure out the right and priority of their lien.

14 Section 5 of our DACA says it expressly that our lien is

15 senior.

16        And just as to the allegation that everything in this

17 estate was stolen from FedEx, there's nothing in evidence on

18 that today.  You heard an argument that this settlement should

19 be denied because FedEx thinks Mr. Seidel hasn't investigated

20 that.  That strikes us as pretty remarkable that they think

21 Mr. Seidel has to do their in investigation on their

22 allegation.

23        They're alleging, a big public company, that the

24 Goodmans stole $80 million from them.  That's an incredible

25 allegation.  And they had months to do discovery of Prosperity

1  to trace very single dollar that went into all the operating

2  accounts that would flow through every account subject to a

3  DACA and make a tracing argument.  They didn't do that.

4        The one statement we looked at yesterday showed that

5  the funds that went into the 3992 account went in the day

6  before anything from the 4352 account flowed through -- and I'm

7  getting the numbers wrong, but the account from which the 3992

8  account was funded.

9        And that's all, Your Honor, unless you have any

10  questions.

11        THE COURT:  No.  Thank you, Mr. Clarke.

12        All right.  Just give me one moment.

13        I'm going to take the matter under advisement.  I

14  think that, picking up on what Mr. Muenker said, this is not a

15  melting ice cube.  I mean the money is in a legal hold account

16  at this juncture.  I think the parties have given the Court a

17  lot to think about.

18        There is something to be said of essentially facts

19  coming out in the midst of a hearing.  This isn't -- I'll date

20  myself.  This isn't Perry Mason.  you don't get the "gotcha"

21  and "aha" moments very often in court, but there were new facts

22  that came out.  I trust the Trustee and found the Trustee's

23  testimony credible when he says, well, at the end of the day,

24  facts did come out from March till now, but they haven't

25  changed my mind.

221

1          And I do believe each party, the Bondholders and the

2   Trustee on this side and the Objecting Creditors on this side,

3   in the depths of their beliefs, okay, of how much each party

4   believes that they're right.  And there is something to be said

5   I guess on both sides, depending on how you flip the coin of

6   whether that means, aha, it means it's right for a compromise

7   or it means that you shouldn't summarily decide it.

8          And so, like I said, there's a lot for the Court to

9   think about.  And so I will take the matter under advisement.

10  I cannot encourage the parties enough to continue talking while

11  the Court has this under advisement.  I think there are very

12  obvious areas where the parties could compromise here.  I think

13  that despite us being in this case, oh gosh, I've lost my

14  docket but for it feels like a year, I think it's over a year

15  because I think we started in September maybe, of 2021 maybe.

16          Yes.  Excuse me.

17          UNIDENTIFIED SPEAKER:  August.

18          UNIDENTIFIED SPEAKER:  September 22.

19          THE COURT:  There we go, September 22, exactly.

20          So we've been in this over a year.  And, from the

21  Court's perspective, we've only touched upon the motions that

22  the Trustee has brought to date, many of which are in the guise

23  of settlement.  And we had a lot of things status

24  conference-wise that came at the Court as part of the motion to

25  convert proceedings.

1    And so I know that there is a lot to unpack from the

2 Trustee's perspective and how that impacts the Bondholders on

3 one side and their liens, the unsecured creditors on their side

4 including FedEx and its arguments for a constructive trust and

5 things of that nature.  There's a lot to unpack there.

6    But I'll say what I said in connection with the AMRR

7 settlement.  At some point, I really do believe that folks need

8 to be rowing in the same direction because pointing your

9 fingers at one another probably doesn't bring a lot of good to

10 the entirety of the estate.  This particular litigation I can

11 only assume has cost the estate and the various creditor

12 constituencies hundreds of thousands of dollars.

13    And do I believe that what the Trustee has brought me

14 is the best recovery possible?  No, I don't.  I don't.  But at

15 the same time, it is a hard-fought settlement.  So I'm going to

16 encourage the parties to keep talking.  And I want all the

17 parties to be reasonable, but at the same time, I think that

18 the bigger picture here can't be lost which is each of you

19 creditors fought to have this case put into a Chapter 7.  You

20 won.  It's in a Chapter 7, okay, and you knew when you did that

21 because you're all incredibly sophisticated parties and

22 counsel, and you knew when you did that that you'd have a

23 Chapter 7 Trustee.

24    And at this point, from what I can see with the

25 exception of a motion to pay mediation costs in the tune of

223

1  $7,000, every other thing has been fought.  Every other thing.

2  So, again, I'm going to encourage the parties to talk.  If not,

3  I'll make the tough decisions.  It's why I make all this money

4  being a judge.

5        But I encourage the parties to talk because I believe

6  that reaching a settlement might be the bigger ointment for

7  what's going wrong in this case thus far, which is the ability

8  to reach reasonable settlements with the major constituencies,

9  the three biggest creditors in this case, may be what you need,

10  to coin Mr. Rukavina, to go and fight the bad guys because

11  there's insurance proceeds out there, there's some really

12  questionable transfers.

13        I mean I've only seen the top of them, okay.  But

14  just watching the money flow around these bank accounts, at one

15  time before I was rolling in the dough up here, I did this

16  litigation so I understand.  I can see it.  I see what the

17  parties see.  But I also think that at some point the parties

18  have to get on the same page.

19        So I will delve head first into 9019 and I think that

20  there is no choice but for me to delve head first into the UCC

21  which I'm very angry about with all of you.  I've been offered

22  the opportunity to teach a secured transactions class, and I

23  was like, nope, took it once, I'm all good.

24        But, no, I'm kidding with you guys.  I'll delve

25  first, like I said, into 9019, to the UCC, and to your cases

224

1   and take a hard look at the evidence.  But I encourage the

2   parties to talk while I have it under advisement.  And, if

3   anything, in terms of a resolution is reached and an agreed

4   order can be entered into, just alert the Court.

5         All right.  With that, the Court will stand adjourned

6   for the day, and I'll be on the bench for a minute cleaning up,

7   so you guys feel free.

8         UNIDENTIFIED COUNSEL:  Thank you, Your Honor.

9         THE CLERK:  All rise.

10      (Proceedings concluded at 3:58 p.m.)

11                    * * * * *

12

13

14

15             **C E R T I F I C A T I O N**

16         I, DIPTI PATEL, court approved transcriber, certify

17  that the foregoing is a correct transcript from the official

18  electronic sound recording of the proceedings in the above-

19  entitled matter, and to the best of my ability.

20

21

22  _____

23  DIPTI PATEL, CET-997

24  LIBERTY TRANSCRIPTS              DATE: October 16, 2023

25

**WWW.LIBERTYTRANSCRIPTS.COM**