# **EXHIBIT A**

**Complaint**

DMS 304504210

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| FEDEX SUPPLY CHAIN LOGISTICS & ELECTRONICS, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | |
| JAMES E. GOODMAN, JR., JOHN GOODMAN, JONATHAN GOODMAN, JAKE GOODMAN, JOSEPH "JODY" GOODMAN, JAMES FRINZI, SHALOM AUERBACH, NEIL AUERBACH, STEVEN ZAKHARYAYEV, EVALINA PINKHASOVA, GENESIS NETWORKS TELECOM SERVICES, LLC, GNET ATC, LLC, GREATER TECH HOLDINGS, INC. f/k/a GOODMAN TELECOM HOLDINGS, LLC, GOODMAN INVESTMENT HOLDINGS, LLC, UNIFIED FIELD SERVICES, INC., AMERICAN METALS RECOVERY AND RECYCLING, INC. a/k/a MBG HOLDINGS, INC., MULTIBAND FIELD SERVICES, INC., HSB HOLDINGS, LLC f/k/a MULTIBAND GLOBAL RESOURCES, LLC, AMR RESOURCES, LLC, HUDSON CLEAN ENERGY ENTERPRISES, LLC, 18920 NW 11th, LLC, PROSPERITY BANCSHARES, INC., THE FRINZI FAMILY TRUST, ALLIANCE TEXAS HOLDINGS, LLC, AUERBACH PARTNERS, LP, and ONEPATH SYSTEMS, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 3:23-cv-02397 |
| Defendants. | ) ) | |

## COMPLAINT

Comes now FedEx Supply Chain Logistics & Electronics, Inc., a Delaware corporation, ("Plaintiff" or "FSCLE") and for its complaint against James E. Goodman, Jr. ("James Goodman"), John Goodman, Jonathan Goodman, Jake Goodman, Joseph Goodman ("Jody Goodman"), James Frinzi ("Jim Frinzi" or "Frinzi"), Shalom Auerbach, Neil Auerbach, Steven Zakharyayev, Evalina Pinkhasova, Genesis Networks Telecom Services, LLC ("Genesis-ATC"), GNET ATC, LLC ("GNET ATC"), Goodman Investment Holdings, LLC ("GIH"), Greater Tech Holdings, Inc. f/k/a Goodman Telecom Holdings, LLC ("GTH"), Unified Field Services, Inc. ("UFS"), American Metals Recovery and Recycling, Inc.  a/k/a MBG Holdings, Inc. ("AMRR" or "MBG"), Multiband Field Services, Inc. ("MFS"), HSB Holdings, LLC f/k/a Multiband Global Resources , LLC ("Multiband Global"), AMR Resources, LLC ("AMR Resources"), Hudson Clean Energy Enterprises, Inc. ("Hudson"), 18920 NW 11th, LLC ("18920 NW"), Prosperity Bancshares, Inc. ("Prosperity Bank"), the Frinzi Family Trust ("Frinzi Trust"), Alliance Texas Holdings, LLC ("Alliance Texas"), Auerbach Partners LP ("Auerbach Partners") and OnePath Systems, LLC ("OnePath") states as follows:

## NATURE OF THE ACTION

1. This case concerns a protracted and multi-faceted scheme to defraud FSCLE of more than eighty million dollars ($80,000,000) and then to launder that stolen money through a series of fraudulent commercial transactions by which the named Defendants benefited and/or participated in significant ways.

2. In 2015, FedEx Corporation purchased a company named GENCO Distribution System, Inc. ("Genco").

3. A GENCO subsidiary[1] was a party to a Master Services Agreement with Genesis Networks Telecom Services, LLC ("Genesis-ATC") and later Goodman Networks, Inc. ("Goodman Networks") to service certain logistics needs related to AT&T.

4. Under the Master Services Agreement, FSCLE would pre-purchase inventory of mobile device accessories from AT&T or its suppliers, Genesis-ATC/Goodman Networks would receive the pre-purchased inventory and provide contract labor and logistics services. Genesis-ATC/Goodman Networks would resale the inventory to AT&T or an end-purchaser on behalf of FSCLE, send FSCLE the original pre-purchase amount less .02% as compensation for the services provided.

5. Under this process, millions of dollars per month would flow from FSCLE to Genesis-ATC/Goodman Networks and a nearly identical amount (less .02%) would flow back to FSCLE.[2]

6. This process of orders and flow of funds was automated in late 2020 whereby payments from FSCLE to Genesis-ATC/Goodman Networks went from a FSCLE bank located in Pennsylvania to a Genesis-ATC account at the Bank of San Antonio in Texas and then to a Goodman Networks bank account at Prosperity Bank in Texas (the "4352 Account").

7. The Goodman Networks 4352 Account only received funds from FSCLE and was established specifically for the purpose of facilitating the automated transfer of funds between FSCLE and one or more of the Goodman controlled entities.

8. The orders for mobile device accessories and related services were also automated in a Microsoft Dynamics 365 software database whereby the communications between

---

[1] The referenced subsidiary, ATC Logistics & Electronics, Inc., later became FedEx Supply Chain Logistics & Electronics, Inc.
[2] FSCLE also paid for pallet moves.

FSCLE and Genesis-ATC/Goodman Networks would flow back and forth between
Tennessee (where FSCLE is located), Pennsylvania (where the FSCLE Oracle cloud
operated) and Texas (where Genesis-ATC/Goodman Networks provided services and
were located).

9.  The automated service ordering and funding system worked as expected until November
2021.

10. In November 2021, Jim Frinzi, James Goodman and others made the decision to
unilaterally disrupt the automated funds transfer to FSCLE but did not alert FSCLE to
that fact.  Rather, Goodman Networks/GNET ATC continued to send invoices to FSCLE
and receive funds from FSCLE after the decision was made not to transfer FSCLE any
further sums under the Master Services Agreement.

11. That decision caused the 4352 Account at Prosperity Bank to swell with tens of millions
coming into the account without payments being processed back to FSCLE.

12. In November 2021, FSCLE asked Goodman Networks why transfers back to FSCLE
were interrupted and demanded payment.

13. Frinzi and others directed Goodman Networks/GNET ATC employees to hide the true
motivations for the disruption and instead to tell FSCLE that Goodman Networks/GNET
ATC would soon be migrating off the Microsoft Dynamics platform and needed to
transition to a new platform to continue to do business with FSCLE.  FSCLE cooperated
with the migration to a new platform completing that transition work by February 15,
2022 only to discover that the tens of millions of FSCLE dollars had been stolen.

14. Unknown to FSCLE, Genesis-ATC/Goodman Networks and AT&T began to have a falling out in late 2018 that culminated in AT&T filing a multi-million-dollar arbitration against Genesis-ATC in February 2020.

15.  AT&T obtained an arbitration award against Genesis ATC on November 18, 2020 and started the eventual wind down of that business relationship.

16. Facing the loss of its most significant customer and unknown to FSCLE, James Goodman, John Goodman, Jason Goodman, Jody Goodman, Jonathan Goodman, Jim Frinzi and those associated with them began a process to try to take as much as they could from the Genesis ATC/Goodman Networks group of companies before a possible bankruptcy.

17. Between June 2020 and December 2020, Genesis-ATC approached FSCLE about transitioning from Genesis-ATC to Goodman Networks.  Genesis-ATC represented to FSCLE that this would only be a name change for their entity and that there would otherwise be a continuity of business. None of the problems with AT&T were disclosed.

18. The challenges the Goodmans had with AT&T spread from Genesis-ATC to Goodman Networks.

19. In 2020, Goodman Networks, then controlled by John Goodman, caused its two primary businesses to be transferred to entities also controlled by John Goodman, which entities later became GTH, pursuant to a non-competitive sale agreement. This transaction permitted John Goodman to strip significant portions of the value of Goodman Networks out of Goodman Networks and further left Goodman Networks with dwindling capital and revenues to pay its debts in the ordinary course.

20. In June 2021, Goodman Networks, then controlled by James Goodman, caused its last significant business unit to be transferred to UFS, which was also controlled by James Goodman, pursuant to a non-competitive sale agreement. This transaction permitted James Goodman to strip significant value out of Goodman Networks and further left Goodman Networks with an eventual inability to pay its debts in the ordinary course.

21. In October 2021, Genesis-ATC, controlled by James Goodman, caused its business assets to be transferred to GIH and Endeavor Managed Systems, Inc. ("Endeavor") both of which are owned and controlled in substantial part by James Goodman.

22. By October 2021, AT&T had terminated its business with Genesis-ATC, Goodman Networks, and related Goodman companies.

23. By November 2021, Goodman Networks and related companies stopped making contractually required fund transfers to FSCLE but did not notify FSCLE of that decision, the sale and transfer of the various Goodman controlled companies or the AT&T fallout. Instead, Defendants blamed delays in payments on system issues and a turnover in personnel. Further, Jim Frinzi and others discussed that it would be better for them to let the FSCLE funds build up in the 4352 Account than to inform FSCLE and turn off the automated processes.

24. On November 23, 2021, Jim Frinzi authored a memo in which he stated, "Goodman Networks Incorporated (the 'Company') no longer has any remaining revenue source. At this point in time, a Shareholder's Meeting will be requested to dissolve the Company. Further information on this topic will be sent out at a later date." This memo was not sent to FSCLE and the substance of it was affirmatively hidden from FSCLE.

25. Between December 2021 and June 2022, Jim Frinzi, James Goodman, Shalom Auerbach, Neil Auerbach, Steven Zakharyayev and Evalina Pinkhasova entered into a number of fraudulent transactions by which approximately $80,000,000 in FSCLE money sitting in the 4352 Account at Prosperity Bank was stolen and then used to finance a number of fraudulent transactions designed to launder the $80,000,000 for the benefit of the Defendants in this case.

26. Those fraudulent transactions include but are not limited to:

   a. In excess of $44 million in stolen FSCLE funds from the 4352 Account were used to "purchase" and capitalize AMRR which as of late 2021 was worth only $138.00. AMRR then used the stolen cash to purchase AMR Resources from OnePath Systems for $40.4 million when the true value of AMR Resources was significantly less.  The excess appears to have found its way to other Defendants.  AMRR also issued a note for $44 million on "debt" that it did not owe and never intended to pay.   The beneficiaries of this scheme include but are not limited to: Jim Frinzi, The Frinzi Family Trust, James Goodman, Shalom Auerbach, Steven Zakharyayev and Evalina Pinkhasova;

   b. At least $14.5 million in stolen FSCLE funds from the 4352 Account were used to purchase otherwise worthless preferred stock that James Goodman and John Goodman owned in Goodman Networks. The beneficiaries of this scheme include but are not limited to James Goodman, John Goodman, Jim Frinzi, Shalom Auerbach, Steven Zakharyayev and Evalina Pinkhasova;

   c. At least $17.5 million in stolen FSCLE funds from the 4352 Account were used to acquire Goodman Networks bonds through Hudson.  The beneficiaries of this scheme

include but are not limited to James Goodman, Jim, Frinzi, Shalom Auerbach, and

Neil Auerbach; and

d.   Payment of "severance", "benefits" and "consulting agreements" with stolen FSCLE

funds out of the 4352 Account allegedly for Goodman Networks after it ceased to

function as a business for the benefit of Jim Frinzi, James Goodman, Jonathan

Goodman, Jody Goodman, Jason Goodman, Jake Goodman and others.

27. Prosperity Bank played a central role in this scheme as it conspired with Jim Frinzi and

James Goodman to falsify and/or accept falsified corporate documents for Goodman

Networks which in turn allowed Frinzi and others to access funds in the 4352 Account

and transfer those funds to entities and persons other than FSCLE with actual or

constructive knowledge that Goodman Networks had ceased to exist and/or was defunct.

Prosperity Bank took these actions because it wanted to continue to do business with the

Goodmans, Frinzi and others in the businesses and enterprises the stolen FSCLE money

was direct to and because some of the FSCLE stolen money was used to pay off loans

that one or more Goodmans or Goodman controlled companies owed to Prosperity Bank.

Thus, Prosperity Bank directly benefited from the theft and the schemes to steal FSCLE

money and launder it through various fraudulent commercial transactions.

28. This theft and laundering of the stolen funds continue today as the Defendants continue to

wash the stolen money through various commercial entities including but not limited to

the named Defendants.

## **PARTIES**

29.  FSCLE is a Delaware Corporation with its principal place of business located in

Memphis, Tennessee.

30.  James Goodman is a citizen of Texas and may be served at 103 Tomahawk Trail, San Antonio, TX 78232.

31.  John Goodman is a citizen of Texas and may be served at 1008 Middle Creek Road, Fredericksburg, TX 78624.

32.  Jonathan E. Goodman is a citizen of Texas and may be served at 137 Eagle Landing Drive, Belton, TX 76513.

33.  Jake Goodman is a citizen of Texas and may be served at 103 Crest Trail, San Antonio, TX 78232.

34.  Joseph "Jody" Goodman is a citizen of Texas and may be served at 37 Old Fredericksburg Road, Boerne, TX 78015.

35.  James "Jim" Frinzi is a citizen of Texas and may be served at 200 N. Cuernavaca Drive, Austin, TX 78746.

36.  Shalom Auerbach is a citizen of New York and may be served at 15 Langeries Drive, Monsey, NY 10952.

37.  Neil Auerbach is a citizen of New York and may be served at 50 Lawrence Avenue, Lawrence, NY 11559.

38.  Steven Zakharyayev is a citizen of both Florida and New Jersey and may be served at either 1111 Bickell Bay Drive, Miami, FL 33131 or 43 W. Canadian Woods Road, Marlboro, NJ 67746.

39.  Evalina Pinkhasova is a citizen of New Jersey and may be served at 43 W. Canadian Woods Road, Marlboro, NJ 67746.

40.  Genesis Networks Telecom Services, LLC d/b/a Genesis-ATC is a Texas limited liability company whose members are upon information and belief all residents of Texas.  Its

principal place of business is 1354 N. Loop 1604, Ste. 103, San Antonio, TX 78232.

Genesis-ATC may be served through its registered agent for service of process:  Capitol

Corporate Services, 1501 S. Mopar Expressway, Ste. 220, Austin, TX 78746.

41. GNET ATC, LLC is a Texas limited liability company whose members are upon

information and belief all residents of Texas.  It is 100% owned by Goodman Networks,

a Texas corporation.  Its principal place of business is located at 2801 Network Blvd.,

Ste. 300, Frisco, TX 75034.  GNET ATC may be served through its registered agent for

service of process:  Capitol Corporate Services, 1501 S. Mopar Expressway, Ste. 220,

Austin, TX 78746.

42. Greater Tech Holdings, Inc., is a Texas corporation.  Its principal place of business is 103

Industrial Loop Road, Ste. 1100, Fredericksburg, TX 78624. GTH may be served through

its registered agent for service of process:  Capitol Corporate Services, 1501 S. Mopar

Expressway, Ste. 220, Austin, TX 78746.

43. Goodman Investment Holdings, LLC is a Texas limited liability company whose

members are upon information and belief all are residents of Texas and South Dakota.  Its

principal place of business is 1354 N. Loop 1604, Ste. 103, San Antonio, TX 78232. GIH

may be served through its registered agent for service of process:  Capitol Corporate

Services, 1501 S. Mopar Expressway, Ste. 220, Austin, TX 78746.  GIH also operates

under the name Symbiont Investments.

44. Unified Field Services, Inc. is a Texas corporation. Its principal place of business is 1354

N. Loop 1604, Ste. 103, San Antonio, TX 78232.  UFS may be served through its

registered agent for service of process:  Capitol Corporate Services, 1501 S. Mopar

Expressway, Ste. 220, Austin, TX 78746.

45. American Metals Recovery and Recycling, Inc. now known as MBG Holdings, Inc. is a Nevada corporation.  Its principal place of business is located at 4301 Westbank Drive, Ste. B-110, Austin, TX 78746.  This corporation may be served through its registered agent for service of process:  Corporation Service Company, 211 E. 7th Street, Ste. 620, Austin, TX 78701.

46. Multiband Field Services, Inc. is a Delaware corporation whose principal place of business was at all relevant times to this lawsuit located at 2801 Network Blvd., Ste. 300, Frisco, TX 75034 and is now located at 5605 Green Circle Drive, Minnetonka, MN 55343.  MFS may be served through its registered agent for service of process:  Capitol Corporate Services, 1501 S. Mopar Expressway, Ste. 220, Austin, TX 78746.

47. HSB Holdings, LLC, f/k/a Multiband Global Resources, LLC, is a Delaware limited liability company whose member is a citizen of Texas and its principal place of business is 2603 DeSoto Dr., Austin, TX 78733. Multiband Global may be served through its registered agent for service of process: Agents and Corporations, Inc., 1201 Orange St., Ste 600, One Commerce Center, Wilmington, DE 19801.

48. AMR Resources is a Delaware limited liability company, which is owned 100% by AMRR. Its principal place of business is 110 Allgood Industrial Ct, Marietta, GA, 30066. It may be served through its registered agent for service of process: Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, GA 30092.

49. Hudson Clean Energy Enterprises, LLC is a Delaware limited liability company whose members are upon information and belief citizens of New York and Florida.  Upon information and belief, its principal place of business is 333 SE 2nd Ave., Ste. 3410,

Miami, FL 33131.  Hudson may be served through its registered agent for service of process:  Cogency Global, Inc. 850 New Burton Road, Ste. 201, Dover, DE 19904.

50. Auerbach Partners, LP is a Delaware limited partnership whose partners are, upon information and belief, citizens of New York and Florida.  Upon information and belief, its principal place of business is 333 SE 2nd Ave., Ste. 3410, Miami, FL 33131.  Auerbach Partners may be served through its registered agent for service of process:  Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

51. 18920 NW 11th LLC is a Florida limited liability company whose members are, upon information and belief, residents of New Jersey and/or New York.  Its principal place of business was located at 2719 Hollywood Blvd, Hollywood, FL 33020.  18920 NW may be served through its registered agent for service of process:  Evalina Pinkhasova at 43 W. Canadian Woods Road, Marlboro, NJ 67746.

52. Prosperity Bancshares, Inc. d/b/a Prosperity Bank is a Texas corporation.  Its principal place of business is 4295 San Felipe, Houston, TX 77027.  Prosperity Bancshares may be served through its registered agent for service of process:  Charlotte M. Rasche, 80 Sugar Creek Center Blvd., Sugar Land, TX 77478.

53. Frinzi Family Trust is upon information and belief a Texas trust.  Upon information and belief, its Trustee is Jim Frinzi.  The trust may be served at 200 N. Cuernavaca Dr., Austin, TX 78746.

54. Alliance Texas Holdings, LLC was a Florida limited liability corporation whose members are, upon information and belief, residents of New Jersey and/or Florida.  Its principal place of business is believed to have been 8 South Main Street, P.O. Box 342, Marlboro, NJ 07446.  Alliance Texas Holdings, LLC may be served through its registered agent for

the service of process:  Steven Zakharyayez, 43 W. Canadian Woods Road, Marlboro, NJ

67746.  The Florida Secretary of State administratively dissolved Alliance Texas

Holdings, LLC on September 23, 2023.

55. OnePath Systems, LLC is a Georgia limited liability company whose members are, upon

information and belief, citizens of Georgia and Texas.  It's principal place of business is

1765 W. Oak Parkway, Ste. 500, Marietta, GA 30062.  OnePath may be served through

its registered agent for service of process:  the Corporation Service Company, 211 E. 7th

Street, Ste. 620, Austin, TX 87801.

## JURISDICTION AND VENUE

56. The jurisdiction of this Court is founded upon federal question jurisdiction.  28 U.S.C. §

1331.  The federal statute at issue in this case is the Racketeer Influenced and Corrupt

Organizations Act 18 U.S.C. § 1961 et seq. and specifically 18 U.S.C. § 1964.

57. The Court further has supplemental jurisdiction over the state law claims brought herein

pursuant to 28 U.S.C. § 1367.

58. Venue is appropriate in this district pursuant to 28 U.S.C. § 1391 (b)(2) and (3) and 18

U.S.C. § 1965 (a), (b) and (d).  A substantial part of the events giving rise to this case

occurred in this district.  The underlying Master Services Agreement which provided the

means to steal tens of millions of dollars from FSCLE was performed in this district by

one or more companies located in this district.  The bank account into which the FSCLE

funds were deposited and then stolen was located in this district.  Three of the

Defendants, GNET ATC, MFS and UFS are located or were located in this district.  It is

alleged that the Defendants were part of a RICO enterprise and conspiracy to first steal

the funds from FSCLE specifically from a bank account located in this district and then

to launder the stolen funds through a series of fraudulent transactions and shell

companies benefiting the Defendants. It is further alleged that the Defendants were part

of a RICO enterprise and conspiracy that involve acts of fraud connected with a

bankruptcy case located within this district. There is no one district in which every

Defendant involved in this enterprise could be brought through ordinary jurisdictional

and venue processes.  Therefore, FSCLE pleads nationwide service of process under the

RICO statutes.  18 U.S.C. § 1965.

## BACKGROUND AND FACTS

### The Master Services Agreement

59. January 20, 2014, Genesis-ATC and ATC Logistics & Electronics, Inc. ("ATC Logistics')
    entered into the Master Services Agreement at issue in this matter. A true and correct copy
    of the Master Services Agreement is attached hereto as Exhibit A.

60. Also, on January 20, 2014, Genesis-ATC and ATC Logistics entered into a Statement of
    Work, which detailed the scope of services to be provided under the Master Services
    Agreement. A true and correct copy of the Statement of Work is attached hereto as Exhibit
    B.

61. On July 30, 2015, FedEx Corp. acquired GENCO which owned ATC Logistics.

62. After the FedEx acquisition of GENCO, ATC Logistics was renamed FSCLE.

63. Thus, FSCLE acquired the Master Services Agreement through acquisition of GENCO.

64. Genesis-ATC and Goodman Networks through their longstanding relationship with
    AT&T, Inc. and AT&T Services, Inc. (together, "AT&T") have provided services to
    AT&T and a number of AT&T's suppliers and customers, including FSCLE.

**The AT&T Fallout Creates Financial Urgency on the Part of The Goodmans
and Companies Controlled by Them**

65. Unknown to FSCLE, Genesis-ATC and AT&T began to have a falling out in late 2018, when AT&T's supplier, Technicolor Connected Home USA, LLC ("Technicolor"), sued AT&T related to a supply arrangement that was contracted through Genesis-ATC.

66. Genesis-ATC had a longstanding commercial relationship with AT&T and Technicolor, which was the successor in interest to Cisco Systems, Inc., whereby, Technicolor would supply products and goods to AT&T through Genesis-ATC.

67. On or about December 10, 2018, a dispute arose between Technicolor and AT&T regarding AT&T's obligation to purchase products and goods from Technicolor through Genesis-ATC, and Technicolor commenced a lawsuit against AT&T in the Superior Court for Fulton County, Georgia, seeking damages in excess of $30 million.

68. On or about December 28, 2018, AT&T demanded Genesis-ATC indemnify it for the claims asserted by Technicolor, as the agreements memorializing the tri-party arrangement imposed an indemnity obligation on Genesis-ATC in favor of AT&T (the "AT&T Demand").

69. During 2019, Genesis-ATC began to materially alter its internal affairs to prepare for the day in which it had to pay the AT&T Demand. Paying the AT&T Demand or losing the AT&T business would put Genesis-ATC in danger of being insolvent. None of this was communicated to FSCLE.

70. On or about February 19, 2020, AT&T commenced an arbitration proceeding against Genesis-ATC regarding the AT&T Demand.

71. On or about November 18, 2020, AT&T was awarded approximately $12.3 million against Genesis-ATC related to the AT&T Demand (the "AT&T Arbitration Award") and begun to wind down its affairs with Genesis-ATC.  None of this was disclosed to FSCLE.

**The Goodmans Close Down Genesis-ATC and Goodman Networks**

72. In September 2019, James Goodman began to transition the business of Genesis-ATC to Goodman Networks owned and controlled by his brother John Goodman without notice to, or the consent of, FSCLE.

73. On September 14, 2019, Genesis-ATC entered into a non-competitive Asset Purchase Agreement to sell substantially all of its assets to Goodman Networks.  Goodman Networks purportedly assigned its rights in the Asset Purchase Agreement to GNET ATC. Again, neither of these transactions were disclosed to, or done with the consent of, FSCLE.

74. In June 2020, Goodman Networks, then controlled by John Goodman, caused its two primary businesses to be transferred to a newly formed John Goodman controlled entity called Goodman Telecom Holdings, LLC, which later was incorporated as GTH, pursuant to a non-competitive sale agreement.

75. On June 19, 2020, John Goodman emailed James Goodman in relation to restraints Goodman Networks' general counsel, Tony Rao, and officer, John Debus, were attempting to put on the sale and stated:

> . . . I really need your help. **I got ATC closed** and saw the stuff Tony and Debus were trying to sneak in on you. **This is a sneak tactic to try to prevent for (sic) being able to do what I want with the company to helm me and the family** as well as employees or other things. This is not something they should be approving or allowing. I PLEASE NEED YOUR HELP TO COMPELTELY TAKE THIS OUT. Goodman already has massive control to have to approve almost everything. You would never want this burden placed on you!! . . . **I also don't know why Godman (sic) would have to approve the sale of the business and the other things it is very very far reaching**. . . . PLEASE HELP ME WITH THIS . . .

(emphasis added).

76. After the sale of business assets to GTH. James Goodman exercised control over Goodman Networks.

77. At or about the same time as the sale to GTH, Genesis-ATC and Goodman Networks approached FSCLE about transitioning the Master Service Agreement from Genesis-ATC to Goodman Networks. Genesis-ATC and Goodman Networks affirmatively withheld from FSCLE information about the sale to GTH. Instead, they represented this as a name change only.

78. By December 4, 2020, FSCLE consented to the transition from Genesis-ATC to Goodman Networks completely unaware of the wider issues as described herein.

79. Funds received by Goodman Networks from FSCLE were made to the 4352 Account at Prosperity Bank which only held funds from FSCLE transferred pursuant to the Master Services Agreement.

80. In June 2021, Goodman Networks (James Goodman) caused significant business assets to be transferred to UFS, an affiliate of GNE (James Goodman), pursuant to another non-competitive sale agreement.  That transfer of business assets from Goodman Networks to UFS was finalized on September 11, 2021.

81. In August and September 2021, Goodman Networks began the process of requesting Prosperity Bank to change the names of the people who could control its bank accounts, including the 4352 Account.

82. Prosperity Bank asked for corporate bylaws and board resolutions supporting the requested changes.

83. Goodman Networks sent Prosperity Bank the 4th Amended Bylaws of Goodman Networks which required the consent of at least three board members to make such changes.

84. By October 2021, AT&T had terminated its business with Genesis-ATC (James Goodman), Goodman Networks (James Goodman and Jim Frinzi), and GNET ATC (James Goodman and Jim Frinzi).

85. On October 12 and 13, 2021, Jim Frinzi sent emails within Goodman Networks about a spin-off of significant portions of Goodman Networks business to either a new public company to be formed or GNET ATC including but not limited to the FSCLE business. Jason Goodman and Jody Goodman were copied on those emails in which Jim Frinzi said:

> Frontier and LSU can easily be managed as a small business. That is what's moving first. FedEx is going to be a lift, so we aren't doing that immediately. . . .
>
> The public company is taking FedEx, Frontier, LSU, and some cash in exchange for assuming the entire bond debt. We are going to leave ATC as a Goodman subsidiary until we know the overall workout situation. In the perfect world, we are going to have to come to agreements with all the OEMs, the new company will assume those debts, and we will move all of ATC to the new company. However, it is possible that we work something out with only some of the OEMs.

86. Neither Frinzi nor anyone associated with Genesis-ATC, Goodman Networks nor GNET ATC informed FSCLE that Goodman Networks was winding down and its assets being parceled out.

87. Meanwhile, the automated processes by which orders were invoiced to FSCLE and paid by FSCLE continued with millions being paid into the 4352 Account at Prosperity Bank.

88. On October 14, 2021, James Goodman (Genesis and Goodman Networks) met with Bater Bates (Prosperity Bank) and upon information and belief informed Bater Bates of the plan to strip the assets out of Genesis, Goodman Networks and Genesis-ATC. The Genesis entities owed loans to Prosperity Bank and any transfer of assets would require Prosperity Bank's approval to switch collateral on the loans.

89. Based on requests by Prosperity Bank in mid-October for additional information to switch control of the accounts at Prosperity Bank, including the 4352 Account, both John Goodman and James Goodman emailed Prosperity Bank on October 13 and 14, 2021 asking that Prosperity Bank switch control over the accounts.

90. Specifically, James Goodman traded emails with Bater Bates (Prosperity Bank) on October 14, 2021 about pledging the funds in the 4352 Account as collateral to secure a loan owed to Prosperity Bank thus freeing up the Genesis businesses and assets to be transferred to either GIH or Endeavor.

91. Both James Goodman and Bater Bates (Prosperity Bank) knew the 4352 Account was exclusively for funds from FSCLE and was used to automatically sweep funds back to FSCLE pursuant to the automated process then in place for at least 10 months.

92. Consistent with the undisclosed plan to transfer the FSCLE business to a new company without necessarily disclosing that to FSCLE, on October 14, 2021, Goodman Network's Steve Seago emailed FSCLE saying:

> Goodman would like to request your assistance again to help us migrate our connections/integrations related to the Accessories Packaging business. When Genesis became part of Goodman a couple of years ago we needed to migrate the connections to Goodman systems and we now need to move them to new systems.  Who can we/should we work with on this?  Really appreciate your flexibility on this.

93. Steve Seago knew at the time he sent his October 14, 2021 email to FSCLE that Goodman Networks was being divested but did not disclose any of that to FSCLE.

94. On October 15 and 19, 2021, Prosperity Bank again asked Goodman Networks for corporate documents authorizing transfer of the accounts.

95. On October 19, 2021, James Goodman acknowledged the need for corporate documents authorizing the transfer saying in an email to Prosperity Bank, "Working on the amendment and authority now."

96. Between October 20 and October 22, 2021, Jason Goodman and Jody Goodman resigned from the Goodman Networks board.  That left only one director on the Goodman Networks board:  James Goodman.

97. Pursuant to the Goodman Networks 4th Amended Bylaws, Goodman Networks could not take action without the consent of at least three directors/board members.

98. Prior to the resignations of Jason Goodman and Jody Goodman, the Goodman Networks Board did appoint Jim Frinzi to act as the CEO of Goodman Networks but did not adopt the 5th Amended Bylaws which on their face say that action can be taken by the CEO (Jim Frinzi) or confirm approval to change the ownership of the bank accounts at Prosperity Bank.

99. The failure to take appropriate corporate action prior to the resignations of Jason Goodman and Jody Goodman left James Goodman, John Goodman, and Jim Frinzi without any way to validly authorize the transfer of the Prosperity Bank accounts including the 4352 Account.

100.　　That did not stop Jim Frinzi and James Goodman from moving forward with their plan to strip all the assets, including funds in the 4352 Account, from Goodman Networks and the Genesis entities.

101.　　On October 21 and 22, 2021, Jim Frinzi emailed Prosperity Bank an unsigned and unauthorized version of the alleged Fifth Amended and Restated Bylaws which gave the power to transfer the bank accounts to Jim Frinzi.

102.     Frinzi's October 21, 2021 email with the fraudulent Fifth Amended and Restated Bylaws copied James Goodman.

103.     Frinzi and James Goodman knew the Fifth Amended and Restated Bylaws were unauthorized and were thus fraudulent.

104.     Bater Bates (Prosperity Bank) also knew that the Fifth Amended and Restated Bylaws were false and unauthorized.  He accepted them anyway to facilitate the banking transactions being requested including a change in control of the 4352 Account.

105.     Bater Bates followed up with James Goodman on October 22 and 25, 2021, asking for a signed version of the Fifth Amended and Restated Bylaws.  No signed version was sent to Bater Bates, but Bater Bates permitted the transfer of the accounts to move forward anyway.

106.     On October 25, 2021, Bater Bates, Taylor Burns, and Prosperity Bank agreed to accept an Assignment of Goodman Network's 3992 Account at Prosperity Bank, which would soon include funds misappropriated from the 4352 Account, as replacement and substitution collateral for the collateral pledged by the Genesis Entities related to their loans with Prosperity Bank. Goodman Networks received no value for this Assignment.

107.     James Goodman signed the Assignment as CEO of Goodman Networks and as manager of the Genesis entities.

108.     At the time of the Assignment, each of Bater Bates, Taylor Burns, Prosperity Bank, and James Goodman knew that James Goodman was not the CEO of Goodman Networks and that he had no authority to enter into the Assignment on behalf of Goodman Networks.  They accepted and effectuated the Assignment anyway to facilitate the transfer of the

Genesis assets to GIH and or its affiliate, Endeavor, because of the going concern caused by the AT&T Demand and Arbitration Award.

109.    Shortly after the Assignment, Genesis caused its businesses and assets to be transferred to either GIH or Endeavor.

110.    On October 27, 2021, Goodman Network's Steve Seago sent an email to FSCLE saying, "Want to introduce you to Jim Frinzi who is the new CEO here at Goodman.  I've brought Jim up to speed on our history as well as the Accessories Packaging program.  Jim would like to have a brief introductory call with you all to get a better sense of the project and overall relationship.  Can you please provide some dates/times when you all would be available."

111.    Seago's October 27, 2021 email did not disclose any of the efforts to wind down Goodman Networks or to transfer funds in the 4352 Account.

112.    On November 2, 2021, FSCLE sent an email inquiring why Goodman Networks had not made a payment as part of the automated processes.

113.    That FSCLE email was forwarded to Jim Frinzi with a request as to what to tell FSCLE.

114.    Frinzi responded on November 2, 2021 with emails within Goodman Networks saying:

> I realize we have AR coming in from them, with matching AP, so my impression is that overall the FedEx project is negative $5.4 million dollars. . . .
>
> It is pretty clear that we have a deficit with FedEx that would be difficult if not impossible to resolve.  At this point it seems futile to pay the balance when we will still come up short anyway.  Josh, are we in a better place if we cease operations on FedEx, and instigate negotiations with them on settlement? . . .

> Also, for ATC debts, just send emails and correspondence to me, Stephanie, or Samantha.  I don't want emails that tie in Jody [Goodman], Jason [Goodman] and James [Goodman].  Although to a large extent the horse has already been let out of the barn, it has just become more critical to create that segregation.

115.     On November 3, 2021, Frinzi emailed others within Goodman Networks and gave the following instruction:

> Please pay this invoice to FedEx – 9/24/2021 - $361,127.02.  **Please suspend all other payments to FedEx after this payment**. . . .
>
> We need to consolidate Prosperity 4352 and EWB [East West Bank] 0690 into a new account at Chase Bank, that I will ask you to open. . .

(Emphasis added).

116.     Neither Frinzi nor anyone associated with Goodman Networks informed FSCLE of their decision to stop any further payments to FSCLE.

117.     Rather than inform FSCLE of that decision, Frinzi and others associated with Goodman Networks continued to send invoices to FSCLE for processing pursuant to the automated system in place and at the same time continued the sham of explaining a lack of fund transfer by a need to transition off the Microsoft Dynamics 365 automated system to a new system, and blamed personnel turn over for the lack of funds flow.

118.     Meanwhile FSCLE continued to transfer millions into the 4352 Account relying upon the false statements from various Goodman Networks personnel as directed by Frinzi.

119.     On November 10, 2021, Frinzi sent an email to James Goodman, Jason Goodman and others saying:

> My understanding is that we need to segregate Goodman and GNET ATC, because the creditors on each side are going to go after the other side.  If Goodman Networks controls the bank accounts of ATC, then I believe it opens the claim that it's all the same company . . . **I think the goal here is to isolate liability to each respective organization, and not get personally dragged into litigation.**

> **Also, as a practical matter for me, my name is going to be on all of the lawsuits, and I will have to bear the responsibility of settling with creditors.** That's fine and what I signed up for the turnaround plan. However, I have no authority settles me with risk, but little domain over my outcome.
>
> **First and foremost I want a plan that protects people with the last name Goodman, and myself from personal liability.** Then protect each respective asset and develop a plan that is reasonable with the bond holders and trade debt creditors.

(Emphasis added).

120. Jason Goodman responded to Frinzi's November 10 email by saying, "Currently Goodman owns ATC. So even if you segregate bank accounts they are still connected."

121. By mid-November 2021, more than $10 million in FSCLE funds were in the 4352 Account and employees at Goodman Networks were asking for permission to make the reciprocal transfer to FSCLE.

122. Jim Frinzi, CEO of both Goodman Networks and GNET ATC, responded to those requests on November 16, 2021 saying, "We are still holding on FedEx payments. **We are developing a complex plan on how we spend <u>our money</u> at ATC. Definitely do not pay 10 million to FedEx**." (emphasis added). Neither Frinzi nor anyone else informed FSCLE that no further fund transfers would be sent to FSCLE.

123. Jason Goodman and Jody Goodman emailed each other on November 16, 2021 in response to the Frinzi email of the same day saying that direction from James Goodman was needed.

124. Upon information and belief and informed by his subsequent actions, James Goodman did weigh in and agreed with Frinzi's decision to take the FSCLE funds and not use it for its intended purpose.

125.     Employees of Genesis, Goodman Networks and/or GNET ATC began to email that they were "uncomfortable" with the situation and wanted to "stand down".

126.     On November 16, 2021, an employee of Genesis-ATC, Goodman Networks and/or GNET ATC sent an email to Frinzi saying, "I would bank on losing the FedEx business line as their request for payment of the 10M is broaching two weeks old and dates back to late September.  Their payments to date total 25M.  They continue to send promptings requesting payment **we will continue to ignore per your directive**."  (emphasis added).

127.     On November 16, 2021, Frinzi sent an internal email analyzing the FSCLE business saying, "We are about 5.4 million in the negative with FedEx.  The project has an EBITDA of $500,000 at best, so we'd need an 11 year run to eventually pay it off.  Potentially genesis owes them something too, but GNET ATC definitely is negative $5.4 million."

128.     By November 22, 2021, the accounts payable employees within Goodman Networks/GNET ATC were discussing the necessity of sweeping funds from the "Prosperity/FedEx account" (the 4352 Account) to pay their bills.  Frinzi responded at that time that he didn't want to "use the FedEx money."  Frinzi's directive would soon change.

129.     On November 23, 2021, FSCLE once again followed up on payment prompting another round of internal inquiries as to whether to pay FSCLE and Frinzi directing that FSCLE not be paid.

130.     On November 23, 2021, Frinzi caused Goodman Networks to issue a document in which Goodman Networks stated that effective October 13, 2021 GNET ATC lost 60% of its revenue with the loss of the AT&T business and that, "**Goodman Networks Incorporated (the 'Company') no longer has any remaining revenue source.**  At this

point in time, **a Shareholder's Meeting will be requested to dissolve the Company**.

Further information on this topic will be sent out at a later date."  (emphasis added).

131.    If the November 23, 2021 memo was circulated to anyone it was not provided to

FSCLE nor did anyone tell FSCLE that Goodman Networks was effectively out of

business.

132.    Frinzi and others continued to accept payments from FSCLE and obscure the real

situation.

**The Defendants Continue to Hide the True Picture
While Getting FSCLE to Make Payments to the 4352 Account**

133.    On December 7, 2021, Jim Frinzi emailed Steve Seago (who had the direct

relationship with FSCLE) saying, "We are in the process of migrating FedEx to a new

tenant.  **I want to make sure we are still doing business with them.**  Steve the general

plan is that Genesis is going to buy back the FedEx business from us.  If they are already

done with us, and there is nothing to sell back to Genesis, please let me know.  **Use your**

**discretion as to what you communicate with FedEx.  Presently we have been advised**

**to not share financial data with any outside parties as we are in litigation.**"  (emphasis

added).  No entity related to Goodman Networks was then in bankruptcy or in any lawsuit

that would have prevented them from dealing fairly and honestly with FSCLE.  Moreover,

there was no actual plan to "sell" the FSCLE business to Genesis-ATC because Genesis-

ATC had already transferred its businesses to GIH and Endeavor.

134.    On December 9, 2021, the Chief Financial Officer of Genesis-ATC emailed Jim

Frinzi saying, "I have been advised by both BK lawyers, and H&B about conflicts and

direct involvement of Genesis in GNET ATC matters.  It creates conflicts that will

ultimately personal [sic] hurt me and James [Goodman] as individuals. . . . We [Genesis-

ATC] are not agreeable to you [GNET ATC] engaging express.  As stated, we need formal guidance on the viability of the transfer [of the FSCLE business]."

135.     Frinzi responded to Genesis-ATC via email on December 9, 2021 stating, "I have copied both Josh and Bobby [attorneys], as there are matters involving **FedEx trust funds**, and a potential claw back from FedEx **if we pay non-trust money to them**."  (emphasis added).  Frinzi further emailed individuals within Goodman Networks and/or GNET ATC on December 9, 2021 stating, "We are holding off on making any changes to the **FedEx account with Prosperity, *4352,** for now.  Remember that account is tied to Goodman's tax ID number."  (emphasis added).

136.     On December 9, 2021, Goodman Networks/GNET ATC's Steve Seago emailed FSCLE furthering the illusion that a change in the Microsoft Dynamics software was driving the inability to pay FSCLE by saying, "Darek/Ken – we are in the process of migrating the Goodman Dynamics 365 environment to a new tenant and will need to work with you to get the transfer set up.  Please let me know if you have the time in the next couple of days to discuss."  This email failed to disclose the true nature of what was happening at Goodman Networks.  Consistent with Jim Frinzi's instruction to Seago, it did not disclose any of the financial troubles Goodman Networks was facing and did not disclose that Goodman Networks had effectively shut down as of November 23, 2021.

137.     In response to Seago's email, FSCLE's Greg Bullard responded saying, "Considering James Goodman told Steve [Berry – FSCLE employee] and I that he intended to subcontract the ADS system work to Goodman, is this change still necessary or should we postpone starting until the path forward is resolved?"

138.     James Goodman had communicated to FSCLE that the work would go from Goodman Networks to Genesis-ATC without telling FSCLE that Goodman Networks and Genesis-ATC were shutting down or effectively defunct.  James Goodman was the only director of Goodman Networks at the time of that oral misrepresentation.  Further, that oral misrepresentation had no basis in any fact and was just made to stall while FSCLE continued to make payments to the 4352 Account.

139.     On December 17, 2021, Steve Seago emailed FSCLE doubling down on the false narrative that a migration in the software platform was needed and requested.

140.     On December 23, 2021, GNET ATC informed Seago that his employment was being terminated but that they wanted him to sign a consulting agreement to continue his work with FSCLE.  Seago asked for different payment terms and Frinzi responded to Seago via email saying, "We are granting the consulting agreement because we need access to you as you are the only single person in our entire company with material knowledge of FedEx, and we will probably need you to participate at some point in bankruptcy proceedings.  Really doing any more than this will pose a risk for me as CEO, pose a risk for you from a bankruptcy claw back."

141.     Frinzi, Seago and other employees at Goodman Networks represented to FSCLE that Goodman Networks would continue to service the Master Service Agreement under its "Multiband" tradename.

142.     At the time of such representations, Goodman Networks had a subsidiary called Multiband Field Services, Inc. and a tradename for "Multiband Global."

143.     Unknown to FSCLE, Frinzi had also formed a new, unaffiliated company called Multiband Global Resources, LLC, which was in the process of being used to acquire

AMRR, a public shell company, which would be used as part of the enterprise to defalcate and launder the FSCLE funds.

144.       In early January 2022, Steve Seago pushed forward with the narrative of getting FSCLE to migrate to a new automated system.

145.       FSCLE assigned internal personnel to work on the IT connectivity on its end.

146.       The FSCLE IT connectivity work was completed by February 15, 2022 and FSCLE asked the IT vendor working with Goodman Networks/GNET ATC to confirm the connection.

147.       On February 16, 2022, the IT vendor working with Goodman Networks/GNET ATC emailed FSCLE saying, "Jim – I was just informed that Multiband won't be continuing with the FedEx project."

148.       FSCLE reached out to Steve Seago that same day saying, "Can you help translate David Corso's email below?"

149.       Seago first responded by saying, "I have no idea why this happened or what is their direction.  I'm no longer with Goodman/Multiband.  I'm consulting them on a few items but this hits me blind as well.  I've already asked them 'what the heck?' and I'll let you know something as soon as I know."

150.       Seago then emailed Frinzi on February 16, 2022 asking for direction as to what to tell FSCLE.  Frinzi responded by email saying, "Yes, that's just not possibility with the impending bond debt and lawsuit."  Seago then responded to FSCLE on February 16 saying, "I'm looking into all that.  Sorry it's taking a bit longer than anticipated but I hope to have a path for you to consider early next week."  Seago knew or should have known

based on the information provided to him that there was no path forward but failed to tell FSCLE the truth and continued to stall FSCLE though early March 2022.

**Meanwhile FSCLE Transfers Funds into the 4352 Account**

151.    Despite making the decision not to pay FSCLE any further amounts as of November 3, 2021, Goodman Networks, GNET ATC, Frinzi and/or James Goodman caused and permitted continued invoices to be sent to FSCLE as part of the automated processes put in place and received funds from FSCLE with no intention to pay FSCLE any sums back.

152.    On November 3, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 55 transactions with an invoice value of $746,004.01.

153.    On November 3, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 67 transactions with an invoice value of $747,194.43.

154.    On November 4, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 40 transactions with an invoice value of $355,670.00.

155.    On November 5, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 32 transactions with an invoice value of $300,946.68.

156.    On November 6, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 53 transactions with an invoice value of $1,081,973.13.

157.     On November 7, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 20 transactions with an invoice value of $ 538,354.15.

158.     On November 8, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 103 transactions with an invoice value of $1,657,876.57.

159.     On November 8, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 85 transactions with an invoice value of $1,133,205.56.

160.     On November 9, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 12 transactions with an invoice value of $105,196.63.

161.     On November 9, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 48 transactions with an invoice value of $327,702.48.

162.     On November 10, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 73 transactions with an invoice value of $897,369.60.

163.     On November 10, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 33 transactions with an invoice value of $646,752.36.

164.     On November 11, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 12 transactions with an invoice value of $309,096.40.

165.     On November 11, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 65 transactions with an invoice value of $738,619.29.

166.     On November 12, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 49 transactions with an invoice value of $418,843.55.

167.     On November 12, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 9 transactions with an invoice value of $193,555.21.

168.     On November 13, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 72 transactions with an invoice value of $659,814.01.

169.     On November 14, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 33 transactions with an invoice value of $956,426.18.

170.     On November 15, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 43 transactions with an invoice value of $3,693,476.56.

171.     On November 15, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 107 transactions with an invoice value of $951,185.09.

172.     On November 16, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 19 transactions with an invoice value of $322,216.37.

173.     On November 16, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 25 transactions with an invoice value of $2,717,999.80.

174.     On November 17, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 55 transactions with an invoice value of $1,372,211.91.

175.     On November 17, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 48 transactions with an invoice value of $548,173.90.

176.     On November 18, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 40 transactions with an invoice value of $566,801.87.

177.     On November 19, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 26 transactions with an invoice value of $337,010.22.

178.     On November 19, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 44 transactions with an invoice value of $1,183,865.66.

179.     On November 20, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 51 transactions with an invoice value of $768,633.47.

180.     On November 21, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 73 transactions with an invoice value of $1,688,414.01.

181.     On November 22, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 54 transactions with an invoice value of $1,546,341.97.

182.     On November 22, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 45 transactions with an invoice value of $495,858.11.

183.     On November 23, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 21 transactions with an invoice value of $463,804.43.

184.     On November 23, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 99 transactions with an invoice value of $803,645.74.

185.     On November 24, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in

Tennessee for 41 transactions with an invoice value of $243,087.95. These wire transmissions came after Goodman Networks indicated it had no revenue and was effectively ceasing operations.

186.     On November 26, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 77 transactions with an invoice value of $1,800,900.89. These wire transmissions came after Goodman Networks indicated it had no revenue and was effectively ceasing operations.

187.     On November 29, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 27 transactions with an invoice value of $101,970.62. These wire transmissions came after Goodman Networks indicated it had no revenue and was effectively ceasing operations.

188.     On November 30, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 75 transactions with an invoice value of $438,747.35. These wire transmissions came after Goodman Networks indicated it had no revenue and was effectively ceasing operations.

189.     On December 1, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 66 transactions with an invoice value of $756,986.49. These wire transmissions came after Goodman Networks indicated it had no revenue and was effectively ceasing operations.

190.     On December 2, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 54 transactions with an invoice value of $790,886.70.   These wire transmissions came after Goodman Networks indicated it had no revenue and was effectively ceasing operations.

191.     On December 3, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 19 transactions with an invoice value of $244,651.91.   These wire transmissions came after Goodman Networks indicated it had no revenue and was effectively ceasing operations.

192.     On December 6, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 61 transactions with an invoice value of $351,698.98.   These wire transmissions came after Goodman Networks indicated it had no revenue and was effectively ceasing operations.

193.     On December 7, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 29 transactions with an invoice value of $599,038.40.   These wire transmissions came after Goodman Networks indicated it had no revenue and was effectively ceasing operations.

194.     On December 8, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 30 transactions with an invoice value of $215,249.17.   These wire

transmissions came after Goodman Networks indicated it had no revenue and was effectively ceasing operations.

195.     On December 9, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 37 transactions with an invoice value of $485,178.37.   These wire transmissions came after Goodman Networks indicated it had no revenue and was effectively ceasing operations.

196.     On December 10, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 17 transactions with an invoice value of $95,605.23.   These wire transmissions came after Goodman Networks indicated it had no revenue and was effectively ceasing operations.

197.     On December 13, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 18 transactions with an invoice value of $79,885.97.   These wire transmissions came after Goodman Networks indicated it had no revenue and was effectively ceasing operations.

198.     On December 14, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 9 transactions with an invoice value of $221,082.65.   These wire transmissions came after Goodman Networks indicated it had no revenue and was effectively ceasing operations.

199.    On December 15, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 24 transactions with an invoice value of $207,918.65.    These wire transmissions came after Goodman Networks indicated it had no revenue and was effectively ceasing operations.

200.    On December 16, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 3 transactions with an invoice value of $18,778.88.    These wire transmissions came after Goodman Networks indicated it had no revenue and was effectively ceasing operations.

201.    On December 16, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC sent an email from Texas to FSCLE in Tennessee for "November pallet moves" in the amount of $19,014.50.  This invoice came after Goodman Networks indicated it had no revenue and was effectively ceasing operations.

202.    On December 17, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 32 transactions with an invoice value of $182,826.93.    These wire transmissions came after Goodman Networks indicated it had no revenue and was effectively ceasing operations.

203.    On December 18, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC in Texas used interstate wires to invoice FSCLE in Tennessee for 5 transactions with an invoice value of $15,748.44.    These wire

transmissions came after Goodman Networks indicated it had no revenue and was effectively ceasing operations.

204.     On December 31, 2021, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC sent an email from Texas to FSCLE in Tennessee for "December pallet moves" in the amount of $11,058.50.  This invoice came after Goodman Networks indicated it had no revenue and was effectively ceasing operations.

205.     On February 15, 2022, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC sent an email from Texas to FSCLE in Tennessee for "January pallet moves" in the amount of $17,671.50.  This invoice came after Goodman Networks indicated it had no revenue and was effectively ceasing operations.

206.     On March 23, 2022, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC sent an email from Texas to FSCLE in Tennessee for "February pallet moves" in the amount of $11,084.00.  This invoice came after Goodman Networks indicated it had no revenue and was effectively ceasing operations.

207.     On May 19, 2022, Frinzi and persons acting at Frinzi's direction at Goodman Networks and/or GNET ATC sent an email from Texas to FSCLE in Tennessee for "April pallet moves" in the amount of $16,966.00.  This invoice came after Goodman Networks indicated it had no revenue and was effectively ceasing operations.

208.     In response to the above listed invoices and ones from August, September and October 2021, FSCLE made the following funds transfers into the 4352 Account on or after October 20, 2021:

(a) October 20, 2021 - $4,131,075.76;

(b) October 22, 2021 - $1,598,017.40;

39

(c) October 27, 2021 - $4,233,157.45;

(d) November 3, 2021 - $5,613,496.88;

(e) November 5, 2021 - $746,004.21;

(f) November 10, 2021 - $3,383,400.48;

(g) November 12, 2021 - $955,848.76;

(h) November 17, 2021 - $8,221,271.76;

(i) November 19, 2021 – 1,327,211.91;

(j) November 24, 2021 - $7,791,801.74;

(k) December 3, 2021 - $4,901,076.92;

(l) December 8, 2021 - $6,316,937.10;

(m) December 15, 2021 - $3,434,746.04;

(n) December 22, 2021 - $2,642,591.36;

(o) December 28, 2021 - $5,895,234.17;

(p) January 5, 2022 - $2,592,207.41;

(q) January 10, 2022 - $1,133,205.56;

(r) January 12, 2022 - $2,382,534.92;

(s) January 19, 2022 - $2,725,387.45;

(t) January 26, 2022 - $1,221,764.99;

(u) February 3, 2022 - $2,313,243.07;

(v) February 7, 2022 - $351,698.98;

(w) February 9, 2022 - $1,395,071.17;

(x) February 11, 2022 - $11,058.50;

(y) February 16, 2022 - $710,493.08;

(z) February 18, 2022 - $15,748.44;

(aa)      March 29, 2022 - $17,671.50;

(bb)      May 4, 2022 - $11,084.00; and

(cc)      June 28, 2022 - $16,966.00.

209.      As of February 16, 2022, FSCLE was entitled to receive $81,158,452.82 from Genesis-ATC, Goodman Networks, and/or GNET ATC.

210.      The invoices from Goodman Networks and/or GNET ATC and the funds transfers to the 4352 Account were automated such that it took an affirmative action to disrupt the transactions and turn off the work flow.

211.      Goodman Networks, GNET ATC, Frinzi and James Goodman were well aware that Goodman Networks and GNET ATC were effectively shutting down in late 2021 and affirmatively chose to leave the automated processes on thus prompting FSCLE to make payments and build a significant cash balance in the 4352 Account.

212.      FSCLE did not have visibility into the 4352 Account and could not see transactions out of it, how the funds were being used or where the funds were going.

213.      FSCLE made inquiries as to the status of payments back to FSCLE and Goodman Networks/GNET ATC personnel including Seago (at the direction of Frinzi) misled FSCLE to keep the payments coming despite Goodman Networks', GNET ATC's, Frinzi's and James Goodman's actual knowledge that Goodman Networks and GNET ATC were effectively defunct.

214.      Frinzi, James Goodman and others perpetrated this fraud to build a huge cash balance in the 4352 Account that they could steal and then use for their own purposes.

**Collusion with Prosperity Bank to Steal the Funds in the 4352 Account**

215.     James Goodman, Jason Goodman, and others had been working to get control over the accounts at Prosperity Bank including the 4352 Account since August 2021, and Frinzi joined those efforts in October 2021.

216.     In November 2021, Frinzi sent falsified corporate documents to Prosperity Bank (the Fifth Amended and Restated Bylaws) to accomplish a change in control over the accounts including the 4352 Account.

217.     On November 22, 2021, Nicole Rodriguez with Prosperity Bank sent James Goodman the corporate resolutions that needed to be signed to give Jim Frinzi control over the accounts including the 4352 Account.  Thus, James Goodman was aware of the effort to transfer control of the 4352 Account.

218.     On December 1, 2021, employees of Prosperity Bank communicated with each other via email that Prosperity Bank was missing signed corporate resolutions authorizing transfer of the accounts from GNET ATC, MFS, and Goodman Networks.

219.     Thus, Prosperity Bank sought signed resolutions from GNET ATC, MFS, and Goodman Networks authorizing the account changes sought by Frinzi.

220.     Of course, after October 22, 2021, Goodman Networks only had one director and could not take valid corporate action as its then existing bylaws required three directors, and the existing bylaws and board resolutions did not allow its CEO to manage or control its bank accounts.

221.     Prosperity Bank's Bater Bates knew that Goodman Networks was in winddown and lacked the ability to execute the corporate documents requested by the treasury services personnel at Prosperity Bank.

222.     Frinzi emailed Prosperity Bank's Bater Bates on December 14, 2021 pressuring

him to make the requested changes saying:

> I felt you were serious about our relationship, but the more I consider, it is
> not what was posed to me this morning.  East West [Bank] is trying harder,
> and frankly Prosperity is disappointingly not what was presented to me.
> Doming Ng the president of East West invited to meet me in SF next week,
> AND they have managed to complete all the authorizations.  Prosperity has
> been a Herculean effort to accomplish simple transition efforts that have been
> much easier with our other banks.  You have been the worst actually. . . .
> Prosperity has delivered promises of customer service, but delivers hassle,
> red tape, and no solutions.  Really disappointing.

223.     On December 16, 2021, Jim Frinzi emailed Prosperity Bank's Ana McCollum

further pressuring Prosperity Bank saying:

> I really felt like you were the opposite of Wells Fargo, but Prosperity is an
> aspiring Wells Fargo, which is not a good thing.  I think if you could
> experience how other banks I work with have handled the transition, you
> would also be extremely disappointed with Prosperity.  Perhaps try some
> competitive analysis.  East West ate your lunch, while you guys are still
> sending me forms, making things difficult. . . . After this experience, it is
> beyond my comprehension why the Goodman Family would have decided to
> do business with Prosperity.

224.     On December 21, 2021, Prosperity Bank's Ana McCollum emailed James

Goodman again asking for authorization to take the banking actions demanded by Frinzi

and asking for written corporate authorizations.

225.     On December 23, 2021, Bater Bates forwarded Frinzi's December 14 email to

James Goodman in substance asking for James Goodman's intervention and saying, "He

[Frinzi] is not an authorized signor on the account which appears to be his frustration."

226.     On December 27, 2021, Prosperity Bank's Ana McCollum emailed James

Goodman and explained that Prosperity Bank could send checks for the various accounts

to Jim Frinzi but that Jim Frinzi could not sign any checks unless or until Goodman

Networks executed signed corporate resolutions adding him to the account as an authorized signor.

227.     As of December 27, 2021, Goodman Networks only had one director, James Goodman, and could not take official action without two more directors.  Thus, there was no way for Goodman Networks to adopt a board resolution to validly add Frinzi as an authorized signor on any of the accounts including the 4352 Account.

228.     Bater Bates, Jim Frinzi and James Goodman had actual knowledge of the situation at Goodman Networks.  Yet all three took actions to get Frinzi authorization on the accounts without proper authority from Goodman Networks.

229.     On December 28, 2021, James Goodman sent an email to Ana McCollum at Prosperity Bank simply saying, "Could we add James Frinzi, please."  The same day McCollum emailed Frinzi, cc'ing James Freeman and Bater Bates again asking for signed corporate resolutions.  Jim Frinzi, James Goodman and Bater Bates all knew that valid signed resolutions were not possible.  Yet, all three worked to get Frinzi access anyway.

230.     On January 6, 2022, Frinzi sent Prosperity Bank signed corporate resolutions as requested by Ana McCollum.  However, at least one of those resolutions was not signed by the requisite number of signors and the resolutions claimed to have been signed on either December 9, 2021 or January 6, 2022 during which time there was only one director of Goodman Networks and no valid corporation action could be taken.  Those resolutions also claimed that they had been originally executed and voted upon in October prior to the resignations of Jason Goodman and Jody Goodman from the Goodman Networks Board yet no such resolutions or any reference of them appear in the Goodman Networks corporate documents until January 2022.

231.     After millions had already improperly left the 4352 Account, on February 14, 2022, Bater Bates sent the Goodman Networks corporate resolutions which he knew to be false to Ana McCollum saying "Let's get in our folders."

232.     As of the filing of this Complaint, Bater Bates and Prosperity Bank continue to provide banking and lending services to the Goodmans and the companies controlled by them.

233.     Prosperity Bank has admitted in deposition and court testimony in other matters that Bater Bates took improper actions in relation to Goodman Networks accounts in August 2022.  Prosperity Bank has not yet been asked about Bater Bates actions in relation to adding Frinzi as a signatory to the accounts in late 2021 or early 2022.

234.     Having obtained control over the accounts at Prosperity Bank including the 4352 Account, Frinzi caused at a minimum the following transfers out of the 4352 Account to persons and entities other than FSCLE:

| Date | Transferee | Amount |
|------|------------|--------|
| 12/16/2021 | Goodman Networks – Prosperity Account *1838 (Traced to AMRR) | $4,200,000.00 |
| 12/22/2021 | Goodman Networks – Prosperity Account *1838 | $2,000,000.00 |
| 12/29/2021 | Winstead PC | $160,450.60 |
| 1/11/2022 | AMRR | $8,000,000.00 |
| 1/12/2022 | AMRR | $8,000,000.00 |
| 1/13/2022 | AMRR | $8,000,000.00 |
| 1/14/2022 | AMRR | $7,925,000.00 |
| 1/18/2022 | AMRR | $8,000,000.00 |
| 1/28/2022 | AMRR | $4,075,000.00 |
| 2/3/2022 | Hudson | $17,032,060.00 |
| 2/18/2022 | Connor Lee & Shumaker PLLC | $250,000.00 |
| 2/24/2022 | RBC Capital Markets, LLC(traced to 18920 NW) | $2,000,000.00 |
| 3/11/2022 | Goodman Networks – Prosperity Account *1838 (traced to 18920 NW) | $6,175,403.71 |
| 6/28/2022 | Goodman Networks – Prosperity Account *1838 | $28,755.50 |
| 7/7/2022 | Goodman Networks – Prosperity Account *1838 | $16,966.00 |
| | **TOTAL** | **$75,863,635.81** |

235.     Upon information and belief, the December unauthorized transfers were accomplished fraudulently using the login credentials of two persons who no longer worked at Goodman Networks: (1) Jason Goodman and (2) a former accounting employee, who had been terminated effective December 1, 2021.  Jason Goodman, who remained a signatory on Goodman Networks' accounts even though he had resigned, had actual knowledge that his login credentials were being used to facilitate the unauthorized transfers and assented to their use. Jim Frinzi, Samantha Sondrup, and Stephanie Elmore fraudulently used the login credentials to effectuate the December transfers.  Those transfers went from one Goodman Networks account to another before then being sent outside of the organization to another person or entity other than FSCLE.  The December transactions required two factor authentication and the employee's credentials who no longer worked at Goodman Networks was fraudulently used to effect those transfers. Frinzi oversaw and directed these transfers.

236.     Some of the funds from the 4352 Account were used to pay off loans with Prosperity Bank and thus Prosperity Bank directly benefited from the theft in addition to retaining the banking business of the Goodmans and the companies controlled by them.

237.     Without Prosperity Bank's assistance in adding Frinzi as a signatory on the accounts and changing controls on the 4352 Account, it would have been difficult, if not impossible to transfer out the funds that were subsequently transferred.

238.     On or about February 3, 2023, Prosperity Bank aided and abetted the fraudulent transfers out of the 4352 Account by raising the daily transfer limit on the 4352 Account

to $17.5 million. Prosperity Bank in an email told Frinzi that this account change came from the "top of the house."

239.    Once Frinzi obtained control of the 4352 Account, he worked with the other Defendants to steal the FSCLE funds and launder them.

### The AMRR – Multiband Global Scheme

240.    On January 5, 2021, Jim Frinzi began looking for an Over-the-Counter Shell Corporation for the "Goodman Family Holdings" to purchase.

241.    In the fall of 2021, Frinzi found AMRR, a dormant public shell corporation domesticated in Nevada, that could be purchased.

242.    Frinzi consulted with Shalom Auerbach and others regarding the ultimate purchase of AMRR.

243.    On December 1, 2021, Frinzi in Texas, acting on behalf of Multiband Global while also serving as CEO of Goodman Networks and GNET ATC, sent a letter of intent by email to Kavi Packiam at Layer 7 Capital in New York offering to purchase for $38 million the stock of OnePath. Frinzi represented that the "Buyer's source of funds is cash" and that it proposes to pay the purchase price "in one lump sum payment." This representation was false because the source of funds was not Multiband Global's cash but instead was the accumulated funds in the 4352 Account at Goodman Networks that had been defalcated from FSCLE.

244.    In December 2021, Frinzi caused $6,200,000 to be taken from the 4352 Account in Texas and be sent to a bank account in California at East West Bank in the name of Multiband Global.

245.     On December 23, 2021, Frinzi used a portion of those funds to cause Multiband Global (another company controlled by him) to purchase 7,923,230 shares of common stock in AMRR (representing 71.5% of the outstanding common stock) and 600,000 shares of series A preferred stock in AMRR (representing 100% of the outstanding preferred stock).

246.     A portion of the $6.2 million taken from the 4352 Account was used to pay for legal services related to the purchase of AMRR stock and other legal work.

247.     Prior to the purchase, AMRR reported in its public filings $138.00 in assets.

248.     Jim Frinzi became the CEO and Chairman of the Board of AMRR.

249.     Frinzi was simultaneously the CEO of Goodman Networks, MFS, GNET ATC, Multiband Global and AMRR.

250.     Shalom Auerbach was a member of the board of directors of AMRR after the purchase.

251.     On January 1, 2022, Frinzi arranged for GNET ATC to "loan" $44 million to AMRR for the purchase of AMR Resources, which was an entity formed by OnePath to facilitate the transaction between it and AMRR.

252.     The $44 million "loaned" to AMRR came from the 4352 Account in a series of transfers in January 2022.  Each transfer occurred because of and with the assistance and direction of Frinzi, James Goodman and Prosperity Bank.  None of the transfers were validly authorized.

253.     In exchange for the $44 million "loan," AMRR gave GNET ATC a Secured Promissory Note in the amount of $44 million (the "AMRR Note") and a Security

Agreement pledging substantially all of the assets of AMRR, but not the assets of AMR Resources.

254.    James Goodman's signature is on the AMRR Note, but he contends that his signature was forged.

255.    Frinzi's signatures are on the AMRR Note and Security Agreement.

256.    Frinzi, James Goodman and Shalom Auerbach knew where the $44 million that funded the transaction actually came from – the 4352 Account that was FSCLE money.

257.    The $44 million that was stolen from the 4352 Account went from Prosperity Bank in Texas to a bank account at East West Bank in California.

258.    On February 1, 2022, AMRR paid OnePath $40,407,647 for 100% of the membership interests of AMR Resources using funds from the East West Bank account in California sending those funds to an account with Truist Bank in North Carolina.

259.    The funds used for this purchase originally came from the 4352 Account.

260.    On July 18, 2022, AMRR offered to pay $22 million of the AMRR Note in a letter to James Goodman and GNET ATC.

261.    Upon information and belief, additional funds originally stolen from the 4352 Account flowed to James Goodman.

262.    By stealing the money from the 4352 Account, sending it first to Multiband Global and then to AMRR for the purchase of AMRR and then ultimately to OnePath for the purchase of AMR Resources, James Goodman, John Goodman, Jason Goodman, Jonathan Goodman and Jody Goodman effectively stole money from one of their companies to launder it through the purchase and sale of business units and distance those assets from Genesis-ATC, Goodman Networks or GNET ATC.

263.     Pursuant to these transactions, funds continued to flow between and through these

entities throughout 2022 into 2023.

264.     On August 31, 2022, AMRR "purchased" all of the assets of Multiband Global in

exchange for 1,000,000 shares of series A preferred stock in AMRR that was assigned to

the Frinzi Family Trust and AMRR retired the 600,000 shares of series A preferred stock

in AMRR held by Multiband Global and issued 600,000 in new series A convertible

preferred stock to the Frinzi Family Trust, as designee for Multiband Global.

265.     Frinzi was on all sides of this transaction.

266.     Upon information and belief, the transactions were not conducted at arms-length or

for reasonable commercial value but were another instance of laundering money using the

purchase and sale of a business.

267.     Frinzi is both a co-trustee of the Frinzi Family Trust and a beneficiary.

268.     On November 16, 2022, AMRR entered into an Amendment to the Asset Purchase

Agreement with Multiband Global; whereby: (i) the parties waived Multiband Global's

obligation to pay $1,000,000 in cash and AMRR's obligation to issue to Multiband Global

or its designee the 1,000,000 shares of series A preferred stock of AMRR; and (ii) in lieu

thereof AMRR paid Multiband Global or its designee $100 for the assets of Multiband

Global.

269.     On August 16, 2022, AMRR and AMR Resources acquired the intellectual property

of Goodman Networks, which had been laundered through 18920 NW, in return for the

issuance of preferred stock valued at $10,000. This transaction was documented in a

fraudulent Trademark Acquisition Agreement, which was executed by Jim Frinzi and

Evalina Pinkhasova. Joseph O'Bell and Steven Zakaryayev drafted the Trademark Acquisition Agreement with knowledge of the fraud, theft and laundering.

270.    The fraudulent Trademark Acquisition Agreement was sent by email among Joseph O'Bell in Texas, Jim Frinzi in Texas, Samantha Sondrup in Texas, and Stephen Zakaryayev in New Jersey and Shalom Auerbach in New York.

271.    On or about September 26, 2022, AMRR and 18920 NW entered into a Settlement; whereby, AMRR settled $22 million of the AMRR Note by issuing series B preferred shares of AMRR (valued at $1,200,000) to 18920 NW.

272.    The fraudulent Trademark Acquisition Agreement was sent by email among Joseph O'Bell in Texas, Jim Frinzi in Texas, Samantha Sondrup in Texas, and Stephen Zakharyayev in New Jersey and Shalom Auerbach in New York.

273.    The ultimate beneficiaries of this transaction on behalf of 18920 NW were Steven Zakharyayev, Evalina Pinkhasova, Neil Auerbach, Shalom Auerbach and/or Auerbach Partners.

274.    As with the other transactions there was no real value given, no arms-length commercial negotiations and the original source of the funds were the stolen FSCLE money from the 4352 Account.

275.    Steven Zakharyayev, Evalina Pinkhasova, Neil Auerbach, Shalom Auerbach and/or Auerbach Partners knew or reasonably should have known that the source of the funds paid to them came from stolen FSCLE money from the 4352 Account.

276.    On October 4, 2022, in furtherance of the enterprise, John Goodman, acting through GTH, entered into a Non-Disclosure and Confidentiality Agreement with AMRR for "exploring a potential business relationship."

277.     On October 19, 2022, John Goodman, acting through GTH, offered to purchase the construction business of OnePath that had been acquired by AMRR for $1.8 million. The construction business of OnePath was valued in the AMRR acquisition at approximately 1/3 of the purchase price or approximately $13 million. This purchase was frustrated after potential investors learned about the involuntary bankruptcy case of Goodman Networks. Nonetheless, it further demonstrates that the Goodmans were the intended beneficiaries of the AMRR transactions.

278.     On November 2, 2022, AMRR (through AMR Resources) wired a total of $700,000 to Goodman Networks.

279.     John Goodman was the recipient of those funds.  He took $450,000 of those funds for his own purposes and paid the remainder to a law firm to represent his interests.

280.     The source of the $700,000 ultimately paid to John Goodman were the stolen FSCLE funds and he knew or should have known that as there was no legitimate basis for AMRR to be paying John Goodman the $700,000.

281.     On November 4, 2022, AMRR amended and restated its Articles of Incorporation and changed its name to MBG Holdings Inc.  Multiband Global has been renamed as HSB Holdings, LLC, and Jim Frinzi is the sole member of Multiband Global.

282.     In September 2023 with AMRR cratering, Shalom Auerbach, through a special purpose entity named Alliance Partners, bought the construction business of OnePath that had been acquired by AMRR/AMR Resources for approximately $5,000,000, payable $300,000 upfront and the remainder payable pursuant to a hope note to the Goodman Networks bankruptcy trustee.

283.     From the more than $44 million FSCLE dollars stolen from the 4352 Account, James Goodman, John Goodman, Jim Frinzi, the Frinzi Family Trust, Steven Zakharyayev, Evalina Pinkhasova, Neil Auerbach, Shalom Auerbach, Auerbach Partners and the companies and entities controlled by them including but not limited to the other named Defendants benefited by receiving those stolen funds after laundering them through a series of fraudulent corporate transactions.

### The Auerbach/Alliance/Hudson Scheme

284.     On December 9, 2021, Jim Frinzi (in Texas) and Shalom Auerbach (in New York) spoke by phone and exchanged texts discussing a "path forward" to get as much of the value and cash out of Goodman Networks, GNET ATC and Genesis-ATC.

285.     On December 29, 2021, Frinzi texted James Goodman saying, "Also I have a way to monetize your bonds legally without blow back.  It's very smart, and ties into the s-Corp strategy.  It's very smart."  James Goodman did not immediately respond.

286.     On December 30, 2021, Frinzi called James Goodman and when there was no answer texted James Goodman saying, "I can sell all of your bonds [in Goodman Networks] for .15 next week.  I believe that would get you 4.8 million personally.  It would be a completely 3rd party unrelated transaction."

287.     The buyer that Frinzi was talking about was Shalom Auerbach.

288.     James Goodman texted Frinzi on December 30, 2021 saying, "Ask him to buy my bonds at .24 cents . . ."

289.     On January 3, 2022, Jim Frinzi initiated an email chain between himself (in Texas), Shalom Auerbach (in New York) and attorneys for James Goodman (in Texas) aimed at facilitating a sale of James Goodman's bonds in Goodman Networks.

290.     Shalom Auerbach responded to that email chain on January 4, 2022 saying, "Checking in if you guys are still interested in moving forward if not please let me know."

291.     Negotiations and discussions via email, text and telephone between Shalom Auerbach in New York and the various people including Frinzi and James Goodman in Texas continued through January 2022.

292.     On January 28, 2022, Anthony Rao, attorney for James Goodman located in Connecticut, contacted Asperion Wealth in San Antonio to serve as a broker for a sale of $32 million in Goodman Network bonds at 24 cents per unit to Shalom Auerbach.

293.     Asperion Wealth responded on January 31, 2022 to Goodman's attorneys saying, "Please transfer the assets to a Broker Dealer that will facilitate this transfer. **This is not in our line of business and are not comfortable with the transaction.**" (emphasis added).

294.     Goodman's attorneys forwarded that message to Shalom Auerbach who responded on January 31, 2022 saying, "What other path can we take to get this completed?"

295.     The bonds to be sold were transferred from Asperion in San Antonio, Texas to San Blas Securities in Atlanta.

296.     Upon information and belief, James Goodman and/or Jim Frinzi had a pre-existing relationship with San Blas Securities. San Blas Securities was willing to facilitate the sale and was paid in stolen FSCLE funds.

297.     The original draft of the Bond Purchase Agreement showed the bond purchaser as Auerbach Partners LP. That references was deleted and Alliance Texas Holdings, LLC, a shell company for the Auerbachs, Steven Zakharyayev and Evalina Pinkhasova, ("Alliance") inserted in its place.

298.     Alliance's registered agent is Steven Zakharyayev and its principal place of business is in the same town in New Jersey in which Zakharyayev lives.  Upon information and belief, it was a shell limited liability company owned and controlled by Zakharyayev.

299.     Zakharyayev is an attorney for Shalom Auerbach.

300.     The Funds Flow memorandum for the transaction showed the "agent" for purposes of receiving the bonds and distributing the funds to be Hudson.

301.     Hudson is a limited liability company owned and controlled by Neil Auerbach.

302.     On February 3, 2022, Frinzi caused $17,032,060 to be taken from the 4352 Account at Prosperity Bank in Texas (FSCLE money) and then be sent to Citizens Commercial Banking in Rhode Island in the name of Hudson.

303.      Hudson then paid $10,570,912.00 to James Goodman through GIH by sending the money back to Texas at Texas Partners Bank.

304.     Hudson paid $561,041.00 to Genesis-ATC by sending the funds back to Texas at Texas Partners Bank.  Upon information and belief, this amount also went to James Goodman.

305.     Hudson then paid Auerbach Partners $5,900,107.00 by sending the money to Citibank in New York.  Upon information and belief Shalom Auerbach and Neil Auerbach were the beneficiaries of this payment of stolen FSCLE funds.

306.     Hudson, Auerbach Partners, Neil Auerbach, and Shalom Auerbach maintained two sets of flow of funds records for the transaction: one that showed the complete flow of funds from Goodman Networks to James Goodman's entities and another that showed only the partial flow of funds between Alliance and James Goodman's entities, which was formalized into a Funds Flow Memorandum and fraudulently concealed Goodman

Networks and the 4352 Account as the source of funds for the bond purchase. The complete

flow of funds was fraudulently concealed by James Goodman and the Auerbach parties

from attorneys involved in the transaction and only the partial flow of funds was shared to

everyone. Had the true nature of the transaction been disclosed to the attorneys, they would

not have participated in the transactions.

307.　　On February 4, 2022, Neil Auerbach expressly "Approved!" the complete flow of

funds record by email sent from Florida to his Hudson associates and Shalom Auerbach in

New York.

308.　　In February 2022, the partial flow of funds record and the derived Funds Flow

Memorandum, which fraudulently concealed the complete nature of the transactions, were

sent by emails among participants in at least Florida, Connecticut, Georgia, Texas, and

New York.

309.　　The bond transaction consummated with Alliance/the Auerbachs was prohibited by

the bond indenture, which required redemption of bonds by Goodman Networks to be done

pro rata and through the indenture trustee.

310.　　The Bond Purchase Agreement, dated February 3, 2022, contained a provision that

stated: "Purchaser [Alliance Texas] is aware of, and Seller [GIH and Genesis] has fully

disclosed to Purchaser, the current financial and operational condition of GNI, including,

without limitation, that GNI has no material assets, employees or operations, that GNI's

liabilities exceed GNI's assets, that GNI may be considered insolvent and that GNI is very

likely to default on future payments with respect to the GNI Bonds . . ."

311.　　At the time of the sale of Goodman Networks bonds in February 2022, Goodman

Networks was insolvent.  Frinzi wrote a memo documenting as such on November 23,

2021.  James Goodman and his attorneys further made this representation around the same
time as the bond sale in a stock sale agreement to 18920 NW.

312.        Shalom Auerbach, Neil Auerbach, Alliance, Hudson and Auerbach Partners were
aware of Goodman Networks' insolvency.

313.        The funds to be paid for the bonds did not originate from Alliance, Hudson or
Auerbach Partners but instead came from the 4352 Account.

314.        The Auerbach parties moved forward with the bond transaction anyway even after
Asperion indicated that it was not comfortable with the transaction because the Auerbach
parties would be paid $5,900,107.00 for facilitating the transaction.

315.        Shalom Auerbach participated in the transaction through numerous emails, texts
and phone calls between New York and Texas.

316.        Neil Auerbach is listed on the Bond Sale Agreement as the contact person at
Alliance and signed the Bond Sale Agreement as the purchaser.

317.        The fact that Auerbach Partners attempted to insulate themselves from liability for
this transaction by removing their name from the Bond Sale Agreement, using Alliance as
the nominal purchaser and then using Hudson as the agent to distribute the funds shows
that they knew or should have known that this transaction was illegitimate.

318.        Based on the text messages involving Frinzi and others, the Auerbachs and their
companies knew that the funds to be used for this transaction came from stolen FSCLE
funds.

319.        Based on text messages between Frinzi and James Goodman, both Frinzi and James
Goodman knew the funds to be used for this transaction came from the FSCLE funds in
the 4352 Account.

**The 18920 NW Scheme**

320.    On September 15, 2021, James Goodman sent Goodman Networks, which he

controlled, a letter requesting Goodman Networks purchase his shareholdings in Goodman

Networks for $25,000,000.

321.    Attorneys for James Goodman became aware of James Goodman's request to have

his shares purchased and advised against the transaction because Goodman Networks was

insolvent.

322.    With knowledge that he could not sell his shares in Goodman Networks through a

legitimate commercial transaction, on January 14, 2022, James Goodman texted Jim Frinzi

saying, "How can I pull $3.5m from Goodman [Networks]."

323.    Frinzi responded to James Goodman the same day saying, "I will figure it out. No

problem.  I'll have it done legally by Tuesday or Wednesday.  I will get you the transaction

by Monday.  I've already kind of thought about this.  **After you read these messages**

**please delete them**."  (emphasis added).

324.    James Goodman responded by saying, "I delete them at the end of the day . . ."

325.    On January 17, 2022, Frinzi texted James Goodman saying, "What do you think

about some of your shares in Goodman, for $4 million cash.  You do a 3rd party share sale.

The buyer will monetize its proportional share of the NOL monetizing program.  Otherwise

I have a plan through Antigua."

326.    James Goodman responded by text the same day saying, "My Goodman [Networks]

stock?  I'm okay selling Goodman stock and Goodman Preferred stock."

327.    Frinzi then texted saying, "Ok.  I think that is the cleanest way."

328.      On January 17, 2022, Frinzi texted James Goodman saying, "I will get you 80 million in 4 years." To which James Goodman responded, "I will be dreaming of the $80 million."

329.      Frinzi then texted James Goodman saying, "Well if you get 8 from Shalom and 4 for your stock, I'd only need 8 more for this year to stay on track."  James Goodman responded with "True!!".

330.      On January 19, 2022, James Goodman texted Frinzi asking, "How much cash does Goodman have on hand and how much does GNET ATC have?"

331.      Frinzi responded the same day texting James Goodman, "I think between them probably 60 something.  We should catch up though.  Do you have time tomorrow afternoon or Friday to meet up.  **I have a plan to get most money back to you, without exposing you are the beneficiary** and a reasonable settlement for creditors." (emphasis added).

332.      On January 20, 2022, Frinzi texted James Goodman saying, "Just FYI your Antigua company that is owned by Holland Partners is called HGP Venture Fund Ltd.  Our lawyer is the custodial agent.  Steven the buyer can close Monday.  He would need a copy of one of the shares.  $20 million in preferred for $4 million cash.  This is who wants the pref. shares.  Steven Zakharyayev."

333.      Steven Zakharyayev is an attorney in New York and Florida with ties to Shalom Auerbach.

334.      On January 21, 2022, Steven Zakharyayev initiated contact directly with James Goodman to "purchase" James Goodman's preferred shares of Goodman Networks.

335.     Rather than directly purchase the preferred shares in his own name, Steven
Zakharyayev and his wife Evalina Pinkhasova chose to have a Florida shell limited liability
company, 18920 NW, be the front for the purchase of the shares.

336.     In response to the "inquiry" from Steven Zakharyayev on behalf of 18920 NW,
multiple entities controlled by James Goodman and owning the preferred stock transferred
4,032,918 shares of preferred stock of Goodman Networks to 18920 NW.

337.     In paragraph 3.04(g) of the agreement selling the shares, James Goodman disclosed
"Buyer is aware of, and Seller has fully disclosed to Buyer, the current financial and
operational condition of the Company, including that the Company's liabilities exceed the
Company's assets, and that the Company may be considered insolvent."  This language
was negotiated with changes between the first draft and the final draft.  Therefore,
Zakharyayev knew that the shares were worthless when 18920 NW purchased them.
Despite that written disclosure, the transaction moved forward anyway.

338.     The emails negotiating the sale of the shares went between Texas and New York
and included James Goodman, Steven Zakharyayev and others.

339.     The transaction on paper was allegedly for consideration of a payment by 18920
NW of $12,381,602 however, the share price for these sales bore no correlation to the value
of Goodman Networks and ranged from $1.00 per share to $4.05 per share.

340.     18920 NW did not use its own funds to "purchase" the preferred stock rather the
money used came from the FSCLE funds in the 4352 Account.

341.     On February 28, 2022, Frinzi texted James Goodman about the sale of James
Goodman's shares saying, "**He [Shalom Auerbach] wants to close today as well.  He**

**wants you to close through Steven though.** You can definitely close today. Just call him." (emphasis added).

342.     James Goodman texted Frinzi right back saying, "Then I need a document from them I can sign, buying the share $4 dollars per share . . . I will sign it."

343.     On March 1, 2022, James Goodman texted Frinzi saying, "Steven is trying to get me sell at $3.00 . . . tell him $3.50. **He will get his money back and then some** . . ." (emphasis added).

344.     On March 9, 2022, Steven Zakharyayev (in New York) and Jim Frinzi (in Texas) communicated by phone and email to put in place the next step in this scheme: an alleged "redemption" of the shares that 18920 NW had just purchased. Zakharyayev wrote, "As a follow up to our call, the parties have agreed to settle 18920 NW 11th LLC's demand for redemption and other rights entitled to it via a promissory note in the amount of $50,000,000 at 8% interest per annum with a maturity date of one year from the effective date."

345.     On March 9, 2022, 18920 NW, acting through Evelina Pinkhasova, made a demand to Goodman Networks for an alleged mandatory redemption of 4,032,918 preferred shares in Goodman Networks.

346.     There was no right to a mandatory redemption that could be exercised.

347.     However, the "purchase" of the shares which were disclosed to have no value followed closely by the demand for a redemption shows the true purpose of the entire scheme: to create a commercial vehicle to demand money from GNET ATC and/or Goodman Networks.

348.     Despite there being no right to a redemption, on March 10, 2022, Frinzi and James Goodman, acting on behalf of Goodman Networks/GNET ATC, "purchased" the 4,032,918 preferred shares in Goodman Networks in exchange for a $50 million note (the "18920 Note").

349.     The same day the 18920 Note was issued by Goodman Networks, Frinzi and James Goodman, acting on behalf of Goodman Networks/GNET ATC, transferred the following to 18920 NW among others: (1) $14,500,000; (2) a $22,000,000 Note Receivable from AMRR; (3) LSU DAS rights and (4) trademarks.  In return, 18920 NW released Goodman Networks of the 18920 Note.

350.     This entire transaction was fraudulent and designed to launder money out of the 4352 Account.

351.     The emails and wires related to this transaction went between Texas for Frinzi/James Goodman and New York or Florida for 18920 NW.

352.     On April 6, 2022, Frinzi, James Goodman and 18920 NW allegedly entered into a second settlement agreement that had the same terms as the March 10, 2022 settlement but also included a $4.5 million note payable by MFS to 18920 NW.

353.     Both the March 10 and the April 6 transaction were fraudulent and nothing more than a way to paper the flow of money from the 4352 Account into the accounts of others.

354.     On March 11, 2022, Frinzi caused $6,175,403.71 to be transferred out of the 4352 Account in Texas ultimately to 18920 NW's bank account at Bank of America in North Carolina.

355.     In total more than $8,175,403.71 in FSCLE funds was sent to 18920 NW's account at Bank of America in North Carolina.

356.      All involved knew that the funds were from FSCLE and the 4352 Account.

357.      Upon information and belief, a portion of the funds from these transactions went to James Goodman, a portion went to John Goodman, a portion went to Steven Zakharyayev and Evelina Pinkhasova as the middlemen and a portion went to Shalom Auerbach.

358.      On August 16, 2022, 18920 NW and AMRR/AMR Resources entered into a Trademark Acquisition Agreement; whereby, AMRR/AMR Resources acquired the trademarks held by Goodman Networks and purportedly transferred to 18920 NW in return for issuing $10,000 worth of preferred shares in AMRR.

359.      Frinzi signed this agreement as did Evelina Pinkhasova.

360.      On September 26 and 27, 2022, 18920 NW and AMRR entered into a Confidential Settlement Agreement and Release.  The terms of the agreement provided that 18920 NW would deliver the $22 million note issued by AMRR to GNET ATC/Goodman Networks in return for preferred shares of AMRR equal to $1.2 million.

361.      All of these transactions are fraudulent and designed to launder cash through them to their beneficiaries.

362.      Through this scheme in excess of $8,175,403.71 in stolen FSCLE funds were laundered to James Goodman, John Goodman, Jim Frinzi, Steven Zakharyayev, Evelina Pinkhasova, Shalom Auerbach and entities controlled by them including but not limited to 18920 NW, GNET ATC and AMRR.

**The Goodmans Pull Cash Out of Goodman Networks**

363.      Based on Frinzi's November 23, 2021 memo, Goodman Networks was insolvent.

364.      On December 13, 2021, James Goodman Texted Frinzi saying, "I need $200,000 from Goodman."

365.     The only source of those funds or any transfer of funds as of December 2021 were the FSCLE funds.

366.     Frinzi responded by saying that he would send the funds to James Goodman and asked him where he wanted the funds to go.

367.     James Goodman directed that the $200,000 be sent to one of his companies.

368.     Upon information and belief, James Goodman received $200,000 in stolen FSCLE funds.

369.     On December 21, 2021, James Goodman texted Jim Frinzi saying, "Leave all my guys on Goodman [Networks] payroll until April."

370.     Frinzi texted back that "I have them taken care of."

371.     On December 21, 2021, James Goodman sent another text to Frinzi saying, "What are we doing with my people . . . they are telling me this Friday is there [sic] last day. What's the plan?"

372.     Frinzi responded by text saying, "Pre paid [sic] contracts.  They are getting a bunch of upfront contractor money plus severance."

373.     Upon information and belief, Jonathan Goodman and Jody Goodman were paid six figure sums from Goodman Networks in "severance benefits", and "upfront contractor money."

374.     At the time of those payments, Jody and Jonathan Goodman had resigned from the Goodman Networks board, were well aware of the financial situation at Goodman Networks and accepted the payments anyway.

375.     The payments that went to them were ultimately from the FSCLE funds in the 4352 Account.

376.　　　On January 4, 2022, James Goodman texted Jim Frinzi saying, "I need Goodman to pay $258k in rents this month."

377.　　　James Goodman knew that Goodman Networks was defunct at that point in time and the only remaining source of cash was the FSCLE funds yet he asked for the payments of "rents" anyway.

378.　　　Frinzi facilitated the payment of $258,000 to James Goodman or entities controlled by him.

379.　　　On January 22, 2022, James Goodman texted Frinzi saying, "Also I need my son full severance paid.  $200,000 severance."

380.　　　James Goodman knew when he asked for this that Goodman Networks was defunct and the only source for such a payment was the FSCLE funds.

381.　　　The son James Goodman was referring to is Jake Goodman.

382.　　　Jake Goodman resigned from the "Goodman Board" on June 8, 2021.

383.　　　Jake Goodman was presented with a consulting agreement with Goodman Networks on December 7, 2021 that would pay him $200,000.

384.　　　Jake Goodman never signed that agreement and provided no "consulting services" to Goodman Networks on or after December 7, 2021 but took $200,000 from Goodman Networks first being paid $50,000 in December 2021 or January 2022.

385.　　　James Goodman texted Frinzi on January 25, 2022 saying, "Also pay Jake G. the $150k severance this week."

386.　　　Upon information and belief, Frinzi caused Jake Goodman to be paid a total of $200,000 in "severance" using stolen FSCLE funds.

387. Jake Goodman knew or should have known the $200,000 "severance" payment was illegitimate, that Goodman Networks was defunct and insolvent and the payment came from FSCLE funds.

388. James Goodman, Jody Goodman, and Jason Goodman caused Goodman Networks to pay $491,725 to Jason Goodman. Upon information and belief, the source of these payments was the FSCLE funds from the 4352 Account.

389. James Goodman, Jody Goodman, and Jason Goodman caused Goodman Networks to pay $377,967.39 to Jody Goodman. Upon information and belief, the source of these payments was the FSCLE funds from the 4352 Account.

390. James Goodman and Frinzi caused Goodman Networks to pay at least $240,681.39 to People NQ, Inc., a Texas corporation, which James Goodman wholly owned. Upon information and belief, the source of these payments was the FSCLE funds from the 4352 Account.

391. Frinzi caused Goodman Networks to pay at least $396,853.74 to World Conquest, LLC, a Wyoming limited liability, which Frinzi wholly owned. Upon information and belief, the source of these payments was the FSCLE funds from the 4352 Account.

**The Endeavor Scheme**

392. James Goodman formed Endeavor in January 2022.

393. Endeavor is owned by GIH.

394. James Goodman used stolen FSCLE funds generated from the bond sale with the Auerbachs and the stock sale with 18920 NW to purchase several legitimate businesses.

395.    On May 31, 2022, Endeavor entered into an asset purchase agreement with Genesis-ATC whereby Genesis-ATC contributed its assets, acquired from OnePath for no consideration, in exchange for Endeavor assuming Genesis-ATC's liabilities.

396.    Thus, in essence Endeavor is the successor to Genesis-ATC capitalized by GIH with stolen FSCLE funds.

397.    James Goodman controls GIH and the portfolio of companies under it including Endeavor.

**Prosperity Bank's Loan Scheme**

398.    In 2020, James Goodman, through two affiliated Genesis companies, borrowed approximately $5 million from Prosperity Bank on two notes (the "Genesis Loans")., which was secured by Genesis's assets and a guaranty by James Goodman.

399.    In October 2021, James Goodman sought to transfer his business assets at Genesis to Endeavor and needed Prosperity Bank to allow the transfer of assets free and clear of the liens resulting from the Genesis Loans.

400.    James Goodman and Bater Bates caused Goodman Networks to pledge the 3992 Account as substitution collateral for the Genesis Loans, but the 3992 Account contained insufficient funds to satisfy Prosperity Bank's collateral demand.

401.    At the time of the pledge of the 3992 Account, Goodman Networks lacked an operative board of directors and James Goodman was not an officer; therefore, the pledge was unauthorized. Bates Bates, Prosperity Bank, and James Goodman had knowledge of this lack of authority.

402.     James Goodman and Bater Bates then caused $236,883.48 to be transferred from the 4352 Account, holding funds from FSCLE, to the 3992 Account to satisfy Prosperity Bank's collateral demand.

403.     At the time of the $236,883.48 transfer, Goodman Networks lacked an operative board of directors and James Goodman was not an officer; therefore, the transfer was unauthorized. Bates Bates, Prosperity Bank, and James Goodman had knowledge of this lack of authority.

404.     With the pledge of the 3992 Account and the transfer of the $236,883.48, Bater Bates and Prosperity Bank allowed Genesis entities to transfer their assets to GIH or Endeavor, free and clear of the liens resulting from the Genesis Loans.

405.     From January 2021 through August 2022, Goodman Networks caused $539,974.17 to be paid on the Genesis Loans. Upon information and belief, a portion of these payments were made from funds from the 4352 Account.

406.     On August 15, 2022, Bater Bates and Prosperity Bank became concerned with Goodman Networks' financial condition and the potential for a bankruptcy case and determined to sweep the 3992 account to pay off the Genesis Loans.

407.     The sweep resulted in $4,463,804.68 being transferred from Goodman Networks' 3992 Account to pay off the Genesis Loans owed to Prosperity Bank.

408.     Prosperity Bank has testified under oath that its actions including those of Bater Bates were improper.

409.     As of October 2023, FSCLE recently learned that Prosperity Bank was showing one or more loans involving James Goodman and his Genesis entities as being paid off or restructured with either GIH or Endeavor.

410.    Upon information and belief, some or all of the funds used in that pay off came from the FSCLE funds stolen by the Defendants and laundered back to them. Thus, the overall scheme of stealing the funds and laundering them continues almost two years after the scheme began.

### Efforts to Interfere with the Goodman Networks Involuntary Bankruptcy

411.    Despite all of the texts and emails between the various Defendants in late 2021 and early 2022 discussing an alleged impending bankruptcy, no Goodman or Frinzi controlled entity filed for bankruptcy protection in 2021 or 2022.

412.    Certain bondholders owed money by Goodman Networks filed an involuntary chapter 11 petition against Goodman Networks in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") on September 6, 2022, and FSCLE joined in that involuntary petition.

413.    The Goodman Networks bankruptcy is styled as *In re: Goodman Networks, Inc.*, Case No. 22-31641 (N.D. TX Bkrtcy.)

414.    John Goodman, James Goodman, Frinzi, and their businesses knowingly and fraudulently acted to conceal property, make false statements and documents, and frustrate the fair administration of the bankruptcy case.

415.    No claims are brought in this case against Goodman Networks.

### Concealment of the UFS Receivable

416.    While contemplating bankruptcy, James Goodman and Frinzi, acting in their personal capacities and as officers or directors of Goodman Networks and GNET ATC, knowingly and fraudulently transferred funds out of the 4352 Account for their own

personal uses and concealed those funds and transactions from FSCLE and the other creditors of Goodman Networks.

417.      In June 2021, Goodman Networks sold its e-commerce business to James Goodman (UFS) and entered into a transition services agreement dated June 4, 2022; whereby, Goodman Networks would provide services to UFS in return for remuneration.

418.      From June 2021 through June 2022, Goodman Networks performed services valued at $6,618,639 (the "UFS Receivable") per the books and records of Goodman Networks.

419.      James Goodman and UFS did not pay the UFS Receivable, but, instead, directed Frinzi, John Goodman, and Goodman Networks to write-off the UFS Receivable as uncollectible.

420.      Frinzi and John Goodman knowingly and fraudulently caused or directed Goodman Networks to falsify its books and records by writing of the UFS Receivable to conceal James Goodman's and UFS' obligations to Goodman Networks.

421.      John Goodman, acting for Goodman Networks, knowingly and fraudulently caused Goodman Networks to file bankruptcy schedules and statements of financial affairs without listing the UFS Receivable to conceal James Goodman's and UFS' obligations to Goodman Networks.

**Concealment of the GTH Stock and John Goodman Put Obligation**

422.      In June 2020, Goodman Networks sold its professional services and infrastructure businesses to John Goodman (Goodman Telecom Holdings, LLC) and was issued 1,516,519 Class E Units in Goodman Telecom Holdings, LLC, which was valued at $8 million, and granted a put option from John Goodman, which obligated John Goodman to purchase Goodman Networks' Class E Units at $8 million.

423.     In May 2022, John Goodman invited Frinzi to his home and requested that he resign from Goodman Networks, and Frinzi agreed to resign immediately.

424.     On or around August 2022, Goodman Telecom Holdings, LLC, sought to convert from a limited liability company to a corporation, being GTH, and in doing so sought to retire its membership units and issue replacement securities in GTH (the "<u>GTH Conversion</u>"). The GTH Conversion would also have the effect of release John Goodman's put obligation to Goodman Networks.

425.     Goodman Networks' consent to the GTH Conversion was mandatory; however, Goodman Networks had no officers or directors to consent to the GTH Conversion.

426.     John Goodman, knowing that Frinzi had resigned from Goodman Networks, requested Frinzi sign on behalf of Goodman Networks the Shareholders Agreement that would effectuate the GTH Conversion.

427.     Frinzi, knowing he had no authority to act on behalf of Goodman Networks, fraudulently signed an early version of the Shareholders Agreement on behalf of Goodman Networks on or around August 2022 (the "<u>Frinzi GTH Consent</u>).

428.     John Goodman and James Goodman requested Frinzi send them a written resignation letter with an effective resignation date of September 4, 2022, to Goodman Networks' counsel in Florida and their consultant in Florida, which written resignation letter was meant to falsely show that Frinzi was acting with authority when he executed the early version of the Shareholders Agreement.

429.     The closing of the GTH Conversion was delayed due to complications other than those caused by Goodman Networks' lack of officers and directors, and the version of the Shareholders Agreement was materially changed.

430.     A final version of the Shareholders Agreement was effectuated on October 12, 2022, but Goodman Networks did not execute a copy of the October 12, 2022 Shareholders Agreement; instead, John Goodman and GTH took the Frinzi GTH Consent from August 2022 and slipped it as the signatory page for the October 12, 2022 Shareholders Agreement. Goodman Networks did not have any officers or directors to authorize the use of the Frinzi GTH Consent on October 12, 2022.

431.     GTH issued 1,906,399 shares of common stock to Goodman Networks (the "GTH Stock") and retired the Class E membership interests and terminated the John Goodman put option based on the fraudulent Frinzi GTH Consent to the Shareholder Agreement.

432.     John Goodman, acting for Goodman Networks, knowingly and fraudulently caused Goodman Networks to file bankruptcy schedules and statements of financial affairs without listing the GTH Stock to conceal it and the fraudulent Frinzi GTH Consent.

433.     The GTH Conversion on October 12, 2022, occurred post-bankruptcy petition and effectuated John Goodman's and GTH's concealment and release of property of the bankruptcy estate.

### False Corporate Authority

434.     On September 6, 2022, Goodman Networks had no officers or directors and was incapable of taking corporate actions in response to the involuntary bankruptcy petition.

435.     Despite this lack of authority, James Goodman, John Goodman, Jonathan Goodman, Jason Goodman, and Jody Goodman, acting collectively as the Goodman MBE Group, conspired to cause John Goodman to be hired as a "consultant" by Goodman Networks.

436.     On September 21, 2022, the Goodman MBE Group executed a *Consent of a Majority of the Managers of the General Partners of Goodman MBE Group LP* that authorized it to employ John Goodman as its Consultant.

437.     On October 4, 2022, Samantha Sondrup, purportedly acting as "Chief of Staff" to Frinzi at Goodman Networks but also employed as Chief Operating Officer at AMRR, executed a Consulting Agreement to employ Goodman MBE Group and, specifically, John Goodman, as the Debtor's Consultant to provide "advisory and consulting services from time to time that are customarily associated with executive management, financial counsel and review, capital structure and potential capital raises, and overall business strategy, and shall include, but not necessarily be limited to the following . . .: (i) Consultant shall provide advisory services related to all legal, financial, personal and operational decisions for the Company and its affiliates and subsidiaries [and] (ii) Consultant shall provide other services as may reasonably be requested by the Company . . ." Consulting Agreement, § 1(a).

438.     Moreover, the Consulting Agreement provided that Goodman Networks "will not control, direct, or otherwise supervise Consultant's performance of the Services . . ." Consulting Agreement, § 1(b).

439.     The Consulting Agreement was fraudulent, void, and entered into to allow John Goodman under color of authority to conceal property of the estate, to falsify books, records and documents of Goodman Networks, and to frustrate FSCLE's and the other creditors' attempts to have a trustee administer the property of Goodman Networks.

440.     On October 31, 2022, John Goodman and the Goodman MBE Group, acting under color of authority for Goodman Networks, caused Goodman Networks to file in the

Bankruptcy Court an Objection to FSCLE's joinder to the involuntary bankruptcy petition and made the knowingly false statement that "FSCLE is not a creditor – in any form – of Goodman." John Goodman and the Goodman MBE Group made this false statement with knowledge that the Goodmans and Frinzi had caused Goodman Networks to misappropriate $81 million of funds from FSCLE.

441. From October 2022, through February 2022, John Goodman and the Goodman MBE Group, acting under color of authority for Goodman Networks, caused Goodman Networks to take other actions and commit discovery abuses to frustrate FSCLE, the involuntary bankruptcy case, and the fair administration of property of the estate.

442. Between November 15, 2022, and December 6, 2022, five additional creditors joined the involuntary bankruptcy petition, and on December 12, 2022, the Court entered an order for relief.

443. In response, John Goodman and the Goodman MBE Group, acting under color of authority for Goodman Networks, caused Goodman Networks to file a Motion to Convert Chapter 7 Case to Chapter 11. A chapter 11 case would allow John Goodman and the Goodman MBE Group to continue acting under color of authority as "debtor in possession," while a chapter 7 case would have an independent trustee.

444. The purpose of the Motion to Convert was to further conceal property, obfuscate false statements and documents, and frustrate the fair administration of the bankruptcy case for creditors.

445. From December 12, 2022, through February 7, 2022, John Goodman and the Goodman MBE Group, acting under color of authority for Goodman Networks, caused Goodman Networks to prosecute the fraudulent Motion to Convert, which damaged

FSCLE, who incurred attorneys' fees and costs of litigation in response to the Motion to Convert.

446.    On January 7, 2022, John Goodman, acting under color of authority for Goodman Networks, caused Goodman Networks to file bankruptcy schedules and statements of financial affairs and affixed his signature as "consultant" under penalty of perjury.

447.    The bankruptcy schedules and statements of financial affairs concealed material property, including the UFS Receivable, the GTH Stock and put option, and the AMRR Note.

448.    The bankruptcy schedules and statements of financial affairs contained false statements, including the following: "[Frinzi's] tenure with the Debtor ended on September 4, 2022."

449.    On January 10, 2022, the statutory meeting of creditors was held, and John Goodman appeared and falsely held himself out as having authority to act on behalf of Goodman Networks.

450.    On February 25, 2023, the bankruptcy trustee entered into a settlement with John Goodman and the Goodman MBE Group that allowed them to keep $450,000 in return for withdrawing the Motion to Convert.

451.    John Goodman and the Goodman MBE Group knowingly and fraudulently received $450,000 for acting to file the Motion to Convert and attempting to defeat the involuntary bankruptcy case and the provisions of title 11.

## The False Forbearance Demand

452.     On or about November 1, 2022, John Goodman, acting under color of authority for Goodman Networks, began pressuring Frinzi and AMRR to pay money in return for Goodman Networks forbearance on enforcing the AMRR note.

453.     In response to John Goodman's demand, on November 1, 2022, James Frinzi and Jodi Frinzi (James Frinzi's wife) paid $200,000 to the Goodman Networks *5481 Account at East West Bank.

454.     In response to John Goodman's demand, on November 2, 2022, AMR Resources (a subsidiary of AMRR) paid $100,000 to the Goodman Networks' *5481 Account at East West Bank.

455.     On and around November 3, 2022, John Goodman, acting under color of authority for Goodman Networks in Texas, sent an email that demanded Frinzi, Jeremie Peterkin (CFO of AMRR located in Georgia), and Jeff Spranger (affiliated with AMRR in Georgia) pay $400,000 "that needs to get to the trustee today!" John Goodman, through deposition testimony, admitted that the statement about a trustee was false and that he was the primary beneficiary of the forbearance demand.

456.     In response to John Goodman's demand, on November 4, 2022, an account of OnePath, controlled by Frinzi and AMRR/AMR Resources, transferred $400,000 to the Goodman Networks *5481 Account at East West Bank.

457.     Also on November 4, 2022, John Goodman, acting for the Goodman MBE Group, caused $450,000 to be paid to himself from the *5481 Account at East West Bank.

458.      Upon information and belief, the $700,000 paid to the Goodman Networks *5481 Account at East West Bank and the $450,000 paid to John Goodman from the *5481 Account was proceeds of the stolen funds from FSCLE.

459.      John Goodman and the Goodman MBE Group knowingly and fraudulently received $450,000 for forbearing to act on the AMRR Note and with intent to frustrate the involuntary bankruptcy case and defeat the provisions of title 11.

## CAUSES OF ACTION

### Cause No. 1 – Violation of Civil R.I.C.O. 18 U.S.C. § 1961 et seq.

### Against all Defendants

460.      FSCLE incorporates the averments of the preceding paragraphs of this Complaint as if fully set forth herein.

### Culpable Persons

461.      Each of the Defendants is "capable of holding a legal or beneficial interest in property," and therefore is a "person" within the meaning of 18 U.S.C. § 1961(3).

### The Enterprise

462.      The Enterprise in this case consists of each of the Defendants.  James Goodman, John Goodman, Jason Goodman, Jody Goodman, Jonathan Goodman, Jim Frinzi and the companies aligned and controlled by them including but not limited to GNET ATC, GIH, MFS, Multiband Global, AMRR, AMR Resources, and the Frinzi Family Trust decided first to steal funds from FSCLE by stopping funds from flowing back to FSCLE as of November 3, 2021 under the Master Services Agreement and continuing to send FSCLE invoices thereafter to pay and covering up what was really happening:  that Genesis-ATC and Goodman Networks were shutting down and all of their assets were being stripped out.

The result was that the 4352 Account at Prosperity Bank (which even Frinzi referred to on December 9, 2021 as holding the "FedEx trust funds" and being the "FedEx account" and James Goodman has testified under oath saying, "You know, that was FedEx's money") swelled with tens of millions of dollars that should have gone back to FSCLE but did not.

463.     However, the enterprise did not consist solely of isolating the funds in the 4352 Account. Rather the second purpose of the Enterprise was to steal those funds <u>and</u> launder them through the various commercial transactions described above to get the funds from the 4352 Account to the Defendants. All of the Defendants participated in this second and critical part of the overall Enterprise including but not limited to James Goodman, John Goodman, Jim Frinzi, Shalom Auerbach, Neil Auerbach, Steven Zakharyayev, Evalina Pinkhasova, Prosperity Bank and the companies associated with them including but not limited to: Genesis-ATC, GNET ATC, AMRR, AMR Resources, Multiband Global, MFS, OnePath, Alliance, Hudson, Auerbach Partners, 18920 NW, GIH, GTH and the Frinzi Family Trust.

464.     The Enterprise began in the fall of 2021 and continues as of the filing of this Complaint in 2023 as the efforts to launder the stolen FSCLE funds continues.

**Effect on Interstate Commerce and Use of Instrumentalities of Interstate Commerce**

465.     Both the activities of the Enterprise and the predicate acts of racketeering affect interstate commerce, as the Defendants have used mail, wires, and other instrumentalities of interstate commerce to perpetrate their fraudulent schemes.

466.     In particular, the FSCLE relationship with the Goodman and Frinzi controlled entities including but not limited to Goodman Networks/GNET ATC was an interstate relationship with automated processes that caused emails, wires and phone calls to flow

between Tennessee, Pennsylvania and Texas and caused a flow of funds between FSCLE in Tennessee and Pennsylvania and the Goodman/Frinzi entities in Texas.

467.     When the funds were stolen from the 4352 Account, they were sent to banks outside of Texas including East West Bank in California and assorted banks in New York, Rhode Island, North Carolina, Florida and Georgia.

468.     The persons and entities chosen to help launder the funds are located in Florida, New Jersey, New York and Nevada.  Thus, the stolen funds went from Texas to other states and then back to Texas again through banking wires and ACH transfers.

469.     The commercial transactions chosen to paper over and launder the stolen funds involved law firms and other professionals in Texas and outside of Texas including a broker dealer in Atlanta, a consulting firm in California and lawyers in Florida, California, New York and New Jersey.

470.     The theft and money laundering ultimately stole more than $80 million from a publicly traded company located in Memphis, Tennessee, and was a securities reportable event.

471.     The theft and money laundering involved a publicly traded company regulated by the Securities Exchange Commission and traded on the Over-the-Counter market with tenacles extending to a Texas Senator, who is the wife of the Texas Attorney General, to a majority leader of the Illinois Senate.

472.     The stolen assets are now scattered over multiple states including Texas, New York, New Jersey, Florida, South Dakota and Georgia.

473.     The theft and money laundering involved shell companies and special purpose entities in Wyoming, Nevada, Florida, Delaware, and Texas.

474.     Upon information and belief, the persons and entities involved in the Enterprise have conducted business in most states.

475.     The Enterprise and its activities have had a direct and substantial impact on interstate commerce.

## Racketeering Activity

## 18 U.S.C. § 1962(a) and (b) – Predicate Acts

## James Goodman

476.     James Goodman committed predicate acts by seeking and accepting the proceeds of the stolen FSCLE funds directly by asking for payments for himself from the "Goodman" bank accounts in texts with Jim Frinzi as described above that ultimately came from the 4352 Account when he knew that such funds were not his to take and knew that Goodman Networks was practically insolvent.

477.     James Goodman committed predicate acts by seeking and accepting the proceeds of the stolen FSCLE funds through the fraudulent AMRR/Multiband Global Scheme described above. James Goodman knew that the stock being "sold" was worthless and was nothing more than an effort to launder the funds to him and other entities controlled by him.

478.     James Goodman committed predicate acts by seeking and accepting the proceeds of the stolen FSCLE funds through the fraudulent sale of his Goodman Network bonds to the Auerbachs, Auerbach Partners, Alliance and Hudson as described above when James Goodman knew those bonds were potentially worthless and proceeded forward with the transaction just to launder the funds out of any entity controlled by him to himself and other entities controlled by him.

479.     James Goodman committed predicate acts by seeking and accepting a portion of the stolen FSCLE funds paid to 18920 NW as part of that scheme as described above. James Goodman knew that the source of the funds was the 4352 Account and stolen FSCLE funds and knew that the 18920 NW transaction was designed to launder the money out of Goodman Networks back to him.

480.     James Goodman then took these stolen FSCLE funds and invested them in one or more entities including GIH and Endeavor that he used to further the Enterprise.

481.     The Enterprise affected interstate commerce.

482.     None of the commercial transactions engaged in by James Goodman were for the purpose of investing in securities on the open market without an intent to control the issuer.

483.     As a direct and proximate result of James Goodman's racketeering activities and in violation of 18 U.S.C. § 1962(a) and/or (b), FSCLE has been damaged in an amount that exceeds $75,000.   FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

**John Goodman**

484.     John Goodman sought and received stolen FSCLE funds from the 4352 Account as part of the payment of $700,000 from AMRR in November 2022 of which John Goodman kept $450,000 for himself.   John Goodman knew the original source of the funds and accepted them anyway.

485.     John Goodman received a portion of the stolen funds received as part of the 18920 NW Scheme, as alleged above.

486.     John Goodman used the stolen funds to further his ownership in a variety of Goodman controlled entities that have played parts in the overall schemes complained of herein.

487.     John Goodman committed offenses involving fraud connected with a bankruptcy case under title 11 of the United States Code in an effort to maintain control over Goodman Networks, GNET ATC, and MFS as part of the Enterprise.

488.     While acting or forbearing to act in a bankruptcy case, John Goodman knowingly and fraudulently gave, offered, received, and attempted to obtain money, property, remuneration, compensation, reward, and advantage, including but not limited to $700,000, the AMRR construction business, and the release of the put option on the GTH Stock, and such actions furthered and maintained his investment and control of GTH, as part of the Enterprise.

489.     The Enterprise affected interstate commerce.

490.     None of the commercial transactions engaged in by John Goodman were for the purpose of investing in securities on the open market without an intent to control the issuer.

491.     As a direct and proximate result of John Goodman's racketeering activities and in violation of 18 U.S.C. § 1962(a) and/or (b), FSCLE has been damaged in an amount that exceeds $75,000.  FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

**Jake Goodman**

492.     Jake Goodman sought and accepted $200,000 in stolen FSCLE funds as part of his alleged "consulting agreement" with Goodman Networks in December 2021 even though

he never signed the consulting agreement and even though he never provided any consulting services to Goodman Networks.

493.    Jake Goodman used the stolen funds to further his ownership in a variety of Goodman controlled entities that have played parts in the overall schemes complained of herein.

494.    The Enterprise affected interstate commerce.

495.    None of the commercial transactions engaged in by Jake Goodman were for the purpose of investing in securities on the open market without an intent to control the issuer.

496.    As a direct and proximate result of Jake Goodman's racketeering activities and in violation of 18 U.S.C. § 1962(a) and/or (b), FSCLE has been damaged in an amount that exceeds $75,000.   FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

<strong>GNET ATC</strong>

497.    GNET ATC transferred and laundered stolen funds through the AMRR/Multiband Global Scheme and acquired an interest in AMRR, the $44 million AMRR Note and Security Agreement.

498.    GNET ATC knowingly and fraudulently participated in the 18920 NW Scheme, including but not limited to transferring a portion of the AMRR Note to 18920 NW.

499.    The Enterprise affected interstate commerce.

500.    None of the commercial transactions engaged in by GNET ATC were for the purpose of investing in securities on the open market without an intent to control the issuer.

501.    As a direct and proximate result of GNET ATC's racketeering activities and in violation of 18 U.S.C. § 1962(a) and/or (b), FSCLE has been damaged in an amount that

exceeds $75,000. FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

### AMRR

502. AMRR sought and accepted stolen funds from FSCLE, as part of the AMRR/Multiband Global Scheme.

503. AMRR then used those funds to purchase and control Multiband Global and AMR Resources.

504. AMRR participated in the 18920 NW Scheme by acquiring the Goodman Networks trademarks and "settling" the AMRR Note with 18920 NW and then using those benefits in maintenance of its control of AMRR, Multiband Global, and AMR Resources.

505. The Enterprise affected interstate commerce.

506. None of the commercial transactions engaged in by AMRR were for the purpose of investing in securities on the open market without an intent to control the issuer.

507. As a direct and proximate result of AMRR's racketeering activities and in violation of 18 U.S.C. § 1962(a) and/or (b), FSCLE has been damaged in an amount that exceeds $75,000. FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

### Multiband Field Services

508. MFS received at least $4.5 million in stolen FSCLE funds and laundered those funds through Multiband Global as part of the AMRR/Multiband Global Scheme.

509. Using the stolen funds laundered through MFS, Multiband Global acquired AMRR which in turn used approximately $40 million in stolen FSCLE funds to acquire AMR Resources from OnePath.

510.    The Enterprise affected interstate commerce.

511.    None of the commercial transactions engaged in by MFS were for the purpose of investing in securities on the open market without an intent to control the issuer.

512.    As a direct and proximate result of MFS's racketeering activities and in violation of 18 U.S.C. § 1962(a) and/or (b), FSCLE has been damaged in an amount that exceeds $75,000.  FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

### Multiband Global

513.    Multiband Global received at least $4.5 million in stolen FSCLE funds as part of the AMRR/Multiband Global Scheme and, using the stolen funds laundered through MFS, acquired AMRR which in turn used approximately $40 million in stolen FSCLE funds to acquire AMR Resources from OnePath.

514.    Multiband Global caused all or part of the securities it owned in AMRR, which are proceeds of the stolen FSCLE funds, to be transferred to the Frinzi Family Trust.

515.    The Enterprise affected interstate commerce.

516.    None of the commercial transactions engaged in by Multiband Global were for the purpose of investing in securities on the open market without an intent to control the issuer.

517.    As a direct and proximate result of Multiband Global's racketeering activities and in violation of 18 U.S.C. § 1962(a) and/or (b), FSCLE has been damaged in an amount that exceeds $75,000.  FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

**AMR Resources**

518.    AMR Resources is a special purpose entity, which was created by Frinzi, AMRR, Multiband Global, and OnePath, and it acquired the businesses of OnePath as part of the AMRR/Multiband Global Scheme.

519.    AMR Resources has operated the OnePath businesses and caused income derived from those businesses to be used and invested by AMRR, Multiband Global, Jim Frinzi, John Goodman, and the Frinzi Family Trust as part of the Enterprise.

520.    The Enterprise affected interstate commerce.

521.    None of the commercial transactions engaged in by AMR Resources were for the purpose of investing in securities on the open market without an intent to control the issuer.

522.    As a direct and proximate result of AMR Resources' racketeering activities and in violation of 18 U.S.C. § 1962(a) and/or (b), FSCLE has been damaged in an amount that exceeds $75,000.  FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

**Goodman Investment Holdings**

523.    GIH sought and accepted stolen FSCLE funds including but not limited to receiving in excess of $11 million in funds laundered through the alleged sale of bonds to the Auerbachs through Alliance, Hudson and Auerbach Partners as part of the Alliance/Hudson/Auerbach Scheme.

524.    GIH used those stolen funds to found and control Endeavor.

525.    GIH and Endeavor acquired the business assets from Genesis-ATC, which had been obtained from OnePath for no consideration, and controlled these assets as a result of Prosperity Bank's Loan Scheme.

526.    Genesis-ATC was directly involved in the Enterprise.

527.     The Enterprise affected interstate commerce.

528.    None of the commercial transactions engaged in by GIH were for the purpose of investing in securities on the open market without an intent to control the issuer.

529.    As a direct and proximate result of GIH racketeering activities and in violation of 18 U.S.C. § 1962(a) and/or (b), FSCLE has been damaged in an amount that exceeds $75,000.  FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

### James Frinzi and the Frinzi Family Trust

530.    James Frinzi sought and accepted stolen FSCLE funds through a variety of sources not the least of which were the compensation paid to Frinzi as the CEO or President of Goodman Networks, GNET ATC, MFS, Multiband Global, AMRR, AMR Resources and a variety of other companies with the express purpose of orchestrating the various fraudulent schemes set forth herein.

531.    Frinzi and/or the Frinzi Family Trust sought and accepted stolen funds through the shares in in AMRR, AMR Resources, Multiband Global and other companies that were obtained through the AMRR/Multiband Global Scheme outlined above.  It is believed those shares were worth more than $1,000,000.

532.    Frinzi and/or the Frinzi Family Trust used the stolen FSCLE funds to acquire Multiband Global, AMRR, AMR Resources and OnePath.

533.    The Enterprise affected interstate commerce.

534.    None of the commercial transactions engaged in by Frinzi and/or the Frinzi Family Trust were for the purpose of investing in securities on the open market without an intent to control the issuer.

535.    As a direct and proximate result of Frinzi's and the Frinzi Family Trust's racketeering activities and in violation of 18 U.S.C. § 1962(a) and/or (b), FSCLE has been damaged in an amount that exceeds $75,000.  FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

**Shalom Auerbach, Neil Auerbach, Auerbach Partners, Alliance and Hudson**

536.    Shalom Auerbach, Neil Auerbach, Auerbach Partners, Alliance and Hudson sought and accepted stolen FSCLE funds through the fraudulent purchase of bonds from James Goodman.  These entities accepted at least $17,032,060 as part of the bond transaction before laundering some of that money back to James Goodman and keeping at least $5,900,107.00 for themselves.

537.    Shalom Auerbach, Neil Auerbach and Auerbach Partners sought and accepted at least $1,200,000 of the fraudulent transaction involving 18920 NW as outlined above.

538.    Shalom Auerbach acquired the construction business of AMRR as a result of his involvement in the AMRR/Multiband Global Scheme, and, at the time of the acquisition, Shalom Auerbach had knowledge that AMRR was proceeds of the funds stolen from the 4352 Account.

539.    They used those funds to further Auerbach Partners, Alliance and/or Hudson which were all part of the Enterprise.

540.    The Enterprise affected interstate commerce.

541. None of the commercial transactions engaged in by Shalom Auerbach, Neil Auerbach and Auerbach Partners were for the purpose of investing in securities on the open market without an intent to control the issuer.

542. As a direct and proximate result of Shalom Auerbach, Neil Auerbach and Auerbach Partners, LP's racketeering activities and in violation of 18 U.S.C. § 1962(a) and/or (b), FSCLE has been damaged in an amount that exceeds $75,000. FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

**18920 NW, Steven Zakharyayev and Evelina Pinkhasova**

543. 18920 NW, Steven Zakharyayev and Evelina Pinkhasova sought and accepted stolen FSCLE funds as described in the 18920 NW Scheme described above.

544. The entire 18920 NW transaction was a fraud designed to launder money through 18920 NW back to James Goodman.

545. Steven Zakharyayev and Evelina Pinkhasova were compensated in stolen FSCLE funds and in other ways for facilitating the theft and laundering and used those funds in part to invest in 18920 NW which was key to the scheme and to the Enterprise.

546. Through the 18920 NW Scheme, 18920 NW, Steven Zakharyayev and Evelina Pinkhasova acquired preferred stock or rights to preferred stock in AMRR.

547. The Enterprise affected interstate commerce.

548. None of the commercial transactions engaged in by 18920 NW, Steven Zakharyayev and Evelina Pinkhasova were for the purpose of investing in securities on the open market without an intent to control the issuer.

549.     As a direct and proximate result of 18920 NW, Steven Zakharyayev and Evelina Pinkhasova racketeering activities and in violation of 18 U.S.C. § 1962(a) and/or (b), FSCLE has been damaged in an amount that exceeds $75,000.  FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

### Prosperity Bank

550.     Prosperity Bank sought and accepted stolen FSCLE funds to pay off the Genesis loans owed to Prosperity Bank.

551.     Prosperity Bank used the funds to reinvest in itself.

552.     Prosperity Bank used the funds to finance James Goodman, Goodman Investments Holdings, Endeavor, and other Goodman or Frinzi controlled entities and thereby obtain an interest in the Enterprise.

553.     Prosperity Bank was central to the overall Enterprise as it permitted fraudulent corporate documents known to its agent, Bater Bates, to be used to withdraw more than $76 million from the FSCLE account.

554.     Prosperity Bank is responsible for the acts of Bater Bates, its employee.

555.     Bates knew the source of the funds and worked with Frinzi and James Goodman to facilitate the theft of those funds.

556.     The Enterprise affected interstate commerce.

557.     None of the commercial transactions engaged in by Prosperity Bank were for the purpose of investing in securities on the open market without an intent to control the issuer.

558.     As a direct and proximate result of Prosperity Bank's racketeering activities and in violation of 18 U.S.C. § 1962(a) and/or (b), FSCLE has been damaged in an amount that

exceeds \$75,000.  FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

## 18 U.S.C. § 1962(c) – Predicate Acts

### James Goodman

559.     James Goodman participated in and facilitated multiple acts of wire fraud in violation of 18 U.S.C. § 1343, including but not limited to causing and permitting the hundreds of invoices as outlined above to be sent from Texas to Tennessee on or after November 3, 2021 when he and his companies (Goodman Networks and GNET ATC) made the decision not to pay FSCLE any of those sums back.  James Goodman knew that the sending of those invoices would prompt FSCLE to transfer funds from FSCLE in Pennsylvania into bank accounts in Texas that he and his associates would then be able to control and would use for purposes other than paying FSCLE back in accordance with the Master Services Agreement.  Goodman pushed to keep the funds flow coming from FSCLE long after the decision was made to stop the reverse funds flow by the continued sending of invoices that were in substance fraudulent after it was obvious to him and others in his circle that neither he nor any of his companies had any intention of performing the Master Services Agreement.

560.     James Goodman participated in and facilitated multiple acts of wire fraud in violation of 18 U.S.C. § 1343, including but not limited to emails between he and Shalom Auerbach, Steven Zakharyayev and Evalina Pinkhasova in connection with the fraudulent bond purchase transaction and the fraudulent 18920 NW stock sale described above.  The emails sent between James Goodman in Texas and Shalom Auerbach, Steven Zakharyayev and/or Evalina Pinkhasova went in interstate communications as they were

located in New York, New Jersey and/or Florida at the time of those communications in

2021.  Each of those transactions involved law firms in Texas and outside of Texas to

paper the fraudulent transactions.  James Goodman participated in those email strings.

He signed the transactional documents associated with the alleged bond sale and the

stock sale and sent them via email outside of Texas to New York, New Jersey and/or

Florida.

561.    James Goodman engaged in acts of bank fraud with and against Prosperity Bank

in violation of 18 U.S.C. § 1344 including but not limited to communicating with Bater

Bates and others at Prosperity Bank that he "authorized" the transfer of control over the

funds at Prosperity Bank when James Goodman and Bater Bates knew that James

Goodman did not have the authority to authorize the transfer of those accounts without

the approval of at least two other directors of Goodman Networks and at that time there

were no other directors of Goodman Networks.  James Goodman further signed

documents to facilitate the transfer control over those accounts when James Goodman

knew that he had no such unilateral authority.  Without the transfer in control of those

accounts including the 4352 Account, it would not have been possible for the Defendants

to commit fraud, theft and money laundering on the scale that they subsequently engaged.

562.    James Goodman committed multiple acts of money laundering in violation of 18

U.S.C. § 1956 including but not limited to:

(a) Directing the payment of "rents" through Goodman Networks or GNET ATC

ultimately to himself when no "rents were then validly due;

(b) Working with Frinzi and the Auerbachs to engage in a fraudulent bond "sale" that

was nothing more than an effort to pull money out of the 4352 Account,

(c) Working with Frinzi, the Auerbachs, Steven Zakharyayev and Evalina Pinkhasova on the fraudulent 18920 NW alleged stock "sale"; and

(d) Working with Frinzi on the AMRR/Multiband Global Scheme as outlined above.

563.     In each of these cases, money from FSCLE first went from outside of Texas into the 4352 Account (as intended) and then was transferred out to a variety of banks outside of Texas including banks in California, Rhode Island, New York, North Carolina, Georgia and/or Florida and then a significant portion of those funds flowed back to Texas bank accounts for the benefit of James Goodman after paying fees to the other participants to launder the funds through them back to James Goodman.  These transactions were done for the purpose of hiding the true source of the funds and making it difficult to trace the funds from the 4352 Account to their end source.  These transactions had no real independent value other than to launder the funds out of the 4352 Account to others.

564.     James Goodman committed multiple acts of causing stolen funds with a value greater than $5,000 to be sent across state lines in violation of 18 U.S.C. § 2314 including but not limited to:

(a) The fraudulent bond "sale" involving the Auerbachs as described in detail above. The stolen funds from the 4352 Account went from the 4352 Account in Texas to an account in the name of Alliance outside of Texas, to accounts for Hudson and then Auerbach Partners outside of Texas and back into Texas into a bank account for the benefit of James Goodman;

(b) The fraudulent 18920 NW stock "sale" in which funds stolen from the 4352 Account were sent from Texas to the account for 18920 NW in either Florida or the northeast and then were sent back to an account in Texas for the benefit of James Goodman;

(c) The AMRR/Multiband Global Scheme as outlined above.  The funds used in this scheme came from the 4352 Account in Texas through accounts at East West Bank in California and then back to accounts in Texas for the benefit of James Goodman.

In each of these instances James Goodman knew that the funds were stolen and that the funds were being routed through banks outside of Texas as part of the money laundering scheme.  James Goodman sent these stolen funds and then accepted them for his own purposes.

565.    James Goodman committed multiple acts of receiving stolen funds with a value greater than $5,000 that were sent across state lines in violation of 18 U.S.C. § 2315 including but not limited to:

(d) The fraudulent bond "sale" involving the Auerbachs as described in detail above. The stolen funds from the 4352 Account went from the 4352 Account in Texas to an account in the name of Alliance outside of Texas, to accounts for Hudson and then Auerbach Partners outside of Texas and back into Texas into a bank account for the benefit of James Goodman;

(e) The fraudulent 18920 NW stock "sale" in which funds stolen from the 4352 Account were sent from Texas to the account for 18920 NW in either Florida or the northeast and then were sent back to an account in Texas for the benefit of James Goodman;

(f)  The AMRR/Multiband Global Scheme as outlined above.  The funds used in this

scheme came from the 4352 Account in Texas through accounts at East West Bank in

California and then back to accounts in Texas for the benefit of James Goodman.

In each of these instances James Goodman knew that the funds were stolen and that the
funds were being routed through banks outside of Texas as part of the money laundering
scheme.  James Goodman accepted these stolen funds and used them for his own
purposes.

566.     James Goodman committed acts involving fraud connected with a bankruptcy case

under title 11 of the United States Code, including the following violations under 18 U.S.C.

§ 152:

   a.  In contemplation of bankruptcy and after the filing of a bankruptcy case, James

   Goodman knowingly and fraudulently transferred and concealed funds and

   proceeds of the 4352 Account, which had been obtained from the Enterprise, in an

   effort to frustrate a United States Bankruptcy Court, the appointed bankruptcy

   trustee, the bankruptcy estate, and the bankruptcy creditors, including FSCLE, and

   aid the Enterprise; and

   b.  In furtherance of the schemes described above, James Goodman knowingly and

   fraudulently made false entries, oaths, statements, certificates, verifications,

   schedules, books, records, papers, accounts, and declarations in, related to, and in

   contemplation of, the bankruptcy case in an effort to frustrate a United States

   Bankruptcy Court, the appointed bankruptcy trustee, the bankruptcy estate, and the

   bankruptcy creditors, including FSCLE, and aid the Enterprise.

567.     As a direct and proximate result of James Goodman's racketeering activities and in violation of 18 U.S.C. § 1962(c), FSCLE has been damaged in an amount that exceeds $75,000.  FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

**John Goodman**

568.     John Goodman committed one or more acts of receiving stolen funds with a value greater than $5,000 that were sent across state lines in violation of 18 U.S.C. § 2315 including but not limited to: (a) the $700,000 in funds paid to him on Nov. 2, 2022 of which he kept $450,000 and used the rest to pay professional fees; and (b) a portions of the stolen funds as laundered through the 18920 NW scheme went to John Goodman.

569.     The original source of these payments was the stolen FSCLE funds from the 4352 Account at Prosperity Bank in Texas.

570.     The funds flowed from Prosperity Bank in Texas to East West Bank in California and banks in the northeast and North Carolina and then back to John Goodman in Texas.

571.     Goodman knew the source of the funds and knew or should have known that the funds were stolen.

572.     John Goodman committed multiple acts of money laundering in violation of 18 U.S.C. § 1956 including but not limited to:

(a) Working with Frinzi, the Auerbachs, Steven Zakharyayev and Evalina Pinkhasova on the fraudulent 18920 NW alleged stock "sale"; and

(b) Working with Frinzi on the AMRR/Multiband Global Scheme as outlined above to receive the $700,000 payment.

573.     In each of these cases, money from FSCLE first went from outside of Texas into

the 4352 Account (as intended) and then was transferred out to a variety of banks outside

of Texas including banks in California, the northeast, Georgia and/or Florida and then a

significant portion of those funds flowed back to Texas bank accounts for the benefit of

John Goodman after paying fees to the other participants to launder the funds through

them back to John Goodman.  These transactions were done for the purpose of hiding the

true source of the funds and making it difficult to trace the funds from the 4352 Account

to their end source.  These transactions had no real independent value other than to

launder the funds out of the 4352 Account to others.

574.     John Goodman committed acts involving fraud connected with a bankruptcy case

under title 11 of the United States Code, including the following violations under 18

U.S.C. § 152:

    c.   In contemplation of bankruptcy and after the filing of a bankruptcy case, John

Goodman knowingly and fraudulently transferred and concealed assets and funds,

which had been obtained from the Enterprise, in an effort frustrate a United States

Bankruptcy Court, the appointed bankruptcy trustee, the bankruptcy estate, and the

bankruptcy creditors, including FSCLE;

    d.   In furtherance of the schemes described above, John Goodman knowingly and

fraudulently made false entries, oaths, statements, certificates, verifications,

schedules, books, records, papers, accounts, and declarations in, related to, and in

contemplation of, the bankruptcy case in an effort to frustrate a United States

Bankruptcy Court, the appointed bankruptcy trustee, the bankruptcy estate, and the

bankruptcy creditors, including FSCLE, and aid the Enterprise; and

e.  While acting or forbearing to act in a bankruptcy case, John Goodman knowingly and fraudulently gave, offered, received, and attempted to obtain money, property, remuneration, compensation, reward, and advantage, including but not limited to $700,000, the AMRR construction business, and the release of the put option on the GTH Stock.

575.  John Goodman engaged in multiple acts of wire fraud in violation of 18 U.S.C. § 1343 including but not limited to the emails and document he sent to and from lawyers in Florida as part of his bankruptcy fraud as outlined above.

576.  As a direct and proximate result of John Goodman's racketeering activities and in violation of 18 U.S.C. § 1962(c), FSCLE has been damaged in an amount that exceeds $75,000.  FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

**GNET ATC**

577.  GNET ATC committed multiple acts of causing stolen funds with a value greater than $5,000 to be sent across state lines in violation of 18 U.S.C. § 2314 including but not limited to:

(a) The fraudulent 18920 NW stock "sale" in which funds stolen from the 4352 Account were sent from Texas to the account for 18920 NW in either Florida or the northeast and then were sent back to bank accounts in Texas; and

(b) The AMRR/Multiband Global Scheme as outlined above.  The funds used in this scheme came from the 4352 Account in Texas through accounts at East West Bank in California and then back to accounts in Texas.

578.    In each of these instances GNET ATC knew that the funds were stolen and that the funds were being routed through banks in Texas to banks outside of Texas as part of the money laundering scheme.

579.    GNET ATC participated in and facilitated multiple acts of wire fraud in violation of 18 U.S.C. § 1343, including but not limited to causing and permitting the hundreds of invoices as outlined above to be sent from Texas to Tennessee on or after November 3, 2021 when Goodman Networks and GNET ATC made the decision not to pay FSCLE any of those sums back.  GNET ATC knew that the sending of those invoices would prompt FSCLE to pay money from FSCLE outside of Texas into bank accounts in Texas that the Goodman or Frinzi and their associates would then be able to control and would use for purposes other than paying FSCLE back in accordance with the Master Services Agreement.  GNET ATC pushed to keep the funds flow coming from FSCLE by the continued sending of invoices that were in substance fraudulent after it was obvious to GNET ATC and others that Goodman Networks had no intention of performing the Master Services Agreement.

580.    GNET ATC participated in and facilitated multiple acts of wire fraud in violation of 18 U.S.C. § 1343, including but not limited to emails and texts between Jim Frinzi and Shalom Auerbach, Steven Zakharyayev and Evalina Pinkhasova in connection with the AMRR/Multiband Global Scheme and the fraudulent 18920 NW Scheme described above.  The emails sent between Jim Frinzi in Texas and Shalom Auerbach, Steven Zakharyayev and/or Evalina Pinkhasova went in interstate communications as they were located in New York, New Jersey and/or Florida at the time of those communications in 2021.  Each of those transactions involved law firms in Texas and outside of Texas to

paper the fraudulent transactions. Jim Frinzi participated in those email strings and was an officer/manager/owner of GNET ATC at the time of those communications.

581.    GNET ATC committed offenses involving fraud connected with a bankruptcy case under title 11 of the United States Code, including the following violations under 18 U.S.C. § 152:

> (a) In contemplation of bankruptcy and after the filing of a bankruptcy case, GNET ATC knowingly and fraudulently transferred and concealed assets and funds, which had been obtained from the Enterprise, in an effort frustrate a United States Bankruptcy Court, the appointed bankruptcy trustee, the bankruptcy estate, and the bankruptcy creditors, including FSCLE, and aid the Enterprise; and

> (b) GNET ATC knowingly and fraudulently made false entries, oaths, statements, certificates, verifications, schedules, books, records, papers, accounts, and declarations in, related to, and in contemplation of, the bankruptcy case in an effort to frustrate a United States Bankruptcy Court, the appointed bankruptcy trustee, the bankruptcy estate, and the bankruptcy creditors, including FSCLE, and aid the Enterprise.

582.    As a direct and proximate result of GNET ATC's racketeering activities and in violation of 18 U.S.C. § 1962(c), FSCLE has been damaged in an amount that exceeds $75,000. FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

### AMRR and AMR Resources

583.    AMRR and AMR Resources committed one or more acts of receiving stolen funds with a value greater than $5,000 that were sent across state lines in violation of 18

U.S.C. § 2315 including but not limited to the $44 million sent to AMRR's bank accounts at East West Bank in California from the 4352 Account at Prosperity Bank in Texas.

584.     The original source of these payments was the stolen FSCLE funds from the 4352 Account at Prosperity Bank in Texas.

585.     AMRR and AMR Resources knew the source of the funds and knew or should have known that the funds were stolen.  It had no value prior to be purchased as an Over-the-Counter shell company.

586.     AMRR and AMR Resources committed multiple acts of causing stolen funds with a value greater than $5,000 to be sent across state lines in violation of 18 U.S.C. § 2314 including but not limited to the funds that flowed through AMRR and AMR Resources to Multiband Global, Frinzi, Frinzi Family Trust, OnePath and the Goodmans.

587.     These transactions involved funds from flowing from Texas to East West Bank in California to banks in Georgia, the northeast and ultimately back to Texas.

588.     AMRR and AMR Resources committed multiple acts of money laundering in violation of 18 U.S.C. § 1956 including but not limited to:

(a) working through Frinzi, the Auerbachs, Steven Zakharyayev and Evalina Pinkhasova on the fraudulent 18920 NW alleged stock "sale"; and

(b) working through Frinzi on the AMRR/Multiband Global Scheme as outlined above.

589.     In each of these cases, money from FSCLE first went from outside of Texas into the 4352 Account (as intended) and then was transferred out to a variety of banks outside of Texas including banks in California, the northeast, Georgia and/or Florida and then a significant portion of those funds flowed back to Texas bank accounts after paying fees to the other participants to launder the funds.  These transactions were done for the purpose

of hiding the true source of the funds and making it difficult to trace the funds from the 4352 Account to their end source. These transactions had no real independent value other than to launder the funds out of the 4352 Account to others.

590.     AMRR and AMR Resources committed offenses involving fraud connected with a bankruptcy case under title 11 of the United States Code, including the following violations under 18 U.S.C. § 152:

(a) In contemplation of bankruptcy and after the filing of a bankruptcy case, AMRR and AMR Resources knowingly and fraudulently transferred and concealed assets and funds, which had been obtained from the Enterprise, in an effort frustrate a United States Bankruptcy Court, the appointed bankruptcy trustee, the bankruptcy estate, and the bankruptcy creditors, including FSCLE, and aid the Enterprise; and

(b) AMRR and AMR Resources knowingly and fraudulently made false entries, oaths, statements, certificates, verifications, schedules, books, records, papers, accounts, and declarations in, related to, and in contemplation of, the bankruptcy case in an effort to frustrate a United States Bankruptcy Court, the appointed bankruptcy trustee, the bankruptcy estate, and the bankruptcy creditors, including FSCLE, and aid the Enterprise.

591.     AMRR and AMR Resources fraudulently concealed the nature of the Enterprise and its receipt of the stolen FSCLE funds from its mandatory reporting to Securities and Exchange Commission, and AMRR and AMR Resources fraudulently held out the fraudulent AMRR Note and Security Agreement as valid commercial transactions in its reporting to the Securities and Exchange Commission.

592.     As a direct and proximate result of AMRR's racketeering activities and in violation of 18 U.S.C. § 1962(c), FSCLE has been damaged in an amount that exceeds $75,000.  FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

### Multiband Field Services

593.     MFS committed one or more acts of receiving stolen funds with a value greater than $5,000 that were sent across state lines in violation of 18 U.S.C. §§ 2314 and 2315 including but not limited to the portion of the $4.5 million originally sent to Multiband Global's bank accounts at East West Bank in California from the 4352 Account at Prosperity Bank in Texas.

594.     MFS committed multiple acts of causing stolen funds with a value greater than $5,000 to be sent across state lines in violation of 18 U.S.C. § 2314 including but not limited to the funds that flowed through Multiband Global to OnePath, Frinzi, Frinzi Family Trust, and the Goodmans.

595.     The original source of these payments was the stolen FSCLE funds from the 4352 Account at Prosperity Bank in Texas.

596.     MFS knew the source of the funds and knew or should have known that the funds were stolen.

597.     MFS committed multiple acts of money laundering in violation of 18 U.S.C. § 1956 including but not limited to:

(a) working through Frinzi on the AMRR/Multiband Global Scheme as outlined above. In each of these cases, money from FSCLE first went from outside of Texas into the 4352 Account (as intended) and then was transferred out to a variety of banks outside of Texas

including banks in California, the northeast, Georgia and/or Florida and then a significant
portion of those funds flowed back to Texas bank accounts after paying fees to the other
participants to launder the funds.  These transactions were done for the purpose of hiding
the true source of the funds and making it difficult to trace the funds from the 4352
Account to their end source.  These transactions had no real independent value other than
to launder the funds out of the 4352 Account to others.

598.       As a direct and proximate result of MFS's racketeering activities and in violation
of 18 U.S.C. § 1962(c), FSCLE has been damaged in an amount that exceeds $75,000.
FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees
and costs pursuant to 18 U.S.C. § 1964(c).

**Multiband Global**

599.       Multiband Global committed one or more acts of receiving stolen funds with a
value greater than $5,000 that were sent across state lines in violation of 18 U.S.C. §
2315 including but not limited to the portion of the $4.5 million originally sent to
Multiband Global's bank accounts at East West Bank in California from the 4352
Account at Prosperity Bank in Texas.

600.       The original source of these payments was the stolen FSCLE funds from the 4352
Account at Prosperity Bank in Texas.

601.       Multiband Global knew the source of the funds and knew or should have known
that the funds were stolen.

602.       Multiband Global committed multiple acts of causing stolen funds with a value
greater than $5,000 to be sent across state lines in violation of 18 U.S.C. § 2314 including

but not limited to the funds that flowed through Multiband Global to OnePath and the Goodmans.

603.     These transactions involved from flowing from Texas to East West Bank in California to banks in Georgia, the northeast and ultimately back to Texas.

604.     Multiband Global committed multiple acts of money laundering in violation of 18 U.S.C. § 1956 including but not limited to:

(a) Working through Frinzi, the Auerbachs, Steven Zakharyayev and Evalina Pinkhasova on the fraudulent 18920 NW alleged stock "sale"; and

(b) Working through Frinzi on the AMRR/Multiband Global Scheme as outlined above. In each of these cases, money from FSCLE first went from outside of Texas into the 4352 Account (as intended) and then was transferred out to a variety of banks outside of Texas including banks in California, the northeast, Georgia and/or Florida and then a significant portion of those funds flowed back to Texas bank accounts after paying fees to the other participants to launder the funds.  These transactions were done for the purpose of hiding the true source of the funds and making it difficult to trace the funds from the 4352 Account to their end source.  These transactions had no real independent value other than to launder the funds out of the 4352 Account to others.

605.     As a direct and proximate result of Multiband Global's racketeering activities and in violation of 18 U.S.C. § 1962(c), FSCLE has been damaged in an amount that exceeds $75,000.  FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

**OnePath**

606.     OnePath committed one or more acts of receiving stolen funds with a value greater than $5,000 that were sent across state lines in violation of 18 U.S.C. § 2315 including but not limited to the portion of the $44 million originally sent to AMRR's bank accounts at East West Bank in California from the 4352 Account at Prosperity Bank in Texas.  The funds were first sent to AMRR and then to OnePath.

607.     The original source of these payments was the stolen FSCLE funds from the 4352 Account at Prosperity Bank in Texas.

608.     OnePath knew the source of the funds and knew or should have known that the funds were stolen.

609.     OnePath committed multiple acts of causing stolen funds with a value greater than $5,000 to be sent across state lines in violation of 18 U.S.C. § 2314 including but not limited to the funds that flowed through OnePath to the Goodmans.

610.     These transactions involved from flowing from Texas to East West Bank in California to banks in Georgia, the northeast and ultimately back to Texas.

611.     OnePath committed multiple acts of money laundering in violation of 18 U.S.C. § 1956 including but not limited to working through Frinzi on the AMRR/Multiband Global Scheme as outlined above.

612.     In each of these cases, money from FSCLE first went from outside of Texas into the 4352 Account (as intended) and then was transferred out to a variety of banks outside of Texas including banks in California, the northeast, Georgia and/or Florida and then a significant portion of those funds flowed back to Texas bank accounts after paying fees to the other participants to launder the funds.  These transactions were done for the purpose

of hiding the true source of the funds and making it difficult to trace the funds from the 4352 Account to their end source.  These transactions had no real independent value other than to launder the funds out of the 4352 Account to others.

613.    As a direct and proximate result of OnePath's racketeering activities and in violation of 18 U.S.C. § 1962(c), FSCLE has been damaged in an amount that exceeds $75,000.  FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

### Goodman Investment Holdings

614.    GIH committed one or more acts of receiving stolen funds with a value greater than $5,000 that were sent across state lines in violation of 18 U.S.C. § 2315 including but not limited to in excess of $11,000,000 in stolen FSCLE funds paid to it by Hudson as part of the Alliance/Hudson/Auerbach Scheme outlined above herein.

615.    $10,570,912 was paid directly to GIH by Hudson.

616.    $561,041 was paid to GIH by first paying it to Genesis-ATC.  Genesis-ATC was acquired by Endeavor.  GIH owns Endeavor.

617.    The original source of these payments was the stolen FSCLE funds from the 4352 Account at Prosperity Bank in Texas.

618.    GIH knew the source of the funds and knew or should have known that the funds were stolen.

619.    GIH committed multiple acts of money laundering in violation of 18 U.S.C. § 1956 including but not limited to:

(a) Working through Frinzi on the AMRR/Multiband Global Scheme as outlined above;

(b) Working with Frinzi, Alliance, Hudson and the Auerbachs to launder the bond "sale"
money through to the Goodmans; and

(c) Founding and owning Endeavor which owns Genesis-ATC or for which Genesis-
ATC was merged into Endeavor.

620.      In each of these cases, money from FSCLE first went from outside of Texas into
the 4352 Account (as intended) and then was transferred out to a variety of banks outside
of Texas including banks in California, the northeast, Georgia and/or Florida and then a
significant portion of those funds flowed back to Texas bank accounts after paying fees to
the other participants to launder the funds.  These transactions were done for the purpose
of hiding the true source of the funds and making it difficult to trace the funds from the
4352 Account to their end source.  These transactions had no real independent value
other than to launder the funds out of the 4352 Account to others.

621.      As a direct and proximate result of GIH's racketeering activities and in violation
of 18 U.S.C. § 1962(c), FSCLE has been damaged in an amount that exceeds $75,000.
FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees
and costs pursuant to 18 U.S.C. § 1964(c).

**Jim Frinzi**

622.      Jim Frinzi participated in and facilitated multiple acts of wire fraud in violation of
18 U.S.C. § 1343, including but not limited to causing and permitting the hundreds of
invoices as outlined above to be sent from Texas to Tennessee on or after November 3,
2021 when he and his companies (Goodman Networks and GNET ATC) made the
decision not to pay FSCLE any of those sums back.  Jim Frinzi knew that the sending of
those invoices would prompt FSCLE to pay money from FSCLE outside of Texas into

bank accounts in Texas that he and his associates would then be able to control and would use for purposes other than paying FSCLE back in accordance with the Master Services Agreement.  Frinzi pushed to keep the funds flow coming from FSCLE long by the continued sending of invoices that were in substance fraudulent after it was obvious to him and others in his circle that neither he nor any of his companies had any intention of performing the Master Services Agreement.

623.     Jim Frinzi participated in and facilitated multiple acts of wire fraud in violation of 18 U.S.C. § 1343, including but not limited to emails and texts between he and Shalom Auerbach, Steven Zakharyayev and Evalina Pinkhasova in connection with the fraudulent bond purchase transaction and the fraudulent 18920 NW stock sale described above.  The emails sent between Jim Frinzi in Texas and Shalom Auerbach, Steven Zakharyayev and/or Evalina Pinkhasova went in interstate communications as they were located in New York, New Jersey and/or Florida at the time of those communications in 2021 and 2022.   As detailed above, those wire communications occurred on December 9, 2021, January 3, 4, and 31, February 28 and March 9, 2022 among others.  Frinzi also had wire communications with San Blass Securities in Georgia in connection with these fraudulent transactions.  Each of those transactions involved persons and professionals in Texas and outside of Texas to paper the fraudulent transactions.  Jim Frinzi participated in those email strings and calls.  He signed certain transactional documents associated with the alleged stock sale and sent them via email outside of Texas to New York, New Jersey and/or Florida.

624.     James Frinzi engaged in acts of bank fraud with and against Prosperity Bank in violation of 18 U.S.C. § 1344 including but not limited to communicating with Bater

Bates and others at Prosperity Bank that he "authorized" the transfer of control over the

funds at Prosperity Bank when Jim Frinzi and Bater Bates knew that Jim Frinzi did not

have the authority to authorize the transfer of those accounts without the approval of at

least two other directors of Goodman Networks and at that time there were no other

directors of Goodman Networks.  Jim Frinzi further sent false documents to facilitate the

transfer of those accounts when Frinzi knew that the documents were without authority

and were false.  Without the transfer in control of those accounts including the 4352

Account, it would not have been possible for the Defendants to commit fraud, theft and

money laundering on the scale that they subsequently engaged.  Jim Frinzi misued or

directed others to misuse banking login credentials in an effort to facilitate wire transfers

in December 2021 in furtherance of the AMRR/Multiband Global Scheme.

625.      Jim Frinzi committed multiple acts of money laundering in violation of 18 U.S.C.

§ 1956 including but not limited to:

(a) Directing the payment of "rents" through Goodman Networks or GNET ATC

ultimately to James Goodman when no "rents were then validly due;

(b) Working with James Goodman and the Auerbachs to engage in a fraudulent bond

"sale" that was nothing more than an effort to pull money out of the 4352 Account,

(c) Working with James Goodman, the Auerbachs, Zakharyayev and Pinkhasova on the

fraudulent 18920 NW alleged stock "sale"; and

(d) Working with James Goodman on the AMRR/Multiband Global Scheme as outlined

above.

626.      In each of these cases, money from FSCLE first went from outside of Texas into

the 4352 Account (as intended) and then was transferred out to a variety of banks outside

of Texas including banks in California, the northeast, Georgia and/or Florida and then a

significant portion of those funds flowed back to Texas bank accounts for the benefit of

Jim Frinzi and/or the Frinzi Family Trust after paying fees to the other participants to

launder the funds through them to Frinzi and/or the Frinzi Family Trust.  These

transactions were done for the purpose of hiding the true source of the funds and making

it difficult to trace the funds from the 4352 Account to their end source.  These

transactions had no real independent value other than to launder the funds out of the 4352

Account to others.

627.     Jim Frinzi committed multiple acts of causing stolen funds with a value greater

than $5,000 to be sent across state lines in violation of 18 U.S.C. § 2314 including but not

limited to:

(a) The fraudulent bond "sale" involving the Auerbachs as described in detail above.
The stolen funds from the 4352 Account went from the 4352 Account in Texas to an
account in the name of Alliance outside of Texas, to accounts for Hudson and then
Auerbach Partners outside of Texas and back into Texas into a bank account for the
benefit of James Goodman;

(b) The fraudulent 18920 NW stock "sale" in which funds stolen from the 4352 Account
were sent from Texas to the account for 18920 NW in either Florida or the northeast
and then were sent back to an account in Texas for the benefit of James Goodman an
John Goodman;

(c) The AMRR/Multiband Global Scheme as outlined above.  The funds used in this
scheme came from the 4352 Account in Texas through accounts at East West Bank in

California and then back to accounts in Texas for the benefit of James Goodman, Jim

Frinzi and/or the Frinzi Family Trust.

628.       In each of these instances Frinzi knew that the funds were stolen and that the

funds were being routed through banks outside of Texas as part of the money laundering

scheme.  Jim Frinzi sent these stolen funds and then accepted them for his own purposes.

629.       Jim Frinzi committed multiple acts of receiving stolen funds with a value greater

than $5,000 that were sent across state lines in violation of 18 U.S.C. § 2315 including

but not limited to:

(a) The fraudulent bond "sale" involving the Auerbachs as described in detail above.

The stolen funds from the 4352 Account went from the 4352 Account in Texas to an

account in the name of Alliance outside of Texas, to accounts for Hudson and then

Auerbach Partners outside of Texas and back into Texas into a bank account for the

benefit of James Goodman;

(b) The fraudulent 18920 NW stock "sale" in which funds stolen from the 4352 Account

were sent from Texas to the account for 18920 NW in either Florida or the northeast

and then were sent back to an account in Texas for the benefit of James Goodman and

John Goodman;

The AMRR/Multiband Global Scheme as outlined above.  The funds used in this

scheme came from the 4352 Account in Texas through accounts at East West Bank in

California and then back to accounts in Texas for the benefit of James Goodman, Jim

Frinzi and/or the Frinzi Family Trust.

630.       In each of these instances Frinzi knew that the funds were stolen and that the

funds were being routed through banks outside of Texas as part of the money laundering

scheme. Frinzi accepted these stolen funds and used them for his own purposes and to benefit other Defendants.

631.     James Frinzi committed acts involving fraud connected with a bankruptcy case under title 11 of the United States Code, including the following violations under 18 U.S.C. § 152:

(a) In contemplation of bankruptcy and after the filing of a bankruptcy case, James Frinzi knowingly and fraudulently transferred and concealed funds and proceeds of the 4352 Account, which had been obtained from the Enterprise, in an effort to frustrate a United States Bankruptcy Court, the appointed bankruptcy trustee, the bankruptcy estate, and the bankruptcy creditors, including FSCLE, and aid the Enterprise; and

(b) In furtherance of the schemes described above, James Frinzi knowingly and fraudulently made false entries, oaths, statements, certificates, verifications, schedules, books, records, papers, accounts, and declarations in, related to, and in contemplation of, the bankruptcy case in an effort to frustrate a United States Bankruptcy Court, the appointed bankruptcy trustee, the bankruptcy estate, and the bankruptcy creditors, including FSCLE, and aid the Enterprise.

632.     Jim Frinzi caused AMRR to fraudulently conceal the nature of the Enterprise and AMRR's receipt of the stolen FSCLE funds from its mandatory reporting to Securities and Exchange Commission, and Jim Frinzi caused AMRR to fraudulently hold out the fraudulent AMRR Note and Security Agreement as valid commercial transactions in its reporting to the Securities and Exchange Commission. Jim Frinzi signed each of the

reporting documents containing the frauds that were filed with the Securities and

Exchange Commission.

633.     As a direct and proximate result of Jim Frinzi's racketeering activities and in

violation of 18 U.S.C. § 1962(c), FSCLE has been damaged in an amount that exceeds

$75,000.  FSCLE is entitled to recover its damages, trebled, as well as its reasonable

attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

**The Frinzi Family Trust**

634.     The Frinzi Family Trust committed multiple acts of receiving stolen funds with a

value greater than $5,000 that were sent across state lines in violation of 18 U.S.C. §

2315 including but not limited to:  The AMRR/Multiband Global Scheme as outlined

above.  The funds used in this scheme came from the 4352 Account in Texas through

accounts at East West Bank in California and then back to accounts in Texas for the

benefit of James Goodman, Jim Frinzi and/or the Frinzi Family Trust.

In each of these instances Frinzi knew that the funds were stolen and that the funds were

being routed through banks outside of Texas as part of the money laundering scheme.

Frinzi accepted these stolen funds and used them for his own purposes and to benefit

other Defendants.

635.     The Frinzi Family Trust committed multiple acts of money laundering in violation

of 18 U.S.C. § 1956 including but not limited to: (a) participating in the

AMRR/Multiband Global Scheme as outlined above.

636.     In each of these cases, money from FSCLE first went from outside of Texas into

the 4352 Account (as intended) and then was transferred out to a variety of banks outside

of Texas including banks in California, the northeast, Georgia and/or Florida and then a

significant portion of those funds flowed back to Texas bank accounts for the benefit of

Jim Frinzi and/or the Frinzi Family Trust after paying fees to the other participants to

launder the funds through them to Frinzi and/or the Frinzi Family Trust.  These

transactions were done for the purpose of hiding the true source of the funds and making

it difficult to trace the funds from the 4352 Account to their end source.  These

transactions had no real independent value other than to launder the funds out of the 4352

Account to others.

637.     The Frinzi Family Trust committed acts involving fraud connected with a

bankruptcy case under title 11 of the United States Code, including the following violations

under 18 U.S.C. § 152:

    (a) In contemplation of bankruptcy and after the filing of a bankruptcy case, the Frinzi

        Family Trust knowingly and fraudulently transferred and concealed funds and

        proceeds of the 4352 Account, which had been obtained from the Enterprise, in an

        effort to frustrate a United States Bankruptcy Court, the appointed bankruptcy

        trustee, the bankruptcy estate, and the bankruptcy creditors, including FSCLE, and

        aid the Enterprise; and

    (b) In furtherance of the schemes described above, the Frinzi Family Trust knowingly

        and fraudulently made false entries, oaths, statements, certificates, verifications,

        schedules, books, records, papers, accounts, and declarations in, related to, and in

        contemplation of, the bankruptcy case in an effort to frustrate a United States

        Bankruptcy Court, the appointed bankruptcy trustee, the bankruptcy estate, and the

        bankruptcy creditors, including FSCLE, and aid the Enterprise.

638.     The Frinzi Family Trust caused AMRR to fraudulently conceal the nature of the Enterprise and its receipt of the proceeds of the stolen FSCLE funds from AMRR's mandatory reporting to Securities and Exchange Commission, and the Frinzi Family Trust caused AMRR to fraudulently hold out the fraudulent AMRR Note and Security Agreement as valid commercial transactions in its reporting to the Securities and Exchange Commission.

639.     As a direct and proximate result of the Frinzi Family Trust's racketeering activities and in violation of 18 U.S.C. § 1962(c), FSCLE has been damaged in an amount that exceeds $75,000.  FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

**Shalom Auerbach**

640.     Shalom Auerbach participated in and facilitated multiple acts of wire fraud in violation of 18 U.S.C. § 1343, including but not limited to emails and texts between he and Jim Frinzi, James Goodman, Steven Zakharyayev and Evalina Pinkhasova in connection with the fraudulent bond purchase transaction and the fraudulent 18920 NW stock sale described above.  The emails sent between Jim Frinzi or James Goodman in Texas and Shalom Auerbach, Steven Zakharyayev and/or Evalina Pinkhasova went in interstate communications as they were located in New York, New Jersey and/or Florida at the time of those communications in 2021 and 2022.   As detailed above, those wire communications occurred on December 9, 2021, January 3, 4, and 31, February 28 and March 9, 2022 among others.  Shalom Auerbach also had wire communications with San Blass Securities in Georgia in connection with these fraudulent transactions.  Each of those transactions involved persons and professionals in Texas and outside of Texas to

paper the fraudulent transactions.  Shalom Auerbach participated in those email strings and calls.  He signed certain transactional documents associated with the alleged stock sale and the bond purchase and sent them via email from New York to Texas, Georgia, New Jersey and/or Florida.

641.     Shalom Auerbach committed multiple acts of money laundering in violation of 18 U.S.C. § 1956 including but not limited to:

(a)  Working with James Goodman, Jim Frinzi and Neil Auerbach to engage in a fraudulent bond "sale" that was nothing more than an effort to pull money out of the 4352 Account; and

(b) Working with James Goodman, Jim Frinzi, Zakharyayev and Pinkhasova on the fraudulent 18920 NW alleged stock "sale".

642.     In each of these cases, money from FSCLE first went from outside of Texas into the 4352 Account (as intended) and then was transferred out to a variety of banks outside of Texas including banks in California, the northeast, Georgia and/or Florida and then a significant portion of those funds flowed back to Texas bank accounts for the benefit of James Goodman and/or John Goodman after taking fees for himself and Auerbach Partners to launder the funds.  These transactions were done for the purpose of hiding the true source of the funds and making it difficult to trace the funds from the 4352 Account to their end source.  These transactions had no real independent value other than to launder the funds out of the 4352 Account to others.

643.     Shalom Auerbach committed multiple acts of causing stolen funds with a value greater than $5,000 to be sent across state lines in violation of 18 U.S.C. § 2314 including but not limited to:

(a) The fraudulent bond "sale" as described in detail above.  The stolen funds from the
4352 Account went from the 4352 Account in Texas to an account in the name of
Alliance outside of Texas, to accounts for Hudson and then Auerbach Partners
outside of Texas and back into Texas into a bank account for the benefit of James
Goodman; and

The fraudulent 18920 NW stock "sale" in which funds stolen from the 4352 Account
were sent from Texas to the account for 18920 NW in either Florida or the northeast
and then were sent back to an account in Texas for the benefit of James Goodman.

644.     In each of these instances Shalom Auerbach knew that the funds were stolen and
that the funds were being routed through banks outside of Texas as part of the money
laundering scheme.  Shalom Auerbach sent these stolen funds and then accepted them for
his own purposes.

645.     Shalom Auerbach committed multiple acts of receiving stolen funds with a value
greater than $5,000 that were sent across state lines in violation of 18 U.S.C. § 2315
including but not limited to:

(a) The fraudulent bond "sale" as described in detail above.  The stolen funds from the
4352 Account went from the 4352 Account in Texas to an account in the name of
Alliance outside of Texas, to accounts for Hudson and then Auerbach Partners
outside of Texas and back into Texas into a bank account for the benefit of James
Goodman;

(b) The fraudulent 18920 NW stock "sale" in which funds stolen from the 4352 Account
were sent from Texas to the account for 18920 NW in either Florida or the northeast

and then were sent back to an account in Texas for the benefit of James Goodman and

John Goodman;

646.      In each of these instances Shalom Auerbach knew that the funds were stolen and

that the funds were being routed through banks outside of Texas as part of the money

laundering scheme.  Shalom Auerbach accepted these stolen funds and used them for his

own purposes and to benefit other Defendants.

647.      Shalom Auerbach committed acts involving fraud connected with a bankruptcy

case under title 11 of the United States Code, including the following violations under 18

U.S.C. § 152:

(a) In contemplation of bankruptcy and after the filing of a bankruptcy case, Shalom

Auerbach knowingly and fraudulently transferred and concealed funds and

proceeds of the 4352 Account, which had been obtained from the Enterprise, in an

effort to frustrate a United States Bankruptcy Court, the appointed bankruptcy

trustee, the bankruptcy estate, and the bankruptcy creditors, including FSCLE, and

aid the Enterprise; and

(b) In furtherance of the schemes described above, Shalom Auerbach knowingly and

fraudulently made false entries, oaths, statements, certificates, verifications,

schedules, books, records, papers, accounts, and declarations in, related to, and in

contemplation of, the bankruptcy case in an effort to frustrate a United States

Bankruptcy Court, the appointed bankruptcy trustee, the bankruptcy estate, and the

bankruptcy creditors, including FSCLE, and aid the Enterprise.

(c) Shalom    Auerbach    knowingly    and    fraudulently    participated    in    the

AMRR/Multiband Global Scheme with intent to defeat the provisions of the

Bankruptcy Code and, after the filing of a bankruptcy case, acquired the AMRR construction business from AMRR based on the justification that AMRR was a "melting ice cube" that would lose all value if he did not rescue it at a steep discounted price on commercially unreasonable terms.

648.    Shalom Auerbach, while serving on the AMRR board, caused AMRR to fraudulently conceal the nature of the Enterprise and its receipt of the proceeds of the stolen FSCLE funds from AMRR's mandatory reporting to Securities and Exchange Commission, and Shalom Auerbach, while serving on the AMRR board, caused AMRR to fraudulently hold out the fraudulent AMRR Note and Security Agreement as valid commercial transactions in its reporting to the Securities and Exchange Commission. The AMRR board, including Shalom Auerbach approved or signed AMRR's filings with the Securities and Exchange Commission.

649.    As a direct and proximate result of Shalom Auerbach's racketeering activities and in violation of 18 U.S.C. § 1962(c), FSCLE has been damaged in an amount that exceeds $75,000.  FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

**Neil Auerbach and Auerbach Partners**

650.    Neil Auerbach and Auerbach Partners committed multiple acts of money laundering in violation of 18 U.S.C. § 1956 including but not limited to working with Shalom Auerbach, James Goodman and Jim Frinzi to engage in a fraudulent bond "sale" that was nothing more than an effort to pull money out of the 4352 Account.

In each of these cases, money from FSCLE first went from outside of Texas into the 4352 Account (as intended) and then was transferred out to a variety of banks outside of Texas

including banks in California, the northeast, Georgia and/or Florida and then a significant portion of those funds flowed back to Texas bank accounts for the benefit of James Goodman after taking fees for himself and/or Auerbach Partners to launder the funds. These transactions were done for the purpose of hiding the true source of the funds and making it difficult to trace the funds from the 4352 Account to their end source. These transactions had no real independent value other than to launder the funds out of the 4352 Account to others.

651.    Neil Auerbach committed multiple acts of causing stolen funds with a value greater than $5,000 to be sent across state lines in violation of 18 U.S.C. § 2314 including but not limited to: the fraudulent bond "sale" as described in detail above. The stolen funds from the 4352 Account went from the 4352 Account in Texas to an account in the name of Alliance outside of Texas, to accounts for Hudson and then Auerbach Partners outside of Texas and back into Texas into a bank account for the benefit of James Goodman.

652.    In each of these instances Neil Auerbach knew or should have known that the funds were stolen and that the funds were being routed through banks outside of Texas as part of the money laundering scheme. There was no legitimate business reason to rout the funds flow for the "bond sale" in which the funds simply flowed through his various entities minus a transactional payment of several million dollars. The very nature of the transaction shows his knowledge. Neil Auerbach sent these stolen funds and then accepted them for his own purposes.

653.    Neil Auerbach and Auerbach Partners committed multiple acts of receiving stolen funds with a value greater than $5,000 that were sent across state lines in violation of 18

U.S.C. § 2315 including but not limited to:  the fraudulent bond "sale" as described in detail above.  The stolen funds from the 4352 Account went from the 4352 Account in Texas to an account in the name of Alliance outside of Texas, to accounts for Hudson and then Auerbach Partners outside of Texas and back into Texas into a bank account for the benefit of James Goodman.

654.     In each of these instances Neil Auerbach and/or the Auerbach Partners knew or should have known that the funds were stolen and that the funds were being routed through banks outside of Texas as part of the money laundering scheme.  There was no legitimate business reason to rout the funds flow for the "bond sale" in which the funds simply flowed through his various entities minus a transactional payment of several million dollars.  The very nature of the transaction shows his knowledge and that of Auerbach Partners.   Neil Auerbach and Auerbach Partners accepted these stolen funds and used them for their own purposes and to benefit other Defendants.

655.     As a direct and proximate result of Neil Auerbach and Auerbach Partner's racketeering activities and in violation of 18 U.S.C. § 1962(c), FSCLE has been damaged in an amount that exceeds $75,000.  FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

**Alliance and Hudson**

656.     Alliance and Hudson committed multiple acts of receiving stolen funds with a value greater than $5,000 that were sent across state lines in violation of 18 U.S.C. § 2315 including but not limited to:  the fraudulent bond "sale" as described in detail above.  The stolen funds from the 4352 Account went from the 4352 Account in Texas to an account in the name of Alliance outside of Texas, to accounts for Hudson and then

Auerbach Partners outside of Texas and back into Texas into a bank account for the

benefit of James Goodman.

657.      In each of these instances Alliance and Hudson knew or should have known that

the funds were stolen and that the funds were being routed through banks outside of

Texas as part of the money laundering scheme.  There was no legitimate business reason

to rout the funds flow for the "bond sale" in which the funds simply flowed through his

various entities minus a transactional payment of several million dollars.  The very nature

of the transaction shows the knowledge of Alliance and Hudson.   Alliance and Hudson

accepted these stolen funds and used them for their own purposes and to benefit other

Defendants.

658.      Alliance and Hudson committed multiple acts of money laundering in violation of

18 U.S.C. § 1956 including but not limited to working with Shalom Auerbach, James

Goodman, Jim Frinzi, Zakharyayev and Pinkhasova to engage in a fraudulent bond "sale"

that was nothing more than an effort to pull money out of the 4352 Account.

In each of these cases, money from FSCLE first went from outside of Texas into the 4352

Account (as intended) and then was transferred out to a variety of banks outside of Texas

including banks in California, the northeast, Georgia and/or Florida and then a significant

portion of those funds flowed back to Texas bank accounts for the benefit of James

Goodman, Jim Frinzi and/or the Frinzi Family Trust after taking fees for Alliance and/or

Hudson or simply to wash the funds through their organizations to James Goodman,

Frinzi and/or the Frinzi Family Trust.  These transactions were done for the purpose of

hiding the true source of the funds and making it difficult to trace the funds from the

4352 Account to their end source.  These transactions had no real independent value other than to launder the funds out of the 4352 Account to others.

659.        As a direct and proximate result of Alliance's and Hudson's racketeering activities and in violation of 18 U.S.C. § 1962(c), FSCLE has been damaged in an amount that exceeds $75,000.  FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

### 18920 NW, Steven Zakharyayev and Evalina Pinkhasova

660.        18920 NW, Steven Zakharyayev and Evalina Pinkhasova participated in and facilitated multiple acts of wire fraud in violation of 18 U.S.C. § 1343, including but not limited to emails and texts between them and Jim Frinzi, James Goodman and Shalom Auerbach in connection with the fraudulent bond purchase transaction and the fraudulent 18920 NW stock sale described above.  The emails sent between them and Jim Frinzi or James Goodman in Texas and Shalom Auerbach went in interstate communications as they were located in New York, New Jersey and/or Florida at the time of those communications in 2021 and 2022.   As detailed above, those wire communications occurred in January, February and March, 2022 among others.  Zakharyayev and Pinkhasova signed certain transactional documents associated with the alleged stock sale and the bond purchase and sent them via email from New York to Texas, Georgia, New Jersey and/or Florida.

661.        18920 NW, Steven Zakharyayev and Evalina Pinkhasova committed multiple acts of money laundering in violation of 18 U.S.C. § 1956 including but not limited to working with James Goodman and Jim Frinzi on the fraudulent 18920 NW alleged stock "sale" and the AMRR/Multiband Global Scheme.

662.     In each of these cases, money from FSCLE first went from outside of Texas into the 4352 Account (as intended) and then was transferred out to a variety of banks outside of Texas including banks in California, the northeast, Georgia and/or Florida and then a significant portion of those funds flowed back to Texas bank accounts for the benefit of James Goodman after taking fees for themselves to launder the funds.  These transactions were done for the purpose of hiding the true source of the funds and making it difficult to trace the funds from the 4352 Account to their end source.  These transactions had no real independent value other than to launder the funds out of the 4352 Account to others.

663.     18920 NW, Steven Zakharyayev and Evalina Pinkhasova committed multiple acts of causing stolen funds with a value greater than $5,000 to be sent across state lines in violation of 18 U.S.C. § 2314 including but not limited to:  the fraudulent 18920 NW stock "sale" in which funds stolen from the 4352 Account were sent from Texas to the account for 18920 NW in either Florida or the northeast and then were sent back to an account in Texas for the benefit of James Goodman and John Goodman.

In each of these instances 18920 NW, Steven Zakharyayev and Evalina Pinkhasova knew that the funds were stolen and that the funds were being routed through banks outside of Texas as part of the money laundering scheme.  18920 NW, Steven Zakharyayev and Evalina Pinkhasova sent these stolen funds and then accepted them for their own purposes.

664.     18920 NW, Steven Zakharyayev and Evalina Pinkhasova committed multiple acts of receiving stolen funds with a value greater than $5,000 that were sent across state lines in violation of 18 U.S.C. § 2315 including but not limited to:  the fraudulent 18920 NW stock "sale" in which funds stolen from the 4352 Account were sent from Texas to the

account for 18920 NW in either Florida or the northeast and then were sent back to an account in Texas for the benefit of James Goodman;

665.    In each of these instances 18920 NW, Steven Zakharyayev and Evalina Pinkhasova knew that the funds were stolen and that the funds were being routed through banks outside of Texas as part of the money laundering scheme.  They accepted these stolen funds and used them for their own purposes and to benefit other Defendants.

666.    As a direct and proximate result of 18920 NW, Steven Zakharyayev and Evalina Pinkhasova's racketeering activities and in violation of 18 U.S.C. § 1962(c), FSCLE has been damaged in an amount that exceeds $75,000.  FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

**Prosperity Bank**

667.    Prosperity Bank committed multiple acts of causing stolen funds with a value greater than $5,000 to be sent across state lines in violation of 18 U.S.C. § 2314 including but not limited to the more than $80,000,000 in funds that Prosperity Bank sent out of the 4352 Account to bank accounts at East West Bank in California and other banks outside of Texas including as part of the Alliance/Hudson/Auerbach Scheme, the AMRR/Multiband Global Scheme and the fraudulent 18920 NW Scheme.

668.    Prosperity Bank had visibility into the funds flow into and out of the 4352 Account when it was being used as intended to hold the FSCLE funds before they were paid back to FSCLE less .02%.

669.    Prosperity Bank knew that Frinzi and James Goodman had to validly authorize the transfer of the accounts and the funds listed therein.

670.     Prosperity Bank's Bater Bates knew that Goodman Networks did not have three directors and could not validly authorize transactions.  He further knew that the Fifth Amended Restated Bylaws were fraudulent and unexecuted and yet worked with Frinzi and James Goodman to get them access to the accounts and then worked with them to send the funds out stolen and being used in money laundering schemes.

671.     Bater Bates took these actions to keep the banking business of the Goodmans, Jim Frinzi and the companies controlled by them.

672.     Under these circumstances Prosperity Bank is charged with the knowledge and actions of Bater Bates and thus knew the funds were stolen before sending them out.

673.     Some of the funds stolen from the 4352 Account were used for purposes of paying off loans owed to Prosperity Bank and/or being held as security by Prosperity Bank.

674.     Upon information and belief, after some of the stolen funds were sent out of Prosperity Bank and sent to banks outside of Texas (for example East West Bank in California) as outlined above, some of those funds came back to Prosperity Bank and were deposited into other accounts for one or more of the other Defendants.  Thus, Prosperity Bank also committed multiple acts of receiving stolen funds with a value greater than $5,000 across state lines in violation of 18 U.S.C. § 2315.

675.     Prosperity Bank committed multiple acts of bankruptcy fraud in violation of 18 U.S.C. § 157 as described above including but not limited to causing certain accounts for Goodman Networks to be swept shortly before bond holders attempted to exercise control over the accounts for the purpose of keeping those funds for their own purposes and

Case 22-31641-mvl7    Doc 424-1    Filed 11/09/23    Entered 11/09/23 16:29:38    Desc
Case 3:23-cv-02397-S    Document 1-A    Filed 12/29/23    Page 128 of 153    PageID 128
Exhibit A    Page 129 of 154    Page 128 of 153

continuing to assert that Prosperity Bank had a right to those funds including the portion of those funds that were directly traceable to the 4352 Account.

676.     As a direct and proximate result of Prosperity Bank's racketeering activities and in violation of 18 U.S.C. § 1962(c), FSCLE has been damaged in an amount that exceeds $75,000.  FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

**18 U.S.C. § 1962(d)**

677.     Defendants Jim Frinzi, James Goodman, John Goodman, Jason Goodman, Jody Goodman and Jonathan Goodman together with the entities that they control and acted through (including but not limited to Defendants such as GNET ATC, GIH, GTH, AMRR, AMR Resources, Multiband Global, MFS, the Frinzi Family Trust and Endeavor) entered into an agreement, conspiracy and enterprise in the fall of 2021 to pull as many of the assets out of the Genesis entities, Goodman Networks and GNET ATC as possible in advance of those entities becoming insolvent as a result of the AT&T disputes.

678.     The initial group of conspirators would be joined later by Prosperity Bank (through Bater Bates), the Auerbachs, Steven Zakharyayev, Evalina Pinkhasova and the entities that they control and acted through (including but not limited to Defendants such as 18920 NW, Alliance, Hudson and Auerbach Partners) to launder the money from the 4352 Account back to the Goodmans, Frinzi and the entities they control all while taking payments to facilitate the money laundering and theft.

679.    The initial agreement to pursue this course of actions can be seen in the October

12-13 emails between Frinzi and various people within Goodman Networks including

numerous Goodmans about spinning off various business units and the FSCLE business.

680.    Acts taken in furtherance of this conspiracy include but are not limited to:

(a) James Goodman meeting with Bater Bates on October 14, 2021 to explain the need to

get the funds out of the accounts and solicit his help in doing so;

(b) James Goodman and John Goodman's efforts to effect a change in control of the

Prosperity Accounts after there was only one director at Goodman Networks

including but not limited to sending documents without valid corporate authorization

to do so and pressuring Prosperity Bank to transfer control of the accounts to Frinzi;

(c) Jim Frinzi sending the fraudulent Fifth Amended and Restated Bylaws to Prosperity

bank knowing that they were not validly authorized and doing so for the purpose of

improperly obtaining control over the accounts;

(d) Bater Bates knowing that the Fifth Amended and Restated Bylaws and "signed"

corporate resolutions were false and fraudulent but accepting them anyway to

facilitate the improper control of the accounts;

(e) Frinzi's November 3, 2021 decision to stop any further funds transfer back to FSCLE

all while demanding that invoices continue to be sent to FSCLE to prompt further

funds transfers into the 4352 Account and directing that FSCLE be misled as to true

nature of what was occurring;

(f) The November 10, 2021 email communications between Frinzi, James Goodman, and

Jason Goodman about the need to protect the Goodmans from these transactions;

Case 22-31641-mvl7   Doc 424-1   Filed 11/09/23   Entered 11/09/23 16:29:38   Desc
Case 3:23-cv-02397-S   Document 1A   Filed 01/31/23   Page 130 of 153   PageID 130
Exhibit 1A   Page 131 of 154   Page 130 of 153

(g) Frinzi's December 7, 2021 email directing that the FSCLE business needs to be
maintained and FSCLE not told the true nature of what was occurring;

(h) Frinzi, James Goodman and others at their direction continuing to send invoices to
FSCLE after the November 3 decision to suspend further transfers back to FSCLE
and after the November 23 memo in which Frinzi admitted that Goodman Networks
was insolvent;

(i) Frinzi transferring millions out of the 4352 Account to persons and entities other than
FSCLE; and

(j) James Goodman, John Goodman, Jason Goodman, Jody Goodman, Jonathan
Goodman and Jim Frinzi seeking funds from the 4352 Account knowing the improper
nature of the demand and knowing the funds sent to them were stolen.

681.    Shalom Auerbach agreed to join the conspiracy in early December 2021 (as early
as December 9, 2021) based on phone calls, emails and texts between him and Jim Frinzi
and/or James Goodman.  Shalom Auerbach had done work prior to that to help identify
AMRR as a public shell company that could be purchased but at this point there is not
sufficient evidence to suggest that he knew at that point that AMRR would be used for
fraudulent purposes to launder funds.  However, by early December 2021, the nature of
the plan was sufficiently clear that Auerbach's participation or continued participation is
implicit in his continued association.

682.    Shalom Auerbach was warned by at least one broker dealer that the transactions
made the uncomfortable.  Shalom Auerbach moved forward anyway.

683.    Shalom Auerbach brought Neil Auerbach, Alliance, Hudson, Auerbach Partners,
Steven Zakharyayev, Evalina Pinkhasova and 18920 NW to the conspiracy.

684.     Neil Auerbach's agreement to join the conspiracy to help launder the money can

be seen in his effort to sign off on the funds flow of the bond purchase that had the funds

originally coming from the 4352 Account through Alliance and Hudson back to the

Goodmans and Frinzi and taking nearly $6 million as a fee for facilitating the transaction.

The fact that two sets of funds flow (one showing the real funds flow and one hiding it)

were created and the nature of the transactions themselves shows the improper nature of

the actions and Neil Auerbach's consent to the same.

685.     Steven Zakharyayev's and Evalina Pinkhasova's agreement to join the conspiracy

to launder the stolen funds can be seen in their communications with Frinzi, Shalom

Auerbach and James Goodman.  As with Shalom and Neil Auerbach, the nature of the

transactions and the fact that the original source of the funds is hidden, and the bulk of

the funds go back to the Goodmans with a fee being paid for the facilitation shows the

improper nature of the transactions and their consent to the agreement to launder the

funds.

686.     Acts taken in furtherance of the portion of the conspiracy to launder the stolen

funds including but are not limited to:

(a) Frinzi's actions in December 2021 and January 2022 to take more than $6 million in

stolen FSCLE funds to purchase AMRR through Multiband Global;

(b) Frinzi's and James Goodman's January 1, 2022 efforts to steal in excess of $44 million

from the 4352 Account and then "loan" those funds from GNET ATC to AMRR which

then used a portion of those funds to purchase AMR Resources from OnePath;

(c) Frinzi's forgery of James Goodman's signature on the AMRR "note";

(d) James Goodman's acceptance of various funds from AMRR, AMR Resources, Multiband Global and/or OnePath that were nothing more than funds laundered through those transactions from the 4352 Account to him;

(e) Frinzi's efforts in August 2022 to restructure AMRR and Multiband Global to cause it to be owned in substantial part by him and the Frinzi Family Trust and he and the Frinzi Family Trusts' acceptance of those funds;

(f) The efforts of Frinzi, James Goodman, John Goodman, Steven Zakharyayev, Evalina Pinkhasova and Shalom Auerbach and the entities they control to "settle" fraudulent legal disputes involving AMRR and 18920 NW that resulted in more payments to them that were laundered through those transactions;

(g) Frinzi, James Goodman and Shalom Auerbach exchanging texts and emails about Shalom Auerbach buying bonds in Goodman Networks from James Goodman when Goodman Networks was known to be insolvent;

(h) Shalom Auerbach and/or Neil Auerbach changing the original bond purchase agreement to substitute the purchaser from being Auerbach Partners to Alliance and getting Steven Zakharyayev and Evalina Pinkhasova involved in the effort;

(i) Frinzi causing in excess of $17 million in funds from the 4352 Account to be used as the "payment" for the bonds;

(j) Neil Auerbach, Shalom Auerbach, Jim Frinzi, Steven Zakharyayev and/or Evalina Pinkhasova causing two versions of the funds flow memo on the bond sale to be created to hide the true source of the funds and the flow of the funds;

(k) Neil Auerbach, Shalom Auerbach, Jim Frinzi, Steven Zakharyayev and/or Evalina Pinkhasova and the entities that they control including but not limited to Alliance,

Hudson, Auerbach Partners and 18920 NW accepting the stolen funds and participating in the money laundering that was the fraudulent bond sale;

(l) James Goodman and Frinzi exchanging texts and emails in January, February and March 2022 concerning an effort to get an additional $3.5 million out of the 4352 Account and then using the 18920 NW scheme described above as the vehicle to do it;

(m) Frinzi and Goodman exchanging an email on January 19, 2022 in which Frinzi says, "I have a plan to get most money back to you without exposing you are the beneficiary."

(n) Steven Zakharyayev and Evalina Pinkhasova being the front face of the 18920 NW Scheme including signing the documents associated with the scheme and communicating with outside professionals to further the scheme;

(o) Steven Zakharyayev triggering the false "redemption" to further launder the funds;

(p) Jim Frinzi and James Goodman agreeing to the "redemption" when there was no right to such a "redemption"; and

(q) Frinzi causing more than $6 million in funds from the 4352 Account to be sent to 18920 NW to be laundered back to the Goodmans and Frinzi.

687.     Many of the individual acts taken in furtherance of the conspiracy were in and other themselves potentially lawful actions if taken for a lawful purpose.  For example, signing the documents associated with the various corporate transactions described herein.  However, when those transactions were themselves fraudulent and nothing more than a vehicle to launder stolen funds, those otherwise lawful acts became unlawful.

688.     The Defendants knew that their actions were being taken for unlawful purposes by the express content of their communications, the nature of the plan and the inherently questionable and unlawful nature of the transactions themselves.

689.     Some of the actions taken in furtherance of the conspiracy were on their face unlawful for example but not limited to sending a forged document the AMRR Note using interstate wire or sending stolen funds worth more than $5,000 across state lines.

690.     As a direct and proximate result of the conspiracy described herein and the actions taken in furtherance of it and in violation of 18 U.S.C. § 1962(d), FSCLE has been damaged in an amount that exceeds $80,000,000.

691.     FSCLE is entitled to recover its damages, trebled, as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

692.      Further, FSCLE asserts that all of the named Defendants are members of this conspiracy and are jointly and severally liable for the damage caused by the conspiracy no matter what their benefit from participating in the scheme may be.

### Cause No. 2 – Theft (Embezzlement) Pursuant to Texas Theft Liability Act

### Tex. Civ. Prac. & Rem. Code § 134.003 - .005

### Against Jim Frinzi and James Goodman

693.     FSCLE incorporates the averments of the preceding paragraphs of this Complaint as if fully restated herein.

694.     Defendants Jim Frinzi and James Goodman have stolen in excess of $80,000,000 in FSCLE funds.

695.     FSCLE made the transfer of funds to the 4352 Account on the express promise and contractual agreement that all but .02% of those funds would be paid back to FSCLE.

696.     Both Frinzi and Goodman knew that the 4352 Account housed funds received from FSCLE pursuant to the Master Services Agreement and that pursuant to the Master

Services Agreement all but .02% of those funds had to be paid back to FSCLE in the automated workflow.

697.     As of November 3, 2021, Frinzi, with James Goodman's blessing and support, made the decision to stop any funds flow back to FSCLE and at the same time continued to cause Goodman Networks and/or GNET ATC to continue to send invoices to FSCLE which would prompt a transfer of funds from it with no intention of ever sending the funds back to FSCLE.

698.     Frinzi even referred to the 4352 Account as the "FedEx account" and the funds contained therein as the "FedEx funds."

699.     Frinzi, with James Goodman's blessing and participation, caused others within Goodman Networks and/or GNET ATC to lie to FSCLE as to the circumstances under which funds were not flowing back to FSCLE.  The purpose of those lies was to keep FSCLE funding the 4352 Account.

700.     Starting in October 2021 and culminating in January 2022, Frinzi and James Goodman worked to get the signatory authority on the 4352 Account and the other accounts at Prosperity Bank switched to Jim Frinzi.

701.     Frinzi and James Goodman knew that because Goodman Networks had only one director on or after October 20, 2021, no such valid corporate action could be taken to authorize Frinzi to obtain control over the accounts.

702.     Upon information and belief, Bater Bates and Prosperity Bank also knew that no such valid corporate action could be taken by Goodman Networks.

703.      Yet, Prosperity Bank (through Bater Bates), Jim Frinzi and James Goodman worked together to get Frinzi control over those accounts even though they knew no such valid corporate authorization did exist or could exist.

704.      Frinzi sent unauthorized and fraudulent documents to Prosperity Bank to affect the transfer.

705.      James Goodman and Bater Bates knew those documents were unauthorized and invalid and said nothing.

706.      Prior to Frinzi getting control over the accounts, he used the log in credentials of employees who no longer worked at Goodman Networks/GNET ATC to access and steal the funds.

707.      Upon gaining signatory authority over the accounts, Frinzi made multiple withdrawals of the FSCLE funds in the 4352 Account and used them for purposes inconsistent with the Master Services Agreement all designed to ultimately launder the funds through a series of transactions back to James Goodman, Jim Frinzi and entities owned and/or controlled by them.

708.      Frinzi and James Goodman caused some of the stolen funds to be paid to others to launder the money.  FSCLE asserts that Frinzi's and James Goodman's payment of laundered funds to others including but not limited to Shalom Auerbach, Neil Auerbach, Auerbach Partners, Alliance, Hudson, 18920 NW, Steven Zakharyayev and Evalina Pinkhasova are funds stolen and used for the benefit of Frinzi and James Goodman.

709.      Frinzi and James Goodman's actions were fraudulent and for the purpose of stealing/embezzling the funds, laundering them to hide the original source and then keeping the FSCLE funds for their own use and benefit.

Case 22-31641-mvl7   Doc 424-1   Filed 11/09/23   Entered 11/09/23 16:29:38   Desc
Case 3:23-cv-02397-S   Document 1-A   Filed 10/28/23   Page 137 of 153   PageID 137
Exhibit A   Page 138 of 154   Page 137 of 153

710.     As a direct and proximate result of Jim Frinzi's and James Goodman's theft in violation of the Texas Theft Liability Act, FSCLE has been damaged in an amount to be proven at trial but certainly in excess of $80,000,000.

711.     FSCLE prays for an award of its damages against Frinzi and James Goodman, jointly and severally, and an award of attorneys' fees pursuant to the Texas Theft Liability Act.

### Cause No. 3 – Common Law Theft/Embezzlement/Conversion
### Against All Defendants

712.     FSCLE incorporates the averments of the proceeding paragraphs of this Complaint as if fully set forth herein.

713.     FSCLE transferred funds into the 4352 Account on the express promise and contractual agreement that all but .02% of those funds would be paid back to FSCLE.

714.     As set forth in the second cause of action Jim Frinzi and James Goodman stole/embezzled more than $80 million in FSCLE funds located in the 4352 Account.

715.     In addition to pursuing relief against them for their acts of theft under the Texas Theft Liability Act, FSCLE seeks relief against them in common law for the same theft/embezzlement/conversion and against all other Defendants for their roles in either receiving the stolen money (for example, being paid in stolen funds to launder the money) or in taking acts to aid and abet the theft (for example Bater Bates and Prosperity Bank).

716.     Each of the Defendants knew the original source of the funds and knew that these were FSCLE funds in the 4352 Account.

717.      Each of the Defendants accepted the funds knowing that they were stolen/embezzled.

718.      In addition, some of the Defendants including but not limited to Prosperity Bank (Bater Bates), Shalom Auerbach, Neil Auerbach, Auerbach Partners, Alliance, Hudson, Steven Zakharyayev, Evalina Pinkhasova and 18920 NW played significant roles (as described above) helping embezzle or launder the stolen funds and as part of those efforts received stolen funds in payment for those efforts.

719.      Prosperity Bank (Bater Bates), Shalom Auerbach, Neil Auerbach, Auerbach Partners, Alliance, Hudson, Steven Zakharyayev, Evalina Pinkhasova and 18920 NW each knew that the source of the funds paying them came from stolen funds from the 4352 Account.

720.      In addition, some of the Defendants including but not limited to Jason Goodman, Jody Goodman, Jonathan Goodman, John Goodman, GIH and the Frinzi Family Trust ultimately received portions of the funds that Frinzi and/or James Goodman stole/embezzled from the 4352 Account.

721.      Jason Goodman, Jody Goodman, Jonathan Goodman, John Goodman, GIH and the Frinzi Family Trust each knew that the source of the funds they received were the stolen funds from the 4352 Account.

722.      None of the Defendants had the right or authority to do anything with the FSCLE funds in the 4352 Account other than send those funds back to FSCLE less .02%.

723.      All Defendants either directly took the money in the first place, assisted with the money laundering and kept a portion in payment or received and kept the stolen benefits for their own use.

724.        FSCLE has repeatedly asked for repayment of the $80 million stolen from it.

725.        None of the defendants has thus far volunteered or agreed to return their portion
of the stolen funds.

726.        As a direct and proximate result of the actions of the Defendants as set forth
herein, FSCLE has been damaged in an amount that exceeds $80 million.

727.        FSCLE Prays for an award of its damages in an amount to be proven at trial in
excess of $80 million against the Defendants individually and joint and severally due to
the coordinated nature of the theft and the fact it results from a civil conspiracy.

**Cause No. 4 – Common Law Unjust Enrichment**

**Against All Defendants**

728.        FSCLE incorporates the averments of the proceeding paragraphs of this Complaint
as if fully set forth herein.

729.        FSCLE provided in excess of $80 million in funds to Goodman Networks/GNET
ATC pursuant to the Master Services Agreement with the express agreement and
contractual commitment that the entirety of the funds other than .02% of those funds
would be transferred back to FSCLE.

730.        While there may not have been an express trust agreement limiting how the funds
were to be held in the interim, FSCLE and Goodman Networks/GNET ATC worked
together to automate their funds flow and invoicing process such that the invoices were
input into the cloud-based system and then the funds flow both ways were automated.

731.        The 4352 Account was established as part of that automated process.

732.        The automated workflows and fund flows from FSCLE into the 4352 Account
and then back to FSCLE worked as established and as agreed for months prior to

November 3, 2021 when Frinzi, with the blessing and approval of James Goodman,
stopped the funds flow back to FSCLE but continued to cause actions which spurred
FSCLE to continue to pay funds to Goodman Networks/GNET ATC.

733.     The course of dealing between FSCLE and Goodman Networks/GNET ATC
created a justifiable and reasonable expectation that the funds would be paid back to
FSCLE minus .02%.

734.     There certainly was nothing in the course of dealing between FSCLE and
Genesis-ATC, Goodman Networks or GNET ATC which could or would have created
any expectation that Genesis-ATC, Goodman Networks or GNET ATC could transfer the
FSCLE funds to any person or entity other than FSCLE other than the .02%.

735.     The Defendants took the funds from the 4352 Account, exercised control over the
funds through the various money laundering schemes described above and/or received
the funds directly or after the money laundering knowing the original source of the funds
was the FSCLE funds originally held in the 4352 Account.

736.     The Defendants accepted the stolen FSCLE funds and utilized them for their own
purposes.

737.     Under the circumstances of this case, it would be unjust for any of the Defendants
to retain the stolen FSCLE funds or any portion of them.

738.     As a direct and proximate result of the Defendants acts and omission in this case,
FSCLE has been damaged in an amount to be determined at trial but alleged to be in
excess of $80,000,000 and the Defendants have been unjustly enriched at least in the
amount of $80,000,000.

739.      FSCLE prays for an award of damages against the Defendants, jointly and

severally, for its damages and an awarded disgorging the amounts the Defendants have

been unjustly enriched.

### Cause No. 5 – Common Law Constructive Trust

### Against All Defendants

740.      FSCLE incorporates the averments of the proceeding paragraphs of this Complaint

as if fully set forth herein.

741.      The funds FSCLE paid to Genesis-ATC, Goodman Networks and/or GNET ATC

were held in a constructive trust for the benefit of FSCLE.

742.      First the Master Services Agreement and the SOW expressly states that after

FSCLE transfers the funds to Genesis-ATC, Goodman Networks and/or GNET ATC, that

those funds shall be paid back to FSCLE minus a fee of .02%.

743.      Genesis-ATC, Goodman Networks and/or GNET ATC worked with FSCLE to set

up an automated work flow and funds flow including establishing a specific account, the

4352 Account at Prosperity Bank, which only held funds from FSCLE pursuant to the

commercial relationship.

744.      Frinzi even referred to the 4352 Account as the "FedEx account" and the funds

therein as the "FedEx funds."

745.      Further James Goodman has testified under oath that the funds in the 4352

Account were "FedEx money."

746.      This arrangement worked well for months.

747.      The invoices and work were automated, and the funds flow was also automated.

748.     The actual written agreement, the established bank account for a specific purpose and the course of dealing created a special trust and/or a fiduciary relationship by which Genesis-ATC, Goodman Networks and/or GNET ATC held the FSCLE funds for FSCLE.

749.     The entire arrangement was financing arrangement that did not require the minority business enterprise to have significant cash outlays.

750.     The defendants and in particular Frinzi and James Goodman committed actual fraud and theft to steal the funds from the 4352 Account.

751.     As outlined above, they worked without valid corporate authorization to gain control of the accounts, they took money out using the log ins of people who were no longer employees, they lied to FSCLE to continue the payments and then transferred the funds out to money laundering schemes to wash the funds of their original source and then direct the bulk back to themselves.

752.     Each of the Defendants knew the original source of the funds and participated in the theft, money laundering or receipt of the stolen funds anyway.

753.     Each of the Defendants was unjustly enriched as a result of their acts in furtherance of the overall enterprise.

754.     As a direct and proximate result of the Defendants actions and omissions, FSCLE has been damaged in an amount to be proven at trial in excess of $80 million.

755.     FSCLE prays for an award of an equitable constructive trust over the stolen FSCLE funds in the hands that hold them today and an order compelling those who hold those funds in constructive trust for FSCLE today to pay those funds to FSCLE.

**Cause No. 6 – Common Law Fraud or Constructive Fraud**

**Against Frinzi, James Goodman, Genesis-ATC and GNET ATC**

756.     FSCLE incorporates the averments of the proceeding paragraphs of this

Complaint as if fully set forth herein.

757.     Jim Frinzi, James Goodman, Genesis-ATC and GNET ATC each made material

misrepresentations to FSCLE that damaged FSCLE.

758.     Frinzi caused Steve Seago and others within GNET ATC to misrepresent to

FSCLE the reason for the lack of funds being transferred back to FSCLE under the

Master Services Agreement.

759.     By late October/early November 2021, FSCLE noticed that the automated funds

transfers back to it had stopped and inquired why.

760.     Frinzi directed others to not tell FSCLE that the decision had been made to stop

further funds transfers back to FSCLE.

761.     Frinzi directed others including Seago to tell FSCLE that, just as there had been

an operational shift from Genesis-ATC to Goodman Networks/GNET ATC, there needed

to be another process change to a new entity which was reported to be another name

change only and that once the new system was set up the funds flow could be restored.

762.     Because there had already been one change from Genesis-ATC to Goodman

Networks/GNET ATC and there had not ultimately been an issue with FSCLE getting its

funds, the newly announced shift seemed to be reasonable and based in the history of the

commercial relationship.

763.    In reasonable reliance on the misrepresentation as the reason for the stop in funds flow, FSCLE assigned IT personnel to work with the third-party vendor represented to be working on the IT connection on the Goodman Networks/GNET ATC side.

764.    That work went from December 2021 to February 15, 2022.

765.    The fact that there was an IT vendor working on the transition with the FSCLE IT personnel further bolstered the reasonableness of the story.

766.    It was not until February 15, 2022 when the IT conversion work was completed that FSCLE was then told that the payment processing was not moving forward.

767.    In the interim between November 3, 2021 and February 15, 2022, Frinzi working with others as described above: (1) caused continuing invoices to be sent to FSCLE after Goodman Networks was defunct; (2) obtained control over the 4352 Account; and (3) transferred millions out of the account for his own benefit and the benefit of other Defendants.

768.    Jim Frinzi and James Goodman caused and allowed hundred of invoices to be sent to FSCLE after November 3, 2022 when the decision was made not to transfer any further funds to FSCLE and the change in operating system began to be directed at FSCLE.

769.    Jim Frinzi and James Goodman caused and allowed hundred of invoices to be sent to FSCLE after November 23, 2021 – the date on which Frinzi documented that Goodman Networks was defunct.

770.    FSCLE reasonably relied upon the representation of each of those invoices – that FSCLE would be paid back less .02% - because that had always been the course of

dealing between the entities and because FSCLE was being provided with a believable

story as to why the funds transfers had been paused.

771.     Frinzi directly made these representations/misrepresentations to FSCLE

personnel.  Steve Seago set up a direct meeting between Frinzi and FSCLE personnel in

late October/early November 2021.  During that meeting Frinzi portrayed the relationship

as business as usual and portrayed that just as there had been a seamless transition from

Genesis-ATC to Goodman Networks/GNET ATC the same was about to happen again –

a name change only.

772.     At the time Frinzi made those misrepresentations to FSCLE directly, he knew that

Goodman Networks, Genesis-ATC and GNET ATC were all being liquidated in response

to the AT&T threat.  Frinzi hid the real background and induced FSCLE into reasonably

believing it was business as usual.

773.     James Goodman spoke directly with FSCLE personnel in December 2021.

774.     FSCLE was cooperating with request to shift the IT connections to a new system

as requested by Goodman Networks/GNET ATC but had questions as to what was next

in the relationship.

775.     James Goodman spoke with FSCLE and consistent with Jim Frinzi's continuing

fraud, assured FSCLE that all was well and would be resolved once the relationship was

ported over to the next named Goodman entity.

776.     James Goodman even said that the relationship might go back to Genesis-ATC.

777.     At the time James Goodman misrepresented that all was well and misrepresented

that the relationship might go back to Genesis-ATC, James Goodman knew that Genesis-

ATC was liquidating, knew that Goodman Networks was defunct and knew that GNET ATC was also being liquidated.

778.    In January 2022, Jim Frinzi then misrepresented to FSCLE that Multiband would be the new entity to service the Master Services Agreement.

779.    At the time Jim Frinzi made that misrepresentation to FSCLE, Frinzi had already emailed and texted others within the Goodman entities that he did not want the FSCLE business, that it did not produce enough of a return, that it would take years to pay it off and he had already started stealing from the 4352 Account.

780.    FSCLE's reliance on these misrepresentations were reasonable given the nature of the prior relationship, the prior switch from Genesis-ATC to Goodman Networks/GNET ATC and then the work with the third-party IT vendor to establish the new IT connection.

781.    Jim Frinzi, James Goodman. Genesis-ATC and GNET ATC made these misrepresentations to FSCLE with the express purpose that FSCLE would rely upon them.

782.    Frinzi directly said that he wanted the FSCLE funds transfers into the 4352 Account to continue weeks after he said he would not permit any further funds transfers back to FSCLE.

783.    Given the millions that flowed from FSCLE into the 4352 Account, that account was a target for Frinzi and the Goodmans to steal millions and then launder the funds.

784.    As a direct and proximate result of the actual and constructive fraud of Jim Frinzi and James Goodman and Genesis-ATC and GNET ATC, FSCLE has been damaged in an amount to be determined at trial alleged to be in excess of $80 million.

785.     FSCLE prays for an award of its compensatory damages from Frinzi, James

Goodman, Genesis-ATC and GNET ATC, jointly and severally.

786.     Because the misrepresentations of Frinzi, James Goodman, Genesis-ATC and

GNET ATC were both intentional and fraudulent, FSCLE further asks for an award of

punitive damages in an amount to be determined at trial.

## Cause No. 7 – Tortious Interference

### Against Frinzi, James Goodman, Prosperity Bank, Genesis-ATC and GNET ATC

787.     FSCLE incorporates the averments of the proceeding paragraphs of this

Complaint as if fully set forth herein.

788.     There exists a valid contract between FSCLE and Goodman Networks:  the

Master Services Agreement and the Statement of Work.

789.     The Master Services Agreement and the Statement of Work had originally been

between FSCLE and Genesis-ATC.

790.     Genesis-ATC sought to assign the Master Services Agreement and the Statement

of Work to Goodman Networks d/b/a GNET ATC.

791.     FSCLE consented to the assignment of the Master Services Agreement and the

Statement of Work to Goodman Networks d/b/a GNET ATC but never consented to any

assignment to GNET ATC.

792.     Thus, both genesis-ATC and GNET ATC were not parties to the Master Services

Agreement or the Statement of Work at the time it was breached in late 2021 and early

2022.

793.     Jim Frinzi, James Goodman, Genesis-ATC and GNET ATC were all well aware

of the Master Services Agreement and the Statement of Work.

794.     Prosperity Bank was also aware of the Master Services Agreement and the Statement of Work.

795.     First, the 4352 Account was set up at Prosperity Bank specifically to receive the funds transfers from FSCLE pursuant to the Master Services Agreement and the Statement of Work.

796.     Second, Prosperity Bank saw months of funds flow from FSCLE's bank account into the 4352 Account and would have seen that the only source of funds going into that account were coming from FSCLE.

797.     Third, Jim Frinzi and James Goodman had multiple meetings with Prosperity Bank's Bater Bates in October 2021 and December 2021 to discuss how to gain access to the 4352 Account.

798.     Bater Bates even suggested using some of the funds in the 4352 Account as collateral to permit Genesis-ATC and/or GNET ATC funds to be freed from collateral restrictions or liens that would allow those funds to be liquidated and used for other purposes.

799.     Fourth, after months of a regular funds flow into the 4352 Account and then funds transfers back to FSCLE from Prosperity Bank accounts in the name of Goodman Networks, Prosperity Bank would have seen irregular and large dollar transfers out of the 4352 Account that were not in keeping with the prior course of dealing.

800.     Because Jim Frinzi and James Goodman were intentionally stripping Goodman Networks of funds and assets in the fall of 2021, while they were officers or directors of Goodman Networks, they were also acting on their own behalf and as the principals of GNET ATC, Genesis-ATC and other Goodman or Frinzi controlled entities.  They thus

were both inside and outside of Goodman Networks and for purposes of this cause of action were acting as third parties to the FSCLE-Goodman Networks contractual relationship.

801.    Further, Frinzi wrote an internal memo on November 23, 2021 saying that Goodman Networks was defunct and insolvent.  Yet he continued to act thereafter along with James Goodman individually and through other Goodman and Frinzi controlled entities to interfere in the FSCLE-Goodman Networks contractual relationship and thus were third parties to that relationship.

802.    Frinzi, with the knowledge and blessing of James Goodman, caused Goodman Networks to stop making any funds flows back to FSCLE on or after November 3, 2021.

803.    The Master Services Agreement and the Statement of Work required Goodman Networks to transfer the funds advanced to it by FSCLE less a .02% fee.  See e.g. Section 5.1 of the State of Work and Section 12 of the Master Services Agreement.

804.     Frinzi and James Goodman knew that the Master Services Agreement and Statement of Work required the return funds flow back to FSCLE less a payment of .02%.

805.    Yet both Frinzi and James Goodman on behalf of themselves and Genesis-ATC and GNET ATC caused that return funds flow to stop, to have millions build up in the 4352 Account and at the same time misrepresented to FSCLE the reason for the disruption in funds flow.

806.    On behalf of GNET ATC, Frinzi then stole at least $44 million in FSCLE funds and "loaned" those funds to AMRR to buy AMR Resources from OnePath.

807.    On behalf of Genesis-ATC, Frinzi and James Goodman caused some of the funds in the 4352 Account to be taken and laundered through the various schemes described above.

808.    Prosperity Bank interfered with the Master Services Agreement by working with Frinzi and James Goodman to transfer control of the 4352 Account to Frinzi when Prosperity Bank knew that there could be no valid corporate authorization to give Frinzi control over that account.

809.    Prosperity Bank is charged with the knowledge of Bater Bates.

810.    Bater Bates had multiple meetings, email exchanges and calls with both Jim Frinzi and James Goodman aimed at getting Frinzi control over the 4352 Account.

811.    Prosperity Bank's Ana McCollum appropriately was asking for valid signed corporate resolutions authorizing the transfer of the accounts.

812.    Prosperity Bank's Bater Bates knew that no such valid corporate authorization was possible based on his knowledge of the unwinding of Goodman Networks and the fact that there was at that time (December 2021) only one director left at Goodman Networks.

813.    Knowing why they wanted Frinzi to control the 4352 Account and that they did not and could not get valid corporate authorization, Bater Bates helped them gain control anyway through acceptance of documents he knew were fraudulent and unauthorized.

814.    Bater Bates actions are chargeable to Prosperity Bank.

815.    As a direct and proximate result of the actions of Jim Frinzi, James Goodman, Genesis-ATC, GNET ATC and Prosperity Bank, not only was the return funds flow back to FSCLE stopped in violation of the Master Services Agreement and the Statement of

Work but the funds which could have been directed back to FSCLE at any time until

taken out of the 4352 Account were then stolen and sent to persons and entities other than

FSCLE. None of that would have happened but for the actions of Jim Frinzi, James

Goodman, Genesis-ATC, GNET ATC or Prosperity Bank.

816.    FSCLE has been damaged in an amount to be determined at trial but asserted to

be in excess of $80,000,000. FSCLE prays for an award of its compensatory damages for

tortious interference with contract.

817.    Because the actions of Jim Frinzi, James Goodman, Genesis-ATC, GNET ATC

and Prosperity Bank were both intentional and fraudulent, FSCLE prays for an award of

punitive damages in an amount to be determined at trial.

### Cause No. 8 – Civil Conspiracy

### Against All Defendants

818.    FSCLE incorporates the averments of the proceeding paragraphs of this

Complaint as if fully set forth herein.

819.    In Cause No. 1, the civil RICO count, FSCLE asserted a conspiracy in violation

of 18 U.S.C. § 1962(d).

820.    FSCLE readopts the allegations of that cause of action and additionally asserts

them as a common law civil conspiracy claim.

821.    Outside of the Rico claim, that conspiracy is one to steal funds from FSCLE and

the launder them.

822.    FSCLE asserts the same members of the civil conspiracy and the same acts in

furtherance of the civil conspiracy.

823.      As a direct and proximate result of the civil conspiracy engaged in by the Defendants, FSCLE has been damaged in an amount to be determined at trial but asserted to be in excess of $80,000,000.

824.      FSCLE prays for an award of its compensatory damages.

825.      Because the Defendants' actions were both intentional and fraudulent, FSCLE prays for an award of punitive damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

Having now asserted its Complaint, FSCLE prays for:

1. That all Defendants be served and made to appear before this Court;

2. The specific relief sought in each of its eight causes of action;

3. An award of compensatory damages in an amount to be determined at trial in an amount that is greater than $80,000,000;

4. An award of treble damages pursuant to the RICO statutes;

5. An award of punitive damages;

6. Attorneys' fees;

7. Pre-judgment and post-judgment interests to the extent permitted by law;

8. An award of FSCLE's discretionary costs; and

9. All such other and further relief to which FSCLE may be entitled as a matter of law or equity.

Attorneys for Plaintiff FedEx Supply Chain
Logistics & Electronics, Inc.

**BUTLER SNOW LLP**

By:  s/ S. Keenan Carter

DANIEL W. VAN HORN  (Pro Hac to be filed)
S. KEENAN CARTER (TX Bar No. 24006966)
R. CAMPBELL HILLYER (Pro Hac to be filed)
ADAM M. LANGLEY (Pro Hac to be filed)
KATHERINE KUCHENBECKER (Pro Hac to be
     filed)
6075 Poplar Ave., Ste. 500
Memphis, TN 38119
(901) 680-7200
(901) 680-7201 (fax)
Danny.VanHorn@butlersnow.com
Keenan.Carter@ButlerSnow.com
Cam.Hillyer@butlersnow.com
Adam.Langley@butlersnow.com
Katherine.Kuchenbecker@butlersnow.com

CEDRIC E. EVANS (TX Bar No. 00793707)
1400 Lavaca Street, Ste. 1400
Austin, TX 78701
(737) 802-1800
(737) 802-1801 (fax)
Cedric.Evans@butlersnow.com

BRYONY HARRIS (TX Bar No. 24116488)
2911 Turtle Creek Blvd., Ste. 1400
Dallas, TX 75219
(469) 680-5500
(469) 680-5501 (fax)
Bryony.Harris@butlersnow.com

83826074.v1