Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
**MUNSCH HARDT KOPF & HARR, P.C.**
500 N. Akard Street, Suite 4000
Dallas, Texas  75201
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| GOODMAN NETWORKS, INC., | § | Case No. 22-31641-mvl-7 |
| | § | |
| Debtor. | § | **Hearing:** <u>December 21, 2023 at 9:30 a.m.</u> |

## <u>FEE APPLICATION COVER SHEET</u>

| | |
|---|---|
| Fee Application: | First Interim |
| Applicant: | Munsch Hardt Kopf & Harr, P.C. |
| Time Period: | December 18, 2022 through October 31, 2023 |
| Capacity: | General Counsel to Scott M. Seidel, Trustee |
| Retainer Received: | $120,000.00 (from GNET ATC, LLC) |
| Amounts Previously Paid: | $0.00 |
| Amount Requested to Allow: | $1,564,050.42 ($1,484,254.50 fees + $79,795.92 expenses[1]) *less* $25,000.00 voluntary deduction[2] |
| Amount Requested to Pay: | up to $700,000.00 |
| Number of Hours: | 2,872.1 |
| Highest Attorney Rate: | $650 (680.2 hours) |
| Lowest Attorney Rate: | $320 (118.9 hours) |
| Blended Rate: | $516 |

---

[1]     Munsch Hardt is not seeking reimbursement of $3,447.69 for meals appearing on its invoices.

[2]     This amount is intended to address possible duplication of services between Munsch Hardt professionals and inefficiencies, some of which is inevitable in an Application of this size and given the realities of the case, especially early on.

---

FIRST INTERIM APPLICATION OF MUNSCH HARDT KOPF & HARR, P.C. FOR THE ALLOWANCE OF FEES AND REIMBURSEMENT OF EXPENSES AS GENERAL COUNSEL TO TRUSTEE AND REQUEST FOR PARTIAL PAYMENT OF SAME—Page 1

**FIRST INTERIM APPLICATION OF MUNSCH HARDT KOPF & HARR, P.C. FOR
THE ALLOWANCE OF FEES AND REIMBURSEMENT OF EXPENSES AS GENERAL
COUNSEL TO TRUSTEE AND REQUEST FOR PARTIAL PAYMENT OF SAME**

TO THE HONORABLE MICHELLE V. LARSON, U.S. BANKRUPTCY JUDGE:

COMES NOW Munsch Hardt Kopf & Harr, P.C. ("Munsch Hardt"), general counsel to Scott M. Seidel (the "Trustee"), the duly appointed chapter 7 trustee of the bankruptcy estate (the "Estate") of Goodman Networks, Inc. (the "Debtor"), the debtor in the above styled and numbered bankruptcy case (the "Bankruptcy Case"), and files this its *First Interim Application of Munsch Hardt Kopf & Harr, P.C. for the Allowance of Fees and Reimbursement of Expenses as General Counsel to Trustee and Request for Partial Payment of Same* (the "Application"), respectfully stating as follows:

## I.    RELIEF REQUESTED

1.      This is a large and complicated Bankruptcy Case, where the Trustee has needed substantial assistance of counsel to understand the Estate and to begin to monetize its assets, including substantial present and future litigation.  Discovery has been massive, there have been multiple contested hearings, and there have been numerous meetings and negotiations with third parties.  The Trustee needed to analyze and understand numerous legal and factual issues, and he has initiated multiple adversary proceedings, has been managing the Debtor's wholly-owned subsidiaries, and has analyzed in detail various insurance policies which he believes are among the Estate's biggest assets.  Following a necessary learning curve, the Trustee is now well underway with monetizing the Estate's assets, and he is reasonably confident the Estate will be able to recover tens of millions of dollars for the benefit of its creditors.  All of this has necessitated extensive legal services from multiple professionals, representing different expertises, at Munsch Hardt.  In many ways, Munsch Hardt has been financing the Trustee's ability to manage the Estate and being to monetize its assets.

2.      Therefore, by this Application, Munsch Hardt requests the Court's allowance, on an interim basis, of the fees and expenses incurred in its role as general counsel to the Trustee for the period December 18, 2022 through October 31, 2023 (the "Subject Period"). Munsch Hardt's fees and expenses for the Subject Period are evidenced by its invoice attached hereto as Exhibit "A" and incorporated herein.[3]

3.      Munsch Hardt requests the interim allowance of fees in the amount of $1,484,254.00 (the "Requested Fees") and the interim reimbursement of expenses in the amount of $79,795.92 (the "Requested Expenses"), which Requested Expenses do not include $3,447.69 in meals otherwise appearing on Exhibit "A." From these, Munsch Hardt voluntarily deducts $25,000.00 to account for potential duplication of services and inefficiencies which, despite Munsch Hardt's best efforts, is unavoidable to a degree in a Bankruptcy Case this large and complicated.

4.      Munsch Hardt requests an interim, partial payment against the Requested Fees and Requested Expenses in the maximum amount of $700,000.00, depending on certain proceedings in the Bankruptcy Case the results of which are not yet known, as discussed below. Any such payment would be subject to full disgorgement pending the final allowance of the Requested Fees and Requested Expenses and approval of the Trustee's final report. An interim payment is necessary and appropriate to offset some of the continuing risk and credit that Munsch Hardt is facing, as it continues to assist the Trustee in monetizing the Estate's assets.

---

[3]      To save photocopying and postage expenses, Munsch Hardt is not serving the exhibit to this Application on all parties to this Bankruptcy Case. However, any party wishing to obtain a copy of said exhibits may obtain one free of charge by contacting the undersigned counsel.

Furthermore, the invoice is redacted, in part, with respect to certain services for ongoing litigation and strategy matters, in order to ensure that no privilege of the Trustee is waived. The invoice as will be transmitted to the Court and to the United States Trustee will not be redacted.

## II.    **BACKGROUND**

5.      Various petitioning creditors filed an involuntary chapter 7 petition against the Debtor on September 6, 2022 (the "Petition Date"), thereby initiating this Bankruptcy Case and creating the Estate.

6.      The Court entered an order for relief on December 12, 2022.  The Trustee was appointed as the chapter 7 trustee to administer the Estate.

7.      The Court has jurisdiction over this Application under 28 U.S.C. § 1334.  Said jurisdiction is core under 28 U.S.C. § 157(b)(2).  Venue of the Bankruptcy Case before this Court is proper under 28 U.S.C. §§ 1408 and 1409.

## III.    **RETENTION OF MUNSCH HARDT**

8.      As noted, this is a large and complicated Estate and Bankruptcy Case, where the Trustee hit the ground running with respect to both then-pending contested matters and with investigating and understanding the Estate and its assets.  Among other things, it appeared that the Debtor and its insiders had made very large avoidable transfers, had engaged in breaches of fiduciary duty, and that extensive discovery and litigation would be required to monetize the Estate's assets.  While the petitioning creditors did an excellent job taking discovery and identifying various transactions, transfers, claims, and Estate assets—with respect to which discovery the Estate certainly benefited—it is the Trustee with the fiduciary duty to the Estate tasked with managing the Estate.  While the creditors provided a valuable roadmap, the Trustee appropriately took over.

9.      This necessitated retaining general counsel to assist him with his duties.  And because of the size and complexity of this Bankruptcy Case, the Trustee sought to retain a full-service law firm such as Munsch Hardt (with extensive expertise in representing Chapter 7 estate

fiduciaries and a willingness to extent substantial credit).  Thus, on January 18, 2023, at Docket No. 192, the Trustee filed his application to retain Munsch Hardt as his general counsel, proposing to retain Munsch Hardt at its hourly rates for its services and the reimbursement of its actual expenses.  Said application contained the necessary disclosures by Munsch Hardt under the Bankruptcy Code and the Bankruptcy Rules.  On March 1, 2023, at Docket No. 219, the Court approved Munsch Hardt's retention, effective as of December 18, 2022, and providing that "Munsch Hardt shall be paid from the Estate for its fees and expenses upon such interim and final fee applications as may be proper."

10.    At the time of Munsch Hardt's retention, the Estate did not provide Munsch Hardt with a retainer.  However, one of the Debtor's wholly-owned subsidiaries, GNET ATC, LLC ("GNET"), had certain funds on hand which, because this entity had not filed a bankruptcy petition, did not constitute "cash collateral" under the Bankruptcy Code.  At the same time, as the sole owner of GNET, the Trustee effectively managed GNET and undertook an examination of its assets.  He has administered those assets—including by filing adversary proceedings on behalf of GNET and preparing to file other adversary proceedings—for the ultimate benefit of the Estate, given that the Estate's and GNET's interests were fully aligned.  Munsch Hardt therefore requested of the Trustee that he provide Munsch Hardt with a retainer from GNET to provide some level of protection for Munsch Hardt's services to the Trustee for GNET, which the Trustee agree to do.

11.    Thus, on August 9, 2023, the Trustee funded a retainer in the amount of $120,000.00 from GNET to Munsch Hardt (the "Retainer"), which Munsch Hardt has held since. As part of its agreement with the Trustee, Munsch Hardt agreed that it would not seek to draw from the Retainer, even though it was not property of the Estate, without this Court's approval of

both the underlying fees and expenses and of the draw from the Retainer, as Munsch Hardt now

does on an interim basis only and subject to full disgorgement.

12.     Munsch Hardt has not previously filed any interim fee applications and has not

received any interim payments from the Trustee (whether from the Estate or from GNET).

## IV.    SUMMARY OF SERVICES

13.     Exhibit "A" hereto details the Requested Fees and Requested Expenses the

subject of this Application.  A summary of the same is provided below grouped by tasks.  A few

points regarding tasks and time entry:

- It was not always foreseeable, especially early on in the Bankruptcy Case, that a particular matter would evolve into a large enough matter to warrant its own task. Thus, there are services (mainly under Task 1, General) that have not been assigned a task because they were provided before a task was opened, although efforts have been made to go back and assign tasks after-the-fact where it was obvious that a time entry was related to an as-yet unopened task (which was not always possible).

- Various services cross over more than one task.  The D&O task, for example, will include an extensive review of discovery taken in connection with other services (for example, the Debtor's motion to convert), which could in some ways be assigned to that separate task, and will include services related to D&O insurance coverage.  Where reasonably possible, Munsch Hardt sought to separate its services between crossover tasks, but this was not always possible.

- As different Munsch Hardt professionals were engaged in similar tasks, one may have billed to one task while the other to a different task on crossover matters, particular with respect to discovery.  For example, while one attorney was considering discovery taken in connection with the motion to convert, another was reviewing the same discovery for potential causes of action; thus the two would be billed to separate tasks.

## A.    TASK 1—GENERAL ($87,411.00)

14.     During the Subject Period, Munsch Hardt incurred $87,411.00 in fees on general

matters, meaning not otherwise assigned to a specific task.  These services included: assisting the

Trustee with locating and collecting certain liquid property of the Estate; assisting the Trustee

with the meeting of creditors; assembling massive amounts of electronic data from the Debtor and preserving the same for future use; engaging in strategy conferences and meetings with the Trustee to decide more than one issue and to allocate work; meeting and conferring with creditors on general and/or specific issues; meeting and conferring with former officers and directors to understand the Debtor's background, its finances, and Estate assets; meeting and conferring with Estate defendants; reviewing Debtor documents and third-party documents for general background and to identify potential claims and causes of action (prior to further discovery and review with respect to specific litigation and tasks); coordinating with CR3, the Trustee's financial advisor; and participating and engaging in internal meetings and communications to coordinate and allocate work and services.

15.    These were actual and necessary services as they enabled the Trustee to understand the Estate and its assets, and to commence and then to manage the process of monetizing the Estate's assets. Without these services, the Trustee could not have meaningfully understood the Estate and commenced its administration.

**B.    TASK 2—INVOLUNTARY/CONVERSION ($142,437.50)**

16.    During the Subject Period, Munsch Hardt incurred $142,437.50 in fees related to the Trustee and the petitioning creditors contesting the Debtor's motion to convert the Bankruptcy Case from Chapter 7 to Chapter 11. This was a major, fast-moving issue that arose almost immediately upon the Trustee's appointment. While the petitioning creditors were already contesting the Debtor's motion, the Trustee had an independent duty to administer and protect the Estate, and the petitioning creditors actively welcomed his involvement. Much of these services included extensive discovery, in the form of tens of thousands of documents produced by multiple parties, and in the form of multiple personal and corporate depositions.

Additionally, extensive briefing on corporate governance and Bankruptcy Code issues was involved, and the Court held multiple hearings on the motion.

17.     The Trustee's participation in this proceeding was highly beneficial to the Estate, for the principal reason that the extensive discovery initiated and managed by the petitioning creditors enabled the Trustee and all parties to rapidly identify major prepetition transactions and transfers and to begin to understand what the assets of the Estate were and how best to manage them.  And, ultimately, the Trustee negotiated a settlement with the Debtor, which was approved by the Court at a contested hearing as being in the best interests of the Estate, which led to the Debtor withdrawing its motion to convert.  This was also highly beneficial to the Estate as it meant that the Trustee could focus on the Estate as opposed to ancillary litigation, and because all of the parties saved hundreds of thousands of dollars that would certainly have been incurred in continuing discovery, discovery disputes, a multi-day trial, and an inevitable appeal.  Thus, these services were actual and necessary services to the Trustee that benefited the Estate.

C.     TASK 3—EMPLOYMENT AND COMPENSATION ($7,559.00)

18.     During the Subject Period, Munsch Hardt incurred $7,559.00 in fees related to Estate employment and compensation issues.  These services consisted primarily of securing Munsch Hardt's own retention, as well as negotiating and securing the Trustee's retention of CR3 as financial advisor.  These were actual and necessary services that benefited the Estate, as they enabled the Trustee to have capable professionals to assist him with administering the Estate.  Compensation for such services is specifically provided for in section 330 of the Bankruptcy Code.

C.    TASK 4—SUBSIDIARIES ($41,314.00)

19.    During the Subject Period, Munsch Hardt incurred $41,314.00 in fees related to assisting the Trustee with Estate subsidiaries.  The Debtor wholly owns three subsidiaries, although only two have any assets that are known: GNET and Multiband Field Services, Inc.  These subsidiaries are not managed by independent managers or officers, but rather by their sole member, in the form of the Debtor and now the Trustee.

20.    Neither subsidiary has any business operations.  GNET has assets in the form of causes of action, and overlapping creditors with the Debtor, and was involved in prepetition litigation commenced by third parties.  As noted above, the Trustee has already commenced adversary proceedings on behalf of GNET and the Debtor.  Multiband[4] has millions of dollars in funds serving as collateral for worker's compensation policies and claims.  The Trustee believes that these reserves are overfunded and that millions of dollars should be refunded to Multiband, which can then be used to pay its trade creditors and the rest either distributed to the Debtor or used to pay the Senior Secured Bondholders' claims (with a corresponding dollar-for-dollar reduction in their claims against the Debtor).  The Trustee, in consultation with CR3, an outside claims agent, and the Senior Secured Bondholders, is assessing the best option for attempting to free up these funds.

21.    Munsch Hardt assisted the Trustee with respect to these and other issues at the subsidiary level.  Among other things, Munsch Hardt assisted the Trustee with: investigating the assets and determining the liabilities of these subsidiaries, to determine whether there is value to the Estate; managing outside counsel in non-bankruptcy litigation; negotiating agreements and settlements with worker's compensation claims; filing adversary proceedings; and developing a

---

[4]    Most if not all of the Debtor's and its affiliates' employees were housed at Multiband; hence the large worker's compensation issues and security for such claims.

plan to monetize the assets of Multiband, which remains in negotiations and process. These were actual and necessary services provided to the Trustee to manage and monetize Estate assets, it appearing that the subsidiaries have value to the Estate.

D.    TASK 5—ASSET REVIEW/LIQUIDATION ($178,059.00)

22.    During the Subject Period, Munsch Hardt incurred $178,059.00 in fees related to investigating Estate assets and assisting with their monetization. Importantly, these services are different from more discrete services the subject of other tasks, although, as noted above, what may have begun as a general review of Estate assets may have turned into more focused, discrete, or significant services, in which case a separate task was opened. Thus, for example, with respect to Prosperity and the pending Prosperity 9019 and related Senior Secured Bondholders' asserted liens, much of the services investigating the validity of those liens would be tasked under task 5, but, as the matter became a hotly contested matter, the separate task number 17 was ultimately opened to address the Prosperity 9019 litigation itself.

23.    The services within this task consisted primarily of the following: engaging in extensive discovery (during the motion to convert hearings) to understand and identify the Estate's litigation assets; extensively reviewing the Estate's insurance policies, both for crime coverage and fiduciary duty coverage; reviewing the Senior Secured Bondholders' claims and liens; reviewing claims and causes of action against Prosperity Bank, preparing a draft complaint for the same, and compromising the same (which motion remains under consideration); reviewing Estate claims against Greater Tech and AMRR, and meeting with representatives of both to attempt to resolve and monetize the same; and investigating claims and causes of action against third parties, not otherwise assigned a separate task, and taking discovery from the same.

24.     These were actual and necessary services that enabled the Trustee to understand Estate assets, develop Estate claims, negotiate and interact with creditors and potential defendants, and advance various litigation matters to the next stage.

E.     TASK 6—CLAIM REVIEW / LITIGATION ($81,037.00)

25.     During the Subject Period, Munsch Hardt incurred $81,037.00 in fees related to investigating Estate assets and assisting with their monetization.  As such, it overlaps with Task 5 to some extent.  Other than that overlap, these services consisted primarily of: analyzing the Senior Secured Bondholders' asserted liens against approximately $4.4 million on deposit at Prosperity Bank (which is separate from analyzing potential claims against Prosperity Bank or prosecuting the Prosperity 9019); and analyzing the Estate's insurance rights under various crime and theft policies under which the Debtor is the insured, which in turn relates primarily to certain prepetition transfers orchestrated by the Debtor's former officer and/or director.

26.     These were actual and necessary services that enabled the Trustee to understand Estate assets, develop Estate claims, negotiate and interact with creditors and potential defendants, and advance various litigation matters to the next stage.

F.     TASK 7—AUTOMATIC STAY / ADEQUATE PROTECTION ($39,031.00)

27.     During the Subject Period, Munsch Hardt incurred $39,031.00 in fees related to defending against motions for relief from the automatic stay.  These services included resolving in large part the Senior Secured Bondholders' motion for limited stay relief, and successfully defending against the part not resolved; responding to a supplemental motion from the bondholders for stay relief, and resolving the same; resolving a lift stay motion related to a personal injury action; and providing extensive services related to a motion by certain former directors and officers for relief from the automatic stay to be paid defense costs from insurance

policies belonging to the Debtor (a significant issue as the Debtor's $25 million in D&O coverage is subject to "wasting" as a result of defense costs), which was ultimately resolved by agreement after briefing and extensive negotiations.

28.     These were actual and necessary services required to protect Estate assets.  These services were beneficial to the Estate because vital Estate assets have been protected as a result of various rulings and agreements, and because significant additional risk and expense litigating the underlying motions and issues was avoided.

## G.     TASKS 8 AND 9—AVOIDANCE ACTIONS AND GENERAL LITIGATION ($18,299.50)

29.     During the Subject Period, Munsch Hardt incurred $18,299.50 in fees related to task 8, Avoidance Actions ($5,320.00), and task 9, general litigation matters ($12,979.50), for claims and causes of action not then assigned a specific task.  These were actual and necessary services that enabled the Trustee to understand Estate assets, develop Estate claims, negotiate and interact with creditors and potential defendants, and advance various litigation matters to the next stage.  The act of identifying, understanding, and preparing for prosecuting Estate assets is itself a benefit to the Estate and to its creditors.

## H.     TASK 10—D&O CLAIMS ($361,877.50)

30.     During the Subject Period, Munsch Hardt incurred $361,877.50 in fees related to the Estate's claims and causes of action against former directors and officers, including the subsidiary issue of the Estate's rights under various D&O policies.

31.     As the Trustee has previously informed the Court, it appears that the Estate's breach of fiduciary duty claims against former directors and officers are the largest assets of the

Estate, exceeding $80 million in face value.  And, with $25 million in D&O coverage,[5] the Trustee believes that the Estate will be able to recover for much of the damage and harm that the Debtor's former offices and directors caused.  It should go without saying that every creditor should expect the Trustee to investigate, develop, and prosecute these claims and causes of action, especially unsecured creditors, since the Trustee believes that these claims and causes of action would not be subject to prepetition security interests and liens.

32.    It is therefore no surprise that this category of services represents Munsch Hardt's largest amount of fees by task.  On the cause of action side, Munsch Hardt reviewed massive amounts of documents, discovery, and depositions, obtained both through formal discovery, informal discovery, and the Debtor's records.  As a result, Munsch Hardt assisted the Trustee with understanding the facts and developing the Estate's claims, which included drafting a comprehensive complaint, tied to documents and testimony.  On the insurance side, Munsch Hardt assisted with the preparation and transmission of demands to the former officers and directors and with subsequent communications with them and with carriers.  Munsch Hardt also undertook a detailed and comprehensive review of the Estate's D&O policies, made considerably more difficult because there are five (5) stacked policies each in the amount of $5 million (and made more complicated still because there is also crime and theft coverage as part of the same policies that may or not be subject to the same limits of liability (the first $5 million tier is not so subject and represents $10 million of coverage)).

33.    These services remain ongoing, and both the Trustee and Munsch Hardt continue to devote significant time to these issues.  These were actual and necessary services that enabled the Trustee to understand Estate assets, develop Estate claims, negotiate and interact with

---

[5]     GNET is also an insured under these policies and the same directors and officers of the Debtor, who harmed the Debtor, were also directors and officers of GNET.  Hence part of the reason the Trustee is managing GNET and has retained Munsch Hardt to prosecute GNET's claims.

creditors and potential defendants and insurance carriers, and advance the Estate's largest assets to the next stage, which will likely include filing a complaint. The carriers' position on coverage is not known and, should there be a coverage dispute in the future, these services have also enabled the Trustee to prepare for any such dispute and to intelligently argue the Estate's rights and interests.

I.    **TASK 11—MGR LITIGATION ($48,991.50)**

34.    During the Subject Period, Munsch Hardt incurred $48,991.50 in fees related to the Estate's claims causes of action against James Frinzi and certain of his companies and his family trust (pending as Adversary Proceeding No. 23-03036). Namely, in addition to causing the Debtor to transfer $44 million to AMRR, Frinzi also caused the Debtor and its subsidiaries to transfer approximately $5 million to another entity that he owned, which it then used to purchase AMRR, and which transferred funds to his family trust, which that trust then used to purchase a lake house and lake lot.

35.    Munsch Hardt assisted with identifying these claims, reviewing relevant discovery and documents, preparing a complaint, and filing the complaint. In the background, Munsch Hardt assisted with preparing and recording *lis pendenses* against the family trust's properties, which were still free and clear of debt (and hence urgency was warranted). Subsequent to the Subject Period, Munsch Hardt also assisted the Trustee with successfully amending his complaint to assert embezzlement claims, which the Trustee believes are covered by the Debtor's theft policy.

36.    This litigation and these services remain ongoing. These were actual and necessary services that enabled the Trustee to develop and prosecute Estate claims. Identifying, understanding, and prosecuting Estate assets are benefits to the Estate and to its creditors.

J.      **Task 12—AMRR ($186,724.50)**

37.      During the Subject Period, Munsch Hardt incurred $186,724.50 in fees related to AMRR.  As the Court knows, James Frinzi caused the Debtor (or its subsidiary) to transfer $44 million to AMRR, which he owned and controlled, which funds AMRR then used to purchase various existing businesses.  In return, AMRR purportedly issued GNET[6] (*not* the Debtor) a promissory note and security instrument, on which it defaulted and never paid a penny.[7]  The Estate holds multiple claims and causes of action as a result of these transactions, including against Frinzi for breaches of fiduciary duty and also against AMRR and its business subsidiaries.  And, the Trustee believes that these breach of fiduciary duty claims are insured, although that does not mean that the Trustee would not monetize the Estate's direct claims against AMRR to the best of his reasonable ability.

38.      Early in the Bankruptcy Case, it appeared that AMRR had significant value and that it would be able to monetize its business assets to repay, at least in part, what it owed the Debtor.  To that end, the Trustee undertook an informal investigation of AMRR and met with Frinzi multiple times to attempt a forbearance and out-of-court workout, as it appeared that aggressive litigation and collection efforts against AMRR would have been unproductive at that time.  When AMRR defaulted on its promises, the Trustee successfully prosecuted a contested motion for Rule 2004 examination of AMRR, and took extensive resulting discovery.  As AMRR retained a CRO and restructuring counsel, the Trustee engaged with them in an attempt to negotiate.  Ultimately, the Trustee helped convince AMRR to fire Frinzi and to retain a true, independent CRO.

---

[6]      Hence another reason why the Trustee's management of GNET, and retention of Munsch Hardt to represent GNET, is relevant and beneficial to the Estate.

[7]      The Trustee reserves all rights regarding the promissory note and related documents, including as to their genuineness.

39.     It is now clear that Frinzi and AMRR's prior management grossly mismanaged it (and that Frinzi may have overpaid, by a lot, for the business units AMRR purchased).  Namely, AMRR paid at least $38 million for those established, existing business units.  Yet, within a year, AMRR could not repay a penny to the Debtor, it was insolvent, it was losing money, and it had to start liquidating its business units (after losing one completely).  The Trustee's investigation suggests massive self-dealing at AMRR, gross breaches of fiduciary duty, and overpayment for business assets.  In any event, the Trustee has been working with AMRR's CRO to minimize litigation and for AMRR to repay the Debtor.  To that end, the Trustee negotiated a transaction with AMRR which, over time, promises to pay the Estate approximately $4.5 million.  The Trustee prepared and filed a contested motion which, after a two day evidentiary hearing, the Court approved as in the best interests of the Estate.

40.     These services continue, as the Trustee continues to work with AMRR to maximize the Estate's recoveries while minimizing litigation risks, delays, and costs.  These were actual and necessary services that enabled the Trustee to understand a significant Estate asset and to begin the process of monetizing the same.  These services were also beneficial because, even at this stage, the Estate has received compensation of approximately $4.5 million from AMRR and expects more as AMRR continues to liquidate itself (in addition to claims against Frinzi and others related to the AMRR transaction which, as noted above, are insured).

## K.     TASK 13—HUDSON ($25,391.00)

41.     During the Subject Period, Munsch Hardt incurred $25,391.00 in fees related investigating, developing, and prosecuting the Estate's claims related to the transfer of approximately $17 million orchestrated by the Debtor's former officers and directors and for which the Debtor did not receive proper value, resulting in, among other things, claims for

fraudulent transfer and breach of fiduciary duty (and for which the Trustee believes there may be coverage).  Munsch Hardt assisted the Trustee with respect to discovery regarding the transfer and transaction, with drafting a comprehensive complaint, with discussing the same with defense counsel in an attempt to understand the issues better, with respect to preparing for a mediation with the defendants, and, ultimately (albeit outside the Subject Period) with filing the complaint against various defendants (pending as Adversary Proceeding No. 23-03090) including Hudson Clean Energy, Auerbach Partners, members of the Auerbach family and their entities, James Frinzi, James Goodman, and his entities.

42.     These were actual and necessary services required to advance the Estate's rights, claims, and causes of action.  At $17 million in transfers, which the Trustee believes are fully avoidable and recoverable, the Trustee and Munsch Hardt believe that this litigation is, and will be, highly valuable to the Estate.

**L.    TASK 14—18920 ($70,272.50)**

43.     During the Subject Period, Munsch Hardt incurred $70,272.50 in fees related investigating, developing, and prosecuting the Estate's claims related to the transfer of approximately $13.5 million orchestrated by the Debtor's former officers and directors and for which the Debtor did not receive value, resulting in, among other things, claims for fraudulent transfer and breach of fiduciary duty (and for which the Trustee believes there may be coverage). Munsch Hardt assisted the Trustee with respect to discovery regarding the transfer and transaction, with drafting a comprehensive complaint, with discussing the same with defense counsel in an attempt to understand the issues better, with respect to preparing for a mediation with the defendants and mediating the dispute (which did not result in a settlement), and with filing the complaint against various defendants (pending as Adversary Proceeding No. 23-

03072), including 18920 NW 11th, LLC, its insiders Steven Zakharyayev and Evelina Pinkhasova, James Frinzi, James Goodman, and his entities.

44.     These were actual and necessary services required to advance the Estate's rights, claims, and causes of action.  At $13.5 million in transfers, which the Trustee believes are fully avoidable and recoverable, the Trustee and Munsch Hardt believe that this litigation is, and will be, highly valuable to the Estate.

## M.     TASK 15—UFS ($6,182.00)

45.     During the Subject Period, Munsch Hardt incurred $6,182.00 in assisting the Trustee with investigating, developing, and asserting the Estate's claims and causes of action for breach of contract against Unified Field Services, Inc. for at least $3.7 million (pending as Adversary Proceeding No. 23-03088).  These were actual and necessary services required to advance the Estate's rights, claims, and causes of action.

## N.     TASK 17—PROSPERITY 9019 ($187,387.50)

46.     During the Subject Period, Munsch Hardt incurred $187,387.50 in fees assisting the Trustee with respect to prosecuting a motion for compromise under Rule 9019 with the Senior Secured Bondholders and Prosperity Bank regarding approximately $4.4 million of Debtor funds held by Prosperity and approximately $530,000 in prepetition transfers to Prosperity which the Trustee believes were constructively fraudulent transfers.  Under the settlement, $425,000.00 is paid to the Estate in free and clear funds, while approximately $4.3 million of secured debt is paid.  These services are related to prosecuting the Prosperity 9019 alone; investigating the underlying claims and lien issues and negotiating the underlying settlement is accounted for in different tasks above.

47.     As the Court knows, the Prosperity 9019 was opposed by two large creditors.  The result was extensive discovery (including documentary discovery, and including from third persons, and multiple depositions), multiple hearings, extensive briefing, and a two day evidentiary hearing.  The Prosperity 9019 remains under consideration as of this filing.  Hence, the final benefit of that motion is not known at present.  Nevertheless, these were actual and necessary services to the Estate, provided to assist the Trustee with administering Estate assets and proposing compromises, which have benefited the Estate even if the final result is not known because, if the Court denies the Prosperity 9019, the Trustee will have the benefit of the discovery, the briefing, and the proceedings in order to initiate litigation against the Senior Secured Bondholders and Prosperity Bank on the underlying issues the subject of the Prosperity 9019.

## O.     EXPENSES ($79,795.92)

48.     The Invoice attached as Exhibit "A" includes $3,447.69 in expenses for meals.  Munsch Hardt is <u>not</u> seeking reimbursement of these expenses.  Hence the reason why the amount of the Requested Expenses differs from the expenses listed on Exhibit "A."

49.     During the Subject Period, Munsch Hardt advanced the Trustee $19,556.14 in travel expenses.  Most of these expenses related to the Trustee's and Munsch Hardt's flights, hotels, and taxi service to attend in-person meetings in Miami, New York City, and Memphis.  These meetings were appropriate and necessary to negotiate important issues (such as an AMRR payoff and the purchase of AMRR assets and Greater Tech stock).  An additional approximately $1,000 is for parking and mileage, including attendance at various hearings, depositions, and meetings.

50.     During the Subject Period, Munsch Hardt advanced the Trustee approximately $17,000 in expenses for professional services related to third-party retrieval, archival, and maintenance of electronic records of the Debtor and for third-party storage, hardware, and software for maintaining and searching a massive amount of electronic documents produced in discovery, Rule 2004 examinations, or obtained through informal discovery from third parties. These expenses are appropriate and necessary to preserve records and to ensure that the Trustee has proper and efficient access to electronic documents and discovery.  Munsch Hardt contracts with a third party (which Munsch Hardt has no ownership in) for these services, as Munsch Hardt does not otherwise have the capacity to store massive electronic files for its many clients and many litigation matters, and the Trustee himself does not have the capacity to store such massive files.

51.     During the Subject Period, Munsch Hardt advanced the Trustee approximately $15,128 in deposition costs, both for court reporters and transcript services.  An additional $860 is for court transcripts.  These were appropriate and necessary to enable the Trustee to take discovery and participate in discovery.

52.     During the Subject Period, Munsch Hardt advanced the Trustee approximately $8,535 for third-party photocopying and mailing expenses in order to serve pleadings, notices, and the like in the Bankruptcy Case.  These expenses were necessary in order to enable the Trustee to comply with his obligations to provide service and notice of pleadings.

53.     During the Subject Period, Munsch Hardt advanced the Trustee approximately $6,655 in third-party copy services, necessitated to produce documents, prepare binders and exhibits for depositions, and prepare binders and exhibits for multiple contested hearings.

54.     During the Subject Period, Munsch Hardt advanced the Trustee approximately $4,127 for mediation fees, for former Judge Harlin D. Hale to mediate the 18920 dispute.

55.     During the Subject Period, Munsch Hardt advanced the Trustee approximately $3,209 for Federal Express charges, necessitated to transmit documents overnight and as required by various rules and contracts for service and notice provisions.

56.     During the Subject Period, Munsch Hardt advanced the Trustee approximately $1,671 is for title work and *lis pendens* recordings, necessitated in order to record the Trustee's *lis pendenses* against certain real property owned by James Frinzi's family trust in which the Estate claims interests.

57.     During the Subject Period, Munsch Hardt advanced the Trustee approximately $859 in filing fees for filing complaints before this Court and other filing fees.

58.     All of these expenses were reasonable and were necessary to enable the Trustee to comply with various requirements and duties and to advance the administration of the Estate and file lawsuits.  Munsch Hardt makes no profit off of these expenses and there is no "mark-up."

## V.     ARGUMENTS AND AUTHORITIES

### A.     APPROVAL UNDER BANKRUPTCY CODE

59.     Under section 330 of the Bankruptcy Code, the Court may allow reasonable compensation for actual, necessary professional services rendered by a professional in the case, determining the reasonableness of the compensation requested based upon the nature, extent and value of such services to the estate.  Similarly, the Court may allow the reimbursement of actual, necessary expenses incurred by a professional in connection with the rendition of services. Specifically, section 330 provides in pertinent part:

(a)(1)  . . . the court may award to . . . a professional person employed under section 327 . . . –

(A)  reasonable compensation for actual, necessary services rendered by the … professional person, or attorney and by any paraprofessional person employed by any such person;

(B)  reimbursement for actual, necessary expenses.

. . .

(3) In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –

(A)  the time spent on such services;

(B)  the rates charged for such services;

(C)  whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D)  whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E)  with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F)  whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(1) & (3) (2010).

60.     The Fifth Circuit has held that the five factors set out in section 330(a)(3) of the Bankruptcy Code are the most relevant to fee determinations in bankruptcy cases.  *See, e.g., Peele v. Cunningham (In re Texas Securities, Inc.)*, 218 F.3d 443, 445 (5th Cir. 2000).  Of additional relevance are the twelve factors set forth by the Fifth Circuit in the seminal case of *Johnson v. Georgia Highway Express, Inc.*, 488 F. 2d 714 (5th Cir. 1974).

61.     The final benefit of some of Munsch Hardt's services is not know at present, especially as they relate to ongoing and contemplated litigation.  The Fifth Circuit follows the

"reasonable at the time" standard to evaluate compensation under sections 330 and 331. *Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner)*, 783 F.3d 266, 275-77 (5th Cir. 2015). As the Fifth Circuit explained, rather than requiring evaluation "by hindsight," this is a prospective standard:

> [The standard is] one that looks to the necessity or reasonableness of legal services at the time they were rendered. Under this framework, if a fee applicant establishes that its services were "necessary to the administration" of a bankruptcy case or "reasonably likely to benefit" the bankruptcy estate "at the time at which [they were] rendered," . . . then the services are compensable.

*Id.* at 275-76. The Fifth Circuit has expressly rejected the hindsight methodology previously applicable under *Andrews & Kurth LLP v. Family Snacks, Inc. (In re Pro-Snax Distributors, Inc.)*, 157 F.3d 414 (5th Cir. 1998). *See, generally*, *Woerner*, 783 F.3d 266. It goes without saying that investigating, developing, and prosecute Estate claims worth tens of millions of dollars—which at least on their face have serious merit and value—is reasonable and beneficial.

62.    Here, application of any of the Bankruptcy Code's or the Fifth Circuit's factors support the allowance of the Requested Fees and the Requested Expenses. As explained above, and as listed in detail on Exhibit "A", Munsch Hardt's Requested Fees and Requested Expenses:

- are reasonable based on the hourly rates charged in relation to the local market and in relation to the rates charged by comparable professionals, as evidenced by the $516 per hour blended rate;

- are reasonable based on the experience and hourly rate of the attorneys used, meaning that Munsch Hardt staffed this representation efficiently to ensure that there was no "overkill";

- were, to a large degree, necessitated by the actions of others, such as the Debtor seeking to convert the Bankruptcy Case, or objections to various motions to compromise that creditors filed (as was their right) and extensive resulting discovery and court proceedings;

- are reasonable based on the allocation of work and staffing of the representation, and the avoidance of duplication and unnecessary services, while the voluntary $25,000.00 reduction (in addition to a separate deduction of $22,000 not

appearing on the invoice) is intended to address minor duplication and inefficiencies which were inevitable in a Bankruptcy Case of this size;

- are beneficial because they enabled the Trustee to comply with his duties, understand the Estate, formulate a plan for monetizing the Estate's assets, and commence that process of monetization, although Munsch Hardt concedes that the ultimate benefit of its services will not be known until the results of the Trustee's litigation and other actions are known (to the extent a known benefit remains relevant following *Woerner*);

- represent actual time spent by Munsch Hardt on the representation employing contemporaneous and detailed time entries in the process; and

- were incurred by persons skilled and experienced in their various fields of expertise and practice.

63.    Munsch Hardt will add the following (equally applicable to an interim payment as to interim allowance).  Unlike under the Bankruptcy Act, the Bankruptcy Code encourages estate fiduciaries to retain capable professionals, based on market rates (and Munsch Hardt would submit that its rates are actually considerably lower than comparable professionals).  This Bankruptcy Case necessitates the services of a full service law firm and professionals highly experienced with assisting estate fiduciaries, reviewing insurance coverage issues and litigating the same, investigating and prosecuting breach of fiduciary duty claims, and multiple other issues in addition to investigating and prosecuting Chapter 5 avoidance actions and the like. Second, there is a risk of nonpayment.  While the Trustee and Munsch Hardt are confident that the Estate will recover substantial funds, that is not yet known, and there are alleged constructive trust and cash collateral liens and interests that may make a payment more difficult even if large funds are recovered.[8]  Thus, there is a risk of nonpayment.  Third, there is a substantial delay in

---

[8]    To be clear, nothing in this Application is intended to prejudice any such issues.  To the extent future developments are such that Estate funds are subject to a trust or other liens and interests, then Munsch Hardt understands that it may have to disgorge some or all of any interim payment.  Those present uncertainties are not, however, sufficient to deny the Trustee the ability to pay his professionals on an interim basis, and subject to potential competing rights and claims.  Any concerns regarding these issues are readily addressable through an order of this Court that preserves all such rights and claims.

payment, even of a partial one. Munsch Hardt has been advancing the Estate significant amounts of credit for almost one year, for the benefit of the Estate's creditors. Defraying that risk and delay with a partial payment is equitable and needed to ensure that the Trustee has continuing support of capable professionals.

64.     Therefore, based on the representations in this Application, Exhibit "A" hereto, the Court's own familiarity with the Bankruptcy Case and the proceedings therein, and on any evidence presented by Munsch Hardt at the hearing on this Application, Munsch Hardt believes that its Requested Fees and Requested Expenses are fully allowable.

**B.     INTERIM PAYMENT**

65.     The Bankruptcy Code provides for potential interim payments to a trustee's counsel. *See* 11 U.S.C. § 331. Here, some of the funds that the Trustee is presently holding may represent "cash collateral" of the Senior Secured Bondholders or are otherwise subject to an order preventing their distribution (such as the $300,000.00 payment from AMRR which, for the avoidance of doubt, Munsch Hardt is not seeking any payment from). And the Trustee's ability to make an interim payment to Munsch Hardt depends on certain negotiations or motions presently in process or under consideration by the Court. This, in turn, makes the Trustee's ability to make an interim payment to Munsch Hardt somewhat of a "moving target." Yet, with year-end issues approaching for Munsch Hardt, and with Munsch Hardt having advanced extensive credit to the Estate, it is important to Munsch Hardt that the Trustee make a reasonable interim payment that he is able to make both legally and economically, taking into account the continuing need of the Estate to have some cash on hand and given the interests of other Estate professionals and the Trustee himself.

66.    At the same time, the Trustee and Munsch Hardt are confident that the Trustee will soon commence recovering unencumbered litigation and potentially other proceeds that will solve his present limited ability to pay Munsch Hardt.  It is for this reason that Munsch Hardt is willing to accept a partial, interim payment, and to undertake the risk of potential disgorgement.[9] Thus, this Bankruptcy Case represents precisely the issue addressed by section 331 of the Bankruptcy Code and the changes that the Bankruptcy Code brought to the Bankruptcy Act concerning professional compensation: on the one hand, the Trustee needs the continuing services of capable counsel, while on the other hand, the facts of the Estate (like most Chapter 7 estates) are such that a full payment is not possible at this time.  Hence the purpose of an interim payment to defray some of the risk and cost to the professional for effectively financing a liquidation for the benefit of creditors.

67.    Munsch Hardt requests that the interim payment be up to $700,000.00, depending on what may happen with respect to the Prosperity 9019 and cash collateral issues, as follows:

(i)    the Retainer--$120,000.00;

(ii)    if the Court grants the Prosperity 9019, then $300,000.00[10] from those funds;[11]

(iii)    $280,000.00 from funds on hand (excluding the AMRR funds and excluding subsidiary funds) subject to the Senior Secured Bondholders' cash collateral

---

[9]    Munsch Hardt generates more than $100 million in annual revenue and is fully solvent and healthy, and therefore fully ready, willing, and able to pay any disgorgement that may become appropriate or necessary in the future.

[10]    As the Court knows, these settlement funds consist of an agreed $150,000.00 surcharge of the Prosperity funds and a payment of $275,000.00 from Prosperity, thus totaling $425,000.00, all of which would be free and clear of liens and interests (the $200,000 originally payable by Prosperity was increased to $275,000.00 with the agreement of Prosperity after the hearing on the Prosperity 9019 motion).

[11]    Munsch Hardt recognizes that, in such an instance, there may be an appeal and a motion for stay pending appeal.  If there is a stay pending appeal, then the Trustee would not be able to make this payment, as he will not have the funds.  If there is no stay pending appeal, yet the Court's order is reversed, and the Trustee does not otherwise recover funds for the Estate, then Munsch Hardt recognizes that it would have to disgorge any portion of its payment from the Prosperity 9019 funds back to the Senior Secured Bondholders and Prosperity.

claims, if an agreement with the same is reached for the use of cash collateral and, if no such agreement is reached, then $177,072.37 of those funds (again excluding the AMRR funds).

68.     To reiterate, any interim payment would be subject to full disgorgement pending final approval of the Requested Fees and Requested Expenses and pending approval of the Trustee's final report.

**C.    S****ERVICE OF** **I****NVOICE (E****XHIBIT "A")**

69.     To save the Estate what would otherwise be sizable service costs, Munsch Hardt is not serving the exhibits hereto on all creditors.  Nevertheless, any creditor who wishes to obtain a copy of said exhibits may obtain one free of charge by contacting one of the undersigned counsel at Munsch Hardt.

## VI.     PRAYER

WHEREFORE, PREMISES CONSIDERED, Munsch Hardt respectfully requests that the Court enter an order: (i) granting this Application; (ii) approving the Requested Fees and Requested Expenses on an interim basis; (iii) authorizing and directing the Trustee to make an interim payment, of up to $700,000, subject to full disgorgement; and (iv) granting Munsch Hardt such other and further relief to which it may be justly entitled.

RESPECTFULLY SUBMITTED this 28th day of November, 2023.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Thomas D. Berghman, Esq.
    Texas Bar No. 24082683
    Julian P. Vasek, Esq.
    Texas Bar No. 24070790
    500 N. Akard Street, Suite 4000
    Dallas, Texas 75201-6659
    Telephone:  (214) 855-7500
    Facsimile:   (214) 855-7584
    Email: drukavina@munsch.com
    Email: tberghman@munsch.com
    Email: jvasek@munsch.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 28th day of November, 2023, true and correct copies of this document, with the exhibit thereto, were electronically served by the Court's ECF system on parties entitled to notice thereof and that, on the same day, he caused true and correct copies of this document, without the exhibit thereto, to be served by U.S. first class mail, postage prepaid, on the parties listed on the attached Service List.

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.