Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

ATTORNEYS FOR
SCOTT M. SEIDEL, TRUSTEE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | Case No. 22-31641-mvl-7 |
| Debtor. | § | |

**TRUSTEE'S EXPEDITED MOTION TO APPROVE TRANSACTION WITH AMRR REGARDING ONEPATH SYSTEMS, LLC**

TO THE HONORABLE MICHELLE V. LARSON, U.S. BANKRUPTCY JUDGE:

COMES NOW Scott M. Seidel (the "Trustee"), the duly appointed trustee for the estate (the "Estate") of Goodman Networks, Inc. (the "Debtor") in the above-styled bankruptcy case (the "Bankruptcy Case") and files this *Expedited Motion to Approve Transaction with AMRR Regarding OnePath Systems, LLC* (the "Motion"), respectfully stating as follows:

I.    **JURISDICTION AND VENUE**

1.    On September 6, 2022 (the "Petition Date"), various creditors of the Debtor filed an involuntary petition against the Debtor under Chapter 7 of the Bankruptcy Code, thereby initiating the Bankruptcy Case and creating the Estate.

2.    The Court entered its order for relief against the Debtor on December 12, 2022. The Trustee was thereafter appointed as the Chapter 7 trustee of the Estate.

3.  The Court has jurisdiction over this Motion under 28 U.S.C. § 1334. Said jurisdiction is core under 28 U.S.C. § 157(b)(2). Venue of the Bankruptcy Case before this Court is proper under 28 U.S.C. §§ 1408 and 1409.

## II. RELIEF REQUESTED

4.  By this Motion, and pursuant to Bankruptcy Rule 9019, the Trustee seeks authority to enter into the following transaction (the "Proposed Transaction") with AMRR:

(i) AMRR is selling (the "Sale") its Lockheed Martin government contract business (the "Business") to Albers Aerospace Holdings, LLC ("Albers"), which Business is housed in AMRR's wholly owned subsidiary, OnePath Systems, LLC ("OnePath"), in the form of a membership interest purchase agreement (the "MPA"), in exchange for which Albers is paying AMRR gross consideration of $3,563,000.00, of which:

   (a) $2,200,000.00 is paid in cash at closing:

   (b) $400,000.00 is paid through an unsecured promissory note payable by May 31, 2024 at 6% interest;

   (c) $800,000.00 is paid (via a Contract Holdback) if the Business' contract with Lockheed Martin is extended through at least September 30, 2025 (which will be known, and therefore this amount payable, by September 30, 2024);

   (d) $163,000.00 is paid (via a Indemnification Holdback) six (6) months after closing, assuming no indemnification claims;

(e) *with* the potential of an additional sum by way of a contractual Earnout, but as to which, for purposes of this Motion, the Trustee ascribes no value.

(ii) AMRR thereafter intends to liquidate itself for the benefit of its creditors, by far the largest of which is the Trustee. To this end, the Trustee has agreed to the Carveout (defined below) of $600,000.00 to fund professional fees and expenses and US Trustee fees in a contemplated AMRR Chapter 11 proceeding, which Carveout would be subject to the Trustee's first priority liens and replacement liens, and would constitute "cash collateral" in any AMRR filing. If AMRR does not file a Chapter 11 proceeding, then the $600,000.00 would be paid to the Trustee.

(iii) Upon the closing of the Sale, AMRR would pay the foregoing cash sums to the Trustee, and the Trustee would retain all rights against the Carveout and to a future payment of the Contract Holdback, Indemnification Holdback, and Earnout, in exchange for a release by the Trustee of a corresponding amount of debt owed by AMRR and a release of all liens, claims, interests, and encumbrances against OnePath and the Business, but otherwise retaining all claims, rights, liens, interests and encumbrances against AMRR and its remaining assets.

(iv) The Trustee would hold all proceeds of the Sale, including any future payments on the Carveout, Contract Holdback, Indemnification Holdback, and Earnout, and release or refund of the Carveout as well as any payments in an AMRR bankruptcy, including on account of replacement liens, in a segregated account pending further proceedings and order(s) as to how any such proceeds may be used or paid.

5. Attached hereto as Exhibit "A" is the *Limited Settlement Agreement* between the Trustee and AMRR (the "Proposed Agreement") pursuant to which the Trustee would effectuate the Proposed Transaction.

### III. BACKGROUND

6. In January, 2022, James Frinzi ("Frinzi") was the chief executive officer of the Debtor.

7. American Metals Recovery and Recycling, Inc., now known as MBG Holdings, Inc. ("AMRR") is a publicly traded company. In December, 2021, and using funds transferred from the Debtor, Frinzi caused a company that he owns, Multiband Global Resources, LLC ("MGR") to acquire the majority shares of stock of AMRR, and Frinzi became a director and the chief executive officer of AMRR.

8. In January, 2022, Frinzi caused $44 million of the Debtor's funds to be transferred to AMRR. FedEx Supply Chain Logistics & Electronics, Inc. ("FedEx") claims that these funds, held in the Debtor's bank account at Prosperity Bank, were held in trust by the Debtor for its benefit and it claims constructive trust and resulting trust rights and interests against these funds and the proceeds of these funds. The Trustee is not proposing that the Court adjudicate these rights and interests at this time, as such an adjudication is not necessary to decide this Motion. Rather, whatever rights, claims, and interests that FedEx asserts against the funds in question and their proceeds would remain unaffected by this Motion and would attach, subject to all defenses thereto, to all consideration from the Proposed Transaction.

9. After the Debtor transferred the $44 million to AMRR, AMRR used approximately $38 million of those funds to purchase an existing business, including OnePath. This company had several business lines and units, one of which (the "Fiber Business") AMRR previously sold and provided certain consideration to the Trustee, as approved by separate and prior order of the

Court. A different business line (the Job Corp business) was closed by AMRR due to a lack of funds. A third business line, housed within OnePath, is referred to as the "Lockheed Martin" business, which is the subject of this Motion, and consists of AMRR and OnePath providing certain "secret" or "top secret" services to Lockheed Martin in connection with government and military contracts. The business depends solely on a contract between OnePath and Lockheed Martin and has very little tangible assets, it instead being in the nature of a staffing business.

10. On January 21, 2022, AMRR signed that certain *Secured Promissory Note* payable to a wholly owned subsidiary of the Debtor, GNET ATC, LLC ("GNET"), which is not presently a debtor in any bankruptcy case (the "AMRR Note"). Except for a partial payment from the sale of the Fiber Business, AMRR has not repaid a penny on the AMRR Note, despite making representations that it would pay a significant forbearance fee to the Trustee as it sought to restructure its obligations to the Estate.

11. Also on January 21, 2022, AMRR executed that certain *Security Agreement*, granting GNET security interests in various of its assets. GNET perfected its security interests in September, 2022 by filing the appropriate U.C.C. financing statement. However, while GNET holds perfected security interests against AMRR's assets, it does not have a contractual security agreement with respect to any assets of AMRR's subsidiaries, including OnePath. This represents a problem for the Trustee, because he has been unable to simply foreclose against AMRR's business assets since the subsidiaries are not parties to any promissory note or security agreement. However, the Trustee asserts constructive and resulting trust claims and interests against all assets of AMRR's subsidiaries, since the funds used to purchase those assets originated with the Debtor through fraudulent transfers and breaches by Frinzi of his fiduciary duties.

12. The Trustee is aware of claims and allegations that the AMRR Note is a fraudulent document and that it was allegedly not signed by James Goodman, his signature instead being allegedly forged by Frinzi. It is not necessary for the Court to adjudicate the legitimacy of the AMRR Note at this time in order to consider this Motion. Suffice it to say that the Debtor and the Estate hold claims and causes of action against AMRR (and others) of more than $44 million as of the Petition Date[1] related to the transactions discussed above, whether in the nature of breach of contract or fraudulent transfer, as well as other torts (including as being the recipient of Frinzi's breaches of fiduciary duty owed to the Debtor).

13. It is the Trustee's position that GNET is not the proper payee under the AMRR Note and that its inclusion as the payee was a mistake by Frinzi. Among other things, all of the $44 million were transferred from the Debtor's account and not any account of GNET; Frinzi's subsequent communications and contracts reference that the Debtor was the holder of the AMRR Note; and there is no contract or agreement between the Debtor and GNET concerning the transfer or transaction. Even if GNET is a proper payee under the AMRR Note, this does not matter for purposes of the Proposed Transaction, because the Estate holds its own claims and causes of action against AMRR and any subsequent transferee, including AMRR's subsidiaries. Again, this is not an issue that the Court need address or resolve to consider the Proposed Transaction.

14. UMB Bank, N.A., as indenture trustee, and U.S. Bank, N.A., as collateral agent, assert perfected security interests against the Debtor and the Estate, for the benefit of various secured bondholders related to the Debtor's issuance of secured bonds which became due in 2022 and on which the Debtor defaulted. As such, the bondholders assert security interests against the AMRR Note and its proceeds, including potentially the proceeds of the Proposed Transaction. It

---

[1] This amount has been reduced by $4,516,500.00 as a result of the prior sale by AMRR of its Fiber Business and the assumption of said amount of debt by the buyer of that business.

is not necessary to adjudicate the extent of those security interests at this time, as all lien rights of the bondholders would attach to all proceeds of the Proposed Transaction with the same validity and priority as presently exists, but subject to the Trustee's rights and defenses regarding whether those liens extend to such proceeds. In turn, this question would likely require an analysis of the validity of the AMRR Note and whether proceeds of the Proposed Transaction are given as partial consideration for the debt represented by the AMRR Note (in which case the bondholders' liens would likely extend to such proceeds), or whether the Proposed Note is given as partial consideration for business torts and causes of action (in which case the Trustee would argue that the bondholders' liens do not extend to such proceeds).

15. Almost immediately after his appointment, the Trustee initiated negotiations with AMRR, still controlled by Frinzi, with the goal of AMRR repaying as much of its debt to the Estate as was realistically possible. The Trustee's ongoing investigation strongly suggests that, in a litigation or foreclosure scenario, AMRR does not have any meaningful assets that the Trustee could collect from, its only real assets being its various business lines and unliquidated causes of action. These business lines, in turn, have not enabled AMRR to derive sufficient income to repay the AMRR Note or the debt that AMRR owes to the Estate. Thus, the Trustee's strategy with respect to AMRR has been to not force a liquidation or litigation, but instead for AMRR to sell its business units and to pay any sale proceeds to the Trustee. However, as the Court has previously heard, the financial situation at AMRR is dire, and AMRR is at risk of losing the Business due to its inability to pay its creditors and vendors.

16. In July, 2023, and upon the insistence of the Trustee (as a condition of continuing negotiations), Frinzi resigned as a director and officer of AMRR. AMRR retained a chief restructuring officer, Joseph Baum of CFGI Partners (AMRR had earlier retained Sierra to provide

financial advice and CRO services to it). Mr. Baum has retained restructuring counsel to assist with his duties.

17. Mr. Baum is a true, independent CRO of AMRR and the Trustee is satisfied that he has control over the business, books and records, and funds of AMRR. In other words, the Trustee is satisfied that Frinzi is out and that Mr. Baum is making independent, fiduciary decisions for AMRR. The Court has already heard about the dire financial situation at AMRR and that AMRR has already lost one of its business lines (its Job Corps business) because its customer refused to extend its contract, that AMRR is past due on its obligations to its vendors, and that AMRR will run out of cash soon. Accordingly, Mr. Baum has commenced the process of AMRR selling its assets in order to pay the Trustee and its vendors.

18. In that connection, AMRR is entering into the MPA with Albers for the sale of its interests in OnePath and therefore for the sale of the Lockheed Martin Business. Albers is not affiliated with Frinzi, or any of the Goodman family, or any of the Auerbach family. The Trustee is not aware of any possible claims or causes of action of the Estate or GNET against Albers, unless it obtains the Business without the Proposed Transaction being approved. It is partially due to AMRR's need to sell the Business free and clear of the Trustee' claims and interests that motivates Mr. Baum to enter into the Proposed Transaction as, otherwise, the Trustee could seek to derail the Sale by asserting his claims and interests against OnePath and its Business.

19. Under the MPA, Albers will purchase the Business, in the form of purchasing AMRR's membership interest in OnePath, for gross consideration of $3,563,000.00. However, this amount is <u>not</u> paid in full up front, and it is <u>not</u> paid in full in cash. Rather, the payment structure is as follows:

    (a)    $2,200,000.00 is paid in cash at closing;

(b) $400,000.00 is paid through an unsecured[2] promissory note payable by May 31, 2024 at 6% interest (the "Note"), which would be assigned by AMRR to the Trustee at closing, without recourse;

(c) $800,000.00 is subject to a "Contract Holdback" and is payable only if Lockheed Martin extends its contract with the Business through at least September 30, 2025, which will be known by the end of September, 2024, at which time the Contract Holdback will be payable, and as against which the Trustee would hold a first priority lien position;

(d) $163,000.00 is subject to an "Indemnification Holdback" for potential indemnification claims under the MPA and, to the extent not used, is released six (6) months after closing, and as against which the Trustee would hold a first priority lien position; and

(e) there is the potential of an "Earnout" pursuant to a formula in the MPA, if EBIDTA improves post-closing, as to which the Trustee ascribes no present value but as against which the Trustee would hold a first priority lien position.

20. After the closing of the MPA, AMRR will have no business lines or business assets left. However, the Trustee will continue to hold very large claims against AMRR and any remaining subsidiaries or more than $35 million. This will be the largest claim against AMRR, although AMRR has other creditors and vendors. The Trustee believes that AMRR has other assets that, if properly monetized, can result in additional, sizable future distributions to the Trustee. These assets may include preferences, fraudulent transfers, breach of fiduciary duty claims (AMRR holds $1 million in D&O insurance), and other claims and causes of action that

---

[2] The Note is unsecured because Albers is obtaining secured financing for fund the transaction, and is therefore unable to provide a secured note.

TRUSTEE'S EXPEDITED MOTION TO APPROVE TRANSACTION WITH AMRR REGARDING ONEPATH SYSTEMS, LLC—Page 9

may require litigation to monetize. The Trustee believes that the best mechanism for AMRR to monetize these and all other of its assets may be through a Chapter 11 liquidating bankruptcy proceeding with a liquidating Chapter 11 plan, employing the tools of Chapter 5 of the Bankruptcy Code and the powers of a bankruptcy court as a centralized forum. Given AMRR's state of incorporation, such a case would be filed in Delaware. Mr. Baum would continue as the Chief Restructuring Officer in such a case, but the identity of any postconfirmation liquidating trustee has not been determined and the Trustee anticipates having a substantial say in who such person will be. The decision whether to file such a case, however, is not the Trustee's, but rather is Mr. Baum's.

21. In this respect, if Mr. Baum decides to file a Chapter 11 proceeding for AMRR, the Trustee has negotiated a carveout in the amount of $600,000.00 of the gross proceeds of the Sale (the "Carveout") to enable AMRR to pay the professional fees and expenses, and US Trustee fees, anticipated to be incurred in connection with such Chapter 11 proceeding. The Carveout would be available only for wind-down and Chapter 11 professional fees and expenses and would not be available to pay any other creditor or expense, including any prepetition employee or vendor claims. The Carveout, as specified in the Proposed Agreement, would constitute the "cash collateral" of the Trustee in any AMRR bankruptcy, as would the Contract Holdback, Indemnification Holdback, and Earnout.

22. The Trustee believes that agreeing to the Carveout is necessary and appropriate. First, it is a negotiated point required by AMRR in exchange for the benefits of the Proposed Transaction, because AMRR needs funds to pay for its own wind-down and liquidation. Second, under the Proposed Agreement, the Trustee obtains replacement liens to the extent of any use of the Carveout, including as against AMRR's Chapter 5 claims, meaning that the Trustee is likely

to be repaid the Carveout. Third, the Trustee believes that the Estate will benefit from the Carveout because someone—an independent fiduciary and insolvency expert—needs to liquidate AMRR and the Trustee, as AMRRs largest creditor, is likely the biggest beneficiary of said liquidation. In other words, the Trustee believes that there is significant value at AMRR to enable it to repay the Trustee and its creditors in some material amount, but that value requires litigation and insolvency professionals to monetize, and AMRR has no funds from which to pay the same other than a portion of the proceeds of the Sale.

23. The Trustee has considered alternatives to a Chapter 11 proceeding for AMRR and the Carveout, each of which he believes is less efficient and less in the best interests of the Estate. One alternative is for AMRR to assign all remaining assets to the Trustee. Here, however, the Trustee would be concerned about whether certain claims are assignable, whether other creditors of AMRR would allege that the assignment could be avoided and would file an involuntary petition against AMRR, and the Trustee would need to expend estate resources in any event to fund the monetization. Another alternative would be a receivership or an assignment for the benefit of creditors, but a receiver or assignee could contest the Trustee's claims and interests and force a liquidation, would lack the powers and tools of a bankruptcy, and would cost at least as much anyway to undertake an appropriate liquidation. Another alternative would be a Chapter 7 proceeding for AMRR. In such a proceeding, a Chapter 7 trustee may likewise contest the Trustee's claims and interests, may litigate with the Trustee, and would also cost substantial fees, expenses, and commissions. Through a liquidating Chapter 11 proceeding with a creditor's trust, however, the Trustee believes that he retains significant control and protections while enabling Mr. Baum to monetize whatever assets AMRR has, using the powers and tools of a bankruptcy, in an efficient, speedy, and professional manner.

24. In sum, the Trustee believes that he will be repaid the Carveout through an AMRR bankruptcy liquidation and that he will likely recover significant additional value from such a liquidation, as opposed to insisting on retaining the $600,000 and walking from any remaining recovery or trusting an unknown person, with no funds, to manage the AMRR wind-down and liquidation. If, however, AMRR decides not to file a Chapter 11 proceeding, then the $600,000.00 would be paid over to the Trustee.

25. The Trustee has retained CR3 Partners and William Snyder to provide financial and accounting assistance and services to him. Mr. Baum has enabled Mr. Snyder and his team to have full access to AMRR's financial books and records. Mr. Snyder has confirmed that the situation at AMRR is indeed dire and that AMRR is unable to pay its debts as they become due, and that, absent a prompt sale, the value of the Business will be dead. The situation is more complicated because the Business cannot file a present Chapter 11 for itself due to its the top secret clearance, and the government contract on which it relies could be lost and may be unassignable under section 365. Mr. Snyder has likewise confirmed that the consideration being paid to AMRR for the Business is fair and reasonable under the circumstances. Should anyone else make a credible offer to Mr. Baum for the Business on terms that are more favorable to the Estate, or the Trustee believes it more advantageous to the Estate, then the Trustee will withdraw his support for the Proposed Transaction and will instead consider seeking authority from the Court to engage in an alternative. However, it must be remembered that it is Mr. Baum's decision to sell, and not the Trustee, and that all the Trustee can do is to effectively block any sale by asserting his claims and interests, but then that would mean the loss of any sale as it would be impossible for the Trustee to somehow manage, run, and fund the Business (especially with respect to the top-secret clearances needed) were he to somehow foreclose against the Business or have it assigned to him.

## IV. DISCUSSION

26. As this Court has previously held with respect to the Trustee's prior limited settlement with AMRR concerning its sale of its Fiber Business, Bankruptcy Rule 9019 controls the present Motion. Under that Rule, the Court should approve a settlement only if it is "fair and equitable and in the best interests of the estate." *In re Foster Morgtage Corp.*, 68 F.3d 914, 917 (5th Cir. 1995). The factors to consider include "(1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) all other factors bearing on the wisdom of the compromise." *Id*. Such other factors include the reasonable views of creditors, although such views are not binding, and "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Id*. at 918. *See also Official Comm. Of Unsecured Creditors v. Cajun Elec. Power Coop. Inc. (In re Cajun Elec. Power Coop. Inc.)*, 119 F.3d 349, 356 (5th Cir. 1997); *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 559, 602 (5th Cir. 1960). The Court need not conduct a mini-trial on the underlying claims; rather, the Court "must apprise itself of the relevant facts and law so that it can make an informed and intelligent decision." *In re Age Ref. Inc.*, 801 F.3d 530, 541 (5th Cir. 2015) (internal quotation omitted).

27. Here, the Trustee has proposed to enter into the Proposed Transaction as an exercise of his reasonable and sound business judgment and as being in the best interests of the Estate. Among other things:

- AMRR is almost out of money and, unless it is able to sell the Business promptly, the Business may be lost for good, as occurred with the Job Corp business unit at AMRR. AMRR lacks the funds and time to retain an investment banker to market the Business. However, Mr. Baum has engaged in a competitive sales proceeds with entities believed to have an interest in the Business and he has received several

letters of intent or offers for the Business, the highest and best of which is the present MPA.

- Any litigation or foreclosure is likely to destroy the Business or result in far less consideration, since the Business consists mainly of non-assignable intangible property as opposed to hard assets that could be sold at auction. Furthermore, the Business depends on top-secret clearance, which greatly increases the risks of any foreclosure or receivership or involuntary bankruptcy proceeding.

- The Debtor may not have direct liens and security interests against the Business, since the Business is housed in a subsidiary of AMRR, which may make a foreclosure by the Trustee highly uncertain. Under the Proposed Agreement, the proceeds of the Sale are paid to the Trustee without the need to litigate these and various other issues which, at a minimum, would take substantial fees, expense, and time, and may also entail significant risk of loss.

- The overall consideration is fair and reasonable based on the financials of the Business.

- The Trustee is not relying solely on Mr. Baum and his expertise, which the Trustee has no reason to dispute (it appearing to the Trustee that Mr. Baum is honestly trying to maximize consideration for the Business), but has had the benefit of Mr. Snyder's independent advice and verification.

- Other than relieving AMRR of a portion of its obligations to the Estate, the Trustee is not granting any releases as part of the Proposed Transaction, and he reserves all of the Estate's rights, claims, and causes of action against AMRR and its property and against all third parties.

- Agreeing to the Carveout (which itself is in a reasonable amount) is necessary and appropriate, and in the Estate's best interests, not only for the other benefits of the Proposed Transaction but also because the Carveout will be used by AMRR to monetize its other assets through a controlled, professional manner, the largest beneficiary of which will be the Estate, while the Estate will be adequately protected for the use of the Carveout by replacement liens and other "cash collateral" protections in any AMRR bankruptcy.

28. The present situation is far from ideal, and the Trustee is deeply disappointed by AMRR's inability to repay anywhere close to its obligations to the Estate. Difficult decisions are needed. The Trustee is investigating and will be prosecuting the Estate's claims against Frinzi and others related to the AMRR transaction. For now, he intends to mitigate the harm that Frinzi

caused to the extent that he can and to the extent that AMRR has any ability to repay any of its obligations. The Proposed Transaction represents an important step, but certainly not the last.

29. Finally, as the Trustee has pointed out above, it is not necessary for the Court to decide various contested issues related to the AMRR Note and related transactions: whatever the nature of AMRR's obligations is, AMRR certainly owes the Estate at least $40 million, and whatever the alleged rights of FedEx and the Bondholders may be, those rights will be preserved and can be adjudicated at the appropriate time and through the appropriate process. For now, the Trustee seeks only to preserve and monetize whatever value the Business has before that value if lost.

## V. PRAYER

WHEREFORE, PREMISES CONSIDERED, the Trustee respectfully requests that the Court enter an order: (i) granting this Motion; (ii) authorizing the Trustee to enter into the Proposed Transaction; and (iii) granting the Trustee such other and further relief as may be appropriate.

RESPECTFULLY SUBMITTED this 30th day of November, 2023.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Thomas D. Berghman, Esq.
    Texas Bar No. 24082683
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas 75201
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584

**ATTORNEYS FOR SCOTT M. SEIDEL, TRUSTEE**

**CERTIFICATE OF SERVICE**

  The undersigned hereby certifies that, on this the 30th day of November, 2023, true and correct copies of this document, with the exhibit, were served by the Court's ECF system on parties entitled to notice thereof and that, additionally, on the same day he caused a true and correct copy of this document, without the exhibit, to be served by U.S. first class mail, postage prepaid, on the parties listed on the attached service list.

               By: /s/ Davor Rukavina
                  Davor Rukavina