

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

*Michelle V. Larson*

**Signed February 5, 2024**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **GOODMAN NETWORKS, INC.,** | § | **Case No. 22-31641-MVL7** |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |

### ORDER GRANTING TRUSTEE'S SECOND AMENDED MOTION
### FOR APPROVAL OF SETTLEMENT AND COMPROMISE

**I.    INTRODUCTION.**

On October 10 and 11, 2023, the Court held an evidentiary hearing (the "**Hearing**") on the *Trustee's Second Amended Motion Under Bankruptcy Rule 9019 for Approval of Settlement and Compromise with Prosperity Bank and UMB Bank, National Association* (the "**Motion**" or the "**9019**") [ECF No. 300], filed by the duly appointed Chapter 7 Trustee, Scott Seidel (the "**Trustee**" or "**Mr. Seidel**").   In the Motion, the Trustee sought approval of a compromise (the "**Proposed Settlement**" or "**Proposed Compromise**") between the Trustee, Prosperity Bank, for itself and as

1

successor to LegacyTexas Bank ("**Prosperity**"), U.S. Bank National Association, as Collateral Agent (the "**Collateral Agent**"), UMB Bank, National Association, as Indenture Trustee (the "**Indenture Trustee**"), and the Majority Noteholder Group[1] (together with the Collateral Agent and the Indenture Trustee, the "**Bondholders**"). Objections to the Proposed Settlement were filed by FedEx Supply Chain Logistics & Electronics and Arris Solutions (the "**Objecting Creditors**"), to which replies were filed by Prosperity and the Bondholders.[2] This Court has thoroughly reviewed the legal and factual bases set forth in the pleadings and, taken together with all argument and evidence presented at the Hearing, the Court finds just cause to **GRANT** the Motion and **APPROVE** the Proposed Settlement between the Trustee, Prosperity, and the Bondholders as amended after the Hearing.[3] The following constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure (the "**Rules**"), as made applicable herein by Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").[4]

## II.  FACTUAL BACKGROUND.

### A.  Prepetition Background

On May 31, 2017, Goodman Networks, Inc. (the "**Debtor**") issued its 8% Senior Secured Notes (the "**Notes**") pursuant to an indenture by and among the Debtor, as Issuer, the Indenture Trustee, and the Collateral Agent for a principal amount of $112,500,000.00.  *See* ECF No. 400-1.  The Debtor, the Indenture Trustee and the Collateral Agent entered into a Pledge and Security

---

[1] The Majority Noteholder Group consists of beneficial holders of a majority of the 8% Senior Secured notes due 2022 issued by Goodman Networks, Inc., including petitioning creditors JLP Credit Opportunity Master Fund Ltd., JLP Credit Opportunity IDF Series Interests of the SALI Multi-Series Fund, L.P., JLP Institutional Credit Master fund LP and Alimco Re Ltd.

[2] *See* ECF Nos. 269, 277 and 278. The Objecting Creditors also filed a Surreply at ECF No. 354.

[3] *See* ECF No. 414. The Court issued an oral bench ruling on January 22, 2024, which ruling is fully incorporated herein by reference.

[4] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Agreement (the "**Pledge**") on May 31, 2017, pursuant to which the Bondholders assert perfected first priority liens and security interests in substantially all of the Debtor's property and assets of the Debtor's subsidiaries. *See* ECF No. 400-3. The Collateral Agent also entered into Deposit Account Control Agreements (the "**DACAs**") with the Debtor, granting the Collateral Agent perfected, unavoidable and enforceable security interests in the Debtor's several accounts held at Prosperity. *See* ECF No. 400-5. The Notes reached maturity on May 31, 2022, at which time all amounts under the Notes became due and payable. *See* ECF No. 400-1. The Debtor subsequently defaulted, and the Bondholders assert a principal amount of $18,018,573.00 and unpaid interest of $720,160.10 remained due and owing as of the petition date. *See* ECF No. 2, pp. 1–2.

Important to these proceedings, on July 3, 2020, Prosperity loaned $3 million to Genesis Telecom LLC and Genesis Networks Global Services LLC (collectively, the "**Genesis Borrowers**"), and on August 31, 2020, Prosperity loaned the Genesis Borrowers another $1.95 million (collectively, the "**Genesis Loans**"). *See* ECF No. 401-1; *see also* ECF No. 401-12. A principal of the Genesis Borrowers is James Goodman, an insider of the Debtor. Likewise, both Genesis Loans were guaranteed by James Goodman. *See* ECF No. 401-2; *see also* ECF No. 401-13.

The Debtor had a deposit account with Prosperity with a balance of approximately $4.66 million (the "**3992 Account**"), which was subject to the DACAs, by which the Collateral Agent held valid and perfected first priority security in the 3992 Account. *See* ECF No. 401-6; *see also* ECF No. 400-5. On October 25, 2021, the Debtor executed an Assignment of Deposit Account (the "**Assignment**") in favor of Prosperity, which purports to grant Prosperity a security interest in the 3992 Account to secure obligations to Prosperity by the Genesis Borrowers in reference to the Genesis Loans. *See* ECF No. 401-9. James Goodman executed the Assignment on behalf of

Debtor. *Id.*    On October 31, 2021, James Goodman, acting on behalf of the Debtor, transferred $236,883.48 of funds from a deposit account subject to a Master Service Agreement executed between FedEx and the Debtor (the "**4352 Account**") into the 3992 Account. *See* ECF No. 401-6; *see also* ECF No. 398-13. FedEx asserts that it did not consent to this transfer. *See* ECF No. 354, p. 5, ¶ 7(f); *see also* Proof of Claim 32-1, p. 11, ¶ 41. Additionally, the Debtor made several payments from the 3992 Account totaling $513,742.92 between January 22, 2021, and August 1, 2022, with regard to the monthly obligations owed to Prosperity by the Genesis Borrowers (the "**Prosperity Payments**"). *See* ECF No. 401-17. The Trustee has asserted that the Prosperity Payments are "constructively fraudulent transfers" which may be avoided because the Debtor (1) was not obligated to Prosperity, (2) received no reasonably equivalent value for the Prosperity Payments, and (3) because James Goodman caused the Debtor to make the Prosperity Payments in order to benefit the Genesis Borrowers and himself as guarantor. *See* ECF No. 300, p. 6, ¶ 13. Prosperity has asserted a "good faith" defense to the Trustee's claims, claiming it acted in reliance on James Goodman's authority to act on behalf of the Debtor. *See* ECF No. 278, p. 6, ¶ 12.

On August 1, 2022, the balance in the 3992 Account was $4,666,707.03. *See* ECF No. 400-9. On August 11, 2022, upon inquiry from counsel to the Collateral Agent concerning an exercise of its remedies against the 3992 Account in accordance with the notice provisions in its DACAs, Prosperity advised the Collateral Agent that the same balance remained in the 3992 Account. *See* ECF No. 398-17, p. 1. On August 15, 2022, two transfers were initiated from the 3992 Account in the amounts of $2,996,799.46 and $1,467,005.22, each described as "GENESIS PAYOFF/YECJ[.]" See ECF No. 400-9.

On August 16, 2022, at the direction of the Indenture Trustee, the Collateral Agent sent a notice of exclusive control to Prosperity under the DACA for the 3992 Account (the "**Notice**").

4

*See* ECF No. 400-6.  In response to the Notice, on August 19, 2022, Prosperity wired the remaining

funds in the 3992 Account, totaling $202,902.35, to the Indenture Trustee.  *See* ECF No. 398-17,

p. 1.  After receiving only a small portion of the expected funds, counsel to the Indenture Trustee

sent Prosperity a letter, on August 22, 2022, indicating its concern that the funds were "wrongfully

transferred," requesting documentation showing the parties authorized on the 3992 Account as of

August 15, 2022, and asking that Prosperity freeze all funds transferred from the 3992 Account

and return those funds to the 3992 Account.  *See* ECF No. 398-17.

Prosperity responded on August 31, 2022, denying it engaged in any wrongful conduct or

in violation of any provision of the DACA.  *See* ECF No. 398-18, p. 1.  Prosperity indicated in its

letter that "Prosperity honored the instructions or directions of James Elmer Goodman, Jr. on

behalf of Goodman Networks Incorporated[.]" *Id.*  Regardless, Prosperity stated that it had "since

taken action to successfully retrieve the subject funds in the total amount of $4,463,804.68," (the

"**Subject Funds**") and "deposited them into secured account number XXXX0188" (the "**0188**

**Account**").  *Id.* at 2.  Prosperity further stated, "the funds will remain in that secured account

pending resolution of the conflicting instructions, notices, and directions from [the Debtor] and

[the Collateral Agent] with respect to the transfer of funds."  *Id*.  The Indenture Trustee thereafter

requested that Prosperity return the Subject Funds to the 3992 Account, subject to the terms of the

DACA.  *See* ECF No. 398-20.

### B. Postpetition Background

On September 6, 2022, members of the Majority Noteholder Group filed an involuntary

petition for relief under Chapter 7 of the Bankruptcy Code against the Debtor.  *See* ECF Nos. 1–

11.  On October 28, 2022, John Goodman, James Goodman's brother, acting on behalf of the

Debtor, demanded the return of a portion of the Subject Funds so that the Debtor could pay certain

insurance obligations, but on October 31, 2022, Prosperity declined, stating "the funds are pledged." *See* ECF No. 398-21, p. 1. Thereafter, the Court entered an order for relief against the Debtor on December 12, 2022. *See* ECF No. 132. On January 7, 2023, the Debtor filed its schedules, listing as an asset an account at Prosperity with a balance the same as the Subject Funds. This account was not identified by an account number. *See* ECF No. 184, p. 9.

The Trustee filed his initial 9019 Motion for approval of the original compromise (the "**Original Compromise**") on March 22, 2023. *See* ECF No. 226. Although the Original Compromise was set for hearing on April 19, 2023, the Trustee ultimately reset the hearing to May 18, 2023, at which time a status conference was held by the Court. The day before the status conference, the Trustee filed an amended 9019 motion for approval of a revised settlement with slightly different terms, principally the breadth of the release of Prosperity. *See* ECF No. 261.

At the status conference, it was determined that discovery and further briefing would take place as to the amended motion. The Court conducted a further status conference on the amended 9019 motion on July 12, 2023, where it was announced, as part of the discovery efforts and further investigation, that the Trustee intended to file a second amended 9019 motion to be heard on September 28, 2023.

On July 28, 2023, the Trustee filed the instant Motion, requesting that the Court approve the Proposed Settlement containing the following terms:

(a) all parties agree, and the Court finds, the Subject Funds are property of the Estate;[5]

(b) the Trustee, for the Estate, is allowed an agreed surcharge in the amount of $150,000 (the "**Agreed Surcharge**") against the Subject Funds, in full and final satisfaction of any surcharge claim of the Estate against the Subject Funds, but without prejudice to any other potential surcharge claim the Estate may have against other collateral of the Collateral Agent;

(c) Prosperity transfers to the Trustee the Subject Funds (together with any accrued interest), subject to the perfected, valid, unavoidable first-priority security

---

[5] Capitalized terms not otherwise herein defined shall have the meaning ascribed to them in the Motion.

interests of the Collateral Agent and, no later than one business day thereafter, the Trustee transfers to the Collateral Agent the Subject Funds (together with any accrued interest), less the Agreed Surcharge, for application by the Collateral Agent and Indenture Trustee as is otherwise appropriate;

(d) Prosperity will pay $200,000.00 from its funds to the Estate, as unencumbered property of the Estate;

(e) the Trustee grants a limited release to Prosperity, releasing it from any and all claims and causes of action related to the Subject Funds and the Prosperity Payments, but the Trustee will not otherwise release Prosperity and retains all other claims that the Estate may have against Prosperity, and the Trustee reserves and retains the ability to bring any and all claims and causes of action on account of the Prosperity Payments against the Genesis Borrowers or any other parties, and Prosperity grants a limited release to the Estate related to the Subject Funds and the Prosperity Payments;

(f) Prosperity, on the one hand, and the Indenture Trustee, Collateral Agent, and Majority Noteholders, on the other hand, release each other;

(g) the Trustee, on the one hand, and the Indenture Trustee, Collateral Agent, and Majority Noteholders, on the other hand, release each other from all claims and causes of action related to the Subject Funds, but not from any other claims and causes of action that may exist; and

(h) the Agreement is subject to approval by the Bankruptcy Court.

ECF No. 300, pp. 7–8, ¶ 18. On August 22, 2023, Prosperity filed a *Stipulation of Fact Between the Trustee, Prosperity Bank, and the Objecting Creditors* (the "**Stipulation**"). *See* ECF No. 317. This Stipulation was the beginning of a flurry of litigation. The Stipulation specifically set forth that the Trustee "did not consider whether any collusion occurred between Prosperity and the Debtor or the Debtor's representatives, including James E. Goodman." *Id.* at 1–2. The parties that signed the Stipulation, notably excluding the Bondholders, further agreed that "evidence regarding any alleged collusion is not relevant for the hearing on the Motion." *See* ECF No. 317, p. 2.

On August 31, 2023, the Bondholders filed a Joinder to the Motion (the "**Joinder**"). *See* ECF No. 326. The Objecting Creditors thereafter challenged the Bondholders' right to "join" in the Motion.[6] On September 12, 2023, the Bondholders filed a motion to strike the Stipulation (the "**Motion to Strike**"), requesting that the Court strike the Stipulation because the Bondholders

---

[6] *See* ECF No. 351, p. 6, ¶¶ 18–19.

believed evidence of collusion was relevant to the Court's decision on the Motion.  *See* ECF No. 347.  Three days later, the Objecting Creditors filed their *Joint Motion in Limine to Prohibit Bondholders from Introducing Evidence Related to Collusion* (the "**Motion in Limine**") at ECF No. 351.  In the Motion in Limine, the Objecting Creditors argued that evidence of collusion was not relevant to the Court's determination on the wisdom of the Proposed Settlement because the Trustee never considered whether collusion had occurred when entering the Proposed Settlement, and even if the evidence were relevant, the Court should still exclude it pursuant to Federal Rule of Evidence 403 and the doctrine of laches.  *See* ECF No. 351, pp. 3–5.

On September 18, 2023, the Objecting Creditors filed a *Joint Motion to Compel Testimony by Trustee or in the Alternative to Exclude Trustee Testimony at Hearing* (the "**Motion to Compel**") at ECF No. 355.  The Objecting Creditors argued that in order for the Court to rule on the 9019, the Trustee should be required to provide all of the factual and legal analysis that he conducted to support his business decision deeming the Bondholders perfected as to the Subject Funds, including any legal memoranda by counsel.  *See* ECF No. 355, pp. 5–7.  Without the Trustee's analysis, the Objecting Creditors argued, the Trustee should be excluded from offering any testimony at the Hearing as to the Subject Funds except that it is a "close call," as Mr. Seidel had testified at his deposition.  *Id.* at 7–8.  At its heart, the Objecting Creditors requested that the Court compel the Trustee to produce information otherwise protected by the attorney-client privilege.  *Id.* at 8. Objections were subsequently filed in opposition to the Motion to Strike, the Motion in Limine, and the Motion to Compel (collectively, the "**Foundational Motions**").

On September 22, 2022, the Court held a hearing on the Foundational Motions. After a thorough review of the pleadings, testimony, and oral arguments, with due consideration for the expedited nature of the relief sought, the Court denied each of the Foundational Motions by oral

ruling. The Court first determined that the Bondholders' Motion to Strike would be denied because the requested relief was unnecessary. The Stipulation was not binding upon the Bondholders and did not preclude their introduction of evidence of collusion at the Hearing on the Motion. Second, the Court denied the Motion in Limine because the Court determined it could not make an informed, intelligent decision about the Proposed Settlement while precluding a settling party from bringing evidence that goes to the heart of the legal issue. Finally, the Court denied the Motion to Compel because a review of the case law on the issue showed that the Trustee is entitled to rely on his counsel and his counsel's judgment in reaching a determination about whether to proceed with a settlement without waiving his privilege. Further, the Court held that the Objecting Creditors failed to prove that the Trustee had waived his privilege under the "offensive-use" doctrine. On October 10 and 11, 2023, the Court heard testimony from three witnesses, admitted scores of exhibits into evidence, and heard oral argument on the Motion before taking the matter under advisement. The following shall serve to summarize the testimony of the witnesses, each of which the Court found to be credible, unless otherwise indicated.

### C. The Trustee's Testimony

At the Hearing, Mr. Seidel testified about his investigation of the estate's claims against Prosperity and the Bondholders regarding the Subject Funds and the due diligence he undertook to reach the Proposed Settlement. Soon after he was appointed the Trustee in this case, Mr. Seidel had various calls and meetings with the major parties and their counsel, including counsel for the Debtor, FedEx, Arris, the Bondholders, and Prosperity. As part of those discussions, the Trustee was approached about recovery of the Subject Funds by the Bondholders. Over the course of several weeks, the Trustee visited with parties in order to investigate the facts underlying the Prosperity Payments and the disposition of the Subject Funds. After thorough investigation, the

Trustee understood that the Subject Funds had been swept by Prosperity and utilized to pay down a portion of the Genesis Loans the day before the Bondholders sent their Notice.

Mr. Seidel understood that the Bondholders had requested the return of the funds into the 3992 Account, and that Prosperity, after a period of several days, put the money into a separate account that may not have been subject to the DACA.  The Trustee testified that Prosperity initially informed him that the funds were in an "escrow account."  The Trustee further testified that the Subject Funds were being held for the benefit of the Debtor or the Bondholders and that Prosperity had disclaimed its own interest in the Subject Funds.  At the point in time when the Original Compromise was negotiated, Mr. Seidel was under the impression that the estate was going to be the recipient of approximately $22 million from a third party and therefore he believed that the Bondholders, whose claims were worth approximately $18 million, were going to be oversecured. Even though in April or May the Trustee learned that the Bondholders may not become oversecured and that the Bondholders' security interest in the Subject Funds was not a certainty, nothing had arisen over the course of the past six months that changed his estimation of the wisdom of the Proposed Settlement.

Mr. Seidel felt the Proposed Settlement obviated the need of having to file a turnover claim, which he felt would ultimately be counterproductive. Expanding on this, he pointed out that once the Subject Funds were turned over to the Estate, the Bondholders would still be asserting their liens against them, which would require further litigation likely under section 544 of the Bankruptcy Code. The Trustee asserted that such an action would be a hard fight to win, as the Bondholders asserted multiple theories of perfection under the Uniform Commercial Code (the

"**UCC**"),[7] which the Trustee, on investigation, considered to be plausible. Ultimately, he concluded that it was a complex situation to which there did not appear to be an easily determinable legal solution.

Furthermore, the Trustee considered what he termed as the "equities" of the situation and determined that the Bondholders likely would remain perfected in the Subject Funds. The Trustee felt that the Bondholders "did nothing wrong" in this situation and that Prosperity acted unilaterally to put the money back into a different account without any intervening rights of innocent third parties. The Trustee concluded on those facts, specifically, that he felt this Court would likely rule that the Bondholders remain perfected in the proceeds of the 3992 Account based on principles of equity, especially where the Trustee could not find any authority which proposed a "silver bullet" solution for this situation.

The Trustee testified that, because he took the objections of two of his largest creditors very seriously, he gave full consideration to the objections of FedEx and Arris when they were raised. Specifically, the Trustee pointed out that he paused the initial process of seeking to have the Original Compromise approved. The Trustee felt that the Objecting Creditors focused solely on the issue of perfection. Accordingly, the Trustee consulted an expert in UCC matters (the "**UCC Expert**") on the issue of perfection and further asked the Bondholders to provide an in-depth analysis of their position on the matter. Mr. Seidel's UCC Expert went through each side's analysis "with a fine-tooth comb," including by attending a long conference call between the Trustee, the UCC Expert and counsel for FedEx.[8]

---

[7] For the purposes of this Order, references made to the UCC shall refer specifically to those portions of the UCC codified in Title 1 of the Texas Business and Commercial Code. *See generally* TEX. BUS. & COM. CODE §§ 1.101–12.004.

[8] As the Court noted in its ruling on the Motion to Compel, the Trustee was not required to share the substance of the UCC Expert's analysis with the Court, and the Court will separately note that the Court has not considered the

At the conclusion of the Trustee's renewed investigation into the perfection issues, which took a couple of months, the Trustee concluded that the crux of the issues remained the same, but that the estate's position in the proposed litigation was ***worse*** than he had originally anticipated. Specifically, Mr. Seidel testified that he understood that if any of the Bondholders' arguments were successful in litigation, the Bondholders would wind up the recipient of the Subject Funds and the estate would be unable to recover either a surcharge or any of its attorneys' fees. Furthermore, because the litigation would involve the collusion issue, which is factual in nature, the Trustee testified that just the initial lawsuit would likely cost upwards of $300,000.00 for the estate to pursue.

Even if the estate was successful in any initial suit, the Trustee's original understanding that the Bondholders would be prepared to appeal was only redoubled by his further analysis into the perfection issue. The Trustee believed appellate courts would be particularly interested in the perfection issue and that appeals would be extremely expensive to pursue in part because of the *de novo* review standard. In his estimation, appellate litigation would likely cost somewhere between $250,000 and $300,000 at each appellate level. Therefore, after having reviewed the underlying facts and legal arguments on the perfection issue, the Trustee concluded that litigation against the Bondholders would be an imprudent use of the estate's resources, especially considering his underlying thoughts on the equities of the case, the nature of the Bondholders' claims, and the Court's equitable powers under sections 105 and 552 of the Bankruptcy Code.

Mr. Seidel repeatedly noted the degree to which he earnestly considers the opinions of the estate's creditors, especially the largest unsecured creditors of an estate. He explained that he

---

substance of the UCC Expert's analysis in coming to its decision on the Motion. Instead, the Court only considered the fact that such an analysis was conducted by the Trustee and his UCC Expert before he arrived at his decision to support the Proposed Settlement.

offered counsel to FedEx and Arris the opportunity to pursue a number of different alternative options to the Proposed Compromise.  For instance, the Trustee offered FedEx the option to purchase the cause of action outright and the alternative option to pursue the cause of action on behalf of the estate for an initial cost of $100,000.00 in return for recovery of 15% of the amount recovered in the litigation in addition to its pro rata share of recovery of assets subsumed into the estate.  Mr. Seidel testified that FedEx rejected these offers and provided no counteroffer, only repeatedly instructing him to withdraw the Proposed Settlement as ill advised.  The Trustee was shocked by this reaction because he was willing to negotiate on both the amount charged and the percentage of recovery, and it seemed to him that the Objecting Creditors were "excited" about this cause of action in particular.

Ultimately, in the Trustee's estimation, the Proposed Compromise was fair, reasonable, and in the best interests of the estate ***and its creditors*** as a result of his extensive experience as a Chapter 7 Trustee and his business judgment. He explained that the Proposed Compromise was a product of his outlook on the Chapter 7 litigation process in this case, where he views his role as threefold: (1) get money into the estate; (2) put controversies to bed; and (3) try to move forward and chase other "bad guys."

### D.  The Testimony of the Prosperity Witnesses

Two witnesses testified on behalf of Prosperity at the Hearing regarding the factual circumstances surrounding the Subject Funds, the 3992 Account and the 0188 Account: Mr. Lawrence Bates ("**Mr. Bates**") and Mr. David Montgomery ("**Mr. Montgomery**").  Both witnesses were subject to direct questioning by counsel for Prosperity and cross-examined by counsel for each of the other parties.

Mr. Bates testified that he was an Executive Vice President of Prosperity responsible for maintaining client relationships for two lending groups. James Goodman had been a client of his for approximately ten years, and that relationship had been carried over the course of multiple transitions in Mr. Bates' career with different banking entities. Mr. Bates was responsible for managing the relationship with Mr. Goodman and with the two Genesis Borrowers in 2022, but he was not personally responsible for "keeping track of" DACAs. Rather, Prosperity's treasury management group was responsible for monitoring and "flagging" accounts subject to such an agreement. In October of 2021, Mr. Bates inquired of the treasury management group whether the 3992 Account had a DACA in place. After that inquiry, Mr. Bates concluded that there was "no flag" in place and thus the 3992 Account was no longer subject to a DACA. When asked whether Prosperity had an actual document showing that the Bondholders had released their DACA, Mr. Bates testified that he assumed that such documentation must have been in place in October of 2021 because there was no flag on the 3992 Account at that time. However, in August of 2022, Prosperity was unable to locate any such documentation.[9] It was also Mr. Bates' testimony that, had Prosperity known that the DACA on the 3992 Account had not been released, Prosperity would not have accepted the Assignment of the 3992 Account.

Mr. Montgomery was a Senior Credit Officer for Prosperity responsible for managing its Special Assets division. Mr. Montgomery testified that in the time period between the initial paydown of the Genesis Loans and the unwinding of that transaction, Prosperity investigated whether the DACA had been released, as Mr. Bates had insisted. Once it was determined that a

---

[9] Mr. Bates believed that it was possible that the documentation of such a release had been provided prior to the sale of LegacyTexas Bank to Prosperity and the documentation had been lost in the transition because a lot of the former LegacyTexas systems had been "purged" and could no longer be accessed. The Court found Mr. Bates' testimony credible as to the circumstances leading to the Assignment. However, the Court seriously questions whether the absence of a "flag" is a reasonable basis on which to assume a release existed. No tangible evidence of the existence of a release was offered by any party.

release of the DACA could not be located, the Subject Funds were placed into the 0188 Account

and Prosperity disavowed ownership of the 3992 Account or any proceeds therefrom.   Mr.

Montgomery stated that the Subject Funds were placed into the 0188 Account prior to September

6, 2022, when the Bondholders filed the initial petition commencing this bankruptcy case, and that

no party has since accessed or devised the Subject Funds in any manner.  Mr. Montgomery clarified

that no one, either within or outside of Prosperity, could access the Subject Funds in the 0188

Account without express approval from Prosperity's legal department.

At closing, the Objecting Creditors reiterated and expanded on the arguments raised in their

pleadings that the Trustee's release of the estate's claims against Prosperity and the Bondholders

was ill advised and based on faulty information, especially considering their arguments against the

Bondholders' perfection in the Subject Funds. After the conclusion of testimony and hearing each

parties' closing arguments, the Court took the matter under advisement. After the Hearing, the

Court recommended that the parties continue to confer, primarily for the betterment of creditor

relations in the overall proceedings.  The Court will note that Prosperity subsequently "improved"

its offer to the estate for a return of a greater portion of the funds underlying the Prosperity

Payments.  Prosperity is now offering $275,000.00 in unencumbered cash to the estate.  *See* ECF

No. 414.

## III.   LEGAL STANDARD.

Pursuant to Bankruptcy Rule 9019(a), the Court may approve a compromise and settlement

of claims held by the bankruptcy estate.[10]   Compromises are "desirable and wise methods of

bringing to a close proceedings otherwise lengthy, complicated and costly."[11]  The burden is on

---

[10] FED. R. BANKR. P. 9019(a); *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Co.)*, 68 F.3d
914, 917 (5th Cir. 1995).
[11] *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980) (citation omitted).

the Trustee, but he need only show that a compromise falls within the "range of reasonable litigation alternatives."[12] Approval of a compromise lies within the sound discretion of the bankruptcy court.[13] To assure a proper compromise the bankruptcy judge must be apprised of all necessary facts for an intelligent, objective, and educated evaluation.[14] There are two general standards against which a proposed compromise and settlement is to be assessed by the bankruptcy court: (1) whether the agreement is "fair and equitable," and (2) whether the agreement is "in the best interests of the estate."[15]

In determining whether a settlement is fair and equitable, the Fifth Circuit has articulated five factors for courts to consider: (1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, including the difficulties, if any, to be encountered in the matter of collection; (3) the paramount interest of the creditors and a proper deference to their reasonable views; (4) the extent to which the settlement is truly the product of arms-length bargaining and not fraud or collusion; and (5) all other factors bearing on the wisdom of the compromise.[16] Notably, Bankruptcy Rule 9019 does not require a bankruptcy judge to hold a full evidentiary hearing, or even a "mini-trial" before a compromise can be approved.[17] Rather

---

[12] *In re Roqumore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008) (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)).

[13] *United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984) ("The decision of whether to approve a particular compromise lies within the discretion of the trial judge; an appellate court will reverse only when that discretion has been abused.") (citing *Jackson Brewing*, 624 F.2d at 602-03)).

[14] *Jackson Brewing*, 624 F.2d at 605.

[15] *See In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).

[16] *See Jackson Brewing*, 624 F.2d at 602 (holding that a bankruptcy judge "must evaluate and set forth in a comprehensible fashion: (1) The probability of success in the litigation, with due consideration for the uncertainty in fact and law, (2) The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of the compromise."); *see also Foster Mortgage*, 68 F.3d at 917–18 (holding that "other factors bearing on the wisdom of the compromise" includes "the paramount interest of creditors and a proper deference to their reasonable views" and "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.").

[17] *In re Cajun Elec. Power Coop.*, 119 F.3d 349, 355–56 (5th Cir. 1997).

than being forced to decide all questions of law and fact, courts have consistently held that a bankruptcy court need only "canvas the issues [to] see whether the settlement fall[s] below the lowest point in the range of reasonableness."[18] The Fifth Circuit has further concluded that it is sufficient for a bankruptcy court to find that a substantial controversy exists for which there is an uncertain outcome in litigation.[19]

Courts in this district have recognized the "unique role of the Chapter 7 Trustee in the bankruptcy process as an independent fiduciary, with a completely different perspective and interest in a bankruptcy estate than either a debtor or an individual creditor."[20]  In the words of the Chief Judge of this District, the Honorable Stacey G.C. Jernigan, "the Trustee is expected to be a gatekeeper and to exercise his reasonable business judgment in deciding what actions to bring and what are not worth the expense. … [T]he trustee is a fair, balanced, and experienced official who can be depended upon to exercise good litigation judgment."[21]  These are just a few of the reasons that bankruptcy courts grant deference to a trustee's business judgment in proposing a compromise, so far as the compromise falls within the range of reasonable litigation alternatives, as determined by the court's independent evaluation.

## IV.   <u>ANALYSIS</u>.

The Trustee's counsel advanced the several arguments in support of the reasonableness and wisdom of the compromise. They are summarized by the following four main points:

(1) The only alternative to the compromise is the prosecution of at least two lawsuits, each with its own complex legal and factual issues that make their outcomes uncertain. At least one of these lawsuits would involve appeals

---

[18] *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2nd Cir. 1983), *cert. denied*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97; *Roqumore*, 393 B.R. 474, 480 (S.D. Tex. 2008); *Nellis v. Shugrue*, 165 B.R. 115 (S.D.N.Y. 1994); *In re Drexel Burnham Lambert Group Inc.*, 138 B.R. 723, 759 (Bankr. S.D.N.Y. 1992).

[19] *American Can Co. v. Herpel (Matter of Jackson Brewing)*, 624 F.2d 605, 610 (5th Cir. 1980) (affirming a district court's approval of a compromise based on the court's conclusion that there was a substantial controversy between the trustee and the objector with an uncertain resolution).

[20] *In re Cooper*, 405 B.R. 801, 812 (Bankr. N.D. Tex. 2009).

[21] *Id.*

        reviewed *de novo* and potentially go all the way up to the Fifth Circuit, meaning years of extremely expensive litigation costing the estate hundreds of thousands of dollars, without the possibility of attorney's fees being recovered.

(2) It is possible that the Bondholders will become oversecured in the pendency of this case, and if so, they would be able to claim postpetition interest, default interest, and attorney's fees, making any contemplated litigation or appeals even more expensive, especially if the contemplated litigation resulted in the estate being unable to recover the Subject Funds.

(3) The limited release of Prosperity contemplated by the Proposed Settlement is tailored to the claims associated with the Subject Funds and the Prosperity Payments specifically, meaning the Trustee would retain his claims and causes of actions against the Genesis Borrowers to avoid and recover said payments, which the Trustee fully intends to assert and prosecute.

(4) The Proposed Settlement results in unencumbered cash flowing into the estate now, which it desperately needs to pursue other claims and causes of action against third parties.[22]

On the other hand, the Objecting Creditors almost exclusively argued the merits — that the Motion should be denied because they believe that the Subject Funds are no longer subject to the Bondholders' security interest under section 9-332(b) of the UCC. As such, they assert that the estate could recover the Subject Funds free and clear of any liens through a chapter 5 cause of action and that the unsecured creditors would have the possibility of enjoying a *pro rata* distribution from the $4.4 million *less* any administrative costs spent in obtaining them. The Objecting Creditors further assert that if this Court were to approve the Proposed Compromise "against their deference," such would constitute an abuse of discretion under Fifth Circuit precedent in *Foster Mortgage*, wherein the Fifth Circuit held that a bankruptcy court must "carefully consider the wishes of the majority of the creditors" as one of several factors bearing on the wisdom of the compromise. After applying the Fifth Circuit's factor test to this case, the Court concludes that the Trustee has satisfied his burden of establishing that the Proposed Settlement is fair, equitable, and in the best interest of the bankruptcy estate. The Court will now apply the five-factor test for reviewing compromises pursuant to Bankruptcy Rule 9019.

---

[22] *See* ECF No. 300, pp. 9–11, ¶ 21.

### A. The Extent to Which the Settlement is Truly the Product of Arms-Length Bargaining and Not of Fraud or Collusion

The Court will not mince words: the Court was most swayed in its analysis by the Trustee's testimony that he fairly considered the Objecting Creditors' arguments, juxtaposed them with the arguments of the Bondholders and Prosperity and conducted the proper due diligence on the benefits and burdens of undertaking the proposed litigation. The Trustee offered the causes of action for sale to the Objecting Creditors as well as the opportunity to pursue the causes of action on behalf of the estate on a contingency basis. They declined his offer and never made a counter. He approached several other well-respected firms about taking up the causes of action on a contingency basis and, with the exception of his current counsel, each firm declined to pursue the litigation. These actions and responses are telling. Further, the Trustee asked an expert in UCC law to take a deep dive into the legal arguments proposed by the Bondholders and the counter analysis proposed by FedEx. FedEx spoke with that expert on the phone extensively regarding its arguments. Likewise, the Trustee's settlement offer from Prosperity was improved over the lifecycle of the negotiations.[23]  At the end of this process, which the Trustee testified took him *many months* to complete, he still felt that the result of the proposed litigation was uncertain, any litigation would be extremely costly in terms of both time and money, and therefore, the Proposed Compromise was in the estate's best interest. In light of the foregoing, the Court finds that the Trustee unquestionably acted in good faith and that the Proposed Settlement is the product of arms-length bargaining; it is not the product of fraud or collusion.

---

[23] The monetary amount coming into the estate was raised and the scope of the release for Prosperity was narrowed from the Original Compromise.

### B. The Probability of Success in the Litigation, with Due Consideration for the Uncertainty in Fact and Law

When contemplating the probability of success in the proposed litigation, the Court notes that the issues underlying this compromise are both factually and legally complex. The Bondholders have asserted five principal legal theories for why they believe they remain perfected in the Subject Funds where they currently reside in the 0188 Account, as summarized below:

1. Section 9-332 of the UCC is not implicated because there was no attempt to "pay" Prosperity when the Subject Funds were placed in the 0188 Account, and Prosperity is not the transferee of such funds because it is merely holding them pending the resolution of the conflicting instructions.
2. Section 9-332 of the UCC did not strip the Bondholders' security interest because Prosperity, the Genesis Borrowers, and the Debtor acted in collusion, through James Goodman and Mr. Bates, to violate the Bondholders' rights in the DACA.
3. The Subject Funds in the 0188 Account are proceeds of the 3992 Account, and because Prosperity intended to hold the funds pending a determination of who the appropriate transferee should be, Prosperity was not a transferee of the Subject Funds. Therefore, the Bondholders' security interest attached to the 0188 Account pursuant to section 9-315 of the UCC.
4. The 0188 Account is not a "deposit account" as such is defined under the UCC. It is an internal account held in the name of Prosperity, and the Debtor no longer has the right to demand the Subject Funds directly from Prosperity under the terms of the DACA. Therefore, any contingent interest retained by the Debtor in the Subject Funds would give rise to a cause of action against Prosperity for return of the funds, and this chose in action would be a "general intangible" under the UCC, specifically a "payment intangible." The Bondholders have a perfected security interest in all of the Debtors' general intangibles, and therefore the Bondholders remain perfected.
5. Assuming that a court ruled that the 0188 Account is a deposit account or other form of collateral that requires control to perfect, the Bondholders would still have control over the 0188 Account by virtue of Prosperity's representations to the Bondholders in their letter dated August 31, 2022, and the terms of the DACA. The letter is an authenticated record, as it is a document signed by a representative of Prosperity whose clear intent was to preserve the rights of the Collateral Agent to the Subject Funds and its control of the 0188 Account.[24]

The Objecting Creditors rail against these arguments with fervor. They advance several arguments against the Bondholders' perfection, summarized as follows:

---

[24] *See generally* ECF No. 277.

1. Neither the estate nor the Bondholders have an interest in the Subject Funds because they are funds in a deposit account held and controlled by Prosperity, to which **only** Prosperity had control. The only interests that the Debtors and Bondholders still hold are litigation claims against Prosperity.

   (a) Section 9-203(b)(2) of the UCC states that a security interest is not enforceable if "the debtor does not have rights in the collateral or the power to transfer rights in the collateral to a secured party." Here, the Debtor no longer has rights in the funds placed into the 0188 Account.

   (b) The funds in the 0188 Account are not "proceeds" of the 3992 Account.

      a. Section 9-315 of the UCC is an inapplicable "general" provision that is overruled by section 9-332(b), which provides the "specific" governance on this issue dealing with a deposit account.

      b. The funds were not immediately deposited into the 0188 Account. The Genesis Borrowers received a transfer and a payment for which no value was returned to the Debtor. Because the Debtor did not acquire or receive something in the disposition of the funds from the 3992 Account, the Subject Funds cannot be considered "proceeds" under section 9-102 of the UCC.

      c. The Debtor did not retain a "general intangible" because the 0188 Account is a deposit account, which is expressly excluded from the definition of general intangibles.

   (c) A fraudulent transfer occurred. Prosperity's error of applying funds from the 3992 Account to the Genesis Loans was never corrected because the Debtor does not have any funds remaining in the 3992 Account. Therefore, the "Subject Funds" are no more, because the 0188 Account is not an account of the Debtor, and the 0188 Account is not subject to an authenticated record giving control to anyone other than Prosperity.

      a. The segregation of new money into an account exclusively held by Prosperity does not return control or possession to the Debtor or the Bondholders. Prosperity became the transferee as soon as the funds were applied to the Genesis Loans.

      b. An "authenticated record" is a term of art when related to a deposit account. The August 31 letter does not qualify as such, because the Debtor, Prosperity, and the Bondholders did not sign a tangible document that expressed the required disclosures.

2. The Bondholders cannot show that collusion violated their rights, because of the nature of the passive DACA: at the time of the fraudulent transfers, the Bondholders had yet to exercise exclusive control of the Debtor's deposit account. Therefore, Prosperity's sweep of the funds did not violate the Bondholders' rights, whether or not any collusion occurred between the Debtor, Prosperity, and the Genesis Borrowers.[25]

---

[25] *See generally* ECF No. 354.

Prosperity argues that it acted in good faith and in reliance on James Goodman's authority to act on behalf of the Debtor. *See* ECF No. 278, pp. 5–9. Further, Prosperity points out that even were the Trustee to be successful in litigating a chapter 5 claim and avoiding the transfers underlying the Proposed Settlement, Prosperity would be able to assert claims against the estate in the amount of that recovery in addition to its indemnity claim under the DACA. *Id.*

A cursory review of the above and the authority underlying the same leads to the irrefutable conclusion that there is much "uncertainty in fact and law" as it regards the potential litigation. No party brought forth an undisputed theory of recovery. No party could find solace in a binding opinion on all fours with the instant facts. On the contrary, the Bondholders do not have a DACA covering the 0188 Account. There is ambiguity on whether the 0188 Account can even be considered a deposit account, given Prosperity's disclaimer of its own interest. However, any court would need to consider Prosperity's express statements to the Bondholders representing their view that the Bondholders' security interest continues in the 0188 Account. Any trial court would also need to juxtapose that statement with Prosperity's representation that "no one" may move funds into or out of the 0188 Account, the quintessential measure of "control."

The Court also notes that regardless of whether the Trustee considered the issue of collusion in his decision on the wisdom of the compromise, collusion most certainly ***would*** be an issue of fact for trial in any litigation regarding the Prosperity Payments or the Subject Funds, which issue would involve significant further discovery to prove or disprove conclusively.[26] Considering the *de novo* standard of review, the Court concludes that there would be significant

---

[26] At the Hearing, no party sought testimony from James Goodman, a direct party to the alleged collusion. James Goodman would, by any stretch of the imagination, be a ***key*** witness in proving or disproving whether collusion between the Debtor, Prosperity, and the Genesis Borrowers occurred such that the Bondholders' lien persisted. Without his testimony, the Court can only conclude that there would be significant uncertainty as to the potential litigation on these issues.

uncertainty on appeal, as well.  There is still the issue of whether the Subject Funds might be considered a payment intangible or a general intangible, and therefore remain subject to the Bondholders' perfected liens. Finally, the Court points out that any litigation would begin in a court of equity and this Court would be called upon to consider whether the Bondholders should be divested of their lien based solely on what, at a minimum, was a mistake by Prosperity. Therefore, the Court concludes that the probability of success in litigation with due consideration for the uncertainty in fact and law, as well as the scarcity of existing legal precedent on this specific factual scenario, strongly favors approving the Proposed Settlement.

### C. The Complexity and Likely Duration of the Litigation and any Attendant Expense, Inconvenience and Delay

As the Court stated above, the Court finds that the issues involved in the Proposed Settlement are incredibly complex.  Further, declining a settlement would throw the estate into multiple rounds of litigation with Prosperity on the one hand, fighting the turnover of the Subject Funds and the Prosperity Payments, and with the Bondholders on the other, seeking to avoid their lien.  The Trustee considered the novel issues of law in his determination of the likely duration of the litigation.  A *de novo* review standard means that each appellate court would need to re-engage with each fact issue.  Importantly, ***no evidence was provided*** to rebut the Trustee's testimony that the proposed litigation could cost the estate roughly $300,000.00 at the bankruptcy court level, and between $200,000 and $300,000 at each successive appellate level.  Similarly, ***no evidence was provided*** to rebut the Trustee's testimony that this litigation would likely last many years and, in the meantime, cost the estate significant resources without the possibility of recovery of attorneys' fees or expenses.  Lastly, the Court notes that the litigation could become a sideshow to pursuing the causes of actions which are at the root of the Debtor's insolvency.  Therefore, the Court finds that any litigation, due in part to the complexity and novelty of the issues contemplated, would

require the Trustee to expend valuable estate resources over the course of several years, resources which would be better spent in litigating other claims and causes of action for a more certain reward.  Accordingly, this factor weighs in favor of approving the Proposed Settlement.

### D. Whether the Compromise Serves the Paramount Interest of Creditors with Proper Deference to their Reasonable Views

The Court will note that, contrary to the assertions of the Objecting Creditors in closing arguments, the Fifth Circuit in *Foster Mortgage* **did not** hold that a court must decide with certainty the legal and factual issues contemplated in litigation in order to overrule the objections of a majority of creditors.  Indeed, in a subsequent opinion, *Cajun Electric*, the Fifth Circuit makes clear: "it is unnecessary to conduct a mini-trial to determine the probable outcome of any claims waived in the settlement," and further that "***the desires of the creditors are not binding.*** … [T]he test is not the desires of the majority as such, but the ***best*** interests of the creditors, taking into account their reasonable views."[27]  The Fifth Circuit has separately held:

> a trustee 'realistically cannot be required to demonstrate to the satisfaction of every individual creditor and the debtor, or to any compelling degree of certitude, that the settlement benefit the [estate] and the value of the settled claim comprise a matched set' … the trustee need only reach an informed judgment that it would be 'prudent to eliminate the inherent risks, delay, and expense of prolonged litigation in an uncertain case.'[28]

Taken holistically, what the Fifth Circuit instructs is that a court must show deference to the reasonable views of the creditors ***by considering*** the amount of creditor support for a compromise and further that a court may not ***ignore*** creditors' overwhelming opposition to a settlement.

The Court finds the underlying facts of *Foster Mortgage* to be instructive in coloring the Fifth Circuit's ruling in that case. In *Foster Mortgage*, a debtor subsidiary was settling a claim it had against ***its own parent corporation***, and most notably, the proposed settlement was undertaken

---

[27] *Cajun Elec.*, 119 F.3d at 356–58 (emphasis added).
[28] *In re Solomon*, 129 F.3d 608, 614 (5th Cir. 1997).

without the participation of *any* creditor.[29]  That is clearly not the situation before the Court in the instant case.  There are two major distinctions here: (1) the Proposed Settlement is truly the product of arms-length bargaining with third party creditors and litigation counterparties; and (2) the Proposed Settlement is actively approved by the estate's largest secured creditors, the Indenture Trustee, the Collateral Agent, and the Majority Noteholders.

The evidence clearly showed that the Trustee spent weeks investigating the facts underlying the contemplated fraudulent transfers to determine whether the estate could assert rights to the Subject Funds before proposing the Original Compromise. Once the Trustee was apprised of the Objecting Creditors' opposition to the Original Compromise, he halted the process and engaged with their objections.  Once the Objecting Creditors fleshed out their positions, he engaged the UCC Expert to review the Bondholders' position on the perfection issue. After determining that the estate's position had, if anything, gotten worse with regard to his potential recovery of the Subject Funds in litigation, the Trustee offered the cause of action to the Objecting Creditors for sale or to pursue on a contingency basis for the estate. They declined.  Still, the Trustee was able to negotiate an increase in the recovery terms for the estate by negotiating with the Bondholders and Prosperity.  Therefore, the Court finds that it is without question that the Objecting Creditors' opinions were ***adequately considered*** and that the Proposed Settlement was the product of an arms' length bargain, especially in light of the fact that negotiations on the 9019 ***spanned over eight months***.

Furthermore, it is important to note that the Proposed Settlement is not being undertaken without *any* creditor support, which was the situation in *Foster Mortgage*. The Bondholders hold approximately 10% of the estate's debt. The Proposed Settlement releases the estate from

---

[29] *Foster Mortgage*, 68 F.3d at 918.

approximately *a quarter* of those claims.  Moreover, the Court must note that it is not altogether surprising that there is a dispute between secured and unsecured creditors as the same is typical in bankruptcy cases, and to say that creditor dissention is more the norm than an outlier *in this case* is a vast understatement.  Although the Court appreciates and compliments the estate's creditors on their legal prowess and the zeal with which they pursue their interests in this Chapter 7 case, that zeal has without question *cost* the estate a great deal in additional administrative expenses through repeated contested litigation.  Therefore, even though the Objecting Creditors certainly represent a majority of the unsecured debt in this bankruptcy case, the Court still believes that the compromise is in the best interests of the estate as a whole, because it is reducing the share of the debt held by the Bondholders, bringing unencumbered cash into the estate, and saving the estate significant time and the expense of further protracted litigation on the merits with undoubted appeals.

Finally, on this point, the Court wishes to once again reiterate that if the Objecting Creditors wished to see this cause of action pursued so badly, they had the chance to do so themselves and they declined to engage with that option whatsoever.  The Trustee's testimony on this matter was particularly persuasive to the Court.  He offered counsel for FedEx the opportunity to purchase the cause of action or pursue it on a contingency basis, and they declined his offer without engaging in any negotiations on the terms of the offer whatsoever.  These facts left the Trustee with the impression that the Objecting Creditors wanted the lion's share of any proceeds without having to do the work themselves or shell out any attendant expense.  The Court finds that these facts cut against the reasonableness of the views expressed by the Objecting Creditors in their opposition to the Proposed Settlement.  Therefore, the Court finds that the Proposed Settlement sufficiently serves the paramount interests of creditors with proper deference to their reasonable views.

## V.    CONCLUSION.

Based on the foregoing factors, the Court holds that the Proposed Settlement is fair and equitable. Could the Trustee have fared better in any portion of this settlement? Maybe so. However, that is not the operative question, nor the standard by which a settlement is considered under Bankruptcy Rule 9019. Likewise, is it certain that the Bondholders would achieve the results of this settlement if this were litigated to a final judgment? No. That, too, is uncertain and that, too, is not the operative question nor the standard by which the Court must consider the Motion. The question decided by the Court on this Motion is whether the Proposed Settlement is a wise one and whether approving such would ultimately benefit the estate, when compared with the alternative of expensive, protracted merits litigation and appeals. The answer to that question, in the Court's estimation, is a resounding yes.

To be clear, the magnitude of time spent, pleadings filed, hearings held and arguments raised by the parties getting to ***this point*** speaks volumes on the nature of what substantive merits litigation would entail. The cost and complexity of that litigation would be staggering. The estate's prospects in the proposed litigation are dubious. The Proposed Settlement was the result of multiple rounds of arms-length bargaining, discovery, and the passage of more than eight months. Although the Objecting Creditors oppose the settlement, the Trustee bore his burden to bring forth a compromise that meets the Fifth Circuit's mandate for approval of a compromise under Bankruptcy Rule 9019 and which falls well above the lowest range of reasonableness. Therefore, the Motion is hereby **GRANTED**.

**###END OF ORDER###**
