Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

GENERAL COUNSEL FOR
SCOTT M. SEIDEL, TRUSTEE

Michael J. Quilling
Texas Bar No. 16432300
Joshua L. Shepherd
Texas Bar No. 24058104
QUILLING, SELANDER, LOWNDS, WINSLETT &
MOSER, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Facsimile)

SPECIAL COUNSEL FOR
SCOTT M. SEIDEL, TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | Case No. 22-31641-mvl-7 |
| Debtor. | § | |

## TRUSTEE'S MOTION UNDER BANKRUPTCY RULE 9019 FOR APPROVAL OF MULTI-PARTY SETTLEMENT REGARDING PROPERTY OF THE ESTATE

TO THE HONORABLE MICHELLE V. LARSON, U.S. BANKRUPTCY JUDGE:

COMES NOW Scott M. Seidel (the "Trustee"), the duly appointed chapter 7 trustee of the bankruptcy estate (the "Estate") of Goodman Networks, Inc. (the "Debtor"), the debtor in the above styled and numbered bankruptcy case (the "Bankruptcy Case"), and files this his *Motion Under Bankruptcy Rule 9019 for Approval of Multi-Party Settlement Regarding Property of the Estate* (the "Motion"), respectfully stating as follows:

## I.     RELIEF REQUESTED[1]

1.     By this Motion, and pursuant to Bankruptcy Rule 9019, the Trustee requests that the Court approve a comprehensive compromise and settlement (the "Proposed Settlement"), reached after extensive mediation proceedings, between the Trustee, the Estate and the

---

[1]    Capitalized terms are defined below.

Subsidiaries, the Settling Bondholders, FedEx, and ARRIS, which will: resolve pending disputes and litigation regarding asserted interests in property of the Estate; avoid extensive future litigation regarding the same; enable the Trustee to commence making distributions; and put to rest most if not all intra-creditor disputes such that the Trustee and the Estate's major creditors are once again united and aligned as they assert their various rights against third parties.

2.      The Proposed Settlement is outlined in the unsigned term sheet attached hereto as Exhibit "A" (the "Term Sheet"), which, together with the descriptions contained herein, accurately state and summarize the Proposed Settlement.  The parties are presently negotiating and drafting definitive documentation to memorialize the Proposed Settlement, in the form of a proposed order on this Motion, which the Trustee will file and serve as a supplement to this Motion once finalized and executed.

## II.      THE SETTLEMENT PARTIES

3.      The following entities are parties to the Proposed Settlement (the "Settlement Parties"):

- The Trustee;

- UMB Bank, National Association, as indenture trustee (the "Indenture Trustee"); U.S. Bank, N.A., as collateral Agent (the "Collateral Agent"); and the Majority Noteholder Group[2] (collectively with the Indenture Trustee and the Collateral Agent, the "Settling Bondholders");

- FedEx Supply Chain Logistics and Electronics, Inc. ("FedEx"); and

- ARRIS Solutions, Inc. ("ARRIS").

---

2    The Majority Noteholder Group consists of investment advisers or managers of funds that hold (with such investment advisers and managers acting on behalf of such holders), or are beneficial holders of, a majority of the 8% Senior Secured Notes due 2022 issued by Goodman Networks, Inc., and include JLP Credit Opportunity Master Fund Ltd., JLP Credit Opportunity IDF Series Interests of the SALI Multi-Series Fund, L.P., JLP Institutional Credit Master Fund LP, Alimco Re Ltd., Marli B. Miller Trust A4, Miller Family Education and Medical Trust, Susan F Miller Spousal IRA, Susan F. Miller Spousal Trust A4, DuPont Pension Trust, and Hilltop Securities, Inc.

### III.    PROCEDURAL BACKGROUND

4.      On September 6, 2022 (the "Petition Date"), various creditors of the Debtor filed an involuntary petition against the Debtor under Chapter 7 of the Bankruptcy Code, thereby initiating the Bankruptcy Case and creating the Estate.

5.      The Court entered its order for relief against the Debtor on December 12, 2022. The Trustee was thereafter appointed as the Chapter 7 trustee of the Estate.

6.      The Court has jurisdiction over this Motion under 28 U.S.C. § 1334.   Said jurisdiction is core under 28 U.S.C. § 157(b)(2).  Venue of the Bankruptcy Case before this Court is proper under 28 U.S.C. §§ 1408 and 1409.

### IV.    DISPUTES AND PROPOSED SETTLEMENT THEREOF

#### A.    THE DEBTOR'S SUBSIDIARIES

7.      As relevant to this Motion, the Debtor has two (2) wholly owned subsidiaries, which have not filed bankruptcy and are presently property of the Estate (together, the "Subsidiaries"): (i) GNET ATC, LLC ("GNET"); and (ii) Multiband Field Services, Inc. ("Multiband").

8.      The relevance of GNET to this Motion and to the Proposed Settlement is that various directors and officers of the Debtor were also the directors and officers or GNET, that GNET is involved in some of the transfers discussed herein (i.e. some or all of the transfers nominally originated from GNET), that GNET holds Commercial Tort Claims (defined below) for, among other things, breaches of fiduciary duty and fraudulent transfers,[3] and that GNET is an insured and/or beneficiary under the Crime Policies (defined below) and the D&O Policies

---

[3]    Among other things, the Trustee, as a creditor of GNET, has standing to assert fraudulent transfers as such for transfers made by GNET under the Texas Uniform Fraudulent Transfer Act.

(defined below). Additionally, the Settling Bondholders and FedEx assert interests against GNET and the proceeds or recoveries from various of its transfers, as discussed below.

9.     The relevance of Multiband to this Motion is that, to the Trustee's understanding, it housed all employees of the Debtor and its Subsidiaries. As such, Multiband holds rights under various workmen compensation insurance policies issued by AIG and its affiliates (collectively, "AIG") and, more relevant, to certain funds put up as security for the same: (i) funds held by AIG in the approximate amount of $3.7 million as of the Petition Date; and (ii) an irrevocable letter of credit issued by East West Bank in favor of AIG in the amount of $3,664,465.00, as secured by the same amount of funds held by GNET at East West Bank. The Collateral Agent, on behalf of the Bondholders (defined below), holds junior liens against all such funds and collateral, to the extent not properly applied by AIG. The Trustee, with his professional financial advisors and insurance broker, understands that, while certain claims administration and payments will be required into the future, after taking into account reasonable estimates of existing claims, AIG will be obligated to refund substantial funds to Multiband and/or GNET and the Debtor.

10.    The Trustee has been considering a potential Chapter 11 proceeding for Multiband with the goal of settling, estimating, or liquidating all obligations to AIG, for the purpose of obtaining a refund of the appropriate amount of the foregoing security, with the aim of using such funds to pay the costs of administration of such Chapter 11, paying all creditors, and paying all appropriate remaining funds to the Indenture Trustee for the benefit of the Bondholders to reduce their claims against the Estate. The Trustee has been engaged in negotiations regarding the same with the Settling Bondholders, to ensure that the Estate is protected against the costs of any such Chapter 11 proceeding while providing a benefit to all creditors by paying down as much of the Bondholder claims as reasonably possible.

B.    **BONDHOLDER CLAIMS AND ASSERTED INTERESTS**

11.    On or about May 31, 2017, the Debtor issued its 8% Senior Secured Notes due 2022 (the "Notes") pursuant to that certain indenture dated as of May 31, 2017 (as amended, restated, or otherwise modified from time to time, the "Indenture"), by and among Goodman Networks as Issuer, the Indenture Trustee, and the Collateral Agent, in the original principal amount of $112,500,000.  The Notes matured on May 31, 2022, at which time all amounts due under the Indenture, including principal, interest, fees, costs, and other expenses, became due and payable. The Debtor failed to pay the Notes on and after such date, and was in default under the Indenture at least as of said date.

12.    As of the Petition Date, the Indenture Trustee and the Collateral Agent assert that the Debtor owed $18,738,733.10 on the Notes, held by various holders of such Notes (the "Bondholders").  To that end, the Indenture Trustee filed Claim No. 13, asserting a fully secured claim in the amount of $18,738,733.10 (the "Indenture Trustee Claim").  Additionally, the Collateral Agent filed Claim No. 14, asserting a fully secured claim in the amount of $18,738,733.10 (the "Collateral Agent Claim").  The foregoing claims, and the Proposed Settlement, are without prejudice to all parties' rights regarding any postpetition interest, attorney's fees, and other costs that the Indenture Trustee may be able to assert on behalf of the Bondholders.

13.    The Trustee notes that the Indenture Trustee Claim and the Collateral Agent Claim are duplicates, and that the asserted amount actually owing to the Bondholders as of the Petition Date is $18,738,733.10.  The Trustee has reviewed the amount of this claim and, other than with respect to $1,600,000.00 of the Notes[4] (the "Trustee Reservation"), the Trustee believes that the

---

[4]    Specifically, as the Trustee has alleged in Adversary Proceeding No. 23-03090, the Trustee believes that funds of the Debtor were used to purchase $1,600,000.00 of the Notes, with the express intention that such notes then be

Indenture Trustee Claim and the Collateral Agent Claim should be allowed as secured claims[5] as asserted, as of the Petition Date, but not both; *i.e.* only one such claim should be allowed.

14.     Separate from the issue of the size of the Bondholders' claims is the issue of security.  Generally, the Trustee agrees that the Collateral Agent, on behalf of the Bondholders, holds valid and perfected first priority security interests and liens against substantially all property of the Estate and against all assets of the Subsidiaries, subject to potential superior tax lien claims and the Asserted FedEx Interests (defined below), which both the Trustee and the Settling Bondholders dispute.  The Bondholders assert the foregoing would include first priority security interests against the insurance policies and insurance proceeds of the Debtor and its Subsidiaries. The Trustee and along with the Estate's primary beneficiaries, FedEx and ARRIS, dispute such liens extend to the insurance policies and any proceeds that are payable on account of claims that the Collateral Agent does not otherwise hold perfected security interests against.

15.     However, there is a present dispute between the Trustee and the Settling Bondholders regarding whether the Collateral Agent's prepetition security interests attach (or are perfected against) "commercial tort claims," which is a type of asset defined in the Uniform Commercial Code with respect to which additional steps are needed for attachment and perfection, which the Trustee asserts the Collateral Agent failed to take.[6]  This is of relevance to claims and causes of action that the Trustee has asserted and will assert on behalf of the Estate and the Subsidiaries against former officers, directors, and third parties for, among other things, fraudulent

---

cancelled, which, upon information and belief, has not occurred.  Thus, the Trustee asserts that the Bondholders' claims should be reduced by this amount or that the Estate should own $1,600,000.00 of the Notes.  Hence the purpose of the Trustee Reservation.  After a thorough investigation, the Trustee is not aware of any other basis to challenge the claims as asserted; nor has one been stated to him.

[5]     That the claims should be allowed as secured claims does not mean that the value of any security, and section 506(a) of the Bankruptcy Code, are such that the claims are fully secured, which will depend on present and future proceedings.

[6]     The Settling Bondholders dispute this assertion.

transfers, breaches of fiduciary duty, conversion, and tort claims against third parties for conspiracy and similar causes of action seeking to hold them liable (the "Commercial Tort Claims").

16.    The disputed issues arise when the issue of the Debtor's and the Subsidiaries' insurance policies are concerned.  In this respect, the Estate and the Subsidiaries generally hold two forms of insurance coverage that are applicable, pursuant to various prepetition insurance policies.  Namely, the Estate and the Subsidiaries have rights under certain crime and theft policies issued by various insurers, ranging between $5 million and $15 million for various relevant time periods (collectively, all such crime, theft, and non-D&O insurance policies, the "Crime Policies"). Additionally, the Estate and the Subsidiaries have rights under certain directors and officers liability insurance policies issued by various insurers, ranging between $5 million and $25 million for various relevant time periods (collectively, all such D&O and breach of fiduciary duty insurance policies, the "D&O Policies").

17.    Under the Proposed Settlement:

(i)     the Indenture Trustee Claim is allowed as a secured claim, subject only to the Trustee Reservation;

(ii)    the Collateral Agent Claim is withdrawn without prejudice as duplicative;

(iii)   fifty percent (50%) of any net proceeds[7] recovered by the Trustee on the Crime Policies will be paid over to the Indenture Trustee for application against the Indenture Trustee Claim, with the other fifty percent (50%) being retained by the Estate as free and clear property of the Estate[8];

---

[7]    As used in this Motion, "net proceeds" means any proceeds net of the attorney's fees, expenses, and other costs (such as filing fees and expert witness fees and trustee commission) incurred in recovering such proceeds, but in all events subject to approval of the Bankruptcy Court where and as such approval is necessary, with all parties reserving all rights to object to the same.

[8]    The Indenture Trustee will share pro-rata, as is otherwise appropriate, with respect to such Estate portion, to the extent of any deficiency claim.

(iv)     the first $425,000.00 of any net proceeds recovered by the Trustee on the D&O Policies will be paid to the Indenture Trustee for application against the Indenture Trustee Claim, as Bondholder collateral;

(v)      one-third (1/3) of any additional net proceeds recovered by the Trustee on the D&O Policies will be paid over to the Indenture Trustee for application against the Indenture Trustee Claim, as Bondholder collateral, with the other two-thirds (2/3) being retained by the Estate as free and clear property of the Estate;[9]

(vi)     if payments to the Indenture Trustee from recoveries under the D&O Policies reach $8,000,000.00 (inclusive of the $425,000.00), then any further net proceeds from the Crime Policies paid to the Indenture Trustee would be reduced from fifty percent (50%) to one-third (1/3), with the Estate retaining the remaining two-thirds (2/3);

(vii)    the Settlement Parties agree and confirm that the Collateral Agent, for the benefit of the Bondholders, has first priority security interests, to the exclusion of any of the FedEx Asserted Interests (defined below) or other asserted security interests or liens, in the Estate's and Subsidiaries' rights against funds held at AIG or otherwise as collateral for workers' compensation insurance (including in any Multiband bankruptcy case), the Trustee's judgment against Unified Field Services, Inc.,[10] and rights against the stock of Greater Tech Holdings, Inc., all subject to the Estate's surcharge claims related thereto and to all objections to such surcharge claims; and

(viii)   if the Trustee causes Multiband to file a Chapter 11 petition and the Trustee recovers funds payable to the Indenture Trustee in the same, the Settling Bondholders will agree to a surcharge against such funds to pay professional fees and commissions incurred therein, to the extent that free and clear funds in such case are not otherwise available to pay professionals and commissions, subject only to the reasonableness thereof with respect to the allowance thereof under the Bankruptcy Code.

18.      For the avoidance of doubt, all recoveries on the Crime Policies or D&O Policies, in addition to all other recoveries shared by the Proposed Settlement, would first flow through and be paid to the Estate as Estate property, and then distributed by the Trustee.  Furthermore, the foregoing sharing with the Bondholders would apply only until the Indenture Trustee Claim is paid in full, subject to rights under section 506(b) of the Bankruptcy Code, as applicable, and subject

---

[9]    See note 5.

[10]   The Trustee has obtained a judgment against this entity in the amount of just under $6 million.  The Trustee is in the process of taking post-judgment discovery and assessing his collection rights.

to the Trustee Reservation.  In other words, in no event would the Bondholders be paid more than they are entitled to under the Bankruptcy Code, including, if appropriate, their (and the Collateral Agent's and Indenture Trustee's) postpetition interest, attorney's fees, and costs, to the extent otherwise appropriate.

C.    FEDEX CLAIMS AND ASSERTED INTERESTS

19.    FedEx filed proof of claim number 32 in the Bankruptcy Case, asserting a general unsecured claim against the Estate in the amount of $81,158,452.82 (the "FedEx Claim").  FedEx asserts the same claim against GNET.  In sum, the Debtor (and GNET) stopped paying FedEx, which had the effect of amassing funds which the Debtor and GNET shortly thereafter used to transfer to various third parties, which transferred funds also underpin many of the Trustee's Commercial Tort Claims.

20.    Hence the dispute: FedEx asserts that it held interests in approximately $76,104,141.98 of the funds transferred by the Debtor and the Subsidiaries to third parties because those funds were unlawfully and fraudulently taken from FedEx.  In particular, FedEx has asserted in the FedEx Claim and otherwise that said $76,104,141.98 was its stolen property and reserved the right to assert a constructive, actual, or resulting trust for its benefit against such funds or any proceeds thereof held by the Debtor and the Subsidiaries, such that FedEx, and not the Estate or the Subsidiaries, would have the right to recover these funds and any proceeds thereof, including assets acquired with the same (collectively, the "FedEx Asserted Interests").[11]  Thus, while the FedEx Claim is generally unsecured, FedEx asserts that it holds trust and ownership claims to

---

[11]    The Trustee, the Indenture Trustee, the Collateral Agent, and the Settling Bondholders dispute these allegations.

many of the Trustee's Commercial Tort Claims and to the proceeds thereof, including assets acquired as a result of such transfers or by the transferees thereof.

21.     On October 27, 2023, FedEx filed a Complaint in the United States District Court for the Northern District of Texas, thereby initiating Civil Action No. 3:23-cv-02397 (the "District Court Proceeding").  Generally, in the District Court Proceeding, FedEx asserts claims and causes of action against multiple defendants, many of whom are also defendants of the Trustee with respect to the Commercial Tort Claims, under the Racketeering Influenced and Corrupt Organizations Act ("RICO").  The Trustee takes no position with respect to the validity of the same, to the extent that FedEx asserts claims and causes of action that are personal to it and that are not claims and causes of property of the Estate or that are asserted against property of the Estate.

22.     However, in the District Court Proceeding, FedEx had previously asserted a constructive trust claim against what the Trustee believes was property of the Estate or would become property of the Estate if the Trustee's fraudulent transfer claims avoid the transfers. Namely, FedEx had asserted its RICO and constructive trust claims against many of the same defendants, and on account of the same transfers, that the Trustee has sued various defendants to avoid and to recover, including as against property acquired as a result of said transfers.  Among other things, the Trustee believed that FedEx violated the automatic stay by asserting possession and control over property of the Estate by asserting what are in reality fraudulent transfer and similar claims that, under applicable Fifth Circuit precedent, are property of the Estate.  FedEx disputes that it violated the automatic stay or asserted any claims belonging to the Estate in the District Court Proceeding.

23.     FedEx's filing of the District Court Proceeding prompted the Trustee to file a complaint against FedEx before this Court on November 15, 2023, thereby initiating Adversary

Proceeding No. 23-03091-mvl (the "<u>FedEx Adversary Proceeding</u>"), by which the Trustee sought

declarations that the FedEx Asserted Interests were not valid or enforceable, and by which the

Trustee additionally sought damages for FedEx's alleged violations of the automatic stay by filing

the District Court Proceeding and asserting control over property of the Estate.    FedEx has

defended against the FedEx Adversary Proceeding and denies the Trustee's allegations therein.

24.    The Trustee is confident that he will prevail in the Trustee Adversary Proceeding

by obtaining declarations that FedEx has no valid FedEx Asserted Interests against property of the

Estate, including the Estate's fraudulent transfer claims and the proceeds thereof.    At the same

time, the Trustee acknowledges that almost $80 million of Debtor and GNET transfers to third

parties originated with funds that the Debtor and GNET were obligated to pay FedEx, but which

they did not pay in order to amass funds to then use to make the fraudulent transfers.    Thus, FedEx's

theory and its FedEx Asserted Interests are not without some basis in law and in fact.    And, on the

question of whether FedEx violated the automatic stay with the filing of the District Court

Proceeding, the question is not as clear because FedEx asserts that the RICO claims are personal

to it and the Fifth Circuit precedent on that issue is potentially ambiguous or fact-specific.

25.    Ultimately, if FedEx succeeds in the FedEx Adversary Proceeding then, under the

Bankruptcy Code (including section 541(d)), then the transfers and resulting proceedings that

underpin most of the Trustee's and GNET's fraudulent transfer claims may not be property of the

Estate inuring to the benefit of all creditors, but may inure solely to the benefit of FedEx, further

jeopardizing the Estate's rights under the Crime Policies and the D&O Policies.    The Trustee

further asserts that FedEx has no valid FedEx Asserted Interests against property of the Estate, including the Estate's fraudulent transfer claims and the proceeds thereof.[12]

26.     Under the Proposed Settlement:

(i)      FedEx amended the District Court Proceeding to withdraw the constructive trust claim, and the Trustee agrees that FedEx's other claims as asserted in said amended complaint, including the RICO claims, the fraud claims,[13] the theft claims, the unjust enrichment claims, the tortious interference claims, and the conspiracy claims, as asserted in the District Court Proceeding are personal to FedEx and are not property of the Estate;

(ii)     the Trustee dismisses the FedEx Adversary Proceeding without prejudice, reserving the right to reassert his claims if FedEx were to again seek a constructive trust claim or otherwise seek a fraudulent transfer claim, a breach of fiduciary duty claim, or other substantially similar derivative claim of the Estate;

(iii)    the FedEx Claim is allowed as a general unsecured claim against the Estate, and FedEx agrees not to assert any property interests, including constructive, actual or resulting trusts, against property of the Estate, except as provided in the Proposed Settlement;

(iv)     the Estate and the Subsidiaries will assign to FedEx any breach of contract or other state law claims that they may have against Prosperity (defined below) that are not released as part of the Prosperity Settlement (defined below), without warranty, representation, or recourse and the Trustee agrees to reasonably cooperate with FSCLE in its prosecution of the assigned claims;

(v)      any net proceeds recovered by FedEx in the District Court lawsuits will be retained by FedEx[14] in the amount of eighty-five percent (85%) of such net proceeds, for application against the FedEx claim, and shared five percent (5%) with ARRIS and ten percent (10%) with the Estate;[15]

(vi)     ten percent (10%) of any net proceeds recovered by the Trustee for the Estate or the Subsidiaries on account of causes of action asserted by the Trustee (with the exception of the adversary proceedings described in subsection (vii), below), but not paid from the Crime Policies or D&O Policies, and only as may be recovered after the date of the Term Sheet, and not otherwise the collateral of the Collateral

---

[12]   The Settling Bondholders similarly believe that FedEx has no valid FedEx Asserted Interests against any property of the Estate.

[13]   FedEx is not asserting fraudulent transfer claims in the District Court Proceeding.

[14]   Any such net proceeds will not be property of the Estate and will not flow through the Estate, but the Estate's ten percent (10%) portion will be property of the Estate.

[15]   For the avoidance of doubt, both ARRIS and FedEx will share pro-rata, as is otherwise appropriate, in the Estate's share, unless and until their claims are paid in full.

Agent, for the benefit of the Bondholders, with respect to specific assets at Multiband related to AIG, the Unified Field Services receivable, or Greater Tech Holdings securities, to be applied to the FedEx Claim, but with respect to such ten percent (10%), the same shall be a credit against FedEx's pro-rata distributions as a general unsecured creditor of the Estate;[16]

(vii)    FedEx will not object to any proposed settlement the Trustee seeks authority to enter into under Bankruptcy Rule 9019 concerning Adversary Proceeding 23-03036[17] or Adversary Proceeding 23-03090,[18] the proceeds and recoveries of which would be free and clear property of the Estate and not subject to subsection (vi), above, or to any other proposed Estate settlement,[19] but with FedEx reserving and preserving all personal claims it has against any of the defendants therein; and

(viii)   The Trustee and FedEx will enter into a reasonable and standard common interest agreement to facilitate the sharing of discovery, depositions and to aid each in the pursuit of their separate claims, but without waiving or prejudicing their respective privileges.

27.    For the avoidance of doubt, in no event would the FedEx Claim or the ARRIS Claim (defined below), as asserted against the Estate but not necessarily third parties, be paid more than the allowed amounts thereof, and subject to all credit that may be properly applied by the Trustee to such claims from collateral sources of recovery (and without prejudice to FedEx's and ARRIS' rights to contest such credit).

---

[16]    For the avoidance of doubt, FedEx will share pro-rata, as is otherwise appropriate, in the Estate's share, unless and until their claims are paid in full.

[17]    This Adversary Proceeding is pending against James Frinzi, his entity Multiband Global Resources, LLC, and his family trust, the Frinzi Family Trust, seeking to recover approximately $5 million for alleged fraudulent transfer, breach of fiduciary duty, embezzlement, and other claims and remedies.

[18]    This Adversary Proceeding is pending against James Goodman and various entities affiliated with him, James Frinzi, Hudson Clean Energy Enterprises, LLC, Nel Z. Auerbach, and various entities affiliated with him, relating to approximately $17 million of transfers, under theories of breach of fiduciary duty, fraudulent transfer, and other claims and remedies.

[19]    For the avoidance of doubt, FedEx will not object to the terms of any settlement so long as any property recovered on account of such settlement as property of the Estate is distributed pro rata in accordance with the priorities of the Bankruptcy Code. FedEx reserves the right to object to any settlement that alters its rights to share in any recovery under this Proposed Settlement or as a general unsecured creditor, that prioritizes any claim above the general unsecured claims or that otherwise impairs its rights under this Proposed Settlement.

D.     **ARRIS CLAIMS AND ASSERTED INTERESTS**

28.     ARRIS filed proof of claim number 29 in the Bankruptcy Case asserting a general unsecured claim in the amount of $30,293,887.09 (the "ARRIS Claim"). ARRIS asserts that a prepetition escrow exists in the amount of $228,987.38 at Texas Partners Bank (the "ARRIS Escrow"), to secure the ARRIS Claim in part. The Trustee has reviewed the ARRIS Claim and the ARRIS Escrow and believes both to be valid and not subject to avoidance. He has not been informed of any basis on which to object to the allowance or validity of either.

29.     Under the Proposed Settlement:

(i)     ARRIS is permitted relief from the automatic stay in order to take all necessary action to recover and collect on the ARRIS Escrow, to be applied against the ARRIS Claim, and the Trustee will reasonably cooperate with respect to the same;

(ii)    the ARRIS Claim is allowed as asserted, less the amount of the ARRIS Escrow actually recovered;

(iii)   ARRIS receives limited interests in certain litigation of FedEx as discussed above, and a certain payment from FedEx as asserted below, to be applied to the ARRIS Claim; and

(iv)    ARRIS otherwise shares in any pro-rata recoveries on account of the ARRIS Claim as otherwise appropriate.

E.     **PROSPERITY SETTLEMENT**

30.     Beginning on March 22, 2023 [docket no. 226], as amended thereafter and finally on July 28, 2023 [docket no. 300], the Trustee requested authority under Bankruptcy Rule 9019 to enter into a settlement with the Indenture Trustee, the Collateral Agent, and Prosperity Bank ("Prosperity" and the "Prosperity Settlement"). FedEx and ARRIS objected. What followed were months of discovery and motion practice, with a two-day evidentiary hearing held by the Court on the Prosperity Settlement on October 10 and 11, 2023. On February 7, 2024, the Court entered its *Amended Order Granting Trustee's Second Amended Motion for Approval of Settlement and*

*Compromise* [docket no. 494], by which the Court approved the Prosperity Settlement (the "Prosperity Order").

31.    Pursuant to the Prosperity Settlement and the Prosperity Order, Prosperity transferred to the Trustee $4,738,804.68.[20]  The Trustee then transferred $4,313,804.68 of such funds to the Collateral Agent for application towards the claims of the Bondholders, retaining $150,000.00 of such funds as an agreed surcharge and $275,000.00 of such funds as free and clear settlement proceeds of the Estate.

32.    Both FedEx and ARRIS have the right to appeal the Prosperity Order, and both have indicated that they intend to do so absent the Proposed Settlement.

33.    The Trustee is of the strong opinion that avoiding any such appeal is in the best interests of the Estate.  While the Trustee believes that the Prosperity Order will be affirmed on appeal, this may take upwards of two years, during which rights will remain uncertain, and will cost the Estate several hundred thousand dollars to defend, which funds are not recoverable.  This, in turn, would remove much of the benefit of the Prosperity Settlement from the Estate.

34.    Under the Proposed Settlement, FedEx and ARRIS agree not to appeal the Prosperity Order.[21]  Thus, the paydown of the Bondholders' claims by $4,313,804.68 will be final, with an obvious benefit to the Estate, as will the receipt by the Estate of $425,000.00 of free and clear funds.

---

[20]    This amount consists of $4,463,804.68 of Debtor funds held by Prosperity, the rights to which were disputed, and an additional $275,000.00 of Prosperity's own funds used for settlement purposes.

[21]    The parties to the Proposed Settlement acknowledge that FedEx and ARRIS may appeal the Prosperity Order solely for purposes of preserving their appellate rights while this Proposed Settlement is heard and determined in this Court. If the Proposed Settlement is approved, the Parties will cooperate to dismiss any appeal filed. If the Proposed Settlement is not approved, FedEx and ARRIS may prosecute their appeals.

F.    **AMRR LIQUIDATION PROCEEDS**

35.    One of the main transfers that give rise to some of the Commercial Tort Claims and D&O Policies concerns the transfer, orchestrated by James Frinzi and potentially other insiders of the Debtor, of $44,000,000.00 from the Debtor and/or GNET to MBG Holdings, Inc. f/k/a American Metals Recovery and Recycling, Inc. ("AMRR"). The facts and circumstances regarding the transactions with AMRR and the transfers to AMRR are uncertain and disputed. The Trustee gives the foregoing and the following description, but makes no admissions and reserves all rights regarding the facts.

36.    Both the Settling Bondholders and FedEx assert interests with respect to the Estate's and the subsidiaries' rights against AMRR. First, the nature of those rights is disputed. In purported return for the $44 million, AMRR gave GNET (not the Debtor) a secured promissory note that is alleged to have been fraudulent. Second, the Debtor subsequently purported to own the note, and to have assigned half of it to 18920 NW 11th, LLC ("18920"). The Trustee has sued 18920 in Adversary Proceeding 23-03072 to, among other things, invalidate the purported assignment. Third, the source of the funds used to make the $44 million transfers was from the Debtor's and GNET's relationship with FedEx, on account of which FedEx alleges that the funds, any proceeds therefrom, and any assets acquired therewith are subject to the FedEx Asserted Interests. Fourth, the Trustee has asserted that the $44 million transfers were fraudulent transfers that may be avoided and recovered by the Estate. Fifth, AMRR used the funds to purchase businesses, in part, which it housed through wholly owned subsidiaries, which did not enter into promissory notes, guarantees, or security agreements with the Debtor or GNET. The Trustee nevertheless asserts that the Estate and GNET have direct claims to the assets of those subsidiaries, where any real value resided, because their funds were used to acquire the businesses and their assets.

37.     All this results in a factual and legal mess.  On the one hand, the Collateral Agent, for the benefit of the Bondholders, has perfected security interests against the Estate's and GNET's perfected security interests against AMRR, but not against AMRR's subsidiaries' assets.  That is only if the alleged promissory note and collateral agreement are valid, in which case the Collateral Agent's security interests would also attach to any portion thereof allegedly assigned to 18920, but again not to the AMRR subsidiaries where the assets resided.  On the other hand, if the transaction was really a fraudulent transfer—a Commercial Tort Claim—then the Trustee asserts that the Collateral Agent would not have any security interests against the resulting claims and proceeds, except to the extent paid by D&O Insurance and subject to the above-described dispute regarding the Collateral Agent's asserted security interests against the proceeds of the same.  Or, if FedEx is right, then its alleged FedEx Asserted Interests may mean that all proceeds of the $44 million transfers belong to it, and there may be a dispute with the Settling Bondholders as to whose interest is superior, but again not as against the subsidiaries where the assets resided as the Settling Bondholders would have no claim to the proceeds thereof.  And then, as between two competing fraudulent transfer or constructive and equitable trust claimants, those being GNET and FedEx, there would also be a dispute as to priority.

38.     After his appointment, the Trustee took extensive discovery from AMRR, threatened litigation and bankruptcy filings, and succeeded in convincing AMRR to retain a chief restructuring officer to liquidate it and its subsidiaries' assets for the benefit of the Estate.  The Trustee then proposed two transactions with AMRR, which the Court approved and which have closed, and with respect to the proceeds of which all competing rights of the Trustee, the Settling Bondholders, FedEx, and 18920 were preserved.

39.     First, the Trustee entered into a transaction with AMRR and Alliance Global Solutions, LLC ("Alliance") pursuant to which AMRR sold to Alliance its Fiber Business, with

the return consideration being paid over to the Estate.  That consideration includes a cash payment to the Trustee of $300,000.00 (which Alliance made and which the Trustee is holding in a separate account), a secured promissory note payable to the Trustee in the amount of $4,200,000.00, to be payable over time with a balloon feature, and a 10% equity stake in Alliance (all such consideration received or to be received, including through any litigation, collection, foreclosure, bankruptcy proceedings, and the like, the "Alliance Proceeds").  Because the Alliance Proceeds were for the sale by AMRR of the assets of one of its subsidiaries, the Trustee asserts that the Collateral Agent does not have security interests against the same.  The Settling Bondholders dispute this.  FedEx also asserts that the Alliance Proceeds would be subject to the disputed FedEx Asserted Interests.

40.     Later, the Trustee entered into a transaction with AMRR and Albers Aerospace Holdings, LLC ("Albers") pursuant to which AMRR sold its equity interests in its subsidiary, OnePath Systems, LLC ("OnePath") to Albers.  The return consideration, payable to the Estate, included a payment from Albers of $2,200,000.00 (which Albers made and which the Trustee is holding in a separate account), $400,000.00 payable by promissory note by May 31, 2024, an $800,000.00 holdback payable to the Trustee if certain conditions are met (likely by September 30, 2024), a $163,000.00 litigation holdback payable to the Trustee by six months after closing if litigation claims are not asserted, and a potential earnout if certain metrics are met (all such consideration received or to be received, including through any litigation, collection, foreclosure, bankruptcy proceedings, and the like, the "Albers Proceeds").  Unlike with Alliance, because this was a transfer of AMRR's equity interests, the Bondholders may have a security interest against the Albers Proceeds, since the Debtor and/or GNET hold perfected liens against AMRR's equity interests.  However, there would still be the issue as to whether this was on account of fraudulent transfer claims, and it would still be subject to the disputed FedEx Asserted Interests.

41.     Separately, AMRR is in the process of liquidating its remaining assets, which may include a bankruptcy filing, and related potential liquidation of claims and causes of action that it may own, as well as any *de minimis* property or cash that it may hold or recover (all such proceeds of any liquidation payable to the Debtor or GNET, the "<u>AMRR Liquidation Proceeds</u>").  The Trustee does not know what the value of any AMRR Liquidation Proceeds may be, but he is hopefully that it will yield an additional net amount in the mid-six figures range.

42.     As noted above, untangling the mess of legal and factual issues with respect to who owns what rights, and with what priorities, regarding the foregoing will be highly uncertain, costly, and will take years.  No readily apparent litigated solution exists.  Thus, under the Proposed Settlement the following would result:

(i)     The Estate, FedEx, and the Indenture Trustee would each receive one-third (1/3) of the Alliance Proceeds, the Albers Proceeds, and the AMRR Liquidation Proceeds, as of the date of the Term Sheet, with FedEx transferring $100,000.00 of its share to ARRIS.[22]  Thus, each would receive approximately $833,333.

(ii)    As for any of the Alliance Proceeds, Albers Proceeds, or AMRR Liquidation Proceeds received by the Estate after the date of the Term Sheet, the net proceeds thereof recovered by the Estate would likewise be shared between the Estate, FedEx, and the Indenture Trustee one-third (1/3) each.  If all Alliance and Albers Proceeds are paid, that would mean an additional approximately $1,853,333 to each, before any potential earnout or equity value.

(iii)   The Estate's one-third (1/3) portions above would be free and clear of all liens and interests, subject only to the disputed interests of 18920, and, for the avoidance of doubt, the Indenture Trustee, FedEx, and ARRIS would share pro-rata in the Estate's portion as is otherwise appropriate, up to the full amount of their claims.

(iv)    All such funds received by the Indenture Trustee, FedEx, and ARRIS would be applied to their allowed claims against the Estate.

43.     The appeal of this portion of the Proposed Settlement to the Estate is particularly strong because, absent a settlement of the competing rights and interests to the AMRR liquidation

---

[22]   All such funds would belong to the Estate in the first instance and would flow through the Estate.

proceeds, those proceeds would remain frozen for years while litigation proceeded and concluded, during which time no party would have any practical benefit from such funds, while eroding the net benefits of such funds to all parties.

## G.   CASH COLLATERAL

44.   On December 21, 2023 the Court entered its *Interim Order Authorizing Scott M. Seidel, Chapter 7 Trustee to Utilize Cash Collateral, Granting Adequate Protection, and Granting Related Relief* [docket no. 472] (the "Cash Collateral Order").   By the same, the Settling Bondholders agreed to permit a portion of their asserted cash collateral to be used by the Trustee to pay certain professional claims in part, which the Trustee did.   The Cash Collateral Order reserved the issue of granting the Collateral Agent a replacement lien with respect to said funds, to be heard by the Bankruptcy Court if a settlement of outstanding issues was not reached.   Under the Proposed Settlement, the Collateral Agent, on behalf of the Bondholders, waives its right to assert an interest in or a replacement lien with respect to said funds. FedEx and ARRIS agree to waive any objection to $125,000 that was distributed to the Indenture Trustee, and the Parties agree that the remaining requests for relief and objections related to the Cash Collateral Motion and Interim Order are therefore moot.

## V.   **DISCUSSION**

45.   As explained in some detail above, and as the history of this Bankruptcy Case to-date has shown, there are multiple, serious, disputed, and uncertain issues between the Estate and its major creditors that go to the heart of what property of the Estate may be and who has valid interests against the same, and in what priorities.   These disputes have already led to significant litigation and, without a resolution will lead to substantially more litigation: the only thing that can be certain about that litigation is that it will be uncertain, but very costly and lengthy to sort out the competing and disputed issues.   In the meantime, the Trustee and creditors are using their

resources on these disputes instead of all being aligned with the Trustee as he seeks to hold third parties responsible and to monetize the Estate's assets.

46.     For these and other reasons, and with the approval of the Court, the Settlement Parties mediated these disputes in person with former chief bankruptcy judge Steven A. Felsenthal on January 23, 2024, with significant mediation communications and negotiations continuing thereafter.  The Proposed Settlement and the Term Sheet are the results of that mediation.

47.     Bankruptcy Rule 9019 provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  FED. R. BANKR. P. 9019(a). Under that Rule, the Court should approve a settlement only if it is "fair and equitable and in the best interests of the estate."  *In re Foster Mortgage Corp.*, 68 F.3d 914, 917 (5th Cir. 1995).  The factors to consider include "(1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) all other factors bearing on the wisdom of the compromise."  *Id.*  Such other factors include the reasonable views of creditors, although such views are not binding, and "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion."  *Id.* at 918.  *See also Official Comm. Of Unsecured Creditors v. Cajun Elec. Power Coop. Inc. (In re Cajun Elec. Power Coop. Inc.)*, 119 F.3d 349, 356 (5th Cir. 1997); *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 559, 602 (5th Cir. 1960).

48.     The Court need not conduct a mini-trial on the underlying claims; rather, the Court "must apprise itself of the relevant facts and law so that it can make an informed and intelligent decision."  *In re Age Ref. Inc.*, 801 F.3d 530, 541 (5th Cir. 2015) (internal quotation omitted).  The settlement need not result in the best possible outcome for the Estate, but must not "fall beneath the lowest point in the range of reasonableness."  *Vaughn v. Drexel Burnham Lambert Group, Inc.*

*(In re Drexel Burnham Lambert Group, Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).  Finally, the Trustee is entitled to employ his reasonable business judgment in proposing a settlement, and that judgment is entitled to reasonable deference from the Court where, as here, the proposed settlement is not between insiders:

> The Trustee's decision to settle must represent the interests of the bankruptcy estate and its creditors and is reviewed under the 'business judgment rule.'  Under the business judgment rule, the challenging party must establish that the course of action chosen by the fiduciary was outside the parameters of what a rational and reasonably informed businessperson might select.  The business judgment rule creates a presumption in favor of the fiduciary.

*In re Woodberry*, 629 B.R. 239, 243 (Bankr. E.D. Mich. 2021) (internal quotations omitted).

49.    Here, the Trustee believes that the Proposed Settlement is fair, equitable, and in the Estate's best interests, for at least the following reasons:

- On a macro level, obtaining judicial determinations of the above-described disputes will entail multiple rounds of expensive, risky, and lengthy litigation and appeals. Some of the issues are highly uncertain and may present matters of first impression.

- In the meantime, the Trustee would be litigating with his major creditors, and they with themselves, when all resources are better served by assisting the Trustee to monetize the Estate's assets, mainly litigation claims against third parties. And, each party would be expending its valuable resources, without litigation fees and expenses being compensable, thus diminishing what is already as zero sum game.

- In the meantime, there would be significant uncertainly as to what the Estate's assets are, which would mean delayed litigation against third parties, and uncertainty as to what claims, if any, the Trustee could settle or recover on.

- The Proposed Settlement is supported by the overwhelming major creditors of the Estate. Every dollar paid to them will be used to pay their and other claims dollar-for-dollar, with a corresponding benefit to the Estate and to all creditors. Thus, while the Proposed Settlement is supported by the major creditors, it is also fair to all creditors and ensures that the Trustee has sufficient cash and assets to continue litigating and monetizing assets for the benefit of the Estate and all of its creditors.

- On a micro level, the compromises with the Settling Bondholders are fair and equitable, and represent fair compromises of disputed and uncertain issues and claims. With respect to the Crime Policies, the Trustee believes the Settling Bondholders have colorable arguments that they have perfected security interests

as to any proceeds.  With respect to the D&O Policies, the Trustee believes the Settling Bondholders' arguments are weaker, but not without some basis and uncertainly in the law.  Compromising these rights at 50% and 33%, respectively, makes sense and avoids the costs, delays, and risks of litigation, while still paying down debt.

- The compromises of the AMRR liquidation proceeds at one-third each is even more fair and appropriate because, as the Trustee has said above, it is a legal and a factual mess.  The underlying transactions are so heavily disputed, that untangling them and assigning to them neat, legal definitions is nearly impossible.  There is little question that the Settling Bondholders have some rights, depending on how the transactions and AMRR proceeds are characterized, and there is no question that the funds used to make the transfer to AMRR originated with funds that the Debtor and GNET received from and were obligated to pay FedEx, in what appears to have been an intention by the Debtor's former principals to amass funds payable to FedEx to use for other purposes.  That FedEx has no resulting rights is unlikely, but again what those rights may be depends on how the transactions and transfers, and resulting payments, are characterized.  Not only would the litigation be exceedingly expensive, risky, and lengthy, but it would also depend on the credibility of witnesses (as opposed to legal issues) that no one can reasonably predict how the trier of fact would determine.  And, given the amounts involved, little benefit may remain after all-out litigation.  The principal witnesses, those being the Debtors' former officers and directors, may have no credibility such that their testimony on the underlying facts cannot be counted on by the Trustee to help prove his claims to the AMRR liquidation proceeds.

- The compromises with FedEx are also fair and equitable and reflective of the fact that FedEx is by far the largest creditor of the Estate.  With respect to the District Court Proceeding, the only thing the Trustee cares about is that FedEx does not assert or recover on Estate claims—which was the main point of the FedEx Adversary Proceeding.  The Trustee recognizes that FedEx asserts claims that are personal to it and that are not Estate claims, regardless of their merit or value, on which points the Trustee takes no present position.  With FedEx already amending its District Court Proceeding to not assert the FedEx Asserted Interests, FedEx has already resolved the issue, and it has agreed to not assert these interests therein again, thereby effectively granting the Trustee the relief he requests in the FedEx Adversary Proceeding.  And, the Proposed Settlement also resolves the FedEx Asserted Interests as against the Estate and in the Bankruptcy Case as well, with the agreements to share in claims and recoveries.

- The Trustee believes that effectively releasing FedEx from his allegations of an automatic stay violation as asserted in the FedEx Adversary Proceeding is fair and reasonable.  The damages, now that FedEx has amended its FedEx Adversary Proceeding, are not large, and the issue of whether FedEx violated the automatic stay is disputed and is uncertain given Fifth Circuit precedent.  And, while the

Trustee does not like what FedEx did, how it did it, and when it did it, he does not question that FedEx acted in good faith to preserve its interests.

- The Trustee concedes that FedEx pursuing the same target defendants in the District Court Proceeding that the Trustee is and will be pursuing in his actions will make a settlement of the Estate's claims harder, because the Trustee will not be able to grant full releases. But, there is nothing that the Trustee can do about that anyway. Nevertheless, the Trustee believes that FedEx will be mostly reasonable if he proposes a settlement that requires a FedEx release, and any subsequent possible splitting of proceeds can be addressed then, when it is ripe, and the Estate retains all rights to the Crime Policies and the D&O Policies, where the Trustee believes that much of the recoveries should come from.

- With respect to the allowance of the Indenture Trustee Claim, the FedEx Claim, and the ARRIS Claim, the Trustee has reviewed the claims and the underlying documents and knows of no basis to challenge the allowance of the same, and none has been alleged to him by any other creditor.

- The Proposed Settlement, including the waiver of appeals of the Prosperity Order and the splitting of the AMRR liquidation proceeds, means that the Trustee can start making material payments on legitimate debt right away.

- With the Proposed Settlement, the Estate has free and clear funds (including from the Prosperity Order and the splitting of the AMRR liquidation proceeds) to fund litigation which the Trustee believes will be of substantial value to the Estate.

- The Proposed Settlement is the result of extensive, arm's length, negotiations and a lengthy and contentious mediation with an excellent mediator. There are no undisclosed agreements. This is not an "insider" settlement.

50.     The issues addressed in the Proposed Settlement have been brewing for some time. At one point, the Trustee thought it best to freeze all such issues and related rights until the Trustee recovered significant funds over which to litigate. That proved not practical for various reasons that are obvious and some that are not. The issues thus escalated from brewing to boiling, and all parties—including at the prompting of the Court—agreed that continued fratricide was wasteful and would not help anyone. All parties have acted reasonably, with each giving some and taking some, to arrive at a comprehensive, global, and fair resolution. This is precisely what this Bankruptcy Case needs to ensure that the Trustee can do his job effectively, efficiently, and

expeditiously.  The Trustee therefore asks the Court to approve the Proposed Settlement and to authorize him to take all actions necessary or advisable to implement and to effectuate the same.

51.    The Indenture Trustee will provide notice of this Motion, the Proposed Settlement, and the deadline to object thereto to all Bondholders.

## VI.    PRAYER

WHEREFORE, PREMISES CONSIDERED, the Trustee respectfully requests that the Court: (i) grant this Motion; (ii) approve the Proposed Settlement; (iii) authorize and direct the Trustee to perform all actions required by the Proposed Settlement; and (iv) grant the Trustee such other and further relief to which he may be justly entitled.

RESPECTFULLY SUBMITTED this 29th day of February, 2024.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Thomas D. Berghman, Esq.
    Texas Bar No. 24082683
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas 75201
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584

**GENERAL COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE**

**-- and --**

**QUILLING, SELANDER, LOWNDS,
WINSLETT & MOSER, P.C.**

2001 Bryan Street
Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Facsimile)
By: /s/ Michael J. Quilling
Michael J. Quilling
Texas Bar No. 16432300
Joshua L. Shepherd
Texas Bar No. 24058104

**SPECIAL COUNSEL FOR SCOTT M. SEIDEL,
TRUSTEE**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 29th day of February, 2024, true and correct copies of this document, with the exhibit referenced herein, were electronically served by the Court's ECF system on parties entitled to notice thereof, and that, on the same date, he caused true and correct copies of this document, with the exhibit referenced herein, to be served by U.S. first class mail, postage prepaid, on the parties listed on the attached Exhibit "A."

By: /s/ Davor Rukavina
     Davor Rukavina, Esq.