IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

IN RE:                              .
                                    . Case No. 22-31641-MVL-7
GOODMAN NETWORKS, INC., AND         .
GOODMAN NETWORKS, INC.              . U.S. Bankruptcy Court
DBA GOODMAN SOLUTIONS,              . 1100 Commerce Street
                                    . Dallas, Texas 75242
                                    .
                    Debtor.         . Thursday, March 28, 2024
. . . . . . . . . . . . . . . .     . 4:00 P.M.


TRANSCRIPT OF BENCH RULING
RE: MOTION TO COMPROMISE CONTROVERSY WITH MULTI-PARTY
SETTLEMENT CONCERNING PROPERTY OF THE ESTATE FILED BY
TRUSTEE SCOTT M. SEIDEL (502)

**BEFORE THE HONORABLE MICHELLE V. LARSON**
**UNITED STATES BANKRUPTCY COURT JUDGE**


APPEARANCES ON NEXT PAGE.


Audio Operator:    Hawaii S. Jeng


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**LIBERTY TRANSCRIPTS**
**9107 Topridge Drive**
**Austin, Texas 78750**
**Phone:   (847) 848-4907**
**E-mail:  DBPATEL1180@GMAIL.COM**
**Website: www.libertytranscripts.com**

APPEARANCES:

| | |
|---|---|
| For the Trustee: | Munsch Hardt Kopf & Harr PC<br>BY: THOMAS DANIEL BERGHMAN, ESQUIRE<br>     DAVOR RUKAVINA, ESQUIRE<br>500 North Akard Street, Suite 3800<br>Dallas, Texas 75201 |
| For FedEx Supply Chain Logistics and Electronics, Inc.: | Butler Snow LLP<br>BY: ADAM M. LANGLEY, ESQUIRE<br>6075 Poplar Avenue, Suite 500<br>Memphis, Tennessee 38119 |
| For UMB Bank Indentured Trustee and The Majority Noteholder Group: | Hunton Andrews Kurth LLP<br>BY: PAUL N. SILVERSTEIN, ESQUIRE<br>     BRIAN CLARKE, ESQUIRE<br>200 Park Avenue<br>New York, New York 10166<br><br>Stonecipher Law Firm<br>BY: ERIC A. SCHAFFER, ESQUIRE<br>125 First Avenue<br>Pittsburgh, Pennsylvania 15222 |
| For Hudson Clean Energy Enterprises, LLC, and All Other Third-Party Moving Defendants: | Jordan, Lynch & Cancienne PLLC<br>BY: JOSEPH W. GOLINKIN, II, ESQUIRE<br>1980 Post Oak Boulevard, Suite 2300<br>Houston, Texas 77056 |
| For James Goodman: | Pulman, Cappuccio & Pullen, LLP<br>BY: RANDY PULMAN, ESQUIRE<br>2161 NW Military Highway, Suite 400<br>San Antonio, Texas 78213 |

3

# **I N D E X**

Page

Motion to compromise controversy with Multi-Party
Settlement Concerning Property of the Estate
Filed by Trustee Scott M. Seidel (502)

**Court's Ruling - Granted**                              **7**


Objection to Motion to compromise controversy with
Multi-Party Settlement Concerning Property of the Estate
Filed by Third-Party Litigation Defendants (514)

**Court's Ruling - Overruled**                           **7**

4

1          (Proceedings commenced at 4:00 p.m.)

2          THE CLERK:  All rise.  The United States Bankruptcy

3   Court for the Northern District of Texas, Dallas Division, is

4   now in session; the Honorable Michelle Larson presiding.

5          THE COURT:  Please be seated.

6          Good afternoon, everyone.  We're here on our 4:00

7   docket.  First, thank you to all the parties.  I know I had to

8   push this by an hour.  I appreciate your understanding.  I'll

9   go ahead and call the one matter on the docket, which is Case

10  Number 22-31641, Goodman Networks, Inc. and Goodman Networks.

11         We're primarily here with respect to the Court's

12  bench ruling on the motion to compromise controversy with

13  multi-party settlement concerning the property of the estate

14  that was filed by Chapter 7 Trustee Scott Seidel.  Given that

15  there might be a little discussion with respect to the order

16  afterwards, I'm going to go ahead and take any appearances now.

17         If you are on the phone, you may have to press *6 to

18  unmute.  So I'll take appearances now.

19         MR. RUKAVINA:  Your Honor, good afternoon.

20         Davor Rukavina, lead counsel for the Trustee.  I am

21  traveling.  I do not have a copy of the proposed order with me.

22  I apologize.  Hopefully, my partner, Thomas Berghman is on.

23         THE CLERK:  He is.

24         THE COURT:  I think he is.

25         MR. BERGHMAN:  Good afternoon, Your Honor.

1          Thomas Berghman.  I'm on, as well, and Mr. Seidel is

2   on, as well.

3          THE COURT:  All right.  Thank you all.

4          Anyone else wish to make an appearance?

5          MR. SILVERSTEIN:  Your Honor, it's Paul Silverstein

6   and Brian Clarke.

7          MR. PULMAN:  Good afternoon, Your Honor.

8          Randy Pulman for James Goodman.

9          MR. GOLINKIN:  Jeb Golinkin for the moving

10  defendants.

11         MR. LANGLEY:  Good afternoon, Your Honor.

12         Adam Langley, Butler Snow, for FedEx Supply Chain

13  Logistics and Electronics, Inc.

14         MR. SCHAFFER:  Your Honor, it's Eric Schaffer here on

15  behalf of UMB Bank as Indenture Trustee.

16         THE COURT:  Anyone else wish to make an appearance?

17    (No audible response)

18         THE COURT:  All right.  Give me one moment.

19         And my audio is a little cut off, but I know that

20  Mr. Silverstein and Mr. Clarke represent the majority

21  bondholders as well as special counsel to UMB, so I'll go ahead

22  and state that for the record.

23         MR. SILVERSTEIN:  Thank you, Your Honor.  For some

24  reason, I thought I said that.  Maybe you didn't hear me.  I'm

25  having computer problems.

6

1          THE COURT:  No problem.  It may have just gotten a

2  little but cut off and choppy in the audio, but I appreciate

3  it.  Thank you.

4          MR. SILVERSTEIN:  Thank you.

5          THE COURT:  All right.  With respect to the Court's

6  ruling, my day yesterday and my day today got a little out of

7  control and away from me, so I will probably be a little bit

8  more verbose and less polished than I otherwise would like to

9  be, for sake of this record, but I also wanted to get it out

10  timely for sake of the parties, given the amount of work that

11  has gone into it by everyone to date.

12          So I'll just go ahead and get started.

13          Before the Court is the Trustee's motion under

14  Bankruptcy Rule 9019 for approval of a multi-party settlement

15  regarding property of the estate, which I'll call the "9019

16  motion."  And that was filed at Docket 502.

17          That motion contemplates the approval of a proposed

18  compromise by and between the Trustee as a representative of

19  the estate and the subsidiaries, the bondholders, FedEx Supply

20  Chain Logistics and Electronics, and ARRIS Solutions: to

21  resolve certain pending disputes and litigation, to avoid

22  future litigation regarding the same, to enable the Trustee to

23  commence making distributions from the estate, and to lay to

24  rest what the Trustee has dubbed "fratricidal intercreditor

25  disputes" that have come to dominate these proceedings for most

1  of the past 18 months.

2         There is one objection to the motion by certain

3  third-party litigation defendants, namely 18920 NW 11th, Steven

4  Zakharyayev, Evelina Pinkhasova, Hudson Clean Energy

5  Enterprises, Alliance Texas Holdings, Mr. Neil Auerbach,

6  Ms. Judith Auerbach, Auerbach Partners, L.P., Auerbach

7  Childrens Dynasty Trust u/a/d October 9, 2012, and Auerbach

8  Family Dynasty Trust u/a/d October 9, 2012.

9         That objection was docketed at ECF 514.  The Court

10  will refer to the objecting parties as the "objecting adversary

11  defendants."  I probably should have chosen a shorter name.

12         The replies were filed by numerous parties.  The

13  Court has reviewed each of the pleadings carefully and has

14  heard and considered the Trustee's evidence as well as the

15  respective arguments of counsel.  For the reasons explained

16  more fully hereafter, the Court will grant the 9019 motion and

17  overrule the objection.

18         The following constitutes the Court's findings of

19  fact and conclusions of law, pursuant to Rule 52 of the Federal

20  Rules of Civil Procedure, as made applicable herein by

21  Bankruptcy Rule 7052 and 9014(c) of the Federal Rules of

22  Bankruptcy Procedure.  To the extent any of the following

23  findings of fact and conclusions of law are vice versa, they

24  will be adopted as such.

25         The Court has jurisdiction over this case pursuant to

1  28 U.S.C. Sections 157 and 1334.  This is a core proceeding

2  pursuant to 28 U.S.C. 157(b)(2), and venue is proper in this

3  district pursuant to 28 U.S.C. Sections 1408 and 1409.

4        I'll begin with the facts.  This case has a

5  multi-faceted factual background that the Court will not

6  discuss at length in this bench ruling.  However, the Court

7  feels the following facts bear some discussion in terms of

8  setting the stage for its approval of the proposed compromise.

9        On September 6th, 2022, several creditors of Goodman

10 Networks, Inc., the debtor in this Chapter 7 bankruptcy, filed

11 an involuntary petition against the debtor, thereby initiating

12 this bankruptcy case and creating the estate.  The Court

13 entered its order for relief against the debtor on December

14 12th, 2022, and the Trustee was thereafter appointed as the

15 Chapter 7 Trustee for the estate.

16       The debtor has two wholly-owned subsidiaries who have

17 not filed bankruptcy, the interest in which are presently

18 property of the estate: number one, GNET ATC, LLC, and, number

19 two, Multiband Field Services, Inc.  Various directors and

20 officers of the debtor were also directors and officers of

21 GNET.  GNET holds commercial tort claims relevant to these

22 proceedings, and GNET is also an insured or beneficiary under

23 certain insurance policies to which the bondholders and FedEx

24 assert interests in or against.

25       Multiband housed all employees of the debtor and its

1  subsidiaries.  As such, Multiband holds rights under various

2  workers' comp policies and certain funds put up as securities

3  for the same.  Generally speaking, the bondholders hold junior

4  liens against all such funds and collateral to the extent not

5  properly applied by the insurance company.

6           Pre-petition, Mr. Frinzi and potentially other

7  insiders of the debtor orchestrated a transfer of $44 million

8  from the debtor and/or GNET to MBG Holdings, formerly known as

9  American Metals Recovery and Recycling, what I'll refer to as

10 AMRR.  This transfer is one of the main events giving rise to

11 some of the commercial tort claims and insurance-policy claims.

12          Without getting too deep into the facts of the

13 transfer, the Court will suffice it to say that the Trustee

14 asserts that he has before him a factual and legal mess on

15 which he and the settling creditors have taken extensive

16 discovery, threatened litigation, and future bankruptcy

17 filings.  However, the Trustee has succeeded in convincing AMRR

18 to retain a chief restructuring officer to liquidate it and its

19 subsidiary assets for the benefit of the estate.

20          The Court has approved two transactions with AMRR,

21 each of which closed successfully and the proceeds of which are

22 now property of the estate.  Both the bondholders and FedEx

23 assert interest with respect to the estates and their

24 subsidiaries' rights against AMRR.

25          As of the petition date, the bondholders assert that

1  the debtor owed $18,738,733 on its 8-percent senior secured

2  notes issued in May of 2017 in the original principal amount of

3  $122.5 million.  Claims relating to the bonds are found at

4  Claim Numbers 13 and 14 with respect to proofs of claim, and

5  these two proofs of claim are duplicate.

6       ARRIS filed Proof of Claim Number 29 in this

7  bankruptcy case, asserting a general unsecured claim in the

8  amount of just over $30 million.  ARRIS asserts that a pre-

9  petition escrow exists in the amount of $228,987.38 at Texas

10 Partners Bank to secure the ARRIS claim in part.

11      FedEx filed a Proof of Claim Number 32 in this

12 bankruptcy case, asserting a general unsecured claim against

13 the estate for just over $81 million.  FedEx asserts the same

14 claim against GNET.  These claims are based upon the fact that

15 the debtor and GNET stopped paying FedEx under the terms of

16 their master services agreement which had the effect of

17 amassing funds which the debtor and GNET shortly thereafter

18 used to transfer to various third parties, which transferred

19 funds also underpin many of the Trustee's commercial tort

20 claims.

21      FedEx has asserted that just over 76 million of that

22 cash was its stolen property and reserved the right to assert a

23 constructive, actual, or resulting trust for its benefit

24 against such funds or any proceeds thereof held by the debtor

25 and the subsidiaries such that FedEx and not the estate would

11

1   have the right to recover these funds and any proceeds thereof,

2   including assets acquired with the same.

3          On December 21st, 2023, the Court entered a

4   cash-collateral order wherein the bondholders agreed to permit

5   a portion of their asserted cash collateral to be used by the

6   Trustee to pay certain professional claims in part, which the

7   Trustee did.  The cash-collateral order reserved the issue of

8   granting the collateral agent a replacement lien with respect

9   to said funds to be heard by the bankruptcy court if a

10  settlement of outstanding issues was not reached.

11         Beginning in March of 2023 and as amended twice

12  thereafter, the Trustee requested authority under Bankruptcy

13  Rule 9019 to enter into a settlement between the estate, the

14  bondholders, and Prosperity Bank whereby Prosperity would

15  transfer over $4.7 million to the Trustee and then the Trustee

16  would subsequently transfer over 4.3 million of these funds to

17  the bondholders, retaining $150,000 as an agreed surcharge and

18  $275,000 as free and clear settlement proceeds for the estate.

19         After months of discovery and motion practice,

20  including a two-day evidentiary hearing held by this Court on

21  October 10th and 11th, 2023, the Court ruled on February 7th,

22  2024 to approve the Prosperity settlement.  This ruling has

23  been appealed by both FedEx and ARRIS.

24         On October 27th, 2023, FedEx filed a complaint in the

25  United States District Court for the Northern District of

12

1    Texas, initiating Civil Action Number 23-2397, asserting claims

2    and causes of action under RICO on the same facts and

3    circumstances described above and in certain pending adversary

4    proceedings filed by the Trustee against multiple defendants,

5    many of whom are also defendants of the Trustee with respect to

6    the commercial tort claims.

7         Originally, FedEx asserted a constructive-trust claim

8    against what the Trustee believed was property of the estate or

9    would become property of the estate if the Trustee's fraudulent

10    transfer claims were to be successful.  The Court would note

11    that FedEx had reserved these same claims in this Court from

12    time to time on the record.

13         Thereafter, the Trustee filed a complaint against

14    FedEx before this Court on November 15th, 2023, initiating

15    Adversary Proceeding Number 23-3091, asserting a stay

16    violation, and by which the Trustee sought declarations that

17    FedEx's asserted interests were not valid or enforceable.

18         I have skipped over numerous contested hearings

19    before this Court as well as intercreditor disputes between and

20    among the Trustee, ARRIS, the bondholders, and FedEx.  Suffice

21    it to say that prior to this settlement, almost the only thing

22    this group agreed upon was that Goodman Networks should be in

23    bankruptcy under Chapter 7.

24         On January 23rd, 2024, the Trustee met with FedEx,

25    the bondholders, and ARRIS about these and other issues in a

1  structured mediation conducted by the Honorable Steven

2  Felsenthal.  After the mediation, FedEx amended its district

3  court complaint to withdraw the constructive-trust claim, and

4  the Trustee agreed that FedEx's clams as asserted in the

5  amended complaint are personal to FedEx and not property of the

6  estate.  Thereafter, the Trustee dismissed the FedEx adversary

7  proceeding without prejudice.

8          The instant 9019 motion was filed on February 29th,

9  2024, denoting the global settlement between each of the

10  aforementioned parties and an order, a proposed form of order

11  was later filed on the docket at Docket 509, basically

12  embodying the proposed global settlement.

13          I'll go to the legal standard.  I have had reason to

14  share this Court's opinion on the standard for approval of a

15  compromise under Bankruptcy Rule 9019 on many occasions in this

16  case.  Pursuant to Bankruptcy Rule 9019(a), the Court may

17  approve a compromise and settlement of claims held by the

18  bankruptcy estate.  Compromises are desirable and wise methods

19  of bringing to a close proceedings otherwise lengthy,

20  complicated, and costly.  I'll cite to you there from Jackson

21  Brewing at 624 F.2d 599.

22          The burden is on the Trustee, but he need only show

23  that a compromise falls within the range of reasonable

24  litigation alternatives.  Approval of a compromise lies within

25  the sound discretion of the bankruptcy court.  To assure proper

compromise, the bankruptcy judge must be apprised of all

necessary facts for an intelligent, objective, and educated

evaluation.

There are two general standards against which a

proposed compromise and settlement is to be assessed by the

bankruptcy court: number one, whether the agreement is fair and

reasonable and, number two, whether the agreement is in the

best interest of the estate.  In determining whether a

settlement is fair and equitable -- I think I said fair and

reasonable earlier, I apologize.

In determining whether a settlement is fair and

equitable, the Fifth Circuit has articulated five factors for

the Court to consider: number one, the probability of success

in the litigation with due consideration for the uncertainty in

fact and law; number two, the complexity and likely duration of

the litigation and any attendant expense, inconvenience, and

delay, including the difficulties, if any, to be encountered in

the matter of collection; number three, the paramount interest

of the creditors and a proper deference to their reasonable

views; number four, the extent to which the settlement is truly

the product of arms-length bargaining and not fraud or

collusion; and number five, all other factors bearing on the

wisdom of the compromise.

I cite to you there from <u>Jackson Brewing</u> and the

Fifth Circuit's decision in <u>Foster Mortgage</u>.

1   Courts in this district have recognized the unique

2   role of the Chapter 7 Trustee in the bankruptcy process as an

3   independent fiduciary with a completely different perspective

4   and interest in a bankruptcy estate than either a debtor or an

5   individual creditor.  The Trustee is expected to be a

6   gatekeeper and to exercise his reasonable business judgment in

7   deciding what actions to bring and what are not worth the

8   expense.  The Trustee is a fair, balanced, and experienced

9   official who can be dependent upon to exercise good litigation

10  judgment.

11      I cite to you there from Judge Jernigan's opinion in

12  In re Cooper, 405 B.R. 801.

13      These are just a few of the reasons that bankruptcy

14  courts grant deference to a Trustee's business judgment in

15  proposing a compromise so far as the compromise falls within

16  the range of reasonable litigation alternatives as determined

17  by the Court's independent evaluation.

18      The Trustee's counsel and its allied settling parties

19  advanced several arguments in support of the reasonableness and

20  the wisdom of the compromise.  They can generally be summarized

21  as follows.

22      Number one, the proposed compromise would eliminate

23  the need to engage in multiple rounds of lengthy expensive

24  litigation against each of the estate's largest creditors in

25  which the estate's chances of success are uncertain.  Given the

1 Court's approval, the settlement would preserve the estate's

2 resources, which the Trustee asserts would be better spent

3 pursuing litigation against third parties and otherwise

4 monetizing the estate's assets.

5         Number two, the proposed compromise is supported by

6 an overwhelming majority of the estate's creditors who have

7 supported it as a fair settlement that maximizes the benefit to

8 all classes of creditors.

9         Number three, the specific settlements with the

10 bondholders, FedEx, and ARRIS regarding the allowance of

11 claims, the recognition of liens, the rights to the proceeds of

12 the crime and D&O policies, the AMRR liquidation, and the

13 sharing percentages are fair and reasonable given the

14 significant uncertainty in fact and law as to the several

15 disputes underlying these issues.

16         Number four, the Trustee argues that the proposed

17 compromise is truly the result of extensive arms-length

18 negotiations as demonstrated by the incorporation of Judge

19 Felsenthal as a mediator.

20         Number five, the proposed compromise would allow the

21 Trustee to both, A, fund the litigation which the Trustee

22 believes would be a substantial value to the estate and, B,

23 start making material payments on legitimate debt right away.

24         The objecting adversary defendants have a single

25 narrow objection.  They argue that FedEx's claims are not

1   unique to it and instead belong to the estate.  They,

2   therefore, posit that if the Court were to approve the proposed

3   compromise and allow FedEx to pursue its claims in district

4   court, the estate could potentially lose millions of dollars,

5   frustrating fundamental bankruptcy policy and hindering the

6   effective administration of the bankruptcy estate.

7           In several replies, the Trustee, FedEx, and the

8   bondholders each advanced arguments in support of the Court's

9   approval of the proposed compromise.  FedEx challenges

10  specifically whether the objecting adversary defendants have

11  the necessary standing to contest the 9019 motion.  Further, it

12  argues that the objecting adversary defendants' arguments

13  constitute an improper collateral attack on FedEx's personal

14  claims against them in district court.  Finally, FedEx and the

15  bondholders argue that the compromise satisfies the 9019

16  standard articulated by the Fifth Circuit.

17          In the Trustee's reply, he notes that the Chapter 7

18  Trustee's primary concern is to protect the bankruptcy estate

19  and its assets and that because, number one, FedEx has certain

20  claims which are personal to it and, number two, FedEx has

21  amended its district-court complaint to remove any relief

22  related to the constructive-trust claim.  The Trustee believes

23  that the potential harm from a violation of the automatic stay

24  has now been remedied and is at least partially mooted going

25  forward.

1          The Court will first briefly address the parties'

2    arguments regarding standing before turning to the five-factor

3    test.  I won't spend a great deal of time addressing standing

4    because of two things: number one, because one of the issues

5    that were addressed by the objecting adversary defendants is

6    one that frankly concerned the Court, the fact that the Trustee

7    and FedEx will be pursuing the same targets which could

8    potentially negatively affect the estate's ability to settle

9    with or collect from the objecting adversary defendants if they

10   were to be found liable.  And, secondly, because the objecting

11   adversary defendants failed to overcome their burden to rebut

12   the case in chief put on by the Trustee.  For those two

13   reasons, the Court won't address standing.

14         The settlement herein may not be perfect.  There may

15   be holes in it, as Mr. Goodman's counsel stated, and the

16   Trustee readily admitted in his papers.  But perfect is not the

17   standard, nor is perfect an option when you consider the fact

18   that the four sophisticated parties to the settlement, each of

19   which approaches this case from varying positions of strength

20   or weakness under differing litigation scenarios, are

21   attempting to settle what has been a year or more of nearly

22   constant litigation.

23         As I will discuss a little bit further, no creditor

24   of this estate has objected to this settlement.  Only

25   litigation targets who brought forth no evidence of a concrete

1   injury other than the fact that they're being pursued by two

2   different plaintiffs.  The fact that one set of facts could

3   generate two sets of litigation is by no means unique.  This

4   won't be the first or the last time that a defendant is sued by

5   more than one party.

6          So that's all I'll have to say on standing.  I'll

7   turn to the 9019 factors.  I'll start with the extent to which

8   the settlement is truly the product of arms-length bargaining

9   and not of fraud or collusion.

10         Well, this one is a no-brainer, and it was not hotly

11  contested.  The parties are highly sophisticated and

12  represented by very able counsel.  At every stage of this

13  bankruptcy, these parties who again approached this case from

14  very different legal positions addressed the various issues

15  independently, vigorously, and they formed different alliances

16  in battle multiple times in this case.  The term they coined

17  "fratricide" may be hyperbolic, but it is not ill-fitting.

18         The Court flatly encouraged the parties to try to sit

19  down and reach an agreement on numerous occasions in open court

20  for the sake of the bankruptcy case, the sake of creditor and

21  Trustee relations and, candidly, for the sake of these

22  individual players' pocketbooks.  I take absolutely no credit

23  for this settlement, of course.  But I only note that the Court

24  believes that a resolution of intercreditor squabbles is the

25  only path forward to maximize the value of this bankruptcy

1  estate and allow the Trustee to do the work the Bankruptcy Code

2  tasks them to do.

3        I would further note and thank Judge Steven

4  Felsenthal for his role as mediator.  He was the former chief

5  judge of this Court, a great judge, and I personally know him

6  from a former life to be a respected and substantively

7  excellent mediator which was seconded and thirded by the

8  parties in this case.  In sum, I have no question that the

9  settlement is truly the product of arms-length bargaining.

10        The next factor is the probability of success in

11  litigation with due consideration for the uncertainty in fact

12  and law.  It is important to note here that the objecting

13  adversary defendants focus on one and only one piece of

14  litigation, the FedEx district-court action.  This action is

15  but one in a long line of litigation in this case.  As the

16  Trustee details in his motion and at the hearing, this

17  settlement addresses global issues between and among the

18  Trustee, the bondholders, ARRIS, and FedEx.

19        For reference, the following constitutes a very short

20  list of the matters which the parties have already litigated,

21  not counting the adversary proceedings against numerous

22  third-party defendants, which if history is a guide, would have

23  generated further 9019 fights.

24        Number one, not one, not two, and not even three but

25  four rounds of hearings on the bondholder and Prosperity

1  settlement counting the pre-hearing evidentiary motions.

2  Number two, the sale of Onepath to Albers.  Number three, the

3  sale of the fiber business to Alliance.  Number four, whether

4  the former directors and officers of the debtor and GNET are

5  able to access policy benefits for their defense costs and

6  litigation.  And, number five, the use of cash collateral.

7       There was already one pending appeal, which is being

8  settled pursuant to this global compromises.  And all this

9  litigation is being born by a "cause of action rich but cash

10 poor" estate.

11      The FedEx district-court action and the resulting

12 automatic-stay complaint filed by the Trustee is but one piece

13 of litigation that comes in a long line of disputes in this

14 case.  In this Court's estimation, the fact that FedEx filed

15 the district-court action with no forewarning and the fact that

16 the automatic-stay complaint was filed is truly the culmination

17 of the intrinsic friction between the parties' legal positions,

18 negotiating positions and, frankly, colorful personalities

19 which all came to a tipping point.

20      To pigeonhole a discussion of the "probability of

21 success in litigation" factor to merely a discussion of the

22 FedEx district-court action in the stay litigation is to do an

23 injustice to the breadth of the disputes cataloged in the

24 motion and the multitude of the issues settled.  Those issues

25 are detailed in the motion and the fact of their existence is

1 incorporated herein.  Nevertheless, given that this is the only

2 area that the objecting adversary defendants challenge, the

3 Court will narrow its focus.

4        I will not mince words.  I certainly would have

5 preferred that FedEx give notice to the Trustee and to this

6 Court of the intent to file the district-court action.  The

7 Court is very familiar, as FedEx cited in its papers, with the

8 Seven Seas and Educators Trust cases and their progeny.  But

9 where I quibble with FedEx's proposition is that this Court

10 views the Fifth Circuit holdings in Chesnut and in Seven Seas

11 as distinct and different.

12        Seven Seas addresses whether the same operative facts

13 might give rise to personal and derivative claims.  To be

14 clear, a derivative claim is a claim that belongs to the

15 estate.  The Court has stated more than once that Chesnut

16 stands for the simple proposition in questioning whether the

17 stay applies: ask for permission, not for forgiveness.

18 Although the Court agrees with FedEx that it holds personal

19 claims and that the estate plainly could not bring every claim

20 in the district-court action, nevertheless, whether any of the

21 claims FedEx asserted arguably belong to the estate was not as

22 plain in the Court's estimation.  Hence, the automatic stay

23 complaint.

24        But I won't harp on this issue.  Why?  Because that

25 is the import of the settlement.  Any harm, any damage was that

1 belonging to the Trustee and to the estate and that is being

2 settled.  The settlement on this point is complex and nuanced,

3 but it is settled nonetheless.

4 　　　　　Speaking to the substance of the argument of whether

5 the FedEx claims are personal or derivative, the Court will

6 again note, as I have in prior opinions, that Rule 9019 does

7 not require a bankruptcy judge to hold a full evidentiary

8 hearing or even a mini-trial before a compromise can be

9 approved.  Rather than being forced to decide all questions of

10 law and fact, this Court need only determine whether the

11 settlement falls below the lowest point in the range of

12 reasonableness.

13 　　　　　The Fifth Circuit has further advised in the <u>Matter</u>

14 <u>of Jackson Brewing</u> that it is sufficient for a bankruptcy court

15 to find that a substantial controversy exists for which there

16 is an uncertain outcome in litigation.

17 　　　　　9019 does not require a bankruptcy judge to hold a

18 full evidentiary hearing or even a mini-trial before a

19 compromise can be approved.  Rather than being forced to decide

20 all questions of law and fact, courts have consistently held

21 that a court need only canvas the issues to see whether the

22 settlement falls below the lowest point in the range of

23 reasonableness.

24 　　　　　Here, there is no question this settlement satisfies

25 this standard.  The objecting adversary defendants pull one

1   line out of Buccaneer, which is 912 F.3d 291, to primarily rely

2   upon, and that line is, "As long as the injury a creditor is

3   pursuing against a third party does not stem from the depletion

4   of estate assets, the injury is a direct one that does not

5   belong to the estate."

6          But a fulsome reading of Buccaneer yields more

7   context.  The situation in the instant case is factually

8   inapposite from Buccaneer.  In Buccaneer, the debtor was a

9   potential defendant, not a plaintiff.  The plaintiff in

10  Buccaneer sought to bring a tortious interference claim.  The

11  Fifth Circuit found that an injury like Burton's in that case

12  from an improper firing were clearly personal, but it noted

13  that the principle was the same whether "the third party

14  engages in tortious conduct that causes harm to a particular

15  creditor," citing to you there from Page 295.

16         The Fifth Circuit stated plainly that the factual

17  situation faced by the parties in Buccaneer was distinctly

18  different from the one presented in Seven Seas.  In Seven Seas,

19  both the creditor and the debtor had claims against third

20  parties, so the dispute was about which one was the proper

21  plaintiff or whether both could be.  That is precisely the

22  situation here, where both the creditors and the estate have

23  claims against third-party defendants.

24         Reading to you from Seven Seas, "It is entirely

25  possible for a bankruptcy estate and a creditor to own separate

1  claims against the third party arising out of the same general

2  series of events and broad course of conduct."

3          The court states in <u>Seven Seas</u>:

4          "In sum, we believe that the claims brought by the

5          bondholders allege an injury that is not merely

6          derivative of an injury to Seven Seas and that Seven

7          Seas could not have asserted the claims as of the

8          commencement of the bankruptcy case.  That's not to

9          say, of course, that Seven Seas might not also have

10         suffered its own direct injury because of some

11         wrongdoing on the part of Chesapeake, or could not

12         have brought any claims against Chesapeake as the

13         commencement of the case.

14         "Indeed, the Trustee did bring claims against

15         Chesapeake on behalf of the estate alleging, among

16         other things, that Chesapeake breached duties that it

17         owed to Seven Seas and interfered with management

18         duties of Seven Seas.  But the bondholders' claims

19         and the estate's claims are not mutually exclusive.

20         there is nothing illogical or contradictory about

21         saying that Chesapeake might have inflicted direct

22         injuries on both the bondholders and Seven Seas

23         during the course of the dealings that formed the

24         backdrop of both sets of claims."

25         Here, FedEx asserts that the debtor and, more

1  specifically, Mr. Goodman and Mr. Frinzi as directors and

2  officers of the debtor, fraudulently submitted invoices to

3  FedEx under the master services agreement causing FedEx to

4  forward payments of over $80 million for which there was no

5  legal basis under the terms of that contract.  By the

6  submission of these invoices and the larger alleged

7  racketeering scheme, FedEx was directly harmed and the debtor

8  would be unable to assert a direct injury from the specific

9  wrongdoing that FedEx complains of.

10      To borrow language from the Seven Seas court, "It is

11  thus not surprising that the injury that this claim alleges is

12  not derivative of the injury to the estate."  The FedEx claim

13  is not derivative because it exists whether or not the payments

14  to the objecting adversary defendants were fraudulent.

15      Finally, as I mentioned at the hearing, the objection

16  reads very much like a collateral attack on the district-court

17  complaint, which is well outside of this Court's purview.  As

18  the Fifth Circuit noted in Seven Seas, again, it bears

19  emphasizing that:

20          "Our holding here is a narrow one that in no way

21          passes on the merits of the claims.  It's not our

22          place to consider whether the creditors' allegations

23          are sufficient to state a cause of action under Texas

24          law or to speculate as to what set of facts might

25          ultimately be proven in support of recovery.  Simply

1            put, the fact that the creditor ultimately may be

2            unable to prevail on the claims does not render the

3            claims property of the estate."

4        So here too, even though the Court is not called upon

5  to determine the merits, there exists substantial controversy

6  to be settled by FedEx and the estate, which they have.  And

7  this substantial controversy is one but a dozen of

8  controversies and disputes, large and small, that are

9  compromised by the global settlement.  For these reasons, the

10 settlement satisfies the probability of success in litigation

11 with due consideration for the uncertainty prong.

12       The Court will now address the complexity and likely

13 duration of the litigation and any attendant expense,

14 inconvenience, and delay.

15       The Trustee credibly testified that he believes that

16 litigating all of the various disputes that are made part of

17 the global settlement, including the automatic-stay litigation,

18 would be complex, lengthy, and costly.  The Trustee has

19 testified multiple times in multiple hearings as to these

20 creditors' capacity for, let's say, independence,

21 self-protection, and perhaps sometimes obstinance, and that,

22 therefore, he believes that any litigation would likely result

23 in multiple rounds of appeal, which we've already seen the

24 makings of, and that the estate would never be able to

25 successfully litigate claims against third parties and thereby

1    monetize the assets of the estate for fear of tripping yet

2    another dispute between the bondholders and the secured

3    creditors and the estate.

4            Therefore, there's no question that this factor is

5    satisfied.  I'll now turn to whether the compromise serves the

6    paramount interest of creditors with proper deference to their

7    reasonable views.

8            In Foster Mortgage, 68 F.3d 914, the Fifth Circuit

9    addressed the importance of whether the proposed compromise

10   serves the paramount interest of the creditors with proper

11   deference to their reasonable views.  In the instant case, the

12   creditors representing well over 90 percent of the estate's

13   debt unanimously support the settlement that has been proposed

14   and actively and independently, with the advice of independent

15   and able counsel, participated in negotiations to resolve these

16   issues.

17           This is incredibly important in the Court's mind

18   because the proposed compromise is not simply being foisted

19   upon the creditors over their objection.  Instead, the

20   settlement being proposed today was handcrafted by the estate's

21   largest shareholders and, therefore, deserves the Court's

22   deference to a significant degree.

23           The final factor is any other factor that's bearing

24   upon the wisdom of the compromise.  Although it's been stated

25   at least once thus far in this bench ruling, the Court notes

1    that the proposed compromise will maximize the efficient

2    monetization of the assets of the estate.  The settlement will

3    also pacify existing disputes over the distribution of proceeds

4    from insurance claims, the distribution of proceeds from

5    judgments obtained on the commercial tort actions, future

6    liquidation and monetization of AMRR, and further distribution

7    of those proceeds, the outstanding reservation of rights by the

8    collateral agent regarding a replacement lien for its

9    collateral funds already paid to estate's professionals and,

10   lastly, the allowance of claims of the estate's largest

11   creditors in definitive amounts including the bondholders'

12   status as secured creditors.

13          Finally, the Court finds that it bears repeating that

14   the only objection to the proposed compromise was filed by the

15   objecting adversary defendants, which are not creditors of the

16   estates but, rather, litigation targets.

17          Based upon the foregoing, the Court will overrule the

18   objection and approve the global settlement as embodied in the

19   form of order.  I'll now turn to that order as I have minor

20   comments which were mostly aimed at the incorporation of the

21   Court's ruling and some jurisdictional issues.

22          With regard to the proposed form of order, and I'm

23   again speaking to that which was filed at Docket 509, as you

24   might expect, I'd ask that you incorporate this bench ruling

25   into the preamble of the order.  I ask that, with respect to

30

1  the resolution of the cash-collateral dispute, that the parties

2  submit a separate form of final order on cash collateral after

3  this settlement goes effective so that we kind of button that

4  motion up for sake of the docket.

5          And I'll ask that, again, the order note the

6  existence and the overruling of the objection to the

7  settlement.  And, finally, with regard to this order, I'd like

8  a statement that the Court retains exclusive jurisdiction as to

9  the enforcement and interpretation of this settlement but

10 obviously not with respect to the separate district-court

11 action that is within the purview and jurisdiction of I think

12 it's Judge Scholer in the district court.

13         Do the parties have any questions regarding the

14 Court's ruling or with regard to the proposed form of order?

15     (No audible response)

16         THE COURT:  Again, if you're on the phone, you can

17 press *6 to unmute if you have any questions.

18         MR. RUKAVINA:  Your Honor, this is Davor Rukavina.

19 Thank you for your thoughtful ruling and for your time.  We

20 have no questions.  I'm sure that we will rapidly make the

21 changes that Your Honor requested.  We'll file a redline, and

22 we'll upload the order and we'll do a cash-collateral order.

23         THE COURT:  Okay.  Thank you very much, Mr. Rukavina.

24         Anything else?

25     (No audible response)

**LIBERTY TRANSCRIPTS**
**(847) 848-4907**

31

1          THE COURT:  All right.  That concludes the matter

2    today, and the Court will stand adjourned.  You guys have a

3    great day.

4          THE CLERK:  All rise.

5        (Proceedings adjourned at 4:41 p.m.)

6                        *  *  *  *  *

7

8

9

10

11

12               **C E R T I F I C A T I O N**

13          I, DIPTI PATEL, court-approved transcriber, certify

14   that the foregoing is a correct transcript from the official

15   electronic sound recording of the proceedings in the above-

16   entitled matter, and to the best of my ability.

17

18

19   _____

20   DIPTI PATEL, AAERT CET-997

21   Expires: December 6, 2026

22   LIBERTY TRANSCRIPTS               DATE: April 4, 2024

23

24

25