Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

GENERAL COUNSEL FOR
SCOTT M. SEIDEL, TRUSTEE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re: § <br> § <br> GOODMAN NETWORKS, INC., § <br> § <br> Debtor. § <br> § | Chapter 7 <br><br> Case No. 22-31641-mvl-7 |

**TRUSTEE'S MOTION UNDER BANKRUPTCY RULE 9019 FOR APPROVAL OF
LIMITED SETTLEMENT WITH THE FRINZI FAMILY TRUST**

**NO HEARING WILL BE CONDUCTED HEREON, AND THE HEARING SCHEDULED ON THIS MOTION MAY BE CANCELLED WITHOUT FURTHER NOTICE, UNLESS A WRITTEN RESPONSE IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AT EARLE CABELL FEDERAL BUILDING, 1100 COMMERCE ST., RM. 1254, DALLAS, TX 75242-1496, BEFORE CLOSE OF BUSINESS ON MAY 31, 2024, WHICH IS AT LEAST 21 DAYS FROM THE DATE OF SERVICE HEREOF.**

**ANY RESPONSE SHALL BE IN WRITING AND FILED WITH THE CLERK, AND A COPY SHALL BE SERVED UPON COUNSEL FOR THE MOVING PARTY PRIOR TO THE DATE AND TIME SET FORTH HEREIN. IF A RESPONSE IS FILED A HEARING MAY BE HELD WITH NOTICE ONLY TO THE OBJECTING PARTY.**

**IF NO HEARING ON SUCH NOTICE OR MOTION IS TIMELY REQUESTED, THE RELIEF REQUESTED SHALL BE DEEMED TO BE UNOPPOSED, AND THE COURT MAY ENTER AN ORDER GRANTING THE RELIEF SOUGHT OR THE NOTICED ACTION MAY BE TAKEN.**

TO THE HONORABLE MICHELLE V. LARSON, U.S. BANKRUPTCY JUDGE:

COMES NOW Scott M. Seidel (the "Trustee"), the duly appointed chapter 7 trustee of the bankruptcy estate (the "Estate") of Goodman Networks, Inc. (the "Debtor"), the debtor in the above styled and numbered bankruptcy case (the "Bankruptcy Case"), and files this his *Motion Under Bankruptcy Rule 9019 for Approval of Limited Settlement With the Frinzi Family Trust* (the "Motion"), respectfully stating as follows:

## I.    RELIEF REQUESTED

1. By this Motion, and pursuant to Bankruptcy Rule 9019, the Trustee requests that the Court approve the *Limited Settlement and Release Agreement* (the "Agreement") and the limited settlement evidenced thereby (the "Proposed Settlement"), a copy of which is attached hereto as Exhibit "A," between the Trustee, the Frinzi Family Trust ("FFT"), and James Frinzi ("Frinzi").  Under the Settlement Agreement, the FFT would have 180 days to pay to the Trustee $1,200,000.00 (the "Settlement Payment").  To secure such payment, and in addition to the Trustee's already filed *lis pendenses*, the FFT escrows transfer deeds to the Lakehouse and the Lot (defined below) with the Trustee, and Frinzi escrows titles to the Boats (defined below) with the Trustee, both of which, upon a default under the Agreement, the Trustee would cause to be recorded and filed, thus taking ownership of these properties.  Frinzi does not obtain any release under the Agreement and only the FFT is released, in exchange for basically turning over to the Trustee everything that he would obtain upon a judgment in the Adversary Proceeding (defined below).

## II.    PROCEDURAL BACKGROUND

2. On September 6, 2022 (the "Petition Date"), various creditors of the Debtor filed an involuntary petition against the Debtor under Chapter 7 of the Bankruptcy Code, thereby initiating the Bankruptcy Case and creating the Estate.

3. The Court entered its order for relief against the Debtor on December 12, 2022. The Trustee was thereafter appointed as the Chapter 7 trustee of the Estate.

4. The Court has jurisdiction over this Motion under 28 U.S.C. § 1334. Said jurisdiction is core under 28 U.S.C. § 157(b)(2). Venue of the Bankruptcy Case before this Court is proper under 28 U.S.C. §§ 1408 and 1409.

### III. FACTUAL BACKGROUND

5. Prior to the Petition Date, Frinzi was the Chief Executive Officer of the Debtor and of its wholly-owned subsidiaries, GNET ATC, LLC ("GNET") and Multiband Field Services, Inc. ("Multiband").

6. In 2021, Frinzi identified an opportunity for the Debtor or other entities affiliated with James Goodman to acquire certain business assets and units from the private equity firm of MSouth and its affiliates, loosely referred to as "OnePath." At some point in late 2021, Frinzi decided to take this business opportunity for himself, although he disputes this allegation, instead asserting that he acted under the directions of, or with the approval of, James Goodman. The resolution of those disputed allegations is in no way implicated by this Motion.

7. Either way, in late 2021, Frinzi incorporated Multiband Global Resources, LLC ("MGR") as a Delaware entity, as its sole owner and member, for the purpose of MGR acquiring the majority of the stock of publicly traded American Metals Recover and Recycling, Inc. n/k/a MBG Holdings, Inc. ("AMRR"). AMRR, then, would purchase OnePath. The way that AMRR ended up purchasing OnePath was that Frinzi eventually caused the Debtor to transfer $44 million to AMRR, in what the Trustee alleges is a breach of fiduciary duty and a fraudulent transfer, with respect to which the Trustee reserves all rights. This Motion and the Agreement do not relate to AMRR or the $44 million transfers; rather, they relate to other transfers that Frinzi was coordinating in the background through MGR.

8. Specifically, on January 4, 2022, Frinzi caused $4,400,000.00 to be transferred from Multiband's bank account at East West Bank (ending in 8462) to MGR (the "$4.4 Million Transfer"). However, the Trustee believes, and has asserted, that the funds used to make the $4.4 Million Transfer were property of the Debtor, in that Frinzi caused the Debtor to transfer $4,500,000.00 of its funds to Multiband on December 10, 2021 and December 21, 2021, for the express purpose of "parking" them there to ultimately transfer to MGR.

9. It is the Trustee's position that the $4.4 Million Transfer constituted embezzlement by Frinzi, breaches of fiduciary duty by Frinzi, and fraudulent transfer to MGR. Among other things, the Debtor received no value back whatsoever for the $4.4 Million Transfer, which funds Frinzi used for his personal benefit and enjoyment.

10. On or about January 24, 2022, MGR purchased certain real property and improvements located at 521 N. Horseshoe Bay Blvd., Horseshoe Bay, Texas (the "Lakehouse"). The purchase price was $1,875,000.00. The source of the funds used to buy the Lakehouse was the $4.4 Million Transfer.

11. On or about April 7, 2022, MGR purchased certain undeveloped real property in Llano County, Texas, consisting of approximately .7 acres, identified as Lot 44 at the La Serena Loop, Horseshoe Bay, Texas 78657 (the "Lot"). The Lot is not lakefront, but is in a lake neighborhood. The Trustee does not know the purchase price for the Lot, but the Lot is tax assessed at $136,716. The source of funds used to buy the Lot was the $4.4 Million Transfer.

12. It is the Trustee's position that the Estate owns, has equitable title to, or a trust over, both the Lakehouse and the Lot given that the Debtor's wrongfully transferred funds were used by MGR to purchase both properties.

13. Frinzi and his wife, Jodi Jean Frinzi (the "Wife"), created the FFT in May, 2022 as co-settlors and co-trustees, for their benefit and for their children as beneficiaries after their deaths.

14. On May 13, 2022, MGR transferred both the Lakehouse and the Lot to the FFT, for no consideration. It is the Trustee's position that the Estate's rights against the Lakehouse and Lot continued notwithstanding these transfers. Furthermore, because MGR, a debtor of the Estate, transferred these properties for no consideration, these transfers are fraudulent transfers in their own right, in addition to the FFT being a subsequent transferee of the initial $4.4 Million Transfer.

15. Since these transfers, the FFT has used the Lakehouse for the personal use and enjoyment of Frinzi and the Wife. The FFT, according to discovery responses, has not rented-out or leased the Lakehouse. The Lot remains undeveloped.

16. Separately, in approximately the same timeframe, Frinzi purchased a used 25 foot Cobalt ski boat, and several personal water crafts (Seadoos and/or jet skis) (collectively, the "Boats").[1] The source of funds used to purchase the Boats is believed to be from the $4.4 Million Transfer, and the Trustee has asserted trust, fraudulent transfer, and other claims and interests against the Boats. The Purchase Price for the Boats is not fully known, but is approximately $300,000.

17. Other than *ad valorem* taxes, the Lakehouse and Lot are not subject to liens or deeds of trust. The Lakehouse is not Frinzi's homestead, he and the Wife instead owning other real property in Austin that is their homestead (and that the Trustee has not been able to identify as having been purchased from the $4.4 Million Transfer, there otherwise being a first priority, purchase money deed of trust against that property). With respect to the Boats, Frinzi asserts that the ski boat is subject to a lien of approximately $125,000, which the Trustee has not been able to verify, but the personal water crafts are free and clear of liens.

---

[1] According to Frinzi, one of the personal water crafts was destroyed, and insurance covered the loss. Frinzi obtained the insurance proceeds before the Trustee knew of these facts and was able to seize the same. Two personal water crafts remain.

18. On May 4, 2023, the Trustee filed his original complaint against Frinzi, the FFT, and MGR, related primarily to the $4.4 Million Transfer, assigned Adversary Proceeding No. 23-03036 pending before this Court (the "Adversary Proceeding"). With respect to the FFT, the Trustee has asserted fraudulent transfer claims and trust claims, both as a subsequent transferee from the $4.4 Million Transfer, and as an initial transferee of the Lakehouse and Lot from MGR for no value, at a time when MGR was insolvent, and with the Trustee being a direct creditor under TUFTA for the same.

19. At approximately the same time, the Trustee recorded a *lis pendens* against each of the Lakehouse and the Lot (the "Lis Pendenses"). The effect of the Lis Pendenses is basically to prevent the FFT from further transferring or encumbering these real properties, because any buyer or lender would be put on notice of the Trustee's superior rights and claims and would purchase or lend subject to the Lis Pendenses. However, the Lis Pendenses are not liens and the Trustee cannot simply foreclose on them. Any ability to actually seize the Lakehouse and the Lot would have to await judgment in the Adversary Proceeding or preliminary relief in the nature of a receivership to monetize the Lakehouse and the Lot, but even then the proceeds would be held pending a judgment. Thus, while the Lis Pendenses help to protect the Estate, they do not get the Estate paid without an actual judgment.

20. Subsequently, and with the consent of Frinzi, MGR, and the FFT, the Court entered a preliminary injunction prohibiting the transfer of the Boats or the granting of liens against the Boats. In this manner, the Trustee was able to ensure that the Boats would not be further transferred because, unlike with real property, there is no Texas instrument for the Trustee to file against the Boats to block their transfer. However, as with the Lis Pendenses, the preliminary injunction does not itself get the Estate paid, and the Trustee would have to secure a judgment before he could exercise any rights against the Boats.

21. Other than depositions, discovery in the Adversary Proceeding is substantially over. However, there have been two important developments for purposes of this Motion: (i) the Court has agreed that the defendants, including the FFT, properly asserted jury trial rights and that they have those rights; and (ii) the District Court has ordered the withdrawal of the reference once the Adversary Proceeding is certified by this Court as being trial ready. The effect of the foregoing is that any jury trial in the District Court is likely at least one (1) year away, and likely considerably longer.

22. Separately, Frinzi is a defendant in various other present and to-be filed adversary proceedings, none of which are affected by the Proposed Settlement and the Agreement.

## IV. PROPOSED SETTLEMENT

23. Parties are cautioned to review the Agreement in detail, as it contains the precise terms and provisions of the Proposed Settlement. Nevertheless, the following is a summary of the key provisions of the Agreement:

(i) the FFT agrees to pay the Trustee the Settlement Payment ($1.2 million) no later than 180 days after the Effective Date (as defined in the Agreement);

(ii) the FFT and the Trustee, for the Estate, exchange comprehensive and mutual releases, including the Wife;

(iii) Frinzi does not obtain any release, and the Adversary Proceeding against him and MGR continues;

(iv) to secure the Settlement Payment, and as a condition of the Effective Date and the hearing on this Motion, the FFT must deliver executed transfer deeds to the Trustee, transferring the Lakehouse and the Lot to the Trustee (for the Estate) if the FFT fails to timely make the Settlement Payment;

(v) additionally, Frinzi must deliver to the Trustee the originals of the titles to the Boats (or, if the one is pledged as collateral, a junior lien against the same), executed in blank, transferring the Boats to the Trustee (for the Estate) if the FFT fails to timely make the Settlement Payment;

(vi) the FFT may make the full or partial Settlement Payment from a combination of the Lakehouse, Lot, Boats, or the Frinzi homestead;

(vii) if the FFT defaults in timely making the Settlement Payment, the Trustee will record the deeds and file the titles, thus becoming the owner of the Lakehouse, Lot, and Boats (or foreclosing against the one boat) but, if the FFT timely makes the Settlement Payment, the Trustee will return said deeds and titles;

(viii) the Agreement contains enforceable provisions requiring that the FFT and Frinzi insure the underlying properties and properly maintain and service them;

(ix) the Agreement contains an attorney fee-shifting provision in the event of any litigation or disputed under the Agreement, and an agreement to this Court's core jurisdiction over the same;

(x) the FFT will be required to prepare and sign, under penalty of perjury, bankruptcy schedules and statements (not to file a bankruptcy case, but as additional sworn representations of its assets and liabilities, in addition to discovery in the Adversary Proceeding); and

(xi) the Agreement is subject to the approval of the Court.

## V. DISCUSSION

24. Bankruptcy Rule 9019 provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." FED. R. BANKR. P. 9019(a). Under that Rule, the Court should approve a settlement only if it is "fair and equitable and in the best interests of the estate." *In re Foster Mortgage Corp.*, 68 F.3d 914, 917 (5th Cir. 1995). The factors to consider include "(1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) all other factors bearing on the wisdom of the compromise." *Id*. Such other factors include the reasonable views of creditors, although such views are not binding, and "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Id*. at 918. *See also Official Comm. Of Unsecured Creditors v. Cajun Elec. Power Coop. Inc. (In re Cajun Elec. Power Coop. Inc.)*, 119 F.3d 349, 356 (5th Cir. 1997); *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 559, 602 (5th Cir. 1960).

25. The Court need not conduct a mini-trial on the underlying claims; rather, the Court "must apprise itself of the relevant facts and law so that it can make an informed and intelligent decision." *In re Age Ref. Inc.*, 801 F.3d 530, 541 (5th Cir. 2015) (internal quotation omitted). The settlement need not result in the best possible outcome for the Estate, but must not "fall beneath the lowest point in the range of reasonableness." *Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991). Finally, the Trustee is entitled to employ his reasonable business judgment in proposing a settlement, and that judgment is entitled to reasonable deference from the Court where, as here, the proposed settlement is not between insiders:

> The Trustee's decision to settle must represent the interests of the bankruptcy estate and its creditors and is reviewed under the 'business judgment rule.' Under the business judgment rule, the challenging party must establish that the course of action chosen by the fiduciary was outside the parameters of what a rational and reasonably informed businessperson might select. The business judgment rule creates a presumption in favor of the fiduciary.

*In re Woodberry*, 629 B.R. 239, 243 (Bankr. E.D. Mich. 2021) (internal quotations omitted).

26. Here, the Trustee believes that the Proposed Settlement is fair, equitable, and in the Estate's best interests, for at least the following reasons:

- the Trustee is not aware of any causes of action against the FFT or the Wife, except to recover the Lakehouse and Lot, and no party has made the Trustee aware of any such potential cause of action;

- the Trustee is not aware of any assets that the FFT has other than the Lakehouse and the Lot, meaning that the Trustee would be limited in any recovery against the FFT to the Lakehouse and the Lot, as the FFT has no other assets and as the Trustee's claims against the FFT are likely not insured;

- the Trustee believes that, were he to obtain the Lakehouse and the Lot immediately, and once related expenses are deducted, including for: (i) taxes; (ii) real estate commissions; and (iii) receiver fees and receiver attorney's fees, the net benefit to the Estate of the Lakehouse and the Lot would be approximately $1.5 million if the Trustee was able to recover fair market value, however, the lakehouse and lake lot market is depressed at present, due mostly to high interest rates (and these would

- be second homes), and the Lakehouse is not particularly attractive (being half of a duplex), and a receiver or foreclosure sale would likely bring in less than fair market value, meaning that the net recovery may end up being significantly less;

- absent a settlement, any such recovery would likely be two years out, due first to the need to obtain a judgment against the FFT, and second due to the time that it will take to sell and monetize the Lakehouse and the Lot;

- absent a settlement, the Trustee's interim remedies would be to appoint a receiver to sell the Lakehouse and Lot, which the Trustee intends to do, but that again would increase the costs of disposition, decrease values, and still entail waiting up to two years to recover;

- next, the Trustee would have to pay his own attorney's fees and expenses to get to judgment which, with a jury trial, are likely to exceed $150,000.00, even absent appeals, and, while the Trustee may secure a judgment against the FFT for his reasonable attorney's fees under TUFTA, because the FFT has no other assets anyway, such a judgment would likely not be collectible;

- the Trustee does not believe that there is material litigation risk of loss with the Lakehouse and the Lot, although with a jury, one never knowns, but his claims against the Boats will be harder to prove because of the requirement to trace funds, and which would likely require an expert, whose fees would also erode any net benefit;

- if the FFT defaults in paying the Settlement Payment, the Trustee can be very assured of owning the Lakehouse, Lot, and Boats, in 180 days, without the need for further litigation to get there and the related litigation delays, expense, and risk; and

- the Agreement and the Proposed Settlement were negotiated at arm's length, through good faith negotiations between counsel, with no undisclosed agreements or superior knowledge of the underlying facts by the FFT.

27. In the end, $1.2 million is likely what the Trustee would net once litigation expenses, sale expenses, receivership expenses, and the time value of money are taken into account, except that under the Proposed Settlement the Trustee gets this amount reasonably quickly, without litigation risk, and on a net basis. If the FFT defaults, the Trustee is still better off because he will take title to the Lakehouse, Lot, and Boats, and secure any "upside" that may exist over and above $1.2 million, and he will do so before the end of 2024 and without litigation risks and fees. Either way, the interests of the Estate are materially improved and benefited.

28. The Trustee will add an important note. Every creditor in this case knowns what Frinzi has done and that the Estate has claims against him worth tens of millions of dollars, which the Estate is prosecuting and which the Trustee believes to be insured. The Trustee does not relish reaching any partial agreement with Frinzi that may provide him an upside. But the claims here, at least against the FFT, are in reality *in rem* claims against the Lakehouse and the Lot which, under the Proposed Settlement, the Trustee receives the value of. That should be the most important consideration. And, with respect to the balance of Frinzi's embezzlement of the $4.4 Million Transfer and other transfers being litigated in the Adversary Proceeding, the Trustee believes those claims to be insured under the Debtor's crime and theft policies, he has made a demand against the carrier(s), and he intends to pursue that claim, including through litigation against the carrier(s). In other words, the expected recovery to the Estate from the $4.4 Million Transfer and related transfers is not over and is not limited to the Settlement Payment.

## VI. PRAYER

WHEREFORE, PREMISES CONSIDERED, the Trustee respectfully requests that the Court: (i) grant this Motion; (ii) approve the Proposed Settlement; (iii) authorize and direct the Trustee to perform all actions required by the Agreement; and (iv) grant the Trustee such other and further relief to which he may be justly entitled.

RESPECTFULLY SUBMITTED this 10th day of May, 2024.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75201
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

**GENERAL COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 10th day of May, 2024, true and correct copies of this document, with the exhibit referenced herein, were electronically served by the Court's ECF system on parties entitled to notice thereof, and that, on the same date, he caused true and correct copies of this document, with the exhibit referenced herein, to be served by U.S. first class mail, postage prepaid, on the parties listed on the attached Service List.

By: /s/ Davor Rukavina
Davor Rukavina, Esq.