Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: (214) 855-7500

COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-31641-mvl7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| MSOUTH EQUITY PARTNERS III, L.P., | § | |
| 1PATH MANAGED SERVICES, LLC, | § | |
| ONEPATH ITDS HOLDINGS, LLC, | § | |
| ONEPATH ITDS BUYER, INC., ONEPATH | § | Adv. No. 24-_____ |
| HOLDINGS, LLC, ONEPATH HOLDING | § | |
| CORPORATION, BLUEWAVE COMPUTING, | § | |
| LLC, ONEPATH SYSTEMS OF NC, LLC, | § | |
| DIRECT RESOURCES, LLC, INTERNET & | § | |
| TELEPHONE, LLC, PARADIGM COMPUTER | § | |
| CONSULTING, INC., and UNKNOWN | § | |
| SHAREHOLDERS OF PARADIGM | § | |
| COMPUTER CONSULTING, LLC. | § | |
| | § | |
| Defendants. | § | |

## <u>TRUSTEE'S ORIGINAL COMPLAINT</u>

Scott M. Seidel (the "<u>Trustee</u>"), as the chapter 7 trustee of Goodman Networks, Inc. (the

"<u>Debtor</u>"), the debtor in the above-styled chapter 7 bankruptcy case (the "<u>Bankruptcy Case</u>"), files

this *Original Complaint* (this "Complaint") against MSouth Equity Partners III, L.P., 1Path Managed Services, LLC, Onepath ITDS Holdings, LLC, Onepath ITDS Buyer, Inc., Onepath Holdings, LLC, Onepath Holding Corporation, BlueWave Computing, LLC, Onepath Systems of NC, LLC, Direct Resources, LLC, Internet & Telephone, LLC, Paradigm Computer Consulting, Inc., and the unknown shareholders of Paradigm Computer Consulting, Inc (collectively, the "Defendants"), in support of which he would respectfully show as follows:

## I.    INTRODUCTION

1.    James Frinzi, the Debtor's CEO, transferred $44 million from one of the Debtor's bank accounts to an unaffiliated company he owned.  He used $41.5 million of those funds to purchase another business for himself from one of the Defendants.  The Debtor received nothing in exchange for its money, whereas the Defendants benefitted from the sale because the proceeds went to pay down their debt by more than $35 million, and they pocketed the rest.  The Defendants knew Frinzi was using another company's funds and ignored various other red flags, even acknowledging Frinzi's lack of sophistication, opting instead to expedite the transaction to close as quickly as possible.  At the end of the day, Frinzi paid twice what the business was worth, as evidenced by the only other bid, and Frinzi only paid what he did because the Defendants' representative misled him about the offers they had received (and because he had to use the Debtor's money before creditors froze that money).  The Trustee therefore asserts actual and constructive fraudulent transfer claims against the Defendants to recover the Debtor's funds, both as subsequent transferees and as a creditor under UFTA.

## II.    JURISDICTION & VENUE

2.    On September 6, 2022 (the "Petition Date"), various petitioning creditors filed an involuntary bankruptcy petition against the Debtor, thereby initiating the Bankruptcy Case.

3.    The Court entered an order for relief against the Debtor on December 12, 2022.

4.    The Trustee is the duly appointed chapter 7 trustee of the Debtor and the bankruptcy estate (the "Estate").

5.    The Court has jurisdiction over this Complaint under 28 U.S.C. § 1334.

6.    Such jurisdiction is core under 28 U.S.C. § 157(b)(2).

7.    To the extent that any matter in this adversary proceeding is not core, the Trustee consents to this Court's entry of a final orders and judgment.

8.    Venue of this adversary proceeding before this Court is proper under 28 U.S.C. §§ 1408 and 1409.

### III.    PARTIES

9.    The Trustee is the chapter 7 trustee of the Debtor and the Estate and files this Complaint in such capacity only.

10.    MSouth Equity Partners III, L.P. is a Delaware limited partnership, which may be served under Fed. R. Bankr. P. 7004(b)(3) by mailing a copy of this Complaint and the summons via first class U.S. mail, postage prepaid, to its registered agent as follows: MSouth Equity Partners III, L.P., c/o The Corporation Trust Company, Registered Agent, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.

11.    1Path Managed Services, LLC is a Delaware limited liability company, which may be served under Fed. R. Bankr. P. 7004(b)(3) by mailing a copy of this Complaint and the summons via first class U.S. mail, postage prepaid, to its registered agent as follows: 1Path Managed Services, LLC, c/o Corporation Service Company, Registered Agent, 251 Little Falls Drive, Wilmington, DE 19808.

12.    Onepath ITDS Holdings, LLC is a Delaware limited liability company, which may be served under Fed. R. Bankr. P. 7004(b)(3) by mailing a copy of this Complaint and the summons via first class U.S. mail, postage prepaid, to its registered agent as follows: Onepath ITDS

Holdings, LLC, c/o Corporation Service Company, Registered Agent, 251 Little Falls Drive, Wilmington, DE 19808.

13.      Onepath ITDS Buyer, Inc. is a Delaware corporation, which may be served under Fed. R. Bankr. P. 7004(b)(3) by mailing a copy of this Complaint and the summons via first class U.S. mail, postage prepaid, to its registered agent as follows: Onepath ITDS Buyer, Inc., c/o Corporation Service Company, Registered Agent, 251 Little Falls Drive, Wilmington, DE 19808.

14.      Onepath Holdings, LLC is a Delaware limited liability company, which may be served under Fed. R. Bankr. P. 7004(b)(3) by mailing a copy of this Complaint and the summons via first class U.S. mail, postage prepaid, to its registered agent as follows: Onepath Holdings, LLC, c/o Corporation Service Company, Registered Agent, 251 Little Falls Drive, Wilmington, DE 19808.

15.      Onepath Holding Corporation is a Delaware corporation, which may be served under Fed. R. Bankr. P. 7004(b)(3) by mailing a copy of this Complaint and the summons via first class U.S. mail, postage prepaid, to its registered agent as follows: Onepath Holding Corporation, c/o Corporation Service Company, Registered Agent, 251 Little Falls Drive, Wilmington, DE 19808.

16.      Bluewave Computing, LLC is a Georgia limited liability company, which may be served under Fed. R. Bankr. P. 7004(b)(3) by mailing a copy of this Complaint and the summons via first class U.S. mail, postage prepaid, to its registered agent as follows: Bluewave Computing, LLC, c/o Corporation Service Company, Registered Agent, 2 Sun Court, Suite 400, Peachtree Corners, GA 30092.

17.      Onepath Systems of NC, LLC is a Delaware limited liability company, which may be served under Fed. R. Bankr. P. 7004(b)(3) by mailing a copy of this Complaint and the summons via first class U.S. mail, postage prepaid, to its registered agent as follows: Onepath Systems of

NC, LLC, c/o Corporation Service Company, Registered Agent, 251 Little Falls Drive, Wilmington, DE 19808.

18.     Direct Resources, LLC is a Georgia limited liability company, which may be served under Fed. R. Bankr. P. 7004(b)(3) by mailing a copy of this Complaint and the summons via first class U.S. mail, postage prepaid, to its registered agent as follows: Direct Resources, LLC, c/o Corporation Service Company, Registered Agent, 40 Technology Pkwy South, #300, Norcross, GA 30092.

19.     Internet & Telephone, LLC is a Massachusetts limited liability company, which may be served under Fed. R. Bankr. P. 7004(b)(3) by mailing a copy of this Complaint and the summons via first class U.S. mail, postage prepaid, to its registered agent as follows: Internet & Telephone, LLC, c/o Corporation Service Company, Registered Agent, 84 State St., Boston, MA 02109.

20.     Paradigm Computer Consulting, Inc. is a New Hampshire corporation, which may be served under Fed. R. Bankr. P. 7004(b)(3) by mailing a copy of this Complaint and the summons via first class U.S. mail, postage prepaid, to its registered agent as follows: Paradigm Computer Consulting, Inc., c/o Corporation Service Company, Registered Agent, 10 Ferry Street S313, Concord, NH 03301.

21.     Paradigm Computer Consulting, Inc. was voluntarily dissolved on or about October 12, 2022.  The identities of the shareholders of Paradigm Computer Consulting, Inc. are currently unknown but are liable for the claims set forth herein to the extent set forth in N.H. Rev. Stat. § 293-A:14.07(d)(2).

## IV.    **BACKGROUND**

22.    On October 16, 2017, MSouth Equity Partners III, L.P. ("MSouth") closed on the acquisition of the business enterprise known as Onepath ("Onepath"), including Onepath Systems, LLC ("Onepath Systems") and upon information and belief some or all of the Defendants.

23.    For example, MSouth owns a majority of the equity in Onepath ITDS Holdings, LLC, which upon information and belief directly owns Onepath ITDS Buyer, Inc., which upon information and belief directly or indirectly owned Onepath Systems (and now its success-in-interest, 1Path Managed Services, LLC).

24.    However, following MSouth's investment, Onepath's financial performance fell significantly below expectations, with TTM EBITDA declining from $25 million at acquisition to $6.7 million at TTM August 2021.

25.    Indeed, in August 2021 the situation had deteriorated to the point that Onepath breached a minimum EBITDA covenant with the Defendants' senior lender, BMO Harris Bank, N.A., as administrative agent to various lenders (collectively, "BMO").

26.    BMO was involved with multiple MSouth investments, not just Onepath.

27.    To address this problem, MSouth decided in 2021 to divest Onepath Systems of its Onepath integrated business solutions ("OIS") division, while retaining Onepath's managed IT services ("OMS") division.

28.    MSouth belied the OIS division was worth about $25 million, as it targeted paying down the senior debt by about that much following the sale.

29.    BMO indicated a willingness to allow MSouth and Onepath Systems time to pursue the divestiture, and MSouth kept BMO apprised of the progress along the way.

30.     Indeed, BMO expressed directly to MSouth the importance of receiving the a settlement statement and waterfall showing net proceeds, and BMO and MSouth exchanged numerous correspondence on the topic.

31.     Onepath Systems, under the leadership and direction of MSouth, retained Layer 7 Capital, LLC ("Layer 7") as its exclusive financial advisor in connection with the proposed transaction.

32.     Members of MSouth also served as officers of Onepath Systems and various Defendants, and correspondence addressed to certain Defendants would often be sent care of MSouth.

33.     Given MSouth's ownership and management of the other Defendants, whenever one Defendant learned information the others necessarily learned it as well.

34.     MSouth conducted the process to market and sell the OIS division with the cooperation of BMO, and with junior lenders also on board, MSouth planned to convert junior debt to equity once the OIS divestiture was complete.

35.     This was attractive to the junior lenders because they had no interest in managing the Onepath investment day-to-day, which MSouth had been doing anyway.

36.     Throughout the process, Layer 7 acted as MSouth's and Onepath Systems' agent and representative in negotiations with potential purchasers of the OIS division and, as such, its knowledge and actions are imputed to MSouth and OnePath.

37.     Together, they advertised the OIS division as capable of designing, deploying, and maintaining connectivity solutions by engaging with its clients to implement network engineering, structured cabling, DAS, audiovisual, electronic security, and fire & life safety solutions for projects, programs, and systems integrators in locations ranging from single-family homes to large scale infrastructure.

38.    But they did not disclose to potential buyers Onepath's steep decline in EBITDA from 2017 to 2021.  In the Confidential Investment Memorandum that Layer 7 prepared under MSouth's and Onepath Systems' supervision, they only disclosed to potential buyers EBITDA beginning two years earlier in 2019, at which point most of the decline had already occurred.

39.    In addition to failing to disclose the past steep decline in EBITDA, the CIM included rosy projections for 2021 through 2025, all conveniently showing growth rather than reflecting the reality of the company's financial track record.

40.    Meanwhile, James Frinzi ("Frinzi") was the Debtor's CEO and the CEO of Debtor-subsidiary GNET ATC, LLC ("GNET").  As such, and at all times relevant to this Complaint, Frinzi owed fiduciary duties to the Debtor and to GNET.

41.    Prior to February 1, 2022, the Debtor and its subsidiaries acted as a value-added reseller ("VAR") for FedEx Supply Chain Logistics & Electronics, Inc. ("FedEx").  FedEx would facilitate and pay for the Debtor and its subsidiaries to purchase products and shortly thereafter would repurchase those products from the Debtor for a markup.  This contract with FedEx accounted for over 20% of the Debtor's revenue by 2021—and nearly all the Debtor's revenue following the 2021 termination of the Debtor's VAR contract with AT&T—and resulted in large sums of money flowing in and out of the Debtor's bank account on a regular basis.

42.    Frinzi instructed the Debtor to cease making payments to FedEx, which resulted in the accumulation of about $80 million.  He did so for his own benefit or the benefit of other insiders whom he favored, often using shills to add a façade of legitimacy, and he and his friends walked away with millions.  One such scheme is the subject of this Complaint.

43.    On September 16, 2021, Layer 7 sent a teaser email to Jay Bock, the CEO of Debtor-affiliate Genesis Networks Telecom Services, LLC ("Genesis"), regarding Onepath, soliciting potential interest in Onepath.  MSouth or its affiliates had previously sold a different

business line to Genesis or its affiliates, and MSouth therefore knew that Genesis or its affiliates may have an interest in Onepath.

44.     Genesis Networks Enterprises, LLC was the sole member of Genesis.

45.     Five days later, on September 21, 2021, Bock forwarded the teaser email to James Goodman, the Debtor's sole director, who forwarded it to Frinzi.

46.     The next day, September 22, 2021, Bock executed a confidentiality agreement with Onepath Systems in order to gain access to the OIS division data room.

47.     That same day, Frinzi contacted Layer 7 directly in an email that stated: "Hi, I got this from Mr. Goodman.  I believe Jay Bock has looked at this too.  Do I need to sign a different NDA?  I have an interest in this deal."

48.     As this email indicates and as Layer 7 and Onepath Systems should have therefore known given Frinzi's peculiar choice of language ("*I have an interest in this deal.*"), Frinzi's interest in the deal was not necessarily the same as the interest of Genesis or the Debtor.

49.     Additional red flags included the fact that, within a month, Frinzi stopped using his Genesis email address in connection with the negotiations, and he used at least four different email addresses over the course of less than five months.

50.     On September 30, 2021, Layer 7 sent out a first round process letter to Bock and Frinzi explaining in detail the procedures and content required to submit an indication of interest for the OIS division.

51.     Bock did not respond, and in fact neither Layer 7 nor Onepath Systems ever heard anything else from Bock, the Debtor, or Genesis until after the sale of the OIS division to Frinzi closed.

52.     That is because the ultimate beneficial owner of Genesis, James Goodman, elected not to go forward with the potential acquisition because, for him, the potential price being discussed with Frinzi was far too high.

53.     On October 22, 2021, Frinzi submitted an indication of interest (the "Frinzi IOI") to Onepath Systems through Layer 7, which he sent from a GNET email address but signed as the CEO of Multiband Global Resources, LLC ("MGR").

54.     Frinzi had just organized MGR in Delaware about three months earlier as MGR's sole direct or indirect owner.

55.     MGR had no common ownership with the Debtor, GNET, or Genesis and no affiliation other than Frinzi's control as the latter entities' officer.

56.     The Frinzi IOI proposed for MGR to acquire the OIS division in exchange for $18,200,000.00 in cash and $7,800,000.00 worth of MGR stock.

57.     Onepath Systems also received an indication of interest (the "Competing IOI") from a large, third-party company completely unrelated to the Debtor and Frinzi (the "Competing Bidder"), pursuant to which the Competing Bidder indicated that it *might consider* acquiring the OIS division for between $30,000,000.00 and $35,000,000.00, subject to considerable due diligence.[1]

58.     As one might suspect, the Competing IOI did not constitute a bid nor an offer subject to acceptance, as it was expressly conditioned upon due diligence and the execution of a mutually satisfactory definitive agreement, and it was merely aspirational, intended to get the attention of Layer 7 and MSouth.

---

[1] The Trustee omits the name of the Competing Bidder, which the Defendants certainly know, due to a protective order that governed MSouth's production of relevant documents which, with respect to the Competing Bidder, were produced as "confidential."

59.     Nevertheless, on November 30, 2021, Layer 7, acting on behalf of Onepath Systems, sent Frinzi an email containing the statement that "The highest offer we received in the first round was in the mid-$30s.  We recommend that you put your best foot forward for the enterprise value …."

60.     But given all the contingencies including the lack of diligence, Onepath Systems had not received any "offers" at all, and following due diligence, the Competing Bidder ultimately submitted a non-binding letter of intent to acquire the OIS division for only $20 million (a fact neither Onepath nor Layer 7 ever brought to Frinzi's attention).  Thus, Layer 7's representation to Frinzi was intentionally false and misleading, designed to induce him to make an offer higher than the nonexistent "offer" from the Competing Bidder.

61.     The most plausible explanation for the Competing Bidder decreasing its level of financial interest by upwards of $15 million is that extensive due diligence conducted by capable professionals revealed the OIS division to be worth far less than the rose-tinted promotional materials suggested.

62.     They likely discovered the fact that Onepath's EBITDA had decreased substantially year after year since MSouth acquired it and concluded there was no basis for the rosy future projections.

63.     By sending its November 30 email, Layer 7 plainly intended to induce Frinzi to bid more than $35,000,000.00, and by providing misleading information Layer 7 and Onepath Systems ultimately caused Frinzi to submit an offer on behalf of MGR to purchase the OIS division for $38,000,000.00 plus a potential upward working capital adjustment.

64.     On or about December 1, 2021, Frinzi submitted his letter of intent as the CEO of MGR to acquire the OIS division for at least $38,000,000.00—$20 million more than Frinzi's original expression of interest.

65. Onepath Systems did not receive any letters of intent other than those submitted by the Competing Bidder and Frinzi.

66. Certain aspects of Frinzi's offer caused confusion at Layer 7 and Onepath Systems, which highlighted Frinzi's ineptitude and led to further discussions over the next several days, including a request that Frinzi submit a revised letter of intent to address their concerns.

67. On December 4, 2021, Layer 7 sent Frinzi an email which stated, "Whoever we choose to move forward with, we want to make sure that there aren't any contingencies on the acquisition financing. I know we talked about it at a high level, but more certainty you can provide to us, the better received the offer would be. In addition to price, this is the other main critical factor in our decision making process."

68. Frinzi responded from his GNET email address (despite having made the offer to purchase on behalf of MGR) that "We have over $40 million cash on hand right now, but our plan is to finance 60 to 70 percent of the costs through debt."

69. Frinzi submitted his revised $38 million letter of intent to Layer 7 and Onepath Systems on December 13, 2021, which he signed as the CEO of MGR but which he sent from a GNET email address under a cover email signed as the CEO of GNET.

70. Layer 7 and Onepath Systems kept in touch with Frinzi over next couple of weeks, requesting additional updates and participating in multiple telephone conferences.

71. Among other things, Layer 7 and Onepath Systems continued to have concerns about Frinzi's and MGR's ability to fund the proposed transaction, which suggests they had reason to doubt Frinzi's bona fides.

72. Frinzi's response suggests they pressured him to abandon his plan to procure third-party financing. Furthermore, Frinzi has confirmed that Layer 7 pressured him to proceed quickly

and at his high offer under the threat that there were multiple other bidders in the mid-$30 million

range when, in fact, as pled above, there were no such offers.

73.    On December 31, 2021, Frinzi sent Layer 7 an email meant to address these

concerns in which he stated the following:

> I wanted to update you on the financing.  This is a screenshot of one of our accounts
> at GNET ATC.
>
> As stated previously, in the worst case scenario, I am prepared to have GNET ATC
> bridge loan the full amount of acquisition, and I can refinance with my traditional
> banks later.  Also, as you may be aware, we completed the acquisition of AMRR,
> which is traded on the OTC and we are up listing to NASDAQ.  Of course we are
> raising further equity through that vehicle.
>
> In any case, I would like to initiate proceeding with the acquisition, and the stock
> purchase agreement.  How do you suggest we can proceed?  Joey O'Bell is the
> General Counsel for Multiband Global.

74.    The mail contained a screenshot from the Prosperity Bank online treasury center

listing various accounts, including one ending 4352 and described as "GNET ATC Collection Acct

xx4352" with a current balance of $54,601,003.19.

75.    In reality, however, account 4352 belonged to the Debtor and on the bank

statements was styled as "Goodman Networks Inc Controlled Disbursement Account."

76.    In other words, regardless of whether the Debtor or GNET owned the account, as

of December 31, 2021, Layer 7 and Onepath had notice that Frinzi intended to use an unaffiliated

entity's cash to fund a transaction for the benefit of himself and MGR, knowing, additionally, that

he was an officer of such other entity which, upon information and belief, they knew or should

reasonably have known was a wholly-owned subsidiary of the Debtor.

77.    Entities as sophisticated as Layer 7 and OnePath Systems (and therefore MSouth)

knew that Frinzi, as an officer of GNET and/or the Debtor, owed fiduciary duties to GNET and

the Debtor.

78.     Layer 7 and OnePath Systems had no legitimate reason to believe that MGR, on the one hand, and GNET and the Debtor, on the other hand, were affiliates.  For that reason and others, Layer 7 and OnePath Systems had no indication that Frinzi had authority to make any such alleged "bridge" loan, that GNET or the Debtor had or would approve the same (as a transfer of sums in that amount would logically and reasonably require board approval at any company, which Frinzi did not obtain and which he did not inform Layer 7 or OnePath Systems that he obtained), or that GNET or the Debtor would be receiving any return value or consideration either for any such alleged "bridge" loan or for the anticipated acquisition.

79.     Nor, upon information and belief, did Layer 7 or OnePath Systems take any steps to inquire into the foregoing or to obtain any confirmation regarding the foregoing, placing their "heads into the sand" instead in order to take advantage of Frinzi's almost unbelievable offer.

80.     Layer 7 and OnePath Systems, and through them the remaining Defendants, therefore knew that the funds for the acquisition would not be coming from MGR but instead from GNET and/or the Debtor, for no obvious return consideration and with no due diligence undertaken by them that GNET and/or the Debtor had properly approved any alleged "bridge" loan through their respective boards.  At a minimum, a reasonable seller would have requested or required an appropriate resolution of the board of either or both companies.

81.     Email traffic between members of MSouth further reveals how they allowed their greed to overcome their skepticism about Frinzi.

82.     On January 6, 2022, Jerry Nowlin at MSouth wrote to Barry Boniface and Peter Pettit:

I just spoke to Kavi and Steve [at Layer 7] following a discussion they had with James Frinzi and the Multiband CFO.  They indicated they are comfortable closing the transaction with their cash on hand and would like to close by the end of the month.  James also indicated they had already completed a lot of their due diligence. Hard to really read these guys, but Layer 7's view (which I share) is that we should

try to be as accommodating as possible with regards to making this happen as soon as possible.

83.    Peter Pettit responded, "Unbelievable! If they say they want to close at the end of the month and fund the $38M PP with cash on hand, I say we do whatever they ask to make that happen!"

84.    Barry Boniface later stated, referring to Frinzi and MGR and the prospect of actually closing the transaction, "this isn't the most professional group so you never know what will happen."

85.    Over the course of January 2022, in order to fund the transaction between MGR and Onepath Systems, Frinzi caused the following transfers (collectively, the "$44 Million Transfer") to occur from the Debtor's bank account ending 4352 to an account held by American Metals Recovery & Recycling, Inc. ("AMRR"):

| Date | Amount |
|---|---|
| 1/11/2022 | $8,000,000.00 |
| 1/12/2022 | $8,000,000.00 |
| 1/13/2022 | $8,000,000.00 |
| 1/14/2022 | $7,925,000.00 |
| 1/18/2022 | $8,000,000.00 |
| 1/28/2022 | $4,075,000.00 |
| **TOTAL** | **$44,000,000.00** |

86.    AMRR, at that time and at all times relevant to this Complaint, was majority owned by MGR and was controlled by MGR and by Frinzi.

87.    Just about two months earlier, in early December 2023, Frinzi had caused MGR to purchase a majority of the outstanding common shares in AMRR from Repository Services, LLC, by similarly appropriating Debtor funds for that purpose.

88.    Even before the $44 Million Transfer, the Debtor was insolvent because its liabilities exceeded its assets.  Furthermore, even before the $44 Million Transfer, the Debtor was generally not paying its debts as they became due.

89.    The Debtor owed its senior secured noteholders at least $18 million, and it owed FedEx more than $80 million, among other creditors.

90.    The funds used to make the $44 Million Transfer were not pledged as collateral to any creditor.

91.    According to the Court's CM/ECF claims register, claims filed in the Debtor's bankruptcy case total more than $180 million.

92.    The Debtor's schedules, filed less than a year after the transaction the subject of this Complaint, show asses of about $7.5 million and liabilities of about $106 million.

93.    Before Frinzi caused the Debtor to transfer $44 million to AMRR, the Debtor's accounts held a total balance of about $63 million.

94.    By the end of the month, after the transfers, the cumulative balance of those account was about $27.7 million.

95.    At this point in time, the Debtor did not have any assets more valuable than cash, as its most valuable contract (accounting for about 60% of its revenue) had been terminated by AT&T.

96.    As the sole owner and control person of MGR, Frinzi likewise now had exclusive control over AMRR, MGR's direct subsidiary.

97.    Rather than having MGR purchase the OIS division directly, Frinzi elected to have AMRR purchase it, which is why he transferred $44 million from the Debtor to AMRR.

98.    In a feeble attempt to legitimize the $44 million in transfers from the Debtor to AMRR, Frinzi—apparently so out of touch with the entities he served as CEO he did not realize

the money came from the Debtor rather than GNET—caused AMRR to execute a $44 million promissory note in favor of GNET instead of the Debtor (the "Note"). The Note, however, was always intended to be payable to the Debtor, if it was ever intended to be repaid at all, and subsequent communications from Frinzi and documents executed by Frinzi confirm that the Note was intended to be payable to the Debtor and that the reference to GNET was a mistake.

99.    AMRR has acknowledged a debt of at least $44 million to the Debtor, whether under the Note or under fraudulent transfer and breach of duty causes of action. As of the date hereof, AMRR remains liable to the Debtor and to the Trustee, by its own admission, of at least $34 million.

100.    MGR was a newly formed entity, which does not appear to have been capitalized at all, and AMRR was a public shell that had been trading over the counter, so neither entity had the means to acquire the OIS division legitimately.

101.    The Defendants knew AMRR was a shell because Frinzi told them in his December 31, 2021 email, and because MSouth received an email in January which said, "it sounds like Multiband bought a public shell company that trades under AMRR in December …."

102.    The transaction for the sale and purchase of the OIS division closed on February 1, 2022, facilitated by a multistep process, boiled down to its essence as follows:

a.    First, the relevant parties organized a new entity, AMR Resources, LLC ("AMR Resources") as a wholly owned subsidiary of Onepath Systems.

b.    Second, Onepath Systems contributed its assets and liabilities constituting the OIS division to AMR Resources pursuant to a *Contribution Agreement* between Onepath Systems and AMR Resources.

c.    Third, AMRR purchased the equity in AMR Resources from Onepath Systems pursuant to a *Unit Purchase Agreement* between the three entities (the "Purchase Agreement") in exchange for a total purchase price of $40,407,647.70.

d.    Fourth, AMRR, AMR Resources, and Onepath Systems entered into a *Transition Services Agreement* (the "TSA"), pursuant to which Onepath

Systems agreed to provide certain transition services to AMR Resources for a limited period of time, in exchange for which AMRR agreed to pay certain fees and expenses, including $802,000.00 paid at closing.

e.  Fifth, Onepath Systems, AMRR, and Truist Bank entered into an *Escrow Agreement* (the "Escrow Agreement"), pursuant to which Trust Bank would hold $2.5 million of the purchase price for one year to cover potential indemnification obligations owed to AMRR, to be released to Onepath Systems in the event no timely indemnification claims were made.

103.  At closing, Frinzi caused AMRR to wire the following amounts (from the funds it had received in January from the Debtor) to the following recipients:

| Recipient | Purpose | Amount |
|---|---|---|
| Onepath Systems | OIS sale | $37,907,647.70 |
| Truist Bank | Escrow | $2,500,000.00 |
| SUBTOTAL | | $40,407,647.70 |
| Onepath Systems | TSA | $802,000.00 |
| TOTAL | | $41,209,647.70 |

104.  The Trustee has learned from an individual with knowledge that people at MSouth were literally popping champagne in utter disbelief that Frinzi would pay so much for the OIS division when the next highest bid was half as much.

105.  They undoubtedly recognized the Competing Bidder's vastly higher level of sophistication and therefore that its lesser bid more accurately represented the value of the OIS division, particularly given how they commented on Frinzi's lack of professionalism earlier in the process.

106.  They had even encouraged the process to conclude as quickly as possible and to make every possible accommodation before Frinzi could wise up.

107.  Simultaneously with closing, MSouth caused $35,943,261.00 of the purchase price to be paid to BMO, in satisfaction of a debt owed by some or all of the Defendants.

108.     Even if one or more of the Defendants were not directly liable for the debt owed to

BMO, they benefitted from this payment to the extent they directly or indirectly held equity in the

liable Defendants and the payment increased the value of that equity and paved the way for a

beneficial recapitalization later in 2022.

109.     The Debtor, on the other hand, did not receive anything in exchange for its $44

million.

110.     Several months later in July 2022, a dispute arose between AMRR, Onepath

Systems, and MSouth concerning the OIS division transaction.

111.     Joseph O'Bell, writing in his capacity as general counsel of AMRR, sent a letter to

Onepath Systems and MSouth on July 18, 2022 in which he made, *inter alia*, the following

allegations:

> Pursuant to the Unit Purchase Agreement, OnePath was to properly transfer all of
> the material assets necessary to operate the OIS Business to AMR Resources, LLC.
> The AT&T Services, Inc. (Lockheed Martin Aeronautics) contract was one of those
> material assets and OnePath failed to properly transfer it to AMR Resources, LLC.
> In order for AMR Resources, LLC to be properly and contractually perform the
> obligations contained in the AT&T Services Inc. (Lockheed Martin Aeronautics)
> contract, it would have to obtain government security clearance which is a very
> timely and difficult process that may involve sponsorship to even apply. OnePath
> failed to properly disclose the extent of what would be required for AMR
> Resources, LLC to service the AT&T Services Inc. (Lockheed Martin Aeronautics)
> contract. OnePath also failed to secure sufficient arrangements for AMR Resources,
> LLC to be able to properly obtain and service the AT&T Services Inc. (Lockheed
> Martin Aeronautics) contract at the closing of the purchase of AMR resources,
> LLC.
>
> * * *
>
> We were also made aware that OnePath made key management take pay cuts prior
> to AMRR closing on the purchase of AMR Resources, LLC in an effort to
> manipulate EBIDTA numbers.
>
> OnePath Systems, LLC is in breach of contract for failing to disclose information
> regarding the extent of obtaining government security clearance and for failure to
> properly transfer the AT&T Services Inc. (Lockheed Martin Aeronautics) contract
> in connect with AMRR's purchase of AMR Resources, LLC from OnePath. AMRR
> hereby demands that you immediately cure this breach by doing whatever is

necessary for AMR Resources, LLC to properly operate and service the AT&T Services Inc. (Lockheed Martin Aeronautics) contract.

112.     The allegation concerning EBITDA provides a plausible explanation for why the Competing Bidder lowered its potential offer by as much as $15 million following due diligence, in addition to the fact that MSouth and Onepath Systems failed to disclose the prior dramatic decline in EBITDA.

113.     Given that certain key executives and employees of Onepath Systems followed the OIS division to AMRR, there was a plausible basis for AMRR to make this accusation—*i.e.*, AMRR would have learned it directly from those people.

114.     The fact that Onepath Systems failed to disclose the pay cuts to Frinzi and otherwise misrepresented the value of the OIS division to Frinzi as alleged above further taints any suggestion that Onepath Systems provided reasonably equivalent value in exchange for the $41 million Frinzi paid, in addition to the fact that he paid twice as much as the next highest (and only other) offer.

115.     Furthermore, Frinzi's and MGR's successful offer does not represent a market transaction and does not represent market or fair market value for the acquired assets because, in addition to the foregoing material misrepresentations by Layer 7 and OnePath Systems, Frinzi was not acting as a reasonable market participant desiring to pay market or fair value for the assets but, instead, as someone breaching his fiduciary duties to the Debtor who needed to use the Debtor's funds to which he had access by converting such funds into tangible assets for his personal benefit as soon as possible before the Debtor's creditors would take action to seize those funds.

116.     Furthermore, upon information and belief, Frinzi failed to undertake any reasonable due diligence for the assets and the transaction, instead relying on the misrepresentations from Layer 7 and the incorrect and incomplete historical financial data from OnePath Systems and the

unreliable and misleading future projections from Layer 7. He did so again because of his urgent and pressing need to launder the funds he had transferred from the Debtor before the Debtor's creditors could act to seize those funds. Furthermore, Frinzi was not sophisticated when it came to reading financials and understanding financial documents, and therefore was incapable of reasonably testing the information given to him by Layer 7. Finally, as noted above, James Goodman declined the potential acquisition because he told Frinzi that the assets were not worth more than the mid-$20 million range.

117. In fact, the sale process undertaken by Layer 7 confirms that the actual, fair market value of those assets as of February 1, 2022 was in the neighborhood of $23 million, and this aside from the above facts concerning the manipulation of the value of those assets and Frinzi's ulterior motives in making his offer.

118. Among other things, Layer 7 informed more than sixty (60) entities which it reasonably believed may be interested in the assets as being in the relevant market; only three of such entities ever made any informal offer; Frinzi's initial offer was far less than his ultimate purchase price; MSouth expected the sale to bring in approximately $25 million; the Competing Bid was almost $20 million less than Frinzi's price; and the Defendants' and Layer 7's internal communications demonstrate their knowledge that Frinzi was grossly overpaying for the assets.

119. Furthermore, after AMRR acquired the assets, and within one year of such acquisition, AMRR and its subsidiaries were insolvent, AMRR entered voluntary winddown and liquidation, and the value of AMRR's assets—the same assets as purchased for almost $41 million—was less than $10 million, thus confirming the long-term and serious decline in the value of those assets that Layer 7 and the Defendants knew about but failed to disclose to Frinzi.

120. As part of resolving the dispute discussed above (the full extent of the settlement is unknown without the benefit of further discovery), MSouth and various subsidiaries agreed to

transfer ownership of Onepath Systems (but not its remaining assets) to AMRR, which was accomplished through the following steps:

> a.    First, the relevant parties organized 1Path Managed Services, LLC ("1Path Managed Services") in Delaware as a wholly owned subsidiary of Onepath Systems.
>
> b.    Second, Onepath Systems contributed substantially all its assets and liabilities to 1Path Managed Services pursuant to a *Contribution Agreement*.
>
> c.    Third, Onepath Systems transferred and assigned its membership interests in 1Path Managed Services to its manager and parent, Onepath Holding Corporation ("Onepath Holding Corp."), pursuant to a *Distribution of Membership Interests*.
>
> d.    Fourth, Onepath Holding Corp. transferred and assigned its membership interests in Onepath Systems to AMRR.

121.    As part of this supplemental transaction, 1Path Managed Services acquired all the assets and assumed all the liabilities of Onepath Systems, so 1Path Managed Services is therefore the successor-in-interest to Onepath Systems for purposes of determining liability for the claims alleged in this Complaint.

## V.    CAUSES OF ACTION

**COUNT 1:    Avoidance and Recovery of Actual Fraudulent Transfers as Trustee under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)(2)**

122.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated here.

123.    The Bankruptcy Code provides in relevant part as follows:

The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred

11 U.S.C. § 548(a)(1)(A).

> [T]o the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>
> (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

124.    The $44 Million Transfer originated from the Debtor's bank account, so it constituted a transfer of an interest of the Debtor in property.

125.    The $44 Million Transfer occurred within 2 years before the Petition Date.

126.    The Debtor made the $44 Million Transfer with actual intent to hinder, delay, or defraud present and/or future creditors because its CEO was actively engaged in a concerted effort to strip the Debtor of all its cash for the personal benefit of himself and others.

127.    Several badges of fraud were also present, including but not limited to:

a.    The transfer was to an insider because Frinzi controlled both the transferor and transferee.

b.    Before the transfer occurred, the Debtor had been sued by ARRIS Solutions, Inc. in Cause No. 2021CI24147 in the 166th Judicial District Court of Bexar County, Texas.

c.    The Debtor received no value or consideration whatsoever in exchange for the transfer.

d.    The Debtor was insolvent when the transfer was made and/or became insolvent as a result of the transfer.

e.    The transfer was concealed.

f.    Frinzi had to dispose of, and benefit from, the funds that the Debtor had accumulated by not paying its creditors before those creditors, including FedEx, would take action to seize and freeze those funds.

128.    AMRR was the initial transferee of the $44 Million Transfer.

129.    1Path Managed Services (as successor-in-interest to Onepath Systems) was a subsequent transferee of the $44 Million Transfer.

130.    Upon information and belief, one or more of the other Defendants were also subsequent transferees.

131.    Because the Defendants knew or should have known that the Debtor was not receiving any value for the transfers to them or for their benefit and that Frinzi was breaching his fiduciary duties to the Debtor, none of the Defendants took any related transfer in good faith and none of them provided any value to the Debtor for such transfers.

132.    Only $35,943,261.00 of the $41,209,647.70 went to BMO, so the remaining $5,266,386.70 is unaccounted for and plausibly could have been distributed to equity, whichever Defendant or Defendants that might be.

133.    The Trustee therefore seeks a money judgment against the Defendants, jointly and severally, for $41,209,647.70, or such lower amount with respect to each Defendant that such Defendant either received by way of transfer or by way of resulting benefit.

**COUNT 2:**      **Avoidance and Recovery of Constructive Fraudulent Transfers as Trustee under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)(2)**

134.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated here.

135.    The Bankruptcy Code provides in relevant part as follows:

The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

* * *

(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).

[T]o the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

136.    The $44 Million Transfer originated from the Debtor's bank account, so it constituted a transfer of an interest of the Debtor in property.

137.    The $44 Million Transfer occurred within 2 years before the Petition Date.

138.    The Debtor received nothing whatsoever in exchange for the $44 Million Transfer.

139.    The Debtor was insolvent when the $44 Million Transfer was made and/or became insolvent as a result of the $44 Million Transfer.

140.    The Debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital because it could not continue to service its FedEx contract with its remaining cash.

Case 22-31641-mvl7    Doc 560    Filed 05/24/24    Entered 05/24/24 19:48:17    Desc Main
Document    Page 26 of 39

141.    The Debtor intended to incur, or believed that it would incur, debts that would be beyond the Debtor's ability to pay as such debts matured because it continued to collect money from FedEx.

142.    The $44 Million Transfer was to or for the benefit of Frinzi, an insider.

143.    AMRR was the initial transferee of the $44 Million Transfer.

144.    1Path Managed Services (as successor-in-interest to Onepath Systems) was a subsequent transferee of the $44 Million Transfer.

145.    Upon information and belief, one or more of the other Defendants were also subsequent transferees.

146.    Only $35,943,261.00 of the $41,209,647.70 went to BMO, so the remaining $5,266,386.70 is unaccounted for and plausibly could have been distributed to equity, whichever Defendant or Defendants that might be.

147.    Because the Defendants knew or should have known that the Debtor was not receiving any value for the transfers to them or for their benefit and that Frinzi was breaching his fiduciary duties to the Debtor, none of the Defendants took any related transfer in good faith and none of them provided any value to the Debtor for such transfers.

148.    The Trustee therefore seeks a money judgment against the Defendants, jointly and severally, for $41,209,647.70, or such lower amount with respect to each Defendant that such Defendant either received by way of transfer or by way of resulting benefit.

**COUNT 3:    Avoidance and Recovery of Actual Fraudulent Transfers as Trustee under 11 U.S.C. §§ 544(b)(1) and 550(a)(2) and Tex. Bus. & Comm. Code § 24.005(a)(1)**

149.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated here.

150.    The Bankruptcy Code provides in relevant part as follows:

> [T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1).

> [T]o the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

> (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

151.     At the time of the $44 Million Transfer, the Debtor had one or more creditors with existing, non-contingent claims, and which claims are allowable under the Bankruptcy Code, including FedEx, ARRIS Solutions, Inc., and UMB Bank, N.A., as Indenture Trustee for more than $50 million of the Debtor's then-outstanding publicly traded bonds, as well as the individual beneficial holders of said bonds.

152.     The Texas Business and Commerce Code provides in relevant part as follows:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor

Tex. Bus. & Comm. Code § 24.005(a)(1).

153.     The $44 Million Transfer originated from the Debtor's bank account, so it was made by the Debtor.

154.    The Debtor made the $44 Million Transfer with actual intent to hinder, delay, or defraud present and/or future creditors because its CEO was actively engaged in a concerted effort to strip the Debtor of all its cash for the personal benefit of himself and others.

155.    Several badges of fraud were also present, including but not limited to:

   a.    The transfer was to an insider because Frinzi controlled both the transferor and transferee.

   b.    Before the transfer occurred, the Debtor had been sued by ARRIS Solutions, Inc. in Cause No. 2021CI24147 in the 166th Judicial District Court of Bexar County, Texas.

   c.    The Debtor received no value or consideration whatsoever in exchange for the transfer.

   d.    The Debtor was insolvent when the transfer was made and/or became insolvent as a result of the transfer.

   e.    The transfer was concealed.

   f.    Frinzi had to dispose of, and benefit from, the funds that the Debtor had accumulated by not paying its creditors before those creditors, including FedEx, would take action to seize and freeze those funds.

156.    AMRR was the initial transferee of the $44 Million Transfer.

157.    1Path Managed Services (as successor-in-interest to Onepath Systems) was a subsequent transferee of the $44 Million Transfer.

158.    Upon information and belief, one or more of the other Defendants were also subsequent transferees.

159.    Only $35,943,261.00 of the $41,209,647.70 went to BMO, so the remaining $5,266,386.70 is unaccounted for and plausibly could have been distributed to equity, whichever Defendant or Defendants that might be.

160.    Because the Defendants knew or should have known that the Debtor was not receiving any value for the transfers to them or for their benefit and that Frinzi was breaching his

fiduciary duties to the Debtor, none of the Defendants took any related transfer in good faith and none of them provided any value to the Debtor for such transfers.

161.    The Trustee therefore seeks a money judgment against the Defendants, jointly and severally, for $41,209,647.70, or such lower amount with respect to each Defendant that such Defendant either received by way of transfer or by way of resulting benefit.  The Trustee further seeks an award of his reasonable attorney's fees incurred herein.

**COUNT 4:**     **Avoidance and Recovery of Constructive Fraudulent Transfers as Trustee under 11 U.S.C. §§ 544(b)(1) and 550(a)(2) and Tex. Bus. & Comm. Code § 24.005(a)(2)**

162.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated here.

163.    The Bankruptcy Code provides in relevant part as follows:

[T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1).

[T]o the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

164.    At the time of the $44 Million Transfer, the Debtor had one or more creditors with existing, non-contingent claims, and which claims are allowable under the Bankruptcy Code, including FedEx, ARRIS Solutions, Inc., and UMB Bank, N.A., as Indenture Trustee for more

than $50 million of the Debtor's then-outstanding publicly traded bonds, as well as the individual

beneficial holders of said bonds.

165.    The Texas Business and Commerce Code provides in relevant part as follows:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

* * *

(2)  without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A)  was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;  or

(B)  intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Tex. Bus. & Comm. Code § 24.005(a)(2).

166.    The $44 Million Transfer originated from the Debtor's bank account, so it was

made by the Debtor.

167.    The Debtor received nothing whatsoever in exchange for the $44 Million Transfer.

168.    The Debtor was not paying its debts as they became due at the time of the $44

Million Transfer.

169.    The Debtor was engaged or was about to engage in a business or a transaction for

which the remaining assets of the debtor were unreasonably small in relation to the business or

transaction because it could not continue to service its FedEx contract with its remaining cash and

other assets.

170.    The  Debtor intended to incur, or believed or reasonably should have believed that

it would incur, debts beyond the Debtor's ability to pay as they became due because it continued

to collect money from FedEx.

171.     AMRR was the initial transferee of the $44 Million Transfer.

172.     1Path Managed Services (as successor-in-interest to Onepath Systems) was a subsequent transferee of the $44 Million Transfer.

173.     Upon information and belief, one or more of the other Defendants were also subsequent transferees.

174.     Only $35,943,261.00 of the $41,209,647.70 went to BMO, so the remaining $5,266,386.70 is unaccounted for and plausibly could have been distributed to equity, whichever Defendant or Defendants that might be.

175.     Because the Defendants knew or should have known that the Debtor was not receiving any value for the transfers to them or for their benefit and that Frinzi was breaching his fiduciary duties to the Debtor, none of the Defendants took any related transfer in good faith and none of them provided any value to the Debtor for such transfers.

176.     The Trustee therefore seeks a money judgment against the Defendants, jointly and severally, for $41,209,647.70, or such lower amount with respect to each Defendant that such Defendant either received by way of transfer or by way of resulting benefit.  The Trustee further seeks an award of his reasonable attorney's fees incurred herein.

**COUNT 5:**   **Avoidance and Recovery of Constructive Fraudulent Transfers as Trustee under 11 U.S.C. §§ 544(b)(1) and 550(a)(2) and Tex. Bus. & Comm. Code § 24.006(a)**

177.     The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated here.

178.     The Bankruptcy Code provides in relevant part as follows:

[T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1).

[T]o the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

179.    At the time of the $44 Million Transfer, the Debtor had one or more creditors with existing, non-contingent claims, and which claims are allowable under the Bankruptcy Code, including FedEx, ARRIS Solutions, Inc., and UMB Bank, N.A., as Indenture Trustee for more than $50 million of the Debtor's then-outstanding publicly traded bonds, as well as the individual beneficial holders of said bonds.

180.    The Texas Business and Commerce Code provides in relevant part as follows:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Tex. Bus. & Comm. Code § 24.006(a).

181.    The $44 Million Transfer originated from the Debtor's bank account, so it was made by the Debtor.

182.    The Debtor received nothing whatsoever in exchange for the $44 Million Transfer.

183.    The Debtor was insolvent when the $44 Million Transfer was made and/or became insolvent as a result of the $44 Million Transfer.

184.    AMRR was the initial transferee of the $44 Million Transfer.

185.    1Path Managed Services (as successor-in-interest to Onepath Systems) was a subsequent transferee of the $44 Million Transfer.

186.    Upon information and belief, one or more of the other Defendants were also subsequent transferees.

187.    Only $35,943,261.00 of the $41,209,647.70 went to BMO, so the remaining $5,266,386.70 is unaccounted for and plausibly could have been distributed to equity, whichever Defendant or Defendants that might be.

188.    Because the Defendants knew or should have known that the Debtor was not receiving any value for the transfers to them or for their benefit and that Frinzi was breaching his fiduciary duties to the Debtor, none of the Defendants took any related transfer in good faith and none of them provided any value to the Debtor for such transfers.

189.    The Trustee therefore seeks a money judgment against the Defendants, jointly and severally, for $41,209,647.70, or such lower amount with respect to each Defendant that such Defendant either received by way of transfer or by way of resulting benefit.  The Trustee further seeks an award of his reasonable attorney's fees incurred herein.

**COUNT 6:** **Avoidance and Recovery of Constructive Fraudulent Transfers as a Creditor under Tex. Bus. & Comm. Code § 24.005(a)(2)**

190.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated here.

191.    The Trustee brings this Count on behalf of the Debtor in its capacity as a creditor of AMRR, rather than as a trustee standing in the shoes of the Debtor's creditors.

192.    The Debtor was and is a creditor of AMRR at the time of the $44 Million Transfer and at the time of AMRR's transfers to the Defendants.

193.    The Texas Business and Commerce code provides in relevant part as follows:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

* * *

(2)  without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A)  was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;  or

(B)  intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Tex. Bus. & Comm. Code § 24.005(a)(2).

In an action for relief against a transfer or obligation under this chapter, a creditor, subject to the limitations in Section 24.009 of this code, may obtain:

(1)  avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim

Tex. Bus. & Comm. Code § 24.008(a)(1).

Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor under Section 24.008(a)(1) of this code, the creditor may recover judgment for the value of the asset transferred, as adjusted under Subsection (c) of this section, or the amount necessary to satisfy the creditor's claim, whichever is less.  The judgment may be entered against:

(1)  the first transferee of the asset or the person for whose benefit the transfer was made;  or

(2)  any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee.

Tex. Bus. & Comm. Code § 24.009(b).

194.    AMRR received less than reasonably equivalent value in exchange for the $41,209,647.70 purchase price because the OIS division was worth roughly half that much.

195.    AMRR was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction because AMRR had no other assets.

196.    AMRR intended to incur, or believed or reasonably should have believed that it would incur, debts beyond the debtor's ability to pay as they became due because it connection with the OIS transaction in became indebted to the Debtor for $44 million, which it had no realistic prospect to repay.

197.    AMRR was insolvent at the time of its transfers to the Defendants.  Among other things, its sole assets, being the acquired business, was not worth nearly as much as AMRR's debt to the Debtor and did not generate sufficient income for AMRR to service or to repay that debt.

198.    AMRR was not generally paying its debts as they became due, namely its debt to the Debtor, and was therefore presumed to be insolvent.

199.    1Path Managed Services (as successor-in-interest to Onepath Systems) was the first transferee of $41,209,647.70.

200.    The other Defendants were persons for whose benefit $35,943,261.00 of that amount was made because $35,943,261.00 went to pay down their senior lender BMO.

201.    One or more of the other Defendants may have been subsequent transferees of up the $5,266,386.70, which the Trustee seeks to investigate in discovery.

202.    Because the Defendants knew or should have known that AMRR was grossly overpaying for the acquisition and was not paying fair market value, including based on the Defendants' and Layer 7's misrepresentations and false financial information, none of the Defendants took any related transfer in good faith without knowledge of the avoidability of such transfer.

203.    The Trustee therefore seeks a money judgment against the Defendants, jointly and

severally, for $41,209,647.70, or such lower amount with respect to each Defendant that such

Defendant either received by way of transfer or by way of resulting benefit.  The Trustee further

seeks an award of his reasonable attorney's fees incurred herein.

**COUNT 7:**    **Avoidance and Recovery of Constructive Fraudulent Transfers as a Creditor under Tex. Bus. & Comm. Code § 24.006(a)**

204.    The Trustee hereby incorporates all factual allegations set forth above and below,

throughout this Complaint, as though fully stated here.

205.    The Trustee brings this Count on behalf of the Debtor in its capacity as a creditor

of AMRR, rather than as a trustee standing in the shoes of the Debtor's creditors.

206.    The Debtor was and is a creditor of AMRR at the time of the $44 Million Transfer

and at the time of AMRR's transfers to the Defendants.

207.    The Texas Business and Commerce code also provides in relevant part as follows:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Tex. Bus. & Comm. Code § 24.006(a).

In an action for relief against a transfer or obligation under this chapter, a creditor, subject to the limitations in Section 24.009 of this code, may obtain:

(1)  avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim

Tex. Bus. & Comm. Code § 24.008(a)(1).

Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor under Section 24.008(a)(1) of this code, the creditor may recover judgment for the value of the asset transferred, as adjusted under Subsection (c) of this section, or the amount necessary to satisfy the creditor's claim, whichever is less.  The judgment may be entered against:

(1)  the first transferee of the asset or the person for whose benefit the transfer was made;  or

(2)  any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee.

Tex. Bus. & Comm. Code § 24.009(b).

208.    AMRR received less than reasonably equivalent value in exchange for the $41,209,647.70 purchase price because the OIS division was worth roughly half that much.

209.    AMRR paid the $41,209,647.70 without receiving reasonably equivalent value because the OIS division was worth roughly half that amount.

210.    AMRR was insolvent at the time of its transfers to the Defendants.  Among other things, its sole assets, being the acquired business, was not worth nearly as much as AMRR's debt to the Debtor and did not generate sufficient income for AMRR to service or to repay that debt.

211.    AMRR was not generally paying its debts as they became due, namely its debt to the Debtor, and was therefore presumed to be insolvent.

212.    1Path Managed Services (as successor-in-interest to Onepath Systems) was the first transferee of $41,209,647.70.

213.    The other Defendants were persons for whose benefit $35,943,261.00 of that amount was made because $35,943,261.00 went to pay down their senior lender BMO.

214.    One or more of the other Defendants may have been subsequent transferees of up the $5,266,386.70, which the Trustee seeks to investigate in discovery.

215.    Because the Defendants knew or should have known that AMRR was grossly overpaying for the acquisition and was not paying fair market value, including based on the Defendants and Layer 7's misrepresentations and false financial information, none of the Defendants took any related transfer in good faith without knowledge of the avoidability of such transfer.

216.    The Trustee therefore seeks a money judgment against the Defendants, jointly and severally, for $41,209,647.70, or such lower amount with respect to each Defendant that such Defendant either received by way of transfer or by way of resulting benefit.  The Trustee further seeks an award of his reasonable attorney's fees incurred herein.

**COUNT 8:**    **Attorneys' Fees**

217.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated here.

218.    The Trustee may recover costs and attorneys' fees under Tex. Bus. & Comm. Code § 24.013.

## VI.    CHOICE OF LAW

219.    The Trustee has asserted various causes of action against the Defendants under the Texas Uniform Fraudulent Transfer Act ("TUFTA") because the Trustee seeks to recover the Debtor's funds, the Debtor is a Texas entity, and Frinzi was located in Texas through the series of events that led to the avoidable transfer(s).  In the event the Court determines that Georgia law applies because, for example, some of the Defendants, including Onepath Systems, are Georgia entities, and because MSouth is headquartered in Georgia, then the Trustee is entitled to recover Counts 3 – 9 under the applicable provisions of the Georgia Uniform Voidable Transactions Act (Georgia Code title 18, chapter 2, Article 4), which are substantially similar to TUFTA in all material respects.   The Trustee believes Texas has the most and strongest contacts to the dispute but is prepared to proceed under Georgia law as well.

## VII.    PRAYER

WHEREFORE, PREMISES CONSIDERED, the Trustee respectfully pray that the Defendants be summoned to answer this Complaint and that, following a trial on the merits, the Court award the Trustee:

A.      the avoidance under the Bankruptcy Code and TUFTA of the transfers discussed above;

B.      a money judgment jointly and severally against all the other Defendants for up to $41,209,647.70, or such amount as each Defendant received by way of transfer or benefit from such transfer;

C.      an award of prejudgment and postjudgment interest jointly and severally against all the Defendants;

D.      an award of attorneys' fees jointly and severally against all the Defendants; and

E.      such other and further relief to which the Trustee is entitled at law or in equity.

RESPECTFULLY SUBMITTED this 24th day of May, 2024.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
_____
Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
500 N. Akard Street, Ste. 4000
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Email: drukavina@munsch.com
Email: tberghman@munsch.com
Email: jvasek@munsch.com

**COUNSEL FOR SCOTT SEIDEL, TRUSTEE**