Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

ATTORNEYS FOR
SCOTT M. SEIDEL, TRUSTEE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 7 |
| GOODMAN NETWORKS, INC., | § § | Case No. 22-31641-mvl-7 |
| Debtor. | § § | |

**TRUSTEE'S EXPEDITED MOTION TO APPROVE RESCISSION TRANSACTION WITH AMRR REGARDING ONEPATH SYSTEMS, LLC**

TO THE HONORABLE MICHELLE V. LARSON, U.S. BANKRUPTCY JUDGE:

COMES NOW Scott M. Seidel (the "Trustee"), the duly appointed trustee for the estate (the "Estate") of Goodman Networks, Inc. (the "Debtor") in the above-styled bankruptcy case (the "Bankruptcy Case") and files this *Expedited Motion to Approve Rescission Transaction with AMRR Regarding OnePath Systems, LLC* (the "Motion"), respectfully stating as follows:

### I.    JURISDICTION AND VENUE

1. On September 6, 2022 (the "Petition Date"), various creditors of the Debtor filed an involuntary petition against the Debtor under Chapter 7 of the Bankruptcy Code, thereby initiating the Bankruptcy Case and creating the Estate.

2. The Court entered its order for relief against the Debtor on December 12, 2022. The Trustee was thereafter appointed as the Chapter 7 trustee of the Estate.

3. The Court has jurisdiction over this Motion under 28 U.S.C. § 1334. Said jurisdiction is core under 28 U.S.C. § 157(b)(2). Venue of the Bankruptcy Case before this Court is proper under 28 U.S.C. §§ 1408 and 1409.

## II. RELIEF REQUESTED

4. By this Motion, and pursuant to section 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, the Trustee seeks approval of that certain *Rescission Agreement and Mutual Release* (the "Rescission Agreement") between American Metals Recovery and Recycling, Inc., now known as MBG Holdings, Inc. ("AMRR") and Albers Aerospace Holdings, LLC ("Albers"), a true and correct copy of which is attached hereto as Exhibit "A". Pursuant to the Rescission Agreement, AMRR and Albers rescind their *Membership Interest Purchase Agreement* dated December 22, 2023 (the "MIPA") and restructure their transaction into an asset purchase instead. Critically for the Trustee, the Rescission Agreement does not change the economics for the Estate and in fact improves those economics, which should, in addition to amounts previously paid to the Estate by Albers, immediately pay $272,444 to the Estate and very likely an additional $800,000 in late September or early October, 2024. However, because the Rescission Agreement changes the underlying transaction from what the Court previously approved, the Trustee believes, both out of an abundance of caution and to provide full transparency, that this Court should approve the Rescission Agreement and authorize him to effectuate the same.

## III. BACKGROUND

**A. BACKGROUND OF AMRR**

5. In January, 2022, James Frinzi ("Frinzi") was the chief executive officer of the Debtor. AMRR was a publicly traded company. In December, 2021, and using funds transferred from the Debtor, Frinzi caused a company that he owns, Multiband Global Resources, LLC

("MGR") to acquire the majority shares of stock of AMRR, and Frinzi became a director and the chief executive officer of AMRR.

6. In January, 2022, Frinzi caused $44 million of the Debtor's funds to be transferred to AMRR. After the Debtor transferred the $44 million to AMRR, AMRR used approximately $38 million of those funds to purchase an existing business, including OnePath Systems, LLC ("OnePath").

7. OnePath had several business lines and units, one of which (the "Fiber Business") AMRR previously sold and provided certain consideration to the Trustee, as approved by separate and prior order of the Court. A different business line (the Job Corp business) was closed by AMRR due to a lack of funds. A third business line, housed within OnePath, is referred to as the "Lockheed Martin" business, which is the subject of this Motion, and consisted of AMRR and OnePath providing certain "secret" or "top secret" services to Lockheed Martin in connection with government and military contracts.

8. On January 21, 2022, AMRR signed that certain *Secured Promissory Note* payable to a wholly owned subsidiary of the Debtor, GNET ATC, LLC ("GNET"), which is not presently a debtor in any bankruptcy case (the "AMRR Note"). Also on January 21, 2022, AMRR executed that certain *Security Agreement*, granting GNET security interests in various of its assets. GNET perfected its security interests in September, 2022 by filing the appropriate U.C.C. financing statement. However, while GNET holds perfected security interests against AMRR's assets, it does not have a contractual security agreement with respect to any assets of AMRR's subsidiaries, including OnePath. This represents a problem for the Trustee, because he has been unable to simply foreclose against AMRR's business assets since the subsidiaries are not parties to any promissory note or security agreement. However, the Trustee asserts constructive and resulting

trust claims and interests against all assets of AMRR's subsidiaries, since the funds used to purchase those assets originated with the Debtor through fraudulent transfers and breaches by Frinzi of his fiduciary duties.

9. The Trustee is aware of claims and allegations that the AMRR Note is a fraudulent document and that it was allegedly not signed by James Goodman, his signature instead being allegedly forged by Frinzi. It is not necessary for the Court to adjudicate the legitimacy of the AMRR Note at this time in order to consider this Motion. Suffice it to say that the Debtor and the Estate hold claims and causes of action against AMRR (and others) of more than $44 million as of the Petition Date[1] related to the transactions discussed above, whether in the nature of breach of contract or fraudulent transfer, as well as other torts (including as being the recipient of Frinzi's breaches of fiduciary duty owed to the Debtor).

10. It is the Trustee's position that GNET is not the proper payee under the AMRR Note and that its inclusion as the payee was a mistake by Frinzi. Among other things, all of the $44 million were transferred from the Debtor's account and not any account of GNET; Frinzi's subsequent communications and contracts reference that the Debtor was the holder of the AMRR Note; and there is no contract or agreement between the Debtor and GNET concerning the transfer or transaction. Even if GNET is a proper payee under the AMRR Note, this does not matter because the Estate holds its own claims and causes of action against AMRR and any subsequent transferee, including AMRR's subsidiaries.

11. UMB Bank, N.A., as indenture trustee, and U.S. Bank, N.A., as collateral agent, asserted perfected security interests against the Debtor and the Estate, for the benefit of various secured bondholders (the "Bondholders") related to the Debtor's issuance of secured bonds which

---

[1] This amount has been reduced by $4,516,500.00 as a result of the prior sale by AMRR of its Fiber Business and the assumption of said amount of debt by the buyer of that business, and well as prior payments by Albers.

became due in 2022 and on which the Debtor defaulted. As such, the bondholders asserted security interests against the AMRR Note and its proceeds. Likewise, FedEx Supply Chain Logistics and Electronics, Inc. ("FedEx") asserted various equitable and other rights against the funds Frinzi transferred out of the Debtor to AMRR, and therefore to the proceeds of the same, including OnePath and any consideration from Albers.

12. All of these disputed interests were resolved through a multi-party, comprehensive settlement agreement approved by the Court on March 29, 2024, in its *Order Approving Multi-Party Settlement Regarding Property of the Estate* [docket no. 526] (the "Global 9019 Order"). As part of the Global 9019 Order, the parties thereto agreed, and the Court ordered, that all proceeds from the liquidation of the AMRR payable to the Debtor, including all payments made by Albers, would be shared one-third each as between the Estate, FedEx, and the Bondholders. Thus, and unlike with respect to prior motions involving the liquidation of AMRR, there is no need at this time to segregate and hold any consideration being paid to the Estate by AMRR or Albers.

B. **THE MIPA AND CONSIDERATION FROM ALBERS TO THE ESTATE**

13. Almost immediately after his appointment, the Trustee initiated negotiations with AMRR, still controlled by Frinzi, with the goal of AMRR repaying as much of its debt to the Estate as was realistically possible. The Trustee's ongoing investigation strongly suggests that, in a litigation or foreclosure scenario, AMRR does not have any meaningful assets that the Trustee could collect from, its only real assets being its various business lines and unliquidated causes of action. These business lines, in turn, have not enabled AMRR to derive sufficient income to repay the AMRR Note or the debt that AMRR owes to the Estate. Thus, the Trustee's strategy with respect to AMRR has been to not force a liquidation or litigation, but instead for AMRR to sell its business units and to pay any sale proceeds to the Trustee.

14. In July, 2023, and upon the insistence of the Trustee (as a condition of continuing negotiations), Frinzi resigned as a director and officer of AMRR. AMRR retained a chief restructuring officer, Joseph Baum of CFGI Partners (AMRR had earlier retained Sierra to provide financial advice and CRO services to it). Mr. Baum has retained restructuring counsel to assist with his duties. Mr. Baum is a true, independent CRO of AMRR and the Trustee is satisfied that he has control over the business, books and records, and funds of AMRR. In other words, the Trustee is satisfied that Frinzi is out and that Mr. Baum is making independent, fiduciary decisions for AMRR.

15. Accordingly, Mr. Baum commenced the process of AMRR selling its assets in order to pay the Trustee and AMRR's vendors. One of these transactions concerned the MIPA. Namely, AMRR sold its Lockheed Martin government contract business (the "Business") to Albers in the form of a purchase of AMRR's members interests in its subsidiary, OnePath, pursuant to the MIPA. Under the MIPA, Albers agreed to pay the following to AMRR, which AMRR assigned in full to the Estate:

    (a)    $2,200,000.00 in cash at closing;

    (b)    $400,000.00 is paid through an unsecured promissory note payable by May 31, 2024 at 6% interest;

    (c)    $800,000.00 is paid (via a Contract Holdback) if the Business' contract with Lockheed Martin is extended through at least September 30, 2025;

    (d)    $163,000.00 is paid (via a Indemnification Holdback) six (6) months after closing, assuming no indemnification claims;

    (e)    and the potential of an additional sum by way of a contractual Earnout.

16. As part of that initial transaction, on November 30, 2023 the Trustee filed a motion with this Court for authority to participate in the overall transaction, including the approval of a

*Limited Settlement Agreement* between the Trustee and AMRR attached to that motion, which agreement specified the credit that AMRR would receive for its payments to the Estate on account of the sale of the Business.

17. On December 7, 2023, the Court entered its *Order Granting Trustee's Expedited Motion to Approve Transaction with AMRR Regarding OnePath Systems, LLC* [docket no. 462] (the "Approval Order"). Pursuant to the Approval Order, the Court authorized the Trustee to enter into the limited settlement agreement with AMRR, the Court approved the overall transaction and authorized the Trustee to enter into it and otherwise to facilitate it, and the Court ordered that all payments under the MIPA be assigned and paid over to the Estate (subject, at that time, to all rights of the Bondholders and FedEx against the same).

18. Albers and AMRR thereafter paid the $2,200,000.00 up-front cash to the Trustee (which the Trustee subsequently paid out to the Bondholders and to FedEx pursuant to the Global 9019 Order). Albers also paid the Estate the $400,000.00 promissory note assigned from AMRR to the Estate in full, with interest, in June, 2024. However, a dispute arose between AMRR and Albers regarding the Indemnification Holdback in the MIPA, as Albers asserted a claim against this amount. A dispute also arose regarding the Earnout, specifically whether any funds were payable thereunder. And, with respect to the $800,000.00 Contract Holdback, the underlying contract has yet to be renewed in order to earn these funds.

C. THE RESCISSION AGREEMENT

19. The Trustee is not a party to the Rescission Agreement. He did not negotiate it and he does not know of all of the reasons why the underlying parties agreed to it. He did, however, insist that any agreement between AMRR and Albers be subject to approval of this Court, and he further insisted on all consideration being paid by Albers to AMRR being paid directly to the

Estate. That being said, as the Trustee understands it, Albers approached AMRR and sought to rescind its purchase of the equity of OnePath, instead retaining the assets and business opportunities of OnePath, due both to unexpected alleged expenses and claims and to facilitate the renewal and extension of the underlying contract on which the Business depends. As the Trustee further understands it, it was because AMRR was willing to enter into the Rescission Agreement that Albers is agreeable to resolving and promptly paying the Indemnification Holdback and the Earnout, in the amounts of $163,000 and $109,044 respectively.

20. With respect to the $800,000.00 Contract Holdback, the Rescission Agreement requires, as a condition of payment, that the underlying AT&T contract (the exact details of how this contract relates to Lockheed Martin are not known and are asserted to be top secret, and neither that contract nor the details thereof have been shared with the Trustee) be renewed for calendar year 2025. This is not a change from the original MIPA, which likewise conditioned payment of the $800,000.00 on the contract being extended. Thus, the Rescission Agreement does not change the economics of the original transaction from the Trustee's perspective.

21. The Trustee has been informed and believes that it is likely that the underlying contract will be extended by the end of September, 2024. If so, then under the Rescission Agreement Albers will pay the $800,000.00 to the Estate no later than fourteen (14) days after such renewal and extension. Therefore, the total consideration under the Rescission Agreement to be paid to the Estate should be $1,072,444.00 which, pursuant to the Global 9019 Order, would be split in thirds with the Bondholders and FedEx.

## IV.  DISCUSSION

22. As this Court has previously held with respect to the Trustee's prior limited settlement with AMRR concerning its sale of its Fiber Business, Bankruptcy Rule 9019 controls

the present Motion. Under that Rule, the Court should approve a settlement only if it is "fair and equitable and in the best interests of the estate." *In re Foster Morgtage Corp.*, 68 F.3d 914, 917 (5th Cir. 1995). The factors to consider include "(1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) all other factors bearing on the wisdom of the compromise." *Id*. Such other factors include the reasonable views of creditors, although such views are not binding, and "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Id*. at 918. *See also Official Comm. Of Unsecured Creditors v. Cajun Elec. Power Coop. Inc. (In re Cajun Elec. Power Coop. Inc.)*, 119 F.3d 349, 356 (5th Cir. 1997); *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 559, 602 (5th Cir. 1960). The Court need not conduct a mini-trial on the underlying claims; rather, the Court "must apprise itself of the relevant facts and law so that it can make an informed and intelligent decision." *In re Age Ref. Inc.*, 801 F.3d 530, 541 (5th Cir. 2015) (internal quotation omitted).

23.     Here, the Trustee has proposed to accept and to facilitate the Rescission Agreement as an exercise of his reasonable and sound business judgment and as being in the best interests of the Estate. The Court already entered the Approval Order and it has already approved the underlying transaction and consideration by which Albers purchased the Business. The negotiations and agreements between AMRR and Albers are of no interest to the Estate, except with respect to consideration that AMRR, and therefore the Estate, will receive. However, insofar as the Estate held first priority rights against the MIPA, which is now being rescinded, the Estate's rights and interests are involved. For this reason, for maximum transparency, and out of an abundance of caution, the Trustee believes it proper for this Court to consider approving the

Rescission Agreement as a settlement and compromise of the Estate's rights, including as this pertains to the Estate being paid disputed compensation under the original MIPA.

24. Here, the consideration being paid to the Estate has not changed from what was previously negotiated and approved. If anything, under the Rescission Agreement that consideration is far more likely to be paid: the $163,000.00 Indemnification Holdback is paid in full without the risks, costs, and delays of litigation; the $109.444.00 Earnout (post-closing purchase price adjustment) is likewise paid without the risks, costs, and delays of litigation; and, as the Trustee understands it, the renewal of the underlying Lockheed Martin contract is made more likely under the Rescission Agreement, meaning also that the $800,000 payment to the Estate becomes more likely.

25. As the Trustee has previously informed the Court, his role with respect to AMRR is that of a creditor. He does not manage AMRR and cannot sell AMRR's property. What he can do, therefore, is to respond to proposals and transactions that AMRR brings to him. That is what AMRR has done, and the Trustee believes that the result and promised consideration is worth it and is in the Estate's best interests.

## V.    **PRAYER**

WHEREFORE, PREMISES CONSIDERED, the Trustee respectfully requests that the Court enter an order: (i) granting this Motion; (ii) approving the Rescission Agreement and authorizing the Trustee to facilitate the same and accept all consideration under the same; and (iii) granting the Trustee such other and further relief as may be appropriate.

RESPECTFULLY SUBMITTED this 18th day of September, 2024.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75201
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

**ATTORNEYS FOR SCOTT M. SEIDEL, TRUSTEE**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 18th day of September, 2024, true and correct copies of this document, with the exhibit, were served by the Court's ECF system on parties entitled to notice thereof and that, additionally, on the same day he caused a true and correct copy of this document, without the exhibit, to be served by U.S. first class mail, postage prepaid, on the parties listed on the attached service list.

By: /s/ Davor Rukavina
Davor Rukavina