Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

GENERAL COUNSEL FOR
SCOTT M. SEIDEL, TRUSTEE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | Case No. 22-31641-mvl-7 |
| Debtor. | § | |

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| MULTIBAND FIELD SERVICES, INC., | § | |
| | § | Case No. 25-30515-mvl-11 |
| Debtor. | § | |

**JOINT MOTION UNDER BANKRUPTCY RULE 9019
FOR APPROVAL OF FINAL COMPROMISE AND SETTLEMENT WITH
THE GOODMAN BROTHERS**

TO THE HONORABLE MICHELLE V. LARSON, U.S. BANKRUPTCY JUDGE:

COME NOW Scott M. Seidel (the "Trustee"), the duly appointed chapter 7 trustee of the bankruptcy estate of Goodman Networks, Inc. (the "Goodman Debtor"), the debtor in Bankruptcy Case No. 22-31641-mvl-7 (the "Goodman Case"), and Multiband Field Services, Inc. ("MFS"), the debtor-in-possession in Bankruptcy Case No. 25-30515-mvl-11 (the "MFS Case"), and jointly file this *Motion Under Bankruptcy Rule 9019 for Approval of Final Compromise and Settlement With the Goodman Brothers* (the "Motion"), respectfully stating as follows:

## I.     RELIEF REQUESTED

1.     By this Motion, and pursuant to Bankruptcy Rule 9019, the Trustee and MFS request that the Court approve the *Mutual Settlement and Release Agreement* (the "Agreement") and the settlement evidenced thereby (the "Proposed Settlement"), a copy of which is attached hereto as Exhibit "A,"[1] between the Trustee, including the Debtor's wholly-owned subsidiary GNET ATC, LLC ("GNET"), and MFS, on the one hand, and James E. Goodman, Jason Goodman, and Joseph Goodman (collectively, the "Goodman Brothers"), on the other hand. The Proposed Settlement would fully and finally resolve all claims and litigation against the Goodman Brothers, in exchange for a payment of $7,100,000.00 (the "Settlement Payment") from the Debtor's D&O insurers (in addition to all other amounts previously paid by the same). The Proposed Settlement must be approved in both the Goodman Case and the MFS Case. However, any allocation of the Settlement Payment between the Goodman Estate and the MFS Estate would be subject to separate motion and order and would not affect the allowance or finality of the Proposed Settlement, if otherwise approved pursuant to this Motion.

## II.     PROCEDURAL BACKGROUND

2.     On September 6, 2022, various creditors of the Goodman Debtor filed an involuntary petition against the Goodman Debtor under Chapter 7 of the Bankruptcy Code, thereby initiating the Goodman Case and creating the Goodman Debtor estate (the "Goodman Estate"). The Court entered its order for relief against the Goodman Debtor on December 12, 2022. The Trustee was thereafter appointed as the Chapter 7 trustee of the Estate.

3.     On February 11, 2025, MFS, under the control of the Trustee as the owner of 100% of the equity of MFS through the Goodman Estate, filed its voluntary petition for relief under

---

[1] The Agreement contains as an exhibit thereto the proposed order on this Motion.

Chapter 11 of the Bankruptcy Code, thereby initiating the MFS Case and creating its bankruptcy estate (the "MFS Estate"). MFS remains a debtor-in-possession in the MFS Case, and no trustee or examiner has been appointed.

4. The Court has jurisdiction over this Motion under 28 U.S.C. § 1334. Said jurisdiction is core under 28 U.S.C. § 157(b)(2). Venue of the Bankruptcy Case before this Court is proper under 28 U.S.C. §§ 1408 and 1409.

### III. FACTUAL BACKGROUND

5. Prior to the Petition Date, the Goodman Brothers were directors of the Goodman Debtor. As such, they were also directors of MFS, MFS being a wholly owned subsidiary of the Goodman Debtor.

6. At all times material hereto, GNET was and remains wholly owned by the Goodman Debtor. GNET is not a debtor in any bankruptcy proceeding. Since the Petition Date, the Trustee has effectively controlled GNET as the sole shareholder. Prior to the Petition Date, the Goodman Brothers were also directors of GNET.

7. The Goodman Debtor maintained various insurance policies for itself, GNET, and MFS. As relevant to the Proposed Settlement is a tower of coverage that in total provides for $25 million in directors and officers insurance coverage, with additional coverage for crime and theft (the "Tower").

8. This Tower has five layers, each having a limit of $5 million in D&O coverage, as follows: (1) ForeFront Portfolio Policy No. 8259-6686 (the "Primary ABC Policy") issued to Debtor by Federal Insurance Company ("Federal"), which has a $5M Aggregate Limit of Liability under its Directors & Officers and Entity Liability Coverage Part, (2) excess D&O Policy No. 100039151 issued to the Debtor by QBE Specialty Insurance Company ("QBE") for $5M in excess of $5M, (3) excess D&O Policy No. 652241819 issued to the Debtor by Continental Casualty

Company ("CNA") for $5M in excess of $10M, (4) excess D&O Policy No. LHY H300594 00 issued to the Debtor by Hanover Insurance Company ("Hanover") for $5M in excess of $15M, and (5) CODA Premier Directors and Officers Liability Excess DIC Policy No. G46647233 004 ("Side-A DIC Policy") issued to the Debtor by Westchester Fire Insurance Company ("Westchester").

9.      This Tower of coverage is a depleting or "wasting" policy, meaning that defense costs advanced by the insurers to defend directors and officers erode the indemnity coverage of $5 million in each layer of the tower.

10.      The Trustee has asserted a number of causes of action and has filed a number of adversary proceedings against the Goodman Brothers and various of their relatives and affiliates. Most of these claims and causes of action have been previously released.

11.      Specifically, on May 22, 2025, the Court entered its *Order Approving Trustee's Compromise and Settlement with Goodman Family Members and Affiliates* [docket no. 735] (the "Prior Settlement Order") in the Goodman Case.  By the Prior Settlement Order, the Court approved a comprehensive, yet limited, settlement with the Goodman Brothers and their family members and affiliates (the "Prior Settlement").  The Prior Settlement closed, and $4,550,000.00 was paid to the Trustee for the Goodman Estate (none of which was allocated to MFS, MFS not being a party to the Prior Settlement).

12.      Importantly for purposes of this Motion, $2,200,000.00 of the Prior Settlement was paid by Federal under the Primary ABC Policy.  As confirmed in the Prior Settlement Order, this payment, as well as prior payments under the Primary ABC Policy and advanced defense costs, exhausted the Primary ABC Policy.  The point is that $5 million of the Tower has been exhausted and is no longer available for a recovery.

13.  Thereafter, $20 million of D&O coverage was left under the Tower.  This made QBE the next in line under the Tower, with CNA coming in after QBE, each with coverage of $5 million, subject to wasting.

14.  The Prior Settlement released all claims and causes of action against the Goodman Brothers, their family members, and their affiliates, except those asserted by the Trustee in Adversary Proceeding No. 24-03039 pending before the Court (the "D&O Adversary").  In the D&O Adversary, the Trustee sued the Goodman Brothers for breaches of fiduciary duty related to approximately $44 million of funds of the Goodman Debtor which James Frinzi ("Frinzi"), the Goodman Debtor's former CEO, caused to be transferred to American Metals Recovery and Recycling, Inc. n/k/a MBG Holdings, Inc. ("AMRR"), and the Trustee has objected to proofs of claim filed by J. E. Goodman.  GNET and MFS were not and are not plaintiffs in the D&O Adversary.

15.  The Court has ordered that the causes of action for breach of fiduciary duty be arbitrated before the American Arbitration Association, which arbitration is now pending in AAA Case Number 01-25-0000-4679 (the "Arbitration").  A hearing in the Arbitration is set for December 2025.  Extensive discovery, including depositions, as well as expert analysis and preparation, has been undertaken by the parties in the Arbitration.  The Arbitration has been paused pending the Proposed Settlement but, should the Proposed Settlement not be approved or should it not become effective, the Trustee estimates that the Arbitration can be completed in approximately four (4) more months after it is reinstated.

16.  Commencing in July 2025, the Trustee and the Goodman Brothers engaged in extensive mediation for the purpose of seeking a global resolution of all remaining claims, including the D&O Adversary and the Arbitration.  The Court approved said mediation by its *Order Approving Trustee's Motion for Order Approving Mediation and Authorizing Payment of*

*Mediation Costs* [docket no. 758]. To that end, they retained JAMS, Inc., which assigned insurance specialists as joint mediators: Jed Melnick, Orna Artal, and Reginald Greene. Importantly, QBE and CNA participated in the mediation, while other carriers were also aware of it and had some level of participation.

17. An all-day, in-person mediation was held. Progress continued for weeks, and then months, with weekly (if not more frequent) communications and negotiations, with the mediators taking an exceptionally active (albeit neutral) role. Progress was slow, but it was progress nonetheless. The issues were numerous and complex. Obviously, there was the question of the Goodman Brothers' liability, which they vehemently denied. Past that were coverage issues: coverage not only regarding the asserted liability, but various asserted exclusions and inter-carrier disputes regarding whether any given carrier's liability had been triggered and regarding whether Federal's top layer of the Policy had been properly exhausted. The Trustee asserted that he had properly "Stowerized" the Goodman Brothers and the carriers, but that too was disputed. Also relevant was the large RICO lawsuit filed by FedEx against the Goodman Brothers and others, which the Goodman Brothers assert needs to be at least defended by the carriers and potentially indemnified, meaning that they insisted that some of the Tower remain for these purposes after any settlement with the Trustee. Insofar as the Goodman Brothers need to approve any settlement, as the counterparties thereto, their insistence that some coverage remain for defense and potentially indemnity meant that not all of the remaining Tower would be available for the Trustee. This is something that the Trustee could do nothing about, since the Court is not able to force the Goodman Brothers to settle.

18. Ultimately, in September 2025, with the mediators' active involvement, a settlement was reached under which QBE and CNA pay the Settlement Payment in exchange for a full and final release of the Goodman Brothers and their own potential liabilities and obligations.

As the Trustee understands it, QBE will pay $4,500,000.00 of the Settlement Payment, and CNA $2,600,000.00. If either payment is not made, then the Proposed Settlement will not become effective. Thus, there is no risk of non-payment to the Goodman Estate or to the MFS Estate.

19. Most of the $44 million transferred by Frinzi originated from the Goodman Debtor and its accounts.[2] Accordingly, the Trustee asserts that GNET should receive none of the Settlement Payment, since its funds were not used for the overwhelming majority of the transfers. GNET receives return consideration from the Proposed Settlement because its joint liabilities to the Goodman Debtor's main creditors, including the Bondholders and FedEx, will be reduced dollar-for-dollar. However, because MFS is in its own Chapter 11 bankruptcy case, the Court would have to approve any allocation of the Settlement Payment as between the Goodman Estate and the MFS Estate, since the Goodman Brothers and the carriers are requiring releases from MFS as well as from the Debtor and GNET. Any such allocation will be addressed through separate motion filed or to be filed by the Trustee and MFS and would not prejudice or prevent the Proposed Settlement from becoming effective, with the Trustee holding all relevant funds in trust pending any such allocation (but subject to professional claims regarding the litigation).

20. Other than the claims and causes of action asserted by the Trustee in the D&O Adversary and the Arbitration, the Trustee is not aware of any other remaining claims or causes of action that the Goodman Debtor, GNET, or MFS have against the Goodman Brothers, the carriers, or any affiliates thereof released under the Proposed Settlement, and none were scheduled by the Goodman Debtor. As noted above, all such other claims and causes of action were resolved and released as part of the Prior Settlement.

---

[2] About $1.4 million of the funds transferred by Frinzi originated in an East West Bank Account owned by GNET ATC, LLC,

21. Finally, the Trustee believes that Federal may be liable to the Estate not under the D&O coverage parts of the Tower (the Primary ABC Policy) but under theTtower's separate crime and theft coverage part (a separate $5 million of coverage) and also under a subsequent insurance policy providing for a separate $5 million coverage part for crime and theft.[3] The Trustee has sued Federal in Adversary Proceeding No. 23-03036 to recover the $5 million in theft coverage under that subsequent policy. No such claims are released as part of the Proposed Settlement, and the Trustee retains all such claims.

## IV. <u>PROPOSED SETTLEMENT</u>

22. Parties are cautioned to review the Agreement in detail, as it contains the precise terms and provisions of the Proposed Settlement. Nevertheless, the following is a summary of the key provisions of the Agreement:

(i) The Settlement Payment is $7,100,000.00, paid by QBE and CNA. If the Settlement Payment is not timely made in full, then there is no settlement and there are no releases.

(ii) The Goodman Brothers, their relatives, affiliates, agents, etc., and QBE and CNA, receive full and comprehensive releases from the Goodman Debtor, the Goodman Estate, the Trustee, GNET, and MFS and its MFS Estate. The D&O Adversary and the Arbitration are dismissed with prejudice.

(iii) Each of the Goodman Brothers fully and finally releases the Goodman Debtor, the Goodman Estate, the Trustee, GNET, and MFS and its estate, including from any proofs of claim that they may have filed.

(iv) The Trustee's claims under the separate Federal crime and theft policy are preserved and are not released, including as pled and pending in Adversary Proceeding No. 23-03036 (and, for the avoidance of doubt, none of the Trustee's claims and causes of action against the "Hudson" and "Auerbach" defendants, including as pled and pending in Adversary Proceeding No. 23-03090, are released or prejudiced).

---

[3] That subsequent policy also contained D&O coverage of $5 million, which was exhausted when Federal paid that amount to the Trustee as part of his prior settlement with Frinzi.

(v)     The parties remain liable for arbitration and mediation fees and expenses as otherwise and previously agreed.

(vi)     The Goodman Brothers agree to cooperate and to accept service with respect to the Trustee's other pending lawsuits against third parties.

(vii)     The Agreement is subject to the Court's approval.

## V.     <u>DISCUSSION</u>

23.     Bankruptcy Rule 9019 provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." FED. R. BANKR. P. 9019(a). Under that Rule, the Court should approve a settlement only if it is "fair and equitable and in the best interests of the estate." *In re Foster Mortgage Corp.*, 68 F.3d 914, 917 (5th Cir. 1995). The factors to consider include "(1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) all other factors bearing on the wisdom of the compromise." *Id*. Such other factors include the reasonable views of creditors, although such views are not binding, and "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Id*. at 918. *See also Official Comm. Of Unsecured Creditors v. Cajun Elec. Power Coop. Inc. (In re Cajun Elec. Power Coop. Inc.)*, 119 F.3d 349, 356 (5th Cir. 1997); *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 559, 602 (5th Cir. 1960).

24.     The Court need not conduct a mini-trial on the underlying claims; rather, the Court "must apprise itself of the relevant facts and law so that it can make an informed and intelligent decision." *In re Age Ref. Inc.*, 801 F.3d 530, 541 (5th Cir. 2015) (internal quotation omitted). The settlement need not result in the best possible outcome for the Estate, but it must not "fall beneath the lowest point in the range of reasonableness." *Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991). Finally,

the Trustee is entitled to employ his reasonable business judgment in proposing a settlement, and

that judgment is entitled to reasonable deference from the Court where, as here, the proposed

settlement is not between insiders:

> The Trustee's decision to settle must represent the interests of the bankruptcy estate and its creditors and is reviewed under the 'business judgment rule.' Under the business judgment rule, the challenging party must establish that the course of action chosen by the fiduciary was outside the parameters of what a rational and reasonably informed businessperson might select. The business judgment rule creates a presumption in favor of the fiduciary.

*In re Woodberry*, 629 B.R. 239, 243 (Bankr. E.D. Mich. 2021) (internal quotations omitted).

25. Here, the Trustee believes that the Proposed Settlement is fair, equitable, and in the

Estate's best interests, for at least the following reasons:

- The primary factor motivating the Trustee's business decision is collectability. The Trustee believes that he will obtain a very large judgment at the Arbitration, despite the Goodman Brothers' defenses and affirmative defenses, but collecting that judgment is a different matter. Nevertheless, to take the Arbitration through a ruling, then obtaining a judgment confirming that ruling, and then defending that judgment on appeal, would take many hundreds of thousands of dollars more in discovery, expert, trial, and appellate fees and expenses, and there is risk that the arbitrators will disagree with the Trustee and find for the defendants to one degree or another. And, the process will likely take at least one year, if not longer.

- The Trustee's review of the Goodman Brothers' personal finances suggests that they will not have the assets to satisfy a large judgment. Much of their property is exempted or is already encumbered, while their businesses appear to be suffering and are heavily indebted. Any collection activities, to the extent of assets, would take additional substantial fees and expenses, involve significant delays, and involve significant risks.

- This leaves the remaining carriers on the Tower. With Federal exhausted, this leaves $20 million. However, one or more of the Goodman Brothers have informed the Trustee that they will not agree to a settlement that does not leave at least $5 million from the Tower available to defend the FedEx lawsuit. In practice, therefore, this leaves $15 million available.

- The carriers have asserted substantial defenses to coverage, meaning that extensive coverage litigation would be required even after a successful judgment at the Arbitration. This litigation itself would take years, cost millions of dollars, and entail significant risks, including at the Fifth Circuit.

- The main issue regarding coverage concerns the policy period. The policy period under the Tower is asserted to have expired on October 31, 2021. Yet many of the actual transfers orchestrated by Frinzi occurred after this date. The Trustee maintains that the dates of the transfers themselves do not control, since the breaches of fiduciary duty that enabled those transfers to occur were committed during the policy period. If a jury or court disagrees with the Trustee, then the carriers would not be required to pay anything.

- A subsidiary issue raised by CNA is its assertion that Federal did not properly exhaust the first layer of coverage, even though this Court entered an order (the Prior Settlement Order) that found otherwise. According to CNA, its obligations are not even triggered because of this argument. While the Trustee is confident that CNA is wrong, this is another legal hurdle to coverage.

- The Tower contains wasting policies, meaning that, as litigation fees and expenses continue to grow—including because the Goodman Brothers have two sets of counsel—the available coverage will decrease. Thus, not only will the Trustee's own fees and expenses continue to increase, thus effectively eroding a net recovery, but the policies will also continue to erode, meaning that the point of maximum return is considerably less than the face amount left on the Tower.

- The Trustee's claims for first-party coverage under the subsequent $5 million Federal policy remain.

- There is significant benefit to creditors in the Trustee being able to move the Goodman Estate, and MFS its estate, to a final resolution, from a timing perspective and a net benefit perspective. Although other litigation after the Arbitration will remain, much of the Trustee's litigation has already been resolved, meaning that the estates are much closer to being fully administered.

- $7.1 million is objectively within the range of reason and, even on a net basis, will provide a material recovery to creditors. If litigation continues, it can easily be the case that the QBE layer of coverage will be depleted for defense costs which, when considering the Goodman Brothers' demand that some coverage remain for the FedEx lawsuit, the current maximum of $20 million may well deplete to $10 million, which is not materially more than the present $7.1 million settlement when all other risk and expense factors are considered.

- The Agreement is the direct result of extensive, multi-month mediation conducted by exceptionally competent, subject-matter (coverage) mediators. It is the product of extensive and contentious arm's length bargaining. There are no undisclosed agreements.

26. In the end, $7.1 million now, without the risk, cost, and extensive delays of multiple sets of litigation—Arbitration, confirmation, appeals, coverage, and coverage appeals—is in the

Estate's best interests and represents the most reasonable and prompt method for the Estate to recover on its claims and from the carriers. This would mean that, to-date, the Trustee will have recovered $14,350,000.00 from insurance, with at least $5 million remaining (under the subsequent policy) that the Trustee is actively pursuing. For this and all other reasons, the Proposed Settlement is in the best interests of both the Goodman Estate and the MFS Estate, while any inter-estate dispute regarding allocation need not be resolved in order to properly consider this Motion.

## VI.    PRAYER

WHEREFORE, PREMISES CONSIDERED, the Trustee respectfully requests that the Court: (i) grant this Motion; (ii) approve the Proposed Settlement; (iii) authorize and direct the Trustee to perform all actions required by the Agreement; and (iv) grant the Trustee such other and further relief to which he may be justly entitled.

RESPECTFULLY SUBMITTED this 8th day of October, 2025.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75201
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

**GENERAL COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 8th day of October, 2025, true and correct copies of this Motion and the exhibit thereto were electronically served by the Court's ECF system on parties entitled to notice thereof and that, additionally, on the same day he caused true and correct copies of this Motion and the exhibit thereto to be served, by U.S. first class mail, postage prepaid, on the parties listed on the attached Service List.

By: /s/ Davor Rukavina
Davor Rukavina, Esq.